1  James S. Blackburn (State Bar No. 169134)
   ARNOLD & PORTER LLP
2  777 South Figueroa Street, 44th Floor
   Los Angeles, California  90017-5844
3  Telephone:  (213) 243-4000
   Facsimile:  (213) 243-4199
4
   Joseph A. Micallef (admitted *pro hac vice*)
5  ARNOLD & PORTER LLP
   555 Twelfth Street, N.W.
6  Washington, D.C.  20004-1206
   Telephone:  (202) 942-5000
7  Facsimile:  (202) 942-5999
8  Joel M. Freed (admitted *pro hac vice*)
   McDERMOTT WILL & EMERY LLP
9  600 13th Street, N.W.
   Washington, D.C.  20005-3096
10 Telephone:  (202) 756-8000
   Facsimile:  (202) 756-8087
11
   Attorneys for *Dell Inc.*
12

13            **UNITED STATES DISTRICT COURT**

14           **SOUTHERN DISTRICT OF CALIFORNIA**

15

16 LUCENT TECHNOLOGIES INC.  and          )    Case No. 02-CV-2060 B (CAB)
   MULTIMEDIA PATENT TRUST,                )    consolidated with Case No. 03-CV-0699 B
17                                         )    (CAB) and Case No. 03-CV-1108 B (CAB)
          Plaintiffs and Counterclaim-defendants, )
18                                         )    **DECLARATION OF JOSEPH A.**
       v.                                  )    **MICALLEF IN SUPPORT OF THE**
19                                         )    **REPLY IN SUPPORT OF DELL INC.'S**
   GATEWAY, INC. AND GATEWAY              )    **MOTION FOR PARTIAL SUMMARY**
20 COUNTRY STORES LLC, GATEWAY           )    **JUDGMENT OF NO WILLFUL**
   COMPANIES, INC., GATEWAY               )    **INFRINGEMENT OF THE ASSERTED**
21 MANUFACTURING LLC and                 )    **CLAIMS OF U.S. PATENT NOS.**
   COWABUNGA ENTERPRISES, INC.,           )    **4,958,226; 4,383,272; AND 4,763,356**
22                                         )
          Defendants and Counter-claimants,  )    Judge Marilyn L. Huff
23                                         )
   and                                     )    Hearing:  October 19, 2007 at 1:30 p.m.
24                                         )    Location: Courtroom 13, 5th Floor
   MICROSOFT CORPORATION,                 )
25                                         )
          Intervener and Counter-claimant,  )
26 _____ )

27

28

1  | MICROSOFT CORPORATION,                                )
2  |         Plaintiff and Counter-defendant,             )
3  | v.                                                    )
4  | LUCENT TECHNOLOGIES INC. and                          )
   | MULTIMEDIA PATENT TRUST,                              )
5  |                                                       )
   |         Defendants and Counter-claimants,            )
6  | _____           )
7  | LUCENT TECHNOLOGIES INC. and                          )
   | MULTIMEDIA PATENT TRUST,                              )
8  |                                                       )
   |         Plaintiffs and Counterclaim-defendants,      )
9  |                                                       )
   | v.                                                    )
10 |                                                       )
   | DELL INC.,                                            )
11 |                                                       )
   |         Defendant and Counter-claimant.              )
12 | _____           )

I, Joseph A. Micallef, declare as follows:

1. I am an attorney and a partner of the law firm of Arnold & Porter LLP, counsel for defendant Dell Inc. I make this declaration in support of the Reply in Support of Dell Inc.'s Motion for Partial Summary Judgment of No Willful Infringement of the Asserted Claims of U.S. Patent Nos. 4,958,226; 4,383,272; and 4,763,356, which is filed concurrently with this declaration. Unless otherwise stated herein, I have personal knowledge of the facts set forth below and, if called as a witness, could and would competently testify thereto.

2. Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the Expert Report of Mr. Dale E. Buscaino Re Non-Infringement of United States Patent No. 4,763,356, May 12th, 2006.

3. Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Rebuttal Expert Report of Edward J. Delp III, May 12th, 2006.

4. Attached hereto as Exhibit 3 is a true and correct copy of the United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Day '356 patent, May 3rd, 2007.

5. Attached hereto as Exhibit 4 is a true and correct copy of the second United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Day '356 patent, July 3rd, 2007.

6. Attached hereto as Exhibit 5 is a true and correct copy of the United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Haskell '226 patent, October 5th, 2007.

7. Attached hereto as Exhibit 6 is a true and correct copy of the United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Netravali '272 patent, July 12th, 2007.

8. Attached hereto as Exhibit 7 is a true and correct copy of the Second Supplemental Expert Report of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356, September 14, 2007 (Exhibits excluded).

9. Attached hereto as Exhibit 8 is a true and correct copy of a letter from Joel M. Freed to Stephen Samuels, February 3, 2006.

- 1 -

1       10.    I declare under penalty of perjury under the laws of the United States of America that

2 the foregoing is true and correct.

3       11.    Executed this 12th day of October 2007 at Washington, D.C.

4

5

6             By:   s/Joseph A. Micallef

7                   Joseph A. Micallef
                  joseph.micallef@aporter.com

8                   Attorney for Dell Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

# EXHIBITS TABLE OF CONTENTS

| **Exhibit** | **Document** | **Page No.** |
|---|---|---|
| 1 | Excerpts from the Expert Report of Mr. Dale E. Buscaino Re Non-Infringement of United States Patent No. 4,763,356, May 12th, 2006. | 5 |
| 2 | Excerpts from the Rebuttal Expert Report of Edward J. Delp III, May 12th, 2006. | 10 |
| 3 | United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Day '356 patent, May 3rd, 2007. | 15 |
| 4 | Second United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Day '356 patent, July 3rd, 2007.. | 25 |
| 5 | United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Haskell '226 patent, October 5th, 2007. | 36 |
| 6 | United States Patent and Trademark Office Order Granting Request for Ex Parte Reexamination of the Netravali '272 patent, July 12th, 2007. | 54 |
| 7 | Second Supplemental Expert Report of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356, September 14, 2007 (Exhibits excluded) | 70 |
| 8 | Letter from Joel M. Freed to Stephen Samuels, February 3, 2006. | 111 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14                **THIS PAGE INTENTIONALLY LEFT BLANK**
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., | Case No. 02-CV-2060 B (CAB) consolidated with |
|       Plaintiff and Counterclaim-defendant, | Case No. 03-CV-0699 B (CAB); and Case No. 03-CV-1108 B (CAB) |
|       v. | **EXPERT REPORT OF MR. DALE E. BUSCAINO RE NON-INFRINGEMENT OF UNITED STATES PATENT NO. 4,763,356** |
| GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | |
|       Defendants and Counter-claimants, | **SUBJECT TO PROTECTIVE ORDER OUTSIDE COUNSEL ONLY** |
|       and | |
| MICROSOFT CORPORATION, | |
|       Intervenor and Counter-claimant. | |
| MICROSOFT CORPORATION, | |
|       Plaintiff and Counter-defendant, | |
|       v. | |
| LUCENT TECHNOLOGIES INC., | |
|       Defendant and Counter-claimant, | |
| LUCENT TECHNOLOGIES INC., | |
|       Plaintiffs, | |
|       v. | |
| DELL INC. | |
|       Defendant. | |

1        I, Mr. Dale E. Buscaino, have been retained by Microsoft Corporation, Dell Incorporated

2    and Gateway Incorporated (collectively "Defendants") through their counsel to serve in this case

3    as an independent expert. I understand the Complainant in this case to be Lucent Technologies,

4    Incorporated, herein referred to as "Lucent." This report addresses whether U.S. patent No.

5    4,763,356 ("the '356 patent") is infringed by Microsoft Money, Microsoft Outlook, Microsoft

6    Pocket PC or Windows Mobile, or Microsoft Word Mobile (collective "the Accused Products")

7    and rebuts the report of Lucent's expert Bruce Tognazzini.

8        1.    I present this report at the request of Defendants and if called to testify as to the

9    contents of the report could and would testify thereto competently and truthfully.

10        2.    As explained below, I believe that none of the asserted claims of the '356 patent are

11    infringed, either literally or under the doctrine of equivalents, by any of the accused products.

12    **I.    QUALIFICATIONS AND PROFESSIONAL EXPERIENCE**

13        3.    The details of my education and work experience are set forth in my report entitled

14    "Expert Report of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356" filed

15    in this case.

16        **1.    Prior Testimony**

17        4.    The details of my prior testimony are set forth in my report entitled "Expert Report of

18    Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356" filed in this case.

19        **2.    Compensation**

20        5.    My consulting services are being provided at an hourly rate of $275.00. I have

21    previously worked as an independent consultant and expert witness on behalf of companies that

22    have been involved in intellectual property disputes. My compensation does not depend either on

23    the conclusions I reach or the outcome of this case.

24    **II.    INFORMATION RELIED UPON**

25        6.    In forming my opinions, I rely on my knowledge and experience noted above. I also

26    rely on the documents and information referenced and cited in this report and in my report entitled

27

28

OUTSIDE COUNSEL ONLY INFORMATION          Case No. 02-CV-2060 B (CAB)

**Exhibit 1    Page 6**

1    Therefore, a dependent claim cannot be infringed by an accused product or process if the product

2    or process does not infringe the independent claim from which the dependent claim depends.

3        25.   I have read and understand 35 U.S.C. §§ 271(b-c), which state:

4

5            (b)    Whoever actively induces infringement of a patent shall be
                liable as an infringer.

6            (c)    Whoever offers to sell or sells within the United States or
7                imports into the United States a component of a patented machine,
                manufacture, combination or composition, or a material or apparatus
                for use in practicing a patented process, constituting a material part
8                of the invention, knowing the same to be especially made or
                especially adapted for use in an infringement of such patent, and not
9                a staple article or commodity of commerce suitable for substantial
10                noninfringing use, shall be liable as a contributory infringer.

11        26.   It is my understanding that for the Defendants to be liable for infringement under §§

12    271(b) or (c), an act of direct infringement by another party (for example, one of the Defendants'

13    customers) has to actually occur.

14                **OPINIONS AND BASES FOR THOSE OPINIONS**

15    **IV.    SUMMARY OF OPINIONS**

16        27.   I conclude that claims 1, 2, 6, 7, 10-12, 15, 16, 19 and 21 of the '356 patent are not

17    literally infringed, either directly or indirectly, by any of the accused products which include

18    versions of Microsoft Money, Microsoft Outlook, Microsoft Pocket PC or Windows Mobile,

19    Microsoft Word Mobile, and Intuit Quicken.  My specific analysis regarding why the accused

20    products do not literally infringe these claims of the '356 patent is contained herein.

21        28.   I conclude that claims 1, 2, 6, 7, 10-12, 15, 16, 19 and 21 of the '356 patent are not

22    infringed, either directly or indirectly, under the DOE by any of the accused products.  My specific

23    analysis regarding why the accused products do not infringe these claims of the '356 patent under

24    the DOE is contained herein.

25        29.   It is my understanding that during the course of this litigation Lucent has asserted

26    additional claims of the '356 patent and has accused additional products,[2] however, Lucent's

27    _____

28    [2] It is my understanding that at least Pocket PC Expense has been accused of infringement during
        the course of this litigation and was addressed in the report of Lucent's damages expert.

                                        7

1    expert has opined only in regard to the claims and products referenced above. On that basis I

2    understand that the remaining claims of the '356 patent have not been asserted by Plaintiff and no

3    other products are accused of infringement of the '356 patent.

4         30.   Should Lucent or Lucent's expert offer an opinion about any additional claims or

5    products, I reserve the right to supplement this report to address Lucent's contentions.

6    **V.     TECHNOLOGY BACKGROUND**

7        **1.   Background Of The Technology Claimed In The '356 Patent**

8         31.   I expect to provide a tutorial on the technology of the patent and the prior art at the

9    trial. My technology tutorial may include aspect of the tutorials given by Defendants during the

10   technology hearing and the *Markman* hearings. I have attached, as Exhibit 11 to the Expert Report

11   of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356, Microsoft's

12   technology tutorial presented during the September *Markman* hearing.

13        32.   The '356 patent relates to a form entry system for use in a personal computer. The

14   '356 patent describes the use of a form entry system in conjunction with a touch screen that can

15   input data to the form entry system by touching the display with either a finger or a stylus.

16        33.   The form entry system uses tools that are displayed concurrently on the form to allow

17   the user to input information into fields. A tool can be a menu of alternative options or a

18   composition tool such as an on-screen keyboard or calculator. Once information has been inserted

19   into a field, the form entry system can advance to the next field. By repeating this process for

20   each of the fields the form can be completed.

21        34.   The use of a form for collecting information was not a new concept at the time of the

22   introduction of a personal computer system. Forms have been used for decades as a way to collect

23   information in a logical and organized fashion. Until the arrival of the computer, this information

24   was organized on paper instead of electronically as done in a computer system. As computer

25   systems became available with keyboards and displays, form entry systems were used to input

26   information from a wide variety of applications. As described in the background of the '356

27   patent, persons such as securities traders, sales persons, order takers, and nurses, were examples of

28

8

1  recently become available. There is no list of alternatives for which Word Mobile provides the

2  option of composing an entry using a tool in the event that the user is unsatisfied with the choices

3  offered in a menu of alternatives.

4       756. For all the reasons stated above, Word Mobile is substantially different that what is

5  required by this element of this claim of the '356 patent. Accordingly, Word Mobile does not

6  infringe this claim of the '356 patent under the doctrine of equivalents.

7  **ADDITIONAL ANALYSIS AND OPINIONS**

8       757. I reserve the right to supplement my report in light of any additional fact discovery,

9  opinions by Plaintiff's experts, and/or trial testimony. I also reserve the right to provide rebuttal

10  opinions and testimony in response to Plaintiff's experts, and rebuttal testimony in response to any

11  of Plaintiff's fact witnesses. Further, I reserve the right to use animations, demonstratives,

12  enlargements of actual exhibits, and other information in order to illustrate my opinions.

13       758. At trial, I expect to demonstrate and testify about the functionality I have described in

14  my report using actual physical computers and computer systems. I reserve the right to

15  demonstrate other systems not listed here.

16       759. I expect to continue to develop my opinions discussed in this report. I also reserve the

17  right to supplement my opinions based on information obtained from additional discovery or from

18  Lucent's experts, as indicated above.

19       760. I declare under penalty of perjury under the laws of the United States of America that

20  the foregoing report on behalf of Defendant is true and correct. Executed this 12th day of May

21  2006 in San Diego, California.

22

23  Dated: May 12, 2006         Respectfully submitted,

24

25  By: _____

26       Mr. Dale E. Buscaino

27

28

OUTSIDE COUNSEL ONLY INFORMATION     Case No. 02-CV-2060 B (CAB)

**Exhibit 1   Page 9**

Exhibit 2

1

2

3                          UNITED STATES DISTRICT COURT

4                          SOUTHERN DISTRICT OF CALIFORNIA

5

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., | Case No. 02-CV-2060 B (CAB) consolidated with |
|      Plaintiff and Counterclaim-defendant, | Case No. 03-CV-0699 B (CAB); and Case No. 03-CV-1108 B (CAB) |
|     v. | |
| GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | **REBUTTAL EXPERT REPORT OF EDWARD J. DELP III** <br><br> **NON-INFRINGEMENT OF THE '272 AND '226 PATENTS** |
|     Defendants and Counter-claimants, | |
|     and | **CONFIDENTIAL – OUTSIDE COUNSEL ONLY INFORMATION** |
| MICROSOFT CORPORATION, | |
|     Intervenor and Counter-claimant. | |
| MICROSOFT CORPORATION, | |
|     Plaintiff and Counter-defendant, | |
|   v. | |
| LUCENT TECHNOLOGIES INC., | |
|     Defendant and Counter-claimant, | |
| LUCENT TECHNOLOGIES INC., | |
|     Plaintiffs, | |
|   v. | |
| DELL INC., | |
|     Defendant. | |

1

1

# TABLE OF CONTENTS

2

TABLE OF CONTENTS ................................................................................................................. 2

3

ASSIGNMENT ............................................................................................................................. 4

4

QUALIFICATIONS ....................................................................................................................... 4

5

PRIOR TESTIMONY .................................................................................................................... 6

6

COMPENSATION ......................................................................................................................... 7

7

INFORMATION CONSIDERED .................................................................................................. 7

8

UNDERSTANDINGS AND ASSUMPTIONS ............................................................................. 9

9

SUMMARY OF OPINIONS ....................................................................................................... 13

10

OPINIONS AND CONCLUSIONS ............................................................................................. 13

11
    A.   BACKGROUND OF THE TECHNOLOGY CLAIMED IN THE '272 AND '226 PATENTS: VIDEO COMPRESSION ........ 13
    B.   MICROSOFT PRODUCTS ACCUSED BY LUCENT OF INFRINGING THE '272 AND '226 PATENTS ............ 31

12
    C.   DELL AND GATEWAY PRODUCTS ACCUSED BY LUCENT OF INFRINGING THE '272 AND '226 PATENTS ........... 33
    D.   LEVEL OF ORDINARY SKILL IN THE ART ..................................................................... 34

13
    E.   FACTUAL INACCURACIES ......................................................................................... 34
    F.   NONINFRINGEMENT OF THE MEDIAMATICS MPEG-1 DECODER ................................. 35

14
        1.   Claims 13 and 22 of the '272 Patent .................................................................. 35
            a.   Claim 13, Item 1 - Preamble ..................................................................... 35

15
            b.   Claim 13, Item 2 ...................................................................................... 38
            c.   Claim 13, Item 3 ...................................................................................... 41

16
            d.   Claim 22 ................................................................................................. 43
            e.   Claim 22, Item 1 - Preamble ..................................................................... 44

17
            f.   Claim 22, Item 2 ...................................................................................... 44
            g.   Claim 22, Item 3 ...................................................................................... 45

18
            h.   Claim 22, Item 4 ...................................................................................... 46
         2.   Claim 12 of the '226 Patent ................................................................................ 46

19
            a.   Claim 12, Item 1- Preamble ...................................................................... 46
            b.   Claim 12, Item 2 ...................................................................................... 48

20
            c.   Claim 12, Item 3 ...................................................................................... 50
            d.   Claim 12, Items 3 and 4 – Shift Circuits 31 and 39 ....................................... 51

21
    G.   NONINFRINGEMENT OF CYBERLINK MPEG-2 DECODER ........................................... 64
        1.   Claims 13 and 22 of the '272 Patent .................................................................. 64

22
            a.   Claim 13, Item 1 - Preamble ..................................................................... 64
            b.   Claim 13, Item 2 ...................................................................................... 67

23
            c.   Claim 13, Item 3 ...................................................................................... 70
            d.   Claim 22 ................................................................................................. 72

24
            e.   Claim 22, Item 1 - Preamble ..................................................................... 72
            f.   Claim 22, Item 2 ...................................................................................... 73

25
            g.   Claim 22, Item 3 ...................................................................................... 73
            h.   Claim 22, Item 4 ...................................................................................... 74

26
        2.   Claim 12 of the '226 Patent ................................................................................ 74
            a.   Claim 12, Item 1- Preamble ...................................................................... 75

27
            b.   Claim 12, Item 2 ...................................................................................... 76
            c.   Claim 12, Item 3 ...................................................................................... 78

28
            d.   Claim 12, Items 4 and 5 – Shift Circuits 31 and 39 ....................................... 79
    H.   NONINFRINGEMENT OF WMV-9 MAIN PROFILE DECODER ......................................... 88

1    1. *Claim 12 of the '226 Patent* ............................................................. 88
     a. Claim 12, Item 1- Preamble ........................................................ 89
2     b. Claim 12, Item 2 ....................................................................... 90
     c. Claim 12, Item 3 ....................................................................... 92
3     d. Claim 12, Items 4 and 5 – Shift Circuits 31 and 39 ..................... 93
     e. Claim 12, Items 5 and 6 – DCT[-1] 24 and DCT[-1] 34 ............... 103
4  I. NONINFRINGEMENT OF WMV-9 ADVANCED PROFILE DECODER ......................... 106
    1. *Claim 12 of the '226 Patent* ............................................................. 106
5     a. Claim 12, Item 1- Preamble ...................................................... 107
     b. Claim 12, Item 2 ..................................................................... 107
6     c. Claim 12, Item 3 ..................................................................... 108
     d. Claim 12, Items 4 and 5 – Shift Circuits 31 and 39 ................... 109
7     e. Claim 12, Items 5 and 6 – DCT[-1] 24 and DCT[-1] 34 ............. 114
  J. OTHER NON-INFRINGEMENT ISSUES .......................................................... 116
8    1. *No Direct Infringement* ................................................................. 116
    2. *No Indirect Infringement* ............................................................... 116
9  K. DESIGN AROUND ...................................................................................... 118
    1. *Mediamatics MPEG-1 Decoder* ..................................................... 118
10    2. *Cyberlink MPEG-2 Decoder* .......................................................... 119
    3. *Microsoft WMV-9 Decoder* ........................................................... 120

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUMMARY OF OPINIONS**

19.   Based on the information I have considered, it is my opinion that the Mediamatics MPEG-1 Decoder, the Cyberlink MPEG-2 Decoder, and Microsoft's WMV-9 Main Profile and Advanced Profile Decoders, do not infringe claims 13 and 22 of the '272 patent either literally or under the doctrine of equivalents.

20.   Based on the information I have considered, it is my opinion that Windows Media Player, Windows MovieMaker, Windows Media Encoder, Cyberlink PowerDVD, Cyberlink PowerDVD SE, and Cyberlink Powerpack do not infringe claims 13 and 22 of the '272 patent either literally or under the doctrine of equivalents.

21.   Based on the information I have considered, it is my opinion that the Mediamatics MPEG-1 Decoder, the Cyberlink MPEG-2 Decoder, and Microsoft's WMV-9 Main Profile and Advanced Profile Decoders, do not infringe claim 12 of the '226 patent either literally or under the doctrine of equivalents.

22.   Based upon the information I have considered, it is my opinion that Windows Media Player, Windows MovieMaker, Windows Media Encoder, Cyberlink PowerDVD, Cyberlink PowerDVD SE, and Cyberlink Powerpack do not infringe claims 12 of the '226 patent either literally or under the doctrine of equivalents.


**OPINIONS AND CONCLUSIONS**

    **A.**     **Background Of The Technology Claimed in the '272 and '226 Patents: Video Compression**

23.   In paragraphs 14-24 of my previous report, I summarized the work in signal processing and video compression up through the 1980s.  In those paragraphs, I explained theoretical developments, transform methods, predictive coding, quantization, and motion-based techniques for video compression.  I will elaborate and add to that overview here.

1

2     I declare under penalty of perjury under the laws of the United States of America that this report

3     on behalf of Defendants is true and correct.  Executed this 12th day of May 2006 in San Diego,

4     California.

5

6                                              By: _Edward J. Delp III_____

7                                                  Edward J. Delp III, Ph.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 3

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,625 | 05/03/2007 | 4763356 | 75543-011 | 1812 |

7590          06/14/2007

John P. McDonnell
AT&T BELL LABORATORIES
600 Mountain Ave.
Murray Hill, NJ   07974

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 06/14/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

6/15/07

KENNETHL. CAGE

MCDERMOTT, WIL, & EMERY LLP

600 13TH STREET, N.W.

WASHINGTON,DC 20005-3096

## *EX PARTE*  REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO  90/008625

PATENT NO.   4,763,356

ART UNI   3993

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

Exhibit 3   Page 16

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/008,625 | 4763356 |
| | Examiner | Art Unit | |
| | Albert W. Paladini | 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>03 May 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐  PTO-892,     b)☐  PTO/SB/08,     c)☒ Other: <u>PTO-1449</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐  by Treasury check or,

b) ☐  by credit to Deposit Account No. _____,  or

c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Albert W Paladini
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)                    Office Action in *Ex Parte* Reexamination                    Part of Paper No. 20070604

**Exhibit 3   Page 17**

Application/Control Number: 90/008,625                                    Page 2
Art Unit: 3992

## DECISION ON REQUEST FOR REEXAMINATION

1.     A substantial new question of patentability affecting claims 19 and 21 of United

States Patent Number 4,763,356 issued to Day et al. is raised by the request for *ex*

*parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).

### *References*

(1) Datamation, Vol. 30, Jan 1984, pp. 146-154, article by Michael Tyler on Touch

Screens.

(2) Claim Construction Order for US Patent 4,763,356 from court cases 02cv2060,

03cv0699, and 03cv1108.

### *Prosecution History*

2.     The Application for US Patent 4,763,356 issued to Day et al. was filed on
12/11/96.

**Exhibit 3   Page 18**

Application/Control Number: 90/008,625          Page 3
Art Unit: 3992

A Notice of Allowance including an examiner's amendment was sent on
3/22/88. There are no reasons for allowance included in the records.

### *Substantial Question of Patentability*

#### Datamation Article by Tyler

On pages 10-12 of the Request, the Requestor enumerates all of the elements
of claim 19 of the Day patent and allegedly relates them to elements of the Tyler article,
which describes the planned use of an Easel workstation by the Chemical Bank. Tyler
describes some intended features of the Easel workstation. For some of the elements
of the claims, the Requestor utilizes the Requestor's interpretation of the Claim
Construction Order for claim interpretation to allegedly relate elements of the Tyler
article to elements of the Day patent.

On pages 10 and 11 of the request, the Requestor enumerates general
elements of claim 19 of the Day patent such as "displaying a plurality of information
fields", "identifying a kind of information to be inserted", "indicating a particular one of
said information fields" and allegedly relating them to elements described by Tyler on
pages 148 to 152 of the article.

On page 12 of the request, the Requestor allegedly relates "displaying a
predefined tool associate with said one of said fields," disclosed by Day in claim 19 to

**Exhibit 3   Page 19**

Tyler's description of a trader touching a screen and obtaining entries on a display. The

Requestor does not identify a "tool" in the Tyler article, but refers to page 9 of the Claim

Construction Order to allegedly relate "displaying a predefined tool" recited by Day to

touching the screen in the Tyler article. Page 9 of the Construction Order contains a

GLOSSARY OF TERMS. The Requestor refers to the definition of "Predefined tools

associated with said one of said fields" in the Construction Order and allegedly uses the

definition given by the Construction Order to imply that "displaying a predefined tool"

recited in claim 19 is equivalent to touching the screen as described in the Tyler article.

On page 13, the Requestor allegedly relates "said tool being selected from a

group of predefined tools including a tool adapted to supply an individual entry from a

menu of alternatives" disclosed by Day in claim 19 to the phrase on page 148 of the

Tyler article "when a user hits the broker cell". The Requestor refers to the definition of

"A tool adapted to allow said user to compose such information" in the GLOSSARY OF

TERMS of the Construction Order to attempt to justify the alleged relationship between

this element claimed by Day and the phrase on page 148 of the Tyler article.

On page 13, the Requestor allegedly relates "the method of displaying said

pattern includes the step of displaying one or more of said information fields as a bit-

mapped-graphics field" disclosed by Day in claim 21 to the description of entering

information by writing on a touch screen using a stylus on page 148 of the Tyler article.

The Requestor refers to the definition of "Bit-mapped-graphics field" in the GLOSSARY

OF TERMS of the Construction Order to attempt to justify the alleged relationship

between this element claimed by Day and the phrase on page 148 of the Tyler article.

Exhibit 3   Page 20

Application/Control Number: 90/008,625                                    Page 5
Art Unit: 3992

3.      The use of single reference Tyler combined with the Construction Order which

appear to discuss all of the elements or limitations of claims 19 and 21, make it likely

that a reasonable examiner would consider these teachings important in deciding

whether or not the claims are patentable.


4.  ·    Reference Tyler was not previously discussed by the examiner nor applied to

claims in the prior examination of the patent as described above.


5.      There was also no final holding of invalidity by the Federal Courts regarding US

Patent 4,763,356.


6.      Thus, a reasonable examiner would view the teachings of Tyler, in combination

with the definitions given in the Construction Order, important in deciding to allow the

claims being considered, thus raising a substantial new question of patentability

regarding claims 19 and 21 of US Patent 4,763,356.


### *Scope of Reexamination*

Since requester did not request reexamination of claims 1-18, 20 and 22 and did

not assert the existence of a substantial new question of patentability (SNQP) for such

claims  (see 35 U.S.C. § 311(b)(2); see also 37 CFR 1.915b and 1.923), such claims

will not be reexamined. This matter was squarely addressed in *Sony Computer*

**Exhibit 3   Page 21**

Application/Control Number: 90/008,625                                    Page 6
Art Unit: 3992

*Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447

(E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462.  (Not Reported in F.Supp.2d.)

The District Court upheld the Office's discretion to not reexamine claims in an *inter*

*partes* reexamination proceeding other than those claims for which reexamination had

specifically been requested.  The Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter*
> *partes* review of each and every claim of a patent.  Moreover,
> while the PTO in its discretion may review claims for which *inter*
> *partes* review was not requested; nothing in the statute compels
> it to do so.  To ensure that the PTO considers a claim for *inter*
> *partes* review, § 311(b)(2) requires that the party seeking
> reexamination demonstrate why the PTO should reexamine
> each and every claim for which it seeks review.  Here, it is
> undisputed that Sony did not seek review of every claim under
> the '213 and '333 patents.  Accordingly, Sony cannot now claim
> that the PTO wrongly failed to reexamine claims for which Sony
> never requested review, and its argument that AIPA compels a
> contrary result is unpersuasive.

(Slip copy at page 9.)

The *Sony* decision's reasoning and statutory interpretation apply analogously to

*ex parte* reexamination, as the same relevant statutory language applies to both *inter*

*partes* and *ex parte* reexamination.  35 U.S.C. § 302 provides that the *ex parte*

reexamination "request must set forth the pertinency and manner of applying cited prior

art <u>to every claim for which reexamination is requested</u>" (emphasis added), and 35

U.S.C. § 303 provides that "the Director will determine whether a substantial new

question of patentability affecting <u>any claim of the patent</u> concerned is <u>raised by the</u>

<u>request</u>..." (Emphasis added).  These provisions are analogous to the language of 35

U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be

**Exhibit 3   Page 22**

construed in the same manner. As the Director can decline to reexamine non-

requested claims in an *inter partes* reexamination proceeding, the Director can likewise

do so in *ex parte* reexamination proceeding. See *Notice of Clarification of Office Policy*

*To Exercise Discretion in Reexamining Fewer Than All the Patent Claims* (signed Oct.

5, 2006) 1311 OG 197 (Oct. 31, 2006). See also MPEP § 2240, Rev. 5, Aug. 2006.

Therefore, claims 1-18, 20, and 22 will not be reexamined in this *ex parte*

reexamination proceeding.

## Conclusion

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).


The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the Alcorn patent throughout the course of this reexamination

proceeding. The requester is also reminded of the ability to similarly appraise the Office

of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP §§ 2207, 2282 and 2286.

Exhibit 3   Page 23

Application/Control Number: 90/008,625                                    Page 8
Art Unit: 3992

**All** correspondence relating to this *ex parte* reexamination proceeding should be

directed as follows:

By **U.S. Postal Service Mail** to:

        Mail Stop *Ex Parte* Reexam
        ATTN:  Central Reexamination Unit
        Commissioner for Patents
        P.O. Box 1450
        Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
              Central Reexamination Unit

By hand to:   Customer Service Window
              Randolph Building
              401 Dulany St.
              Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should

be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:                                                      Conferees:

Albert W. Paladini
Primary Examiner

**Exhibit 3   Page 24**

Exhibit 4

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,749 | 07/03/2007 | 4763356 | 75543-015 | 9960 |

7590     09/10/2007

John P. McDonnell
AT&T BELL LABORATORIES
600 Mountain Ave.
Murray, NJ  07974

| EXAMINER |
|---|
| *Albert W. Paladini* |

| ART UNIT | PAPER NUMBER |
|---|---|
| *3992* | *IFW* |

DATE MAILED: 09/10/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

**Exhibit 4   Page 25**



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Kenneth L. Cage
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,749*.

PATENT NO. *4763356*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

**Exhibit 4   Page 26**

| ***Order Granting / Denying Request For Ex Parte Reexamination*** | Control No. | Patent Under Reexamination |
| | 90/008,749 | 4763356 |
| | Examiner | Art Unit | |
| | Albert W. Paladini | 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>03 July 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☒ PTO-892,    b)☐ PTO/SB/08,    c)☐ Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐  by Treasury check or,

b) ☐  by credit to Deposit Account No. _____,  or

c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Albert W Paladini
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)                    Office Action in *Ex Parte* Reexamination                    Part of Paper No. 20070904

**Exhibit 4   Page 27**

Application/Control Number: 90/008,749                                    Page 2
Art Unit: 3992

## DECISION ON REQUEST FOR REEXAMINATION

1.      A substantial new question of patentability affecting claims 19 and 21 of United

States Patent Number 4,763,356 issued to Day et al. is raised by the request for *ex*

*parte* reexamination.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).

### *References*

(1) Datamation, Vol. 30, Jan 1984, pp. 146-154, article by Michael Tyler on Touch

Screens.

(2) Claim Construction Order for US Patent 4,763,356 from court cases 02cv2060,

03cv0699, and 03cv1108.

(3) Home Accountant for the Macintosh Users Guide, 1985.

(4) Apple Macintosh Manual 1984.

(5) Principles of Interactive computer Graphics, 1979.

**Exhibit 4   Page 28**

Application/Control Number: 90/008,749                                         Page 3
Art Unit: 3992

### Prosecution History

2.      The Application for US Patent 4,763,356 issued to Day et al. was filed on
12/11/96.

        A Notice of Allowance including an examiner's amendment was sent on

3/22/88. There are no reasons for allowance included in the records.

### Substantial Question of Patentability

        On pages 12-16 of the Request, the Requestor enumerates all of the elements

of claim 19 of the Day patent and allegedly relates them to elements of the Tyler article,

which describes the planned use of an Easel workstation by the Chemical Bank in view

of the Home Accountant for the Macintosh, the Apple Macintosh Manual, and Principles

of Interactive Graphics. Tyler describes some intended features of the Easel

workstation.  For some of the elements of the claims, the Requestor utilizes the

Requestor's interpretation of the Claim Construction Order for claim interpretation to

allegedly relate elements of the Tyler article to elements of the Day patent.

        On pages 12 -15 of the request, the Requestor enumerates general elements of

claim 19 of the Day patent such as "displaying a plurality of information fields",

"identifying a kind of information to be inserted", "indicating a particular one of said

information fields" and allegedly relating them to elements described by Tyler on pages

148 to 152 of the article.  When addressing the limitation of "indicating a particular one

**Exhibit 4   Page 29**

Application/Control Number: 90/008,749                                    Page 4
Art Unit: 3992

of said information fields into which information is to be inserted" disclosed by Day, the

Requestor states on page 14 "It would have been obvious to modify the system

disclosed in Tyler to include the insertion bar of the Home Accountant's Users Guide

and the Apple Macintosh Manual, the cursor of Sproul, or the highlighting of The Home

Accountant's User's Guide and Sproul."

    On page 16 of the request, the Requestor allegedly relates "displaying a

predefined tool associate with said one of said fields," disclosed by Day in claim 19 to

Tyler's description of a trader touching a screen and obtaining entries on a display. The

Requestor does not identify a "tool" in the Tyler article, but refers to page 9 of the Claim

Construction Order to allegedly relate "displaying a predefined tool" recited by Day to

touching the screen in the Tyler article. Page 9 of the Construction Order contains a

GLOSSARY OF TERMS.  The Requestor refers to the definition of "Predefined tools

associated with said one of said fields" in the Construction Order and allegedly uses the

definition given by the Construction Order to imply that "displaying a predefined tool"

recited in claim 19 is equivalent to touching the screen as described in the Tyler article.

    On page 16, the Requestor allegedly relates "said tool being selected from a

group of predefined tools including a tool adapted to supply an individual entry from a

menu of alternatives" disclosed by Day in claim 19 to the phrase on page 148 of the

Tyler article "when a user hits the broker cell".  The Requestor refers to the definition of

"A tool adapted to allow said user to compose such information" in the GLOSSARY OF

TERMS of the Construction Order to attempt to justify the alleged relationship between

this element claimed by Day and the phrase on page 148 of the Tyler article.

Exhibit 4   Page 30

Application/Control Number: 90/008,749                                    Page 5
Art Unit: 3992

On page 17, the Requestor allegedly relates "the method of displaying said

pattern includes the step of displaying one or more of said information fields as a bit-

mapped-graphics field" disclosed by Day in claim 21 to the description of entering

information by writing on a touch screen using a stylus on page 148 of the Tyler article.

The Requestor refers to the definition of "Bit-mapped-graphics field" in the GLOSSARY

OF TERMS of the Construction Order to attempt to justify the alleged relationship

between this element claimed by Day and the phrase on page 148 of the Tyler article.


3.     The use of reference Tyler combined with the Construction Order, the Home

Accountant for the Macintosh Users Guide, the Apple Macintosh Manual, and the

Principles of Interactive Computer Graphics which appear to discuss all of the elements

or limitations of claims 19 and 21, make it likely that a reasonable examiner would

consider these teachings important in deciding whether or not the claims are patentable.


4.     Reference Tyler the Home Accountant for the Macintosh Users Guide, the Apple

Macintosh Manual, and the Principles of Interactive Computer Graphics was not

previously discussed by the examiner nor applied to claims in the prior examination of

the patent as described above.


5.     There was also no final holding of invalidity by the Federal Courts regarding US

Patent 4,763,356.


Exhibit 4   Page 31

6.      Thus, a reasonable examiner would view the teachings of Tyler, in combination

with the other references and the definitions given in the Construction Order, important

in deciding to allow the claims being considered, thus raising a substantial new question

of patentability regarding claims 19 and 21 of US Patent 4,763,356.


### *Scope of Reexamination*

Since requester did not request reexamination of claims 1-18, 20 and 22 and did

not assert the existence of a substantial new question of patentability (SNQP) for such

claims  (see 35 U.S.C. § 311(b)(2); see also 37 CFR 1.915b and 1.923), such claims

will not be reexamined. This matter was squarely addressed in *Sony Computer*

*Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447

(E.D.Va. May 22, 2006), Slip Copy, 2006 WL 1472462.  (Not Reported in F.Supp.2d.)

The District Court upheld the Office's discretion to not reexamine claims in an *inter*

*partes* reexamination proceeding other than those claims for which reexamination had

specifically been requested.  The Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter*
> *partes* review of each and every claim of a patent.  Moreover,
> while the PTO in its discretion may review claims for which *inter*
> *partes* review was not requested; nothing in the statute compels
> it to do so.  To ensure that the PTO considers a claim for *inter*
> *partes* review, § 311(b)(2) requires that the party seeking
> reexamination demonstrate why the PTO should reexamine
> each and every claim for which it seeks review.  Here, it is
> undisputed that Sony did not seek review of every claim under
> the '213 and '333 patents.  Accordingly, Sony cannot now claim
> that the PTO wrongly failed to reexamine claims for which Sony
> never requested review, and its argument that AIPA compels a
> contrary result is unpersuasive.

**Exhibit 4   Page 32**

(Slip copy at page 9.)

The *Sony* decision's reasoning and statutory interpretation apply analogously to *ex parte* reexamination, as the same relevant statutory language applies to both *inter partes* and *ex parte* reexamination. 35 U.S.C. § 302 provides that the *ex parte* reexamination "request must set forth the pertinency and manner of applying cited prior art to every claim for which reexamination is requested" (emphasis added), and 35 U.S.C. § 303 provides that "the Director will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request..." (Emphasis added). These provisions are analogous to the language of 35 U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be construed in the same manner. As the Director can decline to reexamine non-requested claims in an *inter partes* reexamination proceeding, the Director can likewise do so in *ex parte* reexamination proceeding. *See Notice of Clarification of Office Policy To Exercise Discretion in Reexamining Fewer Than All the Patent Claims* (signed Oct. 5, 2006) 1311 OG 197 (Oct. 31, 2006). *See* also MPEP § 2240, Rev. 5, Aug. 2006.

Therefore, claims 1-18, 20, and 22 will not be reexamined in this *ex parte* reexamination proceeding.

## Conclusion

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37

**Exhibit 4   Page 33**

Application/Control Number: 90/008,749                                                    Page 8
Art Unit: 3992

CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).


The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the Alcorn patent throughout the course of this reexamination

proceeding. The requester is also reminded of the ability to similarly appraise the Office

of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP §§ 2207, 2282 and 2286.


**All** correspondence relating to this *ex parte* reexamination proceeding should be

directed as follows:


By **U.S. Postal Service Mail** to:

      Mail Stop *Ex Parte* Reexam
      ATTN: Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA 22313-1450


By FAX to:    (571) 273-9900
            Central Reexamination Unit


By hand to:   Customer Service Window
           Randolph Building
           401 Dulany St.
           Alexandria, VA 22314

**Exhibit 4   Page 34**

Application/Control Number: 90/008,749                                    Page 9
Art Unit: 3992


Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should

be directed to the Central Reexamination Unit at telephone number (571) 272-7705.



Signed:                                                    Conferees:

Albert W. Paladini
Primary Examiner

_____


Exhibit 4   Page 35

Exhibit 5

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

10/5/07

KENNETH L. CAGE

MCDERMOTT, WILL, & EMERY LLP

600 13TH STREET, NW

WASHINGTON, DC 20005



## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO 90/008770

PATENT NO.  4,958,226

ART UNI  3992



Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a replly has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

**Exhibit 5   Page 36**

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/008,770 | Patent Under Reexamination 4958226 | |
|---|---|---|---|
| | Examiner Roland G. Foster | Art Unit 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>16 July 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO/SB/08,    c)☒ Other: <u>*See the Decision.*</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

      RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

    a) ☐  by Treasury check or,

    b) ☐  by credit to Deposit Account No. _____,  or

    c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Roland  G. Foster
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)      Office Action in *Ex Parte* Reexamination      Part of Paper No. 20071003

Exhibit 5   Page 37

Application/Control Number: 90/008,770                                    Page 2
Art Unit: 3992

# DECISION

## *Substantial New Question*

A substantial new question of patentability affecting claim 12 of United States Patent No.

4,958,226 to Haskell et al. (hereinafter the "Haskell" patent) is raised by the request for *ex parte*

reexamination, filed on July 16, 2007 (hereinafter the "Request").


Pages 6-11 identify the following printed publications as providing teachings relevant to

the claims of the Haskell patent:


1.    U.S. Patent No. 4,849,9810 to Ericsson ("Ericsson").
2.    U.S. Patent No. 4,703,350 to Hinman ("Hinman").
3.    U.S. Patent No. 4,858,005 to Lodge ("Lodge I").
4.    N K Lodge, "A Hybrid Interpolative and Predictive Code For the Embedded
      Transmission of Broadcast Quality Television Pictures," Independent
      Broadcasting Authority, United Kingdom, Second International Conference on
      Image Processing and its Applications, Conference Publication Number 265, pp.
      242-247, June 24-26, 1986 ("Lodge II").
5.    Arun N. Netravali, et al., "Digital Pictures Representation and Compression,"
      ISBN 0-306-42791-5, Plenum Publishing Corporation, 1988 ("Digital Pictures").


A reasonable examiner would consider the above prior references important in making a

decision as to the patentability of claim 12 in the Haskell patent.

**Exhibit 5   Page 38**

Application/Control Number: 90/008,770                                          Page 3
Art Unit: 3992

### *The Haskell Patent:  Claim 12*

Claim 12, the only claim for which reexamination was requested, recites:

> **A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising:**
>
> **means for developing block approximations from said codes that describe deviations from approximated blocks;  and**
>
> **means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.**

The first two paragraphs of claim 12 however are recited in substantially the same language as the language in the preamble of claim 2, where claim 2 is drafted in Jepson format.[1] Drafting a claim in Jepson format (i.e., the "improvement comprising..." format as described in 37 CFR 1.75(e)) may be taken as an implied admission that the subject matter of the preamble is the prior-art work of another.  See MPEP § 2129.III.  Thus, a substantial question is raised as to whether the first two paragraphs of claim 12 are also the admitted prior art of another.  Thus, the analysis of whether a substantial new question is raised for claim 12 turns to the last paragraph of claim 12, which broadly recites:

> **means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.**

---

[1] The "codes that describe deviations from interpolated bocks" language in the preamble of claim 12 is <u>not</u> included in the preamble of claim 2, however it is recognized that this language is directed to an allegedly inventive feature (as discussed *infra*), and thus does not affect the analysis regarding the admitted prior art in claim 2.

**Exhibit 5   Page 39**

Application/Control Number: 90/008,770                                    Page 4
Art Unit: 3992

The limitation "means responsive to said block approximations" apparently refers to the
prior "means for developing block approximations from said codes that describe deviations from
approximated blocks" limitation and thus refers to admitted prior art, as discussed above. For
example, the Haskell patent teaches conventional "motion compensated interpolation," where a
"prediction error signal" (code that describes deviation from approximated blocks) is developed
from previously approximated frames $F_{i+1}$ and $F_{i-1}$ (col. 2, ll. 18-37 and col. 3, ll. 61 – col. 4, l.
34). Thus, even the first limitation in the last paragraph of claim 12 may be substantially
directed to prior art.

The limitation "codes that describe deviations from interpolated blocks to develop
interpolated blocks" apparently refers to an allegedly inventive feature in the Haskell patent.
Specifically, an interpolated, prediction frame $F_i$ is produced from an interpolation algorithm (in
the case of the Haskell patent, by structure that averages the values of $F_i$ produced by time
shifting the approximated frames $F_{i+1}$ and $F_{i-1}$ using the motion compensated interpolation) (col.
4, ll. 35 – 62). Then, a deviation code from the interpolated frame $F_i$ is developed (in the case of
the Haskell patent, by structure that determines the difference between the interpolated
prediction frame $F_i$ and an actual frame $F_i$) (col. 4, ll. 35 – 62). Other claims in the Haskell
patent however, such as independent claims 1 and 2, recite <u>different</u> means plus function
language that clearly corresponds to some of the specific, Haskell structures discussed above.
Thus, a claim interpretation issue also exists as to the scope of the structure in the Haskell patent

**Exhibit 5   Page 40**

Application/Control Number: 90/008,770                                      Page 5
Art Unit: 3992

that the "means responsive to...said codes that describe deviations from interpolated blocks to

develop said interpolated blocks" limitation of claim 12 is intended to correspond to.


### *Ericsson*

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider Ericsson, either alone or

used in combination with said admitted prior art of another or in combination with other

secondary references, important in making a decision as to the patentability of claim 12 in the

Haskell patent.  Ericsson recites that system transmits and decodes "a sequence of image frames

both with and without motion compensation" (abstract).  Thus, encoding and decoding blocks

transmitted using conventional, motion compensation would read on the limitation "means

responsive to said block approximations" as discussed above.   Ericsson also teaches that a

deviation code is developed from an interpolated frame by determining the difference between

the interpolated frame and an actual frame (col. 2, l. 58 – col. 3, l. 4), thus reading on the

limitation "means responsive to...said codes that describe deviations from interpolated blocks to

develop said interpolated blocks" (bearing in mind that there is a question as to what type of

structure this alleged, means plus function language refers to, as discussed above).


For additional reasons why Ericsson raises a substantial new question of patentability, see

also pages 6, 7, and 11-21 of the Request, which includes a detailed claim chart, all of which are

hereby incorporated by reference from the Request for their explanation of the teachings

**Exhibit 5   Page 41**

Application/Control Number: 90/008,770                                                    Page 6
Art Unit: 3992

provided in Ericsson that were not present in the prosecution of the application which became

the Haskell patent.

The Ericsson patent was not previously cited or discussed by the examiner in the original

prosecution of the Haskell patent.

There was also no final holding of invalidity by the Federal Courts regarding the Haskell

patent.

Thus, a reasonable examiner would view the teachings of the Ericsson patent, alone or in

combination with the admitted prior art of another, or in combination with any of the various

secondary references cited in the Request, important in deciding to allow the claims being

considered, thus raising a substantial new question of patentability regarding claim 12 of the

Haskell patent.

*Hinman*

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider Hinman, either alone or used

in combination with said admitted prior art of another or in combination with other secondary

references, important in making a decision as to the patentability of claim 12 in the Haskell

patent.    Hinman is generally directed to conventional motion compensation and thus, as

discussed above, would teach the "block approximation" limitations.  Ericsson would provide

**Exhibit 5   Page 42**

explicit teachings/suggestion/motivation (e.g., lower bandwidth "while providing for graceful

degradation of the image during a scene change or during periods of heavy motion," see col. 2, ll.

35-43) to add its teachings regarding the "interpolated block" limitation, as extensively discussed

above, to the teachings of Hinman.  See also pages 8-9 of the Request regarding additional

motivations to combine these two references.


   For additional reasons why Hinman raises a substantial new question of patentability, see

also pages 8, 9 and 21-37 of the Request, which includes a detailed claim chart, all of which are

hereby incorporated by reference from the Request for their explanation of the teachings

provided in Hinman that were not present in the prosecution of the application which became the

Haskell patent.


   The Hinman patent was not previously cited or discussed by the examiner in the original

prosecution of the Haskell patent.


   There was also no final holding of invalidity by the Federal Courts regarding the Haskell

patent.


   Thus, a reasonable examiner would view the teachings of the Hinman patent, alone or in

combination with the admitted prior art of another, or in combination with any of the various

secondary references cited in the Request, important in deciding to allow the claims being

Exhibit 5   Page 43

Application/Control Number: 90/008,770                                      Page 8
Art Unit: 3992

considered, thus raising a substantial new question of patentability regarding claim 12 of the

Haskell patent.


### *Lodge I and II*


In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider Lodge I and II, either alone

or used in combination with said admitted prior art of another or in combination with other

secondary references, important in making a decision as to the patentability of claim 12 in the

Haskell patent.   As discussed above regarding Haskell claim 12, the analysis of whether a

substantial new question is raised for claim 12 focuses on the last, broadly recited paragraph of

claim 12.  Furthermore as discussed above, a substantial question exists as to the scope (e.g.,

broad or narrow) of the corresponding structure in said means limitation recited in the last

paragraph of claim 12.  In view of this, the teachings of Lodge I and II read on the last paragraph

of claim 12.  For example, Lodge I teaches transmitting a predictive error code (means

responsive to said block approximations) and transmitting an interpolative error code (codes that

describe deviations from interpolated blocks to develop said interpolated blocks) (Lodge I, col.

11, l. 43 – col. 12, l. 2).


For additional reasons why Lodge I and II raise a substantial new question of

patentability, see also pages 9, 10 and 38-53 of the Request, which includes a detailed claim

chart, all of which are hereby incorporated by reference from the Request for their explanation of

**Exhibit 5   Page 44**

Application/Control Number: 90/008,770                                   Page 9
Art Unit: 3992

the teachings provided in Lodge I and II that were not present in the prosecution of the

application which became the Haskell patent.

The Lodge I and II printed publications were not previously cited or discussed by the

examiner in the original prosecution of the Haskell patent.

There was also no final holding of invalidity by the Federal Courts regarding the Haskell

patent.

Thus, a reasonable examiner would view the teachings of the Lodge I and II publications,

alone or in combination with the admitted prior art of another, or in combination with any of the

various secondary references cited in the Request, important in deciding to allow the claims

being considered, thus raising a substantial new question of patentability regarding claim 12 of

the Haskell patent.

### Digital Pictures

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider the Digital Pictures

publication, either alone or used in combination with said admitted prior art of another or in

combination with other secondary references, important in making a decision as to the

patentability of claim 12 in the Haskell patent.   Digital Pictures teaches of conventional motion

compensation (e.g., pp. 472-3) and thus, as discussed above, would teach the "block

**Exhibit 5   Page 45**

Application/Control Number: 90/008,770                                    Page 10
Art Unit: 3992

approximation" limitations.    Ericsson would provide explicit teachings/suggestion/motivation
(e.g., lower bandwidth "while providing for graceful degradation of the image during a scene
change or during periods of heavy motion," see col. 2, ll. 35-43) to add its teachings regarding
the "interpolated block" limitation, as extensively discussed above, to the teachings of Hinman.
See also pages 8-9 of the Request regarding additional motivations to combine these two
references.

For additional reasons why Digital Pictures raises a substantial new question of
patentability, see also pages 10, 11 and 53-61 of the Request, which includes a detailed claim
chart, all of which are hereby incorporated by reference from the Request for their explanation of
the teachings provided in Digital Pictures that were not present in the prosecution of the
application which became the Haskell patent.

The Digital Pictures publication was not previously cited or discussed by the examiner in
the original prosecution of the Haskell patent.

There was also no final holding of invalidity by the Federal Courts regarding the Haskell
patent.

Thus, a reasonable examiner would view the teachings of the Digital Pictures publication,
alone or in combination with the admitted prior art of another, or in combination with any of the
various secondary references cited in the Request, important in deciding to allow the claims

**Exhibit 5   Page 46**

Application/Control Number: 90/008,770                                   Page 11
Art Unit: 3992

being considered, thus raising a substantial new question of patentability regarding claim 12 of

the Haskell patent.

### *Scope of Reexamination*

Since requester did not request reexamination of all the claims and did not assert the

existence of a substantial new question of patentability (SNQ) for all the claims (see 35 U.S.C. §

302); see also 37 CFR 1.510b and 1.515), such claims for which no SNQ was asserted will not

be reexamined. This matter was squarely addressed in Sony Computer Entertainment America

Inc., et al. v. Jon W. Dudas, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy,

2006 WL 1472462. The District Court upheld the Office's discretion to not reexamine claims in a

reexamination proceeding other than those claims for which reexamination had specifically been

requested. The Court stated:

> To be sure, a party may seek, and the PTO may grant,...review of each and every claim of a
> patent. Moreover, while the PTO in its discretion may review claims for which...review was
> not requested, nothing in the statute compels it to do so. To ensure that the PTO considers a
> claim for...review,...requires that the party seeking reexamination demonstrate why the PTO
> should reexamine each and every claim for which it seeks review. Here, it is undisputed that
> **Sony** did not seek review of every claim under the '213 and '333 patents. Accordingly, **Sony**
> cannot now claim that the PTO wrongly failed to reexamine claims for which **Sony** never
> requested review, and its argument that AIPA compels a contrary result is unpersuasive.

**Exhibit 5   Page 47**

Application/Control Number: 90/008,770                                    Page 12
Art Unit: 3992

## Conclusion

### *Service of Papers*

After the filing of a request for reexamination by a third party requester, any document

filed by either the patent owner or the third party requester must be served on the other party (or

parties where two or more third party requester proceedings are merged) in the reexamination

proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530

to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner

waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in

the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third

party requester, see 37 C.F.R 1.550(f). The Patent Owner may consider <u>using the following</u>

statement in a document waiving the right to file a Patent Owner Statement:

### *WAIVER OF RIGHT TO FILE PATENT OWNER STATEMENT*

*Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement.*

### *Extensions of Time*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

**Exhibit 5   Page 48**

Application/Control Number: 90/008,770                                    Page 13
Art Unit: 3992

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).


### *Amendment in Reexamination Proceedings*

Patent owner is notified that any proposed amendment to the specification and/or claims

in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c).


### *Submissions*

In order to insure full consideration of any amendments, affidavits or declarations or

other documents as evidence of patentability, such documents must be submitted in response to

the first Office action on the merits (which does not result in a close of prosecution).

Submissions after the second Office action on the merits, which is intended to be a final action,

will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33

after appeal, which will be strictly enforced.

**Exhibit 5   Page 49**

Application/Control Number: 90/008,770    Page 14
Art Unit: 3992

### *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a)

to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

the Haskell patent throughout the course of this reexamination proceeding.  The requester is also

reminded of the ability to similarly appraise the Office of any such activity or proceeding

throughout the course of this reexamination proceeding.  See MPEP §§ 2207, 2282 and 2286.

### *Notice Re Patent Owner's Correspondence Address*

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that the patent

owner's correspondence address for all communications in an *ex parte* reexamination or an *inter*

*partes* reexamination is designated as the correspondence address of the patent.

*Revisions and Technical Corrections Affecting Requirements for Ex Parte and
Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the**

**same correspondence address as that of the patent is, by way of this revision to 37 CFR**

**1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as

of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination

proceeding which is filed after that date.

**Exhibit 5   Page 50**

Application/Control Number: 90/008,770                                    Page 15
Art Unit: 3992

Parties are to take this change into account when filing papers, and direct communications

accordingly.


In the event the patent owner's correspondence address listed in the papers (record) for the

present proceeding is different from the correspondence address of the patent, it is strongly

encouraged that the patent owner affirmatively file a Notification of Change of Correspondence

Address in the reexamination proceeding and/or the patent (depending on which address patent

owner desires), to conform the address of the proceeding with that of the patent and to clarify the

record as to which address should be used for correspondence.


      Telephone Numbers for reexamination inquiries:


         Reexamination and Amendment Practice      (571) 272-7703
         Central Reexam Unit (CRU)               (571) 272-7705
         Reexamination Facsimile Transmission No.   (571) 273-9900

**Exhibit 5   Page 51**

Application/Control Number: 90/008,770                              Page 16
Art Unit: 3992

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed

as follows:

By **U.S. Postal Service Mail** to:

      Mail Stop *Ex Parte* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA  22313-1450

By FAX to:   (571) 273-9900
            Central Reexamination Unit

By hand to:   Customer Service Window
            Randolph Building
            401 Dulany St.
            Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be

directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:                                                Conferees:

_____                 SCOTT L. WEAVER
Roland G. Foster                                       CRU EXAMINER-AU 3992
Central Reexamination Unit, Primary Examiner
Electrical Art Unit 3992
(571) 272-7538

                                                        MARK J. REINHART
                                                        SPRE-AU 3992
                                                        CENTRAL REEXAMINATION UNIT

**Exhibit 5   Page 52**

SHEET 1 of 1

| INFORMATION DISCLOSURE CITATION IN AN APPLICATION | ATTY. DOCKET NO. **075543-0016** | PATENT NO. **4,958,226** |
|---|---|---|
| | APPLICANT **HASKELL, et al.** | |
| (PTO-1449) | FILING DATE **July 16, 2007** | GROUP |

### U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Document Number<br>Number-Kind Code (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /RF/ | | US 4,849,810 | Jul. 18, 1989 | Ericsson | |
| ↓ | | US 4,858,005 | Aug. 15, 1989 | Lodge | |
| | | US 4,703,350 | Oct. 27, 1987 | Hinman | |
| | | US 4,575,756 | Mar. 11, 1986 | Furukawa | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Foreign Patent Document Country Codes -Number - -Kind Codes (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines Where Relevant Figures Appear | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER ART (Including Author, Title, Date, Pertinent Pages, Etc.)

| EXAMINER'S INITIALS | CITE NO. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. |
|---|---|---|
| /RF/ | | N.K. Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Pictures," Second International Conference on Image Processing and Its Applications, Vol. 265, 24-26 June 1986 |
| /RF/ | | Arun N. Netravali & Barry G. Haskell, DIGITAL PICTURES: REPRESENTATION AND COMPRESSION (1988) |
| | | |
| | | |

| EXAMINER /Roland Foster/ | DATE CONSIDERED 10/03/2007 |
|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
1 Applicant's unique citation designation number (optional). 2 Applicant is to place a check mark here if English language Translation is attached.
WDC99 1421178-1.075543.0016

Exhibit 5   Page 53

Exhibit 6

# Actions Due

**Wednesday, August 22, 2007          Page: 1**

| | | |
|---|---|---|
| **Client-Matter:** | 075543 -0017 | |
| **Family Number:** | 075543-0017 | **Sub Matter:** |
| **Country:** | US          United States of America | **SubCase:** A001 |
| **Client Ref. #:** | | **Case Type:** REE |
| **Responsible Atty.:** JMF | **Assigned Atty.:** KLC     **Paralegal:** | **Resp. Office:** WDC |

| | | |
|---|---|---|
| **Status :** | Pending | **Filing Date:** 12-Jul-2007 |
| **Action Type:** | WDC-US-ReExam-Pat Owners Stmt | **Base Date:** 16-Aug-2007 |
| **Application # :** | 90/008,740 | **Response sent date:** |

| Action(s) Due | Due Date | Indicator | Taken | LP |
|---|---|---|---|---|
| Patent Owners Stmt Due (O.S.) | 16-Oct-2007 | Reminder | | |

**Remarks:**

ORDER GRANTING REQ FOR EXPARTE REEXAM DTD 8/16/07 RECD 8/20/07, OWNER'S STMT DUE 2 MOS
**NOTE THIS IS A DUE DATE FOR THE PATENT OWNER, MWE IS REQUESTOR**

**Created By:** kmclark          **User ID:** madirogers          **Date Created:** 21-Aug-2007          **Last Update:** 22-Aug-2007

**Exhibit 6   Page 54**



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

McDermott Will & Emery
Attn:  Kenneth L. Cage
600 13th Street N. W.
Washington DC  20005-3096



# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,740*.

PATENT NO. *4,383,272*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(e)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(e)).

PTO-465 (Rev.04-03)

**Exhibit 6   Page 55**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,740 | 07/12/2007 | 4,383,272 | 75543-017 | 8621 |

7590          08/16/2007

S.E. HOLLANDER
BELL TELEPHONE LABS. INC.
600 MOUNTAIN AVE.
MURRAY HILL, NJ 07974

| EXAMINER |
|---|
| Ovidio Escalante |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 08/16/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

**Exhibit 6   Page 56**

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/008,740 | Patent Under Reexamination 4,383,272 | |
|---|---|---|---|
| | Examiner Ovidio Escalante | Art Unit 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>12 July 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO/SB/08,    c)☒ Other: <u>Decision</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

                RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

    a) ☐  by Treasury check or,

    b) ☐  by credit to Deposit Account No. _____,  or

    c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Ovidio  Escalante
CRU Examiner
Art Unit: 3992

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)                    Office Action in *Ex Parte* Reexamination                    Part of Paper No. 20070803

**Exhibit 6   Page 57**

Application/Control Number: 90/008,740                                    Page 2
Art Unit: 3992

## DECISION

1.    A substantial new question of patentability affecting claim 13 of United States Patent

Number 4,383,272 (Netravali et al.) is raised by the request for *ex parte* reexamination.

2.    The instant patent issued May 10, 1983 based on US Patent Application Ser. No.

06/253,698, filed April 13, 1981.

### *Patent Status*

Under 37 CFR 1.510(a), any person may, at any time during the period of enforceability

of a patent, file a request for > ex parte< reexamination. This period was set by rule, since

the Office considered that Congress could not have intended expending Office resources

on deciding patent validity questions in patents which cannot be enforced. In this regard

see Patlex Corp.  v.  Mossinghoff, 758 F.2d 594, 225 USPQ 243, 249 (Fed. Cir.

*>1985<). The period of enforceability is determined by adding 6 years to the date on

which the patent expires.

In addition, if litigation is instituted within the period of the statute of limitations,

requests for reexamination may be filed after the statute of limitations has expired, as long as the

patent is still enforceable against someone.

The requester notes that The '272 patent is currently the subject of litigation before the

United States District Court for the Southern District of California, where MPT has accused

Requester of patent infringement, in a proceeding styled Lucent Technologies Inc. and

Multimedia Patent Trust v. Gateway, Inc. et al., Case No. 02-CV-2060 B (CAB) consolidated

with Case Nos. 03-CV-699 B (CAB) and 03-CV-1108 B (CAB).

**Exhibit 6   Page 58**

Application/Control Number: 90/008,740                                        Page 3
Art Unit: 3992

Accordingly, even though more than six years has passed, the timing of the filing of the

request is appropriate.

### *References Cited in the Request*

3.     In the request, the third party requester asserts that claims of the '272 Netravali patent are

rendered unpatentable by the following cited references:

  1.     D. Gabor, et al. Television Band Compression by Contour Interpolation, The
         Proceeding of the Institution of Electrical Engineers, Vol. 108, Part B, No. 39.

  2.     J.O. Limb and R.F. W Pease, A Simple Interframe Coder for Video Telephony,
         The Bell System Technical Journal, Vol. 50, No. 6, July-Aug. 1971, (hereinafter
         Lim & Pease).

  3.     Arun N. Netravali and John O. Limb, Picture Coding: A Review, Proceeding of
         the IEEE, Vol. 68, No. 3, Mar. 1980, (hereinafter Picture Coding).

  4.     E. R. Kretzmer, Statistics of Television Signals, The Bell Systems Technical
         Journal, July 1952.

  5.     D. Gabor, Television Compression by Contour Interpolation, Supplemento Al
         Volume III, Serie X, Del Nuovo Cimento, 1959

  6.     P. C. J. Hill, Television Bandwidth Compression by Interpolation, The Electrical
         Engineering Department, Imperial College London, March 1960.

  7.     Limb et al. - Exchange of Spatial and Temporal Resolution in Television Coding,
         The Bell System Technical Journal, January 1971.

  8.     R. F. W. Pease, Conditional Vertical  Subsampling - A Technique to Assist in the
         Coding of Television Signals, The Bell System Technical Journal, Vol. 51, No. 4,
         April 1972.

  9.     J.O. Limb, et al., Combining Intraframe and Frame-to-Frame Coding for
         Television, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974.

**Exhibit 6   Page 59**

Application/Control Number: 90/008,740                                        Page 4
Art Unit: 3992

### *Identification of Every Claim for Which Reexamination is Requested*

4.      The above-cited references are separately discussed regarding claim 13 of the '272

patent. See page 4 of the request.

Specifically, the third party requester considers that claim 13 is unpatentable over Gabor,

et al. Television Band Compression by Contour Interpolation, (hereinafter Gabor & Hill)

The third party requester also considers that claim 13, is unpatentable over J.O. Limb and

R.F. W Pease, A Simple Interframe Coder for Video Telephony, (hereinafter Limb & Pease).

The third party requester also considers that claim 13 is unpatentable over Arun N.

Netravali and John O. Limb, Picture Coding: A Review, (hereinafter Picture Coding).

The third party requester also considers that claim 13, is unpatentable over Gabor & Hill

in view of E. R. Kretzmer, Statistics of Television Signals (hereinafter Kretzmer), D. Gabor,

Television Compression by Contour Interpolation or P. C. J. Hill, Television Bandwidth

Compression by Interpolation.

The third party requester also considers that claim 13, is unpatentable over Limb & Pease

in combination with Limb et al. - Exchange of Spatial and Temporal Resolution in Television

Coding,, R. F. W. Pease, Conditional Vertical  Subsampling - A Technique to Assist in the

Coding of Television Signals or J.O. Limb, et al., Combining Intraframe and Frame-to-Frame

Coding for Television.

### *Prosecution History*

During the prosecution of the 06/253,698 application, the applicant, filed a response on

October 25, 1982 in response to the office action mailed on July 26, 19982. The response argued

that the prior art references clearly reveal that an <u>intensity value</u> is not being interpolated from

**Exhibit 6   Page 60**

Application/Control Number: 90/008,740                                          Page 5
Art Unit: 3992

preceding <u>and succeeding</u> version of the picture. The applicant stated that the prior art of record

pertain to recursive estimation of displacement in a series of pictures and its use in predictive

encoding of the present picture version. Such predictive encoding uses information only from

<u>preceding picture version.</u>

### *Substantial New Question of Patentability*

5.      The teachings in each cited prior art document that provides a basis for each substantial

new question of patentability is separately discussed. See the pages 7-33 of the Request, which

point out the teachings in each of the above-cited references.

### *Limb & Pease*

Limb & Pease discloses a method of applying resolution exchange to a differentially

quantized (DPCM) signal. The resulting channel capacity required for the subjectively

satisfactory transmission of the differential signal is halved. The coder is simpler than most

interframe coders and should not increase the sensitivity of the system to channels errors.

On page 1879, Limb & Pease states that when movement is detected, pels from alternate

sampled fields are received, decode, and displayed. In place of pels from the unsampeld fields,

an average is formed <u>from the four nearest neighbors in the y-t diagram</u>. For example, pels in

lines (y,1) are replace with the average value of pels in liens (y-1,0) (y+1, 0) (y-1,2) and (y+1,2).

Thus both spatial and temporal interpolation is used to form the new value in the unsampled

field. Therefore, Limb & Pease discloses a method for estimating the intensities of pels in a

picture in accordance with information defining intensities of pels in preceding and succeeding

versions of the picture.

**Exhibit 6   Page 61**

Application/Control Number: 90/008,740                                    Page 6
Art Unit: 3992

The teaching of the intensity value being interpolated from preceding and succeeding versions of the picture was not present in the prosecution of the application which became the '272 patent and thus it is agreed that Limb & Pease raises an SNQ over claim 13 of the instant '272 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Furthermore, the Limb & Pease reference was not before the examiner during the prosecution of the '272 Patent. Accordingly, the Limb & Pease reference raises a SNQ as to claim 13 of the instant '272 Patent.

### Picture Coding

Picture Coding describes an interpolative Frame-to-Frame Coder. Picture Coding describes in Figure 53 that the basic coding scheme was limited to groups of four lines, consisting of pairs of consecutive lines in consecutive frames. The group of four lines is subdivided into blocks of eight pels. Further, Picture Coding discloses that the key elements in a block, on which all of the other elements depend are the A1 's. These elements are DPCM coded along a line using the previous A1 as a predictor. The coding of the remaining elements (B's, C's, D's) uses the four surrounding Al's, two of which are in the next pair of lines which would not normally be coded with the current block. Furthermore, Figure 53(a) depicts a series of frames along a temporal axis, where frame 1 is the first frame, followed by Frame 2 and then Frame 1' in time. Picture Coding describes the coding of the middle frame, Frame 2, stating "[a] first test is made to see if it is permissible to interpolate all four elements [A2, B2, C2, D2] from frame 1 and frame 1'. This test indicates that "[i]f the error of an individual pel, or if the average error of

**Exhibit 6   Page 62**

Application/Control Number: 90/008,740                                    Page 7
Art Unit: 3992

all four pels, is greater than a third threshold, then the block must be coded. As such, this test

inherently requires estimating the intensities of elements (pels) in a picture in accordance with

information defining intensities of pels in preceding and succeeding versions of the picture.

The teaching of the intensity value being interpolated from preceding and succeeding

versions of the picture was not present in the prosecution of the application which became the

'272 patent and thus it is agreed that Picture Coding raises an SNQ over claim 13 of the instant

'272 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Furthermore, the Picture Coding reference was not before

the examiner during the prosecution of the '272 Patent.  Accordingly, the Picture Coding

reference raises a SNQ as to claim 13 of the instant '272 Patent.

### *Gabor & Hill*

Gabor & Hill presents a video signal transmission method referred to as contour

interpolation, which involves transmitting only one interlaced field out of two, and constructing

the missing interlaced field.

Gabor & Hill also discloses that the method of contour interpolation is equally applicable

to the interpolation of missing fields and missing frames. Moreover, Gabor & Hill indicates that

a missing picture is reconstructed by estimating the intensities of elements comprising the

missing picture. For example, Gabor & Hill discloses that the elements of a missing line can be

reconstructed with reference to the intensities of elements in the corresponding line of a

preceding and a succeeding picture.

**Exhibit 6   Page 63**

Application/Control Number: 90/008,740                                      Page 8
Art Unit: 3992

Gabor & Hill also discloses that each line is comprised of elements, stating "[a]ssume, for instance, that we allow a searching time corresponding to 10 picture points, which is about 1/50 of a line.. A picture point represents an element and is characterized by an intensity value. Further, the intensity value of a picture point is encoded using five binary digits (bits). Therefore, Gabor & Hill teaches that the elements of one or more pictures can be reconstructed - or estimated - in accordance with information defining the intensities of elements in preceding and succeeding pictures.

The teaching of the intensity value being interpolated from preceding and succeeding versions of the picture was not present in the prosecution of the application which became the '272 patent and thus it is agreed that Gabor & Hill raises an SNQ over claim 13 of the instant '272 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Furthermore, the Gabor & Hill reference was not before the examiner during the prosecution of the '272 Patent.  Accordingly, the Gabor & Hill reference raises a SNQ as to claim 13 of the instant '272 Patent.

### *Scope of Reexamination*

6.       Since requester did not request reexamination of claims 1-12 and 14-24 and did not assert the existence of a substantial new question of patentability (SNQP) for such claims  (see 35 U.S.C. § 311(b)(2); see also 37 CFR 1.915b and 1.923), such claims will not be reexamined. This matter was squarely addressed in *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL

**Exhibit 6   Page 64**

Application/Control Number: 90/008,740                                    Page 9
Art Unit: 3992

1472462. (Not Reported in F.Supp.2d.)  The District Court upheld the Office's discretion to not

reexamine claims in an *inter partes* reexamination proceeding other than those claims for which

reexamination had specifically been requested.  The Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter partes* review of each and every claim of a patent.  Moreover, while the PTO in its discretion may review claims for which *inter partes* review was not requested, nothing in the statute compels it to do so.  To ensure that the PTO considers a claim for *inter partes* review, § 311(b)(2) requires that the party seeking reexamination demonstrate why the PTO should reexamine each and every claim for which it seeks review.  Here, it is undisputed that Sony did not seek review of every claim under the '213 and '333 patents.  Accordingly, Sony cannot now claim that the PTO wrongly failed to reexamine claims for which Sony never requested review, and its argument that AIPA compels a contrary result is unpersuasive.

The *Sony* decision's reasoning and statutory interpretation apply analogously to *ex parte*

reexamination, as the same relevant statutory language applies to both *inter partes* and *ex parte*

reexamination.  35 U.S.C. § 302 provides that the *ex parte* reexamination "request must set forth

the pertinency and manner of applying cited prior art <u>to every claim for which reexamination is</u>

<u>requested</u>" (emphasis added), and 35 U.S.C. § 303 provides that "the Director will determine

whether a substantial new question of patentability affecting <u>any claim of the patent</u> concerned is

<u>raised by the request</u>..." (Emphasis added).  These provisions are analogous to the language of

35 U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be

construed in the same manner.  As the Director can decline to reexamine non-requested claims in

an *inter partes* reexamination proceeding, the Director can likewise do so in *ex parte*

reexamination proceeding.  <u>See</u> *Notice of Clarification of Office Policy To Exercise Discretion in*

*Reexamining Fewer Than All the Patent Claims* (signed Oct. 5, 2006) 1311 OG 197 (Oct. 31,

2006).  <u>See also</u> MPEP § 2240, Rev. 5, Aug. 2006.

**Exhibit 6   Page 65**

Application/Control Number: 90/008,740                                    Page 10
Art Unit: 3992

Therefore, claims 1-12 and 14-24 will not be reexamined in this *ex parte* reexamination

proceeding.

7.      Claim 13 will be reexamined as requested in the request.

### *Conclusion*

8.      Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

9.      The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

Patent No. 4,383,272 throughout the course of this reexamination proceeding.

10.     After the filing of a request for reexamination by a third party requester, any document

filed by either the patent owner or the third party requester must be served on the other party (or

parties where two or more third party requester proceedings are merged) in the reexamination

proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

11.     In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530

to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner

waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in

the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third

party requester, see 37 C.F.R 1.550(f).

12.     Patent Owner is notified that any proposed amendment to the specification and/or claims

in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

**Exhibit 6   Page 66**

Application/Control Number: 90/008,740                                    Page 11

Art Unit: 3992

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c).

13.    All correspondence related to this *ex parte* reexamination proceeding should be directed

as follows:

**Please MAIL any communications to:**

Attn: Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

**Please FAX any communication to:**

(571) 273-9900
Central Reexamination Unit

**Please HAND-DELIVER any communications to:**

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

14.    Any inquiry by the patent owner concerning this communication or earlier

communications from the Legal Advisor or Examiner, or as to the status of this proceeding,

should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Ovidio Escalante
Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-7537

Conferee:

MARK J. REINHART
SPRE-AU 3992
CENTRAL REEXAMINATION UNIT

Conferee:

**Exhibit 6   Page 67**

| INFORMATION DISCLOSURE CITATION IN AN APPLICATION<br><br>(PTO-1449) | ATTY. DOCKET NO.<br>**075543-0017** | PATENT NO.<br>**4,383,272** |
|---|---|---|
| | APPLICANT<br>**NETRAVALI, et al.** | |
| | FILING DATE<br>**July 12, 2007** | GROUP |

## U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Document Number<br>Number-Kind Code2 (if known) | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |

## FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Foreign Patent Document<br>Country Codes<sub></sub>-Number<sub></sub>-Kind Codes (if known) | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines Where Relevant Figures Appear | Translation | |
|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## OTHER ART (Including Author, Title, Date, Pertinent Pages, Etc.)

| EXAMINER'S INITIALS | CITE NO. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | |
|---|---|---|---|
| /OE/ | | D. Gabor, *Television Compression by Contour Interpolation*, Supplemento Al Volume III, Serie X, Del Nuovo Cimento, 1959 | |
| /OE/ | | J. O. Limb, et al., *Combining Intraframe and Frame-to-Frame Coding for Television*, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974 | |
| /OE/ | | R. F. W. Pease, *Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals*, The Bell System Technical Journal, Vol. 51, No. 4, April 1972 | |
| /OE/ | | P. C. J. Hill, *Television Bandwidth Compression by Interpolation*, The Electrical Engineering Department, Imperial College London, March 1960 | |
| /OE/ | | Kretzmer, E.R., "Statistics of Television Signals," The Bell Systems Technical Journal, pp. 276-88 (July 1952) | |
| /OE/ | | J. O. Limb and R. F. W. Pease, *A Simple Interframe Coder For Video Telephony*, The Bell System Technical Journal, Vol. 50, No. 6, July-Aug., 1971 | |

**Exhibit 6   Page 68**

| /OE/ | D. Gabor, et al., *Television Band Compression By Contour Interpolation*, The Proceedings of the Institution of Electrical Engineers, Vol. 108, Part B, No. 39, May 1961 | |
|------|------|---|
| /OE/ | Arun N. Netravali and John O. Limb, *Picture Coding: A Review*, Proceedings of the IEEE, Vol. 68, No. 3, Mar. 1980 | |
| /OE/ | Limb et al., *Exchange of Spatial and Temporal Resolution in Television Coding*, The Bell System Technical Journal, January 1971 | |

| EXAMINER | DATE CONSIDERED |
|----------|-----------------|
| ./Ovidio Escalante/ | 08/16/2007 |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

1 Applicant's unique citation designation number (optional). 2 Applicant is to place a check mark here if English language Translation is attached.

WDC99 1421180-1.075543.0017

Exhibit 6   Page 69

Exhibit 7

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   LUCENT TECHNOLOGIES INC. and          Case No. 02-CV-2060 B (CAB)
     MULTIMEDIA PATENT TRUST,               consolidated with
12                                          Case No. 03-CV-0699 B (CAB); and
                                            Case No. 03-CV-1108 B (CAB)
13           Plaintiff and Counterclaim-defendant,

14           v.                             **SECOND SUPPLEMENTAL EXPERT
                                            REPORT OF MR. DALE E. BUSCAINO
15   GATEWAY, INC. and GATEWAY COUNTRY      RE INVALIDITY OF UNITED STATES
     STORES LLC, GATEWAY COMPANIES,         PATENT NO. 4,763,356**
16   INC., GATEWAY MANUFACTURING LLC
     and COWABUNGA ENTERPRISES, INC.,

17           Defendants and Counter-claimants,

18   and

19   MICROSOFT CORPORATION,

20           Intervenor and Counter-claimant,

21   _____

22   MICROSOFT CORPORATION,

23           Plaintiff and Counter-defendant,

24   v.

25   LUCENT TECHNOLOGIES INC.,

26           Defendant and Counter-claimant,

27

28

1

2

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,

3

        Plaintiff,

4

v.

5

DELL, INC.,

6

        Defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 02-CV-2060 B (CAB)

Exhibit 7   Page 71

1    I, Mr. Dale E. Buscaino, have been retained by Microsoft Corporation, Dell Incorporated

2    and Gateway Incorporated (collectively "Defendants") through their counsel to serve in this case

3    as an independent expert.  I understand the Complainant in this case to be Lucent Technologies,

4    Incorporated, herein referred to as "Lucent."  I have submitted four prior reports in this case,

5    "Expert Report of Mr. Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356"

6    ("Buscaino I") dated March 31, 2006, "Expert Report of Mr. Dale E. Buscaino re Non-

7    Infringement of United States Patent No. 4,763,356" ("Buscaino II") dated May 12, 2006, "Expert

8    Report of Mr. Dale E. Buscaino re Secondary Considerations of Non-Obviousness Regarding

9    United States Patent No. 4,763,356" ("Buscaino III") and "Supplemental Expert Report of Mr.

10    Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356" ("Buscaino IV").

11    This second supplemental report addresses whether U.S. patent No. 4,763,356 ("the '356

12    patent") is valid.

13    1.    As explained below, I believe that claims 19 and 21 of the '356 patent are invalid.

14    **I.    QUALIFICATIONS AND PROFESSIONAL EXPERIENCE**

15    2.    The details of my education and work experience are set forth in Buscaino I and are

16    incorporated herein by reference.

17    **1.  Prior Testimony**

18    3.    The details of my prior testimony are set forth in Buscaino I and are incorporated

19    herein by reference.  Additionally, I have testified at trial on November 8th, 2006 in the Samsung

20    Electronics Co., Ltd v. Quantal Computer et al. case listed in Buscaino I.

21    **2.  Compensation**

22    4.    My consulting services are being provided at an hourly rate of $275.00.  I have

23    previously worked as an independent consultant and expert witness on behalf of companies that

24    have been involved in intellectual property disputes.  My compensation does not depend either on

25    the conclusions I reach or the outcome of this case.

26    **II.    INFORMATION RELIED UPON**

27    5.    In forming my opinions, I rely on my knowledge and experience noted above and in

28    my prior reports.  I also rely on the documents and information referenced and cited in this report

1

Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 72**

1  and in Buscaino I-IV (which are hereby incorporated by reference in their entirety including any

2  exhibits thereto).

3       6.  I have reviewed the documents and systems identified in attached Exhibit 1 (Materials

4  Considered).  These are the materials upon which I am basing my opinions.  I may, if appropriate,

5  cite to these materials for additional support for any of my opinions, beyond what I expressly cite

6  in this report.

7       7.  I have reviewed the March 2, 2004 "Amended Order Superseding the Order of

8  October 29, 2003, Construing Claims For Patent Number 4,763,356," ("Claim Construction

9  Order") as well as transcripts of the Markman hearing relating to the '356 patent that took place on

10  September 22 and 23, 2003.  In the preparation of this report, I adhered to the claim construction

11  of the '356 patent as set forth in the Court's Claim Construction Order which I have attached as

12  Exhibit 2.

13       8.  I have reviewed the April 17, 2007 "Claim Construction Order Clarifying and

14  Superceding the Order of March 1, 2004, Construing Claims for U.S. Patent No. 4,763,356"

15  ("Claim Construction Order II") and note that the Court states, "the instant order does not change

16  the substance of the Court's prior claim construction" in that order.

17       9.  I have further reviewed the May 15, 2007 Order Denying Plaintiff's and Defendant's

18  Cross-Motions Regarding the Invalidity of U.S. Patent No. 4,763,356, and I understand that the

19  Court has clarified the construction of the term "concurrently displaying," ruling as follows:

20  "display[ing] the tools side-by-side with the form, rather than as an overlaying… is not excluded

21  from the definition of "concurrently displaying.""

22      10.  I understand that claim construction is ultimately a matter for the Court to decide.  I

23  reserve the right to supplement or modify my opinions and this report based upon any further

24  claim construction by the Court.  My opinions, as expressed herein, are based on the Court's claim

25  construction and my opinion as to the proper interpretation of the Court's construction of the

26  claims asserted in this case.

27      11.  I have reviewed the reports of Lucent's expert Mr. Bruce Tognazzini, including all

28  exhibits as well as documents and materials referenced therein.

2

1    12.   To the extent not already reflected in Exhibit 1, I have reviewed all other documents

2  discussed or cited in this report, and reserve the right to make additional references to those

3  documents at trial as the need may arise.

4  **III.    RELEVANT LEGAL PRINCIPLES**

5    13.   I will not offer opinions of the law as I am not an attorney.  However, I am informed

6  of several principles concerning patent validity and invalidity, which I used in arriving at my

7  conclusions.

8    14.   I incorporate here by reference the legal principles set forth at ¶¶ 20-26 of Buscaino I

9  and ¶¶ 12-16 of Buscaino IV, on issues of validity related to the '356 patent.

10    15.   I am informed that legal principles regarding invalidity of a claim due to obviousness

11  were clarified by the U.S. Supreme Court after I wrote my reports, Buscaino I-IV.  I am informed

12  that the principles described in ¶23 of Buscaino I and ¶ 15 of Buscaino IV (relating to a

13  "motivation," "suggestion," or "teaching" in the prior art to combine references to produce the

14  claimed alleged invention) remain an appropriate approach in a validity analysis.  I understand,

15  however, that the U.S. Supreme Court clarified that additional principles may also be applied in

16  such an analysis.  I set forth some such additional principles below.

17    16.   I am informed that the combination of familiar elements according to known methods

18  is likely to be obvious when it does no more than yield predictable results.  In other words, when a

19  claim simply arranges prior art elements with each performing the same function it had been

20  known to perform and yields no more than one would expect from such an arrangement, such a

21  combination is obvious.  Moreover, when a patent claims a structure already known in the prior art

22  that is altered by the mere substitution of one element for another known in the field, the

23  combination is likely to be obvious unless the combination yields an unpredictable result.  I am

24  informed that a corollary principle is that when the prior art teaches away from combining certain

25  known elements, a claim directed to a discovery of a successful means of combining them is more

26  likely to be non-obvious.

27    17.   I am informed that when a work is available in one field of endeavor, design

28  incentives and other market forces can prompt variations of it, either in the same field or a

3                              Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 74**

different one.  If one of ordinary skill in the art can implement a predictable variation, such a variation is likely unpatentable.  For the same reason, if a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.  One question to consider is whether the improvement is more than the predictable use of prior art elements according to their established functions.

18.  I am informed that it may be often be necessary, in a validity analysis, to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by one of ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

19.  I am informed that a validity analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim; it is appropriate to take account of the inferences and creative steps that one of ordinary skill in the art would employ.  I understand that a person of ordinary skill is also a person of ordinary creativity.

20.  I understand that a claim composed of several elements is not proved obvious merely by demonstrating that each element was, independently, known in the prior art.  I understand that it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.  Therefore, I am informed, in determining whether a claimed combination is obvious, the correct question is whether the combination was obvious to one of ordinary skill in the art.  I am told that one of the ways in which subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.  I understand that any need or problem known in the field of endeavor at the time of alleged invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

21.  I am informed that one should not assume that a person of ordinary skill in the art attempting to solve a problem will be led only to those elements of prior art designed to solve the

1   same problem. Instead, I understand that since familiar items may have obvious uses beyond their

2   primary purposes, in many cases one of ordinary skill in the art will be able to fit the teachings of

3   multiple prior art references together like pieces of a puzzle.

4        22. I am informed that, when there is a design need or market pressure to solve a problem

5   and there are a finite number of identified, predictable solutions, one of ordinary skill in the art has

6   good reason to pursue the known options within his or her technical grasp. If this leads to the

7   anticipated success, it is likely the product not of innovation but of ordinary skill and common

8   sense, I understand that, in such an instance, the fact that the combination was obvious to try may

9   show that the combination is obvious.

10       23. I am informed that, when determining whether a claimed combination is obvious, the

11   correct analysis is not whether one of ordinary skill in the art, writing on a blank slate, would have

12   chosen the particular combination of elements described in the claim. Instead, I understand the

13   correct analysis considers whether one of ordinary skill, facing the wide range of needs created by

14   developments in the field of endeavor, would have seen a benefit to selecting the combination

15   claimed.

16                 **OPINIONS AND BASES FOR THOSE OPINIONS**

17   **IV.**    **SUMMARY OF OPINIONS**

18       24. If called as an expert witness in this case, I expect that my testimony may concern,

19   among other topics addressed below, the relationship between claims 19 and 21 of the '356 patent,

20   on the one hand, and certain prior art references, on the other hand. Based upon my review, it is

21   my opinion that each of claims 19 and 21 of the '356 patent is anticipated and/or rendered obvious

22   by various prior art references. My specific analysis regarding the prior art is contained in this

23   report and in Buscaino I, III and IV.

24       25. I may testify regarding, among other topics, the state of the industry up to and through

25   December 11, 1986, the filing date of the '356 patent. My anticipated testimony may be affected

26   by the positions Lucent takes with respect to the interpretation and application of the asserted

27   claims, in the context of the accused products as well as the prior art.

28

## V.    TECHNOLOGY BACKGROUND OF THE '356 PATENT

26.   I expect to provide a tutorial, as described in Buscaino I, on the technology of the patent and the prior art at the trial.

27.   The '356 patent relates to work its inventors allegedly did on a project and device called "Slate." *See* December 20, 2005 Deposition of Gillon ("Gillon Depo.") at 50:18-51:1.  The Slate project was a project to use a personal computer to provide automation for the trading floor of a Wall Street trading firm, Solomon Brothers.  *Id.* at 24:16-25:1.  Slate devices were deployed onto Solomon Brothers' trading floor.  *Id.* at 42:15-42:21.

28.   The '356 patent generally relates to a form entry system for use in a personal computer.  The patent describes displaying a form consisting of a plurality of fields on a computer screen.  Identifiers are displayed to tell the user what type of information is requested by each field.  Prior to the time of the '356 patent it was widely appreciated that computers were useful for managing information.  Thus, providing forms on a computer screen was a natural step, and had been widely implemented well before the '356 patent.

29.   Computerized forms at the time of the '356 patent were like paper forms in many respects.  For instance, paper forms provide labels that tell the user what kind of information is required by each field.  Likewise, computer form systems in the art prior to the time of the '356 patent similarly included such labels.

30.   However, there were also important differences between paper forms and computer forms.  A user with a pencil would clearly know what field was being filled in at any given moment.  A computer-based form would have to indicate to the user what field would receive the information supplied.  Many such indicators were well-known in computerized form systems well before the time of the '356 patent including drawing boxes around the field that will receive information, shading the background of that field in a different color from other fields, increasing the intensity of the label next to the field, and, commonly, merely putting a blinking cursor in the field that will receive information.  Such indicators were widespread and existed long before the '356 patent.

**Exhibit 7   Page 77**

31. The '356 patent contemplates providing various tools to assist the user in supplying input for some fields. These tools sometimes look or act similar to physical aids a person might use to fill out a paper form. For example, a person filling out a financial form might find it useful to have a calculator close by so that he or she could quickly add up some numbers before writing the total on the form. It was known in the art prior to the '356 patent that such tools, including a calculator utility, for example, could be displayed on the computer screen to help the user enter information.

32. Another type of tool that was used in the art, prior to the '356 patent, to fill out computerized forms was an alternative to the familiar physical keyboards. As computers advanced, some systems began to use other devices to enter information into the computer, such as touch-screens and mice, which allowed the user to send information to the computer by pointing to pictures or elements on the screen instead of typing using physical keyboards. Some touch screen systems omitted the physical keyboard entirely. Whenever such a system needed the user to enter text or numbers, it was natural to provide graphical versions of things such as keyboards and calculator-style number-pads. Computer systems having such graphic tools were well-known in the art before the '356 patent.

33. The '356 patent also describes another kind of tool that presents a menu of alternative choices and allows the user to pick one of the choices for input into a field. Selecting one of a group of possible options is often more efficient than typing the information out using a keyboard. Computer systems using menus to fill-in fields in a form were already well-known in the art before the '356 patent.

34. The use of a bit-mapped graphics display and input by handwriting using a stylus are described in the '356 patent. Bit-mapped graphics displays were not unusual in 1985; to the contrary, they were commonplace. Devices allowing users to enter input by handwriting were also on the market at that time. Depending on the implementation, the user might write on the bit-mapped graphics field with a stylus or a finger. Furthermore, the screen on which the user would write might be on the computer's display or on a unit that was intended to sit next to the computer

1  on the desktop. Such digitizers with styluses or "touch tablets," as well as touch screens that

2  accepted handwriting input, were known prior to the filing of the '356 patent.

3  **VI.    THE ASSERTED CLAIMS**

4        35.  I am informed that Lucent asserted claims 1, 2, 4, 6, 7, 10-13, 15, 16, 19, and 21 of

5  the '356 patent. I am further informed that summary judgment of non-infringement was granted

6  with respect to claims 1, 2, 4, 6, 7, 10-13, 15, and 16. Therefore, this report addresses only the

7  remaining asserted claims 19 and 21.

8        36.  I understand that the Court has construed the asserted claims of the '356 patent, and,

9  as stated above, I have reviewed the Court's construction as well as the May 15, 2007 Order

10  Denying Plaintiff's and Defendant's Cross-Motions Regarding the Invalidity of U.S. Patent No.

11  4,763,356, in which the Court clarified the construction of the term "concurrently displaying,"

12  ruling that: "display[ing] the tools side-by-side with the form, rather than as an overlaying… is not

13  excluded from the definition of "concurrently displaying."

14        37.  In this report, I compare the elements of claims 19 and 21 of the '356 patent with the

15  prior art in light of my knowledge of ordinary skill in the art. I discuss each prior art reference as

16  it would be understood by one of ordinary skill in the art, not one of extraordinary skill.

17  **VII.    OPINIONS ON VALIDITY**

18        **A.    J.K. Lasser's Your Money Manager**

19        38.  Claims 19 and 21 of the '356 patent are invalid in light of J.K. Lasser's Your Money

20  Manager.

21        39.  J.K. Lasser's Your Money Manager for the IBM PC software program (the "YMM

22  program") and the related documentation, J.K. Lasser's Your Money Manager Manual, © 1985,

23  ("YMM Manual"), invalidate the asserted claims of the '356 patent both separately and taken

24  together. I have examined the YMM program running on an IBM PC compatible computer as

25  detailed in Exhibit 1,[1] and have reviewed the YMM Manual (collectively "YMM"). Based on my

26  review of this system and materials, I conclude that each of YMM, the YMM program, and YMM

---

27
28  [1] I have also reviewed J.K. Lasser's Your Money Manager for the Commodore 64 and 128
    running on a Commodore 64 computer with an external floppy drive as detailed in Exhibit 1.
    The Commodore version contained identical features and performed identically in all relevant
    respects to the IBM version.

1    Manual invalidates claims 19 and 21 of the '356 patent. Specifically, I conclude that the

2    disclosure of the YMM Manual alone or in combination would be sufficient to describe or render

3    obvious the method recited in claims 19 and 21 of the '356 patent. I conclude that the YMM

4    program in normal use alone or in combination would meet or render obvious claims 19 and 21 of

5    the '356 patent. I conclude that using the YMM program in the manner directed by the YMM

6    Manual, alone or in combination would meet or render obvious claims 19 and 21 of the '356

7    patent. Support for my opinion that YMM meets or renders obvious the limitations of claims 19

8    and 21 of the '356 patent is detailed in the claim charts attached as Exhibit 3 and as follows:

9        **1. Claim 19 – Preamble "method for use in a computer having a display
         comprising the steps of"**

10

11       40.   YMM discloses a method for use in a computer having a display. The YMM program

12   is a software program for managing finances. Examination of the YMM program;[2] YMM Manual

13   at MSLT_1233952. It was designed for use on the IBM Personal Computer and most compatible

14   computers ("IBM PCs"). Examination of the YMM program; YMM Manual at MSLT_123395.

     YMM, running on an IBM PC performs the steps below.

15       **2. Claim 19 – Element 1 "displaying on said display a plurality of information
         fields,"**

16

17       41.   The YMM program displays a plurality of information fields on the computer's

18   display. For example, one way in which information may be input into the YMM program is

19   through the use of the Payments Form. When this form is accessed, the screen displays a plurality

20   of information fields related to the current transaction including fields labeled 'Account,' 'Date,'

21   'Payee,' 'Amt,' etc. Examination of the YMM program; YMM Manual MSLT_1233979-

22   MSLT_1233980; Exhibit 4.

23

24

25

26

27

28

---

[2] References to the examination of the YMM program refer to use of the software running on a
computer as described in Exhibit 1.

9                                    Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 80**



**Payments Form**

Figure 1. YMM Payments Form. YMM Manual at MSLT_1233979.

### 3. Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"

42.   As noted and pictured above, YMM identifies for the fields the kind of information to be inserted in the fields. Fields on the screen have labels that indicate the type of information to be inserted into the field including 'Account,' 'Date,' 'Payee,' etc. *Id.*

### 4. Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"

43.   I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

**Exhibit 7   Page 81**

1  44. I understand that the Court has construed "predefined tools associated with said one

2 of said fields" as "a tool specified by the system as an appropriate tool for filling in the

3 information called for by that field."

4  45. I understand that the Court has construed "a tool adapted to allow said user to

5 compose said information" as "a graphical keyboard tool or a graphical number keypad tool,

6 which allows the user to compose information by pointing to the display keys of that tool."

7  46. YMM "indicates a particular one of said information fields into which information is

8 to be inserted." For example, when the Account field is selected, YMM displays a cursor in that

9 field. "The Payments form appears with the cursor blinking in the first blank field, called

10 Account." YMM Manual at MSLT_1233979; Examination of the YMM program. When the

11 Check field is selected, the blinking cursor appears in that field. *Id.*

12  47. YMM "concurrently display[s] a predefined tool associated with said one of said

13 fields." In order to enter an account code, the user may press the F3 key. Doing so will cause

14 YMM to display a menu of alternative codes from which the user can select. Examination of the

15 YMM program; Exhibit 4; *see also* MSLT_1233976. YMM specifically provides the

16 functionality to set up the account codes. This is part of the normal operation of the software, the

17 software cannot operate fully without the account codes, and setting up the codes is specifically

18 instructed by the manual. *Id.*

19  48. In addition to the menu of alternative codes, YMM includes a "tool adapted to allow

20 [the] user to compose [] information" – an on-screen calculator  The user may use the on-screen

21 calculator, for example, to enter an amount in the Amount field as follows. When the Amount

22 field is selected, the user may press the F2 key. Doing so will cause an on-screen calculator to be

23 displayed. The user may then compose the amount to be entered by pointing to the display keys of

24 the on-screen calculator. YMM Manual at MSLT_1233965; Examination of the YMM program;

25 Exhibit 4; '356 patent at col. 3:23-3:33.

26  49. To the extent that Lucent contends that YMM does not meet this limitation, it would

27 have been obvious to one of skill in the art to combine the teaching of YMM with the composition

28

tools disclosed by other prior art references that are displayed concurrently with field indicators and can be operated using a computer mouse or a touch screen. Claim 19 is rendered obvious at least by YMM in combination with any of the following references described in Buscaino I: The Home Accountant Program, the Xerox Star, or the Apple Lisa. Claim 19 is rendered obvious by YMM in combination with Michael Tyler, Touch Screens: Big Deal or No Deal?, Datamation, January 1984, pp. 146-154 or with United States Patent No. 4,725,694, discussed in Buscaino IV. Claim 19 is further rendered obvious in combination with any of the references described in Sections B, C, D, or G, below.

50. Use of a computer mouse is an obvious solution for operation of an on-screen composition tool. The above references are each in the same field of endeavor. The tools described and illustrated in the '356 patent are examples of what is known as a "graphical user interface." The above references all made early use of a graphical user interface. The purpose of such an interface is to facilitate input of data into computers by allowing users to avoid typing by selecting and manipulating graphical images, and the on-screen keyboard in each provides the user the ability to use an on-screen composition tool without the necessity of using the physical keyboard. YMM is also directed to the facilitation of data entry through the use of graphical forms and tools.

51. One of ordinary skill, facing the wide range of needs created by developments in the field, would have seen an obvious benefit in combining YMM with a mouse-operated compositions tool and implementation of the combination would have been straightforward.

52. In the 1985 time period, there was an industry trend toward mouse-driven interfaces. Several companies were selling mouse peripherals for the IBM PC (e.g. Microsoft, Logitech, Mouse Systems). The mouse peripherals would attach to the computer system through the industry standard RS-232C communication ports. A program, such as YMM, could be easily adapted to either communicate directly with the mouse via the RS-232C port, or use the mouse drivers that were provided by the mouse peripheral manufacturer. It would have been a straightforward programming task to implement support for a mouse in YMM, that would allow

the user to "point" and "click" with the mouse at items such as a composition tool or fields on the display screen.

### 5. Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

53.    YMM "insert[s] in said one field information that is derived as a result of said user operating said displayed tool." For example, when the user wishes to enter an account code and YMM has displayed a menu of alternative codes as described above, the user may select a code from the menu of alternative codes. When the desired code is selected, the user simply presses the Enter key and the selected code is inserted by YMM into the Account field. Examination of YMM; *see also* MSLT_1233976-MSLT_1233977.

54.    YMM inserts information from the composition tool into a field as well. When the user has composed an amount to be entered into the Amount field using the on-screen calculator as described above, the user press the enter key and the composition is inserted by YMM into the Amount field. Examination of YMM; *see* Ex.4.

### 6. Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."

55.    I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

56.    Claim 21 is obvious in light of YMM in combination with FXFE or Michael Tyler, *Touch Screens: Big Deal or No Deal?*, Datamation, January 1984, pp. 146-154 ("Tyler"). It would have been obvious to one of skill in the art to combine the teaching of YMM with Tyler's "resistive membrane" touch panel (a "touch-sensitive screen") that can accept input from a pen (a "stylus"), as discussed in Buscaino IV.

57.    Claim 21 is also invalidated by YMM in combination with United States Patent No. 4,757,549 ("Machart"), MSLT_1230331-MSLT_1230335. Machart discloses inputting information into a computer using handwriting on a touch-sensitive screen.

58.    The advantages of the use of a stylus for certain applications are obvious. The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen. YMM discloses a form with numerous input fields. As

1  the number of fields displayed increases, and the size of the fields decreases, selection of the fields

2  using a stylus becomes even more advantageous.

3      59.  One of ordinary skill, facing the wide range of needs created by developments in the

4  field, would have seen an obvious benefit in combining YMM with a touch-sensitive screen that

5  can accept input from a stylus and implementation of the combination would have been a

6  straightforward task.

7      **7. Conclusions**

8      60.  As described above, YMM anticipates or renders obvious claims 19 and 21 of the

9  '356 patent.

10      **B.    Foreign Exchange Front End and Tyler**

11      61.  Foreign Exchange Front End ("FXFE") is a computer workstation that was developed

12  by Interactive Images Corporation and Chemical Bank for use by traders on the Chemical Bank

13  foreign exchange trading floor to automate the process of entering trades into the bank's

14  computers.  FXFE was described in Michael Tyler, *Touch Screens: Big Deal or No Deal?*,

15  DATAMATION, January 1984, pp. 146-154 ("Tyler").  *See* Ex. 6, p. 148, MSLT_228724.  Claims 19

16  and 21 of the '356 patent are invalidated by Tyler as discussed in Buscaino IV.  Additionally,

17  claims 19 and 21 are invalidated by FXFE which was used publicly in a successful demonstration

18  in the United States at least as early as January of 1984.  Conversation with Robert Long.[3]  This

19  public use of FXFE is corroborated by Tyler.  *See* Ex. 6, p. 148, MSLT_228724.  The use of

20  FXFE as described by Robert Long and as confirmed by Tyler practiced or rendered obvious

21  claims 19 and 21.

22      62.  Support for my opinion that FXFE meets the limitations of claims 19 and 21 of the

23  '356 patent is detailed in the claim charts attached as Exhibit 5 and as follows:

24

25

26

27

28  _____

[3] References to "Conversation with Robert Long" refer to a telephone conversation on September 6' 2007 with Robert Long who was a project manager at Chemical Bank involved in the development of FXFE.

**1.  Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"**

63.  FXFE was a computer workstation that included "a color monitor with a touch-sensitive screen."  Conversation with Robert Long; Ex. 6, p. 148, MSLT_228724.  FXFE performed the steps below.

**2.  Claim 19 – Element 1 "displaying on said display a plurality of information fields,"**

64.  FXFE displayed a plurality of information fields on the color monitor.  FXFE allowed the user to declare the current transaction a "buy" or a "sell."  Once the "buy" or "sell" box was touched, the screen displayed a plurality of information fields related to the current transaction including rate (in dollars and the foreign currency), value, broker, customer, and location.  *Id.*  The information fields were located on right hand side of the display.  *Id.*

**3.  Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"**

65.  FXFE identified for the fields the kind of information to be inserted.  Fields on the screen had labels that indicate the type of information to be inserted into the field including those detailed in the preceding paragraph.  *Id.*  In most fields, the identifying label immediately preceded the information field.  *Id.*

**4.  Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"**

66.  I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

67.  I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

68.  I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

15                              Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 86**

69.  FXFE indicated the particular field into which information was to be inserted.  To select a particular field, the desired field would be touched with a finger.  FXFE would then indicate that field by increasing the intensity of the field identifier.  *Id.*  In the example of the "customer" field, the identifier "Customer" would be intensified to inform the trader that that was the field into which information was to be inserted.

70.  FXFE "concurrently display[ed] a predefined tool associated with said one of said fields."  For example, touching the "customer" field would cause FXFE to automatically display the menu of alternatives tool on the left hand side of the display consisting of a list of customer names.  Touching a customer name would cause FXFE to insert the name into the "customer" field.  As a further example, when the user hits the "broker" field, a list of brokers would appear. *Id.*

71.  In addition to the menu of alternatives tool, FXFE included tools "adapted to allow [the] user to compose [] information:" an on-screen alphabetic keyboard tool and an on-screen numeric keypad.  Ex. 6, p. 148, MSLT_1 228720.  If, for example, the user did not find the desired customer listed in the menu of alternatives tool then an entry such as "other" could be touched.  *Id.*  Doing so would bring up the keyboard composition tool, allowing the trader to use the alphabetic keyboard to compose a customer name to be used with the "customer" field.  The user composed information by touching the display keys on the on-screen alphabetic keyboard.  *Id.; see also* Ex. 7.

72.  To the extent that Lucent contends that indicating the particular field into which information is to be inserted is not disclosed by either FXFE or Tyler, it clearly would have been obvious to one of skill in the art to do so.  For example, the Home Accountant program and the Xerox Star system discussed in Buscaino I both have screens that, like FXFE and Tyler, display a plurality of fields.  Indeed, Home Accountant, like FXFE and Tyler, is directed to the same field, namely, forms with multiple data-entry fields to record financial transactions.  Both Home Accountant and Star use cursors in the fields to indicate to the user which field is active, at the same time that the tool is displayed.  Other references that disclose indicating the field into which information is to be inserted are described in Section A and E.

73.   The advantages of such indicators for FXFE would have been obvious, and the motivation for using them in FXFE is self-evident:  They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool.  This technique improved Home Accountant, Star and the references in Sections A and E, and one of ordinary skill in the art would recognize that the technique would improve similar devices such as FXFE and Tyler in the same way.  Thus, either FXFE or Tyler, each alone and each in combination with Home Accountant, Star, or any of the references discussed in Sections A or E, discloses a concurrent display of tools and indicators.

### 5.   Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

74.   Information from the user's operation of the tool was inserted by FXFE in the appropriate field.  For example, touching a broker name in the menu of alternatives tool would insert the broker name into the "broker" field.  *Id.*  Alternatively, if the desired broker name did not appear in the menu of alternatives tool, the user could activate the alphabetic composition tool and compose the broker name.  Once the composition was completed, the broker name would be inserted into the broker field.  *Id.*  For numeric data, the user would type in the numeric data on the on-screen keypad.  *Id.*

### 6.   Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."

75.   I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

76.   FXFE included a resistive membrane touch screen.  "Resistive membrane touch panels offer significantly higher resolutions, to the point where they can replace digitizing tablets."  Ex. 6 at p. 148, MSLT_1228720.

77.   To the extent that Lucent contends FXFE does not anticipate claim 21, it clearly would have been obvious to combine FXFE with any of the references discussed in Buscaino I that disclose computer devices that accept handwritten input including the Koalapad, manufactured by Koala Technologies Corporation.

78. Claim 21 of the '356 patent is also invalidated by the combination of FXFE with either Apple Graphics Tablet, MSLT_1234289-MSLT_1234418 or United States Patent No. 4,757,549 to Machart, MSLT_1230331-MSLT_1230335. Each of these references discloses inputting information into a computer using handwriting.

79. The '356 patent is directed to the use of computers to fill out forms. Many forms require the signature of the person who completed them. Accepting handwriting input is an obvious solution for the completion of such forms. One of ordinary skill, facing the wide range of needs created by developments in the field, would have seen an obvious benefit in combining FXFE with handwriting input and implementation of the combination would have been a straightforward task.

### 7. Conclusions

80. FXFE, alone or in combination, meets all of the limitations of claims 19 and 21 as described here and in Buscaino IV.

### C.    United States Patent No. 4,756,706

81. United States Patent No. 4,756,706 ("Kern") entitled "Centrally Managed Modular Infusion Pump System" was filed on January 21, 1986. Kern is a continuation-in-part of United States Patent Application Serial No. 693,771 which was filed on January 23, 1985. Kern issued on July 12, 1988. Kern invalidates claims 19 and 21 of the '356 patent. Support for my opinion that Kern meets the limitations of claims 19 and 21 of the '356 patent is detailed in the claim charts attached as Exhibit 8 and as follows:

#### 1. Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"

82. Kern discloses a method for use in a computer having a display. Kern describes a system of pump modules connected to a central management unit. The modules "can be programmed by the central management unit and their operating information displayed by the central management unit." Kern, Abstract, MSLT_1234078. Kern discloses the steps below.

#### 2. Claim 19 – Element 1 "displaying on said display a plurality of information fields,"

83.  Kern displays a plurality of information fields on the computer's display.  For example, Kern displays a form for programming a new pump as depicted in Figure 2 (Figure 7 of the patent) below.



Figure 2.  Kern, new pump form.  *Id* at Fig. 7, MSLT_1234085.

84.  When this form is accessed, the screen displays a plurality of information fields labeled 'Rate,' 'Volume,' and 'Time.'  *Id.* at Figure 7 MSLT_1234085; col. 6:21-6:31 MSLT_1234093.

### 3.  Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"

85.  As noted and pictured above, Kern identifies for the fields the kind of information to be inserted in the fields.  Fields on the screen have labels that indicate the type of information to be inserted: 'Rate,' 'Volume,' and 'Time.'  *Id.*

### 4.  Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"

86.  I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

87.  I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

**Exhibit 7   Page 90**

89.   I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

90.   Kern "indicates a particular one of said information fields into which information is to be inserted."  According to Kern, information is entered by touching the appropriate portions of the screen.  "The entry line shows SELECT FUNCTION if no function has been selected, or the function (e.g. VOLUME) which has been selected for entry by touching one of the function keys 222."  *Id*. at col. 7:66-8:1, MSLT_1234094.

91.   Kern "concurrently display[s] a predefined tool associated with said one of said fields."  For example, as can be seen if Figure 2 above, the display entitled "PUMP 4" displays the entry line together with a keypad for entering information.  *Id*. at col. 7:66-8:31, MSLT_1234094.

92.   Kern discloses "a tool adapted to supply an individual entry from a menu of alternatives."  Kern describes setting a variable called "occlusion pressure" as follows.  As can be seen in Figure 3 below, the entry line is displayed on the screen for confirmation simultaneously with a menu of alternative pressures: 'Low,' 'Med,' 'High,' and 'Max.'  *Id*. at Figure 11, MSLT_1234087; col. 9:8-9:12, MSLT_1234095.



Figure 3.  Kern, menu of alternative "occlusion pressures."  *Id*. at Fig. 11, MSLT_1234087.

93.   In addition to the menu of alternative pressures, Kern includes a "tool adapted to allow [the] user to compose [] information," an on-screen keypad.  *See* Figure 2 above.  For example, as noted above, the display entitled "PUMP 4" displays the entry line indicting the

1    selected function, together with a keypad for entering information. *Id.* at col. 7:66-8:11,

2    MSLT_1234093. Kern further explains, "[by] touching appropriate portions of the screen, the

3    requisite information can be entered...." *Id.* at col. 6:30-6:32, MSLT_1234093.

4        93.   To the extent that Lucent contends that Kern does not meet this limitation, claim 19 is

5    rendered obvious at least by Kern in combination with any of the references that disclose field

6    indicators described in Buscaino I: The Home Accountant Program, the Xerox Star, and the Apple

7    Lisa. Claim 19 is rendered obvious by Kern in combination with Japanese Patent Application No.

8    61-187024 or United States Patent No. 4,725,694 discussed in Buscaino IV. Claim 19 is further

9    rendered obvious in combination with YMM or FXFE described above or with any of the

10    references described below in Section E, below.

11        94.   The advantages of the use of cursors or highlighting in the fields to indicate to the

12    user which field is active, at the same time that the tool is displayed would have been obvious:

13    They let the user see instantly into which of the plurality of fields data will be entered through

14    operation of the tool. The use of cursors or highlighting to identify an active field was very

15    common in software programs from various fields. Moreover, as discussed below, practitioners in

16    the field of Human Computer Interface promoted the use of feedback to increase ease of use.

17        **5.  Claim 19 – Element 4 "inserting in said one field information that is derived as**
        **a result of said user operating said displayed tool."**

18

19        95.   Kern discloses "inserting in said one field information that is derived as a result of

20    said user operating said displayed tool." For example, as was noted above, Kern describes the use

21    of the composition tool, the on-screen keypad, to enter information into fields: "[by] touching

22    appropriate portions of the screen, the requisite information can be entered....Simultaneously, the

23    selected parameters are displayed on the screen for confirmation." Kern at col. 6:30-6:35,

24    MSLT_1234093. Kern also illustrates the completed form, after the information derived as a

25    result of the use of the on-screen keypad has been inserted into the fields of the "PUMP 4" form

26    which was seen above in Figure 2 as it appeared prior to information having been inserted.

27

28

Figure 4. Kern, new pump form with information inserted. *Id*. at Fig. 8, MSLT_1234085.

96.   When the user has completed the composition to be entered into one of the fields using the on-screen keypad, the user presses the enter key and the composition is inserted into the appropriate field. *Id*. at col. 6:30-6:35, MSLT_1234093. Similarly, the user's selection from the menu of alternative described above is inserted into the appropriate field.

**6.   Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."**

97.   I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

98.   Kern discloses the use of touch-sensitive screens which were well-known in the art. *See e.g.*, United States Patent No. 4,725,694 (Auer), MSLT_632827-MSLT_632839 at col. 3:13-3:1 5, MSLT_632837. Kern describes entering information by touching appropriate portions of the screen. Touch screens that accepted input from a stylus were also well known in the art. *See, e.g.* Tyler p. 48, MSLT_1228720. To the extent that Lucent contends that writing on a touch sensitive screen using a stylus is not disclosed, it clearly would have been obvious to one of skill in the art to do so.

99.   For example, Michael Tyler, *Touch Screens: Big Deal or No Deal?*, DATAMATION, January 1984, pp. 146-154 ("Tyler") discloses that fingers and pen are alternative input sources for touch screens. Tyler, p. 148, MSLT1228720. The advantages of the use of a stylus for certain applications are obvious. The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen, which is desirable

1  where precision is at issue, for example in the medical field.  Kern discloses a form with several

2  input fields.  As the number of fields displayed increases, and the size of the fields decreases,

3  selection of the fields using a stylus becomes even more advantageous.

4      100. Claim 21 is also invalidated by Kern in combination with United States Patent No.

5  4,757,549 ("Machart"), MSLT_1230331-MSLT_1230335.  Machart discloses inputting

6  information into a computer using handwriting on a touch-sensitive screen.

7      101. Claim 21 is obvious in light of Kern alone or in combination with either Tyler,

8  discussed in Buscaino IV, with the Foreign Exchange Front End discussed in Section B, above or

9  with Machart.

10          **7.  Conclusions**

11      102. As described above, Kern anticipates or renders obvious claims 19 and 21 of the '356

12  patent.

13      **D.      Japanese Patent Publication No. JP 60-50589**

14      103. Japanese Patent Publication No. JP 60-50589 ("Miyao") entitled "System for Creating

15  Documents" was filed on August 30, 1983.  Miyao was published on March 20, 1985.  Miyao

16  invalidates claims 19 and 21 of the '356 patent.  Support for my opinion that Miyao meets the

17  limitations of claims 19 and 21 of the '356 patent is detailed in the claim charts attached as Exhibit

18  9 and as follows:

19          **1.  Claim 19 – Preamble "method for use in a computer having a display**
             **comprising the steps of"**
20

21      104. Miyao discloses a method for use in a computer having a display.  Miyao describes a

22  system for creating documents.  The system includes a central processing unit (CPU) and a CRT

    controller.  *See* MSLT_1073799.  Miyao discloses the steps below.
23

24          **2.  Claim 19 – Element 1 "displaying on said display a plurality of information**
             **fields,"**

25      105. Miyao displays a plurality of information fields on the computer's display.  For

26  example, Miyao displays a form for entering expenses as depicted in Figures 1(a) and 6(a) of

27  Miyao.  The expenses include 'Transportation,' 'Lodging,' 'Tour,' and 'Total.'  MSLT_1073806.

28

**2. Claim 19 – Element 2 "Identifying for each field a kind of information to be inserted therein,"**

106. As noted above Miyao identifies for the fields the kind of information to be inserted in the fields. Fields on the screen have labels that indicate the type of information to be inserted into the fields: 'Transportation,' 'Lodging,' 'Tour,' and 'Total.' *Id.*

**4. Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"**

107. I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

108. I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

109. I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

110. Miyao "concurrently display[s] a predefined tool associated with said one of said fields." For example, as can be seen in Figure 4 of Miyao, the display shows a plurality of fields displayed concurrently with selected tools. MSLT_1073807.

111. Miyao discloses "a tool adapted to supply an individual entry from a menu of alternatives." Figure 6(b) shows a tool that discloses an organizational chart. Miyao teaches that the user can use the mouse to select one of the titles in this organizational chart and the characters associated with that title will be inserted into the "To:" addressee field shown in Figure 6(b). *Id.* at MSLT_1073804.

112. Miyao discloses "a tool adapted to allow [the] user to compose [] information:" a numeric keypad. The keypad is adapted to allow the user to compose information. In particular, the user can use a mouse to manipulate the numeric keypad to fill in the 'Transportation,' 'Lodging,' and 'Tour' fields. *See, e.g., id.* at Figure 6(a), MSLT_1073801-MSLT_1073803.

24

Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 95**

113. Miyao selects the appropriate tool from the group of tools described above such that the tool is "operable to supply information of the kind identified" for each of the fields identified above. For example, the fields in the "Social Trip Expenses" table hold numeric information, and Miyao associates these fields with the numeric keypad shown in Figure 6(a). The "To:" field receives address information, and Miyao associates this addressee field with a title from the graphical chart tool shown in Figure 6(b).

114. Miyao discloses a plurality of fields to be filled in. *See id.* From the perspective of a person of skill in the art, I understand Miyao to teach indication to the user of which of the plurality of fields is the "active" one into which information is to be inserted. To the extent that Lucent contends that indicating the particular field into which information is to be inserted is not disclosed, not only would I consider that an improper and unreasonably narrow interpretation of the reference, but it also clearly would have been obvious to one of skill in the art to do so.

115. For example, the Home Accountant program and the Xerox Star system discussed in Buscaino I both have screens that, like Miyao, display a plurality of fields. Indeed, Home Accountant, like Miyao, is directed to the same field, namely, forms with multiple data-entry fields to record financial transactions. Both Home Accountant and Star use cursors in the fields to indicate to the user which field is active, at the same time that the tool is displayed. The advantages of such indicators for Miyao would have been obvious, and the motivation for using them in Miyao is self-evident: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool.

116. Claim 19 is rendered obvious by Miyao in combination with Japanese Patent Application No. 61-187024 or United States Patent No. 4,725,694 discussed in Buscaino IV or with YMM or FXFE described above or with any of the references described below in Section E, below.

117. The advantages of the use of cursors or highlighting in the fields to indicate to the user which field is active, at the same time that the tool is displayed would have been obvious: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool. The use of cursors or highlighting to identify an active field was very

common in software programs from various fields. Moreover, practitioners in the field of Human Computer Interface promoted the use of feedback to increase ease of use.

**5. Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."**

118. Miyao discloses "inserting in said one field information that is derived as a result of said user operating said displayed tool." With respect to the use of the composition tool, the on-screen keypad is used to insert the numbers entered into the keypad into each of the 'Transportation,' 'Lodging,' and 'Tour' fields. *Id.* at MSLT _1073802. Miyao also illustrates the completed form, after the information derived from the amounts entered into the on-screen keypad has been inserted into the fields as shown in Figure 6(b).

119. With respect to the use of the menu of alternatives tool, the organizational chart is used to insert the characters associated with the selected person in the organizational chart into the "To:" addressee field. *Id.* at MSLT _1073804.

**6. Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."**

120. I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

121. Claim 21 is obvious in light of Miyao in combination with Michael Tyler, Touch Screens: Big Deal or No Deal?, Datamation, January 1984, pp. 146-154 ("Tyler"). It would have been obvious to one of skill in the art to combine the teaching of Miyao with Tyler's "resistive membrane" touch panel (a "touch-sensitive screen") that can accept input from a pen (a "stylus"), as discussed in Buscaino IV.

122. Claim 21 is also invalidated by Miyao in combination with United States Patent No. 4,757,549 ("Machart"), MSLT_1230331-MSLT_1230335. Machart discloses inputting information into a computer using handwriting on a touch-sensitive screen.

123. The advantages of the use of a stylus for certain applications are obvious. The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen. Miyao discloses a form with numerous input fields.

26                                    Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 97**

1  As the number of fields displayed increases, and the size of the fields decreases, selection of the

2  fields using a stylus becomes even more advantageous.

3      124. One of ordinary skill, facing the wide range of needs created by developments in the

4  field, would have seen an obvious benefit in combining Miyao with a touch-sensitive screen that

5  can accept input from a stylus and implementation of the combination would have been a

6  straightforward task.

7          **7.  Conclusions**

8      125. As described above, Miyao anticipates or renders obvious claims 19 and 21 of the

9  '356 patent.

10         **E.      References That Disclose Indicating Information Fields**

11     126. As was noted above, the use of feedback of some sort to inform the user of the active

12  field was common in software applications across various fields.

13         **1.  References discussed in Buscaino I, III, IV**

14     127. In addition to the references discussed herein, my previous reports have discussed the

15  use by the prior art of various means of indicating an information field.  *See generally* Buscaino I,

16  III and IV.  As examples only, Home Accountant makes use of either a cursor or reverse video to

17  identify the currently active field.  Xerox Star similarly has multiple means for indicating which is

18  the currently selected field for inserting information.  A "caret" or cursor appears in the currently

19  selected field.  In addition, the field may be highlighted by displaying the field in reverse video.

20  Japanese Patent Application No. 61-1 87024 (Sasaki) discloses indicating a field into which

21  information is to be inserted using a cursor.

22         **2.  Microsoft Windows 1.01**

23     128. Microsoft's Windows operating system version 1.01 was released in November of

24  1985.  Examination of Windows 1.01;[4] *see* Ex. 11.  In Windows, Microsoft itself made use of

25  various means of indicating active fields including cursors and reverse video.  For example, the

26  Phone Settings screen includes a plurality of fields each of which has an identifier signifying the

27  kind of information to be inserted: "Connect to,' 'Wait for tone,' and 'Wait for answer.'  A

28  _____

[4] References to the examination of Windows 1.01 refer to use of the operating system running on a
computer as described in Exhibit 1.

27                          Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 98**

blinking cursor is displayed in whichever of these fields is currently active. Examination of

Windows 1.01; *see* Ex. 11. Reverse video was used in other areas, for example, on the Paragraph

Indents screen which also included a plurality of identified fields. *Id.*

### 3. Carter, *Non-Sequential Cursor Movement on Data Entry Display Terminal*, IBM Technical Disclosure Bulletin

130. Carter discloses the use of cursors to identify the 'primed' field among a plurality of

fields each with an identifier. Carter, *Non-Sequential Cursor Movement on Data Entry Display

Terminal*, IBM Technical Disclosure Bulletin at MSLT_1229464. Carter provides an example of

a 'ship to' address composed of four fields (name, street, city and county). *Id.* Carter notes that

"when the 'name' field is completed, the cursor could be positioned ready for the 'street' portion

and so on." *Id.*

### 4. Pickering, *Touch-Sensitive screens*, Int. J. Man-Machine Studies

131. Pickering, *Touch Sensitive Screens: the Technologies and Their Application*, Int J.

Man-Machine Studies ("Pickering") discloses indicating with the use of cursors and highlighting.

According to Pickering, a component of selection is "confirmation" which is "the system

responding with some combination of visual, auditory and tactile feedback." Pickering at

MSLT_1234060.

132. Pickering discloses that user accuracy can be improved by the touch-screen system

providing "feedback by marking the current position with a cursor or highlighting the nearest

quantifying object." *Id* at MSLT_1234069. Pickering discloses that the time to produce feedback

should "be created instantly as far as the user is concerned" such feedback including both "moving

a cursor" and "brightening an object." *Id* at MSLT_1234071. That the article is directed towards

discussing touch-screen systems and overcoming problems within some touch-screen systems

provides an additional reason to combine this reference with references disclosing touch-screen

systems such as FXFE, Kern, and Tyler.

### 5. Newman & Sproul, *Principles of Interactive Computer Graphics* (2nd ed.).

133. Newman & Sproul, Principles of Interactive Computer Graphics (2nd ed.) ("Newman

& Sproul") also discloses and recommends indicating with the use of cursors to provide user

feedback. "In the case of cursor feedback, for example, feedback is an indispensable part of the

1  process." MSLT_1234038. "Some forms of feedback are provided mainly to help inexperienced

2  users and can be ignored by experts. On the other hand, some command languages are inherently

3  dependent on feedback; graphical positioning commands, for example, almost always require

4  cursor feedback on the screen in response to the movement of the positioning device."

5  MSLT_1234046.

6        **6.  Morland, *Human factors guidelines for terminal interface design***

7        133. Moreland not only disclosed the use of highlighting and reverse video, but also

8  encouraged such use noting that to do so increased ease of use.

> 3.4.5 Field Attributes. Many terminals allow application programs to
> control certain characteristics of the fields defined on the display…
> certain areas of the screen can be defined for input only and the
> cursor will be automatically positioned to these fields by the
> terminal hardware. Fields can be highlighted by intensifying each
> character or by reversing the video distinction between the
> characters and the background (light characters on a dark field and
> vice versa). By taking advantage of these options, designers can
> make their screens much simpler and easier to use.

14  Moreland at 489, MSLT_1229654.

15        **7.  The benefits of the use of indicators, performing their known function, would
16           have been obvious**

17        134. Implementation of the use of indicators with any of the references previously

18  discussed would be a simple task. Indicators in the '356 patent perform the same function they

19  had been known to perform and yield no more than one would expect from such an arrangement.

20        135. The advantages of the use of cursors or highlighting in the fields to indicate to the

21  user which field is active, at the same time that the tool is displayed would have been obvious:

22  They let the user see instantly into which of the plurality of fields data will be entered through

23  operation of the tool. The use of cursors or highlighting to identify an active field was very

24  common in software programs from various fields. Moreover, practitioners in the field of Human

25  Computer Interface promoted the use of feedback to increase ease of use.

      **F.    References That Disclose Menu Tools**

26        **1.  References discussed in Buscaino I, III, IV**

27        136. In addition to the references discussed herein, my previous reports have discussed the

28  use by the prior art of tools adapted to supply an individual entry from a menu of alternatives. *See*

1   *generally* Buscaino I, III and IV.  As examples only, Home Accountant included both Names and

2   Categories tools.  Using the mouse, the user can select from these menus of alternative names or

3   categories and the selection will be inserted into the appropriate field.  Each menu can be used

4   only with its appropriate associated field.  Xerox Star includes a menu of alternative page sizes as

5   well as a number of "Special Keyboards" which supply menus of alternatives.  And Japanese

6   Patent Application No. 61-187024 discloses a menu of alternative train names.

7                    **2.   Microsoft Windows 1.01**

8             137. Microsoft itself made use of menus of alternatives in its Windows operating system

9   version 1.01.  Examination of Windows 1.01; *see* Ex. 11.  For example, The 'Fonts' form includes

10  two fields with identifiers, namely 'Font Name,' and 'Font Size.'  *Id.*  The field into which

11  information is to be inserted is indicated using reverse video.  Each of the fields has a menu of

12  alternatives associated with it and each tool is displayed concurrently with the reverse-video

13  indicator.  *See id.*.

14                   **3.   Pickering, *Touch-Sensitive Screens*, Int. J. Man-Machine Studies**

15            138. Pickering, *Touch Sensitive Screens: the Technologies and Their Application*, Int J.

16  Man-Machine Studies ("Pickering") discloses using a touch-screen computer to input information

17  by selecting, or picking, an item "from a set of alternative items."  According to Pickering, a

18  common example of such input "is the menu, where the user selects one from the items displayed

19  as a menu list."  Pickering at MSLT_1234058.

20                   **4.   The benefits of the use of menu tools, performing their known function, would
                          have been obvious**
21

22            139. Implementation of the use of menu tools with any of the references previously

23  discussed would be a simple task.  Menu tools in the '356 patent perform the same function they

24  had been known to perform and yield no more than one would expect from such an arrangement.

25            140. The advantages of the use of menu tools would have been obvious to one of ordinary

26  skill in the art. The user can enter information more efficiently with a list of alternatives than, for

27  example, with an on-screen keyboard.  As stated in Tyler, the keyboard QWERTY layout is an

28  alternative to the menu tools : "[a] QWERTY layout can be called up on the left for entry of

                                    30                    Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 101**

1  nonstandard or rare names – an infrequently traded currency, for example." Ex. 6, p. 148,

2  MSLT_1228720.

3  **G.    References That Disclose Composition Tools**

4  **1.  References discussed in Buscaino I, III, IV**

5  141. In addition to the references discussed herein, my previous reports have discussed the

6  use by the prior art of tools adapted to allow a user to compose information. *See generally*

7  Buscaino I, III and IV.  For example, the Macintosh Key Caps tool can be used in conjunction

8  with Home Accountant to compose information and insert it into the Personal Checkbook form.

9  Xerox Star includes an on-screen keyboard that allows the user to compose information, the Apple

10  Lisa includes a number pad composition tool and both Michael Tyler, Touch Screens: *Big Deal or*

11  *No Deal?*, DATAMATION, January 1984, pp. 146-154 and United States Patent No . 4,725,694

12  ("Auer") disclose simulated keyboards that are operated by the user touching the keys on the

13  touch-sensitive screen.

14  **2.  Microsoft Windows 1.01**

15  142. Microsoft Windows version 1.01 included an on-screen calculator which was

16  interoperable with various other aspects of the operating system as well as other software

17  applications.  Examination of Windows 1.01; *see* Ex. 11.

18  **3.  Xerox United States Patent No. 4,332,464 and Xerox European Patent Application No. 0 030 160**

19

20  143. United States Patent No. 4,332,464 ("Xerox US"), MSLT_1235504-MSLT_1235579,

    filed on September 22, 1980 and European Patent Application No. 0 030 160 ("Xerox EP"),

21  MSLT_1233868-MSLT_1233941, filed on March 12, 1980, (collectively the "Xerox patents")

22  disclose a device with a touch-sensitive display for control of complex machinery that includes

23  composition tools that may be displayed on the display.  Xerox US at Abstract, MSLT_1235504,

24  Xerox EP at MSLT_1233879.  The Xerox patents describe the device as used for control of a

25  photocopier.  Control is accomplished by the "touch of the screen by the user's finger or similar."

26  Xerox US at col. 1:52-1:53, MSLT_1235569; Xerox US at Xerox EP at MSLT_1233871.  The

27  Xerox patents disclose fields with identifiers that indicate the kind of information to be inserted,

28  for example fields labeled 'Number of Copies,' and 'Frame Number.'

144. One of the composition tools disclosed in Xerox EP is a keypad. "For example, a ten-digit touch pad, similar to the ubiquitous telephone "touch-tone" pad, appears on the screen whenever the entry of numerical data is a legitimate user operation and disappears when numerical data are not need." Xerox US at col. 2:20-2:26, MSLT_1235569, Xerox EP at MSLT_1233871. The Xerox patents illustrate use of keypad, for example to allow a user to compose a number of copies or a frame number and insert that information into the corresponding fields.



Figure 5. Xerox patents: on-screen keypad composition tool. Xerox EP at MSLT_1233908, MSLT_1233939, Figs. 15 & 31.

145. The Xerox patents also disclose a keyboard composition tool, noting that when a typed response is required of the operator, "a QWERTY keyboard may be displayed on the display." Xerox US at Abstract, MSLT_1235504, Xerox EP at MSLT_1233868.

### 4. Xerox 5700 Electronic Printing System Reference Manual

146. The Xerox 5700 Electronic Printing System Reference Manual ("Xerox 5700") discloses control of a photocopier using a touch-sensitive display. Xerox 5700 at 1-3, MSLT_1235328. "The principle device used to control the operation of the 5700 system is the TouchControl Screen. This display and touch-sensing elements provide the means for the operator and the system to interact. *Id.* Xerox 5700 discloses fields with identifiers that indicate the kind of information to be inserted. For example Xerox 5700 discloses fields labeled 'First Page,' and 'Last Page.' *Id.* at MSLT_1235364, 4-17.

147. One of the composition tools disclosed in Xerox 5700 is a keypad. "Button selections are displayed [on the TouchControl Screen] along with keypads...to enable the user to set up each job." *Id.* at MSLT_1235328, 1-3. Xerox 5700 illustrates the use of a keypad, for example to allow a user to compose a first page and a last page and insert that information into the corresponding fields. *Id.* at MSLT_1235364, 4-17.




Figure 6. Xerox 5700 keypad. *Id.*

148. Xerox 5700 also discloses a keyboard composition tool. When a typed response is required of the operator, "[a] keyboard appears on the screen." *Id.* at MSLT_1235436, 9-9.



Figure 7. Xerox 5700 on-screen keyboard. *Id* at MSLT_1235438, 9-11.

33                    Case No. 02-CV-2060 B (CAB)

Exhibit 7   Page 104

### 5.  United States Patent No. 4,587,630

149. United States Patent No. 4,587,630 ("Straton"), MSLT_1230175-MSLT_1230187, entitled "Intelligent programmable touchscreen system" was filed on February 15, 1984.  Straton discloses a system that includes a "soft keyboard" on a touchscreen display.  Straton at col. 1:52-1:54, MSLT_1230181.  Straton's soft keyboard keys are areas of the display screen that allow information, including ASCII data, to be sent from the touchscreen to a software program.  *Id.* at col. 4:54-4:56, MSLT_1230182.  Straton notes that "data generated by ASCII fields is undistinguishable from data generated by operating the physical keyboard for either local or remote target programs."  *Id.* at col. 4:65-4:68, MSLT_1230182.  Hence, such a soft keyboard could be used to output data to any target software program that could accept data from a physical keyboard.

### 6.  United States Patent No. 4,509,526

150. United States Patent No. 4,509,526 ("Barnes"), MSLT_1234960-MSLT_1235016, entitled Method and System for Non-Invasive Ultrasound Doppler Cardiac Output Measurement, was filed on February 8, 1983.  Barnes discloses a system that includes a CRT (cathode ray tube) display "and a touch-sensitive overlay."  Barnes at col. 2:54-2:55, MSLT_1234974.  "Data is introduced into the system via the display upon a controlled presentation of active areas in the form of an alphanumeric keyboard to facilitate use of the system by a wide range of individuals having equally diverse backgrounds."  *Id.* at col. 2:59-2:64.

151. Barnes discloses a form with a plurality of fields including identifiers, for example, 'Patient ID Number,' and 'Body Surface Area.'  *See id* at Fig. 10, MSLT_1234965.  Barnes also discloses the use of cursors to indicate the field into which information is to be inserted.  *Id* at col. 12:53-12:54, MSLT_1234979.  The cursor is concurrently displayed with a composition tool: an on-screen keypad.  *See id* at Fig. 10, MSLT_1234965.



Figure 8.  Barnes on-screen keypad and concurrently displayed indicator (154).  *Id* at Fig. 10, MSLT_1234965.

152. Information that results from the use of the on-screen keypad is inserted into the appropriate field.  *Id*. at col. 12:50-12:52, MSLT_1234979.

### 7.  United States Patent No. 4,570,217

153. United States Patent No. 4,570,217 ("Allen"), MSLT_1235017-MSLT_1235310, entitled "Man Machine Interface," was filed on March 29, 1983 as a continuation-in-part of Serial No. 363,404 filed March 29, 1982.  Allen discloses a machine interface that includes a "color CRT monitor having a touch-panel on the surface of the CRT screen."  Allen at Abstract, MSLT_1235017.  Allen further discloses numerous on-screen composition tools for data input including a keypad, *see id*. at col. 85:35-85:58, MSLT_1235126, Fig. 48, 55, MSLT_1235089, MSLT_1235092, and various keyboards, *see id*. at col. 86:4-86:42, MSLT_1235126, Figs. 57, 58, 63, MSLT_1235093-MSLT_1235094, MSLT_1235100.

### 9.  Donkey Kong Arcade Game

154. The Donkey Kong arcade game supplies a tool adapted to allow a player to compose information.  When a player of the game achieves a higher score than has been previously recorded, the user is presented with an on-screen keyboard with which to compose the player's

initials in order to record the score. The player selects a character by moving a cursor until it points to the desired character. The character is then input into the 'Name' field which is concurrently displayed.

### 10. The benefits of the use of composition tools, performing their known function, would have been obvious

155. Implementation of the use of composition tools with any of the references previously discussed would be a simple task. Composition tools in the '356 patent perform the same function they had been known to perform and yield no more than one would expect from such an arrangement.

156. The advantages of the use of composition tools would have been obvious to one of skill in the art. Any time menus of alternatives are provided by the system, the menus will need to be updated periodically. A composition tool is an obvious solution for a menu that has become out of date, or otherwise does not include the user's desired information, as expressly stated in Tyler: "[a] QWERTY layout can be called up on the left for entry of nonstandard or rare names - an infrequently traded currency, for example." Ex. 6, p. 148, MSLT_1228720.

### ADDITIONAL ANALYSIS AND OPINIONS

157. I reserve the right to supplement my report in light of any additional fact discovery, opinions by Plaintiff's experts, and/or trial testimony. I also reserve the right to provide rebuttal opinions and testimony in response to Plaintiff's experts, and rebuttal testimony in response to any of Plaintiff's fact witnesses. Further, I reserve the right to use animations, demonstratives, enlargements of actual exhibits, and other information in order to illustrate my opinions.

158. At trial, I expect to demonstrate and testify about the prior art I have described in my report using actual physical computers and computer systems. In this way, I will demonstrate how the prior art anticipates and/or renders obvious the purported inventions in the asserted claims. I reserve the right to demonstrate other prior art not listed here.

159. I expect to continue to develop my opinions discussed in this report. I also reserve the right to supplement my opinions based on information obtained from additional discovery or from Plaintiff's experts, as indicated above.

36                                           Case No. 02-CV-2060 B (CAB)

**Exhibit 7   Page 107**

160. I declare under penalty of perjury under the laws of the United States of America that the foregoing report on behalf of Defendant is true and correct.

Dated:  September 14, 2007                 Respectfully submitted,

By: _____
                  Mr. Dale E. Buscaino

**Exhibit 7   Page 108**

**PROOF OF SERVICE**

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

The certify that a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4. Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

On September 14, 2007, I caused a copy of the following document(s):

**SECOND SUPPLEMENTAL EXPERT REPORT OF MR. DALE E. BUSCAINO RE INVALIDITY OF UNITED STATES PATENT NO. 4,763,356**

to be served on the interested parties in this action as follows:

Alison P. Adema  
Hahn & Adema  
501 West Broadway, Suite 1600  
San Diego, CA 92101  
Telephone: (619) 235-2100  
Facsimile: (619) 235-2101  
*VIA FACSIMILE & ELECTRONIC MAIL*

Attorneys for Plaintiffs  
MULTIMEDIA PATENT TRUST;  
LUCENT TECHNOLOGIES INC.

Email: aadema@hahnadema.com

David J. Zubkoff  
Seltzer, Caplan, McMahon & Vitek  
2100 Symphony Towers  
750 B Street, Suite 2100  
San Diego, CA 92101  
Telephone: (619) 685-3003  
Facsimile: (619) 702-6827  
*VIA FACSIMILE & ELECTRONIC MAIL*

Attorneys for Defendants  
GATEWAY, INC. and GATEWAY  
COUNTRY STORES LLC

Email: zubkoff@scmv.com

James S. Blackburn  
Arnold & Porter LLP - (L.A.)  
777 S. Figueroa Street, 44th Floor  
Los Angeles, CA 90017  
Telephone: (213) 243-4000  
Facsimile: (213) 243-4199  
*VIA FACSIMILE & ELECTRONIC MAIL*

Attorneys for Defendant  
DELL INC.

Email: james_blackburn@aporter.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct. Executed on September 14, 2007, at San Diego, California.

Lara Garner

**COURTESY COPIES BY ELECTRONIC MAIL TO:**

Trial Counsel For Multimedia/Lucent:
John M. Desmarais/Paul Bondor/Michael Stadnick/Gregory Corbett
Kirkland & Ellis LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
E-mail: jdesmarais@kirkland.com; pbondor@kirkland.com; gcorbett@kirkland.com; mstadnick@kirkland.com; jmafale@kirkland.com

Trial Counsel for Gateway:
Bryan Farney / Steven R. Daniels / Jeffrey B. Plies / Lawrence Fluker
DECHERT LLP
300 W. Sixth Street, Suite 1850
Austin, TX 78701
Email:        bryan.farney@dechert.com; steven.daniels@dechert.com; jeff.plies@dechert.com; lawrence.fluker@dechert.com

Trial Counsel for Dell:
Ali R. Sharifahmadian, Esq.
Matthew Bathon, Esq.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
E-mail:        ali_sharifahmadian@aporter.com; Matthew_Bathon@aporter.com; Thomas_Wischer@aporter.com

Trial Counsel for Dell:
Joel Freed, Esq.
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Email:        jfreed@mwe.com


Courtesy Emails include:

| | | |
|---|---|---|
| ☐ | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |
| **XX** | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email, except for exhibits.  Exhibits were over 50 pages long.  As per our service agreement, a hard copy will follow via overnight mail. |

4                          Case No. 02-CV-2060 B (CAB)

**Exhibit 7    Page 110**

Exhibit 8

# ARNOLD & PORTER

**Joel M. Freed**
Joel_Freed@aporter.com

202.942.6602
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

February 3, 2003

Stephen Samuels
IP Licensing Director
Lucent Technologies
600 Mountain Ave Murray Hill, NJ  07974

Dear Mr. Samuels:

When I spoke with you and Mr. Brickman on Thursday the 23rd of January you asked when I 'needed' to hear back from you.  I have since learned that I am already "overdue" on my initial report, which means I would like to hear from you as soon as possible on all the issues which I covered in our conversation, namely:

Re: '272 Netravali:

- explain the basis for contending that MPEG-2 decoders, which are basically "dumb" and do what they are told to do, can be said to be selecting related locations as a function of object displacement as called for in claim 13

- explain the basis for contending that MPEG implementations, which manage error over a 64 pel block (regardless of what is in the block), can be said to be selecting related locations as a function of object displacement as called for in claim 13

- explain the basis for contending that MPEG implementations, which are based on reconstruction of actual frames, are determining by interpolation as called for in claim 13

    (we have considered you brief telephone comment that a decoder which 'reverses' interpolation performed by an encoder performs interpolation, but even if that were so, we still ask that you to explain how implementations that are based on reconstruction of **actual** frames are engaged in "determining by interpolation" as called for in claim 13)

- explain the basis for contending that the Gabor-Hill reference does not disclose selecting related locations as a function of object displacement as called for in claim 13, inasmuch as the contour is displaced

Washington, DC     New York     Los Angeles     Century City     Denver     London     Northern Virginia

**Exhibit 8   Page 111**

# ARNOLD & PORTER

Stephen Samuels
February 3, 2003
Page 2

Re: '226 Haskell:

- explain what is claimed that is not in Chapter 5 of Netravali & Haskell's book "Digital Pictures: Representation and Compression"
- explain what we have come to understand is your position that the reference "A Hybrid Scheme of Subsampled DPCM and Interpolative EPCM for the GDTV Coding" by Tanimoto and Mori does not disclose block-based coding (see its disclosure of block-based coding on 4x4 blocks with both subsampled DPCM and interpolative DPCM)

Re: '878 Puri:

- inform us whether your position is that claim 13 should be considered with the missing words, or without them
- in either case, explain the meaning of selectively and the meaning of adaptively in the claim

Re: '938 Johnston:

- please provide us with an up to date file of the reissue
- please provide your claim read position regarding Dolby

Re: '457 Hall:

- please provide your claim read positions regarding both AC-3 and MP-3

Re: '956 Doughty:

- please provide the names of licensees who have "marked"
- please also reconsider our request for the names of all licensees (which in our telephone conversation you indicated would not be provided)

Re: '759 Fleming:

- we cannot determine the basis of your claim read position in the context of the previous "demonstration", so please explain that position
- you also indicated you would provide, along with that explanation, any extant videotapes or other electronic materials reflecting that demonstration

**Exhibit 8   Page 112**

# ARNOLD & PORTER

Stephen Samuels
February 3, 2003
Page 3

Re: '956 Torok:

- please explain your claim read positions on various implementations of a Net Meeting conference, or your claim read position applicable to all uses of Net Meeting

Re: '676 Jayant:

- please provide your claim read positions regarding G.723.1, including whether it is your position that the standard cannot be practiced outside the claims

- please explain your participation in the standard, and whether the patent was disclosed

Re: '356 Day:

- please provide your claim read positions, including the basis for applying them outside the context of touch screens notwithstanding the title of the patent

- please explain your position on and a list of what tools are covered

Re: '131 Ackerman:

- although you indicated that you are not taking the position that all HTML implementation is covered, please explain and provide claim read positions that reflect the extent to which HTML is or is not implicated

I look forward to hearing from you very soon.

Very truly yours,

*Joel M. Freed*

Joel M. Freed

cc:    Henry Garrana, Esq.
       Michael Davis, Esq.

**Exhibit 8   Page 113**