# ARNOLD & PORTER LLP

213.243.4000
213.243.4199 Fax

44th Floor
777 South Figueroa Street
Los Angeles, CA 90017-5844

October 24, 2007

Hon. Magistrate Cathy Bencivengo
United States District Court, Southern District of California
940 Front Street, 1st Floor, Courtroom E
San Diego, California 92101

      Re:    *Lucent, Multimedia Patent Trust v. Gateway, Microsoft, et al.*
               U.S.D.C., S.D. Cal., Case No. 07-CV-2000 H (CAB) (consisting of matters
               severed from consolidated cases:  Case No. 02-CV-2060 B (CAB); Case
               No. 03-CV-0699 B (CAB); and Case No. 03-CV-1108 B (CAB))

Dear Judge Bencivengo:

By this letter, Defendants Microsoft and Dell respond to the letter brief sent to you last week by Lucent demanding that Defendants supplement unspecified "sales and financial information." Microsoft and Dell do not dispute that a narrowly tailored supplementation will be appropriate if and when Lucent prevails on its infringement claims.  Microsoft and Dell do dispute, however, that an expensive and time consuming supplementation is appropriate ***both now and again later*** given that trial is fast approaching and that a supplement at this juncture will not obviate the need for further supplementation as part of a post-trial accounting should Lucent prevail.  Microsoft and Dell submit that a single, post-trial accounting of all of their financial information would achieve the same result and be far more efficient, a position bolstered by Lucent's admission during the meet and confer process that it will insist on a post-trial accounting irrespective of whether or not Defendants supplement now.

Notwithstanding their preference for a post-trial accounting, in an effort to resolve this dispute, Microsoft and Dell alternatively proposed updating their financial data subject to a few, reasonable conditions.  In particular, Microsoft and Dell asked Lucent to agree that:  (1) following the supplementation Lucent would only bring its existing damages calculations current, not alter its expert opinions; (2) the requested supplementation be limited only to products that are still properly in the case; and (3) given the time and expense of performing such an update, it would only be performed once between now and the February trial.  (Ex. 3 to Lucent's 10/19/07 Ltr. Br.)  Lucent flatly refused each of these reasonable conditions, insisting that it would only accept an unrestricted supplement and that it was free to change its expert opinions and otherwise use supplemental data in any way.  Lucent's position (particularly its unwillingness to agree that at most Lucent is entitled to update its calculations based on the supplementation, and not to alter its damage theories) confirmed Defendants' concerns that Lucent's aim is to use the supplement as a pretext to overhaul and repair its deficient expert reports long after expert discovery has been closed.  Accordingly, Defendants requested that Lucent bring this dispute to the Court for resolution.

# ARNOLD & PORTER LLP

Hon. Magistrate Cathy Bencivengo
October 24, 2007
Page 2

## I.    A Post-Trial Accounting Is the Most Efficient Way to Proceed.

After the Audio trial, Lucent sought to amend the judgment by way of a post-trial accounting. In doing so, Lucent characterized post-trial accountings as "standard practice" and provided three pages of legal citations discussing their use and prevalence. Exhibit A (Mot. to Amend J. at 2-5.) Here, Lucent has acknowledged during the parties' meet and confer that, instead of supplementation, it likewise could utilize a post-trial accounting if it were successful at trial. Moreover, Lucent further acknowledged that, even if the Defendants supplement now, Lucent will still insist on a post-trial accounting for the period between supplementation and trial. Thus, Lucent is asking that Defendants perform two burdensome supplements within just months of each other.

Lucent offers two vague justifications for that unreasonable demand. First, Lucent claims that Defendants are unconditionally obligated to supplement under Rule 26(e)(2). Lucent's position ignores that here we are not dealing with information that corrects or supplements a response previously made, but with information that came into existence after Defendants provided complete and accurate responses. Lucent's position also ignores that this Court may limit the "frequency or extent" of discovery otherwise permitted if, *inter alia*, "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). Here, the burden to Defendants clearly outweighs any purported benefit to Lucent, especially given the availability of a post trial accounting and the inherent limitation on the scope of an accounting by the results of the trial.

Gathering information for one update is obviously more efficient than performing two. Nor is Lucent prejudiced by that efficiency. Lucent has already produced expert reports calculating damages in the billions of dollars based on several years' worth of Defendants' sales.[1] As such, the jury will certainly grasp the gravity of this case whether later sales are included or not, and updating Lucent's calculations will not resolve any of the other issues in the case. Finally, waiting for a post-trial accounting may actually reduce Defendants' burden by narrowing the scope of supplementation if some products are found not to infringe.

Lucent seeks to make much of the fact that Microsoft opposed Lucent's motion to amend the Audio trial judgment, arguing Lucent had waived damages since Microsoft's

---

[1] Lucent's most recent expert reports claim Defendants' maximum collective liability for the Day '356 patent is approximately $1.9 billion and for the Haskell '226 and Netravali '272 patents is over $2 billion.

# ARNOLD & PORTER LLP

Hon. Magistrate Cathy Bencivengo
October 24, 2007
Page 3

last supplement by failing to address them before trial.[2]  But that situation was completely different from the scenario here.  In the Audio trial, Lucent never sought a supplement or Microsoft's agreement to a post-trial accounting.  Indeed, Lucent never mentioned Microsoft's financial information after it was last supplemented until the parties filed the pretrial order.  That silence prompted and was the basis of Microsoft's waiver argument.  Here, Lucent has raised this issue and Defendants agree that a post-trial accounting would be acceptable if Lucent were successful.  Thus, the issue here is not waiver, but rather why supplementation is necessary *in addition to* an accounting.

Ultimately, the burdens of *both* supplementing now *and* conducting a post-trial accounting far outweigh the benefits of doing so.  Furthermore, as discussed below, Defendants believe that Lucent is advocating this inefficient process for an ulterior motive that will severely prejudice Defendants.  Accordingly, Microsoft and Dell request that the Court deny Lucent's supplementation demand.

## II.    Lucent's Supplement Demand Is a Pretext for Overhauling and Repairing Its Flawed Damages Opinions and Reports.

Although Lucent demands that Defendants supplement their financial data, *two* supplementations are actually at issue here:  Defendants' supplementation of financial information, and then Lucent's supplementation of its expert opinions after receiving that information.  Microsoft and Dell have significant concerns that Lucent's demand is motivated by more than a simple desire to account for additional sales and that Lucent will try to use Defendants' supplementation to do far more than just update calculations.  In particular, the following events give rise to Microsoft's and Dell's concerns:

- On August 6, 2007, the Court reversed the Audio trial jury's nearly $2 billion damages award, and in doing so called Lucent's damages theories in the upcoming trial into serious question.  In particular, the Court held that Lucent's royalty base -- the average price of a computer -- violated the entire market value rule because Lucent had failed to establish that the patented features themselves produced any customer demand or value of the product.  Exhibit B (8/6/07 Order on Post-Trial Mots.)  The Court further found that Lucent's 0.5% royalty rate -- supposedly supported by Lucent's purported licensing "policy" -- was "against the clear weight of the evidence."  *Id.*  These very same flaws plague Lucent's damages opinions for each of the patents at issue in the upcoming trial.

- Lucent's supplementation demand actually came in response to Defendants' attempt to depose Lucent's damages expert Wayne Hoeberlein on a topic that would

---

[2] Lucent's motion -- and Microsoft's opposition to that motion -- were mooted by the Court's granting of Microsoft's motions for JMOL overturning the Audio trial verdict.

# ARNOLD & PORTER LLP

Hon. Magistrate Cathy Bencivengo
October 24, 2007
Page 4

definitively knock three products accused of infringing the Day '356 patent out of the case. Exhibit C (9/12/07 Ltr. from Reid to Bernard.) Specifically, in January 2006 -- months after Defendants had deposed him on his reports and expert discovery was closed -- Mr. Hoeberlein inexplicably issued a third report on the '356 patent that purported to calculate damages for three products, Microsoft Outlook (standalone), Microsoft Money, and Intuit Quicken, that had been *omitted* from all of his previous calculations. Defendants moved *in limine* to strike the January 2007 report before the then-pending Group 4 trial, and the Court agreed that, unless Lucent could show the report was based on a late production by Defendants, testimony regarding the omitted products would not be admissible. Exhibit D (4/27/07 Hr'g Tr. at 134.) The deposition would indeed confirm that Mr. Hoeberlein's January 2007 report was unjustified and Microsoft Outlook (standalone), Microsoft Money, and Intuit Quicken were out of the case.[3] It is clear, therefore, that Lucent seeks to use a supplement as a belated 'justification' for buttressing its attempt to inject the previously omitted products into the case.

- Indeed, during the meet and confer process here, Lucent *refused* to limit any further expert reports to merely incorporating into its existing calculations new data on products properly in the case. This confirms Lucent's intent to do far more than that. *As such, any order of supplementation should be coupled with an order that restricts any further expert reports from Lucent to merely incorporating into its existing calculations new data on products properly in the case.*

Lucent wrongly asserts an unfettered right. However, Rule 26(e) expert supplementation is not a "do-over" to correct a flawed analytical premise. *See Saint-Gobain Corp. v. Gemtron Corp.*, 2006 WL 1307890, *2 (W.D. Mich. 2006) ("To allow Gemtron to seek a change in its expert's conclusions . . . would defeat the purpose of disclosure because it would permit the bolstering of a report based solely on a desire to answer the opposing party's anticipated challenges."); *see also Dag Enters., Inc. v. Exxon Mobile Corp.*, 226 F.R.D. 95, 109-110 (D.D.C. 2005) (finding that plaintiffs "fundamentally misconstrue[d]" the idea of supplementation under Rule 26(e) by seeking to "*rework*' their damage analysis and change the substance of their contentions -- *i.e.*, basically 'substituting another report' for the ones that they already have submitted" under the guise of a Rule 26(e) supplementation). Lucent should not be allowed to revise its damages theories under the guise of incorporating updated financial information from Defendants' supplementation, or to use Defendants' financial supplementation as means

---

[3] The deposition had been scheduled for May 11, but Lucent cancelled it twenty minutes before it began in light of the *KSR* postponement and has yet to offer to reschedule it. Exhibit C (9/12/07 Ltr. from Reid to Bernard.)

ARNOLD & PORTER LLP

Hon. Magistrate Cathy Bencivengo
October 24, 2007
Page 5

to recapture damages on the products it omitted from its previous calculations.[4]

**III.     Any Supplement Should be Limited to Updating the Spreadsheets Upon Which the Parties' Experts Based their Calculations.**

Lucent fails to specify discovery requests for which it seeks supplementation or to otherwise limit the "financial information" that it wants supplemented, rendering its demand facially overbroad. As a consequence of summary judgment and other orders, several patents have been eliminated from the case and/or the list of products at issue has been narrowed. Moreover, during discovery, the parties produced vast quantities of financial data, only a small fraction of which was used by the experts in their damages calculations. To avoid undue burden to Defendants, if this Court orders a supplement, that order should require only an update of that financial information on which the parties' respective experts actually relied for their damages calculations for patents that will be part of the upcoming trial.

**IV.     Conclusion**

Lucent's supplementation demand is a thinly-veiled attempt to justify overhauling its damages expert reports. Accordingly, the Court should deny Lucent's request for supplementation in its entirety in favor of a post-trial accounting if and when Lucent prevails on its infringement claims. Alternatively, if the Court grants Lucent's request, it should also order that Lucent (1) may obtain updates only to those data actually used by the parties' experts in their damages calculations for products properly at issue in the upcoming trial; (2) may not obtain additional information regarding standalone Outlook, Money and Quicken; and (3) may only use the new information to update the totals of its existing damages calculations.

Respectfully submitted,

/s/ James Blackburn                    /s/  Joseph P. Reid

James S. Blackburn                     Joseph P. Reid
Attorneys for Dell Inc.                Attorneys for Microsoft Corporation

---

[4] Otherwise, revised expert reports by Lucent will require Defendants to issue opposing new reports, followed by expert discovery shortly before trial, and then by motion practice. This significant expense for Defendants is unwarranted. *See Dag Enters.*, 226 F.R.D. at 110.

# EXHIBIT A

Alison P. Adema, SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone:     (619) 235-2100
Facsimile:     (619) 235-2101

Attorneys for Lucent Technologies Inc.

Additional counsel listed on the last page

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff, <br> v. <br><br> GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., <br><br> Defendants, <br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervener. | Case No. 02-CV-2060 B (CAB) <br> consolidated with <br> Case No. 03-CV-0699 B (CAB) <br> Case No. 03-CV-1108 B (CAB) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LUCENT'S MOTION TO ALTER OR AMEND THE GROUP 2 JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)** <br><br> Date:             June 21, 2007 <br> Time: <br> Courtroom:   2 <br> Judge:          Hon. Rudi M. Brewster |
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br> v. <br><br> LUCENT TECHNOLOGIES INC., <br><br> Defendant. | |
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff, <br> v. <br><br> DELL INC., <br><br> Defendant. | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LUCENT'S MOTION TO ALTER OR AMEND THE JUDGMENT
PURSUANT TO FED. R. CIV. P 59(E)

Case Nos. 02-CV-2060-B (CAB)
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

EXHIBIT A   PAGE 6

## I.    INTRODUCTION

Lucent moves pursuant to Federal Rule of Civil Procedure 59(e) to amend this Court's final judgment in the Group 2 Audio Trial to grant Lucent: (1) an accounting and supplemental damages based on that accounting; (2) prejudgment interest; (3) postjudgment interest; and (4) a permanent injunction against future infringement, or, in the alternative, a compulsory royalty-bearing license for postjudgment infringement.

On February 22, 2007, the jury returned a verdict in this patent infringement case finding in Lucent's favor on all remaining issues for the Group 2 audio coding patents, including an award of damages based on a running royalty. Accordingly, this Court entered final judgment in favor of Lucent on April 30, 2007 for $1,538,056,702 in reasonable royalty damages. Not only did the jury find for Lucent on every one of the infringement issues, but the jury's Special Verdict also clearly demonstrates that the jury adopted Lucent's damages theories in full. The jury awarded damages based on precisely the same per-unit rate sought by Lucent for Microsoft's infringing sales. As explained in the Final Pretrial Order, and as Lucent's accounting expert testified, the damages amounts that Lucent was able to present to the jury covered Microsoft's infringement only through November 30, 2005, as discovery closed in January 2006 under the Court's then-applicable scheduling order.

Accordingly, as provided for in the Final Pretrial Order, Lucent now requests that the Court amend its judgment to provide for an accounting to establish the amount of damages owed for Microsoft's infringement from December 1, 2005 to the entry of a permanent injunction. In addition, under well-established case law, Lucent should be awarded prejudgment interest on all of its damages through the date of the judgment, as well as postjudgment interest as provided by statute.[1]

---

[1] Lucent expects that Microsoft may seek a reduction in that award based on the Supreme Court's ruling in *Microsoft Corp. v. AT&T Corp.*, 127 S.Ct. 1746 (U.S. April 30, 2007). If so, and if some different amount is found to be appropriate, Lucent will submit revised calculations for pre- and postjudgment interest. Any such alteration of the amount of judgment has no effect on the substance of Lucent's requests herein for pre- and postjudgment interest, an accounting, and an injunction or compulsory license.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LUCENT'S MOTION TO ALTER OR AMEND THE JUDGMENT
PURSUANT TO FED. R. CIV. P 59(E)

1

Case Nos. 02-CV-2060-B (CAB)
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

EXHIBIT _A_ PAGE _7_

1    Finally, as detailed below, Microsoft's continued infringement will irreparably harm Lucent by

2    ignoring Lucent's rights as a patentee to exclude others from making unauthorized use of the patented

3    invention, and by usurping Lucent's prerogative as a patentee to authorize use of its inventions only

4    under terms and conditions consistent with its licensing practices.   Accordingly, in addition to a

5    supplemental damages award based on an accounting of infringing sales made after November 30,

6    2005, and prejudgment and postjudgment interest on all damages, Lucent further requests that the

7    Court enter a permanent injunction against Microsoft's continued infringing activity.   In the

8    alternative, if the Court declines to enter a permanent injunction prohibiting Microsoft's continued

9    infringing activity, Lucent requests that the Court enter a compulsory license for all postjudgment

10   infringing sales by Microsoft at the reasonable royalty rate determined by the jury.

11   **II.   ARGUMENT**

12       **A.   The Court Should Order An Accounting To Determine The Damages For Infringing Sales Made From December 1, 2005 Through Entry Of An Injunction**

13

14   Lucent requests amendment of the Court's judgment to order an accounting of infringing sales

15   from November 30, 2005 to the entry of the permanent injunction and to award supplemental

     damages based on that accounting.
16

17       **1.   A Court-Ordered Accounting Is Standard Practice To Determine The Full Amount Of Prejudgment Damages In Patent Infringement Cases**

18   It is "standard practice" in patent infringement actions to order a post-verdict accounting for

19   any infringing sales not included in the jury's verdict.[2]  *Mikohn Gaming Corp. v. Acres Gaming, Inc.,*

20   No. CV-S-97-1383-EJW, 2001 WL 34778689, at *18 (D. Nev. Aug. 2, 2001) (collecting cases) (Ex.

21   1)[3]; *see also IMX, Inc. v. Lendingtree, LLC,* No. Civ.03 1067 SLR, 2007 WL 1232184, at *2 (D. Del.

22

23   _____

24   [2] Lucent's request for an accounting to determine damages for the period between the last date of available discovery (November 30, 2005) through and until the entry of an injunction is

25   confirmed in the Final Pre-Trial Order.  (D.I. 842-1 at 9).

26   [3] All references to Exhibits refer to the Exhibits to the Declaration of Elizabeth T. Bernard in Support of Lucent's Motion To Alter or Amend the Group 2 Judgment Pursuant to Fed. R. Civ. P.

27   59(e) filed concurrently herewith.

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
LUCENT'S MOTION TO ALTER OR AMEND THE JUDGMENT
PURSUANT TO FED. R. CIV. P 59(E)

2

Case Nos. 02-CV-2060-B (CAB)
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

EXHIBIT _A_ PAGE _8_

1    April 25, 2007) (ordering accounting for defendant's continued infringing activities during trial) (Ex.

2    2); *Lisle Corp., v. A.J. Mfg. Co.*, No. 02 C 7024, 2004 WL 765872, at *1 (N.D. Ill. April 7, 2004)

3    (granting plaintiff's request to include an accounting for sales through injunction) (Ex. 3); *Itron, Inc. v.*

4    *Benghiat*, No. Civ.99-501 (JRT/FLN), 2003 WL 22037710, at *15 (D. Minn. Aug. 29, 2003) ("Courts

5    'routinely grant motions for further accounting' where the jury did not consider certain periods of

6    infringing activity.") (citation omitted) (Ex. 4); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 746, 748

7    (W.D. Mich. 1999) (granting accounting for period between the verdict and entry of a permanent

8    injunction), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000); *Tech. for Energy Corp. v. Computational Sys., Inc.*,

9    Civ. No. 3-89-476, 1992 WL 535791, at *3 (E.D. Tenn. July 29, 1992) (granting the patentee an

10   accounting based on the jury-determined rate where the verdict included only damages through

11   November 30, 1991 and judgment was entered on February 21, 1992), *aff'd on other grounds*, 6 F.3d

12   788 (Fed. Cir. 1993) (Ex. 5); *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, Civ. A. No. 89-167-JJF, 1992 WL

13   470239, at *5 (D. Del. July 8, 1992) (finding that the patentee is entitled to an accounting) (Ex. 6).[4]

14        That standard practice is no surprise, because the Federal Rules of Civil Procedure expressly

15   contemplate an accounting in patent infringement cases. *See* FED. R. CIV. P. 62(a) (stating that an

16   appeal does not stay certain proceedings pending appeal, including "a judgment or order directing an

17

18   ―――――――――――――――

19   [4]    Indeed, an accounting is such standard practice that the patentee's request for an accounting is
     usually unopposed by the infringer. *See, e.g., Stryker*, 75 F. Supp. 2d at 747; *Dentsply*, 1992 WL

20   470239, at *5; *see also Floe Int'l, Inc. v. Newmans' Mfg. Inc.*, Civil No. 04-5120 (DFW/RLE),
     2006 WL 2472112, at * 9 (D. Minn. Aug. 23, 2006) (stating defendant's agreement to produce an

21   accounting of units sold through the effective date of the permanent injunction) (Ex. 7); *Aero
     Prods. Int'l, Inc. v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 2091996, at *1 (N.D. Ill.

22   Sept. 16, 2004) (stating that the defendant does not dispute that the plaintiff is entitled to damages
     by accounting until entry of injunction), *aff'd-in-part and rev'd-in-part on other grounds*, 466

23   F.3d 1000 (Fed. Cir. 2006) (Ex. 8); *Virginia Panel Corp. v. MAC Panel Co.*, 887 F. Supp. 880,
     886 (W.D. Va. 1995) (stating that the parties stipulated to an accounting of damages for a period

24   of infringement beyond what was presented to the jury), *aff'd-in-part and rev'd-in-part on other
     grounds*, 133 F.3d 860 (Fed. Cir. 1997); *Oscar Mayer Foods Corp. v. Conagra, Inc.*, 869 F. Supp.

25   656, 668 (W.D. Wis. 1994) (stating that parties agreed that the patentee was entitled to additional
     damages for post-judgment infringing sales), *aff'd on other grounds*, 45 F.3d 443 (Fed. Cir.

26   1994); *Braun Inc. v. Dynamics Corp. of Am.*, 775 F. Supp. 33, 38 (D. Conn. 1991) (stating that
     the parties' agreed to an accounting for unit sales through the date of full compliance with an

27   injunction), *aff'd-in-part and rev'd-in-part on other grounds*, 975 F.2d 815 (Fed. Cir. 1992).

28

EXHIBIT *A* PAGE *9*

1  accounting in an action for infringement of letters patent"); *see also Mikohn Gaming*, 2001 WL

2  34778689, at *18 ("Furthermore, Federal Rule of Civil Procedure 62(a) makes clear that Congress

3  contemplated accountings in patent actions."). In addition, an accounting is recognized as necessary to

4  fully compensate the patentee for the infringement in accordance with the statutory mandate of 35

5  U.S.C. § 284. *See Nat'l Instruments Corp. v. The Mathworks, Inc.*, No. Civ.A.2:01-CV-11-TJW, 2003

6  WL 24049230, at *4 (E.D. Tex. 2003) ("The court orders that supplemental damages be awarded to

7  compensate the plaintiff for any infringement occurring between the date of the jury's verdict and the

8  date of the judgment . . . . A failure to award such damages would grant an infringer a windfall by

9  enabling it to infringe without compensating a patentee for the period of time between the jury's

10  verdict and the judgment."), *aff'd on other grounds*, 113 Fed. Appx. 895 (Fed. Cir. 2004) (Ex. 9);

11  *Mikohn Gaming*, 2001 WL 34778689, at *22 (finding that to deny the patentee an accounting for all

12  damages during the entire period of infringement would "contradict the patent law's purpose of

13  compensating patent holders for the damages suffered due to infringement"); *Alpex Computer Corp. v.*

14  *Nintendo Co.*, No. 86 Civ. 1749 (KMW), 1994 WL 681752, at *48 (S.D.N.Y. Dec. 5, 1994) (finding

15  "complete compensation" of the patentee requires an accounting of all infringing sales), *aff'd-in-part*

16  *and rev'd-in-part on other grounds*, 102 F.3d 1214 (Fed. Cir. 1996) (Ex. 10); *see also Gen. Motors*

17  *Corp. v. Devex Corp.*, 461 U.S. 648, 654-55 (1983) (recognizing that through enactment of 35 U.S.C.

18  § 284 "Congress sought to ensure that the patent owner would in fact receive full compensation for

19  'any damages' [the patent owner] suffered as a result of the infringement") (citation omitted). Thus, to

20  ensure that the patentee receives adequate compensation for the infringement, courts routinely order an

21  accounting to update a jury's damages award to the time of entry of the injunction.

22      **2.    An Accounting Is Appropriate In This Case Because Microsoft Has**
        **Continued Its Infringement Following The Damages Period Presented To**
23      **The Jury**

24      As Lucent's accounting expert Wayne Hoeberlein testified at trial, the damages amounts

25  presented to the jury covered the period through November 30, 2005, just before the close of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF    4    Case Nos. 02-CV-2060-B (CAB)
LUCENT'S MOTION TO ALTER OR AMEND THE JUDGMENT    03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)
PURSUANT TO FED. R. CIV. P 59(E)

EXHIBIT *A* PAGE *10*

1    discovery.[5]  (Ex. 11, Feb. 2, 2007 Trial Tr. at 73:3-23; *see also* Ex. 12, PTX 3128).  Accordingly, both

2    parties' experts performed their respective analyses based on the data then available, and the parties'

3    trial presentations were limited to that data.  As a result, the amount of damages awarded by the jury

4    does not include damages for any infringing sales after November 30, 2005.

5         However, as the trial testimony confirmed, Microsoft has continued to infringe Lucent's

6    patents after November 30, 2005 and continues to do so.  (Ex. 13, Feb. 7, 2007 Trial Tr. at 61:3-19,

7    72:8-15; Ex. 14, Feb. 8, 2007 Trial Tr. at 135:10-14).  Therefore, because the sales data available at

8    trial necessarily did not cover the entire period of infringement, an accounting is necessary and

9    appropriate pursuant to the standard practice in patent cases. *See supra,* section A.1.

10         **3.    The Rate Determined By The Jury Should Be Applied To Determine**

11                **Damages For Microsoft's Infringing Sales Up To Entry Of The Permanent Injunction**

12         As noted above, when the data for a period of infringement is not available to the patentee,

13    Courts regularly order an accounting during which the infringer produces data disclosing the extent

14    of additional infringing sales.  Once the actual sales figures are known, supplemental damages are

15    calculated by multiplying by the applicable reasonable royalty rate. *See, e.g., Nat'l Instruments,* 2003

16    WL 24049230, at * 4 (using defendant's actual sales figures multiplied by a reasonable royalty rate to

17    determine the appropriate amount of damages due to infringement between the date of the jury's

18    verdict and the date of the judgment).

19         In determining the amount of supplemental damages, courts apply the reasonable royalty rate

20    determined by the jury in reaching the verdict. *See Stryker,* 75 F. Supp. 2d at 747 (applying the 20%

21    reasonable royalty rate determined by the jury to the sales made during the accounting period as the

22    measure of damages); *Alpex,* 1994 WL 681752, at *48 (applying the 6% reasonable royalty rate

23    determined by the jury to the sales made during the accounting period as the measure of damages

24    even where verdict form did not request the jury to specifically identify the rate); *Tech. for Energy,*

25

26

27       [5] *See also* Ex. 15, DTX 6099 (Exhibit to Expert Report of Wayne Hoeberlein).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF          5  ·            Case Nos. 02-CV-2060-B (CAB)
LUCENT'S MOTION TO ALTER OR AMEND THE JUDGMENT                  03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)
PURSUANT TO FED. R. CIV. P 59(E)

EXHIBIT *A* PAGE *11*

# EXHIBIT B

1

2                    UNITED STATES DISTRICT COURT

3                   SOUTHERN DISTRICT OF CALIFORNIA

4

5   LUCENT TECHNOLOGIES INC.,

6          Plaintiff and Counterclaim-defendant,

7   v.

    GATEWAY, INC. and GATEWAY
8   COUNTRY STORES LLC, GATEWAY
    COMPANIES, INC., GATEWAY
9   MANUFACTURING LLC and
    COWABUNGA ENTERPRISES, INC.,
10                                                 Civil No: 02CV2060-B(CAB)
           Defendants and Counter-claimants,       consolidated with
11                                                 Civil No: 03CV0699-B (CAB) and
    and                                            Civil No: 03CV1108-B (CAB)
12
    MICROSOFT CORPORATION,
13                                                 ORDER ON MICROSOFT'S MOTIONS
           Intervenor and Counter-claimant,        FOR JUDGMENT AS A MATTER OF
14                                                 LAW AND NEW TRIAL AND
                                                   LUCENT'S MOTION TO ALTER OR
15  _____              AMEND THE JUDGMENT
                                                   REGARDING U.S. PATENT NOS.
16  MICROSOFT CORPORATION,                         5,341,457 AND RE 39,080

17         Plaintiff and Counterclaim-defendant,

18  v.

19  LUCENT TECHNOLOGIES INC.,

           Defendant and Counter-claimant
20

21  _____

22  LUCENT TECHNOLOGIES INC.,

23         Plaintiff,

24  v.

25  DELL, INC.,

26         Defendant.

27  _____

28                                                 02CV2060-B (CAB)

EXHIBIT _B_ PAGE _12_

I.     **INTRODUCTION**

On January 29, 2007, a jury trial commenced in case no. 02cv2060 on issues pertaining to audio coding patents U.S. Patent Nos. 5,341,457 and RE 39,080 ("the '457 patent" and "the '080 patent," respectively).  On February 22, 2007, the jury returned a verdict in favor of Plaintiff Lucent Technologies, Inc. ("Lucent") finding the patents valid and infringed by Defendant Microsoft Corporation ("Microsoft").

Following the trial, the Court also ruled on the non-jury issues of standing and Microsoft's license defense.  These rulings were based on the jury's finding that the work incorporated into U.S. Patent No. 5,627,938 ("the '938 patent"), the patent on which the reissue '080 patent is based, was not performed on or after April 1989.  The Court held that the '080 reissue patent is not co-owned by Fraunhofer; Lucent is sole owner of the '080 patent and has standing to sue for infringement.  The Court also ruled that the Fraunhofer-Microsoft Agreement did not confer a license to Microsoft to practice the'080 patent.

Microsoft now moves the Court for judgment as a matter of law under Fed. R. Civ. P. 50(b) on the following issues: (1) no infringement of the '457 patent; (2) no infringement the '080 patent; (3) the '080 patent is not "existing work" under the AT&T-Fraunhofer Agreement; (4) invalidity; and (5) damages.  In addition, Microsoft moves the Court to amend its judgment under Fed. R. Civ. P. 52(b) regarding Lucent's standing and Microsoft's license defense.  Microsoft also moves for a new trial on related issues including: (1) infringement; (2) the categorization of the '080 patent as "Existing Work";(3) invalidity; and (4) damages.

II.     **STANDARD OF LAW**

   A.     **Judgment as a Matter of Law**

A motion for judgment as a matter of law must be denied, and a jury verdict upheld, if the judgment is supported by substantial evidence.  <u>Johnson v. Paradise Valley Unified School District</u>, 251 F.3d 1222, 1227 (9th Cir. 2001).  Substantial evidence is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary

2

1  conclusion from the same evidence." Id. The Court must review the record as a whole but

2  disregard all evidence favorable to the moving party that the jury is not required to believe.

3  Id. All reasonable inferences must be drawn in the light most favorable to the nonmoving

4  party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).

5      **B.    New Trial**

6      The power of the court to grant a new trial under Fed. R Civ. P. 59(a) is "confided

7  almost entirely to the exercise of discretion on the part of the trial court." Murphy v. City of

8  Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) (quoting Allied Chem. Corp. v. Daiflon,

9  Inc., 449 U.S. 33, 36 (1980)). Unlike a motion for judgment as a matter of law, "[t]he

10 judge can weigh the evidence and assess the credibility of witnesses, and need not view the

11 evidence from the perspective most favorable to the prevailing party." Landes Const. Co.,

12 Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987); Molski v. M.J. Cable,

13 Inc., 481 F.3d 724, 729 (9th Cir. 2007) ("the district court has the duty to weigh the

14 evidence as the court") (internal quotations omitted). The district court should "set aside

15 the verdict of the jury, even though supported by substantial evidence, where, in the court's

16 conscientious opinion, the verdict is contrary to the clear weight of the evidence." Molski,

17 481 F.3d at 729.; see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d

18 814, 819 (9th Cir. 2001) ("a trial court may grant a new trial if the verdict is contrary to the

19 clear weight of the evidence . . . or to prevent, in the sound discretion of the trial court, a

20 miscarriage of justice"). In general, a court should grant a new trial only when it "is left

21 with the definite and firm conviction that a mistake has been committed." Landes Constr.,

22 833 F.2d at 1372. "[A] district court may not grant a new trial simply because it would have

23 arrived at a different verdict." Silver Sage Partners, 251 F.3d at 819.

24 **III.    OWNERSHIP AND LICENSE OF THE '080 PATENT**

25      Among the affirmative defenses raised by Microsoft, two related to the ownership of

26 the '080 patent. Microsoft asserted that the '080 patent was co-owned by Fraunhofer

27 Gesellschaft ("Fraunhofer"), a German research company. As such, Microsoft contended

28

EXHIBIT _B_ PAGE _14_

1   that Lucent lacked standing to bring suit against Microsoft for infringement of the '080

2   patent.   Microsoft also asserted the defense of license, contending that it had a license from

3   Fraunhofer to practice the '080 patent. These affirmative defenses were addressed in two

4   parts at trial.   The jury heard evidence on the factual question of whether any work

5   performed during the period of collaboration between AT&T and Fraunhofer had been

6   incorporated into any of the claims of U.S. Patent No. 5,627,938 ("the '938 patent") which

7   then was reissued as the '080 patent. The Special Verdict Form included a "Special

8   Question" on this issue: "Has Microsoft proven by a preponderance of the evidence that

9   work was performed on or after April 1989 which was incorporated into any of the claims

10  of the '938 patent?  Please answer yes or no."  The jury answered "no." Based then on the

11  jury's factual finding, the Court ruled that under the 1989 research agreement between

12  AT&T and Fraunhofer ("the JDA"), Fraunhofer was not a co-owner of the '938 patent or

13  the '080 reissue patent.  Therefore, Lucent had standing to sue and the defense of license

14  was not available to Microsoft.  Microsoft now challenges the jury's findings and the

15  Court's subsequent rulings on a number of grounds.

16          **A.      Exclusion of Deposition Testimony from Mr. Restaino and Mr. Devilliers**

17          At trial on February 12, Microsoft attempted to play two video-taped depositions

18  before the jury to which Lucent objected.  (Trial Tr. vol. X, 17:6-24:7, Feb. 12, 2007.)  The

19  first was the deposition of Mr. Restaino from AT&T and the other was the deposition of

20  Mr. DeVilliers from Creative Labs.  Mr. Restaino was to testify about AT&T's view of the

21  rights under the JDA.  (Id. at 18:4-18.)  The Court ruled that AT&T's opinions of Lucent's

22  duties under the agreement were not relevant.  (Id. at 19:16-24.)  Mr. DeVilliers was to

23  testify about Lucent 's reticence in its negotiations with Creative Labs to discuss Lucent's

24  rights under the JDA.  (Id. at 20: 8-16, 21:18-25.)  The Court ruled that this latter testimony

25  was collateral, lacking relevance and confusing to the jury.  (Id. at 23:2-6.)

26          Microsoft now argues that the exclusion of these depositions was in error because

27  the jury was entitled to hear how AT&T and Lucent viewed the JDA.  The Court, however,

28                                          4

EXHIBIT _B_ PAGE _15_

1  finds no error or prejudice in the exclusions.  First, Microsoft incorrectly asserts that the

2  Court's reason for the exclusion of the testimony was because it was deemed "not

3  credible" and that credibility should have been a question for the jury.  This is belied by the

4  record; the Court excluded the testimony as not relevant and/or prejudicial.  Microsoft

5  confuses "credibility" with "admissibility."  Admissibility is a question for the court, not

6  the jury.  Fed. R. Evid. 104.  Additionally, Microsoft has not pointed to any jury issue on

7  which this evidence would have been relevant.  The interpretation of the JDA was a

8  question left to the Court, not the jury.  Therefore, the Court **DENIES** Microsoft's motion

9  for a new trial on this ground.

10       **B.       New Work Versus Existing Technology Under the JDA**

11            The JDA between Fraunhofer and AT&T covered collaborative work during the

12  period of the stay of Karlheinz Brandenburg at AT&T.  (DX 6489 at 2.)  This period began

13  in April 1989 and ended in June 1990.  (Trial Tr. vol. VI, 192:15-17, Feb. 5, 2007.)  All

14  work done on digital audio coding during this period was classified as "New Work" and

15  would be jointly owned by AT&T and Fraunhofer.  (DX 6489 at 2, 3 § 1.)  In 1991, the

16  period covering New Work was extended by AT&T and Fraunhofer to cover work that

17  continued after the expiration of the JDA and the departure of Brandenburg.  ("the

18  extension letter," DX5616.)  The parties agreed to extend the period indefinitely, until one

19  of the parties gave notice to terminate the arrangement.  (Id.)  No evidence was presented

20  that the parties ever terminated the agreement.  Hence, the combined effect of the JDA and

21  the extension letter defines the period of New Work as beginning in April 1989 at the

22  arrival of Brandenburg and continuing indefinitely thereafter.

23            In the instant trial, Lucent and Microsoft agreed to present the factual question of

24  New Work to the jury by asking whether or not work performed on or after April 1989 was

25  incorporated into any of the claims of the '938 patent. (Special Verdict Form; Tr. Chambers

26  Feb. 7, 2007, 173:12-24; Trial Tr. vol. XII, 90:7-22, Feb. 14, 2007.)  Microsoft's prima

27  facie case relied on the description of the work in the '938 patent specification.  The '938

28                                         5

EXHIBIT _B_   PAGE _16_

1   patent was applied for on September 22, 1994 and claimed priority as a continuation of

2   application serial no. 844,811 to March 2, 1992. This dated the work described and

3   claimed therein to 1992. Lucent argued that the claims of the '938 patent were described in

4   the '457 patent specification filed in 1988; this placed the date of this work before the April

5   1989 dividing line in the JDA.[1] Lucent also presented testimony of Mr. Johnston, the

6   inventor of the '938 patent, on work he had performed on or around 1988.

7          Microsoft now contends that there was insufficient evidence on which the jury could

8   have found that the work encompassed in claims 2 and 4 of the '938 patent was not

9   performed on or after April 1989.

10               **1.      Claim 2**

11         Claim 2 is a dependent claim which includes the method of claim 1 and adds the

12   limitation "wherein the set of frequency coefficients are MDCT coefficients." Microsoft

13   contends that MDCT (modified discrete cosine transform) coefficients are nowhere

14   mentioned in the '457 patent and thus this patent and its date of filing cannot provide

15   evidence that the work embodied in claim 2 was performed before April 1989.

16         Regarding the disclosure of the claimed method using an MDCT, Lucent argues that

17   sufficient evidence was presented on this point in the form of testimony of witnesses and

18   statements in the '938 patent specification showing that MDCT coefficients were well

19   known in the art. It contends that because the '457 patent describes time to frequency

20   transforms and an MDCT is a type of such transform, one of ordinary skill in the art would

21   understand the '457 to include the method set forth in claim 2 of the '938 patent.

22         This contention is problematic. First, as a matter of law, claim 2 cannot claim

23   _____

24         [1] The '080 patent claims priority as a continuation-in-part (CIP) to an application filed in
     February 1992 which was a continuation of an application filed in December 1988. This latter 1988

25   application issued as the '457 patent. Claims in a CIP application may have different priority dates,
     but only those supported by the parent application are entitled to the earlier filing date. <u>Waldemar</u>

26   <u>Link v. Osteonics Corp.</u>, 32 F.3d 556, 558-59 (Fed. Cir. 1994) (noting that the priority date for each
     claim is not memorialized by the patent office; when a dispute arises the Court must determine the

27   proper date for each claim at issue).

28                                        6

1    priority to the '457 patent based on the evidence presented at trial.  The '457 specification

2    does not mention MDCTs.  Dr. Jayant's testimony stated only that MDCTs were known at

3    the time of the '457 patent.  (Trial Tr. vol. XI, 101:4-11, Feb. 13, 2007.)  He also testified

4    that one of ordinary skill in the art would have recognized that the claimed methods could

5    have been implemented with an MDCT and would have been able to do so without undue

6    specification.  (Id. at 101:12-24.)  This testimony does not demonstrate that the method of

7    claim 2 was sufficiently described in the '457 patent. "A description which renders obvious

8    the invention for which an earlier filing date is sought is not sufficient." Lockwood v.

9    American Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997).   A demonstration of

10   obviousness is not sufficient to show the inventor "possessed" the invention.  Id.

11           Second, simply because one of skill in the art may have been able to implement

12   claim 2 from the '457 patent specification and the knowledge in the art as to MDCTs, does

13   not lead to the conclusion that the inventor of the '938 patent, Johnston, performed such

14   work as of the filing date of the '457 patent.  On this topic, Johnston testified that he did

15   not perform this work before the collaborative period of the AT&T-Fraunhofer agreement

16   began:

17          Q       Who taught you about an MDCT?
             A       Well, I hadn't heard of it until I saw Karlheinz's
18   paper, and then I had sort of looked at it before Karlheinz
     came, but when Karlheinz came and sat down and explained it,
19   that was when I really learned about it. It was the first
     time I actually got my hands on it practically.
20          Q       In other words, in 1989?
             A       Yeah.
21          Q       Okay. And did you have any understanding from Doctor
     Karlheinz -- Doctor Brandenburg at the time you did the work
22   on the 457 patent?
             A       No. I hadn't heard of the MDCT at all. Apparently the
23   publication was out, but I hadn't spotted it.

24   (Trial Tr. vol. VI, 36:13-25, Feb 5, 2007.)  Although Lucent argues that the jury could have

25   disregarded this testimony, there was no other evidence of record that the work was

26   performed prior to April 1989.  The only other evidence of the work encompassed by claim

27

28                                                         7

EXHIBIT _B_ PAGE _18_

1    2 was the '938 specification itself, with a date of 1992.[2] Therefore, the jury's finding that

2    claim 2 was not performed on or after April 1989 is not supported by sufficient evidence;

3    the Court therefore **GRANTS** judgment as a matter of law on this ground. Additionally,

4    because the jury's verdict was against the clear weight of the evidence, in the alternative,

5    the Court **GRANTS** a new trial on this issue.

6              **2.    Claim 4**

7         In the Markman hearing preceding trial, the Court construed the means for receiving

8    and the means for converting as set forth in claim 4 to require the same corresponding

9    structure:

10        Structure: (as described in the ['938] specification at Col. 23:59 - Col. 24:1)[3], a
          digital signal processor (DSP), a DSP with software, VLSI hardware embodiments,
11        or hybrid DSP/VLSI embodiments.

12   These corresponding structures (DSP and VLS1) do not appear in the '457 specification;

13   they appear for the first time in the '938 patent specification filed in 1992. At trial,

14   however, Lucent's expert Dr. Jayant testified in a conclusory fashion that this

15   corresponding structure was disclosed in the '457 specification. (Trial Tr. vol. XI, 110:12-

16   18, Feb. 13, 2007.) He did not, however, indicate where these structures could be found in

17   the '457 specification. Instead, Jayant's testimony took two paths - both insufficient as a

18   matter of law to demonstrate that the written description in the '457 patent could provide a

19   1988 priority date for claim 4.

20        First, Jayant testified that the two "means" could be found in Figure 7 of the '457

21   patent, labeled as boxes 72 and 76. He indicated that box 76 was where the bitstream came

23        [2] Lucent's argument that the reference in Figure 2 of the '080 patent to MDCTs as prior art
     with a reference to a publication dated 1987 does not change this analysis. This reference does not
24   indicate one way or the other whether Johnston performed or even conceived of his method using
     MDCTs before April 1989. The specification of the '080 patent is based on applications filed in 1992
25   and 1994. At most, it suggests that on or around 1992 or 1994, Johnston knew of MDCTs and had
     considered their use in his claimed method.
26
          [3] The reference to the '938 specification corresponds to Col. 24:18-24 in the '080 reissue
27   specification.

28                                    8

1   into the decoder and was unpacked; box 72 transformed frequency information into a time

2   wave form. (Id. at 109:5-15, 110:1-11.) He did not identify these boxes as "structures."

3   Figure 7 of the '457 patent identifies only function and does not describe any structures that

4   carry out these functions. Moreover, even if boxes 72 and 76 could themselves arguably

5   represent a structure, Lucent did not present any evidence through Jayant or any other

6   witnesses to show that such structure was the same or equivalent to the corresponding

7   structure for claim 4 as construed by the Court.

8        Second, Jayant's testimony that one of skill in the art would know that the

9   DSP/VLS1 structures could be used for implementing the means for receiving and

10  converting functions (id. at 110:19-111:6) also is insufficient. "[S]tructure supporting a

11  means-plus-function claim under § 112, ¶ 6 must appear in the specification . . . [the]

12  consideration of the understanding of one skilled in the art in no way relieves the patentee

13  of adequately disclosing sufficient structure in the specification. Medical Instrumentation

14  and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1212 (Fed. Cir. 2003); Biomedino,

15  LLC v. Waters Technologies Corp., - - F.3d - -, 2007 WL 1732121, *5 (Fed. Cir. June 18,

16  2007).

17       Dr. Jayant's legally unsupportable opinions cannot support the jury's verdict. See

18  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993)

19  ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of

20  the law, or when indisputable record facts contradict or otherwise render the opinion

21  unreasonable, it cannot support a jury's verdict."); Tronzo v. Biomet, Inc.,156 F.3d 1154,

22  1159 (Fed. Cir.1998) (expert testimony that was either contradicted by the patent

23  specification itself and/or incorrect based on the applicable law was insufficient to support

24  the jury's verdict on written description and priority date).

25       As with claim 2, the disclosure of the '938 patent establishes a prima facie case that

26  the corresponding structure for claim 4 was first described therein and thus entitled to a

27  date no earlier than 1992. Having excluded Dr. Jayant's testimony on claim 4, there is no

28

9

1   other evidence that rebuts this prima facie showing.  The only other evidence relied on by

2   Lucent, the inventor Mr. Johnston's testimony, does not indicate that the work incorporated

3   in claim 4 was performed prior to April 1989.  Johnston testified that he constructed his

4   perceptual transform (PXFM) decoder software by April 2, 1987 (Trial Tr. vol. VI, 97:5-

5   11, Feb. 5, 2007.)  Johnston testified only that his constructed PXFM performed the

6   functionality related to the decoder described in the '457 patent; he did not testify as to

7   whether his constructed decoder had the DSP and/or VLS1 corresponding structures.

8   Lucent's argument that several experts testified as to the existence of DSPs before April

9   1989 is of no avail, nor is the evidence that Johnston may have known about DSPs in some

10  general context (but not in the context of his invention). The question is not whether the

11  inventor *could* have constructed the decoder with the corresponding structure but whether

12  he did.

13        Because the only evidence of work involving the decoder constructed with the DSP

14  and/or VLSI corresponding structure appeared in the '938 specification as filed September

15  22, 1994 (priority date March 2, 1992), there was insufficient evidence to support the jury's

16  verdict that claim 4 was performed before April 1989.  Therefore, Microsoft's motion for

17  judgment as a matter of law on this issue is **GRANTED**.  Additionally, because the jury's

18  verdict was against the clear weight of the evidence, in the alternative, the Court **GRANTS**

19  a new trial on this issue.

20        **C.    Ownership of the '080 Patent**

21        Having determined that claims 2 and 4 were performed on or after April 1989, under

22  the JDA, these claims constitute "New Work." The question then turns to the ownership

23  rights of this work as it stands incorporated into the '938 and '080 patents.  The JDA

24  contains the following relevant provisions on ownership of New Work:

25        All New Work is treated as joint work. The intellectual property rights to that work
        will be jointly owned by AT&T and FhG.  Each party has the nonexclusive right to
26      make use of the results of New Work (including intellectual property rights), and
        may grant nonexclusive licenses to others to use the results of such New Work.

27

28                                          10

1  (DX 6489 at 3 § 1.)

2      The parties will consult with each other regarding the filing of patent applications on
   New Work including New Work reflected in the above-mentioned transmittals and
3  papers proposed for publication. Each party will have the first opportunity to file
   patent applications for New Work done primarily by its employees, but if a party
4  declines the opportunity to file any such patent application, or after filing any patent
   application chooses not to proceed further in attempting to secure a patent, the other
5  party may elect to do so. Each party will ensure that its employees, and others
   cooperating with it in New Work cooperate with the other party in filing all patent
6  applications.

7  (Id. at 3 § 2.)  Based on these passages and the context of the agreement, the JDA

8  evidences an intent to share ownership of New Work, including work on which patent

9  applications would be filed.

10      The '938 and '080 patents encompassing the jointly owned New Work also contains

11  two additional claims (claims 1 and 3) that are not New Work.[4]  These claims are classified

12  as "Existing Technology" under the JDA, defined as Digital Audio Coding Work before the

13  beginning of the period of Brandenburg's stay at AT&T (before April 1989) as described in

14  Attachments A and B to the JDA.  (Id. at 2.)  The JDA addresses Existing Technology

15  under licensing provisions:

16
       Existing AT&T Technology and Existing FhG Technology, including related patents
17     and patent applications will be available under license to the other party, subject to
       the terms of a perpetual nonexclusive. royalty-free license between AT&T and FhG.
18
   (Id. at 3 § 3.)  The JDA also envisioned that Fraunhofer would have rights to sublicense
19
   AT&T's Existing Technology to third parties only under defined circumstances.[5]  (Id. at 3
20
   §§ 5, 6.)
21
       The JDA does not contain any explicit provisions for newly filed patents and/or
22

23  _____

       [4] The '938 patent contains claims 1-4.  The '080 patent contains claims 1, 3 and 4; Lucent
24  removed claim 2 from the '080 patent during prosecution of the reissue application.  At trial,
    Microsoft did not show that claims 1 and 3 were not entitled to the earliest priority date of the '080
25  patent (1988).  The evidence indicated that these claims were performed by Johnston prior to the
    collaboration with Fraunhofer and could claim priority to the '457 patent.  The '457 patent was
26  defined as Existing Technology under the JDA.  (Id. at 2, Attachment A.)

27     [5] These circumstances have previously been determined not to apply to the Fraunhofer-
    Microsoft agreements covering the technology at issue here.
28
                                          11

1   patent applications that contain both New Work and Existing Technology.  Under Pope

2   Mfg. Co. v. Gormully & Jeffery Mfg. Co., 144 U.S. 248, 252 (1892), a patentee can not

3   split up ownership of an existing patent by assigning separate claims to different parties.

4   Hence, the JDA cannot readily be interpreted to split the '938 and/or '080 patents into

5   "New Work" (claims 2 and 4) owned by both AT&T and Fraunhofer and "Existing

6   Technology" (claims 1 and 3) owned solely by AT&T, without coming into conflict with

7   Pope.

8          Lucent argues that the JDA should be interpreted to provide full ownership of the

9   '938 and '080 patents to AT&T and give only licensing rights on the New Work to

10   Fraunhofer.  It argues that the sentence dictating "joint ownership" over New Work does

11   not give Fraunhofer true ownership rights because the subsequent sentence provides

12   Fraunhofer only with the right to use the New Work, not make it or sell it.  (See DX 6489

13   at 3 § 1.)  This position is unpersuasive.  The JDA does not divide the rights to make, use

14   and sell between the parties.  It only provides the rights "to make use" to both parties.

15   Interpreting this phrase as only the right to use would suggest that neither party could make

16   or sell technology encompassing the New Work, a result that is nonsensical.  Additionally,

17   the JDA states that the parties may "make use of" intellectual property rights to the New

18   Work and that the parties envisioned that rights to New Work would be memorialized in

19   patent applications filed on the New Work.  (Id. at 3 §§ 1, 2.)  Intellectual property rights

20   (e.g., patent ownership) on New Work would include rights to make, use and sell.  There is

21   nothing to suggest that the JDA did not intend for these intellectual property rights of

22   making, using and selling the New Work to flow to both parties.

23          The circumstances here have many parallels with those of Israel Bio-Engineering

24   Project v. Amgen, Inc., 475 F.3d 1256, 1263-64 (Fed. Cir. 2007).  In that case, two parties

25   executed a series of agreements regarding a joint research and development project which

26   provided ownership of work performed during the joint project to one party and all work

27   done subsequent to the joint project to the other.  Id. at 1259-1260.  A patent was filed

28                                    12

1    containing three claims: one claim encompassed work done as part of the joint project; the

2    other two claims encompassed later work. Id. at 1261. Since ownership attaches to the

3    patent as a whole, the Court found that neither party could have sole ownership of the

4    patent. Id. at 1267-68. Instead, the two parties each had undivided co-ownership interest.[6]

5    Id. at 1268. Furthermore, the Court refused the suggestion that because one party had filed

6    all the claims together, that party forfeited all ownership rights to the joint work

7    incorporated therein. Instead, the only thing forfeited was either parties' right to

8    exclusivity to any of the work encompassed in the claims of the patent. Id. at 1267.

9        Similarly here, by filing claims to New Work in the same application as claims to

10    Existing Technology, the patent is jointly owned by AT&T and Fraunhofer. AT&T cannot

11    cause Fraunhofer to forfeit its ownership rights to New Work simply by filing AT&T's

12    Existing Technology in the same patent application. If anything is forfeited, it is AT&T's

13    rights to exclusive ownership of the entire '938 patent. AT&T forfeited that right when it

14    chose to file all four claims in one application. Lucent made a similar decision when it

15    applied for the reissue that became the '080 patent and chose to keep claim four in the same

16    application with claims one and three, all with one priority claim. The Court therefore

17    **FINDS** that under the JDA, the '938 patent and its reissue, the '080 patent, are jointly

18    owned by AT&T and Fraunhofer.

19        **D.    Lucent's Standing**

20        "An action for infringement must join as plaintiffs all co-owners." Ethicon, Inc. v.

21    U.S. Surgical Corp., 135 F.3d 1456, 1467 (Fed. Cir. 1998). Since Fraunhofer is a co-owner

22    of the '080 patent and it is not joined in the instant suit, Lucent lacks standing to sue

23    _____

24        [6] Although the situation in Israel also concerned joint inventors, that difference does not
     render the comparison to the instant circumstances inapplicable. Here, the situation created by the
25    filing of New Work and Existing Work into a single patent is much like the filing of a patent with
     more than one inventor, where all the inventors did not contribute to each and every claim. Even
26    though Johnston is a single inventor, there are two "personas": Johnston with AT&T as the sole owner
     of his Existing Technology and Johnston with joint owners AT&T and Fraunhofer to his New Work.
27    The filing of an application with these two "personas" renders the same result as filing with multiple
     inventors - each assignee is a joint owner of the whole patent.

28                                              13

1   Microsoft for infringement on this patent.  The Court therefore **DISMISSES** under Fed. R.

2   Civ. P. 12(b)(1) Lucent's claims on the '080 patent in their entirety and **AMENDS** its Rule

3   52(b) judgment accordingly.

4           Although Lucent could potentially amend its complaint to join all co-owners in the

5   suit and establish standing, as discussed below, it appears from the record that Fraunhofer

6   has granted a license to Microsoft.  Absent any challenge of this license, even if Lucent

7   could establish standing, Microsoft would not be liable to Lucent or any other co-owner of

8   the '080 patent.

9           **E.      Microsoft's License Defense**

10          In 1997, Microsoft entered into a software agreement with Fraunhofer.  (PX34.)

11  This agreement provided Microsoft with the codecs which were incorporated into Windows

12  Media Player and are now at issue in the instant suit.  (Id. at § 4.1.)  The agreement also

13  granted to Microsoft licenses to patents owned by Fraunhofer necessary to exercise the

14  software licencing rights provided therein.  (Id. at § 4.2.)  Because the '938 patent and

15  therefore the '080 patent is jointly owned by AT&T and Fraunhofer, to the extent the '080

16  patent is necessary to the performance of the Windows Media Player functions accused

17  herein,  Microsoft, through its agreement with Fraunhofer has a license to the '080 patent.

18  See Schering Corp. v. Roussel-UCLAF SA., 104 F.3d 341, 344 (Fed. Cir. 1997) ("Each

19  co-owner's ownership rights carry with them the right to license others, a right that also

20  does not require the consent of any other co-owner.").  Microsoft as a licensee cannot be

21  liable for infringement of the '080 patent.  35 U.S.C. § 271.  Therefore, the Court **FINDS**

22  that Microsoft has prevailed on its licensing defense and is **NOT LIABLE** for infringement

23  of the '080 patent.  The Court **AMENDS** its Rule 52(b) judgment accordingly.

24  **IV.    INFRINGEMENT OF THE '457 PATENT**

25          **A.      Direct Infringement**

26          Microsoft argues that no reasonable jury could have found on the evidence presented

27  at trial that the back-up HQ encoder of the Windows Media Player infringed the claims of

28                                              14

EXHIBIT ___*B*___ PAGE _*25*_

1   the '457 patent because there was no evidence that the HQ encoder had ever performed the

2   claimed methods.

3        To prove infringement of a methods claim (such as claims 1 and 5 of the '457

4   patent), there must be sufficient evidence that establishes the device is capable of

5   performing the method and that *it indeed performs that method*.  Joy Technologies, Inc. v.

6   Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993) ("A method claim is directly infringed only by

7   one practicing the patented method"); see also Ormco Corp. v. Align Technology, Inc., 463

8   F.3d 1299, 1311 n. 12 (Fed. Cir. 2006).

9        There was no direct evidence that the HQ encoder performed the patented methods

10   presented at trial.  Even Lucent's expert, Dr. Polish, testified that he had never observed the

11   HQ encoder running, he had not made a CD encoded by the HQ encoder, and he could not

12   explain how a user would select and run the HQ encoder (over the default fast encoder).

13   (Trial Tr. vol. III, 198:1-199:5, 200:18-24, Jan. 31, 2007.)  Instead, Lucent argues that its

14   proof of infringement centered on circumstantial evidence that the HQ encoder would run

15   automatically when the fast encoder failed and therefore carry out the claims of the '457

16   patent.

17        Circumstantial evidence may be sufficient in some circumstances to prove direct

18   infringement.  Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed.

19   Cir.1986) ("circumstantial evidence of extensive puzzle sales, dissemination of an

20   instruction sheet teaching the method of restoring the preselected pattern with each puzzle,

21   and the availability of a solution booklet on how to solve the puzzle" was sufficient to show

22   direct infringement of patented method claims to solve the Rubik's cube).  On other facts,

23   circumstantial evidence may be insufficient.  E-Pass Technologies, Inc. v. 3Com Corp., 473

24   F.3d 1213, 1222 (Fed. Cir. 2007) (each step of the claimed method was only taught in

25   isolation such that too much speculation was needed to conclude that any customer had

26   ever performed the steps of the method in the order claimed in the patent).

27        Here, the evidence regarding the functioning of the HQ encoder presented an

28

interesting dilemma.  According to Lucent's expert Dr. Polish, the HQ encoder would
initialize and run if the default fast encoder of Windows Media Player failed.  (Trial Tr.
vol. III, 139:13-16; 142:16-20, Jan. 31, 2007.)  This analysis was based on his review of the
source code.  (Id. at 139:17-20, 141:15-24.)  Dr. Polish opined that four types of errors
would cause the fast encoder to fail. (Id. at 144:7-145:4.)  Although he testified that in his
opinion, these errors occur in practice, (id. at 146:7-9), he did not know at what rate such
errors occurred, nor had he ever observed such errors  (id. at 145:23-146:6, 185:8-25,
196:2-14).  He also testified that errors that would cause the fast encoder to fail would not
cause the HQ to also fail because the two encoders used different initialization tests.  (Id. at
146:17-147:9.) Again, this analysis was based on an examination of the source code; Dr.
Polish had never seen it happen in practice, nor reproduced it himself.  (Id. at 185:1-186:5.)
No other witness testified to having observed the HQ encoder perform, nor was there any
tangible evidence of such performance.  Tellingly, when Lucent's expert was asked if he
had tested his theories, he replied in the negative.  Although he had available to him a
debugger which he successfully used to test the fast encoder's functions as they pertained
to the claims of the other patent in suit, the '080 patent (id. at 159:16-160:2), he never
attempted to use the same debugger to test for the failure of fast encoder or the running of
the HQ encoder  (id. at 197:7-13).  Furthermore, although he admitted he could have built
an apparatus to test for the errors that would make the fast encoder fail and trigger the HQ
encoder, he chose not to do so.  (Id. at 197:14-19.)   When asked if he could even explain to
the jury how he would go about making the HQ encoder work, he replied that he could not
(Id. at 198:6-17; see also id. at 199:4-5 ("If I could tell you how to do it, I could have done
it myself.").)

In essence, Lucent offered circumstantial evidence that proved at most that the HQ
encoder was possibly *capable of* running. What it failed to show, circumstantially or

16

EXHIBIT ___*B*___ PAGE _*27*_

1  otherwise, was that HQ had actually ever run and performed the claimed method.[7] This

2  evidence is insufficient as a matter of law to demonstrate infringement of a methods claim.

3  While Lucent argues that "the record was replete with evidence that the HQ encoder will be

4  invoked as a result of common conditions that occur routinely in practice," as the Federal

5  Circuit noted in E-Pass Technologies, Inc. v. 3Com Corp., 473 F.3d 1213, 1223 (Fed. Cir.

6  2007), if it was so common and so routine, certainly Lucent could have introduced

7  evidence of at least one instance where the HQ encoder had run.

8      The instant circumstances differ from those of Moleculon, on which Lucent relies.

9  In that case, there was no question that if a user followed the instruction manual, the

10  Rubik's cube puzzle would be solved.  Witness testimony established that, in addition to

11  the circumstantial evidence of instructions to solve the puzzle, many people had been

12  observed solving the accused Rubik's cube.  Moleculon Research Corp. v. CBS, Inc., 594

13  F. Supp. 1420, 1440 (D.C. Del. 1984), overruled by Moleculon, 793 F.2d 1261 (Fed.

14  Cir.1986).  In contrast, here, although according to the source code the HQ encoder could

15  infringe the claimed methods if it ran, the evidence established only uncertainty and

16  speculation as to whether it had ever run even once.  Like the circumstances in E-Pass, 473

17  F.3d at 1222, where the accused personal digital assistant (PDA) could perform many

18  functions other than the claimed method, here, even according to Lucent's expert, a

19  computer running Windows Media Player is running dozens of processes, with thousands

20  of instructions, "there may be bugs.  There may not be bugs.  There's all kinds of things

21  that could be happening."  (Trial Tr. vol. III, 183:20-184:5.)[8]

22  _____

23  [7] The Court considers here the evidence under the standard for judgment as matter of law.
   There also was evidence at trial from Microsoft to refute Lucent's theories. However, the jury was not
24  required to believe Microsoft's expert, nor accord him the same weight as Lucent's expert.

25  [8] The Court also finds Lucent's argument unavailing that simply because the HQ encoder is
26  in Windows Media Player as a backup, it must perform the claimed methods.  Whether or not
   Microsoft may have intended or attempted to perform the claimed methods with the HQ encoder, the
27  key question is whether the accused software did perform. "Attempted infringement" does not create
   liability.

28                                    17

1    Given this amount of speculation, the Court finds that Lucent failed to meet its

2   burden to demonstrate by a preponderance of the evidence, direct or circumstantial,

3   performance of the methods claims of the '457 patent by the HQ encoder.  Therefore the

4   Court **GRANTS** judgment as a matter of law that the HQ encoder does not infringe claims

5   1 and 5 of the '457 patent.  In the alternative, the Court **GRANTS** a new trial as to

6   infringement of these claims.  Based on the level of speculation and uncertainty, as well as

7   the lack of any attempt by Lucent or its experts to demonstrate the failure of the fast

8   encoder and/or the performance of the HQ encoder, the Court finds that the jury's verdict

9   of infringement was against the clear weight of the evidence.

10    The remaining claim of the '457 patent at issue, claim 10, is a product-by-process

11   claim.  The case law is divided on whether this type of claim is treated as a product claim

12   or more like a methods claim.  In Scripps Clinic & Research Foundation v. Genentech, Inc.,

13   927 F.2d 1565, 1583 (Fed. Cir. 1991), one panel of the Federal Circuit ruled that products

14   by process claims "are not limited to product prepared by the process set forth in the

15   claims."  One year later in Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834,

16   846 -847 (Fed. Cir. 1992), another Federal Circuit panel ruled "process terms in

17   product-by-process claims serve as limitations in determining infringement."  While

18   seemingly in contradiction, this Court resolved the issue relative to the '457 patent based

19   on the context of the claim at issue.  Claim 10 reads "A storage medium manufactured in

20   accordance with a process comprising the steps of:" and then lists several steps defining the

21   process.  Ignoring the process steps would leave only "a storage medium" as the claimed

22   product, an untenable position since storage media were well known in the art as of the

23   '457 patent.  Thus, the Court concluded that claim 10 was limited by these process steps

24   and instructed the jury that "[a] product-by-process claim is a product or 'apparatus' claim

25   that is further defined by one or more steps of a process used to make the product."

26   (Court's Jury Instruction No. 33; docket no. 1168.)

27    Lucent argues that the jury's verdict of infringement of this claim is supported by

28                                     18

EXHIBIT _B_ PAGE _29_

1   sufficient evidence because it proved that a computer loaded with Microsoft's Windows

2   Media Player is capable of carrying out these process steps.  While generally, to infringe a

3   product claim, the accused device need only be capable of infringement, this determination

4   may depend on the claim language.  In Intel Corp. v. U.S. Intern. Trade Com'n, 946 F.2d

5   821, 832 (Fed. Cir. 1991), the  use of the phrases "programm *able* selection means" and

6   "whereby *when* said alternate addressing mode is selected" led the Court to conclude that

7   the device need only be capable of operating in such a manner rather than requiring proof

8   of such actual operation.  In contrast, in Cross Medical Products, Inc. v. Medtronic

9   Sofamor Danek, Inc., 424 F.3d 1293, 1310-12 (Fed. Cir. 2005), the Court found the term

10  "operatively joined" to be a structural limitation such that an accused device would only

11  infringe if it actually was joined, but not if it was simply "capable of" being joined.

12      Here, the claim language resembles that in Cross Medical.  Claim 10 uses the term

13  "manufactur*ed* in accordance with a process comprising" indicating that to infringe the

14  claim, the accused storage medium must have been made using the process, rather than one

15  that is made in another manner but capable of carrying out the process.  There was no

16  evidence at trial that anyone had ever made anything with the claimed process.[9]  As

17  Lucent's expert admitted, he had not even attempted to make the HQ encoder run, let alone

18  derive a storage medium product (such as a CD with an mp3 file) made by the HQ encoder.

19  Therefore, the Court finds that as a matter of law, the evidence presented at trial cannot

20  support a finding of infringement of claim 10.  Microsoft's motion for judgment as a matter

21  of law of no infringement of claim 10 is **GRANTED**.

22      Alternatively, the Court also **GRANTS** Microsoft's motion for a new trial on the

23  infringement of claim 10.  The new trial is granted on two grounds.  First, for the same

24  reasons as found for claims 1 and 5, the clear weight of the evidence does not support the

25  jury's finding of infringement of claim 10.  Second, the Court finds that there was a conflict

26

27  _____

     [9] The process steps of claim 10 are essentially the method steps set out in claim 1.

28

                                              19

EXHIBIT *B* PAGE 30

in the jury instructions which may have provided an erroneous standard for the jury. Although the Court's Jury Instruction No. 32 correctly instructed the jury that "[i]n order to literally infringe a product-by-process claim, you must find that each step of the process is literally performed in making the accused product," the Court's Jury Instruction No. 33, instructed "[a]n accused product may be found to infringe a product-by-process-claim if the accused product is manufactured so that it is capable of using the steps of the process as they are recited in the claim." (See Court's Jury Instructions; docket no. 1168.) The jury may have therefore decided the question of infringement of claim 10 on the erroneous standard set out in the latter instruction.

## B.    Indirect Infringement

"Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." Joy Technologies, Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993). In light of the Court's rulings on no direct infringement, the Court therefore **GRANTS** judgment as a matter of law and in the alternative, a new trial on indirect infringement. Although Microsoft raises other grounds in its motions, the Court need not and does not address them here.

## V.    INFRINGEMENT OF THE '080 PATENT

Although as analyzed herein, Lucent lacks standing to sue for infringement of the '080 patent and Microsoft has a license through its agreement with Fraunhofer to practice the '080 patent with regards to the accused encoders, the Court alternatively rules herein on Microsoft's motions for judgment as a matter of law and for new trial pertaining to infringement issues, as well as invalidity and damages issues on the '080 patent.

## A.    Claim Construction

Microsoft contends that the Court's claim construction of the element (c) in claim 1 of the '080 patent was overly broad and therefore a new trial is warranted. Element (c) reads:

   (c) using a rate loop processor in an iterative fashion to determine a set of

20

1    quantization step size coefficients for use in encoding the set of frequency
2    coefficients, said set of quantization step size coefficients determined by using the
     masking threshold and an absolute hearing threshold;

3    Microsoft argues that the Court's claim construction encompassed combining the masking

4    threshold and absolute hearing threshold as an "input" to the rate loop. It argues that the

5    prosecution history required the "use" of both thresholds within the rate loop itself.

6        This issue was considered during the Markman hearings and the Court ruled that the

7    claim was not limited to the use of both thresholds within the rate loop. Microsoft has

8    provided no new arguments on this point. It simply asserts the issue here to preserve it for

9    appeal. Therefore, the Court **DENIES** Microsoft's motion for a new trial on this ground.

10   **B.    Direct Infringement**

11       Microsoft contends in cursory fashion that there was insufficient evidence for the

12   jury to have concluded that the pbThresholdQuiet of the accused products meets the

13   Court's claim construction for an absolute hearing threshold (AHT) in the '080 patent

14   claims. Microsoft argues that its expert testified to just the opposite, that pbThresholdQuiet

15   was not the AHT of the patent. Lucent, however, points to testimony of its own expert that

16   pbThresholdQuiet is an AHT. Additionally, Lucent points to the cross-examination of

17   Microsoft's expert where Lucent used the expert's own report to impeach him; the report

18   stated that pbThresholdQuiet is an AHT. The Court finds that the jury had sufficient

19   evidence on which it could have based its finding of infringement.

20       Microsoft also argues that the Court's refusal to allow reference to the judgment in

21   the Dolby case (a suit on the predecessor '938 patent against Dolby's technology)

22   prejudiced Microsoft's ability to show non-infringement. At the hearing on Lucent's

23   motions in limine, the Court excluded the findings in Dolby as hearsay, although it allowed

24   the parties to use statements made in that case by witnesses or parties for purposes of

25   impeachment. (Transcript in limine Hr'g, 113:7-9; 114:21-115:1, Jan. 3, 2007.) Microsoft

26   has not offered an exclusion, exemption or exception to hearsay under the rules of evidence

27   which would suggest that this decision was in error. Furthermore, Microsoft primarily

28                                21

1  argued in its opposition to this motion in limine that the evidence was relevant to

2  willfulness and/or impeachment of witnesses, not as direct evidence of non-infringement.[10]

3  Thus, the exclusion was not in error and there was no prejudice to Microsoft. Microsoft's

4  motions for judgment as a matter or law and for a new trial on the issue of direct

5  infringement of the '080 patent are **DENIED**.

6      **C.**    **Contributory Infringement by All of the Accused Encoders**

7      Microsoft argues that the jury's findings on contributory infringement are wrong and

8  against the clear weight of the evidence in light of the recent holding by the Supreme Court

9  in Microsoft Corp. v. AT & T Corp., 127 S. Ct. 1746, 1750 (2007). Microsoft contends

10  that the AT&T holding addressing foreign sales under 35 U.S.C. § 271(f) also should be

11  applied to infringement under § 271(c) for domestic sales.

12      This Court has no reason to interpret AT&T so expansively. One of the key

13  concerns regarding § 271(f) is the effect of U.S. patent law on extraterritorial activities.

14  "The traditional understanding that our patent law operates only domestically and does not

15  extend to foreign activities . . . is embedded in the Patent Act itself, which provides that a

16  patent confers exclusive rights in an invention within the United States." Id. at 1758

17  (internal quotations and citation omitted). This concern does not infect § 271(c). While

18  domestic patent laws more readily govern facilitation and inducement of infringement, §

19  271(f) is limited to components supplied for a combination that will be made outside the

20  United States.

21      There is no precedent for limiting the scope of § 271(c) to the limits placed on §

22  271(f). Just as the Supreme Court declined to remedy potential inconsistencies or

23  loopholes in the patent laws and left such issues for Congress to address, here too, this

24  Court leaves the legislature to consider whether supplying software as an "intangible"

25  _____

26      [10] (See Transcript in limine Hr'g, 113:10-19, Jan. 3, 2007.) Microsoft prevailed on the issue
of willfulness at trial, regardless of the exclusion. With respect to infringement and validity issues,

27  Microsoft primarily argued the Dolby case was relevant because of the inconsistent positions taken
by Lucent and its witnesses. The Court permitted the use of testimony from Dolby for these purposes.

28

EXHIBIT ___*B*___ PAGE ___33___

1    should be exempted from § 271(c). Microsoft's motion for a new trial on contributory

2    infringement is **DENIED**.

3    **D.    Indirect Infringement by the Cyberlink Encoder**

4    Microsoft challenges the sufficiency of the evidence for the jury's verdict on

5    contributory infringement and inducing infringement of the '080 patent by the Cyberlink

6    plug-in encoder. Regarding contributory infringement, Microsoft, in a cursory fashion,

7    contends that Lucent failed to introduce sufficient evidence because Windows Media

8    Player with the Cyberlink plug-in encoder has substantial noninfringing uses. The Court,

9    however, finds no evidence of any other uses for the Cyberlink plug-in encoder in the

10   record. Simply packaging the Cyberlink plug-in encoder with the Windows Media Player,

11   a device that itself has many other functions, does not insulate the encoder from

12   infringement. Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 945 (Fed. Cir.

13   1990) (the addition of features to a patented device or the addition of functions to a device

14   performing a patented method does not avoid direct infringement).[11] Therefore,

15   Microsoft's motions for judgment as a matter of law and for a new trial as to contributory

16   infringement by the Cyberlink plug-in are **DENIED**.

17   As for inducing infringement, Microsoft contends that the element of specific intent

18   was not met because there was no evidence that Microsoft knew how the Cyberlink product

19   functioned and additionally, that there was little or no evidence of inducement other than a

20   website link. As to the website, evidence and testimony was presented showing that

21   Microsoft advertised its products with a link to the Cyberlink plug-in to provide users with

22   their choice of features; thus a jury could conclude that such advertising was sufficient

23   encouragement and/or instructions for inducement.

24

25   [11] This is not the circumstances present in Hodosh v. Block Drug Co., Inc., 833 F.2d 1575,

26   1578 (Fed. Cir.1987) and Aquatex Industries, Inc. v. Techniche Solutions, 419 F.3d 1374, 1380 n.*
     * (Fed. Cir.2005), where a patented product incorporated a staple ingredient (and hence selling the

27   staple was not contributory infringement). Here, the Cyberlink Plug-in is not a staple, and
     incorporating it into Windows Media Player does not somehow "convert" it into a staple ingredient.

28                                                  23

However, the Court finds that there was insufficient evidence to show that Microsoft had any knowledge that the Cyberlink encoder was an infringing device. The testimony pointed to by Lucent on this issue demonstrates only that the binary code (machine code) was provided to Microsoft by the Cyberlink Corporation; the source code was not provided. (Trial Tr. vol. X, 26:22-27:4, Feb. 12, 2007.) Lucent does not point to any evidence or testimony that would explain how Microsoft should have known from the binary code that the Cyberlink plug-in infringed the '080 patent. According to the testimony of the witness from Cyberlink, the function of the encoder with regard to encoding mp3 files was never discussed with Microsoft. (Id. at 27:24-28:23.) Therefore, as to inducing infringement as it relates to Windows Media Player with Cyberlink plug-in, the Court finds that there was insufficient evidence to demonstrate that Microsoft knew or should have known that its aid or encouragement would cause the infringement of the '080 patent; judgment as a matter of law on this issue is **GRANTED**. Alternatively, because the jury's verdict was against the clear weight of the evidence, the Court **GRANTS** a new trial on this issue.

## VI.    INVALIDITY DEFENSES

### A.    Anticipation/Obviousness of the '080 Patent: the OCF Paper

Microsoft contends that Lucent failed to present any evidence to rebut Microsoft's prima facie case that the OCF Paper rendered claim 4 of the '080 patent anticipated and/or obvious. However, as Lucent argues, the jury may have reached its verdict because Microsoft failed to demonstrate invalidity by clear and convincing evidence and/or because Lucent's expert Dr. Jayant provided amble rebuttal evidence.

Microsoft's expert Dr. Brandenburg testified that claim 4 (a means-plus-function claim) had several overlapping elements with claim 1 (Trial Tr. vol. VII, 88:16-89:2, Feb. 6, 2007.) These overlapping elements were analyzed in detail with regard to claim 1. (Id. at 78:19-87:4.) In contrast, Brandenburg addressed the means-plus -function element of claim 4, which is not an element in claim 1, in only a cursory fashion. (Id. at 91:4-13.) Although he testified about function of this element, he did not opine where the

24

EXHIBIT _B_ PAGE 35

1    corresponding structure could be found in the prior art. Absent this testimony, the jury may

2    have found his analysis lacking.

3        As for rebuttal evidence, Lucent's expert Dr. Jayant testified that elements (c) and

4    (d) of claim 1 were not found in the OCF paper, nor was it obvious to combine other art to

5    arrive at these claim limitations. (Trial Tr. vol. XI, 78:24-90:4, Feb 13, 2007.) As

6    explained above, these claim limitations overlapped those of claim 4 and would thus be

7    missing in both claims. Therefore, the Court finds that there was ample evidence in the

8    record to support the jury's findings that the OCF Paper did not anticipate the '080 patent

9    or render it obvious. Microsoft's motions for judgment as a matter of law and a new trial

10   on this issue are **DENIED**.

11   **B.    Failure to Swear Behind Low Bit Rate Paper**

12       Microsoft also contends that a jury could not have found the '080 patent valid in

13   view of the Low Bit Rate Paper. It claims that Lucent failed to provide any evidence to

14   swear behind this reference and thus, the Low Bit Rate Paper was definitively prior art.

15       As for the status of the paper as prior art, Microsoft contends that all the evidence

16   establishing the date of invention of the '080 patent came from the uncorroborated

17   testimony of the inventor Johnston. In response, Lucent points to the corroborating

18   evidence of a technical memo and a publication by Johnston.[12] Irrespective of the

19   corroboration issue, however, as discussed supra, Johnston's testimony and supporting

20   documentation cannot support a priority date of 1988 for all of the claims of the '080

21   patent. In particular, they do not establish a date of invention earlier than the '938 patent

22   itself for claim 4 which contains specific corresponding structure for the means-plus-

23

_____

24   [12] As to the technical memo, it has Johnston's signature and also an additional unlabeled
     "signature." (PX128.) Lucent claims it is Dr. Jayant's signature and Microsoft has not challenged this

25   assertion. This latter signature acts as the necessary corroboration to establish a date of invention.
     See

26   Finnigan Corp. v. International Trade Com'n, 180 F.3d 1354, 1369 (Fed. Cir. 1999)(establishing that
     "corroboration is required of any witness whose testimony alone is asserted to invalidate a patent,

27   regardless of his or her level of interest" and distinguishing prior cases such as Thomson, S.A. v.
     Quixote Corp., 166 F.3d 1172, 1176 (Fed. Cir. 1999) which stated otherwise).

28                                          25

1    function limitations. Therefore, the Low Bit Rate Paper which was published before the

2    '938 patent may be considered prior art at least for claim 4.

3        Even so, Microsoft's contention that a jury could have only found that this reference

4    anticipates the '080 patent meets with problems. First, as Lucent points out, Microsoft had

5    the burden to demonstrate anticipation by clear and convincing evidence. Dr. Strawn,

6    Microsoft's only witness on this topic, did not opine on claims 1 and 3 and only offered

7    conclusory testimony as to claim 4, simply "checking off" on a chart that each element of

8    the claim was present in the reference.[13]  (Trial Tr. vol. VIII, 200:3 - 205:4, Feb. 7, 2007.)

9    This testimony alone cannot be considered substantial evidence put before the jury. See

10   Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1152 (Fed. Cir. 2004)

11   ("[T]estimony concerning anticipation . . . must identify each claim element, state the

12   witnesses' interpretation of the claim element, and explain in detail how each claim element

13   is disclosed in the prior art reference. The testimony is insufficient if it is merely

14   conclusory." (quoting Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315-16 (Fed.

15   Cir.2002))).  The Court thus finds that the jury's verdict was supported by substantial

16   evidence and **DENIES** Microsoft's motion for judgment as a matter of law on this ground.

17       **C.    Exclusion of Mr. Johnston's Testimony**

18       Microsoft asserts that it wished, but was not permitted, to elicit Johnston's testimony

19   that Lucent's interpretation of the '080 patent claims was over-broad and rendered the

20   patent invalid.  It argues that this exclusion substantially prejudiced the outcome against

21   Microsoft.

22       The Court finds that this exclusion was not in error and did not result in any

23   prejudice. First, as to the scope of Johnston's testimony, at the motions in limine hearing

24   before trial, Microsoft told the Court that Johnston would not be giving an opinion on

25

26       [13] While Strawn also testified that this analysis was covered in his expert report, he did not
27   further elaborate to say whether the report was also equally as conclusory or more detailed, nor was
     the report put into evidence. (Trial Tr. vol. VIII, 205:10-12, Feb. 7, 2007.)

28                                              26

EXHIBIT _B_ PAGE _37_

1   invalidity; he would testify as a fact witness on issues such as the circumstances

2   surrounding the filing of the reissue application.  (Transcript in limine Hr'g, 26:23-27:12,

3   Jan 3. 2007.)  To the extent Microsoft wished to elicit additional testimony at trial, it should

4   have raised this in a timely manner, especially in light of its prior statement to the Court.

5         Second, while Microsoft argues that an inventor's testimony may be used to

6   invalidate a patent, the relevance of Johnston's possible testimony on this issue is

7   questionable at best.  An inventor's subjective opinion as to the interpretation of the claims

8   is no longer relevant. "[O]nce the patent issues, the claims and written description must be

9   viewed objectively, from the standpoint of a person of skill in the art."  Solomon v.

10  Kimberly-Clark Corp., 216 F.3d 1372, 1380 (Fed. Cir. 2000).  Here, Johnston was not

11  designated as an expert witness and thus could not offer opinions as to invalidity.   Further,

12  Microsoft has not indicated any facts that Johnston would have offered that would have

13  possibly changed the outcome here.

14        Third, Microsoft's primary objective for Johnston's testimony as expressed during

15  the motions in limine hearing and at side-bar during trial was to elicit facts regarding the

16  circumstances of the reissue application that could be relevant to inequitable conduct in

17  procuring the patent or the reissue.  (Transcript in limine Hr'g, 26:23- 27:12, Jan 3. 2007;

18  Trial Tr. vol. VI, 73:8-79:13, Feb. 5, 2007.)  The Court permitted this testimony at trial and

19  therefore Microsoft suffered no prejudice on this issue.. (Trial Tr. vol. VI, 83:13-84:5, Feb.

20  5, 2007.)  Therefore, the motion for a new trial on this ground is **DENIED**.

21        **D.      Impact of KSR Intern. Co. v. Teleflex Inc.**

22        Based on the recent U.S. Supreme Court's ruling in KSR Intern. Co. v. Teleflex Inc.,

23  127 S. Ct. 1727 (2007), Microsoft moves for judgment as a matter of law and/or new trial

24  on obviousness.[14]   Having considered the evidence presented at trial and the instructions

25  _____

26        [14]  The decision in KSR issued on April 30, 2007, almost two months after the verdict in the
      instant Group 2 trial.  Since this trial remains here on direct review, KSR's holding applies.  See
27  Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 90 (1993) ("[the Supreme] Court's application of
      a rule of federal law to the parties before the Court requires every court to give retroactive effect to

28                                          27

EXHIBIT _B_ PAGE _38_

1   given to the jury on obviousness, the Court finds that neither judgment as a matter of law or

2   a new trial is warranted.  The standard used at trial was consistent with <u>KSR</u> and Microsoft

3   has not persuaded the Court that the obviousness analysis would have proceeded any

4   differently had the ruling in <u>KSR</u> been available at the time of the trial.

5          The Court's instructions to the jury did not require an explicit teaching or suggestion

6   to combine:

7          In deciding whether to combine what is described in various items of prior art, you
           **may consider whether or not there was some motivation or suggestion** for a
8          skilled person to make the combination covered by the patent claims.  The
           motivation or suggestion to combine the teachings of different prior art references
9          **may be found either explicitly or implicitly** in the references themselves **or in the
           knowledge generally available** to one of ordinary skill in the art.

10  (Court's Jury Instruction No. 51; docket no.1168 (emphasis added)).  Although Microsoft

11  argues that the instruction should have explicitly stated that a suggestion or motivation to

12  combine was not required, <u>KSR</u> does not completely remove these considerations from the

13  analysis:  "a patent composed of several elements is not proved obvious merely by

14  demonstrating that each of its elements was, independently, known in the prior art."  <u>KSR</u>,

15  127 S. Ct. at 1741.  A reason for the combination is still an important consideration, even

16  though it need not be a rigid formula, nor "a formalistic conception":

17         Often, it will be necessary for a court to look to interrelated teachings of multiple
           patents; the effects of demands known to the design community or present in the
18         marketplace; and the background knowledge possessed by a person having ordinary
           skill in the art, all in order to determine whether there was an apparent reason to
19         combine the known elements in the fashion claimed by the patent at issue.

20

21  <u>Id.</u> at 1740 -1741.   <u>KSR</u> also reaffirmed familiar principles set out in <u>Graham v. John</u>

22  <u>Deere Co. of Kansas City</u>, 383 U.S. 1, 17-18 (1966).  <u>KSR</u>, 127 S. Ct. at 1739.  The jury

23  instructions here mirrored these <u>Graham</u> factors, and did not require a rigid or explicit

24  teaching, suggestion or motivation to combine.  The jury therefore considered the

25  obviousness question under instructions compatible with <u>KSR</u>.

26  _____

27  that decision").

28                                        28

1    Microsoft's contentions that the testimony from Dr. Jayant (Lucent's expert) was in

2 contradiction with the KSR standard are unfounded.    Jayant stated that he disagreed with

3 the conclusion of Microsoft's expert, who had opined that the citation of the book on

4 psychoacoustics within the OCF paper would lead one of ordinary skill in the art to

5 combine the two to result in the invention of the '080 patent:

6        . . . what you're letting the reader know in the OCF paper is that there's this book that
         exists on psycho-acoustics. And that, by itself, doesn't mean that it teaches the reader
7        to go into that book and look at one particular part in the book that indeed goes into
         absolute thresholds and so on, let alone put everything together to come up with the
8        inventions of the claims of the 080 patent.

9 (Trial Tr. vol. XI, 89:22-90:4, Feb. 13, 2007.)  This testimony is not in contradiction with

10 KSR which requires more than simply combining previously known elements from the

11 prior art.  KSR, 127 S. Ct. at 1741.  Jayant's reference to the impermissible use of hindsight

12 analysis also is not in contradiction with KSR.  "A factfinder should be aware, of course, of

13 the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex

14 post reasoning." Id. at 1742

15    Finally, the Court is unpersuaded that KSR's "broad implications" warrant

16 reopening discovery and searching for new prior art.  Although Microsoft points out that

17 this Court allowed reopening of discovery in Groups 4 and 5, the circumstances differ here.

18 Groups 4 and 5 had not started trial before the KSR ruling came out, whereas the Group 2

19 trial has been completed.  Additionally, an examination of district court and Federal Circuit

20 rulings on obviousness since the KSR decision does not support Microsoft's requested

21 upheaval.[15]  In sum, Microsoft has not offered any meritorious reason why obviousness on

22

23        [15] See e.g., Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd., - - F.3d - - , 2007 WL
         1839698, *4 (Fed. Cir. June 28, 2007) (finding that the district court's analysis of obviousness using
24       the Graham factors was consistent with an analysis under KSR); Leapfrog Enterprises, Inc. v.
         Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007) (affirming the district court's finding that
25       reasons in the industry to combine elements were sufficient to show obviousness); Sundance, Inc. v.
         De Monte Fabricating, Ltd., 2007 WL 1655423, *2 (E.D. Mich. June 7, 2007) (denying judgment as
26       a matter of law and/or new trial because the jury's obviousness determination did not use a rigid TSM
         test and thus was consistent with KSR); Stryker Trauma S.A. v. Synthes (USA), 2007 WL 1959231,
27       *6 n.6 (D. N.J. June 29, 2007) (finding that substantial evidence supported the jury's verdict of no
         obviousness because there was no evidence the jury applied a rigid "TSM" test and sufficient evidence

28                                                   29

EXHIBIT _B_ PAGE _40_

1   the '080 patent should be re-tried or why the jury's verdict as to non-obviousness of the

2   '080 patent was not support by sufficient evidence.  Therefore, the motions for judgment as

3   a matter of law and for a new trial on obviousness are **DENIED**.

4        Regarding the '457 patent, an obviousness defense was not pursued by Microsoft at

5   summary judgment or at trial.[16]  Microsoft made a tactical choice not to pursue this

6   defense; it has made no showing that the defense was discarded because of the rigid TSM

7   test or some other factor changed by KSR.  Microsoft should not get another "bite at the

8   apple" simply because it might have chosen a different strategy if KSR had already been

9   decided.  Case law is always a moving target and a party must keep that in mind when

10  making tactical decisions.  Therefore, the motion for a new trial on these grounds regarding

11  the '457 patent also is **DENIED**.

12  **VII.   DAMAGES**

13       By statute, the damages for infringement are set at an amount "adequate to

14  compensate for the infringement, but in no event less than a reasonable royalty for the use

15  made of the invention by the infringer."  An award of damages by the jury "must be upheld

16  unless the amount is grossly excessive or monstrous, clearly not supported by the evidence,

17  or based only on speculation or guesswork." Monsanto Co. v. Ralph, 382 F.3d 1374, 1383

18  (Fed. Cir. 2004) (quoting Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d

19  1555, 1580 (Fed. Cir.1992)).

20       Microsoft sets forth several grounds on which it argues that the jury's damages

21  verdict should be overturned as a matter of law and/or a new trial should be granted: (1) the

22  royalty rate and the royalty base used to calculate a reasonable royalty; (2) the lack of

23  consistency of the jury's numeric calculations; (3) the impact of the Supreme Court's recent

24  holding in Microsoft Corp. v. AT & T Corp., 127 S. Ct. 1746 (2007); and (4) the sway of

25  _____

26  that the verdict was supported with an analysis using only the Graham factors).

27       [16] At summary judgment Microsoft put forth only anticipation on this patent; it was denied
    because of issues of fact.  Microsoft did not pursue even this invalidity defense at trial.

28                                        30

1  passion and prejudice on the jury. These are each reviewed below.

2  **A.     The Royalty Base - Application of the Entire Market Value Rule**

3       Lucent presented a damages model based on a reasonable royalty for the patent; the

4  model presented was a 0.5% royalty rate applied to the average price of a personal

5  computer over the relevant years. Microsoft now argues that there was insufficient

6  evidence to support the application of the entire market value rule on which Lucent

7  predicated the royalty base on the cost of the entire computer.

8       The entire market value rule is applicable where patented and unpatented

9  components are sold together as a functional unit "so as to produce a desired end product or

10  result." Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1550 (Fed. Cir. 1995).

11  Moreover, the patented component must be "the basis for customer demand or

12  "substantially create the value of the component parts." Id. at 1549.

13       Two major problems arise in applying the entire market value rule here. The first is

14  the failure of the evidence to establish a link between the cost of the *computers* (rather than

15  the operating system, Windows Media Player, the MP3 codec or some other "unit") and the

16  customer demand or value of the patented technology. The second and probably even more

17  troublesome problem is the failure to establish that the patented features themselves

18  produced any customer demand or value of the product.

19       The accused products were the HQ and fast encoders present in Windows Media

20  Player. Lucent failed to establish at trial that a commercial necessity and/or desirability of

21  these features was required in computers. Instead, Lucent established at most that there

22  was a desirability that personal computers carry MP3 capabilities. Thobias Jones, a

23  software design engineer at Microsoft, testified that MP3 was a popular request from users

24  who desired Windows Media Player. (Trial Tr. vol. IV, 14:1-13, Feb. 1, 2007.) Dell

25  representative Leonard Zwik testified that Windows Media Player was an integrated

26  function of the computer's operating system and that Dell would not sell a Windows

27  operating system without Windows Media Player. (Id. at 72:5-73:1.) He also testified that

28                                          31

1   there was no customer demand for the version of Windows (XP-N) that lacked Windows

2   Media Player. (Id. 73:2-74:10.)  Witness David Fester, general manager of the Microsoft

3   Windows Digital Media Division testified that MP3 was a feature which attracted users to

4   Windows Media Player.  (Id. at 85:23-86:7).   Finally, Microsoft employee Geoff Harris,

5   responsible for the development of the Windows Media Player product, testified that there

6   was a market need and consumer demand for MP3 encoding capabilities. (Id. at 112:16-

7   113:2.)  The sum of this evidence establishes at most a market demand for an operating

8   system containing Windows Media Player with MP3 capabilities.  It does not establish that

9   the demand for *computers* is based on Microsoft's Windows Media Player and/or MP3

10   technology.

11        Even more problematically, however, is the lack of evidence showing that the

12   patented features set forth in the claims of the '457 and/or '080 patents were the basis for

13   customer demand and/or the substantial value of the product sold.  Importantly, neither the

14   '457 patent nor the '080 patent covers MP3 capability per se.  Rather, each patent relates to

15   a particular *feature* of MP3 capability.[17]  Hence, to apply the entire market value rule, the

16   evidence must show that these features were the basis of the customer demand or

17   substantially created the value of the product.  See e.g., Fonar Corp. v. General Elec. Co.,

18   107 F.3d 1543, 1549, 1553 (Fed. Cir. 1997) (the multi-angle oblique (MAO) imaging

19   feature claimed in the patent was emphasized as a selling feature in the device found to

20   infringe and thus a reasonable royalty was correctly based on the cost of the entire device);

21   Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1361 (Fed. Cir. 2001) (entire loudspeaker cost

22   was the proper royalty base where the patented feature functioned as one unit with the other

23   _____

24   [17] Lucent's own witness Dr. Jayant, testified that MP3 technology originated from many
     sources and is composed of many features, including the bit stream syntax (how the bit stream is

25   interpreted and meaningfully decoded to play back the audio signal), features of the decoder and some
     features of the encoder.  (Trial Tr. vol. II, 121:11-23, 123:2-22, Jan. 30, 2007.)  In contrast, the claims

26   at issue related to only particular features that could be used in conjunction with MP3 encoders.  The
     '457 patent relates to the methods of audio coding using a tonality value and a masking threshold.  The

27   '080 patent relates to methods and apparatus for audio coding which incorporates the use of an
     absolute hearing threshold in conjunction with a masking threshold.

28

EXHIBIT __B__ PAGE __43__

1    components to provide the desired audible performance, the patented feature improved the

2    performance of the loudspeaker, and the improved performance was the basis for the

3    customer demand); Tec Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1362 (Fed.

4    Cir. 1999) (damages based on entire assembly of motor, radiator and condensor where the

5    performance of the whole assembly was important to the customer, the fan was required for

6    the assembly and the patented method of balancing the fan was critical to the function of

7    the assembly and important to customer demand for the assembly); compare e.g., Imonex

8    Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1380 (Fed.

9    Cir. 2005) (insufficient evidence for the entire market rule where the patented feature,

10   which differentiated which coins were put into the machine, was not shown to be the basis

11   for the customer demand of the entire laundry machine); Medtronic, Inc. v. Catalyst

12   Research Corp., 547 F. Supp. 401, 414 (D.C. Minn. 1982) (the cost of entire pacemaker

13   could not be the royalty base where value of the pacemaker was not substantially due to the

14   patented features of the battery).

15        Here, the Court finds no evidence adduced at trial that establishes that the patented

16   features of either the '457 or the '080 patents were critical to MP3 or that they established

17   the basis for the customer demand or value of MP3, let alone were critical or provided

18   value to the whole computer.  The evidence cited by Lucent from the trial record shows

19   only that MP3 capabilities *overall* were a commercially important feature.  According to

20   Lucent's expert Dr. Jayant, MP3 technology originated from many sources and the MP3

21   standard specifies many aspects of audio compression.  (Trial Tr. vol. II, 121:11-123-22,

22   Jan 30, 2007.)  Although Jayant pointed out what he considered important in the MP3, the

23   key technology he identified related to the decoding of the bit stream syntax (which allows

24   decoders from different manufactures to interpret and play back the audio signal); he did

25

26

27

28

33

1   not identify either the invention of the '080 patent or the '457 patent as critical to MP3.[18]

2   (Id. at 123:2-22.)  Additionally, the evidence demonstrated that although the inventions of

3   these patents could be used with the MP3 standard, they were not required or critical to

4   practice the MP3 standard.

5        Finally, Lucent's assertion that even absent application of the entire market value

6   rule, the use of the computers as a royalty base was correct because Microsoft has joint and

7   several liability for Dell's and Gateway's infringement, is misplaced.  Although an indirect

8   infringer may be liable for all damages attributable to infringing sales, Water Tech., 850

9   F.2d 660, 669 (Fed. Cir. 1988); Glenayre v. Jackson, 443 F.3d 851 (Fed. Cir. 2006), simply

10  because Dell and Gateway sell computers does not automatically designate the computer as

11  the royalty base. The same foundation for application of the entire market value rule would

12  have been required even if Lucent had been in direct litigation with Dell and Gateway.  In

13  the absence of this nexus, Lucent may only recover damages for the value of the patented

14  technology itself, regardless of the named defendant.[19]

15       In sum, the Court finds that there was insufficient evidence to establish the required

16  nexus between the patented features and the value of the entire computer and therefore, the

17  jury's application of the entire market value rule to the computer was unsupported as a

18  matter of law.  On this basis, Microsoft's motion for judgment as a matter of law on the

19  damages award is **GRANTED**.  Lacking sufficient evidence to establish the proper royalty

20  _____

21       [18] Additionally, although Lucent point to the testimony of Microsoft's witness Dr. Brandenburg
    as evidence that the patented features were essentially MP3, this testimony established at best that the
22  technology which improved upon the '457 patent, set forth in U.S. Patent No. 5,040,217 ("the '217
    patent"), was incorporated as an optional psychoacoustic model in the MP3 standard.  He testified
23  that the '217 patent was the basis of AT&T's (along with other companies') submission to the MP3
    standard (ASPEC submission). According to Brandenburg, the '938 patent (on which the '080 reissue
24  patent is based) was not even around when this submission was made. (Trial Tr. vol. VII, 13:2-17,
    15:10-17, Feb. 6, 2007.)  He also stated that this technology was optional for the MP3 standard. (Id.
25  at 191:4-11.)

26       [19] Aside from the issue of the entire market value rule, Microsoft disputes generally that Lucent
    offered sufficient evidence of any value of the accused HQ and fast encoders to justify the $1.53
27  billion verdict.  Since this issue is intertwined with the establishment of a proper royalty base on
    which a new trial is granted, the issue need not and is not further addressed here.

28                                      34

EXHIBIT _B_  PAGE _45_

1   base (both what the base would be and its cost) from the evidence at trial, the Court also

2   **GRANTS** a new trial to determine damages.

3       **B.    Royalty Rate**

4       Microsoft contends that there was insufficient evidence for the 0.5% royalty rate

5   utilized by the jury in the damage award.  Since, as explained herein, the base used in the

6   reasonable royalty calculation must be reconsidered, this will likely influence selection and

7   therefore require reconsideration of the royalty rate.  However, the Court considers some of

8   the issues pertaining specifically to the royalty rate here.

9       Under Georgia Pacific, a hypothetical negotiation may consider royalties received

10  for the patents in suit and licenses for comparable technologies.  Georgia-Pacific Corp. v.

11  U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (D.C.N.Y. 1970).  The parties presented

12  differing perspectives on these factors.  Lucent focused on a single license it had made for

13  the '457 and '080 patents, the knowledge of its licensing expert obtained from his

14  experiences licensing IBM's hardware technology and a single royalty-bearing agreement

15  made by Microsoft.  Microsoft's evidence concentrated on recent licenses it had made with

16  SISVEL (Societa Italiana Per Lo Sviluppo Dell Electtronica) for MP3 technology,

17  Microsoft's agreements with Fraunhofer for the HQ and fast encoder software and

18  Microsoft's agreements with other companies exchanging other software technologies.

19  Each perspective had its strengths and weaknesses, and yet, the overall result offered the

20  jury very little guidance in setting a royalty rate applicable to the technology and parties at

21  hand.

22      With regard to Lucent's license of the technologies in suit here, it had only a single

23  example of a royalty-based license (PX 1532; Trial Tr. vol. IV, 161:1-162:8, 163:8-14, Feb.

24  1, 2007) and this was made on a scale far smaller than would be relevant here.[20]  See

25  _____

26      [20] Lucent's expert Roger Smith testified that although the patents in suit had been licensed to
    a number of players in the industry (e.g., IBM, HP, Sony), these licenses were all broad cross licenses
27  from which it was difficult to discern the value of the instant patents.  (Trial Tr. vol. IV,159:20 -
    160:25, Feb. 1, 2007.)  The single license example (the Nel-Tech license), although offering a 1%

28

EXHIBIT B PAGE 46

1    <u>Unisplay, S.A. v. American Electronic Sign Co., Inc.</u>, 69 F.3d 512, 519 (Fed. Cir. 1995)

2    (evidence of licensing proposals and agreements probative but insufficient because the

3    scale of the license was not comparable).  Lucent's expert Roger Smith testified that

4    Lucent's "best licensing practices" document specified  a 1-5% royalty rate assessed on the

5    product sold.  (Trial Tr. vol. IV,155:20-156:9, Feb. 1, 2007.)  He also testified about

6    internal Lucent documents which indicated that Lucent intended to license its MPEG and

7    audio standard patents at 0.5%.  (<u>Id.</u> at 156:22 - 157:4, 157:25-158:19.)  Whether these

8    rates were ever implemented and could be considered an established rate was not apparent

9    from the record. See <u>Trell v. Marlee Electronics Corp.</u>, 912 F.2d 1443, 1446 (Fed. Cir.

10    1990) ("for a royalty to be established, it must be paid by such a number of persons as to

11    indicate a general acquiescence in its reasonableness by those who have occasion to use the

12    invention"); <u>Hanson v. Alpine Valley Ski Area, Inc.</u>, 718 F.2d 1075, 1078 (Fed. Cir. 1983)

13    ("mere offers to license" without actual consummated licenses are insufficient to show an

14    "established" royalty rate for the technology).

15        Smith also testified that 1% royalty to use IBM's products was the norm in the

16    computer industry.  However, such licenses (<u>see e.g.</u>, PX1560) were hardware licenses, not

17    licenses for software or features of software comparable to the products in suit.  Other than

18    IBM's hardware licenses, Smith referred to the industry norm set out in an article (PX

19    1505), but again this was a survey of royalties for computer hardware; the article did not

20    address the software industry, let alone any connection to the MP3 technology at hand here.

21    Smith did not explain why the same royalty rate would apply in licensing the technology at

22    suit here.

23    _____

24    royalty on MP3 products incorporating the instant patents, generated only $1450 in its first quarter.
      (<u>Id.</u> at 163:6-14.)  Moreover, this license was entered into between Lucent and NelTech in 2005, two

25    years after the initiation of the instant suit (Trial Tr. vol. V, 26:19-27:1, Feb. 2, 2007.)  The date of
      the hypothetical negotiation is set just before the infringement began. <u>Panduit Corp. v. Stahlin Bros.</u>

26    <u>Fibre Works, Inc.</u>, 575 F.2d 1152, 1158 (Fed. Cir. 1978). Lucent's expert asserted that his calculations
      were based on a hypothetical negotiations date of 1988 (Trial Tr. vol. IV, 150:2-5, Feb. 1, 2007);

27    although he claimed that if Microsoft's model of a date at 1997 or 2004 was used, his calculations
      would not change. (<u>Id.</u> at 150:6-19)

28                                36

1      Lucent also had a single example of royalty rate based agreements between

2 Microsoft and another company; the Microsoft-Stac agreement was offered by Smith as an

3 example of a 1-2% royalty-bearing agreement. (Id. at 174:2-9; PX1534.) Most of

4 Microsoft's agreements were for lump sum payments (see e.g., Trial Tr. vol. IV, 170:11-20,

5 172:5-11, and 172:3-7, Feb. 1, 2007) and were categorized by Smith as software licenses

6 with narrower rights than a patent license (id. at 168:16-169:13).

7      Microsoft, on the other hand, brought forward two sets of agreements related to MP3

8 technology. One set was composed of two agreements executed between Microsoft and

9 Fraunhofer for the very software code at issue in the infringement here. Microsoft paid a

10 total of $16 million. (PX34, PX36.) These agreements were criticized by Lucent's expert

11 as software agreements with only the minimum patent rights necessary to use the licensed

12 code. (Trial Tr. vol. V, 6:23-7:16, Feb. 2, 2007.) The agreements did not grant any rights to

13 use Fraunhofer's patents for technologies divorced from the source and object code

14 provided with the license. The hypothetical negotiation here was not necessarily limited to

15 a patent license for only specific software code. See Trell v. Marlee Electronics Corp., 912

16 F.2d 1443, 1447 (Fed. Cir. 1990) ("A particular fee is not the correct measure of damages

17 unless that which is provided by the patentee to its licensees for that fee is commensurate

18 with that which the defendant has appropriated." (quoting Bandag, Inc. v. Gerrard Tire Co.,

19 Inc., 704 F.2d 1578, 1582 (Fed. Cir.1983))).

20      The second agreement was between Microsoft, Audi MPEG and SISVEL (Societa

21 Italiana Per Lo Sviluppo Dell Electtronica) concerning rights to a group of patents for audio

22 coding. (DX 6715.) The royalty was $0.30 per software copy with a maximum of $5.625

23 million payment. (Id. § 4.02.) The relevance of this agreement to the hypothetical

24 negotiation is questionable, as the SISVEL agreement was executed in November 2006,

25 only a few months before the commencement of the instant trial. See Panduit Corp. v.

26 Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (Fed. Cir.1978) (the hypothetical

27 negotiation is set just before the date of infringement).

28

EXHIBIT _B_ PAGE 48

1    In sum, it is not so much that the jury lacked any evidence on which to base a

2  reasonable royalty rate, but that the evidence provided limited guidance.  The Court cannot

3  definitively conclude that there was insufficient evidence on which a reasonable jury could

4  have reached the 0.5% royalty rate stated in the verdict form and as such Microsoft's

5  motion for judgment as a matter of law on this ground is **DENIED**.  However, the Court

6  **GRANTS** Microsoft's motion for a new trial.  The Court finds that the jury's verdict was

7  against the clear weight of the evidence; although a plethora of licensing agreements were

8  admitted into evidence, the majority of these which advocated a royalty rate in the 0.5%

9  range lacked sufficient relevance to the technology at issue here, the relevant date of the

10  hypothetical negotiation and/or the scope of a license that would be negotiated between

11  these parties.  Moreover, since the royalty base must be redetermined, the royalty rate

12  dependent thereon also should be reconsidered.

13    **C.    Inconsistency of the Verdict**

14    The jury awarded $769 million for infringement on each patent.  According to the

15  Special Verdict Form, it used a 0.5% royalty rate.  Microsoft argues that the jury verdict is

16  inconsistent with the evidence presented at trial:  If the average selling price of the

17  computer is $1128 (see PX3134), a 0.5% royalty would yield $5.64 per computer.  Applied

18  to the 130.5 million units sold with the HQ encoder, the total should be approximately $736

19  million for the '457 patent; applied to the 272 million infringing units for the '080 patent.

20  yields $1.53 billion for this patent. (See DX6099.)  Adding the damages for the two patents

21  could have yielded a jury verdict of $2.269 billion.

22    The jury was not required to report on the verdict form the number of infringing

23  units it took into consideration in its calculations.  Moreover, whether the jury followed

24  Microsoft's logic or chose to arrive at a reasonable royalty based on other factors and/or

25  adjustments to this simple calculation is unknown.  A plethora of payments and sums

26  related to other licenses was in evidence in addition to the summary slides of the parties'

27  damages models.  Absent a view into the "black-box" of the jury's decision making

28

EXHIBIT _B_ PAGE _49_

1  process, the Court cannot say that the jury's verdict was inconsistent or without the support

2  of sufficient evidence.  Moreover, while it might be permissible in some circumstances to

3  rationalize the damages verdict such that adjustments by the Court could be made, the other

4  issues affecting the damages verdict here make this consideration moot.  Therefore, the

5  Court **DENIES** Microsoft's motions for judgment as a matter of law and for a new trial on

6  this ground.

7      **D.**    **Impact of the Supreme Court's Ruling in <u>Microsoft Corp. v. AT & T Corp.</u>**

8      Microsoft argues that the $1.53 billion damages includes foreign sales which is

9  inconsistent with the very recent decision in <u>Microsoft Corp. v. AT & T Corp.</u>, 127 S. Ct.

10  1746, 1750 (2007), regarding the inapplicability of § 271(f) to software sent overseas on a

11  master disc (or electronically) for reproduction and sale because foreign sales of Windows

12  Media Player were included in the damages verdict here.

13      In <u>AT&T</u>, the Supreme Court held that "a copy of Windows, not Windows in the

14  abstract, qualifies as a 'component' under § 271(f)." <u>Id.</u> at 1756.  It also held that

15  "components" under § 271(f) did not include copies of software installed on computers

16  where the copies themselves were not supplied from the United States. <u>Id.</u> at 1757.

17      In the instant case, the Special Verdict Form did not separately list damages for U.S.

18  and foreign sales.  Additionally problematic, the damages covered infringement of both

19  apparatus and methods claims of the '457 and '080 patents.[21]  <u>AT&T</u> expressly limited its

20  holding to apparatus claims:

21         We need not address whether software in the abstract, or any other intangible, can
22         ever be a component under § 271(f). If an intangible method or process, for instance,
       qualifies as a "patented invention" under § 271(f) (a question as to which we express
23         no opinion), the combinable components of that invention might be intangible as
       well. The invention before us, however, AT & T's speech-processing computer, is a
24         tangible thing.

25

26  ─────────────────────

27      [21] The '457 patent and the '080 patent each had three claims at issue; of the total six claims,
four were methods claims.

28                             39

1   Id. at 1756 n.13.  Even if this Court declines to consider here whether AT&T should be

2   extended to apply to the methods claims and applies the holding to the apparatus claims, the

3   problem is not solved.  The lack of transparency as to how the jury arrived at the numbers

4   for its damages verdict makes any attempt at "subtracting out" foreign sales nearly

5   impossible.  Moreover, the parties have not pointed to any evidence that separated damages

6   calculated for infringing methods claims versus apparatus claims of the patents.  Hence, the

7   Court has no guidance as to how even the damages for the foreign sales related to only

8   apparatus claims could be removed.

9       The Court, however, need not and does not address this mountain of difficulties

10  given the insufficient evidence to support the damages verdict as it stands now, i.e., the

11  inapplicability of the entire market value rule to the computer as the royalty base.  Once the

12  reasonable royalty base and rate are properly addressed, these remaining challenges can be

13  rectified in the presentation of the evidence, jury instructions and a new verdict form in the

14  new trial.  The Court therefore defers the consideration on the impact of AT&T on the

15  damages award until such time.  Therefore, Microsoft's motions for judgment as a matter of

16  law and for a new trial on this issue are **DENIED AS MOOT.**

17      **E.    Passion and Prejudice**

18      Microsoft next argues that the $1.53 billion damages award was driven by the jury's

19  passion and prejudice against Microsoft as a high earning large company.  Microsoft points

20  to statements made by Lucent in its closing argument referring to Microsoft's "80% plus

21  profit" and references to revenue from computer sales of $38-$61 billion (when Microsoft

22  did not even sell the computers).  Microsoft also argues that the inclusion of foreign sales

23  interjected prejudice into the damages calculation.  It contends that Lucent's argument to

24  the jury that Microsoft distributed millions of copies of the software around the world and

25  made billions of dollars biased the jury and improperly inflated considerations under

26

27

28

40

1    Georgia Pacific.[22]

2           Microsoft's contentions are pure speculation.  Other than isolated statements made

3    in Lucent's opening and closing statements, there is no evidence that would suggest that the

4    verdict was inflated by passion or prejudice.  Simply the large number of units sold, the

5    lack of royalty evidence other than something in the 0.5-1% range, and the use of the

6    computer as the base price provides a possible reasoning for the jury's damages verdict.

7    The Court cannot say that passion and prejudice necessarily played any role in reaching the

8    amount of damages, rather than the jury's simple acceptance of Lucent's sums at face-

9    value.  On this ground, Microsoft's motion for a new trial is **DENIED**.

10   **VIII.   CONCLUSION**

11          For the reasons herein, the Court rules as follows on Microsoft's grounds for

12   judgment as a matter of law and/or new trial:

13   **Liability on the '457 Patent**

14          No direct infringement                         GRANTED judgment as a matter of law
                                                            Alternatively, GRANTED new trial

15          No indirect infringement                       GRANTED judgment as a matter of law
16                                                          Alternatively, GRANTED new trial

17   **Ownership of the '080 Patent**

18          Claims 2 and 4 are New Work                     GRANTED judgment as a matter of law
                                                            Alternatively, GRANTED new trial
19
            Fraunhofer is a co-owner                        GRANTED judgment as a matter of law
20          of the '080 patent                               Alternatively, GRANTED new trial

21          Lucent lacks standing                           GRANTED judgment as a matter of law
                                                            Alternatively, GRANTED new trial
22
            Microsoft's license defense                     GRANTED judgment as a matter of law
23                                                          Alternatively, GRANTED new trial

24

25

26

27          [22] The record does not indicate that Microsoft objected to any of these statements during trial.

28                                            41

EXHIBIT _B_ PAGE _52_

**Liability on the '080 Patent**

    Incorrect claim construction — DENIED as to new trial*[23]

    No direct infringement — DENIED as to judgment as a matter of law and new trial

    No contributory infringement — DENIED as to judgment as a matter of law and new trial

    No inducing Infringement — GRANTED judgment as a matter of law Alternatively, GRANTED new trial

**Invalidity**

    Obviousness -Impact of KSR — DENIED as to judgment as a matter of law and new trial

    Anticipation - OCF paper — DENIED as to judgment as a matter of law and new trial

    Anticipation - low bit rate paper — DENIED as to judgment as a matter of law and new trial

    Exclusion of Johnston's testimony — DENIED as to new trial*

    Exclusion of deposition testimony of Restaino and deVilliers — DENIED as to new trial*

**Damages**

    Royalty base - entire market value — GRANTED judgment as a matter of law, GRANTED new trial

    Royalty rate — DENIED as to judgment as a matter of law, GRANTED new trial

    Inconsistent verdict — DENIED as to judgment as a matter of law and new trial

    Impact of AT&T — DENIED AS MOOT

    Passion/prejudice — DENIED as to new trial*

//
//

[23] Microsoft moved only for new trial and not judgment as a matter of law on those issues marked with an asterisk (*).

42



1    The net result of the rulings above results in a judgment under Fed. R. Civ. P. 54(b)

2  in favor of Microsoft and against Lucent with costs to Microsoft, terminating the case as it

3  pertains to these two patents, U.S. Patent Nos. 5,341,457 and RE 39,080..

4    In light of these rulings, Lucent's motion to amend or alter the judgement under Fed.

5  R. Civ. P. 59(e) regarding supplemental damages, prejudgment and post judgment interest,

6  and a permanent injunction is **DENIED AS MOOT** since Lucent is no longer the

7  prevailing party.

8

9    **IT IS SO ORDERED.**

10

11  DATED:  August 6, 2007

12

13                                   Hon. Rudi M. Brewster
                                      United States Senior District Court Judge

14

15  cc:  Hon. Cathy Ann Bencivengo
16       United States Magistrate Judge

17       All Counsel of Record

18

19

20

21

22

23

24

25

26

27

28                                      43

EXHIBIT __B__  PAGE __54__

# EXHIBIT C

# FISH & RICHARDSON P.C.

12390 El Camino Real
San Diego, California
92130

Telephone
858 678-5070

Facsimile
858 678-5099

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA EMAIL**

September 12, 2007

Elizabeth T. Bernard, Esq.
Kirkland & Ellis LLP
153 East 53rd Street
New York, NY 10022-4675

Re:     *Lucent v. Gateway, Microsoft, et al.*
USDC-S.D. Cal. - Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-0699 B (CAB) and Case No. 03-CV-1108 B (CAB)



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Dear Elizabeth:

As you will recall, on May 11, 2007 Microsoft, Dell, and Gateway were just minutes from beginning a three-hour deposition of Wayne Hoeberlein regarding the second supplementation of his user interface report when Lucent summarily indicated the witness would not appear in light of Judge Brewster's decision to postpone trial. On June 4, 2007, you wrote to counsel for Microsoft, Dell and Gateway, indicating that you were "confident" that the parties would "be able to arrange a mutually convenient date and place for Mr. Hoeberlein's Group 4 deposition" once the Court had "finalized the supplemental expert discovery schedule." Unfortunately, although the Court "finalized" the expert discovery schedule just three days after your letter, your team has remained silent regarding Mr. Hoeberlein's availability since then.

Given that trial is rapidly advancing, Microsoft would like to take its deposition of Mr. Hoeberlein as soon as practicably possible. After conferring with Dell and Gateway regarding their availability, it appears that all three parties could appear for such a deposition on Monday, October 8, Tuesday, October 9, or Wednesday, October 10. Please let us know whether Mr. Hoeberlein is available on one of these days.

Thank you very much for your prompt attention to this matter.

Very truly yours,

Joseph P. Reid

JPR/mzb

cc:    James Blackburn, Esq.
Jonathan Baker, Esq.

EXHIBIT ___C___ PAGE ___55___

# EXHIBIT D

```
 1                 UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  LUCENT TECHNOLOGIES,          )   Case No. 02CV2060-B(CAB)
                                  )              Consolidated with
 5            Plaintiff,          )              03CV0699-B(CAB)
                                  )              03CV1108-B(CAB)
 6  vs.                           )              Related to:
                                  )              06CV0684-B(CAB)
 7  GATEWAY, INC., et al.,        )
                                  )   San Diego, California
 8            Defendants.         )
    _____)   Friday,
 9                                     April 27, 2007
                                       9:00 a.m.
10

11                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE RUDI M. BREWSTER
12               UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Plaintiff:

15                                JOHN DESMARAIS, ESQ.
                                  PAUL A. BONDOR, ESQ.
16                                GREGORY F. CORBETT, ESQ.
                                  ERIC HAYES, ESQ.
17                                Kirkland & Ellis, LLP.
                                  153 East 53rd Street
18                                New York, New York 10022
                                  (212) 909-3189

19  For the Defendant:           JONATHAN BAKER, ESQ.
                                  STEVE R. DANIELS, ESQ.
20                                W. BRYAN FARNEY, ESQ.
                                  Dechert, LLP
21                                300 West Sixth Street
                                  Suite 1850
22                                Austin, Texas 78701
                                  (512) 394-3000
23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```



133

1  have -- the element's got to be there, either in a -- letter

2  or together.  So, that's the ruling.

3

4      MR. DESMARAIS:  Agreed, your Honor, and we'll live

5  by the ruling.

6      MR. FARNEY:  Your Honor, just for some

7  clarification on that, because they say they'll abide by the

8  ruling.  I think, implicit in that ruling is, when you're

9  cobbling, some of the old stuff that you're trying to cobble

10 to the new stuff at least has to be relevant to the patent

11 we're talking about.  In other words, you can't --

12     THE COURT:  It's all got to be -- it's all -- I've

13 just said, it's got to be on the patent we're talking about.

14     MR. FARNEY:  So, if the old stuff is not related

15 to --

16     THE COURT:  If it's a portfolio of patents and

17 then he says, here's the notice that you're infringing,

18 that's not going to do it.  You've got to identify 356

19 specifically somewhere.  And if it's identified -- here's

20 another thing.  If the 356 is clearly identified in the

21 group of portfolio, and then you come back to the letter and

22 say, this notice is you're infringing our patents or our

23 patent, but you don't say which one, not adequate.

24     MR. DESMARAIS:  We're all in agreement, your

25 Honor, and we'll live by that.

*Echo Reporting, Inc.*



134

1          THE COURT:  So, that's number three, and that's

2    also -- it's related to Gateway's number 6, I believe.

3          MR. BONDOR:  That's right, essentially the same.

4          THE COURT:  Same.  Okay, now, we're on Dell number

5    18, which I think is related to Gateway number 1, and that's

6    exclude damages testimony on Quicken and Money because of

7    Wayne Hoberlein's untimely second supplemental expert

8    report.  Now, this is the one, I'm led to believe from the

9    briefs that there was late production of figures, and then a

10   late report after that late production.  Let me give you the

11   rule.  I'm going to give you the rule.  This is not a

12   summary judgment motion.  Any late discovery of numbers

13   which can be the subject of an expert witness's testimony

14   may be followed by a supplemental report by the expert on

15   those late-produced numbers.

16         MR. FARNEY:  That last part is the important part.

17         THE COURT:  Well, that's the only part --

18         MR. FARNEY:  Because what they added was something

19   not related to the late numbers.

20         THE COURT:  If the supplemental report goes beyond

21   the late production, that which goes beyond is, should we

22   say, recapture or something?

23         MR. DESMARAIS:  No, don't mention that.

24         THE COURT:  Yeah, it's not going to come in.  It's

25   not going to come in.

*Echo Reporting, Inc.*


EXHIBIT D PAGE 58

135

1          MR. BAKER:  I understand, your Honor.  Well, your

2    Honor, what's going on here is that all --

3          THE COURT:  It's not going to come in.  The

4    supplemental report must be limited to the tardy production

5    which energized the late report.  Isn't that clear enough?

6       (Speaking all at once.)

7          MR. BAKER:  Your Honor, this is our motion.  Your

8    Honor, if I could address this first.  This is our motion.

9          THE COURT:  I don't -- I'm not ruling that the

10   expert report did or didn't, because I haven't seen it.  I'm

11   giving you the rule of law.  Isn't that easy enough to

12   follow?  Don't tell me -- don't tell me that it does this or

13   doesn't do that.  I don't care.

14         MR. BAKER:  I think it's perfectly clear, because

15   they --

16         THE COURT:  I don't care.  I've given you the rule

17   of law.

18         MR. BAKER:  No, I think your rule is perfectly

19   clear.  The problem is Lucent -- Lucent has the problem --

20         THE COURT:  There will be nothing, this expert

21   report, if there is one that follows the late production of

22   figures, it will be limited to those figures, nothing

23   beyond.

24         MR. DESMARAIS:  Yes, and we're willing to live

25   with that.

*Echo Reporting, Inc.*


EXHIBIT _D_ PAGE _59_