1  James S. Blackburn (State Bar No. 169134)
   ARNOLD & PORTER LLP
2  777 South Figueroa Street, 44th Floor
   Los Angeles, California  90017-5844
3  Telephone:  (213) 243-4000
   Facsimile:  (213) 243-4199
4
   Joseph A. Micallef (admitted *pro hac vice*)
5  ARNOLD & PORTER LLP
   555 Twelfth Street, N.W.
6  Washington, D.C.  20004-1206
   Telephone:  (202) 942-5000
7  Facsimile:  (202) 942-5999

8  Joel M. Freed (admitted *pro hac vice*)
   McDERMOTT WILL & EMERY LLP
9  600 13th Street, N.W.
   Washington, D.C.  20005-3096
10 Telephone:  (202) 756-8000
   Facsimile:  (202) 756-8087
11
12 Attorneys for *Dell Inc.*

13                    UNITED STATES DISTRICT COURT

14                  SOUTHERN DISTRICT OF CALIFORNIA

15

16 LUCENT TECHNOLOGIES INC.  and        )  Case No. 07-CV-2000-H (CAB)
17 MULTIMEDIA PATENT TRUST,             )  consisting of matters severed from
                                        )  consolidated cases:
18      Plaintiffs and Counterclaim-defendants, )  Case No. 02-CV-2060-B (CAB)
                                        )  Case No. 03-CV-0699-B (CAB)
19      v.                              )  Case No. 03-CV-1108-B (CAB)
                                        )
20 GATEWAY, INC. AND GATEWAY            )  **DECLARATION OF KATHERINE B.**
   COUNTRY STORES LLC, GATEWAY          )  **FARKAS IN SUPPORT OF**
21 COMPANIES, INC., GATEWAY             )  **DEFENDANTS' MOTION FOR STAY**
   MANUFACTURING LLC and                )  **OR, IN THE ALTERNATIVE,**
22 COWABUNGA ENTERPRISES, INC.,         )  **SEVERANCE OF THE HASKELL AND**
                                        )  **NETRAVALI PATENTS FOR**
23      Defendants and Counter-claimants, )  **CONSOLIDATION WITH CASE NO. 07-**
                                        )  **CV-0747**
24 and                                  )
                                        )  Judge Marilyn L. Huff
25 MICROSOFT CORPORATION,               )
                                        )  Hearing Date:  January 7, 2008
26      Intervener and Counter-claimant, )  Hearing Time:  10:30 a.m.
                                        )  Location:     Courtroom 13, 5th Floor
27 _____ )
28

| | |
|---|---|
| 1 | MICROSOFT CORPORATION, |
| 2 |      Plaintiff and Counter-defendant, |
| 3 | v. |
| 4 | LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, |
| 5 | |
| 6 |      Defendants and Counter-claimants, |
| 7 | LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, |
| 8 | |
| 9 |      Plaintiffs and Counterclaim-defendants, |
| 10 | v. |
| 11 | DELL INC., |
| 12 |      Defendant and Counter-claimant. |

1    I, Katherine B. Farkas, declare as follows:

2    1.    I am an attorney in the law firm of Arnold & Porter LLP, counsel for defendant Dell

3    Inc. ("Dell"). I make this declaration in support of Defendants' Motion for Stay or, in the

4    Alternative, Severance of the Haskell and Netravali Patents for Consolidation with Case 07-CV-

5    0747, which is filed concurrently with this declaration. Unless otherwise stated herein, I have

6    personal knowledge of the facts set forth below and, if called as a witness, could and would

7    competently testify thereto.

8    2.    Attached hereto as Exhibit 1 is a true and correct copy of Excerpts from Expert

9    Report of Wayne A. Hoeberlein Re Damages for Video Coding Patents, dated March 31, 2006.

10    **[FILED UNDER SEAL]**

11    3.    Attached hereto as Exhibit 2 is a true and correct copy of Second Modified

12    Scheduling Order and Extension of Discovery (02-cv-2060), dated January 12, 2006.

13    4.    Attached hereto as Exhibit 3 is a true and correct copy of Agreement Among

14    Licensors (LUC1312617 - LUC1312647.1). **[FILED UNDER SEAL]**

15    5.    Attached hereto as Exhibit 4 is a true and correct copy of MPEG-2 Patent Portfolio

16    License (DELL312379 - DELL312411). **[FILED UNDER SEAL]**

17    6.    Attached hereto as Exhibit 5 is a true and correct copy of Transcript of Telephonic

18    Pretrial Conference Hearing Before the Honorable Rudi M. Brewster (02-cv-2060), dated August

19    14, 2006.

20    7.    Attached hereto as Exhibit 6 is a true and correct copy of Order Staying Certain

21    Proceedings, Vacating Certain Hearing Dates, and Setting Status Conference (02-cv-2060), dated

22    August 14, 2006.

23    8.    Attached hereto as Exhibit 7 is a true and correct copy of Lucent's Confidential

24    Letter Brief and Exhibits Re Video Coding Patents Under Seal Pursuant to Local Rule 79-2 (02-cv-

25    2060), dated December 11, 2006. **[FILED UNDER SEAL]**

26    9.    Attached hereto as Exhibit 8 is a true and correct copy of Trust Agreement between

27    Lucent and Wilmington Trust Company (WTC00030 - WTC00051). **[FILED UNDER SEAL]**

28

- 1 -

1    10.    Attached hereto as Exhibit 9 is a true and correct copy of Patent Assignment between

2   Lucent Technologies, Inc. and Multimedia Patent Trust (WTC00021 - WTC00029). **[FILED**

3   **UNDER SEAL]**

4    11.    Attached hereto as Exhibit 10 is a true and correct copy of Excerpts from the

5   Deposition of Barbara Landmann, dated April 20, 2007. **[FILED UNDER SEAL]**

6    12.    Attached hereto as Exhibit 11 is a true and correct copy of Excerpts from the

7   Deposition of William Carapezzi, April 20, 2007. **[FILED UNDER SEAL]**

8    13.    Attached hereto as Exhibit 12 is a true and correct copy of Pretrial Scheduling Order

9   (07-cv-2000-H), dated November 9, 2007.

10    14.    Attached hereto as Exhibit 13 is a true and correct copy of Order Severing and

11   Transferring Part of Case (02-cv-2060), dated October 16, 2007.

12    15.    Attached hereto as Exhibit 14 is a true and correct copy of Complaint by Multimedia

13   Patent Trust, dated April 24, 2007.

14    16.    Attached hereto as Exhibit 15 is a true and correct copy of Multimedia's Disclosure

15   of Asserted Claims and Preliminary Infringement Contentions (07-cv-0747), dated September 10,

16   2007.

17    17.    Attached hereto as Exhibit 16 is a true and correct copy of Case Management

18   Conference Order Regulating Discovery and Other Pretrial Proceedings (07-cv-0747); dated

19   November 1, 2007.

20    18.    Attached hereto as Exhibit 17 is a true and correct copy of Verified Complaint by

21   MPEG LA, LLC against Alcatel Lucent, Lucent Technologies, Inc., and Multimedia Patent Trust

22   (In the Court of Chancery of the State of Delaware in and for Newcastle County), October 26, 2007.

23    19.    Attached hereto as Exhibit 18 is a true and correct copy of Second Amended Answer

24   and Counterclaims of Dell Inc. In Reply to Second Amended Complaint in 03-cv-1108 B (CAB),

25   dated September 28, 2007.

26    20.    Attached hereto as Exhibit 19 is a true and correct copy of Excerpts from Lucent's

27   Eighth Supplemental Response to Interrogatory No. 2 From Microsoft, Dell and Gateway (02-cv-

28   2060), dated March 24, 2006.

21.     Attached hereto as Exhibit 20 is a true and correct copy of Excerpts from Lucent's Seventh Supplemental Response to Interrogatory No. 2 From Microsoft, Dell and Gateway (02-cv-2060), dated March 3, 2006.

22.     Attached hereto as Exhibit 21 is a true and correct copy of Dell Inc.'s Supplemental Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a) (02-cv-2060), dated January 27, 2006.

23.     Attached hereto as Exhibit 22 is a true and correct copy of Gateway, Inc.'s Fifth Supplemental Initial Disclosures (02-cv-2060), dated September 7, 2007.

24.     Attached hereto as Exhibit 23 is a true and correct copy of Microsoft Corporation's Eighth Supplemental Initial Disclosures (02-cv-2060), dated September 20, 2006.

25.     Attached hereto as Exhibit 24 is a true and correct copy of Lucent Technologies Inc.'s  Amended Initial Disclosures Statement (02-cv-2060), dated January 27, 2006.

26.     Attached hereto as Exhibit 25 is a true and correct copy of First Page of United States Patent No. 5,563,593.

27.     Attached hereto as Exhibit 26 is a true and correct copy of First Page of United States Patent No. 5,500,678.

28.     Attached hereto as Exhibit 27 is a true and correct copy of First Page of United States Patent No. 4,958,226.

29.     Attached hereto as Exhibit 28 is a true and correct copy of First Page of United States Patent No. 5,627,938.

**30.**     Attached hereto as Exhibit 29 is a true and correct copy of First Page of United States Patent No. 4,383,272.

**31.**     Attached hereto as Exhibit 30 is a true and correct copy of LUC1001377 - LUC1001383. **[FILED UNDER SEAL]**

32.     Attached hereto as Exhibit 31 is a true and correct copy of LUC1272925 - LUC1272927. **[FILED UNDER SEAL]**

33.     Attached hereto as Exhibit 32 is a true and correct copy of Excerpts from the Deposition of Kapu Kumar, dated May 8, 2007. **[FILED UNDER SEAL]**

- 3 -

34.    Attached hereto as Exhibit 33 is a true and correct copy of Excerpts from the Expert Report of Roger S. Smith Regarding Damages Issues Pertaining to Lucent Video Coding Patents, dated March 31 2006. **[FILED UNDER SEAL]**

35.    Attached hereto as Exhibit 34 is a true and correct copy of United States Patent and Trademark Office Decision on Request for Reexamination of United States Patent No. 4,958,226, dated October 5, 2007.

36.    Attached hereto as Exhibit 35 is a true and correct copy of United States Patent and Trademark Office Decision on Request for Reexamination of United States Patent No. 4,383,272, dated August 16, 2007.

37.    Attached hereto as Exhibit 36 is a true and correct copy of Haskell Deposition No. 20.

38.    Attached hereto as Exhibit 37 is a true and correct copy of Case Management Order (07-cv-2000); dated October 18, 2007.

39.    Attached hereto as Exhibit 38 is a true and correct copy of Scheduling Order for Groups 1, 4, 5 and 6 Patents (02-cv-2060); dated June 7, 2007.

40.    Attached hereto as Exhibit 39 is a true and correct copy of Order Granting Summary Adjudication of No Infringement of U.S. Patent No. 5,347,295 (02-cv-2060); dated March 8, 2007.

41.    Attached hereto as Exhibit 40 is a true and correct copy of Order Granting in Part and Denying in Part Parties' Motions for Summary Judgment Regarding Defendants' Affirmative Defenses and Counterclaims Pertaining to the Transfer of the Group 1 Patents to the Multimedia Patent Trust (02-cv-2060); dated October 1, 2007.

42.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of November, 2007 at Los Angeles, California.


By:    /s/ Katherine B. Farkas
        Katherine B. Farkas
        katherine.farkas@aporter.com
        Attorney for Dell Inc.

- 4 -

1

# EXHIBITS TABLE OF CONTENTS

2

3

| Exhibit | Document | Page No. |
|---|---|---|
| 1 | Excerpts from Expert Report of Wayne A. Hoeberlein Re Damages for Video Coding Patents, dated March 31, 2006. **[FILED UNDER SEAL]** | 8 |
| 2 | Second Modified Scheduling Order and Extension of Discovery (02-cv-2060), dated January 12, 2006. | 13 |
| 3 | Agreement Among Licensors (LUC1312617 - LUC1312647.1). **[FILED UNDER SEAL]** | 16 |
| 4 | MPEG-2 Patent Portfolio License (DELL312379 - DELL312411) - Confidential Filed Under Seal. **[FILED UNDER SEAL]** | 48 |
| 5 | Transcript of Telephonic Pretrial Conference Hearing Before the Honorable Rudi M. Brewster (02-cv-2060), dated August 14, 2006. | 81 |
| 6 | Order Staying Certain Proceedings, Vacating Certain Hearing Dates, and Setting Status Conference (02-cv-2060), dated August 14, 2006. | 124 |
| 7 | Lucent's Confidential Letter Brief and Exhibits Re Video Coding Patents Under Seal Pursuant to Local Rule 79-2 (02-cv-2060), dated December 11, 2006. **[FILED UNDER SEAL]** | 126 |
| 8 | Trust Agreement between Lucent and Wilmington Trust Company (WTC00030 - WTC00051). **[FILED UNDER SEAL]** | 184 |
| 9 | Patent Assignment between Lucent Technologies, Inc. and Multimedia Patent Trust (WTC00021 - WTC00029). **[FILED UNDER SEAL]** | 206 |
| 10 | Excerpts from the Deposition of Barbara Landmann, dated April 20, 2007. **[FILED UNDER SEAL]** | 215 |
| 11 | Excerpts from the Deposition of William Carapezzi, dated April 20, 2007. **[FILED UNDER SEAL]** | 232 |
| 12 | Pretrial Scheduling Order (07-cv-2000-H), dated November 9, 2007. | 239 |
| 13 | Order Severing and Transferring Part of Case (02-cv-2060), dated October 16, 2007. | 241 |
| 14 | Complaint by Multimedia Patent Trust, dated April 24, 2007 | 245 |
| 15 | Multimedia's Disclosure of Asserted Claims and Preliminary Infringement Contentions (07-cv-0747), dated September 10, 2007. | 252 |
| 16 | Case Management Conference Order Regulating Discovery and Other Pretrial Proceedings (07-cv-0747); dated November 1, 2007. | 350 |

17    Verified Complaint by MPEG LA, LLC against Alcatel Lucent, Lucent Technologies, Inc., and Multimedia Patent Trust (In the Court of Chancery of the State of Delaware in and for Newcastle County), dated October 26, 2007.. .................................................................... 363

18    Second Amended Answer and Counterclaims of Dell Inc. In Reply to Second Amended Complaint in 03-cv-1108 B (CAB), dated September 28, 2007. ................................................................................ 385

19    Excerpts from Lucent's Eighth Supplemental Response to Interrogatory No. 2 From Microsoft, Dell and Gateway (02-cv-2060), dated March 24, 2006. ................................................................................ 390

20    Excerpts from Lucent's Seventh Supplemental Response to Interrogatory No. 2 From Microsoft, Dell and Gateway (02-cv-2060), dated March 3, 2006. ................................................................................. 406

21    Dell Inc.'s Supplemental Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a) (02-cv-2060), dated January 27, 2006. ............................ 422

22    Gateway, Inc.'s Fifth Supplemental Initial Disclosures (02-cv-2060), dated September 7, 2007. ............................................................................. 438

23    Microsoft Corporation's Eighth Supplemental Initial Disclosures (02-cv-2060), dated September 20, 2006. ....................................................... 450

24    Lucent Technologies Inc.'s Amended Initial Disclosures Statement (02-cv-2060), dated January 27, 2006. ............................................................. 470

25    First Page of United States Patent No. 5,563,593. ..................................................... 478

26    First Page of United States Patent No. 5,500,678. ..................................................... 479

27    First Page of United States Patent No. 4,958,226. ..................................................... 480

28    First Page of United States Patent No. 5,627,938. ..................................................... 481

29    First Page of United States Patent No. 4,383,272. ..................................................... 482

30    LUC1001377 - LUC1001383. **[FILED UNDER SEAL]** ........................................ 483

31    LUC1272925 - LUC1272927. **[FILED UNDER SEAL]** ........................................ 490

32    Excerpts from the Deposition of Kapu Kumar, dated May 8, 2007. **[FILED UNDER SEAL]** ........................................................................ 493

33    Excerpts from the Expert Report of Roger S. Smith Regarding Damages Issues Pertaining to Lucent Video Coding Patents, dated March 31 2006. **[FILED UNDER SEAL]** ............................................... 500

34    United States Patent and Trademark Office Decision on Request for Reexamination of United States Patent No. 4,958,226, dated October 5, 2007. ................................................................................. 510

- 6 -

| | 35 | United States Patent and Trademark Office Decision on Request for Reexamination of United States Patent No. 4,383,272, dated August 16, 2007. ..................................................................................528 |
| | 36 | Haskell Deposition No. 20. ..................................................................544 |
| | 37 | Case Management Order (07-cv-2000); dated October 18, 2007. ............545 |
| | 38 | Scheduling Order for Groups 1, 4, 5 and 6 Patents (02-cv-2060); dated June 7, 2007.. ...................................................................................549 |
| | 39 | Order Granting Summary Adjudication of No Infringement of U.S. Patent No. 5,347,295 (02-cv-2060); dated March 8, 2007. .....................552 |
| | 40 | Order Granting in Part and Denying in Part Parties' Motions for Summary Judgment Regarding Defendants' Affirmative Defenses and Counterclaims Pertaining to the Transfer of the Group 1 Patents to the Multimedia Patent Trust (02-cv-2060); dated October 1, 2007...............559 |

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases: Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)

# Exhibit 1
## Filed Under Seal

Exhibit 2

FILED

2005 JAN 12 AM 9: 07

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., | Civil No: 02CV2060-B(CAB);<br>03CV0699-B(CAB);<br>03CV1108-B(CAB) |
| Plaintiff, | |
| v. | **SECOND MODIFIED<br>SCHEDULING ORDER AND<br>EXTENSION OF DISCOVERY** |
| GATEWAY, INC AND GATEWAY<br>COUNTRY STORES LLC; and,<br>MICROSOFT CORPORATION; and, DELL,<br>INC., | |
| Defendants. | |

*3 88* 1

1       After further consultation with the parties the Court hereby modifies its December 8,

2   2005 Modified Scheduling Order as follows:

3       The Court has determined that the patents at issue in this case will be tried in the

4   following groupings with the following schedule:

5   **-Group 1: "Video Coding Patents"**
    Patents at issue: U.S. Patents **4,383,272** and **4,958,226**

6       Last Day to File any Summary Judgment Motions: **August 4, 2006**

7       Hearing Date for Summary Judgment Motions: **September 8, 2006** at 9:00 a.m.
    Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **November**

8       **1, 2006** at 10:30 a.m.

9       Trial: **November 20-December 14, 2006** at 9:00 a.m.

10  **-Group 2: "Audio Coding Patents"**

11      Patents at issue: U.S. Patents **5,341,457** and **5,627,938**
    Last Day to File any Summary Judgment Motions: **September 29, 2006**

12      Hearing Date for Summary Judgment Motions: **November 3, 2006** at 9:00 a.m.

13      Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **January 4,**
    **2007** at 9:00 a.m.

14      Trial: **January 22-February 15, 2007** at 9:00 a.m.

15  **-Group 3: "Speech Coding Patents"**

16      Patents at issue: U.S. Patents **4,617,676**; **4,910, 781**; and **4,701,954**

17      Last Day to File any Summary Judgment Motions: **December 4, 2006**
    Hearing Date for Summary Judgment Motions: **January 8, 2007** at 9:00 a.m.

18      Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **February**
    **23, 2007** at 9:00 a.m.

19      Trial: **March 19-April 12, 2007** at 9:00 a.m.

20  **-Group 4: "User Interface Patents"**

21      Patents at issue: U.S. Patents **4,763,356**; **5,649,131**; **5,347,295**; and **4,317,956**

22      Last Day to File any Summary Judgment Motions: **January 26, 2007**
    Hearing Date for Summary Judgment Motions: **March 2, 2007** at 9:00 a.m.

23      Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **April 27,**
    **2007** at 9:00 a.m.

24      Trial: **May 21-June 14, 2007** at 9:00 a.m.

25

26  **-Group 5: "Fleming and Doughty Patents"**
    Patents at issue: U.S. Patents **4,439,759** and **4,582,956**

27      Last Day to File any Summary Judgment Motions: **March 29, 2007**

28     02CV2060; 03CV0699; 03CV1108

**Exhibit 2  Page 14**

1    Hearing Date for Summary Judgment Motions: **May 4, 2007** at 9:00 a.m.
2    Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **June 29, 2007** at 9:00 a.m.
3    Trial: **July 16-August 9, 2007** at 9:00 a.m.

4

5        Any brief filed in opposition to a motion for summary judgment shall be submitted
6    not later than 14 calendar days after the motion for summary judgment is filed. Any reply
7    brief filed in response to an opposition brief shall be filed not later than 7 calendar days
8    after the opposition brief is filed. All parties shall hand deliver copies of any motion for
9    summary judgment, opposition brief, or reply brief, along with all supporting documents, to
10   chambers on the day they are filed.

11       The Court holds that plaintiff Lucent Technologies, Inc. ("Lucent") will not be
12   allowed to assert claims for infringement of U.S. Patent Number 5,227,878 (the "'878
13   patent") in the current action. This decision is without prejudice to Lucent filing a separate
14   action alleging infringement of the '878 patent by any of the defendants in this action, and
15   in that event any discovery obtained in this case relevant to the '878 case shall be usable as
16   though obtained in the later filed '878 case.

17       The Court further holds that Lucent shall be allowed to obtain additional discovery
18   from Microsoft Corporation regarding the "X-box 360". The Magistrate Judge shall
19   determine the scope and timing of such discovery. The Court declines at this time to set a
20   trial schedule regarding any allegations of patent infringement involving the "X-box 360".

21
22   **IT IS SO ORDERED**.

     DATED: _/-//-06_                    _____
23                                        UNITED STATES SENIOR DISTRICT JUDGE
24

25   cc:    All Parties
            The Honorable Cathy Ann Bencivengo, United States Magistrate Judge
26

27

28                              3                    02CV2060; 03CV0699; 03CV1108

**Exhibit 2  Page 15**

# Exhibit 3
## Filed Under Seal

# Exhibit 4
## Filed Under Seal

# Exhibit 5

1                   UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3

4  LUCENT TECHNOLOGIES,          )  Case No. 02CV2060-B(CAB)
                                 )
5            Plaintiff,          )
                                 )
6  vs.                           )  San Diego, California
                                 )
7  GATEWAY, INC., et al.,        )  Monday,
                                 )  August 14, 2006
8            Defendants.         )  2:00 p.m.
   _____)

9

10      TRANSCRIPT OF TELEPHONIC PRETRIAL CONFERENCE HEARING
              BEFORE THE HONORABLE RUDI M. BREWSTER
11                UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:          JOHN DESMARAIS, ESQ.
                                ROBERT APPLEBY, ESQ.
14                              SCOTT R. SAMAY, ESQ.
                                Kirkland & Ellis, LLP.
15                              153 East 53rd Street
                                New York, New York 10022
16
    For Gateway:                W. BRYAN FARNEY, ESQ.
17                              JEFFREY B. PLIES, ESQ.
                                Dewey Ballantine, LLP
18                              816 Congress Avenue
                                Suite 1900
19                              Austin, Texas 78701
                                (512) 226-0415
20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

**Exhibit 5  Page 81**

ii

1  APPEARANCES:  (Cont'd.)

2  For Microsoft:                JOHN E. GARTMAN, ESQ.
                                 CHRISTOPHER MARCHESE, ESQ.
3                                Fish & Richardson P.C.
                                 4350 La Jolla Village Drive
4                                Suite 500
                                 San Diego, California 92122
5                                (858) 678-5070

6  For Dell:                     JOEL FREED, ESQ.
                                 JOSEPH MICALLEF, ESQ.
7                                JAMES S. BLACKBURN, ESQ.
                                 Arnold & Porter
8                                555 Twelfth Street, NW
                                 Washington, D.C. 20004
9                                (202) 942-5721

10 Transcript Ordered by:        CHRISTOPHER MARCHESE, ESQ.

11 Court Recorder:               Jennie Hinkle
                                 United States District Court
12                               940 Front Street
                                 San Diego, California  92101
13
   Transcriber:                  Jordan Keilty
14                               Echo Reporting, Inc.
                                 6336 Greenwich Dr., Suite B
15                               San Diego, California 92122
                                 (858) 453-7590
16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Exhibit 5  Page 82**

1

1  SAN DIEGO, CALIFORNIA  MONDAY, AUGUST 14, 2006 2:00 P.M.

2                        --oOo--

3      (Call to order of the Court.)

4          THE COURT:  This is Judge Brewster.

5          COUNSEL:  Good afternoon, your Honor.  We're all

6  on.

7          THE COURT:  Okay.  I have Mr. Appleby and Mr.

8  Desmarais and Mr. -- is that Samay?

9          MR. SAMAY (Telephonic):  Samay.

10          THE COURT:  Samay.

11          MR. SAMAY:  Yes, sir.

12          THE COURT:  Okay.  And that's for Lucent, right?

13          MR. DESMARAIS (Telephonic):  Yes, your Honor.

14          THE COURT:  And for Gateway I have Mr. Farney and

15  Mr. Plies.

16          MR. FARNEY (Telephonic):  Yes, your Honor.

17          THE COURT:  And for Dell I have -- I have Mr.

18  Freed, Mr. MiCallef, and a computer Blackberry -- no -- oh,

19  I see, Mr. Blackburn, is that right, Mr. Blackburn?

20          MR. BLACKBURN (Telephonic):  That is correct, your

21  Honor.

22          THE COURT:  Okay.  And for Microsoft I have Mr.

23  Gartman and Mr. Marchese.

24          COUNSEL:  Correct.

25          THE COURT:  All right.  Well, good afternoon to

*Echo Reporting, Inc.*

**Exhibit 5  Page 83**

2

1  all of you.

2          COUNSEL:  Good afternoon, your Honor.

3          THE COURT:  I've reviewed the papers.  This is a

4  very -- this is a very interesting issue I'll tell you.

5  These problems are never real real simple.

6          Here's my tentative thinking.  I regard the

7  likelihood of -- of acquisition of Lucent by Alcatel within

8  the next three or four months to be nearly 100 percent.

9  Given that, the only question I want to know is when that

10 happens, what affect will it have on the two patents which

11 are in that pool or the type of patents in the pool which

12 are at risk in this lawsuit if -- if the patents are owned

13 by Alcatel and, therefore, are required since Alcatel is a

14 sublicensee to the litigation administrator to go into the

15 pool.  Then the question is what effect will that have on

16 the cause of action that Lucent has prior to acquisition

17 against I guess just one Defendant, I guess just Microsoft,

18 for those two patents, and if the answer is that that cause

19 of action is lost because the -- Microsoft is a pool member

20 and, therefore, upon acquisition by the parent which is a

21 sublicensee, all those patents are in the pool and there --

22 the license for the pool members is backdated to 1994, is

23 the pool members have a license to those patents back to

24 1994, there wouldn't be any suit for infringement which

25 occurred after 1994.

3

1          So if that's the case, then there's no reason not

2    to stay this lawsuit, and -- because if the merger takes

3    place, that's going to be the end of it.  However, if

4    there's a chance that even though the merger takes place

5    there can be certain posturing or positioning within the

6    meaning of the MPEG L.A. agreement which would keep the two

7    patents out of the pool or if in the pool, at least to

8    permit the existence of these prior to merger type causes of

9    action which Lucent had, if that's still a possibility and

10   it would have to be determined by events that fall out after

11   the merger is a fact and maybe by correlary legal action,

12   then if that's going to be the possibility, then I would be

13   inclined to stay the lawsuit to see how that works out.

14          But if the outcome is that they -- that they for

15   sure would not lose the cause of action, then I wouldn't

16   stay it, and we'd go ahead and try it because merger

17   wouldn't make any difference.  So I -- that's kind of where

18   I think we're at.  Does anybody think that we're chasing up

19   the wrong issues?

20          MR. FREED (Telephonic):  Well, your Honor, this is

21   Joel Freed for Dell, and I think you mentioned for

22   Microsoft, but I think it applies to Dell and Gateway as

23   well because there are causes of action asserted against

24   them.

25          THE COURT:  I see, those two audio patents are

4

1 also against all three of them?

2           MR. FREED:  -- patents, they're --

3           THE COURT:  Okay.

4           MR. FREED:  -- against all of us.

5           THE COURT:  Okay.

6           MR. FREED:  And I think you're on the right

7 issues.  And given your laying out of the issues, getting to

8 the last one, I don't think anybody could -- you know, I

9 don't think even -- well, I don't want to speak for Lucent,

10 but it would be hard for Lucent to say that it's a certainty

11 that they would be able to keep these things from becoming

12 licensed.  The best they're going to be able to say is

13 they're going to have counter-arguments to our arguments

14 that they would be automatically licensed.  And, you know,

15 certainly there wouldn't -- we wouldn't be in the realm of a

16 certainty that they could keep these things out.

17           So, given your conclusion -- and I think it's

18 correct -- that the likelihood of the merger taking place is

19 near 100 percent and given the fact that at best Lucent's

20 going to be able to say, "Well, we're going to be able to

21 disagree with these guys that these patents are licensed

22 under the pool," we're in the realm of the first two options

23 which leads you to conclude stay.

24           THE COURT:  Well, if anybody -- if anybody would

25 disagree with what you just said, it probably would be

5

1 Lucent.

2        MR. DESMARAIS:  Yes, your Honor.  This is John

3 Desmarais, and I do disagree with it on a couple of

4 different levels.

5        Addressing the issues that your Honor said you

6 wanted to hear about, taking the -- the first one in order

7 about whether even if the merger closed and even if these

8 patents made it into the pool, even in the -- you know, what

9 I would consider to be the least likely scenario, but if

10 that were to happen, even then we still have a cause of

11 action.

12       It's pretty clear that the agreement is limited to

13 its terms MPEG-2, and that's pretty clear.  I don't think I

14 need to point out the provisions.  I don't think anyone on

15 the phone disagrees with that.

16       MR. FREED:  I do.  This is Joel Freed for Dell.  I

17 think the effect of the agreement is not limited to the

18 MPEG-2, but I'll let you speak, and then I'll -- I just

19 wanted to voice my disagreement and go on.  Go on.

20       MR. DESMARAIS:  All right.  Well, it seems pretty

21 clear if you look at paragraph 2.3 of the agreement that

22 it's pretty clearly enumerated to be limited to MPEG-2, and

23 in the second agreement it specifically says and does not

24 include MPEG-1.

25       Our allegations in the case cover MPEG-1, MPEG-2,

*Echo Reporting, Inc.*

**Exhibit 5  Page 87**

6

1 and WMZ-9.  So, as an initial matter, no matter what, even

2 if the merger does close before the trial, which I doubt,

3 and even if these patents make it into the pool, which I

4 doubt, we still have active litigation against MPEG-1 and

5 WMZ-9.  So, no matter what, the case needs to go forward,

6 and there will be damages due and owing to Lucent for these

7 patents against these Defendants.

8         But that's just the first level of issues.  So the

9 first level issue, we have a case no matter what.  Secondly,

10 as I pointed out last time, you can see from these

11 agreements these are not agreements between Alcatel and the

12 Defendants.  They're between Alcatel and the MPEG L.A.

13 licensing authority.  These agreements do not give the

14 Defendants any rights vis-a-vis these two patents, and it

15 says right in the agreement there are no third-party

16 beneficiary rights, and that's pretty clearly articulated

17 expressly in paragraph 8.10.  It says there are no third-

18 party beneficiaries to these agreements.

19         So they can't claim any rights from these

20 agreements.  They have to close the merger, and then Alcatel

21 has to decide to execute a license agreement and license

22 these Defendants to the two patents in suit.  That is highly

23 unlikely to happen.  If you look at paragraph 2.10, it says

24 explicitly that each party shall have the right to instruct

25 the licensing administrator to exclude any of its MPEG-2

7

1  patent portfolio patents from an MPEG-2 patent portfolio

2  license to a prospective sublicensee against whom the party

3  has brought a claim for infringement of the patents to be

4  excluded.  It's explicit in paragraph 2.10.

5        So even if the merger closes before the trial and

6  even if Alcatel -- Alcatel's other assets would go into the

7  MPEG L.A., and even if that would absolve all liability,

8  which it doesn't, by -- by the express provisions of

9  paragraph 2.10, all Alcatel has to do is tell the licensing

10 administrator "We already have a lawsuit on these two

11 patents.  They're not going into the pool."  So why on earth

12 Alcatel wouldn't do that when our damages claim in this case

13 is over a billion dollars and the licensing fee that would

14 come from the pool is on the order of the small number of

15 millions, you know, I think we can safely assume Alcatel is

16 going to do that.

17        And, thirdly, if you look at provision 7.2, it

18 says quite clearly that Alcatel can terminate voluntarily on

19 30 days' notice these MPEG agreements.  And, again, with a

20 situation where we have a damages claim over a billion

21 dollars and the alternative licensing revenue in the small

22 number of millions, I think it's rational to conclude that

23 Alcatel is going to take one of these other courses of

24 action which is either voluntarily termination or by

25 provision 2.10 take these two litigating patents out of the

*Echo Reporting, Inc.*

**Exhibit 5  Page 89**

8

1 pool.

2          You know, so I mean, I don't see a rational

3 analysis of the agreements that lead to the conclusion that

4 Alcatel is going to sit by and let these patents go into

5 their pool.  So, I mean, it seems to me pretty clear that

6 it's speculation and wishful thinking on the part of the

7 Defendants to think that this merger activity between Lucent

8 and Alcatel is going to make this case go away.

9          MR. FREED:  Your Honor, this is Joel Freed again.

10 Let me address each one of those issues.

11          THE COURT:  Okay.  Slow down just a little bit.  I

12 was trying to keep up with that, and I was, frankly, having

13 a hard time.  So before you knock him down, I mean, I didn't

14 soak him up.  You --

15          MR. FREED:  If I knock him down, it will help you

16 soak him up.

17          THE COURT:  Maybe knocking him down will help me

18 soak him up.  You -- Mr. Desmarais referred to 7.2 or

19 something like that --

20          MR. FREED:  Before we get to 72., your Honor, the

21 first point he made was that somehow or other that MPEG-1 is

22 not affected by this --

23          THE COURT:  MPEG-1 is Exhibit A to the --

24          MR. FREED:  The MPEG license is Exhibit A to the

25 paper we filed.

*Echo Reporting, Inc.*

**Exhibit 5  Page 90**

9

1          THE COURT:  Yeah.  Okay.  I got that right in

2  front of me.

3          MR. FREED:  Yeah.  Now, but there's an Exhibit B,

4  and Exhibit B is the license that is actually granted in

5  this instance to Dell.

6          THE COURT:  I got it.

7          MR. FREED:  Okay.

8          THE COURT:  I got it right in front of me.

9          MR. FREED:  Okay.  Turn to Exhibit B, paragraph

10  2.1.  I believe that's on page --

11          THE COURT:  I've got it.  It's on page eight,

12  licensing administrative grant.

13          MR. FREED:  Right.

14          THE COURT:  Two point one.

15          MR. FREED:  Right.  If you look at that grant,

16  that grant says that there's a grant of a license to have

17  made, et cetera, et cetera, and it says MPEG-2 intermediate

18  products.

19          Now, if you go back and look at the definition of

20  MPEG-2 intermediate products, that's what all these people

21  have, okay.  They have these MPEG-2 products.  Now, but

22  that's a product license, your Honor.  The product is

23  licensed.  But once the product is licensed, it's licensed

24  under all the patents in the pool, including ones that may

25  cover MPEG-1.  The product itself is licensed.

*Echo Reporting, Inc.*

**Exhibit 5  Page 91**

10

1    Their position all along has been that MPEG-2

2 embodies MPEG-1.  But once that product is licensed, it may

3 become licensed because it's practicing MPEG-2, but it is

4 also licensed under every patent that is in the pool, which

5 includes both Haskle and Metraveli (phonetic) if our

6 positions are correct on that.

7    And let me address that next point, which is his

8 argument about paragraph 7.2 I believe which he says gives

9 them the right to withhold these patents.

10    THE COURT:  Okay.  Now, is that on page --

11    MR. FREED:  That's in Exhibit A, your Honor.

12    THE COURT:  Oh, that's Exhibit A?

13    MR. FREED:  That one is in Exhibit A he was

14 referring to.

15    THE COURT:  Okay.  Just a minute, 7.2.

16    MR. DESMARAIS:  You're referring to the wrong one.

17 It's 2.10 actually.

18    MR. FREED:  It may be 2.10.  I'm sorry.

19    THE COURT:  Is that Exhibit A, 2.10?

20    MR. FREED:  That's right, 2.10.

21    THE COURT:  All right.  Just a minute.

22    MR. FREED:  Apologize, your Honor.  It's 2.10.

23    THE COURT:  All right.  Just a second.

24    MR. FREED:  And that will appear on page, let me

25 see, of Exhibit A --

*Echo Reporting, Inc.*

**Exhibit 5  Page 92**

11

1          THE COURT:  Page four, page four.

2          MR. FREED:  -- appear on page --

3          THE COURT:  Page four, page four.

4          MR. FREED:  Right.

5          MR. DESMARAIS:  It's page eight of Exhibit A.

6          MR. FREED:  Page eight of Exhibit A, your Honor.

7          THE COURT:  Well, wait a second.  Exhibit A in the

8   Defendant Dell's brief is the -- Exhibit A is the agreement

9   among licensors, right?

10          MR. DESMARAIS:  Yeah.  It's paragraph 2.10.

11          THE COURT:  Oh, 2.10.  Well, I'm looking at 2.1.

12          MR. FREED:  Two point one zero.

13          THE COURT:  That would be 2.10.  I see.  Okay.

14   Okay.  I got 2.10, okay.

15          MR. FREED:  It says each party, blah, blah, blah,

16   can do what they want relative to a prospective licensee

17   against whom the party has brought a claim for infringement.

18          Well, none of us are prospective licensees, your

19   Honor.  We are existing licensees.  So on its face that

20   paragraph is inapplicable, number one.

21          MR. DESMARAIS:  If you were --

22          MR. FREED:  Number -- let me finish, please.

23   We're existing licensees under the MPEG scenario.

24          THE COURT:  Wait a second.  Stop there.  It's the

25   titles that I'm having trouble.  I thought the parties were

*Echo Reporting, Inc.*

**Exhibit 5  Page 93**

12

1  the -- were the people that put together this agreement.

2         MR. FREED:  They are the people that hold the

3  patent.

4         THE COURT:  Okay.  And it says each party shall

5  have the right to instruct the licensing administrator.

6  That's the guy that has the master license agreement from

7  all of the owners of the patents.

8         MR. FREED:  Right.

9         THE COURT:  And that guy, the licensing

10 administrator, has the right to make sublicenses to all of

11 the members of the pool who become sublicensees to this

12 agreement, right?

13        MR. FREED:  Yeah, he has the right to issue all

14 licenses under the agreement.  And under paragraph 2.0, he

15 has --

16        THE COURT:  Two point one zero?

17        MR. FREED:  He could be -- each party, a patent

18 holder, could instruct the licensing administrator to

19 exclude things from prospective licensees but not from

20 existing licensees.  If you're already an existing licensee,

21 he has no -- doesn't have that right.

22        Now, Mr. Desmarais may argue otherwise, but I'll

23 get -- I'll get to his argument in --

24        MR. DESMARAIS:  This is not an existing licensee

25 to the --

*Echo Reporting, Inc.*

**Exhibit 5  Page 94**

13

1          MR. FREED:  Let me -- let me -- let me finish my

2  point.

3          MR. DESMARAIS:  That doesn't even make any --

4          MR. FREED:  Let me finish my point, please.

5  Number one, this paragraph doesn't apply to prospective

6  licensees.  And also, to the extent it applies at all even

7  to prospective licensees, it applies to people that the

8  lawsuit existed at the time the agreement was signed.  It

9  says had granted or has brought a lawsuit, has brought a

10  claim of infringement against them.

11         Nobody in this case had a claim of infringement

12  brought against them at the time the agreement was signed.

13  So there's two reasons on its face that paragraph 2.10 does

14  not apply, but there's yet a third reason why it doesn't

15  matter even if it did apply, and for that you'll have to go

16  back to Exhibit B, and you'll have to go back to Exhibit B

17  in paragraph 7.3.

18         THE COURT:  All right.  Just a minute, 7.3, that's

19  on page 25, licensee grant?

20         MR. FREED:  Yeah.

21         THE COURT:  Okay.  On Exhibit B --

22         MR. FREED:  You're faster than I am.  Let me get

23  there.

24         THE COURT:  That's Exhibit B, bravo, B as in

25  bravo.  Seven point three is entitled "License Grant --

14

1 Licensee Grant?"

2          MR. FREED:  Yeah.

3          MR. DESMARAIS:  Right, your Honor.

4          THE COURT:  What does that say?

5          MR. FREED:  Well, what it says in essence is that

6 the people who are licensees -- and, by the way, Alcatel is

7 not only a member of the pool, but they themselves are a

8 licensee, okay.

9          THE COURT:  Why?

10          MR. FREED:  Alcatel signed a license, and Alcatel

11 as a licensee, under its agreement that looks just like this

12 Dell agreement, Alcatel took on the obligation on its behalf

13 and on behalf of its affiliates to license everybody who is

14 a licensee on the same terms that Alcatel would receive if

15 it were a member, if -- if the license had been granted by

16 the pool itself.  That's what that paragraph says.

17          THE COURT:  Okay.  Now, licensee, that is the

18 Alcatel?

19          MR. FREED:  In that instance it would be Alcatel,

20 because they are one of the licensees.

21          THE COURT:  Okay.  So Alcatel agrees to grant a

22 license and/or sublicense under any and all MPEG-2 essential

23 patents that a licensee or its affiliates have the right to

24 license.  That would include -- that would include Lucent?

25          MR. FREED:  That would include the merger company

15

1 that has the patents, yeah.

2        MR. DESMARAIS:  Well, it might include the merger

3 company.

4        MR. FREED:  Well, wait a minute.

5        MR. DESMARAIS:  Right?  I mean, the point is

6 that -- it didn't include the merger company --

7        MR. FREED:  They are an affiliate --

8        MR. DESMARAIS:  -- agreement to a --

9        MR. FREED:  There's no question that they're a

10 wholly -- wholly owned sub of Alcatel.  They will be -- if

11 the merger goes through as you suspect it's going to go

12 through, they are a wholly owned sub of Alcatel, and they

13 will be an affiliate.  There's no argument over that.  And

14 Alcatel has this obligation here.

15        So, for three reasons, three independent reasons,

16 the argument that these won't go into the pool just doesn't

17 hold any water.  And let me reiterate the three reasons.

18 Number one, that paragraph 2.1 applies only to prospective

19 licensees.  We're existing licensees.  Also, it only applies

20 to situations where the infringement suit has already been

21 brought.  Those infringement suits had not already been

22 brought at the time of the license.

23        And, number three, even if it did apply, Alcatel

24 by virtue of itself being a licensee would have the

25 obligation to license these patents on the same terms that

16

 1  they would have had to be licensed on if they were licensed
 2  by the pool.
 3          MR. DESMARAIS:  I don't -- I don't -- this is John
 4  Desmarais.  I don't see how you can interpret 2.10 on -- in
 5  the first agreement, Exhibit A, to argue that you're not a
 6  prospective licensee when you don't -- I think you admit you
 7  don't have a license to my two patents right now and the
 8  only way you're going to get them is at some point into the
 9  future --
10          MR. FREED:  It doesn't say licensee under the
11  patent.
12          MR. DESMARAIS:  Let me finish, please.
13          MR. FREED:  It says licensee --
14          MR. DESMARAIS:  Let me finish.
15          MR. FREED:  And I have a status with --
16          MR. DESMARAIS:  The only way you get them in the
17  future is if Alcatel executes a license agreement with you
18  at some point post-merger and then that license agreement
19  will effectuate the license and at that point you'll become
20  licensed.  If that's not the definition of a prospective
21  sublicensee, I don't know what is.
22          MR. FREED:  That's not correct.  A licensee is a
23  person who holds a license from the pool, from the
24  administrator, and I am such a person, Dell.  I am such a
25  person, Gateway, and I am such a person, Microsoft.

*Echo Reporting, Inc.*

**Exhibit 5  Page 98**

17

1          MR. DESMARAIS:  Not to these patents you do not.

2          MR. FREED:  It doesn't say that.  It just says I

3    have to be a licensee, and I am a licensee.

4          MR. DESMARAIS:  That --

5          MR. FREED:  The whole purpose of licensing the

6    pool of patents is so that I don't have to worry about

7    individual patents.  I get what's in the pool, and your

8    reading of the agreement as saying that licensee means a

9    license under an individual patent would render that entire

10   paragraph nonsense because it says it's talking about

11   individual patents in the context where they already know

12   there wasn't a license under the individual patent.

13         MR. DESMARAIS:  No.  It's talking about the option

14   of taking patents out of the pool if there's pending

15   litigation, and the only way you three Defendants get a

16   license is after the merger Alcatel has to execute a license

17   agreement to you, and 2.10 says if there is pending

18   litigation before that license agreement is executed,

19   Alcatel has the sole discretion to opt those two patents

20   out.  That's what the provision says if you read it.

21         MR. FREED:  Well, I read it, and I --

22         MR. DESMARAIS:  You're interpreting it to say

23   something different.

24         MR. FREED:  The licensees that they're talking

25   about are licensees under the pool, and I am a licensee

*Echo Reporting, Inc.*

**Exhibit 5  Page 99**

18

1  under the pool.  I'm not a prospective licensee under the

2  pool.

3          THE COURT:  Can I just -- can I just insert a

4  question here?  I'm looking at 2.10.  It's on page eight of

5  Exhibit A.  And it says each party -- and I want to know who

6  we're talking about -- each party -- who would be the party

7  that we're talking about?  Who is each party?  Who's that?

8          MR. DESMARAIS:  That's Alcatel.

9          THE COURT:  Okay.  Alcatel shall have the right to

10 instruct the licensing administrator -- I know who that is.

11 That's the guy that got a license on all of the patents that

12 the forming parties that formed this cabal, they put all

13 their patents in a pool, and they gave a master license to

14 the licensing administrator, and the licensing

15 administrator, as I understand it, is the guy that turns

16 around and makes license agreements with all of the

17 sublicensees.  That would be Dell, Gateway, Microsoft, and

18 Alcatel.  Aren't those all sublicensees?

19         MR. FREED:  Yes, your Honor.

20         THE COURT:  What?

21         MR. FREED:  Yes.

22         THE COURT:  Okay.  And so the license

23 administrator is expected to give all of those license,

24 sublicensees -- sub to licensing administrator -- they're

25 sublicensees -- all of the patents in the pool.  So each

19

1 party shall have the right to instruct the licensing

2 administrator -- the parties are the licensors.

3         MR. FREED:  Right.

4         THE COURT:  They're the ones that license the

5 licensing administrator.  So each party -- is Alcatel a

6 licensor?  Are they original founding party?

7         MR. FREED:  In this agreement, they're a patent

8 holder.

9         MR. DESMARAIS:  Yes, they're a licensor, yes.

10         MR. FREED:  Well, they're a --

11         THE COURT:  Well, is -- how about Dell, Microsoft,

12 and Gateway, are they also licensors?

13         MR. DESMARAIS:  They are -- not -- not for this

14 purpose.  They are -- they are actual licensees from the

15 license administrator.  They hold a license from the

16 licensing administrator.

17         THE COURT:  So they are sublicensees?

18         MR. DESMARAIS:  Right.

19         THE COURT:  Okay.  So Alcatel shall -- I'm reading

20 2.10 now.

21         "Alcatel shall have the right to

22         instruct the licensing administrator to

23         exclude any of its MPEG-2 patent

24         portfolio patents."

25         Are those the patents that he got from the

20

1 licensors?

2        MR. DESMARAIS:  Yeah.

3        THE COURT:  Of which Alcatel --

4        MR. FREED:  By the -- by the --

5        THE COURT:  -- Alcatel is one?

6        MR. FREED:  -- members of the pool, of which

7 Alcatel is one.

8        THE COURT:  Yeah.  And so the -- the -- each party

9 has the right to instruct the licensing administrator to

10 exclude any of its, meaning the party's, MPEG-2 patent

11 portfolio patents from an MPEG-2 patent portfolio license to

12 a prospective sublicensee against whom the party has brought

13 a claim for infringement of the patents to be excluded.

14 Now --

15        MR. FREED:  They're talking about an MPEG-2 patent

16 portfolio license that has not yet been granted to a

17 licensee.  We are people who already hold MPEG-2 patent

18 portfolio license.

19        MR. DESMARAIS:  Not to the patents in the lawsuit.

20        MR. FREED:  Well --

21        THE COURT:  Let me finish the question now.

22        MR. FREED:  -- licensee --

23        THE COURT:  I can see that 2.10 pertains to those

24 patents which were transferred by the licensors to the

25 licensing administrator way back when this thing was

21

1   started, and I don't -- was it started in '94?

2          MR. FREED:  Right.

3          THE COURT:  Okay.  And obviously these two audio

4   patents that we're talking about in this lawsuit were not

5   one of those.

6          MR. FREED:  -- video patents, and that's correct,

7   your Honor.  They --

8          THE COURT:  They were not one of those?

9          MR. FREED:  They were not.

10         THE COURT:  Okay.  Thank you.  They're video

11  patents.  So we're talking about Alcatel having the right to

12  tell the licensing administrator to keep out of its MPEG-2

13  patent portfolio patents from an MPEG-2 patent portfolio

14  license to a prospective sublicensee, and that would be

15  somebody new after the date of this agreement, and that

16  would be -- I suppose that would be Alcatel as joined by

17  Lucent, wouldn't it?

18         MR. DESMARAIS:  Yes.

19         MR. FREED:  Not really.  It -- it would be people

20  who don't yet hold an MPEG-2 license.

21         THE COURT:  Well, but Alcatel as it was

22  constituted in '94 isn't the same Alcatel that would be

23  constituted after this merger.  So it's a different -- it's

24  a different generation of Alcatel.

25         MR. DESMARAIS:  Yes.

*Echo Reporting, Inc.*

**Exhibit 5  Page 103**

22

1          THE COURT:  So you could say that in part --

2          MR. FREED:  -- part of this agreement.

3          THE COURT:  -- in part, Alcatel is a prospective

4 sublicensee.

5          MR. FREED:  Well, I don't think they're talking

6 about the license to Alcatel.

7          MR. DESMARAIS:  No, but Alcatel is a -- the Judge

8 is right.  Alcatel is a prospective sublicensee.

9          MR. FREED:  No, they're not.  They hold a license.

10 They are not a prospective sublicensee.  They actually hold

11 an MPEG-2 patent portfolio license.

12          THE COURT:  But if --

13          MR. DESMARAIS:  License to --

14          THE COURT:  Wait a minute.  But if -- if Lucent

15 had come into the pooling agreement not acquired by Alcatel,

16 just came in as a prospective -- as a new licensee into this

17 MPEG deal, pool, they would be a prospective sublicensee,

18 wouldn't they?

19          MR. MARCHESE:  Your Honor, this is Chris Marchese

20 for Microsoft.  If I could just step in for one second, I

21 think I can clear the whole thing up.

22          If you look at this language in 2.10, claims that

23 we're talking about have to be brought by the party.  That

24 says against whom the party has brought a claim for

25 patent -- for infringement of the patents.  Party in this

*Echo Reporting, Inc.*

**Exhibit 5  Page 104**

23

1 case is Alcatel.

2          THE COURT:  That's right.

3          MR. MARCHESE:  Lucent is absolutely not a party to

4 this agreement, and, therefore, this provision absolutely

5 cannot apply to these claims.

6          MR. DESMARAIS:  Well, that's not right.  Actually,

7 Alcatel is the party for the purposes of this provision.

8          MR. MARCHESE:  It can't be.

9          MR. DESMARAIS:  But Lucent's -- are not licensed

10 yet at the time of this provision.  Any future license is a

11 prospective licensee to the patents in this case.

12 Otherwise, you'd all be licensed.

13          THE COURT:  But wait.  If what you say is right,

14 Mr. Desmarais, it seems to me that it's referring to a

15 lawsuit between Alcatel and Lucent, and there isn't any

16 lawsuit between Alcatel and Lucent because it says that each

17 party has the right to instruct the licensing administrator

18 to exclude any of its, Alcatel's, portfolio patents to a

19 prospective sublicense.  He can exclude it to the

20 prospective sublicensee against whom the party, Alcatel, has

21 brought a claim for infringement.

22          Alcatel didn't sue Lucent for infringement.

23          MR. DESMARAIS:  I just wanted to -- your Honor, so

24 you could see the thinking.

25          THE COURT:  What?

*Echo Reporting, Inc.*

**Exhibit 5  Page 105**

24

1          MR. DESMARAIS:  The party -- the party in this

2  provision is -- for the purposes that we're talking about is

3  Alcatel.  The prospective sublicensees are the Defendants,

4  and the way it works is once there is a merger between

5  Alcatel and Lucent, Alcatel will become the owner of the

6  Lucent patent.  At that point, these agreements give Alcatel

7  the option of executing then new agreements with prospective

8  licensees to include these new patents.  Once Alcatel does

9  that, Alcatel has the choice, according to 2.10, prior to

10 executing those new license agreements which will include

11 the new patents, of excluding any that Alcatel is already in

12 litigation with.

13         MR. FREED:  That can't be right.

14         MR. DESMARAIS:  If the merger closes before our

15 case is tried, Alcatel will be in litigation because Alcatel

16 will be the named party in our case.

17         MR. MARCHESE:  Your Honor, this is Chris Marchese

18 for Microsoft.  That --

19         MR. DESMARAIS:  -- to apply at all to Alcatel --

20         MR. MARCHESE:  -- said in our last --

21         MR. DESMARAIS:  -- would be the party that owns

22 the patents, and Alcatel would, therefore, have pending

23 litigation, and when Alcatel is executing its new license

24 agreement to convey the Lucent patents to the MPEG patent

25 pool, Alcatel will have the option of excluding the two that

25

1  are in the litigation.

2         THE COURT:  The problem I have with that, Mr.

3  Desmarais, is that if you're right, then this expression

4  "prospective sublicensee" includes Dell, Microsoft, and

5  Gateway, and they're already licensees.  They're not

6  prospective sublicensees.  So it's got to be talking

7  about --

8         MR. FREED:  Absolutely correct.

9         MR. DESMARAIS:  They're licensees already --

10         MR. FREED:  The purpose of --

11         MR. DESMARAIS:  -- to the --

12         MR. FREED:  The purpose of the patent --

13         MR. DESMARAIS:  -- in the pool.  They are

14  prospective licensees to the patents not yet in the pool.

15         MR. FREED:  The purpose of taking a license under

16  a pool is so that you get everything in the pool.  If he's

17  trying to make us a prospective licensee for some of the

18  patents, that -- that renders the entire scheme of the MPEG

19  licensing arrangement nonsensical.

20         MR. DESMARAIS:  They're not patents in the pool

21  yet.

22         MR. FREED:  We are supposed to get everything that

23  belongs in the pool.

24         MR. DESMARAIS:  I would agree with you if the

25  patents were in the pool.

*Echo Reporting, Inc.*

**Exhibit 5  Page 107**

26

1          THE COURT:  Okay.  Let me -- can I ask a different
2    question now, please.  Let's assume that the merger goes
3    forward.  Let's assume that the case is stayed, the merger
4    goes forward.  Who is going to litigate -- this -- this is
5    obviously going to have to be litigated because I don't -- I
6    don't think there's going to be agreement on this.
7          MR. DESMARAIS:  Well, that's the point I was
8    making --
9          MR. FREED:  I think you're right.
10         MR. DESMARAIS:  -- in the last --
11         THE COURT:  I just have a hunch that there may not
12    be total agreement on this point.
13         MR. DESMARAIS:  No, the point -- the point I was
14    making in the last --
15         THE COURT:  Who's going to litigate -- who's going
16    to litigate this?
17         MR. FREED:  I think, your Honor, the way it would
18    be litigated is immediately after the merger goes through,
19    we will take steps to either -- if they don't want to join
20    Alcatel, we will take steps to join Alcatel, and then we
21    will make a motion for summary judgment that we're licensed
22    under these patents.
23         MR. DESMARAIS:  You --
24         MR. FREED:  And then we'd litigate it right in
25    front of whoever has the case, either you or whoever has the

*Echo Reporting, Inc.*

**Exhibit 5  Page 108**

27

1  case after that.

2        MR. DESMARAIS:  Your Honor, there is no such

3  motion, and that was the point I was trying to make earlier

4  in this call and during the last call.  There are no third-

5  party beneficiary rights in these agreements.

6        MR. FREED:  We're not asserting a third-party

7  beneficiary right.  We're asserting our own rights.

8        MR. DESMARAIS:  The agreement --

9        MR. FREED:  We are a licensee.

10       MR. DESMARAIS:  -- is between Alcatel and the

11  licensing administrator.  It has nothing to do with the

12  Defendants.  You're not a party to this agreement.

13       MR. FREED:  We are a party to our agreement, and

14  our agreement gives us every right to everything that's in

15  the -- it's in the pool or that should be in the pool.

16       MR. DESMARAIS:  The patents don't go into the pool

17  by magic.

18       THE COURT:  Okay.  Just --

19       MR. DESMARAIS:  The way the agreements are set up

20  is when it -- when and if there is a merger, Alcatel will

21  have to execute new agreements, and they are not self-

22  executing.

23       MR. FREED:  Well --

24       THE COURT:  Okay.  Let me -- wait a minute.

25       MR. DESMARAIS:  -- in the MPEG L.A. administrator.

28

1          THE COURT:  Okay.  Wait a minute.

2          MR. FREED:  -- is not self-executing.  It's

3  ministerial.

4          THE COURT:  Okay.  Wait a minute.  Let me ask Mr.

5  Desmarais, Mr. Desmarais, who -- what's your answer to the

6  question?  Obviously if the case is stayed, then there's

7  going to come a time when we're going to have to have a

8  ruling on this issue.  Somebody's going to have to decide

9  what's the status of these two video patents, are they in

10  the pool, can they be exempted, excepted, and litigated

11  outside the pool?  Who's going to decide that question?

12          MR. DESMARAIS:  The person who's going to decide

13  that question is if and only if there is litigation

14  between -- well, let me start again.  Either Alcatel is

15  going to put them in the pool and the case will go away or

16  Alcatel is going to take one of the steps which I know

17  they're going to take which I outlined in the message.

18  Either they're going to exempt them from 2.10, they're going

19  to terminate the license, or the parties are going to come

20  up with some other arrangement to exclude the patent.  I

21  know this.  That's why I think this is all folly for us to

22  speculate.

23          But let's assume that we then get into a situation

24  where the -- there has to be some enforcement of the rights

25  in this agreement.  The only way that can -- the only

*Echo Reporting, Inc.*

**Exhibit 5  Page 110**

29

1 vehicle for that is for the MPEG L.A., the licensing

2 administrator, to sue Alcatel for specific performance

3 because the agreement says right in it there are no third-

4 party beneficiaries.  This is an agreement between Alcatel

5 and the MPEG L.A.  Dell can't sue.  Microsoft can't sue, and

6 Gateway can't sue.

7          MR. FREED:  But Dell can sue and allege that it

8 has a license under its own agreement with the licensing

9 administrator and assert its own rights under its own

10 agreement, including the right that -- to have a license

11 under everything in the pool.

12          THE COURT:  I think -- it seems to me -- it seems

13 to me that all the parties present here, all four of you,

14 have standing to bring a declaratory relief action for

15 interpretation of this agreement claiming that you all

16 have -- you could -- you all have rights under that

17 agreement, not third party but contractual rights as

18 sublicensees and that you want some court to determine the

19 rights and privileges and obligations of each one of the

20 four of you.

21          MR. DESMARAIS:  The reason that can't be done

22 now --

23          MR. FREED:  That court --

24          MR. DESMARAIS:  -- and it can't be done later is

25 because we don't know what structure the merger is going to

30

1 take with respect to the two patents in the lawsuit. That's

2 the point I was making before.

3         THE COURT: Well, I'm not trying to say it needs

4 to be done now. I'm just saying --

5         MR. DESMARAIS: -- be taken out.

6         THE COURT: I'm just saying sometime. I'm not

7 saying right now. I think the first order of business is to

8 let the merger go forward and find out what -- what exists

9 after the merger, what comes out of the room, and when you

10 see what comes out of the room --

11         MR. DESMARAIS: -- which I think is more -- will

12 more clearly crystalize the issue for you, your Honor, which

13 I think is the one you're struggling with.

14         THE COURT: Yeah, but the question is then after

15 the merger, then we still have the question as to what do we

16 do about this lawsuit, and there may be some difference of

17 opinion as to what we do with this lawsuit, whether we

18 dismiss it, try it, what do we do with it, and I think that

19 that means that somebody's going to have to make a ruling on

20 the --

21         MR. FREED: We would bring our motions.

22         THE COURT: -- on the rights of the parties to

23 this MPEG agreement.

24         MR. FREED: Well, we would bring our motions to

25 add Alcatel if they didn't voluntarily join, and then we

**Exhibit 5  Page 112**

31

1  would make -- move to enforce our rights under the

2  agreement, which is the right to enforce the fact that we

3  have a license.

4          MR. FARNEY:  Well, your Honor, this is Brian

5  Farney for Gateway.  I just want to add that Mr. Freed's

6  saying we would force Alcatel to join.  That might be the

7  case, but at least Gateway -- if Alcatel -- our view is if

8  Alcatel doesn't join once it controls the patents, the case

9  has to be dismissed for lack of standing on Lucent's part.

10 Alcatel either has to join or the case goes away, and if

11 Alcatel joins, then the issue is joined as between Alcatel,

12 the MPEG L.A. licensing administrator and the parties

13 because --

14         MR. DESMARAIS:  No, because the MPEG L.A. is not a

15 party at that point.

16         MR. FARNEY:  I mean the two agreements involving

17 those entities is what I mean.

18         MR. DESMARAIS:  But I think -- your Honor, I think

19 that it's premature to talk in that fashion.  I think the

20 better approach would be -- this is obviously a complicated

21 issue that you're struggling with, and we've done it now

22 twice orally over the telephone, and I think these

23 provisions in the agreement and the structure of the merger

24 will quite clearly show you that there is no issue with

25 respect to going forward with the case as currently

*Echo Reporting, Inc.*

**Exhibit 5  Page 113**

32

1  scheduled.

2        So I would request, before we do anything, let the

3  Defendants make a formal motion about why they think these

4  agreements should delay the trial.  We will respond with

5  declarations from the people who are involved in the merger,

6  and we'll explain why the structure of the merger is going

7  to have no effect on these patents.

8        MR. FREED:  Your Honor, that just creates

9  paperwork where paperwork is unnecessary.  The appropriate

10  point here is, as you said, unless there's a slam dunk

11  that -- that there's going to be no way we're going to get a

12  license because of this merger, the thing to do is stay this

13  case, and I think --

14        MR. DESMARAIS:  I believe that it is a slam dunk,

15  and when we brief it for the Court in paper with

16  declarations, the Judge will see that this is a non-issue

17  that you guys are making into something that doesn't exist.

18        MR. DESMARAIS:  Well --

19        MR. MARCHESE:  Chris Marchese.  You already had

20  the chance to submit any papers you wanted to submit.

21        MR. FREED:  The paper and the arguments already

22  show that at best you can't claim that it's a slam dunk in

23  your favor and at best, therefore -- and that dictates a

24  stay under these circumstances.  So it's really silly to

25  paper this thing any further.  I agree that we should let it

33

1  shake out and then paper it, but there's no sense papering

2  it before it shakes out.

3          MR. MARCHESE:  Your Honor, this is --

4          MR. DESMARAIS:  It doesn't make any sense to --

5  trial when you don't have merger structure in mind.  We can

6  put together a brief with declarations from the people

7  involved in the merger which will show this is a non-issue.

8          MR. FREED:  -- the opportunity to submit those.

9          MR. MARCHESE:  Mr. Desmarais, is this the same

10 merger that last week you were telling us wasn't even going

11 to occur?

12          MR. DESMARAIS:  Yes.  What I said last week is

13 that it's not likely to occur before the trial, but even if

14 it does, it is going to be structured in a way that does not

15 do away with the liability in this lawsuit.  I said that

16 last time, and I'm saying it again this time.  I know that

17 for a fact from talking with the people.  So that to sit

18 here and bump the trial when we haven't even put in formal

19 papers on this is -- it seems to me premature.

20          UNIDENTIFIED SPEAKER:  -- Mr. Desmarais could not

21 have pointed out what structure he's talking about.  As we

22 pointed out in our papers we submitted to you, Lucent has

23 put the merger agreement which describes the structure of

24 the merger in detail on Lucent's own Web site.  So Mr.

25 Desmarais could have given you exactly what he says is out

34

1  there now.  I don't know why he didn't, but it seems to me

2  that we know exactly what the structure is going to be.

3  It's on their Web site.

4          THE COURT:  Well, what is it?

5          MR. DESMARAIS:  I am not a corporate lawyer and --

6          UNIDENTIFIED SPEAKER:  Well, the structure of

7  the --

8          MR. DESMARAIS:  -- I don't feel comfortable in the

9  call just talking about the -- the details of a merger.  I

10 need to get the people who are involved in the merger, and

11 we'll put together declarations and explain it, but I am

12 told by the corporate lawyers that these patents is not

13 going to be an issue for this case.

14         MR. MARCHESE:  Your Honor, if I may, this is Chris

15 Marchese for Microsoft.  What I just heard Mr. Desmarais say

16 a few minutes ago, however, was that Alcatel was going to

17 own these patents, that they would become a necessary party,

18 and now he's saying he doesn't know what's going to be.

19         MR. FREED:  Well, if Alcatel's going to own

20 these -- this is Joel Freed for Dell.  If Alcatel's going to

21 own these patents, I perfectly agree with Mr. Farney that we

22 don't have to make them join.  If they don't join, this case

23 gets thrown out immediately.

24         MR. GARTMAN:  Absolutely.  And Microsoft agrees

25 with that as well.  That's just black letter law.

*Echo Reporting, Inc.*

**Exhibit 5  Page 116**

35

1          MR. MARCHESE:  And, your Honor, if Microsoft --

2          MR. DESMARAIS:  -- in writing.  You guys are all

3    about talking about these agreements, what's going to

4    happen.  I want to see your analysis in writing.

5          MR. FREED:  Well, you're the one who said that --

6          MR. DESMARAIS:  I think we should have --

7          MR. FREED:  -- Alcatel is going to own the

8    patents.  If Alcatel owns the patents, there's no question

9    but that Alcatel has to join or it's all over.  If Alcatel

10   doesn't own the patents, the only person who's going to own

11   the patents if the wholly owned subsidiary of Alcatel.  And

12   if the wholly owned subsidiary of Alcatel owns the patents,

13   then Alcatel has the obligation to put them in the pool.

14         So, either way, we should wait until that shakes

15   out.  I think you're wrong in what you're saying, but if

16   you're right, either way, we shouldn't have a trial on the

17   merits of infringement and validity of something that could

18   be very well licensed.

19         MR. DESMARAIS:  Yeah, and we shouldn't have to

20   deal with -- even responded to the fact that it is not going

21   to be licensed because it doesn't include MPEG-1 and WMZ-9.

22   I haven't heard you say anything about that.

23         MR. FREED:  I plainly said that --

24         MR. DESMARAIS:  Your Honor, the fact is we

25   shouldn't be making these decisions based on telephone

36

1 conferences --

2          MR. FREED:  Well, that is a -- I addressed that

3 very first point --

4          MR. DESMARAIS:  If the Defendants want to make a

5 formal motion to dismiss the trial, they should, and we

6 should have an opportunity to respond to it in writing.  I

7 think these agreements are too complicated to deal with on

8 the telephone.

9          You will see if we can lay it out with

10 declarations that there is no issue here.

11      (Parties speaking simultaneously.)

12          MR. FREED:  He could have made this argument last

13 week, and we wouldn't have wasted this time.

14          MR. DESMARAIS:  I did make it last week.  I said

15 the structure of the merger is going to be such that this is

16 a non-issue.

17          MR. MARCHESE:  And, your Honor, this is Chris

18 Marchese --

19          MR. FREED:  You said it wouldn't happen.

20          MR. MARCHESE:  It doesn't make sense for us to

21 continue going along and filing papers and however long it

22 will take to get, you know, those papers filed and responses

23 and replies, and we are steaming towards a trial that will

24 probably be unnecessary when it's all said and done.  We

25 have wasted -- we have other patents out there that are

37

1   scheduled to be tried at other times.  We should just try

2   those patents.  They don't have these issues.

3          THE COURT:  Okay.  Well, here's what we're going

4   to do fellows.  I'm persuaded that it would be a waste of a

5   lot of time for the Court and for counsel to litigate this

6   case in advance of the outcome of whether or not there's a

7   merger.  I'm not going to do that.  I'm not going to hear

8   summary judgment motions, and I'm not going to try the case.

9          So I'm going to stay both, and I don't know what

10  to give you for a stay date.  I don't know what to do about

11  that.  For the moment I'd like to defer rescheduling it

12  until I see what happens on the merger front because if

13  it -- if it happens before December -- and I got a hunch

14  it's going to happen this year, then there's time then to --

15  to get together, get some dates, and also to decide what --

16  what kind of motions are going to be made and what we have

17  as a problem and whether this Court has jurisdiction or

18  whether maybe it doesn't.  I don't know.

19         So what I'd like to do is vacate the trial date.

20  It's November what?

21         MR. DESMARAIS:  20th.

22         THE COURT:  November 20, and the September motion

23  for summary judgment date is the 29th I think of September.

24  I want to vacate both of those dates.  Don't file any more

25  briefs on that motion for summary judgment.  Just bank them.

*Echo Reporting, Inc.*

**Exhibit 5  Page 119**

38

1 You can prepare them, but put them in a safe and leave them

2 there until we find out what's going on, because once the --

3 once the merger takes place, a lot of this stuff may just

4 fall out because it's possible that Alcatel will absorb them

5 and throw them in the pool and concede the issue, and that

6 will take care of itself.

7             MR. DESMARAIS:  Your Honor, this is John

8 Desmarais.  I have a modest request to make.  I would like

9 you to stay that ruling for one week, until a week from

10 today.  Let me speak to the corporate lawyers and prepare a

11 declaration about the structure of the merger to submit it

12 to your Honor and the Defendants to show you that there is

13 no reason to delay because these patents are not going to be

14 part of the pool.  Give me one week to paper it from the

15 corporate lawyers, and I believe it will be clear as can be

16 that these patents are not going to be part of the pool.

17 And if they're not clear, we can adjourn everything and I'll

18 agree to it, but I think right now to do it on a telephone

19 conference before we have the details of the structure

20 before your Honor is premature.

21             MR. FARNEY:  Your Honor, this is Mr. Farney.  It

22 was Mr. Desmarais last week telling us we couldn't know the

23 actual final specific structure of the merger until it was

24 completed.  So even if he submitted something next week, the

25 basis for your ruling would still stand, that we would need

*Echo Reporting, Inc.*

**Exhibit 5  Page 120**

39

1  to see how this thing wraps up by the end of the year, which

2  is when everybody says it's going to happen, and then see

3  how it sits then.  His papers next week wouldn't be any more

4  concrete than what his promises were last week.

5          THE COURT:  Yeah, I'm concerned about this.  This

6  is --

7          MR. FREED:  -- asking for the second bite at the

8  apple.

9          THE COURT:  I think this is too complicated for --

10  I don't want to go with predictions of corporate lawyers.  I

11  don't want to go with predictions.  I want to go with a --

12  with a fait accompli.

13          UNIDENTIFIED SPEAKER:  -- only thing that makes

14  sense, your Honor.

15          THE COURT:  So I know I've got the moving papers

16  on the summary judgment motion.  Marc tells me I've got

17  them.  I haven't looked at them, but I've got them.  So I'm

18  just going to extend the time to respond to them and all the

19  other dates on it just -- they're going to be suspended.

20  The summary judgment is suspended.  The trial is suspended,

21  and contact the Court as soon as you get a merger agreement

22  done and it's on the books and it exists.  Then we can take

23  a look and see what we've got.

24          MR. FREED:  Your Honor, we will contact the Court

25  either then or, you know, January 5th or something like

40

1 that, whichever comes first.

2          THE COURT:  Okay.  And I'll get a short order out

3 doing this.  And let's just shake it out and see what

4 happens.  It's just way way too much -- too many factors

5 have to be taken in consideration to speculate with a

6 declaration as to what that merger's going to do.  It's

7 just -- it's way too complicated for that, Mr. Desmarais.

8 I'm not going to do that.

9          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

10          MR. DESMARAIS:  The only point I was making is how

11 do we know it's too complicated when we haven't actually

12 discussed the parameters of the merger.  It might actually

13 be quite simple.

14          THE COURT:  Well, I'm not going to -- I'm not

15 going to debate about what the parameters are going to be

16 until it's been done.  Those things get changed at midnight

17 of the night before.  I'm not going to do that.  I'm not

18 going to do that.

19          So let's just cool it, and if you want quick

20 action on this, Mr. Desmarais, get them to sign their merger

21 agreement, and let's get off the ground, get going.  You got

22 it within your power to expedite, but only you.

23          MR. DESMARAIS:  I wish I had that power, your

24 Honor.

25          THE COURT:  Okay.  Well, that -- that's -- I think

41

1  that's got to be done.  That's what we're going to do.

2         ALL:  Thank you, your Honor.

3         THE COURT:  Thanks for all of you being present on

4  the phone.  Bye bye.

5      (Proceedings concluded.)

6

7

8

9

10        I certify that the foregoing is a correct

11 transcript from the electronic sound recording of the

12 proceedings in the above-entitled matter.

13

14 _____        _____

   Transcriber                    Date

15

16 FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

17

18 _____

   L.L. Francisco, President

19 Echo Reporting, Inc.

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Exhibit 5  Page 123**

Exhibit 6

FILED

1

2      UNITED STATES DISTRICT COURT    06 AUG 15 PM 2: 48

3      SOUTHERN DISTRICT OF CALIFORNIA    DISTRICT COURT
                                          SOUTHERN DISTRICT OF CALIFORNIA

4                                         PDC

                                          KUT                    DEPUTY

5  LUCENT TECHNOLOGIES INC.,

6          Plaintiff and Counterclaim-defendant,

7  v.

8  GATEWAY, INC. and GATEWAY
   COUNTRY STORES LLC, GATEWAY
   COMPANIES, INC., GATEWAY
9  MANUFACTURING LLC and
   COWABUNGA ENTERPRISES, INC.,

10         Defendants and Counter-claimants,        Civil No: 02CV2060-B(CAB)
                                                    consolidated with
11 and                                              Civil No: 03CV0699-B (CAB) and
                                                    Civil No: 03CV1108-B (CAB)
12 MICROSOFT CORPORATION,

13         Intervenor and Counter-claimant,         ORDER STAYING CERTAIN
                                                    PROCEEDINGS, VACATING CERTAIN
14                                                  HEARING DATES, AND SETTING
                                                    STATUS CONFERENCE
15 _____

16 MICROSOFT CORPORATION,

17         Plaintiff and Counterclaim-defendant,

18 v.

19 LUCENT TECHNOLOGIES INC.,

20         Defendant and Counter-claimant

21 _____

22 LUCENT TECHNOLOGIES INC.,

23         Plaintiff,

24 v.

25 DELL, INC.,

26         Defendant.

27 _____

28

                                                    02CV2060-B (CAB)

Exhibit 6  Page 124

1    After consulting with the parties the court is satisfied that, in light of a potential merger

2   involving Lucent Technologies, Inc., the interests of efficiency and economy would be served by

3   staying proceedings related to the trial of the Group 1 "Video Coding Patents". Therefore the court

4   hereby orders that:

5    -The **September 29, 2006** hearing date for summary judgment motions on Group 1 "Video

6   Coding Patents" is **VACATED**.

7    -The Pre-Trial Conference and Hearing Date for *In Limine* motions regarding the Group 1

8   "Video Coding Patents" on **November 1, 2006** is **VACATED**.

9    -The Trial dates of **November 20-December 14, 2006** for the Group 1 "Video Coding

10  Patents" are **VACATED**.

11    -All other proceedings related to the Group 1 "Video Coding Patents", including briefing of

12  pending motions, are **STAYED**.

13    The stay of proceedings with regard to the Group 1 "Video Coding Patents" shall have no

14  effect on the other proceedings in this matter as outlined in the Second Modified Scheduling Order

15  [Docket No. 388-1] and amended by subsequent orders.

16    The court hereby sets a status conference to revisit these matter for **January 3, 2007** at

17  **10:00 a.m.**

18

19    **IT IS SO ORDERED**

20

21  Dated: ___8-14-06___          _____

22                                HON. RUDI M. BREWSTER
                                  United States Senior District Judge

23

24  cc: Hon. Cathy Ann Bencivengo
        United States Magistrate Judge

25

26    All Counsel of Record

27

28                                                    02CV2060-B (CAB)

**Exhibit 6  Page 125**

# Exhibit 7
## Filed Under Seal

# Exhibit 8
## Filed Under Seal

# Exhibit 9
## Filed Under Seal

# Exhibit 10
## Filed Under Seal

# Exhibit 11
## Filed Under Seal

Exhibit 12

1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   LUCENT TECHNOLOGIES, INC. and      CASE NO. 07-CV-2000-H (CAB)
     MULTIMEDIA PATENT TRUST            consisting of matters severed from
12                                      the consolidated cases:
             Plaintiffs and Counter-    CASE NO. 02-CV-2060-B (CAB)
13           Defendants,                CASE NO. 03-CV-0699-B (CAB)
                                        CASE NO. 03-CV-1108-B (CAB)
14           vs.
                                        **PRE-TRIAL SCHEDULING**
15   GATEWAY, INC., *et al*.            **ORDER**

16           Defendants and Counterclaimants.

17   and

18   MICROSOFT CORPORATION,

19           Intervenor and Counterclaimant

20   ──────────────────────────────────

21   AND RELATED CLAIMS

22           This order supplements the Court's prior scheduling orders.  All other dates

23   remain as set.

24      1.     If the parties wish to use a questionnaire for screening potential jurors,

25             they should meet and confer in good faith to agree on the form of the

26             questionnaire.  The parties shall submit a joint motion proposing the form

27             of any questionnaire on or before **December 10, 2007**.  Whether or not the

28             parties agree on the form of the questionnaire, they should **advise the**

- 1 -

07cv2000

**Exhibit 12  Page 239**

1    **Court of the anticipated length of trial** on or before **December 10, 2007**.

2    If the parties are unable to agree on the form of a questionnaire, the Court

3    may exercise its discretion not to use a questionnaire, except to the extent

4    needed to screen jurors for availability due to the anticipated length of

5    trial.

6    2.    At or before the status conference on **February 19, 2008 at 10:30 AM**,

7         the parties shall submit their proposed jury instructions.

8    3.    At or before the status conference on **February 19, 2008 at 10:30 AM**,

9         each party shall submit to Judge Huff's Courtroom Deputy three (3) copies

10        of a final exhibit list.  These are required **in addition to** any exhibit list

11        submitted with a memorandum required by Civil Local Rule  16.1(f)(2).

12        The parties shall **mark their exhibits in advance of trial**.  The parties

13        should contact the Courtroom Deputy to obtain the approved form of this

14        list, and should contact the Courtroom Deputy or the Clerk's Office to

15        obtain appropriate labels for exhibits.  If any exhibits will require the

16        Court's permission for admission through security, the parties shall call

17        chambers prior to the date of trial to make the necessary arrangements.

18   4.    The Court will impose reasonable time limits for trial, which will apply to

19        all aspects of trial including, but not limited to, opening and closing

20        statements, jury instructions, and both direct and cross-examination of

21        witnesses, subject to exception for good cause shown.

22   **IT IS SO ORDERED.**

23   Dated: November 9, 2007

24

25   MARILYN L. HUFF, District Judge
     UNITED STATES DISTRICT COURT

26   COPIES TO:

27   All parties of record.

28

- 2 -

07cv2000

**Exhibit 12  Page 240**

Exhibit 13

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  **LUCENT TECHNOLOGIES, INC.,** | **CIV. NO. 02-2060-B (CAB)** |
| **MULTIMEDIA PATENT TRUST.,** *et* | **consolidated with** |
| 12  *al.,* | **Civil No:  03CV0699-B (CAB) and** |
| | **Civil No:  03CV1108-B (CAB)** |
| 13         **Plaintiffs & Counter-Defendants,** | |
| 14         **vs.** | **ORDER SEVERING AND** |
| | **TRANSFERRING PART OF CASE** |
| 15  **GATEWAY, INC, et al.,** | |
| 16       **Defendants and Counter-Claimants,** | |
| 17  **and** | |
| 18  **MICROSOFT CORPORATION,** | |
| **Intervenor and Counter-Claimant,** | |
| 19 _____ | |
| 20  **AND CONSOLIDATED CASES** | |
| 21 _____ | |

22         On the Court's own motion and due to the under-signed's inactive status, the Court is

23   severing part of this patent infringement case for transfer to another District Judge, but is

24   retaining jurisdiction over other parts.  The severed parts will be assigned a new case number

25   and transferred to a randomly-assigned District Judge.  The Court notes, however, that on

26   March 19, 2007, when this Court was returning its docket to the draw in preparation for its

27   quasi-retirement, District Judge Marilyn L. Huff was randomly-assigned a recent, related

28   patent case between the same parties.  *Lucent Technologies, Inc. v. Microsoft Corp*, 06-CV-

- 1 -

**Exhibit 13  Page 241**

02CV2060

684-H (CAB); *see* Clerk's Docket No. 61 from 06-CV-684.   Thereafter, on April 6, 2007, pursuant to the Local Rule governing related cases, a second case, *Multimedia Patent Trust v. Gateway, Inc.*, 07-CV-747-H (CAB), was low-numbered to Judge Huff.   Civil Local Rule 40.1; *see* Clerk's Docket Nos. 4-6 in 07-CV-747.

As previously discussed, and pursuant to division of these consolidated cases into five groups (*See* Court's Scheduling Order [Docket Nos. 374, 377 & 388]), the under-signed will continue to retain jurisdiction over certain matters.

**Group 1**:  This group contains two patents related to compression of video coding (U.S. Patent Nos. 4,383,272 and 4,958,226).  All outstanding issues, including trial, on these two patents are severed and transferred to the new case number.

**Group 2**:  This group contains two patents related to audio coding technology (U.S. Patent Nos. 5,341,547 and RE 39,080).  The Court presided over the jury trial of these two patents as well as post-judgment motions and entered a partial judgment pursuant to Fed. R. Civ. P. 54(b).  [# 1975, 1976, & 1977]  Cross appeals are pending.  [# 2027 & 2088] (Federal Circuit Docket Nos. 2007-1546 & 2007-1580).  Thus, the Court retains jurisdiction over these two patents.

**Group 3**:  This group originally contained three patents on speech coding but two were dismissed by stipulation of the parties (U.S. Patent No. 4,617,676) [# 332, 334, 348, & 437]; U.S. Patent No. 4,910,781 [# 330, 333, 343, & 578]).

As to Patent No. 4,701,954, the Court entered summary judgment of non-infringement in favor of Defendants'; ruled on certain affirmative defenses and counterclaims; and entered a Rule 54(b) partial judgment.  [# 450, 844, 845, 846, 1225, & 1261]  Those matters are pending on appeal. [# 1553, 1555, & 1736. ] (Federal Circuit Docket Nos. 2007-1338, 2007-1336, & 2007-1337).  Thus, the Court retains jurisdiction of the remaining patent in this group (U.S. Patent No. 4,701,954).

**Group 4**:  This group contained four patents on computer devices and software programs (Nos. 4,763,356; 4,649,131; 5,347,295; and 4,317,956).  **This group is split**.

The Court entered summary judgment of no infringement on two of the four patents in

this group of patents (U.S. Patent No. 4,649,131 and 4,317,956).  As to U.S. Patent No. 4,317,956, the Court entered partial judgment pursuant to Rule 54(b).  [# 1253]  Although the parties filed notices of appeal, they dismissed them.  [# 1554, 1701, 1723, 1735, 1827, 1996] (Federal Circuit Docket Nos. 2007-1335 & 2007-1338)  Thus, there is no need to transfer that closed matter.  As to U.S. Patent No. 4,649,131, the Court entered partial judgment pursuant to Rule 54(b) and an appeal is pending.  [#1231, 1251, 1815, 1840] (Federal Circuit Docket No. 2007-1376).  Thus, the Court retains jurisdiction over this patent.

All matters pertaining to the other two patents (U.S. Nos. 4,763,356 & 5,347,295), including trial, are severed and transferred to the new case number.

**Group 5:**  This miscellaneous group contains two patents.  **This group is split.**

All outstanding issues, including trial, on U.S. Patent No. 4,439,759 (Fleming) are severed and transferred to the new case number.

The Court retains jurisdiction over the other patent (U.S. Patent No. 4,582,956) (Doughery).  An appeal is pending on this Court's partial judgment [# 2024, 2027, & 2078] (Federal Circuit Docket No. 2007-1546), and the Court has denied the motion for attorney's fees *without prejudice to renewal* depending upon the outcome of the appeal.  [# 2080 & 2117]

For those parts of the case retained by this Court, the above-captioned case number remains the same.  The parties shall continue to contact this Court's chambers for those matters on which this Court has retained jurisdiction, such as mandate hearings.

The Court orders that all outstanding matters as to U.S. Patent No. 4,383,272 (Group 1); U.S. Patent No. 4,958,226 (Group 1); U.S. Patent No. 4,763,356 (Group 4); U.S. Patent No. 5,347,295 (Group 4); and U.S. Patent No. 4,439,759 (Group 5) be severed and transferred for further proceedings, including trial.  **The Clerk shall assign a new case number to the severed portion based upon this Order and shall docket a copy of this Order as the first entry.**

Because the 02-CV-2060 Docket contains many documents that may affect the five patents transferred to the new case number, *further Orders regarding the docketing of the*

*new case will necessarily follow* (including pending motions such as Docket Nos. 1288 (Microsoft's Motion in Limine No.12 on Group 4 patents), 2049 (Dell's Motion for Summary Judgment of No Willful Infringement on Group 1, 4, & 5 patents), 2053 (same, for Microsoft), 2056 (same, for Gateway), 2130 (equipment order), and 2136 (motion to seal)). In any event, *the parties are permitted to refer to documents previously filed and docketed in 02-CV-2060* at any time and for any purpose in future proceedings on the severed portion of this case (e.g., designation of record for appeal).

Once the Clerk has opened the new case number, the Clerk shall terminate these consolidated proceedings in the above-captioned case, 02-CV-2060, and its member cases, 03-CV-699 and 03-CV-1108.

**IT IS SO ORDERED.**

DATED: October 16, 2007

Hon. Rudi M. Brewster
United States Senior District Judge

Exhibit 14

1  Alison P. Adema, SBN 149285
   HAHN & ADEMA
2  501 West Broadway, Suite 1600
   San Diego, California 92101-3595
3  Telephone: (619) 235-2100
   Facsimile: (619) 235-2101
4  Attorney for *Multimedia Patent Trust*

5  *Additional counsel listed on the last page.*

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

'07 CV 0747 J        JMA

10  MULTIMEDIA PATENT TRUST,

11           Plaintiff,                    Case No. _____

12      v.

13  MICROSOFT CORPORATION, GATEWAY
    INC., GATEWAY PROFESSIONAL LLC,       **COMPLAINT**
14  GATEWAY COMPANIES, INC., GATEWAY
    MANUFACTURING LLC, GATEWAY            DEMAND FOR JURY TRIAL
15  DIRECT, INC., GATEWAY US RETAIL, INC.,
16  and DELL INC.,

17           Defendants.

18

19                         **COMPLAINT**

20      Plaintiff Multimedia Patent Trust (the "Trust") for its complaint against Defendants

21  Microsoft Corporation ("Microsoft"), Gateway Inc., Gateway Professional LLC, Gateway

22  Companies, Inc., Gateway Manufacturing LLC, Gateway Direct, Inc., Gateway US Retail, Inc.

23  (collectively "Gateway"), and Dell Incorporated ("Dell", and collectively with Gateway and

24  Microsoft, "Defendants") hereby demands a jury trial and alleges as follows:

25                    **Jurisdiction and Venue**

26      1.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§

27  1331 and 1338(a).

28      2.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and 1400(b)

COMPLAINT                              1                    Case No. _____

**COPY**

Exhibit 14  Page 245

1  because Defendants have committed acts of infringement in this district and because Defendants are

2  subject to personal jurisdiction in this district.

3  <u>**Nature of the Action**</u>

4  3.    This is a civil action for infringement of United States Patent Nos. 5,136,377,

5  5,500,678, and 5,563,593 (the "Patents-in-Suit").  This action is based upon the Patent Laws of the

6  United States, 35 U.S.C. § 1 *et seq.*

7  <u>**Parties**</u>

8  4.    Plaintiff Multimedia Patent Trust is a Delaware statutory trust under the Delaware

9  Statutory Trust Act, 12 Del. C. §§ 3801, et seq.

10  5.    The Multimedia Patent Trust was established in accordance with a certain trust

11  agreement between Lucent Technologies, Inc. ("Lucent"), a Delaware corporation, with offices at

12  600 Mountain Avenue, Murray Hill, New Jersey 07974, and Mr. Gerard deBlasi, an individual,

13  having a business address at 991 Route 22 West, Bridgewater, New Jersey 08807 (the "Licensing

14  Trustee" and the "Litigation Trustee") and Wilmington Trust Company, a Delaware banking

15  corporation, having a corporate headquarters office at Rodney Square North, 1100 North Market

16  Street, Wilmington, Delaware 19890 (the "Administrative Trustee"), as the Trustees.

17  6.    Lucent transferred, assigned, conveyed, delivered and vested to the Multimedia

18  Patent Trust, all of Lucent's interests and rights in U.S. Patent Nos. 5,136,377, 5,500,678, and

19  5,563,593 in all countries, jurisdictions and political entities, along with the right to sue for past

20  infringement (including all current and future claims and causes of action).

21  7.    On information and belief, Defendant Microsoft is a corporation organized under the

22  laws of the state of Washington, with its principal place of business at One Microsoft Way,

23  Redmond, Washington 98052.

24  8.    Microsoft makes, uses, sells, and offers for sale in the United States, and imports into

25  the United States, computer software, video-game computer systems, components, and accessories.

26  9.    On information and belief, Defendant Dell is a corporation organized under the laws

27  of the state of Delaware with its principal place of business at One Dell Way, Round Rock, Texas

28  78682.

COMPLAINT                                          2                              Case No. _____

**Exhibit 14  Page 246**

10.     Dell makes, uses, sells, and offers for sale in the United States, and imports into the United States, computers systems, components, and accessories.

11.     On information and belief, Defendant Gateway Inc. is a company organized under the laws of the state of Delaware with its principal place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

12.     On information and belief, Defendant Gateway Professional LLC is a company organized under the laws of the state of Delaware with its principal place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

13.     On information and belief, Defendant Gateway Companies, Inc. is a company organized under the laws of the state of Delaware with a place of business at 610 Gateway Drive, North Sioux City, SD 57049.

14.     On information and belief, Defendant Gateway Manufacturing LLC is a company organized under the laws of the state of Delaware with a place of business at 610 Gateway Drive, North Sioux City, SD 57049.

15.     On information and belief, Defendant Gateway Direct, Inc. is a company organized under the laws of the state of Delaware with a place of business at 610 Gateway Drive, North Sioux City, SD 57049.

16.     On information and belief, Defendant Gateway US Retail, Inc. is a company organized under the laws of the state of Delaware with a place of business at 7565 Irvine Center Drive, Irvine CA 92618.

17.     Gateway makes, uses, sells, and offers for sale in the United States, and imports into the United States, computers systems, components, and accessories.

### The Patents-in-Suit

18.     United States Patent No. 5,136,377 (the "Johnston '377 Patent"), entitled "Adaptive Non-Linear Quantizer," was duly and legally issued on August 4, 1992 to Johnston et al. A copy of the Johnston '377 Patent is attached hereto as Exhibit A.

19.     United States Patent No. 5,500,678 (the "Puri '678 Patent"), entitled "Optimized Scanning of Transform Coefficients in Video Coding," was duly and legally issued on March 19,

COMPLAINT                                    3                          Case No. _____

Exhibit 14  Page 247

1    1996 to Puri. A copy of the Puri '678 Patent is attached hereto as Exhibit B.

2        20.    United States Patent No. 5,563,593, entitled "Video Coding With Optimized Low

3    Complexity Variable Length Codes," was duly and legally issued on October 8, 1996 to Puri. A

4    Certificate of Correction to the Puri '593 Patent was duly and legally issued on March 28, 2006. A

5    copy of the Puri '593 Patent, with Certificate of Correction, is attached hereto as Exhibit C. The

6    Puri '593 Patent, with Certificate of Correction, is referred to herein as the "Puri '593 Patent."

7        21.    The Trust owns each of the Patents-in-Suit, with the right to sue for past

8    infringement.

9                                    **COUNT I**

10                    **(Infringement of United States Patent No. 5,136,377)**

11        22.    Paragraphs 1 through 21 are incorporated by reference as if stated fully herein.

12        23.    The Johnston '377 Patent is valid and enforceable.

13        24.    Defendants have infringed and are infringing by making, using, selling, offering to

14    sell or importing products protected by at least one claim of the Johnston '377 Patent.

15        25.    Defendants have and are engaged in contributing to and/or inducing the infringement

16    of at least one claim of the Johnston '377 Patent.

17        26.    On information and belief, Defendants' infringement of the Johnston '377 Patent was,

18    and continues to be, willful.

19        27.    Defendants' infringement of the Johnston '377 Patent has injured the Trust, and the

20    Trust is entitled to recover damages adequate to compensate for the Defendants' infringement, which

21    in no event can be less than a reasonable royalty.

22        28.    Defendants have caused the Trust substantial damage and irreparable injury by their

23    infringement of the Johnston '377 Patent, and the Trust will continue to suffer damage and

24    irreparable injury unless and until the infringement by Defendants is enjoined by this Court.

25                                    **COUNT II**

26                    **(Infringement of United States Patent No. 5,500,678)**

27        29.    Paragraphs 1 through 21 are incorporated by reference as if stated fully herein.

28        30.    The Puri '678 Patent is valid and enforceable.

COMPLAINT                                    4                          Case No. _____

**Exhibit 14  Page 248**

1    31.    Defendants have infringed and are infringing by making, using, selling, offering to

2    sell or importing products protected by at least one claim of the Puri '678 Patent.

3    32.    Defendants have and are engaged in contributing to and/or inducing the infringement

4    of at least one claim of the Puri '678 Patent.

5    33.    On information and belief, Defendants' infringement of the Puri '678 Patent was, and

6    continues to be, willful.

7    34.    Defendants' infringement of the Puri '678 Patent has injured the Trust, and the Trust

8    is entitled to recover damages adequate to compensate for the Defendants' infringement, which in no

9    event can be less than a reasonable royalty.

10    35.    Defendants have caused the Trust substantial damage and irreparable injury by their

11    infringement of the Puri '678 Patent, and the Trust will continue to suffer damage and irreparable

12    injury unless and until the infringement by Defendants is enjoined by this Court.

13    ## COUNT III

14    ### (Infringement of United States Patent No. 5,563,593)

15    36.    Paragraphs 1 through 21 are incorporated by reference as if stated fully herein.

16    37.    The Puri '593 Patent is valid and enforceable.

17    38.    Defendants have infringed and are infringing by making, using, selling, offering to

18    sell or importing products protected by at least one claim of the Puri '593 Patent.

19    39.    Defendants have and are engaged in contributing to and/or inducing the infringement

20    of at least one claim of the Puri '593 Patent.

21    40.    On information and belief, Defendants' infringement of the Puri '593 Patent was, and

22    continues to be, willful.

23    41.    Defendants' infringement of the Puri '593 Patent has injured the Trust, and the Trust

24    is entitled to recover damages adequate to compensate for the Defendants' infringement, which in no

25    event can be less than a reasonable royalty.

26    42.    Defendants have caused the Trust substantial damage and irreparable injury by their

27    infringement of the Puri '593 Patent, and the Trust will continue to suffer damage and irreparable

28    injury unless and until the infringement by Defendants is enjoined by this Court.

COMPLAINT                                5                              Case No. _____

Exhibit 14  Page 249

1

**Prayer for Relief**

2   WHEREFORE, Multimedia Patent Trust prays for judgment as follows:

3   A.    That Defendants have infringed, contributorily infringed, and/or induced the

4         infringement of the Patents-in-Suit, and continue to infringe, contribute to the

5         infringement of, and/or induce the infringement of the Patents-in-Suit;

6   B.    That Defendants' infringement has been willful and continues to be willful;

7   C.    That Defendants, their officers, agents, and employees, and those persons in active

8         concert or participation with Defendants, and their successors and assigns be

9         permanently enjoined from infringement, inducement of infringement, and

10        contributory infringement of the Patents-in-Suit, including but not limited to making,

11        importing, using, offering for sale, or selling any devices or systems, or using

12        processes that are protected by the Patents-in-Suit;

13  D.    That Multimedia Patent Trust be awarded all damages adequate to compensate it for

14        Defendants' infringement of the Patents-in-Suit, such damages to be determined by a

15        jury, and if necessary to adequately compensate Multimedia Patent Trust for the

16        infringement, an accounting, and that such damages be trebled and awarded to

17        Multimedia Patent Trust with prejudgment interest;

18  E.    That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285

19        and that Multimedia Patent Trust be awarded the attorney fees, costs, and expenses

20        that it incurs in prosecuting this action; and

21  F.    That Multimedia Patent Trust be awarded such other and further relief as this Court

22        deems just and proper.

23

24

25

26

27

28

COMPLAINT                                    6                          Case No. _____

**Exhibit 14  Page 250**

## JURY DEMAND

Multimedia Patent Trust demands a trial by jury on all issues triable of right by a jury.

Dated:  April 24, 2007

By: *Alison Adema*

Alison P. Adema. SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

John M. Desmarais (admitted *pro hac vice*)
Robert A. Appleby (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Ephraim D. Starr SBN 186409
777 South Figueroa Street
Los Angeles, California 90017-5800
Telephone:  (213) 680-8400
Facsimile:   (213) 680-8500

Attorneys for *Multimedia Patent Trust*

**Exhibit 14  Page 251**

Exhibit 15

1  Alison P. Adema, SBN 149285
   HAHN & ADEMA
2  501 West Broadway, Suite 1600
   San Diego, California 92101-3595
3  Telephone:     (619) 235-2100
   Facsimile:     (619) 235-2101
4

5  Attorney for *Multimedia Patent Trust*
   *Additional counsel listed on the last page*

6

7              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF CALIFORNIA
8

9  MULTIMEDIA PATENT TRUST,

10             Plaintiff,                          CASE NO. 07-CV-0747 H (CAB)

11        v.

12 MICROSOFT CORPORATION, GATEWAY
   INC., GATEWAY PROFESSIONAL LLC,        **MULTIMEDIA'S DISCLOSURE OF**
13 GATEWAY COMPANIES, INC., GATEWAY        **ASSERTED CLAIMS AND**
   MANUFACTURING LLC, GATEWAY DIRECT,     **PRELIMINARY INFRINGEMENT**
14 INC., GATEWAY U.S. RETAIL, INC.,        **CONTENTIONS**
   and DELL INC.,
15
16             Defendants.
17

18 MICROSOFT CORPORATION, GATEWAY
   INC., GATEWAY PROFESSIONAL LLC,
19 GATEWAY COMPANIES, INC., GATEWAY
   MANUFACTURING LLC, GATEWAY DIRECT,
20 INC., GATEWAY U.S. RETAIL, INC.,
   and DELL INC.,
21
22             Third-Party Plaintiffs,

23        v.

24 LUCENT  TECHNOLOGIES, INC.

25             Third-Party Defendant.

26

27

28

**Exhibit 15  Page 252**

1    Multimedia Patent Trust provides the following disclosure of asserted claims and

2    preliminary infringement contentions to the defendants in accordance with Patent Local Rule 3.1

3    and based on its investigations to date.  Multimedia contends that the defendants, Microsoft

4    Corporation, Gateway Inc., Gateway Professional LLC, Gateway Companies, Inc., Gateway

5    Direct, Inc., Gateway U.S. Retail, Inc. (collectively Gateway), and Dell, Inc., have been

6    infringing the following patents:

7    U.S. Patent No. 5,136,377 titled "Adaptive Non-Linear Quantizer"
       by James D. Johnston *et al.*,

8    U.S. Patent No. 5,500,678 titled "Optimized Scanning of

9    Transform Coefficients in Video Coding"  by Atul Puri, and

10   U.S. Patent No. 5,563,593 titled "Video Coding With Optimized
       Low Complexity Variable Length Codes" by Atul Puri.

11

12    Multimedia contends that the asserted patents cover defendants' products that include the

13   capability for encoding video data in a manner such that the encoded video may be decoded

14   using any product or application that is compliant with one of the video coding standards

15   established by the International Telecommunications Union ("ITU-T") or  International

16   Organization for Standardization and the International Electrotechnical Commission

17   ("ISO/IEC").  In particular, products that have the capability to encode video in compliance with

18   the H.262 standard (a.k.a. the MPEG-2 standard) infringe one or more claims of each of the

19   patents-in-suit.  Products that have the capability to encode video in compliance with H.263,

20   H.264 (a.k.a. MPEG-4 Part 10), MPEG-4 Part 2 or VC-1 standards infringe one or more claims

21   of the '678 Patent.

22    Multimedia further contends that defendants' acts of making, using, selling, offering for

23   sale, and/or importing into United States at least the following Microsoft products, and Dell and

24   Gateway products that contain these Microsoft products, infringe at least one claim of each of the

25   patents-in-suit:

26   **Windows DreamScene -** "Windows DreamScene supports video files that
       are in one of the following formats: • Moving Picture Experts Group

27

28

**Exhibit 15  Page 253**

(.mpeg)   Note Windows DreamScene supports MPEG 1 and MPEG 2 video files."  http://support.microsoft.com/kb/929327

**Windows Media Encoder -** "MPEG-4 video content can be encoded and stored in an .asf file container by using Windows Media Tools and Windows Media Encoder. You can then play these files in Windows Media Player."  http://support.microsoft.com/kb/316992

**Windows Media Player -** "This article provides a list of codecs that are supported in Microsoft Windows Media Player for Microsoft Windows XP. . . .  The following codecs are supported in Windows Media Player for Windows XP: • Cinepak codec … • Microsoft MPEG-4 Standard Video Codec • Microsoft MPEG-4 Video Codec v1 • Microsoft MPEG-4 Video Codec v2 • Microsoft MPEG-4 Video Codec v3." http://support.microsoft.com/kb/291948

**Windows Media Video 9 Codec -** "With VC-1 standardization now completed, Microsoft has released a WMV 9 decoder that is available to the public and fully conforms to the standardized VC-1 bit stream. Microsoft—through the update to Windows Media Encoder 9 Series—and many other companies continue to develop VC-1 encoding capabilities to drive the authoring of audio and video that creates content conforming to VC-1." http://www.microsoft.com/windows/windowsmedia/forpros /events/NAB2005/VC-1.aspx

**Windows Vista DVD Maker -** "DVD Maker in Windows Vista publishes directly to MPEG-2 format, enabling you to burn DVDs directly from your video camera. … In addition, Windows DVD Maker gives you maximum choice and control over the quality and size of your video files when you are encoding; you can even choose widescreen or standard format to publish a slide show or movie that looks best on your TV." http://www.microsoft.com/windows/products/windowsvista/features/detail s/dvdmaker.mspx

**Windows Vista Media Center -** "Other features of Windows Vista Media Center include: … Native DVD/MPEG-2 support." http://en.wikipedia.org/wiki/Windows_Media_Center#Media_Center_in_ Windows_Vista

**Windows Vista Movie Maker -** "using the Home Premium and Ultimate Windows Vista editions, you can edit content from high-definition cameras that support the HDV format. You can also edit native MPEG-2 content, the format used in commercial-release DVDs." http://www.microsoft.com/windows/products/windowsvista/features/detail s/moviemaker.mspx

**Exhibit 15  Page 254**

**Windows XP Media Center Edition -** "Microsoft Digital Video Recording (.dvr-ms)  In Microsoft Windows XP Media Center Edition, Microsoft introduced the *.dvr-ms file format for storing recorded TV content. Similar to *.asf files, *.dvr-ms file enhancements permit key Personal Video Recorder (PVR) functionality, including time-shifting, live pause, and simultaneous record and playback. Video contained in a *.dvr-ms file is encoded as MPEG-2 video stream. . . ."
http://support.microsoft.com/kb/316992

**DirectX**  - "Microsoft is providing a Microsoft DirectX application programming interface (API) and a corresponding device driver interface (DDI) for acceleration of video codec processing. This API/DDI provides an interface definition focused on support of MPEG-2 'main profile' video (formally ITU-T H.262 | ISO/IEC 13818-2), but also intended to support other key video codecs (ITU-T Recommendations H.263 and H.261, and MPEG-1 and MPEG-4)."
http://www.microsoft.com/whdc/device/stream/DirectX_VA/default.mspx

**NetMeeting** - "The NetMeeting conferencing API… takes advantage of all the functionality provided at lower layers, including, optionally, the NetMeeting user interface (UI). …  H.263 Video   Compresses and decompresses video data using a H.263-compliant video codec."
http://msdn2.microsoft.com/en-us/library/ms709075.aspx

**Office Communicator** - "Communicator 2007 is a unified communications client that helps people communicate easily with others in different locations using a range of different communication options, including instant messaging (IM), voice, and video."
http://office.microsoft.com/en-us/communicator/FX101729051033.aspx

**Phone Dialer** - "Phone Dialer supports video conferencing, voice conferencing, or a combination of both."  "During the conferencing process, audio and video data must be compressed and decompressed. Phone Dialer uses the following codec compression and decompression protocols:  Video: H.261, H.263  …"
http://www.microsoft.com/resources/documentation/windows/xp/all/proddocs/en-us/dialer_conference_overview.mspx?mfr=true

**Producer for Microsoft Office PowerPoint** - "Free to licensed users of PowerPoint 2003 and PowerPoint version 2002, Producer 2003 features include improved audio and video quality, better synchronization, and presentation-sharing tools."
http://www.microsoft.com/windows/windowsmedia/technologies/producer.mspx

**MSN Messenger** - includes video call capability with web cam integration.  See RTC below.

**Exhibit 15  Page 255**

**Windows Messenger** - includes video call capability. See RTC below.

**Windows Real-Time Communications** - "The Real-Time Communications (RTC) platform is a set of core components that provide rich real-time communications features. … With the introduction of Microsoft Windows XP, rich communications features have been combined and enhanced to provide the infrastructure for a real-time communications (RTC) experience. These features are leveraged by various Microsoft applications, including Microsoft Office Communicator, MSN Messenger, and Windows Messenger, to expose user-to-user communications by using *real-time voice and video*…. When applications are built on the Real-Time Communications platform, the end user receives a vivid audio and video experience. … This paper discusses the following features and improvements: Audio and Video Codec Availability…." "The H.263 and H.261 codecs are supported for video. H.263 is always preferred…." http://msdn2.microsoft.com/en-us/library/ms997607.aspx

Multimedia contends that the following Dell products, in addition to those Dell products that contain the above-identified Microsoft products, infringe at least one claim of each of the patents-in-suit based on capability of these products to encode video in compliance with one or more ITU-T or ISO/IEC video coding standards, as indicated: Dazzle Video Creator Platinum, which includes hardware and/or software for encoding into MPEG-2 and MPEG-4 formats; InterVideo iVideo ToGo Platinum, which includes hardware and/or software for supporting H.264 high compression format; and GeForce 6200 256 MB DDR2 AGP Graphics Card, Win TV-HVR-1800 PCI Express X1 Hybrid Video Recorder, Win TV-HVR-1800 PCLe Tuner Card, Win TV-HVR-950 Hybrid USB TV Tuner, Win TV-PVR USB 2.0 Personal Video Recorder with MCE-Kit, Win TV-PVR-150 Media Center Personal Recorder with NTSC TV Tuner, Win TV-PVR-150 PCI Personal Video Recorder, Win TV-PVR-150 PCI Personal Video Recorder Kit with NTSC TV Tuner, Win TV-PVR-500 MCE-Kit with NTSC TV Tuner and Media Center Remote Control, PVR USB 2.0 W/FM Tuner REM control, and Win TV-PVR-500 PCI Dual Tuner for Windows XP Media Center Edition 2005, each of which include an MPEG-2 encoder.

Multimedia contends that the following Gateway products, in addition to those Gateway products that contain the above-identified Microsoft products, infringe at least one claim of each

Exhibit 15  Page 256

1     of the patents-in-suit based on capability of these products to encode video in compliance with

2     one or more ITU-T or ISO/IEC video coding standards, as indicated:  Hauppauge WinTV-PVR-

3     150 Hardware MPEG2 PCI TV Turner w/ Recording, which includes hardware and/or software

4     for encoding video in compliance with MPEG-2; and KWORLD L883D PCI DVD Maker Edit

5     Burn MPEG 4/2/1 Encoding Card, which includes hardware and/or software for encoding video

6     in compliance with MPEG-2 and MPEG-4.

7              Multimedia's preliminary infringement contentions are based on capability of the

8     products to encode video in compliance with one or more ITU-T or ISO/IEC video coding

9     standards, as indicated, and Multimedia reserves all rights to supplement these contentions based

10    upon source code, schematics and other information ascertained through fact and expert

11    discovery regarding the accused products, including the disclosures required by Patent Local

12    Rule 3.4(a).

13             Multimedia contends that defendants' acts of making, using, selling, offering for sale,

14    and/or importing at least the above-listed products constitute direct and/or indirect infringement

15    of the following claims, as indicated, either literally or under the doctrine of equivalents:  The

16    products that are compatible with the H.262 standard infringe at least the '377 Patent claims 1, 8,

17    13 and 26, the '678 Patent claims 1-19, and the '593 Patent claims 1-18.  These include at least

18    Windows DreamScene, Windows Vista DVD Maker, Windows Vista Media Center, Windows

19    Vista Movie Maker, Windows XP Media Center Edition, and DirectX; Dazzle Video Creator

20    Platinum, GeForce 6200 256 MB DDR2 AGP Graphics Card, Win TV-HVR-1800 PCI Express

21    X1 Hybrid Video Recorder, Win TV-HVR-1800 PCLe Tuner Card, Win TV-HVR-950 Hybrid

22    USB TV Tuner, Win TV-PVR USB 2.0 Personal Video Recorder with MCE-Kit, Win TV-PVR-

23    150 Media Center Personal Recorder with NTSC TV Tuner, Win TV-PVR-150 PCI Personal

24    Video Recorder, Win TV-PVR-150 PCI Personal Video Recorder Kit with NTSC TV Tuner,

25    Win TV-PVR-500 MCE-Kit with NTSC TV Tuner and Media Center Remote Control, PVR

26    USB 2.0 W/FM Tuner REM control, and Win TV-PVR-500 PCI Dual Tuner for Windows XP

27    Media Center Edition 2005; and Hauppauge WinTV-PVR-150 Hardware MPEG2 PCI TV

28

**Exhibit 15  Page 257**

1  Turner w/ Recording and KWORLD L883D PCI DVD Maker Edit Burn MPEG 4/2/1 Encoding

2  Card.  The products that are compatible with the H.263 standard or MPEG-4 Part II infringe at

3  least the '678 Patent claims 1, 7, 13, and 19.  These include at least Windows Media Encoder,

4  Windows Media Player, DirectX, NetMeeting, Phone Dialer, and Windows Real-Time

5  Communications; Dazzle Video Creator Platinum and InterVideo iVideo ToGo Platinum; and

6  KWORLD L883D PCI DVD Maker Edit Burn MPEG 4/2/1 Encoding Card.  And the products

7  that are compatible with the H.264 or VC-1 standards infringe at least the '678 Patent claims 7

8  and 19.  These include at least Windows Media Video 9 Codec.

9        The following claim charts identify the bases for Multimedia's preliminary infringement

10  contentions with respect to each relevant video coding standard.

| '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| 1. An encoder including | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoder in a product compatible with H.262:<br><br>This Part of this Recommendation \| International Standard was developed in response to the growing need for a generic coding method of moving pictures…..<br><br>(ITU-T Rec. H.262 2000E at v.)<br><br>Encoder is "an embodiment of an encoding process," which is "a process, not specified in ITU-T Rec. H.262 \| ISO/IEC 13818-2, that reads a stream of input pictures and produces a valid coded bitstream as defined in ITU-T Rec. H.262 \| ISO/IEC 13818-2."  (ITU-T Rec. H.262 2000E at 3.) |
| [claim 1 cont.] a coder for developing encoder output signals from frame difference signals, | The accused products contain hardware and/or software for developing encoder output signals from frame difference signals.  The ITU-T Recommendation H.262 describes:<br><br>A number of techniques are used to achieve high compression.   The algorithm first uses block- |

**Exhibit 15  Page 258**

| '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. Motion vectors are defined for each 16-sample by 16-line region of the picture. The prediction error, is further compressed using the Discrete Cosine Transform (DCT) to remove spatial correlation before it is quantised in an irreversible process that discards the less important information. Finally, the motion vectors are combined with the quantised DCT information and encoded using variable length codes. (ITU-T Rec. H.262 2000E at vi.)

"Prediction error" is defined as "The difference between the actual value of a sample or data element and its predictor." (ITU-T Rec. H.262 2000E at 5.) |
| [claim 1 cont.] prediction means responsive to said encoder output signals for predicting a next frame's signals, | The accused products contain hardware and/or software for predicting a next frame's signals in response to the encoder output signals, consistent with ITU-T Recommendation H.262:

The standard's "basic coding algorithm is a hybrid of motion compensated prediction and DCT." (ITU-T Rec. H.262 2000E at i.)

Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. …

Predictive Coded Pictures (P-Pictures) are coded more efficiently using motion compensated prediction from a past intra or predictive coded picture and are generally used as a reference for further prediction.

(ITU-T Rec. H.262 2000E at vi.)

Each macroblock can be temporally predicted in one of a number of different ways. For example, in frame encoding, the prediction from the previous reference frame …. |

| '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | (ITU-T Rec. H.262 2000E at vii.) <br><br> The motion compensation process forms predictions from previously decoded pictures which are combined with the coefficient data (from the output of the IDCT) in order to recover the final decoded samples. <br><br> (ITU-T Rec. H.262 2000E at 69.) |
| [claim 1 cont.] and means for developing said frame difference signals from applied next frame signals of an image frame and from output signals of said prediction means, | The accused products contain hardware and/or software for developing the frame difference signals from applied next frame signals of an image frame and from output signals of the prediction means.  The ITU-T Recommendation H.262 describes: <br><br> Motion vectors are used to provide "an offset from the coordinate position in the current picture or field to the coordinates in a reference frame. . . ."  The reference frame "is a reconstructed frame that was coded in the form of a coded I-frame or a coded P-frame."  (ITU-T Rec. H.262 2000E at 5-6.) |
| [claim 1 cont.] the improvement comprising: said coder including controllable quantizer means that quantizes said difference signals in accordance with a quantization schema that varies with the dictates of a control signal; and | The accused products contain hardware and/or software for quantizing the difference signals in accordance with a quantization schema that varies with the dictates of a control signal.  The ITU-T Recommendation H.262 describes an inverse quantization schema that uses weighting matrices and scaling factors: <br><br> 7.4    Inverse quantization <br><br> The two-dimensional array of coefficients, $QF[v][u]$, is inverse quantised to produce the reconstructed DCT coefficients. This process is essentially a multiplication by the quantiser step size. The quantiser step size is modified by two mechanisms; a weighting matrix is used to modify the step size within a block and a scale factor is used in order that the step size can be modified at the cost of only a few bits (as compared to encoding an entire new weighting matrix). <br><br> (ITU-T Rec. H.262 2000E at 66.) |

Exhibit 15  Page 260

| | '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|---|
| | [claim 1 cont.] said coder including means, responsive to said applied next frame signals, to develop said control signal, which control signal varies throughout said applied next frame with changes in at least one selected characteristic of said applied next frame signals. | The accused products contain hardware and/or software for developing the control signal, which varies throughout the applied next frame with changes in at least one selected characteristic of said applied next frame signals. The ITU-T Recommendation H.262 describes the use of weighting matrices combined with scaling factors to generate unique quantizer step sizes for each element in a macroblock in the applied next frame signals:<br><br>7.4.2.1    Weighting matrices<br><br>When 4:2:0 data is used two weighting matrices are used.    One shall be used for intra macroblocks and the other for non-intra macroblocks.  When 4:2:2 or 4:4:4 data is used, four matrices are used allowing different matrices to be used for luminance and chrominance data.    . . . Let the weighting matrices be denoted by W[w][v][u] where w takes the values 0 to 3 indicating which of the matrices is being used.<br><br>7.4.2.2    Quanitiser scale factor<br><br>The quantisation scale factor is encode as a 5-bit fixed length code, quantiser_scale_code.    This indicates the appropriate quantiser_scale to apply to the inverse quantization arithmetic. q_scale_type (encoded in the picture coding extension) indicates which of two mappings between quantiser_scale_code and quantiser_scale shall apply.<br><br>(ITU-T Rec. H.262 2000E at 66-67.)<br><br>Based on the equation for reconstructing the DCT coefficients, and quantiser_scale_code, the H.262 standard indicates that modification of the scale factor modifies the quantization matrix.<br><br>(ITU-T Rec. H.262 2000E at 55 and 67.) |
| | 8. The encoder of claim 1 further comprising an output buffer for receiving said encoder output signals, and said coder comprising means for receiving | The accused products contain hardware and/or software comprising an output buffer for receiving said encoder output signals, and hardware and/or software for receiving signals from the output buffer that indicate the level of |

Exhibit 15  Page 261

| **'377 PATENT** | **ACCUSED PRODUCTS BASED ON H.262 STANDARD** |
|---|---|
| signals from said output buffer that indicate the level of buffer fullness of said output buffer. | buffer fullness of the output buffer. The ITU-T Recommendation H.262 describes the use of an output buffer and an indication of the level of the buffer fullness to prevent overflow: |
| | Video buffering verifier |
| | (This annex forms an integral part of this Recommendation International Standard) |
| | Coded video bitstreams shall meet constraints imposed through a Video Buffering Verifier (VBV) defined in this annex. Each bitstream in a scalable hierarchy shall not violate the VBV constraints defined in this annex. |
| | The VBV is a hypothetical decoder, which is conceptually connected to the output of an encoder. It has an input buffer known as the VBV buffer. Coded data is placed in the buffer as defined below in C.3 and is removed from the buffer as defined in C.5, C.6, and C.7. It is required that a bitstream that conforms to this Specification shall not cause the VBV buffer to overflow. When low delay equals zero, the bitstream shall not cause the VBV buffer to underflow. When low delay equals one, decoding a picture at the normally expected time might cause the VBV buffer to underflow. If this is the case, the picture is not decoded and the VBV buffer is re-examined at a sequence of later times specified in C.7 and C.8 until it is all present in the VBV buffer. |
| | (ITU-T Rec. H.262 2000E at Annex C, 138.) |
| 13. The encoder of claim 1 wherein said coder is responsive to applied scale factor signals to control the effective range of said quantizer means. | The accused products contain hardware and/or software responsive to applied scale factor signals to control the effective range of said quantizer means. The ITU-T Recommendation H.262 describes the use of scaling factors to control quantization: |
| | 7.4        Inverse quantization |
| | The two-dimensional array of coefficients, $QF[v][u]$, is inverse quantised to produce the reconstructed DCT coefficients. This process is essentially a multiplication by the quantiser step |

**Exhibit 15  Page 262**

| '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | size. The quantiser step size is modified by two mechanisms; a weighting matrix is used to modify the step size within a block and a scale factor is used in order that the step size can be modified at the cost of only a few bits (as compared to encoding an entire new weighting matrix). |
| | (ITU-T Rec. H.262 2000E at 66.) |
| | 7.4.2.2   Quanitiser scale factor |
| | The quantisation scale factor is encode as a 5-bit fixed length code, quantiser_scale_code.   This indicates the appropriate quantiser_scale to apply to the inverse quantization arithmetic. q_scale_type (encoded in the picture coding extension) indicates which of two mappings between quantiser_scale_code and quantiser_scale shall apply. |
| | (ITU-T Rec. H.262 2000E at 67.) |
| 26.  An encoder comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoder in a product compatible with H.262: |
| | "This Part of this Recommendation \| International Standard was developed in response to the growing need for a generic coding method of moving pictures …."  (ITU-T Rec. H.262 2000E at v.) |
| | An encoder is "an embodiment of an encoding process," which is "a process, not specified in ITU-T Rec. H.262 \| ISO/IEC 13818-2, that reads a stream of input pictures and produces a valid coded bitstream as defined in ITU-T Rec. H.262 \| ISO/IEC 13818-2."  (ITU-T Rec. H.262 2000E at 3.) |
| [claim 26 cont.] prediction means responsive to output signals of said encoder, for developing frame prediction | The accused products contain hardware and/or software responsive to output signals of said encoder, for developing frame prediction signals. The ITU-T Recommendation H.262 describes: |

**Exhibit 15  Page 263**

| '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| signals; | The standard's "basic coding algorithm is a hybrid of motion compensated prediction and DCT." (ITU-T Rec. H.262 2000E at i.)<br><br>Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. …<br><br>Predictive Coded Pictures (P-Pictures) are coded more efficiently using motion compensated prediction from a past intra or predictive coded picture and are generally used as a reference for further prediction.<br><br>(ITU-T Rec. H.262 2000E at vi.)<br><br>Each macroblock can be temporally predicted in one of a number of different ways. For example, in frame encoding, the prediction from the previous reference frame ….<br><br>(ITU-T Rec. H.262 2000E at vii.)<br><br>The motion compensation process forms predictions from previously decoded pictures which are combined with the coefficient data (from the output of the IDCT) in order to recover the final decoded samples.<br><br>(ITU-T Rec. H.262 2000E at 69.) |
| [claim 26 cont.] means for developing frame difference signals in response to said frame prediction means and applied frame signals; | The accused products contain hardware and/or software for developing the frame difference signals in response to the frame prediction means and applied frame signals. The ITU-T Recommendation H.262 describes:<br><br>Motion vectors are used to provide "an offset from the coordinate position in the current picture or field to the coordinates in a reference frame. . . ." The reference frame "is a reconstructed frame that was coded in the form of a coded I-frame or a coded P-frame." (ITU-T Rec. H.262 2000E at 5-6.) |
| [claim 26 cont.] coder means, responsive to said frame | The accused products contain hardware and/or software for encoding frame difference signals under direction of said |

**Exhibit 15  Page 264**

| ‘377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| difference signals and to a control signal, for encoding frame difference signals under direction of said control signal, where said coder means codes different portions of said frame difference signals with different coding schemas, where different coding schemas yield different numbers of bits when coding any given signal, said coder means thereby generates a number of bits when encoding said applied frame signals; and | control signal, coding different portions of the frame difference signals with different coding schemas, where different coding schemas yield different numbers of bits when coding any given signal, and for generating a number of bits when encoding the applied frame signals. The ITU-T Recommendation H.262 describes an inverse quantization schema that use weighting matrices and scaling factors:

A number of techniques are used to achieve high compression. The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current picture from a previous picture, and for non-causal, interpolative prediction from past and future pictures. Motion vectors are defined for each 16-sample by 16-line region of the picture. The prediction error, is further compressed using the Discrete Cosine Transform (DCT) to remove spatial correlation before it is quantised in an irreversible process that discards the less important information. Finally, the motion vectors are combined with the quantised DCT information, and encoded using variable length codes.

(ITU-T Rec. H.262 2000E at vi.)

The ITU-T Recommendation H.262 uses “macroblocks for motion compensation unit....” “The term macroblock can either refer to source and decoded data or to the corresponding coded data elements.”

(ITU-T Rec. H.262 2000E at vii and 19.)

7.4       Inverse quantisation

The two-dimensional array of coefficients, $QF[v][u]$, is inverse quantised to produce the reconstructed DCT coefficients. This process is essentially a multiplication by the quantiser step size. The quantiser step size is modified by two mechanisms; a weighting matrix is used to modify the step size within a block and a scale |

| **'377 PATENT** | **ACCUSED PRODUCTS BASED ON H.262 STANDARD** |
|---|---|
|  | factor is used in order that the step size can be modified at the cost of only a few bits (as compared to encoding an entire new weighting matrix). |
|  | (ITU-T Rec. H.262 2000E at 66.) |
| [claim 26 cont.] control means for developing said control signal in response to said encoder output signals, to control the number of bits generated by said coder means while encoding said applied frame signals. | The accused products contain hardware and/or software for developing the control signal in response to the encoder output signals, to control the number of bits generated by the coder means while encoding the applied frame signals. The ITU-T Recommendation H.262 describes the use of weighting matrices combined with scaling factors to generate unique quantizer step sizes for each element in a macroblock in response to the encoder output signals: |
|  | 7.4.2.1    Weighting matrices |
|  | When 4:2:0 data is used two weighting matrices are used.     One  shall  be  used  for  intra macroblocks   and   the   other   for   non-intra macroblocks.  When 4:2:2 or 4:4:4 data is used, four  matrices  are  used  allowing  different matrices   to   be   used   for   luminance   and chrominance  data.    .  .  .  Let  the  weighting matrices  be  denoted  by  W[w][v][u]  where w takes  the  values  0 to 3  indicating which of the matrices is being used. |
|  | 7.4.2.2    Quanitiser scale factor |
|  | The quantisation scale factor is encode as a 5-bit fixed length code, quantiser_scale_code.   This indicates the appropriate quantiser_scale to apply to    the    inverse    quantization    arithmetic. q_scale_type (encoded in the picture coding extension)  indicates  which  of  two  mappings between        quantiser_scale_code        and quantiser_scale shall apply. |
|  | (ITU-T Rec. H.262 2000E at 66-67.) |
|  | Based  on  the  equation  for  reconstructing  the DCT coefficients, and quantiser_scale_code, the H.262 standard indicates that modification of the scale factor modifies the quantization matrix. |

| '377 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | (ITU-T Rec. H.262 2000E at 55 and 67.)<br><br>Furthermore, the ITU-T Recommendation H.262 describes that the output buffer at the encoder should not be permitted to overflow:<br><br> Video buffering verifier <br> (This annex forms an integral part of this Recommendation International Standard) <br>Coded video bitstreams shall meet constraints imposed through a Video Buffering Verifier (VBV) defined in this annex. Each bitstream in a scalable hierarchy shall not violate the VBV constraints defined in this annex.<br><br>The VBV is a hypothetical decoder, which is conceptually connected to the output of an encoder. It has an input buffer known as the VBV buffer. Coded data is placed in the buffer as defined below in C.3 and is removed from the buffer as defined in C.5, C.6, and C.7. It is required that a bitstream that conforms to this Specification shall not cause the VBV buffer to overflow. When low delay equals zero, the bitstream shall not cause the VBV buffer to underflow. When low delay equals one, decoding a picture at the normally expected time might cause the VBV buffer to underflow. If this is the case, the picture is not decoded and the VBV buffer is re-examined at a sequence of later times specified in C.7 and C.8 until it is all present in the VBV buffer.<br><br>(ITU-T Rec. H.262 2000E at Annex C, 138.) |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON H.262 STANDARD** |
|---|---|
| 1. A method of encoding a video signal, comprising the steps of: | The accused products use methods of encoding, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoding method used in a product compatible with H.262:<br><br>This Recommendation/International Standard specifies the coded representation of picture information for digital storage media and digital video communication and specifies the decoding process. The representation supports constant bitrate transmission, variable bitrate transmission, random access, channel hopping, scalable decoding, bitstream editing, as well as special functions such as fast forward playback fast reverse playback, slow motion, pause and still pictures. This Recommendation / International Standard is forward compatible with ISO/IEC 11172-2 and upward or downward compatible with EDTV, HDTV, SDTV formats.<br><br>(ITU-T Rec. H.262 2000E at 1.) |
| [claim 1 cont.] generating a set of frequency coefficient signals, the set representing the video signal, and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ITU-T Recommendation H.262, the accused products generate a set of frequency coefficients (i.e. DCT coefficients), the set representing the video signal, and corresponding to an NxM matrix (i.e. 8x8), wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted |

**Exhibit 15  Page 268**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ITU-T Rec. H.262 2000E at vii.)<br><br>Each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix, which is demonstrated by implication in the ITU-T Recommendation H.262 discussion of the decoder.<br><br>    Let the data at the output of the variable length decoder be denoted by QFS[n].  n is in the range 0 to 63.<br><br>    This subclause specifies the way in which the one-dimensional data, QFS[n], is converted into a two-dimensional array of coefficients denoted by $QF$[v][u]. u and v both lie in the range 0 to 7.<br><br>(ITU-T Rec. H.262 2000E at 64.) |
| [claim 1 cont.] scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals:<br><br>(0, 0), (0, 1), (0, 2), (0, 3), (1, 0), (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7); | Consistent with ITU-T Recommendation H.262, the accused products scan a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the list of coordinate pairs in Claim 1, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals.<br><br>When the variable *alternate_scan* is set to 1, then, under the Recommendation, inverse scanning is performed according to Figure 7.3 which lists the same order of coordinate pairs as in Claim 1.<br><br>    Figure 7-3 defines *scan*[alternate_scan][v][u] for the case that alternate_scan is one.<br><br>(ITU-T Rec. H.262 2000E at 64.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | 

Figure 7-3 – Definition of *scan*[1][*v*][*u*]

(ITU-T Rec. H.262 2000E at 65.)

The ordered set defined in the claim corresponds to entries 0 through 14 in the table. |
| [claim 1 cont.] and generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | Consistent with the ITU-T Recommendation H.262, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.

Intro. 4.1.4 Spatial redundancy reduction

Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.

(ITU-T Rec. H.262 2000E at vii.) |

Exhibit 15  Page 270

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
|  | 3.140 zigzag scanning order: A specific sequential ordering of the DCT coefficients from (approximately) the lowest spatial frequency to the highest.<br><br>(ITU-T Rec. H.262 2000E at 7.) |
| 2. The method of claim 1 wherein the scanning step is performed in response to a frame format associated with the video signal. | The accused products contain hardware and/or software wherein the scanning is performed in response to a frame format associated with the video signal.<br><br>Two scan patterns are defined. The scan that shall be used shall be determined by alternate_scan which is encoded in the picture coding extension.<br><br>(ITU-T Rec. H.262 2000E at 64.) |
| 3. The method of claim 2 in which the frame format is an interlaced frame format. | The accused products contain hardware and/or software in which the frame format is an interlaced frame format.<br><br>This specification deals with coding of both progressive and interlaced sequences. … [F]or interlaced sequences … the two fields of a frame may be coded separately<br><br>(ITU-T Rec. H.262 2000E at 11.) |
| 4. The method of claim 1 further including a step of scanning a second subset of the frequency coefficient signals within the set in a predetermined second subset scanning order such that the ordered set includes frequency coefficient signals in the second subset, wherein the second subset scanning order is represented by the following list of coordinate pairs:<br><br>(1, 6), (1, 5), (1, 4), (2, 3), (2, 2), (3, 0), (3, 1), (4, 0), (4, 1), (3, 2), (3, 3), (2, 4), (2, 5), (2, 6), (2, 7). | The accused products contain hardware and/or software for scanning a second subset of the frequency coefficient signals within the set in a predetermined second subset scanning order such that the ordered set includes frequency coefficient signals in the second subset, wherein the second subset scanning order is represented by the list of coordinate pairs defined in the claim.<br><br>When the variable *alternate_scan* is set to 1, then, under the Recommendation, inverse scanning is performed according to Figure 7.3 which lists the same order of coordinate pairs as in Claim 1.<br><br>Figure 7-3 defines *scan*[alternate_scan][v][u] for the case that alternate_scan is one.<br><br>(ITU-T Rec. H.262 2000E at 64.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | <br><br>**Figure 7-3 – Definition of** *scan*[1][*v*][*u*]<br><br>(ITU-T Rec. H.262 2000E at 65.)<br><br>The ordered set defined in the claim corresponds to entries 15 through 29 in the table. |
| 5. The method of claim 4 further including a step of scanning a third subset of the frequency coefficient signals within the set in a predetermined third subset scanning order such that the ordered set includes the scanned frequency coefficient signals in the third subset, wherein the third subset scanning order is represented by the following list of coordinate pairs:<br><br>(3, 4), (3, 5), (3, 6), (3, 7), (4, 2), (4, 3), (5, 0), (5, 1), (6, 0), (6, 1), (5, 2), (5, 3), (4, 4), (4, 5), (4, 6), (4, 7). | The accused products contain hardware and/or software for scanning a third subset of the frequency coefficient signals within the set in a predetermined third subset scanning order such that the ordered set includes the scanned frequency coefficient signals in the third subset, wherein the third subset scanning order is represented by the list of coordinate pairs defined in the claim.<br><br>When the variable *alternate_scan* is set to 1, then, under the Recommendation, inverse scanning is performed according to Figure 7.3 which lists the same order of coordinate pairs as in Claim 1.<br><br>Figure 7-3 defines *scan*[alternate_scan][v][u] for the case that alternate_scan is one.<br>(ITU-T Rec. H.262 2000E at 64.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
|  |   Figure 7-3 – Definition of $scan[1][v][u]$  (ITU-T Rec. H.262 2000E at 65.)  The ordered set defined in the claim corresponds to entries 30 through 45 in the table. |
| 6. The method of claim 5 further including a step of scanning a fourth subset of the frequency coefficient signals within the set in a predetermined fourth subset scanning order such that the ordered set includes the scanned frequency coefficient signals in the fourth subset, wherein the fourth subset scanning order is represented by the following list of coordinate pairs:  (5, 4), (5, 5), (5, 6), (5, 7), (6, 2), (6, 3), (7, 0), (7, 1), (7, 2), (7, 3), (6, 4), (6, 5), (6, 6), (6, 7), (7, 4), (7, 5), (7, 6), (7, 7). | The accused product contains hardware and/or software for scanning a fourth subset of the frequency coefficient signals within the set in a predetermined fourth subset scanning order such that the ordered set includes the scanned frequency coefficient signals in the fourth subset, wherein the fourth subset scanning order is represented by the list of coordinate pairs as defined in the claim.  When the variable *alternate_scan* is set to 1, then, under the Recommendation, inverse scanning is performed according to Figure 7.3 which lists the same order of coordinate pairs as in Claim 1.  Figure 7-3 defines *scan*[alternate_scan][v][u] for the case that alternate_scan is one.  (ITU-T Rec. H.262 2000E at 64.) |

**Exhibit 15  Page 273**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
|  | 

Figure 7-3 – Definition of $scan[1][v][u]$

(ITU-T Rec. H.262 2000E at 65.)

The ordered set defined in the claim corresponds to entries 46 through 63 in the table. |
| 7.  A method for encoding a video signal, comprising the steps of: | The accused products employ a method of encoding, as indicated above.  By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoding method used in a product compatible with H.262:

This Recommendation/International Standard specifies the coded representation of picture information for digital storage media and digital video communication and specifies the decoding process. The representation supports constant bitrate transmission, variable bitrate transmission, random access, channel hopping, scalable decoding, bitstream editing, as well as special functions such as fast forward playback, fast reverse playback, slow motion, pause and still pictures. This Recommendation / International Standard is forward compatible with ISO/IEC 11172-2 and upward or downward compatible with EDTV, HDTV, SDTV formats. |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | (ITU-T Rec. H.262 2000E at 1.) |
| [claim 7 cont.] generating a set of frequency coefficient signals, the set representing the video signal, wherein the set corresponds to an NxM matrix and each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ITU-T Recommendation H.262, the accused products generate a set of frequency coefficients (i.e. DCT coefficients), the set representing the video signal, and corresponding to an NxM matrix (i.e. 8x8), wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>    Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br>(ITU-T Rec. H.262 2000E at vii.)<br><br>Each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix, which is demonstrated by implication in the ITU-T Recommendation H.262 discussion of the decoder.<br><br>    Let the data at the output of the variable length decoder be denoted by $QFS$[n].  n is in the range 0 to 63.<br><br>    This subclause specifies the way in which the one-dimensional data, $QFS$[n], is converted into a two-dimensional array of coefficients denoted by $QF$[v][u]. u and v both lie in the range 0 to 7.<br>(ITU-T Rec. H.262 2000E at 64.) |

Exhibit 15  Page 275

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| [claim 7 cont.] alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ITU-T Recommendation H.262, the accused products alternatively select between a first scanning order and a second scanning order in response to a frame format associated with the video signal.<br><br>This subclause specifies the way in which the one-dimensional data, $QFS[n]$, is converted into a two-dimensional array of coefficients denoted by $QF[v][u]$. $u$ and $v$ both lie in the range 0 to 7.<br><br>Two scan patterns are defined. The scan that shall be used shall be determined by alternate_scan which is encoded in the picture coding extension. . . . Figure 7-3 defines scan[alternate_scan][$v$][$u$] for the case that alternate_scan is one.<br><br>(ITU-T Rec. H.262 2000E at 64.)<br><br>6.3.10 Picture coding extension<br><br>… alternate_scan - This flag affects the decoding of transform coefficient data as described in 7.3.<br><br>(ITU-T Rec. H.262 2000E at 48-50.) |
| [claim 7 cont.] scanning the set of frequency coefficient signals according to the selected scanning order to [create] an ordered set of frequency coefficient signals; and | Consistent with ITU-T Recommendation H.262, the accused products scan the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals.<br><br>This subclause specifies the way in which the one-dimensional data, $QFS[n]$, is converted into a two-dimensional array of coefficients denoted by $QF[v][u]$. $u$ and $v$ both lie in the range 0 to 7.<br><br>Two scan patterns are defined. The scan that shall be used shall be determined by alternate_scan which is encoded in the picture coding extension.<br><br>… Figure 7-3 defines scan[alternate_scan][$v$][$u$] for the case that alternate_scan is one.<br><br>(ITU-T Rec. H.262 2000E at 64.) |

**Exhibit 15  Page 276**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| [claim 7 cont.] generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | Consistent with the ITU-T Recommendation H.262, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br>(ITU-T Rec. H.262 2000E at vii.)<br><br>3.140 zigzag scanning order: A specific sequential ordering of the DCT coefficients from (approximately) the lowest spatial frequency to the highest.<br>(ITU-T Rec. H.262 2000E at 7.) |
| 8. The method of claim 7 in which the first scanning order comprises a zigzag scanning order. | The accused products contain hardware and/or software in which the scanning order is a zigzag scanning order.<br>3.140 zigzag scanning order: A specific sequential ordering of the DCT coefficients from (approximately) the lowest spatial frequency to the highest.<br>(ITU-T Rec. H.262 2000E at 7.) |
| 9. The method of claim 7 in which the second scanning order includes a first subset scanning order represented by the following list of coordinate pairs, each pair representing a horizontal and vertical | The accused products contain hardware and/or software in which the scanning order includes the coordinate pairs defined in the claim.<br><br>When the variable *alternate_scan* is set to 1, then, under the Recommendation, inverse scanning is performed according to Figure 7.3 which lists the same order of |

**Exhibit 15  Page 277**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| coordinate in the matrix:<br><br>(0, 0), (0, 1), (0, 2), (0, 3), (1, 0), (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7). | coordinate pairs as in Claim 1.<br><br>Figure 7-3 defines *scan*[alternate_scan][v][u] for the case that alternate_scan is one.<br>(ITU-T Rec. H.262 2000E at 64.)<br><br>*[table figure: Definition of scan[1][v][u]]*<br><br>**Figure 7-3 – Definition of *scan*[1][v][u]**<br><br>(ITU-T Rec. H.262 2000E at 65.)<br><br>The ordered set defined in the claim corresponds to entries 0 through 14 in the table. |
| 10. The method of claim 9 in which the second scanning order further includes a second subset scanning order matrix such that the ordered set includes frequency coefficient signals in a second subset, the second subset scanning order represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix:<br><br>(1, 6), (1, 5), (1, 4), (2, 3), (2, 2), (3, 0), (3, 1), (4, 0), (4, 1), (3, 2), (3, 3), (2, 4), (2, 5), (2, 6), (2, 7). | See claim 4 above. |
| 11. The method of claim 10 in | See claim 5 above. |

The figure within the cell shows:

|  | u |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 0 | 0 | 4 | 6 | 20 | 22 | 36 | 38 | 52 |
| 1 | 1 | 5 | 7 | 21 | 23 | 37 | 39 | 53 |
| 2 | 2 | 8 | 19 | 24 | 34 | 40 | 50 | 54 |
| 3 | 3 | 9 | 18 | 25 | 35 | 41 | 51 | 55 |
| 4 | 10 | 17 | 26 | 30 | 42 | 46 | 56 | 60 |
| 5 | 11 | 16 | 27 | 31 | 43 | 47 | 57 | 61 |
| 6 | 12 | 15 | 28 | 32 | 44 | 48 | 58 | 62 |
| v  7 | 13 | 14 | 29 | 33 | 45 | 49 | 59 | 63 |

**Exhibit 15  Page 278**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| which the second scanning order further includes a third subset scanning order matrix such that the ordered set includes frequency coefficient signals in a third subset, the third subset scanning order represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix:<br><br>(3, 4), (3, 5), (3, 6), (3, 7), (4, 2), (4, 3), (5, 0), (5, 1), (6, 0), (6, 1), (5, 2), (5, 3), (4, 4), (4, 5), (4, 6), (4, 7). | |
| 12. The method of claim 11 in which the second scanning order further includes a fourth subset scanning order matrix such that the ordered set includes frequency coefficient signals in the fourth subset, the fourth subset scanning order represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix:<br><br>(5, 4), (5, 5), (5, 6), (5, 7), (6, 2), (6, 3), (7, 0), (7, 1), (7, 2), (7, 3), (6, 4), (6, 5), (6, 6), (6, 7), (7, 4), (7, 5), (7, 6), (7, 7). | See claim 6 above. |
| 13. An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoder in a product compatible with H.262:<br><br>This Recommendation/International Standard specifies the coded representation of picture information for digital storage media and digital video communication and specifies the decoding |

**Exhibit 15  Page 279**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | process. The representation supports constant bitrate transmission, variable bitrate transmission, random access, channel hopping, scalable decoding, bitstream editing, as well as special functions such as fast forward playback fast reverse playback, slow motion, pause and still pictures. This Recommendation / International Standard is forward compatible with ISO/IEC 11172-2 and upward or downward compatible with EDTV, HDTV, SDTV formats.<br><br>(ITU-T Rec. H.262 2000E at 1.) |
| [claim 13 cont.] a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ITU-T Recommendation H.262, the accused products use a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ITU-T Rec. H.262 2000E at vii.)<br><br>Each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined |

**Exhibit 15  Page 280**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | vertical coordinate in the matrix, which is demonstrated by implication in the ITU-T Recommendation H.262 discussion of the decoder. |
| | Let the data at the output of the variable length decoder be denoted by $QFS[n]$. n is in the range 0 to 63. |
| | This subclause specifies the way in which the one-dimensional data, $QFS[n]$, is converted into a two-dimensional array of coefficients denoted by $QF[v][u]$. u and v both lie in the range 0 to 7. |
| | (ITU-T Rec. H.262 2000E at 64.) |
| [claim 13 cont.] a scanner for scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals: <br><br> (0, 0), (0, 1), (0, 2), (0, 3), (1, 0), (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7); | Consistent with ITU-T Recommendation H.262, the accused products use a scanner for scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the list of coordinate pairs in Claim 13, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals.  If the variable *alternate_scan* is set to 1, then, under the Recommendation, inverse scanning is performed according to Figure 7.3 which lists the same order of coordinate pairs as in Claim 13. <br><br> Figure 7-3 defines *scan*[alternate_scan][$v$][$u$] for the case that alternate_scan is one. <br> (ITU-T Rec. H.262 2000E at 64.) |

**Exhibit 15  Page 281**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| |  Figure 7-3 – Definition of *scan*[1][*v*][*u*] (ITU-T Rec. H.262 2000E at 65.) |
| [claim 13 cont.] and a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the ITU-T Recommendation H.262, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br>(ITU-T Rec. H.262 2000E at vii.)<br><br>3.140    zigzag scanning order:    A specific |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
|  | sequential ordering of the DCT coefficients from (approximately) the lowest spatial frequency to the highest.<br><br>(ITU-T Rec. H.262 2000E at 7.) |
| 14. The apparatus of claim 13 in which the scanner performs the scanning in response to a frame format associated with the video signal. | See claim 2 above. |
| 15. The apparatus of claim 14 in which the frame format is an interlaced frame format. | See claim 3 above. |
| 16. The apparatus of claim 13 in which the scanner further including a means for scanning a second subset of the frequency coefficient signals within the set in a predetermined second subset scanning order such that the ordered set includes frequency coefficient signals in the second subset, wherein the second subset scanning order is represented by the following list of coordinate pairs:<br><br>(1, 6), (1, 5), (1, 4), (2, 3), (2, 2), (3, 0), (3, 1), (4, 0), (4, 1), (3, 2), (3, 3), (2, 4), (2, 5), (2, 6), (2, 7). | See claim 4 above. |
| 17. The apparatus of claim 16 in which the scanner further includes a means for scanning a third subset of the frequency coefficient signals within the set in a predetermined third subset scanning order such that the ordered set includes the scanned frequency coefficient signals in the third subset, wherein the third subset scanning order is represented by the following list of coordinate pairs: | See claim 5 above. |

**Exhibit 15  Page 283**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| (3, 4), (3, 5), (3, 6), (3, 7), (4, 2), (4, 3), (5, 0), (5, 1), (6, 0), (6, 1), (5, 2), (5, 3), (4, 4), (4, 5), (4, 6), (4, 7). | |
| 18. The apparatus of claim 17 in which the scanner further includes a means for scanning a fourth subset of the frequency coefficient signals within the set in a predetermined fourth subset scanning order such that the ordered set includes the scanned frequency coefficient signals in the fourth subset, wherein the fourth subset scanning order is represented by the following list of coordinate pairs:<br><br>(5, 4), (5, 5), (5, 6), (5, 7), (6, 2), (6, 3), (7, 0), (7, 1), (7, 2), (7, 3), (6, 4), (6, 5), (6, 6), (6, 7), (7, 4), (7, 5), (7, 6), (7, 7). | See claim 6 above. |
| 19. An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoder in a product compatible with H.262:<br><br>This Recommendation/International Standard specifies the coded representation of picture information for digital storage media and digital video communication and specifies the decoding process. The representation supports constant bitrate transmission, variable bitrate transmission, random access, channel hopping, scalable decoding, bitstream editing, as well as special functions such as fast forward playback fast reverse playback, slow motion, pause and still pictures. This Recommendation/International Standard is forward compatible with ISO/IEC 11172-2 and |

**Exhibit 15  Page 284**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | upward or downward compatible with EDTV, HDTV, SDTV formats.<br><br>(ITU-T Rec. H.262 2000E at 1.) |
| [claim 19 cont.] a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ITU-T Recommendation H.262, the accused products use a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ITU-T Rec. H.262 2000E at vii.)<br><br>Each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix, which is demonstrated by implication in the ITU-T Recommendation H.262 discussion of the decoder.<br><br>Let the data at the output of the variable length decoder be denoted by $QFS$[n].  n is in the range 0 to 63.<br><br>This subclause specifies the way in which the |

**Exhibit 15  Page 285**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | one-dimensional data, $QFS[n]$, is converted into a two-dimensional array of coefficients denoted by $QF[v][u]$. u and v both lie in the range 0 to 7.<br><br>(ITU-T Rec. H.262 2000E at 64.) |
| [claim 19 cont.] a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ITU-T Recommendation H.262, the accused products use a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal.<br><br>    This subclause specifies the way in which the one-dimensional data, $QFS[n]$, is converted into a two-dimensional array of coefficients denoted by $QF[v][u]$. $u$ and $v$ both lie in the range 0 to 7.<br><br>    Two scan patterns are defined. The scan that shall be used shall be determined by alternate_scan which is encoded in the picture coding extension.<br><br>    …    Figure    7-3    defines scan[alternate_scan][$v$][$u$]  for  the  case  that alternate_scan is one.<br>(ITU-T Rec. H.262 2000E at 64.)<br><br>6.3.10 Picture coding extension<br><br>… alternate_scan - This flag affects the decoding of transform coefficient data as described in 7.3.<br>(ITU-T Rec. H.262 2000E at 48-50.) |
| [claim 19 cont.] a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals; and | Consistent with ITU-T Recommendation H.262, the accused products use a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals.<br><br>    This subclause specifies the way in which the one-dimensional data, $QFS[n]$, is converted into |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON H.262 STANDARD** |
|---|---|
| | a two-dimensional array of coefficients denoted by $QF[v][u]$. $u$ and $v$ both lie in the range 0 to 7.<br><br>Two scan patterns are defined. The scan that shall be used shall be determined by alternate_scan which is encoded in the picture coding extension.<br><br>… Figure 7-3 defines scan[alternate_scan][$v$][$u$] for the case that alternate_scan is one.<br><br>(ITU-T Rec. H.262 2000E at 64.) |
| [claim 19 cont.] a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the ITU-T Recommendation H.262, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>Intro. 4.1.4 Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy. This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ITU-T Rec. H.262 2000E at vii.)<br><br>3.140 zigzag scanning order: A specific sequential ordering of the DCT coefficients from (approximately) the lowest spatial frequency to the highest.<br><br>(ITU-T Rec. H.262 2000E at 7.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| 1.  A method of encoding a video signal, comprising the steps of: | The accused products use methods of encoding, as indicated above.  By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.263 implicates certain aspects of the encoding method used in a product compatible with H.263:<br><br><br><br>**Figure 1/H.263 – Outline block diagram of the video codec**<br>(ITU-T Rec. H.263 01/2005 at 2.) |
| [claim 1 cont.] generating a set of frequency coefficient signals, the set representing the video signal, and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ITU-T Recommendation H.263, the accused products generate a set of frequency coefficient signals, the set representing the video signal, and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>6.2.3  Zigzag positioning<br><br>The quantized transform coefficients are placed into an 8 x 8 block according to the sequence given in Figure 14, unless the optional Advanced INTRA Coding mode is in use (see Annex I). Coefficient 1 is in the dc-coefficient. |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON H.263 STANDARD** |
|---|---|
| | <br>| 1 | 2 | 6 | 7 | 15 | 16 | 28 | 29 |<br>| 3 | 5 | 8 | 14 | 17 | 27 | 30 | 43 |<br>| 4 | 9 | 13 | 18 | 26 | 31 | 42 | 44 |<br>| 10 | 12 | 19 | 25 | 32 | 41 | 45 | 54 |<br>| 11 | 20 | 24 | 33 | 40 | 46 | 53 | 55 |<br>| 21 | 23 | 34 | 39 | 47 | 52 | 56 | 61 |<br>| 22 | 35 | 38 | 48 | 51 | 57 | 60 | 62 |<br>| 36 | 37 | 49 | 50 | 58 | 59 | 63 | 64 |<br><br>**Figure 14/H.263 – Zigzag positioning of quantized transform coefficients**<br>(ITU-T Rec. H.263 01/2005 at 47.) |
| [claim 1 cont.] scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals:<br><br>(0, 0), (0, 1), (0, 2), (0, 3), (1, 0), (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7); | The ITU-T Recommendation H.263 implicates scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, in accordance with the list of coordinate pairs in Claim 1, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals. The ordered list of coordinate pairs claimed is disclosed in Figure I.2.b.<br><br>I.3 Decoding process<br><br>Two scans in addition to the zigzag scan are employed. The two added scans are shown in Fig I.2-a and I.2-b, and the zigzag scan is shown in Figure 14.<br><br><br>a)  Alternate-Horizontal scan    b)  Alternate-Vertical scan (as in ITU-T Rec. H.262)<br><br>**Figure I.2/H.263 – Alternate DCT scanning patterns for Advanced INTRA coding**<br><br>(ITU-T Rec. H.263 01/2005 at 74.) |
| [claim 1 cont.] and generating an encoded video signal, the encoded video signal including | Consistent with the ITU-T Recommendation H.263, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| the ordered set of frequency coefficient signals. | signals.<br><br>3.4.7 Advanced INTRA, Coding mode<br><br>In this optional mode, INTRA blocks are first predicted from neighbouring INTRA blocks prior to coding (see also Annex I). Separate Variable Length Code (VLC) tables are defined for the INTRA blocks. The technique is applied to INTRA-macroblocks within INTRA pictures and to INTRA-macroblocks within INTER pictures.  This mode significantly improves the compression performance over the INTRA coding of the core H.263 syntax.<br><br>(ITU-T Rec. H.263 01/2005 at 3-4.) |
| 7.  A method for encoding a video signal, comprising the steps of: | The accused products use methods of encoding, as indicated above.  By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.263 implicates certain aspects of the encoding method used in a product compatible with H.263:<br><br><br><br>**Figure 1/H.263 – Outline block diagram of the video codec**<br>(ITU-T Rec. H.263 01/2005 at 2.) |
| [claim 7 cont.] generating a set of frequency coefficient signals, the set representing the video signal, wherein the set corresponds to an NxM matrix and each of the frequency coefficient signals corresponds | Consistent with ITU-T Recommendation H.263, the accused products generate a set of frequency coefficient signals, the set representing the video signal, and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix. |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | **6.2.3  Zigzag positioning**<br><br>The quantized transform coefficients are placed into an 8 x 8 block according to the sequence given in Figure 14, unless the optional Advanced INTRA Coding mode is in use (see Annex I). Coefficient 1 is in the dc-coefficient.<br><br><table><tr><td>1</td><td>2</td><td>6</td><td>7</td><td>15</td><td>16</td><td>28</td><td>29</td></tr><tr><td>3</td><td>5</td><td>8</td><td>14</td><td>17</td><td>27</td><td>30</td><td>43</td></tr><tr><td>4</td><td>9</td><td>13</td><td>18</td><td>26</td><td>31</td><td>42</td><td>44</td></tr><tr><td>10</td><td>12</td><td>19</td><td>25</td><td>32</td><td>41</td><td>45</td><td>54</td></tr><tr><td>11</td><td>20</td><td>24</td><td>33</td><td>40</td><td>46</td><td>53</td><td>55</td></tr><tr><td>21</td><td>23</td><td>34</td><td>39</td><td>47</td><td>52</td><td>56</td><td>61</td></tr><tr><td>22</td><td>35</td><td>38</td><td>48</td><td>51</td><td>57</td><td>60</td><td>62</td></tr><tr><td>36</td><td>37</td><td>49</td><td>50</td><td>58</td><td>59</td><td>63</td><td>64</td></tr></table><br>**Figure 14/H.263 – Zigzag positioning of quantized transform coefficients**<br>(ITU-T Rec. H.263 01/2005 at 47.) |
| [claim 7 cont.] alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ITU-T Recommendation H.263, the accused products alternatively select between a first scanning order and a second scanning order in response to a frame format associated with the video signal, using the variable *Prediction Mode*.<br><br>For INTRA-coded blocks: if Prediction Mode = 0, the zigzag scan shown in Figure 14 is selected for all block 3 in the macroblock; otherwise, the prediction direction is used to select a scan for the macroblock.<br><br>Prediction Mode = 1 uses the vertically adjacent block in forming a prediction. This prediction mode is designed for INTRA blocks which are dominated by stronger horizontal frequency content, so the vertically adjacent block is used to predict the horizontal frequency content of the current block, with a prediction of zero for all coefficients representing vertical AC content. Then the scanning pattern is chosen to scan the stronger horizontal frequencies prior to the |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| | vertical ones, using the Alternate-Horizontal scan.<br><br>Prediction Mode = 2 uses the horizontally adjacent block in forming a prediction. This prediction mode is designed for INTRA blocks Which are dominated by stronger vertical frequency content, so the horizontally adjacent block is used to predict the vertical frequency content of the current block, with a prediction of zero for all coefficients representing horizontal AC content. Then the scanning pattern is chosen to scan the stronger vertical frequencies prior to the horizontal ones, using the Alternate-Vertical scan.<br><br>(ITU-T Rec. H.263 01/2005 at 74.) |
| [claim 7 cont.] scanning the set of frequency coefficient signals according to the selected scanning order to [create] an ordered set of frequency coefficient signals; and | Consistent with ITU-T Recommendation H.263, the accused products scan the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals, as in Figures 14, I.2.a, and I.2.b.<br><br>I.3 Decoding process<br><br>Two scans in addition to the zigzag scan are employed. The two added scans are shown in Fig I.2-a and I.2-b, and the zigzag scan is shown in Figure 14.<br><br>a) Alternate-Horizontal scan  b) Alternate-Vertical scan (as in ITU-T Rec. H.262)<br><br>Figure I.2/H.263 – Alternate DCT scanning patterns for Advanced INTRA coding<br>(ITU-T Rec. H.263 01/2005 at 74.) |
| [claim 7 cont.] generating an encoded video signal, the | Consistent with the ITU-T Recommendation H.263, an encoded video signal is generated and the encoded video |

Exhibit 15  Page 292

| | '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|---|
| | encoded video signal including the ordered set of frequency coefficient signals. | signal includes the ordered set of frequency coefficient signals.<br><br>3.4.7 Advanced INTRA, Coding modeIn this optional mode, INTRA blocks are first predicted from neighbouring INTRA blocks prior to coding (see also Annex I). Separate Variable Length Code (VLC) tables are defined for the INTRA blocks. The technique is applied to INTRA-macroblocks within INTRA pictures and to INTRA-macroblocks within INTER pictures. This mode significantly improves the compression performance over the INTRA coding of the core H.263 syntax.<br><br>(ITU-T Rec. H.263 01/2005 at 3-4.) |
| | 13. An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.263 implicates certain aspects of the encoder in a product compatible with H.263:<br><br><br><br>Figure 1/H.263 – Outline block diagram of the video codec<br>(ITU-T Rec. H.263 01/2005 at 2.) |
| | [claim 13 cont.] a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM | Consistent with ITU-T Recommendation H.263, the accused products use a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a |

**Exhibit 15  Page 293**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>6.2.3 Zigzag positioning<br><br>The quantized transform coefficients are placed into an 8 x 8 block according to the sequence given in Figure 14, unless the optional Advanced INTRA Coding mode is in use (see Annex I). Coefficient 1 is in the dc-coefficient.<br><br>Figure table below<br><br>**Figure 14/H.263 – Zigzag positioning of quantized transform coefficients**<br><br>(ITU-T Rec. H.263 01/2005 at 47.) |
| [claim 13 cont.] a scanner for scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals:<br><br>(0, 0), (0, 1), (0, 2), (0, 3), (1, 0), (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7); | The ITU-T Recommendation H.263 implicates the use of a scanner for scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, in accordance with the list of coordinate pairs in Claim 13, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals. The ordered list of coordinate pairs claimed is disclosed in Figure I.2.b.<br><br>I.3 Decoding process<br><br>Two scans in addition to the zigzag scan are employed. The two added scans are shown in Fig I.2-a and I.2-b, and the zigzag scan is shown in Figure 14. |

The table shown in Figure 14:

| 1 | 2 | 6 | 7 | 15 | 16 | 28 | 29 |
|---|---|---|---|---|---|---|---|
| 3 | 5 | 8 | 14 | 17 | 27 | 30 | 43 |
| 4 | 9 | 13 | 18 | 26 | 31 | 42 | 44 |
| 10 | 12 | 19 | 25 | 32 | 41 | 45 | 54 |
| 11 | 20 | 24 | 33 | 40 | 46 | 53 | 55 |
| 21 | 23 | 34 | 39 | 47 | 52 | 56 | 61 |
| 22 | 35 | 38 | 48 | 51 | 57 | 60 | 62 |
| 36 | 37 | 49 | 50 | 58 | 59 | 63 | 64 |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| | <br><br>(ITU-T Rec. H.263 01/2005 at 74.) |
| [claim 13 cont.] and a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the ITU-T Recommendation H.263, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>    3.4.7 Advanced INTRA, Coding mode<br><br>    In this optional mode, INTRA blocks -are first predicted from neighbouring INTRA blocks prior to coding (see also Annex I). Separate Variable Length Code (VLC) tables are defined for the INTRA blocks. The technique is applied to INTRA-macroblocks within INTRA pictures and to INTRA-macroblocks within INTER pictures. This mode significantly improves the compression performance over the INTRA coding of the core H.263 syntax.<br><br>(ITU-T Rec. H.263 01/2005 at 3-4.) |
| 19. An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.263 implicates certain aspects of the encoder in a product compatible with H.263: |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON H.263 STANDARD** |
|---|---|
|  |  Figure 1/H.263 – Outline block diagram of the video codec (ITU-T Rec. H.263 01/2005 at 2.) |
| [claim 19 cont.] a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ITU-T Recommendation H.263, the accused products use a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix. |

6.2.3  Zigzag positioning

The quantized transform coefficients are placed into an 8 x 8 block according to the sequence given in Figure 14, unless the optional Advanced INTRA Coding mode is in use (see Annex I). Coefficient 1 is in the dc-coefficient.

| 1 | 2 | 6 | 7 | 15 | 16 | 28 | 29 |
|---|---|---|---|---|---|---|---|
| 3 | 5 | 8 | 14 | 17 | 27 | 30 | 43 |
| 4 | 9 | 13 | 18 | 26 | 31 | 42 | 44 |
| 10 | 12 | 19 | 25 | 32 | 41 | 45 | 54 |
| 11 | 20 | 24 | 33 | 40 | 46 | 53 | 55 |
| 21 | 23 | 34 | 39 | 47 | 52 | 56 | 61 |
| 22 | 35 | 38 | 48 | 51 | 57 | 60 | 62 |
| 36 | 37 | 49 | 50 | 58 | 59 | 63 | 64 |

Figure 14/H.263 – Zigzag positioning of quantized transform coefficients

(ITU-T Rec. H.263 01/2005 at 47.)

| | '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|---|
| | [claim 19 cont.] a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ITU-T Recommendation H.263, the accused products use a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal, which uses the variable *Prediction Mode* to select between the various scanning orders. |
| | | For INTRA-coded blocks: if Prediction Mode = 0, the zigzag scan shown in Figure 14 is selected for all block 3 in the macroblock; otherwise, the prediction direction is used to select a scan for the macroblock. |
| | | Prediction Mode = 1 uses the vertically adjacent block in forming a prediction. This prediction mode is designed for INTRA blocks which are dominated by stronger horizontal frequency content, so the vertically adjacent block is used to predict the horizontal frequency content of the current block, with a prediction of zero for all coefficients representing vertical AC content. Then the scanning pattern is chosen to scan the stronger horizontal frequencies prior to the vertical ones, using the Alternate-Horizontal scan. |
| | | Prediction Mode = 2 uses the horizontally adjacent block in forming a prediction. This prediction mode is designed for INTRA blocks Which are dominated by stronger vertical frequency content, so the horizontally adjacent block is used to predict the vertical frequency content of the current block, with a prediction of zero for all coefficients representing horizontal AC content. Then the scanning pattern is chosen to scan the stronger vertical frequencies prior to the horizontal ones, using the Alternate-Vertical scan. |
| | | (ITU-T Rec. H.263 01/2005 at 74.) |
| | [claim 19 cont.] a scanner for | The ITU-T Recommendation H.263 implicates the use of a |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.263 STANDARD |
|---|---|
| scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals; and | scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals:<br><br>I.3 Decoding process<br><br>Two scans in addition to the zigzag scan are employed. The two added scans are shown in Fig I.2-a and I.2-b, and the zigzag scan is shown in Figure 14.<br><br><br><br>a)   Alternate-Horizontal scan    b)   Alternate-Vertical scan (as in ITU-T Rec. H.262)<br><br>Figure I.2/H.263 – Alternate DCT scanning patterns for Advanced INTRA coding<br><br>(ITU-T Rec. H.263 01/2005 at 74.) |
| [claim 19 cont.] a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the ITU-T Recommendation H.263, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>3.4.7 Advanced INTRA, Coding mode<br><br>In this optional mode, INTRA blocks are first predicted from neighbouring INTRA blocks prior to coding (see also Annex I). Separate Variable Length Code (VLC) tables are defined for the INTRA blocks. The technique is applied to INTRA-macroblocks within INTRA pictures and to INTRA-macroblocks within INTER pictures. This mode significantly improves the compression performance over the INTRA coding of the core H.263 syntax.<br><br>(ITU-T Rec. H.263 01/2005 at 3-4.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
| 7. A method for encoding a video signal, comprising the steps of: | The accused products use methods of encoding, as indicated above. By specifying the representation of encoded video data and the decoding process, the SMPTE Standard VC-1 implicates certain aspects of the encoding method used in a product compatible with VC-1:<br><br><br>Figure 6: Overview Block Diagram of the Encoding Process (Informative)<br><br>(SMPTE 421M-2006 VC-1 at 7.) |
| [claim 7 cont.] generating a set of frequency coefficient signals, the set representing the video signal, wherein the set corresponds to an NxM matrix and each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with SMPTE Standard VC-1, the accused products generate a set of frequency coefficient signals, the set representing the video signal, wherein the set corresponds to an NxM matrix and each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix:<br><br>8.1.3.6 **Zigzag Scan of AC: Coefficients**<br><br>Decoding the run-level pairs as described in section 8.1.3.5 produces a one-dimensional array of quantized transform coefficients. The elements in the array shall be scanned to form an 8x8 two-dimensional array in preparation for the Inverse Transform. Figure 44 shows the elements in an 8x8 array labeled from 0 to 63. A mapping array is |

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
| | used to scan out the coefficients in the one-dimensional array to the 8x8 array, where the DC coefficient always maps to position (0,0). The process of scanning out coefficients for an NxM Inverse Transform block is defined m Figure 43.<br><br>(SMPTE 421M-2006 VC-1 at 130.) |
| [claim 7 cont.] alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with SMPTE Standard VC-1, the accused products alternatively select between a first scanning order and a second scanning order in response to a frame format associated with the video signal:<br><br>The zigzag scan arrays for Inter blocks in simple and main profiles shall be as defined by Table 236 to Table 239, respectively. The scan arrays in the advanced profile depend on whether interlace or progressive mode is used. The process of scanning out coefficients is defined in Figure 43.<br><br>(SMPTE 421M-2006 VC-1 at 158.)<br><br>Since the method of Claim 7 uses the open-ended term "comprising," the method described by the SMPTE Standard VC-1 for selecting third, fourth, or other scanning orders does not constitute grounds for non-infringement. |
| [claim 7 cont.] scanning the set of frequency coefficient signals according to the selected scanning order to [create] an ordered set of frequency coefficient signals; and | Consistent with SMPTE Standard VC-1, the accused products scan the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals: |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1** |
|---|---|

### 11.9.2 Inter zigzag tables

**Table 236: Inter 8x8 Scan for Simple and Main Profiles and Progressive Mode in Advanced Profile**

| 0 | 8 | 1 | 2 | 9 | 16 | 24 | 17 | 0 | 3 | 4 | 18 | 25 | 32 | 40 | 48 | 56 | 41 | 33 | 21 | 16 | 19 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 63 | 10 | 27 | 49 | 57 | 50 | 25 | 58 | 14 | 47 | 75 | 52 | 29 | 63 | 19 | 10 | 20 | | | | | | |
| 47 | 30 | 31 | 23 | 38 | 34 | 45 | 56 | 65 | 64 | 35 | 44 | 53 | 45 | 56 | | | | | | | | |

**Table 237: Inter 8x4 Scan for Simple and Main Profiles**

| 0 | 1 | 2 | 8 | 3 | 9 | 10 | 16 | 4 | 11 | 7 | 4 | 18 | 2 | 5 | 9 | 5 | 3 | 20 | 6 | 7 | 6 | 1 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 22 | 29 | 7 | 30 | 15 | 23 | 31 | | | | | | | | | | | | | | | | |

**Table 238: Inter 4x8 Scan for Simple and Main Profiles**

| 0 | 4 | 1 | 8 | 5 | 1 | 9 | 2 | 1 | 6 | 3 | 0 | 1 | 0 | 2 | 1 | 4 | 7 | 1 | 4 | 8 | 1 | 8 | 2 | 1 | 8 | 3 | 2 | 5 | 2 | 7 | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | 12 | 15 | 30 | 13 | 19 | 23 | 27 | 31 | 1 | | | | | | | | | | | | | | | | | | | | | | |

**Table 239: Inter 4x4 Scan for Simple and Main Profiles and Progressive Mode in Advanced Profile**

| 0 | 4 | 8 | 1 | 5 | 12 | 9 | 2 | 6 | 11 | 3 | 13 | 7 | 14 | 11 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Table 240: Progressive Mode Inter 8x4 Scan for Advanced Profile**

| 0 | 8 | 1 | 6 | 2 | 9 | 10 | 3 | 4 | 7 | 4 | 11 | 18 | 2 | 5 | 9 | 5 | 3 | 20 | 6 | 7 | 6 | 1 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 22 | 29 | 7 | 30 | 15 | 23 | 31 | 1 | | | | | | | | | | | | | | | |

**Table 241: Progressive Mode Inter 4x8 Scan for Advanced Profile**

| 0 | 1 | 4 | 2 | 5 | 8 | 9 | 1 | 6 | 1 | 16 | 1 | 13 | 2 | 0 | 3 | 1 | 7 | 1 | 2 | 7 | 2 | 8 | 2 | 1 | 8 | 5 | 2 | 9 | 2 | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | 12 | 15 | 30 | 13 | 19 | 23 | 27 | 31 | 1 | | | | | | | | | | | | | | | | | | | | | |

**Table 242: Interlace Mode Inter 8x8 Scan for Advanced Profile (Also used for Intra Mode 8x8 scan for Interlace Frame Pictures)**

| 0 | 8 | 1 | 6 | 2 | 4 | 9 | 2 | 3 | 20 | 4 | 8 | 6 | 7 | 0 | 3 | 25 | 8 | 1 | 4 | 3 | 1 | 4 | 9 | 7 | 5 | 2 | 6 | 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45 | 52 | 50 | 18 | 92 | 25 | 70 | 36 | 65 | 81 | 14 | 75 | 52 | 29 | 63 | 31 | 56 | 90 | 2 | | | | | | | | | | |
| 43 | 37 | 23 | 30 | 31 | 38 | 35 | 53 | 16 | 12 | 44 | 46 | 34 | 97 | 75 | 53 | | | | | | | | | | | | | |

**Table 243: Interlace Mode Inter 8x4 Scan for Advanced Profile**

| 0 | 8 | 6 | 4 | 1 | 9 | 2 | 7 | 5 | 0 | 3 | 8 | 6 | 4 | 1 | 9 | 2 | 5 | 3 | 0 | 7 | 6 | 1 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 22 | 29 | 7 | 30 | 15 | 23 | 31 | 1 | | | | | | | | | | | | | | | |

**Table 244: Interlace Mode Inter 4x8 Scan for Advanced Profile**

| 0 | 1 | 2 | 4 | 8 | 5 | 1 | 9 | 6 | 3 | 1 | 2 | 0 | 2 | 4 | 8 | 3 | 1 | 0 | 1 | 7 | 1 | 4 | 1 | 8 | 2 | 5 | 2 | 9 | 7 | 2 | 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 | 12 | 15 | 30 | 13 | 19 | 23 | 27 | 31 | 1 | | | | | | | | | | | | | | | | | | | | | | |

**Table 245: Interlace Mode Inter 4x4 Scan for Advanced Profile**

| 0 | 4 | 8 | 1 | 12 | 5 | 9 | 2 | 13 | 6 | 10 | 3 | 7 | 14 | 11 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1** |
|---|---|
| | (SMPTE 421M-2006 VC-1 at 410-11.)<br><br>8.3.6.1.7  Inverse Transform<br><br>After reconstruction of the transform coefficients, the resulting 8 x 8 blocks shall be processed by a separable two-dimensional inverse transform of size 8 x 8, and shall comply with Annex A.  The inverse transform output has a dynamic range of 10 bits, as a signed integer.  Finally, the constant value of 128 shall be added to the reconstructed intra block and the result shall be clamped to the range [0 255] and shall form the reconstruction prior to loop filtering.<br><br>(SMPTE 421M-2006 VC-1 at 155-56.) |
| [claim 7 cont.] generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | Consistent with the SMPTE Standard VC-1, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br><br>Table 1: Functional Elements in VC-1 and their section numbers<br><br>(SMPTE 421M-2006 VC-1 at 7.)<br><br>8.1.3.4  AC Coefficient Bitstream Decode<br><br>The non-zero quantized AC coefficients shall be coded using a 3D run-level method. A set of tables and constants are used to decode the *run*, *level* and *last_flag* values. For descriptive purposes, the set of tables and constants is called an AC coding set. |

**Exhibit 15  Page 302**

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
| | Following is a description of the tables and constants that make up an AC coding set.<br><br>(SMPTE 421M-2006 VC-1 at 122.) |
| 19. An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the SMPTE Standard VC-1 implicates certain aspects of the encoder in a product compatible with VC-1:<br><br><br>Figure 6: Overview Block Diagram of the Encoding Process (Informative)<br><br>(SMPTE 421M-2006 VC-1 at 7.) |
| [claim 19 cont.] a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with SMPTE Standard VC-1, the accused products use a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>8.1.3.6  Zigzag Scan of AC: Coefficients<br><br>Decoding the run-level pairs as described in section 8.1.3.5 produces a one-dimensional array of quantized transform coefficients. The elements |

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
| | in the array shall be scanned to form an 8x8 two-dimensional array in preparation for the Inverse Transform. Figure 44 shows the elements in an 8x8 array labeled from 0 to 63. A mapping array is used to scan out the coefficients in the one-dimensional array to the 8x8 array, where the DC coefficient always maps to position (0,0). The process of scanning out coefficients for an NxM Inverse Transform block is defined m Figure 43.<br><br>(SMPTE 421M-2006 VC-1 at 130; *Id.* at 7.)<br><br>The transform generator selected by SMPTE Standard VC-1 is equivalent to a discrete cosine transform generator. |
| [claim 19 cont.] a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with SMPTE Standard VC-1, the accused products use of scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal:<br><br>The zigzag scan arrays for Inter blocks in simple and main profiles shall be as defined by Table 236 to Table 239, respectively. The scan arrays in the advanced profile depend on whether interlace or progressive mode is used. The process of scanning out coefficients is defined in Figure 43.<br>(SMPTE 421M-2006 VC-1 at 158.)<br><br>Since the apparatus of Claim 19 uses the open-ended term "comprising," the apparatus described by the SMPTE Standard VC-1 for selecting third, fourth, or other scanning orders does not constitute grounds for non-infringement. |
| [claim 19 cont.] a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals; and | Consistent with SMPTE Standard VC-1, the accused products scan the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals: |

**Exhibit 15  Page 304**

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
| | **11.9.2  Inter zigzag tables** |

**Table 236: Inter 8x8 Scan for Simple and Main Profiles and Progressive Mode in Advanced Profile**

| 0 | 8 | 1 | 2 | 9 | 16 | 24 | 17 | 0 | 3 | 4 | 11 | 18 | 25 | 32 | 40 | 48 | 56 | 41 | 33 | 26 | 19 | 12 | 5 |
| 6 | 30 | 7 | 49 | 7 | 8 | 50 | 5 | 58 | 1 | 4 | 7 | 52 | 29 | 6 | 31 | 19 | 0 | 2 | | | | | |
| 4 | 3 | 3 | 2 | 3 | 3 | 4 | 5 | 6 | 6 | 5 | 4 | 3 | 4 | 5 | 6 | | | | | | | | |
| 7 | 0 | 1 | 8 | 8 | 5 | 3 | 1 | 2 | 4 | 9 | 7 | 5 | 3 | | | | | | | | | | |

**Table 237: Inter 8x4 Scan for Simple and Main Profiles**

| 0 | 1 | 2 | 8 | 3 | 9 | 10 | 16 | 4 | 17 | 24 | 18 | 25 | 19 | 53 | 30 | 26 | 17 | 61 | 28 |
| 1 | 2 | 2 | 3 | 1 | 2 | 2 | 3 | | | | | | | | | | | | |
| 4 | 2 | 9 | 7 | 0 | 5 | 3 | 1 | | | | | | | | | | | | |

**Table 238: Inter 4x8 Scan for Simple and Main Profiles**

| 0 | 4 | 1 | 8 | 5 | 1 | 9 | 2 | 1 | 6 | 1 | 2 | 1 | 2 | 1 | 1 | 8 | 1 | 3 | 2 | 5 | 7 | 2 |
| | | | | | 2 | | | 6 | | 3 | 0 | 0 | 4 | 7 | 4 | | 8 | | | 9 | | 2 |
| 1 | 2 | 1 | 3 | 1 | 2 | 2 | 3 | | | | | | | | | | | | | | | |
| 1 | 6 | 5 | 0 | 9 | 3 | 7 | 1 | | | | | | | | | | | | | | | |

**Table 239: Inter 4x4 Scan for Simple and Main Profiles and Progressive Mode in Advanced Profile**

| 0 | 4 | 8 | 1 | 5 | 12 | 9 | 2 | 6 | 1 | 13 | 3 | 7 | 11 | 1 | 1 | 15 |
| | | | | | | | | | 0 | | | | | 4 | 5 | |

**Table 240: Progressive Mode Inter 8x4 Scan for Advanced Profile**

| 0 | 8 | 1 | 6 | 2 | 9 | 0 | 3 | 4 | 7 | 4 | 1 | 1 | 8 | 2 | 5 | 9 | 5 | 3 | 0 | 6 | 7 | 6 | 1 | 2 | 8 |
| 1 | 2 | 2 | 3 | 1 | 2 | 2 | 3 | | | | | | | | | | | | | | | | | | |
| 4 | 2 | 9 | 7 | 0 | 5 | 3 | 1 | | | | | | | | | | | | | | | | | | |

**Table 241: Progressive Mode Inter 4x8 Scan for Advanced Profile**

| 0 | 1 | 4 | 2 | 5 | 8 | 9 | 1 | 6 | 1 | 1 | 3 | 1 | 2 | 3 | 1 | 1 | 2 | 7 | 2 | 1 | 2 | 2 | 2 |
| | | | | | | | 2 | | 6 | 3 | 0 | 0 | | 7 | 4 | 4 | 8 | | 8 | | 8 | 5 | 9 | 2 |
| 1 | 2 | 1 | 3 | 1 | 2 | 2 | 3 | | | | | | | | | | | | | | | | |
| 1 | 6 | 5 | 0 | 9 | 3 | 7 | 1 | | | | | | | | | | | | | | | | |

**Table 242: Interlace Mode Inter 8x8 Scan for Advanced Profile (Also used for Intra Mode 8x8 scan for Interlace Frame Pictures)**

| 0 | 8 | 1 | 16 | 24 | 9 | 2 | 32 | 40 | 48 | 6 | 7 | 10 | 3 | 25 | 81 | 1 | 4 | 33 | 41 | 9 | 7 | 6 | 34 |
| 4 | 5 | 5 | 1 | 1 | 2 | 2 | 7 | 0 | 3 | 6 | 5 | 8 | 1 | 7 | 5 | 2 | 9 | 6 | 3 | 1 | 9 | 0 | 2 |
| 4 | 3 | 3 | 2 | 3 | 1 | 5 | 4 | 3 | 4 | 6 | 5 | 3 | | | | | | | | | | | |
| 7 | 7 | 0 | 3 | 1 | 8 | 5 | 1 | 2 | 6 | 4 | 9 | 7 | 5 | 3 | | | | | | | | | |

**Table 243: Interlace Mode Inter 8x4 Scan for Advanced Profile**

| 0 | 8 | 6 | 1 | 4 | 1 | 9 | 2 | 7 | 5 | 0 | 3 | 8 | 6 | 4 | 1 | 1 | 9 | 2 | 5 | 3 | 0 | 7 | 6 | 1 | 8 |
| | | | 1 | | | | | | | | | | | | 1 | | | | | | | | | 1 | 2 |
| 1 | 2 | 2 | 3 | 1 | 2 | 2 | 3 | | | | | | | | | | | | | | | | | | |
| 4 | 2 | 9 | 7 | 0 | 5 | 3 | 1 | | | | | | | | | | | | | | | | | | |

**Table 244: Interlace Mode Inter 4x8 Scan for Advanced Profile**

| 0 | 1 | 2 | 4 | 8 | 5 | 1 | 9 | 6 | 3 | 1 | 2 | 1 | 2 | 8 | 1 | 1 | 1 | 2 | 1 | 2 | 5 | 7 | 2 |
| | | | | | | 2 | | | | 6 | | 0 | 4 | | 3 | 0 | 7 | 4 | | 8 | 9 | | 2 |
| 1 | 2 | 1 | 3 | 1 | 2 | 2 | 3 | | | | | | | | | | | | | | | | |
| 1 | 6 | 5 | 0 | 9 | 3 | 7 | 1 | | | | | | | | | | | | | | | | |

**Table 245: Interlace Mode Inter 4x4 Scan for Advanced Profile**

| 0 | 4 | 8 | 1 | 1 | 5 | 9 | 2 | 1 | 3 | 6 | 1 | 3 | 1 | 7 | 1 | 1 |
| | | | | 2 | | | | 3 | | | 0 | | 1 | | 4 | 5 |

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
|  | (SMPTE 421M-2006 VC-1 at 410-11.)<br><br>8.3.6.1.7  Inverse Transform<br><br>After reconstruction of the transform coefficients, the resulting 8 x 8 blocks shall be processed by a separable two -dimensional inverse transform of size 8 x 8, and shall comply with Annex A.  The inverse transform output has a dynamic range of 10 bits, as a signed integer.  Finally, the constant value of 128 shall be added to the reconstructed intra block and the result shall be clamped to the range [0 255] and shall form the reconstruction prior to loop filtering.<br><br>(SMPTE 421M-2006 VC-1 at 155-56.) |
| [claim 19 cont.] a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the SMPTE Standard VC-1, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals. |

Table 1: Functional Elements in VC-1 and their section numbers

| Number | Function Name | Simple/Main Profile (Progressive only) | Advanced Profile, Progressive | Advanced Profile, Interlace |
|---|---|---|---|---|
| 1 | Sequence level Bitstream Parsing | N/A | 6.1 | 6.1 |
| 2 | Entry Point Bitstream Parsing | N/A | 6.2 | 6.2 |
| 3 | Picture Level Bitstream Parsing | 7.1 | 7.1 | 9.1 |
| 4 | VLC Decode Coeffs (VLC tables) | 0,8.3.6.2,11 | 0,8.3.6.2,11 | 10.1.2.5,11 |

(SMPTE 421M-2006 VC-1 at 7.)

8.1.3.4  AC Coefficient Bitstream Decode

The non-zero quantized AC coefficients shall be coded using a 3D run-level method. A set of tables and constants are used to decode the *run*, *level* and *last_flag* values. For descriptive purposes, the set of tables and constants is called an AC

| '678 PATENT | ACCUSED PRODUCTS BASED ON THE SMPTE STANDARD VC-1 |
|---|---|
|  | coding set. Following is a description of the tables and constants that make up an AC coding set.<br><br>(SMPTE 421M-2006 VC-1 at 122.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
| 7. A method for encoding a video signal, comprising the steps of: | The accused products use method of encoding, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.264 implicates certain aspects of the encoding methods used in a product compatible with H.264:<br><br>This subclause does not form an integral part of this Recommendation/International Standard.<br><br>This Recommendation/International Standard was developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, Internet streaming, and communication. It is also designed to enable the use of the coded video representation in a flexible manner for a wide variety of network environments. The use of this Recommendation/International Standard allows motion video to be manipulated as a form of computer data and to be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcasting channels.<br><br>(ITU-T Rec. H.264 3/2005 at 1.) |
| [claim 7 cont.] generating a set of frequency coefficient signals, the set representing the video signal, wherein the set corresponds to an NxM matrix | Consistent with ITU-T Recommendation H.264, the accused products generate a set of frequency coefficients (i.e. DCT coefficients), the set representing the video signal, and corresponding to an NxM matrix (i.e. 8x8), wherein each of the frequency coefficient signals corresponds to a |

**Exhibit 15  Page 307**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
| and each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix:<br><br>Both source pictures and prediction residuals have high spatial redundancy. This Recommendation / International Standard is based on the use of a block-based transform method for spatial redundancy removal. After inter prediction from previously-decoded samples in other pictures or spatial-based prediction from previously-decoded samples within the current picture, the resulting prediction residual is split into 4x4 blocks. These are converted into the transform domain where they are quantised. After quantisation many of the transform coefficients<br><br>(ITU-T Rec. H.264 3/2005 at 3.) |
| [claim 7 cont.] alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ITU-T Recommendation H.264, the accused products alternatively select between a first scanning order and a second scanning order in response to a frame format associated with the video signal.  The scan order is selected based on whether the macroblock is: a frame or field macroblock; a 4x4 or 8x8 macroblock:<br><br>The inverse scanning process for transform coefficients maps the sequence of transform coefficient levels to the transform coefficient level positions. Table 8-13 specifies the two mappings: inverse zig-zag scan and inverse field scan. The inverse zig-zag scan is used for transform coefficients in frame macroblocks and the inverse field scan is used for transform coefficients in field macroblocks.<br><br>(ITU-T Rec. H.264 3/2005 at 164.)<br><br>The inverse scanning process for transform coefficients maps the sequence of transform coefficient levels to the transform coefficient level positions. Table 8-14 specifies the two mappings: |

**Exhibit 15  Page 308**

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
| | inverse 8x8 zig-zag scan and inverse 8x8 field scan. The inverse 8x8 zig-zag scan is used for transform coefficients in frame macroblocks and the inverse 8x8 field scan is used for transform coefficients in field macroblocks.<br><br>(ITU-T Rec. H.264 3/2005 at 165.)<br><br>Since the method of Claim 7 uses the open-ended term "comprising," the method described by the ITU-T Recommendation H.264 for selecting third, fourth, or other scanning orders does not constitute grounds for non-infringement. |
| [claim 7 cont.] scanning the set of frequency coefficient signals according to the selected scanning order to [create] an ordered set of frequency coefficient signals; and | Consistent with ITU-T Recommendation H.264, the accused products scan the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals.<br><br><br><br>Figure 8-8 – 4x4 block scans. (a) Zig-zag scan. (b) Field scan (informative)<br><br>(ITU-T Rec. H.264 3/2005 at 164.) |

Exhibit 15  Page 309

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
| |  Figure 8-9 – 8x8 block scans. (a) 8x8 zig-zag scan. (b) 8x8 field scan (informative) <br><br> (ITU-T Rec. H.264 3/2005 at 165.) |
| [claim 7 cont.] generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | Consistent with the ITU-T Recommendation H.264, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals. <br><br> The coded representation specified in the syntax is designed to enable a high compression capability for a desired image quality. With the exception of the transform bypass mode of operation for lossless coding in the High 4:4:4 profile and the I_PCM mode of operation in all profiles, the algorithm is typically not lossless, as the exact source sample values are typically not preserved through the encoding and decoding processes. A number of techniques may be used to achieve highly efficient compression. Encoding algorithms (not specified in this Recommendation / International Standard) may select between inter and intra coding for block-shaped regions of each picture. Inter coding uses motion vectors for block-based inter prediction to exploit temporal statistical dependencies between different pictures. Intra coding uses various spatial prediction modes to exploit spatial statistical dependencies in the source signal for a single picture. Motion vectors and intra prediction modes may be specified for a variety of block sizes in the picture. The prediction |

| | |
|---|---|
| 1 | |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
| | residual is then further compressed using a transform to remove spatial correlation inside the transform block before it is quantised, producing an irreversible process that typically discards less important visual information while forming a close approximation to the source samples. Finally, the motion vectors or intra prediction modes are combined with the quantised transform coefficient information and encoded using either variable length codes or arithmetic coding.<br><br>(ITU-T Rec. H.264 3/2005 at 2.) |
| 19.  An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.264 implicates certain aspects of the encoder in a product compatible with H.264:<br><br>This subclause does not form an integral part of this Recommendation/International Standard.<br><br>This Recommendation/International Standard was developed in response to the growing need for higher compression of moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, Internet streaming, and communication. It is also designed to enable the use of the coded video representation in a flexible manner for a wide variety of network environments. The use of this Recommendation/International Standard allows motion video to be manipulated as a form of computer data and to be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcasting channels.<br><br>(ITU-T Rec. H.264 3/2005 at 1.) |
| [claim 19 cont.] a discrete cosine transform generator for generating a set of frequency | Consistent with ITU-T Recommendation H.264, the accused products use a discrete cosine transform generator for generating a set of frequency coefficients, the set |

Exhibit 15  Page 311

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON H.264 STANDARD** |
|---|---|
| coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | representing the video signal, and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix:<br><br>Both source pictures and prediction residuals have high spatial redundancy. This Recommendation/International Standard is based on the use of a block-based transform method for spatial redundancy removal. After inter prediction from previously-decoded samples in other pictures or spatial-based prediction from previously-decoded samples within the current picture, the resulting prediction residual is split into 4x4 blocks. These are converted into the transform domain where they are quantised. After quantisation many of the transform coefficients<br><br>(ITU-T Rec. H.264 3/2005 at 3.)<br><br>The transform generator selected by ITU-T Recommendation H.264 is equivalent to a discrete cosine transform generator. |
| [claim 19 cont.] a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ITU-T Recommendation H.264, the accused products use a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal. The scan order is selected based on whether the macroblock is: a frame or field macroblock; a 4x4 or 8x8 macroblock:<br><br>The inverse scanning process for transform coefficients maps the sequence of transform coefficient levels to the transform coefficient level positions. Table 8-13 specifies the two mappings: inverse zig-zag scan and inverse field scan. The inverse zig-zag scan is used for transform coefficients in frame macroblocks and the inverse field scan is used for transform coefficients in field macroblocks.<br><br>(ITU-T Rec. H.264 3/2005 at 164.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
| | The inverse scanning process for transform coefficients maps the sequence of transform coefficient levels to the transform coefficient level positions. Table 8-14 specifies the two mappings: inverse 8x8 zig-zag scan and inverse 8x8 field scan. The inverse 8x8 zig-zag scan is used for transform coefficients in frame macroblocks and the inverse 8x8 field scan is used for transform coefficients in field macroblocks.<br><br>(ITU-T Rec. H.264 3/2005 at 165.)<br><br>Since the method of Claim 7 uses the open-ended term "comprising," the apparatus described by the ITU-T Recommendation H.264 for selecting third, fourth, or other scanning orders does not constitute grounds for non-infringement. |
| [claim 19 cont.] a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals; and | Consistent with ITU-T Recommendation H.264, the accused products use a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals.<br><br><br><br>Figure 8-8 – 4x4 block scans. (a) Zig-zag scan. (b) Field scan (informative)<br><br>(ITU-T Rec. H.264 3/2005 at 164.) |

Exhibit 15  Page 313

| '678 PATENT | ACCUSED PRODUCTS BASED ON H.264 STANDARD |
|---|---|
|  |  |
|  | Figure 8-9 – 8x8 block scans. (a) 8x8 zig-zag scan. (b) 8x8 field scan (informative) |
|  | (ITU-T Rec. H.264 3/2005 at 165.) |
| [claim 19 cont.] a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the ITU-T Recommendation H.264, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>The coded representation specified in the syntax is designed to enable a high compression capability for a desired image quality. With the exception of the transform bypass mode of operation for lossless coding in the High 4:4:4 profile and the I_PCM mode of operation in all profiles, the algorithm is typically not lossless, as the exact source sample values are typically not preserved through the encoding and decoding processes. A number of techniques may be used to achieve highly efficient compression. Encoding algorithms (not specified in this Recommendation / International Standard) may select between inter and intra coding for block-shaped regions of each picture. Inter coding uses motion vectors for block-based inter prediction to exploit temporal statistical dependencies between different pictures. Intra coding uses various spatial prediction modes to exploit spatial statistical dependencies in the |

Exhibit 15  Page 314

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON H.264 STANDARD** |
|---|---|
| | source signal for a single picture. Motion vectors and intra prediction modes may be specified for a variety of block sizes in the picture. The prediction residual is then further compressed using a transform to remove spatial correlation inside the transform block before it is quantised, producing an irreversible process that typically discards less important visual information while forming a close approximation to the source samples. Finally, the motion vectors or intra prediction modes are combined with the quantised transform coefficient information and encoded using either variable length codes or arithmetic coding.<br><br>(ITU-T Rec. H.264 3/2005 at 2.) |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD** |
|---|---|
| 1. A method of encoding a video signal, comprising the steps of: | The accused products use methods of encoding, as indicated above. By specifying the representation of encoded video data and the decoding process, the ISO/IEC MPEG-4 Part II implicates certain aspects of the encoding method used in a product compatible with MPEG-4 Part II:<br><br>Purpose<br><br>This part of ISO/IEC 14496 was developed in response to the growing need for a coding method that can facilitate access to visual objects in natural and synthetic moving pictures and associated natural or synthetic sound for various applications such as digital storage media, internet, various forms of wired or wireless communication etc. The use of ISO/IEC 14496 means that motion video can be manipulated as a form of computer data and can be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcast channels. |

**Exhibit 15  Page 315**

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD** |
|---|---|
| | (ISO/IEC 14496-2:2004(E) at vii.) |
| [claim 1 cont.] generating a set of frequency coefficient signals, the set representing the video signal, and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ISO/IEC MPEG-4 Part II, the accused products generate a set of frequency coefficients (i.e. DCT coefficients), the set representing the video signal, and corresponding to an NxM matrix (i.e. 8x8), wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Spatial redundancy reduction<br><br>Both source VOPs and prediction errors VOPs have significant spatial redundancy. This part of ISO/IEC 14496 uses a block-based DCT method with optional visually weighted quantisation, and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8x8 blocks. These are transformed into the DCT domain where they can be weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ISO/IEC 14496-2:2004(E) at xiv.) |
| [claim 1 cont.] scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals:<br><br>(0, 0), (0, 1), (0, 2), (0, 3), (1, 0), | Consistent with ISO/IEC MPEG-4 Part II, the accused products scan a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the list of coordinate pairs in Claim 1, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals.<br><br>The variable *ac_predflag* and the DC Prediction direction set the scan type. |

| **'678 PATENT** | **ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD** |
|---|---|
| (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7); |  Figure 7-4 — (a) Alternate-Horizontal scan   (b) Alternate-Vertical scan   (c) Zigzag scan <br> (ISO/IEC 14496-2:2004(E) at 241.) |
| [claim 1 cont.] and generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | Consistent with the ISO/IEC MPEG-4 Part II, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals. <br><br> A number of techniques are used to achieve high compression.  The algorithm first uses block-based motion compensation to reduce the temporal redundancy.  Motion compensation is used both for causal prediction of the current VOP from a previous VOP, and for non-causal, interpolative prediction from past and future VOPs.  Motion vectors are defined for each 16-sample by 16-line region of the VOP or 8-sample by 8-line region of a VOP as required.  The prediction error, is further compressed using the discrete cosine transform (DCT) to remove spatial correlation before it is quantised in an irreversible process that discards the less important information  Finally, the shape information, motion vectors and the quantized DCT information, are encoded using variable length codes. <br><br> (ISO/IEC 14496-2:2004(E) at xiii.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| 7. A method for encoding a video signal, comprising the steps of: | The accused products use methods of encoding, as indicated above. By specifying the representation of encoded video data and the decoding process, the ISO/IEC MPEG-4 Part II implicates certain aspects of the encoding methods used in a product compatible with MPEG-4 Part II:<br><br>Purpose<br><br>This part of ISO/IEC 14496 was developed in response to the growing need for a coding method that can facilitate access to visual objects in natural and synthetic moving pictures and associated natural or synthetic sound for various applications such as digital storage media, internet, various forms of wired or wireless communication etc. The use of ISO/IEC 14496 means that motion video can be manipulated as a form of computer data and can be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcast channels.<br><br>(ISO/IEC 14496-2:2004(E) at vii.) |
| [claim 7 cont.] generating a set of frequency coefficient signals, the set representing the video signal, wherein the set corresponds to an NxM matrix and each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ISO/IEC MPEG-4 Part II, the accused products generate a set of frequency coefficients (i.e. DCT coefficients), the set representing the video signal, and corresponding to an NxM matrix (i.e. 8x8), wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix:<br><br>Spatial redundancy reduction<br><br>Both source VOPs and prediction errors VOPs have significant spatial redundancy. This part of ISO/IEC 14496 uses a block-based DCT method with optional visually weighted quantisation, and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8x8 blocks. These are transformed into the DCT domain where they can be weighted before being quantised. After |

**Exhibit 15  Page 318**

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| | quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ISO/IEC 14496-2:2004(E) at xiv.) |
| [claim 7 cont.] alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ISO/IEC MPEG-4 Part II, the accused products alternatively select between a first scanning order and a second scanning order in response to a frame format associated with the video signal. The variable *ac_predflag* and the DC Prediction direction set the scan type:<br><br>7.4.2 Inverse scan<br><br>This subclause specifies the way in which the one dimensional data, QFS[n] is converted into a two-dimensional array of coefficients denoted by PQF[v][u] where u and v both lie in the range of 0 to 7. Let the data at the output of the variable length decoder be denoted by QFS[n] where n is in the range of 0 to 63. Three scan patterns are defined as shown in Figure 7-4. The scan that shall be used is determined by the following method. For intra blocks, if acpred_flag=0, zigzag scan is selected for all blocks in a macroblock. Otherwise, DC prediction direction is used to select a scan on block basis. For instance, if the DC prediction refers to the horizontally adjacent block, alternate-vertical scan is selected for the current block. Otherwise (for DC prediction referring to vertically adjacent block), alternate-horizontal scan is used for the current block. For all other blocks, the 8x8 blocks of transform coefficients are scanned in the "zigzag" scanning direction.<br><br>(ISO/IEC 14496-2:2004(E) at 241.)<br><br>Since the method of Claim 7 uses the open-ended term "comprising," the method described by the ISO/IEC MPEG-4 Part II for selecting third, fourth, or other scanning orders |

**Exhibit 15  Page 319**

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| | does not constitute grounds for non-infringement. |
| [claim 7 cont.] scanning the set of frequency coefficient signals according to the selected scanning order to [create] an ordered set of frequency coefficient signals; and | Consistent with ISO/IEC MPEG-4 Part II, the accused products scan the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals.  Figure 7-4 — (a) Alternate-Horizontal scan  (b) Alternate-Vertical scan  (c) Zigzag scan (ISO/IEC 14496-2:2004(E) at 241.) |
| [claim 7 cont.] generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | Consistent with the ISO/IEC MPEG-4 Part II, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals. A number of techniques are used to achieve high compression.  The algorithm first uses block-based motion compensation to reduce the temporal redundancy.  Motion compensation is used both for causal prediction of the current VOP from a previous VOP, and for non-causal, interpolative prediction from past and future VOPs.  Motion vectors are defined for each 16-sample by 16-line region of the VOP or 8-sample by 8-line region of a VOP as required.  The prediction error, is further compressed using the discrete cosine transform (DCT) to remove spatial correlation before it is quantised in an irreversible process that discards the less important information  Finally, the shape information, motion vectors and the quantized DCT information, are encoded using variable length codes. (ISO/IEC 14496-2:2004(E) at xiii.) |

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| 13.  An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ISO/IEC MPEG-4 Part II implicates certain aspects of the encoder in a product compatible with MPEG-4 Part II:<br><br>This part of ISO/IEC 14496 was developed in response to the growing need for a coding method that can facilitate access to visual objects in natural and synthetic moving pictures and associated natural or synthetic sound for various applications such as digital storage media, internet, various forms of wired or wireless communication etc. The use of ISO/IEC 14496 means that motion video can be manipulated as a form of computer data and can be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcast channels.<br><br>(ISO/IEC 14496-2:2004(E) at vii.) |
| [claim 13 cont.] a discrete cosine transform coefficient generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ISO/IEC MPEG-4 Part II, the accused products use a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Spatial redundancy reduction<br><br>Both source VOPs and prediction errors VOPs have significant spatial redundancy. This part of ISO/IEC 14496 uses a block-based DCT method with optional visually weighted quantisation, and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8x8 blocks. These are transformed into the DCT domain where they can |

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| | be weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ISO/IEC 14496-2:2004(E) at xiv.) |
| [claim 13 cont.] a scanner for scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the following list of coordinate pairs, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals:<br><br>(0, 0), (0, 1), (0, 2), (0, 3), (1, 0), (1, 1), (2, 0), (2, 1), (1, 2), (1, 3), (0, 4), (0, 5), (0, 6), (0, 7) (1, 7); | Consistent with ISO/IEC MPEG-4 Part II, the accused products use a scanner for scanning a first subset of the frequency coefficient signals within the set in a predetermined first subset scanning order, as represented by the list of coordinate pairs in Claim 13, each pair representing a horizontal and vertical coordinate in the matrix, to create an ordered set of frequency coefficient signals.<br><br>The variable *ac_predflag* and the DC Prediction direction set the scan type.<br><br>| 0 | 4 | 6 | 20 | 22 | 36 | 38 | 52 |<br>| 1 | 5 | 7 | 21 | 23 | 37 | 39 | 53 |<br>| 2 | 8 | 19 | 24 | 34 | 40 | 50 | 54 |<br>| 3 | 9 | 18 | 25 | 35 | 41 | 51 | 55 |<br>| 10 | 17 | 26 | 30 | 42 | 46 | 56 | 60 |<br>| 11 | 16 | 27 | 31 | 43 | 47 | 57 | 61 |<br>| 12 | 15 | 28 | 32 | 44 | 48 | 58 | 62 |<br>| 13 | 14 | 29 | 33 | 45 | 49 | 59 | 63 |<br><br>Figure 7-4 — (a) Alternate-Horizontal scan  (b) Alternate-Vertical scan  (c) Zigzag scan<br>(ISO/IEC 14496-2:2004(E) at 241.) |
| [claim 13 cont.] and a means for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal including the ordered set of frequency coefficient signals. Consistent with the ISO/IEC MPEG-4 Part II, an encoded video signal is generated and the encoded video signal |

**Exhibit 15  Page 322**

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| | includes the ordered set of frequency coefficient signals.<br><br>A number of techniques are used to achieve high compression. The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current VOP from a previous VOP, and for non-causal, interpolative prediction from past and future VOPs. Motion vectors are defined for each 16-sample by 16-line region of the VOP or 8-sample by 8-line region of a VOP as required. The prediction error, is further compressed using the discrete cosine transform (DCT) to remove spatial correlation before it is quantised in an irreversible process that discards the less important information  Finally, the shape information, motion vectors and the quantized DCT information, are encoded using variable length codes.<br><br>(ISO/IEC 14496-2:2004(E) at xiii.) |
| 19.  An apparatus for encoding a video signal, comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ISO/IEC MPEG-4 Part II implicates certain aspects of the encoder in a product compatible with MPEG-4 Part II:<br><br>This part of ISO/IEC 14496 was developed in response to the growing need for a coding method that can facilitate access to visual objects in natural and synthetic moving pictures and associated natural or synthetic sound for various applications such as digital storage media, internet, various forms of wired or wireless communication etc. The use of ISO/IEC 14496 means that motion video can be manipulated as a form of computer data and can be stored on various storage media, transmitted and received over existing and future networks and distributed on existing and future broadcast channels. |

**Exhibit 15  Page 323**

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| | (ISO/IEC 14496-2:2004(E) at vii.) |
| [claim 13 cont.] a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix; | Consistent with ISO/IEC MPEG-4 Part II, the accused products use a discrete cosine transform generator for generating a set of frequency coefficient signals, the set representing the video signal and corresponding to an NxM matrix, wherein each of the frequency coefficient signals corresponds to a predetermined horizontal coordinate and a predetermined vertical coordinate in the matrix.<br><br>Spatial redundancy reduction<br><br>Both source VOPs and prediction errors VOPs have significant spatial redundancy. This part of ISO/IEC 14496 uses a block-based DCT method with optional visually weighted quantisation, and run-length coding. After motion compensated prediction or interpolation, the resulting prediction error is split into 8x8 blocks. These are transformed into the DCT domain where they can be weighted before being quantised. After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ISO/IEC 14496-2:2004(E) at xiv.) |
| [claim 13 cont.] a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal; | Consistent with ISO/IEC MPEG-4 Part II, the accused products use a scan selector for alternatively selecting between a first scanning order and a second scanning order in response to a frame format associated with the video signal. The variable *ac_predflag* and the DC Prediction direction set the scan type.<br><br>7.4.2 Inverse scan<br><br>This subclause specifies the way in which the one dimensional data, QFS[n] is converted into a two-dimensional array of coefficients denoted by |

| **'678 Patent** | **Accused Products Based on MPEG-4 Part II Standard** |
|---|---|
| | PQF[v][u] where u and v both lie in the range of 0 to 7. Let the data at the output of the variable length decoder be denoted by QFS[n] where n is in the range of 0 to 63. Three scan patterns are defined as shown in Figure 7-4. The scan that shall be used is determined by the following method. For intra blocks, if acpred_flag=0, zigzag scan is selected for all blocks in a macroblock. Otherwise, DC prediction direction is used to select a scan on block basis. For instance, if the DC prediction refers to the horizontally adjacent block, alternate-vertical scan is selected for the current block. Otherwise (for DC prediction referring to vertically adjacent block), alternate-horizontal scan is used for the current block. For all other blocks, the 8x8 blocks of transform coefficients are scanned in the "zigzag" scanning direction.<br><br>(ISO/IEC 14496-2:2004(E) at 241.)<br><br>Since the method of Claim 7 uses the open-ended term "comprising," the method described by the ISO/IEC MPEG-4 Part II for selecting third, fourth, or other scanning orders does not constitute grounds for non-infringement. |
| [claim 13 cont.] a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals; and | Consistent with ISO/IEC MPEG-4 Part II, the accused products use a scanner for scanning the set of frequency coefficient signals according to the selected scanning order to create an ordered set of frequency coefficient signals:<br><br>Figure 7-4 — (a) Alternate-Horizontal scan  (b) Alternate-Vertical scan  (c) Zigzag scan<br><br>(ISO/IEC 14496-2:2004(E) at 241.) |
| [claim 13 cont.] a means for generating an encoded video | The accused products contain hardware and/or software for generating an encoded video signal, the encoded video signal |

**Exhibit 15  Page 325**

| '678 PATENT | ACCUSED PRODUCTS BASED ON MPEG-4 PART II STANDARD |
|---|---|
| signal, the encoded video signal including the ordered set of frequency coefficient signals. | including the ordered set of frequency coefficient signals. Consistent with the ISO/IEC MPEG-4 Part II, an encoded video signal is generated and the encoded video signal includes the ordered set of frequency coefficient signals.<br><br>A number of techniques are used to achieve high compression. The algorithm first uses block-based motion compensation to reduce the temporal redundancy. Motion compensation is used both for causal prediction of the current VOP from a previous VOP, and for non-causal, interpolative prediction from past and future VOPs. Motion vectors are defined for each 16-sample by 16-line region of the VOP or 8-sample by 8-line region of a VOP as required. The prediction error, is further compressed using the discrete cosine transform (DCT) to remove spatial correlation before it is quantised in an irreversible process that discards the less important information  Finally, the shape information, motion vectors and the quantized DCT information, are encoded using variable length codes.<br><br>(ISO/IEC 14496-2:2004(E) at xiii.) |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| 1.  An apparatus for performing variable word-length coding comprising: | The accused products contain encoders, as indicated above. By specifying the representation of encoded video data and the decoding process, the ITU-T Recommendation H.262 implicates certain aspects of the encoder in a product compatible with H.262:<br><br>Intro. 4.1.4        Spatial redundancy reduction<br><br>Both source pictures and prediction errors have high spatial redundancy.  This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding.  After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks. These are transformed into the DCT domain where they are weighted before being quantised.  After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently.<br><br>(ITU-T Rec. H.262 2000E at vii.)<br><br>Figure 7-1 is a diagram of the Video Decoding Process without any scalability.  The diagram is simplified for clarity.<br><br>NOTE – Throughout this Specification two dimensional arrays are represented as name[q][p] where 'q' is the index in the vertical dimension and 'p' the index in the horizontal dimension. |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| |  (ITU-T Rec. H.262 2000E at 61.) |
| [claim 1 cont.] a means for receiving video signals each having a run-length and a level, the video signals representing at least a portion of an intra-coded picture; | The accused products contain hardware and/or software for receiving video signals each having a run-length and a level, the video signals representing at least a portion of an intra-coded picture. The ITU-T Recommendation H.262 implicates receiving video signals each having a run-length and a level.

The term "run" means "the number of zero coefficients preceding a non-zero coefficient, in the scan order." The term "level" means the "absolute value of the non-zero coefficient." (ITU-T Rec. H.262 2000E at 6.)

7.2.2     Other coefficients

All coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15 and B.16.

In all cases a variable length code shall first be decoded using either Table B.14 or Table B.15. The decoded value of this code denotes one of three courses of action:

1) *End of Block* – In this case there are no more coefficients in the block in which case the remainder of the coefficients in the block (those for which no value has yet been decoded) shall be set to zero. This is denoted by "End of block" in the syntax specification of 6.2.6. |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | 2) A "normal" coefficient in which a value of *run* and *level* is decoded followed by a single bit, *s*, giving the sign of the coefficient *signed_level* is computed from *level* and *s* as shown below, *run* coefficients shall be set to zero and the subsequent coefficient shall have the value *signed_level*. |

if (*s* = =0)

          *signed_level* = *level*;

        else

          *signed_level* = (-*level*);

3) An "Escape" coded coefficient. In which the values of *run* and *signed_level* are fixed length coded as described in 7.2.2.3.

(ITU-T Rec. H.262 2000E at 63.)

Further, the ITU-T Recommendation H.262 describes that the video signals represent at least a portion of an intra-coded picture.

picture_coding_type – The picture_coding_type identifies whether a picture is an intra-coded picture(I), predictive-coded picture(P) or bidirectionally predictive-coded picture(B). The meaning of picture_coding_type is defined in Table 6-12.

NOTE 2 – Intra-coded pictures with only DC coefficients (D-pictures) that may be used in ISO/IEC 11172-2 are not supported by this Specification.

Table 6-12 – picture_coding_type

| picture_coding_type | coding method |
|---|---|
| 000 | Forbidden |
| 001 | intra-coded (I) |
| 010 | predictive-coded (P) |
| 011 | bidirectionally-predictive-coded (B) |
| 100 | Shall not be used (dc intra-coded (D) in ISO/IEC11172-2) |
| 101 | Reserved |
| 110 | Reserved |
| 111 | Reserved |

(ITU-T Rec. H.262 2000E at 47.)

Exhibit 15  Page 329

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| [claim 1 cont.] a means for performing variable word-length coding of the video signals in accordance with the following table: | The accused products contain hardware and/or software for performing variable word-length coding of the video signals in accordance with the following table. The ITU-T Recommendation H.262 states that "[a]ll coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15, and B.16."<br><br>7.2.2     Other coefficients<br><br>All coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15 and B.16.<br>(ITU-T Rec. H.262 2000E at 63.) |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|

**'593 PATENT**

RUN | | | | LEVEL | | | |
LENGTH 1 2 3 4 5 6 7 8
0 3 4 5 6 6 7 7 8
1 4 6 8 9 9
2 6 8 9 11
3 6 9
4 7 9
5 7 10
6 8
7 8
8 8
9 8
10 8
11 9
12 9
13 9
14 10
15 10
16 11

RUN | | | | LEVEL | | |
LENGTH 9 10 11 12 13 14 15
0 8 9 9 9 9 9 9
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

in which the values on the abscissa each represent the level of a video signal, the values on the ordinate each represent the run-length of a video signal, and the entries in the table each represent a number of bits in codes to be assigned to a video signal.

Table B.15 – DCT coefficients Table one

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 0110 (Note 2) | End of Block | |
| 10 s | 0 | 1 |
| 010 s | 1 | 1 |
| 110 s | 0 | 2 |
| 0010 1 s | 2 | 1 |
| 0111 s | 0 | 3 |
| 0011 1 s | 3 | 1 |
| 0001 10 s | 4 | 1 |
| 0011 0 s | 1 | 2 |
| 0001 11 s | 5 | 1 |
| 0000 110 s | 6 | 1 |
| 0000 100 s | 7 | 1 |
| 1110 0 s | 0 | 4 |
| 0000 111 s | 2 | 2 |
| 0000 101 s | 8 | 1 |
| 1111 000 s | 9 | 1 |
| 0000 01 | Escape | |
| 1110 1 s | 0 | 5 |
| 0001 01 s | 0 | 6 |
| 1111 001 s | 1 | 3 |
| 0010 0110 s | 3 | 2 |
| 1111 010 s | 10 | 1 |
| 0010 0001 s | 11 | 1 |
| 0010 0101 s | 12 | 1 |
| 0010 0100 s | 13 | 1 |
| 0001 00 s | 0 | 7 |
| 0010 0111 s | 1 | 4 |
| 1111 1100 s | 2 | 3 |
| 1111 1101 s | 4 | 2 |
| 0000 0010 0 s | 5 | 2 |
| 0000 0010 1 s | 14 | 1 |
| 0000 0011 1 s | 15 | 1 |
| 0000 0011 01 s | 16 | 1 |

| '593 Patent | Accused Products based on H.262 Standard |
|---|---|
| | Table B.15 – DCT coefficients Table one *(continued)* |

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 1111 011 s | 0 | 8 |
| 1111 100 s | 0 | 9 |
| 0010 0011 s | 0 | 10 |
| 0010 0010 s | 0 | 11 |
| 0010 0000 s | 1 | 5 |
| 0000 0011 00 s | 2 | 4 |
| 0000 0001 1100 s | 3 | 3 |
| 0000 0001 0010 s | 4 | 3 |
| 0000 0001 1110 s | 6 | 2 |
| 0000 0001 0101 s | 7 | 2 |
| 0000 0001 0001 s | 8 | 2 |
| 0000 0001 1111 s | 17 | 1 |
| 0000 0001 1010 s | 18 | 1 |
| 0000 0001 1001 s | 19 | 1 |
| 0000 0001 0111 s | 20 | 1 |
| 0000 0001 0110 s | 21 | 1 |
| 1111 1010 s | 0 | 12 |
| 1111 1011 s | 0 | 13 |
| 1111 1110 s | 0 | 14 |
| 1111 1111 s | 0 | 15 |
| 0000 0000 1011 0 s | 1 | 6 |

(ITU-T Rec. H.262 2000E at 134-35.)

The claim language requires only that "the entries in the table [of Claim 1] each represent a number of bits in codes to be assigned to a video signal." The number of bits (i.e., the number of zeros, ones and the bit 's' which denotes the sign of the level) used for each combination (run-length and level) in the ITU-T Recommendation H.262 is identical to those for corresponding combinations in the table disclosed in Claim 1.

| 2. The apparatus of claim 1 wherein said table includes a plurality of additional entries which are compatible with the Motion Pictures Expert Group Phase 1 standard. | In the ITU-T Recommendation H.262, the table B.15 DCT coefficients Table one includes a plurality of additional entries which are compatible with the Motion Pictures Expert Group Phase 1 standard. |

**Exhibit 15  Page 332**

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | Table B.15 – DCT coefficients Table one *(continued)* |

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 1111 011 s | 0 | 8 |
| 1111 100 s | 0 | 9 |
| 0010 0011 s | 0 | 10 |
| 0010 0010 s | 0 | 11 |
| 0010 0000 s | 1 | 5 |
| 0000 0011 00 s | 2 | 4 |
| 0000 0001 1100 s | 3 | 3 |
| 0000 0001 0010 s | 4 | 3 |
| 0000 0001 1110 s | 6 | 2 |
| 0000 0001 0101 s | 7 | 2 |
| 0000 0001 0001 s | 8 | 2 |
| 0000 0001 1111 s | 17 | 1 |
| 0000 0001 1010 s | 18 | 1 |
| 0000 0001 1001 s | 19 | 1 |
| 0000 0001 0111 s | 20 | 1 |
| 0000 0001 0110 s | 21 | 1 |
| 1111 1010 s | 0 | 12 |
| 1111 1011 s | 0 | 13 |
| 1111 1110 s | 0 | 14 |
| 1111 1111 s | 0 | 15 |
| 0000 0000 1011 0 s | 1 | 6 |
| 0000 0000 1010 1 s | 1 | 7 |
| 0000 0000 1010 0 s | 2 | 5 |
| 0000 0000 1001 1 s | 3 | 4 |
| 0000 0000 1001 0 s | 5 | 3 |
| 0000 0000 1000 1 s | 9 | 2 |
| 0000 0000 1000 0 s | 10 | 2 |
| 0000 0000 1111 1 s | 22 | 1 |
| 0000 0000 1111 0 s | 23 | 1 |
| 0000 0000 1110 1 s | 24 | 1 |
| 0000 0000 1110 0 s | 25 | 1 |
| 0000 0000 1101 1 s | 26 | 1 |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | **Table B.15 – DCT coefficients Table one** *(continued)* |

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 0000 0000 0111 11 s | 0 | 16 |
| 0000 0000 0111 10 s | 0 | 17 |
| 0000 0000 0111 01 s | 0 | 18 |
| 0000 0000 0111 00 s | 0 | 19 |
| 0000 0000 0110 11 s | 0 | 20 |
| 0000 0000 0110 10 s | 0 | 21 |
| 0000 0000 0110 01 s | 0 | 22 |
| 0000 0000 0110 00 s | 0 | 23 |
| 0000 0000 0101 11 s | 0 | 24 |
| 0000 0000 0101 10 s | 0 | 25 |
| 0000 0000 0101 01 s | 0 | 26 |
| 0000 0000 0101 00 s | 0 | 27 |
| 0000 0000 0100 11 s | 0 | 28 |
| 0000 0000 0100 10 s | 0 | 29 |
| 0000 0000 0100 01 s | 0 | 30 |
| 0000 0000 0100 00 s | 0 | 31 |
| 0000 0000 0011 000 s | 0 | 32 |
| 0000 0000 0010 111 s | 0 | 33 |
| 0000 0000 0010 110 s | 0 | 34 |
| 0000 0000 0010 101 s | 0 | 35 |
| 0000 0000 0010 100 s | 0 | 36 |
| 0000 0000 0010 011 s | 0 | 37 |
| 0000 0000 0010 010 s | 0 | 38 |
| 0000 0000 0010 001 s | 0 | 39 |
| 0000 0000 0010 000 s | 0 | 40 |
| 0000 0000 0011 111 s | 1 | 8 |
| 0000 0000 0011 110 s | 1 | 9 |
| 0000 0000 0011 101 s | 1 | 10 |
| 0000 0000 0011 100 s | 1 | 11 |
| 0000 0000 0011 011 s | 1 | 12 |
| 0000 0000 0011 010 s | 1 | 13 |
| 0000 0000 0011 001 s | 1 | 14 |

**Exhibit 15  Page 334**

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | Table B.15 – DCT coefficients Table one *(concluded)* <br><br> | Variable length code (Note 1) | Run | Level | <br> | 0000 0000 0001 0011 s | 1 | 15 | <br> | 0000 0000 0001 0010 s | 1 | 16 | <br> | 0000 0000 0001 0001 s | 1 | 17 | <br> | 0000 0000 0001 0000 s | 1 | 18 | <br> | 0000 0000 0001 0100 s | 6 | 3 | <br> | 0000 0000 0001 1010 s | 11 | 2 | <br> | 0000 0000 0001 1001 s | 12 | 2 | <br> | 0000 0000 0001 1000 s | 13 | 2 | <br> | 0000 0000 0001 0111 s | 14 | 2 | <br> | 0000 0000 0001 0110 s | 15 | 2 | <br> | 0000 0000 0001 0101 s | 16 | 2 | <br> | 0000 0000 0001 1111 s | 27 | 1 | <br> | 0000 0000 0001 1110 s | 28 | 1 | <br> | 0000 0000 0001 1101 s | 29 | 1 | <br> | 0000 0000 0001 1100 s | 30 | 1 | <br> | 0000 0000 0001 1011 s | 31 | 1 | <br><br> NOTE 1 – The last bit 's' denotes the sign of the level: '0' for positive, '1' for negative. <br> NOTE 2 – "End of Block" shall not be the only code of the block. |
| | (ITU-T Rec. H.262 2000E at 135-37.) |
| 3. The apparatus of claim 1 wherein a Motion Pictures Expert Group Phase 1 compatible variable word-length code is utilized to encode non-intra coded video signals. | The ITU-T Recommendation H.262 indicates use of the MPEG-1 compatible variable word-length code to encode non-intra coded video signals. <br><br> 7.2.2.2 First coefficient of a non-intra block <br><br> In the case of the first coefficient of a non-intra block (a block in a non-intra macroblock) Table B.14 is modified as indicated by Notes 2 and 3 at the foot of the table. <br> (ITU-T Rec. H.262 2000E at 63.) <br><br> Table B.14 of ITU-T Rec. H.262 (2000E at 130-133) is the same as Table B.5.c of MPEG-1 (ISO/IEC 11172-2: 1993 (E) at 45-47), which is used for non-intra blocks. |
| 4. The apparatus of claim 3 further including a means for adaptively selecting a first or a second coding mode. | The ITU-T Recommendation H.262 indicates that the coding mode is adaptively selected. <br><br> 7.2.2.1 Table Selection <br><br> Table 7-3 indicates which Table shall be used for decoding the DCT coefficients. |

**Exhibit 15  Page 335**

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | Table 7-3 – Selection of DCT coefficient VLC tables<br><br>| intra_vlc_format | 0 | 1 |<br>\|---\|---\|---\|<br>\| intra blocks (macroblock_intra = 1) \| B.14 \| B.15 \|<br>\| non-intra blocks (macroblock_intra = 0) \| B.14 \| B.14 \|<br><br>(ITU-T Rec. H.262 2000E at 63.) |
| 5. The apparatus of claim 4 wherein said first coding mode utilizes variable word-length coding entries in said table. | See claim 4 and ITU-T Recommendation H.262 Table B.15. |
| 6. The apparatus of claim 5 wherein said second coding mode utilizes Motion Pictures Expert Group Phase 1 compatible variable word-length coding. | See claim 4 and ITU-T Recommendation H.262 Table B.14. (2000E at 130-133), which is the same as Table B.5.c of MPEG-1 (ISO/IEC 11172-2: 1993 (E) at 45-47). |
| 7. The apparatus of claim 4 wherein said means for adaptively selecting are responsive to a picture type received by said means for receiving. | The accused products contain hardware and/or software for adaptively selecting are responsive to a picture type received by the means for receiving. Consistent with ITU-T Recommendation H.262, the accused products adaptively select the coding mode responsive to a picture type (intra or non-intra coded pictures).<br><br>7.2.2.1 Table Selection<br><br>Table 7-3 indicates which Table shall be used for decoding the DCT coefficients.<br><br>Table 7-3 – Selection of DCT coefficient VLC tables<br><br>\| intra_vlc_format \| 0 \| 1 \|<br>\|---\|---\|---\|<br>\| intra blocks (macroblock_intra = 1) \| B.14 \| B.15 \|<br>\| non-intra blocks (macroblock_intra = 0) \| B.14 \| B.14 \|<br><br>(ITU-T Rec. H.262 2000E at 63.) |
| 8. The apparatus of claim 1 wherein said variable word-length coding is performed on a segment of the received video signal wherein said segment is | Consistent with ITU-T Recommendation H.262, the accused products perform variable word-length coding on a segment of the received video, which segment is selected from the group consisting of blocks, macroblocks, and pictures. |

**Exhibit 15  Page 336**

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| selected from the group consisting of blocks, macroblocks, and pictures. | 3.29  component: A matrix, block or single sample from one of the three matrices (luminance and two chrominance) that make up a picture. <br><br> … <br><br> 3.85  macroblock: The four 8 by 8 blocks of luminance data and the two (for 4:2:0 chrominance format), four (for 4:2:2 chrominance format) or eight (for 4:4:4 chrominance format) corresponding 8 by 8 blocks of chrominance data coming from a 16 by 16 section of the luminance component of the picture. <br> (ITU-T Rec. H.262 2000E at 3-5.) <br><br> 7.2.2.1 Table Selection <br><br> Table 7-3 indicates which Table shall be used for decoding the DCT coefficients. <br><br> Table 7-3 – Selection of DCT coefficient VLC tables <br><br> | intra_vlc_format | 0 | 1 | <br> |---|---|---| <br> | intra blocks (macroblock_intra = 1) | B.14 | B.15 | <br> | non-intra blocks (macroblock_intra = 0) | B.14 | B.14 | <br><br> (ITU-T Rec. H.262 2000E at 63.) |
| 9. The apparatus of claim 3 wherein said non-intra coded video signals includes inter-coded video signals. | The ITU-T Recommendation H.262 indicates that non-intra coded video signals includes inter-coded video signals.  See sections 7.2.2, 7.2.2.1 and 7.2.2.2 cited above. |
| 10. The apparatus of claim 1 wherein said non-intra coded video signal includes predicted-coded video signals. | The ITU-T Recommendation H.262 indicates that non-intra coded video signal includes predicted-coded video signals. See sections 7.2.2, 7.2.2.1 and 7.2.2.2 cited above. |
| 11. The apparatus of claim 1 wherein one or more MPEG-1 variable word-length codes are utilized when a received video signal has a combination of run-length and level for which there is no entry in said table. | The ITU-T Recommendation H.262 indicates that one or more MPEG-1 variable word-length codes are utilized when a received video signal has a combination of run-length and level for which there is no entry in said table. <br><br> One or more entries in Table B.15 of ITU-T Rec. H.262 (2000E at 135-136) for combinations of run-length and level that are not indicated in the claimed table are the same as the corresponding entries in Table B.5.c  of MPEG-1 (ISO/IEC |

Exhibit 15  Page 337

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | 11172-2: 1993 (E) at 45-47.  See for example the entries below from Table B.15 which are compatible with MPEG-1 standard: |

…

| | Run | Level |
|---|---|---|
| 0000 0000 1011 0 s | 1 | 6 |
| 0000 0000 1010 1 s | 1 | 7 |
| 0000 0000 1010 0 s | 2 | 5 |
| 0000 0000 1001 1 s | 3 | 4 |
| 0000 0000 1001 0 s | 5 | 3 |
| 0000 0000 1000 1 s | 9 | 2 |
| 0000 0000 1000 0 s | 10 | 2 |
| 0000 0000 1111 1 s | 22 | 1 |
| 0000 0000 1111 0 s | 23 | 1 |
| 0000 0000 1110 1 s | 24 | 1 |
| 0000 0000 1110 0 s | 25 | 1 |
| 0000 0000 1101 1 s | 26 | 1 |

**Table B.15 – DCT coefficients Table one** *(continued)*

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 0000 0000 0111 11 s | 0 | 16 |
| 0000 0000 0111 10 s | 0 | 17 |
| 0000 0000 0111 01 s | 0 | 18 |
| 0000 0000 0111 00 s | 0 | 19 |
| 0000 0000 0110 11 s | 0 | 20 |
| 0000 0000 0110 10 s | 0 | 21 |
| 0000 0000 0110 01 s | 0 | 22 |
| 0000 0000 0110 00 s | 0 | 23 |
| 0000 0000 0101 11 s | 0 | 24 |
| 0000 0000 0101 10 s | 0 | 25 |
| 0000 0000 0101 01 s | 0 | 26 |
| 0000 0000 0101 00 s | 0 | 27 |
| 0000 0000 0100 11 s | 0 | 28 |
| 0000 0000 0100 10 s | 0 | 29 |
| 0000 0000 0100 01 s | 0 | 30 |
| 0000 0000 0100 00 s | 0 | 31 |
| 0000 0000 0011 000 s | 0 | 32 |
| 0000 0000 0010 111 s | 0 | 33 |
| 0000 0000 0010 110 s | 0 | 34 |
| 0000 0000 0010 101 s | 0 | 35 |
| 0000 0000 0010 100 s | 0 | 36 |
| 0000 0000 0010 011 s | 0 | 37 |
| 0000 0000 0010 010 s | 0 | 38 |
| 0000 0000 0010 001 s | 0 | 39 |
| 0000 0000 0010 000 s | 0 | 40 |
| 0000 0000 0011 111 s | 1 | 8 |
| 0000 0000 0011 110 s | 1 | 9 |
| 0000 0000 0011 101 s | 1 | 10 |
| 0000 0000 0011 100 s | 1 | 11 |
| 0000 0000 0011 011 s | 1 | 12 |
| 0000 0000 0011 010 s | 1 | 13 |
| 0000 0000 0011 001 s | 1 | 14 |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| | (ITU-T Rec. H.262 2000E at 135-37.) |
| 12.  A method for performing variable word-length coding comprising: | The accused products use methods for performing variable word-length coding.  In Introductory Section 4.1.4 and Figure 7-1, the ITU-T Recommendation H.262 implicates performing variable word-length coding. |
| | Intro. 4.1.4   Spatial redundancy reduction |
| | Both source pictures and prediction errors have high spatial redundancy.  This Specification uses a block-based DCT method with visually weighted quantisation and run-length coding.  After motion compensated prediction or interpolation, the resulting prediction error is split into 8 by 8 blocks.  These are transformed into the DCT domain where they are weighted before being quantised.  After quantisation many of the DCT coefficients are zero in value and so two-dimensional run-length and variable length coding is used to encode the remaining DCT coefficients efficiently. |
| | (ITU-T Rec. H.262 2000E at vii.) |
| | Figure 7-1 is a diagram of the Video Decoding Process without any scalability.  The diagram is simplified for clarity. |
| | NOTE – Throughout this Specification two dimensional arrays are represented as *name*[q][p] where 'q' is the index in the vertical dimension and 'p' the index in the horizontal dimension. |

**Exhibit 15  Page 339**

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
|  |  Figure 7-1 – Simplified Video Decoding Process<br><br>(ITU-T Rec. H.262 2000E at 61.) |
| [claim 12 cont.] receiving video signals each having a run-length and a level, the video signals representing at least a portion of an intra-coded picture; | The ITU-T Recommendation H.262 implicates receiving video signals each having a run-length and a level.<br><br>The term "run" means "the number of zero coefficients preceding a non-zero coefficient, in the scan order."  The term "level" means the "absolute value of the non-zero coefficient."  (ITU-T Rec. H.262 2000E at 6.)<br><br>7.2.2       Other coefficients<br><br>All coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15 and B.16.<br><br>In all cases a variable length code shall first be decoded using either Table B.14 or Table B.15. The decoded value of this code denotes one of three courses of action:<br><br>1)  *End of Block* – In this case there are no more coefficients in the block in which case the remainder of the coefficients in the block (those for which no value has yet been decoded) shall be set to zero.  This is denoted by "End of block" in the syntax specification of 6.2.6.<br><br>2)  A "normal" coefficient in which a value of *run* and *level* is decoded followed by a single bit, *s*, giving the sign of the coefficient *signed_level* is computed from *level* and *s* as shown below, *run* |

| **'593 PATENT** | **ACCUSED PRODUCTS BASED ON H.262 STANDARD** |
|---|---|
| | coefficients shall be set to zero and the subsequent coefficient shall have the value *signed_level*. |
| | if (*s* = =0) |
| |             *signed_level* = *level*; |
| |           else |
| |             *signed_level* = (-*level*); |
| | 3) An "Escape" coded coefficient. In which the values of *run* and *signed_level* are fixed length coded as described in 7.2.2.3. |
| | (ITU-T Rec. H.262 2000E at 63.) |
| | Further, the ITU-T Recommendation H.262 describes that the video signals represent at least a portion of an intra-coded picture. |
| |     picture_coding_type – The picture_coding_type identifies whether a picture is an intra-coded picture(I), predictive-coded picture(P) or bidirectionally predictive-coded picture(B). The meaning of picture_coding_type is defined in Table 6-12. |
| |     NOTE 2 – Intra-coded pictures with only DC coefficients (D-pictures) that may be used in ISO/IEC 11172-2 are not supported by this Specification. |
| | Table 6-12 – picture_coding_type |
| | <table><tr><td>picture_coding_type</td><td>coding method</td></tr><tr><td>000</td><td>Forbidden</td></tr><tr><td>001</td><td>intra-coded (I)</td></tr><tr><td>010</td><td>predictive-coded (P)</td></tr><tr><td>011</td><td>bidirectionally-predictive-coded (B)</td></tr><tr><td>100</td><td>Shall not be used<br>(dc intra-coded (D) in ISO/IEC11172-2)</td></tr><tr><td>101</td><td>Reserved</td></tr><tr><td>110</td><td>Reserved</td></tr><tr><td>111</td><td>Reserved</td></tr></table> |
| | (ITU-T Rec. H.262 2000E at 47.) |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| [claim 12 cont.] performing variable word-length coding of the video signals in accordance with the following table: | The ITU-T Recommendation H.262 states that "[a]ll coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15, and B.16." |

The ITU-T Recommendation H.262 states that "[a]ll coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15, and B.16."

### 7.2.2    Other coefficients

All coefficients with the exception of the DC intra coefficients shall be encoded using Tables B.14, B.15 and B.16.

(ITU-T Rec. H.262 2000E at 63.)

Left column tables:

| RUN | LEVEL | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LENGTH | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 0 | 3 | 4 | 5 | 6 | 6 | 7 | 7 | 8 |
| 1 | 4 | 6 | 8 | 9 | 9 | | | |
| 2 | 6 | 8 | 9 | 11 | | | | |
| 3 | 6 | 9 | | | | | | |
| 4 | 7 | 9 | | | | | | |
| 5 | 7 | 10 | | | | | | |
| 6 | 8 | | | | | | | |
| 7 | 8 | | | | | | | |
| 8 | 8 | | | | | | | |
| 9 | 8 | | | | | | | |
| 10 | 8 | | | | | | | |
| 11 | 9 | | | | | | | |
| 12 | 9 | | | | | | | |
| 13 | 9 | | | | | | | |
| 14 | 10 | | | | | | | |
| 15 | 10 | | | | | | | |
| 16 | 11 | | | | | | | |

| RUN | LEVEL | | | | | | |
|---|---|---|---|---|---|---|---|
| LENGTH | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 0 | 8 | 9 | 9 | 9 | 9 | 9 | 9 |
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |

in which the values on the abscissa each represent the level of a video signal, the values on the ordinate each represent the run-length of a video signal, and the entries in the table each represent a number of bits in codes to be assigned to a video signal.

Table B.15 – DCT coefficients Table one

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 0110 (Note 2) | End of Block | |
| 10 s | 0 | 1 |
| 010 s | 1 | 1 |
| 110 s | 0 | 2 |
| 0010 1 s | 2 | 1 |
| 0111 s | 0 | 3 |
| 0011 1 s | 3 | 1 |
| 0001 10 s | 4 | 1 |
| 0011 0 s | 1 | 2 |
| 0001 11 s | 5 | 1 |
| 0000 110 s | 6 | 1 |
| 0000 100 s | 7 | 1 |
| 1110 0 s | 0 | 4 |
| 0000 111 s | 2 | 2 |
| 0000 101 s | 8 | 1 |
| 1111 000 s | 9 | 1 |
| 0000 01 | Escape | |
| 1110 1 s | 0 | 5 |
| 0001 01 s | 0 | 6 |
| 1111 001 s | 1 | 3 |
| 0010 0110 s | 3 | 2 |
| 1111 010 s | 10 | 1 |
| 0010 0001 s | 11 | 1 |
| 0010 0101 s | 12 | 1 |
| 0010 0100 s | 13 | 1 |
| 0001 00 s | 0 | 7 |
| 0010 0111 s | 1 | 4 |
| 1111 1100 s | 2 | 3 |
| 1111 1101 s | 4 | 2 |
| 0000 0010 0 s | 5 | 2 |
| 0000 0010 1 s | 14 | 1 |
| 0000 0011 1 s | 15 | 1 |
| 0000 0011 01 s | 16 | 1 |

Table B.15 – DCT coefficients Table one (continued)

**Exhibit 15  Page 342**

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| |  |

| Variable length code (Note 1) | Run | Level |
|---|---|---|
| 1111 011 s | 0 | 8 |
| 1111 100 s | 0 | 9 |
| 0010 0011 s | 0 | 10 |
| 0010 0010 s | 0 | 11 |
| 0010 0000 s | 1 | 5 |
| 0000 0011 00 s | 2 | 4 |
| 0000 0001 1100 s | 3 | 3 |
| 0000 0001 0010 s | 4 | 3 |
| 0000 0001 1110 s | 6 | 2 |
| 0000 0001 0101 s | 7 | 2 |
| 0000 0001 0001 s | 8 | 2 |
| 0000 0001 1111 s | 17 | 1 |
| 0000 0001 1010 s | 18 | 1 |
| 0000 0001 1001 s | 19 | 1 |
| 0000 0001 0111 s | 20 | 1 |
| 0000 0001 0110 s | 21 | 1 |
| 1111 1010 s | 0 | 12 |
| 1111 1011 s | 0 | 13 |
| 1111 1110 s | 0 | 14 |
| 1111 1111 s | 0 | 15 |
| 0000 0000 1011 0 s | 1 | 6 |
| 0000 0000 1010 1 s | 1 | 7 |
| 0000 0000 1010 0 s | 2 | 5 |
| 0000 0000 1001 1 s | 3 | 4 |
| 0000 0000 1001 0 s | 5 | 3 |
| 0000 0000 1000 1 s | 9 | 2 |
| 0000 0000 1000 0 s | 10 | 2 |
| 0000 0000 1111 1 s | 22 | 1 |
| 0000 0000 1111 0 s | 23 | 1 |
| 0000 0000 1110 1 s | 24 | 1 |
| 0000 0000 1110 0 s | 25 | 1 |
| 0000 0000 1101 1 s | 26 | 1 |

(ITU-T Rec. H.262 2000E at 134-35.)

The claim language requires only that "the entries in the table [of Claim 12] each represent a number of bits in codes to be assigned to a video signal." The number of bits (i.e., the number of zeros, ones and the bit 's' which denotes the sign of the level) used for each combination (run-length and level) in the ITU-T Recommendation H.262 is identical to those for corresponding combinations in the table disclosed in Claim 12.

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| 13. The method of claim 12 wherein one or more MPEG-1 variable word-length codes are utilized when a received video signal has a combination of run-length and level for which there is no entry in said table. | See claim 11. |
| 14. The method of claim 12 | See claim 4. |

| '593 PATENT | ACCUSED PRODUCTS BASED ON H.262 STANDARD |
|---|---|
| further including a step of adaptively selecting a first or a second coding mode. | |
| 15. The method of claim 12 wherein said first coding mode utilizes variable word length coding entries in said table. | See claim 5. |
| 16. The method of claim 15 wherein said second coding mode utilizes Motion Pictures Expert Group Phase 1 compatible variable word-length coding. | See claim 6. |
| 17. The method of claim 16 wherein said step of adaptively selecting is responsive to a picture type received during said step of receiving video signals. | See claim 7. |
| 18. The method of claim 12 wherein said variable word-length coding is performed on a segment of the received video signal wherein said segment is selected from the group consisting of blocks, macroblocks, and pictures. | See claim 8. |

1   Dated:  September 10, 2007                By:  _____

2                                                John M. Desmarais (admitted pro hac vice)
                                                 Robert A. Appleby  (admitted pro hac vice)
3                                                Chanah Brenenson (admitted pro hac vice)
                                                 KIRKLAND & ELLIS LLP
4                                                153 East 53rd Street
                                                 New York, New York 10022
5                                                Telephone:  (212) 446-4800
                                                 Facsimile:  (212) 446-4900

6                                                Ephraim D. Starr (SBN 186409)
                                                 KIRKLAND & ELLIS LLP
7                                                777 South Figueroa Street
                                                 Los Angeles, California 90017-5800
8                                                Telephone:  (213) 680-8400
                                                 Facsimile:  (213) 680-8500

9
                                                 Alison P. Adema (SBN 149285)
10                                               HAHN & ADEMA
                                                 501 West Broadway, Suite 1600
11                                               San Diego, California  92101-3595
                                                 Telephone:  (619) 235-2100
12                                               Facsimile:  (619) 235-2101

13                                               Attorneys for *Multimedia Patent Trust*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 15  Page 345**



Alison P. Adema  (SBN 149285)
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101
Telephone:    (619) 235-2100
Facsimile:    (619) 235-2101

Ephraim D. Starr (SBN 186409)
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017-5800
Telephone:  (213) 680-8400
Facsimile:  (213) 680-8500

Attorneys for *Lucent Technologies Inc.*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MULTIMEDIA PATENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION, GATEWAY INC., GATEWAY PROFESSIONAL LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC, GATEWAY DIRECT, INC., GATEWAY U.S. RETAIL, INC., and DELL INC.,<br><br>Defendants. | Case No. 07-CV-0747 H (CAB)<br><br><br>**PROOF OF SERVICE** |
| MICROSOFT CORPORATION, GATEWAY INC., GATEWAY PROFESSIONAL LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC, GATEWAY DIRECT, INC., GATEWAY U.S. RETAIL, INC., and DELL INC.,<br><br>Third-Party Plaintiffs,<br><br>v.<br><br>LUCENT  TECHNOLOGIES, INC.<br><br>Third-Party Defendant. | |

Proof of Service                    **Exhibit 15  Page 346**                    Case No. 07-CV-0747 H (CAB)

1

**PROOF OF SERVICE**

2      I am a resident of the state of New Jersey the age of eighteen years, and not a party to the within action.  My business address is Kirkland & Ellis, 153 East 53 Street, New York, New York, 10022.

3

4      On September 10, 2007, I served the within documents:

5      **1.  MULTIMEDIA'S DISCLOSURE OF ASSERTED CLAIMS AND PRELIMINARY INFRINGEMENT CONTENTIONS**

6      by hand delivering the document(s) listed above in a sealed envelope addressed as set forth below.

7

8      by placing the document(s) listed above in a sealed envelope via United States Postal Service, with full pre-paid postage for first class mail, addressed as set forth below.

9      by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

10

11  X   by transmitting the document(s) listed above via electronic transmission to the addressee(s) as set forth below.  The transmission was reported completed without error.

12  Shekhar Vyas                          Jeffrey B. Plies
    **FISH & RICHARDSON P.C.**            **DECHERT LLP**
13  12390 El Camino Real                  300 West 6th Street, Suite 1850
    San Diego, CA  92130                  Austin, TX  78701
14  Telephone:    858-678-5070            Tel:    512-394-3000
    Facsimile:    858-678-5099            Fax:    512-394-3001
15  vyas@fr.com                           jeff.plies@dechert.com

16  Attorneys for *Microsoft Corp.*       Attorneys for *Gateway et al*

17  Ali Sharifahmadian
    **ARNOLD & PORTER LLP**
18  555 Twelfth Street, N.W.
    Washington, DC  20004-1206
19  Telephone:    202-942-6370
    Facsimile:    202-942-5999
20  Ali_sharifahmadian@aporter.com

21  Attorney for *Dell, Inc.*

22      I am familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with United States Postal Service, for facsimile, for electronic transmission, and for overnight delivery by Federal Express, Express Mail or other overnight service.

23

24

25      Executed on September 10, 2007, at New York, New York.

26                                        _____
                                          Michael Catanese
27

**COURTESY COPIES BY UNITED STATES POSTAL SERVICE TO:**

Counsel for Microsoft:
Shekhar Vyas
**FISH & RICHARDSON P.C.**
12390 El Camino Real
San Diego, CA  92130

Counsel for Gateway:
Jeffrey B. Plies
**DECHERT LLP**
300 West 6th Street, Suite 1850
Austin, TX  78701

Counsel for Dell:
Ali Sharifahmadian
**ARNOLD & PORTER LLP**
555 Twelfth Street, N.W.

**COURTESY COPIES BY ELECTRONIC MAIL TO:**

Counsel for Microsoft:
John E. Gartman
Christopher S. Marchese
**FISH & RICHARDSON P.C.**
12390 El Camino Real
San Diego, CA  92130
Telephone:     858-678-5070
Facsimile:     858-678-5099
Email: gartman@fr.com
          marchese@fr.com

Counsel for Gateway:
Bryan Farney
Lawrence Fluker
Steven Daniels
**DECHERT LLP**
300 West 6th Street, Suite 1850
Austin, TX  78701
Tel:     512-394-3000
Fax:     512-394-3001
Email: bryan.farney@dechert.com
          lawrence.fluker@dechert.com
          steven.daniels@dechert.com

Counsel for Dell:
James S. Blackburn
**ARNOLD & PORTER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017
Telephone:     213-243-4000
Facsimile:     213-243-4199
Email: james_blackburn@aporter.com

Joel Freed
**MCDERMOTT WILL & EMERY**

600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
Email: jfreed@mwe.com

Courtesy emails include:

| | | |
|---|---|---|
| X | **All documents filed served** | All pleadings filed or served were included in the email along with any exhibits. |
| | **Main Pleading documents (without exhibits)** | All main pleading documents were included in the email except for exhibits. Exhibits were over 50 pages long. As per our service agreement, a hard copy will follow via overnight mail. |

4

Error! Reference source not found.
PROOF OF SERVICE

Case No. **Error! Reference source not found.**

**Exhibit 15  Page 349**

Exhibit 16

Case 3:07-cv-00747-H-CAB   Document 58-2   Filed 11/20/2007   Page 185 of 417

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MULTIMEDIA PATENT TRUST, | Civil No.    07cv0747-H (CAB) |
| Plaintiff, | |
| v. | **CASE MANAGEMENT CONFERENCE ORDER REGULATING DISCOVERY AND OTHER PRETRIAL PROCEEDINGS** |
| MICROSOFT CORPORATION; GATEWAY, INC.; GATEWAY PROFESSIONAL LLC; GATEWAY COMPANIES, INC.; GATEWAY MANUFACTURING LLC; GATEWAY DIRECT, INC.; GATEWAY U.S. RETAIL, INC.; and DELL INC., | **(Fed. R. Civ. P. 16)**<br>**(Local Rule 16.1)**<br>**(Fed. R. Civ. P. 26)**<br>**(Patent Local Rules)** |
| Defendants. | |
| And related counterclaim. | |

On August 27, 2007, the Court held an Early Neutral Evaluation Conference.  The case did not settle.  Therefore, the Court sets the following pretrial dates, pursuant to Rule 16 of the Federal Rules of Civil Procedure and the Patent Local Rules:

1.     **Disclosure of Asserted Claims and Preliminary Infringement Contentions.**  On or before **September 10, 2007**, Plaintiff shall serve on all parties a "Disclosure of Asserted Claims and Preliminary Infringement Contentions."  Separately for each opposing party, the "Disclosure of Asserted Claims and Preliminary Infringement Contentions" must contain the following information:

a.     Each claim of each patent in the suit that is allegedly infringed by each opposing party;

07cv0747

**Exhibit 16  Page 350**

b.      Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware.  This identification must be as specific as possible.  Each product, device and apparatus must be identified by name or model number, if known.  Each method or process must be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;

c.      A chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality, including for each element that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function;

d.      Whether each element of each asserted claim is claimed to be literally present or present under the doctrine of equivalents in the Accused Instrumentality;

e.      For any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled; and

f.      If a party claiming patent infringement asserts that its own apparatus, product, device, process, method, act, or other instrumentality practices the claimed invention, the party must identify, separately for each asserted claim, each such apparatus, product, device, process, method, act, or other instrumentality that incorporates or reflects that particular claim.

2.      **Document Production Accompanying Disclosure.**  With the "Disclosure of Asserted Claims and Preliminary Infringement Contentions," the party claiming patent infringement must produce to each opposing party, or make available for inspection and copying, the following documents in the possession, custody and/or control of that party:

a.      Documents (e.g., contracts, purchase orders, invoices, advertisements, marketing materials, offer letters, beta site testing agreements, and third party or joint development agreements) sufficient to evidence each discussion with, disclosure to, or other manner of providing to a third party, or sale of or offer to sell, the claimed invention prior to the date of application for the patent in suit.  A party's production of a document as required herein does not constitute an admission that such document evidences or is prior art under 35 U.S.C. §102;

**Exhibit 16  Page 351**

1          b.      All documents evidencing the conception, reduction to practice, design, and

2 development of each claimed invention, which were created on or before the date of application for the

3 patent in suit or the priority date identified pursuant to Patent L.R. 3.1(e), whichever is earlier; and

4          c.      A copy of the file history for each patent in suit and each application to which a

5 claim for priority is made under Patent L.R. 3.1(e).

6       The producing party must separately identify by production number which documents correspond

7 to each category.

8       The party claiming patent infringement is required to use its best efforts to obtain the documents

9 to make a timely disclosure if the documents identified above are not in the possession, custody and/or

10 control of that party.

11      3.    **Preliminary Invalidity Contentions.**  On or before **November 9, 2007**, Defendants shall

12 serve on all parties its "Preliminary Invalidity Contentions" which must contain the following

13 information:

14          a.      The identity of each item of prior art that allegedly anticipates each asserted claim

15 or renders it obvious.  This includes information about any alleged knowledge or use of the invention in

16 this country prior to the date of invention of the patent.  Each prior art patent must be identified by its

17 number, country of origin, and date of issue.  Each prior art publication must be identified by its title,

18 date of publication, and where feasible, author and publisher.  Prior art under 35 U.S.C. §102(b) must be

19 identified by specifying the item offered for sale or publicly used or known, the date the offer or use took

20 place or the information became known, and the identity of the person or entity which made the use or

21 which made and received the offer, or the person or entity which made the information known or to

22 whom it was made known.  Prior art under 35 U.S.C. §102(f) must be identified by providing the name

23 of the person(s) from whom and the circumstances under which the invention or any part of it was

24 derived.  Prior art under 35 U.S.C. §102(g) must be identified by providing the identities of the person(s)

25 or entities involved in and the circumstances surrounding the making of the invention before the patent

26 applicant(s);

27          b.      Whether each item of prior art anticipates each asserted claim or renders it

28

1   obvious.  If a combination of items of prior art makes a claim obvious, each such combination must be

2   identified;

3           c.      A chart identifying where specifically in each alleged item of prior art each

4   element of each asserted claim is found, including for each element that such party contends is governed

5   by 35 U.S.C. §112(6), the identity of the structure(s), act(s), or material(s) in each item of prior art that

6   performs the claimed function;

7           d.      Any grounds of invalidity based on indefiniteness under 35 U.S.C. §112(2) of any

8   of the asserted claims; and,

9           e.      Any grounds of invalidity based on lack of written description, lack of enabling

10  disclosure, or failure to disclose the best mode under 35 U.S.C. §112(1).

11      4.      **Document Production Accompanying Preliminary Invalidity Contentions.**  With the

12  "Preliminary Invalidity Contentions," the party opposing a claim of patent infringement must produce or

13  make available for inspection and copying:

14          a.      Source code, specifications, schematics, flow charts, artwork, formulas, or other

15  documentation sufficient to show the operation of any aspects or elements of any Accused

16  Instrumentality identified by the patent claimant in the "Disclosure of Asserted Claims and Preliminary

17  Infringement Contentions;"

18          b.      A copy of each item of prior art identified in the Preliminary Invalidity

19  Contentions, which does not appear in the file history of the patent(s) at issue.  To the extent any such

20  item is not in English, an English translation of the portion(s) relied upon must be produced.

21      5.      **Exchange of Proposed Claim Constructions and Extrinsic Evidence.**

22          a.      On or before **April 18, 2008**, the parties shall simultaneously exchange a

23  preliminary proposed construction of each claim term, phrase, or clause which the parties have identified

24  for claim construction purposes.  Each such "Preliminary Claim Construction" will also for each element

25  which any party contends is governed by 35 U.S.C. §112(6), identify the structure(s), act(s), or

26  material(s) corresponding to that element.

27          b.      At the same time the parties exchange their respective "Preliminary Claim

28  Constructions," they must also provide a preliminary identification of extrinsic evidence, including

without limitation, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses they contend support their respective claim constructions. The parties must identify each such item of extrinsic evidence by production number or produce a copy of any such item not previously produced. With respect to any such witness, percipient or expert, the parties must also provide a brief description of the substance of that witness' proposed testimony.

        c.     On or before **May 2, 2008**, the parties shall simultaneously exchange "Responsive Claim Constructions" identifying whether the responding party agrees with the other party's proposed construction, or identify an alternate construction in the responding party's preliminary construction, or set forth the responding party's alternate construction.

        d.     At the same time the parties exchange their respective "Responsive Claim Constructions," they must also provide a preliminary identification of extrinsic evidence, including without limitation, dictionary definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses they contend support any responsive claim constructions. The parties must identify each such item of extrinsic evidence by production number or produce a copy of any such item not previously produced. With respect to any such witness, percipient or expert, the parties must also provide a brief description of the substance of that witness' proposed testimony.

        e.     The parties must thereafter meet and confer for the purposes of narrowing the issues and finalizing preparation of a Joint Claim Construction Chart, Joint Claim Construction Worksheet and Joint Hearing Statement.

     6.    **Joint Claim Construction Chart, Worksheet and Hearing Statement.** On or before **May 16, 2008**, the parties shall complete and file a Joint Claim Construction Chart, Joint Claim Construction Worksheet and Joint Hearing Statement.

        a.     The Joint Claim Construction Chart must have a column listing complete language of disputed claims with the disputed terms in bold type and separate columns for each party's proposed construction of each disputed term. Each party's proposed construction of each disputed claim term, phrase, or clause, must identify all references from the specification or prosecution history that support that construction and an identification of any extrinsic evidence known to the party on which it intends to rely either to support its proposed construction of the claim or to oppose any other party's

1  proposed construction of the claim, including, but not limited to, as permitted by law, dictionary

2  definitions, citations to learned treatises and prior art, and testimony of percipient and expert witnesses.

3           b.     The parties Joint Claim Construction Worksheet must be in the format set forth in

4  **Appendix A** and include any proposed constructions to which the parties agree, as well as those in

5  dispute.  The parties must jointly submit the Joint Claim Construction Worksheet on computer disk in

6  both Word and Wordperfect format or in such other format as the court may direct.

7           c.     The Joint Hearing Statement must include:

8                 1.     The anticipated length of time necessary for the Claim Construction

9  Hearing; and

10                 2.     Whether any party proposes to call one or more witnesses, including

11  experts, at the Claim Construction Hearing, the identity of each such witness, and for each expert, a

12  summary of each opinion to be offered in sufficient detail to permit a meaningful deposition of that

13  expert.

14           d.     At the Court's discretion, within five calendar days of the submission of the Joint

15  Claim Construction Chart, Joint Claim Construction Worksheet and Joint Hearing Statement, the Court

16  will hold a status conference with the parties, in person or by telephone, to discuss the schedule,

17  witnesses and any other matters regarding the Claim Construction Hearing.

18       7.     **Completion of Claim Construction Discovery.**  The parties shall complete all

19  discovery, including any depositions of any witnesses, including experts, the parties intend to use in the

20  Claim Construction Hearing by **June 13, 2008**.  Fed. R. Civ. P. 30 applies to depositions, except as to

21  experts.  An expert witness identified in a party's Joint Hearing Statement may be deposed on claim

22  construction issues.  The identification of said expert in the Joint Hearing Statement may be deemed

23  good cause for a further deposition on all substantive issues.

24       8.     **Claim Construction Briefs.**

25  _____a.     On or before **June 20, 2008**, the parties shall simultaneously file and serve

26  opening briefs and any evidence supporting their claim construction.

27

28

07cv0747

**Exhibit 16  Page 355**

b.  On or before **July 3, 2008**, the parties shall simultaneously file and serve briefs responsive to the opposing party's opening brief and any evidence directly rebutting the supporting evidence contained in the opposing party's opening brief.

9.  A Mandatory Settlement Conference shall be held on **July 25, 2008**, at **10:00 a.m.** in the chambers of Magistrate Judge Cathy Ann Bencivengo.  Counsel shall submit **confidential** settlement statements **directly to chambers** no later than **July 18, 2008**.  Each party's settlement statement shall set forth the party's statement of the case, identify controlling legal issues, concisely set out issues of liability and damages, and shall set forth the party's settlement position, including the last offer or demand made by that party, and a separate statement of the offer or demand the party is prepared to make at the settlement conference.  **Settlement conference briefs shall not be filed with the Clerk of the Court, nor shall they be served on opposing counsel.**

10.  Pursuant to Local Civil Rule 16.3, all party representatives and claims adjusters for insured defendants with full and unlimited authority[1] to negotiate and enter into a binding settlement, as well as the principal attorney(s) responsible for the litigation, must be present and legally and factually prepared to discuss and resolve the case at the mandatory settlement conference.  Retained outside corporate counsel shall not appear on behalf of a corporation as the party who has the authority to negotiate and enter into a settlement.  For good cause, and on *ex parte* application at least one day before the scheduled settlement conference, Magistrate Judge Bencivengo may excuse a party or representative from personal attendance provided such party or parties will be available by telephone during the conference.  Failure to attend the conference or obtain proper excuse will be considered grounds for sanctions.

---

[1]  "Full authority to settle" means that the individuals at the settlement conference must be authorized to fully explore settlement options and to agree at that time to any settlement terms acceptable to the parties. Heileman Brewing Co., Inc. v. Joseph Oat Corp., 871 F.2d 648 (7th Cir. 1989).  The person needs to have "unfettered discretion and authority" to change the settlement position of a party.  Pitman v. Brinker Intl., Inc., 216 F.R.D. 481, 485-486 (D. Ariz. 2003).  The purpose of requiring a person with unlimited settlement authority to attend the conference includes that the person's view of the case may be altered during the face to face conference.  Id. at 486.  A limited or a sum certain of authority is not adequate.  Nick v. Morgan's Foods, Inc., 270 F.3d 590 (8th Cir. 2001).

07cv0747

**Exhibit 16  Page 356**

1    11.    **Claim Construction Hearing.**  On **July 18, 2008**, the **Honorable Marilyn L. Huff** will

2    conduct a Claim Construction Hearing, to the extent that parties or the court believe a hearing is

3    necessary for construction of the claims at issue.

4    12.    **Final Contentions.**  Each party's "Preliminary Infringement Contentions" and

5    "Preliminary Invalidity Contentions" will be deemed to be that party's final contentions, except as set

6    forth below.

7    a.    If a party claiming patent infringement believes in good faith that the Court's

8    Claim Construction Ruling so requires, not later than 30 days after service by the Court of its Claim

9    Construction Ruling, that party may serve "Final Infringement Contentions" without leave of court that

10   amend its "Preliminary Infringement Contentions."

11   b.    Not later than 50 days after service by the Court of its Claim Construction Ruling,

12   each party opposing a claim of patent infringement may serve "Final Invalidity Contentions" without

13   leave of court that amend its "Preliminary Invalidity Contentions" if:  i) a party claiming patent

14   infringement has served "Final Infringement Contentions," or ii) the party opposing a claim of patent

15   infringement believes in good faith that the Court's Claim Construction Ruling so requires.

16   13.    **Amendment to Contentions.**  Amendment or modification of the Preliminary or Final

17   Infringement Contentions or the Preliminary or Final Invalidity Contentions, other than as expressly

18   permitted in the section above, may be made only by order of the court, which will be entered only upon

19   a showing of good cause.

20   14.    **Opinion of Counsel.**  Not later than 30 days after filing of the Claim Construction Order,

21   each party opposing a claim of patent infringement that will rely on an opinion must:

22   a.    Produce or make available for inspection and copying the opinion(s) and any other

23   documentation relating to the opinion(s) as to which that party agrees the attorney-client or work product

24   protection has been waived; and

25   b.    Serve a privilege log identifying any other documents, except those authored by

26   counsel acting solely as trial counsel, relating to the subject matter of the opinion(s) which the party is

27   withholding on the grounds of attorney-client privilege or work product protection.

28

07cv0747

**Exhibit 16  Page 357**

1    A party opposing a claim of patent infringement who does not comply with this requirement will

2    not be permitted to rely on an opinion of counsel as part of a defense to willful infringement absent a

3    stipulation of all parties or by order of the court, which will be entered only upon showing of good cause.

4          15.    On or before **August 22, 2008**, all parties shall exchange with all other parties a list of all

5    expert witnesses expected to be called at trial.  The list shall include the name, address, and phone

6    number of the expert and a brief statement identifying the subject areas as to which the expert is

7    expected to testify.  The list shall also include the normal rates the expert charges for deposition and trial

8    testimony.  On or before **September 12, 2008**, any party may supplement its designation in response to

9    any other party's designation so long as that party has not previously retained an expert to testify on that

10   subject.

11         16.    All fact discovery shall be completed on or before **November 14, 2008**.  All expert

12   discovery shall be completed on or before **February 6, 2009**.  *"Completed"* means that all discovery

13   under Rules 30-36 of the Federal Rules of Civil Procedure must be initiated a sufficient period of time in

14   advance of the cut-off date, so *that it may be completed* by the cut-off date, taking into account the times

15   for services, notice, and response as set forth in the Federal Rules of Civil Procedure.  All discovery

16   motions must be filed within 30 days of the service of an objection, answer or response which becomes

17   the subject of dispute or the passage of a discovery due date without response or production, and only

18   after counsel have met and conferred and have reached impasse with regard to the particular issue.

19         17.    Each expert witness designated by a party shall prepare a written report to be provided to

20   all other parties **no later than December 12, 2008**, containing the information required by Fed. R. Civ.

21   P. 26(a)(2)(A) and (B).

22         **Except as provided in the paragraph below, any party that fails to make these disclosures**

23   **shall not, absent substantial justification, be permitted to use evidence or testimony not disclosed**

24   **at any hearing or at the time of trial.  In addition, the Court may impose sanctions as permitted by**

25   **Fed. R. Civ. P.  37(c).**

26         18.    Any party, through any expert designated, shall in accordance with Fed. R. Civ. P.

27   26(a)(2)(C) and Fed. R. Civ. P. 26(e), supplement any of its expert reports regarding evidence intended

28

1    solely to contradict or rebut evidence on the same subject matter identified in an expert report submitted

2    by another party.  Any such supplemental reports are due on or before **January 8, 2009**.

3          19.     All motions, other than motions to amend or join parties, or motions in limine, shall be

4    **FILED** on or before **February 9, 2009**.  Please be advised that counsel for the moving party must obtain

5    a motion hearing date from the law clerk of the judge who will hear the motion.  Be further advised that

6    the period of time between the date you request a motion date and the hearing date may vary from one

7    judge to another.  Please plan accordingly.  For example, you should contact the judge's law clerk in

8    advance of the motion cut-off to calendar the motion.  Failure to make a timely request for a motion date

9    may result in the motion not being heard.

10       Briefs or memoranda in support of or in opposition to any pending motion shall not exceed 25

11    pages in length without permission of the judge who will hear the motion.  No reply memorandum shall

12    exceed 10 pages without leave of the judge who will hear the motion.

13          20.     Parties or their counsel shall serve on each other and file with the Clerk of the Court their

14    Memoranda of Contentions of Fact and Law in compliance with Local Rule 16.1(f)(2) on or before

15    **March 9, 2009**.

16          21.     All parties or their counsel shall also fully comply with the Pretrial Disclosure

17    requirements of Fed. R. Civ. P. 26(a)(3) on or before **March 9, 2009**.  **Failure to comply with these**

18    **disclosures requirements could result in evidence preclusion or other sanctions under Fed. R. Civ.**

19    **P. 37.**

20          22.     Counsel shall meet together and take the action required by Local Rule 16.1(f)(4) on or

21    **before March 16, 2009**.  At this meeting, counsel shall discuss and attempt to enter into stipulations and

22    agreements resulting in simplification of the triable issues.  Counsel shall exchange copies and/or display

23    all exhibits other than those to be used for impeachment.  The exhibits shall be prepared in accordance

24    with Local Rule 16.1(f)(4)(c).  Counsel shall note any objections they have to any other parties' Pretrial

25    Disclosures under Fed. R. Civ. P.  26(a)(3).  Counsel shall cooperate in the preparation of the proposed

26    pretrial conference order.

27          23.     The proposed final pretrial conference order, including objections they have to any other

28    parties' Fed. R. Civ. P. 26(a)(3) Pretrial Disclosures shall be prepared, served and lodged with the Clerk

07cv0747

**Exhibit 16  Page 359**

1 of the Court on or before **March 23, 2009**, and shall be in the form prescribed in and in compliance with

2 Local Rule 16.1 (f)(6).  Counsel shall also bring a court copy of the pretrial order to the pretrial

3 conference.

4       24.    The final pretrial conference shall be held before the **Honorable Marilyn L. Huff**,

5 United States District Judge, on **March 30, 2009**.

6       25.    The dates and times set forth herein will not be modified except for good cause shown.

7       26.    Plaintiff's counsel shall serve a copy of this order on all parties that enter this case

8 hereafter.

9

10 DATED:  November 1, 2007

11

12 _____

    **CATHY ANN BENCIVENGO**

13     United States Magistrate Judge

11

**Exhibit 16  Page 360**

APPENDIX A
APPROVED FORM OF
JOINT CLAIM CONSTRUCTION WORKSHEET

**Exhibit 16  Page 361**

CLAIM CONSTRUCTION WORKSHEET

| PATENT CLAIM | AGREED PROPOSED CONSTRUCTION | PLAINTIFF'S PROPOSED CONSTRUCTION | DEFENDANT'S PROPOSED CONSTRUCTION | COURT'S CONSTRUCTION |
|---|---|---|---|---|
| 1. Claim language as it appears in the patent **with terms and phrases to be construed in bold.** | Proposed construction if the parties agree. | Plaintiff's proposed construction if parties disagree. | Defendant's proposed construction if parties disagree. | Blank column for Court to enter its construction. |
| 2. Claim language as it appears in the patent **with terms and phrases to be construed in bold.** | Proposed construction if the parties agree. | Plaintiff's proposed construction if parties disagree. | Defendant's proposed construction if parties disagree. | Blank column for Court to enter its construction. |
| 3. Claim language as it appears in the patent **with terms and phrases to be construed in bold.** | Proposed construction if the parties agree. | Plaintiff's proposed construction if parties disagree. | Defendant's proposed construction if parties disagree. | Blank column for Court to enter its construction. |

**Exhibit 16  Page 362**

Exhibit 17

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| MPEG LA, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| ALCATEL LUCENT, | ) | |
| LUCENT TECHNOLOGIES, INC., and | ) | |
| MULTIMEDIA PATENT TRUST, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## VERIFIED COMPLAINT

Plaintiff MPEG LA, L.L.C. ("MPEG LA"), by and through its undersigned

attorneys, for its verified complaint in this action against defendants Alcatel Lucent ("Alcatel"),

Lucent Technologies, Inc. ("Lucent") and Multimedia Patent Trust (the "Trust"), alleges as

follows:

## NATURE OF THE ACTION

1.      MPEG LA, L.L.C. ("MPEG LA") brings this action for declaratory,

injunctive and other equitable relief due to Alcatel's unjust enrichment and intentional breach of

several contractual commitments made by Alcatel in the course of Alcatel becoming a Licensor

in the MPEG-2 patent portfolio licensing program.  The other defendants, Lucent and the Trust,

have also been unjustly enriched and participated in and aided and abetted Alcatel in its effort to

avoid its clear contractual obligations.  In short, Alcatel promised to make available to licensees

around the world through the MPEG-2 Patent Pool licensing program (the "MPEG-2 Pool") all

MPEG-2 essential patents which Alcatel can license or sublicense – and not to take any action to

subvert that commitment.  Rather than abide by this promise, Alcatel and Lucent created the

**Exhibit 17  Page 363**

Trust to hold patents that Alcatel was and is required to place in the MPEG-2 Pool. As a result of this sham, Alcatel has taken the indefensible position that the essential MPEG-2 patents purportedly transferred to the Trust cannot be placed in the MPEG-2 Pool.

2.      On November 30, 2006 Alcatel and Lucent merged. As a result of that merger, Alcatel and Lucent admit that the essential MPEG-2 patents owned by Lucent would have become subject to Alcatel's commitment to place all essential MPEG-2 patents – including the Lucent essential patents acquired by the merger – into the MPEG-2 Pool. Rather than abide by this obligation, Alcatel and Lucent conspired to create a scheme to avoid Alcatel's commitment.

3.      Under the secret plan agreed to by Lucent and Alcatel, the Lucent MPEG-2 essential patents were purportedly transferred to the Trust two days before the Alcatel/Lucent merger closed. By this transfer, Alcatel and Lucent intended to avoid Alcatel's commitment to place the Lucent MPEG-2 patents into the MPEG-2 Pool. The patents were transferred to the Trust with Alcatel's agreement and consent, and the only purpose of the transfer was to avoid Alcatel's contractual commitment. Alcatel is entitled to receive 99% of any income received by the Trust.

4.      Defendants have been unjustly enriched as a result of their improper conduct. Rather than provide access to the Lucent essential patents through the MPEG-2 Pool, as required by Alcatel's contractual commitments, Alcatel, Lucent and the Trust have sought to extract additional royalties from MPEG-2 licensees for their use of MPEG-2 technology by means of litigation and otherwise. The MPEG-2 Pool licensees which are the targets of this effort at harassment are entitled to a license under the Lucent patents through their MPEG-2 licenses. If allowed to continue such course of action in breach of its commitment, Alcatel

**Exhibit 17  Page 364**

would continue to receive its share of royalty revenue under the MPEG-2 Pool while unreasonably coercing any or all of the more than 1,300 MPEG-2 licensees to pay additional royalties under the MPEG-2 patents Alcatel has unfairly, and in violation of its commitment, held out of the MPEG-2 Pool. Doing so not only violates the rights of MPEG LA and all MPEG-2 Pool Licensors, but also threatens to interfere with the rights of more than 1,300 licensees who expect that all Licensor MPEG-2 essential patents will be made available through the MPEG-2 Pool, and that they will not be subject to demands by Licensors such as Alcatel for additional royalties on MPEG-2 essential patents. Alcatel's and Lucent's scheme to enrich themselves unjustly at the expense of MPEG LA and the MPEG-2 licensees should not be permitted, and injunctive relief should issue to prevent this conduct from continuing. Alcatel and Lucent should also be held to account for any profits they have made as a result of their improper conduct.

5.     Rather than honor its contractual commitments to MPEG LA, other MPEG-2 Licensors, and to more than 1,300 licensees, Alcatel flagrantly and intentionally broke its promises to the detriment of MPEG LA and other parties. MPEG LA, by this action, seeks, among other things, to have Alcatel abide by the promises it made and to live up to its clear and unambiguous commitments.

The Parties

6.     MPEG LA is a Delaware limited liability company with offices in Chevy Chase, Maryland. MPEG LA is the world leader in offering technology patent portfolio licenses as alternative means by which those wishing to use such technology can acquire certain identified worldwide patent rights necessary to lawfully use such technology in a single pool

**Exhibit 17  Page 365**

license.  In addition to the MPEG-2 technology, MPEG LA offers patent portfolio licenses based on ATSC, AVC, VCI, MPEG-4, DVB-T, and IEEE 1394 technologies.

   7. Alcatel is a corporation established in 1898 under the laws of France.  On November 30, 2006, in connection with the merger of Lucent, Alcatel changed its name to Alcatel-Lucent.  Alcatel joined the MPEG-2 Pool as a patent licensor in March of 2003.  Alcatel participated in the creation of the Trust in Delaware to, among other things, cause wrongful acts toward MPEG LA.

   8. Lucent is a Delaware corporation.  It was a participant in the original effort to form the MPEG-2 Pool, although it later broke its agreement to join the MPEG-2 Pool.

   9. The Trust is an irrevocable Delaware Statutory Trust organized by Agreement executed on November 21, 2006, with certificate of Trust issued on November 28, 2006.  Lucent is a 99% beneficiary of the Trust, with the remaining 1% (with certain limitations) being held by Lucent Technologies Foundation.  For all intents and purposes, Alcatel controls the Trust and the Trust now operates wholly for Alcatel's benefit.

The MPEG-2 Patent Portfolio Licensing Program

   10. The MPEG-2 Patent Portfolio licensing program began in 1997 after the United States Department of Justice Antitrust Division issued a favorable business review letter, concluding that the MPEG-2 licensing program had "features designed to enhance the usual procompetitive effects [of patent pool licensing] and mitigate potential anticompetitive dangers." (Letter of Assistant Attorney General Joel Klein to Garrard R. Beeney, at 9.)  The business review letter was sought by several original Licensors in the MPEG-2 program as well as by defendant Lucent.  In connection with the organization of the program, Lucent had been determined to own one or more patents essential to MPEG-2 technology.  Notwithstanding its

**Exhibit 17  Page 366**

substantial role in organizing the MPEG-2 Pool and, indeed, MPEG LA itself, Lucent at the last moment decided not to join the MPEG-2 Pool. Prior to abandoning the Pool, however, Lucent had given every indication that it would become a Licensor and under that guise required other licensors to make concessions in terms of the formation of the MPEG-2 Pool and its licensing policies and practices.

11.     While Lucent was still a participant in forming the Pool and in connection with obtaining the favorable business review letter from the U.S. Department of Justice, Lucent and other applicants represented to the United States Government that Licensors in the MPEG-2 licensing program would grant to MPEG LA "the non exclusive right to sublicense all their essential patents" (Letter from Garrard R. Beeney to the Hon. Joel I. Klein ("Letter") at 17) and that "a structure has been devised . . . . to include at a later date [in the MPEG-2 Pool] any other patents that are deemed essential." The promise by Lucent and others that the MPEG-2 Pool would include all essential patents was repeated by Alcatel in 2003 when Alcatel joined the MPEG-2 Pool.

12.     In addition, in connection with obtaining the favorable business review letter, Lucent and other applicants represented to the United States Government that placing as many essential MPEG-2 patents into the MPEG-2 Pool as possible would be procompetitive and create numerous efficiencies. (Letter at 2.) By failing to place the Lucent essential MPEG-2 patents into the MPEG-2 Pool, defendants have acted contrary to those representations in the Letter.

13.     The MPEG-2 patent portfolio license offered to users of MPEG-2 technology around the world provides a license under hundreds of patents necessary to the implementation of the MPEG-2 technology. The single license constitutes an efficient and pro-

**Exhibit 17  Page 367**

competitive means by which users of MPEG-2 technology can elect – as an alternative to

negotiating individual licenses from individual patent holders – to obtain in a single pool license

rights to hundreds of patents necessary to the implementation and use of MPEG-2.  MPEG-2 is a

digital compression technology used in DVDs, set top boxes, PCs and other devices.

   14. There are currently more than 1,300 licensees who have executed the

standard MPEG-2 patent portfolio license.  While the program began with eight Licensors, it has

been expanded to twenty-three.  Each Licensor, including Alcatel promises that any MPEG-2

essential patent which can be licensed by it or its affiliates will be contributed to the MPEG-2

Pool now and in the future.

   15. The MPEG-2 Licensing Program is defined by four contracts:  an

Agreement Among Licensors ("AAL"), a Licensing Administrator Agreement ("LAA"), an

MPEG-2 Patent Portfolio License ("PPL") and a License from Licensors to the Licensing

Administrator ("License").  When Alcatel joined the MPEG-2 licensing program in 2003, it duly

executed the License, the LAA and the AAL.  Alcatel also executed the PPL as a licensee.

The Promises Made by Alcatel

   16. In the LAA, Alcatel agreed that it and other Licensors had granted

MPEG LA a worldwide license "under all MPEG-2 Essential Patents licensable or

sublicensable" by Alcatel with a right of MPEG LA to sublicense such essential patents in the

PPL.  (LAA, 4th WHEREAS clause, p. 2.)

   17. Alcatel also "represent[ed] and warrant[ed]" in the LAA to MPEG LA that

Alcatel has not made and shall not make any outstanding agreements, assignments or

encumbrances inconsistent with the provisions of this Agreement." (LAA § 7.1(a) (emphasis

added)).  Among the "provisions of the Agreement" are the obligations of Alcatel to grant to

6

**Exhibit 17  Page 368**

MPEG LA a license with a right to sublicense all MPEG-2 Essential Patents licensable by

Alcatel now or in the future (WHEREAS clause p. 2).

      18.    Alcatel also agreed in Section 4.1 of the LAA to "fully and in good faith

cooperate with the Licensing Administrator in connection with the subject matter of this

Agreement and to enable the Licensing Administrator to carry out its obligations under the

Agreement." ((LAA § 4.1 (emphasis added)).  The "subject matter" of the LAA and the

obligation of the Licensing Administrator under the LAA include the obligations to offer to

licensees a license under all essential patents licensable by Licensors.

      19.    Alcatel also represent[ed] and warrant[ed] in Section 7.1(c) of the LAA

that it would "comply with all applicable laws . . . pertaining to its performance hereunder."

(LAA, § 7.1(c)).  This representation and warranty included Alcatel's promise not to breach its

contractual obligation regarding its participation in the MPEG-2 Pool, including the promises

made by Alcatel to other Licensors in the AAL.

      20.    In the AAL, Alcatel made additional promises and commitments to other

MPEG-2 Licensors.  Among other things, Alcatel promised to "grant to [MPEG LA] a

worldwide, nonexclusive, nontransferable license or sublicense under all MPEG-2 Essential

Patent(s) which [Alcatel] and its Affiliates, if any, presently or in the future have the right to

license or sublicense. . . ." (AAL, § 2.3 (emphasis added)).

      21.    Alcatel also executed the PPL and made several commitments to

MPEG LA in the PPL, including that Alcatel would

> "grant a worldwide, nonexclusive license and/or sublicense under
> any and all MPEG-2 Essential Patent(s) that [Alcatel] or its
> Affiliates, if any, have the right to license and/or sublicense, to any
> Licensor or any sublicensee of [MPEG LA] desiring such a license
> and/or sublicense on fair and reasonable terms and conditions.  For
> purposes of this Section 7.3 only, the Licensors' per patent share of

7

**Exhibit 17  Page 369**

royalties payable pursuant to Section 3.1 of this Agreement shall
be presumed to be a fair and reasonable royalty rate for the
aforementioned license and/or sublicense to be granted by
[Alcatel]."

22.    The Lucent essential MPEG-2 patents currently held by the Trust are

licensable and/or sublicensable by Alcatel and its Affiliates as that term is defined in the PPL.

23.    On information and belief, defendants are seeking royalties under the

Lucent essential MPEG-2 Patents from MPEG-2 Pool licensees through litigation and otherwise

in the amount of .5% or $1.50 for every computer system.  Such amount grossly exceeds the

"Licensors' per patent share of royalties."  (PPL, § 7.3.)

24.    In the License, Alcatel granted to MPEG LA a license under all Alcatel

essential patents, and promised that

"If during the term of this Agreement, [Alcatel] acquires rights to
grant licenses under additional MPEG-2 Essential Patent(s),
Attachment 1 of this Agreement will be supplemented to include
such additional MPEG-2 Essential Patent(s). (License, § 7.5.1).

Attachment 1 to the License lists patents licensed by Alcatel to MPEG LA.  The License

continues in full force and effect.

25.    Consequently, in the contracts that define the MPEG-2 Pool and in

representations to the United States Government, it was clear that all Licensors, including

Alcatel, would contribute to the MPEG-2 Pool all essential MPEG-2 patents such Licensor had

or will have the right to sublicense.  The Licensors, including Alcatel, further agreed that they

would not in the future enter into any agreement that would be inconsistent with the obligations

to contribute all MPEG-2 essential patents into the MPEG-2 Pool now or in the future.  (*See,*

*e.g.,* LAA ¶ 7.1(a).)

8

**Exhibit 17  Page 370**

Alcatel's and Lucent's Scheme to Avoid Alcatel's Obligations

      26.    On April 2, 2006 – approximately three years after Alcatel made the promises referred to above – Lucent and Alcatel entered into an Agreement and Plan of Merger ("Merger Agreement"). Ultimately, Lucent was merged into and effectively became a wholly-owned subsidiary of Alcatel.

      27.    Both Lucent and Alcatel were well aware of the nature of the MPEG-2 Pool and Alcatel's commitments to add to the MPEG-2 Pool all essential patents. Alcatel and Lucent both recognized that upon consummation of the transactions contemplated by their Merger Agreement, the Lucent MPEG-2 essential patents would become subject to Alcatel's commitment to MPEG LA to place such patents into the MPEG-2 Pool. Rather than abide by this admitted obligation, Alcatel and Lucent exerted significant effort and set out to craft a scheme whereby Alcatel would breach its obligations to MPEG LA, to all other MPEG-2 Licensors, to the more than 1,300 MPEG-2 licensees, and to refute promises made to the United States Government by Lucent. Such promises were later adopted by Alcatel.

      28.    After examining several options, the Lucent essential patents were secretly transferred to the Trust on November 28, 2006. Alcatel and Lucent attempted to keep this purported transfer confidential even to the point of limiting information about this scheme within the companies. Indeed, in a public filing with the United States Securities and Exchange Commission on April 7, 2006, Lucent represented that "the way the proposed merger is structured, all of the patents will continue to be owned by Lucent and its subsidiaries." Lucent also represented to its shareholders in a publicly filed proxy statement on April 4, 2006 that "the 2 companies will combine their patent portfolio."

9

**Exhibit 17  Page 371**

29.     Notwithstanding those public statements on which third parties were entitled to rely, Alcatel and Lucent consummated their secret plan to avoid Alcatel's contractual commitment and purportedly transfer the Lucent MPEG-2 essential patents to the Trust on November 28, 2006. Alcatel and Lucent merged two days later.

30.     Because Alcatel and Lucent had agreed in April of 2006 that Lucent would not transfer any material assets – including the Lucent MPEG-2 essential patents – Alcatel had the ability to prevent the transfer of the patents to the Trust in November of 2006. Far from doing so, Alcatel conspired and consented to the transfer of the patents into the Trust, and freely participated in the planning and process by which the purported transfer was achieved. By failing to exercise its ability to stop the MPEG-2 essential patents from being placed in the Trust, Alcatel breached its various contractual commitments.

31.     As a result of Alcatel's failure to abide by its contractual commitments, defendants have continued to harass and file litigation against MPEG-2 Pool licensees. If allowed to continue their behavior, each of the more than 1,300 MPEG-2 Pool licensees would be subject to defendants' attempt to extract license royalties over and above what Alcatel is entitled to receive as a result of being a member of the MPEG-2 Pool. By Lucent's own estimate, the amount of additional and unjustifiable royalties defendants are seeking from just three of the 1,300 MPEG-2 Pool licensees amounts to between $240 million and $2.047 billion.

32.     Lucent and Alcatel (as a result of the merger) both have control over the Trust. Among other things, they can remove each of the trustees of the Trust with or without cause, they can grant or withhold consent over the disposition of the patents – including the essential MPEG-2 patents secretly placed in the Trust, they can appoint successor trust advisors, and they can renew or not renew the appointment of the Trust Advisor. Alcatel and Lucent have

10

Exhibit 17  Page 372

the ability to direct all trustees of the Trust – or to replace them if they fail to carry out such instructions – to place the MPEG-2 essential patents held by the Trust into the MPEG-2 Pool as required by Alcatel's contractual commitments.

33.    Alcatel has refused to abide by its commitments and has actively sought to evade them by the establishment of the Trust.  MPEG LA seeks the aid of this Court to require Alcatel to abide by its obligations, to prevent the defendants' unjust enrichment, to cause the MPEG-2 essential patents purportedly held by the Trust to be placed into the MPEG-2 Pool, and to issue such other equitable or injunctive relief as is necessary to remedy defendants' improper conduct.

## FIRST CAUSE OF ACTION

### (Breach of Contract against Alcatel — LAA §§ 4.1, 7.1(a), 7.1(c))

34.    MPEG LA repeats and re-alleges paragraphs 1 through 33 as if fully set forth in this paragraph.

35.    The LAA is a valid and binding contract between MPEG LA and Alcatel enforceable by MPEG LA.

36.    In consideration for MPEG LA's agreement to offer, issue, administer and enforce MPEG-2 patent portfolio licenses for the benefit of Alcatel, among others, Alcatel agreed, as one of its primary obligations under the LAA, "to use commercially reasonable best efforts to fully and in good faith cooperate with [MPEG LA] in connection with the subject matter of [the LAA] and to allow [MPEG LA] to carry out its obligations."  (LAA § 4.1.)

37.    Alcatel also agreed and warranted (a) that it would not "make any outstanding agreements, assignments or encumbrances inconsistent with the provisions of [the LAA]" (LAA § 7.1(a)), and (b) that it would "comply with all applicable laws, regulations and ordinances pertaining to its performance" under the LAA (LAA § 7.1(c)).

11

**Exhibit 17  Page 373**

38.    At all relevant times, MPEG LA has duly performed all material conditions, covenants and promises on its part to be performed under the LAA.

39.    As set forth herein, despite MPEG LA's diligent fulfillment of its obligations, Alcatel has:

a.    breached its obligation to fully and in good faith cooperate with MPEG LA to achieve the ends of the MPEG-2 licensing program, and instead worked to defeat the purposes of and circumvent its agreements by creating and agreeing to a scheme to deprive MPEG LA of the full benefit of the contract;

b.    entered into agreements, assignments and encumbrances with Lucent and the Trust inconsistent with the provisions of the LAA; and

c.    breached its obligation to comply with the private law created by the other MPEG LA agreements, including the AAL and the more than 1,300 executed PPLs, pertaining to its performance under the LAA.

40.    By so depriving MPEG LA of its sublicensing rights to certain MPEG-2 essential patents, Alcatel has breached its agreement, caused MPEG LA irreparable harm and deprived MPEG LA of unique and irreplaceable benefits of the LAA.

41.    MPEG LA has no adequate remedy at law for Alcatel's multiple and ongoing breaches of the LAA.

42.    MPEG LA is entitled to declaratory relief and specific performance as against Alcatel deeming, ordering and declaring that the Lucent MPEG-2 patents purportedly transferred to the Trust are governed by and subject to the terms of the LAA and are part of Alcatel's contribution to patents licensed through the MPEG-2 Pool.

12

**Exhibit 17  Page 374**

## SECOND CAUSE OF ACTION

### (Breach of Contract against Alcatel — License Art. 2, § 7.5.1)

43.    MPEG LA repeats and re-alleges paragraphs 1 through 42 as if fully set forth in this paragraph.

44.    The License is a valid and binding contract between MPEG LA and Alcatel enforceable by MPEG LA

45.    In consideration of obligations to offer sublicenses and other commitments by MPEG LA, Alcatel agreed in the License to grant MPEG LA a license with the right to sublicense all MPEG-2 essential patents owned or otherwise licensable or sublicensable by Alcatel (License Art. 2).  Alcatel further agreed to supplement the License with the rights to any additional MPEG-2 essential patents to which it subsequently acquired right to license (License § 7.5.1), which includes the patent rights Alcatel was entitled to acquire and did acquire through its merger with Lucent.

46.    At all relevant times, MPEG LA has duly performed all material conditions, covenants and promises on its part to be performed under the License.

47.    As set forth above, despite MPEG LA's fulfillment of its obligations to Alcatel, Alcatel entered into a scheme to deprive MPEG LA of its rights under the License, and has maintained that MPEG LA is not licensed to the MPEG-2 essential patents it acquired through its acquisition of Lucent.

48.    By depriving MPEG LA of its right to sublicense the Lucent MPEG-2 patents as part of the MPEG-2 Pool, Alcatel has breached its agreement, caused MPEG LA irreparable harm and deprived MPEG LA of a unique and irreplaceable benefit of the agreement.

49.    MPEG LA has no adequate remedy at law for Alcatel's multiple and ongoing breaches of the License.

13

**Exhibit 17  Page 375**

50.     MPEG LA is entitled to declaratory relief and specific performance as against Alcatel deeming, ordering and declaring that the MPEG-2 patents purportedly transferred to the Trust in violation of Alcatel's agreement are governed by and subject to the terms of the License and part of Alcatel's contribution to patents licensed through the MPEG-2 Pool.

## THIRD CAUSE OF ACTION

### (Breach of Contract Against Alcatel — PPL § 7.03)

51.     MPEG LA repeats and re-alleges paragraphs 1 through 50 as if fully set forth in this paragraph.

52.     The PPL is a valid and binding contract between MPEG LA and Alcatel enforceable by MPEG LA.

53.     In consideration of sublicensing numerous patents and other commitments by MPEG LA, Alcatel agreed in Section 7.3 of the PPL that it would license or sublicense to all MPEG-2 Pool Licensors and licensees all MPEG-2 essential patents licensable by Alcatel and its Affiliates on fair and reasonable terms and conditions.

54.     Section 7.3 of the PPL further specified that the fair and reasonable royalty to be charged for such license or sublicense by Alcatel shall be presumed to be "the Licensor's" per patent share of royalties in the MPEG-2 Pool.

55.     The Lucent essential MPEG-2 patents are licensable by Alcatel, Lucent and the Trust. Lucent and the Trust are "affiliates" of Alcatel as that term is defined in the PPL.

56.     Alcatel has refused to license the Lucent essential MPEG-2 patents to MPEG-2 licensees on fair and reasonable terms that Alcatel agreed to provide in the PPL, in breach of its obligation under § 7.3 of the PPL.

57.     At all relevant times, MPEG LA has duly performed all material conditions, covenants and promises on its part to be performed under the PPL.

14

**Exhibit 17  Page 376**

58.    MPEG LA has no adequate remedy at law for Alcatel's ongoing breach of the PPL.

59.    MPEG LA is entitled to declaratory relief and specific performance as against Alcatel deeming, ordering and declaring that Alcatel shall take such steps as are necessary to cause Lucent and the Trust to license the Lucent essential MPEG-2 patents in accordance with Alcatel's obligation under § 7.3 of the PPL.

## FOURTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing against Alcatel)

60.    MPEG LA repeats and re-alleges paragraphs 1 through 59 as if fully set forth in this paragraph.

61.    Alcatel agreed that the LAA and License would be governed by New York law.  Pursuant to New York law, both agreements contain implied covenants of good faith and fair dealing.

62.    As set forth above, through its scheme to purportedly secrete the Lucent MPEG-2 patents in the Trust, Alcatel sought to destroy or injure MPEG LA's right to receive the fruits of the LAA and License and to withhold the benefits of those contracts from MPEG LA.

63.    Alcatel's carefully orchestrated scheme to avoid its contractual obligations does not conform to the requirement of good faith and fair dealing in contractual performance as required by New York law.

64.    Because of Alcatel's breach of the covenant of good faith and fair dealing, MPEG LA has been deprived of substantial benefits of its contracts with Alcatel.

65.    At all relevant times, MPEG LA has duly performed all material conditions, covenants and promises on its part to be performed under the LAA and License.

15

**Exhibit 17  Page 377**

66.    MPEG LA has no adequate remedy at law for Alcatel's breach of the covenant of good faith and fair dealing.

67.    MPEG LA is entitled to declaratory relief and specific performance as against Alcatel deeming, ordering and declaring that the MPEG-2 patents purportedly transferred to the Trust in violation of Alcatel's obligation of good faith and fair dealing are governed by and subject to the terms of the License and part of Alcatel's contribution to patents licensed through the MPEG-2 Pool.

### FIFTH CAUSE OF ACTION

**(Declaratory Judgment and Injunctive Relief:  Control of Trust)**

68.    MPEG LA repeats and re-alleges paragraphs 1 through 67 as if fully set forth in this paragraph.

69.    There exists an actual and justiciable controversy concerning whether Alcatel exercises control over the Trust such that it the patents held by the Trust are licensable by Alcatel and subject to its agreements with MPEG LA.

70.    Pursuant to 10 Del. Code § 6501 *et seq.*, MPEG LA seeks a declaratory judgment binding upon Alcatel, Lucent and the Trust that the essential MPEG-2 patents held by the Trust are subject to the control of, and therefore licensable or sublicensable by, Alcatel, and that MPEG LA has been granted a non-exclusive license to those patents pursuant to its agreements with Alcatel.  In the alternative, MPEG LA seeks the issuance of a mandatory injunction requiring Alcatel and/or Lucent to instruct the trustees of the Trust to cause the Trust to license to MPEG LA the essential MPEG-2 patents held by the Trust.

16

**Exhibit 17  Page 378**

## SIXTH CAUSE OF ACTION

### (Equitable and Injunctive Relief Based on Sham Transaction)

71.     MPEG LA repeats and re-alleges paragraphs 1 through 70 as if fully set forth in this paragraph.

72.     As set forth above, the Trust was created as part of an improper sham transaction to deprive MPEG LA of its rights under its contract with Alcatel.

73.     On information and belief, despite the assumption of the corporate form of an irrevocable Delaware statutory trust, the Trust is, and at all times has been, under the complete domination and control of Lucent and its parent Alcatel.

74.     Because the trust was created for an improper and wrongful purpose and is under the domination and control of Alcatel and Lucent, MPEG LA seeks injunctive or equitable relief requiring defendants to cause the MPEG-2 patents ostensibly owned by the Trust to be licensed to MPEG LA according to the obligations of Alcatel under its agreements with MPEG LA.

75.     MPEG LA lacks an adequate remedy at law.

### SEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

76.     MPEG LA repeats and re-alleges paragraphs 1 through 75 as if fully set forth in this paragraph.

77.     Defendants were unjustly enriched by (a) Alcatel and Lucent's improper scheme, carried out through the artifice of the Trust, to secrete Lucent's essential MPEG-2 patents on the eve of Lucent's acquisition by Alcatel; and (b) any royalties on Lucent's essential MPEG-2 patents improperly received since November 30, 2006 ("Royalties").

17

**Exhibit 17  Page 379**

78.     The unjust enrichment of defendants by their secretion of the MPEG-2 patents was to the detriment and expense of MPEG-2 and all MPEG-2 Pool licensees who paid Royalties in light of Alcatel's obligation to make these patents available to MPEG LA and to MPEG-2 sublicensees as part of the MPEG-2 Pool in accordance with its obligations to MPEG LA, the other licensors and the sublicensees.

79.     Alcatel, Lucent and the Trust created and agreed to the foregoing scheme expressly for the wrongful purpose of aiding and abetting Alcatel's violation of its contractual obligations to MPEG LA, through which Alcatel would receive 99% of the income of the Trust.

80.     The Trust's retention of the exclusive right to license the Lucent essential MPEG-2 patents in these circumstances and defendant's retention of any Royalties paid would be unjust.

81.     MPEG LA has no adequate remedy at law.

82.     Equity demands that relief issue to prevent defendants' unjust enrichment and that a constructive trust in favor of MPEG LA be imposed on all MPEG-2 essential patents purportedly transferred to the Trust and any Royalties paid to allow MPEG LA to sublicense such patents in the MPEG-2 Pool and properly redistribute any such Royalties.

## EIGHTH CAUSE OF ACTION

### (Tortious Interference with Contract against Lucent and the Trust)

83.     MPEG LA repeats and re-alleges paragraphs 1 through 82 as if fully set forth in this paragraph.

84.     The LAA and License are valid and enforceable contracts between MPEG LA and Alcatel.

85.     At all relevant times, Lucent and the Trust were aware of Alcatel's obligations under its contracts with MPEG LA.

18

**Exhibit 17  Page 380**

86.     As set forth above, on or around April 2, 2006, Alcatel and Lucent entered into a merger agreement that precluded Lucent from transferring or assigning any material assets, including the MPEG-2 essential patents, absent Alcatel's permission.

87.     After entering into the merger agreement, Alcatel and Lucent announced publicly and, on information and belief, informed the Department of Justice, the Federal Trade Commission, the Securities and Exchange Commission and other governmental agencies and regulators that they would continue to hold Lucent's patents following the merger, making all Lucent's essential MPEG-2 patents subject to obligations to MPEG LA, the other MPEG-2 licensors and the MPEG-2 portfolio licensees.

88.     As set forth above, despite express knowledge of Alcatel's obligations to MPEG LA, Lucent and the Trust, prior to the consummation of the Lucent-Alcatel merger, intentionally, maliciously and through wrongful means entered into an improper scheme with Alcatel to use the Trust as a vehicle to defeat MPEG LA's contractual rights.

89.     Through the foregoing actions, Lucent and the Trust interfered with and induced the breach of the LAA and License by Alcatel, and MPEG LA was damaged and irreparably harmed thereby.

90.     MPEG LA is therefore entitled to the issuance of equitable and/or injunctive relief necessary to remedy these defendants' tortious interference with contracts between MPEG LA and Alcatel.

91.     MPEG LA lacks an adequate remedy at law.

## NINTH CAUSE OF ACTION

### (Tortious Interference with Prospective Economic Advantage)

92.     MPEG LA repeats and re-alleges paragraphs 1 through 91 as if fully set forth in this paragraph.

19

**Exhibit 17  Page 381**

93.     As set forth above, on and after April 2, 2006, Alcatel and Lucent made numerous representations to the public and regulators that Alcatel would hold, through Lucent or otherwise, among other things, Lucent's MPEG-2 patent rights, after its merger with Lucent was finalized.

94.     Additionally, the terms of the MPEG LA agreements, including the LAA, License, AAL and more than 1,300 PPLs, provided a reasonable expectation that because of Alcatel's obligations to the MPEG-2 stakeholders, the merger agreement would result in the Lucent patent rights becoming part of the MPEG-2 Pool.

95.     The addition of Lucent's MPEG-2 essential patents to the MPEG-2 Pool would make the MPEG-2 Pool and the PPL offered by MPEG LA more valuable and attractive to prospective licensees.

96.     Alcatel, Lucent and the Trust were aware of MPEG LA's reasonable expectation of prospective economic advantage in attaining the rights to the Lucent MPEG-2 patents for inclusion in the MPEG-2 Pool.

97.     As set forth above, after entering into an agreement to merge with Alcatel that precluded Lucent from transferring material assets – including essential MPEG-2 patents – without Alcatel's permission, Alcatel and Lucent intentionally, maliciously and through wrongful means entered into an improper scheme to use the Trust as a vehicle to defeat MPEG LA's reasonable business expectation that the Lucent essential MPEG-2 patents would become part of the MPEG-2 Pool on completion of the Alcatel-Lucent merger.

98.     Through the foregoing actions, Alcatel and Lucent interfered with MPEG LA's prospective economic advantage, and MPEG LA was thereby irreparably harmed and damaged as a result.

**Exhibit 17  Page 382**

99.     MPEG LA is therefore entitled to damages and to the issuance of equitable and/or injunctive relief necessary to remedy these defendants' tortious interference with MPEG LA's prospective economic advantage.

100.     MPEG LA lacks an adequate remedy at law.

## DEMAND FOR JUDGMENT

WHEREFORE, plaintiff MPEG LA demands that judgment be entered against defendants as follows:

A.     Declaring that the essential MPEG-2 patents purportedly transferred to the Trust in violation of Alcatel's agreement are governed by and subject to the terms of the LAA and License and form part of the MPEG-2 Pool;

B.     Ordering and enjoining Alcatel to specifically perform its obligations under the LAA and License to license the Lucent MPEG-2 patents to MPEG LA with the right to sublicense;

C.     Declaring that the MPEG-2 essential patents assigned to the Trust are subject to Alcatel's license to MPEG LA and issuing injunctive relief necessary to require either Alcatel or the Trust to license those essential patents to plaintiff in accordance with the agreements discussed herein;

D.     Declaring that the Trust is subject to the control of Alcatel;

E.     Declaring that the Trust is an affiliate or under the control of Alcatel and that the patents held by the Trust are subject to the obligations of Alcatel;

F.     Voiding and revoking the transfer of Lucent's MPEG-2 essential patents to the Trust;

G.     Ordering a constructive trust over the MPEG-2 essential patents held by the Trust and any Royalties paid in favor of MPEG LA;

21

**Exhibit 17  Page 383**

H.     Alternatively, ordering Alcatel to take such steps as may be necessary to cause Lucent and the Trust to license the Lucent MPEG-2 essential patents in accord with Alcatel's obligations under the PPL;

I.     Awarding MPEG LA damages in an amount to be proven at trial;

J.     Awarding MPEG LA the legal fees and expenses it incurred in prosecuting this action; and

K.     Granting MPEG LA such other and further relief as the Court deems just and proper under the circumstances.

POTTER ANDERSON & CORROON LLP

Richard L. Horwitz (I.D. No. 2246)
Matthew E. Fischer (I.D. No. 3092)
Timothy R. Dudderar (I.D. No. 3890)
Hercules Plaza
1313 North Market Street
Wilmington, Delaware  19801
(302) 984-6000

*Attorneys for Plaintiff MPEG LA, L.L.C.*

Dated:   October 26, 2007

827996v1

22

**Exhibit 17  Page 384**

Exhibit 18

1   James S. Blackburn (State Bar No. 169134)
    ARNOLD & PORTER LLP
2   777 South Figueroa Street, 44th Floor
    Los Angeles, California  90017-5844
3   Telephone:  (213) 243-4000
    Facsimile:  (213) 243-4199
4
    Joseph A. Micallef (admitted *pro hac vice*)
5   ARNOLD & PORTER LLP
    555 Twelfth Street, N.W.
6   Washington, D.C.  20004-1206
    Telephone:  (202) 942-5000
7   Facsimile:  (202) 942-5999
8   Joel M. Freed (admitted *pro hac vice*)
    McDERMOTT WILL & EMERY LLP
9   600 13th Street, N.W.
    Washington, D.C.  20005-3096
10  Telephone:  (202) 756-8000
    Facsimile:  (202) 756-8087
11
    Attorneys for *Dell Inc.*
12

13                  **UNITED STATES DISTRICT COURT**
14
                    **SOUTHERN DISTRICT OF CALIFORNIA**
15

16

17  LUCENT TECHNOLOGIES INC. and     )   Case No. 02-CV-2060 B (CAB)
    MULTIMEDIA PATENT TRUST,          )   consolidated with Case No. 03-CV-0699 B
18                                    )   (CAB) and Case No. 03-CV-1108 B (CAB)
            Plaintiffs and Counterclaim-defendants, )
19                                    )
        v.                            )   **SECOND AMENDED ANSWER AND**
20                                    )   **COUNTERCLAIMS OF DELL INC.**
    GATEWAY, INC. AND GATEWAY         )   **IN REPLY TO SECOND AMENDED**
21  COUNTRY STORES LLC, GATEWAY       )   **COMPLAINT IN CASE NO.**
    COMPANIES, INC., GATEWAY          )   **03-CV-1108 B (CAB)**
22  MANUFACTURING LLC and             )
    COWABUNGA ENTERPRISES, INC.,      )
23                                    )   JURY TRIAL DEMANDED
            Defendants and Counter-claimants, )
24                                    )
        and                           )
25                                    )
    MICROSOFT CORPORATION,            )
26                                    )
            Intervener and Counter-claimant, )
27

28

_____
CASE NO. 02-CV-2060 B (CAB) consolidated with Case Nos. 03-CV-1108 B (CAB) and 03-CV-0699 B (CAB)

**Exhibit 18  Page 385**

1    MICROSOFT CORPORATION,

2            Plaintiff and Counter-defendant,

3    v.

4    LUCENT TECHNOLOGIES INC. and
     MULTIMEDIA PATENT TRUST,

5

6            Defendants and Counter-claimants,

7    LUCENT TECHNOLOGIES INC. and
     MULTIMEDIA PATENT TRUST,

8

9            Plaintiffs and Counterclaim-defendants,

10   v.

11   DELL INC.,

12           Defendant and Counter-claimant.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANSWER AND COUNTERCLAIMS OF DELL INC.**

**IN REPLY TO SECOND AMENDED COMPLAINT IN CASE NO. 03-CV-1108 B (CAB)**

Defendant Dell Inc. ("Dell"), through counsel, answers the Second Amended Complaint in Case No. 03-CV-1108 B (CAB) of Plaintiffs Lucent Technologies Inc. ("Lucent") and Multimedia Patent Trust [Docket No. 922], and sets forth affirmative and other defenses, and counterclaims, as follows:

### THE PARTIES

1.      Paragraph 1 of the complaint is admitted.

2.      Paragraph 2 of the complaint is denied.

3.      Dell admits that Multimedia Patent Trust purports to be a Delaware Statutory Trust organized under the Delaware Statutory Trust Act, 12 Del. C. §§ 3801, *et seq.*, but Dell has insufficient information to otherwise admit or deny and therefore denies the same and puts Plaintiffs to their proof.

4.      Paragraph 4 of the complaint is admitted.

5.      Paragraph 5 of the complaint is admitted.

### NATURE OF THE ACTION

6.      Paragraph 6 of the complaint is admitted.

### JURISDICTION AND VENUE

7.      Paragraph 7 of the complaint is admitted.

8.      Venue and personal jurisdiction are admitted, but Paragraph 8 of the complaint is otherwise denied.

### THE PARTIES

9.      Paragraph 9 of the complaint is denied, except it is admitted that Exhibit A to the complaint is a copy of the Fleming '759 patent issued on March 27, 1984.

10.     Paragraph 10 of the complaint is denied, except it is admitted that Exhibit B to the complaint is a copy of the Ketchum '781 patent issued on March 20, 1990.

- 1 -

2.      This is a counterclaim for a declaratory judgment that Dell is licensed under the Haskell '226 patent and the Netravali '272 patent pursuant to Dell's Patent Portfolio License executed by MPEG LA.  This claim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

3.      There is a justiciable controversy between Dell, on the one hand, and Lucent and MPT, on the other hand, regarding whether Lucent and MPT have succeeded in their efforts to deprive Dell of a license under the Haskell '226 patent and the Netravali '272 patent pursuant to Dell's Patent Portfolio License executed by MPEG LA.

4.      Dell is licensed under the Haskell '226 patent and the Netravali '272 patent pursuant to Dell's Patent Portfolio License with MPEG LA.  The merger of Lucent with Alcatel, pursuant to Alcatel's agreements with the MPEG LA licensing consortium, put the Haskell '226 patent and the Netravali '272 patent into the MPEG LA patent pool.  Dell, as an existing licensee of MPEG LA, is licensed under the Haskell '226 patent and the Netravali '272 patent from the effective date of Dell's license (June 1, 1994) forward, thereby extinguishing any claims for infringement under those patents.

## COUNT X

### (Fraudulent Transfer under Delaware's Uniform

### Fraudulent Transfer Act, §§ 1300 *et seq.* Against Lucent)

5.      Dell incorporates what is set out in the preceding paragraphs as if fully set forth here.

6.      In an effort to avoid Dell's license under the Patent Portfolio License to all essential MPEG-2 patents of MPEG LA's licensors and their affiliates, from the effective date of Dell's license (June 1, 1994) forward, Lucent created MPT and assigned the Haskell '226 patent and the Netravali '272 patent (among other patents) to MPT for the sole purpose of evading Dell's Patent Portfolio License and depriving Dell of its benefits under that license.  Lucent undertook these actions with the intent to defraud Dell.

7.      Dell is informed and believes, and on that basis alleges, that Lucent became insolvent by the purported assignment of the Haskell '226 patent and the Netravali '272 patent to

- 22 -

1  MPT, insofar as Lucent's assignment divested Lucent of those patents to which Dell is entitled to a

2  license under the Patent Portfolio License.

3         8.     As a result of this fraudulent assignment, Dell has incurred damages, including, but

4  not limited to, fees and costs associated with defense of this action.

5         9.     Dell is entitled, under Delaware's Fraudulent Transfer Act, § 1307, to the avoidance

6  and rescission of the assignment to MPT, a constructive trust over the Haskell '226 patent and the

7  Netravali '272 patent for the benefit of Dell and other MPEG LA MPEG-2 licensees, and/or any

8  other equitable relief deemed appropriate by the Court to remedy this fraudulent transfer.

9  **COUNT XI**

10  **(Common Law Fraud Under Delaware Law Against Lucent)**

11       10.     Dell incorporates what is set out in the preceding paragraphs as if fully set forth here.

12       11.     Although Lucent has purported to assign the Haskell '226 patent and the Netravali

13  '272 patent to MPT, Lucent is the primary beneficiary of MPT and thereby has retained the Haskell

14  '226 patent and the Netravali '272 patent for its own benefit while purporting to avoid Dell's

15  license rights under the Patent Portfolio License.

16       12.     Dell is informed and believes, and on that basis alleges, that the economic function

17  of MPT is as a vehicle to avoid Dell's license rights under the Patent Portfolio License and the

18  license rights of other MPEG LA MPEG-2 licensees.

19       13.     As a result of Lucent's fraud, Dell has incurred damages, including, but not limited

20  to, fees and costs associated with defense of this action.

21       14.     Dell is entitled to the avoidance and rescission of the assignment to the MPT, a

22  constructive trust over the Haskell '226 patent and the Netravali '272 patent for the benefit of Dell

23  and other MPEG LA MPEG-2 licensees, and/or any other equitable relief deemed appropriate by

24  the Court to remedy this fraudulent transfer.

25

26

27

28

- 23 -

Exhibit 19

1  Jane Hahn, SBN 125203
   Alison P. Adema, SBN 149285
2  HAHN & ADEMA
   501 West Broadway, Suite 1730
3  San Diego, California 92101-3595
   Telephone: (619) 235-2100
4  Facsimile: (619) 235-2101

5  Attorneys for *Lucent Technologies Inc.*

6  *Additional counsel listed on the last page*

7

8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  LUCENT TECHNOLOGIES INC.,                    Case No. 02-CV-2060-B (CAB)
                                                       consolidated with
12                    Plaintiff,                 Case No. 03-CV-0699-B (CAB)
              v.                                 Case No. 03-CV-1108-B (CAB)
13
    GATEWAY, INC., GATEWAY COUNTRY
14  STORES LLC, GATEWAY COMPANIES,
    INC., GATEWAY MANUFACTURING LLC             **LUCENT'S EIGHTH**
15  and COWABUNGA ENTERPRISES, INC.,            **SUPPLEMENTAL RESPONSE TO**
                                                 **INTERROGATORY NO. 2 FROM**
16                    Defendants,                **MICROSOFT, DELL, AND**
              and                                **GATEWAY**
17
    MICROSOFT CORPORATION,
18
                     Intervener.
19
    MICROSOFT CORPORATION,
20
                     Plaintiff,
21            v.

22  LUCENT TECHNOLOGIES INC.,

23                   Defendant.

24  LUCENT TECHNOLOGIES INC.,

25                    Plaintiff,
              v.
26
    DELL INC.,
27
                     Defendant.
28

LUCENT'S EIGHTH SUPPLEMENTAL RESPONSE TO INTERROGATORY          CASE NOS. 02-CV-2060-B (CAB),
NO. 2 FROM MICROSOFT, DELL, AND GATEWAY                    03-CV-0699-B (CAB), AND 03-CV-1108-B (CAB)

**Exhibit 19  Page 390**

1  Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Lucent Technologies

2 Inc. hereby supplements its response to Interrogatory No. 2 from Microsoft, Dell, and Gateway.

3 Lucent reserves the right to further supplement or amend these objections and responses to the extent

4 allowed by the Federal Rules of Civil Procedure and the Local Rules of this Court.

5          **GENERAL OBJECTIONS**

6  Lucent incorporates by reference, to the extent applicable, its general objections to the First

7 Set of Interrogatories from Microsoft, Dell, and Gateway, which apply to each interrogatory

8 regardless of whether the general objections are specifically incorporated into the specific objections

9 and responses below.

10      **SPECIFIC OBJECTIONS AND RESPONSES**

11 **Interrogatory No. 2:**

12  Explain in detail the bases for Lucent's allegations that Microsoft and/or any Microsoft

13 Customer is infringing or has infringed each of the Patents-In-Suit by: (i) as to each of the Patents-

14 In-Suit, identifying on a claim-by-claim basis the Accused Products (including identifying any

15 encoders, decoders, and/or codecs accused of infringement and including identifying any Standard(s)

16 that Lucent contends provide any support for any infringement allegation) and whether the purported

17 infringement is direct, contributory, or by inducement; (ii) providing a claim chart for each of the

18 Patents-In-Suit explaining on a claim-by-claim and limitation-by-limitation basis the factual bases

19 for Lucent's infringement allegations as to each Accused Product, including whether each limitation

20 is met literally or under the doctrine of equivalents; (iii) identifying the documents and things that

21 support or relate to Lucent's infringement allegations, including the allegations of direct,

22 contributory, or induced infringement, and describing how and where such documents support or

23 relate to Lucent's infringement allegations; (iv) as to each claimed element that Lucent alleges is met

24 under the doctrine of equivalents, explaining how substantially the same function is performed, in

25 substantially the same way, to achieve substantially the same result and the basis, if any, for

26 maintaining that there are "insubstantial differences"; (v) identifying the documents and things that

27 support or relate to Lucent's doctrine of equivalents allegations and how and where such documents

28 and things support or relate to Lucent's doctrine of equivalents allegations; (vi) as to each means

LUCENT'S EIGHTH SUPPLEMENTAL RESPONSE TO INTERROGATORY  2  CASE NOS. 02-CV-2060-B (CAB),
NO. 2 FROM MICROSOFT, DELL, AND GATEWAY      03-CV-0699-B (CAB), AND 03-CV-1108-B (CAB)

**Exhibit 19  Page 391**

1   plus function element, specifying what in the Accused Product constitutes the corresponding

2   structure described in the specification or what in the Accused Product constitutes equivalents

3   thereof, along with the basis for asserting such equivalents; and (vii) identifying all the documents

4   and things that support or relate to Lucent's means plus function structure allegations and how and

5   where such documents and things support or relate to Lucent's means plus function structure

6   allegations.

7   **Seventh Supplemental Response to Interrogatory No. 2:**

8         Based on its investigations to date, and subject to and without waiver of any of its previously

9   stated general and specific objections, Lucent supplements its response as follows:  Lucent identifies

10  video coding infringement by Microsoft in Attachment A, video coding infringement by Gateway in

11  Attachment B, and video coding infringement by Dell in Attachment C.  Lucent reserves the right to

12  further supplement or amend its response to this interrogatory as discovery and Lucent's

13  investigation in this case proceed, and during the course of expert discovery.

14

15  Dated:  March 24, 2006                                    *Lucent Technologies Inc.*

16

17                                                   By: _____

18                                                   John M. Desmarais (admitted *pro hac vice*)
                                                     Robert A. Appleby (admitted *pro hac vice*)
19                                                   Jon T. Hohenthaner (admitted *pro hac vice*)
                                                     Richard M. Koehl (admitted *pro hac vice*)
20                                                   KIRKLAND & ELLIS LLP
                                                     153 East 53rd Street
21                                                   New York, New York  10022
                                                     Telephone:  (212) 446-4800
22                                                   Facsimile:  (212) 446-4900

23                                                   Jane Hahn, SBN 125203
                                                     Alison P. Adema, SBN 149285
24                                                   HAHN & ADEMA
                                                     501 West Broadway, Suite 1730
25                                                   San Diego, California  92101-3595
                                                     Telephone:  (619) 235-2100
26                                                   Facsimile:  (619) 235-2101

27                                                   Attorneys for *Lucent Technologies Inc.*

28

LUCENT'S EIGHTH SUPPLEMENTAL RESPONSE TO INTERROGATORY        3        CASE NOS. 02-CV-2060-B (CAB),
NO. 2 FROM MICROSOFT, DELL, AND GATEWAY                                    03-CV-0699-B (CAB), AND 03-CV-1108-B (CAB)

**Exhibit 19  Page 392**

**CERTIFICATE OF SERVICE**

1

2    I hereby certify that on this 24TH day of March, 2006, a copy of the foregoing **LUCENT'S EIGHTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2 FROM MICROSOFT, DELL, AND GATEWAY** was served on counsel for Gateway, Microsoft and Dell

3    as follows:

4

**FEDERAL EXPRESS**                    **FEDERAL EXPRESS**

5    John E. Gartman                        James S. Blackburn
Christopher S. Marchese                 ARNOLD & PORTER LLP

6    FISH & RICHARDSON P.C.                 777 South Figueroa Street, 44th Floor
12390 El Camino Real                   Los Angeles, CA  90017

7    San Diego, California  92130           Telephone:  213-243-4000
Telephone:  858-678-5070               Facsimile:  213-243-4199

8    Facsimile:  858-678-5099

9    **EMAIL**                              **EMAIL**
marchese@fr.com                        jfreed@mwe.com

10   srodriguez@fr.com                      sidney_rosenzweig@aporter.com

11   Attorneys for *Microsoft Corp.*        Attorneys for *Dell Inc.*

12

13   **FEDERAL EXPRESS**
David J. Zubkoff

14   SELTZER, CAPLAN, MCMAHON & VITEK
750 'B' Street, Suite 2100

15   San Diego, California 92101
Telephone:  619-685-3003

16   Facsimile:  619-702-6827

17   **EMAIL**
jeff.plies@dechert.com

18   bryan.farney@dechert.com
lawrence.fluker@dechert.com

19

20   Attorneys for *Gateway, Inc., et al.*

21

22   _____

23

24

25

26

27

28

LUCENT'S EIGHTH SUPPLEMENTAL RESPONSE TO INTERROGATORY    4    CASE NOS. 02-CV-2060-B (CAB),
NO. 2 FROM MICROSOFT, DELL, AND GATEWAY                          03-CV-0699-B (CAB), AND 03-CV-1108-B (CAB)

**Exhibit 19  Page 393**

## Attachment A:  Infringement By Microsoft

**I.**    **U.S. Patent No. 4,383,272 ("Netravali")**

Lucent has not interposed any claim in this action against Microsoft for infringement of

U.S. Patent No. 4,383,272, which is now expired.

**Exhibit 19  Page 394**

## II.     U.S. Patent No. 4,958,226 ("Haskell")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claim 12 of U.S. Patent No. 4,958,226, literally or under the doctrine of equivalents:

- Every Microsoft product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 11172 ("MPEG-1 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Microsoft.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, Microsoft DirectShow software, Microsoft ActiveMovie software, Microsoft MovieMaker software, and Microsoft Windows Media Player software (with any associated MPEG-1 codec), whether made, used, sold, offered for sale, or imported separately or as part of any Microsoft operating system software, Internet Explorer software, or otherwise.

- Every Microsoft product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 13818 ("MPEG-2 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Microsoft.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the Microsoft Xbox 360 Video Game System, the Microsoft Xbox Video Game System, the Microsoft Xbox DVD Movie Playback Kit, and DVD "plug-in packs" for Microsoft Windows Media Player software, such as Intervideo DVD Xpack or CyberLink Power DVD SE.

- Every Microsoft product (or portion thereof) for decoding data representing video in accordance with Microsoft's Windows Media Video 9 ("WMV-9") codec, that was made, used, sold, or offered for sale in the United States, by or for Microsoft. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the Windows XP Media Center Edition 2005 operating system, Windows XP operating system with Service Pack 1, Windows XP operating system with Service Pack 2, Windows Server 2003 operating system, Windows Movie Maker 2 software (with any associated WMV-9 codec), Windows Media Player 9 series software (with any associated WMV-9 codec), Windows Media Player 10 series software (with any associated WMV-9 codec), and Windows Media Encoder software (with any associated WMV-9 codec), whether made, used, sold, offered for sale, or imported separately or as part of any Microsoft operating system software, Internet Explorer software, or otherwise.

Microsoft's acts of making, using, selling, offering for sale, and/or importing those products constitute direct, contributory, and/or induced infringement of claim 12.  Microsoft directly

2

**Exhibit 19  Page 395**

infringes by making, using, selling, offering for sale and/or importing those products. Microsoft also induces infringement by supplying those products to customers and providing technical support, manuals, and other documentation to customers with information on how to use those products. For example, Microsoft induces infringement by providing DirectShow and ActiveMovie as a software product (or portion thereof) and by providing users with instructions on how to use this software to support playback of MPEG file formats, such as with Windows Media Player or MovieMaker software. Microsoft further induces infringement by working with third parties to develop and promote DVD "plug-in packs," and by providing users with instructions on how to obtain and use such "plug-in packs" in conjunction with Windows Media Player to support playback of MPEG-2 files. *See* MSLT_0640003-0640009, MSLT_0640026-0640027, MSLT_0745099-0745102, LUC 1220742-1220744, LUC 1297463-1297469; Lin Feb. 10, 2006 Tr. at 14-15; Tzou Feb. 10, 2006 Tr. at 28-29; Berns Feb. 15, 2006 Tr. at 29-38, 53-54, 75-77, 95-102, 109-11. Microsoft further induces infringement by providing WMV-9 "porting kits" to third parties, and by providing third parties with instructions on how to use those porting kits to support playback of WMV-9 files. *See* Srinivasan Mar. 8, 2006 Tr. at 10-11, 13, 56, 82-83, 87-88, 120.

Microsoft further induces infringement by providing users of the Xbox Video Game System with an Xbox DVD Movie Playback Kit and by providing users with instructions on how to use this Playback Kit to support playback of DVD movies. The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claim 12. The standards documents cited in the claim charts can be found at LUC 1126755-1126876 (ISO/IEC 11172-2), LUC 1126918-1127137 (ISO/IEC 13818-2), and MSLT_1028363-1028852 (SMPTE 421M). Lucent reserves the right to supplement or amend this response as discovery

3

**Exhibit 19  Page 396**

and Lucent's investigation in this case proceed, and during the course of expert discovery. Lucent notes that outstanding discovery relevant to this response includes at least the production of Microsoft documents regarding MPEG-2 products, the Rule 30(b)(6) deposition of Intervideo regarding MPEG-2 products, and the production of Intervideo documents regarding MPEG-2 products. Lucent will supplement this response as appropriate upon completion of this and any other pertinent discovery.

### A. MPEG-1 Video

| U.S. Patent No. 4,958,226 ("Haskell") | Accused Products |
|---|---|
| 12. A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising: | The accused products include hardware and software, comprising a path that can carry an electrical current, for decoding MPEG-1 encoded video signals. An MPEG-1 video signal contains information corresponding to a series of consecutive pictures called frames. "Video is represented as a succession of individual pictures, and each picture is treated as a two-dimensional array of picture elements (pels)." ISO/IEC 11172-2 § D.2.2, p.52; *see also* ISO/IEC 11172-2 § 2.1.108, p.8.<br><br>Furthermore, in MPEG-1 video, "[t]here are four types of coded picture that use different coding methods. An Intra-coded picture (I-picture) is coded using information only from itself. A Predictive-coded picture (P-picture) is a picture which is coded using motion compensated prediction from a past I-Picture or P-Picture. A Bidirectionally predictive-coded picture (B-picture) is a picture which is coded using motion compensated prediction from a past and/or future I-Picture or P-Picture. A dc coded (D) picture is coded using information only from itself. Of the DCT coefficients only the dc ones are present." ISO/IEC 11172-2 § 2.4.1, p.16. *See also* ISO/IEC 11172-2 § 0.2.1, p.v; § D.2.3, p.54; § D.5.3, p.70. The "picture_coding_type" code identifies the type of picture. For example, a value of "001" identifies an I-picture, "010" identifies a P-picture, "011" identifies a B-picture, and "100" identifies a D picture. *See, e.g.*, ISO/IEC 11172-2 § 2.4.3.4, p.27; § 2.4.2.5, p.21; § D.5.3, p.70; D.5.3.3, p.71. An example of the relationships between I, P, and B-pictures is illustrated in ISO/IEC 11172-2 § 0.2.1, p.v, Fig. 1; *see also* ISO/IEC 11172-2 § D.2.3, p.54, Fig. D.2. |

4

**Exhibit 19  Page 397**

## Attachment B:  Infringement By Gateway

**I.**    **U.S. Patent No. 4,383,272 ("Netravali")**

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claims 13 and 22 of U.S. Patent No. 4,383,272, literally and/or under the doctrine of equivalents:

- Every Gateway product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 11172 ("MPEG-1 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway before April 13, 2001.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system made, used, sold, offered for sale, or imported by Gateway with Microsoft DirectShow software, Microsoft ActiveMovie software, Microsoft MovieMaker software, and/or Microsoft Windows Media Player software (with any associated MPEG-1 codec).

- Every Gateway product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 13818 ("MPEG-2 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway before April 13, 2001.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system or other product made, used, sold, offered for sale, or imported by Gateway with a DVD player and/or recorder and associated hardware and/or software for decoding MPEG-2 video, such as CyberLink PowerDVD and Intervideo WinDVD software products.

Gateway's acts of making, using, selling, offering for sale, and/or importing those products constitute direct and/or induced infringement of claims 13 and 22.  Gateway directly infringes through its own use of these products and Gateway induces infringement by supplying these products to customers (whether separately, as part of a computer system, or otherwise), and/or providing technical support, manuals, and other documentation to customers with information on how to use those products.  The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claims 13 and 22.  The standards documents cited in the claim charts can be found at LUC 1126755-1126876 (ISO/IEC 11172-2) and LUC

**Exhibit 19  Page 398**

1126918-1127137 (ISO/IEC 13818-2). Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery. Lucent notes that outstanding discovery relevant to this response includes at least the Rule 30(b)(6) deposition of Microsoft regarding WMV-9 products, the Rule 30(b)(6) deposition of Intervideo regarding MPEG-2 products, and the production of Intervideo documents regarding MPEG-2 products. Lucent will supplement this response as appropriate upon completion of this and any other pertinent discovery.

### A.    MPEG-1 Video

| U.S. Patent No. 4,383,272 ("Netravali") | Accused Products |
|---|---|
| 13. A method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture including the step of | The accused products decode MPEG-1 video. *See* Pennington Feb. 17, 2006 Tr. at 115-16. "Video is represented as a succession of individual pictures, and each picture is treated as a two-dimensional array of picture elements (pels). The colour representation for each pel consists of three components: Y (luminance), and two chrominance components, Cb and Cr." ISO/IEC 11172-2 § D.2.2, p.52; *see also* ISO/IEC 11172-2 § 2.1.108, p.8. In MPEG-1 video, a picture is an image that occupies a frame. In the decoding of MPEG-1 video, as described below, the intensities (values describing the different color components) of pels (picture elements) in B-pictures are estimated using interpolation in accordance with information defining the intensities of pels in preceding and succeeding versions of the B-picture, *e.g.*, I-pictures and/or P-pictures. The accused Gateway MPEG-1 video products decode MPEG-1 video in this manner. |
| determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions, | In MPEG-1 video, "[t]here are four types of coded picture that use different coding methods. An Intra-coded picture (I-picture) is coded using information only from itself. A Predictive-coded picture (P-picture) is a picture which is coded using motion compensated prediction from a past I-Picture or P-Picture. A Bidirectionally predictive-coded picture (B-picture) is a picture which is coded using motion compensated prediction from a past and future I-Picture or P-Picture. A dc coded (D) picture is coded using information only from itself." ISO/IEC 11172-2 § 2.4.1, p.16. *See also* ISO/IEC 11172-2 § 0.2.1, p.v; § D.2.3, p.54; § D.5.3, p.70. The "picture_coding_type" code identifies the type of picture. For |

2

**Exhibit 19  Page 399**

## II.    U.S. Patent No. 4,958,226 ("Haskell")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claim 12 of U.S. Patent No. 4,958,226, literally and/or under the doctrine of equivalents:

- Every Gateway product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 11172 ("MPEG-1 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system made, used, sold, offered for sale, or imported by Gateway with Microsoft DirectShow software, Microsoft ActiveMovie software, Microsoft MovieMaker software, and/or Microsoft Windows Media Player software (with any associated MPEG-1 codec).

- Every Gateway product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 13818 ("MPEG-2 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system or other product made, used, sold, offered for sale, or imported by Gateway with a DVD player and/or recorder and associated hardware and/or software for decoding MPEG-2 video, such as CyberLink PowerDVD and Intervideo WinDVD software products.

- Every Gateway product (or portion thereof) for decoding data representing video in accordance with Microsoft's Windows Media Video 9 ("WMV-9") codec, that was made, used, sold, or offered for sale in the United States, by or for Gateway. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system made, used, sold, offered for sale, or imported by or for Gateway with the Windows XP Media Center Edition 2005 operating system, Windows XP operating system with Service Pack 1, Windows XP operating system with Service Pack 2, Windows Server 2003 operating system, Windows Movie Maker 2 software (with any associated WMV-9 codec), Windows Media Player 9 series software (with any associated WMV-9 codec), Windows Media Player 10 series software (with any associated WMV-9 codec), Windows Media Encoder software (with any associated WMV-9 codec), and/or associated hardware and/or software relating to the decoding of WMV-9 video.

Gateway's acts of making, using, selling, offering for sale, and/or importing those products constitute direct, contributory, and/or induced infringement of claim 12.  For example, Gateway infringes by supplying these products to customers (whether separately, as part of a computer

31

**Exhibit 19  Page 400**

system, or otherwise), and/or by providing technical support, manuals, and other documentation to customers with information on how to use those products.  The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claim 12.  The standards documents cited in the claim charts can be found at LUC 1126755-1126876 (ISO/IEC 11172-2), LUC 1126918-1127137 (ISO/IEC 13818-2), and MSLT_1028363-1028852 (SMPTE 421M).  Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery.  Lucent notes that outstanding discovery relevant to this response includes at least the Rule 30(b)(6) deposition of Intervideo regarding MPEG-2 products and the production of Intervideo documents regarding MPEG-2 products.  Lucent will supplement this response as appropriate upon completion of this and any other pertinent discovery.

### A.     MPEG-1 Video

| U.S. Patent No. 4,958,226 ("Haskell") | Accused Products |
|---|---|
| 12.  A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising: | The accused products include hardware and software, comprising a path that can carry an electrical current, for decoding MPEG-1 encoded video signals.  An MPEG-1 video signal contains information corresponding to a series of consecutive pictures called frames.  "Video is represented as a succession of individual pictures, and each picture is treated as a two-dimensional array of picture elements (pels)."  ISO/IEC 11172-2 § D.2.2, p.52; *see also* ISO/IEC 11172-2 § 2.1.108, p.8.

Furthermore, in MPEG-1 video, "[t]here are four types of coded picture that use different coding methods.  An Intra-coded picture (I-picture) is coded using information only from itself.  A Predictive-coded picture (P-picture) is a picture which is coded using motion compensated prediction from a past I-Picture or P-Picture.  A Bidirectionally predictive-coded picture (B-picture) is a picture which is coded using motion compensated prediction from a past and/or future I-Picture or P-Picture.  A dc coded (D) picture is coded using information only from itself.  Of the DCT coefficients only the dc ones are |

32

**Exhibit 19  Page 401**

**Attachment C:  Infringement By Dell**

**I.     U.S. Patent No. 4,383,272 ("Netravali")**

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claims 13 and 22 of U.S. Patent No. 4,383,272, literally and/or under the doctrine of equivalents:

- Every Dell product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 11172 ("MPEG-1 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell before April 13, 2001.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system made, used, sold, offered for sale, or imported by Dell with Microsoft DirectShow software, Microsoft ActiveMovie software, Microsoft MovieMaker software, and/or Microsoft Windows Media Player software (with any associated MPEG-1 codec).

- Every Dell product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 13818 ("MPEG-2 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell before April 13, 2001.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system or other product made, used, sold, offered for sale, or imported by Dell with a DVD player and/or recorder and associated hardware and/or software for decoding MPEG-2 video, such as CyberLink PowerDVD and Intervideo WinDVD software products.

Dell's acts of making, using, selling, offering for sale, and/or importing those products constitute direct and/or induced infringement of claims 13 and 22.  Dell directly infringes through its own use of these products and Dell induces infringement by supplying those products to customers (whether separately, as part of a computer system, or otherwise), and/or providing technical support, manuals, and other documentation to customers with information on how to use those products.  The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claims 13 and 22.  The standards documents cited in the claim charts can be found at LUC 1126755-1126876 (ISO/IEC 11172-2) and LUC 1126918-1127137

**Exhibit 19  Page 402**

(ISO/IEC 13818-2). Lucent reserves the right to supplement or amend this response as discovery

and Lucent's investigation in this case proceed, and during the course of expert discovery.

Lucent notes that outstanding discovery relevant to this response includes at least the Rule

30(b)(6) deposition of Microsoft regarding WMV-9 products, the Rule 30(b)(6) deposition of

Intervideo regarding MPEG-2 products, and the production of Intervideo documents regarding

MPEG-2 products. Lucent will supplement this response as appropriate upon completion of this

and any other pertinent discovery.

### A. MPEG-1 Video

| U.S. Patent No. 4,383,272 ("Netravali") | Accused Products |
|---|---|
| 13. A method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture including the step of | The accused products decode MPEG-1 video. *See* Pennington Feb. 17, 2006 Tr. at 115-16. "Video is represented as a succession of individual pictures, and each picture is treated as a two-dimensional array of picture elements (pels). The colour representation for each pel consists of three components: Y (luminance), and two chrominance components, Cb and Cr." ISO/IEC 11172-2 § D.2.2, p.52; *see also* ISO/IEC 11172-2 § 2.1.108, p.8. In MPEG-1 video, a picture is an image that occupies a frame. In the decoding of MPEG-1 video, as described below, the intensities (values describing the different color components) of pels (picture elements) in B-pictures are estimated using interpolation in accordance with information defining the intensities of pels in preceding and succeeding versions of the B-picture, *e.g.*, I-pictures and/or P-pictures. The accused Dell MPEG-1 video products decode MPEG-1 video in this manner. |
| determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions, | In MPEG-1 video, "[t]here are four types of coded picture that use different coding methods. An Intra-coded picture (I-picture) is coded using information only from itself. A Predictive-coded picture (P-picture) is a picture which is coded using motion compensated prediction from a past I-Picture or P-Picture. A Bidirectionally predictive-coded picture (B-picture) is a picture which is coded using motion compensated prediction from a past and future I-Picture or P-Picture. A dc coded (D) picture is coded using information only from itself." ISO/IEC 11172-2 § 2.4.1, p.16. *See also* ISO/IEC 11172-2 § 0.2.1, p.v; § D.2.3, p.54; § D.5.3, p.70. The "picture_coding_type" code identifies the type of picture. For |

2

**Exhibit 19  Page 403**

## II.     U.S. Patent No. 4,958,226 ("Haskell")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claim 12 of U.S. Patent No. 4,958,226, literally and/or under the doctrine of equivalents:

- Every Dell product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 11172 ("MPEG-1 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system made, used, sold, offered for sale, or imported by Dell with Microsoft DirectShow software, Microsoft ActiveMovie software, Microsoft MovieMaker software, and/or Microsoft Windows Media Player software (with any associated MPEG-1 codec).

- Every Dell product (or portion thereof) for decoding data representing video in accordance with International Standard ISO/IEC 13818 ("MPEG-2 video"), that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system or other product made, used, sold, offered for sale, or imported by Dell with a DVD player and/or recorder and associated hardware and/or software for decoding MPEG-2 video, such as CyberLink PowerDVD and Intervideo WinDVD software products.

- Every Dell product (or portion thereof) for decoding data representing video in accordance with Microsoft's Windows Media Video 9 ("WMV-9") codec, that was made, used, sold, or offered for sale in the United States, by or for Dell.  Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, every computer system made, used, sold, offered for sale, or imported by or for Dell with the Windows XP Media Center Edition 2005 operating system, Windows XP operating system with Service Pack 1, Windows XP operating system with Service Pack 2, Windows Server 2003 operating system, Windows Movie Maker 2 software (with any associated WMV-9 codec), Windows Media Player 9 series software (with any associated WMV-9 codec), Windows Media Player 10 series software (with any associated WMV-9 codec), Windows Media Encoder software (with any associated WMV-9 codec), and/or associated hardware and/or software relating to the decoding of WMV-9 video.

Dell's acts of making, using, selling, offering for sale, and/or importing those products constitute direct, contributory, and/or induced infringement of claim 12.  For example, Dell infringes by supplying those products to customers (whether separately, as part of a computer system, or

31

**Exhibit 19  Page 404**

otherwise), and/or by providing technical support, manuals, and other documentation to customers with information on how to use those products.   The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claim 12. The standards documents cited in the claim charts can be found at LUC 1126755-1126876 (ISO/IEC 11172-2), LUC 1126918-1127137 (ISO/IEC 13818-2), and MSLT_1028363-1028852 (SMPTE 421M).   Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery. Lucent notes that outstanding discovery relevant to this response includes at least the Rule 30(b)(6) deposition of Intervideo regarding MPEG-2 products and the production of Intervideo documents regarding MPEG-2 products.   Lucent will supplement this response as appropriate upon completion of this and any other pertinent discovery.

### A.    MPEG-1 Video

| U.S. Patent No. 4,958,226 ("Haskell") | Accused Products |
|---|---|
| 12.   A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising: | The accused products include hardware and software, comprising a path that can carry an electrical current, for decoding MPEG-1 encoded video signals.  An MPEG-1 video signal contains information corresponding to a series of consecutive pictures called frames.   "Video is represented as a succession of individual pictures, and each picture is treated as a two-dimensional array of picture elements (pels)."  ISO/IEC 11172-2 § D.2.2, p.52; *see also* ISO/IEC 11172-2 § 2.1.108, p.8.

Furthermore, in MPEG-1 video, "[t]here are four types of coded picture that use different coding methods.  An Intra-coded picture (I-picture) is coded using information only from itself.  A Predictive-coded picture (P-picture) is a picture which is coded using motion compensated prediction from a past I-Picture or P-Picture.  A Bidirectionally predictive-coded picture (B-picture) is a picture which is coded using motion compensated prediction from a past and/or future I-Picture or P-Picture.  A dc coded (D) picture is coded using information only from itself.  Of the DCT coefficients only the dc ones are |

32

**Exhibit 19  Page 405**

Exhibit 20

1  Jane Hahn, SBN 125203
   Alison P. Adema, SBN 149285
2  HAHN & ADEMA
   501 West Broadway, Suite 1730
3  San Diego, California 92101-3595
   Telephone: (619) 235-2100
4  Facsimile: (619) 235-2101

5  Attorneys for *Lucent Technologies Inc.*

6  *Additional counsel listed on the last page*

7

8           **UNITED STATES DISTRICT COURT**

9           **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  LUCENT TECHNOLOGIES INC.,

12              Plaintiff,
        v.

13  GATEWAY, INC., GATEWAY COUNTRY
14  STORES LLC, GATEWAY COMPANIES,
    INC., GATEWAY MANUFACTURING LLC
15  and COWABUNGA ENTERPRISES, INC.,

16              Defendants,
          and
17
    MICROSOFT CORPORATION,
18
                Intervener.
19
    MICROSOFT CORPORATION,
20
                Plaintiff,
21        v.

22  LUCENT TECHNOLOGIES INC.,

23              Defendant.

24  LUCENT TECHNOLOGIES INC.,

25              Plaintiff,
          v.
26
    DELL INC.,
27
                Defendant.
28

Case No. 02-CV-2060-B (CAB)
consolidated with
Case No. 03-CV-0699-B (CAB)
Case No. 03-CV-1108-B (CAB)

**LUCENT'S SEVENTH
SUPPLEMENTAL RESPONSE TO
INTERROGATORY NO. 2 FROM
MICROSOFT, DELL, AND
GATEWAY**

1    Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Lucent Technologies

2    Inc. hereby supplements its response to Interrogatory No. 2 from Microsoft, Dell, and Gateway.

3    Lucent reserves the right to further supplement or amend these objections and responses to the extent

4    allowed by the Federal Rules of Civil Procedure and the Local Rules of this Court.

5                                    **GENERAL OBJECTIONS**

6    Lucent incorporates by reference, to the extent applicable, its general objections to the First

7    Set of Interrogatories from Microsoft, Dell, and Gateway, which apply to each interrogatory

8    regardless of whether the general objections are specifically incorporated into the specific objections

9    and responses below.

10                         **SPECIFIC OBJECTIONS AND RESPONSES**

11   **Interrogatory No. 2:**

12   Explain in detail the bases for Lucent's allegations that Microsoft and/or any Microsoft

13   Customer is infringing or has infringed each of the Patents-In-Suit by:  (i) as to each of the Patents-

14   In-Suit, identifying on a claim-by-claim basis the Accused Products (including identifying any

15   encoders, decoders, and/or codecs accused of infringement and including identifying any Standard(s)

16   that Lucent contends provide any support for any infringement allegation) and whether the purported

17   infringement is direct, contributory, or by inducement; (ii) providing a claim chart for each of the

18   Patents-In-Suit explaining on a claim-by-claim and limitation-by-limitation basis the factual bases

19   for Lucent's infringement allegations as to each Accused Product, including whether each limitation

20   is met literally or under the doctrine of equivalents; (iii) identifying the documents and things that

21   support or relate to Lucent's infringement allegations, including the allegations of direct,

22   contributory, or induced infringement, and describing how and where such documents support or

23   relate to Lucent's infringement allegations; (iv) as to each claimed element that Lucent alleges is met

24   under the doctrine of equivalents, explaining how substantially the same function is performed, in

25   substantially the same way, to achieve substantially the same result and the basis, if any, for

26   maintaining that there are "insubstantial differences"; (v) identifying the documents and things that

27   support or relate to Lucent's doctrine of equivalents allegations and how and where such documents

28   and things support or relate to Lucent's doctrine of equivalents allegations; (vi) as to each means

LUCENT'S SEVENTH SUPPLEMENTAL RESPONSE TO              2          CASE NOS. 02-CV-2060-B (CAB),
INTERROGATORY NO. 2 FROM MICROSOFT, DELL, AND GATEWAY              03-CV-0699-B (CAB), AND 03-CV-1108-B (CAB)

**Exhibit 20  Page 407**

1  plus function element, specifying what in the Accused Product constitutes the corresponding

2  structure described in the specification or what in the Accused Product constitutes equivalents

3  thereof, along with the basis for asserting such equivalents; and (vii) identifying all the documents

4  and things that support or relate to Lucent's means plus function structure allegations and how and

5  where such documents and things support or relate to Lucent's means plus function structure

6  allegations.

7  **Seventh Supplemental Response to Interrogatory No. 2:**

8      Based on its investigations to date, and subject to and without waiver of any of its previously

9  stated general and specific objections, Lucent supplements its response as follows:  Lucent identifies

10  infringement by Microsoft in Attachment A, infringement by Gateway in Attachment B, and

11  infringement by Dell in Attachment C.  Lucent reserves the right to further supplement or amend its

12  response to this interrogatory as discovery and Lucent's investigation in this case proceed, and

13  during the course of expert discovery.

14

15  Dated:  March 3, 2006                                    *Lucent Technologies Inc.*

16

17                                          By:  _Howard Shag_

18                                          John M. Desmarais (admitted *pro hac vice*)
                                            Robert A. Appleby (admitted *pro hac vice*)

19                                          Jon T. Hohenthaner (admitted *pro hac vice*)
                                            KIRKLAND & ELLIS LLP

20                                          153 East 53rd Street
                                            New York, New York  10022

21                                          Telephone:  (212) 446-4800
                                            Facsimile:  (212) 446-4900

22                                          Jane Hahn, SBN 125203
                                            Alison P. Adema, SBN 149285

23                                          HAHN & ADEMA
                                            501 West Broadway, Suite 1730

24                                          San Diego, California  92101-3595
                                            Telephone:  (619) 235-2100

25                                          Facsimile:  (619) 235-2101

26                                          Attorneys for *Lucent Technologies Inc.*

27

28

LUCENT'S SEVENTH SUPPLEMENTAL RESPONSE TO                    3                    CASE NOS. 02-CV-2060-B (CAB),
INTERROGATORY NO. 2 FROM MICROSOFT, DELL, AND GATEWAY                              03-CV-0699-B (CAB), AND 03-CV-1108-B (CAB)

Exhibit 20  Page 408

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of March, 2006, a copy of the foregoing **LUCENT'S SEVENTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2 FROM MICROSOFT, DELL, AND GATEWAY** was served on counsel for Gateway, Microsoft and Dell as follows:

**FEDERAL EXPRESS**
John E. Gartman
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California  92130
Telephone:  858-678-5070
Facsimile:  858-678-5099

**EMAIL**
marchese@fr.com
srodriguez@fr.com

Attorneys for *Microsoft Corp.*

**FEDERAL EXPRESS**
James S. Blackburn
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017
Telephone:  213-243-4000
Facsimile:  213-243-4199

**EMAIL**
jfreed@mwe.com
sidney_rosenzweig@aporter.com

Attorneys for *Dell Inc.*

**FEDERAL EXPRESS**
David J. Zubkoff
SELTZER, CAPLAN, MCMAHON & VITEK
750 'B' Street, Suite 2100
San Diego, California 92101
Telephone:  619-685-3003
Facsimile:  619-702-6827

**EMAIL**
jeff.plies@dechert.com
bryan.farney@dechert.com
lawrence.fluker@dechert.com

Attorneys for *Gateway, Inc., et al.*

_Meredith S. Greisman_
Meredith S. Greisman

LUCENT'S FIRST SUPPLEMENTAL RESPONSE TO THE THIRD SET OF INTERROGATORIES FROM DELL INC. (NO. 13)     Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 20  Page 409**

X.      **U.S. Patent No. 4,763,356 ("Day")**

Based on its investigation to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe the following claims of the Day Patent:

- Microsoft infringes or induces infringement of claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21 by making, using, selling, or offering for sale in the United States, or importing into the United States, Microsoft Money software.

- Microsoft infringes or induces infringement of claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21 by making, using, selling, or offering for sale in the United States, or importing into the United States, Microsoft Pocket PC Expense software.

- Microsoft infringes or induces infringement of claims 1–2, 6–7, 10–12, 15–16, 19, and 21 by making, using, selling, or offering for sale in the United States, or importing into the United States, Microsoft Outlook software (including Microsoft Outlook with Business Manager).

- Microsoft infringes or induces infringement of claims 1–2, 6–7, 19, and 21 by making, using, selling, or offering for sale in the United States, or importing into the United States, Microsoft Windows Mobile for Pocket PC and Pocket PC operating system software.

- Microsoft infringes or induces infringement of claims 1-2, 6-7, 10-12, 15-16, 19, and 21 by making, using, selling, or offering for sale in the United States, or importing into the United States, Microsoft Pocket Word software infringes.

Microsoft's acts of making, using, selling, offering for sale, and/or importing those products constitute infringement of these claims. For example, Microsoft induces infringement by supplying these products to customers and providing manuals and other documentation to customers that provide information on how to use these products. The following claim charts summarize how each such apparatus or method satisfies each element or feature of these claims. Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery.

153

**Exhibit 20  Page 410**

## XI.    U.S. Patent No. 5,347,295 ("Agulnick")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe one or more of claims 1, 3, 4, 6, 12, 39–41, 43 and 46 of U.S. Patent No. 5,347,295, literally or under the doctrine of equivalents:

- Each version of Microsoft Windows Mobile and Pocket PC operating system software that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Microsoft, infringes claims 1, 4, 6, 39–41, 43 and 46.

- Each version of Microsoft Windows XP Tablet PC Edition operating system software that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Microsoft, infringes claims 1, 3, 4, 6, 12, 39–41, 43 and 46.

Microsoft's acts of making, using, selling, offering for sale, and/or importing those products constitute induced infringement of those claims. For example, Microsoft induces infringement by supplying these products to customers for use with stylus-based computing devices (including without limitation PDAs and tablet PCs), and providing manuals and other documentation to customers that provide information on how to use these products. The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claims 1, 3, 4, 6, 12, 39–41, 43 and 46. Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery.

191

K&E 10997739.1

**Exhibit 20  Page 411**

## VI.    U.S. Patent No. 4,439,759 ("Fleming")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claims 1–4 of U.S. Patent No. 4,439,759, literally or under the doctrine of equivalents:

- Every computer system that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway before May 19, 2001. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, portable computers, desktop computers, and servers

Gateway's acts of making, using, selling, offering for sale, and/or importing these products constituted direct and/or induced infringement of claims 1-4. (*See, e.g.*, Gateway's Responses to Lucent's Interrogatory No. 16; Gateway's Response to Lucent's Interrogatory No. 35; GW-LT 286616-622; LUC 0009341-378, LUC 009531, LUC 010904, LUC 011337, LUC 1006022-035.) For example, Gateway induced infringement by supplying these products to customers and providing manuals and other documentation to customers that provide information on how to use these products. (*See, e.g.*, GW-LT 1348768, GW-LT 049089, GW-LT 046941.) Gateway also contributed to and induced the infringement of claims 1-4 by selling computers without displays with the intent that they be used by customers with displays. (*See, e.g.*, LUC 009531, LUC 010951, LUC 011337.) These computers as sold included all of the elements of claims 1-3 other than a display, and could perform all of the steps of claim 4 other than the step of displaying, but were ready for connection to a standard display, and therefore constituted a material part of the invention especially made and adapted for use in an infringement of claims 1-4. The following claim charts summarize how the accused products satisfy each element or limitation of claims 1-4. Lucent reserves the right to supplement or amend this response to the extent additional discovery is received, and during the course of

93

**Exhibit 20  Page 412**

expert discovery (Lucent's expert has not completed a review of discovery produced to date and has not completed his analysis).

In particular, Lucent has filed two motions to compel as described in Lucent's February 24, 2006 letter to the Court regarding third-party suppliers and/or manufacturers NVIDIA and Intel. Furthermore, at the request of the third-party supplier Creative Labs, Lucent was forced to postpone its deposition of Creative Labs, which will be rescheduled for a date this month. Accordingly, the following claim charts do not reflect outstanding third-party discovery, or discovery only recently received (*e.g.,* the March 2, 2006 30(b)(6) deposition of Microsoft), and may be updated after this discovery is received and analyzed.

In addition, Lucent has purchased a number of videocards used in Gateway's infringing systems. Lucent may have its expert test and analyze those videocards during expert discovery to uncover additional evidence of infringement. To the extent Lucent will rely on the results of any such analyses or tests at trial, Lucent will disclose them to Gateway during expert discovery.

| U.S. Patent No. 4,439,759 ("Fleming") | Accused Products |
|---|---|
| 1. In a digital image display system: | The accused products constitute a digital image display system. The accused products are compatible with the video graphics array (VGA) standard (*see, e.g.,* GW-LT 120249, GW-LT 150159, GW-LT 150655-56, GW-LT 148840-41, GW-LT 046945, GW-LT 049095, GW-LT 131188, GW-LT 140886; LUC 1246197-198, LUC 1246170, LUC 1248250, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320; Decker Tr. at 85-86, 222-223; Schindler Tr. at 220-222; Chiappini Tr. at 2050-2051, Chiappini Exs. 4-8; Louie Tr. at 53-54, Louie Exs. 7-25; NVIDIA 00024, 00145, 00285; CREATIVE 000025-26, 000055-56, 000090, 000116, 000135, 000155; Bjernfalk Ex. 6; INTEL 00663, 00677, 01180) and include the Windows Graphics Device Interface (GDI). (*See, e.g.,* GW-LT 120290, GW-LT 148840-41, GW-LT 150160-62, GW-LT 150656, GW-LT 049095, GW-LT 007367; LUC 1246197-98, LUC 1283990-93, LUC 1283997- |

94

Exhibit 20  Page 413

## VIII.   U.S. Patent No. 4,763,356 ("Day")

Based on its investigation to date, and subject to its previously stated general and specific

objections, Lucent contends that the following products infringe the following claims, literally or

under the doctrine of equivalents of the Day Patent:

- Every computer system incorporating Microsoft Money software that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway, infringes claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21.

- Every computer system incorporating Intuit Quicken software that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway, infringes claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21.

- Gateway's sale or offer for sale of Microsoft Money and/or Intuit Quicken software induces infringement of claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21.

- Every computer device incorporating Microsoft Outlook software (including Microsoft Outlook with Business Manager) that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway infringes claims 1–2, 6–7, 10–12, 15–16, 19, and 21.

- Gateway's sale or offer for sale of Microsoft Outlook software (including Microsoft Outlook with Business Manager) induces infringement of claims 1–2, 6–7, 10–12, 15–16, 19, and 21.

- Every computing device that incorporates Microsoft Windows Mobile for Pocket PC and Pocket PC operating system software infringes claims 1-2, 6-7, 19, and 21.

Gateway's acts of making, using, selling, offering for sale, and/or importing those products

constitute direct and/or induced infringement of these claims.  For example, Gateway induces

infringement by supplying these products to customers and providing manuals and other

documentation to customers that provide information on how to use these products.  The

following claim charts summarize how each such apparatus or method satisfies each element or

feature of these claims.  Lucent reserves the right to supplement or amend this response as

discovery and Lucent's investigation in this case proceed, and during the course of expert

discovery.

**Exhibit 20  Page 414**

IX.    **U.S. Patent No. 5,347,295 ("Agulnick")**

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe one or more of claims 1, 3, 4, 6, 12, 39–41, 43 and 46 of U.S. Patent No. 5,347,295, literally or under the doctrine of equivalents:

- Stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Microsoft Windows Mobile or Pocket PC operating system software, that were made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway, infringe claims 1, 4, 6, 39–41, 43 and 46.    Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the products identified in response to Lucent's Interrogatory No. 19 to Gateway that include any version of Microsoft Windows Mobile or Pocket PC operating system software.

- Stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Palm OS software, that were made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway, infringe claims 1, 4, 6, 39–41, 43 and 46.    Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the products identified in response to Lucent's Interrogatory No. 19 to Gateway that include any version of Palm OS software.

- Stylus-based computing devices (including without limitation tablet PCs) incorporating Microsoft Windows XP Tablet PC Edition operating system software, that were made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Gateway, infringe claims 1, 3, 4, 6, 12, 39–41, 43 and 46.    Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the products identified in response to Lucent's Interrogatory No. 19 to Gateway that include any version of Microsoft Windows XP Tablet PC Edition operating system software.

Lucent will supplement its identification of accused products after Gateway provides a complete response to Interrogatory No. 19.

Gateway's acts of making, using, selling, offering for sale, and/or importing those products constitute direct infringement of those claims.    In addition Gateway induces infringement by supplying these products to customers and providing manuals and other documentation to customers that provide information on how to use these products.    The

146

**Exhibit 20  Page 415**

following claim charts summarize how each such apparatus or method satisfies each element or limitation of claims 1, 3, 4, 6, 12, 39–41, 43 and 46. Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery.

### A.    Stylus-Based Computing Devices Incorporating Microsoft Windows Mobile Or Pocket PC Operating Systems

| U.S. Patent No. 5,347,295 ("Agulnick") | Accused Products |
|---|---|
| 1. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including: | Microsoft Windows Mobile for Pocket PC and Pocket PC operating system software, herein "Windows Mobile," is designed for use with PDAs or other hand-held devices such as Pocket PCs ("accused products") that include circuitry for controlling a computer system. Each accused product has a screen that displays information, and also includes a stylus with a tip. *See, e.g.,* S. Skroupa Dep. Tr. 62 (stating that Windows Mobile will work with a device with a touch sensitive screen). *See also, e.g.,* P. Williamson Dep. Tr. 46-47 (stating that [t]he touch driver is a piece of software that works together with a piece of hardware that is called a "screen" to collect data from the hardware and then present that data to the [Windows Mobile] operating system.). The stylus is a pen-like object whose position and contact with a surface can be continuously detected electronically. The stylus is used for inputting information into the device. *See, e.g.,* S. Skroupa Dep. Tr. at 38 (describing Windows Mobile on a device with a touch sensitive screen receiving input from a stylus). *See also, e.g.,* P. Williamson Dep. Tr. 46 (describing inputting information into the Pocket PC by drawing a sequence of points onto the touch screen). |

147

Exhibit 20  Page 416

## VI.    U.S. Patent No. 4,439,759 ("Fleming")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe claims 1–4 of U.S. Patent No. 4,439,759, literally or under the doctrine of equivalents:

- Every computer system that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell before May 19, 2001. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, portable computers, desktop computers, and servers

Dell's acts of making, using, selling, offering for sale, and/or importing these products constituted direct and/or induced infringement of claims 1-4. (*See, e.g.*, Dell's Responses to Lucent's Interrogatory No. 17; Dell's Response to Lucent's Interrogatory No. 32; DELL 340164-181; LUC 1048717-932.) For example, Dell induced infringement by supplying these products to customers and providing manuals and other documentation to customers that provide information on how to use these products. (*See, e.g.*, DELL 159558, DELL 159866, DELL 182996, DELL 230392.) Dell also contributed to and induced the infringement of claims 1-4 by selling computers without displays with the intent that they be used by customers with displays. (*See, e.g.*, LUC 1048717-932; LUC 1048702-706.) These computers as sold included all of the elements of claims 1-3 other than a display, and could perform all of the steps of claim 4 other than the step of displaying, but were ready for connection to a standard display, and therefore constituted a material part of the invention especially made and adapted for use in an infringement of claims 1-4. The following claim charts summarize how the accused products satisfy each element or limitation of claims 1-4. Lucent reserves the right to supplement or amend this response to the extent additional discovery is received, and during the course of

93

**Exhibit 20  Page 417**

expert discovery (Lucent's expert has not completed a review of discovery produced to date and has not completed his analysis).

In particular, Lucent has filed two motions to compel as described in Lucent's February 24, 2006 letter to the Court regarding third-party suppliers and/or manufacturers NVIDIA and Intel. Dell has also not updated its Response to Lucent's Interrogatory No. 32 despite having been alerted to a significant error in this response and updated its Response to Lucent's Interrogatory No. 17 on the last day of fact discovery, leaving Lucent little time to analyze that response. Furthermore, at the request of the third-party supplier Creative Labs, Lucent was forced to postpone its deposition of Creative Labs, which will be rescheduled for a date this month. Accordingly, the following claim charts do not reflect outstanding third-party discovery, or discovery only recently received (*e.g.,* the March 2, 2006 30(b)(6) deposition of Microsoft), and may be updated after this discovery is received and analyzed.

In addition, Lucent has purchased a number of videocards used in Dell's infringing systems. Lucent may have its expert test and analyze those videocards during expert discovery to uncover additional evidence of infringement. To the extent Lucent will rely on the results of any such analyses or tests at trial, Lucent will disclose them to Dell during expert discovery.

| U.S. Patent No. 4,439,759 ("Fleming") | Accused Products |
| --- | --- |
| 1. In a digital image display system: | The accused products constitute a digital image display system. The accused products are compatible with the video graphics array (VGA) standard (*see, e.g.,* DELL 171883-84, 184294, DELL 260275-76; LUC 1246197-198, LUC 1246170, LUC 1248250, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320, MSLT_0123091; Decker Tr. at 73-80, 85-86, 99, 121, 222-223; Chiappini Tr. at 2050-2051, Chiappini Exs. 4-8; Louie Tr. at 53-54, Louie Exs. 7-25; NVIDIA 00024, 00145, 00285; CREATIVE 000025-26, 000055-56, 000090, 000116, 000135, 000155; Bjernfalk Ex. 6; INTEL 00663, |

**Exhibit 20  Page 418**

## IX.    U.S. Patent No. 4,763,356 ("Day")

Based on its investigation to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe the following claims, literally or under the doctrine of equivalents of the Day Patent:

- Every computer system incorporating Microsoft Money software that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell, infringes claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21.

- Every computer system incorporating Intuit Quicken software that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell, infringes claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21.

- Dell's sale or offer for sale of Microsoft Money and/or Intuit Quicken software induces infringement of claims 1–2, 4, 6–7, 10–13, 15–16, 19, and 21.

- Every computer device incorporating Microsoft Outlook software (including Microsoft Outlook with Business Manager) that was made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell infringes claims 1–2, 6–7, 10–12, 15–16, 19, and 21.

- Dell's sale or offer for sale of Microsoft Outlook software (including Microsoft Outlook with Business Manager) induces infringement of claims 1–2, 6–7, 10–12, 15–16, 19, and 21.

- Every computing device that incorporates Microsoft Windows Mobile for Pocket PC and Pocket PC operating system software infringes claims 1-2, 6-7, 19, and 21.

Dell's acts of making, using, selling, offering for sale, and/or importing those products constitute direct and/or induced infringement of these claims. For example, Dell induces infringement by supplying these products to customers and providing manuals and other documentation to customers that provide information on how to use these products. The following claim charts summarize how each such apparatus or method satisfies each element or feature of these claims. Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery.

146

**Exhibit 20  Page 419**

## X.    U.S. Patent No. 5,347,295 ("Agulnick")

Based on its investigations to date, and subject to its previously stated general and specific objections, Lucent contends that the following products infringe one or more of claims 1, 3, 4, 6, 12, 39–41, 43 and 46 of U.S. Patent No. 5,347,295, literally or under the doctrine of equivalents:

- Stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Microsoft Windows Mobile or Pocket PC operating system software, that were made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell, infringe claims 1, 4, 6, 39–41, 43 and 46. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, Dell Axim X5, Axim X3, Axim X30, Axim X50, Axim X50v, Axim X51, and Axim X51v computing devices, and any other products identified in response to Lucent's Interrogatory No. 20 to Dell that include any version of Microsoft Windows Mobile or Pocket PC operating system software.

- Stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Palm OS software, that were made, used, sold, or offered for sale in the United States, or imported into the United States, by or for Dell, infringe claims 1, 4, 6, 39–41, 43 and 46. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the following Dell part numbers: A0146036; A0176916; A0176922; A0109542; A0109548; and A0097751; and any other products identified in response to Lucent's Interrogatory No. 20 to Dell that include any version of Palm OS software.

- Stylus-based computing devices (including without limitation tablet PCs) incorporating Microsoft Windows XP Tablet PC Edition operating system software, that were made, used, sold, or offered for sale in the United States, by or for Dell, or imported into the United States, infringe claims 1, 3, 4, 6, 12, 39–41, 43 and 46. Applicable products include, without limitation and subject to supplementation and/or amendment as discovery progresses, the following Dell part numbers: A0239611; A0239614; A0239615; and A0239616; and any other products identified in response to Lucent's Interrogatory No. 20 to Dell that include any version of Microsoft Windows XP Tablet PC Edition operating system software.

Lucent will supplement its identification of accused products after Dell provides a complete response to Interrogatory No. 20.

Dell's acts of making, using, selling, offering for sale, and/or importing those products constitute direct infringement of those claims.    In addition Dell induces infringement by

172

**Exhibit 20  Page 420**

supplying these products to customers and providing manuals and other documentation to customers that provide information on how to use these products. The following claim charts summarize how each such apparatus or method satisfies each element or limitation of claims 1, 3, 4, 6, 12, 39–41, 43 and 46. Lucent reserves the right to supplement or amend this response as discovery and Lucent's investigation in this case proceed, and during the course of expert discovery.

A.    **Stylus-Based Computing Devices Incorporating Microsoft Windows Mobile Or Pocket PC Operating Systems**

| U.S. Patent No. 5,347,295 ("Agulnick") | Accused Products |
|---|---|
| 1. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including: | Microsoft Windows Mobile for Pocket PC and Pocket PC operating system software, herein "Windows Mobile," is designed for use with PDAs or other hand-held devices such as Pocket PCs ("accused products") that include circuitry for controlling a computer system. Each accused product has a screen that displays information, and also includes a stylus with a tip. *See, e.g.,* S. Skroupa Dep. Tr. 62 (stating that Windows Mobile will work with a device with a touch sensitive screen). *See also, e.g.,* P. Williamson Dep. Tr. 46-47 (stating that [t]he touch driver is a piece of software that works together with a piece of hardware that is called a "screen" to collect data from the hardware and then present that data to the [Windows Mobile] operating system.). The stylus is a pen-like object whose position and contact with a surface can be continuously detected electronically. The stylus is used for inputting information into the device. *See, e.g.,* S. Skroupa Dep. Tr. at 38 (describing Windows Mobile on a device with a touch sensitive screen receiving input from a stylus). *See also, e.g.,* P. Williamson Dep. Tr. 46 (describing inputting information into the Pocket PC by drawing a sequence of points onto the touch screen). |

173

**Exhibit 20  Page 421**

Exhibit 21

1  Ronald L. Johnston (State Bar No. 57418)
   James S. Blackburn (State Bar No. 169134)
2  ARNOLD & PORTER LLP
   777 South Figueroa Street, 44th Floor
3  Los Angeles, California  90017-5844
   Telephone:  (213) 243-4000
4  Facsimile:  (213) 243-4199

5  Joel M. Freed (admitted *pro hac vice*)
   Joseph A. Micallef (admitted *pro hac vice*)
6  Sidney A. Rosenzweig (admitted *pro hac vice*)
   ARNOLD & PORTER LLP
7  555 Twelfth Street, N.W.
   Washington, D.C.  20004-1206
8  Telephone:  (202) 942-5000
   Facsimile:  (202) 942-5999

9

10  Attorneys for *Dell Inc.*

11              UNITED STATES DISTRICT COURT

12              SOUTHERN DISTRICT OF CALIFORNIA

13

14  LUCENT TECHNOLOGIES INC.,            )   Case No. 03-CV-1108 B (CAB)
                                         )   Master Case No. 02-CV-2060 B (CAB)
15          Plaintiff, counterclaim defendant,  )
                                         )   **DELL INC.'S SUPPLEMENTAL**
16      v.                               )   **INITIAL DISCLOSURES PURSUANT**
                                         )   **TO FEDERAL RULE OF CIVIL**
17  DELL INC.,                           )   **PROCEDURE 26(a)**
                                         )
18          Defendant, counterclaim plaintiff,  )
    *et al.*                             )   Judge Rudi M. Brewster
19                                       )
                                         )
20  _____     )

21

22          Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, defendant and

23  counterclaim plaintiff Dell Inc. ("Dell") provides the following supplemental initial disclosures to

24  plaintiffs and counterclaim defendants Lucent Technologies, Inc. ("Lucent"). These initial

25  disclosures are based on information reasonably available to Dell at this time.  Dell may amend or

26  supplement these disclosures based upon its continuing investigation and discovery.

27

28

_____
CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

**Exhibit 21  Page 422**

By making these disclosures, Dell does not represent that it is identifying every witness, document or tangible thing possibly relevant to this lawsuit. Nor does Dell waive its right to object to production of any document or tangible thing disclosed on the basis of any privilege, the work product doctrine, relevancy, undue burden, or any other valid objection. Dell's disclosures represent a good faith effort to identify information it reasonably believes it may use to support its claims and defenses that it is aware of as of this date.

**A.    Individuals With Discoverable Information**

Dell lists the following individuals who are likely to have discoverable information relevant to the claims and defenses in this action. In disclosing these individuals, Dell does not authorize any contact by Lucent in connection with this lawsuit, except through appropriate counsel.

| **Name** | **Subject Matter** |
| --- | --- |
| James R. Fleming | U.S. Patent No. 4,439,759 |
| William A. Frezza | U.S. Patent No. 4,439,759 |
| Gerald S. Soloway | U.S. Patent No. 4,439,759 |
| Harry Newman | U.S. Patent No. 4,439,759 |
| Richard Shoup<br>5273 Country Lane<br>San Jose, CA 95129 | Invalidity of U.S. Patent No. 4,439,759 |
| Dr. Takeo Kanade<br>Carnegie Mellon University<br>Robotics Institute<br>5000 Forbes Avenue<br>Pittsburgh, PA 15213 | Invalidity of U.S. Patent No. 4,439,759 |
| Nick England<br>119 E. Franklin St., Third Floor<br>Chapel Hill, NC 27514 | Invalidity of U.S. Patent No. 4,439,759 |
| Mary Whitton<br>CB 3175, 207 Sitterson Hall<br>Chapel Hill, NC 27599 | Invalidity of U.S. Patent No. 4,439,759 |
| James Benster<br>40 4th Street, #255<br>Petaluma, CA 94952<br>(707) 780-1907 | Invalidity of U.S. Patent No. 4,439,759 |

- 2 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)<br>Dell Inc.'s Supplemental Initial Disclosures<br>Pursuant to Federal Rule of Civil Procedure 26(a)

Exhibit 21  Page 423

| Name | Subject Matter |
|------|----------------|
| Dr. James D. Foley<br>College of Computing<br>Georgia Institute of Technology<br>Atlanta, GA 30332 | Invalidity of U.S. Patent No. 4,439,759 |
| Dr. James Templeman | Invalidity of U.S. Patent No. 4,439,759 |
| George McLeod<br>20995 Hemlock St.<br>Groveland, CA 95321 | Invalidity of U.S. Patent No. 4,439,759 |
| Richard H. Ketchum | U.S. Patent No. 4,910,781 |
| Willem B. Kleijn | U.S. Patent No. 4,910,781 |
| Daniel J. Krasinski | U.S. Patent No. 4,910,781 |
| John Robbins | U.S. Patent No. 4,383,272 |
| Arun Netravali | U.S. Patent No. 4,383,272 |
| Henry Brendzel | U.S. Patent No. 4,383,272 and U.S. Patent No. 4,958,226 |
| Barry Freedman | U.S. Patent No. 4,383,272 and U.S. Patent No. 4,958,226 |
| Steffan Ericsson | Invalidity of U.S. Patent No. 4,958,226 |
| Richard Schaphorst | Invalidity of U.S. Patent No. 4,958,226 |
| Barin G. Haskell | U.S. Patent No. 4,958,226 |
| Michael Arlen Davis, Jr.<br>9020 N. Capital of Texas Hwy.<br>Bldg. 1, Suite 375<br>Austin, Texas 78759<br>(512) 306-8324 | Invalidity of U.S. Patent No. 4,958,226 |
| Atul Puri | U.S. Patent No. 4,958,226 and U.S. Patent No. 5,227,878 |
| Rangarajan Aravind | U.S. Patent No. 5,227,878 |
| Todd Agulnick | U.S. Patent No. 5,347,295 |
| Robert Carr | U.S. Patent No. 5,347,295 |
| Tony Hoeber | U.S. Patent No. 5,347,295 |
| S. Jerrold Kaplan | U.S. Patent No. 5,347,295 |
| David R. Low | U.S. Patent No. 5,347,295 |

- 3 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)<br>Dell Inc.'s Supplemental Initial Disclosures<br>Pursuant to Federal Rule of Civil Procedure 26(a)

Exhibit 21  Page 424

| Name | Subject Matter |
|------|----------------|
| Michael Quye | U.S. Patent No. 5,347,295 |
| Chaim M. Ackerman | U.S. Patent No. 5,649,131 |
| Alan L. Glasser | U.S. Patent No. 5,649,131 |
| Reuben Klein | U.S. Patent No. 5,649,131 |
| James Tierney<br>Lucent Technologies, Inc. | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Joe Braski<br>Lucent Technologies, Inc. | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Roger Stricker<br>Vice President, Intellectual Property | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Stephen Samuels<br>Intellectual Property Licensing Director<br>Lucent Technologies, Inc. | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Mark Stockwell<br>District Manager, Intellectual Property Business<br>Lucent Technologies, Inc. | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Donald Galler | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint and U.S. Patent 4,439,759. |
| David Rosenblatt | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Eugene Indyk | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| James DiGiorgio<br>Lucent Technologies, Inc. | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Mony Ghose | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |

- 4 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)<br>Dell Inc.'s Supplemental Initial Disclosures<br>Pursuant to Federal Rule of Civil Procedure 26(a)

Exhibit 21  Page 425

| **Name** | **Subject Matter** |
| --- | --- |
| Joel Karp<br>Vice President of Intellectual Property<br>Rambus, Inc. | Negotiations between Lucent and Lucent Technologies, Inc. Dell prior to Lucent filing its complaint. |
| Bill Sauber<br>Dell Inc. | Attended at least one of the negotiation meetings between Lucent and Dell prior to Lucent filing its complaint. |
| George Kokkosoulis<br>Dell Inc. | Video streaming, video encoding and/or decoding products sold by Dell |
| Ira Rush<br>(no longer employed by Dell Inc.) | Axim® Personal Digital Assistant |
| Intuit, Inc. | Structure, function and operation of Quicken software product |
| PalmSource, Inc. | Structure, function and operation of Palm OS operating system |
| Palm, Inc. | Structure, function and operation of Palm PDA |
| PalmOne, Inc. | Structure, function and operation of Palm PDA |
| Microsoft Corp. | Structure, function and operation of Microsoft products accused of infringement or appearing in Lucent's infringement contentions against Dell |
| Carolyn Doughty | U.S. Patent No. 4,582,956 |
| Werner Ulrich | U.S. Patent No. 4,582,956 |
| Robert Foster | U.S. Patent No. 4,582,956 |
| Brian Decker<br>Dell Inc. | Dell BIOS and video-display apparatuses |
| Lenny Zwik<br>Dell Inc. | Dell's incorporation of Microsoft operating systems. |
| Aga Webb<br>Dell Inc. | Dell web site operations. |
| Alan Patterson<br>Dell Inc. | Dell stylus products. |
| Kevin Kettler<br>Dell Inc. | Dell business and licensing practices. |
| Nimish Ghatalia<br>Dell Inc. | Dell products with calling party identification. |

- 5 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)<br>Dell Inc.'s Supplemental Initial Disclosures<br>Pursuant to Federal Rule of Civil Procedure 26(a)

**Exhibit 21  Page 426**

1    Other individuals not specifically known to Dell may posses relevant information,

2    particularly information relating to the invalidity of the patents-in-suit.  Such individuals include:

3    (1) authors of prior art publications and patents relevant to the subject matter of the patent-in-suit;

4    (2) individuals having knowledge of any prior art use, sale, offer to sell, or invention relevant to the

5    subject matter of the patent-in-suit;  (3) individuals having knowledge of the level of ordinary skill

6    in the art to which the alleged invention pertains; (4) individuals having knowledge of any license to

7    the patent-in-suit, any offer to license or refusal to license the patent-in-suit; (5) individuals having

8    knowledge of the circumstances or manner of the alleged invention disclosed in the patent-in-suit;

9    (6) individuals having knowledge of the ownership or rights in the patent and/or the subject matter

10   of the patent-in-suit; (7) individuals having knowledge of products developed and supplied to Dell

11   by third parties; (8) individuals having knowledge of the representations made in Lucent's

12   advertising and marketing materials; and (9) individuals having knowledge concerning Lucent's

13   knowledge of Dell's products prior to this lawsuit.  Dell expressly reserves the right to rely upon the

14   testimony of any individual who has been deposed in this case.  Dell also expressly incorporates by

15   reference all individuals identified in Microsoft's and Gateway's Initial Disclosures and all

16   supplements thereto.

17   **B.    Documents**

18   Dell provides the following description of documents, data compilations, and tangible things

19   that may contain information relevant to the claims and defenses in this case.  Dell reserves the right

20   to rely on all documents produced by Dell, Gateway, Microsoft, Lucent, or any third party in the

21   course of this litigation, including, but not limited to, documents set forth in Microsoft's, Gateway's

22   or Lucent's Fed. R. Civ. P. 26(a)(1) disclosures and all supplements thereto.

23   A copy of documents and things identified below which are in the possession, custody or

24   control of Dell will be produced to Lucent.

25   1)    A video tape believed to have been created by Lucent which purports to show

26   a program believed to have been written by Lucent running on an allegedly Dell-

27   manufactured computer which allegedly evidences that Dell infringes U.S. Patent 4,439,759.

28   - 6 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

**Exhibit 21  Page 427**

1   This video tape was shown to Dell's representatives in a meeting between Lucent and Dell

2   prior to Lucent filing its complaint. The video tape is believed to be in the possession,

3   custody or control of Lucent.

4         2)     A software program believed to have been written by Lucent which when

5   executed by an allegedly Dell-manufactured computer allegedly evidences that Dell

6   infringes U.S. Patent 4,439,759. A video tape of this software running on an allegedly Dell-

7   manufactured computer was shown to Dell's representatives in a meeting between Lucent

8   and Dell prior to Lucent filing its complaint. The software is believed to be in the

9   possession, custody or control of Lucent.

10         3)     Documents relating to the formation of the MPEG standard.

11         4)     Patents and/or other public documents relating to the subject matter of the

12   patents in suit,

13         5)     Documents relating to Dell's procurement of accused products.

14         6)     Documents relating to the Video Electronics Standards Association.

15         7)     Documents relating to the invalidity of the patents, including:

16

| | | |
|---|---|---|
| A Two-Dimensional, Level 2 Core System for the Apple II, Freiden, SRI International | 02/00/80 | DELL312790 to DELL312815 |
| Raster Graphics Extensions to the Graphics Compatibility System (GCS), Foley et al, GWU | 03/00/79 | DELL312816 to DELL312899 |
| 5216 Standard Firmware User's Manual Document No. 150-6045-004 | 6/1/1981 | DELL312900 to DELL313077 |
| 6200A Colorgraphic Terminal System, Programming Manual - TCS Release 2.0, Ramtek Corp. | | DELL313078 to DELL313083 |
| 6211 Color Graphics Terminal; Hardware Reference Manual, Ramtek Corp. | 10/1/1981 | DELL313084 to DELL313091 |
| 9000 Series Graphic Display System; Programming Manual , Ramtek Corp. | 3/1/1977 | DELL313092 to DELL313103 |
| 9000 Series Graphic Display System; The Theory of Operation Manual Vol.1 , Ramtek Corp. | 9/30/1977 | DELL313104 to DELL313117 |
| 9400 Series: Ramtek Introduces the Most Powerful Raster Graphics and Imaging Display System Ever Made, Ramtek Corp. | 7/8/1981 | DELL313118 to DELL313121 |
| A Controversial Picture Processing System for Processing Digital Pictorial Data,Information Processing, Vol. 15, No. 12, 1-22 | 12/1/1974 | DELL313122 to DELL313143 |

- 7 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

**Exhibit 21  Page 428**

| | | | |
|---|---|---|---|
| 1 2 | A General Description of Telidon: a Canadian Proposal for VideoTex Systems, Brown et al., CRC/Technology and Systems Branch 1978 | 00/00/78 | DELL313144 to DELL313172 |
| 3 | A Low-Cost Interactive Computer-Driven Full-Color Raster-Scan Display System, , Wissenburgh and Janse, Computer Graphics, Vol. 15 No. 4 | 12/00/81 | DELL313173 to DELL313178 |
| 4 | A Methodology for Populating Default Color Maps, Straayer, Information Display Division Tektronix, Inc., p. 311 | 1/1/1982 | DELL313179 to DELL313179 |
| 5 6 | A Persepctive on the Development of Videotex in North America, Douglas et al., IEEE Journal on Selected Areas in Communications vol. SAC-2, 260-266 | 2/1/1983 | DELL313180 to DELL313186 |
| 7 | A Random-Access Video Frame Buffer, Kajiya et al., Proceedings of the Conference on Computer Graphics, Pattern Recognition & Data Structure, 1-6 | 5/14/1975 | DELL313187 to DELL313193 |
| 8 9 | Add This Graphics Display to Your System, Buschbach, Byte, The Small Systems Journal, Issue 16, | 11/1/1976 | DELL313194 to DELL313224 |
| 10 | ADI Light 50 Users Guide, ADI, 1-1-80, pp 1-33, ADI, ADI, 1-33 | 1/1/1980 | DELL313225 to DELL313259 |
| 11 | Atari Home Computer System Hardware Manual | | DELL313260 to DELL313382 |
| 12 | Aydin 5216 Users Manual, 6-1-81, Aydin, Aydin, | 6/1/1981 | DELL313383 to DELL313560 |
| 13 | Build A Television Display, Gantt, Byte, The Small Systems Journal, issue 10, 16-21 | 6/1/1976 | DELL313561 to DELL313575 |
| 14 | Color Graphics for Remote Teaching, William Hankley and Virgil Wallentine, Department of Computer Science, Kansas State University, 147-153 | | DELL313576 to DELL313582 |
| 15 | Color Graphics Language (CGL); Software Reference Manual,Ramtek Corp. | 12/1/1981 | DELL313583 to DELL313597 |
| 16 | Color Image Quantization for Frame Buffer Display, Heckbert, Massechusetts Institute of Technology , 1-50 | 5/1/1980 | DELL313598 to DELL313616 |
| 17 | Color Process Information Display System, Model IDT-2000, Industrial Data Terminals Corp., IDT | | DELL313617 to DELL313621 |
| 18 19 | Color-Mapping Techniques for Computer-Aided Design and Verification of VLSI Systems, Tanimoto, Computer & Graphics Vol. 5, 103-113 | 5/5/1980 | DELL313622 to DELL313632 |
| 20 | Computer Graphics for Half-Tone Three-Dimensional Object Images, Staudhammer et al., Computer & Graphics Vol. 1, 109-114 | 1/1/1975 | DELL313633 to DELL313638 |
| 21 | Computer Graphics, Vol. 13, No. 2, Pollack, ed., SIGGRAPH-ACM | 08/00/79 | DELL313639 to DELL313651 |
| 22 | De Re Atari Anno Domini MCMLXXX, L. Cross | | DELL313652 to DELL313894 |
| 23 | Digital Paint Systems: An Anectdotal and Historical Overview, Smith, IEEE Annals of History of Computing, 4-30 | 4/1/2001 | DELL313895 to DELL313921 |
| 24 25 | Digital Paint Systems: Historical Overview - Technical Memo 14, Smith, Microsoft Corporation, 1-11 | 5/30/1997 | DELL313922 to DELL313932 |
| 26 | Digital Video Display Systems and Dynamic Graphics, Ronald Baecker, Associate Professor of Computer Science and Electrical Engineering, University of Toronto, 48-56 | | DELL313933 to DELL313941 |
| 27 | Dorado Hardware Manual, Xerox, Xerox Company, | 10/8/1979 | DELL313942 to |

28

- 8 -

Exhibit 21  Page 429

| | | DELL314111 |
|---|---|---|
| High Performance Raster Graphics for Microcomputer Systems, Andreas Bechtolsheim and forest Baskett, Stanford University, 43-47 | | DELL314112 to DELL314116 |
| Image Processing and Computer Graphics, Robin Williams, IBM Research Laboratory, San Jose, CA 183-193 | 12/18/1978 | DELL314117 to DELL314127 |
| ISO/EEC MPEG2 Information Technology- Generic coding of motion pictures and associated audio information: Video, Intl. Organization for Standardization | 5/15/1996 | DELL314128 to DELL314338 |
| ISO/IEC 11172-2 MPEG1- Information Technology- Coding of moving pictures and associated audio digital sotrage media at up to about 1,5 Mbits,  Intl. Organization for Standardization | 8/1/1993 | DELL314339 to DELL314460 |
| JP 54122031A, Akira | | DELL314461 to DELL314474 |
| JP 55109935A, Yuji | | DELL314475 to DELL314479 |
| JP 55121574A, Takeshi | | DELL314480 to DELL314491 |
| Look Up Table Video Processor for Multiband Image Display Terminals, Gonzalez, IBM Technical Disclosure Bulletin, 2012-2013 | 10/1/1978 | DELL314492 to DELL314493 |
| Model GM-613 and GM-619 Graphic Monitor Instruction Manual, Ramtek Corp. | 11/22/1976 | DELL314494 to DELL314496 |
| More Colors For Your Apple, Watson, Byte, The Small Systems Journal,, Volume 4 no 6, 60-66 | 6/1/1979 | DELL314497 to DELL314510 |
| NAPLPS:  A new standard for text and graphics; Part 1: Introduction, history, and structure, Fleming et al., ?, 203-254 | 2/00/1983 | DELL314511 to DELL314532 |
| NAPLPS:  A new standard for text and graphics; Part 2: Basic features, Fleming, ?, 152-185 | 3/00/1983 | DELL314533 to DELL314549 |
| NAPLPS:  A new standard for text and graphics; Part 3: Advanced features, Fleming, ?, 190-206 | 04/00/1983 | DELL314550 to DELL314557 |
| NAPLPS:  A new standard for text and graphics; Part 4: More advanced features and conclusions, Fleming, ?, 272-283 | 05/00/1983 | DELL314558 to DELL314564 |
| Nexus 5500; Mode 1 (Nexus 5300) & Mode 2 (Nexus 5400), OHM Co. Ltd. 1-11 | 10/1/1980 | DELL314565 to DELL314596 |
| Nexus5000, OHM, 10-1-80, Nexus, Nexus | 10/1/1980 | DELL314597 to DELL314628 |
| Ramtek 9400 Series | | DELL314629 to DELL314630 |
| Ramtek9400-2 Series Product Description, 7-8-81, Ramtek, Ramtek Corp. | 7/8/1981 | DELL314631 to DELL314634 |
| RDS-300 Image Memory and Video Control, Ikonas Graphinc Systems Inc. | 1/1/1980 | DELL314635 to DELL314647 |
| Real Time Animation Playback on a Frame Store Display System, Bryan Ackland and Neil Weste, Bell Laboratories, 182-188 | | DELL314648 to DELL314654 |
| RM-9000-DR11-B/C Interface Board,  , Ramtek Corp. | | DELL314655 to DELL314661 |
| RM-9460 Graphic Display System; Hardware Reference Manual, Ramtek Corp. | 9/24/1982 | DELL314662 to DELL314669 |

- 9 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

**Exhibit 21  Page 430**

| | | | |
|---|---|---|---|
| 1 | SuperPaint:  An Early Frame Buffer Graphics System , Shoup, Richard, IEEE Annals of History of Computing, 32-37 | 00/00/01 | DELL314670 to DELL314675 |
| 2 | System Description: The Apple II, Wonziak, Byte, The Small Systems Journal, Volume 2 Number 5, 34-45 | 5/1/1977 | DELL314676 to DELL314692 |
| 3 | System Independence for Interactive Computer Graphics Applications Program, Bown, H.G., O'Brien, C.D., Warburton, R.E., and Thorgeirson, G.W, Proceedings, 4th Man-Computer Communications Conference, Ottawa, | 5/26/75 - 5/27/75 | DELL314693 to DELL314705 |
| 4 | | | |
| 5 | Television, Lancaster, Byte, The Small Systems Journal, Issue 2, 20-33 | 10/1/1975 | DELL314706 to DELL314728 |
| 6 | The story of PLP, Wetherington, IEEE Journal on Selected Areas in Communications vol. SAC-1, No. 2, 267-277 | 02/00/1983 | DELL314729 to DELL314739 |
| 7 | TV Color Graphics, Lancaster, Byte, The Small Systems Journal, 62-69 | 2/1/1976 | DELL314740 to DELL314753 |
| 8 | USP 03,422,419 (Mathews) | 1/14/1969 | DELL314754 to DELL314768 |
| 9 | USP 04,091,374 (Muller) | 5/23/1978 | DELL314769 to DELL314776 |
| 10 | USP 04,121,283 (Walker) | 10/17/1978 | DELL314777 to DELL314795 |
| 11 | USP 04,233,601 (Hankins) | 11/11/1980 | DELL314796 to DELL314808 |
| 12 | USP 04,342,029 (Hofmanis) | 7/27/1982 | DELL314809 to DELL314820 |
| 13 | USP 3,309,692 (Wilhelmsen) | 3/14/1967 | DELL314821 to DELL314839 |
| 14 | USP 3,335,416 (Hughes) | 8/8/1967 | DELL314840 to DELL314851 |
| 15 | USP 3,603,962 (Lechner) | 9/7/1971 | DELL314852 to DELL314859 |
| 16 | USP 3,624,634 (Clark) | 11/30/1971 | DELL314860 to DELL314872 |
| 17 | USP 3,771,155 (Hayashi) | 11/6/1973 | DELL314873 to DELL314895 |
| 18 | USP 3,925,776 (Swallow) | 12/9/1975 | DELL314896 to DELL314929 |
| 19 | USP 4,070,710 (Sukonick et al) | 1/24/1978 | DELL314930 to DELL314957 |
| 20 | USP 4,139,838 (Inose et al) | 2/13/1979 | DELL314958 to DELL314971 |
| 21 | USP 4,142,180 (Burson) | 2/27/1979 | DELL314972 to DELL315000 |
| 22 | USP 4,149,152 (Russo) | 4/10/1979 | DELL315001 to DELL315005 |
| 23 | USP 4,149,184 (Giddings et al.) | 4/10/1979 | DELL315006 to DELL315013 |
| 24 | USP 4,155,095 (Kirschner) | 5/15/1979 | DELL315014 to DELL315024 |
| 25 | USP 4,180,805 (Burson) | 12/25/1979 | DELL315025 to DELL315052 |
| 26 | USP 4,191,956 (Groothuis) | 3/4/1980 | DELL315053 to DELL315080 |
| 27 | USP 4,200,867 (Hill) | 4/29/1989 | DELL315081 to DELL315099 |
| 28 | - 10 - | | |

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

**Exhibit 21  Page 431**

| | | |
|---|---|---|
| USP 4,206,457 (Weisbecker) | 6/3/1980 | DELL315100 to DELL315105 |
| USP 4,213,189 (Mueller) | 7/15/1980 | DELL315106 to DELL315173 |
| USP 4,232,311 (Agneta) | 11/4/1980 | DELL315174 to DELL315177 |
| USP 4,237,543 (Nishio) | 12/2/1980 | DELL315178 to DELL315188 |
| USP 4,243,984 (Ackley) | 1/6/1981 | DELL315189 to DELL315214 |
| USP 4,255,861 (Langdon Jr.) | 9/30/1980 | DELL315215 to DELL315224 |
| USP 4,262,302 (Sexton) | 4/14/1981 | DELL315225 to DELL315248 |
| USP 4,296,476 (Mayer et Al.) | 10/20/1981 | DELL315249 to DELL315282 |
| USP 4,303,912 (Stafford) | 12/1/1981 | DELL315283 to DELL315293 |
| USP 4,303,986 (Lans) | 12/1/1981 | DELL315294 to DELL315310 |
| USP 4,310,838 (Juso et al.) | 1/12/1982 | DELL315311 to DELL315341 |
| USP 4,368,461 (Komatsu et al) | 1/11/1983 | DELL315342 to DELL315346 |
| USP 4,388,639 (Cox et al) | 6/14/1983 | DELL315347 to DELL315353 |
| USP 4,4008,200 (Bradley) | 10/4/1983 | DELL315354 to DELL315380 |
| USP 4,424,572 (Lorig et al) | 1/3/1984 | DELL315381 to DELL315394 |
| USP 4,454,593 (Fleming) | 6/12/1984 | DELL315395 to DELL315411 |
| USP 4,471,465 (Meyer) | 9/11/1984 | DELL315412 to DELL315443 |
| Transform Picture Coding | 7/1/1972 | DELL320801 to DELL320818 |
| Principles of Interactive Computer Graphics | 7/1/1978 | DELL329813 to DELL331729 |
| IKONAS | | DELL334055 to DELL339043 |

## C.  Computation of Damages

This matter is currently under investigation.

## D.  Insurance Policies

Dell will make available for inspection and copying insurance policy(ies) applicable to the claims and defenses in this lawsuit.

- 11 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

Exhibit 21  Page 432

1   January 27, 2006                          ARNOLD & PORTER LLP

2

3                                      By: _____

4                                          Sidney A. Rosenzweig (*admitted pro hac vice*)

5                                          Attorney for Dell Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          - 12 -
CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02 CV 2060 B (CAB)
Dell Inc.'s Supplemental Initial Disclosures
Pursuant to Federal Rule of Civil Procedure 26(a)

Exhibit 21  Page 433

Exhibit 21  Page 434

1  Ronald L. Johnson (State Bar No. 57418)
   James S. Blackburn (State Bar No. 169134)
2  ARNOLD & PORTER LLP
   1900 Avenue of the Stars, 17th Floor
3  Los Angeles, California  90067-4408
   Telephone:  (310) 552-2500
4  Facsimile:  (310) 552-1191

5  Joel M. Freed
   Joseph A. Micallef
6  ARNOLD & PORTER LLP
   555 Twelfth Street, N.W.
7  Washington, D.C.  20004-1206
   Telephone:  (202) 942-5000
8  Facsimile:  (202) 942-5999

9  Attorneys for *Dell Inc.*

10

11                    **UNITED STATES DISTRICT COURT**

12                **SOUTHERN DISTRICT OF CALIFORNIA**

13

14
   LUCENT TECHNOLOGIES INC.,        )    Case No. 03-CV-1108 B (LAB)
15                                  )
                    Plaintiffs,     )    Master Case No.
16                                  )    02-CV-2060 B (LAB)
         v.                         )
17                                  )    [Consolidated with Case Nos.
   DELL INC.,                       )    02-CV-2060 B (LAB) and
18                                  )    CV-0699 B (LAB)]
                    Defendants,     )
19                                  )    **CERTIFICATE OF SERVICE**
   and                             )
20                                  )
   MICROSOFT CORPORATION,           )
21                                  )
                                    )
22                  Intervenor.     )
                                    )
23                                  )
                                    )
24  _____)

25

26

27

28

1    <u>**CERTIFICATE OF SERVICE**</u>

2    I am a citizen of the United States, over the age of eighteen years, and I am not a party to the

3    within action.  My business address is 555 Twelfth Street, N.W., Washington, DC 20008.

4    On January 27, 2006, I caused the following documents:

5    **1.    DELL'S SECOND SUPPLEMENTAL RESPONSE TO LUCENT'S SECOND**

6    **SET OF INTERROGATORIES (NOS. 22-23).**

7    **2.    DELL'S SIXTH SUPPLEMENTAL RESPONSE TO LUCENT'S FIRST SET**

8    **OF INTERROGATORIES (NOS. 1-21)**

9    **3.    DELL'S SUPPLEMENTAL INITIAL DISCLOSURES PURSUANT TO FED.**

10   **R. CIV. P. 26(a)**

11   to be served on counsel for the interested parties in the captioned action addressed as follows, via

12   the indicated method:

13

14   <u>**Via First-Class Mail and Electronic Mail**</u>

15   Jane Hahn, SBN 125203
     Alison P. Adema, SBN 149285

16   HAHN & ADEMA
     501 West Broadway, Suite 1730

17   San Diego, California  92101-3595
     Telephone:  (619) 235-2100

18   Facsimile:  (619) 235-2101

19   jhahn@hahnadema.com
     aadema@hahnadema.com

20

21   <u>**Via Electronic Mail**</u>

22   Robert A. Appleby
     Jon T. Hohenthaner

23   KIRKLAND &  ELLIS, LLP
     Citicorp Center

24   153 East 53rd Street

25   New York, NY  10022-4675
     Telephone:  (212) 446-4800

26   Facsimile:  (212) 446-4900
     rappleby@kirkland.com

27   jhohenthaner@kirkland.com

28

- 2 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Christopher S. Marchese
Roger Denning
FISH & RICHARDSON
4350 La Jolla Village Drive, Suite 500
San Diego, CA  92122
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099
marchese@fr.com
denning@fr.com

W. Bryan Farney
Jonathan Baker
DEWEY BALLENTINE
816 Congress Avenue, Suite 1900
Austin, TX  78701
Telephone:  (512) 226-0300
Facsimile:  (512) 226-0333
Jplies@deweyballantine.com
bfarney@deweyballantine.com
jbaker@deweyballantine.com

I declare that I am employed in the office of a member of the Bar of this Court at whose

directions the service was made.

_____
Sidney A. Rosenzweig

- 3 -

Exhibit 22

1    Bryan W. Farney (SBN: 06826600 (TX)(*pro hac vice*)
     Jeffrey B. Plies (SBN: 24027621)(*pro hac vice*)
2    DECHERT LLP
     300 W. 6th Street, Suite 1850
3    Austin, Texas 78701
     Telephone: (512) 394-3000
4    Facsimile: (512) 394-3001

5    David J. Zubkoff (SBN 149488)
     SELTZER CAPLAN McMAHON VITEK
6    A Law Corporation
     750 "B" Street, Suite 2100
7    San Diego, California 92101
     Telephone: (619) 685-3003
8    Facsimile: (619) 702-6827

9    Attorneys for Defendants and Counter-Claimants,
     GATEWAY, INC., GATEWAY COUNTRY STORES LLC,
10   GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING
     LLC, AND COWABUNGA ENTERPRISES, INC.

11

               **UNITED STATES DISTRICT COURT**
12            **SOUTHERN DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| 14   LUCENT TECHNOLOGIES, INC. | Case No. 02-CV-2060 B (WMc) |
| | consolidated with |
| 15      Plaintiff and Counter-Defendant, | Case No. 03-CV-699 B (WMc) |
| | Case No. 03-CV-1108 B (WMc) |
| 16      vs. | **GATEWAY, INC.'S FIFTH** |
| 17   GATEWAY, INC., GATEWAY COUNTRY | **SUPPLEMENTAL INITIAL** |
|      STORES LLC, GATEWAY COMPANIES, | **DISCLOSURES** |
| 18   INC., GATEWAY MANUFACTURING LLC | |
|      and COWABUNGA ENTERPRISES, INC. | |
| 19 | |
|      Defendants and Counter-Claimants, | |
| 20 | |
|      and | |
| 21 | |
|    MICROSOFT CORPORATION | |
| 22 | |
|      Intervenor and Counter-Claimant. | |
| 23 | |
| 24   AND CONSOLIDATED CASES | |

25       Pursuant to Fed. R. Civ. P. 26(a)(1), Defendants Gateway, Inc. and Gateway Country

26   Stores LLC ("Gateway") provides Lucent Technologies Inc. and Lucent Technologies

27   Guardian I LLC ("Lucent") with the following Fifth Supplemental Initial Disclosures based upon

28

reasonably available information at this time.  Gateway reserves the right to supplement or correct the disclosures to include information acquired hereafter under Fed. R. Civ. P. 26(e).

**INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT GATEWAY MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES**

After a reasonable inquiry, Gateway believes that the following individuals likely have discoverable information that Gateway may use to support its claims or defenses.  Gateway reserves the right to identify additional individuals at a later date.

| | NAME | TOPIC |
|---|---|---|
| 1. | Arun N. Netravali<br>10 Byron Court<br>Westfield, NJ 07090<br>Telephone: 908-654-7763 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 2. | John D. Robbins<br>100 Florence Avenue, 1A<br>Denville, NJ 07834<br>Telephone: 973-627-4129 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 3. | Barin G. Haskell<br>1190 Fairbrook Drive<br>Mountain View, CA 94040 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 4. | Atul Puri<br>19500 Pruneridge Avenue, #203<br>Cupertino, CA 95014 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 5. | Nuggehally S. Jayant<br>4390 Candacraig<br>Alpharetta, Georgia 30022 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 6. | Venkatasubbarao Ramamoorthy<br>6704 Paseo San Leon<br>Pleasanton, CA 94566 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 7. | Benjamin W. Day, Jr.<br>1 Bingham Avenue<br>Rumson, NJ 07760<br>Telephone: 732-747-6142 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 8. | William A. Frezza<br>83 Cambridge Parkway, #201<br>Cambridge, MA 02142<br>Telephone: 617-494-9290 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 9. | Alexander C. Gillon<br>20 Longview Drive<br>Sedona, AZ 86336<br>Telephone: 928-282-1090 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 10. | Raoul A. LeConte<br>10 Montery Court<br>Jackson, NJ 08527<br>Telephone: 732-833-7980 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |

| | **NAME** | **TOPIC** |
|---|---|---|
| 11. | Carolyn A. Doughty<br>521 Wakeman Avenue<br>Wheaton, IL 60187<br>Telephone: 630-668-6534 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 12. | Gabor P. Torok<br>31 Air Castle Isle<br>Andover, NJ 07821<br>Telephone: 973-770-5770 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 13. | Andrew B. White | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 14. | James R. Fleming<br>1412 Calcutta Lane<br>Naperville, IL 60564<br>Telephone: 630-717-1078 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 15. | Gerald S. Soloway<br>6 Brookview Court<br>Holmdel, NJ 07733<br>Telephone: 732-946-2918 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 16. | Frank Liebenow<br>Larson & Larson, PA<br>11199 69th Street N<br>Largo, FL 33773 | Products from vendors; Lucent and Gateway's pre-suit conduct. |
| 17. | Mark S. Walker<br>Consulting Attorney<br>IBM Corp.<br>Intellectual Property Law - MS 4054<br>11400 Burnet Road<br>Austin, TX 78758<br>Tel: 512-823-5884 | Damages; Lucent and Gateway's pre-suit conduct. |
| 18. | Kelly Thacker<br>Manager, Finance<br>Gateway, Inc.<br>14303 Gateway Place<br>Poway, CA 92064 | Damages |
| 19. | Richard H. Ketchum<br>11S076 West<br>Naperville, IL 60565 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 20. | Todd Agulnick<br>3701 Divisadero Street #303<br>San Francisco, CA 94123 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 21. | Bishnu S. Atal<br>6226 95th Place SW<br>Mukilteo, Washington 98275 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice. |
| 22. | Andrew Quinn, Esq.<br>Director, Law Department<br>Sony Electronics Inc.<br>16530 Via Esprillo, MZ-7345<br>San Diego, CA 92127<br>(858) 942-2466 | Release |

| NAME | TOPIC |
|---|---|
| 23.  Gregory Call<br>14123 Via Corsini<br>San Diego, CA 92128 | Release, Gateway litigation conduct. |
| 24.  Richard Shoup<br>5273 Country Lane<br>San Jose, CA 95129 | Invalidity of '759 |
| 25.  Michael Arlen Davis, Jr.<br>9020 N. Capital of Texas Hwy.<br>Bldg. 1, Suite 375<br>Austin, Texas 78759<br>(512) 306-8324 | Invalidity of '226 |
| 26.  Takeo Kanade<br>Carnegie Mellon University<br>Robotics Institute<br>5000 Forbes Avenue<br>Pittsburgh, PA 15213 | Invalidity of '759 |
| 27.  Richard Gilly<br>919 N. Market Street, Suite 1100<br>P.O. Box 1114<br>Wilmington, DE 19899<br>(302) 652-5070 | Gateway's pre-suit conduct |
| 28.  Neal West<br>Gateway, Inc.<br>7565 Irvine Center Dr.<br>Irvine, CA 92618 | Gateway financials |
| 29.  Mike Flannery<br>Gateway, Inc.<br>610 Gateway Drive<br>North Sioux City, SD 57049 | Gateway engineering and manufacturing;<br>Gateway products |
| 30.  D.W. Anderson<br>Gateway, Inc.<br>610 Gateway Drive<br>North Sioux City, SD 57049 | Gateway engineering and manufacturing;<br>Gateway products |
| 31.  Douglas Gude<br>Gateway, Inc.<br>610 Gateway Drive<br>North Sioux City, SD 57049 | Gateway unit tracking and financial<br>information |
| 32.  Nick England | Invalidity of '759 |
| 33.  James Benster<br>40 4th Street, #255<br>Petaluma, CA 94952<br>(707) 780-1907 | Invalidity of '759 |
| 34.  Robert Carr<br>725 Euclid Avenue<br>San Francisco, CA 94108 | Invalidity, inequitable conduct, claim<br>construction, conception and reduction to<br>practice, diligence in reducing to practice |
| 35.  Tony Hoeber | Invalidity, inequitable conduct, claim<br>construction, conception and reduction to<br>practice, diligence in reducing to practice |
| 36.  S. Jerrold Kaplan<br>125 Stonehedge Road<br>Hillsborough, CA 94010 | Invalidity, inequitable conduct, claim<br>construction, conception and reduction to<br>practice, diligence in reducing to practice |

| NAME | TOPIC |
|------|-------|
| 37.   David R. Low | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 38.   Michael Ouye | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 39.   Matthew Rainey<br>c/o Kirkland & Ellis<br>Citigroup Center<br>153 E. 53rd Street<br>New York, NY 10022 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 40.   Amir H. Raubvogel<br>Fenwick & West LLP<br>801 California Street<br>Mountain View, CA 94041 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 41.   Frederick P. Luludis<br>3725 SE 12th Place<br>Cape Coral, FL 33904 | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 42.   Mitchell Kapor | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 43.   Steve Sakoman | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 44.   Peter Miller | Invalidity, inequitable conduct, claim construction, conception and reduction to practice, diligence in reducing to practice |
| 45.   Intuit, Inc. | Structure, function and operation of Quicken software product |
| 46.   PalmSource, Inc. | Structure, function and operation of Palm OS operating system |
| 47.   Palm, Inc. | Structure, function and operation of Palm PDA |
| 48.   PalmOne, Inc. | Structure, function and operation of Palm PDA |
| 49.   Dr. James D. Foley<br>College of Computing<br>Georgia Institute of Technology<br>Atlanta, GA 30332 | Invalidity of '759 |
| 50.   James Templeman<br>7914 Brompton St.<br>Springfield, VA 22152 | Invalidity of '759 |
| 51.   Steve Fox<br>Manager, Finance<br>Gateway, Inc.<br>610 Gateway Drive<br>North Sioux City, SD 57049 | Damages and Gateway financials. |
| 52.   John Schindler<br>Gateway, Inc.<br>7565 Irvine Center Dr.<br>Irvine, CA 92618 | Gateway Marketing |

| NAME | TOPIC |
|------|-------|
| 53. Jeff Plotnick<br>3 Persimmon Court<br>Medford, NJ 08055 | Fleming '759 Prior Art |
| 54. Thomas Wehberg<br>Dept. of Communications Engineering<br>and Information processing<br>University of Hanover, Germany | Haskell '226 Prior Art |
| 55. Helga Röper<br>(formerly?) Dept. of Communications<br>Engineering<br>and Information processing<br>University of Hanover, Germany | Haskell '226 Prior Art |
| 56. Dr. Jaswant R. Jain<br>25801 Hackamore Street<br>Tehachapi, California 93561 | Invalidity of '272 Patent |
| 57. D.Kazakos<br>1100 Augusta Drive, Apt 72<br>Houston, Texas 77057 | Invalidity of '272 Patent, corroborating witness as to Dr. Jaswant R. Jain's conception and reduction to practice |
| 58. Shenq H. Wang<br>4105 Glen Meadows Drive<br>Allen, Texas 75002 | Invalidity of '272 Patent, corroborating witness as to Dr. Jaswant R. Jain's conception and reduction to practice |
| 59. Christopher Shook<br>Gateway, Inc.<br>610 Gateway Drive<br>North Sioux City, SD 57049 | Gateway web site |
| 60. Dr. Patricia Wenner<br>Bucknell University<br>Lewisburg, PA 17837<br>(570) 577-1266 | Invalidity of '759 Patent |
| 61. C. Douglas O'Brien<br>1390 Prince of Wales Dr.<br>Ottawa, Canada, K2C 3N6<br>(613) 233-8260 | Invalidity of '759 Patent |
| 62. Jean Pec<br>Gelman Library<br>George Washington University<br>(202) 994-8886<br>(or alternative GWU/Gelman<br>Librarian) | Invalidity of '759 Patent |
| 63. Michael Tyler<br>1915 Straits View Drive<br>Belvedere-Tiburon, CA 94920-1820<br>(415) 288-2150 | Invalidity of Day '356 Patent |
| 64. John Verity<br>377 Vose Ave.<br>South Orange, NJ 07079<br>(973) 763-1241 | Invalidity of Day '356 Patent |
| 65. David Kessler<br>20 Barberry Road<br>Lexington, MA 02421<br>(781) 863-1140 | Invalidity of Day '356 Patent |
| 66. Robert Long<br>West Highlands | Invalidity of Day '356 Patent |

| NAME | TOPIC |
|---|---|
| Three Gates Lane<br>Haslemere,<br>Surry,<br>GU27 2ET<br>+44 7788 672 096 | |
| 67.  John Annaloro<br>4408 Shore Drive NW<br>Gig Harbor, WA 98335<br>(253) 224-5279 | Invalidity of Day '356 Patent |
| 68.  Steven Foster<br>161 Ingrave Rd.<br>Brentwood<br>Essex<br>CM13 2AA<br>+44 1277 225 625 | Invalidity of Day '356 Patent |

Other individuals not specifically known to Gateway may posses relevant information, particularly information relating to the invalidity of the patents-in-suit. Such individuals include: (1) authors of prior art publications and patents relevant to the subject matter of the patent-in-suit; (2) individuals having knowledge of any prior art use, sale, offer to sell, or invention relevant to the subject matter of the patent-in-suit; (3) individuals having knowledge of the level of ordinary skill in the art to which the alleged invention pertains; (4) individuals having knowledge of any license to the patent-in-suit, any offer to license or refusal to license the patent-in-suit; (5) individuals having knowledge of the circumstances or manner of the alleged invention disclosed in the patent-in-suit; (6) individuals having knowledge of the ownership or rights in the patent and/or the subject matter of the patent-in-suit; (7) individuals having knowledge of products developed and supplied to Gateway by third parties; (8) individuals having knowledge of the representations made in Lucent's advertising and marketing materials; and (9) individuals having knowledge concerning Lucent's knowledge of Gateway's products prior to this lawsuit. Gateway expressly reserves the right to rely upon the testimony of any individual identified in the above list or who has been deposed in this case. Gateway also expressly incorporates by reference all individuals identified in Microsoft's and Dell's Initial Disclosures and all supplements thereto.

# DOCUMENTS AND THINGS

Gateway reserves the right to rely on all documents produced by Gateway, Microsoft, Dell, Lucent, or any third-party during the course of this litigation.  Gateway also intends to rely on sales and financial information located in its databases (*e.g.*, JDE/AS400).

## US PATENTS

| | | |
|---|---|---|
| 3,361,520 | 3,422,419 | 3,591,722 |
| 3,609,749 | 3,651,508 | 3,706,850 |
| 3,715,512 | 3,727,003 | 3,739,347 |
| 3,750,024 | 3,852,721 | 3,868,640 |
| 3,949,391 | 3,959,585 | 4,027,331 |
| 4,091,374 | 4,117,471 | 4,125,743 |
| 4,133,976 | 4,140,882 | 4,173,771 |
| 4,179,709 | 4,185,282 | 4,202,041 |
| 4,218,703 | 4,218,704 | 4,224,615 |
| 4,232,338 | 4,233,601 | 4,242,539 |
| 4,272,787 | 4,276,565 | 4,289,931 |
| 4,291,198 | 4,307,420 | 4,342,029 |
| 4,369,464 | 4,371,895 | 4,383,138 |
| 4,383,272 | 4,411,003 | 4,431,870 |
| 4,442,454 | 4,451,895 | 4,460,923 |
| 4,469,499 | 4,491,953 | 4,575,756 |
| 4,653,086 | 4,659,876 | 4,661,849 |
| 4,663,665 | 4,665,436 | 4,667,233 |
| 4,668,989 | 4,689,671 | 4,689,672 |
| 4,689,673 | 4,717,956 | 4,725,694 |
| 4,727,422 | 4,736,248 | 4,745,459 |
| 4,771,331 | 4,782,387 | 4,853,775 |
| 4,862,267 | 4,864,393 | 4,864,394 |
| 4,864,398 | 4,890,160 | 4,924,306 |
| 4,942,465 | 5,134,476 | 6,404,813 B1 |
| 5,001,560 | 4,575,756 | 4,202,011 |
| 4,858,005 | 4,979,020 | 3,736,373 |
| 4,771,331 | 4,788,589 | 4,890,160 |
| 5,113,255 | 4,710,813 | 5,027,206 |
| 4,862,267 | 4,837,632 | 4,723,161 |
| 4,460,923 | 4,371,895 | 4,805,017 |

## FOREIGN PATENTS

EU 0082512
FR 2183442
GER 2720435
GER 3025462
GER 2538820
JP 59-170929

## ARTICLES

- "A Frame-Based Real-Time Graphic Interaction System" by Werner Horn, Robert Trappl, Dietmar Ulrich, and Gerhard Chroust, European Meeting on Cybernetics and Systems Research, 1984, pp. 825-830.

- "An Interactive Touch Phone for Future Offices", by To Russell Hsing, Hoa Anh Quach, Charles LeBlanc, Ralph Mednick, and Leonard Abraham, IEEE International Conference on Communications, 20th Amsterdam, May 14-17, 1984, pp. 272-275.

- "An Interactive Touch Phone for Office Automation" by To Russell Hsing, Hoa Anh Quach, Charles LeBlanc and James C. Stoddard, IEEE Communications Magazine, Feb. 1985-vol. 23, No. 2, pp. 21-26.

- "Movement-Compensated Frame-Frequency Conversion of Television Signals" by H. Yamaguchi, T. Sugi and K. Kinuhata, IEEE Transactions on Communications, vol. COM-35, No. 10, Oct. 1987, pp. 1069-1082.

- "System for Terminals Creates Keyboards Anyone Can Use" by Linda Lowe, Electronics, Jun. 5, 1980, pp. 39 and 40.

- "Interframe Adaptive Data Compression Techniques for Images" by Jaswant R. Jain, A Dissertation Submitted to the Faculty of the Graduate School of the State University of New York at Buffalo in Partial Fulfillment of the Requirements for the Degree of Doctor of Philosophy, Sept.. 1979-Chapter 2, pp. 23-47.

- "Television Band Compression by Contour Interpolation" by D. Gabor and P.C.J. Hill, He Institution of Electrical Engineers, Paper No. 3507 E, May 1961, pp.303-315.

- "Picture Coding: A Review" by Arun N. Netravali and John O. Limb, Proceedings of the IEEE, March 1980 vol. 68, No. 3, pp. 366-407.

- "Image Data Compression: A Review" by Anil K. Jain, Proceedings of the IEEE, March 1981 vol. 69, No. 3, pp. 349-389.

- "Digital Pictures Representation and Compression" by Arun n. Netravali and Barry G Haskell, Published 1988 by Plenum Press, Chapters 3, 5, and 6.

- "Fixed and Adaptive Predictors for Hybrid Predictiv/Transform Coding" by Staffan Ericsson, IEEE Transactions on Communications, vol. COM-33. No. 12, Dec. 1985, pp.1291-1302.

- "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding" by M. Tanimoto and T. Mori, The Transactions of the IEICE, vo. E 70, No. 7, July 1987, pp.611-613.

- MPEG Submission 89/182, "MCPIC - Motion Compensated Predictive-Interpolative Coding," Bellcore, October 1989

- MPEG Submission 89/189, Matsushita, October 1989.

- S. Sabri, K Cuffling and B. Prasada, *Coding of Video Signals at 50 Kb/s Using Motion Compensation Techniques*, 1983 IEEE Military Communications Conference

- Mathias Bierling & Robert Thoma, *Motion Compensated Field Interpolation Using A Hierarchically Structured Displacement Estimator, Signal Processing*, Vol. 11 (1986)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- Hans C. Bergman, *Motion Adaptive Frame Interpolation*, IEEE, Int'l Zurich Seminar on Digital Communications, March 1984

- CCITT SGXV Document #78 (MSLT 0625858-69)

- CCITT SGXV Document #81 (MSLT 0625891-94)

- Thomas Micke, "Comparison of a Predictive and an Interpolative Motion Compensated Coding Method for Television Video Signals," University of Hanover, April 1986 (GW-LT 255054-84)

- CCITT SGXV Document #43 (MSLT 0625571-85)


Gateway may also rely upon additional prior art or documents produced by Gateway or any other party or third-party in this litigation. Technical documentation and things related to products supplied to Gateway by third-parties, to the extent such items are in Gateway's possession, custody, and control, are located either in Gateway's California or its South Dakota facilities. Other documents and things not presently known to Gateway may contain information that Gateway may use to support its claims or defenses, particularly information relating to the invalidity of the patents-in-suit, and Gateway reserves all rights as to such information.

### DAMAGES

Gateway seeks judicial determination and declaration that it has not and is presently not infringing the patents-in-suit, and further that such patents be declared invalid. Accordingly, Gateway is not liable for damages arising from the alleged infringement.

To the extent that Gateway is found to infringe any valid patent, Lucent's recovery is limited to no more than a reasonable royalty which will be computed based upon the well-known *Georgia-Pacific* factors. Because fact and expert discovery are ongoing, a precise calculation will be presented in Gateway's expert damages report. Some data to be used in this calculation is located in Gateway's electronic databases (*e.g.*, JDE/AS400), which Lucent is invited to inspect.

### INSURANCE

Based on present information, Gateway has no insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which

1   may be entered in this action, or to indemnify or reimburse Gateway for payments made to

2   satisfy such a judgment.

3

4   Dated:  September 7, 2007

5

6                                             DECHERT LLP

7   By: _____
                                              Jeffrey B. Plies

8                                             ATTORNEYS FOR DEFENDANTS AND
                                              COUNTER-CLAIMANTS GATEWAY, INC.,
9                                             GATEWAY COUNTRY STORES LLC,
                                              GATEWAY COMPANIES, INC., GATEWAY
10                                            MANUFACTURING LLC AND
                                              COWABUNGA ENTERPRISES, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I am a resident of the State of Texas, over the age of eighteen years, not a party to the within action, and am employed in Austin, Travis County, Texas. On September 7, 2007, I served a copy of the following document: ·

## GATEWAY'S FIFTH SUPPLEMENTAL INITIAL DISCLOSURES.

I am readily familiar with the business practice at Dechert LLP regarding collection and processing and correspondence for personal delivery, for mailing with U.S. Postal Service, for facsimile and for overnight delivery by Federal Express, Express Mail, or other overnight services. Said document was served as follows:

**BY FACSIMILE:**          Said document was served by facsimile to the addresses stated below:

Counsel for Lucent:

Alison P. Adema
Hahn & Adema
501 West Broadway, Suite 1730
San Diego, CA 92101
Facsimile:     (619) 235-2101

Counsel for Microsoft

Christopher S. Marchese
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Facsimile:     (858) 678-5099

Counsel for Dell

James S. Blackburn
Arnold & Porter
777 South Figueroa Street
Los Angeles, California 90017-5844
Facsimile:     (213) 243-4199

**ELECTRONIC MAIL:**     Courtesy copies of said documents have been served by electronic mail as stated below.

Counsel for Lucent

rappleby@kirkland.com
jhohenthaner@kirkland.com
akellman@kirkland.com
aadema@hahnadema.com

Counsel for Microsoft

marchese@fr.com
denning@fr.com

Exhibit 23

John E. Gartman (SBN 152300)
Juanita R. Brooks (SBN 75934)
Christopher S. Marchese (SBN 170239)
Roger A. Denning (SBN 228998)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone:      (858) 678-5070
Facsimile:      (858) 678-5099

Stephen P. McGrath (SBN 202696)
One Microsoft Way
Redmond, WA 98052
Telephone:      (425) 882-8080
Facsimile:      (425) 936-7329

Attorneys for Intervener, Counter-claimant
and Plaintiff/Counter-defendant
MICROSOFT CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff and Counterclaim-defendant, <br><br> v. <br><br> GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWBUNGA ENTERPRISES, INC., <br><br> Defendants and Counter-claimants, <br><br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervener and Counter-claimant, | Case No. 02-CV-2060 B (CAB) consolidated with Case 03-CV-0699 B (CAB) and Case 03-CV-1108 B (CAB) <br><br> **MICROSOFT CORPORATION'S EIGHTH SUPPLEMENTAL INITIAL DISCLOSURES** |
| MICROSOFT CORPORATION, <br><br> Plaintiff and Counter-defendant, <br><br> v. <br><br> LUCENT TECHNOLOGIES INC., <br><br> Defendant and Counter-claimant, | |

**Exhibit 23  Page 450**

1  | LUCENT TECHNOLOGIES INC.,
2  |          Plaintiff,
3  | v.
4  | DELL, INC.,
5  |          Defendant.
6

7      Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Microsoft Corporation

8  makes the following Eighth Supplemental Initial Disclosures for the "DJ Patents" (U.S. Patent Nos.

9  4,317,956;  4,383,272;  4,617,676;  4,763,356;  4,958,226;  4,701,954;  4,910,781;  5,341,457;

10  5,347,295; 5,627,938; and 5,649,131).  Microsoft understands that Lucent is asserting that certain

11  Microsoft products infringe the DJ Patents.

12                                    **GENERAL STATEMENT**

13      Microsoft has not completed its investigation relating to this action.  The supplemental

14  initial disclosures made are limited to the information reasonably available to Microsoft at the

15  present time.  Discovery as well as Microsoft's ongoing investigation and analysis may yield

16  additional information.  Microsoft therefore reserves the right to further supplement, revise, correct,

17  clarify or otherwise amend the information disclosed, consistent with the Federal Rules of Civil

18  Procedure and any applicable orders of the Court.  By making these disclosures, Microsoft does not

19  waive any applicable privilege, work product or other objection, and reserves its right to object to

20  the production or admissibility of any information included in the categories described below.

21      A.      **Identification of Individuals- Rule 26(a)(1)(A).**

22      After a reasonable inquiry, Microsoft believes the following individuals are likely to have

23  discoverable information that Microsoft may use to support its claims or defenses.  "Contact

24  information" lists the last known address for individuals.  Microsoft reserves the right to supplement

25  this list and identify additional individuals at a later date.

26

27

28

                                              1

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Gabor P. Torok | 1109 Grand Cay Drive<br>Palm Beach Gardens, FL 33418<br>561/799-7976 | U.S. Patent No. 4,317,956, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Andrew B. White | Marlboro, NJ | U.S. Patent No. 4,317,956, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Arun N. Netravali | Lucent Technologies, Inc.<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br>908/582-8500 | U.S. Patent No. 4,383,272, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| D. Robbins | 3734 Leewood Lane<br>Jacksonville, FL 32217-4221<br>904/737-8514 | U.S. Patent No. 4,383,272, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Nuggehally S. Jayant | 4390 Candacraig<br>Alpharetta, GA 30022<br>404/894-7285 | U.S. Patent No. 4,617,676, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope; joint development agreement between AT&T and Fraunhofer |

**Exhibit 23  Page 452**

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Venkatasubbarao Ramamoorthy | 6704 Paseo San Leon Pleasanton, CA 94566 925/417-8517 | U.S. Patent No. 4,617,676, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Benjamin W. Day, Jr. | 1 Bingham Ave. Rumson, NJ 07760 732/747-6142 | U.S. Patent No. 4,763,356, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Alexander C. Gillon | 20 Longview Drive Sedona, AZ 86336 928/282-1090 | U.S. Patent No. 4,763,356, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Raoul A. LeConte | 10 Monterey Court Jackson, NJ 08527 732/833-7980 | U.S. Patent No. 4,763,356, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Barin G. Haskell | 1190 Fairbrook Dr. Mountain View, CA 94040 (650) 428-0990 | U.S. Patent No. 4,958,226, including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |
| Atul Puri | 19500 Pruneridge Avenue, No. 203 Cupertino, CA 95014 | U.S. Patent No. 4,958,226 including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability, and claim scope |

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Bishnu S. Atal | 6226 95th Pl. S.W.<br>Mukilteo, WA 98275<br>425/353-2762 | U.S. Patent No. 4,701,954 including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Richard H. Ketchum | Wheaton, IL | U.S. Patent No. 4,910,781 including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Willem B. Klejn | 509 Van Buren Street<br>Batavia, IL 60510-2333 | U.S. Patent No. 4,910,781 including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Daniel J. Kransinski | 131 Wakefield Ct.<br>Aurora, IL 60506<br>630/859-3892 | U.S. Patent No. 4,910,781 including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Joseph L. Hall, II | Last Known Address:<br>20 Kinnan Way<br>Basking Ridge, NJ 07920 | U.S. Patent No. 5,341,457 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| James D. Johnston | Fish & Richardson P.C. | U.S. Patent Nos. 5,341,457 and 5,627,938 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Todd Agulnick | 3701 Divisadero Street<br>San Francisco, CA 94123<br>415/885-8519 | U.S. Patent No. 5,347,295 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Robert Carr | San Francisco, CA | U.S. Patent No. 5,347,295 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Tony Hoeber | 21786 Via Regina<br>Saratoga, CA 95070<br>408/868-9008 | U.S. Patent No. 5,347,295 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| S. Jerrold Kaplan | San Francisco, CA | U.S. Patent No. 5,347,295 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| David R. Low | Oakland, CA | U.S. Patent No. 5,347,295 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Michael Ouye | Palo Alto, CA | U.S. Patent No. 5,347,295 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |

| NAME | CONTACT INFORMATION | SUBJECT |
|------|---------------------|---------|
| Chaim M. Ackerman | 752 S. Lake Dr.<br>Lakewood, NJ 08701<br>732/901-1446 | U.S. Patent No. 5,649,131 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Alan L. Glasser | 4 Sheffield Drive.<br>Manalpan, NJ 07726-3619 | U.S. Patent No. 5,649,131 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Reuben Klein | 8 Mount Court<br>East Brunswick, NJ 08816<br>732/446-6272 | U.S. Patent No. 5,649,131 invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| Karlheinz Brandenburg | Buckenhof, Germany | Prior art to audio patents; joint development agreement between AT&T and Fraunhofer |
| Henry T. Brendzel | AT&T<br>Room B2133<br>131 Morristown Road<br>Basking Ridge, NJ 07920-1650<br>908/204-8542<br>908/953-4455 | U.S. Patent No. 4,958,226; and 5,341,457 including prosecution, prior art, and unenforceability |
| Jack S. Cubert | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ 07974<br>201/582-3809 | U.S. Patent Nos. 4,617,676 and 4,701,954 including prosecution, prior art, and unenforceability |
| Barry H. Freedman | AT&T<br>Room B2133<br>131 Morristown Road<br>Basking Ridge, NJ 07920-1650<br>908/204-8542<br>908/953-4455 | U.S. Patent No. 4,383,272, including prosecution, prior art, and unenforceability |

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| S.E. Hollander | 19 Beech Terrace<br>Milburn, NJ 07041 | U.S. Patent Nos. 4,383,272; 4,617,676 and 4,701,954 including prosecution, prior art, and unenforceability |
| Frederick B. Luludis | Lucent Technologies Intellectual Property<br>101 Crawfords Corner Road<br>Holmdel, NJ 07733-1900<br>732/332-0982<br>732/817-1870 | U.S. Patent No. 4,763,356 and 5,649,131 including prosecution, prior art, and unenforceability |
| John P. McDonnell | 68 Dale Dr.<br>Summit, NJ<br>908/273-4419 | U.S. Patent Nos. 4,763,356; 4,910,781 and 5,341,457 including prosecution, prior art, and unenforceability |
| Ronald D. Slusky | Lucent Technologies<br>600 Mountain Avenue<br>Murray Hill, NJ 07974-2008<br>908/582-4530 | U.S. Patent No. 4,763,356, including prosecution, prior art, and unenforceability |
| David H. Tannenbaum | Fulbright & Jaworski L.L.P.<br>2200 Ross Avenue, Suite 2800<br>Dallas, TX 75201-2784<br>214/855-8000 | U.S. Patent No. 4,317,956, including prosecution, prior art, and unenforceability |
| Frederick W. Padden | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent No. 4,910,781 including prosecution, prior art, and unenforceability |
| David Volejnicek | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent No. 4,910,781 including prosecution, prior art, and unenforceability |
| Thomas Restaino | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent Nos. 5,341,457 and 5,627,938, including prosecution, prior art, and unenforceability; AT&T's ownership of audio patents |

7                                Case No. 02-CV-2060 B (CAB)

Exhibit 23  Page 457

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| William Wisner | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent Nos. 5,341,457 and 5,627,938, including prosecution, prior art, and unenforceability |
| George S. Indig | Bell Telephone Laboratories, Inc.<br>600 Mountain Avenue<br>Murry Hill, NJ  07974-2070 | U.S. Patent No. 4,701,954 including alleged invention, conception, reduction to practice, invalidity, noninfringement, unenforceability and claim scope |
| A. E. Hirsch, Jr. | Last Known Address:<br>AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent No. 4,910,781 including prosecution, prior art, and unenforceability |
| John C. Moran | Last Known Address:<br>AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent No. 4,910,781 including prosecution, prior art, and unenforceability |
| P. V. D. Wilde | Last Known Address:<br>AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent Nos. 5,341,457; 5,649,131 and 5,627,938 including prosecution, prior art, and unenforceability |
| William Ryan | Last Known Address:<br>Law Offices of William Ryan<br>Suite 360<br>1253 Springfield Ave.<br>New Providence, NJ  07974 | U.S. Patent No. 5,341,457 and 5,627,938 including prosecution, prior art, and unenforceability; joint development agreement between AT&T and Fraunhofer |
| Geoffrey D. Green | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent No. 5,341,457 including prosecution, prior art, and unenforceability |
| Amir H. Raubvogel | Fenwick & West<br>801 California Street<br>Mountain View, California 94041<br>Phone: 650/988-8500 | U.S. Patent Nos. 4,347,295 and 5,347,295 including prosecution, prior art, and unenforceability |

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Matthew C. Rainey | Irell & Manella<br>545 Middlefield Road, Suite 200<br>Menlo Park, CA  94025 | U.S. Patent No. 4,347,295 including prosecution, prior art, and unenforceability |
| Peter T. Dehlinger | Perkins Coie LLP<br>101 Jefferson Drive<br>Menlo Park, CA 94025-1114 | U.S. Patent No. 4,347,295 including prosecution, prior art, and unenforceability |
| Jonathan A. Small | Formerly of:<br>Weil, Gotshal & Manges<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065 | U.S. Patent No. 4,347,295 including prosecution, prior art, and unenforceability |
| S. H. Dworetsky | Last Known Address:<br>AT&T Bell Laboratories<br>600 Mountain Avenue<br>Room 3C-512<br>P.O. Box 626<br>Murray Hill, NJ 07974-0636 | U.S. Patent Nos. 5,627,938 and 5,649,131 including prosecution, prior art, and unenforceability |
| David M. Rosenblatt | AT&T Bell Laboratories<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974-2070 | U.S. Patent Nos. 5,627,938 and 5,341,457 including prosecution, prior art, and unenforceability |
| Donald P. Dinella | Last Known Address:<br>Lucent Technologies, Inc.<br>600 Mountain Ave.<br>P.O. Box 626<br>Murray Hill, NJ 07974-0636 | U.S. Patent No. 5,627,938 including prosecution, prior art, and unenforceability |
| Kenneth M. Brown | Last Known Address:<br>Lucent Technologies, Inc<br>600 Mountain Ave.<br>P.O. Box 626<br>Murray Hill, NJ 07974-0636 | U.S. Patent No. 5,627,938  including prosecution, prior art, and unenforceability |

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Mu Han<br>Henrique Malvar<br>Jordi Ribas<br>Stan Pennington<br>Peter Loforte<br>Venkatesh Gopalikrishnan<br>Sridhar Srinivasan<br>Petr Slavik<br>Wilhelm Schmieder<br>Kasy Srinivas<br>Gary Sullivan<br>Geoff Harris<br>Tobias Jones<br>Geoff Dunbar<br>Mark Nielsen<br>Adam Berns<br>Scott Skorupa<br>Mark Brown<br>William Kennedy<br>Scott Stamps<br>Peter Williamson | Fish & Richardson, P.C. | Technical information regarding the accused products |
| David Fester<br>Rodney Jenkins<br>Barry Spector<br>Donald Coyner<br>Thomas Laemmel<br>Jordi Ribas<br>Adam Berns<br>William Kennedy | Fish & Richardson P.C. | Marketing and sales information regarding the accused products |
| Tony Davis<br><br><br><br>Neil Meyers | Thomson Multimedia Inc.<br>10330 North Meridian Street<br>Indianapolis, IN  46290-1024<br>317/587-6727<br><br>Fish & Richardson P.C. | Licensing information regarding one or more of the DJ Patents and/or accused products |
| John Weresh | Fish & Richardson P.C. | Discussions with Lucent and ThinkFire; discussions with OEMs; pre-suit diligence; equitable defenses; licensing policies |
| Blake Irving<br>Max Morris<br>Toby Nixon<br>Curt Smith | Fish & Richardson P.C. | Elemedia; Netmeeting; G.723.1; Intel H.323 stack |
| Professor Peter Hill | See deposition transcript | Prior art re the '272 patent |
| Anil Jain | See deposition transcript | Prior art re the '272 patent |

**Exhibit 23  Page 460**

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Steffan Ericcson | See deposition transcript | Invalidity of video patents |
| Richard Schaphorst | See deposition transcript | Invalidity of '226 patent |
| Louise Coates | See deposition transcript | Prior art re the '272 patent |
| Nancy Caldwell | See deposition transcript | Prior art re the '272 patent |
| Neal Kaske | See deposition transcript | Prior art re the '272 patent |
| Delphine Lewis | See deposition transcript | Prior art re the '272 patent |
| Nancy McClements | See deposition transcript | Prior art re the '272 patent |
| Sue Phillips | See deposition transcript | Prior art re the '226 patent |
| Didier LeGall | 1235 Lisa Lane<br>Los Altos, CA 94024 | Invalidity of video patents; MPEG standards and patent pooling |
| MPEG-LA | | MPEG-2 patent pool; AT&T and Lucent's involvement in same |
| Daniel McCurdy<br>Charles Hirsch | ThinkFire Services USA, Ltd.<br>Perryville Corporate Park III<br>53 Frontage Road<br>P.O. Box 4013<br>Clinton, NJ 08809 | Negotiations with Microsoft; valuation of Lucent patent portfolio |
| May Cheng<br>Christopher Godziela<br>Donald Padilla<br>Michael Greene<br>James Lamar<br>Stephen Haggerty | Kirkland & Ellis | Joint development agreement between AT&T and Fraunhofer |
| AT&T Corp. | AT&T Corp.<br>600 Mountain Avenue<br>Murray Hill, NJ, 07974 | MPEG; ownership of audio patents; agreement with Fraunhofer; division of patents with Lucent |
| David Thomson | See deposition transcript | '781 inventorship, best mode |

**Exhibit 23  Page 461**

| NAME | CONTACT INFORMATION | SUBJECT |
|------|---------------------|---------|
| Walt Hartwell | See deposition transcript | '781 inventorship, best mode |
| Anibal Ferreira | Department of Electrical and Computer Engineering School of Engineering of the University of Porto<br><br>Rua Dr. Roberto Frias, 4200-465 Porto, Portugal | '938 inventorship, best mode |
| Helmut Schubert<br>Michael Gross | Fraunhofer-Gesellschaft Patente und Lizenzen Leonrodstrasse 68 80636 München Germany | Join development agreement between AT&T and Fraunhofer; Fraunhofer's ownership and licenses of audio patents |
| Martin Sieler<br>Stefan Gewinner<br>Markus Werner | Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. Postfach 20 07 33 80007 München Germany | Structure and operation of accused MP3 encoders and decoders |
| Fraunhofer Gesellschaft | Fraunhofer-Gesellschaft zur Förderung der angewandten Forschung e.V. Postfach 20 07 33 80007 München Germany | Structure and operation of accused MP3 encoders and decoders; joint development agreement between AT&T and Fraunhofer |
| Detlef Krahe | Bergi University of GH Wuppertal, Fuhlrottstr. 10, 42097 Wuppertal Germany | Prior art re audio patents |
| Jose Tribolet | Instituto Superior Técnico Computer Engineering Dept. Lisbon, Portugal | Prior art re the audio patents |
| Ernst Schroeder | Thomson Multimedia Corporate Research & Advanced Development Hannover, Germany | Prior art re the audio patents |
| Robert Garner<br>David Smith<br>Robert Belleville<br>David Liddle<br>David Curbrow | Xerox PARC | Prior art re the '356 patent |
| William Verplank | See deposition transcript | Xerox Star |

**Exhibit 23  Page 462**

| NAME | CONTACT INFORMATION | SUBJECT |
|------|---------------------|---------|
| Len Reiffel | 602 West Deming Place #1 Chicago, IL 60614 | Prior art re the '956 patent |
| Joel Remde | See deposition transcript from AT&T vs. Microsoft case | Inventorship of the '954 patent |
| Andy Hertzdeld Bruce Horn Steve Capps Adam Osbourne Donn Denman Susan Hare | Apple Computer Corp. | Prior art re the '356 patent |
| All individuals listed in Dell and Gateway's Initial Disclosures that are not listed above | Arnold & Porter Dewey Ballantine | See Dell and Gateway's Initial Disclosures |
| Elmer Hill | 6498 Surfside Way Sacramento, CA 95831 | Prior art re the '956 |
| Dr. Douglas Engelbart | c/o Peter Chen McDermott Will & Emery 3150 Porter Drive Palo Alto, CA 94304-1212 | Prior art re the '956 and '356 |
| Robert Bloeden | 2310 W. Hickory Street #D Denton, TX 76201 | Prior art re the '356 |
| Michael Wakin | 900 Morrison Drive #203 Ottawa, Ontario K2H8K7 Canada | Prior art re the '356 |
| Chris White | | Prior art re the '356 |
| Mike Farmer | c/o Survivor Software Ltd. 11222 La Cienega Blvd., Suite 450 Inglewood CA 90304-1134 | Prior art to the '356 |
| James Gosling | c/o Sun Microsystems, Inc. 4150 Network Circle Santa Clara, CA 95054 | Prior art re the '131 |
| Jim Rhyne | c/o Gretchen Fritz Hogan & Hartson 875 Third Avenue New York, NY 10022 | Prior art re the '131 |
| Bill Atkinson | 90 Hayfields Road Portola Valley, CA 94028 | Prior art to the '131 |
| Todd Prince | 1001 Fourth Ave. #3200 Seattle, WA 98154 | Prior art to the '131 |
| John R. Powers, III | 13303 Hopeful Hill Road #R Nevada City, CA 95959 | Prior art to the '131 |
| Keith Odom | 18816 Afton Avenue Saratoga, CA 95070 | Prior art to the '131 |
| Jacqueline Landman Gay | 5226 W. Nokomis Pkwy. Minneapolis, MN 55417 | Prior art to the '131 |
| Danny Goodman | | Prior art to the '131 |
| Bill Randle | c/o J.B. Hadden Porter Wright Columbus, OH | Invalidity of the '131 |

**Exhibit 23  Page 463**

| NAME | CONTACT INFORMATION | SUBJECT |
|---|---|---|
| Charles Irby | 65 Yale Road Menlo Park, CA 94025-5334 | Prior art to the '131 |
| Michael Grisham | Kirkland & Ellis | Invalidity of the '131 |
| David Rosenthal | 11144 Greenwood Ave Palo Alto, CA 94301 | Prior art to the '131 |
| Jeff Hawkins | 42 Camino Por Los Arboles Atherton, CA 94027 | Prior art to the '295 |
| Daniel S. Bricklin | 38 Lakewood Rd Newton Highlands, MA 02461-1226 | Prior art to the '295 |
| Ralph Sklarew | 2004 Turtle Pond Drive Reston, VA 20191 | Prior art to the '295 |
| Alan Kay | | Prior art to the '295 |
| Valerie Quercia | | Prior art to the '295 |
| Tim O'Reilly | 8905 Barnett Valley Road Sebastopol, CA 95472 | Prior art to the '295 |
| Stephen Levin | | Prior art to the '295 |
| Alex Harui | 1048 Galley Lane Foster City, CA 94404 | Prior art to the '295 |
| Hiroshi Takahashi | | Prior art to the '295 |
| D. Kazakos | 1100 Augusta Drive, Apt. 72 Houston, TX 77057 | Invalidity of '272 Patent, corroborating witness as to Dr. Jaswant r. Jain's conception and reduction to practice |
| Shenq H. Wang | 4105 Glen Meadows Drive Allen, TX 75002 | Invalidity of '272 Patent, corroborating witness as to Dr. Jaswant r. Jain's conception and reduction to practice |
| Francois DeVilliers | 1228 Hermosa Way San Jose, CA 95125 | Lucent licensing negotiations with Creative Labs |
| Claus Hoffman | Teglholm Alle 13, DK-2450 Copenhagen, Denmark | Public availability of PA 1987 03272 |
| Carsten Midskov | Denmark cmidskov@danbbs.dk | Public availability of PA 1987 03272 |
| Thomas Tobin | Merrill Corporation One Merrill Circle St. Paul, MN 55108 | Translations of foreign language documents |
| Thomas Alwood | Merrill Corporation One Merrill Circle St. Paul, MN 55108 | Translations of foreign language documents |
| Bridget Freed | Merrill Corporation One Merrill Circle St. Paul, MN 55108 | Translations of foreign language documents |
| Kara Dempsey | Merrill Corporation One Merrill Circle St. Paul, MN 55108 | Translations of foreign language documents |

Other individuals currently or previously employed by or associated with Lucent (including its predecessors) may have discoverable information concerning all issues pending in this litigation, including but not limited to Lucent's decision to file suit, Lucent's licensing and assignments and related discussions of the DJ Patents, Lucent's (including its predecessor's) participation in ITU-T and ISO/IEC standards bodies, Lucent's and its predecessor's marketing, sales and offers for sale of any products embodying the technologies claimed in the DJ Patents, and damages. Microsoft does not yet know all of these persons' identities.

Other individuals not specifically known to Microsoft may possess relevant information, particularly information relating to infringement, invalidity, and unenforceability of the DJ Patents. Such individuals include: (1) authors of prior art publications relevant to the subject matter of the DJ Patents; (2) individuals having knowledge of any prior knowledge, use, sale or invention relevant to the subject matter of the DJ Patents; (3) individuals having knowledge of any license or assignment of the DJ Patents, or any offer to license or assign or refusal to license or assign the DJ Patents; (4) individuals having knowledge of the circumstances of alleged invention of the subject matter of the DJ Patents; (5) individuals having knowledge of the ownership or rights in the work relating to the subject matter of the DJ Patents; and (6) individuals having technical knowledge of the accused products to the extent that the accused products are not Microsoft products.

Microsoft's identifications are not an admission that these individuals' testimony would be admissible evidence or that discovery may properly be sought from them consistent with Rule 26. In addition, no direct contact with Microsoft employees is authorized.

**B.     Documents- Rule 26(a)(1)(B)**

Categories of documents, data compilations, and tangible things that Microsoft may use to support its claims or defenses include.

1. The DJ Patents.

2. File histories for the DJ Patents.

3. Prior art to the DJ Patents, including actual working models of the prior art.

4. The Microsoft accused products, including source code.

**Exhibit 23  Page 465**

5.   Documents relating to the operation of the Microsoft accused products to the extent they relate to this case.

6.   Documents relating to the marketing and sales of the Microsoft accused products to the extent they relate to this case.

7.   Press releases, web pages, articles and other publicly available information about Lucent, the relevant industry, accused products, and prior art.

8.   Documents relating to ITU-T and/or ISO/IEC standards to the extent that they relate to this case.

9.   Documents relating to Lucent's license or assignment of the DJ Patents, or any offer or refusal to license or assign the DJ Patents.

10. Documents relating to Gateway, Dell or other third party products to the extent that Lucent accuses them of infringement.

11. Documents related to the formation and adoption of the MPEG standards.

12. Documents relating to the invalidity of the patents-in-suit listed in Dell's Supplemental Initial Disclosures.

13. Documents cited in Microsoft Corporation's Response to Lucent's First, Second, Third, Fourth, and Fifth Sets of Interrogatories to Microsoft (Nos. 1-34) served on January 27, 2006, including all documents, such as prior art references, cited, listed, and/or described in the attachments to that Response.

14. Documents produced by Lucent.

15. Documents produced by Dell and Gateway.

16. Documents produced by Microsoft.

17. Documents produced by the inventors of the DJ Patents.

18. Documents produced by the prosecuting attorneys of the DJ Patents.

19. Documents produced by prior art witnesses.

20. Documents produced by corporate third parties.

To the extent that they are within Microsoft's possession, custody or control, the documents and tangible items described above are located at the offices of counsel for Microsoft, Fish &

16                          Case No. 02-CV-2060 B (CAB)

**Exhibit 23  Page 466**

Richardson, 12390 El Camino Real, San Diego, CA 92130, or at Microsoft Corporation, One Microsoft Way, Redmond, WA 98052-6399. Microsoft notes that its investigation is ongoing and that additional documents may be within its possession, custody, or control and will be identified if located.

**C.    Damages – Rule 26(a)(1)(C)**

Microsoft seeks costs of suit and attorneys' fees under 35 U.S.C. §285. Since the litigation is ongoing, Microsoft does not yet have a computation of these costs.

Microsoft believes that Lucent is not entitled to damages on the DJ Patents as they relate to any Microsoft product, but reserves the right to challenge any claim for damages that Lucent may make and identify any related documents. To date, Lucent has yet to articulate its damages theory and has stated it is "unable to compute its exact amount of damages at this time and will provide applicable calculations during expert discovery." [Lucent Technologies Inc.'s Amended Initial Disclosures Statement served 1/27/06.] Until Lucent articulates its damages theory, Microsoft cannot identify any damages documents and cannot rebut any claim of damages Lucent may seek.

**D.    Insurance Agreements – Rule 26(a)(1)(D)**

Microsoft is unaware of any applicable insurance agreements.

Dated: September 20, 2006                    FISH & RICHARDSON P.C.

                                             By: _____
                                                 Jaime K. Olin (SBN 243139)

                                             Attorneys for Intervener, Counter-claimant
                                             and Plaintiff/Counter-defendant
                                             MICROSOFT CORPORATION

10667149.doc

1

## **PROOF OF SERVICE**

2      I am employed in the County of San Diego. My business address is Fish & Richardson
P.C., 12390 El Camino Real, San Diego, California 92130.  I am over the age of 18 and not a

3   party to the foregoing action.

4      I am readily familiar with the business practice at my place of business for collection and
processing of correspondence for personal delivery, for mailing with U.S. Postal Service, for

5   facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

6      On September 20, 2006, I caused a copy of the following document(s):

7   **MICROSOFT CORPORATION'S EIGHTH SUPPLEMENTAL INITIAL DISCLOSURES**

8      to be served on the interested parties in this action by placing a true and correct copy
thereof, enclosed in a sealed envelope, and addressed as follows:

9

10   | | |
|---|---|
| Alison P. Adema | Attorneys for Plaintiffs |
| Hahn & Adema | LUCENT TECHNOLOGIES INC. |

11   501 West Broadway, Suite 1600
San Diego, CA  92101                     Email: aadema@hahnadema.com

12   Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

13   *VIA FACSIMILE & ELECTRONIC MAIL*

14   David J. Zubkoff                         Attorneys for Defendants
Seltzer, Caplan, McMahon & Vitek          GATEWAY, INC. and GATEWAY

15   2100 Symphony Towers                      COUNTRY STORES LLC
750 B Street, Suite 2100

16   San Diego, CA  92101                      Email: zubkoff@scmv.com
Telephone:  (619) 685-3003

17   Facsimile:  (619) 702-6827
*VIA FACSIMILE & ELECTRONIC MAIL*

18

19   James S. Blackburn                        Attorneys for Defendant
Arnold & Porter LLP - (L.A.)              DELL INC.

20   777 S. Figueroa Street, 44th Floor
Los Angeles, CA  90017                    Email: james_blackburn@aporter.com

21   Telephone:  (213) 243-4000
Facsimile:  (213) 243-4199

22   *VIA FACSIMILE & ELECTRONIC MAIL*

23      I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.  I declare under penalty of perjury that the above is true and

24   correct.  Executed on September 20, 2006, at San Diego, California.

25   _____
Susan Rodriguez

26

27

28

## COURTESY COPIES BY ELECTRONIC MAIL TO:

Trial Counsel For Lucent:
Jon T. Hohenthaner/Alan Kellman/James Bailey
Kirkland & Ellis LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
E-mail:    jhohenthaner@kirkland.com; akellman@kirkland.com; jbailey@kirkland.com

Trial Counsel for Gateway:
Bryan Farney / Jeffrey B. Plies / Lawrence Fluker
DECHERT LLP
106 East 6th Street, Ste. 800
Austin, TX 78701
Email:    bryan.farney@dechert.com; jeff.plies@dechert.com; lawrence.fluker@dechert.com

Trial Counsel for Dell:
Ali R. Sharifahmadian, Esq.
Matthew Bathon, Esq.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
E-mail:    ali_sharifahmadian@aporter.com; Matthew_Bathon@aporter.com

Trial Counsel for Dell:
Joel Freed, Esq.
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Email:    jfreed@mwe.com

Courtesy Emails include:

| | | |
|---|---|---|
| XX | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |
| | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email, except for exhibits.  Exhibits were over 50 pages long.  As per our service agreement, a hard copy will follow via overnight mail |

Exhibit 24

Jane Hahn, SBN 125203
Alison P. Adema, SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1730
San Diego, California 92101-3595
Telephone:    (619) 235-2100
Facsimile:    (619) 235-2101

Attorneys for *Lucent Technologies Inc.*

*Additional counsel listed on the last page*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff, <br> v. <br><br> GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., <br><br> Defendants, <br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervener. | Case No. 02-CV-2060 B (WMc) <br> consolidated with <br> Case No. 03-CV-0699 B (WMc) <br> Case No. 03-CV-1108 B (WMc) <br><br> **LUCENT TECHNOLOGIES INC.'S AMENDED INITIAL DISCLOSURES STATEMENT** |
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br> v. <br><br> LUCENT TECHNOLOGIES INC., <br><br> Defendant. | |
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff, <br> v. <br><br> DELL INC., <br><br> Defendant. | |

**Exhibit 24  Page 470**

1    Pursuant to Rules 26(a)(1) and 26(e) of the Federal Rules of Civil Procedure, Lucent

2 Technologies Inc. and Lucent Technologies Guardian I LLC (collectively, "Lucent") submit their

3 Amended Initial Disclosure Statement which is applicable to all parties in this case.   These

4 disclosures are based on Lucent's investigations to date, which are ongoing.   Lucent reserves the

5 right to correct, modify, and/or supplement these disclosures pursuant to Rule 26(e).

6   **A.     INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT
        LUCENT MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES**

7

8    Lucent identifies the following individuals known to date that Lucent may use to support its

9 claims or defenses.   Lucent anticipates that other individuals may also have discoverable

10 information, many of which have already been deposed in this case, upon which Lucent may rely

11 and specifically reserves the right to identify additional witnesses as discovery proceeds.

12    Lucent does not consent to communications with, or authorize Microsoft or its agents to

13 communicate with, Lucent's employees, former employees, or those persons being represented by

14 attorneys, and does not consent to or authorize any communications with the individuals listed below

15 that is otherwise prohibited by the applicable rules of professional conduct.

16    **Carolyn A. Doughty,** 521 Wakeman Ave.,Wheaton, Illinois 60187, 630-668-6534,
      who is knowledgeable regarding the conception, reduction to practice, and
17    technologies involved in the invention claimed in Patent No. 4,582,956.

18    **Nuggehally S. Jayant,** 4390 Candacraig, Alpharetta, Georgia 30022, 404-894-7285,
      who is knowledgeable regarding the conception, reduction to practice, and
19    technologies involved in the invention claimed in U.S. Patent No. 4,617,676.

20    **Venktasubbarao Romamoorthy,** 6704 Paseo San Leon, Pleasanton, California
      94566, 925-417-8517, who is knowledgeable regarding the conception, reduction to
21    practice, and technologies involved in the invention claimed in U.S. Patent No.
      4,617,676

22    **Benjamin W. Day, Jr.,** 1 Bingham Avenue, Rumson, New Jersey 07760, 732-747-
23    6142, who is knowledgeable regarding the conception, reduction to practice, and
      technologies involved in the invention claimed in U.S. Patent No. 4,763,356.

24    **Alexander C. Gillon,** 20 Longview Drive, Sedona, Arizona 86336, 928-282-1090,
25    who is knowledgeable regarding the conception, reduction to practice, and
      technologies involved in the invention claimed in U.S. Patent No. 4,763,356.

26    **Raoul A. LeConte,** 10 Monterey Court, Jackson, New Jersey 08527, 732-833-7980,
27    who is knowledgeable regarding the conception, reduction to practice, and
      technologies involved in the invention claimed in U.S. Patent No. 4,763,356.

28

**Gabor P. Torok,** 1109 Grand Cay Drive, Palm Beach Gardens, Florida 33418, 561-799-7976, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,317,956.

**Andrew B. White,** address and phone number unknown, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,317,956.

**Barin G. Haskell,** 1190 Fairbrook Drive, Mountain View, California 94040, 650-428-0990, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 4,958,226.

**Atul Puri,** Apple, 1 Infinite Loop, Cupertino, California 95014, 408-996-1010, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the inventions claimed in U.S. Patent Nos. 4,958,226 and 5,227,878.

**Richard H. Ketchum,** 11 S. 076 West Street, Naperville, Illinois 60565, 630-548-9359, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 4,910,781.

**Willem B. Kleijn,** Tallåsvägen # 11, 182 75 Stocksund, Sweden, 46-8-790-8869, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 4,910,781.

**Daniel J. Krasinski,** 131 Wakefield Court, Aurora, Illinois 60506, 630-859-3892, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 4,910,781.

**Rangarajen Aravind,** TeNeT – The Telecommunications and Computer Networks Group, Department of Electrical Engineering + Computer Science & Engineering, Indian Institute of Technology (IIT) Madras, Chennai 600036, India, 011-91-44-2257-8382, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,227,878.

**Todd Agulnick,** 3701 Divisadero Street, #303, San Francisco, California 94123, 415-885-8519, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,347,295.

**Arun N. Netravali,** Lucent Technologies Inc., 600 Mountain Avenue, Murray Hill, NJ 07974, 908-582-8500, who is knowledgeable regarding Bell Labs and the conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,383,272.

**John D. Robbins,** 3734 Leewood Lane, Jacksonville, FL 32217-4221, 904-737-8514, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,383,272.

**Robert Carr,** Sofinnova Ventures, 140 Geary Street, 10th Floor, San Francisco, California, 94108, 415-228-3380 Ext. 399, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,347,295.

**Tony Hoeber,** 21786 Via Regina, Saratoga, California 95070, 408-868-9008, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,347,295.

**Exhibit 24  Page 472**

**S. Jerrold Kaplan,** 124 Stonehedge Road, Hillsborough, California 94010, 650-340-9686, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,347,295.

**David R. Low,** Nimblefish, 149 New Montgomery Street, 6th Floor, San Francisco, California, 94105, 415-247-7014, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,347,295.

**Michael Ouye,** PSS Systems, Inc., 2471 East Bayshore Road, Suite 600, Palo Alto, California, 94025, 650-496-2300, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,347,295.

**Gary McElvany**, 157 East Mount Avenue, Atlantic Highlands, NJ 07716-1525, who is knowledgeable generally about Lucent, its business activities and its corporate history.

**Chaim M. Ackerman,** Net2Phone, Inc., 520 Broad Street, Newark, New Jersey 07102, 973-412-2800, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,649,131.

**Alan L. Glasser**, AT&T Labs, 200 Laurel Avenue South, Middletown, New Jersey 07748, 732-420-5092, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,649,131.

**Reuben Klein,** AT&T Labs, 200 Laurel Avenue South, Middletown, New Jersey 07748, 732-420-5092, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,649,131.

**Bishnu S. Atal**, 6226 95th Place SW, Mukilteo, Washington 98275, 425-353-2762, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 4,701,954.

**Joseph L. Hall, II**, 20 Kinnan Way, Basking Ridge, New Jersey 07920, 908-766-7097, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent No. 5,341,457.

**James David Johnston**, Microsoft Corporation, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in U.S. Patent Nos. 5,341,457 and 5,627,938.

**James K. Tierney**, 15 Palma Valley, Trabuco Canyon, CA 92679, who is knowledgeable about Lucent's licensing discussions and notice of infringement provided to Dell and Gateway.

**James R. Fleming**, 1412 Calcutta Lane, Naperville, Illinois 60563, 630-717-1078, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,439,759.

**William A. Frezza**, Adams Capital Management, 6680 Stoney Hill Road, Suite 155, Yardley, Pennsylvania 19067, 215-321-0929, who is knowledgeable regarding the

**Exhibit 24  Page 473**

conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,439,759.

**Gerald S. Soloway**, 6 Brookview Court, Holmdel, New Jersey 07733, 732-946-2918, who is knowledgeable regarding the conception, reduction to practice, and technologies involved in the invention claimed in Patent No. 4,439,759.

**Stephen McGrath**, Microsoft Corporation, who is knowledgeable regarding Microsoft's notice of the patents-in-suit.

**Dan Crouse**, Microsoft Corporation, who is knowledgeable regarding Microsoft's notice of the patents-in-suit.

**Bart Eppenaur**, Microsoft Corporation, who is knowledgeable regarding Microsoft's notice of the patents-in-suit.

**Barbara A. Landmann**, Lucent Technologies Inc., 600 Mountain Avenue, Murray Hill, NJ 07974, 908-582-8500, who is knowledgeable regarding the corporate background of Lucent Technologies and its Intellectual Property Business.

**William O'Shea**, Lucent Technologies Inc., 600 Mountain Avenue, Murray Hill, NJ 07974, 908-582-8500, who is knowledgeable regarding the corporate background of Lucent Technologies and Bell Labs.

**David J. Bishop**, Lucent Technologies Inc., 600 Mountain Avenue, Murray Hill, NJ 07974, 908-582-8500, who is knowledgeable regarding the corporate background of Lucent Technologies and Bell Labs.

**Rod C. Alferness**, Lucent Technologies Inc., 600 Mountain Avenue, Murray Hill, NJ 07974, 908-582-8500, who is knowledgeable regarding the corporate background of Lucent Technologies and Bell Labs.

**B.    A DESCRIPTION BY CATEGORY OF DOCUMENTS IN LUCENT'S CUSTODY OR CONTROL THAT LUCENT MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES**

Lucent identifies the following categories of documents located to date that Lucent presently believes it may use to support its claims or defenses. This information is based on Lucent's investigation to date, which is ongoing. Lucent specifically reserves the right to identify additional categories and locations of documents as discovery proceeds. The documents described below are at either Lucent Technologies Inc., 600 Mountain Avenue, Murray Hill, New Jersey 07974, Thinkfire Services USA, Ltd., Perryville Corporate Park III, 53 Frontage Road, Clinton, New Jersey 08809, or the offices of Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022.

1.    U.S. Patent Nos. 4, 317,956, 4, 383,272, 4,439,759; 4,582,956; 4,617,676; 4,701,954; 4,763,356; 4,910,781; 4,958,226; 5,227,878; 5,341,457; 5,347,295; 5,627,938; and

**Exhibit 24  Page 474**

5,649,131 and their respective United States Patent and Trademark Office prosecution histories.

2.    Documents relating to the ownership of U.S. Patent Nos. 4, 317,956, 4, 383,272, 4,439,759; 4,582,956, 4,617,676; 4,701,954; 4,763,356; 4,910,781; 4,958,226; 5,227,878; 5,341,457; 5,347,295; 5,627,938; and 5,649,131.

3.    Documents relating to the licensing of U.S. Patent Nos. 4, 317,956, 4, 383,272, 4,439,759; 4,582,956, 4,617,676; 4,701,954; 4,763,356; 4,910,781; 4,958,226; 5,227,878; 5,341,457; 5,347,295; 5,627,938; and 5,649,131.

4.    Documents relating to Microsoft Corporation and its related companies ("Microsoft"), Microsoft's and its licensees' infringing products, and Microsoft's and its licensees' sales of infringing products.

5.    Documents relating to Dell Inc. and its related companies ("Dell"), Dell's infringing products, and Dell's sales of infringing products.

6.    Documents relating to Gateway, Inc. and its related companies ("Gateway"), Gateway's infringing products, and Gateway's sales of infringing products

7.    Invention records, technical memoranda, and publications relating to the technologies claimed in U.S. Patent Nos. 4, 317,956, 4, 383,272, 4,439,759; 4,582,956, 4,617,676; 4,701,954; 4,763,356; 4,910,781; 4,958,226; 5,227,878; 5,341,457; 5,347,295; 5,627,938; and 5,649,131.

8.    Documents produced in this litigation.

## C.    COMPUTATION OF DAMAGES CLAIMED BY LUCENT

Lucent is unable to compute its exact amount of damages at this time and will provide applicable calculations during expert discovery. The basis for Lucent's damages claim is a reasonable royalty. Lucent also intends to seek enhanced damages and attorneys' fees for willful infringement by Microsoft, Dell and Gateway.

1

2   **D.      ANY RELEVANT INSURANCE AGREEMENTS**

3          Lucent is not presently aware of any applicable insurance agreements.

4

5   DATED: January 27, 2006                    *Lucent Technologies Inc.*

6

7

8          BY: _____

9          John M. Desmarais (admitted *pro hac vice*)
           Robert A. Appleby (admitted *pro hac vice*)
10         Scott R. Samay (admitted *pro hac vice*)
           KIRKLAND & ELLIS LLP
11         153 East 53rd Street
           New York, New York 10022
12         Telephone: (212)446-4800
           Facsimile: (212)446-4900

13

14         Jane Hahn, SBN 125203
           Alison P. Adema, SBN 149285
15         HAHN & ADEMA
           501 West Broadway, Suite 1730
16         San Diego, California 92101-3595
           Telephone: (619) 235-2100
17         Facsimile: (619) 235-2101

18         Attorneys for *Lucent Technologies Inc.*

19

20

21

22

23

24

25

26

27

28

**Exhibit 24  Page 476**

# CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of January, 2006, a copy of the foregoing LUCENT TECHNOLOGIES INC.'S AMENDED INITIAL DISCLOSURES was served on counsel for Gateway, Microsoft, and Dell as follows:

**FACSIMILE**
John E. Gartman
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone  858-678-5070
Facsimile  858-678-5099

**EMAIL**
marchese@fr.com
mcdonough@fr.com
srodriguez@fr.com

Attorneys for *Microsoft Corp.*

**FACSIMILE**
James S. Blackburn
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone  213-243-4000
Facsimile  213-243-4199

**EMAIL**
joel_freed@aporter.com
sidney_rosenzweig@aporter.com

Attorneys for *Dell Inc.*

**FACSIMILE**
David J. Zubkoff
SELTZER, CAPLAN, MCMAHON & VITEK
750 "B" Street, Suite 2100
San Diego, California 92101
Telephone  619-685-3003
Facsimile  619-702-6827

**EMAIL**
bfarney@deweyballantine.com
ahewgley@deweyballantine.com

Attorneys for *Gateway, Inc.*

_____
Meredith S. Greisman

Exhibit 25



US005563593A

# United States Patent [19]

## Puri

[11] **Patent Number:** 5,563,593

[45] **Date of Patent:** Oct. 8, 1996

[54] **VIDEO CODING WITH OPTIMIZED LOW COMPLEXITY VARIABLE LENGTH CODES**

[75] Inventor: **Atul Puri**, Riverdale, N.Y.

[73] Assignee: **Lucent Technologies Inc.**, Murray Hill, N.J.

[21] Appl. No.: **215,341**

[22] Filed: **Mar. 18, 1994**

[51] Int. Cl.$^6$ ........................................ H03M 7/40
[52] U.S. Cl. ............................................ 341/67
[58] Field of Search ................................ 341/67, 50, 63, 341/106

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,534,055 | 8/1985 | Iinuma | 381/34 |
| 5,381,144 | 1/1995 | Wilson et al. | 341/63 |

*Primary Examiner*—Brian K. Young
*Attorney, Agent, or Firm*—Eugene S. Indyk; Mark K. Young

[57] **ABSTRACT**

A novel group of optimized variable word-length codes for intra coded pictures is disclosed. Hardware complexity and implementation cost is minimized by only optimizing the variable word-length codes for intra coded pictures for a small, but frequently occurring number of discrete cosine transform events. A table of variable word-length codes conforming to the Motion Pictures Expert Group Phase 1 ("MPEG-1") standard may be used for the remaining number of less frequently occurring events. In an illustrative example of the invention, the MPEG-1 variable word-length code table is also used to code non-intra pictures which advantageously allows for totally compatible operation with the MPEG-1 standard.

**18 Claims, 7 Drawing Sheets**



**Exhibit 25  Page 478**

Exhibit 26



US005500678A

# United States Patent [19]

## Puri

[11] Patent Number: 5,500,678

[45] Date of Patent: Mar. 19, 1996

[54] **OPTIMIZED SCANNING OF TRANSFORM COEFFICIENTS IN VIDEO CODING**

[75] Inventor: **Atul Puri**, Riverdale, N.Y.

[73] Assignee: **AT&T Corp.**, Murray Hill, N.J.

[21] Appl. No.: **215,532**

[22] Filed: **Mar. 18, 1994**

[51] Int. Cl.⁶ ........................................ **H04N 7/50**

[52] U.S. Cl. .............................. **348/408**; 348/405

[58] **Field of Search** .................... 348/408, 405, 348/419; H04N 7/133, 7/50

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,227,878  7/1993  Puri ........................................ 348/416

*Primary Examiner*—Howard W. Britton
*Attorney, Agent, or Firm*—Eugene S. Indyk; Mark K. Young

[57] **ABSTRACT**

An improved scanning apparatus and method which allows for increased coding efficiency over conventional zigzag scans is disclosed. The invention advantageously allows for total compatibility with the MPEG-1 standard, and accomodates video sequences which may be composed of both the progressive and interlaced format frames.

**19 Claims, 7 Drawing Sheets**

|   | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| 0 | 601 | 602 | 603 | 604 | 605 | 606 | 607 | 608 |
| 1 | 609 | 610 | 611 | 612 | 613 | 614 | 615 | 616 |
| 2 | 617 | 618 | 619 | 620 | 621 | 622 | 623 | 624 |
| 3 | 625 | 626 | 627 | 628 | 629 | 630 | 631 | 632 |
| 4 | 633 | 634 | 635 | 636 | 637 | 638 | 639 | 640 |
| 5 | 641 | 642 | 643 | 644 | 645 | 646 | 647 | 648 |
| 6 | 649 | 650 | 651 | 652 | 653 | 654 | 655 | 656 |
| 7 | 657 | 658 | 659 | 660 | 661 | 662 | 663 | 664 |

**Exhibit 26  Page 479**

Exhibit 27

# United States Patent [19]

## Haskell et al.

| | |
|---|---|
| [11] | **Patent Number:** **4,958,226** |
| [45] | **Date of Patent:** **Sep. 18, 1990** |

[54] **CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO**

[75] Inventors: **Barin G. Haskell**, Tinton Falls, N.J.; **Atul Puri**, Bronx, N.Y.

[73] Assignee: **AT&T Bell Laboratories**, Murray Hill, N.J.

[21] Appl. No.: **413,520**

[22] Filed: **Sep. 27, 1989**

[51] Int. Cl.$^5$ ............................................ H04N 7/12
[52] U.S. Cl. ............................ 358/136; 358/135
[58] Field of Search ................ 358/135, 136, 133

[56]                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,218,703 | 8/1980 | Netravali et al. | . |
| 4,218,704 | 8/1980 | Netravali et al. | . |
| 4,383,272 | 5/1983 | Netravali et al. | . |
| 4,442,454 | 4/1984 | Powell | 358/167 |
| 4,460,923 | 7/1984 | Hirano et al. | 358/136 |
| 4,665,436 | 5/1987 | Osborne et al. | 358/135 X |
| 4,667,233 | 5/1987 | Furukawa | 358/136 |
| 4,727,422 | 2/1988 | Hinman | 358/135 X |
| 4,782,387 | 11/1988 | Sabri et al. | 358/135 |

### OTHER PUBLICATIONS

"Movement–Compensated Frame–Frequency Conversion of Television Signals," H. Yamaguchi, T. Sugi and K. Kinuhata, IEEE Transactions on Communications, vol. COM–35, No. 10, Oct. 1987, pp. 1069–1082.

*Primary Examiner*—James J. Groody
*Assistant Examiner*—Victor R. Kostak
*Attorney, Agent, or Firm*—Henry T. Brendzel

[57]                    **ABSTRACT**

Motion digital video is encoded and decoded by a motion compensated interpolation method and apparatus. In accordance with the method, selected frames of the video are interpolated in the decoder with the aid of interpolation correction codes that are generated in the encoder and sent to the decoder. In an encoder embodiment that interpolates half of the frames, every other frame is encoded and decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information, are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

**12 Claims, 2 Drawing Sheets**



Exhibit 28

US005627938A

# United States Patent [19]

## Johnston

| | |
|---|---|
| [11] | **Patent Number:** | **5,627,938** |
| [45] | **Date of Patent:** | **May 6, 1997** |

[54] **RATE LOOP PROCESSOR FOR PERCEPTUAL ENCODER/DECODER**

[75] Inventor: **James D. Johnston**, Warren, N.J.

[73] Assignee: **Lucent Technologies Inc.**, Murray Hill, N.J.

[21] Appl. No.: **310,898**

[22] Filed: **Sep. 22, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 844,811, Mar. 2, 1992, abandoned.

[51] **Int. Cl.**$^6$ ................................. **G10L 3/02**; G10L 9/00
[52] **U.S. Cl.** ........................ **395/2.39**; 395/2.39; 395/2.38
[58] **Field of Search** ............................. 395/2, 2.35, 2.31, 395/2.38, 2.36, 2.42, 2.39; 381/29–41, 30, 45, 47, 37, 2; 358/133

[56]              **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,216,354 | 8/1980 | Esteban et al. | 395/2.39 |
| 4,860,313 | 8/1989 | Shpiro | 375/27 |
| 4,953,214 | 8/1990 | Takeguchi et al. | 395/2.39 |
| 4,972,484 | 11/1990 | Theile et al. | 381/37 |
| 5,014,318 | 5/1991 | Schott et al. | 381/47 |
| 5,054,217 | 10/1991 | Brandenburg | 381/47 |
| 5,079,547 | 1/1992 | Fuchigama et al. | 341/51 |
| 5,185,800 | 2/1993 | Mahieux | 381/29 |

| | | | |
|---|---|---|---|
| 5,218,435 | 6/1993 | Lim et al. | 358/133 |
| 5,285,498 | 2/1994 | Johnston | 381/2 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 376553 | 12/1989 | European Pat. Off. | H04B 1/66 |

### OTHER PUBLICATIONS

J. D. Johnston, "Transform Coding of Audio Signals Using Perceptual Noise Criteria", *IEEE J. on Selected Areas in Communications*, vol. 6, No. 2, pp. 314 to 323 (1988).
R.N.J. Veldhuis et al., "Subband Coding of Digital Audio Signals," Philips Journal of Research, vol. 44, No. 2/3, Jul. 1989, pp. 329–343.
Mussmann, H.G, "The Iso Audio Coding Standard," Globecom'90, vol. 1(3), Dec. 1990, NY, USA, pp. 511–517.

*Primary Examiner*—Allen R. Macdonald
*Assistant Examiner*—Patrick N. Edouard
*Attorney, Agent, or Firm*—David M. Rosenblatt; Donald P. Dinella

[57]            **ABSTRACT**

A method and apparatus for quantizing audio signals is disclosed which advantageously produces a quantized audio signal which can be encoded within an acceptable range. Advantageously, the quantizer uses a scale factor which is interpolated between a threshold based on the calculated threshold of hearing at a given frequency and the absolute threshold of hearing at the same frequency.

**4 Claims, 10 Drawing Sheets**



**Exhibit 28  Page 481**

Exhibit 29

# United States Patent [19]

## Netravali et al.

[11]     **4,383,272**

[45]     **May 10, 1983**

[54]  **VIDEO SIGNAL INTERPOLATION USING MOTION ESTIMATION**

[75]  Inventors: **Arun N. Netravali**, Westfield; **John D. Robbins**, Aberdeen, both of N.J.

[73]  Assignee: **Bell Telephone Laboratories, Incorporated**, Murray Hill, N.J.

[21]  Appl. No.: **253,698**

[22]  Filed:     **Apr. 13, 1981**

[51]  Int. Cl.$^3$ ..................................... **H04N 7/12**

[52]  U.S. Cl. ..................................... **358/136;** 358/138; 358/105

[58]  Field of Search .............. 358/136, 133, 105, 138; 375/28; 364/518, 521

[56]     **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,218,703 | 8/1980 | Netravali et al. | 358/136 |
| 4,218,704 | 8/1980 | Netravali et al. | 358/136 |
| 4,232,338 | 11/1980 | Netravali et al. | 358/136 |
| 4,307,420 | 12/1981 | Ninomiya et al. | 358/136 |

*Primary Examiner*—Benedict V. Safourek
*Assistant Examiner*—Edward L. Coles
*Attorney, Agent, or Firm*—Barry H. Freedman

[57]     **ABSTRACT**

Information defining elements of a picture is estimated by interpolation using information from related locations in preceding and succeeding versions of the picture. The related locations are determined by forming an estimate of the displacement of objects in the picture. Displacement estimates are advantageously formed recursively, with updates being formed only in moving areas of the picture. If desired, an adaptive technique can be used to permit motion compensated interpolation or fixed position interpolation, depending upon which produces better results.

**24 Claims, 4 Drawing Figures**



# Exhibit 30
## Filed Under Seal

# Exhibit 31
## Filed Under Seal

# Exhibit 32
## Filed Under Seal

# Exhibit 33
## Filed Under Seal

# Exhibit 34

 United States Patent and Trademark Office

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

10/5/07

KENNETH L. CAGE

MCDERMOTT, WILL, & EMERY LLP

600 13TH STREET, NW

WASHINGTON, DC 20005

 COPY

## *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO  90/008770

PATENT NO.   4,958,226

ART UNI   3992


RECEIVED
OCT 11 2007
McDermott Will & Emery LLP
DC Office

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

**Exhibit 34  Page 510**

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/008,770 | Patent Under Reexamination 4958226 | |
|---|---|---|---|
| | Examiner Roland G. Foster | Art Unit 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>16 July 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐  PTO-892,    b)☒  PTO/SB/08,    c)☒  Other: <u>See the Decision.</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

      RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

    a) ☐  by Treasury check or,

    b) ☐  by credit to Deposit Account No. _____,  or

    c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Roland  G. Foster
Primary Examiner
Art Unit: 3992

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)                Office Action in *Ex Parte* Reexamination                Part of Paper No. 20071003

Exhibit 34  Page 511

Application/Control Number: 90/008,770                                          Page 2
Art Unit: 3992

## DECISION

### *Substantial New Question*

A substantial new question of patentability affecting claim 12 of United States Patent No.

4,958,226 to Haskell et al. (hereinafter the "Haskell" patent) is raised by the request for *ex parte*

reexamination, filed on July 16, 2007 (hereinafter the "Request").

Pages 6-11 identify the following printed publications as providing teachings relevant to

the claims of the Haskell patent:

1.    U.S. Patent No. 4,849,9810 to Ericsson ("Ericsson").
2.    U.S. Patent No. 4,703,350 to Hinman ("Hinman").
3.    U.S. Patent No. 4,858,005 to Lodge ("Lodge I").
4.    N K Lodge, "A Hybrid Interpolative and Predictive Code For the Embedded
      Transmission of Broadcast Quality Television Pictures," Independent
      Broadcasting Authority, United Kingdom, Second International Conference on
      Image Processing and its Applications, Conference Publication Number 265, pp.
      242-247, June 24-26, 1986 ("Lodge II").
5.    Arun N. Netravali, et al., "Digital Pictures Representation and Compression,"
      ISBN 0-306-42791-5, Plenum Publishing Corporation, 1988 ("Digital Pictures").

A reasonable examiner would consider the above prior references important in making a

decision as to the patentability of claim 12 in the Haskell patent.

**Exhibit 34  Page 512**

Application/Control Number: 90/008,770                                    Page 3
Art Unit: 3992

### *The Haskell Patent:  Claim 12*

Claim 12, the only claim for which reexamination was requested, recites:

**A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising:**

**means for developing block approximations from said codes that describe deviations from approximated blocks;  and**

**means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.**

The first two paragraphs of claim 12 however are recited in substantially the same language as the language in the preamble of claim 2, where claim 2 is drafted in Jepson format.[1] Drafting a claim in Jepson format (i.e., the "improvement comprising..." format as described in 37 CFR 1.75(e)) may be taken as an implied admission that the subject matter of the preamble is the prior-art work of another.  See MPEP § 2129.III.  Thus, a substantial question is raised as to whether the first two paragraphs of claim 12 are also the admitted prior art of another.  Thus, the analysis of whether a substantial new question is raised for claim 12 turns to the last paragraph of claim 12, which broadly recites:

**means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.**

---

[1] The "codes that describe deviations from interpolated bocks" language in the preamble of claim 12 is not included in the preamble of claim 2, however it is recognized that this language is directed to an allegedly inventive feature (as discussed *infra*), and thus does not affect the analysis regarding the admitted prior art in claim 2.

**Exhibit 34  Page 513**

Application/Control Number: 90/008,770                                          Page 4
Art Unit: 3992

The limitation "means responsive to said block approximations" apparently refers to the prior "means for developing block approximations from said codes that describe deviations from approximated blocks" limitation and thus refers to admitted prior art, as discussed above. For example, the Haskell patent teaches conventional "motion compensated interpolation," where a "prediction error signal" (code that describes deviation from approximated blocks) is developed from previously approximated frames $F_{i+1}$ and $F_{i-1}$ (col. 2, ll. 18-37 and col. 3, ll. 61 – col. 4, l. 34). Thus, even the first limitation in the last paragraph of claim 12 may be substantially directed to prior art.

The limitation "codes that describe deviations from interpolated blocks to develop interpolated blocks" apparently refers to an allegedly inventive feature in the Haskell patent. Specifically, an interpolated, prediction frame $F_i$ is produced from an interpolation algorithm (in the case of the Haskell patent, by structure that averages the values of $F_i$ produced by time shifting the approximated frames $F_{i+1}$ and $F_{i-1}$ using the motion compensated interpolation) (col. 4, ll. 35 – 62). Then, a deviation code from the interpolated frame $F_i$ is developed (in the case of the Haskell patent, by structure that determines the difference between the interpolated prediction frame $F_i$ and an actual frame $F_i$) (col. 4, ll. 35 – 62). Other claims in the Haskell patent however, such as independent claims 1 and 2, recite <u>different</u> means plus function language that clearly corresponds to some of the specific, Haskell structures discussed above. Thus, a claim interpretation issue also exists as to the scope of the structure in the Haskell patent

**Exhibit 34  Page 514**

Application/Control Number: 90/008,770                                          Page 5
Art Unit: 3992

that the "means responsive to...said codes that describe deviations from interpolated blocks to

develop said interpolated blocks" limitation of claim 12 is intended to correspond to.


### *Ericsson*

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider Ericsson, either alone or

used in combination with said admitted prior art of another or in combination with other

secondary references, important in making a decision as to the patentability of claim 12 in the

Haskell patent.  Ericsson recites that system transmits and decodes "a sequence of image frames

both with and without motion compensation" (abstract).  Thus, encoding and decoding blocks

transmitted using conventional, motion compensation would read on the limitation "means

responsive to said block approximations" as discussed above.   Ericsson also teaches that a

deviation code is developed from an interpolated frame by determining the difference between

the interpolated frame and an actual frame (col. 2, l. 58 – col. 3, l. 4), thus reading on the

limitation "means responsive to...said codes that describe deviations from interpolated blocks to

develop said interpolated blocks" (bearing in mind that there is a question as to what type of

structure this alleged, means plus function language refers to, as discussed above).


For additional reasons why Ericsson raises a substantial new question of patentability, see

also pages 6, 7, and 11-21 of the Request, which includes a detailed claim chart, all of which are

hereby incorporated by reference from the Request for their explanation of the teachings

**Exhibit 34  Page 515**

Application/Control Number: 90/008,770                                          Page 6
Art Unit: 3992

provided in Ericsson that were not present in the prosecution of the application which became
the Haskell patent.

The Ericsson patent was not previously cited or discussed by the examiner in the original
prosecution of the Haskell patent.

There was also no final holding of invalidity by the Federal Courts regarding the Haskell
patent.

Thus, a reasonable examiner would view the teachings of the Ericsson patent, alone or in
combination with the admitted prior art of another, or in combination with any of the various
secondary references cited in the Request, important in deciding to allow the claims being
considered, thus raising a substantial new question of patentability regarding claim 12 of the
Haskell patent.

*Hinman*

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the
admitted prior art of another, a reasonable examiner would consider Hinman, either alone or used
in combination with said admitted prior art of another or in combination with other secondary
references, important in making a decision as to the patentability of claim 12 in the Haskell
patent.   Hinman is generally directed to conventional motion compensation and thus, as
discussed above, would teach the "block approximation" limitations.  Ericsson would provide

**Exhibit 34  Page 516**

Application/Control Number: 90/008,770                                      Page 7
Art Unit: 3992

explicit teachings/suggestion/motivation (e.g., lower bandwidth "while providing for graceful

degradation of the image during a scene change or during periods of heavy motion," see col. 2, ll.

35-43) to add its teachings regarding the "interpolated block" limitation, as extensively discussed

above, to the teachings of Hinman.  See also pages 8-9 of the Request regarding additional

motivations to combine these two references.


For additional reasons why Hinman raises a substantial new question of patentability, see

also pages 8, 9 and 21-37 of the Request, which includes a detailed claim chart, all of which are

hereby incorporated by reference from the Request for their explanation of the teachings

provided in Hinman that were not present in the prosecution of the application which became the

Haskell patent.


The Hinman patent was not previously cited or discussed by the examiner in the original

prosecution of the Haskell patent.


There was also no final holding of invalidity by the Federal Courts regarding the Haskell

patent.


Thus, a reasonable examiner would view the teachings of the Hinman patent, alone or in

combination with the admitted prior art of another, or in combination with any of the various

secondary references cited in the Request, important in deciding to allow the claims being

Exhibit 34  Page 517

Application/Control Number: 90/008,770                                   Page 8
Art Unit: 3992

considered, thus raising a substantial new question of patentability regarding claim 12 of the

Haskell patent.


### *Lodge I and II*

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider Lodge I and II, either alone

or used in combination with said admitted prior art of another or in combination with other

secondary references, important in making a decision as to the patentability of claim 12 in the

Haskell patent.   As discussed above regarding Haskell claim 12, the analysis of whether a

substantial new question is raised for claim 12 focuses on the last, broadly recited paragraph of

claim 12.  Furthermore as discussed above, a substantial question exists as to the scope (e.g.,

broad or narrow) of the corresponding structure in said means limitation recited in the last

paragraph of claim 12.  In view of this, the teachings of Lodge I and II read on the last paragraph

of claim 12.  For example, Lodge I teaches transmitting a predictive error code (means

responsive to said block approximations) and transmitting an interpolative error code (codes that

describe deviations from interpolated blocks to develop said interpolated blocks) (Lodge I, col.

11, l. 43 – col. 12, l. 2).


For additional reasons why Lodge I and II raise a substantial new question of

patentability, see also pages 9, 10 and 38-53 of the Request, which includes a detailed claim

chart, all of which are hereby incorporated by reference from the Request for their explanation of

**Exhibit 34  Page 518**

Application/Control Number: 90/008,770                                                Page 9
Art Unit: 3992

the teachings provided in Lodge I and II that were not present in the prosecution of the

application which became the Haskell patent.


The Lodge I and II printed publications were not previously cited or discussed by the

examiner in the original prosecution of the Haskell patent.


There was also no final holding of invalidity by the Federal Courts regarding the Haskell

patent.


Thus, a reasonable examiner would view the teachings of the Lodge I and II publications,

alone or in combination with the admitted prior art of another, or in combination with any of the

various secondary references cited in the Request, important in deciding to allow the claims

being considered, thus raising a substantial new question of patentability regarding claim 12 of

the Haskell patent.


### Digital Pictures

In view of the Haskell claim 12 limitations discussed above, which may mostly recite the

admitted prior art of another, a reasonable examiner would consider the Digital Pictures

publication, either alone or used in combination with said admitted prior art of another or in

combination with other secondary references, important in making a decision as to the

patentability of claim 12 in the Haskell patent.   Digital Pictures teaches of conventional motion

compensation (e.g., pp. 472-3) and thus, as discussed above, would teach the "block

**Exhibit 34  Page 519**

Application/Control Number: 90/008,770                                    Page 10
Art Unit: 3992

approximation" limitations.    Ericsson would provide explicit teachings/suggestion/motivation (e.g., lower bandwidth "while providing for graceful degradation of the image during a scene change or during periods of heavy motion," see col. 2, ll. 35-43) to add its teachings regarding the "interpolated block" limitation, as extensively discussed above, to the teachings of Hinman. See also pages 8-9 of the Request regarding additional motivations to combine these two references.

For additional reasons why Digital Pictures raises a substantial new question of patentability, see also pages 10, 11 and 53-61 of the Request, which includes a detailed claim chart, all of which are hereby incorporated by reference from the Request for their explanation of the teachings provided in Digital Pictures that were not present in the prosecution of the application which became the Haskell patent.

The Digital Pictures publication was not previously cited or discussed by the examiner in the original prosecution of the Haskell patent.

There was also no final holding of invalidity by the Federal Courts regarding the Haskell patent.

Thus, a reasonable examiner would view the teachings of the Digital Pictures publication, alone or in combination with the admitted prior art of another, or in combination with any of the various secondary references cited in the Request, important in deciding to allow the claims

**Exhibit 34  Page 520**

Application/Control Number: 90/008,770                                    Page 11
Art Unit: 3992

being considered, thus raising a substantial new question of patentability regarding claim 12 of

the Haskell patent.


### *Scope of Reexamination*

Since requester did not request reexamination of all the claims and did not assert the

existence of a substantial new question of patentability (SNQ) for all the claims (see 35 U.S.C. §

302); see also 37 CFR 1.510b and 1.515), such claims for which no SNQ was asserted will not

be reexamined. This matter was squarely addressed in <u>Sony Computer Entertainment America</u>

<u>Inc., et al. v. Jon W. Dudas</u>, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy,

2006 WL 1472462. The District Court upheld the Office's discretion to not reexamine claims in a

reexamination proceeding other than those claims for which reexamination had specifically been

requested. The Court stated:

> To be sure, a party may seek, and the PTO may grant,...review of each and every claim of a
> patent. Moreover, while the PTO in its discretion may review claims for which...review was
> not requested, nothing in the statute compels it to do so. To ensure that the PTO considers a
> claim for...review,...requires that the party seeking reexamination demonstrate why the PTO
> should reexamine each and every claim for which it seeks review. Here, it is undisputed that
> **Sony** did not seek review of every claim under the '213 and '333 patents. Accordingly, **Sony**
> cannot now claim that the PTO wrongly failed to reexamine claims for which **Sony** never
> requested review, and its argument that AIPA compels a contrary result is unpersuasive.

**Exhibit 34  Page 521**

Application/Control Number: 90/008,770                                             Page 12
Art Unit: 3992

## Conclusion

### *Service of Papers*

After the filing of a request for reexamination by a third party requester, any document

filed by either the patent owner or the third party requester must be served on the other party (or

parties where two or more third party requester proceedings are merged) in the reexamination

proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530

to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner

waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in

the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third

party requester, see 37 C.F.R 1.550(f). The Patent Owner may consider <u>using the following</u>

statement in a document waiving the right to file a Patent Owner Statement:

### *WAIVER OF RIGHT TO FILE PATENT OWNER STATEMENT*

*Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement.*

### *Extensions of Time*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination

**Exhibit 34  Page 522**

Application/Control Number: 90/008,770                                     Page 13
Art Unit: 3992

proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in

*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).


### *Amendment in Reexamination Proceedings*

Patent owner is notified that any proposed amendment to the specification and/or claims

in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c).


### *Submissions*

In order to insure full consideration of any amendments, affidavits or declarations or

other documents as evidence of patentability, such documents must be submitted in response to

the first Office action on the merits (which does not result in a close of prosecution).

Submissions after the second Office action on the merits, which is intended to be a final action,

will be governed by the requirements of 37 CFR 1.116, after final rejection and by 37 CFR 41.33

after appeal, which will be strictly enforced.

**Exhibit 34  Page 523**

Application/Control Number: 90/008,770                    Page 14
Art Unit: 3992

### *Notification of Concurrent Proceedings*

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a)

to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving

the Haskell patent throughout the course of this reexamination proceeding. The requester is also

reminded of the ability to similarly appraise the Office of any such activity or proceeding

throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.


### *Notice Re Patent Owner's Correspondence Address*

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that the patent

owner's correspondence address for all communications in an *ex parte* reexamination or an *inter*

*partes* reexamination is designated as the correspondence address of the patent.


*Revisions and Technical Corrections Affecting Requirements for Ex Parte and
Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the**

**same correspondence address as that of the patent is, by way of this revision to 37 CFR**

**1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**


This change is effective for any reexamination proceeding which is pending before the Office as

of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination

proceeding which is filed after that date.

**Exhibit 34  Page 524**

Application/Control Number: 90/008,770                                    Page 15
Art Unit: 3992

Parties are to take this change into account when filing papers, and direct communications

accordingly.


In the event the patent owner's correspondence address listed in the papers (record) for the

present proceeding is different from the correspondence address of the patent, it is strongly

encouraged that the patent owner affirmatively file a Notification of Change of Correspondence

Address in the reexamination proceeding and/or the patent (depending on which address patent

owner desires), to conform the address of the proceeding with that of the patent and to clarify the

record as to which address should be used for correspondence.


Telephone Numbers for reexamination inquiries:


Reexamination and Amendment Practice          (571) 272-7703
Central Reexam Unit (CRU)                     (571) 272-7705
Reexamination Facsimile Transmission No.    (571) 273-9900

Exhibit 34  Page 525

Application/Control Number: 90/008,770                                    Page 16
Art Unit: 3992

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed

as follows:

By **U.S. Postal Service Mail** to:

      Mail Stop *Ex Parte* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
              Central Reexamination Unit

By hand to:    Customer Service Window
              Randolph Building
              401 Dulany St.
              Alexandria, VA  22314

Any inquiry concerning this communication or earlier communications from the

Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be

directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:                                                                  Conferees:

_____

Roland G. Foster                                                    SCOTT L. WEAVER
Central Reexamination Unit, Primary Examiner                        CRU EXAMINER-AU 3992
Electrical Art Unit 3992
(571) 272-7538

                                                                    MARK J. REINHART
                                                                    SPRE-AU 3992
                                                                    CENTRAL REEXAMINATION UNIT

**Exhibit 34  Page 526**

| INFORMATION DISCLOSURE CITATION IN AN APPLICATION | | ATTY. DOCKET NO.<br>075543-0016 | PATENT NO.<br>4,958,226 |
|---|---|---|---|
| | | APPLICANT<br>HASKELL, et al. | |
| (PTO-1449) | | FILING DATE<br>July 16, 2007 | GROUP |

### U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Document Number<br>Number –Kind Code2 (if known) | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| /RF/ | | US 4,849,810 | Jul. 18, 1989 | Ericsson | |
| ↓ | | US 4,858,005 | Aug. 15, 1989 | Lodge | |
| | | US 4,703,350 | Oct. 27, 1987 | Hinman | |
| | | US 4,575,756 | Mar. 11, 1986 | Furukawa | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Foreign Patent Document<br>Country Codes –Number 4 –Kind Codes (if known) | Publication Date<br>MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines Where Relevant Figures Appear | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER ART (Including Author, Title, Date, Pertinent Pages, Etc.)

| EXAMINER'S INITIALS | CITE NO. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. |
|---|---|---|
| /RF/ | | N.K. Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Pictures," Second International Conference on Image Processing and Its Applications, Vol. 265, 24-26 June 1986 |
| /RF/ | | Arun N. Netravali & Barry G. Haskell, DIGITAL PICTURES: REPRESENTATION AND COMPRESSION (1988) |
| | | |
| | | |

| EXAMINER<br>/Roland Foster/ | DATE CONSIDERED<br>10/03/2007 |
|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
1 Applicant's unique citation designation number (optional). 2 Applicant is to place a check mark here if English language Translation is attached.
WDC99 1421178-1.075543.0016

Exhibit 34  Page 527

Exhibit 35

# Actions Due

**Wednesday, August 22, 2007**    **Page: 1**

| | | | |
|---|---|---|---|
| **Client-Matter:** | 075543 -0017 | | |
| **Family Number:** | 075543-0017 | **Sub Matter:** | |
| **Country:** | US    United States of America | **SubCase:** | A001 |
| **Client Ref. #:** | | **Case Type:** | REE |
| **Responsible Atty.:** JMF | **Assigned Atty.:** KLC | **Paralegal:** | **Resp. Office:** WDC |

| | | | |
|---|---|---|---|
| **Status :** | Pending | **Filing Date:** | 12-Jul-2007 |
| **Action Type:** | WDC-US-ReExam-Pat Owners Stmt | **Base Date:** | 16-Aug-2007 |
| **Application # :** | 90/008,740 | **Response sent date:** | |

| Action(s) Due | Due Date | Indicator | Taken | LP |
|---|---|---|---|---|
| Patent Owners Stmt Due (O.S.) | 16-Oct-2007 | Reminder | | |

**Remarks:**

ORDER GRANTING REQ FOR EXPARTE REEXAM DTD 8/16/07 RECD 8/20/07, OWNER'S STMT DUE 2 MOS
**NOTE THIS IS A DUE DATE FOR THE PATENT OWNER, MWE IS REQUESTOR**

**Created By:** kmclark    **User ID:** madirogers    **Date Created:** 21-Aug-2007    **Last Update:** 22-Aug-2007

**Exhibit 35  Page 528**



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

McDermott Will & Emery
Attn: Kenneth L. Cage
600 13th Street N. W.
Washington DC  20005-3096



# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/008,740*.

PATENT NO. *4,383,272*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(e)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(e)).

PTO-465 (Rev.04-03)

**Exhibit 35  Page 529**

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,740 | 07/12/2007 | 4,383,272 | 75543-017 | 8621 |

7590          08/16/2007

S.E. HOLLANDER
BELL TELEPHONE LABS. INC.
600 MOUNTAIN AVE.
MURRAY HILL, NJ 07974

| EXAMINER |
|---|
| *Ovidio Escalante* |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | IFW |

DATE MAILED: 08/16/2007

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

**Exhibit 35  Page 530**

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/008,740 | Patent Under Reexamination 4,383,272 | |
|---|---|---|---|
| | Examiner Ovidio Escalante | Art Unit 3992 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>12 July 2007</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐  PTO-892,    b)☒  PTO/SB/08,    c)☒  Other: <u>Decision</u>

1. ☒    The request for *ex parte* reexamination is GRANTED.

    RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

    a) ☐  by Treasury check or,

    b) ☐  by credit to Deposit Account No. _____,  or

    c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

Ovidio  Escalante
CRU Examiner
Art Unit: 3992

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)          Office Action in *Ex Parte* Reexamination          Part of Paper No. 20070803

Exhibit 35  Page 531

Application/Control Number: 90/008,740                                    Page 2
Art Unit: 3992

## DECISION

1.      A substantial new question of patentability affecting claim 13 of United States Patent

Number 4,383,272 (Netravali et al.) is raised by the request for *ex parte* reexamination.

2.      The instant patent issued May 10, 1983 based on US Patent Application Ser. No.

06/253,698, filed April 13, 1981.

### *Patent Status*

Under 37 CFR 1.510(a), any person may, at any time during the period of enforceability

of a patent, file a request for > ex parte< reexamination. This period was set by rule, since

the Office considered that Congress could not have intended expending Office resources

on deciding patent validity questions in patents which cannot be enforced. In this regard

see Patlex Corp.  v.  Mossinghoff, 758 F.2d 594, 225 USPQ 243, 249 (Fed. Cir.

*>1985<). The period of enforceability is determined by adding 6 years to the date on

which the patent expires.

In addition, if litigation is instituted within the period of the statute of limitations,

requests for reexamination may be filed after the statute of limitations has expired, as long as the

patent is still enforceable against someone.

The requester notes that The '272 patent is currently the subject of litigation before the

United States District Court for the Southern District of California, where MPT has accused

Requester of patent infringement, in a proceeding styled Lucent Technologies Inc. and

Multimedia Patent Trust v. Gateway, Inc. et al., Case No. 02-CV-2060 B (CAB) consolidated

with Case Nos. 03-CV-699 B (CAB) and 03-CV-1108 B (CAB).

**Exhibit 35  Page 532**

Application/Control Number: 90/008,740                                    Page 3
Art Unit: 3992

Accordingly, even though more than six years has passed, the timing of the filing of the

request is appropriate.

### *References Cited in the Request*

3.     In the request, the third party requester asserts that claims of the '272 Netravali patent are

rendered unpatentable by the following cited references:

    1.     D. Gabor, et al. Television Band Compression by Contour Interpolation, The
        Proceeding of the Institution of Electrical Engineers, Vol. 108, Part B, No. 39.

    2.     J.O. Limb and R.F. W Pease, A Simple Interframe Coder for Video Telephony,
        The Bell System Technical Journal, Vol. 50, No. 6, July-Aug. 1971, (hereinafter
        Lim & Pease).

    3.     Arun N. Netravali and John O. Limb, Picture Coding: A Review, Proceeding of
        the IEEE, Vol. 68, No. 3, Mar. 1980, (hereinafter Picture Coding).

    4.     E. R. Kretzmer, Statistics of Television Signals, The Bell Systems Technical
        Journal, July 1952.

    5.     D. Gabor, Television Compression by Contour Interpolation, Supplemento Al
        Volume III, Serie X, Del Nuovo Cimento, 1959

    6.     P. C. J. Hill, Television Bandwidth Compression by Interpolation, The Electrical
        Engineering Department, Imperial College London, March 1960.

    7.     Limb et al. - Exchange of Spatial and Temporal Resolution in Television Coding,
        The Bell System Technical Journal, January 1971.

    8.     R. F. W. Pease, Conditional Vertical  Subsampling - A Technique to Assist in the
        Coding of Television Signals, The Bell System Technical Journal, Vol. 51, No. 4,
        April 1972.

    9.     J.O. Limb, et al., Combining Intraframe and Frame-to-Frame Coding for
        Television, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974.

**Exhibit 35  Page 533**

Application/Control Number: 90/008,740                                         Page 4
Art Unit: 3992

### *Identification of Every Claim for Which Reexamination is Requested*

4.      The above-cited references are separately discussed regarding claim 13 of the '272

patent. See page 4 of the request.

        Specifically, the third party requester considers that claim 13 is unpatentable over Gabor,

et al. Television Band Compression by Contour Interpolation, (hereinafter Gabor & Hill)

        The third party requester also considers that claim 13, is unpatentable over J.O. Limb and

R.F. W Pease, A Simple Interframe Coder for Video Telephony, (hereinafter Limb & Pease).

        The third party requester also considers that claim 13 is unpatentable over Arun N.

Netravali and John O. Limb, Picture Coding: A Review, (hereinafter Picture Coding).

        The third party requester also considers that claim 13, is unpatentable over Gabor & Hill

in view of E. R. Kretzmer, Statistics of Television Signals (hereinafter Kretzmer), D. Gabor,

Television Compression by Contour Interpolation or P. C. J. Hill, Television Bandwidth

Compression by Interpolation.

        The third party requester also considers that claim 13, is unpatentable over Limb & Pease

in combination with Limb et al. - Exchange of Spatial and Temporal Resolution in Television

Coding,, R. F. W. Pease, Conditional Vertical  Subsampling - A Technique to Assist in the

Coding of Television Signals or J.O. Limb, et al., Combining Intraframe and Frame-to-Frame

Coding for Television.

### *Prosecution History*

        During the prosecution of the 06/253,698 application, the applicant, filed a response on

October 25, 1982 in response to the office action mailed on July 26, 19982. The response argued

that the prior art references clearly reveal that an <u>intensity value</u> is not being interpolated from

**Exhibit 35  Page 534**

Application/Control Number: 90/008,740                                    Page 5
Art Unit: 3992

preceding <u>and succeeding</u> version of the picture. The applicant stated that the prior art of record

pertain to recursive estimation of displacement in a series of pictures and its use in predictive

encoding of the present picture version. Such predictive encoding uses information only from

<u>preceding picture version.</u>

### *Substantial New Question of Patentability*

5.    The teachings in each cited prior art document that provides a basis for each substantial

new question of patentability is separately discussed. See the pages 7-33 of the Request, which

point out the teachings in each of the above-cited references.

### *Limb & Pease*

Limb & Pease discloses a method of applying resolution exchange to a differentially

quantized (DPCM) signal. The resulting channel capacity required for the subjectively

satisfactory transmission of the differential signal is halved. The coder is simpler than most

interframe coders and should not increase the sensitivity of the system to channels errors.

On page 1879, Limb & Pease states that when movement is detected, pels from alternate

sampled fields are received, decode, and displayed. In place of pels from the unsampeld fields,

an average is formed <u>from the four nearest neighbors in the y-t diagram</u>. For example, pels in

lines (y,1) are replace with the average value of pels in liens (y-1,0) (y+1, 0) (y-1,2) and (y+1,2).

Thus both spatial and temporal interpolation is used to form the new value in the unsampled

field. Therefore, Limb & Pease discloses a method for estimating the intensities of pels in a

picture in accordance with information defining intensities of pels in preceding and succeeding

versions of the picture.

**Exhibit 35  Page 535**

Application/Control Number: 90/008,740                                    Page 6
Art Unit: 3992

    The teaching of the intensity value being interpolated from preceding and succeeding versions of the picture was not present in the prosecution of the application which became the '272 patent and thus it is agreed that Limb & Pease raises an SNQ over claim 13 of the instant '272 Patent.

    Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Furthermore, the Limb & Pease reference was not before the examiner during the prosecution of the '272 Patent. Accordingly, the Limb & Pease reference raises a SNQ as to claim 13 of the instant '272 Patent.

### *Picture Coding*

    Picture Coding describes an interpolative Frame-to-Frame Coder. Picture Coding describes in Figure 53 that the basic coding scheme was limited to groups of four lines, consisting of pairs of consecutive lines in consecutive frames. The group of four lines is subdivided into blocks of eight pels. Further, Picture Coding discloses that the key elements in a block, on which all of the other elements depend are the A1 's. These elements are DPCM coded along a line using the previous A1 as a predictor. The coding of the remaining elements (B's, C's, D's) uses the four surrounding Al's, two of which are in the next pair of lines which would not normally be coded with the current block. Furthermore, Figure 53(a) depicts a series of frames along a temporal axis, where frame 1 is the first frame, followed by Frame 2 and then Frame 1' in time. Picture Coding describes the coding of the middle frame, Frame 2, stating "[a] first test is made to see if it is permissible to interpolate all four elements [A2, B2, C2, D2] from frame 1 and frame 1'. This test indicates that "[i]f the error of an individual pel, or if the average error of

**Exhibit 35  Page 536**

all four pels, is greater than a third threshold, then the block must be coded. As such, this test

inherently requires estimating the intensities of elements (pels) in a picture in accordance with

information defining intensities of pels in preceding and succeeding versions of the picture.

The teaching of the intensity value being interpolated from preceding and succeeding

versions of the picture was not present in the prosecution of the application which became the

'272 patent and thus it is agreed that Picture Coding raises an SNQ over claim 13 of the instant

'272 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable

examiner would consider these teachings important in deciding whether or not the instant claims

under reexamination are patentable. Furthermore, the Picture Coding reference was not before

the examiner during the prosecution of the '272 Patent.  Accordingly, the Picture Coding

reference raises a SNQ as to claim 13 of the instant '272 Patent.

### Gabor & Hill

Gabor & Hill presents a video signal transmission method referred to as contour

interpolation, which involves transmitting only one interlaced field out of two, and constructing

the missing interlaced field.

Gabor & Hill also discloses that the method of contour interpolation is equally applicable

to the interpolation of missing fields and missing frames. Moreover, Gabor & Hill indicates that

a missing picture is reconstructed by estimating the intensities of elements comprising the

missing picture. For example, Gabor & Hill discloses that the elements of a missing line can be

reconstructed with reference to the intensities of elements in the corresponding line of a

preceding and a succeeding picture.

**Exhibit 35  Page 537**

Application/Control Number: 90/008,740
Art Unit: 3992
Page 8

Gabor & Hill also discloses that each line is comprised of elements, stating "[a]ssume, for instance, that we allow a searching time corresponding to 10 picture points, which is about 1/50 of a line.. A picture point represents an element and is characterized by an intensity value. Further, the intensity value of a picture point is encoded using five binary digits (bits). Therefore, Gabor & Hill teaches that the elements of one or more pictures can be reconstructed - or estimated - in accordance with information defining the intensities of elements in preceding and succeeding pictures.

The teaching of the intensity value being interpolated from preceding and succeeding versions of the picture was not present in the prosecution of the application which became the '272 patent and thus it is agreed that Gabor & Hill raises an SNQ over claim 13 of the instant '272 Patent.

Thus, given the above teachings, there is a substantially likelihood that a reasonable examiner would consider these teachings important in deciding whether or not the instant claims under reexamination are patentable. Furthermore, the Gabor & Hill reference was not before the examiner during the prosecution of the '272 Patent. Accordingly, the Gabor & Hill reference raises a SNQ as to claim 13 of the instant '272 Patent.

### Scope of Reexamination

6.    Since requester did not request reexamination of claims 1-12 and 14-24 and did not assert the existence of a substantial new question of patentability (SNQP) for such claims  (see 35 U.S.C. § 311(b)(2); see also 37 CFR 1.915b and 1.923), such claims will not be reexamined. This matter was squarely addressed in *Sony Computer Entertainment America Inc., et al. v. Jon W. Dudas*, Civil Action No. 1:05CV1447 (E.D.Va. May 22, 2006), Slip Copy, 2006 WL

**Exhibit 35  Page 538**

Application/Control Number: 90/008,740                                    Page 9
Art Unit: 3992

1472462. (Not Reported in F.Supp.2d.)  The District Court upheld the Office's discretion to not

reexamine claims in an *inter partes* reexamination proceeding other than those claims for which

reexamination had specifically been requested.  The Court stated:

> To be sure, a party may seek, and the PTO may grant, *inter partes*
> review of each and every claim of a patent.  Moreover, while the PTO
> in its discretion may review claims for which *inter partes* review was
> not requested, nothing in the statute compels it to do so.  To ensure
> that the PTO considers a claim for *inter partes* review, § 311(b)(2)
> requires that the party seeking reexamination demonstrate why the
> PTO should reexamine each and every claim for which it seeks review.
> Here, it is undisputed that Sony did not seek review of every claim
> under the '213 and '333 patents.  Accordingly, Sony cannot now claim
> that the PTO wrongly failed to reexamine claims for which Sony never
> requested review, and its argument that AIPA compels a contrary
> result is unpersuasive.

The *Sony* decision's reasoning and statutory interpretation apply analogously to *ex parte*

reexamination, as the same relevant statutory language applies to both *inter partes* and *ex parte*

reexamination.  35 U.S.C. § 302 provides that the *ex parte* reexamination "request must set forth

the pertinency and manner of applying cited prior art to every claim for which reexamination is

requested" (emphasis added), and 35 U.S.C. § 303 provides that "the Director will determine

whether a substantial new question of patentability affecting any claim of the patent concerned is

raised by the request..." (Emphasis added).  These provisions are analogous to the language of

35 U.S.C. § 311(b)(2) and 35 U.S.C. § 312 applied and construed in *Sony*, and would be

construed in the same manner.  As the Director can decline to reexamine non-requested claims in

an *inter partes* reexamination proceeding, the Director can likewise do so in *ex parte*

reexamination proceeding.  See *Notice of Clarification of Office Policy To Exercise Discretion in*

*Reexamining Fewer Than All the Patent Claims* (signed Oct. 5, 2006) 1311 OG 197 (Oct. 31,

2006).  See also MPEP § 2240, Rev. 5, Aug. 2006.

**Exhibit 35  Page 539**

Application/Control Number: 90/008,740                                    Page 10
Art Unit: 3992

Therefore, claims 1-12 and 14-24 will not be reexamined in this *ex parte* reexamination
proceeding.

7.    Claim 13 will be reexamined as requested in the request.

### *Conclusion*

8.    Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings
because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a
reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination
proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).  Extensions of time in
*ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

9.    The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to
apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving
Patent No. 4,383,272 throughout the course of this reexamination proceeding.

10.    After the filing of a request for reexamination by a third party requester, any document
filed by either the patent owner or the third party requester must be served on the other party (or
parties where two or more third party requester proceedings are merged) in the reexamination
proceeding in the manner provided in 37 CFR 1.248. See 37 CFR 1.550(f).

11.    In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530
to file a Patent Owner Statement. The document needs to contain a statement that Patent Owner
waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof of service in
the manner provided by 37 C.F.R. 1.248, if the request for reexamination was made by a third
party requester, see 37 C.F.R 1.550(f).

12.    Patent Owner is notified that any proposed amendment to the specification and/or claims
in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be formally

**Exhibit 35  Page 540**

Application/Control Number: 90/008,740                                      Page 11
Art Unit: 3992

presented pursuant to 37 CFR 1.52(a) and (b), and must contain any fees required by 37 CFR

1.20(c).

13.     All correspondence related to this *ex parte* reexamination proceeding should be directed

as follows:

**Please MAIL any communications to:**

Attn: Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

**Please FAX any communication to:**

(571) 273-9900
Central Reexamination Unit

**Please HAND-DELIVER any communications to:**

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

14.     Any inquiry by the patent owner concerning this communication or earlier

communications from the Legal Advisor or Examiner, or as to the status of this proceeding,

should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

*Ovidio Escalante*
Ovidio Escalante
Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-7537

Conferee:

MARK J. REINHART
SPRE-AU 3992
CENTRAL REEXAMINATION UNIT

Conferee:

**Exhibit 35  Page 541**

| INFORMATION DISCLOSURE CITATION IN AN APPLICATION (PTO-1449) | ATTY. DOCKET NO. **075543-0017** | PATENT NO. **4,383,272** |
|---|---|---|
| | APPLICANT **NETRAVALI, et al.** | |
| | FILING DATE **July 12, 2007** | GROUP |

### U.S. PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Document Number Number-Kind Code2 (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |
| | | US | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER'S INITIALS | CITE NO. | Foreign Patent Document Country Code3-Number4-Kind Code5 (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines Where Relevant Figures Appear | Translation Yes | No |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### OTHER ART (Including Author, Title, Date, Pertinent Pages, Etc.)

| EXAMINER'S INITIALS | CITE NO. | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | |
|---|---|---|---|
| /OE/ | | D. Gabor, *Television Compression by Contour Interpolation*, Supplemento Al Volume III, Serie X, Del Nuovo Cimento, 1959 | |
| /OE/ | | J. O. Limb, et al., *Combining Intraframe and Frame-to-Frame Coding for Television*, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974 | |
| /OE/ | | R. F. W. Pease, *Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals*, The Bell System Technical Journal, Vol. 51, No. 4, April 1972 | |
| /OE/ | | P. C. J. Hill, *Television Bandwidth Compression by Interpolation*, The Electrical Engineering Department, Imperial College London, March 1960 | |
| /OE/ | | Kretzmer, E.R., "Statistics of Television Signals," The Bell Systems Technical Journal, pp. 276-88 (July 1952) | |
| /OE/ | | J. O. Limb and R. F. W. Pease, *A Simple Interframe Coder For Video Telephony*, The Bell System Technical Journal, Vol. 50, No. 6, July-Aug., 1971 | |

**Exhibit 35  Page 542**

| /OE/ | D. Gabor, et al., *Television Band Compression By Contour Interpolation*, The Proceedings of the Institution of Electrical Engineers, Vol. 108, Part B, No. 39, May 1961 | |
| /OE/ | Arun N. Netravali and John O. Limb, *Picture Coding: A Review*, Proceedings of the IEEE, Vol. 68, No. 3, Mar. 1980 | |
| /OE/ | Limb et al., *Exchange of Spatial and Temporal Resolution in Television Coding*, The Bell System Technical Journal, January 1971 | |

| EXAMINER<br>./Ovidio Escalante/ | DATE CONSIDERED<br>08/16/2007 |
|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
1 Applicant's unique citation designation number (optional). 2 Applicant is to place a check mark here if English language Translation is attached.
WDC99 1421180-1.075543.0017

Exhibit 35  Page 543

Exhibit 36

MOTION PICTURES EXPERT GROUP (MPEG)

ISO/IEC JTC 1/SC 2/WG11

Date: November 28, 1990

SOURCE: AT&T

TITLE: AT&T's patent statement

AT&T is desirous of the adoption of an ISO Standard for Coding of Moving Pictures and Associated Audio ("the STANDARD"). Toward this end, it is intended that our patents not present an impediment to the adoption of the STANDARD and we wish to encourage a broad deployment of the STANDARD while maintaining incentive to continue innovation.

Accordingly, to the extent that AT&T has existing patents or may in the future obtain patents which are essential to the STANDARD, it is our policy that a license will be made available by AT&T to any applicant upon reasonable terms and conditions that are demonstrably free of any unfair discrimination and provided that a similar grant under any licensee's patents within the scope of the license granted to licensee is made available upon request to AT&T.

As a result of our past licensing practices, many of the major manufacturers who would be interested in providing the type of equipment which will use the STANDARD are currently licensed.

AT&T has filed patent applications on aspects of some of the features in the coding f moving pictures and associated audio.



HASKELL
12-15-05 20
EXHIBIT NO.
T DARNELL CSR9966

**91APP0472**

**Exhibit 36  Page 544**

Exhibit 37

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  LUCENT TECHNOLOGIES, INC. and MULTIMEDIA PATENT TRUST | CASE NO. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases: |
| 12 | |
| 13         Plaintiffs and Counter-Defendants, | CASE NO. 02-CV-2060-B (CAB) CASE NO. 03-CV-0699-B (CAB) CASE NO. 03-CV-1108-B (CAB) |
| 14         vs. | |
| 15  GATEWAY, INC., *et al*. | **CASE MANAGEMENT ORDER** |
| 16         Defendants and Counterclaimants. | |
| 17  and | |
| 18  MICROSOFT CORPORATION, | |
| 19         Intervenor and Counterclaimant | |
| 20  AND RELATED CLAIMS | |
| 21 | |

22

23           On October 16, 2007, Judge Brewster signed an order severing certain matters

24    from cases 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB),

25    thus creating this case.  (Doc. No. 1.)  The case was then randomly drawn to Judge

26    Houston.  On October 17, 2007, the case was reassigned to Judge Huff pursuant to the

27    low number rule, Local Rule 40.1.

///

28    ///

<u>Prior Dates Remain Set</u>

Accordingly, the Court **ORDERS that all prior dates set before Judge Huff in 02-CV-2060-B (CAB) remain as set** unless otherwise ordered, including but not limited to dates for any hearing, pre-trial conference, or trial.  (<u>See, e.g.</u>, 02-CV-2060, Doc. Nos. 1876, 2054.)  In particular, the Court reminds the parties that the hearing on motions for partial summary judgment of no willful infringement **remains set for October 19, 2007 at 1:30 PM** or as soon thereafter as the Court can call the case.

<u>Adoption of Previous Orders</u>

The Court **ADOPTS** all orders from 02-CV-2060-B (CAB) to the extent they apply to the severed matters.

<u>Filing Procedures</u>

Regarding filing procedures, the Court **ORDERS** that the **parties promptly file** in this case **copies of the pending motions for partial summary judgment of no willful infringement** that were effectively severed by Judge Brewster's order **and any related documents supporting or opposing the motion,** provided, however, that the parties **need not resubmit sealed filings**.  (<u>See</u> Doc. No. 1 (listing pending motions).)  Where the parties filed both redacted and sealed versions, they may file only the redacted version in the docket for this case.  The parties **may refer to the prior docket to the extent relevant to the severed matters**.  Thus, the parties **need not refile other documents previously filed in 02-CV-2060-B** except as ordered by the Court.  For all future filings, the parties should **file documents related to the severed matters only in 07-CV-2000-H** unless otherwise ordered.  The parties **should not file documents in 07-CV-2000-H if they do not related to severed matters**.  This may include filings related to bills of costs, pending appeals, or other matters that Judge Brewster's ordered retained for 02-CV-2060-B.

Motions in Limine:

      Microsoft previously filed a motion in limine to preclude evidence regarding foreign sales and contributory infringement. (02-CV-2060 Doc. No. 1288.) The Court deferred this motion in light of a then pending Supreme Court decision. (02-CV-2060 Doc. No. 1737.) The Court sets the following schedule for motions in limine:

- The parties shall file any motions in limine on or before **January 14, 2008**. If it wishes to continue with its pending motion, Microsoft shall submit a revised memorandum of points and authorities at that time.
- Opposition briefs to motions in limine are due on or before **January 28, 2008**
- Reply briefs, if any, are due on or before **February 4, 2008**.
- The Court shall hold a hearing on motions in limine on **February 11, 2008 at 10:30 AM** or as soon thereafter as the Court can call the case.

Pre-Trial Status Conference:

      In addition to any dates set, the Court sets a pre-trial status conference for **Feburary 19, 2008 at 10:30 AM** or as soon thereafter as the Court can call the case. At an appropriate time before trial, the Court will also issue orders concerning time limits, deadlines for jury questionnaires, or other trial logistics.

Pending Requests to File Documents Under Seal:

      There are two pending requests to file documents under seal. Although filed in 02-CV-2060-B (CAB), these requests pertain to the summary judgment hearing on willful infringement and thus were effectively severed to become part of this case. (See 02-CV-2060 Doc. No. 2136, 2138-2.) The Court **GRANTS** these requests as they now relate to 07-CV-2000-H (CAB) .

      Accordingly, Gateway may file the following under seal in this case:

- Exhibit 4, excerpts from the deposition of Stephen Samuels, taken on March 3, 2006.

      Microsoft may file the following under seal in this case:

1    •     Reply in Support of Microsoft's Motion for Partial Summary Judgment of No

2           Willful Infringement of The Asserted Claims of U.S. Patent NOS. 4,958,226;

3           4,383,272; 5,347,295; and 4,763,356.

4    •     Exhibit 1, a true and correct copy of excerpts from the deposition transcript of

5           Kenneth Rubenstein, Ph.D. taken May 4, 2006.

6    •     Exhibit 3, a true and correct copy of the First Supplemental Rebuttal Expert

7           Report of Edward J. Delp, III dated June 5, 2006.

8    •     Exhibit 4, a true and correct copy of the Expert Report of Edward J. Delp, III

9           dated March 31, 2006.

10

11    Equipment Requests

12         Dell's counsel submitted a motion to bring two laptops into the Courtroom for the

13    October 19, 2007 hearing at 1:30 PM. (02-CV-2060 Doc. No. 2130.) As previously

14    ordered, parties **do not need to file written motions to request permission to bring**

15    **equipment into Judge Huff's courtroom**, and may simply contact chambers by phone

16    in a timely fashion. (See 02-CV-2060 Doc. No. 2128.) The Court **GRANTS** this

17    request, but encourages the parties not to file written motions in the future. Counsel

18    wishing to bring equipment should call chambers at least **two court days** before the

19    hearing and ask to speak to Judge Huff's assistant who will then make appropriate

20    arrangements for access to the Courtroom. The parties should use reasonable judgment,

21    however, and contact chambers sooner if the request is likely to require significant

22    alteration of the courtroom setup.

23         **IT IS SO ORDERED.**

24    DATED: October 18, 2007

25

26    MARILYN L. HUFF, District Judge
    UNITED STATES DISTRICT COURT

27

28    COPIES TO:
    All parties of record.

Exhibit 38

1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10   LUCENT TECHNOLOGIES, INC.,                    Civil No.    02cv2060-B (CAB)

11                              Plaintiff,

12          v.                                     **SCHEDULING ORDER FOR GROUPS
                                                   1, 4, 5 AND 6 PATENTS**
13   GATEWAY, INC.; GATEWAY COUNTRY
     STORES LLC; MICROSOFT
14   CORPORATION; and DELL, INC.,

15                              Defendants.

16   And related counterclaims.

17          On June 6, 2007, the Court held a discovery conference to discuss the scheduling of motions,

18   pre-trial and trial schedules for the remaining patents in this case.  After considering input from

19   counsel, the Court sets the following schedule:

20          1.     On **June 19 and 20, 2007**, at **9:00 a.m.**, motions for summary judgment on the Group

21   1/6 patents, excluding those involving issues of obviousness, shall be heard before Judge Brewster.

22          2.     On **September 6, 2007**, at **9:00 a.m.**, motions regarding the trust/licensing, which

23   will address Plaintiff's continued standing to assert the Group 1/6 patents, shall be heard before

24   Judge Brewster.

25          3.     On or before **September 14, 2007**, Defendants shall serve their supplemental expert

26   reports on the obviousness defense for the Groups 1/6, 4 and 5 patents.

27          4.     On or before **October 12, 2007**, Plaintiff shall serve its supplemental rebuttal expert

28   report on the obviousness defense.

                                              - 1 -                                    02cv2060

**Exhibit 38  Page 549**

5.   On or before **November 9, 2007**, expert depositions on the supplemental reports shall be completed.

6.   On or before **November 30, 2007**, Defendants shall file opening briefs on the obviousness defense as it relates to the Groups 1/6, 4 and 5 patents.

7.   On or before **December 14, 2007**, Plaintiff shall file opposition briefs on the obviousness defense.

8.   On or before **December 21, 2007**, Defendants shall file reply briefs on the obviousness defense.

9.   On **January 7, 2008**, at **10:30 a.m.**, the motion for summary judgment on the obviousness defense shall be heard before Judge Huff.

10.   On or before **January 14, 2008**, all parties shall file Memoranda of Contentions of Fact and Law in compliance with Local Rule 16.1(f)(2), as it relates to the Groups 1/6, 4 and 5 patents.

11.   On or before **January 14, 2008**, all parties shall fully comply with the Pretrial Disclosure requirements of Fed. R. Civ. P. 26(a)(3), as it relates to the Groups 1/6, 4 and 5 patents. **Failure to comply with these disclosures requirements could result in evidence preclusion or other sanctions under Fed. R. Civ. P. 37.**

12.   On or before **January 21, 2008**, counsel shall meet together and take the action required by Local Rule 16.1(f)(4).  At this meeting, counsel shall discuss and attempt to enter into stipulations and agreements resulting in simplification of the triable issues.  Counsel shall exchange copies and/or display all exhibits other than those to be used for impeachment.  The exhibits shall be prepared in accordance with Local Rule 16.1(f)(4)(c).  Counsel shall note any objections they have to any other parties' Pretrial Disclosures under Fed. R. Civ. P.  26(a)(3).  Counsel shall cooperate in the preparation of the proposed pretrial conference order.

13.   On or before **January 28, 2008**, the proposed final pretrial conference order, including objections they have to any other parties' Fed. R. Civ. P. 26(a)(3) Pretrial Disclosures shall be prepared, served and lodged with the Clerk of the Court, and shall be in the form prescribed in and in compliance with Local Rule 16.1 (f)(6).  Counsel shall also bring a court copy of the pretrial

02cv2060

**Exhibit 38  Page 550**

1 order to the pretrial conference.

2       14.     The final pretrial conference shall be held before the **Honorable Marilyn L. Huff**,

3 United States District Court Judge, on **February 4, 2008**, at **10:30 a.m.**

4       15.     The trial on the Groups 1/6, 4 and 5 patents shall commence on **February 20, 2008**,

5 at **9:00 a.m.**

6       16.     The dates and times set forth herein will not be modified except for good cause

7 shown.

8       17.     Plaintiff's counsel shall serve a copy of this order on all parties that enter this case

9 hereafter.

10       **IT IS SO ORDERED.**

11

12 DATED: June 7, 2007

13                           _____

14                           **CATHY ANN BENCIVENGO**
United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit 38  Page 551**

Exhibit 39

1

2                    **UNITED STATES DISTRICT COURT**

3                   **SOUTHERN DISTRICT OF CALIFORNIA**

4

5    LUCENT TECHNOLOGIES INC.,                    |

6            Plaintiff and Counterclaim-defendant,|

7    v.                                           |

8    GATEWAY, INC. and GATEWAY                     |
     COUNTRY STORES LLC, GATEWAY                   |
     COMPANIES, INC., GATEWAY                      |
9    MANUFACTURING LLC and                         |
     COWABUNGA ENTERPRISES, INC.,                  |

10           Defendants and Counter-claimants,      |   **Civil No:** 02CV2060-B(CAB)
                                                       consolidated with
11   and                                           |   **Civil No:** 03CV0699-B (CAB) and
                                                       **Civil No:** 03CV1108-B (CAB)
12   MICROSOFT CORPORATION,                        |

13           Intervenor and Counter-claimant,       |   **ORDER GRANTING SUMMARY**
                                                       **ADJUDICATION OF NO**
14   _____          |   **INFRINGEMENT OF U.S. PATENT NO.**
                                                       **5,347,295**
15   MICROSOFT CORPORATION,                        |

16           Plaintiff and Counterclaim-defendant,|

17   v.                                           |

18   LUCENT TECHNOLOGIES INC.,                     |

19           Defendant and Counter-claimant        |

20   _____          |

21   LUCENT TECHNOLOGIES INC.,                     |

22           Plaintiff,                            |

23   v.                                           |

24   DELL, INC.,                                   |

25           Defendant.                            |

26   _____          |

27

28                                                           02CV2060-B (CAB)

**Exhibit 39  Page 552**

1 **I.    INTRODUCTION**

2      Dell moves the Court for summary judgment[1] that Dells' Axim® line of Personal

3 Digital Assistants (PDAs) do not infringe U.S. Patent No. 5,347,295 ("the '295 patent").

4 Microsoft joins this motion and asserts that if there is no direct infringement, Microsoft

5 cannot be liable for indirect infringement.  For the reasons herein, the Court **GRANTS**

6 Dell's and Microsoft's motions.

7 **II.    BACKGROUND**

8      Lucent has asserted the '295 patent against Defendant Dell, accusing Dell's Axim®

9 line of Personal Digital Assistants (PDAs) of literal infringement and infringement under

10 the doctrine of equivalents.  Lucent has also accused Microsoft of indirectly infringing the

11 patent by selling Windows Mobile and Pocket PC operating software that is included in

12 Dell's PDAs.

13      The '295 patent is directed to a notebook computer that is controlled by a stylus.

14 Using the stylus, the user can enter commands.  The computer and stylus contain

15 complementary circuitry to detect proximity with, contact and movement of the stylus on

16 the computer screen

17      The claims at issue in the '295 patent are apparatus claims drafted in means-plus-

18 function language.  At issue in this motion is "the first detecting means."  The Court

19 construed this term to have the function of "detecting a stroke of the stylus tip in contact

20 with the screen."  The corresponding structure was designated as Pen position digitizer 20,

21 as shown in figures 2 and 3 of the patent, and as described in the specification at col. 6 on

22 lines 21-22 and lines 53-58.

23      Dell now moves for summary judgment that its products do not infringe because

24 they lack an identical or corresponding structure to this first detecting means.  Microsoft

25

26      [1] The parties titled the instant motions as "summary judgment." However, the Court treats them
27 as motions for summary adjudication (or partial summary judgment) under Fed. R. Civ. P. 56(d)
because the motions do not encompass the entire case on the '295 patent.

28                                                   2

**Exhibit 39  Page 553**

1   joins the motion, contending that if there is no direct infringement by Dell, there can be no

2   indirect infringement by Microsoft.  Additionally, Dell and Microsoft contend that there

3   can be no contributory infringement because Dell's use of Microsoft's software is a

4   substantial  non-infringing use.  The motion was heard on March 2, 2007.

5   **III.     DISCUSSION**

6        **A.     STANDARD OF LAW**

7        Summary judgment is appropriate if the "pleadings, depositions, answers to

8   interrogatories, and admissions on file, together with the affidavits, if any, show that there

9   is no genuine issue as to any material fact and that the moving party is entitled to judgment

10   as a matter of law."  Fed. R. Civ. P. 56(e) (West 2006).  A dispute about a material fact is

11   genuine "if the evidence is such that a reasonable jury could return a verdict for the

12   nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In

13   considering the motion, the court must examine all the evidence in the light most favorable

14   to the non-moving party and "all justifiable inferences are to be drawn in his favor."

15   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 257 (1986).

16        When the moving party does not bear the burden of proof, summary judgment is

17   warranted by demonstration of an absence of facts to support the non-moving party's case."

18   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Summary judgment must be granted if

19   the party responding to the motion fails "to make a sufficient showing on an essential

20   element of her case with respect to which she has the burden of proof."  Id. at 323.

21        **B.     Analysis**

22           **1.     Means Plus Function Limitations**

23        The main point of contention between the parties is whether or not Dell's PDAs

24   have a corresponding structure to the "first detecting means."  This is a means plus function

25   limitation to which a specific body of law applies.  Means-plus-function language permits

26   the patentee to "short-hand" all of the structures in the specification that correspond to a

27   particular function.   However, the quid pro quo for this convenience is the duty to link the

28                         3

**Exhibit 39  Page 554**

आ

1    corresponding structure and function.  Utah Medical Products, Inc. v. Graphic Controls

2    Corp., 350 F.3d 1376, 1384 (Fed. Cir. 2003).  The claimed "means" can then only refer to

3    structures identical or equivalent to those disclosed and only where the specification and

4    prosecution history link such structures with the claimed function.  Id.

5         "Literal infringement of a means-plus-function claim limitation requires that the

6    relevant structure in the accused device perform the identical function recited in the claim

7    and be identical or equivalent to the corresponding structure in the specification."  Applied

8    Medical Resources Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1333 (Fed. Cir. 2006).  A

9    structure is an equivalent if to the disclosed structure if "the two perform the identical

10   function in substantially the same way, with substantially the same result."  Id.

11        The doctrine of equivalents applies to mean-plus-function claims in a modified

12   manner as a "question of timing."  Frank's Casing Crew & Rental Tools, Inc. v.

13   Weatherford Intern., Inc., 389 F.3d 1370, 1379 (Fed. Cir. 2004).  Where a proposed

14   equivalent has arisen before the patent is filed, the equivalent is considered under the literal

15   infringement analysis, as described above, and the doctrine of equivalents essentially

16   collapses into this analysis.  Id.  A traditional doctrine of equivalents analysis is only

17   applied where the equivalent arises after the patent was filed.  Ishida Co., Ltd. v. Taylor,

18   221 F.3d 1310, 1317 (Fed. Cir. 2000).

19            **2.    "First Detecting Means"**

20        In the instant case, all of the claims at issue contain the means plus function

21   limitation "a first detecting means."  The Court construed "first detecting means" to carry

22   out the function of "detecting a stroke of the stylus tip in contact with the screen."  For an

23   accused device to infringe, it must carry out the identical function. Applied Medical

24   Resources, 448 F.3d at 1333.

25        Dell contends that its PDAs do not infringe because the stylus tip does not come into

26   contact with the screen and thus it does not carry out an identical function to the claims of

27   the '295 patent.  Dell contends that because the accused PDAs have a front-mounted

28                                                4

**Exhibit 39  Page 555**

digitizer, the stylus contacts the digitizer and not the screen.

The contention over this point rests with the interpretation of the word "screen." The '295 patent specification uses the terms "front surface," "display,""liquid crystal display," and "screen" in describing the invention (see e.g., '295 patent col. 6:20-22, 58-63). The terms "display" and "screen"are used synonymously in the patent; both are labeled as component **10** in the patent (see e.g., '295 patent col. 6:48, 7:21-22, 8:55, 17:14). In contrast, these terms are not used synonymously with the term "digitizer." The specification distinguishes the digitizer as a separate component from the display:

> FIG. 2 shows the internal mechanical layout of the computer 2. Liquid crystal display 10 is mounted as the front surface of the unit. Mounted behind the display is the pen position digitizer 20.

('295 patent; Col 6:20-22.) The drawing in Figure 2 of the patent also shows the digitizer as a separate component, mounted behind the display and a protective layer. Hence, the patentee distinguished the terms "screen" and "digitizer" to refer to different parts of the invention.

In the claims of the '295 patent and in the prosecution history, the patentee chose to focus on the term "screen." The claims as issued exclusively use the word "screen" in the context of detecting the stylus in contact or proximity to the apparatus. Similarly, during prosecution, in response to the USPTO examiner's obviousness rejection the patentee also specifically referred to the screen; the patentee stated that the claims had been amended "to clarify that the present invention has means for detecting *both* proximity and contact of the stylus tip with the screen." (emphasis in the original). The limitation of the first detecting means for detecting the stylus "in contact with the screen" was then added to the claims.

In light of the use of the term "screen" in the specification and the prosecution history, the Court interprets the word "screen" to include the display (i.e. the display screen with or without a protective cover) but not to include the digitizer. Since the accused devices contain a display that lies behind the front-mounted digitizer, the stylus in these

5

Exhibit 39 Page 556

1   devices cannot contact the "screen" as the Court has defined it.  Hence, because the stylus

2   of the accused PDAs do not contact the screen, they do not perform the identical function to

3   the "first detecting means" of the '295 patent.  For this reason, there is no literal

4   infringement by the accused devices.

5       Additionally, there is no infringement under the doctrine of equivalents. As

6   explained above, where a proposed equivalent exists before the patent is filed, the doctrine

7   of equivalents collapses into the literal infringement analysis.  Frank's Casing Crew, 389

8   F.3d at 1379. Both parties admit that digitizers mounted in front of the display were known

9   in the art as of the filing of the patent; in fact, the '295 specification refers to front-mounted

10  digitizers at column 6, lines 53-58.  Therefore, only statutory equivalents are considered

11  under the literal infringement analysis.  Again, these equivalents must still perform the

12  identical function set forth in the claims.  Applied Medical Resources, 448 F.3d at 1333.

13  Since the accused devices fail to perform this function, regardless of any purported

14  equivalent structure, as a matter of law they do not meet "first detecting means" limitation.

15      In sum, there is no direct infringement of the '295 patent by Dell's Axim® line of

16  PDAs.  Therefore, on this ground Dell's motion for no direct infringement is **GRANTED**.

17                  **3.      Indirect Infringement**

18      Lucent also has accused Microsoft of indirectly infringing the '295 patent.  Liability

19  for indirect infringement requires a showing of direct infringement. Dynacore Holdings

20  Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement,

21  whether inducement to infringe or contributory infringement, can only arise in the presence

22  of direct infringement. . . .").  Because there is no direct infringement of Dell's Axim® line

23  of PDAs, there can be no indirect infringement by Microsoft as it would relate to these

24  devices.  Therefore, on this ground Microsoft's motion is **GRANTED**.

25  **IV.   CONCLUSION**

26      For the reasons herein, the Court **GRANTS** summary adjudication of no direct

27  infringement of the '295 patent by Dell's Axim® line of PDAs and **GRANTS** summary

28                          6

**Exhibit 39  Page 557**

1  adjudication of no indirect infringement as it relates to Dell's Axim® line of PDAs.  This

2  Order does not dispose of the remaining infringement issues in the case with respect to

3  other accused devices.  These issues will proceed to trial.

4

5  **IT IS SO ORDERED**

6

7  DATED:  March 8, 2007

8  Hon. Rudi M. Brewster
   United States Senior District Judge

9

10

11

12  cc:  Hon. Cathy Ann Bencivengo
        United States Magistrate Judge

13      All Counsel of Record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

Exhibit 39  Page 558

Exhibit 40

1

2

3

4

5

6

7

8                **UNITED STATES DISTRICT COURT**

9                **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   LUCENT TECHNOLOGIES, INC.,            CIV. NO. 02-2060-B (CAB)
     **MULTIMEDIA PATENT TRUST.,** *et*    consolidated with
12   *al.*,                                Civil No:  03CV0699-B (CAB) and
                                           Civil No:  03CV1108-B (CAB)
13        **Plaintiffs & Counter-Defendants,**

14        **vs.**                          **ORDER GRANTING IN PART
                                           AND DENYING IN PART
15   **GATEWAY, INC, et al.,**             PARTIES' MOTIONS FOR
                                           SUMMARY JUDGMENT
16        **Defendants and Counter-Claimants,**  REGARDING DEFENDANTS'
                                           AFFIRMATIVE DEFENSES AND
17   **and**                               COUNTERCLAIMS
                                           PERTAINING TO THE
18   **MICROSOFT CORPORATION,**            TRANSFER OF THE GROUP 1
          **Intervenor and Counter-Claimant,**  PATENTS TO THE
19   _____      MULTIMEDIA PATENT TRUST

20   **AND CONSOLIDATED CASES**            **[Docket Nos. 1980, 1981, & 1992]**

21

22   **I.     INTRODUCTION**

23          The parties –  Plaintiffs Lucent and Multimedia Patent Trust ("MPT") and Defendants

24   Microsoft, Dell, and Gateway –  have filed cross-motions for summary judgment on

25   Defendants' affirmative defenses and counterclaims regarding the transfer of

26    two patents in Group 1, U.S. Patent Nos. 4,958,226 and 4,383,272, from Lucent to MPT.

27   The cross-motions concern the issues of license, unclean hands, and estoppel/implied license.

28   In addition, Plaintiffs move for summary judgment on a number of affirmative defenses and

**Exhibit 40  Page 559**

1    counterclaims specific to Gateway's pleadings:  (1) exhaustion; (2) breach of contract; (3)

2    third party beneficiary breach of contract; (4) breach of good faith and fair dealing; (5)

3    tortious interference with contract; (6) tortious interference with prospective economic

4    advantage; (7) violation of the Sherman Act § 1; (8) violation of the Sherman Act § 2 –

5    monopolization; (9) violation of the Sherman Act § 2 – attempted monopolization; and (10)

6    patent misuse.

7         On motions orally made at the hearing on September 26, the Court ordered that *all*

8    motions filed by any Defendant and Counter-Claimant shall be joined by all other

9    Defendants and Counter-Claimants.  All orders concerning those motions shall apply to all

10   Defendants and Counter-Claimants.

11   **II.    BACKGROUND**

12        The MPEG-2 standard is an international standard for video data compression and

13   data transport.  In 1997, a number of companies joined together in an agreement, entitled

14   "Agreement Among Licensors" to create a pool of patents related to MPEG-2.  The

15   companies covenanted to grant to the licensing administrator of the pool "a worldwide,

16   nonexclusive, non-transferrable license or sublicense under all MPEG-2 Essential Patent(s)."

17   (Dec. Blackburn Supp. Dell's Mot. (hereinafter "Blackburn Dec.") Ex. 10 §§ 2.2, 2.3.)   This

18   covenant covered "all MPEG-2 Essential Patent(s) which the Party and its Affiliate(s) . . .

19   presently or in the future, have the right to license or sublicense."  (Id. § 2.3.)  The licensing

20   administrator was authorized to grant sublicenses to third parties.  (Id.)

21        At the time of the formation of the MPEG-2 pool (hereinafter "MPEG LA"), Lucent

22   owned several patents which it and others deemed essential to the MPEG-2 standard.

23   Lucent, however, chose not to join MPEG LA and instead pursued licensing of these patents

24   through its own independent avenues.  Alcatel, although not an original member of MPEG

25   LA, joined the pool of licensors in March 2003.  Defendants are sublicensees to MPEG LA.

26   Dell joined in December 2001 (Blackburn Dec. Ex. 11.)  Gateway joined in January 2002

27   (Id. Ex. 20.)  Microsoft became a sublicensee of MPEG LA in February 2006.  (Id. Ex. 21.)

28        On April 2, 2006, Lucent and Alcatel entered into an Agreement and Plan of Merger.

**Exhibit 40  Page 560**

(hereinafter "the Merger Agreement," Blackburn Dec. Ex. 2.)  This document contains

numerous provisions, some of which address transferring assets, entering in contracts, and

conduct in the ordinary course of business during the period before the two companies

actually merged.  On September 7, 2006, shareholders of both companies voted and approved

the Merger Agreement.  The merger took place on November 30, 2006; Lucent became a

wholly owned subsidiary of Alcatel-Lucent.

Sometime in July 2006, while the merger plans were on-going, Lucent began

strategizing as to the fate of its MPEG-2 related patents.  According to its in-house counsel,

if the status quo was maintained, upon the merger Lucent's patents including U.S. Patent

Nos. 4,958,226 and 4,383,272 (hereinafter collectively referred to as "the video coding

patents") would be subject to Alcatel's commitment to MPEG LA.  After examining several

options, in September 2006, Lucent's Chief Operating Officer Mr. D'Amelio gave the final

approval to transfer the video coding patents into a trust.

Multimedia Patent Trust ("MPT" or alternatively, "the Trust"), was set up under

Delaware law as an irrevocable Delaware Statutory Trust by an Agreement executed on

November 21, 2006 (hereinafter "the Trust Agreement") and with a certificate of trust issued

November 28, 2006.  (Marina Dec. Supp. Lucent's and MPT's Mot. Summ. J. (hereinafter

"Marina Dec.") Ex. 10, 11.).  The structure of the Trust includes a trust advisor and three

trustees – a licensing trustee, a litigation trustee, and an administrative trustee.  The

beneficiaries of the Trust are Lucent Technologies Foundation (1% with a maximum of

$100,000 in any year) and Lucent (the remainder).  A patent assignment agreement between

Lucent and MPT ("the Patent Assignment"), which included the video coding patents, was

executed on November 28, 2006, two days before the merger of Lucent and Alcatel.  (Id. Ex.

12.)

## III.    STANDARD OF LAW

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate

if the "pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that

1   the moving party is entitled to judgment as a matter of law." In considering the motion, the

2   court must examine all the evidence in the light most favorable to the non-moving party.

3   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). If the Court is unable to render

4   summary judgment upon an entire case and finds that a trial is necessary, it shall if

5   practicable grant summary adjudication for any issues as to which, standing alone, summary

6   judgment would be appropriate. Fed. R. Civ. P. 56(d).

7       When the moving party does not bear the burden of proof, summary judgment is

8   warranted by demonstration of an absence of facts to support the non-moving party's case.

9   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Summary judgment must be granted if

10  the party responding to the motion fails "to make a sufficient showing on an essential

11  element of her case with respect to which she has the burden of proof." *Id.* at 323.

12  **IV.    ISSUES FOR SUMMARY ADJUDICATION**

13      **A.    License**

14      Defendants have raised the affirmative defense of license. They assert a number of

15  theories under which they argue they are licensed under the agreement between Alcatel and

16  MPEG-LA: (1) ineffective assignment of the patents to MPT; (2) MPT is an "affiliate" under

17  the Agreement Among Licensors; and (3) MPT is the alter ego of Lucent.

18          **1.    Ineffective Assignment**

19      Defendants contend that the attempted transfer of the patents from Lucent to MPT was

20  ineffective such that the merged company Alcatel-Lucent retains sufficient rights to the video

21  coding patents to trigger its obligation to place the patents in the MPEG LA pool; Defendants

22  therefore contend that they have a license through their sublicensing agreements with MPEG

23  LA.

24      Defendants first assert that the Trust Agreement and the Patent Assignment fail to

25  transfer "all substantial rights" from Lucent to MPT, thereby rendering the transfer merely a

26  license, while the ownership of the patents remains with Lucent (and therefore Alcatel-

27  Lucent). The labeling of a party as an owner, assignee, or a licensee of the patent is not

28  determinative in the assessment of the party's rights. *Vaupel Textilmaschinen KG v.*

1   *Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991) (citing *Waterman v.*

2   *Mackenzie*, 138 U.S. 252, 256 (1891)).  "To determine whether a provision in an agreement

3   constitutes an assignment or a license, one must ascertain the intention of the parties and

4   examine the substance of what was granted." *Id.* at 874.

5       In the instant case, the Patent Assignment is couched in assignment language,

6   transferring all rights from Lucent (Assignor) to MPT (Assignee):  "Assignor . . . does

7   hereby assign, convey, transfer and deliver to Assignee, its successors, assigns and legal

8   representatives or nominees, Assignor's entire right, title and interest in and to the Trust

9   Patents." (Marina Dec. Ex. 12 § 1; see also Id. Recitals ¶ C .)   Beyond these general

10  recitations, the rights of the parties are more specifically delineated within the body of the

11  Patent Assignment; this includes a recitation that the Patent Assignment is subject to the

12  provisions of the Trust Agreement between these same two parties.  (Id. Recitals ¶ A, §10.)

13      The combination of these two agreements vests the majority of the rights with MPT.

14  The Trust Agreement rests the exclusive power of granting licenses with MPT.  (Id. Ex. 10 §

15  5.1(a)(i).)   Although Lucent retains a world-wide nonexclusive license to the patents under

16  the Patent Assignment, it has no rights to extend sublicenses to third parties.  (Id. Ex. 12 § 4.)

17  Also according to the Trust Agreement, the Licencing Trustee of MPT has the power to enter

18  into, administer and enforce licensing agreements without Lucent's consent.  (Id. Ex. 10 §

19  5.1(a)(i).)  Additionally, the Trust Agreement vests MPT with the sole power to initiate and

20  control litigation on the patents.  (Id. § 5.1(b).)

21      One particular right is retained by Lucent:  MPT cannot assign the patents to a third

22  party absent Lucent's consent.  This is expressly stated in the Patent Assignment:  "The

23  parties . . . intend that this Patent Assignment and/or any of the licenses granted hereunder

24  not be assigned or transferred without the other party's express written consent."  (Id. Ex. 12

25  § 13.)  It is further detailed in the Trust Agreement:

> The Licensing Trustee shall also have the exclusive power to sell or otherwise
> monetize the Trust Patents owned by the Trust; provided, however that any
> such sale or monetization shall require the Company's prior written consent.

28  (Id. Ex. 10 § 5.1(a)(i).)

**Exhibit 40  Page 563**

1    The absence of complete control over the transfer of property may be indicative of a

2    lack of true ownership.  *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1191 (Fed. Cir.

3    2007) ("The right to dispose of an asset is an important incident of ownership, and such a

4    restriction on that right is a strong indicator that the agreement does not grant [the transferee]

5    all substantial rights under the patent."); *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*,

6    427 F.3d 971, 979 (Fed. Cir. 2005) ("Without a right to assign, the court need look no further

7    in determining that the licensor reserved substantial rights under the [a]greement.").

8    However, where a party does not have the unfettered right to assign, a finding that the party

9    lacks "all substantial rights" to the patent has generally involved circumstances where the

10   party lacks additional key rights, such as the right to initiate litigation independently, full

11   control of the sublicensing rights, legal title and/or the exclusive right to practice the patent.

12   *Propat*, 473 F.3d at 1191; *Sicom*, 427 F.3d at 978-80; *Intellectual Property Dev., Inc. v. TCI*

13   *Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001); *Abbott Labs. v. Diamedix*

14   *Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995).

15   Here, however, MPT lacks only the right to assign without Lucent's consent:  it

16   possesses complete control of the licensing and litigation rights on the patents.  This

17   circumstance is more in parallel with statements by the Federal Circuit in *Morrow v.*

18   *Microsoft Corp.*, Nos. 2006-1512, -1518, -1537, 2007 WL 2713248 (Fed Cir. Sept. 19,

19   2007).  There, the Court found that another's required consent to the transfer of a patent "is

20   not significantly restrictive" of "exclusionary rights" where the party holds other additional

21   key rights.  *Id*. at *8.  Therefore, based on the parallels to *Morrow*, the Court finds that here

22   the restriction on MPT's ability to assign the patents does not significantly impact MPT's

23   exclusionary rights; MPT possesses "all substantial rights" to the patents sufficient to

24   demonstrate an effective transfer of ownership from Lucent to MPT.

25   Moreover, even if MPT were not to possess sufficient rights to demonstrate

26   ownership, the transfer of the exclusive rights to license and sublicense the patents to MPT,

27   places these patents out of the reach of Alcatel-Lucent's obligations to MPEG-LA.  The

28   Agreement Among Licensors for MPEG LA reads in relevant part:

1

2.3     Each Party shall grant to the Licensing Administrator a worldwide,
nonexclusive, non-transferrable license or sublicense **under all MPEG-2
Essential Patent(s) which the Party** and its Affiliate(s), if any, presently, or in
the future, **have rights to license or sublicense** . . . .

2

3

4  (Blackburn Dec. Ex. 10 (emphasis added).)  Under the Trust Agreement and the Patent

5  Assignment between Lucent and MPT, Lucent did not retain any rights to license or

6  sublicense the patents.  (Marina Dec. Ex. 12 § 4.)  Thus, Alcatel-Lucent is not obligated by

7  Section 2.3 of the Agreement Among Licensors.

8      Defendants argue that the obligation still stands, because according to the Patent

9  Assignment, the transfer of rights to MPT is subject to "(a) existing rights and licenses (and

10  associated obligations) of third parties, and Assignor's and its subsidiaries obligations to such

11  third parties and (b) the license grant set forth in Section 4." (Id. § 1.)  Defendants contend

12  that Lucent was obligated to transfer the patents to Alcatel in the merger and hence, MPT's

13  rights to the patents remain subject to this previous obligation.

14      In the Merger Agreement executed by Lucent and Alcatel in April 2006, Lucent

15  coveted not to sell, transfer or license any material asset prior to the merger:

16

Lucent will not, and will not permit any of its Subsidiaries to sell, transfer,
lease, license, pledge, encumber or otherwise dispose of any material (as
determined with respect to Lucent and its Subsidiaries taken as a whole) assets
or stock, other than (i) inventory, receivables and vendor financing loans in the
ordinary course of business consistent with past practice and (ii) pursuant to
existing contracts or commitments.

17

18

19

20  (Blackburn Ex.2 § 5.01(j).)

21      The video coding patents at issue here would be covered by this provision if they are

22  "material assets."  The totality of the evidence indicates the patents fall into this

23  classification.  The parties do not dispute that the two patents are essential to the MPEG-2

24  standard.  Plaintiffs claim that Dell sells all of its computers with DVD playback features

25  incorporating the MPEG 2 standard and substantially all of Gateway's computers also

26  incorporate this same technology.  (Blackburn Dec. Ex. 17, Expert Report of Roger S. Smith

27  at 30.)   Additionally, Plaintiffs here are seeking as a reasonable royalty 0.5% of the fair

28  market value or $1.50 on every infringing computer system sold by Defendants.  (Id. at 37.)

**Exhibit 40  Page 565**

1  Lucent's Law Vice President-Intellectual Property and Intellectual Property Corporate

2  Counsel quoted Lucent's damages expert as estimating these damages to "range from $146

3  million to $1.43 billion against Microsoft; $64 to $491 million against Dell; and $30 to $126

4  million against Gateway." (Blackburn Dec. Ex. 1.) Defendants have offered that these

5  damages are placed against Lucent's pre-merger value of $11.42 billion, a figure that

6  Plaintiffs have not disputed. Finally, as detailed herein, Lucent has exerted significant effort

7  to place these patents out of the reach of MPEG LA's patent pool through its creation of

8  MPT. This evidence overwhelmingly indicates that these assets are "material" with respect

9  to Lucent. Therefore, Court finds that as a matter of law, no reasonable jury could find that

10  the two video coding patents at issue here do not constitute "material assets."

11  When Lucent transferred these material assets to MPT pre-merger, did it violate

12  Section 5.01(j) of the Merger Agreement? Evidence offered by Defendants themselves

13  answers this question in the negative. Defendants contend that Alcatel knew and participated

14  in the decision to transfer the patents from Lucent to MPT. Defendants point to a series of

15  emails, memoranda, and presentations between Lucent and Alcatel discussing the problem

16  created by Alcatel's obligations to MPEG LA and strategies to avoid this obligation. (Dec.

17  Marchese Supp. Microsoft's Opp. (hereinafter "Marchese Dec.") Ex. 25, Ex. 14 Dep.

18  Landmann 15-16, Ex. 26, Ex. 1, Ex. 3, Ex. 28, Ex. 4, Ex. 17; Blackburn Dec. Ex. 5, Ex. 1.)

19  Thus, from this evidence Defendants contend that Alcatel acknowledged and consented to

20  Lucent's actions, either by participating in the strategy-making or, at the very least, by not

21  taking any actions to stop Lucent from transferring the patents pre-merger. This consent

22  exempts the transfer of the patents from the covenant in Section 5.01(j) of the Merger

23  Agreement; Lucent only covenanted not to transfer its material assets absent the consent of

24  Alcatel. (Blackburn Dec. Ex. 2 § 5.01.) Here, however, Alcatel gave its apparent consent to

25  a transfer of these particular material assets.

26  Defendants' attempts to escape this conclusion are unpersuasive. Defendants point

27  only to Section 10.01 of the Merger Agreement which specifies the form and addressees for

28  written notices required between Lucent and Alcatel, and Section 10.03, specifying that any

- 8 -

**Exhibit 40  Page 566**

waiver of a provision must be in a signed writing.  The Court finds that the notice provisions
were substantially performed by the parties.  The communications included written emails
and memoranda.  Although they were not sent to the addresses listed in Section 10.01, this
section also permits communications to other parties "as such party may hereafter specify."
The emails were sent to the heads of departments and other key decision makers in both
companies.  Finally, beyond the written communications, Alcatel's active participation in the
decision to transfer the patents to MPT and its lack of any conduct or communications to
suggest that it considered the transfer a violation of the pre-merger covenants, additionally
indicate Alcatel's consent.  In addition, it should be reminded that Alcatel-Lucent became the
99% beneficiary of the trust property upon the merger.

Therefore, the Court finds that the divestiture of the two patents to MPT with
Alcatel's consent was not a violation of the Merger Agreement.  Accordingly, the transfer of
the patents from Lucent to MPT was effective.  MPT took these patents unfettered by any
obligations to Alcatel.  Absent any such obligations, MPT has full control of the licensing
rights to the patents; Alcatel has no rights to license or sublicense the patents.  Since Alcatel
lacks these rights, it cannot provide them (and thus is not required to provide them) to MPEG
LA under the Agreement Among Licensors.  Therefore, absent any such rights given to the
MPEG LA pool, Defendants do not have a license to the patents on this basis.[1]

### 2.    MPT as an "Affiliate" of Alcatel-Lucent

As a second and independent basis for Defendants' license defense, Defendants
contend that the patents are obligated to MPEG LA because MPT is an "affiliate" of Alcatel-
Lucent.  Under the MPEG LA Agreement among Licensors, a party and its affiliates are
obligated to grant MPEG LA a license to any MPEG-2 essential patents to which it presently
has licensing rights or to which it obtains such in the future.  (Blackburn Dec. Ex. 10 §

---

[1] The Court also rejects Defendants' contention that the Merger Agreement provided
Alcatel with control over Lucent's assets prior to the consummation of the merger on
November 30, 2006.   While the Merger Agreement provides a host of conditions which were
required to be satisfied pre-merger and a list of circumstances which could terminate the
merger, (Blackburn Dec. Ex. 2 §§ 8, 9), these conditions do not indicate that assets or control
of the assets would flow from one party to the other prior to the consummation of the merger.

02CV2060

**Exhibit 40  Page 567**

2.3.)  An affiliate is defined by MPEG LA:

> Affiliate shall mean a corporation, company or other entity which now or hereinafter, directly or indirectly, controls, is controlled by or is under common control with a Party.  The term "control" as used in this Section 1.1 shall mean ownership of more than 50% of the outstanding shares representing the right to vote for directors or other managing officers of such corporation, company or other entity, or for a corporation, company or other entity which does not have outstanding shares, more than 50% of the ownership interest representing the right to make decisions for such corporation, company or other entity; provided, however, such corporation, company or other entity shall be deemed an Affiliate only so long as such "control" exists.

(Id. § 1.1.)

The definition of affiliate and hence the issue here focuses on the key word "control."  The Trust Agreement provides Lucent with substantial indirect control over MPT.  The Trust Agreement provides Lucent with the following powers:  (1) to grant or withhold consent to a sale of the Trust Patents; (2) to appoint successive trust advisors; (3) to remove each of the trustees with or without cause (no more than once per year); and (4) to renew or not renew the appointment of the Trust Advisor.  (Marina Dec. Ex. 10 §§ 4.3, 6.1(a), 6.1(c).)  In addition, Lucent had the power to appoint the initial Trust Advisor and the initial three trustees (litigation, licensing, and administrative).  These are all indirect powers over the trust; the direct decision making pertaining to the licensing and litigation over the trust property (the patents) rests exclusively with the trustees.  (Id. §§ 5.1(a)(i), (b).)

Defendants argue that Lucent's indirect control over MPT is sufficient to meet the definition of "affiliate" because Section 1.1 of the Agreement Among Licensors envisions indirect control.  Even so, the agreement is more specific; it defines "control"in two specific clauses.  The first does not fit with the situation here.  It pertains to entities with "outstanding shares."  MPT does not have any shares.

The second definition requires "more than 50% of the ownership interest representing the right to make decisions for such corporation, company or other entity."  Although Defendants argue that Lucent is a beneficial owner of  98% of the principal and 99% of the income (Marina Dec. Ex. 10 §§ 3.1, 3.2, 3.3), this ownership does not "represent the right to make decisions."  While it is true that Lucent has considerable indirect control of the trustees, it does not have "ownership" of the trustees.  Moreover, its power to exert this indirect

**Exhibit 40  Page 568**

1    control does not come from its beneficial ownership of the trust property; instead, the powers

2    flow from Lucent's contractual rights under the Trust Agreement.  (Id. § 5.1; see also Del.

3    Code Ann. tit. 12, § 3806 (2007) providing that the affairs of a statutory trust are managed by

4    the trustees unless indicated otherwise by the governing instrument).  Defendants attempt to

5    argue that Lucent's beneficial ownership "represents the right to make decisions" because

6    Lucent can take court action against the trustees is unpersuasive.  While a beneficiary can act

7    to ensure the trustees perform their duties as required by the trust, this does not give the

8    beneficiary any power to participate in the decision-making by the trustee or to direct the

9    trustees to make any particular decisions.

10   Therefore, since neither definition of "control" is satisfied, the Court finds that MPT is

11   not an "affiliate" of Lucent (or Alcatel-Lucent) as defined in the Agreement Among

12   Licensors.  MPT is therefore not obligated to the Agreement Among Licensors and thus has

13   no obligation to license the patents to MPEG LA.  Absent such obligations, MPEG LA

14   cannot and does not provide Defendants with a license to the patents.

15          **3.       MPT as an "Alter Ego" of Lucent**

16   Defendants offer a third basis as to why the patents are subject to the obligations of

17   Alcatel's agreements with MPEG LA.  Defendants contend that MPT is an alter ego of

18   Lucent and that the corporate veil of MPT should be pierced because Lucent and MPT are

19   one and the same.

20   Under Delaware law to pierce the corporate veil and demonstrate that one entity is the

21   alter ego of another, it must be shown that the other entity exerts "complete domination and

22   control."  *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d

23   1175, 1184 (Del. Ch. 1999).  "The degree of control required to pierce the veil is exclusive

24   domination and control . . . to the point that . . . [the dominated entity] no longer has legal or

25   independent significance of its own."  *Id*.  It must also be shown that the dominated entity is

26   "a sham and exist[s] for no other purpose than as a vehicle for fraud."  *Id*.

27   As a matter of law, this theory cannot succeed because the element of control is

28   lacking.  On this element, Defendants can only point to Lucent's power to make decisions on

**Exhibit 40  Page 569**

1  the removal of the trustees, and the non-renewal and appointment of the trust advisor, as well

2  as Lucent's power to pay MPT's expenses.  Although this evidence demonstrates some

3  control by Lucent over MPT, as Defendants acknowledge throughout their briefings and as

4  discussed in detail herein, this control is only indirect.  Lucent has no direct input to the day-

5  to-day decisions pertaining to the licensing and litigation of the patents; these decisions are

6  the responsibilities of the trustees and trust advisor.  Thus, Defendants have by no means

7  offered any evidence that rises to the level of "exclusive domination" by Lucent such that

8  MPT has no "independent significance of its own."  Therefore, the Court finds that MPT is

9  not the alter ego of Lucent; thus, this basis cannot support Defendants' defense of license.

10       In sum, based on the above analyses, the Court finds that as a matter of law none of

11  the three bases offered by Defendants – ineffective transfer, affiliate status and alter ego –

12  provide a basis for the defense of license.  Accordingly, the Court **DENIES** Defendants'

13  motion for summary judgment and **GRANTS** Plaintiffs' motion on this defense.[2]

14       **B.    Unclean Hands**

15       The doctrine of unclean hands "closes the doors of a court of equity to one tainted

16  with inequitableness or bad faith relative to the matter in which he seeks relief, however

17  improper may have been the behavior of the defendant."  *Precision Instrument Mfg. Co. v.*

18  *Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  It requires that the party seeking

19  relief "have acted fairly and without fraud or deceit as to the controversy in issue."  *Id*.

20  Although courts are divided as to whether unclean hands applies to claims at law for money

21  damages, the doctrine has been applied in patent suits.  *See e.g.*, *Glaxo Inc. v. Novopharm*

22  *Ltd.*, 52 F.3d 1043, 1055 (Fed. Cir. 1995) (noting the endorsement of the Supreme Court for

23  application of unclean hands to patent suits as set forth in *Precision Instrument*, 324 U.S. at

24  816).  Generally, to demonstrate unclean hands there must be some misconduct such as fraud

25  underlying the relevant circumstances.  *See e.g.*, *Winbond Electronics Corp. v. International*

26  *Trade Com'n*, 262 F.3d 1363, 1372 (Fed. Cir. 2001) (misconduct before the U.S. Patent and

27

28       [2] Because the Court finds that Defendants do not have a license to the patents, the Court need not and does not reach the issues of retroactivity and specificity to MPEG-2 products that such a license might confer.

**Exhibit 40  Page 570**

1  Trademark Office); *Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369, 1374

2  (Fed. Cir. 2001) (litigation misconduct).

3  　　In the instant case, Defendants contend that Lucent's conduct with respect to the

4  transfer of the patents to MPT was fraudulent, or at least "sharp and unscrupulous" enough to

5  warrant the application of unclean hands.  They argue that the transfer of the patents was in

6  violation of state and federal laws and/or regulations and in violation of the Merger

7  Agreement between Lucent and Alcatel.  Defendants additionally contend that Lucent misled

8  the government, the public, and its shareholders as to the fate of its intellectual property in

9  the merger.

10  　　As to the violation of the Merger Agreement, this argument has been disposed above

11  regarding the license defense.  Because the patents were transferred with Alcatel's consent

12  and participation, there was no violation of the agreement.

13  　　Regarding Defendants' contention of misleading statements to governmental

14  organizations, they point to representations made by Lucent pre-merger that its intellectual

15  property, including its patents, would remain with the company and its subsidiaries.  Lucent

16  represented to the Securities and Exchange Commission ("SEC") in public filing on April 7,

17  2006:  "In fact, the way the proposed merger is structured, all of the patents will continue to

18  be owned by Lucent and its subsidiaries." (Blackburn Dec. Ex. 8 at LUC 1306135.)  Lucent

19  also represented to its shareholders in a publicly filed proxy statement on April 4, 2006,  that

20  "the 2 companies will combine their patent portfolio." (Marchese Dec. Ex. 19 at

21  LUC1305826.)  No evidence has been presented by either party that Lucent made any

22  attempt to correct these statements or to amend them to account for the transfer of a number

23  of patents to MPT in November 2006 before the merger.  In fact, Defendants have pointed to

24  evidence that Lucent and Alcatel strove to keep that information confidential even to the

25  point of limited distribution within the companies.  (Marchese Dec. Ex. 16, 17.)

26  　　Even accepting these circumstances without further question, Defendants have failed

27  to show why this conduct by Lucent offers the Defendants a basis for an unclean hands

28  defense here.  With respect to conduct affecting third parties, it is not so much who is harmed

- 13 -

**Exhibit 40  Page 571**

1  directly but whether the equities between the instant litigants are affected by such conduct:

2      [Courts] apply the maxim requiring clean hands only where some
3      unconscionable act of one coming for relief has immediate and necessary
    relation to the equity that he seeks in respect of the matter in litigation. They do
4      not close their doors because of plaintiff's misconduct, whatever its character,
    that has no relation to anything involved in the suit, but only for such violations
5      of conscience as in some measure affect the equitable relations between the
    parties in respect of something brought before the court for adjudication.

6  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). Defendants have

7  not shown that Lucent's conduct towards other parties, the government, and/or its

8  shareholders, had any effect on the issue of the instant litigation. First, Defendants have not

9  offered any evidence that had the concerned government agencies, the SEC, the Federal

10  Trade Commission ("FTC"), and/or the Department of Justice ("DOJ"), been aware of the

11  misstatements, that they would have taken any different action with regard to the merger of

12  Lucent and Alcatel or, even if they had, that the fate of the patents would be any different

13  than it is now. Second, Defendants have not offered any evidence that if Lucent had

14  amended its April statements to the SEC and/or shareholders to include the information of

15  the transfer to MPT that the circumstances of the merger and/or the patents would be any

16  different. Third, Defendants not even offered any evidence that they have in any way

17  attempted to take any action to alert the SEC, FTC, or DOJ the Lucent's conduct, rather than

18  just capitalize on it here. Fourth, after the merger of Alcatel-Lucent, the creation of MPT,

19  and the transfer of the patents became publicly known. Defendants have offered no evidence

20  that this "change of events" from the pre-merger plans had any effect on the approvals of the

21  government agencies or Alcatel-Lucent shareholders. Finally, Defendants have offered no

22  basis for their argument that had they known of Lucent's plans to transfer the patents,

23  Defendants would have moved to enjoin the transfer.[3]

24      In sum, Defendants have not offered any evidence that Lucent's conduct affected the

25  equities between the parties in the instant litigation. Therefore, the Court **DENIES**

26  Defendants' motion for summary judgment and **GRANTS** Plaintiffs' motion for summary

27  _____

28      [3] Defendants have failed to provide any legal basis on which they would have had
standing to challenge Lucent's actions, let alone any valid basis on which to base an
injunction.

**Exhibit 40  Page 572**

1    judgment on this defense.

2            **C.    Cross-Motions Pertaining to Gateway's Counterclaims**[4]

3            **1.    Legal Estoppel**

4            "Legal estoppel refers to a narrow[] category of conduct encompassing scenarios

5    where a patentee has licensed or assigned a right, received consideration, and then sought to

6    derogate from the right granted." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d

7    1571, 1581 (Fed. Cir. 1997). "A patentee cannot sell his rights to another, and buy or obtain

8    control of an older patent, and, through such older patent, dispossess his assignee of the full

9    benefit of what he purchased." *AMP Inc. v. United States*, 389 F.2d 448, 452 (Ct. Cl. 1968).

10           Here, Gateway first argues that Alcatel has on one hand entered the MPEG LA pool

11   with its patents and yet, has obtained additional patents to this technology which it now

12   withholds by placing them with MPT. As Plaintiff points out, this contention has problems

13   with a confusion of entities. The only promise made to MPEG LA was made by Alcatel.

14   The patents, however, were first owned by Lucent and now by MPT. Neither Lucent nor

15   MPT has or had any obligations to MPEG LA. Hence, legal estoppel is inapplicable where

16   the first license and the subsequent rights withheld stem from the actions of two separate

17   parties.

18           Gateway's second argument contends that before the merger of Lucent and Alcatel

19   was finalized, Alcatel acquired the right to license the patents through the Merger

20   Agreement; thus, Alcatel concurrently held the rights to the patents and the obligations to

21   MPEG LA. This contention has already been rejected with respect to the licensing defense

22   and it is equally unsupported here. Prior to the actual consummation of the merger, the

23   Merger Agreement did not provide Alcatel with any rights to the patents; Alcatel therefore

24   did not concurrently hold the patents and its obligations to the MPEG LA pool.

25           Because the Court finds that as a matter of law, the doctrine of legal estoppel is

26   inapplicable, Gateway's motion for summary judgment is **DENIED** and Plaintiffs'

27   ───────────────

28   [4]As noted in the introduction, *supra* page 2, the Court granted the oral joinder motions
     of the co-defendants. For simplicity, the Court refers specifically to arguments by
     "Gateway," but this Order applies to all Defendants and Counter-Claimants.

1  cross-motion is **GRANTED**.

2  ## 2. Equitable Estoppel

3  Equitable estoppel requires three elements:  (1) "[t]he patentee . . .leads the alleged

4  infringer to reasonably infer that the patentee does not intend to enforce its patent against the

5  alleged infringer"; (2) "[t]he alleged infringer relies on that conduct"; and (3) "[d]ue to its

6  reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to

7  proceed with its claim."  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020,

8  1028 (Fed. Cir.1992) (equitable estoppel).  "Equitable estoppel . . . focuses on 'misleading'

9  conduct suggesting that the patentee will not enforce patent rights.  *Wang*, 103 F.3d at 1581.

10  Gateway's defense fails on the element of reliance.  Although Gateway sets forth the

11  examples of Lucent's misleading statements to government agencies and shareholders (the

12  same as those for Defendants' unclean hands defense), Gateway fails to offer any evidence

13  that it relied on these statements or that it was materially prejudiced by any such reliance.

14  First, this suit concerns Gateway's alleged infringement beginning in 1998.  The statements

15  by Lucent occurred in mid-2006.  Thus, there can be no reliance between 1998 and mid-

16  2006.  Next, even after the issuance of the statements in April 2006, Gateway has not offered

17  any evidence that it saw Lucent's proxy statements or the SEC filings prior to the recent

18  discovery period for the instant litigation, yet alone relied on such statements.

19  Finally, Gateway argues, but fails to offer any evidence, that Alcatel induced Gateway

20  and the other Defendants to make and sell products that utilize MPEG 2 technologies.  This

21  last argument is unmeritorious for many reasons.  Alcatel is not a party here, and thus

22  Alcatel's conduct cannot provide a basis for equitable estoppel against MPT and/or Lucent.

23  Additionally, Defendants' alleged infringement began in 1998, but Alcatel did not even join

24  MPEG LA until 2003.  Furthermore, at the time when Defendants were making and selling

25  the technology prior to the commencement of this suit as well as the first four years of the

26  instant litigation, Lucent owned the patents.  Lucent had not made any representations that its

27  patents would be licensed through MPEG LA; to the contrary, Defendants such as Gateway

28  were informed that they would need a license directly from Lucent.  Moreover, the MPEG

LA sublicensee agreement explicitly warns that the MPEG LA pool does not necessarily include all the patents necessary to practice the technology and that sublicensee signs the agreement aware of such risks.  (Blackburn Dec. Ex. 20 §§ 4.2, 4.3.)

In sum, Gateway fails to offer any evidence that would raise an issue of fact on the required elements of equitable estoppel.  Therefore, Gateway's motion for summary judgment is **DENIED** and Plaintiff's cross-motion is **GRANTED**.

### D.      Plaintiffs' Motions Pertaining to Gateway's Counterclaims

#### 1.      Unopposed Motions

Plaintiffs move for summary judgment on Gateway's defenses of exhaustion and breach of contract.  Gateway does not oppose either motion.  Although it is maintaining its opposition to Plaintiffs' motion regarding its third party beneficiary counterclaim, Gateway concedes that any claim for breach of contract is subsumed within this claim.  Under the Federal Rules of Civil Procedure, if an adverse party does not respond to a motion for summary adjudication, the Court may enter judgment against the adverse party if it is appropriate. Fed. R. Civ. P. 56(e).   Therefore, as to exhaustion and breach of contract, Plaintiffs' motions are **GRANTED**.

#### 2.      Third Party Beneficiary

Gateway's third party beneficiary counterclaim is predicated on the assertion that Gateway is an intended beneficiary to the MPEG LA Agreement Among Licensors and as such may bring a breach of contract claim against Lucent as a third party beneficiary. Plaintiffs move for summary judgment on this counterclaim on two bases:  (1) Plaintiffs were not a party to the contract; and (2) the contract expressly negates any third party beneficiary rights.

With respect to the first ground, Gateway contends that after the merger of the two companies, Alcatel-Lucent as an entity assumes all of the obligations under Alcatel's agreements with MPEG LA.  As such, Alcatel-Lucent has an obligation to place the Group 1 video coding patents into the MPEG LA pool, and having failed to do so has breached the contract with MPEG LA.

1    Contrary to Gateway's contentions, however, prior to the consummation of the merger

2   on November 30, 2006, Alcatel had no rights to license the patents.  Moreover, Lucent,

3   which had control of the patents before the merger, had no obligations to MPEG LA.

4   Therefore, before November 30, 2006, there cannot be any breach of contract to provide a

5   basis for this counterclaim.

6    Moreover, even after November 30, 2006, Gateway's third party beneficiary

7   counterclaim is barred by the explicit language of the contract at issue.  Although Gateway

8   contends that the sublicensees of the MPEG LA pool are intended beneficiaries to the

9   Agreement Among Licensors, Section 8.10 of the contract contradicts this contention:

10  "Nothing in this Agreement shall be construed to give rise to any obligation on any party

11  hereto for the benefit of a third party or to confer any rights on any third party." (Blackburn

12  Dec. Ex. 10.)

13    While Gateway argues that this literal provision should be disregarded, the applicable

14  law dictates otherwise.  The contract at issue falls under New York law based on its choice of

15  law provision.  (Id. § 8.9.)  New York law allows third party beneficiaries to sue for breach

16  of contract where the third party is an intended beneficiary but does not extend such rights to

17  incidental beneficiaries:

18    [G]enerally it has been held that the ordinary construction contract – i.e., one
     which does not expressly state that the intention of the contracting parties is to
19    benefit a third party-does not give third parties who contract with the promisee
     the right to enforce the latter's contract with another. Such third parties are
20    generally considered mere incidental beneficiaries.

21  *Board of Managers of Riverview at College Point Condo. III v. Schorr Bros. Dev. Corp.*, 582

22  N.Y.S.2d 258, 259 (N.Y. App. Div. 1992) (quoting *Portchester Elec. v. Atlas*, 40 N.Y.2d

23  652, 656 (N.Y. App. Div. 1976)).

24    New York law also recognizes express disclaimers of third party beneficiaries.  "The

25  best evidence of whether contracting parties intended their contract to benefit third parties

26  remains the language of the contract itself. . . .  Where a provision exists in an agreement

27  expressly negating an intent to permit enforcement by third parties . . . that provision is

28  decisive."  *Nepco Forged Products, Inc. v. Consolidated Edison Co. of New York, Inc.*, 470

- 18 -

02CV2060

**Exhibit 40  Page 576**

1  N.Y.S.2d 680, 681 (N.Y. App. Div. 1984) (internal citations omitted); *see also Adelaide*

2  *Productions, Inc. v. BKN Intern. AG*, 834 N.Y.S.2d 3, 8 (N.Y. App. Div. 2007) (provision

3  expressly negating third party beneficiary controlling as a matter of law); *Board of Managers*

4  *of Alexandria Condo. v. Broadway/72nd Assocs.*, 729 N.Y.S.2d 16, 18 (N.Y. App. Div.

5  2001) (same).

6     Furthermore, Gateway has not met its burden to show that it was an intended

7  beneficiary, rather than simply an incidental beneficiary, of the Agreement Among

8  Licensors.  While it argues that the primary purpose of the agreement was to encourage

9  widespread adoption of the MPEG 2 standard, it points to no language in the contract which

10 would distinguish whether the primary purpose was to benefit the industry and sublicensees

11 like Gateway as opposed to its purpose as a tool to benefit the licensors for promoting

12 adoption of their technologies throughout the world.

13    Therefore, because Gateway has failed to meet its burden to show that it is an

14 intended beneficiary and because the "no third party beneficiaries" clause is controlling as a

15 matter of law, Plaintiffs' motion on this counterclaim is **GRANTED**.

16          **3.      Breach of Good Faith and Fair Dealing**

17    Plaintiffs move for summary judgment to dismiss Gateway's counterclaim for breach

18 of good faith and fair dealing, arguing that without a contract between Lucent and Gateway,

19 this claim cannot be maintained.  To support this counterclaim, Gateway relies on its claim as

20 third party beneficiary coupled with the principle that all contracts under New York law

21 incorporate a covenant of good faith and fair dealing.  For the reasons explained above,

22 Gateway has not met its burden to show that it is an intended beneficiary under the

23 Agreement Among Licensors and thus it cannot show that Lucent and/or Alcatel owed

24 Gateway, at most an incidental beneficiary, a duty of good faith and fair dealing.  Therefore,

25 Plaintiffs' motion on this counterclaim is **GRANTED**.

26 / / /

27 / / /

28 / / /

### 4. Tortious Interference with Contract and/or Prospective Economic Advantage[5]

Gateway predicates these two counterclaims on the contention that Lucent intentionally interfered with its sublicense from MPEG LA when Lucent transferred the patents to MPT.[6]

Claims for tortious interference require four elements: (1) the existence of the contract (or a prospective economic relationship); (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages. *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997). New Jersey law recognizes two distinct causes of action: tortious interference with performance of a contract and tortious interference with a prospective contract or economic relationship. *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 36 (N.J. 1989). The former requires an enforceable contract where the latter does not. *Id.*

Gateway's counterclaims rest on its asserted expectation that it would have received a sublicense to the video coding patents upon the merger of Lucent and Alcatel pursuant to the existing obligations between Alcatel and MPEG LA and the sublicensing agreement between Gateway and MPEG LA. This contention cannot support a claim for tortious interference with contract. The alleged interfering conduct by Lucent was the execution of the Trust Agreement and the Patent Assignment; both were executed prior to November 30, 2006. Prior to November 30, 2006, however, Lucent had no obligations to MPEG LA. Thus, prior

---

[5] Although Microsoft has stated similar counterclaims, these were the subject of the very recent amendments. As set forth in the Court's order September 14, 2007, Microsoft's summary judgment motions on these newly added counterclaims will not be addressed herein.

[6] The Court applies New Jersey law to these counterclaims based on the choice of law provisions of the court where the instant action commenced, Virginia. *See Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp.2d 1118, 1157 (N.D. Cal. 2003) (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 525 (1990) for the premise that cases transferred under 28 U.S.C. § 1404(a) fall under the choice of law provisions of the transferor court). For torts, Virginia applies the law of "the place where the last event necessary to make an actor liable for an alleged tort takes place." *Terry v. June*, 420 F. Supp.2d 493, 503 (W.D. Va. 2006) (citations and quotations omitted). The agreements alleged to constitute the basis of the interference were executed in New Jersey.

02CV2060

**Exhibit 40  Page 578**

1   to November 30, 2006, the sublicensee agreement between MPEG LA and Gateway did not
2   confer any rights to Lucent's patents.  Hence, Lucent's actions on November 28, 2006 did
3   not interfere with an existing contractual right held by Gateway.  Therefore, Plaintiffs'
4   motion for summary judgment on this counterclaim is **GRANTED**.

5        Rather than interference with an existing right, Gateway's contention more squarely
6   fits with a claim for tortious interference with a prospective economic relationship, a separate
7   cause of action.  This tort has been pleaded as a separate counterclaim by Gateway (and now
8   by all defendants).  To succeed on this cause of action, Gateway must demonstrate "a
9   reasonable expectation of economic advantage that was lost as a direct result of [Plaintiffs
10  and Counter-]defendants' malicious interference, and that it suffered losses thereby.
11  Causation is demonstrated where there is proof that if there had been no interference there
12  was a reasonable probability that the victim of the interference would have received the
13  anticipated economic benefit."  *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170
14  (N.J. 2001) (citations and quotations omitted).

15       Here, Plaintiffs argue that Gateway could not have any reasonable expectation of
16  rights to the video coding patents because (1) Lucent always represented it would
17  independently license the patents and not join MPEG LA and (2) Lucent's counsel made
18  representations in this Court that the patents would not become part of the MPEG LA pool as
19  a result of the merger.  Plaintiffs' arguments do no more than raise questions of fact.  As
20  discussed with respect to other defenses and counterclaims herein, Lucent and Alcatel made
21  several public representations in the Agreement and Plan of Merger and the proxy materials
22  that suggested the merged company would hold all of Lucent's intellectual property and that
23  these properties would not be transferred pre-merger.  (Blackburn Dec. Ex. 2, 25.)
24  Additionally, the terms of the MPEG LA agreements, the Agreement Among Licensors, and
25  the sublicensee agreement between MPEG LA and Gateway, coupled with these statements
26  could provide a reasonable expectation that any patent rights obtained by Alcatel to MPEG-2
27  Essential Patents would flow into the MPEG LA pool.

28       Plaintiff also argues that Gateway is unable to demonstrate the element of malice.

1  "Malice is defined to mean that the harm was inflicted intentionally and without justification

2  or excuse." *Printing Mart-Morristown*, 563 A.2d at 37. "The conduct must be both

3  'injurious and transgressive of generally accepted standards of common morality or of law.'"

4  *Lamorte Burns*, 770 A.2d at 1170-71. A business-related reason may provide a justification

5  where the motive, purpose, and means used can be justified by the alleged interfering party.

6  *Id*. at 1171. However, "[t]he line clearly is drawn at conduct that is fraudulent, dishonest, or

7  illegal." *Id*. at 1170.

8      Here, Lucent's arguments on the element of malice only serve to raise issues of fact.

9  Although Lucent asserts that its conduct was legal and carried out for a legitimate business

10  purpose to protect the value of the patents for its shareholders, these assertions are met by

11  opposing contentions from Gateway regarding Lucent's employment of wrongful means to

12  achieve its ends, including alleged violations of the Delaware Uniform Fraudulent Transfers

13  Act and allegedly misleading statements made to the SEC, FTC, and DOJ. In light of these

14  issues of fact as well as those pertaining to a reasonable expectation of rights, Plaintiffs'

15  motion on this counterclaim is **DENIED**.

16      **5.    Violation of the Sherman Act Section 1**

17      Plaintiff moves for summary judgment on Gateway's Sherman Act Section 1

18  counterclaim, arguing that Gateway fails to provide evidence to demonstrate any of the

19  required elements. A violation of Section 1 requires a showing of an agreement,

20  combination, or conspiracy which unreasonably restrains interstate trade or commerce.

21  *County of Tuolumne v. Sonora Cmty Hosp.*, 236 F.3d 1148, 1155 (9th Cir. 2001). A restraint

22  on trade may be demonstrated as a *per se* violation or established under a rule of reason.

23  Where the latter is invoked, as it is in the instant case, it must be demonstrated "that the

24  conduct at issue actually caused injury to competition, beyond the impact on the claimant,

25  within a field of commerce in which the claimant is engaged." *Metro Industries, Inc. v.*

26  *Sammi Corp.*, 82 F.3d 839, 847 (9th Cir. 1996). Such a showing involves the demonstration

27  that the violating parties have sufficient market power to significantly impair competition and

28  "that the restraint has actually produced significant anti-competitive effects." *Id.* at 848.

1     On the first element, an agreement or conspiracy, Gateway points to the

2  communications between Lucent and Alcatel, prior to their merger pertaining to the fate of

3  the video coding patents.  While these communications do not explicitly spell out a plan of

4  action to avoid Alcatel's obligations to MPEG LA, they provide at least a reasonable

5  inference that the two companies were communicating plans of action and/or acting together

6  in making decisions on the fate of the patents.  This evidence is sufficient to raise a triable

7  issue of fact on this first element.

8     Regarding the showing of an unreasonable restraint on trade under a rule of reason,

9  Gateway must demonstrate market power of Lucent and MPT with regards to these patents

10 and injury to the particular field of commerce.  As to market power, Gateway has made only

11 a cursory showing, primarily consisting of attorney argument.  It contends that MPEG-2 is

12 ubiquitous in the relevant computer market and a license on the video coding patents would

13 be required for every MPEG-2 compliant product.  It does not substantiate this contention

14 with any evidence.  It provides no evidence as to how "ubiquitous" MPEG-2 technology is

15 within the market, nor does it substantiate the conclusion that there are no alternative ways to

16 provide the technology absent employing the patents.  The latter is likely a reasonable

17 inference since both parties admit that the video coding patents are "essential" to MPEG-2.

18 However, even accepting these contentions as true, Gateway's further assertion that Lucent

19 and/or MPT is exacting or could exact "supracompetitive" licensing fees is without any

20 support.  As such, all Gateway has shown is that Lucent and/or MPT hold a legal patent

21 monopoly.

22    Furthermore, Gateway has similarly failed to show any anti-competitive injury in the

23 relevant market.  It offers only speculation and attorney argument that if Lucent/MPT

24 withholds the patents, the efficiencies of the patent pool will deteriorate and participants in

25 the market will be paying double licensing fees to the pool and MPT.

26    In sum, Gateway has failed to meet its burden to demonstrate an issue of fact with

27 respect to the required element of an unreasonable restraint of trade.  Accordingly, Plaintiffs'

28 motion for summary judgment on this counterclaim is **GRANTED**.

**Exhibit 40  Page 581**

02CV2060

1    **6.    Violation of the Sherman Act Section 2 – Monopolization**

2        "The offense of monopoly under § 2 of the Sherman Act has two elements:  (1) the

3    possession of monopoly power in the relevant market and (2) the willful acquisition or

4    maintenance of that power." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S.

5    451, 481 (1992).   Gateway fails to raise an issue of fact on either of these elements.

6        Monopoly power is "the power to control prices or exclude competition" in the

7    relevant market. *Id*.  Gateway appears to argue that the relevant market is MPEG-2

8    compliant computers; however, it does not offer any evidence to support this assertion nor

9    does it offer any argument, let alone evidence that MPEG-2 technology does not have any

10   interchangeability with other technologies in the market. *See United States v. E. I. du Pont*

11   *de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("When a product is controlled by one interest,

12   without substitutes available in the market, there is monopoly power.").  In essence, other

13   than an assertion that Lucent/MPT own two MPEG-2 essential patents, Gateway has made

14   no showing on this element.[7]

15       Similarly, on the element of willful acquisition or maintenance of monopoly power,

16   Gateway has done no more than speculate.  It argues that Lucent willfully acquired

17   monopoly power by creating MPT and sheltering the patents from becoming part of the

18   MPEG LA pool.  This theory, however, neglects two key facts.  First, participation in the

19   MPEG LA pool is optional.  Although Alcatel entered the pool in 2003, it has the option to

20   withdraw.  (Blackburn Dec. Ex. 2 §7.2.)  Second, the control of the patents by MPT is no

21   different in the relevant market from the previous circumstances where Lucent owned the

22   same patents –  the patents were not entered into the MPEG LA pool but were only licensed

23   individually.  Gateway has offered no evidence to suggest that the transfer of the patents to

24   MPT has changed these circumstances.  Ownership and control of a patent without more is

25   not an unreasonable restraint on trade. *See United States v. Westinghouse Elec. Corp.*, 648

26   F.2d 642, 647 (9th Cir. 1981) (noting that patents may create monopoly power but there must

27

28   _____

        [7]Simple ownership of a patent does not create a presumption of market power. *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006).

1  be something more to run afoul of antitrust laws such as procuring the patent by fraud,

2  extending the monopoly outside the patent grant such as through a tying arrangement with

3  unpatented products and/or acquiring all past and future patents relevant within a market).

4      In sum, Gateway has failed to meet its burden to demonstrate evidence in support of

5  the essential elements of its counterclaim for violation of the Sherman Act Section 2,

6  therefore, Plaintiffs' motion for summary judgment on this counterclaim is **GRANTED**.

7      **7.**    **Violation of the Sherman Act Section 2 – Attempted Monopolization**

8      The elements of attempted monopolization are: "(1) that the defendant has engaged in

9  predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a

10  dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*,

11  506 U.S. 447, 456 (1993). Plaintiffs argue that Gateway lacks evidence on each of these

12  essential elements.

13      Gateway again provides nothing other than cursory argument in its attempt to support

14  this counterclaim. As to anticompetitive conduct, Gateway relies on its "showing" as to its

15  Section 1 counterclaim. As explained therein, Gateway has made no such showing.

16  Gateway also relies on its Section 1 claim for a showing on a specific attempt to monopolize.

17  Again, this fails for the same reason – reasonable inferences must be based on facts and

18  evidence, not just speculation and attorney argument. Finally, as to a dangerous probability

19  of achieving monopoly power, all Gateway offers is attorney argument that MPT's and

20  Lucent's control of the patents are "blocking" to the industry. Even if such a theory could be

21  supported, Gateway has not proffered a single piece of evidence or expert opinion to

22  establish such a contention. Speculation and attorney argument do not create issues of triable

23  fact to preclude summary judgment. Plaintiffs' motion on this counterclaim is therefore

24  **GRANTED**.

25      **8.**    **Patent Misuse**

26      Patent misuse is an equitable defense and an extension of the unclean hands doctrine.

27  *Senza-Gel Corp. v. Seiffart*, 803 F.2d 661, 668 (Fed. Cir. 1986). "Patent misuse is an

28  affirmative defense to an accusation of patent infringement, the successful assertion of which

1   requires that the alleged infringer show that the patentee has impermissibly broadened the

2   'physical or temporal scope' of the patent grant with anticompetitive effect." *Virginia Panel*

3   *Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (citations omitted).  A rule of

4   reason analysis is applied:  "the finder of fact must decide whether the questioned practice

5   imposes an unreasonable restraint on competition, taking into account a variety of factors,

6   including specific information about the relevant business, its condition before and after the

7   restraint was imposed, and the restraint's history, nature, and effect." *Id*. at 869 (quoting

8   *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997)).

9       Here, Gateway's patent misuse counterclaim is predicated on Defendants' license

10  defense, namely that Defendants have a license to the patents as sublicensees of MPEG LA

11  based on the "incomplete" transfer of the patents to MPT and Alcatel's outstanding

12  obligations to MPEG LA.  Because Defendants' license defense fails on this ground,

13  Gateway's patent misuse defense fails for the same reasons.  Therefore, Plaintiffs' motion for

14  summary judgment on Gateway's defense of patent misuse is **GRANTED**.

15  **V.     CONCLUSION**

16      For the reasons herein, the Court rules as follows:

17  **Cross-motions**

18      **License**
        Plaintiffs' motion                      **GRANTED**
19      Defendants' motions                      **DENIED**

20      **Unclean Hands**

21      Plaintiffs' motion                       **GRANTED**
        Defendants' motions                      **DENIED**
22
        **Legal Estoppel**
23      Plaintiffs' motion                       **GRANTED**
        Gateway's motions                        **DENIED**
24
        **Equitable Estoppel**
25      Plaintiffs' motion                       **GRANTED**
        Gateway's motions                        **DENIED**
26

27  **Plaintiffs' motions**

28      Exhaustion                               **GRANTED**

**Exhibit 40  Page 584**

| | |
|---|---|
| Breach of Contract | **GRANTED** |
| Third Party Beneficiary | **GRANTED** |
| Breach of Good Faith and Fair Dealing | **GRANTED** |
| Tortious interference with Contract | **GRANTED** |
| Tortious Interference with Prospective Economic Advantage | **DENIED** |
| Violation of Sherman Act § 1 | **GRANTED** |
| Violation of Sherman Act § 2 Monopolization | **GRANTED** |
| Violation of Sherman Act § 2 Attempted Monopolization | **GRANTED** |
| Patent Misuse | **GRANTED** |

**IT IS SO ORDERED.**

DATED:  October 1, 2007

Hon. Rudi M. Brewster
United States Senior District Judge

cc:  Magistrate Judge Bencivengo
    All Counsel of Record