1  Bryan W. Farney *(pro hac vice)*
   Jeffrey B. Plies *(pro hac vice)*
2  DECHERT LLP
   300 West 6th Street, Suite 1850
3  Austin, Texas 78701
   Telephone:  (512) 394-3000
4  Facsimile:  (512) 394-3001

5  David J. Zubkoff (SBN 149488)
   SELTZER CAPLAN McMAHON VITEK
6  750 "B" Street, Suite 2100
   San Diego, CA  92101
7  Telephone:  (619) 685-3003
   Facsimile:  (619) 685-3100

8
   Attorneys for Defendants and Counterclaimants,
9  GATEWAY, INC., GATEWAY COUNTRY STORES LLC,
   GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING
10 LLC, AND COWABUNGA ENTERPRISES, INC

11

12                 **UNITED STATES DISTRICT COURT**

13                **SOUTHERN DISTRICT OF CALIFORNIA**

14

15 LUCENT TECHNOLOGIES INC. and        )   Case No. 07-CV-2000-H (CAB)
   MULTIMEDIA PATENT TRUST,            )   consisting of matters severed from
                                       )   consolidated cases:
16         Plaintiff and Counter-Defendant,  )   Case No. 02-CV-2060-B (CAB)
                                       )   Case No. 03-CV-0699-B (CAB)
17      v.                             )   Case No. 03-CV-1108-B (CAB)
                                       )
18                                     )
   GATEWAY, INC., GATEWAY COUNTRY      )   **GATEWAY'S MEMORANDUM OF**
19 STORES LLC, GATEWAY COMPANIES,      )   **POINTS AND AUTHORITIES IN**
   INC., GATEWAY MANUFACTURING LLC     )   **SUPPORT OF ITS MOTION FOR**
20 and COWABUNGA ENTERPRISES, INC.     )   **PARTIAL SUMMARY JUDGMENT OF**
                                       )   **INVALIDITY OF U.S. PATENT**
21        Defendants and Counter-Claimants,  )   **NO. 4,439,759 (FLEMING)**
                                       )
22      and                            )   Date:      January 7, 2008
                                       )   Time:      10:30 a.m.
23                                     )   Courtroom: 13, 5th Floor
   MICROSOFT CORPORATION               )   Judge:     Hon. Marilyn L. Huff
24                                     )
          Intervenor and Counter-Claimant.  )
25 ─────────────────────────────────── )
                                       )
26 AND CONSOLIDATED CASES              )
                                       )
27 ─────────────────────────────────── )

28
   ─────────────────────────────────────────────────────────────────
   GATEWAY'S MEMORANDUM OF POINTS AND                    Case No. 07-CV-2000- H (CAB)
   AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL
   SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT
   NO. 4,439,759 (FLEMING)

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................ 1

II. FACTUAL BACKGROUND .......................................................................................... 4

  A. The Asserted Claims Of The '759 Patent ............................................................ 4

  B. The State Of The Art In Videotex Prior To The Alleged Invention Shows That All Of The Elements Of The Claimed Invention Were Known ................... 5

  C. The Expert Opinions Of The Parties .................................................................. 10

III. THE LEGAL STANDARDS FOR OBVIOUSNESS UNDER *KSR V. TELEFLEX* ...... 11

  A. Procedural History In The KSR Case .................................................................. 12

  B. The Supreme Court's Decision And Rationale In KSR ....................................... 12

IV. ARGUMENT ................................................................................................................. 15

  A. There Is No Dispute Regarding The Level Of Skill Possessed By The Person Of Ordinary Skill In The Art ................................................................... 16

  B. Claim 1 Of The '759 Patent Is Invalid For Obviousness ................................... 16

    1. "a digital image display system" ............................................................ 16

    2. "a memory for storing color data values"; "color memory" .................... 17

    3. "processing means" ................................................................................. 18

    4. "first mode of access" ............................................................................ 18

    5. "second mode of access" ........................................................................ 18

    6. "third mode of access" ........................................................................... 19

    7. "display means" ...................................................................................... 21

    8. Reasons To Combine Known Elements In The Prior Art ........................ 21

  C. Claims 2 And 3 Of The '759 Patent Are Invalid For Obviousness .................... 22

V. CONCLUSION .............................................................................................................. 25

GATEWAY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF
U.S. PATENT NO. 4,439,759 (FLEMING)

i

Case No. 07-CV-2000- H (CAB)

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)..................................................................24

*Andersen Corp. v. Pella Corp.*,
500 F.Supp.2d (D.Minn. 2007)..................................................................15

*Aventis Pharma Deustchland GmbH v. Lupin. Ltd.*,
499 F.3d 1293 (Fed. Cir. 2007)..................................................................15

*Constant v. Advanced Micro-Devices*,
848 F.2d 1560 (Fed. Cir. 1988)..................................................................18

*Eaton Corp. v. ZF Meritor LLC*,
504 F.Supp.2d 217 (E.D.Mich. 2007)........................................................15

*Craig v. Foldfast, Inc.*,
504 F.Supp.2d 1313 (S.D.Fla. 2007) .........................................................15

*Friskit, Inc. v. RealNetworks, Inc.*,
499 F.Supp.2d 1145 (N.D.Cal. 2007) ........................................................15

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)..........................................................................11, 12, 13

*In re Icon Health and Fitness, Inc.*,
496 F.3d 1374 (Fed. Cir. 2007)..................................................................15

*KSR International Co. v. Teleflex, Inc.*,,
127 S.Ct. 1727...........................................................11, 12, 13, 24, 25

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007)..................................................................15

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007)..............................................................15, 18

*Sakraida v. Ag Pro, Inc.*,
425 U.S. 273 (1976).................................................................................13

*Single Chip Systems Corp., v. Intermec IP Corp.*,
495 F.Supp.2d 1066 (S.D.Cal. 2007).........................................................15

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
247 F.3d 1316 (Fed. Cir. 2001)..................................................................18

*In re Trans Texas Holding Corp.*,
498 F.3d 1290 (Fed. Cir. 2007)..................................................................15

GATEWAY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF
U.S. PATENT NO. 4,439,759 (FLEMING)

ii

Case No. 07-CV-2000- H (CAB)

1

**STATE CASES**

2

*Apple Computer, Inc. v. Burst.com, Inc.*, Slip Copy,
    2007 WL 3342829 (N.D.Cal. 2007) ...............................................................15

3

*PBI Performance Products, Inc. v. NorFab Corp.*,
    2007 WL 2464507 (E.D.Pa. 2007) ...............................................................15

4

*Panoptx, Inc. v. Protective Optics Inc.*, Slip Copy,
    2007 WL 3344453 (N.D.Cal. 2007) ...............................................................15

5

6

*Sud-Chemie, Inc. v. Multisorb Technologies, Inc.*,
    2007 WL 2669366 (W.D.Ky. 2007) ...............................................................15

7

8

**FEDERAL STATUTES**

9

35. U.S.C. § 103...............................................................................................11, 13, 15

10

U.S. Const., Art. I, § 8, cl. 8.............................................................................15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.      **INTRODUCTION**

In its recent decision in *KSR International Co. v. Teleflex, Inc*., the Supreme Court made clear that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws" and explained that "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." 550 U.S. ____, 127 S.Ct 1727, 1740, 1746 (2007) (citation omitted).  Under the legal standards set out in the *KSR* decision, Lucent's U.S. Patent No. 4,439,759 ("the '759 patent" or "the Fleming patent") is invalid, especially in light of the admissions set out in the patent itself regarding the prior art and the fact that the claimed invention is merely a combination of known elements.

The '759 patent pertains to terminals used in videotex systems (also known as viewdata and teletext services). Ex. 1, '759 patent at 1:39-40.[1]  "Videotex" refers generally to a system where a small box (a terminal) attached to a TV in someone's house receives commands and data over the phone line or TV signal from a "host computer" located in a central facility, such as a phone company's headquarters. *Id*. at 1:39-42.  Once the information is received at the terminal, it is decoded and then displayed on the TV.  *Id*.

The '759 patent admits that several videotex systems and terminals existed in the prior art and were "well known." *Id*. at 1:10-30.  The patent explains that these prior art systems each had different techniques for specifying the color to be used for displaying images on the screen. *Id*. at 1:12-16.  As the patent explains, the prior art Telidon system in Canada used "a specific color value selection method:  a direct selection of data values for the primary colors – red, green and blue." *Id*. at 1:16-22.  The patent also explains that two other prior art systems, Prestel in Britain and Antiope in France, "employ a technique for specifying both a foreground and a background color by indexing a permanent read-only color memory."  *Id*. at 1:22-27.  The patent also admits that "[i]n the art of color computer graphics, the terminal manufacturers generally employ a color look-up table called a color map indexed by a binary number."  *Id*. at 1:28-30.

---

[1]  Unless otherwise noted, "Ex. ___" refers to the corresponding exhibit attached to the Declaration of Andrew Thomases In Support Of Gateway's Motion For Partial Summary Judgment of Invalidity of U.S. Patent No. 4,439,759 (Fleming), filed concurrently.

1    According to the '759 patent, terminals used in one videotex system were not compatible

2    with the commands and data of another system, in part because of the way the terminals specify

3    colors.  *Id*. at 1:12-16, 39-46.  In other words, for example, a terminal made for Telidon could

4    not decode information sent from an Antiope host computer, and an Antiope terminal could not

5    decode information sent from a Telidon host computer.  The '759 patent purports to solve this

6    incompatibility problem by describing a terminal that simply incorporates "the known modes of

7    color access" of the prior art terminals:  "In accordance with the present invention, ***the known***

8    ***modes of color access*** are incorporated into the present algorithm for selecting a particular mode

9    of color memory access."  *Id*. at 1:55-58 (emphasis added).

10    Thus, according to the indisputable admissions in the '759 patent itself, the alleged

11    invention of the patent is merely a combination of "known" techniques for accessing color in a

12    videotex terminal with "known" elements performing their "known" functions.  Under *KSR*, such

13    a combination of known elements cannot be protected by a patent.

14    This is especially true because Lucent was not the first entity to think of the idea of

15    having a videotex terminal that would be compatible with all of the known videotex protocols

16    and could practice all of the known methods of color access.  Instead, as early as 1979, the idea

17    of having a videotex terminal that would be compatible with the known modes of access to color

18    prompted the world-wide standards setting body called the International Telegraph and

19    Telephone Consultative Committee ("CCITT") to work on a standard for videotex terminals,

20    which was promulgated in 1980 and called "Recommendation S.100:  International Information

21    Exchange for Interactive Videotex" (hereinafter "Recommendation S.100").  Ex. 2.  This prior

22    art document describes the three different types of terminals associated with Prestel, Antiope,

23    and Telidon, and describes a protocol and commands that would permit one to make a single

24    terminal that can switch between modes such that, in one mode, the terminal could receive

25    commands and data from a Telidon host computer, in another mode from an Antiope host

26    computer, and in another mode from a Prestel host computer.  *Id*.  Thus, following

27    Recommendation S.100, one would make a terminal that was compatible with all three videotex

28    services and that practiced the alleged invention of claim 1 of the '759 patent.  (Notably, the

1     inventors of the '759 patent possessed a copy of Recommendation S.100, but kept it from the

2     Patent Office.)

3        Moreover, Recommendation S.100 and at least one other publication on videotex (the

4     "Crowther article") suggested using a rewritable color memory where new color data values can

5     be stored in the color memory. Ex. 3. at 68-69. This prior art teaches the additional elements of

6     claims 2 and 3 of the '759 patent.

7        Thus, all of the elements of the asserted claims of the '759 patent were known in the prior

8     art and the prior art gave plenty of reasons to combine those elements and use them for their

9     known function. Thus, at a minimum, the claims of the '759 patent are invalid as being obvious.

10        Lucent basically has only three arguments against obviousness. First, Lucent's expert,

11     Mr. Richter, asserts that Antiope and Prestel did not use a technique for specifying colors by

12     indexing a color memory. However, this opinion is belied by the indisputable language of the

13     patent's description of those terminals in the "Description of the Prior Art" section. That section

14     clearly states that Prestel and Antiope terminals "employ a technique for specifying both a

15     foreground and background color by ***indexing*** a permanent read-only ***color memory***." Ex. 1 at

16     1:22-27 (emphasis added). This language parallels the language of the claims. Certainly, Lucent

17     cannot create a genuine issue of a material fact by proffering an expert opinion that clearly

18     contradicts the statements in Lucent's own patent.

19        Second, Lucent's expert says that Antiope does not use an "in-use background color," as

20     required by the Court's claim construction. Lucent's argument is based entirely on a misreading

21     of the Court's claim construction and, thus, does not create any genuine issue of fact. Indeed, it

22     is undisputed that Recommendation S.100 describes a command to set a background color that

23     persists and causes subsequent text and graphics characters "to be displayed in their foreground

24     colour on a background of the colour indicated." Ex. 2 at 43, ¶ 5.4.2.2.10. The Court's claim

25     construction for an "in-use background color" is "a color that will be used as the background

26     color for subsequently received text and graphics drawing commands until changed." Ex. 4 at

27     78. The background color in Recommendation S.100 meets this definition, and Lucent's

28     expert's attempt to argue that "displayed" is different from "used" is legally flawed and fails to

1 create a genuine issue of material fact.

2      Third, Lucent's expert argues that there is no reason to combine the teachings of the

3 Crowther reference (which discloses a rewritable color memory) with the other prior art videotex

4 systems to render obvious claims 2 and 3.  However, it is not disputed that Crowther is

5 describing an improvement to videotex terminals, and a person of ordinary skill in the art would

6 certainly look to such prior art in creating an improved terminal.  Essentially, Lucent's argument

7 is based on a strict application of the "teaching, suggestion, motivation to combine" test that was

8 explicitly rejected by the Supreme Court in the *KSR* decision.  *KSR*, 127 S.Ct. at 1739.  Under

9 the less onerous standard set forth in the *KSR* decision, there are many reasons why the known

10 prior art would be combined in a way that would meet all of the elements of the asserted claims.

11      Accordingly, there is no genuine issue of material fact, and the Court should find as a

12 matter of law that claims 1 to 3 of the '759 patent are invalid as obvious in light of the prior art.[2]

13 **II.**    **FACTUAL BACKGROUND**

14     **A.**    **The Asserted Claims Of The '759 Patent**

15     Lucent has asserted claims 1, 2, and 3 of the '759 patent.  Claim 1 reads as follows:

16           1.  In a digital image display system:
        a memory for storing color data values;
17         processing means responsive to a predetermined
           command and data sequence comprising at least one command,
18            the processing means decoding the predetermined command and
           data sequence, the predetermined command and data sequence
19            selecting one of a plurality of modes of access to color data
           values, the modes comprising
20         a first mode of access wherein an in-use foreground color is
           directly specified as a color data value;
21         a second mode of access wherein the in-use foreground color is
           specified as an index into the color memory; and
22         a third mode of access wherein the in-use foreground color and an
           in-use background color are specified as indexes into the color
23            memory; and
        display means responsive to the processing means, the display
24            means displaying the colors associated with the color data
           values accessed by the selected mode.
25

26 Ex. 1 at 14:20-40.

27     Claim 2 is similar to claim 1 but also requires that the processing means set or store a

28 _____
[2] Defendant Dell has indicated that it joins this motion.

color data value in the color memory:

> 2.  A digital image display system comprising:
> a color memory for storing color data values;
> processing means responsive to predetermined command and data
>     sequences, the processing means, responsive to a first command,
>     selecting a mode of access to the color memory; and responsive
>     to a second command, setting a color data value in the color
>     memory; and
> display means responsive to the processing means, the display
>     means displaying a color associated with the color data value
>     accessed by the selected mode.

*Id*. at 14:41-52.

Claim 3 depends from claim 2 and adds the requirement that a command stores plural

color data values in the color memory:

> 3.  A display system as recited in claim 2, wherein the processing
> means responsive to a second commend sets plural color data
> values in color memory.

*Id*. at 14:53-55.

On November 15, 2005, the Court issued its Order Construing Claims for United States

Patent Number 4,439,759, in which the Court set forth its constructions for claims 1 to 3 of the

'759 patent.  Ex. 4.

**B.    The State Of The Art In Videotex Prior To The Alleged Invention Shows That All Of The Elements Of The Claimed Invention Were Known**

It cannot be disputed that the alleged invention of the '759 patent is a combination of

"known modes of color access." Ex. 1 at 1:55-58.   The patent explains that "[i]n accordance

with the present invention, ***the known modes of color access*** are incorporated into the present

algorithm for selecting a particular mode of color memory access." *Id*. at 1:55-58 (emphasis

added).  The patent also describes "videotex, also known as viewdata and teletex services" as

admitted prior art, and acknowledges that "[v]arious modes of access to color memory, wherever

located, in a digital image display system, are employed by the providers of viewdata and teletex

services." *Id*. at 1:39-40, 4:36-39.

Moreover, the patent explicitly acknowledges that each of the claimed modes of access to

color data values were used in the prior art videotex systems.  Specifically, the patent admits that

1  the prior art Telidon system in Canada used "a specific color value selection method:  a direct

2  selection of data values for the primary colors – red, green and blue."  *Id*. at 1:16-22.  Lucent's

3  expert admits that this prior art system practices the claimed "first mode of access."  Ex. 5 at

4  393:18-394:7.  The patent further admits that the Prestel and Antiope terminals could specify the

5  foreground or background color by indexing a color memory as required by the second and third

6  modes of access of the claims:  "The Prestel videotex customer terminal developed by the British

7  Post Office and the Antiope terminal developed by the French CCETT employ a technique for

8  specifying both a foreground and a background color by indexing a permanent read-only color

9  memory."  Ex. 1 at 1:22-27.   This description of a technique of specifying the colors by

10  indexing a color memory tracks the language of the second and third modes of claim 1.  The

11  patent also admits that "[i]n the art of color computer graphics, the terminal manufacturers

12  generally employ a color look-up table called a color map indexed by a binary number."  *Id*. at

13  1:28-30.  This language tracks the Court's construction of "color memory" from the claim

14  construction order.  Ex. 4 at 83.

15        As the '759 patent itself concedes, it was well known in the art that the terminals of the

16  different videotex systems were not compatible. Ex. 1 at 1:12-16, 39-46.  For example, a

17  terminal developed for the Telidon videotex system could display colors for text and graphics

18  from a Telidon-based host computer, but such a terminal could not receive commands and data

19  from a Prestel or Antiope host computer in order to display colors on the TV.  Likewise, an

20  Antiope terminal could receive commands and data from an Antiope host computer to display

21  colors on a TV, but could not interpret commands and data from a Telidon host computer.

22        Long before the '759 patent, people in the field of videotex were already working on

23  making videotex terminals compatible.  For example, a July 1980 article on videotex stated:

24        Of course, it is possible for the different graphic methods to be combined.  For
        example, Prestel has demonstrated alphamosaic and photographic images (of
25        restricted size on the same page.  Antiope and Telidon have performed similarly.
        At present, it is still not clear which method, or combination of methods, will
26        prove to be the most widely acceptable.

27  Ex. 6 at 192.  Indeed, years before the '759 patent was filed, the international standards setting

28  body CCITT established a working group to formulate a standard for international videotex

1    terminals, and, by early 1980, the working group approved of a standard, which was freely

2    distributed to the industry.  Ex. 7 at 36:16-37:3, 227:17-233:15, 259:7-261:18, 268:3-273:22; Ex.

3    8 at 323; Ex. 23.  In November 1980, the full plenary assembly adopted the standard for

4    Videotex Terminals entitled "Recommendation S.100:  International Information Exchange for

5    Interactive Videotex."  Ex. 2 at 23; Ex.7 at 36:16-37:3, 268:3-273:22.[3]

6         Recommendation S.100 describes the existing videotex protocols and services, and

7    provides a set of commands that permit a terminal to switch from one mode in which the

8    terminal can decode commands and data from one type of videotex host computer to another

9    mode where the terminal can decode commands and data from another type of videotex system.

10   Ex. 2 at 24-26; Ex. 7 at 277:11-285:5.

11        Specifically, Recommendation S.100 explains that "it is desirable that terminal

12   equipment compatibility should exist between broadcast teletext systems for general reception

13   and public network-based data systems."  Ex. 2 at 24.  Recommendation S.100 then explains that

14   one of its purposes is "to identify parameters needed to design Videotex terminals."  *Id*. at 25, ¶

15   1.1.1.  Next, Recommendation S.100 describes the different techniques for presenting color and

16   graphics in existing videotex systems and explains how systems can be created that use more

17   than one of these options:

18        For the international service, four different options for representing pictorial
          information have been recognized:
19

---

20   [3]  Recommendation S.100 was indisputably published and made available to the public in 1980 –
     prior to the alleged invention of the '759 patent.  The final draft of Recommendation S.100 was
21   distributed to and approved by a large committee of CCITT members in June 1980 and was
     made widely available to all countries for approval, including Lucent's predecessor (AT&T) in
22   the United States, prior to the final plenary assembly approval in November 1980, and this final
     draft was substantively identical to the final, approved version of Recommendation S.100.  Ex. 7
23   at 42:2-19, 43:8-17, 46: 2-6, 47:2-20; *compare* Ex. 2 *with* Ex. 23.  In fact, the alleged inventors
     of the '759 patent even cite to Recommendation S.100 in the bibliography of the document that
24   allegedly constitutes evidence of conception, and this document attributes a publication date of
     1980 to Recommendation S.100.  Ex. 9 at 346.  Notably, the inventors stated that the coding
25   scheme of the AT&T's videotex system is "built upon the framework established by the CCITT
     S.100 standard."  *Id*. at 335.  Additionally, the inventors filed at least three additional patent
26   applications the same day as the patent application for the '759 patent was filed, and all three of
     those other patents cite to Recommendation S.100 and attribute to it a publication date of 1980.
27   *See* Ex. 10 at 9:5-10; Ex. 11 at 6:19-25; Ex. 12 at 3:41-45.  Importantly, the inventors never
     provided a copy of Recommendation S.100 to the patent examiner responsible for the '759
28   patent.

1          a) mosaic character sets;

2          b) geometric system;

        c) dynamically redefinable character sets;

3          d) photographic representation.

4  These options are not mutually exclusive and it is possible that systems may develop using two or more options.

5  *Id*. at 25, ¶ 1.2.4.

6          These options are explained in more detail throughout the document.  The "alphamosaic

7  option" (which uses text and mosaic graphic characters) is described as having "two modes" –

8  "serial mode" and "parallel mode."  *Id*. at 31, ¶ 5.1.2.  It was well understood at the time that the

9  alphamosaic serial mode described the Prestel videotex system, while the alphamosaic parallel

10  mode described the Antiope videotex system.  Ex. 7 at 240:17-241:22, 256:6-261:8, 288:16-

11  289:18; Ex. 13 at 394; Ex. 14 at 402.  Similarly, the "alphageometric option" of

12  Recommendation S.100 is the Telidon videotex system developed in Canada.  *Id*.  Moreover,

13  Recommendation S.100 provides different command sequences that are used to invoke the

14  different modes.  Ex. 2 at 26, ¶¶ 2.2, 2.3.

15          Thus, Recommendation S.100 provides a description that would enable one terminal to

16  switch modes such that it could receive commands and data from a Prestel host computer, from

17  an Antiope host computer, or from a Telidon host computer.  Ex. 7 at 277:11-285:8; Ex. 15 at

18  419-420, ¶¶ 35-38.  In the alphageometric (Telidon) mode, the current or "in-use" foreground

19  color is directly specified as a color data value.  In the other modes, the terminal acts as a Prestel

20  or Antiope terminal where, as the '759 patent admits, the terminal employs a technique for

21  specifying both a foreground color and a background color by indexing a color memory.  *See* Ex.

22  1 at 1:22-27; Ex. 7 at 277:11-285:8, 293:20-299:1; Ex. 15 at 421-422, ¶¶ 42-45.

23          Recommendation S.100 also suggests a number of possible enhancements to videotex

24  terminals.  For example, it explains that instead of just having the 8 basic colors available in a

25  color memory, a terminal could pick 8 colors from 512 different potential colors.  Ex. 2 at 57, ¶

26  9.3.1.  This would be done by having a rewritable color memory.  Ex. 16 at 68:1-72:10.

27  Additionally, Recommendation S.100 explains that the ability to simulate motion (*i.e*.,

28  animation) could be achieved by "dynamically altering the colour of portions of the display

image, making them appear or disappear by redefining the color table (an image disappears when its color is set to the same color as the surrounding area)." Ex. 2 at 57, ¶ 9.3.2.  This statement about "redefining *the* color table" shows that a color table already exists and is consistent with the patent's admission that Prestel and Antiope used a color memory. Ex. 1 at 1:22-27.  This method of using a redefinable color memory to achieve animation was very well known in the art.  Ex. 17 at 190:17-202:24; Ex. 18 at 626; Ex. 19 at 632.

Another researcher in the field of videotex was G. O. Crowther.  Mr. Crowther published an article in the spring of 1980 that describes a videotex terminal that includes a color memory that can be loaded with color data values downloaded from the host computer.  Ex. 3.  In a section entitled "Colour Mode," Crowther describes how the terminal can achieve "adaptive colours" by having a color memory that can hold 16 colors out of a much larger color repertory and those 16 colors can be rewritten to provide a different set of 16 colors when needed:

> To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data defining the colours to be employed in the particular picture.  The 16 colours would be chosen from a larger colour chart.  The colours would be coded simply by allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for each of the three primary colours.  These codes of the 16-predefined colours would be stored in memory as shown in Figure 4.

*Id.* at 69.  Figure 4 of Crowther shows a color memory and is reproduced below.



"ADAPTIVE COLOUR MODE"

Figure 4

GATEWAY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT
NO. 4,439,759 (FLEMING)

9

Case No. 07-CV-2000- H (CAB)

1    *Id.*  Lucent's expert admits that this is the same type of color memory discussed in the '759

2    patent and shown in Figure 2 of that patent. Ex. 5 at 529:7-16.   Indeed, the '759 patent admits

3    that "[i]n the art of color computer graphics, the terminal manufacturers generally employ a color

4    look-up table called a color map indexed by a binary number.  The application of a color map

5    expands the repertory of available colors for display."  Ex. 1 at 1:28-32.

6        Crowther also describes commands, called DRCS Instruction Codes, used to download

7    the colors into the color memory.  *See* Ex. 3 at 69, 71, 73, including Figs. 5 and 8 and Table I.

8        **C.    The Expert Opinions Of The Parties**

9        On September 14, 2007, pursuant to the Court's scheduling order, the Defendants' expert,

10    Dr. Wedig, provided his Supplemental Report providing opinions on the videotex prior art under

11    penalty of perjury. Ex. 15.  On October 12, 2007, Lucent's expert, Mr. Richter, provided his

12    Supplemental Rebuttal Report in response to Dr. Wedig's report.  Ex. 20.  In this report, Mr.

13    Richter did not rebut a number of opinions provided by Dr. Wedig.

14        On October 23, 2007, Lucent deposed Dr. Wedig on his opinions set forth in his

15    Supplemental Report.  Then, on November 12, 2007, without leave from the Court and just two

16    days before Mr. Richter's deposition, Lucent served a Second Supplemental Report of Mr.

17    Richter.  On November 14, 2007, Defendants took the deposition of Mr. Richter. Ex. 5.

18        In his deposition, Lucent's own expert, Mr. Richter, admitted that the following elements

19    were all known in the prior art:

20
- "digital image display systems" as mentioned in the '759 patent claims were known in the prior art.  Ex. 5 at 419:12-20.

21
22
- digital image display systems that included a color memory (as defined in the Court's claim construction) were known in the prior art.  *Id*. at 419:21-420:8.  *See also id.* at 373:3-8, 374:15-19, 375:2-8.

23
24
- digital image display systems with processors that could decode predetermined command and data sequences existed in the prior art.  *Id*. at 420:9-17.

25
26
- digital image display systems that were responsive to predetermined command and data sequences and use an algorithm equivalent to the algorithm identified by the Court's claim construction existed in the prior art.  *Id*. at 421:1-15.

27
28
- digital image display systems with a processor that could respond to predetermined command and data sequences to select a mode of access to color data values existed in the prior art.  *Id*. at 424:16-21.

- digital image display systems wherein the in-use foreground color was directly specified as a color data value existed in the prior art. *Id*. at 425:2-9.

- digital image display systems wherein an in-use foreground color was specified as an index into a color memory existed in the prior art. *Id*. at 425:14-17.

- digital image display systems that had a display responsive to a processor existed in the prior art, and those systems could display colors associated with color data values previously accessed. *Id*. at 427:8-19.

- with respect to claims 2 and 3, digital image display systems that had a processor responsive to a command for setting a color data value into color memory existed in the prior art. *Id*. at 427:25-428:4, 428:18-25.

- digital image display systems that had a processor responsive to a command for setting plural color data values into a color memory existed in the prior art. *Id*. at 429:1-7.

- the videotex systems of Prestel, Antiope, Telidon and the teachings of Recommendation S.100 and the Crowther article were all in the same field as the alleged invention. *Id*. at 418:12-419:11, 528:12-529:16, 551:7-13.

- Recommendation S.100 taught command and data sequences that would use a qualitative algorithm to set the terminal in a mode to receive alphamosaic information on the one hand and alphageometric information on another. *Id*. at 522:6-18.

The above admissions leave Lucent with only two arguments concerning potential differences between the asserted claims and the prior art: (1) Antiope allegedly did not specify colors using an index into a color memory; and (2) Antiope allegedly did not provide an "in-use background color." The first argument cannot raise a genuine issue of material fact because it is directly contradicted by the admissions in the patent itself. The second argument is based on a flawed view of the Court's claim construction, which cannot defeat summary judgment.

## III.    THE LEGAL STANDARDS FOR OBVIOUSNESS UNDER *KSR V. TELEFLEX*

Under the Patent Statute, a patent claim is invalid when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35. U.S.C. § 103. Whether a patent is invalid under § 103 is a question of law and, thus, is amenable to summary judgment. *KSR*, 127 S.Ct. at 1745 citing *Graham v. John Deere Co*., 383 U.S. 1, 17 (1966).

The Supreme Court's recent decision in *KSR* overruled a long line of Federal Circuit

decisions on obviousness and created significant new standards regarding how district courts should analyze obviousness. *KSR*, 127 S.Ct. 1727. The Supreme Court in *KSR* rejected the Federal Circuit's rigid approach to analyzing obviousness in favor of a more expansive and flexible approach as set out in the Court's earlier decision in *Graham v. John Deere Co.*, 383 U.S. 1 (1966). *See KSR*, 127 S.Ct. at 1739. As a result, it is now easier to invalidate patents based on obviousness, particularly those patents that merely claim combinations of elements known in the prior art.

### A.  Procedural History In The *KSR* Case

*KSR* involved a patent on a vehicle gas pedal assembly that was adjustable to accommodate drivers of different stature. The patent at issue was directed to a mechanism for combining an electronic sensor with an adjustable automobile pedal so the pedal's position could be transmitted to a computer that controls the throttle in a vehicle's engine, where the sensor was placed on a fixed pivot point. *KSR*, 127 S.Ct. at 1735-36. Several prior art patents disclosed the various elements of the asserted claim, but not all in the same patent. *Id*.

The District Court granted KSR's motion for summary judgment of obviousness of the asserted claim. Following the Supreme Court's guidance in *Graham*, the District Court reviewed pedal design history, the asserted patent's scope, and the relevant prior art, and found that there was little difference between the prior art's teachings and the asserted claim. The District Court also held that KSR satisfied the teaching, suggestion, motivation ("TSM") test for determining obviousness, reasoning that the state of the industry would have inevitably led to combinations of electronic sensors and adjustable pedals and that the prior art patents provided the basis and motivation for these developments. *Id*. at 1737-38.

On appeal, the Federal Circuit reversed the District Court's grant of summary judgment. The Federal Circuit held that the District Court had not been strict enough in applying the TSM test. *Id*. at 1738.

### B.  The Supreme Court's Decision And Rationale In *KSR*

Upon review, the Supreme Court unanimously reversed the Federal Circuit's decision. The Supreme Court held that the strict TSM test was too "rigid" and thus incompatible with the

"expansive and flexible approach" of the Court's own precedents. *KSR*, 127 S.Ct. at 1739. The Court affirmed that *Graham* provided the proper framework for applying the statutory language of § 103. Under *Graham*, "the scope and content of prior art are to be determined, the differences between the prior art and the claims at issue are to be ascertained, and the level of ordinary skill in the pertinent art resolved." *Id*. at 1734, quoting, *Graham*, 383 U.S. at 17-18.

The Supreme Court's decision focused on patents like the '759 patent that are based on the combination of elements found in the prior art. The Court stressed "caution" in granting these types of patents because "a patent for a combination which only unites old elements with no change in their respective functions … obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men." *Id*. at 1739. The Court further emphasized that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id*. In other words, "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." *Id*. at 1740, citing *Sakraida v. Ag Pro, Inc*., 425 U.S. 273, 282 (1976) (quotations omitted).

In rejecting the Federal Circuit's rigid approach, the Supreme Court set out new standards for determining whether a patent claiming a combination of elements of prior art is obvious. First, when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. Second, if a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. Third, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. *See id*. at 1740. Thus, in determining whether a patent is obvious, a court must ask "whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id*.

If the patent involves more than a simple substitution of elements or a simple application of a known technique to a piece of prior art ready for improvement, courts may also consider

1    whether there was an apparent "reason to combine" the known elements by looking at: (1) the

2    interrelated teachings of multiple patents; (2) the effects of demands known to the design

3    community or present in the marketplace; and (3) the background knowledge possessed by a

4    person having ordinary skill in the art.  *Id*. at 1740-41.  A court need not take into account

5    "precise teachings" of the prior art, but rather can consider the "inferences and creative steps"

6    that a person of ordinary skill in the art would likely use.  *Id*.

7         The Supreme Court identified four specific errors in the Federal Circuit's obviousness

8    inquiry.  First, the Federal Circuit erred in focusing only on the specific problem the inventor

9    was trying to solve.  Rather, "any need or problem known in the field of endeavor at the time of

10   the invention and addressed by the patent can provide a reason for combining elements" taught

11   by references. *Id*. at 1742.  Second, the Federal Circuit erred by assuming that a person of

12   ordinary skill in the art would be led only to the elements directed to solving the same problem.

13   Common sense, however, dictates that familiar elements can have uses beyond their primary

14   purposes, and a person of ordinary skill in the art may recognize such alternative uses and fit

15   such elements together like pieces of a puzzle.  *Id*.  The Supreme Court emphasized that "[a]

16   person of ordinary skill is also a person of ordinary creativity, not an automaton."  Third,

17   contrary to long standing Federal Circuit precedent, an invention can be proved obvious merely

18   by showing that the combination of elements was "obvious to try."  The Supreme Court reasoned

19   that "when there is a design need or market pressure to solve a problem and there are a finite

20   number of identified, predictable solutions, a person of ordinary skill has good reason to pursue

21   the known options within his or her technical grasp.  If this leads to the anticipated success, it is

22   likely the product not of innovation but of ordinary skill and common sense." *Id*.  Finally, the

23   Federal Circuit tried too hard to prevent hindsight analysis by applying a rigid standard, and a

24   standard that precludes consideration of "common sense" is erroneous. *Id*.

25        The Supreme Court held that the Federal Circuit's "fundamental misunderstanding" of

26   the law of obviousness caused it to apply the TSM test in a manner that was inconsistent with

27   Supreme Court precedents.  *Id*. at 1743.  Applying the proper standard, the Supreme Court

28   concluded that the asserted claim was obvious.  *Id*.

1        The Supreme Court concluded with a caution that a rigid test or formulation would defeat

2   the intent of the patent laws and would stifle innovation and noted that something more than

3   "ordinary innovation" is required to obtain the exclusive rights under patent law:

> We build and create by bringing to the tangible and palpable reality around us
> new works based on instinct, simple logic, ordinary inferences, extraordinary
> ideas, and sometimes even genius. These advances, once part of our shared
> knowledge, define a new threshold from which innovation starts once more. And
> as progress beginning from higher levels of achievement is expected in the normal
> course, *the results of ordinary innovation are not the subject of exclusive rights
> under the patent laws. Were it otherwise patents might stifle, rather than
> promote, the progress of useful arts. See* U.S. Const., Art. I, § 8, cl. 8. These
> premises led to the bar on patents claiming obvious subject matter established in
> *Hotchkiss* and codified in § 103. Application of the bar must not be confined
> within a test or formulation too constrained to serve its purpose.

10  *KSR*, 127 S.Ct. at 1746 (emphasis added).[4]

11  **IV.    ARGUMENT**

12       Applying the legal standards set forth by the Supreme Court to the indisputable

13  admissions regarding the videotex prior art found in the '759 patent itself and the teachings of

14  the prior art publications discussed above, the Court should find that Defendants have established

15  as a matter of law and by clear and convincing evidence that claims 1 to 3 of the '759 patent are

16  obvious.  Defendants' expert, Dr. Wedig, in a thorough report that includes detailed invalidity

17  claim charts, established that the asserted claims of the '759 patent are rendered obvious.  Ex. 15

18  at 416-426 (incl. Wedig exhibit 2).  Lucent, through its expert, Mr. Richter, only offers a handful

19  of attempts to rebut the evidence of obviousness, but those rebuttals fail because they contradict

---

[4]  Following the Supreme Court's decision in *KSR*, the Federal Circuit has held numerous
"combination" patents like the Fleming '759 patent to be invalid as obvious.  *See, e.g.*, *Aventis
Pharma Deustchland GmbH v. Lupin, Ltd.*, 499 F.3d 1293 (Fed. Cir. 2007); *In re Trans Texas
Holding Corp.*, 498 F.3d 1290 (Fed. Cir. 2007); *In re Icon Health and Fitness, Inc.*, 496 F.3d
1374 (Fed. Cir. 2007); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir.
2007); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007).
Similarly, since *KSR*, many district courts, including those in the Ninth Circuit, have granted
motions for summary judgment of invalidity based on obviousness.  *See, e.g.*, *Single Chip
Systems Corp., v. Intermec IP Corp.*, 495 F.Supp.2d 1066 (S.D.Cal. 2007); *Panoptx, Inc. v.
Protective Optics, Inc.*, Slip Copy, 2007 WL 3344453 (N.D.Cal. 2007), *Apple Computer, Inc. v.
Burst.com, Inc.*, Slip Copy, 2007 WL 3342829 (N.D.Cal. 2007); *Friskit, Inc. v. RealNetworks,
Inc.*, 499 F.Supp.2d 1145 (N.D.Cal. 2007); *Sud-Chemie, Inc. v. Multisorb Technologies, Inc.*,
2007 WL 2669366 (W.D.Ky. 2007); *PBI Performance Products, Inc. v. NorFab Corp.*, 2007
WL 2464507 (E.D.Pa. 2007);  *Craig v. Foldfast, Inc.*, 504 F.Supp.2d 1313 (S.D.Fla. 2007);
*Andersen Corp. v. Pella Corp.*, 500 F.Supp.2d (D.Minn. 2007); *Eaton Corp. v. ZF Meritor LLC*,
504 F.Supp.2d 217 (E.D.Mich. 2007).

1   the express words of the patent and misread the Court's claim construction.  As such, there is no

2   genuine issue of material fact, and the Court should find claims 1 to 3 invalid, especially since

3   obviousness is a question of law amenable to summary judgment.

4       A.      **There Is No Dispute Regarding The Level Of Skill Possessed By The Person**
                **Of Ordinary Skill In The Art**

5

6       The parties and their respective experts are in agreement regarding the level of skill

7   possessed by the person of ordinary skill in the art.  Defendants' expert, Dr. Wedig, opined that a

8   person of ordinary skill at the time the '759 patent was filed would be either "an engineer

9   holding a Bachelor of Science degree in electrical engineering or computer engineering with a

10  least 2 years of experience in the field of computer graphics" or "an engineer holding a Master of

11  Science degree in electrical engineering or computer engineering who has pursued a course of

12  study relating to computer graphics technology."  Ex. 21 at 685, ¶ 22.  Lucent's expert agrees,

13  but would also add that a person of skill in the art could alternatively have a computer science

14  degree.  Ex. 20 at 657, ¶ 13.

15      What is important to note with respect to this undisputed level of skill in the art is that it

16  describes a very skilled person – either a master's degree in a very technical field or a significant

17  amount of industry experience in such a field.  Such a person would be very intelligent and

18  knowledgeable and could make significant creative inferences when analyzing the prior art.  *See*

19  *KSR*, 127 S.Ct. at 1740-41.  Many concepts would be obvious to such a person of skill.

20      B.      **Claim 1 Of The '759 Patent Is Invalid For Obviousness**

21      Under the legal standards of the *KSR* decision, claim 1 of the '759 patent is obvious in

22  light of the patent's admissions regarding the prior art videotex systems (and the "known modes"

23  of access to color data values ) in view of Recommendation S.100.  Each claim limitation is

24  addressed below.  Lucent does not dispute that most of the claim limitations exist in the prior art.

25  Where Lucent does raise disputes, those disputes are based on its expert's opinion that squarely

26  contradicts the language of the patent or misreads this Court's claim construction.

27      1.      **"a digital image display system"**

28      The prior art videotext systems were digital image display systems – the subject matter of

1    the claims. Ex. 15 at 417, ¶ 29.  Lucent does not dispute this.  Ex. 5 at 419:12-20.  Indeed, the

2    admitted prior art videotex systems are referred to in the patent as "digital image display

3    terminals."  Ex. 1 at 1:39-44.

4                    **2.      "a memory for storing color data values"; "color memory"**

5        Claim 1 requires "a memory for storing color data values" and then refers back to that

6    memory as "the color memory."  This Court's construction construes those phrases the same.

7    Ex. 4 at 77, 83.

8        The admitted prior art in the patent teaches that videotex terminals used a color memory,

9    as required by claim 1.  For example, in the "Description of the Prior Art" section, the '759

10   patent itself states that the Prestel and Antiope terminals "employ a technique for specifying both

11   a foreground and a background color by indexing a permanent read-only ***color memory***."  *Id.* at

12   1:22-27 (emphasis added).  The patent also admits that prior art videotex terminals used modes

13   of access to color memory:  "Various modes of access to ***color memory***, wherever located, in a

14   digital image display system, are employed by the providers of viewdata and teletext services."

15   *Id.* at 4:36-39 (emphasis added).  Elsewhere in the discussion of the admitted prior art, the patent

16   explains that "terminal manufacturers generally employ a color look-up table called a color map

17   indexed by a binary number."  *Id.* at 1:28-30.  This language parallels the language in the claim

18   and the Court's claim construction.  *See* Ex. 4 at 77, 83.

19       Despite this clear language from the patent, Lucent's expert argues that the admissions in

20   the patent specification regarding the existence of a color memory in the prior art videotex

21   systems are simply wrong.  Mr. Richter asserts that, contrary to the language of the patent, the

22   Antiope and Prestel systems do not use a color memory.  He does so by interpreting another

23   document regarding the Antiope system and a figure in Recommendation S.100.  Ex. 5 at 394:8-

24   395:2; Ex. 20 at 659, ¶ 20.  However, Mr. Richter admitted that his interpretation was not the

25   only interpretation of Recommendation of S.100 and that a possible interpretation of the

26   document was that it could be discussing a color memory.  *See, e.g.*, Ex. 5 at 496:20-24, 497:21-

27   498:2, 543:3-11.  Moreover, although Mr. Richter states that he believes parallel mode in

28   Recommendation S.100 describes direct specification of color, he could not point to any text that

specifically says just that. *Id*. at 623:14-624:10. Such a conclusory and unsupported opinion cannot create a genuine issue of material fact. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001). This is especially true because an admission in the patent regarding the content of the prior art binds the patentee. *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342. 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *Constant v. Advanced Micro-Devices*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) (affirming grant of summary judgment of obviousness and holding held that "[a] statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness").

### 3.     "processing means"

With respect to the "processing means" limitation, Lucent and its expert do not dispute that Recommendation S.100 discloses that limitation. Ex. 5 at 523:16-23. In fact, Mr. Richter testified that Recommendation S.100 discloses command and data sequences that use a "qualitative" algorithm to select modes of access, and, in his infringement opinions, Mr. Richter opined that such an algorithm would meet the corresponding structure for the "processing means" limitation. *Id*. at 522:6-18; Ex 22 at 725-726.

### 4.     "first mode of access"

Likewise, Dr. Wedig established and Lucent does not dispute that the "first mode of access" limitation was found in the videotex prior art. Ex. 15 at 421, ¶¶ 40-41 (including Wedig exhibit 2 at 3-5); Ex. 20 at 659. In fact, Mr. Richter admits that the Telidon videotex terminal (and, thus, the alphageometric option described in Recommendation S.100) practice the "first mode of access" limitation of claim 1. Ex. 5 at 393:18-394:7.

### 5.     "second mode of access"

With respect to the "second mode of access" limitation, Dr. Wedig established that the Antiope videotex terminals (and, thus, the "alphamosaic parallel mode" of Recommendation S.100) meet this limitation. Ex. 15 at 421-422, ¶¶ 42-43 (including Wedig exhibit 2 at 5-7). This opinion is supported by the patent's own admissions regarding the prior art. In particular,

the "second mode of access" is one "wherein the in-use foreground color is specified as an index into the color memory." The patent's Description of the Prior Art explains that Prestel and Antiope terminals "employ a technique for specifying both a foreground and a background color by indexing a permanent read-only color memory." Ex. 1 at 1:22-27. Moreover, as Recommendation S.100 explains, the alphamosaic parallel mode includes commands for specifying the color attribute for subsequent text and mosaic graphics drawing commands; thus, it has "in-use" colors as required by the Court's claim construction. Ex. 2 at 42, ¶ 5.4.2.2.1 (color selection "[c]auses the following characters to be written in the colour indicated"). In other words, in Antiope and the alphamosaic parallel mode, the terminal specifies the foreground color and it persists for subsequent text and graphics drawing commands until the color is changed.

In arguing that this limitation is not met, Lucent's expert merely reasserts his opinion that Antiope did not specify colors by indexing into a color memory. Ex. 20 at 659, ¶ 20. However, as explained above, Lucent cannot create a genuine issue of material fact by contradicting the plain language of the patent specification. Other than this color memory issue, Lucent does not dispute that this limitation is met by the videotex prior art and Recommendation S.100. *See, e.g.,* Ex. 5 at 472:3-7, 516:13-17.

### 6.      "third mode of access"

The "third mode of access" limitation is also met by the prior art. *See* Ex. 15 at 422, ¶¶ 44-45 (including Wedig exhibit 2 at 7-8). The "third mode of access" limitation is similar to the "second mode of access" limitation, but it also requires the specification of an in-use background color: "a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory." As explained previously, the patent admits that Antiope and Prestel videotex terminals perform the technique of this mode: "The Prestel videotex customer . . . and the Antiope terminal . . . employ a technique for specifying both a foreground and a background color by indexing a permanent read-only color memory." Ex. 1 at 1:22-27. Moreover, as explained above, Antiope (the "alphamosaic parallel mode") uses an "in-use" foreground color, as construed by the Court, and Lucent does not dispute this.

1   Ex. 2 at 42, ¶ 5.4.2.2.1.  Similarly, Antiope also uses an "in-use background color," as that term

2   is construed by the Court.  Ex. 15 at Wedig exhibit 2 at 464-465; Ex. 2 at 43, ¶ 5.4.2.2.10; Ex. 7

3   at 167:19-171:15, 175:17-178:3, 182:1-185:12.  Specifically, as Recommendation S.100

4   explains, the background color attribute can be set to one of eight colors and the selected color

5   acts as the background color for the text and graphics drawing commands that follow.  Ex. 2 at

6   43, ¶5.4.2.2.10 (selected background color "[c]auses the following characters to be displayed in

7   their foreground colour on a background of the colour indicated").  This shows that the

8   alphamosaic parallel mode (Antiope) of Recommendation S.100 meets the Court's claim

9   construction for "in-use background color" – "a color that will be used as the background color

10  for subsequently received text and graphics drawing commands until changed."  Ex. 4 at 78.

11      Lucent disputes that this "third mode of access" limitation is met in the Antiope prior art

12  or in Recommendation S.100.  Lucent's first response is to again assert that Antiope does not use

13  a color memory, despite the clear language of the patent itself.  Ex. 20 at 660, ¶ 23.  As discussed

14  above, this assertion is flawed and Lucent cannot create a genuine issue of material fact by

15  disputing the admissions in the patent itself.  Next, Lucent and its expert argue that

16  Recommendation S.100 does not teach an "in-use background color."  *Id*.  Essentially, Mr.

17  Richter argues that, although Recommendation S.100 does say that characters will be displayed

18  "on a background of the color indicated," Recommendation S.100 does not say that the

19  foreground color and the background color will be written at the exact same time by the same

20  command.  *Id*.; Ex. 5 at 517:6-19.

21      There are two fundamental flaws with Lucent's argument.  First, nothing in the Court's

22  claim construction requires that the foreground color and the background color need to be written

23  at the exact same time by the same command.  The Court's construction for "in-use background

24  color" is "a color that will be used as the background color for subsequently received text and

25  graphics drawing commands until changed."  Ex. 4 at 78.  Nothing requires the background color

26  to be written at the exact same time as the foreground color or that it be written using the same

27  command as the foreground color.  Thus, Lucent's rebuttal is dependent entirely on a misreading

28  of the Court's claim construction, and such a rebuttal does not create a genuine issue of material

fact and does not avoid summary judgment.  Second, even under Lucent's flawed reading of the claim construction, a person of ordinary skill in the art at the time of the invention would understand that Antiope and the alphamosaic parallel mode did set both a foreground color and a background color that would persist and be used for subsequently received text and graphics drawing commands and that both the foreground and background colors would be written by the same command at the same time.  Ex. 7 at 175:17-178:3.  In fact, Mr. Richter acknowledged that the background color described in Recommendation S.100 affects multiple characters and could be written at the same time as the foreground color.  Ex. 5 at 472:25-473:15, 518:10-15.

### 7.    "display means"

The last limitation of claim 1 is the "display means" limitation.  The Prestel/Antiope systems indisputably used the claimed display means, and such display means were described in Recommendation S.100.  Ex. 15 at 422-423, ¶ 46; *see also* Ex. 2 at 25, ¶1.2.2 and 27, ¶3.2 et seq. Lucent's expert does not really rebut the fact that the prior art teaches a display means, except to say that the display cannot display color accessed by the selected mode because (as addressed above) he believes the different modes of the claims are not met.  *See* Ex. 20 at 661, ¶25.  For the same reasons discussed above, this argument is flawed and does not avoid summary judgment.

### 8.    Reasons To Combine Known Elements In The Prior Art

Thus, all of the limitations of claim 1 can be found in the prior art.  Moreover, as shown above, there a many reasons why a person of ordinary skill in the art would combine the teachings of the prior art.  As the patent itself notes, it was known in the art that the various videotex systems were not compatible and that there was a need for a terminal that was compatible with the various systems. Ex. 1 at 1:39-46.  Indeed, the entire purpose behind Recommendation S.100 was to promulgate a standard that described the existing protocols for videotex systems as well as the commands and data needed to have a compatible terminal switch between the different modes.  Ex. 15 at 416-418, ¶¶ 27-31; Ex. 2 at 24-26.  Thus, Recommendation S.100 would permit one to create a videotex terminal designed to use the techniques of both the Telidon terminal and the Antiope terminal. Ex. 15 at 419-423, ¶¶ 35-46; Ex. 7 at 277:11-285:5, 288:16-289:18.  In fact, prior to the '759 patent, there were market

1    demands and design trends to have a single terminal that could be set in one mode to receive

2    Telidon information and in another mode or modes to receive information from Antiope or

3    Prestel host computers.  Ex. 7 at 163:16-164:17, 222:14-227:15; Ex. 8 at 324, 329-330.  Lucent's

4    expert acknowledged that if there were market demand for a terminal that can receive both

5    Antiope information and Telidon information, such a terminal could have been built.  Ex. 5 at

6    556:2-6.

7        For all of the reasons above, claim 1 of the '759 patent is obvious in light of the prior art.

8    **C.    Claims 2 And 3 Of The '759 Patent Are Invalid For Obviousness**

9        Claim 2 was construed to be the same as claim 1 with the addition of the ability to set or

10   store a color data value in the color memory.  Ex. 4 at 79-80.  Specifically, claim 2 calls for "a

11   second command, setting a color data value in the color memory."  Ex. 1 at 14:47-48.  Claim 3

12   depends from claim 2 and requires that the second command sets plural color data values in the

13   color memory.  *Id*. at 14:53-55.  These claims are invalid for all of the reasons set forth in the

14   preceding section and because setting color data values in the color memory was well known in

15   the art and was disclosed in Recommendation S.100 and in the Crowther article.  *See* Ex. 15 at

16   423-426 and Wedig exhibit 2 at 466-470.

17       For example, the '759 patent itself admits that the ability to load color data values into a

18   color memory was well known in the prior art:

19           In the art of color computer graphics, the terminal manufacturers generally
        employ a color look-up table called a color map indexed by a binary number.  The

20       application of a color map expands the repertory of available colors for display.  In
        particular, the Tektronix 4027 terminal is capable of providing 8 colors for direct

21       use from the 64 possible ***color values that may be loaded into its color map***.

22   Ex. 1 at 1:28-35 (emphasis added).  Similarly, well known articles and textbooks from the time

23   disclosed the ability to use a rewritable color memory where the color data values could be

24   written and rewritten into the indexed locations in the color memory.  Ex. 17 at 190:17-202:24;

25   Ex. 18 at 626; Ex. 19 at 632.

26       As noted above, Recommendation S.100 also suggests that, instead of just having the 8

27   basic colors available in a color memory, a terminal could pick 8 colors from a 512 different

28   potential colors.  Ex. 2 at 57, ¶ 9.3.1.  This would be done by having a rewritable color memory.

Ex. 16 at 68:1-72:10.  Additionally, Recommendation S.100 explains that the ability to simulate

motion (*i.e.*, animation) could be achieved by "dynamically altering the colour of portions of the

display image, marking them appear or disappear by redefining the color table (an image

disappears when its color is set to the same color as the surrounding area)."  Ex. 2 at 57, ¶ 9.3.2.

This statement about "***redefining*** the color table" shows that Recommendation S.100 disclosed a

redefinable color memory where new color data values could be written into the color memory.

Ex. 15 at 423, ¶¶ 47-48.  Even Mr. Richter acknowledges that this is one of the prior art methods

for achieving animation.  Ex. 5 at 496:20-24, 497:21-498:2.  This suggestion to combine the

known videotex modes together along with a redefinable color memory appears plainly in

Recommendation S.100; thus, the "reasons to combine" standards of *KSR* are clearly met.

   Moreover, as explained above, the Crowther article describes a videotex terminal that

includes a color memory that can be loaded with color data values downloaded from the host

computer.  Ex. 3; Ex. 15 at 423-424, ¶¶ 49-50.  The "adaptive colours" section of that article

describes how the terminal can have a color memory that can hold 16 colors out of a much larger

color repertory and those 16 colors can be rewritten to provide a different set of 16 colors when

needed:

> To achieve the adaptive colours it is proposed to transmit codes as part of the
> D.R.C.S. data defining the colours to be employed in the particular picture.  The
> 16 colours would be chosen from a larger colour chart.  The colours would be
> coded simply by allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity
> for each of the three primary colours.  These codes of the 16-predefined colours
> would be stored in memory as shown in Figure 4.

Ex. 3 at 69, including Figure 4.  Crowther also describes commands, called DRCS Instruction

Codes, used to download the colors into the color memory.  *See* Ex. 3 at 69, 71, 73, including

Figs. 5 and 8 and Table I.  These commands are necessarily decoded by a processor and would

have the ability to load multiple color data values. Ex. 15 at 424-426.  Moreover, Lucent's expert

admits that the Crowther article teaches a decoder and a color memory loaded with color data

values.  Ex. 5 at 529:1-16.

   Because the "Description of the Prior Art" section of the '759 patent discusses a

rewritable color map and because Recommendation S.100 explicitly teaches one to "redefine the

GATEWAY'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT
NO. 4,439,759 (FLEMING)

23

Case No. 07-CV-2000- H (CAB)

color table," a person of ordinary skill in the art would look to other teachings in the prior art regarding storing colors into a color memory. Crowther is just such a publication because it pertains to videotex terminals, such as for viewdata and teletext. *See* Ex. 3 at 65; Ex. 15 at 424-426, ¶¶ 50-53. Indeed, Crowther's article is entitled "Dynamically Redefinable Character Sets – D.R.C.S." and there is a discussion of DRCS within Recommendation S.100. Ex. 2 at 166, ¶1.2.4, 196-197, ¶ 7 et seq. Moreover, a person of ordinary skill in the art would be very familiar with the use of rewriteable color memories and how to store color data values in such memories. Ex. 17 at 190:17-202:24; Ex. 18 at 626; Ex. 19 at 632.

Lucent's arguments regarding the obviousness of claims 2 and 3 do not create a genuine issue of material fact. First, Lucent merely raises the same arguments it raised with respect to claim 1, and, as discussed above, those arguments do not avoid summary judgment. Second, Lucent's expert asserts that Recommendation S.100 and Crowther do not use the exact algorithm described in the corresponding structure for the function of setting color data values. Ex. 20 at 661-662. However, this argument directly contradicts Lucent's infringement argument, where Lucent and its expert assert that the exact algorithm does not need to be met in order for the limitation to be practiced. *See* Ex. 22 at 727. Lucent cannot create a genuine issue of material fact by asserting an argument that conflicts with its infringement contentions. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.") (citations omitted).

Finally, Lucent asserts that a person of ordinary skill in the art would not have been motivated to combine Recommendation S.100 with the knowledge of a person of skill in the art or with Crowther because there is no explicit teaching to combine. Ex. 20 at 662-663. This argument is merely an attempt to invoke the strict application of the "teaching, suggestion, motivation" test that was flatly rejected in the *KSR* decision. *KSR*, 127 S.Ct. at 1739. As the Supreme Court has explained, a person of ordinary skill is not an automaton, but is a person of ordinary creativity and can use inferences and creative steps to achieve a combination. *Id.* at 1742. This is especially true where Lucent admits that the prior art to be combined is in the same

1    field and the same field as the alleged invention. *Id*. at 1740; Ex. 5 at 418:12-419:11, 528:12-

2    529:16, 551:7-13.

3         Thus, Defendants have established that claims 2 and 3 are obvious in light of the admitted

4    prior art in the patent in view of Recommendation S.100 and the Crowther article.

5    **V.    CONCLUSION**

6         In view of the foregoing, Gateway respectfully requests that the Court grant Gateway's

7    motion for partial summary judgment of invalidity of claims 1 to 3 of the '759 patent.

8

9    Dated:  November 30, 2007          DECHERT LLP

10

11                                      By:    _____/s/Jeffrey B. Plies_____

12                                             Jeffrey B. Plies

13                                      Attorneys For Defendants And Counterclaimants
                                        GATEWAY, INC. *et. al*.

14

15   13022408

16

17

18

19

20

21

22

23

24

25

26

27

28