1  Bryan W. Farney *(pro hac vice)*
   Jeffrey B. Plies *(pro hac vice)*
2  DECHERT LLP
   300 West 6th Street, Suite 1850
3  Austin, Texas 78701
   Telephone: (512) 394-3000
4  Facsimile: (512) 394-3001

5  David J. Zubkoff (SBN 149488)
   SELTZER CAPLAN McMAHON VITEK
6  750 "B" Street, Suite 2100
   San Diego, CA 92101
7  Telephone: (619) 685-3003
   Facsimile: (619) 685-3100

8
   Attorneys for Defendants and Counterclaimants,
9  GATEWAY, INC., GATEWAY COUNTRY STORES LLC,
   GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING
10 LLC, AND COWABUNGA ENTERPRISES, INC

11

12                    **UNITED STATES DISTRICT COURT**

13                    **SOUTHERN DISTRICT OF CALIFORNIA**

14
   _____
15 LUCENT TECHNOLOGIES INC. and      )   Case No. 07-CV-2000-H (CAB)
   MULTIMEDIA PATENT TRUST,          )   consisting of matters severed from
16                                    )   consolidated cases:
                                      )   Case No. 02-CV-2060-B (CAB)
             Plaintiff and Counter-Defendant,  )   Case No. 03-CV-0699-B (CAB)
17                                    )   Case No. 03-CV-1108-B (CAB)
                                      )
18     v.                             )
                                      )
19 GATEWAY, INC., GATEWAY COUNTRY     )   **GATEWAY'S MEMORANDUM OF**
   STORES LLC, GATEWAY COMPANIES,     )   **POINTS AND AUTHORITIES IN**
20 INC., GATEWAY MANUFACTURING LLC    )   **SUPPORT OF ITS MOTION FOR**
   and COWABUNGA ENTERPRISES, INC.    )   **PARTIAL SUMMARY JUDGMENT OF**
                                      )   **INVALIDITY OF U.S. PATENT**
21         Defendants and Counter-Claimants,  )   **NO. 4,763,356 (DAY)**
                                      )
22     and                            )   Date:      January 7, 2008
                                      )   Time:      10:30 a.m.
23 MICROSOFT CORPORATION              )   Courtroom: 13, 5th Floor
                                      )   Judge:     Hon. Marilyn L. Huff
24         Intervenor and Counter-Claimant.   )
   _____ )
25 AND CONSOLIDATED CASES            )
                                      )
26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS .............................................................................. 1

    A.    Summary of the '356 Patent ................................................................ 1

    B.    Summary of Chemical Bank's FXFE System and the Tyler Article ................... 3

III.  LEGAL STANDARDS ................................................................................... 6

IV.   ARGUMENT ................................................................................................... 8

    A.    Claim 19 is Invalid Under § 102(b) Based On The Public Use of the FXFE
        System More Than One Year Before The Filing Date Of The '356 Patent. ......... 8

        1.    The FXFE System Was Publicly Used More Than One Year
            Before The Filing Date of the '356 Patent ................................... 8

        2.    The FXFE System Meets all the Limitations of Claim 19 ......................... 9

    B.    Claim 19 is Invalid Under § 102(g) Based on the Prior Invention of the
        FXFE System Before The Invention of the '356 Patent ...................................... 12

        1.    The FXFE System was Invented Before the Invention of the '356
            Patent ........................................................................................... 12

        2.    The FXFE System Meets all the Limitations of Claim 19 ....................... 13

    C.    Claim 19 is Obvious Based On The Tyler Article Alone or In Combination
        With References Disclosing Indicating A Selected Field. .................................... 14

        1.    The Tyler Article Was Published More Than One Year Before The
            Filing Date Of The Day '356 Patent. ........................................ 14

        2.    The Tyler Article Explicitly Discloses All Limitations Of Claim 19
            Except For Indicating The Selected Field. ............................... 15

        3.    Claim 19 is Obvious in View of the Tyler Article Alone or in
            Combination with the Prior Art Discussed in the Buscaino Expert
            Report ........................................................................................ 17

    D.    Claim 21 is Obvious in View of The FXFE System and the Tyler Article
        in Combination with References Disclosing Use of Handwritten Input .............. 19

    E.    The Secondary Considerations of Nonobviousness Do Not Alter The
        Result ................................................................................................ 20

V.    CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................6

*Barmag Barmer Maschinefabrik AG v. Murata Mach., Ltd.*,
    731 F.2d 831 (Fed. Cir. 1984)...................................................................6

*Baxter Int'l, Inc. v. COBE Laboratories, Inc.*,
    88 F.3d 1054 (Fed. Cir. 1996).............................................................6, 8

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
    229 F.3d 1120 (Fed. Cir. 2000)...............................................................20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................6

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966).....................................................................................7

*Harrington Mfg. Co. v. Powell Mfg. Co.*,
    815 F.2d 1478 (Fed. Cir. 1986)................................................................8

*Holmwood v. Sugavanam*,
    948 F.2d 1236 (Fed. Cir. 1991)..............................................................13

*Johns Hopkins University v. CellPro, Inc.*,
    152 F.3d 1342 (Fed Cir. 1998).................................................................8

*KSR Intern. Co. v. Teleflex Inc.*,
    127 S.Ct. 1727 (2007)....................................................................7, 8, 19

*Lockwood v. American Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997).................................................................6

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996)................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................6

*Maxwell v. K Mart Corp.*,
    880 F.Supp. 1323 (D. Minn. 1995).........................................................13

*Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*,
    264 F.3d 1344 (Fed. Cir. 2001)...........................................................6, 12

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005)..............................................................14

**TABLE OF AUTHORITIES**

Page

**STATUTES**

Fed. R. Civ. P. 56..................................................................................................6

35 U.S.C. § 102(b) ............................................................1, 6, 8, 9, 12, 14

35 U.S.C. § 103...................................................................1, 2, 3,7, 8

I.    **INTRODUCTION**

Defendant Gateway, Inc. ("Gateway") respectfully moves for summary judgment of invalidity of claims 19 and 21 of U.S. Patent No. 4,763,356 to Day, et al. ("the Day patent" or "the '356 patent") asserted by Lucent Technologies, Inc. ("Lucent"). These two method claims are the only claims of the Day patent that remain in the case. Claim 19 is invalid based on a currency trading system developed by Chemical Bank in 1983 called the Foreign Exchange Front End ("FXFE") as well as based on an article describing the FXFE system written by Michael Tyler and published in Datamation magazine in January 1984 ("the Tyler article"). Both the FXFE system and the Tyler article describing the FXFE system existed nearly three years before the filing date of the Day patent.

The FXFE system and the Tyler article invalidate claim 19 on three separate legal grounds. First, claim 19 is invalid under 35 U.S.C. § 102(b) based on the public use of the FXFE system more than one year before the filing date of the '356 patent. Second, claim 19 is invalid under § 102(g) based on the prior invention of the FXFE system before the invention of the '356 patent. Third, claim 19 is invalid as obvious under § 103 based on the Tyler article either alone or in combination with other references showing that it was well-known in the art to highlight a selected field. In addition, claim 21 is invalid as obvious based on the FXFE system and the Tyler article in combination with references showing the use of handwritten input.

II.    **STATEMENT OF FACTS**

A.    **Summary of the '356 Patent**

The Day patent is directed to a method for allowing a user to fill out forms on a computer using on-screen tools. Ex. 1 at 1:25-32.[1] These tools include an on-screen number pad, an on-screen keyboard, and a menu of alternatives. *Id.* at 3:47-57, 4:13-24, 5:6-15. In the method described by the patent, a number of information fields are displayed on the screen along with labels identifying the kind of information that is to be entered into each field. *Id.* at 3:11-16. When the user touches a field that he wants to fill-in, the system highlights that field and displays

---

[1] All citations to "Ex. __" refer to exhibits attached to the Declaration of Jonathan D. Baker submitted concurrently with this brief.

1  a predefined tool for providing the type of information that goes in that field. *Id.* at 1:32-35.

2  When the user enters the information using the tool, the information is then inserted into the

3  selected field. *Id.* at 3:54-57, 4:30-41.

4       The Day patent describes an embodiment that could be used in a car dealership for

5  ordering new cars. *Id.* at 3:11-13. Fig. 2 of the Day patent shows the car ordering form

6  including the information fields and labels such as "Model," "Year," "Qty," and "Customer

7  Name." *Id.* at 3:1-16. In Fig. 3, the user has selected the "Model" field, and the system has

8  displayed a menu tool. *Id.* at 3:47-57.



18  In Fig. 5, the user has selected the "Qty" field, and the system has displayed the "number entry"

19  tool. *Id.* at 4:13-25. When the user enters the information using the displayed tool, the

20  information is inserted into the selected field. *Id.* at 3:54-57, 4:30-41.



Gateway's MPAs ISO of its Motion for Partial    2    Case Nos. 02-CV-2060 B (CAB)
Summary Judgment of Invalidity of U.S. Patent        03-CV-0699-B (CAB, and 03-CV-41108-B CAB)
No. 4,763,356 (Day)

1

2        Lucent has asserted claims 19 and 21 of the '356 patent.  Claim 19 reads as follows:

3                    19.  A method for use in a computer having a display
         comprising the steps of
4

5               [a]     displaying on said display a plurality of information fields,

6               [b]     identifying for each field a kind of information to be
                inserted therein,

7
                [c]     indicating a particular one of said information fields into
8        which information is to be inserted and for concurrently displaying
         a predefined tool associated with said one of said fields, said
9        predefined tool being operable to supply information of the kind
         identified for said one field, said tool being selected from a group
10       of predefined tools including a tool adapted to supply an individual
         entry from a menu of alternatives and at least a tool adapted to
11       allow said user to compose said information, and

12              [d]     inserting in said one field information that is derived as a
                result of said user operating said displayed tool.

13   Ex. 1 at 17:27-18:14.  Claim 21 depends from claim 19 and requires that at least one of the fields

14   be a bit-mapped graphics field:

15                   21.  The method set forth in claim 19 wherein the step of
                displaying said pattern includes the step of displaying one or more
16              of said information fields as a bit-mapped-graphics field.

17   *Id*. at 18:19-22.

18       On April 17, 2007, the Court issued its most recent claim construction order setting forth

19   its constructions for the terms appearing in claims 19 and 21 of the '356 patent.  Ex. 2.  The

20   Court also further clarified the meaning of "concurrently displaying" in its May 15, 2007 order

21   denying cross-motions for summary judgment of invalidity.  Ex. 3 at 43 n.3.

22       **B.    Summary of Chemical Bank's FXFE System and the Tyler Article.**

23       By January 1984, nearly three years before the filing date of the Day patent, Chemical

24   Bank had developed a touch-screen system that provided on-screen tools that allowed currency

25   traders to fill out trading forms using a touch-screen computer system rather than manually on

26   slips of paper.  Ex. 4 at 49; Ex. 7 ¶ 6.  This system was called the Foreign Exchange Front End

27   ("FXFE").  Ex. 7 ¶ 4.  Chemical Bank developed the FXFE system using the "Easel"

28

1  development platform from Interactive Images, Inc.  Ex. 4 at 49; Ex. 7 ¶ 13.  Easel allowed

2  programmers to easily create interactive touch-screen interfaces.  Ex. 4 at 49; Ex. 7 ¶ 13.

3       Although the FXFE system was originally developed at Chemical Bank's offices in the

4  United Kingdom, the FXFE system was brought to the United States by January 1984 for a

5  demonstration to the press.  Ex. 7 ¶ 5-6; Ex. 4 at 49.  Robert Long was the project manager at

6  Chemical Bank who supervised the development of the FXFE system.  Ex. 7 ¶ 4.  Mr. Long

7  demonstrated the FXFE system for Michael Tyler, a reporter from Datamation magazine.  Ex. 7

8  ¶ 6.  This demonstration took place by January 1984 at Chemical Bank's offices in New York.

9  *Id*.  During the demonstration, Mr. Long demonstrated the FXFE user interface features that

10  allowed users to enter data into a currency trading form using on-screen tools.  *Id*.  The

11  demonstration was made without any agreement or expectation of confidentiality.  *Id*.  Indeed,

12  the demonstration was made with the expectation that Mr. Tyler would write an article

13  discussing the FXFE system in Datamation magazine.  *Id*.

14       Shortly after the demonstration, an article by Michael Tyler appeared in the January 1984

15  edition of Datamation magazine describing Chemical Bank's FXFE system.  *See* Ex. 4, Michael

16  Tyler, *Touch Screens: Big Deal or No Deal?*, DATAMATION, January 1984, pp. 146-154 ("the

17  Tyler article").  As described in the Tyler article, Chemical Bank's FXFE system allowed the

18  currency traders to complete currency trading orders by entering information directly on the

19  screen.  *Id*. at 49.  The right-half of the screen displayed a currency trading form that included a

20  number of information fields and labels related to the current transaction including:  buyer bank,

21  seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer,

22  exchange location, and method of payment.  Ex. 7 ¶ 8; Ex. 4 at 49.  When the user touched one

23  of the fields, the label for that field was highlighted, and the left-half of the screen displayed the

24  appropriate tool for entering information into the selected field.  Ex. 7 ¶¶ 8-10; Ex. 4 at 49.  For

25  example, if the user touched the "broker" field, the system displayed a menu tool containing a

26  list of brokers.  Ex. 7 ¶ 11; Ex. 4 at 49.  Then, when the user touched the name of the desired

27  broker in the list, that broker's name was entered into the "broker" field on the right side of the

28  screen.  *Id*.  As another example, if the user touched the "exchange rate" field, the system

1  displayed a numeric keypad that could then be used to enter numeric information into the

2  "exchange rate" field. Ex. 7 ¶ 12l; Ex. 4 at 49. The system also provided an on-screen keyboard

3  that could be used to enter non-standard or rare names. Ex. 4 at 49. This system allowed the

4  user to complete an entire currency trading transaction directly on the computer screen. *Id*.

5      A photograph showing a screen shot of Chemical Bank's FXFE system was included in

6  the Tyler article. Ex. 4 at 50 & 53. In this photograph, the labels for fields including the "Rate,"

7  "Value," "US Rate," "US Value," "Broker," "Customer," and "Location" fields can be seen, as

8  well as the adjacent information fields which contain the information that was entered regarding

9  the current transaction. *Id*. The keyboard appearing on the left-side of the screen is used to enter

10  information into some fields appearing on the right-side of the screen.



24  Ex. 4 at 53. In addition, at the bottom of the screen, certain selection buttons are shown, with the

25  one currently selected by the user, the "SERVICE" button, being highlighted to indicate it has

26  been selected. *Id*. Mr. Long has confirmed that the Tyler article accurately described the

27  operation of the FXFE system. Ex. 7 ¶ 7.

## III.    LEGAL STANDARDS

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322023 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Summary judgment is as appropriate in a patent case as in any other… [C]ourt[s] should utilize the salutary procedure of Fed. R. Civ. P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources." *Barmag Barmer Maschinefabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984). To defeat a summary judgment motion, the opposing party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In this regard, conclusory statements on the ultimate issue of obviousness do not raise "genuine issues of material fact" and will not avoid summary judgment of invalidity. *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997). Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Matsushita Elec.*, 475 U.S. at 587.

A patent claim is invalid if "the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b); *Baxter Int'l, Inc. v. COBE Laboratories, Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996) (affirming summary judgment based on a use of invention in view of others "who were under no duty to maintain it as confidential"). A patent claim is also invalid if "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g); *Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) ("A prior art device can anticipate a claimed invention under § 102(g)(2) if it was conceived and reduced to practice prior to the filing date of the patent").

Under the Patent Statute, a patent claim is also invalid when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in

1    the art to which said subject matter pertains." 35 U.S.C. § 103.  Whether a patent is invalid

2    under § 103 is a question of law and, thus, is amenable to summary judgment.  *See KSR Intern.*

3    *Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1745 (2007) ("*KSR*") citing *Graham v. John Deere Co.*, 383

4    U.S. 1, 17 (1966).

5            The Supreme Court's decision in *KSR Intern. Co. v. Teleflex Inc.* overrules long-standing

6    Federal Circuit precedent that had required a teaching, suggestion, or motivation to combine

7    prior art references.[2]  *See KSR*, 127 S.Ct. at 1739.  In rejecting the Federal Circuit's rigid

8    approach, the Supreme Court set out new standards for determining whether a patent claiming a

9    combination of elements of prior art is obvious.  First, when a work is available in one field of

10   endeavor, design incentives and other market forces can prompt variations of it, either in the

11   same field or a different one.  *See id.* at 1740.  Second, if a person of ordinary skill can

12   implement a predictable variation, § 103 likely bars its patentability.  *See id.*  Third, if a

13   technique has been used to improve one device, and a person of ordinary skill in the art would

14   recognize that it would improve similar devices in the same way, using the technique is obvious

15   unless its actual application is beyond his or her skill.  *See id.*  Thus, in determining whether a

16   patent is obvious, a court must ask "whether the improvement is more than the predictable use of

17   prior art elements according to their established functions."  *Id.*  The Court emphasized that

18   "[t]he combination of familiar elements according to known methods is likely to be obvious

19   when it does no more than yield predictable results."  *Id.* at 1739.  In other words, "when a patent

20   simply arranges old elements with each performing the same function it had been known to

21   perform and yields no more than one would expect from such an arrangement, the combination is

22   obvious." *Id.* at 1740 (citing *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)).  The Court also

23   recognized that "a person of ordinary skill will be able to fit the teachings of multiple patents

24   together like pieces of a puzzle. . . . A person of ordinary skill is also a person of ordinary

25   creativity, not an automaton."  *Id.* at 1742.

26   _____

27          [2] A more complete discussion of the Supreme Court's *KSR* decision is provided in the
     concurrently filed Gateway's Memorandum Of Points And Authorities In Support Of Its Motion
     For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming).  For

28   brevity, that full discussion is not repeated here.

# IV.    ARGUMENT

Claim 19 of the '356 patent is invalid on three separate legal grounds.  First, claim 19 is invalid under § 102(b) based on the public use of the FXFE system more than one year before the filing date of the '356 patent.  Second, claim 19 is invalid under § 102(g) based on the prior invention of the FXFE system before the invention of the '356 patent.  Third, claim 19 is invalid as obvious under § 103 based on the Tyler article either alone or in combination with references showing indicating of the selected field.  In addition, claim 21 is invalid as obvious based on the FXFE system and the Tyler article in combination with references showing the use of handwritten input.  Each of these invalidity grounds are discussed in turn below.

## A.    Claim 19 is Invalid Under § 102(b) Based On The Public Use of the FXFE System More Than One Year Before The Filing Date Of The '356 Patent.

Chemical Bank's FXFE system met all the limitations of claim 19 and was in public use more than one year before the filing date of the '356 patent thereby rendering claim 19 invalid under § 102(b).[3]

### 1.    The FXFE System Was Publicly Used More Than One Year Before The Filing Date of the '356 Patent.

The FXFE system was in public use more than one year before the filing date of the '356 patent as a result of its demonstration to a Datamation magazine reporter without any agreement of confidentiality.  A patent claim is invalid if "the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b); *Baxter Int'l, Inc. v. COBE Laboratories, Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996).  A demonstration to a reporter without any confidentiality obligations constitutes a public use under § 102(b).  *See Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1479-80 (Fed.

---

[3] When the Court reopened prior art discovery in response to the Supreme Court's *KSR* decision on obviousness, the Court recognized that the parties would search for additional prior art.  Ex. 16 at 52:6-18, 48:7-19.  Some of the additional art that was located, such as the FXFE system, was anticipatory prior art.  Nothing in the Court's ruling reopening discovery precludes the parties from arguing that such art anticipates the asserted claims.  Moreover, because "anticipation is the epitome of obviousness," anticipation arguments are properly heard when obviousness is at issue.  *See Johns Hopkins University v. CellPro, Inc.*, 152 F.3d 1342, 1358 n.21 (Fed Cir. 1998) (approving of presenting anticipation arguments during a new trial on obviousness).

Cir. 1986) (finding that the demonstration of a prototype of an invention to a journalist under no promise of secrecy who then published an article constituted a public use). Here, the project manager for the FXFE system, Mr.Long, demonstrated the operation of the FXFE user interface including its on-screen tools to Mr. Tyler, the Datamation magazine reporter. Ex. 7 ¶ 6. This demonstration took place at Chemical Bank's offices in New York by January 1984, which is more than one year before the December 11, 1986 filing date of the '356 patent. *Id*. Further, this demonstration was not subject to any confidentiality agreement. *Id*. The demonstration for Mr. Tyler is corroborated by the Tyler article itself which describes the operation of the FXFE user interface and which was published in January 1984. Ex. 4 at 45; Ex. 8 ¶ 6. Accordingly, this demonstration of the FXFE system constitutes a public use under § 102(b).

### 2. The FXFE System Meets all the Limitations of Claim 19.

As explained below, the FXFE system meets all of the limitations of claim 19.

**[Preamble]     A method for use in a computer having a display comprising the steps of**

The FXFE system was a computer system with a touch-screen display. Ex. 7 ¶ 4-13; Ex. 4 at 49; Ex. 10 ¶63.

**[a]     displaying on said display a plurality of information fields**

The FXFE system included information fields appearing on the right half of the display, such as the broker and exchange rate fields. Ex. 7 ¶ 8, Ex. 4 at 49; Ex. 10 ¶ 64.

Lucent's expert, Mr. Tognazzini, inexplicably argues that the FXFE system does not display any information fields. Ex. 5 at 129:4-22. According to Mr. Tognazzini, an information field is something that the user can select and then enter data into. *See id*. at 242:7-244:17. Even under Mr. Tognazzini's definition of a field, the FXFE system clearly displayed a plurality of fields including the broker and exchange rate fields. Ex. 7 ¶ 8. The user could select one of these fields and then use the broker list to enter data into the broker field or the numeric keypad to enter data into the exchange rate field. *Id*. ¶¶ 11-12. Thus, Mr. Tognazzini's argument is simply meritless.

1

           **[b]**     **identifying for each field a kind of information to be inserted therein**

2

3
       A label, such as "Broker" or "Exchange Rate," appeared next to each field which

indicated the kind of information that was to be inserted into each field.  Ex. 7 ¶ 8; Ex. 4 at 49;
4

Ex. 10 ¶ 65.  The labels and adjacent fields can be seen in the photograph of the Easel system
5

from the article.  Ex. 4 at 50 & 53.
6

7
           **[c]**     **indicating a particular one of said information fields into which**
                       **information is to be inserted and for concurrently displaying a**
                       **predefined tool associated with said one of said fields, said predefined**
8
                       **tool being operable to supply information of the kind identified for**
                       **said one field, said tool being selected from a group of predefined tools**
9
                       **including a tool adapted to supply an individual entry from a menu of**
                       **alternatives and at least a tool adapted to allow said user to compose**
10
                       **said information**

11
       A user could select a field by touching the label for the field.  Ex. 7 ¶ 8 ; Ex. 4 at 49;

12
Ex. 10 ¶ 69.  When the user selected a field by touching the label, the FXFE system provided a

13
visual indication on the screen of the selected field by displaying the label for that field in bold.

14
Ex. 7 ¶ 9; Ex. 10 ¶ 69.  The FXFE system also displayed a tool for entering information into the

15
selected field at the same time.  Ex. 7 ¶ 10; Ex. 4 at 49; Ex. 10 at 70-71.  The FXFE system

16
displayed different tools depending on which field was selected.  *See id*.  Some fields in the

17
FXFE system, such as the 'broker' field described in the Tyler article, caused a list of brokers to

18
appear on the left half of the screen.  Ex. 7 ¶ 11, Ex. 4 at 49.  The user would select the

19
appropriate broker by pointing to the broker's name, and that name would be inserted into the

20
broker field.  *See id*.  Other fields in the FXFE system, such as the exchange rate field, caused a

21
numeric keypad to appear on the left half of the screen.  Ex. 7 ¶ 12; Ex. 4 at 49.  The user would

22
type the number using the numeric keypad and that number would be inserted into the exchange

23
rate field.  *See id*.

24
       Lucent's expert, Mr. Tognazzini, argues that the FXFE system does not satisfy this claim

25
limitation for several reasons.  First, Mr. Tognazzini asserts that the FXFE system does not

26
perform the step of "concurrently displaying a predefined tool" because the broker list and

27
numeric keypad are displayed in a region of the screen that is always present rather than in an

28
overlay window.  Ex. 15 at ¶¶ 7, 54; Ex. 5 at 89:3-15, 232:9-233:9.  However, the Court has

GATEWAY'S MPAS ISO OF ITS MOTION FOR PARTIAL    10          Case Nos. 02-CV-2060 B (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT        03-CV-0699-B (CAB, and 03-CV-41108-B CAB)
NO. 4,763,356 (DAY)

1   already rejected Mr. Tognazzini's interpretation of this claim language.  In ruling on Lucent's

2   motion for summary judgment, the Court held as follows:

> Lucent also argues that the tools in Apple Lisa are not concurrently
> displayed because the numbers pad and tape window are side-by-
> side rather than one overlaying the other.  This argument fails.
> Although the Court provided the definition of concurrently
> displaying to include the example 'as by a window overlaying the
> form,' that phrase is an example of the definition of 'displaying at
> the same time.'  **The Court's construction does not exclude side-
> by-side displays** such as those present in the Apple Lisa.

8   Ex. 3 at 43 n.3 (emphasis added).  Thus, Mr. Tognazzini's argument is meritless.

9       Next, Mr. Tognazzini argues that the numeric keypad is not a predefined tool associated

10   with the exchange rate field because it may be a system-level tool rather than a field-level tool.

11   Ex. 5 at 234:3-14.  In Mr. Tognazzini's view, a system-level tool is a tool that is supplied "whole

12   and complete" by the system, rather than being customized specifically for a field.  *Id.* at 234:15-

13   21.  Mr. Tognazzini asserts that a system-level tool is not "associated" with a field.  *Id.* at

14   234:13-14.  According to Mr. Tognazzini, in order for a tool to be "associated" with a field, that

15   tool must be "significantly modified by the developer" so that it becomes "a unique tool for that

16   developer."  *Id.* at 235:9-236:2; 240:18-241:6.  Mr. Tognazzini refers to such a tool as a "field-

17   level" tool.  *Id.* at 240:18-241:11.

18       However, Mr. Tognazzini's argument is fundamentally flawed for at least two reasons.

19   First, his interpretation is contrary to the Court's construction of this claim language.  The Court

20   construed the phrase "predefined tool associated with said one of said fields" to mean "a tool

21   specified by the system as an appropriate tool for filling in the information called for by that

22   field."  Ex. 2 at 35-36.  The Court's construction does not require that a tool must be customized

23   specifically for a field or that it be "significantly modified by the developer."  In order to satisfy

24   the Court's construction, the tool must simply be able to fill in the information required by a

25   particular field.  Here, the numeric keypad in the FXFE system could be used to fill in the

26   exchange rate field.  Ex. 7 ¶ 12; Ex. 4 at 49.  Accordingly, Mr. Tognazzini's argument fails.

27   Second, even if the Court were to accept Mr. Tognazzini's plainly incorrect interpretation of the

28   claim language, the numeric keypad in the FXFE system satisfies that interpretation.  The

GATEWAY'S MPAS ISO OF ITS MOTION FOR PARTIAL   11       Case Nos. 02-CV-2060 B (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT     03-CV-0699-B (CAB, and 03-CV-41108-B CAB)
NO. 4,763,356 (DAY)

1  numeric keypad was <u>not</u> a system-level tool provided by the operating system or the Easel

2  development environment. Ex. 7 ¶ 13.  Instead, the numeric keypad was a unique tool designed

3  and programmed by the Chemical Bank software team that developed the FXFE application

4  software. *Id.* Thus, the numeric keypad satisfies even Mr. Tognazzini's flawed interpretation of

5  the claim language.  Accordingly, Mr. Tognazzini's arguments regarding this claim limitation

6  are meritless.

7            **[d]        inserting in said one field information that is derived as a result of
                          said user operating said displayed tool.**

8

9            When the broker field was selected and the user pointed to a name in the broker list, that

10 name was inserted into the broker field.  Ex. 7 ¶ 11; Ex. 4 at 49.  Similarly, when the exchange

11 rate field was selected and the user typed a number using the numeric keypad, that number was

12 inserted into the exchange rate field.  Ex. 7 ¶ 12 ; Ex. 4 at 49.

13                          *              *              *

14           Thus, the FXFE system met all the limitations of claim 19 and its public use more than

15 one year before the filing date renders claim 19 invalid under § 102(b).

16 **B.       Claim 19 is Invalid Under § 102(g) Based on the Prior Invention of the FXFE
            System Before The Invention of the '356 Patent.**

17

18 **        1.       The FXFE System was Invented Before the Invention of the '356
                     Patent.**

19           Mr. Long and the FXFE development team at Chemical Bank developed the FXFE

20 system several years before the alleged invention of the '356 patent.  A patent claim is invalid if

21 "before such person's invention thereof, the invention was made in this country by another

22 inventor who had not abandoned, suppressed, or concealed it."  35 U.S.C. § 102(g); *Sandt*

23 *Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001) ("A

24 prior art device can anticipate a claimed invention under § 102(g)(2) if it was conceived and

25 reduced to practice prior to the filing date of the patent").  Here, the evidence shows that

26 Chemical Bank invented the FXFE system by January 1984, which is nearly three years before

27

28

1   the December 11, 1986 filing date of the '356 patent.[4]  Ex. 7 ¶¶ 5-13; Ex. 4 at 45.  A party may

2   establish a prior invention by showing the domestic introduction of an invention originally

3   developed abroad.  *See Holmwood v. Sugavanam*, 948 F.2d 1236, 1238-40 (Fed. Cir. 1991)

4   (holding that although invention was made in Germany, prior invention in this country was

5   shown through evidence that inventor's assignee sent a sample to its research unit in the United

6   States to verify test results); *Maxwell v. K Mart Corp.*, 880 F.Supp. 1323, 1333-34 (D. Minn.

7   1995) ("It is well established that the introduction of a completed invention into the United

8   States may be relied upon for priority purposes even though the invention was conceived and

9   reduced to practice abroad.").  Here, although the FXFE system was originally conceived and

10  reduced to practice in the United Kingdom, the shipment of the system to the United States and

11  the successful demonstration for Michael Tyler in New York by January 1984 constitute both a

12  conception and reduction to practice of the invention in the United States.  *Id.*  The FXFE

13  demonstration showed that the FXFE user interface successfully worked for its intended purpose

14  of allowing users to enter data into a currency trading form using the on-screen tools.  Ex. 7 ¶ 6.

15  Furthermore, the public disclosure of the FXFE system in the Tyler article demonstrates that

16  Chemical Bank did not abandon, suppress, or conceal the invention.  On the contrary, Chemical

17  Bank publicized the invention.  The prior invention of the FXFE system is corroborated by the

18  Tyler article itself which describes the operation of the FXFE user interface and which was

19  published in January 1984.  Ex. 4 at 45.  Thus, the FXFE system is entitled to an invention date

20  at least as early as January 1984, which is well-before the invention of the '356 patent.

21          **2.      The FXFE System Meets all the Limitations of Claim 19.**

22          As explained in Section A.2 above, the FXFE system meets all the limitations of

23  claim 19.

24                          *               *               *

25

26  [4] When a patentee fails to produce any corroborated evidence of an earlier conception or
    reduction to practice, the invention date is the filing date.  *See Mahurkar v. C.R. Bard, Inc.*, 79
27  F.3d 1572, 1577 (Fed. Cir. 1996) (noting that if there were no evidence of an earlier date of
    invention, the "invention date would have been the filing date of [the] patent").  In this case,
28  Lucent has failed to disclose during discovery any evidence corroborating an earlier conception
    or reduction to practice date.

1    Thus, the FXFE system meets all the limitations of claim 19 and its invention before the

2    invention date of the '356 patent renders claim 19 invalid under § 102(g).

3    **C.    Claim 19 is Obvious Based On The Tyler Article Alone or In Combination With References Disclosing Indicating A Selected Field.**

4

5    The Tyler article constitutes a prior art publication that renders claim 19 obvious either

6    alone or in combination with various prior art references that disclose indicating the field

7    selected by a user.  The Tyler article was published more than one year before the filing date of

8    the '356 patent and discloses all of the limitations of claim 19 with the possible exception of

9    indicating a selected field.  As explained below, it would have been obvious to a person of skill

10   in the art to combine the Tyler article with one or more of the prior art reference that showed

11   indicating a selected field.

12   **1.    The Tyler Article Was Published More Than One Year Before The Filing Date Of The Day '356 Patent.**

13

14   The Tyler article qualifies as prior art under 35 U.S.C. § 102(b).  A printed publication

15   constitutes prior art under § 102(b) if it was publicly available more than one year before the

16   filing date of the patent.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342

17   (Fed. Cir. 2005).  In this case, the Tyler article was publicly available in January 1984, almost

18   three years before the December 11, 1986 filing date of the Day patent.  Ex. 4 at 45.  The public

19   availability of the Tyler article in January 1984 is confirmed in several ways.  First, a former

20   editor of Datamation magazine, John Verity, confirms that the January 1984 issue of Datamation

21   was publicly distributed in January 1984.  Ex. 8 at ¶¶ 5-6.  Furthermore, the cover page of the

22   Datamation magazine issue containing the Tyler article indicates a date of January 1984.  Ex. 4

23   at 45.  Finally, the particular copy of the magazine obtained from the University of Texas Library

24   bears a stamp of "Jan. 23 1984."  *Id.*  Thus, the Tyler article clearly constitutes prior art under §

25   102(b).

26

27

28

**2.    The Tyler Article Explicitly Discloses All Limitations Of Claim 19 Except For Indicating The Selected Field.**

As explained below, the Tyler article explicitly discloses all of the limitations of claim 19 except for one feature of the claim which requires the highlighting or some other form of indication of the information field that has been selected by the user.

**[Preamble]    A method for use in a computer having a display comprising the steps of**

The Tyler article explains that the Chemical Bank currency trading system was a computer system with a touch-screen display.  Ex. 4 at 49; Ex. 9 ¶ 28.

**[a]    displaying on said display a plurality of information fields**

The article further explains that the system displayed a plurality of information fields on the screen related to the current transaction including:  buyer bank, seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer, exchange location, and method of payment.  Ex. 4 at 49; Ex. 9 ¶ 29.  Specifically, the article states that "The right half of the screen lists key information about the current transaction, including buyer bank, seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer, exchange location, and method of payment."  *Id.*

**[b]    identifying for each field a kind of information to be inserted therein**

The system also indicated the kind of information to be inserted into each field by displaying a label next to each of these fields.  Ex. 4 at 49; Ex. 9 ¶ 30.  The labels and adjacent fields can be seen in the photograph of the Easel system from the article.  Ex. 4 at 50, 53.

**[c]    indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information**

The article explains that when a user selected a particular field by touching it, the system concurrently displayed on the screen a tool that was appropriate for filling in the information called for by that field.  Ex. 4 at 49.  Specifically, the article states that "[w]hen the trader

1    touches the screen in one of these areas, a list of potentially valid entries or a numeric keypad

2    appears on the left half, inviting the user to choose the information needed on the right." *Id*. The

3    available tools included a menu tool, a number pad tool, and a keyboard tool. Ex. 9 ¶ 37. For

4    example, with respect to the menu tool, the article explains that "when the user hits the 'broker'

5    cell on the right, a list of brokers appears on the left; the trader then hits the name of the broker to

6    be involved in the current trade, and that information is entered into the system." *Id*. With

7    respect to the number pad tool, the article states that "[f]or exchange rates and other numerical

8    data, the user hits the proper cell on the right and then types in the numeric data on the keypad

9    that appears on the left." *Id*. In describing the keyboard tool, the article explains that "A

10   QWERTY layout can be called up on the left for entry of nonstandard or rare names--an

11   infrequently traded currency, for example." *Id*. The keyboard tool is shown on the computer

12   screen in the photograph from the article. *Id*. at 50, 53.

13          The only aspect of this limitation of claim 19 that is not explicitly described by the article

14   in so many words, and is not readily apparent from the photographs in the article, is the

15   highlighting or some other form of indication of the information field which has been selected by

16   the user for data entry. As explained below, such highlighting was well-known in the art and

17   would have been obvious.

18          **[d]**      **inserting in said one field information that is derived as a result of**
                          **said user operating said displayed tool.**
19

20          When the user enters information using either the menu tool, the number pad tool, or the

21   keyboard tool, that information is inserted into the information field on the right side of the

22   screen. Ex. 4 at 49; Ex. 9 ¶ 38. For example, the article explains that "the trader then hits the

23   name of the broker to be involved in the current trade, and that information is entered into the

24   system". Ex. 4 at 49. The photograph from the article shows that the information has been

25   inserted into each of the fields of the currency trading form. *Id*. at 50, 53.

26          **3.**       **Claim 19 is Obvious in View of the Tyler Article Alone or in**
                          **Combination with the Prior Art Discussed in the Buscaino Expert**
27                        **Report.**

28          The Tyler article renders claim 19 obvious either alone or in combination with the prior

1    art discussed in the Buscaino expert report that discloses indicating selected fields.  As noted

2    above, the only feature required by Claim 19 not explicitly mentioned in the Tyler article is the

3    "indicating" of the field selected by the user for data entry by highlighting or other means.  But

4    highlighting such selected fields was common knowledge in the industry, and it would have been

5    obvious to one of ordinary skill in the art to add such a feature if it were missing.[5]  Ex. 10 ¶¶ 72,

6    135.  For example, J.K. Lasser's Your Money Manager program, the Home Accountant program,

7    the Xerox Star system, and Microsoft Windows 1.01 all used cursors or reverse video to indicate

8    to the user which field is active.  *Id.* ¶¶ 46, 72, 127-128.  Moreover, prior art publications

9    teaching user interface design taught the importance of providing visual feedback to the user.  *Id.*

10   ¶¶ 131-133.  For example, one publication specifically encouraged the use of highlighting and

11   reverse video for selected fields in order to make the screens simpler and easier to use.  *Id.* ¶ 133;

12   Ex. 14 at 251.  Moreover, practitioners in the field of Human Computer Interface promoted the

13   use of feedback to increase ease of use.  *Id.* ¶ 135.  Mr. Tognazzini admits that providing an

14   indication of a selected field was already a known technique for user interface design in 1985.

15   Ex. 5 at 223:22-224:14.  Mr. Tognazzini also conceded that there were a variety of known ways

16   to indicate a selected field in 1985 including highlighting the contents of the field in reverse

17   video and using a text cursor.  *Id.* at 224:15-225:5.

18        The advantages of using such indicators for the Chemical Bank system discussed in the

19   Tyler article would have been obvious, and the motivation for using them in Tyler is self-

20   evident:  They let the user see instantly into which of the plurality of fields data will be entered

21   through operation of the tool.  Ex. 10 ¶¶ 73, 135.  Absent some indication, by highlighting or

22   other means, the user would be left uncertain as to which field he was filling in using the on-

23   screen tool.  *See* Ex. 4 at 50-51 (resistive membrane technology inaccurate, a user cannot be

24   certain what has been selected without highlighting).  Mr. Tognazzini acknowledged that in

25   1985, a user interface designer would have recognized that it was desirable to provide an

26

27        [5] A person of ordinary skill in the art would have a bachelor's degree in computer
     science, electrical engineering, or equivalent, and two to three years of technical experience
28   working in the computing industry with data entry systems.  Ex. 9 ¶ 16.

1    indication of the selected field in certain designs. Ex. 5 at 220:16-221:9. For example,

2    Mr. Tognazzini admitted that it was important to provide an indication of a selected field in

3    touch-screen systems where the user might think that they have touched one field, but the system

4    thinks they have touched a different field. *Id.* at 221:18-222:6.

5        Indeed, the Tyler article expressly teaches the desirability of "indicating" or

6    "highlighting" a field on the display chosen by the user because of the physical limitations on the

7    accuracy of touch screens at the time. Specifically, the Tyler article notes that "[u]nless the user

8    sits directly in front of the screen at eye level, the area he thinks he has touched may not be the

9    area he did in fact touch." Ex. 4 at 50. The article expressly teaches that this is a problem found

10   in the resistive membrane technology used by the applications described in the article. *Id.* at 50-

11   51. The Tyler article itself also teaches highlighting features on the display selected by the user,

12   such as the "SERVICE" button shown in the picture in the article. It would have been obvious to

13   anyone, much less one with skill in the art, that if the application described in the Tyler article

14   did not include highlighting the information field selected by the user for data entry, that it would

15   be desirable and easy to do so. Indeed, one would be motivated to highlight the field selected by

16   the user for the same reason that a button for the "SERVICE" function is highlighted – namely,

17   to quickly and clearly let the user know which function or field has been selected and is currently

18   active. Thus, the Tyler article expressly teaches that touch screens are such that a user cannot be

19   certain of what the system concludes he has touched, and the article demonstrates in the

20   photograph (Ex. 4 at 53) that a solution for this is to highlight the field selected by the user.

21       Additionally, the technique of indicating selected fields improved Your Money Manager,

22   Home Accountant, Xerox Star, and Microsoft Windows, and one of ordinary skill in the art

23   would have recognized that the technique would improve similar devices such as that disclosed

24   in the Tyler article in the same way. Ex. 10 ¶ 73. Accordingly, it would have been obvious for

25   the Chemical Bank system described in the Tyler article to highlight or otherwise indicate the

26   selected field into which information would be inserted. *Id.* Furthermore, implementation of the

27   use of indicators would be a simple task. Ex. 10 ¶ 134. Additionally, the use of indicators in

28   claim 19 of the '356 patent perform the same function they had been known to perform and yield

1  no more than one would expect from such an arrangement. *Id.* ¶ 134. Mr. Tognazzini does not

2  dispute this point. Ex. 5 at 225:14-227:14.

3       In summary, the technique of indicating a selected field was already well-known in the

4  art, and the reasons for applying that technique to the Chemical Bank system were readily

5  apparent and had been widely used in touch-screen systems. Indeed, even though the use of

6  indicators was not explicitly mentioned in the Tyler article, the FXFE system did in fact include

7  such indicators. Ex. 7 ¶ 9. Thus, under *KSR*, claim 19 would have been obvious.

8      **D.**    **Claim 21 is Obvious in View of The FXFE System and the Tyler Article in**
               **Combination with References Disclosing Use of Handwritten Input.**

9

10       As noted, claim 21 depends from claim 19 and further requires at least one field be a bit-

11  mapped graphics field. Claim 21 would have been obvious based on the FXFE System and the

12  Tyler article in combination with the prior art discussed in the Buscaino expert reports that

13  accepted handwritten input. Ex. 10 ¶¶ 77-78. The Court construed "bit-mapped-graphics field"

14  to mean "a field into which a user is to enter information by writing on a touch sensitive screen

15  using a stylus." Ex. 2 at 35-36. The Tyler article describes different touch screen technologies,

16  including the "resistive membrane" technology used in the FXFE system. Ex. 4 at 49-51; Ex. 10

17  ¶ 76. It specifically notes that resistive membrane technology is particularly sensitive, and "can

18  replace digitizing tablets," which are tablets on which one can write using a stylus. Ex. 4 at 49.

19  The article specifically notes that resistive membranes can accept "a pen" which plainly is used

20  for "writing" and equates to a "stylus."[6] *Id.* It therefore would have been obvious to combine

21  the FXFE system with prior art references that disclose computer devices that accept handwritten

22  input including the Koalapad, the Apple Graphics Tablet, and U.S. Patent No. 4,757,549 to

23  _____

24      [6] The similarities between the product described in the Tyler article and the Day patent
with respect to the touch panel used is highlighted by the fact that both describe using the exact

25  same touch panel made by the same company. The Tyler article discloses that the Easel's
resistive membrane touch panel "touchable resolution is 960 by 720 pixels, and a resistive

26  membrane touch panel made by Elographics, in Oak Ridge, Tenn., can obtain a touchable
resolution of 4,000 by 4,000 - 16 million distinct touchable areas." Ex. 4 at 49. The '356 patent

27  similarly indicates that the "touchsensitive screen could be, for example, the TIX touch-screen
available from the Elographics Company of Oak Ridge, Tenn." Ex. 1 at 2:37-39.

28

GATEWAY'S MPAS ISO OF ITS MOTION FOR PARTIAL     19     Case Nos. 02-CV-2060 B (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF U.S. PATENT     03-CV-0699-B (CAB, and 03-CV-41108-B CAB)
NO. 4,763,356 (DAY)

1  Machart.  Ex. 10 ¶¶ 77-78.  Each of these references discloses inputting information into a

2  computer using handwriting.  *Id.*  The '356 patent is directed to the use of computers to fill out

3  forms.  *Id.*  Many forms require the signature of the person who completed them. *Id.*  Accepting

4  handwriting input is an obvious solution for the completion of such forms. *Id.*  One of ordinary

5  skill, facing the wide range of needs created by developments in the field, would have seen an

6  obvious benefit in combining the computer system in the Tyler article with handwriting input

7  and implementation of the combination would have been a straightforward task.  *Id.*  Thus, claim

8  21 is invalid as obvious.

9  **E.    The Secondary Considerations of Nonobviousness Do Not Alter The Result**

10         In his expert report, Mr. Tognazzini alleges that there was a "long-felt need" in the

11  industry and that there was a "failure of others" to make the user experience more efficient.

12  Ex. 15 ¶ 113.  However, rather than demonstrating the presence of these secondary

13  considerations, these statements merely reveal that Mr. Tognazzini was unaware of the Easel

14  system that was being used by Chemical Bank, Merrill Lynch, and countless other companies to

15  develop highly efficient user interfaces nearly three years before the filing date of the Day patent.

16  Ex. 4 at 49.  The Tyler article itself demonstrates that others, had already met the need for a

17  system with the claimed tools and had not failed.  Finally, even if Mr. Tognazzini's secondary

18  consideration arguments had any merit, which they do not, secondary considerations cannot

19  overcome a clear showing of obviousness based on the prior art, as is the case here.  *See Brown*

20  *& Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)

21  (finding secondary considerations "cannot overcome the strong evidence of obviousness.").

22  **V.    CONCLUSION**

23         In view of the foregoing, Gateway respectfully requests that the Court grant Gateway's

24  motion for summary judgment of invalidity of claims 19 and 21.

25

26

27

28

1   Dated:   November 30, 2007          DECHERT LLP

2

3                                        By:      /s/ Jonathan D. Baker
                                                  Jonathan D. Baker
4                              .

                                         Attorneys For Defendants And Counterclaimants
5                                        GATEWAY, INC. *et. al.*

6

7   13026036.2

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28