1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., | Case No. 02-CV-2060 B (CAB) consolidated with |
| Plaintiff and Counterclaim-defendant, | Case No. 03-CV-0699 B (CAB); and |
| v. | Case No. 03-CV-1108 B (CAB) |
| GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | **SUPPLEMENTAL EXPERT REPORT OF MR. DALE E. BUSCAINO RE INVALIDITY OF UNITED STATES PATENT NO. 4,763,356** |
| Defendants and Counter-claimants, | |
| and | |
| MICROSOFT CORPORATION, | |
| Intervenor and Counter-claimant. | |
| MICROSOFT CORPORATION, | |
| Plaintiff and Counter-defendant, | |
| v. | |
| LUCENT TECHNOLOGIES INC., | |
| Defendant and Counter-claimant, | |
| LUCENT TECHNOLOGIES INC., | |
| Plaintiffs, | |
| v. | |

Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 140

| | |
|---|---|
| 1 | DELL INC. |
| 2 | Defendant. |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 141

I, Mr. Dale E. Buscaino, have been retained by Microsoft Corporation, Dell Incorporated and Gateway Incorporated (collectively "Defendants") through their counsel to serve in this case as an independent expert. I understand the Complainant in this case to be Lucent Technologies, Incorporated, herein referred to as "Lucent." This supplemental report addresses whether U.S. patent No. 4,763,356 ("the '356 patent") is valid.

1. As explained below, I believe that claims 19 and 21 of the '356 patent are invalid.

## I. QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

2. The details of my education and work experience are set forth in my report entitled "Expert Report of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356" served in this case.

### 1. Prior Testimony

3. The details of my prior testimony are set forth in my March 31, 2006 report entitled "Expert Report of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356" served in this case.

### 2. Compensation

4. My consulting services are being provided at an hourly rate of $275.00. I have previously worked as an independent consultant and expert witness on behalf of companies that have been involved in intellectual property disputes. My compensation does not depend either on the conclusions I reach or the outcome of this case.

## II. INFORMATION RELIED UPON

5. In forming my opinions, I rely on my knowledge and experience noted above. I also rely on the documents and information referenced and cited in this report and in my previously submitted reports (which are hereby incorporated by reference in their entirety): "Expert Report of Mr. Dale E. Buscaino Re Invalidity of United States Patent No. 4,763,356," of March 31, 2006, "Expert Report of Mr. Dale E. Buscaino re Non-Infringement of United States Patent No. 4,763,356," of May 12, 2006, "Expert Report of Mr. Dale E. Buscaino re Secondary

1

Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 142

Considerations of Non-Obviousness Regarding United States Patent No. 4,763,356, May 30, 2006.[1]

6. I have reviewed the documents identified in attached Exhibit 1 (Materials Considered). These are the documents upon which I am basing my opinions. I may, if appropriate, cite to these documents for additional support for any of my opinions, beyond what I expressly cite in this report.

7. I have reviewed the March 2, 2004 "Amended Order Superseding the Order of October 29, 2003, Construing Claims For Patent Number 4,763,356," ("Claim Construction Order") as well as transcripts of the Markman hearing relating to the '356 patent that took place on September 22 and 23, 2003. In the preparation of this report, I adhered to the claim construction of the '356 patent as set forth in the Court's Claim Construction Order which I have attached as Exhibit 2, and also applied the parties' respective constructions in the one instance discussed below where the Court has indicated that it may change its construction.

8. I understand that claim construction is ultimately a matter for the Court to decide I reserve the right to supplement or modify my opinions and this report based upon any further claim construction by the Court. My opinions, as expressed herein, are based on the Court's claim construction and my opinion as to the proper interpretation of the Court's construction of the claims asserted in this case.

9. I have reviewed the reports of Lucent's expert Mr. Bruce Tognazzini, including all exhibits as well as documents and materials referenced therein.

10. To the extent not already reflected in Exhibit 1, I have reviewed all other documents discussed or cited in this report, and reserve the right to make additional references to those documents at trial as the need may arise.

### III. RELEVANT LEGAL PRINCIPLES

11. I will not offer opinions of the law as I am not an attorney. However, I am informed of several principles concerning patent validity and invalidity, which I used in arriving at my conclusions.

---

[1] References to "report" include any exhibits thereto.

2                                               Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 143

12. I understand that invalidity must be proven by clear and convincing evidence, and that is the standard I have used throughout my report. Further, I understand that each patent claim is considered separately for purposes of invalidity.

13. I am informed that a patent claim is invalid as "anticipated" if each and every feature of the claim is found in a single prior art reference or product.

14. I understand that a patent claim is invalid as "obvious" if, in view of a prior art reference or a combination of prior art references, it would have been obvious to a person of ordinary skill in the art at the time of the invention, taking into account:

  the scope and content of the prior art;

  the differences between the prior art and the claim under consideration;

  the level of ordinary skill in the art.

15. I am informed that prior art references or products may be combined to show that a claim as a whole would have been obvious to a person of ordinary skill in the art at the time of the invention if there is a "motivation," "suggestion," or "teaching" in the prior art to combine the references to produce the claimed invention. I am informed that the suggestion or motivation may be either explicit or implicit, may come from knowledge generally available to one of ordinary skill in the art, and may come from the nature of the problem to be solved. The test for an implicit motivation, suggestion, or teaching is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art. The problem examined is not the specific problem solved by the invention but the general problem that confronted the inventor before the invention was made.

16. I understand that Lucent claims to have made the invention of the '356 patent by March 22, 1985.[2] I am informed that prior art is to be analyzed, as stated above, from the perspective of "one of ordinary skill in the art" who would be involved in data entry systems. In my opinion, "ordinary skill in the art" in data entry systems in 1985 would typically minimally include a bachelor's degree in either computer science, electrical engineering, or equivalent and

---

[2] In this report, I am assuming that Lucent claims to have made the invention on that date. However, I do not mean suggest that Lucent's statement is true.

two to three years of technical experience working in the computing industry with data entry systems. Such a person would have been familiar with and able to understand data entry arrangements as described in the '356 patent.

**OPINIONS AND BASES FOR THOSE OPINIONS**

### IV. SUMMARY OF OPINIONS

17. If called as an expert witness in this case, I expect that my testimony may concern, among other topics addressed below, the relationship between claims 19 and 21 of the '356 patent, on the one hand, and certain prior art references, on the other hand. Based upon my review, it is my opinion that each of claims 19 and 21 of the '356 patent is anticipated and/or rendered obvious by various prior art references. My specific analysis regarding the prior art is contained in this report and in my expert reports of March 31, 2006 and May 30, 2006.

18. I may testify regarding, among other topics, the state of the industry up to and through December 11, 1986, the filing date of the '356 patent. My anticipated testimony may be affected by the positions Lucent takes with respect to the interpretation and application of the asserted claims, in the context of the accused products as well as the prior art.

### V. TECHNOLOGY BACKGROUND OF THE '356 PATENT

19. I expect to provide a tutorial on the technology of the patent and the prior art at the trial as described in my expert report of March 31, 2006.

20. The '356 patent relates to work its inventors allegedly did on a project and device called "Slate." *See* December 20, 2005 Deposition of Gillon ("Gillon Depo.") at 50:18-51:1. The Slate project was a project to use a personal computer to provide automation for the trading floor of a Wall Street trading firm, Solomon Brothers. *Id.* at 24:16-25:1. Slate devices were deployed onto Solomon Brothers' trading floor. *Id.* at 42:15-42:21.

### VI. THE ASSERTED CLAIMS

21. I am informed that Lucent asserted claims 1, 2, 4, 6, 7, 10-13, 15, 16, 19, and 21 of the '356 patent. I am further informed that summary judgment of non-infringement was granted with respect to claims 1, 2, 4, 6, 7, 10-13, 15, and 16. Therefore, this report addresses only the remaining asserted claims 19 and 21.

22. I understand that the Court has construed the asserted claims of the '356 patent, and, as stated above, I have reviewed the Court's construction. I also understand that the Court has stated that it would consider the issue of whether the display of the tool must be automatic. Specifically, Microsoft's proposed claim construction for the claim language "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields" is "indicating a particular one of said information fields into which information is to be inserted and, simultaneous with the appearance of the indicator in the field, automatically bringing up a predefined tool associated with said one of said fields." I understand that Lucent contends that the only portion of that phrase that requires construction is "concurrently displaying," and that it should be construed to mean "displaying at the same time, as by a window overlaying the form."

23. In this report, I compare the elements of claims 19 and 21 of the '356 patent with the prior art in light of my knowledge of ordinary skill in the art. I discuss each prior art reference as it would be understood by one of ordinary skill in the art, not by one of extraordinary skill.

## VII. OPINIONS ON VALIDITY

24. Claims 19 and 21 of the '356 patent are anticipated by Michael Tyler, *Touch Screens: Big Deal or No Deal?*, DATAMATION, January 1984, pp. 146-154 ("Tyler").

25. To the extent that claims 19 and 21 of the '356 patent require tools that are automatically displayed, those claims are also obvious in light of either Home Accountant on the Macintosh, or Star, in combination with either of the following references:

- Japanese Patent Application No. 61-187024;
- United States Patent No. 4,725,694

### A. Anticipation Analysis

**1. Michael Tyler, Touch Screens: Big Deal or No Deal?, Datamation, January 1984, pp. 146-154**

26. Tyler describes a system called "Easel" to be used by traders on the Chemical Bank foreign exchange trading floor to automate the process of entering trades into the bank's computers. *See* Ex. 3, p. 148, MSLT_1228720.

27. Tyler anticipates claims 19 and 21 of the '356 patent, as follows:

**(a) Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"**

28. Tyler discloses a method for use in a computer having a display. Easel is a computer workstation used by Chemical Bank, that is a "hardware/software combination" that includes "a color monitor with a touch-sensitive screen." *Id* at p. 146, MSLT_1228719; *see also* p. 152, MSLT_1228724, photograph of Chemical Bank's Easel computer workstation. The Easel system performs the steps below.

**(b) Claim 19 – Element 1 "displaying on said display a plurality of information fields,"**

29. Easel displays a plurality of information fields on the color monitor. The Easel workstation allows the user to declare the current transaction a "buy" or a "sell." The screen displays a plurality of information fields related to the current transaction: "[t]he right half of the screen lists key information about the current transaction, including buyer bank, seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer, exchange location, and method of payment." *Id.* at p. 148 MSLT_1228720; *see also* p. 152, MSLT_1228724, photograph of Chemical Bank's Easel computer workstation displaying a form having a plurality of fields on the right half of the screen.

**(c) Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"**

30. Easel also identifies for the fields the kind of information to be inserted in the fields. Fields on the screen have labels that indicate the type of information to be inserted into the field. Tyler calls these fields "cells," for example, "the 'broker' cell." *Id.* at p. 148. The labels indicate the kind of information to be inserted, including "buyer bank, seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer, exchange location, and method of payment." *See id.* at p. 148, MSLT_1228720; *see also* p. 152, MSLT_1228723, photograph of Chemical Bank's Easel computer workstation displaying the fields described including, for example "Broker" and "Customer."

(d) **Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"**

31. I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

32. I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

33. I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

34. As discussed above, I further understand that construction of this limitation is under consideration by the Court. It is my opinion that this limitation is met by Tyler under either Microsoft's or Lucent's proposed construction.

35. Predefined tools associated with the fields are automatically brought up. "When the trader touches the screen in one of these areas [on the right half of the screen listing information about the transaction], a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to chose information needed on the right." Ex. 3, p. 148, MSLT_1228720.

36. Tyler discloses numerous indicators displayed on the screen. *See id.*; *see also* p. 152, MSLT_1228724. Tyler further discloses a plurality of fields to be filled in. *See id.* From the perspective of a person of skill in the art, I understand Tyler to teach indication to the user of which of the plurality of fields is the "active" one into which information is to be inserted. To the extent that Lucent contends that indicating the particular field into which information is to be inserted is not disclosed, not only would I consider that an improper and unreasonably narrow interpretation of the reference, but it also clearly would have been obvious to one of skill in the art to do so. For example, the Home Accountant program and the Xerox Star system discussed in my first invalidity report both have screens that, like Easel, display a plurality of fields. Indeed, Home

Accountant, like Easel, is directed to the same field, namely, forms with multiple data-entry fields to record financial transactions. Both Home Accountant and Star use cursors in the fields to indicate to the user which field is active, at the same time that the tool is displayed. The advantages of such indicators for Easel would have been obvious, and the motivation for using them in Easel is self-evident: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool. Thus, Tyler, both alone and in combination with either Home Accountant or Star, discloses a concurrent display of tools and indicators, in accordance with Lucent's proposed construction ("displaying at the same time, as by a window overlaying the form"). It also meets Microsoft's proposed construction ("indicating a particular one of said information fields into which information is to be inserted and, simultaneous with the appearance of the indicator in the field, automatically bringing up a predefined tool associated with said one of said fields"), since, as noted above, the tools are automatically brought up upon the user's selection of the field.

37. Tools available for use in filling out these fields include menus of alternatives. "For instance, when the user hits the "broker" cell on the right, a list of brokers appears on the left." The Easel system also includes composition tools. "For exchange rates and other numerical data, the user hits the proper cell on the right and then types in the numeric data on the keypad that appears on the left." *Id.* Easel also allows user to select a composition tool or a menu tool; specifically, Tyler also describes a keyboard that can be called up "for entry of nonstandard or rare names." *Id.*

(e) Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

38. Information from the user's operation of the tool on the left half of the screen is inserted by Easel in the field on the right half. "When the trader touches the screen in one of these areas, a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to chose information needed on the right." *Id.* at p. 148, MSLT_1228720. "For exchange rates and other numerical data, the user hits the proper cell on the right and then types in the numeric data on the keypad that appears on the left. In this way, an entire transaction can be completed directly on the workstation." *Id.*

**(f) Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."**

39. I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

40. The Easel system included a "resistive membrane" touch panel (a "touch-sensitive screen"). Tyler discusses the advantages of resistive membrane technology over other touch-screen technology. "The resolution – how many distinct areas the user can touch – differs dramatically for each approach....Resistive membrane touch panels...offer significantly higher resolutions, to the point where they can replace digitizing tablets." *Id.* at p. 148, MSLT_1228720.

41. Tyler discloses that the Easel's resistive membrane touch panel "touchable resolution is 960 by 720 pixels, and a resistive membrane touch panel made by Elographics, in Oak Ridge, Tenn., can obtain a touchable resolution of 4,000 by 4,000 – 16 million distinct touchable areas." *Id.* The '356 patent similarly indicates that the "touchsensitive screen could be, for example, the TIX touch-screen available from the Elographics Company of Oak Ridge, Tenn." '356 patent, col 2:37-2:39. Tyler further notes that resistive membrane techniques can accept input from a finger, *a pen*, or any other device. Ex. 3, p. 148, MSLT_1228720.

**(g) Conclusions**

42. As described above, Tyler anticipates claims 19 and 21 of the '356 patent. Tyler discloses each and every one of the steps of claim 19 and its dependant claim 21. If Tyler does not anticipate claims 19 and 21 of the '356 patent, it clearly renders each claim obvious.

**B.   Obviousness Analysis**

43. As stated above and in my expert report of March 31, 2006, I conclude that claims 19 and 21 of the '356 patent are invalid over the prior art as having been obvious, and there is a "suggestion" or "motivation" in the prior art to combine the prior art references to produce the arrangement of elements in the claim.

44. The claims of the '356 patent are rendered obvious by a number of references. In addition to the combinations discussed in my expert report of March 31, 2006, if claims 19 and 21 require that tools be displayed automatically in accordance with Microsoft's proposed

construction, those claims are rendered obvious at least by each of the references previously discussed in combination with one or more of the following references:

    **(a) Japanese Patent Application No. 61-187024**

        i. **Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"**

45. Japanese Patent Application No. 61-187024 ("Sasaki") discloses a data processing device to facilitate a user's entry of data into fields. Sasaki (English translation) at 3, MSLT_1073811; *see also* 7, MSLT_1073815.

        ii. **Claim 19 – Element 1 "displaying on said display a plurality of information fields,"**

46. Sasaki discloses displaying a plurality of fields, which Sasaki calls "item entry fields." *Id.* at 3, 48, MSLT_1073811; see also 7, MSLT_1073816.

        iii. **Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"**

47. The item entry fields have field identifiers, called "guides," for example "train names." *Id.*

        iv. **Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"**

48. Sasaki discloses indicating a field into which information is to be inserted using a cursor, and concurrently displaying a tool adapted to supply information for that field from a menu of alternatives. *Id.* at 4, MSLT_1073812. When a cursor is placed in an entry field, the various menu items that can be selected are displayed. *Id.*

49. Furthermore, the data entry device disclosed in Sasaki "can automatically display the selected item based on the type of item entry field on the screen." *Id.* at 7, MSLT_1073815. Specifically, when a cursor is placed in a field, the various items that can be selected for that field are automatically displayed on a second screen. When the user selects one of the items, the

selected item is transferred, entered and displayed in the item entry field. *Id.* at 4, MSLT_1073811.

50. Sasaki therefore discloses "indicating a particular one of said information fields into which information is to be inserted and, simultaneous with the appearance of the indicator in the field, automatically bringing up a predefined tool associated with said one of said fields." Thus this satisfies Microsoft's proposed construction for the first half of this element.

51. Sasaki does not disclose a tool adapted to allow the user to compose information. However, it would have been obvious to one of skill in the art to combine the teaching of Sasaki with the composition tools disclosed by other prior art references including Easel, discussed above, or Home Account or Xerox Star, discussed in my opening report.

52. For example, Sasaki discloses an embodiment that allows the user to fill out a form requiring train names and train station names. For example, "[t]he names of trains in this example are Hikari, Kodoma, Yamabiko, Aoba, Asahi, And Toki." *Id.* Any lists of alternatives provided by the system will need to be updated periodically. A composition tool is an obvious solution for a list that has become out of date, or otherwise does not include the user's desired information, as expressly stated in Tyler: "[a] QWERTY layout can be called up on the left for entry of nonstandard or rare names – an infrequently traded currency, for example." Ex. 3, p. 148, MSLT_1228720.

53. So too is such a modification of Sasaki obvious from Home Accountant and Xerox Star. These references are each in the same field of endeavor. The tools described and illustrated in the '356 patent are examples of what is known as a "graphical user interface." Home Accountant and Star all made early use of a graphical user interface. The purpose of such an interface is to facilitate input of data into computers by allowing users to avoid typing by selecting and manipulating graphical images, and the on-screen keyboard in each provides the user the flexibility to enter whatever information he or she desires, even if not on a list of pre-selected menu items. Sasaki is also directed to the facilitation of data entry through the use of graphical forms and tools.

### v. Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

54. Sasaki discloses inserting the user's selection from the menu of alternatives into the selected field. For example, when the train name "Hikari" is selected from the list of alternative train names, the name "appears in the item entry field." Sasaki at 4-5, MSLT_1073812-MSLT_1073813.

### vi. Other Obvious Combinations.

55. It also would have been obvious to modify both Home Accountant and Star to include the automatic feature of Sasaki, under Microsoft's proposed construction.

56. The tools disclosed by Home Accountant and Star are left on the screen even when they are not in use. Even with just one or a few tools, doing so takes up screen area and may create a cluttered appearance. The advantage of bringing up tools automatically is obvious; the tool is there only when it is in use, and does not distract the user when it is not. As the number of tools available for use in a given program increases, the advantage of automatic tools becomes even more apparent. Moreover, as was discussed above each of these reference is in the same field of endeavor as each other and as the '356 patent.

### (b) United States Patent No. 4,725,694

#### i. Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"

57. United States Patent No. 4,725,694 issued to Carol M. Auer, et al. ("Auer") discloses a computer interface device that incorporates a touch-sensitive screen. *See* Auer, Abstract.

#### ii. Claim 19 – Element 1 "displaying on said display a plurality of information fields,"

58. The touch-sensitive screen displays a plurality of fields. *See* Auer, col. 4:3-4:19, Fig. 6.

#### iii. Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"

59. The fields on the touch-sensitive screen have field identifiers. *Id.* "Across the top of the display of FIG. 6 appears identifying information concerning the particular patent." *Id.* at col. 4:6-4:8. Examples illustrated include "TIME DONE," "TEMP," "PULSE." *Id.* at FIG. 6.

> iv. **Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"**

60. Auer discloses tools that are displayed on a portion of the touch-sensitive screen. *Id.* at col. 1:42-1:45. Simulated keyboards are operated by the user touching the keys on the screen. *Id.*, Abstract. Keyboards as well as a numerical keypad are "entirely under the control of software in a digital computer and hence can be called up automatically in response to computer-driven signals. In this way, the standard simulated keyboard is displayed only when alphabetic input is appropriate, a numerical key pad is displayed only when numeric input is appropriate." *Id.* at col. 2:8-2:18. Auer therefore also discloses "automatically bringing up a predefined tool associated with said one of said fields."

61. Auer discloses numerous indicators displayed on the screen. *Id.* at FIG. 6. Auer further discloses a plurality of fields to be filled in as discussed above. *Id.* From the perspective of a person of skill in the art, I understand Auer to teach indication to the user of which of the plurality of fields is the "active" one into which information is to be inserted. To the extent that Lucent contends that indicating the particular field into which information is to be inserted is not disclosed, not only would I consider that an improper and unreasonably narrow interpretation of the reference, but it also clearly would have been obvious one of skill in the art to do so. For example, the Home Accountant program and the Xerox Star system discussed in my first invalidity report both have screens that, like Auer, display a plurality of fields. Both Home Accountant and Star use cursors in the fields to indicate to the user which field is active, at the same time that the tool is displayed. The advantages of such indicators for Auer would have been obvious, and the motivation for using them in Auer is self-evident: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool. Thus, Auer, both alone and in combination with either Home Accountant or Star, discloses a concurrent display of tools and indicators, in accordance with Lucent's proposed construction ("displaying at

13                                        Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 154

1  the same time, as by a window overlaying the form"). It also meets Microsoft's proposed
2  construction ("indicating a particular one of said information fields into which information is to be
3  inserted and, simultaneous with the appearance of the indicator in the field, automatically bringing
4  up a predefined tool associated with said one of said fields"), since, as noted above, the tools are
5  automatically brought up upon the user's selection of the field.

6      62. Auer notes that the prior art includes touch-sensitive displays that allow the user to
7  select a command to be executed from a menu of alternatives. Auer at col. 1:28-1:29. Auer does
8  not describe tools adapted to supply an individual entry from a menu of alternatives to be input
9  into a field. However, it would be obvious to one of skill in the art to combine the teaching of
10 Auer with the menus of alternatives disclosed by other prior art references including Easel,
11 discussed above, or Home Account or Xerox Star, discussed in my opening report.

12     63. Auer discloses an embodiment that allows the user to fill out a form that records
13 patient's vital signs. The device is intended to be portable and is to be used as an electronic
14 clipboard. The advantages of lists of alternatives in such a device would have been obvious. The
15 user can enter information more efficiently with a list of alternatives than, for example, with the
16 disclosed simulated "q-u-e-r-t-y" keyboard, using only one hand while supporting the device with
17 the other hand. As stated in Tyler, the QWERTY layout is an alternative to the menu tools: "[a]
18 QWERTY layout can be called up on the left for entry of nonstandard or rare names – an
19 infrequently traded currency, for example." Ex. 3, p. 148, MSLT_1228720.

20     64. The kind of information being gathered makes the advantages of lists of alternatives
21 even more apparent. The data to be input into some these fields, "TEMP" for example, is likely to
22 be within discrete ranges. As such, the number of possible choices is not very great and a list of
23 alternatives would be relatively short.

24     65. Thus there is a motivation to combine the menus of alternatives disclosed in Easel,
25 Home Accountant or Xerox Star with this reference to facilitate data input using only one hand.
26 Auer is in the same field of endeavor as these three references, in that all are directed to interfaces
27 that facilitate input of data into computers by allowing users to avoid typing on a physical
28 keyboard, specifically by instead selecting items on the display.

> v. **Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."**

66. Auer discloses inserting the information from the tool into the field. *See* Auer at col. 4:3-4:27.

> vi. **Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."**

67. As was noted above, I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

68. Auer discloses the user of touch-sensitive screens which Auer notes are "well-known in the art." Auer at col. 3:13-3:15. Auer describes entering information using the user's finger. Touch screens that accepted input from a stylus were also well known in the art. *See, e.g.* Tyler p. 148, MSLT_1228720. To the extent that Lucent contends that writing on a touch sensitive screen using a stylus is not disclosed, it clearly would have been obvious to one of skill in the art to do so. For example, Tyler discloses that fingers and pen are alternative input sources for touch screens. Ex. 3, p. 148, MSLT_1228720. The advantages of the use of a stylus for certain applications are obvious. The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen, which is desirable where precision is at issue. Auer discloses a form with numerous input fields. As the number of fields displayed increases, and the size of the fields decreases, selection of the fields using a stylus becomes even more advantageous.

> vii. **Other Obvious Combinations.**

69. It also would have been obvious to modify both Home Accountant and Star to include the automatic feature of Auer under Microsoft's proposed construction.

70. The tools disclosed by Home Accountant and Star are left on the screen even when they are not in use. Even with just one or a few tools, doing so takes up valuable screen area and may create a cluttered appearance. The advantage of bringing up tools automatically is obvious; the tool is there only when it is in use, and does not distract the user when it is not. As the number of tools available for use in a given program increases, the advantage of automatic tools becomes

15                                          Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 156

Case 3:07-cv-02000-H-CAB   Document 70-12   Filed 11/30/2007   Page 18 of 20

even more apparent. Moreover, as was discussed above each of these reference is in the same field of endeavor as each other and as the '356 patent.

## ADDITIONAL ANALYSIS AND OPINIONS

71. I reserve the right to supplement my report in light of any additional fact discovery, opinions by Plaintiff's experts, and/or trial testimony. I also reserve the right to provide rebuttal opinions and testimony in response to Plaintiff's experts, and rebuttal testimony in response to any of Plaintiff's fact witnesses. Further, I reserve the right to use animations, demonstratives, enlargements of actual exhibits, and other information in order to illustrate my opinions.

72. At trial, I expect to demonstrate and testify about the prior art I have described in my report using actual physical computers and computer systems. In this way, I will demonstrate how the prior art anticipates and/or renders obvious the purported inventions in the asserted claims. I reserve the right to demonstrate other prior art not listed here.

73. I expect to continue to develop my opinions discussed in this report. I also reserve the right to supplement my opinions based on information obtained from additional discovery or from Plaintiff's experts, as indicated above.

74. I declare under penalty of perjury under the laws of the United States of America that the foregoing report on behalf of Defendant is true and correct.

Dated: April 10, 2007

Respectfully submitted,

By. _____
Mr. Dale E. Buscaino

Exhibit 9
Page 157

## PROOF OF SERVICE

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

On April 10, 2007, I caused a copy of the following document(s):

**SUPPLEMENTAL EXPERT REPORT OF MR. DALE E. BUSCAINO RE INVALIDITY OF UNITED STATES PATENT NO. 4,763,356**

to be served on the interested parties in this action as follows:

| | |
|---|---|
| Alison P. Adema<br>Hahn & Adema<br>501 West Broadway, Suite 1600<br>San Diego, CA 92101<br>Telephone: (619) 235-2100<br>Facsimile: (619) 235-2101<br>*VIA FACSIMILE & ELECTRONIC MAIL* | Attorneys for Plaintiffs<br>LUCENT TECHNOLOGIES INC. and<br>MULTIMEDIA PATENT TRUST<br><br>Email: aadema@hahnadema.com |
| David J. Zubkoff<br>Seltzer, Caplan, McMahon & Vitek<br>2100 Symphony Towers<br>750 B Street, Suite 2100<br>San Diego, CA 92101<br>Telephone: (619) 685-3003<br>Facsimile: (619) 702-6827<br>*VIA FACSIMILE & ELECTRONIC MAIL* | Attorneys for Defendants<br>GATEWAY, INC. and GATEWAY<br>COUNTRY STORES LLC<br><br>Email: zubkoff@scmv.com |
| James S. Blackburn<br>Arnold & Porter LLP - (L.A.)<br>777 S. Figueroa Street, 44th Floor<br>Los Angeles, CA 90017<br>Telephone: (213) 243-4000<br>Facsimile: (213) 243-4199<br>*VIA FACSIMILE & ELECTRONIC MAIL* | Attorneys for Defendant<br>DELL INC.<br><br>Email: james_blackburn@aporter.com |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct. Executed on April 10, 2007, at San Diego, California.

*/s/ Susan Gonzales*
Susan Gonzales

18   Case No. 02-CV-2060 B (CAB)

Exhibit 9
Page 158

**COURTESY COPIES BY ELECTRONIC MAIL TO:**

Trial Counsel For Lucent and Multimedia Patent Trust:
John M. Desmarais/Alan Kellman/Paul Bondor/Gregory Corbett
Kirkland & Ellis LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
E-mail:    jdesmarais@kirkland.com; akellman@kirkland.com; pbondor@kirkland.com; gcorbett@kirkland.com

Trial Counsel for Gateway:
Bryan Farney / Steven R. Daniels / Jeffrey B. Plies / Lawrence Fluker
DECHERT LLP
300 W. Sixth Street, Suite 1850
Austin, TX 78701
Email:    bryan.farney@dechert.com; steven.daniels@dechert.com; jeff.plies@dechert.com; lawrence.fluker@dechert.com

Trial Counsel for Dell:
Ali R. Sharifahmadian, Esq.
Matthew Bathon, Esq.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
E-mail:    ali_sharifahmadian@aporter.com; Matthew_Bathon@aporter.com

Trial Counsel for Dell:
Joel Freed, Esq.
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Email:    jfreed@mwe.com

Courtesy Emails include:

| [X] | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |
| [ ] | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email, except for exhibits. Exhibits were over 50 pages long. As per our service agreement, a hard copy will follow via overnight mail |