## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES, INC., )
)
      Plaintiff, )
)
      v. )
)
GATEWAY, INC.; GATEWAY COUNTRY )
STORES LLC; MICROSOFT )
CORPORATION; AND DELL, INC., )
)
      Defendants. )
)

**Case No. 02-CV-2060-B (CAB),
consolidated with Case No. 03-CV-
0699-B (CAB) and Case No. 03-
CV-1108-B (CAB)**

## EXPERT REPORT OF BRUCE TOGNAZZINI RELATING TO THE SECOND SUPPLEMENTAL EXPERT REPORT OF DALE BUSCAINO RE LUCENT'S DAY PATENT

      1.    I have been retained as a technical expert in this case by Lucent Technologies Inc. ("Lucent") to provide my opinions regarding the contentions put forth by Microsoft Corporation, Gateway, Inc., and Dell, Inc. regarding the validity and other technical matters concerning certain claims of U.S. Patent No. 4,763,356 ("the '356 patent").

## I.    QUALIFICATIONS AS AN EXPERT

      2.    My background and qualifications are set forth in my infringement report.

      3.    I have not provided testimony in other matters over the past 4 years.

## II.    SCOPE OF STUDY AND OPINION

### A.    Documents and Information Considered in Forming Opinions

      4.    In addition to the materials listed in my prior reports, I reviewed and considered all the materials cited in Mr. Buscaino's Second Supplemental Expert Report, including the written materials, devices, systems and software.

      5.    I understand that the Defendants have recently identified in their 5th Supplemental Initial Disclosures a number of individuals, namely Michael Tyler, John Verity,

**EXHIBIT 15
PAGE 257**

David Kessler, Robert Long, John Annaloro, and Steven Foster, that Defendants represent potentially have knowledge regarding the validity of the '356 patent. I note that Mr. Buscaino relies on a conversation with one of those individuals, Mr. Robert Long, in coming to his opinions. Lucent has on several occasions attempted to arrange for me to speak with Mr. Long and the other individuals. I understand that Defendants will make Mr. Long and the other individuals available for deposition. Should Mr. Buscaino be allowed to rely on any of the information from these recently identified individuals, including Mr. Long, I reserve the right to supplement my report as appropriate after the respective depositions.

6.     Further with respect to the '356 patent, my opinions and analysis are based upon a review of the '356 patent, the file history for the '356 patent, the prior art cited in the file history, the Buscaino Report regarding the '356 patent ("the Buscaino Report"), the Supplemental Buscaino Report ("the Supplemental Buscaino Report"), and the materials identified in the Buscaino Report and the Supplemental Buscaino Report. I also relied upon the claim interpretations provided by the Court in the Court's March 1, 2004 Claim Construction Order, and the Court's April 17, 2007 Claim Construction Order Clarifying and Superceding the Order of March 1, 2004 which does not change the substance of the Court's prior claim construction.

7.     I have reviewed the May 15, 2007 Order denying Plaintiff's and Defendant's Cross-Motions Regarding the Invalidity of U.S. Patent No. 4,763,356, and I do not think that the Court's Order changed, amended or clarified any of the constructions of the terms at issue for the '356 patent, including the term "concurrently displaying." The March 1, 2004 Claim Construction Order construes the claims, and the April 17, 2007 Claim Construction Order "does not change the substance."

**EXHIBIT 15**
**PAGE 258**

2

**B.     Exhibits to Be Used as a Summary or Support for the Opinions**

8.     At trial I expect to rely upon materials and documents produced in this litigation and various other documents that the parties have exchanged, such as interrogatory responses. I also may rely on visual aids and demonstrative exhibits that I may prepare or have prepared based on these materials, including by way of example, figures and excerpts from the '356 patent, claim charts, deposition testimony, diagrams and other graphical presentations describing the technology relevant to the '356 patent and the design, operation and functions of the accused products I have been asked to analyze. I also plan to rely on demonstrations of the actual devices, systems, and software cited in Mr. Buscaino's reports.

9.     I traveled to San Diego on April 26, 2006 from San Francisco, CA to examine certain actual devices, systems, and software relied upon by Mr. Buscaino or cited specifically in his reports. I have also independently examined certain actual software relied upon by Mr. Buscaino.

**C.     Summary of Opinions**

10.     I understand that based upon certain rulings in this case that only claims 19 and 21 remain at issue at this time. Accordingly, I analyze only claims 19 and 21 below.

11.     It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of J.K. Lasser's Your Money Manager alone or in combination with any of the other cited references.

12.     It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of Tyler (or any system allegedly described therein) alone or in combination with any of the other cited references.

13.     It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of U.S. Patent No. 4,756,706 alone or in combination with any of the other cited references.

14.    It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of Japanese Patent Publication No. JP 60-50589 alone or in combination with any of the other cited references.

15.    It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of what Mr. Buscaino refers to as References That Disclose Indicating Information Fields alone or in combination with any of the other cited references.

16.    It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of what Mr. Buscaino refers to as References That Disclose Menu Tools alone or in combination with any of the other cited references.

17.    It is my opinion that claims 19 and 21 of the Day '356 patent are not invalid in light of what Mr. Buscaino refers to as References That Disclose Composition Tools alone or in combination with any of the other cited references.

18.    It is my opinion that the asserted claims are not rendered obvious by the mix and match of various references identified by Mr. Buscaino in his report in combination with any of the other references listed in Mr. Buscaino's prior reports.

19.    I note further that at various times in Mr. Buscaino's reports they incorporate by reference Exhibits including claim charts, and those claim charts sometimes refer in passing (without analysis) to additional references beyond the text of the body of Mr. Buscaino's reports. These Exhibits in many instances contain no analysis, no description of which claimed features are present in the reference or which claimed features are missing from the reference, no discussion of the additional references cited for obviousness purposes, or any indications tying these charts back to the analysis in Mr. Buscaino's reports. To the extent that Mr. Buscaino has provided actual analysis, I have addressed it in the corresponding sections in my report. For

4

EXHIBIT 15
PAGE 260

instances where there is no analysis present, if Mr. Buscaino is allowed to present any additional opinions or analysis, I would expect to provide analysis in rebuttal.

20.    At trial I anticipate that I would give a basic tutorial that will assist the Court and/or jury in understanding the technology applicable to the '356 patent and the prior art cited by Mr. Buscaino.

## III.    TECHNOLOGICAL BACKGROUND

21.    At trial, in addition to what is set forth in my earlier reports, I may discuss additional fundamental concepts of form entry systems and in particular user interface aspects of such systems to provide background material to the Court or jury.

22.    The majority of on-screen keyboard and keycap arrays that have been discussed in Mr. Buscaino's report are associated with systems not having physical keyboards, thus requiring such virtual alternatives. Although one of ordinary skill in the art may have been aware of these various touch- and stylus-driven systems, those skilled in the art would not have been led to add virtual keyboards or keypads to conventional physical keyboard-driven systems, given the potential slow down that would occur and the fact that physical keyboards were typically more efficient for most applications. When such objects were added, for example, as they were in the case of the Macintosh KeyCaps Desk Accessory, it was done not to facilitate text entry but rather to enable users to help select different fonts or for other specialized purposes. System-level tools such as the Windows and Macintosh calculators featured on-screen keypads but the efficient way of using these desk accessories was to press the numeric keys on the physical keyboard, not the keys presented on the screen. In fact, our primary motivation in showing such keys in the case of the Apple computers was to make the desk accessory as familiar as possible to the user, not to encourage the use of the mouse as an alternative to the physical keyboard for entering numeric data.

EXHIBIT 15
PAGE 261

IV.    **LEVEL OF ORDINARY SKILL IN THE ART**

23.    I addressed the level of ordinary skill in the art in my previous report and that analysis applies here as well.

V.    **UNDERSTANDING OF LEGAL STANDARDS**

24.    I understand from counsel that a patent is invalid on the basis of anticipation if a single prior art reference discloses, either expressly or inherently, each and every limitation of the claimed invention.  Accordingly, if any limitations are not disclosed by that single prior art reference, then the patent is not anticipated by that reference.

25.    I understand that a patent claim may be found invalid as having been obvious only if the differences between the claimed subject matter of the patent and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art of the invention at the time the invention was made.

26.    Counsel has informed me that, since my last report, the Supreme Court has clarified the legal standards for invalidity due to obviousness. Counsel has informed me that the Supreme Court confirmed that, while identification of a teaching, suggestion, or motivation to combine prior art references is no longer strictly required to demonstrate obviousness, the principles set forth in my previous report otherwise remain valid.  I understand that the fundamental question remains whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness.  Having considered my previous opinions in light of the Supreme Court's clarification of the legal standards for invalidity due to obviousness, as explained to me by counsel, my ultimate conclusions concerning the nonobviousness of the '356 patent have not changed.

EXHIBIT 15
PAGE 262

27.     I also understand that an invention is not obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching, suggestion, or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed invention does. This is so because inventions in most, if not all, instances rely upon building blocks already known, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

28.     I understand that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

29.     I also understand that that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to

combine them is less likely to be obvious. I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

30.     I also understand that one must be cautious and resist the temptation to rely on hindsight reasoning when attempting to combine references to suggest that a claim may be obvious.

31.     I understand that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious. I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

32.     I understand that to determine whether a patent claim is invalid as obvious, one examines secondary considerations of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, copying, and unexpected results.

33.     I understand that patents are presumed valid. I further understand that the presumption of validity can be overcome only if the party seeking to invalidate the patent can prove invalidity by clear and convincing evidence.

34.     I understand that the Court's rulings on the construction of claims are binding. I have followed the Court's Claim Construction Orders for the '356 patent in my analysis.

## VI.     VALIDITY ANALYSIS

35.     For each claim of the '356 patent asserted against Microsoft, Gateway, and/or Dell, I discuss the limitations of the claims that are not present, or taught, in the prior art, alone or in combination, as asserted by Mr. Buscaino.

36.     In the instances where Mr. Buscaino states an opinion that the claims of the '356 patent are obvious in view of the prior art, alone or in combination, I discuss the reasons why the

8

EXHIBIT 15
PAGE 264

asserted claims would not be obvious, including, where applicable, the secondary considerations of non-obviousness.

37.    I understand that claim construction is ultimately a legal issue for the Court, and that the Court has provided interpretations of certain terms whose meaning was apparently disputed by the parties.

38.    I understand that where a reference does not disclose something, that something may be "inherent" in the reference, but only where the thing is "necessarily present"; "possibilities and probabilities" are not sufficient.

## VII.    VALIDITY OF THE '356 PATENT

### A.    J.K. Lasser's Your Money Manager

39.    Your Money Manager ("YMM") was a personal finance program based on large-scale professional finance programs, and was designed using the MS DOS vernacular. That assumed a system with no pointing device or touch entry. It also assumed that any menus or other accessories would be invoked by function keys dedicated to each menu or other accessory. The MS DOS approach is one of the system-in-control with the user wandering through a labyrinth of menus and carrying out series of operations in the order dictated by the designers. The MS DOS interface paradigm is inherently different from that of the graphical user interface machines.

#### (1)    Claim 19

40.    This claim requires "a tool adapted to allow said user to compose said information" which the Court has construed to mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool." Mr. Buscaino specifically points to an on-screen calculator that the user may call up by pressing the "F2" key when the Amount field is selected as meeting this limitation. I

disagree. The on-screen calculator of YMM is not a tool within the meaning of the Court's construction; it does not permit a user to compose information by pointing to display keys. Rather, the on-screen calculator that Mr. Buscaino points to is merely a visual guide to the user of a reconfiguration of the physical keyboard. For example, the on-screen calculator visually indicates numbers that are available only via the physical keyboard, and certain functions, "CLR", "+/-", etc. that are also available only via the physical keyboard using certain function keys. This visual representation is presented only as an aid for the user in using the physical keyboard. The on-screen calculator does not have "display keys," nor anything by which a user could "point" to "display keys."

41.    Mr. Buscaino appears to recognize the lack of this limitation in YMM by admitting that YMM does not disclose use of a mouse, pointing device, or touch-screen. Mr. Buscaino contends that it would have been obvious to add the use of a mouse, pointing device, or touch screen, in light of various other prior art references. I disagree. First of all, YMM teaches away from using a mouse because it uses the MS DOS operating system, and as discussed above, it was presumed that YMM would not be used with a mouse or other pointing device. YMM was optimized for the keyboard and it would be extremely difficult without starting over to make YMM work with a pointing device with anywhere close to the same efficiency. Programs designed for MS DOS were optimized for the keyboard interface. Such programs, like YMM, are difficult to modify for use with a mouse, pointing device, or touch-screen in such a way as to maintain the same level of user efficiency. Instead, when a developer elects to write a pointing-device-driven program, they will typically completely re-write it in a different, user-in-control vernacular. This is typically done as a completely new design without reference to that which came before. This explains why neither Quicken nor Home Accountant (or any other personal

finance programs) built on the work of YMM. This likewise explains why the types of predefined and associated tools claimed in the '356 patent continued to elude software developers at the time.

42. Further, even if it were obvious to one of ordinary skill in the art to add a mouse to a system running YMM, doing so would still not meet the limitations of claim 19. When I attempted to run YMM on a computer with a mouse, the visual representation that Mr. Buscaino calls an on-screen calculator does not respond to the mouse. As discussed above, the on-screen calculator of YMM does not possess "display keys" with which a user can interact. Thus, even if a mouse were added to a system running YMM, the on-screen calculator would need to be wholly redesigned to permit a user to interact with the on-screen calculator using the mouse. Also, additional elements would have to be added to the on-screen calculator. For example, there is no "Enter" button or transfer mechanism to allow a user to transfer the information from the on-screen calculator to an information field. One would have to take yet another step of reconfiguring the on-screen calculator of YMM to meet this limitation. Thus, it would not be obvious to one of ordinary skill in the art to add all these missing features to YMM to meet the limitation of a tool that "allows the user to compose information by pointing to the display keys of that tool." Contrary to Mr. Buscaino's opinion, it is not just a simple matter of adding a mouse to YMM to reach the claimed invention, rather to arrive at the claimed invention would require a complete shift in user-interface paradigm from a physical keyboard driven device to an on-screen driven device.

43. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to make this paradigm shift or to combine YMM with any of the prior art mouse

devices, pointing devices, or touch-screens cited by Mr. Buscaino. As discussed above, YMM was designed for MS DOS, and was not presumed to work with—or need—such pointing devices. At the relevant time, the developers of mouse or pointer-driven systems were mining mouse-driven systems such as the Apple Macintosh for ideas, not MS DOS applications optimized for keyboard use. Thus, at the time, there was simply no reason to combine the mouse-based interface used in such newer systems with the keyboard-based interface used in the older and soon-to-be obsolete MS DOS system. Further, one of ordinary skill in the art would not have considered adding a mouse-based interface to YMM because YMM was optimized for the keyboard-driven MS DOS system. Such a combination would likely have slowed down the YMM user. In addition, as discussed above, adding a mouse to YMM would not even work, and require not only reconfiguring the system but also reconfiguring the on-screen calculator discussed by Mr. Buscaino. In other words, the prior art as a whole taught away from combining YMM with any mouse, pointer, or touch-screen interface disclosed in the references cited by Mr. Buscaino. And even if a mouse were added to the YMM system, further modifications would be necessary as discussed above to arrive at the claimed invention.

44.    For the reasons stated above, claim 19 is not rendered obvious or otherwise invalid in light of YMM in combination with any of the following references cited by Mr. Buscaino, including: Home Accountant Program, Xerox Star, Apple Lisa, Tyler article, or any of the references described in Sections B, C, D, or G of Mr. Buscaino's September 14, 2007 supplemental expert report.

### (2)    Claim 21

45.    Claim 21 depends from claim 19, therefore my analysis above applies here. Claim 21 adds the requirement where the step of displaying the information fields is done in a "bit-mapped-graphics field," which this Court has construed to mean "a field into which a user is to

enter information by writing on a touch sensitive screen using a stylus." Mr. Buscaino admits that YMM fails to disclose this limitation. I agree with Mr. Buscaino on this point. Mr. Buscaino contends that the Tyler article and U.S. Patent No. 4,757,549 ("Machart") when combined with YMM render this claim obvious. I disagree.

46.    I disagree that Tyler discloses "writing on a touch sensitive screen" in such a "bit-mapped-graphics field." Although the Tyler article discloses a touch sensitive screen, it fails to disclose the ability to write in a bit-mapped-graphics field as contemplated by this claim limitation. Indeed, Mr. Buscaino fails to identify where Tyler discloses any writing in a bit-mapped-graphics field, or the use of a stylus or pen and writing with the system disclosed in the article. In fact, Mr. Buscaino seems to contradict himself when later in his report he admits that the FXFE system allegedly set forth in the Tyler article does not disclose this limitation.

47.    Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine either the Tyler article or the Machart reference with YMM on this point. YMM is a high-efficiency keyboard entry system designed for maintaining personal finance information, sold for use in standard MS DOS computers that did not have touch screens and that did not utilize graphics tablets. Accordingly, the YMM program never contemplated the use of handwriting or signatures. Further, handwriting is a slow and inefficient method of accepting input. Indeed, Mr. Buscaino suggests no problem to be solved in YMM that would require the use of writing in bit-mapped-graphics fields. Similar to my discussion above, adding a bit-mapped-graphics field would require a paradigm shift from a physical keyboard driven device to an on-screen driven device.

48.     For the reasons stated above, claim 21 is not rendered obvious or otherwise invalid in light of YMM in combination with any of the references cited by Mr. Buscaino.

**B.     Foreign Exchange Front End and Tyler**

49.     Mr. Buscaino alleges that the Tyler article describes the Foreign Exchange Front End ("FXFE"), based on conversations with Mr. Robert Long. I note that the Tyler article does not mention FXFE. Although I understand that counsel for Lucent have attempted to arrange for me to talk to Mr. Long, I have not had an opportunity to do so. The only information that Mr. Buscaino has presented regarding the assertion that the "FXFE" renders obvious this claim is the Tyler article itself, an article which does not mention "FXFE." If Defendants are allowed to present additional information regarding FXFE, I reserve the right to provide analysis and rebuttal at that time.

50.     Based on my review of the Tyler article, that article does not disclose each and every limitation of claims 19 and 21 of the '356 patent. Nor does it render the claims obvious.

51.     I note that the Tyler article is a magazine article. It is not an instruction manual or any other type of technical document regarding or even referencing FXFE. The Easel system as described by this four-page article does not disclose many of the claim limitations required by claims 19 and 21 of the '356 patent.

**(3)     Claim 19**

52.     Mr. Buscaino states that FXFE discloses "indicating a particular one of said information fields into which information is to be inserted" by having the field identifier "intensif[y]" after being "touched with a finger." This is not disclosed in the Tyler article. The Tyler article certainly does not disclose a system that indicates any field into which information is to be inserted and Mr. Buscaino points to no such disclosure. Mr. Buscaino also states that

**EXHIBIT 15**
**PAGE 270**

this limitation is obvious in light of other prior art references such as Home Accountant or Xerox Star. I disagree.

53.     There is no disclosure in the Tyler article of a system that indicates the current field. When the user touches a label on the right side of the screen described in Tyler, it typically causes the contents of the left side of the screen to change. This change in content would draw the users' eyes immediately and involuntarily to the left side of the screen. Thus, because the user is no longer looking at the right side of the screen, there is no need for any highlighting of any field on the right side of the screen at that point because the right side of the screen would go unnoticed. The Tyler article also does not suggest that the system controlled movement between active fields. Where the user has chosen the active field, and feedback in the form of the other side of the screen changing acknowledges that the system received that request, the need to identify the active field is sharply reduced or eliminated.

54.     Mr. Buscaino also contends that FXFE "concurrently display[s] a predefined tool associated with said one of said fields." The Tyler article has no such disclosure. In fact, Mr. Buscaino admits that touching the "customer" field causes a "menu of alternatives tool" to be displayed on the left hand side of the display—not in a window overlaying the form, or any other kind of window, as required by the Court's claim construction. The single screen-shot picture in the Tyler article appears to show a side-by-side tiling type of display, similar to that disclosed by the Xerox Star system. It does not appear to disclose any "window overlaying" the form, or any other type of "windowing" technology.

55.     Further, I know of no reason to combine overlaying windows with the Tyler article from any other prior art reference, nor does Mr. Buscaino suggest any. Nor was there any problem with system of the Tyler article to be solved by adding overlaying windows.

15

EXHIBIT 15
PAGE 271

56.     Mr. Buscaino also states that FXFE discloses "predefined tool[s] associated with said one of said fields." This is not disclosed in the Tyler article. The Tyler article certainly does not disclose a system that uses any predefined tool associated with an information field that is specified by the system as an appropriate tool for filling in the information called for by such information field.

57.     I also know of reason to combine such "predefined tool[s] associated with said one of said fields" with the system disclosed in Tyler from any other prior art reference. Nor was there any problem with the system disclosed in Tyler to be solved by adding such predefined tools.

58.     Likewise, Mr. Buscaino states that FXFE discloses predefined tools that include both a "menu of alternatives" and a "tool adapted to allow said user to compose said information." Again, I disagree that the Tyler article discloses these elements. The Tyler article does not disclose any "menu of alternatives" tool, or any "tool adapted to allow said user to compose said information" as required by the claims. The Tyler article does not disclose whether the "list of brokers," "QWERTY layout," or "numeric keypad" mentioned in the Tyler article are "predefined tools associated with said one of said fields" and otherwise satisfy the Court's claim construction. There is no evidence that either the "QWERTY layout" or "numeric keypad" are associated with specific information fields and are not, instead, system-level tools. In fact, the single example of a "composition tool" cited by Mr. Buscaino recognizes that the "QWERTY layout" is activated only upon touching the "other" entry—and thus is not associated or otherwise linked with any information field.

59.     Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or

motivation to combine such "composition tools" or "menu of alternatives" tools that are associated with specific information fields into the system disclosed in the Tyler article from any other prior art reference, including the references cited in sections F and G of Mr. Buscaino's report. Nor was there any problem with the system disclosed in the Tyler article to be solved by adding such composition or menu of alternatives tools that are associated with specific information fields. This further supports my opinion that claim 19 is not obvious over the Tyler article.

60.     Mr. Buscaino also states that FXFE discloses "inserting in said one field information that is derived as a result of said user operating said displayed tool." Again, I disagree that the Tyler article discloses this element. For example, the Tyler article does not disclose whether numeric data entered into the numeric keypad would have been entered into an indicated field.

61.     For the reasons stated above, claim 19 is not rendered obvious or otherwise invalid in light of the Tyler article in combination with any of the references cited by Mr. Buscaino.

(4)     **Claim 21**

62.     Claim 21 depends from claim 19, therefore my analysis above applies here. Claim 21 adds the requirement where the step of displaying the information fields is done in a "bit-mapped-graphics field," which this Court has construed to mean "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus." Mr. Buscaino contends that the Machart reference, the Apple Graphics Tablet, the Koalapad, and/or other references, when combined with FXFE render this claim obvious. I disagree.

63.     First, I disagree that the Tyler article, discloses "writing on a touch sensitive screen" in such a "bit-mapped-graphics field." Although the Tyler article discloses a touch

sensitive screen, it fails to disclose the ability to write in a bit-mapped-graphics field as contemplated by this claim limitation. Indeed, Mr. Buscaino fails to identify where Tyler discloses any writing in a bit-mapped-graphics field, or the use of a stylus or pen and writing with the system disclosed in the article. In fact, Mr. Buscaino seems to contradict himself when later in his report he admits that the FXFE system that he alleges is set forth in the Tyler article does not disclose this limitation.

64.    Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine the Machart reference, the Apple Graphics Tablet, the Koalapad, and/or other references with Tyler on this point. The Tyler article discloses a high-efficiency touch-screen entry system designed for entering trades in high volumes on a trading floor.  Such systems had no need or use for writing on bit-mapped graphics fields.  There is no evidence that the system of the Tyler article ever contemplated the use of handwriting or signatures. Further, handwriting is a slow and inefficient method of accepting input. Indeed, Mr. Buscaino suggests no problem to be solved in Tyler that would require the use of writing in bit-mapped-graphics fields. This further supports my opinion that claim 21 is not obvious over the Tyler article.

65.    For the reasons stated above, claim 21 is not rendered obvious or otherwise invalid in light of the Tyler article in combination with any of the references cited by Mr. Buscaino.

**C.    United States Patent No. 4,756,706**

66.    U.S. Patent No. 4,756,706 discloses portable infusion pump modules connected to a central management unit.  The central management unit software will display for each unit, when the operator presses a button on that unit, the first of a series of fixed single-layer screens with all necessary control buttons for each particular screen fixed in place. The '706 patent does

not disclose any tools. The arrays of buttons that Mr. Buscaino refers to as tools are ever-present; they do not come up and overlay either in response to a given field being touched or by a user purposefully invoking them. The '706 patent discloses only a single "field" as that term is used in the '356 patent. The screens have an array of displayed information ("status lines") but the user cannot interact with this array in any way even to the extent of identifying to the system the information the user wants to alter. Instead, all work takes place with the buttons and the single read/write field labeled "entry line" in the '706 patent. Because the above-mentioned display area is strictly read-only, even were a tool involved in composing information, it would not be associated with any "field."

        (5)    **Claim 19**

67.    Mr. Buscaino suggests that the '706 patent discloses "indicating a particular one of said information fields into which information is to be inserted." I disagree. The '706 patent does not disclose a particular one of said information fields into which information is to be inserted because there is only one "information field[] into which information is to be inserted." Because the user only enters information into that single active field, the user always knows where the information is to be entered and there is no need to offer an indicator of the active field. The use of indicators enable users to determine which of multiple fields is active. Because the '706 patent discloses only a single active field, there was no reason to include "indicating a particular one of said information fields into which information is to be inserted."

68.    Mr. Buscaino also suggests that this limitation would have been obvious in light of other references including Home Accountant, Xerox Star, Apple Lisa, U.S. Patent 4,725,694, Japanese Patent Application No. 61-187024, YMM, FXFE, and/or the references discussed in section E of Mr. Buscaino's report. I disagree because, in the '706 patent, there is only one field in question and therefore there is no need for users to be able to discriminate among fields. In

any case, Mr. Buscaino fails to explain why one of ordinary skill in the art would be led to combine this feature of Home Account, Xerox Star, or any of the other references cited with the invention of the '706 patent. As discussed above, the '706 patent discloses no need or problem that would need such a feature, as the inventors disclosed only a single active field.

69.     For example, Mr. Buscaino, in section E of his report, lists several references, then argues that "implementation of the use of indicators ... would be a simple task," and that "the advantages...would have been obvious." I disagree. The '706 patent uses only a single information entry field. This field is invoked by pressing dedicated buttons on the far right of the display. To generate the need for indicators would require moving to a different architecture by eliminating the buttons and by turning the information display area on the right side of the screen into a series of input fields. Such a change would not only require completely rethinking and recoding the interface, it would require retraining all the users, and it could, by its more complex nature, slow the users down and increase error.

70.     Mr. Buscaino states that the '706 patent discloses "displaying on said display a plurality of information fields." I disagree. The '706 patent discloses only a single information field within the meaning of the '356 patent. The '706 patent discloses a single read/write "entry line" which allows a user to interact with the display. The status lines are simply a read-only display of static information and have no interactivity associated either with the status lines or the labels associated with the status lines. Mr. Buscaino admits that the '706 patent discloses a single field within the meaning of the '356 patent because he repeatedly mentions only the single entry line when discussing tools associated with fields.

71.     It would not have been obvious to combine any other reference with the '706 patent to arrive at a system with a plurality of information fields. The '706 patent discloses a

20

EXHIBIT 15
PAGE 276

reasonable and practical interface for doctors and nurses to use. Altering the design set forth in the '706 patent to make it operate in the nature of the '356 patent would lead to a more complex interface, more prone to error and less user-friendly. One skilled in the art therefore would not be led to combine the '706 patent with any of these references. The '706 patent discloses a system that requires high accuracy for the limited data required, in keeping with the needs of critical care equipment. The data entry task is not complex, so there is no need for a multiplicity of fields and no need for a multiplicity of tools to overlay on a single screen.

72.    Mr. Buscaino states that the '706 patent discloses "concurrently displaying a predefined tool associated with said one of said fields." I disagree. First, the '706 patent does not disclose concurrently displaying a predefined tool, as by a window overlaying a form. Rather, all buttons are available on a given screen from the moment that screen is displayed. There is no association between the buttons and the single entry line field.

73.    It would not have been obvious to combine any other reference with the '706 patent to add this feature. The '706 patent discloses a reasonable and practical interface for doctors and nurses to use. Altering the design set forth in the '706 patent to make it operate in the nature of the '356 patent would lead to a more complex interface, more prone to error and less user-friendly. One skilled in the art would not be led to combine the '706 patent with another reference to add a function by which a tool associated with a field is "currently displayed." The '706 patent discloses a system that requires high accuracy for the limited data required, in keeping with the needs of critical care equipment. The data entry task is not complex, so there is no need for a multiplicity of fields and no need for a multiplicity of tools to overlay on a single screen.

74.    I also disagree with Mr. Buscaino that the '706 patent discloses "predefined tools associated with said one of said fields." In fact, Mr. Buscaino cites to only one field present in the '706 patent. The single field disclosed in the '706 patent does not invoke any tools, nor are any tools invoked by any user-action. In fact, all buttons that Mr. Buscaino has characterized as tools are present on the screen before the field even appears. Because there is only one field, there can by definition be no unique association between the buttons and a single field.

75.    It would not have been obvious to combine any other reference with the '706 patent to arrive at a system that would employ this feature. The '706 patent discloses a reasonable and practical interface for doctors and nurses to use. Altering the design set forth in the '706 patent to make it operate in the nature of the '356 patent would lead to a more complex interface, more prone to error and less user-friendly. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine the '706 patent with any other references. The '706 patent discloses a system that requires high accuracy for the limited data required, in keeping with the needs of critical care equipment. The data entry task is not complex, so there is no need for tools to be popping up onto the screen, then disappearing as the user interacts with the single field.

76.    Likewise, Mr. Buscaino states that the '706 patent discloses predefined tools that include both a "menu of alternatives" and a "tool adapted to allow said user to compose said information." Again, I disagree with Mr. Buscaino that the '706 patent discloses these elements. The '706 patent does not disclose any "menu of alternatives" tool, or any "tool adapted to allow said user to compose said information" as required by the claims. The '706 patent does not disclose whether the "pressure selection screen" or "keypad" are "predefined tools associated

with said one of said fields" and otherwise satisfy the Court's claim construction. Indeed, with respect to the required "menu of alternatives" limitation, the cited "pressure selection screen" in the '706 patent is a separate and distinct screen, not a tool. And the "keypad" is not associated with a specific information field, but is rather a screen-level array.

77.     Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine such "composition tools" or "menu of alternatives" tools that are associated with specific information fields into the '706 patent from any other prior art reference, including the references cited in sections F and G of Mr. Buscaino's report. Nor was there any problem with the '706 patent to be solved by adding such composition or menu of alternatives tools that are associated with specific information fields.

78.     For the reasons stated above, claim 19 is not rendered obvious or otherwise invalid in light of the '706 patent in combination with any of the references cited by Mr. Buscaino.

### (6)     Claim 21

79.     Claim 21 depends from claim 19, therefore my analysis above applies here. Claim 21 adds the requirement where the step of displaying the information fields is done in a "bit-mapped-graphics field," which this Court has construed to mean "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus." Mr. Buscaino admits that the '706 patent fails to disclose this limitation. I agree with Mr. Buscaino on this point. Mr. Buscaino contends that the Tyler article, U.S. Patent No. 4,757,549 ("Machart"), or FXFE when combined with the '706 patent render this claim obvious. I disagree.

80.     I disagree that Tyler discloses "writing on a touch sensitive screen" in such a "bit-mapped-graphics field." Although the Tyler article discloses a touch sensitive screen, it fails to

disclose the ability to write in a bit-mapped-graphics field as contemplated by this claim limitation. Indeed, Mr. Buscaino fails to identify where Tyler discloses any writing in a bit-mapped-graphics field, or the use of a stylus or pen and writing with the system disclosed in the article. In fact, Mr. Buscaino seems to contradict himself when later in his report he admits that the FXFE system allegedly set forth in the Tyler article does not disclose this limitation.

81.     Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine either the Tyler article or the Machart reference with the '706 patent on this point. The '706 patent discloses a system that requires high accuracy for the limited data required, in keeping with the needs of critical care equipment. Mr. Buscaino declares as obvious the advantages of the use of a stylus for certain applications because "the smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen, which is desirable where precision is at issue, for example, in the medical field." I disagree. I note first that use of a stylus does not necessarily imply a bit-mapped-graphics field. In any event, my experience in designing various applications for medical personnel is that accuracy is desirable and "precision" as discussed by Mr. Buscaino results in higher error rates and thus a reduction in accuracy. Big buttons mean few errors. Adding a stylus to this application for the sake of being able to crowd the screens with more buttons would be sharply counterproductive. My experience in medical settings is that all patient notes are confined to the patient chart and adding a handwriting bit-map field would serve no useful purpose.

82.     Further, handwriting is a slow, inefficient, and inaccurate method of accepting input. Indeed, Mr. Buscaino suggests no problem to be solved in the '706 patent that would

require the use of writing in bit-mapped-graphics fields. In fact, there would be no reason to add an expensive, less efficient, and less accurate interface to a piece of critical-care equipment.

83.     For the reasons stated above, claim 21 is not rendered obvious or otherwise invalid in light of the '706 patent in combination with any of the references cited by Mr. Buscaino.

### D.     Japanese Patent Publication No. JP 60-50589[1]

84.     Japanese Patent Publication No. JP 60-50589 ("the '589 reference") discloses a "system for creating documents." The technology involves a CRT display with multiple frame buffers. The '589 reference discloses two different applications, one for social trip expenses and one for composing a memo. These two applications are disclosed as two separate embodiments, each having one form and a single "tool" used with that form. There is no multiplicity of tools used within a single application. There is no disclosure of an indication of an active field. In the first embodiment ("social trip expenses"), the calculator utility is specifically not associated with an individual field, but rather with all the fields simultaneously. In the second embodiment (a memo composer), the single tool appears to be a name-picker utility provided as a preface for entry into the form. The inventors make no mention of any way to voluntarily open this tool later or to reopen the tool once the system has closed it, if the system closes it at all. The figures disclose no affordances that would enable the user to open, close, or move these windows although the inventors earlier suggested the technology would support moveable windows.

### (7)     Claim 19

85.     Mr. Buscaino admits that the '589 reference fails to explicitly disclose "indicating a particular one of said information fields into which information is to be inserted." I agree.

---

[1] I note that Mr. Buscaino relies on an unverified translation of this Japanese language reference.

There was no reason to include this feature in the '589 reference because the system lacks the concept of an active field. Mr. Buscaino states that it would have been obvious to add this feature as disclosed by various systems. In the systems cited by Mr. Buscaino, a three-step process is used for data construction and entry. First, in those systems, the field to be acted upon is identified before the operation takes place, either by the system or the user. Second, in those systems, the user prepares the data to be entered and, third, the user commands the system to enter it in the predetermined field.

86.    However, the system of the '589 reference uses a simpler, two-step process. The field to be acted upon is not pre-identified. Instead, the user first prepares the data without concern as to where it ultimately will be placed and, second, chooses the location and pastes it in place by touching the location. Because the location is not predetermined, there is no need for an indicator as set forth in the '356 patent. When using the organization chart, for example, the user first touches the desired name, then indicates what field to paste it in by clicking on the "To:" field. Because of this reverse paradigm, I disagree that this "indicating" limitation is inherently disclosed in the '589 reference or that this element would have been obvious to one of skill in the art.

87.    Mr. Buscaino also suggests that this limitation would have been obvious in light of other references including Home Accountant, Xerox Star, U.S. Patent 4,725,694, YMM, FXFE, and/or the references discussed in section E of Mr. Buscaino's report. I disagree because, in the '589 reference, the system never needs to know where the information will appear, because the information will be placed wherever the user eventually touches. Therefore, in the '589 reference, because there is nothing to indicate, there is no need for any indicator. As discussed

above, the '589 reference discloses no need or problem that would lead one skilled in the art to employ this feature, because it discloses a system where an active field is not predetermined.

88.    For example, Mr. Buscaino, in section E of his report, lists several references, then argues that "implementation of the use of indicators ... would be a simple task," and that "the advantages ... would have been obvious." I disagree. The '589 reference specifies a simple, two-step process for data entry: (1) compose the data, and (2) paste into place. As stated above, this requires no active field and, hence, no indicator. To add indicators would require moving to a more complex-for-the-user, three-step process of (1) identify the field, (2) compose the data, and (3) paste the data into place. Such a change would not only require completely rethinking and recoding the interface, it would also require retraining all the users.

89.    I also disagree with Mr. Buscaino that the '589 reference discloses "predefined tools associated with said one of said fields." Mr. Buscaino points to the embodiment using a numeric keypad as such a tool. However, the keypad disclosed in the '589 reference is not associated with any individual information fields—rather it is a screen-level object that acts on every field on the screen. The '589 patent discloses that any information obtained from the "tools" is only transferred to information fields when the user clicks on the displayed information and subsequently clicks on an information field or other part of the screen. Thus, there is no requisite association between the "tools" disclosed in the '589 reference and any individual information fields.

90.    It would not have been obvious to combine any other reference with the '589 reference to add such an "association." The applications disclosed in the '589 reference did not contemplate the notion of associating tools with specific information fields as contemplated by the '356 patent, nor would there have been any need or motivation to do so. There is no reason to

combine the '589 reference with any other references and Mr. Buscaino fails to identify any. The '589 reference discloses a way for inputting information into certain applications, whereby the user manually selects the information, then points to where the user wants the information to be placed, similar to moving text with a copy-and-paste function.   Accordingly, the '589 reference discloses no need or problem that would lead to such an association.

91.    The '589 reference does not disclose any tool "selected from a group of predefined tools." As discussed above, the '589 reference discloses two separate and different applications, one for social trip expenses and one for composing a memo. These two applications are disclosed as two separate embodiments, each having one form and a single "tool" used with that form. There is no multiplicity of tools used within either of the single applications. Accordingly, the '589 reference does not disclose the use of a "group of predefined tools" in a form-entry system. For this reason also, the '589 reference does not disclose the use of both a "menu of alternatives" tool and a tool "adapted to allow said user to compose said information" in a single form entry system.

92.    Nor would it have been obvious to combine any other reference with the '589 reference to add such a "group of predefined tools" to the applications disclosed in the '589 patent. As discussed above, each of the applications disclosed in the '589 reference used a single "tool" for a single, specific purpose. There would have been no reason to add other "tools," into the '589 reference. This is because the "tools" disclosed in the '589 reference were very different than the '356 patent tools, which are predefined, specified by the system, and associated with specific information fields.

93.    Likewise, Mr. Buscaino states that the '589 reference discloses predefined tools that include both a "menu of alternatives" and a "tool adapted to allow said user to compose said

information." Again, I disagree with Mr. Buscaino that the '589 reference discloses these elements. As I discussed above, the '589 reference does not disclose "predefined tools associated with said one of said fields," and thus cannot disclose any "menu of alternatives" tool, or any "tool adapted to allow said user to compose said information" as required by the claims. There is no requisite association between the so-called "tools" disclosed in the '589 reference and any individual information fields. The keypad disclosed in the '589 reference is not associated with any individual information fields—rather it is a screen-level object that acts on every field on the screen—and is not a tool within the meaning of the '356 patent.

94.     Mr. Buscaino also fails to identify any reasons to combine such "composition tools" or "menu of alternatives" tools that are associated with specific information fields into the '589 reference from any other prior art reference, including the references cited in sections F and G of Mr. Buscaino's report. And as discussed above, there was no problem with the '589 reference to be solved or advantages to be gained by adding such composition or menu of alternatives tools that are associated with specific information fields.

95.     The '589 reference does not disclose "inserting in said one field information that is derived as a result of said user operating said displayed tool," as contemplated by the '356 patent. Further, contrary to Mr. Buscaino's characterization, the organizational chart disclosed in the '589 reference does not "insert the characters" into an information field. As discussed above, the '589 reference discloses that any information obtained from a "tool" is only transferred to an information field when the user manually and explicitly clicks on the displayed information and subsequently clicks on an information field. In the '589 reference, because the user must manually transfer information by pointing and clicking, there is no association between tools and

29

EXHIBIT 15
PAGE 285

fields, and thus the form entry system of the '589 reference does not insert information into any information field as contemplated by the '356 patent.

96.    Nor would it have been obvious to combine any other reference with the '589 reference to add this type of "inserting in said one field." As discussed above, the applications disclosed in the '589 reference did not contemplate the notion of having the form entry system insert information into a predetermined field. Instead, the applications of the '589 reference relied on the user to manually transfer information by pointing and clicking, as there is no association between tools and fields. Accordingly, there would have been no need or problem to be solved by having the form entry system insert information into a predetermined field. In fact, the systems disclosed in the '589 reference teach away from such a feature, as they relied on the user to manually transfer information by pointing and clicking. Likewise, there is no reason to combine the '589 reference with any other references on this point and Mr. Buscaino fails to identify any.

97.    For the reasons stated above, claim 19 is not rendered obvious or otherwise invalid in light of the '589 reference in combination with any of the references cited by Mr. Buscaino.

            (8)    Claim 21

98.    Claim 21 depends from claim 19, therefore my analysis above applies here. Claim 21 adds the requirement where the step of displaying the information fields is done in a "bit-mapped-graphics field," which this Court has construed to mean "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus." Mr. Buscaino admits that the '589 reference fails to disclose this limitation. I agree with Mr. Buscaino on this point. Mr. Buscaino contends that the Tyler article and U.S. Patent No. 4,757,549 ("Machart") when combined with the '589 reference render this claim obvious. I disagree.

99.    I disagree that Tyler discloses "writing on a touch sensitive screen" in such a "bit-mapped-graphics field." Although the Tyler article discloses a touch sensitive screen, it fails to disclose the ability to write in a bit-mapped-graphics field as contemplated by this claim limitation. Indeed, Mr. Buscaino fails to identify where Tyler discloses any writing in a bit-mapped-graphics field, or the use of a stylus or pen and writing with the system disclosed in the article. In fact, Mr. Buscaino seems to contradict himself when later in his report he admits that the FXFE system allegedly described in the Tyler article does not disclose this limitation.

100.    Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine either the Tyler article or the Machart reference with the '589 reference on this point. The '589 reference does not disclose any bit-mapped display technology. Thus, one would not have been motivated to combine the concept of writing on a touch-sensitive screen with the systems disclosed in the '589 reference.

101.    Mr. Buscaino declares as obvious the advantages of the use of a stylus for certain applications because "the smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen." I note first that use of a stylus does not necessarily imply a bit-mapped-graphics field. In any event, however, as discussed above, neither the applications nor the hardware disclosed in the '589 reference ever contemplated the use of writing on a bit-mapped display, nor was there any reason for such applications to use bit-mapped handwriting or writing on a touch-sensitive screen. Indeed, Mr. Buscaino suggests no problem to be solved in the '589 reference that would require the use of writing in bit-mapped-graphics fields.

31

EXHIBIT 15
PAGE 287

102.    For the reasons stated above, claim 21 is not rendered obvious or otherwise invalid in light of the '589 reference in combination with any of the references cited by Mr. Buscaino.

**E.    References That Disclose Indicating Information Fields**

103.    In this section, Mr. Buscaino lists several other references he contends disclose "indicating information fields." Mr. Buscaino cites to these references in Sections A through D of his report and suggests that these references provide the missing "indicating information field" limitation in the primary references. As an initial matter, I addressed above why such combinations would not have been obvious.

104.    Further, I note that Mr. Buscaino does not contend that any of these references on their own invalidate the '356 patent claims. Nor does Mr. Buscaino contend that these references contain any limitations other than the "indicating information fields" limitation. I note that neither in this section nor in the previous sections of his report does Mr. Buscaino explain any specific reason that would have prompted one of ordinary skill in the art to combine the "indicating information fields" aspect of these references with the primary references above. Mr. Buscaino quotes a number of individuals in the field who suggest that "indicating information fields" may be important. This position is true under some circumstances but not others. For example, as discussed in my report above, indicating an active field becomes irrelevant when there is no concept of an active field with the application.

**F.    References That Disclose Menu Tools**

105.    Mr. Buscaino lists several references he contends disclose "menu tools." Mr. Buscaino cites to these references in Sections A through D of his report and suggests that these references provide the missing "menu tools" limitation in the primary references. As an initial matter, I addressed above why such combinations would not have been obvious. Second, none of

the newly cited references appear to disclose tools within the meaning of the '356 patent. Objects such as scrolling lists in the Microsoft Windows 1.01 reference, or the "menu list" disclosed in the Pickering article, do not have the attributes of a tool within the meaning of the '356 patent.

106.    Further, I note that Mr. Buscaino does not contend that any of these references on their own invalidate the '356 patent claims. Nor does Mr. Buscaino contend that these references contain any limitations other than the "menu tools" limitation. I note that neither in this section nor in the previous sections of his report does Mr. Buscaino explain any specific reason that would have prompted one of ordinary skill in the art to combine the "menu tools" aspect of these references with the primary references above.

G.    **References That Disclose Composition Tools**

107.    Mr. Buscaino lists several references he contends disclose "composition tools." Mr. Buscaino cites to these references in Sections A through D of his report and suggests that these references provide the missing limitation ("a tool adapted to allow said user to compose said information") in the primary references. I addressed above why such combinations would not have been obvious.  For example, all of the Xerox references cited by Mr. Buscaino in Section G of his report disclose only screen-level ("frame"-level) composition objects. Likewise, the "soft keyboard" discussed in the '630 patent, the "alphanumeric keyboard" or "on-screen keypad" in the '526 patent, and the "keypad" in the '217 patent are all screen-level or system-level composition objects, not composition tools within the meaning of the '356 patent. Mr. Buscaino also cites to an unknown version of the Donkey Kong arcade game, but I note that he provides no reference or documentation regarding what version he reviewed, if any.  Based on my understanding of arcade games at the time, any such on-screen keyboards were screen-level or system-level objects—not composition tools within the meaning of the '356 patent.

108.    Further, I note that Mr. Buscaino does not contend that any of these references on their own invalidate the '356 patent claims. Nor does Mr. Buscaino contend that these references contain any limitations other than the "composition tools" limitation. I note that neither in this section nor in the previous sections of his report does Mr. Buscaino explain any specific reason that would have prompted one of ordinary skill in the art to combine the "composition tools" aspect of these references with the primary references above.

## VIII.    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

109.    I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success, Long-Felt But Unsolved Need and/or Failure of Others, and Industry Recognition.

110.    With respect to the '356 patent, the computers of the day, e.g., the Xerox Star and Apple Lisa, were, by today's standard, ploddingly slow computers. They had tiny memories, less than 1000th that of a personal computer today, and ran more than 1000 times slower. When the Lisa was introduced in 1981, it took 45 seconds to just open a desk accessory like a clock in preparation for use. Inventions like the '356 patent with it's pop-up calendar were unthinkable, let alone obvious because of the lag that would have occurred while the data was painstakingly transferred from the hard disk to memory and massaged into a useful form before finally being presented. In that time, a user could easily glance at a paper desk calendar and then manually insert the information.

111.    The Macintosh's introduction in 1984 actually made things worse. The Lisa's tiny hard disk was replaced by floppy disks, a far smaller, slower medium. The Mac's internal memory was so small that nothing more than essentials could reside in memory. Any time a special routine was needed for the program, the user would have to remove the disk holding the

34

EXHIBIT 15
PAGE 290

user's documents, replace it with the program disk, and swap back the document disk. The memory got marginally larger by 1985, but there was still no hard disk, and the extra memory was soon being used by the Switcher, enabling people to hold more than one application in memory at a time. By this time, both the Lisa and the Xerox Star had been retired. Having failed numerous times in the past and knowing the shortcomings of the technology, those of us working in the art were interested only in those improvements that could be implemented successfully in the short term. Developers were, overwhelmingly, interested in using those tools that we at Apple were supplying, both because it made their development cycles shorter and because they faced their own memory and performance limitations. Developers were also struggling with learning the new and foreign technology that the Macintosh environment represented.

112.    Computers from the 1985 era, to the extent they supplied accessories, the accessories that were supplied were indirect. The user could open the standard calculator, but the numbers didn't magically float into place in an application. The user had to paste them there.

113.    We all knew there was a problem—people were clicking the mouse too often and "traveling" too far to assemble the information they needed—but we didn't know what to do about it within the tight confines of the hardware with which we had to work. Those in the art were trying but failing to make the user experience more efficient.

114.    The '356 inventors took a clever approach to solve this problem and overcome all the failures of others: They reduced the task actually being addressed by their experimental system to an absolute minimum, so that memory constraints no longer boxed them in, then made that    user    experience    as    efficient    and    pleasant    as    possible. http://www.macos.utah.edu/Documentation/MacOSXClasses/macos xone/macintosh.html#7

EXHIBIT 15
PAGE 291

## IX.    COMPENSATION

115.    I am being compensated at a rate of $750 per hour for my first 50 hours of work on this report and $500 per hour for my work beyond the first 50 hours, plus expenses. My compensation does not depend in any way on the conclusions or outcome of my analysis.

## X.    CONCLUSION

116.    The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available. I reserve the right to respond to further arguments and analysis made by Mr. Buscaino and statements that might be made by third party individuals.

**EXHIBIT 15**
**PAGE 292**

Dated: October 12, 2007

Bruce Tognazzini