UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - -

LUCENT TECHNOLOGIES INC., and   )

MULTIMEDIA PATENT TRUST,        ) CASE NO.

       Plaintiffs,          ) 02-CV-2060 B (CAB)

vs.                             )   consolidated with

GATEWAY, INC., et al.,          ) 03-CV-699 B (CAB)

       Defendants,          ) 03-CV-1108 B (CAB)

and                             )

DELL INC.,                      )

       Defendant,           )

and                             )

MICROSOFT CORPORATION,          )

       Intervenor.          )

- - - - - - - - - - - - - - - - - -

AND RELATED CROSS-ACTIONS.      )

- - - - - - - - - - - - - - - - - -

DEPOSITION OF ROBERT G. WEDIG, Ph.D.

TUESDAY, OCTOBER 23, 2007

BY:  MELINDA M. IBANEZ, CSR NO. 10686, CRP

Exhibit 16
Page 492

Page 2

```
 1
 2
 3
 4
 5
 6
 7
 8
 9       Deposition of ROBERT G. WEDIG, Ph.D., taken on
10   behalf of LUCENT TECHNOLOGIES, at 2440 W. El Camino
11   Real, Suite 700, Mountain View, California,
12   commencing at 11:01 a.m., TUESDAY, OCTOBER 23, 2007,
13   before Melinda M. Ibanez, Certified Shorthand
14   Reporter No. 10686, pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES OF COUNSEL:
 2   FOR LUCENT TECHNOLOGIES, INC.:
 3       KIRKLAND & ELLIS LLP
 4       BY:  JAMES MARINA, ATTORNEY AT LAW
 5       153 East 53rd Street
 6       New York, New York 10022-4611
 7       Telephone:  (212) 446-4877
 8
 9   FOR DELL, INC. and THE WITNESS:
10       ARNOLD & PORTER, LLP
11       BY:  ALI R. SHARIFAHMADIAN, ATTORNEY AT LAW
12       555 Twelfth Street, NW
13       Washington DC 20004-1206
14       Telephone:  (202) 942-6370
15
16   FOR GATEWAY, INC., et al.:
17       DECHERT LLP
18       BY:  JUSTIN BOYCE, ATTORNEY AT LAW
19       2440 W. El Camino Real, Suite 700
20       Mountain View, California 94040-1499
21       Telephone:  (650) 813-4800
22
23
24
25
```

Page 4

```
 1   APPEARANCES OF COUNSEL (CONTINUED):
 2   FOR MICROSOFT CORPORATION:
 3       FISH & RICHARDSON P.C.
 4       BY:  KELLY C. HUNSAKER, ATTORNEY AT LAW
 5       500 Arguello Street, Suite 500
 6       Redwood City, California 94063-1526
 7       Telephone:  (650) 839-5070
 8
 9   ALSO PRESENT:
10       BRIAN MONROE, VIDEOGRAPHER
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            INDEX
 2   TUESDAY, OCTOBER 23, 2007
 3   ROBERT G. WEDIG, Ph.D.           Page
 4   PROCEEDINGS                      8
 5     Examination by MR. MARINA          10
 6   AFTERNOON SESSION                67
 7     Examination resumed by MR. MARINA       67
 8
 9            -oOo-
10
11   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
12       PAGE  LINE
13        30   24
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

**Exhibit 16**
**Page 493**

## Page 6

1                    EXHIBITS
2    Number        Description           Page
3    Exhibit 100  Document entitled "SUPPLEMENTAL EXPERT
4       REPORT OF DR. ROBERT G. WEDIG ON THE
5       INVALIDITY OF U.S. PATENT NUMBER 4,439,759
6       - 84 pages                      8
7
8    Exhibit 101  United States Patent 4,439,759 - 20 pages   51
9
10   Exhibit 102  Fax from Clerk U.S. District Court to
11      Robert Appleby dated 11/17/05, plus
12      attachment - 10 pages           57
13
14   Exhibit 103  Document entitled "TELEGRAPH AND TELEMATIC
15      SERVICES TERMINAL EQUIPMENT,
16      RECOMMENDATIONS OF THE S AND T SERIES"
17      - 42 pages                      67
18
19   Exhibit 104  Document entitled "Radio-television
20      Broadcasting" dated April-May 1977
21      - 9 pages                       87
22
23   Exhibit 105  Document entitled "DYNAMICALLY REDEFINABLE
24      CHARACTER SETS - D.R.C.S." - 10 pages       127
25

## Page 7

1
2             EXHIBITS (CONTINUED)
3    Number        Description           Page
4    Exhibit 106  Document entitled "PICTURE DESCRIPTION
5       INSTRUCTIONS PD1 FOR THE TELIDON VIDEOTEX
6       SYSTEM" - dated November 1979 - 72 pages       137
7
8    Exhibit 107  Document entitled "FINAL REPORT - NASA
9       GRANT NSG 1508, EXTENSION OF THE CORE
10      GRAPHICS SYSTEM FOR RASTER GRAPHICS
11      DISPLAY" - 156 pages            156
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 8

1    TUESDAY, OCTOBER 23, 2007; 11:01 A.M.
2
3          (Exhibit No. 100 was marked for
4          identification.)
5
6       THE VIDEOGRAPHER:  Here begins DVD number 1 in
7    the deposition of Robert Wedig in the matter of
8    Multimedia Patent Trust versus Microsoft Corporation
9    in the United States District Court, Southern
10   District of California, Case Number 0-CV-0684 H
11   (CAB).
12          Would you like to correct that?
13      MR. SHARIFAHMADIAN:  Yes, please.  That's not the
14   correct caption.  That's the 684 case.  We're here in
15   the 2060 case.
16      THE VIDEOGRAPHER:  Okay.
17          We are in the United States District Court,
18   Southern District of California, Case Number
19   02-CV-2060 B (CAB), consolidated with Case Number
20   03-CV-699 B (CAB) and Case Number 03-CV-1108 B (CAB).
21          Today's date is October 23rd, 2007, and the
22   time on the video monitor is 11:01 a.m.
23          The video operator today is Brian Monroe,
24   employed by Behmke Reporting & Video Services,
25   located at 1320 Adobe Drive, Pacifica, California.

## Page 9

1       This video deposition is taking place at
2    2440 West El Camino Real, Suite 700, and that's in
3    Mountain View, California, and was noticed by James
4    Marina, Esquire, of Kirkland & Ellis.
5          Counsel, please voice identify yourselves
6    and state whom you represent.
7       MR. MARINA:  James Marina from Kirkland & Ellis,
8    representing Lucent Technologies.
9       MR. SHARIFAHMADIAN:  Ali Sharifahmadian from
10   Arnold & Porter, representing Dell, Inc. and
11   Dr. Wedig.
12      MR. BOYCE:  Justin Boyce from Dechert,
13   representing Gateway.
14      MS. HUNSAKER:  Kelly Hunsaker from Fish &
15   Richardson, representing Microsoft.
16      THE VIDEOGRAPHER:  The court reporter today is
17   Melinda Ibanez, certified shorthand reporter
18   contracted by Behmke Reporting & Video Services.
19          Would the court reporter please swear in the
20   witness.
21          (The witness was duly sworn.)
22      THE VIDEOGRAPHER:  Please begin.
23
24
25

3  (Pages 6 to 9)

**Exhibit 16**
**Page 494**

Page 10

1     ROBERT G. WEDIG, Ph.D.,
2 having been first duly sworn, testified as follows:
3
4       EXAMINATION
5 BY MR. MARINA:
6    Q.  Good morning, Dr. Wedig.
7    A.  Good morning.
8    Q.  I'll place before you what I've marked as
9 Exhibit 100.
10   A.  Okay.
11   Q.  Which is a copy of a document titled
12 "Supplemental Expert Report of Dr. Robert G. Wedig on
13 the Invalidity of U.S. Patent Number 4,439,759."
14       Did I read that correctly?
15   A.  Yes, you did.
16   Q.  Okay.  And do you recognize Exhibit 100?
17   A.  (Witness reviewing document.)
18       Yes, I do.
19   Q.  What is Exhibit 100?
20   A.  It is a supplemental expert report that I
21 generated in this case as to the invalidity of U.S.
22 Patent 4,439,759.
23   Q.  Okay.  What do you mean "generated"?
24   A.  It means that I created it, that -- that I
25 wrote it.

Page 11

1    Q.  You wrote --
2       You wrote every word of Exhibit 100?
3    A.  I did not gener -- I did not write every
4 word of it, no.
5    Q.  Okay.  What portions of Exhibit 100 did you
6 write?
7    A.  I wrote the majority of it.
8    Q.  Can you tell me what portion -- since you
9 wrote the majority of it, maybe what portions you
10 didn't write.
11   A.  Okay.
12      (Witness reviewing document.)
13      In the area of Section II, "The Question of
14 Obviousness," that text was suggested to me and I
15 adopted it.
16   Q.  Who was it suggested to you by?
17   A.  It -- I can't recall exactly.  It was either
18 the Arnold & Porter attorneys or the Dechert
19 attorneys.
20   Q.  But it was an attorney?
21   A.  It was an attorney, yes.
22   Q.  Okay.  What other portions of Exhibit 100
23 did you not write?
24   A.  There was a -- there was a document that had
25 had a presentation related to Section V and "No

Page 12

1 Conception of the Claims on the Date Lucent
2 Contends."  That's starting back on page 32.
3       And I -- either I created my own based on
4 that outline or I adopted some sections of that, but,
5 in any case, these are my words that were -- whereby
6 a document that the lawyers created helped in forming
7 the structure and in forming the overall presentation
8 of this section.
9    Q.  So in creating Section V of your report you
10 relied on a document that was prepared by your
11 attorneys?
12   A.  I can't say that I relied on it.
13      I utilized that as a guide for the structure
14 and for the overall presentation.  The reliance for
15 generating this text was the underlying documents
16 that I cite in the -- in that section.
17   Q.  Do you know if that document created by the
18 lawyers was produced?
19   A.  I don't know.
20   Q.  Okay.  Is it cited in your list of materials
21 cited in the back of your report, Exhibit 1?
22   A.  I -- I don't know for sure.
23   Q.  Are there any other portions of your report
24 that you didn't write?
25   A.  And, again, it's a little bit of a

Page 13

1 misrepresentation to say that I didn't write it,
2 because even in that section I just talked about, I
3 think I explained how I utilized another document.
4       And in the section in the beginning that I
5 said that I used, it is a section which was created
6 by someone else, but which I adopted and I take as my
7 own -- as my own.
8    Q.  How long did it take you to write
9 Exhibit 100?
10   A.  (Witness reviewing document.)
11      I think on the order of two to three weeks.
12 I don't recall if it was two or three.
13   Q.  Okay.  And in those two to three weeks did
14 you generate drafts of your report?
15   A.  Yes, I did.
16   Q.  And did you share those drafts with counsel?
17   A.  Yes, I did.
18   Q.  Did counsel comment on those drafts?
19   A.  Yes, they did.
20   Q.  Did counsel edit the drafts?
21   A.  They gave me comments back.  In terms of
22 edits, they would -- they would give me feedback on
23 it, yes.
24   Q.  And you incorporated that feedback into your
25 report?

4  (Pages 10 to 13)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 495

Page 14

1    A.  To the extent that I thought that feedback
2  was useful to help clarify the explanation, I would.
3    Q.  You previously submitted an expert report on
4  the issue of invalidity, correct?
5    A.  Yes, I did.
6    Q.  Okay.  And Exhibit 100 supplements that
7  report, right?
8    A.  Yes, it does.
9    Q.  Okay.  And in Exhibit 100 you opine that the
10  Fleming '759 patent is invalid, correct?
11    A.  That's correct.
12    Q.  And in Exhibit 100 you cite to certain
13  references that you did not cite in your first
14  invalidity report, right?
15    A.  That's correct.
16    Q.  Where did the references come from that you
17  cite in Exhibit 100 that you didn't cite in your
18  first report?
19    A.  Those were provided to me.
20    Q.  Okay.  They were provided to you by counsel?
21    A.  That's correct.
22    Q.  Okay.  When is the first time -- well,
23  strike that.
24      Had you ever seen -- strike that again.
25      When were they provided to you by counsel?

Page 15

1    A.  Some of them were provided in about the
2  mid-August time frame.
3    Q.  Of this year?
4    A.  Yes.
5    Q.  Okay.  So, for example, one of the
6  references you cite is Recommendation S.100, right?
7    A.  Yes.
8    Q.  When is the first time you saw
9  Recommendation S.100?
10    A.  I don't recall exactly.  It was either in
11  mid-August -- the latest it would have been would
12  have been by the end of August.
13    Q.  Okay.  Another one of the references you
14  cite is CRC 699-E, correct?
15    A.  Correct.
16    Q.  When was the first time you saw that
17  reference?
18    A.  Again, I don't recall.  It would have been
19  in the -- sometime in August.
20    Q.  Of 2007?
21    A.  Of 2007, correct.
22    Q.  And a third reference that you cite is -- I
23  think you referred to it as the NASA Final Report,
24  right?
25    A.  That's correct.

Page 16

1    Q.  Okay.  When was the first time you saw the
2  NASA Final Report?
3    A.  I believe that was around the end of
4  August 2007.
5    Q.  Okay.  The NASA Final Report relates to
6  prior art that you previously cited, right?
7    A.  Yes, it does.
8    Q.  Okay.  Do you know why you didn't discuss
9  the NASA Final Report in your first report?
10    MR. SHARIFAHMADIAN:  Objection, argumentative.
11    THE WITNESS:  I don't believe we found it at that
12  time.
13  BY MR. MARINA:
14    Q.  Did you do any prior-art searches in
15  connection with Exhibit 100?
16    A.  No, I did not.
17    Q.  Exhibit 1 to your supplemental report has a
18  list of almost 300 documents, right?
19    A.  Yes.
20    Q.  You reviewed all those documents?
21    A.  (Witness reviewing document.)
22      As far as I can tell, every one of these
23  documents I have seen and at least scanned, at least
24  seen that they are relevant to -- to this matter.
25      I cannot say that I've read every one in

Page 17

1  detail.
2    Q.  Okay.  So it's fair to say you haven't read
3  every document listed in Exhibit 1 cover to cover,
4  right?
5    MR. SHARIFAHMADIAN:  Objection to the extent it
6  mischaracterizes testimony.
7    THE WITNESS:  As I said, I haven't read them in
8  detail.  I've seen that they've existed, I've scanned
9  them, I saw that they were relevant to this matter.
10  BY MR. MARINA:
11    Q.  How long did it take you to scan all of the
12  documents listed in Exhibit 1 to your supplemental
13  report?
14    A.  I don't recall.  It wasn't all done in one
15  sitting.
16    Q.  How much money did you bill Dell and Gateway
17  last year?
18    A.  I don't know.
19    Q.  You don't know how much money you generated
20  from work in this case?
21    A.  No, I haven't computed that.
22    Q.  Don't you have to report that to the IRS,
23  sir?
24    A.  I have to report my entire income to the
25  IRS.  I don't have to break it down by client.

Exhibit 16
Page 496

Page 18

1    Q.  It's your testimony today you can't tell me
2  how much money you made last year from working on
3  this case?
4    MR. BOYCE:  Objection, argumentative,
5  mischaracterizes testimony.
6    THE WITNESS:  That's correct, I can't.
7  BY MR. MARINA:
8    Q.  Over a hundred thousand dollars?
9    MR. SHARIFAHMADIAN:  Objection, asked and
10  answered.
11    THE WITNESS:  I don't know.
12  BY MR. MARINA:
13    Q.  Over $200,000?
14    MR. SHARIFAHMADIAN:  Objection, argumentative.
15    THE WITNESS:  I don't know how much I billed.
16  BY MR. MARINA:
17    Q.  Did you make over $500,000?
18    MR. SHARIFAHMADIAN:  Objection, argumentative,
19  asked and answered.
20    THE WITNESS:  As I said, I -- I haven't
21  calculated how much I billed.
22  BY MR. MARINA:
23    Q.  You're working for Dell and Gateway for
24  money, right?  I mean that's why you're here?
25    MR. SHARIFAHMADIAN:  Objection, argumentative,

Page 19

1  relevance.
2    THE WITNESS:  I'm working as an independent
3  consultant to provide an objective opinion about --
4  about these patents.
5  BY MR. MARINA:
6    Q.  Right.
7    You're not here out of the goodness of your
8  heart.  You're here because you're getting paid,
9  right?
10    MR. SHARIFAHMADIAN:  Objection, argumentative.
11    THE WITNESS:  I am getting paid to be here,
12  that's correct.
13  BY MR. MARINA:
14    Q.  Okay.  Let's take a look at Exhibit 100.
15    A.  Okay.
16    Q.  Do you understand why you were asked to do a
17  supplemental report?
18    A.  I understand that there were -- there was a
19  Supreme Court decision that came out --
20    Q.  Okay.
21    A.  -- that may have changed the way that you
22  analyze prior art for -- for obviousness.
23    Q.  Okay.  Did you read that decision?
24    A.  Yes, I did.
25    Q.  When did you read it?

Page 20

1    A.  I read it shortly after it came out.
2    Q.  How did you come to read it?
3    A.  How did I come to read it?  I --
4    Q.  Well, you're not a lawyer, right?
5    A.  That's correct.
6    Q.  Okay.  How did you come to read a Supreme
7  Court opinion if you're not a lawyer?
8    A.  It was on the web.  I mean it was widely
9  known at the time it happened, and there was many
10  reviews of it, and so I simply did a search on the
11  web.  And it was easy to find.
12    Q.  Why was it of interest to you?
13    A.  Because I'm frequently asked to give
14  opinions of whether prior art is obvious, and so I
15  think it's useful for my own professional
16  development.
17    Q.  Have you ever been hired to -- strike that.
18    Have you ever been hired by a party accused
19  of infringing a patent and come to the conclusion
20  that the patent was valid?
21    MR. SHARIFAHMADIAN:  Objection, relevance.
22    THE WITNESS:  I -- I don't recall.
23  BY MR. MARINA:
24    Q.  How many times have you been hired by a
25  party accused of infringement to opine on the

Page 21

1  invalidity or validity of the patent in question?
2    A.  I don't know.  We could look at my resume
3  and review that, if you'd like.
4    Q.  Is your resume included?
5    A.  Not in this particular report.  It was
6  provided previously.
7    Q.  And did you update --
8    Since your last report, have you updated
9  your resume?
10    A.  Yes, I have.
11    Q.  Have you updated it to include any other
12  litigations that you've been involved with?
13    A.  Yes, I have.
14    Q.  Which litigations are those?
15    A.  It was at least -- I can't remember who was
16  the -- I can't remember who was listed first, but it
17  was Matsushita v Media Tech.  I believe that was the
18  proper order.
19    Q.  Who did you represent?
20    A.  Media Tech.
21    Q.  And was Media Tech accused of infringement?
22    A.  No.  It was -- Media Tech was the plaintiff,
23  so I guess maybe it was listed the other way.
24    Q.  And you gave an opinion in that case that
25  the patent was valid?

6  (Pages 18 to 21)

Page 22

1    A.  Yes, I did.
2    Q.  Have you ever given an opinion opposite to
3  the opinion that the party that hired you was
4  interested in?
5    MR. BOYCE:  Objection.
6    MR. SHARIFAHMADIAN:  Objection to form.
7    MR. BOYCE:  Vague and ambiguous.
8    THE WITNESS:  I have to the attorneys themselves,
9  yes.
10  BY MR. MARINA:
11    Q.  Okay.  Can you tell me what cases those are.
12    A.  I don't believe I can without getting
13  permission from the client, because I was never
14  disclosed as an expert.
15    Q.  Okay.  As you sit here today, can you think
16  of one example where you were asked to give an
17  opinion by an accused infringer as to the invalidity
18  of the patent and you came to the conclusion that the
19  patent was valid?
20    MR. SHARIFAHMADIAN:  Objection, vague and
21  ambiguous.
22    MR. BOYCE:  Asked and answered.
23    THE WITNESS:  And, I'm sorry, I'm going to need
24  to ask you to ask that question one more time,
25  please.

Page 23

1  BY MR. MARINA:
2    Q.  Okay.  As you sit here today, can you
3  provide me one example where you were hired by an
4  accused infringer to opine on the validity of the
5  patent and you concluded that the patent was valid?
6    MR. SHARIFAHMADIAN:  Same objections.
7    MR. BOYCE:  Same objections.
8    THE WITNESS:  Yeah, I -- I don't recall.
9  BY MR. MARINA:
10    Q.  Okay.
11    MR. SHARIFAHMADIAN:  Just for the record, Dell
12  joins in all of Gateway's objections.  We just won't
13  repeat them in order to expedite things.
14  BY MR. MARINA:
15    Q.  Turn to page 5, please, of Exhibit 100.
16    A.  Sure.
17    Q.  And I'm looking specifically at
18  paragraph 16.
19      Do you see that?
20    A.  Yes, I do.
21    Q.  First of all, Section III, the heading is
22  called "State of the Art as of the Time of the
23  Alleged Invention."
24      Do you see that?
25    A.  Yes, I do.

Page 24

1    Q.  Then under that, the first paragraph is
2  paragraph 16, right?
3    A.  Yes, it is.
4    Q.  Okay.  You say in the second sentence that
5  you've had conversations with Dr. James Foley and
6  Mr. Douglas O'Brien; is that correct?
7    A.  That's correct.
8    Q.  When did you first speak to Mr. Foley?
9    A.  It would have been early September 2007.
10    Q.  Why did you speak to Mr. Foley?
11    A.  I simply was sitting in on a phone
12  conversation that the attorneys had with him.
13    Q.  What did Mr. Foley say in that phone
14  conversation?
15    MR. SHARIFAHMADIAN:  I'm sorry.  I didn't hear
16  that.  Can you repeat it.
17  BY MR. MARINA:
18    Q.  What did Mr. Foley say in that phone
19  conversation?
20    A.  He talked about the state of the art at the
21  time of -- in the 1980 time frame.
22    Q.  And what did he say?
23    A.  He simply talked about how color memories
24  were known.  He talked about how -- basically how
25  graphics operated in that time frame is the best I

Page 25

1  can recall.
2    Q.  Okay.  Yet you rely on those conversations
3  in your expert report, right?
4    A.  Not specifically, no.
5    Q.  You don't list in Exhibit 1, entry
6  number 285, discussions with Dr. James Foley?
7    A.  Yes, I do.
8    Q.  Okay.  But you didn't rely on those
9  conversations?
10    A.  Well, it helped to confirm what I've read
11  and what I understood.  So rely, meaning did I form
12  an opinion based purely on what he said, I would say
13  no.  But it did help to bolster my understanding that
14  I had through all the other documents that I read.
15    Q.  So you didn't have a firsthand understanding
16  of the state of the prior art back in the early '80s,
17  right?
18    MR. SHARIFAHMADIAN:  Objection, vague and
19  ambiguous.
20    THE WITNESS:  I had some understanding of it.
21  I'd say that I was not working -- I was not working
22  in the Videotex area, but I was studying computers at
23  that time, and I believe that in my -- at that point
24  in time I was working on my Ph.D.  I believe that my
25  educational studies would have included graphic

7  (Pages 22 to 25)

Page 26

1  systems.  I believe I had some knowledge of it at
2  that time.
3  BY MR. MARINA:
4      Q.  Can you tell me what knowledge you had.
5      A.  Sure.
6          I believe that I understood that graphic
7  systems were made up of data-frame memories and color
8  memories and that you would have the ability to be
9  able to read a value out of a data frame, go into a
10 color memory and be able to produce a picture on the
11 screen via that mechanism.
12         I was familiar with languages for being able
13 to generate images on the screen.  I was familiar
14 with the difference between vector graphics versus
15 raster scan graphics.
16         I would say that I had a general knowledge
17 of graphics that any engineer would have had.
18     Q.  Were you familiar with the Antiope system?
19     A.  In the 1980 time frame?
20     Q.  Yeah.
21     A.  No, I was not.
22     Q.  Okay.  And were you familiar with the
23 Telidon system in the 1980 time frame?
24     A.  No, I was not.
25     Q.  How long had this --

Page 27

1          So you were on the phone once with
2  Dr. Foley; is that right?
3      A.  That's correct.
4      Q.  And have you ever spoken to him in person?
5      A.  No, I have not.
6      Q.  Okay.  So in this one telephone
7  conversation, did you say anything?
8      A.  Not much.
9      Q.  Okay.
10     A.  I believe the -- I believe they asked if I
11 had any questions, and I don't recall any questions
12 that I had.
13     Q.  Okay.  And what lawyers were on the phone?
14     A.  Let's see.  I believe Ali "Sharifahmadian."
15     MR. SHARIFAHMADIAN:  Close enough.
16     THE WITNESS:  Justin Boyce was on the phone.
17 BY MR. MARINA:
18     Q.  Okay.  Anybody else?
19     A.  I -- I can't recall for sure who else was on
20 the phone.  There -- I believe there were others.
21 I'm just -- I can't be positive.
22     Q.  Okay.  Do you recall what Mr. Boyce said in
23 that phone call?
24     A.  Not specifically.  He was -- he was
25 primarily the one asking Mr. Foley questions.

Page 28

1      Q.  Okay.  Do you recall what questions he asked
2  Mr. Foley?
3      A.  He was basically asking him about what the
4  state of the art was in graphic systems in the 1980
5  time frame.  He was the one saying what -- you know,
6  how did systems operate, how was the Core system
7  utilized.
8      Q.  What's the relevance of how the Core system
9  was utilized?
10     A.  Well, how did the Core system tie in with
11 what was --
12     MR. SHARIFAHMADIAN:  I'm sorry, objection to the
13 extent it calls for a legal conclusion.
14     THE WITNESS:  Basically how was the Core system
15 used in graphic systems, how did -- how did people
16 use it in -- in graphic systems.
17 BY MR. MARINA:
18     Q.  One of the references you cite is the NASA
19 Final Report, right?
20     A.  That's correct.
21     Q.  And you rely on that reference in your
22 supplemental report, right?
23     A.  Yes, I do.
24     Q.  And you're not relying on how the Core
25 system was actually utilized in your report, right?

Page 29

1      A.  No, I'm not.
2      Q.  Okay.  You're relying on the four corners of
3  that document, right?
4      A.  That's correct.
5      Q.  Okay.  How long was that phone conversation?
6      A.  15 minutes to a half hour, at the most.
7      Q.  Do you know when Mr. Foley agreed to even
8  participate on that conversation?
9      A.  I'm sorry.  Do I know when he agreed --
10     Q.  Do you know why Mr. Foley agreed to
11 participate in that conversation?
12     MR. SHARIFAHMADIAN:  Objection, calls for
13 speculation.
14     THE WITNESS:  No, I don't know why.
15 BY MR. MARINA:
16     Q.  Do you know if he's represented by either of
17 the attorneys for Gateway or Dell in this matter?
18     A.  No, I don't know.
19     Q.  Do you know if he's getting paid by Dell and
20 Gateway?
21     A.  No, I don't know.
22     Q.  Is there a transcription of this phone
23 conversation?
24     A.  I don't know.
25     Q.  Is there a tape recording of it?

8  (Pages 26 to 29)

**Exhibit 16**
**Page 499**

Page 30

1     A.  I don't know.
2     Q.  Did you take notes of the conversation?
3     A.  No, I did not.
4     Q.  Do you recall anything else that Mr. Boyce
5  asked Mr. Foley?
6     MR. SHARIFAHMADIAN:  Objection to the extent it
7  calls for a narrative.
8     THE WITNESS:  No, not really.
9  BY MR. MARINA:
10    Q.  Can you recall anything that
11 Mr. Sharifahmadian said in that call?
12    A.  No, I don't recall.
13    Q.  Did he ask Mr. Foley any questions?
14    A.  I don't recall.  If he had, it would have
15 been at most one, because he was not one of the
16 primary speakers in the conversation.
17    Q.  Who were the primary speakers?
18    A.  As I said, it was Mr. Boyce asking the
19 questions, and Mr. Foley was doing most of the
20 talking.
21    Q.  Okay.  How did you come to be on that phone
22 call?
23    A.  They simply asked me to -- to join in.
24    Q.  Did they say why?
25    A.  Not specifically.  I -- I found it --

Page 31

1     MR. SHARIFAHMADIAN:  Actually --
2     THE WITNESS:  Sorry.
3     MR. SHARIFAHMADIAN:  -- objection, calls for -- I
4  believe that's within the scope of the agreement that
5  the parties have reached with respect to expert
6  discovery, modifying what would otherwise be
7  permissible by the federal rules, so I'm going to ask
8  you not to answer that question.
9     MR. MARINA:  He's relying on this conversation,
10 and you don't want him to testify.  That's fine.
11    Q.  Did you find it strange that a year --
12 almost a year after you submitted an invalidity
13 report you needed to be on a conversation that told
14 you what the state of the art was?
15    MR. SHARIFAHMADIAN:  Objection, vague,
16 argumentative.
17    THE WITNESS:  Well, I take exception to the
18 question, because I don't believe I need to be told
19 what the state of the art was, so I -- but to answer
20 your question, no, I didn't find it strange.
21 BY MR. MARINA:
22    Q.  So is it true you didn't rely on anything
23 Mr. Foley told you in that conversation in creating
24 your supplemental report?
25    MR. SHARIFAHMADIAN:  Objection to the extent

Page 32

1  misrepresents earlier testimony.
2     THE WITNESS:  Exclusively, no, I didn't.  It
3  simply helped to confirm my understanding I already
4  had.
5  BY MR. MARINA:
6     Q.  You also had a conversation with Mr. Douglas
7  O'Brien?
8     A.  Yes, I did.
9     Q.  Who was that?
10    A.  Mr. O'Brien is one of the inventors of
11 what's called the Telidon system in Canada.
12    Q.  How do you know that?
13    A.  His name is on a number of papers related to
14 Telidon, and I think he confirmed that in his -- in
15 the conversation.
16    Q.  Okay.  And so because his name appears on a
17 paper, he's an inventor of the Telidon system?
18    MR. SHARIFAHMADIAN:  Objection, argumentative.
19 BY MR. MARINA:
20    Q.  Is that your testimony?
21    A.  I would assume if someone gets their name on
22 a paper, they would have contributed to the paper,
23 and the papers that I read were detailed descriptions
24 of the Telidon system.
25    Q.  When was this conversation with Mr. O'Brien?

Page 33

1     A.  It's in -- in September, sometime before the
2  report was produced.
3     Q.  And was it also a telephone conversation?
4     A.  Yes, it was.
5     Q.  And have you ever -- have you ever met
6  Mr. O'Brien in person?
7     A.  No, I have not.
8     Q.  How long did this telephone conversation
9  last?
10    A.  Again, it was 15, 20 minutes.
11    Q.  Who was on the call?
12    A.  Again, it was at least Mr. Boyce,
13 Mr. Sharifahmadian.
14    Q.  Anyone else?
15    A.  I'm sure there were a couple others, but I
16 can't be sure who they were.
17    Q.  What did Mr. O'Brien say during that
18 conversation?
19    MR. SHARIFAHMADIAN:  Objection to the extent it
20 calls for a narrative.
21    THE WITNESS:  He talked generally about the
22 Telidon system.  He talked about what made up the
23 system.
24 BY MR. MARINA:
25    Q.  And what did he say?

9  (Pages 30 to 33)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 500

Page 34

1    A.  He talked about how it was an extensible
2    system, that is, it was intended to be added to or
3    enhanced.
4    Q.  Mm-hmm.  Anything else?
5    A.  He talked about how, in the same light, that
6    it was a forward-looking system, in that they foresaw
7    that as the -- as technology advanced that you'd be
8    able to make more complex systems and still be
9    compatible with the original design.
10   Q.  Okay.  Anything else?
11   A.  There may have been other things, I don't
12   recall.
13       There was also something that I believe, to
14   be sure I'm complete -- oh, he also talked about how
15   the developers for Telidon and Antiope were involved
16   in the generation of the Recommendation S.100.
17   Q.  Who were those people?
18   A.  The -- the actual individuals that were
19   involved?
20   Q.  Yes.
21   A.  I don't believe he gave any names.
22   Q.  You took everything Mr. O'Brien said to you
23   at face value?
24   A.  I had no reason to doubt him.  He didn't say
25   anything that was inconsistent with my own knowledge,

Page 35

1    and I -- he didn't say anything that I thought was
2    contradictory to what I already knew.
3    Q.  Okay.  Wasn't he talking about things that
4    took place 27 years ago?
5    A.  Is that the right -- yeah, approximately,
6    yes.
7    Q.  Okay.  And even though almost 30 years have
8    passed, you didn't have any difficulty believing
9    everything he said to you?
10   MR. SHARIFAHMADIAN:  Objection, asked and
11   answered, argumentative.
12   THE WITNESS:  He didn't go into tremendous
13   detail.  He was not describing the operation of any
14   particular system at a -- at a great -- you know, at
15   a great depth, and so I would not be surprised if
16   someone can remember the general characteristics of
17   something they've done 27 years ago and the general
18   participation that someone might have in generating a
19   report or generating a recommendation.  So I didn't
20   feel as though that that memory was selective.  I
21   feel that that -- what -- the memory he had was the
22   type of level of memory that someone would have in
23   that area from 27 years ago.
24   BY MR. MARINA:
25   Q.  Did you rely on what Mr. O'Brien told you in

Page 36

1    creating Exhibit 100?
2    A.  Only in the one place where I cited it in my
3    report.
4    Q.  Paragraph 31?
5    A.  That's correct.
6    Q.  Do you recall anything else that Mr. O'Brien
7    said during your conversation?
8    A.  No, I don't.
9    Q.  Do you recall anything that the attorneys
10   said?
11   A.  No, I don't.
12   Q.  Did Mr. Boyce ask any questions?
13   A.  Yes, I think, once again, Mr. Boyce was the
14   primary -- the primary attorney asking the questions,
15   and Mr. O'Brien was answering his questions.
16   Q.  Do you recall any questions that were asked?
17   A.  Not specifically, no.
18   Q.  Okay.  Did you say anything during this
19   conversation with Mr. O'Brien?
20   A.  I introduced myself.  I think I may have
21   asked him a couple questions.
22   Q.  Do you have Exhibit 100?
23       Your report, Exhibit 100, talks about the
24   Telidon and the Antiope systems, right?
25   MR. SHARIFAHMADIAN:  Objection to the extent it

Page 37

1    mischaracterizes the record.
2    THE WITNESS:  My report -- the report is what it
3    is, but, yes, it does involve discussions that
4    include the Telidon and Antiope systems and the
5    specifications for those systems.
6    BY MR. MARINA:
7    Q.  Why didn't you discuss those systems in your
8    first report?
9    A.  The documents for the systems were not
10   available at that time.
11   Q.  Aren't there references in the patent itself
12   to the Antiope and the Telidon system?
13   A.  Yes, there is.
14   Q.  Yet when you submitted your first report you
15   didn't think it was important to discuss those
16   systems, right?
17   MR. SHARIFAHMADIAN:  Objection, argumentative,
18   mischaracterizes the report, vague.
19   THE WITNESS:  I would have been happy to talk
20   about them.
21   BY MR. MARINA:
22   Q.  But you didn't, sir, right?
23   MR. SHARIFAHMADIAN:  Objection, argumentative.
24   THE WITNESS:  I had no documents in order to
25   allow me to do that.

10  (Pages 34 to 37)

Exhibit 16
Page 501

## Page 38

1  BY MR. MARINA:
2      Q.  And you knew about those systems when you
3  did your first report, right?
4      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
5  the record.
6      THE WITNESS:  I knew those systems existed only
7  from the statement within the patent.
8  BY MR. MARINA:
9      Q.  Okay.  And did you go --
10     So you knew when you submitted your first
11  invalidity report that the Telidon and Antiope
12  systems existed, right?
13     MR. SHARIFAHMADIAN:  Objection, mischaracterizes
14  the record, misdescribes his prior testimony,
15  argumentative.
16     THE WITNESS:  I knew what it said in the patent.
17  BY MR. MARINA:
18     Q.  Right.
19     A.  Those words -- those specific names are
20  listed in the patents.
21     Q.  Yet you didn't go out and do any
22  investigation about those systems, right?
23     MR. SHARIFAHMADIAN:  Objection, argumentative,
24  mischaracterizes the record, assumes facts not in
25  evidence.

## Page 39

1      THE WITNESS:  I was not asked to search for
2  those.
3  BY MR. MARINA:
4      Q.  And there was no reason you couldn't have
5  researched the Antiope and the Telidon systems back
6  when you did your first invalidity report; isn't that
7  correct?
8      MR. SHARIFAHMADIAN:  Same objection, lack of
9  foundation.
10     THE WITNESS:  If I had been asked to search for
11  them, I would have.
12  BY MR. MARINA:
13     Q.  There's no impediment to finding the
14  documents that are now referenced in Exhibit 100,
15  right?
16     MR. BOYCE:  Objection.
17     MR. SHARIFAHMADIAN:  Objection, argumentative.
18     MR. BOYCE:  Calls for speculation.
19     THE WITNESS:  Yeah, I don't know.  I didn't find
20  them.  They -- there may have been.
21  BY MR. MARINA:
22     Q.  Okay.  What's the difference between a
23  background color and an in-use background color?
24     MR. SHARIFAHMADIAN:  Objection, vague, ambiguous,
25  lack of foundation.

## Page 40

1      THE WITNESS:  Well, one term is a term being used
2  in the patent.  "In-use background color" is a
3  ˉdefined term in the patent.
4  BY MR. MARINA:
5      Q.  Mm-hmm.
6      A.  "Background color" is not a defined term in
7  the patent, so it could have a variety of meanings,
8  one of which could be the same as an in-use
9  background color.
10     Q.  Can you tell me all the meanings of
11  background color that you're aware of.
12     MR. SHARIFAHMADIAN:  Objection, calls for a
13  narrative, vague, ambiguous, lack of foundation,
14  argumentative.
15     THE WITNESS:  Well, as I said, one of them could
16  be the same as in-use background color.  Another
17  could simply be the color that is shown in the
18  background of a graphics picture.
19  BY MR. MARINA:
20     Q.  So in the latter situation, that's not an
21  in-use background color, right?
22     MR. SHARIFAHMADIAN:  Objection, mischaracterizes
23  testimony.
24     THE WITNESS:  It's not the exact words used by
25  the Court.  It could be the same as an in-use

## Page 41

1  background color, depending upon how it was
2  generated.
3  BY MR. MARINA:
4      Q.  What does that mean?  How would it be
5  generated such that it was an in-use background
6  color?
7      MR. SHARIFAHMADIAN:  Objection, vague,
8  ambiguous --
9      THE WITNESS:  When --
10     MR. SHARIFAHMADIAN:  -- lack of foundation,
11  argumentative.
12     THE WITNESS:  Well, I think it would be
13  instructive to review what the Court defined an
14  in-use background color to be.
15  BY MR. MARINA:
16     Q.  Okay.
17     A.  Okay?
18     Q.  What did it define it to mean?
19     A.  Well, I would need a document to help get
20  that.
21     Q.  You don't know as you sit here?
22     A.  I don't have the words of the Court
23  memorized, sir.
24     Q.  Do you list those words in your report
25  anywhere?

11 (Pages 38 to 41)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 502

Page 42

1    A.  I -- they may appear somewhere.  They do
2  appear in my initial report.
3    MR. SHARIFAHMADIAN:  Do you want him to search
4  through the whole report --
5    MR. MARINA:  Stop interrupting.
6    MR. SHARIFAHMADIAN:  -- to find every --
7    MR. MARINA:  Stop interrupting.
8    MR. SHARIFAHMADIAN:  -- instance of it?
9  BY MR. MARINA:
10    Q.  Sir, you're here opining on serious issues,
11  correct?
12    MR. SHARIFAHMADIAN:  Objection, you're harassing
13  the witness.
14    MR. MARINA:  I'm not harassing the witness.
15    MR. SHARIFAHMADIAN:  If you're going to ask him
16  about the Court's claim construction, you can put it
17  in front of him; otherwise, you're just harassing
18  him.
19    THE WITNESS:  I'm sorry.  What was the question?
20  BY MR. MARINA:
21    Q.  You're here opining on serious issues,
22  right?
23    MR. SHARIFAHMADIAN:  Objection, argumentative.
24    THE WITNESS:  Yes, sir, I am.
25  BY MR. MARINA:

Page 43

1    Q.  All right.
2      And as you sit here, you don't have any idea
3  what the Court's claim construction for in-use
4  background color is?
5    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
6  his testimony, argumentative.
7    THE WITNESS:  Yes, I have an idea.
8  BY MR. MARINA:
9    Q.  What's your idea?
10    MR. SHARIFAHMADIAN:  Objection, argumentative.
11    THE WITNESS:  I could try my best to try and
12  recall the exact words of the Court.
13  BY MR. MARINA:
14    Q.  Okay.  Please --
15    MR. SHARIFAHMADIAN:  I would encourage you not to
16  speculate, Dr. Wedig.
17    MR. MARINA:  You can't instruct him not to answer
18  the question.
19    Q.  Please answer the question.
20    MR. SHARIFAHMADIAN:  I'm instructing you not to
21  speculate.
22    THE WITNESS:  And it would require me to
23  speculate, and so --
24  BY MR. MARINA:
25    Q.  Well, I'm asking you to speculate.

Page 44

1    MR. SHARIFAHMADIAN:  Objection --
2    MR. BOYCE:  Calls for speculation.
3    MR. SHARIFAHMADIAN:  -- calls for speculation.
4    THE WITNESS:  The -- the back -- the
5  background --
6    MR. SHARIFAHMADIAN:  Again, Dr. Wedig --
7    MR. MARINA:  Stop interrupting his answer.  He
8  got his objection.
9    MR. SHARIFAHMADIAN:  You're harassing the
10  witness.
11    MR. MARINA:  I'm not harassing the witness.  I'm
12  asking him to tell me what he believes that
13  construction is.
14    MR. SHARIFAHMADIAN:  And you're not compelled to
15  speculate.
16    MR. MARINA:  He's compelled to answer my
17  questions unless you instruct him not to on the
18  grounds of attorney-client privilege or work product.
19  That's the rule.
20    THE WITNESS:  I'm sorry.  In order to answer
21  that, I'd have to speculate, and I'd really rather
22  not do that.
23  BY MR. MARINA:
24    Q.  You don't want to do that?
25    A.  No.

Page 45

1    Q.  Yet you --
2    A.  It would be much more accurate if I had the
3  words of the Court in front of me.  I could tell you
4  exactly what the Court said.
5    Q.  Okay.  You're the expert.
6    MR. SHARIFAHMADIAN:  Objection, argumentative.
7  BY MR. MARINA:
8    Q.  Would you turn to paragraph 21 of
9  Exhibit 100, please.
10    A.  Okay.
11    Q.  First sentence you say that "Systems capable
12  of displaying both foreground and background colors
13  were also well known before the time of the alleged
14  invention."
15      Do you see that?
16    A.  Yes, I do.
17    Q.  And then the last sentence of paragraph 21
18  says, "The concepts of an in-use foreground color
19  (i.e., a color that will be used as a foreground
20  color for subsequently received text and graphics
21  drawing commands until changed) and an in-use
22  background color (i.e., a color that will be used as
23  the background color for subsequently received text
24  and graphics drawings commands until changed) were
25  also very well known before the time of the alleged

12  (Pages 42 to 45)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 503

Page 46

1  invention."
2      Do you see that?
3      A.  Yes, I do.
4      Q.  Do you agree with me, sir, that in
5  paragraph 21 you are distinguishing between
6  background colors and in-use background colors?
7      A.  (Witness reviewing document.)
8      I will agree with you that the particular
9  kind of background color, which the Court defines to
10  be an in-use background color, could be different
11  from a background color, and it's a particular kind
12  of background color.
13      Q.  That's what I'm trying to ask you.  I'm
14  trying to ask you what types of background colors
15  would not be an in-use background color.
16      MR. SHARIFAHMADIAN:  Objection, vague, lacks
17  foundation.
18  BY MR. MARINA:
19      Q.  And you have the Court's construction right
20  there in 21.
21      A.  Yeah.
22      (Witness reviewing document.)
23      Well, it could be a background color that is
24  not used for subsequently received text and graphics
25  drawing commands until changed.

Page 47

1      Q.  And what does that mean?
2      A.  What that means is that this background
3  color was previously used, and now there's a
4  different background color that's being used for
5  subsequently received text and graphics drawing
6  commands until changed.
7      Q.  What does it mean to be used by subsequently
8  received text and graphics drawing commands?
9      MR. SHARIFAHMADIAN:  Objection, form.
10      THE WITNESS:  That means that this is the
11  background color that will appear for subsequent text
12  and graphics drawing commands until a different one
13  appears.
14  BY MR. MARINA:
15      Q.  So if I have -- if I set the background of
16  the entire screen to blue, right, and then I --
17      A.  Mm-hmm.
18      Q.  -- write yellow text on top of the blue
19  screen, is the blue the in-use background color?
20      MR. SHARIFAHMADIAN:  Objection, incomplete
21  hypothetical.
22      THE WITNESS:  That is the color that appears
23  behind that text for those commands, so it -- the
24  hypothetical is incomplete, but based on what you
25  said so far, it sounds as though it could be.

Page 48

1  BY MR. MARINA:
2      Q.  Is it or isn't it?
3      A.  Well, there's other -- I mean I have to look
4  at --
5      MR. SHARIFAHMADIAN:  Objection, asked and
6  answered, argumentative.
7      THE WITNESS:  As I said, it's an incomplete
8  hypothetical, but I'm just trying to answer it the
9  best I can.
10  BY MR. MARINA:
11      Q.  Okay.  Why is it --
12      Besides what your attorney just said to you,
13  why is the --
14      MR. SHARIFAHMADIAN:  Objection --
15  BY MR. MARINA:
16      Q.  -- hypothetical incomplete?
17      MR. SHARIFAHMADIAN:  -- argumentative, harassing
18  the witness.
19      MR. MARINA:  I'm not harassing the witness.
20      THE WITNESS:  Well, were there any other
21  background commands issued since that time?  I mean
22  are you --
23      I have to understand the complete system
24  that -- that you -- that you're suggesting.
25  BY MR. MARINA:

Page 49

1      Q.  My hypothetical was I set the background
2  color of the entire screen to blue.
3      A.  Mm-hmm.
4      Q.  The very next thing I do is write a letter
5  on the screen in the color yellow.
6      A.  Okay.
7      Q.  Okay?
8      Is the blue background an in-use background
9  color?
10      MR. SHARIFAHMADIAN:  Objection, incomplete
11  hypothetical.
12      THE WITNESS:  And --
13      MR. SHARIFAHMADIAN:  Vague and ambiguous.
14      THE WITNESS:  As I said, there's still not
15  sufficient information for me to answer that.
16  BY MR. MARINA:
17      Q.  Okay.  What additional information would you
18  need?
19      A.  For example, does the text command have the
20  ability to issue a background color?  Can it indicate
21  what background color it wants to use?
22      Q.  Okay.  Why is that important?
23      A.  Well, because that would then become
24  possibly the in-use background color.
25      Q.  Okay.  And what if it can't?

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 504

Page 50

1    A.  Well, then there's other factors to take
2  into account.
3    Q.  Okay.  I'm just interested in what the
4  factors are.  Can you tell me what those factors are.
5    A.  See, I guess -- I'd have to see the text
6  command, because, you know, how is that text actually
7  created on the screen?
8    Q.  And how would that impact whether the
9  background is an in-use background color?
10    MR. SHARIFAHMADIAN:  Objection, vague, lack of
11  foundation.
12    THE WITNESS:  Yeah, well, I'm not sure.  I mean I
13  just -- I'd want to see the system.
14  BY MR. MARINA:
15    Q.  In paragraph 19 --
16    A.  Okay.
17    Q.  -- the last sentence of that paragraph reads
18  "The Fleming '759 patent also acknowledges that" --
19    A.  I'm sorry.  Wait a minute.  I want to get to
20  it.
21    Q.  Sure.  Go ahead.
22    A.  You're now actually on page 7?
23    Q.  Page 7, paragraph 19.
24    A.  Okay.
25    Q.  Last -- last sentence of that paragraph.

Page 51

1    A.  Okay.  I'm with you now.
2    Q.  And that sentence reads, quote, "The Fleming
3  '759 patent also acknowledges that the prior art
4  Telidon system specified colors directly using color
5  data values (e.g., values representing red, green and
6  blue color components), while the prior art Prestel
7  and Antiope systems specified colors indirectly using
8  an index into a color memory (i.e., color map that
9  stores a table of color data values indexed by
10  numbers)."
11    Do you see that?
12    A.  Yes, I do.
13    Q.  Okay.  I'm interested in the part of the
14  sentence where you talk about the Prestel and Antiope
15  systems.
16    A.  Okay.
17    Q.  Let me mark Exhibit 101, a copy of the '759
18  patent, and give it to you.
19    A.  Okay.
20    (Exhibit No. 101 was marked for
21    identification.)
22  BY MR. MARINA:
23    Q.  Can you show me where in the '759 patent it
24  says "the prior art Prestel and Antiope systems
25  specified colors indirectly using an index into a

Page 52

1  color memory (i.e., color map that stores a table of
2  color data values indexed by numbers)."
3    A.  (Witness reviewing document.)
4    Well, sir, I believe I cite exactly where I
5  get that support from.
6    Q.  Okay.
7    A.  But in particular the last sentence of that
8  section of the patent that I cite says, "The Prestel
9  videotex customer terminal developed by the British
10  Post Office and the Antiope terminal developed by the
11  French CCETT employ a technique for specifying both a
12  foreground and a background color by indexing a
13  permanent read-only color memory."
14    Q.  Okay.  Where does the word "indirectly"
15  appear in that sentence?
16    MR. SHARIFAHMADIAN:  Objection, the sentence
17  speaks for itself.
18    MR. MARINA:  Yes, it does.
19    Q.  Where does the word "indirectly" appear?
20    A.  The color -- the word "indirectly" was not
21  quoted from the citation, and so I believe the word
22  "indirectly" is a proper paraphrasing of what this
23  citation says.
24    Q.  Okay.  Can you --
25    A.  Excuse me.

Page 53

1    Q.  Okay.
2    A.  Where they are contrasting a system, the
3  Telidon system, which operates to produce direct
4  colors, and they're contrasting that with the Prestel
5  and the Antiope systems, which uses an indirect form
6  of generating colors.
7    Q.  The word "indirect" does not appear in that
8  citation, right?
9    A.  The word "indirect" is not in the citation.
10    As I said, I believe that that is an
11  accurate paraphrasing of what is being discussed in
12  that section.
13    Q.  Is it possible to access a color memory in a
14  direct color mode?
15    MR. SHARIFAHMADIAN:  Objection, vague, ambiguous,
16  incomplete hypothetical.
17    THE WITNESS:  Are you asking is it possible to
18  bypass the color memory?
19  BY MR. MARINA:
20    Q.  No.
21    Doesn't the '759 patent, in its discussion
22  of the direct color mode, discuss actually going into
23  the color memory and pulling out a color value?
24    MR. SHARIFAHMADIAN:  Objection to the extent it
25  mischaracterizes the patent.

14  (Pages 50 to 53)

Exhibit 16
Page 505

Page 54

1    THE WITNESS: Well, when you're operating --
2 it -- in the '759 patent, as I understand it, the
3 only way you access a color is always by going
4 through the color memory to access the value.
5 BY MR. MARINA:
6    Q.  Is that --
7    A.  So I -- but that's not the way we've been
8 using direct, at least to -- what I've been using
9 direct in the most recent -- in the discussion we're
10 having right now.
11    Q.  In the Telidon system, in the direct mode
12 that you identify in your report --
13    A.  Yes.
14    Q.  -- does that access a color memory, direct
15 mode?
16    A.  No, it does not.
17    Q.  Okay.  So in --
18       When the '759 patent discusses the Telidon
19 system and the fact that the Telidon system does
20 direct selection of data values, that's not talking
21 about mode zero of the patent, right?
22    A.  Yes, it -- I believe it falls within mode
23 zero.
24    Q.  Okay.  Even though you just said that mode
25 zero, you had to access the color memory?

Page 55

1    MR. SHARIFAHMADIAN: Objection, mischaracterizes
2 testimony.
3    THE WITNESS: I believe that this patent
4 primarily is talking about accessing through a color
5 memory, but mode zero has very general terminology,
6 and it uses the words -- well, we can go and see
7 exactly what the words are, mode zero.  I don't want
8 to mischaracterize it.
9 BY MR. MARINA:
10    Q.  Mm-hmm.
11    A.  Mode zero, which the claim calls a first
12 mode, says a first mode of access wherein a in-use
13 foreground color is directly specified as a color
14 data value.
15       And I don't believe that that really even
16 addresses how you access the color memory.  It
17 specifies how you specify the foreground color.
18    Q.  So is it your --
19       You're saying that the modes of access of
20 the claims have to do with how you access the color
21 memory?
22    MR. SHARIFAHMADIAN: Objection, mischaracterizes
23 testimony.
24    MR. MARINA: I'm just trying to understand the
25 distinction between modes.

Page 56

1    Q.  So it's your testimony that modes of the
2 claimed invention have to do with how you access
3 - color memory?
4    A.  No, sir.  I think I said exactly the
5 opposite of that in my last answer.
6    Q.  Could you repeat it.  I'm having trouble
7 understanding it.
8    A.  Well --
9    MR. SHARIFAHMADIAN: Can we have it read back,
10 please.
11    THE WITNESS: It would be best to have my answer
12 read back.
13 BY MR. MARINA:
14    Q.  I'd like you to repeat it because I didn't
15 understand it.  I won't understand it the second
16 time.
17    MR. SHARIFAHMADIAN: Objection, argumentative.
18       Do you want the exact same words?  He won't
19 be able to remember --
20    MR. MARINA: Oh, stop it.  Come on.
21    THE WITNESS: Sir, I don't think I can say
22 exactly what I said.  I can do my best --
23 BY MR. MARINA:
24    Q.  Yeah, could you try --
25    A.  -- to answer the question again.

Page 57

1    Q.  Yeah, could you do that, please.
2       What's a mode of access in the context of
3 the claims?
4    MR. SHARIFAHMADIAN: Objection to the extent it
5 calls for a legal conclusion.
6    THE WITNESS: I believe my -- I think we -- it
7 would probably be best to pull out the Court's claim
8 construction, because I believe the Court defines
9 what a mode of access is.
10    MR. SHARIFAHMADIAN: Jim, we've been going for
11 about an hour, so whenever it's a good time for a
12 break.
13    MR. MARINA: Yeah.  Let's just finish this line
14 of questioning.
15       (Exhibit No. 102 was marked for
16       identification.)
17 BY MR. MARINA:
18    Q.  Let me show you Exhibit 102, which is the
19 Court's claim construction for the '759 patent.
20    A.  Okay.
21    Q.  Okay.  So what's a mode of access again?
22    A.  A mode of access the Court defines to be a
23 manner of retrieving.
24    Q.  And now going back to the citation you were
25 just discussing concerning the Antiope system --

Exhibit 16
Page 506

Page 58

1   A.  Mm-hmm.
2   Q.  -- is it your opinion that that sentence,
3 column 1, line 22 --
4   A.  I'm sorry.  Wait a minute.
5   Q.  -- discloses a mode of access?
6   A.  Column . . .
7   Q.  Right.  We were talking about the sentence
8 starting at column 1, line 22.
9   A.  (Witness reviewing document.)
10      Yes.
11   Q.  Does that sentence disclose mode of access?
12   A.  No, it doesn't go -- it doesn't go to that
13 level.  I mean it -- it discusses the general
14 characteristics of the systems.  It doesn't get to
15 the level of talking about mode of access.
16   Q.  Okay.  That -- that's the question I had.
17      So is it true, then, that --
18      (Reporter interruption.)
19 BY MR. MARINA:
20   Q.  Is it true that the sentence before that
21 sentence, which starts at column 1, line 16,
22 concerning the Telidon system also does not discuss
23 modes of access?
24   A.  It describes a genesis testimony.  I mean it
25 relates to the modes of access, but it is not of

Page 59

1 sufficient detail to completely explain that.  It's
2 just talking about the general characteristics of the
3 systems.
4   Q.  All right.
5      The same is true of the last sentence of
6 that paragraph concerning the Prestel and Antiope
7 systems?  There's not sufficient detail concerning
8 modes of access in there, right?
9   A.  Well, of course, as I said, it relates to
10 the modes of access, but, you know, this talks about
11 the general characteristics of these systems, and so
12 you need this knowledge, I think, along with the
13 other parts that I've cited to be able to completely
14 understand how these systems perform the modes of
15 access.
16   Q.  Right.
17      So, for example, to understand -- completely
18 understand the Antiope system, you can't just rely on
19 this sentence, you have to also rely on the Antiope
20 specification that you cite in your report, right?
21   A.  You have -- I believe you have to rely on
22 everything that I talked about in my report.
23   Q.  Okay.
24   A.  Which was -- I mean it depends on which
25 particular section we want to talk about.

Page 60

1   Q.  Okay.  So what I'm getting at is the --
2 getting at is that the -- to understand what was
3 going on in the Telidon, Antiope, and Prestel
4 systems, you can't rely on what the '759 patent says
5 by itself, you have to look at the underlying
6 documentation that you cite in your report, right?
7   MR. SHARIFAHMADIAN:  Objection to the extent it
8 mischaracterizes testimony.
9   THE WITNESS:  Well, first of all, if it were
10 possible to only rely on this section of the '759
11 patent, then I believe you would have a serious
12 problem in the '759 patent, because this is all
13 stated to be prior art.
14 BY MR. MARINA:
15   Q.  Mm-hmm.
16   A.  And so I think it -- it's clear that you --
17 that this section alone does not completely describe
18 the patent, and so, therefore, yes, you cannot
19 completely understand modes of access reading just
20 the section that I've identified.
21   MR. MARINA:  Okay.  So now we can take a break.
22   THE VIDEOGRAPHER:  Going off the record, the time
23 is 12:07 p.m.
24      (Recess taken.)
25   THE VIDEOGRAPHER:  We're back on the record.  The

Page 61

1 time is 12:15 p.m.
2      Please begin.
3 BY MR. MARINA:
4   Q.  Going back to the patent in column 1,
5 lines 22 through 27 --
6   A.  Okay.
7   Q.  -- you agree with me, don't you, that that
8 sentence does not say that the Prestel or Antiope
9 system used in-use foreground or background colors,
10 right?
11   A.  The words "in-use foreground" and
12 "background" color do not appear in that sentence.
13   Q.  So just reading that sentence by itself,
14 right --
15   A.  Mm-hmm.
16   Q.  -- it doesn't say in-use foreground or
17 background colors, right?
18   A.  I think I just answered that question.  I
19 agree that the word "in-use foreground," "in-use
20 background," those are -- those exact words are not
21 used in that sentence.
22   Q.  All right.
23      And does that sentence convey to you that
24 the Prestel and Antiope systems used in-use
25 foreground and background colors?

16  (Pages 58 to 61)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

**Exhibit 16**
**Page 507**

Page 62

1    A.  I believe that this -- these sentences are
2  at least related to in-use foreground and in-use
3  background colors, that this -- that these sentences
4  indicate that the attempt was to try and combine
5  different terminals that had different ways of
6  performing their display and different ways of
7  generating foreground and background colors and the
8  entire purpose of this patent is to try and come up
9  with a compatible system.  So, therefore, this
10  sentence alone may not make it clear that it's in-use
11  foreground, in-use background colors, but along with
12  additional documents that we've been able to uncover,
13  we see that that, in fact, is the case.
14    Q.  Okay.  That's the point I was getting at.
15       You can't tell, by the sentence in the '759
16  patent that appears at column 1, lines 22 through 27,
17  whether the Prestel and the Antiope systems made use
18  of in-use foreground and background colors, right?
19    A.  Yeah, there's not sufficient information.
20  It does not fully explain what is -- what the Court
21  has defined it to be.
22    Q.  Okay.
23    A.  But it does leave open, of course, the
24  possibility, because it does use foreground and
25  background colors and it's -- therefore, it could be

Page 63

1  in-use foreground and background colors.
2    Q.  Thank you.
3       And "could be."  You would need to look at
4  other documents to figure out if they're actually
5  in-use foreground and background colors, right?
6    A.  Yes, which is what I did.
7    Q.  At page 9 of your report, Exhibit 100 --
8    A.  Okay.
9    Q.  -- there's a paragraph 25.
10       Do you see that?
11    A.  Yes.
12    Q.  Okay.  And in paragraph 25 you list -- well,
13  in paragraph -- strike that.
14       In paragraph 25 there are five bullet
15  points, right?
16    A.  Yes, there is.
17    Q.  And in those five bullet points you identify
18  prior art that you believe renders invalid Claims 1,
19  2 and 3 of the '759 patent, right?
20    MR. SHARIFAHMADIAN:  Objection to the extent it
21  mischaracterizes the document.
22    THE WITNESS:  Yes, that's the general purpose of
23  those bullet periods.
24  BY MR. MARINA:
25    Q.  Okay.  And the references you cite in

Page 64

1  paragraph 25 do not appear in your original
2  invalidity report, right?
3    A.  Not those exact references.
4    Q.  Okay.  Other than what is in your original
5  invalidity report and -- strike that.
6       Other than the references that are cited in
7  your original invalidity report and the references
8  identified in paragraph 25 of your supplemental
9  report, are there any other references that you
10  believe alone or in combination render invalid any
11  claim of the '759 patent?
12    MR. SHARIFAHMADIAN:  Objection, vague.
13    THE WITNESS:  There may be.  I mean do I believe
14  this?  I don't know.  I think the answer is I don't
15  know.
16  BY MR. MARINA:
17    Q.  Okay.  But you haven't --
18       I guess the point I'm making is the extent
19  of your opinions on invalidity --
20    A.  Mm-hmm.
21    Q.  -- are going to be with respect to the
22  references identified in your original invalidity
23  report and the references discussed in paragraph 25,
24  right?
25    A.  To this point, yes.  I mean that is what I'm

Page 65

1  relying on as we sit here today.
2    Q.  Okay.  I just want to make sure you're not
3  going to come to trial and start giving me other
4  prior-art combinations.
5    A.  Sure.
6    Q.  I want to make sure we know all the
7  prior-art combinations and prior-art references we're
8  talking about.  Right?
9    A.  And I also want to make clear that if asked
10  to perform additional analysis, if -- and if I
11  determine anything else -- you know, if it is proper
12  to do so, if given leave by the Court to do further
13  analysis, I will do so.
14    Q.  Okay.  But as you sit here today, you have
15  not done any such further analysis, right?
16    A.  That's correct.
17    Q.  Paragraph 24, in the last sentence, refers
18  to your first invalidity report, right?
19    A.  Yes.
20    Q.  And you say in the very last sentence of
21  paragraph 24 that, quote, "I have applied the
22  above-described revised legal principles, regarding
23  invalidity of the claim due to obviousness, to the
24  prior art considered in my Wedig Invalidity Report,
25  and my conclusions regarding obviousness are

17 (Pages 62 to 65)

Page 66

1  unchanged or even stronger in light of the revised
2  legal principles."
3       Do you see that?
4    A.  Yes.
5    Q.  But you provide no analysis in Exhibit 100
6  of the references cited in your original report in
7  view of KSR, correct?
8    A.  That's correct.  I don't -- I don't expound
9  on that.  I just have this one statement.
10    MR. MARINA:  Okay.  All right.  We can go to
11  lunch.
12    MR. SHARIFAHMADIAN:  Okay.
13    THE WITNESS:  Oh, wow.  That's quick.
14    THE VIDEOGRAPHER:  This marks the end of DVD
15  number 1 in the deposition of Robert Wedig.
16       Going off the record, the time is 12:23 p.m.
17       (The deposition proceedings adjourned for
18       the lunch recess at 12:23 p.m.)
19
20
21
22
23
24
25

Page 67

1            AFTERNOON SESSION
2       TUESDAY, OCTOBER 23, 2007; 1:13 P.M.
3
4    THE VIDEOGRAPHER:  Here marks the beginning of
5  DVD number 2 in the deposition of Robert Wedig.
6  Going on the record, the time is 1:13 p.m.
7       Please begin.
8    MR. BOYCE:  Mr. Marina, I just wanted to make it
9  clear for the record, if it wasn't clear earlier,
10  that Gateway is joining in all the objections made by
11  Dell.
12    (Exhibit No. 103 was marked for
13    identification.)
14
15            EXAMINATION RESUMED
16  BY MR. MARINA:
17    Q.  I've placed before you, Dr. Wedig, what's
18  been marked as Exhibit 103, which is a document
19  bearing Bates numbers GW-LT 438217 to GW-LT 438258.
20       Please identify Exhibit 103.
21    A.  (Witness reviewing document.)
22       This is a document that is called "Videotex
23  Terminals, Recommendation S.100," and below that it
24  says "International Information Exchange for
25  Interactive Videotex."

Page 68

1    Q.  Is Exhibit 103 the Recommendation S.100
2  referred to in your supplemental invalidity report?
3    A.  Yes, it is.
4    Q.  Is Exhibit 103 published?
5    A.  (Witness reviewing document.)
6    MR. SHARIFAHMADIAN:  Objection to the extent it
7  calls for a legal conclusion.
8    THE WITNESS:  I don't know.
9  BY MR. MARINA:
10    Q.  Let me talk about this reference with you.
11       And I guess the discussion of Recommendation
12  S.100 is set forth in Section IV-A of your
13  supplemental report.  Starting on page 9, right?
14    A.  Okay.
15    Q.  Is it your opinion that Recommendation S.100
16  discloses a color memory within the meaning of the
17  claims of the '759 patent?
18    A.  (Witness reviewing document.)
19       Well, the answer is yes, but I'm just trying
20  to find where I discuss that in my report.  I know I
21  do.
22       (Witness reviewing document.)
23       Oh, there it is.  Okay.  Okay.  Yes, it
24  does.
25    Q.  Where?

Page 69

1    A.  If you turn to page 198.
2    Q.  Okay.
3    A.  And Section 9.3.2, that section makes it
4  clear that a color memory is disclosed.
5    Q.  Okay.  How so?
6    A.  In that section, if you'll allow me to read
7  that into the record --
8    Q.  Go ahead.
9    A.  It says, in 9.3.2, "The ability to simulate
10  motion (i.e., animation) is a potential enhancement
11  that can be achieved by several means.  These
12  include" -- and I would like to focus now on the
13  second suggestion.
14    Q.  Okay.
15    A.  Which is "dynamically altering the colour of
16  portions of the display image, making them appear or
17  disappear by redefining the colour table."  Then it
18  says, in parentheses, "an image disappears when its
19  colour is set to the same colour as the surrounding
20  area," closed parentheses.
21       I believe that those statements make clear
22  to one of ordinary skill a color table.
23    Q.  Why -- well, wait a minute.  Let me strike
24  that.  I'm asking you about a color memory, not a
25  color table.

Exhibit 16
Page 509

Page 70

1    A.  I'm sorry.  Color memory.
2    Q.  What's the Court's construction of the term
3  color memory?
4    A.  Well, the Court actually construed memory.
5    Q.  Okay.
6    A.  That's what you would like the Court's
7  construction of?
8    Q.  Well, it construed both, but you can give
9  me . . .
10    A.  Okay.  Well --
11    Q.  You can give me memory.
12    A.  Yeah.  It construed memory as a color map
13  that stores a table of color table -- sorry.  I'll
14  start again -- a color map that stores a table of
15  color data value indexed by numbers.
16    Q.  And does Section 9.3.9.2 -- strike that.
17       Does Section 9.3.2 of Recommendation S.100
18  say that the color table is a color map that stores a
19  table of color data value indexed by numbers?
20    A.  Well, of course those exact words do not
21  exist.
22    Q.  All right.
23    A.  But I believe that one of ordinary skill in
24  reading this would see the same definition, would see
25  that those words are encompassed in the description

Page 71

1  being provided.
2    Q.  So from the words "color table," you
3  extrapolate that to mean a color map that stores a
4  table of color data values indexed by numbers?
5    MR. SHARIFAHMADIAN:  Objection to the extent it
6  mischaracterizes the report.
7  BY MR. MARINA:
8    Q.  Is that right?
9    A.  No, not just those two words.
10    Q.  Okay.  What other words?
11    A.  "The ability to simulate motion," for
12  example, "i.e., animation," that helps to also define
13  it.
14    Q.  Why?
15    A.  Because one of ordinary skill is quite
16  familiar in this time frame that in order to perform
17  animation, one technique for performing animation is
18  to modify the contents of a color table.
19    Q.  Okay.
20    A.  And they go on to explain that in item b,
21  where they say an image disappears when its color is
22  set to the same color as the surrounding area.
23       And so they've made it abundantly clear that
24  this is a color table that holds colors that you can
25  write into so that you can make an image appear to

Page 72

1  disappear when its color is set the same as its
2  surrounding area.
3       Since it's a table, tables are accessed or
4  referenced by indexing into the table, so it's made
5  clear that this is a color table holding colors.
6  Colors is what the Court called color data values.
7  And being that it's a table, you access those color
8  data values by indexing.  And everything in the
9  computer is done with numbers.  So the only way you
10  would index it is by indexing by numbers.
11    Q.  You can't index by words, sir?
12    A.  Words?
13    Q.  Words.
14    A.  The -- the words "cat" and "dog" could be a
15  way of indexing into a table in a computer system.
16    Q.  Right.
17    A.  Even if that -- even if that were the case,
18  the word "cat" and the word "dog" would be
19  represented as numbers.
20       There is no such thing as a letter or word
21  in a computer that is not ultimately represented as a
22  number.  A computer only understands numbers.
23    Q.  Where does -- and you're under oath.  Where
24  does 9.3.2 say that the color table has color data
25  values?

Page 73

1    A.  It says it has colors.
2    Q.  Right.
3       It doesn't say it has color data values,
4  right?  You have to admit that.
5    MR. SHARIFAHMADIAN:  Objection, argumentative.
6  And I also object to your reminding the witness that
7  he's under oath before asking him questions.  There
8  is no --
9    MR. MARINA:  Okay.  You can object --
10    MR. SHARIFAHMADIAN:  -- necessity for that.
11    MR. MARINA:  You can object to whatever you want.
12    THE WITNESS:  The exact words "color data values"
13  are not found in there.
14       The writer of this document did not have
15  access to the '759 patent.  It was not looking for
16  this to be prior art to the '759 patent.
17       To one of ordinary skill, the word "color
18  data values," as used in the '759 patent and as
19  construed by the Court, is what is described as
20  "colours" in this document.
21  BY MR. MARINA:
22    Q.  So you read this phrase "dynamically
23  altering colour portions" -- I mean does it at all
24  say that there are colors in the color table?
25    A.  It says in item b --

TSG Reporting - Worldwide        877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 510

Page 74

1    Q.  All right.
2    A.  -- "an image disappears when its colour is
3  set to the same colour as the surrounding area."
4    Q.  Okay.  So the image has a color, correct?
5    A.  The image has --
6    Q.  Right.
7    A.  I'm sorry.  The --
8    Q.  Is --
9        What you just read says the image has a
10  color, right?
11    A.  That's correct.
12    Q.  The surrounding area has a color, right?
13    A.  Correct.
14    Q.  Where does it say that the color table has
15  colors in it?
16    MR. SHARIFAHMADIAN:  Objection, asked and
17  answered, argumentative.
18    THE WITNESS:  Well, sir, this is a table, and it
19  uses the adjective "color" table.  It's a table
20  holding something.
21  BY MR. MARINA:
22    Q.  Right.
23    A.  The adjective "color" table --
24    Q.  Right.
25    A.  -- I think makes clear even to anyone on the

Page 75

1  street that a table described as a "color table"
2  would hold colors.
3    Q.  Does it have to hold color data values?
4    A.  A color in this document, as described by
5  the Court -- when the Court uses the word "color data
6  values," that same term is what is a color in this
7  document.
8    Q.  Where does the document say that?  I
9  understand you believe that, but where does the
10  document say that?
11    MR. SHARIFAHMADIAN:  Objection, asked and
12  answered, argumentative.
13    THE WITNESS:  Okay.  Well, it used the word
14  "colour" here (indicating).
15  BY MR. MARINA:
16    Q.  Okay.
17    A.  I can show you how the word "colour" is
18  satisfied by the Court's definition in this document.
19    Q.  Okay.  I just want to make sure.
20        This is the only reference -- Section 9.3.2
21  is the only reference in the entirety of
22  Recommendation S.100 to what you believe is a color
23  memory, correct?
24    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
25  the record and the report.

Page 76

1    THE WITNESS:  Within the -- in this document
2  itself -- I'm trying to recall here if there's
3  something else.
4        (Witness reviewing document.)
5        I believe, just looking at this document
6  itself, this is the place where it talks about a
7  color memory.
8  BY MR. MARINA:
9    Q.  Okay.  It doesn't say color memory.  You
10  agree with me?
11    A.  It doesn't use exactly the words "color
12  memory."
13        A color memory, as defined by the Court, is
14  what is being described in Section 9. --
15    Q.  And how do you know that --
16    A.  -- 3.2.
17    Q.  How do you know that?
18    A.  I'll go through it again, if you'd like.
19    MR. SHARIFAHMADIAN:  Objection, asked and
20  answered.
21  BY MR. MARINA:
22    Q.  Nothing in Section 9.3.2 says that the color
23  table is a color map that stores a table of color
24  data values indexed by numbers; isn't that right?
25    MR. SHARIFAHMADIAN:  Objection, argumentative,

Page 77

1  asked and answered.
2  BY MR. MARINA:
3    Q.  You have to admit it's literally not on the
4  page, right?
5    A.  As I said, those exact words are not found;
6  however, there is sufficient description that the
7  same meaning as the Court's definition is found in
8  this passage.
9    Q.  Okay.  Can you show me that.
10    A.  Okay.
11    MR. SHARIFAHMADIAN:  Objection, asked and
12  answered.
13    THE WITNESS:  I will do it again.  Okay.
14        As I said, in the first section, it says
15  "The ability to simulate motion."
16  BY MR. MARINA:
17    Q.  Okay.
18    A.  That is animation.
19        One of ordinary skill knows that there's
20  multiple ways to simulate motion in a display system.
21    Q.  Okay.
22    A.  And they highlight the three various ways
23  that that can be done.
24        The second way is by "dynamically altering
25  the colour portion of the display image," by "making

TSG Reporting - Worldwide        877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 511

Page 78

1 them appear or disappear by redefining the color
2 table."
3    Q.   Why do you need to redefine the color table?
4    A.   That is a way of performing animation that
5 is well known, and there are multiple articles
6 written in this time frame which describe that, and
7 I'm happy to explain how that works to you.
8    Q.   I'm asking you why would you need to
9 redefine the color table.
10    A.   In order to try and perform animation.  And,
11 if you'd like, I'll go into the details of how
12 that --
13    Q.   Can't you --
14    A.   -- that works.
15    Q.   Can't you just change the color without
16 changing the color table?
17    A.   That is another way of doing it.  That is
18 what item number 1(a) says.  A describes a way
19 whereby you change different data within the display
20 frame.  That's one way to do it.
21       Another way to do it is to redefine the
22 color table.  Redefine the color table is whereby you
23 are changing the colors within the color table, as it
24 says here, and that means that the value that is held
25 in the -- in the data frame, display frame, would now

Page 79

1 point to the same index that holds a different color.
2 When the color in the color table changes, it has the
3 appearance of motion on the screen.  There are
4 well-known articles that are written as to how this
5 operates.  One of ordinary skill would be familiar
6 with this technique.
7    Q.   Okay.  But you're not citing those articles
8 here, sir.  You're saying this reference invalidates,
9 right?
10    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
11 his report and testimony.
12    THE WITNESS:  I believe I do --
13 BY MR. MARINA:
14    Q.   Where?
15    A.   -- cite --
16    Q.   In combination with Recommendation S.100.
17 Show me where.
18    A.   Okay.  Give me a moment.
19       (Witness reviewing document.)
20       Okay.  If you look in paragraph 20 --
21    Q.   Okay.  Give me a second.
22    A.   Mm-hmm.
23    Q.   Okay.  So now we're going to a completely
24 different section, right?
25    A.   A different section --

Page 80

1    Q.   Okay.
2    A.   -- which explains something that -- in
3    relation to S.100, yes.
4    Q.   Okay.  Let's see.  Show me.
5    A.   In the middle of that paragraph, at around
6 line 13, it says, "It was well understood by 1979
7 that a color map could be used for animation."
8    Q.   Okay.
9    A.   And I give a reference to color table
10 animation by Richard Shoup.  And that's exactly what
11 I'm talking about now, and so although that word --
12 the actual reference of Shoup is not found in the
13 paragraph you would like it to be --
14    Q.   Okay.
15    A.   -- this does indicate that I'm showing that
16 people knew about the Shoup article in relation to
17 animation in this time frame.
18    Q.   So are you offering a new opinion, sir, that
19 Recommendation S.100 in combination with Shoup
20 invalidates --
21    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
22 the testimony.
23    MR. MARINA:  No, it does not.
24    THE WITNESS:  No, sir, that's not what I'm
25 saying.

Page 81

1 BY MR. MARINA:
2    Q.   Sir, I asked you earlier whether
3 paragraph 25 set forth the bases for your opinions,
4 and you said yes, right?
5    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
6 the testimony.
7    THE WITNESS:  Yes, I said that.
8 BY MR. MARINA:
9    Q.   Okay.  Now you're --
10       Now you're trying to bring in another piece
11 of prior art, correct?
12    MR. SHARIFAHMADIAN:  Objection, argumentative,
13 mischaracterizes the testimony.
14    THE WITNESS:  No, sir, I'm not trying to bring in
15 another piece of art in order to argue obviousness of
16 this claim.
17 BY MR. MARINA:
18    Q.   Would you agree with me, sir, that you are
19 taking the position that the reference to "colour
20 table" in Section 9.3.2 inherently discloses a color
21 memory within the meaning of the --
22    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
23 testimony.
24    THE WITNESS:  No.
25 BY MR. MARINA:

21 (Pages 78 to 81)

## Page 82

1    Q. You agree with me Section 9.3.2 doesn't tell
2  you exactly what the color table looks like, right?
3    A. It says it to the -- to the extent that it's
4  required for the definition defined by the Court.
5    Q. All it says is "colour table."
6    MR. SHARIFAHMADIAN: Objection, argumentative.
7    THE WITNESS: And it doesn't just say "colour
8  table." It says more than that.
9  BY MR. MARINA:
10    Q. You agree with me, sir, that Section 9.3.2
11  does not even say that there are colors in the color
12  table?
13    MR. SHARIFAHMADIAN: Objection, mischaracterizes
14  testimony, argumentative.
15    THE WITNESS: No, sir, I don't agree with that.
16  BY MR. MARINA:
17    Q. Okay. How are colors specified in
18  Recommendation S.100?
19    A. How are colors specified?
20    Q. Yes.
21    A. I believe they can be specified directly and
22  indirectly.
23    Q. Okay. Can you show me how they can be
24  specified indirectly.
25    A. Okay.

## Page 83

1    (Witness reviewing document.)
2    Well, I discuss in my report how it was well
3  known to one of ordinary skill that the Antiope
4  system is what was being considered and what were
5  being actually performed when implementing what's
6  called the parallel mode of the alphamosaic option.
7    Q. How do you know that?
8    A. Well, I know that from a number of sources,
9  and if you give me a moment, I will find those.
10    (Witness reviewing document.)
11    Well -- okay, well, one specific
12  reference -- first of all, I think this was generally
13  known to one of ordinary skill.
14    Q. Okay.
15    A. However -- however, I -- I have a particular
16  citation that I believe says this explicitly.
17    Q. Okay.
18    A. And it is an article which is called "A
19  Perspective on the Development of Videotex in North
20  America," and it was written by Mr. O'Brien.
21    Q. Okay. Go ahead.
22    A. If you have that reference, I can show you
23  the words in there where it specifically says that
24  when S.100 was written, that it was meant for the --
25  parallel form of the alphamosaic option to be -- to

## Page 84

1  mimic or to provide the same facilities as, and
2  therefore to provide an emulation for, the Antiope
3  system.
4    Q. If you could turn to paragraph 43 of your
5  supplemental report.
6    A. Okay.
7    Q. And the second sentence there says -- or
8  third sentence, sorry, says, "In the parallel form of
9  the alphamosaic mode, the colors are specified as
10  simple 7 bit values indicating the color such as
11  yellow, magenta, et cetera," right?
12    A. Correct.
13    Q. And then it says, "These color data operands
14  are indexes into a color memory of a compatible
15  Antiope system," right?
16    A. Yes.
17    Q. What do you mean by "7 bit values"?
18    A. I'm sorry, I don't know how else to explain
19  it. A value that's made up of seven individual bits,
20  each bit being one and zero.
21    Q. And what do those bits represent?
22    A. Those bits are actually indexes into a color
23  memory.
24    Q. Can you show me where Recommendation S.100
25  says that.

## Page 85

1    A. Okay. One moment.
2    (Witness reviewing document.)
3    Okay. If you turn to page 181.
4    Q. Okay. Okay.
5    A. You see a table.
6    Q. Right.
7    A. And the table, starting -- if you look at
8  column 4.
9    Q. Okay.
10    A. And you read from the top, it says "Black
11  foreground."
12    Q. Okay.
13    A. And you see that's made up -- that's a 7 bit
14  value.
15    Q. Okay.
16    A. Then you go down -- reading down to about
17  the middle of the table, it says "White," and it
18  says, "F." That would be the word foreground, simply
19  not fully shown out.
20    Q. Okay.
21    A. And then next to that is column 5, which has
22  the same thing for the background.
23    Q. Sir, isn't it true that bits 1, 2 and 3
24  represent the RGB values?
25    A. No.

22 (Pages 82 to 85)

**Exhibit 16**
**Page 513**

Page 86

1    Q.  So --
2    A.  They represent an index into -- into a
3  table.
4    Q.  Okay.  So, for example, in column 4 where it
5  says "Red," right?  You see that?
6    A.  Yes.
7    Q.  And it says bit 1 is one, bit 2 is zero and
8  bit 3 is zero, right?
9    A.  Those are the three bits of -- of that
10  command, yes.  That -- that is the least significant
11  three bits of that command.
12    Q.  And then if you go down to blue, b1 is zero,
13  b2 is zero and b3 is one, right?
14    A.  I'm sorry.  Say that again.
15    Q.  If you go down to the blue color, right?
16    A.  Yes, yes.
17    Q.  And b1 is zero, b2 is zero and b3 is one,
18  correct?
19    A.  That happens to be the least significant
20  three bits of that command, yes.
21    Q.  And then green is -- b1 is zero, b2 is one
22  and b3 is zero?
23    A.  Again, that is also the least significant
24  three bits of that command.
25    Q.  Doesn't that tell you, sir, that b1

Page 87

1  represents red and b2 represents green and b3
2  represents blue?
3    A.  No.
4    Q.  It doesn't tell you that?
5    A.  No.
6    Q.  What does figure --
7        What is Figure 7/S.100 that we're looking
8  at?
9    A.  That is a table of commands for specifying
10  the -- a series of -- a series of commands that
11  includes the commands for specifying the foreground
12  and background colors in a -- in the system described
13  here.
14    Q.  That's not -- Figure 7/S.100 is not
15  representing a color memory, is it?
16    A.  No, that's not the color memory itself.
17    Q.  Got you.
18        Let me show you the Antiope specification.
19  I'll mark that as Exhibit 104.
20    A.  Okay.
21        (Exhibit No. 104 was marked for
22        identification.)
23    MR. MARINA:  And, for the record, the Antiope
24  specification bears Bates numbers GW-LT 433452
25  through 433460.

Page 88

1    Q.  Could you identify 104 for the record,
2  please.
3    A.  This is a article that is titled the
4  "Preliminary Specification for the Antiope Teletext
5  System."
6    Q.  And in your report when you refer to the
7  Antiope specification, this is what you're referring
8  to?
9    A.  Yes, it is.
10    Q.  Okay.  And if you turn to page 7, at the top
11  of page 7, sir.
12    A.  Okay.
13    Q.  See it says at the top, "There is a direct
14  correspondence between the binary elements b1, b2 and
15  b3 of the code and the presence of the primary colors
16  red, green and blue"?
17    A.  Yes, I see that.
18    Q.  Do you know what that means?
19    A.  It means that those bits relate to the
20  colors red, green and blue.
21    Q.  So would b1, b2 and b3 be color data values?
22    A.  No, I don't believe so.
23    Q.  Why not?
24    A.  Because what they're talking about there is
25  the -- the bits of the command for specifying the

Page 89

1  foreground and background colors.
2    Q.  Right.
3        So in specifying the colors, you specify a
4  number that represents the R value and a number that
5  represents the G value and a number that represents
6  the B value, correct?
7    A.  No, that's not correct, not in this system.
8    Q.  But isn't that what it says?
9    A.  No, that's not the way I read it.
10    Q.  How do you read it?
11    A.  I read it that these three bits are used for
12  specifying the colors, and it's these three bits that
13  identify which one of the indices you're going to use
14  into the table for selecting the color.
15    Q.  Sir, it says that -- doesn't it, that b1,
16  for example, corresponds to the color red, b2
17  corresponds to the color green, and b3 corresponds to
18  the color blue?  Doesn't it say that?
19    A.  No, it doesn't say that.
20    Q.  Doesn't say that.
21        If b1, b2 and b3 were RGB values, what would
22  the RGB value be for the color red?
23    MR. SHARIFAHMADIAN:  Objection, vague, incomplete
24  hypothetical.
25    THE WITNESS:  I'm sorry.  Ask the question again,

23  (Pages 86 to 89)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 514

Page 90

1  please.
2  BY MR. MARINA:
3      Q.  If b1, b2 and b3, as described in the
4  Antiope specification, were color data values, what
5  would the RGB value for the color red be?
6      MR. SHARIFAHMADIAN:  Same objections.
7      THE WITNESS:  It could be anything.  I mean
8  you -- you can choose.  It depends on what system of
9  RGB you're using.
10  BY MR. MARINA:
11     Q.  Well, in reference to the Antiope
12  specification.
13     MR. SHARIFAHMADIAN:  Same objection, vague,
14  incomplete hypothetical.
15     THE WITNESS:  Well, if it's in relation to the
16  Antiope specification, then the question makes no
17  sense, because there is no RGB value that's
18  specifically associated with red.
19         I -- maybe to help you understand that when
20  you provide an index into the table, there is a
21  element of the table that holds red, and that could
22  be at index zero zero one.
23  BY MR. MARINA:
24     Q.  But, sir, doesn't the document say that b1
25  corresponds to red, b2 corresponds to green and b3

Page 91

1  corresponds to blue?
2      MR. SHARIFAHMADIAN:  Objection, argumentative,
3  asked and answered.
4      THE WITNESS:  No, I don't see that.
5  BY MR. MARINA:
6      Q.  Well, how do you --
7          How else could you possibly read the
8  sentence at the top of page 7?
9      MR. SHARIFAHMADIAN:  Objection, argumentative.
10     THE WITNESS:  I read that these bits are used in
11  order to select from the table the colors red, green
12  and blue.
13  BY MR. MARINA:
14     Q.  And you don't read this to say that b1
15  corresponds to red, b2 corresponds to green and b3
16  corresponds to blue?
17     MR. SHARIFAHMADIAN:  Objection, argumentative,
18  asked and answered.
19     THE WITNESS:  I -- I don't -- I don't believe
20  that's the case.
21  BY MR. MARINA:
22     Q.  Okay.  Do you know how to say the word red
23  in French?
24     A.  No, I don't.
25     Q.  How about the word black?

Page 92

1      A.  No, I don't.  French was not my language.
2          I studied German.
3      Q.  Do you know how to say Antiope system --
4  that's in France, right?
5      A.  I don't know.  I assume it's "Antiope."
6      Q.  Can you tell me what's shown in Figure 7 of
7  the Antiope specification.
8      A.  This is a similar table as we saw in the
9  S.100 specification --
10     Q.  Mm-hmm.
11     A.  -- for specifying commands for setting the
12  various parameters, some of which are the foreground
13  and background.
14     Q.  Do you know what the --
15         So if you look sort of the -- the sixth
16  column of Figure 7, there's the one that has the
17  letters N, R, V, J, B --
18     A.  Well --
19     Q.  -- M, C and W.
20         Do you see that?
21     A.  Does it say alpha first?
22     Q.  Correct.
23     A.  In fact, if you go right above it, is it in
24  what's marked 4, 5 or 6?
25     Q.  4.

Page 93

1      A.  4, okay.  Yes, I see that.
2      Q.  Do you know what the letters --
3          Do you know what the letter "n" stands for?
4      A.  The table -- or the -- oh, no, there's no --
5  there's no guide for that.  So no, I'm not sure.  No,
6  I don't know what it means.  But it does say
7  alphanumerical is -- the alpha means alphanumerical.
8      Q.  Okay.  But do you know what the letters
9  mean?
10     A.  I can't be sure, no.
11     Q.  What -- in the S.100 document, what is the
12  second mode?
13     MR. SHARIFAHMADIAN:  Objection, vague.
14     THE WITNESS:  The second mode is the alphamosaic
15  mode.
16  BY MR. MARINA:
17     Q.  And what's the third mode?
18     A.  It's -- it's a different command in the
19  parallel form of the alphamosaic mode, a different
20  set of commands.
21     Q.  So is --
22         Are you identifying the same mode as
23  satisfying the second and third modes?
24     MR. SHARIFAHMADIAN:  Objection, mischaracterizes
25  testimony.

24  (Pages 90 to 93)

**Exhibit 16**
**Page 515**

Page 94

1    THE WITNESS: I'm using the same methodology that
2  Mr. Richter used, in that I am identifying individual
3  commands which set the -- and I'll say the word
4  "state" just so I distinguish -- that sets the state
5  of the graphic system so as to operate in a
6  particular mode.
7  BY MR. MARINA:
8    Q.  What makes the parallel mode of the
9  alphamosaic option the mode of access within the
10  meaning of the claims?
11   A.  It's the same logic that Mr. Richter uses.
12   Q.  Is that all you can tell me, sir?
13   A.  I can explain that in more detail, if you'd
14  like.
15   Q.  I'm interested in your logic, since you're
16  the one who is opining on the issue of invalidity.
17   MR. SHARIFAHMADIAN: Objection, argumentative.
18   THE WITNESS:  And I tried to explain as carefully
19  as I could in the report, and I'm happy to elaborate
20  on it, sir, that I am using Mr. Richter's method of
21  analyzing the art, and it -- what Mr. Richter did was
22  to identify individual commands and indicate that
23  once that command was issued that it somehow put you
24  into a pretty clear mode of operation.
25  BY MR. MARINA:

Page 95

1    Q.  In paragraph 35 of your supplemental
2  report --
3    A.  Mm-hmm.
4    Q.  -- when you say -- in reference to
5  Recommendation S.100 that "The processing means
6  selects from a plurality of modes of access to color
7  data values including an alphamosaic, alphageometric,
8  dynamically redefinable character sets and
9  photographic representation" -- do you see that?
10   A.  Yes, I do.
11   Q.  Why are those modes of access within the
12  meaning of the claims?
13   A.  Because those are different ways -- those
14  are different --
15   MR. SHARIFAHMADIAN: Objection to the extent it
16  mischaracterizes the report.
17   THE WITNESS:  Those are different manners of
18  retrieving color data values.
19  BY MR. MARINA:
20   Q.  Can you explain that.  For example, with
21  respect to photographic representation, how is that a
22  mode of access?
23   A.  Photographic representation is given a very
24  terse discussion in S.100, and I'll have to review
25  it, if you give me a moment.

Page 96

1    Q.  Okay.
2    A.  (Witness reviewing document.)
3    Okay.  The best description of it in S.100
4  is found in page 197, in Section 8, and it relates
5  to -- if you read the first line there, it says, "The
6  alphaphotographic option is used to render an image
7  by the transmission and display of individual picture
8  elements," so this particular mode of access renders
9  an image by using individual pixels, whereas in the
10  alphamosaic, the alphageometric and, I believe, in
11  the dynamic reconfigurable character sets, you're
12  working in blocks of bits.  So the colors are being
13  now identified with individual bits as opposed to
14  blocks of bits, so it's being accessed in a way so
15  that, you know, each color is with one -- one bit,
16  with one -- I'm sorry, with one pixel.
17   Q.  What does that have to do with the matter of
18  retrieving?  Where are things being retrieved from?
19   A.  Well, it doesn't really matter for this
20  purpose as to where you're retrieving it from.  The
21  important point is that when it's retrieved, you're
22  retrieving it for an individual pixel and not for a
23  block of pixels.  So it's different than the other
24  ones.
25   Q.  I understand.

Page 97

1    But if a mode of access is a manner of
2  retrieving, you have to be retrieving from somewhere,
3  right?
4    A.  Yeah, that's true.
5    Q.  Where are you retrieving from?
6    A.  The -- in this particular case, S.100
7  doesn't say, and I guess I -- I don't know for this
8  particular mode where it's retrieving from.
9    Q.  What about the other modes that you
10  identified?  Where are color data values being
11  retrieved from?
12   A.  Well, I talk about that in relation to the
13  various modes.
14   Q.  Mm-hmm.
15   A.  We can walk through each one, if you like.
16   Q.  Can you just tell me.
17   A.  Well, it depends on the mode.
18   Q.  Well, the first one is mosaic character
19  sets.
20   A.  Okay.  That's doing a direct access.  That's
21  based on the -- no, I'm sorry.  I screwed that up.
22   Mosaic is what I've also called alphamosaic
23  characters.  That's based on the Antiope system, and
24  so that is being accessed from the color memory.
25   Q.  Does that make it the second mode or third

Exhibit 16
Page 516

Page 98

1  mode?
2      A.  It's -- I mean the second mode is what I
3  said the second mode was.
4      Q.  Right.
5      A.  We can go back to that.
6      Q.  What I'm getting at, isn't it true that even
7  the first mode you can access the color mode?
8      MR. SHARIFAHMADIAN:  Objection; lack of
9  foundation.
10     THE WITNESS:  Yes, of course.  In the first mode,
11 you can access the color memory, but that's not the
12 way the -- in the first mode, the foreground color is
13 specified directly.  That's what distinguishes the
14 mode.
15 BY MR. MARINA:
16     Q.  And if you turn to Section 9.3.1 of
17 Recommendation S.100 --
18     A.  Okay.  I'm sorry.  Let me get back there.
19     Q.  Okay.
20     A.  Okay.
21     Q.  See it says there that "Most of the
22 currently planned and/or offered services utilize
23 images created with only eight colours, which are
24 formed by the various combinations (on or off) of the
25 three primary colors -- red, green and blue"?

Page 99

1      A.  Yes, I see that.
2      Q.  Okay.  What does that mean to you?
3      A.  It means that there -- the -- exactly what
4  it says, that currently the systems that are being
5  offered only have eight colors.
6      Q.  And with respect to the part of the sentence
7  that talks to "various combinations (on or off) of
8  the three primary colors," what does that mean?
9      A.  It means that those eight colors are
10 combinations of the three primary colors.  For three
11 bits, or three colors, there's eight possible
12 combinations.
13     Q.  So, for example, one zero -- if we look at
14 it red, green, blue, one zero zero would be red?
15     MR. SHARIFAHMADIAN:  Objection, vague.
16     THE WITNESS:  Well, it depends on if that's -- if
17 that's the way you want to define it, that one zero
18 zero is red, I'll accept that.
19 BY MR. MARINA:
20     Q.  Well, there are two values, on or off,
21 right?
22     A.  For each bit there is always two values, on
23 or off, that's correct.
24     Q.  Let's assume on is one and off is zero.
25     A.  Okay.

Page 100

1      Q.  Then if I have one zero zero, that's red,
2  correct?
3      A.  Well, not necessarily.  I mean it depends on
4  how you define your system.
5      Q.  Well, I'm just reading this sentence.  If
6  the combination of the primary colors I have is red
7  on, green off and blue off --
8      A.  Okay.
9      Q.  -- don't I have a red color?
10     A.  Well, now you just added more information,
11 and in that situation, if red is the only gun that
12 you have on, then, of course, you have red.  You have
13 a red display at that point.
14     Q.  Right.
15         And so if I have, similarly, red off, green
16 on and blue off, then I have the color green, right?
17     A.  If the only gun you have activated is green,
18 then, of course, you have green.
19     Q.  And so isn't Section 9.3.1 saying that you
20 specify an on or off value for each of the primary
21 colors?
22     A.  I -- I don't think I can quite reconcile
23 your statement with what -- with that first sentence.
24     Q.  Well, do you agree that 9.3.1 is talking
25 about Recommendation S.100?

Page 101

1      A.  And display enhancements to it, yes.
2      Q.  Right.
3         It says "currently," what's currently going
4  on, right --
5      A.  Mm-hmm.
6      Q.  -- "and/or offered" --
7      A.  Mm-hmm.
8      Q.  -- is that you specify colors, three
9  combinations of three primary colors, right?
10     A.  It's --
11     MR. SHARIFAHMADIAN:  Objection, mischaracterizes
12 the document.
13     THE WITNESS:  It says that the colors that are
14 currently being offered are combinations of those
15 three colors.
16 BY MR. MARINA:
17     Q.  Right.
18     A.  Is -- that's what I feel it says.
19     Q.  Okay.  And the way that they're combined,
20 though, is that you have an on or off value for the R
21 value; you have an on or off value for the green
22 value; and you have an on or off value for the blue
23 value, right?
24     A.  Well, it says it's through various
25 combinations, and then it says on or off of the three

26  (Pages 98 to 101)

Page 102

1  primary colors. So it is all eight possible
2  combinations of those three possible primary colors.
3      Q. Right. And isn't --
4        With respect to any given combination, isn't
5  the value you give to red a color data value?
6      MR. SHARIFAHMADIAN: Objection, vague,
7  mischaracterizes the document.
8      THE WITNESS: A color data value, if we go back
9  to the Court, is -- we can look it up again.
10  BY MR. MARINA:
11      Q. All right. I can tell you.
12        It's a color component of a particular
13  color.
14      A. Right.
15      Q. Such as the red, green and blue RGB color
16  components.
17      A. Correct. So -- okay. I'm sorry. Go ahead.
18      Q. So isn't 9.3.1 saying that you specify the
19  RGB in blue components --
20      MR. SHARIFAHMADIAN: Objection, mischaracterizes
21  the --
22  BY MR. MARINA:
23      Q. -- through either an on or a off?
24      MR. SHARIFAHMADIAN: Same objection.
25      THE WITNESS: 9.3.1 says that the images are

Page 103

1  created with only eight colors. Those eight colors
2  are made up of the eight possible combinations of
3  red, green and blue, and so it says -- it's kind of a
4  given for all displays that the display shows color
5  data values on the screen that happen to be, in
6  current systems, these eight possibilities, which are
7  the -- all eight combinations of red, green and blue.
8  BY MR. MARINA:
9      Q. But you won't admit for me, sir, that in
10  Figure 7/S.100 on page 181 of Recommendation S.100
11  that bits 1, 2 and 3 are the on and off values for
12  the -- for R, G and B?
13      MR. SHARIFAHMADIAN: Objection, asked and
14  answered.
15      THE WITNESS: Figure 7 shows a series of commands
16  for setting the foreground and background colors.
17  The -- the bits -- the least of your three bits help
18  to define the least -- the least of the three bits of
19  those commands.
20  BY MR. MARINA:
21      Q. They're the on and off values of R, G and B,
22  correct?
23      MR. SHARIFAHMADIAN: Objection, mischaracterizes
24  the document, the previous testimony and is
25  argumentative.

Page 104

1      THE WITNESS: No, it's not. Those bits select
2  which one of the foreground or background commands
3  are going to be issued.
4  BY MR. MARINA:
5      Q. Do you know if Recommendation S.100 was ever
6  implemented?
7      A. I don't know.
8      Q. So it could have been a big failure, right?
9      MR. SHARIFAHMADIAN: Objection, calls for
10  speculation.
11      THE WITNESS: I don't know. It could have been
12  implemented everywhere. It could have been a big
13  success.
14  BY MR. MARINA:
15      Q. But you don't know?
16      A. I don't know.
17      Q. And, therefore, you won't be offering any
18  opinions on that issue, correct?
19      A. That's correct.
20      Q. Okay. Let's -- I think we talked about this
21  earlier today, and I asked you what in-use background
22  color is, and you said you needed the construction,
23  right?
24      A. Okay.
25      Q. Now you have it, so I want to understand a

Page 105

1  little bit about an in-use background color.
2      A. Okay.
3      Q. That's defined, right, as a color that will
4  be used as a background color for subsequently
5  received text and graphics drawing commands until
6  changed, right?
7      A. That's correct. That's what the Court said.
8      Q. Okay. So does that mean if --
9        A user sets a background color, right?
10      A. Okay.
11      Q. And then the user issues, for example, a
12  text command, right?
13      A. Mm-hmm.
14      Q. And then the background of the text will be
15  whatever the in-use background color was that was
16  set, right?
17      MR. SHARIFAHMADIAN: Objection --
18      THE WITNESS: Okay.
19      MR. SHARIFAHMADIAN: -- vague, incomplete
20  hypothetical.
21  BY MR. MARINA:
22      Q. Right.
23        I'm just trying to understand. Does that
24  make sense so far?
25      A. That is all part of your hypothetical? I --

TSG Reporting - Worldwide      877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

**Exhibit 16**
**Page 518**

1    Q.  Right.
2    A.  I understand it so far.
3    Q.  All right.
4        So then the idea is -- is it --
5        Well, is it the idea that you only have to
6    set the in-use background color once, right, so that
7    in the future when you're giving text commands, for
8    example, you don't have to keep issuing the
9    background color command, right?
10       MR. SHARIFAHMADIAN: Objection, vague, incomplete
11   hypothetical.
12       THE WITNESS:  Well, I think you're -- I mean
13   you're talking -- just talk about the intent
14   behind -- behind why we have an in-use background
15   color some?
16   BY MR. MARINA:
17       Q.  I'm trying to understand what this means,
18   this construction.
19       A.  Okay.
20       MR. SHARIFAHMADIAN: Objection to the extent it
21   calls for a legal conclusion.
22       THE WITNESS:  Well, I -- I think it would -- it
23   might be improper for me to try and explain beyond
24   what the Court said, but I mean I could do so, but
25   the ultimate -- the ultimate definition is what the

1    Court provided.
2    BY MR. MARINA:
3        Q.  I understand that, but, I mean, are you not
4    going to explain to the jury, beyond reading the
5    claim construction, what an in-use color is?
6        MR. SHARIFAHMADIAN: Objection, vague,
7    argumentative.
8        THE WITNESS:  I think I will try and do my best
9    to try and stay within the bounds of what the Court
10   intended in the definition, but, yes, I think I -- I
11   mean I don't know.  I'll answer whatever questions
12   are asked of me on the stand.
13   BY MR. MARINA:
14       Q.  If I set an in-use -- strike that.
15       If the user sets an in-use background color,
16   is it true that the user will not be required to set
17   the background color each time a drawing command is
18   given?
19       MR. SHARIFAHMADIAN: Objection, vague, incomplete
20   hypothetical.
21       THE WITNESS:  You wouldn't have to.  I mean if
22   that's the way he wanted his system to operate, if
23   that's the way he wanted the display to appear.
24   BY MR. MARINA:
25       Q.  Well, do you agree with me that if you

1    have -- if the user has to set the background color
2    each time a drawing command is given, then that's not
3    -an in-use background color, right?
4        MR. SHARIFAHMADIAN: Objection, vague, incomplete
5    hypothetical, lacks foundation.
6        THE WITNESS:  Well, let's put it this way:  If he
7    did set it each time, he would be redefining the
8    in-use background color, and so no, I think -- I
9    think I need a little more detail as to whether --
10   does this -- can you issue a command that gives both
11   a text -- both a text character and a foreground and
12   a background specification with it?  I mean I -- I'm
13   sorry --
14   BY MR. MARINA:
15       Q.  I guess -- I guess --
16       Is what you're saying that there's no
17   difference between an in-use background color and a
18   background color?
19       MR. SHARIFAHMADIAN: Objection, mischaracterizes
20   testimony and the report.
21       THE WITNESS:  No.  I think I said earlier that a
22   background color could be an in-use background color,
23   so, therefore, that means that the word "background
24   color," in my mind, is more general than "in-use
25   background color."

1    BY MR. MARINA:
2        Q.  All right.
3        A.  So in-use background color is one type of
4    background color.
5        Q.  And what distinguishes an in-use background
6    color from some other background color?
7        A.  I would say an in-use background color is
8    one that satisfies the Court definition, that it's a
9    color that can be used as the background color for
10   subsequently received text and graphics drawing
11   commands until completion.
12       Q.  Can you give me an example of a background
13   color that does not satisfy --
14       A.  The Court's definition?
15       Q.  The Court's definition.
16       A.  Sorry, didn't mean to --
17       Q.  That's all right.
18       A.  -- jump on your question.
19       A background color that is being shown on
20   the screen at this time in some -- some manner
21   whereby the display is produced, but now you're
22   producing a display somewhere else on the screen that
23   is being -- whereby the characters in the graphics as
24   they are being generated are using a different
25   background color.  The background color in the area

TSG Reporting - Worldwide    877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 519

Page 110

1  that is not being affected may be not in use because
2  it's a different color, selected at a different time.
3      MR. SHARIFAHMADIAN:  Whenever is a good time for
4  a break.
5  BY MR. MARINA:
6      Q.  So how can --
7          How can an in-use background color be
8  changed?  How is it changed?
9      MR. SHARIFAHMADIAN:  Objection, argumentative,
10  incomplete hypothetical.
11      THE WITNESS:  The Court doesn't say.  It -- it
12  can -- I mean it says "until changed."  The Court
13  gave it in as a passive form.
14  BY MR. MARINA:
15      Q.  Mm-hmm.
16      A.  So however it's changed.
17          I mean I can give you examples how it could
18  be changed.
19      Q.  Okay.
20      A.  It could be changed by a new command.  It
21  could also be changed by something happening in the
22  machine, such as a reset.
23      Q.  Mm-hmm.
24      A.  It could be changed by starting a new screen
25  display.  It could be changed by some particular

Page 111

1  sequence of text being printed.  It's however it's
2  changed.
3      Q.  In the hypothetical you -- you gave me where
4  you -- you have one portion of the screen is a
5  certain background and you're drawing text with
6  another background --
7      A.  Mm-hmm.
8      Q.  -- why isn't the background of the text that
9  you're drawing in the in-use background?
10      MR. SHARIFAHMADIAN:  Objection to the extent it
11  mischaracterizes testimony.
12      THE WITNESS:  Because in my hypothetical I assume
13  it had been changed.
14  BY MR. MARINA:
15      Q.  But from the point of changing going
16  forward, is it -- it's not an in-use background
17  color?
18      MR. SHARIFAHMADIAN:  Objection, argumentative,
19  incomplete hypothetical.
20      THE WITNESS:  The background color that is no
21  longer being used, the one in the -- what I'll call
22  the old part of the screen, that was what I said is
23  not an in-use --
24  BY MR. MARINA:
25      Q.  I see.

Page 112

1      A.  -- background color.
2      Q.  How do you interpret the phrase "used as the
3  background color for subsequently received text and
4  graphics drawings commands"?
5      MR. SHARIFAHMADIAN:  Objection, vague, lacks
6  foundation, calls for a legal conclusion.
7      THE WITNESS:  I think the Court's words are
8  pretty clear.  This is the background color -- this
9  is the color that will be used as the background when
10  you get subsequently received text and graphics
11  drawings commands.
12  BY MR. MARINA:
13      Q.  It doesn't say -- you can tell me if I'm
14  wrong -- it doesn't say that it's the colors used as
15  the background for subsequently received text and
16  graphics, right?
17      MR. SHARIFAHMADIAN:  Objection --
18  BY MR. MARINA:
19      Q.  It doesn't say that?
20      MR. SHARIFAHMADIAN:  -- calls for a legal
21  conclusion.
22      THE WITNESS:  It says for text and graphics
23  drawing commands.
24          I'm sorry.  Is that different than what you
25  just said?

Page 113

1  BY MR. MARINA:
2      Q.  So it has to be the colors used for the
3  commands, right?
4      MR. SHARIFAHMADIAN:  Objection, calls for a legal
5  conclusion, vague.
6      THE WITNESS:  For subsequently received text and
7  drawing commands, right.  That's what they -- that's
8  what the words say.
9  BY MR. MARINA:
10      Q.  So there's a linkage, is there not, between
11  the color and the commands, right?
12      MR. SHARIFAHMADIAN:  Objection, vague, incomplete
13  hypothetical, calls for a legal conclusion.
14      THE WITNESS:  Well, they're used in the same
15  sentence.  It's -- the words "subsequently received
16  text and graphics drawing commands" are -- follows
17  the "for," so I mean it's -- it's -- this is the
18  background color that's going to be used for
19  subsequently received text and graphics drawing
20  commands.
21  BY MR. MARINA:
22      Q.  So isn't it true that the text and graphics
23  drawing commands have to actually draw in that
24  background color?
25      MR. SHARIFAHMADIAN:  Objection, calls for a legal

29  (Pages 110 to 113)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 520

Page 114

1  conclusion.
2      THE WITNESS: I don't see those words. It
3  doesn't say the word "draw" in there.
4  BY MR. MARINA:
5      Q.  It says "drawing commands," right?
6      A.  Well, it says that these are the text and
7  graphics drawing commands, commands which -- commands
8  which perform a drawing function.
9      Q.  Right.
10     A.  But it doesn't say that it has to draw in
11 that background color.
12     Q.  Well, it says, though, that the background
13 color is used for subsequently received text and
14 graphics drawings commands, correct?
15     A.  That's --
16     MR. SHARIFAHMADIAN: Objection, calls --
17     THE WITNESS: Sorry.
18     MR. SHARIFAHMADIAN: Excuse me.
19     THE WITNESS: Sorry.
20     MR. SHARIFAHMADIAN: Objection, argumentative --
21 BY MR. MARINA:
22     Q.  Doesn't that --
23     MR. SHARIFAHMADIAN: -- calls for a legal
24 conclusion.
25 BY MR. MARINA:

Page 115

1      Q.  Doesn't that tell you that the text and
2  graphics drawing commands are going to use a color?
3      MR. SHARIFAHMADIAN: Objection, argumentative,
4  calls for a legal conclusion.
5      THE WITNESS: It doesn't say that in there.
6  BY MR. MARINA:
7      Q.  You don't read it that way?
8      A.  No, I don't.
9      MR. SHARIFAHMADIAN: I asked a few minutes ago if
10 there's a good time for a break.
11     MR. MARINA: Okay.
12     MR. SHARIFAHMADIAN: I'd like to accommodate you,
13 but if you're going to keep going, I'm going to just
14 take the break after --
15     MR. MARINA: I know.  But you can't take a break
16 when you want.  I have a deposition going on.  We've
17 got three lawyers here.
18     MR. SHARIFAHMADIAN: I can take a break any time
19 I want --
20     MR. MARINA: No, you cannot.
21     MR. SHARIFAHMADIAN: -- provided a question is
22 not pending.
23     MR. MARINA: Yeah, and a question was pending.
24 I'm in the middle of a line of questioning, and
25 because you don't like where it's going, you can't

Page 116

1  just take a break.
2      But we can take a break now.
3      THE VIDEOGRAPHER: Going off the record, the time
4  is 2:18 p.m.
5      (Recess taken.)
6      THE VIDEOGRAPHER: Back on the record, the time
7  is 2:28 p.m.
8      Please begin.
9  BY MR. MARINA:
10     Q.  With respect to Claim 1, one of the elements
11 there is a processing means, right?
12     A.  Yes, I believe it is.
13     Q.  And the Court construed the processing means
14 to have certain corresponding structure, correct?
15     A.  Yes, it did.
16     Q.  And the structure included an algorithm,
17 right?
18     A.  Yes, it did.
19     Q.  And certain lines from the specification of
20 the patent, correct?
21     A.  Yes.
22     Q.  Please show me where in your report you
23 indicate how Recommendation S.100 purportedly
24 discloses the corresponding structure identified by
25 the Court.

Page 117

1      A.  Okay.
2      (Witness reviewing document.)
3      On the discussion of how you get into the
4  various modes of access by using command and data
5  sequence as executed by the processing means is
6  discussed, at least partially, in paragraph 36, which
7  talks about, as an example, two different modes for
8  the alphamosaic option, and it gives the command
9  sequences for -- for getting into those modes.
10     In addition, in paragraph 37, it talks about
11 how to get into the alphageometric option, and,
12 again, it gives the command sequences -- command and
13 data sequences for doing that.
14     Q.  Okay.  Where is the algorithm?
15     A.  The algorithm is as -- understood by reading
16 these references that when you execute the processor
17 and you encounter one of these command and data
18 sequences, you then enter that mode.
19     And that is very similar to what is
20 discussed in the patent for entering modes based on
21 reading certain command and data sequences.
22     Q.  But where do you explain how the algorithm
23 in Recommendation S.100 is the same as the algorithm
24 that the Court identifies as corresponding structure?
25     MR. SHARIFAHMADIAN: Objection, asked and

30  (Pages 114 to 117)

Exhibit 16
Page 521

Page 118

1  answered, argumentative.
2      THE WITNESS: Are you asking me where do I, for
3  example, do a one-for-one lineup between the
4  individual flow-chart boxes?
5  BY MR. MARINA:
6      Q. You don't do any lineup, isn't that correct?
7      MR. SHARIFAHMADIAN: Objection, argumentative,
8  mischaracterizes the report and his testimony.
9      THE WITNESS: I describe in my report how you get
10 into the different modes, which is what the Court
11 said was required for the appropriate structure.
12 BY MR. MARINA:
13     Q. Well, the Court didn't say what was required
14 was a certain algorithm with certain boxes in it,
15 correct?
16     MR. SHARIFAHMADIAN: Objection, vague.
17     THE WITNESS: The Court provided those boxes as a
18 explanation for what the structure was for getting
19 into the different modes, and that's what -- that's
20 what I explain here, how to get into the various
21 modes.
22 BY MR. MARINA:
23     Q. It's not an explanation, sir, it's the
24 construction that must be present, correct?
25     A. Mm-hmm.

Page 119

1      Q. All right.
2      MR. SHARIFAHMADIAN: Objection, calls for a legal
3  conclusion, vague --
4  BY MR. MARINA:
5      Q. And I don't see it.
6      MR. SHARIFAHMADIAN: -- argumentative.
7  BY MR. MARINA:
8      Q. Maybe you can point me to it. I don't see
9  where -- anywhere in your point with regard to any
10 reference you cite where you discuss how any
11 reference discloses the corresponding structure of
12 the processing means in Claim 1.
13     MR. SHARIFAHMADIAN: Objection, argumentative --
14 BY MR. MARINA:
15     Q. Can you show me where that is, sir.
16     MR. SHARIFAHMADIAN: -- mischaracterizes the
17 report.
18     THE WITNESS: Well, it's at least in
19 paragraphs 36 and 37.
20 BY MR. MARINA:
21     Q. Okay.
22     A. And also paragraph 38 discusses how these
23 various options can be used together.
24     Q. Okay.
25     A. And of course each of the different

Page 120

1  individual -- first, second and third mode, I
2  described in subsequent paragraphs for how those are
3  entered by issuing the different commands which
4  utilize the commands for specifying the foreground
5  and background colors.
6  BY MR. MARINA:
7      Q. But you don't describe how those commands
8  are interpreted, correct?
9      MR. SHARIFAHMADIAN: Object --
10 BY MR. MARINA:
11     Q. You don't disclose the algorithm anywhere in
12 your report, correct?
13     MR. SHARIFAHMADIAN: Objection, mischaracterizes
14 the report and the testimony.
15     THE WITNESS: The algorithm is a software program
16 which executes a specific set of -- specific command
17 and data sequence for entering these various modes,
18 and what I provide is the -- the exact commands that
19 are necessary, the -- what escape sequence is
20 provided, what escape sequence is required and the
21 various commands that are -- that would execute in
22 order to perform these functions.
23     And so I believe I provided that structure
24 that the Court was asking for.
25 BY MR. MARINA:

Page 121

1      Q. But you don't describe the underlying
2  algorithm, right, that would interpret those commands
3  and data sequences, correct?
4      MR. SHARIFAHMADIAN: Objection, mischaracterizes
5  the report, the prior testimony, argumentative.
6      THE WITNESS: The underlying algorithm, I guess
7  I'm -- I'm not understanding what you're saying,
8  because -- maybe we're talking past each other.
9  Because I'll tell you again that I -- I provide the
10 detailed mechanism for how to get into the various
11 modes that I identified, and so to me that -- those
12 detailed mechanisms, that is the commands that are
13 issued, provides, I believe, the algorithm that
14 you're looking for.
15 BY MR. MARINA:
16     Q. You agree with me, sir, that the --
17 Claim 1 -- sorry.
18     (Reporter interruption.)
19     MR. MARINA: Let me say that again.
20     Q. You agree with me, sir, that Claim 1
21 requires a predetermined command and data sequence
22 comprising at least one command, correct?
23     MR. SHARIFAHMADIAN: Objection, mischaracterizes
24 the claim, incomplete.
25     THE WITNESS: That's at least part of Claim 1.

31 (Pages 118 to 121)

Page 122

1   BY MR. MARINA:
2       Q.  And then it also requires a processing means
3   responsive to the predetermined command and data
4   sequence, correct?
5       A.  That's correct.
6       Q.  And the Court identified the corresponding
7   structure for the processing means as a particular
8   algorithm and particular lines from the specification
9   of the '759 patent, correct?
10      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
11  the Court's claim construction.
12      THE WITNESS:  The Court identifies what the Court
13  identifies on page -- top of page 4 of the Court's
14  construction, which --
15      MR. MARINA:  So -- go ahead.
16      THE WITNESS:  Which says "Structure," and then it
17  says, the "Data processor 1 programmed to perform,"
18  and then there's a series of boxes that it -- that it
19  identifies.
20  BY MR. MARINA:
21      Q.  All right.
22          And nowhere do you say that
23  Recommendation S.100 or any other reference that you
24  cite discloses an algorithm as set forth in the
25  Court's corresponding structure, right?

Page 123

1       MR. SHARIFAHMADIAN:  Objection, mischaracterizes
2   the report, prior testimony, vague, compound.
3       THE WITNESS:  Sir, I do not use your exact words;
4   however, I do describe how the data processor is
5   programmed to perform the same functions using the
6   same structure as what the Court has required.
7   BY MR. MARINA:
8       Q.  And those are in the paragraphs you just
9   showed me?
10      A.  That would be at least in those paragraphs.
11  I believe the entirety of the S.100 section
12  encompasses that, because it's not only -- not only
13  for getting into the various modes that are shown in
14  36 and 37, but the modes for the first, second and
15  third mode, as it describes in the rest of that
16  section.
17      Q.  Do you agree with me that to show that -- to
18  show invalidity, at a minimum, you would have to show
19  that a prior-art reference contained predetermined
20  command and data sequence and also contained the
21  processing means responsive to the predetermined
22  command and data sequence?
23      MR. SHARIFAHMADIAN:  Objection, vague, calls for
24  legal conclusion, incomplete hypothetical.
25      THE WITNESS:  To show invalidity, you have to

Page 124

1   show that the entire claim is taught, all the
2   elements, and I -- what you just stated --
3       - (Reporter interruption.)
4       THE WITNESS:  Taught, t-a-u-g-h-t, taught.
5       -- and what -- what you just indicated, or
6   at least portions of that claim, so, yes, you have to
7   show that each of those elements are present or at
8   least obvious in light of the prior-art teaching.
9   BY MR. MARINA:
10      Q.  And so you agree with me that just showing
11  the predetermined command and data sequence does not
12  necessarily show the corresponding structure of the
13  processing means, right?
14      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
15  prior testimony, calls for a legal conclusion, vague
16  and mischaracterizes the report.
17      THE WITNESS:  I -- I believe I demonstrated what
18  I need to demonstrate; that is, I've indicated
19  exactly what commands are necessary, and at the very
20  least I -- I've done what -- what Mr. Richter
21  provided.  Mr. Richter provided only the commands
22  for -- he felt satisfied the claims, and I've at
23  least done that, and I've actually, I believe, taken
24  it further by giving the various codes that are
25  required in order to get you into those modes.

Page 125

1   BY MR. MARINA:
2       Q.  You didn't analyze the algorithm of the
3   Court's corresponding structure, correct, in your
4   report?
5       MR. SHARIFAHMADIAN:  Objection, vague,
6   mischaracterizes the report, mischaracterizes prior
7   testimony, asked and answered, argumentative.
8       THE WITNESS:  To the extent that the algorithm is
9   made up of commands that get you into the various
10  modes, that's what I -- exactly I believe that I
11  disclosed.
12  BY MR. MARINA:
13      Q.  Would you agree that you don't discuss the
14  algorithm from the Court's corresponding structure in
15  your supplemental report?
16      MR. SHARIFAHMADIAN:  Objection, argumentative,
17  asked and answered, mischaracterizes the report and
18  the prior testimony.
19      THE WITNESS:  I believe that the entire
20  discussion -- within the entire discussion of S.100,
21  the algorithm is provided.
22  BY MR. MARINA:
23      Q.  In paragraph 35 you say, "A processing means
24  is necessarily required to process the coded
25  information defined by Recommendation S.100."

32  (Pages 122 to 125)

Page 126

1    A. Yes.
2    Q. What does that mean?
3    A. Well, it means that the -- the piece of
4  prior art discusses a series of commands and data
5  that need to be executed to operate as described in
6  S.100, and one of ordinary skill recognizes that, of
7  course, a processing means is what executes commands
8  and reads data.
9    Q. So will there have to be like a data
10 processor?
11   A. There would have to be some type of
12 computing device that reads commands.
13   Q. So --
14   A. And commands the data and performs the
15 function.
16   Q. So, for example, in -- like a personal
17 computer you have a CPU, right?
18   A. Mm-hmm, yes.
19   Q. Okay. In the accused products, for example,
20 you have a CPU, right?
21   A. Yes.
22   Q. Okay. And what kind of processor does
23 Recommendation S.100 disclose?
24   A. It doesn't narrow that down. You can use
25 any processor you want.

Page 127

1    Q. It doesn't disclose any, right?
2    MR. SHARIFAHMADIAN: Objection, mischaracterizes
3  testimony, mischaracterizes the document,
4  argumentative.
5    THE WITNESS: It discloses a series of commands
6  and data for performing the functions, so it -- it
7  can be whatever you want. So it does not disclose
8  any particular processing means, because it doesn't
9  matter which processing means you use for
10 implementing the S.100 recommendation.
11 BY MR. MARINA:
12   Q. Except it does matter, because we have a
13 construction from the Court that needs to be
14 satisfied, right?
15   MR. SHARIFAHMADIAN: Objection, argumentative.
16   THE WITNESS: Well, we need to have a processing
17 means which performs the functions that the Court
18 specifies, and I have given you exactly what -- what
19 the commands are that perform the functions and that
20 have the structure that are required, and so you can
21 now use -- so by that explanation, you simply pick a
22 processing means to do that for you.
23 BY MR. MARINA:
24   Q. Let me show you the Crowther reference.
25   A. Okay.

Page 128

1    C-r-o-w-t-h-e-r.
2    (Exhibit No. 105 was marked for
3  -   identification.)
4    MR. MARINA: I can't find my own copy of the
5  Crowther reference, of course.
6    THE WITNESS: I saw you just passed . . .
7    MR. MARINA: There we go. So, for the record,
8  the Crowther reference, Exhibit 105, bears Bates
9  numbers GW-LT 437609 through 437618.
10   Q. So is it true that it's your opinion that
11 Crowther, combined with Recommendation S.100,
12 invalidates Claims 2 and 3 of the '759 patent?
13   A. (Witness reviewing document.)
14     Yes, that's correct.
15   Q. And is it true that one of the bases --
16 strike that.
17     I think you testified earlier that it -- you
18 believe Recommendation S.100 discloses color memory,
19 right?
20   MR. SHARIFAHMADIAN: Objection, mischaracterizes
21 earlier testimony.
22   THE WITNESS: S.100 does describe it. I pointed
23 out to you where that was, yes.
24 BY MR. MARINA:
25   Q. If it turns out that Recommendation S.100

Page 129

1  does not disclose a color memory --
2    A. Okay.
3    Q. -- how would your analysis of Claims 2 and 3
4  change?
5    MR. SHARIFAHMADIAN: Objection, incomplete
6  hypothetical.
7    THE WITNESS: Well, I -- I don't think it would
8  change because -- well, I don't think it would
9  change.
10 BY MR. MARINA:
11   Q. So you think one of ordinary skill in the
12 art would be led to combine a reference that deals
13 with the color memory to another reference that
14 doesn't have a color memory?
15   MR. SHARIFAHMADIAN: Objection, mischaracterizes
16 the report and earlier testimony.
17   THE WITNESS: Yes, I believe it still would.
18 BY MR. MARINA:
19   Q. And if --
20     You agree with me that if -- if
21 Recommendation S.100 does not contain a color memory,
22 then it certainly does not contain the first and
23 second -- strike that.
24     If -- if Recommendation S.100 does not
25 contain a color memory, then Recommendation S.100

33  (Pages 126 to 129)

Exhibit 16
Page 524

Page 130

1  does not disclose the second and third modes of
2  Claim 1, correct?
3      MR. SHARIFAHMADIAN: Objection, incomplete
4  hypothetical, mischaracterizes earlier testimony.
5      THE WITNESS: (Reviewing document.)
6          Well, since the color memory is required by
7  the second and third modes, then your statement is
8  correct.
9  BY MR. MARINA:
10     Q.  And you don't opine anywhere that Crowther
11 discloses any of the modes of access of Claim 1,
12 right?
13     MR. SHARIFAHMADIAN: Objection, mischaracterizes
14 the report.
15     THE WITNESS: No, I -- I don't opine on that. I
16 don't opine on that; although -- well, no, I don't
17 opine on that.
18 BY MR. MARINA:
19     Q.  Okay.  Claims 2 and 3 each have a processing
20 means, right?
21     A.  Yes, it does.
22     Q.  And the Court has identified corresponding
23 structure for those processing means in its claim
24 construction, correct?
25     A.  Yes, it has.

Page 131

1      Q.  Please show me in your supplemental report
2  where you provide an explanation as to how the
3  Crowther reference discloses the corresponding
4  structure of Claim 2.
5      MR. SHARIFAHMADIAN: Objection, lack of
6  foundation, mischaracterizes the report.
7      THE WITNESS: Okay.  Well, first of all, the
8  structure required is made up of two parts for
9  Claim 2.  The first part is structure for selecting a
10 mode of access to the color memory.  That is covered
11 in S.100, as we just discussed.  Okay?
12         So in -- in addition, the Court has added a
13 second part, which is setting a color data value in
14 the color memory.  And I believe the reference that I
15 made to Crowther on the top of page 17 covers that
16 structure.
17 BY MR. MARINA:
18     Q.  But you don't compare Crowther to the actual
19 construction, correct?
20     MR. SHARIFAHMADIAN: Objection, mischaracterizes
21 the report and the prior testimony.
22     THE WITNESS: The -- the construction identified
23 by the Court pointed out individual boxes which set a
24 color data value and color memory.  I identify a
25 discussion in Crowther which specifically talks about

Page 132

1  the design of a particular color memory and the
2  commands for setting color data values into that
3  -color memory.
4          So I believe in that discussion it has
5  satisfied the structure required by the Court.
6  BY MR. MARINA:
7      Q.  Could you have different algorithms to
8  implement a particular command?
9      MR. SHARIFAHMADIAN: Objection, vague, ambiguous,
10 incomplete hypothetical.
11     THE WITNESS: You're talking about in the
12 abstract for a computer design?
13 BY MR. MARINA:
14     Q.  Yeah.
15     A.  Yeah, that's possible.
16     Q.  So isn't it true that by merely pointing out
17 a certain command you -- without further you're not
18 explaining what the algorithm is that implements that
19 command?
20     MR. SHARIFAHMADIAN: Objection, vague,
21 argumentative, mischaracterizes the report and
22 earlier testimony.
23     THE WITNESS: No.  I think that by identifying
24 the command that I've shown here, that the Court's
25 structure that's shown is general enough that it says

Page 133

1  that it's -- you know, that it implements this
2  command, and so the specification of the commands
3  that are talked about in Crowther, I believe, are
4  satisfactory for describing that structure.
5  BY MR. MARINA:
6      Q.  Okay.  What's the command in Crowther that
7  you're talking about?
8      A.  It's -- in the reference it says these codes
9  in -- I'm looking at the top of page 17 now.
10     Q.  Mm-hmm.
11     A.  It says, "These codes are the 16 pre-defined
12 colours would be stored in memory as shown in
13 Figure 4," and there's a Figure 4 which shows the
14 structure of the color memory and decoders, and so
15 the command is the command that would be issued by
16 the processor for storing the colors into the memory.
17     Q.  What is the command?
18     MR. SHARIFAHMADIAN: Objection, asked and
19 answered.
20     THE WITNESS: The command --
21 BY MR. MARINA:
22     Q.  What's the name of the command?
23     A.  It doesn't say the name of the command.
24     Q.  How does the command work?
25     MR. SHARIFAHMADIAN: Objection, asked and

34  (Pages 130 to 133)

Page 134

1 answered.
2    THE WITNESS: It stores the color into the color
3 memory.
4 BY MR. MARINA:
5    Q.  What's the argument of the command?
6    MR. SHARIFAHMADIAN: Objection, vague.
7    THE WITNESS: It would necessarily be the color
8 to be stored.
9 BY MR. MARINA:
10    Q.  Is there only one argument?
11    MR. SHARIFAHMADIAN: Objection, vague, calls for
12 a hypothetical -- incomplete hypothetical.
13    THE WITNESS: It doesn't say.
14 BY MR. MARINA:
15    Q.  What format does the color that needs to
16 be --
17       What format does the color take in the
18 argument?
19    A.  It would necessarily be the format as
20 described in Crowther.
21    Q.  Which is what?
22    A.  It said it could be one of two different
23 possibilities. You could have 16 colors that are
24 coded in 4 levels or 16 levels. And I can read
25 exactly what Crowther says at the top, if you'd like.

Page 135

1    Q.  I can see it.
2       Can you have multiple algorithms to
3 implement such a command?
4    MR. SHARIFAHMADIAN: Objection, vague, incomplete
5 hypothetical.
6    THE WITNESS: I don't see how you would to the
7 level of this discussion.
8       The algorithm is for implementing this
9 command, so I think to the level that it's discussed,
10 it's -- it's a single high-level algorithm.
11 BY MR. MARINA:
12    Q.  How about the corresponding structure for
13 the setting function of Claim 3? Can you describe
14 where Crowther discloses that corresponding
15 structure.
16    A.  It's -- it's the same reference, because the
17 only difference between 2 and 3 is that, as I
18 understand it -- well, let me be careful and make
19 sure.
20       (Witness reviewing document.)
21       Yeah. 3 is simply dependent on 2, and it
22 adds the necessity to set multiple colors. And so it
23 says in Crowther that "These codes," plural, "of the
24 16 pre-defined colours," plural, "would be stored in
25 memory as shown in Figure 4."

Page 136

1       So it specifically addresses the idea of
2 plural -- plural storage or multiple color storage
3 - into the color memory.
4    Q.  Well, does Crowther disclose box 501 in
5 Figure 5?
6    MR. SHARIFAHMADIAN: Objection, calls for legal
7 conclusion, make the relevance argument later.
8    THE WITNESS: Let me find . . .
9       (Witness reviewing document.)
10    Box 501, just so we both understand, says
11 "Set index at equal to current foreground color."
12 BY MR. MARINA:
13    Q.  Right.
14    A.  And no, it doesn't specifically say those
15 words.
16    Q.  That's part of the corresponding structure,
17 though, correct?
18    MR. SHARIFAHMADIAN: Objection, mischaracterizes
19 the Court's claim construction, calls for a legal
20 conclusion.
21    THE WITNESS: That is in his Court claim
22 construction order.
23 BY MR. MARINA:
24    Q.  And would you --
25    A.  Although --

Page 137

1    Q.  Go ahead.
2    A.  -- I don't see that the Court requires that
3 you do an exact one-for-one correlation between
4 individual boxes in the specification and the -- and
5 the prior art.
6    Q.  So do you just ignore Box 501?
7    MR. SHARIFAHMADIAN: Objection, mischaracterizes
8 his testimony and his report.
9    THE WITNESS: No, you don't.
10 BY MR. MARINA:
11    Q.  You didn't even consider Box 501, right,
12 when you opined that Crowther, in combination with
13 Recommendation S.100, invalidates claim 3, correct?
14    MR. SHARIFAHMADIAN: Objection, mischaracterizes
15 testimony, mischaracterizes the report,
16 argumentative.
17    THE WITNESS: I considered the structure as a
18 whole that the Court gave me, of which 501 is part of
19 it.
20    MR. MARINA: I'm going to mark as Exhibit 106 a
21 document bearing Bates numbers GW-LT 437773 to
22 437844.
23       (Exhibit No. 106 was marked for
24       identification.)
25    THE WITNESS: Thank you.

Page 138

1  BY MR. MARINA:
2      Q.  Can you tell me what Exhibit 106 is, sir.
3      A.  This is a document from the Communications
4  Research Center, from the Department of
5  Communications in Canada, and it's titled "Picture
6  Description Instructions PDI for the Telidon Videotex
7  System."
8      Q.  And is it your opinion that CRC 699-E
9  discloses the color memory?
10     A.  Yes, it does.
11     Q.  Can you show me where.
12     A.  Okay.
13         (Witness reviewing document.)
14         Okay.  It's disclosed a couple different
15  places.  First I'd like to point out it's on page 70,
16  which is in the very back of the document,
17  second-to-last page.
18     Q.  Okay.
19     A.  And it says -- item b says, "Colour Lookup
20  could provide the capability of defining specific
21  colors such as flesh tones or shades of yellow to
22  brown to extend a terminal's colour capability.
23  Additional hardware is required for this capability
24  which is not cost effective at this time."
25     Q.  So you're saying that the words "Colour

Page 139

1  Lookup" refer to color memory in accordance with the
2  Court's claim construction?
3      MR. SHARIFAHMADIAN:  Objection to the extent it
4  mischaracterizes the testimony and the report.
5      THE WITNESS:  That word -- those words in
6  addition to -- the rest of that section which
7  describes what the capabilities of the color lookup
8  are.
9  BY MR. MARINA:
10     Q.  You agree with me that that section does not
11  actually describe what the color lookup -- first of
12  all, that -- paragraph b on page 7, it doesn't even
13  refer to color lookup as a noun, right?
14     MR. SHARIFAHMADIAN:  Objection, vague, compound,
15  mischaracterizes the document.
16     THE WITNESS:  I -- my parsing of that sentence is
17  it precedes the word "could," and normally a noun
18  precedes a verb, so I believe --
19  BY MR. MARINA:
20     Q.  Is --
21     A.  I believe that's a noun.
22     Q.  Is --
23         Does paragraph b refer to a color lookup
24  table?
25     A.  I think that's what it means to me.

Page 140

1  That's -- I believe it means to one of ordinary
2  skill.
3      Q.  I understand what it means to you, sir, but
4  I'm -- you need to answer my question.
5      A.  Okay.
6      Q.  Does paragraph b on page 70 of CRC 699
7  reference a color lookup table?
8      MR. SHARIFAHMADIAN:  Objection, argumentative,
9  asked and answered.  The witness is answering your
10  questions.  Just because you don't like the answer
11  doesn't mean that you get to harass him.
12     MR. MARINA:  I would love for this witness to get
13  in front of a jury and put up paragraph b and say
14  that paragraph b discloses a table when the word
15  "table" does not appear anywhere in paragraph b.
16     MR. SHARIFAHMADIAN:  I'm sorry.  Was that a
17  question?
18     MR. MARINA:  You engaged me, sir, in colloquy.
19     Q.  Sir, paragraph b on page 70 does not
20  disclose a table, correct?
21     MR. SHARIFAHMADIAN:  Objection, asked and
22  answered.
23     THE WITNESS:  No, sir, I disagree.  I believe
24  that the words that are provided makes clear that
25  it's referring to a table.

Page 141

1  BY MR. MARINA:
2      Q.  Paragraph b on page 70 does not mention
3  color data values; is that correct?
4      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
5  the document.
6      THE WITNESS:  It uses the word "colour."  It's a
7  "Colour Lookup," describing a table which contains
8  colors, which the color, as defined in the rest of
9  this document, is a color data value, as described by
10  the Court.
11  BY MR. MARINA:
12     Q.  Paragraph b on page 70 doesn't reference
13  color data values, does it?
14     A.  It does.
15     MR. SHARIFAHMADIAN:  Objection, asked and
16  answered, argumentative.
17     THE WITNESS:  It does.
18  BY MR. MARINA:
19     Q.  Inherently, is that your view?
20         It certainly expressly doesn't say that --
21  "color data values" in paragraph b on page 70, right?
22     MR. SHARIFAHMADIAN:  Objection, argumentative,
23  asked and answered, mischaracterizes prior testimony.
24     THE WITNESS:  The specific words "color data
25  values" do not appear.  The word "colour" does, which

36  (Pages 138 to 141)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 527

Page 142

1  is what -- what's addressed in the document describes
2  as to what it means by color, which would be the same
3  as the Court's definition of color data value.
4  BY MR. MARINA:
5     Q.  The word "table" also doesn't appear in
6  paragraph b on page 70, correct?
7     A.  The specific word "table" does not appear,
8  that's correct.
9     Q.  The word "memory" doesn't appear in
10 paragraph b on page 70, correct?
11    A.  Memory does not appear.
12    Q.  Okay.  And then at --
13       The last sentence says, "Additional hardware
14 is required for this capability which is not cost
15 effective at this time," right?
16    A.  Yes.
17    Q.  Wouldn't that tell one of ordinary skill in
18 the art not to implement a color lookup?
19    A.  I -- I don't see it that way, no.
20    Q.  You think that by saying "Additional
21 hardware is required for this capability which is not
22 cost effective at this time" is recommending that
23 somebody use a color lookup?
24    MR. SHARIFAHMADIAN:  Objection, asked and
25 answered, argumentative --

Page 143

1     THE WITNESS:  I think --
2     MR. SHARIFAHMADIAN:  -- mischaracterizes
3  testimony.
4     THE WITNESS:  I believe that it is recommending
5  that you can do this when it is cost effective.  In
6  fact, at the top it says this -- these various items
7  down here can be implemented.
8        And I'll read the sentence at the very top
9  of 70.  It says, "In addition there exist spare
10 Status Commands Access via the Control (STATUS)
11 opcodes to allow more system status features to be
12 developed."  And so they're, in fact, suggesting
13 these are more things that can be developed, and
14 they're only saying that the only thing holding up
15 this future development would be cost effectiveness.
16 When it becomes cost effective, I believe they're
17 recommending that this would be a good feature to
18 have.
19 BY MR. MARINA:
20    Q.  And isn't it possible it became cost
21 effective after the invention of the Fleming patent?
22    MR. SHARIFAHMADIAN:  Objection, hypothetical --
23 calls for a hypothetical, calls for speculation,
24 calls for a legal conclusion.
25    THE WITNESS:  Even if that were true, it doesn't

Page 144

1  stop one of ordinary skill from recognizing that this
2  is a feature that could be added, and having a design
3  - which performs a function that satisfies the patent
4  is not based on the economics.
5  BY MR. MARINA:
6     Q.  Do you think --
7        Well, sir, don't you say it is in your
8  background section?
9     MR. SHARIFAHMADIAN:  Objection, mischaracterizes
10 the report and the testimony.
11    THE WITNESS:  Can you point me to where I say
12 that?
13 BY MR. MARINA:
14    Q.  You don't know what you say in your
15 background section?
16    MR. SHARIFAHMADIAN:  Objection.
17 BY MR. MARINA:
18    Q.  Let me ask you this:  Is it good engineering
19 practice to implement a design that is not cost
20 effective?
21    MR. SHARIFAHMADIAN:  Objection, incomplete
22 hypothetical.
23    THE WITNESS:  It depends on -- on your purpose.
24 Sometimes designs are cost insensitive because the
25 functionality is required and it may be expensive but

Page 145

1  you still need to do it.
2  BY MR. MARINA:
3     Q.  Well, CRC 699 thought that using a color
4  lookup was not cost effective, right?
5     MR. SHARIFAHMADIAN:  Objection, mischaracterizes
6  the document.
7     THE WITNESS:  At the time of the document, that
8  is what it says.
9  BY MR. MARINA:
10    Q.  And therefore -- and did not implement a
11 color lookup, correct?
12    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
13 the document.
14    THE WITNESS:  Not at that time.
15 BY MR. MARINA:
16    Q.  Is there anywhere else in CRC 699 where you
17 believe that color memory is disclosed?
18    A.  Yes, there is.
19    Q.  Okay.  Can you show me that.
20    A.  There is a discussion that goes on for a few
21 pages, and if we need to we can refer to those also,
22 but ultimately on page 50 --
23    Q.  Okay.
24    A.  -- there's a statement near the top of the
25 page that says, "The facility bit b2 is reserved for

37 (Pages 142 to 145)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 528

Page 146

1  possible future use with colour reference tables."
2      Q.  Okay.  And you -- and you take "colour
3  reference tables" to mean color memory in accordance
4  with the Court's claim construction?
5      A.  Yes, I do.
6      Q.  Do you agree with me that the sentence on
7  page 50 that you just cited does not mention color
8  data values, correct?
9      A.  Again, it doesn't specifically use those
10  three words.  It says "colour," which in this
11  document is described as the same capabilities as
12  what the Court requires for color data values.
13      Q.  And you agree with me, sir, that on page 50
14  in the sentence you just cited the word "memory"
15  doesn't appear, right?
16      A.  That's correct.
17      Q.  And you agree that on page 50 it doesn't say
18  that color reference table is a color map that stores
19  a table of color data values indexed by number,
20  correct?  It doesn't say that?
21      A.  It doesn't say exactly those words.
22      Q.  Okay.
23      A.  The definition -- the description provided
24  there gives the same content.
25      Q.  And in the earlier -- according to you,

Page 147

1  right?
2      A.  I believe it's according to anyone of
3  ordinary skill.
4      Q.  So you believe --
5          You agree with me, sir, that on page 70 the
6  phrase "Colour Lookup" is used and on page 50 the
7  term "colour reference table" is used?
8      A.  Yes, that's correct.
9      Q.  So you believe that they're the same thing
10  even though inconsistent nomenclature is used?
11      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
12  the document, mischaracterizes the testimony.
13      THE WITNESS:  I believe that they are within the
14  same general discussion.  They're within the same
15  topic of being discussed.  They may not refer to the
16  identical object, but I think they're pointing
17  towards the same -- the same capability, the same
18  mechanism.
19  BY MR. MARINA:
20      Q.  You agree with me, sir, that CRC 699-E does
21  not actually disclose a second mode of access?
22      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
23  the document.
24      THE WITNESS:  (Reviewing document.)
25          I think that one of ordinary skill would

Page 148

1  understand that a second mode of access would be
2  obvious, given the teachings of 699-E alone.
3  BY MR. MARINA:
4      Q.  Okay.  Again, you agree with me, sir, that
5  CRC 699 talks about future implementation of a color
6  reference table and color lookup, right?
7      A.  Yes.
8      MR. SHARIFAHMADIAN:  Objection, mischaracterizes
9  the document.
10  BY MR. MARINA:
11      Q.  So can you conclude from that that CRC 699
12  does not actually make use of color reference tables
13  or color lookup in the system described --
14      MR. SHARIFAHMADIAN:  Objection, asked and
15  answered.
16  BY MR. MARINA:
17      Q.  -- since they don't exist in the system,
18  color reference tables and color lookup?
19      MR. SHARIFAHMADIAN:  Objection, vague, asked and
20  answered.
21      THE WITNESS:  The document -- the four corners of
22  the document provide information about what was
23  existent at the time of the writing of the document.
24  It also talks about future capabilities.
25          So within the -- within the text of the

Page 149

1  complete document, it provides one of ordinary skill
2  with the teachings which allows you to have a color
3  memory and to implement the second mode.
4          I mean I agree with you, to answer your
5  question directly, the system at the time of the
6  writing of this document, that physical system did
7  not literally include a color memory.  However,
8  within the entirety of the document, it taught a
9  color memory and, therefore, the possibility for --
10  the mechanisms for a second mode.
11  BY MR. MARINA:
12      Q.  What about the third mode?  Did it disclose
13  a third mode?
14      A.  (Witness reviewing document.)
15      MR. SHARIFAHMADIAN:  Objection, vague.
16      THE WITNESS:  No, I don't believe that it
17  discloses by itself a third mode.
18  BY MR. MARINA:
19      Q.  Okay.  You need to incorporate another
20  reference into it?
21      A.  That's correct.
22      Q.  Which one is that?
23      A.  The Antiope specification.
24      Q.  So CRC 699 relates to Telidon?
25      A.  That's correct.

38  (Pages 146 to 149)

**Exhibit 16**
**Page 529**

## Page 150

1    Q.  Do you know if there was a system ever
2    developed that included both Telidon and Antiope
3    functionality?
4    A.  I believe that was the motivation behind the
5    S.100 recommendation.
6    Q.  Right.
7        But you don't know if Recommendation S.100
8    was actually ever implemented anywhere, right?
9    A.  That's correct.
10   MR. MARINA:  We have to change the tape.
11   MR. SHARIFAHMADIAN:  Okay.
12   THE VIDEOGRAPHER:  This marks the end of DVD
13   number 2 in the deposition of Robert Wedig.  Going
14   off the record, the time is 3:18 p.m.
15       (Recess taken.)
16   THE VIDEOGRAPHER:  This marks the beginning of
17   DVD number 3 in the deposition of Robert Wedig.
18   Going off the -- going on the record, the time is
19   3:27 p.m.
20       Please begin.
21   BY MR. MARINA:
22   Q.  In paragraph 71 of your supplemental report
23   you talk about one of ordinary skill in the art
24   having many reasons to combine the teachings of CRC
25   699 with Antiope.

## Page 151

1    A.  Yes.
2    Q.  And then you have a citation to Videotex
3    report series, right?  See that?
4    A.  "Videotex Key Issues," is that what --
5    Q.  Right --
6    A.  -- the cite you're referring to?
7    Q.  Right.
8    A.  Yes.
9    Q.  The paragraph you reproduced there, that
10   doesn't talk about combining Antiope with Telidon,
11   right?
12   MR. SHARIFAHMADIAN:  Objection, mischaracterizes
13   the document.
14   THE WITNESS:  (Reviewing document.)
15       I think it could be read that way.
16   BY MR. MARINA:
17   Q.  Where -- where does it --
18       How could you read it that way, sir?  Please
19   explain it to me.
20   A.  Well, it clearly says that it's possible to
21   define different graphic methods in the first
22   sentence.
23   Q.  Okay.
24   A.  And then it talks about how Prestel has
25   combined alphamosaic and photographic.

## Page 152

1    Q.  Okay.
2    A.  Okay?
3    -    And then it says Antiope and Telidon have
4    performed similarly, meaning that they've combined
5    various modes also.
6    Q.  Okay.
7    A.  Well, the various modes that were known were
8    alphamosaic, alphageographic, photographic and
9    CRCS -- I forget the -- ERCS, and so if Antiope and
10   Telidon are performing similarly, that is they're
11   combining modes, then it's very reasonable that they
12   would combine modes of each other.
13   Q.  What I'm saying is the citation in
14   paragraph 71 doesn't say Antiope and Telidon should
15   be combined, right?
16   MR. SHARIFAHMADIAN:  Objection, mischaracterizes
17   your original question, mischaracterizes the
18   testimony.
19   THE WITNESS:  This citation says that various
20   organizations are combining their modes.  It says
21   that -- also says that Antiope and Telidon, in
22   addition to Prestel in here, is combining modes.
23   They are performing that kind of function.
24   BY MR. MARINA:
25   Q.  Okay.

## Page 153

1    A.  It says that -- well, it indicates that this
2    is happening.  And in the -- I believe read in
3    context, also, it says, you know, this is desirable
4    or this is the future, and in fact it says, in that
5    last sentence, at present it's not clear which method
6    or combination of methods will be -- will prove to be
7    the most widely acceptable, and so it points towards
8    a future where a method or multiple methods will be
9    the standard that everyone uses.
10   Q.  So it's true, then, that in 1980 one of
11   ordinary skill in the art could not predict which
12   combination of graphics method would be the most
13   desirable, correct?
14   MR. SHARIFAHMADIAN:  Objection, mischaracterizes
15   the testimony.
16   THE WITNESS:  I believe this says that in 1980 we
17   weren't sure which particular combination would win
18   out, but, in fact, that a combination was clearly
19   going to happen.
20   BY MR. MARINA:
21   Q.  But does it say a combination of Antiope and
22   Telidon would happen?
23   MR. SHARIFAHMADIAN:  Objection, asked and
24   answered.
25   THE WITNESS:  I would say that that's completely

TSG Reporting - Worldwide        877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 530

Page 154

1  within the description that's given there, that that
2  is -- that that is a possibility.
3  BY MR. MARINA:
4     Q.  Do you know what technical differences
5  existed between the Antiope system and the Telidon
6  system?
7     MR. SHARIFAHMADIAN: Objection, vague.
8     THE WITNESS: Telidon -- as it says in the '759
9  patent, Telidon was specified color data values
10  directly, and Antiope specified it indirectly, as one
11  example.
12  BY MR. MARINA:
13     Q.  You know, sir, that '75 patent -- the '759
14  patent does not say that Antiope specified colors
15  indirectly, right?
16     MR. SHARIFAHMADIAN: Objection --
17  BY MR. MARINA:
18     Q.  You're inserting the word "indirectly" into
19  that, correct?
20     MR. SHARIFAHMADIAN: Objection, argumentative.
21     THE WITNESS: We can go back and review it, sir,
22  but this is the way I paraphrased it, and I believe
23  that it's clear. It's clear from that citation that
24  I have in column 1 that that is what it's saying.
25  BY MR. MARINA:

Page 155

1     Q.  But you are paraphrasing, correct?
2     A.  I am describing what is being -- what is
3  being discussed in that -- in that column 1 of the
4  patent, that's correct.
5     Q.  Beyond what you've just said, can you tell
6  me any other differences between Antiope and Telidon?
7     MR. SHARIFAHMADIAN: Objection, calls for a
8  narrative.
9     THE WITNESS: It's an extensive question. We
10  can -- I can take the Antiope specification side by
11  side with the Telidon specification. We can walk
12  through all the differences.
13  BY MR. MARINA:
14     Q.  Well, in paragraph 72 you opine that "a
15  person of ordinary skill in the art could have
16  predicted that the specification of foreground and
17  background colors using an index into a color map in
18  the Antiope system would perform the same function in
19  the manner used in the Telidon system specified by
20  CRC 699-E."
21     Do you see that?
22     A.  Yes, I see that.
23     Q.  In rendering that opinion, did you consider
24  any differences between Antiope and Telidon?
25     A.  I considered the whole of their design. I

Page 156

1  considered that, yes, of course, there are
2  differences. There are also vast similarities, that
3  they're both oriented towards the same market, they
4  are both Videotex systems, they are both meant to
5  display images on a screen. And so I considered the
6  entirety of their similarities and their differences.
7     Q.  Do you know if Telidon and Antiope were
8  designed or were meant to work on similar hardware?
9     MR. SHARIFAHMADIAN: Objection, vague.
10     THE WITNESS: No, I don't know what hardware
11  they're meant to work on.
12  BY MR. MARINA:
13     Q.  Telidon was a Canadian system; is that
14  right?
15     A.  That's correct.
16     Q.  And Antiope was French?
17     A.  That's correct.
18     Q.  Last time I checked, those countries are on
19  opposite sides of the Atlantic Ocean, right?
20     MR. SHARIFAHMADIAN: Objection, argumentative.
21     THE WITNESS: That is a correct statement.
22     MR. MARINA: I'll mark as Exhibit 107 a copy of a
23  document bearing Bates numbers GW-LT 444838 through
24  444993.
25     (Exhibit No. 107 was marked for

Page 157

1     identification.)
2  BY MR. MARINA:
3     Q.  Could you tell me what Exhibit 108 -- sorry,
4  107 is.
5     A.  Exhibit 107 is a final report to NASA for a
6  Grant NSG 1508, and it's titled "Extension of the
7  Core Graphic System for Raster Graphics Display," and
8  the principal investigator was James D. Foley.
9     Q.  And is Exhibit 107 the document you referred
10  to in your report as the NASA Final Report?
11     A.  (Witness reviewing document.)
12     Yes, it is.
13     Q.  Do you have any opinion as to whether
14  Exhibit 107 was available as prior art to the Fleming
15  patent?
16     MR. SHARIFAHMADIAN: Objection, calls for a legal
17  conclusion.
18     THE WITNESS: No, I don't.
19  BY MR. MARINA:
20     Q.  Do you have any opinion as to whether
21  Exhibit 107 was ever published?
22     MR. SHARIFAHMADIAN: Objection, calls for a legal
23  conclusion.
24     THE WITNESS: (Reviewing document.)
25     Well, I never -- I never gave an opinion to

TSG Reporting - Worldwide    877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

**Exhibit 16**
**Page 531**

Page 158

1  that regard, but I -- you know, I -- I just know by
2  secondhand that it was available in a library in
3  the -- I -- this is -- I -- well, this is beyond my
4  report, so --
5  BY MR. MARINA:
6     Q.  Okay.
7     A.  I don't have any official opinion on that.
8     Q.  You have no personal knowledge as to whether
9  Exhibit 107 was ever available in a library, correct?
10    A.  I have no personal knowledge, no.  I didn't
11 take it out from the library, so, no, I don't know.
12    Q.  So, therefore, you will not be opining at
13 trial that Exhibit 107 was available in a library at
14 a certain point in time, correct?
15    A.  That's correct, I will not be opining on
16 that.
17    Q.  And Exhibit 107 is similar to some
18 references you cited in your previous report, right?
19    A.  Similar --
20    MR. SHARIFAHMADIAN:  Objection,
21 mischaracterizes -- to the extent that it
22 mischaracterizes the document.
23 BY MR. MARINA:
24    Q.  Go ahead.
25    A.  I'm sorry.  There are some similarities,

Page 159

1  some differences.  It's based on the same basic
2  research.
3     Q.  It has to do with the Core system, C-o-r-e?
4     A.  That's correct.
5     Q.  The NASA Final Report, Exhibit 107, has
6  three appendices, correct?
7     A.  Yes, it does.
8     Q.  What is the relationship between Appendix A
9  and Appendix C?
10    A.  (Witness reviewing document.)
11       Appendix A is the proposed Raster extensions
12 to the Core system.
13    Q.  Mm-hmm.
14    A.  And Appendix C is George Washington
15 University -- their -- their implementation of the
16 1979 Core system.
17    Q.  If you'd turn to page GW-LT 444920.
18    A.  Okay.  Yes.
19    Q.  Do you see at the top a sort of diagram
20 that's called Figure 2?
21    A.  I see that.
22    Q.  Can you tell me what's shown there.  Explain
23 what's shown there.
24    A.  Well, this is not in my report.
25    Q.  Mm-hmm.

Page 160

1     A.  But I understand this to be that -- what's
2  shown is that there is an application program, and it
3  speaks to code which is what's called the device
4  independent portion of the Core, and then that speaks
5  to individual device drivers, which then communicate
6  with individual devices.
7     Q.  Do you understand Appendix A to relate to
8  the device independent Core --
9        (Reporter interruption.)
10 BY MR. MARINA:
11    Q.  Do you understand Appendix A to relate to
12 the device independent Core?
13    A.  I never limited -- I never thought that it
14 was limited to only device independent Core.  I know
15 it includes that.
16    Q.  Do you have an opinion on it as you sit
17 here?
18    MR. SHARIFAHMADIAN:  Objection, asked and
19 answered.
20    THE WITNESS:  No, I don't.
21 BY MR. MARINA:
22    Q.  Do you understand that -- Appendix C to
23 relate to the device dependent portion of Figure 2?
24    A.  I'm sorry.  I have to amend my last answer.
25    Q.  Okay.  Go ahead.

Page 161

1     A.  And just to make sure I understood, the
2  question was did I understand whether Appendix A
3  related to the device independent portion of Core.
4  And, I'm sorry, I heard the question as did I
5  understand Appendix A to be related to the vice --
6  I'm sorry.  I understood the question to be does
7  Appendix C relate to the device independent portion
8  of Core.
9     Q.  Okay.  So let me ask again.
10    A.  Okay.
11    Q.  Does Appendix A relate to the device
12 independent portion of Core?
13    A.  It relates to it.  It is not only.  It is
14 not meant to be the entirety of it, but it -- it is
15 related to it, yes.
16    Q.  Does Appendix C relate to the device
17 dependent portion of Core?
18    MR. SHARIFAHMADIAN:  Objection, vague.
19    THE WITNESS:  I wouldn't narrow it to that.  It
20 does -- it does include discussions of that, but it
21 is not -- I don't believe that its only purpose.
22 BY MR. MARINA:
23    Q.  So with respect to Figure 2, where does the
24 George Washington Core system sit with respect to the
25 line that says "DI/DD Interface"?  Is it above or

41 (Pages 158 to 161)

Exhibit 16
Page 532

Page 162

1   below it?
2       MR. SHARIFAHMADIAN:  Objection, vague.
3       THE WITNESS:  Well, that sentence -- that
4   question doesn't completely make sense.
5   BY MR. MARINA:
6       Q.  Okay.
7       A.  Because the George Washington version of
8   Core is not -- is not -- not in the same kind of
9   discussion as Appendix A.  They are covering two
10  different aspects of Core.
11      Q.  What do you mean they are covering -- who is
12  "they"?
13      A.  They meaning both document -- the two
14  different documents.
15      Q.  Okay.  And you don't recognize any
16  relationship between Appendix A and Appendix C?
17      A.  Oh, yeah, there's a relationship.
18      Q.  What --
19      A.  But, I'm sorry, your question before just
20  didn't make sense.
21      Q.  What's the relationship?
22      A.  The relationship is that Appendix A
23  discusses the Core as an implementation -- or as a
24  graphics language, and Appendix C discusses George
25  Washington University's implementation of that

Page 163

1   language in a particular environment.
2       Q.  What -- what environment is that?
3       A.  Well, within -- within George Washington
4   University on the machines -- on the computers that
5   they had and on the display devices that they had.
6       Q.  So that's device specific, correct, device
7   dependent?
8       A.  Not all of it.  Some of it was.  That's why
9   I said -- well, I'm sorry to have muddled the
10  transcript, but that's why Appendix C does not only
11  relate to the device-dependent portion of it.  It
12  also relates to the device-independent portion of it.
13      Q.  One of the -- well, in paragraph -- first
14  let me find it -- 83, you identified a
15  SET_CURRENT_COLOR command.
16      A.  (Witness reviewing document.)
17      Yes.
18      Q.  Okay.  And then in paragraph 84 you identify
19  SET_COLOR command.
20      A.  Correct.
21      Q.  Is there any relationship between those two
22  commands?
23      A.  Let me check.
24      (Witness reviewing document.)
25      It doesn't specifically say, but I think

Page 164

1   it's a reasonable assumption that the high-level
2   command, the SET_CURRENT_COLOR command, would use the
3   SET_COLOR command as part of -- as part of
4   implementing the SET_COLOR command.
5       Q.  Okay.  Good.
6       And I guess I have the same question with
7   respect to paragraph 88.
8       A.  Mm-hmm.
9       Q.  You identify a SET_COLOR_BACKGROUND_INDEX
10  command, right?
11      A.  Yes, I do.
12      Q.  And that's in Appendix A.
13      And then you identify a SET_BACKGROUND_INDEX
14  command from Appendix C, right?
15      A.  Yes, I do.
16      Q.  Same question as I had before:  Is there a
17  relationship between SET_COLOR_BACKGROUND_INDEX
18  command and the SET_BACKGROUND_INDEX command?
19      A.  Again, it doesn't -- it doesn't say in the
20  text for sure that there is.
21      MR. MARINA:  Could you read back that answer.
22      (Record read as follows:
23      "A.  Again, it doesn't -- it doesn't say in
24      the text for sure that there is.")
25  BY MR. MARINA:

Page 165

1       Q.  But you would suspect that there is, the
2   same way you suspected there was a relationship
3   between the SET_CURRENT_COLOR command and the
4   SET_COLOR command, right?
5       A.  I would think that it would be reasonable
6   for the SET_BACKGROUND_INDEX command to use the
7   SET_BACKGROUND_INDEX -- I'm sorry, let me make sure I
8   said it clearly.
9       I would suspect that the
10  SET_BACKGROUND_COLOR_INDEX command would use the
11  SET_BACKGROUND_INDEX command as part of its
12  implementation.
13      Q.  Okay.  What does floating point mean?
14      A.  A floating point is a system for
15  representing numbers whereby you allow
16  representations that have both integers -- an integer
17  portion and a decimal or a fractional portion to the
18  number.
19      Q.  Is that also known as real, r-e-a-l?
20      A.  Yes, another way of describing it is real.
21      Q.  Are you aware of any graphics system in the
22  1980 time frame that could process color data values
23  specified in floating point?
24      A.  Yeah, the Core system.
25      Q.  What hardware did the Core system use?

TSG Reporting - Worldwide        877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

**Exhibit 16**
**Page 533**

Page 166

1    A.  Whatever hardware you wanted.  That was the
2  purpose of Core, to be able to be independent of
3  specific hardware implementation.
4    Q.  But if -- if a hardware -- a piece of
5  hardware could only handle integers, wouldn't you
6  need to somehow convert the floating point into
7  integers?
8    MR. SHARIFAHMADIAN:  Objection, vague, incomplete
9  hypothetical.
10    THE WITNESS:  It depends.  I think you need a
11  little more specifics on your hypothetical.
12  BY MR. MARINA:
13    Q.  Such as?
14    A.  When you say it could only handle integers,
15  if that were the case, then -- if it didn't only
16  handle integers, then it wouldn't be possible to
17  specify any number in floating point, so, therefore,
18  you wouldn't be able to convert it from floating
19  point to integer because you couldn't represent it as
20  floating point.
21    Q.  Okay.  Are you aware of any actual graphics
22  hardware -- actual piece of hardware in the 1980 time
23  frame that could interpret a color data value
24  specified in floating point?
25    MR. SHARIFAHMADIAN:  Objection, vague, calls for

Page 167

1  speculation.
2    THE WITNESS:  And I think we -- I want to
3  understand what you mean by interpret color data
4  value.
5  BY MR. MARINA:
6    Q.  Could it write a floating point value into
7  the video memory?
8    MR. SHARIFAHMADIAN:  Objection, vague, incomplete
9  hypothetical.
10  BY MR. MARINA:
11    Q.  And then use that value to fire an RGB, you
12  know, RGB value as to a monitor?
13    MR. SHARIFAHMADIAN:  Same objections.
14    THE WITNESS:  I mean I think it would be
15  physically possible.  It's physically possible, you
16  know, if that's what you're asking.
17  BY MR. MARINA:
18    Q.  I'm asking are you aware of any such
19  graphics systems --
20    A.  Yeah.
21    Q.  -- back in the 1980 time frame --
22    MR. SHARIFAHMADIAN:  Objection, vague, calls for
23  speculation.
24    THE WITNESS:  That?  I'm sorry.  Please finish
25  your question.

Page 168

1  BY MR. MARINA:
2    Q.  -- where RGB values could be written into a
3  - video memory and then those RGB values directly used
4  to fire RGB guns into a monitor?
5    MR. SHARIFAHMADIAN:  Objection, vague, incomplete
6  hypothetical.
7    THE WITNESS:  Well, to try and be as accurate as
8  possible, it is -- you could have taken any one of
9  the graphics systems in the 1980 time frame and taken
10  a value, which would be in floating-point format,
11  which is simply a series of bits, and you could have
12  written that into the color memory, and the computer
13  would have accepted that command and would have
14  performed it, and then you would have gotten some
15  type of display.
16    So when I say it's physically possible, what
17  I mean is that a computer could have executed that
18  function and it would have operated.
19  BY MR. MARINA:
20    Q.  I understand -- I understand you're saying
21  it's physically possible.
22    What I'm asking you is did any actual system
23  that you're aware of from the 1980 time frame work
24  that way?
25    MR. SHARIFAHMADIAN:  Same objections, asked and

Page 169

1  answered.
2    THE WITNESS:  And -- and I was trying to make it
3  clear that they all worked that way, and what I mean
4  by that is they all would -- well, they all would
5  allow you to take any binary number and allow you to
6  write that into a color memory.  At the level of the
7  machine, it doesn't know if it's an integer or a
8  floating point number.
9  BY MR. MARINA:
10    Q.  Turn to page GW-LT 444851 of the NASA Final
11  Report, please.
12    A.  Okay.
13    MR. SHARIFAHMADIAN:  I'm sorry.  Can you repeat
14  that number.
15    MR. MARINA:  Sure.  444851.
16    THE WITNESS:  Okay.  I'm there.
17  BY MR. MARINA:
18    Q.  Okay.  And then -- and you see
19  Section 4.2.1.1.2, it talks about the
20  SET_CURRENT_COLOR --
21    A.  Yes, I see that.
22    Q.  -- function.
23    A.  Yes.
24    Q.  And one variation of that -- well,
25  SET_CURRENT_COLOR and then, in parentheses, "R,G,B,"

43  (Pages 166 to 169)

Exhibit 16
Page 534

Page 170

1  right?
2      A.  Yes.
3      Q.  Okay.  What does R,G,B represent?
4      A.  It represents the three components of color
5  for describing the particular color data value you
6  would like to -- you would like to write, like you
7  would like to set.
8      Q.  Okay.  And there --
9          There it's specified as floating point,
10 right?
11     A.  Yes, in the range zero to one, yes.
12     Q.  But then it says they're rounded to the
13 nearest displayable color?
14     A.  That's correct.
15     Q.  What does that mean?
16     A.  It means that in a -- in a given system that
17 doesn't have the ability to display every value to
18 the -- to the range of that floating point number, it
19 would need to try and truncate it -- well, actually
20 it said rounded.  They would need to round the
21 floating point number to a value that fit within the
22 displayable capabilities of the machine.
23     Q.  And in that situation, is the color you
24 specified the color being displayed?
25     A.  To -- to -- within the capabilities of that

Page 171

1  hardware, yes.  I mean it would do its best it can,
2  given the hardware -- the hardware functionality, the
3  hardware capabilities of that -- of that particular
4  graphics system.
5      Q.  But it's not the identical color that was
6  specified, right?
7      MR. SHARIFAHMADIAN:  Objection, vague.
8      THE WITNESS:  Only due to the limitations of the
9  hardware, yeah, it would be -- it would be limited to
10 those -- to that capability.
11 BY MR. MARINA:
12     Q.  Do you agree --
13         Well, Mr. Richter talked -- talked in his
14 infringement report about qualitative and
15 quantitative algorithms.
16         Do you recall that?
17     A.  Somewhat, yes.  I mean if we're going to go
18 into it in detail, we might want to pull out his
19 report, but I generally remember that, yes.
20     Q.  Is it your opinion that at the time that the
21 Fleming patent issued, qualitative algorithms were
22 known in the art?
23     MR. SHARIFAHMADIAN:  Objection, vague.
24     THE WITNESS:  Which was which?
25         I -- I don't remember him using that --

Page 172

1  Mr. Richter using the word "qualitative algorithm."
2      I thought he was talking about a qualitative command
3  set.  I think we better make sure we both agree
4  it's -- what we mean by qualitative algorithms or if
5  it's quantitative algorithm.
6  BY MR. MARINA:
7      Q.  What's your understanding of qualitative
8  command set?
9      A.  That the commands have a fixed number of
10 parameters, and it is the value within the parameters
11 that determine how the function is to be
12 accomplished.
13     Q.  All right.
14         And was that known in the art prior to the
15 issuance of the Fleming '759 patent?
16     A.  Yes.
17     Q.  And was the use of qualitative commands and
18 data sequences to select modes of access known in the
19 art prior to the issuance of the final patent?
20     MR. SHARIFAHMADIAN:  Objection, vague.
21     THE WITNESS:  I don't know.  I haven't
22 investigated that.
23 BY MR. MARINA:
24     Q.  You --
25         With respect to the NASA report, you cite --

Page 173

1  well, let's -- let's look at paragraph 86.
2      A.  Okay.
3      Q.  It talks about a second mode of access,
4  correct?
5      A.  Yes.
6      Q.  And then it cites the
7  SET_CURRENT_COLOR_INDEX, right?
8      A.  Yes.
9      Q.  Is the SET_CURRENT_COLOR_INDEX command a
10 qualitative command?
11     MR. SHARIFAHMADIAN:  Objection, vague.
12     THE WITNESS:  It takes a fixed number of
13 parameters, so based on my understanding of what
14 Mr. Richter meant by qualitative, I believe it
15 satisfies his description.
16 BY MR. MARINA:
17     Q.  The SET_CURRENT_COLOR_INDEX command
18 performs its function based on the value of I?
19     A.  That's correct.
20     Q.  Okay.  And it --
21         And the SET_CURRENT_COLOR_INDEX value
22 doesn't do anything based on the number of operands
23 in the parentheses, right?
24         (Reporter interruption.)
25     MR. MARINA:  Operands.

44 (Pages 170 to 173)

Exhibit 16
Page 535

Page 174

1    MR. SHARIFAHMADIAN: Objection, vague.
2    THE WITNESS: That's correct.
3 BY MR. MARINA:
4    Q. So to go back to my earlier question, were
5 qualitative commands for selecting modes of access
6 known prior to the issuance of the Fleming patent?
7    MR. SHARIFAHMADIAN: Objection to the extent it's
8 asked and answered.
9    THE WITNESS: Yeah, I answered that, and I
10 believe I said yes.
11 BY MR. MARINA:
12    Q. So just so the record is clear, yes,
13 qualitative commands for selecting modes of access
14 were known prior to the issuance of the Fleming
15 patent?
16    MR. SHARIFAHMADIAN: Objection, vague, asked and
17 answered.
18    THE WITNESS: Yes, that's correct.
19 BY MR. MARINA:
20    Q. Okay. You identify --
21       In connection with the third mode, you say
22 that the NASA Final Report discloses an in-use
23 background color by the SET_BACKGROUND_COLOR_INDEX
24 command?
25    A. As one of the possibilities, yes.

Page 175

1    Q. Well, what other possibilities are there?
2    A. The SET_BACKGROUND_COLOR_INDEX command.
3    Q. So with respect to the SET -- you agree with
4 respect to the SET_BACKGROUND_COLOR_INDEX command,
5 the background color that is set is only set after a
6 new frame command is received, correct?
7    A. That's when the command is acted upon.
8    Q. And does that --
9       Does the SET_BACKGROUND_COLOR_INDEX command
10 set the color of the entire background of the screen?
11    MR. SHARIFAHMADIAN: Objection, vague.
12    THE WITNESS: Let me -- let me check to make
13 sure.
14 BY MR. MARINA:
15    Q. Sure.
16    A. (Witness reviewing document.)
17       My understanding is that's correct, that's
18 what it does.
19    Q. So -- so --
20       So, for example, if I have a letter O,
21 right, the SET_BACKGROUND_COLOR_INDEX command will
22 not set the color inside the O, right? It sets the
23 color of the whole screen?
24    MR. SHARIFAHMADIAN: Objection, vague, incomplete
25 hypothetical, compound.

Page 176

1    THE WITNESS: Well, it sets it inside the O also,
2 I mean, because that part that's inside the O is not
3 part of the foreground, so, therefore, the inside of
4 the O would still be part of the background, so yes,
5 it does set what is inside the O.
6 BY MR. MARINA:
7    Q. Will you agree that the command that's
8 drawing the O is not drawing in that background
9 color, correct?
10    MR. SHARIFAHMADIAN: Objection, vague.
11    THE WITNESS: The command for setting -- for
12 drawing an O in a Core-based system draws the --
13 what -- maybe we can agree on calling it the stroke
14 portion of it, the actual portion that you see of the
15 physical letter.
16 BY MR. MARINA:
17    Q. It doesn't draw the background, correct?
18    A. The background is drawn when you do the new
19 frame.
20    Q. Okay. And do you know if --
21       Well, can you tell me if the NASA report
22 actually draws a text or drawing command that
23 draws in a background color?
24    MR. SHARIFAHMADIAN: I'm sorry. Can you repeat
25 the question, please.

Page 177

1       (Record read as follows:
2       "Q. Well, can you tell me if the NASA
3       report actually discloses a text or drawing
4       command that draws in a background color?")
5    MR. MARINA: Let me ask that again.
6    Q. Can you tell me if the NASA Final Report
7 discloses an actual text or graphics command that
8 draws not only the stroke portion, but the background
9 portion?
10    MR. SHARIFAHMADIAN: Objection, vague.
11    THE WITNESS: (Reviewing document.)
12       Well, that -- that would be accomplished by
13 setting the background, issuing the new frame, then
14 issuing the -- the text or graphics command. So it
15 requires a combination of commands. It's not a
16 single command.
17 BY MR. MARINA:
18    Q. Well, it --
19       In paragraph 88 of your report, at sort of
20 line 14 -- do you see the line number on the
21 left-hand side?
22    A. On page 30?
23    Q. Page 30.
24    A. Okay.
25    Q. Line 14.

45 (Pages 174 to 177)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

**Exhibit 16**
**Page 536**

1    A.  Yes.
2    Q.  You say, "To the extent that Lucent or its
3  expert assert that the NASA Final Report does not
4  disclose the 'in-use background color' element, it is
5  my opinion that a person of ordinary skill in the art
6  would have knowledge of systems that had the ability
7  to set the background color of individual characters
8  or graphic primitives by color memory," right?
9    A.  Yes.
10    Q.  Then you cite some references, right?
11    A.  Yes.
12    Q.  You do not, however, explain why one of
13  ordinary skill in the art, in your opinion, would
14  have been led to include the ability to set
15  background color of individual characters of graphic
16  primitives by index to a color memory in the NASA
17  Final Report, right?
18    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
19  the report.
20    THE WITNESS:  Well, I'm sorry, that was a bit --
21  bit too long there.
22  BY MR. MARINA:
23    Q.  I mean --
24    A.  Let's try it one more time.
25    Q.  I mean when you talked about combining

1  CRC 699 with Antiope, for example, you gave reasons
2  why one -- why, in your opinion, one of ordinary
3  skill in the art would be led to combine them in the
4  way that you say, right?
5    A.  Mm-hmm.  I'm sorry.
6    Q.  With respect to combining the NASA report
7  with the references in paragraph 88, you provide no
8  such explanation, right?
9    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
10  the report.
11    THE WITNESS:  Well, I -- my intent was to say
12  that one of ordinary skill would have this knowledge,
13  and the purpose of these references is really
14  primarily to show you the general knowledge of one of
15  ordinary skill to help support my statement that this
16  is just something that one of ordinary skill knows.
17    It would not intend -- I was not intending
18  it to try and specifically say that one of ordinary
19  skill would take Core and combine it with these
20  references in order to -- in order to make an
21  obviousness argument.
22    So these citations were really in order to
23  support my statement that this is just within the
24  normal skill of -- of -- normal knowledge of one of
25  ordinary skill.

1  BY MR. MARINA:
2    Q.  Okay.  You don't explain, though, why, in
3  your opinion, one of ordinary skill in the art might
4  take the system talked about in the NASA Final Report
5  and add the ability to set the background color of
6  individual characters or graphic primitives by index
7  to a color memory, right?
8    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
9  the report, asked and answered.
10    THE WITNESS:  Yeah, I said that I think that that
11  is just something that would be obvious to one of
12  ordinary skill.  You -- all of the pieces are there,
13  and it's a -- it's a non -- I think a noncreative
14  step to -- to take it the final -- the final --
15  final step; that is, the in-use background color,
16  first of all, as I said, I believe it's already
17  taught, but even if the Court feels that it's not
18  directly taught, that it would be obvious to one of
19  ordinary skill that you could create a background --
20  create an in-use background color by using an index
21  to a color memory, because this is just something
22  that would have been knowledgeable to one of ordinary
23  skill.
24  BY MR. MARINA:
25    Q.  Why would someone of ordinary skill add that

1  feature if the Core system doesn't even disclose a
2  text or drawing command that could use a background
3  color?
4    MR. SHARIFAHMADIAN:  Objection, mischaracterizes
5  Core, asked and answered, vague, incomplete
6  hypothetical.
7    THE WITNESS:  I think it's -- it's -- I think it
8  would be pretty clear because, first of all, as I
9  say -- as I say here and as I support here with
10  various references, background colors were known.  If
11  a person would like to be able to draw text or
12  graphics on a screen and he wants to be able to put
13  it in a background color that may not be the
14  background color of the current screen without having
15  to do a complete screen redraw, it would -- would
16  seem obvious that you could do that with a command
17  that produces an in-use background color that
18  operates on an index to a color memory.
19    You already have that mechanism for the
20  foreground memory, and so what creative step does it
21  take to provide that exact same capability in the
22  background memory.
23  BY MR. MARINA:
24    Q.  Sir, I understand what you're saying now,
25  but what you're saying now you don't say in your

TSG Reporting - Worldwide     877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 537

Page 182

1  report, right?
2      MR. SHARIFAHMADIAN: Objection, mischaracterizes
3  the report.
4  BY MR. MARINA:
5      Q. You don't say anything about a creative step
6  in your report, right?
7      MR. SHARIFAHMADIAN: Objection, mischaracterizes
8  the report.
9      THE WITNESS: Well, sir, I tried to say that, and
10 I understand the purpose of us meeting is for me help
11 explain and help you to further understand what I was
12 saying in my report.
13 BY MR. MARINA:
14     Q. As with your other -- the other references
15 you cite, you don't identify any algorithm in the
16 NASA Final Report that satisfies the Court's
17 corresponding structure for the processing means of
18 Claim 1, right?
19     MR. SHARIFAHMADIAN: Objection, mischaracterizes
20 the report and prior testimony.
21     THE WITNESS: I believe I provide sufficient
22 structure in the explanation of the various commands,
23 in the same way I did in the other references.
24 BY MR. MARINA:
25     Q. So the full extent of your opinions are set

Page 184

1  those would satisfy, along with
2  SET_BACKGROUND_COLOR_INDEX or SET_BACKGROUND_INDEX.
3  By issuing those two commands, that will put you into
4  the third mode.
5      Q. Okay. Are there any other commands and data
6  sequences that will put you into the third mode in
7  the NASA Final Report, according to you?
8      A. (Witness reviewing document.)
9         Well, no -- no other main -- no other basic
10 commands. It may be -- you could argue that you need
11 the new frame with it also, but I think you could
12 still be in the third mode. You'll be in the third
13 mode with or without the new frame.
14     MR. MARINA: Okay. I have no further questions.
15     THE VIDEOGRAPHER: Any questions?
16     MR. BOYCE: No.
17     MR. SHARIFAHMADIAN: No.
18     THE VIDEOGRAPHER: This concludes the deposition
19 of Robert Wedig. The number of tapes used was -- or
20 DVDs used was three.
21     The original DVDs will be retained at
22 TSG Reporting, located at 747 Third Avenue,
23 28th Floor, New York, New York 10017.
24     (Continued on next page to include jurat)
25

Page 183

1  forth in your supplemental report?
2      A. Yes, it is.
3      Q. Do you have any opinions that are not in
4  your supplemental expert report that you'd like to
5  express to me today?
6      A. No, sir.
7      MR. MARINA: Okay. I'm almost done. Why don't
8  we take a break.
9      THE WITNESS: Okay.
10     THE VIDEOGRAPHER: Going off the record, the time
11 is 4:14 p.m.
12     (Recess taken.)
13     THE VIDEOGRAPHER: Back on the record, the time
14 is 4:25 p.m.
15     Please begin.
16 BY MR. MARINA:
17     Q. With respect to the NASA Final Report, what
18 do you say is the predetermined command and data
19 sequence that selects the third mode?
20     A. Okay.
21     (Witness reviewing document.)
22     Using the same way that Mr. Richter
23 discloses finding a third mode, I've identified two
24 commands, the first command being the
25 SET_CURRENT_COLOR_INDEX or SET_INDEX, either one of

Page 185

1      Going off the record, the time is 4:28 p.m.
2      (The deposition proceedings concluded at
3  4:28 p.m.)
4
5
6
7
8  _____
9      ROBERT G. WEDIG, Ph.D.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

e7e1c07c-4a2b-47fa-a2b2-712b93918106

Exhibit 16
Page 538

Page 186

1  STATE OF CALIFORNIA        )
2                             )  ss
3  COUNTY OF SAN MATEO        )
4        I hereby certify that the witness in the
5  foregoing deposition of ROBERT G. WEDIG, Ph.D., was
6  by me duly sworn to testify to the truth, the whole
7  truth and nothing but the truth, in the
8  within-entitled cause; that said deposition was taken
9  at the time and place herein named; that the
10 deposition is a true record of the witness' testimony
11 as reported by me, a duly certified shorthand
12 reporter and a disinterested person, and was
13 thereafter transcribed into typewriting by computer.
14        I further certify that I am not interested
15 in the outcome of the said action, nor connected
16 with, nor related to any of the parties in said
17 action, nor to their respective counsel.
18        IN WITNESS WHEREOF, I have hereunto set my
19 hand this 24th day of October, 2007.
20
21
                 - - - - - - - - - - - - - - -
22          MELINDA M. IBANEZ, CSR #10686
23          STATE OF CALIFORNIA
24
25

Page 187

1  NAME OF CASE:
2  DATE OF DEPOSITION:
3  NAME OF WITNESS:
4  Reason Codes:
5     1. To clarify the record.
6     2. To conform to the facts.
7     3. To correct transcription errors.
8  Page _____ Line _____ Reason _____
9  From _____ to _____
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25        _____

48  (Pages 186 to 187)

e7e1c07c-4a2b-47fa-a2b2-712b93918106

**Exhibit 16**
**Page 539**