# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

            Plaintiff,

    v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES,
INC., GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,

            Defendants,
    and

MICROSOFT CORPORATION,

            Intervener.

MICROSOFT CORPORATION,

            Plaintiff,

    v.

LUCENT TECHNOLOGIES INC.,

            Defendant.

LUCENT TECHNOLOGIES INC.,

            Plaintiff,

    v.

DELL INC.,

            Defendant.

Case No. 02-CV-2060 B (CAB)
          consolidated with
Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER

**October 12, 2007**

DFT/PLF. EXHIBIT __17__ FOR I.D.
PAGE __1__ OF __22__ PAGES
LISA SOMMERHAUSER CSR #10985
DATE __11-14-07__ 19__
WITNESS __J. Richter, VI II__

**Exhibit 20**
**Page 652**

**Introduction**

1. I submit this Supplemental Expert Report in response to the "Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent No, 4,439,759" dated September 14, 2007. I have read Dr. Wedig's supplemental report and, as explained below, it is my opinion that none of the references cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-3 of U.S. Patent No. 4,439,759 ("the '759 patent").

**The Court's Claim Construction Order**

2. I have reviewed the Court's November 15, 2005 claim construction Order concerning the '759 patent and have used the constructions set forth in that Order in forming my opinions set forth in this Supplement Expert Report.

**Validity - Legal Principles**

*Presumption of Validity*

3. I have been informed that each claim of an issued patent is presumed to be valid. I further understand that a party challenging a patent's validity must present clear and convincing evidence to overcome the presumption that an issued patent is valid.

*Anticipation*

4. I have been informed that a patent claim is invalid for anticipation only if a single prior art reference discloses each and every element of the claim exactly and as arranged as set forth in the claim. The prior art reference must be a publicly accessible printed publication and include a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed invention, but also to make and use it without undue experimentation. I understand that a reference that fails to disclose expressly one or more elements of the patent

Exhibit 20
Page 653

claim may nevertheless anticipate the claim if the missing elements are disclosed inherently. I further understand that an element is disclosed inherently only if it is necessarily present in the process or product described in the prior art reference. Elements that may or may not be present based on the express disclosure of a reference are not inherently disclosed.

*Obviousness*

5. I have been informed that, since my last report, the Supreme Court has clarified the legal standards for invalidity due to obviousness. I have also been informed that the Supreme Court confirmed that, while identification of a teaching, suggestion, or motivation to combine prior art references is no longer strictly required to demonstrate obviousness, the principles set forth in my May 12, 2006 Expert Report otherwise remain valid. I understand that the fundamental question remains whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness.

6. I have been informed that the Supreme Court provided further guidance concerning the obviousness analysis. Specifically, I have been informed that obviousness is not established by simply combining previously known elements from the prior art. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching, suggestion or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis

**Exhibit 20**
**Page 654**

need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

7.  I have also been informed that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.  I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.  I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results.  I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

8.  I have also been informed that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill.  I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has good reason to pursue the known options.  I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 3

Exhibit 20
Page 655

9.  I have also been informed that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious.  I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

10.  I have also been informed that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious.  I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

11.  I have also been informed that obviousness of a patent cannot properly be established through hindsight, and that elements from different prior art references, or different embodiments of a single prior art reference, cannot be selected to create the claimed invention using the invention itself as a roadmap.  I understand that the claimed invention as a whole must be compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through hindsight which would not have been combined absent the inventors' insight.

12.  I have also been informed that secondary considerations of nonobviousness must be considered in addition to the primary considerations of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art.  I have also been informed that secondary considerations of nonobviousness may include commercial success of products or processes using the invention, long felt need for the invention, failure of others to make the invention, industry acceptance of the invention, licensing of the

Exhibit 20
Page 656

invention, copying of the invention by others, initial skepticism aimed at the invention,

statements of acclaim for the invention, and unexpected results achieved by the invention.

***Level Of Ordinary Skill In The Art***

13.  As I previously opined in this case, a person of ordinary skill in the art pertinent to

the '759 patent in the early 1980s would have had at least a Bachelor of Science degree in

electrical engineering, computer engineering, or computer science with at least 2 years of

experience in the field of computer graphics, or, alternatively, a person of ordinary skill in the art

would have been an engineer holding a Master of Science degree in electrical engineering,

computer engineering, or computer science who had pursued a course of study relating to

computer graphics technology.

**Analysis**

14.  I have reviewed Dr. Wedig's supplemental report and the references he discusses

therein, and, as discussed in further detail below, it is my opinion that none of the references

cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-3 of the '759

patent.  Further, my discussion of these references herein is not an agreement or admission that

any particular reference constitutes prior art.

15.  Dr. Wedig refers in his report to conversations he had with James Foley and Douglas

O'Brien.  Dr. Wedig, however, did not provide a transcript of those conversations or otherwise

reveal in his report the content of his conversations with Mr. Foley and Mr. O'Brien.  I have

therefore not been afforded an opportunity to respond to what Dr. Wedig was told by Mr. Foley

or Mr. O'Brien.

Exhibit 20
Page 657

16. Dr. Wedig also lists nearly 300 references in Exhibit 1 of his supplemental report, but he discusses only a handful of those references in the body of his report and in the claim charts attached as Exhibits 2-4. To the extent Dr. Wedig is permitted to provide an opinion on references not discussed in his supplemental report, I reserve the right to further supplement this report in response and to provide responsive opinions at trial.

17. In the section of his report "State of the Art as of the Time of the Alleged Invention," Dr. Wedig opines that "each of the elements of the Asserted Claims were known in the prior art." Dr. Wedig then goes on to discuss a number of references, but never explains how those reference purportedly disclose each of the elements of claims 1-3 of the '759 patent. In fact, as discussed below, none of the references cited by Dr. Wedig, alone or in combination, disclose all of the elements of claims 1-3 of the '759 patent. Further, as discussed in connection with the particular prior art combinations relied upon by Dr. Wedig, I disagree with the purported motivations to combine set forth in paragraph 23 of his report.

18. I also reiterate and incorporate by reference my previous opinions set forth in my May 12, 2006 Rebuttal Report, which remain unchanged in view of the recent Supreme Court guidance on the issue of obviousness.

### Recommendation S.100, "International Information Exchange for Interactive Videotex"

19. I have reviewed "Recommendation S.100" cited by Dr. Wedig in his supplemental report, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how Recommendation S.100 discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how Recommendation S.100 provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions, but also to

**Exhibit 20**
**Page 658**

make and use them.  It is my opinion that Recommendation S.100 neither anticipates nor renders

obvious, alone or in combination with the Crowther reference also cited by Dr. Wedig, claims 1-

3 of the '759 patent.

20.  First, Recommendation S.100 does not disclose "a memory for storing color data

values," which the Court construed as "a color map that stores a table of color data values

indexed by numbers."  Dr. Wedig points to section 9.3.2 of Recommendation S.100 as

purportedly disclosing "a memory for storing color data values," but that section merely refers to

"a colour table."  Section 9.3.2 provides no indication or suggestion that that "colour table" is

"a color map that stores a table of color data values indexed by numbers."  Furthermore,

Recommendation S.100 is clear that the colors described in the document are direct colors, not

indexed colors.  When colors in Recommendation S.100 are specified, they are specified by

specifying bit values b1, b2, and b3, where b1 is the red component, b2 is the green component,

and b3 is the blue component.  (*See, e.g,* Section 9.3.1; Fig. 7/S.100.)

21.  Second, Recommendation S.100 does not disclose the second mode of access of

claim 1, "wherein the in-use foreground color is specified as an index into the color memory."

As discussed above, Recommendation S.100 does not disclose the color memory required by the

claimed invention, and therefore does not disclose any indexed color modes.

22.  Dr. Wedig asserts that "the alphamosaic parallel mode specified in Recommendation

S.100 was known to have been taken from the French Antiope system," but provides no

substantive evidence to support his assertion. The "Preliminary Specification for the ANTIOPE

Teletext System" ("Antiope Specification") cited by Dr. Wedig, and upon which Dr. Wedig

relies, makes no reference to an "alphamosaic parallel mode," and also makes clear that the

Exhibit 20
Page 659

system described in the Antiope Specification was a system in which color data was directly specified, and not one in which indexed colors were used. (*See, e.g.,* ¶ 5.2.) Furthermore, while the '759 patent states that "the Antiope terminal developed by the French CCETT employ[s] a technique for specifying both a foreground color and a background color by indexing a permanent read-only color memory," the '759 patent does not state that the "permanent read-only color memory" in this particular version of the Antiope system is "a color map that stores a table of color data values indexed by numbers." Furthermore, the '759 patent does not state that the Antiope system used in-use foreground and background colors.

23. Third, Recommendation S.100 does not disclose the third mode of access of claim 1, "wherein the in-use foreground color and in-use background color are specified as indexes into the color memory," where "in-use background color" is defined as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." As an initial matter, as discussed above, Recommendation S.100 does not disclose the use of indexed color. Moreover, Recommendation S.100 does not disclose the use of an in-use background color. Dr. Wedig cites to pages 181 and 184, but nothing on those pages indicates the use of an in-use background color. While Section 5.4.2.2.10 discusses displaying characters "on a background of the colour indicated," Section 5.4.2.2.10 does not indicate that the color of the background "will be used as the background color for subsequently received text and graphics drawing commands until changed."

24. Dr. Wedig also points to Section 1.2.4 as disclosing the three required modes of access. But Section 1.2.4 discusses four possible options for representing pictorial information, and does not disclose modes of access within the meaning of the Claim 1 as construed by the

**Exhibit 20**
**Page 660**

Court. Furthermore, as discussed above, Recommendation S.100 only discloses the use of direct color, and therefore Recommendation S.100 at most could only disclose a single mode of access, and not a plurality of modes as required by claim 1.

25. Fifth, because Recommendation S.100 does not disclose the three modes of access required by claim 1, it necessarily does not disclose the processing means or display means of claim 1, which require the three modes of access. Furthermore, Dr. Wedig fails to explain how Recommendation S.100 discloses the corresponding structure identified by the Court for the processing means of claim 1. Additionally, even if Recommendation S.100 disclosed each element of claim 1, it is my opinion that the disclosure contained in Recommendation S.100 would not by itself enable one of ordinary skill in the art to make or use the claimed invention without undue experimentation. Recommendation S.100 is an inter-networking protocol recommendation that provides no substantive guidance on how to implement a digital image display system.

26. Recommendation S.100 also fails to anticipate or render obvious Claims 2 and 3. First, based on the Court's claim construction, claims 2 and 3 require a color memory, the three modes of access of claim 1, and the corresponding structure of claim 1. As discussed above, Recommendation S.100 does not disclose these claim elements. Second, because Recommendation S.100 does not disclose a color memory, it necessarily does not disclose setting colors in the color memory, which is required by each of claims 2 and 3.

27. Dr. Wedig cites to page 711 of the Crowther reference as disclosing the setting of color data values in a color memory, and combines Crowther with Recommendation S.100 . Dr.

Exhibit 20
Page 661

Wedig, however, fails to explain how Crowther purportedly discloses the corresponding structure for the setting function of the processing means of claims 2 and 3.

28. Moreover, one of ordinary skill in the art would not have been led to combine Recommendation S.100 with Crowther. Dr. Wedig argues that "Recommendation S.100 provides reasons to employ a writable color memory where it suggests 'redefining the colour table," and that "[a] person of ordinary skill in the art would have had reason to look to Crowther for details on exactly how to implement this suggested feature because Crowther teaches how to implement this very same feature in a videotex system." But the premise of this argument is incorrect, because, as discussed above, Recommendation S.100 provides no indication or suggestion that that "colour table" is "a color map that stores a table of color data values indexed by numbers." Dr. Wedig is therefore incorrect when he states that "both references suggest color display enhancements for videotex terminals having color maps" and that "both of these references were concerned with videotex terminals . . . wherein color data values may be accessed via index values into a color memory."

29. I also disagree with Dr. Wedig's opinions that "the trends toward higher resolution display, a wider range of colors, and decreasing costs of memory also provided reasons to combine the teachings of Recommendation S.100 and Crowther." To the extent Crowther discloses a color memory within the meaning of the claims, these trends would teach away from the use of a color memory, since a higher resolution display, a wider range of colors, and decreasing costs of memory weigh in favor of direct color and against indexed color.

30. Dr. Wedig also states that Crowther "was well known to those in the videotex community, as was Recommendation S.100," but provides no basis for that assertion other than

Exhibit 20
Page 662

speculation. Dr. Wedig states that the "Crowther paper was presented at the 1980 Spring Conference on videotex topics," but there is no evidence that Crowther was actually presented at the 1980 Spring Conference. Further, the subject of the 1980 Spring Conference appears to have been consumer electronics, not videotex topics.

31. I also disagree with Dr. Wedig's opinion that "[t]he addition of the methodology described in Crowther (for 'adaptively' defining the colors in a color map by transmitting codes as part of DRCS data) to the videotex system specified by Recommendation S.100 led to results that could have been predicted by a person of ordinary skill in the art prior to the time of the alleged invention" and the other statements in paragraph 53 of Dr. Wedig's report. First, there is no evidence that a system that combined Crowther with Recommendation S.100 was ever developed. Second, Recommendation S.100 does not disclose a color memory within the meaning of the Court's construction, and thus combining Crowther with Recommendation S.100 would not lead to predictable results. Third, Recommendation S.100 and Crowther address different aspects of DRCS, and thus one or ordinary skill in the art would not be led to combine these references simply because they both mention DRCS.

32. Accordingly, for at least these reasons, it is my opinion that Recommendation S.100 does not anticipate or render obvious, alone or in combination with Crowther, claims 1-3 of the '759 Patent.

### CRC Technical Note No. 699-E, "Picture Description Instructions PDI for the Telidon Videotex System"

33. I have reviewed "CRC Technical Note No. 699-E, Picture Description Instructions PDI for the Telidon Videotex System" ("CRC 699-E") cited by Dr. Wedig in his supplemental report, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how CRC

Exhibit 20
Page 663

699-E discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how CRC 699-E provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that CRC 699-E neither anticipates nor renders obvious, alone or in combination with the Antiope Specification or Crowther, claims 1-3 of the '759 patent.

34. First, CRC 699-E does not disclose "a memory for storing color data values," which the Court construed as "a color map that stores a table of color data values indexed by numbers." Dr. Wedig cites to page 70 of CRC 699-E, but page 70 merely makes reference to a "Color Lookup." CRC 699-E does not disclose a color map that stores a table of color data values indexed by numbers. Moreover, to the extent CRC 699-E discloses a color map that stores a table of color data values indexed by numbers, page 70 of CRC 699-E teaches away from the use of a color map due to cost concerns. Dr. Wedig also cites to page 50 of CRC 699-E. But page 50 merely mentions "colour reference tables" without explaining what those tables are or how they were to be used. Further, Dr. Wedig states that "[a]llocating a specific bit in the TONAL CONTROL status flag and specifically indicating that it should be used to enable a 'colour reference table' teaches one of ordinary skill in the art a memory for storing color data values," but the four forms on page 50 teach one of ordinary skill in the art such bit is not reserved.

35. Second, CRC 699-E does not disclose the second mode of access of claim 1, "wherein the in-use foreground color is specified as an index into the color memory." As discussed above, CRC 699-E does not disclose a color memory, and therefore does not disclose any indexed color modes. Dr. Wedig also cites to the Antiope Specification as disclosing the use of indexed color, but as discussed above the Antiope Specification discloses a direct color system

Exhibit 20
Page 664

and not an indexed color system. (*See* ¶ 5.2.)  Moreover, Telidon, which is described in CRC 699-E, and Antiope were competing technologies that both used direct color and had different and potentially conflicting underlying technologies, and in my opinion one of ordinary skill would have not been led to combine these two systems.  For example, the Antiope Specification targeted a fixed resolution terminal with significant graphics limitations, while the CRC 699-E targeted variable resolutions and higher end graphics capabilities, and combining the two as Dr. Wedig suggests would not have made sense from a technical perspective and would not have led to predictable results.

36.  Third, CRC 699-E does not disclose the third mode of access of claim 1, "wherein the in-use foreground color and in-use background color are specified as indexes into the color memory," where "in-use background color" is defined as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." As an initial matter, as discussed above, CRC 699-E does not disclose the use of indexed color. Moreover, CRC 699-E does not disclose the use of an in-use background color.  Dr. Wedig also cites to Recommendation S.100 and the Antiope Specification, but neither of those references uses indexed color or discloses "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed."  Recommendation S.100 is discussed above.  In the Antiope Specification, the background color needs to be re-set at the start of each row.  Thus the background color is not "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." Additionally, as discussed above, the Antiope Specification does not disclose indexed color. Moreover, even if Recommendation S.100 or the Antiope Specification disclosed an in-use

**Exhibit 20**
**Page 665**

background color, one of ordinary skill in the art would not have been led to combine these references with CRC 699-E because the PDI instructions disclosed in CRC 699-E have no requirement of an in-use background color and for the reasons discussed above.

37. I also disagree with Dr. Wedig's statement that "a person of ordinary skill in the art could have predicted that the specification of foreground and background colors using an index into a color map in the Antiope system would perform the same function in the manner used in the Telidon system specified by CRC 699-E," given the fact that the Antiope Specification does not disclose "the specification of foreground and background colors using an index into a color map" and that Telidon and Antiope had different underlying technologies.

38. I also disagree with Dr. Wedig's opinion that "[t]he trend toward higher resolution display and a wider range of colors, along with the decreasing cost of memory also would have prompted persons of ordinary skill in the art to employ the technique of specifying foreground and background colors using an index into a color map (as taught by the Antiope Specification) in a selectable mode of operation on the Telidon system." First, the Antiope Specification does not teach "the technique of specifying foreground and background colors using an index into a color map." Second, even if it did, these trends would teach away from the use of a color memory, since a higher resolution display, a wider range of colors, and decreasing costs of memory weigh in favor of direct color and against indexed color.

39. Fourth, Dr. Wedig points to the TONAL CONTROL status flag in CRC 699-E as evidence of the required modes of access, but the TONAL CONTROL status flag only selects between grey scale and color, and does not select different modes of access as required by the claimed invention and the Court's construction. Furthermore, CRC 699-E only discloses the use

Exhibit 20
Page 666

of direct color, and therefore CRC 699-E at most could only disclose a single mode of access, and not a plurality of modes as required by Claim 1.

    40. Fifth, because CRC 699-E and the Antiope Specification do not disclose the three modes of access required by claim 1, they necessarily do not disclose the processing means or display means of claim 1, which also require the three modes of access. Furthermore, Dr. Wedig fails to explain how these references purportedly disclose the corresponding structure identified by the Court for the processing means of claim 1.

    41. CRC 699-E also fails to anticipate or render obvious claims 2 and 3. First, based on the Court's claim construction, claims 2 and 3 require a color memory, the three modes of access of claim 1, and the corresponding structure of claim 1. As discussed above, however, CRC 699-E and the Antiope Specification do not disclose these claim requirements. Second, because CRC 699-E and the Antiope Specification do not disclose a color memory, they necessarily do not disclose setting colors in the color memory, which is required by each of claims 2 and 3. Dr. Wedig also fails to explain how CRC 699-E or the Antiope Specification purportedly disclose the corresponding structure for the setting function of the processing means of claims 2 and 3.

    42. Dr. Wedig also cites to Crowther as disclosing "a command for setting or storing a color data value in color memory." Dr. Wedig, however, fails to explain how Crowther purportedly discloses the corresponding structure for the setting function of the processing means of claims 2 and 3.

    43. Dr. Wedig also states that "[t]he same reasons discussed above with respect to Recommendation S.100 and Crowther, and with respect to CRC 699-E and Antiope also apply to

**Exhibit 20**
**Page 667**

the combination of CRC 699-E and [Crowther]." I disagree for the same reasons discussed above.

44. Accordingly, for at least these reasons, it is my opinion that CRC 699-E does not anticipate or render obvious, alone or in combination with the Antiope Specification, Recommendation S.100, or Crowther, claims 1-3 of the '759 Patent.

**Final Report - NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display**

45. I have reviewed the "Final Report - NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display" ("NASA Report") cited by Dr. Wedig, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how the NASA Report discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how the NASA Report provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that the NASA Report neither anticipates nor renders obvious claims 1-3 of the '759 patent.

46. With respect to claim 1, the NASA Report fails to disclose the first and third modes of access required by claim 1. Dr. Wedig points to the function SET_CURRENT_COLOR (R,G, B) as evidence that the NASA Report discloses the first mode of access. But claim 1 requires that in the first mode of access an in-use foreground color be directly specified as a color data value. The NASA Report indicates, however, that R, G, and B in the SET_CURRENT_COLOR (R,G, B) function are floating point numbers in the range of 0 to 1, which need to be converted to integers in order to be processed by the system. As such, the NASA Report does not disclose

**Exhibit 20**
**Page 668**

direct specification of color data values. Dr. Wedig also points to SET COLOR function. But the SET COLOR function also takes real (floating point) parameters rather than integers, and thus does not directly specify color data values either.

47.  Dr. Wedig points to the SET_BACKGROUND_COLOR_INDEX (INDEX) function as evidence that the NASA Report discloses the third mode of access of claim 1. In pointing to this function, however, Dr. Wedig ignores the Court's construction of "in-use background color" as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." The NASA Report states at page 20 of Appendix A that the color set by the SET_BACKGROUND_COLOR_INDEX (INDEX) function does not take effect until a NEWFRAME occurs. The color set by this function is thus not "used as the background color for subsequently received text and graphics drawing commands until changed," and is therefore not an in-use background color. Dr. Wedig also points to the device-dependent SET BACKGROUND INDEX function discussed in Appendix C of the NASA Report as evidence of the third mode of access, but Appendix C does not indicate that the color set by that function is an in-use background color as defined by the Court. Moreover, the device-dependent SET BACKGROUND INDEX function is intended to be called when a user program calls the device-independent SET_BACKGROUND_COLOR_INDEX (INDEX) function of Appendix A, and therefore it too would not take effect until a NEWFRAME occurs. (*See, e.g.,* Section 2 of Appendix C.)

48.  Dr. Wedig also argues that it would have been obvious to one of ordinary skill in the art to add an in-use background color to the system described in the NASA Report, but the NASA report does not disclose any actual text or drawing commands that use a background

Exhibit 20
Page 669

color. Thus, one of ordinary skill in the art would not have been motivated to add an in-use background color to a system that could not make use of such a color. Furthermore, the references that Dr. Wedig cites to do not disclose an in-use background color as defined by the Court. The Carter reference at page 163 mentions background colors, but it does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed." Similarly, the Ramtek manual at page 3-21 refers to a background flag which inverts the polarity of incoming binary data, but it does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed." The Antiope Specification at pages 6-7 discusses background colors, but it likewise does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed," as discussed above.

49. Because the NASA Report does not disclose all three modes of access required by claim 1, it necessarily does not disclose the processing means or display means of claim 1, which require the three modes of access.

50. With respect to claims 2 and 3 of the '759 patent, the Court's claim construction for these claims requires the three modes of access and the corresponding structure of claim 1. Because the NASA Report fails to disclose those elements of claim 1, it also fails to anticipate or render obvious claims 2 and 3.

51. Accordingly, for at least these reasons, it is my opinion that the NASA Report does not anticipate or render obvious claims 1-3 of the '759 patent.

Exhibit 20
Page 670

*Documents and Other Materials Reviewed*

52. My understanding of the '759 patent is based on my review of the patent, the asserted claims, the patent prosecution history, the prior art cited in the Patent Office, the Court's Claim Construction Order, and on my professional experience in the field of display technology over the last 29 years.

53. In preparing this report, I reviewed the supplement report of Dr. Wedig, the references discussed in Dr. Wedig's supplemental report, my May 12, 2006 Rebuttal Expert Report, the '759 patent and file history, and the Court's claim construction order.

54. To aid my testimony at trial, I may rely on any or all of these materials, including those referenced in this report as examples, as well as other materials that I have considered. I may also rely at trial on demonstrative exhibits, summary exhibits, testimonial aids, animations, sample code, demonstrations, and the like in support of my testimony to illustrate the bases of my opinions.

*Compensation*

55. My company is charging a rate of $250 per hour plus expenses for my work on this case. My compensation is in no way contingent on the content of my testimony or the outcome of this litigation.

*Other Testimony*

56. In the last four years I testified by deposition as an expert in the matter of Grandeye Ltd. vs. IPIX Corporation, Civil Action No 2:05 CV 134 (WDK) (TEM) (United States District Court, Eastern District of Virginia), and in this case.

**Exhibit 20**
**Page 671**

October 12, 2007

By _____
                        Jake Richter

**Exhibit 20**
**Page 672**

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, a copy of the foregoing SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER was served on counsel for Microsoft, Dell, and Gateway as follows:

**EMAIL**

Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099
marchese@fr.com
srodriguez@fr.com

Attorneys for *Microsoft Corp.*

**EMAIL**

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Dell Inc.*

**EMAIL**

Jeffrey Plies
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
jeff.plies@dechert.com

Attorneys for *Gateway, Inc., et al.*

**Exhibit 20**
**Page 673**