1  James S. Blackburn (State Bar No. 169134)
   ARNOLD & PORTER LLP
2  777 South Figueroa Street, 44th Floor
   Los Angeles, California  90017-5844
3  Telephone:  (213) 243-4000
   Facsimile:  (213) 243-4199
4
   Joseph A. Micallef (admitted *pro hac vice*)
5  ARNOLD & PORTER LLP
   555 Twelfth Street, N.W.
6  Washington, D.C.  20004-1206
   Telephone:  (202) 942-5000
7  Facsimile:  (202) 942-5999
8  Joel M. Freed (admitted *pro hac vice*)
   McDERMOTT WILL & EMERY LLP
9  600 13th Street, N.W.
   Washington, D.C.  20005-3096
10 Telephone:  (202) 756-8000
   Facsimile:  (202) 756-8087
11
   Attorneys for *Dell Inc.*
12
13              UNITED STATES DISTRICT COURT
14            SOUTHERN DISTRICT OF CALIFORNIA
15
16 LUCENT TECHNOLOGIES INC.  and          )  Case No. 07-CV-2000-H (CAB)
   MULTIMEDIA PATENT TRUST,               )  consisting of matters severed from
17                                        )  consolidated cases:
        Plaintiffs and Counterclaim-defendants, )  Case No. 02-CV-2060-B (CAB)
18                                        )  Case No. 03-CV-0699-B (CAB)
        v.                                )  Case No. 03-CV-1108-B (CAB)
19                                        )
   GATEWAY, INC. AND GATEWAY              )  **DECLARATION OF JAMES S.**
20 COUNTRY STORES LLC, GATEWAY            )  **BLACKBURN IN SUPPORT OF DELL**
   COMPANIES, INC., GATEWAY               )  **INC.'S MOTIONS FOR SUMMARY**
21 MANUFACTURING LLC and                  )  **JUDGMENT OF INVALIDITY ON THE**
   COWABUNGA ENTERPRISES, INC.,           )  **ASSERTED CLAIMS OF U.S. PATENT**
22                                        )  **NOS. 4,958,226, 4,383,272, 4,439,759, AND**
        Defendants and Counter-claimants, )  **4,763,356**
23                                        )
   and                                    )  Judge Marilyn L. Huff
24                                        )
   MICROSOFT CORPORATION,                 )  Hearing:  January 7, 2008, 10:30 a.m.
25                                        )  Location: Courtroom 13, 5th Floor
        Intervener and Counter-claimant,  )
26                                        )
                                          )
27 _____ )
28

1   MICROSOFT CORPORATION,                      )
                                                )
2           Plaintiff and Counter-defendant,    )
                                                )
3   v.                                          )
                                                )
4   LUCENT TECHNOLOGIES INC. and                )
    MULTIMEDIA PATENT TRUST,                    )
5                                               )
            Defendants and Counter-claimants,   )
6                                               )
    _____        )
7   LUCENT TECHNOLOGIES INC. and                )
    MULTIMEDIA PATENT TRUST,                    )
8                                               )
            Plaintiffs and Counterclaim-defendants, )
9                                               )
    v.                                          )
10                                              )
    DELL INC.,                                  )
11                                              )
            Defendant and Counter-claimant.     )
12  _____        )

I, James S. Blackburn, declare as follows:

1.     I am an attorney and a partner of the law firm of Arnold & Porter LLP, counsel for defendant Dell Inc. ("Dell").  I make this declaration in support of Dell's Motions for Summary Judgment of Invalidity of the Asserted Claims of U.S. Patent Nos. 4,958,226, 4,383,272, 4,439,759, and 4,763,356, which are filed concurrently with this declaration.  Unless otherwise stated herein, I have personal knowledge of the facts set forth below and, if called as a witness, could and would competently testify thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of U.S. Patent No. 4,763,356 to Day, et al., marked with Bates range LUC 1004455-81.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Court's Order Denying Plaintiff's and Defendants' Cross-Motions Regarding the Invalidity of U.S. Patent No. 4,763,356, dated May 15, 2007.  [Docket No. 1795].

4.     Attached hereto as Exhibit 3 is a true and correct copy of *Touch Screens: Big Deal or No Deal?*, Michael Tyler,  DATAMATION, dated January 1984, marked with Bates range GW-LT422215-22.

5.     Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the deposition Michael E. Farmer, taken February 23, 2006.

6.     Attached hereto as Exhibit 5 is a true and correct copy of excerpts of "The Home Accountant and Financial Planner for the Macintosh," dated 1984, marked with Bates range MSLT_1060811-813.

7.     Attached hereto as Exhibit 6 is a true and correct copy of excerpts of the deposition of Dale Buscaino, taken November 7, 2007.

8.     Attached hereto as Exhibit 7 is a true and correct copy of the Court's Claim Construction Order Clarifying and Superceding the Order of March 1, 2004, Construing Claims for U.S. Patent No. 4,763,356, dated April 17, 2007.  [Docket No. 1552.]

9.     Attached hereto as Exhibit 8 is a true and correct copy of U.S. Patent No. 4,439,759 to Fleming et al., marked with Bates range LUC1114390-409.

- 1 -

10. Attached hereto as Exhibit 9 is a true and correct copy of "Final Report – NASA Grant NSG 1508, Extension of the Core Graphics System for Raster Graphics Display," James D. Foley, marked with Bates range DELL366644-799.

11. Attached hereto as Exhibit 10 is a true and correct copy of the Supplemental Rebuttal Expert Report of Jake Richter, dated October 12, 2007.

12. Attached hereto as Exhibit 11 is a true and correct copy of excerpts of the deposition of Jake Richter, taken November 14, 2007.

13. Attached hereto as Exhibit 12 is a true and correct copy of the Court's Order Construing Claims for United States Patent Number 4,439,759, dated November 15, 2005.

14. Attached hereto as Exhibit 13 is a true and correct copy of the Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent Number 4,439,759, dated September 14, 2007.

15. Attached hereto as Exhibit 14 is a true and correct copy of the Affidavit of Jean A. Pec, with Exhibits A-B, dated September 14, 2007.

16. Attached hereto as Exhibit 15 is a true and correct copy of the "Status Report of the Graphics Standards Planning Committee," Computer Graphics, Vol. 11, No. 3, Fall 1977, marked with Bates range GW-LT253851-997.

17. Attached hereto as Exhibit 16 is a true and correct copy of excerpts of the deposition of James D. Foley, taken November 7, 2007.

18. Attached hereto as Exhibit 17 is a true and correct copy of "Home Information Systems - Provisional Standard," Bell Laboratories, dated April 14, 1981, marked with Bates range LUC 003905-4026. **FILED UNDER SEAL.**

19. Attached hereto as Exhibit 18 is a true and correct copy of the Expert Report of Edward J. Delp III Regarding Obviousness, dated September 14, 2007.

20. Attached hereto as Exhibit 19 is a true and correct copy of the Supplemental Rebuttal Expert Report of Professor Bernd Girod Regarding Validity of Lucent's 4,383,272 and 4,958,226 Patents, dated October 12, 2007.

21.    Attached hereto as Exhibit 20 is a true and correct copy of excerpts of the deposition of Bernd Girod, taken on November 20, 2007.

22.    Attached hereto as Exhibit 21 is a true and correct copy of excerpts of "Digital Pictures: Representation and Compression," Arun N. Netravali and Barry G. Haskell, 1988, marked with Bates range MSLT_0004995-99, 5408, and 5481.

23.    Attached hereto as Exhibit 22 is a true and correct copy of excerpts of the deposition of Barry Haskell, taken December 15, 2005. **FILED UNDER SEAL.**

24.    Attached hereto as Exhibit 23 is a true and correct copy of a certified copy of a translation of the Master's Thesis of Thomas Micke, entitled "Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Signals, April 1986, marked with Bates range GW-LT255053-131.

25.    Attached hereto as Exhibit 24 is a true and correct copy of U.S. Patent No. 4,958,226 to Haskell, et al., marked with Bates range LUC1112272-77.

26.    Attached hereto as Exhibit 25 is a true and correct copy of the Court's Order Construing Claims for United States Patent Number 4,958,226, dated July 14, 2005.  [Docket No. 311.]

27.    Attached hereto as Exhibit 26 is a true and correct copy of the "Copyright Information for Digital Pictures," marked with Bates range DELL318997-99.

28.    Attached hereto as Exhibit 27 is a true and correct copy of the Affidavit of Michael A. Davis, Jr., dated March 12, 1999, with Exhibits A-F, marked with Bates range DELL320793-800.

29.    Attached hereto as Exhibit 28 is a true and correct copy of "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Picture," N.K. Lodge, marked with Bates range DELL318140-47.

30.    Attached hereto as Exhibit 29  is a true and correct copy of "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Masayuki Tanimoto, July 1987, marked with Bates range DELL318251-54.

- 3 -

31.     Attached hereto as Exhibit 30 is a true and correct copy of "CCITT SG XV Working Party Document #81: Comments on Conditional Motion Compensated Frame Interpolation," March 1986, marked with Bates range MSLT0625891-94.

32.     Attached hereto as Exhibit 31 is a true and correct copy of U.S. Patent No. 4,849,810 to Ericsson, marked with Bates range DELL319258-315.

33.     Attached hereto as Exhibit 32 is a true and correct copy of U.S. Patent No. 4,816,914 to Ericsson, marked with Bates range DELL320565-607.

34.     Attached hereto as Exhibit 33 is a true and correct copy of U.S. Patent No. 4,794,455 to Ericsson, marked with Bates range DELL319147-73.

35.     Attached hereto as Exhibit 34 is a true and correct copy of U.S. Patent No. 4,703,350 to Hinman, marked with Bates range DELL320519-37.

36.     Attached hereto as Exhibit 35 is a true and correct copy of U.S. Patent No. 4,727,422 to Hinman, marked with Bates range MSLT_0001034-51.

37.     Attached hereto as Exhibit 36 is a true and correct copy of U.S. Patent No. 4,661,849 to Hinman, marked with Bates range DELL318173-90.

38.     Attached hereto as Exhibit 37 is a true and correct copy of U.S. Patent No. 4,754492 to Malvar, marked with Bates range DELL319037-59.

39.     Attached hereto as Exhibit 38 is a true and correct copy of the Declaration of Thomas Wehberg.

40.     Attached hereto as Exhibit 39 is a true and correct copy of "The Efficiency of Motion-Compensating Prediction for Hybrid Coding of Video Sequences," Bernd Girod, August 1987, marked with Bates range MSLT_0233488-502.

41.     Attached hereto as Exhibit 40 is a true and correct copy of "Television Band Compression by Contour Interpolation," Professor D. Gabor, et al., May 1961, marked with Bates range MLST0001228-40.

42.     Attached hereto as Exhibit 41 is a true and correct copy of "Picture Coding: A Review," Arun N. Netravali and John O. Limb, March 1980, marked with Bates range MSLT_0001623-63.

- 4 -

43.     Attached hereto as Exhibit 42 is a true and correct copy of the Court's Order Denying-in-Part Dell's Motion for Summary Judgment on U.S. Patent No. 4,383,272, dated July 27, 2007.  [Docket No. 1948.]

44.     Attached hereto as Exhibit 43 is a true and correct copy of the Court's Superceding Order Construing Claims for United States Patent Number 4,383,272, dated August 16, 2005. [Docket No. 329.]

45.     Attached hereto as Exhibit 44 is a true and correct copy of the Court's Order Denying Gateway's Motions for Summary Judgment that U.S. Patent No. 4,383,272 is Invalid Under 35 U.S.C. §102(g) and Granting Summary Adjudication on Certain Predicate Issues Pertaining to This Defense, dated July 12, 2007.  [Docket No. 1948.]

46.     Attached hereto as Exhibit 45 is a true and correct copy of United States Patent 4,383,272 to Netravali, et al., marked with Bates range LUC0001363-73.

47.     Attached hereto as Exhibit 46 is a true and correct copy of Response to the Examiner dated October 22, 1982, marked with Bates range LUC0001428-31.

48.     Attached hereto as Exhibit 47 is a true and correct copy of the Doctorate thesis of Jaswant Raj Jain, entitled "Interframe Adaptive Data Compression Techniques for Images," September 1979, marked with Bates range MSLT_0001425-622.

49.     Attached hereto as Exhibit 48 is a true and correct copy of excerpts of the deposition of Delphine Lewis, taken June 30, 2005.

50.     Attached hereto as Exhibit 49 is a compact disk containing video excerpts from the videotaped deposition of Michael Farmer, taken on February 23, 2006.  **LODGED SEPARATELY.**

\\

\\

\\

\\

\\

\\

- 5 -

1     51.    I declare under penalty of perjury under the laws of the United States of America that

2  the foregoing is true and correct.

3     Executed this 30th day of November at Los Angeles, California.

4

5                                          ARNOLD & PORTER LLP

6                                          James S. Blackburn
                                           Joseph A. Micallef

7

8                                          McDERMOTT WILL & EMERY LLP
                                           Joel M. Freed

9

10

11                                    By:  /s/James S. Blackburn
                                           James. S. Blackburn

12                                         james.blackburn@aporter.com
                                           Attorney for Dell Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## EXHIBITS TABLE OF CONTENTS

2

| Exhibit | Document | Page No. |
|---------|----------|----------|
| 1 | U.S. Patent No. 4,763,356 to Day, et al., marked with Bates range LUC 1004455-81 | 12 |
| 2 | Order Denying Plaintiff's and Defendants' Cross-Motions Regarding the Invalidity of U.S. Patent No. 4,763,356, dated May 15, 2007 [Docket No. 1795] | 39 |
| 3 | "Touch Screens: Big Deal or No Deal?," Michael Tyler, DATAMATION, dated January 1984, marked with Bates range GW-LT422215-22 | 47 |
| 4 | Excerpts of the deposition Michael E. Farmer, taken February 23, 2006 | 55 |
| 5 | Excerpts of "The Home Accountant and Financial Planner for the Macintosh," dated 1984, marked with Bates range MSLT_1060811-813 | 67 |
| 6 | Excerpts of the deposition of Dale Buscaino, taken November 7, 2007 | 73 |
| 7 | Claim Construction Order Clarifying and Superceding the Order of March 1, 2004, Construing Claims for U.S. Patent No. 4,763,356 [Docket No. 1552], dated April 17, 2007 | 79 |
| 8 | U.S. Patent No. 4,439,759 to Fleming et al., marked with Bates range LUC1114390-409 | 88 |
| 9 | "Final Report – NASA Grant NSG 1508, Extension of the Core Graphics System for Raster Graphics Display," James D. Foley, marked with Bates range DELL366644-799 | 108 |
| 10 | Supplemental Rebuttal Expert Report of Jake Richter, dated October 12, 2007 | 264 |
| 11 | Excerpts of the deposition of Jake Richter, taken November 14, 2007 | 286 |
| 12 | Order Construing Claims for United States Patent Number 4,439,759, dated November 15, 2005 | 311 |
| 13 | Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent Number 4,439,759, dated September 14, 2007 | 321 |
| 14 | Affidavit of Jean A. Pec, with Exhibits A-B, dated September 14, 2007 | 409 |
| 15 | Status Report of the Graphics Standards Planning Committee, Computer Graphics, Vol. 11, No. 3, Fall 1977, marked with Bates range GW-LT253851-997 | 574 |
| 16 | Excerpts of the deposition of James D. Foley, taken November 7, 2007 | 721 |
| 17 | "Home Information Systems - Provisional Standard," Bell Laboratories, dated April 14, 1981, marked with Bates range LUC 003905-4026. **FILED UNDER SEAL** | 732 |

- 7 -

18   Expert Report of Edward J. Delp III Regarding Obviousness, dated September 14, 2007 ...............................................................854

19   Supplemental Rebuttal Expert Report of Professor Bernd Girod Regarding Validity of Lucent's 4,383,272 and 4,958,226 Patents, dated October 12, 2007 ...............................................................1011

20   Excerpts of the deposition of Bernd Girod, taken on November 20, 2007 ......1045

21   Excerpts of "Digital Pictures: Representation and Compression," Arun N. Netravali and Barry G. Haskell, 1988, marked with Bates range MSLT_0004995-99, 5408, and 5481 ...............................................................1084

22   Excerpts of the deposition of Barry Haskell, taken December 15, 2005. **FILED UNDER SEAL**...............................................................1103

23   Translation of the Master's Thesis of Thomas Micke, entitled "Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Signals, April 1986, marked with Bates range GW-LT255053-131 ...............................................................1094

24   U.S. Patent No. 4,958,226 to Haskell, et al., marked with Bates range LUC1112272-77 ...............................................................1182

25   Order Construing Claims for United States Patent Number 4,958,226, dated July 14, 2005 ...............................................................1188

26   Copyright Information for Digital Pictures, marked with Bates range DELL318997-99 ...............................................................1194

27   Affidavit of Michael A. Davis, Jr., dated March 12, 1999, with Exhibits A-F, marked with Bates range DELL320793-800 ............1197

28   "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Picture," N.K. Lodge, marked with Bates range DELL318140-47 ...............................................................1205

29   "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Masayuki Tanimoto, July 1987, marked with Bates range DELL318251-54 ...............................................................1213

30   "CITT SG XV Working Party Document #81: Comments on Conditional Motion Compensated Frame Interpolation," March 1986, marked with Bates range MSLT0625891-94 ...............................................................1217

31   U.S. Patent No. 4,849,810 to Ericsson, marked with Bates range DELL319258-315 ...............................................................1221

32   U.S. Patent No. 4,816,914 to Ericsson, marked with Bates range DELL320565-607 ...............................................................1280

33   U.S. Patent No. 4,794,455 to Ericsson, marked with Bates range DELL319147-73 ...............................................................1323

- 8 -

34    U.S. Patent No. 4,703,350 to Hinman, marked with Bates range DELL320519-37 ...................................................................................... 1350

35    U.S. Patent No. 4,727,422 to Hinman, marked with Bates range MSLT_0001034-51 .................................................................................. 1369

36    U.S. Patent No. 4,661,849 to Hinman, marked with Bates range DELL318173-90 ...................................................................................... 1387

37    U.S. Patent No. 4,754492 to Malvar, marked with Bates range DELL319037-59 ...................................................................................... 1405

38    Declaration of Thomas Wehberg ................................................................. 1428

39    "The Efficiency of Motion-Compensating Prediction for Hybrid Coding of Video Sequences," Bernd Girod, August 1987, marked with Bates range MSLT_0233488-502 ....................................................................................... 1430

40    "Television Band Compression by Contour Interpolation," Professor D. Gabor, et al., May 1961, marked with Bates range MLST0001228-40 .......... 1445

41    "Picture Coding: A Review," Arun N. Netravali and John O. Limb, March 1980, marked with Bates range MSLT_0001623-63 ...................................... 1459

42    Order Denying-in-Part Dell's Motion for Summary Judgment on U.S. Patent No. 4,383,272 [Docket No. 1948], dated July 27, 2007 ..................... 1500

43    Superceding Order Construing Claims for United States Patent Number 4,383,272, dated August 16, 2005 ................................................................. 1507

44    Order Denying Gateway's Motions for Summary Judgment that U.S. Patent No. 4,383,272 is Invalid Under 35 U.S.C. §102(g) and Granting Summary Adjudication on Certain Predicate Issues Pertaining to This Defense [Docket No. 1948], dated July 12, 2007 ........................................... 1513

45    United States Patent 4,383,272 to Netravali, et al., marked with Bates range LUC0001363-73 ................................................................................. 1519

46    Response to the Examiner dated October 22, 1982, marked with Bates range LUC0001428-31 ................................................................................. 1530

47    Doctorate thesis of Jaswant Raj Jain, entitled "Interframe Adaptive Data Compression Techniques for Images," September 1979, marked with Bates range MSLT_0001425-622 ....................................................................... 1534

48    Excerpts of the deposition of Delphine Lewis, taken June 30, 2005 .............. 1732

49    Compact disk of video excerpts from the videotaped deposition of Michael Farmer, taken on February 23, 2006.  **LODGED SEPARATELY**

- 9 -

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases:
Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIS PAGE INTENTIONALLY LEFT BLANK**

1
2
3
4
5
6
7
8
9
10
11
12
13
14          **THIS PAGE INTENTIONALLY LEFT BLANK**
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 1

# United States Patent [19]

**Day, Jr. et al.**

[11] **Patent Number:** 4,763,356

[45] **Date of Patent:** Aug. 9, 1988

[54] **TOUCH SCREEN FORM ENTRY SYSTEM**

[75] Inventors: Benjamin W. Day, Jr., Rumson; Alexander C. Gillon, Aberdeen; Raoul A. LeConte, Howell, all of N.J.

[73] Assignee: AT&T Information Systems, Inc. American Telephone and Telegraph Company, Murray Hill, N.J.

[21] Appl. No.: 940,408

[22] Filed: Dec. 11, 1986

[51] Int. Cl.⁴ ...................... H04M 1/23; G06F 15/18; G08C 21/00

[52] U.S. Cl. .................................. 379/368; 379/396; 340/712; 340/734; 178/18; 364/900

[58] Field of Search .................. 379/93, 96, 100, 396, 379/354, 368; 178/18, 19, 20; 340/712, 734, 365 C, 365 P, 365 VL; 364/200 MS File, 900 MS File

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 4,185,282 | 1/1980 | Pick | 340/711 |
| 4,202,041 | 5/1980 | Kaplow et al. | 364/900 |
| 4,224,615 | 9/1980 | Penz | 340/712 |
| 4,291,198 | 9/1981 | Anderson et al. | 376/96 |
| 4,431,870 | 2/1984 | May et al. | 379/354 X |
| 4,451,895 | 5/1984 | Sliwkowski | 364/521 |
| 4,649,499 | 3/1987 | Sutton et al. | 178/18 X |
| 4,653,086 | 3/1987 | Laube | 379/96 |
| 4,659,876 | 4/1987 | Sullivan et al. | 379/96 |
| 4,725,694 | 2/1988 | Auer et al. | 178/18 |

**FOREIGN PATENT DOCUMENTS**

59-170929 9/1984 Japan ..................................... 340/712

**OTHER PUBLICATIONS**

Linda Lowe, "System for Terminals Creates Keyboards Anyone Can Use," Electronics, Jun. 5, 1980, pp. 39 and 40.

To Russell Hsing, Hoa Anh Quach, Charles LeBlanc and James C. Stoddard, "An Interactive Touch Phone

for Office Automation," IEEE Communications Magazine, Feb. 1985–vol. 23, No. 2, pp. 21 through 26.

Werner Horn, Robert Trappl, Dietmar Ulrich, and Gerhard Chroust, "A Frame–Based Real–Time Graphic Interaction System," European Meeting on Cybernetics and Systems Research, 1984, pp. 825 through 830.

To Russell Hsing, Hoa Anh Quach, Ralph Mednick, and Leonard Abraham, "An Interactive Touch Phone for Future Offices," IEEE International Conference on Communications, 20th, Amsterdam, May 14–17, 1984, pp. 272 through 275.

*Primary Examiner*—Keith E. George
*Attorney, Agent, or Firm*—Frederick B. Luludis

[57] **ABSTRACT**

A personal computer connected to a display and touch screen panel is provided with a form entry system integrated therewith. The form entry system is adapted to display a predefined form and to automatically display a predefined tool, such as a keyboard, menu, calculator, etc., to facilitate inputting information in a respective field of the form or chart. Specifically, the user is prompted as to which field is to be filled in by highlighting the field and concurrently displaying as an overlay (window) the tool that the user will use to input the information called for by the highlighted field. In the case where a field calls for illustratively the insertion of a name, the system may be adapted to display a menu of names as the tool for filling in that field. The user selects the name that he or she desired to be inserted in the field by touching that name. The system responsive thereto inserts the name in that field, highlights the next field to be filled in and displays the tool for filling that field. The system may also be adapted to communicate with a host computer to obtain the information that is to be inserted in one or more fields. Also, the user may erase the tool that is displayed by the system and direct the system to display another tool, such as the aforementioned keyboard.

**22 Claims, 17 Drawing Sheets**



Exhibit 1  Page 12

LUC 1004455

*FIG. 1*



**Exhibit 1  Page 13**

LUC 1004456



FIG. 2

Exhibit 1  Page 14

LUC 1004457



FIG. 3

Exhibit 1  Page 15

LUC 1004458



Exhibit 1  Page 16

LUC 1004459



FIG. 5

Exhibit 1  Page 17

LUC 1004460



FIG. 6

Exhibit 1  Page 18

LUC 1004461



Exhibit 1  Page 19

LUC 1004462



FIG. 8

Exhibit 1  Page 20

LUC 1004463



FIG. 9

Exhibit 1  Page 21

LUC 1004464

*FIG. 10*



| SPECIALS | | HIGHLIGHT | | TOOLBOX | | STYLUS | | CLEAR |

Special Equipment Request Worksheet    Page 2

**SATURN**

| Model | Year | Day | Bid Date | Saturn Ord No. |
| CONVERTIBLE | 1986 | 10 | 05/10/86 | SMRN-0604420 |

| Customer Name | Dealer Contract | Dealer Phone No. |
| CHERYL HIRKALER | SUN SATURN | (201)555-7200 |

| Return Request To | Street Adress | City | State | Zip |
| RALPH SMITH | 2222 MAIN STREET | BAXTER | N. J. | 07555 |

**SPECIAL EQUIPMENT ITEMS**

RTN

30

111

110

**Exhibit 1  Page 22**

LUC 1004465

FIG. 11



**Exhibit 1  Page 23**

LUC 1004466

FIG. 12



Exhibit 1  Page 24

LUC 1004467



FIG. 13

Exhibit 1  Page 25

LUC 1004468

**U.S. Patent**    Aug. 9, 1988    Sheet 14 of 17    **4,763,356**

FIG. 14



Exhibit 1  Page 26

LUC 1004469



FIG. 17

FIG. 15 | FIG. 16

FIG. 15

**Exhibit 1  Page 27**

LUC 1004470

FIG. 16



Exhibit 1  Page 28

LUC 1004471

FIG. 18



Exhibit 1  Page 29

LUC 1004472

4,763,356

1

## TOUCH SCREEN FORM ENTRY SYSTEM

### FIELD OF THE INVENTION

The invention relates to data entry arrangements.

### BACKGROUND OF THE INVENTION

It is well known that such persons as securities traders, sales people, order takers, nurses, etc., spend an appreciable amount of time over the course of a day manually filling in various forms, such as purchase orders, charts, etc. Various techniques have been devised to reduce the amount of time spent filling in such forms. One such technique displays the fields of a form on the cathode ray tube or other display of a computer. A user "fills in" the displayed fields by entering the information called for by each field using the computer keyboard. However, the amount of time that such known techniques save over the manual method of filling in a form is not substantial when a user thereof is not proficient in using a computer keyboard.

### SUMMARY OF THE INVENTION

We have recognized that a more desirable approach to providing a computerized form entry system is one that upon displaying a form indicates in a predetermined sequence which of the information fields of the displayed form a user is to fill in and concurrently displays one of a plurality of predefined tools adapted to specifically facilitate the inputting of the information called for by that field. Specifically, in our arrangement, the field that is to be filled in by the user is highlighted and the tool which the user operates to fill in the highlighted field is displayed as an overlay (window) on the form. A tool could be, for example, a calculator, a keyboard, a date pad, etc.

In accordance with one aspect of the invention, the form entry system may be arranged to communicate with illustratively a host computer during the course of filling in a form or chart to obtain the entries for one or more fields thereof. In accordance with another aspect of the invention, one of the displayed fields could be a bit-mapped graphics field which the user fills in by writing on the touch screen using a hand-held stylus. In accordance with another aspect of the invention, the user may erase a displayed tool and bring up another tool and use the other tool to fill in a respective field.

### BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects and features, together with the operation and utilization of the present invention, will be more apparent from the illustrative embodiment shown in conjunction with the drawings in which

FIG. 1 illustrates a computer arrangement in which the present invention is illustratively implemented;

FIGS. 2 through 10 show various stages of a customized form displayed by the computer arrangement of FIG. 1 in which a field in the form is filled in using a respective displayed tool in accordance with the invention;

FIG. 11 depicts a menu of predefined tools that is displayed by the computer arrangement of FIG. 1 when a user points to a respective one of the function keys shown in FIGS. 2 through 10;

FIG. 12 shows a telephone station set tool which may be displayed by the computer arrangement of FIG. 1 to establish a telephone call;

2

FIG. 13 is a simplified block diagram of the computer arrangement of FIG. 1;

FIG. 14 is a simplified block diagram showing a central computer connected to a plurality of other computers, such as the computer depicted in FIG. 1, the computers, in turn, being shown connected to respective display panels;

FIGS. 15 and 16 are flowcharts describing the operation of the computer arrangement of FIG. 1 in relation to, inter alia, filling in the form of FIGS. 2 through 10, in accordance with the invention;

FIG. 17 shows the manner in which FIGS. 15 and 16 should be arranged; and

FIG. 18 illustrates a portion of memory contained within the computer of FIG. 1 in which is stored, inter alia, the form shown in FIG. 2.

### DETAILED DESCRIPTION

Form entry system 10 depicted in FIG. 1 includes personal computer 20 and display panel 15. Computer 20 operates under a predetermined operating system—illustratively the MS-DOS operating system. (The MS-DOS operating system is available from Microsoft, Inc.) The computer includes a display 21, keyboard 23 and floppy diskette unit 22 as well as other internal components not explicitly shown in FIG. 1, such as a hard disk unit. The keyboard 23 provides a mechanism for the user to input instructions to the computer, such as an instruction to bring up a predefined screen pattern on display 21. In the practice of the invention, display 21 is not required since any screen pattern that is brought up on display 21 is also brought up on display panel 15.

In particular, panel 15 includes a touch-sensitive screen 16 overlaying a display device, for example, an ac plasma display. The touchsensitive screen could be, for example, the TIX touch-screen available from the Elographics Company of Oak Ridge, Tenn., and the ac plasma display could be, for example, the D0640LB ac plasma display available from DIXY Corporation of Japan. The display 21 and the D0640LB ac plasma display each comprise 400 rows of 640 picture elements (pixels) in each row and therefore, both are suitable for displaying so-called bit-mapped graphics.

Cable 17 includes a multilead bus connected between the ac plasma display and a video (monitor) output port (not shown) available at the back of computer 20. It also includes signal leads connected between touch-sensitive screen 16 and a touch-screen controller circuit board mounted in an available computer 20 circuit board slot (not shown). When touch-screen 16 is touched by the user, the voltage levels appearing on particular signal leads of cable 17 change. The touch-screen controller decodes these changes in the signal levels into x and y coordinates, which define the location that is being touched.

As will be discussed below, a user of the invention may design a customized form for display on panel 15 such that the fields of the form are highlighted one at a time in a particular pattern, such as a sequential pattern. Moreover, the user may associate a predefined tool with a particular field and have that tool displayed as an overlay when the associated field is highlighted. When the user "fills in" a highlighted field using the displayed tool, the system automatically advances to the next field to be filled in, highlights that field and displays the tool that will be used to fill in the field.

**Exhibit 1  Page 30**

LUC 1004473

4,763,356

| 3 | 4 |
|---|---|

Referring now to FIG. 2, there is shown an illustrative example of a customized form which may be displayed on the ac plasma display of panel 15 after the computer 20 is turned on and has performed some initial tasks including the "booting" of the operating system from the aforementioned hard disk unit, and a screen command identifying the form has been inputted into computer 20 via keyboard 23. Form 30 comprises two pages in which the first page is shown in FIGS. 2–9 and the second page is shown in FIG. 10.

Form 30 is illustratively a customized form for ordering a particular model of automobile from the fictitious Saturn Motor Company (SMC). The form comprises a plurality of information fields each identifying the kind of information to be inserted therein, such as Model, Year, Qty (quantity), etc. The fields, when filled in by a user (e.g., a salesperson), define a particular model of automobile having a particular set of options, the options being filled when the user reaches the options section 31 of the form. Also, special equipment may be ordered when the user points to the box labeled SP EQUIP, as will be discussed below.

(The term "points to" and the variants of that term as used herein is meant to include other terms that are understood by the art and which define similar functions. For example, it includes such notions as moving a screen cursor to the location of displayed text or to an entry in a menu of entries and operating, for example, an enter key; as "touching" the screen as one would touch the touch screen 16 of panel 15; or even as identifying particular displayed text or a menu of entries using terminal buttons, for example, computer keyboard buttons.)

It is seen from FIG. 2 that the fields of form 30 are actually constructed from a plurality of vertical and horizontal lines, such as lines 20, 21, 23, 24 and 25 which define fields 41 and 51 labeled Model and Year, respectively. Function keys 32 through 37 and the manner in which a user specifies the various horizontal and vertical lines to construct the fields of a customized form will be discussed below.

When a form is first brought up on panel 15, one of the fields in the form is illustratively highlighted and, in accordance with the invention, the predefined tool for filling in that field is concurrently displayed illustratively as a window overlaying the form.

Specifically, FIG. 3 depicts form 30 when it is first brought up on panel 15. It is seen from FIG. 3 that the first field in the form—the Model field 41—is highlighted and the tool 40 for filling in that field is displayed as an overlay (window) on form 30. In this instance, tool 40 is a menu of predefined entries (or items) 42 through 46 representing respective models of automobiles available from SMC. To "fill in" field 41, then, in accordance with a feature of the invention, all that the user needs to do is to point to one of the entries 42 through 46.

(Other functions related to a displayed tool can be invoked by touching tool movement icon 48 or tool erase icon 47, the former allowing the user to move the tool to another location on the display and the latter allowing the user to erase the tool from the display.)

For example, if it is assumed that a purchaser wishes to purchase the CONVERTIBLE model, then the user points to that entry. As shown in FIG. 4, the form entry system, responsive thereto (a) inserts the name CONVERTIBLE in field 41, (b) erases menu 40 from the display of panel 15, (c) highlights the next field—the

Year field—and (d) brings up the corresponding tool 50 to fill in that field.

It is assumed for the purpose of illustrating the invention that SMC has an inventory of automobiles that it manufactured during the years 1978 through 1986 and the entries in tool 50 reflect that fact. To fill in field 51, then, all that the user needs to do is to point to one of the entries displayed in tool 50. Assuming that the user selects the entry 1986, the system (a) inserts 1986 in field 51, (b) erases tool 50 from the display, (c) highlights the next field to be filled in, i.e., the Qty field, and (d) displays the tool for filling in that field.

Turning then to FIG. 5, there is shown form 30 at the point where fields 41 and 51 have been filled in and field 61 is highlighted, indicating that field 61 is the next field to be filled in by the user. The device for filling in field 61—number entry tool 60—has also been brought up on the display. The number entry tool 60 operates similar to a standard hand-held calculator in which the user composes a string of numbers by touching individual ones of the displayed buttons of tool 60, for example, the button labeled 0 (zero), as though the user were touching the number buttons on a hand-held calculator or the number buttons on a computer keyboard.

Number entry tool 60 also includes four function keys 63 through 66. Briefly, the BS (back space) key 63 allows the user to backspace to overwrite a digit displayed in the display section 62. The C (clear) key 64 clears the number displayed in display section 62. The E (enter) key 65 allows the user to transfer the number displayed in display section 62 to the highlighted field, i.e., field 61, but the system does not automatically skip, or advance, to the next field to be filled in. To advance to the next field, the user would have to point to it. When the user does so, the system highlights that field (i.e., the Bid Date field) and brings up the tool for filling in the field. The E/S (enter/skip) key 66 causes the system to transfer the number displayed in display section 62 to field 61 and advance to the next field to be filled in.

In the illustrative example of the present invention, it is assumed that the number of automobiles to be ordered is ten. Accordingly, the user touches the digit 1 and 0, respectively, to enter the number 10. In turn, the system displays the digits in the display section 62 of tool 60, as shown in FIG. 6.

FIG. 6 depicts the result of the user having pointed to the E/S key 66 of tool 60. It is seen that the system has inserted the number 10 in field 61 and has highlighted the Bid Date field 71 to indicate to the user that that field is the next field to be filled in. The system has also brought up the tool 70 for filling in field 71, which, in this case, is a transitory date and time entry tool 70 that is updated periodically. The current date 72 and time 73 displayed in tool 70 are derived from computer 20.

Since the Bid Date field 71 calls for a date and not a time, the user points to the E/S key 74 of tool 70. When the user does so, the system inserts the current date 72 in the associated field 71 and advances to the next field to be filled in.

As will be discussed below, the form entry system of the present invention may be programmed, in accordance with a feature of the invention, to advance to any field in the form. Thus, the system may be programmed, for example, to pass over one or more fields and to return to those fields after the other fields have been filled in.

**Exhibit 1  Page 31**

LUC 1004474

4,763,356

5

Turning then to FIG. 7, there is shown an example in which the system has been programmed to pass over field 85-1 and highlight field 81. The system has also brought up keyboard tool 80, since field 81 calls for the insertion of a name.

Specifically, tool 80 is patterned after a conventional keyboard having a display section 82. The user may illustratively compose a name by pointing to respective ones of the displayed keys of tool 80. When the user touches a key, for example, the key labeled C, the system displays that letter in display section 82 of tool 80. Upon composing the customer's name and seeing it displayed in display section 82, as shown in FIG. 7, the user then enters the name in the associated field 81 by pointing to the E/S key 83.

At this point in the discussion, it is assumed that, upon filling in field 81, the system is programmed to skip over fields 85-2 and 85-3 and advance to the Return Request To field 91. When the system advances to field 91, it highlights that field and brings up the corresponding tool for filling in the field, such as a menu of names (not shown). In the present illustrative example of the invention, when the user selects one of the names in the displayed menu of names, the system inserts the selected name in field 91 and advances to DLR INFO 90.

In certain instances, it may be advantageous to allow a central location, such as a host computer, to determine the information that is to be inserted in a field of a form. For example, a unique number is typically printed on each copy of a printed form to distinguish one copy of the form from another copy. The preprinted form number thus prevents the same number from being used on more than one copy of the form, which may not be ensured if the person who is filling in the form also fills in the form number, since the person could mistakenly write the same number on more than one copy.

Also, in certain instances, the same information may be inserted in a particular field(s) of a form each time a copy of the form is filled in, such information being, for example, the phone number of the dealer inserted in field 85-3.

In accordance with a feature of the invention, the form entry system may be programmed to communicate with other equipment, such as a host computer, via an application program to obtain information for filling in one or more fields of a form, such as fields 85-1 through 85-7.

Turning then to FIG. 8, there is shown form 30 with DLR INFO 90 highlighted. In this instance, DLR INFO 90 provides the function of a "button" rather than a field. When the user touches button 90, computer 20 communicates with a host computer via an application program (discussed below) to obtain the information for filling in fields 85-1 through 85-7. Upon obtaining such information, the system automatically (a) inserts it in fields 85-1 through 85-7, (b) removes the highlighting at button 90 and (c) advances to the option section 31 of the form, as shown in FIG. 9.

It is seen from FIG. 9 that the system, in advancing to option section 31, has highlighted field 101 and has brought up tool 100 comprising a menu of alternatives which the user operates to fill in that field in the manner as discussed above. The remaining fields of section 31, i.e., the fields labeled Engine through Ex Sys, are filled in by the user as each of those fields is highlighted and the respective tool is displayed.

It is assumed at this point in the discussion that page 1 of form 30 has been filled in and the system has high-

6

lighted the SP EQUIP (special equipment) button 102. When the user points to button 102, the system erases page 1 of form 30 and displays page 2 of form 30, as shown in FIG. 10.

It is seen from FIG. 10 that the fields in the top section of page 2 and the fields in the top section of page 1 of form 30 are identical. Accordingly, the system, upon bringing up page 2 of the form, automatically fills in those fields using the information inserted in the corresponding fields of page 1. In bringing up page 2, the system also highlights field 110 of form 30.

Specifically, field 110 is, in accordance with a feature of the invention, a bit-mapped graphics field which permits the user to "write in" instructions in the field. These instructions may be, illustratively, special equipment items to be ordered from SMC. Other instructions, such as the method of delivering the automobiles to the purchaser, may also be written in field 110 as well as the signature of the person filling in form 30. In the present example of the invention, the special equipment item called "cruise control" is being ordered. Accordingly, the user writes in the name of that item in field 110. In turn, the system tracks the points on touch screen 16 that is being touched by the stylus and illuminates the corresponding points on the ac plasma display of panel 15, thereby tracking the user's handwriting. Upon filling in field 110, the user touches the RTN (return) button 111. When the user does so, the system erases page 2 and redisplays page 1 of form 30.

Page 1 of form 30 includes a COMP (complete) button 103, as shown in FIG. 9. Upon filling in the form, the user touches button 103. In response thereto, the system illustratively (a) stores the various field entries in a so-called hand-off file, (b) erases form 30 from the display and brings up a fresh form 30, as shown in FIG. 3, and (c) passes the hand-off file to the host computer for processing.

Other functions related to either filling in form 30 or creating a customized form can be invoked, or selected, by pointing to, i.e., touching, individual ones of the function keys 32 through 37 displayed along the top of form 30, as shown in FIG. 9. Briefly, key 32 is blank and available for future use, such future use being, for example, an edit key which causes a menu of editing functions to be displayed when the user touches key 32. The SPECIALS key 33 provides two functions, the first function allowing the user to store a customized form in hard disk, and the second function allowing the user to calibrate a touch point on touch screen 16 with either the ac plasma display of panel 15 or display 21 of computer 20 if the touch screen happens to be overlaying the latter display. The HIGHLIGHT key 34 allows the user to change the contrast of form 30 when it is being displayed from light to dark or vice-versa. The TOOL-BOX key 35 displays a menu of predefined "tools" as will be discussed below. The STYLUS key 36 changes the style of handwriting displayed in a bit-mapped graphics field of form 30 to either fine or bold point writing. The CLEAR key 37 allows the user to either clear one or all of the filled in fields of a displayed form.

In certain instances the tool that the system brings up for filling in a corresponding field may be out of date. For example, assume that SMC adds a new tire to its product line and that the tool 100, shown in FIG. 9, has not been updated to include the new tire as an option. Thus, tool 100 could not be used to fill in field 101 if the new tire is the selected option. This problem is dealt with, in accordance with a feature of the invention, by

**Exhibit 1  Page 32**

LUC 1004475

4,763,356

7

allowing the user to bring up another tool, such as the keyboard shown in FIG. 7, and use that tool to fill in field 101. The user brings up the keyboard by first touching the erase icon of the displayed tool, which erases the displayed tool, and then touching the toolbox function key 35, which displays a menu of predefined tools.

Turning then to FIG. 11, there is shown the menu 115 of predefined tools that is displayed as an overlay when the user touches function key 35. The user may redisplay the tool that was erased from the screen by touching the corresponding one of the tools 1 through 8. For example, tool 100 (shown in FIG. 9) is redisplayed by touching menu item 1 and is redisplayed with an E/S button if menu item 2 is touched. In particular, the user may bring up either the keyboard tool 80 (shown in FIG. 7), the number pad tool 60 (shown in FIG. 5) or the date and time tool 70 (shown in FIG. 6) by touching either menu item 4, 5 or 6, respectively. The user may bring up a date pad tool (not shown) by touching item 3. The date pad that is brought up on the display has a format that is similar to the format of number pad 60 and is used to insert a date in a field when the date to be inserted is not the current date. The user may bring up a calculator tool (not shown) by touching item 7. The calculator tool is similar in appearance to a conventional hand-held calculator and includes four registers. The user operates the displayed calculator as though the user was operating a hand-held calculator. The user may also bring up the four calculator registers (not shown) without bringing up the calculator by touching menu item 8.

The foregoing was discussed in terms of displaying a customized form and the tools that are used to enter data in the fields of the form. Alternatively, the present invention may be adapted to bring up a tool which is used to perform a specific function other than inserting data in a field.

For example, FIG. 12 shows tool 120 which is patterned after a telephone station set and which may be brought up on panel 15 when the latter is connected to a computer having the capability to establish a telephone connection, such as the AT&T UNIX PC 7300. Specifically, the buttons bearing the labels 1 through 0, * and # represent telephone buttons which the user touches as though he or she were touching the similarly labeled buttons on a conventional telephone station set to dial in a telephone number. Included in telephone tool 120 are buttons 121 through 124 which are used to invoke well-known telephone features. For example, Conference button 121 is used to establish a conference call, Drop button 122 is used to terminate a call, Transfer button 123 is used to transfer a call to another station or computer and Hold button 124 is used to place a call on hold. Telephone tool 120 also includes fields 125-1 through 125-3 which display the status of respective telephone lines connected to the computer. FIG. 12 shows two such telephone lines—Line 1 and Line 2—in fields 125-1 and 125-2, respectively. Field 125-3 is shown blank to indicate that it is reserved for a third telephone line not yet connected to the computer. Each of the fields 125-1 through 125-3 has associated therewith two other fields, such as fields 126 and 127, to simulate the functions performed by the well-known in-use lamps that are found on conventional business telephone station sets. For example, field 126 represents the red in-use lamp and is highlighted to indicate to the user that line 1 is the line that will be used (or is being

8

used) when placing a telephone call. It is noted that the computer will typically select line 1 and will place that line in the off-hook state when tool 120 is brought up on the display. The user may select line 2 by touching field 125-2, in which case, the computer places line 1 in the on-hook state if a call has not been established over that line and places line 2 in the off-hook state.

Field 127 represents the green in-use lamp and is highlighted to indicate to the user that the associated line is active. The field is also placed in a flashing mode by highlighting and removing the highlighting from the field to indicate that a call is being received over the associated line.

Field 128 represents an intercom button which is highlighted when the user touches field 128. In that event, the computer connects the user to an intercom line. Fields 129-1 through 129-5 represent the well-known one-touch dialing buttons that are found on conventional station sets. For example, if the user wishes to place a telephone call to the person named in field 129-1, i.e., DAY, then all the user needs to do is touch that field rather than dialing the person's telephone number using the displayed telephone keypad.

In operation, when tool 120 is brought up, fields 126 and 127 are highlighted indicating that line 1 is the active line. When the user touches one of the digits of the displayed keypad, for example, the digit labeled 2, the form entry system passes the coordinates of the touch point to an application program, as will be discussed below. The application program, in turn, causes the computer to outpulse the digit over line 1, line 1 and line 2 being connected to, for example, a telephone company central office. The form entry system operating in conjunction with the application program handles the remaining digits touched by the user in the same fashion to establish a telephone connection to the desired telephone number.

According to a feature of the invention, the user may design his or her own customized form for a particular application. In designing such a form the user specifies, using various commands, where on the screen the rectangles (fields), lines, text and graphic images should be placed, such commands being stored in a screen file as they are being inputted by the user via keyboard 23 of computer 20 (FIG.1). The user also specifies the attributes of each field, i.e., the highlighting of the field, the tool that is brought up when the field is highlighted, the next field that is highlighted when the current field is filled in, etc., as will be discussed below. In discussing the design of a form, reference will be made to FIG. 2.

Returning then to FIG. 2, it is noted that function keys 32 through 37 are typically displayed regardless of which form or tool is brought up, function keys 32 through 37 being displayed over illustratively the first 30 rows of pixels. Thus, the beginning (upper left-hand corner) of form 30 starts at row 31 of the display. It is seen from FIG. 2, that a demarcation between form 30 and keys 32 through 37 is established by the bold line 22. A line in a form, such as line 22, may be specified using illustratively a line command as follows:

putline(x1,y1,x2,y2,linewidth)

where x1 and y1 are the horizontal and vertical coordinates (row and column) of one endpoint of the line, x2 and y2 are the coordinates of the other endpoint of the line and linewidth is the thickness of the line, in pixels, and is restricted to 1, 2 or 3, such as the thickness of

**Exhibit 1  Page 33**

4,763,356

9

lines 20, 21 and 22, respectively. Accordingly, the command that is inputted to display line 22 is as follows:

    putline(31,3,31,635,3)

(It is noted that the putline command may also be used to bring up a diagonal line by specifying the coordinates of the endpoints of the line.)

A horizontal line may be displayed using illustratively the command,

    puthline(x,y,length,linewidth)

where x and y are the coordinates of the upper-left-most pixel of the line and length is the length of the line in pixels. Thus, line 22 may also be inputted as follows:

    puthline(31,3,635,3)

A vertical line may be displayed using illustratively the command,

    putvline(x,y,length,linewidth)

where length in this case is the height (number of rows) of the vertical line.

Text may be inserted in a form using illustratively a text command as follows:

    puttext(x,yh,font,"text")

where x is the horizontal coordinate of the location of where the text is to being, yh is the top pixel of the text string, font specifies the type of font to be used (for example, the type of font that is used to spell out "SATURN", "Model" or "Required Options" shown in FIG. 1), and text is the string of text to be displayed. Thus, the user inputs the following commands to display the text that is shown across the the top of form 30:

    puttext1(28,37,9,"SATURN")

    puttext1(250,37,1"Special Equipment Worksheet Page 1")

The following sequence of commands establishes the first set of fields of form 30; namely, the Model, Year, Qty, Bid Date and Saturn Ord. fields:

| puthline(3,60,537,2); | (1) |
| putvline(3,60,105,2); | (2) |
| puttext1(15,65,1,"Model"); | (3) |
| putvline(95,60,35,1); | (4) |
| puttext1(98,65,1,"Year"); | (5) |
| putvline(135,60,35,1); | (6) |
| puttext1(138,65,1,"Qty"); | (7) |
| putvline(190,60,35,1); | (8) |
| puttext1(193,65,1,"Bid date") | (9) |
| putvline(325,60,35,1); | (10) |
| puttext1(328,65,1,"Saturn Ord. No.") | (11) |
| putvline(540,60,70,2); | (12) |

10

    puthline(3,95,537,1);                          (13)

Of the above commands the first command (1) displays horizontal line 22, commands 2, 4, 6, 8, 10 and 12 display vertical lines 23 through 28, commands 3, 5, 7, 9 and 11 display the labels for those fields, respectively, and command 13 displays line 20.

A field may also be displayed on a display using a command which displays a rectangle. For example, either of the following commands may be used to draw any size rectangle, anywhere on the display:

    putrect1(x1,y1,width,height,linewidth)

    putrect2(x1,y1,x2,y2,linewidth)

Where x1 and y1 are the horizontal and vertical coordinates of the upper left corner of the rectangle, respectively, x2 and y2 are the horizontal and vertical coordinates of the lower right corner of the rectangle, respectively, width and height are the width and height (including the border lines) of the rectangle, respectively, and linewidth is the width in pixels of the border around the rectangle. Thus, a rectangular field and the text identifying the field, such as button 90, may be drawn on the display as follows:

    putrect1(565,75,55,50,2)

    puttext1(576,85,2,"DLR")

    puttext1(574,103,2,"INFO")

Once the form designer has completed the layout of the fields of the desired form using the above mentioned commands, he or she then specifies the attributes of the fields, i.e., the highlighting of the respective field, which tool is brought up when the field is highlighted, which field is next highlighted after the field is "filled in", etc.

In particular, either of the following commands specify the highlighting of a field:

    deflite1(litenum,x1,y1,width,height)

    deflite2(litenum,x1,y1,x2,y2)

where litenum is an integer which uniquely identifies the area to be highlighted, x1 and y1 are the horizontal and vertical coordinates of the upper left corner of the highlighted area, respectively, width and height are the width and height of the highlighted area, respectively and x2 and y2 are the horizontal and vertical coordinates of the lower right corner of the highlight area, respectively. For example, fields 41, 51, 61, 71 and 75 are highlighted by inputting the following commands:

    deflite1(1,3,60,92,35);

    deflite1(2,95,60,39,35);

    deflite1(3,135,60,54,35);

    deflite1(5,190,60,135,35);

    deflite1(10,325,60,214,35);

The other attributes of a field may be specified using, for example, the following command:

Exhibit 1  Page 34

LUC 1004477

4,763,356

**11**

```
deffld1(fldnum,"fldname",x1,y1,width,height,type,
   litenum,autotool,xtool,ytool,autoskip,enable,
   keygroup,font,valid,vmin,vmax);
```

Where fldnum is an integer uniquely identifying the respective field; fldname is the name (label) displayed on the corresponding tool that is specified in the "auto-tool" field of the command and is the name that is used when the system displays validation errors; x1 and y1 are the horizontal and vertical coordinates of the upper left corner of the field; respectively; width and height are the width and height of the respective field; type is the field type, such as a bit-mapped-graphics field or an ASCII text area; litenum is the number of the associated highlighted area, mentioned above; autotool identifies the particular tool that is displayed when the field is highlighted, for example, the values 1 through 8 are used to specify the predefined tools shown in FIG. 11, respectively, the value 0 is used to signify a null state, i.e., no tool; xtool and ytool are the horizontal and vertical coordinates of the upper left corner of the tool to be displayed; autoskip is the number of the next field to be highlighted; enable is the field number (if any) of another key field which must be activated before current field can be activated; font is the type of font to be used when inserting the entry in the respective field; valid is an indication of whether a validation is to be done on the selected entry before it is entered in the field, for example, validating a date that is to be entered in the field, vmin and vmax specify the range of the validation, such as whether a number falls within the range of vmin and vmax.

The attributes of, for example, fields 41 and 51 of form 30, may be specified (inputted) as follows:

```
deffld1(1,"MODEL",15,82,79,12,4,1,2,175,100,2,
   0,0,0,0,0,0);

deffld1(2,"YEAR",101,82,33,12,4,2,2,175,100,3,
   0,0,0,0,0,0);
```

(It is noted that the attributes of a field may be specified using, alternatively, a deffld2 command, the format of the deffld2 being similar to the format of the deffld1 command.)

The following command may be used to specify which field is to be highlighted when illustratively a form is first displayed:

```
defstart (fldnum);
```

where fldnum is defined above in connection with defining the deffld1 command.

We turn now to the hardware and software which implement the present illustrative embodiment of the invention.

FIG. 13 is a simplified block diagram of computer 20. At the heart of the computer is a microprocessor 211 which communicates with its peripherals via a bus 210. These peripherals include ROM 213, RAM 215, memory management circuitry 212, hard and floppy disk units 214 and 217, respectively, interrupt controller 218, video controller 220 and various other peripherals denoted collectively at 216. As mentioned above, touch screen controller 219 is used to determine the x and y coordinates of a location on touch screen 16 that is being touched by the user.

Specifically, touch screen 16 of panel 15 comprises a glass plate with a transparent resistive coating that is

**12**

fired onto the active side of the glass plate at a high temperature to provide a voltage divider. A mylar contact sheet is stretched over the glass substrate and is held above the resistive coating by separator points. Finger or stylus pressure causes the mylar cover sheet to deform and make electrical contact with the resistive coating at the point of touch. Controller 219, which can be, for example, the Elographics E271-101 controller, periodically impresses a voltage gradient across the resistive coating on the glass plate via a pair of leads of cable 17. The voltage gradient is alternately applied between the x and y directions to obtain voltages which are analog representations of the coordinates of the location on touch screen 16 that is being touched by the user. These analog voltages are digitized by controller 219 and transmitted to microcomputer 211 for processing.

Ac plasma display 18 of panel 15 is composed of multiple rows and columns (400×640) of individual gas cells (pixels), formed at the intersection of a cover glass and two (addressing and common sustain) parallel substrate electrodes. The control circuitry (not shown) upon receiving digital video signals from controller 220 ignites individual gas pixels to form a pattern on display 18, such as the screens depicted in FIGS. 2 through 12. To illuminate a pixel on display 18, a neon-argon gas mixture within the corresponding cell is excited by applying a high voltage potential across the the cover glass electrode and addressing substrate electrode, thereby causing the gas mixture to become ionized and emit light. Ionization is sustained by transferring the electrical charge from the cover glass electrode to the common sustain substrate electrode. The pattern brought up on display 18 is erased by removing the sustaining voltage from the common sustain substrate electrode.

FIG. 14 is a simplified block diagram of central (host) computer 140 and a plurality of computers 20-1 through 20-N. Computer 140 is a multiserver computer, such as Digital Equipment Corporation's VAX-11/780 operating under, for example, the UNIX operating system, and having stored therein, such as in memory 141, the earlier mentioned handoff files that it receives from respective ones of computers 20-1 through 20-N. Also stored in memory 141 are the entries that are inserted in illustratively fields 85-1 through 85-7 of form 30, as discussed above.

Each of the computers 20-1 through 20-N can be either a personal computer, such as computer 20, workstation, or another VAX11/780. Computers 20-1 through 20-N communicate with computer 140 over respective bidirectional communication paths 14-1 through 14-N. Such communication paths can be either a hard-wired connection, a telephone line, or a local area network, the latter being represented by dashed line 14-N. It is seen that computer 20-3 also has two telephone lines L1 and L2 connected to it. Lines L1 and L2, in turn, connect to a telephone company central office (CO) so that computer 20-3 can establish a telephone connection between telephone station set S1 and the central office when it is directed to do so by a user using station set tool 120 shown in FIG. 12.

Each of the computers 20-1 through 20-N is arranged to implement the invention and each is connected to a respective touch screen and display panel 15-1 through 15-N via respective cables 17-1 through 17-N. In the practice of the invention, each of the computers 20-1

**Exhibit 1  Page 35**

LUC 1004478

4,763,356

13                                                                                    14

through 20-N may be arranged to bring up the same form, such as form 30 discussed above, different pages of a form, different customized forms, or different customized tools, in which a customized tool performs a specific function, as discussed above.

As mentioned above, a form may be displayed via an application program designed by the user. The application program may be, for example, a program which firsts displays, for example, instructions to the user, erases the instructions and then directs the form entry system to bring up a particular form. It could also be a program which controls the display of a series of forms or pages of a form, such as page 1 and page 2 of form 30, discussed above. The application program could also be a program which responds to user inputs when, for example, the station set tool of FIG. 12 is displayed on either panel 15 or display 21.

Turning then to FIGS. 15 and 16, there is shown a flowchart of an application program, as represented by block 1501, and the form entry system program, as represented by blocks 1502 through 1533. FIGS. 15 and 16 should be arranged as shown in FIG. 17. Hereinafter the form entry system program will be referred to as the program. It is assumed that the application program at block 1501 is arranged to pass the name of a file containing the commands for displaying a customized form to block 1502. Upon receiving the name of the file, the program at block 1502 executes the commands contained in the file, the commands being, for example, the above mentioned puthline, putvline and puttext commands. The program then proceeds to block 1503 where it scans the file for a defstart command. If the file contains a defstart command, the program executes the command and then proceeds to block 1504. If the file does not contain a defstart command, then the program executes the deffld1 command associated with the first field of the displayed form and then proceeds to block 1504.

At block 1504, the program determines if it should return to the application program, i.e., the value in the autoskip field of the deffld1 command being executed equals illustratively 126 or 127. If the autoskip field contains a number other than 126 or 127, then the program proceeds to block 1505. Otherwise, it returns to the application program.

At block 1505, the program tests the value contained in the autotool field of the deffld1 command being executed. If the value is zero, then the program proceeds to block 1506 where it waits for a response from the user. Otherwise, the program proceeds to block 1515 to bring up the tool identified in the autotool field.

The program at block 1506, waits for the user to touch the touch screen. When the user touches the touch screen of panel 15, the program proceeds to block 1507 to determine if the user has touched a point within the boundary of a displayed field. If not, the program proceeds to block 1508 to check if the user has touched one of the function keys 32 through 37. If the program finds that the user has not touched one of those keys, it then proceeds to block 1509 to output an audible tone as an indication that the user has touched an invalid point. The program returns to block 1506 upon outputting the tone to wait for the next input from the user.

If the program at block 1508 finds that the user has indeed touched one of the function keys 32 through 37 it proceeds to block 1511 where it displays a menu of functions associated with the touched key, as discussed above. The program then proceeds to block 1512 upon completing that task. Block 1512 is representative of a software program which (a) waits for the user to select one of the items from the displayed menu and (b) processes the item selected by the user. After processing the user's selection, the program returns to block 1506 to wait for the next input from the user.

If, on the other hand, the determination made at block 1507 turns out to be positive, i.e., the program finds that the user has touched a valid field, then it proceeds to block 1510. At block 1510, the program tests the type field of the deffld1 command associated with the field touched by the user. If the type field indicates that the displayed field is a bit-mapped-graphics (BMG) field, then the program proceeds to block 1513. Otherwise, it proceeds to block 1514 where it erases the highlighting from the currently active field (if any) and highlights the field touched by the user. The program then proceeds to block 1504 to execute the deffld1 command associated with the newly highlighted field.

At block 1513, the program highlights the point on the display having the same coordinates as the touch point, as discussed above. The program then proceeds to block 1506.

As mentioned above, the program at block 1515 displays the tool identified in the autotool field of the deffld1 command being executed. It then proceeds to block 1516 to wait for the user to touch the tool.

When the user touches the touch screen the program proceeds to block 1517 to determine if the touch point is within the boundary of the displayed tool and transfers to block 1519 if it finds that to be the case. Otherwise, it proceeds to block 1518 where it outputs an error and returns to block 1516 to await receipt of the coordinates of the next touch point.

At block 1519, the program tests to see if the user has touched the exit icon of the displayed tool and proceeds to block 1520 if the result of the test turns out to be affirmative. At block 1520, the program erases the displayed tool and then proceeds to block 1506. Otherwise, the program proceeds to block 1521 if the results of the test made at block 1520 turns out to be negative. At block 1521 the program determines if the user has touched the move icon of the displayed tool and proceeds to block 1522 if it finds that to be the case. At block 1522, the program "moves" the displayed tool in the direction of the point touched by the user. The program upon "moving" the tool returns to block 1516.

The program, on the other hand, proceeds to block 1523 if it finds that the user has not touched the move icon. At block 1523, the program determines if the tool that is being touched is one of the predefined tools, discussed above. If it finds that to be the case, then the program proceeds to block 1524. Otherwise, the program considers the displayed tool to be a tool that is defined by the user, for example, station set tool 120 shown in FIG. 12, and proceeds to block 1525 where it passes the input (coordinates of the touched point) to the application program. The program then proceeds to block 1516 upon completing that task.

At block 1524, the program determines if the tool that is being displayed is a menu without an E or E/S key, such as menu 40 depicted in FIG. 3. If this determination is affirmative, then the program transfers to block 1526 where it (a) loads the menu item touched by the user in the corresponding field, (b) removes the highlighting from the field, and (c) proceeds to block 1527 to

**Exhibit 1  Page 36**

LUC 1004479

4,763,356

**15**

erase the displayed tool. The program proceeds to block 1528 upon completing the above task.

Block 1528 is representative of a software routine which (a) transfers to block 1506 if the user has touched the E key of the previously displayed tool or the autoskip field of the command being executed contains a zero, or (b) transfers to block 1529 to highlight the next field if the user has touched the E/S key of the previously displayed tool. At block 1529, the program highlights the field identified by the value contained in the autoskip field of the command being executed and then transfers to block 1504 to execute the deffld1 command associated with the newly highlighted field.

If the determination made at block 1524 is negative, then the program proceeds to block 1530 where it tests the coordinates of the touch point to see if they match the coordinates of either the E or E/S key of the displayed tool and transfers to block 1526 if it finds that to be the case. Otherwise, it proceeds to block 1531.

At block 1531, the program determines if the displayed tool is the calculator tool and passes the coordinates of the touch point to block 1532 if it finds that to be the case. Block 1532 is representative of a calculator program which processes user's inputs when the calculator tool is displayed. The calculator program processes inputs similar to the way that a hand-held calculator processes inputs. The calculator program also displays the result brought about by the user's input (i.e, the result of a multiplication, division, addition, etc.) in the display section of the tool, as represented by block 1533.

If the result of the determination made at block 1531 is negative, then the program proceeds to block 1533 where it displays the designation (label) of the tool button that is displayed at the coordinates of the point touched by the user, the label being displayed in the display section of the tool. Block 1533 then transfers to block 1516 upon completing its task.

FIG. 18 illustrates a layout of the (a) application program and form entry system program of FIGS. 15 and 16, (b) customized forms, such as form 30, (c) tools, such as tools 40, 50, 60, 70, 80, 100, and 120, discussed above, and (d) hand-off file, discussed above, in the hard disk 214 of computer 20.

The foregoing is merely illustrative of the principles of our invention. Those skilled in the art will be able to devise numerous arrangements which, although not explicitly shown or described herein, embody those principles that are within its spirit and scope.

What is claimed is:

1. An arrangement for use in a computer having a display associated therewith comprising
   means for displaying on said display a pattern including a plurality of information fields and for identifying for each field a kind of information to be inserted therein,
   means for indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including at least a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and

**16**

means for inserting in said one field information that is derived as a result of said user operating said displayed tool.

2. The arrangement set forth in claim 1 wherein said group of predefined tools further includes a tool which displays transitory information, said transitory information being changed periodically.

3. The arrangement set forth in claim 2 wherein said tool which displays transitory information includes at least a date and time tool.

4. The arrangement set forth in claim 1 wherein said tool adapted to allow said user to compose said information includes at least a number pad, a keyboard, and a calculator.

5. The arrangement set forth in claim 1 further comprising means for obtaining from a host computer the information that is to be inserted in one or more of said fields.

6. The arrangement set forth in claim 1 wherein said display includes a touch-sensitive screen overlaying said display.

7. The arrangement set forth in claim 1 wherein at least one of said fields is a bit-mapped-graphics field adapted to allow said user to compose said information by writing on said bit-mapped-graphics field.

8. The arrangement set forth in claim 1 further comprising means for displaying a menu of labels identifying respective ones of said group of predefined tools and for displaying one of said predefined tools when said user points to its label.

9. The arrangement set forth in claim 1 wherein said computer includes at least one telephone line connected to a telephone system and wherein one of said predefined tools is adapted to operate as a telephone station set when it is displayed on said display to allow said user to establish a telephone call over said at least one telephone line by touching respective buttons displayed in said telephone station set tool.

10. An arrangement for use in a computer having a display comprising
   means for displaying a plurality of information fields and for identifying for each field a kind of information to be inserted therein,
   means for storing a plurality of predefined tools associated with respective ones of said fields, each of said tools being adapted to supply information of the kind identified for its associated field, and
   means responsive to information being inserted in at least one of said fields for indicating another of said fields to be filled in and for concurrently displaying the respective one of said tools to be used by said user to supply the kind of information identified for said other field.

11. The arrangement set forth in claim 10 wherein said one tool is selected from a group of tools including (a) a menu tool which displays a plurality of predefined items in which said user selects one of said items to be inserted in the associated field by pointing to that item, and (b) a tool adapted to allow said user to compose the information to be inserted in the associated field.

12. The arrangement set forth in claim 11 wherein said group of tools further includes a tool which displays information which is changed periodically so that the information that is to be inserted in the associated field is current.

13. The arrangement set forth in claim 10 wherein said plurality of predefined tools includes at least a number pad, a keyboard, and a calculator.

**Exhibit 1  Page 37**

LUC 1004480

4,763,356

17

**14.** The arrangement set forth in claim **10** further comprising means for obtaining from a host computer the information that is to be inserted in one or more of said fields.

**15.** The arrangement set forth in claim **10** wherein said display includes a touch-sensitive screen overlaying said display.

**16.** The arrangement set forth in claim **10** wherein at least one of said fields is a bit-mapped-graphics field adapted to allow said user to compose said information by writing on said bit-mapped-graphics field.

**17.** The arrangement set forth in claim **10** further comprising means for displaying a menu of labels identifying respective ones of said predefined tools and for displaying one of said tools when said user points to its label.

**18.** The arrangement set forth in claim **10** wherein said computer includes at least one telephone line connected to a telephone system and wherein one of said predefined tools is adapted to operate as a telephone station set when it is displayed on said display to allow said user to establish a telephone call over said at least one telephone line by touching respective buttons displayed in said telephone station set tool.

**19.** A method for use in a computer having a display comprising the steps of

    displaying on said display a plurality of information fields,

18

    identifying for each field a kind of information to be inserted therein,

    indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and inserting in said one field information that is derived as a result of said user operating said displayed tool.

**20.** The method set forth in claim **19** wherein said inserting step includes the step of obtaining from a host computer information that is to be inserted in one or more of said fields.

**21.** The method set forth in claim **19** wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field.

**22.** The method set forth in claim **19** further comprising the steps of

    displaying a menu of labels when directed to do so by a user, said labels identifying respective ones of said predefined tools, and

    displaying the respective predefined tool when said user points to its label.

\* \* \* \* \*

**Exhibit 1  Page 38**

LUC 1004481

Exhibit 2

1

2                    **UNITED STATES DISTRICT COURT**

3                   **SOUTHERN DISTRICT OF CALIFORNIA**

4

5   LUCENT TECHNOLOGIES INC.,                |

6         Plaintiff and Counterclaim-defendant, |

7   v.                                        |

8   GATEWAY, INC. and GATEWAY                 |
    COUNTRY STORES LLC, GATEWAY               |
    COMPANIES, INC., GATEWAY                  |
9   MANUFACTURING LLC and                     |
    COWABUNGA ENTERPRISES, INC.,              |

10        Defendants and Counter-claimants,   |    **Civil No:** 02CV2060-B(CAB)
                                              |    consolidated with
11   and                                      |    **Civil No:** 03CV0699-B (CAB) and
                                              |    **Civil No:** 03CV1108-B (CAB)
12   MICROSOFT CORPORATION,                   |

13        Intervenor and Counter-claimant,    |    **ORDER DENYING PLAINTIFF'S AND
                                              |    DEFENDANTS' CROSS-MOTIONS
14   _____      |    REGARDING THE INVALIDITY OF
                                              |    U.S. PATENT NO. 4,763,356**
15   MICROSOFT CORPORATION,                   |

16        Plaintiff and Counterclaim-defendant, |

17   v.                                       |

18   LUCENT TECHNOLOGIES INC.,                |

19        Defendant and Counter-claimant      |

20   _____      |

21   LUCENT TECHNOLOGIES INC.,                |

22        Plaintiff,                          |

23   v.                                       |

24   DELL, INC.,                              |

25        Defendant.                          |

26   _____      |

27

28
                                                       02CV2060-B (CAB)

                         **Exhibit 2  Page 39**

1   Microsoft moves the Court for summary judgment that the software program Home

2   Accountant anticipate the claims of U.S. Patent No. 4,763,356 ("the '356 patent").  Dell

3   and Gateway join in Microsoft's motion.[1]  Lucent moves the Court for summary judgment

4   that the claims of the '356 patent are not anticipated by Home Accountant or by two

5   additional programs, Apple Lisa and Xerox Star.  For the reasons herein, the motions are

6   **DENIED**.

7   **I.      BACKGROUND**

8   Lucent has asserted the '356 patent against Defendants Dell, Gateway and

9   Microsoft.  This patent relates to a form entry system for filling out computerized forms

10  using on-screen tools, rather than using a physical keyboard.  Lucent contends that

11  Gateway's and Dell's computers infringe the '356 patent when the computers are

12  programmed with Microsoft Money, Microsoft Outlook, Intuit Quicken and Microsoft

13  Windows Mobile and Pocket PC operating software.

14  On January 26, 2007, Defendants brought two summary judgment motions on the

15  '356 patent - one for non-infringement and the other for invalidity-anticipation.  Lucent

16  also brought motions for summary adjudication for no invalidity by anticipation and on the

17  Defendants' affirmative defenses.  On March 7, 2007, the Court granted the motion for

18  non-infringement on the mean-plus-function claims at issue in the '356 patent (independent

19  claims 1 and 10 and dependent claims 2, 4, 6, 7, 11-13, and 16) on the grounds that Lucent

20  had failed to provide any evidence that the corresponding structures (particular algorithms)

21  were present in the accused devices.  The Court did not rule as to the remaining methods

22  claims, independent claim 19 and dependent claim 21.  The Court deferred the remaining

23  issues on the '356 patent pending a supplemental claim construction briefing and allowed

24  the parties to file additional summary judgment motions.  In the instant order, the Court

25  now rules on the cross-motions filed by Lucent and Microsoft regarding the alleged

26  _____

27  [1] For simplicity purposes, the motion herein is referred to as Microsoft's motion rather than Defendants' motion.

28                                            2

**Exhibit 2  Page 40**

1    anticipation of the '356 patent as they concern the remaining methods claims, 19 and 21

2    **II.    STANDARD OF LAW**

3         Federal Rule of Civil Procedure 56(c) provides that summary judgment is

4    appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on

5    file, together with the affidavits, if any, show that there is no genuine issue as to any

6    material fact and that the moving party is entitled to judgment as a matter of law."  In

7    considering the motion, the court must examine all the evidence in the light most favorable

8    to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  If

9    the Court is unable to render summary judgment upon an entire case and finds that a trial is

10   necessary, it shall if practicable grant summary adjudication for any issues as to which,

11   standing alone, summary judgment would be appropriate.  Fed. R. Civ. P. 56(d).

12        When the moving party does not bear the burden of proof, summary judgment is

13   warranted by demonstration of an absence of facts to support the non-moving party's case.

14   "  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Summary judgment must be granted

15   if the party responding to the motion fails "to make a sufficient showing on an essential

16   element of her case with respect to which she has the burden of proof."  Id. at 323.  The

17   evidence offered need not be in a form admissible at trial to avoid summary judgment.  Id.

18   at 324.

19   **III.    ANALYSIS**

20        " To anticipate a claim, a prior art reference must disclose every limitation of the

21   claimed invention, either explicitly or inherently."  MEHL/Biophile Intern. Corp. v.

22   Milgraum, 192 F.3d 1362, 1365 (Fed. Cir. 1999) (quoting In re Schreiber, 128 F.3d 1473,

23   1477 (Fed. Cir.1997).   Defendants have alleged that the '356 patent is anticipated by

24   several software programs available before the filing of the '356 patent: Home Accountant,

25   Apple Lisa and Xerox Star.

26

27

28                                            3

**Exhibit 2  Page 41**

## A.    Home Accountant

Microsoft moves the Court on summary judgment that Home Accountant anticipates claims 19 and 21.  Lucent has filed a cross-motion for summary jdugment that the '356 patent is not anticipated by Home Accountant.

Home Accountant is a computer program that was released in January 1985 and designed to run on an Apple Macintosh computer.  It predates the '356 patent filed in December 1986.  The Home Accountant program is a software program to manage personal finances on the computer; it provides forms for the user to fill out such as a checkbook form.

Claim 19 at issue is an independent claim; claim 21 depends on claim 19 and thus incorporates all the limitations of claim 19.  These claims related to a method for use in a computer having a display.  On the first three elements, Microsoft has presented a prima facie case that Home Accounted contains these elements and Lucent has not offered any opposition.  These elements are: displaying on said display a plurality of information fields; identifying for each field a kind of information to be inserted therein; and indicating a particular one of said information fields into which information is to be inserted. Only two of the elements shared by claims 19 and 21 are in dispute by the parties.

One of these elements reads:

> and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information.

Microsoft argues that this element is met by Home Accountant because a menu of alternatives may be displayed when information is to be inserted in the category or names field (hereinafter referred to as "Names" and "Categories" menu tools).  The menu of alternatives is displayed in a smaller box that overlays the Home Accountant checkbook form.  Microsoft also argues an on-screen keyboard ("Key Caps") can be displayed as an overlay to the checkbook form and the user can use that keyboard to enter information into

4

Exhibit 2  Page 42

1  other fields such as names or categories.  Microsoft characterizes Key Caps as a

2  composition tool as defined by the '356 patent.

3       Lucent disputes this claim element.  It argues that Key Caps is not a "predefined tool

4  associated with" any information field because Key Caps is not part of the Home

5  Accountant program.  Instead, when the user wants to fill in a particular field, the user

6  clicks on the apple icon which is part of the computer operating system (but not part of the

7  Home Accountant software).  Clicking on the apple icon displays a menu of tools including

8  Key Caps and once the user clicks on the Key Caps option, the tool is brought up on screen

9  overlaying the Home Accountant form.  The user must then cut and paste the information

10  composed in Key Caps into the appropriate field of Home Accountant.  Lucent contends

11  that such user intervention fails to meet the limitation because (1) Home Accountant does

12  not "predefine" the tool, (2) the program does not associate the tool with a particular field,

13  and (3) Key Caps falls outside of the "form entry system."

14       In support of their respective positions, the parties have offered testimony from their

15  experts as well as pointing out inconsistencies in the opposing experts' opinions.  These

16  conflicting opinions indicate an area of disputed fact as to what may be included or

17  excluded in the "form entry system" of the '356 patent.  Further supporting the existence of

18  a disputed fact, the specification of the '356 patent describes at least two modes where a

19  tool is utilized to place information in a field.  In one mode, when the system or the user

20  advances the cursor to a particular field, the form entry system automatically brings up the

21  tool.  (See e.g., '356 patent, Col. 3:65-4:2.)  In the other mode described, the user

22  participates in the selection of the tool either by erasing the first tool and choosing another

23  (id. at Col. 6:61-7:7) or by setting the "autotool" of the algorithm to zero so that the system

24  does not bring up any tool automatically but allows the user to bring up a menu of tools

25  from which to select (id. at Col. 11:15-21, Fig. 15).

26       Similarly, an issue of fact remains as to the final claim element, "inserting in said

27  one field information that is derived as a result of said user operating said displayed tool."

28                 5

**Exhibit 2  Page 43**

1   Microsoft argues that this element is met by Home Accountant in one of two ways.  For the

2   category tool, once the user clicks on the selected choice from the menu, it is automatically

3   placed into the field.  For the composition tool, the user cuts and pastes the composed

4   information using the editing function of the computer and this action places the

5   information into the chosen field.  Lucent, however, argues that Home Accountant does not

6   meet this element because the manner of inserting information differs from that described

7   in the '356 patent.  In the patent, the user clicks on "enter" or "enter/skip" and the

8   information is directly inputted into the proper information field.  In contrast, Home

9   Accountant requires the user to cut and paste information from the key caps tool into the

10  field.

11          In sum, there remain sufficient issues of material fact on claim elements shared by

12  claims 19 and 21 to preclude summary judgement either for or against invalidity.

13  Therefore, the Court **DENIES** both parties' motions on this ground.

14          **B.    Apple Lisa**

15          Lucent also moves the Court for summary adjudication that the software program

16  Apple Lisa does not anticipate the '356 patent.[2]  Apple Lisa is an on-screen calculator for

17  use on a Macintosh computer, available as of 1983.

18          Lucent contends that Apple Lisa cannot anticipate because it is not a form entry

19  system with predefined tools.  According to Lucent, the Apple Lisa displays a numbers pad

20  (that looks like a calculator) on the left-hand side of the screen and a "tape window" on the

21  right hand side which displays the calculations and results.  Lucent argues that Microsoft's

22  expert has failed to opine on any tools that are distinct from the form entry system itself.

23  However, Microsoft's expert opines that there are three fields in the calculator, M, X and

24  Y, a numbers pad below, and the tape window to the side, thus evidencing distinct tools

25  and fields.  Information can be inserted into the X field by using two "tools" - the numbers

26

27          [2] Microsoft has not filed a cross-motion for no invalidity on this issue.

28                                                    6

**Exhibit 2  Page 44**

1   pad or by cutting and pasting information from the tape window (which Mr. Buscaino

2   characterizes as a menu of alternatives).

3       Additionally, similar to its arguments for Home Accountant, Lucent argues that

4   Apple Lisa fails to meet the element "and for concurrently displaying a predefined tool

5   associated with said one of said fields . . ." and/or the step of inserting information, because

6   the user must cut and paste information from the tape window into the calculator entry

7   fields rather than have the program insert the information automatically.  As explained with

8   Home Accountant, an issue of material fact remains as to whether the user manipulations

9   satisfy these claim elements.[3]

10      In summary, issues of material fact remain to preclude summary judgment.

11  Therefore, Lucent's motion regarding no anticipation by Apple Lisa is **DENIED**.

12      **C.    Xerox Star**

13      Lucent also moves the Court for summary adjudication that the software program

14  Xerox Star does not anticipate the '356 patent.[4]  Xerox Star is a program for creating forms

15  which includes an on-screen keyboard.  The arguments made by Lucent and Microsoft

16  parallel many of the arguments discussed above.

17      Lucent contends that the tools of Xerox Star are not "associated" with a field or

18  "predefined" because it is a separate operating accessory that is not called up by the

19  "property sheet" form of the Xerox Star program and/or the "inserting" step of the claim is

20  not met because the user must cut and paste the information into the field.   As above,

21  genuine issues of fact remain on these points.  Lucent also argues that Xerox Star displays

22  the tools side-by-side with the form, rather than as an overlaying; as explained above, this

23  _____

24      [3] Lucent also argues that the tools in Apple Lisa are not concurrently displayed because the
    numbers pad and tape window are side-by-side rather than one overlaying the other.  This argument

25  fails.  Although the Court provided the definition of concurrently displaying to include the example
    "as by a window overlaying the form," that phrase is an example of the definition of "displaying at

26  the same time."  The Court's construction does not exclude side-by-side displays such as those present
    in Apple Lisa.

27      [4] Microsoft has not filed a cross-motion for invalidity based on this program.

28                  7

**Exhibit 2  Page 45**

arrangement is not excluded from the definition of "concurrently displaying."  Finally,
Lucent makes the conclusory statement that Xerox Star does not include a menu of
alternatives according to its expert's assessment.  However, Microsoft's expert presents the
opposite opinion and identifies menus such as those for page size options (Dec. Vyas in
Supp. M's Opp. To L's original motion; Ex. C at 102.)  Thus again, genuine issues of fact
remain.  Therefore, summary judgment of no anticipation by Xerox Star is **DENIED**.

## IV.   CONCLUSION

Because material issues of fact remain with respect to anticipation by all three
software programs, Home Accountant, Apple Lisa and Xerox Star, Lucent's motion for
summary adjudication of no anticipation by these three programs is **DENIED**.  Similarly,
because of the remaining issues of genuine material fact pertaining to Home Accountant,
Microsoft's motion for summary adjudication of anticipation of the '356 patent by this
software program also is **DENIED**.


**IT IS SO ORDERED**


DATED:  May 15, 2007

Hon. Rudi M. Brewster
United States Senior District Court Judge


cc:  Hon. Cathy Ann Bencivengo
     United States Magistrate Judge

     All Counsel of Record

8

**Exhibit 2  Page 46**



GW-LT 422215

Exhibit 3  Page 47

# DATAMATION®

JANUARY 1984/$4.00 U.S.A.
VOLUME 30 NUMBER 1
This issue: 176,845 copies

## FEATURES

**38 IN FOCUS**
High tech and high profits are at the heart of the pacemaker industry, explains Janet Raloff in "Keeping Pace."

**96 THE MICRO VS. THE APPLICATIONS LOGJAM**
Gary D. Brown and Donald H. Sefton
Personal computers may relieve the data processing department's burden—or just add to the demand.

**108 COBOL DUMPED**
Scott G. Abbey
Fourth generation languages, training, and management support are one MIS department's secrets to success.

**118 DIALING DILEMMAS**
A DATAMATION staff report
Users and competitors react to AT&T deregulation with concern over costs, confusion over service, and some confidence in the future.

**129 SURVIVAL OF THE SWIFTEST**
Willie Schatz
Specialized common carriers must adapt to deregulation or be forced out of the telecom race.

**137 THE INFOCENTER EXPERIENCE**
Richard T. Johnson
How Exxon developed a resource to provide consulting, training, and technical assistance to end users.

**146 TOUCH SCREENS: BIG DEAL OR NO DEAL?**
Michael Tyler
The ultimate in user-friendly man/machine interfaces may be catching on in some applications, but there are still several drawbacks.

**159 DECISION-ORIENTED INFORMATION**
Victor E. Millar
Despite their desire to plan for the information age, most ceos are hesitant—so far.

**166 COMPUTER II, PART I**
Francis Bacon
"Now is the Winter of our Disconnect," declares Lord ATT in this Elizabethan Tragedy of Divestiture.



**187 DATA ADMINISTRATION: IT'S CRUCIAL**
Arvind D. Shah
As liaison and arbiter between end users and dp, a DA group could make a database work.

**197 WANTED: EXPERIENCED KAMIKAZE PILOTS**
Frank Sweet
The complexities of a shared database demand a data administrator who's totally dedicated and maybe a little crazy.

## NEWS IN PERSPECTIVE

**48 GOVERNMENT**
Politics and policies.

**50 ARTIFICIAL INTELLIGENCE**
Prolog vs. Lisp.
An eye on AI.

**59 MARKETING**
IBM's new NDD.
Dealing with DOD.

**73 TELECOMMUNICATIONS**
Of lions and lambs.
SNA to SNA.

**78 TECHNOLOGY**
British fish for chips.
Speaking in tongues.

**84 ACQUISITIONS**
Shopping spree at Crowntek.

**85 MAINFRAMES**
Elxsi system debuts.

**86 NETWORKING**
P-System network software.

**88 USER EDUCATION**
Training for Infocenters.

**92 BENCHMARKS**

## DEPARTMENTS

6 LOOKING BACK
13 LOOK AHEAD
18 CALENDAR
23 LETTERS
35 EDITORIAL
201 PEOPLE
206 HARDWARE
219 SOFTWARE & SERVICES
235 SOURCE DATA
248 ON THE JOB
253 ADVERTISERS' INDEX
254 MARKETPLACE
256 READERS' FORUM

## INTERNATIONAL 200-1

- 3 GOING GLOBAL WITH WORLDWIDE NETS
- 9 MOVING INTO THE NETWORK MODE
-11 GETTING ON THE TDF TRACK

## OEM SUPPLEMENT 201-1

- 3 MY VENDOR, MY COMPETITOR
- 9 LISA'S FIRST DATE
-13 JUST WHAT THE DOCTOR ORDERED

COVER ILLUSTRATION BY BOB WEBER

GW-LT 422216

Exhibit 3  Page 48





## From the cutting edge
## of NCR software engineering comes
## NCR/SNA Systems Network Architecture

If you are a computer manufacturer, or an OEM, there are two ways that you can implement SNA or X.25 on your systems:

- Do it yourself.
- Call NCR.

NCR systems engineers have developed portable communication products which can be easily implemented on a variety of processors and operating systems. These products allow for SNA communications, SNA network management and communication using X.25. Many of the products are immediately available, and could be ported onto most processors with minimum effort. And that's not all. NCR/SNA is backed by the resources and experience of an international company with a long background in data processing, and with the engineering technology that will keep it among the leaders.

In 1984, NCR will become 100 years young. If you are going to make a major investment in a strategic product, you'll want the innovative technology and service for which NCR has long been famous.

If you would like more information contact:

**NCR Corporation**
11010 Torreyana Road
San Diego, California 92121
Phone (519) 452-1020

If you are an NCR computer user, and would like to learn more about SNA implementation on NCR's Systems, contact your local Account Manager.

CIRCLE 6 ON READER CARD

## DATAMATION

Editor   Rebecca S. Barna
Senior Editor   Larry Marion
News Editor   John W. Verity
Features Editor   Kenneth Klee
Copy Editor   Florence Lazar
Assistant News Editor   Michael Tyler
Assistant Features Editor   Deborah Sojka
Assistant Copy Editor   Harriet Sigerman
Assistant Editor   Lauren D'Attilo
Editorial Assistant   Donna Lyons
Copy Assistant   Eric Brand
Bureau Managers
  San Francisco   Edward K. Yasaki
  Los Angeles   Edith D. Myers
  Minneapolis   Jan Johnson
  Boston   R. Emmett Carlyle
  Washington   Willie Schatz
Advisory Board   Lowell Amdahl,
  Howard Bromberg, Philip H. Dorn,
  Joseph Ferreira, Bruce W. Hasenyager,
  David Hebditch, John Imlay, Terry G. Mahn,
  Angeline Pantages, Robert L. Patrick,
  Russell Pipe, Carl Reynolds, F. G. Withington,
  Amy Wohl.
Contributing Editors   Pamela Archbold,
  Laton McCartney, Hesh Wiener

International Editor   Linda Runyan
European Managing Editor   Paul Tate
Technology Editor, Europe   Fred Lamond
Foreign Correspondents   John Lamb,
  London: James Etheredge, Paris; Peter Hidas,
  Oslo; Norman Kemp, Sydney, Australia

Art Director   Kenneth Surabian
Assistant Art Director   Susan M. Rasco
Art Assistant   Catherine Kennedy
Production Manager   Geri McDonald
Assistant Production Manager   Bettye Wright

Publisher   James M. Morris
Executive Editor   John L. Kirkley

EDITORIAL OFFICES
Headquarters: 875 Third Ave., New York, NY 10022. Phone (212) 605-9400; telex 429575. New England: 1 Chaucer St., RFD 2, Sandwich, MA 02563, (617) 888-6312. Midwestern: 3607 Garfield Ave. S., Minneapolis, MN 55409, (612) 827-4664. Western: 1801 S. La Cienega Blvd., Los Angeles, CA 90035, (213) 559-5111; 2680 Bayshore Frontage Rd., Suite 401, Mountain View, CA 94043, (415) 965-8222. International: 130 Jermyn St., London SW14UJ, England, (441) 839-2916, telex 914911; 13 Stanley Place, Budd Lake, NJ 07828, (201) 691-0592, telex 498-4308.

Circulation Vice President   Joseph J. Zaccaria
Circulation Manager   Mary Agnes Glenister
Operations Manager   Patricia Adamo
Research Director   Laurie Schnepf

**Technical Publishing**
DB a company of The Dun and Bradstreet Corporation

VBPA Circulation audited
by Business Publications Audit

☆ABP Member American Business Press, Inc.

DATAMATION (ISSN 0011-0963) Magazine is issued monthly on or about the first day of every month. Published by Technical Publishing, a company of The Dun and Bradstreet Corp., John R. Abele, President. Executive, advertising, editorial offices, and subscription departments, 875 Third Ave., New York, NY 10022. Published at Lincoln, Nebr. Annual subscription rates: U.S. and possessions: $42. Canada: $60; Japan, Australia, New Zealand: $100. Europe; $90 air freight, $190 air mail. All other countries: $90 surface, $190 air mail. Reduced rate for qualified U.S. students, public and school libraries: $33. Single copy: $4 in U.S. Specify DatamationMagazine's issue: $35. Sole agent for all subscriptions outside the U.S.A. and Canada is J. B. Tratsart, Ltd. 154-4 Greenford Road, Harrow, Middlesex HA13QT, England. (01)422-8295 or 422-2456. No subscription agency is authorized by us to solicit or take orders for subscriptions. Second-class postage paid at New York, NY 10001 and at additional mailing offices. ©Copyright 1984 by Technical Publishing Co., a Division of Dun-Donnelley Publishing Corp., a company of The Dun and Bradstreet Corp. All rights reserved. "Datamation" registered trademark of Technical Publishing Company. Microfilm copies of Datamation may be obtained from University Microfilms, A Xerox Company, 300 No. Zeeb Road, Ann Arbor, Michigan 48106. Printed by Foote & Davies/Mid-America. POSTMASTER: Send address changes to Datamation, 875 Third Avenue, New York, NY 10022.

4 DATAMATION

GW-LT 422217

**Exhibit 3  Page 49**

**Touch-sensitive terminals may be very sexy in the office, but whether they actually stimulate people to use computers is open to doubt.**

# TOUCH SCREENS: BIG DEAL OR NO DEAL?

### by Michael Tyler

Chemical Bank's foreign exchange trading room is in a small corner on the sixth floor of the bank's lower Manhattan office building. In that room, some 30 traders virtually live on the telephone, buying and selling the currencies of the world. Each trader has about half a dozen crt terminals stacked in front of him, looking dangerously unstable and about to come crashing down on the mountain of paper that covers the remainder of the desk area. The terminals provide the latest foreign currency rates, stock market figures, business news, and other pertinent information.

The exchange moves quickly. When the right price for a certain currency is within reach, the trader must pounce with the speed of a leopard or wind up losing money. When he has the price he wants, he needs, to telephone the broker he feels is in the best position to find a willing trade partner, negotiate the terms of the deal—amount, price, method of payment, etc.—and then record that information for posting on the exchange's ticker.

Yet for all the speed of the exchange, and all the computer terminals teetering atop the traders' desks, the Chemical Bank foreign exchange department is often overwhelmed by the slow, manual method by which deals are entered into the bank's computers and posted on the exchange, says Anthony P.R. Herriott, senior operations officer of the bank's treasury division. When a trader completes a deal, Herriott says, he is required to fill out a form listing the particulars of the deal and place it on a conveyor belt to another section of the room. There, data entry clerks receive the trade forms and key them into a 10-year-old Arbat system, which is connected to a PDP-11/70 across the street. The deal will be posted on the exchange after the PDP receives this information.

The process takes about 15 minutes from the time the trader completes the deal until the time he can see it posted on the ticker. That system worked well enough in 1973, when the exchange handled some 100 trades a day, Herriott says. The trader had enough time to fill out the form and place it securely on the conveyor, so that few trades

were lost for very long. Now, says bank vice president John M. Wigzell, the same traders handle 1,000 trades a day, and often deal so quickly that they cannot write down all their trades on separate slips of paper. The result is that they keep a running list on a scratch pad, which intermediaries must then rewrite and stick on the conveyor; with a little luck, the paper reaches the other end and the data entry clerks key it correctly into the system. "We need a better system just to stay in the game," Herriott says.

A few miles uptown, Merrill Lynch and Co.'s Advanced Technology Development Department is developing new ways for the financial services firm's branch offices to improve the quality of information that reaches clients. The group is looking at videodisks, portable computers, teletext, touchscreen technologies, and just about anything else that may give the company a strategic advantage, says systems analyst David Rossien. Right now Rossien is examining several ways to provide clients with direct access to Merrill Lynch's databases in a controlled manner, so that they cannot make unauthorized entries or typographical errors.

Enter a small startup from Woburn, Mass., called Interactive Images Inc. Its first product—and its only product for the foreseeable future, according to president and founder Leonard I. Hafetz—is a hardware/software combination called Easel that might best be described as a user's front end to a computer terminal. It comes in several versions, each of which ultimately boils down to a color monitor with a touch-sensitive screen and a lot of software.

Both Chemical Bank and Merrill Lynch have acquired beta test Easels and are developing dedicated applications for the product. For each firm, the key factor in choosing Easel was the touch-sensitive screen. Indeed, more and more users are turning to touch-sensitive crts as "ergonomic" user interfaces. Says T.S. Springer, a senior associate with the Springer Associates consulting firm in St. Charles, Ill., "Manufacturers are realizing that computer devices are moving out of the clerical areas and into the managerial and executive areas, where

keyboarding is not recognized as a high-status activity. The result is that manufacturers and users are turning to alternative methods of interacting with the computer." Fortunately, he says, the types of computer interactions often found on these levels lend themselves well to such alternatives. On the other hand, clerical functions such as word processing and data entry rely more on the keyboard.

The advent of touch-sensitive screens as alternatives to the keyboard has been heralded for several years, but only in the past few months have users and manufacturers begun to take them seriously. Easel was introduced last June, and the Hewlett-Packard HP 150—the first personal computer with a touch-sensitive screen—premiered in October. The sudden movement to touch-sensitive screens has raised the expectations of vendors such as Carroll Touch Technology, a Champaign, Ill., maker of touch screens. The day after the HP 150 was announced, Carroll Touch ceo Arthur B. Carroll told the New York Times, "I had a companywide celebration. I struggled for 10 years to get a stamp of approval on touch technology and they just did it."

### SCREENS' PAST A STRUGGLE

What Hewlett-Packard's announcement holds for the future of touch screens is arguable, but the past has indeed been a struggle. In the decade since touch screens first made their appearance in commercial products, business has grown slowly to a current industry volume of $10 million annually, Carroll says. Bart Goodmandson, the marketing manager at Sierracin Transflex, another touch panel vendor, tags the market at closer to $30 million; either way, the industry is microscopic.

Yet even for such a small industry, there is no shortage of vendors or technologies. About a dozen vendors currently provide touch systems based on any of four different touch technologies. The HP 150 uses an optical system, in which a user's finger interrupts crossing beams of infrared light. The beams are generated by LEDs just in front of the screen on two sides, and detected by pho-

GW-LT 422218

Exhibit 3  Page 50

'A little lower, please

GW-LT 422219

Exhibit 3  Page 51

## About a dozen vendors provide touch-sensitive systems based on any of four technologies.

tosensors on the other two sides. The intersection of a vertical and a horizontal beam is a touch point.

A similar technology uses acoustic surface waves. Acoustic signals travel along a curved glass overlay that conforms to the shape of the crt. When the user touches the screen, his finger interrupts the echo pattern and a controller interprets the interruption to indicate which point on the screen was touched. TSD Display Products of Bohemia, N.Y., manufactures this type of device.

The third technology might best be called a capacitive sensing system, such as is found on AT&T Information Systems' touch-sensitive terminal. These products use a thin, transparent material that is fused onto predetermined areas of the crt face. When a user touches one of the areas, the capacitive value of that particular area changes, indicating that a touch has been made. The AT&T terminal has some 30 such areas.

The fourth technology, which is used on the Easel and Sierracin Transflex products, can be called a resistance membrane approach. A set of parallel electrodes is etched onto a sheet of Mylar; then, two of these sheets are stretched across the crt at right angles to each other, creating a grid of electrodes. When a finger presses on the outer of the two Mylar sheets, the sheets touch and short-circuit a pair of electrodes.

While all four technologies are designed for the same function, significant differences exist. The resolution—how many distinct areas the user can touch—differs dramatically for each approach. The smallest touch-sensitive area on the AT&T capacitive sensing terminal, for example, is about half an inch wide by an inch deep. Infrared systems are limited by the size of LEDs and photodetectors; the HP 150 uses a grid of 40 beams across by 27 down, which divides the 12-inch monitor into touchable areas about a quarter of an inch square. Acoustical methods provide similar resolutions. Resistive membrane touch panels, however, offer significantly higher resolutions, to the point where they can replace digitizing tablets. Easel's touchable resolution is 960 by 720 pixels, and a resistive membrane touch panel made by Elographics, in Oak Ridge, Tenn., can obtain a touchable resolution of 4,000 by 4,000—16 million distinct touchable areas, compared to 30 on the AT&T terminal.

Other differences exist as well. Optical, acoustic, and resistive membrane techniques can accept a finger, a pen, or any other device; capacitive sensing systems require a human finger with a known electrical charge. And with resistive membrane and capacitive sensing systems, the user must actually touch the screen with something, while for the other technologies merely pointing from a very

close distance is fine.

After evaluating the technologies available, both Merrill Lynch and Chemical Bank chose the Easel system, which adds an authoring system, a programming language, and other software to a resistive membrane approach. A software feature that attracted both companies to Easel is a utility that allows programmers to disable areas of the screen at any time, much as a software program might disable keys on the keyboard. Both firms are using a cpu and monitor supplied by Interactive Images Inc., Easel's maker, although versions are currently available for the IBM Personal Computer and for mainframes running software from Applied Data Research in Princeton, N.J.

### INVESTOR INQUIRY SYSTEM

Merrill Lynch is working on a client inquiry system through which clients will be able to walk into a branch office and find out how their investments are doing and what other avenues of investment might do. The Easel terminal would be tied into a Quotron or some other stock service, and would provide each client with the price of any stock or investment in which the client has an interest. Nonclients could query the prices of a couple of stocks to whet their appetites, but no more. "One of the things that Merrill Lynch sells to its customers is information and the access to information," Rossien says. "We don't want to give it away."

The firm's application takes advantage of Easel's selective touch sensitivity by restricting the kinds of input available to the customer; since there is no keyboard, the customer must follow the screen's directions and cannot tamper with the system or obtain unauthorized information.

The Merrill Lynch application is experimental. "We have one Easel, and it's on an approval basis," Rossien says. "If it doesn't work to our satisfaction, we'll return it to Interactive Images." If the product is approved by Rossien's group, it will be installed in a single branch in New York for a six-month tryout. If it is successful there, it will be offered to other branches, without obligation to accept any technology coming out of Merrill Lynch's advanced technology development labs.

Chemical Bank, on the other hand, is fully committed to converting its foreign exchange trading to Easel; it has attempted other ways of automating the process and consistently been dissatisfied, says Herriott.

"We tried electronic pens, tablets, voice input, you name it. But the tablets demand too much precision on the part of the trader, and the voice input products we tried couldn't separate the speaker from all the

noise in the room."

His colleague Wigzell adds, "We were convinced that the only way to automate was to have the trader key in each trade. But the unfriendliness and structure of the keyboard is a big problem. We tried to use conventional means, but we need a breakthrough technology."

The bank is in the process of implementing a two-phase strategy that it feels will accomplish the breakout. The plan employs Easel workstations programmed in the bank's London office. Each workstation's screen is divided roughly in half vertically. Large touch-sensitive boxes at the top of the screen invite the user to declare the current transaction a "buy" or a "sell"; at the bottom, similar boxes let the users deal, service, cancel, log out, or lock out their screens. The right half of the screen lists key information about the current transaction, including buyer, bank, seller bank, currency, exchange rate (in dollars and the foreign currency), broker's bank customer, exchange location, and method of payment.

When the trader touches the screen in one of these areas, a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to choose the information needed on the right. For instance, when the user hits the "broker" cell on the right, a list of brokers appears on the left; the trader then hits the name of the broker to be involved in the current trade, and that information is entered into the system. For exchange rates and other numerical data, the user hits the proper cell on the right and then types in the numeric data on the keypad that appears on the left. In this way, an entire transaction can be completed directly on the workstation. (A QWERTY layout can be called up on the left for entry of nonstandard or rare names—an infrequently traded currency, for example.)

In the first phase of Chemical's plan, the Easel workstations will replace only the Arbat data entry system, while the rest of the trading system remains in effect, Wigzell says. Traders will still create blizzards of paper, which will then be rewritten by intermediaries onto proper forms and sent along the conveyor to the data entry area. There, data entry clerks will enter the data on the Easel system. The primary gains in this phase of the operation are accuracy in listing trades and independence from other bank areas sharing the Arbat system, Herriott says.

In the second, more ambitious stage of the plan, the Easels will be installed on the traders' desks alongside the various other crts. The trader can then talk on the phone with a broker or customer and simultaneously enter the transaction information directly into the system. Once a trade is complete, Easel

GW-LT 422220

**Exhibit 3  Page 52**



One of Chemical Bank's traders interacting with computer via touch screen.

can send it to the PDP-11 and out to the ticker. No more scratch paper, intermediaries, conveyor belts, data entry, or 15-minute lag between the transaction and its posting.

## INSTANT FEEDBACK ON TICKER

Reducing the number of transactions lost on the floor beneath the conveyor belt and providing virtually instant feedback on the exchange ticker are two advantages that appeal to traders, according to S. Waite Rawls, the bank senior vice president in charge of the New York trading operation. The system also provides other advantages to bank management, he says, some of which the traders may also appreciate.

Easel workstations used in the trading room, for example, will include cells that indicate what the trader's customer and trading limitations are, and how close he is to those limits. The trader can then incorporate this information, previously unavailable online, when making decisions about deals. "The faster and the better our traders can analyze the information at their disposal, the more money the bank can make," Rawls says. "Automation now is not a way of saving money but a weapon for profit."

Easel is also a way of managing the traders, which may not sit well with these independent-minded, free-spirited people. Managers can keep track of how individual traders are performing, Horriott says, and use the selective touch-sensitive facility to lock traders off their terminals if they are doing poorly. "We can finally establish some management control," he says. "We can police the traders and cut our losses." The same central control facility will enable trainees to begin trading in a controlled environment where their inexperience cannot cost the bank too much money; when the average amount of each transaction is $3 million, even a few minor errors can cost the bank a bundle.

Other users have begun integrating touch-sensitive screens into less traditional fields than banking and finance. Walt Disney's Epcot Center, several Manhattan office buildings, and many business hotels throughout the country use them as informational directories. People walk in off the street and ask the computer where a particular restaurant, exhibit, or office is. These information requests are particularly amenable to menu operation, and therefore to touch screens. For example, the crt could ask the user to touch a box labeled "restaurants," "night clubs," "theaters," or "sports," and then present a screen with more information on the chosen area.

Because of their usefulness to computer neophytes who are merely looking for information or following a menu, says Richard Peterson of Input, a market research firm

in Saddle Brook, N.J., "the MIS reaction has been very favorable. A touch screen is a very effective vehicle to get people into a computer system."

Touch screens are also catching on in applications where the user simply does not have the time to hunt for keys, even if he is computer literate and uses computers all the time. Chemical Bank's traders, with their crts heaped precipitously atop their desks, certainly are computer literate, but they do not have the time to use a keyboard accurately. The American Stock Exchange in New York uses a similar system, in which a specialist can execute a trade by touching the order as it comes up on the screen. The user then touches the price and broker information, and the trade is completed.

Applications requiring rugged equipment that is amenable to menu-driven software are also prime targets for touch screens. Goodmandson of Sierracin Transflex reports a system his company developed with Litton and Westinghouse for the military. Generals operating command posts behind the front lines in a battle situation can deploy troops,

tanks, and other forces using a touch-sensitive screen. Hafetz of Interactive Images notes that touch panels work well in industrial process control applications. In both of these applications, the potential for dirt and grime to pollute a keyboard is reduced since touch panels can be more hardy.

## DRAWBACKS OF TOUCH PANELS

Yet touch panels are not without their drawbacks, and these may prove fatal to the fledgling industry. Parallax—in which the actual touch-sensitive area does not align exactly with the crt's image of where it should be—affects all touch-sensitive systems, but it is more of a factor in acoustic and infrared systems because the sensitive areas of those technologies are farther away from the crt face on which the image is seen. Unless the user sits directly in front of the screen at eye level, the area he thinks he has touched may not be the area he did in fact touch.

Capacitive sensing and resistive membrane touch panels are in effect part of the crt face, not separate from them, so the

GW-LT 422221

Exhibit 3  Page 53

## "People will always touch the screen. You have to ask what the cost of random interactions with the screen will be."

parallax effect is reduced; yet even with these technologies the thickness of the crt's face causes some parallax. Moreover, critics charge that resistive membranes have been known to slide slightly from their original location, also causing parallax.

The reliability of the various technologies has also been questioned. Acoustical systems are extremely sensitive and can be thrown off by dirt or small scratches in the surface of the crt screen. With optical systems, a speck of cigarettes falling from the top of the terminal can break the light beams as easily as an intentional touch, producing the same result as smashing a book against several keys on a keyboard. Capacitive sensing systems are inflexible; because the touch areas are fixed in size and location by the manufacturer, it is more difficult to modify software for touch input. In addition, critics claim that these systems do not hold up well in environments marked by temperature and humidity fluctuations. Finally, resistive membrane touch panels, because of the properties of Mylar, block out light from the crt, reducing the visibility and clarity of the screen itself. The resistive membrane overlays are also more delicate than the crt's glass face or other touch panel technologies, and can be damaged easily by careless users.

And users are careless, more so than they may realize. T.S. Springer of Springer Associates recalls that when IBM brought out an antireflection coating for its crts a few years ago, people touched the screen and got the residue on their fingers. The end result was not less glare but rainbows on every screen. "People will always touch" the screen, whether it is touch sensitive or not," he says. "They point out information to a colleague, or point to the screen to compare specific items to a printout, or whatever. Manufacturers have to be aware of this and ask what the cost of random interactions with the screen will be."

Another potential drawback is that human interaction with touch panel crts is even more direct than it is with keyboard-based crts. While this may not bother managers who have been using terminals and personal computers happily for several years, it may scare away the very neophytes that touch terminals are supposed to attract. Says Paul Nesdore, an analyst with Datapro in Delran, N.J., "If a user isn't going to like a keyboard, he's not going to like actually having to touch the screen. You know, think about the radiation and the fear of injury and all that." (No such complaints have yet been registered, according to Janice Blood, a spokesperson for 9 to 5, the National Association of Working Women.)

Yet another negative factor is price. Touch panels, not including the crt, cost up to

$1,000 each; no significant price differences exist among the four technologies. Joe Kelly, another Datapro analyst, says, "Terminals are too cheap and too laden with other features to support touch panels."

Many terminal makers agree, and have shied away from adding touch panels to their products. Burt Hochfeld, vice president of Raytheon Data Systems, says, "They're just too expensive. If we could buy a touch screen and make money on it, we would be doing it. The applications are there, but right now it's too expensive."

But perhaps the most important drawback to touch-sensitive terminals, at least in terms of gaining widespread acceptance, is the inherent restriction the technology places on which applications can be run. Says Rossien of Merrill Lynch, "Some applications make more sense than others, and some make less sense. One of the things we're doing is seeing whether applications we would want to use will make sense." Consequently, he adds, his company is moving cautiously on Easel and may eventually drop it entirely.

Says Kelly of Datapro, "Touch panels are only for very specialized applications. They have to be menu-driven, and they are slow. The currently available applications are as a result quite simplistic compared to what's available for a keyboard."

Springer adds, "You have to display meaningful information on the screen so that people can respond to it. It becomes difficult to replace the keyboard in applications like word processing, but it can be very good in replacing the special function keys."

### WORK WELL WITH MICROS

On some personal computer applications, touch screens can work well. Several microcomputer applications software vendors have already announced versions of their products that can take advantage of the touch screen on the HP 150. Peterson of Input notes, "You need to have the keyboard. You can use the two together very well. The touch screen with a keyboard can make a micro very easy to use, and yet very versatile."

In comparison, the touch screen's success in mainframe-based systems is more uncertain. Richard Telesca, a consultant with Aetna Life and Casualty in Hartford, Conn., says that his company experimented with Easel but dropped the product. "We weren't satisfied with the interface to the software we already have. It's too difficult to fit a touch screen to interface our existing CMS software; you need a system designed to work with touch to begin with."

Rossien of Merrill Lynch complains that touch screen's present additional problems for programmers accustomed to work-

ing on traditional mainframe applications. "You really need intelligent software design: Easel, or other touch-sensitive products, demands a different mentality in programming. You have to know everything the user can possibly want to do at any time and be prepared to handle it in some way. When you lock out everything but the prescribed menu items and there is no keyboard to write a command, the user cannot get the system to do anything but what's presented. If he has a legitimate need for something else then you've failed in your software design."

The combination of these drawbacks and outside influences may doom the touch-sensitive terminal, analysts fear. Kelly says, "The touch screen's main advantage is for users who are unfamiliar with a keyboard and unwilling to become more familiar. But with microcomputers all over the place and at all levels of a corporation, people are more comfortable on the keyboard. That eliminates the main competitive advantage of the touch screen. They've been around a while, and they will continue to be around, but I don't think there's much interest in them."

His colleague Nesdore is even more pessimistic: "I just don't think the concept can make it today."

Springer notes that touch screens, even in applications designed for computerphobes or computerphobes, may be eclipsed by other technologies. "Touch screens, I think, are only a stopping point in the evolution to voice input. Touch is currently a more sophisticated and well-developed technology than voice input, but voice input is more versatile and promising. When voice input comes around, touch screens will no longer be needed."

Even touch technology's greatest proponents admit that the future is not as bright as it once seemed. Chemical Bank, in plunging forward with Easel, clearly is optimistic about its effectiveness in automating the bank's foreign exchange area, and eventually, all similar transaction-oriented areas. Even still, vice president Rawls says, Chemical does not see Easel as an effective long-term strategy. "We'll be rolling it in over the next year and a half, but I wouldn't put even a five-year life span on it. I think it will be obsolete by then." The system can handle upwards of 2,000 to 3,000 trades per day—triple the current rate—but Rawls says that amount may not be sufficient and that the Easel system may not be able to deliver more because of touch technology's inherent slowness. "We may be on the leading edge for a few minutes, but not for long unless we keep going to new technology. Touch screens aren't going to be the newest technology for long, and we have to prepare for what comes next."

is develop

GW-LT 422222

**Exhibit 3  Page 54**



One of Chemical Bank's traders interacting with computer via touch screen.

in Saddle Brook, N.J., ''the MIS reaction has been very favorable. A touch screen is a very effective vehicle to get people into a computer system.''

Touch screens are also catching on in applications where the user simply does not

tanks, and other forces using a touch-sensitive screen. Hafetz of Interactive Images notes that touch panels work well in industrial process control applications. In both of these applications, the potential for dirt and grime to pollute a keyboard is

Exhibit 3   Page 54.1

GW-LT 422223



Exhibit 3    Page 54.2

GW-LT 422224

Exhibit 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| _____ | Case No. |
| LUCENT TECHNOLOGIES, INC., | ) 02-CV-2060 B (CAB) |
| Plaintiff and Counterclaim Defendant | ) consolidated with |
| vs. | ) Case No. |
| GATEWAY, INC., and GATEWAY COUNTRY | ) 03-CV-0699 B (CAB) |
| STORES LLC, GATEWAY COMPANIES, INC., | ) and Case No. |
| GATEWAY MANUFACTURING LLC and | ) 03-CV-1108 B (CAB) |
| COWABUNGA ENTERPRISES, INC., | ) |
| Defendants and Counter-claimants, | ) VOLUME I |
| and | ) |
| MICROSOFT CORPORATION, | ) |
| Intervener and Counter-claimant, | ) |
| _____ | ) |

(Caption continued on next page.)


Videotaped Deposition of MICHAEL E. FARMER,

at 6161 West Centinela Avenue, Culver City,

California, commencing at 2:12 p.m.,

Thursday, February 23, 2006, before

Janice Schutzman, CSR No. 9509



550 West C Street, Suite 600
San Diego, CA  92101
619-235-2400

Exhibit 4  Page 55

1    (Caption continued from first page.)

2

3    MICROSOFT CORPORATION,                    )

4    Plaintiff and Counter-defendant,          )

5    v.                                        )

6    LUCENT TECHNOLOGIES INC.,                 )

7    Defendant and Counter-claimant            )

8    -----------------------------------)

9

10

11

12              Videotaped Deposition of

13              MICHAEL E. FARMER

14          Thursday, February 23, 2006

15

16

17

18

19

20

21

22

23

24

25

2

1    start.  We started Home Accountant under The

2    Computer School.  We took it back, it belonged to

3    The Computer School, and we decided that we couldn't

4    call a software company The Computer School and came

5    up with the name Survivor Software and filed all the        02:34PM

6    dbas necessary to start doing business as Survivor

7    Software.

8        Q.    Okay.  So let's talk about The Home

9    Accountant for the Mac, then.

10              When did you start working on that?             02:34PM

11       A.    Okay.  I do not remember the exact month.

12    It was in the latter part of 1983.  It was prior to

13    the release of the MacIntosh computer.  We were part

14    of a group of, I believe it was 100 companies that

15    wanted to develop programs for this new computer.          02:34PM

16       Q.    And at that time, you had not yet formed

17    Survivor Software, is that right?

18       A.    No, we had not formed Survivor Software.

19       Q.    And when you said this was prior to the

20    release of the Mac, you're talking about the              02:35PM

21    original Macintosh?

22       A.    Yes.  The original Macintosh was released

23    January 20th, 1984.

24       Q.    How do you remember the date?

25       A.    Because it's one of my favorite              02:35PM

18

1    commercials, it was a Super Bowl commercial and it

2    says at the end, "On January 20th, 1984, we'll no

3    longer be 1984." So just because it happens to be

4    one of my favorite TV commercials.

5        Q.   And do you actually remember it being          02:35PM

6    released on or about January 20th, 1984?

7        A.   Yes.  Jim Sadlier also owned a Computerland

8    store, and I remember unpacking them and helping set

9    them up.

10       Q.   Were there any features of The Home           02:36PM

11   Accountant for the Mac that were especially

12   different from the other Home Accountant software

13   that you had worked on?  Or is that even a fair

14   question to ask?

15           MR. HOHENTHANER:  Objection, vague,            02:36PM

16   leading.

17           THE WITNESS:  You'll need to clarify it.

18           Maybe I could state it this way:  When we

19   sat down to write the Macintosh version of The Home

20   Accountant, very quickly in our development work      02:37PM

21   before we started coding, we decided that we could

22   not use the basis, that we had to rewrite the

23   program, that the Mac was a sufficiently different

24   machine that the style that The Home Accountant was

25   written in could not be used.                         02:37PM

19

1              Therefore, there are elements of The Home

2     Accountant Mac that parallel what the IBM one did,

3     but they are somewhat different and in many cases

4     quite different.

5              Is that what you were asking?                02:37PM

6        Q.   I think it was, yes.

7        A.   Okay.

8        Q.   What was the first version of The Home

9     Accountant for the Mac that you released?

10       A.   That would have been version 1.01.            02:38PM

11       Q.   And do you remember, sitting here today,

12    when that version was released?

13       A.   I believe when I looked on the list that it

14    was in January of 1985.

15             (Deposition Exhibit 1 was marked for

16    identification.)

17    BY MR. SIDDIQUI:

18       Q.   Mr. Farmer, you've been handed what's been

19    marked Farmer Exhibit 1.  It's Bates stamped, for

20    the record, SSW 000051 through SSW 000052.            02:39PM

21             Do you recognize the document?

22       A.   Yes.  It is the header to the program of

23    Home Accountant.

24       Q.   It's the header to The Home Accountant for

25    the Mac program?                                       02:39PM

                                                            20

1       A.    Okay.  To be clear, this is the header for

2    MacMoney version 4, but this is the version track

3    record of all the versions.

4       Q.    Okay.  And what is the correlation between

5    Home Accountant for Mac and MacMoney?                    02:40PM

6       A.    Okay.  Home Accountant was version 1;

7    MacMoney was, started at version 2 because

8    technically that's what it was, it was a version 2

9    of Home Accountant.

10      Q.    So version 2 of Home Accountant, you just     02:40PM

11   changed the name to MacMoney, basically?

12      A.    Right.  Arrays never, ever received a

13   version 2.  If you'll look on this list, there is a

14   mention of a 1.05, we called it Ebenezer.  At that

15   point we had decided to pull the program because       02:41PM

16   Arrays was not living up to the agreement that had

17   been, we had made.

18      Q.    Okay.

19      A.    And since we didn't have a name for it, we

20   nicknamed the program Ebenezer.                         02:41PM

21      Q.    I'm going to come back to that in a second.

22   I just want to make sure that, sort of I get your

23   statement about the document generally.

24            Do you recognize on the first page, Bates

25   stamped SSW -51, do you recognize the handwriting on    02:41PM

21

1      in the ability to be transferred.

2              Does that answer it?

3      BY MR. SIDDIQUI:

4          Q.    Under normal operation, would the

5      information listed in the list be the same as the      03:52PM

6      information in the data array?

7              MR. HOHENTHANER:  Objection, vague,

8      leading.

9              THE WITNESS:  It would depend on what's in

10     the names list entry.  Because the names list          03:52PM

11     actually transfers two pieces of information.  It

12     transfers the name, the Pay To name, and it has the

13     possibility of transferring a default category if

14     you had set it up that way.

15     BY MR. SIDDIQUI:

16         Q.    In this case --

17         A.    This case.

18         Q.    -- when you clicked on "Fred," the effect

19     was to transfer the information in Fred to the Pay

20     To field, is that right?                               03:52PM

21         A.    That is correct.

22         Q.    And what would happen if you clicked on

23     "George" with the mouse?

24         A.    If I clicked on "George"?

25         Q.    Which is the second entry, is that right?    03:53PM

                                                              **52**

1      A.    Second entry.   It would put "George" there.

2      Q.    So the effect is that information George

3  appears in the Pay To field?

4      A.    That's correct.

5      Q.    What about the window in the bottom left?    03:53PM

6      A.    The Categories window?

7      Q.    What does that window represent?

8      A.    The Categories window is the accounts or

9  categories that are available to process transaction

10  data.   They can be a bank account, they can be a    03:53PM

11  credit card, they can be a cash account, they can be

12  another type of liability or another type of asset

13  or they can be an income or an expense.

14      Q.    Okay.

15      A.    They represent those types.    03:54PM

16      Q.    So if you could click on the third option

17  in that window?

18      A.    The one that says "cash account"?

19      Q.    Yes, please.   Click on that.

20      A.    If I click on that.    03:54PM

21      Q.    So what happened on the first click?

22      A.    It activated the window.

23      Q.    And the second click did what?

24      A.    Transferred, again like the names list, it

25  looked up positionally where I clicked, determined    03:54PM

53

1    an index into the Category list array, and picked up

2    the string that says "cash account" and moved it to

3    the Category box.

4        Q.    And so the effect was to transfer the

5    information, the phrase "cash account" into the          03:54PM

6    field with the label next to it Category, is that

7    right?

8        A.    That is correct.

9        Q.    How did it know to transfer that

10   information to that field and not to the Pay To          03:55PM

11   field that we were just entering information into?

12       A.    The mechanism that determines where I've

13   clicked on the screen knows that I've clicked in

14   this window, the window that is called Categories.

15   And so it returns to me -- what is returned on the       03:55PM

16   click is the window and where in that window I

17   clicked.

18            So knowing that I clicked in the Category

19   window, when I go to do the transfer, I know that

20   the only box I can move the data to is the Category      03:55PM

21   box on the transaction entry form; if that form is

22   up, it's open.

23       Q.    And could the information from the

24   Categories window be transferred to any other field

25   in the check form by clicking in the Categories         03:56PM

                                                              54

1      window?

2              MR. HOHENTHANER:  Objection, vague.

3              THE WITNESS:  In the, in the form that the

4      entry window is now, there is no other box that it

5      will go into.  If I clicked on a second category,          03:56PM

6      just like we did the names, it's replacing it.

7      BY MR. SIDDIQUI:

8          Q.   And you clicked on?

9          A.   I clicked on Cat One.

10         Q.   And it replaced the phrase "cash             03:56PM

11     account" --

12         A.   Right.

13         Q.   -- with the phrase "Cat One" in the

14     category field?

15         A.   Right.                                        03:56PM

16         Q.   Back, let's go back to the Names window in

17     the top left.

18         A.   Right.

19         Q.   Is there a way for any of this information

20     to be transferred from the Names array to any other    03:57PM

21     field other than the Pay To field?

22         A.   No, there is not.  Again, because the

23     system told me that I clicked in the Names window

24     and where I clicked in the Names window, setting up

25     an array, I know to look on the Names list array at    03:57PM

                                                              55

1    that index and move a certain string, being the Pay

2    To information or the name to the transaction

3    window.

4        Q.    So is it correct to say that your

5    interaction with the Names window will only enter        03:57PM

6    information into the Pay To field in this check form

7    as we have it up right now?

8        A.    It is better to say that it will only enter

9    it into the fields that it's supposed to because of

10   the fact that the name can also have the category       03:58PM

11   associated with it.

12       Q.    I understand.

13       A.    But those are the only fields that it will

14   go into.

15       Q.    So there is an association between the         03:58PM

16   Names window and certain fields in the form, is that

17   right?

18       A.    That is correct.

19       Q.    In all the functionality that we've seen

20   demonstrated here today, is this how Home Accountant    03:58PM

21   for Macintosh version 1.01 worked when it was

22   released?

23            MR. HOHENTHANER:    Objection, leading,

24   vague.

25            THE WITNESS:    This is how I remember it.     03:59PM

56

1            There is no reason for me to believe that

2    this is an altered version of the program.

3    BY MR. SIDDIQUI:

4        Q.    Okay, thank you.

5            And if you click on the Apple icon again?    03:59PM

6        A.    Yes.

7        Q.    And if you select Key Caps, please.

8            Could you type by --

9            Well, first of all, what did you, what

10    happened when you selected the Key Caps?    03:59PM

11        A.    Key caps is an Apple provided, or was an

12    Apple-provided desk accessory with the system.  Desk

13    accessories are small applications that can either

14    stand alone by themselves or in some cases could

15    interact with other functions, such as the hardware    04:00PM

16    or other devices.  They were special purpose mini

17    programs.

18        Q.    And what does the Key Caps window look like

19    visually to you?

20        A.    It looks like a keyboard.    04:00PM

21        Q.    And are you able to type or click on the

22    letters on this keyboard in the Key Caps window?

23        A.    I believe so.  I just clicked on Q and it

24    appears in the window.

25        Q.    So if you could just write any word, you    04:00PM

                                                    57

Exhibit 5

# THE HOME ACCOUNTANT
## And
## Financial Planner
## For The Macintosh

Written By

**Mike Farmer**
**Colin Jameson**
**George W. Lee**
**John Tinsman**

Users' Guide By

**Laura Speek Welch**
**IPS Publishing, Inc.**



**Arrays, Inc./
Continental
Software**
11223 South Hindry Avenue
Los Angeles, CA 90045
(213) 417-8031/417-3003 Support Services
(213) 410-3977 Business Office

**Exhibit 5  Page 67**

MSLT_1060801

## NOTICE

Arrays, Inc./Continental Software reserves the right to make changes and improvements in this manual or in the product described in this manual at any time and without notice.

---

### LIMITATIONS ON WARRANTIES AND LIABILITY

Arrays, Inc./Continental Software makes no warranties, either expressed or implied, with respect to the software described in this manual, its quality, performance, merchantability, or fitness for any particular purpose. Arrays, Inc./Continental Software's software is sold or licensed "as is."

The entire risk as to its quality and performance is with the buyer. Should any program prove defective after its purchase, the buyer (and not Arrays, Inc./Continental Software, its distributor, or its retailer) assumes the entire cost of all necessary servicing, repair, or correction and any incidental or consequential damages.

In no event will Arrays, Inc./Continental Software or its software suppliers be liable for direct, indirect, incidental or consequential damages resulting from any defect in the software, even if Arrays, Inc./Continental Software has been advised of the possibility of such damages. In particular, they shall have no liability for any program or data which is lost or damaged.

---

Copyright 1984 by Arrays, Inc./Continental Software. All rights reserved. Printed in the United States of America. No part of this publication (including the software media) may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise without the prior written permission of Arrays, Inc./Continental Software.

Macintosh™ is a trademark licensed to Apple Computer, Inc.

Apple®, The Finder™, MacWrite™, and MacPaint™ are registered trademarks of Apple Computer, Inc.

The use of trademarks or other designations is for reference purposes only.

Documentation services by IPS Publishing, Inc. — Westlake Village, CA.

1st Printing                                                                    January, 1985

ISBN 0-88688-052-1

ii

**Exhibit 5  Page 68**

MSLT_1060802

# WARRANTY

### Arrays, Inc./Continental Software

### Limited Warranty Policy

**ALL** of Arrays, Inc./Continental Software's products are warranted against any manufacturing defects for a period of 90 days from the date of purchase. If the product becomes defective or fails to perform as described in the manual during this 90 day period, we will replace the program disk at no charge. Also, we will provide telephone assistance to all new customers setting up their program for the first time.

In addition, upon our receipt of a completed warranty registration card, you are entitled to the following:

1) a backup program disk for copy protected software;

2) support via mail service for one year;

3) replacement of any damaged program disk which is out of the 90-day warranty period for a charge of $17.50 plus $2.00 shipping and handling per disk.

### Extended Warranty Policy

To extend your warranty coverage beyond the normal 90 day period to one full year, please return the completed warranty card with the extended warranty fee of $20.00. When we receive the registration card and fee, you will be entitled to these benefits, in addition to those listed above:

4) support via telephone for a period of one year;

5) immediate notification of all updates or enhancements to the program during the year in which you are registered;

6) free replacement of damaged disks for one year (instead of the $19.50 charge listed in item 3, above);

7) an informative newsletter with helpful hints on using our programs;

We cannot accept telephone queries about any problems, except initial set-up, if you are not registered under our extended warranty program. However, if you do have a problem you wish to discuss on the telephone, and you have not yet registered, it is possible to do so over the phone with your VISA or MasterCard.

iii

**Exhibit 5  Page 69**

MSLT_1060803

*Introduction continued*

then did our best to make improvements with each new release. By the time Apple sent us a developer's model Macintosh, we were ready! *The Home Accountant and Financial Planner for the Macintosh* is the culmination of all our experience, dedication, and programming skills. We present it to you with real pride as the best home accounting and financial planning package your hard earned money can buy.

## WHAT CAN IT DO FOR *YOU?*

The overall purpose of *The Home Accountant* is to help you keep track of your money. This boils down to two simple questions: "From where does it come?" and "To where does it go?". Most of your money flows in and out of your checkbook(s) so of course, *The Home Accountant* can help you monitor, balance, and reconcile your checkbooks.

But that's only the beginning. In addition to checkbooks, you can track the cash in your wallet along with other assets, such as your house, car, savings account, or other items of value. You can keep track of your debts, loans, mortgages, or other liabilities. And don't forget that plastic money! *The Home Accountant* can help you keep strict tabs on all the tabs you pick up with your credit cards.

You can even create up to fifty automatic transactions (relating to any bank account type transaction) for each month. *The Home Accountant* will remind you when each transaction is due, whether monthly, quarterly, or semi-annually. Think of it, no more forgotten important payments!

Each purchase or receipt you make (called a *transaction*) is assigned to a *category*. For example, you go to the grocery store and buy Food; you pay a bill for your Telephone; you use a credit card to buy Clothing; you receive your Salary, and so on. All of these (Food, Telephone, Clothing, Salary) are possible categories.

The program keeps constant track of how much money is spent or earned for each category and reports this information to you on the screen or via the printer. This means at any point in time you can get a very accurate picture of where you stand financially. Is your income covering expenses? Can you afford that new

**Exhibit 5  Page 70**

MSLT_1060811

appliance? How much have you paid this year in taxes? *The Home Accountant* can answer all of these questions and more.

We've added a system of ID codes to further classify your financial dealings. With ID codes, you can identify and report on different sets of transactions almost any way you wish!

When it comes time to dazzle your banker or crank out the bottom line on the old tax return, you'll be way ahead of the game. *The Home Accountant* prints out neat financial statements, listing your assets, liabilities, and net worth. Bankers truly love these, and lots of times you can use your *Home Accountant* printouts instead of filling out those tedious bank forms.

You can print standard reports, which are predesigned, or you can create custom reports to show exactly the information you want. For those of you who think a picture is worth a thousand words, wait 'til you see our graphs! Like the reports, you have standard graph options or you can create your own custom graphs. Selections for custom reports or graphs can be saved and recalled.

Worrying about doing your taxes? Don't. Filling out tax forms is immeasurably easier and faster when all the information is organized, totaled, and summarized for you. Anything which might affect your taxes can be marked for your review. You can even print out information, such as the interest paid on a loan, to send to your tax collector if he requests backup for those claims you made. If you have an accountant prepare your forms, he'll appreciate your superior financial information management and the time it saves him.

### THE BUCKS DON'T STOP HERE

Good money management doesn't stop with tax returns and financial statements. It goes a giant step further into serious planning, and this is where *The Home Accountant and Financial Planner for the Macintosh* really shines. The planning routines are simply powerful. By that we mean they're simple to use, and they yield very powerful results.

**Future Value/Goal:** You can calculate how much an investment will be worth in any number of years, assuming different rates of return and inflation; or how much you'll need to save

**Exhibit 5  Page 71**

MSLT_1060812

**Introduction** *continued*

every month to reach a certain financial goal at different rates of return and inflation.

**Retirement Planning:** You can also determine how much money you'll need to save to support your current standard of living at any time in the future (typically, when you retire). Of course you can study the effects of various rates of inflation and returns on investments.

**Loan Planning:** Thinking about taking out a loan? How does a change in the interest rate affect your payments? What if you shorten or lengthen the term of the loan? What about balloon payments? Need to create a quick and accurate *Amortization Schedule? The Home Accountant* gives you the tools for finding out exactly what it means when you sign on the dotted line.

## THE FACTS AND FIGURES

Here's a precise list of what *The Home Accountant* can do:

- Handle up to 200 different categories (transactions can be further classified by using memos and ID codes)
- Store up to 3000 cash, bank account, and credit card transactions per disk
- Divide a single transaction over as many as 8 categories
- Flag transactions to be recalled for tax or other purposes
- Store up to 50 automatic transactions per month and remind you of those due at the beginning of each session
- Reconcile bank statements quickly and easily
- Print checks, if desired, on preprinted check forms
- Produce the following reports on your screen or printer:
  - Income & Expense Report
  - Personal Balance Sheet
  - This Month's Activity Report
  - Bill Payer Summary (of automatic transactions)
  - Categories List
  - Names List
  - ID Codes List
  - Custom List Reports
  - Custom Financial Reports
  - Custom Transaction Activity Reports
- Produce the following graphs on your screen or printer:

**4**   THE HOME ACCOUNTANT

**Exhibit 5  Page 72**

MSLT_1060813

Exhibit 6

1                 UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - -- - - )

5    LUCENT TECHNOLOGIES INC.,          )

6                   Plaintiff,     )

7    V.                             ) CASE NO.

8    GATEWAY, INC., et al.,         ) 02-CV-2060 B (CAB)

9                   Defendants,    ) consolidated with

10                                  ) 03-CV-0699 B (CAB)

11   and                            ) 03-CV-1108 B (CAB)

12                                  )

13   MICROSOFT CORPORATION,         )

14                   Intervenor.   )

15   - - - - - - - - - - - - - - - )

16   AND CONSOLIDATED ACTIONS.      )

17   - - - - - - - - - - - - -- - - )

18       VIDEOTAPED DEPOSITION OF DALE EDWARD BUSCAINO

19              WEDNESDAY, NOVEMBER 7, 2007

20

21

22              BY:  MELANIE A. VIZENOR, CSR NO. 4026

23

24

25

Exhibit 6  Page 73

Page 2

1

2

3

4

5

6

7

8      Videotaped Deposition of DALE EDWARD BUSCAINO, taken

9    on behalf of Plaintiff, at Fish & Richardson, 12390

10   El Camino Real, Torrey Pines Room, San Diego,

11   California, commencing at 9:08 A.M., WEDNESDAY,

12   NOVEMBER 7, 2007, before Melanie A. Vizenor, Certified

13   Shorthand Reporter No. 4026, pursuant to Notice of

14   Videotaped Deposition.

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 6  Page 74**

1    A.   My understanding is that the computer work

2    station was a culmination of the two -- let me rephrase

3    that.

4         My understanding was both companies,

5    Interactive Image Corporation and Chemical Bank,

6    provided the solution, the system, which was the

7    software and the hardware, to produce what is called the

8    foreign exchange front end.

9    Q.   And who is Interactive Images Corporation?

10   MS. GARNER:  Objection.  Vague.

11   BY MR. DONOVAN:

12   Q.   Do you know who they are?

13   A.   Interactive Images Corporation was a company, I

14   believe on the East Coast, that, according to Tyler,

15   produced some of the software referred to as the Easel

16   software.

17   Q.   Had you ever heard of Interactive Images

18   Corporation before your work in this case?

19   A.   No, I haven't.

20   Q.   And you said that they developed software

21   called Easel?  Is that the case?

22   A.   Easel was their -- their development

23   environment that they used for their software.

24   Q.   Is Easel an operating system?

25   A.   My understanding of Easel is a system that

Exhibit 6  Page 75

1   would actually run on top of an operating system.

2       Q.   Do you know what operating system it ran on top

3   of?

4       A.   I don't know if it was limited to one

5   particular operating system, but my recollection is that

6   it was something of a UNIX-based operating system.

7       Q.   And what's your understanding of -- what is

8   your -- what is that understanding based on?

9       A.   It's based on information that I received from

10  Rob Long, in conversations that I've had with Rob Long.

11  And I think it's based on other information that I may

12  have read regarding the Easel system.

13      Q.   Now, Interactive Images Corporation, then, so

14  they developed this software which you understand works

15  on at least one operating system called Easel, right?

16      MR. SHARIFAHMADIAN:  Objection.  Mischaracterizes

17  the record and his previous testimony.

18      THE WITNESS:  I understand that the software

19  developed by Interactive Images Corporation, the

20  platform software is called Easel that runs on top of a

21  variation of UNIX, and this -- this Easel software is

22  customizable to work in different environments and could

23  be adapted in such a manner that Chemical Bank did to

24  make their modifications in order to perform the

25  capabilities that they were looking for in their

**Exhibit 6  Page 76**

1  product.

2  BY MR. DONOVAN:

3      Q.   So this Easel platform developed by Interactive

4  Images Corporation, did it have applications that could

5  run on it?

6      MR. SHARIFAHMADIAN:   Objection.   Mischaracterizes

7  the record.

8      THE WITNESS:   I'm sure that you could take Easel

9  software and you could develop a whole series of

10  applications.   But as far as I believe Chemical Bank was

11  concerned, it was a single application that they were

12  particularly interested in.   In fact, I think in the

13  Tyler article it indicates that it was a dedicated

14  application that they were using the Easel environment

15  for.

16  BY MR. DONOVAN:

17      Q.   Was it a dedicated application running on Easel

18  or was Easel modified to be the dedicated application?

19      A.    It's my understanding that Easel is -- the

20  software was modified to meet the requirements of the

21  Chemical Bank and the software is running on a variation

22  of UNIX or some operating system of that -- that sort.

23      Q.    Okay.   So we've got Interactive Images

24  Corporation, and they've developed this platform

25  software called Easel.   And how does that relate to the

1   foreign exchange front end that you are referencing here

2   in paragraph 61?

3        A.   Well, the foreign exchange front end

4   encompasses not just the software but the hardware, as

5   well, which would be the computer work station, that it

6   also includes the touch screen.

7        Q.   And Citibank developed that?

8        MR. BAKER:  Objection.  You mean --

9   BY MR. DONOVAN:

10       Q.   Or excuse me.  Chemical Bank.  Chemical Bank

11   developed that.

12       A.   I -- I don't know if Chemical Bank developed

13   that or not.

14       Q.   All right.  So we've got this FXFE, which is a

15   hardware including a computer work station and touch

16   screen, and we've got software, which is Easel modified

17   for a specific application, correct?

18       MR. SHARIFAHMADIAN:  Objection.  Mischaracterizes

19   his testimony.

20       THE WITNESS:  I think that's a general summary.

21   BY MR. DONOVAN:

22       Q.   Anything else you can think of that is part of

23   this foreign exchange front end?

24       A.   Let me restate so we don't miss anything, but

25   what I believe that the foreign exchange front end

Exhibit 6  Page 78

Exhibit 7

1
2
3
4
5
6                      **UNITED STATES DISTRICT COURT**

7                    **SOUTHERN DISTRICT OF CALIFORNIA**

8

9   LUCENT TECHNOLOGIES, INC.,            )    Civil No: 02CV2060-B(LAB);
                                          )              03CV0699-B(LAB);
10                                        )              03CV1108-B(LAB)
                                          )
11              Plaintiff,                )
                                          )    **CLAIM CONSTRUCTION ORDER**
12  v.                                    )    **CLARIFYING AND**
                                          )    **SUPERCEDING THE ORDER OF**
13  GATEWAY, INC AND GATEWAY              )    **MARCH 1, 2004, CONSTRUING**
    COUNTRY STORES LLC; and,              )    **CLAIMS FOR U.S. PATENT NO.**
14  MICROSOFT CORPORATION; and, DELL,     )    **4,763,356**
    INC.,                                 )
15                                        )
                Defendants.               )
16                                        )
    _____ )

17

18

19

20          On March 7, 2007, the Court heard motions for summary adjudication concerning

21  U.S. Patent No. 4,763,356 ("the '356 patent").  During the hearing, a dispute came to light

22  on the meaning of the term "concurrently displaying" and the Court instructed the parties to

23  submit briefing on this claim term.  Having now fully considered the parties' briefs and the

24  oppositions filed thereto, the Court hereby retains the construction of the term

25  "concurrently displaying" as it is set forth in the Court's Order on March 1, 2004.

26          Although the instant order does not change the substance of the Court's prior claim

27  construction, the instant order clarifies the preceding order through a change in the format

28                                       1              02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 79**

1  of Exhibit A.  The instant order therefore supercedes the Court's claim construction order

2  of March 1, 2004.  As set forth in the attached Exhibits A and B, the Court **HEREBY**

3  **CONSTRUES** all claim terms in dispute in the '356 Patent and **ISSUES** the relevant jury

4  instructions as written in exhibit A, attached hereto and **HEREBY DEFINES** all pertinent

5  technical terms as written in exhibit B, attached hereto.

6        Because the Court decides the claim construction issue herein pursuant to Local

7  Rule 7.1 without oral argument, the hearing on the claim construction issue originally

8  scheduled for April 27, 2007 is hereby **VACATED**.

9

10

11       **IT IS SO ORDERED**

12

13  DATED:  April 17, 2007

14

15                    Hon. Rudi M. Brewster
                       United States Senior District Court Judge

16

17  cc:  Hon. Cathy Ann Bencivengo
         United States Magistrate Judge

18

19      All Counsel of Record

20

21

22

23

24

25

26

27

28                2             02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 80**

**EXHIBIT A**

| **VERBATIM CLAIM ELEMENT** | **COURT'S CLAIM CONSTRUCTION** |
|---|---|
| **CLAIM 1** | |
| An arrangement for use in a computer having a display associated therewith comprising | An arrangement for use in a computer having a display associated therewith comprising |
| means for displaying on said display a pattern including a plurality of information fields and for identifying for each field a kind of information to be inserted therein, | **means for displaying on said display a pattern including a plurality of information fields and for identifying for each field a kind of information to be inserted therein** [*This is a means plus function element*: *The function is*: *performing the function of displaying on the display; The corresponding structure is*: *a microprocessor 211 programmed with the algorithm that displays a form 1501-1502, an associated controller - 220 and/or 219 - and a display - 21 and/or (16 and 18).(see Fig. 13, Col. 11:57-58; Fig. 15, Col. 13:24-31; Col. 11:62-64; Col. 12: 8-11)]*, |
| means for indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including at least a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | **means for indicating a particular one of said information fields into which information is to be inserted** and for **concurrently displaying a predefined tool associated with said one of said fields** [*This is a means plus function element*: *The function is*: *indicating a particular one of the information fields into which information is to be inserted and* ***concurrently displaying*** *[displaying at the same time, as by a window overlaying the form]* ***a predefined tool associated with that particular field*** *[a tool specified by the system as an appropriate tool for filling in the information called for by that field]; The corresponding structure is*: *a microprocessor 211 (see Fig. 13) programmed with the algorithm that indicates the currently active information* |

3

**Exhibit 7  Page 81**

| | |
|---|---|
| | field and displays a tool 1503-1515 (*see* Fig. 15) an associated "controller" - 220 and/or 219 (*see* Fig. 1 & 13), and a "display" - 21 and/or (16 and 18)).  (*See* Fig. 13; Col. 13: 31-51; 57-58; 64-68; Col. 14: 1-20; 25-29)], said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including at least a tool adapted to supply an individual entry from a menu of alternatives and at least **a tool adapted to allow said user to compose said information** [*a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool*], and |
| means for inserting in said one field information that is derived as a result of said user operating said displayed tool. | **means for inserting in said one field information that is derived as a result of said user operating said displayed tool** [*This is a means plus function element. The function is: inserting in a particular field information that is derived as a result of the user operating the displayed tool. The corresponding structure is: a microprocessor 211 (see Fig. 13) with the algorithm that inserts information derived from a tool into an information field 1512, 1523-24, 1526, 1530 (see Fig. 15) and an associated "controller" - 220 and/or 219. (See Figs. 13; Col. 11: 57-58; Col. 13:68 - Col.14: 4; Col. 14: 50 - Col. 15:19)*]. |
| **CLAIM 2** | |
| The arrangement set forth in claim 1 wherein said group of predefined tools further includes a tool which displays transitory information, said transitory information being changed periodically. | The arrangement set forth in claim 1 wherein said group of predefined tools further includes a tool which displays **transitory information** [*information that is changed from time to time*], said **transitory information** being changed periodically. |
| **CLAIM 4** | |
| | |

4

02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 82**

| | |
|---|---|
| The arrangement set forth in claim 1 wherein said tool adapted to allow said user to compose said information includes at least a number pad, a keyboard, and a calculator. | The arrangement set forth in claim 1 wherein said tool adapted to allow said user to compose said information includes at least a number pad, a keyboard, and a calculator. |
| **CLAIM 6** | |
| The arrangement set forth in claim 1 wherein said display includes a touch-sensitive screen overlaying said display. | The arrangement set forth in claim 1 wherein said display includes a touch-sensitive screen overlaying said display. |
| **CLAIM 7** | |
| The arrangement set forth in claim 1 wherein at least one of said fields is a bit-mapped-graphics field adapter to allow said user to compose said information by writing on said bit-mapped-graphics field. | The arrangement set forth in claim 1 wherein at least one of said fields is a **bit-mapped-graphics field** [*a field into which a user is to enter information by writing on a touch-sensitive screen using a stylus*] adapter to allow said user to compose said information by writing on said bit-mapped-graphics field. |
| **CLAIM 10** | |
| An arrangement for use in a computer having a display comprising | An arrangement for use in a computer having a display comprising |
| means for displaying a plurality of information fields and for identifying for each field a kind of information to be inserted therein, | **means for displaying a plurality of information fields and for identifying for each field a kind of information to be inserted *therein*** [*This is a means plus function element. The function is: displaying on the display a pattern including a plurality of information fields and identifying for each field a kind of information to be inserted therein. The corresponding structure is: a microprocessor 211 programmed with the algorithm that displays a form 1501-1502, an associated controller - 220 and/or 219 - and a display - 21 and/or (16 and 18). (see Fig. 13, Col. 11:57-58; Fig. 15, Col. 13:24-31; Col. 11:62-64; Col. 12: 8-11)*], |

5

02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 83**

| | |
|---|---|
| means for storing a plurality of predefined tools associated with respective ones of said fields, each of said tools being adapted to supply information of the kind identified for its associated field, and | **means for storing a plurality of predefined tools associated with respective ones of said fields** [*This is a means plus function element. <u>The function is</u>: storing a plurality of predefined tools associated with respective ones of said fields. <u>The corresponding structure is</u>: a microprocessor 211, hard disk 214, memory management circuitry 212, and interrupt controller 218. (<u>See</u> Col. 11:57-61; Col.15:39-45)*], each of said tools being adapted to supply information of the kind identified for its associated field, and |
| means responsive to information being inserted in at least one of said fields for indicating another of said fields to be filled in and for concurrently displaying the respective one of said tools to be used by the user to supply the kind of information identified for said other field. | **means responsive to information inserted in at least one of said fields for indicating another of said fields to be filled in and for concurrently displaying the respective one of said tools to be used by the user to supply the kind of information identified for said other field**. *[This is a means plus function element. <u>The Function is</u>: in response to information being inserted in one of the fields, indicating another of the fields to be filled in and concurrently displaying the respective one of said tools to be used by the user to supply the information identified for the other field. <u>The corresponding structure is</u>: microprocessor 211 programmed with the algorithm that indicates the currently active information field and displays a tool 1528-29, 1504-1515, an associated controller - 220 and/or 219 - and a "display" - 21 and/or (16 and 18). (<u>See</u> Figs. 15 & 16; Col. 15:3-13; Col. 13:31-68; Col. 14:1-20)].* |
| **CLAIM 11** | |
| The arrangement set forth in claim 10 wherein said one tool is selected from a group of tools including (a) a menu tool which displays a plurality of predefined items in which said user selects one of said items to be inserted in the associated field | The arrangement set forth in claim 10 wherein said one tool is selected from a group of tools including (a) a menu tool which displays a plurality of predefined items in which said user selects one of said items to be inserted in the associated field |

6

02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 84**

| by pointing to that item, and (b) a tool adapted to allow said user to compose the information to be inserted in the associated field. | by pointing to that item, and (b) **a tool adapted to allow said user to compose the information** to be inserted in the associated field. |
|---|---|
| **CLAIM 12** | |
| The arrangement set forth in claim 11 wherein said group of tools further includes a tool which displays information which is changed periodically so that the information that is to be inserted in the associated field is current. | The arrangement set forth in claim 11 wherein said group of tools further includes a tool which displays information which is changed periodically so that the information that is to be inserted in the associated field is current. |
| **CLAIM 13** | |
| The arrangement set forth in claim 10 wherein said plurality of predefined tools includes at least a number pad, a keyboard, and a calculator. | The arrangement set forth in claim 10 wherein said plurality of predefined tools includes at least a number pad, a keyboard, and a calculator. |
| **CLAIM 15** | |
| The arrangement set forth in claim 10 wherein said display involves a touch-sensitive screen overlaying said display. | The arrangement set forth in claim 10 wherein said display involves a touch-sensitive screen overlaying said display. |
| **CLAIM 16** | |
| The arrangement set forth in claim 10 wherein at least one of said fields is a bit-mapped-graphics field adapted to allow said user to compose said information by writing in said bit-mapped-graphics field. | The arrangement set forth in claim 10 wherein at least one of said fields is a **bit-mapped-graphics field** adapted to allow said user to compose said information by writing in said bit-mapped-graphics field. |
| **CLAIM 19** | |
| A method for use in a computer having a display comprising the steps of | A method for use in a computer having a display comprising the steps of |

7

02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 85**

| | |
|---|---|
| displaying on said display a plurality of information fields, | displaying on said display a plurality of information fields, |
| identifying for each field a kind of information to be inserted therein, | identifying for each field a kind of information to be inserted therein, |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | indicating a particular one of said information fields into which information is to be inserted and for **concurrently displaying** a **predefined tool associated with said one of said fields**, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a **tool adapted to allow said user to compose said information**, and |
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | inserting in said one field information that is derived as a result of said user operating said displayed tool. |
| **CLAIM 21** | |
| The method set for claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | The method set for claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a **bit-mapped-graphics field**. |
| | |

8

02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 86**

1      **EXHIBIT B - GLOSSARY OF TERMS**

2

3      **Predefined tools associated with said one of said fields** - refers to a tool specified by the
4      system as an appropriate tool for filling in the information called for by that field.

5      **Concurrently displaying** - displaying at the same time, as by a window overlaying the
6      form.

7      **Transitory information** - Information that is changed from time to time

8      **Bit-mapped-graphics field** - refers to a field into which a user is to enter information by
9      writing on a touch sensitive screen using a stylus.

10     **A tool adapted to allow said user to compose said information** - means a graphical
       keyboard tool or a graphical number keypad tool, which allows the user to compose
11     information by pointing to the display keys of that tool.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    9                    02CV2060; 03CV0699; 03CV1108

**Exhibit 7  Page 87**

Exhibit 8

# United States Patent [19]

## Fleming et al.

[11]  **4,439,759**

[45]  **Mar. 27, 1984**

[54] **TERMINAL INDEPENDENT COLOR MEMORY FOR A DIGITAL IMAGE DISPLAY SYSTEM**

[75] Inventors: James R. Fleming, Indianapolis, Ind.; William A. Frezza, North Brunswick; Gerald S. Soloway, Holmdel, both of N.J.

[73] Assignee: Bell Telephone Laboratories, Incorporated, Murray Hill, N.J.

[21] Appl. No.: 265,195

[22] Filed: May 19, 1981

[51] Int. Cl.³ .......................... G09G 1/16
[52] U.S. Cl. ................ 340/703; 340/723; 340/750
[58] Field of Search ............... 340/703, 701, 717, 747, 340/750, 726, 709, 723

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 3,422,419 | 1/1969 | Mathews et al. | 340/736 |
| 4,091,374 | 5/1978 | Müller et al. | 340/717 |
| 4,233,601 | 11/1980 | Hankins et al. | 340/703 |
| 4,342,029 | 7/1982 | Hofmanis et al. | 340/703 |

Primary Examiner—Marshall M. Curtis
Attorney, Agent, or Firm—H. L. Newman

[57]  **ABSTRACT**

The present terminal independent color memory for a digital image display system provides for inter-system compatability, color display systems generally having varying modes of access to color memories, varying color memory capacities, and features such as blinking implemented in varying ways. The data processor (1) of the present system may access color memory (6a) of video controller (6) or color values stored in permanent memory (9) or random access memory (10), responsive to the same command language. The present data processor (1) is also capable of entering color data values comprising color hues and gray levels into color memory for use in a terminal independent manner. Multiple process chained blinking from a particular color to a particular color is also provided by the present processor, the several processes in time-delayed relationship to one another.

10 Claims, 14 Drawing Figures



Exhibit 8  Page 88

LUC 1114390



FIG. 1

Exhibit 8  Page 89

### FIG. 2



### FIG. 3



Exhibit 8  Page 90                    LUC 1114392

### FIG. 4



Exhibit 8  Page 91                    LUC 1114393

U.S. Patent    Mar. 27, 1984    Sheet 4 of 11    4,439,759

## FIG. 5



Exhibit 8  Page 92                    LUC 1114394



FIG. 7



FIG. 6

Exhibit 8  Page 93    LUC 1114395



FIG. 10

FIG. 8

Exhibit 8  Page 94

LUC 1114396

U.S. Patent    Mar. 27, 1984    Sheet 7 of 11    4,439,759

FIG. 9





Exhibit 8  Page 95    LUC 1114397

U.S. Patent    Mar. 27, 1984    Sheet 8 of 11    4,439,759

*FIG. 11*



TICK (CALLED EVERY 1/10TH SECOND)

SET PTR TO FIRST PROCESS BLOCK IN LIST — 1101

WHILE PTR IS NOT NULL — 1102

SUBTRACT 1 FROM COUNT IN PROCESS BLOCK POINTED TO BY PTR — 1103, 1104

1109 — IS COUNT ≤ 0 ? — 1105
NO — YES — 1106

1108 — IS STATUS ON OR OFF ? — 1107
ON — OFF

RESTORE COLOR FROM PROCESS BLOCK INTO COLOR MAP ENTRY INDEXED BY *FROM* COLOR IN PROCESS BLOCK — 1111

SAVE COLOR, IN COLOR MAP ENTRY FROM, IN *SAVE* COLOR OF PROCESS BLOCK — 1110

COPY COLOR IN COLOR MAP ENTRY *TO* TO COLOR MAP ENTRY *FROM* — 1113

SET COUNT TO OFF TIME — 1112

SET COUNT TO *ON* TIME — 1114

SET STATUS TO OFF — 1116

SET STATUS TO ON — 1115

SET PTR TO NEXT PROCESS BLOCK IN LIST — 1117

Exhibit 8  Page 96    LUC 1114398



FIG. 12

* FPIAL – FIRST PROCESS IN ACTIVE LIST

Exhibit 8  Page 97    LUC 1114399



FIG. 13

Exhibit 8  Page 98    LUC 1114400

Case 3:07-cv-02000-H-CAB    Document 76    Filed 11/30/2007    Page 110 of 118



*FIG. 14*

| | PROCESS 3 | | PROCESS 2 | | PROCESS 1 |
|---|---|---|---|---|---|
| 1401 LINK | | 1409 LINK | | 1417 LINK | |
| 1402 STATUS | ON | 1410 STATUS | ON | 1418 STATUS | ON |
| 1403 FROM COLOR | 3 | 1411 FROM COLOR | 7 | 1419 FROM COLOR | 7 |
| 1404 SAVE COLOR | RED | 1412 SAVE COLOR | BLUE | 1420 SAVE COLOR | WHITE |
| 1405 TO COLOR | 7 | 1413 TO COLOR | 1 | 1421 TO COLOR | 3 |
| 1406 ON TIME | 4 | 1414 ON TIME | 4 | 1422 ON TIME | 2 |
| 1407 OFF TIME | 5 | 1415 OFF TIME | 2 | 1423 OFF TIME | 2 |
| 1408 CURRENT COUNT | 3 | 1416 CURRENT COUNT | 2 | 1424 CURRENT COUNT | 1 |

1400 HEAD OF ACTIVE LIST

Exhibit 8  Page 99

LUC 1114401

4,439,759

1

## TERMINAL INDEPENDENT COLOR MEMORY FOR A DIGITAL IMAGE DISPLAY SYSTEM

### BACKGROUND OF THE INVETNION

#### 1. Technical Field

This invention relates to digital image display systems and, more particularly, to a terminal independent color memory for such systems.

#### 2. Description of the Prior Art

Methods and apparatus for providing color digital images on video display screens are well known. A problem, however, has arisen in that compatability among digital display systems has been made difficult by the great variety of methods and apparatus for providing the color images. For example, the Picture Description Instructions PDI for the Telidon Videotex System, CRC Technical Note No. 696-E, developed by the Canadian Department of Communications describes a specific color value selection method: a direct selection of data values for the primary colors—red, green and blue. The Prestel videotex customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and a background color by indexing a permanent read-only color memory.

In the art of color computer graphics, the terminal manufacturers generally employ a color look-up table called a color map indexed by a binary number. The application of a color map expands the repertory of available colors for display. In particular, the Tektronix 4027 terminal is capable of providing 8 colors for direct use from the 64 possible color values that may be loaded into its color map. Other features such as blinking may be provided by such terminals; however, the various methods and apparatus for providing such features are similarly incompatible.

With the advent of videotex, also known as viewdata, and teletext services wherein a customer is able to access a remote host computer and associated data base with a digital image display terminal, there has arisen a need to solve the above-described problems from employing incompatible terminals. There remains a requirement for a terminal-independent color memory for a digital image display system.

### SUMMARY OF THE INVENTION

The above-stated problems and related problems of incompatability among digital image display systems are solved by the principles of the present terminal independent color memory. Processing means are provided for accessing color data in a terminal independent manner, regardless of the size of color memory or its permanent or semi-permanent nature. In accordance with the present invention, the known modes of color access are incorporated into the present algorithm for selecting a particular mode of color memory access, for setting a particular color in a color map memory table or for setting foreground or background in-use drawing color. These in-use drawing colors may be applied by subsequently received text and graphics drawing commands. In a system having a permanent color memory, the algorithm selects the closest color to the desired color hue from the permanent color selection table.

An algorithm for loading the present color map memory selects a gray scale equally spaced between black and white and hue data values equally spaced about a

2

hue circle wherein the primary colors are located in 120 degree relationship. In this manner, a host computer is able upon initialization of the present terminal independent color memory to predict the configuration of a particular color map memory table and the color composition of a digital image or frame of information for display.

An algorithm for providing color blinking by means of a linked list of multiple processes is provided. The on and off intervals of blink-from colors and blink-to colors may be specified. In addition, the delay between processes is selectable. Simple animation is possible with the present technique. For example, a ball may appear to bounce across an image, a river may appear to flow or stars may appear to twinkle.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a general block diagram of a digital image display system which may employ the principles of the present invention, the system being exemplary of arrangements for color processing;

FIG. 2 is an operational diagram of the process for selecting a color data value from a color map memory table for display of particular picture element data;

FIGS. 3, 4, and 5 are flow diagrams of a method for accessing color data values for display regardless of the mode of access employed by a particular digital image display system in accordance with the present invention;

FIG. 6 is a representation of a color hue circle wherein the primary colors—red, green and blue—are located at 120 degrees, 240 degrees and 360 degrees respectively;

FIG. 7 is an exemplary table of color data values selected in accordance with a method for initializing a color map memory table in a terminal independent manner in accordance with the present invention;

FIGS. 8 through 14 generally depict the present method for poviding multiple processes of color blinking in accordance with the present invention;

FIG. 8 is a depiction of the contents of a memory block associated with a particular blink process;

FIG. 9 comprises blink process tables indicating the logical connection of linked lists of active and free process blocks as depicted in FIG. 8;

FIG. 10 is an actual depiction of an active blink process table comprising a plurality of process blocks as depicted in FIG. 8;

FIG. 11 is a flowchart diagram of an algorithm for providing multiple process color blinking;

FIG. 12 is a flowchart diagram of an algorithm for adding a new process to the active blink process table of FIG. 10;

FIG. 13 is an exemplary timing diagram and color tables for a color blink comprising three processes; and

FIG. 14 is an exemplary blink process table similar to that depicted in FIG. 9 whose process memory block entry values are shown relative to a particular point in the timing diagram of FIG. 13.

### DETAILED DESCRIPTION

Referring more particularly to FIG. 1, there is shown a general block diagram of a digital image display system employing the principles of the present invention. The digital image display system comprises a data processor 1 having bidirectional access to a processor data bus 2. A separate timing generator 3 may provide the

**Exhibit 8  Page 100**

LUC 1114402

4,439,759

3

clock signals required on the processor data bus 2; however, in some systems, the timing generator capability is provided by data processor 1. The timing generator 3 may also provide the timing signals on a video data bus 8 for use by video memory 4, and by a video controller 6. The video controller 6 operates video display 7 responsive to the picture element data received over the video data bus 8. The picture element comprises a binary index for selecting color data values from color map memory 6a. Complete digital images or frames 5 of picture element information are sequentially displayed in color by video display 7.

Data processor 1 may be a microprocessor comprising program or read-only memory 9 and scratch pad or random access memory 10. In a viewdata or teletext terminal which may be located in a residential home, it is desirable that data processor 1 be as small as possible; accordingly, a microprocessor may be assumed.

Data processor 1 responds to user input from a keyboard 18, keypad 19, joystick 20, floppy disc 21, light pen or other data input device known in the art through peripheral device interface 17. In accordance with known technology, data processor 1 may program the video memory 4, the timing generator 3 and the video controller 6 to the proper modes of operation which will allow maximum flexibility in remotely reconfiguring the terminal operating characteristics.

In its application with a viewdata or teletext terminal, the data processor 1 may also respond to input provided from a remote or centralized data base such as one located at a television broadcast station or a provider of viewdata services. Such inputs are provided through communications interface 12. In the case of teletext services, a TV broadcast signal 16 is received at receiver 14 and provided to interface 12. In the case of viewdata services, data is provided over a communications line 15 through a data modulator/demodulator 13 to interface 12. Input/output controller 11 under user control provides selectable access to the various data input and output arrangements.

Processor data bus 2 is a bi-directional conduit through which the data processor 1 controls the video memory 4, the timing generator 3 and the video controller 6. Several bus structures may be adapted for use in the present invention. One example is the INTEL Corp. Multibus. Whichever specific bus structure is chosen, the bus generally comprises address capability, a data path and control lines which may include interrupt, reset, clock (for synchronous use), wait (for asynchronous use), and bus request lines.

The timing generator 3 may comprise a chain of programmable logic circuits, digital dividers and counters for providing required timing signal outputs. For operation of the video data bus 8, a number of different timing signals are required. Horizontal and vertical drive signals are provided in accordance with horizontal and field rates respectively. A dot clock signal is provided at the dot frequency (picture element or pel rate) of the system. An odd/even field signal indicates if the odd or even field is to be displayed in an interlaced system. A composite blanking signal indicates if video is being displayed or if vertical or horizontal retrace is occurring. Also, a group clock signal or other signals may be provided. The group clock signal indicates when to access data for a new group of picture element data from memory. For example, picture element data in video memory having a slow access time may be serially provided in groups of 4, 8 or 16 picture elements.

4

On the other hand, a parallel data transmission scheme is possible, potentially increasing the requirements for leads of video data bus 8.

Video controller 6 accepts digital image information from the video data bus 8, pel-by-pel, and converts the digital information, if necessary, to analog form for presentation on video display 7. The video controller comprises three components: (1) color map memory 6a; (2) digital to analog conversion and sample and hold circuits (not shown), if required by video display 7; and (3) a standard composite video encoder (not shown), for example, for providing NTSC standard video or red, green, blue (RGB) outputs.

Color map memory 6a comprises a color map memory table in random access memory indexed by a binary number component of pel data entering the video controller 6 by way of video data bus 8. For example, if four bits of color data are compiled per picture element, 16 color choices are directly accessible from color map memory table 6a. Each color data value indexed may comprise, for example, 12 bits of RGB data, the domain of possible data values in this case being 4096 possible values. The color map memory 6a may be loaded and updated from the large repertory of possible choices by the data processor 1 under local or remote control.

The application of color map memory 6a provides flexibility and greater color capacity than other color memory means. However, other color memory means are known in the art. Permanent memory 9 of data processor 1 may contain a directly accessible color table. Selections of color data values from permanent memory 9 are transferred to color map memory 6a for subsequent use. Also, random access or semi-permanent memory 10 of data processor 1 may contain a color memory, color data similarly being transferrable to color map memory 6a. Various modes of access to color memory, wherever located, in a digital image display system, are employed by the providers of viewdata and teletext services. Means for providing terminal independent color memory will be subsequently discussed in connection with FIGS. 3-14.

The color memory RGB output may be provided to three separate digital to analog converters, one for each primary color. In accordance with techniques generally known in the art, the RGB output may enter a monitor video display 7 directly, may be converted to a composite video signal for input to a monitor video display 7 or modulated to a particular RF frequency for input through the antenna lead-in of a television set display 7.

Video display 7, as previously discussed, may either be a monitor or a television set. In deference to the previous discussion, it may additionally comprise other forms of video display known in the art including a video projection system, a liquid crystal display or an LED display. The list is not intended to be inclusive and, if another standard format of input video signal is required, the principles of the present invention assume the capability of video controller 6 for providing such a standard video signal.

The video memory 4 comprises random access memory for storage of video picture element information for display. In particular, video memory 4 generally accepts input from the data processor 1 in the form of an image comprising digitized picture element information. The video memory 4 stores the information until rearrangement of data occurs and periodically passes the pel information over video data bus 8 to the video controller 6 on command of data processor 1. As previ-

Exhibit 8  Page 101

LUC 1114403

4,439,759

5        6

ously indicated, the pel data comprises binary data employed to index a particular color entry in color map memory 6a.

The video data bus 8 connects the timing generator 3 and the video memory 4 to the video controller 6. It comprises the following types of leads: data leads for picture element information which is used for indexing into the color map memory 6a of video controller 6, and timing leads for providing video timing and control. The six timing and control leads include the previously mentioned horizontal and vertical drive signals, the dot clock, the field signal, the composite blanking signal and the group clock signal.

Referring more particularly to FIG. 2, an operational diagram is shown which depicts how a binary number component of picture element data stored in a planar bit memory 4 indexes color map memory 6a so that primary color data values for a video signal are provided for video display. Similar reference characters have been employed in FIGS. 2 through 14 wherever possible and in the subsequent discussions wherever possible. In addition, the first numeral of reference characters employed in FIGS. 2 through 14 relates to the location where the referenced element first appears.

In the depicted example a color map memory table of 16 colors is shown. The capacity or domain of the color map memory table may comprise, for example, four bits each of red, green and blue data. The total twelve bit capacity then relates to 4096 possible colors. Accordingly, each of the 16 tabular values indexed may comprise 12 bits of RGB data.

In the depicted example, picture element data 201 comprises, in addition to coordinate data of the location in a particular image or frame 5 for display, the binary index value representing the color that picture element 201 is to be. Binary index value 1011 representing the twelfth entry in the color map memory table may, for example, represent color data value 0011 1111 0000; 0011 being red data; 1111 being green data, and 0000 being blue data. The RGB data value, as previously discussed, illuminates the particular coordinate location in the particular in-use color in frame 5 of display 7.

Upon command of a host computer remotely provided by a teletext or videotex service provider, the color map memory table of 16 colors may be specifically loaded in combination with video processor 1 and the subsequently described software algorithms locally stored in program memory 9. Under control of local keyboard input, the data processor 1 may also specifically load the color map memory table. In accordance with the present invention, either the host computer or the local user may directly load colors into color map memory 6a from permanent memory 9 or from a semi-permanent memory 10 with color data values for use.

Referring to FIGS. 3, 4, and 5, flow diagrams are depicted of a method or algorithm for accessing color memory 6a in a terminal independent manner and for setting the foreground and background in-use color if possible. FIG. 3 particularly represents a command decoding process. If a first particular command is found, then the flow diagram of FIG. 4 is performed within data processor 1. If a second particular command is found, then the flow diagram of FIG. 5 is preformed. Other commands or operation codes (opcodes) are interpreted by the command decoder algorithm depicted in FIG. 3. These other commands may include commands to perform the subsequently described blinking

process or other text or graphic drawing processes. The commands will be hereinafter referred to as opcodes.

Referring particularly to FIG. 3, the data processor is instructed to box 301 of the opcode decoder algorithm to attempt to locate the next opcode. The opcode may be remotely received from a host computer or locally received through the peripheral device interface 17. At decision box 302, the data processor 1 determines if the opcode entered is one for selecting a mode of color memory access. At box 303, transfer is effected to the algorithm for the mode selection process shown in FIG. 4 if there is a match. If there is not a match, the data processor determines at decision box 304 whether the opcode entered is one for setting a color data value. At box 305, transfer is effected to the algorithm for the color setting process shown in FIG. 5 if there is a match. In a similar manner, the entered opcode may be compared with other valid opcodes 306 and the entire opcode decoding process repeated.

Referring to FIG. 4, an algorithm for selecting a mode from a plurality of modes of color memory access and for setting foreground and background in-use colors for two of these modes is shown in flowchart form. Having transferred control to box 401 of the algorithm of FIG. 4 in the operation of the flowchart of FIG. 3, the data processor 1 now interprets the operands or data following the opcode. In general, it is presumed that an opcode will always be followed by a sequence of operands or data entrys or a new opcode. Accordingly, in the process depicted in FIG. 4, the data operands are interpreted and, as a result, the mode of access and the background and foreground color set if possible.

In particular at box 402, the first data operand is recovered if possible. If a box 403 an operand is located, another attempt is made at box 404 to locate a second operand. If at box 407 a second operand is found, the color mode of access is set at box 411 to mode 2. In other words, the color mode is determined by the number of operands following the opcode for selecting the mode of access. Accordingly, when no operands are found, the color mode is set at box 405 to mode 0. If one operand is found, the color mode is set at box 408 to mode 1.

In color mode 0, besides setting the color mode, it may be necessary in systems employing random access color memory 10 to reinitialize color memory 6a to a default set of color data values. Accordingly block 406 suggests this activity if it may be performed. Color mode 0 of the present terminal independent color memory is adapted for use in digital image display systems employing a direct color selection process either from permanent or semi-permanent color memory.

After setting the color modes to 1 or 2 at blocks 408 or 411 respectively, the foreground and background in-use drawing colors are set. If foreground and background colors may be set in color mode 0, the subsequently described algorithm of FIG. 5 performs this feature. In color mode 1, only picture element data of the actual character in video memory 4 is drawn in the current in-use foreground color without illuminating adjoining picture element data in a background color. In color mode 2, text characters will be drawn in the in-use foreground color over the in-use background color. In other words, a character may fill a rectangular field on display 7. The actual character is illuminated in foreground color as in color mode 1, and the rectangular field surrounding the actual character is filled with the current in-use background color.

Exhibit 8  Page 102

LUC 1114404

4,439,759

7

Therefore, in color mode 1, the foreground color is set at box 409 to the value of the first operand. At box 410, the background color is set to a data value representing "invisible" or no color. In color mode 2 the data processor compares the first and second operands entered. If the two operands are equal, then it is assumed that it is desired to only change the background in-use color and not the foreground color. Otherwise, the foreground color is set at box 414 and the background color is set at box 413 to the first and second operands respectively. Control is returned at box 415 to the op-code decoder program upon the completion of the color access algorithm.

Referring to FIG. 5, an algorithm in flowchart form is depicted (1) in color modes 1 or 2, for setting the color data values in color map memory 6a in a terminal independent manner or (2) in color mode 0, for setting foreground and background colors. At decision box 502, the data processor determines if color mode 0 has been previously entered. It is assumed that, before the opcode for setting a color data value is entered, the select color access mode opcode has been read and acted upon in accordance with the flowcharts of FIGS. 3 and 4.

If the color access mode at decision box 502 is 0, then the first operand is located if possible at box 503. If the operand is located at decision box 505 then a second operand is located if possible at box 507.

If a second operand was not successfully located at decision box 509, then the foreground color and the background color will be modified at boxes 512 and 514 respectively. At box 512, the foreground color is set to the index of the closest match of the first operand and a color value from the color map memory table 6a. At box 514, the background color is set to an "invisible" color. "Invisible" is intended to describe the process of depositing pel values in video memory 4 only at the character or graphics drawing command locations corresponding to the foreground of the resulting image and not over-writing those corresponding to the background.

If a second operand has been successfully located at decision box 509 then a check is made at decision box 511 to see if both operands are equal. If the first operand and second operand are equal, then by convention only the background color is set at box 515. If the two operands are not equal at decision box 511 then the foreground color is set at box 513 and the background color is subsequently set at box 515. As in the case of a single operand, the foreground color and the background color are set to the index of the closest matched color in the color map memory table 6a.

If the color mode was not 0 at decision box 502 then the color map memory table 6a will be loaded with colors specified by subsequent operands. The current in use foreground color index will indicate the first potential color map memory table entry to be changed. INDEX is set to the current in-use foreground color index at box 501. An attempt is made to get an RGB operand at box 504 if possible. If the operand is found at decision box 506, then the RGB operand is loaded into the color map memory table 6a at the location determined by INDEX. The INDEX is then incremented at box 510. The sequence of boxes 504, 506, 508, and 510 is repeated as long as operands are available.

Referring to FIG. 6, a color hue circle is shown wherein the primary colors—red, green, and blue—are located at 120 degrees, 240 degrees, and 360 degrees.

8

Upon the operation of the box 406 of FIG. 4 and on other occasions in the operation of a digital image display system, for example, an explicit resetting operation, it is appropriate to initialize or establish color map memory table 6a regardless of the number of possible entries and in a predictable fashion. Accordingly, a method is provided whereby one half of the color map memory is filled with a gray scale whose values are equally spaced between black and white and the other half of color map memory 6a is filled with a color hue scale whose values are spaced about a hue circle of 360 degrees.

In particular, if the number of bits of a binary number index into a particular color map 6a is defined as N, then the number of entries in the color map is $2^N$. Then the quantity $2^N/2$ of entires comprise gray scale values and the quantity $2^N/2$ of entires comprise color hue values.

The capacity or domain of the color map memory table 6a may be defined as comprising M bits of data. Then, the quantity M/3 bits of data may represent data for each primary color—red, green, and blue. In general, the relationship between M and N may be maintained that M be greater than or equal to three times the quantity N-1.

By way of example, if a particular color map memory is indexed by a 4 bit binary index value, then 8 gray scale levels and 8 hues are loaded upon request into color map memory table 6a. The quantity M then should be greater than or equal to 9:3 bits each of red, green, and blue data.

The gray scale is found particularly as a binary number in this example between 000 000 000 and 111 111 111 and generally is represented by the binary result of the equation: $P_1 = k/(I-1)$ where I represents the decimal number of gray scale levels, generally $2^N/2$, k, a quantity between 0 . . . I-1, is the particular entry in the map desired, and $P_1$ is the binary result for a primary color—red, green, and blue. It is most convenient if, in the operation of data processor 1, the result is normalized and rounded to the nearest M/3 bits. The value for all the primary colors is set equal to this last.

Referring briefly to FIG. 7, an exemplary color map memory table is shown. In accordance with the above method, the first eight values are shown initialized to gray scale levels in a gray scale 706 between 000 000 000 at address 704 with the binary index value 0000 and value 111 111 111 at address 704 with the binary index value 0111.

To provide the color hue values, data processor 1 must first calculate the angle of a desired color hue h. If n entries are required then the result of the calculation (j−1) times 360 degrees divided by n (wherein j is an integer between 1 and n) provides the angle of h. In FIG. 6, if eight hue data values are desired then by way of example, color data values are desired for 45 degrees, at location 611, 90 degrees at location 612, 135 degrees at location 613, and so on about the color hue circle.

In general, the data processor must particularly locate the location of the closest primary color angle to the desired angle, the next closest primary color and the furthest primary color from the desired angle. In particular, for the example of color value 611 at 45 degrees, then the primary color blue is the closest primary color at location 601 or 360 degrees. This result may be appropriately established in temporary memory as variable $P_1$. The next closest primary color to the exemplary desired color hue is red at location 603 or 120 degrees. This result may be appropriately established in

Exhibit 8  Page 103

LUC 1114405

4,439,759

9

temporary memory as variable P₂. The furthest primary color from the exemplary desired color hue is green at location 605 or 240 degrees. This result may be established in temporary memory as variable P₃.

The results P₁, P₂, and P₃ of this calculation are then employed generally to establish the color data values for the primary colors—red, green and blue. As it is known that P₁ is blue in the particular example under discussion, the blue data value in binary form is set in color map memory as all 1 bits. As it is known that P₃ is green, the green data value is set in color map memory as all 0 bits.

In the case of P₂, data processor 1 is instructed to calculate the binary result of the equation:

$$P_2 = \left| \frac{\tau h - \tau P_1}{60°} \right|$$

As it is known that P₂ is red, the red data value is set in color map memory to the binary result of the above calculation. As with the gray level calculation, it is generally appropriate that the result be rounded to the nearest M/3 data bits in length after normalizing the result.

Referring again to FIG. 7, the color hue data values are entered in address locations 1000 through 1111 in the depicted exemplary color map memory table. In particular, the above exemplary calculation for a hue at 45 degrees on the hue circle of FIG. 6 is located at address 1001. As previously indicated, the blue data value is all 1 bits or 111; the green value is all 0 bits or 000, and the red value is given by the binary result 101.

Referring to FIG. 8, there is shown a depiction of a memory block associated with a particular process identifying its parameters. Each time a blink process is initiated, a blink process block must be established in memory which stores the relevant parameters associated with that particular blink process. The first entry 801 in the block stores the LINK value, which is a pointer to the starting address of another blink process block. If the process is actively blinking, then the LINK value will point to the next active process block. If the process is INACTIVE, then the LINK value will point to the next FREE process block.

The second entry 802 in the block stores the current STATUS of the blink process. The status can be either INACTIVE, ON, or OFF (the latter two of which are considered active states).

The third entry 803 is used to store the BLINK-FROM COLOR, which is a binary number index that acts as an index into the color map memory table. This index number is extracted from the operand following the opcode representing the color blinking process and does not change throughout the life of the process.

The fourth entry 804 is used to store the SAVE COLOR, which is an RGB value and not a binary index that is periodically copied out of the color map memory table in a manner that will be described subsequently.

The fifth entry 805 is used to store the BLINK-TO COLOR which is a binary number that acts as an index into the color map memory table. This number is also extracted from the operand following the blink process opcode and does not change throughout the life of the process.

The sixth entry 806 stores the ON TIME and the seventh entry 807 stores the OFF TIME, both of which are most conveniently numbers between 1 and 64 that represent time intervals in fractions of a second. These

10

are also extracted from the operand following the blink process opcode and do not change throughout the life of the process.

The eighth entry 808 stores the CURRENT COUNT which is also a number that represents a time interval. This number is updated regularly as the process is executed.

FIG. 9 gives a logical view of how the linked blink process blocks are treated. There are two linked lists kept in memory. The first contains all of the active process blocks and the second contains all of the INACTIVE or free process blocks. The memory occupied by the INACTIVE process blocks is available for use by new blink processes, and hence this list is called the FREE list. The head 901 of the ACTIVE list is a single pointer that contains the address in memory of the beginning of the process block of the most recently received active blink process 902. The LINK entry in this block in turn points to the beginning of the next most recently received active blink process 903, and so on to the beginning of block 904, block 905 through the entire list of process blocks that contain active blink processes. The displaced appearance of the blink process blocks is intended to represent their random appearance in memory. The last process block on the list contains a LINK value NULL indicating the end of the list. The head of the FREE list 910 is a single pointer that contains the address in memory of the beginning of the process block of the first inactive blink process 911. The LINK entry in this block points to the beginning of the next inactive process block 912 and so on to the beginning of block 913, block 914 through the remainder of the inactive process blocks. When the system is initialized, as well as any time that there are no currently active blink processes, all of the available blocks of memory allocated to the blink feature are on the FREE list.

When a new blink process is initiated, more particularly described in the discussion of FIG. 12, the first block in FREE list 911 is made available for its use. When this happens, the head of the FREE list pointer 910 is changed to the address of the beginning of the next free block 912. Also, the head of the ACTIVE list pointer 901 is changed to the address of the beginning of the block 911 just allocated, and the LINK pointer within block 911 is changed to the address of the beginning of what was the most recently received active blink process block 902. The new active process block 911 is then loaded with the relevant parameters of the blink process being defined.

FIG. 10 shows the actual organization within memory of blink process blocks. The first entry 1001 and the second entry 1002 store the head of the ACTIVE list pointer and the head of the FREE list pointer, respectively. Process blocks are stored in sequential memory locations 1003 through 1010 or until the capacity allocated within memory 10 is reached. These locations do not necessarily correspond to the order in which the blocks appear on the linked lists.

FIG. 11 shows a flow diagram for TICK, the primary blink processing subroutine. TICK is periodically called from a main control program, typically every 1/10th second. This subroutine goes through, examines, and updates each process block (and the color map memory table if necessary) in the ACTIVE list starting with the most recently received blink process block and proceeding to the last.

Exhibit 8  Page 104                                    LUC 1114406

11
4,439,759
12

Activity block 1101 with which the TICK subroutine begins sets the value of an internal status variable PTR to the address stored in the head of the ACTIVE list. (This, as described previously, points to the most recently received active process block.) Activity block 1102 initiates a loop, whose steps comprise blocks 1103 through 1117, that is exited only when it returns a PTR value of NULL. The first step in the loop, activity block 1103, subtracts one from the COUNT of the process block pointed to by PTR. Decision block 1104 then checks the value of COUNT to see if it is equal to or less than zero. If it is not, then control action proceeds through block 1109 (by passing blocks 1106 through 1116) to activity block 1117, which changes PTR to the address stored in the LINK entry of the process block pointed to by PTR or, in other words, the current process block. Control then loops back to activity block 1103 as long as PTR does not have the value NULL. If the COUNT is less than or equal to zero, then control proceeds through block 1105 to decision block 1106. Decision block 1106 checks the value of STATUS in the current process block. If STATUS is on, then control proceeds through block 1108 to activity block 1111. If STATUS off, then control proceeds through block 1107 to activity block 1110.

Activity block 1111 takes the RGB value stored in SAVE COLOR of the current process block and writes it into the color map memory table entry indicated by the index stored in the FROM COLOR entry in that process block. Control then passes to activity block 1112, which sets the COUNT entry of the current process block to the contents of the OFF TIME entry of that block.

Activity block 1116 then sets the STATUS of that process block to OFF before control passes to activity block 1117, whose action has been described previously.

Activity block 1110 copies the RGB value from the color map entry indicated by the index stored in the FROM COLOR entry of the current process block into the SAVE COLOR entry of that process block. Activity block 1113 then copies the RGB value from the color map entry indicated by the index stored in the TO COLOR entry of the current process block into the color map entry indicated by the index stored in the FROM COLOR entry of that process block. Activity block 1114 then sets the COUNT entry to the value stored in the ON entry. Finally activity block 1115 sets the STATUS entry to ON before control is passed to Activity block 1117, whose action has been described previously.

When the loop is finally exited, that is, when PTR returns the value NULL, the subroutine TICK is complete and control returns to the main control program.

In the previous discussion, the assumption was made that an active process list already had been established.

FIG. 12 is a flow diagram illustrating how one active blink process is added to the active list. Since only one active process is allowed for the ordered pair of FROM COLOR (FC) and TO COLOR (TC), the current list of active process blocks must be searched to determine if a process is active for a given pair. This search is indicated in box 1201. If the ordered pair (FC, TC), is found in the currently active process blocks then that block is made INACTIVE and is removed from the linked list as indicated in box 1206. When box 1205 is encountered an attempt is made to obtain a free process block from the previously described FREE list. At decision box

1207 a check is made to see if a free block was successfully obtained. If no block was obtained then the entire set of possible blocks must have been already allocated to ACTIVE processes and therefore no addition can be made, so the entire process addition procedure is exited.

If a free process block is obtained then it must be initialized as illustrated in box 1210. The new process always begins with a STATUS of OFF which guarantees that the first transition will be OFF-to-ON as previously stated.

The FROM COLOR, TO COLOR and ON and OFF TIME'S are also initialized in box 1210 from data obtained from the operand entered following the blink process opcode.

The phase delay (PD) is an offset from the next OFF-to-ON transition of the most recently received active process (that is, the process of the head of the ACTIVE process list). The head of the ACTIVE list is checked at decision box 1211 in case the list is empty. If the list is empty, then the phase delay does not apply and the CURRENT COUNT in the new process block is set to the OFF TIME as indicated in box 1219.

If an active process exists then two situations arise, either the process is currently ON or OFF. The STATUS of the proces is checked in decision block 1214. If the process is ON then the next OFF-to-ON transition will occure when the CURRENT COUNT reaches the interval of time represented by OFF TIME expires. Therefore, the total time to the next OFF-to-ON transition will be the CURRENT COUNT plus the OFF TIME. In order to synchronize the new process to the most recently received active process, its CURRENT COUNT is set to the time until the next OFF-to-ON transition plus any phase delay as shown in box 1210.

If the last active process has a STATUS of OFF, then the next OFF-to-ON transition will occur at a total time equal to CURRENT COUNT. The new process is therefore synchronized to that transition simply by setting the new process CURRENT COUNT to the CURRENT COUNT of the most recently received process plus any indicated phase delay.

In all cases once the complete process block is initialized, it is added to the active process list as shown in BOX 1220. The ADD NEW PROCESS returns control to the main control program.

Referring to FIG. 13, exemplary color tables and a timing diagram are illustrated for three active blink processes. Successive representations of an eight entry color table are illustrated in table 1301. Time is indicated by time line 1312. A legend 1311 indicates the assumed color values of color table 1301. The information that was used to establish the three blink processes is as shown in Table I.

TABLE I

| PROCESS 1 | |
|---|---|
| Arrival Time | T = 0 |
| FROM COLOR | 6 |
| TO COLOR | 3 |
| ON TIME | 2 |
| OFF TIME | 2 |
| PHASE DELAY | 3 |
| PROCESS 2 | |
| Arrival Time | T = 5 |
| FROM COLOR | 7 |
| TO COLOR | 1 |
| ON TIME | 4 |
| OFF TIME | 2 |
| PHASE DELAY | 1 |
| PROCESS 3 | |

Exhibit 8  Page 105

LUC 1114407

4,439,759

**13**

TABLE 1-continued

| | |
|---|---|
| Arrival Time | T = 10 |
| FROM COLOR | 3 |
| TO COLOR | 7 |
| ON TIME | 4 |
| OFF TIME | 5 |
| PHASE DELAY | 1 |

The color table 1301 at time T=0 contains the color value white in entry 1, the color value red in entry 3, the color value green in entry 6 and the color value blue in entry 7. The other entries may contain color values but are not important in this example.

Process 1 arrives at time T=0 and assuming no active processes already exist, process 1 is activated with a STATUS of OFF (1304). The phase delay that was specified for process 1 is not relevant because no active blink processes existed when the information for process 1 arrived at time T=0.

When process 1 is activated the CURRENT COUNT is set to the OFF TIME which is equal to 2 and therefore an OFF-to-ON transition will occur at time T=2 (1313).

When the OFF-to-ON transition occurs, the color value in the color table indexed by the FROM COLOR, 25 which is equal to 7, is saved in the process block in the SAVE COLOR entry 1302. The color value saved is blue shown by the entry 1315. After the FROM COLOR is saved, the contents of the color table indexed by the TO COLOR is copied to the color table entry indexed by the FROM COLOR. This results in the color value red in entry 3 at 1316 to be copied to entry 7 at 1317.

As a result of this change, any picture elements which were previously displayed using the color value stored in color map entry 7 will immediately change from blue to red. The STATUS of process 1 will be set to ON and the CURRENT COUNT will be set to the ON TIME which is equal to 2. An ON-to-OFF transition will occur at time T=4 referenced by character 1314. At that transition the previously saved color 1315 is restored in the color table at the entry indexed by the FROM COLOR, which is equal to 7, and referenced by character 1318. The STATUS is again set to OFF and the CURRENT COUNT is set to the OFF TIME which is equal to 2. The above sequence is repeated as long as the process is active.

Process 2 arrives at time T=5 which is after process 1 has been activated. Process 2 is started with a STATUS of OFF and must be synchronized with the next OFF-to-ON transition of process 1. Since at time T=5 the STATUS of process 1 is OFF then the time to the next OFF-to-ON transition will be equal to 1, which is the CURRENT COUNT of process 1. A phase delay of 1 was specified with process 2 so the OFF TIME of process 2 is set to the sum of the CURRENT COUNT of process 1 plus the phase delay of process 2, which equals 2. This setting results in the first OFF-to-ON transition occurring at time T=7 referenced by character 1319. Process 2 then begins the color save, copy and restore sequence previously described for process 1.

Process 3 arrives at time T=14 and must be synchronized to process 2. The next OFF-to-ON transition of process 2 occurs at time T=13 and, because of the phase delay of 1, the first OFF-to-ON transition for process 3 will occur at time T=14, referenced by character 1321. As with process 1 and 2, the save, copy and restore sequence will continue for process 3 until

**14**

changed by either another specification for the same ordered pair of FROM COLOR and TO COLOR or a general resetting procedure.

It should be noted that when colors are copied from one entry in the color table to another that an interaction between processes can result. This is illustrated at time T=13 and T=14. At time T=13, process 2 makes an OFF-to-ON transition referenced by character 1320. The color white is copied to color table entry 7 as referenced by 1324. At time T=14, process 1 makes an OFF-to-ON transition as referenced by 1322. At that transition, the SAVE COLOR, referenced by 1325, is white because of the previous copy operation performed by process 2 at time T=13. This interaction of colors between processes is useful for simple animation and complex blinking sequences.

FIG. 14 illustrates the state of the three process blocks at time T=15.

What is claimed is:

1. In a digital image display system:
   a memory for storing color data values;
   processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising
   a first mode of access wherein an in-use foreground color is directly specified as a color data value;
   a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and
   a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and
   display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode.

2. A digital image display system comprising:
   a color memory for storing color data values;
   processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and
   display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode.

3. A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory.

4. In a video image display system having a color memory, a method for displaying a color image in a terminal independent manner responsive to commands and data received from a command and data source, the method comprising the steps of:
   receiving commands and data from the command and data source;
   reading a first command for selecting a mode of access to the color memory, and responsive to data following the first command, selecting the mode of access to the color memory;
   reading a second command for setting color data values in the color memory and, responsive to data

Exhibit 8  Page 106

LUC 1114408

4,439,759

15

following the second command, setting the color data values in the color memory,

reading a third command for accessing color data values in the color memory, and

displaying a color image associated with the color data values accessed by the third command on a video display terminal.

5. A digital image display system comprising:

a color map memory for storing color data values;

processing means for storing color data values in the color map memory and accessing color data values stored in the color map memory, the color data values comprising $2^N/2$ gray level data values equally spaced between black and white, where N is the number of bits in a color entry address of the color map memory and the processing means storing the gray level data values in one half of the color map memory, the color data values further comprising $2^N/2$ hue data values equally spaced about a 360 degree hue circle wherein primary colors red, green, and blue are located in 120 degree relationship to one another and the processing means storing the hue data values in another half of the color map memory, the processing means upon command accessing color data values stored in the color map memory; and

display means responsive to the processing means for displaying an image associated with accessed color data values.

6. A digital image display system comprising:

a color map memory for storing color data values;

processing means for storing hue color data values in the color map memory and accessing color data values stored in the color map memory, the hues being equally spaced about a 360 degree hue circle wherein primary colors red, green, and blue are located in 120 degree relationship to one another, and where h is a desired hue color data value, n is a desired number of hue color data values, angle of h is determined by $(j-1) \times 360$ degrees divided by n, where j is an integer between 1 and n, $P_1$ is the closest primary color to the angle of h, $P_2$ is the next closest primary color to the angle of h, and $P_3$ is the furthest primary color from the angle of h, the identity of $P_1$, $P_2$, and $P_3$ being assigned among the primary colors, the processing means setting the binary value of $P_1$ in the color map memory as all 1 bits, setting the binary value of $P_3$ in the color map memory as all 0 bits, and setting in the color

16

map memory the normalized and rounded binary value of $P_2$ resulting from the equation:

$$P_2 = \frac{\langle h - \langle P_1}{60}$$

and upon command accessing color data values stored in the color map memory; and

display means responsive to the processing means for displaying an image associated with accessed color data values.

7. A digital image display system comprising:

a color memory for storing color data values;

processing means responsive to a particular command and data sequence providing a blinking of certain picture element data from one particular color specified by the data sequence to another particular color specified by the data sequence by periodically changing color data values in the color memory, multiple color blinking processes being provided responsive to multiple commands, each process subsequent to a first process being in delay relationship to the next previous process; and

a display means for displaying the multiple color blinking responsive to the processing means.

8. A display system as recited in claim 7 wherein the processing means determines the time interval each particular color is displayed during a blinking cycle responsive to the command and data sequence.

9. In a digital image display system having a color memory, a method for providing a blinking of certain picture element data from one particular color to another particular color, the color blinking method initiated by the reception of a particular command and data sequence, the color blinking method characterized by the steps of:

specifying multiple color blinking processes, each color blinking process including providing a blinking of certain picture element data from one particular color specified by the data sequence to another particular color specified by the data sequence by periodically changing color data values in the color memory;

specifying a delay interval, if desired, between the processes; and

displaying the multiple color blinking.

10. A method for providing color blinking as recited in claim 9 further characterized by the steps of

specifying a particular time interval a particular color is displayed during a blinking cycle of a particular color blinking process.

\* \* \* \* \*

Exhibit 8  Page 107

LUC 1114409