1

**EXHIBITS TABLE OF CONTENTS**

2

| Exhibit | Document | Page No. |
|---|---|---|

3

1          U.S. Patent No. 4,763,356 to Day, et al., marked with Bates range
           LUC 1004455-81 ...............................................................................................12

4

2          Order Denying Plaintiff's and Defendants' Cross-Motions Regarding the

5          Invalidity of U.S. Patent No. 4,763,356, dated May 15, 2007
           [Docket No. 1795]..............................................................................................39

6

3          "Touch Screens: Big Deal or No Deal?," Michael Tyler, DATAMATION,

7          dated January 1984, marked with Bates range GW-LT422215-22.....................47

8          4          Excerpts of the deposition Michael E. Farmer, taken February 23, 2006............55

9          5          Excerpts of The Home Accountant and Financial Planner for the
           Macintosh, dated 1984, marked with Bates range MSLT_1060811-813 ...........67

10

11         6          Excerpts of the deposition of Dale Buscaino, taken November 7, 2007.............73

12         7          Claim Construction Order Clarifying and Superceding the Order of March
           1, 2004, Construing Claims for U.S. Patent No. 4,763,356

13         [Docket No. 1552], dated April 17, 2007 ..........................................................79

14         8          U.S. Patent No. 4,439,759 to Fleming et al., marked with Bates range
           LUC1114390-409 ...............................................................................................88

15         9          "Final Report – NASA Grant NSG 1508, Extension of the Core Graphics
           System for Raster Graphics Display," James D. Foley, marked with Bates

16         range DELL366644-799 ...................................................................................108

17         10         Supplemental Rebuttal Expert Report of Jake Richter, dated
           October 12, 2007................................................................................................264

18

19         11         Excerpts of the deposition of Jake Richter, taken November 14, 2007 .............286

20         12         Order Construing Claims for United States Patent Number 4,439,759,
           dated November 15, 2005 ..................................................................................311

21         13         Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of
           U.S. Patent Number 4,439,759, dated September 14, 2007...............................321

22

23         14         Affidavit of Jean A. Pec, with Exhibits A-B, dated September 14, 2007..........409

24         15         Status Report of the Graphics Standards Planning Committee, Computer
           Graphics, Vol. 11, No. 3, Fall 1977, marked with Bates range
           GW-LT253851-997 ...........................................................................................574

25

26         16         Excerpts of the deposition of James D. Foley, taken November 7, 2007 ..........721

27         17         Home Information Systems - Provisional Standard, Bell Laboratories,
           dated April 14, 1981, marked with Bates range LUC 003905-4026.
           **FILED UNDER SEAL**....................................................................................732

28

- 7 -

18      Expert Report of Edward J. Delp III Regarding Obviousness,
        dated September 14, 2007 ..................................................................854

19      Supplemental Rebuttal Expert Report of Professor Bernd Girod Regarding
        Validity of Lucent's 4,383,272 and 4,958,226 Patents,
        dated October 12, 2007 ..................................................................1011

20      Excerpts of the deposition of Bernd Girod, taken on November 20, 2007......1045

21      Excerpts of "Digital Pictures: Representation and Compression," Arun N.
        Netravali and Barry G. Haskell, 1988, marked with Bates range
        MSLT_0004995-99, 5408, and 5481 ..............................................1084

22      Excerpts of the deposition of Barry Haskell, taken December 15, 2005.
        **FILED UNDER SEAL**..................................................................1103

23      Translation of the Master's Thesis of Thomas Micke, entitled
        "Comparison of a Predictive and an Interpolative Motion Compensating
        Coding Method for Television Signals, April 1986, marked with Bates
        range GW-LT255053-131 ..................................................................1094

24      U.S. Patent No. 4,958,226 to Haskell, et al., marked with Bates range
        LUC1112272-77 ..................................................................1182

25      Order Construing Claims for United States Patent Number 4,958,226,
        dated July 14, 2005 ..................................................................1188

26      Copyright Information for Digital Pictures, marked with Bates range
        DELL318997-99 ..................................................................1194

27      Affidavit of Michael A. Davis, Jr., dated March 12, 1999, with
        Exhibits A-F, marked with Bates range DELL320793-800 ...........................1197

28      "A Hybrid Interpolative and Predictive Code for the Embedded
        Transmission of Broadcast Quality Television Picture," N.K. Lodge,
        marked with Bates range DELL318140-47 ..............................................1205

29      A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for
        the HDTV Coding," Masayuki Tanimoto, July 1987, marked with Bates
        range DELL318251-54 ..................................................................1213

30      CITT SG XV Working Party Document #81: Comments on Conditional
        Motion Compensated Frame Interpolation," March 1986, marked with
        Bates range MSLT0625891-94..............................................................1217

31      U.S. Patent No. 4,849,810 to Ericsson, marked with Bates range
        DELL319258-315 ..................................................................1221

32      U.S. Patent No. 4,816,914 to Ericsson, marked with Bates range
        DELL320565-607 ..................................................................1280

33      U.S. Patent No. 4,794,455 to Ericsson, marked with Bates range
        DELL319147-73 ..................................................................1323

34      U.S. Patent No. 4,703,350 to Hinman, marked with Bates range
        DELL320519-37 ..................................................................1350

- 8 -

35    U.S. Patent No. 4,727,422 to Hinman, marked with Bates range
      MSLT_0001034-51 .................................................................................. 1369

36    U.S. Patent No. 4,661,849 to Hinman, marked with Bates range
      DELL318173-90 ...................................................................................... 1387

37    U.S. Patent No. 4,754492 to Malvar, marked with Bates range
      DELL319037-59 ...................................................................................... 1405

38    Declaration of Thomas Wehberg ............................................................... 1428

39    "The Efficiency of Motion-Compensating Prediction for Hybrid Coding of
      Video Sequences," Bernd Girod, August 1987, marked with Bates range
      MSLT_0233488-502 ............................................................................... 1430

40    "Television Band Compression by Contour Interpolation," Professor D.
      Gabor, et al., May 1961, marked with Bates range MLST0001228-40 .......... 1445

41    "Picture Coding: A Review," Arun N. Netravali and John O. Limb, March
      1980, marked with Bates range MSLT_0001623-63 ...................................... 1459

42    Order Denying-in-Part Dell's Motion for Summary Judgment on U.S.
      Patent No. 4,383,272 [Docket No. 1948], dated July 27, 2007 ...................... 1500

43    Superceding Order Construing Claims for United States Patent Number
      4,383,272, dated August 16, 2005 ................................................................ 1507

44    Order Denying Gateway's Motions for Summary Judgment that U.S.
      Patent No. 4,383,272 is Invalid Under 35 U.S.C. §102(g) and Granting
      Summary Adjudication on Certain Predicate Issues Pertaining to This
      Defense [Docket No. 1948], dated July 12, 2007 ......................................... 1513

45    United States Patent 4,383,272 to Netravali, et al., marked with Bates
      range LUC0001363-73 ............................................................................. 1519

46    Response to the Examiner dated October 22, 1982, marked with Bates
      range LUC0001428-31 ............................................................................. 1530

47    Doctorate thesis of Jaswant Raj Jain, entitled "Interframe Adaptive Data
      Compression Techniques for Images," September 1979, marked with
      Bates range MSLT_0001425-622 ............................................................... 1534

48    Excerpts of the deposition of Delphine Lewis, taken June 30, 2005 ............... 1732

49    Physical exhibit of video excerpts from the videotaped deposition of
      Michael Farmer, taken on February 23, 2006.
      This exhibit a compact disk ("CD").

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases:
Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIS PAGE INTENTIONALLY LEFT BLANK**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIS PAGE INTENTIONALLY LEFT BLANK**

# Exhibit 10

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

         Plaintiff,

   v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES,
INC., GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,

         Defendants,
  and

MICROSOFT CORPORATION,

         Intervener.

MICROSOFT CORPORATION,

         Plaintiff,

   v.

LUCENT TECHNOLOGIES INC.,

         Defendant.

LUCENT TECHNOLOGIES INC.,

         Plaintiff,

   v.

DELL INC.,

         Defendant.

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

# SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER

### October 12, 2007

**Exhibit 10  Page 264**

**Introduction**

1.  I submit this Supplemental Expert Report in response to the "Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent No, 4,439,759" dated September 14, 2007. I have read Dr. Wedig's supplemental report and, as explained below, it is my opinion that none of the references cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-3 of U.S. Patent No. 4,439,759 ("the '759 patent").

**The Court's Claim Construction Order**

2.  I have reviewed the Court's November 15, 2005 claim construction Order concerning the '759 patent and have used the constructions set forth in that Order in forming my opinions set forth in this Supplement Expert Report.

**Validity - Legal Principles**

*Presumption of Validity*

3.  I have been informed that each claim of an issued patent is presumed to be valid. I further understand that a party challenging a patent's validity must present clear and convincing evidence to overcome the presumption that an issued patent is valid.

*Anticipation*

4.  I have been informed that a patent claim is invalid for anticipation only if a single prior art reference discloses each and every element of the claim exactly and as arranged as set forth in the claim. The prior art reference must be a publicly accessible printed publication and include a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed invention, but also to make and use it without undue experimentation. I understand that a reference that fails to disclose expressly one or more elements of the patent

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 1
**Exhibit 10  Page 265**

claim may nevertheless anticipate the claim if the missing elements are disclosed inherently. I further understand that an element is disclosed inherently only if it is necessarily present in the process or product described in the prior art reference. Elements that may or may not be present based on the express disclosure of a reference are not inherently disclosed.

***Obviousness***

5.   I have been informed that, since my last report, the Supreme Court has clarified the legal standards for invalidity due to obviousness. I have also been informed that the Supreme Court confirmed that, while identification of a teaching, suggestion, or motivation to combine prior art references is no longer strictly required to demonstrate obviousness, the principles set forth in my May 12, 2006 Expert Report otherwise remain valid. I understand that the fundamental question remains whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness.

6.   I have been informed that the Supreme Court provided further guidance concerning the obviousness analysis. Specifically, I have been informed that obviousness is not established by simply combining previously known elements from the prior art. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching, suggestion or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 2

**Exhibit 10  Page 266**

need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

7. I have also been informed that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

8. I have also been informed that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill. I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has good reason to pursue the known options. I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

9.  I have also been informed that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious.  I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

10.  I have also been informed that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious.  I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

11.  I have also been informed that obviousness of a patent cannot properly be established through hindsight, and that elements from different prior art references, or different embodiments of a single prior art reference, cannot be selected to create the claimed invention using the invention itself as a roadmap.  I understand that the claimed invention as a whole must be compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through hindsight which would not have been combined absent the inventors' insight.

12.  I have also been informed that secondary considerations of nonobviousness must be considered in addition to the primary considerations of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art. I have also been informed that secondary considerations of nonobviousness may include commercial success of products or processes using the invention, long felt need for the invention, failure of others to make the invention, industry acceptance of the invention, licensing of the

invention, copying of the invention by others, initial skepticism aimed at the invention, statements of acclaim for the invention, and unexpected results achieved by the invention.

*Level Of Ordinary Skill In The Art*

13.  As I previously opined in this case, a person of ordinary skill in the art pertinent to the '759 patent in the early 1980s would have had at least a Bachelor of Science degree in electrical engineering, computer engineering, or computer science with at least 2 years of experience in the field of computer graphics, or, alternatively, a person of ordinary skill in the art would have been an engineer holding a Master of Science degree in electrical engineering, computer engineering, or computer science who had pursued a course of study relating to computer graphics technology.

<u>Analysis</u>

14.  I have reviewed Dr. Wedig's supplemental report and the references he discusses therein, and, as discussed in further detail below, it is my opinion that none of the references cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-3 of the '759 patent.  Further, my discussion of these references herein is not an agreement or admission that any particular reference constitutes prior art.

15.  Dr. Wedig refers in his report to conversations he had with James Foley and Douglas O'Brien.  Dr. Wedig, however, did not provide a transcript of those conversations or otherwise reveal in his report the content of his conversations with Mr. Foley and Mr. O'Brien.  I have therefore not been afforded an opportunity to respond to what Dr. Wedig was told by Mr. Foley or Mr. O'Brien.

16.  Dr. Wedig also lists nearly 300 references in Exhibit 1 of his supplemental report, but he discusses only a handful of those references in the body of his report and in the claim charts attached as Exhibits 2-4.  To the extent Dr. Wedig is permitted to provide an opinion on references not discussed in his supplemental report, I reserve the right to further supplement this report in response and to provide responsive opinions at trial.

17.  In the section of his report "State of the Art as of the Time of the Alleged Invention," Dr. Wedig opines that "each of the elements of the Asserted Claims were known in the prior art." Dr. Wedig then goes on to discuss a number of references, but never explains how those reference purportedly disclose each of the elements of claims 1-3 of the '759 patent.  In fact, as discussed below, none of the references cited by Dr. Wedig, alone or in combination, disclose all of the elements of claims 1-3 of the '759 patent.  Further, as discussed in connection with the particular prior art combinations relied upon by Dr. Wedig, I disagree with the purported motivations to combine set forth in paragraph 23 of his report.

18.  I also reiterate and incorporate by reference my previous opinions set forth in my May 12, 2006 Rebuttal Report, which remain unchanged in view of the recent Supreme Court guidance on the issue of obviousness.

### Recommendation S.100, "International Information Exchange for Interactive Videotex"

19.  I have reviewed "Recommendation S.100" cited by Dr. Wedig in his supplemental report, as well as Dr. Wedig's analysis of this reference.  Dr. Wedig fails to explain how Recommendation S.100 discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how Recommendation S.100 provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions, but also to

make and use them.  It is my opinion that Recommendation S.100 neither anticipates nor renders obvious, alone or in combination with the Crowther reference also cited by Dr. Wedig, claims 1-3 of the '759 patent.

20.  First, Recommendation S.100 does not disclose "a memory for storing color data values," which the Court construed as "a color map that stores a table of color data values indexed by numbers."  Dr. Wedig points to section 9.3.2 of Recommendation S.100 as purportedly disclosing "a memory for storing color data values," but that section merely refers to "a colour table."  Section 9.3.2 provides no indication or suggestion that that "colour table" is "a color map that stores a table of color data values indexed by numbers."  Furthermore, Recommendation S.100 is clear that the colors described in the document are direct colors, not indexed colors.  When colors in Recommendation S.100 are specified, they are specified by specifying bit values b1, b2, and b3, where b1 is the red component, b2 is the green component, and b3 is the blue component.  (*See, e.g,* Section 9.3.1; Fig. 7/S.100.)

21.  Second, Recommendation S.100 does not disclose the second mode of access of claim 1, "wherein the in-use foreground color is specified as an index into the color memory." As discussed above, Recommendation S.100 does not disclose the color memory required by the claimed invention, and therefore does not disclose any indexed color modes.

22.  Dr. Wedig asserts that "the alphamosaic parallel mode specified in Recommendation S.100 was known to have been taken from the French Antiope system," but provides no substantive evidence to support his assertion. The "Preliminary Specification for the ANTIOPE Teletext System" ("Antiope Specification") cited by Dr. Wedig, and upon which Dr. Wedig relies, makes no reference to an "alphamosaic parallel mode," and also makes clear that the

system described in the Antiope Specification was a system in which color data was directly specified, and not one in which indexed colors were used. (*See, e.g.,* ¶ 5.2.) Furthermore, while the '759 patent states that "the Antiope terminal developed by the French CCETT employ[s] a technique for specifying both a foreground color and a background color by indexing a permanent read-only color memory," the '759 patent does not state that the "permanent read-only color memory" in this particular version of the Antiope system is "a color map that stores a table of color data values indexed by numbers." Furthermore, the '759 patent does not state that the Antiope system used in-use foreground and background colors.

23.   Third, Recommendation S.100 does not disclose the third mode of access of claim 1, "wherein the in-use foreground color and in-use background color are specified as indexes into the color memory," where "in-use background color" is defined as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." As an initial matter, as discussed above, Recommendation S.100 does not disclose the use of indexed color. Moreover, Recommendation S.100 does not disclose the use of an in-use background color. Dr. Wedig cites to pages 181 and 184, but nothing on those pages indicates the use of an in-use background color. While Section 5.4.2.2.10 discusses displaying characters "on a background of the colour indicated," Section 5.4.2.2.10 does not indicate that the color of the background "will be used as the background color for subsequently received text and graphics drawing commands until changed."

24.   Dr. Wedig also points to Section 1.2.4 as disclosing the three required modes of access. But Section 1.2.4 discusses four possible options for representing pictorial information, and does not disclose modes of access within the meaning of the Claim 1 as construed by the

Court.  Furthermore, as discussed above, Recommendation S.100 only discloses the use of direct

color, and therefore Recommendation S.100 at most could only disclose a single mode of access,

and not a plurality of modes as required by claim 1.

   25.  Fifth, because Recommendation S.100 does not disclose the three modes of access

required by claim 1, it necessarily does not disclose the processing means or display means of

claim 1, which require the three modes of access.  Furthermore, Dr. Wedig fails to explain how

Recommendation S.100 discloses the corresponding structure identified by the Court for the

processing means of claim 1.  Additionally, even if Recommendation S.100 disclosed each

element of claim 1, it is my opinion that the disclosure contained in Recommendation S.100

would not by itself enable one of ordinary skill in the art to make or use the claimed invention

without undue experimentation.  Recommendation S.100 is an inter-networking protocol

recommendation that provides no substantive guidance on how to implement a digital image

display system.

   26.  Recommendation S.100 also fails to anticipate or render obvious Claims 2 and 3.

First, based on the Court's claim construction, claims 2 and 3 require a color memory, the three

modes of access of claim 1, and the corresponding structure of claim 1.  As discussed above,

Recommendation S.100 does not disclose these claim elements.  Second, because

Recommendation S.100 does not disclose a color memory, it necessarily does not disclose setting

colors in the color memory, which is required by each of claims 2 and 3.

   27.  Dr. Wedig cites to page 711 of the Crowther reference as disclosing the setting of

color data values in a color memory, and combines Crowther with Recommendation S.100 .  Dr.

Wedig, however, fails to explain how Crowther purportedly discloses the corresponding structure for the setting function of the processing means of claims 2 and 3.

28. Moreover, one of ordinary skill in the art would not have been led to combine Recommendation S.100 with Crowther. Dr. Wedig argues that "Recommendation S.100 provides reasons to employ a writable color memory where it suggests 'redefining the colour table," and that "[a] person of ordinary skill in the art would have had reason to look to Crowther for details on exactly how to implement this suggested feature because Crowther teaches how to implement this very same feature in a videotex system." But the premise of this argument is incorrect, because, as discussed above, Recommendation S.100 provides no indication or suggestion that that "colour table" is "a color map that stores a table of color data values indexed by numbers." Dr. Wedig is therefore incorrect when he states that "both references suggest color display enhancements for videotex terminals having color maps" and that "both of these references were concerned with videotex terminals . . . wherein color data values may be accessed via index values into a color memory."

29. I also disagree with Dr. Wedig's opinions that "the trends toward higher resolution display, a wider range of colors, and decreasing costs of memory also provided reasons to combine the teachings of Recommendation S.100 and Crowther." To the extent Crowther discloses a color memory within the meaning of the claims, these trends would teach away from the use of a color memory, since a higher resolution display, a wider range of colors, and decreasing costs of memory weigh in favor of direct color and against indexed color.

30. Dr. Wedig also states that Crowther "was well known to those in the videotex community, as was Recommendation S.100," but provides no basis for that assertion other than

speculation. Dr. Wedig states that the "Crowther paper was presented at the 1980 Spring Conference on videotex topics," but there is no evidence that Crowther was actually presented at the 1980 Spring Conference. Further, the subject of the 1980 Spring Conference appears to have been consumer electronics, not videotex topics.

31. I also disagree with Dr. Wedig's opinion that "[t]he addition of the methodology described in Crowther (for 'adaptively' defining the colors in a color map by transmitting codes as part of DRCS data) to the videotex system specified by Recommendation S.100 led to results that could have been predicted by a person of ordinary skill in the art prior to the time of the alleged invention" and the other statements in paragraph 53 of Dr. Wedig's report. First, there is no evidence that a system that combined Crowther with Recommendation S.100 was ever developed. Second, Recommendation S.100 does not disclose a color memory within the meaning of the Court's construction, and thus combining Crowther with Recommendation S.100 would not lead to predictable results. Third, Recommendation S.100 and Crowther address different aspects of DRCS, and thus one or ordinary skill in the art would not be led to combine these references simply because they both mention DRCS.

32. Accordingly, for at least these reasons, it is my opinion that Recommendation S.100 does not anticipate or render obvious, alone or in combination with Crowther, claims 1-3 of the '759 Patent.

### CRC Technical Note No. 699-E, "Picture Description Instructions PDI for the Telidon Videotex System"

33. I have reviewed "CRC Technical Note No. 699-E, Picture Description Instructions PDI for the Telidon Videotex System" ("CRC 699-E") cited by Dr. Wedig in his supplemental report, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how CRC

699-E discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how CRC 699-E provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that CRC 699-E neither anticipates nor renders obvious, alone or in combination with the Antiope Specification or Crowther, claims 1-3 of the '759 patent.

34. First, CRC 699-E does not disclose "a memory for storing color data values," which the Court construed as "a color map that stores a table of color data values indexed by numbers." Dr. Wedig cites to page 70 of CRC 699-E, but page 70 merely makes reference to a "Color Lookup." CRC 699-E does not disclose a color map that stores a table of color data values indexed by numbers. Moreover, to the extent CRC 699-E discloses a color map that stores a table of color data values indexed by numbers, page 70 of CRC 699-E teaches away from the use of a color map due to cost concerns. Dr. Wedig also cites to page 50 of CRC 699-E. But page 50 merely mentions "colour reference tables" without explaining what those tables are or how they were to be used. Further, Dr. Wedig states that "[a]llocating a specific bit in the TONAL CONTROL status flag and specifically indicating that it should be used to enable a 'colour reference table' teaches one of ordinary skill in the art a memory for storing color data values," but the four forms on page 50 teach one of ordinary skill in the art such bit is not reserved.

35. Second, CRC 699-E does not disclose the second mode of access of claim 1, "wherein the in-use foreground color is specified as an index into the color memory." As discussed above, CRC 699-E does not disclose a color memory, and therefore does not disclose any indexed color modes. Dr. Wedig also cites to the Antiope Specification as disclosing the use of indexed color, but as discussed above the Antiope Specification discloses a direct color system

and not an indexed color system. (*See* ¶ 5.2.) Moreover, Telidon, which is described in CRC 699-E, and Antiope were competing technologies that both used direct color and had different and potentially conflicting underlying technologies, and in my opinion one of ordinary skill would have not been led to combine these two systems. For example, the Antiope Specification targeted a fixed resolution terminal with significant graphics limitations, while the CRC 699-E targeted variable resolutions and higher end graphics capabilities, and combining the two as Dr. Wedig suggests would not have made sense from a technical perspective and would not have led to predictable results.

36. Third, CRC 699-E does not disclose the third mode of access of claim 1, "wherein the in-use foreground color and in-use background color are specified as indexes into the color memory," where "in-use background color" is defined as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." As an initial matter, as discussed above, CRC 699-E does not disclose the use of indexed color. Moreover, CRC 699-E does not disclose the use of an in-use background color. Dr. Wedig also cites to Recommendation S.100 and the Antiope Specification, but neither of those references uses indexed color or discloses "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." Recommendation S.100 is discussed above. In the Antiope Specification, the background color needs to be re-set at the start of each row. Thus the background color is not "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." Additionally, as discussed above, the Antiope Specification does not disclose indexed color. Moreover, even if Recommendation S.100 or the Antiope Specification disclosed an in-use

background color, one of ordinary skill in the art would not have been led to combine these references with CRC 699-E because the PDI instructions disclosed in CRC 699-E have no requirement of an in-use background color and for the reasons discussed above.

37. I also disagree with Dr. Wedig's statement that "a person of ordinary skill in the art could have predicted that the specification of foreground and background colors using an index into a color map in the Antiope system would perform the same function in the manner used in the Telidon system specified by CRC 699-E," given the fact that the Antiope Specification does not disclose "the specification of foreground and background colors using an index into a color map" and that Telidon and Antiope had different underlying technologies.

38. I also disagree with Dr. Wedig's opinion that "[t]he trend toward higher resolution display and a wider range of colors, along with the decreasing cost of memory also would have prompted persons of ordinary skill in the art to employ the technique of specifying foreground and background colors using an index into a color map (as taught by the Antiope Specification) in a selectable mode of operation on the Telidon system." First, the Antiope Specification does not teach "the technique of specifying foreground and background colors using an index into a color map." Second, even if it did, these trends would teach away from the use of a color memory, since a higher resolution display, a wider range of colors, and decreasing costs of memory weigh in favor of direct color and against indexed color.

39. Fourth, Dr. Wedig points to the TONAL CONTROL status flag in CRC 699-E as evidence of the required modes of access, but the TONAL CONTROL status flag only selects between grey scale and color, and does not select different modes of access as required by the claimed invention and the Court's construction. Furthermore, CRC 699-E only discloses the use

of direct color, and therefore CRC 699-E at most could only disclose a single mode of access, and not a plurality of modes as required by Claim 1.

40.  Fifth, because CRC 699-E and the Antiope Specification do not disclose the three modes of access required by claim 1, they necessarily do not disclose the processing means or display means of claim 1, which also require the three modes of access.  Furthermore, Dr. Wedig fails to explain how these references purportedly disclose the corresponding structure identified by the Court for the processing means of claim 1.

41.  CRC 699-E also fails to anticipate or render obvious claims 2 and 3.  First, based on the Court's claim construction, claims 2 and 3 require a color memory, the three modes of access of claim 1, and the corresponding structure of claim 1.  As discussed above, however, CRC 699-E and the Antiope Specification do not disclose these claim requirements.  Second, because CRC 699-E and the Antiope Specification do not disclose a color memory, they necessarily do not disclose setting colors in the color memory, which is required by each of claims 2 and 3.  Dr. Wedig also fails to explain how CRC 699-E or the Antiope Specification purportedly disclose the corresponding structure for the setting function of the processing means of claims 2 and 3.

42.  Dr. Wedig also cites to Crowther as disclosing "a command for setting or storing a color data value in color memory."  Dr. Wedig, however, fails to explain how Crowther purportedly discloses the corresponding structure for the setting function of the processing means of claims 2 and 3.

43.  Dr. Wedig also states that "[t]he same reasons discussed above with respect to Recommendation S.100 and Crowther, and with respect to CRC 699-E and Antiope also apply to

the combination of CRC 699-E and [Crowther]." I disagree for the same reasons discussed above.

44. Accordingly, for at least these reasons, it is my opinion that CRC 699-E does not anticipate or render obvious, alone or in combination with the Antiope Specification, Recommendation S.100, or Crowther, claims 1-3 of the '759 Patent.

***Final Report - NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display***

45. I have reviewed the "Final Report - NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display" ("NASA Report") cited by Dr. Wedig, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how the NASA Report discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how the NASA Report provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that the NASA Report neither anticipates nor renders obvious claims 1-3 of the '759 patent.

46. With respect to claim 1, the NASA Report fails to disclose the first and third modes of access required by claim 1. Dr. Wedig points to the function SET_CURRENT_COLOR (R,G, B) as evidence that the NASA Report discloses the first mode of access. But claim 1 requires that in the first mode of access an in-use foreground color be directly specified as a color data value. The NASA Report indicates, however, that R, G, and B in the SET_CURRENT_COLOR (R,G, B) function are floating point numbers in the range of 0 to 1, which need to be converted to integers in order to be processed by the system. As such, the NASA Report does not disclose

direct specification of color data values. Dr. Wedig also points to SET COLOR function. But the SET COLOR function also takes real (floating point) parameters rather than integers, and thus does not directly specify color data values either.

47. Dr. Wedig points to the SET_BACKGROUND_COLOR_INDEX (INDEX) function as evidence that the NASA Report discloses the third mode of access of claim 1. In pointing to this function, however, Dr. Wedig ignores the Court's construction of "in-use background color" as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." The NASA Report states at page 20 of Appendix A that the color set by the SET_BACKGROUND_COLOR_INDEX (INDEX) function does not take effect until a NEWFRAME occurs. The color set by this function is thus not "used as the background color for subsequently received text and graphics drawing commands until changed," and is therefore not an in-use background color. Dr. Wedig also points to the device-dependent SET BACKGROUND INDEX function discussed in Appendix C of the NASA Report as evidence of the third mode of access, but Appendix C does not indicate that the color set by that function is an in-use background color as defined by the Court. Moreover, the device-dependent SET BACKGROUND INDEX function is intended to be called when a user program calls the device-independent SET_BACKGROUND_COLOR_INDEX (INDEX) function of Appendix A, and therefore it too would not take effect until a NEWFRAME occurs. (*See, e.g.,* Section 2 of Appendix C.)

48. Dr. Wedig also argues that it would have been obvious to one of ordinary skill in the art to add an in-use background color to the system described in the NASA Report, but the NASA report does not disclose any actual text or drawing commands that use a background

color. Thus, one of ordinary skill in the art would not have been motivated to add an in-use background color to a system that could not make use of such a color. Furthermore, the references that Dr. Wedig cites to do not disclose an in-use background color as defined by the Court. The Carter reference at page 163 mentions background colors, but it does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed." Similarly, the Ramtek manual at page 3-21 refers to a background flag which inverts the polarity of incoming binary data, but it does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed." The Antiope Specification at pages 6-7 discusses background colors, but it likewise does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed," as discussed above.

49. Because the NASA Report does not disclose all three modes of access required by claim 1, it necessarily does not disclose the processing means or display means of claim 1, which require the three modes of access.

50. With respect to claims 2 and 3 of the '759 patent, the Court's claim construction for these claims requires the three modes of access and the corresponding structure of claim 1. Because the NASA Report fails to disclose those elements of claim 1, it also fails to anticipate or render obvious claims 2 and 3.

51. Accordingly, for at least these reasons, it is my opinion that the NASA Report does not anticipate or render obvious claims 1-3 of the '759 patent.

*Documents and Other Materials Reviewed*

52. My understanding of the '759 patent is based on my review of the patent, the asserted claims, the patent prosecution history, the prior art cited in the Patent Office, the Court's Claim Construction Order, and on my professional experience in the field of display technology over the last 29 years.

53. In preparing this report, I reviewed the supplement report of Dr. Wedig, the references discussed in Dr. Wedig's supplemental report, my May 12, 2006 Rebuttal Expert Report, the '759 patent and file history, and the Court's claim construction order.

54. To aid my testimony at trial, I may rely on any or all of these materials, including those referenced in this report as examples, as well as other materials that I have considered. I may also rely at trial on demonstrative exhibits, summary exhibits, testimonial aids, animations, sample code, demonstrations, and the like in support of my testimony to illustrate the bases of my opinions.

*Compensation*

55. My company is charging a rate of $250 per hour plus expenses for my work on this case. My compensation is in no way contingent on the content of my testimony or the outcome of this litigation.

*Other Testimony*

56. In the last four years I testified by deposition as an expert in the matter of Grandeye Ltd. vs. IPIX Corporation, Civil Action No 2:05 CV 134 (WDK) (TEM) (United States District Court, Eastern District of Virginia), and in this case.

October 12, 2007

By _____

Jake Richter

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 20

Exhibit 10  Page 284

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, a copy of the foregoing SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER was served on counsel for Microsoft, Dell, and Gateway as follows:

**EMAIL**

Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile:  858-678-5099
marchese@fr.com
srodriguez@fr.com

Attorneys for *Microsoft Corp.*

**EMAIL**

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Dell Inc.*

**EMAIL**

Jeffrey Plies
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
jeff.plies@dechert.com

Attorneys for *Gateway, Inc., et al.*

Exhibit 11

Page 1

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3                            - - -

4    LUCENT TECHNOLOGIES INC.,        )
                                      )
5              Plaintiff,             )
                                      )
6         Vs.                         )
                                      )
7    GATEWAY, INC., GATEWAY COUNTRY   )
     STORES LLC, GATEWAY COMPANIES,   )
8    INC., GATEWAY MANUFACTURING LLC ) Case No. 02-CV-2060B(CAB)
     and COWABUNGA ENTERPRISES, INC.,)        consolidated with
9                                     ) Case No. 03-CV-0699B(CAB)
              Defendants.             ) Case No. 03-CV-1108B(CAB)
10                                    )
          and                         )
11                                    )
     MICROSOFT CORPORATION,           )
12                                    )
              Intervener.             )
13   _____)
                                      )
14   AND RELATED CROSS-ACTIONS.       )
     _____)

15

16

17              DEPOSITION OF JAKE RICHTER

18                     TAKEN ON

19            WEDNESDAY, NOVEMBER 14, 2007

20

21

22

23

24   Reported by:   LISA RAE SOMMERHAUSER

25                   CSR NO. 10985

Page 235

1    a better term, to the right of a decimal point?

2        A    Prior to the application of the scaler.

3        Q    Prior to the application of the scaler.

4             And then the next bit over would represent --

5    it would be sort of like just putting the bits on the

6    right side of the decimal point and then multiplying it

7    by a scaler --

8        A    Not really because those bits don't translate

9    to an actual number directly.  It's not like binary

10   coded decimal where you use some number bits, like four

11   bits to basically encode a number from 0 to 9.  Each one

12   of those bits represents a fraction.

13            I don't know if you're -- I'm sure you've

14   heard like the math trick from, maybe from the math

15   teacher when you were in grade school.  If I'm basically

16   running a race of a thousand feet, okay, a relay race.

17   And I basically relay runners set at half the distance

18   from where I am to the finish line, will I actually ever

19   reach the finish line?  And the answer is no, you'll

20   basically end up approximating almost towards the end.

21   But you're always going to be half of the remaining

22   distance from that person to the finish line, even

23   though it might be, you know, a minute, minute amount.

24            And that, this basically, this one potential,

25   one exemplary embodiment of floating point numbers using

1    computer systems utilizes that to basically try to get

2    as much accuracy as it has room for storage for the

3    floating point number.

4         Q    I see.  Can you go back to the page in the

5    NASA final report that is marked Dell 366737.

6         A    I have that open.

7         Q    Okay.  And the fourth full paragraph on that

8    page?

9         A    Uh-huh.

10        Q    I believe it's the fifth sentence, which says,

11   "The user may specify color directly with three

12   parameters between zero and one."  Do you see that?

13        A    Yes, I do.

14        Q    And this is a description of the direct

15   specification of color; right?

16        A    Well, not really because floating point

17   numbers, which this is certainly what a parameter

18   between zero and one implies is a floating point number;

19   because you can't have an integer between zero and one.

20   It's either zero or one.

21        Q    So a fraction between zero and one implies a

22   floating point number?

23        A    This text implies a floating point number.  It

24   doesn't actually say a fraction.  It says a value, or

25   the parameter is between zero and one.  And up above

Page 237

1    it says, "The user may specify intensity directly with

2    values between 0 and 1," talking about the intensity

3    version of the NASA specification.

4        Q    You can't have integers between zero and one;

5    right?

6        A    That's what I just said.

7        Q    It's got to be a fraction if it's a value

8    between zero and one; right?

9        A    It has to be in computing terms a floating

10   point number.

11       Q    If it's between zero and one, it has to be a

12   floating point number; that's your opinion?

13       A    Yes.

14       Q    It doesn't say floating point number?

15       A    Right.

16       Q    But that's your interpretation of --

17       A    That's my interpretation of that.  I do know,

18   by the way -- this is kind of an interesting thing

19   here -- it does say the next sentence, "These parameters

20   may specify red, green and blue, or hue, lightness and

21   saturation," which is what I was referring to is the

22   other color models or color spaces in one of the

23   previous discussions.

24       Q    Do you think fractions between zero and one,

25   is it fair to characterize them as percentages?

Page 242

1       Q    If I specify RGB colors with a parameter

2   between zero and one, wouldn't that call for a

3   particular color?

4       A    Again, in what context?

5       Q    The context of this case.

6       A    Well, you don't specify color between zero and

7   one in the patent.  So where else?

8       Q    Anywhere else.  Would it at any time call for

9   a particular color?  Do you know?

10      A    Well, you can't specify a zero to one in the

11  patent.  So you can't specify something between zero and

12  one -- between zero and one there are no integers.

13      Q    Do you think the patent claim is limited to

14  exactly that which is described in the patent?

15      A    No.

16      Q    Okay.  So explain your last answer.

17      A    Well, my last answer basically comes back down

18  to the fact that the inventors obviously had something

19  specific in mind when they said the color is directly

20  specified as a color value.  If they --

21      Q    Did the inventors tell you that?

22      A    If they had intended to have it cover a

23  broader range of number systems, I believe they would

24  not have included the word "directly" in there.

25      Q    So you think --

Page 243

1      A     They would have just said foreground color is

2   specified as a color data value.

3      Q     So you think the patent is limited to the use

4   of integers to specify a color data value; correct?

5      A     I believe that the term "directly specified as

6   color data values" precludes the usage of floating point

7   specified color components as part of the requirements

8   to basically -- to meet the requirements of that claim

9   element.

10     Q     Well, if I specify color data values using

11  values between zero and one, won't that call for a

12  particular color?

13     A     I mean, in the context of the NASA system, if

14  you specify your RGB components between zero and one and

15  provide three different numbers of those, based on how

16  the NASA system works as I understand it, then yes, you

17  would produce a particular color based on a combination

18  of those three numbers.

19     Q     If I used those same color data values the

20  next day, I would get -- with the same system, I would

21  get the same color called output; correct?

22     A     Close enough.  Depends whether you have drift

23  in your CRT.

24     Q     But it does call for a particular color?

25     A     Yes.

Exhibit 11  Page 291

Page 244

1    Q    Okay.  So just to make sure I understand your

2    position, you are not expressing the opinion that if

3    color data values need to be converted in some manner in

4    order to eventually output a color, that that has any

5    relevance to the claim; is that correct?  It's not your

6    opinion; right?

7    A    Well, my opinion is that for the first mode of

8    access, basically you have to directly specify the color

9    data values.

10    Q    And your opinion is that that requires

11    specifying using integers?

12    A    It requires specifying in some number system

13    that doesn't require a significant conversion to get to

14    something you can actually utilize in the hardware.

15    Q    Well, what's a significant conversion?

16    A    Floating point integer.

17    Q    What else would be a significant conversion?

18    A    I can't think of anything else off the top of

19    my head.

20    Q    The only thing you can think of is the one

21    that happens to be in this particular prior art

22    reference; right?

23    A    Well, it's probably by coincidence the most

24    extreme example that I can think of because doing

25    floating point in these systems in the early '80s and

1     A     They would have just said foreground color is
2     specified as a color data value.
3     Q     So you think the patent is limited to the use
4     of integers to specify a color data value; correct?
5     A     I believe that the term "directly specified as
6     color data values" precludes the usage of floating point
7     specified color components as part of the requirements
8     to basically -- to meet the requirements of that claim
9     element.
10     Q     Well, if I specify color data values using
11     values between zero and one, won't that call for a
12     particular color?
13     A     I mean, in the context of the NASA system, if
14     you specify your RGB components between zero and one and
15     provide three different numbers of those, based on how
16     the NASA system works as I understand it, then yes, you
17     would produce a particular color based on a combination
18     of those three numbers.
19     Q     If I used those same color data values the
20     next day, I would get -- with the same system, I would
21     get the same color called output; correct?
22     A     Close enough.  Depends whether you have drift
23     in your CRT.
24     Q     But it does call for a particular color?
25     A     Yes.

Page 244

1      Q    Okay.  So just to make sure I understand your

2   position, you are not expressing the opinion that if

3   color data values need to be converted in some manner in

4   order to eventually output a color, that that has any

5   relevance to the claim; is that correct?  It's not your

6   opinion; right?

7      A    Well, my opinion is that for the first mode of

8   access, basically you have to directly specify the color

9   data values.

10     Q    And your opinion is that that requires

11  specifying using integers?

12     A    It requires specifying in some number system

13  that doesn't require a significant conversion to get to

14  something you can actually utilize in the hardware.

15     Q    Well, what's a significant conversion?

16     A    Floating point integer.

17     Q    What else would be a significant conversion?

18     A    I can't think of anything else off the top of

19  my head.

20     Q    The only thing you can think of is the one

21  that happens to be in this particular prior art

22  reference; right?

23     A    Well, it's probably by coincidence the most

24  extreme example that I can think of because doing

25  floating point in these systems in the early '80s and

Page 245

1   late '70s required a lot of either hardware and/or

2   bandwidth basically to make the conversions.

3          Even in the regular PCs -- I don't know if you

4   recall the early days of the IBM PC -- you would

5   actually purchase a separate processor called a floating

6   point processor.  So you could actually perform these

7   operations somewhat more quickly than doing them in

8   software because they were so overwhelmingly a burden on

9   the system.

10      Q    How about converting to an index value?  Is

11  that a significant conversion?

12      A    Converting from what?

13      Q    From the color data values, RGB values to an

14  index?

15      A    Well, I don't know necessarily where that's

16  being done in the claims over here.

17      Q    But would you consider it a significant

18  conversion?

19      A    Explain to me what the process would be and

20  I'll tell you, if I can.

21      Q    The process would be just taking your RGB

22  values and washing them through some kind of

23  mathematical operation that outputs an index value.

24      A    It depends on how easy it is.  I mean, I can

25  convert from color to gray scale by dropping my reds and

Page 247

1    conversion significant or otherwise, then your opinion

2    on the subject is wrong; right?

3         A    Well, I mean, it's basically -- you know, the

4    court will have made that decision.  The court is

5    entitled to make whatever decisions it makes based on

6    what it believes it should decide.

7         Q    About the meaning of the claim?

8         A    Sure.

9         Q    And about the meaning of the claim

10   interpretation?

11        A    Well, that is the court's jurisdiction as I

12   understand it.

13        Q    Let me get back to this significant

14   conversion.  How about, how about an integer that's

15   originally in a decimal format converted to an integer

16   in a binary format?  Is that a significant conversion?

17        A    I am not sure what you mean by integer in a

18   decimal format.

19        Q    The kind of numbers we usually use as human

20   beings.

21        A    Those are floating numbers.

22        Q    Base 10?

23        A    Those are floating point numbers.  They are

24   represented in the system --

25        Q    They could be --

Page 248

1      A    -- in the way that I explained.

2      Q    Oh, so is 100, is 1-0-0, is that a floating

3   point number?

4      A    No.  That's just a pure integer.  If you have

5   100.0, that would actually become a floating point

6   number.

7      Q    That's what I meant by decimal.  Pure

8   integers?

9      A    Okay.  Well, those are -- from a program

10  concept those mean different things.

11     Q    So converting a pure integer to -- from a

12  decimal format, meaning base 10, to a binary format,

13  meaning base 2, is that a significant conversion?

14     A    Well, I guess I'm not getting your distinction

15  because integers, when they are stored in a computer,

16  are basically, they are integers.  So you know, 100

17  would be represented by the bits that make up 100.

18     Q    Yeah.  But when you write it in your checkbook

19  you don't right it -- maybe you do; I don't know -- you

20  don't write it in bits; right?  If you were to right me

21  a check for 100 bucks, you'd write a 1-0-0, and that's

22  base 10; right?

23     A    Well, yeah.

24     Q    And if -- so converting that number --

25     A    But there's no conversion involved.  What

Page 249

1  happens --

2      Q    Let me finish my question.

3      A    I'm sorry.

4      Q    Converting that number to the binary version

5  of that, of that number that computers use, is that a

6  significant conversion?

7      A    Well, as I said, there's no actual conversion

8  per se that happens.  If I go in a program and specify

9  100, my compiler will automatically generate the binary

10  data that gets put in memory.  If I generate -- if I

11  basically put in a No. 100.1, which is a floating point

12  number, it's going to generate this large bit encoded

13  thing similar to what I described earlier.  And that was

14  the binary presentation of 100.1.

15      Q    Well, the compiler will convert it from one

16  format to another; right?

17      A    It will convert it from one format to another

18  at compiled time.

19      Q    Yeah, right.

20      A    Right.

21      Q    So you think that that's not a conversion?

22      A    That's a different kind of conversion.  The

23  conversion I was talking about with respect to floating

24  point is, I can write a program that basically goes and

25  draws a color ramp in the NASA system where I add .1 to

1    my ready component every time.  And the compiler is not

2    going to basically interpret that conversion and produce

3    an integer for me.  That has to be done at run time.

4        Q    So is what the compiler does, is that a

5    significant conversion or not?

6        A    No.

7        Q    How about converting to hexadecimal?  Is that

8    a significant conversion?

9        A    Hexadecimal is just another format of reading

10   binary numbers.

11       Q    How about converting ASCII to integer?  Is

12   that a significant conversion?

13       A    I'm not sure what you mean by converting ASCII

14   to integer.

15       Q    You don't know what an ASCII character is?

16       A    I do know what an ASCII character is.

17       Q    Is one an ASCII character?

18       A    It depends on how it's used.  If it's used to

19   represent a bit, then no.

20       Q    Can it be used as an ASCII character?

21       A    Yeah, I think 31 hex.

22       Q    How about converting 1-0-0 as an ASCII

23   character to an integer?  Is that a significant

24   conversion?

25       A    That would be considered a binary coded

**Exhibit 11  298.1**

Page 253

1    here basically that either the user could do it or that

2    other core routines could do that as well, call this

3    function.

4        Q    But you don't have an understanding without

5    studying the document more --

6        A    Well --

7        Q    -- about --

8        A    I didn't find a reference to New Frame as a

9    documented item in this document in Appendix A, which is

10   where the New Frame function would be called from, so --

11       Q    Well, in your supplemental report, Exhibit 17,

12   at page 17 --

13       A    Uh-huh.

14       Q    -- paragraph 47, about five lines down you

15   say, "The NASA report states at page 20 of Appendix

16   A" --

17       A    Let's go take a look there.  Okay.

18       Q    -- "that the function does not take effect

19   until a new frame occurs; and therefore, it's not used

20   as the background color for subsequently received," et

21   cetera, et cetera?

22       A    That's right.

23       Q    So can you explain -- now does that refresh

24   your recollection?

25       A    It does.

Page 254

1      Q    So what's the New Frame?

2      A    The New Frame function -- because Appendix A

3   as I understand it is basically a modification to, I

4   guess, the previous core interface.  Basically the New

5   Frame function causes the display that's being drawn to

6   be cleared.  And then in the case of the background, set

7   background color function, would go and fill the screen

8   with the specified color.  And if you're working in a

9   segmented system where your list of drawing commands

10  have already been, I guess, put into a segment or

11  display list, then that would be redrawn over the top of

12  that.

13     Q    I'm going to ask you to take a look at one

14  page, Dr. Wedig's supplemental expert report which I

15  think was marked as Exhibit 100 at his deposition, the

16  Wedig deposition.  I'm not going to mark it here because

17  it's just killing trees.  And I only have one question.

18  So it's page 30 of that.

19         THE WITNESS:  Is that okay with you?

20         MR. MARINA:  That's okay with me.  I just need a

21  copy of it.

22  BY MR. MICALLEF:

23     Q    Here.  I opened it to page 30.

24     A    Okay.

25     Q    Near the top of page 30 at about line 5

Page 255

1    there's a sentence that says, "Once a New Frame command

2    is received, the color identified by the index into the

3    color memory will be used as the background color for

4    subsequently received text and graphics drawing

5    commands."  Do you see that sentence?

6         A    I do.

7         Q    Do you agree with that sentence?

8         A    Not exactly.

9         Q    In what way do you disagree?

10        A    Basically once a new frame command is

11   received, the color identified by the index into the

12   color memory is the background color for the entire

13   screen.  And there's basically no -- it's not an in-use

14   background color because it's not used by the individual

15   functions.

16        Q    By that you mean it's not actively drawn on

17   the screen by the individual functions?

18        A    Correct, correct.

19        Q    Okay.  That's all I was going to ask you about

20   that.  Thank you.

21             So if I understand the NASA final report, that

22   this background back color and index into the background

23   color is stored in memory when the set background color

24   command is used, some index is stored in memory

25   somewhere.  Does that make sense?

Page 254

1        Q     So what's the New Frame?

2        A     The New Frame function -- because Appendix A

3    as I understand it is basically a modification to, I

4    guess, the previous core interface.  Basically the New

5    Frame function causes the display that's being drawn to

6    be cleared.  And then in the case of the background, set

7    background color function, would go and fill the screen

8    with the specified color.  And if you're working in a

9    segmented system where your list of drawing commands

10    have already been, I guess, put into a segment or

11    display list, then that would be redrawn over the top of

12    that.

13        Q     I'm going to ask you to take a look at one

14    page, Dr. Wedig's supplemental expert report which I

15    think was marked as Exhibit 100 at his deposition, the

16    Wedig deposition.  I'm not going to mark it here because

17    it's just killing trees.  And I only have one question.

18    So it's page 30 of that.

19        THE WITNESS:  Is that okay with you?

20        MR. MARINA:  That's okay with me.  I just need a

21    copy of it.

22    BY MR. MICALLEF:

23        Q     Here.  I opened it to page 30.

24        A     Okay.

25        Q     Near the top of page 30 at about line 5

Page 255

1   there's a sentence that says, "Once a New Frame command

2   is received, the color identified by the index into the

3   color memory will be used as the background color for

4   subsequently received text and graphics drawing

5   commands."  Do you see that sentence?

6        A    I do.

7        Q    Do you agree with that sentence?

8        A    Not exactly.

9        Q    In what way do you disagree?

10       A    Basically once a new frame command is

11  received, the color identified by the index into the

12  color memory is the background color for the entire

13  screen.  And there's basically no -- it's not an in-use

14  background color because it's not used by the individual

15  functions.

16       Q    By that you mean it's not actively drawn on

17  the screen by the individual functions?

18       A    Correct, correct.

19       Q    Okay.  That's all I was going to ask you about

20  that.  Thank you.

21            So if I understand the NASA final report, that

22  this background back color and index into the background

23  color is stored in memory when the set background color

24  command is used, some index is stored in memory

25  somewhere.  Does that make sense?

Page 256

1        A     Well, the index that you would specify with a

2    set background, I guess it would -- it would have to be

3    with a set background color index function.  Is that

4    what that said, the Wedig reference?

5        Q     Strike that.  Strike that.

6              Let me mark -- I'd like to mark as Exhibit 23

7    a document bearing Bates Nos. LUC 003903 through 004026.

8    It's an extra page.

9              (Defendants' Exhibit 23 was marked for

10                identification.)

11    THE WITNESS:  How much more time on tape?

12    VIDEO OPERATOR:  Seven minutes.

13    MR. MICALLEF:  Why don't we take a quick break.

14    VIDEO OPERATOR:  This marks the end of Tape No. 3

15    in the deposition of Jake Richter.  Going off the

16    record.  The time is 8:20.

17              (Recess taken.)

18    VIDEO OPERATOR:  We're back on the record.  Here

19    begins Videotape No. 4 in the deposition of Jake

20    Richter.  The time is 8:25.

21    BY MR. MICALLEF:

22        Q     I want to go back to this idea of significant

23    conversion; conversion that would in your view

24    demonstrate that certain color data values are not

25    directly specifying a color.  Would it be a significant

Page 256

1        A    Well, the index that you would specify with a
2    set background, I guess it would -- it would have to be
3    with a set background color index function.  Is that
4    what that said, the Wedig reference?
5        Q    Strike that.  Strike that.
6             Let me mark -- I'd like to mark as Exhibit 23
7    a document bearing Bates Nos. LUC 003903 through 004026.
8    It's an extra page.
9             (Defendants' Exhibit 23 was marked for
10                 identification.)
11       THE WITNESS:  How much more time on tape?
12       VIDEO OPERATOR:  Seven minutes.
13       MR. MICALLEF:  Why don't we take a quick break.
14       VIDEO OPERATOR:  This marks the end of Tape No. 3
15   in the deposition of Jake Richter.  Going off the
16   record.  The time is 8:20.
17            (Recess taken.)
18       VIDEO OPERATOR:  We're back on the record.  Here
19   begins Videotape No. 4 in the deposition of Jake
20   Richter.  The time is 8:25.
21   BY MR. MICALLEF:
22       Q    I want to go back to this idea of significant
23   conversion; conversion that would in your view
24   demonstrate that certain color data values are not
25   directly specifying a color.  Would it be a significant

Page 257

1    conversion if you had to -- if you moved around the bits

2    and concatenated them together in a different pattern?

3         A    Such as?

4         Q    Do you know the difference between little

5    Indian and big Indian?

6         A    Yes.

7         Q    How about going from little Indian to big

8    Indian?  Is that a significant conversion?

9         A    It depends on the processor.  Some processors

10   actually have a bit reverse built right into them.  So

11   that would just basically be, maybe two clock cycles on

12   a CPU.

13        Q    So no?  Is that a no?

14        A    That would probably -- that's a qualified no.

15   It depends on the system.  But typically that's a -- not

16   a majorly CPU-intensive function.

17        Q    How does anybody know whether they are

18   directly specifying color, if there's any conversion

19   whatsoever?  What in the patent and in that Markman

20   order tells us whether it's too much conversion or not

21   too much conversion?

22        MR. MARINA:  Objection.  Calls for a legal

23   conclusion.

24        THE WITNESS:  I don't know that there's anything

25   that specifically points this out.  We've already

Page 258

1   discussed that.  It's an issue of what is directly

2   specified as a color data value and what is not directly

3   specified as a color data value.

4   BY MR. MICALLEF:

5       Q    So it's go ask Jake Richter?

6       A    Or the court.  I expect the court's answer

7   would be more authoritative in the long run.

8       MR. MICALLEF:  What did we mark this last one as?

9       THE REPORTER:  23.  Next one is 24.

10  BY MR. MICALLEF:

11      Q    So have you ever seen Richter Exhibit 23

12  before?

13      A    I don't know.  Is it all one exhibit?

14      Q    It is now.

15      A    I do not specifically recall if I've seen this

16  or not.  If I had, it would be listed as one of the

17  documents I've reviewed.

18      Q    I'd like to get you to turn to the page that

19  bears the Bates No. LUC 003957.

20      A    57.  That's the blank page here?

21      Q    Do you have blank pages?

22      A    I have a whole bunch of blank pages.

23      Q    You do?

24      A    And 57 is one of those.

25      Q    It looks like we have a bad exhibit.

Page 265

1      A    I do.

2      Q    What did you mean by that?

3      A    Well, if you combine something that can't use

4   something else with that something else, the results are

5   unpredictable because you don't know --

6      Q    What combination are you talking about here in

7   this paragraph 13?

8      A    This basically had to do with, I think, the

9   suggestion that the NASA report would be combined with

10   another reference -- I don't recall off the top of my

11   head which one it was -- that would provide the use of

12   an in-use background color.

13      Q    And you think one of ordinary skill in the art

14   in 1981 could not have done that?

15      A    Not without creating a whole new set of

16   graphics primitives that use a background color.  But

17   the NASA report, as specified, used stroke or vector

18   graphics.  There's no need for a background color in

19   those.  They don't use it.

20      Q    But a person who does create a whole new set

21   of output primitives, as you put it, could combine them;

22   right?

23      A    Well, why would they use a core as the basis

24   for that?  I mean, it doesn't make technical sense to do

25   it.

1       Q      But my question was, a person who wanted to do

2   that could combine them; right?

3       A      Again, a person with enough will can do

4   anything they want to pretty much.

5       Q      And could combine, perform that combination

6   that we're talking about, that you're referring to here;

7   right?

8       A      Hypothetically.  I don't know what they would

9   end up doing.

10      Q      You don't know --

11      A      I don't know exactly what they would end up

12  doing in order to make that happen.

13      Q      You don't have an opinion on that?

14      A      Well, my opinion is it's unpredictable.

15      Q      But someone could do it?

16      A      Well, again, someone can do pretty much

17  anything they want to within the realm of a possibility.

18      Q      Does the NASA final report disclose a

19  background color?

20      A      It discloses a background color in the terms

21  of the ones we discussed earlier where it sets basically

22  with a New Frame command the entire background of the,

23  of the display on a New Frame of command.

24      Q      So your view is that it doesn't disclose an

25  in-use background color as that term is used in the

Page 267

1    patent?

2        A    That is correct -- used in the claims at

3    issue, that is correct.

4        Q    So really, all somebody would have to do would

5    be to combine the in-useiveness -- the in-use

6    characteristic with the NASA final report in order to

7    get an in-use background color; right?

8        A    Well, I mean, you make that sound like it's a

9    real simple thing.  But the fact is there's no function

10   in the NASA report that would utilize an in-use

11   background color.

12       Q    But my question was, that all somebody would

13   have to do is to combine the in-use characteristic with

14   the NASA final report, and then what you say is missing

15   would be there; right?

16       A    And I, I guess I would like you to elaborate

17   how that would be done because I don't know.

18       Q    Okay.  I'm not going to tell you.  I'm not

19   going to elaborate.  I just want an answer.  However

20   it's done --

21       MR. MARINA:  He's answered your question.

22       MR. MICALLEF:  No, he hasn't.

23       Q    However it's done, that's all somebody would

24   have to do; however it might be done, that's all

25   somebody would have to do, is to add at the in-use

Exhibit 11

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF CALIFORNIA
 3                      - - -
 4   LUCENT TECHNOLOGIES INC.,        )
                                      )
 5           Plaintiff,               )
                                      )
 6       Vs.                          )
                                      )
 7   GATEWAY, INC., GATEWAY COUNTRY   )
     STORES LLC, GATEWAY COMPANIES,   )
 8   INC., GATEWAY MANUFACTURING LLC ) Case No. 02-CV-2060B(CAB)
     and COWABUNGA ENTERPRISES, INC.,)        consolidated with
 9                                    ) Case No. 03-CV-0699B(CAB)
           Defendants.               ) Case No. 03-CV-1108B(CAB)
10                                    )
         and                         )
11                                    )
     MICROSOFT CORPORATION,           )
12                                    )
           Intervener.               )
13   _____)
                                      )
14   AND RELATED CROSS-ACTIONS.       )
     _____)
15
16
17           DEPOSITION OF JAKE RICHTER
18                  TAKEN ON
19         WEDNESDAY, NOVEMBER 14, 2007
20
21
22
23
24   Reported by:   LISA RAE SOMMERHAUSER
25                  CSR NO. 10985
```

Page 235

1    a better term, to the right of a decimal point?

2         A    Prior to the application of the scaler.

3         Q    Prior to the application of the scaler.

4              And then the next bit over would represent --

5    it would be sort of like just putting the bits on the

6    right side of the decimal point and then multiplying it

7    by a scaler --

8         A    Not really because those bits don't translate

9    to an actual number directly.  It's not like binary

10   coded decimal where you use some number bits, like four

11   bits to basically encode a number from 0 to 9.  Each one

12   of those bits represents a fraction.

13             I don't know if you're -- I'm sure you've

14   heard like the math trick from, maybe from the math

15   teacher when you were in grade school.  If I'm basically

16   running a race of a thousand feet, okay, a relay race.

17   And I basically relay runners set at half the distance

18   from where I am to the finish line, will I actually ever

19   reach the finish line?  And the answer is no, you'll

20   basically end up approximating almost towards the end.

21   But you're always going to be half of the remaining

22   distance from that person to the finish line, even

23   though it might be, you know, a minute, minute amount.

24             And that, this basically, this one potential,

25   one exemplary embodiment of floating point numbers using

Page 236

1   computer systems utilizes that to basically try to get

2   as much accuracy as it has room for storage for the

3   floating point number.

4        Q    I see.  Can you go back to the page in the

5   NASA final report that is marked Dell 366737.

6        A    I have that open.

7        Q    Okay.  And the fourth full paragraph on that

8   page?

9        A    Uh-huh.

10       Q    I believe it's the fifth sentence, which says,

11  "The user may specify color directly with three

12  parameters between zero and one."  Do you see that?

13       A    Yes, I do.

14       Q    And this is a description of the direct

15  specification of color; right?

16       A    Well, not really because floating point

17  numbers, which this is certainly what a parameter

18  between zero and one implies is a floating point number;

19  because you can't have an integer between zero and one.

20  It's either zero or one.

21       Q    So a fraction between zero and one implies a

22  floating point number?

23       A    This text implies a floating point number.  It

24  doesn't actually say a fraction.  It says a value, or

25  the parameter is between zero and one.  And up above

Page 237

1    it says, "The user may specify intensity directly with

2    values between 0 and 1," talking about the intensity

3    version of the NASA specification.

4        Q    You can't have integers between zero and one;

5    right?

6        A    That's what I just said.

7        Q    It's got to be a fraction if it's a value

8    between zero and one; right?

9        A    It has to be in computing terms a floating

10   point number.

11       Q    If it's between zero and one, it has to be a

12   floating point number; that's your opinion?

13       A    Yes.

14       Q    It doesn't say floating point number?

15       A    Right.

16       Q    But that's your interpretation of --

17       A    That's my interpretation of that.  I do know,

18   by the way -- this is kind of an interesting thing

19   here -- it does say the next sentence, "These parameters

20   may specify red, green and blue, or hue, lightness and

21   saturation," which is what I was referring to is the

22   other color models or color spaces in one of the

23   previous discussions.

24       Q    Do you think fractions between zero and one,

25   is it fair to characterize them as percentages?

Page 242

1       Q    If I specify RGB colors with a parameter

2   between zero and one, wouldn't that call for a

3   particular color?

4       A    Again, in what context?

5       Q    The context of this case.

6       A    Well, you don't specify color between zero and

7   one in the patent.  So where else?

8       Q    Anywhere else.  Would it at any time call for

9   a particular color?  Do you know?

10      A    Well, you can't specify a zero to one in the

11  patent.  So you can't specify something between zero and

12  one -- between zero and one there are no integers.

13      Q    Do you think the patent claim is limited to

14  exactly that which is described in the patent?

15      A    No.

16      Q    Okay.  So explain your last answer.

17      A    Well, my last answer basically comes back down

18  to the fact that the inventors obviously had something

19  specific in mind when they said the color is directly

20  specified as a color value.  If they --

21      Q    Did the inventors tell you that?

22      A    If they had intended to have it cover a

23  broader range of number systems, I believe they would

24  not have included the word "directly" in there.

25      Q    So you think --

Page 243

1      A    They would have just said foreground color is

2  specified as a color data value.

3      Q    So you think the patent is limited to the use

4  of integers to specify a color data value; correct?

5      A    I believe that the term "directly specified as

6  color data values" precludes the usage of floating point

7  specified color components as part of the requirements

8  to basically -- to meet the requirements of that claim

9  element.

10     Q    Well, if I specify color data values using

11  values between zero and one, won't that call for a

12  particular color?

13     A    I mean, in the context of the NASA system, if

14  you specify your RGB components between zero and one and

15  provide three different numbers of those, based on how

16  the NASA system works as I understand it, then yes, you

17  would produce a particular color based on a combination

18  of those three numbers.

19     Q    If I used those same color data values the

20  next day, I would get -- with the same system, I would

21  get the same color called output; correct?

22     A    Close enough.  Depends whether you have drift

23  in your CRT.

24     Q    But it does call for a particular color?

25     A    Yes.

Page 244

1     Q    Okay.  So just to make sure I understand your

2  position, you are not expressing the opinion that if

3  color data values need to be converted in some manner in

4  order to eventually output a color, that that has any

5  relevance to the claim; is that correct?  It's not your

6  opinion; right?

7     A    Well, my opinion is that for the first mode of

8  access, basically you have to directly specify the color

9  data values.

10    Q    And your opinion is that that requires

11 specifying using integers?

12    A    It requires specifying in some number system

13 that doesn't require a significant conversion to get to

14 something you can actually utilize in the hardware.

15    Q    Well, what's a significant conversion?

16    A    Floating point integer.

17    Q    What else would be a significant conversion?

18    A    I can't think of anything else off the top of

19 my head.

20    Q    The only thing you can think of is the one

21 that happens to be in this particular prior art

22 reference; right?

23    A    Well, it's probably by coincidence the most

24 extreme example that I can think of because doing

25 floating point in these systems in the early '80s and

Page 243

1      A    They would have just said foreground color is

2  specified as a color data value.

3      Q    So you think the patent is limited to the use

4  of integers to specify a color data value; correct?

5      A    I believe that the term "directly specified as

6  color data values" precludes the usage of floating point

7  specified color components as part of the requirements

8  to basically -- to meet the requirements of that claim

9  element.

10     Q    Well, if I specify color data values using

11  values between zero and one, won't that call for a

12  particular color?

13     A    I mean, in the context of the NASA system, if

14  you specify your RGB components between zero and one and

15  provide three different numbers of those, based on how

16  the NASA system works as I understand it, then yes, you

17  would produce a particular color based on a combination

18  of those three numbers.

19     Q    If I used those same color data values the

20  next day, I would get -- with the same system, I would

21  get the same color called output; correct?

22     A    Close enough.  Depends whether you have drift

23  in your CRT.

24     Q    But it does call for a particular color?

25     A    Yes.

1       Q     Okay.  So just to make sure I understand your

2    position, you are not expressing the opinion that if

3    color data values need to be converted in some manner in

4    order to eventually output a color, that that has any

5    relevance to the claim; is that correct?  It's not your

6    opinion; right?

7       A     Well, my opinion is that for the first mode of

8    access, basically you have to directly specify the color

9    data values.

10      Q     And your opinion is that that requires

11   specifying using integers?

12      A     It requires specifying in some number system

13   that doesn't require a significant conversion to get to

14   something you can actually utilize in the hardware.

15      Q     Well, what's a significant conversion?

16      A     Floating point integer.

17      Q     What else would be a significant conversion?

18      A     I can't think of anything else off the top of

19   my head.

20      Q     The only thing you can think of is the one

21   that happens to be in this particular prior art

22   reference; right?

23      A     Well, it's probably by coincidence the most

24   extreme example that I can think of because doing

25   floating point in these systems in the early '80s and

Page 245

1    late '70s required a lot of either hardware and/or

2    bandwidth basically to make the conversions.

3             Even in the regular PCs -- I don't know if you

4    recall the early days of the IBM PC -- you would

5    actually purchase a separate processor called a floating

6    point processor.  So you could actually perform these

7    operations somewhat more quickly than doing them in

8    software because they were so overwhelmingly a burden on

9    the system.

10       Q    How about converting to an index value?  Is

11   that a significant conversion?

12       A    Converting from what?

13       Q    From the color data values, RGB values to an

14   index?

15       A    Well, I don't know necessarily where that's

16   being done in the claims over here.

17       Q    But would you consider it a significant

18   conversion?

19       A    Explain to me what the process would be and

20   I'll tell you, if I can.

21       Q    The process would be just taking your RGB

22   values and washing them through some kind of

23   mathematical operation that outputs an index value.

24       A    It depends on how easy it is.  I mean, I can

25   convert from color to gray scale by dropping my reds and

1   conversion significant or otherwise, then your opinion

2   on the subject is wrong; right?

3        A    Well, I mean, it's basically -- you know, the

4   court will have made that decision.  The court is

5   entitled to make whatever decisions it makes based on

6   what it believes it should decide.

7        Q    About the meaning of the claim?

8        A    Sure.

9        Q    And about the meaning of the claim

10  interpretation?

11       A    Well, that is the court's jurisdiction as I

12  understand it.

13       Q    Let me get back to this significant

14  conversion.  How about, how about an integer that's

15  originally in a decimal format converted to an integer

16  in a binary format?  Is that a significant conversion?

17       A    I am not sure what you mean by integer in a

18  decimal format.

19       Q    The kind of numbers we usually use as human

20  beings.

21       A    Those are floating numbers.

22       Q    Base 10?

23       A    Those are floating point numbers.  They are

24  represented in the system --

25       Q    They could be --

Page 248

1        A     -- in the way that I explained.

2        Q     Oh, so is 100, is 1-0-0, is that a floating

3    point number?

4        A     No.  That's just a pure integer.  If you have

5    100.0, that would actually become a floating point

6    number.

7        Q     That's what I meant by decimal.  Pure

8    integers?

9        A     Okay.  Well, those are -- from a program

10   concept those mean different things.

11       Q     So converting a pure integer to -- from a

12   decimal format, meaning base 10, to a binary format,

13   meaning base 2, is that a significant conversion?

14       A     Well, I guess I'm not getting your distinction

15   because integers, when they are stored in a computer,

16   are basically, they are integers.  So you know, 100

17   would be represented by the bits that make up 100.

18       Q     Yeah.  But when you write it in your checkbook

19   you don't right it -- maybe you do; I don't know -- you

20   don't write it in bits; right?  If you were to right me

21   a check for 100 bucks, you'd write a 1-0-0, and that's

22   base 10; right?

23       A     Well, yeah.

24       Q     And if -- so converting that number --

25       A     But there's no conversion involved.  What

Page 249

1    happens --

2        Q    Let me finish my question.

3        A    I'm sorry.

4        Q    Converting that number to the binary version

5    of that, of that number that computers use, is that a

6    significant conversion?

7        A    Well, as I said, there's no actual conversion

8    per se that happens.  If I go in a program and specify

9    100, my compiler will automatically generate the binary

10   data that gets put in memory.  If I generate -- if I

11   basically put in a No. 100.1, which is a floating point

12   number, it's going to generate this large bit encoded

13   thing similar to what I described earlier.  And that was

14   the binary presentation of 100.1.

15       Q    Well, the compiler will convert it from one

16   format to another; right?

17       A    It will convert it from one format to another

18   at compiled time.

19       Q    Yeah, right.

20       A    Right.

21       Q    So you think that that's not a conversion?

22       A    That's a different kind of conversion.  The

23   conversion I was talking about with respect to floating

24   point is, I can write a program that basically goes and

25   draws a color ramp in the NASA system where I add .1 to

1    my ready component every time.  And the compiler is not

2    going to basically interpret that conversion and produce

3    an integer for me.  That has to be done at run time.

4        Q    So is what the compiler does, is that a

5    significant conversion or not?

6        A    No.

7        Q    How about converting to hexadecimal?  Is that

8    a significant conversion?

9        A    Hexadecimal is just another format of reading

10   binary numbers.

11       Q    How about converting ASCII to integer?  Is

12   that a significant conversion?

13       A    I'm not sure what you mean by converting ASCII

14   to integer.

15       Q    You don't know what an ASCII character is?

16       A    I do know what an ASCII character is.

17       Q    Is one an ASCII character?

18       A    It depends on how it's used.  If it's used to

19   represent a bit, then no.

20       Q    Can it be used as an ASCII character?

21       A    Yeah, I think 31 hex.

22       Q    How about converting 1-0-0 as an ASCII

23   character to an integer?  Is that a significant

24   conversion?

25       A    That would be considered a binary coded

**Exhibit 11  298.1**

Page 253

1    here basically that either the user could do it or that

2    other core routines could do that as well, call this

3    function.

4         Q    But you don't have an understanding without

5    studying the document more --

6         A    Well --

7         Q    -- about --

8         A    I didn't find a reference to New Frame as a

9    documented item in this document in Appendix A, which is

10   where the New Frame function would be called from, so --

11        Q    Well, in your supplemental report, Exhibit 17,

12   at page 17 --

13        A    Uh-huh.

14        Q    -- paragraph 47, about five lines down you

15   say, "The NASA report states at page 20 of Appendix

16   A" --

17        A    Let's go take a look there.  Okay.

18        Q    -- "that the function does not take effect

19   until a new frame occurs; and therefore, it's not used

20   as the background color for subsequently received," et

21   cetera, et cetera?

22        A    That's right.

23        Q    So can you explain -- now does that refresh

24   your recollection?

25        A    It does.

Page 254

1        Q    So what's the New Frame?

2        A    The New Frame function -- because Appendix A

3   as I understand it is basically a modification to, I

4   guess, the previous core interface.  Basically the New

5   Frame function causes the display that's being drawn to

6   be cleared.  And then in the case of the background, set

7   background color function, would go and fill the screen

8   with the specified color.  And if you're working in a

9   segmented system where your list of drawing commands

10  have already been, I guess, put into a segment or

11  display list, then that would be redrawn over the top of

12  that.

13       Q    I'm going to ask you to take a look at one

14  page, Dr. Wedig's supplemental expert report which I

15  think was marked as Exhibit 100 at his deposition, the

16  Wedig deposition.  I'm not going to mark it here because

17  it's just killing trees.  And I only have one question.

18  So it's page 30 of that.

19       THE WITNESS:  Is that okay with you?

20       MR. MARINA:  That's okay with me.  I just need a

21  copy of it.

22  BY MR. MICALLEF:

23       Q    Here.  I opened it to page 30.

24       A    Okay.

25       Q    Near the top of page 30 at about line 5

Page 255

1    there's a sentence that says, "Once a New Frame command

2    is received, the color identified by the index into the

3    color memory will be used as the background color for

4    subsequently received text and graphics drawing

5    commands."  Do you see that sentence?

6        A    I do.

7        Q    Do you agree with that sentence?

8        A    Not exactly.

9        Q    In what way do you disagree?

10       A    Basically once a new frame command is

11   received, the color identified by the index into the

12   color memory is the background color for the entire

13   screen.  And there's basically no -- it's not an in-use

14   background color because it's not used by the individual

15   functions.

16       Q    By that you mean it's not actively drawn on

17   the screen by the individual functions?

18       A    Correct, correct.

19       Q    Okay.  That's all I was going to ask you about

20   that.  Thank you.

21           So if I understand the NASA final report, that

22   this background back color and index into the background

23   color is stored in memory when the set background color

24   command is used, some index is stored in memory

25   somewhere.  Does that make sense?

Page 254

1        Q     So what's the New Frame?

2        A     The New Frame function -- because Appendix A

3   as I understand it is basically a modification to, I

4   guess, the previous core interface.  Basically the New

5   Frame function causes the display that's being drawn to

6   be cleared.  And then in the case of the background, set

7   background color function, would go and fill the screen

8   with the specified color.  And if you're working in a

9   segmented system where your list of drawing commands

10  have already been, I guess, put into a segment or

11  display list, then that would be redrawn over the top of

12  that.

13       Q     I'm going to ask you to take a look at one

14  page, Dr. Wedig's supplemental expert report which I

15  think was marked as Exhibit 100 at his deposition, the

16  Wedig deposition.  I'm not going to mark it here because

17  it's just killing trees.  And I only have one question.

18  So it's page 30 of that.

19       THE WITNESS:  Is that okay with you?

20       MR. MARINA:  That's okay with me.  I just need a

21  copy of it.

22  BY MR. MICALLEF:

23       Q     Here.  I opened it to page 30.

24       A     Okay.

25       Q     Near the top of page 30 at about line 5

Page 255

1    there's a sentence that says, "Once a New Frame command

2    is received, the color identified by the index into the

3    color memory will be used as the background color for

4    subsequently received text and graphics drawing

5    commands."  Do you see that sentence?

6         A    I do.

7         Q    Do you agree with that sentence?

8         A    Not exactly.

9         Q    In what way do you disagree?

10        A    Basically once a new frame command is

11   received, the color identified by the index into the

12   color memory is the background color for the entire

13   screen.  And there's basically no -- it's not an in-use

14   background color because it's not used by the individual

15   functions.

16        Q    By that you mean it's not actively drawn on

17   the screen by the individual functions?

18        A    Correct, correct.

19        Q    Okay.  That's all I was going to ask you about

20   that.  Thank you.

21             So if I understand the NASA final report, that

22   this background back color and index into the background

23   color is stored in memory when the set background color

24   command is used, some index is stored in memory

25   somewhere.  Does that make sense?

Page 256

1        A    Well, the index that you would specify with a

2    set background, I guess it would -- it would have to be

3    with a set background color index function.  Is that

4    what that said, the Wedig reference?

5        Q    Strike that.  Strike that.

6             Let me mark -- I'd like to mark as Exhibit 23

7    a document bearing Bates Nos. LUC 003903 through 004026.

8    It's an extra page.

9             (Defendants' Exhibit 23 was marked for

10               identification.)

11    THE WITNESS:  How much more time on tape?

12    VIDEO OPERATOR:  Seven minutes.

13    MR. MICALLEF:  Why don't we take a quick break.

14    VIDEO OPERATOR:  This marks the end of Tape No. 3

15    in the deposition of Jake Richter.  Going off the

16    record.  The time is 8:20.

17             (Recess taken.)

18    VIDEO OPERATOR:  We're back on the record.  Here

19    begins Videotape No. 4 in the deposition of Jake

20    Richter.  The time is 8:25.

21    BY MR. MICALLEF:

22        Q    I want to go back to this idea of significant

23    conversion; conversion that would in your view

24    demonstrate that certain color data values are not

25    directly specifying a color.  Would it be a significant

Page 256

1       A    Well, the index that you would specify with a

2    set background, I guess it would -- it would have to be

3    with a set background color index function.  Is that

4    what that said, the Wedig reference?

5       Q    Strike that.  Strike that.

6            Let me mark -- I'd like to mark as Exhibit 23

7    a document bearing Bates Nos. LUC 003903 through 004026.

8    It's an extra page.

9            (Defendants' Exhibit 23 was marked for

10             identification.)

11    THE WITNESS:  How much more time on tape?

12    VIDEO OPERATOR:  Seven minutes.

13    MR. MICALLEF:  Why don't we take a quick break.

14    VIDEO OPERATOR:  This marks the end of Tape No. 3

15    in the deposition of Jake Richter.  Going off the

16    record.  The time is 8:20.

17            (Recess taken.)

18    VIDEO OPERATOR:  We're back on the record.  Here

19    begins Videotape No. 4 in the deposition of Jake

20    Richter.  The time is 8:25.

21    BY MR. MICALLEF:

22       Q    I want to go back to this idea of significant

23    conversion; conversion that would in your view

24    demonstrate that certain color data values are not

25    directly specifying a color.  Would it be a significant

Page 257

1    conversion if you had to -- if you moved around the bits

2    and concatenated them together in a different pattern?

3         A    Such as?

4         Q    Do you know the difference between little

5    Indian and big Indian?

6         A    Yes.

7         Q    How about going from little Indian to big

8    Indian?  Is that a significant conversion?

9         A    It depends on the processor.  Some processors

10   actually have a bit reverse built right into them.  So

11   that would just basically be, maybe two clock cycles on

12   a CPU.

13        Q    So no?  Is that a no?

14        A    That would probably -- that's a qualified no.

15   It depends on the system.  But typically that's a -- not

16   a majorly CPU-intensive function.

17        Q    How does anybody know whether they are

18   directly specifying color, if there's any conversion

19   whatsoever?  What in the patent and in that Markman

20   order tells us whether it's too much conversion or not

21   too much conversion?

22        MR. MARINA:  Objection.  Calls for a legal

23   conclusion.

24        THE WITNESS:  I don't know that there's anything

25   that specifically points this out.  We've already

Page 258

1    discussed that.  It's an issue of what is directly

2    specified as a color data value and what is not directly

3    specified as a color data value.

4    BY MR. MICALLEF:

5        Q    So it's go ask Jake Richter?

6        A    Or the court.  I expect the court's answer

7    would be more authoritative in the long run.

8        MR. MICALLEF:  What did we mark this last one as?

9        THE REPORTER:  23.  Next one is 24.

10   BY MR. MICALLEF:

11       Q    So have you ever seen Richter Exhibit 23

12   before?

13       A    I don't know.  Is it all one exhibit?

14       Q    It is now.

15       A    I do not specifically recall if I've seen this

16   or not.  If I had, it would be listed as one of the

17   documents I've reviewed.

18       Q    I'd like to get you to turn to the page that

19   bears the Bates No. LUC 003957.

20       A    57.  That's the blank page here?

21       Q    Do you have blank pages?

22       A    I have a whole bunch of blank pages.

23       Q    You do?

24       A    And 57 is one of those.

25       Q    It looks like we have a bad exhibit.

Page 265

1      A    I do.

2      Q    What did you mean by that?

3      A    Well, if you combine something that can't use

4   something else with that something else, the results are

5   unpredictable because you don't know --

6      Q    What combination are you talking about here in

7   this paragraph 13?

8      A    This basically had to do with, I think, the

9   suggestion that the NASA report would be combined with

10   another reference -- I don't recall off the top of my

11   head which one it was -- that would provide the use of

12   an in-use background color.

13      Q    And you think one of ordinary skill in the art

14   in 1981 could not have done that?

15      A    Not without creating a whole new set of

16   graphics primitives that use a background color.  But

17   the NASA report, as specified, used stroke or vector

18   graphics.  There's no need for a background color in

19   those.  They don't use it.

20      Q    But a person who does create a whole new set

21   of output primitives, as you put it, could combine them;

22   right?

23      A    Well, why would they use a core as the basis

24   for that?  I mean, it doesn't make technical sense to do

25   it.

Page 266

1      Q    But my question was, a person who wanted to do

2  that could combine them; right?

3      A    Again, a person with enough will can do

4  anything they want to pretty much.

5      Q    And could combine, perform that combination

6  that we're talking about, that you're referring to here;

7  right?

8      A    Hypothetically.  I don't know what they would

9  end up doing.

10     Q    You don't know --

11     A    I don't know exactly what they would end up

12  doing in order to make that happen.

13     Q    You don't have an opinion on that?

14     A    Well, my opinion is it's unpredictable.

15     Q    But someone could do it?

16     A    Well, again, someone can do pretty much

17  anything they want to within the realm of a possibility.

18     Q    Does the NASA final report disclose a

19  background color?

20     A    It discloses a background color in the terms

21  of the ones we discussed earlier where it sets basically

22  with a New Frame command the entire background of the,

23  of the display on a New Frame of command.

24     Q    So your view is that it doesn't disclose an

25  in-use background color as that term is used in the

Page 267

1    patent?

2        A    That is correct -- used in the claims at

3    issue, that is correct.

4        Q    So really, all somebody would have to do would

5    be to combine the in-useiveness -- the in-use

6    characteristic with the NASA final report in order to

7    get an in-use background color; right?

8        A    Well, I mean, you make that sound like it's a

9    real simple thing.  But the fact is there's no function

10   in the NASA report that would utilize an in-use

11   background color.

12       Q    But my question was, that all somebody would

13   have to do is to combine the in-use characteristic with

14   the NASA final report, and then what you say is missing

15   would be there; right?

16       A    And I, I guess I would like you to elaborate

17   how that would be done because I don't know.

18       Q    Okay.  I'm not going to tell you.  I'm not

19   going to elaborate.  I just want an answer.  However

20   it's done --

21       MR. MARINA:  He's answered your question.

22       MR. MICALLEF:  No, he hasn't.

23       Q    However it's done, that's all somebody would

24   have to do; however it might be done, that's all

25   somebody would have to do, is to add at the in-use

Exhibit 12



U.S. District Court
Southern District of California
880 Front Street, Room 4290
San Diego, CA 92101-8900

FAX-IN-TIME    NOTICE:
This fax is an official communication of the
U.S. District Court for the Southern District
of California. Please be aware that these are
the only copies of these documents that you
will receive unless specifically requested.

---

To: Matthew Bathon                    Date 11/17/05

From: Clerk U.S. District Court       Page 1 of 10

---

Fax queued: 11/17/05 at 09:40:19              CASE: 022060-CV #00371

CONFIDENTAL
Any questions about missing pages or unreadable copy, please call (619)
557-7667. The information contained in this facsimile message is attorney
privileged and confidential. It is intended only for the use of the
individual or entity named above. If the reader of this message is not the
intended recipient, or the employee or agent responsible to deliver it to
the intended recipient, you are hereby notified that any dissemination,
distribution or copying is strictly prohibited. If you have received this
communication in error, please call us immediately. Thank you.

IMAGES OF CASE FILINGS NOW AVAILABLE ON THE INTERNET!

Web PACER provides users with browser access to dockets and scanned images
of filed documents without leaving the comfort of their office/home.
Document copies can now be obtained more quickly and without making a trip
to the ClerkÆs Office.  Users with a PACER account can visit
http://pacer.casd.uscourts.gov/index.php via user i.d. and password for
immediate Web PACER access to the Southern District of CAÆs docket and case
filings.  Links to other courtsÆ Web PACER sites can be found at
http://pacer.psc.uscourts.gov/cgi-bin/links.pl.  An access fee of $.07 per
page viewed will be assessed.  Those interested in establishing a PACER
account can contact the PACER Service Center at (800) 676-6856 or register
on line at www.pacer.psc.uscourts.gov.

Mail & fax related issues, such as incomplete or illegible pages, should be
directed to
(619)557-7667.

**Exhibit 12  Page 311**

```
                                    FILED

                        05 NOV 16  AM 10: 55

                          BY:                    DEPUTY
```

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11   LUCENT TECHNOLOGIES, INC.,            )    Civil No: 02CV2060-B(WMc);
                                           )              03CV0699-B(WMc);
12                                         )              03CV1108-B(WMc)
                                           )
13              Plaintiff,                 )
                                           )    **ORDER CONSTRUING CLAIMS**
14   v.                                    )    **FOR UNITED STATES PATENT**
                                           )    **NUMBER 4,439,759**
15   GATEWAY, INC AND GATEWAY              )
     COUNTRY STORES LLC; and,              )
16   MICROSOFT CORPORATION; and, DELL,     )
     INC.,                                 )
17                                         )
                Defendants.                )
18                                         )
19   _____)

20

21        Before the Court is the matter of claims construction for U.S. Patent Number

22   4,439,759 ("the '759 Patent") in the above titled cases for patent infringement.[1]  Pursuant to

23   Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Court conducted a

24   _____

25        [1]Lucent originally filed two separate patent infringement actions, one against Defendant
     Gateway (02CV2060), and a second against Defendant Dell (03CV1108). Microsoft intervened in the
26   action filed by Lucent against Gateway.  Microsoft also filed a declaratory judgment action against
     Lucent (03CV0699) and Lucent filed counterclaims for patent infringement against Microsoft in that
27   action.  On July 7, 2003, the Court entered an order consolidating these three cases.  There are a total
     of 15 different patents involved in these three cases collectively.

28                                       1                    02CV2060; 03CV0699; 03CV1108

1  Markman hearing regarding construction of the disputed claim terms for the '759 Patent on
2  July 6 and 7, 2005. Plaintiff Lucent Technologies, Inc. ("Lucent") was represented by the
3  Kirkland & Ellis law firm, Defendant Gateway Inc. ("Gateway") was represented by the
4  Dewey Ballantine law firm, Defendant Microsoft Corporation ("Microsoft") was
5  represented by the law firm of Fish and Richardson and Defendant Dell, Inc. ("Dell") was
6  represented by the Arnold and Porter law firm.

7         The purpose of the Markman hearing was for the Court, with the assistance of the
8  parties, to prepare jury instructions interpreting the pertinent claims for all claim terms at
9  issue in the '759 Patent. Additionally, the Court and the parties prepared a "case glossary"
10 for terms found in the claims and the specification for the '759 Patent, considered to be
11 technical in nature and which a jury of laypersons would not understand clearly without
12 specific definition. As the case advances, the parties may request additional terms to be
13 added to the glossary to further facilitate the jury's understanding of the disputed claims.

14        After careful consideration of the parties' arguments and the applicable statutes and
15 case law, the Court **HEREBY CONSTRUES** all claim terms in dispute in the '759 Patent
16 and **ISSUES** the relevant jury instructions as written in exhibit A, attached hereto. Further,
17 the Court **HEREBY DEFINES** all pertinent technical terms as written in exhibit B,
18 attached hereto.

19
20        IT IS SO ORDERED.
21 DATED: _11-15-05_               _____
22                                 UNITED STATES SENIOR DISTRICT JUDGE
23
24 cc:    All Parties
25        The Honorable William McCurine, Jr., United States Magistrate Judge
26
27
28                                    2                    02CV2060; 03CV0699; 03CV1108

Exhibit 12  Page 313

**EXHIBIT A[2]**
**UNITED STATES PATENT NUMBER 4,439,759**

| VERBATIM CLAIM LANGUAGE | COURT'S CLAIM CONSTRUCTION |
|---|---|
| **CLAIM 1**<br>In a digital image display system: | **CLAIM 1**<br>In a digital image **display system** [*hardware and software, needed to achieve a visible representation of information in a data-processing system*]: |
| a memory for storing color data values; | a **memory** [*a color map that stores a table of color data values indexed by numbers*] for storing **color data values** [*color components of a particular color (such as the red, green and blue (RGB) color components)*]; |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | processing means responsive to a **predetermined command and data sequence** [*a command and data pattern having a known encoded meaning*] **comprising** [*including, but not limited to*] at least one command, the processing means **decoding** [*interpreting*] the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of **modes of access to** [*manners of retrieving*] color data values, the modes comprising<br><br>"Processing Means"<br>**Function:**<br>The function of this element is decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values |

---

[2]All terms appearing in bold face type and underlined have been construed by the court and appear with their definitions in the glossary in Exhibit B. The definition for each construed term appears in italics after its first use in the patent.

02CV2060; 03CV0699; 03CV1108

Exhibit 12  Page 314

| | |
|---|---|
| | **Structure:**<br>Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (*See*, Col.5, line 60 - Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43). |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | a first **mode of access** [*manner of retrieving*] wherein an **in-use foreground color** [*a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed*] is directly **specified as** [*called for by*] a **color data value**; |
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | a second **mode of access** wherein the **in-use foreground color** is **specified as** an index into the **color memory** [*a color map that stores a table of color data values indexed by numbers*]; and |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | a third **mode of access** wherein the **in-use foreground color** and an **in-use background color** [*a color that will be used as the background color for subsequently received text and graphics drawing commands until changed*] are **specified as** indexes into the **color memory**; and |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | display means responsive to the processing means, the display means displaying the colors associated with the **color data values** accessed by the selected mode.<br><br>"Display means"<br>**Function:**<br>The function of this element is displaying the colors associated with the color data values |

02CV2060; 03CV0699; 03CV1108

Exhibit 12 Page 315

| | |
|---|---|
| | accessed by the selected mode<br><br>**Structures:**<br>(1) monitor;<br>(2) television set;<br>(3) video projection system;<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.*, Col. 4, lines 50-55). |
| **CLAIM 2**<br>A digital image display system comprising: | **CLAIM 2**<br>A digital image **display system** comprising: |
| a color memory for storing color data values; | a **color memory** for storing **color data values**; |
| processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and | processing means responsive to **predetermined command and data sequences**, the processing means, responsive to a first command, selecting a **mode of access** to the **color memory**; and responsive to a second command, **setting** [*storing*] a **color data value** in the **color memory**; and<br><br>"Processing means"<br>**Function:**<br>The function of this element is:<br>(a) selecting a mode of access to the color memory; and<br>(b) setting a color data value in the color memory.<br>**Structure:**<br>(a) structure for selecting a mode of access to the color memory is:<br>Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 301-303; Fig. 4: boxes 401-405, 407, 408, and 411 (*See*, Col.5, line 60 - Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and |

| | |
|---|---|
| | the background and foreground color"), and lines 33-43)); |
| | (b) structure for setting a color data value in the color memory is: |
| | Data processor 1 programmed to perform the algorithm shown in Fig. 5: boxes 501, 504, 506, 508, and 510 (*See*, Col. 7, lines 14-17 (except for "or (2) in color mode 0, for setting"), Col. 7, lines 53-64 (except for "The sequence of boxes 504, 506, 508, and 510 is")). |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | display means responsive to the processing means, the display means displaying a color associated with the **color data value** accessed by the selected mode. |
| | "Display means" |
| | Function: |
| | The function of this element is displaying the colors associated with the color data values accessed by the selected mode |
| | Structures: |
| | (1) monitor; |
| | (2) television set; |
| | (3) video projection system; |
| | (4) a liquid crystal display; or |
| | (5) an LED display (*See e.g.*, Col. 4, lines 50-55). |

6

02CV2060; 03CV0699; 03CV1108

Exhibit 12  Page 317

| CLAIM 3 | CLAIM 3 |
|---|---|
| A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory. | A **display system** as recited in claim 2, wherein the processing means responsive to a second command **sets** plural **color data values** in **color memory**.<br><br>"Processing means":<br>**Function:**<br>The function of this element is sets plural color data values in color memory.<br><br>**Structure:**<br>Data processor 1 programmed to perform the algorithm of Fig. 5, Boxes 501, 504, 506, 508 and 510 and the line exiting box 510 (*See* Col. 7 Lns. 14-17 [except for "or (2) in color mode 0, for setting"], Col. 7, Lns. 53-65). |
| CLAIM 4 | CLAIM 4 |
| In a video image display system having a color memory, a method for displaying a color image in a terminal independent manner responsive to commands and data received from a command and data source, the method comprising the steps of: | In a video image **display system** having a **color memory**, a method for displaying a color image in a **terminal independent manner** [*meaning that terminals having varying color capabilities are able to receive common input information and each terminal provides a color display that within its capabilities most closely matches that input information*] responsive to commands and data received from a command and data source, the method comprising the steps of: |
| receiving commands and data from the command and data source; | receiving commands and data from the command and data source; |
| reading a first command for selecting a mode of access to the color memory, and responsive to data following the first command, selecting the mode of access to the color memory; | reading a first command for selecting a **mode of access** to the **color memory**, and **responsive to data following the first command** [*taking some action based on the data following the first command*], selecting the **mode of access** to the **color memory**; |

7

Exhibit 12  Page 318

| | |
|---|---|
| reading a second command for setting color data values in the color memory and, responsive to data following the second command, setting the color data values in the color memory, | reading a second command for setting **color data values** in the **color memory** and, **responsive to data following the second command** [*taking some action based on the data following the second command*], **setting** the **color data values** in the **color memory**, |
| reading a third command for accessing color data values in the color memory, and | reading a third command for **accessing** [*retrieving*] **color data values** in the **color memory**, and |
| displaying a color image associated with the color data values accessed by the third command on a video display terminal. | displaying a color image associated with the **color data values accessed** [*retrieved*] by the third command on a video display terminal. |

8

**Exhibit 12  Page 319**

## EXHIBIT B

### GLOSSARY FOR UNITED STATES PATENT NUMBER 4,439,759

| TERM | DEFINITION |
|---|---|
| color data value | color component of a particular color (such as the red, green and blue (RGB) color components) |
| color memory | a color map that stores a table of color data values indexed by numbers |
| comprising | including, but not limited to |
| decoding | interpreting |
| display system | hardware and software needed to achieve a visible representation of information in a data-processing system |
| in-use background color | a color that will be used as the background color for subsequently received text and graphics drawing commands until changed |
| in-use foreground color | a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed |
| memory | a color map that stores a table of color data values indexed by numbers |
| mode of access | manner of retrieving |
| predetermined command and data sequence | a command and data pattern having a known encoded meaning |
| responsive to data following the first command | taking some action based on the data following the first command |
| setting | storing |
| specified as | called for by |
| terminal independent manner | meaning that terminals having varying color capabilities are able to receive common input information and each terminal provides a color display that within its capabilities most closely matches that input information |

9

**Exhibit 12  Page 320**

Exhibit 13

1

2

3

4

5

6

7                              UNITED STATES DISTRICT COURT

8                            SOUTHERN DISTRICT OF CALIFORNIA

9  LUCENT TECHNOLOGIES INC., and          CASE No. 02-CV-2060 B (CAB)
   MULTIMEDIA PATENT TRUST,                        consolidated with
10                                          CASE No. 03-CV-699 B (CAB)
            Plaintiff and Counter Defendants,   CASE No. 03-CV-1108 B (CAB)
11
            vs.
12                                          **SUPPLEMENTAL EXPERT REPORT OF**
   GATEWAY, INC., GATEWAY              **DR. ROBERT G. WEDIG ON THE**
13 COUNTRY STORES LLC, GATEWAY,        **INVALIDITY OF U.S. PATENT NUMBER**
   GATEWAY COMPANIES, INC.,            **4,439,759**
14 GATEWAY MANUFACTURING LLC
   and COWABUNGA ENTERPRISES, INC.
15
            Defendants and Counter-Claimants
16
            and
17
   DELL INC.,
18
            Defendant and Counter-Claimant.
19
            And
20
   MICROSOFT CORPORATION
21
            Intervener and Counter-Claimant
22

23

24

25

26

27

28

                                        -1-

**Exhibit 13  Page 321**

1        I, Dr. Robert G. Wedig, state as follows:

2   **I.        INTRODUCTION.**

3        1.        I previously submitted an expert report in this matter titled "Expert Report of Dr.

4   Robert G. Wedig on the Invalidity of U.S. Patent Number 4,439,759. ("Wedig Invalidity Report").

5   In that report I provided my background and expertise in these matters, my compensation and my

6   curriculum vitae including a list of publications, all of which I incorporate herein by reference.

7   Furthermore, I have previously submitted a second expert report in this matter titled "Rebuttal

8   Report of Dr. Robert G. Wedig on the Noninfringement of U.S. Patent Number 4,439,759.

9   ("Wedig Noninfringement Report") in which I rebut the findings of Mr. Jake Richter documented

10  in his expert report "Expert Report of Jake Richter" dated March 31, 2006 ("Richter Infringement

11  Report").  I understand that Mr. Richter has also written a report titled "Rebuttal Expert Report of

12  Jake Richter" dated May 12, 2006 ("Richter Validity Report") in which he rebuts my initial Wedig

13  Invalidity Report.  On May 30, 2006, I submitted a third report entitled "Report of Dr. Robert G.

14  Wedig on Secondary Considerations of U.S. Patent Number 4,439,759. ("Wedig Report On

15  Secondary Considerations")

16       2.        It is my understanding that Lucent is now only asserting claims 1-3 of U.S. Patent

17  Number 4,439,759 (the "'759 Patent").  (Wedig Noninfringement Report, ¶ 31).  Should Lucent

18  reassert infringement of claim 4 of the '759 Patent, I reserve the right to update my invalidity

19  opinions to address that claim.  In my Wedig Invalidity Report, I expressed my opinion that claims

20  1-3 of the '759 Patent (the "Asserted Claims") are invalid as being obvious over a number of prior

21  art references.  I have been informed that since the time I submitted my Invalidity Report and my

22  Report On Secondary Considerations, there have been some changes in the law relating to the non-

23  obviousness requirement for patents.  I have been asked to review additional evidence, and to

24  further analyze the validity of the Asserted Claims under revised legal standards pertaining to the

25  non-obviousness requirement.

26       3.        In the preparation of this report, I continue to adhere to the claim construction of

27  the '759 patent as set forth in United States District Judge Rudi M. Brewster's Memorandum and

28  Order signed on November 11, 2005.  ("Court's Claim Construction").   A table showing this

-2-

**Exhibit 13  Page 322**

1    claim construction was provided in my Wedig Invalidity Report.  In preparing this report, I also

2    assume the same level of ordinary skill in the art that I previously specified.  (Wedig Invalidity

3    Report, ¶ 22).  In preparing this report, I have reviewed and relied on the documents referenced in

4    Wedig Invalidity Report, Wedig Noninfringement Report, Richter's Infringement Report and my

5    Wedig Report on Secondary Considerations.  I have also received and reviewed the documents

6    listed in Exhibit 1 attached to this report. I write this report of my own personal knowledge, and if

7    called as a witness, I could and would testify competently to the facts thereto.

8    **II.        THE QUESTION OF OBVIOUSNESS**

9          4.        I would like to make clear that I will not offer opinions of the law as I am not an

10    attorney.  However, I am informed of several principles concerning patent validity and invalidity,

11    which I used in my analysis of the prior art and which assisted me in arriving at my conclusions.

12          5.        In approaching the question of whether or not the Asserted Claims of the `759

13    Patent are obvious over the prior art, I was instructed to: (1) determine the scope and content of the

14    prior art; (2) ascertain the differences between the prior art and the asserted claims; and (3)

15    determine the level of ordinary skill in the art to which the `759 patent pertains.  My understanding

16    of the scope and content of the prior art is based on my review of documents and things cited in

17    this report or cited in Exhibit 1 to this report, as well as documents cited in my other reports.  My

18    opinion on the ordinary level of skill in the art was expressed in my Wedig Invalidity Report.

19    (Wedig Invalidity Report, ¶ 22).    My analysis of how the prior art affects the validity of the

20    Asserted Claims is summarized in the charts attached hereto as Exhibits 2 – 4, and also in the

21    sections that follow.  As explained in further detail below, I have identified combinations of prior

22    art references that I believe render the Asserted Claims obvious.

23          6.        I am informed that legal principles regarding invalidity of a claim due to

24    obviousness were clarified by the U.S. Supreme Court after I wrote my Wedig Invalidity Report.  I

25    am informed that the principles described in paragraph 7 of the Wedig Invalidity Report (relating

26    to a "motivation," "suggestion," or "teaching" in the prior art to combine references to produce the

27    claimed alleged invention) remain an appropriate approach in a validity analysis.  I am informed,

28    however, that the U.S. Supreme Court clarified that additional principles may also be applied in

-3-

**Exhibit 13  Page 323**

1   such an analysis.  I set forth some such additional principles below.

2        7.     I am informed that when a claim simply arranges prior art elements with each

3   performing the same function it had been known to perform and yields no more than one would

4   expect from such an arrangement, such a combination is obvious.  When a claim recites a structure

5   already known in the prior art that is altered by the mere substitution of one element for another

6   known in the field, the claim is obvious if the combination yields merely a predictable result.  I am

7   informed that a corollary principle is that when the prior art teaches away from combining certain

8   known elements, a claim directed to a discovery of a successful means of combining them is more

9   likely to be nonobvious.

10        8.     I am informed that when a work is available in one field of endeavor, design

11   incentives and other market forces can prompt variations of it, either in the same field or a

12   different one.  If one of ordinary skill in the art can implement a predictable variation, such a

13   variation is likely unpatentable.  For the same reason, if a technique has been used to improve one

14   device, and one of ordinary skill in the art would recognize that it would improve similar devices

15   in the same way, using the technique is obvious unless its actual application is beyond his or her

16   skill.  One question to consider is whether the improvement is more than the predictable use of

17   prior art elements according to their established functions.

18        9.     I am informed that it may often be necessary, in a validity analysis, to look to

19   interrelated teachings of multiple patents; the effects of demands known to the design community

20   or present in the marketplace; and the background knowledge possessed by one of ordinary skill in

21   the art, all in order to determine whether there was an apparent reason to combine the known

22   elements in the fashion claimed by the patent at issue.

23        10.    I am informed that a validity analysis need not seek out precise teachings directed

24   to the specific subject matter of the challenged claim; it is appropriate to take account of the

25   interferences and creative steps that one of ordinary skill in the art would employ.  A person of

26   ordinary skill is also a person of ordinary creativity.

27        11.    I am informed that, in determining whether a claimed combination is obvious, the

28   correct question is whether the combination was obvious to one of ordinary skill in the art.  Any

-4-

**Exhibit 13  Page 324**

1   need or problem known in the field of endeavor at the time of alleged invention and addressed by

2   the patent can provide a reason for combining the elements in the manner claimed.

3        12.     I am informed that, because it is common sense that familiar items may have

4   obvious uses beyond their primary purposes, in many cases one of ordinary skill in the art will be

5   able to fit the teachings of multiple prior art references together like pieces of a puzzle.

6        13.     I am informed that, when there is a design need or market pressure to solve a

7   problem and there are a finite number of identified, predictable solutions, one of ordinary skill in

8   the art has good reason to pursue the known options within his or her technical grasp.  If this leads

9   to the anticipated success, it is likely the product of ordinary skill and common sense, and the fact

10  that the combination was obvious to try may show that a claim directed to the combination would

11  be invalid for obviousness.

12       14.     I am informed that a correct validity analysis does not consider whether one of

13  ordinary skill in the art, writing on a blank slate, would have selected a particular combination.

14  Rather, a correct analysis considers whether one of ordinary skill, facing the wide range of needs

15  created by developments in the field, would have seen an obvious benefit to selecting a particular

16  combination.

17       15.     I am informed that in order to rebut a showing of obviousness over the prior art,

18  Lucent may attempt to show "secondary considerations" of non-obviousness.  I have not included

19  opinions on secondary considerations of non-obviousness in this report but I have done so in

20  Wedig Report On Secondary Considerations.  If Lucent or Lucent's expert should assert the

21  presence of secondary considerations of non-obviousness, I may provide a report addressing

22  Lucent's assertions.

23  **III.     STATE OF THE ART AS OF THE TIME OF THE ALLEGED INVENTION.**

24       16.  As mentioned above, I am informed that I must consider the scope and content of

25  the prior art to the `759 patent.  To this end, I have reviewed a large amount of prior art, and I have

26  also had conversations with Dr. James Foley and Mr. Douglas O'Brien.  As explained below, it is

27  clear that each of the elements of the Asserted Claims were known in the prior art.  Claim 1 of the

28  `Fleming `759 Patent recites:

-5-

**Exhibit 13  Page 325**

1    In a digital image display system:

2    a memory for storing color data values;

3    processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command

4    and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising

5    a first mode of access wherein an in-use foreground color is directly specified as a color data value;

6

7    a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and

8    a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and

9    display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the

10    selected mode.

11    `759 Patent, 14:20-40.

12    17.   Claim 2 recites:

13    A digital image display system comprising:

14    a color memory for storing color data values;

15    processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command,

16    setting a color data value in the color memory; and

17    display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the

18    selected mode.

19    `759 Patent, 14:41-52.

20    18.   Claim 3 recites:

21    A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color

22    memory.

23    `759 Patent, 14:53-55.

24    19.   The Fleming `759 Patent acknowledges that "videotex" systems constituted prior

25    art to the alleged invention. `759 Patent, 1:11-46.  Videotex systems allow for retrieving

26    information via a telephone line, and displaying images on a display device (*e.g.,* a television).

27    *See* "Videotex, The New Television/Telephone Information Services," Roger Woolfe, © 1980 (the

28

-6-

**Exhibit 13  Page 326**

1    "VIDEOTEX TEXTBOOK") at pp. 16-19.  The Fleming `759 Patent explains that known prior art

2    videotex systems were previously developed in Britain (*i.e.,* Prestel), France (*i.e.,* Antiope) and

3    Canada (*i.e.,* Telidon).  `759 Patent, 1:10-46.  The Fleming `759 Patent also acknowledges that the

4    prior art Telidon system specified colors directly using color data values (*e.g.,* values representing

5    red, green and blue color components), while the prior art Prestel and Antiope systems specified

6    colors indirectly using an index into a color memory (*i.e.,* color map that stores a table of color

7    data values indexed by numbers).  `759 Patent, 1:10-35.

8            20.    The Fleming `759 Patent also explains that prior art display systems using color

9    maps (*e.g.,* the Tektronix 4027) were commercially available.  `759 Patent, 1:28-39.   A 1979

10   textbook on graphics systems describes the implementation of color maps using both read only

11   memory ("ROM") and read-write memory ("RAM").   *See* Principles Of Interactive Computer

12   Graphics, Second Edition, William M. Newman and Robert F. Sproull, McGraw-Hill, © 1979

13   ("Newman & Sproull"), pp. 279-280.  It was also well understood by 1979 that a color map could

14   be used for animation.  *See, e.g.,* Color Table Animation, Richard Shoup, ACM, ©1979

15   ("Shoup").  This technique took advantage of the ability to dynamically change the set of color

16   values stored in a read-write memory color map.  Id. The idea of dynamically changing the set of

17   color values stored in a read-write memory color map had also been used in videotex systems.

18   *See, e.g.,* "Dynamically Redefinable Character Sets - D.R.C.S.," G.O. Crowther, IEEE

19   Transactions on Consumer Electronics, Volume CE-26,  Issue 4,  Nov. 1980, pp. 707- 716

20   ("Crowther").

21           21.    Systems capable of displaying both foreground and background colors were also

22   well known before the time of the alleged invention.  VIDEOTEX TEXTBOOK at pp. 27-28; see

23   also Preliminary Specification for the Antiope® Teletext System, by C. Schwartz, B. Marti, and A.

24   Poignet, 1977 (the "Antiope Specification") at pp. 3, 6-7; "Final Report – NASA Grant NSG 1508,

25   Extension of the Core Graphics System for Raster Graphics Display" (the "NASA Final Report")

26   at Appendix B, pp 2, 13, Figure 2; Appendix C, pp. 16-18; Recommendation S.100: "'International

27   Information Exchange for Interactive Videotex," CCITT Yellow Book, Vol. VII, Geneva,

28   Switzerland, Nov. 21, 1980 ("Recommendation S.100") at p. 198.  In such systems, the text or

-7-

**Exhibit 13  Page 327**

1    graphics can be displayed in a first color (*i.e.,* the "foreground color") on top of a background

2    painted in a second color (*i.e.,* the "background color"). Id. The concepts of an in-use foreground

3    color (*i.e.,* a color that will be used as the foreground color for subsequently received text and

4    graphics drawing commands until changed) and an in-use background color (*i.e.,* a color that will

5    be used as the background color for subsequently received text and graphics drawing commands

6    until changed) were also very well known before the time of the alleged invention. Id.

7         22. It was also understood prior to the alleged invention that background and

8    foreground colors could be specified both directly and/or indirectly in different modes of

9    operations of a single digital image display system. *See* Recommendation S.100, pp. 166-167;

10   "Picture Description Instructions PDI for the Telidon Videotex System," H.G. Bown, C.D.

11   O'Brien, W. Sawchuk, J.R. Storey, CRC Technical Note No. 699-E, Ottawa, Canada, Nov. 1979

12   ("CRC 699-E"), pp. 41-42, 49-50 and 70; and NASA Final Report, Appendix A, pp. 4-5, 20;

13   Appendix C, 21-7 – 21-8.

14        23. Based on the literature I have reviewed all of the above-described functions and

15   features of image display systems were well known in the field prior to the alleged invention.

16   There were many different reasons to combine these functions and features including known

17   problems already solved, various design incentives, industry trends, and market forces such as:

18        • **terminal independence** (*see, e.g.,* CRC 699-E, pp. 2, 4)

19        • **forward and backward compatibility** (*see, e.g.,* CRC 699-E, pp. 2, 4)

20        • **international videotex standardization** (*see, e.g.,* Recommendation S.100)

21        • **demand for higher resolution display, and a wider range of colors** (*see*
22        Recommendation S.100, pp. 197-198; *see also* "International Videotex
          Standardization: A Canadian View Of Progress Towards the Wired World," Smirle et
23        al., Viewdata and Videotex, 1980-81, ©1980, pp. 271-280 , pp. 274-275)

24        • **cost of memory** (Videotex System Planning, Costa and Marsh, © 1979, p. 339).

25   IV.    **ADDITIONAL OPINIONS REGARDING INVALIDITY OF CLAIMS 1 – 3 OF**

26          **THE '759 PATENT**

27        24. I hereby incorporate by reference all of my previously provided opinions regarding

28

-8-

**Exhibit 13  Page 328**

1  obviousness of the Asserted Claims. *See* Wedig Invalidity Report. I have applied the above-

2  described revised legal principles, regarding invalidity of a claim due to obviousness, to the prior

3  art considered in my Wedig Invalidity Report, and my conclusions regarding obviousness are

4  unchanged (or even stronger) in light of the revised legal principles.

5        25.     I have reviewed multiple additional pieces of prior art and it is my opinion that,

6  under Lucent's application of the claim language in its infringement contentions, the Asserted

7  Claims are anticipated and/or at least obvious in view of the following combinations of prior art

8  references:

9        • Claim 1, if not anticipated is at least rendered obvious in view of Recommendation S.100

10        • Claims 2 and 3 are obvious in view of Recommendation S.100 alone or in combination with Crowther.

11

12        • Claim 1 is obvious in view of CRC 699-E in combination with the Antiope Specification

13        • Claims 2 and 3 are obvious in view of CRC 699-E in combination with the Antiope Specification and Crowther.

14        • Claims 1, 2 and 3, if not anticipated are at least rendered obvious in view of the NASA Final report.

15

16      **A.**    **Claims 1-3 of the '759 Patent are Obvious in view of Recommendation S.100 Alone or In Combination With Crowther**

17

18        26.     It is my opinion that claim 1 of the '759 patent, if not anticipated is at least obvious

19  in view of Recommendation S.100.   It is also my opinion that claims 2-3 of the '759 patent are

20  obvious based on Recommendation S.100 alone or in combination with Crowther.  A chart form

21  analysis of the Asserted Claims as they relate to S.100 and Crowther is provided as Exhibit 2 to

22  this report.  I will now review and elaborate on this analysis.

23        27.     The '759 patent indicates that prior to the alleged invention, methods and apparatus

24  for providing color digital images on video display screens had become well known.  ('759 patent,

25  col. 1:11-12).  The Fleming '759 patent explains that "[a] problem, however, has arisen in that

26  compatibility among digital display systems has been made difficult by the great variety of

27  methods and apparatus for providing color images." ('759 patent, col. 1: 12-16).  The patent states

28  that the Telidon system uses "a direct selection of data values for the primary colors – red, green

-9-

**Exhibit 13  Page 329**

1    and blue." (Id., 1:16-22). It also discloses that the Prestel and Antiope systems both specified

2    foreground and background colors by indexing a permanent read-only color memory. (Id.,1: 22-

3    27). Fleming et al. supposedly solve the problem of using incompatible terminals by providing a

4    terminal-independent color memory. (Id.,1: 39-46). However, this problem had already been

5    solved, and a system satisfying the Asserted Claims had already been developed at least in the

6    manner that Lucent applies the Asserted Claims to the defendants' systems. It is clear to one of

7    ordinary skill in the art that Recommendation S.100 describes a standard for an image processing

8    system that operates in one mode similar to a Telidon system performing direct color display, and

9    in another mode similar to an Antiope system performing indirect color display using an index into

10   a color memory, thereby solving the problem of "employing incompatible terminals" through the

11   use of a terminal-independent color memory   (Id.).

12        28.    Recommendation S.100 states that "it is desirable that terminal equipment

13   compatibility should exist between broadcast teletext systems for general reception and public

14   network-based data systems." (Recommendation S.100, p. 165). It is clear to one of ordinary skill

15   in the art that Recommendation S.100 was written to provide compatibility between a number of

16   existing Videotex systems. Id.

17                1.    **Claim 1, if Not Anticipated, is At Least Obvious in View of**

18        **Recommendation S.100**

19        29.    Recommendation S.100 "describes the characteristics of coded information that is

20   exchanged between countries participating in the international interactive Videotex service … and

21   defines the display features corresponding to its various elements" thereby disclosing a digital

22   image display system. (Id., p. 166). Recommendation S.100 also discloses a memory for storing

23   Color Data Values. (Id., p. 198). This memory is a Color Memory that contains Color Data

24   Values used to provide color information for the display screen.

25        30.    By way of explanation, Recommendation S.100 provides four options for

26   representing pictorial information. These are alphamosaic character sets, a geometric system,

27   dynamically redefinable character sets and photographic representation. (Recommendation S.100,

28   page 166).

                                            -10-

**Exhibit 13  Page 330**

31.     One of ordinary skill in the art would recognize that each of these options correspond to existing videotex systems available at the time the standard was drafted.  For example, the alphamosaic parallel mode specified in Recommendation S.100 was known to have been taken from the French Antiope system, and the alphageometric mode specified in Recommendation S.100 was known to have been taken from the Canadian Telidon system.  *See, e.g.*, "Telidon, A Review," Bown et al., IEEE Communications Magazine, pp. 22-28, © 1981 ("Telidon, A Review") at p. 22; *see also* "A Perspective On The Development Of Videotex In North America," O'Brien et al., IEEE Journal On Selected Areas in Communications, Vol. SAC-1. No. 2, February 1983 ("Perspective On The Development Of Videotex") at p. 261.  I understand that the French developers of Antiope and the Canadian developers of Telidon actually participated in the drafting of Recommendation S.100, and that they each advocated for adoption of their respective videotex systems as options in the standard.  (Discussion with C.D. O'Brien, Sept. 11, 2001).

32.     As Fleming et al. admitted to the Patent Office in the background section of the patent, it was well known to one of ordinary skill in the art prior to 1981 that the Antiope system used a color memory:

> "The Prestel videotex customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and background color by indexing a permanent read-only color memory."

> ('759 patent, Col. 1:22-27).

33.     Furthermore, Recommendation S.100 itself discusses the use of a writable Color Memory as an enhancement to the basic recommendation.

> "The ability to simulate motion (*i.e.* animation) is a potential enhancement that can be achieved by several means. These include: … b) dynamically altering the colour of portions of the display image, making them appear or disappear by **redefining the colour table** (an image disappears when its colour is set to the same colour as the surrounding area)."

> (Recommendation S.100, page 198).

-11-

**Exhibit 13  Page 331**

1   Therefore, given the knowledge of one of ordinary skill in the art and the explicit citation to a

2   color memory, it is clear that Recommendation S.100 discloses a color memory that contains

3   Color Data Values.

4        34.    At least according to the Lucent's interpretation of the claims as applied in its

5   infringement analysis, Recommendation S.100 discloses a processing means responsive to a

6   command and data sequence comprising at least one command, the processing means decoding the

7   command and data sequence, the command and data sequence selecting one of a plurality of

8   modes of access to color data values.  If this claim limitation is applied in the manner alleged by

9   Lucent in its infringement contentions and the Richter Infringement Report, then the structure of

10  the processing means disclosed in Recommendation S.100 is the same or equivalent to the

11  structure identified in the Court's claim construction order.

12       35.    A processing means is necessarily required to process the coded information

13  defined by Recommendation S.100.  The coded information is command and data sequences used

14  by the processor to produce the digital display.  The processing means selects from a plurality of

15  modes of access to color data values including an alphamosaic, alphageometric, dynamically

16  redefinable character sets and photographic representation:

17              "1.2.4  For the international service, four different options for
                representing pictorial information have been recognized:
18                      a) mosaic character sets:
                        b) geometric System:
19                      c) dynamically redefinable character sets;
                        d) photographic representation."
20

21              (Recommendation S.100, page 166).

22       36.    Recommendation S.100 teaches a videotex terminal capable of operating in the

23  alphamosaic mode upon receiving a particular sequence of commands and data:

24              2.2 Designation and invocation in the context of the alphamosaic option

25              2.2.1 Two different modes for the alphamosaic option have been identified.
                They differ in their display control sets. These control sets are designated
26              as the Cl set by control sequences of the form ESC 2/2 (F) where F is
                assigned by ISO. (A registration of these sets must be requested by
27              CCITT.) Individual controls are represented by ESC F1 sequences.

28

                                        -12-

**Exhibit 13  Page 332**

1

2

> 2.2.2 The mosaic graphics set is designated (in the parallel mode) as the G1 set by an escape sequence of the form ESC 2/9 (F) or ESC 2/13 (F) to be allocated by ISO.

3

> (Recommendation S.100 at p. 167).

4      37.      Recommendation S.100 also teaches a videotex terminal capable of operating in the

5    alphageometric mode upon receiving another sequence of commands and data:

6

> 2.3 Designation and invocation in the context of the alpha-geometric option

7

8

> 2.3.1 The alpha-geometric coding scheme is to be designated and invoked by the escape sequence ESC 2/5 (5/x) in accordance with paragraph 5.3.8 of ISO 2022 [1] standard. This designates and invokes a complete code with interpretation as follows.

9

10

> 2.3.2 All the meanings and interpretation of Recommendation V.3 [3] and ISO 2022 [1] remain the same, including CO, GO and G2 with the exception of SI and SO. The codes of the 01 set and their meanings and interpretations are as described in § 6.

11

12

> 2.3.3 The designation and invocation of the complete code by the, sequence ESC 2/5 (5/x) is to be terminated only by ESC 2/9 (F) or ESC 2/13 (F), designating a normal GI set.

13

> (Recommendation S.100 at p. 167).

14

15      38.      Recommendation S.100 also indicates that "these four options are not mutually

16    exclusive and it is possible that systems may develop using two or more options." (Id.)  Therefore,

17    it is clear that the Recommendation S.100 provides the teaching for displaying information using

18    different modes of display with the possibility that one terminal design may implement two or

19    more modes for display.  Persons of ordinary skill in the art recognized that these options could be

20    combined in a single terminal.  For example, the Videotex Report Series stated:

21

22

> Of course, it is possible for the different graphic methods to be combined.  For example, Prestel has demonstrated alphamosaic and photographic images (of restricted size) on the same page.  Antiope and Telidon have performed similarly.  At present it is still not clear which method, or combination of methods, will prove to be the most widely acceptable.

23    *See* Videotex: The Key Issues, Videotex Report Series, Report No. 1, Butler Cox & Partners

24    Limited, July 1980 ("Videotex Key Issues"), p. 29 *citing* CCITT Draft Recommendation Sg No.

25    164E: "The International Information Exchange for Interactive Videotex," Paris, November 1979.

26      39.      In my previous expert report, I reviewed Lucent's infringement position as it relates

27    to the required "predetermined command and data sequence" for selecting modes of access to

28    Color Data Values in claim 1.  (Wedig Noninfringement Report, ¶ 29-32).  I incorporate that

-13-

**Exhibit 13  Page 333**

1   discussion to this report so I will not repeat it here.  However, to summarize, to the extent that that

2   Lucent believes that it has identified accused structure for satisfying the "processing means"

3   element, Recommendation S.100 discloses structure that would satisfy that element in the same

4   manner that Lucent contends it is satisfied by the accused products, in that Recommendation S.100

5   discloses a processor responsive to commands and parameters selecting modes of access to Color

6   Data Values which is the basis for Lucent's identification of supposedly satisfying structure.

7       40.    Recommendation S.100 discloses a first mode of access to Color Data Values from

8   the Color Memory wherein an in-use foreground color is directly specified as a Color Data Value.

9   It was well known to those of ordinary skill in the art prior to 1981 that the alphageometric mode,

10  which was taken from the Canadian Telidon system, used a direct selection of color data values.

11  (Recommendation S.100, pp. 185-196)   This fact is acknowledged in the Fleming `759 Patent.

12  ('759 patent, Col. 1:16-22).  Entering the alphageometric mode is described in Recommendation

13  S.100 as being performed with the command and data sequence ESC 2/5 (5/x). (Recommendation

14  S.100, page 167).

15      41.    When operating in the alphageometric mode, the directly specified in-use

16  foreground color is used as the foreground color for subsequently received text and graphics

17  drawing commands until changed.  The in-use foreground color is specified by the

18  CONTROL(VALUE) command.  This command is followed by a data sequence which specifies

19  the color data value where the green, red and blue color components are specified in order of

20  decreasing levels of intensity.  (Recommendation S.100, page 192).

21      42.    Recommendation S.100 discloses a second mode of access in which the in-use

22  foreground color is specified as an index into the color memory.  It was well known to one of

23  ordinary skill in the art prior to 1981 that the parallel mode of the alphamosaic option described in

24  Recommendation S.100 was taken from Antiope.  (Recommendation S.100, pp. 179-185).   It was

25  also well known to those of ordinary skill in the art prior to 1981 that the Antiope system used a

26  color memory as confirmed by the '759 patent.  ('759 patent, Col. 1:22-27).  Furthermore,

27  Recommendation S.100 discloses as an enhancement a read/write memory for storing color data

28  values.  (Id., p. 198).  Entering the alphamosaic mode is described in Recommendation S.100 as

-14-

Exhibit 13  Page 334

1    being performed with the command and data sequence ESC 2/9 (F) or ESC 2/13 (F).

2    (Recommendation S.100, page 167).

3           43.     In the parallel form of the alphamosaic mode, codes 4/0 – 4/7 are used for

4    specifying the in-use foreground color.  (Recommendation S.100, page 181).  The command and

5    data sequence indicates that it "Causes the following characters to be written in the colour

6    indicated." (Recommendation S.100, page 183).   In the parallel form of the alphamosaic mode,

7    the colors are specified as simple 7 bit values indicating the color such as yellow, magenta, etc.

8    These color data operands are indexes into a color memory of a compatible Antiope system.

9    Furthermore, although unnecessary to satisfy the claim, the parallel mode also has a transparent

10   background command that causes all succeeding characters to be displayed with the underlying

11   background of the character unchanged.  (Id., p. 184).

12          44.     Recommendation S.100 also discloses a third mode of access wherein an in-use

13   foreground color and an in-use background color are specified as indices into the Color Memory.

14   Recommendation S.100 discloses a mode of access wherein the in-use foreground color is

15   specified as an index into the Color Memory.  (See above).  Furthermore, Recommendation S.100

16   discloses a mode of access wherein the in-use background color is specified as an index into the

17   Color Memory.

18          45.     In the parallel mode of the alphamosaic option, the background color is specified as

19   a code which one of ordinary skill in the art would understand to be an index to a color table using

20   command code 5/0 – 5/7.  (Id., p. 181).  Because the parallel mode of the alphamosaic option is

21   based on the Antiope system, and because the Antiope system was known to have been

22   implemented using a color memory, and because the codes 5/0 – 5/7 are not color components

23   themselves, it was clear to one of ordinary skill in the art that the background command specifies

24   an index into a color memory.

25          46.     Recommendation S.100 also discloses a display means responsive to the processing

26   means, the display means displaying the colors associated with the Color Data Values accessed by

27   the selected mode.  The display means disclosed in Recommendation S.100 is the same or

28   equivalent structure of a computer monitor, TV, video projection system, LCD or an LED display

-15-

Exhibit 13  Page 335

1    disclosed in the '759 patent.  ('759 patent, Col. 4:50-55).  Recommendation S.100 states:

2
     "Videotex systems are text communication systems having in
3    addition the capability of a given level of pictorial representation
     and a repertoire of display attributes.  **The text and the pictures**
4    **obtained are intended to be displayed using the current**
     **television (TV) raster standards of the different countries**."
5
6    (Recommendation S.100, p. 166, emphasis added).

     As such, Recommendation S.100 discloses a display means responsive to the processing means.
7
     Id.  Based on the foregoing, Recommendation S.100 makes obvious claim 1 of the '759 patent.
8
              **2.       Claims 2 and 3 are Obvious in View of Recommendation S.100 Alone**
9
     **or in Combination with Crowther**
10
              47.       Recommendation S.100 discloses a digital image display system, a Color Memory
11
     for storing Color Data Values and a processing means responsive to predetermined commands and
12
     data, the processing means, responsive to a first command, selecting a mode of access to the Color
13
     Memory.   Each of these is disclosed by Recommendation S.100 as discussed above in relation to
14
     claim 1.  Claim 2 additionally calls for "a second command, setting a color data value in the color
15
     memory."  Recommendation S.100 makes obvious this second command in its discussion of the
16
     enhancements to Recommendation S.100 to implement animation.  Recommendation S.100 states:
17
     "The ability to simulate motion (*i.e.* animation) is a potential
18   enhancement that can be achieved by several means. These include:
     … b) dynamically altering the colour of portions of the display
19   image, making them appear or disappear by **redefining the colour**
     **table (an image disappears when its colour is set to the same**
20   **colour as the surrounding area**)."  (Recommendation S.100, p.
     198 [emphasis added]).
21
22            48.       In order to set the color of an image to be the same color as the surrounding area, it

23   is necessary for the processor to receive and process a command that changes the value in the

24   color memory.  Such a command would be a second command for setting a color data value in the

25   color memory.

26            49.       Furthermore, the combination of Recommendation S.100 and Crowther makes clear

27   that a color map may be used to add to the number of available colors that can be displayed on a

28   Videotex system.  Crowther discusses an enhancement to videotex systems whereby additional

                                                  -16-

**Exhibit 13  Page 336**

1 character sets can be downloaded to display terminals.  Additionally, Crowther teaches that in

2 addition to new character fonts, color data values can be downloaded to a color memory to provide

3 new color possibilities for the newly downloaded characters.  Crowther states:

> "To achieve the adaptive colours it is proposed to transmit codes as
> part of the D.R.C.S. data defining the colours to be employed in the
> particular picture.  The 16 colours would be coded simply by
> allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for
> each of the three primary colors.  These codes of the 16 pre-defined
> colours would be stored in memory as shown in Figure 4."
> (Crowther, page 711).

Figure 4 of Crowther is a color memory as reproduced below.



50.     Loading the color table in the Crowther extension to the videotex system requires a

command which would act as the second command.  As such, Crowther discloses "a second

command, setting a color data value in the color memory."  Since Recommendation S.100 in

combination with Crowther discloses each of the claim elements of claim 2, these two references

taken together also make obvious claim 2 of the '759 patent.  Recommendation S.100 provides

reasons to employ a writable color memory where it suggests "redefining the colour table."  (Id.,

page 198).  A person of ordinary skill in the art would have had reason to look to Crowther for

details on exactly how to implement this suggested feature because Crowther teaches how to

implement this very same feature in a videotex system.  Furthermore, the fact that

-17-

**Exhibit 13  Page 337**

1    Recommendation S.100 and Crowther both discuss use of dynamically redefinable character sets

2    ("DRCS") techniques in videotex systems also would have motivated a person of ordinary skill in

3    the art to choose Crowther's specific implementation for achieving the function of "redefining the

4    colour table" as suggested in Recommendation S.100.  (Id., page 196-197).

5    51.    In addition, both references suggest color display enhancements for videotex

6    terminals having color maps.  Recommendation S.100 at p. 198; Crowther at p. 710-711.  In

7    addition, both of these references were concerned with videotex terminals capable of operating in

8    an alphamosaic mode wherein color data values (for both foreground and background) may be

9    accessed via index values into a color map.  (Recommendation S.100 at pp. 172-185; Crowther at

10   p. 709-711).

11   52.    The Crowther paper was presented at the 1980 Spring Conference on videotex

12   topics.  (Crowther p. 707).  As such, this paper was well known to those in the videotex

13   community, as was Recommendation S.100.  Based on the fact that these two references were both

14   well known in the videotex community, and the fact that both references were targeted at least in

15   part at the same narrow videotex topics, a person of ordinary skill in the art would have had

16   reasons to combine the teachings of the two references to arrive at the system described in claim 2.

17   In addition, the trends toward higher resolution display, a wider range of colors, and decreasing

18   costs of memory also provided reasons to combine the teachings of Recommendation S.100 and

19   Crowther.

20   53.    The addition of the methodology described in Crowther (for "adaptively" defining

21   the colors in a color map by transmitting codes as part of DRCS data) to the videotex system

22   specified by Recommendation S.100 led to results that could have been predicted by a person of

23   ordinary skill in the art prior to the time of the alleged invention.  The coding scheme described by

24   the Crowther paper would perform the same function, and yield the same results, in the videotex

25   system specified by Recommendation S.100 as it would in any other prior art videotex system

26   capable of operating in an alphamosaic mode wherein color data values (for both foreground and

27   background) may be accessed via index values into a color map.

28   54.    Moreover, Recommendation S.100 discloses the display means of claim 2 as

-18-

**Exhibit 13  Page 338**

1  discussed above.

2       55.     Claim 3 adds that the processing means is responsive to a second command which

3  sets plural Color Data Values in Color Memory.  Recommendation S.100 makes obvious to one of

4  ordinary skill in the art this second command.  Recommendation S.100 discloses a writable color

5  memory as an enhancement to the basic system as previously discussed.  (Recommendation S.100,

6  page 198).  In recommending that an image can disappear when its color is set as the same color as

7  the surrounding area, it is obvious to one of ordinary skill in the art that if the image is made up of

8  multiple colors, it will be necessary to redefine multiple color table entries in order to accomplish

9  this masking operation.  Performing this write of multiple data values in the color memory would

10 need to be directed by a command.  This command would act as the second command.  As

11 Recommendation S.100 teaches each of the elements of claim 3, Recommendation S.100 makes

12 obvious Claim 3 of the '759 patent.

13      56.     Furthermore, Crowther when combined with Recommendation S.100 makes clear

14 that a processing means may be responsive to a second command to set plural color data values in

15 color memory. As previously discussed, Crowther teaches a writable color memory.   (Crowther,

16 p. 710).  Crowther also teaches that multiple colors can be transmitted as codes to load the color

17 memory.  (Id., p. 711).  Loading multiple values in the color table in the Crowthers extension to

18 the videotex system requires a command.  This command can act as the second command of the

19 claim.  As Recommendation S.100 in combination with Crowther discloses each of the claim

20 elements of claim 3, these two references taken together also make obvious claim 3 of the '759

21 patent.  The same reasons for combining the teachings of Recommendation S.100 and Crowther to

22 arrive at the system described in claim 2 also apply to combine these references to arrive at the

23 system described in claim 3.

24      **B.     Claims 1-3 Of The `759 Patent Are Obvious in View of CRC 699-E In**

25           **Combination with Antiope and Crowther**

26      57.     It is my opinion that claim 1 of the Fleming `759 Patent is obvious in view of CRC

27 699-E alone or in combination with the Antiope Specification.  It is also my opinion that claims 2

28 and 3 are obvious in view of CRC 699-E in combination with the Antiope Specification and

-19-

**Exhibit 13  Page 339**

1  Crowther.  A chart form analysis of how these references make obvious claims 1-3 of the '759

2  patent is presented in Exhibit 3 to this report.  I will now review and elaborate on this analysis.

3          **1.      Claim 1 is Obvious in view of CRC 699-E in Combination with the**

4  **Antiope Specification**

5          58.      CRC 699-E describes the Telidon Videotex system.  The Telidon system was

6  designed to display information received from a central database and displayed on a domestic

7  home television receiver using a micro-computer. (CRC 699-E, page 1).  This is exactly the same

8  type of system disclosed in the '759 patent for which the patent is intended to be used. ('759

9  patent, col. 1:39-46).

10         59.      CRC 699-E discloses a memory for storing color data values.  CRC 699-E teaches

11 that a color memory could be used with the Telidon system but that it was not included in the

12 initial trial system because it was not cost effective to implement this hardware at that time.  (CRC

13 699-E, page 70).  CRC 699-E also discloses how the color memory would be activated in the

14 design by setting bit b2 of the TONAL CONTROL status command.  (Id., pp. 49-50).   Allocating

15 a specific bit and specifically indicating that it should be used to enable a color map memory

16 discloses to a person with ordinary skill in the art a memory for storing color data values.

17         60.      CRC 699-E also discloses a processing means responsive to predetermined

18 commands and data comprising at least one command.  CRC Technical note No. 699-E teaches a

19 processing means in the form of a micro-computer.   (CRC 699-E, p. 1).  CRC 699-E discloses that

20 the processing means decodes the predetermined commands and data and selects one of a plurality

21 of modes of access to Color Data Values.  In particular, the flag field of the TONAL CONTROL

22 selects between color versus grayscale display and envisions selecting between direct versus

23 indirect color selection. (Id., pp. 49-50).

24         61.      As I said, I have previously reviewed Lucent's infringement position as it relates to

25 the required "predetermined command and data sequence" for selecting modes of access to Color

26 Data Values in claim 1.  (Wedig Noninfringement Report, ¶ 29-32).  To the extent that Lucent

27 believes that it has identified accused structure for satisfying the "processing means" element,

28 CRC No. 699-E discloses structure that would satisfy that element in the same manner that Lucent

-20-

**Exhibit 13  Page 340**

1  contends it is satisfied by the accused products, in that CRC No. 699-E discloses a processor

2  responsive to commands and parameters selecting modes of access to Color Data Values which is

3  the basis for Lucent's identification of supposedly satisfying structure.  Furthermore, whereas the

4  commands identified in Lucent's infringement contentions do not select a mode of access to Color

5  Data Values and are not, in any event, a command and data *sequence* to which the system

6  responds, the predetermined command and data sequence taught by the CRC No. 699-E follow the

7  teachings of the patent specification in that CRC 699-E allows for a variable number of parameters

8  after the initial command code which changes the way the command is interpreted.

9
10       "The flag field of the command is used to indicate whether the byte
         represents a command opcode or data associated with the
11       command. The flag field is 0 for opcodes and 1 for numeric data.
         The number of bytes in the code sequence associated with a
         particular drawing command is determined from the flag field.  A
12       command's domain begins by its opcode byte and terminates either
         by the start of the following opcode byte or by an SO, SI, SS or
13       ESC character."

14       (CRC 699-E, p. 11)

15       62.     Also to the extent that Lucent contends infringement due to GDI commands that

16  allegedly define different modes of access, CRC 699-E discloses commands for setting modes of

17  access to Color Data Values that are as similar as or more similar to commands disclosed in the

18  '759 patent using structure that is as similar as or more similar to the structure disclosed in the

19  '759 patent.  These modes of access are discussed in relation to first, second and third mode

20  below.

21       63.     CRC 699-E discloses a first mode of access to Color Data Values from the Color

22  Memory wherein an in-use foreground color is directly specified as a Color Data Value.  The

23  VALUE form of the CONTROL opcode directly specifies the color to be used as the in-use

24  foreground color.  (CRC 699-E, page 41)  The specified in-use foreground color is a color data

25  value because it specifies the triplets of values for the three primary colours GREEN, RED and

26  BLUE for a particular color.  (CRC 699-E, page 42)

27       64.     CRC 699-E discloses a second mode of access in which the in-use foreground color

28

-21-

**Exhibit 13  Page 341**

1  is specified as an index into the color memory.  First, as discussed above, CRC 699-E discloses the

2  use of a color memory.   (Id., p. 70).  Furthermore, CRC 699-E allocates a bit for invoking a future

3  use of the color memory. (Id., p. 50).  Also, CRC 699-E discloses the four modes of the TONAL

4  CONTROL Command which includes direct color, direct grayscale, indirect color and indirect

5  grayscale.  These are shown in CRC 699-E in the figure at the bottom of page 50 with direct color

6  selection shown in the upper left, direct grayscale shown in the lower left, indirect color in the

7  upper right and indirect grayscale shown in the lower right of the figure.



16  (CRC 699-E, page 50).

17        65.      One of ordinary skill in the art would understand that if a videotex system based on

18  the teachings of CRC 699-E were to include a color memory as suggested and bit 2 were set to

19  enable the indirect color specification, then the in-use foreground color could be specified using an

20  index into the color memory.  (CRC 699-E, page 41).  Moreover, the Antiope videotex system had

21  the ability to specify an in-use foreground color as an index into color memory.  (Antiope

22  Specification, pp. 6 -7).  Thus, CRC 699-E in combination with the Antiope Specification also

23  discloses this mode of access.

24        66.      Furthermore, CRC 699-E in combination with the Antiope Specification also

25  discloses a mode of access wherein an in-use foreground color and an in-use background color are

26  specified as indices into the Color Memory.  CRC 699-E discloses a mode of access wherein the

27  in-use foreground color is specified as an index into the Color Memory.  (See above).  The

28  Antiope Specification discloses a mode of access wherein the in-use background color is specified

-22-

**Exhibit 13  Page 342**

1  as an index into the Color Memory.   (Antiope Specification, pp. 6 -7).

2      67.     As previously discussed, CRC 699-E teaches extending the capabilities of the

3  Telidon system to include a color memory, and the specification allocates a bit for enabling this

4  memory.  The Antiope Specification was known to one of ordinary skill in the art to display colors

5  by using a color memory.  ('759 patent, 1:22-27).  The Antiope Specification also teaches

6  commands for specifying the in-use background color.  The Antiope Specification teaches one set

7  of commands for specifying the in-use background color of the alphanumeric characters, and a

8  second set of commands for specifying the alphamosaic characters.  Referring to Figure 7, the

9  Antiope Specification teaches a set of commands for specifying the in-use background color of

10  alphanumeric characters:

11          "In the event that the background color and the character color are
            specified independently, the codes being used to transmit the
12          background color in the release sequence are the first eight in
            column 6.  The binary elements b1, b2 and b3 of these codes have
13          the same meaning as those of the codes transmitting the color of the
            character."
14

15          (Antiope Specification, p. 7).

16      68. The Antiope Specification also teaches specifying the in-use background color of

17  semi-graphical characters.

18          "As was noted above, the functions of reversed background, double
            height and double length do not apply to the semi-graphical
19          characters in Figure 3.

20          In this case, the binary elements b2, b3 and b6 of the transmitted
21          code are allocated to the specification of the background color.
            There is a correspondence between these binary elements and the
22          primary colors R, G, B of the received signal."

23          (Antiope Specification, p. 7).

24      69.     Because CRC 699-E teaches extending the specification to include a color memory,

25  and because one of ordinary skill in the art understood that Antiope used an index to a color

26  memory to specify an in-use background color, then the combination of CRC 699-E and the

27  Antiope Specification teaches a mode of access wherein the in-use foreground color and an in-use

28

-23-

**Exhibit 13  Page 343**

1   background color are specified as indices into the color memory.

2       70.     CRC 699-E discloses a display means responsive to the processing means, the

3   display means displaying the colors associated with the Color Data Values accessed by the

4   selected mode.  The display means disclosed in CRC 699-E is the same or equivalent structure of

5   a computer monitor, TV, video projection system, LCD or an LED display disclosed in the '759

6   patent.  ('759 patent, Col. 4:50-55).  CRC 699-E states, for example:

7       "The Telidon Videotex system is a method by which information
        can be accessed from central data bases by the general public.  By
8       the use of a domestic home television receiver augmented by a
        micro-computer controlled interface device a user can access pages
9       over graphical and textual information over a public common
        carrier communication facility such as the telephone network, a
10      cable television line or the data may be even encoded into unused
        space in a broadcast television signal."
11

12      (CRC 699-E, p. 1)

13      71.     Based on the foregoing, it is my opinion that the combination of CRC 699-E and

14  the Antiope Specification teaches all of the elements of claim 1 of the '759 patent.  A person of

15  ordinary skill in the art would have had many reasons to combine the teachings of CRC 699-E and

16  the Antiope Specification prior to the alleged invention.  First, the trends toward international

17  videotex standardization and terminal independence would have motivated a person of ordinary

18  skill in the art to combine the teachings of these references to use a terminal operative to work

19  with Telidon in one mode, and with Antiope in a second mode.  Indeed, the Videotex Report

20  Series stated in 1980 that:

21      "Of course, **it is possible for the different graphic methods to be combined**.  For
        example, Prestel has demonstrated alphamosaic and photographic images (of restricted
22      size) on the same page.  **Antiope and Telidon have performed similarly**.  At present it is
        still not clear which method, or combination of methods, will prove to be the most widely
23      acceptable."

24      Videotex Key Issues, p. 29 *citing* CCITT Draft Recommendation Sg No. 164E

25      (emphasis added).

26      72.     In addition, a person of ordinary skill in the art could have predicted that the

27  specification of foreground and background colors using an index into a color map in the Antiope

28
                                          -24-

**Exhibit 13  Page 344**

1  system would perform the same function in the manner used in the Telidon system specified by

2  CRC 699-E.  The trend toward higher resolution display and a wider range of colors, along with

3  the decreasing cost of memory also would have prompted persons of ordinary skill in the art to

4  employ the technique of specifying foreground and background colors using an index into a color

5  map (as taught by the Antiope Specification) in a selectable mode of operation in the Telidon

6  system.

7  **2.    Claims 2 and 3 are Obvious in View of CRC 699-E in Combination**

8  **with the Antiope Specification and Crowther**

9  73.    In addition to the elements recited in claim 1, claim 2 calls for "a second command,

10  setting a color data value in the Color Memory."  The combination of CRC 699-E and the Antiope

11  Specification discloses all the elements of claim 2 except for a command for setting or storing a

12  color data value in color memory.   However, Crowther teaches that a color map may be used to

13  help add to the number of available colors that can be displayed on a Videotex system.  As

14  discussed above in more detail, Crowther teaches:

15  "In its simplest form the four bits can be used to define one of the
16  eight colours and two levels of intensity.  However, it is felt that by
   a simple extension of the system the four bits could be employed to
17  define up to sixteen adaptively defined colours."

18  (Crowther, p. 710).

19  Colors can only be "adaptively defined" if they can be written and changed.  The necessary

20  command for loading the color table in Crowther would act as the second command.  Because

21  CRC 699-E in combination with the Antiope Specification and Crowther discloses this claim

22  limitation and the other claim limitations already discussed in relation to claim 1, the combination

23  of these references makes obvious claim 2 of the '759 patent.

24  74.    There are many reasons to combine the teachings of these references.  The same

25  reasons discussed above with respect to Recommendation S.100 and Crowther, and with respect to

26  CRC 699-E and Antiope also apply to the combination of CRC 699-E and Antiope.

27  75.    Claim 3 adds that the processing means must be responsive to a command for

28  setting plural Color Data Values in Color Memory.  CRC 699-E and the Antiope Specification

-25-

**Exhibit 13  Page 345**

1    when combined with Crowther makes obvious to one of ordinary skill in the art a second

2    command for setting plural color data values in color memory.  As previously discussed, Crowther

3    discloses a color memory composed of "adaptively defined colours."  Crowther also discloses that

4    to initialize the color memory, the colors are downloaded to the terminal.  (Crowther, page 711,

5    "To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data

6    defining the colours to be employed in the particular picture.")  The command that loads the color

7    values into the color memory is the second command of claim 3.  Therefore, CRC 699-E when

8    combined with Antiope and Crowther makes obvious Claim 3.

9          76.      The same reasons to combine these references for claim 2 also apply to claim 3.

10         **C.      The NASA Final Report Anticipates Or At Least Makes Obvious Claims 1-3**

11                  **of the `759 Patent**

12         77.      I have reviewed the technical paper titled "Final Report – NASA Grant NSG 1508,

13   Extension of the Core Graphics System for Raster Graphics Display".  ("NASA Final Report").

14   The NASA Final Report is made up of three parts.  The first part is a defined set of raster

15   extensions to the Core System developed by ACM/Siggraph and makes up Appendix A.  The

16   second part is a paper of the proposed extensions disseminated at Siggraph '79, the annual

17   computer graphics conference held in 1979.  This section makes up Appendix B.  The final section

18   is a description of George Washington University's implementation of the Core System to

19   accommodate the proposed Core Extensions.  This section makes up Appendix C.

20         78.      The NASA Final Report anticipates or at least renders obvious claims 1 - 3 of the

21   '759 patent.  A chart form analysis of how this paper anticipates or at least renders obvious claims

22   1 – 3 of the '759 patent is presented in Exhibit 4 to this report.  I will now review and elaborate on

23   this analysis.

24         **1.      The NASA Final Report Anticipates Or At Least Makes Obvious**

25         **Claim 1**

26         79.      The NASA Final Report describes the raster extensions to the Core System and an

27   implementation of the Core System at George Washington University.  The Core System with the

28   raster extensions provides a design specification for a terminal independent language designed to

-26-

**Exhibit 13  Page 346**

1  be used on a digital image display system capable of providing a visible representation of

2  information in a data-processing system.  (NASA Final Report, Appendix B, page 2).

3      80.      The NASA Final Report discloses a memory for storing color data values.  The

4  Color Data Values are stored in the Color Memory as components of particular colors such as Red,

5  Green, and Blue.  The NASA Final Report explains that on the device level, there are three ways

6  of specifying color. (NASA Final Report, Appendix C, page 21-2)  Choice B specifies a "color

7  look-up table" or Color Memory.  Therefore, the NASA Final Report discloses a Color Memory.

8  The NASA Final Report also discloses that color data values are stored in the Color Memory as

9  components of particular colors such as Red, Green, and Blue. (NASA Final Report, Appendix C,

10  page 16).

11      81.      The NASA Final Report also discloses a processing means responsive to

12  predetermined commands and data comprising at least one command, the processing means

13  decoding the predetermined commands and data, the predetermined commands and data selecting

14  one of a plurality of modes of access to Color Data Values.  The commands and data sequences

15  disclosed in the NASA Final Report specify if the image display system is to display color or

16  intensity and whether the color or intensity is to be displayed directly or indirectly through the

17  color memory.  These mode selections may be made by setting the TYPE and MODE parameters

18  of the "INITIALIZE_VIEW_SURFACE" command.  (NASA Final Report, page 21-3).

19  Furthermore, the NASA Final Report also discloses selecting modes of access associated with the

20  foreground and background color selection as discussed below.  (NASA Final Report, Appendix

21  C, page 17-18).  To the extent that Lucent contends infringement due to GDI commands that

22  supposedly define different modes of access, the NASA Final Report discloses commands for

23  setting modes of access to Color Data Values that are as similar as or more similar to commands

24  disclosed in the '759 patent using structure that is as similar as or more similar to the structure

25  disclosed in the '759 patent.   These modes of access are discussed in relation to first, second and

26  third mode below.

27      82.      NASA Final Report discloses two related commands for satisfying the first mode of

28  access to Color Data Values from the Color Memory wherein an in-use foreground color is

-27-

Exhibit 13  Page 347

1    directly specified as a Color Data Value.  The Raster graphics extensions to the Core Systems

2    described in Appendix A to the NASA Final Report discloses the "SET_CURRENT_COLOR

3    (R,G, B)" command to directly specify the in-use foreground color.  This command finds the

4    Color Data Value in the Color Memory that has the closest color match to the operand.  The index

5    in Color Memory of this Color Data value becomes the current color index for the in-use

6    foreground color.  All subsequently generated output primitives will be displayed with the in-use

7    foreground color associated with the index until changed. (NASA Final Report, Appendix A, page

8    4).  An output primitive is a text or graphics drawing command.  Appendix A of the NASA Report

9    was meant to be used in conjunction with the original GSPC CORE Specification titled "Status

10   Report of the Graphics Standards Planning Committee," Computer Graphics, Vol. 11, No. 3, Fall

11   1977.  ("1977 GSPC Report") with section numbering scheme following the original 1977 GSPC

12   Report (NASA Final Report, Appendix A, preface).  1977 GSPC Report has a section titled

13   "OUTPUT PRIMITIVES" which defines text and graphics drawing commands such as

14   "TEXT(CHARACTER_STRING)" and "LINE_ABS_2."  (1977 GSPC Report, II-19, II-20).

15           83.     The Core system was designed to generate output primitives including text.  (1977

16   GSPC Report, pp. II-16-18).  The system allows graphics applications to define primitive

17   attributes including color.  (Id., p. II-16).  In the Core system, the "primitive attributes are

18   specified modally; that is, all output primitives created between changes to a current attribute

19   value will have their appearance affected in the same way (with respect to that attribute)."  (Id., p.

20   II-8).  The color attribute applies to all output primitives.  (Id., p. II-17, II-25).  So, for example, if

21   a color attribute was set to "red," then all subsequent text and drawing commands would render

22   primitives in red until the color attribute is changed.  Id.  The SET_CURRENT_COLOR

23   command "sets the current system-maintained attribute value" for the color attribute.  (Id., II-32).

24           84.     Furthermore, Appendix C of the NASA Final Report discloses the "SET COLOR"

25   command that directly sets the color of succeeding output primitives until changed.  The NASA

26   Final Report discloses that for devices with direct color specification, the in-use foreground color

27   of subsequent displayed objects will use the closest match of the specified color data value.

28   (NASA Final Report, Appendix C, page 21-7).

-28-

Exhibit 13  Page 348

85.     It is interesting to note that the method used by SET_CURRENT_COLOR and SET_COLOR for directly specifying the Color Data Value and finding a Color Memory entry which has the best match is how the "mode 0" is described to operate in the '759 patent.  ('759 patent, col. 7:32-34, "At box 512, the foreground color is set to the index of the closest match of the first operand and a color value from the color map memory table 6a.").  Likewise, the NASA Final Report discloses that if the exact Color Data Value is not available in the Color Memory, the closest approximate Color Data Value is used.  (NASA Final Report, Appendix B, page 12, "The color attribute for output primitives is specified in one of two ways:  by value and by index.  The function SET_CURRENT_COLOR [R,G,B] specifies the current value of the color attribute.  If the exact [R,G,B] triple specified in not included in the active color set, then a best fit to an available triple is used.").

86.     The NASA Final Report discloses a second mode of access in which the in-use foreground color is specified as an index into color memory.  The in-use foreground color is used as foreground color for subsequently received text and graphics drawing commands until changed. The Raster graphics extensions to the Core Systems described in Appendix A to the NASA Final Report discloses the "SET_CURRENT_COLOR_INDEX (I)" command to specify the in-use foreground color as an index into the color memory.  All subsequently generated output primitives are then displayed with the color associated with the index. (NASA Final Report, Appendix A, page 5).  Again, output primitives are text and graphics drawing commands as defined in the 1977 GSPC Report.  (1977 GSPC Report, II-19, II-20).

87.     Furthermore, Appendix C of the NASA Final Report discloses the "SET_INDEX" command specify the in-use foreground color as an index into the color memory for subsequently received "output primitives" until changed where "output primitives" are defined to be text and graphics drawing commands as shown in 1977 GPSC Report.  (NASA Final Report, Appendix C, page 21-8). (1977 GSPC Report, II-19, II-20).   Either of these two commands selects a second mode of access in which the in-use foreground color is specified as an index into color memory.

88.     The NASA Final Report also discloses a third mode of access wherein an in-use foreground color and an in-use background color are specified as indices into the Color Memory.

-29-

Exhibit 13  Page 349

1   The NASA Final Report discloses a mode of access wherein the in-use foreground color is

2   specified as an index into the Color Memory.  (See above).  Appendix A to the NASA Final

3   Report also discloses the "SET_BACKGROUND_COLOR_INDEX (INDEX)" command to

4   specify the in-use background color as an index into the color memory.  (NASA Final Report,

5   Appendix A, page 20).  Once a NEWFRAME command is received, the color identified by the

6   index into the color memory will be used as the background color for subsequently received text

7   and graphics drawing commands.  Furthermore, Appendix C of the NASA Final Report discloses

8   the "SET BACKGROUND INDEX" command to specify the in-use background color as an

9   index into the color memory until changed.   (NASA Final Report, Appendix C, page 21-8).

10  Notably, the description of this command does not mention a requirement for a NEWFRAME

11  command.  To the extent that the commands identified by Lucent in its infringement contentions

12  satisfy the court's claim construction, the commands disclosed by the NASA Final Report also

13  satisfy it since the NASA Final Report commands and data are as similar as or more similar to the

14  patented commands and data than those commands and data accused by Lucent.  To the extent

15  that Lucent or its expert assert that the NASA Final Report does not disclose the "in-use

16  background color" element, it is my opinion that a person of ordinary skill in the art would have

17  knowledge of systems that had the ability to set the background color of individual characters or

18  graphic primitives by index to a color memory.  *See, for example*, The Application of The

19  Intercolor 8000 Terminal To Thematic Cartography, James R. Carter, Siggraph '76, July 14-16,

20  1976 at p. 163; Ramtek 9000 Series Graphic Display System Programming Manual at p. 3-21;

21  Antiope Specification, pp. 6-7.  Therefore, at a minimum, the NASA Final Report, in view of the

22  knowledge of a person of ordinary skill would render this claim obvious.

23          89.     The NASA Final Report discloses a display means responsive to the processing

24  means, the display means displaying the colors associated with the Color Data Values accessed

25  by the selected mode.  The display means disclosed in NASA Final Report is the same or

26  equivalent structure of a computer monitor, TV, video projection system, LCD or an LED display

27  disclosed in the '759 patent.  ('759 patent, Col. 4:50-55).  The NASA Final Report states, for

28  example, that

-30-

**Exhibit 13  Page 350**

1
2
3
4
5

"[t]he image display system reads the refresh buffer in synchronism with a TV raster, using the pixel values to control the color or intensity of points on the display screen.  An optional look-up table in the image display system can dynamically assign intensities or colors to pixel values.  There is a 1-1 correspondence between pixels in the refresh buffer and points on the display screen (some contemporary raster systems do not impose this restriction.)"

(NASA Final Report, Appendix B, page 2).

6
7

     90.    Based on the foregoing, the NASA Final Report discloses all of the elements of claim 1 of the '759 patent.

8
9

     **2.**     **The NASA Final Report Anticipates Or At Least Makes Obvious Claims 2 and 3**

10
11
12
13
14
15
16
17

     91.    As discussed above, the NASA Final Report discloses a digital image display system, a Color Memory for storing Color Data Values and a processing means responsive to predetermined commands and data, the processing means, responsive to a first command, selecting a mode of access to the Color Data Values, and display means.   Each of these claim limitations is disclosed by NASA Final Report as discussed above in relation to claim 1.  Claim 2 additionally calls for "a second command, setting a color data value in the Color Memory."  The NASA Final Report discloses, or renders obvious, all the claim limitations of Claim 2 including a command for setting or storing a Color Data Value in Color Memory.

18
19
20
21
22
23
24
25
26
27

     92.    The NASA Final Report also discloses a processing means responsive to a second command setting a color data value in the color memory.  Appendix A to the NASA Final Report discloses the "REDEFINE_COLOR (I,R,G,B)" command for setting a color data value in the color memory.  (NASA Final Report, Appendix A, page 14).  Furthermore, Appendix C of the NASA Final Report discloses the command "DEFINE COLOR INDICES" which sets multiple color memory entries.  In that this command can store multiple color data values in the color memory, it can also store one color data value in the color memory when the two integer parameters are the same value.  (NASA Final Report, Appendix C, page 21-8).  Because the NASA Final Report discloses this claim limitation and the other claim limitations already discussed in relation to claim 1, NASA Final Report discloses all of the elements of claim 2 of the '759 patent.

28

-31-

**Exhibit 13  Page 351**

93.    Claim 3 adds that the processing means must be responsive to a command for setting plural Color Data Values in Color Memory.  The NASA Final Report discloses the command "DEFINE COLOR INDICES" which sets multiple color data values in the color memory when I2 is greater than I1.   (NASA Final Report, Appendix C, page 21-8).  This command defines all the Color Data Values to use within a range of Color Memory entries.  This command sets plural Color Data Values in the Color Memory as required by Claim 3.  Therefore, NASA Final Report discloses all of the elements of Claim 3 of the '759 patent.

## V.    NO CONCEPTION OF THE CLAIMS ON THE DATE LUCENT CONTENDS

94.    It has been explained to me that art dated before the application filing date of a patent is not prior art if the inventor conceived of the invention before the date of the prior art and exercised reasonable diligence from just before the date of the prior art up to the date of the inventor's reduction to practice.  In the present case, I understand that Lucent contends that the subject matter recited in the asserted claims of the `759 Patent was conceived at least as early as February 25, 1980.  As explained below, I have seen no evidence to support this contention.

95.    I have reviewed a portion of Lucent's Second Supplemental Response to Interrogatory No. 4 from Microsoft, Dell and Gateway, served on February 6, 2006, which relates to conception and reduction to practice of the `759 Patent ("Lucent's Second Supplemental Response to Interrogatory No. 4").  More specifically, I reviewed the portion that reads as follows:

> **U.S. Patent No. 4,439,759 ("Fleming"):** The claimed invention was **conceived at least as early as February 25, 1980,** as reflected by at least **LUC 004305-46,** and reduced to practice at least as early as the filing date of May 19, 1981.  Pursuant to Federal Rule of Civil Procedure 33(d), documents demonstrating the conception, reduction to practice, and/or diligence include the patent and corresponding file history, and Lucent business records bearing production numbers **LUC 003903-004026; LUC 004035-004041; LUC 004305-004346; and LUC 004347-004385.**  Deposition testimony demonstrating the conception, reduction to practice, and/or diligence includes the **testimony of James Fleming (e.g., Dep. Tr. at 71-78, 85-91, 158-159, 175.178, 185-187), and Gerald Soloway (e.g., Dep. Tr. at 89.92).**  Lucent reserves the right to supplement or amend its response to this interogatory as discovery and Lucent's investigation in this case proceed, or in the event that defendants present any prior art that would put the facts, dates, and circumstances related to the conception, reduction to practice, and diligence relating to this patent into issue in this case.  (Lucent's Second Supplemental Response to Interrogatory No. 4, p. 4 [emphasis added].)

96.    I have also reviewed the deposition transcripts of Fleming and Soloway.  In

-32-

**Exhibit 13  Page 352**

addition, I have reviewed the following documents cited by Lucent in support of an early

conception of the Asserted Claims of the Fleming Patent:

- Bell Laboratories Technical Memorandum entitled "Home Information System (HIS) Terminal Proposal," by W.A. Frezza, S.D. Hoskins, R.R. Meyer, and W.S. Stoddard, dated February 25, 1980 (LUC 004305-46) (the "February 25, 1980 Memorandum");

- Bell Laboratories Technical Memorandum entitled "Home Information System (HIS) Application Level Code Sets," by W.A. Frezza, dated April 18, 1980 (LUC 004347-004385) (the "April 18, 1980 Memorandum");

- Bell Laboratories document entitled "HIS Market Trial," dated March 18, 1981 (LUC 004035-004041) (the "March 18, 1981 Memo"); and

- Bell Laboratories document entitled "Draft Home Information System Presentation Level Protocol Specification," dated April 14, 1981 (LUC 003903-004026) (the "April 14, 1981 Draft PLP Specification").

97.     I have been asked to form an opinion as to whether or not the above-identified

evidence supports Lucent's contention that the material recited in the asserted claims was

conceived on February 25, 1980.  It has also been explained to me that conception of an invention

is complete when the inventor has formed the idea of how to make and use every aspect of the

claimed invention, and all that is required is that it be made without the need for any further

inventive effort.  In light of this instruction, I have compared the elements of the Asserted Claims

to the documents identified above.

98.     Contrary to Lucent's contentions, the February 25, 1980 Memorandum

demonstrates that Fleming et al. had not formed the ideas defined in the asserted claims of the `759

Patent as of February 25, 1980.  This document appears to have been written by Frezza and others,

and it was distributed to Fleming and Soloway, but there is no evidence that Soloway contributed

to it.  (February 25, 1980 Memorandum, LUC 004305-4306).

99.     While the February 25, 1980 Memorandum discusses color lookup tables, it does

not contain any discussion of a mode of access where color data values are directly specified.

There is certainly no teaching of the specific "processing means" element of claim 1 required to

satisfy the specific requirements of claim 1:

    processing means responsive to a predetermined command and data
    sequence  comprising at least one command, the processing means decoding
    the predetermined  command and data sequence, the predetermined

-33-

**Exhibit 13  Page 353**

command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising

a first mode of access wherein an in-use foreground color is directly specified as a color data value;

a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and

a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and

`759 Patent, claim 1, 14:22-29.

100.    I understand that the processing means element has been interpreted as a means-plus-function claim in accordance with section 112, paragraph 6.  I also understand that the function of this element is "decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values."  I understand that the court has determined the structure of this element to be "Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403,404, 405,407,408, and 411 of Figure 4 (See, Col.5, line 60- Col.6, line 19, Cof.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43).

101.    In my opinion, the February 25, 1980 Memorandum fails to demonstrate conception of the function or the structure of at least the "processing means" recited in claim 1 of the `759 Patent.  The Memorandum contains no mention of a function wherein "color is directly specified as a color data value," no mention of multiple "modes of access to color data values," and no mention of a "predetermined command and data sequence."  In addition, the Memorandum contains no mention of any structure even remotely similar to the structure identified by the Court as corresponding with the "processing means."  Moreover, the Memorandum actually demonstrates that the applicants had yet to settle on any coding scheme (*i.e.,* "predetermined command and data sequence") where it states "a detailed protocol and transmission coding scheme specification must be developed, taking into account the most recent activities in the standard areas as well as the conceivable HIS network configurations."  February 25, 1980 Memorandum,

-34-

**Exhibit 13  Page 354**

1   LUC 004331.

2        102.    For all of the same reasons described above, the February 25, 1980 Memorandum

3   does not demonstrate conception of the function or the structure of the "processing means" recited

4   in claim 2.  Most importantly, because the February 25, 1980 does not contemplate any more than

5   one mode of access to color data values, it does not contemplate "selecting a mode of access to the

6   color memory."

7        103.    Contrary to Lucent's contentions, the April 18, 1980 Memorandum demonstrates

8   that Fleming et al. had not formed the ideas defined in the asserted claims of the `759 Patent as of

9   April 18, 1980.  This document appears to have been written by Frezza, and although it was

10   distributed to Fleming and Soloway, there is no indication that Fleming and Soloway contributed

11   to it.  (April 18, 1980 Memorandum, LUC 004347-4348).

12        104.    The April 18, 1980 Memorandum suggests that in the time period following the

13   February 25, 1980 Memorandum, Frezza focused on developing a coding scheme for performing

14   the same functions described in the February 25, 1980 Memorandum.  Like the earlier memo, the

15   April 18, 1980 Memorandum describes specifying colors using index values into a color table, but

16   fails to describe direct specification of color data values.  Id., LUC 004356-4357.

17        105.    Even if some portion of the April 18, 1980 Memorandum could be read to imply an

18   understanding of the possibility of using direct color specification, there is no teaching of the

19   structure and function of the "processing means" recited in claims 1 and 2.  The Memorandum

20   contains no mention of a function wherein "color is directly specified as a color data value," and

21   no mention of multiple "modes of access to color data values."   In addition, the Memorandum

22   contains no mention of any <u>structure</u> even remotely similar to the ones identified by the Court as

23   corresponding with the "processing means" recited in claims 1 and 2.

24        106.    The March 18, 1981 Memo does not demonstrate conception of any of the elements

25   of the asserted claims of the `759 Patent.  This memo provided schedules for the Documentation

26   and Customer Terminal segments of the HIS market Trial project.  (March 18, 1981

27   Memorandum, LUC 004035).  It did not provide any technical discussion of the proposed terminal

28   design and it surely did not provide any disclosure of a "processing means" as recited in claims 1

<div align="center">-35-</div>

**Exhibit 13  Page 355**

1    and 2 of the '759 patent. Lucent has not explained how this document could even be relevant to

2    conception and it is my opinion that it does not relate to the conception of the '759 patent in any

3    way.

4    **VI.    ADDITIONAL INFORMATION AND EXHIBITS**

5    107.    The opinions in this Report are based upon my consideration of the materials I have

6    reviewed to date. Should additional information become available, the information and opinions

7    presented herein may be supplemented or amended. At trial, I may use graphics, animations,

8    pictures, demonstrations, and/or other audio/visual aids to explain the technical issues relevant of

9    this case.

10    I declare under penalty of perjury under the laws of the United States of America that the

11    foregoing is true and correct. Executed this14th day of September 2007 at Sunnyvale, California.

12

13

14

15

16                                      DR. ROBERT G. WEDIG

17

18

19

20

21

22

23

24

25

26

27

28

-36-

**Exhibit 13  Page 356**

**EXHIBIT 1**

| | |
|---|---|
| 1. | U.S. Patent No. 4,439,759 |
| 2. | File History of U.S. Patent No. 4,439,759 |
| 3. | Bell Laboratories Technical Memorandum entitled "Home Information System (HIS) Terminal Proposal," by W.A. Frezza, S.D. Hoskins, R.R. Meyer, and W.S. Stoddard, dated February 25, 1980 (LUC 004305-46) (the "February 25, 1980 Memorandum") |
| 4. | Bell Laboratories Technical Memorandum entitled "Home Information System (HIS) Application Level Code Sets," by W.A. Frezza, dated April 18, 1980 (LUC 004347-004385) (the "April 18, 1980 Memorandum") |
| 5. | Bell Laboratories document entitled "HIS Market Trial," dated March 18, 1981 (LUC 004035-004041) (the "March 18, 1981 Memo") |
| 6. | Bell Laboratories document entitled "Draft Home Information System Presentation Level Protocol Specification," dated April 14, 1981 (LUC 003903-004026) (the "April 14, 1981 Draft PLP Specification") |
| 7. | Final Report: NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display, by James D. Foley, Dara Dastyar, James Templeman, Patricia Wenner, The George Washington University, Washington D.C., 1980 ("NASA Final Report") |
| 8. | Lucent v. Gateway; Case No. 02-CV-2060 B (CAB) – Affidavit of Jean A. Pec dated September 14, 2007 with attached Exhibits A-B |
| 9. | Fleming Reexamination Petition |
| 10. | "Picture Description Instructions (PDI) For The Telidon Videotex System" by H.G. Bown, C.D. O'Brien, W. Sawchuk and J.R. Storey, Communications Research Center, Department of Communications, Canada, CRC Technical note No. 699-E, published November, 1979 ("CRC 699-E") |
| 11. | Recommendation S.100: "'International Information Exchange for Interactive Videotex," CCITT Yellow Book, Vol. 7. Fascicle 7.2, Geneva, Switzerland, Nov. 21, 1980 ("Recommendation S.100") |
| 12. | Recommendation F.300: "Videotex service," CCITT Yellow Book, Vol. 2, Fascicle 2.4, Geneva, Switzerland, Nov. 21, 1980 |
| 13. | Recommendation S.61: "Telegraph and Telematic Services Terminal Equipment," CCITT Yellow Book, Vol. 7. Fascicle 7.2, Geneva, Switzerland, Nov. 21, 1980 |
| 14. | The Application of The Intercolor 8000 Terminal To Thematic Cartography, James R. Carter, Siggraph '76, July 14-16, 1976. |
| 15. | "Dynamically Redefinable Character SETS - D.R.C.S.," G.O. Crowther, IEEE Transactions on Consumer Electronics, Volume CE-26, Issue 4, Nov. 1980, pp. 707- 716 ("Crowther") |
| 16. | Videotex: The Key Issues, Videotex Report Series, Report No. 1, Butler Cox & Partners Limited, July 1980 ("Videotex Key Issues") |
| 17. | "A Perspective on the Development of Videotex in North America," C. Douglas O'Brien, Herbert G. Bown, IEEE Journal on Selected Areas in Communications, Vol. SAC-1, No. 2, February 1983 ("Perspective On The Development Of Videotex") |
| 18. | "Color Table Animation," Richard G. Shoup, Xerox Palo Alto Research Center, Palo Alto, CA, 1979 ("Shoup") |
| 19. | "Status Report of the Graphics Standards Planning Committee," Computer Graphics, Vol. 11, No. 3, Fall 1977 ("1977 Status Report") |

1

**Exhibit 13  Page 357**

## EXHIBIT 1

| | |
|---|---|
| 20. | Book, "Videotex the New Television-Telephone Information Services," by Roger Woolfe, 1980 (the "Videotex Textbook") |
| 21. | Book, "Principles of Interactive Computer Graphics," McGraw-Hill Computer Science Series, Second Edition, by William M. Newman and Robert Sproull (the "Newman & Sproull") |
| 22. | "The Story of PLP," Joe D. Wetherington, IEEE Journal on Selected Areas in Communications, Vol. SAC-1, No. 2, pp. 267-277, Feb. 1983 |
| 23. | "Antiope LSI," P. Frandon, G. Chauvel, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 334-338, July 1979 |
| 24. | "Viewdata and Videotext, 1980-81: A Worldwide Report," Transcript of Viewdata '80, London, Mar. 26-28, 1980 |
| 25. | "Telidon: A New Approach to Videotex Design," H.G. Bown, C.D. O'Brien, W. Sawchuk, J. Storey, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 256-268, July 1979 |
| 26. | "Telidon – A Review," Herbert G. Bown, William Sawchuk, IEEE Communications Magazine, pp. 22-28, Jan. 1981 ("Telidon, A Review"). |
| 27. | "Design Document for the George Washington University Implementation of the 1979 GSPC Core System," Patricia Wenner, George Washington University, Washington, DC, 1979. |
| 28. | "Core System Implementations – A Status Report," Gary Chappell, Peter Bono, pp. 53-66. |
| 29. | "Implementations of the Core," Gary Chappell, pp. 260-278, Sept. 1979. |
| 30. | "Core Standard Graphic Package for the VGI 3400," Ken Levine, pp. 298-300. |
| 31. | "A Functional Overview of the Core System with Glossary," James C. Michener, Andries Van Dam, Computing Surveys, Vol. 10, No. 4, pp. 381-387, Dec. 1978. |
| 32. | "The DI-3000 Implementation of the 1979 GSPC 'Core' Graphics Standard," Nikolaus J. Kiefhaber, James R. Warner, pp. 170-172, ACM, 1980. |
| 33. | "The George Washington University Core System Implementation," James D. Foley, Patricia A. Wenner, Computer Graphics, Vol. 15, No. 3, pp. 123-131, Aug. 1981. |
| 34. | "The Beginning of the Beginning," Douglas Parkhill. |
| 35. | ISO 646 |
| 36. | ISO 2022.1, 2022.2 |
| 37. | ISO 6429 |
| 38. | ISO6937 |
| 39. | Book, "Viewdata 81" Published by Online Conferences Limited, UK, 1981 |
| 40. | The Telidon Story Address, Parkhill, Douglas F., Department of Communications to Rotary Club, Toronto, OT, Sept. 11, 1981. |
| 41. | "The Antiope Videotex System," Marti, B, et al., CCETT, Rennes, France, June 20, 1979. |
| 42. | "Antiope and D.R.C.S., " Lambert, O., et al., CCETT, France, IEEE Transactions on Consumer Electronics, Vol. CE-26, August 1980. |
| 43. | "Presentation Level Protocol Videotex Standard, " Bell System, May 1981. |

2

Exhibit 13  Page 358

**EXHIBIT 1**

| | |
|---|---|
| 44. | Book, "Videotex '81 International Conference & Exhibition'" May 20-22, 1981, Toronto, Canada |
| 45. | Prestel Terminal Specification, Edition One, Issue July 3, 1982 |
| 46. | Lucent v. Gateway.  Case No.  02CV2060-B – Order Construing Claims for United States Patent Number 4,439,759 dated 11/05/2005 |
| 47. | Preliminary Specification for the ANTIOPE® Teletext System, C. Schwartz, B. Marti and A. Poignet, Radio-television Broadcasting; 11th Year — No. 47 — April – May 1977 (the "Antiope Specification") |
| 48. | Certification of Translation of from French into English of "Preliminary Specification for the ANTIOPE® Teletext System, C. Schwartz, B. Marti and A. Poignet, Radio-television Broadcasting; 11th Year — No. 47 — April – May 1977. |
| 49. | "Implementations of the CORE," Chappell, G., Computer Graphics 13(4), February 1980, pp. 260-278. |
| 50. | "Some raster graphics extensions to the Core System," James D. Foley , James N. Templeman , Dara Dastyar, Proceedings of the 6th annual conference on Computer graphics and interactive techniques, pp.15-24, August 08-10, 1979, Chicago, Illinois. |
| 51. | "Status report of the graphic standards planning committee," Computer Graphics staff, ACM SIGGRAPH Computer Graphics, v.13 n.3, p.1-10, August 1979. |
| 52. | "The George Washington University Core System implementation," ACM SIGGRAPH Computer Graphics archive, Vol. 15 ,  Issue No. 3, August 1981, pp. 123 – 131. |
| 53. | "Status Report of the Graphic Standards Planning Committee," Computer Graphics, Vol. 13, No. 3, New York, NY, Aug. 1979. |
| 54. | NTIS Raster Graphics Extensions to the Graphics Compatibility System (GCS), George Washington University Department of Electrical Engineering and Computer Science, March 1979 |
| 55. | "The Telidon Story Address," Parkhill, Douglas, Department of Communications to the Rotary Club, Sept. 11, 1981 |
| 56. | "The Beginning of a Beginning," Parkhill, Douglas, 1987. |
| 57. | VideoData, Online Conferences, Ltd., London, England, 1981. |
| 58. | "Comparative Terminal Realizations with Alpha-Geometric Coding," H.G. Bown, C.D. O'Brien, W. Sawchuk, J. Storey, R. Marsh, Federal Department of Communications, August 1980, IEEE Transactions on Consumer Electronics, Volume CE-26, Issue 3, pp. 605-617 ("Comparative Terminal Realizations") |
| 59. | "Telidon: A New Approach to Videotex System Design," H.G. Bown, C.D. O'Brien, W. Sawchuk,  J. Storey, Federal Department of Communications; IEEE Transactions on Consumer Electronics, July 1979, Volume CE-25, Issue No. 3, pp. 256-268 ("Telidon"). |
| 60. | "Canadian Videotex System," by Herbert G. Brown, C. Douglas O'Brien, Y. F. Lum, William Sawchuk, J. R. Storey; IPC Business press, Computer Communications, Volume 2, Number 2, pp. 65-68, April 1979 ("Canadian Videotex"). |
| 61. | H.G. Bown, C.D. O'Brien, W. Sawchuk, and J.R. Storey, "A General Description of Telidon:—A Canadian Proposal for Videotex Systems", CRC Technical Note No. 697-E, Communications Research Centre, Canadian Department of Communications, Ottawa, December 1978. |
| 62. | "A Description of the Broadcast Telidon System," J.R. Storey, A. Vincent, , R. Fitzgerald, Federal Department of Communications; IEEE Transactions on Consumer Electronics, Aug. 1980, Volume CE-26, Issue 3, pp. 578-586. |

3

**Exhibit 13  Page 359**

## EXHIBIT 1

| | |
|---|---|
| 63. | "TELIDON-A review," H. Bown, W. Sawchuk, Communications Magazine, IEEE Volume 19, Issue 1, Jan 1981 pp. 22 – 28 |
| 64. | "Telidon Teletext System Field Trials," A. Vincent, G. Phillips, Communications Research Centre Department of Communications;  IEEE Transactions on Consumer Electronics, Aug. 1981 Volume: CE-27,  Issue No. 3, pp. 530-535. |
| 65. | RM-9400 Series Graphic Display System Software Reference Manual, Ramtek Corporation, 2211 Lawson Lane, Santa Clara. CA, 1979 |
| 66. | "Telidon Videotex Presentation Level Protocol: Augmented picture description instructions," C.D. O'Brien, H. C. Bown, J. C. Smirle, Y, F. Lum. and J. K. Kukulka, Dep. Commun., Canada. CRC Tech. Note 709, Feb. 1982. |
| 67. | "Image, A Language for the Interactive Manipulation of a Graphic Environment," C. O'Brien, Master's Thesis, Carleton Univ., Ottawa, Ontario, Canada, May 1975.l |
| 68. | "An Interactive Image Communication System Using Narrowband Lines," William Sawchuk, Herbert G. Bown, C. Douglas O'Brien, G. Wo Thorgeirson, Computers & Graphics 3(4), pp. 129-134, 1978. |
| 69. | "An Interactive Image Communications System Using Packet Switched Networks," W. T. Lalonde and C. D. O'Brien, Dep. Commun., Canada, CRC Tech. Note 701, Dec. 1980 |
| 70. | "NTSC Compatible Text and Graphics," A. Lippman, N. Negroponte, Presentation at T Chicago Spring Conference on Consumer Electronics, 1980 |
| 71. | "Broadcast specification BS-14," Dep. Commun., Canada, Telecommun. Regulatory Service, June 1981. |
| 72. | "On the Generation and Representation of Line Drawings," Bown, H.G.; Allard, P.E., CRC Technical Note No. 689, Department of Communications; Ottawa, Canada, February 1978. |
| 73. | "Adaptation of U.K. Teletext System for 525/60 Operation," Crowther, G.O., Mullard Limited, IEEE Transactions on Consumer Electronics, Aug. 1980, Volume: CE-26 , Issue 3, pp. 587 – 599 ("Adaptation of U.K. Teletext "). |
| 74. | "Enhanced UK Teletext Moves Towards Still Pictures," J.P. Chambers, IEEE Transactions on Consumer Electronics, Volume CE-26,  Issue 3,  Aug. 1980, pp. 527 – 554 ("Enhanced UK Teletext"). |
| 75. | "Teletext and Viewdata Costs as Applied to the U.S. Market," G.O. Crowther, IEEE Transactions on Consumer Electronics, Volume CE-25,  Issue 3,  July 1979, pp. 339 – 344. |
| 76. | "Teletext and Viewdata Systems and Their Possible Extension to Europe and USA," G.O. Crowther, IEEE Transactions on Consumer Electronics, Volume CE-25,  Issue 3,  July 1979, pp. 288 - 294 |
| 77. | "Design Document for the George Washington University Implementation of the 1979 GSPC CORE System," Wenner, P., et al., Technical Report GWU-EE/CS-80-06, The George Washington University, 1980. |
| 78. | "A Random-Access Video Frame Buffer,"  J.T. Kajiya, I.E. Sutherland, E.C. Cheadle, Proceedings of the Conference on Computer Graphics, Pattern Recognition, and Data Structure, IEEE, 1975, pp. 1-6, New York, NY. |
| 79. | "Look-Up Table Video Processor for Multiband Image Display Terminals," J. Gonzalez, IBM Technical Disclosure Bulletin, Vol. 21, No. 5, pp. 2012-14, USA, Oct. 1978. |
| 80. | "Color Map Techniques," Kenneth R. Sloan, Jr., Christopher M. Brown, Computer Graphics and Image Processing 10, pp. 297-317, Feb. 9, 1979. |
| 81. | "Computer Graphics for Half-Tone Three-Dimensional Object Images," John Staudhammer, Deborah J. Ogden, Comput. & Graphics, Vol. 1, pp. 109-114, Great Britain, 1975. |

Exhibit 13  Page 360

**EXHIBIT 1**

| 82. | "Color-Mapping Techniques for Computer Aided Design and Verification of VLSI Systems," Steven L. Tanimoto, Comput. & Graphics, Vol. 5, pp. 103-113, Great Britain, 1980. |
|---|---|
| 83. | "Digital Paint Systems Historical Overview Technical Memo 14, Alvy Ray Smith, May 30, 1997 |
| 84. | 6200A Colorgraphic Terminal System Programming Manual – TCS Release 2.0, Part No. 504600B, Ramtek Corporation, pp.  cover – iii, Sunnyvale, CA.. |
| 85. | 6211 Color Graphic Terminal Hardware Reference Manual, Publication No. 3000039-01, Rev. A, pp.  cover-ix/x, Santa Clara, CA, Oct. 1981. |
| 86. | 9000 Series Rm 9100, 9200, 9300 Graphic Display System Programming Manual, RAMTEK, pp. cover-ix, Sunnyvale, CA, USA, Mar. 1977 |
| 87. | 9000 Series Graphic Display System - System Description Manual, RAMTEK Corporation, pp. cover-iii, Sunnyvale, CA, Nov. 1977. |
| 88. | 9000 Series RM 9100, 9200, 9300 Graphic Display System Theory of Operation Manual Vol. 1, Revision B, pp. cover-x, Sept. 30, 1977. |
| 89. | "Color Image Quantization for Frame Buffer Display," Paul S. Heckbert, Massachusetts Institute of Technology, Cambridge, MA, May 1980. |
| 90. | Japanese Patent No. 0423768721, July 14, 1995. |
| 91. | "ITV Image Input and Color TV Display Equipment for Research of Computer Picture Processing," Toshiyuki Sakai, Takeo Kanade, Masatoshi Kubo, Yasuo Ariki, IE 75-74, Nov. 4, 1975, Kyoto, Japan. |
| 92. | Abstract re:  Conventional Picture Processing System. Japanese Publication, Vol. 15, No. 12, pp. 943-947, Dec. 1974. (handwritten: '759 Patent at top of first page) |
| 93. | Light 50 User's Guide, Applied Dynamics International Graphic Systems Division, 1980. |
| 94. | Terminal Command Protocol, Advanced Electronics Design, Inc., July 1982, Sunnyvale, CA. |
| 95. | "Digital Paint Systems:  An Anecdotal and Historical Overview," Alvy Ray Smith, IEEE Annals of the History of Computing, pp. 4-30, April-June 2001 |
| 96. | 5216 Standard Firmware User's Manual Document No. 150-6045-004, Revision June 1981 |
| 97. | Color Graphics Language (CGL) Software Reference Manual, Model: 6211, 6212, 6412, Ramtek Corporation, Sunnyvale, CA, Dec. 1981. |
| 98. | "Color Image Quantization for Frame Buffer Display," Paul S. Heckbert, Massachusetts Institute of Technology, Cambridge, MA, May 1980. |
| 99. | "SIGGRAPH '79 Proceedings," Computer Graphics, Vol. 13, No. 2, pp. cover-i, 15-24, New York, NY, Aug. 1979. |
| 100. | "Model GM-613 and GM-619 Graphic Monitor Instruction Manual," Ramtek Corporation, Sunnyvale, CA, Nov. 22, 1976. |
| 101. | "RM-9000 – DR11-B/C Interface Board," Ramtek Corporation, pp. cover-iv, Sunnyvale, CA, |
| 102. | "RM-9000 Series Diagnostic Test Card," Revision B-2, Ramtek Corporation, Sunnyvale, CA, Dec. 1977. |
| 103. | "RM-9460 Graphic Display System Hardware Reference Manual," Revision A, Ramtek Corporation, Santa Clara, CA, Sept. 1982. |

5

**Exhibit 13  Page 361**

## EXHIBIT 1

| 104. | "Look Up Table Video Processor for Multiband Image Display Terminals," J. Gonzalez, IBM Technical Disclosure Bulletin, pp. 2012-2013, Switzerland, Oct. 1978. |
|------|---|
| 105. | "Dual Port Color Monitor Adapter," R.C. Kurtz, IBM Technical Disclosure Bulletin, pp. 1331-1332, Austin, TX, Aug. 1982. |
| 106. | "Emulation of Hardware Display Adapter," Bowater, R.J. Harrison, R.B. Norris, PW, IBM Technical Disclosure Bulletin, pp. 5126-5127, United Kingdom, Feb. 1985. |
| 107. | "Interactive Color Selection Apparatus for Color Graphics Displays," Giddings, GM Langdon, GG, IBM Technical Disclosure Bulletin, pp.4400-4401, San Jose, CA, April 1, 1977 |
| 108. | "Color Process Information Display System Model IDT-2000," Industrial Data Terminals Corp., Columbus, OH, Oct. 1979. |
| 109. | "High Performance Graphics/Image Processor and Display System," Ikonas Graphics Systems Inc., Raleigh, NC, 1980. |
| 110. | "ITV Image Input and Color TV Display Device for Research of Computer Image Processing,"  Toshiyuki Sakai, Takeo Kanade, Masatoshi , Yasuo Ariki, Kyoto University, Japan. |
| 111. | "A Random-Access Video Frame Buffer," James Kajiya, Ivan E. Sutherland, Edward C. Chaadle, Proceedings of the Conference on Computer Graphics, Pattern Recognition, & Data Structure, IEEE Catalog No. 75CH0981-1C, May 1975. |
| 112. | "Nexus 5500 Mode 1 (nexus 5300) & Mode 2 (nexus 5400), OHM Co., LTD. Manufacture's Representative, Tokyo, Japan, Oct. 1980. |
| 113. | "Paint," Alvy Ray Smith, Technical Memo No. 7, Tutorial Notes, SIGGRAPH '79-'82, New York Institute of Technology, July 20, 1978. |
| 114. | "A Modular Family of High Resolution Raster Scan Display Systems for Generating Image, Graphics and Alphanumeric Data in Color, Gray Scale and Black and White," Ramtek 9400 Series Product Description RM 9400-10, 30, 50, 8X, 9X, USA, 1980. |
| 115. | "Ramtek Introduces the Most Powerful Raster Graphics and Imaging Display System Ever Made," Ramtek 9400 Series, Ramtek Corporation, Sunnyvale, CA. |
| 116. | "Instruction Manual Model GX-100A Graphic Display System Volume 1," Ramteck Corporation, Sunnyvale, CA, Oct. 1975. |
| 117. | "Raster Graphics Extensions to the Graphics Compatibility System (GCS)," James D. Foley, James Templeton, Dara Dastylar, George Washington University, Washington, DC, Mar. 1979. |
| 118. | "RM-9000-DR11-B/C Interface Board," Ramtek Corporation, Sunnyvale, CA, May 16, 1977. |
| 119. | "RM-9000 Series Diagnostic Test Card Revision B-2," Ramtek Corporation, Sunnyvale, CA, Dec. 1977. |
| 120. | "RM-9460 Graphic Display System Hardware Reference Manual," Ramtek Corporation, Sunnyvale, CA, Sept. 1982. |
| 121. | "A Conversational Picture Processing System for Processing Digital Pictorial Data," Information Processing, Vol. 15, No. 12, Dec. 1974. |
| 122. | Schematic:  Four Channel Video Path, Ikonas Graphics Systems, Inc., Aug. 12, 1980. |
| 123. | "Adage 3000 Color Raster Display System," Adage, Inc., Billerica, MA. |

6

Exhibit 13  Page 362

**EXHIBIT 1**

| 124. | "Advanced Architecture for Graphics and Image Processing," Nick England, SPIE Vol. 301, Design of Digital Image Processing Systems, pp. 54-57, 1981. |
|------|-----------------------------------------------------------------------------------------------------------------------------------------------------|
| 125. | "Dorado Hardware Manual," E.R. Fiala, Xerox Palo Alto Research Center, Palo Alto, CA, Oct. 8, 1979. |
| 126. | "GCT3 Graphic Software System Programming Reference Manual," Genisco Computers, Irvine, CA, Apr. 1977. |
| 127. | Lexidata LEX 90 Display Processing System User Guide |
| 128. | NAPLPS Specification for Online Graphics Format, Michael Dillon, Memra Software Inc., Mar. 1993. |
| 129. | "Outstanding Features of the Ikonas RDS-3000 Product Line," Ikonas. |
| 130. | "Preliminary Programming Guide MA1024/D, MA1024," MCW, Ikonas Graphics Systems, Inc., Sept. 15, 1980. |
| 131. | "Real-Time Image Computer Configuration," P. Wambacq, J. DeRoo, L. Van Eycken, A. Oosterlinck, H. Van den Berghe, SPIE Vol. 301 Design of Digital Image Processing Systems, Leuven, Belgium, 1981. |
| 132. | "Computer Animation Techniques," SIGGRAPH '79 Tutorial, Sixth Annual Conference on Computer Graphics and Interactive Techniques, 1979. |
| 133. | "The Spice Project," J. Eugene Ball, et al., 1980 1981 Computer Science Research Review, Department of Computer Science Carnegie-Mellon University, Pittsburgh, PA, 1980-1981. |
| 134. | "Computers Promise the Fountains of Utopia But All They Deliver Is a Flood of Information," Langdon Winner, Whole Earth Review, No. 44, pp. 22-28, Dec. 1984/Jan. 1985. |
| 135. | "Add Aydin Image-ination," Advertisement. |
| 136. | "Data Structuring Facilities for Interactive Videotex Systems," Frank W. Tompa, Jan Gecsei, Gregor V. Bochmann, IEEE, pp. 72-81, Aug. 1981. |
| 137. | "An Introduction to Teletext and Viewdata with Comments on Compatibility," Walter Ciciora, Gary Sgrignoli, William Thomas, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 235-245, July 1979. |
| 138. | "Prestel the World's First Public Viewdata Service," Roy D. Bright, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 251-255, July 1979. |
| 139. | "The Development of a Coding Hierarchy for Enhanced UK Teletext," John P. Chambers, John L. Riley, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 536-540, Aug. 1981. |
| 140. | "Twenty-Four Rows of Videotex in 525 Scan Lines," Walter S. Ciciora, IEEE Transactions on Consumer Electronics, Vol. CE-27, No. 4, pp. 575-587, Nov. 1981. |
| 141. | "Potential of Extended Teletext," J.P. Chambers, Television: Journal of the Royal Television Society, pp. 43-45, Sept./Oct. 1980. |
| 142. | Excerpts and Photos from the 1980 Chicago Spring Conference |
| 143. | "Conference Calendar," IEEE Communications Magazine, pp. 58-60, May 1980. |
| 144. | "Enhanced UK Teletext Moves Towards Still Pictures," J.P. Chambers, IEEE Transactions on Consumer Electronics, Vol. CE-26, No. 3, pp. 527-554, Aug. 1980. |
| 145. | "Japanese VIDEOTEX System "CAPTAIN" –Experimental Service and User Reactions Outline," Susumu Harashima, Takao Kumamoto, Tadashi Kitamura, IEEE Transactions on Consumer Electronics, Vol. CE-29, No. 12, pp. 1959-1967, Dec. 1981. |
| 146. | "V.H.F. Radio-Data: Experimental BBC Transmissions," S. R. Ely, B. Eng,, BBC Research & Development, June 1981/4. |

7

**Exhibit 13  Page 363**

**EXHIBIT 1**

| | |
|---|---|
| 147. | "Telidon Teletext System Field Trials," A. Vincent, G. Phillips, , IEEE Transactions on Consumer Electronics, Vol. CE-27, No. 3, pp. 530-535, Aug. 1981. |
| 148. | "A Description of the Broadcast Telidon System," J.R. Storey, A. Vincent, R. Fitzgerald, , IEEE Transactions on Consumer Electronics, Vol. CE-26, pp. 578-586, Aug. 1980. |
| 149. | "The Application of Picture Coding Techniques to Viewdata," K. E. Clarke, IEEE Transactions on Consumer Electronics, Vol. CE-26, pp. 568-577, Aug. 1980. |
| 150. | "Proceedings of the National Electronics Conference," National Engineering Consortium, Inc., Vol. 33, Oct. 29-31, 1979. |
| 151. | "Guest Editorial – Canada:  At the Fore of Communications," Douglas F. Parkhill, IEEE Communications Magazine, pp. 3-8, Jan. 1981. |
| 152. | "Comparative Study of Broadcast Teletext Systems," Y, Guinet, European Broadcasting Union Review, No. 165, pp. 242-254, Oct. 1977. |
| 153. | "Teletext:  Towards an Information Utility?" Timothy J. Logue, Journal of Communication, pp. 58-65, Autumn 1979. |
| 154. | "Set Top Adapter Considerations for Teletext," Howard F. Prosser, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 393-399, July 1979. |
| 155. | "Enhanced Graphics for Teletext," R. H. Vivian, IEEE Transactions on Consumer Electronics, Vol. CE-27, No. 3, pp. 541-550, Aug. 1981. |
| 156. | "Implementation and Evaluation of Input Functions for the 1979 Core Graphics System, Version 1 of 2, James Hanlon, George Washington University, Washington, DC, 1982. |
| 157. | "Implementation and Evaluation of Input Functions for the 1979 Core Graphics System, Version 2 of 2, James Hanlon, George Washington University, Washington, DC, 1982. |
| 158. | "New Products," Demetrios A, Michalopoulos, Computer, pp. 72-77, July 1980. |
| 159. | DI-3000 Second Advertisement |
| 160. | "DIGRAF – A FORTRAN Implementation of the Proposed GSPC Standard," James R. Warner, University of Colorado Computing Center Abstract, pp. 301-307, Boulder CO. |
| 161. | "Final Report of the GSPC State-of-the-Art Subcommittee," R. H. Ewald, R. Fryer, pp. 14-169. |
| 162. | "Some Major Issues in the Design of the Core Graphics System," James C. Michener, James D. Foley, , Computing Surveys, Vol. 10, No. 4, pp. 445-463, Dec. 1978. |
| 163. | "Synopsis of Changes," Status Report of the GSPC, 1977. |
| 164. | "Principles of Device- Independent Computer Graphics Software," James R. Warner, IEEE CG&A, pp. 85-100, Oct. 1981. |
| 165. | "GUMBI – A Graphic User Microprogrammable Bit-Slice Interpreter," Neil Weste, Bryan Ackland, IEEE, pp. 232-237, 1979. |
| 166. | "An IC Design Station Needs a High Performance Color Graphic Display," Neil Weste, Bryan Ackland, ACM, pp. 285-291, 1980.. |
| 167. | "Real Time Animation Playback on a Frame Store Display System," Bryan Ackland, Neil Weste, ACM, pp. 182-188, 1980. |

8

**Exhibit 13  Page 364**

**EXHIBIT 1**

| | |
|---|---|
| 168. | "Microprocessors in Consumer Products," Paul M. Russo, Chih-Chung Wang, Phillip K. Baltzer, Joseph A. Weisbecker, Proceedings of the IEEE, Vol. 66, No. 2, pp. 131-141, Feb. 1978. |
| 169. | "Integrating Solid Image Capability into a General Purpose Calligraphic Graphics Package," G. Laib, R. Puk, G. Stowell, ACM, pp. 79-85, 1980. |
| 170. | "The AGF Plotfile – Towards a Standardization for Storage and Transportation of Graphics Information," G. Enderle, I. Giese, M. Krause, H.P. Meinzer, pp. 92-113. |
| 171. | "The BIG System – Synergetic Graphics," Charles E. Quenneville, Harvey Z. Kriloff, Boeing Computer Services, Inc., Seattle, WA, pp. 174-178 |
| 172. | "Interactive Color Map Displays of Domestic Information," J. Dalton, J. Billingsley, J. Quann, P. Bracken, NASA/Goddard Space Flight Center, ACM, pp. 226-233, 1979. |
| 173. | "Device Independent Graphics Software Is It Possible?" Jack R. Davis, Versatec Corp., pp. 232-245, Santa Clara, CA. |
| 174. | "Roster of Graphic Languages and General Subroutine Packages," Toby Berk, Arie Kaufman, Mathmatical Sciences Department, Florida International University, Miami, FL, pp. 362-380. |
| 175. | "Levels of Language for Portable Software," P.J. Brown, Communications of the ACM, Vol. 15, No. 12, pp. 1059-1062, Dec. 1972. |
| 176. | "Omnigraph:  Simple Terminal-Independent Graphics Software," Robert F. Sproull, Xerox Palo Alto Research Center, Palo Alto, CA, Dec. 1973. |
| 177. | "4014 and 4014-1 Computer Display Terminal User's Manual," Tektronix, Inc., Beaverton, OR, July 1974. |
| 178. | "System and Hardware Considerations of Home Terminals with Telephone Computer Access," John Blank, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, pp. 311-317, July 1979. |
| 179. | "A Viewdata Interface for Arbitrary Computer Programs," Jacob Palme, Software: Practice and Experience, Vol. 10, Issue 12, pp. 987-991, Dec. 1980. |
| 180. | "Teletext Systems: A Review," A.J. Biggs, Physics in Technology 10, pp. 11-19, 1979. |
| 181. | "Digital Video Display Systems and Dynamic Graphics," Ronal Baecker, ACM, pp. 48-56, 1979. |
| 182. | "Evaluation of Mouse, Rate-Controlled Isometric Joystick, Step Keys, and Text Keys for Text Selection on a CRT," Stuart K. Card, William K. English, Betty J. Burr, Ergonomics, Vol. 21, No. 8, pp. 601-613, 1978. |
| 183. | "A Single Board Color Graphics System with 'Transparent Memory'," Edward Dwyer, Canadian Electronics Engineering, pp. 19-21, 62, Feb. 1979. |
| 184. | "A Standard Computer Graphics Subroutine Package," James D. Foley, Computers & Structures, Vol. 10, pp. 141-147, 1979. |
| 185. | "Mesa Language Manual," James G. Mitchell, William Maybury, Richard Sweet, Xerox Palo Alto Research Center, Palo Alto, CA, Apr. 1979. |
| 186. | "The Workstation Concept of GKS and the Resulting Conceptual Differences to the GSPC Core System," J. Encarnacao, G. Enderle, K. Kansy, G. Nees, E.G. Schlechtendahl, J. Weiss, P. Wibkirchen, ACM, pp. 226-230, 1980. |
| 187. | "Xerox Introduces 'Intelligent Copier'," Peter J. Schuyten, New York Times, Sept. 25, 1980. |
| 188. | "Advances in Human-Computer Interaction, Volume 3," H. Rex Hartson, Deborah Hix, Ablex Publishing Corp., Norwood, NJ, 1992. |

**Exhibit 13  Page 365**

**EXHIBIT 1**

| 189. | "FORMAL: A Forms-Oriented, Visual-Directed Application Development System," Nan C. Shu, Computer, pp. 38-49, Aug. 1985. |
|---|---|
| 190. | "GRAPH: A System for Television Graphics Part I," John Webster, John Young, BYTE Publications Inc., pp. 62-77, May 1978. |
| 191. | "Advanced Display Systems for Crew Stations of Tactical Aircraft," W.G. Ast, D.E. Green, American Institute of Aeronautics and Astronautics, Inc., pp. 473-481, 1981. |
| 192. | "GRAPHX 11," Jeff Gallup, FALL 1973 Papers and Presentations, Digital Equipment Computer Users Society, pp. 195-198, Fall 1973. |
| 193. | "Cabletext: Text Distribution on CATV Networks," W.A. Kaiser, L. Buehlnaier, Symposium Record GATV Sessions, pp. 3-13. |
| 194. | "A Terminal Control System," Jon A. Meads, Proceedings of the IFIP Working Conference on Graphic Languages, 1972. |
| 195. | "Secretory IgA-, IgG- and C3b-coated Bacteria in the Nasoparynx of Otitis-Prone and Non-Otitis-Prone Children," Lars-Eric Stenfors, Simo Raisanen, Acta Otolaryngol, Vol. 1993 113(2) pp. 191-195. |
| 196. | "Designing Menu Selection Systems," Ben Schneiderman, Journal of the American Society for Information Science, pp. 57-70, Mar. 1986. |
| 197. | "Rapid Prototyping of Interactive Information Systems," Anthony I. Wasserman, David T. Sheumake, ACM Sigsoft Software Engineering Notes, Vol. 7, No. 5, pp. 171-180, Dec. 1982. |
| 198. | "Some Comparisons of On-Display and Off-Display Touch Input Devices for Interaction with Computer Generated Displays," D. Whitfield, R. G. Ball, J. M. Bird, Ergonomics, Vol. 26, No. 11, pp. 1033-1053, 1983. |
| 199. | "European Interactive Videotex Service: Display Aspects and Transmission Coding," CEPT Rec T/CD6-1, Innsbruck, Austria, May 1980. |
| 200. | "NTSC Compatible Text and Graphics," A. Lippman, N. Negroponte, Presentation at T Chicago Spring Conference on Consumer Electronics, 1980 |
| 201. | "Control Procedures of the Teletext Service," Yellow Book, Vol. VII.2, CCITT Rec. 62, Geneva, Switzerland, 1980. |
| 202. | Videotex System Planning, Costa, Jose M., Marsh, Antony H., Proceedings of the National Electronics Conference, National Engineering Consortium, Volume XXXIII, Chicago IL, Oct. 29-31, 1979. |
| 203. | Interactive Color Selection Apparatus for Color Graphics Display_ Technical Disclosure, Apr. 1, 1977 |
| 204. | European Patent Application 0 012 420, June 25, 1980, Methods of Operating Electrochronic Display Devices and Apparatus for Performing the Methods |
| 205. | Demande De Brevet Europeen 0 023 861, February 2, 1981. |
| 206. | International Application Published Under the PCT Publ. No WO 80/01422, July 10, 1980, Data Processing System and Apparatus for Color Graphics Display |
| 207. | Computer Graphics Reaching the User, Myers, Ware, IEEE, March 1981. |
| 208. | Planning the Videotex Network, Costa, J. M., Chitnis, A. M., Canadian Electronics Engineering, April 1980. |
| 209. | The International Telecommunication Union and Development of Worldwide Telecommunications, Bellchamber, W. H., IEEE, Vol. 22, No. 5, May1984. |

**Exhibit 13  Page 366**

**EXHIBIT 1**

| | |
|---|---|
| 210. | Article, "Towards Videotex Standards," Bochmann, Gregor v., Gecsei, Jan, Online Conferences Ltd., University of Montreal, Canada, 1980 pp. 253-263 |
| 211. | A Users Guide to PLOT79, Beebe, Nelson H. F., Department of Physics and Chemistry, University of Utah, Salt Lake City, UT, 1979 |
| 212. | NTIS_The Raster Graphics Extension to the GCS, George Washington University Department of Electrical Engineering and Computer Science, Mar. 1979. |
| 213. | Book, "Device-Independent Graphics with Examples from IBM Personal Computers," by Robert F. Sproull, W.R. Sutherland, and Michael Ullner, 1985. |
| 214. | Radio Shack_Going Ahead with Extended Color Basic TRS-80 Color Computer, 1981. |
| 215. | Videotex in Europe Conference Proceedings, Commission of the European Communities, Luxembourg, July 19-20, 1979 |
| 216. | Implementation of Raster Extensions to the Core System, Marlino, Sarah J., Worcester Polytechnic Institute, January 1982 |
| 217. | Apple II The DOS Manual Disk Operating System, Apple Computer Inc., Cupertino, CA, 1980 |
| 218. | National Research Council Canada Search Hits, http://cat.cisti-icist.nrc-cnrc.gc.ca/search/a?searchtype=t&searcharg=a+general+description, last visited Aug. 8, 2007 |
| 219. | NTIS Programming Guide for Color Graphics on the NorPak VDP/VGS and VDP/RGS, Defense Research Establishment Ottawa, OT, Dec. 1981. |
| 220. | "United Kingdom Videotex Service and the European Unified Videotex Standard," Childs, Geoff, IEEE Journal on Selected Areas in Communications, Vol. Sac-1, No. 2, February 1983. |
| 221. | Whole Earth Review – Computers As Poison, December 1984 – January 1985 No. 44 |
| 222. | "Level One Software System Design for AYGRAF/CORE" Document No. 150-6045-094, September 1979 |
| 223. | Ramtek Programming Manual Micrographic Terminal Graphic Display System (MGT 6000); 6200 Colorgraphic Terminal System – Programming Manual – TCS Release 2.0; Part No. 504600B |
| 224. | Abstract, "Brief Communication – A Review of Telidon Development," by Dorothy Phillips, Online Review, 1980, Vol. 4, No. 2 |
| 225. | IFIP Working Conference on Graphic Language, Vancouver, Canada, May 22-26, 1972 |
| 226. | Memory Control Processor (MCP) Functional Specification – Document No. 296-5210 |
| 227. | Thesis, "An Implementation of the Raster Extensions to the Core System," by Sarah J. Marlino, January 1982 |
| 228. | Abstract, "IMAGE a Language for the Interactive Manipulation of a Graphics Environment," by C.D> O'Brien and H.G. Bown, pp. 53-60 |
| 229. | Computer Graphics Quarterly Report of SIGGRAPH-ACM, Vol. 13, No. 3, August 1979 – Status Report of the Graphic Standards Committee |
| 230. | Computer Graphics Quarterly Report of SIGGRAPH-ACM, Vol. 13, No. 2, August 1979 – SIGGRAPH '79 Proceedings August 8-10, 1979 |
| 231. | Ramtek Color Graphics Language (CGL) Software Reference Manual, Publication No. 8000016-01, Rev. F, June 1982 |

11

**Exhibit 13  Page 367**

**EXHIBIT 1**

| 232. | Canadian Search Hits re: Telidon printed 08/08/2007. 5 pages of search hits from http://cat.cisti-icist.nrc-cnre.gc.ca |
|---|---|
| 233. | Article, "Videotex: The Key Issues, Report #4," Videotex Report Series, July 1980, pp. 31-32 & 35 |
| 234. | Abstract, "GKS '79 Proposal of a Standard for a Graphical Kernel System," by R. Eckert, K. Kansy, G. Enderle, and F. Prester |
| 235. | Abstract, "Device Driver Interface for Decentral Device Drivers'" by Johann Weiss, 1979, pp. 252-262 |
| 236. | Abstract, "Coding for a Viewdata 'Picture in Picture' Facility," by R.C. Nicol and B.A. Fenn, July 9-11, 1979, Paper No. 3.1, pp. 1-2 |
| 237. | Apple II: Basic Programming Manual, 1978 |
| 238. | Aydin Controls: 5216 Display Computer Installation and Operation Manual - Document No, 150-6045-003, May 1980 |
| 239. | Article, "Code Extension Techniques for Use with the ISO 7-bit Coded Character Set," International Standard, ISO 22, 1973, |
| 240. | Book, "The Telidon Book," Edited by: David Godfrey and Ernest Chang, 1981 |
| 241. | NTIS Computer Graphics Research Project: Instruction to the Graphics Compatibility System (Version 2.5), March 1974 |
| 242. | Book, "Interactive Videotex: The Domesticated Computer," by Dimitris N. Chorafas, 1981 |
| 243. | UK Patent Application re: GB 2 032 740 A re: Programmable Color Mapping dated 05/08/1980 |
| 244. | Article, "4004 Futures for Teletext and Videotex in the US," by Robert Plummer, Robert Johansen, Michael Nyhan and P.G. Holmlov, June 20, 1979, pp. 318-326 |
| 245. | Article, "Teletext/Viewdata LSI," by Brian Harden, June 20, 1979, pp. 353-358 |
| 246. | Article, "Data Structuring Facilities for Interactive Videotex Systems," by Frank Tompa, Jan Geesel, and Gregor Bochmann, IEEE August1981, pp. 72-81 |
| 247. | Article, "UK Teletext – Evolution and Potential," by N.E. Tanton, IEEE Transactions on Consumer Electronics, Vol. CE-25, No. 3, July 1979 |
| 248. | Abstract, "Videotex Services: Network and Terminal Alternatives, " by A.M. Chitnis and J.M. Costa, June 1979, pp. 269-278 |
| 249. | Book, "The Systems Programming Series: Fundamentals of  Interactive Computer Graphics," by J.D. Foley and A. Van Dam |
| 250. | U.S. Patent 4,120,028 - Digital Display Data Processor dated October 10, 1978 |
| 251. | U.S. Patent 4,149,152 - Color Display Having Selectable Off-On and Background Color Control dated April  10, 1979 |
| 252. | U.S. Patent 4,180,805 - System for Displaying Character and Graphic Information on a Color Video Display with Unique Multiple Memory Arrangement dated December 25, 1979 |
| 253. | U.S. Patent 4,200,867 - System and Method for Painting Images by Synthetic Color Signal Generation and Control dated April 29, 1980 |
| 254. | U.S. Patent 4,206,457 - Color Display Using Auxiliary Memory for Color Information dated June 3, 1980 |

12

**Exhibit 13  Page 368**

## EXHIBIT 1

| | |
|---|---|
| 255. | U.S. Patent 4,213,189 - Reactive Computer System Adaptive to a Plurality of Program Inputs dated July 15, 1980 |
| 256. | U.S. Patent 4,217,577 - Character Graphics Color Display System dated August 12, 1980. |
| 257. | U.S. Patent 4,225,861 - Method and Means for Texture Display in Raster Scanned Color Graphic dated September 30, 1980 |
| 258. | U.S. Patent 4,232,311 - Color Display Apparatus dated November 4, 1980 |
| 259. | U.S. Patent 4,233,628 - NTSC Receiver Useable with Teletext/Viewdata Information dated November 11, 1980 |
| 260. | U.S. Patent 4,237,543 - Microprocessor Controlled Display System dated December 2, 1980. |
| 261. | U.S. Patent 4,296,476 - Data Processing System with Programmable Graphics Generator dated October 20, 1981 |
| 262. | U.S. Patent 4,303,986 - Data Processing System and Apparatus for Color Graphics Display dated December 1, 1981 |
| 263. | U.S. Patent 4,310,838 - Instruction Controlled Audio Visual System dated January 12, 1982 |
| 264. | U.S. Patent 4,415,922 - Cartographic Indicator dated November 15, 1983 |
| 265. | U.S. Patent 4,424,572 - Device for the Digital Transmission and Display of Graphics and/or of Characters on a Screen dated January 3, 1984 |
| 266. | U.S. Patent 4,439,759 - Terminal Independent Color Memory for a Digital Image Display System dated March 27, 1984 |
| 267. | U.S. Patent 4,821,208 - Display Processors Accommodating the Description of Color Pixels in Variable-Length Codes dated April 11, 1989 |
| 268. | File History re: U.S. Patent 4,396,989 |
| 269. | File History re: U.S. Patent 4,414,621 |
| 270. | File History re: U.S. Patent 4,439,760 |
| 271. | File History re: U.S. Patent 4,439,761 |
| 272. | File History re: U.S. Patent 4,454,593 |
| 273. | File History re: U.S. Patent 5,887,243 |
| 274. | File History re: U.S. Patent 6,829,587 |
| 275. | German Patent Application No. 28 14 980, 1978 (Document is written in German) |
| 276. | Patent Specification No. 1 600 170 re: Application No. 47371/78; Filed December 30, 1977; Inventors: David Burson and Harold Larson.  Title: Digital Control System |
| 277. | Patent Specification No. 1 331 281 re: Application No. 47777/70; Filed October 7, 1970; Inventors: Minoru Takeda.  Title: Method of and System for Alphanumeric Display |
| 278. | Prior Art Search regarding U.S. Patent 4,439,759 by the Danish Patent and Trademark Office listing relevant documents |
| 279. | Article, "The International Telecommunication Union and Development of WorldwideTelecommunications," by Bellchambers and Nickelson, EEE Communications, May 1984 Vol. 22. No. 5, pp. 72-83 |
| 280. | Final Report – Raster Graphics Extensions to GCS; Contract DAC39-78M0073 from Waterways Experiment Station.  Prepared by: James D. Foley, James Templeton, and Dara Dastyar; The George Washington University School of Engineering and Applied Science, 1977 |

13

Exhibit 13  Page 369

**EXHIBIT 1**

| 281. | "International Videotex Standardization: A Canadian View of Progress Towards the Wired World," Smirle et al., Viewdata and Videotex, 1980-81, 1980 |
|------|---|
| 282. | "Raster Extensions to the Core System," by J.D. Foley, J.N. Templeton and D.B. Dastyar, 1977 |
| 283. | Deposition Testimony of James Fleming (e.g., Dep. Tr. at 71-78, 85-91, 158-159, 175-178, 185-187) |
| 284. | Deposition Testimony of Gerald Soloway (e.g.., Dep. Tr. at 89-92) |
| 285. | Discussions with Dr. James Foley, September 10, 2007 |
| 286. | Discussions with C.D. O'Brien, September 11, 2007 |

EXHIBIT 2

## U.S. Patent 4,439,759 Claim Chart

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| **Claim 1** | | |
| In a digital image display system: | In a digital image **display system [hardware and software, needed to achieve a visible representation of information in a data-processing system]:** | The Recommendation S.100 provides a design specification for a digital image display system that is capable of providing a visible representation of information in a data-processing system. "1.2.1 This Recommendation describes the characteristics of coded information that is exchanged between countries participating in the international interactive Videotex service (as described in Recommendation F.300 [2]) and defines the display features corresponding to its various elements. 1.2.2 Videotex systems are text communication systems having in addition the capability of a given level of pictorial representation and a repertoire of display attributes. The text and the pictures obtained are intended to be displayed using the current television (TV) raster standards of the different countries. 1.2.3 Different options are offered as a choice for the Administrations to implement their national services. Substantial degrees of compatibility exist between these options, but some transcoding may be necessary to facilitate interworking. 1.2.4 For the international service, four different options for representing pictorial information have been recognized: a) mosaic character sets: b) geometric system: c) dynamically redefinable character sets; d) photographic representation. These options are not mutually exclusive and it is possible that systems may develop using two or more options." Recommendation S.100, page 166. |

---

[1]      Recommendation S.100: "'International Information Exchange for Interactive Videotex," CCITT Yellow Book, Vol. VII, Geneva, Switzerland, Nov. 21, 1980 ("S.100").

1

**Exhibit 13  Page 371**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| a memory for storing color data values; | a **memory [a color map that stores a table of color data values indexed by numbers]** for storing **color data values [color components of a particular color (such as red, green and blue (RGB) color components)];** | It was well known to one of ordinary skill in the art prior to 1981 that the parallel mode of the alpha-mosaic option described in Recommendation S.100 was taken from Antiope. (Recommendation S.100, pp. 179-185 ).  It was also well known to one of ordinary skill in the art prior to 1981 that the Antiope system used a color memory:<br><br>The Prestel videotext customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and background color by indexing a permanent read-only color memory.<br><br>('759 patent, Col. 1:22-27).<br><br>Furthermore, Recommendation S.100 discloses a memory for storing color data values.<br><br>"9.3 Display related enhancements<br><br>93.1 Most of the currently planned and/or offered services utilize images created with only eight colours, which are formed by the various combinations (on or off) of three primary colours — red, green and blue.  Limiting Videotex to eight colours is an unnecessary restriction, since the electronic emission devices controlling the red, green and blue colours can be caused to have more than just the two states of on or off.  For example, with just eight different states or levels, a potential of 512 colours exist.  Additionally, for those services that use a matrix-oriented screen (e.g. a mosaic graphic mode) different colours could be identified for foreground symbols to those for background areas.<br><br>9.3.2 The ability to simulate motion (*i.e.* animation) is a potential enhancement that can be achieved by several means. These include:<br><br>a) alternating between slightly different display frames stored in the terminal;<br><br>b) dynamically altering the colour of portions of the display image, making them appear or disappear by **redefining the colour table** (an image disappears when its colour is set to the same colour as the surrounding area):<br><br>C) execution of a resident program to redefine the image at a controlled rate."<br><br>Recommendation S.100, p. 198 (emphasis added).<br><br>Therefore, given the knowledge of one of ordinary skill in the art and the explicit citation to a color memory, it is clear that Recommendation S.100 discloses a color memory that contains Color Data Values. |
| processing means responsive to a predetermined | processing means responsive to a **predetermined command and data sequence [a command and data** | Recommendation S.100 discloses processing means responsive to a command and data sequence comprising at least one command, the processing means decoding the command and data sequence, the command and data sequence selecting one of a plurality of modes of access to color data values.  If this claim limitation is applied in the manner alleged by |

2

**Exhibit 13  Page 372**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | **pattern having a known encoded meaning] comprising [including, but not limited to]** at least one command, the processing means **decoding [interpreting]** the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of **modes of access to [manners of retrieving]** color data values, the modes comprising  "Processing Means"  Function:  The function of this element is decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values  Structure:  Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (*See*, Col. 5, line 60 - Col. 6, line 19, Col. 6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43). | Lucent in its infringement contentions, then the structure of the processing means disclosed in Recommendation S.100 is the same or equivalent to the structure identified in the Court's claim construction order. A processing means is necessarily required to process the coded information defined by Recommendation S.100. The coded information is command and data sequences used by the processor to produce the digital display. The processing means selects from a plurality of modes of access to color data values including an alphamosaic, alphageometric, Dynamically redefinable character sets and photographic representation.   "1.2.4  For the international service, four different options for representing pictorial information have been recognized:       a) mosaic character sets:       b) geometric System:       c) dynamically redefinable character sets;       d) photographic representation. These options are not mutually exclusive and it is possible that systems may develop using two or more options." (Recommendation S.100, page 166).   "2.1.3 The different options are designated (and invoked) by specific escape sequences. *2.2 Designation and invocation in the context of the alphamosaic option* 2.2.1 Two different modes for the alphamosaic option have been identified. They differ in their display control sets. These control sets are designated as the C1 set by control sequences of the form ESC 2/2 (F) where F is assigned by ISO. (A registration of these sets must be requested by CCITT.) Individual controls are represented by ESC F sequences. 2.2.2 The mosaic graphics set is designated (in the parallel mode) as the G1 set by an escape sequence of the form ESC 2/9 (F) or ESC 2/13 (F) to be allocated by ISO. *2.3 Designation and invocation in the context of the alphageometric option* 2.3.1 The alphageometric coding scheme is to be designated and invoked by the escape sequence ESC 2/5 (5/x) in accordance with paragraph 5.3.8 of ISO 2022 [1] standard. This designates and invokes a complete code with interpretation as follows. 2.3.2 All the meanings and interpretation of Recommendation V.3 [3] and ISO 2022 [1] remain the same, including CO, GO and G2 with the exception of SI and SO. The codes of the 01 set and their meanings and interpretations are as described in § 6. 2.3.3 The designation and invocation of the complete code by the, sequence ESC 2/5 (5/x) is to be terminated only by ESC 2/9 (F) or ESC 2/13 (F), designating a normal G1 set." (Recommendation S.100, page 167.) |
| a first mode of | a first **mode of access [manner of** | Recommendation S.100 discloses a first mode of access in which the in-use foreground |

3

**Exhibit 13  Page 373**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| access wherein an in-use foreground color is directly specified as a color data value; | retrieving] wherein an **in-use foreground color [a color that will be used as a foreground color for subsequently received text and graphics drawing commands until changed] is directly specified as [called for by] a color data value [color component of a particular color (such as the red, green and blue (RGB) color components];** | color is directly specified as a color data value.<br><br>It was well known to those of ordinary skill in the art prior to 1981 that the alphageometric mode, which was taken from the Canadian Telidon system, used a direct selection of color data values.  (Recommendation S.100, pp. 185-196)   This fact was acknowledged in the Fleming `759 Patent:<br><br>       For example, the Picture Description Instructions PDI for the Telidon Videotex System, CRC Technical Note No. 696-E, developed by the Canadian Department of Communications describes a specific color value selection method: a direct selection of data values for the primary colors – red, green and blue.<br><br>('759 patent, Col.1:16-22).<br><br>The first mode of access is entered by a specific command and data sequence.<br><br> "2.3.1  The alphageometric coding scheme is to be designated and invoked by the escape sequence ESC 2/5 (5/x) in accordance with paragraph 5.3.8 of ISO 2022 [1] standard.  This designates and invokes a complete code with interpretations as follows."<br><br>(Recommendation S.100, page 167)<br><br>"6.1.1.1  In the alphageometric option, the display is composed of alphanumeric texts and pictorial drawings that are defined in geometric primitives transmitted as drawing commands."<br><br>(Recommendation S.100, page 185)<br><br>When operating in the alphageometric mode, the directly specified in-use foreground color is used as the foreground color for subsequently received text and graphics drawing commands until changed.  The color is directly called for by a color data value.  The color data values are color components of the particular colors red, green, and blue.<br><br>"6.5.3 Control(Value)<br><br>6.5.3.1   This opcode specifies the colour attribute or grey scale value of the drawings (or text) that follow."<br><br>(Recommendation S.100, page 192) |

4

**Exhibit 13  Page 374**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | <br><br>FIGURE 14/S.100<br>Bit assignments for grey scale or colour attributes<br><br>(Recommendation S.100, page 192) |
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | a second **mode of access [manner of retrieving]** wherein the **in-use foreground color [a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed]** is **specified as [called for by]** an index into the **color memory [a color map that stores a table of color data values indexed by numbers]**; and | Recommendation S.100 discloses a second mode of access in which the in-use foreground color is specified as an index into the color memory.<br><br>It was well known to one of ordinary skill in the art prior to 1981 that the parallel mode of the alpha-mosaic option described in Recommendation S.100 was taken from Antiope. (Recommendation S.100, pp. 179-185).   It was also well known to those of ordinary skill in the art prior to 1981 that the Antiope system used a color memory:<br><br>The Prestel videotext customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and background color by indexing a permanent read-only color memory.<br><br>('759 patent, Col. 1:22-27.  Furthermore, Recommendation S.100 discloses a read/write memory for storing color data values.<br><br>"b) dynamically altering the colour of portions of the display image, making them appear or disappear by **redefining the colour table** (an image disappears when its colour is set to the same colour as the surrounding area)."<br><br>Recommendation S.100, p. 198 (emphasis added).<br><br>Entering the alpha-mosaic mode is described in Recommendation S.100 as being performed with the command and data sequence ESC 2/9 (F) or ESC 2/13 (F). |

5

**Exhibit 13  Page 375**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | "2.2.2 The mosaic graphics set is designated (in the parallel mode) as the G1 set by an escape sequence of the form ESC 2/9 (F) or ESC 2/13 (F) to be allocated by ISO."<br><br>(Recommendation S.100, page 167)<br><br>Recommendation S.100 discloses a command in parallel mode for setting the foreground color of all alphamosaic characters<br><br>"5.4 *Parallel Mode*<br><br>...<br><br>5.4.2 Display control functions<br><br>5.4.2.2  Attributes for use in the defined display area are as follows:<br><br>5.4.2.2.1     Black foreground<br>            Red foreground<br>            Green foreground<br>            Yellow foreground    Causes the following characters to be written in<br>            Blue foreground         the colour indicated.<br>            Magenta foreground<br>            Cyan foreground<br>            White foreground"<br><br>(Recommendation S.100, page 183)<br><br>Recommendation S.100 also discloses a command in serial mode for setting the foreground color of all alphanumeric characters.<br><br>"5.3 *Serial Mode*<br><br>...<br><br>5.3.2.2     Alpha red<br>          Alpha green<br>          Alpha yellow    Controls functions that cause the currently designated and<br>          Alpha blue        invoked alphanumeric set to be displayed in the indicated<br>          Alpha magenta   color until the occurrence of an explicit colour control or<br>          Alpha cyan       the end of the row.<br>          Alpha white"<br><br>(Recommendation S.100, page 175)<br><br>Furthermore, there are similarly commands in serial mode of the alphamosaic option for setting the foreground color of the alphamosaic characters of successive alphamosaic |

6

**Exhibit 13  Page 376**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | graphics commands.<br><br>"5.3 *Serial Mode*<br><br>....<br><br>5.3.2.9   Graphics red / Graphics green / Graphics yellow / Graphics blue / Graphics magenta / Graphics cyan / Graphics white"   Controls functions that cause the mosaic graphic set to be displayed in the indicated color until the occurrence of an explicit colour control or the end of the row. Unallocated code table positions (4/0-5/15) cause the characters of the currently designated and invoked alphanumeric set to be dispayed. This defined as *blast-through* operation.<br><br>(Recommendation S.100, page 177)<br><br>In both the serial and parallel modes of the alphamosaic option, the colors are specified as simple 7 bit values indicating the color such as yellow, magenta, etc. These color data operands are indexes to a color memory of a compatible Antiope system.<br><br>Furthermore, although unnecessary to satisfy the claim, the parallel mode also has a transparent background command that causes all succeeding characters to be displayed with the underlying background of the character unchanged.<br><br>"5.4.2.2.11 Transparent Background<br><br>This control function causes the characters following it to be displayed with a transparent background. This means the area not occupied by the foreground colour takes the underlying background colour. This may be one of the eight colours or the video picture as defined by the off screen attributes."<br><br>(Recommendation S.100, page 184) |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | a third **mode of access** wherein the **in-use foreground color** and in an **in-use background color [a color that will be used as the background color for subsequently received text and graphics drawing commands until changed]** are **specified** as indexes into the **color memory**; and | Recommendation S.100 teaches that using the mosaic option in either serial or parallel mode an in-use foreground color is specified as an index into the color memory as explained in the previous claim element.<br><br>     Recommendation S.100 further discloses a third mode of access in which the in-use the in-use background color is specified as an index into the color memory. In the parallel mode of the alphamosaic option, the background color is specified as a specific color which one of ordinary skill in the art would understand to be an index to a color table using command code 5/0 – 5/7. (Id., p. 181) Because the parallel mode of the alphamosaic option is based on the Antiope system, and because the Antiope system was known to have been implemented using a color memory, it was clear to one of ordinary |

7

**Exhibit 13  Page 377**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | skill in the art that the background command specifies an index into a color memory.<br><br>"5.4  *Parallel Mode*<br><br>...<br><br>5.4.2.2.10  Black background / Red background / Green background / Yellow background / Blue background / Magenta background / Cyan background / White background"  Causes the following characters to be displayed in their foreground colour on a background of the color indicated.<br><br>(Recommendation S.100, page 184) |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | display means responsive to the process means, the display means displaying the colors associated with the color data values accessed by the selected mode.<br>"Display means"<br><u>Function</u>:<br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode<br><u>Structures</u>:<br>(1) monitor;<br>(2) television set;<br>(3) video projection system;<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.*, Col. 4, lines 50-55). | Recommendation S.100 discloses a display means responsive to the processing means displaying the colors associated with the color data values accessed by the selected mode. The color values accessed by the selected mode are displayed on a computer monitor raster display.<br><br>"1.2.5 For international interworkings, two categories of TV systems have to be considered:<br><br>a)  systems having a vertical resolution of 525 lines per TV frame at 30 TV frames per second;<br><br>b)  systems having a vertical resolution of 625 lines per TV frame at 25 TV frames per second."<br><br>(Recommendation S.100, p. 166).<br><br>"This Recommendation describes the characteristics of coded information that is exchanged between countries participating in the international interactive Videotex service (as described in Recommendation F.300 [2]) and defines the display features corresponding to its various elements."<br><br>1.2.2  Videotex systems are text communication systems having in addition the capability of a given level of pictorial representation and a repertoire of display attributes.  **The text and the pictures obtained are intended to be displayed using the current television (TV) raster standards of the different countries**. |

8

**Exhibit 13  Page 378**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | 1.2.3  Different options are offered as a choice for the Administrations to implement their national services.  Substantial degrees of compatibility exist between these options, but some transcoding may be necessary to facilitate interworking."<br><br>Recommendation S.100, p. 166 (emphasis added). |
| **Claim 2** | | |
| A digital image display system comprising: | A digital image **display system [hardware and software needed to achieve a visible representation of information in a data-processing system]** comprising; | Recommendation S.100 discloses a digital image display system as explained above. |
| a color memory for storing color data values; | a **color memory** for storing **color data values;** | Recommendation S.100 discloses a color memory as explained above. |
| processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and | processing means responsive to **predetermined command and data sequences,** the processing means, responsive to a first command, selecting a **mode of access** to the **color memory**; and responsive to a second command, **setting [storing]** a **color data value**  in the **color memory;** and<br><br>"Processing means"<br><br>Function:<br><br>The function of this element is:<br>(a) selecting a mode of access to the color memory; and<br>(b) setting a color data value.<br><br>Structure:<br>(a) structure for selecting a mode of access to color memory is:<br>Data processor 1 programmed to perform the algorithm shown in Fig. | Recommendation S.100 discloses a processing means responsive to predetermined command and data sequence as discussed above.<br><br>The first command for selecting a mode of access to the color memory is as discussed for Claim 1.<br><br>The second command is obvious to one of ordinary skill in the art based on the discussion of the enhancements to recommendation to implement animation.<br><br>"9.3.2 The ability to simulate motion (*i.e.* animation) is a potential enhancement that can be achieved by several means. These include:<br><br>a) alternating between slightly different display frames stored in the terminal;<br><br>b) dynamically altering the colour of portions of the display image, making them appear or disappear by **redefining the colour table (an image disappears when its colour is set to the same colour as the surrounding area):**<br><br>C) execution of a resident program to redefine the image at a controlled rate."<br><br>Recommendation S.100, p. 198 (emphasis added).<br><br>In order to set the color of an image to be the same color as the surrounding area, it is necessary for the processor to receive and process a command that changes the value in the color memory.  Such a command would be a second command for setting a color data |

9

**Exhibit 13  Page 379**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | 3: boxes 301-303; Fig. 4: boxes 401-405, 407, 408, and 411 (*See,* Col. 5, line 60 - Col. 6, line 19, Col. 6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), and lines 33-43)); <br><br>(b) structure for setting a color data value is: <br>Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 304 and 305; and Fig. 5: boxes 501, 504, 506, 508 and 510 (*See,* Col. 5, lines 60-64; Col. 6, lines 12-17; Col. 7, lines 14-17 (except for "or (2) in color mode 0, for setting"), Col. 7, lines 53-64 (except for "The sequence of boxes 504, 506, 508, and 510 is")). | value in the color memory. <br><br>Furthermore, the article "Dynamically Redefinable Character Sets – D.R.C.S" by G.O. Crowther, 1980 ("Crowther") when combined with Recommendation S.100 makes clear that a color map may be used to help add to the number of available colors that can be displayed on a Videotex system. <br><br>"In its simplest form the four bits can be used to define one of the eight colours and two levels of intensity. However, it is felt that by a simple extension of the system the four bits could be employed to define up to sixteen adaptively defined colours." <br><br>(Crowther, page 710). <br><br>Colors can only be "adaptively defined" if they can be written and changed. <br><br>"To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data defining the colours to be employed in the particular picture. The 16 colours would be coded simply by allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for each of the three primary colors. These codes of the 16 pre-defined colours would be stored in memory as shown in Figure 4. <br><br><br>Figure 4 <br><br>In operation as the Pixel data was read from the main D.R.C.S. memory the 4 bit code of each Pixel would be converted into one of 16 preselected colours. |

10

**Exhibit 13  Page 380**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | This facility gives the possibility of a relatively high definition employing 16 pastel colours from a large colour table."<br><br>(Crowther, page 711).<br><br>Loading the color table in the Crowthers extension to the Videotex system requires a command which could act as the second command. |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | display means responsive to the processing means, the display means displaying a color associated with the **color data value** accessed by the selected mode.<br><br>"Display means"<br><br><u>Function</u>:<br><br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode.<br><br><u>Structures</u>:<br><br>(1) monitor;<br>(2) television set;<br>(3) video projection system<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.,* Col. 4, lines 50-55). | Recommendation S.100 discloses a display means as discussed above. |
| **Claim 3** | | |
| A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color | A **display system** as recited in claim 2, wherein the processing means responsive to a second command **sets** plural **color data values** in **color memory.**<br><br>"Processing means":<br><br><u>Function</u>: | Recommendation S.100 make obvious to one of ordinary skill in the art a second command for setting plural color data values in color memory. Recommendation S.100 discloses a writable color memory as an enhancement to the basic system.<br><br>"9.3.2 The ability to simulate motion (*i.e.* animation) is a potential enhancement that can be achieved by several means. These include:<br><br>a) alternating between slightly different display frames stored in the terminal;<br><br>b) dynamically altering the colour of portions of the display image, making them appear or |

11

**Exhibit 13  Page 381**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| memory. | The function of this element is sets plural color data values in color memory.<br><br>Structure:<br><br>Data processor 1 programmed to perform the algorithm of Fig. 5, Boxes 501, 504, 506, 508 and 510 and the line exiting box 510 (*See* Col. 7 ln. 14-17 [except for "or (2) in color mode 0, for setting"], Col. 7, lns. 53-65). | disappear by **redefining the colour table (an image disappears when its colour is set to the same colour as the surrounding area):**<br><br>C) execution of a resident program to redefine the image at a controlled rate."<br><br>Recommendation S.100, p. 198 (emphasis added).<br><br>In recommending that an image can disappear when its color is set the same color as the surrounding area, it is obvious to one of ordinary skill in the art that if the image is made up of multiple colors, it will be necessary to redefine multiple color table entries in order to accomplish this masking operation. Performing this write of multiple data values in the color memory would need to be directed by a command. This command would act as the second command.<br><br>Furthermore, Crowther when combined with Recommendation S.100 makes clear that a processing means may be responsive to a second command to set plural color data values in color memory.<br><br>Crowther teaches a writable color memory.<br><br>"In its simplest form the four bits can be used to define one of the eight colours and two levels of intensity. However, it is felt that by a simple extension of the system the four bits could be employed to define up to sixteen adaptively defined colours."<br><br>(Crowther, page 710).<br><br>Colors can only be "adaptively defined" if they can be written and changed. Crowther also teaches that multiple colors can be transmitted as codes to load the color memory.<br><br>"To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data defining the colours to be employed in the particular picture. The 16 colours would be coded simply by allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for each of the three primary colors. These codes of the 16 pre-defined colours would be stored in memory as shown in Figure 4. |

12

**Exhibit 13  Page 382**

EXHIBIT 2

| Claim | Court's Claim Construction | Recommendation S.100 [1] |
|---|---|---|
| | | <br><br>"ADAPTIVE COLOUR MODE"<br><br>Figure 4<br><br>In operation as the Pixel data was read from the main D.R.C.S.memory the 4 bit code of each Pixel would be converted into one of 16 preselected colours.<br><br>This facility gives the possibility of a relatively high definition employing 16 pastel colours from a large colour table."<br><br>(Crowther, page 711).<br><br>Loading multiple values in the color table in the Crowther extension to the Videotex system requires one or more commands.  This command can act as the second command of the claim. |

13

Exhibit 13  Page 383

EXHIBIT 3

**U.S. Patent 4,439,759 Claim Chart**

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| **Claim 1** | | |
| In a digital image display system: | In a digital image **display system [hardware and software, needed to achieve a visible representation of information in a data-processing system]:** | CRC 699-E provides a detailed specification of a protocol to be used by a digital image display system which make the system independent of communications channel and display hardware.  The digital image display system which implements the specified code would display a visible representation of coded information in a data-processing system.<br><br>"In order to transmit information to a **Telidon terminal**, at minimum bandwidth, and in a manner independent of the type of communications channel, a coding scheme was devised which encodes a picture into the geometric drawing elements which compose it. These "Picture Description Instructions" are an alpha-geometric coding model and are based on the primitives of POINT, LINE, ARC, RECTANGLE, POLYGON, point by point BIT encoded images and TEXT encoded as ASCII characters. This document provides a detailed specification of this code as well as a description of the principles which make it **independent of** communications channel and **display hardware**."<br><br>(CRC 699-E, page 1, (emphasis added)). |
| a memory for storing color data values; | a **memory [a color map that stores a table of color data values indexed by numbers]** for storing **color data values [color components of a particular color (such as red, green and blue (RGB) color components)];** | CRC 699-E discloses a memory for storing color data values.  CRC 699-E teaches that a color memory could be used with the Telidon system but that it was not included in the initial trial system because it was not cost effective to implement this hardware at that time.<br><br>"**Colour Lookup** could provide the capability of defining specific colours such as flesh tones or shades of yellow to brown **to extend a terminal's colour capability**.  Additional hardware is required for this capability which is not cost effective at this time."<br><br>(CRC 699-E, page 70, (emphasis added)).<br><br>However, CRC 699-E does teach that such a color memory could be added and envisioned how it might be included in the design.  CRC 699-E teaches that if bit b2 of the TONAL CONTROL status command is set, then color memory could then be enabled in a videotext system. |

---

[1]     "Picture Description Instructions (PDI) For The Telidon Videotex System" by H.G. Bown, C.D. O'Brien, W. Sawchuk and J.R. Storey, Communications Research Center, Department of Communications, Canada, CRC Technical note No. 699-E, published November, 1979.

1

**Exhibit 13  Page 384**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| | | "The Control (VALUE) opcode defines the colour or greyscale value accessed by subsequent drawing operations, as described in Section 4.3. This value may be used to represent either colour or greyscale value for a particular picture element as defined by the TONAL CONTROL status flag. The TONAL CONTROL is initially 0 indicating that all subsequent drawing operations would produce coloured lines, rectangles, text, etc. If the TONAL CONTROL flag is set to 1, all subsequent drawing operations would produce picture drawings in which the value would be interpreted as a greyscale level. Both coloured and greyscale graphical drawing entities may co—exist in the same picture. The drawing operations to create the coloured and greyscale picture are separated by TONAL CONTROL Status Commands. **The facility bit b2 is reserved for possible future use with colour reference tables.** CRC 699-E, pp. 49-50 (emphasis added). Allocating a specific bit in the TONAL CONTROL status flag and specifically indicating that it should be used to enable a "colour reference table" teaches one of ordinary skill a memory for storing color data values. |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | processing means responsive to a **predetermined command and data sequence [a command and data pattern having a known encoded meaning] comprising [including, but not limited to]** at least one command, the processing means **decoding [interpreting]** the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of **modes of access to [manners of retrieving]** color data values, the modes comprising "Processing Means" Function: The function of this element is decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access | CRC 699-E  discloses processing means responsive to a command and data sequence comprising at least one command, the processing means decoding the command and data sequence, the command and data sequence selecting one of a plurality of modes of access to color data values.  If this claim limitation is applied in the manner alleged by Lucent in its infringement contentions, then the structure of the processing means disclosed in the CRC 699-E is the same or equivalent to the structure identified in the Court's claim construction order. CRC 699-E teaches a processing means in the form of a micro-computer "The Telidon Videotex system is a method by which information can be accessed from central data bases by the general public.  By the use of a domestic home television receiver augmented by a **micro-computer controlled interface device** a user can access pages of graphical and textual information over a public common carrier communications facility such as the telephone network, a cable television line or the data may be even encoded into unused space in a broadcast television signal." (CRC 699-E, page 1 [emphasis added]). The CRC 699-E discloses that the processing means is responsive to a command and data sequence comprising at least one command. "In order to transmit information to a Telidon terminal, at minimum bandwidth, and in a manner independent of the type of communications channel, a coding scheme was devised which encodes a picture into the geometric drawing elements which compose it. These |

2

**Exhibit 13  Page 385**

| Claim | Court's Claim Construction | CRC 699-E[1] |
|-------|---------------------------|--------------|
|  | to color data values<br><br>Structure:<br><br>Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (*See*, Col. 5, line 60 - Col. 6, line 19, Col. 6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43). | "**Picture Description Instructions**" are an alpha-geometric coding model and are based on the primitives of POINT, LINE, ARC, RECTANGLE, POLYGON, point by point BIT encoded images and TEXT encoded as ASCII characters. This document provides a detailed specification of this code as well as a description of the principles which make it independent of communications channel and display hardware."<br><br>(CRC 699-E, p. 1 (emphasis added).)<br><br>The predetermined command and data sequence taught the CRC 699-E allows for a variable number of parameters after the initial command code which changes the way the command is interpreted.<br><br>"**The flag field of the command is used to indicate whether the byte represents a command opcode or data associated with the command**. The flag field is 0 for opcodes and 1 for numeric data. The number of bytes in the code sequence associated with a particular drawing command is determined from the flag field. A command's domain begins by its opcode byte and terminates either by the start of the following opcode byte or by an SO, SI, SS or ESC character."<br><br>(CRC 699-E, page 11, (emphasis added))<br><br>The CRC 699-E discloses that the processing decodes the command and data sequence.<br><br>"Another way of interpreting the Cl code table assignments is to examine the bit patterns of the codes."<br><br>(CRC 699-E, page 11).<br><br>CRC 699-E teaches a command and data sequence that selects one of a plurality of modes of access to color data values. The flag field of the TONAL CONTROL selects between color versus grayscale display and envisions selecting between direct versus indirect color selection.<br><br>"The Control (VALUE) opcode defines the colour or greyscale value accessed by subsequent drawing operations, as described in Section 4.3. This value may be used to represent either colour or greyscale value for a particular picture element as defined by the TONAL CONTROL status flag. The TONAL CONTROL is initially 0 indicating that all subsequent drawing operations would produce coloured lines, rectangles, text, etc. If the TONAL CONTROL flag is set to 1, all subsequent drawing operations would produce picture drawings in which the value would be interpreted as a greyscale level. Both coloured and greyscale graphical drawing entities may co—exist in the same picture. The drawing operations to create the coloured and greyscale picture are separated by TONAL CONTROL Status Commands. |

3

**Exhibit 13  Page 386**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| | | **The facility bit b2 is reserved for possible future use with colour reference tables.**<br><br>CRC 699-E, pp. 49-50 (emphasis added). |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | a first **mode of access [manner of retrieving]** wherein an **in-use foreground color [a color that will be used as a foreground color for subsequently received text and graphics drawing commands until changed]** is directly **specified as [called for by] a color data value [color component of a particular color (such as the red, green and blue (RGB) color components];** | CRC 699-E discloses a first mode of access in which the in-use foreground color is directly specified as a color data value.  The VALUE form of the CONTROL opcode directly specifies the color to be used as the in-use foreground color.<br><br>"The CONTROL opcode allows control over the states of the terminal and over the form of interpretation of the drawing opcode attributes such as line texture, crosshatching, etc. There are four forms of the CONTROL opcode distinguished by the facilities bits."<br><br>…<br><br>The VALUE form of the CONTROL opcode defines the value (colour of the grey scale) accessed by subsequent drawing opcodes. For example, a CONTROL (VALUE) opcode could be transmitted to define the colour red, and then a RECTANGLE opcode transmitted to draw a rectangle. The rectangle would then be coloured red."<br><br>(CRC 699-E, page 41)<br><br>The specified in-use foreground color is a color data value because it specifies the triplets of values for the three primary colours GREEN, RED and BLUE for a particular color.<br><br>"Terminals very [sic] in the number of colours or levels of grey scale they support. The minimum is a system with merely one level to display only black and white monochrome. A typical system supports eight shades of grey scale, the eight colours Black, Blue, Red, Magenta, Green, Yellow, Cyan, White, blinking on White and a transparent mode to allow captioning of regular television pictures.<br><br>The control information which specifies whether a CONTROL (VALUE) opcode contains colour or grey scale data or whether blinking or transparent mode is invoked is specified in a Status Command. The CONTROL (VALUE) form merely interprets the associated data bytes as levels of grey scale of decreasing significance or of triplets of values for the three primary colours GREEN, RED and BLUE also of decreasing significance."<br><br>(CRC 699-E, page 42) |
| a second mode of access wherein the in-use foreground color is specified as an index into the | a second **mode of access [manner of retrieving]** wherein the **in-use foreground color [a color that will be used as the foreground color for subsequently received text and graphics drawing commands until** | The CRC 699-E discloses a second mode of access in which the in-use foreground color is specified as an index into the color memory.  First, as discussed above, CRC 699-E discloses the use of a color memory.<br><br>"**Colour Lookup** could provide the capability of defining specific colours such as flesh tones or shades of yellow to brown **to extend a terminal's colour capability**.  Additional |

4

**Exhibit 13  Page 387**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| color memory; and | **changed] is specified as [called for by]** an index into the **color memory [a color map that stores a table of color data values indexed by numbers]; and** | hardware is required for this capability which is not cost effective at this time." (CRC 699-E, page 70). Furthermore, CRC 699-E allocates a bit for invoking a future use of the color memory. "The facility bit b2 is reserved for possible future use with colour reference tables." (CRC 699-E, page 50). Also, CRC 699-E discloses the four modes of the TONAL CONTROL Command which includes direct color, direct grayscale, indirect color and indirect grayscale. These are shown in CRC 699-E in the figure at the bottom of page 50 with direct color selection shown in the upper left, direct grayscale shown in the lower left, indirect color in the upper right and indirect grayscale shown in the lower right of the figure.  (CRC 699-E, page 50). One of ordinary skill in the art would understand that if a videotext system based on the teachings of CRC 699-E were to include a color memory and bit 2 were set to enable the indirect memory, then the in-use foreground color could be specified using an index into the color memory.. "The VALUE form of the CONTROL opcode defines the value (colour of the grey scale) accessed by subsequent drawing opcodes.  For example, a CONTROL (VALUE) opcode could be transmitted to define the colour red, and then a RECTANGLE opcode transmitted to draw a rectangle.  The rectangle would then be coloured red." (CRC 699-E, page 41) The Antiope videotex system also had the ability to specify an in-use foreground color as an index into a color memory.  (Antiope Specification, pp. 6 -7). |

5

**Exhibit 13  Page 388**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | a third **mode of access** wherein the **in-use foreground color** and in an **in-use background color [a color that will be used as the background color for subsequently received text and graphics drawing commands until changed]** are **specified** as indexes into the **color memory**; and | CRC 699-E teaches an in-use foreground color is specified as an index into the color memory as explained in the previous claim element.<br><br>Furthermore, CRC 699-E in combination with the Antiope Specification teaches an in-use background color for subsequently received text and graphics drawing commands until changed are specified as an index into the color memory.<br><br>It was well known to one of ordinary skill in the art prior to 1981 that the parallel mode of the alpha-mosaic option described in Recommendation S.100 was taken from Antiope. (Recommendation S.100, pp. 179-185 ).  It was also well known to one of ordinary skill in the art prior to 1981 that the Antiope system used a color memory:<br><br>     The Prestel videotext customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and background color by indexing a permanent read-only color memory.<br><br>('759 patent, Col. 1:22-27).<br><br>The Antiope Specification also teaches commands for specifying the in-use background color.  The Antiope Specification teaches one set of commands for specifying the in-use background color of the alphanumeric characters and a second set of commands for specifying the mosaic or semi-graphical characters.  Referring to Figure 7, the Antiope Specification teaches a set of commands for specifying the in-use background color of alphanumeric characters:<br><br>"[In the event that the background color and the character color are specified independently, the codes being used to transmit the background color in the release sequence are the first eight in column 6.  The binary elements b1, b2 and b3 of these codes have the same meaning as those of the codes transmitting the color of the character."<br><br>(Antiope Specification, page 7).<br><br>The Antiope Specification also teaches specifying the in-use background color of semi-graphical characters.<br><br>"As was noted above, the functions of reversed background, double height and double length do not apply to the semi-graphical characters in Figure 3.<br><br>In this case, the binary elements b2, b3 and b6 of the transmitted code are allocated to the specification of the background color.  There is a correspondence between these binary elements and the primary colors R, G, B of the received signal.<br><br>(Antiope Specification, page 7). |

6

**Exhibit 13  Page 389**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| | | Since CRC 699-E teaches extending the specification to include a color memory and one of ordinary skill in the art knows that Antiope used a color memory to display colors and that Antiope taught the use of in-use background colors, then a combination of CRC 699-E and the Antiope Specification teaches a third mode of access wherein the in-use foreground color and in an in-use background are specified as indexes into the color memory. |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | display means responsive to the process means, the display means displaying the colors associated with the color data values accessed by the selected mode.<br><br>"Display means"<br><br><u>Function:</u><br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode<br><br><u>Structures</u>:<br><br>(1) monitor;<br>(2) television set;<br>(3) video projection system;<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.*, Col. 4, lines 50-55). | The CRC 699-E discloses a display means responsive to the processing means displaying the colors associated with the color data values accessed by the selected mode.  In the Telidon system disclosed in CRC 699-E, the display means is a home television receiver.<br><br>"The Telidon Videotex system is a method by which information can be accessed from central data bases by the general public.  By the use of a domestic home television receiver augmented by a micro-computer controlled interface device a user can access pages over graphical and textual information over a public common carrier communication facility such as the telephone network, a cable television line or the data may be even encoded into unused space in a broadcast television signal."<br><br>(CRC 699-E, page 1) |
| <u>Claim 2</u> | | |
| A digital image display system comprising: | A digital image **display system [hardware and software needed to achieve a visible representation of information in a data-processing system]** comprising; | The CRC 699-E discloses a digital image display system as explained above. |
| a color memory for storing color data values; | a **color memory** for storing **color data values;** | CRC 699-E discloses a color memory as explained above. |
| processing means | processing means responsive to | CRC 699-E discloses a processing means responsive to predetermined command and data |

7

**Exhibit 13  Page 390**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|-------|---------------------------|--------------|
| responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and | **predetermined command and data sequences,** the processing means, responsive to a first command, selecting a **mode of access** to the **color memory**; and responsive to a second command, **setting [storing]** a **color data value** in the **color memory**; and<br><br>"Processing means"<br><br>Function:<br><br>The function of this element is:<br>(a) selecting a mode of access to the color memory; and<br>(b) setting a color data value.<br><br>Structure:<br>(a) structure for selecting a mode of access to color memory is:<br>Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 301-303; Fig. 4: boxes 401-405, 407, 408, and 411 (*See,* Col. 5, line 60 - Col. 6, line 19, Col. 6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), and lines 33-43));<br><br>(b) structure for setting a color data value is:<br>Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 304 and 305; and Fig. 5: boxes 501, 504, 506, 508 and 510 (*See,* Col. 5, lines 60-64; Col. 6, lines 12-17; Col. 7, lines 14-17 (except for "or (2) in color mode 0, for setting"), | sequence as discussed above.<br><br>The first command for selecting a mode of access to the color memory is as discussed for Claim 1.<br><br>The second command is obvious to one of ordinary skill in the art is obvious when CRC 699-E is combined with Crowther.<br><br>The article "Dynamically Redefinable Character Sets – D.R.C.S" by G.O. Crowther, 1980 ("Crowther") when combined with CRC 699-E makes clear that a color map may be used to help add to the number of available colors that can be displayed on a Videotex system.<br><br>"In its simplest form the four bits can be used to define one of the eight colours and two levels of intensity. However, it is felt that by a simple extension of the system the four bits could be employed to define up to sixteen adaptively defined colours."<br><br>(Crowther, page 710).<br><br>Colors can only be "adaptively defined" if they can be written and changed.<br><br>"To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data defining the colours to be employed in the particular picture. The 16 colours would be coded simply by allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for each of the three primary colors. These codes of the 16 pre-defined colours would be stored in memory as shown in Figure 4.<br><br><br><br>"ADAPTIVE COLOUR MODE"<br><br>Figure 4 |

8

**Exhibit 13  Page 391**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| | Col. 7, lines 53-64 (except for "The sequence of boxes 504, 506, 508, and 510 is")). | In operation as the Pixel data was read from the main D.R.C.S.memory the 4 bit code of each Pixel would be converted into one of 16 preselected colours.<br><br>This facility gives the possibility of a relatively high definition employing 16 pastel colours from a large colour table."<br><br>(Crowther, page 711).<br><br>Loading the color table in the Crowthers extension to the Videotex system requires a command which could act as the second command. |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | display means responsive to the processing means, the display means displaying a color associated with the **color data value** accessed by the selected mode.<br><br>"Display means"<br><br><u>Function</u>:<br><br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode.<br><br><u>Structures</u>:<br><br>(1) monitor;<br>(2) television set;<br>(3) video projection system<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.,* Col. 4, lines 50-55). | The CRC 699-E discloses a display means as discussed above. |
| <u>**Claim 3**</u> | | |
| A display system as recited in claim 2, wherein the processing means responsive to a | A **display system** as recited in claim 2, wherein the processing means responsive to a second command **sets** plural **color data values** in **color** | The CRC 699-E when combined with Crowther makes obvious to one of ordinary skill in the art a second command for setting plural color data values in color memory.<br><br>Crowther teaches a writable color memory.<br><br>"In its simplest form the four bits can be used to define one of the eight colours and two |

9

**Exhibit 13  Page 392**

EXHIBIT 3

| Claim | Court's Claim Construction | CRC 699-E[1] |
|---|---|---|
| second command sets plural color data values in color memory. | **memory.**<br><br>"Processing means":<br><br><u>Function</u>:<br><br>The function of this element is sets plural color data values in color memory.<br><br><u>Structure</u>:<br><br>Data processor 1 programmed to perform the algorithm of Fig. 5, Boxes 501, 504, 506, 508 and 510 and the line exiting box 510 (*See* Col. 7 ln. 14-17 [except for "or (2) in color mode 0, for setting"], Col. 7, lns. 53-65). | levels of intensity. However, it is felt that by a simple extension of the system the four bits could be employed to define up to sixteen adaptively defined colours."<br><br>(Crowther, page 710).<br><br>Colors can only be "adaptively defined" if they can be written and changed. Crowther also teaches that multiple colors can be transmitted as codes to load the color memory.<br><br>"To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data defining the colours to be employed in the particular picture. The 16 colours would be coded simply by allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for each of the three primary colors. These codes of the 16 pre-defined colours would be stored in memory as shown in Figure 4.<br><br><br><br>"ADAPTIVE COLOUR MODE"<br><br>Figure 4<br><br>In operation as the Pixel data was read from the main D.R.C.S.memory the 4 bit code of each Pixel would be converted into one of 16 preselected colours.<br><br>This facility gives the possibility of a relatively high definition employing 16 pastel colours from a large colour table."<br><br>(Crowther, page 711).<br><br>Loading multiple values in the color table in the Crowthers extension to the Videotex system requires one or more commands. This command can act as the second command of claim 3. |

10

**Exhibit 13  Page 393**

EXHIBIT 4

**U.S. Patent 4,439,759 Claim Chart**

| Claim | Court's Claim Construction | NASA Final Report [1] |
|-------|---------------------------|----------------------|
| **Claim 1** | | |
| In a digital image display system: | In a digital image **display system [hardware and software, needed to achieve a visible representation of information in a data-processing system]:** | NASA Final Report describes the raster extensions to the Core System. The Core System with the raster extensions provides a design specification for a terminal independent language designed to be used on a digital image display system capable of providing a visible representation of information in a data-processing system.<br><br>"The Core System extensions aim to make effective use of the prototypical raster display shown in Figure 1. The image creation system processes 2D images such as lines, text, points, and areas. Its output is placed in the refresh buffer as the pixel values needed to cause the entities to be displayed. The refresh buffer has a 2D organization, with each row corresponding to a scan-line of the raster display. The size of the refresh buffer and number of bits per pixel varies from one system to another"<br><br>(NASA Final Report, Appendix B, page 2). |
| a memory for storing color data values; | a **memory [a color map that stores a table of color data values indexed by numbers]** for storing **color data values [color components of a particular color (such as red, green and blue (RGB) color components)];** | NASA Final Report discloses a memory for storing color data values. The color data values are stored in the color memory as components of particular colors such as red, green, and blue.<br><br>NASA Final Report explains that on the device level, there are three ways of specifying color:<br><br>"A.  For devices with a small number of displayable colors, color is set by the function SET INDEX. The index values 1 to 8 have the (fixed) association with the colors Black (or complement of background), Red, Green, Blue, Cyan, Yellow, Magenta and White (or background) for color devices, or with the colors Black (or complement) and White (or background) for grey—level devices.<br><br>B.  For devices with a color look-up table, color is set by the functions SET INDEX, DEFINE COLOR INDICES and DEFINE INTENSITY INDICES. In addition, the look-up table is initialized |

---

[1]      "Final Report – NASA Grant NSG 1508; Extension of the CORE Graphics System for Raster Graphics Display." Foley, James D., et al., The George Washington University, Washington D.C. 20052 ("NASA Final Report").

1

**Exhibit 13  Page 394**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| | | as in (A).<br><br>C.    For devices with a large number of displayable colors and no look-up table, references when multiple definitions exist. Some devices (e.g. Dicomed) may incorporate both (A) and (C).The color specification mode is returned as part of the INQUIRE CAPABILITIES function."<br><br>(NASA Final Report, Appendix C, page 21-2)<br><br>Choice B specifies a "color look-up table" or color memory.  Therefore, NASA Final Report discloses a color memory.<br><br>The color data values are stored in the color memory as components of particular colors such as red, green, and blue.<br><br>"The size of the color or intensity index tables will be implicitly be defined by the device's capability.  If the user does not designate values for slots in the index table, they will be undefined.  There are Core-level functions available to load the index tables with a smooth and meaningful set or [sic] color or intensity values.<br>…<br>The user may specify color directly, with three parameters between 0 and 1.  These parameters may specify red, green and blue, or hue, lightness and saturation."<br><br>(NASA Final Report, Appendix C, page 16) |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, | processing means responsive to a **predetermined command and data sequence [a command and data pattern having a known encoded meaning] comprising [including, but not limited to]** at least one command, the processing means **decoding [interpreting]** the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of **modes of access to [manners of retrieving]** color data values, the modes comprising<br><br>"Processing Means"<br><br>Function: | The processing means disclosed by the NASA Final Report is responsive to a predetermined command and data sequence comprising at least one command.  If this claim limitation is applied in the manner alleged by Lucent in its infringement contentions, then the structure of the processing means disclosed in NASA Final Report is the same or equivalent to the structure identified in the Court's claim construction order.<br><br>The processing means selects from a plurality of modes of access to color data values including direct and indirect modes of access to the color look-up table.<br><br>"The user specifies the definition of the view surface as it will be used with the function Initialize View Surface (surface name, type, mode), where type is color or intensity, and mode is direct or index table lookup. The designation of fixed or dynamic with each table lookup specifies whether the device has fixed or dynamic table lookup.  For a fixed table, if the type is color, the first entries of the lookup table are initialized to Black, Red, Green, Blue, Cyan, Yellow, Magenta, White.  Therefore, support can be provided for situations in the table which are indicated as initial load, algorithm, one:one.  Support will not be provided for situations indicated as error, table required, doesn't exist.<br><br>The initial imp1emention of raster functions provided will be direct color to a dynamic |

2

**Exhibit 13  Page 395**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| the modes comprising | The function of this element is decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values<br><br>Structure:<br><br>Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (*See*, Col. 5, line 60 - Col. 6, line 19, Col. 6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43). | color lookup table device, and dynamic index color to a dynamic color lookup table device (the two marked with an asterisk in the table."<br><br>(NASA Final Report, Appendix C, page 17-18).<br><br>Function 2:          INITIALIZE VIEW SURFACE<br>Integer Parameters:<br>TYPE          1-color", 2-intensity".<br>MODE          1-"direct", 2-index-table".<br><br>Initialize the output device. For devices with lookup tables, if TYPE is "color" initialize the first eight entries with the colors Black (or complement of background)1 Red1 Green1 Blue, Cyan. Yellow, Magenta and White (or background). If TYPE is "intensity" initialize the first two entries with the colors Black (or complement) and White (or background). MODE is used only with devices with both "direct-color" and "(fixed) index-table" color specification."<br><br>(NASA Final Report, Appendix C, page 21-3).<br><br><br>The NASA Final Report describes a function called "SET_CURRENT_COLOR":<br><br>"SET_CURRENT_COLOR (R, G, B)<br><br>…<br><br>This is one way to set the current color (intensity) index attribute.  The R, G, B's (INTENSITY) are in the rangle of 0 and 1 and are rounded to the nearest displayable color (intensity) on the currently selected view surface.  The index value associated with the color (intensity) becomes the current color (intensity) index attribute.  All subsequently generated output primitives to which the color (intensity) index attribute value applies will be displayed with the color (intensity) associated with the index.  This association can be changed if the color (intensity) is dynamic, as specified when the view surface is initialized."<br><br> (NASA Final Report, Appendix A, p. 4),<br><br><br>The NASA Final Report describes a function called "SET_COLOR":<br><br>          Function 17: SET_COLOR<br>          Integer Parameters:<br>          PRIMITIVE 1-"line", 2-"fill", 3-"text"<br>          Real Parameters: |

3

**Exhibit 13  Page 396**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|-------|----------------------------|------------------------|
| | | C1,C2, C3   Color parameters interpreted in device's color model. For devices with direct color specification, set the color of the specified output primitives. DD selects the closest match in each of the 3 (independent) components. The initial value of COLOR is complement of background.<br><br>NASA Final Report, Appendix C, p. 21-7 .<br><br>The NASA Final Report describes a function called "SET_CURRENT_COLOR_INDEX":<br><br>"SET_CURRENT_COLOR_INDEX (I)<br><br>…<br><br>The current color (intensity) index is set to I.  That is the Ith color (intensity) in the active color set of the currently selected view surface.  All subsequently generated output primitives to which the color (intensity) index attribute value applies will be displayed with the color (intensity) associated with the index.  This association can be changed if the color (intensity) is dynamic, as specified when the view surface is initialized."<br><br>(NASA Final Report, Appendix A, p. 5),<br><br>The NASA Final Report describes a function called "SET_BACKGROUND_COLOR":<br><br>Function 18: SET_BACKGROUND_COLOR<br>Real Parameters:<br>C1, C2, C3 Color parameters interpreted in device's color model.<br>For devices with direct color specifications set the background color.<br>Ignored by devices without a variable back- ground.<br><br>NASA Final Report, Appendix C, p. 21-7.<br><br>The NASA Final Report describes a function called "SET_INDEX":<br><br>Function 21: SET_INDEX<br>Integer Parameters:<br>PRIMITIVE 1-"line", 2-"text", 3-"fill"<br>INDEX              Index value.<br>For devices with color lookup tables, set the color table index for subsequent output primitives. The initial value of INDEX is 1.<br><br>NASA Final Report, Appendix C, p. 21-8.<br><br>"SET_BACKGROUND_COLOR_INDEX (INDEX)<br>SET_BACKGROUND_INTENSITY_INDEX (INDEX) |

4

**Exhibit 13  Page 397**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| | | The background color (intensity) index attribute is set to INDEX. This action does not take effect until a NEWFRAME occurs."<br><br>(NASA Final Report, Appendix A, page 20).<br><br>The NASA Final Report describes a function called "SET_BACKGROUND_INDEX":<br><br>      Function 22: SET_BACKGROUND_INDEX<br>      Integer Parameters:<br>      INDEX               Index value.<br>      For devices with color lookup tables, set the background index.<br>      Ignored by devices without a variable background.<br><br>NASA Final Report, Appendix C, pg. 21-8. |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | a first **mode of access [manner of retrieving]** wherein an **in-use foreground color [a color that will be used as a foreground color for subsequently received text and graphics drawing commands until changed]** is directly **specified as [called for by] a color data value [color component of a particular color (such as the red, green and blue (RGB) color components];** | NASA Final Report discloses a first mode of access in which the in-use foreground color is directly specified as a color data value. The in-use foreground color is used as foreground color for subsequently received text and graphics drawing commands until changed. The color is directly called for by a color data value. The color data values are color components of particular colors such as red, green, and blue.<br><br>The Raster graphics extensions to the Core Systems described in Appendix A to the NASA Final Report discloses the "SET_CURRENT_COLOR (R,G,B)" command to directly specify the in-use foreground color. This command finds the Color Data Value in the Color Memory that has the closest color match to the operand. The index in Color Memory of this Color Data value becomes the current color index for the in-use foreground color. All subsequently generated output primitives will be displayed with the in-use foreground color associated with the index until changed.<br><br>"4.2.1.1.2  SET_CURRENT_COLOR<br><br>SET_CURRENT_COLOR (R,G,B)<br>SET_CURRENT_INTENSITY (INTENSITY)<br><br>This is one way to set the current color (intensity) index attribute. The R,G,B's (INTENSITY) are in the range of 0 to 1 and are rounded to the nearest displayable color (intensity) on the currently selected view surface. The index value  associated with the color (intensity)  becomes the current color (intensity) index attribute. All subsequently generated output primitives to which the color (intensity) index attribute applies will be displayed with the color (intensity) associated with the index. This association can be changed if the color (intensity) is dynamic, as specified when the view surface is initialized." |

5

**Exhibit 13  Page 398**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| | | (NASA Final Report, Appendix A, page 4). |
| | | An output primitive is a text or graphics drawing command. Appendix A of the NASA Report was meant to be used in conjunction with the original GSPC CORE Specification titled "Status Report of the Graphics Standards Planning Committee," Computer Graphics, Vol. 11, No. 3, Fall 1977. ("1977 GSPC Report") with section numbering scheme following the original 1977 GSPC Report (NASA Final Report, Appendix A, preface). 1977 GSPC Report has a section titled "OUTPUT PRIMITIVES" which defines text and graphics drawing commands such as "TEXT(CHARACTER_STRING)" and "LINE_ABS_2." (1977 GSPC Report, II-19, II-20). |
| | | Furthermore, the Appendix C of the NASA Final Report discloses the" SET COLOR" command that directly sets the color of succeeding output primitives until changed. The NASA Final Report discloses that for devices with direct color specification, the in-use foreground color of subsequent displayed objects will use the closest match of the specified color data value. |
| | | Function 17:        SET COLOR<br>Integer Parameters:<br>PRIMITIVE        1-"line", 2-"fill", 3-"text"<br>Real Parameters:<br>C1,C2, C3 Color parameters interpreted in device's color model.<br><br>For devices with direct color specification, set the color of the specified output primitives. DD selects the closest match in each of the 3 (independent) components. The initial value of COLOR is complement of background. |
| | | (NASA Final Report, Appendix C, page 21-7). |
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | a second **mode of access [manner of retrieving]** wherein the **in-use foreground color [a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed]** is **specified as [called for by]** an index into the **color memory [a color map that stores a table of color data values indexed by** | NASA Final Report discloses a second mode of access in which the in-use foreground color is specified as an index into color memory. The in-use foreground color is used as foreground color for subsequently received text and graphics drawing commands until changed.<br><br>The Raster graphics extensions to the Core Systems described in Appendix A to the NASA Final Report discloses the "SET_CURRENT_COLOR_INDEX (I)" command to specify the in-use foreground color as an index into the color memory. All subsequently generated output primitives are then displayed with the color associated with the index.<br><br>"SET_CURRENT_COLOR_INDEX (I) |

6

**Exhibit 13  Page 399**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| numbers]; and | | SET_CURRENT_INTENSITY_INDEX (I)<br><br>The current color (intensity) index is to set I.  That is the Ith color (intensity) in the active color set of the currently selected view surface.  All subsequently generated output primitives to which the color (intensity) index attribute value applies will be displayed with the color (intensity) associated with the index.  This association can be changed if the color (intensity) is dynamic, as specified when the view surface is initialized."<br><br> (NASA Final Report, Appendix A, page 5).<br><br>Furthermore, Appendix C of the NASA Final Report discloses the "SET_INDEX" command specify the in-use foreground color as an index into the color memory for subsequently received "output primitives" until changed where "output primitives" are defined to be text and graphics drawing commands as shown in 1977 GPSC Report. (1977 GSPC Report, II-19, II-20).<br><br><pre>Function 21:      SET INDEX<br>Integer Parameters:<br>PRIMITIVE        1-"line", 2-"text", 3-"fill"<br>INDEX            Index value.<br>For devices with color lookup tables, set the color table index for<br>   subsequent output primitives. The initial value of INDEX is 1.</pre><br>(NASA Final Report, Appendix C, page 21-8). |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | a third **mode of access** wherein the **in-use foreground color** and in an **in-use background color [a color that will be used as the background color for subsequently received text and graphics drawing commands until changed]** are **specified** as indexes into the **color memory**; and | NASA Final Report discloses a third mode of access in which the in-use foreground color and the in-use background color are specified as indexes into the color memory.  NASA Final Report discloses a mode of access wherein the in-use foreground color is specified as an index into the Color Memory.  (See above).<br><br>The Raster graphics extensions to the Core Systems described in Appendix A to the NASA Final Report discloses the "SET_BACKGROUND_COLOR_INDEX (INDEX)" command to specify the in-use background color as an index into the color memory.<br><br>"SET_BACKGROUND_COLOR_INDEX (INDEX)<br>SET_BACKGROUND_INTENSITY_INDEX (INDEX)<br><br>The background color (intensity) index attribute is set to INDEX.  This action does not take effect until a NEWFRAME occurs."<br><br> (NASA Final Report, Appendix A, page 20).<br><br>Furthermore, Appendix C of the NASA Final Report discloses the "SET BACKGROUND INDEX" command specify the in-use background color as an |

7

Exhibit 13  Page 400

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| | | index into the color memory until changed.<br><br>"Function 22:            SET BACKGROUND INDEX<br>Integer Parameters:       INDEX            Index value.<br>For devices with color lookup tables, set the background index. Ignored by devices without a variable background. "<br><br>(NASA Final Report, Appendix C, page 21-8).<br><br>Notably, the description of this command does not mention a requirement for a NEWFRAME command.  To the extent that the commands identified by Lucent in its infringement contentions satisfy the court's claim construction, the commands disclosed by the NASA Final Report also satisfy it since the NASA Final Report commands and data are as similar as or more similar to the patented commands and data than those commands and data accused by Lucent. |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | display means responsive to the process means, the display means displaying the colors associated with the color data values accessed by the selected mode.<br><br>"Display means"<br><br><u>Function</u>:<br><br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode<br><br><u>Structures</u>:<br><br>(1) monitor;<br>(2) television set;<br>(3) video projection system;<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.,* Col. 4, lines 50-55). | NASA Final Report discloses a display means responsive to the processing means displaying the colors associated with the color data values accessed by the selected mode. The color values accessed by the selected mode are displayed on a computer monitor raster display.<br><br>"The Core System extensions aim to make effective use of the prototypical raster display shown in Figure 1.  The image creation system processes 2D images such as lines, text, points, and areas.  Its output is placed in the refresh buffer as the pixel values needed to cause the entities to be displayed.  The refresh buffer has a 2D organization, with each row corresponding to a scan-line of the raster display.  The size of the refresh buffer and number of bits per pixel varies from one system to another.<br><br>The image display system reads the refresh buffer in synchronism with a TV raster, using the pixel values to control the color or intensity of points on the display screen.  An optional look-up table in the image display system can dynamically assign intensities or colors to pixel values.  There is a 1-1 correspondence between pixels in the refresh buffer and points on the display screen (some contemporary raster systems do not impose this restriction.)"<br><br>(NASA Final Report, Appendix B, page 2). |
| <u>Claim 2</u> | | |
| A digital image display system | A digital image **display system [hardware and software needed to** | NASA Final Report discloses a digital image display system as described above. |

8

**Exhibit 13  Page 401**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| comprising: | **achieve a visible representation of information in a data-processing system]** comprising; | |
| a color memory for storing color data values; | a **color memory** for storing **color data values;** | NASA Final Report discloses a color memory for storing color data values as described above. |
| processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and | processing means responsive to **predetermined command and data sequences,** the processing means, responsive to a first command, selecting a **mode of access** to the **color memory**; and responsive to a second command, **setting [storing]** a **color data value** in the **color memory**; and<br><br>"Processing means"<br><br>Function:<br><br>The function of this element is:<br>(a) selecting a mode of access to the color memory; and<br>(b) setting a color data value.<br><br>Structure:<br>(a) structure for selecting a mode of access to color memory is:<br>Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 301-303; Fig. 4: boxes 401-405, 407, 408, and 411 (*See,* Col. 5, line 60 - Col. 6, line 19, Col. 6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), and lines 33-43)); | NASA Final Report discloses a processing means responsive to command and data sequences, the processing means, responsive to a first command selecting a mode of access to Color Data Values, and display means as described above.<br><br>NASA Final Report also discloses a processing means responsive to a second command setting a color data value in the color memory.<br><br>The Raster graphics extensions to the Core Systems described in Appendix A to the NASA Final Report discloses the "REDEFINE_COLOR (I,R,G,B)" command for setting a color data value in the color memory.<br><br>"4.2.1.3  REDEFINING ATTRIBUTES VALUES FOR STATIC PRIMITIVE ATTRIBUTES<br><br>REDEFINE_COLOR (I,R,G,B)<br>REDEFINE_INTENSITY (I,INTENSITY)<br><br>This function changes the color (intensity) value whose index is I to R,G,B (INTENSITY). The R,G,B (INTENSITY) is rounded by the Core System to the nearest color (intensity) displayable on the currently selected view surface."<br><br>(NASA Final Report, Appendix A, page 14)<br><br>Furthermore, Appendix C of the NASA Final Report discloses the command "DEFINE COLOR INDICES" which sets multiple color memory entries.  In that this command can store multiple color data values in the color memory, it can also store one color data value in the color memory when the two integer parameters are the same value.<br><br>"Function 23:  DEFINE COLOR INDICES<br>Integer Parameters:<br>I1, I2<br><br>Real Parameters:<br>Cl_ARRAY            I2 - I1+ 1 values.<br>C2_ARRAY            I2 - I1+ 1 values. |

9

**Exhibit 13  Page 402**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|---|---|---|
| | (b) structure for setting a color data value is: Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 304 and 305; and Fig. 5: boxes 501, 504, 506, 508 and 510 (*See,* Col. 5, lines 60-64; Col. 6, lines 12-17; Col. 7, lines 14-17 (except for "or (2) in color mode 0, for setting"), Col. 7, lines 53-64 (except for "The sequence of boxes 504, 506, 508, and 510 is")). | C3_ARRAY          I2 - I1+ 1 values. Set color index table entries I1 through I2.  Ignored by devices without lookup tables. " (NASA Final Report, Appendix C, page 21-8) |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | display means responsive to the processing means, the display means displaying a color associated with the **color data value** accessed by the selected mode. "Display means" <u>Function</u>: The function of this element is displaying the colors associated with the color data values accessed by the selected mode. <u>Structures</u>: (1) monitor; (2) television set; (3) video projection system (4) a liquid crystal display; or (5) an LED display (*See e.g.,* Col. 4, lines 50-55). | NASA Final Report discloses a display means responsive to the processing means displaying the colors associated with the color data values accessed by the selected mode as described above. |
| <u>Claim 3</u> | | |
| A display system as recited in claim 2, wherein the | A **display system** as recited in claim 2, wherein the processing means responsive to a second command **sets** | NASA Final Report discloses a processing means responsive to a second command that sets plural color data values in color memory. |

10

**Exhibit 13  Page 403**

EXHIBIT 4

| Claim | Court's Claim Construction | NASA Final Report [1] |
|-------|---------------------------|----------------------|
| processing means responsive to a second command sets plural color data values in color memory. | plural **color data values** in **color memory.**<br><br>"Processing means":<br><br>Function:<br><br>The function of this element is sets plural color data values in color memory.<br><br>Structure:<br><br>Data processor 1 programmed to perform the algorithm of Fig. 5, Boxes 501, 504, 506, 508 and 510 and the line exiting box 510 (*See* Col. 7 ln. 14-17 [except for "or (2) in color mode 0, for setting"], Col. 7, lns. 53-65). | The command "DEFINE COLOR INDICES" sets multiple color data values in the color memory when I2 is greater than I1.<br><br>"Function 23:<br>Integer Parameters: DEFINE COLOR INDICES<br><br>I1, 12<br><br>Real Parameters:<br>Cl ARRAY I2 - I1+ 1 values.<br>C2 ARRAY I2 - I1+ 1 values.<br>03 ARRAY I2 - I1+ 1 values.<br>Set color index table entries I1 through I2.  Ignored by devices without lookup tables. "<br><br>(NASA Final Report, Appendix C, page 21-8) |

11

**Exhibit 13  Page 404**

1    James S. Blackburn (State Bar No. 169134)
     ARNOLD & PORTER LLP
2    777 South Figueroa Street, 44th Floor
     Los Angeles, California 90017-5844
3    Telephone: (213) 243-4000
     Facsimile: (213) 243-4199

4

     Joseph A. Micallef (admitted *pro hac vice*)
5    ARNOLD & PORTER LLP
     555 Twelfth Street, N.W.
6    Washington, D.C. 20004-1206
     Telephone: (202) 942-5000
7    Facsimile: (202) 942-5999

8    Joel M. Freed (admitted *pro hac vice*)
     McDERMOTT WILL & EMERY LLP
9    600 13th Street, N.W.
     Washington, D.C. 20005-3096
10   Telephone: (202) 756-8000
     Facsimile: (202) 756-8087

11

     Attorneys for *Dell Inc.*

12

13

14          **UNITED STATES DISTRICT COURT**

15         **SOUTHERN DISTRICT OF CALIFORNIA**

16

17   LUCENT TECHNOLOGIES INC. and   )  Case No. 02-CV-2060 B (CAB)
     MULTIMEDIA PATENT TRUST,      )  consolidated with Case No. 03-CV-0699 B
18                       )  (CAB) and Case No. 03-CV-1108 B (CAB)
         Plaintiffs and Counterclaim-defendants, )
19                       )
         v.                   )
20                       )  **CERTIFICATE OF SERVICE**
     GATEWAY, INC. AND GATEWAY    )
21   COUNTRY STORES LLC, GATEWAY  )
     COMPANIES, INC., GATEWAY      )
22   MANUFACTURING LLC and       )
     COWABUNGA ENTERPRISES, INC.,   )
23                       )
         Defendants and Counter-claimants,   )
24                       )
     and                   )
25                       )
     MICROSOFT CORPORATION,     )
26                       )
         Intervener and Counter-claimant,    )
27

28

1    MICROSOFT CORPORATION,                    )
                                               )
2              Plaintiff and Counter-defendant, )
                                               )
3    v.                                        )
                                               )
4    LUCENT TECHNOLOGIES INC. and              )
     MULTIMEDIA PATENT TRUST,                  )
5                                              )
               Defendants and Counter-claimants, )
6    _____       )
                                               )
7    LUCENT TECHNOLOGIES INC. and              )
     MULTIMEDIA PATENT TRUST,                  )
8                                              )
               Plaintiffs and Counterclaim-defendants, )
9                                              )
     v.                                        )
10                                             )
     DELL INC.,                                )
11                                             )
               Defendant and Counter-claimant. )
12   _____       )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I am a citizen of the United States, over the age of eighteen years, and I am not a party to the foregoing action.  My business address is 555 12th Street, N.W., Washington, DC 20004.

I HEREBY CERTIFY that on this 14th day of September 2007, in case nos. 02-CV-2060, consolidated with 03-CV-0699 and 03-CV-1108, I caused a copy of the following document to be served on all counsel of record:

1.     Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent Number 4,439,759, attaching Exhibits 1-4.

A true and complete copy of the above named document was served on counsel listed below by the indicated methods:

### VIA ELECTRONIC MAIL

Alison Adema
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101
aadema@hahnadema.com

Robert Appleby
Jon T. Hohenthaner
Alan Kellman
Jay Mafale
KIRKLAND &  ELLIS, LLP
Citicorp Center
153 East 53rd Street
New York, NY  10022-4675
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
rappleby@kirkland.com
jhohenthaner@kirkland.com
akellman@kirkland.com
jmafale@kirkland.com

Christopher S. Marchese
John E. Gartman
Jennifer Bettencourt
Susie Rodriguez
Donna Rousseau
John Thornburgh
FISH & RICHARDSON
12390 El Camino Real
San Diego, CA  92130
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099

- 1 -

marchese@fr.com
gartman@fr.com
bettencourt@fr.com
srodriguez@fr.com
thornburgh@fr.com

Bryan Farney
Jeffrey B. Plies
Lawrence Fluker
DECHERT LLP
106 East 6th Street, Suite 800
Austin, TX  78701
Telephone:  (512) 394-3000
Facsimile:  (512) 394-3001
bryan.farney@dechert.com
jeff.plies@dechert.com
lawrence.fluker@dechert.com

David J. Zubkoff
SELTZER, CAPLAN, MCMAHON & VITEK
750 "B" Street, Suite 2100
San Diego, California 92101
Telephone: 619-685-3003
Facsimile: 619-702-6827
zubkoff@scmv.com

I declare that I am an employee in the office of a member of the bar of this Court at whose direction the service was made.  I declare under penalty of perjury that the above is true and correct. Executed on September 14th, 2007, at Washington, DC.

By: _____

Kathryn M. Rzeszut

- 2 -