1

**EXHIBITS TABLE OF CONTENTS**

2

| <u>Exhibit</u> | <u>Document</u> | <u>Page No.</u> |
|---|---|---|
| 1 | U.S. Patent No. 4,763,356 to Day, et al., marked with Bates range LUC 1004455-81 ................................................. | 12 |
| 2 | Order Denying Plaintiff's and Defendants' Cross-Motions Regarding the Invalidity of U.S. Patent No. 4,763,356, dated May 15, 2007 [Docket No. 1795]................................................. | 39 |
| 3 | "Touch Screens: Big Deal or No Deal?," Michael Tyler, DATAMATION, dated January 1984, marked with Bates range GW-LT422215-22 ...................... | 47 |
| 4 | Excerpts of the deposition Michael E. Farmer, taken February 23, 2006........... | 55 |
| 5 | Excerpts of The Home Accountant and Financial Planner for the Macintosh, dated 1984, marked with Bates range MSLT_1060811-813 ........... | 67 |
| 6 | Excerpts of the deposition of Dale Buscaino, taken November 7, 2007............. | 73 |
| 7 | Claim Construction Order Clarifying and Superceding the Order of March 1, 2004, Construing Claims for U.S. Patent No. 4,763,356 [Docket No. 1552], dated April 17, 2007 ........................ | 79 |
| 8 | U.S. Patent No. 4,439,759 to Fleming et al., marked with Bates range LUC1114390-409 ................................................. | 88 |
| 9 | "Final Report – NASA Grant NSG 1508, Extension of the Core Graphics System for Raster Graphics Display," James D. Foley, marked with Bates range DELL366644-799 ................................................. | 108 |
| 10 | Supplemental Rebuttal Expert Report of Jake Richter, dated October 12, 2007................................................. | 264 |
| 11 | Excerpts of the deposition of Jake Richter, taken November 14, 2007 ............. | 286 |
| 12 | Order Construing Claims for United States Patent Number 4,439,759, dated November 15, 2005 ................................................. | 311 |
| 13 | Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent Number 4,439,759, dated September 14, 2007.............................. | 321 |
| 14 | Affidavit of Jean A. Pec, with Exhibits A-B, dated September 14, 2007.......... | 409 |
| 15 | Status Report of the Graphics Standards Planning Committee, Computer Graphics, Vol. 11, No. 3, Fall 1977, marked with Bates range GW-LT253851-997 ................................................. | 574 |
| 16 | Excerpts of the deposition of James D. Foley, taken November 7, 2007 .......... | 721 |
| 17 | Home Information Systems - Provisional Standard, Bell Laboratories, dated April 14, 1981, marked with Bates range LUC 003905-4026. **FILED UNDER SEAL** ................................................. | 732 |

- 7 -

18    Expert Report of Edward J. Delp III Regarding Obviousness,
dated September 14, 2007 ...................................................................854

19    Supplemental Rebuttal Expert Report of Professor Bernd Girod Regarding
Validity of Lucent's 4,383,272 and 4,958,226 Patents,
dated October 12, 2007 ....................................................................1011

20    Excerpts of the deposition of Bernd Girod, taken on November 20, 2007 ......1045

21    Excerpts of "Digital Pictures: Representation and Compression," Arun N.
Netravali and Barry G. Haskell, 1988, marked with Bates range
MSLT_0004995-99, 5408, and 5481 ..................................................1084

22    Excerpts of the deposition of Barry Haskell, taken December 15, 2005.
**FILED UNDER SEAL** ...................................................................1103

23    Translation of the Master's Thesis of Thomas Micke, entitled
"Comparison of a Predictive and an Interpolative Motion Compensating
Coding Method for Television Signals, April 1986, marked with Bates
range GW-LT255053-131 .................................................................1094

24    U.S. Patent No. 4,958,226 to Haskell, et al., marked with Bates range
LUC1112272-77 .............................................................................1182

25    Order Construing Claims for United States Patent Number 4,958,226,
dated July 14, 2005 .........................................................................1188

26    Copyright Information for Digital Pictures, marked with Bates range
DELL318997-99 .............................................................................1194

27    Affidavit of Michael A. Davis, Jr., dated March 12, 1999, with
Exhibits A-F, marked with Bates range DELL320793-800 ...........................1197

28    "A Hybrid Interpolative and Predictive Code for the Embedded
Transmission of Broadcast Quality Television Picture," N.K. Lodge,
marked with Bates range DELL318140-47 ............................................1205

29    A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for
the HDTV Coding," Masayuki Tanimoto, July 1987, marked with Bates
range DELL318251-54 .....................................................................1213

30    CITT SG XV Working Party Document #81: Comments on Conditional
Motion Compensated Frame Interpolation," March 1986, marked with
Bates range MSLT0625891-94 ..........................................................1217

31    U.S. Patent No. 4,849,810 to Ericsson, marked with Bates range
DELL319258-315 ...........................................................................1221

32    U.S. Patent No. 4,816,914 to Ericsson, marked with Bates range
DELL320565-607 ...........................................................................1280

33    U.S. Patent No. 4,794,455 to Ericsson, marked with Bates range
DELL319147-73 .............................................................................1323

34    U.S. Patent No. 4,703,350 to Hinman, marked with Bates range
DELL320519-37 .............................................................................1350

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases:
Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)

35    U.S. Patent No. 4,727,422 to Hinman, marked with Bates range
      MSLT_0001034-51 ................................................................ 1369

36    U.S. Patent No. 4,661,849 to Hinman, marked with Bates range
      DELL318173-90 .................................................................... 1387

37    U.S. Patent No. 4,754492 to Malvar, marked with Bates range
      DELL319037-59 .................................................................... 1405

38    Declaration of Thomas Wehberg ........................................... 1428

39    "The Efficiency of Motion-Compensating Prediction for Hybrid Coding of
      Video Sequences," Bernd Girod, August 1987, marked with Bates range
      MSLT_0233488-502 ............................................................. 1430

40    "Television Band Compression by Contour Interpolation," Professor D.
      Gabor, et al., May 1961, marked with Bates range MLST0001228-40 .......... 1445

41    "Picture Coding: A Review," Arun N. Netravali and John O. Limb, March
      1980, marked with Bates range MSLT_0001623-63 ........................ 1459

42    Order Denying-in-Part Dell's Motion for Summary Judgment on U.S.
      Patent No. 4,383,272 [Docket No. 1948], dated July 27, 2007 ........ 1500

43    Superceding Order Construing Claims for United States Patent Number
      4,383,272, dated August 16, 2005 ...................................... 1507

44    Order Denying Gateway's Motions for Summary Judgment that U.S.
      Patent No. 4,383,272 is Invalid Under 35 U.S.C. §102(g) and Granting
      Summary Adjudication on Certain Predicate Issues Pertaining to This
      Defense [Docket No. 1948], dated July 12, 2007 ........................ 1513

45    United States Patent 4,383,272 to Netravali, et al., marked with Bates
      range LUC0001363-73 ........................................................ 1519

46    Response to the Examiner dated October 22, 1982, marked with Bates
      range LUC0001428-31 ........................................................ 1530

47    Doctorate thesis of Jaswant Raj Jain, entitled "Interframe Adaptive Data
      Compression Techniques for Images," September 1979, marked with
      Bates range MSLT_0001425-622 ......................................... 1534

48    Excerpts of the deposition of Delphine Lewis, taken June 30, 2005 ....... 1732

49    Physical exhibit of video excerpts from the videotaped deposition of
      Michael Farmer, taken on February 23, 2006.
      This exhibit a compact disk ("CD").

- 9 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

**THIS PAGE INTENTIONALLY LEFT BLANK**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14                        **THIS PAGE INTENTIONALLY LEFT BLANK**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 19

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

---

**LUCENT TECHNOLOGIES INC. and**
**MULTIMEDIA PATENT TRUST,**
      **Plaintiffs,**

    **v.**

**GATEWAY, INC., GATEWAY COUNTRY**
**STORES LLC, GATEWAY COMPANIES, INC.**
**GATEWAY MANUFACTURING LLC**
**and COWABUNGA ENTERPRISES, INC.,**
      **Defendants.**

**And**
**MICROSOFT CORPORATION,**
      **Intervener.**

**Case No. 02-CV-2060 B (CAB)**

**consolidated with**

**Case No. 03-CV-0699 B (CAB)**
**Case No. 03-CV-1108 B (CAB)**

---

**MICROSOFT CORPORATION,**
      **Plaintiff,**

    **v.**

**LUCENT TECHNOLOGIES INC., and**
**MULTIMEDIA PATENT TRUST,**
      **Defendants.**

---

**LUCENT TECHNOLOGIES INC., and**
**MULTIMEDIA PATENT TRUST,**
      **Plaintiffs,**

    **v.**

**DELL INC.,**
      **Defendant.**

---

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF PROFESSOR BERND GIROD REGARDING VALIDITY OF LUCENT'S 4,383,272 AND 4,958,226 PATENTS

Exhibit 19  Page 1011

# TABLE OF CONTENTS

Page

1. Scope of the Report.................................................................................. 3
2. Qualifications........................................................................................... 3
3. Other Cases............................................................................................. 3
4. Compensation .......................................................................................... 3
5. Review and Use of Documents and Other Materials.............................. 4
6. Review of Video Compression Technology ........................................... 4
7. Legal Principles ...................................................................................... 4
8. Level of Ordinary Skill in the Art .......................................................... 7
9. Validity of US Patent 4,383,272 ("Netravali").................................... 8
   9.1 Gabor & Hill/Gabor (Nonobviousness).......................................... 8
   9.2 Gabor & Hill/Hill Thesis (Nonobviousness) ................................ 11
   9.3 Picture Coding/Gabor & Hill (Nonobviousness).......................... 13
   9.4 Picture Coding/Limb & Pease (Nonobviousness) ........................ 14
   9.5 Secondary Considerations Demonstrating Nonobviousness ......... 15
10. Validity of US Patent 4,958,226 ("Haskell")..................................... 16
   10.1 General Knowledge In The Art................................................... 16
   10.2 Bidirectional Prediction ............................................................ 19
   10.3 Claim 12 is Not a Predictable Combination of Techniques Known in the
   Prior Art ............................................................................................ 20
   10.4 Secondary Considerations Demonstrating Nonobviousness ....... 32
11. Signature .............................................................................................. 33

Exhibit 19  Page 1012

## 1. SCOPE OF THE REPORT

I have been asked by Kirkland & Ellis LLP, counsel for Lucent Technologies Inc. ("Lucent") and the Multimedia Patent Trust ("MPT"), to provide my opinions as a technical expert in the field of video compression concerning the validity of Claim 13 of U.S. Patent No. 4,383,272 entitled "Video Signal Interpolation Using Motion Estimation" ("Netravali") and Claim 12 of U.S. Patent No. 4,958,226 entitled "Conditional Motion Compensated Interpolation of Digital Motion Video" ("Haskell").

I previously submitted reports on May 12, 2006 and August 11, 2006 regarding the validity of Netravali and Haskell. I have been asked to consider and respond to certain opinions expressed in the September 14, 2007 report of Edward J. Delp III ("Delp Report"). The bases for my opinions are detailed in this report. I anticipate providing testimony at trial regarding my opinions discussed herein.

## 2. QUALIFICATIONS

In my March 31, 2006 Expert Report, I summarized my qualifications to render expert opinions in the area of video compression.

## 3. OTHER CASES

In my March 31, 2006 Expert Report, I provided a list of other cases in which I have provided testimony.

## 4. COMPENSATION

I am being paid my standard consulting fee of $700 per hour for my services, in addition to a monthly retainer and reimbursement of out-of-pocket expenses. I have no financial or business interests in Lucent, MPT, Gateway, Dell, or Microsoft. My compensation is not in any way dependent on the outcome of the litigation.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1013**

## 5. REVIEW AND USE OF DOCUMENTS AND OTHER MATERIALS

In preparation of this report, I have considered the documents referenced in my prior reports, the September 14, 2007 report of Edward J. Delp. III (including all exhibits and materials cited), Microsoft's Eighth Supplemental Response to Lucent's First Set of Interrogatories (No. 1), and all of the materials referenced in this report. I reserve the right to supplement this report to address any additional information or discovery that may become available.

## 6. REVIEW OF VIDEO COMPRESSION TECHNOLOGY

In my March 31, 2006 Expert Report, I provided a general review of video compression technology.

## 7. LEGAL PRINCIPLES

Counsel for MPT has informed me that, since my last report, the Supreme Court has clarified the legal standards for invalidity due to obviousness. Counsel for MPT has informed me that the Supreme Court confirmed that, while identification of a teaching, suggestion, or motivation to combine prior art references is no longer strictly required to demonstrate obviousness, the principles set forth in my May 12, 2006 Expert Report otherwise remain valid. I understand that the fundamental question remains whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness. Having considered my previous opinions in light of the Supreme Court's clarification of the legal standards for invalidity due to obviousness, as explained to me by counsel for MPT, my ultimate conclusions concerning the nonobviousness of Netravali and Haskell have not changed.

Counsel for MPT has informed me that the Supreme Court provided further guidance concerning the obviousness analysis. Specifically, counsel for MPT has informed me

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1014**

that obviousness is not established by simply combining previously known elements from the prior art. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching suggestion or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

Counsel for MPT has informed me that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

Counsel for MPT has informed me that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill. I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 5 -

**Exhibit 19  Page 1015**

good reason to pursue the known options. I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

Counsel for MPT has also informed me that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious. I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

Counsel for MPT has also informed me that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious. I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

Counsel for MPT has also informed me that obviousness of a patent cannot properly be established through hindsight, and that elements from different prior art references, or different embodiments of a single prior art reference, cannot be selected to create the claimed invention using the invention itself as a roadmap. I understand that the claimed invention as a whole must be compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through hindsight which would not have been combined absent the inventors' insight.

Counsel for MPT has informed me that secondary considerations of nonobviousness must be considered in addition to the primary considerations of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art. Counsel for MPT has also informed me that secondary considerations of nonobviousness may include commercial success of products or processes using the invention, long felt need for the invention, failure of others to make the invention, industry acceptance of the invention, licensing of the invention, copying of

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1016**

the invention by others, initial skepticism aimed at the invention, statements of acclaim for the invention, and unexpected results achieved by the invention.

Counsel for MPT has informed me that the granting of a request for reexamination by the Patent Office does not establish a likelihood of patent invalidity. I understand that the grant of a request for reexamination is not probative of patentability. I understand that the Patent Office will grant a request for reexamination if it raises "a substantial new question of patentability." I further understand that this is a low standard to meet in practice because the Patent Office historically grants over 90% of requests for reexamination.

## 8. LEVEL OF ORDINARY SKILL IN THE ART

In my opinion, a person of ordinary skill in the art of video compression throughout the 1980s would have had at least a Bachelor of Science degree in electrical engineering or a related field and 2 years experience working in the area of video compression systems.

Dr. Delp has opined that, as of 1981, it was known that interpolation could be done adaptively, for example, by selecting the locations from which to interpolate as a function of motion. While the section "Background of the Invention" of Netravali acknowledges that both fixed and adaptive interpolation techniques were known, to the extent that Dr. Delp contends that it was known in the art to select corresponding locations, i.e., locations where the same object is expected to be, I disagree. The prior art did not disclose selection of corresponding locations for interpolation as a function of the displacement of objects in the picture.

Dr. Delp has also opined that the prior art to Haskell expressly suggested combining video coding techniques, identified the problem of visual artifacts in motion compensated interpolated frames, and therefore "provided a motivation to combine any known solution

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1017**

of interpolation deviation codes." Delp Report, § 19. I disagree for the reasons set forth below in my discussion of Haskell.

## 9. VALIDITY OF US PATENT 4,383,272 ("NETRAVALI")

In my March 31, 2006 Expert Report, I provided a background discussion of Netravali. In my May 12, 2006 Expert Report, I provided my anticipation analysis and opinions concerning the validity of Netravali. I continue to believe that Netravali is valid and not anticipated. I have been asked to specifically consider issues regarding the obviousness of Claim 13.

### 9.1 Gabor & Hill/Gabor (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Gabor & Hill with Gabor. To the extent that Dr. Delp contends that the combination of Gabor & Hill with Gabor renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to modify the teachings of Gabor & Hill and Gabor in the manner that Dr. Delp suggests. Furthermore, even if combined, Gabor & Hill and Gabor do not disclose all of the limitations of the claim language as construed by the Court.

#### 9.1.1 No Reasons to Combine

In my opinion, the interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Gabor & Hill with Gabor. Contrary to Dr. Delp's view, the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. The invention of Claim 13 was not simply a combination of known techniques. I disagree with Dr. Delp that Dr. Gabor's receipt of the Nobel Prize has any bearing on the issue of obviousness or even the alleged motivation to combine Dr. Gabor's references. In my opinion, Dr. Delp's analysis uses

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1018**

hindsight to selectively modify the teachings of Gabor & Hill and Gabor in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

### 9.1.2 Combination Does Not Disclose All Limitations of Claim 13

Dr. Delp appears to agree with me that all of the relevant teachings of Gabor & Hill are also found within the Gabor Article. Since all the relevant teachings of Gabor are included in Gabor & Hill as well, the combination of Gabor & Hill with Gabor does not broaden the teachings of Gabor & Hill. Therefore, the combination of Gabor & Hill with Gabor fails to render obvious Netravali Claim 13 for at least the reason that Gabor & Hill with Gabor fails to disclose all of the elements of that claim. Below, I highlight some of the reasons why Gabor & Hill and Gabor, whether taken independently or combined, do not disclose all of the elements of Claim 13.

Gabor & Hill does not disclose "[a] method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture" as required by the language of Claim 13. Digital video has pixels (or pels), while analog video does not. Pixels or pels are samples along the scan lines of a video signal. Gabor & Hill describes a system that operates entirely in the analog domain and does not sample the television signal along scan lines in the horizontal dimension.

Gabor & Hill does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions" as required by the claim language. A person of ordinary skill in the art reading Claim 13 in light of the specification would understand that the phrase "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations" requires processing of intensity information for pels sampled in the temporal, vertical, and horizontal dimensions.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 19  Page 1019

As explained above, Gabor & Hill describes a system that operates entirely in the analog domain, and does not sample in the horizontal dimension to generate pels with intensities at discrete locations. Without pel intensities it is not possible to "determine[] by interpolation intensities of pels . . . in accordance with intensities of pels in related locations," as recited in Claim 13. Gabor & Hill therefore does not determine intensities of pels. It also does not perform any operation in accordance with intensities of pels in related locations in preceding and succeeding versions of the picture to be interpolated. To the extent that it performs interpolation at all, Gabor & Hill interpolates scan line signals, not pels.

Dr. Delp has opined that a person of ordinary skill in the art during the relevant time frame would have understood the term "picture element" to mean any area on a television or computer screen. I disagree. In my opinion, Dr. Delp fails to consider the context of the Netravali invention when proposing his definition. In the context of the video processing inventions described in Netravali, there are no operations performed on the intensities of "picture elements" as defined by Dr. Delp (i.e., any "area of a picture on a television or computer screen" Delp Report § 33). Rather, interpolation is performed for intensities of picture elements that are samples in the temporal, horizontal, and vertical dimensions, also referred to in the art as "pixels."

Further, the Court has construed "related locations" to mean "locations at which the same object is expected to be." For temporal interpolation, Gabor & Hill interpolates signals only between the same scan line in two versions of the picture. Thus it does not disclose interpolation from locations at which the same object is expected to be. Moreover, Gabor & Hill only considers contours, i.e., "position[s] where the intensity changes by more than a certain predetermined rate" along a scan line of an analog television signal. (MSLT_0001230.) It is well known that the location where objects are expected to be cannot be represented by considering only the thresholded intensity gradient in the horizontal direction. Furthermore, I disagree with Dr. Delp's conclusion

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 10 -

Exhibit 19  Page 1020

that a person of ordinary skill in the art would be able to expand on the principles in Gabor & Hill to search for motion in the vertical direction.

Dr. Delp relies heavily on the Patent Office's decision to reexamine claim 13 of Netravali. Counsel for MPT has informed me that the grant of a request for reexamination is not evidence of invalidity. Counsel for MPT has also informed me that the document on which Dr. Delp relies, '272 Reexam (MSLT_1234186 - MSLT_1234201), is the result of a unilateral proceeding in which MPT was not involved. I understand that MPT was therefore not provided an opportunity to refute the significance of the prior art references presented to the examiner in the Patent Office. Counsel for MPT has also informed me that the PTO's reexamination decision turned on the assumption that "the teaching of the intensity value being interpolated from preceding and succeeding versions of the picture was not present in the prosecution of the application which became the '272 patent." That assumption is false because the Background section of Netravali itself notes that fixed and adaptive techniques for interframe interpolation (although without motion compensation) were known in the art. Under these circumstances, the decision to reexamine Claim 13 of Netravali should not have any bearing on the question of obviousness and does not undermine my prior validity analysis in any way.

### 9.2 Gabor & Hill/Hill Thesis (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Gabor & Hill with the Hill Thesis. To the extent that Dr. Delp contends that the combination of Gabor & Hill with the Hill Thesis renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to modify the teachings of Gabor & Hill and the Hill Thesis in the manner that Dr. Delp suggests. Furthermore, even if combined, Gabor & Hill and the Hill Thesis do not disclose all of the limitations of the claim language as construed by the Court.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1021**

### 9.2.1 No Reasons to Combine

The interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Gabor & Hill with the Hill Thesis. Contrary to Dr. Delp's view, in my opinion the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. The invention of Claim 13 was not simply a combination of known techniques. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of Gabor & Hill and the Hill Thesis in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

### 9.2.2 Combination Does Not Disclose All Limitations of Claim 13

As I discussed in my May 12, 2006 Expert Report, I have seen no clear evidence that the Hill thesis was publicly available before the filing of the Netravali patent application. I have seen no evidence to establish the date or time frame when the Hill thesis was catalogued in any publicly accessible library or otherwise publicly available. I have seen no clear evidence that the Hill thesis was catalogued or indexed by subject matter in a manner that would have permitted a person of ordinary skill in the art of video compression in the 1980s to locate the thesis.

So far, Dr. Delp has failed to point out any relevant teachings that are found in the Hill Thesis, but not in Gabor & Hill. If all the relevant teachings of the Hill Thesis are included in Gabor & Hill as well, the combination of Gabor & Hill with the Hill Thesis does not broaden the teachings of Gabor & Hill. As explained above, Gabor & Hill fails to disclose all of the elements of Claim 13. For the same reasons discussed above for Gabor & Hill, the Hill Thesis does not disclose all elements of Claim 13 because it describes a system that does not sample the television signal along scan lines, does not determine by interpolation the intensities of pels, and does not perform any operations

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 19  Page 1022

based on locations where the same object is expected to be. Therefore, the combination of Gabor & Hill with the Hill Thesis fails to render obvious Netravali Claim 13 for at least the reason that Gabor & Hill with Hill fails to disclose all of the elements of that claim.

Additionally, Dr. Delp's invalidity analysis relies heavily on the Patent Office's decision to reexamine Claim 13 of Netravali. For the reasons discussed above, the decision to reexamine Claim 13 of Netravali should not have any bearing on the question of obviousness and does not undermine my prior validity analysis in any way.

### 9.3 Picture Coding/Gabor & Hill (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Picture Coding with Gabor & Hill. To the extent that Dr. Delp contends that the combination of Picture Coding with Gabor & Hill renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to combine the teachings of Picture Coding and Gabor & Hill in the manner that Dr. Delp suggests. Furthermore, even if combined, Picture Coding and Gabor & Hill do not disclose all of the limitations of the claim language as construed by the Court.

#### 9.3.1 No Reasons to Combine

The interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Picture Coding with Gabor & Hill. Contrary to Dr. Delp's view, in my opinion the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. The invention of Claim 13 was not simply a combination of known techniques. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of Gabor & Hill and Picture Coding in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1023**

### 9.3.2 Combination Does Not Disclose All Limitations of Claim 13

As described above and in my May 12, 2006 Expert Report, neither Picture Coding nor Gabor & Hill teaches "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions." The combination of Picture Coding with Gabor & Hill therefore fails to disclose all of the elements of Netravali Claim 13.

Additionally, Dr. Delp's invalidity analysis relies heavily on the Patent Office's decision to reexamine Claim 13 of Netravali. For the reasons discussed above, the decision to reexamine Claim 13 of Netravali should not have any bearing on the question of obviousness and does not undermine my prior validity analysis in any way.

### 9.4 Picture Coding/Limb & Pease (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Picture Coding with Limb & Pease. To the extent that Dr. Delp contends that the combination of Picture Coding with Limb & Pease renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to combine the teachings of Picture Coding and Limb & Pease in the manner that Dr. Delp suggests. Furthermore, even if combined, Picture Coding and Limb & Pease do not disclose all of the limitations of the claim language as construed by the Court.

### 9.4.1 No Reasons to Combine

The interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Picture Coding with Limb & Pease. Contrary to Dr. Delp's view, in my opinion the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. In my opinion, the invention of Claim 13 was not simply a combination of known techniques. I disagree with Dr. Delp that

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1024**

common authorship and subject matter would motivate a person of skill in the art to combine the Picture Coding and Limb & Pease references. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of Picture Coding and Limb & Pease in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

### 9.4.2 Combination Does Not Disclose All Limitations of Claim 13

As described in my May 12, 2006 Expert Report, neither Picture Coding nor Limb & Pease teaches "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions." The combination of Picture Coding with Limb & Pease therefore fails to disclose all of the elements of Netravali Claim 13.

In addition, I disagree with Dr. Delp that Limb & Pease teaches the interpolation technique described in Claim 13. Limb & Pease does not disclose "interpolating the intensities of pels in locations where the same object is expected be."

### 9.5 Secondary Considerations Demonstrating Nonobviousness

In my opinion, several secondary considerations confirm my opinion that the invention described in Netravali Claim 13 is nonobvious. First, products that use the claimed inventions have been highly successful in the marketplace. The claimed inventions are used in numerous video coding standards, including MPEG-1, MPEG-2, VC-1, and others. The Netravali invention has contributed to the success of products based on these standards by reducing the bit-rate needed to transmit or store video bitstreams for a broad range of applications. In my experience, other video coding technologies that do not use the claimed inventions have not been as commercially successful.

Licenses showing industry respect for the claimed inventions also support my conclusion that Claim 13 is nonobvious. I have reviewed several of Lucent's licensing

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 19  Page 1025

agreements that specifically identify Netravali. I have also reviewed several Lucent licensing negotiation documents which refer to Netravali, indicating that Netravali has been a focal point of negotiations for broader licenses with third parties.

Finally, statements of acclaim by others support my conclusion that the invention of Claim 13 was nonobvious. For example, the Research and Development Council of New Jersey awarded Arun Netravali and John Robbins the 1996 Thomas Alva Edison Patent Award for outstanding research and development in the state of New Jersey, as reflected in Netravali. ROBB 000001.

## 10. VALIDITY OF US PATENT 4,958,226 ("HASKELL")

In my March 31, 2006 Expert Report, I provided a background discussion of Haskell. In my May 12, 2006 Expert Report, I provided my anticipation analysis and opinions concerning the validity of Haskell. I continue to believe that Haskell is valid and not anticipated. Haskell contains 12 claims. I have been asked to specifically consider issues regarding the obviousness of Claim 12.

### 10.1 General Knowledge In The Art

Dr. Delp opines that a set of video coding methods combining the use of prediction, motion estimation, motion vectors, and DCT coding of the difference signal were generally known in the art at the time of the Haskell invention, as well as a separate set of video coding methods using transmission of interpolation error. He further opines that motion-compensated interpolation was generally known at that time along with the problem of visual artifacts in frames obtained by motion-compensated interpolation. Because, in his opinion, the transmission of "interpolation deviation codes" was a known solution to the known problem of visual artifacts in interpolated frames, Dr. Delp contends that a person skilled in the art would have been motivated to combine the prior art methods, and that Claim 12 of Haskell is therefore invalid for obviousness. I disagree. In my opinion, Dr. Delp's analysis uses hindsight to selectively combine portions of the

**Exhibit 19  Page 1026**

known art in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12.

Dr. Delp opines that there are certain "baseline" references in the prior art that "teach the coding concepts of motion compensated forward prediction, prediction error, and motion-compensated temporal interpolation." He offers a set of references in the text and footnote of page 19 of his report to show that "the concept of using motion compensated prediction and DCT error coding was well known by one skilled in the art" prior to Haskell. Apparently these references are examples of his "baseline" references. He then offers a second set of references in the text and footnote of page 20 to show that bidirectional prediction and "the advantage to be gained from employing bidirectional prediction error such as interpolation error" were also known in the art. Dr. Delp then suggests that "Claim 12 is therefore simply a combination of these well-known, prior art techniques, used in the same manner in which they were used by the prior art to achieve predictable results." I disagree.

Even if one assumes that Dr. Delp's first and second sets of references were generally known in the art, and known to be potentially beneficial towards better compression and/or better video quality, there were a large number of beneficial video coding techniques available at the time. Theoretically, a person skilled in the art could have attempted to form all possible combinations of video coding techniques that had been reported as improving compression and/or video quality. However, such an exercise goes far beyond a routine pursuit of a finite number of predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art. Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

Dr. Delp contends that a person skilled in the art would have been motivated to combine prior art methods to arrive at the invention of Claim 12 in order to eliminate visual artifacts in interpolated video sequences. I disagree. None of the references on

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1027**

which Dr. Delp relies to identify the problem of visual artifacts in motion-compensated frames suggest that transmission of interpolation error, as opposed to one of many other potential solutions, could eliminate visual artifacts. In fact, since motion compensation artifacts were usually caused by a failure of the motion estimator to extract the true motion of an object, a person of ordinary skill would have typically looked for ways to improve the reliability and accuracy of the motion estimator to eliminate visual artifacts. In addition, or alternatively, a person of ordinary skill might have considered sending a flag to instruct the receiver to omit motion-compensated interpolation and use frame repetition instead, as, e.g., suggested in Japanese patent application 1-163059 (MSLT_1234116 – MSLT_1234130). Oddly, Dr. Delp cites this document to support his theory of near simultaneous invention, even though it teaches away from the Haskell invention. The Delp Report offers no convincing evidence to suggest that a person of skill in the art would recognize that transmission of transform-coded interpolation errors, as opposed to one of many other potential solutions, could eliminate the problem.

Dr. Delp also opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 can be established because certain of his references, such as the Ericsson '914 Patent, utilize motion compensated interpolation. I disagree. This is not a situation in which common sense would dictate that a person of skill in the art employ a predictable solution to respond to design needs or market pressures. The options were too numerous. There were a large number of beneficial video coding techniques available at the time. The fact that a particular video coding technique, in this case motion compensated interpolation, could be combined with a variety of other techniques provides no reason to combine any particular subset of those techniques, let alone a subset that embodies the limitations of Haskell Claim 12.

Dr. Delp also opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 can be established because the coding and transmission of prediction errors and interpolation errors are conceptually similar, and the coding and transmission of a prediction error to maintain picture quality was known in the art. I disagree. Dr.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 19  Page 1028

Delp identifies nothing that would have suggested to a person of ordinary skill in the art that transmission of interpolation error blocks would be beneficial in a system that already used the transmission of prediction errors. In addition, I note that Dr. Delp's opinion is inconsistent with the prosecution history of Haskell Claim 12. During that prosecution, the examiner considered Hinman, which in Dr. Delp's opinion discloses all of the limitations of Haskell Claim 12 except "codes that describe deviations from interpolated blocks." The examiner also considered references that in his opinion disclosed the transmission of prediction errors. Nevertheless, the examiner ultimately concluded that it would not have been obvious to combine such references to arrive at the invention of Claim 12.

Finally, Dr. Delp opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 is provided by the emergence of CD-ROM technology. I disagree. While CD-ROM technology may have offered a person skilled in the art more latitude in trading off bit-rate, video quality, and system delay, CD-ROM technology provided no guidance or reason whatsoever to combine prior art teachings to arrive at the invention of Haskell Claim 12.

### 10.2 Bidirectional Prediction

Dr. Delp has opined that bidirectional prediction followed by averaging and addition of interpolation error were known in the art, and that the invention of Claim 12 is simply a combination of prior art techniques used in the same manner in which they were used by the prior art to achieve predictable results. As explained in the following section, I disagree. In my opinion, Dr. Delp relies on hindsight to contend that it would have been obvious to combine certain abstract "techniques," without demonstrating any reason for a person of ordinary skill in the art to make the specific combination of such techniques described in Claim 12, let alone using the specific corresponding structures identified by the Court.

In his attempt to show that bidirectional prediction is an obvious variation of unidirectional prediction, Dr. Delp speculates that "a person of ordinary skill in the art could do "backward" prediction" by using "the exact same techniques and structures used for forward prediction." I disagree. The recursive structure of a predictive decoder requires that the coder at least obeys constraints posed by causality, otherwise the bitstream cannot be decoded. For example, one cannot simply encode every frame in a sequence by predicting it from the following "future" frame, as Dr. Delp appears to assert. At least some frames have to be predicted in forward direction, while skipping in-between frames with backward prediction. Today, with the benefit of hindsight, such considerations are well understood. However, at the time of the Haskell invention, the structures needed to implement such a system, their interconnection, or their control would not have been obvious to a person of ordinary skill. Nor would the step from backward prediction to bidirectional prediction be obvious, as Dr. Delp asserts.

### 10.3 Claim 12 is Not a Predictable Combination of Techniques Known in the Prior Art

Dr. Delp has opined that the various coding techniques covered by Haskell Claim 12 were well known in the prior art prior to the filing of the application for the Haskell patent. Dr. Delp has also opined that it was well known in the art to combine these various coding techniques, and he discusses several references that he believes disclose the use of such techniques in combination. I disagree with Dr. Delp's characterization of these references, as discussed below.

In addition, I disagree with Dr. Delp's opinion that the obviousness of the invention described in Claim 12 can be demonstrated by reducing the invention to a "combination" of elemental video coding technologies performing their known functions. Dr. Delp asserts that structures used to implement various video coding techniques at the time of the Haskell invention, such as "adders, decoders, DCT-1, shift circuits, averagers" were "combinable to perform the coding techniques of claim 12 in a manner that required no change in their respective functions." I disagree. The performance of a video coder

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 20 -

Exhibit 19  Page 1030

critically depends on the way the constituent elements are combined and artfully optimized as a whole. An efficient video coder cannot simply be built by combining known building blocks. Among other problems, the performance of a certain combination of elements can usually not be readily predicted but requires extended experimentation.

To the extent that Claim 12 can be considered a combination claim, it describes a combination of two particular means that have defined structure and perform specific functions. By focusing on individual components of those means, rather than the means as a whole, Dr. Delp fails to demonstrate that either of those means was known in the art. Nor does he demonstrate any reason why it would have been obvious to combine the two means as set forth in Claim 12. A person of ordinary skill would also not have been able to predict the performance of the Haskell invention as Dr. Delp asserts. For example, Haskell reports that "**Experimentally**, it has been found that interpolating every other frame is quite beneficial." (Haskell, col. 3: 43-44, emphasis added) or "the **observation** that the volume of the frame interpolation code increase with increased use of the frame interpolation code so one could quickly reach a point of 'diminishing returns' in the use of interpolation code." (Haskell, col. 3: 38-42, emphasis added). This illustrates that the Haskell invention required extended experimentation and observation of the performance, since its results were not even predictable to the inventors themselves, let alone to a person of ordinary skill in the art.

I also disagree with Dr. Delp's opinion that design incentives and market forces would have motivated a person of ordinary skill in the art to arrive at the invention of Claim 12. In my opinion, Dr. Delp does little more than note that a demand for better video compression existed, that the invention of Claim 12 discloses an improved decoder for video compression, and then conclude that the invention would therefore have been obvious. I disagree. In the absence of any specific design incentive or market force driving the particular combination of decoding means set forth in Claim 12, in my opinion Dr. Delp's analysis relies on impermissible hindsight.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 21 -

**Exhibit 19  Page 1031**

**10.3.1 Document Nos. 22, 43, 60, 78, 81, and/or 103R**

In the section of his report entitled "The H.261 Submissions," Dr. Delp suggests that *"claim 12 of the '226 patent simply rearranges the elements and techniques disclosed by the H.261 submissions with each technique performing the same function it had been known to perform and with the system of techniques yielding unsurprising results."* (Delp Report, § 92). As discussed in Section 10.1 of my May 12, 2006 report, I have seen no proof that the H.261 submissions qualify as prior art.

To the extent that Dr. Delp contends that the combination of H.261 submissions renders obvious Claim 12 of Haskell, I disagree. In my opinion, a person of skill in the art would not have seen reason to combine the teachings of the H.261 submissions in the manner that Dr. Delp suggests. Furthermore, even if combined, the submissions do not disclose all of the limitations of the claim language as construed by the Court. Nor would a person of skill in the art, using common sense, have combined the teachings of the submissions.

In my opinion, Dr. Delp ignores the competitive reality of the submission process of the H.261 standardization. All the documents cited by Dr. Delp were submitted during the first "divergence" phase of the H.261 standardization. (*See* § 10.1 May 12, 2006 Girod Expert Report). No attempt was made during that time to achieve convergence among competing proposals. In my opinion, Dr. Delp's analysis uses hindsight to select elements of competing proposals to CCITT SGXV in an attempt to point out all the structures required by the Court's construction of Haskell Claim 12. Nothing in the references, the nature of the problem, or the knowledge of a person having ordinary skill in the art suggests that a person of skill in the art would have recognized that the prior art elements could be combined as suggested by Dr. Delp. In fact, because of the competing nature of the various proposals, a person of ordinary skill in the art would consider them as alternatives instead of synergistic contributions. If a person of ordinary skill would have been able to readily combine the competing proposals, the two extended

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 22 -

**Exhibit 19  Page 1032**

convergence phases of the H.261 standardization process would not have been needed. The combined duration of the convergence phases of about 3 years clearly shows that competing proposals cannot be combined with predictable results. Extended experimentation is required, which in the H.261 standardization process manifested itself in a progression of 8 "reference models" gradually improved over the course of more than 3 years.

Furthermore, during the development of the ITU-T Recommendation H.261, nearly 600 separate documents, covering a wide range of different video coding technologies, were submitted to CCITT SGXV Specialists Group. Theoretically, a person skilled in the art could have attempted every possible combination of the numerous technologies and circuits discussed in the CCITT SGXV Specialists Group documents. However, such an exercise goes far beyond a routine pursuit of a finite number of predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art. In my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

Even if Dr. Delp is correct in his assumption that a person of skill in the art would have been motivated to combine these references, the combination does not satisfy every limitation of Haskell Claim 12. My May 12, 2006 Expert Report discusses each of the references and their combinations in detail and I incorporate those discussions by reference here.

### 10.3.2 Micke Thesis

Dr. Delp has opined that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in the Diploma thesis "Vergleich eines prädiktiven und eines interpolativen bewegungskompensierenden Codierverfahrens für Fernsehbildsignale" ("Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals") by Thomas Micke (the "Micke Thesis"), and that therefore the Micke Thesis anticipates Haskell Claim 12. I

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1033**

disagree. It is still my opinion that the Micke Thesis does not qualify as prior art and does not anticipate Haskell Claim 12. I incorporate by reference the discussion of the Micke Thesis from § 10.5 of my May 12, 2006 Expert Report.

As explained in my May 12, 2006 Expert Report, the Micke thesis fails to disclose several elements of Claim 12 of Haskell. To the extent that Dr. Delp contends that *Advances in Picture Coding* by H.G. Musmann et al. supplies the missing elements by disclosing the use of a DCT, I disagree. Furthermore, in my opinion, it would not have been obvious for a person of skill in the art to modify the teachings of the Micke Thesis, in light of the Musmann article or otherwise, to arrive at the invention of Claim 12. Given the large number of video coding techniques available at the time, there was no specific design need, market pressure, or other reason to combine the teachings of the Micke Thesis with any specific technique known in the art to arrive at the invention of Claim 12.

### 10.3.3 The PictureTel References

In the section of his report entitled "The PictureTel References," Dr. Delp has opined that the combination of references he refers to as the "PictureTel References" renders the Haskell Claim 12 obvious. I disagree. In my opinion, a person of skill in the art would not have been motivated to combine the teachings of those references in the manner that Dr. Delp suggests. Furthermore, even if combined, the PictureTel references do not disclose all of the limitations of the claim language as construed by the Court.

Dr. Delp has opined that a person of skill in the art would have recognized reasons to combine the inventions of individual patents because they had a common assignee, overlapping inventors, and related subject matter. I disagree. Even if such factors would motivate a person in the art to collect and combine several references, a reason to consult various references in the abstract is not the same thing as a reason to combine the teachings of the references in a specific manner. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of several patents in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12. Theoretically,

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1034**

a person skilled in the art could have attempted to form all possible combinations of video coding techniques disclosed in the divergent teachings of the seven PictureTel References. However, such an exercise goes far beyond a routine pursuit of a finite number of identified, predictable solutions that would place the invention of claim 12 within the grasp of a person of ordinary skill in the art. Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12 based on the teachings of the PictureTel references.

Dr. Delp's claim charts also purport to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in U.S. Patent No. 4,816,914 to S. Ericsson ("the Ericsson '914 patent"). I disagree. In my opinion, the Ericsson '914 patent does not disclose all of the elements of Haskell Claim 12.

In particular, the Ericsson '914 patent does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, the Ericsson '914 patent fails to disclose the claimed "codes that describe deviations from interpolated blocks," "interpolated blocks," or "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." The Ericsson '914 patent discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Furthermore, the Ericsson '914 patent discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell. As such, the Ericsson '914 patent does not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 19  Page 1035

"means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

Even if combined, the PictureTel references do not disclose all elements of Claim 12. For example, the PictureTel references nowhere disclose blockwise coding of motion-compensated interframe interpolation errors. Dr. Delp glosses over this missing limitation by concluding that the use of interpolation error was an obvious variation of the prior art. I disagree. In my opinion, Dr. Delp's analysis uses hindsight to selectively combine portions of the known art in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12. Furthermore, as discussed above, Dr. Delp identifies nothing that would have suggested to a person of ordinary skill in the art that transmission of interpolation error blocks would be beneficial in a system that already used the transmission of prediction errors. In addition, I note that Dr. Delp's opinion is inconsistent with the prosecution history of Haskell Claim 12. During that prosecution, the examiner considered Hinman, which in Dr. Delp's opinion discloses all of the limitations of Haskell Claim 12 except "codes that describe deviations from interpolated blocks." The examiner also considered references that in his opinion disclosed the transmission of prediction errors. Nevertheless, the examiner ultimately concluded that it would not have been obvious to combine such references to arrive at the invention of Claim 12.

Lastly, Dr. Delp refers to the combination of the PictureTel references with Digital Pictures, but offers no reason why these references should be combined.

### 10.3.4 Near Simultaneous Invention

Dr. Delp's claim charts attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in U.S. Patent No. 5,113,255 to A. Nagata et al. ("Nagata"), Matsushita's submission for the MPEG-1 standard ("Matsushita"), Bellcore's submission for the MPEG-1 standard ("Bellcore"), Sony's October 2, 1989 MPEG submission titled "Description of The Proposed Coding

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1036**

Algorithm" ("Sony"), Philips' 1989 MPEG submission titled "The Full Motion System" ("Philips"), U.S. Patent No. 4,985,768 to K. Sugiyama ("Sugiyama/US"), Japanese patent application 1-11587 ("Sugiyama/JP") and an article by Paul Roos and Max. A. Viergever titled "Interframe vs. intraframe compression of image sequences" ("Roos") and that therefore Nagata, Matsushita, Bellcore, Sony, Philips, Sugiyama/US, Sugiyma/JP, and Roos provide evidence of simultaneous, independent invention of Haskell Claim 12. I disagree.

Documents produced in this case indicate that the inventors conceived of the invention of Haskell Claim 12 by March 1989, when Dr. Haskell proposed conditional motion compensated interpolation for incorporation into the CCITT SGXV reference model. Dr. Atul Puri, Haskell's co-inventor, gave a talk about conditional motion compensated interpolation at the Second International Workshop on 64 kbit/s Coding of Moving Video, held in Hannover, Germany, September 4-6, 1989. A 2-page summary of his talk is included in the conference proceedings. MSLT_0234009-11. Nagata, Bellcore, Matsushita, Sony, Philips, Sugiyama/US, and Roos are all from a later date. Dr. Delp does not cite any evidence that Nagata, Bellcore, Matsushita, Sony, Philips, Sugiyama/US, and Roos were indeed independently developed and did not benefit from Haskell's prior invention.

### The Nagata Applications

Dr. Delp's claim charts attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in three Japanese patent applications (1-118004, 1-163059, and 1-169320) cited in U.S. Patent No. 5,113,255 to A. Nagata et al. ("Nagata"). I disagree. In my opinion, the three patent applications, whether taken alone or together, do not disclose all of the elements of Haskell Claim 12.

I note that U.S. Patent No. 5,113,255 discloses substantial new material not contained in the any of the cited Japanese patent applications. For example, the three Japanese applications nowhere mention and, in fact, teach away from, the use of a DCT or an

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1037**

IDCT circuit, or any other form of block-wise transform coding. For that reason alone, each of the Japanese applications would fail to disclose the Haskell invention. However, other elements of Claim 12 required by the Court are not disclosed either.

In particular, those patent applications do not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, those patent applications fail to disclose the claimed "block approximations," "codes that describe deviations from approximated blocks," and "means for developing block approximations from said codes that describe deviations from approximated blocks." The applications disclose no structure that performs the required function of developing block approximations from said codes that describe deviations from approximated blocks. The applications disclose no circuitry or structure equivalent to the combination of Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. In addition, the applications fail to disclose the claimed "interpolated blocks," "codes that describe deviations from interpolated blocks," and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." The applications disclose no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Furthermore, the applications disclose no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell. As such, the applications also do not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1038**

## Sugiyama/US and Sugiyama/JP

Dr. Delp's claim charts also attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in U.S. Patent No. 4,985,768 to K. Sugiyama ("Sugiyama/US") and Japanese patent application 1-11587 ("Sugiyama/JP"; MSLT_1235588-MSLT_1235601), cited by Sugiyama/US as a priority reference. I disagree. In my opinion, neither Sugiyama/US nor Sugiyama/JP discloses all of the elements of Haskell Claim 12.

I note that Sugiyama/US discloses material not contained in Sugiyama/JP. As the US application was filed in 1990, after the invention of Haskell had become publicly known, Dr. Delp's discussion of Sugiyama/US does not appear to be relevant with respect to near simultaneous invention to the extent that the material was not already disclosed in Sugiyama/JP. I therefore focus on Sugiyama/JP in the following. The analysis and conclusions similarly apply to Sugiyama/US, and, in my opinion, neither Sugiyama/US, nor Sugiyama/JP disclose all of the elements of Haskell Claim 12.

One reason why Sugiyama/JP does not disclose all the elements of Haskell Claim 12 is that the reference does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." Furthermore, Sugiyama/JP does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks." Sugiyama/JP discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. In addition, Sugiyama/JP fails to disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Sugiyama/JP discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 29 -

**Exhibit 19  Page 1039**

39, and Averager 32 as disclosed in Haskell. Sugiyama/JP also does not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

### Sony

Dr. Delp's claim charts also attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in Sony's October 2, 1989 MPEG proposal titled "Description of The Proposed Coding Algorithm" ("Sony"). I disagree. In my opinion, Sony does not disclose all of the elements of Haskell Claim 12.

In particular, Sony does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, Sony discloses no "approximated blocks" and "codes that describe deviations from approximated blocks."

Sony also does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks." Sony discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Furthermore, Sony discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell.

Furthermore, Sony does not disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Sony discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Finally, Sony discloses no circuitry or

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 30 -

**Exhibit 19  Page 1040**

structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.

### Philips

Dr. Delp's claim charts also attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in Philips' 1989 MPEG submission titled "The Full Motion System" ("Philips").  I disagree.  In my opinion, Philips does not disclose all of the elements of Haskell Claim 12.

In particular, Philips does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, Philips discloses no "interpolated blocks" or "codes that describe deviations from interpolated blocks."

Philips does not disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."  Philips discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Furthermore, Philips discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.

### Roos

Dr. Delp's claim charts also purport to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in an article by Paul Roos and Max A. Viergever titled "Interframe vs. intraframe compression of image sequences" ("Roos").  I disagree.  In my opinion, Roos does not disclose all of the elements of Haskell Claim 12.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD -- OCTOBER 12, 2007

Exhibit 19  Page 1041

In particular, Roos does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, Roos does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks." Roos discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. In addition, Roos fails to disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Roos discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell. Roos also does not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

**10.4 Secondary Considerations Demonstrating Nonobviousness**

In my opinion, several secondary considerations confirm my opinion that the invention described in Haskell Claim 12 is nonobvious. First, products that use the claimed invention have been highly successful in the marketplace. The claimed invention is used in numerous video coding standards, including MPEG-1, MPEG-2, WMV-9, VC-1, and others. The Haskell invention has contributed to the success of these products by reducing the bandwidth needed to transmit, or by reducing the quantity of storage needed to store, high-quality video bitstreams. In my experience, other video coding technologies that do not use the claimed invention have not been as commercially successful.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1042**

Licenses showing industry respect for the claimed invention also support my conclusion that Claim 12 is nonobvious. I have reviewed several of Lucent's licensing agreements that specifically identify Haskell. I have also reviewed several Lucent licensing negotiation documents which refer to Haskell, indicating that Haskell has been a focal point of negotiations for broader licenses with third parties.

Finally, Dr. Delp himself identifies several references that purportedly identify the visual artifact problem solved by the invention of Claim 12, but fail to propose the inventive solution. The failure of others to arrive at the invention of Claim 12 provides further objective evidence of nonobviousness. Moreover, the failure of Dr. Delp's "near simultaneous invention" references to disclose the invention of Haskell Claim 12, or any combination of decoding block approximations using prediction error and interpolated blocks using interpolation error, confirms my opinion that the Haskell Claim 12 invention was not obvious.

## 11. SIGNATURE

Stanford, California, October 12, 2007

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 19  Page 1043**

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2007, a copy of the foregoing SUPPLEMENTAL REBUTTAL EXPERT REPORT OF PROFESSOR BERND GIROD REGARDING VALIDITY OF LUCENT'S 4,383,272 AND 4,958,226 PATENTS was served on counsel for Gateway, Microsoft and Dell as follows:

**EMAIL**
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099
marchese@fr.com
srodriguez@fr.com

**EMAIL**
Ali Sharifahmadian
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
Telephone: 202-942-5000
Facsimile: 202-942-5999
ali_sharifahmadian@aporter.com

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Microsoft Corp.*

Attorneys for *Dell Inc.*

**EMAIL**
W. Bryan Farney
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
bryan.farney@dechert.com

Attorneys for *Gateway, Inc., et al.*

**Exhibit 19  Page 1044**

Exhibit 20

BERND GIROD, PH.D.                                                 November 23, 2007

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
--oOo--

LUCENT TECHNOLOGIES INC., and
MULTIMEDIA PATENT TRUST,

            Plaintiffs,

vs.                                No. 02-CV-2060 B (CAB)
                                   consolidated with
GATEWAY, INC., GATEWAY COUNTRY     No. 03-CV-0699 B (CAB)
STORES LLC, GATEWAY COMPANIES,     No. 03-CV-1108 B (CAB)
INC., GATEWAY MANUFACTURING LLC,
and COWABUNGA ENTERPRISES, INC.,
            Defendants.
and

MICROSOFT CORPORATION,

            Intervener,
_____/
AND RELATED CROSS ACTIONS.
_____/

Videotaped Deposition of
BERND GIROD, PH.D.
_____
Tuesday, November 20, 2007

Reported by:
Leslie Rockwood
CSR No. 3462
Job No. 77606

Esquire Deposition Services          505 Sansome street, Suite 502    San Francisco, California 94111
Phone (415) 288-4280                         800-770-3363                    Fax (415) 288-4286

Exhibit 20  Page 1045

BERND GIROD, PH.D.                                                 November 23, 2007

Page 38

1   cited as prior art on the face of a patent or not.  As I

2   said, I would be surprised to see it cited there.  So I

3   would like to see that patent.

4          Q.  BY MR. MARCHESE:  Do you have any other basis

5   besides the public accessibility to support the answer

6   that you just gave?

7          A.  Well, as an engineer, it's my understanding

8   that for a document to constitute prior art, it should be

9   accessible to the public.

10         Q.  So when the patent office lists a document on

11  the front cover of a patent, it's your belief that the

12  patent office is free to list documents that are not

13  available as prior art; right?

14             MR. STADNICK:  Objection.  Vague, calls for a

15  legal conclusion, is an incomplete hypothetical.

16             THE WITNESS:  The documents that I have seen

17  cited as prior art on patents were, as far as I could

18  tell, all accessible to the public.

19         Q.  BY MR. MARCHESE:  Can you think of any

20  instance for any patent that you've ever seen where a

21  prior art document cited on the front of the patent was

22  not available to the public?

23         A.  I cannot think of such an instant right now.

24         Q.  Do you know Barry D. Andrews?

25         A.  I do.

Esquire Deposition Services                505 Sansome street, Suite 502            San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                            Fax (415) 288-4286

Exhibit 20   Page 1045.1

BERND GIROD, PH.D.                                                November 23, 2007

1          Q.  He's a colleague of yours; right?  Or was at

2   some time?

3          A.  I -- I know him.  And he has worked in the

4   same field, yes.

5          Q.  And he knows of Mr. Micke's work; right?  He

6   knows of the thesis?

7               MR. STADNICK:  Objection.  Calls for

8   speculation.

9               THE WITNESS:  I believe he does, yes.

10         Q.  BY MR. MARCHESE:  You told him about it;

11  right?

12         A.  To the best of my recollection, I told him

13  about it, yes.

14         Q.  You've told other people about it, too;

15  right?

16         A.  Most likely, I have, yes.

17         Q.  And you've told other people about it because

18  you think it's an important piece of work; right?

19         A.  Well, we already discussed about the relative

20  importance of the Micke thesis.

21         Q.  But you didn't answer my question.  You've

22  told other people about it, you've told people about the

23  Micke thesis because you consider it to be an important

24  piece of work; correct?

25         A.  There certainly have been different reasons

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                        800-770-3363                          Fax (415) 288-4286

**Exhibit 20    Page 1045.2**

BERND GIROD, PH.D.                                                    November 23, 2007

Page 40

1    why I might have told people about the Micke thesis.    I
2    have myself, for instance, cited the Micke thesis in a
3    publication.    I don't recall the exact conversations that
4    I had with Dr. Andrews, but I believe he was interested
5    in some historical questions that -- at around that time.
6    And that's how the Micke thesis came up in our
7    conversation.
8            Q.    So there are different reasons why you have
9    told people about the Micke thesis.    One of those is
10   because it was an important piece of work; correct?
11           A.    Well, I don't think that I mentioned the
12   Micke thesis to somebody just because I thought this is a
13   particular important piece of work and this would have
14   been the only reason to mention it.
15           Q.    You have never mentioned to anybody that the
16   Micke thesis is an important piece of work; correct?
17           A.    Well, that's not what I just said.    I just
18   said that I don't think that I would have mentioned the
19   Micke thesis out of the blue just because I thought it's
20   an important piece of work.
21           Q.    You have never told anybody at any time that
22   you thought the Micke thesis was an important piece of
23   work; correct?
24           A.    I cannot deny that, nor can I confirm it.
25           Q.    But you think the Micke thesis is an

**Exhibit 20    Page 1045.3**

BERND GIROD, PH.D.                                                    November 23, 2007

1    important piece of work, don't you?

2          A.   As a diploma thesis, it's -- it's a very good

3    work and has a certain importance.

4          Q.   And you have told people that the Micke

5    thesis is a very good piece of work, haven't you?

6                MR. STADNICK:   Asked and answered.

7                THE WITNESS:   Sitting here today, I can't say

8    one way or another, but I might have said that, yes,

9    true.

10         Q.   BY MR. MARCHESE:   You might have said that

11   because you consider it to be important; right?

12         A.   Well, as I said, the -- it's a good diploma

13   thesis.  And is it important?  Well, we have to probably

14   talk about what we mean by important then.

15         Q.   Well, you think it's important, don't you?

16   As a diploma thesis, you think it's important?

17               MR. STADNICK:   Asked and answered about six

18   or seven times now.

19               THE WITNESS:   Well, the reason why I'm

20   reluctant to confirm to you that the Micke thesis is

21   important is that one way to measure the importance of

22   some work in the field is the impact that it has on the

23   field.  The Micke thesis is undoubtedly a very good piece

24   of work, but the -- its impact on the field is doubtful.

25         Q.   BY MR. MARCHESE:   Why?

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                    800-770-3363                          Fax (415) 288-4286

Exhibit 20   Page 1045.4

BERND GIROD, PH.D.                                                    November 23, 2007

Page 42

1          A.   Because people didn't know about it.

2          Q.   But you told people about it; right?

3          A.   Well, I just confirmed to you that

4    undoubtedly I have mentioned the Micke thesis to other

5    people.  You know, and maybe the most important being the

6    mentioning of the thesis in one of the articles I've

7    written.

8          Q.   And you told Mr. -- or Dr. Andrews about it;

9    right?

10         A.   Yes.

11         Q.   And you've told other people at the Stanford

12   University about it, haven't you?

13         A.   You know, I'm not sure whether I've told

14   people at Stanford about the Micke thesis.  I might or

15   might not have.  I don't know one way or another.

16         Q.   Was Dr. Andrews at any point at Stanford

17   University?

18         A.   Yes, he was.

19         Q.   In what capacity?

20         A.   He was a Ph.D. student there.  But that was

21   long before he had the conversation with me about the

22   Micke thesis.

23         Q.   When did you have that conversation with

24   Dr. Andrews?

25         A.   To the best of my recollection, he was

Esquire Deposition Services              505 Sansome street, Suite 502         San Francisco, California 94111
Phone (415) 288-4280                          800-770-3363                        Fax (415) 288-4286

Exhibit 20   Page 1045.5

BERND GIROD, PH.D.                                                      November 23, 2007

Page 43

1    working for the company Eight By Eight then, and it might
2    have been called -- the company changed names more than
3    once.  So it might be -- have a different name.  It might
4    have had a different name then.  It might have been
5    either Netergy or IIT at the time, I don't know.
6           Q.   Why did you discuss the thesis with
7    Dr. Andrews?
8           A.   You know, I don't really recall right now.
9    It's a long time ago.  So I don't recall one way or
10   another.
11          Q.   You mentioned Mr. Micke's work to Professor
12   Gray, haven't you?
13          A.   That's possible, yes.
14          Q.   "Yes" or it's possible?
15          A.   I don't clearly recall, but it's possible
16   that I have mentioned that.
17          Q.   And Professor Gray, what's his capacity at
18   Stanford University?
19          A.   He's a colleague of mine at Stanford.
20          Q.   Isn't he the chair of the electrical
21   engineering department?
22          A.   No, he's not.
23          Q.   What is his title, to the best of your
24   recollection?
25          A.   He's professor of electrical engineering.

Esquire Deposition Services                    505 Sansome street, Suite 502              San Francisco, California 94111
Phone (415) 288-4280                                800-770-3363                                    Fax (415) 288-4286

Exhibit 20   Page 1045.6

BERND GIROD, PH.D.                                                    November 23, 2007

Page 44

1          Q.  And he's the Lucent chair of electrical

2   engineering; right?

3          A.  You know, now that you mention it, I think he

4   is a Lucent chair holder.

5          Q.  And you've mentioned to Professor Gray the

6   Lucent chair -- I'm sorry, the Lucent professor at

7   Stanford, you've mentioned to him Mr. Micke's work from

8   back in the 1980s; right?

9          A.  You know, if I mentioned it, it must have

10  been a long time ago and certainly before he was Lucent

11  chair.

12         Q.  You've mentioned it to him, though, haven't

13  you?

14              MR. STADNICK:  Objection.  Asked and

15  answered.

16              THE WITNESS:  As I said, I don't really

17  recall whether I did or did not, but it's possible that I

18  did.

19         Q.  BY MR. MARCHESE:  You've mentioned

20  Mr. Micke's work from the 1980s to Atul Puri, haven't

21  you?

22              MR. STADNICK:  Counsel, what does this have

23  to do with Dr. Girod's opinions?  It's not a fact

24  deposition.

25              THE WITNESS:  I think it's possible, yeah.

**Exhibit 20   Page 1045.7**

BERND GIROD, PH.D.                                                                November 23, 2007

Page 45

1           Q.  BY MR. MARCHESE:  And you told Didier LeGall

2      about Mr. Micke's work in 1988, didn't you?

3                MR. STADNICK:  Objection.  Vague.

4                THE WITNESS:  That I actually recall.

5      Whether it was in 1988 or some other date, I don't know.

6      It's too long ago.  But I remember that I had at least

7      one discussion with Didier LeGall related to Micke's

8      work.

9           Q.  BY MR. MARCHESE:  Backing up a second,

10     Mr. Puri, who we discussed before, he's a co-inventor

11     with Mr. Haskell, or Dr. Haskell, on the 226 patent;

12     correct?

13          A.  Correct.

14          Q.  And you told Mr. Puri about Thomas Micke's

15     work from the 1980s that you were involved in; right?

16               MR. STADNICK:  Objection.  Vague as to time.

17               THE WITNESS:  I think I had an email exchange

18     at some point with Dr. Puri, where I mentioned the Micke

19     thesis.  That, however, must have been quite a bit later,

20     probably after 2000.  So more than ten years after the

21     invention, yeah.

22          Q.  BY MR. MARCHESE:  You told Didier LeGall,

23     who's also involved in video coding, prior to telling

24     Dr. Puri, you told Didier LeGall about Mr. Micke's

25     thesis; right?

Esquire Deposition Services                505 Sansome street, Suite 502             San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                              Fax (415) 288-4286

Exhibit 20    Page 1045.8

BERND GIROD, PH.D.                                          November 23, 2007

Page 46

```
 1              MR. STADNICK:  Objection.  Vague.
 2              THE WITNESS:  To the best of my recollection,
 3   yes, I did.
 4         Q.  BY MR. MARCHESE:  And you told him about it
 5   because you think it's important; right?
 6         A.  I think we already talked about, you know,
 7   importance and why I'm reluctant to say -- confirm that
 8   it's important.  So there is the question regarding
 9   impact of the work.
10         Q.  Why did you tell Dr. LeGall about Mr. Micke's
11   thesis?
12         A.  I don't recall the exact setting of our
13   discussion.  After all, it's almost 20 years ago.  But I
14   think we were discussing ideas for video compression at
15   the time, and I probably told him what I had been
16   involved in recently.  And he might have asked me, also.
17         Q.  You've authored a lot of documents, haven't
18   you?
19         A.  Documents including --
20         Q.  Let me be more specific.
21         A.  Publications --
22         Q.  Yeah.  You've been a sole author or co-author
23   on a lot of publications; correct?
24         A.  Yes.
25         Q.  Including journal articles; right?
```

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                        800-770-3363                             Fax (415) 288-4286

**Exhibit 20   Page 1045.9**

BERND GIROD, PH.D.                                          November 23, 2007

Page 51

1          Q.   Polycom?

2          A.   No.

3          Q.   What is the problem that the inventors of the

4    226 patent were seeking to solve?  Did it have anything

5    to do with visual artifacts?

6               MR. STADNICK:   Objection.  Vague.

7               THE WITNESS:   The 226 patent is directed

8    towards an improved video compression method, and the

9    inventors in their background section mention visual

10   artifacts that are -- can be observed when performing

11   motion compensated interpolation.

12              MR. STADNICK:   Counsel, if you're moving onto

13   a new topic, we've been going about an hour.  Why don't

14   we take a break.

15              MR. MARCHESE:   Do you want to take a break?

16              THE WITNESS:   It might be a good time, yeah.

17              MR. MARCHESE:   Okay, let's do it.

18              THE VIDEOGRAPHER:   Off the record, the time

19   is 2:13.

20              (Recess.)

21              THE VIDEOGRAPHER:   Back on the record, the

22   time is 2:21.

23         Q.   BY MR. MARCHESE:   Is it your opinion that the

24   226 patent, Claim 12, was directed in any way at solving

25   the problem of visual artifacts in motion compensated

Esquire Deposition Services              505 Sansome street, Suite 502       San Francisco, California 94111
Phone (415) 288-4280                          800-770-3363                   Fax (415) 288-4286

**Exhibit 20  Page 1046**

BERND GIROD, PH.D.                                                    November 23, 2007

Page 52

1   frames?

2            A.    That wasn't the only motivation for the

3   invention claimed in Claim 12, but it was certainly given

4   as a motivation in the background section.

5            Q.    What other motivations are there?

6            A.    In general, coming up with a video coding

7   system that would achieve a lower bit rate at certain

8   picture quality or a better picture quality at a certain

9   bit rate.

10           Q.    Anything else?

11           A.    I think that's the overriding goal of the --

12  in the area of video compression systems that this falls

13  into.

14           Q.    And the 226 patent claims to solve those

15  problems by transmitting interpolation error from the

16  encoder to the decoder; correct?

17           A.    Transmission of interpolation errors is part

18  of what's described in the 226 patent.

19           Q.    Do you consider the transmission of

20  interpolation error to be the novelty of the 226 patent?

21           A.     It's part of the invention of the 226

22  patent.  But the -- there is -- there is more to the 226

23  patent than simply the transmission of interpolation

24  error.  In fact, interpolation error coding was known in

25  the art previously, but certainly not in the way that the

Esquire Deposition Services                505 Sansome street, Suite 502           San Francisco, California 94111
Phone (415) 288-4280                                800-770-3363                            Fax (415) 288-4286

Exhibit 20  Page 1047

BERND GIROD, PH.D.                                                November 23, 2007

Page 53

1    226 patent discloses it.

2         Q.   How was interpolation error coding known in

3    the art prior to the 226 patent?

4         A.   For example, compression systems had been

5    described that would use a non-adaptive interpolation.

6         Q.   What compression systems?

7         A.   Well, there are a number of them, and I

8    believe some of them might even be referred to in the

9    background of the Haskell patent.

10        Q.   What did you mean by "non-adaptive

11   interpolation"?

12        A.   "Non-adaptive interpolation" would be

13   interpolation where the interpolation method does not

14   change with the content of the signal.

15        Q.   Did you consider the transmission of motion

16   compensated interpolation error to be something new in

17   the 226 patent?

18        A.   Are we talking about a particular claim now

19   or just the patent as a whole?

20        Q.   I asked about the patent.

21        A.   In comparing the 226 patent with the prior

22   art, I've particularly considered Claim Number 12, which

23   is a claim directed to a particular decoder in this

24   patent.  I haven't formed an opinion on the other claims

25   in the patent.  The Claim Number 12 is not a claim that

Esquire Deposition Services                505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1048**

BERND GIROD, PH.D.                                          November 23, 2007

Page 55

1          A.   The transmission of motion compensated

2     interpolation error, as disclosed in the Haskell patent,

3     was not known in the prior art.

4          Q.   When you said as disclosed in the Haskell

5     patent, what did you mean?  Because you qualified your

6     answer.

7          A.   The Haskell patent is directed towards a

8     particular coding method that combines predictive coding

9     and interpolative coding both with motion compensation

10    and a block-wise transmission of the information.

11         Q.   Was the transmission of interpolation error

12    known in the prior art to the 226 patent for predictive

13    and interpolative coders?  Is that a difficult question

14    for you?  You've been thinking about it for a long time.

15              MR. STADNICK:  Objection.  Vague.  Please

16    don't harass the witness.  He's trying to give you an

17    honest answer to a confusing question.

18              THE WITNESS:  Could you please repeat the

19    question.

20         Q.   BY MR. MARCHESE:  What's wrong with the

21    question?  You don't understand it?

22         A.   Could you read back the question to me,

23    please.

24              (The record was read by the reporter as

25              follows:

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                        800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1049**

BERND GIROD, PH.D.                                            November 23, 2007

 1                    "QUESTION:  Was the transmission of
 2                    interpolation error known in the prior art to
 3                    the 226 patent for predictive and
 4                    interpolative coders?")
 5                    MR. STADNICK:  Objection.  Vague.  It's
 6      compound as well.
 7                    THE WITNESS:  There were coders known in the
 8      prior art that transmitted prediction errors with and
 9      without motion compensation and --
10           Q.   BY MR. MARCHESE:  Were there coders known --
11           A.   I'm going on.
12                    MR. STADNICK:  He wasn't finished with his
13      answer.
14                    THE WITNESS:  There were also coders known in
15      the prior art that transmitted interpolation errors.
16           Q.   BY MR. MARCHESE:  With motion compensation?
17           A.   To the best of my knowledge, not with motion
18      compensation, or at least not in the way that the Haskell
19      patent discloses it.
20           Q.   And the Haskell patent discloses motion
21      compensation in a block-wise manner; right?
22           A.   It -- Haskell discloses motion compensation
23      in a block-wise manner as well as the encoding of the
24      prediction error and the encoding of the interpolation
25      error both in a block-wise manner.

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                          Fax (415) 288-4286

**Exhibit 20  Page 1050**

BERND GIROD, PH.D.                                          November 23, 2007

```
 1          Q.   In the prior art to the 226 patent, the
 2     concept of motion compensation and interpolation error in
 3     a non-block-wise manner for the encoding of prediction
 4     error and the encoding of interpolation error was known;
 5     right?
 6               MR. STADNICK:  Objection.  Vague and
 7     compound.
 8          Q.   BY MR. MARCHESE:  Are you reading the
 9     question?
10          A.   I'm trying to parse and understand the
11     question, but it doesn't seem to make sense.
12          Q.   Let me ask you a simple way:  Do you believe
13     that in Claim 12 the receipt of interpolation error, that
14     that was something novel in the context of Claim 12?
15          A.   Well, Claim 12 has to be understood as a
16     whole.  So it's really all the elements of the claim.
17     But --
18          Q.   So you think in the concept of Claim 12 that
19     the receipt of interpolation error was something that was
20     known prior to its submission to the patent office;
21     right?
22               MR. STADNICK:  Counsel, I'll have to ask you
23     again not to interrupt the witness in the middle of his
24     answers.  Try and be patient.  If you ask a question,
25     allow him to answer it.
```

Esquire Deposition Services            505 Sansome street, Suite 502      San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                         Fax (415) 288-4286

**Exhibit 20  Page 1051**

BERND GIROD, PH.D.                                          November 23, 2007

Page 59

1          A.   I don't think a person of ordinary skill in

2     the art would look in this direction.   There were many

3     possible ways to -- that one could experiment with to

4     overcome this problem, and many, in fact, have been

5     pursued by people.

6          Q.   And my question was different:   Would a

7     person of skill in the art prior to the 226 patent have

8     recognized that interpolation error could be used to

9     solve the problem of visual artifacts?

10         A.   No.

11         Q.   Why not?

12              MR. STADNICK:   Objection.   Vague.

13              THE WITNESS:   I don't think that would have

14    been something that a person of ordinary skill in the art

15    would necessarily look for in overcoming this problem.

16         Q.   BY MR. MARCHESE:   You said "necessarily."

17    Why "necessarily"?   You kind of qualified.

18         A.   Well, artifacts and motion compensated

19    interpolation were caused by the inaccuracy of and

20    unreliability of motion estimation methods.   So what

21    people at that time usually would try is to improve the

22    reliability and accuracy of these motion estimation

23    methods and have better motion vectors, and by doing

24    that, avoid visual artifacts.

25         Q.   Did Mr. Micke in his thesis come up with a

Esquire Deposition Services                505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                             Fax (415) 288-4286

Exhibit 20  Page 1052

BERND GIROD, PH.D.                                              November 23, 2007

Page 60

1    motion estimation method?

2            A.   I don't think he did.

3            Q.   You don't think he improved on an existing

4    motion estimation method in his thesis?

5            A.   Not as far as I can recall.

6            Q.   Was Mr. Micke describing the use of

7    transmitting interpolation error in a motion compensated

8    system?

9            A.   He was performing a rate distortion analysis

10   in order to gain some insights in various architectures

11   of video coding systems.  And as part of that, he was

12   considering architecture where interpolation error would

13   be encoded.

14           Q.   Was there -- was any of the basis of his work

15   to try to reduce the problem of visual artifacts?

16           A.   To the best of my recollection, the analysis

17   only considered a lower bound on the bit rate that might

18   be achieved for certain mean squared error distortion.  I

19   don't think visual artifacts were considered in the Micke

20   thesis partly because he never showed any video

21   sequences.

22           Q.   Did you ever discuss the problem of visual

23   artifacts with Mr. Micke in the context of his thesis?

24           A.   I really don't have a recollection of that

25   after 20 years.

Esquire Deposition Services              505 Sansome street, Suite 502       San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1053**

BERND GIROD, PH.D.                                                    November 23, 2007

Page 61

1          Q.   Did you know about the knowledge -- the

2     problem of visual artifacts prior to the filing of the

3     226 patent?

4               MR. STADNICK:  Objection.  Vague.

5               THE WITNESS:  I was aware of visual artifacts

6     in motion compensated interpolation at that time, yes.

7          Q.   BY MR. MARCHESE:  At what time?

8          A.   At the time that the patent was filed.

9          Q.   And you were not aware of the -- of solving

10    that problem by sending interpolation error; right?

11         A.   No.

12         Q.   You never thought about that; right?

13         A.   Well, as I said, we had discussions in this

14    direction in the context of the Micke thesis, and maybe

15    other discussions, but not as a means of overcoming

16    interpolation error -- visual artifacts caused by motion

17    compensated interpolation.

18         Q.   You had discussions in the context of the

19    Micke thesis about transmitting interpolation error;

20    right?

21         A.   Yes.

22         Q.   And the reason was?

23         A.   We were interested in the performance bounds

24    of a video coding system that would use motion

25    compensated interpolation.

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                          800-770-3363                       Fax (415) 288-4286

**Exhibit 20  Page 1054**

BERND GIROD, PH.D.                                                November 23, 2007

```
 1          Q.  Did you know about the knowledge -- the
 2   problem of visual artifacts prior to the filing of the
 3   226 patent?
 4               MR. STADNICK:  Objection.  Vague.
 5               THE WITNESS:  I was aware of visual artifacts
 6   in motion compensated interpolation at that time, yes.
 7          Q.  BY MR. MARCHESE:  At what time?
 8          A.  At the time that the patent was filed.
 9          Q.  And you were not aware of the -- of solving
10   that problem by sending interpolation error; right?
11          A.  No.
12          Q.  You never thought about that; right?
13          A.  Well, as I said, we had discussions in this
14   direction in the context of the Micke thesis, and maybe
15   other discussions, but not as a means of overcoming
16   interpolation error -- visual artifacts caused by motion
17   compensated interpolation.
18          Q.  You had discussions in the context of the
19   Micke thesis about transmitting interpolation error;
20   right?
21          A.  Yes.
22          Q.  And the reason was?
23          A.  We were interested in the performance bounds
24   of a video coding system that would use motion
25   compensated interpolation.
```

Esquire Deposition Services                505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                         Fax (415) 288-4286

**Exhibit 20  Page 1055**

BERND GIROD, PH.D.                                                November 23, 2007

Page 62

1          Q.   And your discussions had nothing to do with

2     visual artifacts; right?

3          A.   Since it was a theoretical analysis, I don't

4     think we considered visual artifacts.

5          Q.   But as of the time of the Micke thesis, you

6     were aware of the problem of visual artifacts in the

7     context of motion compensated systems; right?

8          A.   Correct.

9          Q.   And in the context of the Micke thesis, the

10    interpolation error was used or was told to be used

11    transmission from the encoder to the decoder in a video

12    coding system; right?

13              MR. STADNICK:   Objection.  Vague.

14              THE WITNESS:  Well, as I said before, the

15    Micke thesis did not actually simulate a video encoder or

16    a video decoder.  It was a theoretical analysis of

17    possible performance bounds in order to explore whether

18    this is a promising direction.

19         Q.   BY MR. MARCHESE:  Well, the Micke thesis does

20    state that you should transmit interpolation error;

21    right?

22         A.   We concluded from this work that this would

23    be a promising direction.

24         Q.   But you never made the connection between

25    transmitting interpolation error as being promising and

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                          800-770-3363                         Fax (415) 288-4286

**Exhibit 20  Page 1056**

BERND GIROD, PH.D.                                                      November 23, 2007

Page 63

1    solving the problem of visual artifacts; right?

2          A.  I was finishing my dissertation at around

3    that time and then moving on to MIT.  So I had never time

4    to pursue that further.

5          Q.  So you just never made the connection; right?

6          A.  The connection between transmitting

7    interpolation error and visual artifacts?

8          Q.  Correct.

9          A.  Correct.

10          Q.  The first people to do that were Haskell and

11    Puri in the 226 patent, in your opinion; right?

12          A.  They were, to the best of my knowledge, at

13    least, the first ones to do that.

14          Q.  Exhibit 2 to your deposition here is the

15    patent, 226 patent.  I'd like you to take a look at

16    Figure 2, please.

17              And you recognize that in the context of this

18    case, the Court has identified some of the structures

19    shown in Figure 2 as being part of Claim 12; right?

20          A.  I'm aware of that the Court in its claim

21    construction has identified certain structure

22    corresponding to the means-plus-function elements of

23    Claim 12.

24          Q.  Let's take a look at the DCT here, inverse

25    DCT.  I'm sorry.  There's two of them, 24 and 34?

Esquire Deposition Services              505 Sansome street, Suite 502              San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                                    Fax (415) 288-4286

**Exhibit 20  Page 1057**

BERND GIROD, PH.D.                                                    November 23, 2007

Page 74

1   way that it's disclosed in the Haskell patent.

2            Q.  BY MR. MARCHESE:  In what way was it known?

3            MR. STADNICK:  Asked and answered.

4            THE WITNESS:  So motion compensated

5   interpolation was known in the prior art, and there were

6   also systems that interpolated interpolation error,

7   however, without motion compensation.

8            Q.  BY MR. MARCHESE:  Look at Figure 2 again,

9   please.  Which blocks perform motion compensated

10  interpolation?

11           A.  Motion compensated interpolation is performed

12  by the shift circuits 31 and 39 in combination with the

13  averager 32.

14           Q.  You've heard of motion compensated

15  prediction?

16           A.  Yes, I have.

17           Q.  Was that prior art to the 226 patent?

18           A.  Yes.

19           Q.  Which blocks in Figure 2 perform motion

20  compensated prediction?

21           A.  Motion compensated prediction is performed by

22  the shift circuit number 26, and one might or might not

23  include the frame memory 28 in the -- in the motion

24  compensated prediction.

25           Q.  Was it known in the prior art to combine

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                          Fax (415) 288-4286

Exhibit 20  Page 1058

BERND GIROD, PH.D.                                    November 23, 2007

1    this -- the motion compensated prediction circuit that

2    you've just identified, shift 26 and frame 28, with

3    inverse DCT 24 and decoder 22?

4              MR. STADNICK:  Objection.  Vague.

5              THE WITNESS:  Well, it was known to encode

6    prediction errors with -- motion compensated prediction

7    errors with a block-wise DCT, and then the bit stream

8    would be decoded by a decoder that's similar to decoder

9    22 and similar to the inverse DCT that's shown here, and

10   in fact, the Haskell patent discusses that in the

11   background to the invention.

12        Q.  BY MR. MARCHESE:  And would a prior art or

13   could a prior art motion compensated prediction circuit

14   also include the adder 27 in addition to 26, 28, 22, and

15   24?

16        A.  A decoder for motion compensated prediction

17   would certainly add the motion compensated prediction

18   signal with the decoded prediction error.  So 27 or an

19   adder that's similar to the one shown here in Figure 2,

20   the number 27, would be found in such a system in the

21   prior art.

22        Q.  In the prior art to the 226 patent, were

23   there any systems that combined the circuits that you've

24   just identified for motion compensated prediction -- and

25   I'll remind you they were 26, 28, 27, 24, and 22 -- with

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                    800-770-3363                              Fax (415) 288-4286

Exhibit 20  Page 1059

BERND GIROD, PH.D.                                                    November 23, 2007

Page 76

1    the circuits you identified for motion compensated

2    interpolation, which were shift circuits 31 and 39 and

3    the averager 32?

4              MR. STADNICK:  Objection.  Mischaracterizes

5    the witness's testimony.  It's vague.

6              THE WITNESS:  In the prior art, there were

7    systems that performed motion compensated predictive

8    decoding then followed by motion compensated

9    interpolation.  So in that sense, systems which could be

10   described by a similar block diagram were known in the

11   prior art.

12             Q.  BY MR. MARCHESE:  Take a look at Figure 2

13   again, please.  And see there's a line connecting the

14   buffer 23 to the decoder 25?

15             A.  Yes, uh-huh.

16             Q.  And is the signal that travels along that

17   line coded interpolation error?

18             A.  Yeah, the signal that travels along that line

19   would be encoded interpolation error.

20             Q.  And then that encoded interpolation error is

21   decoded by block 25 and block 34; correct?

22             A.  Correct.

23             Q.  And what process does block 25 perform on the

24   encoded interpolation error?

25             A.  It's what's known in the art as entropy

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                         Fax (415) 288-4286

**Exhibit 20  Page 1060**

BERND GIROD, PH.D.                                        November 23, 2007

Page 81

```
 1              Q.  And see the blocks labeled decoder 22,
 2     inverse DCT 24, and adder 27?
 3              A.  I see those blocks.
 4              Q.  And it appears that the output of the decoder
 5     22 goes to the input of the inverse DCT 24; right?
 6              A.  It appears that way.
 7              Q.  And then the output of the inverse DCT 24
 8     goes into the input of the adder 27; right?
 9              A.  It goes into one of the inputs.
10              Q.  Okay.  And then if you look at the decoder
11     25, the inverse DCT 34, and the adder 35 at the bottom of
12     Figure 2.
13                  Do you see those?
14              A.  Yes.
15              Q.  So the output of decoder 25 goes to the input
16     of the inverse DCT 34; right?
17              A.  Yes.
18              Q.  And then the output of the inverse DCT 34
19     goes into one of the inputs of the adder 35; correct?
20              A.  Correct.
21              Q.  So those three blocks -- decoder 25, inverse
22     DCT 34, and adder 35 -- are connected in the same manner
23     as decoder 22, inverse DCT 24, and adder 27; correct?
24                  MR. STADNICK:  Objection.  Vague.
25                  THE WITNESS:  It certainly appears that way.
```

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                    800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1061**

BERND GIROD, PH.D.                                                November 23, 2007

Page 82

1          Q.  BY MR. MARCHESE:  So then is it true with

2    reference to those six blocks we've just been talking

3    about -- 22, 24, 27, and 25, 34, and 35 -- that the

4    encoded interpolation error is processed in the same

5    manner as the encoded prediction error?

6                    MR. STADNICK:  Objection.  Vague.

7                    THE WITNESS:  I guess that's the problem with

8    block diagrams.  They only represent the system at a

9    certain level, and things that might look the same in a

10   block diagram are, in fact, when they're implemented,

11   different underneath.

12         Q.  BY MR. MARCHESE:  Is there any description in

13   the patent of implementing the blocks 22, 24, and 27

14   differently from blocks 25, 34, and 35?

15                   MR. STADNICK:  Objection.  Vague.

16                   THE WITNESS:  You know, I don't recall one

17   way or another.  I think with regards to the -- to these

18   elements, the specification says that these elements were

19   individually known in the art.  And so a person of

20   ordinary skill in the art would know how to implement

21   them.

22         Q.  BY MR. MARCHESE:  So is it true at the block

23   diagram level of Figure 2 that the prediction error,

24   which is input to decoder 22, that is encoded prediction

25   error?

Esquire Deposition Services              505 Sansome street, Suite 502              San Francisco, California 94111
Phone (415) 288-4280                            800-770-3363                                     Fax (415) 288-4286

Exhibit 20  Page 1062

BERND GIROD, PH.D.                                                November 23, 2007

1          A.   Uh-huh.

2          Q.   And then is processed by decoder 22, 24, and

3    27, is processed in the same way at this block diagram

4    level as the encoded interpolation error which flows

5    through decoder 25 and then 34 and 35?

6               MR. STADNICK:  Objection.  Vague.

7               THE WITNESS:  Typically, the -- the precise

8    functioning of the decoder 22 or 25 would reflect the

9    particular statistics of the signals that are being

10   transmitted there.

11         Q.   BY MR. MARCHESE:  Is that described in the

12   patent?

13         A.   I think that's one of the things that Haskell

14   and Puri referred to when they say a person of ordinary

15   skill in the art would know how to do that.  So since the

16   statistics of prediction errors and interpolation errors

17   are different, the inner workings of the decoders would

18   also reflect that, and whether or not Haskell and Puri

19   used identical decoders or different decoders in their

20   implementation, I don't know from the -- from the

21   specification, but certainly the block diagram Figure 2

22   suggests that these are different -- different decoders,

23   since they are shown as two different blocks.

24         Q.   So do you think that one of ordinary skill in

25   the art would know how to construct decoder 22 and

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                      Fax (415) 288-4286

**Exhibit 20  Page 1063**

BERND GIROD, PH.D.                                                    November 23, 2007

Page 93

1    is in common and the papers are describing the same

2    subject matter, no motivation to combine there?

3              A.   Well, in the meantime, they could have, you

4    know, hypothetically gone off in a different direction.

5    And so one would typically look for the more recent

6    documentation and more complete documentation of the

7    work.

8              Q.   But one would never look to earlier work;

9    right?

10             A.   Well, lack for the motivation to combine

11   doesn't mean one wouldn't also look at earlier work.

12             Q.   You could be -- you could want to look at

13   earlier work, but you would have no motivation to combine

14   earlier work; right?

15             MR. STADNICK:   Objection.  Vague, incomplete

16   hypothetical.

17             THE WITNESS:   As I said, for these two

18   particular papers, I don't think there is anything to

19   combine there.

20             Q.   BY MR. MARCHESE:   So that's why there's no

21   motivation to combine; is that right?

22             MR. STADNICK:   Asked and answered.

23             THE WITNESS:   At the very least, that's why

24   one would not combine these two references.  It would not

25   lead to more than the Gabor and Hill paper.

Esquire Deposition Services            505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                         800-770-3363                         Fax (415) 288-4286

**Exhibit 20  Page 1064**

BERND GIROD, PH.D.                                          November 23, 2007

Page 94

1          Q.  BY MR. MARCHESE:  Do you believe that those
2     two references have conflicting elements?
3          A.  In order to answer this question, I would
4     have to look at both of the papers again and analyze them
5     side by side.  I have not done that.  As I sit here now,
6     I don't recall any conflicting elements.
7          Q.  Prior to 1980, did you ever see the term PEL
8     used in the analog domain for video coding?
9          A.  I'm aware of the use of PEL in the context of
10    analog video signals.
11         Q.  Are you aware prior to 1980 of the use of the
12    word PEL in the context of digital video signals?
13         A.  Yes.
14         Q.  In what way has the term PEL been used in the
15    context of analog video signals?
16             MR. STADNICK:  Object, and note again that,
17    Counsel, this has nothing to do with KSR or his new
18    report, has nothing to do with purpose of the Court
19    allowing you to take a deposition here today.  If you
20    want to go a minute past 4:00 o'clock, I suggest you turn
21    to the subject matter that we're here today to deal with.
22             THE WITNESS:  So as far as I know, the origin
23    of PEL or picture element goes back to the very origins
24    of television technology.  And the very first line scan
25    patent for television technology was in the 1880s,

Esquire Deposition Services          505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                    800-770-3363                    Fax (415) 288-4286

**Exhibit 20  Page 1065**

BERND GIROD, PH.D.                                November 23, 2007

Page 95

1    Polynico's (phonetic) patent, so he uses the term "bich

2    punkt" (phonetic), which is German for picture point.

3              And as far as I know, this is -- this is the

4    origin of picture element as used in the context of

5    analog television technology.

6              In digital video, there is -- there's been a

7    different meaning of PEL, and that meaning is usually

8    referred to when somebody uses pixel, and that's in fact

9    the meaning that we have to look for in the context of

10   the Netravali patent.

11        Q.  BY MR. MARCHESE:  Can motion compensated

12   interpolation be applied to analog video signals?

13              MR. STADNICK:  Objection.  Vague.

14              THE WITNESS:  One could certainly digitize

15   analog video signals, perform motion compensated

16   interpolation and then convert them to digital -- from

17   the digital to the analog domain again, and that is in

18   fact sometimes done.  And so certainly in that sense one

19   could speak about motion compensated interpolation

20   applied to analog video signals.

21        Q.  BY MR. MARCHESE:  Suppose you don't convert

22   an analog video signal into the digital domain; could

23   motion compensated interpolation be applied to the analog

24   signal?

25        A.  Are you referring here to motion compensated

Esquire Deposition Services                505 Sansome street, Suite 502                San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1066**

BERND GIROD, PH.D.                                    November 23, 2007

1          Q.   Do you believe, as you've defined in one of

2     ordinary skill in the art could implement -- or I'm

3     sorry, simulate the function of the Gabor and Hill system

4     in the digital domain?

5               MR. STADNICK:   Objection.  Vague.

6               THE WITNESS:   Again, to the extent of

7     abstracting from the implementation just mimicking the

8     behavior of contour interpolation as described in Gabor

9     and Hill, I think somebody of ordinary skill in the art

10    could probably do that in a digital -- in a digital

11    simulation.  But there would be no motivation to do that

12    except for maybe idle academic interest or historic

13    interest, just because this is such an obsolete system,

14    which is -- reflects the, you know, what was known in the

15    1960s that today we are moved way beyond that.

16         Q.   BY MR. MARCHESE:   You talked about a digital

17    simulation.  Do you think it would be possible to create

18    a digital video coding system that would implement the

19    contour interpolation technique of the Gabor and Hill

20    reference?

21         A.   I think we now have to be careful of what we

22    mean by the contour interpolation technique of the Gabor

23    and Hill reference.  Previously I was referring to a

24    simulation of the function of Gabor and Hill.  But the

25    Gabor and Hill system is very much about the

Esquire Deposition Services              505 Sansome street, Suite 502       San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                          Fax (415) 288-4286

**Exhibit 20  Page 1067**

BERND GIROD, PH.D.                                    November 23, 2007

Page 100

1    implementation of a -- of this contour and interpolation

2    and modulating the velocity of line scans --

3                MR. MARCHESE:  I understand --

4                MR. STADNICK:  Let the witness finish his

5    answer.

6          Q.  BY MR. MARCHESE:  Let me go ahead and ask it

7    a little bit differently, Professor Girod.  Would it be

8    possible to simulate the function of Gabor and Hill in a

9    digital video coding system?

10               MR. STADNICK:  Asked and answered.

11               THE WITNESS:  I don't see how that would be

12   possible in a meaningful way.

13         Q.  BY MR. MARCHESE:  What do you mean by

14   "meaningful way"?

15         A.  Well, a video coding system you would try to

16   reduce the number of bits while maintaining a certain

17   video quality, and I don't quite see how the -- even a

18   simulation of the function of Gabor and Hill's contour

19   interpolation might be helpful in that manner.

20         Q.  But it would be possible to do it; right?

21         A.  I don't see right now how Gabor and Hill's

22   contour interpolation could be integrated into a video

23   coding system such that it works better by using that

24   particular technique.

25         Q.  Well, that's not what I asked, but that's

Esquire Deposition Services          505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                     800-770-3363                       Fax (415) 288-4286

**Exhibit 20  Page 1068**

BERND GIROD, PH.D.                                          November 23, 2007

Page 101

1    okay.  I think you gave me the answer I need.

2              H.261, were you present at H.261 meetings?

3         A.  I was not.

4         Q.  None of them; right?

5         A.  None of them.

6         Q.  Prior to your involvement in this case, had

7    you read any of the H.261 submissions that were made?

8         A.  Yes.

9         Q.  Did you read, prior to your involvement in

10   the case, the submissions that were made in the context

11   of the March 1986 Tokyo meeting?

12        A.  You know, this is too long ago.  I don't

13   recall one way or another.

14        Q.  So prior to your involvement in this case,

15   you said you did read some H.261 meeting submissions;

16   right?

17        A.  Yes, I did.

18        Q.  How did you get ahold of those?

19        A.  We had a collaboration with the research

20   institute of the German PTT at that time.

21        Q.  What time was this?

22        A.  In the 1980s.

23        Q.  And was the German PTT involved in the H.261

24   process?

25        A.  Yes.

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                        800-770-3363                        Fax (415) 288-4286

Exhibit 20  Page 1069

BERND GIROD, PH.D.                                                November 23, 2007

 1          THE WITNESS:  Since the specification

 2   doesn't -- doesn't actually say more about this

 3   threshold, that's -- that's what it seems to refer to.

 4          Q.  BY MR. MARCHESE:  So let me make sure I'm

 5   correct here.  It has -- the threshold has nothing to do

 6   with artifacts that can result from motion estimation in

 7   the interpolation process?

 8          MR. STADNICK:  Same objection.

 9          THE WITNESS:  The threshold is something that

10   is adjusted by the system designer, and it's usually tied

11   to the quantizer coarseness.  That's the way I understand

12   it here.

13          Q.  BY MR. MARCHESE:  And is the quantizer

14   coarseness tied in any way to the extent or the magnitude

15   of visual artifacts?

16          MR. STADNICK:  Objection.  Asked and answered

17   three or four times.

18          THE WITNESS:  Well, it's actually, in this

19   system, depends on how full the buffer is and what the

20   channel bit rate is.  So there is a feedback from the --

21   from the buffer memory, which is in Figure 1, number 60,

22   and that makes the quantizer coarser if the buffer is

23   very full, or if the buffer tends to be empty or even

24   under flow, it makes the quantizer finer and would also

25   then lower the threshold for values that are quantized to

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                       800-770-3363                              Fax (415) 288-4286

Exhibit 20  Page 1070

BERND GIROD, PH.D.                                                    November 23, 2007

Page 132

1   zero.

2          Q.  BY MR. MARCHESE:  So would the buffer tend to

3   get more full when there were more artifacts present?

4          A.  Well --

5              MR. STADNICK:  Objection.  Vague.

6              THE WITNESS:  The buffer fullness would

7   depend on quite a number of different factors.  One thing

8   to realize is that the buffer doesn't just hold the

9   encoded prediction error information.  It also holds the

10  encoded interpolation error information.  It holds motion

11  vectors, mote decisions, maybe blocks that were encoded

12  in intra mode without reference to a previous frame.

13              So all of these effects combined, then, would

14  affect the buffer feedback and the quantizer -- the

15  setting of quantizer 40.

16          Q.  BY MR. MARCHESE:  Okay.  So let me make sure

17  I'm clear.  Is it true that the buffer fullness, it

18  reflects at least in part how much visual artifacts there

19  have been as a result of the prediction process and the

20  interpolation process in the encoder of the 226 patent?

21              MR. STADNICK:  Objection.  Vague.

22              THE WITNESS:  Yeah, I wouldn't characterize

23  it in this way.  And in fact, it might even be unrelated

24  to that.  For instance, the noise that's contained in the

25  video sequence usually has quite a strong effect on how

Esquire Deposition Services                    505 Sansome street, Suite 502         San Francisco, California 94111
Phone (415) 288-4280                                    800-770-3363                        Fax (415) 288-4286

**Exhibit 20  Page 1071**

BERND GIROD, PH.D.                                                November 23, 2007

1    full that buffer will be and how many bits are generated.

2    These are not the visual artifacts that we've been

3    talking about in the context of motion compensated

4    interpolation.

5         Q.  BY MR. MARCHESE:  It says here that, in the

6    summary, the first sentence, "In accordance with the

7    principles of this invention, PELs that cause highly

8    visible artifacts are detected and corresponding

9    correction information is transmitted to the decoder."

10         Those visible artifacts result from the

11    motion estimation process in this patent; correct?

12         A.  Well, this -- the way I read this sentence

13    here on line 41, Column 2, is that it refers back to the

14    artifacts that were mentioned at the end of the section

15    Background of the Invention.  So these, then, would be

16    visible artifacts of -- that would be visible in the

17    context of motion compensated interpolation.

18         Q.  Okay.  So when highly visible artifacts are

19    detected, then, in this patent, you transmit the PEL

20    correction information, which is also called

21    interpolation error; right?

22         MR. STADNICK:  Objection.  Vague.

23         Do you want to talk about the claims and the

24    obviousness issues?

25         MR. MARCHESE:  Sir, please stop.

Esquire Deposition Services                 505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                         800-770-3363                        Fax (415) 288-4286

Exhibit 20  Page 1072

BERND GIROD, PH.D.                                                    November 23, 2007

Page 134

 1                  MR. STADNICK:  This is getting ridiculous.

 2                  MR. MARCHESE:  Just stop.

 3                  MR. STADNICK:  We're here for a purpose.

 4                  MR. MARCHESE:  That's exactly right, and I'm

 5      asking questions.  Sir, stop.

 6                  MR. STADNICK:  You want to explain to me how

 7      this relates to his expert report?  Explain to me how

 8      this relates to his expert report.

 9          Q.  BY MR. MARCHESE:  Can you answer the

10      question, sir?

11                  MR. STADNICK:  The question's vague.

12          Q.  BY MR. MARCHESE:  Does the question not make

13      sense?

14          A.  Well, the question is difficult to answer

15      because it's a very high level characterization of what

16      is described here in the specification.

17          Q.  Well, I mean, you're here as an expert on

18      this patent, aren't you?

19          A.  But as a -- at a high level, yes, you could

20      say that -- what were your words?  That PEL correction

21      information, which is also called interpolation error,

22      are transmitted.

23          Q.  When highly visible artifacts are detected;

24      correct?

25                  MR. STADNICK:  Objection.  Vague.

Esquire Deposition Services              505 Sansome street, Suite 502         San Francisco, California 94111
Phone (415) 288-4280                           800-770-3363                        Fax (415) 288-4286

Exhibit 20  Page 1073

BERND GIROD, PH.D.                                                    November 23, 2007

Page 139

1              THE WITNESS:  Well, I think this summary here
2      speaks for itself.  It's as if the interpolation error
3      exceeds the threshold of percept ability, this error is
4      quantized, coded, and transmitted.
5              Q.  BY MR. MARCHESE:  Is it your testimony that
6      the threshold of perceptibility has nothing to do with
7      visual artifacts?
8              MR. STADNICK:  Dr. Girod, were you finished
9      with your answer before Mr. Marchese interjected?  If
10     not, feel free to complete it.
11             THE WITNESS:  Can you repeat your previous
12     question.
13             Q.  BY MR. MARCHESE:  Is it your testimony that
14     the threshold of perceptibility in Micke's thesis has
15     nothing to do with visual artifacts?
16             A.  No, I don't think I have said that.
17             Q.  So the threshold of perceptibility in the
18     Micke thesis does have something to do with visual
19     artifacts?
20             MR. STADNICK:  Objection.  Vague.
21             THE WITNESS:  Well, perceptibility here
22     certainly is related to visual perception.
23             Q.  BY MR. MARCHESE:  And if there are lots of
24     visual artifacts, then you can perceive them more
25     greatly; right?

Esquire Deposition Services            505 Sansome street, Suite 502      San Francisco, California 94111
Phone (415) 288-4280                       800-770-3363                          Fax (415) 288-4286

**Exhibit 20  Page 1074**

BERND GIROD, PH.D.                                                November 23, 2007

Page 140

1          A.   Well, again, if this refers to interpolation

2     error values that would become larger than a threshold of

3     visibility.

4          Q.   So this refers to interpolation error values

5     that when they become perceptible, you would want to

6     transmit the interpolation error; correct?  Let me

7     rephrase that.  I think I said it wrong.

8               So this statement here refers to the fact

9     that when you have perceptible artifacts that the human

10    can see after they've been decoded and displayed on the

11    screen, it would be wise to then encode the interpolation

12    error and transmit it to the decoder so that you could

13    reduce the visual artifacts; right?

14               MR. STADNICK:  Objection.  Vague.

15               THE WITNESS:  Well, that's what this

16    translation here seems to suggest.

17          Q.   BY MR. MARCHESE:  Thank you.  Can you take a

18    look at the next paragraph, please.

19          A.   Uh-huh.

20          Q.   It says here Mr. Micke was tasked to

21    investigate whether motion compensating interpolation

22    error coding has advantages over motion compensating

23    interframe DPCM operating with prediction.

24               Do you see that?

25          A.   Yes.

**Exhibit 20  Page 1075**

BERND GIROD, PH.D.                                                November 23, 2007

Page 141

1          Q.  Who tasked him?  Was it you?

2          A.  I was at least involved in the process.  I'm

3    not entirely sure who came up with the task.  The task

4    ultimately was certainly signed by Professor Musmann.  So

5    where it says signature here.  So he was responsible for

6    setting the task.

7          Q.  To the extent that you can recall, was this

8    task assigned to Mr. Micke in order to figure out whether

9    translating interpolation and this question of whether it

10   would exceed the threshold of perceptibility would create

11   in a better signal if the decoder and then the screen

12   that the person would be watching the video on?

13         A.  Well, as you well noticed, the first

14   paragraph here, you know, provides some context for the

15   actual task, which was then described in the next

16   paragraph.  And so what Micke then actually did was,

17   looking at the potential rate distortion performance of

18   possible coding gains, in that -- in that context.

19         Q.  And he was looking at this concept of the

20   threshold of perceptibility as well; right?

21         A.  No, he actually used the rate distortion

22   model.  So it's visual artifacts, as we discussed

23   previously today, did not play a role in the

24   investigation that he then conducted.

25         Q.  See the last sentence there in that second

Esquire Deposition Services               505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                            800-770-3363                        Fax (415) 288-4286

**Exhibit 20  Page 1076**

BERND GIROD, PH.D.                                              November 23, 2007

Page 148

1    just the object, not object points.  How do you find out
2    where an object is expected to be in a future frame?
3            A.  Well, again, you seem to be tying this to the
4    Netravali claim language, but you're telling me that this
5    is not related to Netravali.  Correct?
6            Q.  I'm trying to be very general, and I'd like
7    to know if you know how one determines where an object is
8    expected to be in a future frame?  Is it within your
9    level of skill to do that, to answer that question?
10           A.  The question is rather vague.  So I'm trying
11   to understand what you are deed asking me.  But I think
12   as soon as I understand what you're asking me, I can
13   answer that question.
14           Q.  Why don't you understand about my question,
15   then?
16           MR. STADNICK:  Which question?  You've asked
17   him two -- actually three.
18           THE WITNESS:  I guess it's the nature of the
19   question.  It's hard to pin down what's missing from the
20   question.  So maybe you can rephrase the question or I'll
21   try again.
22           Q.  BY MR. MICALLEF:  Do you know what the phrase
23   "is expected to be" means in the context of the Netravali
24   patent?
25           A.  Now you're asking in the context of the

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                      800-770-3363                          Fax (415) 288-4286

**Exhibit 20  Page 1077**

BERND  GIROD, PH.D.                                                November 23, 2007

Page 149

1    Netravali patent.

2          Q.  Let me try it that way, and maybe we can

3    broaden it.

4          In the context of the Netravali patent, would

5    you agree that in order to determine where an object in

6    one frame is expected to be in a future frame, one must

7    estimate the translation of the object from frame to

8    frame?

9          MR. STADNICK:  Objection.  Vague.

10          THE WITNESS:  I don't think that's generally

11    true.

12          Q.  BY MR. MICALLEF:  Is it possible to determine

13    where an object in one frame is expected to be in a

14    future frame without estimating the translation of the

15    object in a future frame or from frame to frame?

16          A.  Well, consider the case of zooming into a

17    picture.  No object motion.

18          Q.  So no translation?

19          A.  No motion of objects.  Everything is static

20    in front of the camera.  In that example, you would

21    establish the corresponding points by in some way

22    figuring out what the amount of zoom is that has occurred

23    between two frames of the video sequence.

24          Q.  Let me ask you this:  Is it possible to

25    determine where an object in one frame is expected to be

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                    800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1078**

BERND GIROD, PH.D.                                                    November 23, 2007

Page 150

1    in a future frame by estimating the translation of the

2    object from frame to frame?

3                MR. STADNICK:  Objection.  Vague.

4                THE WITNESS:  If I understand your question

5    correctly, then the answer is yes, it's possible to

6    determine where an object in one frame is expected to be

7    in a future frame by estimating translation of that

8    object from frame to frame in the right cord in that

9    system and setting.  So we have this example of zoom of

10   the camera previously, so obviously if that occurs in

11   combination with the motion of the object in a scene, one

12   would have to consider the combination of these.

13               Q.  BY MR. MICALLEF:  If you zoom in on an object

14   that's not -- that has no translation, does the object

15   move?

16               A.  The object moves relative to the image plane.

17               Q.  So when you estimate the translation of the

18   object from frame to frame, would it be fair to call that

19   motion estimation, in the context of the Netravali

20   patent?

21               A.  Estimation of translation of an object from

22   frame to frame in a video sequence is generally referred

23   to as motion estimation in the art, and the Netravali

24   patent also uses motion estimation in that sense.

25               Q.  And it was referred to that way prior to

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                          800-770-3363                          Fax (415) 288-4286

**Exhibit 20  Page 1079**

BERND GIROD, PH.D.                                                November 23, 2007

Page 151

1      1981; is that fair?

2              A.  Motion estimation or displacement estimation.

3              Q.  Okay.  We have to change the tape real quick.

4      I'm not done, but I don't have many more.

5              A.  Okay.

6              THE VIDEOGRAPHER:  This concludes Tape 2.

7      Off the record, the time is 5:27.

8              (Recess.)

9              THE VIDEOGRAPHER:  Here begins Tape 3.  We

10     are on the record.  The time is 5:28.

11             Q.  BY MR. MICALLEF:  Dr. Girod, does motion

12     compensated prediction necessarily include some form of

13     motion estimation?

14             A.  Motion compensated prediction would use

15     motion information, typically motion vectors, to perform

16     the prediction, and these would -- these motion vectors

17     would usually be obtained by a motion estimator.  Motion

18     compensated prediction, however, is not usually used to

19     also comprise the motion estimator.  So often one would

20     distinguish between the motion compensated prediction

21     part and the motion estimator as two separate parts of a

22     system.

23             Q.  Are you aware of any motion estimation

24     techniques that were known prior to the Netravali 272

25     patent?

Esquire Deposition Services                 505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                          Fax (415) 288-4286

Exhibit 20  Page 1080

BERND GIROD, PH.D.                                                    November 23, 2007

Page 152

1          A.   Yes.

2          Q.   Can you name them for me?

3          A.   Well, one technique that comes to mind was

4    published by Kafforia (phonetic) and Racca in the late

5    '70s.

6          Q.   Any others?

7          A.   No other specific references come to mind.

8    But I'm sure there were others as well.

9          Q.   Did Mr. Netravali ever publish motion

10   estimation techniques prior to the Netravali 272 patent?

11         A.   Yes, he did.

12         Q.   Is the DCT a form of intra-frame encoding?

13         A.   The DCT can be used for intra-frame coding.

14   It's a general signal transform that's used in many

15   settings, including audio coding.

16         Q.   So is that a "yes"?

17              MR. STADNICK:  Asked and answered.

18              THE WITNESS:  It's a "no."  The DCT is not a

19   form of intra-frame coding.

20         Q.   BY MR. MICALLEF:  But you can use it as a

21   form of intra-frame encoding?

22         A.   You can use it as a part of an intra-frame

23   encoder.

24         Q.   If I understand your report, you do not

25   believe that the institution of re-examination

Esquire Deposition Services              505 Sansome street, Suite 502        San Francisco, California 94111
Phone (415) 288-4280                          800-770-3363                        Fax (415) 288-4286

Exhibit 20  Page 1081

BERND GIROD, PH.D.                                              November 23, 2007

Page 153

1    proceedings by the U.S. PTO should have any effect on

2    your validity opinions; is that right?

3         A.   I considered the re-examination of the

4    Netravali patent and concluded that it has no bearing on

5    my August -- analysis.

6         Q.   Did you consider the re-examination of the

7    Haskell patent and come to the same conclusion?

8         A.   I have looked at it and came to the same

9    conclusion, yes.

10        Q.   Can you lay your hands on your supplemental

11   rebuttal report?  I apologize, I don't remember what

12   exhibit it was.

13        MR. STADNICK:  It wasn't marked, believe it

14   or not.

15        THE WITNESS:  It doesn't have a number.

16        Q.   BY MR. MICALLEF:  Well, you know what I'm

17   talking about; right?

18        A.   We will see when we turn to the same page.

19        Q.   I'm talking about your supplemental rebuttal

20   expert report of Professor Bernd Girod.

21        A.   Yeah.

22        Q.   And I'd like you to turn to page 7.

23        A.   Uh-huh.

24        Q.   The first full paragraph that begins:

25   "Counsel for MPT."  Do you see that?

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                 800-770-3363                            Fax (415) 288-4286

**Exhibit 20  Page 1082**

Page 160

1   already examined him on.  We had an agreement --

2                MR. MICALLEF:  Can I do this.

3                MR. STADNICK:  How long is it going to take?

4                MR. MICALLEF:  Very short period of time.

5   Very, very short period of time.

6                MR. STADNICK:  Give me a number.  How many

7   minutes have you got.  Then let's take a break.

8                MR. MICALLEF:  I don't know.  It depends on

9   him.

10               MR. STADNICK:  Then I need a break.

11               THE VIDEOGRAPHER:  Off the record, the time

12  is 5:41.

13               (Recess.)

14               THE VIDEOGRAPHER:  Back on the record, the

15  time is 5:46.

16         Q.  BY MR. MICALLEF:  Dr. Girod, I've handed you

17  a copy of the Court's Markman order --

18               MR. STADNICK:  Do you have a copy?  I'm

19  sorry.

20               MR. MICALLEF:  Sure (indicating).

21         Q.  I've handed you a copy of the Court's Markman

22  order for the Haskell patent, order construing claims for

23  United States Patent Number 4,958,226, just so the

24  record's clear.

25               And my question to you is:  Can you tell me

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                      800-770-3363                            Fax (415) 288-4286

**Exhibit 20  Page 1083**

BERND GIROD, PH.D.                                                      November 23, 2007

Page 161

1    what part of the claim, in your view, requires coding of

2    interpolation error?

3                    MR. STADNICK:  Objection.  Argumentative.

4                    MR. MICALLEF:  Well --

5                    THE WITNESS:  Seems like --

6                    MR. MICALLEF:  Excuse me.  Before you answer,

7    let me ask about that objection.  I'm not so sure I

8    understand that objection.  What's argumentative about

9    it?

10                    MR. STADNICK:  It's a decoder claim.  No

11    claim requires decoding.

12                    Q.  BY MR. MICALLEF:  Well, let me ask it, then,

13    that way:  Do you believe any part of this claim requires

14    coding of interpolation error?

15                    A.  Well, certainly in the claim construction

16    provided by the Court, the term "coding of interpolation

17    error" is not mentioned.

18                    Q.  Are you done?

19                    A.  Yes.

20                    Q.  Well, my question was:  Do you think that any

21    part of the claim requires coding of interpolation error,

22    whether construed by the Court or not?

23                    MR. STADNICK:  Objection.  Vague.

24                    THE WITNESS:  No part of this claim requires

25    coding of interpolation errors.

Esquire Deposition Services                  505 Sansome street, Suite 502              San Francisco, California 94111
Phone (415) 288-4280                                   800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1084**

BERND GIROD, PH.D.                                                November 23, 2007

Page 162

```
 1              Q.  BY MR. MICALLEF:  So this claim could be
 2   satisfied without ever coding interpolation error in any
 3   manner?
 4                  MR. STADNICK:  Objection.  Vague.
 5              Q.  BY MR. MICALLEF:  Correct?  Strike that.
 6                  Let me ask you a different question.
 7                  You know what a means-plus-function claim
 8   element is; correct?
 9              A.  Correct.
10              Q.  And you understand that such a claim element
11   literally covers any -- or the structure disclosed in the
12   specification for performing the claims function and
13   equivalent thereof; right?
14              A.  I understand that.
15              Q.  Did you consider, in coming to your opinions,
16   what might be obvious in view of equivalence of the
17   structures disclosed in the Haskell patent?
18              A.  I looked at the structures and, of course,
19   also the functions of the claim elements and considered
20   obviousness.
21              Q.  You looked at the structures in the Haskell
22   patent?
23              A.  Yes.
24              Q.  For that obviousness analysis?
25              A.  Yes.
```

Esquire Deposition Services                505 Sansome street, Suite 502         San Francisco, California 94111
Phone (415) 288-4280                            800-770-3363                              Fax (415) 288-4286

**Exhibit 20  Page 1085**

Exhibit 21



DIGITAL
PICTURES

NETRAVALI

TK5103.7
.N47
1988

Exhibit 21  Page 1086

MSLT_0004995



**Exhibit 21  Page 1087**

MSLT_0004996

# Digital Pictures
### Representation and Compression

Exhibit 21  Page 1088

MSLT_0004997

# Applications of Communications Theory
## Series Editor: R. W. Lucky, *AT & T Bell Laboratories*

*Recent volumes in this series*

COMPUTER NETWORK ARCHITECTURES AND PROTOCOLS
Edited by Paul E. Green, Jr.

DATA TRANSPORTATION AND PROTECTION
John E. Hershey and R. K. Rao Yarlagadda

DEEP SPACE TELECOMMUNICATIONS SYSTEMS ENGINEERING
Edited by Joseph H. Yuen

DIGITAL PHASE MODULATION
John B. Anderson, Tor Aulin, and Carl-Erik Sundberg

DIGITAL PICTURES: Representation and Compression
Arun N. Netravali and Barry G. Haskell

ERROR-CORRECTION CODING FOR DIGITAL COMMUNICATIONS
George C. Clark, Jr., and J. Bibb Cain

FIBER OPTICS: Technology and Applications
Stewart D. Personick

FUNDAMENTALS OF DIGITAL SWITCHING
Edited by John C. McDonald

MODELING AND ANALYSIS OF COMPUTER
COMMUNICATIONS NETWORKS
Jeremiah F. Hayes

MODERN TELECOMMUNICATION
E. Bryan Carne

OPTICAL FIBER TRANSMISSION SYSTEMS
Stewart D. Personick

PRACTICAL COMPUTER DATA COMMUNICATIONS
William J. Barksdale

TELECOMMUNICATIONS SWITCHING
J. Gordon Pearce

A Continuation Order Plan is available for this series. A continuation order will bring delivery of
each new volume immediately upon publication. Volumes are billed only upon actual shipment
For further information please contact the publisher

Exhibit 21  Page 1089

MSLT_0004998

# Digital Pictures

## Representation
## and Compression

**Arun N. Netravali**

*AT&T Bell Laboratories*
*Murray Hill, New Jersey*

**and**

**Barry G. Haskell**

*AT&T Bell Laboratories*
*Holmdel, New Jersey*

Plenum Press • New York and London

Exhibit 21  Page 1090

MSLT_0004999

Case 3:07-cv-02000-H-CAB    Document 78-2    Filed 11/30/2007    Page 98 of 227

Library of Congress Cataloging in Publication Data

Netravali, Arun N
  Digital pictures: representation and compression / Arun N. Netravali and Barry G.
Haskell
    p    cm —(Applications of communications theory)
  Includes bibliographies and index.
  ISBN 0-306-42791-5
  1  Digital communications. 2. Image processing—Digital techniques  I. Haskell,
Barry G  II. Series
  TK5103.7.N47  1988
  621.38'0413—dc19                                                          87-32722
                                                                              CIP

$$TK5103.7$$
$$N47$$
$$1988$$

BARKER ENGINEERING LIBRARY

M.I.T. LIBRARIES
AUG 1 1 1988
RECEIVED

© 1988 AT&T Bell Laboratories
Plenum Press is a division of
Plenum Publishing Corporation
233 Spring Street, New York, N.Y  10013

All rights reserved

No part of this book may be reproduced, stored in a retrieval system, or transmitted
in any form or by any means, electronic, mechanical, photocopying, microfilming,
recording, or otherwise, without written permission from the Publisher

Printed in the United States of America

Exhibit 21  Page 1001

MSLT_0005000

required. If the separable two-dimensional transform on Eq. (5.3.10) is used, then a KLT only of order $L$ is needed. However, if the image statistics are highly nonstationary then the performance of the separable transform may suffer.

### 5.3.1d  Discrete Cosine Transform (DCT)

In Chapter 3 we defined the Discrete Cosine Transform or DCT.[5 3 6] In recent years, the DCT has become the most widely used of the unitary transforms, and under certain circumstances, as we shall see later, its performance can come close to that of the KLT. The elements of the DCT transform matrix $T$ are given by [$\delta_0 = 1$, $\delta_p = 0$, for $p > 0$]

$$t_{mi} = \sqrt{\frac{2 - \delta_{m-1}}{N}} \cos\left\{\frac{\pi}{N}\left(i - \frac{1}{2}\right)(m-1)\right\} \qquad (5.3.37)$$

$$i, m = 1 \ldots N$$

Thus, DCT basis vectors $t_m$ are sinusoids with frequency indexed by $m$.

For $N = 16$ the DCT basis vectors are shown in Fig. 5.3.13. Note the similarity between the DCT basis vectors and the KLT basis vectors of Fig. 5.3.8 and Fig. 5.3.9. This experimentally observed property is, in part, responsible for the generally good performance of the DCT compared with other transforms, as we shall see later.

Computation of the DCT is greatly facilitated by observing that the elements of $T$ in Eq. (5.3.37) can be written as the real part of

$$\frac{\sqrt{2(2 - \delta_{m-1})}}{\sqrt{2N}} \quad \exp\left[\frac{2\pi\sqrt{-1}}{2N}\left(i - 1 + \frac{1}{2}\right)(m-1)\right]$$

$$= \sqrt{2(2 - \delta_{m-1})}\, \exp\left[\frac{\pi\sqrt{-1}}{2N}\,(m-1)\right]$$

$$\times \frac{1}{\sqrt{2N}}\, \exp\left[\frac{2\pi\sqrt{-1}}{2N}\,(i-1)(m-1)\right] \qquad (5.3.38)$$

$$\triangleq F_m \times F_{mi}$$

Exhibit 21  Page 1092

MSLT_0005408



Fig 5 6 4    Illustration of linear and motion interpolation  (from Musmann et al. [5 2.9]) .

moderate motion, a 4:1 frame dropping (i.e. dropping 3 out of 4 frames) and motion adaptive interpolation often gives reasonable motion rendition. In this as well as other interpolation schemes, since at times the interpolation may be inaccurate, techniques have been devised where the quality of interpolation is checked at the transmitter, and if the interpolation error is larger than a threshold, side information is transmitted to the receiver  It appears that due to unavoidable inaccuracies of the displacement estimator (e.g complex translational and rotational motion) and the segmentation process, such side information would be necessary to reduce artifacts that may otherwise be introduced due to faulty interpolation.

### 5.6.3  Pyramid Coding, Subband Coding

Another technique for image compression is called *pyramid coding*[5 6.1]. It represents the uncoded image as a *series of band-pass images each sampled at successively lower rates*  One implementation of this is to construct in the first stage a sequence of low-pass filtered images, $\{b_k(x_j, y_i)\}$, $k = 1...n$, such that (ignoring edge effects)

$$b_{k+1}(x_j, y_i) = \sum_{m=-p}^{+p} \sum_{n=-p}^{+p} h(m,n)\, b_k(x_{2j+n}, y_{2i+m}) \qquad (5.6.2)$$

Exhibit 21  Page 1093

MSLT_0005481

# Exhibit 22
Filed Under Seal

Exhibit 23

**RIC**
INTERNATIONAL

### Certification of Accuracy

I, __Lily Sun__, hereby certify that the attached document, to the best of my knowledge and belief, is a true, accurate and complete translation from __German__ into __English__ of __Master's Thesis – Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals__, consisting of ___30___ pages.

Signed: _Lily Sun_
Name:    Lily Sun
Address: RIC International, 432 Columbia Street, Cambridge, MA 02141
Date:    __7/3/03__

SWORN TO BEFORE ME
THIS 3RD DAY OF JULY, 2003

_____
**Signature, Notary Public**

_My commission expires 5/18/2008_

432 Columbia Street, Suite B10, Cambridge, MA 02141
**TEL** 800.240.0246 **FAX** 617.344.5639
www.ricintl.com

*precision translation services*

**Exhibit 23  Page 1103**                    GW-LT 255053

University of Hanover

Institute for Theoretical Communications Engineering and Information Processing

Thomas Micke

Master's Thesis

Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for
Television Video Signals

Hanover, April 1986

University of Hannover
Received: May 2, 1986
Office Responsible for Checking
Master's Requirements
[illegible signature]

**Exhibit 23  Page 1104**                                    **GW-LT 255054**

[TEXT MISSING]
and Information Processing
University of Hanover
Prof. Dr.-Ing. H. G. Musmann

Master's Thesis
for
Mr. cand. el. Thomas Micke

"Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for
Television Video Signals"

Motion compensation for data reduction of frame sequences is based on the model concept that
the sampled values of the video signal are highly correlated along the trajectories of moving
objects. In the past, this model concept was exploited either using the DPCM method with motion
compensating prediction or using motion compensating interpolation of the video signal. Both
methods can be combined into a single method known as motion compensating interpolation
error coding. In this combined method, every Nth field of the frame sequence is transmitted with
the help of motion compensating prediction and the intervening fields are computed using motion
compensating interpolation. If the interpolation error exceeds the threshold of perceptibility, this
error is quantized, coded and transmitted.

Mr. Micke was tasked to investigate whether motion compensating interpolation error coding has
advantages over motion compensating interframe DPCM operating with prediction. To do this, a
comparison of the possible coding gains provided by both approaches is to be performed first in
the form of a rate-distortion model computation using a quadratic error criterion. Then, both
methods are investigated and compared in computer simulations using natural frame sequences.

Complete documentation of the programs to be written for the investigations is to be included with
the composition. The submitted copy of the thesis remains the property of the Institute.

{Signature}

**Exhibit 23  Page 1105**                    **GW-LT 255055**

I affirm that I composed this thesis by myself and used no other sources or aids except those cited.

Hanover, 27 April 1986

{Signature}
(Thomas Micke)

**Exhibit 23  Page 1106**                    GW-LT 255056

Contents

1.    Introduction                                                                    5

2.    Motion Compensating Interpolation Error Coding                                  6

3.    Model for Entropy Reduction Using Motion Compensating Coding                    8

3.1   Rate-Distortion Evaluation as a Model Basis                                     8

3.2   Power Density Spectrum of the Television Video Signal                          10

3.3   Conditions for Model Validity                                                  12

3.4   Power Density Spectra of the Motion Compensated Prediction and Interpolation Error  13

3.5   Achievable Redundancy Reduction Using Motion Compensating Prediction and

      Interpolation                                                                  17

4.    Simulation of a Motion Compensating Predictive and Interpolative Coder         20

4.1   Interpolation Error Coder with Motion Compensation Using the Jain & Jain Block Match  22

4.2   Improved Block Match Algorithm for Interpolative Coding (Multi-Field Matching)  24

4.3   Interpolation Error Coder with Motion Compensation Using Multi-Field Matching   26

5.    Summary                                                                        29

6.    Bibliography                                                                    30

Appendix
Derivation of the power density spectra of 3.4
Documentation of the model programs
Documentation of the coder programs

Exhibit 23  Page 1107                                           GW-LT 255057

1.  <u>Introduction</u>

The master's thesis introduced here investigates the potential for data reduction of television video signals using two different motion compensating coding methods.

A method known as motion compensating interpolation error coding is introduced in Section 2 of this report. This method is a combination of conventional motion compensating interframe DPCM and motion compensating interpolation. The following sections investigate whether this method provides advantages over conventional motion compensating prediction.

As there is little information in the literature to date regarding the theoretically possible gains to be achieved using motion compensating coding, Section 3 first introduces a model calculation based on the principles of information theory. A mathematical lower limit for the entropy can be determined using this calculation. The redundancy reduction achievable in the best case with both coding methods is compared using this model.                    {Illegible}

Section 4 continues the comparison using computer simulations involving natural frame sequences. The redundancy reduction that can be achieved with both coding methods under practical conditions is investigated. In doing this, an improved block match algorithm for motion estimation across larger frame intervals is introduced.

The result of the investigation specifies whether and under what conditions motion compensating interpolation error coding is suitable for further data reduction of television video signals.

The simulation programs for the interpolation error coder were developed on the basis of programs for conventional DPCM coders already available at the Institute.

The Appendix of this report contains detailed documentation of all programs used and those newly implemented.

**Exhibit 23  Page 1108**                    **GW-LT 255058**

2.  Motion Compensating Interpolation Error Coding

In theory, there are two possible processes for the interpolative motion compensating coding of television video signals /1/.
The method currently in use omits all data transmission for the fields to be interpolated. These fields are interpolated in a motion compensating manner at the receiver exclusively using the transmitted reference frames and a motion vector that is also transmitted if necessary. As the resulting distortion in the interpolated frames is highly dependent on the frame content and -- at least at this time -- is relatively large, this method is primarily used in narrow-band coding.
As an alternative to this method, the occurring interpolation error can be computed at the transmitter, quantized, coded and transmitted. This second method, known as motion compensating interpolation error coding, is similar to a conventional DPCM. The signal estimation value, however, is interpolated rather than predicted.

Figure 2.1 (p. 4) schematically shows the motion compensating interpolation error coding process.
Every Nth field of the frame sequence is transmitted as a reference field (Field i and Field i-N) using motion compensating prediction /1/. The intervening fields (Field i-b) are interpolated from a previous field (Field i-b-a) and the next reference field using motion compensation /1/.
To do this, the component displacement vectors $d_a$ and $d_b$ are calculated from the outer displacement $d_N$ assuming translation as follows:

$$d_a = \frac{a}{N} \cdot d_N \quad \text{und} \quad d_b = \frac{b}{N} \cdot d_N$$

(and)



(Field)

Figure 2    Schematic representation of motion compensating interpolation error coding
N       Prediction interval
a       Backward interpolation interval
b       Forward interpolation interval
$d_N$    Displacement between the reference fields
$d_a$, $d_b$   Component displacements

This may then be rounded to the nearest integer and the signal values are interpolated along the motion trajectory.
The preceding field used for interpolation may be the previous reference field (Field i-N) or a previously transmitted interpolated field that, due to the smaller backward interpolation interval --

Exhibit 23  Page 1109                                    GW-LT 255059

for example, a = 1 -- is very similar to the interpolated field.

As the error of the reconstructed received signal for motion compensating interpolation error coding and for DPCM consists merely of quantization noise that can be influenced by the coding, this approach appears particularly well-suited for transmitting high-quality video signals.
A coding gain over motion compensating prediction can only then be achieved if the method yields additional redundancy reduction. For this reason, the investigations in the next two sections concentrate on the potential for redundancy reduction.

**Exhibit 23  Page 1110**                    **GW-LT 255060**

### 3.   Model for Entropy Reduction Using Motion Compensating Coding

#### 3.1   Rate-Distortion Evaluation as a Model Basis

The minimal transinformation with which a specified performance index can be maintained at the output of a channel can be determined for a given signal source using rate-distortion theory /2,3/. In the following, the channel is a source encoder with the signal ensemble X at the input, the signal ensemble Y at the output and the transinformation T(X;Y). Then, the following rate-distortion function:

$$R(d^*) = \min_{d \le d^*} T(X;Y) = \min_{d \le d^*} H(Y$$   {- H(Y|X)!  Number all equations {illegible}}

{H(Y|X) = 0 for a deterministic coder}

represents a lower limit for the entropy of the encoded source signal while maintaining a limit d* for the distortion magnitude d = f(x, y). In this function, x and y are symbols from the ensembles X and Y.

For the quadratic error magnitude used in further consideration

$$d(x,y \qquad x - y)^2$$

the rate-distortion function is calculated as in /2/

$$R(d^*) = h(X - 0,5 \quad \log(2\pi e d^*)$$

using Euler's number e and the differential entropy h(X) of the continuous value source signal.

A Gaussian distribution of each signal under consideration is assumed for the following model evaluation. The expression calculated with this then represents an upper limit for R(d*). It is still possible to be below this limit for other distributions /3/.                  {Illegible}
The following applies to the memoryless Gaussian source having the signal variance $\sigma^2$

$$R(d^*) = 0,5 \cdot \max\left(0, \log \frac{\sigma^2}{d^*}\right) \qquad (1)$$

For the Gaussian source with memory, the rate-distortion function takes on a parametric shape. Assume θ is the spectral power density of the white noise assumed to rate-distortion, $S(\omega_x, \omega_y)$ is a two-dimensional signal spectrum, and $\omega_{gx}$, $\omega_{gy}$ are the band limits for the x direction and the y direction. Then, the following apply /2/

{θ is a parameter than assumes all positive values}

Exhibit 23  Page 1111                                      GW-LT 255061

$$R(d^*) = \frac{1}{4\omega_{gx}\omega_{gy}} \int_{-\omega_{gx}}^{+\omega_{gx}} \int_{-\omega_{gy}}^{+\omega_{gy}} 0,5 \cdot \max\left(0, \log\frac{S(\omega_x,\omega_y)}{\theta}\right) d\omega_x d\omega_y \qquad (2a)$$

$$d^* = \int_{-\omega_{gx}}^{+\omega_{gx}} \int_{-\omega_{gy}}^{+\omega_{gy}} \min\left(\theta, S(\omega_x,\omega_y)\right) d\omega_x d\omega_y \qquad (2b)$$

The effective noise power density can never be larger than the signal power density in this case.

To evaluate the model according to equations (1) and (2), a two-dimensional power density spectrum of a television signal is initially specified in Section to 3.2. This spectrum can be used to calculate the resultant power density spectra of the motion compensating prediction and interpolation error considering a series of assumptions made in Section 3.3. These spectra are introduced in Section 3.4. Section 3.5 discusses the results determined from the spectra using the equations (1) and (2).
An abbreviated preliminary representation of the model calculation introduced here in detail without consideration of the motion compensating interpolation error coding is found in /4/.

Exhibit 23  Page 1112

GW-LT 255062

3.2    Power Density Spectrum of the Television Video Signal

The two-dimensional spatial power density spectrum of a television video signal is desired for evaluation with the equations (1) and (2). This spectrum is derived in the following based on a one-dimensional line spectrum.

According to /3/, the one-dimensional power density spectrum of the television video signal sample line-by-line is described by

$$S_{ss}(\omega_x, \omega_y) = A \left( 1 + (\omega_x/\omega_0)^2 \right)^{-1}$$

This spectrum represents a one-dimensional low-pass characteristic with a cut-off radian frequency $\omega_0$ and the amplitude factor A. The inverse Fourier transform of this spectrum in the spatial domain yields the one-dimensional autocorrelation function of the line signal in /5/:

$$R(\Delta x = 0,5 \cdot A \cdot \omega_0 \cdot \exp(-\omega_0|\Delta x|)$$

Assuming an isotropic correlation in the video signal, the two-dimensional autocorrelation function is determined by rotation to be

$$R(\Delta r = 0,5 \cdot A \cdot \omega_0 \cdot \exp(-\omega_0|\Delta r)$$

in polar coordinates, where

$$\Delta r = (\Delta x^2 + \Delta y^2)^{0,5} \qquad \Delta \varphi = \arctan(\Delta y/\Delta x)$$
$$\text{and} \qquad \{\text{Superfluous}\}$$

The Fourier transform of R (Δr) represents the desired two-dimensional power density spectrum and takes the following form:

$$S_{ss}(\omega_x, \omega_y) = A \quad + \frac{\omega_x^2 + \omega_y^2}{\omega_0^2} \quad ,5 \qquad 3 \qquad \{\text{Illegible}\}$$

The cut-off radian frequency is determined by the following using correlation measurements on natural frame sequences:

$$\omega_0 = 2 \cdot \pi \cdot 80 \text{ kHz} \qquad \{\text{At 625 lines, 50 Hz, \{illegible\}}\}$$

Exhibit 23  Page 1113                                    GW-LT 255063

In the subsequent computational evaluation, all radian frequencies are shown normalized to $\omega_0$. For a television signal according to studio standard having a sampling frequency of $f_a = 13.5$ MHz with 288 lines per field, the normalized band limits of the signal spectrum are computed as:

$$\omega_{gx}/\omega_0 \approx 84,4 \quad \text{und} \quad \omega_{gy}/\omega_0 \approx 46,2$$

(and)

Exhibit 23  Page 1114

GW-LT 255064

3.3    Conditions for Model Validity

The following assumptions were made here to enable computation of the power density spectra of the motion compensated prediction and interpolation error from the signal spectrum obtained in Section 3.2:

{brightness}

(A1    The signal contains only objects moving in translation whose signal value does not change {over time}.

A2    The motion is compensated to a displacement estimation error $\vec{d} = (\vec{d}x, \vec{d}y)$.

A3    The actual displacement and the displacement estimation error are statistically independent.

A4)    The probability density function of the displacement estimation error is a linear function:

$$p_{\vec{d}}(\epsilon, \tau) = p_{\vec{d}}(-\epsilon, -\tau)$$

A5    The calculation applies only within areas experiencing homogeneous translation. Effects on the boundaries between differently moving objects are not considered.

**Exhibit 23  Page 1115**

GW-LT 255065

3.4     Power Density Spectra of the Motion Compensated Prediction and Interpolation Error

Considering the assumptions (A1) ... (A5) made in Section 3.3, determining the motion compensated prediction and interpolation error can be reduced to a two-dimensional problem so that a two-dimensional power density spectrum may be calculated. For the sake of clarity, the two spectra are only introduced here. The detailed derivation can be found in Appendix A.

The power density spectrum of the motion compensated prediction error is

$$S_{ee}(\omega_x, \omega_y) = 2 \cdot S_{ss}(\omega_x, \omega_y) \{ 1 - P_d(\omega_x, \omega_y) \}$$
$$+ N(\omega_x, \omega_y) \tag{4}$$

where $S_{ss}$ is the power density spectrum of the original signal, N is the power density spectrum of the quantization noise and $P_d$ is the Fourier transform of the displacement estimation error density.

The MODELL program (Appendix B) was implemented to calculate and perform rate-distortion evaluation of the spectra.
Figure 3.1 (p. 12) depicts the signal spectrum calculated with this program according to equation (3), the prediction error spectrum according to equation (4), and the white spectrum of the quantization noise with the assumed Gaussian distribution of the displacement estimation error for a signal-to-noise ratio of 30 dB. The prediction error spectrum is shown for two different values of the displacement estimation error variance.

The spectra are band-limited to half the sampling frequency with $\omega_{gx} = 2 \cdot \pi \cdot 6.75$ MHz.
The power density of the prediction error increases with increasing displacement estimation error variance up to the upper limit:

$$S_{ee_{max}}(\omega_x, \omega_y) = 2 \cdot S_{ss}(\omega_x, \omega_y) + N(\omega_x, \omega_y)$$

Exhibit 23  Page 1116                                              GW-LT 255066



(Power density)                    (Frequency)

Figure 3.1     Calculated power density spectra in the range $\omega_x = 0 ... \omega_{gx}$ with $\omega_y = 0$, signal-to-noise ratio SNR = 30 dB, sampling frequency $f_a = 13.5$ MHz, Gaussian distribution of the displacement estimation error with variance $\sigma^2$
SIGNAL     Signal spectrum according to equation (3)
MCP        Prediction error spectrum according to equation (4)
N          Quantization error spectrum

The quantization noise represents a lower limit for the prediction error spectrum:

$$S_{ee_{min}}(\omega_x,\omega_y) = N(\omega_x,\omega_y)$$

The following results for the power density spectrum of the motion compensated interpolation error:

$$S_{ee}(\omega_x,\omega_y) \quad 2 \cdot S_{ss}(\omega_x,\omega_y) \quad \left(1 - \underline{a} \quad \underline{b}\right.$$
$$b \quad P_{\tilde{d}_a}(\omega_x,\omega_y$$
$$a \quad P_{\tilde{d}_b}(\omega_x,\omega_y \qquad\qquad 5$$
$$\left.\underline{a} \quad \underline{b} \cdot P_{(\tilde{d}_a+\tilde{d}_b)}(\omega_x,\omega_y)\right)$$
$$N(\omega_x,\omega_y \quad \underline{a}^2 + \underline{b}^2)$$

where $P_{\tilde{d}_a}$ and $P_{\tilde{d}_b}$ are the Fourier transforms for the probability densities of the component

Exhibit 23  Page 1117                    GW-LT 255067

displacement estimation errors, $P_{(da+ab)}$ are the Fourier transforms for the probability density of the sum of both component estimation errors and $\underline{a}$ and $\underline{b}$ are the interpolation coefficients used to weight the two frames used for interpolation:

$$\underline{a} = \frac{a}{a + b} < 1 \qquad \underline{b} = \frac{b}{a + b} < 1$$

The probability density for the component displacement estimation errors and its sum can be calculated from the given probability density of the total displacement (see Appendix A).



(Power density)                                (Frequency)

Figure 3.2        Calculated power density spectra in the range $\omega_x = 0... \omega_{gx}$ with $\omega_y = 0$, signal-to-noise ratio SNR = 30 dB, sampling frequency $f_a$ = 13.5 MHz, Gaussian distribution of the displacement estimation error with variance $\sigma^2 = 0.15$ pel$^2$

SIGNAL        Signal spectrum according to equation (3)
MCP            Prediction error spectrum for the reference field i
MCIi-1        Interpolation error spectrum in the interpolated field i-1
N                Quantization error spectrum

Figure 3.2 illustrates as an example the error spectra calculated using the MODELL program for the predictively coded reference field i according to equation (4) and the interpolated field i-1 according to equation (5) using interpolation error coding with a prediction interval of N = 4, backward interpolation interval of a = 1 and integer rounding of the component displacements in comparison to the signal spectrum according to equation (3).

The curves of the spectra according to equations (4) and (5) are similar. However, their limits differ. At smaller values, both the upper limit for the interpolation error spectra

Exhibit 23  Page 1118

GW-LT 255068

$$S_{ee_{max}}(\omega_x, \omega_y) = 2 \cdot S_{ss}(\omega_x, \omega_y \quad - \underline{a} \cdot \underline{b})$$
$$+ \quad N(\omega_x, \omega_y \quad \underline{a}^2 + \underline{b}^2)$$

and the lower limit

$$S_{ee_{min}}(\omega_x, \omega_y \quad = N(\omega_x, \omega_y) \cdot \underline{a}^2 + \underline{b}^2$$

follow the same curve as for the prediction error spectrum. The power density of the interpolation error increases with increasing interpolation interval (from field i-1 to field i-3).

As the lower limit also forms the convergence value for $\omega \rightarrow \infty$, the interpolation error spectrum is more favorable than the prediction error spectrum even at high frequencies while a prediction error spectrum of smaller variance offers only a slight advantage in this range.

**Exhibit 23  Page 1119**                           GW-LT 255069

3.5     Achievable Redundancy Reduction Using Motion Compensating Prediction and
        Interpolation

Using the previously calculated power density spectra, this section investigates the redundancy reduction that can be achieved by both coding methods with the help of rate-distortion evaluation according to the equations (1) and (2). According to equations (1) and (2), an isotropic Gaussian distribution is assumed for all spectra.
The calculations were performed using the MODELL program (Appendix B).

The following MODELL parameters apply uniformly to all calculations performed here:

   band limiting according to television studio standard with a sampling frequency of $f_a$ = 13.5 MHz and 288 lines per field,

   signal-to-noise ratio SNR = 30 dB,

   isotropic Gaussian distribution of the displacement estimation error,

   integer rounding of the component displacements

The results for the motion compensating interpolation error coding each represent the mean of a predictive coded reference field and the N-1 interpolated fields.

Figure 3.3 (p. 17) reproduces the lower entropy limit with memoryless coding of the motion compensated errors as a function of the displacement estimation error variance. For comparison, the limit for memoryless (ML) and intraframe coding of the signal (2D) is shown.

**Exhibit 23  Page 1120**                                          GW-LT 255070



(Entropy)                          (Displacement estimation error variance)

Figure 3.3    Lower limit for the entropy as a function of the displacement estimation error variance $\sigma^2$ with memoryless coding of the motion compensated errors
ML      Memoryless coding of the signal
2D      Intraframe coding of the signal
MCP     Motion compensating prediction
MCI4    Motion compensating interpolation error coding with a prediction interval of N = 4
+S      Interpolation between the reference fields
+1      Interpolation with a backward interpolation interval of a = 1

The motion compensating prediction (MCP) yields results that are worse than intraframe signal coding (2D) for estimation error variances greater than $\sigma^2 \approx 0.16$ pel$^2$.

The curves for the interpolation error coding (MCI4) lie below the MCP curve for larger estimation error variances. For very small estimation errors, the results are worse compared to motion compensating prediction due to the additional displacement rounding.
Interpolation with a backward interpolation interval of a = 1 is better than interpolation between the reference fields because of the smaller interpolation intervals so that the use of this method in interpolation error coding appears valuable whenever the preceding interpolated field is known to the receiver.

The hatched area identifies the range of the displacement estimation error variance where gain with respect to motion compensating prediction and intraframe signal coding is possible using memoryless interpolation error coding with displacement rounding. The left limit is specified in this by the integer displacement estimation ($\sigma^2 \approx 0.083$ pel$^2$). Smaller estimation error variances can only be achieved with fractional pel accuracy -- comparison to interpolation using rounded component displacements is then no longer useful.

The accuracy of motion estimation across larger field intervals is decisive for achieving gain using interpolation error coding. In the ideal case when the estimation accuracy is independent of the field interval, a redundancy reduction of up to 0.5 bit/pel can be achieved here over the conventional methods.

Exhibit 23  Page 1121                                    GW-LT 255071

A further improvement of motion compensating coding is possible by additional intraframe prediction or transformation coding of the motion compensated errors as shown in Figure 3.4 (p. 19).



(Entropy)                    (Displacement estimation error variance)

Figure 3.4      Lower limit for the entropy as a function of the displacement estimation error variance $\sigma^2$ with intraframe coding of the motion compensated errors
2D       Intraframe coding of the signal
MCP      Motion compensating prediction
MCI4     Motion compensating interpolation error coding with a prediction interval of N = 4
+S       Interpolation between the reference fields
+1       Interpolation with a backward interpolation interval of a = 1

The area of interest for the use of interpolation error coding is again shown using crosshatching. The additional intraframe coding results, in this area, in an added gain of about 0.3 bit/pel in both motion compensating methods and allows worthwhile use of motion compensation even with considerably larger displacement estimation errors -- in the case of interpolation error coding, up to standard deviations of σ ≈ 7 pels.
The improvements achievable make additional intraframe coding appear very valuable despite the greater expense.

With regard to the accuracy of the motion estimation, the same applies as for memoryless coding of the errors. The less the accuracy of the motion estimation degrades with increasing field interval, the greater the possible gain due to motion compensating interpolation error coding.

Exhibit 23  Page 1122                                    GW-LT 255072

4.    Simulation of a Motion Compensating Predictive and Interpolative Coder

The comparison between motion compensating prediction and interpolation error coding started in Section 3 of this report using a model observation is continued in this section with computer simulations. The redundancy reduction possible in practical application using both methods is investigated by way of natural frame sequences.
The motion compensating interpolation error coder implemented for this purpose is based on a predictive coder already available at the Institute. Appendix C contains detailed documentation of all programs implemented and used.

The sequence of one coding cycle is shown schematically as an example for a prediction interval of N = 4 in Figure 4.1.

(Field)                              (Displacement estimation)



Figure 4        Sequence of one coding cycle for a prediction interval of N = 4
                ▮ -- Coding sequence

Every Nth field, here Field i, is encoded as a reference field, using motion compensating prediction, following displacement estimation over the field interval N. The fields between the reference fields are transmitted in their natural temporal sequence (i-3, i-2, i-1) using motion compensating interpolation error coding.
To do this, the component displacements are calculated from the transmitted total displacement, under consideration of the field displacement -- thus to 0.5 line accuracy -- and rounded to the nearest integer. The signal value is linearly interpolated along the estimated motion trajectory. Figure 4.1 illustrates the process for a backward interpolation interval of a = 1 (previous field interpolation). In addition to this, interpolation between the reference fields and a backward interpolation interval of a = 2 (previous frame interpolation) may be selected.

The investigations were performed using the VOIT sequence -- an antique car moving toward the observer. In this case, a temporal and spatial excerpt was selected that contains only moving objects. Even the background is not stationary due to camera panning. Figure 4.2 (p. 23) depicts the first field of the test sequence used: Field 72 of the VOIT sequence.
The sequence was recorded using a sampling frequency of 13.5 MHz.

To confirm the investigations, simulations were also performed on the CAS2 sequence -- a rotating toy castle with camera zoom. These yielded comparable results.

Exhibit 23  Page 1123                                    GW-LT 255073



Figure 4.2        First field of the test sequence used (VOIT, Field 72)

Exhibit 23  Page 1124

GW-LT 255074

4.1    Interpolation Error Coder with Motion Compensation Using the Jain & Jain Block Match

The block match algorithm of Jain & Jain /7/ for displacement estimation between the reference fields was used for the first simulations of a motion compensating interpolation error coder. The block size was selected as 16 pels x 16 lines.

Figure 4.3 (p. 25) shows the variance of the prediction and interpolation errors to be transmitted compared to the signal variance.

The predictively coded fields are shown using white circles (º), the interpolated ones are shown using dark circles (•).

The lowest error variances were achieved using motion compensating prediction (MCP). The MCP curve runs uniformly beneath all others.

The three curves for interpolation error coding displaying a cyclic course. The error variances increase from identical low values -- because of the identical coding -- in the reference fields to high values in the interpolated fields. The errors in the reference fields are somewhat larger than those from the interfield prediction (MCP).

The motion compensating interpolation error coding (MCI4) yielded very poor results. A slight improvement over interpolation between the reference fields can be achieved in both the second and third interpolated fields by selecting a backward interpolation interval of a = 1. Even then, however, motion compensation is worse than simple intraframe interpolation (I4+S) performed between the reference fields.

This shows that the block match algorithm of Jain & Jain /7/ is not suited to motion compensating interpolation.

Exhibit 23  Page 1125

GW-LT 255075



(Variance)                              (Field number)

Figure 4.3    Variance of the prediction/interpolation error in the corresponding field for the
              VOIT sequence
        MCP    Motion compensating prediction
        MCI4   Motion compensating interpolation error coding with a prediction interval
               of N = 4
        I4     Intraframe interpolation (without motion compensation)
        +S     Interpolation between the reference fields
        +1     Interpolation with a backward interpolation interval of a = 1

The unsatisfactory coder results provided the stimulus for developing an improved block match
algorithm for motion compensating interpolation. This is presented in the next section.

Exhibit 23  Page 1126

GW-LT 255076

4.2    Improved Block Match Algorithm for Interpolative Coding (Multi-Field Matching)

An analysis of the shortcomings inherent in the Jain & Jain block match /7/ for interpolative coding is performed using a vector image.



4.4    Graphical representation of the displacement vectors for the VOIT sequence, Field 76 during motion estimation using Jain & Jain block match vs. Field 72, block size: 16 x 16

Figure 4.4 depicts a graphical representation of the displacement vectors against the background of the luminance difference of both reference fields Field 76 and Field 72. Starting from the vector reference point in the center of the block, shown using a black dot, the white lines specify the magnitude and directional of the displacement vectors. The vectors point from the old to the new field, thus in the directional of motion.

Overall, the estimated displacements of Figure 4.4 exhibit a slight coincidence with the motion actually present in the field. This motion is essentially directed horizontally. The distribution of the vectors is very diffused, there are many misdirected vectors pointing to a block corner. Especially glaring errors result from moving periodic structures such as the portcullis in the picture shown. Undersampling in this case results in estimation, instead of the actually present large displacement to the right, of a smaller displacement in exactly the opposite direction. This error has no significance for the transmission of the reference field but results in large errors in the interpolated fields.

The shortcomings of the Jain & Jain block match come from the fact that, in the case of block displacement, only the error in the reference field is minimized. On the one hand, undersampling cannot be avoided while on the other difficulties result in the logarithmic search strategy that presumes a monotonic curve approaching the error minimum /7/. As the similarity between the fields decreases, this minimum is no longer very pronounced, secondary minima occur and the direction of the minimum error (DMD) is not reliably recognized.

In the improved algorithm proposed here, multi-field matching, the fields to be interpolated are considered in addition to the reference field. Figure 4.5 (p. 28) shows the principle for one spatial coordinate.

To determine the error for the specified block having the center (x, y) in the new reference field, a displaced block from the previous reference field is selected using the logarithmic search strategy as for Jain & Jain block match.
In addition, component displaced blocks from the fields used for interpolation are calculated in

Exhibit 23  Page 1127                                          GW-LT 255077

every search step for the corresponding blocks having center (x, y) in the blocks to be interpolated and the resultant interpolation error is determined.



Figure 4.5    Schematic representation of multi-field matching
    a)        Match for the reference field
    b)        Match for a field to be interpolated

The fields used for interpolation are selected in the same manner as for subsequent coding. Consequently, the method is adapted to the backward interpolation interval selected during coding. Motion is estimated in a manner completely analogous to the coding algorithm used. Figure 4.5 depicts the process as an example using one field to be interpolated during interpolation between the reference fields.
The sum of the prediction error and all interpolation errors is formed in every search step as the error criterion. This sum is then minimized using the logarithmic search.

Figure 4.6 (p. 29) depicts the vector image corresponding to Figure 4.4 (p. 26) for Field 76 of the VOIT sequence using multi-field matching.
The estimated vectors are arranged in a very uniform manner and exhibit good coincidence with the motion actually present in the field. Even the motion of the portcullis estimated in the opposite direction previously is now determined properly.



Figure 4.6    Graphical representation of the displacement vectors for the VOIT sequence, Field 76 during motion estimation using multi-field matching vs. Field 72, block size: 16 x 16

Exhibit 23  Page 1128

GW-LT 255078

Overall, the method provides a considerable improvement over the Jain & Jain block match.

The effects of multi-field matching on coding gain are discussed in the following Section 4.3.

**Exhibit 23  Page 1129**                                    **GW-LT 255079**

4.3    Interpolation Error Coder with Motion Compensation Using Multi-Field Matching

Figure 4.7 shows, in a manner similar to that of Figure 4.3 (p. 25), the variances of the prediction and interpolation errors to be transmitted. In this case, motion compensation using multi-field matching is used during interpolation error coding.



(Variance)                              (Field number)

Figure 4.7    Variance of the prediction/interpolation error in the corresponding field for the VOIT sequence
MCP    Motion compensating prediction
MCI4    Motion compensating interpolation error coding with a prediction interval of N = 4
+S    Interpolation between the reference fields
+1    Interpolation with a backward interpolation interval of a = 1

The curves for the interpolation error coding (MCI4) again show a cyclic, but inverse, course. Here, the variance of the prediction error in the reference fields is somewhat larger than that for interfield prediction (MCP), as before. In contrast to Figure 4.3 (p. 25), the curve now drops down at the interpolated fields. The variance of the interpolation error is, without exception, smaller than that of the prediction error in the reference fields. On average -- in the case of MCI4+1 without exception -- it is even smaller than the variance of the interfield prediction error (MCP). Interpolation between the reference fields (MCI4+S) yields poorer results except in the center interpolated field i-2. This field is interpolated both forward and backward using fields that are not displaced. As a result of the almost exclusive horizontal motion, this results in better than average error variances. Both MCI4 curves predict a redundancy reduction over motion compensating prediction (MCP).

Figure 4.8 (p. 32) shows the entropy of prediction and interpolation error for this case with uniform quantization having a step size of 11 (average quantizer).
The entropy in each field behaves similar to the error variance. Even here, the interpolation

**Exhibit 23  Page 1130**                              GW-LT 255080

between the reference fields in the center interpolated field is very good and thus achieves on average about the same entropy values as for previous-field interpolation. However, this behavior is not absolutely typical because of the predominantly horizontal motion.

For comparison, Figure 4.9 (p. 33) shows the corresponding measurement results for the CAS2 sequence. As expected, this shows an advantage of previous-field interpolation.

Interpolation error coding in the form presented here (MCI4+S and MCI4+1) makes possible on average a reduction in redundancy and thus the data rate as compared to motion compensating prediction on the order of magnitude of 0.1... 0.2 bit/pel.



(Entropy)                                    (Field number)

Figure 4.8     Entropy of the prediction/interpolation error in each field for the VOIT sequence
               with uniform quantization having a step width of 11
               MCP    Motion compensating prediction
               MCI4   Motion compensating interpolation error coding with a prediction interval
                      of N = 4
               +S     Interpolation between the reference fields
               +1     Interpolation with a backward interpolation interval of a = 1

Exhibit 23  Page 1131                                    GW-LT 255081



(Entropy)                                    (Field number)

Figure 4.9    Entropy of the prediction/interpolation error in each field for the CAS2 sequence
              with uniform quantization having a step width of 11
              MCP    Motion compensating prediction
              MCI4   Motion compensating interpolation error coding with a prediction interval
                     of N = 4
              +S     Interpolation between the reference fields
              +1     Interpolation with a backward interpolation interval of a = 1

Further optimization of the method is conceivable. Approaches to this include

-    selecting the optimal prediction and interpolation interval (possibly even previous frame
     interpolation with a = 2),

-    nonlinear interpolation along the estimated motion trajectory that corresponds to the possibly
     nonlinear curve of correlation,

                                        {? An impulse response along the motion
                                        trajectory other than a triangle is the intention}

-    optimization of the block size in multi-field matching,

-    use of component displacements with fractional pel accuracy,

-    additional intraframe coding

Motion compensating interpolation without transmitting the interpolation error is another possible
area of use for multi-field matching.
Initial tests on this using the VOIT sequence have yielded quite good results. In these tests, the
vectors estimated using multi-field matching were interpolated in a bi-linear fashion as usual
between the vector reference points so as not to make the block limits visible.    {Illegible}
However, additional investigations and subjective tests are still needed to provide more reliable
information on this application.

Exhibit 23  Page 1132                                    GW-LT 255082

5.   Summary

This report presented a comparison of possible coder gains for motion compensating interfield prediction and motion compensating interpolation error coding.

To this end, the first portion presented a model for entropy reduction by means of motion compensating coding. The spatial power density spectra of the motion compensating prediction and interpolation error were calculated from the signal spectrum and the probability density of the displacement estimation error. With this, a lower limit for the entropy of motion compensating coding was determined.
It was shown that motion compensating interpolation error coding makes possible a maximum redundancy reduction of 0.5 bit/pel over motion compensating prediction and intraframe signal coding if the accuracy of the motion estimation is independent of the field interval.
If additional intraframe coding is used, a further gain of about 0.3 bit/pel can be achieved. At the same time, the use of motion compensation appears worthwhile even with larger displacement estimation errors. The use of a motion estimation algorithm that operates with good accuracy even for larger field intervals is decisive for a coder gain using motion compensating interpolation error coding.

The second portion of the report provided an approach to this with the computer simulation of the coder methods.
After it was shown that the block match algorithm of Jain & Jain for motion compensating interpolation is not suitable, an improved block match algorithm for motion estimation over larger field intervals, multi-field matching, was introduced.

Interpolation error coding in the form presented here using motion compensation provided by multi-field matching yields in practice a redundancy reduction of 0.1... 0.2 bit/pel as compared to motion compensating prediction.
An additional improvement to the method is conceivable and might be the object of further investigations. Approaches to this end could be the optimization of the interpolation algorithm, the use of component displacements with fractional pel accuracy, and additional intraframe coding.

An additional area of use for multi-field matching might be motion compensating interpolation without transmission of the interpolation error. Initial tests in this area yielded rather good results but still need confirmation by additional investigations and subjective tests.

**Exhibit 23  Page 1133**                    GW-LT 255083

6. <u>Bibliography</u>

/1/  Musmann, H. G.; Pirsch, P.; Grallert, H.-J: Advances in Picture Coding. Proc. IEEE 73 985), Vol. 4, pp. 523 -548.

/2/  Berger, T.: Rate Distortion Theory. Englewood Cliffs, N.J.: Prentice-Hall, Inc., 1st edition, 1971.

/3/  Musmann. H. G.: Information Theory (Informationstheorie). Hanover: University of Hanover, Institute for Theoretical Communications Engineering and Information Processing (Universität Hannover. Institut für Theoretische Nachrichtentechnik und Informationsverarbeitung). Lecture script, 1983.

/4/  Girod, B.; Micke, T.: Efficiency of Motion-Compensating Prediction in a Generalized Hybrid Coding Scheme. Presentation at the Picture Coding Symposium; Tokyo, 1986.

/5/  Pearson, D. E.: Transmission and Display of Pictorial Information. London: Pentech Press Limited, 1st edition, 1975.

/6/  Papoulis, A.: Probability, Random Variables, and Stochastic Processes. Singapore: McGraw-Hill, 2nd Edition, 1984.

/7/  Jain, J. R.; Jain, A. K.: Displacement Measurement and Its Application in Interframe Image Coding. IEEE Trans. COM - 29 (1981), Vol. 12, pp. 1799 -1808.

**Exhibit 23  Page 1134**                     GW-LT 255084

<u>Translator's notes for Micke additional pages:</u>

1.    All handwritten notes are shown indented and contained within "{ ... }." Wherever any of the handwriting was illegible, the word "illegible" was entered.

2.    Any composite scientific characters that I was unable to find in MSWord's normal fonts (such as the 'd' with '~' above it) were entered as "d~" so the diacritical marks follow the character they are supposed to be above.

3.    In the program listings at the end, most of the lines are comment lines. In FORTRAN, these lines have a "C" in column 6. I have omitted the "C" for these listings and it is to be assumed for most of the lines.

4.    The page numbers in the translation correspond to those in the original German.

5.    In the program listings, I omitted the list of parameters passed in each call.

6.    The following areas in the translation were illegible/unclear

Pg. 56
{illegible equation}
Translator's note: This is a guess as to the equation:
    SSS(dm_x,dm_y) =
        $A + (1. + (dm\_x^{**}2 + dm\_y^{**}2)/(dm\_0^{**}2)^{**}1.5$
[Note that "**" means "to the power of. This equation could be verified by studying the code]

Pg. 59
    SIG_S{illegible}        -        Signal spectrum
    (Translator's note: "ILLEGIBLE" in this and the following three cases is probably SPEKT and possibly could be derived by studying the code.)

pg. 171
    If fewer than 10 parameters are passed, BLMVIEWI functions just like BLMVIEW with integer vectors. For this reason, it can be used universally in place of BLMVIEW.

Translator's note: Reading the code is necessary to decide if this means integer as opposed to floating-point, or "whole" as opposed to "partial". In the FORTRAN computer language used here one could reasonably assume that the final I in BLMVIEWI means "integer", but here the "I" means "interpolated."

**Exhibit 23  Page 1135**                    **GW-LT 255085**

Translator's notes for library version of Micke thesis:

Page 32 is duplicated as page 33.

Page 36 is duplicated as page 37

Translator's notes for flash cards:

In DIPL-94, the German uses the term "Texturmalen." I translated this as "texture prints" However, I believe that this is a typo for "Texturmerkmalen" which would be "texture features" as used in DIPL-92.

**Exhibit 23  Page 1136**                                    GW-LT 255086

Micke, Thomas                                    DIPL- 123
Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for
Television Video Signals
1986

Siegmann, Stefanie                               DIPL- 126
Automatic Parameter Adaptation with Specified Processing Paths for Image Interpretation
1986

Kösters, Stefan                                  {illegible}
Automatic Configuration of Processing Paths for Image Interpretation
1986

Spiegel, Bernd                                   {illegible}
Rule-based Compensation Method for Parameter Adaptation of Image Interpretation Systems
1986

Micke, Thomas                                    DIPL-123
Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for
Television Video Signals
1986

Röper, Peter                                     DIPL-122
Implementation and Investigation of a Predictive Motion Compensating Coding Method for
Television Signals
1986

Röhler, Uwe                                      DIPL-121
Automatic Parameter Adaptation of an Image Processing Sequence for Image Interpretation with
Specification of the Primitive
1986

Sarfert, Thomas                                  DIPL-120
Optimization of Switching Networks by way of Local Transformations under Consideration of
Technological Boundary Conditions
1986

Busch, Hans-Jürgen                               DIPL-119
Modeling the Surface of 3-D Objects from Image Sequences
1986

1

**Exhibit 23  Page 1137**

GW-LT 255087

Wienecke, Andreas                                DIPL-118
Determination of Corresponding Points on Moving Objects in Image Sequences
1986

Ruckser, Gert                                    DIPL-117
Development of a Measurement Method to Investigate the Auditory Nerves of Deaf People with
the Help of Electrically Evoked Potentials
1985

Iden, H.-J                                       DIPL-116
Definition of Binary Image Evaluation Quantities for Parameter Adaptation During Automatic
Image Interpretation
1985

Vahrmann, R.                                     DIPL-115
Interpreter for a Descriptive Language to Represent 3-D Objects
1985

Artschwager, U.                                  DIPL-114
Design of a Robot Control System under Consideration of a Static 3-D Model World
1984

Funke, Matthias            {2 copies}            DIPL-113
Further Development and Evaluation of a Design Program according to Davidson for Multi-stage
Switching Networks with Several Outputs
1985

Gersten, Claus Michael                           DIPL-112
Computer-aided Simulation of an Interpolative A/D Converter under Consideration of the
Properties of Real Components
1985

Mohrmann, Peter                                  DIPL-111
Implementation of a Model of Visual Perception for Assessing Methods of Image Encoding
1985

Münzner, Andreas                                 DIPL-110

2

**Exhibit 23  Page 1138**                                   GW-LT 255088

Implementation of a Pattern Matcher
1985


Gerken, Peter                                          DIPL-109
A Structural Model of Visual Perception for Translation in Image Sequences
1985


Schiller, Harald                                       DIPL-108
Computer-aided Design and Representation of Digital Filters
1984


Munstermann, Peter                                     DIPL-107
Development of a Method for Motion Adaptive Noise Suppression in Television Signals
1984


Blankenburg, Wolfgang                                  DIPL-106
Determining Contour Thickness Based on Subjective Tests
1983


Ebel, Jörg                                             DIPL-105
Design and Construction of a Programmable Power Supply with an IEC Bus Interface
1985


Gellersen, Hans                                        DIPL-104
Concept of a Macro Library for Cell Layouts and Development of Basic Macros for the UA4 Gate Array
1985


Friedrich, Bernd                                       DIPL-103
Spectral Shaping of Quantization Noise during DPCM Coding of Television Signals
1985


Thoma, Robert                                          DIPL-102
Investigation of Equalization of an FM Radio Channel during Mobile Reception
1984


Fritsch, Uwe                                           DIPL-101
Automatic Parameter Adaptation in Determining the Position of Two-dimensional Workpieces
1985

3

Exhibit 23  Page 1139                    GW-LT 255089

Dannecker, Rolf                                    DIPL-100
Design and Layout of a DPCM Decoder as a CMOS Gate Array
1984


Wehberg, Thomas                                    DIPL-99
Creation of a Program System to Simulate the Viterbi Algorithm
1984


Heuser, Martin                                     Dipl-98
Relaxation for Determining the Position of Two-dimensional Workpieces
1984


Voigt, Andreas                                     Dipl-97 1/2
Description of the Motion of Rigid Bodies Based on two Images
(1) and (2)
1984


Pape, Volker                                       DIPL-96 (1)
Syntax Analysis for Structural Pattern Recognition (Appendix)
1984


Pape, Volker                                       DIPL-96
Syntax Analysis for Structural Pattern Recognition
1984


Heger, Jürgen                                      DIPL-95
Program for Calculating Resistance and Capacitance for Circuit Traces and Diffusion Areas
1984


Norbert Lissel                                     DIPL-94
Creation, Implementation and Investigation of Various Methods for Calculating Texture Gradients
from Texture Prints
1983


Wolfgang Sander                                    DIPL-93
Implementation of the SYLCON Program for the Support of Symbolic Layouts of Integrated MOS
Circuits

4

Exhibit 23  Page 1140                                    GW-LT 255090

1983


Hindrik Groeneveld                          DIPL-92
Performance and Evaluation of Subjective Tests to Determine the Relevance of Texture Features
for Human Texture Differentiation Capability
1983


Wolfgang Beckmann                          DIPL-91
Coding of Handwritten Signals with an Analysis-Synthesis Method
1983


Wolfgang Kohnen                          DIPL-90
Stability Investigations of Adaptive Three-dimensional DPCM Systems
1983


Dietmar Hepper                          DIPL-89
Investigation of a Block Coding Method for Television Signals
1983


Thomas Anna                          DIPL-88
Design and Construction of a Clock Generator for Processing Digital Color Television Signals
1983


Ulrich Jagau                          DIPL-87
Determining Perception Thresholds of Quantization Errors as a Function of the Speed of Moving
Images
1983


W. Pietsch                          DIPL-86
Design of an Interface for Connecting a Disk Drive to a Process Computer
1983


Jens Rosebrock                          DIPL-85
Coding of Air-ground Video Pictures for Low Transmission Bit Rates
1983


Holger Engelhardt                          DIPL-84
Microprogram Control System for a Fast Image Processor

5

Exhibit 23  Page 1141                          GW-LT 255091

1983

Constantin, Thomas                                DIPL-83
Design and Construction of a Real-time Signal Processing System using the TMS 320 Signal
Processor
1983

Bierling, Mathias                                DIPL-82
Calculation of Transcoder Filters for Scanning Rate Conversion using Mixed-integer Optimization
1983

Mavridis, Angelos                                DIPL-81
Design of a Programmable Delay Line for an Implementation using CMOS Gate Arrays
1983

Duwe, Christoph                                  DIPL-80
Image Output Module for an Image Processing System
1982

Ender, Manfred                                   DIPL-79
Development of an Error-correcting Transmission Method for Video Text
1983

Bünstorf, Gerhard                                DIPL-78
Investigation of the Effect of Image Frequency on the Prediction Error Efficiency of Shift-adaptive
Predictors
1982

Voigt, Martin                                    DIPL-77
Investigations of DPCM Coders for Telepicture Signals
1982

Doleschel, Uwe                                   DIPL-76
Subjective Tests for Assessing Image Manipulations
1982

Köhn, Burkhard                                   DIPL-75
Device for Detecting and Processing Impulse-shaped Acoustic Processes

6

Exhibit 23  Page 1142

1982

Glitzner, Wolfgang                                    DIPL-74
Expansion of an Existing Image Display Station to Include the Capability for Interactive
Manipulation of Images
1982

Axmann, Michael                                      DIPL-73
Investigation of the Implementation of DPCM Systems for Television Signals using Gate Arrays
1982

Podien, Wolfram                                      DIPL-72
Design and Implementation of an Interactive System for the Transmission and Display of Images
1982

Michalowitz, Arthur                                  DIPL-71
Transcoder Filter for Digital Television Systems for Scanning Rate Conversion
1982

Thiele, Wolfram                                      DIPL-70
Cell Segmentation with the Help of a Heuristic Contour Finding Method
1982

Sprung, Christian                                    DIPL-69
Design and Construction of the Quantizer Feedback System for an Interpolative PCM Coder
1982

Brandt, Klaus                                        DIPL - 68
Control System for Detecting and Transmitting Hand-drawn Lines on a Plasma Display
1982

Pfannschmidt, Gerald                                 DIPL - 67
Investigation of the Quantization Noise of a Modified DPCM Method
1982

Bartels, Heinrich                                    DIPL - 66
Control Algorithm for an Adaptive Intraframe/interframe Prediction Method

7

**Exhibit 23  Page 1143**                                **GW-LT 255093**

1982

Kunze, Wilfried                                DIPL - 65
Simulation and Design of the Arithmetic Unit of a Fast Filter and Interpolation Processor
1982

Kappei, Frank                                  DIPL - 64
Predictive Coding of Handwritten Signals
1981

Preuth, Hans - Georg                           DIPL - 63
Evaluation of Contour Finding Algorithms Based on a Line Comparison
1981

Borcherding, K. P.                             DIPL - 62
Design and Construction of a Channel Codec for Digital Magnetic Tape Recording of Stereo
Audio Signals
1981

Kierschning, Thomas                            DIPL - 61
Design and Construction of a Source Codec for Stereophonic Audio Signals
1981

Märkel, Eckart                                 DIPL - 60
Signal Processor for Error-correcting Codes
1981

Schulze-Lefert, Ferdinand                      DIPL - 59
Parameter Identification in Signals of Selectable Bandwidth
2 volumes
1981

Speichert, Michael                             DIPL - 58
Investigations of the Transmission Properties of a Magnetic Tape Channel with Longitudinal
Recording Principle
1981

Dewald, Peter                                  DIPL - 57

8

Exhibit 23  Page 1144                                      GW-LT 255094

Design and Construction of a Line Codec for High-density Digital Magnetic Tape Recording
1981

Bahr, Jürgen                                    DIPL - 56
Simulation of a DPCM Loop with Motion Adaptive Predictor for Source Coding of Monochrome
Television Signals
1981

Spoer, Peter                                    DIPL - 55
Design and Construction of a Laboratory Experiment for Analog/Digital and Digital/Analog
Conversion
1981

Maron, Udo                                      DIPL - 54
Design and Construction of a DPCM Coder for Telepicture Devices
1980

Girod, Bernd                                    DIPL - 53
Objective Quality Measures for the Design of Digital Image Transmission Systems
1980

Dittmer, Maritn                                 DIPL - 52
Design and Construction of a Multiplexer and Demultiplexer for a DPCM Hardware System
1981

Brattig, Günter                                 DIPL - 51
Design of an Image Processing System for Press Photographs
1981

Gurgel, Klaus Werner                            DIPL - 50
Design and Implementation of a Measurement Method for Subjective Evaluation of the Error
Susceptibility of Coding Methods for Facsimile Signals
1980

Wermser, Diederich                              DIPL - 49
Design and Implementation of an Internship Experiment: Digital Filter
1979

9

**Exhibit 23  Page 1145**                                    GW-LT 255095

Ammon, Günter                                          DIPL - 48
Investigation of Correlation Methods for the Calculation of the Translation of Television Image
Contents
1981


Pflug, Wolfgang                                        DIPL - 47
Design and Construction of the Laboratory Experiment: Circuit Families
1980


Mao, Chi-Wu                                            DIPL - 46
Contour Finding with the Help of Subjective Tests
1981


Heine, Uwe                                             DIPL - 45
Statistical Investigations of Scanned Handwritten Signals for the Development of Redundancy
Reducing Methods
1979


Sarimeseli, Süleyman                                   DIPL - 44
Design and Construction of an Internship Experiment: Scanning and Quantizing
1979


Prange, Fritz-Ulrich                                   DIPL - 43
Investigation of Auditory Sensitivities Caused by Modulated Alternating Electrical Fields
1980


Meyer, Hans-Hermann                                    DIPL - 42
Design of a Measurement Method for the Early Detection of Damage to Belt Joints in Conveyor
Systems
1980


Freygang, Torsten                                      DIPL - 41
Comparison of Two-dimensional Source Coding Methods for Digital Facsimile Signals
1980


Lange, Michael                                         DIPL - 40
Design and Construction of an Internship Experiment: Microprocessor Controller
3 volumes
1980

10

**Exhibit 23  Page 1146**                                    GW-LT 255096

Haase, Hans-Günter                                    DIPL - 39
Investigation of the Statistical Properties of a Random Generator using Graphical Representation
1979

Weidenbruch, Hans-Ulrich                              DIPL - 38
Design and Construction of a Digital Low-pass Filter for Interpolative Analog-Digital Conversion of
High-quality Audio Signals
1979

Bösche, Carsten                                       DIPL - 37
Extraction of Local Image Features for Segmentation of Blood Cell Images
2 volumes
1980

Plantholt, Martin                                     DIPL - 36
Development and Construction of a Clock Generator for a Codec for Color Video Signals
1979

Bultmann, D.                                          DIPL - 35
Subjective Tests for Determining Just Noticable Quantization Errors
1979

M. Pannhausen                                         DIPL - 34
Investigations on Feature Extraction from White Blood Cells
1979

H. Schwarze                                           DIPL - 33
Design and Construction of an Internship Experiment: Shift Register with Feedback
1979

Th. Batzel                                            DIPL - 32
Matching a Modem to a Microprocessor and Control System of a Serial Data Transmission
System
1979

Pornak, H.                                            DIPL - 31

11

**Exhibit 23  Page 1147**                                    GW-LT 255097

Method for Interpolation of Handwritten Lines on a Display Terminal
1979


R. Thiemann                                    DIPL - 30
Design and Construction of the Internship Experiment: Microprocessors
1979


Dörgeloh, Heiner                               DIPL - 29
Investigations on Interpolative Analog-Digital Conversion
1979


Nickel, Norbert                                DIPL - 28
Development and Implementation of a Fast Split & Merge Algorithm
1978


Jacobsen, Michael                              DIPL - 27
Contour Finding with the Help of a Nonlinear Model of the Spatial Frequency Dependence of the
Human Visual System
1978


Schmitt, P.                                    DIPL - 26
Investigation of Coding Using Variable Code Word Lengths
1978


Winter, W.                                     DIPL - 25
Subjective Tests with the Help of Artificial Test Images for the PCM and DPCM Coding of
Television Luminance Signals
1978


Geuen-Funhoff, U.                              DIPL - 24
Investigation of the Training of Female Electrical Engineering Assistants at the Hanover Technical
University
1977


Geppert, Rudolf                                DIPL - 23
Investigation of Source Coding Methods for the Transmission of Newspaper Pages
1978


12


**Exhibit 23  Page 1148**                              GW-LT 255098

Halle, Volker                                    DIPL - 22
Investigation of the Human-Computer Communications Interface Using the Creation of a Working
Plan as an Example
1978


Decker, Hans                                     DIPL - 21
A Standard Converter for Converting a 313 Line System Video Signal into a 625 Line System
Video Signal
1978


John, Horst                                      DIPL - 20
Implementation of a Fast Jack-Knife Test on the CDC 76/73/73
1978


Schulze, Hubert                                  DIPL - 19
Simulation of a Change Detector for Picture Telephone Signals
1978


Ritter, Ditmar                                   DIPL - 18
Implementation and Extension of the ARTHUR Program System
1977


Schmidt, Joachim                                 DIPL - 17
Automatic Image Evaluation of Metallographic Image Findings
1976


Westerkamp, Dietrich                             DIPL - 16
Contour Finding on the Basis of the Change in Local Statistical Properties
1977


Ey, Horst                                        DIPL - 15
Construction and Operation of a Simulator for a Huffman Coder and a Buffer Memory for
Interframe Coding of Picture Telephone Signals
1976


Mandalka, Klaus-Peter                            DIPL - 14
Construction of a Test Signal Generator for High-quality Programmable Audio Sequences
1977

13

**Exhibit 23  Page 1149**                                    GW-LT 255099

Knauer, Stefan                                    DIPL - 13
Statistical and Functional Relationships between Color Television Signals $U_Y$, $U_{R-Y}$, and $U_{B-Y}$
1977

Beyer, Siegfried                                  DIPL - 12
Creation of a Computer Program for Calculating Delay Equalizers
1977

Lentzer, Axel                                     DIPL - 11
Design and Construction of a Centralized Clock for an Image Processing System
1977

Kelle, Harald                                     DIPL - 10
Design and Construction of a Digital Interpolation Color Computer
1976

Biermeyer, Alfons                                 DIPL - 9
Design and Construction of a Controlled 4-bit Quantizer for 5 MHz Television Signals
1976

Hüffmeyer, Wilhelm                                DIPL - 8
Digital Recordings of Video Signals on Magnetic Tape
1976

Timmermann, Friedrich                             DIPL - 7
Statistical Measurements for Entropy Coding of Video Signals of Moving Image Scenes
1975

Geuen, Wilfried                                   DIPL - 6
Optimal Quantization of Color Difference Signals R-Y, B-Y under Consideration of Opto-physiological Conditions
1975

Sechten, Udo                                      DIPL - 5
Construction of a Switching Addressing Unit for a Core Memory
1975

14

**Exhibit 23  Page 1150**                                    GW-LT 255100

Grabbe, Wilhelm                                    DIPL - 4
A Standard Converter for Converting a 625 Line System Video Signal into a 313 Line System
Video Signal
1976


Heinken, Herbert                                   DIPL - 3
Construction of a System for PCM Coding of Wideband Color Television Signals
1974


Kerntke, Gerd-Dieter                               DIPL - 2
Design and Construction of a Fast Sample and Hold
1974


Radtke, Alfred                                     DIPL - 1
Investigations of Coding of Discrete Markoff Sources with Memory
1974


Micke, Thomas                                      DIPL - 123
Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for
Television Video Signals
1986

15

**Exhibit 23  Page 1151**                                    GW-LT 255101

Appendix A:     Derivation of the power density spectra of Section 3.4

A1. Motion compensated prediction error                    A1

A2. Motion compensated interpolation error                 A4

46

**Exhibit 23  Page 1152**                    **GW-LT 255102**

## A1. Motion compensated prediction error

The following definitions apply:

$s(x,y,t)$    -- Value of the original signal
$\hat{s}(x,y,t)$    -- Estimated value for the original signal (prediction or interpolation value)

$s'(x,y,t)$    -- Reconstructed signal value (with quantization errors)

$d = (dx, dy)$    -- Actual displacement
$\bar{d} = (\bar{d}x, \bar{d}y)$    -- Estimated displacement
$\tilde{d} = (\tilde{d}x, \tilde{d}y)$    -- Displacement estimation error
$= d - \bar{d}$

$p_{\tilde{d}}(\varepsilon, \approx)$    -- Probability density function of the displacement estimation error

Fig. A.1 depicts the curve of the motion compensating prediction schematically for the motion component in the x direction.



Fig. A.1    Schematic representation of the motion compensating prediction with only translation

47

Exhibit 23  Page 1153      GW-LT 255103

For the signal value to be coded $s(x, y, t_n)$ in the field n, a displacement d- is estimated. With this, the prediction value from the reconstructed signal s' of the previous field is specified as

$$\hat{s}(x,y,t_n) = s'(x-\overline{d}x, y-\overline{d}y, t_{n-1})$$

Decomposing the reconstructed signal s' into the sum of the original signal s and the quantization error q yields

$$\hat{s}(x,y,t_n) = s(x-\overline{d}x, y-\overline{d}y, t_{n-1}) + q(x-\overline{d}x, y-\overline{d}y, t_{n-1})$$

Let the actual motion of the object being observed be represented by the displacement d. Considering the assumptions (A1) and (A5) of Section 3.3, the original signal value used for prediction – assuming that the quantization error is decorrelated between the fields -- is recovered again in the current field n. This yields

{What does the decorrelated quantization error have to do with the equation?}

$$s(x-\overline{d}x, y-\overline{d}y, t_{n-1}) = s(x+\tilde{d}x, y+\tilde{d}y, t_n)$$

with the displacement estimation error d¯ = d - d¯ .

In this way, the motion compensated prediction error can be calculated from the signal values of the current field n as

$$e(x,y,t_n) = s(x,y,t_n) - \hat{s}(x,y,t_n)$$
$$= s(x,y,t_n) - s(x+\tilde{d}x, y+\tilde{d}y, t_n)$$
$$- q(x-\overline{d}x, y-\overline{d}y, t_{n-1})$$

If q and s {*)} are statistically independent, then the two-dimensional autocorrelation function of the motion compensated prediction error has the following form /6/

{*) and {stationarity of q and s}

48

Exhibit 23  Page 1154

GW-LT 255104

$$R_{ee}(\Delta x, \Delta y) = E\left\{ e(x+\Delta x, y+\Delta y, t_n) \cdot e(x, y, t_n) \right\}$$
$$= 2 \cdot R_{ss}(\Delta x, \Delta y) + R_{qq}(\Delta x, \Delta y)$$
$$- E\left\{ R_{ss}(\Delta x - \tilde{d}x, \Delta y - \tilde{d}y) \right\}$$
$$- E\left\{ R_{ss}(\Delta x + \tilde{d}x, \Delta y + \tilde{d}y) \right\}$$

{d~ is viewed as illegible}

The two last terms, together with the assumption (A3) of Section 3.3, represent a convolution product between the autocorrelation function of the signal and the probability density function of the displacement estimation error /6/. If assumption (A4) holds, both terms are also identical so that the following applies:

$$R_{ee}(\Delta x, \Delta y) = 2 \cdot R_{ss}(\Delta x, \Delta y) * (\delta(\Delta x, \Delta y) - p_{\tilde{d}}(\Delta x, \Delta y))$$
$$+ R_{qq}(\Delta x, \Delta y)$$

In this equation, $\delta(\varepsilon, \tau)$ is a two-dimensional Dirac impulse, $p_d(\varepsilon, \tau)$ is the probability density function of the displacement estimation error and "*" symbolizes the convolution product.

The Fourier transform of this autocorrelation function is the desired power density spectrum:

$$S_{ee}(\omega_x, \omega_y) = 2 \cdot S_{ss}(\omega_x, \omega_y) \cdot (1 - P_{\tilde{d}}(\omega_x, \omega_y))$$
$$+ N(\omega_x, \omega_y)$$

having the power density spectra of the original signal $S_{ss}$, of the quantization noise N, and of the Fourier transform of the displacement estimation error density $P_{d~}$.

{illegible}

49

Exhibit 23  Page 1155

GW-LT 255105

## A2. Motion compensated interpolation error

The motion compensated interpolation error spectrum is derived in a manner similar to the calculation for the prediction error in Section A1.
Fig. A.2 depicts how to derive the motion compensating interpolation error coding, again for the motion component in the x direction.



Fig. A.2    Schematic representation of the motion compensating interpolation error coding with only translation as an example for a prediction interval of N = 4

The definitions of Section 2 (page 3) and Appendix A1 apply for the displacements.
Let the signal value to be coded be given as $s(x, y, t_{n-b})$ in field n-b. To determine a signal estimation value $s^(x, y, t_{n-b})$, linear interpolation between the signal values in field n-b-a and field n is used

50

Exhibit 23  Page 1156                         GW-LT 255106

along the motion trajectory between the reference frames. (Nonlinear interpolation would also be conceivable. This would then reflect the possible nonlinear path of correlation along the trajectory.)                                                                              {See page 33.}

The signal estimation value is

$$s(x,y,t_{n-b}) = \underline{b} \cdot s'(x-\bar{d}_a x, y-\bar{d}_a y, t_{n-b-a})$$
$$+ \underline{a} \cdot s'(x+\bar{d}_b x, y+\bar{d}_b y, t_n) .$$

In this equation, $\underline{a}$ and $\underline{b}$ are the interpolation coefficients:

$$\underline{a} = \frac{a}{a+b} < 1 \qquad \underline{b} = \frac{b}{a+b} < 1$$

Decomposition into the original signal and noise as well as shifting to field n-b in a manner similar to that of Appendix A.1 leads to the motion compensated interpolation error in the following form:

$$e(x,y,t_{n-b}) = s(x,y,t_{n-b}) - \hat{s}(x,y,t_{n-b})$$
$$= s(x,y,t_{n-b})$$
$$- \underline{b} \cdot s(x+\hat{d}_a x, y+\hat{d}_a y, t_{n-b})$$
$$- \underline{b} \cdot q(x-\bar{d}_a x, y-\bar{d}_a y, t_{n-b-a})$$
$$- \underline{a} \cdot s(x-\hat{d}_b x, y-\tilde{d}_b y, t_{n-b})$$
$$- \underline{a} \cdot q(x+\bar{d}_b x, y+\bar{d}_b y, t_n)$$

and its autocorrelation function:

$$R_{ee}(\Delta x, \Delta y) = 2 \cdot R_{ss}(\Delta x, \Delta y) * \Big( (1 - \underline{a} \cdot \underline{b}) \cdot \delta(\Delta x, \Delta y)$$
$$- \underline{b} \cdot p_{\tilde{d}_a}(\Delta x, \Delta y)$$
$$- \underline{a} \cdot p_{\tilde{d}_b}(\Delta x, \Delta y)$$
$$+ \underline{a} \cdot \underline{b} \; p_{(\tilde{d}_a + \tilde{d}_b)}(\Delta x, \Delta y) \Big)$$
$$+ R_{qq}(\Delta x, \Delta y) \cdot (\underline{a}^2 + \underline{b}^2)$$

{Here, it is assumed that q is uncorrelated over time.}

51

Exhibit 23  Page 1157                                              GW-LT 255107

$p_{d-a}$ and $p_{d-b}$ are the probability density functions of the component displacement estimation errors and $p_{(d-a+d-b)}$ is the probability density for the sum of these functions.

The Fourier transformation again the yields the desired power density spectrum:

$$
\begin{aligned}
S_{ee}(\omega_x, \omega_y) &= 2 \cdot S_{ss}(\omega_x, \omega_y) \cdot \left( 1 - \underline{a} \cdot \underline{b} \right. \\
&\quad - \underline{b} \cdot P_{\tilde{d}_a}(\omega_x, \omega_y) \\
&\quad - \underline{a} \cdot P_{\tilde{d}_b}(\omega_x, \omega_y) \\
&\quad + \underline{a} \cdot \underline{b} \cdot P_{(\tilde{d}_a + \tilde{d}_b)}(\omega_x, \omega_y) \left. \right) \\
&\quad + N(\omega_x, \omega_y) \cdot (\underline{a}^2 + \underline{b}^2)
\end{aligned}
$$

The probability density for the component displacement estimation errors can be calculated from the given probability density of the total displacement. In so doing, a distinction is made between two cases:

a) Calculation using fractional component displacement (sub pel accuracy)

This method can be implemented in practice using a bilinear signal value interpolation in the vicinity of the vector end point.

{Need not be bilinear!}

The following apply:

$$\tilde{d}_a = \frac{\underline{a}}{N} \cdot \hat{d}_N \quad \checkmark \qquad \tilde{d}_b = \frac{\underline{b}}{N} \cdot \hat{d}_N$$

$$\hat{d}_a + \hat{d}_b = \tilde{d}_N \quad \checkmark$$

and in accordance with /6/

$$p_{\hat{d}_a}(\varepsilon, \tau) = \left(\frac{N}{a}\right)^2 \cdot p_{\hat{d}_N}\left(\frac{N}{a}\varepsilon, \frac{N}{a}\tau\right)$$

52

Exhibit 23  Page 1158

GW-LT 255108

$$P\widehat{\tilde{d}}_b(\varepsilon, \tau) = \left(\frac{N}{b}\right)^2 \cdot P\widehat{\tilde{d}}_N\left(\frac{N}{b}\varepsilon, \frac{N}{b}\tau\right)$$

$$P_{(\tilde{d}_a + \tilde{d}_b)}(\varepsilon, \tau) = P\widehat{\tilde{d}}_N(\varepsilon, \tau)$$

and in the frequency domain

$$P\widehat{\tilde{d}}_a(\omega_x, \omega_y) = P\widetilde{\tilde{d}}_N\left(\frac{a}{N}\omega_x, \frac{a}{N}\omega_y\right)$$

$$P\widehat{\tilde{d}}_b(\omega_x, \omega_y) = P\widetilde{\tilde{d}}_N\left(\frac{b}{N}\omega_x, \frac{b}{N}\omega_y\right)$$

$$P_{(\widehat{\tilde{d}}_a + \widehat{\tilde{d}}_b)}(\omega_x, \omega_y) = P\widehat{\tilde{d}}_N(\omega_x, \omega_y)$$

b) Integer rounding of the component displacements (integer pel accuracy)

This method yields poorer results for smaller displacement estimation errors but can be implemented with less effort. It was selected in the evaluation of Section 3.5. The following apply:

$$\tilde{d}_a = \frac{a}{N} \cdot \tilde{d}_N + \widetilde{\tilde{d}}_a \qquad \tilde{d}_b = \frac{b}{N} \cdot \tilde{d}_N + \widetilde{\tilde{d}}_b$$

$$\tilde{d}_a + \tilde{d}_b = \tilde{d}_N + \widetilde{\tilde{d}}_a + \widetilde{\tilde{d}}_b$$

In these equations, $d$~~$_a$ and $d$~~$_b$ are random variables for the rounding error that are statistically independent from the displacement estimation error. They have a uniform distribution over the following range:

$$-0,5 \text{ pel} < \widetilde{\tilde{d}}x < +0,5 \text{ pel} \qquad \text{and}$$

$$-0,5 \text{ lin} < \widetilde{\tilde{d}}y < +0,5 \text{ lin}.$$

{Messy notation}

According to /6/, the probability densities for the component displacement estimation errors are then calculated as

53

Exhibit 23  Page 1159

GW-LT 255109

$$P_{\widehat{d}_a}(\varepsilon,\tau) = \left(\frac{N}{a}\right)^2 \cdot P_{\widetilde{d}_N}(\frac{N}{a}\varepsilon, \frac{N}{a}\tau) \; * \; \widetilde{\widetilde{P}}_d(\varepsilon,\tau)$$

$$P_{\widetilde{d}_b}(\varepsilon,\tau) = \left(\frac{N}{b}\right)^2 \cdot P_{\widetilde{d}_N}(\frac{N}{b}\varepsilon, \frac{N}{b}\tau) \; * \; P_{\widehat{d}}(\varepsilon,\tau)$$

$$P_{(\widehat{d}_a+\widehat{d}_b)}(\varepsilon,\tau) = P_{\widetilde{d}_N}(\varepsilon,\tau) \; * \; P_{\widehat{d}}(\varepsilon,\tau) \; * \; P_{\widehat{d}}(\varepsilon,\tau)$$

and in the frequency domain

$$P_{\widehat{d}_a}(\omega_x,\omega_y) = P_{\widetilde{d}_N}(\frac{a}{N}\omega_x, \frac{a}{N}\omega_y) \cdot P_{\widehat{d}}(\omega_x,\omega_y) \quad \checkmark$$

$$P_{\widehat{d}_b}(\omega_x,\omega_y) = P_{\widetilde{d}_N}(\frac{b}{N}\omega_x, \frac{b}{N}\omega_y) \cdot P_{\widehat{d}}(\omega_x,\omega_y) \quad \checkmark$$

$$P_{(\widehat{d}_a+\widehat{d}_b)}(\omega_x,\omega_y) = P_{\widehat{d}_N}(\omega_x,\omega_y) \cdot P_{\widehat{d}}(\omega_x,\omega_y) \cdot P_{\widehat{d}}(\omega_x,\omega_y)$$

54

**Exhibit 23  Page 1160**                    GW-LT 255110

Appendix B: Documentation of the model programs

PROGRAM MODELL                          81

SUBROUTINE F_PDXY                       B16
SUBROUTINE INSPFILE                     B19
SUBROUTINE SIGNAL                       B22
SUBROUTINE S_TERR                       B24
SUBROUTINE S_PERR                       B27

FUNCTION DSTERR                         B30
FUNCTION GAUSSY                         B32
FUNCTION GLEICHV                        B33
FUNCTION RDF                            B35
FUNCTION SIMPS2D                        B37

55

**Exhibit 23  Page 1161**                          **GW-LT 255111**

{Program Modell}

{Illegible}

Model for reducing entropy by means of motion compensating coding

VERSION:

14-AUG-1985        Th. Micke
26-NOV-1985        Th. Micke
29-APR-1986        Th. Micke

DESCRIPTION:

MODELL calculates the power density spectra of the prediction and interpolation error in motion compensating coding of television video signals using the signal spectrum and the probability density function of the displacement estimation error.

Using the calculated error spectra and the signal spectrum, a lower limit for the entropy of
-- the motion compensated prediction error and
-- the motion compensated interpolation error and
-- the signal
is calculated with the help of a rate-distortion evaluation having a quadratic error size while maintaining a specified distortion limit.
In this method, differentiation is made between memoryless and intraframe coding. White quantization noise with VARNOIS variance is assumed as the distortion.

All spectra considered are two-dimensional x-y spectra with the band limits in accordance with the selected scanning frequency and the number of lines. The evaluation is limited to the range of positive frequencies (first quadrant) under the assumption of an identical curve in all four quadrants of the x-y frequency plane:
fx = 0 ... fgx and fy = 0 ... fgy.
The signal spectrum is calculated by the SIGNAL subroutine and takes the following form

{illegible equation}

The spectrum is normalized by the factor A to a variance of VARSS = 1.
For the displacement estimation error density, an isotropic Gaussian distribution is assumed by the selection of GAUSSV subroutine.
All (radian) frequencies in the evaluation are normalized to the cut-off (radian) frequency of the signal spectrum F0.

The parameters of the selected television standard
-- Scanning frequency FA [Hz]
-- Cut-off frequency of the signal spectrum F0 [Hz]
-- Number of lines in the field  [JMS: I would prefer "subimage" for "field" throughout, but the German author uses "FIELD" in his code] NLINE
-- Aspect ratio B_ZU_H
-- Effective line length TLINE [s]
are specified in MODELL as constants and can be changed if needed.
All other parameters are entered interactively.

56

Exhibit 23  Page 1162

GW-LT 255112

{Paragraph essentially illegible}

MODELL has four different modes of operation that perform different tasks:

MODE = 'D' -- Rate-distortion function R(d*)
      Output of the entropy limits as a function of the effective distortion

MODE = 'V' -- Rate-variance function R(VARDEE)
      Output of the entropy limits as a function of the displacement estimation error variance

MODE = 'P' -- Rate prediction interval function
      Output of the entropy limits as a function of the prediction interval JFPRED during motion
      compensating interpolation. Additional output of the displacement vector and
      displacement estimation error variance for each prediction interval.

MODE = 'S' -- Spectra output
      Output of the signal spectrum, an error spectrum to be selected, and the white noise
      spectrum.

All output is written to the directory
PROG:[MICKEDIR.MOD.DAT]
For each R(.) function, one file containing pairs of YX values in the "+" format is written for
evaluation using the KURVPLOT program.

The R(.) files take the following form

      Rmxxyy_v.DAT

      m =          Program MODE ('D', 'V', 'P')
      xx =    SS        -> Signal
               PE        -> Prediction error for a prediction interval of 1
               PT        -> Prediction total (PE + vector entropy)
               IE        -> Interpolation error (average of 1 prediction error and JFPRED-
      1 interpolation error)
               IT        -> Interpolation total (IE + vector entropy/JFPRED)
      yy =    ML       -> Memoryless coding
               {illegible}  -> Intraframe coding
      v  =    Version number according to the input

The variances output in MODE = 'P' have the following form

      RPVxxx_v.DAT

      xxx =   DEE     -> Displacement estimation error
                VEC     -> Displacement vector
      v  =    Version number according to the input

Two types of spectra are output.
a)  2-D spectra (excerpt) for evaluation using the INSPEC program

57

SIG_S{illegible}        -        Signal spectrum
ERR_S {illegible}       -        Error spectrum

      v  = Version number according to the input

b)   1-D spectra (cut at om_y = 0) for evaluation using the KURVPLOT program (pairs of YX
     values)

SIG_S{illegible}.DAT        -        Signal spectrum
ERR_S {illegible}.DAT  -        Error spectrum
N_SPEK_v.DAT              -        Noise spectrum

v = Version number according to the input

## PARAMETERS:
None (batch program)

## FUNCTION CALLS:

DSTERN        REAL*4        [MICKEDIR.MOD]MODLIB
Calculation of d* for the specified spectrum and white noise

RDF               REAL*4        [MICKEDIR.MOD]MODLIB
Calculation of a function value of the rate-distortion function for the specified spectrum
and white noise

## SUBROUTINE CALLS:

F_PDXY                              [MICKEDIR.MOD]MODLIB
Calculation of the Fourier transform of all necessary displacement estimation error
densities

INSPFILE                          [MICKEDIR.MOD]MODLIB
Output of a 2-D spectrum to a file for the INSPEC program

SIGNAL                              [MICKEDIR.MOD]MODLIB
Calculation of the signal spectrum

S_PERR                            [MICKEDIR.MOD]MODLIB
Calculation of the motion compensated prediction error spectrum

S_IERR                            [MICKEDIR.MOD]MODLIB
Calculation of the motion compensating interpolation error spectrum

## REMARKS:
None

PARAMETER(FA= 13.5 E6)      !   Scanning frequency [Hz]
PARAMETER(FG= 60. E?)        !   Cut-off frequency of the signal spectrum
PARAMETER(NLINE= 288)       !   Number of lines in the field
PARAMETER(V_IH_H= 2, 3.0)   !   Aspect ratio, horizontal/vertical
PARAMETER(TLINE= 12.1e-9)   !   Line length [s]

58

Exhibit 23  Page 1164                    GW-LT 255114

Appendix C: Documentation of the coder programs

C1.    Structure of the interpolation error coder

C2.    Program listings

PROGRAM SLMATCH ........................................ C3
PROGRAM MFMATCH ........................................ C12
PROGRAM CODMCP ........................................ C20
PROGRAM CODMCI ........................................ C29

SUBROUTINE ADACR3I ........................................ C42
SUBROUTINE ADACR3P ........................................ C51
SUBROUTINE AOEF ........................................ C59
SUBROUTINE BLIALG ........................................ C61
SUBROUTINE BLIBLK ........................................ C64
SUBROUTINE BLIDIS ........................................ C68
SUBROUTINE BITJMIN ........................................ C72
SUBROUTINE BLNDIS ........................................ C77
SUBROUTINE BLMVIEWI ........................................ C80
SUBROUTINE CODFIO ........................................ C85
SUBROUTINE HSTTAB ........................................ C92
SUBROUTINE HSTTAB1 ........................................ C96
SUBROUTINE HSTTAB2 ........................................ C98
SUBROUTINE IFINT ........................................ C100
SUBROUTINE FDEF ........................................ C102
SUBROUTINE QDEFI ........................................ C104

Exhibit 23  Page 1165                                    GW-LT 255115

C1. Structure of the interpolation error coder

The simulation of the adaptive motion compensating interpolation error coder introduced in this report is divided into three consecutive program runs (3-pass coder):

- Pass 1
  Motion estimation to produce the displacement vectors, either with the PROGRAM BLMATCH (Jain & Jain block matching) or the PROGRAM MFMATCH (Multi-field matching).

- Pass 2
  Predictive coding of the reference frames using the PROGRAM CODMCP, either only motion compensated or with predictor adaptation.

- Pass 3
  Coding of the fields between the reference frames using the PROGRAM CODMCI, either only with motion compensating interpolation error coding or with predictor/interpolator adaptation.
  In this case, the output sequences from the CODMCP program for the reference frames are interleaved with those of the CODMCI program to form a joint output sequence of the interpolation error coder.

Every following pass accesses the output sequences of all preceding program runs. This ensures the outputs needed in every case cannot be suppressed in the preceding pass.

When selecting a reference frame interval of 1, coding is performed completely by the CODMCP program and pass 3 is omitted.

The same reference frame interval must be selected for all three program runs. As the

95

**Exhibit 23  Page 1166**

GW-LT 255116

MFMATCH and CODMCP programs generate valid output data only for the reference frames, the following program in each case must be assigned one of the reference frames as the first field to be processed. It makes sense to select the same field to be processed first for all three program runs.

In addition, the first field to be processed must contain line 1 of the complete image (upper field), similar to the MBV system. Otherwise, the field correction performed during vector rounding leads to poorer results instead of the desired improvement.

Detailed documentation of the individual programs is contained in each program header.

96

**Exhibit 23  Page 1167**                                    **GW-LT 255117**

PROGRAM BLMATCH

MODULE NAME:

     BLMATCH -- Block match method

VERSION:

| 1.0 | 24-JUL-1995 | U. MEYERDIRKS |
| 1.1 | 8-JAN-1996 | TH. Micke |

DESCRIPTION:

     BLMATCH calculates the displacement vectors block by block according to various block match methods.
The type of the method can be selected as desired.
Image sequences are processed.
The images are input and output using MP files. For each processed image of the input sequence, the x and y components of the displacement vectors for all image blocks are provided in a data MPF.
In addition, the comments on the block match methods are stored in a documentation MPF.

     To document the results, additional images can the generated upon request for each input image. The user may select an image of the luminance differences between the two images used for block matching; the image extrapolated according to the block match method; a luminance difference image of the extrapolated image and the original image; and a graphic representation of the displacement vectors of all blocks from image to image.

     In addition, the statistical values of all calculated images and data are output. Upon request, these can also be written to an MPF. The histogram is processed using the HST* routines.

     The image number of the first and last images to be processed can be selected as desired. The number of images in the output sequences then corresponds to the difference in image numbers + 1.
The algorithm accesses two original images at a time that have image numbers that differ by the image number step size difference. If the image number step size is larger than the first image to be processed in the original sequence, an imaginary gray image is accessed as the reference image. The first image is described with the comments only in the histogram file.

     Furthermore, it is possible to add an identification number to the filenames of the output MPFs. The identification number is appended to the logical output filenames. It is composed of six digits and the first two digits specify the maximum displacement used in the method. The next two pairs of digits specify the block length and block height. The logical filename and identification number are separated from one other by means of an '_'.

REMARKS:

     The following were introduced as abbreviations for the various files:

          SEQ -- Sequence file of the input images
          DPX -- Displacement vector component in the x direction
          DPY -- Displacement vector component in the y direction

97

**Exhibit 23  Page 1168**                                              GW-LT 255118

PROGRAM MFMATCH

MODULE NAME:

MFMATCH -- Multi Field Matching

VERSION:

| 1.0 | 24-JUL-1985 | U. MEYERDIRKS |
| (BLMATCH) | | |
| 1.0 | 7-MAR-1986 | Th. Micke |
| 1.1 | 7-APR-1986 | Th. Micke |

DESCRIPTION:

MFMATCH calculates the displacement vectors block by block according to an improved block match method for motion compensating interpolation.
In doing so, the errors in the fields to be interpolated are calculated in addition to the errors in the predictively coded reference frame and the error sum from the reference frame and all interpolated fields is minimized.
The images are input and output using MP files. For each processed image of the input sequence, the x and y components of the displacement vectors for all image blocks are provided in a data MPF.
In addition, the comments on the block match method are stored in a documentation MPF.

To document the results, additional images can the generated upon request for each input image. The user may select an image of the luminance differences between the two images used for block matching; the image extrapolated according to the block match method; a luminance difference image of the extrapolated image and the original image; and a graphic representation of the displacement vectors of all blocks from image to image.

In addition, the statistical values of all calculated images and data are output. Upon request, these can also be written to an MPF. The histogram is processed using the HST* routines.

The image number of the first and last images to be processed can be selected as desired. The number of images in the output sequences then corresponds to the difference in image numbers + 1.
The algorithm accesses two original images at a time that have image numbers that differ by the image number step size difference. If the image number step size is larger than the first image to be processed in the original sequence, an imaginary gray image is accessed as the reference image. The first image is described with the comments only in the histogram file.

REMARKS:

The following were introduced as abbreviations for the various files:

SEQ -- Sequence file of the input images
DPX -- Displacement vector component in the x direction
DPY -- Displacement vector component in the y direction
DOK -- Comments on the block match (parameters)
DIF -- The luminance differences of the input images
PIC -- A motion compensated image
DFD -- The displaced-frame difference

105

Exhibit 23  Page 1169                                    GW-LT 255119

PROGRAM CODMCP

MODULE NAME:

      CODMCP      --      Coder MC prediction

VERSION:

| 1.0 | 14-AUG-1985 | P.RCEPER |
| 1.5 | 7-NOV-1985 | P.RCEPER |
| (CODMC) | | |
| 1.0 | 6-JAN-1986 | Th. Hicke |
| 1.4 | 29-APR-1986 | Th. Hicke |

DESCRIPTION:

CODMCP simulates an adaptive DPCM coder for MPF sequences.
The main application of the coder is the generation of reference frames for the interpolative motion compensating coder CODMCI. (First pass of a motion compensating interpolation error coder)

Calling the subroutine ADACR3P performs a block by block predictor adaptation that can be switched off. Prior to coding, it is decided for each block whether it needs to be transmitted (conditional replenishment). If it is decided that replenishment is needed, the optimal selection is made between three predictors:
-- Intraframe predictor
-- Interframe predictor and
-- Motion compensating predictor

The motion compensating prediction is performed over a field interval IFIELDD (= 1... 4). If IFIELDD > 1, only every IFIELDDth field is coded in accordance with the application of the coder. The intermediate fields of the output sequence, while they exist, contain undefined data. If IFIELDD = 1, the coder operates without the second pass as a normal adaptive DPCM coder with motion compensating prediction.
If IFIELDD > 2, the field IFIELD - IFIELDD, which is also used for MC prediction, is accessed during interframe prediction because IFIELD - 2 is unknown.

The predictor adaptation has two modes of operation:
MODE = 0 -- >      Block selection of the best of the three predictors
MODE = 1 -- >      Predictor adaptation switched off -- exclusively MC prediction


Whether or not conditional replenishment is necessary is decided prior to the predictor adaptation and takes precedence over the latter (only if replenishment, then predictor selection!). It is not affected by the operating mode of the predictor adaptation.
To switch off conditional replenishment, the decision thresholds must be interactively set to 0 (default setting).

The following must be provided as the input sequences to the coder:
-- Original sequence
-- Displacement vectors (2 data MPFs that contain valid data at least for the reference frames).

113

**Exhibit 23  Page 1170**

GW-LT 255120

The output of the reconstructed signal and of the predictor adaptation cannot be suppressed because these are required in the following interpolative coder run of the CODMCI program.

REMARKS:

SUBROUTINES

```
FINI              HIPP
INIT              HIPP
MPFCLOSE          HIPP
MPFEXI            HIPP
MPFOPEN           HIPP
MPFREAD           HIPP
MPFWRITE          HIPP
SET/GET COMM      HIPP
SET/GET FLAG      HIPP
TERMCHAR          TERMLIB
TERMINT           TERMLIB
TERMREAL          TERMLIB
ADACRSP           CHICKEDIR.CODICODLIB
ADEF              CHICKEDIR.CODICODLIB
BLMVIEWI          CHICKEDIR.CODICODLIB
CODFIG            CHICKEDIR.CODICODLIB
FILENAM           CHICKEDIR.CODICODLIB
HSTCNT            CHICKEDIR.CODICODLIB
HSTINIT           CHICKEDIR.CODICODLIB
HSTSTA            CHICKEDIR.CODICODLIB
HSTSTP            CHICKEDIR.CODICODLIB
HSTTAB            CHICKEDIR.CODICODLIB
HSTTAB1           CHICKEDIR.CODICODLIB
HSTTAB2           CHICKEDIR.CODICODLIB
HSTVEC            CHICKEDIR.CODICODLIB
PDEF              CHICKEDIR.CODICODLIB
QDEF1             CHICKEDIR.CODICODLIB
SCALFIX           CHICKEDIR.CODICODLIB
SETHF             CHICKEDIR.CODICODLIB
```

EXTERNAL FUNCTIONS:

```
PRAEDMC           CHICKEDIR.CODICODLIB
QREP10            CHICKEDIR.CODICODLIB
```

\*\*\*\*\*\*\*\*\*\*\*\*\*
Declarations
\*\*\*\*\*\*\*\*\*\*\*\*\*

```
      PARAMETER(IUS1=21,IUS2=22,IUS3=23)    !    User input files
      PARAMETER(IWOUT=18)

C

      CHARACTER*10    HEADER
      CHARACTER*60    NAM1,NAM2,NAM3,NAMEXT1,NAMEXT2,NAMEXT3
      CHARACTER*10    VERSION
      CHARACTER*1     USE
      LOGICAL         L_OP(10), LEXI
      INTEGER*2       IBUF
C
      EXTERNAL        PRAEDMC,QREP10
C
      COMMON IBUF(1)
```

114

Exhibit 23  Page 1171                                    GW-LT 255121

PROGRAM CODMCI

MODULE NAME:

      CODMCI      --      Coder, MC interpolation

VERSION

| 1.0 | 14-AUG-1985 | P. ROEPER |
| 1.5 | 7-NOV-1985 | P. ROEPER |
| (CODMCI) | | |
| 1.0 | 13-JAN-1986 | Th. Micke |
| 2.0 | 19-FEB-1986 | Th. Micke |
| 2.1 | 9-APR-1986 | Th. Micke |

DESCRIPTION:

CODMCI simulates pass 2 of an adaptive DPCM/MC interpolation error coder for MPF sequences.
The use of CODMCI is only possible if the reference fields for the motion compensating interpolation were produced previously using the CODMCP program. In doing so, the following must (!) be available as input sequences:
--  Original sequence
--  Displacement vectors (2 data MPFs) *
--  Reconstructed output signal from CODMCP *
--  Predictor adaptation from CODMCP *
--  The corresponding output sequences from CODMCP for all output sequences are also to be output in CODMCI (The CODMCP outputs for the reference frames are interleaved with the CODMCI outputs into an overall output sequence of the interpolation error coder) *

The sequences marked with "*" must contain valid data at least in the reference frames (only the reference frames are evaluated).

For the fields between the reference frames, a block by block predictor adaptation that can be switched off is performed by calling the ADACR3I subroutine. For each block, it is decided whether it needs to be transmitted at all (conditional replenishment). If it is decided that replenishment is necessary, the optimal selection is made between
-- intraframe prediction
-- interframe prediction and
-- motion compensating interpolation error coding
Using the predictor adaptation information from CODMCP, motion compensating interpolation error coding is permitted only in blocks that were also subject to motion compensating coding in CODMCP.
The predictor/interpolator adaptation has the same modes of operation as for CODMCP:
MODE = 0 -- >    Block selection of the best coding (MCI only if MCP was also used in CODMCP!)
MODE = 1 -- >    Adaptation switched off -- exclusively MC interpolation error coding.

The decision regarding conditional replenishment takes precedence over adaptation here, too. To switch off conditional replenishment, the decision thresholds must be interactively set to 0 (default setting).

Three different interpolation modes are available for selection:

122

INTMODE = 0 -- >   Interpolation between the reference frames
INTMODE = 1 -- >   Interpolation between the field IFIELD-1 and the next reference frame
INTMODE = 2 -- >   Interpolation between the field IFIELD-2 and the next reference frame

In the case where INTMODE = 0 when "motion compensating picture" output is selected, a nested sequence of reconstructed reference frames and only motion compensated interpolated fields between them is output. The sequence has the extension .INT and corresponds to the receiver signal in the case of motion compensated interpolation without interpolation error transmission.
It would be especially appropriate to employ a bilinear vector interpolation for this application. The motion is compensated then on a pel by pel basis with interpolated vectors (!: computation time).

REMARKS:

```
SUBROUTINES:

      COPYWF              HIPP
      FINI                HIPP
      INIT                HIPP
      MPFCLOSE            HIPP
      MPFEXI              HIPP
      MPFOPEN             HIPP
      MPFREAD             HIPP
      MPFWRITE            HIPP
      GET/SET CONN        HIPP
      GET/SET FLAG        HIPP
      GETWF               HIPP
      TERMCHAR            TERMLIB
      TERMINT             TERMLIB
      TERMREAL            TERMLIB
      ADACRST             CMICKEDIR.COD]CODLIB
      ADEF                CMICKEDIR.COD]CODLIB
      BLMVIEWI            CMICKEDIR.COD]CODLIB
      CODFIO              CMICKEDIR.COD]CODLIB
      FILENAM             CMICKEDIR.COD]CODLIB
      HSTCNT              CMICKEDIR.COD]CODLIB
      HSTINIT             CMICKEDIR.COD]CODLIB
      HSTSTA              CMICKEDIR.COD]CODLIB
      HSTSTP              CMICKEDIR.COD]CODLIB
      HSTTAB              CMICKEDIR.COD]CODLIB
      HSTTAB1             CMICKEDIR.COD]CODLIB
      HSTTAB2             CMICKEDIR.COD]CODLIB
      HSTVEC              CMICKEDIR.COD]CODLIB
      IFINT               CMICKEDIR.COD]CODLIB
      PDEF                CMICKEDIR.COD]CODLIB
      QDEF1               CMICKEDIR.COD]CODLIB
      SCALFIX             CMICKEDIR.COD]CODLIB
      SETWF               CMICKEDIR.COD]CODLIB
      BILINT              [BIERDIR.LIB]BIERLIB
      SIZCHA              [BIERDIR.LIB]BIERLIB

EXTERNAL FUNCTIONS:

      PRAFOMC             CMICKEDIR.COD]CODLIB
      CREF10              CMICKEDIR.COD]CODLIB
```

123

Exhibit 23  Page 1173                                    GW-LT 255123

SUBROUTINE BLIALG

MODULE NAME:

      BLIALG--      Block match algorithm for MC interpolation

VERSION:

```
1.0            13-MAY-1985        U. MEYERDIERKS
1.1            24-JUL-1985
(BLMALG)
1.0            7-MAR-1986         Th. Mieke
```

FORTRAN CALL:

      CALL BLIALG(...)

DESCRIPTION:

    BLIALG checks the dimensions of the input images. If no error occurs, the images are transmitted to the block match algorithms.

    Then, the displacement vector component files are statistically evaluated.

PARAMETERS:

    IWLIST     INPUT  INTEGER
    Table of the work file numbers

    ICUR      INPUT  INTEGER
    Field index for the current image.

    JFBLM    INPUT  INTEGER
    Field interval for the block match.

    IFIELD    INPUT  INTEGER
    Sequence number of the current field.

    IWX       INPUT  INTEGER
    Work file of the X displacement component

    IWY       INPUT  INTEGER
    Work file of the Y displacement component

    IMODE    INPUT  INTEGER
    Identifier for the block match method
          = 1 -- >     Block match according to Jain & Jain
          = 2 -- >     Differential method

    NPIXB    INPUT  INTEGER
    Block length

    NLINB    INPUT  INTEGER

153

Exhibit 23  Page 1174        GW-LT 255124

Block height

IDMAX     INPUT  INTEGER
Maximum recognizable displacement

MODE_INT INPUT  INTEGER
Interpolation mode

MODE_ERR         INPUT  INTEGER
Selection of the error size

REMARKS:
    BLIALG represents a version of the subroutine BLMALG by U. Meyerdirks expanded for
    multi-field matching (PROGRAM MFMATCH).
    As parameters, the complete list of work file numbers with the current index ICUR, the block
    match interval, the field number of the current image (according to the MBV standard), the
    selected mode of the desired error size and the appropriate interpolation mode are taken
    from the program MFMATCH and transferred to the subroutine BLIBLK.

***************
Declarations
***************

```
        INTEGER*2        IBUF
        COMMON           IBUF(1)
        DIMENSION        IWLIST(-6:8)
 C
        DATA IDPX,IDPY/3,4/
```

***************
Determining the image parameters of the input images
***************

```
 CALL GETDIM(IWLIST(ICUR),NPIXA,NLINA)
 CALL GETDIM(IWLIST(ICUR-JFBLM),NPIXO,NLINO)
 IF((NPIXA.NE.NPIXO).OR.(NLINA.NE.NLINO)) THEN
    CALL ERROR(-999,'BLIALG:different Workfile-Dimensions')
 ENDIF
```

***************
JAIN & JAIN algorithm
***************

```
      IF(IMODE.EQ.1) THEN
         NLINEB = NLINB
         CALL BLIBLK(IWLIST,ICUR,JFBLM,IFIELD,IWX,IWY,
    +               NPIXB,NLINEB,IDMAX,MODE_INT,MODE_ERR)
```

***************
Incorrect method number
***************

```
ELSE
         PRINT*, ' *** THAT IS NOT RIGHT'
         PRINT *,' *** ABORT BLIAGL: IMODE =', IMODE
         PRINT *,' '
         PRINT *,' '
```

154

Exhibit 23  Page 1175                                    GW-LT 255125

SUBROUTINE BLIBLK(...)

MODULE NAME:

     BLIBLK --     Block organization for multi-field matching

VERSION

```
1.0          24-JUL-1985         U. MEYERDIERKS
1.1          14-OCT-1985
(BLMBLK)
1.0           7-MAR-1936         TH. MICKE
```

FORTRAN CALL:

     CALL BLIBLK(...)

DESCRIPTION:

     BLIBLK performs block organization in multi-field matching.
     The displacements determined are output to data files.
     In addition, the data necessary for the statistics calculations are transferred to the HST*
     routines. In this way, the lower-level subroutines do not make any calls for statistics
     processing.

PARAMETERS:

     IWLIST     INPUT  INTEGER
     Table of the work file numbers

     ICUR     INPUT  INTEGER
     Field index for the current image.

     JFBLM     INPUT  INTEGER
     Field interval for the block match.

     IFIELD     INPUT  INTEGER
     Field number of the current field
     (decides about even/odd field)

     IWX     INPUT  INTEGER
     Work file of the X displacement component

     IWY     INPUT  INTEGER
     Work file of the Y displacement component

     NPIXB     INPUT  INTEGER
     Block length

     NLINB     INPUT  INTEGER
     Block height

     IDMAX     INPUT  INTEGER

156

Exhibit 23  Page 1176     GW-LT 255126

Maximum recognizable displacement

MODE_INT INPUT  INTEGER
Interpolation mode

MODE_ERR          INPUT  INTEGER
Selection of the error size

REMARKS:

BLIBLK is a version of the subroutine BLMBLK by U. Meyerdirks expanded for multi-field matching.
As parameters, the complete list of work file numbers with the current index, the block match interval, the current field number (according to the MBV standard), the selected mode of the desired error size and the interpolation mode are taken from the subroutine BLIALG and transferred to the subroutine BLIJAIN.
In addition, the field correction for the outer (total) displacement and the vector factors are calculated for all interpolation intervals that occur, the field correction for the component displacement is set as a table and transferred to BLIJAIN.

Declarations
(IWA := current image / IWO := original image)

```
        INTEGER*2     IBUF
        COMMON        IBUF(1)                        ! Table of the work file numbers
        DIMENSION     IWLIST(-6:8),                  ! Table of the vector factors
                      VFAC(6),
                      DL2(0:1,0:1)                   ! Field correction table
  c

        INTEGER  IPIXB1,                             ! First pel of the search block from IWA
      +          ILINB1,                            ! First line of the search block from IWA
      +          NPIXA,                             ! Line length of the current work file IWA
      +          NLINA,                             ! Number of lines of the current work file IWA
      +          NPIXO,                             ! Line length of the past work file IWO
      +          NLINO,                             ! Number of lines of the past work file IWO
      +          NBLKX,                             ! Number of blocks in the horizontal direction
      +          NBLKY                              ! Number of blocks in the vertical direction

        DATA     KSTEP,KMATCH/1,2/
        DATA     DL2/0., 0.5, 0., -0.5/
```
*************
Determining the image parameters of the input images
*************
```
        CALL GETDIM(IWLIST(ICUR),NPIXA,NLINA)
```
*************
Calculating the number of blocks in the x and y direction
*************
```
        NBLKX = INT( NPIXA/NPIXB )
        NBLKY = INT( NLINA/NLINB )
        IF(MOD(NPIXA,NPIXB).NE.0) NBLKX = NBLKX + 1
        IF(MOD(NLINA,NLINB).NE.0) NBLKY = NBLKY + 1
      +*
```

157

Exhibit 23  Page 1177                    GW-LT 255127

SUBROUTINE BLIJAIN(...)

MODULE NAME:

    BLIJAIN       - Jain's algorithm for MC interpolation

VERSION:

| 1.0 | 23-MAY-1985 | U. MEYERDIERKS |
| 1.1 | 14-OCT-1985 | |
| (BLMJAIN) | | |
| 1.0 | 7-MAR-1984 | Th. Micke |

FORTRAN CALL:

    CALL BLIJAIN(...)

DESCRIPTION:

    JAIN searches for one block in the current image IWA within a larger window lying at the same point of the past image IWO.
In so doing, the block is shifted in the window. The distortion (D*istortion) serves as the measure of the quality of coincidence of the block and a block of the same size in the window. The difference of the sum of the luminance values of the pels of both blocks to be compared is defined as the distortion. As a result, the direction DMD is specified in which, seen from the center of the window, the block exhibits the minimal distortion.
The search strategy uses a proposal from Jain & Jain.

PARAMETERS:

    IWLIST    INPUT  INTEGER
Table of the work file numbers

    ICUR     INPUT  INTEGER
Field index of the current image.

    JFBLM    INPUT  INTEGER
Field interval for the block match.

    IFIELD    INPUT  INTEGER
Field number of the current field
(decides about even/odd field)

    DL1      INPUT  INTEGER
Field correction for outer (total) displacement

    DL2      INPUT  INTEGER
Field correction for inner (partial) displacement
(Table)

    VFAC     INPUT  REAL

163

Exhibit 23  Page 1178

GW-LT 255128

Table of vector factors for the current field intervals

IDPX        INPUT  INTEGER
X component of the displacement vector

IDPY        INPUT  INTEGER
Y component of the displacement vector

NPIXB       INPUT  INTEGER
Block size in the horizontal direction [pels]

NLINB       INPUT  INTEGER
Block size in the vertical direction [lines]

IDMAX       INPUT  INTEGER
Maximum recognizable displacement

MODE_INT INPUT  INTEGER
Interpolation mode

IPIXB1      INPUT  INTEGER
First pel of a block line

ILINB1      INPUT  INTEGER
First line of the block

NSTEP       OUTPUT         INTEGER
Number of search steps

NMATCH  OUTPUT         INTEGER
Number of block comparisons

MODE_ERR       INPUT  INTEGER
Selection of the error size

REMARKS:

The local variables are selected to a large extent from the paper by Jain & Jain [IEEE Transactions on Communications, vol. Com-29, No. 12. December, 1981].

In addition, the following definitions apply:
Block          :=  Block in the IWA {NPIXB*NLINB}
Window         :=  Window in IWO extending beyond the block from IWA (search area)
                   { (NPIXB+2*IDMAX)*(NLINB+2*IDMAX) }
Search block   :=  Shifted block in the window in IWO { NPIXB*NLINB }
DMD            :=  Direction of Minimum Distortion

Declarations

164

Exhibit 23  Page 1179                                    GW-LT 255129

SUBROUTINE BLMVIEWI(...)

MODULE NAME:

      BLMVIEWI      --      BLMVIEW expanded for interpolation

VERSION:

| 1.0 | 13-MAY-1985 | U. MEYERDIERKS |
| 1.1 | 22-JUL-1985 | B. GIROD |
| 1.2 | 24-JUL-1985 | U. MEYERDIERKS |
| (BLMVIEW) | | |
| 1.0 | 12-JAN-1986 | Th. Micke |
| 1.2 | 25-FEB-1986 | Th. Micke |

FORTRAN CALL:

      CALL BLMVIEWI(...)

DESCRIPTION:

BLMVIEWI generates the motion compensated output image from the given displacement components of the block match method and the original image used.

If the vectors point beyond the edge of the image IWO, the vector is clipped component by component so that the image edge is accessed.

As an extension of the BLMVIEW program, motion compensation can be performed for motion compensated interpolation with -- considering the field offset -- rounded component vectors. To do this, the field numbers of the reference frames, of the original image, and of the motion compensating image must be passed as parameters 7... 10.
!    The field numbers must correspond to the MBV standard as otherwise the correction of the field offset is wrong!

If fewer than 10 parameters are passed, BLMVIEWI functions just like BLMVIEW with integer vectors. For this reason, it can be used universally in place of BLMVIEW.

PARAMETERS:

IWO      INPUT  INTEGER
Work file number of the original image

IWX      INPUT  INTEGER
Work file number of the x displacement component DPX

IWY      INPUT  INTEGER
Work file number of the y displacement component DPY

IWP      INPUT  INTEGER
Work file number of the image with motion compensation

NPIXB      INPUT  INTEGER

171

**Exhibit 23  Page 1180**      GW-LT 255130

SUBROUTINE IFINT(...)

MODULE NAME:

    IFINT    --       Interfield interpolation

VERSION:

| 1.0 | 12-JAN-1986 | Th. Micke |
| 1.1 | 10-FEB-1986 | Th. Micke |

FORTRAN CALL:

    CALL IFINT(...)

DESCRIPTION:

    IFINT interpolates the field IWINT from the previous field IWBAK and the next field IWFOR. The signal values of IWBAK and IWFOR are weighted in accordance with their intervals to the interpolated field (JFBAK and JFFOR).

PARAMETERS:

    IWINT    INPUT  INTEGER*4
    Interpolated output work file

    IWBAK    INPUT  INTEGER*4
    Previous input work file

    IWFOR    INPUT  INTEGER*4
    Following input work file

    JFBAK    INPUT  INTEGER*4
    Interval between the interpolated and previous field

    JFFOR    INPUT  INTEGER*4
    Interval between the interpolated and the following field

REMARKS:

    --

****************
Message
****************

```
        CALL GET COMM(ICOMM)
        IF(ICOMM.GE.1)THEN
             PRINT 1000,IWINT,IWBAK,IWFOR,JFBAK,JFFOR
        ENDIF
 1000   FORMAT(' EXECUTING  -- IFINT --      IWINT =',I4,' IWBAK =',I4,
      + '  IWFOR =',I4,'  JFBAK =',I4, '  JFFOR =', I4)
```

190

Exhibit 23  Page 1181    GW-LT 255131

Exhibit 24

# United States Patent [19]

## Haskell et al.

[11] **Patent Number:** **4,958,226**

[45] **Date of Patent:** **Sep. 18, 1990**

[54] **CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO**

[75] Inventors: **Barin G. Haskell,** Tinton Falls, N.J.; **Atul Puri,** Bronx, N.Y.

[73] Assignee: **AT&T Bell Laboratories,** Murray Hill, N.J.

[21] Appl. No.: **413,520**

[22] Filed: **Sep. 27, 1989**

[51] Int. Cl.⁵ .......................................... H04N 7/12
[52] U.S. Cl. ................................. 358/136; 358/135
[58] Field of Search ..................... 358/135, 136, 133

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,218,703 | 8/1980 | Netravali et al. . | |
| 4,218,704 | 8/1980 | Netravali et al. . | |
| 4,383,272 | 5/1983 | Netravali et al. . | |
| 4,442,454 | 4/1984 | Powell ................................... | 358/167 |
| 4,460,923 | 7/1984 | Hirano et al. ......................... | 358/136 |
| 4,665,436 | 5/1987 | Osborne et al. ...................... | 358/135 X |
| 4,667,233 | 5/1987 | Furukawa ............................. | 358/136 |
| 4,727,422 | 2/1988 | Hinman ................................ | 358/135 X |
| 4,782,387 | 11/1988 | Sabri et al. ......................... | 358/135 |

### OTHER PUBLICATIONS

"Movement-Compensated Frame-Frequency Conversion of Television Signals," H. Yamaguchi, T. Sugi and K. Kinuhata, IEEE Transactions on Communications, vol. COM-35, No. 10, Oct. 1987, pp. 1069–1082.

*Primary Examiner*—James J. Groody
*Assistant Examiner*—Victor R. Kostak
*Attorney, Agent, or Firm*—Henry T. Brendzel

[57] **ABSTRACT**

Motion digital video is encoded and decoded by a motion compensated interpolation method and apparatus. In accordance with the method, selected frames of the video are interpolated in the decoder with the aid of interpolation correction codes that are generated in the encoder and sent to the decoder. In an encoder embodiment that interpolates half of the frames, every other frame is encoded and decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information, are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

**12 Claims, 2 Drawing Sheets**



**Exhibit 24  Page 1182**

LUC 1112272

FIG. 1



LUC 1112273

Exhibit 24  Page 1183

Case 3:07-cv-02000-H-CAB     Document 78-2     Filed 11/30/2007     Page 185 of 227

FIG. 2



LUC 1112274

**Exhibit 24  Page 1184**

4,958,226

1                                                          2

### CONDITIONAL MOTION COMPENSATED INTERPOLATION OF DIGITAL MOTION VIDEO

#### BACKGROUND OF THE INVENTION

This invention relates to signal coding and, more particularly, to a method and apparatus for encoding and decoding video signals of moving images.

Video signals typically originate from video cameras. The bandwidth of video signals is quite substantial and consequently, practioners in the art have tried to reduce the bandwidth of these signals without unduly degrading the the images. Typically to reduce bandwidth the video signals are encoded and redundancies in the encoded signals are extracted and deleted. Different techniques are used in the art and some are better suited for still images, while others are better suited for moving images. One of the techniques for reducing the bandwidth of moving images is generally referred to as motion compensated predictive coding.

In conventional motion compensated predictive coding, each video frame is first partitioned into square blocks of picture elements (pels); such as blocks fo 8 pels by 8 pels. Each block is coded, in turn, and the developed encoded sequence is transmitted over a communications channel to a decoder. The communications channel may be, or may include, a storage element. Next, a determination is made as to whether or not the pels of the block have changed significantly compared with the previous frame. If not, an indicator signal is sent which signifies to the decoder that it needs to merely repeat the pels of that block from the previous frame obtain the pels for the current block. This is known as "Conditional Replenishment". If the pels have changed since the previous frame, an attempt is made to determine the best estimate of motion that is occurring in the block. This is frequently done by a "Block Matching Motion Estimation" technique wherein the pels of the current block are successively compared with various small shifts of the corresponding block in the previous frame. The shift that gives the best match is deemed to be the "best estimate" of the displacement in the block's image between frames, and the amount of this shift, called the "Motion Vector", is selected and sent to the decoder.

The pels of the current block are then compared with those of the "best" shifted block from the previous frame to see if there is a significant difference. If an indicator signal is sent to the decoder, which merely causes the pels of the shifted block from the previous frame to be repeated for the pels for the current shifted block. Such blocks are said to have been successfully "Motion Compensated". However, if there is a significant difference between the two blocks, the difference is encoded and sent to the decoder so that the pels of the current block may be more accurately recovered. Coding of this difference is typically performed by means of the "Discrete Cosine Transform" (DCT).

The volume of code that is generated by the above procedure is variable. It can be appreciated, for example, that image changes that do not correspond to a uniform translation, or motion, of the image may require substantial encoding to describe the deviation of a block from its best translated replica. On the other hand, when the image does not change between successive frames, then there is a minimal amount of information that needs to be encoded. To accommodate these potentially wide variations in the amount of code that needs to be transmitted, typical encoders include a FIFO memory at the output, to serve as a buffer.

The FIFO is not a panacea. For a given transmission rate, when an excessive volume data is generated, there is always a danger that the FIFO would overflow. When it does, coding must stop until the transmission channel can empty the FIFO sufficiently so that new data to be accepted into it. Since it is inconvenient to stop encoding in the middle of a frame, most systems discard an entire frame whenever the FIFO buffer is full, or nearly so. To compensate for the loss of a frame, such systems cause the decoder to repeat its most recently available frame. Frame repeating results in moving objects in the scene being reproduced in a jerky fashion, rather than in the smooth way that would occur if frame repeating were not invoked.

There have been some suggestions for improving the quality of the repeated frames in order to make them more faithfully resemble the original. One technique is called "Motion Compensated Interpolation". With this technique, instead of simply repeating the pels from the previous frame, the Motion Vectors are used to laterally displace the block by the appropriate amount prior to display. In other words, this method creates the missing block of pels by averaging over the immediately previous and following blocks of pels that are available to the decoder. While this might seem to be a good idea, experimental results show that when the images of successive blocks do not represent translational motion, the reproduced image may be worse than with frame repeating. Although it has been observed that this degradation is caused by a relatively few pels that do not conform to the assumption of translational motion, putting these pels in the wrong places creates highly visible artifacts.

#### SUMMARY OF THE INVENTION

In accordance with the principles of this invention, pels that cause highly visible artifacts are detected, and corresponding correction information is transmitted to the decoder. The amount of correction information that must be sent is relatively small, and the improvement in picture quality is quite large.

Since the interpolation technique that employs the principles of this invention yields good results, it has been found acceptable to interpolate every other frame, or two out of three frames, on a regular basis. The benefit of such regular interpolation is a reduced transmission bit rate which results from the fact that the pel correction information comprises fewer bits than the actual frame coding information.

In an encoder embodiment that interpolates half of the frames, every other frame is encoded and thereafter decoded within the encoder. The decoded versions of adjacent frames are appropriately combined and compared to the interleaved camera frame that is to be interpolated in the decoder. The differences, which correspond to "pels correction" information. are encoded and quantized. Those that exceed a predetermined threshold value are added to the encoder's output buffer. The inverse operation is carried out in the decoder. That is every pair of decoded frames is averaged and combined with the decoded "pels correction" information to form the interpolated frames.

LUC 1112275

Exhibit 24  Page 1185

4,958,226

| 3 | 4 |

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 presents a block diagram of an encoder in accordance with the principles of this invention; and

FIG. 2 depicts a block diagram of a decoder in accordance with the principles of this invention.

## DETAILED DESCRIPTION

Given a specified transmission rate in the communications channel, frame interpolation needs to be resorted to only when the FIFO is at, or near overflow. When that is the selected approach, the encoder of our invention encodes the blocks of every frame and concurrently develops the codes for interpolating the blocks from the information available to the encoder from previous and subsequent frames. At the input to the FIFO buffer, a switch is installed that is sensitive to the available memory in the buffer. When the available memory falls below a preselected threshold, the switch is set to accept the frame interpolation code. Otherwise, the switch is set to accept the frame encoding code. Other control techniques are also available, such as selecting some frames for encoding and some frames for interpolation, based on the occupancy level of the buffer. Both specific frames can thus be selected for interpolations as well as a proportion of frames to be interpolated.

The above insures that the encoder would not exceed the transmission capacity of the communications channel. In some applications, however, it is more important to achieve a low transmission rate. Knowing that the frame interpolation code is less voluminous than the frame encoding code, it makes sense to accept the frame interpolation code wherever possible. The zeal to chose interpolation code in preference to frame encoding code is tempered, however, by the level of degradation that is acceptable to the user in the reconstituted picture. It is further tempered by the observation that the volume of the frame interpolation code increase with increased use of the frame interpolation code so one could quickly reach a point of "diminishing returns" in the use of interpolation code.

Experimentally, it has been found that interpolating every other frame is quite beneficial. Accordingly, for the illustrative purposes of this disclosure, the following describes the structure and operation of an encoder and a decoder that interpolates every other frame in accordance with the principles of this invention.

FIG. 1 describes an encoder of our invention. In FIG. 1, a video signal is applied to switch 10. The switch toggles at the video frame rate and thus feed alternate frames to outputs A and B. The control is such that switch 10 is in position A when frame $F_{i+1}$ is coming out of the video camera. The index i designates the frame number from some arbitrary starting point. During the previous video frame period, frame $F_i$ came out of the camera, passed through output B of switch 10 and to the input of frame memory 16. Now, frame $F_i$ is coming out of frame memory 16. It is frame $F_i$ that will be interpolated in the decoder.

The following segment describes the operation of the motion compensation coding portion of the coder, which is well known to those skilled in the art.

Frame $F_{i+1}$ passes to subtractor 20 and to motion estimator 11. Frame memory 12 contains the frame that was previously coded via motion compensation; and in this case it is frame $F_{i-1}$. The output of memory 12 forms the other input to motion estimator 11. For each block of pels, motion estimator 11 compares the pels of frames $F_{i+1}$ and $F_{i-1}$ to determine the best estimate of motion. The best estimate is delivered as a motion vector signal on bus 100, and thus it passes to shift circuit 15. Circuit 15 also accepts the pels information about the previous frame, $F_{i-1}$, from frame memory 12, applies the appropriate translational shift according to the above-mentioned motion vector and outputs a block of "Prediction" pels to be used as a prediction of the incoming frame $F_{i+1}$ pels.

This prediction block of pels passes to the other input of subtractor 20 whereupon it is subtracted from the incoming pels of frame $F_{i+1}$ to give a "Prediction Error" signal. The prediction error typically is transformed by DCT 30 and the output coefficients are quantized by quantizer 40. The quantized values are coded into bit coder 50 and passed to buffer 60 to await transmission to the decoder.

From the above, it is clear that the input to the quantizer depends on the nature of the moving image, and consequently and as indicated above, it has the possibility of emptying or overflowing. To avoid this, a feedback path is provided to quantizer 40, so that the quantizer coarseness can be increased if buffer overflow threatens, or decreased if buffer emptying is imminent.

Continuing with the description of motion compensated coding, the quantized output signals of quantizer 40 are inverse transformed by inverse DCT 41, and applied to adder 42. Adder 42 also receives the prediction pels of shift circuit 15 resulting in a coded version of frame i + 1, $F_{i+1}$, which is passed into frame memory 12 for use with a subsequent frame as described above.

This completes the discussion of conventional motion compensation coding.

With the coded versions of frames i − 1 and i + 1, i.e., $F_{i-1}$ and $F_{i+1}$ being available, frame $F_i$ can be generated.

The $F_i$ generation starts with the motion vectors that are produced by motion estimator 11. These are used by shift circuit 13 to shift the incoming pels from frame $F_{i-1}$, perhaps by half the motion vector, to produce one estimate of the pels in frame $F_i$. Circuit 14 also uses the motion vectors of line 100 to shift the coded pels of $F_{i+1}$, perhaps by half and in the opposite direction from the motion vector. This produces another estimate of the pels of $F_i$.

The two estimates produced by shift circuits 13 and 14 are combined in averager 17 to produce the final prediction of frame $F_i$. This interpolated prediction is usually very good, but not always.

To improve the interpolated prediction in accordance with our invention, subtractor 43 calculates an error signal that corresponds to the difference between the actual frame data that exits frame memory 16 ($F_i$) and the predicted frame as it appears at the output of averager 17 ($F_i$). The error signal is transformed by DCT 18, quantized by quantizer 19 and passed to coder 44, which detects large occurrences of interpolation error and codes them for transmission. The coded interpolation error is passed to buffer 60 in the same way as from coder 50. Similarly, a feedback path is provided to quantizer 19 to combat buffer overflow and underflow.

The decoder, depicted in FIG. 2, is very similar to the encoder. The components mirror corresponding components in the coder with a few deviations. In particular, the input is received in buffer 23 and is distributed therefrom based on the nautre of the signals. Frame encoding code (e.g. corresponding to $F_{i-1}$ and $F_{i-1}$) is

LUC 1112276

Exhibit 24  Page 1186

4,958,226

5

sent to decoder 22 and therefrom to DCT$^{-1}$ 24, adder 27, memory 28 and shift circuit 26. These elements correspond to elements 41, 42, 12, and 15, respectively, and operate in the same manner. That is completely expected, since the function of these elements in the encoder is to emulate the decoder. Thus, the contents of memory 28 correspond to the estimated frames. Similarly, elements 39, 31 and 32 in the decoder correspond to elements 13, 14 and 17, respectively in the encoder and operate in the same manner.

The pels correction code also exits buffer 23, is decoded in decoder 25 and inverse transformed in element 34. This correction information is added to the estimate of $F_i$ developed by circuit 35 and is applied to memory 33. Memory 33 delays the $F_i$ information to permit a proper interleaving of $F_i$ between $F_{i-1}$ and $F_{i+1}$. As can be observed from above, one of the deviations is that the interpolation error subtractor 43 of the encoder becomes adder 35 at the decoder. Also, another output of frame memory 28 is shown since frame $F_{i-1}$ pels for the video output display may need to be read out at a different rate for the video output at switch 21 than the frame $F_{i-1}$ pels are needed for shift circuits 26 and 39.

It may be noted that there is a tradeoff between the buffer size of buffer 23 and the necessity for frame memory 33. If the buffer is sufficiently large, frame memory 33 could be deleted. The frame $F_i$ output from adder 35 would then pass directly to the video output via switch 21, which would be in position B. Following this, switch 21 would toggle to its A input, and decoding would stop for a frame period while frame $F_{i+1}$ was displayed via the output of frame memory 28 and the A input of switch 21. During this time, decoder buffer 23 would fill with data from the channel.

Many alternative arrangements are possible for the basic conditional motion compensation interpolation approach. For example, more than one frame might be conditionally interpolated, in which case shifter circuits 13, 14, 30 and 31 need to be more versatile and frame memories 16 and 33 need to be larger. Also in computing the best estimate of motion, motion estimator 11 might take frame $F_i$ pels as additional input. This would enable simultaneous minimization of both motion compensation prediction error as well as interpolation error. Still other improvements may be introduced by skilled artisans practicing this invention without departing from the spirit and scope thereof.

We claim:

1. A circuit for encoding applied video signals that comprise successive frames, where each frame is divided into blocks, comprising:

first means for encoding the blocks of some of said frames by developing for each block of such frames (a) and approximated version of said block derived from an approximated version of said block developed for a previous frame, and (b) a code which represents the deviation of said block from said approximated version of said block;

second means for approximating the blocks of those of said frames that are to be interpolated by combining approximated versions of said blocks in selected ones of the frames that are encoded in said first means; and

third means responsive to said second means and to said frames to be interpolated for developing a code that corresponds to those pels in blocks approximated by said second means that differ from

6

corresponding pels in said frames to be interpolated by greater than a preselected threshold.

2. A circuit for encoding applied video signals that comprise successive frames, where each frame is divided into blocks, including means for encoding the blocks of some of said frames by developing for each block of such frames (a) an approximated version of said block derived from an approximated version of said block developed for a previous frame, and (b) a code which represents the deviation of said block from said approximated version of said block, the improvement comprising:

second means for approximating the blocks of those of said frames that are to be interpolated by combining approximated versions of said blocks in selected ones of the frames that are encoded in said means for encoding; and

third means responsive to said second means and to said frames to be interpolated for developing code that corresponds to those pels in blocks approximated by said second means that differ from corresponding pels in said frames to be interpolated by greater than a preselected threshold.

3. The circuit of claim 2 wherein said code developed for a pel by said third means represents the difference between the value of said pel and the value of said pel approximated by said second means.

4. The circuit of claim 2 wherein the frames selected for combining in said second means include a frame encoded in said first means that precedes the frame approximated in said second means and a frame encoded in said first means that succeeds the frame approximated in said second means.

5. The circuit of claim 4 wherein said combining includes developing anticipated versions of said blocks.

6. The circuit of claim 2 wherein a set proportion of frames of said applied video signals are interpolated.

7. The circuit of claim 6 wherein said proportion is approximately one half.

8. The circuit of claim 2 fruther comprising buffer means for interposed between the codes developed by said means for encoding and said third means and an output port of said circuit.

9. The circuit of claim 8 for controlling the proportion of frames selected for interpolation by said second means and code generation by said third means based on the occupancy level of said buffer.

10. The circuit of claim 8 for selecting frames for interpolation by said second means and code generation by said third means when said buffer is occupied beyond a chosen proportion of its capacity.

11. The circuit of claim 7 wherein granularity of the codes generated by said first means and said third means is controlled by the occupancy level of said buffer.

12. A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising:

means for developing block approximations from said codes that describe deviations from approximated blocks; and

means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.

* * * * *

LUC 1112277

Exhibit 24  Page 1187

Exhibit 25

FILED

JUL 14 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES, INC.,

Plaintiff,

v.

GATEWAY, INC AND GATEWAY
COUNTRY STORES LLC; and,
MICROSOFT CORPORATION; and, DELL,
INC.,

Defendants.

Civil No. 02CV2060-B(WMc);
03CV0699-B(WMc);
03CV1108-B(WMc)

**ORDER CONSTRUING CLAIMS
FOR UNITED STATES PATENT
NUMBER 4,958,226**

Before the Court is the matter of claims construction for U.S. Patent Number
4,958,226 ("the '226 Patent") in the above titled cases for patent infringement.[1] Pursuant to
Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Court conducted a

---

[1] Lucent originally filed two separate patent infringement actions, one against Defendant
Gateway (02CV2060), and a second against Defendant Dell (03CV1108). Microsoft intervened in the
action filed by Lucent against Gateway. Microsoft also filed a declaratory judgment action against
Lucent (03CV0699) and Lucent filed counterclaims for patent infringement against Microsoft in that
action. On July 7, 2003, the Court entered an order consolidating these three cases. There are a total
of 15 different patents involved in these three cases collectively.

1                    02CV2060; 03CV0699; 03CV1108

Exhibit 25  Page 1188

1  Markman hearing regarding construction of the disputed claim terms for the '226 Patent on

2  September 9, 2004 and July 5, 2005.  Plaintiff Lucent Technologies, Inc. ("Lucent") was

3  represented by the Kirkland & Ellis law firm, Defendant Gateway Inc. ("Gateway") was

4  represented by the Dewey Ballantine law firm, Defendant Microsoft Corporation

5  ("Microsoft") was represented by the law firm of Fish and Richardson and Defendant Dell,

6  Inc. ("Dell") was represented by the Arnold and Porter law firm.

7       The purpose of the Markman hearing was for the Court, with the assistance of the

8  parties, to prepare jury instructions interpreting the pertinent claims for all claim terms at

9  issue in the '226 Patent.  Additionally, the Court and the parties prepared a "case glossary"

10  for terms found in the claims and the specification for the '226 Patent, considered to be

11  technical in nature and which a jury of laypersons would not understand clearly without

12  specific definition.  As the case advances, the parties may request additional terms to be

13  added to the glossary as to further facilitate the jury's understanding of the disputed claims.

14       After careful consideration of the parties' arguments and the applicable statues and

15  case law, the Court **HEREBY CONSTRUES** all claim terms in dispute in the '226 Patent

16  and **ISSUES** the relevant jury instructions as written in exhibit A, attached hereto.  Further,

17  the Court **HEREBY DEFINES** all pertinent technical terms as written in exhibit B,

18  attached hereto.

19

20       IT IS SO ORDERED.

21

22  DATED:  7-/3-05

23                                              UNITED STATES SENIOR DISTRICT JUDGE

24

25  cc:   All Parties
        The Honorable William McCurine, Jr., United States Magistrate Judge

26

27

28                              2                    02CV2060; 03CV0699; 03CV1108

Exhibit 25  Page 1189

# EXHIBIT A

## UNITED STATES PATENT NUMBER 4,958,226

| VERBATIM CLAIM LANGUAGE | COURT'S CLAIM CONSTRUCTION |
|---|---|
| **CLAIM 12**<br>A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising: | A circuit **[any path that can carry electrical current]** responsive to coded video signals where the video signals comprise **successive frames [one frame following another; consecutive frames]** and each frame includes a plurality of **blocks [sets of pixels (picture elements also called pels) that constitute a portion of a frame]** and where the coded **[change from one form of representation to another]** video signals comprise codes that describe deviations from **approximated blocks [predicted blocks]** and codes that describe **deviations [differences]** from interpolated blocks, comprising: |

02CV2060; 03CV0699; 03CV1108

Exhibit 25  Page 1190

| | |
|---|---|
| means for developing block approximations from said codes that describe deviations from approximated blocks; and | means for developing **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** from said codes that describe deviations from approximated blocks; and<br><br>Function:<br>The function is developing **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** from said codes that describe deviations from approximated blocks.<br><br>Corresponding structure:<br>Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 3-10, 26-32, Col. 4, line 63 to Col. 5, line 7). |

4

Exhibit 25  Page 1191

| means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks. | means responsive to said **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.<br><br>Function:<br>The function is to develop said interpolated blocks responsive to said **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** and to said codes that describe deviations from interpolated blocks.<br><br>Structure:<br>Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 63-65; Col. 5, lines 7-23 [description of the structure and inputs that correspond to these elements is at Col. 4, lines 38-50]). |

02CV2060; 03CV0699; 03CV1108

Exhibit 25  Page 1192

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## EXHIBIT B

## CASE GLOSSARY FOR UNITED STATES PATENT NO.4,958,226

| TERM | DEFINITION |
|---|---|
| approximated blocks | predicted blocks |
| block approximations | the combinations of predicted blocks with differences between the actual blocks and the predicted blocks |
| blocks | sets of pixels (picture elements also called pels) that constitute a portion of a frame |
| circuit | any path that can carry electrical current |
| coded | change from one form of representation to another |
| deviations | differences |
| pixels | picture elements also called pels |
| successive frames | one frame following another; consecutive frames |

6

02CV2060; 03CV0699; 03CV1108

Exhibit 25  Page 1193

Exhibit 26

*LIBRARY OF CONGRESS*

# Copyright Office
## of the United States

*WASHINGTON, D.C.*

## ADDITIONAL CERTIFICATE OF REGISTRATION
## OF A CLAIM TO COPYRIGHT



THIS IS TO CERTIFY THAT THE STATE-
MENTS SET FORTH IN THE ATTACHED
HAVE BEEN MADE A PART OF THE
RECORDS OF THE COPYRIGHT OFFICE
WITH CLAIM OF COPYRIGHT REGIS-
TERED UNDER NUMBER
TX 2 347 303

IN TESTIMONY WHEREOF,
THE SEAL OF THIS OFFICE IS
AFFIXED HERETO ON

NOVEMBER 3, 2005

REGISTER OF COPYRIGHTS
United States of America

**REGISTER OF COPYRIGHTS**

C-731 June 1999 — 10,000

**Exhibit 26  Page 1194**

DELL 318997

**FORM TX**
UNITED STATES COPYRIGHT OFFICE

REGISTRATION NUMBER

TX 2-347 303

☐ TX          ☐ TXU

EFFECTIVE DATE OF REGISTRATION

6          28          88
Month       Day        Year

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

TITLE OF THIS WORK ▼   DIGITAL PICTURES
Representation and Compression

PREVIOUS OR ALTERNATIVE TITLES ▼

PUBLICATION AS A CONTRIBUTION   If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.   Title of Collective Work ▼

If published in a periodical or serial give: Volume ▼        Number ▼        Issue Date ▼        On Pages ▼

NAME OF AUTHOR ▼   Arun N. Netravali

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶ U.S.A.

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?   ☐ Yes  ☒ No

NATURE OF AUTHORSHIP   Briefly describe nature of the material created by this author in which copyright is claimed. ▼
Co-author of entire text

NAME OF AUTHOR ▼   Barry G. Haskell

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☒ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶ U.S.A.

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☒ No
Pseudonymous?   ☐ Yes  ☒ No

NATURE OF AUTHORSHIP   Briefly describe nature of the material created by this author in which copyright is claimed. ▼
Co-author of entire text

NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼        Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶
Domiciled in ▶

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?   ☐ Yes  ☐ No

NATURE OF AUTHORSHIP   Briefly describe nature of the material created by this author in which copyright is claimed. ▼

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED   This information must be given in all cases.   1987 ◀ Year

DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
▶ May   Day ▶ 6   Year ▶ 1988
▶ U.S.A.   ◀ Nation

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼
AT&T Bell Laboratories
Murray Hill, New Jersey

APPLICATION RECEIVED
JUN 28 1988
ONE DEPOSIT RECEIVED
TWO DEPOSITS RECEIVED
JUN 29 1988
REMITTANCE NUMBER AND DATE

Copyright transferred by contractual agreement.

MORE ON BACK ▶

Exhibit 26  Page 1195

DELL 318998

TX 2 347 303

CHECKED BY

☐ CORRESPONDENCE
  Yes

☐ DEPOSIT ACCOUNT
  FUNDS USED

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**PREVIOUS REGISTRATION**  Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?

☐ Yes ☒ No  If your answer is "Yes," why is another registration being sought? (Check appropriate box) ▼

☐ This is the first published edition of a work previously registered in unpublished form.

☐ This is the first application submitted by this author as copyright claimant.

☐ This is a changed version of the work, as shown by space 6 on this application.

If your answer is "Yes," give: **Previous Registration Number** ▼          **Year of Registration** ▼

**5**

**DERIVATIVE WORK OR COMPILATION**  Complete both space 6a & 6b for a derivative work; complete only 6b for a compilation.

a. **Preexisting Material**  Identify any preexisting work or works that this work is based on or incorporates. ▼

b. **Material Added to This Work**  Give a brief, general statement of the material that has been added to this work and in which copyright is claimed. ▼

**6**

See instructions
before completing
this space.

**MANUFACTURERS AND LOCATIONS**  If this is a published work consisting preponderantly of nondramatic literary material in English, the law may require that the copies be manufactured in the United States or Canada for full protection. If so, the names of the manufacturers who performed certain processes, and the places where these processes were performed must be given. See instructions for details.

Names of Manufacturers ▼          Places of Manufacture ▼

Vail-Ballou Press, Inc.          187 Clinton St., Binghamton, NY 13902

**7**

**REPRODUCTION FOR USE OF BLIND OR PHYSICALLY HANDICAPPED INDIVIDUALS**          A signature on this form at space 10, and a check in one of the boxes here in space 8, constitutes a non-exclusive grant of permission to the Library of Congress to reproduce and distribute solely for the blind and physically handicapped and under the conditions and limitations prescribed by the regulations of the Copyright Office: (1) copies of the work identified in space 1 of this application in Braille (or similar tactile symbols), or (2) phonorecords embodying a fixation of a reading of that work; or (3) both.

a ☒ Copies and Phonorecords          b ☐ Copies Only          c ☐ Phonorecords Only

**8**

See instructions

**DEPOSIT ACCOUNT**  If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account.

Name ▼  Plenum Publishing Corporation          Account Number ▼  DA020680

**9**

**CORRESPONDENCE**  Give name and address to which correspondence about this application should be sent.  Name/Address/Apt/City/State/Zip ▼

Varghese Kozhimannil
Plenum Press/ 233 Spring Street
New York, NY  10013

Area Code & Telephone Number ►  (212) 620-8484

Be sure to
give your
daytime phone
◄ number

**CERTIFICATION\***  I, the undersigned, hereby certify that I am the

Check one ►

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  AT&T Bell Laboratories
                      Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge.

**Typed or printed name and date** ▼ If this is a published work, this date must be the same as or later than the date of publication given in space 3.

Varghese Kozhimannil          date ►  6/23/88

✍ Handwritten signature (X) ▼

*Varghese Kozhimannil*

**10**

**MAIL
CERTIFI-
CATE TO**

Name ▼
Varghese Kozhimannil

Number/Street/Apt ▼
Plenum Press          233 Spring Street

City/State/Zip ▼
New York          NY  10013

**Certificate
will be
mailed in
window
envelope**

Have you:
• Completed all necessary spaces?
• Signed your application in space 10?
• Enclosed check or money order for $10 payable to Register of Copyrights?
• Enclosed your deposit material with the application and fee?

MAIL TO:

Exhibit 26  Page 1196

DELL 318999

Exhibit 27

## AFFIDAVIT OF MICHAEL A. DAVIS, JR.

STATE OF TEXAS                                      §
                                                   §
COUNTY OF TRAVIS                                    §

My name is Michael A. Davis, Jr.  I am an attorney with the law firm of Haynes and Boone, L.L.P. in Austin, Texas.  I am assisting Dell Computer Corporation in a study of certain Lucent patents and certain MPEG-LA LLC patents.  I am over the age of 18, have never been convicted of a felony, and am fully competent to make this Affidavit.

In connection with the above-mentioned study, I came into possession of a book entitled Digital Pictures:  Representation and Compression, by Arun N. Netravali and Barry G. Haskell.

Exhibit A (attached hereto) of this Affidavit is a fair and accurate photocopy that I personally made of the book's copyright page and dedication page, which immediately follow the book's title page.  As shown in Exhibit A, the book states that it was published by Plenum Press, a division of Plenum Publishing Corporation, 233 Spring Street, New York, N. Y.  10013.  Also, as shown in Exhibit A, the book's printed copyright notice states, "© 1988 AT&T Bell Laboratories".  On the same page, a printed section entitled "Library of Congress Cataloging in Publication Data" states, "ISBN 0-306-42791-5", "TK5103.7.N47  1988", "621.38'0413-dc19", "87-32722" and "CIP".

Exhibit B (attached hereto) of this Affidavit is a fair and accurate photocopy that I personally made of the book's outer spine.  As shown in Exhibit B, a sticker is attached to the book's outer spine.  This sticker has printing which states, "TK 5103.7 N47 1988 ENGIN".

Exhibit C (attached hereto) of this Affidavit is a fair and accurate photocopy that I personally made of the inside of the book's front cover, plus the book's first page which faces the inside of the book's front cover.  As shown in Exhibit C, a sticker is attached to the inside of the book's front cover.  This sticker has printing which states, "2104093550 TK 5103.7 N47 1988 ENGIN".  Also, as shown in Exhibit C, the inside of the book's front cover bears an ink stamp that has a drawing of a 5-pointed star and states, "THE LIBRARY OF THE UNIVERSITY OF TEXAS AT AUSTIN".

On the book's first page, four sheets of paper are glued.  Exhibit C shows the fourth sheet.  Exhibits D (attached hereto), E (attached hereto) and F (attached hereto) of this Affidavit are fair and accurate photocopies of the third, second and first sheets, respectively.

The top ~½ inch of the first sheet is glued to the page itself.  The top ~½ inch of the second sheet is glued to the top ~½ inch of the first sheet.  Likewise, the top ~½ inch of the third sheet is glued to the top ~½ inch of the second sheet, and the top ~½ inch of the fourth sheet is glued to the top ~½ inch of the third sheet.  Conversely, the bottom of each sheet is unattached.  Each sheet of paper is ~3 ½ inches x ~7 inches in size.

DELL 320793

Exhibit 27  Page 1197

Near the top of each sheet, a printed heading states, "This Item is Due on the Latest Date Stamped". Moreover, as shown in Exhibit C, additional printed heading is visible on the fourth sheet, and it states, "THE UNIVERSITY OF TEXAS AT AUSTIN" and "THE GENERAL LIBRARIES". At the top of other sheets, such additional printed heading is largely obscured as a result of the glue which binds the sheets. Immediately below the printed heading, each sheet bears a vertical line, which segments the sheet into two columns. The left column is headed by the printed word "DUE", and the right column is headed by the printed word "RETURNED".

As shown in Exhibit F, on the first sheet, immediately below the word "DUE", an ink stamp states, "NEW BOOKS". Immediately below the "NEW BOOKS" stamp, another ink stamp states, "AUG 12 1988". Several other subsequently dated ink stamps are present below the "AUG 12 1988" stamp as shown in Exhibit F, and on the other sheets as shown in Exhibits C, D and E.

IN TESTIMONY WHEREOF, I hereunto set my hand on this 12th day of March, 1999.

_____
Michael A. Davis, Jr.

STATE OF TEXAS                    §
                                 §
COUNTY OF TRAVIS                  §

I, __Lisa M. Wilcox_____, a Notary Public in and for the aforesaid County and State, do hereby certify that Michael A. Davis, Jr., personally known to me (or proved to me on the basis of satisfactory evidence) to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged to me that he executed the foregoing instrument by signing it as his free and voluntary act.

IN WITNESS WHEREOF, SWORN TO AND SUBSCRIBED before me, I hereunto set my hand and official Notarial Seal on this 12th day of March, 1999.

[seal]

LISA M. WILCOX
MY COMMISSION EXPIRES
July 16, 2001

_____
NOTARY PUBLIC
By and for the State of Texas
My Commission expires: __July 16, 2001__

DELL 320794

**Exhibit 27  Page 1198**

To CHITRA and ANN

Library of Congress Cataloging in Publication Data

Netravali, Arun N.
  Digital pictures: representation and compression / Arun N. Netravali and Barry G.
Haskell.
      p.    cm. — (Applications of communications theory)
  Includes bibliographies and index.
  ISBN 0-306-42791-5
  1. Digital communications. 2. Image processing — Digital techniques.   I. Haskell,
Barry G. II. Series.
TK5103.7.N47  1988
621.38'0413—dc19                                                              87-32722
                                                                                   CIP

EXHIBIT

A

© 1988 AT&T Bell Laboratories
Plenum Press is a division of
Plenum Publishing Corporation
233 Spring Street, New York, N.Y. 10013

All rights reserved

No part of this book may be reproduced, stored in a retrieval system, or transmitted
in any form or by any means, electronic, mechanical, photocopying, microfilming,
recording, or otherwise, without written permission from the Publisher

Printed in the United States of America

DELL 320795

Exhibit 27  Page 1199

# Digital Pictures

TK
5103.7
N47
1988
ENGIN

EXHIBIT

B

Exhibit 27  Page 1200

DELL 320796



THE UNIVERSITY OF TEXAS AT AUSTIN
THE GENERAL LIBRARIES

This Item is Due on the Latest Date Stamped

| DUE | RETURNED |
|-----|----------|
| RET'D ENGIN | |
| NOV 25 1998 | DEC 13 1998 |
| MAR 2 2 1999 | |

210409550  ENGIN
TK 5103.7 N47 1988

THE LIBRARY
OF
THE UNIVERSITY
OF TEXAS
AT
AUSTIN

**EXHIBIT**

C

DELL 320797

Exhibit 27  Page 1201



THE GENERAL LIBRARIES
This item is Due on the Latest Date Stamped

| DUE | RETURNED |
|---|---|
| AUG 0 9 1994 | RETD OCT 1 8 1994 ENGIN |
| NOV 2 0 1995 | |
| Dec 15, 1995 | |
| Jan 30, 1996 | |
| Feb 13, 1996 | |
| March 4, 96 | |
| APR 08 1996 | MAY 16 1996 |
| May 2-96 | RETD ENGIN |
| June 5, 96 | JUL 1 3 1996 |
| AUG 05 1996 | |
| NOV 03 1996 | RETD ENGIN |
| MAY APR 21 1998 1996 | |



2304093550    ENGIN

TK 5103.7 N47 1988 ENGIN

THE LIBRARY
OF
THE UNIVERSITY
OF TEXAS
AT
AUSTIN

**EXHIBIT**

D

DELL 320798

**Exhibit 27  Page 1202**



THE LIBRARY
OF
THE UNIVERSITY
OF TEXAS
AT
AUSTIN

210409355O

TK 5103.7 N47 1988  ENGIN

EXHIBIT

E

DELL 320799

**Exhibit 27  Page 1203**



2104013550

TK 5103.7 N47 1988 ENGIN

THE LIBRARY
OF
THE UNIVERSITY
OF TEXAS
AT
AUSTIN

EXHIBIT

F

DELL 320800

**Exhibit 27  Page 1204**

Exhibit 28

TA1632
.I553
1986

# SECOND INTERNATIONAL CONFERENCE ON

# image
# image processing
# image processing

and its applications

## Conference Publication Number 265

Exhibit 28  Page 1205

DELL 318140

# Second International Conference on

# Image Processing and
# its Applications

## 24-26 June 1986

*Organised by*
The Electronics Division of the Institution of Electrical Engineers

*in association with the*
British Pattern Recognition Association
European Association for Signal Processing
Institute of Electrical and Electronics Engineers Inc
Institute of Mathematics and its Applications
Institute of Physics
Institution of Electronic and Radio Engineers
Royal Television Society

*Venue*
Imperial College of Science and Technology,
London

Exhibit 28  Page 1206

DELL 318141

# A HYBRID INTERPOLATIVE AND PREDICTIVE CODE FOR THE EMBEDDED TRANSMISSION OF BROADCAST QUALITY TELEVISION PICTURES

N K Lodge

Independent Broadcasting Authority, United Kingdom

## INTRODUCTION

In the television studio there is a continuing trend towards the replacement of analogue, composite picture handling by digital manipulation of separate luminance and chrominance components. This is performed at the internationally agreed rate of 166Mbit.s$^{-1}$, with a further 50Mbit.s$^{-1}$ representing the redundant picture blanking. A full television 'package' however must also comprise audio channels, teletext, synchronisation and control signals which further elevate the source rate. Independently digitisation of the European telecommunications networks is taking place based upon a binary hierarchy which stretches from the trunk rate of 140Mbit.s$^{-1}$ to the rate of a single telephone conversation. So if the broadcaster wishes to convey pictures between studios, to radio transmitters or perhaps directly to the home using these links he is faced with the task of converting his source rate to conform to one of the levels in the telecoms multiplex hierarchy. In particular he will wish to use the most economical level which allows him to achieve adequate quality reproduction.

The broadcaster can however identify two distinct levels of reproduction fidelity required from a coding algorithm, these are 'contribution' quality for interstudio traffic and 'distribution' quality for traffic destined for the home. Each suggests a coding algorithm optimised for different criteria and each a quite different transmission rate. Contribution material should be of studio resolution and of such numerical fidelity that it can withstand post processing, for example by standards conversion, chromakey or multiple passes through the same coding algorithm. We might aim for a transmission rate of 68Mbit.s$^{-1}$ for this. Distribution material (and perhaps news contribution from remote locations) need not be post-processed, but instead conveyed directly to the viewer. Here we can be sure that successive codecs will not be encountered and so we are free to exploit the psychovisual redundancy present in the images and aim for a channel rate of 34Mbit.s$^{-1}$. This rate is emerging as a popular choice for the proposed exchange of pictures within Europe.

A consequence of having two separate levels of compression is the need to consider transcodability or the ability to convert between levels with the minimum of processing and minimum signal degradation. The very least objective of this conversion should be the avoidance of an intermediate reconstruction and recoding operation. Most previous proposals for 34Mbit.s$^{-1}$ coding [1-4] decimate the luminance signal by 3/4 or 2/3 prior to encoding. Since it is not generally possible to interpolate coded symbols, conversion to the contribution standard will require decoding and recoding. Interpolation by these ratios is clumsy and may even have to be performed in a future home receiver if the manufacturer has sought to be compatible with other broadcast standards.

The ultimate in transcodability occurs when the distribution compression is a subset of the contribution coding - this is a fixed-rate embedding procedure. We might have a system where, contained within a trunk multiplex is a channel of 68Mbit.s$^{-1}$ capacity, partly carrying the distribution signal and luminance error signal, increased chrominance bandwidth or perhaps studio-specific information such as a chromakey keying signal. To convert between contribution and distribution it is only necessary to demultiplex one 34Mbit.s$^{-1}$ data stream, and to convert to contribution, no effort is required since the distribution code is already compatible. The embedded approach requires only one codec at the studio and permits greater flexibility of routing in a network, because rate conversion can be performed under network control at any remote location.

## THE DISTRIBUTION ALGORITHM

Let us examine the requirements of a coding algorithm to suit the distribution level of an embedded code for 34Mbit/s$^{-1}$:

(i)    To avoid multiple decimation/interpolation by difficult factors we must choose a sampling rate whose sample sites correspond exactly to those at the studio rate, i.e. ratios 1, 1/2, 1/3,... are allowed. For colour components studio sampling yields a bandwidth well in excess of the eye's requirement and reduction of 1/2 or 1/4 can be tolerated. For luminance however, nothing but full site retention is permissible since reduction by 1/2 would result in unacceptably 'soft' or severely movement-impaired pictures.

(ii)   Robustness of the coded format to transmission error is important in a signal destined for distribution over many paths. Forward error correction can be applied, but if the errors are correlated, cannot be relied upon to protect an algorithm otherwise prone to chronic disintegration. It has, for example, been popular to adapt the predictor of a predictive coder to better exploit local picture statistics, according to previously received pels [1,5], often in the region of edges [6]. While achieving a coding gain under error free conditions, the presence of an error can cause a divergence of predictor choice at coder and decoder resulting in catastrophic failure. Even if this is arrested by periodic updating using a fixed intrafield predictor, the viewer would notice a temporary disturbing picture loss. Adapting a predictor according to control data which is transmitted as an overhead prevents total breakdown due to an error and was the approach adopted in [4]. For our distribution algorithm we would require rapid recovery from an error, which also implies rapid settling at the receiver after switch-on when no previously received pels are available.

(iii)  The coding advantages which may be obtained by exploiting the inadequacies of the human eye to perceive certain types of impairment cannot be ignored in a low-rate distribution compression algorithm.

(iv)   In a distribution situation, the ratio of decoders to encoders will be high, the former perhaps being paid for by the

**Exhibit 28  Page 1207**

DELL 318142

The algorithm which is the subject of this paper fulfils all of these objectives, it will first be summarised:

Source luminance samples are split into two groups according to a grid with a 2 frame structure fig 1, which separates alternate samples with a line and frame offset (Dubois' HEX4 pattern [7]). One group are to form an interpolated set, but in order to obtain a higher spatio-temporal resolution than fixed interpolation would permit, a 3-state interpolator selection signal is retained at each site. Redundancy is removed from this selection signal and it is conveyed to the receiver. Values of this 3-state selector act as a descriptor at sites surrounding a sample to be predicted, and control selection of one of a set of 3 dimensional prediction functions, ranging from purely temporal in static areas to contour-adaptive in moving areas. Since the predictor choice is explicitly defined by the descriptors, recovery from channel errors is assured. Prediction error is quantised and coded for transmission.

A third stage in the coding is used to check the quality of the interpolated samples reproduced at the receiver. This is done by locally decoding the transmitted signal at the coder and applying the error signal to a visual model in the manner of an interpolative coding process [8]. The model attempts to locate interpolated samples which have not been reconstructed well enough subjectively, in the context of their surroundings. These are adjusted by the transmission of an error signal which is sufficient to ensure that the model's fidelity criterion is met at the receiver. As with most coders which attempt to exploit subjective criteria, the complexity bias is very much towards the encoder.

## ADAPTIVE INTERPOLATION

Fig. 1(a) shows the structure of the set of samples to be predicted, for convenience neither the interlaced fields nor the true vertical sample spacing is shown. The interpolated set of samples resides between the samples shown. In static areas of the picture full source bandwidth can be reconstructed by temporal interpolation $I_{ij}^{T} = (S_{ij2} + S_{ij-2})/2$. In moving areas

however this is not acceptable and intrafield interpolation must be performed. Fig. 1b shows that the 2 dimensional aliased spectra restrict the bandwidth which can be preserved using intrafield interpolation to areas which tessellate about the centres shown. Probably the best that can be obtained is the band shaded in the figure however pictures prefiltered to this extent are unacceptably degraded, so that the difference between static and moving resolution is disturbing. Now consider the bands in (c) and (d) which also tessellate about the alias centres, each preserves half of the source bandwidth but together they can reproduce 3/4 of the source spectrum if switching is performed on a local basis. Studies of the 2 dimensional Fourier spectra of typical images and their edge-orientation histograms [9] suggest that the resulting cross shape (e) should preserve the very large majority of spectral components which are also at or near the horizontal and vertical. There is also some evidence that the eye's resolution is similarly anisotropic. The cross itself, of course, does not tessellate about the alias centres, and since it is derived from a non-linear process, would be meaninglessly represented it in such a diagram. One point does arise from this however and that is the need for cross-shaped prefiltering. If not applied, spectral components in the corners would alias into the low frequency quadrant and become objectionable causing moire patterning in texture and jagged diagonal edges.

Cross-shaped prefilters can be conveniently designed from prototype horizontal and vertical lowpass filters in the following way:

(i)     for prototypes

$$H(z_h) = \sum_{n=-N}^{N} h_n z_h^n \qquad V(z_v) = \sum_{m=-M}^{M} v_m z_v^m \qquad (1)$$

(ii)     form separable 2D lowpass filter

$$F(z_h, z_v) = H(z_h) \cdot V(z_v) \qquad (2)$$

(iii)     'modulate' passband to corners of 2D Nyquist interval

$$F'(z_h, z_v) = \sum_{n=-N}^{N} \sum_{m=-M}^{M} (-1)^{m+n} h_n v_m z_h^n z_v^m \qquad (3)$$

(iv)     invert filter so that passband becomes stopband

$$F''(z_h, z_v) = 1 - F'(z_h, z_v)$$

(v)     observe that this has the almost separable structure

$$F''(z_h, z_v) = 1 + \sum_{n=-N}^{N} (-1)^n h_n z_h^n \cdot \sum_{m=-M}^{M} (-1)^m v_m z_v^m \qquad (4)$$

The additional '1' can be individually accounted for and the filter has an essentially separable structure, fig. 2. This is important, since practical filters must be large, an excessive amount of hardware would be required to build a non-separable structure. For clarity fig. 2 does not show exploitation of filter symmetry this further simplifies the hardware. So that the filter is only applied in moving areas of the picture it is adapted in the manner mentioned in [7].

The simplest form of switched horizontal and vertical interpolators is:

$$I_{ij}^{H} = (S_{i-1\ j} + S_{i+1\ j})/2 \qquad I_{ij}^{V} = (S_{i\ j-1} + S_{i\ j+1})/2 \qquad (5)$$

These have been used in [3,10], both authors reporting good results although neither used prefiltering (in [10] reduction of aliasing with additional interpolators is suggested). We have found that higher order classical Newtonian midpoint interpolation outperforms these interpolators but for our purposes interpolators (5) will be used in the following discussions. To determine which interpolator is better in moving areas, we compute the error resulting from application of each, $|S_{ij} - I_{ij}^{H}|$ and $|S_{ij} - I_{ij}^{V}|$, and select the lower. To code this information we could simply assign a binary state to each choice, however the same information can be conveyed by signalling whether the better interpolation is higher or lower than $(I_{ij}^{H} + I_{ij}^{V})/2$. Since surrounding samples are available at the receiver (albeit with some quantisation error) the interpolator yielding the higher or lower output can be selected. In other words for the interpolators (5) we retain the sign of:

$$(S_{i-1j} + S_{i+1j} + S_{ij-1} + S_{ij+1}) - 4S_{ij} \qquad (6)$$

**Exhibit 28  Page 1208**

DELL 318143

which is the familiar form of the discrete Laplacian operator.

In many low activity picture regions there is no significant difference between one interpolator and another so we are free to choose one which increases the run-length of similar choices. An algorithm has been developed which optimally positions the end of runs amongst these 'don't care' choices to minimise some function of interpolation error. This is performed with a single forward and backward pass of each picture line and is real-time implementable. The resulting 3-state signal is run-length coded for transmission. An example showing just the 2 Laplacian states is fig 4. The value of the conversion from simple direct interpolator switching is now apparent in the ability of the Laplacian zero crossings to convey information about significant picture edges. It is interesting to note the similarity between this and Marr's 'primal sketch' model in human vision [11].

### ADAPTIVE PREDICTION

The 3-state descriptor is transmitted in advance of surrounding predicted samples to control the prediction process itself from the future as well as the past. Let us examine the causal neighbourhood of elements just prior to the coding of $S_{00}$: $(P_{ij}:$ previously predicted and reconstructed pels, $D_{ij}:$ values of the 3-state descriptor)

$$P_{22} \quad D_{12} \quad P_{02} \quad D_{-12} \quad P_{-22}$$
$$P_{31} \quad D_{21} \quad P_{11} \quad D_{01} \quad P_{-11} \quad D_{-21} \quad P_{-31}$$
$$P_{20} \quad D_{10} \quad S_{00} \quad D_{-10}$$
$$D_{2-1} \quad D_{0-1} \quad D_{-2-1}$$
$$D_{1-2} \quad D_{-1-2}$$

Logical operations can be written for the choice of one from a large set of predictors. For example if interpolations surrounding $S_{00}$ are all temporal, then we apply a purely temporal prediction. As an example of spatial prediction consider the logical expression:

$$(D_{12}=D_{01}=D_{10}=D_{0-1} \neq D_{-12}=D_{-21}=D_{-10}=D_{-2-1}) \text{ OR} \tag{7}$$
$$(D_{12}=D_{21}=D_{10}=D_{2-1} \neq D_{-12}=D_{01}=D_{-10}=D_{0-1})$$

which determines a vertical edge and applies at points indicated in fig. 5. At first sight it may appear that prediction by this process is upset by the striations in Laplacian descriptions due to artificial extensions of run-lengths. This is not so since runs are only extended in low activity regions. The previous sample prediction suggested by a horizontal striation will be as good as (if not better than) any other in these regions.

The prediction function applied for a particular logical function is designed by assessing the cross-correlation of the predicted sample location with previous samples in the neighbourhood where the logical function applies, over a set of image sequences. In principle any size of neighbourhood may be used and logical functions can be stored in a ROM or minimised and programmed into a PLA. In (7) the logical '=' is an exclusive-NOR function but is actually performing the same operation as Marr's [11] AND-gate model of human edge orientation detection (his fig. 9).

### INTERPOLATIVE CODING

Histograms of interpolation error, even due to 2 dimensional interpolation alone, show a remarkably high concentration about zero despite the fact that an open-loop process has been employed so far. Most of the interpolation errors which are present occur where the localised samples are simultaneously changing their slope in two dimensions, because our interpolators cannot respond to second-differences. These will also tend to be regions where visual masking is operating.

Our adaptive interpolator can therefore form a very good basis for an interpolative receiver-model coding strategy [8]. To realise this we locally decode the transmitted symbols to reconstruct a received picture at the encoder and compute the coding error due to both interpolated and predicted components. The error at the interpolated pels is 'viewed' in the context of the background picture itself by a visual model which attempts to detect visible picture impairment. If an offending interpolation is found, a differential term is generated and coded to improve the subjective reproduction of that pel in the receiver. This improved interpolation is also incorporated back into the visual model because its quality has a bearing on the visibility of future interpolation errors.

Visual models for detecting coding impairments generally account for three main aspects of vision : spatio-temporal filtering; luminance intensity thresholds; and masking. Fig. 6 shows such a model, where the visual filter may be considered to contain a non-linearity which accounts for changes in background luminance [12]. A general model may well be unnecessarily complex to characterise the distortions due to a specific coding algorithm however. A first attempt at this was made by Limb [8] whose visual model was a simple linear lowpass filter, an advantage of the linearity assumption being that the two filters of fig. 6 can be reduced to one, processing only the coding error.

Limb proposed a 'free-running' interpolative coding method, which although not real-time implementable, produced a saving in coding entropy of some 20% over previous-element DPCM for the same subjective quality. He does however report similar performance with his 'grid' algorithm, where samples are alternately predictively coded and interpolated in one dimension. This latter approach overcomes some of the implementability problems inherent in the former. Netravali [13] made significant improvements to the 'free-running' approach by using better interpolation, by incorporating masking into the visual model and by adapting the visual filter spread with his masking function. This resulted in a reduction in coding entropy by almost 40% over subjectively identical DPCM with his test images. The justification for adapting the visual filter was that it has been shown [14] that the visibility of errors is lower if the spectral band of the background and errors are close to each other. In other words, in low activity areas high frequency error noise would be more visible suggesting that the filter should have a small spread and conversely for high activity regions. A consequence of the use of a single filter operating on the error is that masking effects must be determined directly from the background and not as in fig. 6. Netravali's masking function however, incorporates a weighted spread of signal slopes in a 3x3 neighbourhood which may itself be thought of as an approximation to visual filtering.

Although details of the visual model of the coder in this paper have yet to be determined at the time of writing, it should be noted that the interpolation is 3 dimensional and significantly better than has been used before, a 'grid' structure is used which makes for easier implementation of the visual filter and masking effects can be exploited temporally as well as spatially because previous-frame source samples are available. Adapting a (one dimensional) visual filter to encompass large spreads (Netravali's best used 3, 5, 7, 11 elements) does cause some implementational

**Exhibit 28  Page 1209**

DELL 318144

difficulties because of the need to consider the affect of adjusting an interpolated pel on the visibility of future interpolation errors. A true minimum for the number of interpolated elements requiring adjustment can only be found by iterative analysis of the whole scan line which is impractical. To illustrate the problem consider a one dimensional filter containing the following 7 error terms:

$\epsilon(P_{30})$ $(I_{20})\epsilon(P_{10})\epsilon(I_{00})\epsilon(P_{-10})\epsilon(I_{-20})\epsilon(P_{-30})$

If the filter is adapted to have spread 3 (low activity areas) the advantage of a 'grid' algorithm is felt and it is only necessary to consider the adjustment of $I_{00}$ in the context of $\epsilon(P_{10})$, $\epsilon(I_{00})$ and $\epsilon(P_{-10})$. In 'free-running' algorithms there is no regular structure of predicted pels and it would be necessary to consider adjusting any or all of the terms in the filter. Now assume that our filter is adapted to include the 7 terms above, a decision has been made whether to adjust $I_{00}$ and a decision on $I_{00}$ is required. This will involve some parallel considerations of the potential adjustment of $I_{-20}$, two conditions are fairly clear:

A    if interpolative error at $I_{00}$ is acceptable with $I_{-20}$ interpolated : do not adjust $I_{00}$.

B    if interpolative error at $I_{00}$ is not acceptable even if $I_{-20}$ were adjusted : adjust $I_{00}$.

The difficulty is how to treat case C:

C    the interpolative error at $I_{00}$ is acceptable only if $I_{-20}$ is adjusted.

Since visibility of $\epsilon(I_{-20})$ depends upon $\epsilon(I_{00})$ it will be necessary to invent some suboptimal decision for case C, the simplest and safest being to choose to adjust $I_{00}$.

Practicality constraints will either limit the visual filter to 7 terms or otherwise simplify the criteria for the adjustment decision. The filter must be one dimensional with respect to $\epsilon(I)$ terms but can easily include $\epsilon(P)$ terms in a 2 dimensional neighbourhood. There is a further exploitation of our 3-state descriptor signal concerning coding of the quantised adjustment error signal. At interpolated points requiring adjustment we have already reconstructed what is most probably the best of the three functions available, the inferior interpolations however are very likely to act as a pointer showing in which direction the adjustment applies. Because this considerably influences the probability distribution of quantiser states it can be used in the assignment of entropy codes to these states.

## CONCLUSIONS

A coding algorithm has been described for the transmission of distribution quality broadcast television at 34Mbit.s⁻¹ which can form the basis of an embedded code for providing a numerically higher fidelity at 68Mbit.s⁻¹. The technique is a hybrid of interpolative and predictive coding both of which are explicitly controlled by a 3-state descriptor signal, transmitted in place of alternate source samples. This ensures a rapid recovery from the effects of channel errors. The channel capacity expended on this descriptor is justified by exploiting it in three ways, first it defines adaptive interpolation of the omitted samples, second it controls inter/intraframe-contour adaptive prediction and third it is used to control assignment of entropy codes to quantised errors which are used to adjust subjectively inadequate interpolated pels. An important aspect of the algorithm is that when channel capacity is insufficient to convey the highest quality reproduction, a model of the human visual system is used to partition available capacity for minimum subjective distortion. A diagram of the luminance coder is shown in fig. 7 (F denotes a frame delay).

The decoder however is simpler than most adaptive DPCM decoders because of the explicit nature of the control function - this is important for distribution applications. Implementation is also eased because the predictive loop and frame delays are only operating on half of the input samples. It has not been possible to discuss colour coding or entropy considerations which will be reported at the conference.

## ACKNOWLEDGEMENT

The Author wishes to thank the Director of Engineering of the Independent Broadcasting Authority for permission to publish this paper.

## REFERENCES

1    Westerkamp, D., 1984, 'Adaptive Intra-/Interframe DPCM - Coding for Transmission of Colour TV Signals with 34 Mbit/s', Proc. IEEE Int. Zurich Seminar on Digital Comm., March, 39-45.

2    Grallert, H., 1984, 'Component Encoding of Colour Television Signals for Transmission in 34, 70 and 140 Mbit/s Channels', Proc. IEEE Int Zurich Seminar on Digital Comm, March, 33-38.

3    Sabatier, J., et al, 1982, 'Coding System for 34 Mbit/s Digital Transmission of Colour Television', Commutation & Transmission, 1, 69-82.

4    Buley, H. and Stenger, L., 1985, 'Inter/Intraframe Coding of Color TV Signals for Transmission at the Third Level of the Digital Hierarchy', Proc. IEEE, 73, 4, 765-772.

5    Pirsch, P., 1982, 'Adaptive Intra-interframe DPCM Coder', BSTJ, 61, 5, 747-764.

6    Zschunke, W., 1977, 'DPCM Picture Coding with Adaptive Prediction', IEEE Trans. Comm., 25, 11, 1295-1302.

7    Dubois, E., 1985, 'The Sampling and Reconstruction of Time-Varying Imagery with Application in Video Systems', Proc. IEEE, 73, 4, 502-522.

8    Limb, J., 1973, 'Picture Coding' : The Use of a Viewer Model in Source Encoding', BSTJ, 52, 8, 1271-1302.

9    Kretz, F., 1983, 'Edges in Visual Scenes and Sequences', in 'Image Sequence Processing and Dynamic Scene Analysis', NATO ASI Series, Springer-Verlag.

10   Reitmeier, G. and Dischert, R., 1983, 'A Multiplexed Nyquist Region Approach for High Quality 2:1:1 Digital Video', Proc. 13th Int. TV Symp., Montreux, 400-408.

11   Marr, D. and Hildreth, E., 1980 'Theory of Edge Detection', Proc. R. Soc. Lond. B, 207, 187-217.

12   Lukas, F. and Budrikis, Z., 1982, 'Picture Quality Prediction Based on a Visual Model', IEEE Trans. Comm., 30, 7, 1679-1692.

13   Netravali, A., 1977, 'Interpolative Picture Coding Using a Subjective Criterion', IEEE Trans. Comm., 25, 5, 503-508.

14   Stromeyer, C. and Julesz, B., 1972, 'Spatial-Frequency Masking in Vision : Critical Bands and Spread of Masking', JOSA, 62, 10, 1221-1232.

Exhibit 28  Page 1210

DELL 318145

246



Fig.1  *Adaptive interpolation: (a) sample structure (b) fixed interpolator (c) (d) switched interpolators (e) preserved bandwidth (f) practical prefilter.*



Fig.2  *Structure of a cross filter*



Fig.3  *'Boats' source.*



Fig.4  *The two Laplacian states (the temporal*



Fig.5  *Locations where the logical function (7)*

**Exhibit 28  Page 1211**

DELL 318146



*Fig.6   General form of a visual model.*



*Fig.7   Diagram of a Luminance Coder.*

**Exhibit 28  Page 1212**

DELL 318147

Exhibit 29

The Transactions of the Institute of Electronics,
Information and Communication Engineers

Vol. E70, No. 7 (July 1987)

Copyright © 1987 by The Institute of Electronics, Information and Communication Engineers

CONTENTS

LETTERS

**Communication Systems and Communication Protocols**
Jitter Accumulation in a 5000 km Submarine Optical Repeatered Line ...............................
...........................................................................Masaki AMEMIYA, Mamoru AIKI,
  Toshiyuki MATSUNO, Yasutaka ICHIHASHI and Hidetoshi SHIRAKAWA  ( 605 )

Improvement of Polarization Diversity Method for Heterodyne/Coherent Optical Transmission Systems
...................................Hideaki TSUSHIMA, Yoshitaka TAKASAKI and Minoru MAEDA  ( 608 )

**Source Encoding and Communication Terminals**
A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding................
.........................................................Masayuki TANIMOTO and Takashi MORI  ( 611 )

**Integrated Circuits**
High-Speed NRZ-DMI Coder and Decoder Monolithic ICs Using Si Bipolar Technology................
...................Yoshihiro SHIMAZU, Satoki KAWANISHI, Jun-ichi YAMADA and Masao SUZUKI  ( 614 )

**Optical Communication**
Butt Coupling Efficiency of Long-Wavelength Edge-Emitting LEDs to Single-Mode Fibers ..............
...........................................................................H. GHAFOORI-SHIRAZ  ( 617 )

**Optical and Quantum Electronics**
Ultra High Density 50-Fiber Connector........Toshiaki SATAKE, Norio KASHIMA and Masayuki OKI  ( 621 )

Single-Mode 1×50 Switch for 10-Fiber Ribbon......................................................
...............................Toshiaki SATAKE, Shinji NAGASAWA and Norio KASHIMA  ( 623 )

**Medical Electronics and Bioengineering**
Frequency Analysis of Human ERG for Diagnosis of the Disordered Retina ..........................
...................................Hideki NAKAJIMA, Takako ITOH and Yakichi KANATA  ( 625 )

Exhibit 29  Page 1213

DELL 318251

Case 3:07-cv-02000-H-CAB    Document 78-2    Filed 11/30/2007    Page 220 of 227

| LETTER |
| --- |

# A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding

Masayuki TANIMOTO[†], *Member* and Takashi MORI[†], *Associate Member*

**SUMMARY**    A hybrid scheme of subsampled DPCM and interpolative DPCM is proposed for the HDTV coding.  A large bit rate reduction is realized by the two effects of pixel reduction and bit reduction.  SN ratio is greatly improved compared with that of the coventional DPCM.

## 1.  Introduction

Since the high-definition television (HDTV) signal is wide-band, its digital transmission requires a bit rate of at least 400Mb/s[1].  Therefore, bit rate reduction is strongly desired.  140Mb/s or less are considered to be a practical target for the reduced transmission bit rate of the HDTV signal.  A coding of 2.8bit/pel or less is necessary to realize this bit rate.  Furthermore, a coding scheme which dose not need high speed processing is very advantageous for the HDTV signal since the sampling frequency of the HDTV signal is very high.

Two schemes, TAT[2] and MUSE[3], have been proposed for the HDTV compression.  These schemes compress the bandwidth to 8.1MHz by reducing the number of transmitted pixels.  Consequently, the HDTV signal can be transmitted over a single channel of the broadcasting satellite using these schemes.  It can also be transmitted at a rate of 130Mb/s if the transmitted pixels are coded by 8bit/pel.

Here, we propose a new picture coding scheme[4]−[6] aiming at a coding of 2bit/pel or less.  The proposed coding scheme is a hybrid scheme of subsampled DPCM and interpolative DPCM.  It dose not need high speed processing and is suitable for the HDTV coding.

## 2.  Principle and Configuration of the Proposed Scheme

The proposed scheme is a digital version of the TAT system.  In the TAT system, pixels are separated into two kinds : subsampled pixels (basic pixels) and the others.  The pixels excluding the basic pixels are interpolated and the interpolation errors are calculated.  The pixels with large interpolation errors in each field are chosen as the additional pixels.  Then, reduced

Manuscript received March 20, 1987.
Manuscript revised June 3, 1987.
†The authors are with the Faculty of Engineering, Nagoya University, Nagoya-shi, 464 Japan.



(a)  e n c o d e r

(b)  d e c o d e r

Fig. 1  Block diagram of this scheme.

number of pixels, the basic pixels and the additional pixels, are transmitted.

In the proposed sheme, DPCM is applied to the basic pixels and PCM of small bits is applied to the interpolation errors of the additional pixels.  The former is subsampled DPCM and the latter is interpolative DPCM.  Thus, the proposed scheme is a hybrid scheme of subsampled DPCM and interpolative DPCM.

This scheme does not need high speed processing since the number of the pixels coded by DPCM which has a feedback loop as a bottleneck of processing speed is reduced and parallel processing is possible for the pixels of interpolative DPCM.

The other HDTV coding schemes[7]−[9] which separate the pixels into two kinds as this system does have been proposed.  One of the features of this system is pixel reduction.  A large bit rate reduction is expected in this scheme by the two effects of pixel reduction and bit reduction.  It is another feature of this system that this system makes a delayed decision.  The additional pixels are decided after all the interpolation errors of one field are known.  The pixel reduction is not employed in Refs. (7) and (8).  It is employed in Ref. (9) which was

**Exhibit 29  Page 1214**

DELL 318252

developed from Ref. (7) and reported after our proposal[4]-[6]. The difference between our system and Ref. (9) is that in the latter system untransmitted pixels are decided after the interpolation errors of one block are known.

Figure 1 shows a block diagram of the proposed scheme. The pixels are separated into the basic pixels and the others. The basic pixels are coded by DPCM. The pixels excluding the basic pixels are interpolated from the basic pixels decoded by the local decoder of DPCM. Then, the interpolation error is calculated. After calculating the interpolation error of all the pixels in one field, the additional pixels with large interpolation errors are selected. The interpolation error of the additional pixels is quantized by $Q_2$. Actually, field delay is necessary to implement this system since the selection of the additional pixels is done after calculating all the interpolation errors of one field.

### 3. Computer Simulation[5]

Computer simulation is performed to evaluate the performance of this system. Several SIDBA images are used for the simulation. They are 8-bit digitized monochrome still pictures each of which has $256 \times 256$ pixels. In the following discussion, $n_1$ denotes the ratio of the number of the basic pixels to that of the whole pixels and $n_2$ denotes the ratio of the additional pixels. $n_2$ takes a value between 0 and $1-n_1$.

Figure 2 shows two examples of the subsampling pattern of the basic pixels. Black circles denote the basic pixels. Case A is $2:1$ subsampling and case B is $4:1$ subsampling. The prediction of subsampled DPCM is performed using 3 basic pixels. White circles are interpolated by the average value of the neighboring 2 or 4 basic pixels. Interframe prediction and interpolation are not used in this simulation. Variable-length coding is employed in both the subsampled DPCM and the interpolative DPCM. The selection of the additional pixels is performed block by block. The block size is $4 \times 4$ pixels. The results of case A and case B are similar. Thus, those of case A, where $n_1$ is equal to 1/2, are shwon here.

Figure 3 shows a typical example of SN ratio as a function of entropy after quatization. The parameter is $n_2$. Here, the noise of SN ratio means the quantization noise of the basic and additional pixels and the interpolation error of the untransmitted pixels. When $n_2$ is equal to 1/2, all the pixels are transmitted and SN ratio increases monotonically in accordance with the increase of entropy. However, SN ratio is saturated for large entropy when $n_2$ is less than 1/2. The interpolation error of the untransmitted pixels determines this saturated value of SN ratio. The further reduction of $n_2$ causes the degradation of SN ratio in this saturation region.

On the other hand, for small entropy, the reduction of $n_2$ improves the SN ratio. When $n_1$ is reduced, the transmitted pixels can be coded with more bits for the same entropy. This improves the SN ratio. The envelope of the SN curves for various values of $n_2$ gives the best SN ratio. This best SN ratio can be realized by optimizing the value of $n_2$. The improvement due to the optimization of $n_2$ is $2\sim3$dB when entropy is arround 2bit/pel. Thus, large improvement of SN ratio is achieved by reducing $n_2$. The characteristic of conventional DPCM is also shown in the same figure for comparison. Planar prediction using 3 pixels and variable-length coding are employed in this DPCM. SN ratio of the proposed scheme is greatly improved compared with that of the conventional DPCM. The improvement is

Case A $(n_1 = 1/2)$    Case B $(n_1 = 1/4)$

Fig. 2  Examples of the subsampling pattern of the basic pixels.
( ● : basic pixels)



Fig. 3  SN ratio as a function of entropy.



Fig. 4  SN ratio as a function of $n_2$.

**Exhibit 29  Page 1215**

DELL 318253

**LETTER**

613



Fig. 5  Maximum SN ratio as a function of entropy.

Table 1  SN ratio for various pictures. (entropy : 2bit/pel)

|  | this scheme [dB] | DPCM [dB] | difference [dB] |
|---|---|---|---|
| Couple | 43.4 | 38.8 | 4.6 |
| Girl | 41.5 | 37.2 | 4.3 |
| Moon Surface | 39.4 | 35.2 | 4.2 |
| Aerial | 34.5 | 31.0 | 3.5 |

about 4dB when entropy is 2bit/pel.

Figure 4 shows SN ratio as a function of $n_2$. The parameter is entropy. The value of $n_2$ which maximizes SN ratio is obtained from this figure. For example, it is 0.22 for 2bit/pel. Thus, about 70% of the whole pixels are transmitted in this case.

Figure 5 shows the maximum SN ratio as a function of entropy. These curves are obtained as the envelope of the SN curves as shown in Fig. 3. For instance, SN ratio is 43.4dB for 2bit/pel and 41.0dB for 1.6bit/pel in the case of "Couple".

Table 1 summarizes SN ratio for various pictures when entropy is 2bit/pel. SN ratio of conventional DPCM is shown for comparison. The difference of SN ratio between this scheme and conventional DPCM is very large for all pictures.

## 4. Conclusion

A hybrid coding scheme of subsampled DPCM and interpolative DPCM is proposed. 2 : 1 subsampling and 4 : 1 subsampling for subsampled DPCM give nearly the same SN ratio. Optimization of the number of the pixels for interpolative DPCM is very effective to improve SN ratio. SN ratio of this scheme is greatly improved compared with that of conventional DPCM. Thus, this scheme could be a good candidate for the HDTV coding of 100Mb/s or less.

### Acknowledgement

The authors would like to thank Prof. A. Kawamata of Nagoya University for his encouragement. They also would like to thank Grant-in-Aid for Scientific Research of the Ministry of Education, Science and Culture of Japan for its support.

### References

( 1 )  J. Yamada, K. Maki and K. Asatani : "A Study on Digital Transmission System for High-Definition Television Signals", Paper of Technical Group, **TGCS82-97**, IECE Japan (Dec. 1982).

( 2 )  M. Tanimoto, N. Chiba, H. Yasui and M. Murakami : "TAT (Time-Axis Transform) Bandwidth Compression System for High-Defintion Television", J. of Inst. TV Engrs. of Japan, **39**, pp. 934-940(Oct. 1985).

( 3 )  Y. Ninomiya, Y. Ohtsuka and Y. Izumi : "A single Channel Transmission System for HD-TV Satellite Broadcasting : MUSE", Trans. IECE Japan, **J68-D**, pp. 647-654(April 1985).

( 4 )  M. Tanimoto and T. Mori : "Proposal of a New Coding Scheme for HDTV Signal", 1985 Natl. Conf. Rec. on Inf. Syst., IECE Japan, 198.

( 5 )  M. Tanimoto and T. Mori : "A Hybird Scheme of Subsampled DPCM and Interpolative DPCM for Picture Signals", Paper of Technical Group, **TGCS86-1**, IECE Japan (May 1986).

( 6 )  M. Tanimoto and T. Mori : "A New Coding Scheme for the HDTV Signal", 1986 Picture Coding Symposium, 2, 3, pp. 26 -27(April 1986).

( 7 )  Y. Yashima and K. Sawada : "Adaptive Intraframe/Interframe Coding for HDTV Signals by Using Extrpolative and Interpolative Prediction", Paper of Technical Group, **TGIE85-67**, IECE Japan (Sept. 1985).

( 8 )  T. Itoh, K. Matsuda, T. Okazaki and T. Tsuda : "A Consideration on High Efficient Coding for HDTV Signals", 1986 Natl. Conv. Rec. IECE Japan, 1190.

( 9 )  Y. Yashima and K. Sawada : "Adaptive Intraframe/Interframe Coding for HDTV Signals by Using Extrapolative and Interpolative Prediction", Trans. IEICE, **J70-B**, pp. 96-104 (Jan. 1987).

**Exhibit 29  Page 1216**

DELL 318254

Exhibit 30

CCITT SG XV                                   Document #81
Working Party XV/1                            March 1986

Specialst Group on Coding for Visual Telephony

English only

Source: NTT, KDD, NEC AND FUJITSU

Title: COMMENTS ON CONDITIONAL MOTION COMPENSATED FRAME
       INTERPOLATION

## 1.  Introduction

In this Contribution, we shall discuss the advantages
and disadvantages of conditional motion compensated
interpolation (referred to hereafter simply as " CMI ").
Figure 1 gives a schematic diagram of this CMI coding
algorithm.

## 2.  Advantage of CMI

(1) Improvement of Coding Efficiency
The advantage of CMI is that we can increase the
predicion efficiency for interpolative frame, and hence we
can increase the total number of bit which should be
assigned to ordinary extrapolative prediction frame. The
ratio of assigned bit to extrapolative prediction and CMI
can be assumed aproximately in order of 7 : 3 or 8 : 2. As
a result, the number of bits used per extrapolative frame
increases by approximately 40 %.
At the same time, however, the frame dropping rate
doubles, so the amount of motion increases by a
corresponding amount, and the prediction efficiency falls
(actually, there should be no decrease of efficiency
provided we remain within the range of motion compensation,
but in practice, this factor does not in any case improve
the situation).
The increase in the number of bits used and the
decrease of extrapolative prediction efficiency therefore
cancel each other out, but usually the factor which
increase gain is the dominant. For example, if there is a
40% surplus of bits available, the gain sometimes increases
provided the prediction efficiency does not fall below 71%.
Assuming the decrease of prediction efficiency is 90%
(which means the number of significant picture elements
increases by 10%); a result can be expected equivalent to a
26% increase in efficiency.

1

**Exhibit 30  Page 1217**                                    MSLT0625891

### 3. Disadvantages of CMI

**(1) Extra hardware**
For CMI, motion interpolation unit is required as shown in Figure 1 (such a unit would be necessary anyway if the receiver carries out motion interpolation processing; but in this case, as it is not actually required on the transmitting side, it must be regarded as a piece of extra hardwadre).

If we can assume the coding unit 3 is a circuit which processes the extrapolative data for 1 frame in 1 frame interval, and the circuit can be shared as the coding unit 2 with the result that there is no increase in hardware for this part. However, a control mechanism would be necessary for changing over the 2 types of input signals to the encoder (extrpolative prediction error and interpolative prediction error), which does involve some extra hardware.

**(2) Additional delay**
In CMI, interpolated frame decoding cannot take place until at least the decoding of the next frame is complete (this is also true when motion interpolation is performed on the receiving side only), and therefore there is always a delay of 1 frame.

Further, if the encoder is used for a dual purpose as described above in order to economize on hardware, the delay time is increased by one more frame. This means that compared to the case of ordinary extrapolative prediction alone, there is a delay of 2 frames.

### 4. General Evaluation

With CMI, there is certainly a longer delay, but even in the case of extrapolative prediction alone, the difference is only 1 frame if the frame dropping rate improves resolution in the time direction. It is difficult to say which method gives a better overall quality, only by simulation evaluation.

At the same time, it is practically certain that CMI can improve the coding efficiency. Even if any sort of adaptive control of DCT with sophisticated hardware is used, for example, it might be difficult to increase the coding efficiency by 30%, but the extra hardware required for CMI to produce the same effect would probably be no greater.

In conclusion, it would appear that from the viewpoint of the coding efficiency CMI can evidently be incorpolated, although it seems fairly obvious, extra hardware and increased delay go together. The question of whether or not to adopt CMI, therefore, depends on whether the corresponding increase of picture quality is really necessary.

2

**Exhibit 30  Page 1218**                                MSLT0625892



Fig. 1  Schematic diagram of CMI coder

Table 1  Comparison of Delays with a Frame Dropping Rate of n:1

| Extrapolative prediction only | n-1 frames |
|---|---|
| Motion compensated interpolation (CMI, coding units in parallel) | n frames |
| CMI (dual use of circuit) | n+1 frames |

**Exhibit 30  Page 1219**                                    MSLT0625893

Annex to #81

Table. 1        Simulation Results

| Test Sequence | Without CMI | With CMI |
|---|---|---|
| Miss America (140th frame) | 39.57 dB 10 HZ | 39.98 dB (39.05 dB) 10 HZ |
| Checked Jacket ( 52th frame) | 38.75 dB 10 HZ | 38.75 dB (38.29 dB) 10 HZ |
| Split Screen ( 60th frame) | 32.57 dB 7.5 HZ | 33.09 dB (29.98 dB) 7.5 HZ |
| Trevor (140th frame) | 35.24 dB 7.5 HZ | 34.89 dB (32.18 dB) 7.5 HZ |

in parenthesis : CMI frame

**Exhibit 30  Page 1220**                                    MSLT0625894