# EXHIBIT E

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF CALIFORNIA
    --------------------------------X
 3  LUCENT TECHNOLOGIES, INC.        :
    and MULTIMEDIA PATENT TRUST,     :
 4            Plaintiffs             :  Case No:
                  -vs-               :  07-CV-2000-H (CAB)
 5  GATEWAY, INC., GATEWAY            :
    COUNTRY STORES, LLC, GATEWAY     :  Consisting of
 6  COMPANIES, INC., GATEWAY         :  matters severed
    MANUFACTURING, LLC, and          :  from consolidated
 7  COWABUNGA ENTERPRISES, INC.,     :  cases:
            Defendants               :
 8  and                              :
                                     :  Case No.
 9  MICROSOFT CORPORATION,           :  02-CV-2060 B (CAB)
            Intervener               :  Case No.
10  -----------------------------    :  03-CV-0699 B (CAB)
    MICROSOFT CORPORATION,           :  Case No.
11          Plaintiff                :  03-CV-1108 B (CAB)
                  -vs-               :
12  LUCENT TECHNOLOGIES, INC.        :
            Defendant                :
13  -----------------------------    :
    LUCENT TECHNOLOGIES, INC.        :
14  and MULTIMEDIA PATENT TRUST,     :  Pages 1 - 279
            Plaintiffs               :
15                -vs-               :
    DELL, INC.,                      :
16          Defendant                :
                                     :
17  --------------------------------X
18       Videotape Deposition of Bruce Tognazzini
                    Washington, D.C.
19           Tuesday, November 20, 2007
20
21
    Reported by:  Kathleen M. Vaglica, RMR
22  Job No:  184311
```

Page 46

1  objects on screens to facilitate people being able
2  to enter information into a computer which is human
3  computer interaction.
4  BY MS. GARNER:
5      Q.  So do I understand you to say that the
6  field of data entry arrangements is the same thing
7  as the field of HCI?
8          MR. CORBETT:  Objection.
9  Mischaracterizes.
10         THE WITNESS:  The field of HCI is bigger
11 because it goes beyond just data entry, but, when
12 you speak of data entry arrangements, you are
13 speaking of the human computer interaction design of
14 a data entry system.
15 BY MS. GARNER:
16     Q.  So is the field of data entry arrangements
17 a subset of the field of HCI?
18         MR. CORBETT:  Objection.  Vague.  Beyond
19 the scope.
20         THE WITNESS:  I think that would be a fair
21 characterization.
22 BY MS. GARNER:

Page 47

1      Q.  In paragraph 29 you talk about what HCI
2  was like --
3      A.  I'm sorry.  Are we back at Exhibit --
4      Q.  I'm sorry.  Exhibit 2, paragraph 29.  You
5  refer to HCI at the time of the '356 patent's
6  invention, and you talk a little bit about that; is
7  that right?
8      A.  That's correct.
9      Q.  What time is that?  What time did you
10 refer to when you wrote your reports?
11         MR. CORBETT:  I'm going to object again.
12 We're still referring back to his first report.
13 Beyond the scope of supplemental report,
14 supplemental deposition to the extent he's already
15 given testimony on this in the first deposition.
16 I'll give a little more leeway, but if we can move
17 on to the subjects of the supplemental deposition
18 and supplemental report.
19         THE WITNESS:  I don't have the date of
20 filing for the Torok patent, but, essentially, it
21 was the period of time that included the data filing
22 of the Torok patent and the data filing of the Day

Page 48

1  patents.  And I believe the Torok patent was
2  earlier.
3  BY MS. GARNER:
4      Q.  So with respect just to the Day patent,
5  when you considered the state of the art with regard
6  to the Day patent, what time frame, the state of the
7  art at the time of the '356 patent invention, what
8  time frame were you considering?
9      A.  December 11, 1986, the filing date of the
10 patent and the period that preceded it.
11     Q.  How long a period preceding?
12         MR. CORBETT:  Objection.  Vague.  Asked
13 and answered.
14         THE WITNESS:  Well, again, I don't have
15 before me the filing date of the Torok patent or at
16 least I don't think I have it before me, so I can't
17 tell you that.  On the other hand, things were
18 improving, so that, essentially, they only would
19 have been worse in the earlier date than what I'm
20 suggesting here.  Okay.  It does say here around
21 1980 at the time of the '956 patent, so it is
22 covering that full time, so 1980 to 1986.

Page 49

1  BY MS. GARNER:
2      Q.  So, when you considered whether or not
3  something, whether or not the Day patent was
4  obvious, you considered what was going on in HCI in
5  1980; is that right?
6          MR. CORBETT:  Objection.  Mischaracterizes
7  his testimony.
8          THE WITNESS:  No, that is not correct.
9  When I consider what was obvious in terms of the Day
10 patent, I considered what was going on at the end of
11 1986.
12 BY MS. GARNER:
13     Q.  And what was going on in HCI in 1986?
14         MR. CORBETT:  Objection.  Vague.
15         THE WITNESS:  Well, in general terms there
16 was one computer system out there that had a mouse
17 as a standard part of the system, the Macintosh, and
18 there were many, many, many, many others that did
19 not, including a wide variety of, as I recall at
20 this time, and, again, I'm just working from memory,
21 a wide variety of companies making MS DOS compatible
22 machines.

Page 50

1  In addition to several other models of
2  Apples that did not ship with a mouse, there was an
3  initial release of Windows that was available at the
4  time, but was not, had almost no market penetration
5  because it didn't work particularly well and because
6  there were -- people typically didn't have a mouse,
7  so, essentially, it was a world still populated by
8  MS DOS and other menu-driven navigational interface
9  systems while over in the corner there was this
10 emerging mouse-based technology going on.  There was
11 also great hostility between the two camps.
12 BY MS. GARNER:
13    Q.  The mouse guys and the keyboard guys?
14    A.  Yes.
15    Q.  Other than that distinction, mice and
16 keyboards, were there any other changes going on in
17 the field of HCI in 1986?
18       MR. CORBETT:  Objection.  Vague.
19 Ambiguous.  Overbroad.
20       THE WITNESS:  That was the revolutionary
21 change.  There were evolutionary trends going on as
22 computers became more powerful, etc.

Page 51

1  BY MS. GARNER:
2     Q.  What kinds of evolutionary trends?
3     A.  Well, as you -- nothing, actually, there
4  wasn't too much that happened during this era.
5  About 1990 computers finally began to get up to
6  sufficient speed to begin to do new things, so this
7  was kind of an era where the text navigational menu
8  driven interfaces were at their peak trying to hang
9  on while the mouse was making inroads.  The mouse
10 systems were very weak at the time, which is why the
11 text systems were doing so well, and it would be
12 several more years before the horsepower really, of
13 the computers themselves got up there enough to
14 support the beginnings of the kinds of elaborate
15 software that we have today on mouse-based systems.
16       So you had one, the new camp, the mouse
17 camp in its infancy working, struggling to get every
18 last cycle out of the microprocessors and so forth
19 to support this much more elaborate interface, and
20 meanwhile you had these mature text-based systems
21 that were very efficient for the kind of work they
22 did carrying out much more complex tasks typically

Page 52

1  than the mouse-based systems, and it wouldn't be for
2  several more years again before these things took
3  over.
4        In terms of Windows, Microsoft was trying
5  to copy Apple always interface.  They got it wrong.
6  They got it wrong.  They got it wrong.  About
7  version three they began to get it right, but that
8  didn't come up until around 1990, which was, I
9  believe, the first time that any MS DOS machine
10 included a mouse in the box.  So you had a, just
11 a -- the Macintosh came out in 1984 with great
12 splash and then there was this kind of quiet period
13 as the hardware caught up with the vision of the
14 software that lasted up until about 1990.
15    Q.  So the Macintosh, the first computer with
16 a mouse standard, that came out in January of 1984;
17 is that right?
18       MR. CORBETT:  Objection.  Vague.
19 Mischaracterizes.
20       THE WITNESS:  Well, you, and compound
21 because the Mac was not the first computer with a
22 mouse.

Page 53

1  BY MS. GARNER:
2     Q.  Okay.  What was the first computer with a
3  mouse?
4     A.  The Xerox Star.
5     Q.  And you said in 1986 there was one
6  computer with a mouse standard.  What computer were
7  you referring to?
8     A.  The Macintosh.
9     Q.  The Star had a mouse at that point?
10    A.  The Star had died a bad death.
11    Q.  By what date?
12    A.  I think -- well, I'd have to look into it,
13 but I think by 1983.  I think so.  At any rate, it
14 never -- they sold very few machines ever, so it
15 never, never achieved profitability.  It never
16 achieved success.
17    Q.  But the Macintosh did?
18    A.  Ultimately.
19    Q.  And it was introduced in January of 1984;
20 is that right?
21    A.  Yes.
22    Q.  I think we all remember the Super Bowl

Page 62

1      THE WITNESS:  Mouse was invented by Doug
2  Engelbart in approximately 1963.
3  BY MS. GARNER:
4      Q.  And when was the mouse first available?  I
5  think you said on the Xerox Star?
6      A.  Xerox Star was released in 1980.
7      Q.  And today would you say that almost all
8  computers include a mouse or a pointing device?
9      MR. CORBETT:  Objection.  Vague.
10     THE WITNESS:  Actually, if you mean
11 general purpose computers, that's true.  Most
12 computers don't include a pointing device because
13 most computers are Blackberries and cell phones and
14 microwave ovens and digital video recorders and so
15 forth, but, if you're talking about general purpose
16 computers, particularly for productivity, they
17 include a pointing device.
18 BY MS. GARNER:
19     Q.  Did you use an earlier, a very early
20 version of Windows on the computer that Kirland &
21 Ellis provided to you?
22     MR. CORBETT:  Objection.  Vague.  Asked

Page 63

1  and answered.
2      THE WITNESS:  I don't recall what version
3  of Windows I was using, but it was familiar to me,
4  so it was not a very early version of Windows.
5  BY MS. GARNER:
6      Q.  Are you unfamiliar with early versions of
7  Windows?
8      A.  Well, I haven't seen them since the time
9  frame of the Day patent.
10     Q.  Mr. Buscaino opined on Windows Version
11 1.01 with respect to a composition tool, didn't he,
12 in his report?  Do you remember that?  I can point
13 you to it.  It's Exhibit 4.  Take a look at page 30.
14 Actually, start on 27.  Under heading 2, "Microsoft
15 Windows 1.01."
16     A.  I see that.
17     Q.  And then on page 30 under heading 2 also,
18 but that would be heading 2E, it discusses Microsoft
19 Windows 1.01.  Do you see that?
20     A.  Yes.
21     Q.  When's the last time you reviewed Windows
22 1.01?

Page 64

1      MR. CORBETT:  Objection.  Vague.  Asked
2  and answered.
3      THE WITNESS:  Well, I looked at Windows
4  1.01 to see how much copying had been done from the
5  Mac interface shortly after it came out, and I don't
6  really remember the last time I laid eyes on it.
7  BY MS. GARNER:
8      Q.  At least ten years ago?
9      MR. CORBETT:  Objection.  Vague.
10 Mischaracterizes.  Asked and answered.
11     THE WITNESS:  It's hard for me to say.  I
12 don't have any specific recollection of anything
13 within the last ten years.
14 BY MS. GARNER:
15     Q.  You didn't review it for purposes of your
16 reports in this case then?
17     A.  No, I did not.
18     MR. CORBETT:  Objection.
19 Mischaracterizes.  Asked and answered.
20 BY MS. GARNER:
21     Q.  You have no opinions about whether Windows
22 1.01 contains a composition tool or not?

Page 65

1      MR. CORBETT:  Objection.
2  Mischaracterizes.  Asked and answered.
3      THE WITNESS:  As I'm sitting here today, I
4  don't recall providing an opinion on that subject.
5  BY MS. GARNER:
6      Q.  As you're sitting here today, do you have
7  an opinion on that subject?
8      A.  If it's in my report, I have an opinion.
9      Q.  Okay.  And if it's not?
10     A.  If it's not, I don't.
11     Q.  But you don't remember reviewing Windows
12 1.01 for the purposes of preparing your report?
13     A.  That's correct.
14     MR. CORBETT:  Objection.  Asked and
15 answered.  Mischaracterizes.
16 BY MS. GARNER:
17     Q.  Could you take a look at your report
18 Exhibit 1 on page three?  Paragraph nine indicates
19 that you examined some devices in San Diego I think
20 in my office of Fish & Richardson in 2006, and then
21 you said you also independently examined certain
22 actual software relied upon by Mr. Buscaino.  Do you

Page 106

1 representation. This is a text-driven display. It,
2 it's a text representation.
3     Q.   And those little numbers with squares
4 around them, are those, do you think, intended to
5 represent calculator keys?
6         MR. CORBETT: Objection. Vague.
7         THE WITNESS: I would suggest not.
8 BY MS. GARNER:
9     Q.   And why is that?
10    A.   Because a calculator has a readout, and
11 this does not have a readout.
12    Q.   Do you see up in the top corner where it
13 says 98.99?
14    A.   Oh, I'm sorry. Yes. What you've just
15 said does refresh my memory. It does not have an
16 apparent readout field, so, but, so you're asking me
17 about the entire thing as outlined by the yellow
18 line as opposed to the, just the keypad part of it?
19    Q.   Why don't I ask a different question.
20    A.   Okay.
21    Q.   Do you think that those numbers, zero
22 through nine with little squares around them, were

Page 107

1 intended to be a representation of calculator keys?
2     A.   I don't know that I have an opinion as to
3 whether those are calculator keys or numeric keypad
4 keys.
5     Q.   But one or the other?
6     A.   I think that's fair.
7     Q.   Okay. So, when you say the on-screen
8 calculator does not have display keys, what did you
9 mean by that? I'm looking at paragraph ten or,
10 excuse me, page ten of your expert report.
11    A.   Yes. Well, again, going back to Exhibit
12 B, Glossary of Terms, within Exhibit 7 of today's
13 exhibits, the Court has construed a tool adapted to
14 allow said use of the composed said information
15 means a graphical keyboard tool or a graphical
16 keypad number keypad tool which allows the user to
17 compose information by pointing to the display keys
18 of that tool. I interpret display keys in that
19 context to refer to targets of pointing, and there
20 are no targets of pointing in this application, so,
21 therefore, these are not display keys. I would not
22 interpret those as display keys as construed by the

Page 108

1 Court. Again, I'm not a lawyer, but that's what it
2 means to me.
3     Q.   So your opinion in paragraph ten -- excuse
4 me -- paragraph 40 that the on-screen calculator
5 doesn't have display keys is based on the fact that
6 you can't point to the numbers on the screen; is
7 that right?
8         MR. CORBETT: Objection. Mischaracterizes
9 his statement.
10        THE WITNESS: The fact that these symbols
11 on the screen are not targets for a pointing device.
12 BY MS. GARNER:
13    Q.   On page 11 of your expert report,
14 paragraph 42, you indicated that the Your Money
15 Manager on-screen calculator doesn't have an enter
16 button or transfer mechanism. Do you see that about
17 halfway through the paragraph 42?
18    A.   Yes.
19    Q.   When you used Your Money Manager, were you
20 able to transfer a number from the calculator to one
21 of the fields on the payment screen?
22    A.   I believe so.

Page 109

1     Q.   How did you do that?
2     A.   It has been several weeks since I did it,
3 so I don't recall exactly what key I pressed.
4     Q.   You pressed a key to transfer the number
5 from the calculator to the payments form?
6     A.   I believe I did.
7     Q.   And does the Court's claim construction
8 require there to be an enter button on the
9 composition tool?
10        MR. CORBETT: Objection. Calls for a
11 legal conclusion.
12        THE WITNESS: I think one can infer that
13 being able to create the information and yet have no
14 means to move it from a tool into the program that
15 calls it as shown in the Day patent would not be a
16 particularly useful function, so there -- one
17 doesn't necessarily need an enter key in every
18 single tool, but in this case there has to be a
19 means of moving the information from this matrix
20 into the original field.
21 BY MS. GARNER:
22    Q.   And you were able to do that?

28 (Pages 106 to 109)

Page 118

1  words?
2      MR. CORBETT: Objection. Vague.
3      THE WITNESS: To the extent that a number
4  is an entity and a word is an entity, the number
5  would be typed faster.
6  BY MS. GARNER:
7      Q. So, if an expression were a mathematical
8  expression that included operators and operands that
9  was the same number of key strokes as a word, which
10 do you think would typically be typed faster by the
11 average user?
12     A. By the average user --
13     MR. CORBETT: Objection. Vague.
14 Incomplete hypothetical.
15     THE WITNESS: In the situation of a
16 complex series of numbers versus a known word, a
17 word would, by a touch typist -- well, typically,
18 people are going to be able to type numbers faster,
19 words faster than numbers. The exception is a
20 numeric keypad people can be highly efficient on.
21 BY MS. GARNER:
22     Q. On page 12 you said that numerous systems

Page 119

1  with the keyboard-based interface used in the older
2  and soon-to-be-obsolete DOS system. When did the MS
3  DOS system become obsolete?
4      MR. CORBETT: Objection. Form.
5      THE WITNESS: Well, I think it might
6  depend on where you want to draw the line on
7  obsolescence, and I couldn't really give you a date
8  on it, but by the time of the Day patent MS DOS was
9  on, its days were numbered. The mouse was growing
10 and taking over market share. Probably a Windows 3,
11 which came out, I think, in 1990, was the first
12 version that really worked well, and that, that was
13 the time about when the manufacturers started,
14 computer manufacturers started putting mice in the
15 box. That's when the curve really started to rise
16 on mouse-driven systems rather than MS DOS.
17 BY MS. GARNER:
18     Q. So about four years after the Day patent;
19 is that right?
20     A. Well, again, this was a trend, and I'm
21 sure there are people that are still using MS DOS
22 applications today. As of a few years ago, there

Page 120

1  were people still using vacuum tube computers, so
2  these things tend to die slowly.
3      Q. You've written some programs in your
4  career?
5      A. Yes.
6      Q. When's the last time you wrote a program?
7      A. Probably three or four years ago.
8      Q. Have you ever ported a software
9  application from one operating system to another?
10     MR. CORBETT: Objection. Vague.
11     THE WITNESS: I don't recall.
12 BY MS. GARNER:
13     Q. In your report on page 12 just after the
14 reference to the soon-to-be-obsolete MS DOS system,
15 "Further, one of ordinary skill in the art would not
16 have considered adding a mouse-based interface to
17 Your Money Manager because Your Money Manager was
18 optimized for the keyboard-driven MS DOS system."
19 Did you consider in forming your opinions whether
20 someone who is thinking about writing a different
21 piece of software for a different system would have
22 incorporated the teachings of both Your Money

Page 121

1  Manager and some other reference that taught a
2  composition tool that included the ability to point
3  to display keys?
4      A. I did consider other systems.
5      Q. And did you include your opinions in that
6  regard here in this report?
7      A. Yes, I do.
8      Q. Can you point me to them, please?
9      A. The third line on page 12, "At the
10 relevant time, the developers of mouse or
11 pointer-driven systems were mining mouse-driven
12 systems such as the Apple Macintosh for ideas, not
13 MS DOS applications optimized for keyboard use."
14     Q. So that person who was considering making
15 mouse-based application wouldn't even have
16 considered Your Money Manager, wouldn't have looked
17 at it; is that right?
18     MR. CORBETT: Objection.
19 Mischaracterizes.
20     THE WITNESS: There were good and
21 sufficient reasons not to look back at the past when
22 creating revolutionary new designs. The exemplars

31 (Pages 118 to 121)

Page 122

1  of the time were primarily the Apple Macintosh, not
2  that old MS DOS application.
3  BY MS. GARNER:
4      Q.  So any person of ordinary skill in the art
5  in 1986 thinking of developing his own software
6  application would not have looked to the teachings
7  of Your Money Manager; is that your position?
8          MR. CORBETT:  Objection.
9  Mischaracterizes.
10         THE WITNESS:  I'm not saying it couldn't
11 have happened, but, when they looked at it, there
12 were going to be so many reasons not to do it that,
13 even if they have looked at it, they would have
14 abandoned the attempt.  I mean, you spoke of how
15 someone can type a word faster than a number, which
16 is true if they happen to be a touch typist with
17 letters, but are not a touch typist with numbers,
18 but here's a situation where someone hunting and
19 pecking with numbers, which is very likely going to
20 be faster than the same person hunting and pecking
21 with letters, is going to just bury somebody trying
22 to click those numbers by pointing subsequently to

Page 123

1  each and every number on a calculator, so, you know,
2  you don't take an interface that has been optimized
3  and well designed within the framework of MS DOS to
4  be used by a keyboard and suddenly slow it, it and
5  the user way down just to shove a mouse in there.
6  BY MS. GARNER:
7      Q.  Would that same person of ordinary skill
8  in the art have considered, perhaps, the other
9  teachings of Your Money Manager, for example,
10 displaying a plurality of information fields?
11         MR. CORBETT:  Objection.  Vague.
12 Mischaracterizes.  Incomplete hypothetical.
13         THE WITNESS:  I don't believe this is a
14 good exemplar for building a revolutionary kind of
15 software.  This is a good exemplar of a mature
16 pregraphical user interface design.  It is not a
17 good exemplar, a good framework from which to begin
18 drawing lessons for going into the future, but
19 rather into the past.
20 BY MS. GARNER:
21     Q.  What field is Your Money Manager in?
22         MR. CORBETT:  Objection.  Vague.

Page 124

1          THE WITNESS:  Well, it's finance.
2  BY MS. GARNER:
3      Q.  And how does that compare to the field of
4  art of the Day patent?
5          MR. CORBETT:  Objection.  Vague.
6          THE WITNESS:  Orthogonally.
7  BY MS. GARNER:
8      Q.  Is it your position that Your Money
9  Manager is not in the field of art of the Day
10 patent?
11         MR. CORBETT:  Objection.  Vague.
12 Mischaracterizes.
13         THE WITNESS:  The interface of Your Money
14 Manager is in the field of human computer
15 interaction.
16 BY MS. GARNER:
17     Q.  Okay.  I would like to talk a little bit
18 about the Foreign Exchange Front End in the Tyler
19 reference that, your discussion of which begins on
20 page 14 of your report.  You noted in your report
21 that the Tyler reference doesn't refer to Foreign
22 Exchange Front End.  Can we agree to call whatever

Page 125

1  machine Tyler was talking about by the moniker
2  Foreign Exchange Front End?
3          MR. CORBETT:  Objection.  Form.
4          THE WITNESS:  I think that calls for a
5  legal conclusion.  I don't know whether we can agree
6  or not.
7  BY MS. GARNER:
8      Q.  Can you agree with me for the purposes of
9  this deposition that, when I say Foreign Exchange
10 Front End, I'm talking about the machine that Tyler
11 was talking about in his article?
12         MR. CORBETT:  Objection.  Form.  Assumes
13 facts.  Foundation.
14         THE WITNESS:  We can do that as long as
15 you understand the only thing I have opinions on
16 here and the only thing I'm prepared to talk about
17 today is the Tyler article, not the Foreign Exchange
18 Front End.
19 BY MS. GARNER:
20     Q.  The Tyler article is talking about a
21 machine that was demonstrated in New York; is that
22 your understanding of the Tyler article?

Esquire Deposition Services
800.829.6159

Page 174

1  because it's just simply not.
2      Q.  Because you think the term has a well
3  understood meaning in the field of HCI?
4      A.  I know it has a well understood, universal
5  meaning.
6      Q.  And that's the meaning of your client here
7  in your report?
8      A.  That's, yes.  I'm not, again, I'm not
9  spouting a dictionary term right now, but the, what
10 I have suggested in my report, what I'm saying now
11 is the commonly held meaning of pointing.
12     Q.  Mr. Tognazzini, I'd like to ask you some
13 questions now about the YMM software and how that
14 relates to the limitations of Claim 19, and you may
15 want to refer to the Court's claim construction
16 order to help you with this.  So I'd like to start
17 with the preamble of Claim 19.  Does the YMM
18 software disclose a method for use in a computer
19 system?  Or include a method for use in a computer
20 system?
21     A.  I don't believe I expressed an opinion on
22 that, but let me have a look.  I have not expressed

Page 175

1  an opinion on that.
2      Q.  Okay.  Let me ask it this way.  Is Your
3  Money Manager software intended for use on a
4  computer?
5      A.  I'm only hesitating because I'm not a
6  lawyer, and I understand that sometimes you ask
7  trick questions, so, to the extent that what you
8  asked me is in clear English, I believe that
9  software is intended to be run on a computer system.
10     Q.  Okay.  And I appreciate your answer.  I'm
11 not trying to trick you here.  Just trying to ask
12 straight forward questions, so don't feel like you
13 have to look through the layers into the meaning of
14 my questions.
15     A.  Okay.
16     Q.  Let me ask you another hopefully straight
17 forward question.  Is Your Money Manager software
18 intended for use in a computer system with a
19 display?
20     A.  Again, I didn't form an opinion on that.
21 It doesn't fulfill Claim 19 overall, and I, since I
22 didn't form an opinion, I'm not really prepared to

Page 176

1  start forming opinions now off the cuff in general.
2      Q.  Well, you've seen the software in
3  operation; right?
4      A.  Yes, I have.
5      Q.  And it displays information on a screen?
6      A.  Yes.
7      Q.  So wouldn't it be fair to say that the
8  software is intended for use with a display so that
9  it can display information?
10         MR. CORBETT:  Objection.  Asked and
11 answered.
12         THE WITNESS:  I don't know how far I can
13 go in offering new opinions in the middle of a
14 deposition and what kind of limiting factors they
15 have on the fact that Claim 19 does not have all the
16 necessary elements.
17 BY MR. BAKER:
18     Q.  I'm just trying to take it step by step
19 and see where we have a disagreement, where we agree
20 and didn't agree.  I didn't think we'd have a
21 dispute about displays because it seems pretty clear
22 there's a display, but let me just ask the question

Page 177

1  again.  Is the Your Money Manager software intended
2  for use in a computer with a display?
3          MR. CORBETT:  Objection.  Asked and
4  answered.
5          THE WITNESS:  Again, I didn't form an
6  opinion, and I don't want to start forming opinions
7  now in the middle of a deposition.
8  BY MR. BAKER:
9      Q.  Well, are you able to answer the question?
10     A.  Again, I don't know what the legal
11 ramifications are of beginning to agree with various
12 elements of Claim 19 when I'm on the record as
13 saying that Claim 19 does not have the necessary
14 elements, so I'm uncomfortable.
15     Q.  All right.  Well, I appreciate that you're
16 uncomfortable.  I mean, you have said that certain
17 elements are not there, and we'll certainly get to
18 those, but I'm trying to figure out which elements
19 you would agree are there.  And it sounds like you
20 haven't previously, you know, prepared an opinion on
21 this, but being an expert in HCI I would hope you
22 could answer, be able to answer the question about

45 (Pages 174 to 177)

Esquire Deposition Services
800.829.6159

Page 178

1  whether software like YMM is intended for use with a
2  display?
3      MR. CORBETT:  Objection.  Asked and
4  answered.
5  BY MR. BAKER:
6      Q.  So do you think you can answer the
7  question?
8      A.  I think probably the usual mode of using
9  YMM was with a display.
10     Q.  Okay.  Let me turn to the next limitation
11 then.  Does the YMM software perform the steps of
12 displaying on said display a plurality of
13 information fields?
14     A.  If you can bring it up and I can go
15 through it for a while, I might be able to -- I
16 mean, the actual software, not pictures of it, I
17 might be able to start forming new opinions, but
18 it's one thing to say it comes up on a display.
19 It's another thing to start forming new opinions
20 about what it does and doesn't have.
21     Q.  So, if you saw a picture of the display,
22 would you be able to answer my question?

Page 179

1      A.  Well, I think the software running is
2  better evidence of the software than a picture of
3  the software, so --
4      Q.  All right.  Let me ask you this.  You've
5  reviewed the software running; is that right?
6      A.  Yes, I have.
7      Q.  And you are aware that Mr. Buscaino had
8  opined that it met all the limitations of the claim;
9  is that right?
10     A.  That's my recollection as I sit here.
11     Q.  And you were trying to determine whether
12 or not you agreed with his conclusions or disagreed
13 with his conclusions?
14     A.  Well, I spent my time on the portion of
15 Claim 19 having to do with the tool adapted and
16 didn't offer an opinion on the rest of it.
17     Q.  Did you consider whether the YMM software
18 met the displaying limitation?
19     A.  I didn't formally consider it, and I
20 didn't deliver an opinion on it.
21     Q.  Did you think about it, though?
22     MR. CORBETT:  Objection.  Vague.

Page 180

1      THE WITNESS:  I can't tell you.
2  BY MR. BAKER:
3      Q.  Why can't you tell me?
4      A.  I don't mean I'm withholding it from you.
5  I just don't remember whether I looked at that
6  particular aspect of it or not.  It was clear to me
7  from the beginning that it clearly did not meet the
8  particular step that we were talking about, and
9  that's where I put my time and energy into looking
10 at that and seeing whether, in fact, it did, and, if
11 not, why it didn't and whether it almost did or not,
12 but, I mean, it radically didn't as it turned out.
13 So that was, that was where my effort became
14 concentrated.
15     Q.  So do you have an opinion regarding
16 whether or not the YMM software performs a step of
17 displaying on said display a plurality of
18 information fields?
19     A.  As I am sitting here right now, there's no
20 opinion in my report, and I do not want to create an
21 opinion on the fly.
22     Q.  So you don't have an opinion right now on

Page 181

1  that limitation?
2      A.  That's correct.
3      Q.  What about the next limitation?  Did you
4  consider whether the Your Money Manager software
5  forms a step of identifying for each field a kind of
6  information to be inserted therein?
7      A.  I did not form an opinion on that.
8      Q.  Did you consider whether it met that
9  limitation?
10     A.  I don't think I exhaustively went through
11 each field to see whether it met the limitation or
12 not.
13     Q.  Did you consider any fields?
14     MR. CORBETT:  Objection.  Form.
15     THE WITNESS:  Well, there were, I did
16 notice one or two that it wasn't clear that they
17 didn't indicate, but how extensive it was I don't
18 know.
19 BY MR. BAKER:
20     Q.  Were there any fields that you found in
21 the Your Money Manager software that did identify
22 the kind of information to be inserted therein?

Page 182
1   A.  There was some, yes.
2   Q.  And which fields were those?
3   A.  Well, again, I'm just working from memory,
4   but date and amount would have a common meaning to
5   people and understanding of -- well, amount would be
6   better.  Date did not necessarily indicate what
7   format or may or may not have indicated what format
8   it should be.
9   Q.  What about the account field?
10  A.  Certainly a new user would have no idea
11  what to put in there.
12  Q.  What about an experienced user of the
13  software?
14  A.  Experienced user would have learned what
15  to put in there, but the label itself wouldn't have
16  told them what to put in there.
17  Q.  What do you think that label would have
18  meant to a new user?
19  A.  Checking, savings or charge account of the
20  department store.  It's got a very specialized
21  meaning within YMM, and some other financial
22  software, but --

Page 183
1   Q.  So, if someone read the user manual for
2   the software, would they understand what account
3   meant?
4   A.  Yes.
5   Q.  And, if they had used the software for
6   some limited period of time, would they understand
7   what the term "account" meant?
8   A.  They would understand it, but at that
9   point the word "account" would have become a symbol
10  as opposed to an identifier that identifies for each
11  field a kind of information to be inserted therein.
12  The word "amount" is commonly understood.  I'm
13  supposed to enter a dollar figure.  The word
14  "account" is open to interpretation, and even when
15  you learn it, it's not actually account.  It's the
16  account number or something along those lines.
17      Same thing with the word "check" next to
18  it.  You don't enter the check into the box labeled
19  "check."  You enter a number.  There's no connection
20  between that label and the kind of information to be
21  inserted therein, but, again, I didn't go into that.
22  Q.  Well, so what's your understanding then of

Page 184
1   what the identifier has to tell the user in order to
2   meet this limitation?
3   A.  The identifier for each field a kind of
4   information to be inserted therein, and all I can
5   tell you is what it says on the page.  I did not
6   form an opinion as to how these labels fit in there.
7   Q.  Would the user have to understand exactly
8   what kind of information was supposed to be entered
9   into that field in order to meet this limitation?
10      MR. CORBETT:  Objection.  Vague.
11      THE WITNESS:  I don't think that's
12  necessarily true.  And, again, I didn't form an
13  opinion just because I didn't get into these issues.
14  BY MR. BAKER:
15  Q.  I understand, but for account, for
16  example, you said a user could think it's checkings
17  or savings or some other type of account rather than
18  account codes.  I'm trying to understand how that
19  example informs your understanding of the
20  requirements of this limitation.
21  A.  It doesn't inform my understandings, and
22  that's why I didn't form an opinion on this or,

Page 185
1   actually, that's the cart before the horse.  I
2   didn't form an opinion on this.  Therefore, I didn't
3   go into this issue and that, that wouldn't
4   necessarily inform my understanding of this issue.
5   There are many fields in many programs with
6   identifiers that are not immediately obvious to all
7   users, so --
8   Q.  And, if it were not immediately obvious to
9   a user, would that mean it would not satisfy the
10  limitation?
11  A.  I don't believe that's correct.  So in
12  this instance I'm more talking about the fact that
13  they came up with a bad design rather than something
14  that would necessarily be within or without scope of
15  Claim 19.
16  Q.  Well, if a label were subject to multiple
17  interpretations, in your opinion, would that mean it
18  would not identify for each field a kind of
19  information to be inserted therein?
20  A.  No.
21      MR. CORBETT:  Objection.  Incomplete
22  hypothetical.

Page 186
1  BY MR. BAKER:
2      Q.  So what are you saying?
3      A.  I'm just saying those particular labels in
4  YMM are not well chosen, and I did not form an
5  opinion on this issue.
6      Q.  And in particular account label is not
7  well chosen because different users could understand
8  it differently?
9      A.  That's correct.
10     Q.  And for that reason it does not identify
11 for each field a kind of information to be inserted
12 therein?
13         MR. CORBETT:  Objection.
14 Mischaracterizes.
15         THE WITNESS:  That's what I am not saying.
16 I am not saying that.  I'm saying that it's not well
17 chosen, and you're attempting to get me to create
18 opinions on the fly, and I'm really not going to do
19 that.
20 BY MR. BAKER:
21     Q.  I thought you were explaining that
22 problem, why it was not well chosen, as somehow

Page 187
1  relevant to the claim limitation?
2      A.  At some point an identifier would become
3  so poorly chosen that one would have no idea what,
4  how to proceed forward, and at some point an
5  identifier is no longer an identifier.  Where that
6  point is I have not been asked to give an opinion,
7  and, nor have I given one.
8      Q.  Well, do you have a sense right now as to
9  whether the account field is sufficiently clear that
10 it would qualify as an identifier?
11         MR. CORBETT:  Objection.  Asked and
12 answered.
13         THE WITNESS:  No, I don't.  And one of the
14 factors would be the users.  This was typically used
15 by professionals, and, therefore, they might have
16 more of a chance of understanding it, but, again,
17 this is exactly the sort of issue I didn't get into
18 because I didn't offer an opinion on this.
19 BY MR. BAKER:
20     Q.  Okay.  So let me, I think it's probably
21 clear by now.  Let me see if I can confirm it.  Do
22 you have an opinion now as to whether or not the YMM

Page 188
1  software meets the identifying for each field the
2  kind of information to be inserted therein
3  limitation?
4      A.  No.
5          MR. CORBETT:  Objection.  Asked and
6  answered.
7  BY MR. BAKER:
8      Q.  Okay.  Let me move on to the next
9  limitation.  Does the YMM software perform the step
10 of indicating a particular one of said information
11 fields into which information is to be inserted?
12     A.  Again, this is something -- let's see.
13 Where did I -- I did not offer an opinion on that.
14     Q.  So do you have an opinion today whether
15 the YMM software meets that limitation?
16     A.  No.
17     Q.  Do you have an opinion on whether the YMM
18 software meets the limitation of concurrently
19 displaying a predefined tool?
20     A.  No.
21     Q.  Do you have an opinion on whether the YMM
22 software meets the limitation of associated with

Page 189
1  said one of said fields?
2      A.  No.
3      Q.  Do you have an opinion on whether the YMM
4  software meets the limitation of said predefined
5  tool being operable to supply information of the
6  kind identified for said one field?
7      A.  No.
8      Q.  Do you have an opinion on whether the YMM
9  software meets the limitation of said tool being
10 selected from a group of predefined tools including
11 a tool adapted to supply an individual entry from a
12 menu of alternatives?
13     A.  No.
14     Q.  And do you have an opinion on whether the
15 YMM software meets the limitation of at least a tool
16 adapted to allow said user to compose said
17 information?
18     A.  Yes.
19     Q.  And do you have an opinion on whether the
20 YMM software meets the limitation of inserting in
21 said one field information that is derived as a
22 result of said user operating said display tool?

Page 190

1   A.  No.
2   Q.  Okay.  Now, we've been talking thus far
3   about the YMM software.  If I ask you all the same
4   questions about the YMM user manual, would your
5   answer be the same as with respect to the software?
6   A.  Yes.  Insofar as whether or not I have an
7   opinion, yes, as I'm sitting here today.
8   Q.  Okay.  So, if I understand this correctly,
9   the only limitation that you've expressed an opinion
10  on is the, at least a tool adapted to allow said
11  user to compose said information limitation with
12  respect to the YMM software and the YMM manual?
13  A.  I have only discussed a tool adapted to
14  allow said user to compose said information.
15  Q.  So that's the only limitation you've
16  formed an opinion on?
17  A.  That's correct.
18  Q.  Mr. Tognazzini, I'd like to ask you some
19  questions now about MS DOS-based systems more
20  generally.  Did any MS DOS-based systems use a mouse
21  before December of 1986?
22      MR. CORBETT:  Objection.  Vague.

Page 191

1       THE WITNESS:  I don't have direct evidence
2   one way or the other.
3   BY MR. BAKER:
4   Q.  So you don't know?
5   A.  Yes.
6   Q.  Have you ever heard of something called
7   the serial mouse?
8   A.  How do you spell it?
9       MR. CORBETT:  Objection.  Foundation.
10  Vague.
11      MR. BAKER:  S-E-R-I-A-L.
12      THE WITNESS:  I don't recall that.
13  BY MR. BAKER:
14  Q.  If a person of skill in the art wanted to
15  add mouse support to YMM, what would need to be
16  added?
17      MR. CORBETT:  Objection.  Vague.
18  Incomplete hypothetical.  Foundation.  Assumes
19  facts.
20      THE WITNESS:  Well, it would greatly
21  depend on how one went about it and what level of
22  mouse support one wanted to add, and that's a very,

Page 192

1   very broad question, so I --
2   BY MR. BAKER:
3   Q.  Okay.  Suppose you wanted to add mouse
4   support just for the on-screen calculator feature of
5   Your Money Manager.  What would need to be added to
6   the software to accomplish that?
7       MR. CORBETT:  Same objection.
8       THE WITNESS:  One would need to add --
9   okay.  We're talking about an application that ran
10  in text mode on a very slow computer back in the
11  mid-1980s.  To add support for a mouse pointer in
12  text mode on a computer that does not otherwise
13  support it requires coming up with a customized
14  character set, may require changes to the logic in
15  the chips of the computer, will certainly require a
16  mouse, will certainly require mouse drivers and will
17  require, typically require extensive changes to the
18  software.  When one completes all this, one will now
19  be selling a product which requires more memory or,
20  if you've hit the maximum amount of memory, that
21  your customers have now has less functionality
22  because you've had to remove functionality to make

Page 193

1   room for all of this.  You're going to have a very,
2   very small installed base of people that have the
3   necessary systems to be able to use such a text
4   pointer, and your customers, in addition to buying a
5   product from you, are going to have to buy a product
6   from the mouse manufacturer and buy one or more
7   products from software people to make the whole
8   system work, so you've now tremendously limited your
9   potential marketplace, and you've now created a
10  product that is less efficient than the one you
11  started with.
12          On the other hand, if you want to do this
13  in graphics, you can avoid any steps that can be
14  required in creating a text-based mouse.  Thereby
15  you get around the logic board problems and the
16  character set problems, and you put it into graphics
17  mode.  As soon as you put it into graphics mode, in
18  that era you would typically experience an
19  eight-fold decrease in the overall speed of your
20  application.  So your application is now running at
21  extremely slow speed.  Everything the user does is
22  going to be in slow motion, and you won't be able to

Page 194

1  create a viable commercial product.
2       Typically, the systems then also had to
3  take hold of that graphics screen area out of main
4  memory so that, again, you have just shrunk the
5  possible size of your application, and you may have
6  to cut out as much as 50 percent of the
7  functionality of your application depending on how
8  much of a typical user's memory you're requiring for
9  your system.
10      Q.  So at the time, let's say December 1986,
11 the ability to implement a graphics mode version of
12 YMM that had mouse support was limited by the
13 computer speed and by memory constraints?
14      MR. CORBETT:  Same objection, plus
15 mischaracterizes, plus calls for narration.
16      THE WITNESS:  I believe I mentioned a
17 number of factors beyond that including the
18 economics and the reduction in productivity and the
19 fact that your customers had to go spend maybe three
20 times as much money to get a working product, but
21 they are giving two-thirds of it to other companies
22 in order to provide, to buy peripherals.

Page 195

1  BY MR. BAKER:
2       Q.  If a person skilled in the art wanted to
3  implement the mouse change in text mode, you said
4  that you might need to come up with custom character
5  set.  Could you explain why that would be the case?
6       A.  You have to have a mouse pointer which is
7  of a particular shape, typically an arrow, which is
8  facing up and to the left.  That character is not
9  necessarily available in a character set.  It's
10 built into the computer in that era.  So, if you
11 have a built-in character set, you have to modify
12 it.
13      Q.  So you would need to modify it so you
14 could have the character that would serve as the
15 pointer on the screen?
16      A.  That character and all the other necessary
17 characters to build a functioning text user
18 interface, TUI, and analogue of a graphical user
19 interface.
20      Q.  What are the other necessary characters?
21      A.  Various bars and shapes that one can build
22 menus out of and so forth.

Page 196

1       Q.  Could a person skilled in the art have
2  added those characters to a character set?
3       A.  Yes.
4       Q.  You also mentioned some changes to logic
5  chips.
6       A.  But let me just clarify that.  It's a
7  major undertaking.  It's a huge undertaking, and it
8  has to be done at the, by the computer manufacturer,
9  and it requires revamping.  It requires the release
10 of a new model of the computer and pretty much cuts
11 off any possibility of retrofitting because of the
12 extensiveness of the changes.
13      Q.  Well, why is it a huge undertaking?
14      A.  Because changes to chips on the logic
15 board are not trivial.
16      Q.  I thought we were talking about the custom
17 character set.  Is that related to the logic chips?
18      A.  My experience in this area has been that
19 one has to also change at least one logic chip in
20 order to carry it off.
21      Q.  So is that what makes it a huge
22 undertaking is the need to change some hardware?

Page 197

1       MR. CORBETT:  Objection.
2  Mischaracterizes.
3       THE WITNESS:  When you change the
4  hardware, when you change the character set, a lot
5  of people's software no longer functions properly.
6  So now all your developers have to go out and
7  release new software, even though there was nothing
8  wrong with the old software.  So it's a logistical
9  nightmare, and it's a big deal.
10 BY MR. BAKER:
11      Q.  Why would you need to make a change to a
12 logic chip?
13      MR. CORBETT:  Objection.  Vague.
14      THE WITNESS:  It depends on the current
15 architecture of the machine, the current machine, as
16 to what changes you have to make.  I've only done
17 this once.  I had to change the logic.  Whether in a
18 different machine one would not have to do that, I
19 can't tell you.
20 BY MR. BAKER:
21      Q.  When you say you've done this once, what
22 are you referring to?

Page 198

1  A. The Apple 2C in which I put a mousing
2  system in text mode, and it required extensive
3  changes.
4  Q. Could you just explain a little more what
5  the problem was you were addressing in that project?
6  A. Well --
7  Q. Explain a little more about what you were
8  doing with respect to the Apple 2C as relates to
9  this topic.
10  A. I was designing a mousing system that
11  would work in text mode in order to not have the
12  eight-fold decrease in speed that occurs in graphics
13  mode. And, in order to do that, I had to create a
14  custom character set. I had to change a logic chip
15  so that it would point to the custom character set
16  when that custom character set was addressed, and,
17  when that happened, there were a whole bunch of
18  software applications that broke. And so then I had
19  to work with all the developers to bring out new
20  releases of, with the affected developers to bring
21  out new releases of their software so that it
22  worked. And it was a gigantic undertaking, and it

Page 199

1  was anything but trivial to add the mouse to the
2  Apple 2C.
3  Q. So the Apple 2C was a system that
4  originally did not have mouse support?
5  A. Actually, the Apple 2C did originally have
6  mouse support. It was the new model, so it was
7  coming out on a new model.
8  Q. So you were working on mouse support for
9  the initial launch of the Apple 2C?
10  A. That's correct. The Apple 2C was the
11  latest model in the Apple 2 series. Therefore, I
12  was starting out with a, with the predecessor to it
13  and making the necessary changes to support the
14  mouse on the new model.
15  Q. So the predecessor did not support the
16  mouse?
17  A. That's correct.
18  Q. And you were adding mouse support to the
19  predecessor for purposes of developing the Apple 2C?
20  A. Yes. In essence, yes.
21  Q. And were you successful in adding mouse
22  support for the Apple 2C?

Page 200

1  A. Yes, but it took six months of my life.
2  Q. Would it be easier to include mouse
3  support in a software program if you're starting
4  from scratch?
5  MR. CORBETT: Objection. Vague. Calls
6  for an incomplete hypothetical.
7  THE WITNESS: Well, again, the two
8  possible ways of driving this program are text and
9  graphics, and graphics at that time was typically
10  inherently eight times slower, so, if you were
11  starting, you could just move to a graphics
12  environment as long as you didn't mind your users
13  waiting around for the entire course of the
14  application while things were happening in slow
15  motion.
16  BY MR. BAKER:
17  Q. Why was the operation so slow in graphics
18  mode?
19  A. Because you had to address every single
20  pixel on the screen instead of every group of eight
21  pixels, so you were slamming a whole bunch more
22  bytes onto the screen with that system than you were

Page 201

1  in the case of the text mode where the text
2  characters all are already fully formed, and you
3  just simply ship it to the screen with a piece of
4  hardware, send it out. The microprocessor is
5  putting out one bit after the other after the other.
6  Q. Did the performance improve in the
7  graphics mode after computers got faster?
8  A. As computers got faster, graphics mode got
9  faster, which is why graphics-based applications
10  really didn't take off until the computers did get
11  faster.
12  Q. In December of 1986 were there any
13  computer mouses available in the market for use with
14  an IBM PC?
15  MR. CORBETT: Objection. Vague. Asked
16  and answered.
17  THE WITNESS: To my knowledge, there were
18  mice available for the IBM PC. Whether they worked
19  on top of MS DOS, whether they took over the whole
20  computer and essentially were primarily their own
21  operating system, I don't know.
22  BY MR. BAKER: