# EXHIBIT P

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11 | LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST,

12 |     Plaintiff and Counterclaim-defendant,

13 |     v.

14

15 | GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.,

16

17 |     Defendants and Counter-claimants,

18 | and

19 | MICROSOFT CORPORATION,

20 |     Intervenor and Counter-claimant,

21

22 | MICROSOFT CORPORATION,

23 |     Plaintiff and Counter-defendant,

24 | v.

25 | LUCENT TECHNOLOGIES INC.,

26 |     Defendant and Counter-claimant,

27

28

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB); and
Case No. 03-CV-1108 B (CAB)

**SECOND SUPPLEMENTAL EXPERT REPORT OF MR. DALE E. BUSCAINO RE INVALIDITY OF UNITED STATES PATENT NO. 4,763,356**

Case No. 02-CV-2060 B (CAB)

1
2    LUCENT TECHNOLOGIES INC. and
     MULTIMEDIA PATENT TRUST,
3
              Plaintiff,
4
     v.
5
     DELL, INC.,
6
              Defendant.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 02-CV-2060 B (CAB)

I, Mr. Dale E. Buscaino, have been retained by Microsoft Corporation, Dell Incorporated and Gateway Incorporated (collectively "Defendants") through their counsel to serve in this case as an independent expert. I understand the Complainant in this case to be Lucent Technologies, Incorporated, herein referred to as "Lucent." I have submitted four prior reports in this case, "Expert Report of Mr. Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356" ("Buscaino I") dated March 31, 2006, "Expert Report of Mr. Dale E. Buscaino re Non-Infringement of United States Patent No. 4,763,356" ("Buscaino II") dated May 12, 2006, "Expert Report of Mr. Dale E. Buscaino re Secondary Considerations of Non-Obviousness Regarding United States Patent No. 4,763,356" ("Buscaino III") and "Supplemental Expert Report of Mr. Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356" ("Buscaino IV").

This second supplemental report addresses whether U.S. patent No. 4,763,356 ("the '356 patent") is valid.

1. As explained below, I believe that claims 19 and 21 of the '356 patent are invalid.

## I.    QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

2. The details of my education and work experience are set forth in Buscaino I and are incorporated herein by reference.

### 1.  Prior Testimony

3. The details of my prior testimony are set forth in Buscaino I and are incorporated herein by reference. Additionally, I have testified at trial on November 8th, 2006 in the Samsung Electronics Co., Ltd v. Quantal Computer et al. case listed in Buscaino I.

### 2.  Compensation

4. My consulting services are being provided at an hourly rate of $275.00. I have previously worked as an independent consultant and expert witness on behalf of companies that have been involved in intellectual property disputes. My compensation does not depend either on the conclusions I reach or the outcome of this case.

## II.    INFORMATION RELIED UPON

5. In forming my opinions, I rely on my knowledge and experience noted above and in my prior reports. I also rely on the documents and information referenced and cited in this report

1

1  and in Buscaino I-IV (which are hereby incorporated by reference in their entirety including any

2  exhibits thereto).

3    6.    I have reviewed the documents and systems identified in attached Exhibit 1 (Materials

4  Considered). These are the materials upon which I am basing my opinions. I may, if appropriate,

5  cite to these materials for additional support for any of my opinions, beyond what I expressly cite

6  in this report.

7    7.    I have reviewed the March 2, 2004 "Amended Order Superseding the Order of

8  October 29, 2003, Construing Claims For Patent Number 4,763,356," ("Claim Construction

9  Order") as well as transcripts of the Markman hearing relating to the '356 patent that took place on

10 September 22 and 23, 2003. In the preparation of this report, I adhered to the claim construction

11 of the '356 patent as set forth in the Court's Claim Construction Order which I have attached as

12 Exhibit 2.

13    8.    I have reviewed the April 17, 2007 "Claim Construction Order Clarifying and

14 Superceding the Order of March 1, 2004, Construing Claims for U.S. Patent No. 4,763,356"

15 ("Claim Construction Order II") and note that the Court states, "the instant order does not change

16 the substance of the Court's prior claim construction" in that order.

17    9.    I have further reviewed the May 15, 2007 Order Denying Plaintiff's and Defendant's

18 Cross-Motions Regarding the Invalidity of U.S. Patent No. 4,763,356, and I understand that the

19 Court has clarified the construction of the term "concurrently displaying," ruling as follows:

20 "display[ing] the tools side-by-side with the form, rather than as an overlaying... is not excluded

21 from the definition of "concurrently displaying.""

22    10.    I understand that claim construction is ultimately a matter for the Court to decide. I

23 reserve the right to supplement or modify my opinions and this report based upon any further

24 claim construction by the Court. My opinions, as expressed herein, are based on the Court's claim

25 construction and my opinion as to the proper interpretation of the Court's construction of the

26 claims asserted in this case.

27    11.    I have reviewed the reports of Lucent's expert Mr. Bruce Tognazzini, including all

28 exhibits as well as documents and materials referenced therein.

1    12.    To the extent not already reflected in Exhibit 1, I have reviewed all other documents

2    discussed or cited in this report, and reserve the right to make additional references to those

3    documents at trial as the need may arise.

4    **III.    RELEVANT LEGAL PRINCIPLES**

5    13.    I will not offer opinions of the law as I am not an attorney. However, I am informed

6    of several principles concerning patent validity and invalidity, which I used in arriving at my

7    conclusions.

8    14.    I incorporate here by reference the legal principles set forth at ¶¶ 20-26 of Buscaino I

9    and ¶¶ 12-16 of Buscaino IV, on issues of validity related to the '356 patent.

10   15.    I am informed that legal principles regarding invalidity of a claim due to obviousness

11   were clarified by the U.S. Supreme Court after I wrote my reports, Buscaino I-IV. I am informed

12   that the principles described in ¶23 of Buscaino I and ¶ 15 of Buscaino IV (relating to a

13   "motivation," "suggestion," or "teaching" in the prior art to combine references to produce the

14   claimed alleged invention) remain an appropriate approach in a validity analysis. I understand,

15   however, that the U.S. Supreme Court clarified that additional principles may also be applied in

16   such an analysis. I set forth some such additional principles below.

17   16.    I am informed that the combination of familiar elements according to known methods

18   is likely to be obvious when it does no more than yield predictable results. In other words, when a

19   claim simply arranges prior art elements with each performing the same function it had been

20   known to perform and yields no more than one would expect from such an arrangement, such a

21   combination is obvious. Moreover, when a patent claims a structure already known in the prior art

22   that is altered by the mere substitution of one element for another known in the field, the

23   combination is likely to be obvious unless the combination yields an unpredictable result. I am

24   informed that a corollary principle is that when the prior art teaches away from combining certain

25   known elements, a claim directed to a discovery of a successful means of combining them is more

26   likely to be non-obvious.

27   17.    I am informed that when a work is available in one field of endeavor, design

28   incentives and other market forces can prompt variations of it, either in the same field or a

1    different one.  If one of ordinary skill in the art can implement a predictable variation, such a

2    variation is likely unpatentable.  For the same reason, if a technique has been used to improve one

3    device, and one of ordinary skill in the art would recognize that it would improve similar devices

4    in the same way, using the technique is obvious unless its actual application is beyond his or her

5    skill.  One question to consider is whether the improvement is more than the predictable use of

6    prior art elements according to their established functions.

7    18.  I am informed that it may be often be necessary, in a validity analysis, to look to

8    interrelated teachings of multiple patents; the effects of demands known to the design community

9    or present in the marketplace; and the background knowledge possessed by one of ordinary skill in

10   the art, all in order to determine whether there was an apparent reason to combine the known

11   elements in the fashion claimed by the patent at issue.

12   19.  I am informed that a validity analysis need not seek out precise teachings directed to

13   the specific subject matter of the challenged claim; it is appropriate to take account of the

14   inferences and creative steps that one of ordinary skill in the art would employ.  I understand that a

15   person of ordinary skill is also a person of ordinary creativity.

16   20.  I understand that a claim composed of several elements is not proved obvious merely

17   by demonstrating that each element was, independently, known in the prior art.  I understand that

18   it can be important to identify a reason that would have prompted a person of ordinary skill in the

19   relevant field to combine the elements in the way the claimed new invention does.  Therefore, I

20   am informed, in determining whether a claimed combination is obvious, the correct question is

21   whether the combination was obvious to one of ordinary skill in the art.  I am told that one of the

22   ways in which subject matter can be proved obvious is by noting that there existed at the time of

23   invention a known problem for which there was an obvious solution encompassed by the patent's

24   claims.  I understand that any need or problem known in the field of endeavor at the time of

25   alleged invention and addressed by the patent can provide a reason for combining the elements in

26   the manner claimed.

27   21.  I am informed that one should not assume that a person of ordinary skill in the art

28   attempting to solve a problem will be led only to those elements of prior art designed to solve the

1  same problem.  Instead, I understand that since familiar items may have obvious uses beyond their

2  primary purposes, in many cases one of ordinary skill in the art will be able to fit the teachings of

3  multiple prior art references together like pieces of a puzzle.

4       22.  I am informed that, when there is a design need or market pressure to solve a problem

5  and there are a finite number of identified, predictable solutions, one of ordinary skill in the art has

6  good reason to pursue the known options within his or her technical grasp.  If this leads to the

7  anticipated success, it is likely the product not of innovation but of ordinary skill and common

8  sense,  I understand that, in such an instance, the fact that the combination was obvious to try may

9  show that the combination is obvious.

10      23.  I am informed that, when determining whether a claimed combination is obvious, the

11  correct analysis is not whether one of ordinary skill in the art, writing on a blank slate, would have

12  chosen the particular combination of elements described in the claim.  Instead, I understand the

13  correct analysis considers whether one of ordinary skill, facing the wide range of needs created by

14  developments in the field of endeavor, would have seen a benefit to selecting the combination

15  claimed.

## OPINIONS AND BASES FOR THOSE OPINIONS

## IV.     SUMMARY OF OPINIONS

18      24.  If called as an expert witness in this case, I expect that my testimony may concern,

19  among other topics addressed below, the relationship between claims 19 and 21 of the '356 patent,

20  on the one hand, and certain prior art references, on the other hand.  Based upon my review, it is

21  my opinion that each of claims 19 and 21 of the '356 patent is anticipated and/or rendered obvious

22  by various prior art references.  My specific analysis regarding the prior art is contained in this

23  report and in Buscaino I, III and IV.

24      25.  I may testify regarding, among other topics, the state of the industry up to and through

25  December 11, 1986, the filing date of the '356 patent.  My anticipated testimony may be affected

26  by the positions Lucent takes with respect to the interpretation and application of the asserted

27  claims, in the context of the accused products as well as the prior art.

28

1    **V.    TECHNOLOGY BACKGROUND OF THE '356 PATENT**

2        26.   I expect to provide a tutorial, as described in Buscaino I, on the technology of the

3    patent and the prior art at the trial.

4        27.   The '356 patent relates to work its inventors allegedly did on a project and device

5    called "Slate." *See* December 20, 2005 Deposition of Gillon ("Gillon Depo.") at 50:18-51:1.  The

6    Slate project was a project to use a personal computer to provide automation for the trading floor

7    of a Wall Street trading firm, Solomon Brothers.  *Id.* at 24:16-25:1.  Slate devices were deployed

8    onto Solomon Brothers' trading floor.  *Id.* at 42:15-42:21.

9        28.   The '356 patent generally relates to a form entry system for use in a personal

10   computer.  The patent describes displaying a form consisting of a plurality of fields on a computer

11   screen.  Identifiers are displayed to tell the user what type of information is requested by each

12   field.  Prior to the time of the '356 patent it was widely appreciated that computers were useful for

13   managing information.  Thus, providing forms on a computer screen was a natural step, and had

14   been widely implemented well before the '356 patent.

15       29.   Computerized forms at the time of the '356 patent were like paper forms in many

16   respects.  For instance, paper forms provide labels that tell the user what kind of information is

17   required by each field.  Likewise, computer form systems in the art prior to the time of the '356

18   patent similarly included such labels.

19       30.   However, there were also important differences between paper forms and computer

20   forms.  A user with a pencil would clearly know what field was being filled in at any given

21   moment.  A computer-based form would have to indicate to the user what field would receive the

22   information supplied.  Many such indicators were well-known in computerized form systems well

23   before the time of the '356 patent including drawing boxes around the field that will receive

24   information, shading the background of that field in a different color from other fields, increasing

25   the intensity of the label next to the field, and, commonly, merely putting a blinking cursor in the

26   field that will receive information.  Such indicators were widespread and existed long before the

27   '356 patent.

28

31.   The '356 patent contemplates providing various tools to assist the user in supplying input for some fields.  These tools sometimes look or act similar to physical aids a person might use to fill out a paper form.  For example, a person filling out a financial form might find it useful to have a calculator close by so that he or she could quickly add up some numbers before writing the total on the form.  It was known in the art prior to the '356 patent that such tools, including a calculator utility, for example, could be displayed on the computer screen to help the user enter information.

32.   Another type of tool that was used in the art, prior to the '356 patent, to fill out computerized forms was an alternative to the familiar physical keyboards.  As computers advanced, some systems began to use other devices to enter information into the computer, such as touch-screens and mice, which allowed the user to send information to the computer by pointing to pictures or elements on the screen instead of typing using physical keyboards.  Some touch screen systems omitted the physical keyboard entirely.  Whenever such a system needed the user to enter text or numbers, it was natural to provide graphical versions of things such as keyboards and calculator-style number-pads.  Computer systems having such graphic tools were well-known in the art before the '356 patent.

33.   The '356 patent also describes another kind of tool that presents a menu of alternative choices and allows the user to pick one of the choices for input into a field.  Selecting one of a group of possible options is often more efficient than typing the information out using a keyboard.  Computer systems using menus to fill-in fields in a form were already well-known in the art before the '356 patent.

34.   The use of a bit-mapped graphics display and input by handwriting using a stylus are described in the '356 patent.  Bit-mapped graphics displays were not unusual in 1985; to the contrary, they were commonplace.  Devices allowing users to enter input by handwriting were also on the market at that time.  Depending on the implementation, the user might write on the bit-mapped graphics field with a stylus or a finger.  Furthermore, the screen on which the user would write might be on the computer's display or on a unit that was intended to sit next to the computer

Case No. 02-CV-2060 B (CAB)

1   on the desktop.  Such digitizers with styluses or "touch tablets," as well as touch screens that

2   accepted handwriting input, were known prior to the filing of the '356 patent.

3   **VI.     THE ASSERTED CLAIMS**

4        35.  I am informed that Lucent asserted claims 1, 2, 4, 6, 7, 10-13, 15, 16, 19, and 21 of

5   the '356 patent.  I am further informed that summary judgment of non-infringement was granted

6   with respect to claims 1, 2, 4, 6, 7, 10-13, 15, and 16.  Therefore, this report addresses only the

7   remaining asserted claims 19 and 21.

8        36.  I understand that the Court has construed the asserted claims of the '356 patent, and,

9   as stated above, I have reviewed the Court's construction as well as the May 15, 2007 Order

10  Denying Plaintiff's and Defendant's Cross-Motions Regarding the Invalidity of U.S. Patent No.

11  4,763,356, in which the Court clarified the construction of the term "concurrently displaying,"

12  ruling that: "display[ing] the tools side-by-side with the form, rather than as an overlaying… is not

13  excluded from the definition of "concurrently displaying."

14       37.  In this report, I compare the elements of claims 19 and 21 of the '356 patent with the

15  prior art in light of my knowledge of ordinary skill in the art.  I discuss each prior art reference as

16  it would be understood by one of ordinary skill in the art, not by one of extraordinary skill.

17  **VII.    OPINIONS ON VALIDITY**

18       **A.     J.K. Lasser's Your Money Manager**

19       38.  Claims 19 and 21 of the '356 patent are invalid in light of J.K. Lasser's Your Money

20  Manager.

21       39.  J.K. Lasser's Your Money Manager for the IBM PC software program (the "YMM

22  program") and the related documentation, J.K. Lasser's Your Money Manager Manual, © 1985,

23  ("YMM Manual"), invalidate the asserted claims of the '356 patent both separately and taken

24  together.  I have examined the YMM program running on an IBM PC compatible computer as

25  detailed in Exhibit 1,[1] and have reviewed the YMM Manual (collectively "YMM").  Based on my

26  review of this system and materials, I conclude that each of YMM, the YMM program, and YMM

27

28  ---
[1] I have also reviewed J.K. Lasser's Your Money Manager for the Commodore 64 and 128
    running on a Commodore 64 computer with an external floppy drive as detailed in Exhibit 1.
    The Commodore version contained identical features and performed identically in all relevant
    respects to the IBM version.

1   Manual invalidates claims 19 and 21 of the '356 patent. Specifically, I conclude that the

2   disclosure of the YMM Manual alone or in combination would be sufficient to describe or render

3   obvious the method recited in claims 19 and 21 of the '356 patent. I conclude that the YMM

4   program in normal use alone or in combination would meet or render obvious claims 19 and 21 of

5   the '356 patent. I conclude that using the YMM program in the manner directed by the YMM

6   Manual, alone or in combination would meet or render obvious claims 19 and 21 of the '356

7   patent. Support for my opinion that YMM meets or renders obvious the limitations of claims 19

8   and 21 of the '356 patent is detailed in the claim charts attached as Exhibit 3 and as follows:

9           **1.  Claim 19 – Preamble "method for use in a computer having a display
                comprising the steps of"**

10

11          40.  YMM discloses a method for use in a computer having a display. The YMM program

12   is a software program for managing finances. Examination of the YMM program;[2] YMM Manual

13   at MSLT_1233952. It was designed for use on the IBM Personal Computer and most compatible

14   computers ("IBM PCs"). Examination of the YMM program; YMM Manual at MSLT_123395.

     YMM, running on an IBM PC performs the steps below.

15          **2.  Claim 19 – Element 1 "displaying on said display a plurality of information
                fields,"**

16

17          41.  The YMM program displays a plurality of information fields on the computer's

18   display. For example, one way in which information may be input into the YMM program is

19   through the use of the Payments Form. When this form is accessed, the screen displays a plurality

20   of information fields related to the current transaction including fields labeled 'Account,' 'Date,'

21   'Payee,' 'Amt,' etc. Examination of the YMM program; YMM Manual MSLT_1233979-

22   MSLT_1233980; Exhibit 4.

23

24

25

26

27

28

---

[2] References to the examination of the YMM program refer to use of the software running on a
    computer as described in Exhibit 1.

**Payments Form**

Figure 1. YMM Payments Form. YMM Manual at MSLT_1233979.

### 3. Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"

42. As noted and pictured above, YMM identifies for the fields the kind of information to be inserted in the fields. Fields on the screen have labels that indicate the type of information to be inserted into the field including 'Account,' 'Date,' 'Payee,' etc. *Id.*

### 4. Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"

43. I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

Case No. 02-CV-2060 B (CAB)

44.  I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

45.  I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

46.  YMM "indicates a particular one of said information fields into which information is to be inserted."  For example, when the Account field is selected, YMM displays a cursor in that field.  "The Payments form appears with the cursor blinking in the first blank field, called Account."  YMM Manual at MSLT_1233979; Examination of the YMM program.  When the Check field is selected, the blinking cursor appears in that field.  *Id.*

47.  YMM "concurrently display[s] a predefined tool associated with said one of said fields."  In order to enter an account code, the user may press the F3 key.  Doing so will cause YMM to display a menu of alternative codes from which the user can select.  Examination of the YMM program; Exhibit 4; *see also* MSLT_1233976.  YMM specifically provides the functionality to set up the account codes.  This is part of the normal operation of the software, the software cannot operate fully without the account codes, and setting up the codes is specifically instructed by the manual.  *Id.*

48.  In addition to the menu of alternative codes, YMM includes a "tool adapted to allow [the] user to compose [] information" – an on-screen calculator  The user may use the on-screen calculator, for example, to enter an amount in the Amount field as follows.  When the Amount field is selected, the user may press the F2 key.  Doing so will cause an on-screen calculator to be displayed.  The user may then compose the amount to be entered by pointing to the display keys of the on-screen calculator.  YMM Manual at MSLT_1233965; Examination of the YMM program; Exhibit 4; '356 patent at col. 3:23-3:33.

49.  To the extent that Lucent contends that YMM does not meet this limitation, it would have been obvious to one of skill in the art to combine the teaching of YMM with the composition

1  tools disclosed by other prior art references that are displayed concurrently with field indicators

2  and can be operated using a computer mouse or a touch screen. Claim 19 is rendered obvious at

3  least by YMM in combination with any of the following references described in Buscaino I: The

4  Home Accountant Program, the Xerox Star, or the Apple Lisa. Claim 19 is rendered obvious by

5  YMM in combination with Michael Tyler, Touch Screens: Big Deal or No Deal?, Datamation,

6  January 1984, pp. 146-154 or with United States Patent No. 4,725,694, discussed in Buscaino IV.

7  Claim 19 is further rendered obvious in combination with any of the references described in

8  Sections B, C, D, or G, below.

9      50.  Use of a computer mouse is an obvious solution for operation of an on-screen

10  composition tool. The above references are each in the same field of endeavor. The tools

11  described and illustrated in the '356 patent are examples of what is known as a "graphical user

12  interface." The above references all made early use of a graphical user interface. The purpose of

13  such an interface is to facilitate input of data into computers by allowing users to avoid typing by

14  selecting and manipulating graphical images, and the on-screen keyboard in each provides the user

15  the ability to use an on-screen composition tool without the necessity of using the physical

16  keyboard. YMM is also directed to the facilitation of data entry through the use of graphical

17  forms and tools.

18      51.  One of ordinary skill, facing the wide range of needs created by developments in the

19  field, would have seen an obvious benefit in combining YMM with a mouse-operated

20  compositions tool and implementation of the combination would have been straightforward.

21      52.  In the 1985 time period, there was an industry trend toward mouse-driven interfaces.

22  Several companies were selling mouse peripherals for the IBM PC (e.g. Microsoft, Logitech,

23  Mouse Systems). The mouse peripherals would attach to the computer system through the

24  industry standard RS-232C communication ports. A program, such as YMM, could be easily

25  adapted to either communicate directly with the mouse via the RS-232C port, or use the mouse

26  drivers that were provided by the mouse peripheral manufacturer. It would have been a

27  straightforward programming task to implement support for a mouse in YMM, that would allow

28

the user to "point" and "click" with the mouse at items such as a composition tool or fields on the display screen.

### 5. Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

53.    YMM "insert[s] in said one field information that is derived as a result of said user operating said displayed tool." For example, when the user wishes to enter an account code and YMM has displayed a menu of alternative codes as described above, the user may select a code from the menu of alternative codes. When the desired code is selected, the user simply presses the Enter key and the selected code is inserted by YMM into the Account field. Examination of YMM; *see also* MSLT_1233976-MSLT_1233977.

54.    YMM inserts information from the composition tool into a field as well. When the user has composed an amount to be entered into the Amount field using the on-screen calculator as described above, the user press the enter key and the composition is inserted by YMM into the Amount field. Examination of YMM; *see* Ex.4.

### 6. Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."

55.    I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

56.    Claim 21 is obvious in light of YMM in combination with FXFE or Michael Tyler, *Touch Screens: Big Deal or No Deal?*, Datamation, January 1984, pp. 146-154 ("Tyler"). It would have been obvious to one of skill in the art to combine the teaching of YMM with Tyler's "resistive membrane" touch panel (a "touch-sensitive screen") that can accept input from a pen (a "stylus"), as discussed in Buscaino IV.

57.    Claim 21 is also invalidated by YMM in combination with United States Patent No. 4,757,549 ("Machart"), MSLT_1230331-MSLT_1230335. Machart discloses inputting information into a computer using handwriting on a touch-sensitive screen.

58.    The advantages of the use of a stylus for certain applications are obvious. The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen. YMM discloses a form with numerous input fields. As

1    the number of fields displayed increases, and the size of the fields decreases, selection of the fields

2    using a stylus becomes even more advantageous.

3         59.   One of ordinary skill, facing the wide range of needs created by developments in the

4    field, would have seen an obvious benefit in combining YMM with a touch-sensitive screen that

5    can accept input from a stylus and implementation of the combination would have been a

6    straightforward task.

7         **7.  Conclusions**

8         60.   As described above, YMM anticipates or renders obvious claims 19 and 21 of the

9    '356 patent.

10        **B.**      **Foreign Exchange Front End and Tyler**

11        61.   Foreign Exchange Front End ("FXFE") is a computer workstation that was developed

12    by Interactive Images Corporation and Chemical Bank for use by traders on the Chemical Bank

13    foreign exchange trading floor to automate the process of entering trades into the bank's

14    computers.  FXFE was described in Michael Tyler, *Touch Screens: Big Deal or No Deal?*,

15    DATAMATION, January 1984, pp. 146-154 ("Tyler").  *See* Ex. 6, p. 148, MSLT_228724.  Claims 19

16    and 21 of the '356 patent are invalidated by Tyler as discussed in Buscaino IV.  Additionally,

17    claims 19 and 21 are invalidated by FXFE which was used publicly in a successful demonstration

18    in the United States at least as early as January of 1984.  Conversation with Robert Long.[3]  This

19    public use of FXFE is corroborated by Tyler.  *See* Ex. 6, p. 148, MSLT_228724.  The use of

20    FXFE as described by Robert Long and as confirmed by Tyler practiced or rendered obvious

21    claims 19 and 21.

22        62.   Support for my opinion that FXFE meets the limitations of claims 19 and 21 of the

23    '356 patent is detailed in the claim charts attached as Exhibit 5 and as follows:

24

25

26

27

---

28    [3] References to "Conversation with Robert Long" refer to a telephone conversation on September
       6' 2007 with Robert Long who was a project manager at Chemical Bank involved in the
       development of FXFE.

Case No. 02-CV-2060 B (CAB)

### 1. Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"

63.   FXFE was a computer workstation that included "a color monitor with a touch-sensitive screen." Conversation with Robert Long; Ex. 6, p. 148, MSLT_228724. FXFE performed the steps below.

### 2. Claim 19 – Element 1 "displaying on said display a plurality of information fields,"

64.   FXFE displayed a plurality of information fields on the color monitor. FXFE allowed the user to declare the current transaction a "buy" or a "sell." Once the "buy" or "sell" box was touched, the screen displayed a plurality of information fields related to the current transaction including rate (in dollars and the foreign currency), value, broker, customer, and location. *Id.* The information fields were located on right hand side of the display. *Id.*

### 3. Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"

65.   FXFE identified for the fields the kind of information to be inserted. Fields on the screen had labels that indicate the type of information to be inserted into the field including those detailed in the preceding paragraph. *Id.* In most fields, the identifying label immediately preceded the information field. *Id.*

### 4. Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"

66.   I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

67.   I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

68.   I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

15                      Case No. 02-CV-2060 B (CAB)

69.    FXFE indicated the particular field into which information was to be inserted.  To select a particular field, the desired field would be touched with a finger.  FXFE would then indicate that field by increasing the intensity of the field identifier.  *Id*.  In the example of the "customer" field, the identifier "Customer" would be intensified to inform the trader that that was the field into which information was to be inserted.

70.    FXFE "concurrently display[ed] a predefined tool associated with said one of said fields."  For example, touching the "customer" field would cause FXFE to automatically display the menu of alternatives tool on the left hand side of the display consisting of a list of customer names.  Touching a customer name would cause FXFE to insert the name into the "customer" field.  As a further example, when the user hits the "broker" field, a list of brokers would appear.  *Id*.

71.    In addition to the menu of alternatives tool, FXFE included tools "adapted to allow [the] user to compose [] information:" an on-screen alphabetic keyboard tool and an on-screen numeric keypad.  Ex. 6, p. 148, MSLT_1 228720.  If, for example, the user did not find the desired customer listed in the menu of alternatives tool then an entry such as "other" could be touched.  *Id*.  Doing so would bring up the keyboard composition tool, allowing the trader to use the alphabetic keyboard to compose a customer name to be used with the "customer" field.  The user composed information by touching the display keys on the on-screen alphabetic keyboard.  *Id.; see also* Ex. 7.

72.    To the extent that Lucent contends that indicating the particular field into which information is to be inserted is not disclosed by either FXFE or Tyler, it clearly would have been obvious to one of skill in the art to do so.  For example, the Home Accountant program and the Xerox Star system discussed in Buscaino I both have screens that, like FXFE and Tyler, display a plurality of fields.  Indeed, Home Accountant, like FXFE and Tyler, is directed to the same field, namely, forms with multiple data-entry fields to record financial transactions.  Both Home Accountant and Star use cursors in the fields to indicate to the user which field is active, at the same time that the tool is displayed.  Other references that disclose indicating the field into which information is to be inserted are described in Section A and E.

73.   The advantages of such indicators for FXFE would have been obvious, and the motivation for using them in FXFE is self-evident:  They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool.  This technique improved Home Accountant, Star and the references in Sections A and E, and one of ordinary skill in the art would recognize that the technique would improve similar devices such as FXFE and Tyler in the same way.  Thus, either FXFE or Tyler, each alone and each in combination with Home Accountant, Star, or any of the references discussed in Sections A or E, discloses a concurrent display of tools and indicators.

### 5.   Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

74.   Information from the user's operation of the tool was inserted by FXFE in the appropriate field.  For example, touching a broker name in the menu of alternatives tool would insert the broker name into the "broker" field.  *Id.*  Alternatively, if the desired broker name did not appear in the menu of alternatives tool, the user could activate the alphabetic composition tool and compose the broker name.  Once the composition was completed, the broker name would be inserted into the broker field.  *Id.*  For numeric data, the user would type in the numeric data on the on-screen keypad.  *Id.*

### 6.   Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."

75.   I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

76.   FXFE included a resistive membrane touch screen.  "Resistive membrane touch panels offer significantly higher resolutions, to the point where they can replace digitizing tablets." Ex. 6 at p. 148, MSLT_1228720.

77.   To the extent that Lucent contends FXFE does not anticipate claim 21, it clearly would have been obvious to combine FXFE with any of the references discussed in Buscaino I that disclose computer devices that accept handwritten input including the Koalapad, manufactured by Koala Technologies Corporation.

78.    Claim 21 of the '356 patent is also invalidated by the combination of FXFE with either Apple Graphics Tablet, MSLT_1234289-MSLT_1234418 or United States Patent No. 4,757,549 to Machart, MSLT_1230331-MSLT_1230335.  Each of these references discloses inputting information into a computer using handwriting.

79.    The '356 patent is directed to the use of computers to fill out forms.  Many forms require the signature of the person who completed them.  Accepting handwriting input is an obvious solution for the completion of such forms.  One of ordinary skill, facing the wide range of needs created by developments in the field, would have seen an obvious benefit in combining FXFE with handwriting input and implementation of the combination would have been a straightforward task.

### 7.    Conclusions

80.    FXFE, alone or in combination, meets all of the limitations of claims 19 and 21 as described here and in Buscaino IV.

### C.    United States Patent No. 4,756,706

81.    United States Patent No. 4,756,706 ("Kern") entitled "Centrally Managed Modular Infusion Pump System" was filed on January 21, 1986.  Kern is a continuation-in-part of United States Patent Application Serial No. 693,771 which was filed on January 23, 1985.  Kern issued on July 12, 1988.  Kern invalidates claims 19 and 21 of the '356 patent.  Support for my opinion that Kern meets the limitations of claims 19 and 21 of the '356 patent is detailed in the claim charts attached as Exhibit 8 and as follows:

#### 1.    Claim 19 – Preamble "method for use in a computer having a display comprising the steps of"

82.    Kern discloses a method for use in a computer having a display.  Kern describes a system of pump modules connected to a central management unit.  The modules "can be programmed by the central management unit and their operating information displayed by the central management unit."  Kern, Abstract, MSLT_1234078.  Kern discloses the steps below.

#### 2.    Claim 19 – Element 1 "displaying on said display a plurality of information fields,"

83.  Kern displays a plurality of information fields on the computer's display.  For example, Kern displays a form for programming a new pump as depicted in Figure 2 (Figure 7 of the patent) below.



Figure 2.  Kern, new pump form.  *Id* at Fig. 7, MSLT_1234085.

84.  When this form is accessed, the screen displays a plurality of information fields labeled 'Rate,' 'Volume,' and 'Time.'  *Id.* at Figure 7 MSLT_1234085; col. 6:21-6:31 MSLT_1234093.

### 3.  Claim 19 – Element 2 "identifying for each field a kind of information to be inserted therein,"

85.  As noted and pictured above, Kern identifies for the fields the kind of information to be inserted in the fields.  Fields on the screen have labels that indicate the type of information to be inserted: 'Rate,' 'Volume,' and 'Time.'  *Id.*

### 4.  Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"

86.  I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

87.  I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

Case No. 02-CV-2060 B (CAB)

89.   I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

90.   Kern "indicates a particular one of said information fields into which information is to be inserted." According to Kern, information is entered by touching the appropriate portions of the screen. "The entry line shows SELECT FUNCTION if no function has been selected, or the function (e.g. VOLUME) which has been selected for entry by touching one of the function keys 222." *Id.* at col. 7:66-8:1, MSLT_1234094.

91.   Kern "concurrently display[s] a predefined tool associated with said one of said fields." For example, as can be seen if Figure 2 above, the display entitled "PUMP 4" displays the entry line together with a keypad for entering information. *Id.* at col. 7:66-8:31, MSLT_1234094.

92.   Kern discloses "a tool adapted to supply an individual entry from a menu of alternatives." Kern describes setting a variable called "occlusion pressure" as follows. As can be seen in Figure 3 below, the entry line is displayed on the screen for confirmation simultaneously with a menu of alternative pressures: 'Low,' 'Med,' 'High,' and 'Max.' *Id.* at Figure 11, MSLT_1234087; col. 9:8-9:12, MSLT_1234095.



Figure 3. Kern, menu of alternative "occlusion pressures." *Id.* at Fig. 11, MSLT_1234087.

93.   In addition to the menu of alternative pressures, Kern includes a "tool adapted to allow [the] user to compose [] information," an on-screen keypad. *See* Figure 2 above. For example, as noted above, the display entitled "PUMP 4" displays the entry line indicting the

selected function, together with a keypad for entering information. *Id.* at col. 7:66-8:11, MSLT_1234093. Kern further explains, "[by] touching appropriate portions of the screen, the requisite information can be entered...." *Id.* at col. 6:30-6:32, MSLT_1234093.

93.    To the extent that Lucent contends that Kern does not meet this limitation, claim 19 is rendered obvious at least by Kern in combination with any of the references that disclose field indicators described in Buscaino I: The Home Accountant Program, the Xerox Star, and the Apple Lisa. Claim 19 is rendered obvious by Kern in combination with Japanese Patent Application No. 61-187024 or United States Patent No. 4,725,694 discussed in Buscaino IV. Claim 19 is further rendered obvious in combination with YMM or FXFE described above or with any of the references described below in Section E, below.

94.    The advantages of the use of cursors or highlighting in the fields to indicate to the user which field is active, at the same time that the tool is displayed would have been obvious: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool. The use of cursors or highlighting to identify an active field was very common in software programs from various fields. Moreover, as discussed below, practitioners in the field of Human Computer Interface promoted the use of feedback to increase ease of use.

### 5.    Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

95.    Kern discloses "inserting in said one field information that is derived as a result of said user operating said displayed tool." For example, as was noted above, Kern describes the use of the composition tool, the on-screen keypad, to enter information into fields: "[by] touching appropriate portions of the screen, the requisite information can be entered....Simultaneously, the selected parameters are displayed on the screen for confirmation." Kern at col. 6:30-6:35, MSLT_1234093. Kern also illustrates the completed form, after the information derived as a result of the use of the on-screen keypad has been inserted into the fields of the "PUMP 4" form which was seen above in Figure 2 as it appeared prior to information having been inserted.

FIG. 8

Figure 4. Kern, new pump form with information inserted. *Id*. at Fig. 8, MSLT_1234085.

96.   When the user has completed the composition to be entered into one of the fields using the on-screen keypad, the user presses the enter key and the composition is inserted into the appropriate field. *Id*. at col. 6:30-6:35, MSLT_1234093. Similarly, the user's selection from the menu of alternative described above is inserted into the appropriate field.

**6.   Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."**

97.   I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

98.   Kern discloses the use of touch-sensitive screens which were well-known in the art. *See e.g*., United States Patent No. 4,725,694 (Auer), MSLT_632827-MSLT_632839 at col. 3:13-3:1 5, MSLT_632837. Kern describes entering information by touching appropriate portions of the screen. Touch screens that accepted input from a stylus were also well known in the art. *See, e.g*. Tyler p. 48, MSLT_1228720. To the extent that Lucent contends that writing on a touch sensitive screen using a stylus is not disclosed, it clearly would have been obvious to one of skill in the art to do so.

99.   For example, Michael Tyler, *Touch Screens: Big Deal or No Deal?*, DATAMATION, January 1984, pp. 146-154 ("Tyler") discloses that fingers and pen are alternative input sources for touch screens. Tyler, p. 148, MSLT1228720. The advantages of the use of a stylus for certain applications are obvious. The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen, which is desirable

1    where precision is at issue, for example in the medical field.  Kern discloses a form with several

2    input fields.  As the number of fields displayed increases, and the size of the fields decreases,

3    selection of the fields using a stylus becomes even more advantageous.

4         100. Claim 21 is also invalidated by Kern in combination with United States Patent No.

5    4,757,549 ("Machart"), MSLT_1230331-MSLT_1230335.  Machart discloses inputting

6    information into a computer using handwriting on a touch-sensitive screen.

7         101. Claim 21 is obvious in light of Kern alone or in combination with either Tyler,

8    discussed in Buscaino IV, with the Foreign Exchange Front End discussed in Section B, above or

9    with Machart.

10        **7.  Conclusions**

11        102. As described above, Kern anticipates or renders obvious claims 19 and 21 of the '356

12   patent.

13   **D.    Japanese Patent Publication No. JP 60-50589**

14        103. Japanese Patent Publication No. JP 60-50589 ("Miyao") entitled "System for Creating

15   Documents" was filed on August 30, 1983.  Miyao was published on March 20, 1985.  Miyao

16   invalidates claims 19 and 21 of the '356 patent.  Support for my opinion that Miyao meets the

17   limitations of claims 19 and 21 of the '356 patent is detailed in the claim charts attached as Exhibit

18   9 and as follows:

19        **1.  Claim 19 – Preamble "method for use in a computer having a display**
          **comprising the steps of"**
20
21        104. Miyao discloses a method for use in a computer having a display.  Miyao describes a

22   system for creating documents.  The system includes a central processing unit (CPU) and a CRT

     controller.  *See* MSLT_1073799.  Miyao discloses the steps below.
23
24        **2.  Claim 19 – Element 1 "displaying on said display a plurality of information**
          **fields,"**
25        105. Miyao displays a plurality of information fields on the computer's display.  For

26   example, Miyao displays a form for entering expenses as depicted in Figures 1(a) and 6(a) of

27   Miyao.  The expenses include 'Transportation,' 'Lodging,' 'Tour,' and 'Total.'  MSLT_1073806.

28

**2.  Claim 19 – Element 2 "Identifying for each field a kind of information to be inserted therein,"**

106. As noted above Miyao identifies for the fields the kind of information to be inserted in the fields.  Fields on the screen have labels that indicate the type of information to be inserted into the fields: 'Transportation,' 'Lodging,' 'Tour,' and 'Total.'  *Id.*

**4.  Claim 19 – Element 3 "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and"**

107. I understand that the Court previously construed "concurrently displaying" as "displaying at the same time, as by a window overlaying the form."

108. I understand that the Court has construed "predefined tools associated with said one of said fields" as "a tool specified by the system as an appropriate tool for filling in the information called for by that field."

109. I understand that the Court has construed "a tool adapted to allow said user to compose said information" as "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."

110. Miyao "concurrently display[s] a predefined tool associated with said one of said fields."  For example, as can be seen in Figure 4 of Miyao, the display shows a plurality of fields displayed concurrently with selected tools.  MSLT_1073807.

111. Miyao discloses "a tool adapted to supply an individual entry from a menu of alternatives."  Figure 6(b) shows a tool that discloses an organizational chart.  Miyao teaches that the user can use the mouse to select one of the titles in this organizational chart and the characters associated with that title will be inserted into the "To:" addressee field shown in Figure 6(b).  *Id.* at MSLT_1073804.

112. Miyao discloses "a tool adapted to allow [the] user to compose [] information:"  a numeric keypad.  The keypad is adapted to allow the user to compose information.  In particular, the user can use a mouse to manipulate the numeric keypad to fill in the 'Transportation,' 'Lodging,' and 'Tour' fields.  *See, e.g., id.* at Figure 6(a), MSLT_1073801-MSLT_1073803.

113. Miyao selects the appropriate tool from the group of tools described above such that the tool is "operable to supply information of the kind identified" for each of the fields identified above. For example, the fields in the "Social Trip Expenses" table hold numeric information, and Miyao associates these fields with the numeric keypad shown in Figure 6(a). The "To:" field receives address information, and Miyao associates this addressee field with a title from the graphical chart tool shown in Figure 6(b).

114. Miyao discloses a plurality of fields to be filled in. *See id.* From the perspective of a person of skill in the art, I understand Miyao to teach indication to the user of which of the plurality of fields is the "active" one into which information is to be inserted. To the extent that Lucent contends that indicating the particular field into which information is to be inserted is not disclosed, not only would I consider that an improper and unreasonably narrow interpretation of the reference, but it also clearly would have been obvious to one of skill in the art to do so.

115. For example, the Home Accountant program and the Xerox Star system discussed in Buscaino I both have screens that, like Miyao, display a plurality of fields. Indeed, Home Accountant, like Miyao, is directed to the same field, namely, forms with multiple data-entry fields to record financial transactions. Both Home Accountant and Star use cursors in the fields to indicate to the user which field is active, at the same time that the tool is displayed. The advantages of such indicators for Miyao would have been obvious, and the motivation for using them in Miyao is self-evident: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool.

116. Claim 19 is rendered obvious by Miyao in combination with Japanese Patent Application No. 61-187024 or United States Patent No. 4,725,694 discussed in Buscaino IV or with YMM or FXFE described above or with any of the references described below in Section E, below.

117. The advantages of the use of cursors or highlighting in the fields to indicate to the user which field is active, at the same time that the tool is displayed would have been obvious: They let the user see instantly into which of the plurality of fields data will be entered through operation of the tool. The use of cursors or highlighting to identify an active field was very

common in software programs from various fields.  Moreover, practitioners in the field of Human Computer Interface promoted the use of feedback to increase ease of use.

### 5. Claim 19 – Element 4 "inserting in said one field information that is derived as a result of said user operating said displayed tool."

118. Miyao discloses "inserting in said one field information that is derived as a result of said user operating said displayed tool."  With respect to the use of the composition tool, the on-screen keypad is used to insert the numbers entered into the keypad into each of the 'Transportation,' 'Lodging,' and 'Tour' fields.  *Id.* at MSLT _1073802.  Miyao also illustrates the completed form, after the information derived from the amounts entered into the on-screen keypad has been inserted into the fields as shown in Figure 6(b).

119. With respect to the use of the menu of alternatives tool, the organizational chart is used to insert the characters associated with the selected person in the organizational chart into the "To:" addressee field.  *Id.* at MSLT _1073804.

### 6. Claim 21 "The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field."

120. I understand that the Court has construed "bit-mapped-graphics field" as "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus."

121. Claim 21 is obvious in light of Miyao in combination with Michael Tyler, Touch Screens: Big Deal or No Deal?, Datamation, January 1984, pp. 146-154 ("Tyler").  It would have been obvious to one of skill in the art to combine the teaching of Miyao with Tyler's "resistive membrane" touch panel (a "touch-sensitive screen") that can accept input from a pen (a "stylus"), as discussed in Buscaino IV.

122. Claim 21 is also invalidated by Miyao in combination with United States Patent No. 4,757,549 ("Machart"), MSLT_1230331-MSLT_1230335.  Machart discloses inputting information into a computer using handwriting on a touch-sensitive screen.

123. The advantages of the use of a stylus for certain applications are obvious.  The smaller size of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen.  Miyao discloses a form with numerous input fields.

1    As the number of fields displayed increases, and the size of the fields decreases, selection of the

2    fields using a stylus becomes even more advantageous.

3        124. One of ordinary skill, facing the wide range of needs created by developments in the

4    field, would have seen an obvious benefit in combining Miyao with a touch-sensitive screen that

5    can accept input from a stylus and implementation of the combination would have been a

6    straightforward task.

7            **7.  Conclusions**

8        125. As described above, Miyao anticipates or renders obvious claims 19 and 21 of the

9    '356 patent.

10       **E.    References That Disclose Indicating Information Fields**

11       126. As was noted above, the use of feedback of some sort to inform the user of the active

12   field was common in software applications across various fields.

13           **1.  References discussed in Buscaino I, III, IV**

14       127. In addition to the references discussed herein, my previous reports have discussed the

15   use by the prior art of various means of indicating an information field.  *See generally* Buscaino I,

16   III and IV.  As examples only, Home Accountant makes use of either a cursor or reverse video to

17   identify the currently active field.  Xerox Star similarly has multiple means for indicating which is

18   the currently selected field for inserting information.  A "caret" or cursor appears in the currently

19   selected field.  In addition, the field may be highlighted by displaying the field in reverse video.

20   Japanese Patent Application No. 61-1 87024 (Sasaki) discloses indicating a field into which

21   information is to be inserted using a cursor.

22           **2.  Microsoft Windows 1.01**

23       128. Microsoft's Windows operating system version 1.01 was released in November of

24   1985.  Examination of Windows 1.01;[4] *see* Ex. 11.  In Windows, Microsoft itself made use of

25   various means of indicating active fields including cursors and reverse video.  For example, the

26   Phone Settings screen includes a plurality of fields each of which has an identifier signifying the

27   kind of information to be inserted: "Connect to,' 'Wait for tone,' and 'Wait for answer.'  A

28

---

[4] References to the examination of Windows 1.01 refer to use of the operating system running on a
   computer as described in Exhibit 1.

1   blinking cursor is displayed in whichever of these fields is currently active. Examination of

2   Windows 1.01; *see* Ex. 11. Reverse video was used in other areas, for example, on the Paragraph

3   Indents screen which also included a plurality of identified fields. *Id.*

### 3. Carter, *Non-Sequential Cursor Movement on Data Entry Display Terminal*, IBM Technical Disclosure Bulletin

4

5           130. Carter discloses the use of cursors to identify the 'primed' field among a plurality of

6   fields each with an identifier. Carter, *Non-Sequential Cursor Movement on Data Entry Display*

7   *Terminal*, IBM Technical Disclosure Bulletin at MSLT_1229464. Carter provides an example of

8   a 'ship to' address composed of four fields (name, street, city and county). *Id.* Carter notes that

9   "when the 'name' field is completed, the cursor could be positioned ready for the 'street' portion

10  and so on." *Id.*

### 4. Pickering, *Touch-Sensitive screens*, Int. J. Man-Machine Studies

11

12          131. Pickering, *Touch Sensitive Screens: the Technologies and Their Application*, Int J.

13  Man-Machine Studies ("Pickering") discloses indicating with the use of cursors and highlighting.

14  According to Pickering, a component of selection is "confirmation" which is "the system

15  responding with some combination of visual, auditory and tactile feedback." Pickering at

16  MSLT_1234060.

17          132. Pickering discloses that user accuracy can be improved by the touch-screen system

18  providing "feedback by marking the current position with a cursor or highlighting the nearest

19  quantifying object." *Id* at MSLT_1234069. Pickering discloses that the time to produce feedback

20  should "be created instantly as far as the user is concerned" such feedback including both "moving

21  a cursor" and "brightening an object." *Id* at MSLT_1234071. That the article is directed towards

22  discussing touch-screen systems and overcoming problems within some touch-screen systems

23  provides an additional reason to combine this reference with references disclosing touch-screen

24  systems such as FXFE, Kern, and Tyler.

### 5. Newman & Sproul, *Principles of Interactive Computer Graphics* (2nd ed.).

25

26          133. Newman & Sproul, Principles of Interactive Computer Graphics (2nd ed.) ("Newman

27  & Sproul") also discloses and recommends indicating with the use of cursors to provide user

28  feedback. "In the case of cursor feedback, for example, feedback is an indispensable part of the

Case No. 02-CV-2060 B (CAB)

1  process." MSLT_1234038. "Some forms of feedback are provided mainly to help inexperienced

2  users and can be ignored by experts. On the other hand, some command languages are inherently

3  dependent on feedback; graphical positioning commands, for example, almost always require

4  cursor feedback on the screen in response to the movement of the positioning device."

5  MSLT_1234046.

6        **6.  Morland, *Human factors guidelines for terminal interface design***

7        133. Moreland not only disclosed the use of highlighting and reverse video, but also

8  encouraged such use noting that to do so increased ease of use.

9          3.4.5 Field Attributes. Many terminals allow application programs to
        control certain characteristics of the fields defined on the display...

10          certain areas of the screen can be defined for input only and the
        cursor will be automatically positioned to these fields by the

11          terminal hardware. Fields can be highlighted by intensifying each
        character or by reversing the video distinction between the

12          characters and the background (light characters on a dark field and
        vice versa). By taking advantage of these options, designers can

13          make their screens much simpler and easier to use.

14  Moreland at 489, MSLT_1229654.

15        **7.  The benefits of the use of indicators, performing their known function, would
        have been obvious**

16

17        134. Implementation of the use of indicators with any of the references previously

18  discussed would be a simple task. Indicators in the '356 patent perform the same function they

19  had been known to perform and yield no more than one would expect from such an arrangement.

20        135. The advantages of the use of cursors or highlighting in the fields to indicate to the

21  user which field is active, at the same time that the tool is displayed would have been obvious:

22  They let the user see instantly into which of the plurality of fields data will be entered through

23  operation of the tool. The use of cursors or highlighting to identify an active field was very

24  common in software programs from various fields. Moreover, practitioners in the field of Human

25  Computer Interface promoted the use of feedback to increase ease of use.

      **F.    References That Disclose Menu Tools**

26

      **1.  References discussed in Buscaino I, III, IV**

27

28        136. In addition to the references discussed herein, my previous reports have discussed the

use by the prior art of tools adapted to supply an individual entry from a menu of alternatives. *See*

1  *generally* Buscaino I, III and IV.  As examples only, Home Accountant included both Names and

2  Categories tools.  Using the mouse, the user can select from these menus of alternative names or

3  categories and the selection will be inserted into the appropriate field.  Each menu can be used

4  only with its appropriate associated field.  Xerox Star includes a menu of alternative page sizes as

5  well as a number of "Special Keyboards" which supply menus of alternatives.  And Japanese

6  Patent Application No. 61-187024 discloses a menu of alternative train names.

7       **2.  Microsoft Windows 1.01**

8      137. Microsoft itself made use of menus of alternatives in its Windows operating system

9  version 1.01.  Examination of Windows 1.01; *see* Ex. 11.  For example, The 'Fonts' form includes

10  two fields with identifiers, namely 'Font Name,' and 'Font Size.'  *Id.*  The field into which

11  information is to be inserted is indicated using reverse video.  Each of the fields has a menu of

12  alternatives associated with it and each tool is displayed concurrently with the reverse-video

13  indicator.  *See id.*.

14       **3.  Pickering, *Touch-Sensitive Screens*, Int. J. Man-Machine Studies**

15      138. Pickering, *Touch Sensitive Screens: the Technologies and Their Application*, Int J.

16  Man-Machine Studies ("Pickering") discloses using a touch-screen computer to input information

17  by selecting, or picking, an item "from a set of alternative items."  According to Pickering, a

18  common example of such input "is the menu, where the user selects one from the items displayed

19  as a menu list."  Pickering at MSLT_1234058.

20      **4.  The benefits of the use of menu tools, performing their known function, would
   have been obvious**

21

22      139. Implementation of the use of menu tools with any of the references previously

23  discussed would be a simple task.  Menu tools in the '356 patent perform the same function they

   had been known to perform and yield no more than one would expect from such an arrangement.

24

25      140. The advantages of the use of menu tools would have been obvious to one of ordinary

26  skill in the art. The user can enter information more efficiently with a list of alternatives than, for

   example, with an on-screen keyboard.  As stated in Tyler, the keyboard QWERTY layout is an

27  alternative to the menu tools : "[a] QWERTY layout can be called up on the left for entry of

28

1  nonstandard or rare names – an infrequently traded currency, for example." Ex. 6, p. 148,

2  MSLT_1228720.

### G.    References That Disclose Composition Tools

#### 1.  References discussed in Buscaino I, III, IV

5  141. In addition to the references discussed herein, my previous reports have discussed the

6  use by the prior art of tools adapted to allow a user to compose information. *See generally*

7  Buscaino I, III and IV.  For example, the Macintosh Key Caps tool can be used in conjunction

8  with Home Accountant to compose information and insert it into the Personal Checkbook form.

9  Xerox Star includes an on-screen keyboard that allows the user to compose information, the Apple

10  Lisa includes a number pad composition tool and both Michael Tyler, Touch Screens: *Big Deal or*

11  *No Deal?*, DATAMATION, January 1984, pp. 146-154 and United States Patent No . 4,725,694

12  ("Auer") disclose simulated keyboards that are operated by the user touching the keys on the

13  touch-sensitive screen.

#### 2.  Microsoft Windows 1.01

15  142. Microsoft Windows version 1.01 included an on-screen calculator which was

16  interoperable with various other aspects of the operating system as well as other software

17  applications.  Examination of Windows 1.01; *see* Ex. 11.

#### 3.  Xerox United States Patent No. 4,332,464 and Xerox European Patent Application No. 0 030 160

19
20  143. United States Patent No. 4,332,464 ("Xerox US"), MSLT_1235504-MSLT_1235579,

21  filed on September 22, 1980 and European Patent Application No. 0 030 160 ("Xerox EP"),

22  MSLT_1233868-MSLT_1233941, filed on March 12, 1980, (collectively the "Xerox patents")

23  disclose a device with a touch-sensitive display for control of complex machinery that includes

24  composition tools that may be displayed on the display.  Xerox US at Abstract, MSLT_1235504,

25  Xerox EP at MSLT_1233879.  The Xerox patents describe the device as used for control of a

26  photocopier.  Control is accomplished by the "touch of the screen by the user's finger or similar."

27  Xerox US at col. 1:52-1:53, MSLT_1235569; Xerox US at Xerox EP at MSLT_1233871.  The

28  Xerox patents disclose fields with identifiers that indicate the kind of information to be inserted,

for example fields labeled 'Number of Copies,' and 'Frame Number.'

144. One of the composition tools disclosed in Xerox EP is a keypad. "For example, a ten-digit touch pad, similar to the ubiquitous telephone "touch-tone" pad, appears on the screen whenever the entry of numerical data is a legitimate user operation and disappears when numerical data are not need." Xerox US at col. 2:20-2:26, MSLT_1235569, Xerox EP at MSLT_1233871. The Xerox patents illustrate use of keypad, for example to allow a user to compose a number of copies or a frame number and insert that information into the corresponding fields.



Figure 5. Xerox patents: on-screen keypad composition tool. Xerox EP at MSLT_1233908, MSLT_1233939, Figs. 15 & 31.

145. The Xerox patents also disclose a keyboard composition tool, noting that when a typed response is required of the operator, "a QWERTY keyboard may be displayed on the display." Xerox US at Abstract, MSLT_1235504, Xerox EP at MSLT_1233868.

**4. Xerox 5700 Electronic Printing System Reference Manual**

146. The Xerox 5700 Electronic Printing System Reference Manual ("Xerox 5700") discloses control of a photocopier using a touch-sensitive display. Xerox 5700 at 1-3, MSLT_1235328. "The principle device used to control the operation of the 5700 system is the TouchControl Screen. This display and touch-sensing elements provide the means for the operator and the system to interact. *Id*. Xerox 5700 discloses fields with identifiers that indicate the kind of information to be inserted. For example Xerox 5700 discloses fields labeled 'First Page,' and 'Last Page.' *Id*. at MSLT_1235364, 4-17.

147. One of the composition tools disclosed in Xerox 5700 is a keypad. "Button selections are displayed [on the TouchControl Screen] along with keypads…to enable the user to set up each job." *Id.* at MSLT_1235328, 1-3. Xerox 5700 illustrates the use of a keypad, for example to allow a user to compose a first page and a last page and insert that information into the corresponding fields. *Id.* at MSLT_1235364, 4-17.




Figure 6. Xerox 5700 keypad. *Id.*

148. Xerox 5700 also discloses a keyboard composition tool. When a typed response is required of the operator, "[a] keyboard appears on the screen." *Id.* at MSLT_1235436, 9-9.



Figure 7. Xerox 5700 on-screen keyboard. *Id* at MSLT_1235438, 9-11.

Case No. 02-CV-2060 B (CAB)

1

### 5.  United States Patent No. 4,587,630

2      149. United States Patent No. 4,587,630 ("Straton"), MSLT_1230175-MSLT_1230187,

3 entitled "Intelligent programmable touchscreen system" was filed on February 15, 1984.  Straton

4 discloses a system that includes a "soft keyboard" on a touchscreen display.  Straton at col. 1:52-

5 1:54, MSLT_1230181.  Straton's soft keyboard keys are areas of the display screen that allow

6 information, including ASCII data, to be sent from the touchscreen to a software program.  *Id.* at

7 col. 4:54-4:56, MSLT_1230182.  Straton notes that "data generated by ASCII fields is

8 undistinguishable from data generated by operating the physical keyboard for either local or

9 remote target programs." *Id.* at col. 4:65-4:68, MSLT_1230182.  Hence, such a soft keyboard

10 could be used to output data to any target software program that could accept data from a physical

11 keyboard.

12      **6.  United States Patent No. 4,509,526**

13      150. United States Patent No. 4,509,526 ("Barnes"), MSLT_1234960-MSLT_1235016,

14 entitled Method and System for Non-Invasive Ultrasound Doppler Cardiac Output Measurement,

15 was filed on February 8, 1983.  Barnes discloses a system that includes a CRT (cathode ray tube)

16 display "and a touch-sensitive overlay."  Barnes at col. 2:54-2:55, MSLT_1234974.  "Data is

17 introduced into the system via the display upon a controlled presentation of active areas in the

18 form of an alphanumeric keyboard to facilitate use of the system by a wide range of individuals

19 having equally diverse backgrounds."  *Id.* at col. 2:59-2:64.

20      151. Barnes discloses a form with a plurality of fields including identifiers, for example,

21 'Patient ID Number,' and 'Body Surface Area.'  *See id* at Fig. 10, MSLT_1234965.  Barnes also

22 discloses the use of cursors to indicate the field into which information is to be inserted.  *Id* at col.

23 12:53-12:54, MSLT_1234979.  The cursor is concurrently displayed with a composition tool: an

24 on-screen keypad.  *See id* at Fig. 10, MSLT_1234965.

25

26

27

28



FIG. 10

Figure 8. Barnes on-screen keypad and concurrently displayed indicator (154). *Id* at Fig. 10, MSLT_1234965.

152. Information that results from the use of the on-screen keypad is inserted into the appropriate field. *Id*. at col. 12:50-12:52, MSLT_1234979.

### 7. United States Patent No. 4,570,217

153. United States Patent No. 4,570,217 ("Allen"), MSLT_1235017-MSLT_1235310, entitled "Man Machine Interface," was filed on March 29, 1983 as a continuation-in-part of Serial No. 363,404 filed March 29, 1982. Allen discloses a machine interface that includes a "color CRT monitor having a touch-panel on the surface of the CRT screen." Allen at Abstract, MSLT_1235017. Allen further discloses numerous on-screen composition tools for data input including a keypad, *see id.* at col. 85:35-85:58, MSLT_1235126, Fig. 48, 55, MSLT_1235089, MSLT_1235092, and various keyboards, *see id.* at col. 86:4-86:42, MSLT_1235126, Figs. 57, 58, 63, MSLT_1235093-MSLT_1235094, MSLT_1235100.

### 9. Donkey Kong Arcade Game

154. The Donkey Kong arcade game supplies a tool adapted to allow a player to compose information. When a player of the game achieves a higher score than has been previously recorded, the user is presented with an on-screen keyboard with which to compose the player's

initials in order to record the score.  The player selects a character by moving a cursor until it points to the desired character.  The character is then input into the 'Name' field which is concurrently displayed.

### 10. The benefits of the use of composition tools, performing their known function, would have been obvious

155. Implementation of the use of composition tools with any of the references previously discussed would be a simple task.  Composition tools in the '356 patent perform the same function they had been known to perform and yield no more than one would expect from such an arrangement.

156. The advantages of the use of composition tools would have been obvious to one of skill in the art.  Any time menus of alternatives are provided by the system, the menus will need to be updated periodically.  A composition tool is an obvious solution for a menu that has become out of date, or otherwise does not include the user's desired information, as expressly stated in Tyler: "[a] QWERTY layout can be called up on the left for entry of nonstandard or rare names - an infrequently traded currency, for example."  Ex. 6, p. 148, MSLT_1228720.

### ADDITIONAL ANALYSIS AND OPINIONS

157. I reserve the right to supplement my report in light of any additional fact discovery, opinions by Plaintiff's experts, and/or trial testimony.  I also reserve the right to provide rebuttal opinions and testimony in response to Plaintiff's experts, and rebuttal testimony in response to any of Plaintiff's fact witnesses.  Further, I reserve the right to use animations, demonstratives, enlargements of actual exhibits, and other information in order to illustrate my opinions.

158. At trial, I expect to demonstrate and testify about the prior art I have described in my report using actual physical computers and computer systems.  In this way, I will demonstrate how the prior art anticipates and/or renders obvious the purported inventions in the asserted claims.  I reserve the right to demonstrate other prior art not listed here.

159. I expect to continue to develop my opinions discussed in this report.  I also reserve the right to supplement my opinions based on information obtained from additional discovery or from Plaintiff's experts, as indicated above.

1       160. I declare under penalty of perjury under the laws of the United States of America that

2  the foregoing report on behalf of Defendant is true and correct.

3

4  Dated:  September 14, 2007               Respectfully submitted,

5

6                                 By:

7                                  Mr. Dale E. Buscaino

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

The certify that a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4. Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

On September 14, 2007, I caused a copy of the following document(s):

**SECOND SUPPLEMENTAL EXPERT REPORT OF MR. DALE E. BUSCAINO RE INVALIDITY OF UNITED STATES PATENT NO. 4,763,356**

to be served on the interested parties in this action as follows:

| | |
|---|---|
| Alison P. Adema<br>Hahn & Adema<br>501 West Broadway, Suite 1600<br>San Diego, CA 92101<br>Telephone: (619) 235-2100<br>Facsimile: (619) 235-2101<br>*VIA FACSIMILE & ELECTRONIC MAIL* | Attorneys for Plaintiffs<br>MULTIMEDIA PATENT TRUST;<br>LUCENT TECHNOLOGIES INC.<br><br>Email: aadema@hahnadema.com |
| David J. Zubkoff<br>Seltzer, Caplan, McMahon & Vitek<br>2100 Symphony Towers<br>750 B Street, Suite 2100<br>San Diego, CA 92101<br>Telephone: (619) 685-3003<br>Facsimile: (619) 702-6827<br>*VIA FACSIMILE & ELECTRONIC MAIL* | Attorneys for Defendants<br>GATEWAY, INC. and GATEWAY<br>COUNTRY STORES LLC<br><br>Email: zubkoff@scmv.com |
| James S. Blackburn<br>Arnold & Porter LLP - (L.A.)<br>777 S. Figueroa Street, 44th Floor<br>Los Angeles, CA 90017<br>Telephone: (213) 243-4000<br>Facsimile: (213) 243-4199<br>*VIA FACSIMILE & ELECTRONIC MAIL* | Attorneys for Defendant<br>DELL INC.<br><br>Email: james_blackburn@aporter.com |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct. Executed on September 14, 2007, at San Diego, California.

Lara Garner

Case No. 02-CV-2060 B (CAB)

1

## <u>COURTESY COPIES BY ELECTRONIC MAIL TO</u>:

2

<u>Trial Counsel For Multimedia/Lucent</u>:

3

John M. Desmarais/Paul Bondor/Michael Stadnick/Gregory Corbett
Kirkland & Ellis LLP

4

Citicorp Center
153 East 53rd Street

5

New York, NY 10022-4675
E-mail: jdesmarais@kirkland.com; pbondor@kirkland.com; gcorbett@kirkland.com;

6

mstadnick@kirkland.com; jmafale@kirkland.com

7

<u>Trial Counsel for Gateway</u>:

8

Bryan Farney / Steven R. Daniels / Jeffrey B. Plies / Lawrence Fluker
DECHERT LLP

9

300 W. Sixth Street, Suite 1850
Austin, TX 78701

10

Email:        bryan.farney@dechert.com; steven.daniels@dechert.com;
jeff.plies@dechert.com; lawrence.fluker@dechert.com

11

<u>Trial Counsel for Dell</u>:

12

Ali R. Sharifahmadian, Esq.
Matthew Bathon, Esq.

13

Arnold & Porter LLP
555 Twelfth Street, N.W.

14

Washington, D.C. 20004-1206
E-mail:        ali_sharifahmadian@aporter.com; Matthew_Bathon@aporter.com;

15

Thomas_Wischer@aporter.com

16

<u>Trial Counsel for Dell</u>:
Joel Freed, Esq.

17

McDermott Will & Emery LLP
600 13th Street, N.W.

18

Washington, DC 20005-3096
Email:        jfreed@mwe.com

19

20

Courtesy Emails include:

21

22

| | All documents filed/served | All Pleadings filed or served were included in the email along with any exhibits |

23

24

| XX | Main Pleading documents (without exhibits) | All Main Pleading documents were included in the email, except for exhibits.  Exhibits were over 50 pages long.  As per our service agreement, a hard copy will follow via overnight mail. |

25

26

27

28