# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

       Plaintiff and Counterclaim-defendant,

    v.

GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.,

       Defendants and Counter-claimants,

       and

MICROSOFT CORPORATION,

       Intervenor and Counter-claimant.

MICROSOFT CORPORATION,

       Plaintiff and Counter-defendant,

    v.

LUCENT TECHNOLOGIES INC.,

       Defendant and Counter-claimant,

LUCENT TECHNOLOGIES INC.,

       Plaintiffs,

    v.

DELL INC.

       Defendant.

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB); and
Case No. 03-CV-1108 B (CAB)

**SUPPLEMENTAL EXPERT REPORT OF JOHN P. J. KELLY, Ph.D. ON INVALIDITY OF UNITED STATES PATENT NO. 5,347,295**
[Fed. R. Civ. Proc. 26(a)(2)]

**Table of Contents**

I.    Introduction ......................................................................................................... 6
   A.   Background ...................................................................................................... 6
   B.   Materials Considered ...................................................................................... 7
   C.   The Court's Construction ................................................................................ 7
   D.   Applicable Legal Principles ........................................................................... 8
   E.   Summary of Opinions in this report .............................................................. 11
II.   U.S. Patent No. 4,845,478 (Taguchi et al.) .................................................... 14
   A.   Reference ...................................................................................................... 14
   B.   Description .................................................................................................... 14
III.  U.S. Patent No. 5,060,135 (Levine, et al.) ..................................................... 23
   A.   Reference ...................................................................................................... 23
   B.   Description .................................................................................................... 23
   C.   Wang Freestyle Video ................................................................................... 30
   D.   Other References ........................................................................................... 31
IV.   Buxton Paper .................................................................................................... 33
   A.   Reference ...................................................................................................... 33
   B.   Description .................................................................................................... 33
V.    Coleman Paper .................................................................................................. 40
   A.   Reference ...................................................................................................... 40
   B.   Description .................................................................................................... 40
      1.   Computer System ...................................................................................... 40
      2.   Detecting A Stroke Of The Stylus Tip ..................................................... 41
      3.   Recognizing Gestures ............................................................................... 42
      4.   Implementing Gestures ............................................................................. 46
      5.   Detecting Direction Of Motion Of A Gesture .......................................... 48
      6.   Direction of Motion Of A Gesture Is Associated With A Predetermined Action ........ 49
      7.   Displaying Actual Shape Of A Gesture .................................................... 49
VI.   Kim Paper ......................................................................................................... 51
   A.   Reference ...................................................................................................... 51
   B.   Description .................................................................................................... 51
      1.   Computer System ...................................................................................... 51
      2.   Detecting A Stroke Of The Stylus Tip ..................................................... 52
      3.   Detecting A Departure Of The Stylus Tip ................................................ 53
      4.   Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip ......................................................................................... 53
      5.   Recognizing Gestures ............................................................................... 54
      6.   Implementing Gestures ............................................................................. 59
      7.   Stylus Proximity Detection ...................................................................... 61
      8.   Detecting Direction Of Motion Of A Gesture .......................................... 61
      9.   Displaying Actual Shape Of A Gesture .................................................... 62
VII.  Paper-Like Interface System ........................................................................... 63
   A.   References ..................................................................................................... 63
   B.   Description .................................................................................................... 65

1.      Computer System.................................................................................. 65
2.      Applications ........................................................................................ 69
3.      Detecting A Stroke Of The Stylus Tip.................................................. 76
4.      Detecting A Departure Of The Stylus Tip ............................................ 76
5.      Defining Termination Of A Gesture Comprising At Least One Stroke In Response To
Departure Of The Stylus Tip......................................................................... 77
6.      Recognizing Gestures ........................................................................... 78
7.      Implementing Gestures ......................................................................... 80
8.      Stylus Proximity Detection ................................................................... 81
9.      Detecting Direction Of Motion Of A Gesture ...................................... 82
10.       Displaying Actual Shape Of A Gesture .............................................. 83
VIII.   FIDS ........................................................................................................... 84
A.    Reference .................................................................................................. 84
B.    Description ................................................................................................ 84
1.      Computer System.................................................................................. 84
2.      Detecting A Stroke Of The Stylus Tip.................................................. 86
3.      Detecting A Departure Of The Stylus Tip ............................................ 87
4.      Defining Termination Of A Gesture Comprising At Least One Stroke In Response To
Departure Of The Stylus Tip......................................................................... 88
5.      Recognizing Gestures ........................................................................... 88
6.      Implementing Gestures ......................................................................... 94
7.      Detecting Direction Of Motion Of A Gesture ...................................... 95
C.    Proof Correction Standard SFS 2324 ...................................................... 96
IX.     Advanced Display System ......................................................................... 98
X.      Oed and Doster ........................................................................................ 101
A.    References ............................................................................................... 101
B.    Description .............................................................................................. 102
1.      Computer System................................................................................ 102
2.      Detecting A Stroke Of The Stylus Tip................................................ 104
3.      Detecting A Departure Of The Stylus Tip .......................................... 105
4.      Defining Termination Of A Gesture Comprising At Least One Stroke In Response To
Departure Of The Stylus Tip....................................................................... 106
5.      Recognizing Gestures ......................................................................... 106
6.      Implementing Gestures ....................................................................... 113
7.      Stylus Proximity Detection ................................................................. 115
8.      Detecting Direction Of Motion Of A Gesture .................................... 116
XI.     U.S. Patent 4,578,811 (Inagaki)............................................................. 118
A.    Reference ................................................................................................ 118
B.    Description .............................................................................................. 118
1.      Overview.............................................................................................. 118
2.      Detecting A Stroke Of The Stylus Tip................................................ 122
3.      Recognizing Gestures ......................................................................... 122
4.      Implementing Gestures ....................................................................... 127
5.      Detecting Direction Of motion Of A gesture...................................... 128

XII.   The Asserted Claims Of The '295 Patent Are Invalid As Being Obvious ..................... 131
  A.   Court's Claim Construction ........................................................................................ 131
  B.   The Kim Paper ........................................................................................................... 139
     1.   Claim 1 ................................................................................................................ 144
     2.   Claim 3 ................................................................................................................ 146
     3.   Claim 4 ................................................................................................................ 147
     4.   Claim 6 ................................................................................................................ 148
     5.   Claim 12 .............................................................................................................. 148
     6.   Claim 39 .............................................................................................................. 149
     7.   Claim 40 .............................................................................................................. 150
     8.   Claim 41 .............................................................................................................. 151
     9.   Claim 43 .............................................................................................................. 152
     10.    Claim 46 ........................................................................................................... 153
  C.   The Paper-Like Interface System ............................................................................. 153
     1.   Claim 1 ................................................................................................................ 158
     2.   Claim 3 ................................................................................................................ 160
     3.   Claim 4 ................................................................................................................ 161
     4.   Claim 6 ................................................................................................................ 162
     5.   Claim 12 .............................................................................................................. 162
     6.   Claim 39 .............................................................................................................. 163
     7.   Claim 40 .............................................................................................................. 164
     8.   Claim 41 .............................................................................................................. 165
     9.   Claim 43 .............................................................................................................. 166
     10.    Claim 46 ........................................................................................................... 167
  D.   FIDS ........................................................................................................................... 167
     1.   Claim 1 ................................................................................................................ 171
     2.   Claim 3 ................................................................................................................ 174
     3.   Claim 4 ................................................................................................................ 174
     4.   Claim 6 ................................................................................................................ 175
     5.   Claim 12 .............................................................................................................. 175
     6.   Claim 39 .............................................................................................................. 175
     7.   Claim 40 .............................................................................................................. 177
     8.   Claim 41 .............................................................................................................. 177
     9.   Claim 43 .............................................................................................................. 179
     10.    Claim 46 ........................................................................................................... 179
  E.   Oed and Doster ......................................................................................................... 180
     1.   Claim 1 ................................................................................................................ 185
     2.   Claim 3 ................................................................................................................ 187
     3.   Claim 4 ................................................................................................................ 188
     4.   Claim 6 ................................................................................................................ 188
     5.   Claim 12 .............................................................................................................. 189
     6.   Claim 39 .............................................................................................................. 189
     7.   Claim 40 .............................................................................................................. 191
     8.   Claim 41 .............................................................................................................. 191

9.    Claim 43 ............................................................................................. 193
10.    Claim 46 ........................................................................................... 193
F.    Inagaki ......................................................................................................... 194
1.    Claim 39 ............................................................................................. 195
2.    Claim 40 ............................................................................................. 196
3.    Claim 41 ............................................................................................. 197
4.    Claim 43 ............................................................................................. 198
5.    Claim 46 ............................................................................................. 199
G.    Coleman ....................................................................................................... 199
1.    Claim 41 ............................................................................................. 200
2.    Claim 43 ............................................................................................. 201
3.    Claim 46 ............................................................................................. 202
H.    U.S. Patent No. 4,972,496 ("Sklarew") ...................................................... 202
1.    Claim 39 ............................................................................................. 206
2.    Claim 40 ............................................................................................. 207
3.    Claim 41 ............................................................................................. 208
4.    Claim 43 ............................................................................................. 210
5.    Claim 46 ............................................................................................. 210

# I.    Introduction

I, JOHN P. J. KELLY, state the following:

1.    I have been retained by counsel for Microsoft Corporation, Dell Incorporated and Gateway Incorporated (collectively "Defendants") to provide assistance in the above-captioned case, which I understand to be a patent infringement case involving United States Patent No. Patent 5,347,295.

2.    I have been retained to serve as a technical expert witness.  I am the principal of Kelly Computing, Inc. (d/b/a Kelly And Associates), 830 Park Lane, Santa Barbara, CA 93108.  I previously submitted an expert report on issues of validity dated March 31, 2006, an expert report on issues of infringement dated May 12, 2006, and an expert report on alleged secondary considerations of non-obviousness dated May 30, 2006.  I am submitting this report as a supplement to my previous reports.

## A.    BACKGROUND

3.    My background is detailed in my March 31, 2006 expert report on issues relating to validity and is incorporated herein by reference.  I expect to testify regarding my background, qualifications, and experience relevant to the issues in this litigation.

## B.   MATERIALS CONSIDERED

4.      I have reviewed and relied upon United States Patent No. 5,347,295 (the "'295 patent") and its file history.

5.      I have reviewed and relied upon all the materials cited in this report.

6.      I have relied on my own background, knowledge and experience relating to the subject matter of the '295 patent.

7.      I have previously reviewed and considered the documents cited in my report on issues of validity dated March 31, 2006 ("Kelly Invalidity Report"), my rebuttal expert report on alleged secondary considerations of non-obviousness dated May 30, 2006, as well as documents cited in exhibits attached to those reports.

**8.**      I have reviewed and considered the expert report of Jean Renard Ward dated March 31, 2006, and Mr. Ward's deposition transcript dated June 15, 2006."

## C.   THE COURT'S CONSTRUCTION

9.      As with my previous report on issues of validity, and in marked contrast to the approach I took in my report on issues of non-infringement, I assume that the Plaintiff's interpretation of the Court's claim construction order is accurate.

D.     **APPLICABLE LEGAL PRINCIPLES**

10.     I will not offer opinions of law as I am not an attorney.  However, I have been informed of several principles concerning patent validity, which I used in arriving at my conclusions.

11.     I incorporate here by reference the legal principles set forth at ¶¶ 15-24 of the Kelly Invalidity Report.

12.     I am informed that legal principles regarding invalidity of a claim due to obviousness were clarified by the U.S. Supreme Court after I wrote the Kelly Invalidity report. I am informed that the principles described in paragraph 19 of that report (relating to a "motivation," "suggestion," or "teaching" in the prior art to combine references to produce the claimed alleged invention) remain an appropriate approach in a validity analysis.  I understand, however, that the U.S. Supreme Court clarified that additional principles may also be applied in such an analysis.  I set forth some such additional principles below.

13.     I am informed that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  In other words, when a claim simply arranges prior art elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, such a combination is obvious.  Moreover, when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination is likely to be obvious unless the combination yields an unpredictable result.  I am informed that a corollary principle is that when the prior

art teaches away from combining certain known elements, a claim directed to a discovery of a successful means of combining them is more likely to be non-obvious.

14.    I am informed that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If one of ordinary skill in the art can implement a predictable variation, such a variation is likely unpatentable. For the same reason, if a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. One question to consider is whether the improvement is more than the predictable use of prior art elements according to their established functions.

15.    I am informed that it may be often be necessary, in a validity analysis, to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by one of ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

16.    I am informed that a validity analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim; it is appropriate to take account of the inferences and creative steps that one of ordinary skill in the art would employ. I understand that a person of ordinary skill is also a person of ordinary creativity.

17.    I understand that a claim composed of several elements is not proved obvious merely by demonstrating that each element was, independently, known in the prior art. I understand that it can be important to identify a reason that would have prompted a person of

ordinary skill in the relevant field to combine the elements in the way the claimed new

invention does. Therefore, I am informed, in determining whether a claimed combination is

obvious, the correct question is whether the combination was obvious to one of ordinary skill

in the art. I am told that one of the ways in which subject matter can be proved obvious is by

noting that there existed at the time of invention a known problem for which there was an

obvious solution encompassed by the patent's claims. I understand that any need or problem

known in the field of endeavor at the time of alleged invention and addressed by the patent can

provide a reason for combining the elements in the manner claimed.

18. I am informed that one should not assume that a person of ordinary skill in

the art attempting to solve a problem will be led only to those elements of prior art designed to

solve the same problem. Instead, I understand that since familiar items may have obvious uses

beyond their primary purposes, in many cases one of ordinary skill in the art will be able to fit

the teachings of multiple prior art references together like pieces of a puzzle.

19. I am informed that, when there is a design need or market pressure to

solve a problem and there are a finite number of identified, predictable solutions, one of

ordinary skill in the art has good reason to pursue the known options within his or her technical

grasp. If this leads to the anticipated success, it is likely the product not of innovation but of

ordinary skill and common sense, I understand that, in such an instance, the fact that the

combination was obvious to try may show that the combination is obvious.

20. I am informed that, when determining whether a claimed combination is

obvious, the correct analysis is not whether one of ordinary skill in the art, writing on a blank

slate, would have chosen the particular combination of elements described in the claim.

Instead, I understand the correct analysis considers whether one of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to selecting the combination claimed.

### E.    SUMMARY OF OPINIONS IN THIS REPORT

21.    In this report, I have laid out my opinions regarding the obviousness of the claims 1, 3, 4, 6, 12, 39, 40, 41, 43 and 46 of the '295 patent. These opinions include:

22.    At least claims 1, 3, 4, 6 and 12 are obvious over the Kim Paper in view of Taguchi and Levine. At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and Buxton. At least claim 39 is obvious over the Kim Paper in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and the Advanced Display System. At least claims 41 and 43 are obvious over the Kim Paper in view of Taguchi. At least claim 46 is obvious over the Kim Paper in view of Taguchi and Coleman. [See § XII.B]

23.    At least claims 1, 3, 4, 6 and 12 are obvious over the Paper-Like Interface System in view of Taguchi and Levine. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and Buxton. At least claim 39 is obvious over the Paper-Like Interface System in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and the Advanced Display System. At least claims 41 and 43 are obvious over the Paper-Like Interface System in view of Taguchi. At least claim 46 is obvious over the Paper-Like Interface System in view of Taguchi and Coleman. [See § XII.C]

24.    At least claims 1, 3, 4, and 12 are obvious over FIDS in view of Taguchi and Levine.  At least claim 6 is obvious over FIDS in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over FIDS in view of Taguchi.  At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Advanced Display System.  At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Buxton.  At least claim 41 is obvious over FIDS in view of Taguchi.  At least claims 43 and 46 are obvious over FIDS in view of Taguchi and Coleman.  [See § XII.D]

25.    At least claims 1, 3, 4 and 12 are obvious over Oed and Doster in view of Taguchi and Levine.  At least claim 6 is obvious over Oed and Doster in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over Oed and Doster in view of Taguchi and FIDS.  At least claims 39 and 40 are obvious over Oed and Doster in view of Taguchi and Advanced Display System.  At least claims 39, 40 are obvious over Oed and Doster in view of Taguchi and Buxton.  At least claim 41 is obvious over Oed and Doster in view of Taguchi.  At least claims 43, and 46 are obvious over Oed and Doster in view of Taguchi and Coleman. [See § XII.E]

26.    At least claims 39, 40, 41 and 43 are obvious over Inagaki in view of Taguchi.  At least claim 46 is obvious over Inagaki in view of Taguchi and the Casio PF-8000. [See § XII.F]

27.    At least claims 41, 43 and 46 are obvious over Coleman in view of Taguchi.  [See § XII.G]

28.    At least claims 39 and 40 are obvious over Sklarew in view of Taguchi and Buxton.  At least claim 39 is obvious over Sklarew in view of Taguchi and FIDS.  At least

claims 39 and 40 are obvious over Sklarew in view of Taguchi and the Advanced Display

System.  At least claims 41, 43 and 46 are obvious over Sklarew in view of Taguchi and

Coleman.  [See § XII.H]

# II.    U.S. Patent No. 4,845,478 (Taguchi et al.)

### A.    REFERENCE

29.    U.S. Patent No. 4,845,478, entitled "Coordinate Input Device with Display," [MSLT_1231379-MSLT_1231391], was issued to Taguchi and Yamanami and assigned to Wacom Co. Ltd. (hereinafter "Taguchi").  The date of issue was July 4, 1989.

### B.    DESCRIPTION

30.    The patent describes an input device comprised of a display and a position sensing tablet [digitizer].  The device provides the capability of displaying position information upon a display that is superposed on the tablet (*i.e.*, a digitizer mounted behind the display):

> "Accordingly, it is a first object of the invention to provide a coordinate input device with a display, wherein the indicating of a position on a tablet is made by quite a simple operation from a position above and remote from the tablet, more particularly, from a position on a display superposed on the tablet."  [See Taguchi at 1:56-61]

31.    Figure 1 is a block diagram that illustrates the features of the device including the tablet, display, pulse generating circuitry, detection circuitry, and X and Y direction drivers.



**Figure 1. A block diagram of a computer system that incorporates the display/tablet combination of Taguchi. The stylus position detected by the tablet is output through controller 23 to computer 22. The display is updated by computer 22 using controller 30 in order to show the stylus position on the screen. [See Taguchi at Figs. 9 and 10].**

32.    The tablet is composed a number of parallel strips of magnetostrictive material in the X-direction and a number of parallel strips of magnetostrictive material in the Y-direction, forming a grid. [See Figure 2]. The magnetostrictive material may be an amorphous alloy, for example:

> "It is also preferred that the material has a small coercive force in order that it is not easily magnetized when approached by a magnet. Examples of amorphous alloys which can be suitably used are $Fe_{67}Co_{18}B_{14}Si_1$ (atomic %) and $Fe_{81}B_{13.5}Si_{3.5}C_2$ (atomic %) and the like." [See Taguchi at 4:25-30].

Each strip of magnetostrictive material in the grid is surrounded by a coil which is used to measure the magnetic field in the magnetostrictive material. [See Figure 3].



**Figure 2.  This plan view of the tablet shows the vertical and horizontal strips of magnetostrictive material. [See Taguchi at Fig. 5].**

33.     Taguchi makes use of the magnetostrictive material's ability to convert vibration energy to magnetic energy.  The efficiency of this conversion is determined by the electro-mechanical coupling coefficient, which is a property of the magnetostrictive material. In addition, the electro-mechanical coupling coefficient can be temporarily increased by applying an external magnetic field to the magnetostrictive material.  For example, a permanent magnet in a stylus can be used to apply an external magnetic field to a small area while the stylus is in proximity to the magnetostrictive material.

> "When a magnetostrictive vibration wave propagates through a magnetostrictive transmission medium, a part of the mechanical vibration energy thereof is converted into magnetic energy so as to cause a local change in the magnetic field at the position where the vibration wave actually is. The level of the change in the magnetic

field increased and decreases substantially in proportion to a coefficient of conversion from mechanical energy to electric energy. This coefficient will be referred to as "electro-mechanical coupling coefficient" hereinunder. The electro-mechanical coupling coefficient is maximized in a certain range of level of biasing magnetic field.

Therefore, if a magnetic bias of a level sufficient for increasing the electro-mechanical coupling coefficient is applied by a position indicating magnetism generator to a specific portion of a magnetostrictive transmission medium surrounded by a coil over substantially its entire length, a large change in the magnetic field is caused at the moment when that portion of the transmission medium is reached by the magnetostrictive vibration wave propagating through the transmission medium, so that a high voltage is induced in the coil by the magnetostrictive vibration wave at that moment. It is therefore, possible to determine the length of time required for the magnetostrictive vibration wave to reach the position indicated by the position indicating magnetism generator and, hence, the indicated position, by detecting the timing of the induction of the high voltage in the coil." [See Taguchi at 3:1-32]

34.    If a vibration wave is generated at one end of a strip of magnetostrictive material, as the wave travels along the strip vibration energy is converted to magnetic energy, which in turn generates a voltage in the coil. [See Figure 3]. The voltage can be measured as a function of time as the wave travels through the strip. If the stylus is not close to the strip, the electro-mechanical coupling coefficient is approximately constant from one end of the strip to the other, and therefore the voltage in the coil will be approximately constant. If the stylus is close to the strip, the electro-mechanical coupling coefficient will be increased in a small area of the strip, and the voltage in the coil will be larger as the vibration wave passes through the region under the stylus than when it passes through the rest of the strip. The elapsed time from the generation of the vibration wave to the detection of the increased voltage is used to calculate the stylus location.



**Figure 3.  Detailed view of some horizontal magnetostrictive strips showing the coils (5a, 5b, 5c and 5d) and the detector circuitry (6).  The stylus (7) is shown applying an external magnetic field to an area of one of the strips.  [See Taguchi at Fig. 1].**

35.    Taguchi determines the location of the stylus as follows.  Vibration waves are generated in the horizontal strips, and detector circuitry monitors the voltage in the coils wrapped around the horizontal strips to determine the X-coordinate of the stylus.  Similarly, vibration waves are generated in the vertical strips, and detector circuitry monitors the voltage in the coils wrapped around the vertical strips to determine the Y-coordinate of the stylus.  [See Figure 2].

"To achieve this object, the invention proposes the use of a tablet which is composed of a plurality of X-direction magnetostrictive transmission mediums arrayed in parallel, a plurality of Y-direction magnetostrictive transmission mediums arrayed in parallel and substantially perpendicular to the X-direction magnetostrictive transmission mediums, and first and second coils wound around these magnetostrictive transmission mediums. A pulse current is applied to one of the first and second coils so that a voltage is induced in the other array of magnetostrictive transmission mediums by a magnetostrictive vibration wave. When the magnetostrictive vibration wave reaches a position indicated by a position indicating magnetism generator, a voltage induced in the other coil is greatly increased. Therefore, it is possible to detect the indicated position as X- and Y- coordinate data by detecting the length of time between the moment at which the pulse current is applied until the moment at which an induced voltage in excess of a predetermined threshold value is detected." [See Taguchi at 1:62-68 and 2:1-13].

"Referring now to FIG. 1, it is assumed here that the position indicating bar magnet 7 is placed at a point on the magnetostrictive transmission medium 1a spaced by a distance l from the center of the X-direction first coil 2, with its N pole directed downward so as to apply (a magnetic field of a level large enough to cause an appreciable increase in the electro-mechanical coupling coefficient) to the portion of the magnetostrictive transmission medium 1a just beneath the magnet 7. When a pulse current is applied by the pulse current generator 3 to the X-direction first coil 2, the coil 2 generates a momentary change in magnetic field which in turn causes a magnetostrictive vibration wave in the portions of the magnetostrictive transmission mediums 1a to 1d surrounded by the X-direction first coil 2. The magnetostrictive vibration wave then propagates longitudinally through the magnetostrictive transmission mediums 1a to 1d at a propagation velocity peculiar to the material of the transmission mediums. The propagation velocity in this case is about 5000 m/s. During the propagation, conversion of a part of the mechanical vibration energy into magnetic energy is effected at each moment, in the portions where the vibration wave is at that moment. The conversion is made at an efficiency corresponding to the electro-mechanical coupling coefficient in those portions of the transmission mediums. As a result, a voltage is induced in the X-direction second coil 5." [See Taguchi at 5:45-68 and 6:1-3]

36.    The position indicating magnetism generator described in Taguchi is a pen-shaped object [stylus] that includes a cylindrical bar magnet and a signal generator which can be operated using a switch.  [See Figure 4].  Because the stylus is comprised of a permanent magnet, it does not have to be connected to the tablet by a cord.  [See, *e.g.*, Taguchi at Col. 3:63-68].  The signal generator located in the stylus creates an ultrasonic signal, which indicates that the tablet should detect the position of the stylus.

> "A position indicating magnetic generator 40 has a cylindrical magnetic body, i.e., the bar magnet 7, attached to one end of a pen-shaped vessel 41 to the other end of which is attached the transmitter 8.  The pen-shaped vessel 41 accommodates a signal generator 42 which is adapted to be operated by an operation switch 43 which can be operated from the outside of the pen-shaped vessel 41.  In operation, when the operation switch 42 is turned on, an oscillation circuit 44 including an AND circuit, inverter, resistors and a capacitor starts to oscillate so as to generate continuous pulse signals which indicate the commencement of measurement.  The pulse signals are amplified by an amplifier 45 and converted into an ultrasonic signal.  This ultrasonic signal is transmitted to the air and is received by the receiver 9."  [See Taguchi at 7:40-55]



**Figure 4. The stylus is pen-shaped and includes a permanent magnet (7) and a signal generation circuit with a switch (43). [See Taguchi at Fig. 7].**

37.    The position of the stylus relative to the tablet is also shown at the corresponding location on the display. The trace of the stylus on the tablet can also be drawn on the display. A computer system with the display/tablet combination of Taguchi could be used for such purposes as creating and edition documents.

> "A position signal based on the timing of the induced electromotive force in put to a computer and can be displayed via a driver, on a display unit having, for instance liquid crystal elements and electrodes arranged in a grid-like form." [See Taguchi at 3:52-56]

> "… the position indicated on the tablet A is displayed at the corresponding position on the display unit B. Thus, characters and patterns scribed on the tablet A by the position indicating bar magnet 7 from a position on or above the display unit B superposed on the tablet A is displayed as they are by luminescence on the display unit B. Therefore, it is possible to correct and display on the display unit B a character input to the tablet A and to effect editing such as the insertion and deletion of characters and words, provided that a suitable editing device is connected between the display unit B and the computer 22." [See Taguchi at 9:24-36]

"…according to the invention, it is possible to indicate a position on a tablet A from a position remote therefrom, i.e., by means of a position indicating magnetism generator from a position on or above a display unit B which is superposed on the tablet A. At the same time, the indicated position can be instantaneously displayed at the corresponding position on the display unit B."  [See Taguchi at 9:37-42]

# III.    U.S. Patent No. 5,060,135 (Levine, et al.)

### A.    REFERENCE

38.    U.S. Patent No. 5,060,135, entitled "Apparatus For Manipulating Documents In A Data Processing System Utilizing Reduced Images Of Sheets Of Information Which Are Movable," [MSLT_1232286-MSLT_1232314], was issued to Levine, *et al.* and assigned to Wang Laboratories, Inc, (hereinafter "Levine").  The filing date was Nov. 1, 1988 and the date of issue was Oct. 22, 1991.

### B.    DESCRIPTION

39.    Levine describes a computer system with a graphical user interface that mimics an office desk.  The system's graphical user interface to the operating system, which the patent describes as "desk view," displays miniaturized images of documents and icons corresponding to stapler, printer, mailbox, folder, *etc*., providing a pictorial representation of a physical office desk.  [See Figure 5].

> "A data processing system provides a desk view which serves as a graphical user interface to the system. The desk view displays detailed miniaturized images of all documents possessed by the user. The compressed document images are user stackable and are automatically stacked when the images overlap by a predefined amount. The predefined amount is user settable. The desk view also displays icons of operations for mailing, stapling, copying and printing of documents."  [See Levine at Abstract].



**Figure 5.  The desk view showing the inbox (63), printer application (72), notepad application (76), trash (74), documents (34) and other objects.  [See Levine at Fig. 2].**

40.    The computer system includes a keyboard, a display unit, a two-ended

electronic stylus and an electronic tablet, all of which are connected to and controlled by the

computer's processor.  [See Figure 6].

> "The foregoing and other features of the present invention are
> described in more detail and are more readily understood with
> reference to a data processing system which embodies the present
> invention and which is illustrated in FIG. 1a. The data processing
> system 20 includes a computer terminal 10 with a keyboard 12 and
> a display unit 18, a two-ended electronic stylus 14 and an
> electronic tablet 16, all of which are connected to and driven by a
> digital processor 22."  [See Levine at 8:43-51].



**Figure 6. Computer system of Levine showing the processor (22), screen (18), digitizing tablet (16) and stylus (14). [See Levine at Fig. 1a].**

41.     The user interacts with the items on the desk by moving the stylus on the

tablet surface in order to perform operations such as selecting a displayed item, repositioning a

displayed item, *etc.* Although the tablet and screen are separate surfaces in Figure 6, Levine

teaches that the tablet and the screen can be combined into a single unit, allowing the user to

write directly on the display screen.

> "The stylus 14 is used on an upper planar surface of the tablet 16 to
> perform certain tasks such as repositioning displayed items, or
> selecting a displayed item for further processing. The actions of the
> stylus 14 on the surface of the tablet 16 are representatively
> displayed on the display unit 18 and the positions on the table have

a one-to-one correspondence with the view 26 displayed on the display unit 18. Thus as the user applies the stylus 14 to the tablet surface, an image representation of what the user is doing with the stylus is provided in the view 26 of display unit 18.

In the alternative, the tablet and display unit 18 may be a single unit such that the stylus 14 is operated directly on the screen of the display unit 18." [See Levine at 9:1-14].

An electronic tablet serves as a writing surface on which the stylus is used and spatially corresponds in a one-to-one fashion with the view exhibited on the monitor screen. Other surfaces including the monitor screen may alternatively serve as the writing surface." [See Levine at 2:29-34].

42.     The user interacts with the system by operating the stylus in at least four different ways. A first method of use is the "touch and lift" [tap] wherein a user touches and removes one end of the stylus on the tablet position corresponding to a displayed item in order to select the displayed item.

"The first method of use of the stylus, referred to as "touch and lift", enables the selection of a displayed item. One end of the stylus is touched on and removed from the position on the tablet corresponding to the position of a desired item displayed on the monitor screen as indicated by a cursor."  [See Levine at 2:34-39].

43.     For example, a touch and lift in the desk view on an icon corresponding to an application such as "note pad" or "scanner" results in the selection of the application.

"The user selects an application by a touch and lift method of use of the stylus on the position corresponding to the respective icon in the case of the applications of "all done", "scanner" and "note pad"." [See Levine at 5:62-66].

44.     The same touch and lift can also be performed on objects in applications. For example, in the printer application a touch and lift on a number button selects the desired number of copies of a document for printing.  [See Figure 7].

"In the case of the printer or copier icon 72, 91, an illustration of pushbutton control panel 78 shown in FIG. 4 is displayed…. The pushbutton control 78 is displayed to prompt the user to enter the number of copies desired to be generated. To select a desired number, the user uses the "touch and lift" method of use of one end of stylus 14 on the tablet position corresponding to the illustrated button 82 which designates the desired number of copies." [See Levine at 21:3-13].



Figure 7.  The printer application window (78) contains buttons (82) for selecting the desired number of copies for printing using touch and lift.  [See Levine at Fig. 4].

45.    Furthermore, in a send-mail routine, the touch and lift on a tab of an

address book with lettered tabs, selects the letter indicated on the tab:

"When the send-mail routine is activated, processor 22 exhibits an illustration of a common address book 83 with lettered tabs 85

> arranged in alphabetical order along one side of the address book
> 83. To select a recipient of the document represented by the stamp
> 34 used to activate the send-mail routine, the user opens the
> address book 83 to the name of the desired recipient. This is
> accomplished by the user touching and lifting an end of stylus 14
> on the tablet position, which corresponds to the screen position of
> the lettered tab 85 that indicates the first letter of the last name of
> the desired recipient. Upon such action, the selected tab 85 is
> illuminated in reverse video form to indicate to the user that the
> letter indicated on tab 85 has been selected." [See Levine at 15:51-
> 64].

Touch and lift on the name of a person in the address book will select that person to receive the

mail message.

> "The user selects a recipient's name, from the displayed page in the
> opened address book 83, by the touch and lift use of one end of
> stylus 14." [See Levine at 16:1-3].

46. A second method of operation of the stylus is "touch and move" [drag]. In

using the touch and move operation, a user places one end of the stylus on the tablet position

corresponding to a displayed item and moves the stylus across the tablet surface, while

maintaining contact with the tablet surface, to move the displayed item to a new position on the

screen.

> "A 'touch and move' manner of operation enables the user to move
> a displayed item anywhere in the view 26 of display unit 18. The
> operation is invoked upon the user placing the writing tip end 30 or
> the erasure end 28 on the tablet surface and moving the stylus end
> 28, 30 while maintaining it in contact with the tablet surface for
> more than a preset number of pixels, for example, four pixels."
> [See Levine at 10:36-43].

47. A third and a fourth manner of operating the stylus is used for annotations.

In the third method of operation, the user writes with the writing tip of the stylus in a writing

area – *e.g.*, inside a "note pad" document or the label of a desk view tray – in the same manner

as writing with a pen on a sheet of paper.  [See, *e.g.*, Levine at 2:49-53, 5:47-51].  The fourth

method of the use of stylus involves the use of the erasure end of the stylus in a manner similar

to the use of a pencil top eraser.  The erase operation is used for erasing markings generated by

the writing tip end.  [See, *e.g.*, Levine at 2:53-57].

48.      As shown above, Levine's touch and lift gesture is capable of

implementing identical executable commands at both the operating system level context and

the application level context.  In view of this, as well as of Levine's multiple manners of stylus

use described above, one of ordinary skill would recognize the advantage of using the same

stylus actions on both operating system level and application level objects to implement the

same command.  One of ordinary skill, who is also one of ordinary creativity, would see the

benefit of implementing other common functions using the same stylus action on both system

and application objects.  Deleting and creating (or inserting) objects are two examples.

49.      Another feature described in Levine is the detection of proximity of the

stylus tip to the surface of the tablet.  When either the writing end or the eraser end of the

stylus is brought into proximity to the tablet surface, a cursor is displayed on the monitor

screen in a position corresponding to the position of the stylus.  In one of the embodiments

described in Levine, a cursor that looks like a sharpened pencil tip is displayed when the

writing tip end is in proximity to the tablet and an erasure top cursor is displayed when the

erasure end of the stylus is in proximity with the tablet surface.

> "When either the writing tip end 30 or the eraser end 28 is in close
> proximity (about 2 centimeters or less) to the surface of the tablet
> 16, the writing tip 30 is sensed and indicated in the view 26 of
> display unit 18 by a cursor."  [See Levine at 9:30-34].

"In a preferred embodiment, a cursor replicating a sharpened pencil tip is displayed when a writing surface is displayed, and the writing tip end 30 of stylus 14 is in proximity of the tablet surface and thereafter used for writing. An erasure top cursor is displayed when the erasure end 28 of the stylus 14 is in proximity of the tablet surface and thereafter used for erasing."  [See Levine at 11:2-8].

50.     In addition, Levine teaches using the desk view with other applications, including word processors and spreadsheets.

"Also, the system desk may cooperate with application software other than the annotator. For example, the desk may serve as a filing system for conventional word processing and spreadsheet software."  [See Levine at 29:16-20].

### C.     WANG FREESTYLE VIDEO

51.     A 1988 videotaped demonstration of a product called Freestyle from Wang Laboratories, Inc., closely resembles the desk view of the Levine patent.  The demonstration is given by Dr. Stephen Levine, the first named inventor of the Levine patent.  The video of the demonstration can be downloaded in two parts from Google video.  The URL for the first part [MSLT_1234098] is http://video.google.com/videoplay?docid=-1373804178481058208 (hereinafter "Freestyle-1").  The URL for the second part [MSLT_1234099] is http://video.google.com/videoplay?docid=6340489473007497127 (hereinafter "Freestyle-2").

52.     Freestyle is a computer-based system with a digitizing tablet, stylus, and display.  The user controls the system using gestures.  For example, the user can select system level objects, which include icons for documents and applications, from the desk view using a

touch and lift gesture [tap] on the digitizer position corresponding to the object. [See, *e.g.*, Freetyle-1 at minutes 7:35-7:45]. The video shows selecting the notepad application [see, *e.g.*, Freestyle-2 at minutes 6:28-6:34], a scanner application [see, *e.g.*, Freestyle-2 at minutes 3:00-3:16] and a document [see, *e.g.*, Freestyle-2 at minutes 4:08-4:12]. The application and document objects displayed on the desk view are operating system level objects because they can be manipulated by a user and are displayed outside the context of an application program.

53.    The same touch and lift gesture can also be performed in the context of an application. For example, the printer application displays a window containing buttons used to designate the number of copies. The user uses the touch and lift gesture on these buttons. [See, *e.g.*, Freestyle-2 at minutes 2:24-2:40]. As another example, the send-mail application is used to select the recipient of a mail message. The user first opens the address book to the name of the desired recipient by touching and lifting the lettered tab that indicates the first letter of the recipient's last name. Then the user touches and lifts the name of the recipient. [See, *e.g.*, Freestyle-2 at minutes 5:16 – 5:23]. The buttons, tabs, names, *etc.* in the printer and address book windows are application level objects because they can be manipulated by a user and are displayed within the context of an application program.

### D.    OTHER REFERENCES

54.    In addition to Levine, other references describe stylus-based systems with a graphical user interface capable of manipulating objects at the system and application levels including the Wang FreeStyle discussed above, the Mac-UnMouse system and the X Windows System User's Guide. The Kelly Invalidity Report discusses the Mac-UnMouse system and

the X Window System User's Guide, and I incorporate by reference those discussions. Both Mac-UnMouse and X Windows User's Guide also provide gestures (*e.g.*, tap and double tap) that perform identical executable commands at the system level and the application level. For example, in the Mac-UnMouse computer system a click [tap] on an object—either a system level object such as a folder icon, system disk icon, *etc.*, or an application level object such as an icon within a paint application's tool palette—selects the object by highlighting it. [See, *e.g.*, Inside Macintosh, Volumes I, II and III (1985), at p. I-31 (MSLT_0381441)]. A double click [double tap] gesture on a folder in the Finder opens up a folder and displays its contents, and a double click on a topic in the Home Accountant application's Help list opens up the topic and displays the help contents on that topic. In the remainder of this report, when I refer to Levine as describing gestures used on system level and application level objects, it is to be understood that these additional references also disclose this feature.

# IV.   Buxton Paper

### A.   REFERENCE

55.     "The Evolution of the SSSP Score Editing Tools" by William Buxton, Richard Sniderman, William Reeves, S anand Patel and Ronald Baecker [MSLT_1232392-MSLT 1232406] (hereinafter "Buxton") was published in the *Computer Music Journal*, vol. 3, no. 4 in 1979.

### B.   DESCRIPTION

56.     "This paper traces the evolution of score editing tools developed by the Structured Sound Synthesis Project (SSSP) at the University of Toronto."  [See Buxton at p. 14 (MSLT_1232394)].  Buxton discusses some of the issues involved in designing user interfaces, especially interactive graphics interfaces, used for music score editing applications.

> "The main area of SSSP activity has been the development of high level 'front-end' programs which would give the musically sophisticated (but technologically naïve) user a high degree of access to the potential offered by the computer-synthesizer combination.  Thus, the development of score editing tools was initiated even before such tools could be 'hooked up' to the synthesizer, and has proceeded continuously since."  [See Buxton at p. 15 (MSLT_1232395)].

57.     Buxton's  computer system included a graphics display and a digitizing tablet:

> "The hardware environment centers on a PDP-11/45 running under the UNIX time-sharing operating system (Ritchie and Thompson:

> 1974) and a digital sound synthesizer (Buxton, Fogels, Fedorkow,
> Sasaki and Smith: 1978) with its own LSI-11. The graphics
> hardware includes a refresh, vector-drawing graphics display, a
> digitizing tablet with accompanying cursor box, and a slider box."
> [See Buxton at p. 14 (MSLT_1232394)].

58.    The interfaces described in Buxton use menus of various styles or hand-drawn symbols. For example, the user may use the tablet to position the cursor on an object indicating the desired pitch, press a button on the cursor box to bring up the duration menu and then drag the stylus across the tablet to select the duration as shown in Figure 8.

> "It was also at this stage, that an interactive method of note input
> was devised which has remained the major note input tool to date.
> Figure 2a shows the note input tracking cross being positioned
> over the desired pitch. On depressing the button on the cursor, a
> 'marker note' symbol appears at the indicated pitch. Concurrently,
> the tracker is replaced by a sequence of notes. This is shown in
> Figure 2b. This sequence of notes 'tracks' or follows the motion
> of the cursor on the tablet. The roles of the tracking-cross and the
> menu are now reversed. Instead of the conventional stationary
> menu and moving pointing tool, we have a moving menu and a
> stationary pointer. By placing the note of the desired duration over
> the marker note symbol (i.e. moving the menu), and releasing the
> cursor button, a note is input. This is shown in Figure 2c." [See
> Buxton at p. 15 (MSLT_1232395)].

**Figure 8. A sequence of screens showing input of a note. [See Buxton at Fig. 15].**

59.    Alternatively, the pitch, duration, *etc*. may be selected by "hitting" buttons

on the display as shown in Figure 9.

> "Examine the menus as pictured in [Buxton] Figure 8. The user
> indicates the name, octave, accidental, and duration of a note by
> hitting the appropriate light buttons which are then intensified to
> indicate visually the choices made. When the desired choices have
> been made, the user hits the 'ENTER' button." [See Buxton at p.
> 20 (MSLT_1232400)].



**Figure 9. Using the *total menu technique* the user enters notes by selecting buttons on the display. [See Buxton at Fig. 8].**

       60.     Buxton also describes a note input tool called "*char-rec*" that allows the user to input notes by drawing symbols on the digitizing tablet. The symbol as drawn by the user is displayed on the screen as electronic ink. [See Figure 10]. The character recognizer decodes the symbols to determine the duration of the note and then replaces the electronic ink with the musical symbol.

"*Char-rec* is a 'short-hand' technique which employs a character recognizer to decode a set of symbols ([Buxton] Figure 10) designed to represent notes of varying durations.  To enter a note, the tracking-cross is placed over the desired pitch on the appropriate ladder and the cursor button is depressed.  An 'ink trail' is laid down until the button is released during which interval the user draws the desired duration symbol.  Based on the starting point of the symbol, and the shape of the symbol, the pitch and duration of the desired note are decoded."  [See Buxton at p. 20 (MSLT_1232400)].



**Figure 10.  Appending a sixteenth note with *char-rec*.  [See Buxton at Fig. 11].**

61.    Buxton's note duration symbols are shown in Figure 11.  Although many

of the symbols are drawn with one line segment longer than the others, the lengths of the line

segments are not important.  Instead, it is the direction changes in a symbol that are used by the character recognizer to decode the symbol:

> "The lengths of the line segments constituting a symbol are immaterial provided they are greater than a fairly small minimal size.  However, the directional changes in a symbol must be drawn distinctly to ensure correct recognition."  [See Buxton at p. 20 (MSLT_1232400)].

Consequently, some gestures are comprised of other gestures.  For example: the half note gesture comprises a whole note gesture and a quarter note gesture; the sixteenth note gesture comprises a eighth note gesture and a quarter note gesture; the thirty-secondth note gesture comprises an eighth note gesture and another eighth note gesture.



**Figure 11.  *Char-rec* duration symbols.  [See Buxton at Fig. 10].**

62.    In addition to note input, Buxton also discusses editing scores (*e.g.*, deleting notes and changing notes) and playing scores.  For example, a program called *scriva* allows the user to group together musical notes for further operations, including "delete" and "play" operations.  Using the cursor button, the user draws a circle around notes of interest.  The circle is displayed on the screen as electronic ink.  [See Figure 12].

> "The concept of scope is built upon by providing various techniques to facilitate definition of groups of notes of interest, and by providing operators such as 'Delete' and 'Play' which act on

these defined groups.  One method of scope definition involves positioning the tracking cross over each note to be included, and then depressing the cursor button.  This is another application of the 'paint-pot' technique mentioned with respect to orchestration in *ludwig*.  Another method involves simply 'inking' a circle around notes of current interest as shown in [Buxton] Figure 15.  To exclude notes from within a larger circle, the user may draw yet another circle around those not to be included."  [See Buxton at p. 24 (MSLT_1232404)].



**Figure 12.  An example of selecting a group of notes for an operation (*i.e.*, scope definition) in *scriva*.  The outer circle includes the notes that it encloses.  The inner circle excludes the notes that it encloses.  [See Buxton at Fig. 15].**

# V.    Coleman Paper

### A.    REFERENCE

63.    The paper "Text Editing On A Graphic Display Device Using Hand-Drawn Proofreader's Symbols" by Michael L. Coleman [MSLT_1230606-MSLT_1230612] (hereinafter "Coleman") was published in 1969 in "Pertinent Concepts in Computer Graphics," Proceedings of the Second University of Illinois Conference on Computer Graphics, M. Faiman and J. Nievergelt, editors, at pp. 283-290.

### B.    DESCRIPTION

#### 1.    Computer System

64.    Coleman describes a text editing system comprising a CDC G-20 computer, a CRT for displaying text and graphics and a RAND tablet (with a stylus).  Since the computer system includes a display, it necessarily includes a display controller.  "The text editor consists of about 2800 machine code instructions for the Carnegie-Melon Graphic Display System, which uses the CDC G-20 computer.  It will display the user's text ten to twenty lines at a time…." [See Coleman at pp. 283-284 (MSLT_1230608-MSLT_1230609)]. The user enters text editing commands into the system by drawing proofreader's symbols on the tablet.  The symbols specify both the action and the portion of text upon which action is to be performed (scope).

65.    Previous text editing programs relied on keyboard entry of editing commands.  Not only is it cumbersome to identify the scope of an editing command in this

fashion, but users, *e.g.*, secretaries, were more familiar with proofreader's symbols than computer commands such as DELETE, ALTER, and INSERT.  "It was this which led to the designing and development of a text editing system in which the user can draw proofreader's symbols over text appearing on a Cathode Ray Tube (CRT), thus specifying simultaneously both the action desired and that portion of the text upon which the action is to be taken."  [See Coleman at p. 283 (MSLT_1230608)].

> "If a graphic display unit and a suitable input device, such as a
> light pen or RAND Tablet, are added, two important advantages
> are gained:
> 1.  The ability to rapidly display the updates of large portions of
> text;
> 2.  The ability to identify a piece of text by pointing (as with a light
> pen).  We can specify items by direct identification rather than by
> counting (using line numbers) or be retyping a piece of text (using
> context)." [Coleman, at p. 283 (MSLT 1230608)]

As made clear in the above-quoted passage, Coleman teaches using either a RAND tablet or a light pen for input.

## 2.  Detecting A Stroke Of The Stylus Tip

66.     The text editing system described in Coleman detects a stroke of the stylus tip in contact with the screen [see, *e.g.*, claim 41 of the '295 patent].  "To perform editing, the user draws one of the nine allowable symbols on the RAND Tablet."  [See Coleman at p. 284 (MSLT_1230609)].  Figure 13 shows the allowable proofreader's symbols.  Each of the shown symbols is made using a stroke of the stylus in contact with the RAND tablet.  In addition, Coleman mentions the light pen as an alternative to the RAND tablet as discussed above.  [See Coleman at p. 283 (MSLT_1230608)].  In this case the light pen [stylus] draws directly on the surface of the display.



**Figure 13.  Recognized proofreader's symbols.  [See Coleman at Fig. 1 (MSLT 1230609)].**

### 3.  Recognizing Gestures

67.      The text editing system described in Coleman recognizes a gesture

comprising at least one stroke and an event indicating the termination of the gesture [see, *e.g.*,

claim 41 of the '295 patent]. Figure 13 shows the nine proofreader's symbols [gestures] recognized by the text editing system.

> "To perform editing, the user draws one of the nine allowable symbols on the RAND Tablet. The system recognizes the symbol, determines the strings of characters to be manipulated, and takes the appropriate action." [See Coleman at p. 284 (MSLT_1230609)].

Since these proofreader's symbols are each comprised of a single stroke, the departure of the stylus from the RAND tablet indicates termination of the proofreader's symbol [gesture].

68. The proofreader's symbols are recognized by first extracting the characteristic features of the symbol such as maxima and minima of x and y. The symbol is then classified using a discrimination net as shown in Figure 14. [See Coleman at p. 287 (MSLT_1230610)]. As shown, the input proofreader's symbol is recognized by applying a set of rule-based tests for the characteristic features of the input proofreader's symbol. To the extent that recognizing a gesture by applying a set of rule-based tests can be considered to be insignificantly different from recognizing a gesture by comparing it with a predefined shape, as Lucent contends, Coleman discloses recognizing proofreader's symbols by comparing with a predefined shape [see, *e.g.*, claim 41 of the '295 patent].



Figure 2. Discrimination Net.

**Figure 14.  Classification using rule-based discrimination algorithm.  [See Coleman at Fig. 2].**

69.    The recognizer of the text editing system described in Coleman follows

the steps outlined in the article "Automatic Recognition of Handprinted Characters – The State

of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980

[MSLT_1233195-MSLT_1233213] (hereinafter "Automatic Recognition of Handprinted

Characters").  Table 1 presents a comparison of the two algorithms.

Table 1: Comparison of the recognition algorithm of the text editing system described in Coleman with the handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.

| Automatic Recognition of Handprinted Characters | Coleman |
|---|---|
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification". "The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc."  [See Automatic Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | The recognition algorithm of the text editing system described in Coleman includes a feature extraction step:<br><br>"The system recognizes the symbols by first noting various characteristics of the symbol that was drawn, e.g., coordinates of the initial and final points, maxima and minima x and y."  [See Coleman at p. 287 (MSLT_1230610)]. |
| Classification:<br>"Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ….. Classification is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]."  [See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)]. | The recognition algorithm described in Coleman includes a classification step using a discrimination net as shown in Figure 14:<br><br>"These characteristics, combined with the net shown in Figure 2, are sufficient to discriminate between all symbols except the symbol for MOVE."  [See Coleman at p. 287 (MSLT_1230610)]. |

70.    Furthermore, proofreader's symbols can be drawn such that each stroke of

the symbol is located in substantially the same area of the RAND tablet [see, *e.g.*, claim 41 of

the '295 patent].

### 4.  Implementing Gestures

71.    The text editing system described in Coleman implements each recognized

gesture.  [See, *e.g.*, claim 41 of the '295 patent].  Each of the nine proofreader's symbols

[gestures] is associated with a predetermined action.

72.    Symbol (a) in Coleman [see Figure 13], is a straight horizontal line drawn

over text that should be replaced or deleted.

> "Figure 1(a) is the symbol for either an alteration or deletion of
> text.  The figure is drawn over the selected piece of text, crossing it
> out.  The system will erase the symbol, blink the selected text for
> verification, separate the text by opening a blank line, position the
> cursor in the center of the blank line, and enable the keyboard for
> the typing of characters.  The user now must examine the current
> situation and make one of two responses:
>
> 1.  Touch the pen somewhere in the center of the tablet.  This will
> delete the blank line and the blinking characters.
>
> 2.  Type in some characters in the keyboard.  These are
> automatically inserted into the blank line by the hardware, the text
> which follows being pushed across the scope face to make room.
> If the pen is now touched to the tablet in the center, the new text
> will replace the old." [Coleman at p. 284 (MSLT_1230609)]

73.    Symbol (b) in Coleman [see Figure 13] is used to insert text.

> "Figure 1(b) is the symbol for an insertion.  The figure is drawn so
> the tip of the caret is just below the point at which the insertion is
> to take place.  The system will erase the symbol and replace it by a
> small blinking caret, separate the text by opening a blank line,
> position the cursor in the center of the blank line, and enable the
> keyboard for the typing of characters." [Coleman at pp. 284-286
> (MSLT_1230609-MSLT_1230610)]

74.    Symbol (c) in Coleman [see Figure 13] is used to interchange adjacent

characters, words, or groups of words.

"Figure 1(c) is the symbol for an interchange. It may be used to interchange adjacent strings, either letters, groups of letters, words, or groups of words. If, after the interchange takes place, it is determined that it was done incorrectly, it may be cancelled by touching the pen to the lower right hand corner of the tablet." [Coleman at MSLT_1230610]

75.     Symbol (d) in Coleman [see Figure 13] is used to move a block of text.

The selected text block may be moved to another location on the screen or to a temporary location on the computer system's disk. Alternatively, text stored in the temporary buffer on the computer system's disk may be moved to a location on the screen.

"Figure 1(d) is the symbol for a move. The text to be moved is circled and the line is continued to a position just under the point at which the text is to be moved. If the line does not terminate near a character, the circled text is moved out to a temporary location on the disk. If the loop does not circle any text, the text on the disk (if any) is inserted at the point at which the line terminates. This is to provide the limited capability of moving a block of characters to a far removed position in the text." [Coleman at p. 286 (MSLT_1230610)]

76.     Symbol (e) in Coleman [see Figure 13] is used to remove excess spaces from the text.

"Figure 1(e), a cup, is the symbol to remove excess spaces. It is drawn under a line of characters with the ends of the symbol just below the characters with the ends of the symbol just below the characters bounding the spaces to be removed." [Coleman at p. 286 (MSLT_1230610)]

77.     Symbol (f) in Coleman [see Figure 13] is used insert spaces into the text.

"Figure 1(f) is the symbol to add a space. It is a line less than ¾ of an inch long. It is drawn at the position the space is to be inserted." [Coleman at p. 286 (MSLT_1230610)]

78.     Symbol (g) in Coleman [see Figure 13] is used to scroll the screen up 10 lines of text.

"Figure 1(g) is the symbol to move the text up 10 lines.  It is a line drawn from the bottom of the screen towards the top, and is at least 1½ inches long.  Text is removed from the upper part of the screen and new text is added to the bottom."  [Coleman at p. 286 (MSLT_1230610)]

79.    Symbol (h) in Coleman [see Figure 13] is used to scroll the screen down 10 lines of text.

"Figure 1(h) is the symbol to move the text down 10 lines.  It is a line drawn from the top of the screen towards the bottom, and is at least 1½ inches long.  Text is removed from the lower part of the screen and is added to the top."  [Coleman at p. 287 (MSLT_1230610)]

80.    Symbol (j) in Coleman [see Figure 13] is used to delete a block (*i.e.*, a group of whole lines) of text.

"Figure 1(j) is the symbol for a block delete.  It is drawn from the first line of the text to be deleted to the last line, diagonally across the screen.  After recognition, the text to be deleted will blink.  Touching the pen to the tablet will delete the blinking text." [Coleman at p. 287 (MSLT_1230610)]

81.    Furthermore, the recognized proofreader's symbols are implemented by the computer system's processor programmed with the prior art algorithms of Coleman for the editor user interface.  Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see, *e.g.*, '295 patent at Col. 4:32-41].

### 5.  Detecting Direction Of Motion Of A Gesture

82.    The text editing system described in Coleman detects the direction of motion of a gesture [see, *e.g.*, claim 41 of the '295 patent].  For example, symbol (g) in Figure 13 is a long vertical line drawn from the bottom of the RAND tablet towards the top whereas

symbol (h) in Figure 13 is a long vertical line drawn from the top of the RAND tablet towards the bottom.  These symbols have different meanings.  When drawn from bottom to top, the symbol indicates that the screen should be scrolled up 10 lines.  On the other hand, when drawn from top to bottom, the symbol indicates that the screen should be scrolled down 10 lines.

> "Figure 1(g) is the symbol to move the text up 10 lines. It is a line drawn from the bottom of the screen towards the top...
>
> Figure 1(h) is the symbol to move the text down 10 lines. It is a line drawn from the top of the screen towards the bottom…"  [See Coleman at pp. 286-287 (MSLT_1230610)]

To the extent that the rules used by the discrimination net (*e.g.*, YINIT > YEND) represent the shape of the gesture, the predefined shape also represents the direction of motion.

### 6.    Direction of Motion Of A Gesture Is Associated With A Predetermined Action

83.    The text editing system described in Coleman recognizes a gesture wherein the direction of motion of the gesture is associated with a predetermined action [see, *e.g.*, claim 46 of the '295 patent].  As discussed above, drawing the proofreader's symbol (g) [gesture] shown in Figure 13, which is a vertical line drawn from the bottom of the screen towards the top, scrolls the text up 10 lines.  On the other hand, the proofreader's symbol (h) shown in Figure 13, which is a vertical line drawn in the opposite direction from the top of the screen towards the bottom, scrolls the text down 10 lines.

### 7.    Displaying Actual Shape Of A Gesture

84.    The text editing system described in Coleman displays on the screen a shape that represents the actual gesture made by the user [see, *e.g.*, claim 43 of the '295

patent].  The system displays electronic ink on the CRT as the user draws a proofreader's

symbol on the RAND tablet.  After the gesture is interpreted the electronic ink is erased.

> "It was this which led to the designing and development of a text editing system in which the user can draw proofreader's symbols over text appearing on a Cathode Ray Tube (CRT)…"  [See Coleman at p. 283 (MSLT_1230608)].

> "Figure 1(a) is the symbol for either an alteration or deletion of text.  The figure is drawn over the selected piece of text, crossing it out.  The system will erase the symbol, blink the selected text for verification, separate the text by opening a blank line, position the cursor in the center of the blank line, and enable the keyboard for the typing of characters."  [See Coleman at p. 284 (MSLT_1230609)].

> "Figure 1(b) is the symbol for an insertion.  The figure is drawn so the tip of the caret is just below the point at which the insertion is to take place.  The system will erase the symbol and replace it by a small blinking caret, separate the text by opening a blank line, position the cursor in the center of the blank line, and enable the keyboard for the typing of characters."  [See Coleman at p.284 (MSLT_1230609)].

# VIII. FIDS

### A.    REFERENCE

140.    A Flat Panel Interactive Display System is described in an article by Arto Kankaanpaa entitled "FIDS – A Flat-Panel Interactive Display System," [MSLT_1230903-MSLT_1230914] (hereinafter "FIDS Paper").  This article was published in the proceedings of the IEEE conference on Computer Graphics and Applications in March 1988.  As used herein, the term "FIDS" refers to the FIDS Paper in view of SFS 2324 (described in subsection C below)

### B.    DESCRIPTION

#### 1.  Computer System

141.    FIDS discloses a prototype computer system developed at Nokia Information Systems to investigate new approaches to human-computer interaction and, more particularly, new methods of inputting information into the computer.

> "At Nokia Information Systems, we have investigated some new approaches to human-computer interaction—especially new methods to input information into the computer—and combined some advanced existing technologies to form a solution that offers a natural way to communicate with the computer.  [See FIDS Paper at p. 71 (MSLT_1230903)1230907p. 71].

142.    The system "was based on the development of a display system that allows people to work with the computer in the same way that they work with pen and paper."

[See FIDS Paper at p. 81 (MSLT_1230913)].  Accordingly, FIDS discloses an apparatus for controlling a computer system.

143.    FIDS [see Figure 23] discloses a Nokia PC [computer], an electroluminescent (EL) flat panel display [screen for displaying information] with a resistive touch panel on top of the display and a touch pen [stylus] connected to the touch panel for inputting information into the Nokia PC.

> "The prototype display system consists of an electroluminescent flat panel and a resistive touch screen on top of the display. Connected to the touch screen is a touch pen for input. These components were implemented on an existing workstation, the Nokia PC, for evaluation."  [See FIDS Paper at p. 81 (MSLT_1230913)]



**Figure 23.  FIDS Prototype System.  [See FIDS Paper at Fig. 3 (MSLT_1230906)].**

144.    The Nokia PC is an 80186-based microcomputer workstation.  The EL display hardware is the Finlux MDM512.256-11 Matrix Display Module made by Lohja Corporation, Finland.  It is connected to the IDC186 graphics controller of the Nokia PC.  The IDC186 is a bitmapped graphics display controller, which contains an Intel 80186

microprocessor.  A resistive touch panel from Sun-Flex is used on the top of the display

hardware and is connected to the Nokia PC through a controller card.  [See FIDS Paper at p. 74

(MSLT_1230906)].

### 2.  Detecting A Stroke Of The Stylus Tip

145.    FIDS discloses detecting a stroke of the stylus tip in contact with the

screen [see, *e.g.*, claims 39 and 41 of the '295 patent].  FIDS discloses a text editing

application that uses correction marks drawn directly on the display for editing.

> "A text editor using the standard proof correction marks was
> implemented. The marks are drawn with the touch pen directly
> onto the display for identification by pattern recognition
> algorithms."  [See FIDS Paper at p. 81 (MSLT_1230913)].

Table 4 and Table 5 show the implemented correction marks, the operations associated with the

correction marks such as INSERT, DELETE, REPLACE, *etc.*, and how the marks are applied to

the basic text objects such as WORD, LINE, *etc.*

Table 4.  Implemented correction marks in the text editing application.  [See FIDS Paper at Fig. 5 (MSLT_1230909)].



Table 5.  The use of correction marks for editing operations applied to basic text objects.  [See FIDS Paper at Table 3 (MSLT_1230909)].



146.    As shown, each correction mark drawn on the display screen consists of at least one stroke.  Thus, FIDS discloses detecting a stroke of the stylus tip in contact with the screen.

### 3.    Detecting A Departure Of The Stylus Tip

147.    FIDS discloses means for detecting the departure of the digitizing pen tip from the screen.  [See, *e.g.*, claim 1 of the '295 patent].  First, the FIDS Paper states that the marks are drawn on the display.  [See, *e.g.* FIDS Paper at p. 81 (MSLT_1230913)].  Second, the features used to recognize a gesture include the "starting point and ending point of each stroke."  [See, *e.g.*, FIDS Paper at p. 77 (MSLT_1230909)].  Thus, FIDS discloses detecting the departure of the pen from the display.

### 4. Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip

148.     FIDS discloses means for defining the termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen tip from the screen.  [See, *e.g.*, claim 1 of the '295 patent].  FIDS discloses recognizing both single stroke and multi stroke gestures [see Table 4].  As discussed above, FIDS discloses detecting the departure of the stylus from the screen for each stroke of a gesture and recording the coordinates of the point at which that event occurred as the ending point of a stroke.  [See ¶ 147] Accordingly, the departure of the stylus from the screen indicates the termination of a stroke.  In addition, the gesture recognition algorithm in Figure 25 shows that recognition begins only after all strokes of a gesture have been entered   Consequently, one of ordinary skill in the art would recognize that FIDS discloses determining the termination of a gesture based on an algorithm that corresponds to at least an algorithm based on timeout or on touching a part of the screen.

### 5. Recognizing Gestures

149.     FIDS discloses recognizing a plurality of gestures [see, *e.g.*, claims 39 and 41 of the '295 patent].  As discussed above, FIDS discloses a text editing application that uses correction marks [gestures] drawn directly on the display for editing.  The correction marks are recognized using known character recognition methods.

> "For recognition of the editing marks drawn on the display, methods used in character recognition were adapted.  A simple algorithm differentiates between the marks, according to the method shown in Figure 6."  [FIDS Paper at p. 77 (MSLT_1230909)]

> "A text editor using the standard proof correction marks was implemented. The marks are drawn with the touch pen directly

onto the display for identification by pattern recognition
algorithms." [See FIDS Paper at p. 81 (MSLT_1230913)]

150.    FIDS discloses comparing a gesture to at least one predefined shape [see,

*e.g.*, claims 39 and 41 of the '295 patent]. FIDS discloses a simple editing mark recognition

algorithm [see Figure 24] wherein stroke features of the input editing mark are extracted and

compared with the features of the reference marks (the set of editing marks that are recognized)

using a decision tree [see Figure 25]:

> "For recognition of the editing marks drawn on the display,
> methods used in character recognition were adapted. A simple
> algorithm differentiates between the marks, according to the
> method shown in Figure 6.
>
> First some filtering removes faulty coordinates in the beginning of
> a stroke. Then characteristic features are extracted. These include
> starting point and ending point of each stroke, minimum and
> maximum x and y values, and direction angles at the beginning of
> a stroke. Finally, a decision tree is applied to classify the marks.
> The decision tree is shown in Figure 7." [See FIDS Paper at p. 77
> (MSLT_1230909)].

As shown, the input editing mark is recognized by applying a set of rule-based tests for the

characteristic features of the editing mark. To the extent that recognizing a gesture by applying a

set of rule-based tests can be considered to be insignificantly different from recognizing a gesture

by comparing it with a predefined shape, as Lucent contends, FIDS discloses recognizing editing

marks by comparing with a predefined shape [see, *e.g.*, claim 41 of the '295 patent].



**Figure 24.  Editing mark recognition algorithm.  [See FIDS Paper at Fig. 6 (MSLT_1230910)].**



**Figure 25.  Decision tree used in the editing mark recognition algorithm.  [See FIDS Paper at Fig. 7 (MSLT_1230911)].**

151.    As discussed previously, FIDS discloses a simple editing mark recognition algorithm that corresponds to a handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.  Table 6 presents a step-by-step comparison of the two algorithms.

**Table 6.  Comparison of the editing mark algorithm employed in FIDS with the handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.**

| Automatic Recognition of Handprinted Characters | FIDS |
|---|---|
| Preprocessing:<br>"The purpose of preprocessing is to extract the relevant basic features to be used in the recognition process. In on-line character recognition, these features are generally points chosen from the drawing. In order to obtain these points, different classical algorithms may be employed, e.g.,<br>1) Smoothing by averaging a point with its neighbors.<br>2) Filtering by forcing a minimum distance between two consecutive points.<br>3) Angular segmentation by sampling a point as soon as the direction of the tangent to the drawing changes by a certain angle [16], [17].<br>4) Linear piecewise approximations and others [83]"<br>[See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)]. | The FIDS mark recognition algorithm includes preprocessing:<br><br>"First some filtering removes faulty coordinates in the beginning of a stroke." [See FIDS Paper at p. 77 (MSLT_1230909)].<br><br>See also "Smoothing and Filtering", shown in Fig. 6 of the FIDS Paper. |
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification"."The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc." [See Automatic Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | The FIDS mark recognition algorithm includes a feature extraction step:<br><br>"Then characteristic features are extracted. These include starting point and ending point of each stroke, minimum and maximum x and y values, and direction angles at the beginning of a stroke." [See FIDS Paper at p. 77 ( MSLT_1230909)].<br><br>See also "Feature Extraction", shown in Fig. 6 of the FIDS Paper. |
| Classification:<br>"Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier | The FIDS mark recognition algorithm includes a classification step using a decision tree:<br><br>"Finally, a decision tree is applied to classify the marks. The decision tree is shown in Figure 7." [See FIDS Paper at p. 77 (MSLT_1230909)]. |

| Automatic Recognition of Handprinted Characters | FIDS |
|---|---|
| descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ….. Classification is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]" [See Automatic Recognition of Handprinted Characters at p. 480 (MSLT)_1233206]]. | See also "Classification using a decision tree", shown in Fig. 6 of the FIDS Paper.<br><br>See also FIDS Paper at Fig. 7. |

152.    Furthermore, the FIDS Paper states that more advanced algorithms using the direction angles of the point sequences forming the strokes of an editing mark as a feature could be used for mark recognition [see FIDS Paper at pp. 77-78 (MSLT_1230909-MSLT_1230910].  Since the direction angles of the point sequences forming the strokes of an editing mark constitute the shape of the input editing mark, the input editing mark would be recognized by comparing the direction angles of the point sequences forming the strokes [shape] of the input mark with the corresponding feature of the reference marks [predefined shapes].

153.    FIDS also discloses recognizing a first gesture, a second gesture and a third gesture comprising the first and second gestures [see, *e.g.*, claim 39 of the '295 patent]. For example, consider, the MARK DELETE, MARK and DELETE correction marks.  The MARK DELETE correction mark (third gesture) is comprised of a MARK correction mark (first gesture) and a DELETE correction mark (second gesture).  [See § VIII.B.2].

154.    Correction marks can be used so that each stroke of the mark is located in substantially the same area of the screen [see, *e.g.*, claim 41 of the '295 patent].

### 6.  Implementing Gestures

155.    FIDS discloses implementing each recognized gesture and performing a predetermined action associated with each recognized gesture [see, *e.g.*, claims 39 and 41 of the '295 patent].  As discussed previously, FIDS discloses a text editing application that uses correction marks [gestures] drawn directly on the display for editing.  Table 4 and Table 5 show some correction marks disclosed by FIDS, the operations [predetermined actions] associated with the recognized correction marks (such as INSERT, DELETE, REPLACE, *etc.*), and how the marks are applied to the basic text objects such as WORD, LINE, *etc.*

156.    Accordingly, the recognized first, second and third gestures [see ¶ 153] are associated with predetermined actions.  As shown in Table 5, the MARK gesture is used for operations such as MOVE, COPY and TRANSPOSE of Line or Paragraph.  Similarly, the table shows the use of DELETE gesture for deleting a character, word or sentence.  As a matter of common sense, it is inherent that the predetermined action associated with the MARK DELETE gesture is marking and deleting text.

157.    As previously discussed, FIDS discloses a system equipped with a processor.  Recognized correction marks are implemented by the processor programmed with the prior art algorithms of FIDS for the Grafix user interface.  Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see '295 patent at Col. 4:32-41].

### 7. Detecting Direction Of Motion Of A Gesture

158.    FIDS discloses detecting the direction of motion of creation of a gesture. The predefined shape of the recognized gesture also represents the direction of motion of the gesture [see, *e.g.*, claim 41 of the '295 patent].

159.    As discussed previously in ¶ 150, FIDS discloses a simple editing mark [gesture] recognition algorithm wherein stroke features—*e.g.*, the direction angle at the beginning of a stroke—of the input editing mark are extracted and compared with the features of the reference marks (the set of editing marks that are recognized) using a decision tree. As discussed in ¶ 152, the FIDS Paper discloses that advanced algorithms can recognize a mark by analyzing the direction angles of the mark's strokes.

160.    The direction angles of the point sequences of the strokes forming an editing mark indicate the direction of motion of creation of the editing mark. It follows, then, that FIDS discloses detecting the direction of motion of creation of an editing mark.

161.    As discussed in ¶ 152, the direction angles of the point sequences forming the strokes of an editing mark constitute the shape of the input editing mark, and hence recognition of the input editing mark would inherently involve the comparison of the direction angles of the point sequences forming the strokes feature [shape] of the input mark with the corresponding feature of the reference marks [predefined shapes]. It follows, then, that the predefined shape corresponding to the input editing mark also represents the direction of motion.

C.    **PROOF CORRECTION STANDARD SFS 2324**

162.    The FIDS Paper cites to a 1972 version of "Proof Correction Standard – SFS 2324" set forth by the Finish Standards Association.  A translated version of the document is available at [MSLT_1232720-MSLT_1232723].  In my discussion I refer to this translated version as "SFS 2324".

163.    SFS 2324 discloses a number of proofreader's marks for editing a document, and it is the source of the marks described in the FIDS Paper.  [See FIDS Paper at p. 76 (MSLT_1230908)].  In addition to those explicitly described in the FIDS Paper, SFS 2324 describes several other proofreader's marks, and as a matter of common sense, it would have been obvious to one of ordinary skill to add these additional correction marks to those explicitly disclosed in the FIDS Paper and to recognize and implant these additional marks in the same way as in the FIDS Paper.  [See §§ § VIII.B.5 and VIII.B.6].

164.    SFS 2324 discloses a first gesture, a second gesture and a third gesture comprising the first and second gestures [see, *e.g.*, claim 39 of the '295 patent].  For example, consider, the marks for Increase Line Space (see item 7.1 in Figure 26), Decrease Line Space (see item 7.2 in Figure 26), and Straighten Line (see item 7.3 in Figure 26).  The second-depicted Increase Line Space mark (third gesture) is comprised of the first-depicted Increase Line Space mark (first gesture) and the Straighten Line mark (second gesture).  Similarly, the second-depicted Decrease Line Space mark (third gesture) is comprised of the first-depicted Decrease Line Space mark (first gesture) and the Straighten Line mark (second gesture).

| | 7 Correction markings for lines | |
|---|---|---|
| | 7.1 Increase line space | Line spacing that needs to be increased is marked with a line. Place a split mark next to it in the margin and, if necessary, write the number of lines that correspond to the increase. |
| | 7.2 Decrease line space | A decreased line spacing is written as above using the merge mark. |
| | 7.3 Straighten line | Letters and words that are not written on the line are marked with two lines specifying their maximum position. |
| | 7.4 Change line order | Two lines that need to change places are indicated most clearly by using the appropriate transfer mark. If there are several lines in the wrong order, the correct order is indicated by numbering the lines. |

**Figure 26. A subset of proofreader's marks disclosed in SFS 2324. [See SFS 2324 at Page 3 (MSLT_1232722)]**

# XII.  The Asserted Claims Of The '295 Patent Are Invalid As Being Obvious

212.    In the Kelly Invalidity Report, I discuss why all the claims of the '295 patent asserted by Lucent are anticipated or obvious in view of several prior art references.  In this section, I discuss additional grounds for invalidity of the asserted claims of the '295 patent.

## A.    COURT'S CLAIM CONSTRUCTION

213.    I understand that claim construction is ultimately a matter for the Court to decide and, in fact, the Court has construed certain terms of the claims in an order dated February 24, 2004.  Table 9 contains the asserted claims and the Court's construction.  The left hand column of the table numbers the limitations of the claims for reference in subsequent sections of this report.  The middle column is the claim language from the '295 patent.  The right hand column is the Court's construction.

Table 9.

|     | Claim | Claim Construction |
| --- | --- | --- |
| 1 | **Claim 1:** An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a **stylus** having a tip for inputting information into the computer, including: | As is.<br><br>**Stylus** - a pen-like object whose position and contact with a surface can be continuously detected electronically. |
| 1a | first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen; | Function: detecting a stroke of the stylus tip in contact with the screen.<br><br>Corresponding Structure: Pen position digitizer 20, |

| | | |
|---|---|---|
| | | as shown in figs. 2 and 3 and described in the specification at Col. 6: 21 - 22; and Col 6: 53-68. |
| | | **Stroke** - a single drawing movement, including a tap. |
| | | **FIG. 2**<br>"FIG. 2 is a cross-section of a notebook computer according to the present invention." |
| | | **FIG. 3**<br>"FIG. 3 is a block diagram of the computer's components." |
| | | **6:21-22**<br>"Mounted behind the display is the pen position digitizer 20." |
| | | **6:53-68**<br>"Although in certain designs (such as those that have been available from Grid Systems Corporation and Linus Technologies, Inc.), resistive, transparent digitizers have been mounted in front of the display, it is desirable to use a digitizer which does not require contact with the stylus. A digitizer based on non-contacting technology can be mounted behind the display, and thus eliminates one transparent layer above the display. |
| 1b | second detecting means coupled to said computer for detecting a departure of the stylus tip from the screen; | Function: detecting a departure of the stylus tip from the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6: 53-68. |
| 1c | means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip; | Function: defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen.<br><br>Corresponding Structure:<br>(1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6:53-68; and |

| | | |
|---|---|---|
| | | (2) Pen position digitizer co-processor 90, with software that determines that a gesture is complete, as shown in fig. 3 and described in the specification at Col. 6: 36-37, Col.1:65 - Col.2:5, and Col. 17:1-14.<br><br>**Gesture** - a symbol or mark. |
| 1d | means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one pre-defined shape; | Function: recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following handwriting recognition algorithms:<br><br>(2) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980 (see Col 4:41-46); or<br><br>(3) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col. 5:1-6); or<br><br>(4) The Handwriting Translation Subsystem, disclosed in Appendix 1, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10 |
| 1e | means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a | Function: implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape<br><br>Corresponding Structure: CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56. |

| | | |
|---|---|---|
| | first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. | This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level.<br><br>**Operating System Level Object** – an object that can be manipulated by a user, which is displayed outside the context of an application program<br><br>**Application Level Object** - an object that can be manipulated by a user, which is displayed within the context of an application program. |
| 3 | **Claim 3:** The apparatus of claim 1, wherein said second detecting means includes means for detecting proximity of the stylus tip to the screen; and said apparatus further includes means coupled to said computer for displaying an indicator of the proximity of the stylus tip to the screen. | Function: detecting proximity of the stylus tip to the screen<br><br>Corresponding Structure: Complimentary electronic circuitry by which the proximity of the stylus tip to the computer is sensed, including:<br><br>(1) Stylus 4, including radio frequency inductor/capacitor circuit 42 and switch 44 (see Figs. 1-2; Col. 6:16-18; Col. 6: 26-31; Col. 1: 18-21; and Abstract); and<br><br>(2) Pen position digitizer 20, as shown in Figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:61-68.<br><br>Function: Displaying an indicator of the proximity of the stylus tip to the screen<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3; and Col. 6:33-34 and Col. 6:36-3 7)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6:20-21; and Col. 6:48-52). |
| 4 | **Claim 4:** The apparatus of claim 1, further including third detecting | Function: detecting a direction of motion of the gesture. |

| | | |
|---|---|---|
| | means for detecting a direction of motion of said gesture. | Corresponding Structure:<br>(1) Pen position digitizer 20 (see Figs. 2-3; Col. 6: 21-22; and Col. 6:53-68); and<br><br>(2) Pen position digitizer co-processor 90 (see Fig. 3 and Co16:36-37). |
| 6 | **Claim 6:** The apparatus of claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer. | Function: displaying on the screen a shape representing the actual gesture made by a user of the computer.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (See Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| 12 | **Claim 12:** The apparatus of claim 3, further including means for terminating display of said indicator when the stylus tip departs from proximity to the screen. | Function: terminating display of said indicator when the stylus tip departs from proximity to the screen<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3;Col. 6:20-21; and Col. 6:48-52). |
| 39 | **Claim 39:** An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including: | **Stylus** - a pen-like object whose position And contact with a surface can he continuously detected electronically. |
| 39a | detecting means coupled to said computer for detecting a stroke of the | Function: detecting a stroke of the stylus tip in contact with the screen. |

| | | |
|---|---|---|
| | stylus tip in contact with the screen; | Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21 - 22; and Col 6: 53-68.<br><br>**Stroke** - a single drawing movement, including a tap. |
| 39b | means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and | **Gesture** - a symbol or mark<br><br>Function: recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising the first and second gestures.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below);<br><br>(2) Col. l:65 - Col. 2:5, and Col. 17:1-14; and<br><br>(3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col. 5: 1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10. |

| 39c | implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture. | Function: implementing said recognized gesture which function includes the availability of using means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture.

Corresponding Structure:  CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56. |
|---|---|---|
| 40 | **Claim 40:** The apparatus of claim 39, wherein the shapes of said first and second gestures are substantially identical. | As is. |
| 41 | **Claim 41:** An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including: | **Stylus** - a pen-like object whose position and contact with a surface can he continuously detected electronically. |
| 41a | first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen; | Function: detecting a stroke of the stylus tip in contact with the screen.

Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21 - 22; and Col 6: 53-68.

**Stroke** - a single drawing movement, including a tap. |
| 41b | means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen: | **Gesture** - a symbol or mark

Function: recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.

Corresponding Structure: |

| | | |
|---|---|---|
| | | (1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below);<br><br>(2) Col.l:65 - Col. 2:5, and Col. 17:1-14; and<br><br>(3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col.5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10. |
| 41c | second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and | Function: detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion<br><br>Corresponding Structure:<br>(1) Pen position digitizer 20 (see Figs. 2-3; Col. 6: 21-22; and Col. 6:53-68); and<br><br>(2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37). |
| 41d | implementing means coupled to said computer for implementing said recognized gesture, said implementing means including means for performing a predetermined action associated with said predefined shape. | Function: implementing said recognized gesture which function includes the availability of using means for performing a predetermined action associated with said predefined shape<br><br>Corresponding Structure:  CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. |

| | | 4:32-41 and Col. 4:49-56. |
|---|---|---|
| 43 | **Claim 43:** The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer. | Function: displaying on the screen a shape representing the actual gesture made by a user of the computer.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| 46 | **Claim 46:** The apparatus of claim 41, wherein said direction of motion of said gesture is associated with said predetermined action. | As is. |

## B.    THE KIM PAPER

214.    At least claims 1, 3, 4, 6 and 12 are obvious over the Kim Paper in view of Taguchi and Levine.  At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and Buxton.  At least claim 39 is obvious over the Kim Paper in view of Taguchi and FIDS.  At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and the Advanced Display System.  At least claims 41 and 43 are obvious over the Kim Paper in view of Taguchi.  At least claim 46 is obvious over the Kim Paper in view of Taguchi and Coleman. A chart form analysis is presented as Exhibit A to this report.  I will now review and elaborate on that analysis.

### 10. Claim 46

286.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

287.    Coleman discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action. See § V. Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of Coleman.

### D.    **FIDS**

288.    At least claims 1, 3, 4 and 12 are obvious over FIDS in view of Taguchi and Levine. At least claim 6 is obvious over FIDS in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over FIDS in view of Taguchi. At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Advanced Display System. At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Buxton. At least claim 41 is obvious over FIDS in view of Taguchi. At least claims 43 and 46 are obvious over FIDS in view of Taguchi and Coleman. A chart form analysis is presented as Exhibit C to this report. I will now review and elaborate on that analysis.

289.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine FIDS with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or

separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g., reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine FIDS with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of FIDS and Taguchi.

290. One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Levine. Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining FIDS with Levine. In fact, the FIDS Paper discusses the wide variety of programs that would benefit from inclusion in FIDS. The FIDS Paper specifically mentions using FIDS as the basis of a user interface management system (UIMS) and mentions that one benefit of a UIMS is a consistent user interface. [See, *e.g.*, FIDS Paper at p. 76 (MSLT_1230908)]. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. FIDS and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features. Each gesture from each prior

art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with FIDS. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of FIDS and Levine.

291.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Advanced Display System. Among other features, Advanced Display System discloses a stylus-based computer system for inputting and editing text. One of ordinary skill in the art would have seen the obvious benefits in adding the Advanced Display System's gestures to the stylus-based user interface of FIDS. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. FIDS and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the correction marks of FIDS Tables 3 and 4 would not necessarily be affected by the combination of FIDS with the Advanced Display System. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of FIDS and Advanced Display System. In addition, one of ordinary skill in the art would be motivated to combine FIDS and Advanced Display System because both were developed and

written about by the same person, A. Kankaanpaa.  Both based their editing gestures on the

SFS2324 proof correction standard.

      292.    One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would also have known to combine FIDS with Buxton.  Among other features,

Buxton discloses stylus-based gestures in a user interface useful for musical composition and

music score editing.  One of ordinary skill in the art would have seen the obvious benefits in

adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-

based user interface of FIDS.  In fact, the FIDS Paper lists a number of applications that could

benefit from the FIDS design including other types of editors that use graphics and direct

manipulation.  The *char-rec* score editor falls squarely within this category.  The resulting

combination would have yielded no more than what one would expect from such an

arrangement, with each set of prior art features performing the same functions it had been

known to perform.  FIDS and its gestures would have performed just as before, with the simple

addition of Buxton's gestures and other user interface features.  Each gesture from each prior

art system would perform the same function as in its respective prior art system alone.  For

instance, implementation of gestures such as the *char-rec* gestures of  Buxton would not

necessarily be affected by the combination of Buxton with FIDS.  Moreover, given the level of

ordinary skill in the art (discussed in my previous report), one of ordinary skill would have

been able to implement the combination of FIDS and Buxton.

      293.    One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would also have known to combine FIDS with Coleman.  Among other features,

Coleman discloses a stylus-based computer system that implements gestures to edit and

manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in

adding the gestures and other capabilities of Coleman to the stylus-based user interface of

FIDS.  In fact, the FIDS Paper lists Coleman as "the first editing system using proofreading

symbols" and states that it was more limited than FIDS because it did not have the

"possibilities offered by the FIDS hardware."  [See FIDS Paper at p. 77 (MSLT_1230909)].

There are also similarities between the gestures and gesture recognition algorithms of FIDS

and Coleman.  In addition, scrolling is an operation that is commonly performed in text editing

programs because the data contained in the document usually cannot all be displayed on the

screen at the same time.  The up/down gestures of Coleman, which are used for scrolling,

would be useful in the context of FIDS.  The resulting combination would have yielded no

more than what one would expect from such an arrangement, with each set of prior art features

performing the same functions it had been known to perform.  FIDS and its gestures would

have performed just as before, with the simple addition of Coleman's gestures and other user

interface features.  Each gesture from each prior art system would perform the same function

as in its respective prior art system alone.  For instance, implementation of gestures such as the

proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the

combination of Coleman with FIDS.  Moreover, given the level of ordinary skill in the art

(discussed in my previous report), one of ordinary skill would have been able to implement the

combination of FIDS and Coleman.

### 1.  Claim 1

294.    Claim 1 preamble:  FIDS includes an apparatus for controlling a computer

system as discussed in § VIII.B.1.  The computer system of FIDS comprises

electroluminescent (EL) flat panel display [screen] for displaying information and a touch pen [stylus] for inputting information into the computer as discussed in § VIII.B.1.

295.    Limitation 1a:  FIDS can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VIII.B.2.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

296.    Limitation 1b:  FIDS can detect a departure of the digitizing pen [stylus] tip from the screen as discussed in § VIII.B.3.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

297.    Limitation 1c:  FIDS can define termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen [stylus] tip from the screen as discussed in § VIII.B.4.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VIII.B.1, and a processor [pen position digitizer co-processor] [see § VIII.B.1] programmed with software that determines that a gesture is complete as discussed in § VIII.B.4.  Furthermore, Taguchi discusses a digitizer based on non

contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

298.    Limitation 1d:  FIDS can recognize a plurality of said gestures and can compare each said gesture to at least one predefined shape.  See § VIII.B.5.  The structure to perform this function is a processor programmed with a handwriting recognition algorithm. The gesture recognition algorithm is a prior art recognition algorithms that use techniques disclosed in Automatic Recognition of Handprinted Characters.  See § VIII.B.5.  The FIDS Paper teaches that handwriting recognition could be advantageously included in FIDS and refers to several publications that discuss this subject.  [See, *e.g.*, FIDS Paper at p. 76-77].  In addition, during prosecution of the '295, the applicants argued that "[i]t is not crucial in the present invention which of the many available character recognition methods is used in connection with the microprocessor in order to carry out the invention."  [See, *e.g.* '295 File History 1992-05-26 Amendment (Tab 9) at 9(LUC 1050931)].

299.    Limitation 1e:  FIDS can implement each said recognized gesture and can perform a predetermined action associated with each said predefined shape as discussed in § VIII.B.6.  [See, *e.g.*, FIDS Paper at p. 76].  Furthermore, Levine describes the use of a single set of gestures for identical executable commands at both the operating system level and the application level as discussed in § III.  It would have been obvious to one of ordinary skill in the art to use a common set of gestures at both the operating system level and application level in view of Levine.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § III.

## 2. Claim 3

300.    Claim 3 depends on the claim 1 and the analysis of claim 1 applies here.

301.    Both Taguchi [see § II] and Levine [see § III] disclose proximity detection and displaying an indicator of proximity.  The structure for performing this function is a stylus, a digitizing tablet [pen position digitizer], a processor [CPU and a pen position digitizer coprocessor] and a display controller.  [See § VIII.B.1].  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.  In addition, as the Examiner noted, it would have been obvious to one of ordinary skill that a system using a proximity sensing digitizer could display an indicator when the stylus is in proximity to it.  [See e.g., '295 File History 1991-11-20 Office Action (Tab 6) at 5(LUC 1050915)].

## 3. Claim 4

302.     Claim 4 depends on the claim 1 and the analysis of claim 1 applies here.

303.    FIDS can detect the direction of motion of the gesture as discussed in § VIII.B.7.  The structure for performing this function is a digitizing tablet [pen position digitizer], a processor [pen position digitizer coprocessor].  See § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

### 4. Claim 6

304.    Claim 6 depends on the claim 1 and the analysis of claim 1 applies here.

305.    Coleman discloses displaying the actual shape of the gesture. Furthermore, Taguchi discloses displaying of the characters drawn on the screen using the stylus. See § II. Displaying the actual shape of the gesture in FIDS would have been obvious in view of Coleman. Alternatively, displaying the actual shape of the gesture in FIDS would have been obvious in view of Taguchi. The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and an electroluminescent (EL) flat panel display. See § VIII.B.1..

### 5. Claim 12

306.    Claim 12 depends on the claim 1 and the analysis of claim 1 applies here.

307.    Both Taguchi [see § II] and Levine [see § III] can terminate display of said indicator when the stylus tip departs from proximity to the screen. It would have been obvious to one of ordinary skill in the art to use proximity detection,, displaying of an indicator and furthermore terminating the display of the indicator in view of Taguchi and Levine. The structure for performing this function is a processor [pen position digitizer coprocessor] and a display controller. [see § VIII.B.1].

### 6. Claim 39

308.    Claim 39 preamble: FIDS includes an apparatus for controlling a computer system as discussed in § VIII.B.1. The computer system of FIDS comprises an

electroluminescent (EL) flat panel display [screen] for displaying information and a touch pen [stylus] for inputting information into the computer as discussed in § VIII.B.1.

309.    Limitation 39a:  FIDS can detect a stroke of the touch pen [stylus] tip in contact with the screen as discussed in § VIII.B.2  The structure to perform this function is a resistive touch panel [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

310.    Limitation 39b:  FIDS can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape.  See §§  VIII.B.4, VIII.B.5.  Furthermore, to the extent that one contends that FIDS does not recognize compound gestures – *i.e.*, a third gesture comprising a first and a second gesture –Buxton [see § IV] describes compound gestures.  It would have been obvious to one of ordinary skill in the art to use compound gestures in view of Buxton.  Additionally, it would have been obvious to use compound gestures in view of Advanced Display System.  See § IX.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VIII.B.1, VIII.B.4, VIII.B.5, VIII.B.3.

311.    Limitation 39c:  FIDS can implement each said recognized gesture and can perform a predetermined action associated with each said gesture as discussed in § VIII.B.6.  Furthermore, to the extent that one contends that FIDS does not implement

compound gestures, Buxton [see § IV] describes compound gestures. It would have been obvious to one of ordinary skill in the art to implement compound gestures in view of Buxton. It would have been further obvious to one of ordinary skill in the art to implement compound gestures in view of Advanced Display System. The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ VIII.B.1, VIII.B.6.

### 7. Claim 40

312.    Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

313.    The Advanced Display System discloses a gesture for starting a new page (third gesture) that is comprised of a first and a second gesture that are both the gesture for starting a new paragraph. Thus, the first and second gestures are substantially identical. See § IX.

314.    Buxton discloses a gesture for a 1/32 note (third gesture) that is comprised of the gestures for two 1/8 notes (first and second gestures). Thus, the first and second gestures are substantially identical. See § IV.

### 8. Claim 41

315.    Claim 41 preamble: FIDS includes an apparatus for controlling a computer system as discussed in § VIII.B.1. The computer system disclosed in FIDS comprises an electroluminescent (EL) flat panel display [screen] for displaying information and a touch pen [stylus] for inputting information into the computer as discussed in § VIII.B.1.

316.    Limitation 41a:  FIDS can detect a stroke of the touch pen [stylus] tip in contact with the screen as discussed in § VIII.B.2  The structure to perform this function is a resistive touch panel [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

317.    Limitation 41b:  FIDS can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.  See §§ VIII.B.4, VIII.B.5.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VIII.B.1, VIII.B.4, VIII.B.5.

318.    Limitation 41c:  FIDS can detect a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion as discussed in § VIII.B.7.  The structure to perform this function is a resistive touch panel [pen position digitizer] and a processor [pen position digitizer co-processor] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

319.    Limitation 41d:  FIDS can implement a recognized gesture and can perform a predetermined action associated with the predefined shape.  See § VIII.B.6.  The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ VIII.B.1, , VIII.B.6.

### 9.  Claim 43

320.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

321.    Coleman discloses displaying the actual shape of the gesture. Furthermore, Taguchi discloses displaying of the characters drawn on the screen using the stylus.  See § II.  Displaying the actual shape of the gesture in FIDS would have been obvious in view of Coleman.  Alternatively, displaying the actual shape of the gesture in FIDS would have been obvious in view of Taguchi.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and an electroluminescent (EL) flat panel display.  See § VIII.B.1.

### 10. Claim 46

322.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

323.    Coleman discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action.  See § V.  Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of Coleman.