# Schmidt Declaration

# Exhibit 11

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, <br><br> Plaintiffs and Counterclaim-defendants, <br><br> v. <br><br> GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., <br><br> Defendants and Counter-claimants, <br><br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervenor and Counter-claimant. | Case No. 02-CV-2060 B (CAB) <br> consolidated with <br> Case No. 03-CV-0699 B (CAB); and <br> Case No. 03-CV-1108 B (CAB) <br><br> **EXPERT REPORT OF EDWARD J. DELP III REGARDING OBVIOUSNESS** |
| MICROSOFT CORPORATION, <br><br> Plaintiff and Counter-defendant, <br><br> v. <br><br> LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, | |

1  the known techniques into several distinct categories, describes several examples of combinations
2  of the various categories, and explicitly notes that there are many different combinations of
3  techniques in those categories known in the art, *e.g.*, Picture Coding at 379, suggesting to those in
4  the art that combinations of the various cited techniques may be desirable.

5      27.     Picture Coding also describes several market and design needs that would
6  motivate people in the coding arts to combine the various known techniques, such as the need for
7  more efficient video coding to "free valuable spectrum space" and the expanding use of video
8  coding in (at the time) emerging technologies such as facsimile, satellite communications, and
9  military applications. Picture Coding at 366.

10     28.     Picture Coding itself therefore demonstrates that there were design and market
11 needs in the prior art to develop better coding systems, and the combination of known techniques,
12 which was a typical and accepted practice, was a common way to develop such systems.

        **b.     The Combination of Picture Coding and Gabor & Hill Satisfies Every Limitation of Claim 13 of the '272 Patent Even Under MPT's View of the Claim and the Evidence**

15     29.     As set forth in my previous report, it is my opinion that every element required
16 by claim 13 of the '272 patent is included, either explicitly or inherently, in Picture Coding. *See*
17 March 31, 2006 Expert Report at ¶¶ 76-86. I also believe that the Patent Office's decision to
18 reexamine claim 13 of the '272 patent in view of Picture Coding confirms that opinion. '272
19 Reexam at 7.

20     30.     It also remains my opinion that every element required by claim 13 of the '272
21 patent is included, either explicitly or inherently, in Gabor & Hill. *See id.* at ¶¶ 27-35. I further
22 believe that the Patent Office's decision to reexamine claim 13 of the '272 patent in view of
23 Gabor & Hill confirms that opinion. '272 Reexam at 8.

24     31.     In Prof. Girod's rebuttal to my invalidity report, he maintains that Gabor & Hill
25 is limited to analog implementations and as such is distinguishable from the '272 patent. The
26 decision of the Patent Office to reexamine claim 13 undercuts Prof. Girod's argument, since the
27 examiner in the Patent Office would not have believed that Gabor & Hill created a significant
28 validity issue as to claim 13 if Prof. Girod were correct.

1    32.    I also note that although claim 13 requires "pels," this requirement does not
2 limit the claim to digital implementations or to a digital representation of the claimed pels.
3 According to the Court's claim construction, "pels" means "picture elements," also referred to as
4 pixels." Exhibit I, August 16, 2005 '272 Superceding Markman Order at 3. That construction
5 does not require digital implementations. I further note that the '272 patent does not even use the
6 word "digital," and nothing raised during the prosecution of the underlying patent application
7 imposed any such requirement.

8    33.    Indeed the phrase "picture element" would be understood by those of ordinary
9 skill in the art at the relevant time to mean an area of a picture on a television or computer screen,
10 as is demonstrated by various sources published around the time of the purported invention. For
11 example the 1977 IEEE Standard Dictionary of Electrical and Electronics Terms defines "picture
12 element" as "[t]he smallest area of a television picture capable of being delineated by an electric
13 signal passed through the system or part thereof," and the 1976 McGraw-Hill Dictionary of
14 Scientific and Technical Terms defines "picture element" as "any segment of a scanning line, the
15 dimension of which along the line is exactly equal to the nominal line width; the area which is
16 being explored at any instant in the scanning process."

17    34.    Moreover, Gabor & Hill itself uses the phrase "picture element" at page 313.
18 Accordingly, the term "picture element" has long been used by those of skill in the relevant art to
19 mean nothing more than an area of a picture. *See, e.g.*, E. R. Kretzmer's 1952 paper that
20 describes an analog television picture as "an array of approximately 210,000 dots, 500 vertically,
21 420 horizontally, corresponding, respectively, to the 500 scanning lines and 420 resolvable
22 *picture elements* per line of the standard television raster." Kretzmer, E. R., "Statistics of
23 Television Signals," The Bell Systems Technical Journal, pp. 276-88 (July 1952) at 276-77
24 (emphasis added) (DELL 317256-68). *See also* the 1956 paper by William F. Schreiber, a leader
25 in the field of video compression, that describes analog television and states that there "are about
26 200,000 *picture elements* in a standard television frame." Schreiber, W. F., "The Measurement
27 of Third Order Probability Distributions of Television Signals," Institute of Radio Engineers
28 Transactions on Information Theory, Vol. 1-T2, 3, p. 289-300 (September 1956) at 289 (emphasis

added) (DELL 315454-65). There is no dispute that standard television in the 1950's was not digital.

35. I do not believe that Gabor & Hill is limited to analog implementations. *See e.g.*, the discussion of data rates on pages 303-04 of Gabor & Hill ("[o]ur object in discussing this ideal picture transmission system in some detail is rather to point out that the estimates of potential compression based on contrasting the 50 bits/sec of visual intake with the $3\text{-}5 \times 10^7$ bits/sec of television channels . . ."; "[i]f these probabilities were equal, i.e. $p_i = 1/N$, they would require $\log_2 N$ bits/sign for their transmission . . ."). Bits/sec is clearly a reference to digital data and digital encoding.

36. I also note that the United States Patent and Trademark Office has agreed to reexamine claim 13 of the '272 patent. *See*, '272 Reexam. In its determination to institute that reexamination, the examiner agreed that Gabor & Hill discloses a digital technique. *Id.* at 7-8.

37. Even if Prof. Girod's position that Gabor & Hill only described analog implementations is correct, claim 13 would still be invalid as obvious. It was well known in the prior art to the '272 patent that analog techniques could be employed in a digital world. Picture Coding, for example, expressly states that it is desirable to implement video encoding digitally. *See* Picture Coding, Abstract ("A bright future for new systems is forecasted based on emerging new concepts, technology of integrated circuits and the need to digitize in a variety of contexts."); *id.* at 403 ("Looking to the future we could expect television scenes with perhaps twice the vertical resolution of the current standard. . . . An upgrading of the picture could be easily handled within a digital framework." Moreover, Picture Coding describes numerous digital coding techniques, including numerous articles authored by Netravali himself. *See, e.g.*, Picture Coding at 406 *citing* A. N. Netravali & J. A. Stuller, "Motion Compensated Transform Coding," Bell Systems Technical Journal, 1703-18, September 1979 (LUC1037198-LUC1037213); and A. N. Netravali, "Interpolative Picture Coding Using a Subjective Criterion," IEEE Transactions on Communications, vol. COM-25, 503-08, May 1977 (LUC0010310-LUC0010315). *See also* March 31, 2006 Expert Report at ¶¶ 40-42.

38.     Additionally by 1981, video coding was almost universally performed in the digital domain.

39.     Moreover, the prior art that was before the examiner included two prior patents by Netravali, each of which disclosed both motion estimation and interpolation in the digital domain. It was commonplace to replace older mechanical devices with devices utilizing modern electronics. Therefore, it would have been obvious to a person of ordinary skill in the art to implement the system disclosed in Gabor & Hill using the digital techniques disclosed by Picture Coding.

40.     Prof. Girod also states that he believes that Gabor & Hill does not interpolate from locations at which the same object is expected to be because it only discloses interpolation in the horizontal direction. Again, the Patent Office's decision to reexamine claim 13 undercuts Prof. Girod's conclusion.

41.     I also disagree with Prof. Girod. There is nothing in claim 13, the '272 specification, or the Court's claim construction that requires pels to be searched in the vertical direction. In fact, Gabor & Hill simply recognized that "changes from one picture to the next come about mostly by the horizontal motion of objects." *See* Gabor & Hill at 303. Thus, Gabor & Hill teach searching the pels of a picture along the horizontal scan lines, which also corresponds to the manner in which television images were transmitted and displayed. Although Gabor & Hill teach searching pels in a horizontal direction, the interpolation taught by Gabor & Hill also accounts for motion in the vertical direction. Further, a person of ordinary skill in the art would be able to expand upon the principles in Gabor & Hill to search for motion in the vertical direction. Prof. Girod has identified nothing in Gabor & Hill that would strictly limit its teachings to horizontal interpolation.

### 2.     Gabor & Hill and the Gabor Article

42.     The combination of Gabor & Hill and the article *Television Compression by Contour Interpolation* by Dennis Gabor ("Gabor & Hill"), which was published in Supplemento Al Volume XIII, Serie X, Del Nuovo Cimento, 1959, also renders claim 13 of the '272 patent obvious.

1   interpolation error, he would have also been motivated to DCT this interpolation error for the
2   same reasons it was known to be desirable to DCT the prediction error. As set forth above,
3   numerous prior art references teach that prediction error should undergo DCT. Thus, one of
4   ordinary skill in the art designing a codec utilizing interpolation error would have been motivated
5   to include an inverse DCT circuit or software routine equivalent to $DCT^{-1}$ 34.

### 10. Decoding of Interpolation Error

88.     The court's corresponding structure included Decoder 25, which decodes the incoming interpolation error signal. As stated above, the '226 patent is vague regarding the purpose of this decoder. It was known before the filing of the '226 patent that an encoder may in its final coding stages employ run length coding or variable length coding as well as perform formatting operations on the data before transmission. Any of these could be considered "coding" operations that would require a Decoder 25 at the receiver. As in the case of DCT, if a codec design was going to employ run length coding or variable length coding for the prediction error, then the codec designer would also be motivated to provide this same coding for the interpolation error. Once again, the interpolation error would benefit in the same manner as the prediction error and would be handled in the same way. Because the prior art clearly discloses the use of such coding of prediction error, one of ordinary skill would have been motivated to include a similar decoder for the interpolation error. I note that several references expressly teach the use of a coding unit at the encoder for interpolation error and thus necessarily teach the use of a corresponding decoder for the interpolation error (*i.e.*, a Decoder 25) at the receiver. *See, e.g.*, H.261 Doc. No. 81 ("Coding Unit"); H.261 Doc. No. 22 ("Entropy coding").

### 11. Summary

89.     As set forth above, all the various coding techniques covered by claim 12 were well known in the prior art prior to the filing of the patent application for the '226 patent. Those of ordinary skill in the art also were well aware of how to implement each of these coding techniques. Further, the particular corresponding structures identified by the court for implementing each of these coding techniques also were well-known (*i.e.*, adders, decoders, DCT-1, shift circuits, averagers) Notably, all of these structures are old and familiar elements in

1  the art and were combinable to perform the coding techniques of claim 12 in a manner that
2  required no change in their respective functions. The operation of these structures to perform the
3  claimed functions would have yielded no more than predictable results.

4        90.      Moreover, as explained in my report it was simply the happenstance of new
5  design incentives and market forces that blossomed in the late 1980's that created the
6  circumstances under which the alleged invention materialized. In particular, the advent of CD-
7  ROM applications created an incentive to generate video coders that operated at 1-1.5 Mbps.
8  Offering a significantly higher data rate than the approximately 64 kbps available to video
9  teleconferencing applications, there existed enough data to efficiently utilize interpolation error to
10 generate high quality video at this new target data rate. Since interpolation error and the
11 structures needed to implement it were already conceptually well known in the art, it required no
12 inventiveness to simply add it to motion compensated interpolation coders that were also well
13 known, and were known to be improved by the use of interpolation error. Indeed, as set forth in
14 more detail elsewhere in my report, numerous investigators independently developed coders
15 covered by claim 12 at nearly the same time as Haskell and Puri. This suggests that there was
16 already a known solution to the problem of achieving high quality video at 1-1.5 Mbps, and this
17 known solution (*i.e.*, interpolation error combined with motion compensated predictive and
18 interpolative coding) was immediately employed by many investigators as soon as the market
19 targeted the problem of achieving high quality video with a CD ROM.

20       **A.    It Was Known In The Art To Combine Motion Compensated Forward Prediction, Prediction Error, and Motion Compensated Temporal Interpolation**

22       91.      As I stated in my previous report, it was known in the prior art of the '226
23 patent to combine the coding techniques of motion compensated prediction, prediction error,
24 motion compensated temporal interpolation and interpolation error. March 31, 2006 Expert
25 Report at ¶¶ 45-90. The prior art includes several references that disclose the use of such
26 techniques in various combinations, as well as structures for carrying out those techniques. Such
27 references include U.S. Patent No. 4,575,756 to Furukawa ("'756 patent") and U.S. Patent No.
28 4,727,422 to Hinman ("'422 patent"), submissions to the CCITT Specialist Group submissions

critical date. I disagree. As discussed in my March 31, 2006 Expert Report, Dr. Musmann, who is the head of TNT, stated that the library was open to the public. *See* March 31, 2006 Expert Report at ¶155. Likewise, Mr. Thomas Wehberg, who was responsible for the administration of TNT, including the library, stated that the TNT library was open to the public during the relevant time frame. *See* November 13, 2006 Declaration of Thomas Wehberg (Exhibit K) and August 22, 2007 Declaration of Thomas Wehberg (MSLT_1234202 - MSLT_1234204).

### 3. The PictureTel References

111. In the mid- to late-1980's, PictureTel Corporation was actively working to develop methods and equipment to perform video encoding and decoding. During the course of that development, inventors at PictureTel were awarded a number of patents. *See, e.g.*, U. S. Patent No. 4,816,914 ("the Ericsson '914 patent"); U. S. Patent No. 4,794,455 ("the Ericsson '455 patent"); U.S. Patent No. 4,849,810 to Ericsson ("the Ericsson '810 patent"); U.S. Patent No. 4,703,350 to Hinman ("the Hinman '350 patent"), U.S. Patent No. 4,727422 to Hinman ("the Hinman '422 patent"); U.S. Patent No. 4,661,849 to Hinman ("the Hinman '849 patent") (MSLT_0241629-MSLT_0241646); and U.S. Patent No. 4,754,492 to Malvar ("the Malvar patent") (MSLT_1234205 - MSLT_1234227). I will refer to these references collectively as "the PictureTel references." It is my opinion that claim 12 of the '226 patent is invalid as obvious in view of the body of work disclosed in these references.

#### a. Several Reasons Existed in the Art to Combine The PictureTel Patents and Digital Video

112. Several reasons existed in the prior art to combine the teachings of the PictureTel references. They all relate to the same subject matter and share many of the same figures and much of the same written description  They also include over-lapping inventors and a common assignee. Moreover, the patents include cross-references to one another and incorporate each other by reference.[3]

---

[3] For example, the Ericsson '914 patent incorporates by reference both the Hinman patent and the Malvar patent. *See* Ericsson '914 patent, col. 1, line 65 - col. 2, line 4; col. 6, lines 31-40. Similarly, the Hinman '350 patent incorporates by reference the Malvar patent. *See* Hinman '350 patent, col. 10, lines 59-66.

113. For at least these reasons, one of skill in the art would have known that the teachings from any one of the PictureTel patents or the Hinman Thesis could apply to and would be related to the other PictureTel patents, and would have therefore had good reason to combine them.

    **b. The Combination of The PictureTel References Satisfies Every Limitation of Claim 12 of the '226 Patent Even Under MPT's View of The Claim and The Evidence**

114. As shown in the attached claim chart (in which I have used the Ericsson '914 patent as a primary example), the PictureTel references disclose a system that includes motion compensated prediction with prediction error, motion compensated interpolation and the coding of error codes using the DCT. Exhibit H, Ericsson '914 Patent; March 31, 2006 Expert Report at pp. 81-85. Accordingly, as set out in more detail in the attached chart, the PictureTel references render claim 12 of the '226 patent invalid for obviousness.

115. I also note that it was well-known in the prior art that when *inter*frame interpolation was employed, the interpolation might be inaccurate, therefore causing the interpolation error to be large. In such situations it was known that side information (*i.e.*, "codes that describe deviations from interpolated blocks") would necessarily have to be transmitted to the receiver. Indeed, Mr. Haskell's own textbook explicitly makes this point in a section entitled "Motion Adaptive Interpolation":

> In this as well as other interpolation schemes, since at times the interpolation may be in accurate, techniques have been devised where the quality of interpolation is checked at the transmitter, and if the interpolation error is larger than a threshold, side information is transmitted to the receiver. It appears that due to unavoidable inaccuracies of the displacement estimator (e.g. complex translational and rotational motion) and the segmentation process, such side information would be necessary to reduce artifacts that may otherwise be introduced due to faulty interpolation.

Digital Pictures at 473.

116. It was well-known and a common practice in the prior art, where interpolation of video signals was employed, to check the quality of the interpolation at the transmitter, and if the interpolation error was above a threshold, code and transmit the interpolation error to the

transmitter. *See, e.g.*, U.S. Patent No. 4,858,005 to Lodge at col. 4, lines 58-63); Picture Coding at 400-01; John O. Limb, et al., "Combining Intraframe and Frame-to-Frame Coding for Television," The Bell System Technical Journal, Vol. 53, No. 6, July-August 1974 at 1137 (DELL 315875-893); N K Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Pictures," Second Int'l Conference on Image Processing and Its Applications, Vol. 265, 24-26 June 19896, 242, 243; Masayuki Tanimoto, "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Transacations of the IEICE, Vol. E.70, No. 7, July 1987, 611, 611-12.[4]

117. I understand Prof. Girod asserts that at least certain PictureTel patents do not disclose the use of a DCT to encode error, do not perform in a blockwise manner, do not disclose interframe interpolation, and disclose a coder that is different from the one in the '226 patent.

118. First, there is no question that the system described in the PictureTel patents operates in a blockwise manner. See, for example, the Ericsson '914 patent Abstract, which specifically discusses blocks in an image frame. The PictureTel patents have many such references to coding in a blockwise manner, which was, in any event, a technique well-known at the time.

119. As for the use of the DCT to encode error, again the Ericsson '914 patent expressly states that the lossy compression circuitry 46 used to encode the error "can employ a discrete cosine transform." Col. 11, lines 46-48.

120. The Ericsson '914 patent, for example, also performs interframe interpolation. See Fig. 6; col. 8, line 60 - col. 9, line 5; col. 11, lines 6-27.

---

[4] Indeed, systems that employ both "codes that describe deviations from approximated blocks" (*e.g.*, prediction error) and "codes that describe deviations from interpolated blocks" (*e.g.*, interpolation error) were well-known in the prior art. *See* N K Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Pictures," Second Int'l Conference on Image Processing and Its Applications, Vol. 265, 24-26 June 1986, 242, 243-245; Yoshiyuki Yashima & Katsutoshi Sawada, "A Highly Efficient Coding Method for HDTV Signals," Proceedings of the IEEE, Vol. 1, June 8, 1987, 0125, 0126; U.S. Patent No. 4,858,005 to Lodge at col. 4, line 41 - col. 5, line 2; col. 9, line 61 - col. 10, line 5; and col. 11, line 65 - col. 12, line 2; Masayuki Tanimoto, "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Transactions of the IEICE, Vol. E.70, No. 7, July 1987, 611, 611-12; Ericsson '810 patent, col. 7, lines 33-40; col. 12, lines 8-13; and col. 13, lines 11-13.

121. As to decoder 22 of the '226 patent, I note that the '226 patent doesn't describe the decoder at all and merely says that related coder at the transmitter is a "bits coder." '226 Patent at col. 4, ll 16-18. So whatever extra characteristics is reading into that structure were not disclosed in the '226 patent and therefore are not limitations of claim 12. Instead, any type of "bits decoder" would satisfy that component of the corresponding structure, and the PictureTel patents clearly include such decoders. *See, e.g.*, Ericsson '914 patent, Fig. 3.

122. I understand that Prof. Girod has also suggested that the PictureTel patents do not disclose interframe interpolation error. But they do disclose interframe interpolation and the use of interpolation error and, in any event, as noted above, the use of interpolation error was just an obvious variation, well-known to those of ordinary skill in the art.

### 4.    Near Simultaneous Invention

123. I have been informed that certain printed publications that do not legally qualify as prior art under the patent statutes may nevertheless be relevant to the obviousness inquiry. In particular, it is my understanding that references that demonstrate that others in the art independently arrived at the same claimed apparatus near the same point in time may be suggestive that such a combination was obvious at the time to those of ordinary skill in the art. After reviewing many printed publications, and to the extent that the anticipatory references that I have already discussed are found not to be prior art and/or not to anticipate, it is my opinion that there are several publications which demonstrate near simultaneous development of the apparatus claimed by claim 12 of the '226 patent.

124. My March 31, 2006 Expert Report disclosed several references that demonstrate near simultaneous invention, including MPEG submissions by Bellcore and Matsushita, and U.S. Patent No. 5,113,255 ("Nagata") (MSLT_0233099-MSLT_0233110). March 31, 2006 Expert Report at ¶¶ 243.

125. In response to these references, Prof. Girod asserts that Haskell first disclosed the invention of claim 12 to the CCITT SGXV group via Document #490 in March 1989, followed by another disclosure by Dr. Puri in September of 1989 at a conference in Hanover. May 12, 2006 Girod Report at pg. 76. Prof. Girod also asserts that I did not cite "any evidence

1     I declare under penalty of perjury under the laws of the United States of America that this
2 report on behalf of Defendants is true and correct. Executed this 14th day of September 2007 in
3 West Lafayette, Indiana.

By: *[signature]*
Edward J. Delp, III, Ph.D.

**PROOF OF SERVICE**

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for personal delivery, for mailing with U.S. Postal Service, for facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

On September 14, 2007, I caused a copy of the following document(s):

**EXPERT REPORT OF EDWARD J. DELP III REGARDING OBVIOUSNESS**

to be served on the interested parties in this action by placing a true and correct copy thereof, enclosed in a sealed envelope, and addressed as follows:

| | |
|---|---|
| Jane Hahn<br>Alison P. Adema<br>Hahn & Adema<br>501 West Broadway, Suite 1730<br>San Diego, CA  92101<br>Telephone:  (619) 235-2100<br>Facsimile:  (619) 235-2101<br>***VIA OVERNIGHT & ELECTRONIC MAIL*** | Attorneys for Plaintiffs<br>LUCENT TECHNOLOGIES INC. and<br>MULTIMEDIA PATENT TRUST<br><br>Email: janehahn@hahnadema.com<br>aadema@hahnadema.com |
| David J. Zubkoff<br>Seltzer, Caplan, McMahon & Vitek<br>2100 Symphony Towers<br>750 B Street, Suite 2100<br>San Diego, CA  92101<br>Telephone:  (619) 685-3003<br>Facsimile:  (619) 702-6827<br>***VIA OVERNIGHT & ELECTRONIC MAIL*** | Attorneys for Defendants<br>GATEWAY, INC. and GATEWAY<br>COUNTRY STORES LLC<br><br>Email: zubkoff@scmv.com |
| James S. Blackburn<br>Arnold & Porter LLP - (L.A.)<br>777 S. Figueroa Street, 44th Floor<br>Los Angeles, CA  90017<br>Telephone:  (213) 243-4000<br>Facsimile:  (213) 243-4199<br>***VIA OVERNIGHT & ELECTRONIC MAIL*** | Attorneys for Defendant<br>DELL INC.<br><br>Email: james_blackburn@aporter.com |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury that the above is true and correct. Executed on September 14, 2007, at San Diego, California.

*/s/ Alma Truax-Padilla*
Alma Truax-Padilla

**COURTESY COPIES BY ELECTRONIC MAIL TO**:

Trial Counsel For Lucent and Multimedia Patent Trust:
Jon T. Hohenthaner/Alan Kellman/James Bailey
Kirkland & Ellis LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
E-mail:	jhohenthaner@kirkland.com; akellman@kirkland.com; jbailey@kirkland.com

Trial Counsel for Gateway:
Bryan Farney / Jeffrey B. Plies / Lawrence Fluker
DECHERT LLP
106 East 6th Street, Ste. 800
Austin, TX 78701
Email:	bryan.farney@dechert.com; jeff.plies@dechert.com; lawrence.fluker@decher.com

Trial Counsel for Dell:
Joseph A. Micallef
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
E-mail:	joseph_micallef@aporter.com

Trial Counsel for Dell:
Joel Freed, Esq.
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Email:	jfreed@mwe.com

Courtesy Emails include:

| | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |

| XX | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email, except for exhibits. Exhibits were over 50 pages long. As per our service agreement, a hard copy will follow via overnight mail |

3   Exhibit 11
    Page 000246   Case No. 02-CV-2060 B (CAB)