David A. Hahn (SBN 125784)
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

Attorney for Plaintiffs *Lucent Technologies Inc.*
and *Multimedia Patent Trust*
(*Additional counsel listed on the last page*)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, <br><br> Plaintiff, <br> v. <br><br> GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., <br><br> Defendants, <br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervener. | Case No. 07-CV-2000-H (CAB) <br><br> consisting of matters severed from consolidated cases: <br><br> Case No. 02-CV-2060 B (CAB) <br> Case No. 03-CV-0699 B (CAB) <br> Case No. 03-CV-1108 B (CAB) <br><br> **DECLARATION OF BERND GIROD IN SUPPORT OF MULTIMEDIA PATENT TRUST'S OPPOSITIONS TO DELL'S VIDEO CODING SUMMARY JUDGMENT MOTIONS** <br><br> Date:          January 7, 2008 <br> Time:         10:30 A.M. <br> Courtroom:  13 <br> Judge:        Hon. Marilyn L. Huff |
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br> v. <br><br> LUCENT TECHNOLOGIES INC., <br><br> Defendant. | |
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, <br><br> Plaintiff, <br> v. <br><br> DELL INC., <br><br> Defendant. | |

I, Bernd Girod, hereby declare as follows:

**I.  Introduction**

1.      I submit this declaration in support of Multimedia Patent Trust's oppositions to Dell's motions for summary judgment concerning U.S. Patent No. 4,383,272 ("Netravali") and 4,958,226 ("Haskell").  If called to testify as a witness, I could and would testify to the truth of each statement herein.

2.      I am currently a tenured Full Professor of Electrical Engineering in the Information Systems Laboratory of Stanford University, California.  I also hold a courtesy appointment with the Stanford Department of Computer Science.  I direct the Stanford Center for Image Systems Engineering (SCIEN) and the Max-Planck Center for Visual Computing and Communication at Stanford.

3.      My research interests include video signal compression and networked multimedia systems, and I head the Image, Video, and Multimedia Systems Group in the Information Systems Laboratory to carry out research in this area.  My teaching in the Stanford Department of Electrical Engineering includes a graduate-level course in Digital Image Processing, a graduate-level course in Image and Video Compression, as well as a two-course sequence "Image Communication," also for graduate students in Electrical Engineering.  As part of these courses, video compression in general, and the MPEG video compression standards in particular, are discussed in detail.

4.      I have more than 25 years of experience in the area of video compression. During that time, I have authored or co-authored over 400 scientific publications, the majority of them related to video compression. I am inventor of more than 20 patents, with several others pending. Again, most of my patents relate to video compression. A list of my publications is contained in Appendix B to this report. I was elected Fellow of the IEEE in 1998, I received the Technical Achievement Award of the European Signal Processing Society EURASIP in 2004, and I was elected Member of the German Academy of Sciences Leopoldina in 2007.

5.     I have been trained as an electrical engineer, with a Master of Science degree in Electrical Engineering from Georgia Institute of Technology, Atlanta, GA, USA, awarded in 1980, and a doctorate in Electrical Engineering from the University of Hannover, Germany, in 1987.

## II.  Background Technology

### A.     Digital Video

6.     Analog television broadcasting was introduced in the United States in the late 1930s, and then, in 1954, extended to the NTSC (National Television System Committee) color television system that is still in use today.  In the 1980s and 1990s, a transition began from conventional analog video technology to digital video technology.  The first television studios with digital technology were built in the 1980s.  Digital video signals, such as those stored on a DVD, contain information defining many separate pictures, or frames, that produce the illusion of motion when viewed in rapid succession.

7.     The digital representation of a video signal is fundamentally different from an analog representation of a video signal.  In an analog signal representation, the brightness and the color of the moving image is represented by some aspect of an electrical waveform, typically the amplitude of a voltage, which varies continuously.  For example, brighter parts along a scan line may result in a higher voltage, while darker parts may result in a lower voltage.  The space-time continuous brightness and color distribution on the target of a video camera is sampled along the time axis and in vertical direction, but along a scan line it is not sampled, but continuous, both in horizontal direction and in amplitude.  A digital signal, however, must be discrete in both space dimensions and the time dimension, as well as in amplitude, so it can be represented by a stream of binary numbers. The resulting individual samples along a scan line are referred to as picture elements, in short *pels* or *pixels*.  Digital video has pixels, while analog video does not.

### B.     Digital Video Compression

8.     The bit-rate of a digital television studio signal of 166 Mbps is too high for economical storage and transmission.  It is therefore important to reduce the bit-rate required for digital video signals for most transmission or storage applications.  Technology that achieves this is referred to as "video compression" or "video coding."

9.    We distinguish *lossless compression* and *lossy compression*.    With lossless compression, every single bit representing the samples of the digital signal must be reconstructed perfectly.  Lossless compression is used, for example, for fax transmission or medical images.  For lossless video coding the achievable compression is rather limited.  For video signals, practically all applications utilize lossy compression schemes.

10.    With lossy compression, some deviation of the decoded image from the original is acceptable.  The reconstructed video at the decoder is not identical to the original, but it is usually very close.  The deviation is referred to in the art as *distortion*.  Such distortion is acceptable, if the human visual system does not perceive it, or can tolerate it for a given application.  Further, the digital input to an encoder is already an imperfect representation of a real-world scene, due to camera noise, sampling, and quantization, hence a bit-exact, lossless transmission would be wasteful.  Lossy compression of video can achieve much higher compression than lossless compression.  MPEG video compression, which shall be discussed in more detail in the following, is a lossy compression technique.

11.    Compression techniques generally exploit what is known in the art as *statistical redundancy*.  That means that they take advantage of typical patterns in the signal and describe frequently occurring patterns efficiently, *i.e.*, with few bits.  Patterns that are found infrequently in video signals, on the other hand, require more bits.  On average, the bit-rate is reduced.

12.    Video compression techniques that exploit redundancy within a single frame are called "intraframe compression" techniques.  Once common intraframe compression technique applies a *transform* to square blocks of pixels in the original image to obtain a representation of each block of the original image by an array of numbers, the *transform coefficients*.  There are as many transform coefficients in a block as there were pixels in the original image block, and by applying the corresponding inverse transform, the original pixels can be reconstructed without distortion.  The purpose of the transform is to represent the pixel values in a different domain, such that statistical dependencies among the individual numbers are greatly reduced.    This simplifies further compression.  The *Discrete Cosine Transform* (DCT) has been found to be particularly efficient for

images and video, and it is therefore widely used today.  MPEG-1, MPEG-2 and WMV-9 each employ a DCT or a transform very similar to the DCT.

13.    The transform coefficients are typically quantized (*i.e.*, rounded to the next representative value) to reduce the required bit-rate.  The quantization process is not reversible and therefore gives rise to lossy compression.

14.    The quantized coefficients are typically encoded with a *variable length code* that assigns short code word lengths to likely values or combination of values and long code word lengths to unlikely values or combination of values.

15.    To decode the compressed image, first the variable length code words are decoded.  Note that variable length coding can be inverted without loss.  Then, DCT coefficients are reconstructed from the decoded code words, and the inverse block-wise transform, for example, the *Inverse DCT*, is applied to the transform coefficients to obtain reconstructed pixel values.  The reconstructed pixel values deviate from the original pixels, due to the quantization of the transform coefficients.  If the quantization is sufficiently fine, the deviation between the original and the reconstructed pixels is very small.

16.    Nearby frames in a video sequence are often very similar.  In fact, when viewed side-by-side, they may appear almost indistinguishable.  This is because nearby frames typically show the same objects at slightly shifted positions in the image.  Video compression techniques that exploit this redundancy between frames are called "interframe compression" techniques.  Substantial data compression can be achieved by exploiting the frame-to-frame similarities in a video sequence using interframe coding techniques.

17.    Modern video compression systems use an interframe compression technique called "motion-compensated prediction" to exploit the similarities between nearby video frames.  The idea of motion-compensated prediction is to apply an estimate of the displacement that objects have undergone from one frame to the next.  The displacement estimate itself is derived through a separate process called *motion estimation*.  If the displacement estimate is accurate, then pixel information in a current frame can be predicted accurately by applying the displacement estimate to a previous frame.  In practice, this is not always the case, because uncovered background in the

1  image, lighting changes, changes in surface appearance, noise, and many effects other than object

2  displacement may cause frame-to-frame change in video sequences.

3      18.    The prediction error signal can be interpreted as an image, and although it is not

4  suitable for viewing, it can be compressed using a block-wise transform, as described above.  Video

5  compression using motion compensated prediction and transform coding is commonly called

6  *motion-compensated hybrid coding*.  A motion-compensated hybrid coder does not use the original

7  version of the previous frame as the basis for motion-compensated prediction, because that original

8  frame is not available at the decoder.  The decoder only has a decoded and reconstructed version of

9  the previous frame available, which differs from the original signal by quantization errors due to

10  lossy compression.

11      19.    For the proper operation of the motion-compensated hybrid coder, it is important that

12  identical motion-compensated prediction signals are subtracted at the encoder and then added back

13  in again at the decoder.  To achieve this, the encoder contains a replica of the decoder.  Just like the

14  decoder, it adds the decoded reconstructed prediction error signal to the motion-compensated

15  prediction signal, to generate the reconstructed frame that appears at the output of the decoder.  The

16  reconstructed frame, rather than the original frame, serves as input to the motion-compensated

17  predictor, just like in the decoder.

18      20.    Many modern video compression systems also use an interframe compression

19  technique called *motion-compensated interpolation* to exploit the similarities between nearby video

20  frames.  Motion compensated interpolation predicts pixel information in a current frame by

21  averaging pixel information obtained from preceding and subsequent frames.  The pixel information

22  used in the averaging process is obtained using motion compensated prediction as described above.

23  In the case of motion compensated interpolation, however, two displacement estimates are used —

24  one based on a previous frame, and another based on a subsequent frame — to generate forward and

25  backward predictions.  The two predictions are then averaged.

26

27

28

### III. Level Of Ordinary Skill In The Art

21.    In my opinion, a person of ordinary skill in the art of video compression throughout the 1980s would have had at least a Bachelor of Science degree in electrical engineering or a related field and 2 years experience working in the area of video compression systems.

### IV. The Patents-In-Suit

**A.    U.S. Patent No. 4,383,272 ("Netravali")**

22.    U.S. Patent No. 4,383,272 is entitled "Video Signal Interpolation Using Motion Estimation." The inventors recognized that existing interframe interpolation techniques often caused "blurring and other objectionable distortion" (Netravali, 1:43-44), particularly for objects "with high degree of details […] moving quickly in the field of view of the television camera." (Netravali, 1:39-41). The inventors overcame the limitations of the prior art by applying motion compensation to interframe interpolation of pixel intensities.

23.    Specifically, the methods and circuits disclosed in the Netravali '272 patent reconstruct the intensities of pixels in a picture using interframe interpolation. The locations of the pixels used for interpolation ("reference pixels") correspond to locations at which the same object is expected to be in preceding and succeeding versions of the picture.

**B.    U.S. Patent No. 4,958,226 ("Haskell")**

24.    US Patent No. 4,958,226 ("Haskell") is entitled "Conditional Motion Compensated Interpolation of Digital Motion Video." It is related to encoders and decoders for interframe video compression with motion compensation. The inventors considered the limitations of prior motion-compensated hybrid coding systems. The inventors noted that "experimental results show that when the images of successive blocks do not represent translational motion, the reproduced image may be worse than with frame repeating. Although it has been observed that this degradation is caused by a relatively few pels that do not conform to the assumption of translational motion, putting these pels in the wrong place creates highly visible artifacts." (Haskell, 2:29-37).

25.    The inventors describe specific encoder and decoder circuitry for overcoming the limitations of prior motion-compensated hybrid coding systems. The encoder contains novel circuitry for compressing video using motion-compensated prediction and motion-compensated

interpolation. The decoder has specific structures capable of reconstructing predictively encoded blocks in response to codes that describe prediction error, and also has specific structures capable of reconstructing interpolated blocks in response to codes that describe interpolation error.

## V. Validity Analysis

26.    Counsel for MPT has informed me that a patent claim is invalid for obviousness if the invention described in the claim would have been obvious to a person of ordinary skill in the art at the time the invention was made. I understand that the fundamental question in an obviousness analysis is whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness.

27.    Counsel for MPT has also informed me that multiple references can be combined with one another, or with the knowledge of a person of ordinary skill in the art, to render a claim obvious. Counsel has also informed me that obviousness is not established simply because all of the elements of a patent claim can be found in the prior art, but that there must be a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.

28.    Counsel for MPT has informed me that the Supreme Court provided further guidance concerning the obviousness analysis. Specifically, counsel for MPT has informed me that obviousness is not established by simply combining previously known elements from the prior art. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching suggestion or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

29.     Counsel for MPT has informed me that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.  I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.  I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results.  I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

30.     Counsel for MPT has informed me that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill.  I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has good reason to pursue the known options. I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

31.     Counsel for MPT has also informed me that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious.  I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

32.     Counsel for MPT has also informed me that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious.  I

1  understand that an invention is not necessarily rendered obvious simply because it was obvious to try

2  a certain combination.

3      33.    Counsel for MPT has also informed me that obviousness of a patent cannot properly

4  be established through hindsight, and that elements from different prior art references, or different

5  embodiments of a single prior art reference, cannot be selected to create the claimed invention using

6  the invention itself as a roadmap. I understand that the claimed invention as a whole must be

7  compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through

8  hindsight which would not have been combined absent the inventors' insight.

9      34.    Counsel for MPT has informed me that secondary considerations of nonobviousness

10  must be considered in addition to the primary considerations of the scope and content of the prior art,

11  the differences between the prior art and the claims at issue, and the level of ordinary skill in the art.

12  Counsel for MPT has also informed me that secondary considerations of nonobviousness may

13  include commercial success of products or processes using the invention, long felt need for the

14  invention, failure of others to make the invention, industry acceptance of the invention, licensing of

15  the invention, copying of the invention by others, initial skepticism aimed at the invention,

16  statements of acclaim for the invention, and unexpected results achieved by the invention.

17      35.    Counsel for MPT has informed me that the granting of a request for reexamination by

18  the Patent Office does not establish a likelihood of patent invalidity. I understand that the grant of a

19  request for reexamination is not probative of patentability. I understand that the Patent Office will

20  grant a request for reexamination if it raises "a substantial new question of patentability." I further

21  understand that this is a low standard to meet in practice because the Patent Office historically grants

22  over 90% of requests for reexamination. I further understand that reexaminations historically less

23  than 10% of those reexaminations result in a determination of invalidity.

24      **A.    Netravali**

25      **1.  Gabor & Hill**

26      36.    I understand that Dell contends that the article "Television Band Compression By

27  Contour Interpolation," by D. Gabor and P. C. J. Hill ("Gabor & Hill") renders Claim 13 of

28  Netravali invalid as obvious. I disagree. In my opinion, Netravali is not obvious in view of Gabor &

Hill.  Based on my review of the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and certain secondary considerations of nonobviousness, in my opinion, a person of ordinary skill in the art would not have found it obvious to modify the teachings of Gabor & Hill to arrive at the invention of Netravali Claim 13.

37.    Gabor & Hill describes an experimental system for reducing the width of the frequency band ("band compression") required for transmission of analog television signals.  The authors suggest the omission of television fields or frames in regular intervals which can then be reinserted at the receiver by interpolation from transmitted fields or frames.  They propose a method of "contour interpolation," which controls the combination of two analog signals derived by horizontal scanning of two separate lines of stored fields or frames:

> *"In the method of contour interpolation the two [scanning] spots run with equal speed v until one of them reaches an edge, i.e.  a position where the intensity changes at more than a certain predetermined rate.  Here it stops, while the other spot, which has not yet reached the contour, moves on with a speed 2v, so that the interpolated spot, midway between the two, moves on with constant velocity v. This continues until the second spot has also reached the contour, after which the retarded spot gradually catches up with the other until both move again with the same speed v. . . .  [T]he interpolated intensity I is formed as the arithmetical mean of the two intensities, but weighted with the velocities [...]"*

(Ex. 9 at MSLT_0001230.)   The "contour interpolation" technique produces an analog signal corresponding to the intensity of the line being interpolated.

38.    Gabor & Hill does not disclose all of the limitations of Netravali Claim 13 as construed by the Court.  Gabor & Hill does not disclose "[a] method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture" as required by the language of Claim 13.  Digital video has pixels (or pels), while analog video does not.  Pixels or pels are samples along the scan lines of a video signal.  Gabor & Hill describes a system that operates entirely in the analog domain and does not sample the television signal along scan lines in the horizontal dimension.

39.    Gabor & Hill does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions" as required by the claim language.  A person of ordinary skill in the art reading Claim 13 in light of the specification would understand that the phrase "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations" requires processing of intensity information for pels sampled in the temporal, vertical, and horizontal dimensions.

40.    As explained above, Gabor & Hill describes a system that operates entirely in the analog domain, and does not sample in the horizontal dimension to generate pels with intensities at discrete locations.  Without pel intensities it is not possible to "determine[] by interpolation intensities of pels . . . in accordance with intensities of pels in related locations," as recited in Claim 13.  Gabor & Hill therefore does not determine intensities of pels.  It also does not perform any operation in accordance with intensities of pels in related locations in preceding and succeeding versions of the picture to be interpolated.  To the extent that it performs interpolation at all, Gabor & Hill interpolates scan line signals, not pels.

41.    Dr. Delp has opined that a person of ordinary skill in the art during the relevant time frame would have understood the term "picture element" to mean any area on a television or computer screen.  I disagree.  In my opinion, Dr. Delp fails to consider the context of the Netravali invention when proposing his definition.  In the context of the video processing inventions described in Netravali, there are no operations performed on the intensities of "picture elements" as defined by Dr. Delp (i.e., any "area of a picture on a television or computer screen"). (Delp Obviousness Report § 33).  Rather, interpolation is performed for intensities of picture elements that are samples in the temporal, horizontal, and vertical dimensions, also referred to in the art as "pixels."

42.    I understand that Dell contends that it would be an obvious advance over the prior art to implement the Gabor & Hill system in the digital domain, and in a way that results in "determining by interpolation intensities of pels . . . in accordance with intensities of pels in related locations."  I disagree.  A person of skill in the art would have had no reason, and would not have been prompted, to implement the obsolete mechanical-optical system of Gabor & Hill in the digital

1  domain.  Nor would a person of ordinary skill in the art have expected such efforts at digital

2  implementation to have been successful or productive.

3      43.  Further, the Court has construed "related locations" to mean "locations at which the

4  same object is expected to be."  For temporal interpolation, Gabor & Hill interpolates signals only

5  between the same scan line in two versions of the picture.  Thus it does not disclose interpolation

6  from locations at which the same object is expected to be.  Moreover, Gabor & Hill only considers

7  contours, i.e., "position[s] where the intensity changes by more than a certain predetermined rate"

8  along a scan line of an analog television signal.  (MSLT_0001230.)  It is well known that the

9  location where objects are expected to be cannot be represented by considering only the thresholded

10  intensity gradient in the horizontal direction.  Furthermore, I disagree with Dr. Delp's conclusion

11  that a person of ordinary skill in the art would be able to expand on the principles in Gabor & Hill to

12  search for motion in the vertical direction.

13      44.  In my opinion, the interrelated teachings in the prior art would not have provided a

14  person of skill in the art with a reason to modify the teachings of Gabor & Hill to arrive at the

15  invention of Netravali Claim 13.  Contrary to Dr. Delp's view, the general goal of developing more

16  efficient coding systems does not demonstrate specific design or market needs in the pertinent field

17  that would have rendered the invention of Claim 13 obvious.  The invention of Claim 13 was not

18  simply a combination of known techniques.

19      45.  There were a large number of beneficial video coding techniques available at the

20  time.  Theoretically, a person skilled in the art could have attempted to form all possible

21  combinations of video coding techniques that had been reported as improving compression and/or

22  video quality.  However, such an exercise goes far beyond a routine pursuit of a finite number of

23  predictable solutions that would place the invention of Claim 13 within the grasp of a person of

24  ordinary skill in the art.  Furthermore, in my opinion, it would require more than common sense and

25  knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 13.

26      46.  In addition, the performance of a video coder critically depends on the way the

27  constituent elements are combined and artfully optimized as a whole.  An efficient video coder

28  cannot simply be built by combining known building blocks.  Among other problems, the

1    performance of a certain combination of elements can usually not be readily predicted but requires

2    extended experimentation.  In my opinion, Dr. Delp's analysis uses hindsight to selectively modify

3    the teachings of Gabor & Hill in an attempt to point out all the elements required by the Court's

4    construction of Netravali Claim 13.

5        47.    I further disagree with Dr. Delp that Dr. Gabor's receipt of the Nobel Prize has any

6    bearing on the issue of obviousness.

7        48.    Dr. Delp relies heavily on the Patent Office's decision to reexamine claim 13 of

8    Netravali.  Counsel for MPT has informed me that the grant of a request for reexamination is not

9    evidence of invalidity.  Counsel for MPT has also informed me that the document on which Dr. Delp

10   relies, '272 Reexam (MSLT_1234186 - MSLT_1234201), is the result of a unilateral proceeding in

11   which MPT was not involved.  I understand that MPT was therefore not provided an opportunity to

12   refute the significance of the prior art references presented to the examiner in the Patent Office.

13   Counsel for MPT has also informed me that the PTO's reexamination decision turned on the

14   assumption that "the teaching of the intensity value being interpolated from preceding and

15   succeeding versions of the picture was not present in the prosecution of the application which

16   became the '272 patent."  That assumption is false because the Background section of Netravali

17   itself notes that fixed and adaptive techniques for interframe interpolation (although without motion

18   compensation) were known in the art.  Under these circumstances, the decision to reexamine Claim

19   13 of Netravali should not have any bearing on the question of obviousness and does not undermine

20   my prior validity analysis in any way.

21       **2.  Secondary Considerations**

22       49.    In my opinion, several secondary considerations confirm my opinion that the

23   invention described in Netravali Claim 13 is nonobvious.  First, products that use the claimed

24   inventions have been highly successful in the marketplace.  The claimed inventions are used in

25   numerous video coding standards, including MPEG-1, MPEG-2, VC-1, and others.  The Netravali

26   invention has contributed to the success of products based on these standards by reducing the bit-rate

27   needed to transmit or store video bitstreams for a broad range of applications.  In my experience,

28

1    other video coding technologies that do not use the claimed inventions have not been as

2    commercially successful.

3        50.    Licenses showing industry respect for the claimed inventions also support my

4    conclusion that Claim 13 is nonobvious.  I have reviewed several of Lucent's licensing agreements

5    that specifically identify Netravali.  I have also reviewed several Lucent licensing negotiation

6    documents which refer to Netravali, indicating that Netravali has been a focal point of negotiations

7    for broader licenses with third parties.

8        51.    Finally, statements of acclaim by others support my conclusion that the invention of

9    Claim 13 was nonobvious.  For example, the Research and Development Council of New Jersey

10   awarded Arun Netravali and John Robbins the 1996 Thomas Alva Edison Patent Award for

11   outstanding research and development in the state of New Jersey, as reflected in Netravali.  (ROBB

12   000001).

13   **B.    Haskell**

14   **1.  General Knowledge In The Art**

15       52.    Dr. Delp opines that a set of video coding methods combining the use of prediction,

16   motion estimation, motion vectors, and DCT coding of the difference signal were generally known

17   in the art at the time of the Haskell invention, as well as a separate set of video coding methods using

18   transmission of interpolation error.  He further opines that motion-compensated interpolation was

19   generally known at that time along with the problem of visual artifacts in frames obtained by

20   motion-compensated interpolation. Because, in his opinion, the transmission of "interpolation

21   deviation codes" was a known solution to the known problem of visual artifacts in interpolated

22   frames, Dr. Delp contends that a person skilled in the art would have been motivated to combine the

23   prior art methods, and that Claim 12 of Haskell is therefore invalid for obviousness.  I disagree.  In

24   my opinion, Dr. Delp's analysis uses hindsight to selectively combine portions of the known art in

25   an attempt to point out all the elements required by the Court's construction of Haskell Claim 12.

26       53.    There were a large number of beneficial video coding techniques available at the

27   time.   Theoretically, a person skilled in the art could have attempted to form all possible

28   combinations of video coding techniques that had been reported as improving compression and/or

1  video quality.  However, such an exercise goes far beyond a routine pursuit of a finite number of

2  predictable solutions that would place the invention of Claim 12 within the grasp of a person of

3  ordinary skill in the art.  Furthermore, in my opinion, it would require more than common sense and

4  knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

5         54.    Dr. Delp contends that a person skilled in the art would have been motivated to

6  combine prior art methods to arrive at the invention of Claim 12 in order to eliminate visual artifacts

7  in interpolated video sequences.  I disagree.  None of the references on which Dr. Delp relies to

8  identify the problem of visual artifacts in motion-compensated frames suggest that transmission of

9  interpolation error, as opposed to one of many other potential solutions, could eliminate visual

10  artifacts. In fact, since motion compensation artifacts were usually caused by a failure of the motion

11  estimator to extract the true motion of an object, a person of ordinary skill would have typically

12  looked for ways to improve the reliability and accuracy of the motion estimator to eliminate visual

13  artifacts.  In addition, or alternatively, a person of ordinary skill might have considered sending a

14  flag to instruct the receiver to omit motion-compensated interpolation and use frame repetition

15  instead, as, e.g., suggested in Japanese patent application 1-163059 (MSLT_1234116 –

16  MSLT_1234130). Oddly, Dr. Delp cites this document to support his theory of near simultaneous

17  invention, even though it teaches away from the Haskell invention. The Delp Obviousness Report

18  offers no convincing evidence to suggest that a person of skill in the art would recognize that

19  transmission of transform-coded interpolation errors, as opposed to one of many other potential

20  solutions, could eliminate the problem.

21         55.    Dr. Delp also opines that a motivation to combine prior art to arrive at the invention

22  of Haskell Claim 12 can be established because certain of his references, such as the Ericsson '914

23  Patent, utilize motion compensated interpolation.  I disagree. This is not a situation in which

24  common sense would dictate that a person of skill in the art employ a predictable solution to respond

25  to design needs or market pressures. The options were too numerous.  There were a large number of

26  beneficial video coding techniques available at the time.  The fact that a particular video coding

27  technique, in this case motion compensated interpolation, could be combined with a variety of other

28

1    techniques provides no reason to combine any particular subset of those techniques, let alone a

2    subset that embodies the limitations of Haskell Claim 12.

3        56.    Dr. Delp also opines that a motivation to combine prior art to arrive at the invention

4    of Haskell Claim 12 can be established because the coding and transmission of prediction errors and

5    interpolation errors are conceptually similar, and the coding and transmission of a prediction error to

6    maintain picture quality was known in the art.  I disagree. Dr. Delp identifies nothing that would

7    have suggested to a person of ordinary skill in the art that transmission of interpolation error blocks

8    would be beneficial in a system that already used the transmission of prediction errors.

9        57.    Finally, Dr. Delp opines that a motivation to combine prior art to arrive at the

10   invention of Haskell Claim 12 is provided by the emergence of CD-ROM technology.  I disagree.

11   While CD-ROM technology may have offered a person skilled in the art more latitude in trading off

12   bit-rate, video quality, and system delay, CD-ROM technology provided no guidance or reason

13   whatsoever to combine prior art teachings to arrive at the invention of Haskell Claim 12.

14       **2.  Bidirectional Prediction**

15       58.    Dr. Delp has opined that bidirectional prediction followed by averaging and addition

16   of interpolation error were known in the art, and that the invention of Claim 12 is simply a

17   combination of prior art techniques used in the same manner in which they were used by the prior art

18   to achieve predictable results.  As explained in the following section, I disagree.  In my opinion, Dr.

19   Delp relies on hindsight to contend that it would have been obvious to combine certain abstract

20   "techniques," without demonstrating any reason for a person of ordinary skill in the art to make the

21   specific combination of such techniques described in Claim 12, let alone using the specific

22   corresponding structures identified by the Court.

23       59.    In his attempt to show that bidirectional prediction is an obvious variation of

24   unidirectional prediction, Dr. Delp speculates that "a person of ordinary skill in the art could do

25   "backward" prediction" by using "the exact same techniques and structures used for forward

26   prediction." I disagree. The recursive structure of a predictive decoder requires that the coder at least

27   obeys constraints posed by causality, otherwise the bitstream cannot be decoded. For example, one

28   cannot simply encode every frame in a sequence by predicting it from the following "future" frame,

1     as Dr. Delp appears to assert. At least some frames have to be predicted in forward direction, while

2     skipping in-between frames with backward prediction. Today, with the benefit of hindsight, such

3     considerations are well understood. However, at the time of the Haskell invention, the structures

4     needed to implement such a system, their interconnection, or their control would not have been

5     obvious to a person of ordinary skill. Nor would the step from backward prediction to bidirectional

6     prediction be obvious, as Dr. Delp asserts.

### 3.  Claim 12 is Not a Predictable Combination of Techniques Known in the Prior Art

8          60.     Dr. Delp has opined that the various coding techniques covered by Haskell Claim 12

9     were well known in the prior art prior to the filing of the application for the Haskell patent. Dr. Delp

10    has also opined that it was well known in the art to combine these various coding techniques, and he

11    discusses several references that he believes disclose the use of such techniques in combination. I

12    disagree with Dr. Delp's characterization of these references, as discussed below.

13         61.     In addition, I disagree with Dr. Delp's opinion that the obviousness of the invention

14    described in Claim 12 can be demonstrated by reducing the invention to a "combination" of

15    elemental video coding technologies performing their known functions.   Dr. Delp asserts that

16    structures used to implement various video coding techniques at the time of the Haskell invention,

17    such as "adders, decoders, DCT-1, shift circuits, averagers" were "combinable to perform the coding

18    techniques of claim 12 in a manner that required no change in their respective functions." I disagree.

19    The performance of a video coder critically depends on the way the constituent elements are

20    combined and artfully optimized as a whole.  An efficient video coder cannot simply be built by

21    combining known building blocks. Among other problems, the performance of a certain combination

22    of elements can usually not be readily predicted but requires extended experimentation.

23         62.     To the extent that Claim 12 can be considered a combination claim, it describes a

24    combination of two particular means that have defined structure and perform specific functions.  By

25    focusing on individual components of those means, rather than the means as a whole, Dr. Delp fails

26    to demonstrate that either of those means was known in the art.  Nor does he demonstrate any reason

27    why it would have been obvious to combine the two means as set forth in Claim 12.   A person of

28    ordinary skill would also not have been able to predict the performance of the Haskell invention as

1    Dr. Delp asserts. For example, Haskell reports that "**<u>Experimentally</u>**, it has been found that

2    interpolating every other frame is quite beneficial." (Haskell, col. 3: 43-44, emphasis added) or "the

3    **<u>observation</u>** that the volume of the frame interpolation code increase with increased use of the frame

4    interpolation code so one could quickly reach a point of 'diminishing returns' in the use of

5    interpolation code." (Haskell, col. 3: 38-42, emphasis added). This illustrates that the Haskell

6    invention required extended experimentation and observation of the performance, since its results

7    were not even predictable to the inventors themselves, let alone to a person of ordinary skill in the

8    art.

9         63.    I also disagree with Dr. Delp's opinion that design incentives and market forces

10   would have motivated a person of ordinary skill in the art to arrive at the invention of Claim 12. In

11   my opinion, Dr. Delp does little more than note that a demand for better video compression existed,

12   that the invention of Claim 12 discloses an improved decoder for video compression, and then

13   conclude that the invention would therefore have been obvious. I disagree. In the absence of any

14   specific design incentive or market force driving the particular combination of decoding means set

15   forth in Claim 12, in my opinion Dr. Delp's analysis relies on impermissible hindsight.

16                    a.        **The PictureTel References**

17        64.    I understand that Dell contends that the combination of references Dell refers to as the

18   "PictureTel Patents" renders the Haskell Claim 12 obvious. I disagree. In my opinion, Haskell Claim

19   12 is not obvious in view of the PictureTel Patents. Based on my review of the scope and content of

20   the prior art, the differences between the prior art and the claimed invention, the level of ordinary

21   skill in the art, and certain secondary considerations of nonobviousness, in my opinion, a person of

22   ordinary skill in the art would not have found it obvious to modify the teachings of the PictureTel

23   patent to arrive at the invention Haskell Claim 12. In my opinion, a person of skill in the art would

24   not have been motivated to combine or modify the teachings of those references in the manner that

25   Dell suggests. Furthermore, even if combined, the PictureTel Patents do not disclose all of the

26   limitations of the claim language as construed by the Court.

27

28

65.    The " PictureTel Patents" identified by Dell are seven patents reflecting product developments performed at PictureTel Corporation in the late 1980s.  Some of the PictureTel Patents share common inventors and cross-reference one another.

66.    Collectively, the PictureTel Patents can be viewed as describing the evolution of a video compression system.  The original system is described in the earliest-filed PictureTel Patent — U.S. Patent 4,703,350 ("the Hinman '350 patent") — and employs a motion-compensated hybrid coding scheme along with a form of interframe interpolation for post-processing, but without any form of interpolation error codes.

67.    The next five PictureTel Patents address certain features and/or relatively minor modifications of the Hinman '350 Patent system: U.S. Patent No. 4,727,422 ("the Hinman '422 Patent"), which focuses on the lossy compressor of the Hinman '350 Patent system; U.S. Patent No. 4,661,849 ("the Hinman '849 Patent"), which focuses on the motion estimator of the Hinman '350 Patent system; U.S. Patent No. 4,794,455 ("the Ericsson '455 Patent"), which adds an adaptive loop filter to the Hinman '350 Patent system; U.S. Patent No. 4,754,492 ("the Malvar '492 Patent"), which adds an overlapping block transform to the Hinman '350 Patent system; and U.S. Patent No. 4,816,914 ("the Ericsson'914 Patent"), which adds quadtree encoding of transform coefficients to the Hinman '350 Patent system.  As with the Hinman '350 Patent itself, none of these PictureTel Patents describes any form of interpolation error codes.

68.    The seventh, and last-filed, PictureTel Patent describes a substantial modification of the motion-compensated hybrid coding scheme described in the first six PictureTel Patents.  Rather than performing transform coding of the prediction error, U.S. Patent No. 4,849,810 ("the Ericsson '810 Patent") employs a "hierarchical vector quantization" coding technique that uses a pyramid decomposition followed by vector quantization instead of a blockwise transform to exploit spatial correlations within a frame and thereby achieve intraframe compression. Motion compensated prediction is carried out adaptively at each level of  the spatial resolution pyramid. At the same time, the system of the Ericsson '810 Patent eliminates the post-decoder interframe interpolation employed by the system of the Hinman '350 Patent.  Accordingly, the Ericsson '810 Patent system

1    performs no interframe interpolation, let alone interframe interpolation in conjunction with coded

2    interpolation error signals.

3         69.    Dr. Delp's claim charts purport to demonstrate that every element required by Claim

4    12 of Haskell is included, either explicitly or inherently, in the Picture Tel patents.  Dr. Delp uses the

5    Ericsson '914 Patent as a "primary example" of the teachings of the PictureTel Patents.  Dr. Delp

6    identifies no relevant teachings of the other PictureTel Patents that are not also taught by the

7    Ericsson '914 Patent.  Furthermore, in my opinion, none of the other PictureTel Patents disclose the

8    elements of Claim 12 that are missing from the Ericsson '914 Patent.  Accordingly, like Dr. Delp, I

9    address the teachings of the PictureTel Patents herein primarily by reference to the Ericsson '914

10   Patent.

11        70.    The PictureTel Patents, as demonstrated by the Ericsson '914 Patent, do not disclose

12   all of the limitations of the claim language as construed by the Court.  The Ericsson '914 Patent does

13   not disclose "[a] circuit responsive to coded video signals where the video signals comprise

14   successive frames and each frame includes a plurality of blocks and where the coded video signals

15   comprise codes that describe deviations from approximated blocks and codes that describe

16   deviations from interpolated blocks."  For example, the Ericsson '914 Patent fails to disclose the

17   claimed "codes that describe deviations from interpolated blocks," "interpolated blocks," or "means

18   responsive to said block approximations and to said codes that describe deviations from interpolated

19   blocks to develop said interpolated blocks." The Ericsson '914 Patent discloses no structure that

20   performs the required function of developing interpolated blocks using block approximations and

21   codes that describe deviations from interpolated blocks.  Furthermore, the Ericsson '914 Patent

22   discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35,

23   Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.  As such, the Ericsson '914 Patent

24   does not disclose the claimed combination of "means for developing block approximations from said

25   codes that describe deviations from approximated blocks" and "means responsive to said block

26   approximations and to said codes that describe deviations from interpolated blocks to develop said

27   interpolated blocks."

28

71.    As noted above, the system described in the Ericsson '810 Patent makes significant modifications to the system described in the six earlier PictureTel Patents.    None of those differences, however, compensate for the elements missing from the collective teachings of the PictureTel Patents.  The Ericsson '810 Patent does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks."  For example, the Ericsson '810 Patent discloses neither "codes that describe deviations from approximated blocks," nor "interpolated blocks" nor "codes that describe deviations from interpolated blocks."    The Ericsson '810 Patent discloses no circuitry that responds to a video signal comprising "blocks" of any kind, as construed by the Court.  The Court's claim construction requires that a block be "a set of pixels that constitute a portion of a frame." In the Ericsson '810 Patent compression, is carried in a resolution pyramid.    Also, motion compensation ("warping") is not carried out a blockwise manner.  Furthermore, the Ericsson '810 Patent discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. Likewise, the Ericsson '810 Patent discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell, or any component thereof.

72.    In sum, even if combined, the PictureTel references do not disclose all elements of Claim 12.  For example, the PictureTel references nowhere disclose blockwise coding of motion-compensated interframe interpolation errors, and therefore disclose no "codes that describe deviations from interpolated blocks" or "means responsive to . . . codes that describe deviations from interpolated blocks to develop said interpolated blocks."  Nor do they discloses circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.

73.    It is my opinion that the PictureTel Patents as a whole would have taught a person of ordinary skill in the art to abandon interframe interpolation entirely in favor of a resolution pyramid

1    compression scheme disclosed in the Ericsson '810 Patent.  The PictureTel references therefore

2    teach away from the inventive solution of Claim 12.

3    74.    Dr. Delp has opined that a person of skill in the art would have recognized reasons to

4    combine the disclosures of the individual PictureTel Patents in some way that deviates from the

5    Hinman '350 patent system because they had a common assignee, overlapping inventors, and related

6    subject matter.  I disagree. Even if such factors would motivate a person in the art to collect and

7    combine several references, a reason to consult various references in the abstract is not the same

8    thing as a reason to combine the teachings of the references in a specific manner.

9    75.    In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings

10   of several patents in an attempt to point out all the elements required by the Court's construction of

11   Haskell Claim 12.  Theoretically, a person skilled in the art could have attempted to form all possible

12   combinations of video coding techniques disclosed in the seven PictureTel References.  However,

13   such an exercise goes far beyond a routine pursuit of a finite number of identified, predictable

14   solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in

15   the art.  Furthermore, in my opinion, it would require more than common sense and knowledge of

16   the prior art for a person of ordinary skill to arrive at the invention of Claim 12 based on the

17   teachings of the PictureTel references.

18          **b.    Document No. 81**

19   76.    I understand that Dell contends that CCITT Document No. 81 discloses the use of

20   interpolation error codes as a solution to the problem of visible artifacts in interpolated video.  In my

21   opinion, the available evidence does not support the conclusion that documents prepared by the

22   CCITT SGXV Specialists Group were printed publications before the filing date of September 27,

23   1989, let alone the critical date of September 27, 1988.  I have reviewed the documents and

24   deposition testimony referenced by Dr. Delp in his reports, and those materials fail to support his

25   characterization of the CCITT SGXV Specialists Group documents.  I have seen no evidence that the

26   documents were presented at non-confidential meetings, or distributed outside of the working group.

27   My recollection from working in the field at the time is that the Okubo Group was a closed

28   organization.  Meetings were open only to the members and invited observers.  The testimony of

1    Richard Schaphorst, a member of the Okubo Group, is consistent with my recollection.  (Schaphorst

2    Deposition at 30-32, 101-02, 174.)  Accordingly, in my opinion, there is no evidence that a person of

3    ordinary skill in the art, through reasonable diligence, could have located and accessed the CCITT

4    SGXV Specialists Group documents before September 27, 1989.

5       77.  Document No. 81 does not disclose "[a]  circuit responsive to coded video signals

6    where the video signals comprise successive frames and each frame includes a plurality of blocks

7    and where the coded video signals comprise codes that describe deviations from approximated

8    blocks and codes that describe deviations from interpolated blocks."  For example, Document No. 81

9    does not disclose a system that operates in a blockwise manner.  It neither discloses "approximated

10   blocks," nor "codes that describe deviations from approximated blocks," nor "interpolated blocks,"

11   nor "codes that describe deviations from interpolated blocks."

12      78.  Document No. 81 does not disclose the claimed "means for developing block

13   approximations from said codes that describe deviations from approximated blocks."  Document No.

14   81 discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder

15   27, and Shift Circuit 26 as disclosed in Haskell, at least because Document No. 81 fails to disclose

16   any equivalent to $DCT^{-1}$ 24 or Decoder 22.  The coding of prediction error in Document No. 81 does

17   not involve a transform.  In Figure 1, for example, the output of the coding unit *3 is added directly

18   to the motion-compensated prediction signal.  This is only possible if the bits at the output of coding

19   unit *3 can represent the prediction error directly, and neither a transform nor variable-length coding

20   is used. Document No. 81 implies the use of fixed codeword lengths and uniform quantization of the

21   prediction error directly.

22      79.  Dr. Delp opines that Document No. 81 discloses the use of a DCT because it refers to

23   "any sort of adaptive control of DCT with sophisticated hardware."  I disagree.  Read in context, the

24   portion of Document No. 81 quoted by Dr. Delp distinguishes the use of a DCT from the coding

25   scheme proposed by the authors.  In fact, Document No. 81 expressly teaches away from using a

26   DCT in that coding scheme, because it discusses CMI as an alternative to the use of a DCT and notes

27   that each requires additional hardware.

28

80.     Document No. 81 does not disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Document No. 81 discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Furthermore, Document No. 81 discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell, at least because Document No. 81 fails to disclose any equivalent to $DCT^{-1}$ 34, Decoder 22, or Adder 35.

### c.     Micke Thesis

81.     I understand that Dell contends that the Diploma thesis "Vergleich eines prädiktiven und eines interpolativen bewegungskompensierenden Codierverfahrens für Fernsehbildsignale" ("Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals") by Thomas Micke (the "Micke Thesis") demonstrates a motivation to modify the teachings of the PictureTel Patents to arrive at the invention of Haskell Claim 12. I disagree. It is my opinion that the Micke Thesis does not qualify as prior art, and does not compensate for the missing teachings of the PictureTel Patents.

82.     Dr. Delp contends that the Micke Thesis qualifies as a prior art printed publication because the Micke Thesis is cited in a 1987 article authored by me, and because a copy of Micke was shelved in the library of the Institut für Theoretische Nachrichtentechnik und Informationsverarbeitung (TNT) at the University of Hanover. In my opinion, the available evidence does not support the conclusion that the Micke thesis was a printed publication before the filing date of September 27, 1989, or the critical date of September 27, 1988. I have seen no evidence, and Dr. Delp does not appear to contend, that copies of the Micke Thesis were actually disseminated to the public before September 27, 1989.

83.     Furthermore, I do not believe that the materials (and alleged conversation) cited by Dr. Delp support his conclusion that the Micke Thesis was publicly accessible in the relevant time frame. At the time, I worked at TNT as a member of the research staff, and I recall the TNT library where theses were shelved. To the best of my recollection, the TNT library was not open to the

1    general public. Diploma theses were indexed chronologically, but not by subject matter. Consistent

2    with my recollection, the index cards on which Dr. Delp relies simply list theses in the order that

3    they were completed.  Accordingly, in my opinion, there is no evidence that a person of ordinary

4    skill in the art, through reasonable diligence, could have located and accessed the Micke Thesis

5    before September 27, 1989.

6        84.    The Micke Thesis is a study to establish performance bounds for motion compensated

7    predictive coding and motion-compensated interpolative coding.  The bounds are information-

8    theoretic bounds based on a mathematical analysis and supported by statistical measurements

9    performed in computer simulations with digitized video sequences.  As is well known in the art,

10   information theoretic bounds are non-constructive, *i.e.*, they do not provide a blueprint of how to

11   build a system that actually achieves these performance bounds or comes close to them.

12       85.    The Micke Thesis does not disclose "[a] circuit responsive to coded video signals

13   where the video signals comprise successive frames and each frame includes a plurality of blocks

14   and where the coded video signals comprise codes that describe deviations from approximated

15   blocks and codes that describe deviations from interpolated blocks."  For example, the Micke Thesis

16   discloses no circuitry that responds to a video signal comprising "deviations from interpolated

17   blocks."

18       86.    The Micke Thesis does not disclose the claimed "means for developing block

19   approximations from said codes that describe deviations from approximated blocks." The Micke

20   thesis discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24,

21   Adder 27, and Shift Circuit 26 as disclosed in Haskell, at least because the Micke Thesis fails to

22   disclose any equivalent to $DCT^{-1}$ 24 or Decoder 22.

23       87.    The Micke Thesis does not disclose the claimed "means responsive to said block

24   approximations and to said codes that describe deviations from interpolated blocks to develop said

25   interpolated blocks." The Micke Thesis discloses no structure that performs the required function of

26   developing interpolated blocks using block approximations and codes that describe deviations from

27   interpolated blocks. Furthermore, the Micke Thesis discloses no circuitry or structure equivalent to

28   the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as

1    disclosed in Haskell, at least because the Micke Thesis fails to disclose any equivalent to $DCT^{-1}$ 34,

2    Decoder 22, or Adder 35.

3        88.    In addition, Dr. Delp suggests that the disclosure of computer code to implement the

4    coder in the Micke Thesis renders obvious the specific decoder of Haskell Claim 12. I disagree. The

5    statistical measurements of the Micke Thesis do not require a complete video coder implementation,

6    and, in fact, the computer code provided in the Micke Thesis is not a complete video encoder.  Since

7    the Micke Thesis does not disclose a complete video coder implementation, it cannot possibly

8    provide the information necessary for one of ordinary skill in the art to develop a compatible

9    decoder, as Dr. Delp suggests.

10        **d.    Digital Pictures**

11        89.    I understand that Dell contends that the textbook "Digital Pictures" by Arun Netravali

12    and Barry Haskell demonstrates a motivation to modify the teachings of the PictureTel Patents to

13    arrive at the invention of Haskell Claim 12.  I disagree.  It is my opinion that Digital Pictures does

14    not compensate for the missing teachings of the PictureTel Patents.  Contrary to Dr. Delp's opinion,

15    Digital Pictures does not disclose the use of interpolation error codes as a solution to the problem of

16    visible artifacts in interpolated video.

17        **e.    Secondary Considerations Demonstrating Nonobviousness**

18        90.    In my opinion, several secondary considerations confirm my opinion that the

19    invention described in Haskell Claim 12 is nonobvious.  First, products that use the claimed

20    invention have been highly successful in the marketplace.  The claimed invention is used in

21    numerous video coding standards, including MPEG-1, MPEG-2, WMV-9, VC-1, and others.  The

22    Haskell invention has contributed to the success of these products by reducing the bandwidth needed

23    to transmit, or by reducing the quantity of storage needed to store, high-quality video bitstreams.  In

24    my experience, other video coding technologies that do not use the claimed invention have not been

25    as commercially successful.

26        91.    Licenses showing industry respect for the claimed invention also support my

27    conclusion that Claim 12 is nonobvious.  I have reviewed several of Lucent's licensing agreements

28    that specifically identify Haskell.  I have also reviewed several Lucent licensing negotiation

1   documents which refer to Haskell, indicating that Haskell has been a focal point of negotiations for

2   broader licenses with third parties.

3         92.    Finally, Dr. Delp himself identifies several references that purportedly identify the

4   visual artifact problem solved by the invention of Claim 12, but fail to propose the inventive

5   solution.  The failure of others to arrive at the invention of Claim 12 provides further objective

6   evidence of nonobviousness. Moreover, the failure of Dr. Delp's "near simultaneous invention"

7   references to disclose the invention of Haskell Claim 12, or any combination of decoding block

8   approximations using prediction error and interpolated blocks using interpolation error, confirms my

9   opinion that the Haskell Claim 12 invention was not obvious.

## VI. Signature

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on this 14th day of December 2007 at Stanford, California.

By: