David A. Hahn (SBN 125784)
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone: (619) 235-2100
Facsimile: (619) 235-2101

Attorneys for Plaintiff *Lucent Technologies Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,

               Plaintiff,

    v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES,
INC., GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,

               Defendants,
    and

MICROSOFT CORPORATION,

               Intervener.

MICROSOFT CORPORATION,

               Plaintiff,

    v.

LUCENT TECHNOLOGIES INC.,

               Defendant.

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,

               Plaintiff,

    v.

DELL INC.,

               Defendant.

Case No. 07-CV-2000-H (CAB)

consisting of matters severed from
consolidated cases:

Case No. 02-CV-2060 B (CAB)
Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

**LUCENT'S OPPOSITION TO DELL'S
MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO.
4,439,759 TO FLEMING ET AL.**

Date:         January 7, 2008
Time:        10:30 A.M.
Courtroom:   13
Judge:      Hon. Marilyn L. Huff

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

Case No. 07-CV-2000-H (CAB)

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................2

     A.   Technical Background. ...........................................................................2

     B.   The Fleming '759 Patent. ........................................................................2

     C.   The Asserted Claims Of The '759 Patent. ...............................................2

     D.   The NASA Report. ..................................................................................2

     E.   The Pec Affidavit. ...................................................................................3

III. LEGAL STANDARDS ......................................................................................6

     A.   Summary Judgment. ................................................................................6

     B.   Anticipation. ............................................................................................7

     C.   Obviousness. ............................................................................................8

IV.  ARGUMENT .....................................................................................................9

     A.   A Genuine Factual Dispute Exists As To Whether The NASA Report Was A
          Printed Publication As Of The Filing Date Of The Fleming '759 Patent. ...................9

     B.   Dell's "Evidence" Is Unreliable And Should Be Excluded. ........................................10

     C.   Dell Has Failed to Prove That The NASA Report Was Publicly Accessible
          Before May 19, 1981. ............................................................................12

V.   Even If The NASA Report Is Prior Art, Dell Has Failed To Prove The NASA Report
     Invalidates The Asserted Claims Of The Fleming '759 Patent. ...........................................16

     A.   The NASA Report Does Not Anticipate Claims 1-3. ..................................................16

     B.   Ample Evidence Establishes A Genuine Dispute Concerning The Alleged
          Obviousness Of Claims 1-3 Of The Fleming '759 Patent. ..........................................21

VI.  CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
    C.A. No. 95-218-SLR,
    1998 U.S. Dist. LEXIS 3833 (D. Del. Mar. 13, 1998) ....................................... 9, 13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................. 7

*ATD Corp. v. Lydall, Inc.*,
    159 F.3d 534 (Fed. Cir. 1998) ................................................................................. 7

*Beyene v. Coleman Sec. Servs., Inc.*,
    854 F.2d 1179 (9th Cir. 1988) ............................................................................... 14

*Carella v. Starlight Archery and Pro Line Co.*,
    804 F.2d 135 (Fed. Cir. 1986) ................................................................................. 8

*Caterpillar Inc. v. Deere & Co.*,
    224 F.3d 1374 (Fed. Cir. 2000)................................................................................ 7

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................. 6

*Constr. Tech., Inc. v. The Lockformer Co., Inc.*,
    86 Civ. 0457 (JSM), 88 Civ. 0742 (JSM),
    990 U.S. Dist. LEXIS 20000 (S.D.N.Y. November 2, 1990) ................................. 16

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*,
    501 F.3d 1254 (Fed. Cir. 2007) ............................................................................. 10

*Elan Pharm., Inc. v. Mayo Found. for Medical Ed. and Res.*,
    346 F.3d 1051 (Fed. Cir. 2003)................................................................................ 7

*Eli Lilly and Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ................................................................................. 9

*Exxon Corp. v. Mobil Oil Corp.*,
    C.A. No. H-96-3795,
    1998 U.S. Dist. LEXIS 17555 (S.D. Tex. Aug. 13, 1998)..................................... 16

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
    501 F.3d 1263 (Fed. Cir. 2007) ............................................................................. 10

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
    365 F.3d 1054 (Fed. Cir. 2004) ............................................................................... 9

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966) ................................................................................................... 10

*In re Cronyn*,
    890 F.2d 1158 (Fed. Cir. 1989)......................................................................... 9, 15

*In re Hall,*
    781 F.2d 897 (Fed. Cir. 1986)..................................................................................... 8

*In re Kahn,*
    441 F.3d 977 (Fed. Cir. 2006)................................................................................... 11

*In re Wyer,*
    655 F.2d 221 (C.C.P.A. 1981) ................................................................................... 8

*KSR Int'l Co. v. Teleflex Inc.,*
    127 S. Ct. 1727 (2007)..................................................................................... 10, 11, 26

*Lucent Tech. Inc. v. Gateway,*
    02-CV-2060 B (CAB),
    2007 U.S. Dist. LEXIS 46863 (S.D. Cal. June 27, 2007)........................................... 8

*Northern Telecom, Inc. v. Datapoint Corp.,*
    908 F.2d 931 (Fed. Cir. 1990)............................................................................... 9, 17

*Orr v. Bank of Am.*
    285 F.3d 764 (9th Cir. 2002) ................................................................................... 14

*Pfizer, Inc. v. Apotex, Inc,*
    480 F.3d 1348 (Fed. Cir. 2007)................................................................................ 10

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.,*
    491 F.3d 1342 (Fed. Cir. 2007)................................................................................ 11

*Philips Elecs. & Pharm. Indus. Corp. v. Thermal & Elec. Indus., Inc.,*
    450 F.2d 1164 (3d Cir. 1971)..................................................................................... 8

*RCA Corp. v. Data Gen. Corp.,*
    701 F. Supp. 456 (D. Del. 1988)............................................................................... 17

*Richardson v. Suzuki Motor Co., Ltd.,*
    868 F.2d 1226 (Fed. Cir. 1989)................................................................................... 7

*Schumer v. Laboratory Computer Sys., Inc.,*
    308 F.3d 1304 (Fed. Cir. 2002)................................................................................... 9

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,*
    492 F.3d 1350 (Fed. Cir. 2007)................................................................................ 11

*United States v. Boyce,*
    148 F. Supp. 2d 1069 (S.D. Cal. 2001)...................................................................... 6

**Statutes**

35 U.S.C. § 103(a) ........................................................................................................ 8

Fed. R. Civ. P. 56(c) ..................................................................................................... 6

Fed. R. Civ. P. 56(e) ........................................................................................................... 12

Fed. R. Evid. 801(c) ............................................................................................................ 12

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

iv

Case No. 07-CV-2000-H (CAB)

1

## I.    INTRODUCTION

2      Dell's motion for summary judgment of invalidity of claims 1-3 of the Fleming '759 Patent is

3   based on a reference — the NASA Report — that is not prior art to the Fleming '759 Patent.  On that

4   basis alone, Dell's motion for summary judgment fails.[1]

5      Dell bears the burden of proving — by clear and convincing evidence — that the NASA

6   Report qualified as a prior-art printed publication under 35 U.S.C. § 102 before May 19, 1981, when

7   the Fleming '759 Patent was filed.  To meet this heavy burden, Dell must prove that the NASA

8   Report was publicly accessible by that date, which means that Dell must prove that a member of the

9   public could both locate and physically obtain the NASA Report.  Dell, however, has come forward

10  with no competent evidence to prove either of these requirements.  Rather, the only "evidence" that

11  Dell proffers is a conclusory affidavit from a librarian at the library at George Washington University

12  — where the only known copy of the NASA Report currently resides — who has no relevant personal

13  knowledge about the NASA Report or the policies and procedures at George Washington University

14  library before 1993, more than a decade too late.

15     When the facts are fully exposed, it is clear that Dell has failed to adduce *prima facie* evidence

16  that the NASA Report is prior art.  First, within the George Washington University library, the NASA

17  Report is located in a Special Collections Department that is not accessible to members of the public.

18  Second, as of the filing date of the Fleming '759 Patent, the NASA Report was not indexed by subject

19  matter, and therefore it would have been impossible for someone to find unless that person were

20  already aware of its existence.  Thus, at a minimum, a genuine factual dispute exists as to whether a

21  member of the public could both locate and physically obtain the NASA Report as of the filing date of

22  the Fleming '759 Patent, and therefore as to whether it qualifies as a prior-art printed publication

23  under 35 U.S.C. § 102.

24

25  _____

[1] The primary basis for Dell's motion is alleged anticipation, with alleged obviousness asserted only
26  as a fallback position.  But after the *KSR* decision, Judge Brewster permitted Defendants to search for
    additional prior art only to support their obviousness cases, not to search for additional prior art in
27  order to make additional anticipation arguments.  Dell's motion should therefore be stricken.

28

Even if the NASA Report qualifies as prior art, however, Dell's motion for summary judgment still fails. Dell argues that the NASA Report anticipates claims 1-3 of the Fleming '759 Patent. But in making this argument, Dell improperly rewrites claim 1 to delete the word "directly" from the first mode of access, and also ignores the Court's claim construction for the term "in-use background color." When the NASA Report is compared to the actual claim language and the correct claim construction, it is clear that the NASA Report does not disclose all of the elements of claims 1-3, and therefore could not anticipate. Realizing the weakness of its position, Dell seeks to supply the missing elements with an obviousness argument. But Dell's obviousness contention is based entirely on attorney argument, and is unsupported by any competent expert opinion. Lucent's expert, on the other hand, has opined that claims 1-3 would not have been obvious in view of the NASA Report. Dell's motion for summary judgment should, accordingly, be denied.

## II.    BACKGROUND

### A.    Technical Background.

Lucent incorporates by reference the Technical Background discussion from Section II.A of Lucent's Opposition To Gateway's Motion For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming) as if fully set forth herein.

### B.    The Fleming '759 Patent.

Lucent incorporates by reference the discussion of the Fleming '759 Patent from Section II.B of Lucent's Opposition To Gateway's Motion For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming) as if fully set forth herein.

### C.    The Asserted Claims Of The '759 Patent.

Lucent incorporates by reference the discussion of the Asserted Claims of the Fleming '759 Patent from Section II.C of Lucent's Opposition To Gateway's Motion For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming) as if fully set forth herein.

### D.    The NASA Report.

The NASA Report (Blackburn Dec. Ex. 9) purportedly describes the particular implementation of a display system, known as the CORE system, at George Washington University.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

2

Case No. 07-CV-2000-H (CAB)

1    The only known copy of the NASA Report is held in the Special Collections Department of the

2    Melvin Gelman Library at George Washington University (the "Library").  (*Id*.)  The Special

3    Collections Department of the Library is restricted only to Library personnel, and is thus not open to

4    members of the public.  (Ex. 1 at 57:23-58:2.) [2]  And the materials held within the Special Collections

5    Department cannot be checked out or sent outside of the library.  (Ex. 1 at 58:3-15, 61:7-13.)

6        **E.    The Pec Affidavit.**

7        In attempting to prove that the NASA Report is prior art, Dell has submitted an Affidavit from

8    Jean A. Pec, the Head of Collections Management Services for the Library.  (Blackburn Dec. Ex. 14.)

9    In her Affidavit, Ms. Pec purports to opine that the NASA Report was available in the Library to

10   members of the public as of September 1980.

11       During her deposition, however, Ms. Pec made clear that she did not start working at the

12   Library until 1993 — ***twelve years after*** the filing date of the Fleming '759 Patent — and that she did

13   not talk to anyone else at the Library who might have worked at the Library during the relevant

14   timeframe about the purported facts set forth in her Affidavit:

15           Q.  Had you ever worked for George Washington University or any of
             its libraries before February 1993?
16
             A.  No.
17
                              *      *      *
18
             Q.  In preparing your affidavit, did you talk to other library employees
19           or other employees of George Washington University regarding the
             facts set forth in your affidavit?
20
             A.  No.
21
22   (Ex. 1, at 12:22-25, 33:18-22.)  Ms. Pec also clarified that her Affidavit was actually drafted by

23   attorneys for Dell, and that she had only looked at her Affidavit for "a minute or so" before signing:

24           Q.  Do you know who created [your] affidavit?

25           A.  I do not remember the names of people, no.

---

26   [2] Unless otherwise indicated, references herein to "Ex." refer to the Declaration Of James E. Marina
     In Support Of Lucent's Oppositions To Defendants' Motions For Summary Judgment Of Invalidity
27   Of Claims 1-3 Of The Fleming '759 Patent filed concurrently herewith.

28

Q.  Did you see drafts of that affidavit before the version that you signed?

A.  No.

Q.  Did you discuss the language that was going to be included in that affidavit?

A.  No.

                    *        *        *

Q.  Had you seen any of the language that appeared in the affidavit before you signed it?

A.  Had I seen it written?  No.

                    *        *        *

Q.  And did you review this affidavit to assure that it was accurate and truthful before you signed it?

A.  I looked through it.

Q.  How much time did you spend looking at the document?

A.   Looking at the affidavit?

Q.  At the affidavit.

A.  ***I probably spent a minute or so***, however long it takes one to scan through.

(Ex. 1 at 36:6-37:3, 90:19-91:4.)

Ms. Pec further made clear that at least some of the averments in her Affidavit were based ***solely*** on representations by Dell's counsel.  (*See, e.g.*, Ex. 1 at 119:9-120:2.)  And she made clear that the only basis for her opinion that the NASA Report was purportedly first available in the Library in September 1980 was a printout from the Online Computer Library Center ("OCLC") — a third-party library service —  regarding the NASA Report.  (Ex. 1 at 90:2-6.)  But while the OCLC printout contains an "entered" date that purportedly reflects when the Library acquired the NASA Report, Ms. Pec testified that she had no personal knowledge as to how this "entered" date was generated or maintained:

Q.  Have you ever worked for OCLC?

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

4

Case No. 07-CV-2000-H (CAB)

1    A.  Have I ever been an employee of OCLC?  No.

2                        *        *        *

3    Q.  And you're not personally involved in how OCLC maintains its
     databases?

4

5    A. No, I am not.

6    Q.   And you're not aware of the physical equipment they use, their
     methodology, their processes and procedures?

7

8    A. As such, no.

                         *        *        *

9    Q.  [W]ho creates the information that's provided in the "entered" field?

10   A.  The computer at OCLC creates that.

11   Q. And do you know how the computer at OCLC creates the date?

12   A.  No, I don't, sir.

13   (Ex. 1 at 63:3-4, 78:24-79:21.)  Ms. Pec also testified that the OCLC printout she was relying upon

14   had been altered by an unknown third party since this litigation began:

15   Q.  Does that mean that the record was replaced on March 22, 2004?

16   A.  Yes, it does.  It means something in the record was changed, but I
     couldn't tell you what, and I couldn't tell you who.

17                        *        *        *

18   Q.  So you don't know whether it was George Washington or somebody
     outside of George Washington who did that?

19

20   A.  I have no idea.

21                        *        *        *

22   Q.  Do you know which fields or which information [were altered] in
     2004?

23

24   A.  No, I don't.

25   (Ex. 1 at 82:18-22, 85:20-23, 87:3-6.)

     Mr. Pec further testified that the OCLC database is not available to members of the public:

26

27   Q:  To access [OCLC] records, would you also need to enter a log in?

28

---

1

A:  Yes.

2

\*       \*       \*

3

Q:  So assuming I were a GW student and could go into Gelman Library
at the time, I would not have been able to walk up to the  [OCLC]
terminal and start using it?

4

5

A:  That is correct . . .

6

(Ex. 1 at 65:17-66:5.)  Furthermore, Larry Olszewski, a Director of OCLC, has indicated that the

7

Library did not join OCLC until 1987 (Ex. 1 at 89:6-24; Ex. 2), and Ms. Pec admitted that she has no

8

evidence to the contrary.  (Ex. 1 at 29:7-15; 83:11-84:2.)

9

Ms. Pec also testified that subject-matter searching of OCLC records did not become available

10

until the 1990's. (Ex. 1 at 122:4-20, 124:20-125:19.)  Thus, a member of the public interested in

11

"computer graphics" — the subject matter field entered on the OCLC printout for the NASA Report

12

— in 1981 would not have been able to locate the NASA Report by subject-matter searching the

13

OCLC database, and could only have known to seek the NASA Report from the Library if previously

14

informed of its existence.

15

**III.     LEGAL STANDARDS**

16

**A.       Summary Judgment.**

17

Summary judgment is appropriate only where "the pleadings, depositions, answers to

18

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

19

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

20

law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *accord* Fed. R. Civ. P. 56(c).  Where, as

21

here, "the moving party bears the burden of proof at trial, it cannot obtain summary judgment unless it

22

presents evidence so compelling that no rational jury would fail to award judgment for the moving

23

party." *United States v. Boyce*, 148 F. Supp. 2d 1069, 1080 (S.D. Cal. 2001).  Furthermore, "[w]hen

24

ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all

25

justifiable inferences are to be drawn in the nonmovant's favor." *Caterpillar Inc. v. Deere & Co.*, 224

26

F.3d 1374, 1379 (Fed. Cir. 2000).

27

A summary judgment determination must also be guided by the appropriate burden of proof.

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

6

Case No. 07-CV-2000-H (CAB)

If the Court determines that a reasonable jury applying the proper burden of proof — in this case clear-and-convincing evidence — could find for the nonmovant, then there exists a genuine issue of material fact that precludes granting of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### B.    Anticipation.

"A patent is invalid for anticipation when the same device or method, having all of the elements and limitations contained in the claims, is described in a single prior art reference." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed. Cir. 1998).   "Every element of the claimed invention must be literally present, arranged as in the claim." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989).  Furthermore, "[t]o serve as an anticipating reference, the reference must enable that which it is asserted to anticipate." *Elan Pharm., Inc. v. Mayo Found. for Medical Ed. and Res.*, 346 F.3d 1051, 1054 (Fed. Cir. 2003).   "Whether an invention is anticipated is a question of fact." *Id.*

Whether a document qualifies as a printed publication for prior art purposes "depends on the accessibility of the document 'to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.'" *Lucent Tech. Inc. v. Gateway*, 02-CV-2060 B (CAB), 2007 U.S. Dist. LEXIS 46863, at *15 (S.D. Cal. June 27, 2007) (quoting *In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981)); *In re Hall,* 781 F.2d 897, 898-99 (Fed. Cir. 1986) ("Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication.'").   "[O]ne who wishes to characterize the information, in whatever form it may be, as a 'printed publication' . . . should produce sufficient proof of its dissemination or that it has otherwise been available and accessible to persons concerned with the art to which the document relates and thus most likely avail themselves of its contents." *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 139 (Fed. Cir. 1986) (quoting *In re Wyer*, 655 F.2d 221, 227 (C.C.P.A. 1981) (quoting *Philips Elecs. & Pharm. Indus. Corp. v. Thermal & Elec. Indus., Inc.*, 450 F.2d 1164, 1171 (3d Cir. 1971)).

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

7

Case No. 07-CV-2000-H (CAB)

1    Where the public accessibility of a thesis, dissertation, or similar document is at issue, courts

2    look not only to whether the document was shelved in a public library, but also whether it was

3    "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989);

4    *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, C.A. No. 95-218-SLR, 1998 U.S. Dist. LEXIS 3833,

5    at *119 (D. Del. Mar. 13, 1998) ("The key to determining whether the [alleged prior art] thesis was

6    publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.").

7    Dell bears the burden of proving, by clear and convincing evidence, that the NASA Report was

8    publicly accessible before May 19, 1981. *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931,

9    936-37 (Fed. Cir. 1990); *see Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058

10   (Fed. Cir. 2004).

11   **C.    Obviousness.**

12   Because every patent is presumed valid, accused infringers face a "high burden of showing

13   invalidity on summary judgment." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed.

14   Cir. 2002). "[A] moving party seeking to invalidate a patent at summary judgment must submit such

15   ***clear and convincing evidence*** of invalidity so that no reasonable jury could find otherwise." *Eli*

16   *Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (emphasis added).  If evidence is

17   presented establishing a *prima facie* case of invalidity, the nonmovant must come forward with

18   evidence sufficient to support a finding of validity, but "the ultimate burden of proving invalidity

19   remains with the challenger throughout the litigation." *Pfizer, Inc. v. Apotex, Inc,* 480 F.3d 1348,

20   1360 (Fed. Cir. 2007).

21   A claimed invention can be found obvious only "if the differences between the subject matter

22   sought to be patented and the prior art are such that the subject matter as a whole would have been

23   obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. §

24   103(a).  Obviousness is ultimately a question of law based on underlying determinations of fact.

25   *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1269 (Fed. Cir. 2007).  The underlying factual

26   issues to be considered in an obviousness analysis that must be considered by the trier of fact include:

27   (1) the scope and content of the prior art;  (2) the level of ordinary skill in the art;  (3) the differences

28

1    between the claimed invention and the prior art; and (4) objective indicia of nonobviousness."

2    *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).  Earlier this year, the

3    United States Supreme Court reaffirmed the primacy of those factors in determining whether a patent

4    is invalid for obviousness.  *See KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007) (citing

5    *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

6    "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements;

7    instead, there must be some articulated reasoning with some rational underpinning to support the legal

8    conclusion of obviousness."  *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed.

9    Cir. 2006)).  Thus, "the burden falls on the patent challenger to show by clear and convincing evidence

10   that a person of ordinary skill in the art would have had reason to attempt to make the composition or

11   device, or carry out the claimed process, and would have had a reasonable expectation of success in

12   doing so."  *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007)

13   (citing, *inter alia*, *KSR*, 127 S. Ct. at 1740).

14   In that regard, the Supreme Court has "acknowledged the importance of identifying 'a reason

15   that would have prompted a person of ordinary skill in the relevant field to combine the elements in

16   the way the claimed new invention does' in an obviousness determination."  *Takeda Chem. Indus.,*

17   *Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 127 S. Ct. at

18   1731).  Accordingly, "a patent . . . is not proved obvious merely by demonstrating that each of its

19   elements was, independently, known in the prior art."  *KSR*, 127 S. Ct. at 1731.  For example,

20   "combining elements that work together 'in an unexpected and fruitful manner' would not have been

21   obvious."  *PharmaStem*, 491 F.3d at 1360 (quoting *KSR*, 127 S. Ct. at 1740).  Moreover, "when the

22   prior art teaches away from combining certain known elements, discovery of a successful means of

23   combining them is more likely to be nonobvious."  *KSR*, 127 S.Ct at 1740.

24   **IV.    ARGUMENT**

25           **A.    A Genuine Factual Dispute Exists As To Whether The NASA Report Was A**
                 **Printed Publication As Of The Filing Date Of The Fleming '759 Patent.**

26   Dell bears the burden of proving by clear and convincing evidence that the NASA Report is a

27

28

1   prior-art printed publication.  *Northern Telecom*, 908 F.2d at 936-37.  To show that the NASA Report

2   is a prior-art printed publication, Dell must prove all of the following facts: 1) that the NASA Report

3   physically existed within the Library before May 19, 1981[3]; 2) that the NASA Report was catalogued

4   and meaningfully indexed by subject matter before May 19, 1981; 3) that an interested member of the

5   public could have learned of the NASA Report's existence before May 19, 1981; and 4) that such a

6   member of the public could have accessed the NASA Report within the private Special Collections

7   Department of the Library before May 19, 1981.  The lack of any of these elements would be fatal to

8   Dell's motion.  The lack of all of them confirms that the NASA Report is not prior art.

9       **B.    Dell's "Evidence" Is Unreliable And Should Be Excluded.**

10          As a threshold matter, the evidence submitted by Dell to prove prior publication of the NASA

11  Report, the Pec Affidavit and the attached OCLC printout, is unreliable and should be excluded.  With

12  respect to the Pec Affidavit, Ms. Pec has no firsthand knowledge of when the NASA Report was first

13  cataloged and shelved, or where the report was first shelved.  In fact, Ms. Pec testified at her

14  deposition that she has never even seen the original NASA Report.  (Ex. 1 at 69:5-13.)  While Ms.

15  Pec may be able to provide evidence of general library practices in effect since her employment at the

16  Library in 1993, she is unable to provide evidence of the general library practice during the relevant

17  time period:

18          Q.  Have you had any specific conversations regarding what policies
19          and procedures were used in 1980 and 1981 to catalog special collection
            material at George Washington University?

20          A.  No.

21          Q:  Once the material was returned to special collection, do you know
            where it would be shelved or maintained?

22

23          A.  No, I don't.

                            *       *       *

24

25          Q.  And have you done any investigation into the specific policies and
            procedures in place in 1980 and '81 regarding when a document such as

26  ---
    [3] For purposes of this motion only, Lucent is assuming the invention date of the claims 1-3 of the
    Fleming '759 Patent is the filing date of the patent, May 19, 1981.

27

28

[the NASA Report] would have been returned to the special collections department?

A.  You've asked similar questions earlier, and no, I have not done any research into that.

Q.  And by "research," just to clarify, you haven't spoken to anybody on the subject?

A.  No.

Q.  And you haven't looked at any documents on the subject?

A.  No.

(Ex. 1 at 102:4-17.)  This case is analogous to *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, which found on similar facts that a witness did not have sufficient knowledge to establish when a thesis was indexed, cataloged and, shelved:

> Dr. Tribe had no first-hand knowledge of the procedures employed by the university libraries, being a doctoral candidate not a member of the library personnel.  ***Moreover, he was not present at the university for most of the 1977 to 1978 period; consequently, he admitted that there were 'many details of the cataloging with which [he] would not be familiar.'  Thus, his testimony is speculative and not probative of general indexing, cataloging, and shelving procedures in the University of Melbourne libraries at issue.***

1998 U.S. Dist. LEXIS 3833, at *120.  Thus, even though Ms. Pec is a current employee of the Library, she was not an employee during the relevant time period, nor was she present during the relevant time period.  She has no knowledge of the specific catalog and shelving policies and procedures in place in 1980 and 1981.  Therefore, her testimony, like the testimony at issue in *Ajinomoto*, "is speculative and not probative of general indexing, cataloging, and shelving procedures" in the Library during the relevant time period.  The Pec Affidavit cannot support Dell's allegation that the NASA Report is prior art.

With respect to the OCLC printout attached to Ms. Pec's Affidavit, the printout is hearsay without any exception and is therefore inadmissible.  It is well settled that "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am.,* 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Dell is relying on the OCLC printout for the truth of the maters

1  recited therein, rendering the OCLC printout hearsay.  *See* Fed. R. Evid. 801(c).  Absent a narrow

2  range of exceptions, hearsay is inadmissible.  Dell has failed to present evidence that any of those

3  exceptions apply.

4        For example, Ms. Pec's testimony demonstrates her inability to qualify the OCLC printout as a

5  business record under Fed. R. Evid. 803(6).  Ms. Pec stated during her deposition that she had nothing

6  to do with the creation or maintenance of the OCLC printout, and indeed she is not even an employee

7  of OCLC:

8          Q.  Okay.  Just to make sure that I have it clear, this [OCLC printout]
        was accessed from a database maintained by OCLC?

9          A. Yes.

10

11          Q.  And you're not personally involved in how OCLC maintains its
        databases?

12          A. No, I am not.

13          Q.  You're not aware of the physical equipment they use, their
        methodology, their processes and procedures?

14

15          A.  As such, no.

16  (Ex. 1 at 78:20-79:6.)

17        The inadmissibility of hearsay is grounded on the unreliability of such testimony.  The

18  accuracy of its contents cannot be subject to cross-examination or otherwise investigated.  These

19  considerations are especially apt in the present situation where the OCLC printout was altered in some

20  way after the commencement of this litigation.  (*See* § I.A, *supra*.)  Neither which aspects have been

21  altered nor the party responsible for the alteration are known.  (*Id.*)  Such unreliability reinforces the

22  propriety of the legal requirement that the hearsay OCLC printout be excluded from evidence.

23      **C.**   **Dell Has Failed to Prove That The NASA Report Was Publicly Accessible Before
       May 19, 1981.**

24        If Ms. Pec's Affidavit and the OCLC printout are struck from evidence as they should be,

25  Dell's motion fails *a priori*.  But even if the Pec Affidavit and the OCLC printout are considered on

26  this motion, Dell has still failed to prove that the NASA Report is a prior-art printed publication.  Dell

27  has failed to offer evidence that interested members of the public could have located the NASA

28

12

1    Report in 1981 or that they could have accessed the NASA Report once aware of its existence.  This

2    lack of public availability defeats Dell's motion.

**1.    A Member Of The Public Could Not Have Located The NASA Report Before May 19, 1981.**

A document within a library cannot be a printed publication if it is not "catalogued or indexed in any meaningful way."  *In re Cronyn*, 890 F.2d at 1161.  This requires more than just indexing by an author's name and the work's title; it requires research aids which bear a relationship to the ***subject matter*** of the document.  *Id.*  As the party asserting the affirmative defense of invalidity, Dell bears the burden of proving this subject-matter indexing by clear and convincing evidence.

But Dell has offered no evidence that members of the public could have found the NASA Report in any index or catalogue in 1981.  First, the OCLC printout, to the extent it comprises evidence of subject-matter indexing of the NASA Report, was not accessible to the public.  As Ms. Pec testified, OCLC records required user names and passwords to access and were only available on dedicated terminals whose use was limited to specific library personnel.  (*See* § I.B, *supra*.)  Without access to OCLC, an interested member of the public would have had no means of discovering the NASA Report's existence in 1981.  *See Exxon Corp. v. Mobil Oil Corp.*, C.A. No. H-96-3795, 1998 U.S. Dist. LEXIS 17555, at *29-30 (S.D. Tex. 1ug. 13, 1998) (finding that a thesis was not prior art where there was no publicly accessible index that referenced the thesis).

But even if members of the public had access to OCLC, that would not cure the defect in cataloguing.  Notwithstanding the averments in her Affidavit, Ms. Pec testified during her deposition that subject matter searching for the NASA Report was ***not*** available until long after the relevant 1980-81 time period:

> Q.  What is your earliest knowledge of it being searchable by subject matter? What date is earliest?
>
> A.  I would have to estimate subject --
>
> Q.  To your knowledge
>
> A.  Sometime in the 1990s for subject searching.

(Ex. 1 at 122:9-15.)  Ms. Pec's counsel even examined her during her deposition to make clear that

1   any implication to the contrary — that the NASA Report was indexed by subject matter in 1981 —

2   was a misreading of the Affidavit.  (Ex. 1 at 124:20-125:19.)  Moreover, George Washington

3   University did not become a member of OCLC until 1987.  (Ex. 2.)

4        Dell has thus failed to adduce any evidence of subject-mater indexing of the NASA Report

5   during the relevant time frame.  Dell has therefore failed to carry its burden of proof for summary

6   judgment.

7                    **2.      The NASA Report Was Not Physically Accessible Before May 19, 1981.**

8        In addition to requiring subject-matter indexing, courts have held that a document must be

9   physically accessible to the public to constitute a printed publication.  *See Constr. Tech., Inc. v. The*

10  *Lockformer Co., Inc.*, 86 Civ. 0457 (JSM), 88 Civ. 0742 (JSM), 1990 U.S. Dist. LEXIS 20000, at

11  *17-18 (S.D.N.Y. November 2, 1990) (holding that theses that were cataloged but not physically

12  accessible to the public are not  "printed publications"); *RCA Corp. v. Data Gen. Corp.*, 701 F. Supp.

13  456, 468 (D. Del. 1988).

14       As discussed above, the Special Collections Department of the Library is closed to the public.

15  Even if an interested member of the public were to have learned of the existence of the NASA Report

16  prior to May 19, 1981, that person would have been unable to enter the Special Collections

17  Department, a closed stack portion of the Library that did not allow non-staff members to enter and

18  did not allow its holdings to leave the Library.  (*See* § I.C, *supra.*)  And Ms. Pec was unable to

19  provide any evidence regarding how access could be accomplished:

20              Q.   If someone who was physically at Gelman Library went to the
                special collections department to request access to material, do you
21              understand what the policies or criteria would be for granting access to
                that individual?
22
                A.  No, I don't.
23
    (Ex. 1 at 62:3-8.)  Such limited access defeats Dell's assertion that the NASA Report constitutes prior
24
    art.  *See Northern Telecom*, 908 F.2d at 936-37 (Fed Cir. 1990) (holding that a document within a
25
    library that was restricted to authorized personal did not constitute prior art).  Thus, even if the NASA
26
    Report had been sufficiently catalogued, this limited physical access to the NASA Report would
27

28

prevent it from constituting prior art.

### 3. No Evidence Exists That The NASA Report Was Shelved In The Library Before May 19, 1981.

There is also no evidence as to when the NASA Report was first shelved in the library. A document's existence within a library is not sufficient to qualify the document as prior art if its processing is not complete, *i.e.*, if the document is not yet shelved. *See In re Bayer*, 568 F.2d 1357, 1362 (C.C.P.A 1978) (explaining that a thesis, whose processing was not completed by the critical date was not a printed publication). Thus, even if subject-matter indexing existed in 1981, there is no evidence as to whether the NASA Report would have been present at the proper physical location before May 19, 1981.

Ms. Pec testified that she did not know the timeframe for cataloging and shelving documents in the Special Collections Department in the 1980-1981 timeframe:

> Q.  Regarding the special collections department, are you aware for the 1980 to 1981 time frame how long it took them to process a document when they got it back from CMS or the equivalent entity in those days?
>
> A.  No, I'm not personally aware.
>
> Q.  Do you know how long it would have taken for that item to end up on the shelves, once it had been cataloged?
>
> A.  No, I'm not personally aware of how long it would take to have shelved the document.

(Ex. 1 at 105:4-14.) Thus, no evidence exists of when the NASA Report was actually placed on the shelves within the Special Collections Department of the Library. Ms. Pec's Affidavit, based upon the hearsay OCLC printout, cannot cure this defect:

> Q.  Do you know in the 1980/81 time frame, how long it would have taken for a card catalog entry to be generated by OCLC and sent to a library after the information was uploaded into OCLC?
>
> A.  No, I don't.
>
> *        *        *
>
> Q.  Just a few follow-up questions on what we've discussed today.
>
> Are you aware in the 1980/1981 time frame for OCLC how long between an entry was created to when it would be available to other

1    users of the system?

2         A.  No, I'm not specifically aware.

3  (Ex. 1 at 82:6-10, 104:23-105:3.)

4         In view of the foregoing, it is clear that Dell has not even come close to meeting its clear-and-

5  convincing burden of proving that the NASA Report is a prior-art printed publication.  Dell's motion

6  for summary judgment should therefore be denied.

7  **V.    Even If The NASA Report Is Prior Art, Dell Has Failed To Prove That The NASA Report Invalidates The Asserted Claims Of The Fleming '759 Patent.**

8

9       **A.    The NASA Report Does Not Anticipate Claims 1-3.**

10        Dell contends that the NASA Report anticipates claims 1-3 of the Fleming '759 Patent.  As set

11 forth below, however, the NASA Report, even if prior art, fails to disclose the first and third modes of

12 access of claim 1, and therefore does not anticipate claims 1-3.

13             **1.    The NASA Report Does Not Disclose The First Mode Of Access Of Claim 1.**

14        Dell contends that the first mode of access of claim 1 (which is also required by claims 2 and

15 3) — "wherein an in-use color is *directly* specified as a color data value" — is satisfied by the

16 SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions described in the NASA Report.  It is

17 undisputed that the operands of these functions — R, G, B and C1, C2, and C3 — ultimately call for a

18 particular color.  But it is also undisputed that these operands are floating point, or real, numbers that

19 ***must be converted to integers*** before the display system can interpret them as color data values.

20 Thus, while these functions call for a particular color, they do not ***directly*** do so, as the plain language

21 of claim 1 requires.  (Richter Dec. ¶ 39.)

22        Indeed, James Foley, one of the authors of the NASA Report, testified:

23             Q.  Okay.  So I understand this,  then, so when it comes time to specify
24             -- when it comes time for the application, for  them to specify an R, G,
                 B value, that value is specified as floating point, right?

25             A.  That's correct.

26             Q.  But in order to work with the hardware, ***that floating point needs
27             to be converted into an integer at some point***?

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

16                                                Case No. 07-CV-2000-H (CAB)

A.  Correct.

[Objection omitted]

A. It needs to go through -- ***it needs to be converted into a integer by means of a multiply and round***.

(Thomases Dec. Ex. 17 at 94.)   Thus, because of this intermediate conversion step that is necessary for the display system to understand the operands of the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions as color data values, these functions do not directly specify color.

Dell's arguments to the contrary are unavailing.  First, Dell argues that the first mode of access of claim 1 is satisfied by the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions because these functions "call for" a particular color in accordance with the Court's claim construction for the phrase "specified by."  But Dell misses the point.  There is no dispute that the operands of SET_CURRENT_COLOR (R,G,B) and SET_COLOR call for a particular color.  There is also no dispute, however, that they do not ***directly*** call for a particular color as claim 1 requires.  Rather, they must first be converted from floating point to integer form through at least a multiply and round procedure so that they can be processed by the system.  The colors are therefore not directly specified. (Richter Dec. ¶ 39.)

Second, Dell argues that this interpretation is "squarely at odds" with the patent.  (Dell Br. 10.)  But this argument is not only incorrect, it is irrelevant.  The Fleming '759 Patent clearly discloses direct color specification through the use of integers.  For example, in discussing the color selection process in mode 0 — which corresponds to the first mode of access of claim 1 — the patent indicates that the specified RGB value is compared to the RGB values in the color memory and the color is set to the closest match in the color memory.  (Col. 7, lns. 25-34.)  And the RGB values in the color memory are described as binary integers.  (*See, e.g.,* col. 5, lns. 37-41.)

But more importantly, ***it is the claim language***, not the specification, that defines the scope of the invention.  At bottom, Dell's argument is that the word "directly" in the first mode of access is superfluous and should be read out of the claim, so that in the first mode of access "an in-use color is ~~directly~~ specified as a color data value."  Dell's attempt to delete the word "directly" from claim 1

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

17

Case No. 07-CV-2000-H (CAB)

should be rejected.[4]

In view of the foregoing, the NASA Report does not disclose the first mode of access of claim 1, and therefore cannot anticipate claim 1. Because claims 2 and 3 also require the first mode of access of claim 1 by virtue of the Court's corresponding structure for the mode selecting function of those claims, the NASA Report also does not anticipate claims 2 and 3.

### 2. The NASA Report Does Not Disclose The Third Mode Of Access Of Claim 1.

Dell also contends that the NASA Report discloses the third of mode of access of claim 1 (which is also required by claims 2 and 3) — "wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory" — via the SET_BACKGROUND_COLOR_INDEX (INDEX) and SET BACKGROUND INDEX functions. These functions, however, do not specify an in-use background color as construed by the Court: "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." (Thomases Dec. Ex. 4.)

The SET_BACKGROUND_COLOR_INDEX (INDEX) and SET BACKGROUND INDEX functions set the background of the ***entire screen*** to the specified index value after the issuance of a NEWFRAME command. (Richter Dec. ¶ 41; Thomases Dec. Ex. 16 at 165, 175; Thomases Dec. Ex. 17 at 151-52.) After the background color of the screen has been set, subsequently received text and graphics drawing commands draw in a ***foreground color only*** — referred to as the "stroke" portion of the character — over the previously set background color of the entire screen. As Dr. Wedig testified:

Q. Will you agree that the command that's drawing the O is not

---

[4] Dell's attempt to rely on the NASA Report's reference to direct color specification and Dr. Foley's testimony concerning direct color specification is irrelevant. The issue is not whether the NASA Report or Dr. Foley refer to the type of color specification used with the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions as direct color specification. Rather, the issue is how those functions actually specify color in view of the claims and the Court's construction. And as discussed above, they do not do so directly as required by claim 1. Nor is Dell's argument that the draft Bell Home Information System Provision Standard (Blackburn Dec. Ex. 17) refers to a color value "represent[ing] a binary fraction" relevant. First, "representing" a binary fraction and actually being a binary fraction are not the same thing. More importantly however, it is the claims and the Court's construction that determine the scope of the claimed invention, not documents that evidence conception of the invention.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

18

Case No. 07-CV-2000-H (CAB)

1    drawing in that background color, correct?

2    [OBJECTION OMITTED]

3    A.  The command for setting -- for drawing an O in a Core-based
     system draws the -- what -- maybe we can agree on calling it the stroke
4    portion of it, the actual portion that you see of the physical letter.

5    (Thomases Dec. Ex. 16 at 176.)  Dr. Wedig further testified that the NASA Report ***does not disclose***

6    ***any*** text or graphics drawing commands that draw in a background color.  Rather, the background of

7    the entire color is specified, a NEWFRAME command is issued to set the color of the entire screen,

8    and then text and graphics are drawn using only the foreground color:

9    Q.   Can you tell me if the NASA Final Report discloses an actual text
     or graphics command that draws not only the stroke portion, but the
10   background portion?

11   [OBJECTION OMITTED]

12   A.  (Reviewing document.) Well, that -- that would be accomplished
     by setting the  background, issuing the new frame, then issuing the --
13   the text or graphics command.  So it requires a combination of
     commands.  It's not a single command.

14   (Thomases Dec. Ex. 16 at 177.)

15       To draw a character with a background color in the purported implementation CORE system

16   described by the NASA Report, one would have to set the foreground color to the desired background

17   color, and then draw a small rectangle on the screen.  One would then reset the foreground color to

18   the desired color of the character, and then draw that character in that foreground color over the

19   previously drawn rectangle:

20   Q.  For example, if I wanted to draw the letter "O" on a blue back -- on
     a screen that has a blue background, where the strike is black and the
21   portion within was yellow, could I do that?

22   A.  Okay, so again, the question was --

23   Q.  Could I do that?

24   A.  I could do that by drawing a little rectangle of the background
     color and then putting the text on top of that.
25

26   (Thomases Dec. Ex. 17 at 39-40.)

27       Thus, in the purported implementation of the CORE system described by the NASA Report,

28

only a foreground color can be used for subsequently received text and graphics drawing commands. The text and graphics drawing commands draw in foreground color over the previously set or default background color of the entire screen, whatever that color may be and without regard to what the color may be.  Because the text and graphics drawing commands draw only in a foreground color over a previously set background color, ***no background color is used for these commands***.

Dell argues that Lucent is relying on an erroneous reading of the Court's construction, because the Court's construction only requires that the in-use background color be used "for" subsequently received text and graphics drawing commands, not "by" them.  But this is just wordplay.  As a matter of common sense, if a drawing command does not draw in a background color, then a background color is not used for that ***command***.  A background color may independently form the background of the text or graphics that is drawn by the command, ***but it is not used for the command itself***, which is what the Court's claim construction requires.[5]

Moreover, Defendants admitted during the claim construction hearing in this case that in-use foreground and background colors are colors that are drawn by subsequently received drawing commands:

> So when the terminal processor ***receives the draw command***, what it does is it looks to see ***what the current foreground and background colors are, you know, the in-use foreground and in-use background colors***, and it will ***write into video memory*** in the particular pixels that the host computer tells it to draw in certain color information.  And it'll ***set the foreground color for character and video memory to two and the background color to seven***.

(Ex. 11 at 230-31.)  This is also consistent with the Summary of the Invention of the Fleming '759 Patent, which states that "[t]hese in-use drawing colors may be ***applied*** by subsequently received text and graphics drawing commands."  (Fleming '759 Patent, col. 1, lns. 61-63.)  Finally, Dell's technical expert admitted in his original expert report on the issue of alleged invalidity that an in-use

---

[5] Dell's argument that the draft Bell Home Information System Provision Standard (Blackburn Dec. Ex. 17) discloses a point drawing command that does not draw in a background color is irrelevant, since there is no background associated with a point.  More importantly however, as discussed previously, it is the claims and the Court's construction that determine the scope of the claimed invention, not documents that evidence conception of the invention.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

20

Case No. 07-CV-2000-H (CAB)

background color is written into the video memory (frame buffer) along with the in-use foreground

color by the same drawing command at the same time:

> In many image display systems, the idea of foreground and background color is used to help specify the image on the display. The application program issues a command to the image display system and instructs the system that a foreground color is to be used for subsequent drawing commands. ***The user can also issue command that particular background color is to be used for all future drawing commands. Then, whenever a command to draw an object with foreground and background characteristics is issued, the previously specified foreground and background colors are used to determine the Pixel values in Video Memory to create the object on the display***.

(Ex. 12, ¶ 14.)

In view of the foregoing, it is clear that the NASA Report does not disclose an "in-use

background" color as construed by the Court, and therefore does not anticipate claims 1-3 of the

Fleming '759 Patent.

> **B. Ample Evidence Establishes A Genuine Dispute Concerning The Alleged Obviousness Of Claims 1-3 Of The Fleming '759 Patent.**

Realizing that its anticipation case fails, Dell retreats to an obviousness argument. First, Dell

contends that to the extent the NASA Report does not disclose direct color specification, it would

have been obvious to modify the system described in the NASA Report to include direct color

specification. Second, Dell contends that to the extent the NASA Report does not disclose an in-use

background color, it would have been obvious to modify the system described in the NASA Report to

include an in-use background color. But genuine factual disputes exist as to whether or not these

elements would have been obvious to one of ordinary skill in the art, precluding summary judgment.

With respect to the issue of direct color specification, Dell raises for the first time in its brief

the argument that it would have been obvious to modify the system described in the NASA Report to

include color specification through the use of integer RGB values. But Dell offers ***no expert opinion***

in support of this new argument, and instead relies solely on attorney argument. It is Mr. Richter's

opinion, however, that modifying the system described in the NASA Report to specify colors using

integer RGB values would not have been obvious to one of ordinary skill in the art. (Richter Dec.

¶ 40.) As Mr. Richter explains in his Declaration, the use of floating point specification gives the

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

21

Case No. 07-CV-2000-H (CAB)

system described in the NASA Report increased flexibility, in that using floating point specification enables color to be specified without regard to the actual color depth, *i.e.,* the number of bits of R, G, and B, required by different types of graphics hardware that could be used with the system.  (*Id.*)  A conversion could then be used to convert to the appropriate color depth.  (*Id.*)  Thus, in Mr. Richter's opinion, eliminating floating point specification from a flexible system to make a less flexible system would not have been something that was obvious to one of ordinary skill in the art, but in fact would have completely counterintuitive.  (*Id.*)

With respect to Dell's contention that it would have been obvious to modify the system of the NASA Report to include an in-use background color, Dell relies on attorney argument and a conclusory expert opinion from Dr. Wedig.  The following is the sum total of Dr. Wedig's opinion on this issue:

> To the extent that Lucent or its expert assert that the NASA Final Report does not disclose the "in-use background color" element, it is my opinion that a person of ordinary skill in the art would have knowledge of systems that had the ability to set the background color of individual characters or graphic primitives by index to a color memory. *See, for example*, The Application of The Intercolor 8000 Terminal To Thematic Cartography, James R. Carter, Siggraph '76, July 14-16, 1976 at p. 163; Ramtek 9000 Series Graphic Display System Programming Manual at p. 3-21; Antiope Specification, pp. 6-7. Therefore, at a minimum, the NASA Final Report, in view of the knowledge of a person of ordinary skill would render this claim obvious.

(Thomases Dec. Ex.15, ¶ 88.)   As the foregoing make clear, Dr. Wedig's opinion is that it would have been obvious to modify the NASA Report to include an in-use background color because purportedly "a person of ordinary skill in the art would have knowledge of systems that had the ability to set the background color of individual characters or graphic primitives by index to a color memory."  But Dr. Wedig  ***provides no explanation*** as to why one of ordinary skill in the art would have been led to make the suggested combination.  Dr. Wedig's opinion amounts to an argument that using an in-use background color in connection with the system described in the NASA Report would have been obvious to one of ordinary skill in the art merely because background colors were known in the art.  This conclusory opinion is not only inadequate for Gateway to carry its summary judgment

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

22

Case No. 07-CV-2000-H (CAB)

1    burden here, but it is contrary to *KSR*'s admonition that "[a] patent . . . is not proved obvious merely

2    by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S.

3    Ct. at 1731.

4            In contrast, Mr. Richter has opined that, given the fact that the system described in the NASA

5    Report, which uses stroke commands as discussed above, ***has no text or graphics drawing commands***

6    that could make use of a background color, one of ordinary skill in the art would not have been led to

7    combine an in-use background color with the NASA Report system.  (Richter Dec. ¶ 40; Richter Dec.

8    Ex. 1, ¶ 48; Richter Dec. Ex. 2, ¶ 13.)  Indeed, since no commands in the NASA Report system could

9    use a background color, such a combination would have been inoperative.

10           Realizing the deficiency of the opinion set forth in his report, Dr. Wedig tried to remedy his

11   opinion during his deposition:

12           Q.  Okay.  You don't explain, though, why, in your opinion, one of
           ordinary skill in the art might take the system talked about in the
13           NASA Final Report and add the ability to set the background color of
           individual characters or graphic primitives by index to a color
14           memory, right?

15           [OBJECTION OMITTED]

16           A.  Yeah, I said that I think that that is just something that would be
           obvious to one of ordinary skill.  You -- all of the pieces are there, and
17           it's a -- it's a non -- I think a noncreative step to -- to take it the final --
           the final -- the final step; that is, the in-use background color, first of
18           all, as I said, I believe it's already taught, but even if the Court feels
           that it's not directly taught,  that it would be obvious to one of ordinary
19           skill that you could create a background -- create an in-use background
           color by using an index to a color memory, because this is just
20           something that would have been knowledgeable to one of ordinary
           skill.

21
22   (Wedig Tr. 180.)  In response to this newly proffered opinion that the addition of an in-use

23   background color would not have been a creative step — which still does not explain why someone of

24   ordinary skill in the art would have been led to make the asserted combination — Mr. Richter

25   submitted a supplemental report prior to his deposition, and upon which he was questioned at his

26   deposition, indicating his opinion that the proposed combination would have been creative.  (Richter

27   Dec. Ex. 2 ¶ 13.)  Mr. Richter reiterated his previously expressed opinion that adding an in-use color

28

1    to a stroke-based system that could not make use of such a color would make no sense from a

2    technical perspective, and therefore would not have been a predicable combination leading to

3    predicable results.  (*Id.*; Thomases Dec. Ex. 5 at 610-614.)  Mr. Richter also pointed out that

4    developers of the CORE System, who were leaders in the field of computer graphics in the late 1970's

5    and early 1980's, did not include an in-use background color in the version of the CORE system

6    described in the NASA Report, demonstrating that there were no particular design or market demands

7    for an in-use background color or the ability to specify such a color.  (*Id.*)

8         In view of the foregoing, it is clear that a genuine dispute exists as to whether claims 1-3 of the

9    Fleming '759 Patent would have been obvious in view of the NASA Report.

10   **VI.    CONCLUSION**

11        For all the foregoing reasons, Lucent respectfully requests that the Court deny Dell's motion

12   for summary judgment that claim 1, 2, and 3 of the Fleming '759 patent are invalid.

13

14   Dated:  December 14, 2007                    By:  _____s/David A. Hahn_____

15                                                David A. Hahn (SBN 125784)
                                                  HAHN & ADEMA
16                                                501 West Broadway, Suite 1600
                                                  San Diego, California  92101-3595
17                                                Telephone:  (619) 235-2100
                                                  Facsimile:  (619) 235-2101
18
19                                                John M. Desmarais (admitted *pro hac vice*)
                                                  Robert A. Appleby (admitted *pro hac vice*)
20                                                James E. Marina (admitted *pro hac vice*)
                                                  KIRKLAND & ELLIS LLP
21                                                153 East 53rd Street
                                                  New York, New York  10022
22                                                Telephone:  (212) 446-4800
                                                  Facsimile:  (212) 446-4900
23
                                                  Attorneys for *Lucent Technologies Inc.*
24

25

26

27

28