David A. Hahn (SBN 125784)
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone: (619) 235-2100
Facsimile: (619) 235-2101

Attorney for Plaintiffs *Lucent Technologies Inc.*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, <br><br> Plaintiff, <br> v. <br><br> GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., <br><br> Defendants, <br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervener. | Case No. 07-CV-2000-H (CAB) <br><br> consisting of matters severed from consolidated cases: <br><br> Case No. 02-CV-2060 B (CAB) <br> Case No. 03-CV-0699 B (CAB) <br> Case No. 03-CV-1108 B (CAB) <br><br> **DECLARATION OF JAKE RICHTER IN SUPPORT OF LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759** <br><br> Date: January 7, 2008 <br> Time: 10:30 A.M. <br> Courtroom: 13 <br> Judge: Hon. Marilyn L. Huff |
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br> v. <br><br> LUCENT TECHNOLOGIES INC., <br><br> Defendant. | |
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, <br><br> Plaintiff, <br> v. <br><br> DELL INC., <br><br> Defendant. | |

DECLARATION OF JAKE RICHTER IN SUPPORT OF LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

Case No. 07-CV-2000-H (CAB)

I, Jake Richter, hereby declare as follows:

1. I have been retained as an expert in this case by Lucent Technologies Inc.

2. I submit this Declaration in support of Lucent's opposition to Gateway's and Dell's motions for summary judgment of invalidity of claims 1-3 of U.S. Patent No. 4,439,759 (the "Fleming '759 Patent").

3. Attached hereto as Exhibit A and incorporated herein by reference is a copy of my October 12, 2007 Supplemental Expert Report in this case. The report accurately reflects my opinions and the bases therefore.

4. Attached hereto as Exhibit B and incorporated herein by reference is a copy of my November 12, 2007 Second Supplement Expert Report in this case. The report accurately reflects my opinions and the bases therefore.

5. The Fleming '759 Patent relates to video display technology. The basic unit of information that is displayed on a display monitor is a "pixel," a term derived from the words "picture element." A pixel defines both the individually displayable element on the display monitor and the unit of memory used to define the data that generated the element on the display monitor. Pixels and their respective colors are controlled by software executed by the central processing unit (CPU) of the computer, terminal, or workstation to which the display monitor is connected.

6. Regardless of whether the system is a personal computer, a terminal (where keyboard, monitor, and computer chassis are integrated into a single case), or a workstation, the display system will contain a video memory, or frame buffer, that is used to display information on the screen. Memory is typically made up of random access memory (RAM) chips. In a personal computer, the frame buffer may be resident on a separate graphics board, or on the motherboard of the system sharing the memory of the CPU. When a program running on the CPU, such as a word processing or other application program, decides it wants to display something on the display monitor, it puts data into the frame buffer that identifies each pixel and the color to be displayed at each pixel. This information is then transferred to the display monitor.

DECLARATION OF JAKE RICHTER IN SUPPORT OF
LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S
MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

1

Case No. 07-CV-2000-H (CAB)

7. The frame buffer is conceptually laid out in a rectangular array of such pixels as depicted below:



Frame Buffer (showing pixel array)

8. The number of pixels across the horizontal dimension (the X dimension) of the displayed part of the frame buffer and the number of lines of pixels in the vertical dimension (the Y dimension) of the displayed part of the frame buffer are generally expressed as the display resolution using an X by Y nomenclature. Typical display resolutions are 320x200, 512x480, 640x480, 800x600, 1024x768, 1280x1024, and 1600x1200.

9. The frame buffer stores for each pixel a number that identifies the color associated with the pixel. There are two ways that colors can be represented by the number in a pixel – either as a direct color value or as an index into a color map.

10. Color display information typically is generated as a blend of three colored light components: red, green, and blue (RGB). The combination of all three of these color components at full intensity produces a white output, while the absence of all three produces black output. Blending these three color components at different intensities can produce a near infinite number of distinct colors. Below is a table showing some examples of what colors result from blending different combinations of red, green, and blue light:

DECLARATION OF JAKE RICHTER IN SUPPORT OF
LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S
MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

2

Case No. 07-CV-2000-H (CAB)

| Red | Green | Blue | Result |
|---|---|---|---|
| 0% | 0% | 0% | Black |
| 0% | 0% | 100% | Bright Blue |
| 0% | 100% | 0% | Bright Green |
| 100% | 0% | 0% | Bright Red |
| 0% | 100% | 100% | Bright Cyan |
| 100% | 0% | 100% | Bright Magenta |
| 50% | 50% | 0% | Brown / Yellow |
| 100% | 100% | 0% | Bright Yellow |
| 50% | 50% | 50% | Medium Gray |
| 100% | 100% | 100% | Bright White |

Color table for various combinations of red, green, and blue light intensities.

11. In direct color, a certain number of the pixel's bits are assigned to each of the RGB color components. A pixel's size is defined by the number of "bits" of data the pixel occupies, and the number of bits there are per pixel determines the number of possible color values a pixel might have. For example, in the case when the number of bits per pixel is 24, 8 bits might be assigned to each of the three color components, for a total of 24 bits.

12. A drawback of direct color is that, if memory is a concern, it takes a relatively large amount of memory for a frame buffer to support common resolutions, because three different color values are actually stored for each pixel. A color map, or color look-up table, allows a pixel value to be specified by an index into a list of color values stored in memory. This permits the frame buffer to store for each pixel a single number representing a single color, thereby reducing the required frame buffer memory. A color map also adds a degree of versatility. For example, in a 4 bits per pixel mode (16 possible values), a program could choose the 16 colors from a much larger palette of colors instead of being limited to just 16 fixed colors. A color look-up table typically provides a good compromise between memory cost and output. However, as compared to direct color, significantly fewer colors are available at any one time with indexed color.

13. When an application program wishes to display information on a display device, such as a cathode ray tube (CRT), the CPU, either directly or via a graphics chip, places color information for each pixel into the frame buffer, either as a direct color value or as an index to the color map. This color information is then fetched from the frame buffer, one pixel at a time, converted from

DECLARATION OF JAKE RICHTER IN SUPPORT OF
LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S
MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

3

Case No. 07-CV-2000-H (CAB)

digital information into analog electrical signals representing the red, green, and blue intensities for that pixel. If indexed color is used, the color map is consulted to retrieve the RGB values for that index value before the digital to analog conversion. Those electrical signals are then passed to the display monitor, which displays the image.

14. Conceptually, display systems also make use of foreground and background colors. The foreground color is the color used to draw an object, like a line or character. The background color is the color used for the non-foreground space associated with the object, such as the inside of an "O" for example.

15. For some hardware and software combinations, it is possible to set the foreground and background colors at the beginning of a series of object drawing functions, so that it is not necessary to specify the foreground and background colors each time an object is drawn into the frame buffer. For example, a common graphics operation is to display text using a word processor. To draw a character of the text, the processor retrieves the character and the colors for the character from memory, and then draws the character on the display. The display of additional characters can be made more efficient by specifying the foreground and background colors upfront, since the processor will not need to specify the colors for each additional character. These pre-set colors are referred to as in-use foreground and in-use background colors.

16. The Fleming '759 patent generally discloses a digital image display system that makes use of three modes of access to color values: a direct color mode of access and two indexed color modes of access.

17. Before the inventions of the Fleming '759 patent in the early 1980's, most commercial information display systems were textual in nature, representing information solely using text characters. The desire to present information graphically on such display systems led to the use of blocky graphical characters called "block mosaics" from which extremely crude graphical imagery could be constructed. These initial systems required specific display hardware configurations, and content was therefore limited to those configurations, with each vendor having their own specific, fixed configuration incompatible with that of other vendors. Display devices

1  tended to be single function, single resolution devices, operating in a particular manner and no other.
2  If one wanted to increase the resolution or increase the number of colors, one had to physically
3  modify the hardware.
4      18.   The inventions of the Fleming '759 patent overcame these limitations by providing
5  display device independence that enabled content providers to create graphics content portable to a
6  variety of display devices regardless of the particular hardware configuration of the devices.
7      19.   Claim 1 of the Fleming '759 patent is illustrative of the inventions of the Fleming
8  '759 patent. Claim 1 claims a display system having a memory that stores color data values; a
9  processing means that selects one of three modes of access to color data values, a direct color mode
10 of access and two indexed color modes of access; and a display means that displays the colors
11 associated with the color data values accessed based on the mode selected by the processing means.
12     20.   As I previously indicated, it is my opinion that Recommendation S.100 does not
13 render obvious claim 1 of the Fleming '759 Patent, alone or in combination with any other prior art.
14     21.   First, as I previously opined, Recommendation S.100 does not disclose "a memory
15 for storing color data values," which the Court construed as "a color map that stores a table of color
16 data values indexed by numbers." Dr. Wedig points to Section 9.3.2 of Recommendation S.100 as
17 purportedly disclosing "a memory for storing color data values," but that section merely refers to a
18 "colour table." Section 9.3.2 provides no indication or suggestion that that "colour table" is "a color
19 map that stores a table of color data values indexed by numbers."
20     22.   During his deposition, in discussing Recommendation S.100, Dr. Wedig opined for
21 the first time that one of ordinary skill in the art would understand the reference to "colour table" in
22 Section 9.3.2 to refer to "a color map that stores a table of color data values indexed by numbers"
23 because of the reference to "[t]he ability to simulate motion (i.e. animation)" in that section. (*See*
24 pgs. 70-71.) I disagree.
25     23.   For example, the referenced "colour table" could refer to the video memory of a
26 hypothetical system based in some way upon Recommendation S.100. In that case, animation could
27 be produced by modifying certain portions of the displayed image with other colors, *i.e.* "redefining

28 DECLARATION OF JAKE RICHTER IN SUPPORT OF
LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S
MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

5

Case No. 07-CV-2000-H (CAB)

the colour table." This was a method I used myself to produce animation in video games in the early 1980s, and I learned that method from others. And it was understood to us that if we drew with a color similar to the surrounding color, the drawn pixels would visually blend in and would make a graphical object appear to disappear, as Section 9.3.2 suggests would be the case. This mechanism was used, for example, to make space ships and other animated objects move across the display. One would draw in a color to match the surrounding area in the place where one wanted to erase the moving object and modify the portion of the displayed images with the object's colors at the point where you next wanted to have it be viewed.

24. The reference to "colour table" in paragraph b of Section 9.3.2 could also refer to dynamically redefining the color set that a hypothetical system based upon Recommendation S.100 used, so that instead of bits b3, b2, and b1 referring to blue, green, and red color components, respectively, when specifying a color, the hardware would route b3 to red, b2 to blue, and b1 to green, for example. Or, such a redefinition mechanism could enable an intensity line to be set to 1 (high) in hardware, or even boost one of the color components. Such a dynamic change in color and/or intensity creates animation. This hardware redefinition of a color set was a technique I and others used in video games on various platforms in the early 1980s.

25. And another example from video games in that era which applies to Section 9.3.2 was the use of color hardware sprites, which were effectively small arrays of color values which defined an image which could be 'told' where to appear on the display to overlay the content already there. One would dynamically change the sprite's contents, look, and colors by redefining the data in the sprite's pixel array (*i.e.*, the "color table" of the sprite).

26. None of these three examples I have provided is "a color map that stores a table of color data values indexed by numbers," which is the Court's construction for the term "color memory." Thus, in my opinion there are a number of different and valid interpretations of the "colour table" referred to in paragraph b of Section 9.3.2 of Recommendation S.100. Dr. Wedig's opinion that there must be one and only one valid interpretation of this ambiguous language because of the reference to "animation" is therefore incorrect.

DECLARATION OF JAKE RICHTER IN SUPPORT OF LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

6

Case No. 07-CV-2000-H (CAB)

27. I was also questioned at my deposition about whether the reference in Section 9.3.1 of Recommendation S.100 to expanding the number of colors to 512 from 8 could be a reference to color memory. As I testified at my deposition, I do not believe Section 9.3.1 refers to a color memory. Rather, I believe this section refers to direct color.

28. Furthermore, even if Recommendation S.100 did disclose a color memory, Recommendation S.100 is clear that the colors described in the document are direct colors, not indexed colors. For example, when one looks at Figure 7/S.100, it is clear that colors are specified by bit values b1, b2, and b3, where b1 is the red component, b2 is the green component, and b3 is the blue component. This is also confirmed by Section 9.3.1, which indicates that "[m]ost of the currently planned and/or offered services utilize images created with only eight colors, which are formed by the various combinations (on or off) of three primary colors — red, green, and blue."

29. Thus, because Recommendation S.100 does not disclose a color memory or the use of indexed color, it does not disclose the second mode and third modes of access of claim 1, which both require specifying colors as indexes into a color memory.

30. Gateway nonetheless argues in its motion that Recommendation S.100 discloses indexed color because the Fleming '759 Patent admits that the Antiope system used indexed color, and the "alphamosaic parallel mode" of Recommendation S.100 was taken from Antiope. But as I previously opined, the four options discussed in Section 1.2.4 of Recommendation S.100 — including the mosaic option which is a superset of alphamosaic parallel mode — discloses four possible options for representing pictorial information, not modes of access to color data values as required by claim 1.

31. For example, in the version of the Antiope system described in the Preliminary Antiope Specification, it is clear from Section 5.2 that direct color is used: "The code permitting the selection of the color of the character also allows the alphabetic or graphical nature thereof. There is a direct correspondence between the binary elements b1, b2, and b3 of the code and the presence of the primary colors red, green, and blue." Thus, the particular option for representing pictorial information does not dictate the type of color specification used.

DECLARATION OF JAKE RICHTER IN SUPPORT OF LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

7

Case No. 07-CV-2000-H (CAB)

32. It is also my opinion that Recommendation S.100 does not disclose an in-use background color, and therefore does not disclose the third mode of access of claim 1 for this additional reason. While Section 5.4.2.2.10 of Recommendation S.100 discusses displaying characters "on a background of the colour indicated," it does not indicate that the color of the background "will be used as the background color for subsequently received text and graphics drawing commands until changed," since there is no indication that the background color will be drawn by the character drawing command.

33. Gateway nonetheless argues in its motion that "even under Lucent's flawed reading of the claim construction, a person of ordinary skill in the art would understand that Antiope and the alphamosaic parallel mode did set both a foreground color and a background color that would persist and be used for subsequently received text and graphics drawing commands and that both the foreground and background colors would be written by the same command at the same time." But as I previously opined, in the Antiope Specification, the background color needs to be re-set at the start of each row. Thus, the background color is not "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed."

34. Gateway has also argued for the first time in its motion that the reference to "known modes of color access" in the Fleming '759 Patent is an admission that the modes of claim 1 were known in the prior art. Dr. Wedig did not make this argument in his report, so I did not have an opportunity to respond. I have read the passage in question, and I do not agree that there is any such admission. But even there were such an admission, it is still my opinion that claim 1 would not have been obvious to one of ordinary skill in the art. At the time of the inventions of the Fleming '759 Patent, it was believed that combining direct color specification with indexed color specification in a single display system would not likely work. For example, as I noted in my original Rebuttal Report, the Graphics Standard Planning Committee of SIGGRAPH expressly rejected the combination of specifying colors as color data values and specifying colors as indexes into a color memory in a single display system. Thus, in my opinion, at the time of the alleged invention, even if the three modes of access were known in the art, one of ordinary skill in the art would not have been

led to combine them in a single system. It is also my opinion that the market trends toward higher resolution displays, a wider range of colors, and decreasing costs of memory would have led a person of ordinary skill to use just direct color, and not indexed color.

35. As I previously indicated, it is also my opinion that Recommendation S.100 and Crowther do not render obvious claims 2-3 of the Fleming '759 Patent.

36. First, given that Recommendation S.100 does not disclose a color memory or indexed color, it is my opinion that one of ordinary skill in the art would not have been led to combine Recommendation S.100 with Crowther. It is also my opinion that the market trends toward higher resolution displays, a wider range of colors, and decreasing costs of memory would have also led a person of ordinary skill in the art to not combine Recommendation S.100 and Crowther, since these trends weighed in favor of direct color and against indexed color. And I also do not believe that one of ordinary skill in the art would have been led to combine Recommendation S.100 with Crowther simply because they both refer to DRCS, since they address different aspects of DRCS.

37. But even if one were to combine Recommendation S.100 and Crowther, Dr. Wedig has failed to explain how Recommendation S.100 or Crowther discloses the corresponding structures for the setting functions of the processing means of claims 2 and 3. I have reviewed the documents, and I do not see any such structures disclosed anywhere.

38. It is also my opinion that the NASA Report does not anticipate or render obvious claims 1-3.

39. First, the NASA Report fails to disclose the first mode of access of claim 1. Claim 1 requires that in the first mode of access an in-use foreground color be directly specified as a color data value. The NASA Report indicates, however, that R, G, and B in the SET_CURRENT_COLOR (R,G, B) function are floating point numbers in the range of 0 to 1, which need to be converted to integers in order to be processed by the system. As such, the NASA Report does not disclose direct specification of color data values. Dr. Wedig also points to SET COLOR function. But the SET COLOR function also takes real (floating point) parameters rather than integers, and thus does not directly specify color data values either.

DECLARATION OF JAKE RICHTER IN SUPPORT OF
LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S
MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759                9                Case No. 07-CV-2000-H (CAB)

40.     Dell argues for the first time in its motion that it nonetheless would have been obvious to one of ordinary skill in the art to modify the system described by the NASA Report to use direct color specification. I disagree. The use of floating point specification gives the system described in the NASA Report increased flexibility, in that using floating point specification enables color to be specified without regard to the actual color depth, *i.e.,* the number of bits of R, G, and B, required by different types of graphics hardware that could be used with the system. A conversion could then be used to convert to the appropriate color depth. Eliminating floating point specification from a flexible system to make a less flexible system would not have been obvious to one of ordinary skill in the art, but in fact would have been completely counterintuitive.

41.     Second, the NASA Report fails to disclose the third mode of access of claim 1, and in particular fails to disclose an in-use background color. Gateway points to the SET_BACKGROUND_COLOR_INDEX (INDEX) function as evidence that the NASA Report discloses an in-use background color, but that command does not take effect until a NEWFRAME occurs, and thus sets the background of the entire screen, as even Dr. Wedig admits. The color set by the SET_BACKGROUND_COLOR_INDEX (INDEX) is therefore not used as the background color for subsequently received text and graphics drawing commands until changed." In fact, as Dr. Wedig admits, the NASA Report does not disclose any drawing commands that draw in a background color. Dell also points to the SET BACKGROUND INDEX function, but that function is called by the SET_BACKGROUND_COLOR_INDEX (INDEX), and thus operates in the same way.

42.     It is also my opinion that the use of an in-use background color with the system described by the NASA Report would not have been obvious to one or ordinary skill in the art. The reason is that the system described by the NASA Report is a stroke-based system, which means that it only draws in a foreground color, and has no drawing commands that draw in a background color, which Dr. Wedig also admits. Thus, the system described by the NASA Report would be physically incapable of using an in-use background color. For that reason, adding an in-use background color

DECLARATION OF JAKE RICHTER IN SUPPORT OF LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

10

Case No. 07-CV-2000-H (CAB)

1  to that system would not have made any sense from a technical perspective, nor would it have been a
2  predictable combination leading to predictable results.
3      43.    I also note that the developers of the CORE System, some of whom were leaders in
4  the field of computer graphics in the late 1970's and early 1980's, did not include an in-use
5  background color in the purported implementation of the CORE system described in the NASA
6  Report, demonstrating that there were no particular design or market demands for an in-use
7  background color or the ability to specify such a color. Thus, in my opinion the use of an in-use
8  background color would not have been obvious to one of ordinary skill in the art.
9      I declare under penalty of perjury under the laws of the United States that the foregoing is
10 true and correct and that this declaration was executed on this 14th day of December 2007.

*[signature]*

Jake Richter

DECLARATION OF JAKE RICHTER IN SUPPORT OF
LUCENT'S OPPOSITIONS TO GATEWAY'S AND DELL'S     11     Case No. 07-CV-2000-H (CAB)
MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF
CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759

## LUCENT TECHNOLOGIES INC. v. GATEWAY et al.

### Case No. 07-CV-2000-H (CAB)

## INDEX TO EXHIBITS TO DECLARATION OF JAKE RICHTER
### December 14, 2007

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | October 12, 2007 Supplemental Rebuttal Expert Report of Jake Richter |
| 2 | November 12, 2007 Second Supplemental Rebuttal Expert Report of Jake Richter |