# Richter Declaration

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff, <br> v. <br><br> GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., <br><br> Defendants, <br> and <br><br> MICROSOFT CORPORATION, <br><br> Intervener. | Case No. 07-CV-2000 H (CAB) |
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br> v. <br><br> LUCENT TECHNOLOGIES INC., <br><br> Defendant. | |
| LUCENT TECHNOLOGIES INC., <br><br> Plaintiff, <br> v. <br><br> DELL INC., <br><br> Defendant. | |

**SECOND SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER**

1. I submit this Second Supplemental Expert Report to respond to certain opinions offered by Dr. Wedig for the first time during his October 23, 2007 deposition.

2. During his deposition, in discussing Recommendation S.100, Dr. Wedig opined for the first time that one of ordinary skill in the art would understand the reference to "colour table" in Section 9.3.2 to refer to "a color map that stores a table of color data values indexed by numbers" — which is the Court's construction of the term "color memory" — because of the reference to "[t]he ability to simulate motion (i.e. animation)" in that section. (*See* pgs. 70-71.) I disagree.

3. While Section 9.3.2 refers to potential enhancements which could be achieved to "simulate motion (i.e. animation)," it is unclear from Section 9.3.2. what sort of motion would be simulated or what sort of animation would be provided, or in what context or environment. It is also unclear how such motion simulation or animation proposed by Section 9.3.2 would be controlled, as Recommendation S.100 does not provide any guidance on implementing any of the several suggested potential enhancements listed in that section.

4. Dr. Wedig specifically cites to paragraph b of Section 9.3.2., which suggests "dynamically altering the colour of portions of the display image, making them appear or disappear by redefining the colour table (an image disappears when its colour is set to the same colour as the surrounding area)." Recommendation S.100 provides no guidance, however, as to how to control the dynamic alteration of portions of the display image, or what is meant by "redefining the colour table." While Dr. Wedig opines that a "colour table" necessarily refers to a "color memory" as construed by the Court because of the reference to "animation," I disagree.

5. For example, the referenced "colour table" could refer to the video memory of a hypothetical system based in some way upon Recommendation S.100. In that case, animation

could be produced by modifying certain portions of the displayed image with other colors, i.e. "redefining the colour table." This was a method I used myself to produce animation in video games in the early 1980s, and I learned that method from others. And it was understood to us that if we drew with a color similar to the surrounding color, the drawn pixels would visually blend in and would make a graphical object appear to disappear, as Section 9.3.2 suggests would be the case. This mechanism was used, for example, to make space ships and other animated objects move across the display. One would draw in a color to match the surrounding area in the place where one wanted to erase the moving object and modify the portion of the displayed images with the object's colors at the point where you next wanted to have it be viewed.

      6. The reference to "colour table" in paragraph b of Section 9.3.2 could also refer to dynamically redefining the color set that a hypothetical system based upon Recommendation S.100 used, so that instead of bits b3, b2, and b1 referring to blue, green, and red color components, respectively, when specifying a color, the hardware would route b3 to red, b2 to blue, and b1 to green, for example. Or, such a redefinition mechanism could enable an intensity line to be set to 1 (high) in hardware, or even boost one of the color components. Such a dynamic change in color and/or intensity creates animation. This hardware redefinition of a color set was a technique I and others used in video games on various platforms in the early 1980s.

      7. And another example from video games in that era which applies to Section 9.3.2 was the use of color hardware sprites, which were effectively small arrays of color values which defined an image which could be 'told' where to appear on the display to overlay the content already there. One would dynamically change the sprite's contents, look, and colors by redefining the data in the sprite's pixel array (*i.e.*, the "color table" of the sprite).

8. None of these three examples I have provided is "a color map that stores a table of color data values indexed by numbers," which is the Court's construction for the term "color memory." Thus, in my opinion there are a number of different and valid interpretations of the "colour table" referred to in paragraph b of Section 9.3.2 of Recommendation S.100. Dr. Wedig's opinion that there must be one and only one valid interpretation of this ambiguous language because of the reference to "animation" is therefore incorrect.

9. Dr. Wedig also opined for the first time during his deposition that CRC-699- E's reference to "color look-up" and "colour reference table" would be understood by one of ordinary skill in the art to necessarily refer to "a color map that stores a table of color data values indexed by numbers." (*See* pgs. 139-40, 146-47.) I disagree.

10. First, on Page 50 of CRC-699-E, the document states that "The facility bit b2 is reserved for possible future use with colour reference tables." There is no indication what a color reference table is, how it would be accessed, or how it would actually be used, as all color specification in the CRC-699-E document is direct. Furthermore, bit b2, based on the examples provided on page 50, can be combined with either the Grey Scale or Colour bit settings of bit b1 when the Tonal Control function is specified. It is not clear to me how "color reference tables" would be used with both grey scale and colour, but assuming for the moment that they can be used together in some fashion, then this bit b2 could be used to select a different color system, for example YUV or HLS, instead of the default RGB. Certainly YUV, HLS, and other color systems known at the time that the CRC-699-E document was purportedly published, are viable alternate color systems, and as they all use color component triplets, could be supported by the rest of the disclosure in the CRC-699-E document without the addition of new commands or significant modification of existing ones. Thus, in my opinion the reference on page 50 to

"colour reference tables" would not necessarily be understood by one of ordinary skill in the art to refer to a "color memory" within the meaning of the Court's construction of that term.

11. The CRC-699-E document also states on page 70: "b) Colour Lookup could provide the capability of defining specific colours such as flesh tones or shades of yellow to brown to extend a terminal's colour capability. Additional hardware is required for this capability which is not cost effective at this time." Again, CRC-699-E provides no specific guidance on what this suggestion means. In view of my experience in and knowledge of the development of graphics systems in the early 1980s, and working with graphics artists, it is my opinion that one of ordinary skill in the art could interpret this as a suggestion that one could expand, at some not insignificant expense, the hardware system addressed by providing and defining a much greater range of colors (e.g. greater bit depth). In order for a graphics artist developing content for this system to be able to more easily determine which color(s) to specify in his or her visual design from this expanded color range, the artist would use a color lookup system in which commonly used colors are defined. This sort of color lookup system has been in use by graphics designers since at least the early 1970s, per my personal experience, in the form of the Pantone Matching System (PMS), and continues to this day, both with PMS swatch books (known as Pantone Guides) as well as with books published which allow graphics designers to perform color lookups for particular colors, e.g. a warm skin tone, blue sky, the brown of a coconut shell, etc., in the book, and then figure out the color data values they would directly specify in their work to get that color to appear in their graphics output. Thus, in my opinion the reference on page 70 of CRC-699-E to "Colour Lookup" would not necessarily be understood by one of ordinary skill in the art to refer to a "color memory" within the meaning of the Court's construction of that term. Dr. Wedig also opined for the first time that a table with color data values can only be indexed by

numbers. (*See* pgs. 71-72.) I disagree. Such a table could, for example, be indexed by words, as discussed above.

    12. Dr. Wedig also opined for the first time that it would have been a "noncreative" step to add an in-use background color to the system described in the NASA Report. (*See* page 180.) I disagree.

    13. As I indicated in my Supplement Expert Report, the NASA Report does not disclose any text or graphics drawing commands that draw in a background color. The primitives disclosed in the NASA Report are stroke primitives, which means that they draw only in a foreground color. Because the primitives disclosed in the NASA Report are stroke primitives, adding an in-use background color to the system described in the NASA Report, or the ability to specify such a color, would make no sense from a technical perspective, and would not have been a predictable combination leading to predictable results. Moreover, the developers of the CORE System, who were leaders in the field of computer graphics in the late 1970's and early 1980's, did not include an in-use background color in the version of the CORE system described in the NASA Report, demonstrating that there were no particular design or market demands for an in-use background color or the ability to specify such a color. All of the foregoing reasons make clear that it would have been a creative step for one of ordinary skill in the art to add an in-use background color and the ability to select such a color via a color memory to the system described in the NASA Report, and therefore it would not have been obvious to include the third mode of access of claim 1 in that system.

November 11, 2007      By _____/s/ Jake Richter_____
                          Jake Richter

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of November, 2007, a copy of the foregoing SECOND SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER was served on counsel for Gateway, Microsoft and Dell as follows:

**EMAIL**
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099
marchese@fr.com
srodriguez@fr.com

Attorneys for *Microsoft Corp.*

**EMAIL**
Ali Sharifahmadian
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
Telephone: 202-942-5000
Facsimile: 202-942-5999
ali_sharifahmadian@aporter.com

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:   202-756-8000
Fax:   202-756-8087
jfreed@mwe.com

Attorneys for *Dell Inc.*

**EMAIL**
W. Bryan Farney
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:   512-394-3000
Fax:   512-394-3001
bryan.farney@dechert.com

Attorneys for *Gateway, Inc., et al.*

_____
Jay Mafale

Legal Assistant