# Ward Declaration

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES, INC., )
)
       **Plaintiff,** )
)
       **v.** )
)
GATEWAY, INC.; GATEWAY COUNTRY )
STORES LLC; MICROSOFT )
CORPORATION; AND DELL, INC., )
)
       **Defendants.** )
)

**Case No. 02-CV-2060-B (CAB),
consolidated with Case No. 03-CV-
0699-B (CAB) and Case No. 03-
CV-1108-B (CAB)**

**HON. RUDI M. BREWSTER**

## EXPERT REPORT OF JEAN RENARD WARD RELATING TO THE EXPERT REPORT OF JOHN P.J. KELLY, PH.D. RE LUCENT'S AGULNICK PATENT

       1.     I have been retained as a technical expert in this case by Lucent Technologies, Inc. ("Lucent") to provide my opinions regarding the contentions put forth by Microsoft Corporation, Gateway, Inc., and Dell, Inc. regarding the validity and other technical matters concerning certain claims of U.S. Patent No. 5,347,295 ("the '295 patent").

## I.    QUALIFICATIONS AS AN EXPERT

       2.     My background and qualifications are set forth in my Infringement Report.

       3.     I have provided testimony in other matters as set forth in my Infringement Report.

## II.    SCOPE OF STUDY AND OPINION

### A.    Documents and Information Considered in Forming Opinions

       4.     The following opinions and analysis are based upon a review of the '295 patent, the file history for the '295 patent, the prior art cited in the file history, the Kelly Report regarding the '295 patent ("the Kelly Report"), and the materials identified in the Kelly Report, including the devices, systems, and software.

5.      Additional material which I considered in preparing this report is cited herein. Additionally, I have of course considered the materials which I studied for purposes of my initial report.

6.      Finally, I have relied upon the claim interpretations provided by the Court in the Court's February 25, 2004 Claim Construction Order.

**B.      Exhibits to Be Used as a Summary or Support for the Opinions**

7.      At trial I expect to rely upon materials and documents produced in this litigation and various other documents that the parties have exchanged, such as interrogatory responses. I also may rely on visual aids and demonstrative exhibits that I may prepare or have prepared based on these materials, including by way of example, figures and excerpts from the '295 patent, claim charts, deposition testimony, diagrams and other graphical presentations describing the technology relevant to the '295 patent and the design, operation and functions of the accused products I have been asked to analyze, and the operation and functions of the prior art devices, systems, and software cited in Dr. Kelly's report.

8.      Further, I traveled to San Diego on April 25, 2006 from Boston, MA to spend one day examining the actual devices, systems, and software relied upon by Dr. Kelly or cited specifically in his report. During my visit, I made digital video recordings and photographs of the devices and some aspects of their operation for possible further study, reference, and use at trial.

**C.      Summary of Opinions**

9.      It is my opinion that in the Court's February 24, 2004 Claim Construction Order, the Court stated that the claims of the '295 patent cover certain handwriting recognition algorithms and therefore a prior art reference does not necessarily read upon the claims of the '295 patent simply because it discloses recognition of handwritten characters.

Exhibit B
Page 000076

10.      It is my opinion that *none* of claims 1, 3, 4, 6, 12, 39, 40, 41, and 43 of the '295 patent are obvious over what Dr. Kelly calls "Admitted Known Systems" in view of the testimony of Todd Agulnick and/or other prior art as asserted by Dr. Kelly.

11.      It is also my opinion that *none* of claims 39, 40, 41, 43 or 46 of the '295 patent are obvious over the CASIO PF-8000 as asserted by Dr. Kelly

12.      It is also my opinion that *none* of claims 1, 3, 4, 6, 12, 39, 40, 41, 43 and 46 are anticipated by the Paper-like Interface video as asserted by Dr. Kelly.  It is also my opinion that where the Paper-like Interface video fails to put the claimed concepts precisely within the public grasp that it does not make the missing concepts so obvious they readily could be grasped, as Dr. Kelly claims.

13.      It is also my opinion that *none* of claims 1, 4, 6, 39, 41, 43 and 46 are anticipated by U.S. Patent No. 4,972,496 ("the '496 patent).   It is also my opinion that where the '496 patent fails to put the claimed concepts precisely within the public grasp it does not make the missing concepts so obvious they readily could be grasped, as Dr. Kelly claims.

14.      It is also my opinion that *none* of claims 1, 3, 4, 6, 12, 41, 43 and 46 are anticipated by U.S. patent No. 4,839,634 ("the '634 patent).  It is also my opinion that where the '634 patent fails to put the claimed concepts precisely within the public grasp it does not make the missing concepts so obvious they readily could be grasped, as Dr. Kelly claims.

15.      It is also my opinion that *none* of claims 1, 4, 6, 39, 40, 41, 43 and 46 are obvious over the Mac UnMouse computer system in view of touch sensitive display screen systems as asserted by Dr. Kelly.

16.      It is also my opinion that *none* of claims 1, 4, 39, 40, 41, and 46 are anticipated by the X Window System User's Guide.  It is also my opinion that where the X Window System

Exhibit B
Page 000077

User's Guide fails to put the claimed concepts precisely within the public grasp it does not make the missing concepts so obvious they readily could be grasped, as Dr. Kelly claims.

17.     I note that at various times in Dr. Kelly's report he makes the general statement that if the art on which he based his conclusion did not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be. *See* Kelly Report 16. I disagree with those statements as set forth more fully in the sections below. Furthermore, to the extent that Dr. Kelly is allowed to present actual discernable opinions as to precisely which elements are obvious and which are actually in the reference, I would anticipate providing analysis and rebuttal.

18.     I note further that at various times in Dr. Kelly's report he incorporates by reference Exhibits including claim charts and those claim charts seem to propose some additional possible combinations of references apparently for contending obviousness.  For example, Exhibits D, E, and F.  In more than one instance, these Exhibits contain no analysis, no description of which claimed features are present in the reference, no discussion of the motivation to combine the additional references cited for obviousness purposes, or any indication tying these charts back to the analysis in Dr. Kelly's report.  To the extent that Dr. Kelly has provided actual analysis, I have addressed it in the corresponding sections in my report.

19.     At trial I anticipate that I would give a basic tutorial that will assist the Court and/or jury in understanding the technology applicable to the '295 patent and the prior art cited by Dr. Kelly.

20.     I understand that Microsoft, Gateway, and/or Dell may attempt to make certain invalidity, enforceability, and/or claim interpretation arguments beyond those stated in

4

Dr. Kelly's report. If asked to do so at trial, I would expect to rebut such arguments as I see appropriate.

## III.     TECHNOLOGICAL BACKGROUND

21.     At trial, I may discuss and/or demonstrate fundamental concepts of pen computing and in particular stylus-based gesture-controlled devices to provide background material to the Court or jury, as these topics might not be known to someone unfamiliar with the field. Particular topics may include the fundamental differences between mouse-based systems and tablet systems for handwriting capture. For example:

22.     Mouse devices do not obscure the display whereas touch screens and integrated digitizers do obscure the display [Microsoft03c].[1] Mouse input works easily with multiple displays whereas integrated tablets and touch screens do not work with multiple displays [Microsoft06b]. Mouse devices do not require calibration to the display whereas tablets, whether integrated or not, do require calibration and recalibration to the display [Microsoft06c]. A mouse device does not generally move on button up whereas stylus lift is problematic due to motion on stylus lift; a mouse does not generally move between targeting and clicking whereas a stylus tap almost invariably involves motion between targeting and clicking [Microsoft06b] [Microsoft03c] [Microsoft03f]. Mouse devices do not report position when not moving whereas tablet devices for shape recognition report data at a fixed data rate even when the stylus is not moving. Mouse devices do not generally work adequately for handwriting or shape recognition for various technical reasons [GoldbergA04]. Mouse hardware does not need to track and generally does not track every motion increment whereas tablet devices for shape recognition are designed to report

---

[1]     Bracketed citations in this format refer to citations available in my on-line bibliography at http://users.erols.com/rwservices//biblio.html.

Exhibit B
Page 000079

the actual position at all times. Mouse devices report segments of relative motion whereas tablet devices for electronic ink report position of the stylus and that this is specifically true and accurate position [Answers06]. Tablet devices may operate with a puck or may operate with a stylus and these are functionally different devices [WinTab06].

23.     Further: mouse and mouse-like drivers by design and by intent drop intermediate position data [PenWindows92a] whereas tablet drivers for electronic ink do not and specifically in gesture systems they do  not [Microsoft99a].    Mouse drivers typically deliver non-linear motion data whereas tablet drivers for electronic ink must report linear absolute position only. Mouse drivers provide pointing data whereas tablet drivers for gesture input provide electronic ink data [Microsoft03e] and may provide it separately from and in addition to providing mouse data [PenWindows95b].

24.     Further, detection of mouse click and mouse button events do not involve the recognition of shapes, whereas tap gestures are recognized based on special considerations in a shape recognizer.   Mouse GUI's use only position information of a button event or some intermediate positions whereas gesture GUI's require all positions of the stylus motion [Microsoft03e].  A mouse click or mouse action event is a pointing event, and not a drawing or gesture event involving electronic ink [Microsoft06d].  A keyboard-less system can be done with a mouse or other pointing device and perhaps a simulated keyboard but that does not involve gestures or handwriting recognition nor involve electronic ink data [Nokia05] [Itablet06] whereas gestures involve recognition of shapes and necessarily the corresponding electronic ink data.

25.     Other references that form the foundation for a tutorial in the design, operation and use of pen computing systems are numerous, and would include especially the following:

6

"Microsoft Windows for Pen Computing Programmer's Reference: Version 1 Designed for Windows 3.1" (1992) [PenWindows92a]; "Principles of Interactive Computer Graphics", second edition by Newman and Sproull, especially chapter 11 "Graphical Input Devices" [NewmanWM73b]; "Digitizer Technology: Performance Characteristics and the Effects on the User Interface", IEEE CG&A April 1987 [Ward87c]; "Studying the Movement of High Tech. Rodentia: Pointing and Dragging", InterCHI '03 [CohenO93]; MSDN "Microsoft Tablet PC - Working with the Pen Top" [Microsoft06a]; MSDN "Microsoft Tablet PC - Design Recommendations" [Microsoft06b]; MSDN "Developing Tablet PC Software by Using the Windows XP Tablet PC Edition 2005 Recognition Pack" [GoldbergA04]; www.answers.com/topic/graphics-tablet,          http://www.answers.com/topic/computer-mouse [Answers06]; Microtouch Systems Inc. "TouchWare for OS/2 User's Guide" [Microtouch98a]; Microtouch Systems Inc. "MT3000 Capacitive Controller" [Microtouch98b]; "Computer graphics: technology and applications, Academic Press, Boston, 1988 ISBN 0126399700" [CarswellNS88]; MSDN "Microsoft Tablet PC - Windows XP Tablet PC Edition" [Microsoft03c]; "Notes for Tablet Aware Application Developers", www.wacomeng.com [WinTab06]; MSDN "Microsoft Tablet PC - Visual Design for Tablet PC" [Microsoft06c]; "Programmer's Guide to Pen Services for Microsoft Windows95" [PenWindows95b]; MSDN "Microsoft Tablet PC - Making the Pen Work" [Microsoft06d]; MSDN "Microsoft Tablet PC - Timeline of Mouse Messages and System Events" [Microsoft03f]; Nokia "Nokia 770 Internet Tablet", www.nokia.de [Nokia05]; [MSLT_1020838]; "iTab - The Mac Laptop Evolved", www.itablet.theplaceforitall.com [Itablet06]; "Description of Windows for Pen Computing Pens", Microsoft Knowledge Base KB85663 [Microsoft99a]; MSDN "Microsoft Tablet PC - System Events and Mouse Messages" [Microsoft03e].

Exhibit B
Page 000081

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

26.    I have reviewed the subject matter of the patent at issue and have arrived at a conclusion as to the level of ordinary skill in the art applicable to the patent at issue.  I have read Dr. Kelly's proposal for the level of ordinary skill in the art for the '295 patent (*See* Kelly Report 6-7) and generally agree with his opinion of what qualifies as one of ordinary skill.  Importantly, however, although Dr. Kelly states that one of ordinary skill in the art would have a "familiarity" with pen driven computing, what Dr. Kelly means by "familiarity" is unclear.

27.    In my opinion, a person of ordinary skill in the art at the time of the invention of the '295 patent would have a BS degree in computer science or equivalent technical knowledge, plus 2-4 years of experience in software development including at least 2 years experience in pen computing development.  Accordingly, Dr. Kelly and I appear to disagree on the crucial issue of knowledge and experience with pen computing.

28.    Generally, I would expect someone sufficiently "familiar" with pen computing to meet my definition of the person of ordinary skill to have direct personal experience with at least a couple of the following specific areas:

- Stylus-based user interfaces as contrasted to user interfaces designed for a mouse or tablet with puck;

- Handwriting capture and input to computers including device drivers for electronic ink capture as contrasted to mouse-type drivers;

- On-line (real time) handwriting recognition and/or handwriting gesture input;

- Algorithms and software for rendering of ink in an electronic image;

- Touch pad hardware design and physical properties of touch pad devices;

- Behavior of digitizing tablets such as electromagnetic and capacitive digitizers;

- Mechanical design of handwriting sensors or instruments, in particular defective behaviors; and

Exhibit B
Page 000082

- Signal processing or pre-processing of the type used with on-line handwriting capture.

I would note also, at the time of the invention, pen computing was not a standard subject of course matter in engineering schools, and thus a person of ordinary skill in pen computing would necessarily have acquired their basic knowledge and understanding from some amount of actual development experience in this particular field.

29.    I have considered Dr. Kelly's background, as set forth in his CV and described more fully in the background section of his report, and his list of publications. At present, I am unable to find experience in the aspects of pen computing, mentioned above in ¶ 28, nor am I familiar with Dr. Kelly from my experience in the field.

## V.    UNDERSTANDING OF LEGAL STANDARDS

30.    I understand from counsel that a patent is invalid on the basis of anticipation if a single prior art reference discloses, either expressly or inherently, each and every limitation of the claimed invention.  Accordingly, if any limitations are not disclosed by that single prior art reference, then the patent is not anticipated by that reference.

31.    I understand that a patent claim may be found invalid as having been obvious only if the differences between the claimed subject matter of the patent and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art of the invention at the time the invention was made.

32.    I also understand that to conclude that an invention is obvious based upon a combination of two or more references, there must be a reason, suggestion, or motivation that would lead one of ordinary skill in the art to combine the references.  The reason, suggestion, or motivation to combine may be found in the prior art references themselves, in the knowledge of

Exhibit B
Page 000083

one having ordinary skill in the art, or from the nature of the problem to be solved. The motivation to combine the references must have existed at the time of the invention.

33.    I understand that a motivation to conduct further testing or research that may lead to the claimed invention is inadequate to render a claim obvious. That is, an invention is not rendered obvious on the grounds that it was obvious to try the claimed invention.

34.    I understand that to determine whether a patent claim is invalid as obvious, one examines secondary considerations of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, copying, and unexpected results.

35.    I understand that it is improper to use the benefits of hindsight and the teachings of the patent-in-suit to combine the prior art references for an obviousness inquiry.

36.    I understand that patents are presumed valid. I further understand that the presumption of validity can be overcome only if the party seeking to invalidate the patent can prove invalidity by clear and convincing evidence.

37.    I understand that the Court's rulings on the construction of claims is binding. I have followed the Court's February 24, 2004 Claim Construction Order in my analysis. I note that at certain points Dr. Kelly appears to not follow the Court's Order (*e.g.*, Kelly Report paragraph 163).

## VI.    VALIDITY ANALYSIS

38.    For each asserted claim of the '295 patent asserted against Microsoft, Gateway, and/or Dell, I discuss the limitations of the claims that are not present, or taught, in the prior art, alone or in combination, as asserted by Dr. Kelly.

39.    In the instances where Dr. Kelly states an opinion that the claims of the '295 patent are obvious in view of the prior art, alone or in combination, I discuss the reasons why the asserted claims would not be obvious, including the lack of inherency of the missing feature(s) in

10

the cited reference(s), the failure to show any motivation to combine references, and the secondary considerations of non-obviousness.

40.     I understand that claim construction is ultimately a legal issue for the Court, and that the Court has provided interpretations of certain terms whose meaning was apparently disputed by the parties.

41.     I understand that where a reference does not disclose something, that something may be "inherent" in the reference, but only where the thing is "necessarily present"; "possibilities and probabilities" are not sufficient.

A.     **Handwriting Recognition Algorithms**

42.     Dr. Kelly alleges that to the extent that a prior art reference discloses recognition of handwritten characters, he has concluded that it reads upon the claims of the '295 patent. *See* Kelly Report pages 1-2. The Court has instructed that the handwriting recognition algorithms applicable to the patent must fall within one of the three references cited by the Court in the February 24, 2004 Claim Construction Order. Specifically, the references (2), (3), and (4) on page 4 of the Claim Construction Order. I was unable to find in Dr. Kelly's report an analysis of whether or not pieces of prior art for recognizers actually meet the Court's Claim Construction.

43.     Dr. Kelly's statement at the end of Paragraph 27 of his report also results in a logical problem – Dr. Kelly's assumptions *include* technologies which are specifically *excluded* by the claims of the '295 patent. For example, the Court's definition requires that recognition fall within one of the three references, but that is not sufficient. There are types that may happen to fall within these categories, but which are not covered by the claims of the '295 patent – for example, off-line recognition algorithms. Further there may be other types of recognition that are not mentioned in any of the three references, which nonetheless may still be called recognition of handwritten characters.

Exhibit B
Page 000085

**B.     Dr. Kelly's Unknown Collection of References (which Dr. Kelly calls "Admitted Known Systems")**

44.     Dr. Kelly discusses some undefined "group" of alleged prior art references that he calls "Admitted Known Systems." Because this terminology is misleading, and because Dr. Kelly does not define exactly what art or reference he is actually analyzing, I will instead refer to this "group" of alleged prior art as Dr. Kelly's Unknown Collection of References ("UCoRs").

45.     I note that Dr. Kelly does not assert that any of his UCoRs anticipate the claimed invention. I have no reason to disagree with that conclusion.

46.     I note first that Dr. Kelly does not cite to any specific reference which he may have analyzed for such things as the recognition of gestures. I am further confused by some of his citations, such as at paragraph 33 of Dr. Kelly's Report to col. 1, lines 17-32 of the '295 patent because this section does not refer to gestures or recognition. From what I can tell, Dr. Kelly's UCoRs are items that were disclosed in the '295 patent itself. These references were, therefore, apparently considered by the patent Examiner, who must have concluded (contrary to Dr. Kelly) that they did not invalidate the claims of the '295 patent. My conclusion from reviewing the prosecution history of the '295 patent is that the Examiner did a careful and thorough examination of all of Dr. Kelly UCoRs. Based on the issuance of the '295 patent, it is clear that the Examiner's resolved any issues concerning Dr. Kelly's UCoRs in favor of the patentee. I find no arguments in Dr. Kelly's Report that cause me to doubt the Examiner's resolution of these technical points.

47.     I note that Dr. Kelly's "analysis" of his UCoRs was based upon his reading of the deposition of one of the six inventors, Todd Agulnick. However:

- Mr. Agulnick testified about his various experience before working at Go. Corp. I note that he had no prior experience in handwriting recognition or pen computing,

Exhibit B
Page 000086

making it unlikely he would have been familiar with any relevant prior art. (*E.g.*, Agulnick Dep. 41:24-42:1)

- Mr. Agulnick stated during his deposition that he had no specific recollection of the drafting of the patent or participating in its prosecution. (*E.g.*, Agulnick Dep. 24:8-25, 130:13-17);

- At the time of the invention of the '295 patent, Mr. Agulnick could not name his contribution to the patent (Agulnick Dep. 133:7-134:4) and stated that the patent was the result of a team effort (Agulnick Dep. 132:6-15, 194:24-195:6), which team would necessarily consist of at least six individuals, namely the named inventors;

- Mr. Agulnick stated several times that he *was not* familiar with the prior art (*e.g.*, Dep. 183:11-13) and technical points that he was being asked about during the deposition (*e.g.*, Dep. 98:25-99.4 and 201:16-18). Additionally, Mr. Agulnick testified that he had not become familiar with such facts or art in the many years between. (Dep. 193:11-18)

- I note that it was approximately 15 years since Mr. Agulnick's participation in the project that lead to the '295 patent.

- I myself noted from my own review of the materials in this case several erroneous statements by Mr. Agulnick while he was being asked to speculate on various technical matters. (*E.g.*, Dep. 86:5-8 and 210:11-12)

Given the lack of knowledge by Mr. Agulnick, the time that had passed, his repeated disclaimers that he did not have precise information or was speculating, and the confirmation of these difficulties by the incorrect statements Mr. Agulnick made while being asked questions he never knew the answers to, his testimony is in no way the type of information upon which I would rely upon in coming to a definite conclusion in a technical matter. I would certainly not consider any such speculations, or Dr. Kelly's analysis built upon them, to be "clear and convincing" proof of invalidity.

48.    I have been informed that under the law, testimony concerning the contents of the prior art must be corroborated by additional evidence, such as testimony of another witness or documentary evidence. This further supports my conclusion that Mr. Agulnick's testimony is not sufficient to prove invalidity.

13

### (1)    Claim 1

49.    Dr. Kelly states that based on the prior art as a whole, the general knowledge of those skilled in the art and the nature of the problem to be solved, it would have been obvious to combine the techniques of the his UCoRs with the Macintosh computer and applications written for the Macintosh computer to achieve what is set out in claim 1. *See* Kelly Report 4. Dr. Kelly further states that the motivation to combine is explicit in the references. *Id.*

50.    If Dr. Kelly also concluded that any claim of the '295 patent is obvious in light of something other than the Macintosh computer and UnMouse, he has not stated what such combinations actually are. At this point, I can respond only to what Dr. Kelly has actually discussed, which is the combination of the Macintosh and UnMouse.

51.    I note first that Dr. Kelly in his report provides no information to substantiate the MicroTouch UnMouse is *prior* art. When I examined the actual UnMouse device, I noted that the copyright date on the back of the device was 1990. *See* the digital photograph in the collection of digital videos and photographs mentioned above. Further, The Mac UnMouse User's Guide cited by Dr. Kelly in his report has a copyright date of 1991 and this is the same copyright date as what appears to be the original copy in the lab. Based upon either the filing date of the '295 patent or the evidence set forth by Lucent with respect to the dates of conception and reduction to practice of the '295 patent, the evidence indicates that the Mac UnMouse is not prior art at all. Nonetheless, I provide my substantive analysis concerning the UnMouse below (making the assumption for purposes of argument that the UnMouse may be *prior* art).

52.    The Macintosh computer with the addition of the UnMouse does not render obvious Claim 1 of the '295 patent. The combination fails to disclose the following claimed features: a stylus which acts on the screen for displaying information; detecting a stroke of the stylus tip in contact with the screen; detecting a departure of the stylus tip from the screen;

14

termination of gestures comprising at least one stroke in response to said departure of the stylus tip; a recognition of gestures; recognizing a plurality of gestures; comparison of gestures to at least one predefined shape; any handwriting recognition algorithm in any of the references set forth in the Court's Claim Construction Order; implementing recognized gestures; performing predetermined actions associated with a predefined shape; performing the function of predetermined actions being determined by the context in which the gesture is used; executing predetermined actions on operating system level objects in response to gestures; executing predetermined actions on application level objects in response to gestures; and strokes which are drawing movements.

53.     I have considered whether Dr. Kelly might have meant the combination of Macintosh and UnMouse, *plus* one or more other unspecified references (such as one for handwriting recognition and another for the integration of a touch pad and a display) would render one or more claims obvious. Any such combinations with the Mac UnMouse would be, in practical terms, unsuitable and actually discourage a development engineer from designing such a system. For example, a driver which drop/coalesces movement data would provide very unreliable input to a recognizer which must see the full shape of a handwritten input: an experiment with a handwriting recognizer in the presence of unreliable input would likely perform badly, with a high error and/or failure rate, and discourage use of a handwriting recognizer. *See* my analysis above in ¶¶ 22-23.

### (2)     Claim 3 and Claim 12

54.     Dr. Kelly states that (some of?—he is not forthcoming on this point) of his UCoRs include digitizers which sense when the stylus is in proximity to or in contact with the screen as noted by the Examiner. *See* Kelly Report 5. Dr. Kelly further states that, according to the Examiner, it would have been obvious to one or ordinary skill that a system using a

15

proximity sensing digitizer could display an indicator when the stylus is in proximity to it and terminate the indicator when the stylus tip departs from proximity. *Id.*

55.     Claim 3 depends form claim 1 and claim 12 depends from claim 3, therefore my analysis in ¶¶ 49-53 apply here.

56.     In Dr. Kelly's analysis of claims 3 and 12, he has not stated how a proximity sensing digitizer relates to the design of the UnMouse. The UnMouse specifically responds only to touch and indeed has a very definite tactile feel in the pressing mechanism that is used to generate a mouse down input. I note that the Examiner was eventually satisfied as to the appropriateness of claims 3 and 12 as is clear by the granting of the claims in view of the proximity references. Dr. Kelly provides no additional analysis that would lead me to doubt the Examiner's conclusion, and I in fact agree with the Examiner's decision to grant the claims.

57.     Further, technical aspects of the UnMouse device lead one away from providing proximity detection because the design of the UnMouse is unsuitable for operating in front of a screen. *See* my analysis in ¶¶ 22-23 and at ¶ 134.

           (3)    **Claim 4**

58.     Dr. Kelly states that (some of?—again, he is not clear) his UCoRs detected a direction of motion of each gesture. *See* Kelly Report 5. Claim 4 depends from claim 1, therefore my analysis in ¶¶ 49-53 applies here.

59.     Dr. Kelly provides no details of his analysis other than stating that dragging a stylus from right to left is a motion from right to left. However, this is not a gesture, it only involves the detection of some locations of the stylus and the detection of a mouse click event. It does not meet the Court's definition of a gesture, or the definition of a stroke. Further, Dr. Kelly's reference to the patent at Col. 1:17-32 does not discuss or relate to the use of gestures.

16

### (4)    Claim 6 and Claim 43

60.    Dr. Kelly states that (some of?—again, he is not clear) his UCoRs include the ability to "track the stylus" and "display images which mimic various real-world objects" including simulation of "paper", and "ink". Dr. Kelly further states that (some of?) his UCoRs included the capability to display the shape representing the actual gesture made by the user. *See id.* Claim 6 depends from claim 1, therefore my analysis in ¶¶ 49-53 applies here. Claim 43 depends from claim 41, therefore my analysis in ¶¶ 65-66 applies here.

61.    Dr. Kelly does not provide the details of his analysis but refers only to a section of the patent, namely Col 1:6-16, which does not refer to the control of a computer with gestures. This section of the patent only refers to simulation of real world objects. Real world paper and ink do not detect or respond to direction of motion of writing but only to the marking on the page.

### (5)    Claim 39

62.    Dr. Kelly nowhere, that I have been able to locate, states that any of his UCoRs disclose recognizing means including means for comparing said gesture to at least one predefined shape. *See* Kelly Report 6.

63.    Dr. Kelly's reference, with respect to claim 39, to (what he terms) "Admitted Known Systems" provides no details of his analysis other than to refer to sections of the '295 patent. However, the sections of the patent that Dr. Kelly refers to do not make reference to gestures, do not describe gestures, and in fact refer to things which are not gestures. In particular his reference to mouse click events, mouse motion, and moving an Icon in this instance does not involve the use of gestures. *See* my analysis above in ¶¶ 22-23 above.

17

### (6)  Claim 40

64.     Claim 40 depends from claim 39, therefore my analysis in ¶¶ 62-63 applies here. I am confused by Dr. Kelly's reference to the Tap/touch gesture in apparent relation to mouse click events. To the extent Dr. Kelly is asserting that a Tap/touch gesture and mouse click are one in the same, I disagree. *See* my analysis above ¶¶ 22-23.

### (7)  Claim 41

65.     It is difficult to review Dr. Kelly's analysis here once again because of its ambiguity and lack of specificity.   Dr. Kelly cites no specific reference of his UCoRs that discloses a space being from left to right and a backspace written from right to left in an actual system. Accordingly, I see no evidence that supports Dr. Kelly's conclusion that claim 41 is invalid, since I can find not only no evidence of a piece of *prior* art he is relying upon, but I also can not even locate any particular UCoR he is relying upon.

66.     The '295 patent refers to single-stroke editing symbols at col. 2, lines 6-10. Dr. Kelly cites these gestures a tap, strike-through, circle, and caret. Because Dr. Kelly's examples all involve a single-stroke input, it cannot be said that they are in the same area of the screen because there is no other stroke or touch to be considered.

### (8)  Claim 46

67.     Claim 46 depends from claim 41, therefore my analysis in ¶¶ 65-66 applies here.

### C.    CASIO PF-8000

68.     The Casio PF-8000 was in certain ways a highly innovative product for its time, and it remained so at the time of the '295 patent. I note first that Dr. Kelly and I agree that the Casio PF-8000 does not disclose each limitation of claims 39, 40, 41, 43 and 46 of the '295 patent. Dr. Kelly and I agree that the Casio PF-8000 does not anticipate any asserted claim of the '295 patent.

Exhibit B
Page 000092

### (1)    Claim 39

69.     The Casio PF-8000 fails to disclose a single integrated screen for displaying information as well as for receiving the stroke of the stylus tip in contact with the same screen. The Casio PF-8000 provides a screen for displaying information and a separate pressure sensitive touch pad for receiving the stroke of a finger tip in contact with discrete buttons of the touch pad; it also provides mechanical buttons with printed labels, separate from both the display and the touch pad. The Casio PF-8000 does not perform the function of detecting a stroke of the stylus tip in contact with the screen.

70.     That the combination posited by Dr. Kelly is not obvious, can be illustrated by the fact that although such a combination was possible in theory as an engineering matter and would have had certain advantages (we can now see in hindsight), the highly skilled development team for this product did not make such a combination. For example, by combining the display screen and the touchpad, and displaying labels dynamically for the buttons of the touchpad, the mechanical buttons and their printed labels could have been eliminated. This could have allowed additional control functionalities because they would not have been restricted to hard-coded mechanical input buttons. Furthermore, the team could have adapted it to portrait layout instead of landscape, making it easier to hold and use in one hand rather than having to lay it down on a table surface. Based on my personal examination and my observations of having seen a unit used in the past, table-top use is the primary mode of operation of the Casio PF-8000. Further, by eliminating the mechanical buttons, which are relatively small, the designers would have eliminated the possibility of mechanical failure of a button (thus increasing reliability) or misuse of the mechanical button by the user (thus increasing usability). Further, such a combination would have made for an easier upgrade path to improved or additional functionality as only the firmware would have needed changing, not the actual physical device. Nonetheless, despite these

19

advantages which are recognizable *in hindsight*, at the time even a group of practitioners who are clearly above the level of ordinary practitioners, (evidenced by the innovative nature of the Casio PF-8000 device) were not driven to make a combination as proposed by Dr. Kelly. It would certainly not have been obvious to practitioners who were merely ordinary practitioners.

71.    Further, Dr. Kelly's proposed combination is not obvious because it would have required additional acts of invention, which would have been difficult engineering tasks. For example, making a display for a portable unit that would have been physically as large as the even relatively small area of the touch pad and then mechanically integrating the two would have required further invention.

72.    The Casio PF-8000 fails to disclose a pen-position digitizer. Dr. Kelly does not disagree that the Casio PF-8000 fails to disclose a pen-position digitizer. Dr. Kelly states that the pressure sensitive touch pad is equivalent to a pen position digitizer.

73.    The Casio's touch pad can not be considered the equivalent of a pen position digitizer because based on my physical examination of Dr. Kelly's unit, the tactile feel and behavior of the 5 X 6 button matrix and a clearly discernable ridge between each discernable button. It appears more akin to that of a set of small membrane or pressure sensitive switches rather than a touch pad that can perform the functions of a X Y digitizer. This analysis is supported by the fact that a touch, squiggle, or writing a complete character within a touch button functions only as a touch of the button and not as the equivalent of writing or marking on the equivalent of a tablet digitizer. Further, the apparent operation of the recognizer appears to be that of a zone recognizer: based on my analysis of the behavior of the device, it is based on the sequence of actuations of a small number of buttons representing zones and not on the shape information provided by a X Y digitizer. Further it does not teach or lead to the use of a digitizer

because the Casio PF-8000 does not include functionalities that involve a digitizer, such as drawing, pointing to Icons, or other graphical input operations.  Further, based on my analysis of the available functionality of the device, the Casio PF-8000 does not collect electronic ink data as would be used by a recognizer of shapes using a X Y tablet.

74.     Finally, Dr. Kelly appears to have overlooked the unlikelihood that touch pads available at the time of the invention would have been sufficiently transparent (this one is not) that they would inspire someone to place them over a display.

> **(2)     Claim 40**

75.     Claim 40 depends from claim 39, therefore my analysis in ¶¶ 69-73 above applies here.

> **(3)     Claim 41**

76.     The Casio PF-8000 fails to disclose a single integrated screen for displaying information as well as for receiving the stroke of the stylus tip in contact with the same screen. The Casio PF-8000 provides a screen for displaying information and a pressure sensitive touch pad with buttons for receiving the touch of a finger tip on a button of the touch pad; it also provides mechanical buttons with printed labels, separate from both the display and the touch screen. The Casio PF-8000 does not perform the function of detecting a stroke of the stylus tip in contact with the screen. *See* my discussion above in ¶¶ 69-70 on why this combination would not be obvious.

77.     The Casio PF-8000 fails to disclose a pen-position digitizer.  Dr. Kelly does not disagree that the Casio PF-8000 fails to disclose a pen-position digitizer.  Dr. Kelly states that the pressure sensitive touch pad is equivalent to a pen position digitizer.  *See* my discussion above in ¶¶ 73-74 on why this is not so, and why a combination with a pen-position digitizer would not be obvious.

Exhibit B
Page 000095

78.     The Casio PF-8000 fails to disclose each stroke of the gesture being located in substantially the same area of the screen because the stroke input is not made in any area on the screen.

### (4)     Claim 43

79.     Claim 43 depends from claim 41, therefore my analysis in ¶¶ 76-78 applies here.

### (5)     Claim 46

80.     Claim 46 depends from claim 41, therefore my analysis in ¶¶ 76-78 applies here.

81.     Dr. Kelly discusses, as his example of direction of a gesture, a horizontally oriented line drawn left to right and right to left. I note that there is no direction associated with a gesture right to left because no such gesture is recognized by the Casio PF-8000. Based on my knowledge of zone-based and other recognizers, it is my opinion that this is due to a simplification decision made by the designers of the recognizer, such as to reduce memory requirements for storing pre-defined shapes or to improve recognition accuracy by omitting certain entries from the set of predefined shapes. In this case, I consider it likely that the designers of the recognizer made a conscious decision to eliminate "left handed" and other writing styles to meet other design goals at the cost of inconvenience to certain users. Therefore, Dr. Kelly's gesture is not directional as claimed by the '295 patent because the gesture has a direction not for the purpose of issuing a control command associated with that direction, but for the purpose of simplifying the recognizer by cutting down the number of alternatives it must recognize.

### D.     Paper-like Interface Video [MSLT_0971856] & The Paper-Like Interface Paper

82.     I note first that Dr. Kelly in his report provides no information on the actual date of publication or otherwise of the Paper-like Interface Video. Dr. Kelly references the Paper-

Exhibit B
Page 000096

Like Interface Paper, but I see no evidence linking this paper with the video, nor does either the Paper or Video cross reference the other. Based on the evidence set forth by Lucent with respect to the dates of conception and reduction to practice of the '295 patent, this video may not be prior art at all. Assuming that the video may be prior art, I provide my analysis below.

83.    I note that the Paper-like Interface video seems to show a tracking cursor which Dr. Kelly interprets for a basis of an analysis about the system using departure from proximity as a termination of a gesture. I find no mention in the Paper-like Interface paper of proximity sensing and no mention of a tracking cursor, or anything which I think would imply such functionalities or the use of proximity data. It is possible therefore that if this functionality were added to the Paper-like Interface it may have been added after the date of the paper. Dr. Kelly provides no evidence or analysis that proves the functionality was present before the date of filing and/or the date of invention of the '295 patent.

### (1)    Claim 1

84.    The Paper-like Interface video fails to disclose the use of a single gesture in two contexts, including an operating system level object and an application level object. Relying on Dr. Kelly's example at minutes 2:11-2:17 and 2:21-2:27, I note that the action here is a clicking action and not a gesture. Based on my knowledge of the technology at the time, it is likely that this was a behavior inherited from or modeled directly on a mouse-like driver and mouse events. I note that there is no electronic ink which further indicates that this example is not a gesture. The action appears to be instantaneous with the moment of first contact rather than after the stylus has been lifted plus a time out or by touching another button as is apparent in the video for the termination of other gestures. Thus there are no gestures performed on an operating system object. This analysis is bolstered by the statement in the video that users define their own gestures for each application (2:36-2:50), thus stating that the same gesture is not used in more

than one context, much less in the context of an operating system object. Further, at time (2:11-2:17) in the video the narration states that new applications can be supplied with new gestures, which thus indicates that it was not their thinking nor their teaching that the same gesture would be used in two application contexts. I note further that the applications shown appear to be operating on an operating system such as DOS, as evidenced by such things as the use of a non-GUI version of the Lotus spreadsheet application: as is generally known, the DOS operating system used keyboard input, and did not support manipulation of operating system objects via a GUI user interface, as noted in references such as "A Neutral Look at Operating Systems" on http://en.wikibooks.org, and "HCI (Human Computer Interface)" on http://www.theteacher99.btinternet.co.uk

85.    Dr. Kelly does not give an analysis of what type of recognizer is used in the Paper-like Interface video and makes no statement that it is covered by the Court's construction. In fact, he argues that the recognition method is not crucial, which is in my opinion not consistent with the Court's construction orders as I understand them. I note further on his statement of obviousness that he states that the motivation to combine is explicit. However, I note that Dr. Kelly does not address the clear ambiguity of a "V" gesture which cannot be disambiguated from the "V" text character by obvious means. If there is a difference in writing style or shape that relates to the operation of the recognizer, or some other aspect of this experimental system other than the recognizer, Dr. Kelly provides no analysis. The same line of reasoning applies to the ">" gesture and ">" text character. Dr. Kelly make no statement that a solution is obvious, or why it would be obvious. Absent any analysis by Dr. Kelly, I cannot conclude that the recognizer is covered by the Court's construction. I note that the only reference to the recognizer post-dates the 1980 reference cited by the Court in its Claim

Exhibit B
Page 000098

Construction Order by four years and the author of the recognizer as noted in the associated reference "The Paper-Like Interface" (Tappert, 1984) is not mentioned in the 1980 reference used by the court or any other of the references or the Court's claim construction.

86.    Dr. Kelly's reference to Andrew in paragraph 96 of his report is unintelligible. I found no reference to Andrew in the references to the Paper-like Interface video. Further, I could find no disclosure or mention of gestures in any of the references that were cited to Andrew. The reference has no apparent relationship to the Paper-like Interface video. The only reference I can find to Andrew is in Col. 4:32-41 of the '295 patent, which is a citation to available software components for displaying the images, implementing objects, and supporting functionality such as data base and file systems for a notebook GUI, not to any use of gestures or the implementation of gestures. Andrew therefore adds nothing to the Paper-like Interface references.

### (2)    Claim 3

87.    Claim 3 depends from claim 1, therefore my analysis in ¶¶ 84-85 above applies here. Further, I cannot establish from my careful review of the video reference and Dr. Kelly's analysis at paragraph 82 of his report that the video provides justification for assuming that the Paper-Like Interface defines termination of a gesture based on proximity detection. The narration makes no reference to proximity detection or the use of proximity, especially in light of the explicit narration at 3:21-32 to the use of one-stroke gestures, which can easily be terminated without any use of proximity. Dr. Kelly's analysis only leads one to a conclusion that a proximity-sensing tablet happened to be what the researchers employed to get an integrated tablet and display. I note that the use of a proximity cursor actually detracts from the stated "paper-like" quality of this experimental system, because it is a behavior not found in real paper and pen and may furthermore be visually distracting: for example, it might make parallax errors

25

more apparent, as the tracking cursor would be visibly offset from the actual position of the stylus tip. Based on my examination of the video, and the lack of other uses of proximity such as highlighting, I conclude that the proximity tracking cursor – which is Dr. Kelly's proximity indicator – is most likely an artifact because a mouse-type driver or a driver for a non-integrated tablet was used in this experimental system as an available component.

### (3) Claim 4

88.     Claim 4 depends from claim 1, therefore my analysis in ¶¶ 84-85 above applies here.

89.     With respect to Dr. Kelly's analysis and example at paragraph 101, I note that the video makes no reference to left to right or top to bottom direction of motion.   These are assumptions by Dr. Kelly not supported by the reference cited.   Further, my examination of the video indicates that selection may be done by a straight line of any direction.   In the example given, making the line horizontal through the row of a spreadsheet selects everything under the line, which happens to correspond to a row of the spread sheet.   Making a vertical line through a column of the spreadsheet happens to select the elements of that column because that is what is under the line.   There is no example in the reference which shows that a straight line in another direction would not select the spread sheet cells under the line.   In fact, this would be a more powerful use of gesture than that assumed by Dr. Kelly.   Accordingly, I cannot consider Dr. Kelly's assumptions and his corresponding conclusions of invalidity of claim 4 justified by the evidence provided by the reference.

### (4) Claim 6

90.     Claim 6 depends from claim 1, therefore my analysis in ¶¶ 84-85 above applies here.

Exhibit B
Page 000100

### (5)    Claim 12

91.    Claim 12 depends from claim 3, therefore my analysis in ¶ 87 above applies here.

### (6)    Claim 39

92.    The Paper-like Interface video fails to disclose a first gesture, a second gesture, and a third gesture comprising the first and second gestures.  Dr. Kelly posits that the gesture for the letter "L" represents the third gesture composed of a first gesture, a vertical line gesture, and a second gesture, a horizontal line gesture.  *See* Kelly Report 23.  Dr. Kelly further states that the predetermined action associated with the letter "L" gesture is to insert the letter "L" onto the screen.  *See id.,* at 26.  However, Dr. Kelly further states that the predetermined action associated with the letter "L" gesture does not happen until after the user hits the "Enter" button on the screen.  *See id.,* at footnote 5.  Accordingly, the letter "L" gesture Dr. Kelly refers to that includes a vertical line gesture and a horizontal line gesture does not have a predetermined action associated with it.  Rather, a gesture including a vertical line gesture, a horizontal line gesture, *and a tap on the Enter button* has a predetermined action associated with it.  *See* analysis in ¶ 93.

93.    Dr. Kelly has argued that a tap on a button is a gesture.  *See, e.g.,* Kelly Report Paragraph 92.  However, this means that in the above analysis by Dr. Kelly, there is no predetermined action associated with the combined gesture "L" because no action occurs in response to it.  The action only occurs on the "L" gesture of Dr. Kelly's analysis plus Dr. Kelly's tap on button gesture of his analysis, which is contrary to his analysis that the "L" gesture of his analysis has a pre-determined action.

94.    My analysis in ¶ 84 also applies here.

### (7)    Claim 40

95.    Claim 40 depends from claim 39, therefore my analysis in ¶¶ 92-93 applies here.

Exhibit B
Page 000101

**(8)    Claim 41**

96.    My analysis in ¶ 84 applies here.

97.    Dr. Kelly has not defined what he considers the same area of the screen.  From my viewing of the video, it appears that within each of the four separate applications, strokes and gestures can apparently be made anywhere in this one entire area of the display, and not in one area and not in another, which would constitute different areas, and thus define that there is a same area.  In my review of Dr. Kelly's report, I consider also whether the visible examples of gestures involving two separate pen-lifts, such as "+", must be in the same area, using perhaps some other meaning of "substantially the same area".  At most, I find that the two marks of a "+" gesture,  based on my experience with the state of the art in character recognition at the time, that the strokes of a "+" could be made anywhere, as long as they cross each other approximately in the middle.

98.    My analysis in ¶ 89 applies here.

**(9)    Claim 43**

99.    Claim 43 depends from claim 41, therefore my analysis in ¶¶ 96-97 applies here.

**(10)    Claim 46**

100.    Claim 46 depends from claim 41, therefore my analysis in ¶¶ 96-97 applies here.

**E.    U.S. Patent No. 4,972,496 ("the '496 patent)**

101.    I note first that the '496 patent was considered by the United States Patent and Trademark Office during prosecution of the '295 patent.  My conclusion from reading the prosecution history is that the Examiner did a careful and thorough examination of the '496 patent and that based on the issuance of the '295 patent.

102.    I also note that Dr. Kelly and I apparently agree that the '496 patent fails to disclose: (1) the proximity detection features of the '295 patent (*see* Kelly Report 36);

Exhibit B
Page 000102

(2) handwriting recognition algorithms as set forth by the Court in its February 24, 2004 Claim Construction Order (*see* Kelly Report 42-43); and (3) direction of motion of a gesture (*see* Kelly Report 48).

### (1)    Claim 1

103.    In addition to the items discussed in ¶ 102, the '496 patent fails to disclose the use of a gesture in the context of an operating system level object.    The Tap/touch action that Dr. Kelly refers to in the '496 patent is not a gesture.    It does not involve the recognition of shapes nor is it a marking.    What Dr. Kelly refers to in the '496 patent is akin to a click, such as a mouse click.    *See* my analysis above in ¶¶ 22-23.    Further, the '496 patent does not show any use of different contexts in which a same gesture is used and in which the action performed depends on the context.    The '496 patent describes only the single context of the entry and editing of text.

### (2)    Claim 4

104.    Claim 4 depends from claim 1, therefore my analysis above in ¶ 103 applies here.

105.    I further note that Dr. Kelly states that claim 4 would be obvious in view of the combination of the '496 patent and U.S. Patent No. 4,954,967 ("the '967 patent").

106.    I note in Dr. Kelly's analysis for direction of motion of a gesture, he does not state that the '496 patent determines the direction of a gesture. He merely cites a section of the '496 patent that states that direction of a stroke may be used within the recognizer (to effectively increase the probability of the recognizer correctly determining the input stroke).    The '496 patent does not teach, and Dr. Kelly does not cite a case where anything other than the shape or at most the orientation of a gesture is used.    Accordingly there is no disclosure in the '967 patent of a gesture being associated with the direction of motion of the gesture.    Dr. Kelly relied on

Exhibit B
Page 000103

another reference to argue that direction of a gesture for obviousness purposes, namely the '967 patent.

107.    The '967 patent does not implement gestures, does not involve a comparison of shapes, does not disclose the collection of data for recognition of shapes, and fails to display gesture like motion on a touch surface or other surface.

108.    There is no motivation to combine these two references.  First, it is not even clear from Dr. Kelly's analysis how he would propose the two references should be combined to achieve a third means for detecting a direction of motion of a gesture, or whether if doing so, the result would disclose all the claimed features.  The combination of the two patents would introduce at most an additional non-gesture element to the '496 patent, such as the use of scroll bars at the side of the display.  I note that this combination was not apparently made in the '496 patent, despite scroll bars having been well known at the time of the invention from mouse based and windows systems.  Even so, I could not find in the '496 patent any mention of scroll bars or of scrolling, probably precisely because scroll bars do not involve gestures.

(3)    **Claim 6**

109.    Claim 6 depends from claim 1, therefore my analysis above in ¶ 103 applies here.

(4)    **Claim 39**

110.    The examples provided by Dr. Kelly, which he calls compound gestures, do not constitute a third gesture.  My analysis of the reference shows that no recognition result corresponding to the third gesture is produced. Further, I find no indication that a discrete output from the recognizer corresponding to Dr. Kelly's conjectured third gesture is defined.  Further, I find that no discrete single action based on the conjectured third gesture is carried out.

111.    In the examples given by Dr. Kelly, there is no third gesture.  There is a first gesture which selects text: it is obvious that other means to select text could be used, such as a

Exhibit B
Page 000104

mouse click or double mouse click event to select a word or line. There is a second separate gesture which indicates that the current selection should be deleted. It is well known that there are other means to indicate that the current selection should be deleted, such as a touch event on a delete button or softkey. The delete gesture deletes the current selection regardless of how the selection was made, which is its complete action. The select gesture selects text without regard to what will be done on the selection, that is its complete action. There is *no* third gesture that is a hybrid of these two. Dr. Kelly in his attempted reference to compound gestures is misconstruing a dialogue grammar on the composition of separate events with composition of gestures.

### (5)    Claim 41

112.    I note that Dr. Kelly states that claim 41 would be obvious in view of the '496 patent and U.S. Patent No. 4,954,967 ("the '967 patent"). My analysis above in ¶¶ 105-108 applies here.

113.    Further, Dr. Kelly provides no support or analysis for the presence of – and in fact does not even address – the limitation that strokes of gestures be in substantially the same area of the screen.

### (6)    Claim 43

114.    Claim 43 depends from claim 41, therefore my analysis in ¶¶ 112-113 applies here.

### (7)    Claim 46

115.    Claim 46 depends from claim 41, therefore my analysis in ¶¶ 112-113 applies here.

116.    I note in Dr. Kelly's analysis for direction of motion of a gesture, he does not state that the '496 patent determines the direction of a gesture, he only cites a section of the '496

31

patent which states that direction of a stroke may be used within the recognizer. Dr. Kelly does not cite a case where anything other than the shape or at most the orientation of a gesture is used. Accordingly, the '496 patent fails to disclose the direction of motion of the gesture associated with the predetermined action.

  **F.  U.S. Patent No. 4,839,634 ("the '634 patent")**

  117.  I note first that the '634 patent was disclosed to and considered by the United States Patent and Trademark Office during prosecution of the '295 patent. My conclusion from reading the prosecution history is that the Examiner did a careful and thorough examination of the '634 patent and that based on the issuance of the '295 patent.

    **(8)  Claim 1**

  118.  Dr. Kelly's analysis does not show that the '634 patent discloses defining termination of a gesture as set forth by the Court. Dr. Kelly's lengthy quotation from the '634 patent describes only the means for sensing proximity, but makes no relationship to the termination of a gesture that may be used in the '634 patent. *See* Kelly Report pp. 57-58. Dr. Kelly's analysis further provides no analysis or review of the definition of termination of candidate characters that could legitimately be considered completed candidate characters. Dr. Kelly has not shown that the '634 patent shows a termination of a gesture that falls within the court's construction.

  119.  Dr. Kelly makes no argument that the character recognition algorithm as disclosed by the '634 patent, falls within the realm of recognizers referenced by the Court's claim construction. I note further that the '634 patent makes strong assertions (Col. 4:67-6:9) that the invention of the '634 patent overcomes difficulties of and is distinct from the existing state of the art in handwriting recognition, including such relatively well-known references as the Tappert reference dated 1984 (mentioned in the paper reference for "Paper-Like Interface" and

32

elsewhere) which in itself is not mentioned in any of the Court's references nor is any other work by Tappert mentioned in any of the Court's references. *See* '634 patent, Col. 5:53-62. From this I conclude that the recognizer of the '634 patent does not fall within the Court's order on the construction of claims.

120. The '634 patent makes strong claims about the disadvantages about the existing state of the art of handwriting recognition. This directs of ordinary skill away from attempting any combination of the '634 patent with any of the shape recognition techniques mentioned in the Court's Claim Construction Order, since the applicable recognizers (those of the 1980 reference) clearly fall within the existing state of the art criticized in the '634 patent.

121. Further, the '634 patent fails to disclose performing an action in response to a gesture in the context of an operating system level object. Dr. Kelly makes no statement that the '634 patent does so nor does Dr. Kelly make any statement that it would be obvious to do so. The reference to Andrew is confusing because Andrew does not pertain to the implementation of gestures, nor does it make any disclosures about gestures. The touching of a button or object as is described in the '634 patent at numerous places, such as col. 11, lines 5-25, is not a gesture.

**(9)    Claim 3**

122. Claim 3 depends from claim 1, therefore my analysis above in ¶¶ 118-121 applies here.

**(10)    Claim 4**

123. Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 118-121 applies here. The '634 patent clearly states that the recognition process is in effect completely insensitive to direction of strokes and cites the advantages of this characteristic (Col. 29:32-45). Further, as set forth in the '634 patent (Col. 8:22-24), the character recognition places no restrictions on the stroke order or on which the direction in which strokes are drawn. As gestures

33

are composed of strokes, if there is no direction reported for a stroke, there can be no direction reported for a gesture. Further, the example Dr. Kelly attempts to make at paragraphs 178-179 of his report, is not a gesture. Accordingly, the '634 patent fails to disclose or suggest, and in fact teaches away from detecting a direction of motion of the gesture.

### (11)    Claim 6

124.    Claim 6 depends from claim 1, therefore my analysis above in ¶¶ 118-121 applies here.

### (12)    Claim 12

125.    Claim 12 depends from claim 3, therefore my analysis above in ¶ 122 applies here.

### (13)    Claim 41

126.    My analysis above in ¶¶ 118-120 applies here.

### (14)    Claim 43

127.    Claim 43 depends from claim 41, therefore my analysis in ¶ 126 applies here.

### (15)    Claim 46

128.    Claim 46 depends from claim 41, therefore my analysis in ¶ 126 applies here.

### G.    Apple Macintosh Running Operating System 6 Using a MicroTouch UnMouse ("Mac UnMouse")

129.    First, as noted above in ¶ 51, Dr. Kelly has provided no evidence that the MicroTouch UnMouse is *prior* art. Assuming that the Mac UnMouse theoretically could be prior art, I provide my analysis below.

130.    I note next that Dr. Kelly in his report relies on Apple Macintosh Operating System 6 1989. Assuming that the Macintosh Operating System 6 may be prior art, I provide my analysis below.

Exhibit B
Page 000108

131.    I note that Dr. Kelly and I agree that the Mac UnMouse does not disclose each limitation of any of the asserted claims of the '295 patent.  Therefore, Dr. Kelly and I agree that the Mac UnMouse does not anticipate any asserted claim.

**(1)    Claim 1**

132.    My analysis above in ¶¶ 52-53 applies here.

133.    Dr. Kelly and I further agree that the tablet of the UnMouse is different from the display screen, and therefore, any stylus input does not involve stylus contact with the display screen. *See id*.  Accordingly, the Mac UnMouse fails to disclose the function of detecting a stroke of the stylus tip in contact with the screen.

134.    Dr. Kelly specifically states that the combination of the Mac UnMouse features with a touch sensitive display screen is obvious.  I find this combination of the Mac UnMouse with the features of a display screen non-obvious based in part on the following considerations. With the Mac UnMouse, strokes are not input with the stylus in contact with the tablet.  Strokes are input when the stylus presses hard enough on the Mac UnMouse to physically move the surface of the UnMouse down against a spring loaded force and actuate a switch mechanism behind the surface of the tablet.  The Mac UnMouse requires that this switch mechanism be present behind the touch surface, and thus in front of the display.

135.    I further note that Dr. Kelly and I agree that the Mac UnMouse fails to disclose a pen position digitizer.  *See* Kelly Report 71.  The touch sensitive tablet and a pen position digitizer are not equivalent because for example, the touch sensitive tablet of the UnMouse detects a stroke only when the user presses hard enough on the surface to create a physical displacement of the writing surface whereas a touch sensitive screen simply responds to touch.

136.    I further note that Dr. Kelly and I agree that the Mac UnMouse fails to disclose a proximity detecting digitizing device.  *See* Kelly Report 74.  Dr. Kelly provides no analysis of

Exhibit B
Page 000109

what functionality would be performed using proximity sensing given that with the Mac UnMouse, specifically the cursor stops when you lift the stylus from the surface rather than requiring or using any proximity sensing. Further, I can think of no equivalent functionality involving proximity to the Auto Button Hold functionality. Substituting a proximity sensing digitizer and then making no use of proximity sensing, particularly in the absence of the mechanical switch which must be pressed on the Mac UnMouse, achieves no additional functionality and I find no analysis by Dr. Kelly on this point. Its not obvious to incorporate functionality for which no use is imagined.

137.    The Mac UnMouse system includes no means for recognizing gestures. The Mac UnMouse replaces an absolute position pointing device for the relative motion pointing device of a mouse, but remains otherwise mouse-like. The Mac UnMouse system responds to mouse events and does not make use of gestures. For example, the conjectured vertical line gesture which Dr. Kelly posits does not actually involve vertical line motion, a fact which is readily apparent from examination of the system and its behaviors. The predetermined action involves only the single point of click down and final point of click up. The Mac UnMouse makes no comparison of gestures with predefined shapes. A click event has no shape and the Mac UnMouse does not contain a recognizer for shapes. Because the Mac UnMouse system does not use gestures, it does not use gestures in the context of an operating system or application level object.

138.    Dr. Kelly states that it would be obvious to combine one of the known recognizers with the UnMouse. I note that the Mac UnMouse adds absolute positioning to the functionality of a mouse driver. However, other properties of mouse drivers and Mouse GUI systems include that they explicitly and intentionally do not capture all the motion of the mouse or whatever

36

pointing device is being supported. The technical reasons for this are well known to designers of mouse input systems and mouse GUI systems. *See* my analysis in ¶¶ 21-23. Further, UnMouse hardware is known to have worse performance than either a mouse or a touchscreen.: *See* [CohenO93] reference in ¶ **Error! Reference source not found.**. Accordingly, it would not be obvious to add handwriting recognition to a system that would function so badly because the shapes that were being written would not be captured reliably.

> **(2)    Claim 4**

139.    Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 132-138 applies here. Further, in Dr. Kelly's example in paragraph 206 of his report, there is no recognition of gestures and therefore no recognition of direction of motion of a gesture. In paragraph 207, his example does not require a vertical line, or vertical motion or even that the motion be predominantly up or down. In no way does the predetermined action of the mouse events depend upon the motion of the stylus and any generated shape.

> **(3)    Claim 6**

140.    Claim 6 depends from claim 1, therefore my analysis above in ¶¶ 132-138 applies here. The Mac UnMouse system fails to display shapes. Dr. Kelly only states that it contains certain hardware components but there is no software which displays shapes of gestures nor are the shapes of gestures displayed. Further, the system does not recognize gestures.

> **(4)    Claim 39**

141.    My analysis above in ¶¶ 132-138 applies here.

142.    Further, the Mac UnMouse system does not recognize gestures as described above, therefore it cannot recognize a first gesture, second gesture, or a combined third gesture.

Exhibit B
Page 000111

### (5)    Claim 40

143.    Claim 40 depends from claim 39, therefore my analysis above in ¶¶ 141-142 applies here.  I also note that the system does not recognize shapes, and therefore cannot determine whether shapes would be substantially identical.

### (6)    Claim 41

144.    My analysis in ¶ 141 applies here.

145.    Further, I note that Dr. Kelly appears to provide no analysis regarding a stroke of the gesture being located in substantially the same area of the screen.  Thus I conclude that the Mac UnMouse does not meet this claimed limitation.  Further, the UnMouse does not recognize gestures, therefore it does not represent the direction of motion of the gesture.

### (7)    Claim 43

146.    Claim 43 depends from claim 41, therefore my analysis in ¶¶ 140, and 144-145 applies here.

### (8)    Claim 46

147.    Claim 46 depends from claim 41, therefore my analysis in ¶¶ 144-145 applies here.  Further, the UnMouse does not determine direction of motion of gestures.  Further, in the example given by Dr. Kelly at paragraph 207 of his report, the motion to which he refers need not be vertical.  In fact the action of the scroll events show that they in no way depend upon the shape or path of motion, but rather only on the positions of the initial and final mouse click events, which is readily apparent from an examination of the scroll bar behavior.

### H.    X Window System User's Guide ("X Windows")

148.    I note first that Dr. Kelly in his report relies on the X Windows System User's Guide dated July 1989.  *See* Kelly Report page 81.  Assuming that X Windows may be prior art, I provide my analysis below.

38

149.    I note that I specifically requested an opportunity to examine the functioning X Windows device with tablet which would demonstrate the features pointed out by Dr. Kelly in his report, and which he stated (Kelly Report paragraph 26) that he would demonstrate as a working unit at trial. When I arrived at the laboratory at Fish & Richardson's offices in San Diego on April 25, 2006, the X Windows device was not available for my inspection. I specifically asked Ms. Lara Garner, attorney for Microsoft, about the whereabouts of the device with a tablet, so that I could examine certain behaviors of X Windows with a tablet. I asked Ms. Garner whether Dr. Kelly had ever (recently or in the past) used an X Windows device with tablet. Ms. Garner informed me that Dr. Kelly in fact did *not* have such a functioning X Windows device with tablet and had not relied upon an actual device in forming his opinion.

150.    I further note that Dr. Kelly's opinion is that to the extent a "tablet" does not encompass a touch sensitive display system, Claims 1, 4, 39, 40, 41 and 46 are obvious over the X Window System User's Guide in view of touch sensitive display systems. I disagree with Dr. Kelly's opinion.

151.    The X Windows system assumes a multiple-button pointing device. For example, the X Windows System User's guide 3rd Edition, May 1990 ("User's Guide"), refers specifically to the bindings of buttons 1, 2, and 3 of the pointing device. *See* User's Guide, 204-206. Based on my past experience as a user of X Windows (with a three-button mouse), and similar systems, X Windows may have been used with a tablet with a multi-button puck, but it is unlikely to have been used with a stylus or to have been reasonably functional with a stylus in any case because a stylus would not provide multiple buttons. Further, page 206 of the User's guide refers to a pointing device with 5 buttons. As is well known to users of X Windows, X Windows made use of multiple-button pointing devices for convenient access to multiple features, as noted on page

39

204 of the User's guide.  A touch sensitive screen with a stylus, *e.g.*, a finger, has at most a virtualization of one button, the finger tip.  It would therefore not be obvious to combine a touch screen with X Windows, and in fact the advantages of multiple-button input devices as set forth in the X Window's User's guide teach away from such a combination.

152.     I further note that Dr. Kelly and I agree that the X Window System User's Guide fails to disclose a recognition algorithm as set forth by the Court in its February 24, 2004 Claim Construction Order.  *See* Kelly Report 88.

**(1)     Claim 1**

153.     The X Windows reference fails to disclose a stylus having a tip for inputting information.  It is not obvious to use a stylus or touch screen for the reasons outlined above in ¶ 151.  Further, Dr. Kelly's reference to MSLT-0525942 at paragraph 219 of his report and its equivalent reference in the earlier edition is incomplete.  Immediately below the section quoted by Dr. Kelly is a clear reference to the specific functions performed by a first, second, and third pointer button, which are not present on a stylus nor can they be present on a touch sensitive screen mounted on the display.  The specific page of the reference cited by Dr. Kelly clearly teaches away from using a stylus with X Windows.

154.     Dr. Kelly admits that X Windows does not include a recognizer that falls within the limits set forth by the Court.  It would not be obvious to combine a recognizer with X Windows for several reasons.  For example, Dr. Kelly's referenced MSLT_0525942 contains an additional unmistakable reference to the Meta Key which must be present to be used in conjunction with the pointing device. Dr. Kelly describes no means for achieving a keyboard-less interface to a computer system, as he states at paragraph 230 in his report, through the use of gestures, most likely because one cannot simultaneously use the stylus for the input of a gesture or button actuation and for a virtualization of the Meta Key and the act of moving as

40

described in the MSLT reference. *See also* my discussion with respect to mouse drivers versus ink data at ¶¶ 22-23.

155.    X Windows fails to disclose the operation of a gesture executed on an operating system level object. The purported examples of gestures mentioned by Dr. Kelly in paragraphs 224-237 in his report are not gestures and there is no comparison with predefined shapes. For example, MSLT_0525958 clearly states that Dr. Kelly's example at paragraph 225 relates only to motion and location, not to a horizontal motion. A further reference to this fact is found at MSLT-0526076. I note further that Dr. Kelly mischaracterizes his quotation from the '295 patent at paragraph 239 of his report, as noted in ¶ 85.

### (2)    Claim 4

156.    Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 153-155 applies here.

157.    Based on my knowledge as a past user of a X Windows system, and from the available references such as MSLT_0526076 it is clear that the motion involved need not be vertical or horizontal or indeed any particular shape. There is nothing about the predetermined actions of Dr. Kelly's examples that is specific to the direction of motion, only to the location of the button down and button up events.

### (3)    Claim 39

158.    My analysis above in ¶¶ 153-155 applies here. Further, as there are no gestures, there can be no first, second, or third gesture.

### (4)    Claim 40

159.    Claim 40 depends from claim 39, therefore my analysis above in ¶ 158 applies here. Additionally, because there is no first gesture, or second gesture, there cannot be substantially identical gestures.

41

### (5)    Claim 41

160.    My analysis above in ¶¶ 156-157 applies here. Further, Dr. Kelly's report contains no explanation of strokes of gestures being located in substantially the same are of the screen. Therefore, I conclude for this additional reason that this functionality is not present in X Windows nor rendered obvious.

### (6)    Claim 46

161.    Claim 46 depends from claim 41, therefore my analysis in ¶ 160 applies here.  As there are no gestures, nor are gestures rendered obvious, there can be no predetermined action associated with a direction of motion of a gesture.

## VII.    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

162.    I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success; Long-Felt But Unsolved Need and/or Failure of Others; and Industry Recognition.

163.    The commercial success of the invention of claims of the '295 patent cannot be questioned. The ubiquitous use of a stylus and gestures to control, for example, PDAs, hand-held devices, and Pocket PCs indicates the benefits consumers reap through the efficient and effective means of controlling such devices with gestures.

164.    On-line handwriting recognition has an extensive history.  However, the focus of the vast majority of these efforts was on the replacement of the keyboard with direct handwriting input because until relatively recent times, the dominant form of computer input was a keyboard only and keyboarding skills were considered unusual, specialized, and awkward.  The advent of the mouse, a simple pointing device, was a substantial improvement to human computer interaction, as is readily apparent to anyone who observes modern computer systems as

42

compared to dominant computer systems as of 1980. However, the keyboard remained necessary for text input. Although there were some systems which attempted to make use of a computer using only pointing input, with a mouse or a touch panel, these had only limited success in limited application areas, even with the use of a simulated keyboard displayed on the screen. One factor in their limited success was that in addition to the awkwardness of a virtual keyboard, the use of pointing input only or a predominantly pointing input had limited expressive power. Efforts to add pen functionality to a mouse centric OS such as the early versions of Pen Windows were not widely adopted and were in fact discontinued, a cycle which happened more than once. *See* Tablet PC Update by Geoff Walker, page A12, www.tabletpcmagazine.com, Spring 2002. It is the dramatic use of gestures for generally all computer control functions of the technology of the '295 patent, in a user interface metaphor with its reliance on gestures with the expressive power of the features claimed in the '295 patent, that truly dealt successfully with the goal of keyboard-less computer systems and thus achieved pen-computing.

165.    Go Corporation received considerable recognition on a national level for its ground-breaking work. A brief review of any number of press reports at the time makes this abundantly clear. *See, e.g.,* LUC 1236376-83; LUC 1236384-87; LUC 1236394-97; LUC 1236463-66; LUC 1236509-526; LUC 1236600-640. Particularly descriptive is the record given by Marlin Eller, a long-time Microsoft employee and a senior technical leader in Microsoft's Pen Windows development group, in his book "Barbarians Led by Bill Gates" such as in Chapter 8 titled "Pen Ultimate Warfare" and Chapter 9 titled "GO-ing Down". Mr. Eller notes that Microsoft considered the GO pen computing system so compelling, that it was a serious threat to Microsoft's primary source of business revenue based on Microsoft's predominant position in

43

operating systems (page 120) , as the aspects of pen-computing in the GO system could motivate users to change to GO's operating system instead of Microsoft's in spite of the inconveniences and burdens to the user of using a second operating system (page 134).  Still further evidence of the non-obviousness of the Agulnick patent technology was the commitment to develop a hardware product based on the technology.  *See, e.g.,* LUC 1235464-67; LUC 1236535-38; LUC 1236539-46.

## VIII.    COMPENSATION

166.    I am being compensated at a rate of $250 per hour for my work in this matter, plus expenses.  My compensation does not depend in any way on the conclusions or outcome of my analysis.

## IX.    CONCLUSION

167.    The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available.

44

Dated:  May 12, 2006

_____
Jean Renard Ward

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May, 2006, a copy of the foregoing EXPERT REPORT OF JEAN RENARD WARD RELATING TO THE EXPERT REPORT OF JOHN P.J. KELLY, Ph.D. RE LUCENT'S AGULNICK PATENT was served on counsel for Gateway, Microsoft and Dell as follows:

**EMAIL**
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099
marchese@fr.com
srodriguez@fr.com

**EMAIL**
Sidney Rosenzweig
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
Telephone: 202-942-5000
Facsimile: 202-942-5999
sidney_rosenzweig@aporter.com

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Microsoft Corp.*

Attorneys for *Dell Inc.*

**EMAIL**
W. Bryan Farney
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
jeff.plies@dechert.com
bryan.farney@dechert.com
lawrence.fluker@dechert.com

Attorneys for *Gateway, Inc., et al.*

Lori Duignan