# Hayes Declaration

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES, INC.,          )
                                    )
         Plaintiff,                 )
                                    )          Case No. 02-CV-2060-B (WMC),
    v.                              )          consolidated with Case No. 03-CV-
                                    )          0699-B (WMC) and Case No. 03-
GATEWAY, INC.; GATEWAY COUNTRY      )          CV-1108-B (WMC)
STORES LLC; MICROSOFT               )
CORPORATION; AND DELL, INC.,        )          HON. RUDI M. BREWSTER
                                    )
         Defendants.                )
                                    )

EXPERT REPORT OF JEAN RENARD WARD RELATING TO GATEWAY'S,
MICROSOFT'S, AND DELL'S INFRINGEMENT OF LUCENT'S AGULNICK PATENT

# Confidential-Outside Counsel's Eyes Only

Exhibit 2
Page 000006

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LUCENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02-CV-2060-B (WMC), |
| v. | ) | consolidated with Case No. 03-CV- |
| | ) | 0699-B (WMC) and Case No. 03- |
| GATEWAY, INC.; GATEWAY COUNTRY | ) | CV-1108-B (WMC) |
| STORES LLC; MICROSOFT | ) | |
| CORPORATION; AND DELL, INC., | ) | HON. RUDI M. BREWSTER |
| | ) | |
| Defendants. | ) | |
| | ) | |

**EXPERT REPORT OF JEAN RENARD WARD RELATING TO GATEWAY'S, MICROSOFT'S, AND DELL'S INFRINGEMENT OF LUCENT'S AGULNICK PATENT**

1.      I am a practicing software engineer and developer.  I have worked in this field for over 30 years, and I am an inventor on a number of patents related to pen computing.  I am an author of a number of refereed articles and presentations relating to pen computing.  I have maintained for a number of years a reference bibliography on the public internet on topics relating to pen computing.  I have organized presentations at technical conferences or meetings involving representatives of more than one technology organization involved in the development of pen computing.  I have been retained as an expert in this case by Lucent Technologies Inc. ("Lucent") to give my opinion as to whether Gateway, Inc.'s ("Gateway's"), Microsoft Corporation's ("Microsoft's"), and/or Dell, Inc.'s ("Dell's") products infringe certain claims of U.S. Patent No. 5,347,295 ("the '295 Patent").

**I.      QUALIFICATIONS AS AN EXPERT**

2.      My background and qualifications are set forth at Tab 1.

3.      For testimony or work in other matters, a list of my publications, and patents, see my background and qualifications at Tab 1.

Exhibit 2
Page 000007

## II.    SCOPE OF STUDY AND OPINION

### A.    Documents and Information Considered in Forming Opinions

4.    The following opinions and analysis are based upon a review of the Patent-in-Suit and the file history for the Patent-in-Suit. I have also reviewed and studied the materials cited herein and set forth at Tab 2. I understand the Lucent has asked PalmSource, Inc. for information regarding the Palm OS software and that PalmSource, Inc. is refusing to give Lucent the materials they have asked for. I understand that at some point in the future a Court might order PalmSource, Inc. to give Lucent the information. If and when Lucent gets the information from PalmSource, Inc. I will review it and may rely on it to further support my analysis.

5.    I have also used and reviewed the accused products in operation. I reviewed Pocket PC and/or Windows Mobile Version 5.0 OS 5.1.1702 for Pocket PC running on a HP iPAQ and additionally Windows Mobile Version 5.0 OS 5.1.1702 for Pocket PC running on a Dell Axim X51v. I reviewed Microsoft Windows XP Tablet PC Edition 2005 Version 2002 Service Pack 2 software running on a HP TC1100 Tablet PC, as well as on a Gateway M1200 Tablet PC. I reviewed Palm OS software running on a palmOne LifeDrive. When discussing the operation or functionality of software below, I attempted whenever possible to verify my analysis regarding the software by actual use. I would expect at trial to illustrate any or all such functions on these and other similar devices as demonstration and evidence of the operation, functionality, design, etc. of the software.

6.    I understand that Lucent asked Gateway, Microsoft, and Dell to identify each Stylus-Based Product and each operating system for use with a Stylus-Based Product made, used, licensed, distributed, sold, or offered for sale in the United States, or imported into the United States since June 6, 1996. I further understand that Gateway, Microsoft, and Dell identified only some versions. *See* Lucent's Interrogatory No. 19 to Microsoft, and Microsoft's

2

Exhibit 2
Page 000008

Response; Lucent's Interrogatory No. 20 to Dell, and Dell's Response; Lucent's Interrogatory No. 19 to Gateway and Gateway's Response. I also understand that Lucent asked Gateway, Microsoft and Dell for a physical copy of each operating system and device. Microsoft produced only a limited sampling of the software, and Gateway and Dell did not produce any physical devices. I have assumed that there are no relevant differences between the versions of the software produced and other accused versions in how they perform, and Defendants have not suggested that any relevant differences exist. I have looked at the relevant portions of the various versions of the software provided, and the version and physical devices that I purchased, and I have concluded that the same analysis applies to each and every version and device, as well as to any other versions and devices not identified.

7.     I have also relied upon standard engineering, computer science, and pen computing references and my own extensive experience over the course of my 30-year career.

8.     I have relied upon the claim interpretations provided by the Court in its February 25, 2004 Memorandums & Orders construing the claims of the '295 patent. In the instances where the Court interpreted the claims to mean "As is" or provided no additional interpretation, I used the plain and ordinary meaning at the time of the invention of the '295 patent.

9.     I have been informed by counsel and understand that a patent claim is infringed by a device if each claim element is found in that device either literally or under the doctrine of equivalents. I have also been informed that a claim element is present under the doctrine of equivalents if any differences between that element and the corresponding portion of an accused device are insubstantial. One test for insubstantial differences is whether the portion of the

3

Exhibit 2
Page 000009

device in question performs substantially the same function, in substantially the same way, to achieve substantially the same result.

10.    I have been informed by counsel and understand that the patent law permits a patentee to draft a claim by reciting a "means" for performing a recited function, without a recital of any specific structure for performing that function. I have further been informed that when a patentee uses this "means-plus-function" format, the claim element is to be construed to cover the corresponding structure described in the patent specification that performs the recited function, and equivalent structures. I have further been informed by counsel that a "means-plus-function" element is present in an accused device where the accused device performs the recited function using structure that is the same or equivalent to the corresponding structure for performing that function disclosed in the patent specification.

11.    I have further been informed by counsel and understand that a person with knowledge of a patent may induce infringement of the patent by actively encouraging or instructing another person how to make or use a product covered by the patent or perform a method covered by the patent, such as by selling a product and providing instructions or directions on how to use that product in an infringing manner, or by selling a product and encouraging the purchaser to combine that product with another component to create an infringing combination.

12.    I have further been informed by counsel and understand that a person with knowledge of a patent may contribute to the infringement of the patent by supplying a part used to make an infringing combination, where the part is not a common part used for substantial non-infringing uses, but rather, the part is especially made or adapted for a use that infringes the claimed invention.

4

Exhibit 2
Page 000010

13.     I have been informed by counsel and understand that infringement analysis includes a two step process.  In the first step, the claims are interpreted by the Court.  In this case, the Court has interpreted the claims and set forth the interpretations in its Memorandums & Orders mentioned above.  In the second step, the interpreted claims are applied on an element by element analysis to the accused products.

**B.     Exhibits to Be Used as a Summary or Support for the Opinions**

14.     At trial I expect to rely upon materials and documents produced in this litigation and various other documents that the parties have exchanged, such as interrogatory responses. I also may rely on visual aids and demonstrative exhibits that I may prepare or have prepared at my instruction based on these materials, now or in the future, including by way of example, figures and excerpts from the '295 patent, claim charts, historical reference materials, deposition testimony, diagrams, pen computing technical manuals and articles, and other graphical presentations describing the technology relevant to the '295 patent and the design, operation and functions of the Gateway, Microsoft, and Dell products I have been asked to analyze.  I also may rely on demonstrations of actual products I have been asked to analyze.

**C.     Summary of Opinions with Respect to Gateway**

15.     In my opinion, Gateway infringes each of claims 1, 4, 6, 39-41, 43, and 46 of the '295 patent by its selling and offering for sale stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Microsoft Windows Mobile or Pocket PC operating system software as defined in ¶ 35 below.

16.     In my opinion, Gateway infringes each of claims 1, 3, 4, 6, 12, 39-41, 43, and 46 of the '295 patent by its selling and offering for sale stylus-based computing devices (including without limitation tablet PCs) incorporating Microsoft Windows XP Tablet PC Edition operating system software as defined in ¶ 105 below.

5

Exhibit 2
Page 000011

17.     In my opinion, Gateway infringes each of claims 1, 4, 6, 39-41, 43, and 46 of the '295 patent by its selling and offering for sale stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Palm OS software as defined in ¶ 187 below.

**D.     Summary of Opinions with Respect to Microsoft**

18.     In my opinion, Microsoft infringes each of claims 1, 4, 6, 39-41, 43, and 46 of the '295 patent by its making, selling, and offering for sale Microsoft Windows Mobile or Pocket PC operating system software as defined in ¶ 35 below.

19.     In my opinion, Microsoft infringes each of claims 1, 3, 4, 6, 12, 39-41, 43, and 46 of the '295 patent by its making, selling and offering for sale Microsoft Windows XP Tablet PC Edition operating system software as defined in ¶ 105 below.

20.     In my opinion, Microsoft actively induces infringement by supplying these items of software to customers with active encouragement and support of customers' assembly of complete, infringing stylus-based computing devices (including without limitation PDAs and Tablet PCs) integrating the Microsoft software by various acts discussed in detail in ¶ 267 below. In addition, Microsoft contributorily infringes by supplying these items of software, which are not staple articles of commerce with substantial non-infringing uses, to customers with knowledge that customers will assemble complete, infringing stylus-based computing devices (including without limitation PDAs and Tablet PCs) integrating the Microsoft software by various acts as discussed in ¶ 267 below. *See generally*, ¶¶ 259-267.

**E.     Summary of Opinions with Respect to Dell**

21.     In my opinion, Dell infringes each of claims 1, 4, 6, 39-41, 43, and 46 of the '295 patent by selling and offering for sale stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Microsoft Windows Mobile or Pocket PC operating system software as defined in ¶ 35 below.

6

Exhibit 2
Page 000012

22.     In my opinion, Dell infringes each of claims 1, 3, 4, 6, 12, 39-41, 43, and 46 of the '295 patent by its selling and offering for sale stylus-based computing devices (including without limitation tablet PCs) incorporating Microsoft Windows XP Tablet PC Edition operating system software as defined in ¶ 105 below.

23.     In my opinion, Dell infringes each of claims 1, 4, 6, 39-41, 43, and 46 of the '295 patent by its selling and offering for sale stylus-based computing devices (including without limitation handhelds and/or PDAs) incorporating Palm OS softwareas defined in ¶ 187 below.

## III.    BASIS FOR OPINIONS

### A.     General Technological Background

24.     At trial, I may discuss fundamental concepts of stylus-based and pen computers, handwriting recognition, gesture recognition and/or related topics in order to educate the Court and jury as to subject matter that is useful in understanding the Patent-in-Suit and the Gateway, Microsoft, and Dell Products. Such a discussion might include use and demonstrations of the Gateway, Microsoft, and Dell products, or other devices and materials useful to clarify and help the Court and/or jury understand pen computing and related matters.

### B.     Background Information Regarding the '295 Patent

25.     The '295 patent discloses technology relating to a pen computer or tablet pc and the use of gestures for controlling the computer. At the time of the invention, although personal computers existed, they were largely desktop devices and were operated, with rare exception, only by a keyboard and a mouse, or other mouse equivalent device.  In my own personal experience with hand-print and handwriting-recognition devices during the time leading up to the invention, "keyboard reluctance" and "keyboard phobia" were terms often used to describe what was seen as a great business opportunity for a more natural input means.  At the time, people in the industry were primarily addressing the problem of handwriting to replace a keyboard for text

7

Exhibit 2
Page 000013

input, and not addressing the problem of controlling the computer overall with the stylus. The specific work on gestures of which I was aware at the time dealt with the use of gestures within a specific application program, such as an experimental system using a small set of gestures for limited functions editing text e.g., cut/paste/delete. There were some rudimentary steps taken to allow a stylus tablet to be used instead of a mouse on PCs of the day. Some tablet vendors included a "mouse" driver with their products so that the tablet could be used similarly to a mouse without any handwriting recognition much less gesture recognition at all. These were usually awkward to use for mouse operations because of fundamental ergonomic differences in the use of a stylus pointing device versus a mouse pointing device.

26.    The use of gestures to control all user operations of the PC, not just in one application program, as shown in the Tablet PC devices, Pocket PC devices, Palm OS devices and in the Agulnick patent, is a dramatic improvement over the use of a keyboard and mouse and other technologies in use in the 1970s and 1980s. Handheld devices presented a special design problem in the 1980s in part because of the physical size required to put in a full or even highly modified keyboard for text and command input. Another factor was the difficulty typing with one hand while holding a small wobbly device in your other hand or even held in the crook of your arm. The use of a mouse was often completely precluded by these and similar factors. The use of gestures with a stylus in this sort of portable scenario is a dramatic improvement in usability and may account in part for the widespread popularity of stylus-based and gesture-based PDAs, Tablet PCs, and other ultra-mobile personal computing devices.

## C.    General Description of the Gateway, Microsoft, and Dell Accused Products

27.    I intend to give at trial a description of the Gateway, Microsoft, and Dell products that infringe the '295 patent. A general overview of some aspects of those products are given in this section.

8

Exhibit 2
Page 000014

28.     Microsoft Windows XP Tablet Edition software is the version of Microsoft's Windows XP operating system "with additional enhancements for pen-based computing."[1] As described in Microsoft's documentation, Windows XP Tablet Edition is designed to be compatible with all programs capable of running on Microsoft's non-tablet version of the Windows XP operating system.  Computers powered by the Windows XP Tablet PC Edition operating system, and equipped with a sensitive screen designed to interact with a complementary pen, are called Tablet PCs. Tablet PCs are fully-functional laptop PCs and more. You can use the pen directly on the screen to do things like select, drag, and open files; or in place of a keyboard to handwrite notes and communication. Unlike a touch screen, the Tablet PC screen only receives information from a special pen. It will not take information from your finger or your shirt sleeve—so you can rest your wrist on the screen and write naturally.[2]

29.     Windows Mobile software is the operating system software that runs on devices called Pocket PC's and/or Pocket PC Smartphones.[3]   Microsoft states that "Windows Mobile software powers advanced, easy-to-use devices that allow you to send and receive e-mail, browse the Internet, and work on mobile versions of familiar Office software."[4]

---

[1] http://www.microsoft.com/windowsxp/tabletpc/evaluation/overviews/xp.mspx

[2] http://www.microsoft.com/windowsxp/tabletpc/evaluation/about.mspx

[3] At times the operating system running on such handhelds may be or have been referred to as the "Pocket PC operating system" or some version thereof.  As I understand Microsoft's currently-adopted naming scheme, however, Pocket PC properly refers to hardware devices, while Windows Mobile refers to the operating system software.  My analysis of "Pocket PC" devices below is intended to cover devices running the Microsoft operating systems for mobile devices, whether called the "Pocket PC operating system" or "Windows Mobile." Microsoft today appears to roughly divide such devices into three categories – "Pocket PC" devices (which include mobile versions of Office applications); "smartphones" (which include a smaller set of applications but add cellular capabilities); and "Pocket PC Phones" (which include the software of a Pocket PC plus cellular capability).  See http://www.microsoft.com/windowsmobile/about/faq.mspx, question and answer #2.

[4]  http://www.microsoft.com/windowsmobile/about/default.mspx

Exhibit 2
Page 000015

30.    Palm OS software is "a leading operating system for mobile phones and wireless handhelds."[5] The Palm OS software serves as the operating system for a variety of devices, from basic personal organizers such as the PalmPilot (and numerous models through time, such as the current Palm Z22), to cellular devices such as the Treo 650 smartphone.  Products running the Palm OS software are available from both Dell and Gateway.

## IV.    INFRINGEMENT ANALYSIS

31.    For each asserted claim of the Patent-in-Suit asserted against Gateway, Microsoft, and Dell, I have set out the limitations of the claim as headings. Under each heading, I explain how the limitations are literally met by the Gateway, Microsoft, and Dell Products according to my understanding of the proper claim construction.

32.    I understand that claim construction is ultimately a legal issue for the Court, and that the Court in this case has set definitions for certain claim elements. I have considered the Court's claim construction in my infringement analysis so as to ensure that a proper comparison was performed.

33.    Although not stated to save space, the analysis below for each dependent claim should be assumed to include all the analysis of the claim from which it depends.

### A.    '295 PATENT with Respect to a Microsoft Pocket PC and/or Windows Mobile for Pocket PC (herein "Pocket PC")

34.    "Pocket PC device": a device using the Pocket PC software, whether it be, without restriction, a hand-held mobile device, such as a PDA, a portable video device or similar device, or cell phone incorporating PDA-like functionality, is a computer system which includes a screen for displaying information.  Such devices include a touch-screen or passive/resistive

---

[5] http://www.palmsource.com/palmos/

Exhibit 2
Page 000016

input screen or similar device for use with a stylus having a tip for inputting information. A finger and finger tip, or an ordinary pen or an ordinary pencil, for example, can be and often are used as the input stylus with many of these devices.

35.    I have been asked to analyze the infringement of all Windows Mobile operating system software for use with devices known as Pocket PC, Pocket PC Smartphone, and/or Smartphones, and any other similar device running the Windows Mobile operating system made, used, sold, or offered for sale since June 6, 1996. Microsoft has changed its naming conventions over the years with regard to how it refers to the operating system software for such devices. I intend to include in my analysis all versions of such operating systems whether referred to in whole or in part as "Pocket PC" or "Windows Mobile." *See* P. Williamson Dep. Tr. I will refer to any and all devices classified as Pocket PC or Pocket PC Smartphones as "Pocket PC" devices for convenience. My analysis below will focus upon a particular version of Windows Mobile running on a particular Pocket PC device. I have had occasions to examine other such devices both during my involvement in this case and otherwise and I conclude that there are no important differences in any of the versions of the operating systems for these devices that are relevant to my analysis with respect to the Agulnick '295 patent. My analysis on this point is bolstered from my review of Microsoft's Responses to Lucent's Second Set of Interrogatories to Microsoft No. 20 in which I can find no point where Microsoft's analysis makes any distinctions based on different versions of the operating system software.

(1)    **Claim 1**

**1. An apparatus for controlling a computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:**

36.    I understand that the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

11

Exhibit 2
Page 000017

37.     This introductory section of claim 1 is what I understand to be a preamble of claim 1. I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim. In this case, the preamble recites an apparatus for controlling a computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer. Even if the preamble was viewed as a limitation, Pocket PC devices would meet that limitation as demonstrated by my analysis in ¶ 34.

**first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen**

38.     I understand that the Court has construed this feature to include the function "detecting a stroke of the stylus tip in contact with the screen."

39.     I understand the Court has construed the corresponding structure of this feature to include Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68.

40.     I understand the Court has construed "stroke" to mean "a single drawing movement, including a tap."

41.     Pocket PC devices include a digitizer which performs the identical function of detecting a stroke of the stylus tip in contact with the screen. Pocket PC software detects a stroke or strokes from the point in time when the stylus touches the screen, through all its motion, until the time the stylus leaves the screen, or the detection area of the screen. *See* P. Williamson Dep. Tr. 46, which describes inputting information into the Pocket PC by a sequence of points that have been drawn onto the touch screen. The structure of the pen position digitizer is identical to one of the alternatives discussed in the specification of the '295 patent, that of the resistive, transparent digitizers for which the Grid Systems Corporation and the Linus

12

Exhibit 2
Page 000018

Technologies products are given as examples in the patent. This functionality only requires that the digitizer, such as a resistive film digitizer, report the position of the stylus when the stylus tip is in contact with the screen and provide some indication that the stylus tip is not in contact with the screen.

**second detecting means coupled to said computer for detecting a departure of the stylus tip from the screen;**

42. I understand that the Court has construed this feature to include the function "detecting a departure of the stylus tip from the screen."

43. I understand that the Court has construed this feature to include the corresponding structure "Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6: 53-68."

44. The digitizer included with Pocket PC devices performs the identical function of detecting a departure of the stylus tip from the screen. For example, the digitizer no longer provides position information to the computer if the stylus is no longer in contact with the screen, thus indicating to Pocket PC software that the stylus tip has made its departure from contact with the screen. *See, e.g.,* LUC 1302234-35, which describes the screen covered by a resistive touch panel. The structure of the pen position digitizer is identical to the corresponding structure identified by the Court, as described in ¶ 41.

**means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip;**

45. I understand that the Court has construed this feature to include the function "defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen."

13

Exhibit 2
Page 000019

46.    I understand that the Court has construed this limitation to include the corresponding structure "(1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 6:21-22; and Col. 6: 53-68; and (2) Pen position digitizer co-processor 90, with software that determines that a gesture is complete, as shown in fig. 3 and described in specification at Col. 6: 36-37, Col. 1: 65 - Col. 2:5, and Col. 17:1-14."

47.    I understand that the Court has construed "gesture" to mean "a symbol or mark."

48.    Pocket PC devices include a pen position digitizer and a co-processor or virtualization thereof, and software, which perform the identical function of defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen.  Software on the computer uses the departure of the stylus tip from the screen as a signal that the gesture has terminated.  When the digitizer no longer reports the position of the stylus, this indicates that the stylus is not in contact with the screen and has departed the screen.  *See*, LUC 1302234-35, which describes the screen covered by a resistive touch panel.  The structure of the pen position digitizer is identical to that disclosed in the '295 patent, as described in ¶ 41.  The pen position co-processor may be implemented in Pocket PC devices as a software virtualization of hardware.  Modern CPUs in Pocket PC devices are sufficiently capable that they can handle running the software on both the main processor (CPU 50 in the '295 patent) and the pen position digitizer co-processor 90 described in the '295 patent.  Accordingly, the corresponding structure (the CPUs in Pocket PC devices) is identical to pen position digitizer co-processor 90; each are computational hardware programmed to interpret stylus movements as gestures (or other, non-gesture inputs).  If different parts of software processing, such as program execution, gesture recognition, and/or co-processor virtualization were performed on different

14

Exhibit 2
Page 000020

CPUs or processing cores, this difference makes no difference in operation, is insubstantial in terms of the '295 patent and thus the structures are at a minimum equivalent.

49.    The Pocket PC gesture recognition code programs the general purpose CPUs of Pocket PC devices to define termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen.  This implementation of software running on a CPU is at a minimum the equivalent to Pen position digitizer co-processor 90.

> **means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape;**

50.    I understand that the Court has construed this feature to include the function "recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape."

51.    I understand that the Court has construed this feature to include the corresponding structure to include "(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6:36-37; Programmed with one of the following handwriting recognizing algorithms: (2) The techniques for recognizing gestures disclosed in "Automatic Recognition of the Handprinted Characters -- The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (3) the techniques for recognizing gestures disclosed in the U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (4) The Handwriting Translation Subsystem, disclosed in Appendix 1, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

52.    Pocket PC devices include a pen position digitizer, such as a touch-sensitive screen, and a pen position digitizer co-processor or virtualization thereof.  The devices include Pocket PC software, which includes recognition software for comparing the actual gesture to a

Exhibit 2
Page 000021

predefined shape, which is based on a definition of the properties of that pre-defined shape. Pocket PC software includes two recognizers, one of which makes a comparison with definitions of specific pre-defined shapes and a second recognizer which utilizes neural network or similar technology which makes a comparison with shapes.  *See* P. Williamson Dep. Tr. 67-79. Mr. Williamson stated that Pocket PC software includes components such as recognizer software, e.g., Transcriber, Letter Recognizer, which utilize pattern-matching technology and shape-matching technology. It is clear from my review of certain parts of the recognizer software how the software does a comparison with definitions of predefined shapes. For example, in the file "Windows Mobile 2003 Ver 4.21\shellw\ims\callig\app\gest.cpp", which I was able to review on Microsoft's secure computer, the software applies specific definitions for monotonicity, farthest point from the nominal chord of a stroke, degree of straightness, gesture and stroke direction, orthogonal orientation of two separate motions within a gesture, and other clearly stated recognition criteria.  Candidate gestures are compared with specific definitions of the pre-defined shapes recognized by this software.  A further example of such recognition techniques is found in the file "Windows Mobile 2003 Ver 4.21\shellw\ims\gesture.c", where similar recognition principles are applied, and in addition perform identical recognition analysis except for direction for two gestures whose only difference is in direction.  These techniques are fundamentally the same as techniques used in technologies cited in the 1980 IEEE reference of the patent.

53.    The structure of the CPU as programmed by the Pocket PC gesture recognition software is either identical or at least equivalent to Pen position digitizer co-processor 90, as described in ¶ 48.  The gesture recognition algorithms used in Pocket PC devices are identical structures to alternatives described in "Automatic Recognition of the Handprinted Characters --

16

Exhibit 2
Page 000022

The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980.  The "shape recognizer" component is identical in structure to the relatively rigid structural recognizers described in the reference.  The neural net recognizer as described by Mr. Williamson is identical in structure to the adaptive and learning nets types of recognizers described in the reference.  To the extent any defendant argues that because the precise lines of code are different in the Pocket PC devices, such differences are insubstantial.  I note that the reference itself does not describe details of the code, but rather classifies the recognizers according to their essential working principles as practitioners in the field would do, and points out the broad range of techniques which may be intermixed and thus make a classification difficult.  Although it is my opinion the Pocket PC algorithms are identical in structure as described, at a minimum they are equivalent structures.

> **means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.**

54.    I understand that the Court has construed this feature to include the function "implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape."

55.    I understand that the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56."

17

Exhibit 2
Page 000023

56.    I understand that the Court has stated that "This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level."

57.    I understand that the Court has construed "Operating System Level Object" to mean "an object that can be manipulated by a user, which is displayed outside the context of an application program."

58.    I understand that the Court has construed "Application Level Object" to mean "an object that can be manipulated by a user, which is displayed within the context of an application program."

59.    Pocket PC devices include an identical structure to CPU 50, namely a general purpose CPU programmed with software which will perform a specific predetermined action in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used. Specifically, a Tap gesture on an operating system object and thus in the context of that operating system object, such as a file, folder, or application icon, will perform a specific predetermined action, to wit, opening the file, displaying the contents of the folder, or executing the application. The same gesture, a Tap, performed in a word processing application on text, and thus on a part of an application object in the context of the application object, will perform a specific predetermined action, to wit, locate the text input cursor for that application at that position in the text. Additionally, a "Drag" gesture dragging the stylus, which is documented on msdn.Microsoft.com in the section named Microsoft Tablet PC - System Events and Mouse Messages, System Gestures, Programming the Tablet PC and elsewhere by Microsoft, made with the stylus through the letters of a single word in a text editing application will select those letters and a "Drag" gesture made with the stylus through a listing of files will

18

Exhibit 2
Page 000024

select those files. "Tap-and-Hold" gesture in the context of a operating system object, namely a list of files, performs the specific predetermined action of bringing up a pop-up menu of operations on that file including select all. "Tap-and-Hold" gesture in the context of a word processing program on text performs the specific predetermined action of bringing up a pop-up menu of operations on the text, including, select all. Implementing the predetermined actions of such gestures was well-known at the time, since the predetermined actions being taken were ones (such as selecting) already in use in the respective type of software (word processing, for instance).

**(2)    Claim 4**

**The apparatus of claim 1, further including third detecting means for detecting a direction of motion of said gesture.**

60.    I understand that the Court has construed this feature to include the function "detecting a direction of motion of the gesture."

61.    I understand that the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer 20 (see Figs. 2-3; col. 6:21-22; and Col. 6:53-68); and (2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37)."

62.    Pocket PC devices include identical or equivalent structure to the pen position digitizer and pen position digitizer co-processor, as described in, *e.g.*, ¶¶ 41, 48 above. These structures detect the direction of motion of certain gestures. *See* P. Williamson Dep. Tr. 46-47, which describes the digitizer and processor executing gesture recognition software detecting a stroke and distinguishing between a left to right and right to left stroke on the screen.

19

Exhibit 2
Page 000025

(3)    <u>Claim 6</u>

**The apparatus of Claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.**

63.    I understand that the Court has construed this feature to include the function "displaying on the screen a shape representing the actual gesture made by a user of the computer."

64.    I understand that the Court has construed this feature to include corresponding structure to include "(1) Pen position digitizer co-processor 90 and CPU 50 (<u>see</u> Fig. 3 and col. 6:33-34 and Col. 6:36-37); and (2) Display Controller 80 (<u>see</u> Fig. 3; col. 6:36); and (3) Liquid Crystal display 10 (<u>see</u> Figs. 2-3; Col. 6:20-21; and Col. 6:48-52)."

65.    Pocket PC devices include identical or equivalent structure to the pen position digitizer co-processor 90 and the CPU 50, as described in, *e.g.*, ¶¶ 48, 59 above. All Pocket PC devices include an LCD display or equivalent, usually a TFT (thin film transistor) display.[6] This display serves the identical function and is an identical structure to the liquid crystal display 10 of the '295 patent. All Pocket PC devices also include a display controller to control these displays[7] that serves the identical function (controlling the Pocket PC display) and has identical

---

[6] As examples, *see, e.g.*, Dell Axim X51v, with a 640x480 "TFT Color 16-bit, Touch Sensitive, Transflective LCD 3.7 inches," or the HP iPAQ hx2795, with a "3.5" transflective TFT QVGA with LED backlight display, landscape and portrait display modes," each promoted by Microsoft at, respectively, http://www.microsoft.com/windowsmobile/devices/devicedisplay.aspx?module=deviceDisplay;PPCPhone;amer icas;223; and http://www.microsoft.com/windowsmobile/devices/devicedisplay.aspx?module=deviceDisplay;PPC;americas;2 25

[7] *See, e.g.*, http://msdn.microsoft.com/library/default.asp?url=/library/en-us/dnppcgen/html/ppc_api.asp, at "Step 2," providing tips to programmers relating to the display memory and display controllers on Pocket PC devices to assist developers in creating game software. See also, http://focus.ti.com/general/docs/wtbu/wtbuproductcontent.tsp?templateId=6123&navigationId=12000&path=te mplatedata/cm/product/data/omap_850 (describing the architecture for the Texas Instruments OMAP 850 CPU

(Continued...)

Exhibit 2
Page 000026

structure (hardware circuitry to send appropriate control signals to the display) as display controller 80 in the '295 patent.  Together, these structures display on the screen a visible representation of the actual gesture or mark made by the user when the user writes a stroke or gesture in the form of electronic ink.

(4)     **Claim 39**

**An apparatus for controlling a computer system, the computer system compromising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:**

66.     This introductory section of claim 39 is what I understand to be a preamble of claim 39.  I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim.  In this case, the preamble recites an apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer.   Even if the preamble was viewed as a limitation, Pocket PC devices would meet that limitation as demonstrated by my analysis in ¶ 37.

67.     I understand that the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

68.     A Pocket PC device is a computer system which includes a screen for displaying information.  Such devices include a touch-screen or passive/resistive input digitizer or similar device for use with a stylus having a tip for inputting information.  A finger and finger tip can be and often is used as the input stylus with these devices.

_____

for Pocket PC devices such as the Cingular 2125, showing the LCD controller at bottom/middle); Intel XScale architecture data sheet, available at http://www.intel.com/design/intelxscale/xscaledatasheet4.htm, at § 1.0, stating the XScale processors (found in Dell Axim X51v devices, for example) "can be integrated with peripherals such as an LCD controller ..."

Exhibit 2
Page 000027

**detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;**

69.    I understand the Court has construed this feature to include the function "detecting a stroke of the stylus tip in contact with the screen."

70.    I understand the Court has construed this feature to include the corresponding structure "Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68."

71.    I understand the Court has construed "stroke" to mean "a single drawing movement, including a tap."

72.    Pocket PC devices include a stylus/digitizer with structure identical to that disclosed in the '295 patent, as described in ¶ 41, which detects a stroke of the stylus tip in contact with the screen.  Pocket PC software detects a stroke or strokes from the point in time when the stylus touches the screen, through all its motion, until the time the stylus leaves the screen, or the detection area of the screen.  *See* P. Williamson Dep. Tr. 46, which describes inputting information into the Pocket PC by a sequence of points that have been drawn onto the touch screen.   *See*, LUC 1302234-35, which describes the screen covered by a resistive touch panel.

**means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and**

73.    I understand the Court has construed "gesture" to mean "a symbol or mark."

74.    I understand the Court has construed this feature to include the function "recognizing a gesture comprising at least one stroke and an event indicating termination of the

22

Exhibit 2
Page 000028

gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising the first and second gestures."

75.    I understand the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90, as shown in Fig. 3 and described in the specification at Col. 6:36-37; programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below); (2) Col. 1:65 - Col. 2:5, and Col. 17:1-14; and (3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters -- The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

76.    The Pocket PC recognition software implements functionality to recognize gestures and to recognize at least three different gestures. For example, a first gesture would be "Tap," a second gesture would be a "DoubleTap." The composition of this first gesture and this second gesture are recognized as a third gesture, comprising the first and second gesture. In the case of Pocket Word, a "Tap" gesture in the text area would position the cursor, a "DoubleTap" gesture would select a word, but a "TripleTap" gesture comprising the "Tap" gesture and "DoubleTap" gesture would select the entire line.

77.    Additionally, Pocket PC provides a direct user utility (the Shorthand feature of the Transcriber component) for defining additional predetermined actions for gestures, or defining

23

Exhibit 2
Page 000029

composite gestures, specifically combining a first gesture, and a second gesture, to constitute a third gesture via the Shorthand feature of the Transcriber component. A user may easily define a number of predetermined actions for gestures or additional composite gestures and assign to them a meaning or predetermined action command which will be carried out when that gesture is recognized. For example, a Shorthand predetermined action can be defined for the gesture "1" and separately for the gesture "2," or the two gestures can be left to perform their default predetermined actions such as entering the "1," "2," in the context of a word processing application. Further, a short hand "1" and "2" composite gesture comprising the gestures "1" and "2" as a first and a second gesture can be defined to perform a predetermined action such as executing a new program such as Bubble Breaker. Writing such composite gesture as a single gesture in the Transcriber during the middle of text entry in the context of a word processing application will bring up Bubble Breaker without closing the word processing file.

78. The corresponding structures are identical or at least equivalent, as described in ¶¶ 52-53.

> **implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with third said gesture.**

79. I understand the Court has construed this feature to include the function "implementing said recognized gesture, which function includes the availability of using means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture."

24

Exhibit 2
Page 000030

80.    I understand the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and col. 4:49-56."

81.    Pocket PC devices include the identical structure, a CPU programmed to perform a specific predetermined action in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used. In the Pocket Word example above concerning the "Tap," "DoubleTap," and "TripleTap" gestures, the action associated with the "Tap" gesture is to position the cursor, the action associated with the second gesture "DoubleTap" is to select the word, and the action associated with the third composite gesture is to select the sentence or line. Implementing the predetermined actions of such gestures was well-known at the time, since the predetermined actions being taken were ones (such as selecting) already in use in the respective type of software (word processing, for instance). The corresponding structure, the CPU in Pocket PC devices, has the identical structure as described in ¶ 59.

**(5)    Claim 40**

**The apparatus of claim 39, wherein the shapes of said first and second gestures are substantially identical.**

82.    Pocket PC devices include Pocket PC software that will recognize a first gesture, "Tap", in the context of a Word application, and perform the predetermined action of positioning the text cursor. A second "Tap" gesture, being identical and thus substantially identical to the first gesture, when made together with the first gesture and in the same context, is not recognized as a second gesture, but rather the two together are recognized as a third gesture, "DoubleTap" , which performs the predetermined action of selecting an entire word.

25

Exhibit 2
Page 000031

83. Additionally, Pocket PC provides a direct user utility (the Shorthand feature of the Transcriber component) for defining additional predetermined actions or gestures, or for defining additional combinations of gestures, specifically combining a first gesture, and a second gesture, to constitute a third gesture via the Shorthand features of the Transcriber component. The first gesture and the second gesture specifically may be identical and thus substantially identical. A user may easily define a number of predetermined actions to be performed on input of a gesture, or additional composite gestures, and assign to them a meaning or command which will be carried out when that gesture is recognized. For example, a Shorthand definition for the gesture "O" can be defined to perform the predetermined action which is the function of inserting the day of the month, when in a context which allows this insertion. An additional Shorthand gesture comprising two instances of the gesture "O" can be defined to perform the predetermined action which is the function of inserting the name of the month, in a context which allows the insertion of that data such as the context of a word processing program. Writing two separate consecutive gestures "O" will result in the day of the month being inserted twice. However, writing as a single gesture the composite gesture "OO", comprising identical first and second gestures "O", then performs the predetermined action which is the function of inserting the name of the month.

**(6)** **Claim 41**

**An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including**

84. This introductory section of claim 41 is what I understand to be a preamble of claim 41. I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim. In this

26

Exhibit 2
Page 000032

case, the preamble recites an apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer.    Even if the preamble was viewed as a limitation, Pocket PC devices would meet that limitation as demonstrated by my analysis in ¶ 37.

85.    I understand the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

86.    A Pocket PC device, whether it be, without limitation, a hand-held mobile device, such as a PDA, a portable video device or similar device, or cell phone incorporating PDA-like functionality, is a computer system which includes a screen for displaying information.  Such devices include a touch-screen or passive/resistive input screen or similar device for use with a stylus having a tip for inputting information.  A finger and finger tip can be and often is used as the input stylus with these devices.    *See* P. Williamson Dep. Tr. 46, which describes inputting information into the Pocket PC by a sequence of points that have been drawn onto the touch screen.

> **first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;**

87.    I understand the Court has construed this claim language in the identical way as the identical language in claim 1. Accordingly, my analysis above for claim 1 applies.

> **means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen**

88.    I understand the Court has construed "gesture" to mean "a symbol or mark."

89.    I understand the Court has construed this feature to include the function "recognizing a gesture comprising at least one stroke and an event indicating termination of the

27

Exhibit 2
Page 000033

gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen."

90.    I understand the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in specification at Col. 6:36-37; Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5) below: Col. 1:65 - Col. 2:5, and Col. 17:1-14; and (3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters -- The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

91.    My analysis regarding the similar claim element with very similar or identical claim interpretations applies equally here. *See* ¶¶ 45-53.  Both the "shape recognizer" and the neural net recognizers of the Pocket PC software (*see* ¶ 52) function by comparing the actual gesture to a predefined shape, which is based on a definition of the properties of that pre-defined shape.

92.    Pocket PC recognizes gestures comprising strokes located in substantially the same area of the screen.  For example, the Pocket PC software has as one input functionality a component known as Block Recognizer, which defines two areas at the bottom of the screen, "abc" and "123."  When the Block Recognizer is operational, gestures for certain predetermined

28

Exhibit 2
Page 000034

actions must be made entirely within these areas. Those gestures made outside these areas are either not recognized or result in a null predetermined action. For example, the "Left" gesture if made in the Block Recognizer area "abc" is recognized and results in the predetermined action of the character "backspace." The same physical mark made in a Word document performs the predetermined action of selection of text, or perhaps no action at all.

> **second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and**

93. I understand that the Court has construed this feature to include the function "detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion."

94. I understand that the Court has construed this feature to include the corresponding structure (1) Pen position digitizer 20 (see Figs. 2-3; Col. 6:21-22; and Col. 6:53-68); and (2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37)."

95. Pocket PC devices possess identical or equivalent structures, as discussed above. *See, e.g.*, ¶¶ 41, 48.

96. The second detecting means in this claim is operatively the same as the third detecting means in claim 4, since each detects a direction of motion of a gesture. My analysis there applies here as well. *See* ¶ 62.

97. In the Block Recognizer functionality mentioned above, in the area "abc," a vertical stroke gesture made downwards is recognized as the letter "I," whereas an identical vertical stroke gesture made upwards is recognized differently and performs the predetermined action of changing the capitalization mode of the Block Recognizer.

> **implementing means coupled to said computer for implementing said recognized gesture, said implementing**

29

Exhibit 2
Page 000035

**means including means for performing a predetermined action associated with said predefined shape**

98.    I understand the Court has construed this feature to include the function "implementing said recognized gesture which function includes the availability of using means for performing a predetermined action associated with said predefined shape."

99.    I understand the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56."

100.    In the context of a word processing application, a vertical stroke gesture made upwards in the "abc" area performs the specific predetermined action of changing the capitalization mode of the special area "abc".    An identical vertical stroke gesture made downwards in the "abc" area performs the predetermined action of entering the letter "I" into the application program.    The same identical vertical stroke gesture made downwards in the "123" area will enter the digit "1."

101.    My analysis above demonstrates the an identical structure to CPU 50 is present in Pocket PC devices, and performs the functions described in the prior paragraph. *See, e.g.,* ¶ 59.

(7)    **Claim 43**

**The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.**

102.    Claim 6 of the '295 patent is identical to claim 43.    Accordingly, my analysis above applies equally here. *See* ¶¶ 63-65.

30

Exhibit 2
Page 000036

(8)    <u>Claim 46</u>

**The apparatus of claim 41, wherein said direction of motion of said gesture is associated with said predetermined action.**

103.    Pocket PC devices include a pen position digitizer or touch screen and a pen position digitizer co-processor or virtualization thereof, which report position information to the CPU.  Software on the CPU or co-processor determines the direction of motion of the stylus based on the changes in the position in a sequence of points.  The recognizers make use of this information to determine the direction of motion of the gesture.  Specifically, a vertical stroke gesture made upwards in the "abc" area performs the predetermined action which is the function of changing the capitalization mode.  An identical vertical stroke gesture made downwards in the "abc" area performs the predetermined action which is the function of entering the letter "I" into the application program.  The same identical vertical stroke gesture made downwards made in the "123" area will enter the character "1."

**B.    '295 PATENT with Respect to Microsoft Windows XP Tablet PC Edition Operating System Software**

104.    "Tablet PC device": a device using the Tablet PC Edition software, whether it be, without limiting the set of possible devices, a portable device, such as a tablet pc, hand-held mobile device, such as a PDA, a portable video device or similar device, or a desk top pc or similar device using an external digitizing tablet/display unit or electronic whiteboard, is a computer system which includes a screen or equivalent, such as an E-Ink display, for displaying information.  Such devices include a digitizer and stylus, such as a touch-screen, electromagnetic or electrostatic digitizer, acoustic digitizer, similar device based on any number of physical sensing technologies or possibly combination of sensing technologies. The stylus has a tip for inputting information. *See, e.g.,* LUC 1302236-39, 45.

31

Exhibit 2
Page 000037

105.    I have been asked to analyze the infringement of all Windows XP Tablet PC Edition operating system software for use with devices known as Tablet PCs, and any other similar device running the Windows XP Tablet PC Edition operating system made, used, sold, or offered for sale since June 6, 1996.  I understand that Microsoft identified Windows XP Tablet PC Edition, Windows XP Tablet PC Edition 2004, and Windows XP Tablet PC Edition 2005 operating system software as its operating systems designed for use with Stylus-Based products since June 6, 1996.  I include in my analysis all versions of such operating systems.  I will refer to any and all such devices running any of these operating systems as "Tablet PC" devices for convenience.  My analysis below will focus upon a particular version of Windows XP Tablet PC Edition running on a particular Tablet PC device.  I have examined other such devices both during my involvement in this case and otherwise and I conclude that there are no important differences in any of the versions of the operating systems for these devices that are relevant to my analysis with respect to the Agulnick '295 patent.  My analysis on this point is bolstered from my review of Microsoft's Responses to Lucent's Second Set of Interrogatories to Microsoft No. 20 in which I can find no point where Microsoft's analysis makes any distinctions based on different versions of the operating system software.

(1)    **Claim 1**

**1. An apparatus for controlling a computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:**

106.    I understand that the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

107.    This introductory section of claim 1 is what I understand to be a preamble of claim 1.  I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim.  In this

32

Exhibit 2
Page 000038

case, the preamble recites an apparatus for controlling a computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer. Even if the preamble was viewed as a limitation, Tablet PC devices would meet that limitation as demonstrated by my discussion of Tablet PCs above in ¶ 104.

**first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen**

108.    I understand that the Court has construed this term to include the function "detecting a stroke of the stylus tip in contact with the screen."

109.    I understand the Court has construed the corresponding structure of this feature to include Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68."

110.    I understand the Court has construed "stroke" to mean "a single drawing movement, including a tap."

111.    Tablet PC devices include a pen position digitizer which detects when the stylus tip is in contact with the screen.  *See* LUC 1302238, 1302246, 1302253, which state that Tablet PC's are designed to operate with an electromagnetic digitizer.  In some instances, the pen position digitizer consists of a tablet portion and a stylus portion, together constituting the digitizer.  The tablet and/or stylus includes a switch or other means for detecting when the stylus tip is in contact with the screen.  A force transducer, sometimes referred to as a pressure sensor, is an example of such a switch. Tablet PC Edition software running on the device detects a stroke or strokes from the point in time when the stylus touches the screen, through all its motion, until the time the stylus leaves the screen.  The structure of the pen position digitizer of Tablet PCs is identical to one of the alternatives discussed in the specification of the '295 patent, that of the electromagnetic digitizer for which the Wacom digitizer is provided as an example in the patent.

33

Exhibit 2
Page 000039

**second detecting means coupled to said computer for detecting
a departure of the stylus tip from the screen;**

112.    I understand that the Court has construed this feature to include the function "detecting a departure of the stylus tip from the screen."

113.    I understand that the Court has construed this feature to include the corresponding structure "Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6: 53-68."

114.    The digitizer included with Tablet PC devices performs the identical function of detecting a departure of the stylus tip from the screen. *See* LUC 1302238, 1302246, 1302253, which state that Tablet PC's are designed to operate with an electromagnetic digitizer. The stylus tip has departed contact with the screen when the digitizer no longer provides position information to the computer, or when a force-sensing transducer or a switch or equivalent functionality in the digitizer indicates that the stylus tip has departed contact from the screen. The structure of the pen position digitizer is identical to that described in the '295 patent, as discussed in ¶ 111.

**means coupled to said computer for defining termination of a
gesture comprising at least one stroke in response to said
departure of the stylus tip;**

115.    I understand that the Court has construed this feature to include the function "defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen."

116.    I understand that the Court has construed this limitation to include the corresponding structure "(1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 6:21-22; and Col. 6: 53-68; and (2) Pen position digitizer co-processor

34

Exhibit 2
Page 000040

90, with software that determines that a gesture is complete, as shown in fig. 3 and described in specification at Col. 6: 36-37, Col. 1: 65 - Col. 2:5, and Col. 17:1-14."

117.    I understand that the Court has construed "gesture" to mean "a symbol or mark."

118.    A Tablet PC device includes a pen position digitizer and a co-processor or virtualization thereof which determines the specific coordinates of the stylus tip position. *See* LUC 1302238, 1302246, 1302253, which state that Tablet PC's are designed to operate with an electromagnetic digitizer.    Tablet PC devices include a pen position digitizer and a co-processor or virtualization thereof which performs the identical function of defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen.  Software on the computer uses the departure of the stylus tip from the screen as a signal that the gesture has terminated.  The transition from the state of detecting that the stylus is in contact with the screen, to the state that is not, is used by software on the Tablet PC to determine that the stylus tip has departed the screen.

119.    The structure of the pen position digitizer is identical to that disclosed in the '295 patent, as described in ¶ 111.  The pen position co-processor is implemented in Tablet PC devices as a software virtualization of hardware.  Modern CPUs in Tablet PC devices are sufficiently capable that they can handle running the software run on both the main processor (CPU 50 in the '295 patent) and the pen position digitizer co-processor 90 described in the '295 patent.  Accordingly, the corresponding structure (the CPUs in Tablet PC devices) is identical to pen position digitizer co-processor 90; each are computational hardware programmed to interpret stylus movements as gestures (or other, non-gesture inputs).  If for some reason the fact that program execution and gesture recognition algorithms were performed on different processing cores in the '295 patent is different that performing those algorithms on a single processing core

35

Exhibit 2
Page 000041

in Tablet PC devices is a difference, this difference makes no difference to operation, is insubstantial, and thus the structures are at a minimum equivalent. The Tablet PC gesture recognition code programs the general purpose CPUs of Tablet PC devices to define termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen. This implementation of software running on a CPU is at a minimum the equivalent to Pen position digitizer co-processor 90.

> **means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape;**

120. I understand that the Court has construed this feature to include the function "recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape."

121. I understand that the Court has construed this feature to include the corresponding structure to include "(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6:36-37; Programmed with one of the following handwriting recognizing algorithms: (2) The techniques for recognizing gestures disclosed in "Automatic Recognition of the Handprinted Characters -- The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (3) the techniques for recognizing gestures disclosed in the U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (4) The Handwriting Translation Subsystem, disclosed in Appendix 1, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

122. Tablet PC devices include a pen position digitizer, and a pen position digitizer co-processor or virtualization thereof. The devices include Tablet PC Edition software, which includes recognition software for comparing the actual gesture to a predefined shape, which is

36

Exhibit 2
Page 000042

based on a definition of the properties of that pre-defined shape. Tablet PC Edition software includes two recognizers or recognition modules, one of which makes a comparison of an actual gesture with definitions of specific pre-defined shapes based on rules, and a second which utilizes neural network or similar technology which makes a comparison with shapes. *See* P. Slavik Dep. Tr. 65, 69-70. Mr. Slavik described Tablet PC software as including techniques for comparing a gesture to a predefined shape, by for example, looking at the strokes being inputted and using rules to determine, or recognize the gesture. (See discussion below at ¶ 157).

123. The structure of the CPU as programmed by the Tablet PC gesture recognition software is either identical or equivalent to Pen position digitizer co-processor 90, as described in ¶ 118. The gesture recognition algorithms used in Tablet PC devices are identical structures to alternatives described in "Automatic Recognition of the Handprinted Characters -- The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980. The "rule-based" component is identical in structure to the relatively rigid structural recognizers described in the reference. The "neural net" recognizer is identical in structure to the adaptive and learning nets types of recognizers described in the reference. To the extent any defendant argues that because the precise lines of code are different in the Tablet PC devices, such differences are insubstantial. I note that the reference itself does not describe details of the code, but rather classifies the recognizers according to their essential working principles as practitioners in the field would do, and points out the broad range of techniques which may be intermixed and thus make a

Exhibit 2
Page 000043

classification difficult. Although it is my opinion the Tablet PC algorithms are identical in structure as described, at a minimum they are equivalent structures.[8]

> **means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.**

124.   I understand that the Court has construed this feature to include the function "implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape."

125.   I understand that the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56.

126.   I understand that the Court has stated that "This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level."

127.   I understand that the Court has construed "Operating System Level Object" to mean "an object that can be manipulated by a user, which is displayed outside the context of an application program."

---

[8] I understand that Mr. Slavik's testimony regarding the gesture recognizer in Windows XP described application level recognition algorithms and that Mr. Slavik had doubts as to whether his code was also used in the system level recognizer. I also understand that Lucent asked Microsoft for additional information on the system level recognition and that Microsoft did not produce it. I have to assume that the recognition algorithms for both levels are the same or at a minimum equivalent.

Exhibit 2
Page 000044

128.    I understand that the Court has construed "Application Level Object" to mean "an object that can be manipulated by a user, which is displayed within the context of an application program."

129.    Tablet PC devices include an identical structure to CPU 50, specifically, a general purpose CPU programmed with software which will perform a specific predetermined action in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used.  Microsoft documents a number of gestures, on MSDN pages titled "ApplicationGesture Enumeration," "SystemGestureEnumeration," and elsewhere. *See* P. Slavik Dep. Tr. Exhs. 3 and 4.  Specifically, a Tap gesture on an operating system object, and thus in the context of that operating system object, such as a file, folder, or application icon, will carry out a specific action, to wit, selecting the file, folder, or command icon.  The same gesture, a "Tap," performed in the context of a word processing application on text, will locate the input cursor for that application in that position in the text.  Additionally, a "DoubleTap" gesture on a file executes the predetermined action of launching the associated application for that file type.  However a "DoubleTap" gesture on a word in a word processing program executes the predetermined action of selecting the entire word.  Further, a gesture dragging the stylus, which is the "Drag" gesture documented in "Mobile Ink Jots 6: Using Gestures in Tablet PC Applications" on msdn.Microsoft.com and elsewhere by Microsoft, vertically through the lines of text in a text editing application will select characters of those lines, and a similar "Drag" gesture dragging the stylus through a list of files will start the predetermined action of attempting to move the file at the starting point of the drag gesture to a new location determined by the point of lift of the stylus.  A "Tap-and-Hold" gesture in the context of a operating system object, namely a list of files, performs the specific predetermined action of bringing up a pop-up menu

39

Exhibit 2
Page 000045

of operations on an operating system object, the file. A "Tap-and-Hold" gesture in the context of a word processing program on text performs the specific predetermined action of bringing up a pop-up menu of operations on an application object, the text.

### (2)    Claim 3

**The apparatus of claim 1, wherein: said second detecting means includes means for detecting proximity of the stylus tip to the screen; and**

130.    I understand that the Court has construed this feature to include the function "detecting proximity of the stylus tip to the screen."

131.    I understand that the Court has construed this feature to include the corresponding structure "Complimentary electronic circuitry by which the proximity of the stylus tip to the computer is sensed, including: (1) Stylus 4, including radio frequency inductor/capacitor circuit 42 and switch 44 (see Figs. 1-2; Col. 6:16-18; col. 6:26-31; Col. 1:18-21; and Abstract); and (2) Pen position digitizer 20, as shown in Figs. 2 and 3 in the specification at Col. 6:21-22; and Col. 61-68."

132.    Tablet PC devices must meet Microsoft's stated requirements for use with Windows Tablet PC software. This includes the requirement that the digitizers include the functionality of "hover," which is a terminology for technology for sensing proximity of the stylus tip to the screen and the position of the stylus tip over the screen when the stylus tip is sufficiently near the screen but not in contact with the screen. *See* LUC 1302246, which describes the "hovering" ability. Tablet PC devices therefore contain identical structures to stylus 4 and pen position digitizer 20. The stylus in a Tablet PC device may include a radio frequency inductor/capacitor circuit and switch, identically to stylus 4 in the '295 patent, or equivalent structure. The identical structure to pen position digitizer 20 is present in Tablet PC devices as previously discussed in ¶ 111.

40

Exhibit 2
Page 000046

**said apparatus further includes means coupled to said computer for displaying an indicator of the proximity of the stylus tip to the screen.**

133.    I understand that the Court has construed this feature to include the function "displaying an indicator of the proximity of the stylus tip to the screen."

134.    I understand that the Court has construed this feature to include corresponding structure: "(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3; and Col. 6:33-34 and Col. 6:36-37); (2) Display Controller 80 (see Fig. 3; Col. 6:36); and (3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6:20-21; and Col. 6:48-52).

135.    Tablet PC devices include identical or equivalent structure to the pen position digitizer co-processor 90 and the CPU 50, as described in, *e.g.*, ¶¶ A.48, A.59 above.  All Tablet PC devices include an LCD display or equivalent, usually a TFT (thin film transistor) display.[9] This display serves the identical function and is an identical structure to the liquid crystal display 10 of the '295 patent.  All Tablet PC devices also include a display controller to control these displays[10] that serves the identical function (controlling the Tablet PC display) and has identical structure (hardware circuitry to send appropriate control signals to the display) as display controller 80 in the '295 patent.  Together, these four structures display on the screen an indicator of the proximity of the stylus tip to the screen. For example, with the Tablet PC software, the indicator is a special cursor whose presence and motion indicates the position that is reported for the stylus in proximity near or over the display.  This cursor is independent of and visually distinct from other cursors such as the cursor for text input location in a word processing

---

[9]  As examples, *see, e.g.,* models listed at http://www.microsoft.com/windowsxp/tabletpc/evaluation/products.mspx, showing numerous models with LCD's of varying resolution.

[10]  *See, e.g.,* http://www.intel.com/support/graphics/intel830m/sb/cs-009491.htm?iid=graphics+830main&, describing the Intel® 82830M Graphics Controller specially designed for Tablet PCs.

Exhibit 2
Page 000047

document or text field.  In some cases, this hover cursor is an arrow, in other cases such as in the SIP (Soft Input Panel, referred to by other names in some Microsoft documentation such as Developing Applications Using Your Tablet PC) it may be a dot.  Under certain circumstances, the cursor may change from one image to another as a function of the positions of the stylus.

     (3)    <u>Claim 4</u>

           **The apparatus of claim 1, further including third detecting means for detecting a direction of motion of said gesture.**

136.    I understand that the Court has construed this feature to include the function "detecting a direction of motion of the gesture."

137.    I understand that the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer 20 (<u>see</u> Figs. 2-3; col. 6:21-22; and Col. 6:53-68); and (2) Pen position digitizer co-processor 90 (<u>see</u> Fig. 3 and Col. 6:36-37)."

138.    Tablet PC devices include identical or equivalent structure to the pen position digitizer and pen position digitizer co-processor, as described in, *e.g.*, ¶¶ 111, 118 above. *See* LUC 1302245-46, which states that Tablet PCs have been designed to operate with an electromagnetic digitizer.  Software on the CPU or co-processor determines the direction of motion of the stylus based on the changes in the position in a sequence of points.  The recognizers make use of this information to determine the direction of motion of the gesture.  For example, a horizontal stroke gesture made left to right may be identified by the recognizer as the gesture "Right" and is further associated with the predetermined action of "space", whereas an identical horizontal stroke gesture made in the direction from right to left may be identified by the recognizer as the gesture "Left" and is associated with the predetermined action of "backspace."

Exhibit 2
Page 000048

(4)    **Claim 6**

**The apparatus of Claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.**

139.    I understand that the Court has construed this feature to include the function "displaying on the screen a shape representing the actual gesture made by a user of the computer."

140.    I understand that the Court has construed this feature to include corresponding structure to include "(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and col. 6:33-34 and Col. 6:36-37); and (2) Display Controller 80 (see Fig. 3; col. 6:36); and (3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6:20-21; and Col. 6:48-52)."

141.    Tablet PC devices include structures identical to each of these items, as discussed previously in ¶¶ 118, 129, and 135.  Together, these structures display on the screen a visible representation of the actual gesture or mark made by the user when the user writes a stroke or gesture in the form of electronic ink.  An example of this functionality is exhibited by the Soft Input Panel.  For example, in the boxed or "combed" mode, shows a representation of the gesture consisting of all the electronic ink marked in the area until the user lifts the stylus or the gesture is completed.  For example, making a "Scratchout" gesture or other gesture in the Soft Input Panel shows a representation of the actual gesture in the form of electronic ink. This representation may then be removed and replaced by a character if the gesture was a handwriting character gesture.  This character may also be considered an idealized representation of the actual gesture, within the engineering limits of recognition software or other factors.

43

Exhibit 2
Page 000049

     (5)    **Claim 12**

         **The apparatus of claim 3, further including means for terminating display of said indicator when the stylus tip departs from proximity to the screen.**

142.    I understand that the Court has construed this feature to include the function "terminating display of said indicator when the stylus top departs from proximity to the screen"

143.    I understand that the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and col. 6"33-34 and Col. 6:36-37); (2) Display Controller 80 (see Fig. 3; Col. 6:36); and (3) Liquid Crystal display 10 (see Figs. 2-3, Col. 6:20-21; and Col. 6:48-52)."

144.    Tablet PC devices include structures identical to each of these items, as discussed previously in ¶ 141.

145.    Tablet PC devices must meet Microsoft's stated requirements for use with Tablet PC Edition software. This includes the requirement that the digitizers include the functionality of "hover," which is a terminology for technology for sensing proximity of the stylus tip to the screen and the position of the stylus tip over the screen, when the stylus is sufficiently near the screen but not yet in contact with the screen. *See* LUC 1302246, which describes the hovering, and how it allows the user to move the cursor quickly and easily. These digitizers will include complimentary electronic circuitry or an equivalent structure, such as a stylus with a radio frequency inductor/capacitor circuit and switch.

146.    When the stylus is out of proximity range, the digitizer does not report the position of the stylus. Further, when the stylus is out of proximity range, software in the Tablet PC device no longer updates, changes or repositions the special cursor whose motion indicates the proximity of the stylus. The fact that this special cursor is no longer moving in response to

Exhibit 2
Page 000050

motion of the stylus indicates that the stylus is no longer in proximity. Thus the display of the indicator has been terminated.

**(6)    Claim 39**

> **An apparatus for controlling a computer system, the computer system compromising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:**

147.    I understand that the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

148.    This introductory section of claim 39 is what I understand to be a preamble of claim 39. I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim. In this case, the preamble recites an apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer. Even if the preamble was viewed as a limitation, Tablet PC devices would meet that limitation as demonstrated by my discussion of Tablet PCs above in ¶¶ 104 and 149.

149.    "Tablet PC device": a device using the Tablet PC Edition software, whether it be, for example, a portable device, such as a Tablet PC, hand-held mobile device, such as a PDA, a portable video device or similar device, or a desk top pc or similar device using an external digitizing tablet/display unit or electronic whiteboard, is a computer system which includes a screen for displaying information. Such devices include a digitizer and stylus, such as a touch-screen, electromagnetic or electrostatic digitizer, acoustic digitizer, or similar device based on any number of usable physical sensing technologies, or combination of sensing technologies. The stylus has a tip for inputting information. *See* LUC 1302236-39, 45, which describes the stylus being used to input information into the Tablet PC.

Exhibit 2
Page 000051

**detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;**

150.    I understand the Court has construed this feature to include the function "detecting a stroke of the stylus tip in contact with the screen."

151.    I understand the Court has construed this feature to include the corresponding structure "Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68."

152.    I understand the Court has construed "stroke" to mean "a single drawing movement, including a tap."

153.    Tablet PC devices include a stylus/digitizer with structure identical to that disclosed in the '295 patent, as described in ¶ 111, which detects when the stylus tip is in contact with the screen.  *See* LUC 1302238, 1302246, 1302253, which state that Tablet PC's are designed to operate with an electromagnetic digitizer.  In some instances, the pen position digitizer consists of a tablet portion and a stylus portion, together constituting the digitizer.  The tablet and/or stylus include a switch or other means to detect whether the stylus tip is in contact with the screen.  A force transducer, referred to at times as a pressure sensor is one example of such a switch.  Tablet PC Edition software running on the device detects a stroke or strokes from the point in time when the stylus touches the screen, through all its motion, until the time the stylus leaves the screen, or the detection area of the screen, or departs the proximity sensing range of the screen.

Exhibit 2
Page 000052

**means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and**

154.    I understand the Court has construed "gesture" to mean "a symbol or mark."

155.    I understand the Court has construed this feature to include the function "recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising the first and second gestures."

156.    I understand the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90, as shown in Fig. 3 and described in the specification at Col. 6:36-37; programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below); (2) Col. 1:65 - Col. 2:5, and Col. 17:1-14; and (3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters -- The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

157.    Tablet PC devices include a pen position digitizer, and a pen position digitizer co-processor or virtualization thereof.  *See* LUC 1302238, 1302246, 1302253, which state that Tablet PC's are designed to operate with an electromagnetic digitizer.  The devices include

Exhibit 2
Page 000053

Tablet PC Edition software, which includes recognition software for comparing the actual gesture to a predefined shape, which is based on a definition of the properties of that pre-defined shape. Tablet PC devices include Tablet PC Edition software which determines termination of a gesture through a combination of the stylus tip departing contact with the screen, and/or leaving the active area of the touch screen, and/or a timeout after the stylus tip has left the touch screen or gone out of the active area, or the stylus going out of proximity with the digitizer or screen, which are functionalities described in the '295 patent. Tablet PC Edition software includes two recognizers, or recognition modules, one of which is rule based and makes a comparison with definitions of specific pre-defined shapes and a second which utilizes neural network or similar technology which makes a comparison with shapes. *See* P. Slavik Dep. Tr. 65, 69-70; *see also* source code files twister.c, moth.c, grouse.c, taps.c, caligest.cpp, caligest.c. For example, my review of the file "ink\core\twister\moth\src\scratchout.c" from the Tablet PC 2005 version of the Tablet PC software on Microsoft's secure PC, revealed that it carries out a straightforward application of rules-based tests for recognizing the "Scratchout" gesture of the Tablet PC, in particular applying rules for the ratio of total X travel distance to X extent size, a surrogate for the number of separate motions of the gesture, as a function of the total X vs. Y aspect ratio of the gesture. My review of the file "caligest.c" file confirm P. Slavik's characterization of parts of the recognizer software as being rule-based, in that it showed that the application of rule-based tests for properties of a candidate gesture such as straightness, local extrema from the end-points chord, direction of motion of the gesture, and orientation of the gesture, and in part the application of one rule depending on the results of applying another rule.

158. Tablet PC devices include a digitizer, and a pen position co-processor or virtualization thereof coupled to the computer. The Tablet PC Edition recognition software

48

Exhibit 2
Page 000054

implements functionality to recognize gestures and to recognize at least three different gestures. For example, a first gesture would be a "Tap", a second gesture would be a "DoubleTap." The composition of this first gesture and this second gesture, are recognized as a third gesture, comprising the first and second gesture, as indicated by the different predetermined action which is performed. In the case of a word processing application, a "Tap" gesture would position the cursor, a "DoubleTap" gesture would select a word, but a triple tap gesture comprising "Tap" gesture and "DoubleTap" gesture would select the entire line.

159.    As a further example, Tablet PC software, as documented in section ApplicationGesture Enumeration on the MSDN.Microsoft.com website and in the physical edition of MSDN Library as provided on DVD, recognizes a gesture "UpDown". This gesture comprises two separate movements. This compound gesture consists of a vertically upwards movement, a cessation of motion between the two movements, and a vertically downwards movement. Thus, the gesture consists of two separate movements and thus two strokes. The first stroke is a gesture recognized by itself by a Tablet PC as "Up", as documented in the aforementioned reference. The second stroke is a gesture recognized by itself by a Tablet PC as "Down", as documented in the same aforementioned reference. The composite gesture "UpDown" comprising the first gesture "Up" and the second gesture "Down" is a third gesture recognized by the Tablet PC device, also documented in the aforementioned reference.

160.    The corresponding structures are identical or at least equivalent, as described in ¶¶ 111, 123, and 127.

> **implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and**

49

Exhibit 2
Page 000055

**a third predetermined action associated with third said gesture.**

161.    I understand the Court has construed this feature to include the function "implementing said recognized gesture, which function includes the availability of using means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture."

162.    I understand the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and col. 4:49-56."

163.    Tablet PC devices include a CPU programmed with software which will perform a specific predetermined action in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used.  For example, "Tap" gesture, performed in the context of a word processing application on text, performs the predetermined action to locate the input cursor for that application in that position in the text.  A "DoubleTap" gesture on a word in the context of a word processing program performs the predetermined action of selecting the entire word. A triple tap gesture comprising  "Tap" and "DoubleTap" gesture performs the predetermined action of selecting the entire line.   Implementing the predetermined actions of such gestures was well-known at the time, since the predetermined actions being taken were ones (such as selecting) already in use in the respective type of software (word processing, for instance).  The corresponding structure, the CPU in Tablet PC devices, has the identical structure as described in ¶ 129.

50

Exhibit 2
Page 000056

(7)     <u>Claim 40</u>

**The apparatus of claim 39, wherein the shapes of said first and second gestures are substantially identical.**

164.     As one example, Tablet PC devices including Tablet PC Edition software will recognize a first gesture, "Tap", in the context of a word processing application as positioning the cursor.  A second "Tap" gesture, being identical and thus substantially identical to the first gesture, and made together with the first gesture in appropriate fashion, e.g., close together in position and time, is not recognized as a second gesture, but rather the two together are recognized as a third gesture, "DoubleTap," which selects an entire word, in the context just mentioned of the word processing program on text.

(8)     <u>Claim 41</u>

**An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including**

165.     I understand the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

166.     This introductory section of claim 41 is what I understand to be a preamble of claim 41.  I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim.  In this case, the preamble recites an apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer.  Even if the preamble was viewed as a limitation, Tablet PC devices would meet that limitation as demonstrated by my discussion of Tablet PCs above in ¶¶ 104 and 167.

167.     Tablet PC devices include a digitizer or a tablet and a stylus, such as a touch-screen, electromagnetic or electrostatic digitizer, acoustic digitizer, similar device based on any

51

Exhibit 2
Page 000057

number of physical sensing technologies, or combination of sensing technologies. The devices also include a screen, such as an LCD or equivalent, for displaying information. The stylus has a tip for inputting information. *See* LUC 1302236-39, 45, which describes use of a stylus.

> **first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;**

168.    I understand the Court has construed this claim language in the identical way as the identical language in claim 1. Accordingly, my analysis above applies. *See* ¶¶ 108 to 111.

> **means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen**

169.    I understand the Court has construed "gesture" to mean "a symbol or mark."

170.    I understand the Court has construed this feature to include the function "recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen."

171.    I understand the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in specification at Col. 6:36-37; Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5) below: Col. 1:65 - Col. 2:5, and Col. 17:1-14; and (3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters -- The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for

52

Exhibit 2
Page 000058

Pattern Recognition" (see Col. 5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

172.    My analysis regarding the similar claim element with very similar or identical claim interpretations applies equally here. *See* ¶¶ 120 to 123. Both the "shape recognizer" and the neural net components of the Tablet PC software (*see* ¶ 122) function by comparing the actual gesture to a predefined shape, which is based on a definition of the properties of that pre-defined shape.

173.    Tablet PC Edition software includes an element referred to as the SIP ("Soft Input Panel") which defines a special area on the screen. When the Soft Input Panel, specifically in the non-boxed "combless" mode, is operational, gestures such as a "Right", which is associated with the predetermined action of the character "space", the gesture being a horizontal mark made left to right, must be made within this special area, which is the same area of the screen. The same gesture made outside of this area, and thus not in the same area, such as in the text area of a word processing application, will not be recognized as the gesture "Right", or will not perform the predetermined action of a "space." Further, the "Scratchout" gesture if made in this special area, which is the same area of the screen, will be recognized as a gesture for erasing ink and text but the same gesture made in the area of the word processing document will not be so recognized, or in any case does not carry out the same predetermined action.

174.    My analysis of the operation of Tablet PC devices indicates that, under at least some conditions, the area of the gesture and of its composite strokes is defined in part by the point of first contact with the surface of the screen, or a similar functionality. For example, a "Scratchout" gesture as mentioned above, consisting of multiple movements, must have its first

53

Exhibit 2
Page 000059

point of contact in the aforementioned Soft Input Panel area. For example, starting a "Scratchout" gesture near the top edge but within the area of the Soft Input Panel, and making a number of these separate movements in this same area, then making all further movements just outside the area of the Soft Input Panel, is recognized as a "Scratchout" gesture. By contrast, starting an attempted "Scratchout" gesture just outside the Soft Input Panel, and making a number of these movements in this other area very near to the Soft Input Panel, but making all subsequent movements clearly inside the Soft Input Panel area but near the edge of the Soft Input Panel, which is thus not the same area as the first area in this case, may not perform the predetermined action for a scratch out gesture, because the first point of contact of the gesture is not within the area of the Soft Input Panel. This problem was already well known for a long time at the time of the invention in various fashions to ordinary practitioners in the fields related to pen computing. This problem has many possible engineering solutions, each of which has some imperfections. This problem is sometimes referred to in pen computing as "the targeting problem" or "a targeting problem," and can make simple determination of the area of a gesture difficult, and also make simple determination of the area of the strokes of a gesture difficult for even the designers and/or implementers of the software to anticipate or know perfectly other than by direct case by case experimentation.

> **second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and**

175. I understand that the Court has construed this feature to include the function "detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion."

54

Exhibit 2
Page 000060

176.    I understand that the Court has construed this feature to include the corresponding structure  (1) Pen position digitizer 20 (see Figs. 2-3; Col. 6:21-22; and Col. 6:53-68); and (2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37)."

177.    Tablet PC devices possess identical or equivalent structures, as discussed above. *See, e.g.,* ¶¶ 111, 118.

178.    The second detecting means in this claim is operatively the same as the third detecting means in claim 4, since each detects a direction of motion of a gesture.  My analysis there applies here as well.  *See* ¶ 138.

179.    In the Soft Input Panel functionality of a Tablet PC device, a horizontal stroke gesture made from left to right is recognized as the gesture "Right" and is associated with the predetermined action of the character "space," whereas an identical horizontal stroke gesture made from right to left is recognized as the gesture "Left" and is associated with the predetermined action of the character "backspace."

**implementing means coupled to said computer for implementing said recognized gesture, said implementing means including means for performing a predetermined action associated with said predefined shape**

180.    I understand the Court has construed this feature to include the function "implementing said recognized gesture which function includes the availability of using means for performing a predetermined action associated with said predefined shape."

181.    I understand the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56."

182.    Tablet PC devices include a CPU programmed with software which will perform a specific predetermined action in response to a specific gesture, which predetermined action

55

Exhibit 2
Page 000061

may be further determined by the context.   For example, a single tap gesture, performed in the context of a word processing application on text, performs the predetermined action to locate the input cursor for that application in that position in the text.   Additionally, a scratch out gesture made in the Soft Input Panel will cause the predetermined action to be performed of the electronic ink underlying the gesture to be erased.   It also causes the predetermined action of handwriting recognition results from that electric ink to be removed or erased from the text display in the Soft Input Panel.   Implementing the predetermined actions of such gestures was well-known at the time, since the predetermined actions being taken were ones (such as locating the input cursor) already in use in the respective type of software (word processing, for instance).

183.     My analysis above demonstrates the an identical structure to CPU 50 is present in Tablet PC devices, and performs the functions described in the prior paragraph. *See, e.g.*, ¶ 129.

### (9)     Claim 43

> **The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.**

184.     Claim 6 of the '295 patent is identical to claim 43.   Accordingly, my analysis above applies equally here.   *See* ¶¶ 139 to 141.

### (10)     Claim 46

> **The apparatus of claim 41, wherein said direction of motion of said gesture is associated with said predetermined action.**

185.     Tablet PC devices include a pen position digitizer and a pen position digitizer co-processor or virtualization thereof, which report position information or points to the CPU. Software on the CPU or co-processor determines the direction of motion of the stylus based on the changes in the position in a sequence of points.   The recognizer software of a tablet PC device makes use of this information to determine the direction of motion of the gesture.

Exhibit 2
Page 000062

Specifically, a single horizontal stroke gesture made in the Soft Input Panel with motion from right to left will be recognized as the "Left" gesture and perform in the context of a word processing application, the predetermined action associated with deleting a character and moving the text cursor one position to the left. An identical single stroke horizontal gesture with motion from left to right will be recognized as the "Right" gesture in this context and perform the predetermined action associated with inserting a space character and moving the text cursor one logical position to the right. Additionally, an "UpRightLong" gesture as documented in the aforementioned reference titled ApplicationGesture Enumeration, made in the special area of the Soft Input Panel, will be recognized and then carry out in this context the predetermined action of inserting a tab character into the aforementioned word processing application and changing the position of the text cursor to the next defined tabulator position. However, an identical "DownLeftLong" gesture made in the same context, being identical to the "UpRightLong" gesture but made in a different direction will be recognized and then carry out the predetermined action of inserting a new line, possibly of adjusting the position of characters, and changing the position of the text input cursor.

### C.    '295 PATENT with Respect to Palm OS software

186.    "Palm OS device": a device using the Palm OS software, whether it be, without limitation, a hand-held mobile device, such as a PDA, a portable video device or similar device, or cell phone incorporating PDA-like functionality, is a computer system which includes a screen for displaying information. Such devices include a touch-screen or passive/resistive input screen or similar device for use with a stylus having a tip for inputting information. A finger and finger tip, or an ordinary pen or an ordinary pencil, for example, can be and often are used as the input stylus with many of these devices.

Exhibit 2
Page 000063

187.    I have been asked to analyze the infringement of all Palm OS operating system software for use with devices known as PDAs, handhelds and any other similar device running the Palm OS operating system made, used, sold, or offered for sale by Dell or Gateway since June 6, 1996. I intend to include in my analysis all versions of such operating systems. I will refer to any and all such devices running any of these operating systems as Palm OS Devices for convenience. My analysis below will focus upon a particular version of Palm OS running on a particular Palm OS device. I have examined other such devices both during my involvement in this case and otherwise and I conclude that there are no important differences in any of the versions of the operating systems for these devices that are relevant to my analysis with respect to the Agulnick '295 patent.

**(11)    Claim 1**

> **1. An apparatus for controlling a computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:**

188.    I understand that the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

189.    This introductory section of claim 1 is what I understand to be a preamble of claim 1. I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim. In this case, the preamble recites an apparatus for controlling a computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer. Even if the preamble was viewed as a limitation, Palm OS devices would meet that limitation as demonstrated by my discussion above in ¶ 186.

Exhibit 2
Page 000064

**first detecting means coupled to said computer for detecting a
stroke of the stylus tip in contact with the screen**

190.    I understand that the Court has construed this feature to include the function
"detecting a stroke of the stylus tip in contact with the screen."

191.    I understand the Court has construed the corresponding structure of this feature to
include Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at
Col. 6:21-22; and Col. 6:53-68."

192.    I understand the Court has construed "stroke" to mean "a single drawing
movement, including a tap."

193.    Palm OS devices include a digitizer which detects when the stylus tip is in contact
with the screen.  Palm OS software detects a stroke or strokes from the point in time when the
stylus touches the screen, through all its motion, until the time the stylus leaves the screen, or the
detection area of the screen.  The structure of the pen position digitizer is identical to one of the
alternatives discussed in the specification of the '295 patent, that of the resistive, transparent
digitizers for which the Grid Systems Corporation and the Linus Technologies products are
given as examples in the patent.  This functionality only requires that the digitizer, such as a
resistive film digitizer, report the position of the stylus when the stylus tip is in contact with the
screen and provide some indication that the stylus tip is not in contact with the screen.

**second detecting means coupled to said computer for detecting
a departure of the stylus tip from the screen;**

194.    I understand that the Court has construed this feature to include the function
"detecting a departure of the stylus tip from the screen."

195.    I understand that the Court has construed this feature to include the corresponding
structure "Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification
at Col. 6: 21-22; and Col. 6: 53-68."

59

Exhibit 2
Page 000065

196.    Palm OS devices detect when the stylus is no longer in contact with the screen. Based on my analysis of the behavior of Palm OS devices, the digitizer no longer provides position information to the computer if the stylus is no longer in contact with the screen, thus indicating that the stylus tip has departed contact with the screen. The structure of the pen position digitizer in PalmOS devices is identical, as described in ¶ 193.

**means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip;**

197.    I understand that the Court has construed this feature to include the function "defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen."

198.    I understand that the Court has construed this limitation to include the corresponding structure "(1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 6:21-22; and Col. 6: 53-68; and (2) Pen position digitizer co-processor 90, with software that determines that a gesture is complete, as shown in fig. 3 and described in specification at Col. 6: 36-37, Col. 1: 65 - Col. 2:5, and Col. 17:1-14."

199.    I understand that the Court has construed "gesture" to mean "a symbol or mark."

200.    In Palm OS devices, touch-screen digitizing tablets and similar devices include a pen position digitizer and a co-processor or virtualization thereof which determines the specific coordinates of the stylus tip position. Based on my analysis of the behavior of Palm OS devices, software on the computer uses the departure of the stylus tip from the screen as a signal that the gesture has terminated. An additional signal may be a timeout, occurring after this first signal. This is further mentioned in Palm OS developer documentation on the Internet, such as in "Receiving Pen Events" in "Customizing the Dynamic Input Area/ Input Services / Exploring Palm OS." When the digitizer no longer reports the position of the stylus, this indicates that the

60

Exhibit 2
Page 000066

stylus is not in contact with the screen and has departed the screen. *See* '295 Patent, col. 1:65 to col. 2:5; col. 17:1-14.

201.    The structure of the pen position digitizer is identical to that disclosed in the '295 patent, as described in ¶ 193. The pen position co-processor is implemented in Palm OS devices as a software virtualization of hardware. Modern CPUs in Palm OS devices are sufficiently capable that they can handle running the software run on both the main processor (CPU 50 in the '295 patent) and the pen position digitizer co-processor 90 described in the '295 patent. Accordingly, the corresponding structure (the CPUs in Palm OS devices) is identical to pen position digitizer co-processor 90; each are computational hardware programmed to interpret stylus movements as gestures (or other, non-gesture inputs). If for some reason the fact that program execution and gesture recognition algorithms were performed on different processing cores in the '295 patent is different that performing those algorithms on a single processing core in Palm OS devices is a difference, this difference makes no difference to operation, is insubstantial, and thus the structures are at a minimum equivalent.

202.    The Palm OS gesture recognition code programs the general purpose CPUs of Palm OS devices to define termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen. This implementation of software running on a CPU is at a minimum the equivalent to Pen position digitizer co-processor 90.

> **means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape;**

203.    I understand that the Court has construed this feature to include the function "recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape."

61

Exhibit 2
Page 000067

204.    I understand that the Court has construed this feature to include the corresponding structure to include "(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6:36-37; Programmed with one of the following handwriting recognizing algorithms: (2) The techniques for recognizing gestures disclosed in "Automatic Recognition of the Handprinted Characters -- The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (3) the techniques for recognizing gestures disclosed in the U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (4) The Handwriting Translation Subsystem, disclosed in Appendix 1, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

205.    Palm OS devices include a pen position digitizer, such as a touch-sensitive screen, and a pen position digitizer co-processor or virtualization thereof.  The devices include Palm OS software, which includes recognition software for comparing the actual gesture to a predefined shape, which is based on a definition of the properties of that pre-defined shape.  Based on my analysis of a Palm OS device, Palm OS software includes at least one recognizer, which recognizes a plurality of gestures.  Further information is found in developer documentation for the Palm OS such as "Handwriting Recognition Engine" in the documentation "Input Services / Exploring Palm OS," and the documentation for the "pinletName" parameter of "PINSSwitchToPinlet Function.  The recognizer, commonly referred to as the Graffiti recognizer, is based in part on the principle of neography or alternatively the Graffiti 2 recognizer, which is based in part on the principle of neography.  The Graffiti 2 recognizer is a derivative of the JOT recognizer by CIC.  Palm OS developer documentation at

Exhibit 2
Page 000068

www.palm.com/us/products/basics/glossary/#graffiti states that "Graffiti 2 writing" (the recognizer software) is a "Part of the operating system."

206.    The structure of the CPU as programmed by the Palm OS gesture recognition software is either identical or equivalent to Pen position digitizer co-processor 90, as described in ¶ 201.  The gesture recognition algorithms used in Palm OS devices are identical structures to alternatives described in "Automatic Recognition of the Handprinted Characters -- The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980.  The Palm gesture recognition algorithms based in part upon the principle of neography are in structure identical to recognition techniques in the reference.  For example, Fig. 4 contains clear examples of neographic characters as well as the reference to neographic "special marks" in the discussion of Fujimoto et al. on p. 477.  In the concluding remarks, on p. 482, Item 1 in the right hand column, the authors refer specifically to "handprint models which could be comfortably followed by human beings to produce samples easily recognized by machines," which is a description of both Graffiti recognizers.  To the extent any defendant argues that because the precise lines of code are different in the Palm OS devices, such differences are insubstantial.  I note that the reference itself does not describe details of the code, but rather classifies the recognizers according to their essential working principles, as practitioners in the field would do.  Although it is my opinion the Palm OS algorithms are identical in structure as described, at a minimum they are equivalent structures.

63

Exhibit 2
Page 000069

> means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.

207.    I understand that the Court has construed this feature to include the function "implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape."

208.    I understand that the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56.

209.    I understand that the Court has stated that "This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level."

210.    I understand that the Court has construed "Operating System Level Object" to mean "an object that can be manipulated by a user, which is displayed outside the context of an application program."

211.    I understand that the Court has construed "Application Level Object" to mean "an object that can be manipulated by a user, which is displayed within the context of an application program."

212.    Based on my analysis of the behaviors of a Palm OS device, Palm OS devices include an identical structure to CPU 50, namely a general purpose CPU programmed with software which will perform a specific predetermined action in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used.

Exhibit 2
Page 000070

Specifically, a "tap" gesture made in the context of on an operating system object, such as an application Icon, file, or folder will carry out a specific predetermined action, to wit, executing the application, opening the file, or displaying the contents of the folder. The same gesture, a "tap," performed in a word processing application on text, will locate the input cursor for that application in that position in the text. Additionally, a "tap" gesture in the control bar at the top of a folder view column, will carry out the predetermined action of sorting the view based on the values in that column. Further, a gesture such as the composite gesture "Menu" plus "E" when made in the context of a list of files (the list being an operating system object) performs a specific predetermined action for renaming a file, which is a form of changing a setting specifically changing the name of the file. The same composite gesture made in the context of a word processing program in the area of the input panel will perform the specific predetermined action of changing settings or preferences. Additionally, when Graffiti input is enabled a "D" gesture in the context of a display of application icons will perform the predetermined action of selecting the object whose name starts with the character "D" and the same gesture in the context of a list of files will perform the predetermined action of selecting the first object whose name starts with "D." Further information is found in the reference to a "virtual character" in Palm OS developer documentation, in the section "Receiving Input / Input Services / Exploring Palm OS."

**(12)** <u>**Claim 4**</u>

**The apparatus of claim 1, further including third detecting means for detecting a direction of motion of said gesture.**

213. I understand that the Court has construed this feature to include the function "detecting a direction of motion of the gesture."

Exhibit 2
Page 000071

214.    I understand that the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer 20 (see Figs. 2-3; col. 6:21-22; and Col. 6:53-68); and (2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37)."

215.    Palm OS devices include identical or equivalent structure to the pen position digitizer and pen position digitizer co-processor, as described in, e.g., ¶¶ 193, 201, above. Based on my analysis of the behavior of Palm OS devices, and references in Palm OS developer documentation such as the description of the "HWRProcessStrokeFunction," software on the CPU or co-processor determines the direction of motion of the stylus based on the changes in the position in a sequence of points. The recognizers make use of this information to determine the direction of motion of the gesture.

**(13)    Claim 6**

> **The apparatus of Claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer.**

216.    I understand that the Court has construed this feature to include the function "displaying on the screen a shape representing the actual gesture made by a user of the computer."

217.    I understand that the Court has construed this feature to include corresponding structure to include "(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and col. 6:33-34 and Col. 6:36-37); and (2) Display Controller 80 (see Fig. 3; col. 6:36); and (3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6:20-21; and Col. 6:48-52)."

218.    Palm OS devices include identical or equivalent structure to the pen position digitizer co-processor 90 and the CPU 50, as described in, e.g., ¶¶ 201, 212 above. All Palm OS

66

Exhibit 2
Page 000072

devices include an LCD display, usually a TFT (thin film transistor) display.[11]   This display serves the identical function and is an identical structure to the liquid crystal display 10 of the '295 patent.   All Palm OS devices also include a display controller to control these displays[12] that serves the identical function (controlling the Palm OS device display) and has identical structure (hardware circuitry to send appropriate control signals to the display) as display controller 80 in the '295 patent.

219.   Based on my analysis of the behavior of Palm OS devices, together these structures display on the screen a representation of the actual gesture or mark made by the user when the user writes a stroke or gesture, such as the input panel.   References to this behavior are found in the Palm OS developer documentation, such as the section "Implementing Live Ink" in the section "Customizing the Dynamic Input Area / Input Servicses / Exploring Palm OS."   In addition, making the "Menu" gesture, in the Graffiti input panel, results additionally in an additional area being displayed above the input panel, which includes additionally an idealized representation of the gesture.

(14)   **Claim 39**

**An apparatus for controlling a computer system, the computer system compromising a screen for displaying information and**

---

[11]  As examples, *see, e.g.*,
http://accessories.us.dell.com/sna/ProductDetail.aspx?TabPage=techspecs&sku=A0474224&spagenum=&categ ory_id=985&brandid=&k=&c=us&l=en&cs=19&mnf=&prst=&prEnd=&mnfsku=&orderby=&searchtype=&p ageb4search=&page=productlisting.aspx&instock=&refurbished=, (Tungsten E2 Handheld);
http://accessories.us.dell.com/sna/ProductDetail.aspx?sku=A0540350&c=us&l=en&cs=19&category_id=985&f irst=true&page=productlisting.aspx (Palm Z22 Handheld);
http://accessories.gateway.com/AccessoryStore/Consumer+Electronics_381930/Handhelds_F1_PDAs_316816/ Handheld_F1_PDAs_316818/3320074_proddetail.htm?ref=merch (Palm LifeDrive Mobile Manager)

[12]  *See, e.g.*, Intel XScale architecture data sheet, available at
http://www.intel.com/design/intelxscale/xscaledatasheet4.htm, at § 1.0, stating the XScale processors (found in Palm Tungsten E2, Palm TX, and Palm LifeDrive devices, for example) "can be integrated with peripherals such as an LCD controller ..."

Exhibit 2
Page 000073

**a stylus having a tip for inputting information into the computer, including:**

220.    I understand that the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

221.    This introductory section of claim 39 is what I understand to be a preamble of claim 39.  I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim.  In this case, the preamble recites an apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer.  Even if the preamble was viewed as a limitation, Palm OS devices would meet that limitation as demonstrated by my discussion above in ¶¶ 186 and 222.

222.    A Palm OS device is a computer system which includes a screen for displaying information.  Such devices include a touch-screen or passive/resistive input screen or similar device for use with a stylus having a tip for inputting information.  A finger and finger tip can be and often is used as the input stylus with these devices.

**detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;**

223.    I understand the Court has construed this feature to include the function "detecting a stroke of the stylus tip in contact with the screen."

224.    I understand the Court has construed this feature to include the corresponding structure  "Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68."

225.    I understand the Court has construed "stroke" to mean "a single drawing movement, including a tap."

Exhibit 2
Page 000074

226.    Palm OS devices include a stylus/digitizer with structure identical to that disclosed in the '295 patent, as described in, *e.g.*, ¶ 193, which detects when the stylus tip is in contact with the screen.  Based on my analysis of the behavior of Palm OS devices, Palm OS software detects a stroke or strokes from the point in time when the stylus touches the screen, through all its motion, until the time the stylus leaves the screen, or the detection area of the screen.  Based on my analysis, the likely means involves noting that the digitizer is not sending position information or points to the CPU.

> **means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and**

227.    I understand the Court has construed "gesture" to mean "a symbol or mark."

228.    I understand the Court has construed this feature to include the function "recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising the first and second gestures."

229.    I understand the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90, as shown in Fig. 3 and described in the specification at Col. 6:36-37; programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below); (2) Col. 1:65 - Col. 2:5, and Col. 17:1-14; and (3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters -- The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (4)

69

Exhibit 2
Page 000075

the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

230.    Based on my analysis of the functionality of a Palm OS device, the software determines termination of a gesture through a combination of the stylus tip departing contact with the screen, and/or leaving the active area of the touch screen, and/or a time out after the stylus tip has left the touch screen or gone out of the active area. *See* my analysis above in ¶ 200.

231.    Palm OS devices include a touch screen or digitizer, and a pen position co-processor or virtualization thereof coupled to the computer.   Based on my analysis of the behaviors of a Palm OS device, the Palm OS recognition software implements functionality to recognize gestures and to recognize at least three different gestures.  For example, in the context of a list of files, a "Menu" gesture (a single upwards mark) in the Graffiti input panel brings up a special indicator for additional gesture input.  If done separately in this context, a "D" gesture instead will perform the predetermined action of selecting the first file whose name starts with the letter D.   However, a composite gesture consisting of "Menu" plus "D", which is a third gesture comprising the gestures "Menu" and "D", will perform the predetermined action for deleting a file.   Additionally, a first gesture could be "tap," a second gesture could be a "doubletap."  The composition of this first gesture and this second gesture can be combined on a Palm OS device as a third gesture, comprising the first and second gesture.  In the case of a word processor application such as the DataVis Word To Go component included in the Palm OS device that I examined, a "tap" gesture would position the cursor, a "doubletap" gesture would

70

Exhibit 2
Page 000076

select a word, but a "tripletap" gesture comprising the "tap" gesture and "doubletap" gesture would select the entire line.

232.    A further indication of the functionality of a first gesture, a second gesture, and a third gesture comprising the first an second gesture, is documented in CIC's reference information on JOT, of which the Graffiti 2 recognizer of the Palm OS is a licensed derivative, specifically in "Jot for Palm OS Version 2.1" available at www.cic.com, in the section "How do I write an 'L'? I keep getting a 'T'".  My analysis of the behavior of a Palm OS device incorporating what appears to be the Graffiti 2 recognizer shows that this behavior is present in the derivative software of Palm OS.

233.    The corresponding structures are identical or at least equivalent, as described in ¶¶ 201 to 202.

> **implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with third said gesture.**

234.    I understand the Court has construed this feature to include the function "implementing said recognized gesture, which function includes the availability of using means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture."

235.    I understand the Court has construed this feature to include the corresponding structure "CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and col. 4:49-56."

Exhibit 2
Page 000077

236.    Palm OS devices include a CPU programmed with recognition software.    The devices also include software which will perform a specific predetermined action in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used.  Based on my analysis of the behaviors of a Palm OS device, in the example concerning DataVis Word To Go above, the predetermined action associated with the first gesture is to position the cursor, the predetermined action associated with the second gesture is to select the word, and the predetermined action associated with the third gesture, which is a composite gesture comprising the first and second gesture, is to select the sentence or line.    The corresponding structure, the CPU in Pocket PC devices, has the identical structure as described in ¶ 212.

**(15)    Claim 40**

**The apparatus of claim 39, wherein the shapes of said first and second gestures are substantially identical.**

237.    Based on my analysis of the behavior of a Palm OS device, Palm OS devices include Palm OS software that will recognize a first gesture, "tap", in a word processing application as positioning the cursor.  A second "tap" gesture, being substantially identical to the first gesture, if composed with the first gesture "tap", is not recognized as a second gesture, but rather the two together are recognized as a third gesture, double tap, which selects an entire word.  Additionally, when using the Graffiti input panel in the context of a word processing document, an "Apostrophe" gesture performs a specific predetermined action of inserting an single-quote character.  A second "Apostrophe" gesture made in isolation will result in a second single-quote character.  However, two "Apostrophe" gestures made together are recognized as a third gesture "Double Quote", composed of the first "Apostrophe" gesture and the second

72

Exhibit 2
Page 000078

"Apostrophe" gesture and will result in inserting a full quotation mark ("double-quote") character.

> **(16)   Claim 41**
>
> **An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including**

238.   I understand the Court has construed "stylus" to mean "a pen-like object whose position and contact with a surface can be continuously detected electronically."

239.   This introductory section of claim 41 is what I understand to be a preamble of claim 41.  I have also been instructed that a preamble is not a limitation of a claim where the preamble language does not limit the claim beyond the elements of the body of the claim.  In this case, the preamble recites an apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer.  Even if the preamble was viewed as a limitation, Palm OS devices would meet that limitation as demonstrated by my discussion above in ¶¶ 186 and 240.

240.   A Palm OS device is a computer system which includes a screen for displaying information.  Such devices include a touch-screen or passive/resistive input screen or similar device for use with a stylus having a tip for inputting information.  A finger and finger tip can be and often is used as the input stylus with these devices.

> **first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;**

241.   I understand the Court has construed this claim language in the identical way as the identical language in claim 1. Accordingly, my analysis above applies. *See* ¶¶ 190 to 193.

> **means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including**

73

Exhibit 2
Page 000079

**means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen**

242.   I understand the Court has construed "gesture" to mean "a symbol or mark."

243.   I understand the Court has construed this feature to include the function "recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen."

244.   I understand the Court has construed this feature to include the corresponding structure "(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in specification at Col. 6:36-37; Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5) below: Col. 1:65 - Col. 2:5, and Col. 17:1-14; and (3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters -- The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or (4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10."

245.   My analysis regarding the similar claim element with very similar or identical claim interpretations applies equally here. *See* ¶¶ 197 to 206. The Palm OS recognizer software (*see* ¶¶ 205 to 206) functions by comparing the actual gesture to a predefined shape, which is based on a definition of the properties of that pre-defined shape.

74

Exhibit 2
Page 000080

246.    Palm OS devices include a pen position digitizer, and a pen position digitizer co-processor or virtualization thereof.  The devices include Palm OS software, which includes recognition software.  Palm OS devices include Palm OS software which, based on my analysis of the Palm OS device, recognizes termination of a gesture through a combination of the stylus being lifted from the screen and/or leaving the active area of the touch screen, and/or a time out after the stylus has left the touch screen or gone out of the active area.

247.    The Palm OS software makes use of areas, as referenced in Palm OS developer documentation, such as the section "Input Area' of "Receiving Input / Input Services / Exploring Palm OS."  Based on my analysis of the behaviors of a Palm OS device, the Palm OS software has as one input functionality a component known as Graffiti Input Panel, which defines and area, and further defines two areas at the bottom of the screen, "abc" and "123."  When the Graffiti Input Panel is operational, gestures must be made entirely within these areas.  Gestures made outside these areas are not recognized.  For example, the backspace gesture if made in the Graffiti Input Panel area "abc" is recognized as the gesture backspace.  The same physical mark made in the area of a word processing document performs the predetermined action of making a selection of text, or perhaps is not recognized at all.  Additionally, writing the composite gesture consisting of a downward vertical stroke and a horizontal stroke from left to right across the top in the area "abc" is recognized as the gesture "T."  However, if the same composite gesture is attempted with the same identical strokes, in the area "123" the Palm OS device which I examined recognizes the two separate gestures for "1" and "minus".

75

Exhibit 2
Page 000081

**second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and**

248.    I understand that the Court has construed this feature to include the function "detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion."

249.    I understand that the Court has construed this feature to include the corresponding structure  (1) Pen position digitizer 20 (see Figs. 2-3; Col. 6:21-22; and Col. 6:53-68); and (2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37)."

250.    Pocket PC devices possess identical or equivalent structures, as discussed above. *See, e.g.*, ¶¶ 193, 201.

251.    The second detecting means in this claim is operatively the same as the third detecting means in claim 4, since each detects a direction of motion of a gesture.  My analysis there applies here as well.  *See* ¶ 213 to 215.

252.    In the context of a word processing document, using Graffiti Input Panel functionality mentioned above, in the area "ABC," a straight stroke gesture made vertically downwards is recognized as the gesture "L", whereas an identical straight stroke gesture made vertically upwards is not recognized as the gesture "L".  An identical straight stroke gesture made diagonally from upper right to lower left in this area is recognized as a gesture "Enter" and results in a different predetermined action in the word processing application.  An identical straight stroke gesture made from lower left to upper right in this area is recognized as a different gesture, such as the gesture for "Menu," in particular it is not recognized as one of the aforementioned gestures.

**implementing    means    coupled    to    said    computer    for implementing    said    recognized    gesture,    said    implementing**

76

Exhibit 2
Page 000082

**means including means for performing a predetermined action
associated with said predefined shape**

253.    I understand the Court has construed this feature to include the function

"implementing said recognized gesture which function includes the availability of using means

for performing a predetermined action associated with said predefined shape."

254.    I understand the Court has construed this feature to include the corresponding

structure "CPU 50 programmed with algorithms known to persons skilled in the art for

implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56."

255.    Palm OS devices include a CPU programmed with recognition software.  Based

on my analysis of the behavior of a Palm OS device, in the Graffiti Input Panel functionality

mentioned above, in the context of a word processing application, in the area "ABC," a straight

stroke gesture made vertically downwards is recognized as the gesture "L", and results in the

predetermined action of inserting the character "L" in the word processing document.    An

identical straight stroke gesture made diagonally from upper right to lower left is recognized as

the gesture "Enter" and results in the predetermined action of inserting a new line character code

and possibly changing the positions of other characters in the document.

256.    My analysis above demonstrates the an identical structure to CPU 50 is present in

Pocket PC devices, and performs the functions described in the prior paragraph. *See, e.g.*, ¶ 212.

**(17)    <u>Claim 43</u>**

**The apparatus of claim 41, further including means coupled to
said computer for displaying on said screen a shape
representing the actual gesture made by a user of the
computer.**

257.    The language and interpretation of Claim 6 of the '295 patent is similar to claim

43.  Accordingly, my analysis above applies equally here.  *See* ¶¶ 216 to 219.

Exhibit 2
Page 000083

(18)    **Claim 46**

**The apparatus of claim 41, wherein said direction of motion of said gesture is associated with said predetermined action.**

258.    Palm OS devices include a pen position digitizer or touch screen and a pen position digitizer co-processor or virtualization thereof, which report position information to the CPU. Based on my analysis of the behavior of a Palm OS device, software on the CPU or co-processor determines the direction of motion of the stylus based on the changes in the position in a sequence of points. For example, the recognizer software in the Palm OS device makes use of this information to determine the direction of motion of the gesture. In the Graffiti Input Panel functionality mentioned above, used in the context of a word processing application, in the area "ABC," a straight stroke gesture made from left to right is recognized as the gesture "Space" and results in the predetermined action of inserting a space in the word processing document and changing the position of the text cursor. An identical or substantially identical straight stroke gesture made diagonally from upper right to lower left is recognized as the gesture "Enter" and results in the predetermined action in this context of inserting a new line and changing the position of other characters in the document.

## V.    BACKGROUND AND OTHER CONSIDERATIONS REGARDING THE ACCUSED DEVICES AND RELATED PRODUCTS

259.    Pursuant to the legal principles provided to me (*see* ¶ 11-12), I have concluded that Microsoft both induces and contributes to the infringement by others who use, sell and offer for sale the devices I have determined above to infringe. These conclusions are further based upon the remainder of this section.

### A.    Accused Devices are Material Part of Claimed Invention

260.    In my opinion, Windows Mobile is a material part the claimed invention of the '295 patent. That is, pursuant to my analysis above, Windows Mobile is responsible for the

Exhibit 2
Page 000084

infringing devices performing most or all steps of the claims. For example, Windows Mobile performs the essential steps of recognizing gestures, detecting a stroke of the stylus tip in contact with the screen, detecting the departure of the stylus tip from the screen, defining termination of a gesture, comparing gestures to predefined shapes, performing predetermined actions, determining and defining same areas of the screen, defining the application level objects and operating system level objects upon which predetermined actions are performed, displaying representations of gestures, and composing first and second gestures into a third gesture.

261.    In my opinion, Windows XP Tablet PC Edition is a material part the claimed invention of the '295 patent. That is, pursuant to my analysis above, Windows Mobile is responsible for the infringing devices performing most or all steps of the claims. For example, Windows XP Tablet PC Edition performs the essential steps of recognizing gestures, detecting a stroke of the stylus tip in contact with the screen, detecting the departure of the stylus tip from the screen, defining termination of a gesture, detecting proximity of the stylus tip in conjunction with the Tablet, displaying an indicator of the proximity of the stylus tip, comparing gestures to predefined shapes, performing predetermined actions, determining and defining same areas of the screen, defining the application level objects and operating system level objects upon which predetermined actions are performed, displaying representations of gestures, and composing first and second gestures into a third gesture.

**B.    Accused Devices Are Not Staple Articles or Suitable for Substantial Non-Infringing Use**

262.    Pocket PC software has no practical use except to be used on Pocket PC devices. Pocket PC software is not a staple article or commodity of commerce suitable for substantial non-infringing use. Pocket PC software is especially made or especially adapted to be used in normal expected use for gesture recognition as set forth in the '295 patent. As a practical matter,

79

Exhibit 2
Page 000085

the Pocket PC software has no other useful functionality that in normal use would be carried out without infringing the asserted claims.

263.    Tablet PC software while including also substantially the functionality of a laptop PC, when the individual Tablet PC software also includes a physical keyboard and a non-tablet pointing device such as mouse, is not intended for such use and in fact is an ineffective version of a laptop PC OS software because of specific practical considerations such as the increased weight, fragility, and cost of the hardware to run its functionality.    Tablet PC software is especially made for operating in manners which infringe the asserted claims, such as with the use of a stylus and gestures.

### C.    No Use Other Than As a Material Part of An Infringing Device

264.    Windows XP Tablet PC Edition has no useful function other than as a material part of a complete Tablet PC device.  While it would be possible perhaps to operate Windows XP Tablet PC Edition on a device which is not a complete Tablet PC device, such as a laptop pc, this would be an inefficient use of Windows XP Tablet PC Edition and in fact to the best of my determination Microsoft has not licensed this product separately from a complete Tablet PC device.  During my analysis, I attempted to obtain a separate copy of Windows XP Tablet PC Edition and only found a version available for the specialized purpose of software development. Microsoft's website has a link[13]  which takes the user directly to manufacturers of complete Tablet PCs (hardware plus Tablet PC software) and retailers of complete Tablet PCs, and has no information about obtaining Windows XP Tablet PC edition to run without having to purchase it as an installed component of specialized hardware, namely a Tablet PC device.  My experiment

---

[13]  http://www.microsoft.com/windowsxp/tabletpc/howtobuy/default.mspx

Exhibit 2
Page 000086

to attempt to install components of Tablet PC from MSLT_1117800 on a laptop PC was blocked by a specific software check that would not allow it to be installed on anything other than a Tablet PC. In fact, my opinion on this point is based in part on Microsoft's explicit definition on its website "Computers powered by the Windows XP Tablet PC Edition operating system, and equipped with a sensitive screen designed to interact with a complementary pen, are called Tablet PCs."[14]

265.   Windows Mobile OS has no useful function other than as a material part of a complete Pocket PC device. During my analysis, I attempted to find out how to obtain a copy of Windows Mobile OS separately from acquiring a Pocket PC device. Other than a simulator or emulator version available for the limited purpose of software development, I was unable to find out how to get a copy. I noted that on the Windows Mobile website the only link I could find regarding purchase specifically only gave information about purchasing complete Pocket PC devices to "browse and buy devices" and I could find no information about purchasing Windows Mobile OS for any other device.[15] Furthermore, my efforts to find a source to buy an appropriate mobile device that could run Windows Mobile OS but did not already contain a licensed copy of Windows Mobile OS were fruitless. In fact I know of no way for an ordinary consumer to purchase the Windows Mobile OS separately from a Pocket PC device.

266.   Palm OS software has no useful function other than as a material part of a complete Palm OS device. I know of no way for an ordinary consumer to purchase the Palm OS separately from a Palm OS device. My internet searches in this regard were markedly

---

[14] http://www.microsoft.com/windowsxp/tabletpc/evaluation/about.mspx

[15] http://www.microsoft.com/windowsmobile/about/default.mspx

Exhibit 2
Page 000087

unsuccessful. Further, I was unable to locate any source for a Palm OS device or appropriately suitable hardware which did not already include a licensed copy of the Palm OS. The only software version for which I was able to find a source was an upgrade to the Palm OS not a new copy of the Palm OS. The support site www.palmos.com provides a Simulator and an Emulator of the Palm OS software, solely for the limited purposes of software development. I could find no source for an ordinary consumer to purchase or legally obtain the Palm OS software separately from a Palm OS device.

**D.      Assistance to manufacturers and vendors**

267.    Microsoft provides substantial assistance to encourage, support, and facilitate the manufacture and sale of Tablet PC devices and Pocket PC devices. Microsoft's creation of software that will create infringing devices and extensive promotion and sales of the same are themselves strong evidence that Microsoft induces infringement by, and contributes to the infringement of, third parties such as Dell, Gateway, other computer or device manufacturers, as well as end-users. The following list highlights just some examples of Microsoft's assistance to manufacturers, vendors and end-users: (1) Windows XP Tablet PC Edition 2005 Hardware Requirements which requires digitizer vendors in many cases to modify their existing products to meet the licensing requirements to be used on a Tablet PC device. These requirements also require tablet and display manufacturers to harmonize the technical performance of their devices to meet interlocking and interdefined specifications for these two separate components. The requirements specifically exclude hardware which in my expert opinion would be functionally suitable for operating Windows XP Tablet PC Edition. (2) Microsoft provides on their website developer information such as "Why Develop on the Windows Mobile Platform?" which states in part "Microsoft provides developers with a rich, flexible platform, world-class tools and comprehensive resources to build innovative applications for Windows Mobile-based Pocket

Exhibit 2
Page 000088

PCs and Smartphones" which is indicative of Microsoft's commitment to assisting the vendors of infringing Pocket PC devices.[16]  (3) Building Tablet PC Applications from Microsoft Press, also available in substantial excerpt on Microsoft's website and on other websites, provides detailed tutorial and technical assistance on developing applications for Tablet PC devices which applications would necessarily infringe on the '295 patent through their use of gestures and other functionality.   (4) Microsoft provides publicly accessible blogs with specific and detailed technical information to assist developers and vendors of Pocket PC products such as the website titled "Windows Mobile Team Blog."[17]  (5) Microsoft provides links on their developer websites to numerous other sources of technical assistance and consulting on the use and development of Tablet PC devices and applications for them.  (6) Microsoft supports internet discussion groups in more than one international language specifically dedicated to technical questions and mutual assistance for developers of Tablet PC devices and Pocket PC devices and applications for them. (7)  Microsoft provides on their website numerous technical tutorials and information to assist vendors of Tablet PC devices in deploying their products, such as Deploying Microsoft Windows XP Tablet PC Edition 2005.  (8) High ranking Microsoft officials have provided substantial motivation for vendors to build and market Tablet PC devices as evidenced by the transcript on Microsoft's website titled Remarks by Bill Gates at WinHEC 2001 which describes Tablet PC devices as "a big opportunity" for device vendors and states how Microsoft will be "working with all our OEM partners to bring these to market."  This talk included presentations by leading system manufacturers.  (9)  Microsoft bundles in with their other developer documentation

---

[16]  http://msdn.microsoft.com/mobility/windowsmobile/why/whydevelop/default.aspx

[17]  http://blogs.msdn.com/windowsmobile/archive/2006/03/16/552996.aspx

Exhibit 2
Page 000089

provided in the physical edition of MSDN library extensive tutorial information, reference material, white paper articles, and links to further information on their website that is specific to Windows XP Tablet PC Edition and Windows Mobile OS, a material component of Pocket PC devices. Additionally, this inclusion in particular is especially indicative; the substantial additions to the MSDN library of substantial content specific only to the unique components of Tablet PC devices and not to the Windows XP platform that is used in its implementation. (10) Furthermore, these documents, and my general experience with Microsoft, and Microsoft's behavior and role in this industry support my conclusion that Microsoft knows and intends for its customers to make and sell infringing devices.

## VI.    COMPENSATION

268.    I am being compensated at a rate of $250 per hour for my work to include technical consultation, opinion formation and analysis, and testimony, plus expenses. My compensation does not depend in any way on the conclusions or outcome of my analysis or this case.

## VII.    CONCLUSION

269.    The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available. I may also expand upon my opinions based on further consideration and/or analysis of the information available to me now or in the future.

Dated March 31, 2006

_Jean Renard Ward_
Jean Renard Ward

Exhibit 2
Page 000090