# Hayes Declaration

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

LUCENT TECHNOLOGIES, INC.,

        Plaintiff,

     v.

GATEWAY, INC.; GATEWAY COUNTRY
STORES LLC; MICROSOFT
CORPORATION; AND DELL, INC.,

        Defendants.

Case No. 02-CV-2060-B (CAB),
consolidated with Case No. 03-CV-
0699-B (CAB) and Case No. 03-
CV-1108-CAB (CAB)

**EXPERT REPORT OF JEAN RENARD WARD RELATING TO THE**
**SUPPLEMENTAL EXPERT REPORT OF JOHN P.J. KELLY, PH.D. RE LUCENT'S**
**AGULNICK PATENT**

     1.     I have been retained as a technical expert in this case by Lucent Technologies Inc.

("Lucent") to provide my opinions regarding the contentions put forth by Microsoft Corporation,

Gateway, Inc., and Dell, Inc. regarding the validity and other technical matters concerning

certain claims of U.S. Patent No. 5,347,295 ("the '295 patent"). I have previously submitted

expert reports in this matter on issues of infringement dated March 31, 2006, and issues of

validity on May 12, 2006, and various declarations. I am submitting this report as a supplement

to my previous reports and declarations.

**I.     QUALIFICATIONS AS AN EXPERT**

     2.     My background and qualifications are set forth in my Infringement Report.

     3.     I have provided testimony in other matters as set forth in my Infringement Report.

**II.    SCOPE OF STUDY AND OPINION**

    **A.    Documents and Information Considered in Forming Opinions**

     4.     The following opinions and analysis are based upon a review of the '295 patent,

the file history for the '295 patent, the prior art cited in the file history, the Kelly Report

Exhibit 6
Page 000217

regarding the '295 patent ("the Kelly Report"), the Supplemental Kelly Report regarding the '295 patent ("the Supplemental Kelly Report"), the materials identified in the Kelly Report and Supplemental Kelly Report, including the devices, systems, and software, and first hand experience with the systems, devices, and software.

5.      In addition to the materials considered in my previous reports, a list of the data or other material sources which I considered in preparing this report are listed in Tab 1.

6.      Finally, I have relied upon the claim interpretations provided by the Court in the Court's February 25, 2004 Claim Construction Order.

**B.        Exhibits to Be Used as a Summary or Support for the Opinions**

7.      At trial I expect to rely upon materials and documents produced in this litigation and various other documents that the parties have exchanged, such as interrogatory responses. I also may rely on visual aids and demonstrative exhibits that I may prepare or have prepared based on these materials, including by way of example, figures and excerpts from the '295 patent, claim charts, deposition testimony, diagrams and other graphical presentations describing the technology relevant to the '295 patent and the design, operation and functions of the accused products I have been asked to analyze, and the operation and functions of the prior art devices, systems, and software cited in Dr. Kelly's report.

8.      Further, I traveled to San Diego on April 25, 2006 from Boston, MA to spend one day examining certain actual devices, systems, and software relied upon by Dr. Kelly or cited specifically in his report. During my visit, I made digital video recordings and photographs of the devices and some aspects of their operation for further study, reference, and possible use at trial.

**C.        Summary of Opinions**

9.      In addition to my prior opinions on the validity of the asserted claims of the '295 patent, I have provided my opinions regarding the validity of claims 1, 3, 4, 6, 12, 39, 40, 41, 43,

Exhibit 6
Page 000218

and 46 of the '295 patent. It is my opinion that none of the references cited by Kelly anticipate or render obvious any of the asserted claims of the '295 patent.

10.    It is my opinion that each of claims 1, 3, 4, 6 and 12 of the '295 patent are not obvious over the Kim Paper in view of Taguchi and Levine; claims 39 and 40 of the '295 patent are not obvious over the Kim Paper in view of Taguchi and Buxton; claim 39 is not obvious over the Kim Paper in view of Taguchi and FIDS; claims 39 and 40 are not obvious over the Kim Paper in view of Taguchi and the Advanced Display System; claims 41 and 43 are not obvious over the Kim Paper in view of Taguchi; and claim 46 is not obvious over the Kim Paper in view of Taguchi and Coleman.

11.    It is also my opinion that claims 1, 3, 4, 6 and 12 of the '295 patent are not obvious over the Paper-Like Interface System in view of Taguchi and Levine; claims 39 and 40 are not obvious over the Paper-Like Interface System in view of Taguchi and Buxton; claim 39 is not obvious over the Paper-Like Interface System in view of Taguchi and FIDS; claims 39 and 40 are not obvious over the Paper-Like Interface System in view of Taguchi and the Advanced Display System; claims 41 and 43 are not obvious over the Paper-Like Interface System in view of Taguchi; and claim 46 is not obvious over the Paper-Like Interface System in view of Taguchi and Coleman.

12.    It is also my opinion that claims 1, 3, 4, 6, and 12 of the '295 patent are not obvious over FIDS in view of Taguchi and Levine; claim 6 is not obvious over FIDS in view of Taguchi, Levine and Coleman; claim 39 is not obvious over FIDS in view of Taguchi; claims 39 and 40 are not obvious over FIDS in view of Taguchi and the Advanced Display System; claims 39 and 40 are not obvious over FIDS in view of Taguchi and Buxton; claim 41 is not obvious

Exhibit 6
Page 000219

over FIDS in view of Taguchi; and claims 43 and 46 are not obvious over FIDS in view of Taguchi and Coleman.

13.     It is also my opinion that claims 1, 3, 4 and 12 of the '295 patent are not obvious over FIDS in view of Taguchi and Levine; claim 6 is not obvious over FIDS in view of Taguchi, Levine, and Coleman; claim 39 is not obvious over FIDS in view of Taguchi; claims 39 and 40 are not obvious over FIDS in view of Taguchi and the Advanced Display System; claims 39 and 40 are not obvious over FIDS in view of Taguchi and Buxton; claim 41 is not obvious over FIDS in view of Taguchi; and claims 43 and 46 are not obvious over FIDS in view of Taguchi and Coleman.

14.     It is also my opinion that claims 1, 3, 4, and 12, of the '295 patent are not obvious over Oed and Doster in view of Taguchi and Levine; claim 6 is not obvious over Oed and Doster in view of Taguchi, Levine, and Coleman; claim 39 is not obvious over Oed and Doster in view of Taguchi and FIDS; claims 39 and 40 are not obvious over Oed and Doster in view of Taguchi and the Advanced Display System; claims 39 and 40 are not obvious over Oed and Doster in view of Taguchi and Buxton; claim 41 is not obvious over Oed and Doster in view of Taguchi; and claims 43 and 46 are not obvious over Oed and Doster in view of Taguchi and Coleman.

15.     It is also my opinion that claims 39, 40, 41 and 43 of the '295 patent are not obvious over Inagaki in view of Taguchi; and claim 46 is not obvious over Inagaki in view of Taguchi and the Casio PF-8000.

16.     It is also my opinion that claims 41, 43, and 46 of the '295 patent are not obvious over Coleman in view of Taguchi.

17.     It is also my opinion that claims 39 and 40 of the '295 patent are not obvious over Sklarew in view of Taguchi and Buxton; claim 39 is not obvious over Sklarew in view of

Exhibit 6
Page 000220

Taguchi and FIDS; claims 39 and 40 are not obvious over Sklarew in view of Taguchi and the Advanced Display System; and claims 41, 43 and 46 are not obvious over Sklarew in view of Taguchi and Coleman.

18.     I note that Dr. Kelly spends 116 pages of text in his report describing in his words a number of references and what he thinks each discloses.  Supplemental Kelly Report, pp. 14-130.  But none of these 116 pages contain any opinions on the validity of the claims of the '295 patent or any analysis regarding which if any of the particular claim elements are disclosed by any of the references.

19.     At trial I expect that I would give a basic tutorial that will assist the Court and/or jury in understanding the technology applicable to the '295 patent and the many differences between it and the technology disclosed by the prior art cited by Dr. Kelly.

## III.    TECHNOLOGICAL BACKGROUND

20.     As mentioned in my previous reports, at trial, I may discuss and/or demonstrate fundamental concepts of pen computing and in particular stylus-based gesture-controlled devices to provide background material to the Court or jury, as these topics might not be known to someone unfamiliar with the field.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

21.     I set forth the level of ordinary skill in the art in my previous report and that analysis applies here.

## V.    UNDERSTANDING OF LEGAL STANDARDS

22.     I understand from counsel that a patent is invalid on the basis of anticipation if a single prior art reference discloses, either expressly or inherently, each and every limitation of the claimed invention.  Accordingly, if any limitations are not disclosed by that single prior art reference, then the patent is not anticipated by that reference.

Exhibit 6
Page 000221

23.    I understand that a patent claim may be found invalid as having been obvious only if the differences between the claimed subject matter of the patent and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art of the invention at the time the invention was made.

24.    Counsel has informed me that, since my last report, the Supreme Court has clarified the legal standards for invalidity due to obviousness. Counsel has informed me that the Supreme Court confirmed that, while identification of a teaching, suggestion, or motivation to combine prior art references is no longer strictly required to demonstrate obviousness, the principles set forth in my previous report otherwise remain valid. I understand that the fundamental question remains whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness. Having considered my previous opinions in light of the Supreme Court's clarification of the legal standards for invalidity due to obviousness, as explained to me by counsel, my ultimate conclusions concerning the nonobviousness of the '295 patent have not changed.

25.    I also understand that an invention is not obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching, suggestion, or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed invention does. This is so because inventions in most, if not all, instances rely upon building blocks already known, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known. I understand that the Supreme Court has

Exhibit 6
Page 000222

cautioned that in identifying such a reason, the analysis need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

26.    I understand that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

27.    I also understand that that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious. I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

28.    I also understand that one must be cautious and resist the temptation to rely on hindsight reasoning when attempting to combine references to suggest that a claim may be obvious.

Exhibit 6
Page 000223

29.    I understand that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious.  I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

30.    I understand that to determine whether a patent claim is invalid as obvious, one examines secondary considerations of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, copying, and unexpected results.

31.    I understand that patents are presumed valid.  I further understand that the presumption of validity can be overcome only if the party seeking to invalidate the patent can prove invalidity by clear and convincing evidence.

32.    I understand that the Court's rulings on the construction of claims are binding.  I have followed the Court's February 24, 2004 Claim Construction Order in my analysis.

## VI.    VALIDITY ANALYSIS

33.    For each claim of the '295 patent asserted against Microsoft, Gateway, and/or Dell, I discuss the limitations of the claims that are not present, or taught, in the prior art, alone or in combination, as asserted by Dr. Kelly.

34.    In the instances where Dr. Kelly states an opinion that the claims of the '295 patent are obvious in view of the prior art, alone or in combination, I discuss the reasons why the asserted claims would not be obvious, including, where applicable the secondary considerations of non-obviousness.

35.    I understand that claim construction is ultimately a legal issue for the Court, and that the Court has provided interpretations of certain terms whose meaning was apparently disputed by the parties.

Exhibit 6
Page 000224

36.    I understand that where a reference does not disclose something, that something may be "inherent" in the reference, but only where the thing is "necessarily present"; "possibilities and probabilities" are not sufficient.

### A.    Handwriting Recognition Algorithms

37.    The Court has instructed that the handwriting recognition algorithms applicable to the patent must fall within or be equivalent to, an algorithm disclosed in at least one of the three references cited by the Court in the February 24, 2004 Claim Construction Order, specifically, the references (2), (3), and (4) on page 4 of the Claim Construction Order. I was unable to find in Dr. Kelly's report any source code analysis of whether or not pieces of prior art recognizers actually meet the Court's Claim Construction.

### B.    The Kim Paper

38.    The Kim Paper is a description of text editing technology. The Kim Paper does not disclose controlling the operating system with gestures. In fact, the text quoted in Dr. Kelly's report describes controlling applications with gestures. The Kim Paper does not disclose working on operating system objects with gestures. The Kim Paper does not disclose compound gestures combining a first gesture and a second gesture because it refers only to single stroke gestures and single gestures. The Kim Paper does not disclose the composition of a first gesture and a second gestures into a third gesture. The Kim Paper does not disclose the corresponding structure (pen position digitizer co-processor) necessary to perform the functions of defining termination of a gesture and recognizing a plurality of gestures.

39.    I note that Dr. Kelly does not assert that the Kim Paper anticipates the claimed invention. I agree with Dr. Kelly on this point that the Kim Paper does not anticipate the claimed invention.

Exhibit 6
Page 000225

40.    I note that Dr. Kelly must rely on the combination of several references with the Kim Paper in coming to his opinion.

### (1)    Claim 1

41.    The Kim Paper does not disclose an apparatus for controlling a computer system. For example, the Kim Paper does not disclose means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. Kim discloses an apparatus for controlling a single application in a computer system, not for controlling a computer system overall. Specifically, the Kim Paper discloses "a interface to a spreadsheet application." Kim Paper at Abstract. Further, the Kim Paper does not disclose or describe full control of the application. For example, it does not describe how data can be saved and input into the computer system. Additionally, the Kim Paper does not disclose means coupled to said computer for recognizing a plurality of said gestures.

42.    Dr. Kelly suggests that the Kim Paper discloses a pen position digitizer co-processor programmed with software for defining termination of a gesture. I disagree. Nowhere does the Kim Paper suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in the Kim Paper of an identifiable specific component that defines termination of a gesture. The Kim Paper does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing the Kim Paper and the prior art as a

Exhibit 6
Page 000226

whole would not believe that a specific co-processor component is necessarily present or required for determination of gesture termination.

43.     Dr. Kelly admits that the Kim Paper does not disclose "a single set of gestures for identical executable commands at both the operating system level and the application level." I agree with Dr. Kelly on this point. The Kim Paper discloses only gestures that are relevant at the application level, such as deletion of individual words and characters from cells on a spreadsheet. Indeed, the abstract of the Kim Paper makes clear that the gestures it discloses refer only to a "spreadsheet application," and thus are not applicable at the operating system level. The Kim Paper contemplated the use of gestures only in a single application.

44.     Further to this point, Dr. Kelly also states that it would have been obvious to combine the Kim Paper with the Levine reference to meet this limitation which requires "use of a single set of gestures for identical executable commands at both the operating system level and the application level." This is wrong. First, the Levine reference does not disclose control of the operating system. Second, the Levine reference does not involve the use of recognized gestures. The gestures in this limitation are "*said* recognized gesture[s]" from the previous limitation. Accordingly, the Levine reference does not disclose a single set of recognized gestures for identical executable commands at both the operating system level and the application level.

45.     The Levine reference does not disclose the use of recognized gestures because the Levine reference does not disclose the recognition of shapes. The Levine reference is clear in its description of the "touch and lift" and "touch and move" operations. These operations do not involve the use of a recognition of shapes; these operations do not involve a writing or drawing of a symbol or mark; these operations do not involve the determination of the termination of a recognized gesture. The Levine reference makes clear that the "touch and lift" operation only

Exhibit 6
Page 000227

involves a determination of time, not of shape, or mark, or handwriting recognition. Levine Reference 10:20-44. In other words, the operations described in the Levine reference do not involve the use of the handwriting recognition algorithms and gesture recognition techniques set forth in the Court's claim construction.

46.     To the extent Dr. Kelly contends that the Levine reference discloses recognized gestures, I know of no reason that one skilled in the art would combine the Kim Paper with the touch and lift and/or touch and move operations disclosed in the Levine reference. Indeed, both the Kim Paper and the Levine reference teach away from combining these references. For example, the Kim Paper involves operations based on completed strokes, while the Levine reference involves operations based on uncompleted strokes (to the extent that they can be considered strokes at all). Further, the Levine reference discloses very different direct manipulation techniques in its touch and lift and touch and move operations. These techniques are not recognized gestures, as understood by the '295 patent. These fundamentally different and incompatible techniques would lead to very dissimilar and confusing results, and technical difficulties, if one of ordinary skill in the art were to attempt to combine them with the teachings of the Kim Paper. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the operations described in the Levine reference with the Kim Paper. There would be no desire to enhance the prior art by combining the type of operations described in the Levine reference with the Kim Paper due to the difficulties discussed above.

47.     Additionally, the Freestyle system and the Levine reference describe a single application for annotating static images with synchronized markings and voice recording combined with a filing functionality intended to look visually like a large desk top. The Freestyle system and the Levine reference disclose that application control requires separate

Exhibit 6
Page 000228

actions, by separate devices, namely the keyboard. The examples that Dr. Kelly cites from the FreeStyle video are not shown as operating system level objects but rather screen captures or static snapshot pictures of the display put up by other applications. These snapshot pictures are then manipulated only inside the context of the single Freestyle application program.

### (2)    Claim 3

48.    Claim 3 depends from claim 1 and my analysis of claim 1 applies equally here.

### (3)    Claim 4

49.    Claim 4 depends from claim 1 and my analysis of claim 1 applies here.

### (4)    Claim 6

50.    Claim 6 depends from claim 1 and my analysis of claim 1 applies here.

### (5)    Claim 12

51.    Claim 12 depends from claims 1 and 3 and my analysis of those claims applies here.

### (6)    Claim 39

52.    The Kim Paper does not disclose an apparatus for controlling a computer system within the meaning of claim 39. Specifically, the Kim Paper does not disclose compound gestures. Further, the Kim Paper does not disclose means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture within the meaning of this claim.

53.    Dr. Kelly fails to identify how the Kim Paper discloses a "pen position digitizer co-processor … programmed with" the various recognition techniques set forth in the Court's claim construction for recognizing a gesture. Nowhere does the Kim Paper suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in the Kim Paper of an identifiable specific component that defines termination of a gesture. The

Exhibit 6
Page 000229

Kim Paper does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing the Kim Paper and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

54.     Dr. Kelly fails to discuss any structure related to recognizing gestures that consist of a "processor programmed with a handwriting algorithm," as set forth in the Court's claim construction. Dr. Kelly fails to identify which, if any, handwriting recognition algorithms or techniques correspond with those required by the Court's construction.

55.     Dr. Kelly admits that the Kim Paper does not disclose "a third gesture comprising said first and second gestures," or in Dr. Kelly's words, "compound gestures." I agree with Dr. Kelly on this point. The Kim Paper discloses only single stroke gestures. Indeed, the Kim Paper teaches away from compound gestures as it fails to disclose recognizing multi-stroke gestures.

56.     Dr. Kelly states that the FIDS reference discloses compound gestures. I disagree. For example, Dr. Kelly suggests that the MARK DELETE correction mark disclosed in the FIDS reference constitutes a compound gesture consisting of the combination of the MARK and DELETE correction marks. This is incorrect. The DELETE correction mark is a long horizontal line; the MARK correction mark is shown as a left bracket. However, the MARK DELETE correction mark appears to be a combination of a left bracket and a backward slash—plainly not a combination of the DELETE and MARK correction marks. Furthermore, any multi-stroke gesture-like commands disclosed in the FIDS reference are not compound gestures within the meaning of this claim limitation because at best they are grammatical compositions. By grammatical composition I mean a composition taken as a result of combining separate gestures in strict grammatical form without regard to how the constituent gestures were recognized. In

Exhibit 6
Page 000230

comparison, the compound gestures contemplated by this claim limitation are produced as a single recognition result of combining two separate and distinctly recognized gestures.

57.     Dr. Kelly also states that the Buxton reference discloses compound gestures. Again I disagree. The Buxton reference discloses a computer musical composition system that recognizes certain symbols that correspond to certain musical notes. However, the Buxton reference does not disclose compound gestures within the meaning of this claim limitation, nor does it teach combining gestures to create compound gestures. Rather, the Buxton reference discloses several multi-stroke symbols that correspond with different musical notes. For example, the Buxton reference discloses a horizontal line as corresponding with a whole note and a vertical line as corresponding with a quarter note, but Buxton does not disclose that these two symbols should be combined to form the corresponding half note symbol. In my opinion, Dr. Kelly mischaracterizes the half note symbol as a compound gesture because Buxton does not disclose that the shape is a composition of two other gestures or of two other shapes. Instead, Buxton clearly discloses that each shape is a shape unto itself. ("based on the shape of the symbol"), and a single symbol is composed of "line segments constituting a symbol," rather than composed of other symbols or gestures. This is emphasized by Buxton's further disclosure that "the directional changes *in a symbol* must be drawn distinctly to ensure correct recognition" (emphasis added). In fact, Buxton's own characterization that each symbol is a symbol unto itself teaches away from the idea of a compound gesture.

58.     The circle-around-circle example in the Buxton reference is not a compound gesture, it is  instead a composition based on grammar.  Buxton is clear that this example is a grammatical rule relating to scope. Just as in English grammar, a negative combined with a negative constitutes a positive, in this case an exclude (circle) combined with a surrounding

Exhibit 6
Page 000231

exclude (circle) constitutes an include. This is not a compound gestures within the meaning of this claim limitation.

59.    To the extent that Dr. Kelly contends that either FIDS or Buxton disclose compound gestures within the meaning of this claim limitation, I know of no reason that one of ordinary skill in the art would combine the Kim Paper with the symbols disclosed in these references. FIDS mentions a set of proof reading marks standardized in Finland but there is no motivation to prefer one set of proof reading marks over another. Indeed, in terms of implementation it may be preferable not to use the standardized proof reading marks but instead to pick symbols for which better recognition performance may be achieved by the technique of neography. One of ordinary skill in the art would just not consider using musical notations for text editing as this area is even further afield of its plausible use. Looking at the prior art as a whole, I know of no reason that one of ordinary skill in the art would be led to combine the musical notes disclosed in Buxton or the symbols disclosed in FIDS with the Kim Paper. Further, there would be no desire to enhance the prior art by use of the types of symbols disclosed in either Buxton or FIDS for the reasons discussed above.

60.    Moreover, although the Kim Paper discloses the construction of commands via a form of grammar described as "[a] number of gestures are put together to form a command, just the way alphabet letters are put together to form a word"—arbitrary combinations of letters do not constitute words. Likewise, arbitrary combinations of gestures do not constitute compound gestures in the meaning of this claim limitation. Grammatical composition of gestures into commands is not the same as compound gestures. In grammar interface operations, each gesture maintains its discrete, specific, and unaltered meaning. For example, the Kim Paper discloses a gesture command sequence consisting of move, source, and target, three separate gestures. The

Exhibit 6
Page 000232

Kim Paper refers to the recognizer as recognizing the alphabet shapes, and the separate function of a dialogue management system collecting the alphabet elements together to form a complete command, distinct from a compound gesture.

61.    Dr. Kelly appears to be citing the Advanced Display System paper as disclosing compound gestures, but fails to point to or analyze any specific compound gestures disclosed by the Advanced Display System paper. To the extent Dr. Kelly is allowed to further explain his analysis, I reserve the right to further respond. To the extent that Dr. Kelly contends that the Advanced Display System paper discloses compound gestures within the meaning of this claim limitation, I know of no reason that one of ordinary skill in the art would be led to combine the Kim Paper with the symbols disclosed in the Advanced Display System paper. The Advanced Display System paper mentions a set of proof reading marks but I know of no reason that one of ordinary skill in the art would be led to prefer one set of proof reading marks, and in fact the Advanced Display System states that "where even a more natural way of editing could be found it is used instead." Indeed, in terms of implementation it may be preferable not to use the standardized proof reading marks but instead to pick symbols for which better recognition performance may be achieved by the technique of neography. Looking at the prior art as a whole, there was no reason to combine the drawing marks disclosed in the Advanced Display System paper with the Kim Paper. Further, there would be no desire to enhance the prior art by use of the types of symbols reasons discussed above.

62.    Dr. Kelly also appears to be citing SFS 2324 as disclosing compound gestures, but fails to point to or analyze any specific gestures or compound gestures disclosed by SFS 2324. In fact, SFS 2324 says nothing about gestures, gesture recognition or the use of a computer. Rather, SFS 2324 appears to be the Finish Standards Association proofreading

Exhibit 6
Page 000233

corrections handout to be used as a quick reference guide for clerical staff. Accordingly, even if those skilled in the art would be led to combine SFS 2324 with the Kim Paper, which they would not, doing so would not lead to the claimed invention.

        (7)    **Claim 40**

63.    Claim 40 depends from claim 39 and the analysis of claim 39 applies here.

        (8)    **Claim 41**

64.    The Kim Paper does not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, the Kim Paper does not disclose means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, or for detecting a direction of motion of the creation of said gesture within the meaning of this claim.

65.    Dr. Kelly fails to identify how the Kim Paper discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I agree. Nowhere does the Kim Paper suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in the Kim Paper of an identifiable specific component that defines termination of a gesture. The Kim Paper does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing the Kim Paper and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

66.    Dr. Kelly fails to discuss any structure related to recognizing gestures that consist of a "processor programmed with a handwriting algorithm," as set forth in the Court's claim construction. Dr. Kelly fails to identify which, if any, handwriting recognition algorithms or techniques correspond with those required by the Court's construction.

Exhibit 6
Page 000234

**(9)    Claim 43**

67.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here.

**(10)    Claim 46**

68.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here. Dr. Kelly admits that the Kim Paper does not disclose "that the direction of motion of said gesture is associated with said predetermined action." I agree with Dr. Kelly on this point. Dr. Kelly contends that the Coleman reference when combined with the Kim Paper satisfies this limitation. I disagree. First, Dr. Kelly fails to identify any reason to combine the Coleman reference with the Kim Paper on this point. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Kim Paper with this aspect of the Coleman reference. Looking at the prior art as a whole, it is my opinion that there is no reason that would lead one skilled in the art to incorporate the exemplar directional Coleman gestures into the Kim Paper.

69.    For the reasons above, the Kim Paper in combination with the many cited references does not invalidate any claims of the '295 patent.

**C.        The Paper-Like Interface System**

70.    Dr. Kelly relies on four separate sources, three papers and a video when he refers to the Paper-Like Interface System ("PLI"). These four separate sources discussing the Paper-Like Interface System describe different applications, employ different recognizers, are not by the same authors, and describe different capabilities and different user interface designs. The three papers describe only the application set forth in each. Dr. Kelly presents no reason to combine these references. To the extent Dr. Kelly treats these 4 separate systems as a single "PLI system," I will analyze the "PLI system" below as described by these references, but do not agree that these separate systems are appropriately combined. Dr. Kelly fails to disclose that PLI

Exhibit 6
Page 000235

was not a single system, but rather a set of individual projects performed by occasionally overlapping but separate researchers in an advanced research group at IBM's research laboratory. Dr. Kelly was clearly aware but ignores the fact that these were separate projects because he performs a completely separate analysis in his report of at least one of the four separate sources, the Kim Paper.

71.     The PLI references are a description of a small number of separate editing applications, such as text editing for word processing, text editing for a spreadsheet application, and musical notation editing. The PLI references do not disclose working on operating system objects with gestures. The PLI references do not disclose compound gestures combining a first gesture and a second gesture but instead refer to a dialogue interpreter for composing command sequences by grammar. The PLI references refer to single stroke gestures and single gestures. The PLI references do not disclose the composition of a first gesture and a second gesture into a third gesture. The PLI references do not disclose the corresponding structure (pen position digitizer co-processor) necessary to perform the functions of defining termination of a gesture and recognizing a plurality of gestures.

72.     I note that Dr. Kelly does not assert that any of the PLI references anticipate the claimed invention. I agree with Dr. Kelly on this point that the PLI references do not anticipate the claimed invention.

73.     I note that Dr. Kelly in most instances relies on the combination of several references with the PLI references in coming to his opinion.

### (11)    Claim 1

74.     The PLI references do not disclose an apparatus for controlling a computer system. For example, the PLI references do not disclosed means coupled to said computer for implementing each said recognized gesture, said implementing means including means for

20

Exhibit 6
Page 000236

performing a predetermined action associated with each predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. The PLI references disclose an apparatus for controlling a single application in a computer system, not for controlling a computer system overall. Specifically, the PLI references disclose, e.g., "gestural interfaces for different types of applications," and "spreadsheet application[s]." PLI at MSLT 1059920, 1073280. Further, the PLI references do not disclose or describe full control of the application. For example, the PLI references do not describe how data can be saved and input into the computer system. The PLI references do not disclose means coupled to said computer for defining termination of a gesture, or means coupled to said computer for recognizing a plurality of gestures.

75.    Dr. Kelly suggests that the PLI references disclose a pen position digitizer co-processor programmed with software for defining termination of a gesture. I disagree. Nowhere do the PLI references suggest or otherwise disclose any structure that corresponds with such a co-processor.   There is no explicit description in the references Dr. Kelly relies on to describe an identifiable specific component that defines termination of a gesture. The PLI references do not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing the PLI references and the prior art as a whole would not believe that a specific co-processor component is necessarily present or required for determination of gesture termination.

76.    Dr. Kelly suggests that the Chow and Kim Papers disclose separate structures and use different recognition means to recognize "a plurality of gestures" that consists of a

21

Exhibit 6
Page 000237

"processor programmed with a handwriting algorithm," as set forth in the Court's claim construction. These references describe separate systems that Dr. Kelly analyzes individually; Dr. Kelly fails to make an argument that these separate references can be treated as a single system and his report makes clear his belief that they are separate.

77.    Dr. Kelly admits that none of the separate PLI references alone or in combination disclose "a single set of gestures for identical executable commands at both the operating system level and the application level." I agree with Dr. Kelly on this point. The PLI references disclose only gestures that are relevant at the application level, such as deletion of individual words and characters from cells on a spreadsheet. Indeed, the abstract of certain references describing the various PLI projects makes clear that the gestures disclosed refer only to a "spreadsheet application," or "education applications" or specific applications and thus not to the operating system level. Each of the PLI references only contemplate the use of gestures in a specific application.

78.    Further to this point, Dr. Kelly also states that it would have been obvious to combine the PLI references with the Levine reference to meet this limitation which requires "use of a single set of gestures for identical executable commands at both the operating system level and the application level." This is wrong. First, the Levine reference does not disclose control of the operating system. Second, the Levine reference does not involve the use of recognized gestures. The gestures in this limitation are "*said* recognized gesture[s]" from the previous limitation. Accordingly, the Levine reference does not disclose a single set of recognized gestures for identical executable commands at both the operating system level and the application level.

Exhibit 6
Page 000238

79.     The Levine reference does not disclose the use of recognized gestures because the Levine reference does not disclose the recognition of shapes. The Levine reference is clear in its description of the "touch and lift" and "touch and move" operations. These operations do not involve the use of a recognition of shapes; these operations do not involve a writing or drawing of a symbol or mark; these operations do not involve the determination of the termination of a recognized gesture. The Levine reference makes clear that the "touch and lift" operation only involves a determination of time, not of shape, or mark, or handwriting recognition. Levine Reference 10:20-44. In other words, the operations described in the Levine reference do not involve the use of the handwriting recognition algorithms and gesture recognition techniques set forth in the Court's claim construction.

80.     To the extent Dr. Kelly contends that the Levine reference discloses recognized gestures, I know of no reason that one skilled in the art would combine the PLI references with the touch and lift and/or touch and move operations disclosed in the Levine reference. Indeed, both the references discussing the PLI and the Levine reference teach away from combining these references. For example, the references discussing the PLI involve operations based on completed strokes, while the Levine reference involves operations based on uncompleted strokes (to the extent that they can be considered strokes at all). Further, the Levine reference discloses very different direct manipulation techniques in its touch and lift and touch and move operations. These techniques are not recognized gestures, as understood by the '295 patent. These fundamentally different and incompatible techniques would lead to very dissimilar and confusing results, and technical difficulties, if one were to attempt to combine them with the teachings of the PLI references. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the operations described in the Levine reference with the PLI references. There

Exhibit 6
Page 000239

would be no desire to enhance the prior art by combining the type of operations described in Levine with the PLI references due to the difficulties discussed above.

81.     Additionally, the Freestyle system and the Levine reference describe a single application for annotating static images with synchronized markings and voice recording combined with a filing functionality intended to look visually like a large desk top.   The Freestyle system and the Levine reference disclose that application control requires separate actions, by separate devices, namely the keyboard. The examples that Dr. Kelly cites from the FreeStyle video are not shown as operating system level objects but rather screen captures or static snapshot pictures of the display put up by other applications. These snapshot pictures are then manipulated only inside the context of the single Freestyle application program.

### (12)   Claim 3

82.     Claim 3 depends from claim 1 and my analysis of claim 1 applies equally here.  I note again that while certain references discussing different PLI systems may disclose certain elements of claim limitations, other references do not, and Dr. Kelly has identified no basis for combining the various references discussing the different PLI systems.  For example, at least one of the references discussing the PLI, the Chow paper, does not disclose proximity sensing or the display of a proximity indicator, and in fact teaches away from it by displaying the "pen position as the pen is touching and gliding on the tablet surface."

### (13)   Claim 4

83.     Claim 4 depends from claim 1 and my analysis of claim 1 applies here.  I note again that while certain references discussing different PLI systems may disclose certain elements of claim limitations, other references do not, and Dr. Kelly has identified no basis for combining the various references discussing the different PLI systems.  For example, at least one of the references discussing the PLI, the Wolf reference, does not disclose directional detection.

Exhibit 6
Page 000240

### (14)    Claim 6

84.    Claim 6 depends from claim 1 and my analysis of claim 1 applies here.  I note again that while certain references discussing different PLI systems may disclose certain elements of claim limitations, other references do not, and Dr. Kelly has identified no basis for combining the various references discussing the different PLI systems.  For example, at least one of the references discussing the PLI, the Wolf reference, does not disclose displaying the shape of the gesture on the screen.

### (15)    Claim 12

85.    Claim 12 depends from claims 1 and 3 and my analysis of those claims applies here.  I note again that while certain references discussing different PLI systems may disclose certain elements of claim limitations, other references do not, and Dr. Kelly has identified no basis for combining the various references discussing the different PLI systems.  For example, at least one of the references discussing the PLI, the Wolf reference, does not disclose terminating display of the indicator when the stylus tip departs from the proximity of the screen.

### (16)    Claim 39

86.    The references discussing the different PLI systems do not disclose an apparatus for controlling a computer system within the meaning of claim 39. Specifically, the PLI references do not disclose compound gestures. Further, the PLI references do not disclose means coupled to said computer for recognizing a gesture.

87.    Dr. Kelly also suggests that the PLI references disclose a pen position digitizer co-processor programmed with software for termination of a gesture. I disagree. Nowhere do the PLI references suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in the PLI references of an identifiable specific component that defines termination of a gesture. The PLI references do not describe any

Exhibit 6
Page 000241

separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing the PLI references and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

88.    Dr. Kelly suggests that the Chow and Kim Papers disclose separate structures and use different recognition means to recognize "a plurality of gestures" that consists of a "processor programmed with a handwriting algorithm," as set forth in the Court's claim construction. These references describe separate systems that Dr. Kelly analyzes individually; Dr. Kelly fails to make an argument that these separate references can be treated as a single system, and his report makes clear his belief that they are separate.

89.    Dr. Kelly admits that the PLI references do not disclose "a third gesture comprising said first and second gestures," or in Dr. Kelly's words, "compound gestures." I agree with Dr. Kelly on this point. The PLI references disclose only single stroke gestures. Indeed, the PLI references teach away from compound gestures as discloses a grammatical composition of gestures via a dialogue interpreter, which is distinct from the concept of compound gestures.

90.    Dr. Kelly states that the FIDS reference discloses compound gestures. I disagree. For example, Dr. Kelly suggests that the MARK DELETE correction mark disclosed in the FIDS reference constitutes a compound gesture consisting of the combination of the MARK and DELETE correction marks. This is incorrect. The DELETE correction mark is a long horizontal line; the MARK correction mark is shown as a left bracket. However, the MARK DELETE correction mark appears to be a combination of a left bracket and a backward slash—plainly not a combination of the DELETE and MARK correction marks. Furthermore, any multi-stroke

Exhibit 6
Page 000242

gesture-like commands disclosed in the FIDS reference are not compound gestures within the meaning of this claim limitation because at best they are grammatical compositions. By grammatical composition I mean a composition taken as a result of combining separate gestures in strict grammatical form without regard to how the constituent gestures were recognized. In comparison, the compound gestures contemplated by this claim limitation are produced as a single recognition result of combining two separate and distinctly recognized gestures.

91.     Dr. Kelly also states that the Buxton reference discloses compound gestures. Again I disagree. The Buxton reference discloses a computer musical composition system that recognizes certain symbols that correspond to certain musical notes. However, the Buxton reference does not disclose compound gestures within the meaning of this claim limitation, nor does it teach combining gestures to create compound gestures. Rather, the Buxton reference discloses several multi-stroke symbols that correspond with different musical notes. For example, the Buxton reference discloses a horizontal line as corresponding with a whole note and a vertical line as corresponding with a quarter note, but Buxton does not disclose that these two symbols should be combined to form the corresponding half note symbol. Thus, Dr. Kelly mischaracterizes the half note symbol as a compound gesture because Buxton does not disclose that the shape is a composition of two other gestures or of two other shapes. Instead, Buxton clearly discloses that each shape is a shape unto itself. ("based on the shape of the symbol"), and a single symbol is composed of "line segments constituting a symbol," rather than composed of other symbols or gestures. This is emphasized by Buxton's further disclosure that "the directional changes *in a symbol* must be drawn distinctly to ensure correct recognition" (emphasis added). In fact, Buxton's own characterization that each symbol is a symbol unto itself teaches away from the idea of a compound gesture.

Exhibit 6
Page 000243

92.    The circle-around-circle example in the Buxton reference is not a compound gesture, it is instead a composition based on grammar. Buxton is clear that this example is a grammatical rule relating to scope. Just as in English grammar, a negative combined with a negative constitutes a positive, in this case an exclude (circle) combined with a surrounding exclude (circle) constitutes an include. This is not a compound gestures within the meaning of this claim limitation.

93.    To the extent that Dr. Kelly contends that FIDS discloses compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine the PLI references with the symbols disclosed in FIDS. FIDS mentions a set of proof reading marks standardized in Finland but there is no motivation to prefer one set of proof reading marks over another. Indeed, in terms of implementation it may be preferable not to use the standardized proof reading marks but instead to pick symbols for which better recognition performance may be achieved by the technique of neography. Looking at the prior art as a whole, in my opinion one skilled in the are would not be led to combine the symbols disclosed in FIDS with the PLI references. Further, there would be no desire to enhance the prior art by use of the types of symbols disclosed in FIDS for the reasons discussed above.

94.    Likewise, to the extent that Dr. Kelly contends that Buxton discloses compound gestures within the meaning of this claim limitation (it does not), I know of no reason one of ordinary skill in the art would be led to combine Buxton with most of the PLI references cited by Dr. Kelly. And although the Wolf reference cites to Buxton, as discussed above, Buxton does not disclose compound gestures, and there would have been no reason to combine Wolf with Buxton for this reason.

Exhibit 6
Page 000244

95.    Moreover, although the PLI discloses the construction of commands via a form of grammar described as "[a] number of gestures are put together to form a command, just the way alphabet letters are put together to form a word"—arbitrary combinations of letters do not constitute words. Likewise, arbitrary combinations of gestures do not constitute compound gestures in the meaning of this claim limitation. Grammatical composition of gestures into commands is not the same as compound gestures. In grammar interface operations, each gesture maintains its discrete, specific, and unaltered meaning. For example, the PLI discloses a gesture command sequence consisting of move, source, and target, three separate gestures. The PLI refers to the recognizer as recognizing the alphabet shapes, and the separate function of a dialogue management system collecting the alphabet elements together to form a complete command, distinct from a compound gesture.

96.    Dr. Kelly appears to be citing the Advanced Display System paper as disclosing compound gestures, but fails to point to or analyze any specific compound gestures disclosed by the Advanced Display System paper. To the extent Dr. Kelly is allowed to further explain his analysis, I reserve the right to further respond. To the extent that Dr. Kelly contends that the Advanced Display System paper discloses compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine the PLI references with the symbols disclosed in the Advanced Display System paper. The Advanced Display System paper mentions a set of proof reading marks but I know of no reason one of ordinary skill in the art would be led to prefer one set of proof reading marks, and in fact the Advanced Display System states that "where even a more natural way of editing could be found it is used instead." Indeed, in terms of implementation it may be preferable not to use the standardized proof reading marks but instead to pick symbols for which better recognition

29

Exhibit 6
Page 000245

performance may be achieved by the technique of neography. Looking at the prior art as a whole, there was no reason to combine the drawing marks disclosed in the Advanced Display System paper with the PLI references. Further, there would be no desire to enhance the prior art by use of the types of symbols reasons discussed above.

97.     Dr. Kelly also appears to be citing SFS 2324 as disclosing compound gestures, but fails to point to or analyze any specific gestures or compound gestures disclosed by SFS 2324. In fact, SFS 2324 says nothing about gestures, gesture recognition or the use of a computer. Rather, SFS 2324 appears to be the Finish Standards Association proofreading corrections handout to be used as a quick reference guide for clerical staff. Accordingly, even if those skilled in the art would be led to combine SFS 2324 with the PLI references, which they would not, doing so would not lead to the claimed invention.

### (17)    Claim 40

98.     Claim 40 depends from claim 39 and the analysis of claim 39 applies here.

### (18)    Claim 41

99.     The PLI references do not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, the PLI references do not disclose means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture.

100.    Dr. Kelly suggests that the PLI references disclose a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. Nowhere do the PLI references suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in the PLI references of an identifiable specific component that defines termination of a gesture. The PLI references do not describe any separable or specific component for determination of the termination of a gesture that could be

Exhibit 6
Page 000246

construed as a co-processor-type component. One of ordinary skill viewing the PLI references and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

101.    Dr. Kelly suggests that the Chow and Kim Papers disclose separate structures and use different recognition means to recognize "a plurality of gestures" that consists of a "processor programmed with a handwriting algorithm," as set forth in the Court's claim construction. These references describe separate systems that Dr. Kelly analyzes individually, Dr. Kelly fails to make an argument that these separate references can be treated as a single system, and his report makes clear his belief that they are separate.

### (19)    Claim 43

102.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here.

### (20)    Claim 46

103.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here. Dr. Kelly admits that the PLI references do not disclose "that the direction of motion of said gesture is associated with said predetermined action." I agree with Dr. Kelly on this point. Dr. Kelly contends that the Coleman reference when combined with the PLI references satisfies this limitation. I disagree. First, Dr. Kelly fails to identify any basis for combining the Coleman reference with the PLI references on this point. Furthermore, I know of no reason one of ordinary skill in the art would be led  to combine the PLI references with this aspect of the Coleman reference. Additionally, one of ordinary skill in the art would not be led to combine because the incorporation of the exemplar Coleman gestures could lead to recognition complications and logical contradictions. Looking at the prior art as a whole, there was no reason to incorporate the exemplar directional Coleman gestures into the PLI references.

31

Exhibit 6
Page 000247

### D.        FIDS

104.    First, I note that Dr. Kelly appears to rely on two separate sources, the FIDS paper and the Proof Correction Standard - SFS 2324 ("SFS 2324") when he refers to FIDS. I note that the FIDS paper and SFS 2324 are separate sources, one discussing a flat-panel interactive display system and the other a set of Finish national proofreading standards. I further note that the two references are not by the same authors, and Dr. Kelly presents no reason for combining these references. To the extent Dr. Kelly treats these 2 separate references as the single "FIDS," I will analyze "FIDS" below as described by these references.

105.    Second, I note that at various places in Dr. Kelly's report he drops a general cite to SFS 2324. For example, Dr. Kelly appears to be citing SFS 2324 at times as disclosing compound gestures, but fails to point to or analyze any specific gestures or compound gestures disclosed by SFS 2324. In fact, SFS 2324 says nothing about gestures, gesture recognition or the use of a computer. Rather, SFS 2324 appears to be the Finish Standards Association proofreading corrections handout to be used as a quick reference guide for clerical staff. To the extent that Dr. Kelly attempts to rely on SFS 2324 for his analysis, and is allowed to provide further analysis, I reserve the right to respond.

106.    The Flat Panel Interactive Display System reference ("FIDS") describes a prototype tablet (flat panel display with front-mounted digitizer) and a prototype text editing application. FIDS does not disclose working on operating system objects with gestures. FIDS does not disclose compound gestures. FIDS does not disclose the corresponding structure (pen position digitizer co-processor) necessary to perform the functions of defining termination of a gesture and recognizing a plurality of gestures.

107.    I note that Dr. Kelly does not assert that FIDS anticipates the claimed invention. I agree with Dr. Kelly on this point that FIDS does anticipate the claimed invention.

Exhibit 6
Page 000248

108.    I note that Dr. Kelly must rely on the combination of several references with the FIDS reference in coming to his opinion.

**(1)    Claim 1**

109.    FIDS does not disclose an apparatus for controlling a computer system. For example, FIDS does not disclose means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. FIDS discloses an apparatus for controlling a single application in a computer system, not for controlling a computer system overall.  Specifically, FIDS discloses "a text editor using ... proof correction marks" for use with the application "Graphix."  FIDS at 81. Further, FIDS does not disclose or describe full control of the application.  For example, it specifically excludes use of a pen-like device (a stylus) for text input, by use of character recognition software.  Further, FIDS does not describe how data can be saved and input into the operating system by means of gestures.  Also, FIDS does not disclose means coupled to said computer for defining termination of a gesture, or means coupled to said computer for recognizing a plurality of gestures.

110.    Dr. Kelly also suggests that FIDS discloses a pen position digitizer co-processor programmed with software for defining termination of a gesture. I disagree. Nowhere does FIDS suggest or otherwise disclose any structure that corresponds with such a co-processor.   There is no explicit description in FIDS of an identifiable specific component that defines termination of a gesture. FIDS does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of

33

Exhibit 6
Page 000249

ordinary skill viewing FIDS and the prior art as a whole would not believe that a specific co-processor component is necessarily present or required for determination of gesture termination. Further, FIDS does not disclose how the termination of a gesture is determined, nor does Dr. Kelly cite any such disclosure.

111.    Dr. Kelly admits that FIDS does not disclose "a single set of gestures for identical executable commands at both the operating system level and the application level." I agree with Dr. Kelly on this point. FIDS discloses only gestures that are relevant at the application level, such as deletion of individual words and characters in a text-editing application. Indeed, the FIDS summary refers to having implemented a "text editor" program. FIDS discloses "a text editor using ... proof correction marks" for use with the application "Graphix." FIDS at 81. Thus, FIDS does not disclose the use of gestures at the operating system level. FIDS only contemplates the use of gestures in a specific application.

112.    Further to this point, Dr. Kelly also states that it would have been obvious to combine FIDS with the Levine reference to meet this limitation which requires "use of a single set of gestures for identical executable commands at both the operating system level and the application level." This is wrong. First, the Levine reference does not disclose control of the operating system. Second, the Levine reference does not involve the use of recognized gestures. The gestures in this limitation are "*said* recognized gesture[s]" from the previous limitation. Accordingly, the Levine reference does not disclose a single set of recognized gestures for identical executable commands at both the operating system level and the application level.

113.    The Levine reference does not disclose the use of recognized gestures because the Levine reference does not disclose the recognition of shapes. The Levine reference is clear in its description of the "touch and lift" and "touch and move" operations. These operations do not

Exhibit 6
Page 000250

involve the use of recognition of shapes; these operations do not involve a writing or drawing of a symbol or mark; these operations do not involve the determination of the termination of a recognized gesture. The Levine reference makes clear that the "touch and lift" operation only involves a determination of time, not of shape, or mark, or handwriting recognition. Levine Reference 10:20-44. In other words, the operations described in the Levine reference do not involve the use of the handwriting recognition algorithms and gesture recognition techniques set forth in the Court's claim construction.

114.    To the extent Dr. Kelly contends that the Levine reference discloses recognized gestures, I know of no reason one skilled in the art would combine FIDS with the "touch and lift" and/or "touch and move" operations disclosed in the Levine reference. Indeed, both FIDS and the Levine reference teach away from combining these references. For example, FIDS involves operations based on completed strokes, while the Levine reference involves operations based on uncompleted strokes (to the extent that they can be considered strokes at all). Further, the Levine reference discloses very different direct manipulation techniques in its touch and lift and touch and move operations. These techniques are not recognized gestures, as understood by the '295 patent. These fundamentally different and incompatible techniques would lead to very dissimilar and confusing results, and technical difficulties, if one were to attempt to combine them with the teachings of FIDS. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the operations described in the Levine reference with FIDS. There would be no desire to enhance the prior art by combining the type of operations described in Levine with FIDS due to the difficulties discussed above.

115.    Additionally, the Freestyle system and the Levine reference describe a single application for annotating static images with synchronized markings and voice recording

Exhibit 6
Page 000251

combined with a filing functionality intended to look visually like a large desk top. The Freestyle system and the Levine reference disclose that application control requires separate actions, by separate devices, namely the keyboard. The examples the Dr. Kelly cites from the FreeStyle video are not shown as operating system level objects but rather screen captures or static snapshot pictures of the display put up by other applications. These snapshot pictures are then manipulated only inside the context of the single Freestyle application program.

### (2)    Claim 3

116.    Claim 3 depends from claim 1 and my analysis of claim 1 applies equally here. Dr. Kelly admits that FIDS does not disclose proximity sensing (and likewise displaying an indicator of proximity). I agree with Dr. Kelly on this point.

117.    Dr. Kelly states that it would have been obvious to combine FIDS with the Levine reference and/or the Taguchi reference to meet this limitation. This is wrong. FIDS makes no reference to proximity sensing or to any need for proximity sensing, nor to any problem which would drive someone to seek out proximity sensing. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine FIDS with either Levine or Taguchi for the purpose of adding proximity sensing. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the proximity sensing described in Levine or Taguchi with FIDS. There would be no desire to enhance the prior art by adding proximity sensing to FIDS because there is no problem disclosed in FIDS which would require it.

### (3)    Claim 4

118.    Claim 4 depends from claim 1 and my analysis of claim 1 applies here.

Exhibit 6
Page 000252

(4)    **Claim 6**

119.    Claim 6 depends from claim 1 and my analysis of claim 1 applies here. Dr. Kelly admits that FIDS does not disclose displaying the actual shape of a gesture. I agree with Dr. Kelly on this point.

120.    Dr. Kelly states that it would have been obvious to combine FIDS with the Coleman or Taguchi reference to meet this limitation. This is wrong. FIDS makes no reference or suggestion regarding any need or problem that would require the display of the shape representing the actual gestures. FIDS discloses a prototype text-editing application using a limited set of correction marks, and there is no need to show the actual written marks. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine FIDS with Coleman or Taguchi for the purpose of adding this feature. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine displaying the actual shape of a gesture described in Coleman or Taguchi with FIDS. There would be no desire to enhance the prior art by adding this feature to FIDS because there is no problem disclosed in FIDS which would require it.

(5)    **Claim 12**

121.    Claim 12 depends from claims 1 and 3 and my analysis of those claims applies here. Dr. Kelly admits that FIDS does not disclose proximity sensing (and likewise displaying an indicator of proximity). I agree with Dr. Kelly on this point.

122.    Dr. Kelly states that it would have been obvious to combine FIDS with the Levine reference and/or the Taguchi reference to meet this limitation. This is wrong. FIDS makes no reference to proximity sensing or to any need for proximity sensing, nor to any problem which would drive someone to seek out proximity sensing. Although a teaching, suggestion, or

Exhibit 6
Page 000253

motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine FIDS with either Levine or Taguchi for the purpose of adding proximity sensing. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the proximity sensing described in Levine or Taguchi with FIDS. There would be no desire to enhance the prior art by adding proximity sensing to FIDS because there is no problem disclosed in FIDS which would require it.

### (6)    Claim 39

123.    FIDS does not disclose an apparatus for controlling a computer system within the meaning of claim 39. Specifically, FIDS does not disclose compound gestures. Further, FIDS does not disclose means coupled to said computer for recognizing a gesture within the meaning of this claim.

124.    Dr. Kelly suggests that FIDS discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. Nowhere does FIDS suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in FIDS of an identifiable specific component that defines termination of a gesture. FIDS does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing FIDS and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

125.    FIDS does not disclose "a third gesture comprising said first and second gestures," or "compound gestures." FIDS discloses only single gestures. Indeed, FIDS teaches away from compound gestures because it fails to disclose recognizing multi-stroke gestures but instead teaches the composition of editing commands into formatting commands.

Exhibit 6
Page 000254

126.    Dr. Kelly states that FIDS discloses compound gestures. I disagree. For example, Dr. Kelly suggests that the MARK DELETE correction mark constitutes a compound gesture consisting of the combination of the MARK and DELETE correction marks. This is incorrect. The DELETE correction mark is a long horizontal line; the MARK correction mark is shown as a left bracket. However, the MARK DELETE correction mark appears to be a combination of a left bracket and a backward slash—plainly not a combination of the DELETE and MARK correction marks. Furthermore, any multi-stroke gesture-like symbols disclosed in FIDS are not compound gestures within the meaning of this claim limitation because at best they are grammatical compositions. By grammatical composition I mean a composition taken as a result of combining separate gestures in strict grammatical form without regard to how the constituent gestures were recognized. In comparison, the compound gestures contemplated by this claim limitation are produced as a single recognition result of combining two separate and distinctly recognized gestures.

127.    Dr. Kelly also states that it would have been obvious to combine the Buxton reference with FIDS to meet this limitation.  Again I disagree.  First of all, Buxton does not disclose compound gestures.  The Buxton reference discloses a computer musical composition system that recognizes certain symbols that correspond to certain musical notes. However, the Buxton reference does not disclose compound gestures within the meaning of this claim limitation, nor does it teach combining gestures to create compound gestures. Rather, the Buxton reference discloses several multi-stroke symbols that correspond with different musical notes. For example, the Buxton reference discloses a horizontal line as corresponding with a whole note and a vertical line as corresponding with a quarter note, but Buxton does not disclose that these two symbols should be combined to form the corresponding half note symbol.  Thus, Dr. Kelly

Exhibit 6
Page 000255

mischaracterizes the half note symbol as a compound gesture because Buxton does not disclose that the shape is a composition of two other gestures or of two other shapes. Instead, Buxton clearly discloses that each shape is a shape unto itself. ("based on the shape of the symbol"), and a single symbol is composed of "line segments constituting a symbol," rather than composed of other symbols or gestures. This is emphasized by Buxton's further disclosure that "the directional changes *in a symbol* must be drawn distinctly to ensure correct recognition" (emphasis added). In fact, Buxton's own characterization that each symbol is a symbol unto itself teaches away from the idea of a compound gesture.

128.    To the extent that Dr. Kelly contends, however, that Buxton does disclose compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine FIDS with the musical symbols disclosed in Buxton. One of ordinary skill in the art would just not consider using musical notations for text editing as this area is even further afield of its plausible use in FIDS. Looking at the prior art as a whole, there was no motivation, teaching, or suggestion to combine the musical notes disclosed in Buxton with FIDS. Further, there would be no desire to enhance the prior art by use of the types of symbols disclosed in Buxton for the reasons discussed above.

129.    Moreover, the FIDS discloses the construction of commands via composition of editing commands into formatting commands, that is, a composition of commands by a form of grammar described, as distinct from a compound gesture. Grammatical composition of gestures into commands is not the same as compound gestures.

130.    Dr. Kelly appears to be citing the Advanced Display System paper as disclosing compound gestures, but fails to point to or analyze any specific compound gestures disclosed by the Advanced Display System paper. To the extent Dr. Kelly is allowed to further explain his

Exhibit 6
Page 000256

analysis, I reserve the right to further respond. To the extent that Dr. Kelly contends that the Advanced Display System paper discloses compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine FIDS with the symbols disclosed in the Advanced Display System paper. The Advanced Display System paper mentions a set of proof reading marks but I know of no reason one of ordinary skill in the art would be led to prefer one set of proof reading marks, and in fact the Advanced Display System states that "where even a more natural way of editing could be found it is used instead." Indeed, in terms of implementation it may be preferable not to use the standardized proof reading marks but instead to pick symbols for which better recognition performance may be achieved by the technique of neography. Looking at the prior art as a whole, there was no reason to combine the drawing marks disclosed in the Advanced Display System paper with FIDS. Further, there would be no desire to enhance the prior art by use of the types of symbols reasons discussed above.

131.   Dr. Kelly also appears to be citing SFS 2324 as disclosing compound gestures, but fails to point to or analyze any specific gestures or compound gestures disclosed by SFS 2324. In fact, SFS 2324 says nothing about gestures, gesture recognition or the use of a computer. Rather, SFS 2324 appears to be the Finish Standards Association proofreading corrections handout to be used as a quick reference guide for clerical staff. Accordingly, even if those skilled in the art would be led to combine SFS 2324 with FIDS, which they would not, doing so would not lead to the claimed invention.

(7)    **Claim 40**

132.   Claim 40 depends from claim 39 and the analysis of claim 39 applies here.

Exhibit 6
Page 000257

### (8)    Claim 41

133.    FIDS does not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, FIDS does not disclose means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, or for detecting a direction of motion of the creation of said gesture within the meaning of this claim.

134.    Dr. Kelly also suggests that FIDS discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. Nowhere does FIDS suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in FIDS of an identifiable specific component that defines termination of a gesture. FIDS does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing FIDS and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

### (9)    Claim 43

135.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here. Dr. Kelly admits that FIDS does not disclose displaying the actual shape of the gesture. I agree with Dr. Kelly on this point.

136.    Dr. Kelly states that it would have been obvious to combine FIDS with Coleman and/or Taguchi to meet this limitation. This is wrong. FIDS makes no reference or suggestion regarding any need or problem that would require the display of the shape representing the actual gestures. FIDS discloses a prototype text-editing application using a limited set of correction marks, and there is no need to show the actual written marks. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note

Exhibit 6
Page 000258

that there is no such teaching, suggestion, or motivation to combine FIDS with Coleman or Taguchi for the purpose of adding this feature. (FIDS cites Coleman as a historical reference only). One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine displaying the actual shape of a gesture described in Coleman or Taguchi with FIDS. There would be no desire to enhance the prior art by adding this feature to FIDS because there is no problem disclosed in FIDS which would require it.

### (10)    Claim 46

137.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here. Dr. Kelly admits that FIDS does not disclose "that the direction of motion of said gesture is associated with said predetermined action." I agree with Dr. Kelly on this point. Dr. Kelly contends that the Coleman reference when combined with FIDS satisfies this limitation. I disagree. First, Dr. Kelly fails to identify any basis for combining the Coleman reference with FIDS on this point. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine FIDS with this aspect of the Coleman reference. Looking at the prior art as a whole, one of ordinary skill in the art would not be led to incorporate the exemplar directional Coleman gestures into FIDS.

### E.    Oed and Doster

138.    First, I note that Dr. Kelly relies on two separate sources, the Oed paper and the Doster paper when he refers to Oed and Doster. I note that these two references are separate sources, one discussing a user friendly man-machine interface and the other discussing word processing. I further note that Dr. Kelly presents no basis for combining these references. To the extent Dr. Kelly treats these 2 separate references as "Oed and Doster," I will analyze "Oed and

Exhibit 6
Page 000259

Doster" below as described by these two references, but I do not agree that these references are appropriately combined in this manner.

139.    The Oed and Doster references describe a prototype consisting of a separate tablet and display for input into application programs (*e.g.* word processing) as a replacement for a keyboard. The Oed & Doster references do not disclose working on operating system objects with gestures. The Oed & Doster references do not disclose compound gestures. And they do not disclose the corresponding structure (pen position digitizer co-processor) necessary to perform the functions of defining termination of a gesture and recognizing a plurality of gestures.

140.    I note that Dr. Kelly does not assert that the Oed & Doster references anticipate the claimed invention. I agree with Dr. Kelly on this point that the Oed & Doster references do anticipate the claimed invention.

141.    I note that Dr. Kelly must rely on the combination of several references with the Oed & Doster references in coming to his opinion.

    **(1)    Claim 1**

142.    The Oed & Doster references do not disclose an apparatus for controlling a computer system. For example, the Oed and Doster references do not disclose means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. Instead, the Oed & Doster references disclose an apparatus for providing keyboard and position input to a single application, such as their single example—word processing. The Oed & Doster references do not disclose any way for controlling a computer system overall with gestures. Specifically,

Exhibit 6
Page 000260

the references disclose "a pointing and selecting device with online script recognition" for use with word processing applications. Oed & Doster at MSLT 1231124 and 1233214. Further, the Oed & Doster references do not describe the use of gestures at both the application level and the operating system level. Also, the Oed & Doster references do not disclose means coupled to said computer for defining termination of a gesture, or a means coupled to said computer for recognizing a plurality of gestures.

143.    Dr. Kelly suggests that the Oed & Doster references disclose a pen position digitizer co-processor programmed with software for defining termination of a gesture. I disagree. First, Dr. Kelly incorrectly suggests that the Oed & Doster references describe gesture termination that "may be indicated by a timeout event." Instead, the portion of the Oed & Doster references cited by Dr. Kelly for this point actually disclose that a gesture is terminated by a complex process described as "segmentation." Further, nowhere do the Oed & Doster references suggest or otherwise disclose any structure that corresponds with a pen position digitizer co-processor. There is no explicit description in the Oed & Doster references of an identifiable specific component that defines termination of a gesture. The Oed & Doster references do not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing the Oed & Doster references and the prior art as a whole would not believe that a specific co-processor component is necessarily present or required for determination of gesture termination. Further, the Oed & Doster references does not disclose how the termination of a gesture is determined, nor does Dr. Kelly cite any such disclosure.

144.    Dr. Kelly admits that the Oed & Doster references do not disclose "a single set of gestures for identical executable commands at both the operating system level and the

Exhibit 6
Page 000261

application level." I agree with Dr. Kelly on this point. The Oed & Doster references disclose only gestures that are relevant at the application level, such as for use with a word processing application. Indeed, the Oed & Doster references disclose "a pointing and selecting device with online script recognition" for use with word processing applications. Thus, the Oed & Doster references do not disclose the use of gestures at the operating system level. The Oed & Doster references only contemplate the use of gestures in specific applications.

145.    Further to this point, Dr. Kelly also states that it would have been obvious to combine the Oed & Doster references with the Levine reference to meet this limitation which requires "use of a single set of gestures for identical executable commands at both the operating system level and the application level." This is wrong. First, the Levine reference does not disclose control of the operating system. Second, the Levine reference does not involve the use of recognized gestures. The gestures in this limitation are "*said* recognized gesture[s]" from the previous limitation. Accordingly, the Levine reference does not disclose a single set of recognized gestures for identical executable commands at both the operating system level and the application level.

146.    The Levine reference does not disclose the use of recognized gestures because the Levine reference does not disclose the recognition of shapes. The Levine reference is clear in its description of the "touch and lift" and "touch and move" operations. These operations do not involve the use of recognition of shapes; these operations do not involve a writing or drawing of a symbol or mark; these operations do not involve the determination of the termination of a recognized gesture. The Levine reference makes clear that the "touch and lift" operation only involves a determination of time, not of shape, or mark, or handwriting recognition. Levine Reference 10:20-44. In other words, the operations described in the Levine reference do not

Exhibit 6
Page 000262

involve the use of the handwriting recognition algorithms and gesture recognition techniques set forth in the Court's claim construction.

147.    To the extent Dr. Kelly contends that the Levine reference discloses recognized gestures, I know of no reason one skilled in the art would combine the Oed & Doster references with the "touch and lift" and/or "touch and move" operations disclosed in the Levine reference. Indeed, both the Oed & Doster references and the Levine reference teach away from combining these references. For example, the Oed & Doster references involve operations based on completed strokes, while the Levine reference involves operations based on uncompleted strokes. Further, the Levine reference discloses very different direct manipulation techniques in its touch and lift and touch and move operations. These techniques are not recognized gestures, as understood by the '295 patent. These fundamentally different and incompatible techniques would lead to very dissimilar and confusing results, and technical difficulties, if one were to attempt to combine them with the teachings of the Oed & Doster references.  One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the operations described in the Levine reference with the Oed & Doster references.  There would be no desire to enhance the prior art by combining the type of operations described in Levine with the Oed & Doster references due to the difficulties discussed above.

148.    Additionally, the Freestyle system and the Levine reference describe an application for annotating static images with synchronized markings and voice recording combined with a filing functionality intended to look visually like a large desk top.   The Freestyle system and the Levine reference disclose that application control requires separate actions, by separate devices, namely the keyboard. The examples that Dr. Kelly cites from the FreeStyle video are not shown as operating system level objects but rather screen captures or

47

Exhibit 6
Page 000263

static snapshot pictures of the display put up by other applications. These snapshot pictures are then manipulated only inside the context of the single Freestyle application program.

### (2)     Claim 3

149.     Claim 3 depends from claim 1 and my analysis of claim 1 applies equally here. Dr. Kelly suggests that Oed & Doster discloses proximity sensing (and likewise displaying an indicator of proximity). I disagree. Dr. Kelly's quoted portions of the Oed & Doster references do not refer to detection of proximity of the stylus tip to the screen, but rather to the "tablet's surface," which in the Oed & Doster references is different from the screen.

150.     Further, Dr. Kelly states that it would have been obvious to combine Oed & Doster with the Levine reference and/or the Taguchi reference to meet this limitation. This is wrong. The Oed & Doster articles make no reference to proximity sensing or to any need for proximity sensing because the digitizer is not integrated with the screen. Thus, the Oed & Doster references present no problem or need which would drive someone to seek out proximity sensing. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Oed & Doster with either Levine or Taguchi for the purpose of adding proximity sensing. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the proximity sensing described in Levine or Taguchi with Oed & Doster. There would be no desire to enhance the prior art by adding proximity sensing to Oed & Doster because there is no problem disclosed in Oed & Doster which would require it.

### (3)     Claim 4

151.     Claim 4 depends from claim 1 and my analysis of claim 1 applies here.

Exhibit 6
Page 000264

### (4)    Claim 6

152.    Claim 6 depends from claim 1 and my analysis of claim 1 applies here.  Dr. Kelly admits that Oed & Doster does not disclose displaying the actual shape of a gesture.  I agree with Dr. Kelly on this point.

153.    Dr. Kelly states that it would have been obvious to combine Oed & Doster with the Coleman or Taguchi reference to meet this limitation.  This is wrong.  Nothing in Oed & Doster would present any need or problem that would require the display of the shape representing the actual gestures.  Oed & Doster discloses a separate tablet and display for input into application programs (*e.g.* word processing) as a replacement for a keyboard, and there is no need to show the actual written marks.  Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Oed & Doster with Coleman or Taguchi for the purpose of adding this feature.  One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine displaying the actual shape of a gesture described in Coleman or Taguchi with Oed & Doster.  There would be no desire to enhance the prior art by adding this feature to Oed & Doster because there is no problem disclosed in Oed & Doster which would require it.

### (5)    Claim 12

154.    Claim 12 depends from claims 1 and 3 and my analysis of those claims applies here.  As discussed above with respect to claim 3, Oed & Doster does not disclose proximity sensing in the context of this claim limitation.  Oed & Doster discloses only proximity detection to the "tablet's surface," which in the Oed & Doster references is different from the screen.

155.    Further, Dr. Kelly states that it would have been obvious to combine Oed & Doster with the Levine reference and/or the Taguchi reference to meet this limitation.  This is

Exhibit 6
Page 000265

wrong. Oed & Doster makes no reference to proximity sensing or to any need for proximity sensing, nor to any problem which would drive someone to seek out proximity sensing. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Oed & Doster with either Levine or Taguchi for the purpose of adding proximity sensing. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine the proximity sensing described in Levine or Taguchi with Oed & Doster. There would be no desire to enhance the prior art by adding proximity sensing to Oed & Doster because there is no problem disclosed in Oed & Doster which would require it.

### (6)    Claim 39

156.    Oed & Doster does not disclose an apparatus for controlling a computer system within the meaning of claim 39. Specifically, Oed & Doster does not disclose compound gestures. Further, Oed & Doster does not disclose means for recognizing a gesture within the meaning of this claim.

157.    Dr. Kelly suggests that Oed & Doster discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. First, Dr. Kelly incorrectly suggests that the Oed & Doster references describe gesture termination that "may be indicated by a timeout event." Instead, the portion of the Oed & Doster references cited by Dr. Kelly for this point actually disclose that a gesture is terminated by a complex process described as "segmentation." Further, nowhere does Oed & Doster suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in Oed & Doster of an identifiable specific component that defines termination of a gesture. Oed & Doster does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component. One of

Exhibit 6
Page 000266

ordinary skill viewing Oed & Doster and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination. Further, the Oed & Doster references does not disclose how the termination of a gesture is determined, nor does Dr. Kelly cite any such disclosure.

158.    Oed & Doster does not disclose "a third gesture comprising said first and second gestures," or "compound gestures." Oed & Doster discloses only single symbols and multistroke symbols (which are different from compound symbols). In fact Dr. Kelly admits that Oed & Doster does not disclose compound gestures. I agree with Dr. Kelly on this point.

159.    Dr. Kelly relies on the Buxton and FIDS references, in combination with Oed & Doster, to satisfy this element. Dr. Kelly states that the FIDS reference discloses compound gestures. I disagree. For example, Dr. Kelly suggests that the MARK DELETE correction mark disclosed in the FIDS reference constitutes a compound gesture consisting of the combination of the MARK and DELETE correction marks. This is incorrect. The DELETE correction mark is a long horizontal line; the MARK correction mark is shown as a left bracket. However, the MARK DELETE correction mark appears to be a combination of a left bracket and a backward slash—plainly not a combination of the DELETE and MARK correction marks. Furthermore, any multistroke gesture-like commands disclosed in the FIDS reference are not compound gestures within the meaning of this claim limitation because at best they are grammatical compositions. By grammatical composition I mean a composition taken as a result of combining separate gestures in strict grammatical form without regard to how the constituent gestures were recognized. In comparison, the compound gestures contemplated by this claim limitation are produced as a single recognition result of combining two separate and distinctly recognized gestures.

51

Exhibit 6
Page 000267

160. Dr. Kelly also states that the Buxton reference discloses compound gestures. Again I disagree. The Buxton reference discloses a computer musical composition system that recognizes certain symbols that correspond to certain musical notes. However, the Buxton reference does not disclose compound gestures within the meaning of this claim limitation, nor does it teach combining gestures to create compound gestures. Rather, the Buxton reference discloses several multi-stroke symbols that correspond with different musical notes. For example, the Buxton reference discloses a horizontal line as corresponding with a whole note and a vertical line as corresponding with a quarter note, but Buxton does not disclose that these two symbols should be combined to form the corresponding half note symbol. Thus, Dr. Kelly mischaracterizes the half note symbol as a compound gesture because Buxton does not disclose that the shape is a composition of two other gestures or of two other shapes. Instead, Buxton clearly discloses that each shape is a shape unto itself ("based on the shape of the symbol"), and a single symbol is composed of "line segments constituting a symbol," rather than composed of other symbols or gestures. This is emphasized by Buxton's further disclosure that "the directional changes *in a symbol* must be drawn distinctly to ensure correct recognition" (emphasis added). In fact, Buxton's own characterization that each symbol is a symbol unto itself teaches away from the idea of a compound gesture.

161. To the extent that Dr. Kelly contends that either FIDS or Buxton disclose compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine Oed & Doster with the symbols disclosed in these references. Oed & Doster is about simulating the output of a computer keyboard, and is a device for input into applications that were written specifically for keyboard input. The symbols recognized in Oed & Doster correspond with keyboard symbols, or combinations thereof. In

Exhibit 6
Page 000268

contrast, Buxton describes an application written specifically for input via handwritten musical symbols, not keyboard input. Thus, one of ordinary skill in the art would just not consider using musical notations for simulated keyboard input. Looking at the prior art as a whole, there was no teaching, suggestion, or motivation to combine the musical notes disclosed in Buxton or the symbols disclosed in FIDS with Oed & Doster. Further, there would be no desire to enhance the prior art by use of the types of symbols disclosed in either Buxton or FIDS for the reasons discussed above.

162.     Dr. Kelly appears to be citing the Advanced Display System paper as disclosing compound gestures, but fails to point to or analyze any specific compound gestures disclosed by the Advanced Display System paper. To the extent Dr. Kelly is allowed to further explain his analysis, I reserve the right to further respond. To the extent that Dr. Kelly contends that the Advanced Display System paper discloses compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine Oed and Doster with the symbols disclosed in the Advanced Display System paper. The Advanced Display System paper mentions a set of proof reading marks but I know of no reason one of ordinary skill in the art would be led to prefer one set of proof reading marks, and in fact the Advanced Display System states that "where even a more natural way of editing could be found it is used instead." Indeed, in terms of implementation it may be preferable not to use the standardized proof reading marks but instead to pick symbols for which better recognition performance may be achieved by the technique of neography. Looking at the prior art as a whole, there was no basis for combining the drawing marks disclosed in the Advanced Display System paper with Oed and Doster. Further, there would be no desire to enhance the prior art by use of the types of symbols reasons discussed above.

Exhibit 6
Page 000269

163.   Dr. Kelly also appears to be citing SFS 2324 as disclosing compound gestures, but fails to point to or analyze any specific gestures or compound gestures disclosed by SFS 2324. In fact, SFS 2324 says nothing about gestures, gesture recognition or the use of a computer. Rather, SFS 2324 appears to be the Finish Standards Association proofreading corrections handout to be used as a quick reference guide for clerical staff. Accordingly, even if those skilled in the art would be led to combine SFS 2324 with Oed and Doster, which they would not, doing so would not lead to the claimed invention.

### (7)    Claim 40

164.   Claim 40 depends from claim 39 and the analysis of claim 39 applies here.

### (8)    Claim 41

165.   Oed & Doster does not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, Oed & Doster does not disclose means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, or for detecting a direction of motion of the creation of said gesture within the meaning of this claim.

166.   Dr. Kelly suggests that Oed & Doster discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. First, Dr. Kelly incorrectly suggests that the Oed & Doster references describe gesture termination that "may be indicated by a timeout event." Instead, the portion of the Oed & Doster references cited by Dr. Kelly for this point actually disclose that a gesture is terminated by a complex process described as "segmentation." Further, nowhere does Oed & Doster suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in Oed & Doster of an identifiable specific component that defines termination of a gesture. Oed & Doster does not describe any separable or specific component for determination of the

54

Exhibit 6
Page 000270

termination of a gesture that could be construed as a co-processor-type component. One of ordinary skill viewing Oed & Doster and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination. Further, the Oed & Doster references does not disclose how the termination of a gesture is determined, nor does Dr. Kelly cite any such disclosure.

### (9)    Claim 43

167.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here. Dr. Kelly admits that Oed & Doster does not disclose displaying the actual shape of the gesture. I agree with Dr. Kelly on this point.

168.    Dr. Kelly states that it would have been obvious to combine Oed & Doster with Coleman and/or Taguchi to meet this limitation. This is wrong. Nothing in Oed & Doster would present any need or problem that would require the display of the shape representing the actual gestures. Oed & Doster discloses a prototype keyboard/mouse replacement device in a text-editing application, and discloses no need to show the actual written marks. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Oed & Doster with Coleman or Taguchi for the purpose of adding this feature. One of ordinary skill in the art, looking at the prior art as a whole, would not think to combine displaying the actual shape of a gesture described in Coleman or Taguchi with Oed & Doster. There would be no desire to enhance the prior art by adding this feature to Oed & Doster because there is no problem disclosed in Oed & Doster which would require it.

### (10)    Claim 46

169.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here. Dr. Kelly admits that Oed & Doster does not disclose "that the direction of motion of said gesture is

Exhibit 6
Page 000271

associated with said predetermined action." I agree with Dr. Kelly on this point. Dr. Kelly contends that the Coleman reference when combined with Oed & Doster satisfies this limitation. I disagree. Dr. Kelly fails to identify any basis for combining the Coleman reference with Oed & Doster on this point. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Oed & Doster with this aspect of the Coleman reference. Looking at the prior art as a whole, one of ordinary skill in the art would not think to incorporate the exemplar directional Coleman gestures into Oed & Doster.

### F.    Inagaki

170.    I note first that Dr. Kelly does not assert that Inagaki anticipates any of the asserted claims of the '295 patent. I agree with Dr. Kelly on this point that Inagaki does not anticipate the '295 patent. I note that I addressed the Casio PF-8000 device in my prior report and specifically incorporate that prior analysis here.

#### (1)    Claim 39

171.    Inagaki does not disclose an apparatus for controlling a computer system within the meaning of claim 39. Specifically, Inagaki fails to disclose a single integrated screen for displaying the stroke of the stylus tip in contact with the screen. Inagaki fails to disclose means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen. Inagaki fails to disclose means coupled to said computer for comparing said gesture to at least one predefined shape. Further, Inagaki does not disclose the function of detecting a stroke of the stylus tip in contact with the screen.

172.    Dr. Kelly admits that Inagaki does not disclose means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen. I agree with Dr. Kelly on this point. In fact Inagaki teaches away from any use of a digitizer and further teaches away

56

Exhibit 6
Page 000272

specifically from the use of electromagnetic digitizers. Inagaki teaches that digitizers would be "complicated in structure," "have high manufacturing cost," involve "data recognitions [that] is complicated and time consuming," and "the memory used [for recognition and storage of digitizer data] must have a large capacity." Further, Inagaki teaches a completely different means including a "matrix array of keys." Such technology is fundamentally different from a digitizer. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Inagaki with the digitizer disclosed in the Taguchi reference. At the time of the invention, Inagaki further did not teach or lead to the use of a digitizer because the Inagaki application described does not include functionalities that might lead one to using a digitizer, such as drawing, pointing to icons, or other graphical input operations. Further, Inagaki does not disclose the collection of ink data that would be used by a recognizer of shapes using an XY tablet.

173.    Dr. Kelly also suggests that Inagaki discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. Dr. Kelly states that there is a structure that corresponds to a pen position digitizer co-processor. Dr. Kelly's analysis is wrong. The functional differences discussed above with respect to a matrix array of keys do not teach or suggest a digitizer and therefore no pen position digitizer co-processor. Further, nowhere does Inagaki suggest or otherwise disclose any structure that corresponds with such a co-processor. One of ordinary skill viewing Inagaki and the prior art as a whole would not believe that a pen position digitizer co-processor is necessarily present or required for determination of gesture termination.

### (2)    Claim 40

174.    Claim 40 depends from claim 39 and the analysis of claim 39 applies here.

Exhibit 6
Page 000273

### (3)    Claim 41

175.    Inagaki does not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, Inagaki fails to disclose a single integrated screen for displaying the stroke of the stylus tip in contact with the screen. Inagaki fails to disclose means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen. Inagaki fails to disclose means coupled to said computer for comparing said gesture to at least one predefined shape. Inagaki does not disclose means coupled to said computer for recognizing a gesture … each stroke of said gesture being located in substantially the same area of the screen. Further, Inagaki does not disclose the function of detecting a stroke of the stylus tip in contact with the screen.

176.    Dr. Kelly admits that Inagaki does not disclose means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen and the corresponding function. I agree with Dr. Kelly on this point. In fact Inagaki teaches away from any use of a digitizer and further teaches away specifically from the use of electromagnetic digitizers. Inagaki teaches that digitizers would be "complicated in structure," "have high manufacturing cost," involve "data recognitions [that] is complicated and time consuming," and "the memory used [for recognition and storage of digitizer data] must have a large capacity." Further, Inagaki teaches a completely different means including a "matrix array of keys." Such technology is fundamentally different from a digitizer. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Inagaki with the digitizer disclosed in the Taguchi reference. Inagaki further does not teach or lead to the use of a digitizer because the Inagaki application described does not include functionalities that might lead one to using a rear-mounted digitizer, such as

Exhibit 6
Page 000274

drawing, pointing to icons, or other graphical input operations. Further, Inagaki does not disclose the collection of ink data that would be used by a recognizer of shapes using an XY tablet.

177.    Dr. Kelly suggests that Inagaki discloses a pen position digitizer co-processor programmed with software for indicating termination of a gesture. I disagree. Dr. Kelly states that there is a structure that corresponds to a pen position digitizer co-processor. Dr. Kelly's analysis is wrong. The functional differences discussed above with respect to a matrix array of keys do not teach or suggest a digitizer and therefore no pen position digitizer co-processor. Inagaki specifically teaches away from using a pen-position digitizer, and thus specifically away from such a pen position digitizer co-processor. Further, nowhere does Inagaki suggest or otherwise disclose any structure that corresponds with such a co-processor. One of ordinary skill viewing Inagaki and the prior art as a whole would not believe that a pen position digitizer co-processor is necessarily present or required for determination of gesture termination.

178.    Dr. Kelly fails to show that Inagaki alone or in combination with any other reference discloses means coupled to said computer for recognizing a gesture comprising at least one stroke … each stroke of said gesture being located in substantially the same area of the screen. I agree with Dr. Kelly on this point. Inagaki fails to disclose strokes of said gestures being made in substantially the same area of the screen because the stroke input is not made in any area of the screen.

### (4)    Claim 43

179.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here. Inagaki does not disclose displaying the actual shape of the gesture. Inagaki discloses displaying "symbolic marks in a character display" rather than displaying the actual shape of the gesture input on the separate matrix array of keys. Inagaki teaches away from displaying the actual ink because it discloses displaying symbolic marks. This behavior was shown on the Casio device as

Exhibit 6
Page 000275

well during my inspection and analysis of the device. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Inagaki with the Taguchi reference. Further, one of ordinary skill in the art would not be led to combine the rear-mounted digitizer in Taguchi with Inagaki because Inagaki possesses no problem for which a display of the actual gesture is needed.

### (5)    Claim 46

180.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here.

### G.    Coleman

181.    The Coleman reference describes the use of a small set of proofreading marks to edit text, the text having been previously entered via keyboard. Further, Coleman does not disclose means coupled to said computer for recognizing a gesture … said recognizing means including means for comparing said gesture to at least one predefined shape.

182.    I note first that Dr. Kelly does not assert that Coleman anticipates any of the asserted claims of the '295 patent. I agree with Dr. Kelly on this point that Coleman does not anticipate the '295 patent. I also note that Dr. Kelly does not assert the Coleman reference with respect to claims 1, 3, 4, 6, 12, 39, and 40 of the '295 patent.

### (1)    Claim 41

183.    Coleman does not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, Coleman does not disclose means for detecting a stroke or for recognizing a gesture within the meaning of this claim.

184.    Dr. Kelly states that the RAND tablet is the structure to perform the function of detecting a stroke of the stylus tip in contact with the screen. This is wrong. The RAND tablet is opaque, and cannot be integrated with the display.

Exhibit 6
Page 000276

185.    Dr. Kelly fails to identify how Coleman discloses a "pen position digitizer co-processor ... programmed with" the various recognition techniques set forth in the Court's claim construction for recognizing a gesture. Nowhere does Coleman suggest or otherwise disclose any structure that corresponds with such a co-processor. There is no explicit description in Coleman of an identifiable specific component that defines termination of a gesture.  Further, Coleman does not describe any separable or specific component for determination of the termination of a gesture that could be construed as a co-processor-type component.  Indeed, there is no disclosure in Coleman of any gesture termination algorithm or any other means for determining the termination of a gesture.  One of ordinary skill viewing Coleman and the prior art as a whole would not believe that a co-processor is necessarily present or required for determination of gesture termination.

### (2)    Claim 43

186.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here.

### (3)    Claim 46

187.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here.

### H.        Sklarew

188.    I note first that Dr. Kelly does not assert that Sklarew anticipates any of the asserted claims of the '295 patent.  I agree with Dr. Kelly on this point that Sklarew does not anticipate the '295 patent. I further note that I addressed the Sklarew reference in my prior report and specifically incorporate that analysis here.

### (1)    Claim 39

189.    Sklarew does not disclose an apparatus for controlling a computer system within the meaning of claim 39. Specifically, Sklarew does not disclose compound gestures.

Exhibit 6
Page 000277

190.    Sklarew does not disclose "a third gesture comprising said first and second gestures," or "compound gestures." Sklarew discloses only composition by grammar as set forth in my previous report (which is different from compound symbols).

191.    Dr. Kelly admits that Sklarew does not disclose compound gestures. I agree with Dr. Kelly on this point.

192.    Dr. Kelly relies on the Buxton and FIDS references, in combination with Sklarew, to satisfy this element. Dr. Kelly states that the FIDS reference discloses compound gestures. I disagree. For example, Dr. Kelly suggests that the MARK DELETE correction mark disclosed in the FIDS reference constitutes a compound gesture consisting of the combination of the MARK and DELETE correction marks. This is incorrect. The DELETE correction mark is a long horizontal line; the MARK correction mark is shown as a left bracket. However, the MARK DELETE correction mark appears to be a combination of a left bracket and a backward slash—plainly not a combination of the DELETE and MARK correction marks. Furthermore, any multi-stroke gesture-like commands disclosed in the FIDS reference are not compound gestures within the meaning of this claim limitation because at best they are grammatical compositions. By grammatical composition I mean a composition taken as a result of combining separate gestures in strict grammatical form without regard to how the constituent gestures were recognized. In comparison, the compound gestures contemplated by this claim limitation are produced as a single recognition result of combining two separate and distinctly recognized gestures.

193.    Dr. Kelly also states that the Buxton reference discloses compound gestures. Again I disagree. The Buxton reference discloses a computer musical composition system that recognizes certain symbols that correspond to certain musical notes. However, the Buxton reference does not disclose compound gestures within the meaning of this claim limitation, nor

Exhibit 6
Page 000278

does it teach combining gestures to create compound gestures. Rather, the Buxton reference discloses several multi-stroke symbols that correspond with different musical notes. For example, the Buxton reference discloses a horizontal line as corresponding with a whole note and a vertical line as corresponding with a quarter note, but Buxton does not disclose that these two symbols should be combined to form the corresponding half note symbol. Thus, Dr. Kelly mischaracterizes the half note symbol as a compound gesture because Buxton does not disclose that the shape is a composition of two other gestures or of two other shapes. Instead, Buxton clearly discloses that each shape is a shape unto itself ("based on the shape of the symbol"), and a single symbol is composed of "line segments constituting a symbol," rather than composed of other symbols or gestures. This is emphasized by Buxton's further disclosure that "the directional changes *in a symbol* must be drawn distinctly to ensure correct recognition" (emphasis added). In fact, Buxton's own characterization that each symbol is a symbol unto itself teaches away from the idea of a compound gesture.

194.    To the extent that Dr. Kelly contends that either FIDS or Buxton disclose compound gestures within the meaning of this claim limitation, I know of no reason one of ordinary skill in the art would be led to combine Sklarew with the symbols disclosed in these references. Sklarew is about handwriting input with limited use of gestures into individual applications on a computer. The symbols disclosed in Sklarew correspond with character symbols, and text-editing commands. Looking at the prior art as a whole, one of ordinary skill in the art would not think to combine the musical notes disclosed in Buxton or the symbols disclosed in FIDS with Sklarew. Further, there would be no desire to enhance the prior art by use of the types of symbols disclosed in either Buxton or FIDS for the reasons discussed above.

Exhibit 6
Page 000279

195.    FIDS and Advanced Display System disclose the use of proof reading marks for the editing of text. Sklarew discloses no problem for which it is necessary to incorporate the teaching in FIDS or Advanced Display System because Sklarew's system discloses the editing of text with different symbols. In fact, contrary to Dr. Kelly's assertion that the simple addition of FIDS or Advanced Display System gestures to Sklarew and its gestures would have left the system performing as before, such a combination would have created interference between the gestures of Sklarew and FIDS or Advanced Display System. For example, the FIDS merge symbol or the Advanced Display System delete block of text symbol would cause either recognition confusion and/or implementation confusion with symbols disclosed by Sklarew which include alpha-numeric and mathematical characters. Likewise, Kelly's argument that the simple addition of Buxton's gestures to the system of Sklarew and its gestures would have left Sklarew performing just as before ignores the fact that such a combination would have created interference between the gestures of Sklarew and Buxton. For example, the whole note and 8th note symbol disclosed by Buxton would cause either recognition or implementation confusion with symbols recognized by Sklarew.

    **(2)    Claim 40**

196.    Claim 40 depends from claim 39 and the analysis of claim 39 applies here.

    **(3)    Claim 41**

197.    Sklarew does not disclose an apparatus for controlling a computer system within the meaning of claim 41. Specifically, Sklarew does not disclose means for detecting a direction of motion of the creation of said gesture within the meaning of this claim.

198.    Dr. Kelly asserts that it would be obvious to combine Coleman with Sklarew to detect the direction of motion of the creation of gestures. I disagree. In fact, Sklarew teaches away from combining Coleman for this feature because the simple addition of Coleman's

Exhibit 6
Page 000280

gestures to the system of Sklarew and its gestures would have created interference between the gestures of Sklarew and Coleman. For example, the Coleman symbol for scrolling up would cause either recognition confusion and/or implementation confusion with symbols disclosed by Sklarew for specific functions. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine Sklarew with the gestures involving direction of motion in the Coleman reference. Further, one of ordinary skill in the art would not be led to combine the gestures involving direction of motion of Coleman with Sklarew.

### (4)    Claim 43

199.    Claim 43 depends from claim 41 and the analysis of claim 41 applies here.

### (5)    Claim 46

200.    Claim 46 depends from claim 41 and the analysis of claim 41 applies here.

## VII.    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

201.    I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success; Long-Felt But Unsolved Need and/or Failure of Others; and Industry Recognition.

202.    The commercial success of the invention of claims of the '295 patent cannot be questioned. The ubiquitous use of a stylus and gestures to control, for example, Tablet PCs indicates the benefits consumers reap through the efficient and effective means of controlling such devices with gestures.

203.    On-line handwriting recognition has an extensive history. However, the focus of the vast majority of these efforts was on the replacement of the keyboard with direct handwriting input because until relatively recent times, the dominant form of computer input was a keyboard

Exhibit 6
Page 000281

only and keyboarding skills were considered unusual, specialized, and awkward. The advent of the mouse, a simple pointing device, was a substantial improvement to human computer interaction, as is readily apparent to anyone who observes modern computer systems as compared to dominant computer systems as of 1980. However, the keyboard remained necessary for text input. Although there were some systems which attempted to make use of a computer using only pointing input, with a mouse or a touch panel, these had only limited success in limited application areas, even with the use of a simulated keyboard displayed on the screen. One factor in their limited success was that in addition to the awkwardness of a virtual keyboard, the use of pointing input only or a predominantly pointing input had limited expressive power. Efforts to add pen functionality to a mouse-centric OS such as the early versions of Pen Windows were not widely adopted and were in fact discontinued, a cycle which happened more than once. *See* Tablet PC Update by Geoff Walker, page A12, www.tabletpcmagazine.com, Spring 2002. It is the dramatic use of gestures for generally all computer control functions of the technology of the '295 patent, in a user interface metaphor with its reliance on gestures with the expressive power of the features claimed in the '295 patent, that truly dealt successfully with the goal of keyboardless computer systems and thus achieved pen-computing.

204. Go Corporation received considerable recognition on a national level for its ground-breaking work. A brief review of any number of press reports at the time makes this abundantly clear. *See, e.g.,* LUC 1236376-83; LUC 1236384-87; LUC 1236394-97; LUC 1236463-66; LUC 1236509-526; LUC 1236600-640. Particularly descriptive is the record given by Marlin Eller, a long-time Microsoft employee and a senior technical leader in Microsoft's Pen Windows development group, in his book "Barbarians Led by Bill Gates" such as in Chapter 8

Exhibit 6
Page 000282

titled "Pen Ultimate Warfare" and Chapter 9 titled "GO-ing Down".    Mr. Eller notes that Microsoft considered the GO pen computing system so compelling, that it was a serious threat to Microsoft's primary source of business revenue based on Microsoft's predominant position in operating systems (page 120) , as the aspects of pen-computing in the GO system could motivate users to change to GO's operating system instead of Microsoft's in spite of the inconveniences and burdens to the user of using a second operating system (page 134).  Still further evidence of the non-obviousness of the Agulnick patent technology was the commitment to develop a hardware product based on the technology.  *See, e.g.,* LUC 1235464-67; LUC 1236535-38; LUC 1236539-46.

## VIII.  COMPENSATION

205.    I am being compensated at a rate of $250 per hour for my work in this matter, plus expenses.  My compensation does not depend in any way on the conclusions or outcome of my analysis.

## IX.    CONCLUSION

206.    The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available.

Exhibit 6
Page 000283

Dated:  October 12, 2007

Jean Renard Ward

68

Exhibit 6
Page 000284

# Tab 1

Exhibit 6
Page 000285

Anderson, R.; Bator, R; Gagan, R.; Meads, J.; and
Metrick, L. "Interactive Specification of Data Displays", NASA
Contractor Report CR-1628, June 1970

Bigelow, Stephone J. ""Understanding Pen Systems and
Touchpads"", Chapter 34, in "Troubleshooting, Maintaining, and Repairing
PCs -- a Technician's Guide", McGraw-Hill, 1998

Bigelow, Stephone J., ""Understanding Pen Systems and
Touchpads"", Chapter 34, in "Troubleshooting, Maintaining, and Repairing
PCs -- a Technician's Guide", McGraw-Hill, 1998</

Blesser, B., and Ward, J. "Human Factors Affecting the
Problem of Machine Recognition of Hand-printed Text", Vol III
Proceedings of the 7th Annual Computer Graphics Conference, National
Computer Graphics Association, May 11-15 1986, pp 498-514.

Blesser, B., and Ward, J. "Human Factors Affecting the
Problem of Machine Recognition of Hand-printed Text", Vol III
Proceedings of the 7th Annual Computer Graphics Conference, National
Computer Graphics Association, May 11-15 1986, pp 498-514.

Blesser, B. "Digitizing Tablet System Having Stylus
Tilt Correction", United States Patent 4,577,057, assigned to Pencept,
Incorporated, Waltham, Massachusetts, March 18, 1986.

Caswell, N.S. "Introduction to input devices", Computer
graphics: technology and applications, Academic Press, Boston, 1988 ISBN
0126399700

"Pen-Computing Anbieter setzen nicht alle technischen
Trends um", Volume 22, 1993, available at
http://www.computerwoche.de/heftarchiv/1993/22/1128144/

"Der Stift scheint m"chtiger als die gute alte
Tastatur", Volume 30, 1992, available at
http://www.computerwoche.de/heftarchiv/1992/30/1135191/

Davis, M.R. and Ellis, T.O. "The RAND Tablet: A
Man-Machine Graphical Communication Device", AFIPS Fall Joint Computer
Conference #26, part 1, 1964, Spartan Books, Baltimore, Maryland, pp
325-331.

Foley, J.D. and VanDam, A. "Fundamentals of Interactive
Computer Graphics", Addison-Wesly, Reading, Massachusetts, 1982.

Francik, Ellen and Akagi, Kenichi "Designing a computer
pencil and tablet for handwriting", Proceedings of Human Factors Society
33rd Annual Meeting, October 16-20, 1989, Denver Colorado, pp 445-449.

Griepentrog, Scott "We have a friend in Bill ...",
Wiki posting at: twiki.stg.net

Hullender, Gregory and Gounares, Alexander, "Ink
Gestures", European Patent Application EP 1335272, United States Patent
6,938,222 B2 August 30 2005

Exhibit 6
Page 000286

Hullender, Gregory and Gounares, Alexander, "Ink
Gestures", United States Patent 6,938,222, August 30, 2005

Johnson, J., Roberts, T.L., Verplank, W., Smith, D.C.,
Irby, C.H., Beard, M., and Mackey, K. "The Xerox Star: A
Restrospective", IEEE Computer, Vol 22 No 9, September, 1989, pp 11-28.

Kurtzberg, J.M. and Tappert, C.C. "Segmentation
Procedure for Handwritten Symbols and Words", IBM Technical Disclosure
Bulletin, Vol 25 No 7B, December 1982, pp 3848-3852.

Leedham, C.G. and Downton, A.C. "On-line recognition of
Pitman's handwritten shorthand -- an evaluation of potential",
International Journal of Man-Machine Studies, Vol 24, 1986, pp 375-393.

Logitech Corporation "LogiMouse C7 Technical Reference
Manual", Logitech Corporation, 1989.

MicroTouch Systems Inc. "TouchWare for OS/2 User's
Guide", MicroTouch System, Inc. Methuen Mass

MicroTouch Systems Inc. "TouchWare for Macintoch
(USB controllers) User's Guide", MicroTouch System, Inc. Methuen Mass

Microsoft Corporation, "Die Geschichte des Pen Computing",
available at
https://www.microsoft.com/germany/presseservice/detail.mspx?id=530729

Microsoft Corporation, "ApplicationGesture Enumeration --
SystemGesture Enumeration", www.microsoft.com

Microsoft Corporation, "Microsoft Tablet PC - Windows XP
Tablet PC Edition, msdn.microsoft.com, January 15, 2003

Microsoft Corporation, "Microsoft Knowledge Base: Cannot
See Writing with Pen Pointing Device and Super VGA, KB111569",
msdn.microsoft.com, 10/14/2003

Microsoft Corporation, "Microsoft Tablet PC - System
Events and Mouse Messages", msdn.microsoft.com, January 15, 2003

Microsoft Corporation "Microsoft Tablet PC - Timeline
of Mouse Messages and System Events", msdn.microsoft.com, January 15, 2003

Microsoft Corporation "Microsoft Tablet PC -
Unimplemented Glyphs", msdn.microsoft.com, January 15, 2003

Microsoft Corporation "Microsoft Tablet PC - General
Threading Considerations", msdn.microsoft.com, January 15, 2003

Microsoft Corporation "Developing Applications Using
your Tablet PC", msdn.microsoft.com, Microsoft TechNet, May 13, 2003

Microsoft Corporation "Microsoft Tablet PC - Design
Recommendations", msdn.microsoft.com

3

Exhibit 6
Page 000287

Microsoft Corporation "Microsoft Knowledge Base:
Drag-and-Drop Editing not Functional with Pen Windows",
msdn.microsoft.com, 5/20/2005, KB110398

Microsoft Corporation, "Developing Applications Using
your Tablet PC", msdn.microsoft.com, Microsoft TechNet, May 13, 2003

Microsoft Corporation "Description of Windows for Pen
Computing Pens", Microsoft Knowledge Base, 10/13/1999, KB85663

Narayanaswamy, Shankar "Pen and Speech Recognition
in the User Interface for Mobile Multimedia Terminals", Ph.D. Thesis in
EE/CS, University of California, Berkeley, 1996

Newman, W.M. and Sproull, R.F. "Principles of
Interactive Computer Graphics, second edition", ISBN 0-07-046338-7,
McGraw-Hill, New York, 1973, 1979.

Andy Novobilski, "PenPoint Programming", Addison-Wesley,
August 1992

Pen Computing Magazine, "Handwriting Recognition",
1996(?), http://whiterabbit.com/amug/...PenReport/Handwriting.html

PenPoint, "PenPoint Architectural Reference Volume 2", GO
Technical Library, Addison-Wesley Publishing,

PenPoint, "PenPoint User Interface Design Reference", GO
Technical Library, Addison-Wesley Publishing,

PenWindows: Microsoft Corporation, "Microsoft Windows
for Pen Computing: Programmer's Reference, Version 1 Designed to work
with Windows 3.1", Microsoft Press, 1992

PenWindows: Microsoft Corporation, "Programmer's Guide
to Pen Services for Microsoft Windows95", Microsoft Press, ISBN
1-55615-835-1

Pencept "Penpad 320 User's Guide", Pencept,
Incorporated, 39 Green Street, Waltham, Massachusetts 02154, 1986.

Phillips, M. "Several simple tests can help you choose
the correct digitizer", Computer Technology Review, Vol VII No 1,
January 1987.

SIGSOFT "Runaway mouse problem in popular commercial WP
program", contributed by Steven Jones, A.C.M. SIGSOFT Software
Engineering Notes, Vol 13 No 4, page 9, October 1988.

Schomaker, L. "The NICI stroke-based recognizer of
on-line handwriting", Available at
http://hwr.nici.kun.nl/recog/nici-stroke-based-recognizer.html

Slate Corporation, "Slate PenApps Application Builds",
Copyright 1992 by SlateCorporation

Yaysi, Burak M., "Gesture System for a Graph Editor", Master

Exhibit 6
Page 000288

of Science thesis, Washing Universtiy 1992, St. Louis Missouri.
www.cs.wustl.edu/cs/techreports/1992/wucs-92-35.part2.ps.Z

Walker, Geoff, "Tablet PC Update", Pen Computing Magazine,
Spring 2002

Ward, J. and Blesser, B. "Interactive Recognition of
Hand-printed Characters for Computer Input", IEEE Computer Graphics and
Applications, September 1985, pp 24-37.

Ward, Jean Renard "Software Control at the Stroke of a Pen",
SIGGRAPH Video Review, ACM Press: CHI '86.

Ward, J. and Blesser, B. "Implications of Using
Interactive Hand-print Character Recognition for Computer Input",
Proceedings of the 1985 COMPINT Trends and Applications in Computer
Graphics Conference, May 1985, IEEE Catalog No 85CH2148-5.

Ward, J. "Design Criteria for and Electronic Tablet
Technology with Acceptable Performance for Handwriting Capture and
Analysis", Proceedings of the Third International Symposium on
Handwriting and Computer Applications, Montreal, Canada, July 20-23,
1987, pp 178-180.

Ward, J. "Issues in the validity of testing protocols and
criteria for on-line recognition of handwritten text", Proceedings of
the Third International Symposium on Handwriting and Computer
Applications, Montreal, Canada, July 20-23, 1987, pp 67-70.

Ward, J. and Phillips, M. "Digitizer Technology:
Performance Characteristics and the Effects on the User Interface", IEEE
Computer Graphics and Applications, April 1987, pp 31-44.

Ward, J. (organizer): Sibert John (Moderator): Buffa,
Michael G., Crane, Hewitt D., Doster, Wolfgang, and Rhyne, James "Issues
Limiting the Acceptance of User Interfaces Using Gesture Input and
Handwriting Character Recognition", panel discussion, Proceedings of
CHI+GI Conference on Human Factors in Computing Systems and Graphics
Interface, Toronto, April 5-9, 1987, pp 155-158.

Ward, J. and Kuklinski, T. "A Model for Variability
Effects in Hand-printing, with Implications for the Design of On-line
Character Recognition Systems", IEEE Transactions on Systems, Man, and
Cybernetics, Vol 18 No 3, May 1988, pp 438-450.

My direct experience with the Freestyle application and dedicated
hardware during the approximately two years I was employed at Wang
Laboratories in the Freestyle development group.

My direct experience with the use, design, and engineering and operation
of a variety digitizing tablets and/or touch pads during the approximate
time period from about 1978 to about 1990, including one or more models
manufactured and/or developed by Numonics Corporation, PenCept Inc,
MicroTouch, Summagraphics, CalComp, Wacom, Hitachi, and others.

My direct experience with one or more of the hardware units used by the
PLI project group at IBM.

Exhibit 6
Page 000289

My direct experience with one of the hardware and software applications used by Doster and Oed, which I examined during a visit to their research lab in the 1980s.

My direct experience with a pen-computing portable unit developed by Ralph Sklarew during a business customer visit while I was employed at Wang, about 1990.

My direct experience with a version of the CIC HandWriter product during the 1980s, during visits to one or more business visitors during the 1980s.

My direct experience with the PenPad 200, 320, and other PenPad products and prototypes during my employment by PenCept Inc. and it's predecessor and successor companies.

My experience at Slate, developing applications for both the PenPoint and PenWindows/ Windows for Pen computing operating systems.

6

Exhibit 6
Page 000290