1  David A. Hahn (SBN 125784)
   HAHN & ADEMA
2  501 West Broadway, Suite 1600
   San Diego, California  92101-3595
3  Telephone:  (619) 235-2100
   Facsimile:  (619) 235-2101

4

5  Attorney for *Lucent Technologies Inc.*
   and *Multimedia Patent Trust*
6  *(Additional counsel listed on the last page)*

7

8              **UNITED STATES DISTRICT COURT**
            **SOUTHERN DISTRICT OF CALIFORNIA**
9

10 LUCENT TECHNOLOGIES INC. and          Case No. 07-CV-2000-H (CAB)
   MULTIMEDIA PATENT TRUST,
                                         consisting of matters severed from
11                                       consolidated cases:
                    Plaintiffs,
                                         Case No. 02-CV-2060-B (CAB)
12        v.                             Case No. 03-CV-0699-B (CAB)
                                         Case No. 03-CV-1108-B (CAB)
13 GATEWAY, INC., GATEWAY COUNTRY
   STORES LLC, GATEWAY COMPANIES,
14 INC., GATEWAY MANUFACTURING LLC       **LUCENT'S MEMORANDUM OF**
   and COWABUNGA ENTERPRISES, INC.,      **POINTS AND AUTHORITIES IN**
15                                       **OPPOSITION TO DEFENDANTS'**
                    Defendants,          **MOTIONS FOR SUMMARY**
16        and                            **JUDGMENT OF INVALIDITY OF**
                                         **U.S. PATENT NO. 4,763,356**
17 MICROSOFT CORPORATION,

18                  Intervener.
                                         Date:        January 7, 2008
19 MICROSOFT CORPORATION,                Time:        10:30 A.M.
                                         Courtroom:   13, 5th Floor
20                  Plaintiff,           Judge:       Hon. Marilyn L. Huff
21        v.

22 LUCENT TECHNOLOGIES INC.,

23                  Defendant.
   LUCENT TECHNOLOGIES INC. and
24 MULTIMEDIA PATENT TRUST,

25                  Plaintiffs,

26        v.

27 DELL INC.,

28                  Defendant.

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     COUNTER-STATEMENT OF FACTS .................................................................2

        A.      The Invention of the '356 Patent ..............................................................2

        B.      This Court's Construction of the '356 Patent Claims ...............................4

        C.      Supplemental Claim Construction Proceedings for the '356 Patent .........5

III.    PROCEDURAL BACKGROUND..........................................................................5

IV.     LEGAL STANDARDS ..........................................................................................6

        A.      Summary Judgment ...................................................................................6

        B.      Obviousness ...............................................................................................7

V.      ARGUMENT:  SUMMARY ..................................................................................9

VI.     ARGUMENT: GATEWAY'S MOTION REGARDING THE FOREIGN
        EXCHANGE FRONT END ("FXFE") AND THE TYLER ARTICLE ...........9

        A.      The Court Should Not Consider the FXFE System or the Tyler Article for
                Purposes of Summary Judgment..............................................................9

                1.      Gateway Is Attempting an End Run Around this Court's May 15, 2007
                        Order Striking These References ...............................................9

                2.      Gateway's Arguments Based on § 102(b) and § 102(g) Are Improper
                        and Violate this Court's Order Regarding the Scope of Supplemental
                        Summary Judgment ...................................................................10

        B.      The FXFE System Does Not Anticipate the '356 Patent ......................11

                1.      The FXFE System Is Not Prior Art Under Section 102 Because It Was
                        Not Publicly Used...................................................................11

                2.      The FXFE System and Tyler Article Are Not Enabling..........14

                3.      The FXFE System Does Not Meet Each and Every Limitation of the
                        '356 Patent Claims .................................................................14

        C.      The FXFE System Does Not Render Obvious the '356 Patent Claims .................21

                1.      FXFE is Not Prior Art Under Section 103...............................21

                2.      Gateway Fails to Offer Any Physical, Technical, or Credible
                        Documentary Evidence Regarding the FXFE System...............21

                3.      Summary Judgment of Obviousness Is Inappropriate Where There Are
                        Lingering Factual Issues ........................................................22

                4.      Gateway Fails to Make the Required Particularized Showing of
                        Obviousness Under the *Graham* Factors ..............................22

                5.      Defendants Engage In Impermissible Hindsight .....................24

        D.      The Tyler Article Does Not Otherwise Invalidate the '356 Patent Claims............24

VII.    ARGUMENT: Microsoft's Motion Regarding "Your Money Manager" .........24

A.    The YMM Software and the MS DOS Operating System.......................................25

B.    The Invention of the '356 Patent Was Based on Graphical User Interface—Not Text Based—and Requires "Pointing" to "Display Keys".................................25

C.    The YMM Software Does Not Render Obvious the '356 Patent Claims...............26

    1.    YMM Does Not Have "Display Keys" or "Graphical" Tools ...................26

    2.    Pushing Physical Keys on a Physical Keyboard is Not "Pointing to the Display Keys" of a "Graphical" Tool.........................................27

    3.    It Would Not Have Been Obvious to Add "Graphical" Tools With "Display Keys" to the YMM Program.........................................28

    4.    Microsoft Fails to Make Particularized Showing of Obviousness.............30

VIII.    ARGUMENT: Dell's Motion Regarding "Home Accountant" Combined with the Tyler Article...........................................................................31

A.    The Home Accountant Program Does Not Disclose Several Limitations.............31

    1.    Home Accountant Has No Predefined Composition Tool That is Associated With Information Fields as Specified by the Form Entry System...............................................................................31

    2.    Home Accountant Does Not "Insert[] in Said One Field Information That is Derived as a Result of Said User Operating Said Displayed Tool"...................................................................................33

B.    It Would Not Have Been Obvious to Add the Missing Elements to the Macintosh Home Accountant Program...............................................33

    1.    The Home Accountant Application was Not Designed to be Used With, and Would Not Have Worked With, a Predefined and Associated Composition Tool...............................................33

    2.    Dell Fails to Make Particularized Showing of Obviousness ....................34

IX.    CONCLUSION.............................................................................................35

# TABLE OF AUTHORITIES

*Cases*

*Am. Seating Co. v. USSC Group, Inc.*,
   2005 WL 1224603 (W.D. Mich. May 23, 2005) ........................................................... 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................................................... 6

*Beckson Marine, Inc. v. NFM, Inc.*,
   292 F.3d 718 (Fed. Cir. 2002) .......................................................................................... 8

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*,
   386 F.3d 1371 (Fed. Cir. 2004) ................................................................................. 12, 13

*Carella v. Starlight Archery Pro Line Co.*,
   804 F.2d 135 (Fed. Cir. 1986) ........................................................................................ 11

*Caterpillar Inc. v. Sturman Indus., Inc.*,
   387 F.3d 1358 (Fed. Cir. 2004) ........................................................................................ 6

*Celotex v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................................ 11

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988) ....................................................................... 22, 30, 35

*Eli Lilly & Co. v. Barr Labs., Inc.*,
   251 F.3d 955 (Fed. Cir. 2001) .......................................................................................... 7

*Finisar Corp. v. DirecTV Group, Inc.*,
   424 F. Supp. 2d 896 (E.D. Tex. 2006) ..................................................................... 10, 11

*Finnigan Corp. v. ITC*,
   180 F.3d 1354 (Fed. Cir. 1999) ................................................................................. 12, 15

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
   501 F.3d 1263 (Fed. Cir. 2007) ........................................................................................ 7

*Glaxo Group Ltd. v. Apotex, Inc.*,
   376 F.3d 1339 (Fed. Cir. 2004) ...................................................................................... 15

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ....................................................................................................... 7, 22

*Holmwood v. Sugavanam*,
   948 F.2d 1236 (Fed. Cir. 1991) ...................................................................................... 11

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   488 F.3d 982 (Fed. Cir. 2007) ........................................................................................ 14

*Impax Labs., Inc. v. Aventis Pharms. Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006) ............................................................................. 14

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) ................................................................................. 8

*In re Wertheim*,
    646 F.2d 527 (CCPA 1981) ................................................................................... 21

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
    292 F.3d 728 (Fed. Cir. 2002) ............................................................................... 12

*KSR Int'l Co. v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007) .................................................................................... passim

*Lucent Techs. Inc. v. Gateway, Inc.*,
    509 F. Supp. 2d 912 (S.D. Cal. 2007) ..................................................................... 8

*Mercedes-Benz of N. Am., Inc. v. Hartford Acc. & Indem. Co.*,
    974 F.2d 1342 (9th Cir. 1992) ................................................................................. 6

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
    303 F.3d 1294 (Fed. Cir. 2002) ............................................................................. 13

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ....................................................................... 12, 13

*Motionless Keyboard Co. v. Microsoft Corp.*,
    486 F.3d 1376 (Fed. Cir. 2007) ............................................................................. 13

*Pfizer, Inc. v. Apotex, Inc.*,
    480 F.3d 1348 (Fed. Cir.),
    *cert denied*, 128 S. Ct. 110 (2007) ......................................................................... 7

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007) ........................................................................... 8, 24

*Philips Elecs. N. Am. Corp. v. Contec Corp.*,
    177 Fed. Appx. 981 (Fed. Cir. 2006) ................................................................. 22, 23

*Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*,
    324 F.3d 1346 (Fed. Cir. 2003) ............................................................................. 21

*Schumer v. Lab. Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002) ............................................................................... 7

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991) ............................................................................. 24

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007) ............................................................................... 8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Trading Tech. Intern. Inc. v. eSpeed, Inc.*,
513 F. Supp. 2d 969 (N.D. Ill. 2007) .......................................................................................... 12

*TypeRight v. Microsoft*,
374 F.3d 1151 (Fed. Cir. 2004) ...................................................................................... 12, 16, 17

*United States v. Boyce*,
148 F. Supp. 2d 1069 (S.D. Cal. 2001),
*aff'd*, 36 Fed. Appx. 612 (9th Cir. 2002) ............................................................................... 6

*Woodland Trust v. Flowertree Nursery, Inc.*,
148 F.3d 1368 (Fed. Cir. 1998) ............................................................................................ 12, 21

***Statutes***

35 U.S.C. § 103(a) ............................................................................................................................ 7

***Rules***

Fed. R. Civ. P. 56 (c) ...................................................................................................................... 6

## I.    INTRODUCTION

This is defendants' third attempt seeking summary judgment that U.S. Patent No. 4,763,356 ("the '356 patent") is invalid in light of various prior art references. This Court already twice denied defendants' motions for summary judgment of invalidity of the '356 patent, including motions based on some of the very same references that defendants again raise now. Ignoring the limited scope of supplemental briefing allowed by this Court, defendants now attempt an end-run around this Court's scheduling and discovery orders by rehashing arguments that were previously rejected or previously excluded. In any event, as before, these arguments fail on the merits, as defendants' have failed to present evidence sufficient to establish a *prima facie* case of obviousness. Indeed, defendants' arguments ignore critical disputes of fact regarding the disclosures of the prior art references. Defendants have once again failed to demonstrate by clear and convincing evidence that the '356 is rendered obvious or otherwise invalid in light of the prior art, and their motions for summary judgment should be denied.[1]

Ample evidence exists to rebut defendants' various claims of obviousness and—at a minimum—demonstrate genuine disputes for trial. For example, Lucent's technical expert for the '356 patent, Mr. Bruce Tognazzini, explains how the various prior art references fail to disclose individual elements of the asserted claims. Indeed, Mr. Tognazzini notes that certain combinations suggested by defendants ***teach away*** from the invention of the '356 patent. Mr. Tognazzini also analyzes the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and he opines that the invention of the '356 patent was nonobvious. Mr. Tognazzini's opinion is further supported by objective indicia of nonobviousness, including the failure of others to arrive at the invention, the commercial success of the invention, and the licensing of the invention by others. Because more than sufficient evidence therefore exists to

---

[1] Defendants Microsoft, Gateway, and Dell each separately filed a motion for summary judgment of invalidity of the '356 patent. As the Court permitted (D.I. # 134), Lucent responds to each of those motions in this single opposition brief.

support a finding of nonobviousness, defendants' summary judgment motions related to the '356 patent should be denied.

## II.    COUNTER-STATEMENT OF FACTS

### A.    The Invention of the '356 Patent

Pop-up menus, touch-screen form-entry systems, and other computer data entry tools are commonly used today in restaurants, stores, hospitals, and in the home in many personal computer programs.  But in 1986, when the '356 patent was filed, such tools were novel and pioneering inventions.  Before that time, computer users would need to manually move between data entry fields, and manually input data into each field, for example, by using a computer keyboard.  (Ex. 1, '356 Patent col. 1:8-22).  People such as securities traders, sales people, and nurses spent an inordinate amount of time on a daily basis manually inputting information into electronic forms.  *Id.* Thus, the inventors of the '356 patent identified a need for more user-friendly and ***time-saving*** data-entry interfaces.  (*Id.* at 1:24-48).

As a result, the inventors of the '356 patent conceived of many of the time-saving computer pop-up windows and overlay data-entry tools that we take for granted today.  (*Id.* at cols. 15-18). The invention of the '356 patent used ***graphical*** displays and menus—like the graphical window displays used in Microsoft Windows applications today.  When the ideas and inventions of the '356 patent first became known, they were received with comments such as "great"—"wonderful"—"I've never seen this before."  (Ex. 2, 1/5/06 Day Dep. at 90:4-7).

Before the invention of the '356 patent, a salesperson would need to enter all of the information manually, ***perhaps with a computer keyboard***, and the salesperson would have been required to manually switch between each data entry field.  (Ex. 1, '356 Patent col. 1:8-22).  The '356 patent specification describes some of the user-friendly and time-saving aspects of the invention with respect to entering information into this hypothetical automobile sales form:

> When a form is first brought up on panel 15, one of the fields in the form is illustratively highlighted and, in accordance with the invention, the ***predefined tool*** for filling in that field is concurrently displayed illustratively as a window overlaying the form.

(*Id.* at 3:42-46).  To meet these identified needs, the inventors of the '356 patent conceived of a time-saving form-entry system that uses predefined data entry tools that are associated with respective data information fields.  (*Id.* at cols. 15-18).  After pointing to or selecting a field for data entry, the form-entry system allows for the display of a predefined tool that is associated with that field in a separate and overlaying window.  Figure 2 (left) shows a hypothetical data-entry form that might be used by an automobile salesperson, and Figure 3 (right) shows a predefined tool—here, a menu—associated with the "Model" field:



Another critical time-saving aspect described in the '356 patent is that the salesperson simply "point[s] to one of the entries" on the pop-up tool "overlay (window)," after which, the form entry system may "bring[] up the corresponding tool" pop-up window predefined for that field.  (*Id.* at 3:63-4:2).  The '356 patent discloses a "keyboard tool" that can be used to enter text data, and a "number entry tool" that can be used to enter numeric data.  (*Id.* at 4:25; 5:3-5 and Figs. 5 and 7).  The '356 patent also discloses other similar tools such as date composition tools.  *Id.*  The '356 patent discloses how these tools are used with the hypothetical automobile sales form.  The '356 patent discloses that the user may "point" to various fields to bring up the appropriate predefined and associated tool.  (*Id.* at 4:35).  Accordingly, when "the user points" at various fields, he may point and select entries such as the "CONVERTIBLE model" automobile.  (*Id.* at 3:64).

Likewise, when the "Customer Name" field is pointed to or selected, the form-entry system may bring up the keyboard tool which was the predefined tool associated with that field.  (*Id.* at 5:3-5).  The salesperson would then point to the appropriate letters, spell the name, and then point to the "E/S" (enter/skip) key, which would cause the name to be input into the "Customer Name" field.

(*Id.* at 5:12-15). Similarly, the '356 patent discloses a number entry tool that may be used to compose numerical data. (*Id.* at 4:13-56). For example, when the "Quantity" field is pointed to or selected, the form-entry system may bring up a number entry tool which was the predefined tool associated with that field. *Id.* The salesperson would then point to the appropriate number, compose a number, and then point to the "E" (enter) or "E/S" (enter/skip) key, which would cause the number to be input into the "Quantity" field. *Id.* Figures 5 amd 7 below show the keyboard and number entry tools:



Significantly, the '356 patent makes clear that some of the time-saving aspects of the invention include the ability of the user to (1) "point" to fields to call up the associated predefined tools in overlaid windows, and (2) "point" to selections on the overlaid tools that cause the selection to be entered into the appropriate field in the form entry system. (*Id.* at 3-7).

**B.    This Court's Construction of the '356 Patent Claims**

In September 2003, this Court heard two days of claim construction arguments to construe the claims of the '356 patent. On March 1, 2004, the Court issued the following constructions for the limitations of claim 19, based on the claim language and the intrinsic evidence:

| Claim 19 Limitation | Court's Claim Construction |
|---|---|
| A method for use in a computer having a display comprising the steps of | As is. |
| Displaying on said display a plurality of information fields, | As is. |
| identifying for each field a kind of information to be inserted therein, | As is. |

| | |
|---|---|
| indicating a particular one of said information fields into which information is to be inserted and for **concurrently displaying** a **predefined tool associated with said one of said fields**, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a **tool adapted to allow said user to compose said information**, and | As is.<br><br>**Concurrently displaying** - displaying at the same time, as by a window overlaying them.<br><br>**Predefined tool associated with said one of said fields** - refers to a tool specified by the system as an appropriate tool for filling in the information called for by that field.<br><br>**A tool adapted to allow said user to compose said information** - means a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool. |
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | As is. |

(Ex. 3, '356 Patent Am. Claim Const. Order) (emphasis in original).

Significantly, this Court determined that "predefined tools associated with said one of said fields" "refers to a tool specified by the system as an appropriate tool for filling in the information called for by that field." *Id.*  Likewise, this Court determined that a "tool adapted to allow said user to compose said information" means "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool." *Id.*

**C.     Supplemental Claim Construction Proceedings for the '356 Patent**

In March 2007, defendants sought to alter the Court's claim construction for the '356 patent, specifically the Court's construction of "concurrently displaying."   After supplemental claim construction briefing and proceedings, however, Judge Brewster denied defendants' attempts to modify the claim construction, explicitly ruling that "the Court hereby retains the construction of the term 'concurrently displaying' as is set forth in the Court's Order on March 1, 2004."  (Ex. 4, 4/17/07 Claim Construction Order for the '356 Patent).

**III.     PROCEDURAL BACKGROUND**

The procedural history related to the '356 patent in this case is extensive.  Claim construction for this patent included significant briefing and two days of oral argument in September 2003. Discovery closed in February 2006, expert reports were submitted in March 2006, and voluminous summary judgment briefing was filed in early 2007.  This Court held lengthy summary judgment hearings on the issues of invalidity and infringement related to the '356 patent, and decided several

issues.  Supplemental claim construction proceedings occurred in March 2007.  Defendants filed motions in *limine* that were briefed and decided in April 2007.

Indeed, trial on the '356 patent was just days away from beginning on May 21, 2007 when defendants filed a last-minute motion to delay trial based on the Supreme Court's April 2007 decision in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1739, 1741 (2007), which had clarified the law related to obviousness.  This Court granted defendants' request to delay trial, and subsequently set a schedule for defendants to submit supplemental expert reports and discovery limited to the issue of obviousness.  As part of the supplemental schedule, defendants were permitted to file supplemental summary judgment motions on additional obviousness combinations.

## IV.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1373 (Fed. Cir. 2004) (quoting Fed. R. Civ. P. 56 (c)).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Where, as here, "the moving party bears the burden of proof at trial, it cannot obtain summary judgment unless it presents evidence so compelling that no rational jury would fail to award judgment for the moving party."  *United States v. Boyce*, 148 F. Supp. 2d 1069, 1080 (S.D. Cal. 2001), *aff'd*, 36 Fed. Appx. 612 (9th Cir. 2002).  Where the evidence presents a close question that could be resolved either way by a jury, summary judgment should be denied.  *See Mercedes-Benz of N. Am., Inc. v. Hartford Acc. & Indem. Co.*, 974 F.2d 1342 (9th Cir. 1992).

A summary judgment determination must also be guided by the appropriate burden of proof. If the Court determines that a reasonable jury applying the proper burden of proof — in this case clear-and-convincing evidence—could find for the non-movant, then there exists a genuine issue of material fact that precludes granting of summary judgment.  *See Anderson*, 475 U.S. at 255.

### B.    Obviousness

Because every patent is presumed valid, accused infringers face a "high burden of showing invalidity on summary judgment." *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).    "[A] moving party seeking to invalidate a patent at summary judgment must submit ***clear and convincing evidence*** of invalidity so that no reasonable jury could find otherwise." *Eli Lilly &Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (emphasis added).    If evidence is presented establishing a *prima facie* case of invalidity, the non-movant must come forward with evidence to support a finding of validity, but "the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Pfizer, Inc. v. Apotex, Inc.*,    480 F.3d 1348, 1360 (Fed. Cir.), *cert denied*, 128 S. Ct. 110 (2007).    A claimed invention can be found obvious only "if the differences between the [claims] and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a).    Obviousness is ultimately a question of law based on underlying determinations of fact.    *Forest Labs., Inc. v. Ivax Pharms., Inc*., 501 F.3d 1263, 1269 (Fed. Cir. 2007).

Courts have long recognized the need to "guard against slipping into use of hindsight" when considering whether an invention would have been obvious at the time of the invention.    *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 36 (1966) (internal quotations omitted).    To combat the tendency toward hindsight, *Graham* requires courts to focus on several underlying factual inquiries, including "four general types, all of which must be considered by the trier of fact:    (1) the scope and content of the prior art;    (2) the level of ordinary skill in the art;    (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Id.*    Earlier this year, the U.S. Supreme Court reaffirmed the primacy of those factors in determining whether a patent is invalid for obviousness.    *See KSR Int'l. Co. v. Teleflex Inc*., 127 S. Ct. 1727, 1734 (2007) (citing *Graham*, 383 U.S. at 17-18).    Indeed, the trier of fact must consider all four of the *Graham* factors when assessing obviousness, *Forest Labs.*, 501 F.3d at 1269.    Under *Graham*'s fourth factor, courts are to "look at any secondary considerations that would prove instructive," including

1    "identify[ing] a reason that would have prompted a person of ordinary skill in the relevant field to

2    combine elements in the way the claimed new invention does." *KSR*, 127 S. Ct. at 1739, 1741.[2]

3    "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements;

4    instead, there must be some articulated reasoning with some rational underpinning to support the

5    legal conclusion of obviousness." *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d 977, 988

6    (Fed. Cir. 2006)). Thus, "the burden falls on the patent challenger to show by clear and convincing

7    evidence that a person of ordinary skill in the art would have had reason to attempt to make the

8    composition or device, or carry out the claimed process, and would have had a reasonable

9    expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342,

10    1360 (Fed. Cir. 2007) (citing *KSR*, 127 S. Ct. at 1740). In light of these mandated factual inquiries,

11    "a district court properly may grant summary judgment on obviousness . . . only when the[se]

12    underlying factual inquiries present no lingering genuine issues." *Beckson Marine, Inc. v. NFM,*

13    *Inc.*, 292 F.3d 718, 723 (Fed. Cir. 2002).

14    In that regard, the Supreme Court has "acknowledged the importance of identifying 'a reason

15    that would have prompted a person of ordinary skill in the relevant field to combine the elements in

16    the way the claimed new invention does' in an obviousness determination." *Takeda*, 492 F.3d at

17    1356-57 (quoting *KSR*, 127 S. Ct. at 1731). Accordingly, "a patent composed of several elements is

18    not proved obvious merely by demonstrating that element was, independently, known in the prior

19    art." *KSR*, 127 S. Ct. at 1731. For example, "combining elements that work together 'in an

20    unexpected and fruitful manner' would not have been obvious." *PharmaStem*, 491 F.3d at 1360

21    (quoting *KSR*, 127 S. Ct. at 1740). Moreover, "when the prior art teaches away from combining

22
23
24
25
26
27

[2] Defendants misstate the proper legal standard for obviousness, mischaracterize the impact of the Supreme Court's *KSR* decision, and gloss over the heavy burden of proof they face on summary judgment. *KSR* did **not** render a sweeping change in the law of obviousness. Rather, *KSR* reaffirmed the *Graham* framework as the touchstone for an obviousness analysis. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007) (noting that *KSR* held that the *Graham* factors "still control an obviousness inquiry"); *Lucent Techs. Inc. v. Gateway, Inc.*, 509 F. Supp. 2d 912, 934 (S.D. Cal. 2007) ("*KSR* also reaffirmed familiar principles set out in *Graham*."). Also contrary to defendants' view, the Supreme Court acknowledged the continued relevance of the teaching, suggestion, motivation ("TSM") principle. *KSR*, 127 S. Ct. at 1741.

28

1   certain known elements, discovery of a successful means of combining them is more likely to be

2   nonobvious." *KSR*, 127 S. Ct at 1740.

3   **V.    ARGUMENT: SUMMARY**

4           Defendants have filed three separate supplemental motions for summary judgment alleging

5   that claims 19 and 21 of the '356 patent are obvious. Gateway's motion is based on a computer

6   system referred to as "the Foreign Exchange Front End" ("FXFE"). Significantly, however,

7   defendants have failed to present the FXFE system as evidence to support its claims—because it was

8   never reduced to practice or otherwise produced. Instead, defendants rely on (1) a general-purpose,

9   non-technical, magazine article that purports to describe a version of the FXFE system that was

10  never commercialized ("the Tyler Article"), and (2) the testimony of the system's developer (Mr.

11  Long). Microsoft's motion is based on financial software entitled "Your Money Manager." Dell's

12  motion is based on (1) the Tyler Article and (2) computer software entitled "Home Accountant." As

13  demonstrated below, each of these motions should be denied.

14  **VI.   ARGUMENT:   GATEWAY'S MOTION REGARDING THE FOREIGN**
    **EXCHANGE FRONT END ("FXFE") AND THE TYLER ARTICLE**

15          **A.    The Court Should Not Consider the FXFE System or the Tyler Article for**
                  **Purposes of Summary Judgment**

16                **1.    Gateway Is Attempting an End Run Around this Court's May**
                       **15, 2007 Order Striking These References**

17

18          Glaringly absent from defendants' motion is any mention that this Court has expressly

19  precluded defendants from relying on the Tyler Article and the FXFE system in this case. On the

20  eve of the originally scheduled trial, Gateway disclosed the Tyler Article (and the FXFE system it

21  purportedly describes) and moved for summary judgment, arguing that the references rendered the

22  '356 patent obvious. On May 15, 2007—after having decided to allow supplemental briefing on

23  obviousness in light of *KSR*—this Court struck the Tyler Article and the FXFE system from this

24  case, and denied as moot Gateway's motion for summary judgment that was based on FXFE. (Ex. 5,

25  May 15, 2007 Order Striking Tyler and FXFE). In doing so, the Court recognized that defendants

26  had a full and fair opportunity to raise these references earlier in this case—indeed, years ago—and

27  they should not be allowed to circumvent the Court's discovery Order and present new invalidity

28  theories on the eve of trial. *Finisar Corp. v. DirecTV Group, Inc.*, 424 F. Supp. 2d 896, 902-02

(E.D. Tex. 2006) ("A party simply can not wait until shortly before trial to prepare its [invalidity] case. Invalidity is an affirmative defense, **and the party which does not properly investigate applicable prior art early enough to timely meet disclosure requirements risks exclusion of that evidence**.") (emphasis added). In contravention of this Court's May 15, 2007 Order, Gateway has nevertheless again moved for summary judgment of obviousness based on the FXFE system and the Tyler Article. This Court's Order striking these references wholly precludes defendants from relying on the Tyler Article and the FXFE system purportedly described in that article, and Gateway's motion violates the Court's Order by again relying on these references.

### 2. Gateway's Arguments Based on § 102(b) and § 102(g) Are Improper and Violate this Court's Order Regarding the Scope of Supplemental Summary Judgment

As discussed above, the trial with respect to the '356 patent was days away from beginning when defendants filed a last-minute motion to delay trial by seeking additional *obviousness-based* discovery in light of the Supreme Court's decision in *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1739 (2007). The Supreme Court's decision in *KSR* is limited to the issue of *obviousness* under 35 U.S.C. § 103. This Court granted defendants' request, but expressly limited the scope of supplemental expert reports and summary judgment briefing to the issue of *obviousness*. The supplemental briefing was *not*, therefore, *carte blanche* for defendants to introduce all-new theories of *anticipation* on previously disclosed (and stricken) prior art references. Rather, the Court made it perfectly clear that the extraordinary decision to delay trial and allow supplemental briefing was due to the *KSR* decision and thus limited solely to the issue of *obviousness*. (Ex. 6, 5/11/07 Hr'g Tr. at 62:13-22; Ex. 7, 6/7/07 Scheduling Order re Supplemental Obviousness Discovery). Recognizing the limited scope of the Court's order, each party's supplemental report was limited to *obviousness*.

Despite those limitations, Gateway's motion now makes two entirely new invalidity arguments based, *not on obviousness* under 35 U.S.C. § 103, but rather on anticipation under 35 U.S.C. §§ 102(b) and 102(g). Gateway's new anticipation-based arguments are in no way impacted by or related to the *KSR* decision, and they are beyond the Court-ordered scope of this supplemental briefing. Defendants cannot raise new invalidity arguments at this stage, and the Court should not now entertain Gateway's new anticipation arguments. *Finisar Corp.*, 424 F. Supp. 2d at 901-02.

Indeed, the very fact that defendants present anticipation arguments further emphasizes Lucent's point above—that this Court should enforce its May 15, 2007 Order striking the FXFE system.  In other words, if defendants believe that the FXFE system is an ***anticipation*** reference, then it was relevant as such throughout the entire discovery period.  Gateway should have identified it years ago, not on the eve of trial.  *See Finisar*, 424 F. Supp. 2d at 901-02.

### B.    The FXFE System Does Not Anticipate the '356 Patent

As discussed above, this Court should not consider the FXFE system or the Tyler Article, nor should it entertain defendants' anticipation-based arguments.  To the extent it does, however, this Court should deny defendants' motion.  Anticipation under Section 102 requires "the presence in a single prior art disclosure of all elements of a claimed invention arranged as in that claim."  *Carella v. Starlight Archery Pro Line Co.*, 804 F.2d 135, 138 (Fed. Cir. 1986) (internal quotations omitted).  Defendants have not demonstrated by clear and convincing evidence that the FXFE system anticipated claims 19 or 21 of the '356 patent.[3]

### 1.    The FXFE System Is Not Prior Art Under Section 102 Because It Was Not Publicly Used

Defendants argue that there was a sufficient prior public use[4] of the FXFE system in the United States because Chemical Bank—the entity that developed the system in the United Kingdom—allegedly demonstrated an unfinished, incomplete, "beta test" and never-commercialized

---

[3]   We also note that summary judgment is inappropriate at this juncture because Lucent has been denied significant prior-art discovery.  *See Celotex v. Catrett*, 477 U.S. 317, 326 (1986) (recognizing that Rule 56(f) provides non-movants with protection from premature summary judgment motions).  Within the last few weeks, defendants identified all-new purported prior art witnesses—but they have yet to produce them for depositions.  Among the witnesses not yet produced for deposition is Mr. Tyler, the author of the Tyler Article discussed above.  Accordingly, defendants' motions should be denied. *Id.*

[4]   Gateway argues the FXFE system is prior art under section 102(b) and (g).  Section 102(b) requires public use of the invention in the United States.  Section102(g) requires that the invention was "made in this country by another inventor."  Because the FXFE system was exclusively developed in a foreign country, that showing would require a public use of the invention in the United States.  *See, e.g.*, *Holmwood v. Sugavanam*, 948 F.2d 1236, 1238 (Fed. Cir. 1991) (requiring reduction to practice ***in the United States*** for 102(g) (emphasis added)); *see also* Ex. 8, 12/10/2007 Long Dep. at 47:12-25.

prototype version of the system to an individual (Mr. Tyler) at its New York office.  Such a demonstration is insufficient to constitute a public use of the FXFE system—and this Court should determine that there has been no public use of the FXFE system in the United States.  *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1381 (Fed. Cir. 2004) (trade-show for sixty-nine customers and reporters insufficient to show public use despite the fact that the invitees did not sign confidentiality agreements); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1265-66 (Fed. Cir. 1986) (finding insufficient evidence for public use where inventor maintained control of the device and confined the device to his office despite the absence of a confidentiality agreement).

As an initial matter, evidence regarding prior public use must be corroborated in order to invalidate.  *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed. Cir. 2002); *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1366-68 (Fed. Cir. 1999).  Gateway cannot rely on the uncorroborated testimony of Robert Long, because testimony from an interested witness, paid by defendants, recalling long past events is insufficient to establish public use.  *See Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998); *see also Trading Tech. Intern. Inc. v. eSpeed, Inc.*, 513 F. Supp. 2d 969, 977 (N.D. Ill. 2007) (insufficient corroboration where witness is "represented by defendants' counsel, and/or [is] simply being paid outright by defendants").  Indeed, a witness who testifies to antedating an invention with his own activities is always personally interested, and the need for corroboration takes on "special force" when the witness may be biased in favor of the interested party.  *Finnigan*, 180 F.3d at 1367-69.  Here, significant issues exist regarding Mr. Long's bias and credibility:  (1) Mr. Long has been hired by the defendants, (2) defendants have paid for his testimony, (3) he is represented by counsel for defendants, (4) his declaration was written by counsel for defendants, and (5) he has not seen the FXFE system in over twenty years. (Ex. 8, 12/10/07 Long Dep. at 63:20-65:6, 83:1-11, 92:9-93:4).

Mr. Long's uncorroborated testimony is especially suspect here, where defendants have failed to produce the FXFE system or any technical documentation regarding the system.  *Finnigan*, 180 F.3d at 1366 ("[m]ere testimony concerning invalidating activities is received with further skepticism because such activities are normally documented by tangible evidence such as devices . . ."); *see also, e.g., TypeRight v. Microsoft*, 374 F.3d 1151, 1158 (Fed. Cir. 2004) (reversing

summary judgment based on testimony of witness compensated by Microsoft recalling events from 18 years prior).  Mr. Long is not a computer code programmer, and was not involved with programming any of the code involved in the FXFE system.  (Ex. 8, 12/10/07 Long Dep. at 17:8-10). Indeed, Mr. Long's testimony is of especially dubious value, as he admits that his declaration was written almost entirely by defendants' attorneys, and he had no understanding that many of the terms used in his declaration had been construed by this Court.  (*Id.* at 92:18-19, 98:19-99:1).

Second, the demonstration was not open to the public.  Rather, it was a private meeting, where Mr. Tyler was invited to inspect an unfinished demonstration version of the system.  (Ex. 8, 12/10/07 Long Dep. at 59:13-16).  Such a private demonstration cannot constitute public use.  *See, e.g., Bernhardt*, 386 F.3d at 1381 (no public use where exhibitors exercised control over invitees, despite lack of confidentiality agreement).

Third, the prototype FXFE system was demonstrated to Mr. Tyler under the supervision of Chemical Bank employees.  (Ex. 8, 12/10/07 Long Dep. at 55:6-56:12).  Significantly, no evidence exists that Mr. Tyler ever ***used*** the demonstration version of the system, a critical requirement for determining public *use*.  *Id*. at 57:8-9; *Moleculon*, 793 F.2d 1261, 1265-66; *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007) (no public use where computer device was only "visually disclosed" and "never connected to be used in the normal course of business"); *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1306 (Fed. Cir. 2002) (no public use where, although customers received samples, there was no evidence of actual use).

Fourth, the demonstration involved only an "experimental" and "beta test" version of the system, emphasizing the developmental nature of the device.  (Ex 9,  GW-LT422218, 422220 at 146, 148).  Indeed, Mr. Long, the system developer, admits that the version of the system shown to Mr. Tyler was just a "prototype" and it was incomplete (not actively running on the network).  (Ex. 8, 12/10/07 Long Dep. at 55:24-56:1); *Motionless Keyboard*, 486 F.3d at 1385 (no public use where computer device was "never connected to be used in the normal course of business"); *Am. Seating Co. v. USSC Group, Inc.*, 2005 WL 1224603, *5-6 (W.D. Mich. May 23, 2005) (demonstration of single prototype is not public use).  And the demonstration version shown to Mr. Tyler was never produced nor commercialized.  (Long Dep. at 59:5-12).

1    Finally, defendants cannot rely on the Tyler Article to corroborate Mr. Long's testimony or

2  otherwise support public use.  To the contrary, a magazine article about an incomplete, prototype,

3  beta-test, device still under development is evidence that the demonstration was ***not*** a public use.  *Cf.*

4  *Honeywell Int'l Inc. v. Universal Avionics Sys.*, 488 F.3d 982, 998 (Fed. Cir. 2007) (considering a

5  reporter's article describing a system as in its "development phase" as evidence contrary to "public

6  use").  Indeed, the Tyler Article itself recognizes that the system it described was an "experimental"

7  "beta test" version.  (Ex 9, GW-LT422218, 422220 at 146, 148).  Accordingly, defendants have not

8  shown by clear and convincing evidence that there was public use of the FXFE system.

### 2.    The FXFE System and Tyler Article Are Not Enabling

10    Gateway does not even attempt to argue that one of ordinary skill would have been enabled

11  to make or use the FXFE System based on the demonstration to Mr. Tyler or the Tyler Article.

12  *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 468 F.3d 1366, 1381-82 (Fed. Cir. 2006) ("In order to be

13  anticipating, a prior art reference must be enabling so that the claimed subject matter may be made

14  or used by one skilled in the field.").  The Tyler Article is not a technical document, instruction

15  manual, or any other authoritative disclosure.  (Ex. 9, GW-LT 422218-422222).  It does not teach or

16  otherwise enable one of ordinary skill how to make or use the FXFE System, and cannot serve as an

17  enabling reference.  *See Impax*, 468 F.3d at 1381-82.

### 3.    The FXFE System Does Not Meet Each and Every Limitation of the '356 Patent Claims

19    In any case, Gateway's motion should be denied because defendants have failed to present

20  clear and convincing evidence that the FXFE system practiced each and every limitation of claim 19

21  or 21 of the '356 patent.  At the outset, it bears repeating that defendants have failed to present ***any***

22  physical evidence regarding the FXFE system.  They have not offered any working computer

23  system, machine, prototype, or model of the FXFE system.  Indeed, defendants have failed to offer

24  ***any*** technical documentation, specifications, source code, manual, or any other source of legitimate

25  and authentic description regarding the FXFE system.  (Ex. 22, 12/14/07 Tognazzini Decl. ¶ 54).

26  Defendants' assertions are further called into doubt, as the Tyler Article and Mr. Long himself

27  acknowledge that the FXFE project was constantly changing, and the demonstration version was a

28

1  prototype still under development.  (Ex. 8, 12/10/07 Long Dep. at 29:20-30:4, 34:20-36:1, 55:24-

2  56:12, 56:19-57:20, 59:3-59:12).

3        The **only** evidence presented by defendants regarding the FXFE system is (1) the Tyler

4  Article—a short general-purpose magazine article that does not purport to describe the technical

5  details of the system (and in fact does not even refer to the system as "FXFE"), and (2) the

6  uncorroborated testimony of Mr. Long, a witness retained and paid by defendants, and represented

7  by counsel for defendants.  With respect to the latter, as discussed above, a witness' testimony about

8  his own antedating activity is insufficient to prove prior use.  *Finnigan*, 180 F.3d at 1366-68.

9  Corroborating evidence must unambiguously support all elements of the patent-in-suit.  *Id.* at 1369.

10  Thus, to the extent Mr. Long's testimony about the specific features of the FXFE system is not

11  directly and unambiguously supported by the Tyler Article, Mr. Long's testimony must be rejected.

12  Even accepting Mr. Long's testimony, however, Gateway's analysis falls far short of meeting its

13  burden of presenting clear and convincing evidence that the FXFE system disclosed each and every

14  limitation of the asserted claims, either expressly or inherently.  *See, e.g., Glaxo Group Ltd. v.*

15  *Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004).   Accordingly, the FXFE system cannot

16  anticipate the '356 patent as a matter of law.

17            a.      **FXFE Does Not Indicate a Particular Field Into Which**
                     **Information Is to Be Inserted**

18        Claims 19 and 21 of the '356 patent requires the step of "indicating a particular one of said

19  information fields into which information is to be inserted."  (Gateway Br. at 10).  As an initial

20  matter, defendants admit that the Tyler Article does not disclose this limitation.   (*Id.* at 15).

21  Defendants nevertheless contend that the FXFE system "provided a visual indication on the screen

22  of the selected field."  (*Id.* at 10).  Gateway's only basis for this naked assertion is the conclusory

23  statement of its hired witness, Mr. Long.   (*Id.*)   However, Mr. Long's conclusory statement is

24  uncorroborated by any technical documentary evidence.  Moreover, Mr. Long's statement concerns a

25  system that he has neither seen nor worked with in nearly twenty years.  (Ex. 8, 12/10/07 Long Dep.

26  at 83:3-11).  Where these facts are credibly disputed, and where Mr. Long's statements are called

27  into question., summary judgment is not appropriate. *See, e.g., TypeRight Keyboard*, 374 F.3d at

28

1158.  Nor would it have been obvious to add such an indicator.  As recognized by Mr. Tognazzini, it appeared from the Tyler Article that there was "no need for any highlighting of any field," because the Tyler Article "does not suggest that the system controlled movement between active fields."  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 53; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 19).

        **b.**      **Defendants Fail to Present Evidence that the FXFE System Used Any Predefined Tools Associated with Any Information Fields**

Gateway also fails to present any physical, technical, or credible documentary evidence that the FXFE system used any "predefined tools" or "group of predefined tools" that are "associated with" information fields as required by claims 19 and 21.  As this Court recognized when it denied defendants' previous motion for summary judgment of invalidity on the '356 patent, these limitations are critical components of the '356 patent.  This Court's claim construction requires that such "predefined tool" is "associated with" an information entry field, and that the tool be "specified by the system" for filling in the information called for by that field.  (Ex. 3, '356 Patent Am. Claim Const. Order).  In rejecting defendants' previous summary judgment motion on this point, this Court recognized that where, as in the case of the FXFE system, (1) an application "does not predefine the tool," (2) an application "does not associate the tool with a particular field, or (3) where a tool "falls outside of the form entry system," — such a system may not meet this claim limitation, or at a minimum, supports the existence of a disputed fact for trial. (Ex. 11, 5/15/07 Order on Summ. J. of Invalidity of '356 Patent at 5).

Here, defendants have presented no physical, technical, or credible documentary evidence regarding whether the FXFE on-screen keyboard is predefined by any form-entry system, or whether it is a separate operating system tool.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 56) ("The Tyler Article certainly does not disclose a system that uses any predefined tool associated with an information field that is specified by the system as an appropriate tool for filling in the information called for by such information field.").  And Mr. Long's testimony on this point suggests that the FXFE on-screen keyboard was an operating system-level tool that was not predefined by the form entry system for specific information fields:

Q.      [W]ith respecet to the alpha-pad object, was that same object used across various circumstances that might require the alpha-pad object?

A.      Absolutely, yes.

(Ex. 8, 12/10/07 Long Dep. at 82:17-20; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 58).  At best, Mr. Long's testimony is ambiguous on this point.  And in any case, as discussed above, Mr. Long's uncorroborated testimony is insufficient for purposes of summary judgment.  *See, e.g., TypeRight*, 374 F.3d at 1158.  Nor would it have been obvious to add such predefined tools because there was no "problem with the system disclosed in Tyler to be solved by adding such predefined tools."  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 57; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 22-25).

Likewise, defendants have presented no physical, technical, or credible documentary evidence regarding whether the FXFE system used any tool that was "associated with" any information fields of a form-entry system, or "specified by the system as an appropriate tool for filling in the information called for by that field," as required by claims 19 and 21, as construed by the Court.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 56-58).  The "list of brokers" and the "QWERTY layout" pointed to by Gateway are at best ambiguous.  (Gateway Br. at 10).  The Tyler Article does not disclose whether the "list of brokers" or the "QWERTY layout" of the purported FXFE system are predefined tools that are "associated with" any form-entry information field, or "specified by the system as an appropriate tool for filling in the information called for by that field," as required by claims 19 and 21.  *Id.*  Further, the Tyler Article does not disclose whether the FXFE system is in fact a form-entry system, or in any way calls upon or associates the "list of brokers" or the "QWERTY layout" with any information field.  *Id.*  And it does not disclose whether the "list of brokers" is a "menu of alternatives" tool as required by claims 19 and 21.  *Id.*  Again, Mr. Long fails to offer more than conclusory statements on these points, or is at best ambiguous, and his testimony is insufficient to establish, clearly and convincingly, summary judgment of invalidity.

Nor would it have been obvious to add such predefined tools because there was no "problem with the system disclosed in Tyler to be solved by adding such composition or menu of alternatives tools that are associated with specific information fields."  (Ex.10, 10/12/07 Tognazzini Rep. ¶ 59; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 24-25).

### c.    Defendants Fail to Present Evidence that the FXFE System Has a Graphical Composition Tool

The invention of the '356 patent used **graphical** displays, menus, and tools—such as the graphical window displays used in Microsoft Windows operating systems and applications today. Accordingly, the Court's claim construction requires that a "tool adapted to allow said user to compose said information" means "a **graphical** keyboard tool or a **graphical** number keypad tool." (Ex. 3, '356 Patent Am. Claim Const. Order) (emphasis added).  However, defendants have failed to produce clear and convincing evidence that the on-screen keypad of the FXFE system is a **graphical** keyboard tool.  Rather, the evidence suggests that the characters and lines drawn on the FXFE screen are text-based or character-driven—not graphical or bitmapped—representations:

> Q.    Do you recall if the system was either a bitmap display or a character-generated system?
>
> A.    No, I don't recall …
>
> * * *
>
> Q.    Do you have an understanding of whether it would have been possible to draw a box, using character-generated?
>
> A.    I don't know.
>
> Q.    But sitting here today, you aren't sure that [FXFE] was a bitmap system?
>
> A.    Sitting here now today, I can't guarantee it was not a bitmap system.

(Ex. 8, 12/10/07 Long Dep. at 37:21-38:12).  Again, there is insufficient evidence to establish, clearly and convincingly, that the FXFE system used a **graphical** composition tool.  (Ex. 22, 12/14/07 Tognazzini Decl. ¶ 59).

### d.    Defendants Fail to Present Evidence that the FXFE System Used Any Tool that Is Concurrently Displayed as by a Window Overlaying the Form

In describing the operation of the FXFE system, defendants concede that none of the tools, including the on-screen keyboard shown in the Tyler Article, are "concurrently displayed" as by a "window overlaying the form," as required by claims 19 and 21 and this Court's claim construction. (Gateway Br. at 10-11).  Defendants concede that, to bring up a tool, the user hits a "cell" on the **right** side of the screen, and then the tools appears on the **left** side.  (*Id.* at 10, 16) .  The Tyler Article does not disclose any "overlaying" windows, but rather depicts an earlier side-by-side system of tiling display.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 54-55).  Indeed, Mr. Long admits that the

FXFE system did **not** use overlaying windows, but rather used an older system of "tiling" displays. (Ex. 8, 12/10/07 Long Dep. at 80:15-81:1; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 57).

Instead, defendants argue that the Court changed its claim construction in a footnote of its Order denying defendants' motion for summary judgment of invalidity. (Gateway Br. at 11). Not true. Earlier this year the Court again re-affirmed its longstanding construction of "concurrently displaying" as meaning "displaying at the same time, as by a window overlaying the form." (Ex. 4, 4/17/07 Order on Supplemental Claim Construction) ("the Court hereby retains the construction of 'concurrently displaying' as it is set forth in the Court's Order on March 1, 2004"). The Court was crystal clear at the *Markman* hearing that this means having an **overlay** window: "***Concurrently displaying means displaying the overlay*** on a display of the form. ***Concurrently displaying means displaying the overlay*** on a display of the form." (Ex. 12, 9/23/03 Markman Hr'g Tr. at 45:11-14) (emphasis added). This Court's construction and understanding that "concurrently displaying" means "displaying at the same time, as by a window overlaying the form" is supported by the '356 patent which discloses ***overlaying windowing*** technology—not the older ***tiling***-based display technology used in the FXFE system: "the tool … is displayed as an overlay (window)." (Ex. 1, '356 Patent abstract, 1:35, 3:51); (Ex. 13, 5/12/06 Tognazzini Rep. ¶ 141) (recognizing that the "tiling" method of displaying objects is an older "side-by-side" system different from overlaid windows); (Ex. 8, 12/10/07 Long Dep. at 80:15-81:1) (stating that the FXFE system did not use windows, but rather used "tiling" object displays).[5]

Finally, even if the Court intended to change its longstanding claim construction on this point to allow "concurrently displaying" to encompass tiling-based displays, there certainly exists a triable fact as to whether the FXFE system used any tool that was "concurrently display[ed]." As discussed,

---

[5] The Court's footnote from its May 15, 2007 summary judgment order is entirely consistent with, and does not change, its construction requiring overlaying windows technology. It is certainly possible to use overlaying windowing technology, yet place windows in a "side-by-side" manner as recognized in the Court's footnote. What the Court's construction does not encompass, however, is older "tiling" display technology that does not allow for displaying overlaid windows at all. (Ex. 12, 9/23/03 Markman Hr'g Tr. at 45:11-14) ("Concurrently displaying means displaying the overlay on a display of the form.").

the Tyler Article cannot unambiguously support this limitation and, therefore, Mr. Long's biased

testimony cannot support summary judgment.  Nor would it have been obvious to add the notion of

overlaid windows to the FXFE system.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 55; Ex. 22, 12/14/07

Tognazzini Decl. ¶¶ 20-21) ("I know of no reason to combine overlaying windows . . . nor was there

any problem . . . to be solved by adding overlaying windows.").

> **e.    Defendants Fail to Present Evidence That The FXFE
>         System Tools Insert Information into a Form Entry Field**

Defendants again rely on the Tyler Article and Mr. Long's conclusory statements to support

the assertion that the FXFE system tools would insert information into an information field.

(Gateway Br. at 12).  But, the Tyler Article does not include any description to support this

functionality.  (Ex. 9, GW-LT 422218-422222).  All the Tyler Article discloses is that "information

is entered into the system," but there is no disclosure of *how* the information is entered, or *whether*

information is actually transmitted into a form entry information field.  Defendants present no

evidence to support that the FXFE system actually used "information fields" or a form-entry system

within the meaning of the '356 patent.  Indeed, Mr. Long admits that the FXFE system did not use a

relational database.  (Ex. 8, 12/10/07 Long Dep. at 25:12-24).  Nor did the database "fields" of the

FXFE system line-up with the "labels" displayed on the FXFE screen.  *Id.* at 52:7-11.  Accordingly,

there is no evidence that the FXFE system was a form entry system having information fields as

required by the '356 patent claims, or how information is entered, or whether information is actually

transmitted into a form entry field.  Again, defendants have presented no physical or technical

evidence on these points, but rely solely on Mr. Long's uncorroborated statements.

Mr. Long's conclusory statements add nothing on this point—especially as Mr. Long admits

that his declaration *was not written by him*, but by defendants' attorneys, and he had no

understanding that many of the terms used in his affidavit had been construed by this Court.  (Ex. 8,

12/10/07 Long Dep. at 92:18-19, 98:19-99:1).  And as discussed above, Mr. Long is not a computer

code programmer, and he was not involved with programming any of the code involved in the FXFE

system.  (*Id.* at 17:8-10).  Moreover, the Tyler Article says not a word about whether the FXFE

system has any such functionality, namely a tool that "insert[s] in said one field information that is

derived as a result of said user operating said displayed tool," as required by claims 19 and 21.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 60; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 26) ("[T]he Tyler Article does not disclose whether numeric data entered into the numeric keypad would have been entered into an indicated field.").  Defendants have not, and cannot demonstrate by clear and convincing evidence that the alleged tools in the FXFE system insert information into an information field.

### C.    The FXFE System Does Not Render Obvious the '356 Patent Claims

#### 1.    FXFE is Not Prior Art Under Section 103

As discussed above in Section C.1, the FXFE system is not prior art under section 102—as a matter of law, there was no public use of the FXFE system in the United States.  Accordingly, the FXFE system cannot serve as a prior art obviousness reference under section 103.  *See, e.g., In re Wertheim,* 646 F.2d 527, 532 (CCPA 1981) (prior art for purposes of 35 U.S.C. § 103 is generally established by prior art under 35 U.S.C. § 102); *Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003) (same).  For this reason alone, defendants motion must fail.

#### 2.    Gateway Fails to Offer Any Physical, Technical, or Credible Documentary Evidence Regarding the FXFE System

Defendants are asking this Court to invalidate a valid United States patent based on a system that has never been produced or inspected by anyone in this case.  Defendants have produced no technical, physical, or credible documentary evidence.  The only basis of defendants' motion is a general-purpose magazine article, and the conclusory, biased, and uncorroborated testimony of defendants' paid witness.   Summary judgment of obviousness on such a basis is entirely inappropriate.  *See, e.g., Woodland Trust,* 148 F.3d at 1369.

The FXFE system was developed entirely in the United Kingdom.  The only U.S. activity of the FXFE system was the private demonstration of a "beta test," prototype, and demonstration version of the FXFE system—a version which was never produced or commercialized because its developers were unable to get it to work fast enough or in a cost-effective manner.  (Ex. 8, 12/10/07 Long Dep. at 35:19-36:1) ("The system ran quite slow with the touch screen capabilities.  That is true.").  Accordingly, the FXFE system cannot render the '356 patent obvious.

### 3.    Summary Judgment of Obviousness Is Inappropriate Where There Are Lingering Factual Issues

Before invalidating a patent based on obviousness, a district court must conduct a *Graham* analysis and make particularized findings, including examining the very factual-based considerations of obviousness pursuant to *Graham v. John Deere Co.*, 383 U.S. 1 (1966).  Accordingly, the fact-intensive obviousness arguments are typically not appropriate for summary judgment.  *See, e.g., Philips Elecs. N. Am. Corp. v. Contec Corp.*, 177 Fed. Appx. 981, 985 (Fed. Cir. 2006) (recognizing that "*[s]ummary judgment on obviousness was also inappropriate*" where defendants failed to conduct a *Graham* factor obviousness analysis, and there remained issues of fact) (emphasis added).

### 4.    Gateway Fails to Make the Required Particularized Showing of Obviousness Under the *Graham* Factors

As discussed above with respect to each missing claim element, it would not have been obvious to add the missing elements to the FXFE system.  The purported FXFE system was very different from the inventions of the '356 patent, and would not have rendered the '356 patent obvious based on any combination.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 49-64).

Here, defendants have introduced nothing more than conclusory statements regarding a *Graham* obviousness analysis, and have provided no particularized discussion regarding (1) the scope and content of the prior art, (2) the differences between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) secondary considerations including commercial success, long felt but unresolved needs, and failures of others to make the invention.  *Graham*, 383 U.S. at 17-18.  And after analyzing the FXFE system as purportedly described by the Tyler Article, Lucent's expert opines that it does not render claims 19 or 21 obvious.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 49-65; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 15-31, 51-62).

Evidence of secondary considerations must also be considered prior to reaching a conclusion.  *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1390-91 (Fed. Cir. 1988) (reversing district court's holding of nonobviousness). "Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record."  *Id.*  Indeed, Lucent's expert reports examined various secondary, objective indicia of non-obviousness regarding the '356 patent, and put forth objective indicia, based on first-hand knowledge, that the '356 patent is ***not*** obvious.

(Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 194-200; Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 109-114; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 45-50).

- Skepticism of Others: "Inventions like the '356 patent with it's pop-up calendar were unthinkable, let alone obvious because of the lag that would have occurred while the data was painstakingly transferred from the hard disk to memory and massaged into a useful form before finally being presented. In that time, a user could easily glance at a paper desk calendar and then manually insert the information." (Ex. 13, 5/12/06 Tognazzini Rep. ¶ 196).

- Long-felt Need: "[T]hose of us working in the art were interested only in those improvements that could be implemented successfully in the short term. Developers were, overwhelmingly, interested in using those tools that we at Apple were supplying, both because it made their development cycles shorter and because they faced their own memory and performance limitations." (*Id.* ¶ 197)

- Failure of Others, etc.: "Having failed numerous times in the past and knowing the shortcomings of the technology ... (*Id.* ¶ 197). We all knew there was a problem—people were clicking the mouse too often and 'traveling' too far to assemble the information needed—but we didn't know what to do about it within the tight confines of the hardware with which we had to work. Those in the art were trying but failing to make the user experience more efficient. (*Id.* ¶ 199). The '356 inventors took a clever approach to solve this problem an[d] overcome all failures of others . . ." (*Id.* ¶ 200).

Each of these examples of secondary indicia of non-obviousness demonstrates that relevant record evidence exists to rebut any charge of obviousness. *See, e.g., Philips*, 177 Fed. Appx. at 985.

Indeed, the failed development of the FXFE system confirms that the '356 patent is ***not*** obvious:

> A. The system ran quite slow with the touch screen capabilities. That is true.
>
> * * *
>
> Q. The demonstration you gave to Mr. Tyler, that was before you decided not to proceed with the touch-screen version, is that correct?
> A. That's right.
>
> * * *
>
> Q. And is it fair to say that the touch-screen version never went live?
> A. The touch screen version never went into production.
>
> * * *
>
> Q. Did it ever become a commercial product?
> A. No, it did not.
>
> * * *
>
> A. We did not go into production with the touch screen version.

(Ex. 8, 12/10/07 Long Dep. at 33:3-5, 33:15-16, 35:19-36:1, 57:14-17, 59:3-6).

### 5.    Defendants Engage In Impermissible Hindsight

Because many inventions may seem obvious in hindsight, an accused infringer may not "pick and choose among the individual elements of assorted prior art references to recreate the claimed invention" and thereby invalidate a patent claim. *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1576 (Fed. Cir. 1991) (internal quotations omitted). Moreover, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *PharmaStem*, 491 F.3d at 1360 (citing *KSR*, 127 S. Ct. at 1740). For that reason, the Supreme Court's *KSR* decision acknowledged that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine elements in the way the claimed new invention does." *KSR*, 127 S. Ct. at 1741. Defendants simply have not, and cannot demonstrate, that there was any reason to add the missing elements to the FXFE system (discussed above). Accordingly, defendants have not shown, clearly and convincingly, that claims 19 and 21 are obvious in light of the FXFE System.[6]

### D.    The Tyler Article Does Not Otherwise Invalidate the '356 Patent Claims

As discussed above, defendants rely on the Tyler Article merely to describe the FXFE system. Accordingly, for the same reasons discussed above with respect to the FXFE system, the Tyler Article does not invalidate claims 19 and 21 of the '356 patent.

## VII.    ARGUMENT:    MICROSOFT'S MOTION REGARDING "YOUR MONEY MANAGER"

Microsoft's motion is based on a piece of financial software entitled "Your Money Manager" ("YMM") that appears to have been available in 1985. Microsoft's argument, however, mischaracterizes the nature and operation of the YMM software, and completely disregards a critical

---

[6]    Claim 21 depends from claim 19, and is not obvious for the same reasons discussed above. Further, claim 21 requires the use of a "bit-mapped-graphics field" which is a "field into which a user is to enter information by writing on a touch sensitive screen using a stylus." (Ex. 3, '356 Patent Am. Claim Const. Order). FXFE does not disclose this, and there would have been no reason to add this to the FXFE system. (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 62-65; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 28-31).

claim limitation of the '356 patent.  The record demonstrates that the YMM software does not render claim 19 or 21 of the '356 patent obvious, and at a minimum presents factual disputes suitable for trial.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 39-48; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 6-14).

### A.    The YMM Software and the MS DOS Operating System

YMM was a personal finance program based on large-scale professional finance programs. Defendants' motion relies on an IBM PC version of YMM that was designed to work under the MS DOS operating system.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 39).  The MS DOS operating system of the mid-1980s was very different from the common graphical user interfaces of today—such as Windows.  At the time of the invention, applications running under MS DOS were generally text-based, and assumed an operating environment with no pointing device or touch entry.  (*Id.*)  Such a system would have assumed an MS DOS operating system with no pointing device or touch entry, and would have assumed that any menus or accessories may only be invoked with keyboard function keys dedicated to each menu or accessory.  *Id.*  IBM PC computer users of the time may recall the standard MS DOS screen with the "C:\"  prompt:



### B.    The Invention of the '356 Patent Was Based on Graphical User Interface—Not Text Based—and Requires "Pointing" to "Display Keys"

As discussed above, the invention of the '356 patent used *graphical* displays and menus—like the graphical window displays used in Microsoft Windows operating systems and applications today.  Another important part of the invention of the '356 patent was that a user could (1) "point" to fields to call up associated predefined tools, and (2) "point" to "display keys" on the tools that cause the selection to be entered into the appropriate field.  (*Infra* Section II.A; Ex. 1, '356 Patent cols. 3-7).  Accordingly, as discussed above, the Court's claim construction requires that a "tool adapted to allow said user to compose said information" means "a *graphical* keyboard tool or a *graphical*

number keypad tool, which allows the user to compose information **by pointing to the display keys** of that tool." (Ex. 3, '356 Patent Am. Claim Const. Order) (emphasis added).

**C.    The YMM Software Does Not Render Obvious the '356 Patent Claims**

As discussed above, claims 19 and 21 of the '356 patent require a "graphical" based system which allows the user to select and compose information by "pointing," such as with a mouse or touch-screen. (Ex. 3, '356 Patent Am. Claim Const. Order). Defendants admit that the YMM software did not use a mouse or touchscreen to allow users to "point" to selections on the screen. (Microsoft Br. at 9-10). It could not, because YMM was designed under the MS DOS operating system with a text-based interface. (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 39-44). The MS DOS text-based interface of the YMM software can be seen clearly below from defendants' screen-shots:



Thus, defendants are wrong in suggesting that the on-screen calculator in YMM is a "composition tool" within the meaning of claims 19 and 21. It cannot be, because it (1) does not use "display keys", (2) does not permit a user to compose information by "pointing" to "display keys," and (3) is text-based, not "graphical" as required by the Court's claim construction. (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 40; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 6-7).

**1.    YMM Does Not Have "Display Keys" or "Graphical" Tools**

Claims 19 and 21 require that there be "a **graphical** keyboard tool or a **graphical** number keypad tool, which allows the user to compose information by pointing to the **display keys** of that tool." (Ex. 3, '356 Patent Am. Claim Const. Order) (emphasis added). However, YMM uses neither "display keys" nor "graphical tools." Lucent's expert makes this point clear:

The on-screen calculator of YMM is not a tool within the meaning of the Court's construction; it does not permit a user to compose information by pointing to display keys. Rather, the on-screen calculator . . . is merely a visual guide to the user of a reconfiguration of the physical keyboard. For example, the on-screen calculator visually indicates numbers that are available . . . via the physical keyboard using certain function keys. This visual representation is presented only as an aid for the user in using the physical keyboard. ***The on-screen calculator does not have 'display keys,' nor anything by which a user could 'point' to 'display keys.'***

(Ex. 10, 10/12/07 Tognazzini Rep. ¶ 40) (emphasis added). As shown above, the YMM on-screen calculator has no "display keys." Instead, the user must push keys on the physical keyboard, such as the "F1" function key to "CLR" or clear the calculator entry. *Id.*

Further, the on-screen calculator is not a "***graphical*** number keypad tool" as required by the Court's claim construction. (Ex. 3, '356 Patent Am. Claim Const. Order) (emphasis added). Rather, as Mr. Tognazzini makes clear, the YMM calculator is a character-generated or "***text-driven***" display, drawn by text characters, not a ***graphical*** tool:

> Q: [T]he on-screen calculator looks like sort of a graphical representation of what a physical calculator looks like. Do you agree with that?
>
> A: ***I would disagree that it's a graphical representation. This is a text-driven display. It's a text representation.***

(Ex. 14, 11/20/07 Tognazzini Dep. at 105:18-106:2) (emphasis added). Indeed, defendants' expert Mr. Buscaino agrees that YMM does not operate in a "bit-mapped graphics" mode, but rather in a character-generated or "text-based" mode where "information on the screen is represented by characters" not bit-mapped graphics. (Ex. 15, 11/7/07 Buscaino Dep. at 108:3-18).

### 2. Pushing Physical Keys on a Physical Keyboard is Not "Pointing to the Display Keys" of a "Graphical" Tool

Claims 19 and 21 require that a user "compose information by ***pointing to the display keys*** of that tool." (Ex. 3, '356 Patent Am. Claim Const. Order) (emphasis added). In an attempt to put the square pegged-YMM into the round-hole of the '356 claims, defendants contend that pushing physical keys on a physical keyboard is the same as "pointing to the display keys" of a "graphical number keypad tool." The invention of the '356 patent was directed at the use of "more desirable" on-screen graphical tools that ***avoided*** "using the computer keyboard." (Ex. 1, '356 Patent col. 1:16-36). YMM simply does not use "graphical" tools with "display keys." (Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 7-9). The absurdity of defendants' argument is further highlighted by their claim that

pushing a physical keyboard key is the same as "pointing" to a graphical "display key."  This is wrong.  The YMM software admittedly does not use any well-understood "pointing" device such as a mouse or touchscreen—and there is no way to "point" to a "display key."

> I think [Mr. Buscaino's] explanation of a pointing device was, was completely 100 percent wrong . . . I had no idea that Mr. Buscaino would completely redefine 'pointing device' to mean something entirely different from the recognized standard of what a 'pointing device' is.
>
> * * *
>
> [P]ointing devices have been recognized as a separate class from keyboards since at least 1963.

(Ex. 14, 11/20/07 Tognazzini Dep. at 17:13-15; 18:1-5, 12-14).[7]  Because pushing keys on a keyboard is vastly different from "pointing" to a graphical "display kay" with a mouse or other "pointing device," the YMM software does not disclose any composition tool within the meaning of the patent claims.  Thus, at a minimum, the questions of (1) whether the text-based on-screen calculator could be considered a "graphical" tool, (2) whether it has "display keys," and (3) whether pressing a key on a keyboard constitutes "pointing" to a graphical "display key" raise issues of fact.

### 3. It Would Not Have Been Obvious to Add "Graphical" Tools With "Display Keys" to the YMM Program

There was simply no reason to modify YMM to use "graphical" tools used by "pointing to the display keys" of such tools.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 41-42).  YMM was an entirely keyboard-driven application, designed to work on the keyboard-based MS DOS operating system, and designed to work using a text-based display.  *Id.*  The user manual for the YMM system makes clear that the system was designed to be operated only with a keyboard.  (Ex. 16, MSLT_1233963-65).  Indeed, defendants' own expert admits that the YMM software did not work with a mouse, and he was unable to make it work with a mouse:

> Q:    [W]ere you able to use the mouse to point to items while running the YMM program?

---

[7]  Defendants' own witness for the FXFE system admits that "pointing" is vastly different than using keys on a keyboard.  (Ex. 8, 12/10/07 Long Dep. at 95:19-96:16) (recognizing that the "point" and "touch" version of the FXFE system was entirely different than the keyboard driven version).

1    A:    [I]f your question is specific to when the program was operating was I able to use the mouse, ***no, I was not able to use the mouse.***

2    (Ex. 15, 11/7/07 Buscaino Dep. at 106:18-23) (emphasis added).  Mr. Buscaino's observations were

3    consistent with the opinions of Lucent's expert Mr. Tognazzini—that it would not have been

4    obvious, at the time of the invention, to implement a mouse with the YMM software.  (Ex. 10,

5    10/12/07 Tognazzini Rep. ¶¶ 41-42; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 8-11).

6    Nor would it have been obvious to implement "display keys," "graphical" tools, or a mouse

7    with the MS DOS based YMM software.  Indeed, at the time, the use of MS DOS based software

8    ***taught away*** from using a mouse or pointing device.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 41).  MS

9    DOS based programs at the time, such as YMM, were generally presumed to be text-driven, and it

10   was generally presumed that such software would not be used with a mouse or other pointing device.

11   *Id.*  YMM was optimized for the keyboard, and was never designed to work with a mouse.  *Id.*  In

12   order to use a mouse with the YMM software, the software would have needed to be modified

13   significantly, a task characterized as very difficult.  *Id.*

14   Indeed, Lucent's expert Mr. Tognazzini has direct experience with modifying old non-mouse

15   software to be used with a mouse, and characterizes any such task as having "extreme difficulties."

16   (Ex. 14, 11/20/07 Tognazzini Dep. at 27:21).  In this sense, the YMM software teaches away from

17   the use of a composition tool such as a "graphical number keypad tool" having "display keys" and

18   the concept of composing information by "pointing" to those "display keys."

19   Even if a mouse were somehow added to the YMM software, the YMM on-screen calculator

20   would still fail to possess "display keys" with which a user can interact or point to.  (Ex. 10,

21   10/12/07 Tognazzini Rep. ¶ 42; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 9).  The YMM software would

22   need to be wholly redesigned to permit user interaction with the on-screen calculator using a mouse.

23   *Id.*  Contrary to defendants' suggestion, it is not just a simple matter of adding a mouse to YMM and

24   arrive at the claimed invention.  Rather, to somehow convert YMM into a system that meets all the

25   elements of claims 19 or 21 would require "a complete shift in user-interface paradigm from a

26   physical keyboard driven device to an on-screen driven device."  *Id.*

27

28

#### 4.    Microsoft Fails to Make Particularized Showing of Obviousness

As discussed above with respect to each missing claim element, it would not have been obvious to add the missing elements to the YMM software. The tools of YMM were very different from the inventions of the '356 patent, and YMM would not have rendered the '356 patent obvious based on any combination. (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 39-48). As with the previous reference, defendants have introduced nothing more than conclusory statements regarding a *Graham* obviousness analysis. *Graham*, 383 U.S. at 17. Lucent's expert looked at these issues, and demonstrates that relevant record evidence exists to rebut any charge of obviousness. (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 39-48; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 7-14).

For example, as discussed above in Section VI.D.3, Lucent's expert considered several secondary, objective considerations of non-obviousness regarding the '356 patent. *See Demaco*, 851 F.2d at 1391 ("evidence of secondary considerations may often be the most probative and cogent evidence in the record"). Mr. Tognazzini recognized that there was a long-felt need to solve some of the problems identified in the '356 patent; he noted that there was skepticism of others in arriving at a solution based on computer performance limitations at the time; and he recognized that others had failed to develop the invention of the '356 patent. (Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 47-49; Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 109-114; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 46-50).

Defendants likewise neglect to acknowledge the Supreme Court's recognition that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine elements in the way the claimed new invention does." *KSR*, 127 S.Ct. at 1741. Mr. Tognazzini explains that there would have been no reason to modify the YMM software such that it would satisfy the missing claim limitations:

> YMM was designed for MS DOS, and was not presumed to work with—or need—such pointing devices . . . Thus, at the time, there was simply no reason to combine the mouse-based interface used in such newer systems with the keyboard-based interface used in the older and soon to be obsolete MS DOS system. Further, one of ordinary skill in the art would not have considered adding a mouse-based interface to YMM because YMM was optimized for the keyboard-driven MS DOS system. Such a combination would likely have slowed down the YMM user. In addition, as discussed above, adding a mouse to YMM would not even work, and require not only reconfiguring the system but also reconfiguring the on-screen calculator . . . In other

1    words, the prior art as a whole taught away from combining YMM with any mouse, pointer, or touch-screen interface disclosed in the references cited by Mr. Buscaino.

2  (Ex. 10, 10/12/07 Tognazzini Rep. ¶ 43).  Accordingly, this Court should deny Microsoft's motion

3  for summary judgment of obviousness of claims 19 and 21 based on the YMM software.[8]

4  **VIII.    ARGUMENT:    DELL'S MOTION REGARDING "HOME ACCOUNTANT" COMBINED WITH THE TYLER ARTICLE**

5        Defendants previously moved for summary judgment of invalidity of the '356 patent based

6  on the Home Accountant reference.  (Ex. 17, 1/26/07 Br. Re Invalidity of the '356 Patent).  After

7  significant briefing and argument regarding this reference, this Court denied defendants' motion.

8  (Ex. 11, 5/15/07 Order re Invalidity of the '356 Patent).  Defendants now seek to rehash their losing

9  arguments by suggesting that the Home Accountant software renders claims 19 and 21 of the '356

10 patent claims obvious when viewed in light of the Tyler Article.  However, as with the other

11 references discussed above, there is ample evidence to rebut Dell's rehashed claims of obviousness

12 and—at a minimum—demonstrate genuine disputes for trial.[9]

13        **A.    The Home Accountant Program Does Not Disclose Several Limitations**

14        This Court has already recognized that the Home Accountant program does not disclose

15 several required claim limitations.  (Ex. 11, 5/15/07 Order re Invalidity of the '356 Patent).

16            **1.    Home Accountant Has No Predefined Composition Tool That is Associated With Information Fields as Specified by the Form Entry System**

17

18        First, the Home Accountant program does not contain any "predefined" composition tool that

19 is "associated with" the information fields and "specified by" the form-entry system.  Defendants

20 previously argued that the Macintosh "Key Caps" desk accessory satisfied this limitation.  However,

21 the "Key Caps" utility was an unrelated Macintosh operating system accessory, as seen below.  (Ex.

22

23  [8]  Claim 21 depends from claim 19, and is not obvious for the same reasons discussed above.
24  Further, claim 21 requires the use of a "bit-mapped-graphics field" which is a "field into which a
     user is to enter information by writing on a touch sensitive screen using a stylus." (Ex. 3, '356 Patent
25  Am. Claim Const. Order).  YMM does not disclose this, and there would have been no reason to add
     this to the YMM program.  (Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 45-48).

26  [9]  As set forth above, Lucent maintains that defendants are precluded from relying on the Tyler
27  Article pursuant to the Court's May 15, 2007 Order on Lucent's Motion to Strike.

28

13, 5/12/06 Tognazzini Rep. ¶¶ 122-123).   The "Key Caps" utility (like other Macintosh desk

accessories) was a small general purpose application that could be used at any time, and importantly,

***was not associated*** with any other software applications run on the Macintosh  (Ex. 13, 5/12/06

Tognazzini Rep. ¶ 125; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 37).



The Home Accountant program was a completely separate software application for the

Macintosh computer that allowed users to store personal finance information and enter personal

check information.  (Ex. 18, 3/31/06 Buscaino Rep. ¶ 57).  Users of the Home Accountant program

would normally use a computer keyboard to manually enter information into the fields, and

manually move between data entry fields (*e.g.* by using the Tab or Enter key).  (Ex. 18, 3/31/06

Buscaino Rep. ¶¶ 60-61).  This method of entering data was much like the prior art disclosed in the

background section of the '356 patent.  (Ex. 1, the '356 Patent col. 1:8-22).

This Court denied defendants' previous motion for summary judgment regarding the Home

Accountant, and determined that the cobbled-together combination of Home Accountant and Key

Caps does not meet the '356 patent claim limitations, at a minimum because the Home Accountant

application does not contain any "predefined" composition tool that is "associated with" each data

entry field and "specified by" the form-entry system.[10]  (Ex. 11, 5/15/07 Order re Invalidity of the

'356 Patent).

---

[10] Lucent explained in its previous opposition brief on this reference that the "Key Caps" desk
accessory was never intended to be an "on-screen keyboard" or a virtual keyboard as suggested by
Defendants.  (Ex. 21, 2/9/07 Lucent Opp. Br. to Microsoft Motion for SJ of Invalidity re '356
(Continued...)

### 2. Home Accountant Does Not "Insert[] in Said One Field Information That is Derived as a Result of Said User Operating Said Displayed Tool"

Second, the Home Accountant program does not disclose "inserting in said one field information that is derived as a result of said user operating said displayed tool."  Again, defendants previously argued that one could use the Macintosh "Key Caps" desk accessory to somehow compose information and insert it into a Home Accountant information field.  In denying defendants' previous motion regarding Home Accountant, this Court recognized that the Home Accountant form entry system did not insert any information into any field.  (Ex. 11, 5/15/07 Order re Invalidity of the '356 Patent at 5).  Instead, only by going through a time consuming and laborious process could one somehow "cut and paste" information from "Key Caps" into Home Accountant.  (Ex. 19, 6/29/06 Buscaino Dep. (Part B) at 87:11-88:23 (recognizing the process as "a very long set of steps"); Ex. 20, 6/27/06 Tognazzini Dep. at 127:8-13) (same).

### B. It Would Not Have Been Obvious to Add the Missing Elements to the Macintosh Home Accountant Program

#### 1. The Home Accountant Application was Not Designed to be Used With, and Would Not Have Worked With, a Predefined and Associated Composition Tool

Lucent's expert Mr. Tognazzini had significant experience with designing user interface objects for the Apple computer—he worked at Apple for fourteen years, and was Apple's first application software programmer.  (Ex. 20, 6/27/06 Tognazzini Dep. at 12:7-23).  Significantly, he knows that the early on-screen keypads such as the "Key Caps" desk accessory were "never intended" to be a keyboard replacement.  (*Id.* at 126:25-127:1; Ex. 13, 5/12/06 Tognazzini Rep. ¶ 123).  Moreover, Mr. Tognazzini knows well that the desk accessories were not linked to, called into existence by, or otherwise activated by separate application programs as suggested by defendants.

Nor would it have been obvious to modify or change the Macintosh Home Accountant application to either (1) link or associate a predefined composition tool to specific information fields,

---

Patent).  Rather, the "Key Caps" accessory was a simple object to show different  fonts, and to allow a user to cut and paste single non-text-symbols used with certain fonts.  (Ex. 20, 6/27/06 Tognazzini Dep. at 126:13-127:3; Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 124-125).

or (2) modify the Home Accountant form entry system such that it would have inserted information into an associated information field. (Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 121-125). Indeed, during the relevant time, Macintosh memory and programming limitations *taught away* from the type of modifications and combinations now suggested by defendants. (Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 197-200; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 32-44). With respect to Apple Macintosh applications such as the Home Accountant, Mr. Tognazzini was well aware that the type of modification now suggested by Dell would have been unworkable:

> The Macintosh's introduction in 1984 actually made things worse. The Mac's internal memory was so small that nothing more than essentials could reside in memory. Any time a special routine was needed for the program, the user would have to remove the disk holding the user's documents, replace it with the program disk, and swap back the document disk.
>
> ***Providing tools as per the '356 patent would have almost certainly resulted in the original Macintosh computers slowing to a crawl.*** The memory got marginally larger by 1985, but there was still no hard disk, and the extra memory was soon being used by the Switcher, enabling people to hold more than one application in memory at a time.

(Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 197-200; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 35, 47) (emphasis added). In other words, the combination that Dell now suggests in hindsight—modifying the Home Accountant application for the Macintosh to work with the claimed tools of the '356 patent—simply was not workable. *Id.*

### 2.     Dell Fails to Make Particularized Showing of Obviousness

As discussed above, it would not have been obvious to change or modify the Home Accountant application to meet the missing '356 patent claim limitations. Home Accountant was a simple personal finance program that was never intended to be used with the linked composition tools of the '356 patent invention. Home Accountant would not have rendered the '356 patent obvious in light of the Tyler Article. (Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 32-44). As with the previous references, defendants have introduced nothing more than conclusory statements regarding a *Graham* obviousness analysis, including any particularized discussion regarding (1) the scope and content of the prior art, (2) the differences between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) secondary considerations including commercial success,

long felt but unresolved needs, and failures of others to make the invention. *Graham*, 383 U.S. at 17. Lucent's expert looked at these issues, and demonstrates that relevant record evidence exists to rebut any charge of obviousness. (Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 32-44).

For example, as discussed above in Section VI.D.3, Lucent's expert considered several secondary, objective considerations of non-obviousness regarding the '356 patent. *See Demaco*, 851 F.2d at 1391 ("evidence of secondary considerations may often be the most probative and cogent evidence in the record"). Mr. Tognazzini recognized that there was a long-felt need to solve some of the problems identified in the '356 patent; he noted that there was skepticism of others in arriving at a solution based on computer performance limitations at the time; and he recognized that others had failed to develop the invention of the '356 patent. (Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 194-200; Ex. 10, 10/12/07 Tognazzini Rep. ¶¶ 109-114; Ex. 22, 12/14/07 Tognazzini Decl. ¶¶ 45-50).

Defendants likewise neglect to acknowledge the Supreme Court's recognition that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine elements in the way the claimed new invention does." *KSR*, 127 S. Ct. at 1741. Indeed, at the relevant time, there would have been no reason to modify the Home Accountant program such that it would satisfy the missing claim limitations—and in fact the Macintosh system limitations would have ***taught*** away from such changes. (Ex. 13, 5/12/06 Tognazzini Rep. ¶¶ 197-200; Ex. 22, 12/14/07 Tognazzini Decl. ¶ 43). Accordingly, this Court should deny Dell's motion for summary judgment of obviousness of claims 19 and 21 based on the Home Accountant program and the Tyler Article.

## IX.   CONCLUSION

For the foregoing reasons, Lucent respectfully requests that the Court deny defendants' motions for summary judgment of invalidity regarding the '356 patent.

1

2    Dated:  December 14, 2007                    Lucent Technologies Inc.

3
                                        By:   /s/  David A. Hahn
4
                                              David A. Hahn (SBN 125784)
5                                             HAHN & ADEMA
                                              501 West Broadway, Suite 1600
6                                             San Diego, California  92101-3595
                                              Telephone:  (619) 235-2100
7                                             Facsimile:  (619) 235-2101

8
                                              John M. Desmarais (admitted pro hac vice)
9                                             Robert A. Appleby (admitted pro hac vice)
                                              KIRKLAND & ELLIS LLP
10                                            153 East 53rd Street
                                              New York, New York  10022
11                                            Telephone:  (212) 446-4800
                                              Facsimile:  (212) 446-4900
12

13

14                                            Attorneys for Lucent Technologies Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28