# Hayes Declaration

# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

LUCENT TECHNOLOGIES, INC.,                )
                                          )
              Plaintiff,                   )
                                          )
        v.                                 )    Case No. 02-CV-2060-B (CAB),
                                          )    consolidated with Case No. 03-CV-
GATEWAY, INC.; GATEWAY COUNTRY            )    0699-B (CAB) and Case No. 03-
STORES LLC; MICROSOFT                     )    CV-1108-B (CAB)
CORPORATION; AND DELL, INC.,              )    HON. RUDI M. BREWSTER
                                          )
              Defendants.                  )
                                          )

**EXPERT REPORT OF BRUCE TOGNAZZINI RELATING TO THE EXPERT REPORT**
**OF JOHN P.J. KELLY, PH.D. RE LUCENT'S TOROK PATENT AND TO THE**
**EXPERT REPORT OF DALE BUSCAINO RE LUCENT'S DAY PATENT**

1.      I have been retained as a technical expert in this case by Lucent Technologies, Inc. ("Lucent") to provide my opinions regarding the contentions put forth by Microsoft Corporation, Gateway, Inc., and Dell, Inc. regarding the validity and other technical matters concerning certain claims of U.S. Patent Nos. 4,317,956 ("the '956 patent") and 4,763,356 ("the '356 patent").

**I.      QUALIFICATIONS AS AN EXPERT**

2.      My background and qualifications are set forth in my infringement report.

3.      I have not provided testimony in other matters over the past 4 years.

**II.     SCOPE OF STUDY AND OPINION**

**A.      Documents and Information Considered in Forming Opinions**

4.      With respect to the '956 patent, my opinions and analysis are based upon a review of the '956 patent, the file history for the '956 patent, the prior art cited in the file history, the Kelly Report regarding the '956 patent ("the Kelly Report"), and the materials identified in the

Exhibit 13
Page 000244

Kelly Report. I also relied upon the claim interpretations provided by the Court in the Court's October 27, 2003 Claim Construction Order.

5.      With respect to the '356 patent, my opinions and analysis are based upon a review of the '356 patent, the file history for the '356 patent, the prior art cited in the file history, the Buscaino Report regarding the '356 patent ("the Buscaino Report"), and the materials identified in the Buscaino Report. I also relied upon the claim interpretations provided by the Court in the Court's March 1, 2004 Claim Construction Order.

6.      Additional material sources which I considered in preparing this report are cited herein. I have also, to the extent relevant, considered the materials I studied for the purposes of my initial infringement report.

**B.      Exhibits to Be Used as a Summary or Support for the Opinions**

7.      At trial I expect to rely upon materials and documents produced in this litigation and various other documents that the parties have exchanged, such as interrogatory responses. I also may rely on visual aids and demonstrative exhibits that I may prepare or have prepared based on these materials, including by way of example, figures and excerpts from the '956 and '356 patents, claim charts, deposition testimony, diagrams and other graphical presentations describing the technology relevant to the '956 and '356 patents and the design, operation and functions of the accused products I have been asked to analyze. I also plan to rely on demonstrations of the actual devices, systems, and software cited in Dr. Kelly's and Mr. Buscaino's reports.

8.      I traveled to San Diego on April 26, 2006 from San Francisco, CA to examine the actual devices, systems, and software relied upon by Dr. Kelly and Mr. Buscaino or cited specifically in their reports.

2

Exhibit 13
Page 000245

## C.    Summary of Opinions

9.    It is my opinion that the '956 patent specification provides adequate disclosure of structure corresponding to the claimed functions of claim 5 and therefore claim 5 of the '956 patent is valid under 35 U.S.C. § 112.

10.    It is my opinion that one skilled in the art would understand the bounds of claims 15 and 17 of the '956 patent and therefore claims 15 and 17 are definite and valid under 35 U.S.C. § 112.

11.    It is my opinion that claims 15, 17, 18, and 21 of the '956 patent are not anticipated by U.S. Patent No. 3,617,630 ("the '630 patent"). I do not agree with Dr. Kelly's unsupported statement that if the '630 patent does not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be.

12.    It is my opinion that claims 15, 17, 18, and 21 of the '956 patent are not anticipated by the Video Graphics Article. I do not agree with Dr. Kelly's unsupported statement that if the Video Graphics Article does not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be.

13.    It is my opinion that claims 1, 15, and 18 of the '956 patent are not anticipated by the Alternative Tactical Facsimile Subsystem. I do not agree with Dr. Kelly's unsupported statement that if the Alternative Tactical Facsimile Subsystem does not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be.

14.    It is my opinion that claims 1, 3, 15, and 18 of the '956 patent are not anticipated by U.S. Patent No. 4,200,867 ("the '867 patent"). I do not agree with Dr. Kelly's unsupported statement that if the '867 patent does not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be.

3

Exhibit 13
Page 000246

15.     It is my opinion that claims 15 and 18 of the '956 patent are not anticipated by U.S. Patent No. 3,911,419 ("the '419 patent"). I do not agree with Dr. Kelly's unsupported statement that if the '419 patent does not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be.

16.     It is my opinion that claim 18 of the '956 patent is not anticipated by the article Design Considerations For Teleconferencing Systems by Andrew B. White ("the White article"). I do not agree with Dr. Kelly's unsupported statement that if the White article does not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be.

17.     It is my opinion that claims 1, 3, 5, 15, 17 and 21 of the '956 patent are not rendered obvious by the White article in view of the article Electronic Chalkboard: Have Chalk Will Travel by G.P. Torok ("the Torok article").

18.     It is my opinion that claims 1, 3, 5, 15, 17, 18 and 21 of the '956 patent are not rendered obvious by U.S. Patent No. 4,125,743 ("the '743 patent") in view of the White article.

19.     It is my opinion that claims 1, 2, 4, 10-13, 19 and 21 of the '356 patent are not anticipated by the Home Accountant Program running on a Macintosh computer. Further, it is my opinion that the Home Accountant Program alone or in combination with any of the other prior art listed in Exhibits 6 through 10 of the Buscaino Report does not anticipate or render obvious any of the asserted claims of the '356 patent.

20.     It is my opinion that claims 1, 2, 4, 19 and 21 of the '356 patent are not anticipated by the Xerox Star. Further, it is my opinion that the Xerox Star does not anticipate or render obvious any of the asserted claims of the '356 patent.

Exhibit 13
Page 000247

21.     It is my opinion that claims 1, 2, 19 and 21 of the '356 patent are not anticipated by the Apple Lisa. Further, it is my opinion that the Apple Lisa does not anticipate or render obvious any of the asserted claims of the '356 patent.

22.     It is my opinion that the asserted claims are not rendered obvious by the mix and match of various hardware and software identified by Mr. Buscaino in his report in combination with *any of the other references* listed in Mr. Buscaino's report. *See* Buscaino Report 38. Further, I do not agree with Mr. Buscaino's opinion that where groups of references disclose a particular claimed feature, any member of the group could be combined with the references to render obvious the asserted claims. *See id.*

23.     I note that at various times in Dr. Kelly's and Mr. Buscaino's reports they make the general statement that if the art on which they based their conclusions did not put the claimed concepts precisely within the public grasp it made them so obvious that they readily could be. I disagree with those unsubstantiated statements as set forth more fully in the sections below. Furthermore, if Dr. Kelly and/or Mr. Buscaino are allowed to present any additional opinions or analysis, I would expect to provide analysis and potentially rebuttal.

24.     I note further that at various times in Dr. Kelly's and Mr. Buscaino's reports they incorporate by reference Exhibits including claim charts, and those claim charts sometimes refer in passing (without analysis) to additional references beyond the text of the body of Dr. Kelly's and Mr. Buscaino's reports.   These Exhibits in many instances contain no analysis, no description of which claimed features are present in the reference or which claimed features are missing from the reference, no discussion of the motivation to combine the additional references cited for obviousness purposes, or any indications tying these charts back to the analysis in Dr. Kelly's and Mr. Buscaino's reports.   To the extent that Dr. Kelly or Mr. Buscaino have

Exhibit 13
Page 000248

provided actual analysis, I have addressed it in the corresponding sections in my report. For instances where there is no analysis present, if Dr. Kelly and/or Mr. Buscaino are allowed to present any additional opinions or analysis, I would expect to provide analysis and potentially rebuttal.

25.     At trial I anticipate that I would give a basic tutorial that will assist the Court and/or jury in understanding the technology applicable to the '956 and '356 patents and the prior art cited by Dr. Kelly and Mr. Buscaino.

## III.    TECHNOLOGICAL BACKGROUND

26.     At trial, I may discuss fundamental concepts of electronic chalkboard devices and in particular user interface aspects of such devices to provide background material to the Court or jury.  I may also discuss fundamental concepts of form entry systems and in particular user interface aspects of such systems to provide background material to the Court or jury.

27.     For example, I may discuss the differences between a tool which manifests itself on the screen such that a user sees it as a separate and distinct entity versus such definitions as each region of a tool such as a keyboard or paper tape in a calculator somehow being a tool in its own right or defining a small bit of software code within the general code that results in no manifestation on the screen of any sort as being a tool.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

28.     I have reviewed the subject matter of the '956 and '356 patents and have arrived at a conclusion as to the level of ordinary skill in the art applicable to the patents at issue.  The field applicable to both the '956 patent and the '356 patent is that of Human Computer Interaction ("HCI").

29.     Today, there are programs at institutions offering formal degrees in the discipline of HCI. However, at the time of the '956 and the '356 patent inventions such knowledge would

Exhibit 13
Page 000249

have been learned at one of two primary "schools" where one could learn graphical user interface design, namely Xerox Palo Alto Research Center (Xerox PARC) and Apple Computer, Inc. Additionally, a few universities had fledgling programs in the field including UCSD, University of Toronto, and University of Maryland. Other than these few locations, at the time of the '356 patent, little formal training existed, and this was even more true around 1980 at the time of the '956 patent. Thus, at the time of the '956 and '356 patents, the person of ordinary skill would have 3-5 years experience working in the area of the HCI, or specific training at one of the aforementioned universities.

30. The majority of people in the computer field at the time of the '956 and '356 patent inventions were software engineers—programmers—with training and degrees in Computer Science. Few of their curricula had offered any training at all in the science and psychology of human-computer interaction nor graphical user interface design. In fact, of the hundreds of people I have trained in the art and science of HCI design, the group that has struggled the most to accept and to apply the concepts of HCI design is formally-educated computer science graduates. Computer scientists historically have been trained to focus on the machines, often to the exclusion of their users, and too often see users who are struggling with their software as the problem. Computer scientists untrained in HCI are often unaware of the limitations of the human users of computing devices.

## V.    UNDERSTANDING OF LEGAL STANDARDS

31. I understand from counsel that a patent is invalid on the basis of anticipation if a single prior art reference discloses, either expressly or inherently, each and every limitation of the claimed invention. Accordingly, if any limitations are not disclosed by that single prior art reference, then the patent is not anticipated by that reference.

Exhibit 13
Page 000250

32.    I understand that a patent claim may be found invalid as having been obvious only if the differences between the claimed subject matter of the patent and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art of the invention at the time the invention was made.

33.    I also understand that to conclude that an invention is obvious based upon a combination of two or more references, there must be a reason, suggestion, or motivation that would lead one of ordinary skill in the art to combine the references. The reason, suggestion, or motivation to combine may be found in the prior art references themselves, in the knowledge of one having ordinary skill in the art, or from the nature of the problem to be solved. The motivation to combine the references must have existed at the time of the invention.

34.    I understand that a motivation to conduct further testing or research that may lead to the claimed invention is inadequate to render a claim obvious. That is, an invention is not rendered obvious on the grounds that it was obvious to try the claimed invention.

35.    I understand that to determine whether a patent claim is invalid as obvious, one examines secondary considerations of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, copying, and unexpected results.

36.    I understand that it is improper to use the benefits of hindsight and the teachings of the patent-in-suit to combine the prior art references for an obviousness inquiry.

37.    I understand that patents are presumed valid. I further understand that the presumption of validity can be overcome only if the party seeking to invalidate the patent can prove invalidity by clear and convincing evidence.

Exhibit 13
Page 000251

38.     I understand that the Court's rulings on the construction of claims is binding.  I have followed the Court's Claim Construction Orders for the '956 and '356 patents in my analysis.

## VI.    VALIDITY ANALYSIS

39.     For each asserted claim of the '956 and '356 patents asserted against Microsoft, Gateway, and/or Dell, I discuss the limitations of the claims that are not present, or taught, in the prior art, alone or in combination, as asserted by Dr. Kelly and Mr. Buscaino.

40.     In the instances where Dr. Kelly or Mr. Buscaino state an opinion that the claims of the '956 or '356 patents are obvious in view of the prior art, alone or in combination, I discuss the reasons why the asserted claims would not be obvious, including the lack of inherency of the missing feature(s) in the cited reference(s), the failure to show any motivation to combine references, and the secondary considerations of non-obviousness.

41.     I understand that claim construction is ultimately a legal issue for the Court, and that the Court has provided interpretations of certain terms whose meaning was apparently disputed by the parties.

42.     I understand that where a reference does not disclose something, that something may be "inherent" in the reference, but only where the thing is "necessarily present"; "possibilities and probabilities" are not sufficient.

## VII.    VALIDITY OF THE '956 PATENT

### A.    Claim 5 Does Not Lack Structure

43.     Dr. Kelly alleges that the '956 patent specification fails to provide necessary structure that supports the claim 5 functionality of providing a system having multiple sending units that each provides separate distinctive graphic images. *See* Kelly Report 12. Dr. Kelly does not disagree that the specification *does* provide adequate structure for a complete system and

Exhibit 13
Page 000252

contemplates multiple sending units. *See id.* 12-13; '956 patent 9:16-29. In fact, Dr. Kelly agrees that adequate structure is present, but states that modification would be required to the already-existing structure to take into account multiple sending units. *See* Kelly Report 13.  Because adequate structure is present to support the claim 5 functionality, and only a replication of some of the already existing elements would be required, which is contemplated by the applicants as discussed above, I disagree that the patent specification fails to provide adequate structure.

44.    The person of ordinary skill would have no difficulty in understanding how to accomplish a very simple objective—to essentially add extra output sockets as desired to the sending unit—especially considering that the '956 patent explains how to do such a thing. *See* col. 9:16-24

### B.    Claims 15 and 17 are Definite

45.    Dr. Kelly states that claims 15 and 17 are invalid because the meaning of the terms "said received data" and "said provided data" is unclear. *See* Kelly Report 14. Dr. Kelly's analysis ignores the relevant portions of the '956 patent which together with the plain language of the claims make their meaning clear and definite to any person of skill in the art.

46.    Claim 15 of the '956 patent itself is clear as to the nature of the "mixing process" that Dr. Kelly claims one of skill would not understand.  Claim 15 itself states the mixing is done "so that said generated overlay image is positioned with respect to a determined location of said last changed data." The '956 patent specification describes in detail the process of receiving information and data, processing that information, and appropriately displaying the information to accomplish the claimed objective. In the described embodiment, there are five pieces of data being transferred to the remote viewing unit during use.  These are X position, Y position, WRITE, CLEAR, and ERASE (the CLEAR signal is not used by the cursor generation circuitry). Col. 7:60-8:2.

Exhibit 13
Page 000253

47.     This data is used in two parallel ways. First, the data is used to alter the bit map representing the image. Col. 8: 15-48. This process is responsible for making the changes to the underlying image at the remote viewing unit, for example, added drawing or erasures by the operator of the sending unit. Second, the data is also used to generate an appropriate cursor and correctly position it on the underlying image. Col. 8:37-48. Subsequently, these results are mixed and sent to the graphics output (video signal generator) so that the remote viewing unit "displays [a] generated overlay image [] positioned with respect to a determined location of said last changed data." Col. 8:49-59.

48.     This description leaves no doubt as to the meaning of the terms in claims 15 and 17 that Dr. Kelly alleges makes the claims indefinite. The first step of claim 15 requires "receiving transmitted data representative of the location on said viewing screen representative of said changed data." This refers to the collection of data transferred to the remote viewing unit, which includes (but is not solely) data representative of the location of changes, namely the X and Y coordinates which as described in the patent are locations of changes to the underlying image. The next step requires "sequentially and repetitively providing said received data to said viewing screen." This step refers to the step of using the X and Y coordinates along with the WRITE or ERASE indicators to make changes to the underlying image, and providing those to the viewing screen. Claim 15 then *additionally* requires "generating an overlay image" and mixing that overlay image "with said provided data to said viewing screen so that said generated image is positioned with respect to a determined location of last said changed data." This refers unmistakably to the process described at col. 8, lines 49-59 of merging the overlay image with the bit map information of the underlying image to produce the final image sent to the viewing screen of the remote viewing unit. In summary, both "said provided data" and "said received

11

Exhibit 13
Page 000254

data" simply refer to the entire collection of data received from the sending unit, which includes data representative of both changes to the underlying image and the position of those changes. One of ordinary skill in the art would have no difficulty correctly understanding the meaning of Claim 15 given the clear description of an exemplary embodiment given in the specification.

49.    Likewise, Claim 17 is clear because "said received data", which includes the X and Y position information as well as WRITE or ERASE indicators, is used to "determin[e] if said received data represents an addition or a subtraction from the sending unit." In the exemplary embodiment the remote viewing unit determines whether the data being received on each cycle (described as samplings at least 5000 times per second, col. 8, lines 5-6) contains a positive WRITE or ERASE indication. The remote viewing unit may then display an appropriate overlay image such as a pencil or eraser on the screen. As with Claim 15, one of ordinary skill in the art would have no difficulty correctly understanding the meaning of Claim 17 given the clear description of an exemplary embodiment given in the specification.

C.    **The Telestrator System**

50.    I note first that Dr. Kelly fails to point to a ***single reference*** or device that sets forth "The Telestrator System." Rather, Dr. Kelly points to a number of different references in paragraph 40 of his report that he apparently claims constitute "The Telestrator System" prior to the '956 patent. Dr. Kelly admits that no single reference that he cites in his report fully encompasses "The Telestrator System," rather the system is "similar to" certain references yet points out the "primary difference" between them. *See* Kelly Report 17. The Telestrator System was a "moving target," slowly evolving from its inception. The references cited in paragraph 40 of Dr. Kelly's report refer to different versions of the Telestrator along its evolving path. I further note that Dr. Kelly does not rely on an actual Telestrator system in his report.

Exhibit 13
Page 000255

51.    As noted above, I have been informed by counsel for Lucent, and it is therefore my understanding that under the patent law, in order for prior art to anticipate a patent claim, a *single reference* must teach each and every feature of the claim. Dr. Kelly's analysis of "The Telestrator System" fails to meet this requirement. Accordingly, I disagree that "The Telestrator System" anticipates claims 15, 17, 18, and 21 of the '956 patent. Dr. Kelly argues in the alternative that if each single reference does not put the claimed concepts precisely within the public grasp, it made them so obvious that they readily could be.   This is an example of Dr. Kelly's failure to provide any substantive analysis.   Dr. Kelly does not discuss: the differences between the patent claims and the Telestrator System; what other specific knowledge or references would provide any elements of the claims missing in the Telestrator System; how such other knowledge or references would be combined with the Telestrator System; nor what specific motivations there would have been for a person of ordinary skill to combine other references with the Telestrator System.

52.    The Telestrator was originally conceived as a one-to-many device, with an operator such as a sportscaster annotating a football play or TV weatherperson drawing meteorological symbols on a map. For such an exercise, it was important for the operator, *not the viewer,* to be aware of the location of the cursor. When a stylus-mediated erase was later added, it was again important for the operator, not the viewers, to understand that the system was in "erase mode." As such, the cursor shape tracked the current drawing tool—line vs. dotted line, etc.—rather than differing cursor shapes for erase vs. write cursors. Dr. Kelly does not present any evidence that the Telestrator systems, prior to the Torok invention: provided a cursor at a remote viewing unit; nor that any cursor of the system was even *intended* to convey state

Exhibit 13
Page 000256

information to the viewer, because the only cursor disclosed by any Telestrator reference could not be seen by viewers of remote viewing units.

53.    The '956 patent claims the use of two separate and distinct cursor symbols indicating write versus erase modes. Reiffel, in his deposition describes the two cursors viewed by a Telestrator operator as being identical in appearance, reflecting only the size of the tool being used not whether that tool was being used to write or erase. Regarding the write cursor, Reiffel testified "[i]f you had a line that wide, [the cursor] would be a circle that wide...." (Reiffel Dep. Tr. from 120:15-121:4).

54.    Regarding the erase cursor Reiffel testified "I can have a big, round eraser or a little one, depending on what line width I had." (Dep. 116:16-117:17) From a user's point of view, if two cursors appear identical, they are the same cursor. Thus, even in the limited arena of the cursor provided at the sending unit, the Telestrator provided only a single cursor. But again, no cursor at all was provided to any viewing unit.

**U.S. Patent No. 3,617,630 ("the "630 patent")**

    **(1)    Claim 15**

55.    My analysis in ¶¶ 50-54 applies here. The '630 patent, lacking a cursor at the viewing unit, fails to disclose a generated overlay image positioned with respect to the last changed data. The '630 patent therefore also fails to disclose mixing the generated overlay image with the provided data because the overlay image is absent.

    **(2)    Claim 17**

56.    Claim 17 depends from claim 15, therefore my analysis in ¶ 55 applies here. Additionally, because no cursors are provided at the viewing unit, the '630 patent fails to disclose the generation of either of first or second overlay images controlled by whether the changed data is determined to represent an addition or subtraction.

Exhibit 13
Page 000257

### (3)    Claim 18

57.    My analysis in ¶¶ 50-54 applies here. The '630 patent fails to disclose the function of providing "a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed." The '630 patent simply does not disclose any cursor or other graphic image displayed at the viewing unit in a position corresponding to where changes to the image are occurring.

58.    Furthermore, the '630 patent does not disclose providing a graphic image "where images on the sending unit are being changed." Rather, the '630 patent discloses the ability to "add to the [already existing] image to point out a certain feature thereof or to emphasize a particular aspect of a scene." Col. 1:15-18. Additionally, the '630 patent discloses the ability to "add to a television image in much the same manner, for example, as chalk is used to illustrate, emphasize or point out something *previously* written on a chalk board." Col. 1:18:21; 1:25-30.

### (4)    Claim 21

59.    Claim 21 depends from claim 18, therefore my analysis in ¶ 57 applies here. Additionally, the '630 patent fails to disclose a graphic image indicative of which sending unit it comes from.

### Video Graphics Article

### (1)    Claim 15

60.    The Video Graphics Article is an additional reference disclosing a Telestrator system. Accordingly, my analysis in ¶¶ 50-54 applies here. The Video Graphics Article fails to disclose a system that tracks or indicates to the user the location of the changes to the underlying image. The Video Graphics Article also fails to disclose mixing the generated overlay image with the provided data because the overlay image is absent.

Exhibit 13
Page 000258

### (2)    Claim 17

61.    Claim 17 depends from claim 15, therefore my analysis in ¶ 60 applies here. Additionally, the Video Graphics Article fails to disclose the generation of the first and second overlay images controlled by whether the changed data is determined to represent an addition or subtraction.

### (3)    Claim 18

62.    My analysis in ¶¶ 50-54 applies here. The Video Graphics Article fails to disclose the function of providing "a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed." The Video Graphics Article disclosed no cursor at the viewing unit at all.

63.    Additionally, the Video Graphics Article fails to disclose the function of providing "a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where *images created on said sending unit* are being changed." Rather, the Video Graphics Article discloses "[t]he end result is that the user feels as if the stylus can write directly into the other image source. Line drawings, outlining, handwriting, etc. in any color selected at the studio switcher appears *superimposed on the back-ground image* precisely where and when the user wishes." Video Graphics Article at page 16.

### (4)    Claim 21

64.    Claim 21 depends from claim 18, therefore my analysis in ¶ 62 applies here. Additionally, the Video Graphics Article fails to disclose the graphic image indicative of which sending unit it comes from. Dr. Kelly posits at paragraph 61 of his report that "[a graphic] symbol can be made to slide with the stylus as the stylus is moved across the monitor screen." Even though the system is using the cursor buffer as a convenience to enable the operator to drag the symbol, the operator is, in fact, dragging a symbol, not using the symbol to denote cursor

16

Exhibit 13
Page 000259

location. Dr. Kelly then explains that "the symbols displayed while the user is drawing or erasing are positioned at the stylus location, which is the location where the image is being changed." The "symbols displayed" are being positioned there by the operator as graphic elements that are part of the overall image being created. They are not there to indicate where the image is being changed and remain behind when the stylus moves on.

### D.     Alternative Tactical Facsimile Subsystem (ATFS)

#### (1)     Claim 1

65.     I note first that Dr. Kelly would not disagree that the symbol created by the ATFS fails to follow the stylus tip as it "draws" on the screen. *See* Kelly Report 29.  Accordingly, there cannot be a graphic image displayed at the remote viewing unit at locations corresponding to where the image is being changed.

66.     The operator of the ATFS essentially selects a symbol and sticks it onto a map image, which does not itself change. The ATFS is basically an extension of the Telestrator technology to free the operator from having to draw geometric shapes. The ATFS allows the operator to choose to have shapes such as circles, squares, arrows, etc. inserted at the point of contact with the screen instead of merely points or dots as in the traditional Telestrator systems. Note however, that the ATFS provides no "graphic image" which indicates the location of changes to the underlying image. Those changes—the addition of circles, squares, etc.—simply appear without a graphic image indicating their appearance.

67.     Therefore, there are no "means for displaying a selective distinctive graphic image at positions on said viewing unit corresponding to position where said images are being changed on said sending unit."

17

Exhibit 13
Page 000260

(2)    **Claim 15**

68.    My analysis in ¶¶ 65-67 applies here. Based on my analysis, the ATFS fails to disclose "generating an overlay image"; the ATFS also fails to disclose "mixing said generated overlay image with said provided data to said viewing screen so that said generated overlay image is positioned with respect to a determined location of said last changed data."

(3)    **Claim 18**

69.    My analysis in ¶¶ 65-67 applies here. Based on my analysis, the ATFS fails to disclose "generating separate from said drawn images distinctive graphic images"; the ATFS also fails to disclose "selectively enabling one of said graphic images so as to provide a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed."

E.    **U.S. Patent No. 4,200,867 ("the '867 patent)**

70.    There is no concept of a sending unit and a receiving unit disclosed in the '867 patent. The '867 patent describes a system analogous to Microsoft Word. A user creates a document in its entirety on a single, isolated machine. The user may then save the *completed* document or send the *completed* document via modem to another person who also has Microsoft Word. That person cannot watch you create a document in Microsoft Word, he or she can only view the resulting completed document. Nothing is sent "live." Because the '867 patent discloses no facility for any remote device, there is no disclosure of any viewing unit.  In addition and as a consequence, there is no remote graphic image mixed with an underlying image at a position corresponding to changes in the underlying image.

71.    The use of "remote" in the '867 patent is a misnomer, in that the user must be immediately in front of the only monitor (a home TV) at the time of creation in order to know what he or she is painting. Dr. Kelly suggests that "the television receiver can be located at a

Exhibit 13
Page 000261

distance from the control unit." This suggestion is nonsensical. Locating the receiver and unit a few feet apart is in no way a remote display system as claimed in the '956 patent.

72.      Dr. Kelly drew particular attention to the "L" shaped cursor implying the "L" shape was somehow indicative of an effort to supply a "distinctive cursor image." The sole reason for its typical "L" shape was the limitations of the hardware, as clearly stated in the '867 patent. The only changing characteristic of the cursor in operation is its color. The '867 patent discloses neither an erase mode nor an erase cursor.

### (1)    Claim 1

73.      My analysis in ¶¶ 70-72 applies here. The '867 patent fails to disclose a sending unit. The '867 patent fails to disclose a viewing unit. The '867 patent fails to disclose a "means for displaying a selective distinctive graphic image at positions on said viewing unit corresponding to positions where said images are being changed on said sending unit" because there is no possibility of any communication from the user's device during construction of the drawing and because there is neither a sending nor a viewing unit.

### (2)    Claim 3

74.      Claim 3 depends from claim 1, therefore my analysis above in ¶ 73 applies here. Additionally, the '867 patent fails to disclose distinctive graphic images representing addition and erasure of an image at a remote viewing unit. There are no such graphic images at all.

### (3)    Claim 15

75.      My analysis is ¶ 73 applies here. For the reasons previously discussed, the '867 patent fails to disclose a sending unit; fails to disclose "sequentially and repetitively providing said received data to [a] viewing screen"; and fails to disclose "mixing said generated overlay image with said provided data to said viewing screen so that said generated overlay image is positioned with respect to a determined location of said last changed data.

Exhibit 13
Page 000262

(4)    **Claim 18**

76.    My analysis in ¶¶ 73 and 75 applies here.  For the reasons previously discussed, the '867 patent does not disclose "a telautograph system having a sending unit and a separate viewing unit"; the '867 patent does not disclose multiple "distinctive graphic images"; nor does the '867 patent disclose "selectively enabling one of said generated graphic images so as to provide a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed."

F.    **U.S. Patent No. 3,911,419 ("the '419 patent")**

77.    Computers of the era of the early to mid '70s when the '419 patent was invented were typically large mainframe computers. Research labs had also begun using the early minicomputers, including the Data General Nova, mentioned in the '419 patent. In either case, these large computers drove "dumb terminals," with minimal electronics (to reduce costs) and screens limited to perhaps 24 lines of 40 discrete characters each. Everything occurred within the boundaries of the discrete character "cells" on these small screens. What graphics existed typically were built up out of custom-formed characters that, when printed to the screen in the proper order, produced small, blocky black-and-white images.

78.    Moving a text cursor around the screen using cursor keys caused the text cursor, typically represented as a blinking block or bar, to jump from character position to character position. This worked well with users, since they both expected the behavior and because this jumping motion left no ambiguity as to where the next typed character would appear, since the cursor was always enclosed within a character "cell."

79.    The mouse changed all that. Having a mouse cursor leap from cell to cell was disconcerting. Instead, users expected this device they were moving smoothly across the desktop to move equally smoothly across the display.

20

Exhibit 13
Page 000263

80.    In 1965, Stanford Research Institute was demonstrating a mouse-driven "personal computer" with a modern bit-mapped display. The estimated retail price would have been $250,000 in 1965 dollars.  The bit map display computer allowed smooth movement of the cursor but did so at an extremely high cost. The '419 patent responded to this same need by adding a smooth cursor to the traditional, relatively inexpensive character-based display. The '419 patent was limited to a small refinement of preexisting cursor technology, centered around this ability to move the cursor any point on the display, rather than limiting it solely to landing within cursor boundaries.

81.    The '419 patent further enabled the programmer to design and install a variety of cursor types. He or she could thus represent the two most common cursors, the text insertion cursor and the mouse pointer cursor, using different images. In fact, the preferred embodiment of the patent enabled two such cursors to be displayed simultaneously ('419 Col 13:68-14:2) just as is done on computers today. (Modern computers use a mouse pointer and a separate text cursor.) Today virtually all displays are bitmapped, the cost of such personal computers having dropped a thousand-fold, and the need for the '419 patent has disappeared.

82.    Dr. Kelly makes much of the fact that the terminal might be connected to a central computer that would also be handling the processing needs of other terminals. That was the way things typically worked in that era. In order to drive the cost of each user's equipment down to a minimum, large and expensive computers were connected to as many as 100 inexpensive "dumb terminals" containing the minimum electronics necessary to communicate with the large, expensive mainframe. The objective of the '419 patent is for smoothing out the movement of a mouse cursor on a single local device, not for facilitating terminal-to-terminal communications.

Exhibit 13
Page 000264

83.     Dr. Kelly notes that the '419 patent "discloses connecting two character generators together through the video mixer," but the patent does not suggest the source of the external character generator, which might simply be on board the mainframe or minicomputer. It further does not suggest that this is in any way necessary to make the patent work or improve its function. In fact, the '419 patent does not even suggest that this would be a good idea.

84.     Dr. Kelly also states, "[i]n fact, the '419 preferred embodiment contains two independent cursor control units [See, e.g., '419 patent at Col. 13:68-14:2]." Perhaps Dr. Kelly is asserting that this disclosure somehow means that the inventors of the '419 patent intended one cursor to be used to communicate writing and one to communicate erasing. But the presence of two control units is irrelevant to the issue of having write and erase cursors. In a system actually possessing write and erase capabilities, only one cursor generator is needed to display both symbols, since only one symbol appears at a time—the system is either in write-mode or erase-mode.

85.     Dr. Kelly also makes much of the fact that "the cursor can be any shape." It can, but that is does not help Dr. Kelly's argument. Around the time of the '956 patent, engineers could employ software generation of symbols that allows a number of possible combinations of symbols that is, in practical terms, unlimited. [Internal research project by Charles Kellner at Apple Computer in the fall of 1978.] Of all these possible permutations, only a very few would look like write and erase symbols. The mere fact that there is an exceedingly small statistical change that there *could* be two possible cursors related to write and erase modes does not mean the '419 patent actually *discloses* those to a person of ordinary skill. In fact, the overwhelming possible cursor choices merely reinforces the point that the choices disclosed by the '956 patent are non-obvious.

Exhibit 13
Page 000265

### (1)    Claim 15

86.    My analysis above in ¶¶ 77-85 applies here.

87.    Dr. Kelly states, "[t]he '419 patent discloses writing on a special surface with a light pen, digital pointer or mouse to control the cursor. Since any images created or modified using such an input device at the sending terminal are displayed on the monitor at the location of the receiving terminal, this is a system that may be considered a telautograph system." There are a number of problems with this statement. First, the '419 patent makes no mention of "writing" on a special surface or otherwise.

88.    The '419 patent is specifically limited to the entry of characters. There is no way contemplated to either create or modify images. There is no mention of images being sent by or received by any of the terminals. There is no mention of any communication of any sort between terminals.  For these reasons and those state previously, there is certainly no disclosure of "receiving transmitted data representative of the location on said viewing screen of changed data"; no disclosure of "sequentially and repetitively providing said received data to said viewing screen"; no disclosure of "generating an overlay image"; and no disclosure of "mixing said generated overlay image with said provided data to said viewing screen so that said generated overlay image is positioned with respect to a determined location of said last changed data."

### (2)    Claim 18

89.    My analysis in ¶¶ 86-88 applies here.  For the reasons stated there and the paragraphs referred to therein, there is no disclosure of "generating separate from said drawn images distinctive graphic images"; nor any disclosure of "selectively enabling one of said generated graphic images so as to provide a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed."

Exhibit 13
Page 000266

### G.    Design Considerations For Teleconferencing Systems by Andrew B. White ("the White article")

90.    The White article discusses possible slight alterations to an information presentation system of long-standing. White was suggesting ideas for an improvement to televising of static slides, by adding to those images a remote version of the typical pointer that has been long-used by lecturers or presenters in front of their audience. Presenters typically used (and continue to use) straight rods or "sticks," or tightly focused light beams (today laser pointers). White's article was a suggestion that (a) it would be useful to carry over this traditional functionality into the realm of remote viewing and (b) that one way to do so was to impress into service technology already traditional within the computer community, namely the use of a cursor generator to project a position indicator.

91.    White also disclosed a "simple experiment" he carried out wherein he built up a pointer consisting of a circular ring or some modification thereof. This pointer's sole purpose was to enable the operator to point to some pre-existing area of interest on an immutable graphic image. It appears from the White paper that his "simple experiment" consisted of a background of fixed, immutable text over which a pointer was moved in order to gauge users' ability to follow the pointer. Moreover, this experiment was carried out using a *single* computer connected to two displays in a laboratory type setting. *See* White article (stating "we constructed a PDP11/10 terminal with two AC plasma display panels"); White Dep. Tr. 63:5-64:16. This was not a functional remote viewing system of the type claimed by the '956 patent.

92.    White suggested that in the future people might want to experiment with different shapes for this simple pointer. White never stated nor implied that there would ever be a need for separate pointers to distinguish between activities on the screen. Nor would White have done so because the speaker at the sending unit had no ability to change the material on the screen once

Exhibit 13
Page 000267

the slide show had begun. Even when White envisioned the future, his vision stopped at replacing typical slide projectors with video projectors controlled by the speaker but one that would again do no more than enable the speaker to select among a predetermined series of static, immutable slides.

93.    White worked with slide projectors. Torok worked with low-resolution "live" electronic blackboard systems. When White and Torok later got together, they together envisioned a system that combined both in a unique way. This new combination generated new problems that called for new solutions. The '356 patent was one of the solutions to those new problems that neither White nor Torok's articles revealed. The White article certainly reveals neither the problem addressed by the '356 patent nor its solution.

### (1)    Claim 18

94.    My analysis in ¶¶ 90-92 and 96-102 applies here. Claim 18 sets forth the step of "generating separate from said drawn images distinctive graphic images." There are no "drawn images" discussed in the White article either in talking about his current work or his projection of the future. Instead he discusses only static immutable images. He also does not even disclose or even imply the idea of a plurality of "distinctive graphic images" let alone, how one would carry out such an idea.

95.    Claim 18 further states "selectively enabling one of said generated graphic images so as to provide a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said viewing unit are being changed." Again, there is no "selected one of said graphic images" because White suggests there be only one graphic image chosen by the designer of the speaker's system and incorporated as a fixed, permanent image. And furthermore, "the images created on said sending unit" cannot be changed. (White Dep. Tr. 67:4-69:19.) They could not be changed on White's first experimental

25

Exhibit 13
Page 000268

system that used slide projectors, they could not be changed on White's second experimental system that using the PDP11/10 (White Dep. Tr. 67:4-69:19), and they could not be changed in the future systems White then contemplated.

**The White article in view of Electronic Chalkboard: Have Chalk Will Travel by G.P. Torok (the "Torok article")**

96.    I note first that these articles were written by the named inventors of the '956 patent. The non-obviousness of the '956 patent invention, even in light of these two references, is indicated by the further work and experimentation Torok and White had to perform before arriving at the '956 patent invention.

97.    The Torok and White articles disclose devices with disparate natures. White discusses a slide-presentation system. In such a system, the slide is projected up on the screen in its entirety. The speaker may then slowly recite its contents beginning at the top left corner, in which case there is no need for a pointer at all. If, however, the speaker begins to point out various features of an object in the slide, for example, he or she will then need a way to call viewers' attention to the current feature being discussed. As a result, White proposed adding a simple pointer equivalent to today's laser pointers to draw the viewer's attention to the feature being discussed. Because no writing or erasing could occur with these static images, there would be a single pointer image whose meaning was simply "look here."

98.    Torok, meanwhile, discussed electronic versions of blackboards. An electronic blackboard of the type discussed in the Torok article is different than a slide-presentation system. Such a blackboard typically starts out blank. In use, the speaker writes where he or she wishes and the characters or drawing appear before the audience's eyes. The perceived movement caused by the appearance of new material is enough to attract people's eyes to the current location. Unsurprisingly, therefore, the electronic blackboard discussed in the Design

26

Exhibit 13
Page 000269

Considerations for Teleconferencing Systems has no pointer, since there is no pointing device, such as a mouse, connected to the system, nor is there need for one. The electronic blackboard had fairly low resolution, as low as 300x300 pixels, making it less likely that a viewer would be disoriented and making it less clear that some pointer would be useful or needed.

99.    Only after one is able to move beyond the classic "slide presentation" and "blackboard" concepts would the problems that the '956 patent overcame become clear.  It is virtually impossible to invent a solution to a problem when the problem itself has yet to be discovered. In the absence of the discovery, identification, and quantification of the problem solved by the '956 patent, no one of ordinary skill in the art could have arrived at a solution.

100.    Dr. Kelly has quoted the following to support his contention that Torok spoke of the need for write and erase cursors in his Electronic Blackboard article: "The storage device can be switched into the ERASE mode with a remote command providing a visible square erase spot for partial erasing." He derives from this that "accordingly, the Torok article…discloses a cursor for erasing." Such a spot does not mean there was a cursor. There are a minimum of 90,000 spots on the 300x300 electronic blackboard screen. It is doubtful any viewer would be likely to note any single one of them being lit up, and certainly nowhere does the Torok article suggest that is the intention. Note that Torok doesn't say the spot was to *indicate* partial erasure, but was, rather *"for"* partial erasure. It is my opinion that he meant exactly what he said. The operator of the blackboard needed no cursor because she was looking at the end of her physical eraser as it touched the actual blackboard. The viewers would be much more apt to note the disappearance of drawing elements, rather than a tiny spot of light, if there even was one.

101.    The storage device used a storage tube. This was like a television tube—CRT—on which a pixel, once lit up, stayed lit up. Typically, the only way to erase a pixel at all was to

Exhibit 13
Page 000270

erase the screen entirely, producing a brilliant green flash in the process. Storage tubes that do allow selective erasure are erased by bombarding each pixel to be erased with a powerful electronic beam. This beam ends up striking the phosphor screen on the front of the storage tube, causing Torok's "visible square spot for partial erasure."[1]

102.    The spot of light would have been quite visible on the face of the storage tube, as I stated. However, the viewers didn't see the storage tube directly. In practical use, these storage tubes were typically located in a machine room or an equipment closet. Instead, they viewed a standard television set being driven by data from the storage tube. The spot of light would have been no brighter on the television set than any other spot or pixel on the screen and, in fact, may

---

[1]http://ieeexplore.ieee.org/xpl/freeabs_all.jsp?tp=&arnumber=1472642&isnumber=31564

Selective erasure and non-storage writing in direct-view storage tubes

Lehrer, N.H.

This paper appears in: Electron Devices Meeting, 1959 International
Publication Date: 1959
Volume: 5, On page(s): 26- 26
Posted online: 2005-08-09 16:00:27.0
Abstract
A new concept in direct-view half-tone storage tube operation has been developed, based on the use of a special storage target which exhibits dual charging phenomena. One phenomenon, secondary emission, charges the storage surface positively, while the other, bombardment induced conductivity, charges it toward the backplate potential, which in this case is negative. Selection of the charging effect, and therefore the charging direction, is determined by the incident beam energy. At lower beam energies the secondary emission effect predominates, while at higher energies bombardment induced conductivity prevails. This is in contrast to the operation of conventional direct-view half-tone storage tubes which depend only on secondary emission for both positive and negative charging. With such a mode of operation, it is not practical to achieve either selective erasure or non-storage writing. Selective erasure is the ability to rapidly erase one or more of the smallest written elements as distinct from erasure of the entire storage target. By non-storage writing is meant the presentation of cathode-ray information on the viewing screen without disturbing the written or erased areas of the storage target.

28

Exhibit 13
Page 000271

have been blanked out from their view entirely. The article is silent on this and I am not aware of a working system provided by Dell, Gateway or Microsoft for viewing.

### (1)   Claim 1

103.   My analysis in ¶¶ 96-102 applies here. Based on my analysis, the combination of the Torok and White articles fails to disclose "means for displaying a selective distinctive graphic image at positions on said viewing unit corresponding to positions where said images are being changed on said sending unit.

### (2)   Claim 3

104.   Claim 3 depends from claim 1, therefore my analysis above in ¶ 103 applies here.

### (3)   Claim 5

105.   Claim 5 depends from claim 1, therefore my analysis above in ¶ 103 applies here.

### (4)   Claim 15

106.   My analysis in ¶¶ 96-102 applies here. Additionally, based on my analysis, the combination of Torok and White articles fails to disclose "mixing said generated overlay image with said provided data to said viewing screen so that said generated overlay image is positioned with respect to a determined location of said last changed data."

### (5)   Claim 17

107.   Claim 17 depends from claim 15, therefore my analysis above in ¶ 106 applies here.

### (6)   Claim 18

108.   My analysis in ¶¶ 96-102 applies here. Additionally, based on my analysis, the combination of Torok and White articles fails to disclose "generating separate from said drawn images distinctive graphic images"; the combination also fails to disclose "selectively enabling one of said generated graphic images so as to provide a selected one of said graphic images to

Exhibit 13
Page 000272

said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed."

### (7)    Claim 21

109.    My analysis in ¶¶ 94-102 applies here.

### H.    U.S. Patent No. 4,125,743 ("the '743 patent") in view of the White Article

110.    I note first that the '743 patent was considered by the United States Patent and Trademark office during prosecution of the '956 patent. The subject matter of the '743 patent and the Torok article are similar, and thus my analysis above in ¶¶ 90-102 applies here.

### (1)    Claim 1

111.    My analysis in ¶¶ 90-103 and 110 applies here. Based on my analysis, the combination of the Torok and White articles fails to disclose "means for displaying a selective distinctive graphic image at positions on said viewing unit corresponding to positions where said images are being changed on said sending unit."

### (2)    Claim 3

112.    Claim 3 depends from claim 1, therefore my analysis in ¶ 111 applies here.

### (3)    Claim 5

113.    Claim 5 depends from claim 1, therefore my analysis in ¶ 111 applies here.

### (4)    Claim 15

114.    My analysis in ¶¶ 96-102 and 110 applies here. Based on my analysis, the combination of Torok and White articles fails to disclose "mixing said generated overlay image with said provided data to said viewing screen so that said generated overlay image is positioned with respect to a determined location of said last changed data."

### (5)    Claim 17

115.    Claim 17 depends from claim 15, therefore my analysis in ¶ 114 applies here.

Exhibit 13
Page 000273

### (6)    Claim 18

116.    My analysis in ¶¶ 96-102 and 110 applies here. Based on my analysis, the combination of the '743 patent and White article fail to disclose "selectively enabling one of said generated graphic images so as to provide a selected one of said graphic images to said viewing unit at the position on said viewing unit corresponding to where images created on said sending unit are being changed."

### (7)    Claim 21

117.    Claim 21 depends from claim 18, therefore my analysis in ¶ 116 applies here.

### I.    U.S. Patent No. 3,617,630 ("the '630 patent")

118.    I addressed this reference above. My analysis in ¶¶ 55 and 57 applies here.

## The '630 patent in view of U.S. Patent No. 3,718,759 ("the '759 patent")

### (1)    Claim 1

119.    My analysis in ¶¶ 55-59 applies here.  The '759 patent fails to disclose a cursor of any sort.  In fact, claim 5 of the '759 patent defines the viewer's image display as what can best be described as basically a very large electricity-driven Etch-A-Sketch.  The '759 and '630 patents fail to disclose a "selective distinctive graphic image at positions on said viewing unit corresponding to where said images are being changed on said sending unit."  Accordingly, even if it were obvious to combine the '630 and '759 patents, the combination still fails to disclose all the claimed features.

120.    It would not be obvious to combine the '759 patent with the '630 patent because the '630 patent discloses, as set forth in ¶ 52, a one-to-many device whereas the '759 patent discloses an alternative interactive teaching system. The fundamentally different purposes of these systems would teach away from the combination suggested by Dr. Kelly.  Further, the '630 patent discloses a video display system utilizing television display equipment. An objective of

Exhibit 13
Page 000274

the '759 patent was building a relatively inexpensive, easy to use and manufacture teaching system. Col. 2:1-5. The '759 patent discloses that utilizing a film strip projector would be more expensive. Col. 6:5-11. Accordingly, the inventors of the '759 patent would not have utilized the technology disclosed in the '630 patent as it would have been more expensive to do so, counter to one of the '759 patent's stated objectives.

## VIII.    VALIDITY OF THE '356 PATENT

### A.    The Home Accountant And Financial Planner for the Macintosh

121.    The '356 patent is about the user experience, not the construction of specific system software to provide the experience.  Figures 3-7 of the '356 patent, for example, show an exemplary embodiment of the '356 patent, a graphical object displayed to facilitate users making inputs. The tools in the '356 patent are experienced by end users as separate and distinct entities, complete and whole in their own right.  The tools in the '356 patent are also inextricably tied to the input field that has called them into existence.  Any human interface object which is not explicitly called into existence—"concurrently display[ed]"—is not a tool as set forth by the '356 patent.

122.    Neither the Key Caps Desk Accessory nor the Calculator Desk Accessory nor any other Desk Accessory are called into existence—"concurrently display[ed]"—by Home Accountant.  These are therefore not tools as claimed by the '356 patent.

123.    There seems to have been some further confusion, however, on the part of Mr. Buscaino over the role of the Key Caps Desk Accessory specifically. We at Apple added this accessory to the system not to act as an alternate keyboard but rather as a way for people to find characters not printed on the keys of their hardware keyboard.  In typical use, the person would find the image, mentally note what key it was associated with, then type the character by pressing on the physical key.  We also included the optional ability for people to click the image

Exhibit 13
Page 000275

of the keyboard in the Key Caps Desk Accessory and subsequently copy and paste the specific character they were looking for. We never intended, nor have I in my 24 years experience observing users working on various Macintosh's with Key Caps, seen anyone use Key Caps as a replacement for the physical keyboard.

### (1)    Claim 1

124.    My analysis in ¶¶ 121-123 applies here. A "[p]redefined tool associated with said one of said fields" according to the Court's claim interpretation refers to a tool *specified by the system* as an appropriate tool for filling in the information called for by that field.

125.    There is no specification at all on the part of the Home Accountant software or the system software running below it that any tools for composing information are to be used in conjunction with inputting the information into the field other than the hardware keyboard and the hardware mouse being physically controlled by the user. Mr. Buscaino points to the Macintosh operating system's Calculator Desk Accessory and Key Caps Desk Accessory. These are general purpose tools supplied with the original system to be used where and how the users choose to use them. They are equivalent to having a physical adding machine or "crib sheet" card lying on the user's physical desk. Not only are they not specifically associated with any other software, they, as Mr. Buscaino further points out, cannot insert information anywhere at any time. Rather, they require the user take at least two additional steps to get information into information fields, namely Copy and Paste. *See* Buscaino Report 21.

### (2)    Claim 2

126.    Claim 2 depends from claim 1, therefore my analysis above in ¶¶ 124-125 applies here. My analysis in ¶¶ 121-123 applies here.

127.    Mr. Buscaino states "… a tool within the Home Accountant Program will display the current date in the Date field." There is no separate and distinct calendar tool overlaid on the

33

Exhibit 13
Page 000276

forms window as set forth in the '356 patent. Instead, there is (at most) a small piece of code that looks at the system clock and supplies a string to input field routine so that the user has a started date to work from. An internal invisible piece of code is not a tool. Tools are graphical objects displayed to the user.

### (3)     Claim 4

128.     Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 124-125 applies here. My analysis in ¶¶ 121-123 applies here.  There are no tools as set forth in the '356 patent.

### (4)     Claim 6

129.     Claim 6 depends from claim 1, therefore my analysis above in ¶ 124 applies here. My analysis in ¶¶ 121-123 applies here.

### (5)     Claim 7

130.     Claim 7 depends from claim 1, therefore my analysis above in ¶ 124 applies here. My analysis in ¶¶ 121-123 applies here.

### (6)     Claim 10

131.     My analysis in ¶¶ 121-125 applies here.  Based on my analysis, the Home Accountant and Mac fail to disclose means for storing a plurality of predefined tools associated with respective ones of said fields.

### (7)     Claim 11

132.     Claim 11 depends from claim 10, therefore my analysis above in ¶ 131 applies here.  There is no tool adapted to allow the user to compose information.

### (8)     Claim 12

133.     Claim 12 depends from claim 11, therefore my analysis above in ¶ 132 applies here.  Additionally, Mr. Buscaino's report fails to set forth a tool which displays information which is changed periodically.

Exhibit 13
Page 000277

### (9)    Claim 13

134.    Claim 13 depends from claim 10, therefore my analysis above in ¶ 131 applies here.

### (10)    Claim 15

135.    Claim 15 depends from claim 10, therefore my analysis above in ¶ 131 applies here.

### (11)    Claim 16

136.    Claim 16 depends from claim 10, therefore my analysis above in ¶ 131 applies here.

### (12)    Claim 19

137.    My analysis in ¶¶ 121-125 applies here. Based on my analysis, the Home Accountant and Mac fail to disclose "concurrently displaying a predefined tool associated with said one of said fields."

### (13)    Claim 21

138.    Claim 21 depends from claim 19, therefore my analysis above in ¶ 137 applies here.

### B.    Xerox Star

139.    The Xerox Star system was vastly slower than the machines available at the time of the '356 patent, and was for this reason alone not capable of the task of supporting such complex data-entry tools as set forth in the '356 patent.  Opening up even such simple desk accessories as the Calculator or Clock could take tens of seconds rather than a fraction of a second. Having to open a plurality of such tools would have made the application unusable. The state of the technology assured no use of tools as set forth in the '356 patent.

Exhibit 13
Page 000278

### (1)    Claim 1

140.    My analysis in ¶ 139 applies here. The '356 patent is about the user experience, not the construction of system software.  Figures 3-7 of the '356 patent, for example, show an exemplary embodiment of the '356 patent, a graphical object displayed to facilitate users making inputs. The tools in the '356 patent are experienced by end users as separate and distinct entities, complete and whole in their own right.  The tools in the '356 patent are also inextricably tied to the input field that has called them into existence.  Any human interface object which is not inextricably tied to the input field is not a tool as set forth by the '356 patent.

141.    Dr. Kelly's makes arguments concerning the Xerox Star Document Containing Fields.  However, a "[p]redefined tool associated with said one of said fields" according to the Court's interpretations refers to a tool specified by the system as an appropriate tool for filling in the information called for by that field. First, the Xerox Star fails to disclose a tool specified by the system that fills in information called for by the field. Second, there is no tool that supplies an individual entry from a menu of alternatives. Third, the keyboard tool is not "concurrently displayed" as by a window overlaying the form (Xerox Star uses tiling; the windows are laid side-by-side rather than overlapping, a later Apple innovation), a point with which Mr. Buscaino agrees. *See* Buscaino Report 11. Finally, there is no concept of information fields and overlaying tools, everything is on level field.

142.    With respect to Mr. Buscaino's example regarding the Field Property Sheet, the only tool associated with the property sheet is the keyboard. There is no tool adapted to supply an individual entry from a menu of alternatives. There are "button choices" on the form, but they are not separate tools.  There is simply no concept of tools. Furthermore, the buttons do not supply an individual entry of information to a field.

36

Exhibit 13
Page 000279

143.    With respect to Mr. Buscaino's example regarding the Page Property Sheet, the Page Size list is not associated with any field.  This list is simply one element in a dialogue box, and is not a tool as set forth in the '356 patent.  Further, the Page Size list does not supply an individual entry to any field.

144.    The Xerox Star, in all the examples given by Mr. Buscaino, fails to disclose each and every element of the '356 patent claims and therefore does not anticipate the '356 patent.

**(2)    Claim 2**

145.    Claim 2 depends from claim 1, therefore my analysis above in ¶¶ 140-144 applies here. Also, the Xerox Star and Mr. Buscaino's report discloses no evidence of a tool as set forth in the '356 patent that supplies transitory information.

**(3)    Claim 4**

146.    Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 140-144 applies here.

**(4)    Claim 6**

147.    Claim 6 depends from claim 1, therefore my analysis above in ¶¶ 140-144 applies here. *See* my analysis in ¶¶ 176-177.

**(5)    Claim 7**

148.    Claim 7 depends from claim 1, therefore my analysis above in ¶¶ 140-144 applies here. Mr. Buscaino offers no analysis or examples of what he refers to as information fields being a "bit-mapped-graphics-field adapted to allow the user to compose the information by writing on the bit-mapped-graphics field."

**(6)    Claim 10**

149.    My analysis in ¶¶ 140-144 applies here. Based on my analysis, the Xerox Star fails to disclose means for storing a plurality of predefined tools associated with respective ones

Exhibit 13
Page 000280

of said fields, each of said tools being adapted to supply the kind of information identified for its associated field.

### (7)    Claim 11

150.    Claim 11 depends from claim 10, therefore my analysis above in ¶ 149 applies here.

### (8)    Claim 12

151.    Claim 12 depends from claim 11, therefore my analysis above in ¶ 150 applies here. Also, the Xerox Star and Mr. Buscaino's report discloses no evidence of a tool as set forth in the '356 patent that supplies transitory information.

### (9)    Claim 13

152.    Claim 13 depends from claim 10, therefore my analysis above in ¶ 149 applies here.

### (10)    Claim 15

153.    Claim 15 depends from claim 10, therefore my analysis above in ¶ 149 applies here. See my analysis in ¶¶ 176-177.

### (11)    Claim 16

154.    Claim 16 depends from claim 10, therefore my analysis above in ¶ 149 applies here.

### (12)    Claim 19

155.    My analysis in ¶¶ 140-144 applies here. Based on my analysis, the Xerox star fails to disclose "concurrently displaying a predefined tool associated with said one of said fields," and "a tool adapted to supply an individual entry from a menu of alternatives."

Exhibit 13
Page 000281

### (13)    Claim 21

156.    Claim 21 depends from claim 19, therefore my analysis above in ¶ 155 applies here.

### C.    Apple Lisa 2/10 Computer System

157.    The Lisa system was much slower than the machines available at the time of the '356 patent, and was for this reason alone not capable of the task of supporting such complex data-entry tools as set forth in the '356 patent. Opening up even such simple desk accessories as the Calculator or Clock could take longer than 45 seconds. Having to open a plurality of such tools would have made the application unusable. The state of the technology assured that the Lisa did not make use of tools as claimed in the '356 patent.

### (1)    Claim 1

158.    The '356 patent is about the user experience, not the construction of system software. Figures 3-7 of the '356 patent, for example, show an exemplary embodiment of the '356 patent, a graphical object displayed to facilitate users making inputs. The tools in the '356 patent are experienced by end users as separate and distinct entities, complete and whole in their own right. The tools in the '356 patent are also inextricably tied to the input field that has called them into existence. Any human interface object which is not explicitly called into existence—"concurrently display[ed]"—is not a tool as set forth by the '356 patent.

159.    *With respect to a Lisa Write document:* "Predefined tool associated with said one of said fields" according to the Court refers to a tool specified by the system as an appropriate tool for filling in the information called for by that field. The Calculator Desk Accessory requires at least a Copy and Paste to insert the information from the Calculator Desk Accessory into the information field. There is no association between the Calculator Desk Accessory and any form

Exhibit 13
Page 000282

that might be found within Lisa Write or any other application. The Calculator Desk Accessory is not an "appropriate tool," as claimed by the '356 patent, for filling in the field.

160.     *With respect to the Calculator-alone example*: Mr. Buscaino has declared the Calculator as a tool (which it is of course not because it is not associated with a particular field as set forth in the '356 patent). However, then having declared it a tool, Mr. Buscaino characterizes it instead as an agglomeration of tools and forms and form fields all existing simultaneously within the same window. The calculator can not be all things at once. The Court's construction interprets "concurrently displaying" as "displaying at the same time, as by a window overlaying the form." Mr. Buscaino's example of this single entity existing in a single window does not meet the Court's definition. Even were we to ignore the Court's definition, there is no tool specified by the system as an appropriate tool for filling in the information fields. There is not a list of alternative tools. Further, there is nothing indicating the "kind of information" to be inserted into the field, *e.g.*, for the "M" field and the "Y" field, users are given no meaningful labels that will impart the kind of information to be inserted. Further, the Calculator number pad is not a tool, the entire Calculator, including the "paper tape," is the tool.

### (2)    Claim 2

161.     Claim 2 depends from claim 1, therefore my analysis above in ¶¶ 158-160 applies here. The paper tape that Mr. Buscaino depends upon for his example is not a tool. The paper tape is instead a panel within a larger entity, the Calculator, which is in turn not a tool but rather a Desk Accessory.

### (3)    Claim 4

162.     Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 158-160 applies here.

Exhibit 13
Page 000283

### (4)    Claim 6

163.    Claim 6 depends from claim 1, therefore my analysis above in ¶¶ 158-160 applies here. *See* my analysis in ¶ 177.

### (5)    Claim 7

164.    Claim 7 depends from claim 1, therefore my analysis above in ¶¶ 158-160 applies here.

### (6)    Claim 10

165.    My analysis above in ¶¶ 158-160 applies here. Based on my analysis, the Apple Lisa fails to disclose "means for storing a plurality of predefined tools associated with respective ones of said fields."

### (7)    Claim 11

166.    Claim 11 depends from claim 10, therefore my analysis above in ¶ 165 applies here.

### (8)    Claim 12

167.    Claim 12 depends from claim 11, therefore my analysis above in ¶ 166 applies here.  The paper tape that Mr. Buscaino depends upon for his example is not a tool.  The paper tape is instead a panel within a larger entity, the Calculator, which is in turn not a tool but rather a Desk Accessory, as I have already discussed. Mr. Buscaino identifies nothing else which he believes is a tool that "displays information that is changed periodically . . ."

### (9)    Claim 13

168.    Claim 13 depends from claim 10, therefore my analysis above in ¶ 165 applies here.

Exhibit 13
Page 000284

### (10)    Claim 15

169.    Claim 15 depends from claim 10, therefore my analysis above in ¶ 165 applies here. *See* my analysis in ¶ 177.

### (11)    Claim 16

170.    Claim 16 depends from claim 10, therefore my analysis above in ¶ 165 applies here.

### (12)    Claim 19

171.    My analysis above in ¶¶ 158-160 applies here. Based on my analysis, the Apple Lisa fails to disclose "concurrently displaying a predefined tool associated with said one of said fields."

### (13)    Claim 21

172.    Claim 21 depends from claim 19, therefore my analysis above in ¶ 171 applies here.

### D.    Meridian M3000 Touchphone

173.    Mr. Buscaino references the Meridian M3000 Touchphone, apparently for the purpose of finding one or more claims of the '356 invalid as obvious. Mr. Buscaino does not, however, identify *any* particular claim or claims that would supposedly be obvious. Nonetheless, I will discuss below why the M3000 Touchphone does not render any asserted claim of the '356 patent obvious.

174.    Mr. Buscaino states that it would have been obvious to combine the Meridian M3000 with any of the prior art references cited above because touch screens are intended to facilitate inputting information into computing devices. Buscaino Report 39-40. Mr. Buscaino does not cite any specific feature of the Meridian M3000 that would make it suitable to combine with the other prior art. Mr. Buscaino provides no reason why it would be any more suitable to

Exhibit 13
Page 000285

combine the Meridian M3000 than any of the other hundreds of devices disclosing touch screens at the time, or even other types of technology used to facilitate inputting information into computing devices, with the prior art. Accordingly, it would not be obvious to combine the Meridian M3000 with any of the prior art listed above.

175.   Mr. Buscaino suggests such a skilled person would have combined this obscure Meridian M3000 telephone with any of the prior art and, based on its existence, have connected a touch screen to such early graphical-user-interface-driven software and systems as the Home Accountant and Financial Planner for the Macintosh, the Xerox Star computer, and the Apple Lisa. The person of ordinary skill would not have been led to such a combination with any of these three systems.

176.   First, with respect to the Xerox Star, the system was not a general-purpose computer. Instead, it was a dedicated system with a closed architecture. One couldn't simply wire in a touch panel and have everything operate as expected. The development team would have had to throw out the results of all their research for the last 15 years that had led them to a mouse-driven interface and started over in a new direction. These were machines that were costing tens of millions of dollars to bring to market. Such radical moves would never have been considered. Certainly the person of ordinary skill, aware of the extensive interface work that underlay the Xerox Star, would not be motivated to make serious changes to this interface.

177.   Additionally, a person of ordinary skill would not have been led to combine any of the systems with the Meridian Touchphone because the touch interface was considered unsuitable for these systems. Lawrence Tessler, a Xerox, later Apple, engineer did a study in the 1970s on pointer use that found that people using such systems would point and click approximately 10,000 times per month. He concluded that having to raise your arm to touch a

Exhibit 13
Page 000286

vertically-oriented glass picture tube display 10,000 times per month would have been physically damaging. [Private conversation with Lawrence Tessler in 1980.] A vertical display was the only display ever supplied with the Star. Based on Tessler's study, no work was done at Xerox on touch screens for the Star because Tessler had determined it to be a bad idea in this context. The Lisa, likewise, also was supplied exclusively with a vertical display. During the Lisa's development, Apple hired Lawrence Tessler to lead the Human Interface development of the computer. Mr. Tessler brought with him the lesson he had learned about the potentially damaging effects of touch screens on users, and no pointing device other than the mouse was ever contemplated for or supplied with the Lisa. Finally, the Macintosh has always been provided with a vertical display. For the same reasons discovered in Lawrence Tessler's study that caused Apple to never supply a touch screen for the Lisa, Apple did not, and still has not, supplied a touch screen for the Macintosh.

E.    **HP 150 Touchscreen Personal Computer System ("HP 150")**

178.    As with the Meridian M3000 Touchphone, for the HP 150 Mr. Buscaino claims that the reference renders the '356 patent obvious over one or more of the Home Accountant and Financial Planner for the Macintosh, the Xerox Star computer, and the Apple Lisa, but does not provide an identification of the specific claims supposedly invalid as obvious. Nonetheless, below I set forth my reasoning as to why the asserted claims of the '356 patent are not obvious, on a claim by claim basis in this instance because Mr. Buscaino at least attempted to provide more analysis in the case of the HP 150 than the Meridian M3000 Touchphone.

179.    In my opinion, no asserted claim of the '356 patent is obvious over any of these combinations of references including the HP 150 for the same reasons as expressed above for the Meridian M3000. My analysis in ¶¶ 174-177 applies here with respect to the HP 150 in the same way as with the Meridian M3000.

Exhibit 13
Page 000287

### (1)    Claim 1

180.    Mr. Buscaino offers an example of a Personal Application Manager and discusses its "two fields." In fact the Personal Application Manager has only one field and it is neither of one of the ones discussed by Mr. Buscaino.  This one input field lies above the information display region that Mr. Buscaino characterized as information fields. All work takes place in this one input field and is then transferred to the display area. There are no separate tools provided with this device. There are no tools for entering information into this field. Given that there is only one field, this is not even a form as set forth in the '356 patent.

### (2)    Claim 2

181.    Claim 2 depends from claim 1, therefore my analysis above in ¶ 180 applies here. Also, the HP 150 discloses no evidence of a tool that supplies transitory information. Rather here, the user supplies the sum total of all information.

### (3)    Claim 4

182.    Claim 4 depends from claim 1, therefore my analysis above in ¶ 180 applies here. Also, there is no keyboard tool.  Mr. Buscaino puts forth no evidence that such a keyboard actually existed.

### (4)    Claim 6

183.    Claim 6 depends from claim 1, therefore my analysis above in ¶ 180 applies here.

### (5)    Claim 7

184.    Claim 7 depends from claim 1, therefore my analysis above in ¶ 180 applies here.

### (6)    Claim 10

185.    My analysis in ¶ 180 applies here. Based on my analysis, the HP 150 fails to disclose "means for displaying a plurality of information fields and for identifying the kind of information to be inserted therein"; the HP 150 fails to disclose "means for storing a plurality of

Exhibit 13
Page 000288

predefined tools associated with respective ones of said fields"; and the HP 150 also fails to disclose "means responsive to information being inserted in at least one of said fields for indicating another of said fields to be filled in."

       **(7)    Claim 11**

186.    Claim 11 depends from claim 10, therefore my analysis above in ¶ 185 applies here.

       **(8)    Claim 12**

187.    Claim 12 depends from claim 11, therefore my analysis above in ¶ 186 applies here. Also, there is no tool that displays information that is changed periodically.

       **(9)    Claim 13**

188.    Claim 13 depends from claim 10, therefore my analysis above in ¶ 185 applies here. The Financial Calculator to which Mr. Buscaino refers is a simulation of a complex HP-12C Handheld Calculator. It is a full-scale application in its own right and almost certainly would have taken up the entire available memory during operation prohibiting its use in conjunction with any other application and is, of course, not a tool inextricably tied to some associated fields in some other separate and distinct application, thereby failing the definition of a tool, as set forth in the '356 patent.

       **(10)    Claim 15**

189.    Claim 15 depends from claim 10, therefore my analysis above in ¶ 185 applies here.

       **(11)    Claim 16**

190.    Claim 16 depends from claim 10, therefore my analysis above in ¶ 185 applies here.

Exhibit 13
Page 000289

**(12)    Claim 19**

191.    My analysis in ¶ 180 applies here. Based on my analysis, the HP 150 fails to disclose "displaying on said display a plurality of information fields"; the HP 150 fails to disclose "concurrently displaying a predefined tool associated with said one of said fields"; the HP 150 fails to disclose "a tool adapted to supply an individual entry from a menu of alternatives"; and the HP 150 also fails to disclose "at least a tool adapted to allow said user to compose information."

**(13)    Claim 21**

192.    Claim 21 depends from claim 19, therefore my analysis above in ¶ 191 applies here.

**F.    Prior Art References Disclosing Writing On A Bit Mapped Graphics Field**

193.    Mr. Buscaino has provided no prior art showing a form with an information field being "a bit mapped graphics field adapted to allow said user to compose said information by writing on said field." Prior art disclosing writing on a bit mapped graphics field is no more relevant than prior art disclosing typing on a keyboard or viewing output on a monitor. None of these underlying technologies result in, anticipate, or render obvious the '356 patent.

**IX.    SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS**

194.    I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success, Long-Felt But Unsolved Need and/or Failure of Others, and Industry Recognition.

195.    At the time of the '956 patent, people in the field were attempting and failing to provide an effective means of remote collaboration. One camp of those working in the art were experimenting with a cursor generation system. Another camp was experimenting with a

Exhibit 13
Page 000290

freehand drawing (blackboard) system. These two groups failed to identify or even see these two technologies as being related or that one could help solve the problem of the other. Several experimental systems facilitating remote collaboration had been tried for enabling remote collaboration. These had problems both because of their capabilities and because of a lack of understanding of how to provide an effective human interface.

196.    With respect to the '356 patent, the computers of the day, e.g., the Xerox Star and Apple Lisa, were, by today's standard, ploddingly slow computers. They had tiny memories, less than 1000th that of a personal computer today, and ran more than 1000 times slower. When the Lisa was introduced in 1981, it took 45 seconds to just open a desk accessory like a clock in preparation for use. Inventions like the '356 patent with it's pop-up calendar were unthinkable, let alone obvious because of the lag that would have occurred while the data was painstakingly transferred from the hard disk to memory and massaged into a useful form before finally being presented. In that time, a user could easily glance at a paper desk calendar and then manually insert the information.

197.    The Macintosh's introduction in 1984 actually made things worse. The Lisa's tiny hard disk was replaced by floppy disks, a far smaller, slower medium. The Mac's internal memory was so small that nothing more than essentials could reside in memory. Any time a special routine was needed for the program, the user would have to remove the disk holding the user's documents, replace it with the program disk, and swap back the document disk. Providing tools as per the '356 patent would have almost certainly resulted in the original Macintosh computers slowing to a crawl. The memory got marginally larger by 1985, but there was still no hard disk, and the extra memory was soon being used by the Switcher, enabling people to hold more than one application in memory at a time. By this time, both the Lisa and the Xerox Star

Exhibit 13
Page 000291

had been retired. No one had the hardware platform even capable of incorporating the '356 patent advantageously. Having failed numerous times in the past and knowing the shortcomings of the technology, those of us working in the art were interested only in those improvements that could be implemented successfully in the short term. Developers were, overwhelmingly, interested in using those tools that we at Apple were supplying, both because it made their development cycles shorter and because they faced their own memory and performance limitations. Developers were also struggling with learning the new and foreign technology that the Macintosh environment represented.

198.    Computer from the 1985 era continued to have a surprising number of "walls" that lie between those systems and any attempt at replicating the invention of the '356 patent. The accessories that were supplied were indirect. The user could open the standard calculator, but the numbers didn't magically float into place in an application. The user had to paste them there.

199.    We all knew there was a problem—people were clicking the mouse too often and "traveling" too far to assemble the information they needed—but we didn't know what to do about it within the tight confines of the hardware with which we had to work. Those in the art were trying but failing to make the user experience more efficient.

200.    The '356 inventors took a clever approach to solve this problem an overcome all the failures of others: They reduced the task actually being addressed by their experimental system to an absolute minimum, so that memory constraints no longer boxed them in, then made that user experience as efficient and pleasant as possible. http://www.macos.utah.edu/Documentation/MacOSXClasses/macos xone/macintosh.html#7

Exhibit 13
Page 000292

## X.    COMPENSATION

201.    I am being compensated at a rate of $750 per hour for my first 50 hours of work on this report and $500 per hour for my work beyond the first 50 hours, plus expenses. My compensation does not depend in any way on the conclusions or outcome of my analysis.

## XI.    CONCLUSION

202.    The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available.

Exhibit 13
Page 000293

Dated: May 12, 2006

Bruce Tognazzini

Exhibit 13
Page 000294

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May, 2006, a copy of the foregoing EXPERT REPORT OF BRUCE TOGNAZZINI RELATING TO THE EXPERT REPORT OF JOHN P.J. KELLY, Ph.D. RE LUCENT'S TOROK PATENT AND TO THE EXPERT REPORT OF DALE BUSCAINO RE LUCENT'S DAY PATENT was served on counsel for Gateway, Microsoft and Dell as follows:

**EMAIL**
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California  92130
Telephone:  858-678-5070
Facsimile:  858-678-5099
marchese@fr.com
srodriguez@fr.com

**EMAIL**
Sidney Rosenzweig
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC  20004
Telephone:  202-942-5000
Facsimile:  202-942-5999
sidney_rosenzweig@aporter.com

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC  20005-3096
Tel:     202-756-8000
Fax:     202-756-8087
jfreed@mwe.com

Attorneys for *Microsoft Corp.*

Attorneys for *Dell Inc.*

**EMAIL**
W. Bryan Farney
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas  78701
Tel:     512-394-3000
Fax:     512-394-3001
jeff.plies@dechert.com
bryan.farney@dechert.com
lawrence.fluker@dechert.com

Attorneys for *Gateway, Inc., et al.*

_____
Lori Duignan

Exhibit 13
Page 000295