# Hayes Declaration

# Exhibit 22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

LUCENT TECHNOLOGIES INC.,

Plaintiff,

v.

GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.,

Defendants,

and

MICROSOFT CORPORATION,

Intervener.

Case No. 02-CV-2060-B (CAB)
consolidated with
Case No. 03-CV-0699-B (CAB)
Case No. 03-CV-1108-B (CAB)

**DECLARATION OF MR. BRUCE TOGNAZZINI IN SUPPORT OF LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 19 & 21 OF U.S. PATENT NO. 4,763,356**

Date: January 7, 2008
Time: 10:30 A.M.
Courtroom: 13, 5th Floor
Judge: Hon. Marilyn L. Huff

MICROSOFT CORPORATION,

Plaintiff,

v.

LUCENT TECHNOLOGIES INC.,

Defendant.

LUCENT TECHNOLOGIES INC.,

Plaintiff,

v.

DELL INC.,

Defendant.

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000371

I, Bruce Tognazzini, hereby declare as follows:

1. I have been retained as an expert in this case by counsel for Lucent Technologies Inc. ("Lucent"). If called to testify as a witness, I could and would competently testify to the truth of each statement herein.

2. I submit this Declaration in support of Lucent's opposition to Defendants' motions for summary judgment of invalidity of U.S. Patent No. 4,765,356 ("the '356 patent").

3. A true and correct copy of the October 12, 2007 Supplemental Expert Report of Bruce Tognazzini ("Supplemental Report") Relating To The Second Supplemental Expert Report Of Dale Buscaino Regarding Lucent's Day Patent, that I prepared in connection with this case, is attached as Exhibit A.

4. A true and correct copy of the May 12, 2006 Expert Report of Bruce Tognazzini Relating To The Expert Report of Dale Buscaino Re Lucent's Day Patent ("Initial Report"), that I prepared in connection with this case, is attached as Exhibit B.

5. My Initial and Supplemental Reports are based on this Court's existing claim constructions, and accurately reflect my invalidity opinions in this case and the bases therefore, and thus I incorporate these reports as they relate to invalidity of the '356 patent, as if the applicable sections were stated fully herein.

**Your Money Manager ("YMM")**

6. Your Money Manager ("YMM") was a personal finance program based on large-scale professional finance programs, and was designed using the MS DOS operating system. That assumed a system with no pointing device or touch entry. It also assumed that any menus or other accessories would be invoked by function keys dedicated to each menu or other accessory. The MS DOS system requires the user to negotiate a labyrinth of menus and carryout series of operations in dictated by the designers. The MS DOS interface paradigm is inherently different from that of the graphical user interface machines.

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

1

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000372

**(1) Claim 19**

7. This claim requires "a tool adapted to allow said user to compose said information" which the Court has construed to mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool." Mr. Buscaino states that this limitation is met by an on-screen calculator that the user may call up by pressing the "F2" key when the "Amount" field is selected. I disagree. The on-screen calculator of YMM is not a tool within the meaning of the Court's construction; it does not permit a user to compose information by pointing to display keys. Rather, the on-screen calculator that Mr. Buscaino points to is merely a visual guide for the user of a physical keyboard reconfiguration. For example, the on-screen calculator visually indicates numbers that are available only via the physical keyboard, and certain functions, "CLR", "+/-", etc., that are also available only via the physical keyboard using certain function keys. This visual representation only aids the user utilize the physical keyboard. The on-screen calculator does not have "display keys," nor anything by which a user could "point" to "display keys."

8. Mr. Buscaino appears to recognize the lack of this limitation in YMM by admitting that YMM does not disclose using a mouse, pointing device, or touch-screen. Mr. Buscaino contends that it would have been obvious to add the use of a mouse, pointing device, or touch screen, in light of various other prior art references. I disagree. First, YMM teaches away from using a mouse because it uses the MS DOS operating system and, as discussed above, it was presumed that YMM would not be used with a mouse or other pointing device. YMM was optimized for the keyboard and it would be extremely difficult to make YMM work with a pointing device with anywhere close to the same efficiency. Programs designed for MS DOS were optimized for the keyboard interface. Such programs, like YMM, are difficult to modify for use with a mouse, pointing device, or touch-screen while maintaining the same level of user efficiency. Instead, when a developer writes a pointing-device-driven program, they will completely re-write it in a user-in-control vernacular. This is typically done as a completely new design without reference to that which came before. This explains why neither Quicken nor Home Accountant (or any other

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

2

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000373

personal finance programs) built on the work of YMM. This likewise explains why the types of predefined and associated tools claimed in the '356 patent continued to elude software developers at the time.

9. Further, even if it were obvious to one of ordinary skill in the art to add a mouse to a system running YMM, doing so would still not meet the limitations of claim 19. When I attempted to run YMM on a computer with a mouse, the visual representation that Mr. Buscaino calls an on-screen calculator does not respond to the mouse. As discussed above, the on-screen calculator of YMM does not have "display keys" with which a user can interact. Thus, even if a mouse were added to a system running YMM, the on-screen calculator would need to be wholly redesigned to permit a user to interact with the on-screen calculator using the mouse. Also, additional elements would have to be added to the on-screen calculator. For example, there is no "Enter" button or transfer mechanism to allow a user to transfer the information from the on-screen calculator to an information field. One would have to take another step of reconfiguring the on-screen calculator of YMM to meet this limitation. Thus, it would not be obvious to one of ordinary skill in the art to add all these missing features to YMM to meet the limitation of a tool that "allows the user to compose information by pointing to the display keys of that tool." Contrary to Mr. Buscaino's opinion, it is not just a simple matter of adding a mouse to YMM to reach the claimed invention. Rather, to arrive at the claimed invention requires a complete shift in user-interface paradigm from a physical keyboard driven device to an on-screen driven device.

10. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to make this paradigm shift or to combine YMM with any of the prior art mouse devices, pointing devices, or touch-screens cited by Mr. Buscaino. As discussed above, YMM was designed for MS DOS, and was not presumed to work with—or need—such pointing devices. At the relevant time, the developers of mouse or pointer-driven systems were mining mouse-driven systems such as the Apple Macintosh for ideas, not MS DOS applications optimized for keyboard use. Thus, at the time, there was simply no reason to combine the mouse-based interface used in such newer systems with

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

3

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000374

the keyboard-based interface used in the older and soon-to-be obsolete MS DOS system. Further, one of ordinary skill in the art would not have considered adding a mouse-based interface to YMM because YMM was optimized for the keyboard-driven MS DOS system. Such a combination would likely have slowed down the YMM user. In addition, as discussed above, adding a mouse to YMM would not even work and would require not only reconfiguring the system, but also reconfiguring the on-screen calculator discussed by Mr. Buscaino. In other words, the prior art as a whole taught away from combining YMM with any mouse, pointer, or touch-screen interface disclosed in the references cited by Mr. Buscaino. And even if a mouse were added to the YMM system, further modifications would be necessary as discussed above to arrive at the claimed invention.

11. For the reasons stated above, claim 19 is not rendered obvious or otherwise invalid in light of YMM in combination with any of the following references cited by Mr. Buscaino, including: Home Accountant Program, Xerox Star, Apple Lisa, Tyler article, or any of the references described in Sections B, C, D, or G of Mr. Buscaino's September 14, 2007 supplemental expert report.

**a. <u>Claim 21</u>**

12. Claim 21 depends from claim 19, therefore my analysis above applies here. Claim 21 adds the requirement where the step of displaying the information fields is done in a "bit-mapped-graphics field," which this Court has construed to mean "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus." Mr. Buscaino admits that YMM fails to disclose this limitation. I agree with Mr. Buscaino on this point. Mr. Buscaino contends that the Tyler article and U.S. Patent No. 4,757,549 ("Machart") when combined with YMM render this claim obvious. I disagree.

13. I disagree that Tyler discloses "writing on a touch sensitive screen" in such a "bit-mapped-graphics field." Although the Tyler article discloses a touch sensitive screen, it fails to disclose the ability to write in a bit-mapped-graphics field as contemplated by this claim limitation. Indeed, Mr. Buscaino fails to identify where Tyler discloses any writing in a bit-mapped-graphics field, or the use of a stylus or pen and writing with the system disclosed in the article. In fact, Mr.

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

4

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000375

Buscaino seems to contradict himself when later in his report he admits that the FXFE system allegedly set forth in the Tyler article does not disclose this limitation.

14. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine either the Tyler article or the Machart reference with YMM on this point. YMM is a high-efficiency keyboard entry system designed for maintaining personal finance information, sold for use in standard MS DOS computers that did not have touch screens and that did not utilize graphics tablets. Accordingly, the YMM program never contemplated the use of handwriting or signatures. Further, handwriting is a slow and inefficient method of accepting input. Indeed, Mr. Buscaino suggests no problem to be solved in YMM that would require the use of writing in bit-mapped-graphics fields. Similar to my discussion above, adding a bit-mapped-graphics field would require a paradigm shift from a physical keyboard driven device to an on-screen driven device.

For the reasons stated above, claim 21 is not rendered obvious or otherwise invalid in light of YMM in combination with any of the references cited by Mr. Buscaino.

**Foreign Exchange Front End (“FXFE”)**

15. Mr. Buscaino alleges that the Tyler article describes the Foreign Exchange Front End (“FXFE”), based on conversations with Mr. Robert Long. I note that the Tyler article does not mention FXFE. Although I understand that counsel for Lucent have attempted to arrange for me to talk to Mr. Long, I have not had an opportunity to do so. The only information that Mr. Buscaino has presented regarding the assertion that the “FXFE” renders obvious this claim is the Tyler article itself, an article which does not mention “FXFE.” If Defendants are allowed to present additional information regarding FXFE, I reserve the right to provide analysis and rebuttal at that time.

16. Based on my review of the Tyler article, that article does not disclose each and every limitation of claims 19 and 21 of the '356 patent. Nor does it render the claims obvious.

17. I note that the Tyler article is a magazine article. It is not an instruction manual or any other type of technical document regarding or even referencing FXFE. The Easel system as

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

5

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000376

described by this four-page article does not disclose many of the claim limitations required by claims 19 and 21 of the '356 patent.

**(2) <u>Claim 19</u>**

18. Mr. Buscaino states that FXFE discloses "indicating a particular one of said information fields into which information is to be inserted" by having the field identifier "intensif[y]" after being "touched with a finger." This is not disclosed in the Tyler article. The Tyler article certainly does not disclose a system that indicates any field into which information is to be inserted and Mr. Buscaino points to no such disclosure. Mr. Buscaino also states that this limitation is obvious in light of other prior art references, such as Home Accountant or Xerox Star. I disagree.

19. There is no disclosure in the Tyler article of a system that indicates the current field. When the user touches a label on the right side of the screen described in Tyler, it typically causes the contents of the left side of the screen to change. This change in content would draw the users' eyes immediately and involuntarily to the left side of the screen. Thus, because the user is no longer looking at the right side of the screen, there is no need for any highlighting of any field on the right side of the screen at that point because the right side of the screen would go unnoticed. The Tyler article also does not suggest that the system controlled movement between active fields. Where the user has chosen the active field, and feedback in the form of the other side of the screen changing acknowledges that the system received that request, the need to identify the active field is sharply reduced or eliminated.

20. Mr. Buscaino also contends that FXFE "concurrently display[s] a predefined tool associated with said one of said fields." The Tyler article has no such disclosure. In fact, Mr. Buscaino admits that touching the "customer" field causes a "menu of alternatives tool" to be displayed on the left hand side of the display—not in a window overlaying the form, or any other kind of window, as required by the Court's claim construction. The single screen-shot picture in the Tyler article appears to show a side-by-side tiling type of display, similar to that disclosed by the

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

6

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000377

Xerox Star system. It does not appear to disclose any "window overlaying" the form, or any other type of "windowing" technology.

21. Further, I know of no reason to combine overlaying windows with the Tyler article from any other prior art reference, nor does Mr. Buscaino suggest any. Nor was there any problem with system of the Tyler article to be solved by adding overlaying windows.

22. Mr. Buscaino also states that FXFE discloses "predefined tool[s] associated with said one of said fields." This is not disclosed in the Tyler article. The Tyler article certainly does not disclose a system that uses any predefined tool associated with an information field that is specified by the system as an appropriate tool for filling in the information called for by such information field.

23. I also know of no reason to combine such "predefined tool[s] associated with said one of said fields" with the system disclosed in Tyler from any other prior art reference. Nor was there any problem with the system disclosed in Tyler to be solved by adding such predefined tools.

24. Likewise, Mr. Buscaino states that FXFE discloses predefined tools that include both a "menu of alternatives" and a "tool adapted to allow said user to compose said information." Again, I disagree that the Tyler article discloses these elements. The Tyler article does not disclose any "menu of alternatives" tool or any "tool adapted to allow said user to compose said information" as required by the claims. The Tyler article does not disclose whether the "list of brokers," "QWERTY layout," or "numeric keypad" mentioned in the Tyler article are "predefined tools associated with said one of said fields" and otherwise satisfy the Court's claim construction. There is no evidence that either the "QWERTY layout" or "numeric keypad" are associated with specific information fields and are not, instead, system-level tools. In fact, the single example of a "composition tool" cited by Mr. Buscaino recognizes that the "QWERTY layout" is activated only upon touching the "other" entry—and thus is not associated or otherwise linked with any information field.

25. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF
INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

7

Case Nos. 02-CV-2060-B (CAB),
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000378

to combine such "composition tools" or "menu of alternatives" tools that are associated with specific information fields into the system disclosed in the Tyler article from any other prior art reference, including the references cited in sections F and G of Mr. Buscaino's report. Nor was there any problem with the system disclosed in the Tyler article to be solved by adding such composition or menu of alternatives tools that are associated with specific information fields. This further supports my opinion that claim 19 is not obvious over the Tyler article.

26. Mr. Buscaino also states that FXFE discloses "inserting in said one field information that is derived as a result of said user operating said displayed tool." Again, I disagree that the Tyler article discloses this element. For example, the Tyler article does not disclose whether numeric data entered into the numeric keypad would have been entered into an indicated field.

27. For the reasons stated above, claim 19 is not rendered obvious or otherwise invalid in light of the Tyler article in combination with any of the references cited by Mr. Buscaino.

**b. <u>Claim 21</u>**

28. Claim 21 depends from claim 19, therefore my analysis above applies here. Claim 21 adds the requirement where the step of displaying the information fields is done in a "bit-mapped-graphics field," which this Court has construed to mean "a field into which a user is to enter information by writing on a touch sensitive screen using a stylus." Mr. Buscaino contends that the Machart reference, the Apple Graphics Tablet, the Koalapad, and/or other references, when combined with FXFE render this claim obvious. I disagree.

29. First, I disagree that the Tyler article discloses "writing on a touch sensitive screen" in a "bit-mapped-graphics field." Although the Tyler article discloses a touch sensitive screen, it fails to disclose the ability to write in a bit-mapped-graphics field as contemplated by this claim limitation. Indeed, Mr. Buscaino fails to identify where Tyler discloses any writing in a bit-mapped-graphics field, or the use of a stylus or pen and writing with the system disclosed in the article. In fact, Mr. Buscaino seems to contradict himself when later in his report he admits that the FXFE system that he alleges is set forth in the Tyler article does not disclose this limitation.

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

8

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000379

30. Although a teaching, suggestion, or motivation to combine does not necessarily need to exist for a finding of obviousness, I note that there is no such teaching, suggestion, or motivation to combine the Machart reference, the Apple Graphics Tablet, the Koalapad, and/or other references with Tyler on this point. The Tyler article discloses a high-efficiency touch-screen entry system designed for entering trades in high volumes on a trading floor. Such systems had no need or use for writing on bit-mapped graphics fields. There is no evidence that the system of the Tyler article ever contemplated the use of handwriting or signatures. Further, handwriting is a slow and inefficient method of accepting input. Indeed, Mr. Buscaino suggests no problem to be solved in Tyler that would require the use of writing in bit-mapped-graphics fields. This further supports my opinion that claim 21 is not obvious over the Tyler article.

31. For the reasons stated above, claim 21 is not rendered obvious or otherwise invalid in light of the Tyler article in combination with any of the references cited by Mr. Buscaino.

**Home Accountant & Tyler Magazine Article**

32. I have been informed that one of the Defendant's motions claims that the '356 patent claims are rendered obvious by the Home Accountant in combination with the Tyler magazine article. I disagree.

33. I have been informed that Defendants' argue that it would have been obvious to modify or change the Macintosh Home Accountant application to either (1) link or associate a predefined composition tool to specific information fields, or (2) modify the Home Accountant form entry system such that it would have inserted information into an associated information field. I disagree.

34. The majority of on-screen keyboard and keycap arrays that have been discussed in Mr. Buscaino's report are associated with systems not having physical keyboards, thus requiring such virtual alternatives. Although one of ordinary skill in the art may have been aware of these various touch- and stylus-driven systems, those skilled in the art would not have been led to add virtual keyboards or keypads to conventional physical keyboard-driven systems. These virtual keyboards and keypads had the potential to slow down the system and were typically less efficient

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356   9   Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000380

than conventional physical keyboards for most applications. For example, when these objects were added, for example as in the Macintosh KeyCaps Desk Accessory application, it was done not to facilitate text entry but rather to help users select different fonts or for other specialized purposes. Applications such as the Macintosh (and, later, Windows) calculator, did feature on-screen keypads, however the efficient and expected way to use these "desk accessory" applications was to press the numeric keys on the physical keyboard, not the keys presented on the screen. In fact, the primary motivation in showing such keys in Apple computer software was to make the desk accessory familiar to the user, not to encourage the use of the mouse as an alternative to the physical keyboard for entering numeric data.

35. The Macintosh's introduction in 1984 actually made things worse. The Lisa's tiny hard disk was replaced by floppy disks, a far smaller, slower medium. The Mac's internal memory was so small that nothing more than essentials could reside in memory. Any time a special routine was needed for the program, the user would have to remove the disk holding the user's documents, replace it with the program disk, and swap back the document disk. Providing tools as per the '356 patent would have almost certainly resulted in the original Macintosh computers slowing to a crawl. The memory got marginally larger by 1985, but there was still no hard disk, and the extra memory was soon being used by the Switcher, enabling people to hold more than one application in memory at a time. By this time, both the Lisa and the Xerox Star had been retired. No one had the hardware platform even capable of incorporating the '356 patent advantageously. Having failed numerous times in the past and knowing the shortcomings of the technology, those of us working in the art were interested only in those improvements that could be implemented successfully in the short term. Developers were, overwhelmingly, interested in using those tools that we at Apple were supplying, both because it made their development cycles shorter and because they faced their own memory and performance limitations. Developers were also struggling with learning the new and foreign technology that the Macintosh environment represented.

36. I noted in my initial invalidity report that the Home Accountant does not disclose "concurrently displaying a predefined tool associated with said one of said fields." The Home

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

10

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000381

Accountant disclosed separate desk accessories that were not associated with any fields nor were they ever intended to be associated with any fields. Next, I noted in my supplemental validity report that the single example of a "composition tool" in the Tyler article cited by Mr. Buscaino recognizes that the "QWERTY layout" is activated only upon touching the "other" entry—and thus is not associated or otherwise linked with any information field. Accordingly, even if it were obvious to combine the Home Accountant and Tyler article, which it is not, doing so would not result in the claimed invention of the '356 patent.

37. As I discussed in my Initial and Supplemental Reports, and as required by the Court's claim construction, tools in the '356 patent must be predefined tools associated with the information fields. Tools that are not predefined and associated with information fields are not tools in the meaning of the '356 patent. The Home Accountant Key Caps Desk Accessory and Calculator Desk Accessory are not predefined tools nor are they associated with any information fields. Further, there is no specification by the Home Accountant that any tools are used in conjunction with inputting information into information fields. The Key Caps Desk Accessory and Calculator Desk Accessory are, therefore, not tools as claimed by the '356 patent.

38. We at Apple never intended that these Desk Accessories be used for inputting information into information fields. We always intended that the user input information into the fields on the screen with the hardware keyboard because, in the presence of a hardware keyboard, entry is more efficient and faster than the use of an on-screen keyboard operated by a mouse, touch screen, or other pointing device when inputting information

39. With this background in mind, the designers of Home Accountant built their software. The Home Accountant software was not designed with associated tools in the meaning of the '356 patent. In fact, the Home Accountant was not designed with any tools or any means for storing a plurality of predefined tools within the meaning of the '356 patent.

40. Adding tools to Home Accountant would have significantly slowed down the system. The Macintosh simply did not have the memory capability to associate the '356 patent tools with information fields. Prior to 1987, the Macintosh had no internal hard disk. Roughly half the

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

11

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000382

machines produced by the time of the ‘356 patent weren’t even equipped to optionally attach what at the time were expensive very hard disks with limited capacity. (Today’s external hard disks have around one-hundred thousand times the capacity of the disks of that era and yet cost about one quarter as much.) Instead, the Macintosh had a single floppy diskette with approximately one-millionth the capacity of the hard disks inside modern computers. This disk was not only tiny, it was slow. Adding anything other than the most necessary functionality to those early applications would quickly lead to having the Macintosh continually spin up the diskette in order to replace one segment of the program with another segment. This paging operation could take several seconds, leading to extreme user frustration. To make the combination and provide all the features Defendants argue would have been obvious to provide, without an optional hard disk, the Macintosh would have been continuously spinning up the diskette to provide the tool functionality. Accordingly, adding such features would have, in practical terms, rendered the system useless by slowing it down to a crawl. Requiring users to spend ten to twenty times the program cost to buy a hard disk just to properly support a feature that would, in the end, would slow them down anyway, would have been financial suicide for the developers.

41. Indeed, Mr. Robert Long testified during his deposition that the touch screen version of FXFE “ran quite slow.” Mr. Long testified that the touch-screen version of FXFE was never commercially released because of “performance.” Mr. Long testified that the FXFE system used a Motorola 68000 microprocessor. The Macintosh computer used a Motorola 68000 microprocessor as well.

42. Home Accountant discloses a software application designed for use on the Macintosh computer. The Macintosh computer already had separate and non-associated desk accessory applications. The designers of Home Accountant were no doubt aware of the stand alone Macintosh desk accessories—they came with every system and were a prominent part of the marketing of the Macintosh—but in fact did not associate these desk accessories with any of the fields of Home Accountant. The Home Accountant designers were presented with all the pieces of the claimed invention but still did not even make the leap. As I noted above, associating these desk accessories

TOGNAZZINI DECLARATION ISO LUCENT’S OPPOSITION TO DEFENDANTS’ MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

12

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000383

with information fields would have rendered the Macintosh useless by slowing it down to a crawl. Accordingly, it would not have been obvious to one of ordinary skill in the art, it was not obvious to the designers of Home Accountant, and in fact it was not obvious to those of us working at Apple at the time, to make such a combination.

43. I further note that not only is there is no teaching, suggestion, or motivation, to combine the Home Accountant with the Tyler article, the discussion above teaches away from making such a combination. Indeed, Mr. Buscaino fails to identify any specific reason or give any explanation whatsoever in his expert reports on how it would have been obvious to make such a combination. In fact, Mr. Buscaino gives nothing more than a conclusory statement about this combination.

44. Accordingly, Home Accountant, in light of the Tyler article would not have rendered the '356 patent obvious.

**Secondary Considerations of Non-Obviousness**

45. I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success, Long-Felt But Unsolved Need and/or Failure of Others, and Industry Recognition.

46. With respect to the '356 patent, the computers of the day, e.g., the Xerox Star and Apple Lisa, were, by today's standard, ploddingly slow computers. They had tiny memories, less than 1000th that of a personal computer today, and ran more than 1000 times slower. When the Lisa was introduced in 1981, it took 45 seconds to just open a desk accessory like a clock in preparation for use. Inventions like the '356 patent with it's pop-up calendar were unthinkable, let alone obvious because of the lag that would have occurred while the data was painstakingly transferred from the hard disk to memory and massaged into a useful form before finally being presented. In that time, a user could easily glance at a paper desk calendar and then manually insert the information.

47. The Macintosh's introduction in 1984 actually made things worse. The Lisa's tiny hard disk was replaced by floppy disks, a far smaller, slower medium. The Mac's internal memory

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

13

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000384

was so small that nothing more than essentials could reside in memory. Any time a special routine was needed for the program, the user would have to remove the disk holding the user's documents, replace it with the program disk, and swap back the document disk. The memory got marginally larger by 1985, but there was still no hard disk, and the extra memory was soon being used by the Switcher, enabling people to hold more than one application in memory at a time. By this time, both the Lisa and the Xerox Star had been retired. Having failed numerous times in the past and knowing the shortcomings of the technology, those of us working in the art were interested only in those improvements that could be implemented successfully in the short term. Developers were, overwhelmingly, interested in using those tools that we at Apple were supplying, both because it made their development cycles shorter and because they faced their own memory and performance limitations. Developers were also struggling with learning the new and foreign technology that the Macintosh environment represented.

48. Computers from the 1985 era, to the extent they supplied accessories, the accessories that were supplied were indirect. The user could open the standard calculator, but the numbers didn't magically float into place in an application. The user had to paste them there.

49. We all knew there was a problem—people were clicking the mouse too often and "traveling" too far to assemble the information they needed—but we didn't know what to do about it within the tight confines of the hardware with which we had to work. Those in the art were trying but failing to make the user experience more efficient.

50. The '356 inventors took a clever approach to solve this problem and overcome all the failures of others: They reduced the task actually being addressed by their experimental system to an absolute minimum, so that memory constraints no longer boxed them in, then made that user experience as efficient and pleasant as possible.

**Mr. Robert Long Deposition**

51. I note that Mr. Buscaino's Second Supplemental Report alleged that the Tyler article describes the Foreign Exchange Front End ("FXFE"), based on conversations that Mr. Buscaino had with Mr. Robert Long. However, the Tyler article never mentions FXFE but rather describes an

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356    14    Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000385

"Easel" system. (Herein I use the terminology "FXFE" to refer to the system described in the Tyler article.) The opinions in my October 12, 2007 Supplemental Report concerned the FXFE system as I understood it to be described by the Tyler article. I noted that the Tyler article is a magazine article, not a technical document or an instruction manual.

52. In my Supplemental Report, I presented my opinion that the FXFE system, as described by the Tyler article, did not disclose many of the claim limitations required by the ‘356 patent claims, nor did it render them obvious in light of the various combinations suggested by Mr. Buscaino.

53. I understand that Mr. Long was deposed earlier this week, and I have had an opportunity to review Mr. Long's deposition transcript. Nothing in Mr. Long’s deposition transcript changes my ultimate opinions set forth in my October 12, 2007 Supplemental Report that claims 19 and 21 of the '356 patent are not rendered obvious by the FXFE system as described in the Tyler article, in combination with any other references.

54. I note that Mr. Long did not write or develop any of the software code used in the FXFE system. I also recognize that Mr. Long has not seen the FXFE system in more than twenty years. I also note that there has been no physical or technical documentary evidence regarding the FXFE presented in this case.

55. As I stated in my Supplemental Report, there is no evidence that the FXFE system discloses "indicating a particular one of said information fields into which information is to be inserted." This is certainly not shown in the Tyler article. And Mr. Long's testimony that a "label" such as "broker" is "highlighted" is ambiguous at best. There is no evidence that the text display on the right side of the screen contains input information fields as suggested by Mr. Long. Although Mr. Long consistently used the claim term "information field" throughout his deposition testimony, it appears that his understanding of the term was inconsistent with the context of the '356 patent.

56. The right side of the screen does not appear to have input information fields. Instead, the right side of the screen appears to display text that may or may not be a text-based representation of related data fields. But there is nowhere on the right side of the screen where information can be

TOGNAZZINI DECLARATION ISO LUCENT’S OPPOSITION TO DEFENDANTS’ MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

15

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000386

entered into an information field. And it would not have been obvious to add this functionality to the FXFE system for the other reasons discussed in my Supplemental Report.

57. I note that Mr. Long admits that the FXFE system does not use windowing or any display technology where windows are overlaid or even tiled. He admits instead that the FXFE system didn’t even use windows, pushing the design back even farther than the Xerox Star computer. Instead, he stated the display had certain zones, and that they would just simply “replace” the existing information with new information, as it became appropriate. This is the way computer software has been written since the advent of computer monitors and does not arise to the level of “overlaying” because the earlier display of information is not overlaid, it is, instead, simply erased—destroyed. This further supports my opinion that the FXFE does not have "concurrently displaying" which has been construed by this Court to mean "displaying at the same time, as by a window overlaying the form." And it would not have been obvious to add this functionality to the FXFE system for the other reasons discussed in my Supplemental Report.

58. I also maintain my opinion that the FXFE system, as described by the Tyler article and Mr. Long, does not disclose any "predefined tool[s] associated with said one of said fields." There is no evidence of any predefined tool that is associated with an input information field and specified by a form entry system as an appropriate tool for filling in information called for by a certain field. Mr. Long testified that one could touch words on the right part of the screen that would cause certain entry objects to appear on the left part of the screen. However, there is no evidence that the objects on the left are associated with specific information input fields. Mr. Long stated that the number-pad and keyboard objects were not predefined for any specific information field - but rather could be used anywhere in the system - suggesting that these objects may have been system-level objects.

59. Claim 19 and 21 also require certain graphical composition tools. I maintain my opinion that the FXFE system, as described by the Tyler article and Mr. Long, does not use any such tools. The claims require a graphical keyboard tool or graphical number pad tool. But Mr. Long admitted that he wasn't sure whether the display of the FXFE system used text-based (character-generated) representations or bit-mapped graphics. Indeed, it appears from the screen picture that the FXFE

TOGNAZZINI DECLARATION ISO LUCENT’S OPPOSITION TO DEFENDANTS’ MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

16

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000387

system used text-based representations instead of graphical displays, as was common with displays of the time.

60. I maintain my opinion that the FXFE system does not disclose "inserting in said one field information that is derived as a result of said user operating said displayed tool." There is no evidence that anything is entered into any information fields, or that Mr. Long was referring to information fields within the context of the '356 patent. Mr. Long also noted that the FXFE system did not use a relational database, and that any database fields did not line up with the so-called "labels" - or text displays on the right side of the screen.

61. I also note that Mr. Long testified that the touch-screen version of the FXFE system was a prototype only, and it was never implemented. It was never produced or used. Mr. Long stated that the touch-screen FXFE system was too slow, and was not cost effective. This further supports my previous opinions that it would not have been obvious to somehow modify the FXFE system to meet the limitations of the '356 patent claims.

62. As I stated in my Supplemental Report, I reserve the right to supplement my previous expert reports based on further review and consideration of Mr. Long's testimony, and the testimony of other prior-art witnesses who have not yet been deposed, including for example, Mr. Tyler.

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

17

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000388

63. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on

12/14/07

Bruce Tognazzini

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

18

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 22
Page 000389