UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, | |
| Plaintiff and Counter-Defendant, | Case No.: |
| v. | 07-CV-2000-H (CAB) |
| | 02-CV-2060-B (CAB) |
| GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC. | 03-CV-0699-B (CAB) 03-CV-1108-B (CAB) |
| Defendants and Counter-Claimants, | |
| and | |
| MICROSOFT CORPORATION | |
| Intervenor and Counter-Claimant. | |

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF MR. ROBERT LONG

VOLUME I

Monday, December 10, 2007

AT: 10:05 a.m.

Taken at:
Dechert LLP
160 Queen Victoria Street
London EC4V 4BF
UNITED KINGDOM

e0eaf9de-1c88-4774-868c-62419195d6a7

APPEARANCES

Appearing on behalf of Lucent Technologies:

GREGORY F. CORBETT
Kirkland & Ellis LLP
655 Fifteenth Street, N.W
Washington, D C. 20005
Tel: (202) 879 5296

ERIC D HAYES
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Tel: (312) 861 2480

Appearing on behalf of Gateway and the witness:

JONATHAN D. BAKER
Dechert LLP
2440 W. El Camino Real, Suite 700
Mountain View
California 94040-1499
Tel (650) 813 4800

Appearing on behalf of Microsoft and the witness:

LARA S GARNER
Fish & Richardson PC
12390 El Camino Real
San Diego
California 92130-2081
Tel: (858) 678 5070

Also present

Court reporter
ROSE KAY
European Deposition Services

59 Chesson Road
London
W14 9QS
UNITED KINGDOM
Tel: +44 (020) 7385 0077

Videographer:

SIMON ADDINSELL
European Deposition Services
59 Chesson Road
London
W14 9QS
UNITED KINGDOM
Tel: +44 (020) 7385 0077

On behalf of TSG Reporting

INDEX

| DEPONENT | PAGE |
|---|---|
| ROBERT LONG | 8 |
| EXAMINATION BY MR. CORBETT: | 8 |
| EXAMINATION BY MR. BAKER: | 99 |

EXHIBITS

| EXHIBIT NO | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Blown-up photograph | 38 |
| EXHIBIT 2 | Claim construction order regarding patent no. 4,763,356 | 60 |
| EXHIBIT 3 | Letter to from Dechert LLP to Robert Long, dated October 26, 2007, Bates numbered Long 0001 through Long 0003 | 63 |
| EXHIBIT 4 | Subpoena of Robert Long, dated October 4, 2007 | 73 |
| EXHIBIT 5 | Subpoena of Robert Long, dated November 26, 2007 | 75 |
| EXHIBIT 6 | Article from Datamation magazine entitled "Touch Screens: Big Deal Or No Deal?", Bates numbered Long 0004 through Long 0012 | 88 |
| EXHIBIT 7 | United States patent no. 4,763,356, dated August 9, 1988 | 88 |
| EXHIBIT 8 | Declaration of Henry Robert Long, dated November 29, 2007 | 92 |
| EXHIBIT 20 | Article from Datamation magazine entitled "Touch Screens Big Deal Or No Deal?", Bates numbered GW-LT | 101 |

e0eaf9de-1c88-4774-868c-62419195d6a7

422215 through GW-LT 422224

EXHIBIT 21 Article from Datamation . ... ... ... .. 102
magazine entitled "Touch Screens: Big Deal Or No Deal?", Bates numbered MSLT_1228716 through MSLT_1228724

EXHIBIT 22 Blown-up photograph . ... ... ... ... .. 103

Monday, December 10, 2007

(10:05 a.m.)

THE VIDEOGRAPHER: This is the beginning of tape 1, volume 1, of the deposition of Robert Long, in the matter of Lucent Technologies Incorporated, a multimedia patent trust, plaintiff and counter-defendant; versus Gateway Inc, Gateway Country Stores LLC, Gateway Countries Inc, Gateway Manufacturing LLC and Cowabunga Enterprises Incorporated, defendants and counter-claimants; and Microsoft Corporation, intervener and counter-claimant, as consolidated cases.

This matter is in the United States District Court, Southern District of California. The case number is 07-CV-2000-H (CAB), consisting of matters severed from consolidated cases numbers 02-CV-2060-B (CAB), 03-CV-0699-B and 03-CV-1108-B.

Today's date is the 10th December, 2007 the time on the recording equipment is six minutes past 10. Today's deposition is taking part at the offices of Dechert in Queen Victoria Street, London.

The court reporter is Rose Kay; the videographer is Simon Addinsell, of European Deposition Services on behalf of TSG.

Could counsel please put themselves on the record.

MR. CORBETT: My name is Greg Corbett with Kirkland & Ellis, on behalf of Lucent Technologies. And

with me is Eric Hayes, also with Kirkland & Ellis on behalf of Lucent Technologies.

MR. BAKER: I am Jonathan Baker from Dechert, representing Gateway.

MS. GARNER: Lara Garner from Fish & Richardson, on behalf of Gateway and Mr. Long.

THE VIDEOGRAPHER: Could the court reporter --

MS. GARNER: Excuse me, on behalf of Microsoft and Mr. Long.

THE VIDEOGRAPHER: Could the court reporter please swear in the witness.

MR. BAKER: I'm sorry. Before you do that, I should say also for the record, I also am representing Mr. Long in this deposition today, in addition to Gateway.

ROBERT LONG
having been duly sworn,
testified as follows:

THE VIDEOGRAPHER: It is seven minutes past 10. Please begin.

MS. GARNER: Before we begin, Microsoft will join any Gateway objection.

MR. BAKER: And Gateway will join any Microsoft objection.

EXAMINATION BY MR. CORBETT:

BY MR. CORBETT: Good morning.

A. Good morning.
Q. Did you please state your name for the record?
A. Henry Robert Long.
Q. Could you please state your current address?
A. West Highlands, Three Gates Lane, Haslemere, Surrey. Postcode GU27 2ET.
Q. Are you currently employed?
A. I run my own company and I am employed by my own company.
Q. And what is the name of your company?
A. HRL Consultancy Limited.
Q. And what is the business of your company?
A. I am an interim IT director and I am currently engaged with LV, one of the major insurance companies here in the UK.
Q. Okay. Do you understand that you are represented by counsel today in this deposition?
A. I do.
Q. And who are you -- which counsel are representing you today?
A. The colleagues to my left, Jonathan and Lara.
Q. Mr. Long, have you ever been deposed before?
A. No, I have not.
Q. Okay. I just want to go through a few things to talk about the deposition. Do you understand that you

Page 10

are under oath today?
A. I do.
Q. And do you understand that your testimony here today is the same as if it was in a court of law?
A. Absolutely.
Q. Do you understand that the court reporter is taking down the testimony?
A. I do.
Q. And do you understand that because of that, everything needs to be said verbally. There cannot be any head shaking or nodding?
A. I understand.
Q. And it is best if one person speaks at a time, and people try not to speak over each other.
A. I understand.
Q. If you don't understand any questions that I ask today, please let me know.
A. I will do.
Q. And if you need a break at any time, please let me know as well.
A. Thank you.
Q. At times, counsel may object to questions and do you understand that unless counsel instructs you not to answer, that you should answer a question even if there's an objection?

Page 11

A. I do understand.
Q. Okay. Is there any reason why you would not be able to give full, fair and accurate testimony here today?
A. I do not believe so.
Q. Are you on any medication?
A. I am not on any medication.
Q. Okay. Do you have an understanding of why you are here today?
A. I do.
Q. And what is your understanding of why?
A. My understanding is to explain to the court what we did in Chemical Bank with our systems, back in the early 1980s.
Q. Right. We are going to talk a little bit about that. First of all, I want to --
A. I understand.
Q. -- understand a little bit of background about yourself.
Can you tell me a little bit about your educational background?
A. I joined -- my education went through to high school. In the UK we have university entrance exams called A-levels. I passed A-levels in mathematics and physics.
I was due to go to university to read chemistry.

Page 12

I didn't make my chemistry. There were family matters that suggested I would go and find work, instead of going on to university. At that point, I joined Chemical Bank straight out of -- in fact your equivalent of high school, our sixth form, as a management trainee in 1973.
Q. So you joined Chemical Bank in 1973?
A. September 1973, yes.
Q. And what was your position at the time you joined?
A. Management trainee, and it was in the operations area of the bank.
Q. How long did you work at Chemical Bank after joining them in 1973?
A. Some 14 years. I left in the summer of 1988.
Q. During your employment at Chemical Bank, where were you stationed geographically?
A. I was headquartered out of London, although I travelled extensively with the bank.
Q. You mentioned that you started as a management trainee. During your tenure at Chemical Bank, did you hold other positions at Chemical Bank?
A. I held a number of positions. Within 18 months of joining the bank, I transitioned into the IT department and I rose to Assistant Vice President, head of European foreign exchange systems within the bank.

Page 13

Q. Okay.
And how long did you hold the position of Vice President, head of European foreign exchange systems?
A. Correction, it was Assistant Vice President that I held. It must have been some 18 months or so before I left.
Q. And what position did you hold next, after --
A. After leaving the bank?
Q. After leaving. I am sorry. You held Assistant Vice President for 18 months?
A. Some 18 months.
Q. Okay.
A. That was -- that was the end position.
Q. Okay. And when did you -- when were you promoted to Assistant Vice President?
A. It would have been some 18 months before 1988.
Q. Okay.
A. So looking back, that must have been some time in 1986, but I don't remember the precise date.
Q. Okay. What position did you hold directly before becoming Assistant Vice President?
A. The bank had a number of corporate titles, as well as role titles. I was Project Manager for some considerable time, starting off with the corporate title of Assistant Manager, rising through Assistant Secretary and

e0eaf9de-1c88-4774-868c-62419195d6a7

Page 14

then into Assistant Vice President. So you've got both -- at the bank at the time, they had both role titles and corporate titles.
So in answer to your question, "Project Manager" would probably be the most accurate description of my role before.
Q. Okay. I want to talk a little bit about the timeline of the Foreign Exchange Front End project.
A. Mm-hm.
Q. Do you recall when your work on the Foreign Exchange Front End project began?
A. It would have been early 1980s; possibly the back end of 81/early 82. Certainly throughout 83.
Q. And what was your position with Chemical Bank during the time you worked on this project?
A. I was Project Manager for the project and chief -- chief lead architect of the systems.
Q. At what point did you stop working on the Foreign Exchange Front End project?
A. On this particular system, it would have been in 84. 1984.
Q. So is it fair to say -- well, let me back up here.
We have been using the terminology "Foreign Exchange Front End". Do you have an understanding of what

Page 15

that means? Is that fair to say?
A. That was the name that we gave to a particular system, abbreviated to "FXFE".
Q. Was that the name that Chemical Bank used to describe the Foreign Exchange Front End system?
A. Yes, it was.
Q. Was that name used by anyone outside of Chemical Bank?
A. Not that I'm aware of. We certainly used it universally within the bank.
Q. Have you heard of the name Easel?
A. Yes, I have.
Q. Is that synonymous with Foreign Exchange Front End?
A. Easel is a software developer's tool kit that was developed by a company called Interactive Images. We used that tool kit within the Foreign Exchange Front End system.
Q. I am going to talk a little bit about that later, but I just wanted to understand the terminology as we go forward throughout the deposition.
A. I understand.
Q. Do you have any legal experience?
A. No, I do not.
Q. Have you ever been involved in a litigation

Page 16

before?
A. I have not.
Q. And you said you have never been deposed before?
A. That's correct.
Q. Do you have an understanding about patent law?
A. Only as a layman. I have not done any detailed studies of it.
Q. Do you own, hold any patents? Are you --
A. I do not.
Q. Do you have an understanding about what it means to construe the claims of a patent?
A. I am sorry. I don't understand the question.
Q. Okay. That's fine.
Talking a little bit about your role as the Project Manager --
A. Yes.
Q. -- of the Foreign Exchange Front End. What were your responsibilities as Project Manager?
A. As Project Manager and lead architect, I was responsible for working with the business to understand their requirements, to define their requirements, to articulate those requirements to the technology team that was building the system. Actually to build the team, select the players, select the members of the team. Manage the

Page 17

team on a day by day basis, manage the development on a day by day basis and take the development through to implementation.
Q. Did you design the software involved with the Foreign Exchange Front End system?
A. At a high level architectural, yes. We clearly had programmers who were actually writing the code.
Q. But you are not a code programmer?
A. No. None of the -- none of my programmes were actually coded in this application.
Q. How many members were there on your team for the Foreign Exchange Front End system?
A. In addition to myself, there were six others.
Q. And what were the respective roles of the six other people?
A. With the -- the application was quite an extensive application. We broke it up into modules and different members of the team developed different modules within that application set.
Q. Do you recall what some of the different modules were?
A. Well, one of the key was the touch screen software itself. There were a number of maintenance utilities behind that. There was the database field sitting behind all of that.

Page 18

Q. Any other modules?
A. I would say they are probably the key ones.
Q. So different members of your team were responsible for those three different --
A. Different components, yes. And there was, of course, an interface into the back office system as well that needed to be created. So that would be a further module.
Q. And you as the Project Manager, you were responsible for the overall management of the different team members on the different modules; is that fair?
A. Yes, I think that is absolutely fair. I think we should use the word, we did use the word "team". It was operated as a team. But I was clearly the person at the bank that was being -- was having overall responsibility and accountability for the project.
Q. Did you ever consider seeking a patent on your development of the Foreign Exchange Front End?
A. No, that was not something that was common currency in Chemical Bank, in any of our development activities at the time.
Q. Do you have an understanding of why you didn't seek a patent?
A. No, it was just -- it didn't seem to be raised by the bank as something that was normal practice on any of

Page 19

the development activities we were doing.
Q. Okay. Let's talk a little bit about the timeline of developing the Foreign Exchange Front End. I think you said earlier that you started work in the early 1980s; is that fair?
A. I think that's fair. And to some -- to some degree I am tracking to back to when the article, that we will come on to later, was published. And just knowing that it would have taken us a good 18 months plus to have got the system developed at that level, that it was demonstrable.
Q. Do you recall when you first started work on the system that you refer to as the "Foreign Exchange Front End"?
A. As I say, I believe it was probably late 1981, and the reason that that date seems to stick, it was within 18 months of getting married.
Q. Okay. What was the first thing you remember about working on the Foreign Exchange Front End system?
A. High level architectural design, followed up by presentations to the foreign exchange executive within the bank, about the art of the possible. To some degree seeking funding; to a large degree, seeking funding.
Q. What motivated you to begin the Foreign Exchange Front End project?
A. We, the bank, firmly believed that technology

Page 20

had reached the point that we could start to implement technology actually on the trading desk. Up until then, all the trade capture had been done by clerks in the back office on paper tickets, from paper tickets.
Q. Do you recall who -- whose idea it was to first develop the Foreign Exchange Front End?
A. Specifically, no. It came out of some discussions, general digesting-type discussions within the bank.
Q. Was it your idea?
A. I was certainly key in terms of understanding that we believed that technology was possible to do such things. I wouldn't want to claim 100 per cent ownership of that.
Q. Do you think it would have been someone at a higher level than you who directed the project to start, or someone on your team?
A. That would just be purely guesswork. I don't know. It was a long time ago.
Q. You mentioned that there were six team members?
A. Yes.
Q. Do you recall the names of the six?
A. A number of them, indeed I do.
Q. Can you share some of the names with me?

Page 21

A. Yes, of course. One of the lead technical architects was a gentleman called Steve Foster. Another was a Chris Harrison. The third was a Tony Brown. The fourth was Nigel, and it will come to me what his surname is. He will hate me for it, but I have forgotten his surname.
Q. Nigel.
A. And I am trying to think of the others, but they were certainly the key developers.
Q. If I could just briefly go through each person, if you could tell me what each of those persons was responsible for.
A. Yes.
Q. For example, Steve Foster, I think you referred to him as the lead technical architect?
A. The lead technical architect, absolutely. And one of the key developers in the touch screen system itself, the touch screen modules, supported by Chris Harrison.
Q. And when you say "lead technical architect", what does that encompass?
A. The system as written, not only using Easel as a software developer, but also in C. And Steve had a strong -- both Steve and Chris had strong background in C programming.
Q. So the software was written in the C programming language?

A. Yes.
Q. Were there any other responsibilities that Mr. Foster had, other than being the lead technical architect?
A. Well, he actually developed a large part of the code.
Q. Okay. So he was the primary software developer?
A. As far as the -- as far as a combination of the touch screen was concerned, and also some of the networking.
Q. And what about Chris Harrison?
A. Chris Harrison was equally involved in the networking and some of the touch screen modules. The way that we -- the way that we wrote the application, it was very modular. Nowadays, I think you would probably describe it as "object-oriented". In those days, it was described as "structure programming". So we broke it up into multiple modules and different people developed different modules.
Q. So Mr. Harrison developed the -- some of the touch screen modules and some of the networking modules?
A. That would be true.
Q. Did Mr. Harrison, was he responsible for any other programming modules?
A. To -- it was so long ago, undoubtedly.

I mean, it was a whole team of people working together.
Q. Sure.
A. So I could not say positively, categorically, which particular module he would be working with.
Q. I am just trying to understand.
A. Absolutely, I understand.
Q. Did Mr. Harrison work beneath Mr. Foster; is that fair?
A. No, I think it was very much a pretty flat structured organization. In fact --
Q. Everyone on the team was --
A. It was very much a flat structure. I was recognized as the Project Manager and everybody else was operating at gear level.
Q. What about Mr. Brown, Tony Brown?
A. Tony Brown concentrated at the time on the -- what we would probably describe as the maintenance parts of the system; building the mechanisms to take the static data, the customer lists, and build those into the databases. That development was done in Cobol. You didn't need the same level of performance every time you need to add a new customer.
Q. Did Mr. Brown have any other responsibilities?
A. Undoubtedly, yes, he would have done. It was a pretty flat team and the technology sets were pretty well

distributed across the team. That is where Tony tended to concentrate, along with Nigel.
Q. You can see who I was getting to next. Nigel, so he also worked on the maintenance --
A. Absolutely.
Q. Did he concentrate on any other areas of the system?
A. The interfaces to the back office system would have been written, but who wrote those, I don't remember.
Q. Now, I am just trying to understand. So we talked a little bit about the Foreign Exchange Front End versus Easel, and then some of the programming languages used. There is C plus and part of it was written in Cobol?
MR. BAKER: Objection.
A. That was just C.
MR. BAKER: That misstates the testimony.
BY MR. CORBETT:
Q. I apologize. C. And then was it all built upon a Unix operating system?
MR. BAKER: Objection. I think that question is kind of ambiguous and vague and a little muddled.
BY MR. CORBETT:
Q. I can rephrase it. Would that be helpful?
A. The application, the operating system was Unix.

Q. Okay.
A. Yes.
Q. So the operating system was Unix. Can you explain to me again what your characterization of the Easel platform is?
A. The --
MR. BAKER: Objection, asked and answered.
A. Easel was a software development tool kit, designed by Interactive Images to enable software developers to build touch screen-based applications.
BY MR. CORBETT:
Q. Were there any other languages involved in developing the software that went into the Foreign Exchange Front End, besides -- you mentioned C and you mentioned Cobol?
A. The underlying components -- the operating system was Unix. The languages for the front end were a combination of the software development tool kit, Easel and C. Most of the back end code was written in Cobol. There was a database. This was before relational databases were fully available. There was a sequential access database tool that we used. And the interface software to interface this application with the downstream extant back office system was again written in C.
Q. And when you use the term "Foreign Exchange

Front End", is it fair to say that you are only referring to the front end of the entire system?

A. No. The description "Foreign Exchange Front End" referred to the entire system, because it sat in front of the back office system, as -- in its entirety.

Q. Okay. So the "Foreign Exchange Front End" encompasses all of the various components we have been discussing?

A. Absolutely.

Q. Who is Interactive Images?

A. Interactive Images was a U.S. corporation, based out of Massachusetts, that had developed Easel.

Q. And how did -- you mentioned that you incorporated the Easel tool kit, the Easel software development tool kit into your system; is that correct?

A. That is right.

MR. BAKER: Objection. Mischaracterizes the testimony.

MR. CORBETT: I can repeat it.

A. Would you rephrase it, so that I can answer?

BY MR. CORBETT:

Q. Sure. Is it fair to say that you incorporated the Easel software development tool kit into the Foreign Exchange Front End system?

MR. BAKER: Same objection.

A. I think the easiest way to think of Easel is it was a software developer's tool kit. So it came with a whole series of components that would allow us to build applications. So rather than saying: we have incorporated it, it is probably more accurate to describe it as: we used it as part of the development environment.

Q. Do you have an understanding of how you came to use the Easel tool kit?

A. Yes. We were looking at numerous technologies available at the time, ranging from keyboards, tablets and touch screens. We looked at two or three different touch screens technologies and, through trade press, came across Easel.

So we -- we discovered Easel in an article. Which particular article, where, I don't remember; it was a long time ago. And put a call in to Interactive Images, in the normal way of: this looks interesting, can we get together and start talking about how we might use this?

Q. So you reached out to Interactive Images?

A. Yes, we did.

Q. Do you recall when you reached out to Interactive Images?

A. No, but it would have been in that 1981/82 period.

Q. Do you recall the name of anyone at

Interactive Images who you dealt with?

A. Yes, our prime contact there was a gentleman called John Marino.

Q. And who was Mr. Marino's prime contact on your end of the project?

A. Myself.

Q. What role did Mr. Marino have in terms of interacting with you in the Foreign Exchange Front End project?

A. I don't know John's exact title, but he was performing the role of a sales executive for Interactive Images.

Q. Can you explain how you went from reaching out to Interactive Images to actually deciding to incorporate the Easel tool kit, or to use the Easel tool kit in developing your system?

A. It -- we flew to Boston, met with them, liked what we saw in terms of the use of the tool kit. And the "we" in that case was certainly Steve Foster and myself. I don't remember whether Chris Harrison joined me. Certainly it was Steve and myself. We made arrangements to have a pilot copy of Easel available to us, and effectively took the project from there.

Q. Do you recall anything special about the tool kit that led you to choose it over other possibilities?

A. Yes. I think there was a couple of fundamentals with regards to the way that Easel worked over a number of the others.

Easel not only came as a software developer's tool kit that easily allowed you to define areas on the screen and give them characteristics. All of the others were fundamentally around a touch screen that you had to build these underlying components yourself. So Easel came with the means by which you could describe quite easily on the screen.

Q. Do you recall the names of any of the other systems you were considering at the time?

A. No, I am sorry. I don't.

Q. So do you recall when Interactive actually provided you with the Easel tool kit?

A. It would have been in that 1981/82 period. The exact date, I don't remember anymore. But I do remember that we had spent a number of months working with them, developing it.

Q. So just taking us through the timeline. You reached out to Interactive. You decided to use the Easel tool kit. What happened next in the development of the project?

A. We took delivery of Easel. We took delivery of a prototype touch screen, back into London. And then

worked actively -- excuse me. And then worked actively within the project, around the use of this, and had dialogue back with Interactive Images about enhancements that we would appreciate within the tool kit.
Q. In terms of the development, once you took delivery of Easel, was Interactive Images significantly involved with the development of the Foreign Exchange Front End?
A. No, that would be unfair. They were significantly involved in the enrichment of the underlying tool kit, but not the application.
Q. And when you say they were involved in enriching the underlying tool kit, what do you mean by that?
A. Well, the tool kit came with a number of features and we, particularly Steve, had dialogue about the additional features that would be useful to us. So there was this ongoing conversation with the tool kit developers on how we could -- how enrichment of that tool kit could be used to embellish the application that we were wanting to build.
Q. So let's talk about some of the features that the tool kit had. I think you mentioned earlier that one of the features of the tool kit that you appreciated was its ability to delineate parts of the screen; is that fair?
A. I don't think I actually used those words, but

it certainly allowed you to create boxes within the screen or any -- any object within the screen; whether the boxes had a line around them or not would be a characteristic that you could turn on or turn off within the tool kit.
The tool kit would allow you to put values in the boxes. The tool kit would allow you that when you touched it, it would identify which particular box had been touched by way of its coordinates and also you could put in a string of actions that you would want the application to take as a result of touching that. And all of that came effectively out of the box within the tool kit, rather than to have to develop it all yourself.
Q. Okay.
A. But at application level, all of the applications, the definition of the boxes and the values to put in and the actions were very much part of the project itself.
Q. All right.
A. Developed by us.
Q. What were some other features, either out of the box or enhancements to the tool kit, that you found helpful in the development of the project?
MR. BAKER: Objection, vague and ambiguous.
A. I think a couple of the key -- key components is the fact that out of the box, when you touched an area of

the screen, I mentioned you could cause it to have actions. One of those actions could be to highlight, change color. One of those actions could be to call another application through the action list.
And just being able to do all of that really straight out of the box meant to say that we quite accelerated the application development timeline.
Before you ask your next question, could I have a break for a glass of water?
MR. CORBETT: Sure. Let's go off the record.
THE VIDEOGRAPHER: We are going off the record at 10:38.
(10:38 a.m.)
(A short break)
(10:43 a.m.)
THE VIDEOGRAPHER: We are back on the record at 10:43.
BY MR. CORBETT:
Q. Mr. Long, just following up on a couple of things we were talking about. The names of the people from your team, you have mentioned Mr. Foster and Mr. Brown, Mr. Hanson?
A. Harrison.
Q. Harrison. And then Nigel. Do you recall the names of the other remaining team members?

A. No, I'm sorry. I don't.
Q. We were talking a little bit about the development of the system. Did it ever become a commercial product?
A. No, it did not.
Q. Do you know why it didn't become a commercial product?
A. Chemical Bank is a bank and it develops applications for internal use. It had no appetite in getting involved in making things commercial and onwardly supporting them.
Q. Did Chemical Bank use the Foreign Exchange Front End system for its own internal use?
A. The Foreign Exchange Front End system in its wider sense, yes, it did. We did not go into production with the touch screen version.
Q. Okay. Do you know why you didn't go into production with the touch screen version?
A. One of economics, quite frankly. The cost of roll-out of that touch screen technology across an entire trading room was going to be too expensive.
Q. And that was primarily due to the cost of the touch screen technology?
A. Yes. The touch screen technology required a dedicated processor, each running in Unix, and a large

monitor. It was working out at an excess of £10,000 per workstation to do that, by which time as we developed this, IBM had come along with its PC. So whilst it didn't have the power to run touch screens, it certainly gave us a much cheaper platform to go onto the trading desks.

Q. Now, you said:

"In a wider sense, the Foreign Exchange Front End was used internally."

Can you explain to me how the Foreign Exchange Front End system was used internally, but without the touch screen capabilities?

A. As I mentioned earlier, the Foreign Exchange Front End system was an entire front end to the back office system that was being run within the bank. We had built, in addition to the touch screen, much faster trade capture capabilities using the Foreign Exchange Front End system. So we established a middle office to support that. That was how we actually deployed it in London, in front of the main back office system.

Q. But that deployment system did not use the touch screen?

A. That's correct, it did not use the touch screen.

Q. Do you know when, at what point in time the decision was made not to proceed with the touch screen

version?

A. It would have been end Q1/early Q2, 1984.

Q. Was the Foreign Exchange Front End technology ever used outside of Chemical Bank?

A. Not to my knowledge. We certainly didn't sell it.

Q. When you chose not to proceed with the touch screen version of FXFE, if I can refer to it as "FXFE" going forward.

A. That's fine.

Q. You mentioned cost was a factor. Was usability of the touch screen system a factor as well?

A. I think cost was undoubtedly the prime factor, yes. We certainly saw that the cost of roll-out was going to be very, very -- very, very high. We would have needed to have done some tuning in terms of performance as well, but the cost overwrote the desire to spend yet more money tuning.

Q. Did the system run faster or slower with the touch screen capabilities?

A. The system ran quite slow with the touch screen capabilities. That is true. But the main function was the fact that each touch screen required its own dedicated Motorola 68000-based microprocessor. These microprocessors were, in those days, quite large and quite

expensive.

Q. So let's talk a little bit about the hardware, some of the hardware that was used. With the touch screen version of the Foreign Exchange Front End, it used a Motorola processor?

A. In fact, we used Motorola processors throughout the application, for database servers, for application servers, as well as driving the touch screens. We had a rack mountable Motorola 68000. So this was truly a distributed processing architecture that we developed.

Q. Do you know the processor speed?

A. No, I don't remember the exact processor speed. We had them engineered by Plessey Microsystems for this, to our spec, which again increased the cost.

Q. Plessey?

A. Plessey Microsystems. It is a UK-based manufacturer of computers, predominantly for the military in those days.

Q. What was a PDP 11?

A. PDP 11 is a mini computer developed by DEC, Digital Equipment Corporation, in the early/mid 1970s.

Q. Did you ever use the Foreign Exchange Front End system with a PDP 11?

A. The PDP 11 systems that were referred to in the article were the back office system, developed jointly

by Chemical and a company called Arbat. And the Foreign Exchange Front End, FXFE, was to front-end that Arbat system running on the PDP 11s.

Q. Who manufactured the actual terminals, if you recall?

A. The -- we bought the terminals from Interactive Images. Who actually made the tubes, I don't know. But in addition to Easel, Interactive Images had designed and manufactured a touch screen membrane to fit over the monitors.

Q. So Interactive provided not just the Easel tool kit, but also the terminal and the touch screen membrane; is that fair?

A. Yes, effectively we bought the terminal -- the monitors, I think it is probably easier to describe them as "monitors" than "terminals", because that's all they were. We bought the monitors with the touch screen membrane already attached directly from Interactive Images.

Q. Do you recall the resolution of the monitors?

A. No, I do not.

Q. Do you recall if the system was either a bitmap display or a character-generated system? Do you understand the difference between --

A. I absolutely understand the difference. No, I don't recall, other than the fact that because we could

define a box and have that box drawn on the screen, I think it is unlikely it was only a character. But that is reversing the logic as to how the application was actually displayed.

Q. Do you have an understanding of whether it would have been possible to draw a box, using character-generated?

A. I don't know.

Q. But sitting here today, you weren't sure that if it was a bitmap system?

A. Sitting here now today, I can't guarantee it was not a bitmap system.

Q. I am going to give you some pictures of the -- of a screenshot that we have. I want to talk about the picture.

(Exhibit 1 marked for identification)

Q. Do you see the photograph I've identified as exhibit 1 for the deposition?

A. Yes, I do.

Q. Have you seen this photograph before?

A. Yes, I have.

Q. When did you see the photograph?

A. I saw it in the article. It is a blow-up from the article. And to put things into context, that hand is actually my hand.

Q. Good.

All right. So I want to talk about the display of the system, using this photograph. Let me draw on it to help identify some points here.

Is it fair to say that there appear to be different boxes?

MR. BAKER: Objection, vague and ambiguous. Can you be a little more specific, counsel?

BY MR. CORBETT:

Q. Is it fair to say that there appear to be different boxes or regions dividing the screen into various regions?

A. Yes, I think it is fair to say that we have zoned the screen.

Q. Okay. So actually, how would you characterize the different parts of the screen?

A. Can I hold this up?

Q. Yes.

A. So that it would probably help.

The way this particular version is showing is the deal ticket area is here to the right hand side. And then effectively we have got a scratch pad available here, whereby we inserted various tools. In this example, we have been searching an alpha character keyboard type tool.

Q. Okay. I am going to draw on this, so that it

is clear for the record. It is going to be hard, reading the transcript later, to know exactly what you are talking about. So I am going to use my red pen here.

You referred to an area as the "deal ticket area"?

A. Yes.

Q. Could you just use my red pen and trace the outline of what you are referring to as the "deal ticket area"?

THE VIDEOGRAPHER: Counsel, do you want me to zone in on this picture if I can?

MR. CORBETT: You don't need to do that. We will have it as an exhibit.

A. The red pen is not really showing up on the black background.

BY MR. CORBETT:

Q. You can try the blue.

A. No, that's not working either. I am afraid the glossy image of the black is not coping very well. I can hold it up and point to this monitor if that would help.

MR. CORBETT: Let's take a quick break.

THE VIDEOGRAPHER: Going off the record at 10:57.

(10:57 a.m.)

(A short break)

(11:02 a.m.)

THE VIDEOGRAPHER: Back on the record at two minutes past 11.

BY MR. CORBETT:

Q. So if you could use the blue marker and trace the area you referred to as the "deal ticket area".

(The witness drew on the diagram)

Q. And if you could put the letter A to the right of that blue box. Okay.

And do you have the terminology to refer to the row of cells in the middle?

A. Do you mean this column here?

Q. Yes, that column.

A. They were just action buttons that would cause events to happen. As you can see, the top one is labelled "buy". The bottom one is labelled "sell". The system was designed for foreign exchange traders who are buying and selling currency all day. So ...

Q. Could you just draw a line around the action buttons?

A. All of them?

Q. All of them. Just so we know what you are referring to when you talk about these action buttons. And then put "B" above the action buttons.

And now, to the left of the action button column, there's additional parts of the screen; is that fair?

A. You are referring to this area here?
Q. Yes.
A. Yes.
Q. Do you have the terminology to refer to that area?
A. It was just a listing area where we would list the old trades. When I say "old trades", previous trades. So if you like, that that I described as the "deal ticket" is for those deals, that deal that the trader is currently entering. And then this was the means by which we would see what they had previously done with up and down arrows to allow them to scroll it up and down.
Q. Okay. Could you trace the blue around the old trade display area? Is that fair?
A. That is a reasonable description.
Q. And put the letter "C" above that.
And just to be clear, there's two little arrows to the right of that box, the old trade display area. Is it fair to say that those are scroll buttons that would let you go back and see the history of the previous trades?
A. Yes, that is a fair way of describing it. I think it is worth pointing out that we used different zones on the screen for lots of different reasons. So whatever we were listing in that screen at that time was available to be scrolled up and down, using those up and

down arrows.
Q. Okay. Now, directly below that historical old trade display area, how do you refer to that area?
A. Well, I think the easiest thing is: think of this as, there is a scratch pad. It was an area whereby we would put whatever was the relevant tool for the entry stage that you were at, at the time.
In reality, we had full use of the whole screen, but we tried to zone it so it didn't keep on flashing in front of the traders.
Q. And can you draw a box around what you refer to as the "scratch pad area"? Can you put the letter "D" next to it.
Now, in the photograph you are holding, the scratch pad area appears to be displaying a keyboard or key --
A. Yes.
Q. -- letters. Is that fair?
A. Yes, that's right. It is actually showing an alpha character keyboard.
Q. Okay. And is it your understanding that that keyboard is not always displayed?
A. That is absolutely the case. It was not always displayed.
Q. Okay. When -- in what circumstances was it

displayed and in what circumstances was it not displayed?
A. It was the user selection to call up the keyboard and it was used when a name was not available from a pick list. We would produce, using this -- this area, a dynamic pick list of suitable names. If the name was not available off that pick list, the user could cause a keyboard to come up and then type in whatever they wanted.
Q. Okay. And how would the user cause the keyboard to be displayed?
A. On the pick list, there was another button, another zone, which would allow them to call up the other character list.
Q. And, but the pick list was not displayed in this photograph?
A. In this version of the photograph, no, you are right. This is only showing the alpha character, not one of the available pick lists.
Q. Okay. The row of buttons at the bottom of the screen.
A. Yes.
Q. Do you have the terminology to refer to that?
A. I don't remember what we actually called them at the time, but fundamentally these are really controlling buttons.
Q. Mm-hm.

A. They are reading:
"Deal, display, service, cancel, log-out, lock."
So if you were halfway through keying in a trade and you got it wrong, all you needed to do was to tap the "cancel" button and it would get rid of that trade.
Q. Okay.
A. If you wanted to walk away from your desk, because it was a trading desk, you could simply lock the system by tapping the "lock" button. The "deal" button would be to cause the "deal" screen to come up. So someone would have put or touched the "deal" button simply to report up the deal ticket in the first place.
Q. Okay. Could you draw a blue box around the control row buttons at the bottom and label it "E"?
I am just trying to get a common terminology for discussing this. Okay, the area you labelled as the "deal ticket" or "A".
A. Yes.
Q. There appear to be some words listed in that area. Do you see those?
A. Yes, I do. It is probably easier to describe them, rather than just words, as "labels", because they are labels associated with a field.
Q. And can you tell me what those labels are?
A. Unfortunately, the blue pen has obliterated

Page 46

some of them. But from the top, it reads:
"Buy, sell, rate."
And then next to "rate", it reads "value". I think the next one is "dollar rate" and the next one is "dollar equivalent". And then it's "broker, customer, location". I can't read the next two, but from memory they would have been regarding settlement instructions.
Q. And was this deal ticket screen, was this the standard way it usually looked or did it change, based upon the deal?
A. It would change, based upon the deal. This particular display is for a spot foreign exchange trader. We also built screens to handle forward foreign exchange trades which would have two sets of dates accordingly.
Q. Now, you --
A. Swaps.
Q. You referred to those different words as "labels".
A. Yes.
Q. Was that the common terminology used at the time?
A. No, I am just trying to come up with a terminology to describe the difference between the word -- there's lots of words on the screen -- and the associated field that is associated with that.

Page 47

Q. And you are using the word "associated field". What are you referring to as an associated field?
A. I think -- it is very difficult to see on here, but if I highlight, if I use my finger, halfway down there is a label that says "broker" and then very faint next to it is actually the input field that would receive the value for the broker.
Q. So could you explain to me, if someone wanted to change the broker, how they would do that by touching the screen?
A. They would simply touch the label labelled "broker".
Q. And what would happen when they touched the word "broker"?
A. Effectively three things would happen. We would highlight the fact they have touched "broker" on the screens, by way of the feedback. I mentioned earlier that Easel gave you a very simple way to do that. We would highlight the field next to the broker, ready for -- to receive the input. And here, rather than an alpha pad, we would come up with a pick list of broker names that the trader could select, simply by touching them.
Q. So the pick list would be displayed in the region you have identified as "D"?
A. In the area I have identified as "D", which is

Page 48

why I referred to it effectively as the "scratch pad area". It is the area that all of the input we happened to overlay into there.
Q. How did you -- how was the system designed to recognize touch areas?
MR. BAKER: Objection, vague and ambiguous.
A. I suppose, I don't quite understand the question. Could you be a bit more specific?
BY MR. CORBETT:
Q. Sure. Was the system designed to recognize different buttons that could be touched?
A. I think if -- clearly, yes. But in a more general sense, Easel came as a tool set that would allow you to define an area of the screen, any area of the screen that you want, and to give it characteristics when you touched it. All of the rest of it, we developed programmatically within the development team.
Q. So you used the Easel tool set to define certain areas of the screen that could recognize touching?
A. Yes, that's probably the easiest way. To use the example here, this big "buy" button on the top, we would have defined that as a square, using Easel. We would have positioned it there on the screen, using Easel. And we would have given it various characteristics, but all of the actions would have been written programmatically by us. So

Page 49

effectively what Easel is doing is giving you an X and Y coordinate defined within -- within it.
Q. Mm-hm.
A. That defines the square. We happened to have put a line round it, so it is easier for the user to see. Does that answer your question?
Q. Yes. Would one have been able, in the picture in front of you, would one have been able to touch any of the words in the area marked as "A", the deal ticket area, and have an action occur in response to that?
A. Absolutely, yes. It was done such that you could pick any of the words in any order you liked. It was not -- it wasn't a sequence that you stepped through. You simply picked the value, the word, the label that you wanted to have an action on.
Q. And so going back to the example before. You said if someone pushed the word "broker", the first thing that would happen is "broker", the word "broker" would become highlighted or --
A. We would highlight the word "broker". We would highlight the input field. If -- if it was a new ticket and there was no broker in there, it would just highlight it as a blank, effectively a line. If there was already a broker name in there, then we would highlight that broker name because of course you could change it. And at

the same time, in this area "D" on the screen, we would produce a dynamic list of the brokers available to that trader in that currency.
Q. And in that broker list, the user could touch one of the broker names in that list?
A. Absolutely, that's the way it worked.
Q. And what would happen if the user touched one of the broker names in that broker list?
A. Then the field next to "broker" would be populated, so we would input it automatically into that field.
Q. Was there any action required by the user in order to populate the information into the field?
A. Other than touching it, no.
Q. So the --
A. All they needed to do was touch the relevant -- if you can imagine, instead of on this keyboard which has got A, B, C, there was just a list of brokers' names in boxes, all you had to do was touch that relevant "name box" zone of the screen and it would automatically populate it back into the deal ticket.
Q. The historical display area, I think you have marked it as "C", could the user touch and interact with that area of the screen?
A. Yes, they could call a deal ticket back.

Q. And how would the user do that?
A. By touching them. By touching the relevant deal ticket. It would be listed effectively as a one line, and they would pick it back off the list and it would populate it back into the deal ticket and make it available for amendment.
Q. So historical, by -- I want to say this correctly. By selecting an old deal ticket from the area C, the user could touch that historical deal ticket and it would populate area E with that deal ticket?
A. Not area E, area A.
Q. Area A. Could the user then edit that historical deal ticket?
A. Absolutely, yes. In fact, we made it such that the dealer did not have to complete a deal ticket. He could -- he could put the raw, the basic values associated with multiple deal tickets, store them here and then come back and complete them when they were ready.
Q. Where was the underlying information kept?
A. On the database.
Q. So the underlying database, was it on a central server?
A. Yes, there was a -- there was a database server sitting within this network of computers. I think I described earlier that we had built a distributed

system-based application here.
Q. And how was the underlying -- do you know how the underlying database was organized?
A. It was a C-ISAM, so that is using C as the language for access. ISAM stands for "indexed sequential access method", which is a purchase package as a database.
Q. And you referred to different fields in that database. Were the fields in the underlying database, did they line up with the words on region A of a deal ticket?
A. I think that is not necessarily the way that you would build a system, so there was no -- there was clearly a one to one correlation, but we were building a database. So the database contained not only the deals, but it contained the list of possible customers, possible locations. We also had the settlement instructions. We had the brokers' lists. So all of that was held within the database.
Q. Okay.
You mentioned that you were using the word "label" to refer to these words in region A.
A. Indeed I did, yes.
Q. But was it fair to say that that was not the terminology used at the time?
A. I don't remember whether we used "label". It seems a perfectly reasonable way of describing that you've

got, next to this, you've got a field so you would give that field a name.
Q. Would --
A. And in this case, we are using the word "label" to describe effectively a button that has an action on a field.
Q. And you are using the word "field" to refer to additional information related to area A; is that correct?
A. No, I don't -- sorry.
MR. BAKER: Objection. Mischaracterizes the testimony.
A. "Field" is a general, generally used computing term for -- not necessarily for an input screen, but for a value within a database.
BY MR. CORBETT:
Q. Would you have referred to this system as a "form entry system"?
A. "Form", in the sense of: it was there to create deal tickets, if that is what you mean. Otherwise, I am not sure I understand the question.
Q. Do you have an understanding of what a form entry system is?
A. If you describe one to me, I will have a better idea of what you mean.
Effectively, what had happened before we built

this system was a dealer would have a paper deal ticket that would -- he would write on, he or she would write on as he was building the deal and then pass it down the line to a back office. If that you would describe as a form, it is a ticket, a form, a perfectly reasonable way of describing it, yes. We were replacing that deal ticket with electronic means to do so.

Q. I want to turn now to a meeting you had with a reporter by the name of Michael Tyler.

A. Yes.

Q. Do you recall that?

A. I do.

Q. Do you recall when that occurred?

A. Exactly when, no. The article came out in January 1984, and the meeting must have occurred a few weeks before then. So that would have been the end of 1983.

Q. Why did you have the meeting with Mr. Tyler?

A. The bank quite liked the notion of being able to publicise how it was using technology, particularly leading edge technology, and asked us to make -- to go across to New York and demo the system, as it was, to Michael Tyler.

Q. And you went to New York to meet with Mr. Tyler?

A. I did.

Q. And you did meet with Mr. Tyler?

A. I did.

Q. Can you describe for me the circumstances of the meeting with Mr. Tyler? That may be vague, let me --

A. Yes. Could you be a bit more specific?

Q. Where did you meet Mr. Tyler?

A. In Chemical Bank's offices in Manhattan, 277 Park Avenue.

Q. Was Mr. Tyler the only representative from his magazine?

A. There was a photographer along as well. I remember that.

Q. Okay.

A. Whether there was anybody else there, quite frankly, I don't remember. There were a number of us from the bank.

Q. Do you recall who else was there from the bank?

A. Most certainly Tony Herriott was there, John Wilson was there, Steve Foster came with me out of London. And there was a Waite Rawls who was head of foreign exchange in New York at the time, who would have been present.

Q. Did you bring a prototype with you to show to Mr. Tyler?

A. Yes, we did.

Q. Before you brought the prototype to New York to show Mr. Tyler, were there any prototypes in New York or in the United States?

A. No, there weren't.

Q. Was all the development, up until that time, done in the UK?

A. Yes, it was done in Chemical Bank's offices in London.

Q. How long did the meeting last with Mr. Tyler?

A. I don't remember exactly. These things typically take -- typically take a couple of hours.

Q. Okay. And this photograph that we've been looking at, that's a -- is it your understanding that that's a photograph from Mr. Tyler's article?

A. Indeed it is. It is a blow-up of a larger photograph, involving me sitting in front of the screen on one of the trading desks in Chemical Bank.

Q. How did you get the prototype working in New York? Did you have to hook it up to any special server or did you just plug it in?

A. We -- rather than move screens around, we had Interactive Images ship a spare screen down, out of their Boston office into New York. We had a microcomputer, one of these Motorola 68000-based microcomputers shipped across.

We did not take the whole network across. We took a canned version of the database onto that server because it was modular; it allowed us to do that. So effectively we had one computer running the whole -- the whole demo. But it was a full working version of the system. It wasn't a canned demo, per se. We managed to squeeze it all on one box and have that one box provide all of the services.

Q. Did Mr. Tyler use the demo version?

A. I don't remember.

Q. But you certainly, that is your hand in the picture?

A. That is certainly my hand. And as you go to the actual article, you will see more of me.

Q. Do you recall -- the demonstration you gave to Mr. Tyler, that was before you decided not to proceed with the touch screen version; is that correct?

A. That's right.

Q. Do you recall how much more development was done on the project after you met with Mr. Tyler?

A. I don't remember exactly how much more. When you say "the project", are you meaning specifically the touch screen components or are you meaning the application in its entirety?

Q. The Foreign Exchange Front End system.

A. The Foreign Exchange Front End system, as

I mentioned, had a number of different front ends to it, of which touch screen was but one. There was more work because we actually went live with it a few months later.

Q. When you say you went live with it, what do you mean by that?

A. We put it into production and we delivered it into the London office and it was used to catch all live foreign exchange trades out of the London office.

Q. Okay. So it was used live in London a few months after the meeting with Mr. Tyler?

A. Yes, that would have been during 1984. I don't remember the exact date. I believe it -- from memory, it was some time that summer.

Q. Do you know, do you recall how long it was used live?

A. It was used live for probably about 18 months. After this, we re-visited the application set. As I mentioned earlier, the IBM PC was available, running Microsoft DOS, and we did re-engineering around the whole of the front end using PCs. And I project managed that exercise as well.

Q. So would it be fair to say that once you made the switch to the PC system, you ended the development of the previous system?

A. Yes, with the qualification: it was

a production system by now, so it needed to be supported. But extensive enhancements were ceased.

Q. And is it fair to say that the touch screen version never went live?

A. The touch screen system never went into production. We had it -- we had it fully working.

Q. Sure.

A. But it never went into live production.

Q. So when you are talking about the system that went live a few months after the meeting with Mr. Tyler, you are not talking about the touch screen version?

A. That's correct.

Q. Were other members of the press invited to the meeting with Mr. Tyler?

A. I don't believe so, no. I only remember Datamation being involved in that exercise.

Q. Do you recall why Datamation was invited?

A. Specifically, no. It was a reputable -- reputable magazine at the time, well-read by people within the IT industry.

Q. Is it fair to say, then, that it was a private invitation to Mr. Tyler?

MR. BAKER: Objection. Calls -- may call for a legal conclusion.

A. I don't know whether he asked for the

interview or whether we invited him. All I know is I was asked to provide the demo and make it happen.

BY MR. CORBETT:

Q. I asked you earlier if you had an understanding of patent claim construction. Do you recall that?

A. I do recall.

Q. And I think you said that you weren't -- well, let me ask you this.

What is your understanding of patent claim construction?

A. I think my answer, if I can remember my answer, was: no more than a layman. So in that sense, no more than any other person you would expect to find on the street. We know that patents exist but more than that, no detail.

Q. Are you aware that patents have something called "claims" in them?

A. No, I wasn't.

Q. Are you aware that the court decides the meaning and scope of the patent?

A. No, I'm not sure I understand what you are suggesting there.

Q. We will mark this as exhibit number 2.

(Exhibit 2 marked for identification)

Q. I have handed you as exhibit number 2, it is a claim construction order regarding the 356 patent in this case.

A. Mm-hm.

Q. Have you ever seen this document before?

A. No, I have not.

Q. Are you aware that the words of a patent take on a very special meaning in a patent case?

A. Aware? I can imagine, is probably a better way of describing it.

Q. Are you aware that the court in this case defined certain words with respect to the 356 patent in this case?

A. Again, I can imagine. I wasn't aware.

Q. Have you ever -- what is your understanding of the -- have you ever heard of the term "the 356 patent" before?

A. No, I have not.

Q. Okay. Have you ever seen a patent with respect to this case?

A. No, I have not.

Q. Are you aware that there is a patent involved with this case?

A. I am now aware.

Q. Were you aware before this deposition?

A. Before -- at the point that Dechert made contact with me, it became obvious that a patent -- there was a patent issue. But I was totally unaware of that before then.
Q. When did Dechert first make contact with you?
A. August of this year.
Q. Do you recall the circumstances of their first contact with you?
A. Yes, I do. I received an e-mail from an old colleague, a boss of mine, saying that Dechert had made contact with them regarding this FXFE system and asked me whether I would make contact with Dechert direct. He didn't want to give my name and address away. He was leaving that to me, to make a decision as to whether I wanted to contact them or not. I did.
Q. And subsequent to your contact with Dechert, did you enter into a retention agreement with Dechert?
A. If by that you are saying: have I retained Dechert as my legal counsel? Yes, I have.
Q. But at the time of your first discussion with Dechert, had you retained Dechert?
A. At the time of? No, I hadn't. Very early in those first conversations, they explained to me that they could act for and on my behalf.
Q. What did you discuss with Dechert in those

early conversations before you retained them?
MR. BAKER: Let me just caution the witness to be sure that anything you disclose relates to discussions before you retained us as counsel.
A. The very first conversation concerned the -- what we had done in the Foreign Exchange Front End system. I described the system much the same as we have just been talking about today, in terms of what it was that we did and when it was that we did it.
With reference to the Datamation article, I confirmed to them that I understood that article existed, because of course I did; I knew about it. And to a large extent, that was -- that was the understanding of the conversation.
Dechert -- Dechert said that they could act on my behalf and I sought a UK legal view as to the implications of what that meant before I accepted them.
(Exhibit 3 marked for identification)
BY MR. CORBETT:
Q. So before you is exhibit 3. Do you recognize this document?
A. Yes, I do.
Q. What is this?
A. This is a letter from Dechert to myself, setting out how I could work with -- for them, with them, as

a consultant on this case.
Q. Okay. Is it fair to say that this letter is dated October 26, 2007?
A. Indeed it is.
Q. Is it fair to say that this is also the same time that you retained Dechert as your attorneys?
A. Yes, it is.
MR. BAKER: I am just going to object to the last question as vague and ambiguous.
BY MR. CORBETT:
Q. And this is also -- this letter is an engagement letter, whereby you have agreed to assist Dechert and Gateway as well; is that fair?
A. That's right.
Q. And what was your understanding of how you would assist Gateway and Dechert?
A. The -- this is really, as I mentioned earlier, I am independent with my own company and this was to allow Gateway, through Dechert, to reimburse me for expenses that I incurred in assisting them in this exercise; and also to recompense me for any time that I spent, because obviously when I'm doing this week, I am losing fee income from my other customers. And that is the sum total of it.
Q. So you are being paid as a consultant for Gateway?

A. I am being paid as a consultant for my time.
Q. And do you know -- how much are you being paid?
A. It says here. It is an interesting amount, $230.78 an hour, which is derived from my UK charge rate of £900 a day.
Q. And is that your standard UK charge rate?
A. That is.
Q. Do you recall a conversation you had with a consultant for Gateway in September of this year?
A. Do I recall a conversation? Not specifically with a --
Q. Okay. Do you recall a conversation you had with Mr. Buscaino?
A. I had a conversation which was instigated by Dechert with an external consultant who was looking to understand what it was that we built. I am afraid I do not remember his name; therefore to say specifically whether that was the individual, I can't -- I can't honestly say. But there was certainly a consultant that Dechert introduced me to.
Q. Okay. What do you recall about this conversation with this consultant?
A. Again, it was for me to give him an understanding of what it was we had done at Chemical, back

e0eaf9de-1c88-4774-868c-62419195d6a7

Page 66

in the early 80s, on this Foreign Exchange Front End system; specifically around the touch screen -- use of touch screen technologies.

Q. And who set up the call?

A. Dechert.

Q. And how long was that call, if you recall?

A. Exactly, I don't. It must have been in excess of half an hour; maybe three quarters of an hour. Of that sort of duration, from memory.

Q. Okay. And were the Dechert attorneys also on the phone?

A. Yes, they were.

Q. Did you talk to the Dechert attorneys in advance of the call with the consultant?

MR. BAKER: Objection, vague.

A. I had had a number of conversations with Dechert. On this particular call, they asked, they set the call up and they asked, would I speak to a consultant. And they gave me the brief only of: what we want to talk about is the Foreign Exchange Front End system and how it worked. Could you take the call and describe to this consultant?

BY MR. CORBETT:

Q. Okay. Before the call with the consultant, did Dechert's attorneys give you an outline of the topics to be discussed with the consultant?

Page 67

MR. BAKER: I am going to object to this line of questioning as calling for attorney/client privileged communications and attorney work product. You are asking about communications with Dechert, so I am going to advise the witness not to answer that question on the grounds of attorney/client privilege and work product.

MR. CORBETT: I think the witness testified that the relationship with Dechert wasn't established until October. And I am asking about conversations that happened in September, before the establishment of the attorney/client relationship.

MR. BAKER: Yes. I think it is a mischaracterization of the witness's testimony. What he testified was that during early conversations, that the attorney/client privilege and consulting relationship was established; not that it wasn't established until the date of this letter. So you may want to clarify that with the witness, if you want. But I think your understanding of his testimony is not accurate.

BY MR. CORBETT:

Q. Do you recall when you established the attorney/client relationship with Dechert?

A. I recall that we talked about it very early in the conversations; and being that the conversations started very early in August, that would have been the case.

Page 68

There was an implicit understanding on my part that they would be representing me. The paperwork followed on in due course.

Q. So a few moments ago when we were discussing exhibit 3, and I asked you the question:

"Is it fair to say that this is also the same time that you retained Dechert as your attorneys?"

And you answered:

"Yes, it is."

Is it fair to say that that may have been mistaken?

A. I think there is another document which is my retention, or my -- of Dechert as my attorney in this matter. I can't remember the exact date of that. It was, you asked: is it about this time? It was about this time that I signed the letter, but there had been a number of conversations around the principle of it, stemming back from August.

Q. Let me ask you. At the time you had the discussion with the consultant in September, had you retained Dechert as your attorney?

A. I would say I had implied. We would have to find the actual document with the date on it, to remember the actual date I signed it. But there was certainly an implied understanding.

Page 69

Q. Was your conversation with the consultant scripted?

A. Was my conversation scripted? No.

Q. Do you think the consultant's conversation was scripted?

A. I don't know. It was done over the telephone. He was in the U.S. I was at home in the UK.

Q. Were you aware of the questions that the consultant was going to ask you, before he asked you them on that conversation?

A. No, I was not.

Q. Who is Mr. Wigzell?

A. John Wigzell was my boss at Chemical for a number of years. He is now retired. He was -- when he left, he was the Vice President, the Senior Vice President of the bank.

Q. What was his involvement in FXFE?

A. At the time, he was the head of -- was he the head of IT in the UK or had he just moved on to the States at that point? It was about that time that he was either head of IT, effectively the IT director for all IT activities in Europe, or he had moved on to another role in the U.S. But it was of that order.

Q. And it was from him that you first learned of this case?

A. It was from him that I first learned of this case.
Q. Do you know how Dechert found Mr. Wigzell?
A. No, I do not.
Q. Do you have more knowledge of FXFE than Mr. Wigzell?
A. Absolutely.
Q. Is there anyone -- let me ask you this. Are you the person with the most knowledge about the FXFE system?
A. I would say, being that I was the prime architect, the prime link to the business, I was the bridge between understanding what the system needed to do. I am sure you could pick an individual programme and ask one of the programmers who would undoubtedly have more detailed knowledge about that. But the overall construct of the architectural level, I think that's me.
Q. Are you aware that this case is going to trial early next year?
A. I am aware that it is likely to go to trial, yes.
Q. Okay. Do you have an expectation that you will go to that trial?
A. I think that one is open at the moment. It is a question of whether this video recording is good enough or

whether other people want me to go there. I don't -- there's no decision on that, as far as I'm concerned.
Q. If you were asked to go to trial, would you go to trial?
A. I would endeavour to create a space in my diary to achieve that, yes.
Q. And would you be paid as a consultant if you went to trial?
A. That would be my expectation; that the time lost would be recompensed.
Q. What did you do to prepare for today's deposition?
A. I met with Dechert yesterday and they explained --
MR. BAKER: Let me just caution the witness not to disclose any communications between counsel and yourself. You can say what you did, but don't disclose any communications, please.
A. What I did, I attended Dechert's offices here in the UK and understood what the format of today was likely to be.
BY MR. CORBETT:
Q. And who did you meet with?
A. I met with Bryan Atkinson and Lara from Fish & Richardson.

MR. BAKER: Just to clarify. I think you said Bryan Atkinson.
A. Sorry, I did not. I apologize, let me correct that. Bryan Atkinson is another attorney. His name is on the top of this piece of paper. So if I turn that over, I met with Jonathan Baker and Lara yesterday.
BY MR. CORBETT:
Q. And you met with them yesterday?
A. Yesterday.
Q. And how long did you meet with them?
A. A number of hours. From, I think it was around 9:30 in the morning through to about 3:30 in the afternoon, to be ...
Q. And did you review any documents in your meeting yesterday?
MR. BAKER: You can answer that "yes" or "no".
A. Sorry, I misunderstood. Yes, we did review some of the documents.
BY MR. CORBETT:
Q. Do you recall which documents you reviewed?
MR. BAKER: I am going to object to that as calling for attorney/client privileged information and I would advise the witness not to answer.
BY MR. CORBETT:
Q. I think we are up to exhibit 4.

(Exhibit 4 marked for identification)
Q. Exhibit 4 is a subpoena issued in this case to you. Do you see that?
A. I do.
Q. Have you seen this subpoena before right now?
A. Yes, I have.
Q. And when did you first see the subpoena?
A. I don't remember the exact day, but it would have been a few days -- it would have been a couple of weeks ago. A week ago or so.
Q. Okay.
A. Of that order.
Q. And were you aware that you were requested to produce documents before this deposition as well?
A. Yes, I was.
Q. And did you search for documents in advance of this deposition?
A. There was no need to search. All of the documentation associated with the system was vested with Chemical Bank and when I left their employment, obviously I left all of their documentation behind. So I've not been in possession of any documentation to search for.
Q. So you had no documents?
A. I had no documents to search for.
Q. Are you aware that your attorneys produced the

Page 74

Tyler article in response to the subpoena?
A. No, I didn't know that they produced the Tyler article in response to the subpoena.
Q. Did you have the Tyler article in your possession?
A. At the point of the subpoena?
Q. Yes.
A. Yes, but it had been provided to me by Dechert.
Q. So you didn't have it on your own before?
A. So I didn't have it on my own before.
Q. Have you reviewed the document subpoena in this case?
A. When you say "the document subpoena", do you mean this document?
Q. Let me ask you this. Are you aware that there were two subpoenas issued to you?
A. I saw a subpoena.
Q. Okay.
A. And I have to be honest, I believed it was this one, but the one that I saw actually had a whole list of attachments to it. So I may have been mistaken. It may not have been this one. It may have been the second, now that you mention it.
Q. Are we up to exhibit 5?

Page 75

(Exhibit 5 marked for identification)
Q. Okay, so I have given you a second subpoena that is related to the documents. Do you see that?
A. Indeed, I do.
Q. And have you seen this subpoena before right now?
A. And I would like to correct my previous statement. Now that I have seen this version, this is the one that I received, not the former.
Q. Okay. So in exhibit 5, the document subpoena, did you review all of the categories of documents that were requested in this case?
A. I scan read, but knowing that I had no documents, I knew that I had nothing to deliver.
Q. Okay. So you had no documents responsive to any of these categories?
A. I had no documentation at all out of this system.
MR. CORBETT: Okay. I think we need to take a tape change. So let's go off the record.
THE VIDEOGRAPHER: This is the end of tape 1 in volume 1 of the deposition of Robert Long. We are going off the record at 11:55.
(11:55 a.m.)
(A short break)

Page 76

(12:08 p.m.)
THE VIDEOGRAPHER: This is the beginning of tape 2 in volume 1 of the deposition of Robert Long. We are back on the record at eight minutes past 12.
BY MR. CORBETT:
Q. If I can direct your attention back to the photograph that we've marked up. I believe it is exhibit 1. The field you referred to as the "scratch pad", which I think we have identified as D.
A. The area D.
Q. The area D. In this photograph, it depicts an onscreen keyboard; is that fair?
A. That's correct.
Q. And I believe you said previously that one could use that onscreen keyboard to type in the name of a broker?
A. No, I said to type in -- type in names.
Q. Okay.
A. The reason I am questioning that is we would use it typically for typing the name of a customer.
Q. Okay.
A. It is unlikely that you would be typing in a broker name, because there was a contractual relationship between the bank and the broker. Therefore, as soon as that contractual relationship was established, it would have been

Page 77

in the database; as opposed to a customer effectively could be anybody.
Q. How would one type in the name of a customer, using that keyboard shown in the picture in area D?
A. I think the picture is actually quite useful to show this. I don't know if you have noticed. Immediately above it, it has got the words "Chemical Bank". That is actually the area that when you typed in the letters, that is the area that would be populated.
Q. Mm-hm.
A. Because we knew it was a photo opportunity, we put our name up on it.
Q. So as a user touched --
A. As you touched each individual letter, character by character, so it would be built up in that area. Then you might notice, there is a button called "return". At the point you hit "return", it would then take that value and put it into the field on the deal ticket; next to, in this case, the customer.
Q. Now, the onscreen keyboard that is depicted in this photograph, could it only be used with the customer field, or could it be used with others?
A. No, it could be used with others. There were a number of other fields that it could be associated with. The main ones would be customer, location or, more

pertinent, settlement instructions. If we were buying Deutschemarks, for example, then we would be, by definition, selling dollars. And we would need to know where the customer wanted their dollars paid to.

Q. So is it fair to say that whenever the onscreen keyboard would come up, it would always come up in the same region in D?

A. Yes and no. Now, let me explain. I don't mean to be evasive. We actually designed it so that we could have a left handed person's screen or a right handed person's screen. So we could position the tiles, if you like, anywhere on the screen we wished. That was done programmatically, and actually done programmatically based upon the user's sign-on. So as the user would sign on, it would recognize their various characteristics and display the system accordingly.

It happened that we chose to use this area, rather than overlay the middle of another part of the screen that the dealer may be wanting to look at. So we programmatically zoned it to make it easier for the dealer to use.

Q. When the keyboard is not shown in area D, do you recall what was displayed in that area?

A. You mean, what was the default?

Q. What was the default?

A. There would be no default, because it was absolutely pertinent upon the -- which field it is you are looking to key in.

So let me explain. If I keyed, if I touched "rate", then the default would be to bring up a number pad in that area. If I touched "broker", the default would be to bring up the list of brokers. If I touched "customer", it would be to bring up the likely customers that are going to be trading that currency pair. There's the high volume customers in any particular market.

Q. So then, for any default that used text entering, the keypad would appear in area D?

MR. BAKER: Objection, mischaracterizes the testimony.

A. I would actually want to qualify that. What I mean by that, we just talked about: if you want to put in a customer's name in, yes. The system actually knew the list of the top 40, 50, 60 customers that would be likely to be trading in the currency pair that this particular trader has set up to trade in.

So if the example was: it was a spot Deutschemark trader, the likely counterparties that you will be trading with all day would include the Deutsche Banks, the Dresdner Banks, the Commerzbanks, Citibank, and at the time Chase and the like. So there would be high volume houses

trading in a particular currency pair. Those would come up as your dynamic pick list in the first instance.

If instead of being a Deutschemark trader you were a Swiss franc trader, then the ones that would be high on your list, would have been the Swiss Bank Corporation, UBS, Credit Suisse as well. So that was what I meant by "it was dynamic".

Clearly, there are thousands of banks out there that you can be trading with. So we needed a means by which you could go and pick a different name, other than through your usual list. And that is when, in addition to having the list of all the names, there would be another button that would cause the alpha pad to come up, and then you could key it in.

Q. And the alpha pad would replace the list that previously was displayed there?

A. Absolutely. It would just overlay it in the same area of the screen.

Q. When you used the words "overlay it in the same area of the screen", is it your understanding that the list was underneath the alpha pad?

A. I think that would be incorrect, inasmuch as this of course pre-dated Windows and all of those other tiling type capabilities. So when I say "overlaid", it replaced that on the screen. So there was not a drag and

drop capability available back in the early 80s.

Q. The programming for the alpha pad, where was that done? Let me withdraw that question.

At what level of the programming of the Foreign Exchange Front End system was the functionality of the keyboard? Was it done on the back end or at the system level or the front end?

A. I'm not sure that the question, if I can describe what we did and then --

Q. That might be the best way.

A. And see if that answers your question.

The alpha pad that is displayed here, we wrote that. So we developed the alpha pad; using Easel to allow us to define the individual boxes, so one box for the letter A, one box for the letter B. But we wrote that as a programme.

We then defined that. I mentioned before that we used structured programming techniques. Today, you would describe that whole routine, of how to handle this, as an object. Effectively, that's exactly what we did before we invented this concept, this labelling of object encapsulation. That is what really what we did.

Q. So you wrote an object that acted as an alpha pad?

A. Absolutely.

Q. And you wrote an object that acted as a number pad also?
A. That's right.
Q. And is it fair to say, and correct me if I don't say it fairly, but is it fair to say that the way you did that is you define for the alpha pad, define the regions of the screen that corresponded to the different letters. And when those regions were touched, it would put a letter into the area that says now "Chemical Bank"?
A. That is absolutely a fair description. That is exactly what was going on.
Q. And if it was a number pad, the same thing, just --
A. It would be a number that would be displayed.
Q. Okay. Was the same object -- let me withdraw that.
With respect to the alpha pad object, was that same object used across the various circumstances that might require the alpha pad object?
A. Absolutely, yes.
Q. So it wasn't a different programme?
A. No, it wasn't. That is why I am describing it as a tool, as a utility, as an object. I am giving 2007-related labels to what we developed back in 1982/83.
Q. Okay.

When was the last time you have actually seen the FXFE system working?
A. When was the last time I actually saw the FXFE system? By that, do you mean the touch screen version or the whole application?
Q. Well, let's talk about both.
A. Okay. The touch screen system we had available to us throughout 84. Even though we canned the project, we still had the tools available in the lab, in the development area of the bank. So it would have been throughout 84.
The application, as I said, from not using the touch screen front end, went live and was used for a number of months until we replaced it.
Q. And that ended in 86?
A. The reason for the hesitation, I am trying to get the dates right. Following this exercise, I came to New York and I built a team to build the PC-based application in New York. I was in New York for about 12 months before we then started to roll it back out into the UK. So --
Q. When did you come to New York to start working on the project?
A. That would have been 85, yes. End of 84/early 85.

Q. And so you worked in New York for a year?
A. In total, I was back and forth to New York for about 18 months. I ended up having a team in New York and a team in London and we were building this replacement for this using PC technology in New York, and the team in London was -- we were building an arbitrage system at the same time.
Q. When you stop working for Chemical Bank?
A. The summer of 88.
Q. And subsequent to that, what did you do for employment?
A. I went and joined a money broker. I was head hunted into a money broker here in London to head up their systems area.
Q. And what was the name of that money broker?
A. The money broker was called Exco.
Q. And how long did you work there?
A. A number of years, through to -- what was it? Six or eight years I was there? So that would have been 88 through 94. Yes, 94, because then I went to Warburgs.
Q. And before you left Exco, you led their IT systems?
A. At Exco?
Q. Yes.
A. Yes, I was responsible for front end systems

at Exco.
Q. And then you went to Warbucks?
A. Warburgs. SG Warburgs, the investment bank.
Q. Okay. And how long were you at Warburgs?
A. Well, Warburgs was bought by Swiss Bank Corporation and I was at Warburgs for in excess of four years. I started as head of -- global head of architecture for Warburgs.
Q. And that was in 94?
A. That would have been about 94. No, it would have been in the summer of 94.
Q. And did you stay there after the acquisition by Swiss Bank?
A. Absolutely.
Q. And did your responsibility there remain the same after the acquisition by Swiss Bank?
A. No, I took over -- I became global head of a function called applications infrastructure, which is how to glue all the bank systems together.
Q. What year did that happen?
A. That would have happened within -- I was at Warburgs for nine months before we were bought by Swiss Bank. And within six months, I transitioned in as head of applications infrastructure at Warburgs.
Q. And then --

Page 86

A. Sorry, SG -- by then it was SBC Warburg and we then bought the American bank Dillon Reed. So it was SBC Warburg Dillon Reed.
Q. How long did you work at SBC Warburg Dillon Reed?
A. I think it must have been four, maybe five years.
Q. What year was that, when you finished?
A. I am trying to remember my CV now. It was ... I left Warburgs -- well, Swiss Bank -- about four months after Swiss Bank had bought and merged with UBS.
Q. Okay. And then what did you do after that?
A. I was head hunted into the Swiss Re, to head up the UK IT across the Swiss Re.
Q. And do you recall what year that was?
A. The year I left UBS. That must have been 1998. I remember it because we were rapidly approaching the year 2000 and they had some major year 2000 issues.
Q. And how long were you in that position?
A. I was there for four years.
Q. Until 2002?
A. 2002.
Q. And what did you do then?
A. I then formed my own company, in the interim management, and my first assignment was with a fund manager

Page 87

here in the UK called Morley Fund Management. It was the fund management arm of the Global Aviva Insurance Group.
Q. And you have been there since?
A. No, I went there for -- originally as an interim for five months. I then went permanent with them for about 11 months, and then moved on.
Q. Okay. What year was that?
A. What year is it now? We are now 2007, so that would have been 2005 or 6. 5, I think.
I had a year with an insurance company called NGM Insurance and now I have taken my current role with -- I am getting the dates wrong, aren't I? Because I joined the organization that I am currently with in April of last year, so that was April 2006. And I am still there.
Q. So throughout the time that you left Chemical Bank, up until very recently, did you have occasion to think about the FXFE system or review the FXFE system?
A. Not so much the FXFE system. It's the system that we used to supplement it, to replace it.
I had, as I mentioned before, I had a team in New York and a team in London, and there would be usual social gatherings where we would just compare notes about what we were doing. But in terms of technical details, no. It was purely social.
Q. Is there -- are there any physical systems

Page 88

left, that would have been possible for me today to see the touch screen FXFE system in action?
A. I do not know what Chemical Bank has or hasn't retained since 1984. I think it is most unlikely, quite frankly, that there would be anything left there.
Q. You are not aware of anything --
A. I am absolutely not aware of anything.
Q. Do you know who would be the best person to talk to, to see if there was something there?
A. No, because I don't think -- well, I think -- I know that none of the crew that were there in those days are still there. They have all left Chemical's employment in the 20 odd years since then.
Q. Exhibit 6.
(Exhibit 6 marked for identification)
Q. And exhibit 7.
(Exhibit 7 marked for identification)
Q. Let's start with 7, actually, which at the top says "United States patent" and it has a patent number 4,763,356.
A. Mm-hm.
Q. Have you ever seen this patent?
A. No, I have not.
Q. Let's go back to exhibit 6, which is the Tyler article in the Datamation magazine. Have you seen this?

Page 89

A. Yes, I have.
Q. When is the first time you saw the Tyler article?
A. The first time I saw it was not long after it was first published. Looking at the title page here, it reminds me that it was January 1984.
Q. So you saw it shortly after it was published; is that fair?
A. That's true.
Q. Since that time, did you have an opportunity to review the Tyler article until the circumstances of this case arose?
A. No, not at all.
Q. If you could turn to page Long 9.
A. Okay.
Q. Let me ask you this. You've looked at this recently; is that fair?
A. Yes, I have.
Q. Do you understand that the article does not use the term "Foreign Exchange Front End" or "FXFE" anywhere?
A. I did not recognize the fact it did not mention "Foreign Exchange Front End" or "FXFE" anywhere.
MR. BAKER: Counsel, just to be clear. You mean the term, the --

e0eaf9de-1c88-4774-868c-62419195d6a7

BY MR. CORBETT:
Q. The term, the word, yes. If you could just page through it and I will represent that the article does not use the words "Foreign Exchange Front End" or the acronym "FXFE" anywhere. Do you see that?
A. No, it doesn't seem to make reference to that particular name. Regardless of that, that is what we call the system.
Q. I think instead, as you read it, you will see that the author referred to it throughout as "the Easel system".
MR. BAKER: Objection. I think that mischaracterizes the article.
BY MR. CORBETT:
Q. Do you see, there are several instances where the author refers to "Easel systems", "Easel workstations"?
A. It may well have referred to Easel, but that was, as I said before, that was the software development tool kit.
Q. So --
A. The system was absolutely known internally as "Foreign Exchange Front End" or "FXFE".
Q. For example, on page Long 009, in the third column, in the fourth full paragraph, it says:
"In the first phase of Chemical's plan, the Easel

workstations ..."
Do you see where he uses the term "Easel workstations"?
A. Indeed, I do.
Q. And then in the second column, the second full paragraph, the same page, Long 009, it refers to it as:
"The Easel terminal."
Do you see that?
A. Yes.
Q. Is the author of this article using a -- incorrectly referring to the system?
A. I think -- I don't know, but I could surmise. I don't know whether me surmising helps.
But having met with us, I could well imagine he also met with Interactive Images and therefore got an Interactive Images spin on the use of their Easel tool set. I don't know that to be the case. I know that this is the system that we developed and we internally called it "FXFE". We wrote the system, using the Easel software developer's tool kit.
Q. Datamation was -- this article is not a technical specification of the system, is it?
A. That's -- that's correct.
Q. It is more of a general interest article about how the system worked; is that fair?

A. Yes, in the terms of: it was targeted, I presume, and you would need to speak to the editors of Datamation at the time; but I believe it was targeted more at senior management, rather than the deep "techies". As a result, you would end up by putting an end user type commentary to it. That is exactly what is covered here.
Q. I think we are up to exhibit 8.
(Exhibit 8 marked for identification)
Q. I have marked, placed and given to you exhibit 8.
A. Yes.
Q. "Declaration of H. Robert Long." Do you recognize this document?
A. Indeed I do, yes.
Q. Is this an affidavit that you gave in this case?
A. Yes, it is.
Q. Did you write this affidavit?
A. The actual words, no. But I was certainly -- I had overall editorial rights to every word.
Q. Is it fair to say that the attorneys wrote this and gave it to you to sign?
MR. BAKER: I am going to object. That calls for attorney/client privileged communications and I will advise the witness not to answer the question.

BY MR. CORBETT:
Q. Are you going to follow your attorney's instructions?
A. Indeed I am.
Q. Let me ask you this. You said that you didn't -- I am sorry.
You said that you had overall editorial rights, even though you didn't write the actual words. Which -- do you recall which, if any, paragraphs you edited in this affidavit?
A. I don't recall. I do know that we made a few changes. But the general sense was, it was a true and fair representation.
Q. Paragraph 5 in your affidavit says:
"The ..."
MR. BAKER: Counsel, I am sorry to interrupt, but you have been referring to it as an "affidavit". Technically it is a declaration. I am not sure if that matters or not. But just to be clear about what it is.
BY MR. CORBETT:
Q. Paragraph 5 of your declaration says:
"The FXFE system was brought to the United States no later than January 1984."
Do you see that?
A. Absolutely.

Q. Did you write that sentence?
A. Yes, inasmuch as it was left as blank as to when it was brought to the U.S. Quite frankly, in terms of a declaration, I couldn't be explicit as to whether it was December or November or even October 83. So the logic being if the article was published in January 84, it certainly hadn't before then.
Q. Why did you write that sentence?
A. Because there was an understanding -- an understanding that it was required that we actually did bring it to the U.S. and, yes, we did. So this was a simple statement, a simple way of conveying that we had brought the system to New York, to demonstrate it for the Datamation article.
Q. Paragraph 8, you say:
"The FXFE system described in the article and demonstrated for Mr. Tyler included information fields appearing on the right half of the display, such as the broker and exchange rate fields as described in the Tyler article."
Do you see that?
A. Yes, I do.
Q. Did you write that sentence?
MR. BAKER: I am going to object, to the extent that it calls for attorney/client privileged communication.

I think you can answer that question either "yes" or "no", without disclosing any confidential information -- any attorney/client privileged communications. If you can answer that, will you please answer it like that.
A. I don't -- I did not write these words, but I would have written something remarkably similar, because it was a fair encapsulation of what actually happened.
BY MR. CORBETT:
Q. Okay.
We talked a little bit about how users of the FXFE system would point to the various areas of the screen. Maybe we could refer back to exhibit 1.
A. For clarity, I think I should say "touch", rather than "point".
Q. "Touch", okay.
A. Because I think the way that the system worked, it actually required a physical contact with the screen.
Q. Could the system work by touching a keyboard, a physical keyboard? Did the system ever work with a keyboard attached to it?
A. The version that we went live with used the keyboard.
Q. And how, could you describe for me how the keyboard, not the touch screen system, worked? How did

you -- how did the keyboard interact with what was on the screen?
A. It was a different screen. It was a different front end.
Q. So it wouldn't have resembled what we see here in exhibit 1?
A. No, because there would be no point in occupying the real estate of the screen with the keyboards, when you have got one in front of you.
Q. Do you have an understanding of what it means to point to a selection on the screen?
A. I --
MR. BAKER: Objection, to the extent it calls for a legal conclusion. Go ahead.
A. I would treat "point" and "touch" as being one and the same. If you pointed to the "buy" button or you touched the "buy" button, I would view those two in the context of the touch screen system as synonymous.
MR. CORBETT: I am getting close to finishing up. Why don't we take a five minute break and then we'll see how much longer.
THE VIDEOGRAPHER: Going off the record at 12:39.
(12:39 p.m.)
(A short break)
(12:44 p.m.)

THE VIDEOGRAPHER: We are back on the record at 12:44.
BY MR. CORBETT:
Q. Earlier in the deposition, you referred to another document. I am quoting:
"... another document which is my retention of Dechert as my attorney in this matter. I can't remember the exact date of that."
Do you recall saying that?
A. Yes, I did.
Q. Is there a letter or a document where you retained Dechert as your attorneys in this case?
A. I believe -- I believe there was.
Q. But it was not produced to us, pursuant to the subpoena?
A. What was produced to you and what was not, I don't know.
MR. CORBETT: I will just ask, for the record, to produce the retention letter, in order to know the date that the representation began, so that we can properly question what is privileged and what is not. Certain conversations that occurred before that date would not be privileged, and obviously ones after that date would be. To the extent there is a letter, produce it or a privileged log that has the date of such a letter.

MR. BAKER: Okay. If you send us a request for that, we will consider logging it or producing perhaps a redacted version to you.
MR. CORBETT: Okay.
MR. BAKER: So just send me a request, please.
MR. CORBETT: Sure. Technicalities.
A. I understand.
BY MR. CORBETT:
Q. Just going back to exhibit 8, which was your declaration.
A. Yes.
Q. Going -- if you can look at paragraph 9 -- I am sorry, paragraph 8. The second sentence where it says:
"A label appeared next to each field which indicated the kind of information that was to be inserted into each field."
Do you see that sentence?
A. Yes.
Q. Are you aware that that language is almost identical to the language that comes out of the patent at issue in this case?
A. No, I was not aware of that.
Q. Are you aware that various words in your declaration have been given a very specific meaning by the court in this case?

A. No, I was not aware of that.
MR. CORBETT: I have no further questions.
MR. BAKER: Okay. So let's go off the record.
THE VIDEOGRAPHER: Going off the record at 12:47.
(12:47 p.m.)
(A short break)
(1:41 p.m.)
THE VIDEOGRAPHER: We are back on the record at 1:41.
EXAMINATION BY MR. BAKER:
BY MR. BAKER: Could you please tell us your name.
A. Henry Robert Long.
Q. Mr. Long, have you ever heard of a computer system called the Foreign Exchange Front End?
A. Yes, I have.
Q. And can you describe generally what the Foreign Exchange Front End is?
A. It was a trade capture system we developed at Chemical Bank for the foreign exchange traders, back in the early 1980s. It used touch screen technology, amongst other input devices, to allow traders to capture trades directly off the trading desk, and which sat as a front end to the old back office system.
Q. And just generally, what type of features were provided for entering data into the system?

A. The -- we developed both touch screen capabilities, keyboard-based capabilities and we also experimented with some graphics tablets. But the main exercise was around the touch screen.
Q. And using the touch screen, just generally, what kind of features were provided for allowing a user to enter data?
A. It would allow the user to input data in any order they wished. They would be able to touch a field or a -- a name, a label on a screen and that would then call up various tools that could then be used to input the specific data; tools such as a broker's list or a keypad or a number pad.
Q. Mr. Long, how do you know about the Foreign Exchange Front End?
A. I was the Project Manager and chief architect of that system.
Q. What were your responsibilities as Project Manager?
A. As Project Manager, it was to run the project team. In addition to that, as I described, I was architect and I was also the main analyst associated with the project as well. So working very closely both with the business and with the programming resources to match those requirements together to deliver the implementation -- deliver the

system.
Q. And how many people worked on your team?
A. There was a total of about six, excluding myself. So six, plus one other.
Q. And what years did you work at Chemical Bank?
A. I worked at Chemical Bank from September 1973 through to June, yes, June 1988.
Q. And what positions did you hold at Chemical Bank?
A. Various positions. I entered as a management trainee in the operations area of the bank. And by the end, I was Assistant Vice President, head of foreign exchange systems for Europe within the bank.
Q. Was there any abbreviation that was used at Chemical Bank to refer to the Foreign Exchange Front End?
A. Yes, we simply used its -- the letters "FXFE".
Q. That is the letters "FXFE"?
A. "FX" is the foreign exchange. "FE", front end.
Q. Mr. Long, let me show you an document that has been marked as exhibit number 20.
(Exhibit 20 marked for identification)
Q. Do you recognize this document?
A. Yes, I do.
Q. And can you please tell us what it is?

A. It is an article written in the Datamation magazine back in January 1984, and the article in question is titled "Touch Screens, Big Deal Or No Deal?" was ... included material on the interview we gave to the author at Chemical Bank about the Foreign Exchange Front End system.
Q. And who is the author of the article?
A. Michael Tyler.
Q. And how do you recognize this article?
A. Well, I recognize the article from back in 1984 when it was first published. And since then, I have revisited the article as a result of the enquiries around -- the recent enquiries around this case.
Q. And how does this article relate to the FXFE system?
A. I think it covers rather well. It actually talks about, in quite a bit of detail, on the Chemical Bank component in this article, about -- specifically it was about the FXFE system, as we got it.
Q. Now, Mr. Long, let me show you another exhibit that has been marked as exhibit number 21.
(Exhibit 21 marked for identification)
Q. Do you recognize this document?
A. Yes, this is -- this is the self same article from the self same magazine.
Q. And how do you recognize this document?

A. It is the same as the previous one.
Q. Okay. Let me now show you a photograph that has been marked as exhibit number 22.
(Exhibit 22 marked for identification)
Q. Do you recognize this photograph?
A. Yes, I do.
Q. And what is it?
A. It is a close-up of a shot actually from within the article of the touch screen that we developed through the FXFE system, and actually the hand that is on the screen is me. It is mine. If we go back to the actual article, you get a full face of me as well.
Q. So I'll just take a quick look at that. If you turn back to exhibit number 20, will you look at the second to last page.
A. Yes. That is a younger version of me.
Q. Let me just ask you: who is the person in this photograph?
A. That is me.
Q. Can you just hold it up so that we can see it?
Is that you sitting in front of the terminal?
A. This is me here.
Q. And how do you recognize -- well, let me turn back to exhibit number 22, the close-up photograph. And how do you recognize this photograph?

A. Well, I recognize it from the article, but more than that, I actually recognize it as the screen that we built for the Foreign Exchange Front End system.
Q. And does this photograph fairly and accurately show a screenshot of the FXFE system as it existed by January 1984?
A. Yes, it does.
Q. So Mr. Long, I would like to ask you some questions now about the operation of the FXFE system. And with reference to the photograph, can you please explain to us: what is shown on the right half of the screen?
A. On the right half of the screen, in this area, we would refer to that as the "deal ticket". The dealers are obviously trading foreign exchange deals. This was to allow them to actually build a deal ticket up.
Q. Okay. Could I please ask you to use the marker to draw a box around the area that you have referred to as the "deal ticket".
And can you label that with the number 1 outside the box.
Okay. Can you describe to us what is shown within the deal ticket?
A. Well, within the deal ticket, there's a combination of fields and labels attached to -- associated with those fields. So for example, "buy, sell, rate,

broker, customer", as examples of the labels. And next to those labels would be the value that we would put into the field corresponding to that particular deal ticket.
Q. And can you point out to us where the broker label is?
A. The broker label specifically is here.
Q. Okay. Can you draw a box around the "broker" label?
A. Just the label, or the label and the field?
Q. Just the label first. And can you label that number 2?
And can you now show us where the broker field is located?
A. The field is immediately to the right of the label.
Q. And can you label that with number 3?
Next, could you show us where the exchange rate label is? And can you mark that with a number 4, please?
And then can you show us where the exchange rate field is located? And please mark that with a number 5.
Now, Mr. Long, could you please explain to us: how could a user select a field in the FXFE system?
A. Simply by touching the appropriate label. So for example, if I wanted to input the broker field, all I needed to do was touch the broker label. That would then

Page 106

highlight the field that was available for input.
Q. Okay. And specifically, what happened when the user selected a field?
A. Well, a combination of things. The broker -- the broker label itself would be highlighted. The field would be highlighted next to it. And in this area of the screen, the appropriate tool would come up. In the case of a broker, it would be a list, a dynamic list of available brokers that the trader could select from.
Q. And could you draw a box in that photograph around the area in which the tool would be displayed. And then please label that number 6.
Now, you mentioned that the field would be highlighted when it was selected. Could you explain to us why the system highlighted the label when it was selected?
A. Well, it was important for the trader to know that the field that he thought he'd selected had actually been selected by the application, and to make it clear what the value was that was in there already, if there was any value.
Q. And is there any kind of visual feedback shown in this photo, from the article?
A. Yes, I think you can see quite clearly, along the bottom here are a number of particularly large buttons. And I've just touched the button labelled "service" and you

Page 107

can see, I think, quite clearly that it has changed color.
Q. How common was it in 1984 to provide some type of visual feedback to indicate what was selected by a user?
A. I think you always require feedback, back to the user, regardless of whether it was a touch screen or any other system. It is important that the user knows that what they have selected has been recognized by the programme. So absolutely common.
Q. Now, can you explain to us whether there was any relationship between fields and particular tools?
A. Yes, there was. There was an explicit relationship between both fields and tools.
Q. And what do you mean by "explicit relationship"?
A. Well, back to the example that we have just talked about, which was: if I select a broker, it would highlight the "broker" label. It would highlight the broker field. And it would bring up the appropriate tool to select the -- the broker's name. That broker's name would be pre-populated with the collection of brokers that that particular trader would have traded through.
Q. And how is that association between fields and tools created?
A. Within the software, the software developer's environment, known as "Easel", it allowed you to have

Page 108

actions. When you touched something, it would have an action. And then we wrote an application code sitting behind all of that, which then delivered the tool up to the screen.
Q. So who programmed that association?
A. We did at Chemical Bank.
Q. Now, was there any particular order in which the user had to fill in the fields in the ticket?
A. No, not at all. In fact, that was one of the key features of the system. It allowed the trader to keep the -- to touch on any of the labels to input any of the fields in any order that they so wished.
Q. Let's talk about the broker field. What tool was displayed when the user selected the broker field?
A. Simply in this area, it would come up with a list of brokers' names that we had pre-programmed as available to that trader. Each one of those brokers' names would be described in the box and available for selection by the broker by touching the appropriate box.
Q. And what would happen when the user touched one of the broker names?
A. Then the broker's name would then be taken across and input automatically into the field associated with the broker label, on the deal ticket. So the dealer would be able to see which broker had been selected.

Page 109

Q. Okay. Let me ask you a few questions about the exchange rate field. What tool was displayed when the user selected the exchange rate field?
A. The exchange rate field is up -- the exchange rate label is up here, and the field associated with it. By touching the label, instead of an alpha pad which is currently showing, it would show a number pad, so that the trader could then key in the rate associated with that particular trade.
Q. And what would happen as the user would key in the number?
A. Up here on this image with the alpha pad, you can actually see the words "Chemical Bank". We typed that in using the alpha pad because we knew there was a photo opportunity. In the rate -- in the case of a number pad, the numbers would appear in there.
Q. And what happened when the user completed entry of the number?
A. Well, you see on this one, there is a return button. It was a similar button on the number pad. By hitting "return", it would then take that value and insert it into the field next to the appropriate label.
Q. Now, I would like to ask you some questions about the structure of the FXFE system. Can you tell us, what software components made up the FXFE system?

A. The underlying operating system was -- was a flavour of Unix. The touch screens were developed using a combination of a product from a company called Interactive Images called Easel which is a software developer's tool to handle touch screens, and written in C. So the application itself would be written in C.
Q. And did you use Easel to create the broker list tool?
A. Yes, in -- inasmuch as to define the boxes and to accept the labels and handle the touch component, but programmatically written in C, we would have populated that.
Q. So to be a little more specific: what did you have to do to get Easel to actually create the broker list tool?
A. You can see here, there are a number of boxes described in the picture. Simply what Easel allowed you to do was to describe that box, position it on the screen and accept a value programmatically into that box. It would then allow you also to have actions that, when that box was touched, would cause various events to happen.
So for example, if I type on this one the letter A, letter A will appear as the next available character on that display. If I hit "return", programmatically it would then know to take that value and put it in the associated field; whichever was the one that you used, to call up that

tool in the first place.
Q. So the team at Chemical Bank had to programme --
A. Absolutely.
Q. Now, did you also use Easel to create the numeric keypad tool?
A. Yes, we did.
Q. What did you have to do to get Easel to create the numeric keypad tool?
A. As you have got here with the alpha, then you would create the boxes 1 through 0 with a return button number as well. So you actually have to describe within Easel each one of those boxes, 1, 2, 3 as an individual button and the actions that you want to have happen when that button is pushed.
And then we would then combine all of that within effectively one utility, one tool, to allow us to treat it as a single object that was called when the appropriate label was touched.
Q. Now, was the FXFE system ever brought to the United States?
A. Yes, it was.
Q. And when was that?
A. It would have been the back end of 1983, inasmuch as this Datamation article is dated January 1984.

So it would have been at least a few weeks before then.
Q. A few weeks before January 1984?
A. Absolutely.
Q. And where was this FXFE system brought in the United States?
A. It was brought to the Chemical offices in New York, 277 Park Avenue.
Q. And that is in Manhattan?
A. Manhattan.
Q. And why was the system brought to the United States?
A. It was brought specifically to run the article. There had been a request that we -- that we demo the article to the author of the Datamation article. So we brought this system over to demonstrate it.
Q. And who was the demonstration for?
A. It was for a gentleman called Michael Tyler who was the author of the Datamation article.
Q. And what was Michael Tyler's job position at the time?
A. As far as I was aware, he was a journalist working with Datamation.
Q. And what was the purpose of doing a demonstration for Michael Tyler from Datamation magazine?
A. As far as the bank was concerned, the bank

liked to be able to publicise what it was -- how it was using advanced technologies. So it was simply to get the bank's name associated with modern technologies.
Q. What was Chemical Bank's expectation of what Mr. Tyler would do as a result of the demonstration for Datamation magazine?
A. That there would be an article in a subsequent magazine; a subsequent edition of the magazine.
Q. And when did the demonstration take place?
A. As I said before, it would have been -- the article was dated January 84. I don't remember the exact date, but it must have been a few weeks before then; probably before Christmas. So that would suggest the back end of November/early December.
Q. And what was your personal involvement in the demonstration?
A. I actually did the demonstration and the article, along with the photograph, I think, proves that.
Q. Was there any kind of confidentiality agreement with Michael Tyler or Datamation magazine regarding the demonstration of FXFE?
A. No, not at all.
Q. Did Chemical Bank have any expectation of confidentiality regarding the demonstration of FXFE?
A. No, not at all.

Page 114

Q. What features of FXFE did you demonstrate for Michael Tyler?
A. Pretty much all of the major features associated with the touch screen system. The ability to pick, build a trade up in any order, pick the labels, populate those labels, the demonstration of the various tools that we embedded within the application; like the alpha pad, like the number pad, like the brokers' list, like the customers' list. So a pretty all encompassing version of the system was demonstrated to him.
Q. What about the broker field and the exchange rate field you mentioned before?
A. We would certainly have covered those.
Q. And was the demonstration for Michael Tyler successful?
A. Yes, I believe it absolutely was. The system worked, it demonstrated what we wanted to demonstrate to him. He went away and wrote the article. And I think our collective view was that was a success.
Q. Let me ask you some questions about the Datamation article. What is Datamation magazine?
A. Datamation magazine is a magazine aimed at what I would probably describe as the professional end of the IT market; more around the senior management area. A magazine of some standing. We used to -- we used to

Page 115

circulate articles out of Datamation, both before and after this article was written.
Q. Okay. Let me ask you to turn back to exhibit number 20, which is the Datamation article. And let me ask you: have you had a chance to review this article?
A. Yes, yes, I have. I have looked at it again recently as a result of this upcoming case.
Q. When did you originally receive a copy of this article?
A. Not long after it had been first published, so that would have been January/February 1984.
Q. Let me ask you to please turn to page 148 of the article. Take a look at the third column, the second full paragraph, starting with the last sentence that begins:
"The right half ..."
A. Yes.
Q. Do you see that?
A. I do.
Q. Can you please tell us: what does the article say about the operation of the FXFE user interface?
A. Would it be helpful if I read it?
Q. Sure. If you could please do that.
A. Would that actually -- okay. That last sentence starts:
"The right half of the screen lists key

Page 116

information about the current transaction, including buyer bank, seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer, exchange location and method of payment.
"When the trader touches the screen in one of these areas, a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to choose from the information needed on the right. For instance, when the user hits the 'broker' cell on the right, a list of brokers appears on the left; the trader then hits the name of the broker to be involved in the current trade, and that information is entered into the system. For exchange rates and other numerical data, the user hits the proper cell on the right and then types in the numeric data on the keypad that appears on the left. In this way, an entire transaction can be completed directly on the workstation."
It then carries on:
"(A QWERTY layout can be called up on the left for entry of non-standard or rare names -- an infrequently traded currency, for example.)"
Q. Mr. Long, could you please use the blue marker to indicate, on the article that you are just reading, the section that you just read from?
A. Yes, of course.

Page 117

Q. If you just mark that, please.
A. So it's going to be from there, through to there.
Q. Does this article accurately describe the operation of the FXFE system as you demonstrated it to Mr. Tyler?
A. Yes, I think it does.
Q. And if you turn, just for a moment, to exhibit number 21 which is the other copy of the same article. Does your testimony about exhibit 20 also apply to exhibit 21?
A. Absolutely.
Q. Was the FXFE system with the touch screen ever utilized in actual currency trading operations at Chemical Bank?
A. No, we never went live with the touch screen version of the system.
Q. Why not?
A. Quite frankly, the costs proved too high. Each touch screen required a dedicated microprocessor to support it. The screens themselves were expensive. And the thought of trying to roll that out across a whole trading floor just proved too expensive.
Q. Was the FXFE system with the touch screen cancelled because it didn't work?
A. No, it did work. It was more a case, as

Page 118

I said earlier, that it was just going to be too expensive to deploy it.
Q. Mr. Long, do you have any financial interest in the outcome of this case?
A. I do not.
Q. Are you receiving any reimbursement for your time or expenses?
A. Purely for time and expenses, as I incur them. And the time is in recompense for revenue that I will lose by servicing other customers.
Q. What is your reimbursement rate for your work in this matter?
A. My reimbursement rate is derived from my sterling charge rate which is £900 per working day, broken into a dollar rate and agreed foreign exchange rate; I think it equates to something like $230.78 an hour.
Q. And how does that rate relate to the rates you charge for other work you do?
A. It is exactly in line with the £900 a day I charge.
Q. So that is your standard consulting rate?
A. That is my standard consulting rate.
Q. Is your reimbursement dependent on the contents of your testimony or the outcome of this case?
A. Not at all.

Page 119

Q. So just to summarize. Could you please just summarize for us, what are some of the key features of the FXFE user interface that you have been discussing?
A. The key features of this touch screen allows the trader to key in trades, using touch screen technologies, to have pre-populated fields effectively delivered to them, to be able to keep trading in any order without having to scroll up and down or move up and down to a screen.
And it was very much aimed at delivering that functionality direct to the trading desk, rather than the historic way of having to write a ticket out and pass it to the back office.
Q. Are there any particular onscreen tools that you think are key features of this system?
A. I would say the rapid pick mechanisms associated with a broker or a customer would be -- would be key. Most of the previous systems used numbers values and this actually used the names of banks, which made it much easier to pick from. I would say that those would be key.
And then the flexibility of actually being able to turn the screen into a whole host of different features, like the alpha pad, like the number pad, like these pick lists.
MR. BAKER: Thank you very much, Mr. Long.

Page 120

A. Thank you.
MR. BAKER: Let's go off the record.
THE VIDEOGRAPHER: Okay. We are going off the record at seven minutes past 2.
(2:07 p.m.)
(A short break)
(2:13 p.m.)
THE VIDEOGRAPHER: We are back on the record at 13 minutes past 2.
BY MR. BAKER:
Q. Mr. Long, I would like to ask you a couple of questions, to try to clarify some of the responses you gave earlier today when Lucent's counsel was asking you some questions.
One thing is: in response to one of the questions, you said something like, that you were not a programmer. Can you please explain to us what you meant by that, and what level of familiarity you have with the programming tasks that were involved in developing the FXFE system?
A. Yes, of course. It is true, I wouldn't describe myself as a programmer, even though I have programmed in the past. And in particular with regards to this system, my role was Project Manager and architect. But having said that, I was directly involved in determining with the team which components we should write in which

Page 121

language within the project.
I have had some training in programming. There would probably be some programmes around that I wrote in BASIC and in ALGOL back in the very early 70s. But by this stage, I wasn't writing programmes anymore.
Q. What was your role as a system architect?
A. To define the system, the architecture of the system. I mentioned the selection of Easel. That was key in terms of picking, the selection of the Easel component. The selection of the database tool that we use; I was involved in that. Actually, architecting the computers and how we needed to work with the computers. We actually had Plessey build bespoke systems, bespoke computers for us. And I was architecting part of that as well.
Q. And what --
A. So pretty technical throughout.
Q. What was your level of familiarity with how the C software that was developed at Chemical Bank interfaced with the Easel system?
A. Again, C was the -- was the obvious language to use. We wanted performance. Easel came with a very easy interfacing to C as well. So the selection of C became quite obvious. I was not a C programmer, though. That was done by other members of the team.
Q. But you are familiar with the interface?

Page 122

A. Oh, absolutely, yes.
Q. And turning to another topic. This morning, there were some questions about whether the FXFE system was bitmapped or character-based. Did you have any further thoughts on that matter?
A. Yes, I did. It occurred to me afterwards that the underlying operating system was Unix. Unix is character-based -- sorry, is bitmapped-based structures. So it is much more advanced than the old character-based systems.
So Unix as an underlying platform, of course, would be able to support the bitmapped systems.
Q. And this morning, you were talking about programming objects. Do you recall that discussion?
A. Yes, I do.
Q. And as part of that discussion, you said something like: you were giving 2007 labels to what had been done back in the 1980s. Can you please explain what you were referring to when you said that?
A. Yes, I -- from memory, we actually were talking about object orientation and encapsulation. And specifically, the use of those words that I was meaning, object orientation and encapsulation were not a common occurrence back in the 1980s. They certainly are nowadays.
Q. Now, turning to another topic. This morning

Page 123

there was some discussion about your attorney/client retention letter with Dechert and a consulting letter with Dechert. Do you recall that discussion?
A. Yes, I do.
Q. And there was a discussion about the dates of those letters. Do you remember that?
A. Yes, I do.
Q. What is your understanding of when the attorney/client relationship started?
A. Well, we started talking about it very early on when we first made contact, which would have been early August. That was quite clear, that there was going to be that relationship. I took it as read that we had that relationship. And I took the letters as being more formalizing that.
Q. So that would have been several weeks before the letter was signed?
A. Oh, absolutely.
Q. And what about the consulting relationship?
A. The same. There was a clear understanding that I could charge for my time engaged in this exercise, where it was removing me from my other duties, supporting other customers.
Q. So that was also several weeks before the consulting letter was signed?

Page 124

A. Back in August, when we -- when we first started talking.
Q. Now, turning to another topic. This morning, you used the phrase, when talking about the FXFE system, you said something like "populate a field". Can you explain, what did you mean by when you said "populate a field"?
A. Basically to input values into that field. We were talking about building up answers in the scratch pad area and then when you hit the return, I said, used the words "populate the field". For that, read "input into that field and display it back".
Q. And you mean display it in that field?
A. Display it in that field, precisely.
MR. BAKER: Okay. Thank you, Mr. Long. Let's go off the record.
THE VIDEOGRAPHER: Okay. Going off the record at 18 minutes past 2.
(2:18 p.m.)
(A short break)
(2:19 p.m.)
THE VIDEOGRAPHER: Back on the record at 19 minutes past 2.
MR. BAKER: We have no further questions for Mr. Long. So that concludes the deposition for us.
MR. CORBETT: And Lucent has no further questions

Page 125

as well. Thank you for your time.
THE VIDEOGRAPHER: This is the end of tape 2 in volume 1 of the deposition of Robert Long. We are going off the record at 19 minutes past 2. We are off the record.
(2:19 p.m.)
(The deposition concluded)

CERTIFICATE OF DEPONENT

I, ROBERT LONG, hereby certify that I have read the foregoing pages, numbered 1 through 128, of my deposition of testimony taken in these proceedings on Monday, December 10, 2007, and, with the exception of the changes listed on the next page and/or corrections, if any, find them to be a true and accurate transcription thereof.

Signed: ........................
Name: ROBERT LONG
Date: .........................

CERTIFICATE OF COURT REPORTER

I, ROSE HELEN CLAIRE KAY, an Accredited LiveNote Reporter, hereby certify that the testimony of the witness ROBERT LONG in the foregoing transcript, numbered pages 1 through 128, taken on Monday, December 10, 2007 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: ........................
ROSE HELEN CLAIRE KAY
Dated: Monday, December 11, 2007

ERRATA

Deposition of ROBERT LONG

| Page/Line No. | Description | Reason for change |
| --- | --- | --- |

Signed: ....................
Name: ROBERT LONG
Date: ....................