```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
----------------------------------------X
LUCENT TECHNOLOGIES, INC.,
                        Plaintiffs and
                        Counterclaim Defendants,
            vs.
GATEWAY, INC., et al.,
                        Defendant and
                        Counterclaimants,
            and
MICROSOFT CORPORATION,
                        Intervenor and
                        Counterclaimant.

Case No. 02-CV-2060B (WMC)
Consolidated with:
Case Nos. 03-CV-0699B (WMC)
            03-CV-1108B (WMC)
----------------------------------------X
MICROSOFT CORPORATION,
                        Plaintiff and
                        Counterdefendant,
            vs.
LUCENT TECHNOLOGIES, INC.,
                        Defendant and
                        Counterclaimants.
----------------------------------------X
LUCENT TECHNOLOGIES, INC.,
                        Plaintiffs,
            vs.
DELL, INC.,
                        Defendants.
----------------------------------------X
```

         VIDEOTAPED DEPOSITION OF RAOUL LECONTE
                 New York, New York
              Thursday, July 28, 2005

Reported by:
JOYCE G. ABELES

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 380

**Page 2**

```
 1
 2              July 28, 2005
 3              9:30 a.m.
 4
 5
 6        Videotaped deposition of RAOUL LECONTE,
 7   held at the offices of Kirkland & Ellis,
 8   153 East 53rd Street, New York, New York,
 9   pursuant to notice, before Joyce G.
10   Abeles, a Notary Public of the State of
11   New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        IT IS HEREBY STIPULATED AND AGREED, by and
 2   between the attorneys for the respective
 3   parties herein, that filing and sealing be
 4   and the same are hereby waived.
 5        IT IS FURTHER STIPULATED AND AGREED
 6   that all objections, except as to the form
 7   of the question, shall be reserved to the
 8   time of the trial.
 9        IT IS FURTHER STIPULATED AND AGREED
10   that the within deposition may be sworn to
11   and signed before any officer authorized
12   to administer an oath, with the same force
13   and effect as if signed and sworn to
14   before the Court.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   A P P E A R A N C E S :
 2
 3        KIRKLAND & ELLIS, LLP
 4        Attorneys for Lucent Technologies, Inc.
 5            200 East Randolph Drive
 6            Chicago, Illinois 60601
 7        BY:  ERIC D. HAYES, ESQ.
 8
 9        FISH & RICHARDSON, P.C.
10        Attorneys for Microsoft Corporation
11            12390 El Camino Real
12            San Diego, California 92130-2081
13        BY:  OWAIS A. SIDDIQUI, ESQ.
14            ROGER A. DENNING, ESQ.
15
16        ARNOLD & PORTER
17        Attorneys for Dell, Inc.
18            555 12th Street, N.W.
19            Washington, D.C. 20004
20        BY:  MATTHEW BATHON, ESQ.
21            (Via Telephone)
22
23   ALSO PRESENT:
24        TOM DELVECCHIO, Videographer
25
```

**Page 5**

```
 1        THE VIDEOGRAPHER:  This is tape number 1
 2   of the videotaped deposition of Mr. Raoul      09:31:25
 3   LeConte, taken by defendant and                09:31:29
 4   counterclaimants in the matter of Lucent       09:31:35
 5   Technologies, Inc., plaintiffs and             09:31:41
 6   counterclaim defendants, versus Gateway,       09:31:45
 7   Inc., et al., defendants and                   09:31:52
 8   counterclaimants, in the United States         09:31:56
 9   District Court, Southern District of           09:32:00
10   California, CV No. 02-CV-2060B.                09:32:02
11        This deposition is being held at          09:32:12
12   Kirkland & Ellis, 153 East 53rd Street,        09:32:14
13   New York, New York.                            09:32:21
14        Today is Thursday, July 28th, 2005.       09:32:24
15   The time is 9:40 a.m.  My name is Thomas       09:32:30
16   DelVecchio from the firm of Eastwood Stein     09:32:36
17   Reporting.  I'm the legal video                09:32:38
18   specialist.  The court reporter is Joyce       09:32:41
19   Abeles in association with Eastwood Stein      09:32:44
20   Reporting, San Diego.                          09:32:47
21        For the record, will counsel please       09:32:52
22   introduce themselves.                          09:32:54
23        MR. SIDDIQUI:  This is Owais Siddiqui     09:32:55
24   with Fish & Richardson, representing           09:32:57
25   Microsoft Corporation.                         09:32:59
```

2 (Pages 2 to 5)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 381**

Page 6

1      MR. DENNING: Roger Denning from Fish &    09:33:01
2   Richardson representing Microsoft.    09:33:02
3      MR. HAYES: This is Eric Hayes from    09:33:04
4   Kirkland & Ellis on behalf of the witness,    09:33:06
5   Raoul LeConte, and Lucent.    09:33:09
6      THE VIDEOGRAPHER: On the telephone?
7      MR. BATHON: Matthew Bathon with Arnold    09:33:11
8   & Porter, representing Dell, Inc.    09:33:13
9      THE VIDEOGRAPHER: Anybody else? And    09:33:17
10  now the court reporter can swear in the    09:33:19
11  witness.    09:33:21
12  R A O U L    L E C O N T E, called as a witness,
13      having been duly sworn by a Notary Public,
14      was examined and testified as follows:
15  EXAMINATION BY
16  MR. SIDDIQUI:    09:33:28
17   Q. Good morning, Mr. LeConte.    09:33:29
18   A. Good morning.    09:33:32
19   Q. My name is Owais Siddiqui. As you heard, I'm   09:33:32
20  representing Microsoft Corporation.    09:33:34
21   A. Yes.    09:33:36
22   Q. Could you please state your full name for the   09:33:37
23  record?    09:33:40
24   A. Raoul LeConte.    09:33:40
25   Q. Could you please spell that?    09:33:43

Page 7

1    A. It's spelled R A O U L. Last name is    09:33:45
2   L E C O N T E.    09:33:49
3      (Discussion off the record.)    09:34:08
4    Q. Could you please state your current address?  09:34:09
5    A. My address is 10 Monterey Court, Jackson, New   09:34:11
6   Jersey.    09:34:16
7    Q. Zip code?
8    A. Zip code is 08527.    09:34:19
9    Q. Have you ever been deposed before?    09:34:21
10   A. No.    09:34:22
11   Q. Okay. Well, then let me just go over some    09:34:23
12  ground rules real quick. I'll be asking you some    09:34:26
13  questions. Mr. Hayes may be objecting after that.    09:34:30
14  He's placing his objections on the record, but you    09:34:32
15  should still go ahead and answer the question.    09:34:36
16   A. Okay.
17   Q. Do you understand that you're now under oath   09:34:39
18  and that you should answer your questions honestly and  09:34:43
19  fully just as though you were testifying in court?    09:34:44
20   A. Yes, I do.    09:34:47
21   Q. I want your answers to be accurate, so if for   09:34:49
22  any reason you don't understand what I'm saying,    09:34:54
23  either because of the way I phrase the question or    09:34:56
24  because of the way I'm saying it, please just let me    09:34:58
25  know.    09:35:02

Page 8

1    A. Okay.    09:35:03
2    Q. I'll note that we have a court reporter with   09:35:05
3   us today. So that she can make an accurate written   09:35:06
4   record of what you say, please respond yes, no, rather  09:35:14
5   than uh-huh, uh-uh. Don't shake your head or nod your  09:35:18
6   head.    09:35:23
7    A. Okay.    09:35:24
8    Q. If you need to take a break at any point,    09:35:24
9   just go ahead and let us know. I only ask that you   09:35:27
10  finish answering the question that's pending and then   09:35:30
11  we can take a break for however long you want.    09:35:35
12   A. Okay.    09:35:36
13   Q. Is there any reason that you won't be able to  09:35:36
14  give your full and accurate testimony today?    09:35:42
15   A. No.    09:35:44
16   Q. Are you taking any medication or drugs that   09:35:44
17  might inhibit your ability to give full testimony?    09:35:47
18   A. No.    09:35:51
19   Q. Also, because we're making a written record,   09:35:52
20  I ask that you wait until I finish asking the question  09:35:54
21  before you answer it so that the court reporter can   09:35:58
22  get it down accurately.    09:36:00
23   A. Okay.    09:36:02
24   Q. As Tom mentioned, the case here is between    09:36:06
25  Microsoft, Dell and Gateway on the one side, and    09:36:09

Page 9

1   Lucent Technologies on the other side.    09:36:13
2      What do you know about the case?    09:36:16
3    A. Not much, except that it involves a patent    09:36:18
4   that I have.    09:36:22
5    Q. Do you have any financial stake in this    09:36:23
6   litigation at all?    09:36:25
7    A. Not at all.    09:36:25
8    Q. Do you or any of your family members own    09:36:28
9   stock in Lucent, Gateway, Dell or Microsoft?    09:36:31
10   A. Not that I know of. I don't.    09:36:34
11   Q. Do you have any interest in the outcome of   09:36:38
12  the litigation?    09:36:40
13   A. Not really. I don't work for Lucent anymore.  09:36:42
14  No, I only have a patent.    09:36:45
15   Q. Okay. Who do you work for now?    09:36:47
16   A. Well, I'm in transition. I just got off from  09:36:52
17  Techordia and I'm looking for work.    09:36:59
18   Q. Could you spell that?    09:37:02
19   A. Techordia Technologies. It's
20  T E C H O R D I A.    09:37:03
21   Q. Thank you.
22   A. I mean T E L C O R D I A, Telcordia.    09:37:10
23   Q. Do you receive any pension from Lucent or    09:37:19
24  AT&T, Bell Laboratories --    09:37:29
25   A. No, actually I cashed out from AT&T.    09:37:29

3  (Pages 6 to 9)

EASTWOOD-STEIN
deposition services & litigation support    (800)  514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 382

Page 10

1    Q.  What does that mean, you cashed out?    09:37:30
2    A.  Well, they were offering some kind of package  09:37:33
3  a few years ago so I opted out and took the cash value  09:37:36
4  and everything else.    09:37:41
5    Q.  Was that before Lucent split away from AT&T?  09:37:46
6    A.  That was after.    09:37:51
7    Q.  Okay.  Well, we'll get into that in a second.  09:37:52
8        I'm handing you what has been marked as  09:38:05
9  Exhibit 1.    09:38:08
10       (LeConte Exhibit 1, letter dated April 8,
11       2003, marked for identification, as of
12       this date.)    09:38:11
13       MR. HAYES:  Do you happen to have a copy  09:38:11
14  for me?    09:38:13
15       MR. SIDDIQUI:  Yes.    09:38:14
16       MR. HAYES:  Thank you.    09:38:14
17    Q.  Do you recognize this document at all?    09:38:24
18    A.  I haven't seen this, not at all -- I haven't  09:38:29
19  seen this document.    09:38:32
20    Q.  Okay.  This is a letter addressed to you from  09:38:32
21  my colleague, Mr. Denning, dated April 8th, 2003 that  09:38:36
22  enclosed a subpoena requiring you to search for and  09:38:42
23  produce certain documents.    09:38:47
24        Do you remember that at all?    09:38:49
25    A.  No, I don't.    09:38:50

Page 11

1    Q.  Could you take a minute to sort of flip  09:38:59
2  through the document and see if it jogs your memory at  09:39:02
3  all?    09:39:06
4    A.  No, I mean I could tell from the first page  09:39:06
5  that this was mailed to me or anything like that.    09:39:09
6    Q.  Did you ever receive this?    09:39:14
7    A.  No.    09:39:15
8    Q.  I'm handing you what's been marked as LeConte  09:39:36
9  Exhibit 2.    09:39:37
10       (LeConte Exhibit 2, document entitled
11       "Response and Objections of Raoul LeConte
12       to Subpoena," marked for identification,
13       as of this date.)    09:39:38
14    Q.  Does this look familiar to you?    09:39:45
15    A.  No.    09:39:49
16    Q.  When were you first contacted by Kirkland &  09:40:05
17  Ellis?    09:40:08
18    A.  When I -- I couldn't tell.  I mean, I know it  09:40:08
19  was a few times.  I can't remember the year exactly.  09:40:12
20    Q.  When were you first contacted by Kirkland &  09:40:16
21  Ellis in connection with this case?    09:40:19
22    A.  In connection with this case?  I cannot tell  09:40:20
23  exactly what month or what year, but probably,    09:40:25
24  probably like -- I know definitely this year I was  09:40:32
25  contacted, but whether or not I was contacted last  09:40:38

Page 12

1  year is one issue.  But I probably was contacted two  09:40:40
2  years ago, but I couldn't tell for sure -- two years  09:40:48
3  ago.
4    Q.  You see on -- scratch that.    09:40:53
5        If you turn back to Exhibit 1, in    09:41:22
6  Attachment A, there are a list of requests for    09:41:27
7  documents.  That would be page 6 of Attachment A.  09:41:35
8    A.  I'm looking for Attachment A.    09:41:43
9    Q.  Keep turning, there you go.    09:41:46
10    A.  This is Attachment A?    09:41:49
11    Q.  That's right.    09:41:51
12    A.  Page 6, yeah.    09:41:51
13    Q.  There are a list of documents that were    09:41:55
14  requested from you.    09:41:57
15        Did you ever undertake any kind of a    09:42:01
16  document search in relation to this case?    09:42:04
17    A.  Actually, I only found the patent itself    09:42:08
18  because I had it in, framed.  And all the other    09:42:14
19  documents, I don't even know where they were.  I had  09:42:21
20  moved.  Things were boxed up, boxes I never opened.  09:42:24
21  And I have no idea where things were, because this is  09:42:28
22  something I got way back, so...    09:42:33
23    Q.  So it sounds like you did undertake some kind  09:42:36
24  of a document search in relation to this case?    09:42:40
25    A.  There was -- when Kirkland called me --    09:42:43

Page 13

1  Kirkland & Ellis called me, I looked for documents,  09:42:49
2  but I could only find the patent itself and nothing  09:42:54
3  else.    09:43:01
4    Q.  Did you ever see these requests that are in  09:43:04
5  Attachment A?    09:43:07
6    A.  No.    09:43:08
7    Q.  What kind of documents were you looking for?  09:43:09
8    A.  Things linked to the patents, like I say, I  09:43:12
9  only had the patent itself, no other documents.    09:43:15
10    Q.  So you're saying -- Exhibit 2 is titled    09:43:27
11  "Response and Objections of Raoul A. LeConte to  09:43:32
12  Subpoena."    09:43:36
13        You've never seen these objections that    09:43:37
14  you sent, and responses that you sent to the subpoena?  09:43:41
15    A.  I've never seen any such document like this.  09:43:43
16    Q.  Okay.  This is LeConte Exhibit 3.    09:43:46
17       (LeConte Exhibit 3, document bearing Bates
18       Nos. LEC 000001, marked for
19       identification, as of this date.)    09:44:11
20       MR. HAYES:  Thank you.    09:44:11
21    Q.  This is a document Bates numbered LEC    09:44:12
22  000001.    09:44:16
23        Is this a document that you sent to    09:44:20
24  Kirkland & Ellis?    09:44:22
25    A.  Yes, that's the one that I had at my house.  09:44:23

4 (Pages 10 to 13)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 383

Page 14

1    Q.  Okay.  You didn't have any other documents --  09:44:25
2    A.  No.
3    Q.  -- a copy of the patent itself?        09:44:29
4    A.  No, that's what I meant for keeping.  So I    09:44:31
5  didn't have anything else.        09:44:38
6    Q.  All right.  When you said that there were    09:44:39
7  boxes that you never opened, where are those boxes    09:44:51
8  that you never opened?        09:44:55
9    A.  Oh, a lot of them we just threw away.  I had    09:44:57
10  moved, okay, before that, back in November 2000.  And  09:45:00
11  you know, we had tons of stuff around the house.  And  09:45:06
12  you know, things we had there and, you know, we just    09:45:11
13  left them.  Some were left in the garage.  You know,    09:45:16
14  we cleaned up some of them.  We said those things we    09:45:20
15  don't need, we just put it in the garbage --  you    09:45:25
16  know, because I didn't think, you know -- basically my  09:45:28
17  logic is if we're going to open them, that means we're  09:45:31
18  going to need them, so why keep garbage around, you    09:45:35
19  know.        09:45:40
20    Q.  Do you have any of those boxes today    09:45:40
21  anywhere?        09:45:42
22    A.  There are probably some in the basement, yes.  09:45:43
23    Q.  Do you think they might have documents    09:45:45
24  related to this patent at all?        09:45:47
25    A.  I honestly doubt it, because this is all, you  09:45:49

Page 15

1  know, this document, this stuff I probably got 20    09:45:52
2  years ago or so, and you know, it's hard to say what's  09:45:55
3  kept and what's not kept.  The only thing I know, this  09:46:00
4  looks good and I had it framed.  You know, that's what  09:46:03
5  I kept, you know.        09:46:07
6    Q.  If you had unlimited amounts of time and    09:46:16
7  energy to search for documents, where would you    09:46:19
8  search, related to this case?        09:46:22
9    A.  Where would I search?  Gee.  Probably the    09:46:24
10  basement.  I haven't had documents -- I even have    09:46:30
11  boxes in my old attic.  So I just say to my wife, we    09:46:33
12  don't need them, just we're not moving with them,    09:46:39
13  let's get rid of them.        09:46:43
14    Q.  How about at Lucent or AT&T or Bell Labs, if  09:46:46
15  you had to search --        09:46:53
16    A.  None of this stuff -- this is things I worked  09:46:55
17  on back in the '80's.  Nothing was kept, you know, 20  09:46:59
18  years, switch locations, switch buildings, switch    09:47:07
19  offices couple of times.  Each time just pack and    09:47:11
20  clean up old things.  So you know, it's very -- I    09:47:15
21  wouldn't think that you would be able to find any    09:47:27
22  documents that I kept in the office back in -- back    09:47:27
23  when I had these documents.        09:47:33
24    Q.  What location, what AT&T locations were you    09:47:41
25  working in around the time of working on --    09:47:43

Page 16

1    A.  Lincroft and Middletown.
2      MR. SIDDIQUI:  Did you get that?
3    A.  Lincroft.
4    Q.  How do you spell that?        09:47:51
5    A.  It's L I N C R O F T, and Middletown, New    09:47:53
6  Jersey.  Avaya is in Lincroft right now -- there's    09:48:00
7  another company named Avaya -- there's a company    09:48:23
8  called Avaya that's in Lincroft building right now.    09:48:24
9  It's not even Lucent or AT&T anymore.        09:48:29
10    Q.  When were you in the Lincroft building?    09:48:32
11    A.  When was I?        09:48:39
12    Q.  Yes, what years?        09:48:39
13    A.  Was there initially in '82 to 80 -- don't    09:48:41
14  remember, '86, '85, don't recall.  And then I went to  09:48:45
15  Middletown and then moved back to Lincroft probably    09:48:56
16  '89, '90, until the time I left the company in '98.    09:49:01
17    Q.  So it sounds like you were in the Lincroft    09:49:11
18  building from 1982 to about '85 or '86?        09:49:15
19    A.  Yeah.        09:49:15
20    Q.  And then in Middletown from around '85 or '86  09:49:19
21  to '89 or '90?        09:49:24
22    A.  Yes, I went to Middletown, worked there a    09:49:26
23  couple years.  Can't remember exactly which year, but  09:49:28
24  I remember moving back to Lincroft probably in '89 or  09:49:31
25  1990.  Can't say for sure which one.        09:49:36

Page 17

1    Q.  Are you, you're represented by counsel today?  09:49:46
2    A.  Yes, I am.        09:49:49
3    Q.  And who is representing you?        09:49:50
4    A.  I'm represented by Eric Hayes.        09:49:54
5      MR. HAYES:  Just to make it clear, he's    09:49:57
6      represented by Kirkland & Ellis, not Eric    09:49:59
7      Hayes in my individual capacity.        09:50:03
8    Q.  What did you do to prepare for this    09:50:06
9  deposition?        09:50:08
10      MR. HAYES:  I'm going to object on    09:50:09
11      privileged ground, and caution you not to    09:50:13
12      disclose any of our, the substance of any    09:50:16
13      of our communications.        09:50:19
14      THE WITNESS:  Okay.        09:50:23
15    Q.  You can still answer though.        09:50:23
16    A.  What did I do?  Well, I met with my, with    09:50:25
17  Kirkland & Ellis.        09:50:29
18    Q.  When did you meet with someone from Kirkland  09:50:31
19  & Ellis?        09:50:34
20    A.  When did we meet?  Well, we physically met    09:50:35
21  yesterday.        09:50:39
22    Q.  Who did you meet with?        09:50:40
23    A.  I met with Eric Hayes.        09:50:42
24    Q.  Anyone else?        09:50:44
25    A.  Ken -- don't remember Ken's last name.    09:50:46

5 (Pages 14 to 17)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 384

Page 18

1      MR. HAYES:  Ken Bridges.              09:50:51
2   A.  Ken Bridges.                         09:50:53
3   Q.  Anyone else?                         09:50:54
4   A.  No.                                  09:50:55
5   Q.  Did you have telephone conversations in    09:50:57
6   preparation for this deposition?         09:50:59
7   A.  Yeah.                                09:51:00
8   Q.  With whom did you have telephone          09:51:01
9   conversations?                           09:51:03
10  A.  With Eric Hayes.                     09:51:03
11  Q.  And anyone else?                     09:51:05
12  A.  That's it.                           09:51:08
13  Q.  Okay.  How long did you talk to him on the    09:51:09
14  phone?                                   09:51:11
15  A.  Can't tell.  We talked about coming here for    09:51:12
16  a few minutes at a time, the logistics, you know, what    09:51:17
17  time we'd meet, things like that, get ready for today.    09:51:23
18  Q.  What about yesterday when you met with your    09:51:30
19  attorneys, Mr. Hayes and Mr. Bridges, how long did you    09:51:33
20  meet with them?                          09:51:37
21      MR. HAYES:  Again, I'm going to object on    09:51:38
22      the grounds of privilege and caution the    09:51:39
23      witness not to disclose any of the       09:51:42
24      substance.                           09:51:44
25      But you can answer the question,     09:51:45

Page 19

1       specifically how long, how many hours we    09:51:48
2       met.                                 09:51:51
3   A.  How long?  Probably, oh, probably five    09:51:51
4   hours.                                   09:51:54
5   Q.  Okay.  And where did you meet them?      09:51:57
6   A.  Where did I meet them?                09:51:58
7   Q.  Where, yes.                          09:52:00
8   A.  Here in this building.                09:52:02
9   Q.  Okay.  Did you review any documents in    09:52:05
10  preparation for this deposition?         09:52:05
11      MR. HAYES:  Again, I'm going to object on    09:52:08
12      privilege grounds.                   09:52:09
13      And you can answer that yes or no, but    09:52:10
14      not any of the substance of what we might    09:52:14
15      have reviewed.                       09:52:17
16  A.  Yes, we reviewed some documents.      09:52:18
17  Q.  How many documents did you review?    09:52:24
18  DI      MR. HAYES:  I'm going to object on    09:52:28
19      privilege grounds again.             09:52:28
20      Counsel, this is getting pretty close    09:52:30
21      to privileged communication.  And I'm    09:52:32
22      going to instruct the witness not to    09:52:37
23      answer that question.                09:52:38
24      Do not answer that question.         09:52:40
25      THE WITNESS:  Okay.                  09:52:41

Page 20

1   Q.  Did you read any documents outside the    09:52:59
2   presence of your attorney in preparation for this    09:53:02
3   deposition?                              09:53:05
4   A.  No.                                  09:53:05
5   Q.  As I mentioned, this case is between    09:53:11
6   Microsoft, Dell and Gateway on one side, and Lucent on    09:53:14
7   the other side.                          09:53:19
8       Could you just summarize what you know    09:53:20
9   about the case?                          09:53:23
10  A.  The only thing I know is there's a dispute    09:53:24
11  between Lucent and Microsoft and Dell and, I guess,    09:53:27
12  Gateway also, about the patent.          09:53:31
13  Q.  Do you know anything about which products are    09:53:35
14  accused?                                 09:53:38
15  A.  No, I don't.                         09:53:39
16  Q.  Are you involved in this litigation at all in    09:53:44
17  any sort of a consultation capacity, anything like    09:53:46
18  that?                                    09:53:50
19  A.  No, I'm not.                         09:53:51
20  Q.  Have you evaluated Microsoft products at all?    09:53:55
21  A.  Evaluated?  No, I have not.          09:53:58
22  Q.  Have you talked to any experts?      09:54:02
23  A.  No, I have not.                      09:54:03
24  Q.  Okay.  I'd like to just sort of get some    09:54:11
25  background on you.                       09:54:17

Page 21

1       Can you briefly tell me about your      09:54:19
2   education history?                       09:54:21
3   A.  Well, I went to school for -- at City College    09:54:22
4   of New York.  I got a bachelor's degree there.  And I    09:54:27
5   have a master's degree from Stevens Institute of    09:54:31
6   Technology from Hoboken, New Jersey.     09:54:35
7   Q.  And what fields were your bachelor's and    09:54:37
8   master's degrees in?                     09:54:42
9   A.  The master's is in computer science.  The    09:54:43
10  bachelor's is in technology, electrical technology.    09:54:46
11  Right now they call it BET in a lot of places -- BET,    09:54:50
12  bachelor of electrical technology, engineering    09:54:55
13  technology.                              09:55:02
14  Q.  And when did you get these degrees?    09:55:02
15  A.  I got the bachelor's in 1977.  I got the    09:55:04
16  master's in '83.                         09:55:08
17  Q.  Any other schooling at all?          09:55:13
18  A.  No, besides high school.             09:55:15
19  Q.  So, then can you brief me on your employment    09:55:21
20  history, generally, and then we'll go into AT&T in    09:55:25
21  particular?                              09:55:28
22  A.  That was, that's the only company I worked    09:55:29
23  for since out of college.  And then I left in '98 and    09:55:33
24  went to Telcordia Technologies which is a spinoff of    09:55:37
25  AT&T.                                    09:55:43

6 (Pages 18 to 21)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 385

Page 22

```
1    Q.  So it sounds like you started with AT&T in    09:55:54
2  1977.                                    09:55:57
3    A.  Yes.                               09:55:58
4    Q.  And you left AT&T in 1998.         09:55:59
5    A.  Yes.                               09:56:02
6    Q.  And I assume you got your master's while you  09:56:06
7  were working at AT&T.                    09:56:09
8    A.  Correct.                           09:56:11
9    Q.  And then you were with Telcordia?  09:56:11
10   A.  Yes.                               09:56:16
11   Q.  From 1998 until this year?         09:56:16
12   A.  Yeah.                              09:56:19
13   Q.  And now you're in transition?      09:56:19
14   A.  Um-hum.                            09:56:22
15   Q.  When you started with AT&T, what was your    09:56:27
16 first job?                               09:56:30
17   A.  My first job was doing technical writing job. 09:56:32
18   Q.  What sort of technical writing were you asked 09:56:39
19 to do?                                   09:56:41
20   A.  In the documents used by Bell Systems, how to 09:56:42
21 perform tasks or whatever.               09:56:47
22   Q.  Was there a subsidiary company that you      09:57:01
23 worked for?                              09:57:03
24   A.  It was Western Electric.           09:57:04
25   Q.  Western Electric.                  09:57:06
```

Page 23

```
1       And where was that located?        09:57:08
2    A.  That was in Winston-Salem, North Carolina.   09:57:10
3    Q.  And how long were you there?       09:57:17
4    A.  One year.                          09:57:19
5    Q.  And then where did you go?         09:57:21
6    A.  Then I went to Holmdel at Bell Labs in New   09:57:23
7  Jersey.                                  09:57:28
8    Q.  And what did you do there?         09:57:29
9    A.  Oh, did some software.  Did, still did a     09:57:33
10 little bit of tech writing and then I moved to    09:57:40
11 software -- I did a little bit of technical writing 09:57:40
12 and then I moved to software development.  09:57:43
13   Q.  What kind of software did you develop?       09:57:48
14   A.  What kind of software?  Gee, these are old   09:57:52
15 stuff.  Anything that would -- software tools, don't 09:57:57
16 recall exactly because this is so long ago, you know. 09:58:05
17   Q.  What computer programming languages were you 09:58:09
18 writing in?                              09:58:12
19   A.  C.                                 09:58:14
20   Q.  Anything else?                     09:58:15
21   A.  Yes, some UNIX shell again.        09:58:18
22   Q.  And how long were you with Bell Labs in      09:58:27
23 Holmdel?                                 09:58:32
24   A.  How long was I in Bell Labs in Holmdel?      09:58:32
25 Probably left there, probably from '79 to '82.  Well, 09:58:36
```

Page 24

```
1  and then the company kept switching names, you know -- 09:58:42
2  reforming under this -- take employees with them and  09:58:46
3  so now you named this, tomorrow you're named next AT&T 09:58:50
4  Information Systems, you know.  It would be too many   09:58:55
5  names and yet staying the same group of people.  09:58:57
6    Q.  Do you remember all the names of the, or at   09:59:02
7  least some of the names of the companies that --  09:59:04
8    A.  What is it?  American Bell, AT&T Information   09:59:07
9  Systems, AT&T Labs, you know, renamed it names like   09:59:11
10 that.                                    09:59:20
11   Q.  And then in 1982, where did you go?  09:59:23
12   A.  That's when we moved to Lincroft.  09:59:25
13   Q.  Okay.  Your whole group moved to Lincroft?   09:59:28
14   A.  Yes, the whole, the whole, yes, I would say  09:59:32
15 the whole group.                         09:59:37
16   Q.  Did you stay in that same job doing the same  09:59:37
17 sort of work?                            09:59:39
18   A.  Same job, same building, doing different jobs 09:59:40
19 at times.                                09:59:45
20   Q.  What were the different jobs that you did?   09:59:46
21   A.  Testing, sort of being team leader of other  09:59:49
22 people, not really doing technical work, and then --  09:59:59
23 doing more management work, and then go back to   10:00:06
24 technical.                               10:00:09
25   Q.  Do you remember when you were in management? 10:00:23
```

Page 25

```
1    A.  Don't remember which year.         10:00:25
2    Q.  Was the majority of what you did management, 10:00:31
3  or was the majority of what you did technical work?  10:00:35
4    A.  Technical.                         10:00:38
5    Q.  Okay.  That was in Lincroft.       10:00:39
6       How about when you went to Middletown, was   10:00:41
7  there any change in your job --          10:00:46
8    A.  Mostly technical.                  10:00:50
9    Q.  Mostly technical?                  10:00:50
10   A.  All technical, yeah.               10:00:50
11   Q.  And then when you moved back to Lincroft     10:00:50
12 again --                                 10:00:52
13   A.  All technical, again.              10:00:52
14   Q.  And then when you went to Telcordia, what    10:00:57
15 sort of work were you doing there?       10:01:01
16   A.  All technical.                     10:01:03
17   Q.  What sort of technical work are you talking  10:01:04
18 about?                                   10:01:05
19   A.  Development.                       10:01:05
20   Q.  Software development?              10:01:07
21   A.  Software development, yes.          10:01:09
22   Q.  Okay.  So pretty much you're a software      10:01:10
23 programmer until this day?               10:01:13
24   A.  Yes.                               10:01:14
25   Q.  What sort of software development were you   10:01:15
```

7 (Pages 22 to 25)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 386

Page 26

1  doing at Telcordia?                          10:01:19
2     A.  Oh, mostly systems development work.      10:01:19
3     Q.  In what languages?                     10:01:22
4     A.  Oh, some C, Korn shell mostly,          10:01:25
5  Perl -- K O R N, shell, S H E L L, and Perl, P E R L.  10:01:33
6        (Discussion off the record.)            10:02:06
7     Q.  So now I want to focus on the time frame in  10:02:07
8  which now you were working on the work that led up to this  10:02:10
9  patent.                                       10:02:13
10    A.  Okay.                                   10:02:13
11    Q.  What group were you in, was there a name of  10:02:16
12 the group or department that you were in?     10:02:19
13    A.  No.  It was a small group, a very small group  10:02:22
14 of people.                                    10:02:25
15    Q.  Do you remember who was in that group?   10:02:26
16    A.  Alex, Ben, myself, probably a couple of  10:02:29
17 people to do testing, doing some other stuff, but  10:02:37
18 there were just a few of us.                  10:02:45
19    Q.  Okay.  So your group consisted of you, Alex  10:02:47
20 Gillon?
21    A.  Um-hum.
22    Q.  Benjamin Day?                          10:02:56
23    A.  Yeah.                                  10:02:57
24    Q.  And some testers?                      10:02:57
25    A.  Yeah.                                  10:02:59

Page 27

1     Q.  Were there any other software developers?  10:02:59
2     A.  I don't remember at the time.          10:03:02
3     Q.  Who was your manager during that time?   10:03:05
4     A.  Alex -- Ben was my direct manager -- Benjamin  10:03:09
5  Day was my direct supervisor at the time.     10:03:19
6     Q.  Who were the testers, do you remember their  10:03:33
7  names?                                        10:03:37
8     A.  Can't recall.                          10:03:37
9     Q.  How long did you work with that group, how  10:03:39
10 long were you guys together?                  10:03:41
11    A.  How long were you we together?  I can't put a  10:03:43
12 number, but it wasn't, it wasn't for too long.  You  10:03:50
13 know, we probably started like 1985 and then, did  10:03:55
14 this, and then I don't really remember when we  10:04:04
15 switched projects.                            10:04:07
16    Q.  What was the purpose of the project that you  10:04:08
17 were working on, what was it about?           10:04:09
18    A.  The purpose of the project, from what I  10:04:11
19 remember, was to provide something to traders and  10:04:14
20 allow them to enter information easily.       10:04:25
21    Q.  Traders, what kind of traders?         10:04:28
22    A.  Oh, not sure what they were trading, but they  10:04:30
23 were mostly for Salomon Brothers.            10:04:34
24    Q.  Okay.  So you mean like sort of stock market  10:04:36
25 trades, that kind of thing?                   10:04:45

Page 28

1     A.  Yeah, something like that.             10:04:45
2     Q.  Okay.  So you worked in this group with  10:04:47
3  Benjamin Day and Alex Gillon --              10:04:51
4     A.  Yes.
5     Q.  -- from 1985 'til about, when would you say?  10:04:56
6     A.  Until we switched projects.  I can't tell
7  when we switched projects.  Because we were constantly  10:05:03
8  doing this project that's cancelled and then we moved  10:05:05
9  on to other things, you know.                 10:05:07
10    Q.  So when this project was done, did you split  10:05:10
11 up, or did you stay in the same group with them?  10:05:14
12    A.  I -- repeat the question again?        10:05:18
13    Q.  When this project was done, did your group  10:05:20
14 split up, or did you leave that group or --    10:05:25
15    A.  The group split up.                    10:05:28
16    Q.  Did you work with Benjamin Day before this  10:05:33
17 group?                                        10:05:36
18    A.  No.                                    10:05:37
19    Q.  After this group?                      10:05:37
20    A.  No.                                    10:05:39
21    Q.  How about Alex Gillon?                 10:05:40
22    A.  I worked for Alex after the group -- after  10:05:42
23 the project was cancelled.  I moved on to other things  10:05:49
24 and Alex moved on to other things, and then I joined  10:05:52
25 Alex's group back again.                      10:05:55

Page 29

1     Q.  Okay.  When you joined his group again, he  10:06:08
2  was your manager it sounded like, is that right?  10:06:10
3     A.  Yes, he was my department head.  He was two  10:06:14
4  levels above me.                             10:06:19
5     Q.  Two levels above you.                  10:06:19
6        But while you were working in the group,  10:06:20
7  it was Benjamin Day supervising you and Alex Gillon,  10:06:22
8  is that right?                               10:06:26
9     A.  No, no, no.  Alex was Ben's boss.       10:06:26
10    Q.  Oh, okay.  I got you.                  10:06:30
11    A.  But the thre of us were working.  These are  10:06:32
12 guys who would come with blue jeans and sneakers and,  10:06:37
13 you know.                                    10:06:40
14    Q.  Right.  So it was Alex Gillon, Benjamin Day  10:06:40
15 and then you in the chain of supervision?     10:06:43
16    A.  Yes.                                  10:06:45
17    Q.  Okay.  Did the project ever get finished?  10:06:49
18    A.  I'm not sure what you call finish.      10:06:51
19    Q.  What were the objectives of your project?  10:06:55
20    A.  Not sure.  I mean, it was probably to have  10:06:58
21 something, to have a product out -- it was to have a  10:07:04
22 product out there in the field used by customers, used  10:07:10
23 by people, and I don't think it ever reached that  10:07:12
24 stage.                                       10:07:16
25    Q.  What happened to the project?          10:07:17

8  (Pages 26 to 29)

EASTWOOD-STEIN
deposition services & litigation support   (800)  514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 387**

**Page 30**

1    A.  It got cancelled just like everything else.   10:07:19
2  Probably no funding, people aren't interested anymore.  10:07:22
3  I don't know.                          10:07:26
4    Q.  When was it cancelled?            10:07:30
5    A.  Can't tell.  Was cancelled, can't remember   10:07:30
6  what year, what year exactly.            10:07:32
7    Q.  What do you mean it got cancelled like   10:07:43
8  everything else?                        10:07:47
9      MR. HAYES:  Objection, asked and answered.  10:07:47
10    Q.  Was this a frequent occurrence that your   10:07:52
11  projects would get cancelled?            10:07:55
12      MR. HAYES:  Objection, vague, ambiguous.   10:07:56
13    A.  I don't quite understand what you mean.   10:08:04
14    Q.  You said this project got cancelled like   10:08:05
15  everything else, and I was just curious what you meant  10:08:08
16  by it got cancelled, by the like everything else part.  10:08:11
17    A.  I guess these things go to churn, churns.  I  10:08:16
18  mean, there have been many projects -- churns inside   10:08:26
19  the company, you know, like there's a lot of turnover.  10:08:27
20  You start this project, you move on to other projects,  10:08:32
21  you know.                              10:08:35
22    Q.  What was the name of this project?   10:08:36
23    A.  Oh, don't remember.  Don't remember the name.  10:08:37
24    Q.  Was there a code name that was used?   10:08:41
25      MR. HAYES:  Objection, vague.        10:08:48

**Page 31**

1    A.  I really don't remember.           10:08:51
2    Q.  I'm really just trying to get at something   10:08:55
3  that we can say other than this project, so...   10:08:58
4    A.  Yeah, I guess whatever is in the patent,   10:09:01
5  that's what we called it.                10:09:03
6    Q.  So the -- can you turn to Exhibit 3?   10:09:16
7    A.  Yes.                             10:09:21
8    Q.  You see it says that the title of the patent  10:09:21
9  is "Touch Screen Form Entry System"?     10:09:24
10    A.  Yeah.                            10:09:27
11    Q.  Is that how you referred to this project?   10:09:27
12      MR. HAYES:  Objection, asked and answered.  10:09:30
13    A.  I guess that's what you see there.   10:09:32
14    Q.  I'll also then refer to it as the touch   10:09:42
15  screen form entry system project.        10:09:45
16    A.  Okay.                           10:09:49
17    Q.  Did you keep any notebooks?        10:09:52
18    A.  No.                             10:09:53
19    Q.  While were you working there, did you make  10:09:55
20  any notebooks?                         10:09:57
21    A.  Did I make it?  Probably, back then I   10:09:58
22  probably did.  I probably did back then.  Just like   10:10:01
23  anything else I work on.                10:10:05
24    Q.  Did you make your notes in sort of a standard  10:10:10
25  lab notebook?                          10:10:14

**Page 32**

1      MR. HAYES:  Objection, asked and answered.  10:10:15
2    A.  Yeah, just like I said, I don't -- you   10:10:17
3  know, it's just notes you make like what you going to  10:10:19
4  do, what I'm missing, things like that.   10:10:25
5    Q.  Did you keep a lab notebook towards -- that  10:10:33
6  you used in the development of the project?   10:10:37
7      MR. HAYES:  Objection, asked and answered.  10:10:38
8    A.  Well, just like I said, probably make   10:10:43
9  notes like this is -- needs to be done next, that   10:10:47
10  needs to be done next.  Write it anywhere, a piece of  10:10:51
11  paper, you know.  Nothing formal.        10:10:56
12    Q.  I see.                           10:10:57
13      So you wrote your notes just sort of on   10:10:59
14  regular note pads or pieces of paper?    10:11:04
15    A.  Correct.                         10:11:07
16    Q.  But you didn't keep a formal laboratory   10:11:07
17  notebook?                              10:11:11
18    A.  There's no formal --               10:11:11
19      MR. HAYES:  Objection, asked and answered. 10:11:14
20    Q.  Did you ever keep an inventor's notebook?   10:11:29
21      MR. HAYES:  Objection, asked and answered. 10:11:34
22    A.  No.                             10:11:34
23    Q.  Do you know if anyone else in your group kept 10:11:36
24  an inventor's notebook?                 10:11:38
25      MR. HAYES:  Objection, calls for     10:11:41

**Page 33**

1  speculation.                           10:11:42
2    A.  I don't know that.                10:11:43
3    Q.  Did AT&T have any standard practices   10:11:47
4  regarding keeping engineering or laboratory notebooks? 10:11:50
5    A.  No.                             10:11:54
6    Q.  Do you consider yourself an expert in any   10:12:05
7  areas of technology?                    10:12:07
8    A.  No, I'm not --                    10:12:08
9      MR. HAYES:  Objection, calls for     10:12:09
10  speculation.                           10:12:11
11      You need to, so it's clear on the   10:12:11
12  record, you need to give me a minute to   10:12:14
13  state an objection.                     10:12:18
14      THE WITNESS:  All right.            10:12:18
15    Q.  Could you repeat your answer?  I'm sorry.   10:12:21
16  I'll ask it again.                      10:12:22
17      Do you consider yourself an expert in any  10:12:25
18  areas of technology?                    10:12:28
19      MR. HAYES:  Objection, calls for     10:12:29
20  speculation, vague, ambiguous.           10:12:31
21    A.  Yeah, I don't know what you mean by   10:12:32
22  expert.                                10:12:33
23    Q.  I'm just asking what you consider yourself to 10:12:33
24  be?                                    10:12:40
25    A.  Well, no one calls me an expert, you know.  10:12:40

9 (Pages 30 to 33)

EASTWOOD-STEIN
deposition services & litigation support   (800)  514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 388

Page 34

1  Q. Have you received any compensation in  10:12:56
2  relation to working on this case at all?  10:12:58
3  A. No.  10:13:00
4  Q. How much did you get for signing over your  10:13:02
5  patent to AT&T?  10:13:05
6  A. Nothing.  10:13:07
7  Q. Not a cent, not even a dollar?  10:13:11
8  MR. HAYES: Objection, asked and answered.  10:13:14
9  A. Nothing.  10:13:16
10  Q. How do you feel about Lucent generally?  10:13:30
11  MR. HAYES: Objection, calls for  10:13:34
12  speculation.  10:13:37
13  A. I don't have any opinion about Lucent.  10:13:37
14  Q. Is Lucent involved in your pension in any  10:13:43
15  way?  10:13:47
16  A. No.  10:13:47
17  Q. I'm handing you LeConte Exhibit 4.  10:14:10
18  (LeConte Exhibit 4, United States Patent
19  No. 4,763,356, bearing Bates Nos. MSLT
20  0000529 through 0000555, marked for
21  identification, as of this date.)  10:14:29
22  MR. HAYES: Thank you.  10:14:29
23  Q. Do you recognize this document?  10:14:30
24  A. Do I recognize it? Very vaguely.  10:14:31
25  Q. When is the last time you saw it?  10:14:46

Page 35

1  A. When was the last time I saw it? I thought I  10:14:51
2  saw it yesterday, but I probably -- yeah.  10:14:55
3  Q. When is the last time you read it?  10:15:01
4  A. Read it? I have never read it.  10:15:03
5  Q. Just to be clear, this is United States  10:15:09
6  patent No. 4,763,356, entitled "Touch Screen Form  10:15:13
7  Entry System."  10:15:22
8  You're an inventor on this patent, right?  10:15:24
9  A. Yes.  10:15:27
10  Q. But you didn't read it?  10:15:27
11  A. That's my patent.  10:15:31
12  Q. You indicated Exhibit 3. That's basically  10:15:36
13  all that you are interested in. You got your patent  10:15:39
14  and that's it.  10:15:42
15  A. That's what I had framed then. I'm so proud  10:15:43
16  of it and show it to my friends and my kids.  10:15:49
17  Q. Do you know whether Lucent has asserted this  10:15:59
18  patent against anybody else?  10:16:02
19  MR. HAYES: Objection, calls for  10:16:03
20  speculation.  10:16:05
21  A. Don't know.  10:16:05
22  Q. So let's talk about the patent in a little  10:16:12
23  bit more detail.  10:16:15
24  A. Okay.  10:16:16
25  Q. What were your contributions to the  10:16:16

Page 36

1  technology in this patent?  10:16:19
2  MR. HAYES: Objection, calls for  10:16:20
3  speculation -- I'll withdraw my objection.  10:16:22
4  A. What was my contribution? I was one of  10:16:27
5  the developers.  10:16:31
6  Q. Specifically, were there portions of the  10:16:34
7  technology that you were responsible for?  10:16:37
8  A. Yeah, I developed the tools.  10:16:41
9  Q. What do you mean by the tools?  10:16:44
10  A. Well, there were something we call tools here  10:16:46
11  that allow you to -- that allow you to apply specific  10:16:50
12  fields on forms and -- fields, sorry about that.  10:16:55
13  Q. What other portions of this technology were  10:17:18
14  you responsible for?  10:17:20
15  A. Don't recall exactly which other portion.  10:17:21
16  Q. Okay. What portions was Benjamin Day  10:17:25
17  responsible for?  10:17:31
18  MR. HAYES: Objection, calls for  10:17:32
19  speculation.  10:17:33
20  A. Don't recall.  10:17:34
21  Q. How about Alexander Gillon?  10:17:34
22  MR. HAYES: Again objection, calls for  10:17:37
23  speculation.  10:17:38
24  A. Don't recall which portion.  10:17:39
25  Q. Who decided who would be named first on the  10:17:50

Page 37

1  patent?  10:17:52
2  MR. HAYES: Objection, calls for  10:17:55
3  speculation.  10:17:55
4  A. Don't know.  10:17:55
5  Q. Did anybody else work on the technology  10:18:00
6  related to this patent?  10:18:04
7  MR. HAYES: Objection, calls for  10:18:04
8  speculation.  10:18:06
9  A. Repeat that question again, please?  10:18:07
10  Q. Did anybody else work on the technology that  10:18:09
11  led to this patent?  10:18:11
12  A. On the technology? I don't know that.  10:18:12
13  Q. So what was the process in AT&T that you  10:18:15
14  followed to get the patent?  10:18:15
15  A. Lawyers, we call the lawyers and we say we  10:18:23
16  think we have something here --  10:18:28
17  DI  MR. HAYES: I'm going to stop you for a  10:18:29
18  second and object. To the extent it calls  10:18:30
19  for privileged communication, do not  10:18:32
20  disclose any of your communications with  10:18:35
21  your lawyers in the patenting process.  10:18:37
22  THE WITNESS: Okay.  10:18:39
23  Q. You can finish answering the question.  10:18:42
24  You said you would call the lawyers and --  10:18:45
25  MR. HAYES: I've instructed him not to  10:18:48

10 (Pages 34 to 37)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 389**

Page 38

```
 1      answer.                      10:18:49
 2      A.  Yeah -- so I can't answer.    10:18:51
 3         MR. HAYES: Thank you.        10:18:52
 4      Q.  Who called the lawyers?     10:18:53
 5      A.  Don't know.               10:18:55
 6      Q.  So how did you find out that there was a    10:19:01
 7   patent application even in the works?    10:19:02
 8      A.  Don't recall, honestly speaking, how I find    10:19:04
 9   out.                           10:19:07
10      Q.  Did you review any documents in relation with    10:19:19
11   the patent application process?       10:19:21
12      A.  No.                      10:19:22
13      Q.  So I just want to be clear, you were doing    10:19:28
14   your work and did you ever learn that a patent    10:19:31
15   application was in the works?       10:19:37
16         MR. HAYES: Objection, vague, ambiguous.    10:19:37
17      A.  Oh, what do you mean by that?    10:19:42
18      Q.  I guess I'm trying to figure out, before you    10:19:47
19   received the patent certificate, Exhibit 3, what you    10:19:50
20   knew about the patent application at all.    10:19:57
21         Did you know there was a patent    10:19:59
22   application?                    10:20:00
23      A.  I know there was a patent being applied, yes,    10:20:02
24   but was it a day-to-day thing?  It wasn't something I    10:20:05
25   was, you know, thinking about.      10:20:09
```

Page 39

```
 1      Q.  How did you know that there was a patent    10:20:11
 2   being applied?                  10:20:13
 3      A.  I don't know how.  I don't know which method.    10:20:14
 4      Q.  Do you have any other patents?    10:20:29
 5      A.  No, I don't.               10:20:30
 6      Q.  Were you involved in any other patent    10:20:31
 7   applications?                  10:20:33
 8      A.  No.                      10:20:34
 9      Q.  Were there any other patents that came out of    10:20:35
10   this project?                  10:20:38
11      A.  Not that I know of.  I don't know.    10:20:40
12      Q.  So who came up with the idea of a touch    10:20:47
13   screen form entry system?       10:20:52
14         MR. HAYES: Objection.  Calls for    10:20:58
15      speculation.  It's vague and ambiguous, as    10:20:58
16      to who came up with this idea.      10:20:58
17      Q.  How did you know what your objectives were    10:21:04
18   in your project?               10:21:07
19         MR. HAYES: Objection, vague, ambiguous.    10:21:08
20      A.  How did I know?  I don't -- this is    10:21:19
21   something I -- we didn't know which method I know --    10:21:26
22   but how I know, I don't know.      10:21:31
23      Q.  Let me back up then.       10:21:36
24         What was the objective of the project?    10:21:38
25      A.  Objective of the project?  To develop some    10:21:40
```

Page 40

```
 1   cool stuff, from back then was just some cool stuff to    10:21:46
 2   me and to the rest of us.         10:21:53
 3      Q.  What was the AT&T's objective in the project?    10:22:06
 4         MR. HAYES: Objection, calls for    10:22:09
 5      speculation.                 10:22:10
 6      A.  Don't know.               10:22:10
 7      Q.  I mean, certainly, I imagine that nobody came    10:22:15
 8   and said, hey Raoul, let's develop some cool stuff.    10:22:19
 9   So there's probably somebody that said let's develop    10:22:24
10   something.  I'm trying to find out what that something    10:22:28
11   is that they said let's develop.      10:22:32
12         MR. HAYES: Objection, it's been asked and    10:22:34
13      answered.  Calls for speculation.    10:22:36
14      A.  Yes, so I thought I already said that.    10:22:38
15      Q.  Could you repeat it anyway?    10:22:44
16         MR. HAYES: We can have the --    10:22:44
17      A.  What did I say?           10:22:46
18         (Whereupon, the requested portion of
19      the record was read back by the reporter.)    10:23:08
20         THE WITNESS: Yeah.          10:23:08
21      Q.  So I understand your answer to mean that    10:23:09
22   that was your personal objective, to develop some cool    10:23:10
23   stuff?                        10:23:15
24         MR. HAYES: Objection, mischaracterizes    10:23:15
25      the witness' testimony.        10:23:18
```

Page 41

```
 1      A.  That's not what I said.  I never said    10:23:21
 2   personal.                     10:23:21
 3      Q.  So that was the group's objective, to develop    10:23:22
 4   some cool stuff?               10:23:27
 5         MR. HAYES: Objection, asked and answered.    10:23:27
 6      A.  Yeah, can I take a break and talk to my    10:23:28
 7   attorney, please?              10:23:33
 8      Q.  You can take a break.       10:23:36
 9         MR. SIDDIQUI: But don't coach the    10:23:37
10      witness.  That's fine.         10:23:39
11         THE VIDEOGRAPHER: The time is 10:31    10:23:42
12      a.m.  We're off the record.      10:23:44
13         (Recess taken.)             10:23:49
14         THE VIDEOGRAPHER: The time is 10:47    10:38:57
15      a.m.  We're back on the record.    10:39:00
16   BY MR. SIDDIQUI:
17      Q.  Mr. LeConte, before we took a break, we were    10:39:06
18   talking about your project.        10:39:10
19      A.  Um-hum.                   10:39:13
20      Q.  And what are the goals and objectives of your    10:39:13
21   project were.  And you said that the objective was to    10:39:16
22   develop cool stuff.            10:39:21
23         MR. HAYES: Objection, mischaracterizes    10:39:23
24      the witness' statement.        10:39:24
25      Q.  So after you've talked with your attorney,    10:39:26
```

11 (Pages 38 to 41)

Page 42

1  do you have a better idea of --          10:39:30
2     A.  We didn't talk about these things.      10:39:33
3     Q.  Okay.  So what were the goals of your    10:39:35
4  project?                        10:39:41
5        MR. HAYES:  Objection, asked and answered. 10:39:42
6     A.  Yeah, like I say, I don't know exactly   10:39:44
7  what the goals were.  The goals, what is the goal?  10:39:47
8  You know, I'm not sure, because it could have a    10:39:52
9  variety of applications from a sort of technical point 10:39:56
10  of view, if you're asking me, you know.      10:39:59
11     Q.  I'm not asking you what the applications of  10:40:02
12  the project were.                 10:40:05
13        I'm asking you what the goals of the      10:40:08
14  project, when you formed the team to work towards    10:40:11
15  achieving something, what was the something that you 10:40:15
16  were working towards?              10:40:19
17        MR. HAYES:  Objection, asked and answered, 10:40:21
18     vague and ambiguous.            10:40:22
19     A.  I don't know specifically what you're    10:40:30
20  asking, you know.  What the specific goals were?   10:40:32
21     Q.  So when you showed up to work every day.   10:40:35
22     A.  Yeah.                    10:40:38
23     Q.  What were you trying to accomplish?      10:40:39
24     A.  Okay.  Well, okay.  If I tell you, okay, we  10:40:41
25  had to develop this thing to help fill out forms on  10:40:45

Page 43

1  the screen.  And validate fields on the forms --   10:40:52
2  validate the fields on the forms and enter the right  10:41:01
3  information on the form using a computer.      10:41:04
4        But what the goals were, I can't say for   10:41:16
5  sure what they were.  I'm not sure we had any goal -- 10:41:19
6  I don't know.                    10:41:25
7     Q.  Was there ever a product?          10:41:40
8     A.  No, we never sold a product, as far as I   10:41:44
9  remember.                      10:41:49
10     Q.  Was there a plan to sell a product?      10:41:50
11        MR. HAYES:  Objection, calls for      10:41:53
12     speculation.                 10:41:56
13     A.  No, just like anything else, we wish we   10:41:57
14  would see it, but I personally don't know because it's 10:42:02
15  a top management decision to figure out.      10:42:06
16     Q.  Were there any testing models created?   10:42:08
17     A.  Testing models?  Oh, only internally, we had 10:42:15
18  a couple for use.                 10:42:22
19     Q.  Were they software, purely software models, 10:42:29
20  or did you have a stand-alone unit that this was our 10:42:32
21  test model?                     10:42:36
22        MR. HAYES:  Objection, compound.      10:42:36
23     A.  Just what you see here.          10:42:38
24     Q.  Well, I'm not talking about the patent right 10:42:42
25  now.                        10:42:44

Page 44

1     A.  Okay.                    10:42:45
2     Q.  Just in general about your product -- your 10:42:45
3  project.                      10:42:48
4     A.  Okay.                    10:42:48
5     Q.  What did your testing models look like?   10:42:50
6     A.  We didn't have -- what do you mean by testing 10:42:55
7  models?                       10:42:58
8     Q.  Well, you said you had a couple of internal 10:43:02
9  units that you used for testing.         10:43:02
10     A.  Yeah, people were testing, make sure this  10:43:04
11  thing would work, you know, things wouldn't fail.   10:43:07
12  Just like any product you test, you produce the right 10:43:13
13  form and you validate the right thing and the right  10:43:17
14  thing comes up -- we produce the right, the right form 10:43:20
15  would come up on the screen.  You would validate, you 10:43:40
16  would enter the information correctly, and until all 10:43:45
17  the information is entered.            10:43:49
18     Q.  What sort of machines did you use for    10:43:55
19  testing?                      10:43:58
20     A.  What sort of machines?  They were just    10:43:58
21  computers.                     10:44:01
22     Q.  What sort of computers?          10:44:02
23     A.  At the time it was just AT&T computers, you 10:44:03
24  know, the old 8086.  Those were in DOS days, MS DOS 10:44:10
25  days.                        10:44:19

Page 45

1     Q.  So 8086, that's -- you're referring to Intel 10:44:21
2  8086 processor?                   10:44:25
3     A.  Yes.                     10:44:28
4     Q.  That's --                  10:44:30
5     A.  8086, 8088, I think, I don't know.  I don't 10:44:31
6  remember for sure, so many of them.        10:44:37
7     Q.  Did you have a touch screen on those units? 10:44:41
8     A.  Yeah.                    10:44:44
9     Q.  On all of your units?            10:44:47
10     A.  Actually, it's the only units we worked on.  10:44:51
11     Q.  Was it a separate touch screen that, through 10:45:01
12  which you would enter data or was the touch screen on 10:45:05
13  the actual display itself?             10:45:09
14     A.  We had them both ways.            10:45:11
15     Q.  Okay.  How many testing model units were   10:45:18
16  there?                        10:45:20
17        MR. HAYES:  Objection, asked and answered. 10:45:20
18     A.  Don't recall.                10:45:22
19     Q.  I'm sorry?                  10:45:25
20     A.  Don't know the number.  You mean models    10:45:25
21  like --                       10:45:26
22     Q.  How many units did you use for testing --  10:45:27
23     A.  How many total -- how many total was     10:45:28
24  available?                     10:45:31
25     Q.  Yes, total.                 10:45:32

12  (Pages 42 to 45)

EASTWOOD-STEIN
deposition services & litigation support   (800)  514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 391

Page 46

```
 1      A.  Don't know, this has been so long.  I don't   10:45:34
 2  think I ever tried to keep a count of these things.   10:45:39
 3      Q.  I'm not asking for an exact number, less than  10:45:40
 4  10?                             10:45:45
 5          MR. HAYES:  Objection, calls for      10:45:45
 6      speculation.                 10:45:47
 7      A.  I don't know, honestly don't know.      10:45:47
 8      Q.  Okay.  What was the project that you were   10:46:04
 9  working on before this touch screen product?      10:46:05
10      A.  Don't remember, don't remember.  This is more 10:46:09
11  than 20 years ago.               10:46:11
12      Q.  Yeah.                    10:46:12
13      A.  I honestly don't remember.         10:46:13
14      Q.  On your testing models, what forms did you   10:46:29
15  use to test the product?          10:46:32
16          MR. HAYES:  Objection, vague, ambiguous.  10:46:35
17      A.  I don't remember what forms.  We would    10:46:36
18  create our own forms.             10:46:42
19      Q.  The project that you were working on, it got 10:46:53
20  cancelled -- it's, I believe you said, from higher up 10:46:56
21  in management, they just cancelled the project, is   10:47:02
22  that right?                     10:47:05
23      A.  Yes.                    10:47:05
24      Q.  Do you know if they tried to sell any units? 10:47:08
25      A.  Don't know that.           10:47:11
```

Page 47

```
 1      Q.  So earlier, you mentioned some connection to 10:47:20
 2  like Salomon Brothers?            10:47:23
 3      A.  Yes.                    10:47:24
 4      Q.  What was that connection, were they -- do you 10:47:26
 5  know if they tried to sell to Salomon Brothers?    10:47:31
 6          MR. HAYES:  Objection, calls for      10:47:34
 7      speculation.                 10:47:36
 8      A.  I don't know.  It wasn't my decision.  I    10:47:36
 9  was just a technical developer.  So I wouldn't know   10:47:39
10  what was being discussed --       10:47:44
11      Q.  But what did you mean by, when you referred  10:47:49
12  to Salomon Brothers, what were you talking about?    10:47:53
13          MR. HAYES:  Objection, vague, ambiguous.  10:47:56
14      A.  What was I talking about?  Well, they were   10:47:56
15  using it.  They would go back and, you know, I don't  10:48:00
16  know what exactly was being arranged with them.  I    10:48:06
17  don't know.                     10:48:17
18      Q.  But did you have an impression that something 10:48:19
19  was being arranged with them?      10:48:22
20          MR. HAYES:  Objection, calls for      10:48:24
21      speculation, vague, ambiguous.   10:48:26
22      A.  Don't know, honestly, I don't know what     10:48:29
23  was being discussed -- they were probably a user.    10:48:31
24      Q.  I'm just wondering why you mentioned them.   10:48:35
25          Like did you know that they had some plan   10:48:38
```

Page 48

```
 1  to purchase their product, or were you working towards 10:48:40
 2  creating a product for them?      10:48:45
 3          MR. HAYES:  Objection.  Again, calls for  10:48:49
 4      speculation.  It's a compound question.    10:48:49
 5      It's vague and ambiguous.        10:48:50
 6      A.  You see, we're looking at many things to    10:48:57
 7  use, not just one application.  So you know, as       10:49:00
 8  developers -- we wanted to see our products used      10:49:05
 9  everywhere, not just by one person, one customer.     10:49:10
10      Q.  Were your products tested at Salomon        10:49:15
11  Brothers?                       10:49:18
12          MR. HAYES:  Objection.             10:49:19
13      A.  Tested?  I don't know if they were tested.  10:49:21
14      Q.  Were they used at all?         10:49:24
15      A.  Were they used?  They probably were tried   10:49:26
16  there.  I don't know how much seriously they, you     10:49:28
17  know, that happened.  You know, it's been so long.    10:49:33
18      Q.  Right.  They were tried there as part of the 10:49:37
19  testing process?                 10:49:43
20      A.  I don't know what --           10:49:44
21          MR. HAYES:  Objection, asked and answered. 10:49:44
22      A.  I don't know.                 10:49:45
23          MR. HAYES:  Just, again, slow down a      10:49:49
24      little bit because she can't copy the two   10:49:53
25      of you both down at one time.      10:49:53
```

Page 49

```
 1          THE WITNESS:  Yes, I'm sorry.  Right.     10:49:56
 2          MR. HAYES:  It's all right.         10:50:03
 3      Q.  I'm just trying to sort of clarify what     10:50:04
 4  you said earlier.                 10:50:06
 5      A.  Um-hum.                   10:50:08
 6      Q.  You said that they were using it, they     10:50:10
 7  meaning Salomon Brothers, were using the product?    10:50:13
 8          MR. HAYES:  Objection, that          10:50:16
 9      mischaracterizes the witness' prior     10:50:16
10      testimony.                   10:50:19
11      A.  Yeah, I never said they were using it.      10:50:21
12  I'm not sure what -- what they were doing with it.    10:50:23
13      Q.  But did they have it to do something with?   10:50:26
14          MR. HAYES:  Objection, calls for      10:50:28
15      speculation.                 10:50:32
16      A.  You know, they had, they had them -- yeah,  10:50:33
17  but I don't know what they were using them for.  I    10:50:39
18  don't know what applications they had, what capacity, 10:50:42
19  you know, I honestly don't know --  10:50:47
20      Q.  So who else has them?          10:50:53
21          MR. HAYES:  Objection, calls for      10:50:55
22      speculation.                 10:50:57
23      A.  I don't know.  You know, it's been so       10:50:58
24  long.  We really don't know.      10:51:01
25      Q.  But your point is that traders such as      10:51:03
```

13 (Pages 46 to 49)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 392

Page 50

1  Salomon Brothers might find it useful to use the touch  10:51:06
2  screen to enter information into forms?          10:51:10
3      MR. HAYES: Objection, that          10:51:12
4    mischaracterizes the witness' prior      10:51:13
5    testimony. It also calls for speculation.    10:51:15
6  A. Yeah, it's not exactly what I --          10:51:20
7  Q. So then --          10:51:24
8  A. Could you clarify the question? I don't want  10:51:28
9  to give you false answer. I want to make sure I      10:51:36
10  answer your question.          10:51:39
11  Q. So you're saying that they had your -- some  10:51:41
12  testing type unit as a result of this project?      10:51:47
13      MR. HAYES: Objection.          10:51:51
14  Q. But you didn't know whether they were    10:51:51
15  using it?          10:51:52
16      MR. HAYES: Objection. Again, that    10:51:52
17    mischaracterizes his prior testimony.      10:51:54
18    It's a compound question.          10:51:58
19  A. Yeah, I don't know how they were using it.   10:52:06
20  Q. Right. So I'm not -- but you are saying that  10:52:09
21  you don't know how they were using it, but they did   10:52:16
22  have it, right?          10:52:17
23  A. Yeah, they had it.          10:52:20
24  Q. And the reason they had it was because the   10:52:23
25  project that you were developing was to help people  10:52:26

Page 51

1  fill in forms using a touch screen?          10:52:30
2      MR. HAYES: Objection, that          10:52:33
3    mischaracterizes the witness' prior      10:52:34
4    testimony.          10:52:35
5  A. Probably was one of the things. That's    10:52:37
6  it.          10:52:41
7  Q. Okay. So let's go back to the patent,    10:52:52
8  Exhibit 4.          10:52:55
9  A. Okay.          10:52:56
10  Q. You indicated the figures, so let's talk    10:52:57
11  about that.          10:53:01
12      Have you seen these figures before?      10:53:02
13  A. Which figures? What page are you? Oh, the   10:53:04
14  pictures here? Okay.          10:53:07
15  Q. Yeah, the pictures, the second page, the --   10:53:08
16  A. Right.          10:53:11
17  Q. Have you seen this picture before?      10:53:11
18  A. Kind of look familiar. Kind of resemble    10:53:13
19  something we had, yes.          10:53:18
20  Q. How about turn to sheet 2 of 17 of the    10:53:21
21  drawings?          10:53:26
22  A. 2 of 17?          10:53:28
23  Q. That page right there that you have. There  10:53:31
24  you go.          10:53:35
25  A. That page? 2 -- okay, I've got it.      10:53:36

Page 52

1  Q. Have you seen this figure before?      10:53:37
2  A. I think I have, yes.          10:53:39
3  Q. Where have you seen it?          10:53:42
4  A. Where?          10:53:44
5  Q. Um-hum.          10:53:46
6  A. This kind of looks familiar from what we were  10:53:47
7  developing. This shows me some form you try to, you  10:53:50
8  know, fill out, some form that's on this screen and   10:53:56
9  using the software to touch it into the data.    10:53:59
10  Q. Okay. And turn to the next page there, sheet  10:54:08
11  3.          10:54:12
12  A. Um-hum.          10:54:13
13  Q. What does this look like?          10:54:14
14      MR. HAYES: Objection, vague, ambiguous.   10:54:16
15  Q. What does this figure depict to you?      10:54:19
16  A. This is a different form. This is probably a  10:54:22
17  sample form. I'm not sure what exactly it is.    10:54:25
18  Q. And is there a tool on this form?      10:54:32
19  A. Oh, there's no tool that is shown on this --   10:54:34
20  there probably, yeah, there probably is a tool, the   10:54:37
21  one that says "Model." If I go back and remember what  10:54:40
22  we were doing, it's probably something that helps you  10:54:43
23  fill out which model you're picking in and you can    10:54:46
24  fill out the right entry on the form. Most likely    10:54:51
25  that's what this is.          10:54:56

Page 53

1  Q. And your job was to create those tools?    10:55:00
2  A. Right.          10:55:02
3  Q. Okay. Can you flip back to the previous    10:55:11
4  page?          10:55:14
5  A. Um-hum.          10:55:16
6  Q. What is on Figure 2 here? What does "Saturn"  10:55:16
7  refer to on the form? Do you see where it says that?  10:55:21
8  A. Oh, don't know. This is probably one    10:55:25
9  example. Yeah, this is probably one example. You    10:55:28
10  know, you could have called it anything you wanted.   10:55:33
11  We called it Saturn. We were making up names, I don't  10:55:37
12  know.          10:55:41
13  Q. All right, so Saturn was the name of this    10:55:41
14  example form?          10:55:44
15      MR. HAYES: Objection, mischaracterizes   10:55:46
16    the witness' testimony and calls for      10:55:48
17    speculation.          10:55:51
18  A. Yeah, I don't know the name, Saturn, has    10:55:51
19  anything to do --          10:55:55
20  Q. I'm trying to figure out what that means.   10:55:55
21  You said you made that up --          10:55:57
22  A. I personally didn't make it up.      10:55:59
23  Q. Somebody in your group made it up?      10:56:01
24  A. Probably.          10:56:03
25  Q. And I'm trying to find out what that made-up  10:56:04

14 (Pages 50 to 53)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 393

Page 54

```
1   name referred to.                        10:56:09
2         MR. HAYES: Again, objection, it calls for  10:56:10
3      speculation.                          10:56:13
4   A.  Yeah, don't know what it -- this is 1980  10:56:13
5   something.  Who knows what -- I didn't think there was  10:56:17
6   anything called Saturn, maybe -- I don't know.  10:56:19
7   Q.  There's a car company called Saturn, right?  10:56:23
8   A.  Yeah, but was it back then?  I don't even  10:56:27
9   know.                                     10:56:29
10  Q.  Okay.  So that's what I'm asking.      10:56:29
11  A.  Okay, yeah.
12  Q.  Was this being developed for them perhaps?  10:56:30
13        MR. HAYES: Objection.  This has been  10:56:34
14     asked and answered.  And I think it's  10:56:36
15     clear that the witness is just guessing  10:56:36
16     and speculating.  He doesn't know.      10:56:38
17  A.  Yeah, I don't know exactly what it is.  10:56:41
18        MR. SIDDIQUI: You can make your     10:56:47
19     objections, but don't make those speaking  10:56:48
20     objections like that.                   10:56:53
21  Q.  So who came up with the idea of using a  10:57:10
22  touch screen to fill in forms?             10:57:14
23  A.  I'm not sure exactly who came up with it.  10:57:16
24  Probably Alex, I don't know, or Ben.       10:57:23
25  Q.  Okay.                                  10:57:26
```

Page 55

```
1   A.  But I don't know if the envelope itself, but  10:57:28
2   what's inside, how it worked, how it would eventually  10:57:34
3   work, whether it was a combination of us.  10:57:38
4   Q.  Was the idea conceived of before you joined  10:57:41
5   that group?                                10:57:44
6         MR. HAYES: Objection, calls for     10:57:45
7      speculation.  Also a legal conclusion.  10:57:46
8   A.  Yeah, I don't know.  I can't tell you  10:57:51
9   that, when exactly it was done.  Don't even remember,  10:57:52
10  honestly speaking.                         10:57:57
11  Q.  Like when you joined the group, what did you  10:57:59
12  think you were joining?                    10:58:03
13  A.  The idea was probably there.  But was there  10:58:05
14  anything?  I don't think so.  You know, going back and  10:58:08
15  trying to recall what, you know, what was happening.  10:58:15
16  There was small group being formed.  You know, this  10:58:18
17  was, this was an R&D environment -- it was an R&D  10:58:22
18  environment and many groups would be formed to work on  10:58:31
19  things they were thinking about or whatever.  10:58:35
20  Q.  So when you joined the group, was the purpose  10:58:39
21  of your joining the group to work on this project?  10:58:44
22  A.  I think so, yes.                       10:58:50
23  Q.  Okay.  So the project wasn't -- scratch that.  10:58:51
24        So you weren't already in the group and  10:58:59
25  then somebody comes up with the idea?      10:59:01
```

Page 56

```
1         MR. HAYES: Objection, calls for     10:59:03
2      speculation.                           10:59:07
3   A.  I don't think so.                      10:59:07
4   Q.  Okay.  Were you recruited to go join this  10:59:09
5   group, did somebody ask you to come join?  10:59:25
6   A.  Well, let's see -- my guess is that -- if I  10:59:26
7   wanted to do some exploratory work on something, and  10:59:29
8   we needed -- first of all, who is the guy you want to  10:59:35
9   work with, you know?  And I was there.  Alex grabbed  10:59:39
10  me and Ben -- Alex grabbed me -- he grabbed me.  He  10:59:56
11  said, Raoul, can you join my group because we want to  11:00:01
12  work on something together, you know.      11:00:04
13  Q.  What did you think you were going to work on  11:00:08
14  with Alex?                                 11:00:11
15        MR. HAYES: Action, calls for speculation.  11:00:13
16  A.  Don't exactly know what you mean, but I  11:00:17
17  wanted to work on some touch entry stuff with touch  11:00:20
18  screen.                                    11:00:30
19  Q.  How long did you work on this touch screen  11:00:30
20  project?                                   11:00:33
21  A.  How long?  Can't, don't remember exactly how  11:00:34
22  long.                                      11:00:37
23  Q.  A year, two, four?                     11:00:40
24  A.  No, probably -- probably two years.  Probably  11:00:41
25  two years, maybe three years.              11:00:51
```

Page 57

```
1   Q.  Was there a specification that you had to try  11:01:01
2   to meet?                                   11:01:04
3   A.  No, we didn't have any formal specs.  This  11:01:06
4   was just some kind of developer's dreams.  I would  11:01:11
5   come up with something.  Maybe Alex would come up with  11:01:17
6   one.  Ben would come up with one.  And it was like  11:01:21
7   hey, good, let's keep it, you know, we had no formal  11:01:25
8   things to go by.                           11:01:28
9   Q.  What were some of the things that you came up  11:01:29
10  with that you decided not to go with?      11:01:32
11  A.  I don't remember exactly.  Because there were  11:01:34
12  so many things.  You know, you start something today  11:01:37
13  and scratch it tomorrow, whatever.         11:01:39
14  Q.  Did you write any of this down, any of the  11:01:46
15  ideas that you've been talking about?      11:01:49
16  A.  No.
17        MR. HAYES: Objection.  That's been asked  11:01:51
18     and answered.                           11:01:53
19  A.  Yeah.
20  Q.  Were there meeting notes?              11:01:53
21        MR. HAYES: Objection.  That's been asked  11:01:57
22     and answered.                           11:01:57
23  Q.  Emails?                                11:01:57
24  A.  Email?  There was no email at the time.  11:01:57
25  Q.  This was before email.                 11:01:59
```

15 (Pages 54 to 57)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 394

Page 58

1    A.  No such thing as email back then.        11:02:01
2    Q.  How about technical memoranda, did you --    11:02:07
3        MR. HAYES:  Again, objection.  That's been  11:02:11
4    asked and answered.              11:02:12
5    A.  We probably had some, but whether or not I    11:02:14
6    remember any of them...              11:02:18
7    Q.  I'm not asking about what was in them right  11:02:21
8    now.                    11:02:24
9    A.  Okay.
10   Q.  I'm just asking whether --          11:02:25
11   A.  There probably were, yes.        11:02:27
12   Q.  Was it the practice at Bell Labs to write    11:02:30
13   technical memoranda?            11:02:40
14       MR. HAYES:  Objection.  It's been asked    11:02:40
15       and answered.              11:02:40
16   A.  Yes, like I say, there probably were.      11:02:40
17   Q.  Who were the technical memoranda typically    11:02:42
18   being circulated to?              11:02:46
19       MR. HAYES:  Objection, calls for      11:02:47
20       speculation.              11:02:48
21   A.  Don't know.  Most likely people on the      11:02:49
22   project.                  11:02:51
23   Q.  How far up in the chain would they be      11:02:53
24   circulated to, usually?            11:02:56
25       MR. HAYES:  Objection, vague, ambiguous.  11:02:59

Page 59

1    A.  I don't know.  Like I say, those of us who    11:03:00
2    were involved, wanted to, you know, to know what each  11:03:04
3    other was doing probably, you know, maybe some boss.  11:03:08
4    I'm not sure.  But it wouldn't go that far.      11:03:14
5    Q.  Was there a meeting that you had or a      11:03:36
6    discussion that you had with anybody in which your    11:03:38
7    project group decided, hey, we've got something here?  11:03:41
8    A.  Don't recall that.  Don't recall that,      11:03:45
9    honestly speaking.              11:03:51
10   Q.  So let's walk through the figures in the      11:04:07
11   patent.  And if you could just explain how the, this  11:04:09
12   touch screen form entry system would work.      11:04:19
13       MR. HAYES:  Objection.  Vague, ambiguous,  11:04:21
14       and it's going to call for speculation.    11:04:25
15       MR. SIDDIQUI:  Okay.          11:04:29
16   Q.  So for example, in Figure 1, what does      11:04:33
17   Figure 1 depict?              11:04:40
18   A.  This shows a computer, a PC, attached to a    11:04:43
19   touch screen, a touch screen terminal.      11:04:49
20   Q.  And was this the generic setup for all the    11:04:55
21   different applications?            11:04:59
22       MR. HAYES:  Objection, calls for      11:05:01
23       speculation.              11:05:02
24   A.  Not that I know of.  You could have the      11:05:02
25   touch screen on the monitor itself.        11:05:06

Page 60

1    Q.  Okay.  But did all the applications have the  11:05:07
2    touch screen though?              11:05:11
3    A.  Yes.                  11:05:12
4    Q.  Did you ever test it without a touch screen?  11:05:20
5    A.  Yeah, you could.  You really didn't need a    11:05:23
6    touch screen per se, but just to make -- I mean, you  11:05:28
7    had the choice of using your normal keyboard,    11:05:32
8    whatever, from what I remember.        11:05:35
9    Q.  So before this patent, nobody was able to use  11:05:49
10   a normal keyboard to enter data into forms?    11:05:52
11   A.  I don't know that.  Before this patent?    11:05:55
12   Q.  Before this project.            11:06:01
13       MR. HAYES:  Objection, calls for      11:06:02
14       speculation.              11:06:07
15   A.  There are many things out there using a      11:06:08
16   keyboard, right?  So...            11:06:10
17   Q.  Do you think that was new --        11:06:11
18       MR. HAYES:  Objection, calls
19   for --
20   Q.  -- entering data into forms using a keyboard?  11:06:13
21       MR. HAYES:  Objection, calls for      11:06:16
22       speculation.              11:06:19
23   A.  I mean, this was done, right?        11:06:19
24   So -- I think, you know, on a keyboard from our    11:06:26
25   computer allows you always to do  that -- I mean,    11:06:41

Page 61

1    entering data in a computer using a keyboard was    11:06:43
2    pretty common.              11:06:47
3    Q.  Did you develop any applications that didn't  11:06:50
4    use a touch screen?              11:06:52
5    A.  Did I use any applications?  The thing we    11:06:55
6    had, from what I remember, okay, you could, you had    11:07:00
7    the option, okay, you had the option.  But it all    11:07:02
8    depends on the form again, how you could navigate with  11:07:10
9    your key, with your keyboard.  You could navigate    11:07:15
10   through the forms and pop up the right thing, and then  11:07:18
11   use it.                  11:07:22
12   Q.  So you said you could, but I'm asking:  Did    11:07:24
13   you develop any applications that did not use the    11:07:29
14   touch screen?              11:07:30
15       MR. HAYES:  Objection.  It's been asked    11:07:30
16       and answered.              11:07:33
17   A.  No, I don't remember if I developed any      11:07:33
18   specific application.            11:07:37
19   Q.  So in Figure 1, what has reference numeral 21  11:07:56
20   looks like a display and 15 or 16 looks like the touch  11:08:07
21   screen, right?              11:08:10
22   A.  Yes.                  11:08:10
23   Q.  And then in Figure 2, we see a screen shot.  11:08:11
24       So where would this screen shot in Figure    11:08:15
25   2 be displayed in the setup in Figure 1?      11:08:20

16 (Pages 58 to 61)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 395

Page 62

```
1        MR. HAYES:  Objection, calls for      11:08:24
2     speculation.                     11:08:27
3     A.  Where exactly would it show?         11:08:28
4     Q.  Um-hum.               11:08:30
5     A.  Most likely on both, on both screens.   11:08:32
6     Q.  Okay.  So, say, I'm a user of this set-up,   11:08:37
7  and I see what's depicted in Figure 2 on both screens  11:08:52
8  that are in Figure 1, and I want to fill in that form,  11:09:00
9  what would be the first thing I do?       11:09:03
10    A.  Oh, gee, what would be -- I don't recall the  11:09:06
11 exact steps you'd go by.  But basically, a form would  11:09:09
12 come up on the screen and then you would navigate to   11:09:13
13 the field you want to enter information on.  And then  11:09:16
14 the correct tool to allow you to enter that   11:09:20
15 information would come up on the screen, and then you  11:09:23
16 would enter the information.  I mean, there was plenty  11:09:26
17 of flexibility in this thing.          11:09:41
18    Q.  So for example, in Figure 3, there is what   11:09:43
19 you described as a tool --        11:09:46
20    A.  Yeah.                11:09:48
21    Q.  -- depicted, that's entitled "Model."   11:09:49
22    A.  Yeah.                11:09:51
23    Q.  So somehow I got this tool to come up and   11:09:52
24 then it displays a certain number of models?   11:09:57
25    A.  Um-hum.               11:09:58
```

Page 63

```
1     Q.  And I would select one of these?    11:10:00
2     A.  Yes, you'd press one of these buttons here.  11:10:04
3     Q.  I would press one of these buttons:    11:10:07
4  Roadster, Four-door Sedan, Two-door Sedan, et cetera?  11:10:09
5     A.  I think so, yes.            11:10:16
6     Q.  And after I touched that, then it would --   11:10:17
7  then what would happen to the, what would happen?   11:10:19
8        MR. HAYES:  I'm going to object, that    11:10:20
9     mischaracterizes the witness' testimony.    11:10:22
10    A.  I don't know exactly what would happen.   11:10:29
11 Probably the tool would go away, probably, okay, would  11:10:32
12 go away and then you go on to fill the next field.   11:10:37
13 But there is nothing that says, you know, I don't    11:10:40
14 think -- like I say, we providing enough flexibility  11:10:43
15 to fill out the entire thing.         11:10:48
16       I don't know how you would start, but your  11:10:50
17 validation being done, sometimes you'd say I have got  11:10:54
18 to do this first before we'd be there, but not always.  11:10:56
19 It depends on how your form is designed.    11:11:00
20    Q.  Do you remember this particular form, this   11:11:05
21 car --                    11:11:07
22    A.  No.                 11:11:07
23    Q.  -- purchase example?          11:11:08
24    A.  No.                 11:11:09
25    Q.  Okay.  So flipping between Figures 3 and   11:11:14
```

Page 64

```
1  Figure 4, it looks like this tool model in Figure 3   11:11:17
2  was displayed, and in Figure 4, the model field in   11:11:23
3  number 41 has been filled in with "Convertible."   11:11:31
4     A.  Okay.                11:11:33
5     Q.  Right.                11:11:33
6     A.  Yes.                 11:11:34
7     Q.  And then it looks like a new tool has popped  11:11:34
8  up?                      11:11:40
9     A.  Yes.                 11:11:40
10    Q.  So I'm just trying to --       11:11:40
11    A.  Does it say what year?          11:11:42
12    Q.  Right, it says what year.        11:11:46
13    A.  So maybe you're on that field there that says  11:11:46
14 "Year."                   11:11:49
15    Q.  So I'm trying to walk through the way that   11:11:50
16 the system works.               11:11:53
17       So I would hit Convertible, and then    11:11:55
18 Convertible would get filled into the model field?   11:11:58
19    A.  Yes.                 11:12:01
20    Q.  And then the year tool would pop up so that I  11:12:02
21 would fill the year --            11:12:05
22    A.  Probably, you would have to probably select  11:12:07
23 year.                     11:12:10
24    Q.  Okay.                11:12:10
25    A.  I don't recall how much automation we had, to  11:12:10
```

Page 65

```
1  be honestly speaking, how you would design your form,  11:12:15
2  but it was mostly the user could design his own form   11:12:18
3  to do things automatically, I don't know.  There is   11:12:21
4  enough flexibility built into this -- flexibility    11:12:27
5  built into it.                11:12:33
6     Q.  You said Figure 1 shows a PC.       11:12:42
7     A.  Yes.                 11:12:45
8     Q.  With, you mentioned that you used 8086 and   11:12:45
9  8088 processors, right?            11:12:50
10    A.  I guess at the time that was what was    11:12:53
11 available.                  11:12:56
12    Q.  This is pre-Windows, this is DOS days?    11:12:57
13    A.  Exactly.               11:13:01
14    Q.  Were there any other machines that you    11:13:01
15 contemplated this working on?  Did you test it on a   11:13:05
16 VAX, for example?               11:13:08
17    A.  VAX?  No --             11:13:11
18       MR. HAYES:  Objection, calls for      11:13:11
19    speculation.                11:13:14
20    A.  I don't think we tested it on a VAX,    11:13:18
21 because we --                11:13:23
22    Q.  UNIX?                11:13:27
23    A.  UNIX, UNIX wasn't, no.         11:13:27
24    Q.  I'm trying to think of other -- MAC?    11:13:29
25    A.  That's something we didn't have access to, to  11:13:34
```

17  (Pages 62 to 65)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 396**

Page 66

1  be honest with you.                    11:13:38
2      Q.  So your answer for MAC was no, right?    11:13:57
3      A.  I know for MAC, I never tested on a MAC.  I    11:14:00
4  never used a MAC.                    11:14:04
5      Q.  Did anybody else?                11:14:06
6          MR. HAYES:  Objection, calls for        11:14:08
7      speculation.                    11:14:08
8      A.  I don't know.                    11:14:08
9      Q.  If you turn to the second to last page of the  11:14:38
10  patent, in column 15?                    11:14:42
11      A.  Second to last -- sheet 15 of 17?        11:14:46
12      Q.  It's column 15, so it's the actual text.    11:14:58
13      A.  Oh, okay.  Yeah, okay, what is this?        11:15:02
14      Q.  So towards the end of the patent, there are    11:15:09
15  some claims.  You see where at the bottom of 15 it    11:15:11
16  says, "What is claimed is:  1.  An arrangement for    11:15:14
17  use," at the bottom of column 15?            11:15:18
18      A.  Where's column 15?
19          MR. HAYES:  This means column, like this    11:15:21
20  is --                            11:15:23
21          THE WITNESS:  Okay, I'm sorry.        11:15:24
22          MR. HAYES:  So you need to get to the    11:15:26
23  one with the 15 on the top.                11:15:27
24          THE WITNESS:  Okay.  Column 15.        11:15:30
25      Thanks.  Yes.                    11:15:31

Page 67

1      Q.  And it says, "What is claimed is:  An    11:15:34
2  arrangement for use in a computer," right?        11:15:37
3      A.  As arrangement for use in the computer, yeah.  11:15:45
4      Q.  And as you follow from 15 to 16 and 17 and    11:15:48
5  18, there are these numbered paragraphs that are the  11:15:51
6  claims of the patent.                    11:15:54
7      A.  Okay.
8      Q.  Could you take a minute to review these    11:15:59
9  claims and let me know --                11:16:02
10      A.  This is in lawyer's language, if I tell you I  11:16:05
11  can't understand it right away.  You know, I could    11:16:08
12  try --                            11:16:12
13          MR. HAYES:  Can we take a quick break?  I  11:16:14
14  don't know if that's an alarm.                11:16:16
15          MR. SIDDIQUI:  Let's take a break.        11:16:19
16      Sure, we'll check it out.                11:16:19
17          THE VIDEOGRAPHER:  The time is 11:24    11:16:21
18  a.m.  We're off the record.                11:16:24
19      (Brief interruption.)                11:16:36
20          THE VIDEOGRAPHER:  The time is        11:20:57
21      11:29 a.m.  We're back on the record.        11:20:58
22  BY MR. SIDDIQUI:
23      Q.  So we were looking at the claims at the end    11:21:05
24  of the patent.                        11:21:09
25      A.  Um-hum.                    11:21:10

Page 68

1      Q.  Let's look at claim 1.  It says, "An    11:21:12
2  arrangement for use in a computer having a display    11:21:16
3  associated therewith comprising," and then the first    11:21:20
4  clause is "means for displaying on said display a    11:21:27
5  pattern including a plurality of information fields    11:21:32
6  and for identifying for each field a kind of        11:21:35
7  information to be inserted therein."            11:21:38
8      A.  Yes.                        11:21:43
9      Q.  What does that mean?                11:21:44
10          MR. HAYES:  Objection, calls for        11:21:46
11      speculation.  Calls for a legal            11:21:47
12      conclusion.                    11:21:48
13      A.  I'm not sure what, this is lawyer's        11:21:49
14  language, I'm not sure what it means, exactly in    11:21:52
15  lawyer's terms.                    11:21:55
16      Q.  What does it mean to you?            11:21:56
17          MR. HAYES:  Objection, calls for        11:21:58
18      speculation.  Calls for a legal            11:21:59
19      conclusion, and he's not an expert on        11:22:00
20      claims.                        11:22:02
21      A.  Yeah, like I say, I'm not an expert.  I    11:22:03
22  don't want to give you false information here.    11:22:04
23      Q.  This is your patent though, right?        11:22:08
24          MR. HAYES:  Objection.  Objection, calls  11:22:11
25      for speculation and it's argumentative.    11:22:11

Page 69

1      A.  Yeah, I mean, the information described    11:22:15
2  here, so...                        11:22:17
3      Q.  Is this your patent?                11:22:25
4      A.  Yes, it is.                    11:22:25
5      Q.  Okay.  So -- and the patent describes    11:22:26
6  technology that you worked on?            11:22:29
7      A.  Correct.                    11:22:31
8      Q.  So --
9      A.  But I didn't write this.  This is not -- I    11:22:33
10  didn't write it.  And so this is from the lawyer's,    11:22:36
11  right?                            11:22:44
12      Q.  How do you know this has anything to do with  11:22:45
13  your technology at all?                11:22:49
14      A.  How do I know?  Because I know it does.    11:22:49
15      Q.  How though?                    11:22:52
16      A.  I know it does.  This is the stuff I worked    11:22:53
17  on.  It's got the picture.  It's got the first few    11:22:57
18  pages, but I know reading through this, you know, you  11:23:00
19  know, "means for displaying on said display a pattern  11:23:08
20  including --" including information on fields.  Okay,  11:23:11
21  I'm going to say, okay, this probably means a form    11:23:13
22  you're filling out and then provides you with a way to  11:23:15
23  fill out, to enter information and you just fill out    11:23:21
24  the form.                        11:23:25
25      Q.  Well, I'm talking just about this clause --  11:23:26

18  (Pages 66 to 69)

EASTWOOD-STEIN
deposition services & litigation support    (800)  514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 397

Page 70

```
 1    A. Okay --                           11:23:29
 2       MR. HAYES: I'm going to object again. It 11:23:29
 3    calls for speculation. It calls for a     11:23:31
 4    legal conclusion, and the witness is not  11:23:32
 5    been deemed an expert in patent law.      11:23:36
 6    A. Yeah, so I'm going to follow the advice of 11:23:41
 7    my attorney here --                       11:23:45
 8    Q. He actually didn't give you any advice. He's 11:23:46
 9    just making objections for the record.    11:23:49
10    A. Correct, but this is, like I say, I think it 11:23:57
11    means a form filled out with fields in it, if you're 11:23:57
12    asking me --                              11:23:58
13    Q. You can take sometime and read it.     11:24:00
14    A. You have labels on each field -- each field 11:24:04
15    is labeled properly, and the kind of information to be 11:24:06
16    inserted in here, yeah. So it tells you what it 11:24:15
17    expects in each field. So there is a form -- the kind 11:24:22
18    of information expected for each field.
19    Q. What does that mean, it tells you the kind of 11:24:28
20    information expected for each field?       11:24:31
21       MR. HAYES: Objection, calls for       11:24:33
22    speculation. Calls for a legal            11:24:35
23    conclusion. The witness is not an expert  11:24:36
24    in the patent law and the meaning of the  11:24:39
25    patent claims.                            11:24:41
```

Page 71

```
 1    A. Yeah, you know, the form has -- fields 11:24:42
 2    have names, year, whatever, anything you want. So if 11:24:45
 3    it has a year, it expects a year, right? If it 11:24:52
 4    expects a name, you pull out a name, right? 11:25:00
 5    So that's probably, that's my             11:25:00
 6    interpretation, I don't know. This is not my -- I'm 11:25:04
 7    not an expert in anything, but this is probably what I 11:25:07
 8    would think it's saying here.             11:25:12
 9    Q. So you said the rest of the patent, at least, 11:25:12
10    you recognize as being part of your work. So could 11:25:13
11    you look at this clause right here and then go through 11:25:17
12    the patent and tell me, in your work, where is the 11:25:20
13    means for displaying on-site display?     11:25:27
14       MR. HAYES: Objection, that calls for  11:25:34
15    speculation. He's not been deemed an      11:25:37
16    expert in patent law.                     11:25:38
17    A. Yeah, I don't know. There is a display. 11:25:39
18    It's probably what it means to me.        11:25:42
19    Q. I'm asking in your patent to find where this 11:25:45
20    first clause of claim 1, where is that depicted? 11:25:48
21       MR. HAYES: Object, it's been asked and 11:25:56
22    answered. It calls for speculation.       11:25:59
23    A. Yeah.                                  11:26:00
24    Q. You don't need to answer off the cuff. You 11:26:01
25    don't need to have the answer just like that. You can 11:26:04
```

Page 72

```
 1    take your time and look through the patent, that's 11:26:05
 2    fine. Take all the time you want.          11:26:08
 3    A. Okay, I don't know, I think through the first 11:26:08
 4    page it shows a display, or the first figure, sheet 1 11:26:11
 5    of 17. And sheet 2, if I'm going -- you know, the way 11:26:16
 6    this is written, it spells out every little item. I 11:26:25
 7    really don't know --                       11:26:26
 8    Q. Right, so that's what I'm trying to do. I'm 11:26:28
 9    trying to find -- you're exactly right, it spells out 11:26:31
10    many different items.                      11:26:34
11    A. Yeah.                                   11:26:36
12    Q. And I'm trying to isolate each item.    11:26:36
13    A. Okay, yeah --                           11:26:40
14       MR. HAYES: I'm going to object. It calls 11:26:40
15    for speculation.                           11:26:42
16    A. Yeah, I mean, I don't know what you're  11:26:42
17    trying to get to, what exactly where it -- where 11:26:44
18    things begin or where things end.          11:26:58
19    Q. We can take this -- we don't have to take it 11:27:22
20    as a big chunk. We can take it in little chunks. 11:27:25
21    A. Okay.                                   11:27:28
22    Q. The "means for displaying on said display a 11:27:29
23    pattern including a plurality of information fields." 11:27:32
24       So take your time and read that and then 11:27:36
25    look at your patent and tell me where -- what that 11:27:42
```

Page 73

```
 1    refers to?                                 11:27:45
 2       MR. HAYES: Again, I'm going to object. 11:27:46
 3    It's been asked and answered. It's         11:27:47
 4    calling for speculation.                   11:27:50
 5    A. Yeah, I mean, like I said before, you have 11:27:54
 6    a whole form to fill out. It's displayed on all the 11:27:56
 7    screen. And each field is labeled.         11:28:03
 8    Q. Right. So you're talking in generalities. 11:28:05
 9    I'm asking you to look in --               11:28:05
10    A. No, I'm -- I think that's what this means. 11:28:07
11    Oh, in my patent?                          11:28:11
12    Q. Right.                                  11:28:11
13    A. Which figure this is pointing to?       11:28:13
14    Q. Figure or text. Let's find it in the text. 11:28:15
15       Where it that written?                  11:28:16
16       MR. HAYES: Again, objection. It calls  11:28:18
17    for speculation.                           11:28:22
18    A. I don't know. Remember what I said coming 11:28:29
19    here, this is what I remember about my patent. Okay. 11:28:30
20    Q. So you can't --                         11:28:34
21    A. The description is written by whoever entered 11:28:35
22    the patent. The company had patent attorneys to enter 11:28:37
23    things, I don't know. But if you're asking me 11:28:45
24    personally, this is what I have, you know, what I 11:28:46
25    did, recognize what it -- what we're talking about 11:28:50
```

19 (Pages 70 to 73)

**Exhibit 20**
**Page 398**

Page 74

1  here.                          11:28:54
2  Q.  I'm just trying to see if you as an inventor  11:28:57
3  in your patent can find where there's a means for  11:29:00
4  display on said display of a pattern --  11:29:05
5  A.  The means for display?  11:29:08
6      MR. HAYES:  I'll object again.  It's been  11:29:12
7  asked and answered.  11:29:12
8  A.  Yeah, we went through that -- what do you  11:29:12
9  mean a means for display?  Do you mean a screen?  11:29:14
10 There is a screen.  There is a computer.  There's a  11:29:18
11 screen, and there's information on the screen.  11:29:21
12 Q.  Well, instead of just a, your explanation, I  11:29:26
13 was trying to see whether you could find it in your  11:29:31
14 patent, but if you can't, that's okay too.  11:29:33
15 A.  Yeah, I don't -- I don't know what you're  11:29:37
16 asking me, to be honest with you, where I can find it.  11:29:38
17 I can point you to a picture here probably that  11:29:42
18 probably meets that definition, but I don't know  11:29:48
19 exactly what you're saying.  11:29:54
20 Q.  Okay.  Well, then let's skip down a little  11:29:55
21 bit.                          11:29:57
22 A.  Okay.                    11:29:58
23 Q.  The next clause there, it says, "means for  11:29:58
24 indicating a particular one of said information fields  11:30:02
25 into which information is to be inserted and for  11:30:09

Page 75

1  concurrently displaying a predefined tool associated  11:30:13
2  with one of said fields."  11:30:16
3      So since you worked on the tools, what  11:30:22
4  does it mean to be a predefined tool?  11:30:23
5      MR. HAYES:  Objection, calls for  11:30:26
6  speculation and a legal conclusion, and an  11:30:27
7  expert opinion.  11:30:30
8  A.  Yeah, I don't exactly to the expert level,  11:30:32
9  but we have a form to fill out and you can define,  11:30:48
10 make this very flexible for the user, define the form.  11:30:53
11 You define the form and define each field of the form  11:30:59
12 what do we expect to use in that form.  So as you go  11:31:03
13 field by field, you have the correct tool come up.  11:31:14
14 Q.  That's what you're saying a predefined tool  11:31:26
15 means?                        11:31:28
16     MR. HAYES:  I'm going to object.  That  11:31:28
17 mischaracterizes his testimony.  11:31:30
18 A.  Yeah, I mean, predefined, it means the  11:31:32
19 user defines it.  We didn't define it ourselves.  It's  11:31:36
20 so flexible.  11:31:43
21 Q.  So the user defines -- how does the user  11:31:44
22 define the tool?  11:31:49
23 A.  When you create the form.  11:31:52
24 Q.  How would he do that?  11:31:53
25     MR. HAYES:  Objection, calls for  11:31:56

Page 76

1  speculation.                  11:31:59
2  A.  We had means to create forms, that creates  11:31:59
3  form.  And in the forms you label the forms, the  11:32:07
4  fields the way you want, and you define which tool to  11:32:09
5  use when you're filling out a certain, a particular  11:32:16
6  field.  That's probably my interpretation there.  11:32:24
7  Q.  And what would happen if someone tried to use  11:32:31
8  a tool that's, that wasn't one of those tools?  11:32:34
9  A.  It can't, I don't think -- this is the  11:32:38
10 software, how the software would work.  You know, I'm  11:32:43
11 not sure, I don't remember exactly what things would  11:32:46
12 come up, probably -- you know, if things didn't work  11:32:50
13 right, you'd probably get the incorrect things to come  11:32:54
14 up most likely, I'm not sure.  11:32:56
15     But what would happen?  Gee, I don't know,  11:33:00
16 it would definitely blow up in your face -- it would  11:33:03
17 not, it would not.  11:33:10
18 Q.  So it says, "a predefined tool associated  11:33:14
19 with one of said fields."  Do you see that in line  11:33:17
20 16-61 of column 15?  11:33:22
21 A.  Yeah.
22 Q.  And it sounds to me like what you described  11:33:26
23 as the part of the tool being associated one of said  11:33:28
24 fields, or said one of said fields --  11:33:33
25     MR. HAYES:  Objection, that  11:33:34

Page 77

1  mischaracterizes his prior testimony.  11:33:36
2  Also calls for speculation.  11:33:37
3  Q.  But didn't you just say that the user  11:33:39
4  could configure the form so that a certain tool would  11:33:41
5  need to be used to fill in information into a certain  11:33:45
6  field?                        11:33:48
7      MR. HAYES:  Objection, mischaracterizes  11:33:50
8  the witness' prior testimony.  11:33:50
9  A.  Yeah.                    11:33:53
10 Q.  Okay.  So I'm just trying, I'm not being  11:33:54
11 tricky, I'm just trying to understand.  11:33:58
12 A.  Yeah.
13 Q.  So that sounds like a tool that's associated  11:34:02
14 with the field?  11:34:04
15 A.  You associate, you do that.  11:34:05
16 Q.  Right --
17 A.  Well, what I said on the form, when the form  11:34:18
18 creation, the form designer would associate the tool  11:34:20
19 with a field.  11:34:23
20 Q.  Okay.  So, but the phrase I was asking about  11:34:27
21 is the predefined tool that's associated with the  11:34:32
22 field, so I'm trying to -- I'm sorry.  11:34:33
23 A.  What do I mean a predefined tool you  11:34:35
24 associate -- yeah, I mean, you pick a tool, what you  11:34:38
25 want to enter here, what you want to enter into that  11:34:40

20  (Pages 74 to 77)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 399**

Page 78

1  field, so you define the tools you want.        11:34:44
2      Q.  So you're saying the association is      11:34:46
3  predefined?                    11:34:48
4      MR. HAYES:  Objection, mischaracterizes     11:34:49
5      the witness' testimony.             11:34:50
6      A.  No.  What do you mean the association is    11:34:52
7  predefined?                    11:34:55
8      Q.  That when somebody creates a form, they    11:34:56
9  associate that with this field, you use this tool.    11:34:58
10     A.  Right.                   11:35:01
11     Q.  And that's, that's predefined into the form.  11:35:03
12     MR. HAYES:  Objection, vague, ambiguous.    11:35:07
13     A.  Yeah, that's creation now, when you create   11:35:10
14  your forms.  What do you want in it?  If I want the   11:35:13
15  year, the year pops up.  You define whatever you want,  11:35:31
16  in the flexibility built in.              11:35:37
17     Q.  So let's talk about the -- when you said that  11:35:40
18  you had a means that you provided to the users to     11:35:43
19  associate the tools with the fields.          11:35:46
20     MR. HAYES:  Objection, that           11:35:48
21     mischaracterizes his prior testimony.       11:35:49
22     A.  The user would create forms.  The form     11:35:56
23  creation is form creation, right?           11:36:00
24     Q.  Okay.                   11:36:06
25     A.  So this explains how to enter information on  11:36:06

Page 79

1  the form.                     11:36:10
2      Q.  Earlier, you said that the user would      11:36:12
3  associate the tool with the field and you said there   11:36:14
4  was flexibility, you guys designed the flexibility to  11:36:17
5  let the user associate the tool with the field?     11:36:23
6      MR. HAYES:  Objection, that           11:36:28
7      mischaracterizes his prior testimony.       11:36:29
8      It's a compound question.            11:36:31
9      A.  Yeah, what did I say?  I'll go back to my    11:36:35
10  statement.  But yeah, like I say, the user defines his  11:36:39
11  own tool, from what I remember.            11:36:42
12     Q.  Did the user create his own tool?        11:36:43
13     A.  Did the user create his own tool?  I don't   11:36:46
14  know if we ever give user a code to do that.  I don't  11:36:50
15  think so.  I don't remember.             11:36:54
16     Q.  Since you were working on the tools, how many  11:37:04
17  tools were there?                 11:37:08
18     A.  I don't remember how many.  I couldn't come   11:37:09
19  up with -- depends on what forms you could dream and   11:37:11
20  what it is we wanted to do.  I can't put a number to   11:37:17
21  it.                       11:37:22
22     Q.  What types of tools were there?         11:37:23
23     A.  What types of tools?  What do you mean what  11:37:26
24  types?                      11:37:29
25     Q.  Well, the patent shows, in one of the       11:37:30

Page 80

1  figures, an on-screen keyboard, for example, right?   11:37:32
2      A.  Yeah, that's one example.           11:37:36
3      Q.  So I'm looking for some other examples.     11:37:38
4      A.  Yeah, that's one.  We had many.  You know,   11:37:42
5  you would come up -- we had things, a display keyboard  11:37:45
6  that looks like your actual keyboard, and then you    11:37:51
7  would enter information, enter on keyboard.  That was  11:37:54
8  one example.                   11:37:58
9      You know, we had things that just, just      11:38:00
10  menu items, you would select one.  It was -- I mean   11:38:03
11  the capabilities of this were, to me, very, very much  11:38:10
12  open, could do -- well, there are many tools we could  11:38:19
13  have designed.                   11:38:25
14     Q.  Did you provide to the user a way to create   11:38:31
15  their own tools?                  11:38:34
16     A.  I don't, like I say, I don't remember doing   11:38:35
17  that because you have to provide them with codes and   11:38:37
18  API's and things like that -- it's a technical term.   11:38:42
19     Q.  And by API, you mean what?           11:38:52
20     A.  It's some library application and programming  11:38:56
21  interface -- an Application Programming Interface,    11:39:05
22  that's API.  That's the application --         11:39:12
23     Q.  Application programming interface.        
24      Was there a tool that the user could use    11:39:24
25  to create their own tool?               11:39:27

Page 81

1      A.  I don't recall, honestly.  I don't recall.   11:39:30
2      Q.  I mean, I'm trying to -- I'm trying to figure  11:39:37
3  out what a user would have to do to create their own   11:39:38
4  tool.  Would they, they would have to write the code   11:39:42
5  or could they just navigate on the screen and      11:39:44
6  create --                     11:39:48
7      A.  Like I say, I don't remember us giving them   11:39:49
8  code to do it without the principal designer of these  11:39:52
9  things.  Okay.  And I don't recall what we gave to    11:39:56
10  users actually, you know.             11:40:02
11     Q.  So I'm not asking particularly what certain   11:40:18
12  users got, but in the design of the system, was it    11:40:20
13  contemplated that the user would modify these tools   11:40:23
14  that would pop up?                 11:40:27
15     A.  Was it -- probably was, probably was.      11:40:29
16     Q.  But if --                 11:40:34
17     A.  It probably was, but I don't know if we      11:40:35
18  reached the stage to give them code to allow them to   11:40:37
19  do that.                     11:40:42
20     Q.  So I'm just trying to --            11:40:44
21     A.  I said to give them some means to do that.  I  11:40:47
22  don't recall honestly.               11:40:50
23     Q.  Okay.  In that same, that same line, line 60  11:41:11
24  of column 15 --                  11:41:14
25     A.  How do you count lines here?  Oh, okay.     11:41:18

21 (Pages 78 to 81)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 400

Page 82

1    Q.  It's got the -- I'm not doing it that    11:41:21
2  quickly.                                       11:41:24
3    A.  Yeah, I got it.  Okay.  I got it.        11:41:26
4  Information to be inserted into the associated --    11:41:28
5    Q.  Right, so it says, right before "predefined    11:41:30
6  tool --"                                       11:41:36
7    A.  Predefined tools, yes.
8    Q.  It says, "for currently displaying a     11:41:37
9  predefined tool associated                     11:41:43
10  with --"                                      11:41:45
11       MR. HAYES:  Are we, I'm sorry, are we on    11:41:46
12    column 16?                                  11:41:48
13       THE WITNESS:  60, six, zero.
14       MR. HAYES:  15 or 16?
15       MR. SIDDIQUI:  Column 15, line 60.       11:41:50
16       MR. HAYES:  Column 15, you're reading    11:41:54
17    on column 16.
18       THE WITNESS:  Oh, I was on 16.           11:41:55
19       MR. SIDDIQUI:  I'm sorry.                11:41:57
20       (Discussion off the record.)            11:42:01
21       THE WITNESS:  Oh, this is on both sides.  11:42:07
22    The numbers shows -- okay, I got it.        11:42:11
23    Okay.  I got it.                           11:42:12
24    Q.  So you see, right where you're looking, is    11:42:16
25  that phrase that we were talking about predefined    11:42:22

Page 83

1  tools "associated with said one of said fields"?    11:42:26
2    A.  Um-hum.
3    Q.  And then just before that, the whole phrase,  11:42:28
4  it says "for concurrently displaying a predefined tool  11:42:30
5  associated with said one of said fields."     11:42:34
6    A.  Um-hum.
7    Q.  So what does it mean when the tool is     11:42:38
8  concurrently displayed?                        11:42:40
9       MR. HAYES:  Objection, that calls for a    11:42:43
10    speculation, a legal conclusion, and an     11:42:45
11    expert's opinion on the meaning of a claim    11:42:47
12    term.                                      11:42:49
13    A.  Yeah, I don't know what that means.  I    11:42:50
14  mean like --
15    Q.  No, I -- I'm sorry, go ahead.           11:42:55
16    A.  In my own terms, you're saying?        11:42:58
17    Q.  In your invention, what does it mean when a    11:43:00
18  tool, one of these tools is concurrently displayed,    11:43:03
19  what does that mean?                           11:43:06
20    A.  Well -- you have a field to fill out.  You    11:43:07
21  touch.  You indicate, and then this thing comes up.    11:43:11
22  You pick out which entry.  I mean, the right tool    11:43:18
23  comes up on the screen, and allows you -- the screen    11:43:21
24  doesn't go away, the screen is there.          11:43:26
25    Q.  What do you mean by "the screen doesn't go    11:43:29

Page 84

1  away"?                                         11:43:31
2    A.  The original form is still there.        11:43:32
3    Q.  Where is that, where is the original --    11:43:35
4    A.  On the screen.                          11:43:39
5    Q.  It's on the screen?
6    A.  On the screen.  The original form is still on  11:43:39
7  the screen.  And then this other tool comes up and    11:43:39
8  then you pick out the right entry, enter and it goes.  11:43:43
9       (Discussion off the record.)             11:44:08
10       MR. SIDDIQUI:  We can go ahead and stop    11:44:08
11    now since we're running out of tape.        11:44:10
12       THE VIDEOGRAPHER:  The time is 11:52      11:44:13
13    a.m., Thursday, July 28th, 2005.  This is    11:44:15
14    the end of tape number 1 of the videotaped    11:44:19
15    deposition of Mr. Raoul LeConte.            11:44:23
16       We're off the record.                    11:44:26
17       (Time noted:  11:55 p.m.)                11:44:30

Page 85

1       A F T E R N O O N   S E S S I O N
2       (Time noted:  1:09 p.m.)
3    R A O U L   L E C O N T E,  resumed
4       and testified as follows:
5  EXAMINATION BY (Cont'd.)
6  MR. SIDDIQUI:                                  13:09:27
7       THE VIDEOGRAPHER:  The time is 1:09 p.m.,  13:09:41
8    Thursday, July 28th, 2005.  This is tape     13:09:49
9    number 2 of the videotaped deposition of     13:09:52
10    Mr. Raoul LeConte.  We're back on the       13:09:53
11    record.                                    13:09:56
12    Q.  Mr. LeConte, let's pick up where we left    13:09:57
13  off on --                                     13:10:01
14       THE VIDEOGRAPHER:  I'm sorry, counsel, you  13:10:03
15    have to put on the microphone.              13:10:05
16       MR. SIDDIQUI:  Oh, sorry.                13:10:08
17    Q.  Let's pick up where we left off on the    13:10:10
18  patent, Exhibit 4.                             13:10:13
19    A.  Okay.                                   13:10:16
20    Q.  In column 15, around line 60, we were talking  13:10:16
21  about the phrase "concurrently displaying a predefined  13:10:24
22  tool associated with said one of said fields."    13:10:27
23    A.  Um-hum.  15.  Okay.                     13:10:32
24    Q.  And --                                  13:10:46
25    A.  Line 60.                               13:10:48

22  (Pages 82 to 85)

Page 86

1   Q.  Around line 60 in column 15.          13:10:49
2   A.  Yeah.                                 13:10:52
3   Q.  "Concurrently displaying a predefined tool   13:10:53
4  associated with said one of said fields."        13:10:57
5       And so I think we had talked about most of  13:11:00
6  the rest of that phrase and we were talking about 13:11:03
7  concurrently?                               13:11:05
8   A.  Okay.  The word, concurrently.        13:11:07
9   Q.  Right.  And how the tool was concurrently   13:11:08
10 displayed.                                  13:11:12
11      Since you were working on the tools, how  13:11:16
12 were the tools displayed in relation to the form, was  13:11:20
13 there a standard way or were there different ways that  13:11:23
14 the tool would be displayed?                13:11:27
15  A.  There were different ways, but the tool would  13:11:29
16 basically come up on the screen while the original  13:11:33
17 form was still there.                       13:11:37
18  Q.  And what would make the tool come up?   13:11:39
19  A.  The fact that you had hit the field to be  13:11:41
20 filled out.                                 13:11:49
21  Q.  So --
22  A.  You hit the field to be filled out.    13:11:49
23  Q.  So in the touch screen application, when you  13:11:53
24 touch the field, for example, the model field that's  13:11:59
25 described or illustrated in the patent, then the model  13:12:04

Page 87

1  tool would pop up, is that right?          13:12:09
2   A.  Yes, if you had, if that's the way you  13:12:11
3  designed it, yes.                          13:12:14
4   Q.  Okay.  What other ways could you design it  13:12:14
5  though?                                    13:12:16
6   A.  Like I say, there are many different   13:12:16
7  application, many different forms you design to be  13:12:18
8  filled out.                                13:12:21
9   Q.  So when you're saying if that's the way you  13:12:22
10 designed it, you're talking about the type of tool  13:12:25
11 that would come up.                         13:12:28
12      MR. HAYES:  Objection, that           13:12:29
13      mischaracterizes his testimony.        13:12:30
14  A.  Yeah, remember we said you design your own  13:12:33
15 forms and you define your own tools.  You define your  13:12:35
16 own fields and you associate the fields with the tools  13:12:39
17 to be filled out.                           13:12:42
18  Q.  Okay.  So I'm trying to understand the full  13:12:46
19 operation of -- I sit down, I want to fill out this  13:12:52
20 field, or this form, sorry, and I select a field.  13:12:57
21  A.  Right.                                13:13:00
22  Q.  And then the tool that is associated with  13:13:02
23 that field pops up?                         13:13:06
24  A.  Um-hum.                               13:13:09
25  Q.  Is that right?                        13:13:12

Page 88

1   A.  Yeah.                                 13:13:12
2   Q.  And then I use the tool, I select whatever  13:13:12
3  thing I wanted, and the tool puts the information back  13:13:15
4  in the field?                              13:13:18
5   A.  Once you select the right menu -- the tools  13:13:21
6  could provide you with a menu of items to choose from.  13:13:26
7  Once you select that button from the items, right, the  13:13:30
8  tool would go away and then you have the forms  13:13:36
9  available back to you -- available to you, to you the  13:13:43
10 user, and then you would navigate through the form.  13:13:45
11  Q.  And then what would happen?  That's one  13:13:49
12 field, now what?                            13:13:52
13      MR. HAYES:  Objection, vague, ambiguous.  13:13:54
14  Q.  I want to continue filling out the forms,  13:13:55
15 so what happens?                            13:13:58
16  A.  You go on hitting the field that you want to  13:13:59
17 fill out.                                   13:14:02
18  Q.  The next one, the next field?          13:14:03
19  A.  The next one, the next field, however you  13:14:04
20 define it.                                  13:14:07
21  Q.  Could the next field be selected       13:14:08
22 automatically?                              13:14:10
23      MR. HAYES:  Objection, vague, ambiguous.  13:14:12
24  A.  Oh, I guess, yes, if you are asking me,  13:14:15
25 because you could design your forms to work, you know,  13:14:18

Page 89

1  however you wanted your forms to work.     13:14:22
2   Q.  Did you provide an interface to the creator  13:14:32
3  of the forms to specify whether a field would be  13:14:34
4  filled in --                                13:14:43
5   A.  It wasn't my part of this.  I don't know who  13:14:43
6  did.                                        13:14:45
7   Q.  You don't --                          13:14:47
8   A.  One of us had to do it.  I'm not sure which  13:14:48
9  one of us did it.                           13:14:51
10  Q.  So that would be either Benjamin Day or Alex  13:14:53
11 Gillon?                                     13:14:57
12  A.  Yeah, I would say.                     13:14:57
13  Q.  Were you responsible for any other part of  13:15:00
14 the project other than tools?               13:15:02
15  A.  I did many little things in the projects, in  13:15:04
16 that project, but I don't remember specifically which  13:15:08
17 one.  I could use, I could code the function to do  13:15:12
18 this and turn it over, somebody could call it and use  13:15:16
19 it.  You know.                              13:15:22
20  Q.  Was there a project lead?              13:15:23
21  A.  Project lead?  Well, we had a boss.  Alex was  13:15:27
22 the boss, so...                             13:15:30
23  Q.  Did he act as the project lead?         13:15:32
24  A.  Did he act like one?  He was good and I guess  13:15:35
25 we respected him and basically we followed, you know  13:15:40

23 (Pages 86 to 89)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 402

Page 90

1  -- yeah, Alex is Alex, yes.                    13:15:43
2      Q.  Who decided which person would take which    13:15:52
3  part of the project?                          13:15:55
4      A.  I don't know who would do that. People who  13:15:58
5  felt confident to do it, they'd drop in and did it.  13:16:02
6  That was, from what I remember, that was acceptable.  13:16:07
7  If somebody already picked it up, you continue, you  13:16:11
8  know.                                        13:16:19
9      Q.  Did you used to have regular meetings?    13:16:19
10     A.  Regular meetings? Not -- we had meetings.  13:16:22
11 Can't recall like if they were weekly or every two  13:16:25
12 weeks, every other day, it's so long, you know. But  13:16:30
13 we did meet, yes.                            13:16:34
14     Q.  So, let me make sure I understand correctly.  13:16:39
15 You were primarily responsible for the tools, but  13:16:46
16 other tasks that cropped up that needed to be done,  13:16:50
17 you did those as well, but there wasn't another whole  13:16:53
18 area of the project that you were responsible for.  13:16:57
19     MR. HAYES:  Objection, mischaracterizes  13:16:59
20     his prior answer.                        13:17:05
21     A.  Yeah, I mean just like I explained before,  13:17:05
22 I had the main responsibility, anything to do with  13:17:06
23 tools, it was me. But yet I might have written other  13:17:10
24 function or shell coding with somebody else, you know.  13:17:13
25     Q.  So what was Benjamin Day's main           13:17:18

Page 91

1  responsibility?                              13:17:22
2      A.  I don't remember exactly which one Ben has or  13:17:22
3  Alex had, to be honest with you, because there was so  13:17:26
4  much involved, you know, I don't remember which one.  13:17:30
5      Q.  Who was most involved in the coding?     13:17:35
6      A.  Most involved? Most involved? I don't know  13:17:39
7  how -- I don't know if we could measure who was most  13:17:42
8  involved really, okay? But I know three of us were  13:17:46
9  coding, but who was most involved? Gee, it's hard to  13:17:55
10 say who was most involved there.              13:18:03
11     Q.  I'm trying to get an idea of who was the  13:18:05
12 technical lead for the project?                13:18:08
13     A.  Technical lead.                        13:18:10
14     Q.  That would sort of know most about the    13:18:11
15 technology?                                  13:18:13
16     A.  Most likely Alex. He was the DH.          13:18:14
17     Q.  What is DH?                            13:18:27
18     A.  Department head.                       13:18:28
19     Q.  Do you remember generally what the management  13:18:34
20 structure was like over there, how far up was  13:18:35
21 department head?                             13:18:38
22     A.  Alex was two levels above me -- there were a  13:18:43
23 ton of other levels, you know.                13:18:51
24     Q.  Okay. Let's jump back into the patent.    13:18:55
25     A.  Okay.

Page 92

1      Q.  On column 16 at the top --              13:19:06
2      A.  Yes.                                  13:19:08
3      Q.  -- talking about claim 2, around line 7 or  13:19:08
4  so. Claim 2 is short, I'll read the whole thing. It  13:19:14
5  says, "The arrangement set forth in claim 1 wherein  13:19:19
6  said group of predefined tools further includes a tool  13:19:24
7  which displays transitory information, said transitory  13:19:28
8  information being changed periodically." So this is  13:19:33
9  talking about a tool which displays transitory  13:19:37
10 information, by it's own terms.                13:19:41
11          What is that, what kind of tool displays  13:19:44
12 transitory --                               13:19:45
13     MR. HAYES:  Objection, calls for           13:19:45
14     speculation, a legal conclusion and an      13:19:47
15     expert opinion.                           13:19:49
16     A.  I really don't recall what that, what we  13:19:51
17 meant by that.                               13:19:53
18     Q.  Does it mean anything to you?           13:19:54
19     A.  I really can't recall this, believe me, this  13:19:58
20 is so long ago.                              13:20:01
21     Q.  Okay. So let's broaden it more than just  13:20:23
22 transitory information. Let's look at the, from that  13:20:26
23 phrase to the end of the sentence. It says          13:20:26
24 "transitory information, said transitory information  13:20:27
25 being changed periodically."                  13:20:30

Page 93

1      A.  I don't know, I suspect this probably means  13:20:33
2  some status information, where you are. I don't know.  13:20:36
3      Q.  Okay. What do you mean by status          13:20:42
4  information?                                 13:20:43
5      MR. HAYES:  Again, objection. It's          13:20:43
6     calling for speculation, and to the extent   13:20:44
7     it's calling for an expert's opinion.        13:20:48
8      Q.  When you said status information, what did  13:20:53
9  you mean?                                    13:20:56
10     A.  You know, what I'm suspecting here is      13:20:56
11 probably tells you how much you've accomplished, how  13:20:59
12 much there is to be done and provide you with some  13:21:03
13 thing that says you're not done yet, or this is what  13:21:08
14 remains to be done --                        13:21:13
15     Q.  With the form, you're saying?           13:21:14
16     A.  Yeah, with the form, something like that.  13:21:17
17     Q.  Okay.                                 13:21:18
18     A.  And that's how I say this -- I can't say for  13:21:19
19 sure that's how it is -- that's how I interpret this  13:21:28
20 thing, but I can't say for sure that's what it is.  13:21:32
21     Q.  Let's move down to claim 4.             13:21:42
22     A.  Um-hum.                               13:21:45
23     Q.  It says, "The arrangement set forth in claim  13:21:45
24 1 wherein said tool adapted to allow said user to  13:21:49
25 compose said information includes at least a number  13:21:53

24 (Pages 90 to 93)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 403

Page 94

```
1    pad, a keyboard, and a calculator."          13:21:56
2         So this is talking about different types      13:22:00
3    of tools, number pad, keyboard and calculator.      13:22:03
4         Did you develop tools that were, did you    13:22:09
5    develop a number pad tool?                 13:22:13
6    A.  Yes.                        13:22:15
7    Q.  How about a keyboard tool?             13:22:15
8    A.  Yes.                        13:22:17
9    Q.  And a calculator tool?              13:22:18
10   A.  Yes, I remember those three.            13:22:20
11   Q.  Okay.  Do you remember what application those 13:22:22
12   were created for?                    13:22:26
13   A.  Not necessarily one application.  It was just 13:22:29
14   basic tools you should have, from what I remember, the 13:22:33
15   front tools that were always there.            13:22:39
16   Q.  Was the calculator tool -- what sort of     13:22:42
17   functions did it have?                 13:22:45
18   A.  To do calculations, arithmetics, four times 13:22:48
19   two, division, percentage, you know, things like that. 13:22:52
20   Q.  Have you used the calculator tool in Windows? 13:23:02
21   A.  Yes.                        13:23:05
22   Q.  And that tool let's you input information?    13:23:09
23   A.  Yeah -- I tell you, the way I look at this, I 13:23:13
24   say, oh, my God, look at this, I was there.      13:23:21
25   Q.  Oh yeah?
```

Page 95

```
1    A.  Yeah.
2    Q.  Did you ever use a calculator tool before    13:23:26
3    your calculator tool?                 13:23:28
4    A.  Calculator?  I don't -- no.            13:23:30
5    Q.  You had never seen one before you developed  13:23:31
6    yours?                        13:23:34
7    A.  Not on a PC.  This was MS DOS days, no     13:23:34
8    graphical information -- I'm saying, this was MS DOS  13:23:42
9    days -- there's no graphics.             13:23:43
10   Q.  So if I had a calculator in Microsoft Word    13:23:58
11   today, and I called it up and I used it to input 13:24:03
12   information, and yet there's no way that I could enter 13:24:04
13   that information into a, any kind of a document or a  13:24:10
14   form, right?                     13:24:14
15        MR. HAYES:  Objection, calls for       13:24:15
16        speculation.                13:24:19
17   A.  I don't know that.  I mean, you bring it    13:24:19
18   up.  I'm not sure -- you know, I use Microsoft Word  13:24:24
19   with calculator, but I don't know how -- and I never 13:24:27
20   used it in a form or anything.  It depends.  I mean,  13:24:31
21   you could do it that way if you wanted to.      13:24:35
22   Q.  But if I wanted to transfer information from  13:24:38
23   the calculator to, say, a form in Microsoft Word, I 13:24:41
24   would have to highlight the number and copy and paste 13:24:47
25   it into word?                     13:24:52
```

Page 96

```
1    A.  Not necessarily.                13:24:54
2         MR. HAYES:  Objection, calls for       13:24:55
3         speculation.               13:24:58
4    A.  From my experience?                13:24:58
5    Q.  Yes, from your experience.            13:24:59
6    A.  I would say not necessarily.           13:25:04
7    Q.  I'm not talking about your system right now.  13:25:04
8    I'm talking about in Windows.              13:25:06
9    A.  Okay, I don't know Word.  I don't know how  13:25:08
10   you would use it in Word to do these things.     13:25:10
11   Q.  Well, let me ask you --
12   A.  I know the tool is available -- I know the   13:25:19
13   tool is available, I know the calculator is always  13:25:19
14   there, so...                   13:25:19
15   Q.  So say you had a calculator pulled up in     13:25:21
16   Microsoft Word and you used it to, sorry, not     13:25:24
17   Microsoft Word, Microsoft Windows.          13:25:28
18   A.  Yeah.
19   Q.  And you used it to perform some calculations. 13:25:30
20   And you wanted to transfer the result of those    13:25:33
21   calculations into another program.          13:25:36
22        How would you do that?            13:25:38
23        MR. HAYES:  Objection, calls for       13:25:40
24        speculation.                13:25:44
25   A.  Yeah, I mean, I would probably cut and      13:25:44
```

Page 97

```
1    paste.  Depends, depends on what I'm using.  This is 13:25:50
2    my personal use, I'm --                13:25:54
3    Q.  That's all I'm asking.             13:25:59
4    A.  Yeah.
5    Q.  So you would cut and paste it from the      13:25:59
6    calculator?
7    A.  I would cut and paste.  I mean, it depends.  13:26:03
8    Q.  If you were cutting and pasting that into a  13:26:06
9    form, do you think that is covered by your system, do 13:26:11
10   you think your claim, your invention covers that?  13:26:16
11        MR. HAYES:  Objection, that's ambiguous,  13:26:20
12        vague.  It's an incomplete hypothetical.  13:26:21
13   A.  Yeah, like I say, when I use those tools,   13:26:25
14   I mean whenever I use those things, I'm thinking of  13:26:29
15   the work I did way back and see, frankly, the    13:26:33
16   similarities.  And I'm seeing how I did them or how I 13:26:38
17   came up with those things.             13:26:42
18        I mean, it's true, those things they have  13:26:44
19   now are a lot more sophisticated.  They are in color, 13:26:46
20   for one thing.  You know, you can do anything and over 13:26:51
21   the years things have evolved.  I mean, this is just  13:26:56
22   my model of thinking.                13:27:00
23   Q.  So I'm just asking you as your opinion, not a 13:27:02
24   legal conclusion.                  13:27:07
25        As an inventor of this patent, if, do you  13:27:07
```

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 404**

Page 98

1  consider that functionality of cut and pasting from a   13:27:14
2  calculator to fill a form, do you consider that   13:27:17
3  functionality to be covered by your patent?   13:27:20
4      A.  I'm not --   13:27:22
5          MR. HAYES:  Objection.  Calls for   13:27:23
6      speculation.  It's an ambiguous question.   13:27:26
7      A.  Yeah, I'm not saying that I -- I wouldn't   13:27:28
8  know.  I would see a lawyer for those to decide.  I   13:27:31
9  wouldn't know.   13:27:35
10     Q.  So I'm not asking for a legal conclusion.   13:27:35
11 I'm just saying like you said, sometimes I think, hey,   13:27:38
12 I think I worked on that.  I developed that first.   13:27:42
13         So I'm asking a similar sort of, just your   13:27:44
14 reaction, as you sit here today, whether you think   13:27:48
15 that is something that you developed or that is   13:27:51
16 covered by your patent or not?   13:27:55
17         MR. HAYES:  Calls for speculation --   13:27:59
18     objection, it calls for speculation.   13:28:01
19     A.  Yeah, I mean so many things here.  You   13:28:02
20 know, you bring up a calculator, is that the one we're   13:28:05
21 saying is covered by that patent?   13:28:11
22     Q.  I'm talking about the calculator, you have   13:28:12
23 the calculation, and then you cut and paste it into --   13:28:14
24     A.  Right.  You cut and paste it into a field.   13:28:14
25     Q.  Into a form.

Page 99

1      A.  Into a form.
2      Q.  Into a field.
3      A.  So you save that information.   13:28:20
4      Q.  Right.
5      A.  And later on, you bring up a form and paste   13:28:22
6  it in there.   13:28:25
7      Q.  Right.   13:28:26
8      A.  It's hard to say.  But I see, like I say, do   13:28:26
9  I see the interaction?  Maybe things aren't done the   13:28:30
10 exact same way, okay, but there is a lot, to me, there   13:28:32
11 is a lot of similarities there, you know -- the idea   13:28:36
12 of bringing up this thing and pop up a tool -- you   13:28:40
13 know, and then do the right thing, carry out, and then   13:28:45
14 to do your task, you know.   13:28:51
15     Q.  So the difference seems to be, between my   13:28:53
16 hypothetical and the system that you described, is   13:29:01
17 that in my hypothetical, you have to cut and paste   13:29:04
18 from the calculator into the form?   13:29:08
19         MR. HAYES:  Objection, that   13:29:10
20     mischaracterizes the witness' prior   13:29:11
21     testimony.   13:29:14
22         MR. SIDDIQUI:  I'm not done yet.   13:29:14
23     Q.  So that's my hypothetical, you have to cut   13:29:16
24 and paste from the calculator into the form.   13:29:20
25         And in your system, you would use the   13:29:22

Page 100

1  calculator and then hit enter it would go into the   13:29:29
2  form, right?   13:29:32
3      A.  Correct, yes.   13:29:32
4      Q.  So what do you think of that difference, of   13:29:32
5  entering information into the form, either going in   13:29:34
6  straight or cutting and pasting, do you think that's a   13:29:37
7  significant difference?   13:29:41
8          MR. HAYES:  Objection, calls for   13:29:43
9      speculation, incomplete hypothetical.   13:29:44
10     It's an ambiguous question.   13:29:47
11     A.  Yeah, I mean, there are many ways you   13:29:48
12 would do that.  I mean, we didn't have a mouse.  When   13:29:51
13 we develop this, you have no mouse.  There was nothing   13:29:52
14 to highlight information and cut and paste it, but we   13:29:56
15 could have done it through programming -- save that   13:30:04
16 information and then later on pop it into another   13:30:07
17 field.  So there are many ways we could have done the   13:30:11
18 same thing.   13:30:15
19     Q.  So I'm trying to understand your answer   13:30:17
20 properly.  I'm asking about the difference between the   13:30:20
21 way of entering the information in and you're saying   13:30:27
22 that it's not a significant difference between having   13:30:29
23 it go straight from the calculator and having to cut   13:30:36
24 and paste it in because there are many ways that you   13:30:41
25 could transfer data to the form?   13:30:43

Page 101

1      A.  Yeah, back then, if I were to do it, yes, we   13:30:46
2  could have done it, if you asked me technically.   13:30:49
3      Q.  What stopped you from doing it that way?   13:30:54
4      A.  Maybe we had done it.  Maybe we had done it   13:30:58
5  in all the stuff we did.  But I don't know if it's a   13:31:03
6  detail, there are so many details into this.  I don't   13:31:07
7  know if we explicitly described every little ways of   13:31:11
8  using this.  Like I say, we saw many big ways of using   13:31:15
9  it.   13:31:19
10     Q.  But you're saying if you wanted to cut and   13:31:20
11 paste, you could have, but you just doesn't do it that   13:31:23
12 way.   13:31:27
13         MR. HAYES:  Objection, mischaracterizes   13:31:27
14     his prior testimony.   13:31:28
15     A.  Yeah, I didn't say cut and paste.  You   13:31:29
16 said cut and paste.  Cut and paste means you save that   13:31:32
17 information, and then later on, you apply it somewhere   13:31:34
18 else.  Yes, we had the means to do that.   13:31:37
19     Q.  Okay.  Let's move to the next claim, claim 5?   13:31:42
20     A.  Okay.   13:32:04
21     Q.  It says, "The arrangement set forth in claim   13:32:04
22 1 further comprising means for obtaining from a host   13:32:05
23 computer the information that is to be inserted in one   13:32:08
24 or more said fields -- of said fields."   13:32:11
25         What does that mean?   13:32:17

26  (Pages 98 to 101)

Page 102

```
1        MR. HAYES:  Objection, calls for      13:32:18
2    speculation, a legal conclusion, and an    13:32:19
3    expert opinion on the meaning of that      13:32:21
4    claim.                                     13:32:23
5    A.  We're looking at claim 5?             13:32:28
6    Q.  Yes.  You can take your time and read it.   13:32:31
7    A.  Yeah.  What about it?                  13:32:51
8    Q.  What does it mean?                     13:32:54
9        MR. HAYES:  Objection, calls for      13:32:55
10   speculation and a legal opinion.           13:32:57
11   A.  What do you think it means -- maybe I'm   13:33:01
12   not allowed to ask you because I'm not sure.   13:33:08
13   Q.  Well, I --                            13:33:08
14       It seems to say here, you obtain it from a   13:33:08
15   host computer, and then you are, you insert it into   13:33:10
16   one or more fields.                        13:33:16
17       So you didn't really have to go through a   13:33:20
18   tool -- you don't really have to go through a tool to   13:33:22
19   get, to gather that information.  So you'd get it from   13:33:34
20   a host computer and then you apply it there to your   13:33:35
21   field.  That is my interpretation of this.   13:33:39
22   Q.  Did you have applications that did what you   13:33:49
23   just described?                            13:33:51
24   A.  You could have done it.  We probably did it   13:33:53
25   in some of the lab.                        13:33:56
```

Page 103

```
1    Q.  Do you remember having any applications that   13:33:57
2    did that?                                  13:33:59
3    A.  We probably did some in the labs.      13:34:00
4    Q.  Well, probably doesn't quite answer --   13:34:03
5    A.  That's a long time ago.  I couldn't be   13:34:06
6    specific for sure, but the, you know, the seeds were   13:34:09
7    there, the seeds were there to do it.       13:34:14
8    Q.  Okay.  But do you remember, today, do you   13:34:18
9    remember having applications that were like that?   13:34:21
10   A.  I don't remember because we had many dreams   13:34:22
11   for this, many dreams.                     13:34:26
12   Q.  What other sort of functionalities that you   13:34:41
13   had many dreams for, what other functionality did you   13:34:45
14   sort of think might be useful?              13:34:48
15   A.  Many different applications.  One thing I   13:34:51
16   remember is McDonalds's cash registers.  You know, we   13:34:56
17   would create menus, a lot of things -- using our   13:35:04
18   systems.  And then we use our systems and sell cash   13:35:10
19   registers and then somebody could, off the menus,   13:35:17
20   change menus on the fly without having to do much,   13:35:21
21   much work.                                 13:35:23
22   Q.  Who came up with that idea?            13:35:25
23   A.  I don't know who exactly, but we, that idea   13:35:27
24   did fly among us I remember.                13:35:31
25   Q.  So what happened to it?                13:35:35
```

Page 104

```
1    A.  It probably died because we couldn't get   13:35:38
2    enough funding to survive in the project, I guess.   13:35:41
3    Q.  So were individual applications of the   13:35:46
4    project supported or killed or was the whole   13:35:48
5    project --                                 13:35:54
6    A.  Individual applications?               13:35:56
7    Q.  So I'm trying to understand.  You said, for   13:35:57
8    example, here's another application, a McDonald's   13:36:00
9    application that you thought might be useful.   13:36:09
10       Did that die when the whole project died,   13:36:09
11   or did that particular idea get --          13:36:12
12       MR. HAYES:  Objection, that's a compound   13:36:15
13   question, and it's ambiguous.               13:36:18
14   A.  Yeah, I can't recall which one died first,   13:36:18
15   to be honest with you, but we had many things.   13:36:20
16   Q.  I guess I'm not asking which died first.   13:36:23
17       I'm asking:  Did the McDonald's idea not   13:36:26
18   happen as a result of the whole project being   13:36:30
19   cancelled, or did the McDonald's project cancel on its   13:36:33
20   own?                                       13:36:37
21   A.  I really don't know.                   13:36:37
22   Q.  You don't know.                        13:36:38
23   A.  I don't know.                          13:36:55
24   Q.  Can you look at claim 14?  It's on the last   13:36:55
25   page.                                      13:37:00
```

Page 105

```
1    A.  Claim 14 on the last page.             13:37:00
2    Q.  And claim 20 also.                     13:37:00
3    A.  14, column 17?                         13:37:07
4    Q.  Yes, column 17 at the top.             13:37:10
5        (Discussion off the record.)
6    A.  I'm reading it.  It looks like --       13:37:24
7    Q.  Right.  And claim 20.                  13:37:28
8    A.  The method --                          
9    Q.  Well, that's 21.                       13:37:49
10   A.  Oh, I'm sorry.                         13:37:51
11   Q.  20.                                    13:37:52
12   A.  Yeah, I don't know.  If you're asking me, it   13:37:55
13   looks like a repetition on the same thing --   13:38:00
14   Q.  So those all talk about the same kind of idea   13:38:08
15   that you were talking about with the --     13:38:10
16   A.  Yeah, obtaining things from a host computer.   13:38:13
17   Q.  Was the McDonald's application one of those   13:38:24
18   types of applications obtaining from a host computer?   13:38:27
19   A.  This, like I said, there were many things   13:38:31
20   envisioned.  Which one was what, I couldn't tell you   13:38:33
21   what McDonald's -- I know for McDonald's we   13:38:37
22   contemplated some day someone obtaining menus on the   13:38:40
23   displays and be able to change prices without going to   13:38:46
24   much -- much work, more hands-on things, you know.   13:38:54
25   Q.  But the system that would be used with the   13:39:06
```

27  (Pages 102 to 105)

Page 106

1  host computer, you said it would be inserted without a 13:39:09
2  tool, right?                          13:39:13
3       MR. HAYES: Objection, mischaracterizes   13:39:13
4  his prior testimony.              13:39:14
5  A.  No, that's not what I said.      13:39:15
6  Q.  Okay.  So how does it, how does it work?  How 13:39:18
7  does a system that takes information from a host   13:39:21
8  computer, how does that work?  How is it different  13:39:23
9  from the system that you described already?    13:39:27
10  A.  What do you mean, I mean which one?    13:39:29
11  Q.  There's a system that looks like, you said,  13:39:31
12  is described in claim 5, claim 14 and claim 20.    13:39:33
13  A.  Well, we talked about flexibility of these   13:39:39
14  things -- with the envelope, right, the many ways you 13:39:44
15  could use it.  So this was, the McDonald's thing, I  13:39:47
16  say there just one example.           13:39:51
17  Q.  Okay.  So setting the McDonald's application 13:39:52
18  aside, just generally talking about, as you talked  13:39:54
19  about what claims 5, 14 and 20 described, obtaining  13:40:00
20  from the host computer and is information that's going 13:40:04
21  to be put into those fields.          13:40:06
22       How do the tools play into, play in with  13:40:10
23  that whole, with the system that takes information  13:40:14
24  from the host computer?           13:40:16
25       MR. HAYES: Objection, that's an ambiguous 13:40:18

Page 107

1  question.                      13:40:22
2  A.  I don't know.                13:40:23
3  Q.  Are there tools in a system that you're   13:40:33
4  talking about that takes information from a host   13:40:35
5  computer?                      13:40:39
6  A.  Are there tools that take information?  I   13:40:42
7  mean the tools are there, right, but the tools perform 13:40:45
8  many things, not just -- the tools perform     13:40:53
9  validations, field validations of data as well, okay? 13:40:53
10  Q.  What does that mean?          13:40:56
11  A.  Make sure that the data, the correct data  13:40:57
12  goes into the correct field or this field, you mean  13:41:00
13  this kind of data.  This set of numbers like should be 13:41:03
14  ASCII.  It should be within this range, whether it  13:41:09
15  should be integer, You know, that kind of validation  13:41:12
16  -- I'm just saying examples.          13:41:22
17  Q.  All right.  Let's look at claim 8, it's on  13:41:33
18  the previous page there.  Column 8 says, "The    13:41:35
19  arrangement set forth in claim 1 further comprising  13:41:42
20  means for displaying a menu of labels identifying  13:41:45
21  respective ones of said group of predefined tools and 13:41:49
22  for displaying one of said predefined tools when said 13:41:54
23  user points to its label."  And I'm trying to    13:41:59
24  understand what that means.           13:42:03
25       MR. HAYES: Objection, calls for      13:42:05

Page 108

1       speculation, calls for a legal conclusion    13:42:07
2       as to the claim language of the patent.    13:42:08
3  A.  Yeah, I really can't interpret exactly    13:42:12
4  what that means.  If you don't understand, I don't  13:42:13
5  know how else to help you really.       13:42:18
6  Q.  I'm not asking for a legal conclusion, and  13:42:21
7  I'm not asking for the legal scope of these claims.  I 13:42:25
8  think we've already established that.      13:42:28
9       I'm asking you as an inventor, listed on   13:42:30
10  the patent --                   13:42:32
11  A.  Right.                    13:42:34
12  Q.  -- what this means to you today.      13:42:34
13       What does that mean if you read it?    13:42:34
14       MR. HAYES: I'm objecting.  It calls for  13:42:40
15       speculation and a legal conclusion as to    13:42:42
16       the meaning of that.           13:42:44
17  A.  I'm not going to be able to interpret    13:43:09
18  this, to be honest with you -- there are too many   13:43:14
19  things here.  You know, this involved this or -- I  13:43:18
20  honestly don't know what it means.       13:43:23
21  Q.  You're saying this doesn't make sense to you 13:43:34
22  because it's legal language, right?       13:43:37
23  A.  I can't do it.  It's written in blah, blah,  13:43:39
24  blah, you know, this is -- this is 8, right, we're  13:43:43
25  talking about?                  13:43:50

Page 109

1  Q.  That's right.               13:43:52
2  A.  8.  Oh, okay.  Yeah, okay.  What I'm going to 13:43:53
3  interpret it as is that I remember we had this    13:44:16
4  flexibility.  You design, you have many, many    13:44:19
5  different tools you could use for certain fields.  So 13:44:25
6  now which one you would use?  Say beginning with the 13:44:28
7  whole thing, you click control box, there is a bunch 13:44:32
8  of tools displayed out to you and labeled however you 13:44:39
9  want -- and then which one of them do you want to use? 13:44:45
10  Q.  How would you pull up that selection of   13:44:51
11  tools?                       13:44:54
12  A.  There is a tool box.  We had a tool box.  We 13:44:55
13  had some tool bar.               13:44:59
14  Q.  Would the person who is filling in the form  13:45:02
15  do that or the designer of the form itself?    13:45:05
16  A.  The designer would make that available to the 13:45:08
17  user filling the form.  So which tool do you want?  13:45:11
18  Here's a bunch of them.            13:45:17
19  Q.  Was there an indication to the user that   13:45:19
20  certain fields had an option to use multiple tools and 13:45:22
21  certain fields didn't?            13:45:26
22  A.  Indication to the user was built to, mostly  13:45:28
23  built into the application, like which tool you want  13:45:32
24  to do that.  But if you happen to need, to make some  13:45:36
25  calculation on your own without having hit a specific 13:45:40

28  (Pages 106 to 109)

Page 110

1  field, but you had access to a tool, you know, so let  13:45:44
2  me see what, you know, what 4 times 75.99 is,  13:45:50
3  whatever, you know, you would be able to calculate  13:45:57
4  that, as an example.  13:45:59
5  Q.  So you could do that separate from the form  13:46:01
6  itself?  13:46:03
7  A.  Yeah.  13:46:03
8  Q.  Is that what you're saying?  13:46:04
9  A.  I think so.  13:46:05
10  Q.  And if you selected a field for which there  13:46:07
11  were multiple tools available in a tool box, would  13:46:11
12  this menu of tools pop up and then you would select  13:46:17
13  one of the tools?  13:46:21
14  A.  Probably predefined --  13:46:23
15  Q.  Predefined?  13:46:23
16  A.  You know, like a field I define tool A,  13:46:28
17  tool C, tool B, whatever, to display for that user to  13:46:31
18  use that field.  13:46:36
19  Q.  Okay.  And is that what claim 17 and 22 are  13:46:38
20  also talking about?  13:46:41
21      MR. HAYES:  I just want to object.  That  13:46:42
22      calls for speculation and a legal  13:46:45
23      conclusion as to the meaning of the  13:46:46
24      claims.  13:46:48
25  A.  This is one of the things you could do, to  13:46:52

Page 111

1  me.  13:46:54
2  Q.  I'm just trying to understand.  I mean, you  13:46:55
3  made those comments in connection with claim 8.  The  13:46:59
4  language in claim 17 and 22 are similar.  13:47:01
5  A.  Yeah.  13:47:06
6  Q.  So that's why I was, just wanted to see  13:47:06
7  whether those comments would also.  13:47:08
8  A.  Yeah, I can't tell which one is which, to be  13:47:10
9  honest with you.  I mean, I get confused myself  13:47:13
10  reading them.  13:47:16
11  Q.  Okay.  Well, what contribution did you have  13:47:17
12  in drafting the patent application in applying for the  13:47:22
13  patent?  13:47:25
14      MR. HAYES:  Objection.  It's been asked  13:47:25
15      and answered.  13:47:29
16  A.  Yeah, I didn't write this myself, right,  13:47:33
17  just like I answered.  Someone from the law department  13:47:39
18  did it, so I don't know --  13:47:42
19  Q.  How did they know what to write?  13:47:43
20      MR. HAYES:  I'm going to object here and  13:47:45
21      caution you not to answer to the extent it  13:47:47
22      calls for privileged information.  Any  13:47:50
23      communications you might have had with  13:47:52
24      people in the law department.  13:47:55
25      THE WITNESS:  Right, okay.  13:47:57

Page 112

1      MR. HAYES:  So to the extent that  13:48:00
2      you're going to talk about any of that  13:48:01
3      communication, do not answer.  13:48:03
4      THE WITNESS:  I don't even know what  13:48:05
5      method we had to communicate.  I don't  13:48:06
6      even remember.  13:48:09
7  Q.  Did you talk to anybody in the legal  13:48:10
8  department?  13:48:12
9  A.  Gee, this is --  13:48:13
10      MR. HAYES:  Again, objection --  13:48:13
11  Q.  It's just a simple question:  Did you  13:48:15
12  talk?  I'm not asking what you said.  13:48:18
13      MR. HAYES:  Objection.  To the extent it  13:48:19
14      calls for any of the substance, do not  13:48:20
15      answer.  You can answer yes or no whether  13:48:23
16      or not you talked to somebody in the legal  13:48:25
17      department.  13:48:27
18  A.  Um-hum.  I probably did talk to someone in  13:48:27
19  legal.  13:48:31
20  Q.  Did you talk to them before or after the  13:48:33
21  patent application was filed, or both?  13:48:39
22  A.  Can't remember which one, probably before.  13:48:42
23  Q.  Did you talk to anyone outside the legal  13:48:51
24  department about filing the patent application?  13:48:53
25  A.  I don't think so, no.  13:48:55

Page 113

1  Q.  You must have discussed it with Benjamin Day  13:49:00
2  and Alex Gillon though.  13:49:03
3  A.  Well, the three of us are there, so I guess  13:49:05
4  we must have.  I don't know.  13:49:08
5  Q.  Anybody else?  13:49:10
6  A.  Maybe not.  I don't know, maybe somebody  13:49:11
7  finds out -- I got this tool that, you know, but I  13:49:15
8  can't remember for sure.  13:49:19
9  Q.  Did you see the patent application before it  13:49:21
10  was filed?  13:49:24
11  A.  Don't think so.  13:49:25
12  Q.  Did you create any of the figures that are in  13:49:33
13  this patent application?  13:49:35
14  A.  I don't remember if I did or not.  13:49:37
15  Q.  Do you know who created the figures in the  13:49:43
16  patent application?  13:49:45
17  A.  I have no idea.  Probably -- I really don't  13:49:46
18  know who created the figures per se.  13:49:48
19  Q.  Okay.  So after the patent application was  13:49:51
20  filed, did you get copies of any correspondence with  13:49:55
21  the Patent Office?  13:49:58
22  A.  Oh, to be honest with you, I really don't  13:50:03
23  remember if they called me and said, well, we have  13:50:05
24  filed the patent.  This is where things are.  I really  13:50:08
25  don't remember, you know, because this was so long  13:50:11

29 (Pages 110 to 113)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 408

Page 114

```
1   ago.                          13:50:14
2   Q.  So I guess you --
3   A.  All I know was the patent was filed.      13:50:15
4   Q.  So you know the patent was filed, and you   13:50:20
5   know when you got the patent, because they gave you  13:50:22
6   that certificate, right?          13:50:26
7   A.  Yes.                       13:50:27
8   Q.  And in between, were you aware of any of the  13:50:27
9   communications with the Patent Office?    13:50:31
10  A.  No.                        13:50:33
11      MR. HAYES:  Objection.  That's been asked  13:50:34
12      and answered.             13:50:36
13  Q.  And your answer was no, is that right?   13:50:36
14  A.  I really don't know.          13:50:38
15  Q.  You don't -- were you -- I guess, you don't  13:50:40
16  know whether you were aware of the communications with  13:50:49
17  the Patent Office?              13:50:51
18      MR. HAYES:  Objection, that's a vague and  13:50:55
19      ambiguous question.         13:50:55
20  A.  Yeah, I honestly don't know because I     13:50:56
21  wasn't involved in the patent application myself, so I  13:51:02
22  don't know what was done in the Patent Office,   13:51:02
23  whatever.                     13:51:06
24  Q.  But I just want to be clear         13:51:17
25  that -- I'm trying to, you know, we spent a lot of  13:51:19
```

Page 115

```
1   time on the patent, and you don't, you're not able to  13:51:24
2   tell me a whole lot about the meaning of the claims.  13:51:32
3       Did you write these claims?       13:51:37
4   A.  No.                        13:51:37
5   Q.  These are -- who wrote them, do you know?  13:51:38
6   A.  Whoever filed the patent.        13:51:43
7   Q.  Whoever filed the patent from within your  13:51:50
8   group, you, Day and Gillon?          13:51:53
9       MR. HAYES:  Objection.  This is calling  13:51:55
10      for speculation.            13:51:56
11  A.  We're technical people.  We don't write   13:52:02
12  patents.  We don't write patent applications.   13:52:04
13  Q.  So it's just somebody -- the lawyer who filed  13:52:07
14  the patent is the one who wrote this?    13:52:11
15      MR. HAYES:  Objection.  That       13:52:13
16      mischaracterizes his prior testimony.  13:52:14
17  A.  So I don't know who.           13:52:17
18  Q.  So you don't know who wrote this, but you   13:52:41
19  know it wasn't you.               13:52:43
20      MR. HAYES:  Objection.  That's been asked  13:52:45
21      and answered, and it mischaracterizes his  13:52:46
22      prior answer.             13:52:49
23  A.  Yeah --                    13:52:50
24  Q.  Okay.  And do you know if that was Day?   13:52:53
25      MR. HAYES:  Again, objection.  It's been  13:52:57
```

Page 116

```
1       asked and answered, and it's calling for   13:52:57
2       speculation.              13:52:59
3   A.  Yeah, I really can't tell who did but I   13:52:59
4   know technical folks didn't write patent applications.  13:53:02
5   Q.  Okay.  So I'm just trying to get clear    13:53:06
6   answers.                      13:53:08
7   A.  Okay.
8   Q.  You know it wasn't you.          13:53:10
9   A.  Right.
10  Q.  It's not going to call for speculation.   13:53:12
11      I'm asking you whether you know whether,  13:53:14
12  if Day wrote it?                  13:53:17
13      MR. HAYES:  I'm going to object.  You   13:53:18
14      clearly asked and that's clearly been   13:53:22
15      answered.                 13:53:25
16  A.  I don't know.               13:53:25
17  Q.  Okay.  And did Gillon write it?       13:53:26
18  A.  I don't know.               13:53:28
19  Q.  Are you aware that there were foreign patent  13:53:38
20  applications related to this patent application?  13:53:40
21  A.  Somebody called me and said, yeah, there were  13:53:43
22  foreign applications.  I don't remember which country.  13:53:47
23  Q.  Somebody called you while you were at AT&T?  13:53:51
24  A.  Probably, yes.  I don't remember.      13:53:55
25  Q.  Were you involved in those applications, the  13:54:00
```

Page 117

```
1   prosecution of those applications at all?   13:54:02
2   A.  Probably the same thing -- yeah, I'm not sure  13:54:06
3   what -- I'm not even sure what it was.      13:54:08
4       MR. SIDDIQUI:  Would you mark these for us  13:54:32
5       as Exhibit 6?             13:54:34
6       (LeConte Exhibit 6, document bearing
7       Bates Nos. MSLT 0000638 through 0000641,
8       marked for identification, as of this
9       date.)                    13:55:05
10      MR. SIDDIQUI:  Mark this Exhibit 7.     13:55:05
11      (LeConte Exhibit 7, document bearing
12      Bates Nos. MSLT 0000588 through 0000591,
13      marked for identification, as of this
14      date.)                    13:55:36
15      (Discussion off the record.)       13:55:37
16  Q.  You've been handed what have been labeled   13:55:43
17  LeConte Exhibits 6 and 7.  Exhibit 6 is Bates numbered  13:55:54
18  MSLT 638 through MSLT 641.  And 7, Exhibit 7 is Bates  13:56:01
19  labeled MSLT 588 through MSLT 591.  Let's talk about 6  13:56:10
20  first.                        13:56:20
21      Do you recognize this document at all?   13:56:20
22  A.  No.                        13:56:22
23  Q.  At the top of this document it says it's an  13:56:29
24  information disclosure statement.         13:56:32
25      Do you remember searching for any patents  13:56:36
```

30  (Pages 114 to 117)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 409

Page 118

1  or publications in relation to this filing of the    13:56:39
2  patent application?                    13:56:43
3    A.  No.                        13:56:44
4    Q.  If you look to the last page of Exhibit 6,    13:56:56
5  it's signed by Frederick B. Luludis.        13:57:01
6      Do you know who that is?        13:57:07
7    A.  I kind of remember the name. He was the    13:57:09
8  attorney, the patent.                13:57:12
9    Q.  Did you meet with him?            13:57:17
10   A.  Can't recall meeting him, or speaking on the   13:57:23
11 phone with him, I can't recall that.        13:57:24
12   Q.  Do you know whether he was the attorney who   13:57:31
13 was responsible for filing this patent application?    13:57:33
14   A.  Well, if he was the attorney, there were many   13:57:36
15 attorneys in the company in charge of patent        13:57:38
16 applications. I don't know if he was the one. You    13:57:41
17 know what I mean?                13:57:44
18   Q.  For this one, though.            13:57:45
19   A.  If his name is there, I guess that's him, I    13:57:47
20 don't know.                    13:57:50
21   Q.  Do you remember corresponding or interacting   13:57:51
22 with any particular attorneys?            13:57:54
23   A.  No.                    13:57:55
24   Q.  And you just sort of barely remember his    13:57:57
25 name, you're not sure.                13:58:00

Page 119

1    A.  I remember the name because his name was    13:58:01
2  everywhere all the time.                13:58:04
3    Q.  Everywhere in internal correspondence, you're    13:58:08
4  saying, within AT&T, is that what you're talking    13:58:10
5  about?                        13:58:13
6    A.  Yeah, within the, within our environment, the    13:58:14
7  R&D environment, and the labs.            13:58:23
8    Q.  And was that because you had a lot of people    13:58:23
9  around were filing patent applications and they had to    13:58:23
10 deal with Mr. Luludis, is that --            13:58:25
11   A.  I don't -- there were many lawyers in there.    13:58:28
12 There were technical folks working in -- you know, I    13:58:31
13 remember the name Luludis, especially when this, my    13:58:35
14 patent came along. But that's the extent of it. This    13:58:39
15 is November of 1987, wow.                13:58:52
16   Q.  Can you look on the first page again of this    13:58:59
17 Exhibit 6 and look down at the bottom. It looks like    13:59:03
18 there are some articles listed.                13:59:09
19      Do any of these articles look familiar to    13:59:13
20 you?                        13:59:15
21   A.  No.                    13:59:16
22   Q.  There are some patents listed at the top half    13:59:18
23 of that page.                    13:59:21
24      There's no titles of the patents, but by    13:59:23
25 the names of the inventors, do any of those names or    13:59:26

Page 120

1  patents sound familiar?                13:59:32
2    A.  They don't ring a Bell.            13:59:34
3    Q.  How about on the bottom of the second page,    13:59:36
4  there are some other articles?            13:59:39
5    A.  No.                    13:59:44
6    Q.  And on the third page, there are, it looks    13:59:52
7  like two patents.                    13:59:55
8    A.  No.                    14:00:02
9    Q.  No? All right. Let's go to Exhibit 7.        14:00:02
10      Did you ever give your attorney any prior    14:00:27
11 art or articles or patents or anything to disclose to    14:00:30
12 the Patent Office?                    14:00:33
13   A.  No.                    14:00:34
14   Q.  Did he ever ask for that?            14:00:35
15   A.  I don't think so, no.                14:00:36
16   Q.  Let's look at, in Exhibit 7, there is on the    14:00:54
17 second page, it looks like this document which is to    14:00:56
18 the United States Patent and Trademark Office, looks    14:01:02
19 like it was written by John P. McDonnell.        14:01:05
20      Do you know who that is?            14:01:11
21   A.  First time I'm seeing his name.            14:01:12
22   Q.  You've never heard that name before?        14:01:16
23   A.  Never.                    14:01:18
24   Q.  How about the page after that?            14:01:20
25   A.  These guys from Murray Hill -- I'm saying

Page 121

1  these guys from Murray Hill, different location. So I    14:01:24
2  really don't know.                    14:01:30
3    Q.  Was Luludis from where your locations were,    14:01:41
4  Middletown, and where was the other one?        14:01:44
5    A.  Don't know for a fact where he was located.    14:01:48
6    Q.  If he had asked you for prior art that's    14:02:01
7  relevant to your patent that you might want to    14:02:04
8  disclose to the Patent Office, what would you have    14:02:09
9  given him?                    14:02:12
10      MR. HAYES: Objection, calls for        14:02:13
11 speculation.                    14:02:15
12   A.  You know, I honestly don't know. This is    14:02:15
13 so long ago, you know. I honestly don't know.        14:02:18
14   Q.  Did you used to keep abreast of what was    14:02:25
15 happening in technology, sort of around --        14:02:29
16   A.  We had nothing.                14:02:32
17   Q.  Really?                    14:02:33
18   A.  I mean, this was before Google was there.    14:02:33
19 There was a library downstairs with the New York    14:02:42
20 Times --                    14:02:47
21   Q.  Did you subscribe to any journal articles or    14:02:47
22 journals in general?                14:02:51
23   A.  At the time, no.                14:02:52
24   Q.  But later on, you did?            14:02:55
25   A.  Yeah, I mean, at the time I had no time to go    14:02:57

31 (Pages 118 to 121)

Page 122

1  read about articles, whatever, you know. There --    14:03:00
2  there were very few things available, very few.    14:03:05
3     Q.  But you mentioned the library that was    14:03:12
4  downstairs.    14:03:15
5     A.  Yeah, there was a technical library, correct.  14:03:16
6     Q.  What would people use that library for?    14:03:18
7     A.  I don't know, anything.  They carry all the  14:03:20
8  books, textbooks, anything you would like,    14:03:24
9  periodicals, journals.    14:03:29
10    Q.  All right.  Going back to Exhibit 7 on, I    14:03:36
11 guess it was the third page, there's a signature from  14:03:39
12 Ronald D. Slusky?    14:03:44
13    A.  I don't know who Ronald is.    14:03:46
14    Q.  Does that name -- that name doesn't sound    14:03:49
15 familiar to you?    14:03:53
16    A.  No.    14:03:53
17    Q.  How about on the last page, there's a    14:03:56
18 signature from Ruth M. Wiggins.    14:03:59
19       Does that sound familiar to you?    14:04:02
20    A.  No.    14:04:04
21       MR. SIDDIQUI: Could you mark that 8,    14:04:30
22 please?    14:04:31
23       (LeConte Exhibit 8, document bearing
24       Bates Nos. MSLT 0000617 through 0000619,
25       marked for identification, as of this

Page 123

1       date.)    14:05:05
2     Q.  You've been handed what's been marked LeConte  14:05:06
3  Exhibit 8.  It's Bates numbered MSLT 617 to MSLT 619.  14:05:10
4       Do you recognize this document?    14:05:19
5     A.  No, I realized I signed it, but I don't    14:05:21
6  really recall this thing.    14:05:24
7     Q.  It purports to be a declaration and power of  14:05:26
8  attorney, and it appears to be signed by Benjamin Day,  14:05:29
9  Alex Gillon and you.    14:05:35
10    A.  Yes.  Yes.    14:05:37
11    Q.  Is that your signature on the last page?    14:05:38
12    A.  Yes, it is.    14:05:41
13    Q.  Do you know Benjamin Day's signature?    14:05:43
14    A.  I don't know Day's signature, no.    14:05:49
15    Q.  Do you know Alex Gillon's signature?    14:05:52
16    A.  I don't recall those signatures.    14:05:55
17    Q.  I'm just asking.
18    A.  It's been so long.    14:05:57
19    Q.  Going to the first page in the fifth    14:06:14
20 paragraph, it says, "I acknowledge the duty to    14:06:19
21 disclose information which is material to the    14:06:22
22 examination of this application in accordance with    14:06:24
23 Title 37, Code of Federal Regulations, 1.56(a)."    14:06:28
24    A.  Yeah?    14:06:38
25    Q.  So did you read this document before you    14:06:40

Page 124

1  signed it?    14:06:45
2       MR. HAYES: Objection. It's been asked    14:06:45
3       and answered.    14:06:50
4     A.  This is very, this is a long time ago.    14:06:50
5  Something came to me, I sign.  I don't really remember  14:06:54
6  this thing at all.    14:06:58
7     Q.  Do you understand your obligations though,    14:06:59
8  that when you file in the Patent Office under that    14:07:01
9  section, that you need to disclose art that's material  14:07:05
10 to your application?  Did you understand that at that  14:07:09
11 time?    14:07:13
12    A.  Oh, gosh, I don't know what frame of mind I  14:07:14
13 was in at the time.  This is, we're going back a long  14:07:19
14 time ago.    14:07:21
15    Q.  Did you ever know that?    14:07:24
16    A.  Now, you tell me.  Now I know.  I mean,    14:07:25
17 honestly speaking.  But back then -- probably I knew  14:07:29
18 back then, but I don't know, you know, this is    14:07:31
19 something I cannot say for a fact that I did, you    14:07:38
20 know?    14:07:38
21       MR. SIDDIQUI:  Would you mark that 9,    14:08:00
22 please?    14:08:02
23       (LeConte Exhibit 9, document bearing
24       Bates Nos. LUC 1123470 through 1123472,
25       marked for identification, as of this

Page 125

1       date.)    14:08:31
2     Q.  Okay.  You've been handed what's been marked  14:08:32
3  LeConte Exhibit 9.  It's Bates stamped LUC 1123470    14:08:34
4  through LUC 1123472.    14:08:44
5       Do you know what this document is?    14:08:50
6     A.  No.    14:08:53
7     Q.  It purports to be, on the first page, an    14:08:56
8  assignment and agreement.    14:08:59
9       Is that your signature on the last page,    14:09:01
10 on the third page?    14:09:08
11    A.  Yes, it is.    14:09:08
12    Q.  Do you recognize any of the other signatures  14:09:08
13 in this document, Ben Day and Alex Gillon?    14:09:11
14    A.  Well, I see Ben and Alex.  I don't remember  14:09:16
15 their signature per se -- I don't remember their    14:09:22
16 signatures.
17    Q.  Do you remember signing this document?    14:09:25
18    A.  I don't even recall this document.  But I see  14:09:27
19 my signature there.  Yes, I signed it, I guess.    14:09:31
20    Q.  Looking at it now, you can take a moment to  14:09:38
21 scan it, do you have any understanding of what it    14:09:41
22 means?    14:09:47
23    A.  What does it say?    14:09:47
24    Q.  Well, I'm asking you.    14:09:52
25    A.  Yeah, it looks like this is intellectual    14:10:12

32 (Pages 122 to 125)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 411

Page 126

1   property stuff we transferred to AT&T -- that we        14:10:16
2   transferred to AT&T.
3       Q.  Well, why did you sign this document?           14:10:46
4       A.  When?                                14:10:48
5       Q.  Why?                                 14:10:49
6           MR. HAYES:  Objection, calls for        14:10:49
7       speculation.                            14:10:51
8       A.  My take on this is, as employee, we always     14:10:52
9   signed documents saying any inventions, anything we do  14:10:59
10  belongs to the company and not to us as individuals.    14:11:00
11  I guess that's what this is.                    14:11:06
12      Q.  Did you have to sign it?                 14:11:07
13      A.  Yeah.  Every employee had to sign things like  14:11:08
14  that.                                   14:11:14
15      Q.  Did you have an agreement with AT&T that said  14:11:16
16  you had to sign it?                         14:11:19
17      A.  Did I have an agreement?  Like I say, all      14:11:21
18  intellectual properties, anything you do invent on      14:11:24
19  your computer that the company gives you, belongs to    14:11:26
20  the company.  That's the way it's been ever since I     14:11:30
21  joined the company until I left.                14:11:34
22      Q.  Right.  So did you, was that part of an       14:11:37
23  employment agreement that you had with AT&T?            14:11:41
24      A.  To me that was I, guess, that's what I        14:11:42
25  assumed, because all of us had to sign it.          14:11:44

Page 127

1       Q.  Did you expect that you would have to sign it  14:11:48
2   to AT&T and get zero dollars in return?             14:11:51
3       A.  Yeah.                                14:11:55
4       Q.  So what was your incentive to cooperate with   14:12:05
5   the patent application process?                 14:12:08
6           MR. HAYES:  Objection, calls for        14:12:10
7       speculation.  It's an ambiguous question.        14:12:12
8       A.  Yeah, it was for me to get a patent, get      14:12:14
9   something with my name on it, I don't know.         14:12:16
10      Q.  So it was sort of -- was the Bell Labs'       14:12:20
11  culture one that recognized and appreciated people who  14:12:23
12  filed patent applications?                      14:12:27
13      A.  It was encouraged.  It was always encouraged  14:12:28
14  to get patents.  We were always told this looks great   14:12:33
15  for you, good on your resume.  You know, but it        14:12:36
16  belongs to the company.  It doesn't belong to you.     14:12:42
17      Q.  Did they ever give you any guidelines about    14:12:53
18  what you should look out for in your work to know       14:12:56
19  whether it's time to file a patent application?        14:13:01
20          MR. HAYES:  Objection.  It's ambiguous.  14:13:04
21      A.  No guidelines for saying that, that I        14:13:12
22  remember.                               14:13:15
23          MR. SIDDIQUI:  Would you mark that 10,    14:13:58
24      please?                             14:14:02
25          (LeConte Exhibit 10, European Patent

Page 128

1       Specification EP 0 271 280 B1, marked for         14:14:38
2       identification, as of this date.)           14:14:38
3       Q.  Sir, you've been handed what's labeled       14:14:38
4   LeConte Exhibit 10 which is a European patent          14:14:42
5   application, or sorry, a European patent.          14:14:45
6           As you look at it and looking at the      14:14:51
7   figures especially at the end, does this look to be     14:14:53
8   the European counterpart to your U.S. Patent?         14:14:57
9       A.  I guess, yes, but I don't even remember this  14:15:04
10  copy --                                 14:15:14
11      Q.  Well, flip to the figures at the end as well,  14:15:15
12  just to make sure.  I want to make sure we're talking   14:15:18
13  about the right patent.                         14:15:25
14      A.  Yeah -- I see the same pictures.           14:15:44
15      Q.  So do you agree that this is the European     14:16:14
16  counterpart to your U.S. Patent application, patent?    14:16:17
17          MR. HAYES:  I'm going to object for a     14:16:23
18      second to the extent I think              14:16:24
19      it's -- some of it is not even in English,        14:16:24
20      so it's going to call for speculation.           14:16:27
21      A.  Do I agree?  I don't know, looks like it.     14:16:38
22      Q.  Do you see on the front page, your name      14:16:41
23  listed under the field inventors?              14:16:43
24      A.  Yes.                                14:16:49
25      Q.  Do you have any reason to doubt that this is  14:16:50

Page 129

1   the European counterpart patent to your U.S. Patent?    14:16:52
2       A.  I guess I can't doubt, it looks like it says.  14:16:57
3       Q.  So the answer is no, you don't have any       14:17:00
4   reason to think this is not the European counterpart?   14:17:03
5           MR. HAYES:  Objection, that            14:17:06
6       mischaracterizes the witness' answer.        14:17:07
7       A.  I'm sorry?                           14:17:12
8       Q.  I'm saying, do you have any reason to believe  14:17:13
9   that this is not the European patent that corresponds   14:17:15
10  to the U.S., your U.S. Patent?                  14:17:18
11      A.  I have no reason to.  This is             14:17:20
12  not -- I don't have any reason to believe this is not.  14:17:20
13      Q.  Okay.  Do you see on the front page, under    14:17:23
14  the title "References cited," there look to be two      14:17:27
15  articles, a Software Engineering Journal article and a  14:17:32
16  Telesis article?                           14:17:37
17      A.  Yeah.                               14:17:38
18      Q.  Do those look familiar to you?            14:17:43
19      A.  Yeah.                               14:17:45
20      Q.  Let's look to the flow chart that's at the    14:18:09
21  end, page 28, figures 15 and 16 in this patent.        14:18:12
22          Do you agree that the flow charts that are   14:18:42
23  described, that are depicted in the European patent     14:18:45
24  are the same as figures 15 and 16 in the U.S. Patent?  14:18:47
25      A.  Where's the U.S. Patent?                 14:18:52

33  (Pages 126 to 129)

Page 130

```
1     Q.  This one right here.              14:18:55
2     A.  What page are you referring to?         14:18:56
3     Q.  It's sheet 15 and sheet 16.         14:18:58
4     A.  15 and 16. Yeah, I mean, they look alike,  14:19:03
5  yeah.                                  14:19:06
6     Q.  Where did this, where did these flow charts  14:19:11
7  come from?                            14:19:13
8     A.  Where did they come from? I don't know who  14:19:14
9  provided them, to be honest with you.           14:19:16
10    Q.  Did you used to have flow charts as part of  14:19:19
11 your design process?                     14:19:22
12    A.  I, personally, I don't -- it's not a      14:19:23
13 requirement to have anything like flow charts,       14:19:25
14 whatever.                             14:19:30
15    Q.  So you're saying --                  14:19:31
16    A.  You know, you write your code, you write your  14:19:31
17 code.                                 14:19:35
18    Q.  Do you know if anybody else in the team had  14:19:38
19 flow charts --                         14:19:42
20        MR. HAYES: Objection, calls for --     14:19:43
21    Q.  -- in the design process?             14:19:45
22        MR. HAYES: Objection, calls for       14:19:46
23     speculation.                        14:19:47
24    A.  No, this is -- not that I know of. This    14:19:48
25 was a matter of preference.                14:19:52
```

Page 131

```
1     Q.  Did you ever see flow charts during the    14:19:58
2  design process?                        14:20:00
3     A.  During the design process, the design process  14:20:02
4  of this patent?                        14:20:04
5     Q.  Yes.                            14:20:06
6     A.  I don't recall, honestly, what we had. We   14:20:06
7  probably did have flow charts.              14:20:20
8     Q.  Would you turn to page 10 of the European  14:21:03
9  patent, please? It's Exhibit 10?            14:21:06
10    A.  Which page?                       14:21:10
11    Q.  Page 10.                         14:21:10
12    A.  Claims.                          14:21:10
13    Q.  Down towards the bottom, there's claim 1, and  14:21:11
14 around line 50, it says, "for concurrently and    14:21:15
15 automatically displaying on  said display a predefined  14:21:24
16 tool associated with said one of said fields."      14:21:28
17    Do you see that?                      14:21:32
18    A.  Yes.                            14:21:36
19    Q.  What does it mean when it says "automatically  14:21:36
20 displaying" on display of predefined tool?       14:21:42
21        MR. HAYES: I object. It calls for       14:21:43
22     speculation, and a legal conclusion and     14:21:47
23     legal opinion.                      14:21:47
24    A.  Well, I think we went through that        14:21:49
25 already. I'm seeing the same statements here.      14:21:50
```

Page 132

```
1     Q.  Here it says, "concurrently and automatically  14:21:53
2  displaying on said display."               14:21:58
3     A.  And -- what does the other one say?      14:21:59
4     Q.  The other one says concurrently.         14:22:03
5     A.  It doesn't say automatic.             14:22:04
6     Q.  Right. So I'm trying to figure out what the  14:22:06
7  -- what process of your system is automatic.       14:22:09
8     A.  I really don't -- because this is the form,  14:22:16
9  how you design the form --                 14:22:18
10    Q.  Okay.                           14:22:41
11        MR. SIDDIQUI: Could you mark that as 11,  14:22:57
12     please?
13     (LeConte Exhibit 11, letter to European
14     Patent Office dated November 23, 1992,
15     marked for identification, as of this
16     date.)                            14:23:35
17    Q.  You've been handed what's been marked LeConte  14:23:35
18 Exhibit 11. I'd like you to turn to page 2, the    14:23:38
19 fourth paragraph.                       14:23:45
20    A.  Okay.                           14:23:46
21    Q.  There's some writing on here and the fourth  14:23:47
22 and fifth paragraphs are bracketed. I'll note that   14:23:51
23 those are not our marks. Those were provided on the  14:23:54
24 copy that we had obtained.                14:23:59
25        That fourth paragraph reads,           14:24:07
```

Page 133

```
1  "Specifically, a pointing device, e.g., a so-called  14:24:09
2  mouse, or puck, is operated by a computer user to move  14:24:12
3  a displayed cursor from one point to another point on  14:24:17
4  a display. The user typically does so to align the  14:24:22
5  displayed cursor with a displayed function for the   14:24:25
6  purpose of invoking the function, as discussed in   14:24:29
7  reference D1." So this is talking about a different  14:24:31
8  reference, reference D1.                  14:24:33
9         "The function is typically represented by a  14:24:35
10 a displayed menu item or displayed icon. The user may  14:24:38
11 thus invoke a menu item by moving the display cursor  14:24:43
12 to the item and inputting a particular action, for   14:24:48
13 example, such as -- such as operating a particular   14:24:49
14 mouse button."                         14:24:56
15        Now, the fifth paragraph says, "In       14:24:59
16 contrast, the claimed invention," so that fourth one  14:25:00
17 was talking about a different reference, "In contrast,  14:25:04
18 the claimed invention indicates in which displayed   14:25:07
19 information field 'into which information is to be   14:25:11
20 inserted'. Accordingly, the user does not have to   14:25:13
21 perform that function by moving a screen cursor, since  14:25:16
22 the function is automatically done for the user, which  14:25:20
23 is clearly unlike using a puck to move a screen     14:25:20
24 cursor. Thus, in this respect alone, the claimed    14:25:26
25 invention is patentably distinct over reference D1."  14:25:29
```

34 (Pages 130 to 133)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 413**

Page 134

```
 1        So these are, this is a document from what  14:25:36
 2   looks to be a European attorney on your behalf writing  14:25:38
 3   to the European Patent Office distinguishing a cited  14:25:44
 4   reference from the invention.  And it made some  14:25:50
 5   comments about the invention and I wanted to see  14:25:52
 6   whether you agreed with that.  14:25:54
 7        It said, in your system, the user doesn't  14:25:57
 8   have to move a mouse to select a field, but rather,  14:26:01
 9   that function is automatically done for the user  14:26:07
10   because it automatically advances to the next field.  14:26:09
11        Do you agree with that statement?  14:26:13
12        MR. HAYES:  I'm going to object for a  14:26:15
13     second that that doesn't exactly say that.  14:26:16
14        MR. SIDDIQUI:  Okay.  14:26:19
15        MR. HAYES:  In this paragraph.  It's a  14:26:22
16     summary of it.  And then I'll object that  14:26:22
17     it calls for a legal conclusion or a legal  14:26:24
18     opinion of the witness.  14:26:27
19   Q.  Well, the user does not have to perform that  14:26:29
20   function by -- it says, "the function is automatically  14:26:34
21   done for the user," so "which is clearly unlike using  14:26:41
22   a puck to move a screen cursor," or it says earlier a  14:26:47
23   puck is like a mouse.  So I wanted to see whether you  14:26:51
24   thought that's an accurate statement.  Just read that,  14:26:55
25   don't worry about my summary or whatever, just read  14:26:57
```

Page 135

```
 1   that paragraph.  Let's see whether, I want to know  14:27:00
 2   whether you agree with that.  14:27:02
 3        MR. HAYES:  Objection.  It calls for  14:27:04
 4     speculation of the witness.  14:27:07
 5   A.  Yeah, this is just asking what me I think,  14:27:08
 6   right, so, personally.  14:27:10
 7   Q.  Um-hum.  14:27:13
 8   A.  I honestly don't know how to, how to, you  14:27:35
 9   know, I honestly don't know how to make out of this.  14:27:42
10   We didn't have a mouse for sure.  But the automatic  14:27:46
11   filling is available, you know.  So I really don't  14:27:52
12   know how to interpret this, to be honest with you,  14:28:00
13   okay?  14:28:02
14   Q.  So let's break it down just a little bit.  In  14:28:02
15   the fourth paragraph, the last sentence, where your  14:28:04
16   attorney is classifying or characterizing the cited  14:28:08
17   reference and says in that reference, "The user may  14:28:12
18   invoke a menu item by moving the display cursor to the  14:28:16
19   item" and like pushing a mouse button.  Okay, that's  14:28:20
20   what he says that other reference says.  14:28:25
21        And then he says yours is different  14:28:28
22   because, in the claimed invention, "the user does not  14:28:31
23   have to perform that function by moving a screen  14:28:34
24   cursor, since that function is automatically done for  14:28:37
25   the user."  14:28:39
```

Page 136

```
 1   A.  He doesn't have to perform --  14:28:43
 2   Q.  Right.  14:28:43
 3   A.  I'm just echoing what he said.  14:28:44
 4   Q.  So he doesn't have to move the mouse because  14:28:47
 5   that function is automatically done for the user.  14:28:50
 6        So I'm, basically, I'm trying to  14:28:53
 7   investigate that automatic feature, like what does  14:28:56
 8   that mean, that "function is automatically done for  14:28:58
 9   the user"?  14:29:01
10        MR. HAYES:  Objection.  That's a vague and  14:29:01
11     ambiguous question.  14:29:03
12   A.  You're talking information that has to be  14:29:12
13   inserted into a field, right?  14:29:14
14   Q.  Yeah, and the selection --  14:29:16
15   A.  And automatically.  14:29:16
16   Q.  The selection of the field.  He's saying, in  14:29:18
17   the prior art reference, you have to move the mouse,  14:29:19
18   select that field and then you would input the  14:29:22
19   information.  14:29:25
20   A.  Yeah.  14:29:25
21   Q.  And in this one, you don't have to because  14:29:26
22   that's done automatically.  14:29:28
23        And I want to know whether, first of all,  14:29:29
24   I am accurately describing your system?  14:29:37
25   A.  I guess what you see here is what it is.  But  14:29:37
```

Page 137

```
 1   I don't really recall specifically exactly how this  14:29:40
 2   thing worked per se, or how we designed it to work,  14:29:45
 3   what in it was limited to work that way.  You know  14:29:54
 4   what I mean?  Like the field is highlighted, and as  14:29:58
 5   you fill it -- you know, the field is highlighted for  14:30:03
 6   you to fill out, and then what once you fill it out,  14:30:05
 7   the next one is highlighted and wait for it to provide  14:30:09
 8   an input.  14:30:13
 9        I don't recall, you know, to me it was  14:30:14
10   form design, and you design you could do it that way.  14:30:17
11   You know what I mean?  I may be incorrect.  14:30:22
12   Q.  Okay.  14:30:25
13   A.  I may be incorrect, but I don't recall the  14:30:26
14   limitations we had.  14:30:29
15   Q.  So I guess the short answer is, you don't  14:30:44
16   recall what this means about automatic, the function  14:30:48
17   being automatically done by the user?  14:30:52
18   A.  Yeah, I don't recall what that means.  14:30:54
19   Q.  All right.  Let's just take a break from that  14:31:38
20   for a second.  14:31:40
21        MR. HAYES:  You need a break, or are you  14:31:41
22     okay?  14:31:42
23        THE WITNESS:  No, I'm fine.  14:31:43
24        MR. HAYES:  Okay.  14:31:44
25   Q.  I'm just going to ask you about some names  14:31:44
```

35 (Pages 134 to 137)

**Exhibit 20**
**Page 414**

Page 138

1  and see if you know who they are?           14:31:47
2    A.  Okay.                         14:31:50
3    Q.  Edmund Thomas Burke?                  14:31:51
4    A.  Don't know who he is.            14:31:52
5    Q.  Timothy Ian Ross?                     14:31:53
6    A.  Don't recall these names.             14:31:55
7    Q.  Adam V. Reed?                    14:31:57
8    A.  No.                       14:31:59
9    Q.  John M. Scanlon?                      14:32:01
10   A.  John M. Scanlon, I vaguely remember this   14:32:04
11  name, but I don't remember who the person is, person  14:32:09
12  was.                             14:32:13
13   Q.  Do you remember what context you heard the  14:32:14
14  name in at all?                    14:32:15
15   A.  Probably inside AT&T.                 14:32:19
16   Q.  Francis Xavier Lukas?                  14:32:23
17   A.  Don't remember.                 14:32:27
18   Q.  Reuel Raynaud Robertson?              14:32:33
19   A.  No.                         14:32:33
20        MR. SIDDIQUI:  Let's take a break for a   14:33:13
21  few minutes.                       14:33:15
22        THE VIDEOGRAPHER:  The time is 2:32   14:33:16
23  p.m.  We're off the record.            14:33:18
24        (Recess taken.)                14:44:45
25        THE VIDEOGRAPHER:  The time is 2:44   14:45:00

Page 139

1        p.m.  We're back on the record.        14:45:03
2  BY MR. SIDDIQUI:
3    Q.  Mr. LeConte, I wanted to ask you -- you can  14:45:06
4  finish reading that if you want.          14:45:11
5    A.  That's okay.                  14:45:13
6    Q.  Okay.  I wanted to ask you about Benjamin Day  14:45:14
7  and Alex Gillon.                   14:45:17
8        Do you know where they are, right now?  14:45:19
9    A.  I have no idea where they are now.         14:45:21
10   Q.  Really?  When was the last time you talked to  14:45:24
11  Mr. Day?                        14:45:28
12   A.  Way back after this project, I guess.       14:45:28
13   Q.  Okay.
14   A.  It was late '80's.                    14:45:32
15   Q.  Oh, it's been a long time.               14:45:33
16   A.  A long time.  We moved to different        14:45:35
17  locations.                         14:45:37
18   Q.  How about Alex Gillon, do you know anything  14:45:38
19  about where he is?                 14:45:43
20   A.  I don't know where Alex is.             14:45:45
21   Q.  When was the last time you talked to him?    14:45:46
22   A.  Talked to him per se?               14:45:48
23   Q.  Or heard from him?                14:45:49
24   A.  Probably before I left AT&T in '98.  He also  14:45:51
25  left.                            14:45:56

Page 140

1    Q.  Do you know if Benjamin Day was with AT&T   14:45:57
2  last time you heard of him?  Don't know?        14:46:03
3    A.  I guess he was.                  14:46:07
4    Q.  Okay.  Was Mr. Gillon with -- you said he   14:46:10
5  left in '98, around your time, is that right?     14:46:17
6    A.  I believe so.                  14:46:20
7    Q.  Do you remember, was he with Lucent or was he  14:46:22
8  with AT&T?                       14:46:24
9    A.  I think with AT&T.                   14:46:25
10   Q.  Okay.  And you were with AT&T as well, right?  14:46:27
11   A.  Correct.                      14:46:30
12   Q.  Okay.  So you never went to Lucent?        14:46:31
13   A.  No, never went to Lucent, right.          14:46:33
14   Q.  Have you had any conversations directly or   14:46:40
15  indirectly about this case with either Mr. Day or   14:46:44
16  Mr. Gillon?                        14:46:47
17   A.  No.                        14:46:48
18   Q.  Do you have any strong feelings about       14:46:51
19  Microsoft?                         14:46:53
20        MR. HAYES:  Objection, calls for        14:46:53
21  speculation.                       14:46:56
22   Q.  One way or the other.                 14:46:57
23   A.  No.  I don't -- Microsoft is a cool company.  14:46:58
24  You know, successful, they know how to do business.    14:47:04
25   Q.  Have you used any -- let me ask you about    14:47:11

Page 141

1  some Microsoft products.                14:47:14
2        Have you ever used Microsoft Money?     14:47:16
3    A.  No.                        14:47:18
4    Q.  Have you ever used Microsoft Outlook?       14:47:20
5    A.  Outlook, sure.                 14:47:22
6    Q.  Have you ever considered whether Microsoft  14:47:29
7  Outlook might infringe your U.S. Patent?         14:47:31
8        MR. HAYES:  Objection, calls for        14:47:34
9  speculation and a legal conclusion.           14:47:36
10   A.  I don't -- I didn't think about this.      14:47:38
11  Because I see a lot of -- a lot of things I see   14:47:43
12  leave some kind of flavor of things, but you know,   14:47:48
13  that's all I can say.                   14:47:53
14   Q.  Have you ever used Internet Explorer?       14:47:58
15   A.  Sure.                       14:48:00
16   Q.  When you're using Internet Explorer, did you  14:48:02
17  ever think, hey, this might infringe my patent?   14:48:06
18        MR. HAYES:  Again, calls for -- objection,  14:48:09
19  calls for speculation and a legal            14:48:12
20  conclusion.                        14:48:12
21   A.  Yeah, I really don't know about how patent   14:48:12
22  infringement come with those things.          14:48:17
23   Q.  I'm not asking you to give me a legal        14:48:18
24  conclusion about it, about whether something     14:48:20
25  infringes.  That's our job to argue that.        14:48:25

36 (Pages 138 to 141)

EASTWOOD-STEIN
deposition services & litigation support   (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

**Exhibit 20**
**Page 415**

Page 142

```
 1    A.  Okay.  Right.                    14:48:28
 2    Q.  I'm just asking:  When you used the product,  14:48:28
 3  did you say, hey, that's like my patent?          14:48:31
 4    A.  Yes, when I use these products, when I use   14:48:37
 5  Windows, I'm thinking how primitive, things we were  14:48:40
 6  doing in a primitive fashion, with primitive tools we  14:48:46
 7  had, and then what we had done, along what we had     14:48:51
 8  versus what people have now, all those tools they have  14:48:55
 9  to do what they do, and to me there's a lot of       14:48:58
10  resemblance, okay?  But that's the extent I see it.  14:49:02
11    Q.  Have you ever used Pocket PC 2002?          14:49:17
12    A.  No, I haven't -- I have not.                14:49:22
13    Q.  How about Windows Mobile 2003, Pocket PC?   14:49:24
14    A.  I have not.                    14:49:27
15    Q.  Pocket PC Expense?                14:49:30
16    A.  I have not used any Pocket PC at all.       14:49:32
17        MR. SIDDIQUI:  Okay.  I think I'm done.    14:49:43
18        MR. HAYES:  No redirect.               14:49:46
19        MR. SIDDIQUI:  Okay.                14:49:48
20        THE VIDEOGRAPHER:  All through?           14:49:49
21        MR. SIDDIQUI:  Yes.                14:49:50
22        THE VIDEOGRAPHER:  The time is 2:49       14:49:51
23  p.m., Thursday, July 28th, 2005.  This is        14:49:53
24  the end of tape number 2 and completes the       14:49:57
25  videotaped deposition of Mr. Raoul              14:50:05
```

Page 143

```
 1        LeConte.  We're off the record.          14:50:05
 2        (Timed noted:  2:49 p.m.)
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 144

```
 1           A C K N O W L E D G E M E N T
 2
 3  STATE OF NEW YORK   )
 4                      :ss
    COUNTY OF NEW YORK  )
 5
 6
 7        I, RAOUL LECONTE, hereby certify that I
 8  have read the transcript of my testimony taken under
 9  oath in my deposition of July 28, 2005, that the
10  transcript is a true, complete and correct record of
11  my testimony, and that the answers on the record as
12  given by me are true and correct.
13
14
15
16        _____
17            RAOUL LECONTE
18
19  Subscribed and sworn to before me
20  this ___ day of _____, 2005.
21
22  _____
23
24
25
```

Page 145

```
 1           C E R T I F I C A T E
 2  STATE OF NEW YORK   )
 3                      : ss.
 4  COUNTY OF NEW YORK  )
 5
 6        I, JOYCE G. ABELES, a Notary Public within
 7  and for the State of New York, do hereby
 8  certify:
 9        That RAOUL LECONTE, the witness whose
10  deposition is hereinbefore set forth, was
11  duly sworn by me and that such deposition
12  is a true record of the testimony given by
13  the witness.
14        I further certify that I am not related
15  to any of the parties to this action by
16  blood or marriage, and that I am in no way
17  interested in the outcome of this matter.
18        IN WITNESS WHEREOF, I have hereunto set
19  my hand this 2nd day of August, 2005.
20
21
22        _____
23            JOYCE G. ABELES
24
25
```

37 (Pages 142 to 145)

EASTWOOD-STEIN
deposition services & litigation support    (800) 514-2714

3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 416

Page 146

```
 1   ----------------I N D E X-------------------
 2   WITNESS        EXAMINATION BY        PAGE
 3   RAOUL LECONTE   MR. SIDDIQUI          06
 4
 5
 6
 7
 8   ----------INFORMATION REQUESTS-------------
 9   DIRECTIONS:  Page 22, Line 25
10           Page 45, Line 5
11
12
13
14   ----------------EXHIBITS------------------- LECONTE
15   EXHIBITS          FOR ID.
16   LeConte Exhibit 1, letter dated April 8, 2003, marked
17   for identification...... 11:15
18   LeConte Exhibit 2, document entitled "Response and
19   Objections of Raoul LeConte to Subpoena," marked for
20   identification.......
21   .................................. 12:19
22   LeConte Exhibit 3, document bearing Bates Nos. LEC
23   000001, marked for identification
24   .................................. 15:15
25   LeConte Exhibit 4, United States Patent No. 4,763,356,
```

Page 147

```
 1   bearing Bates Nos. MSLT 0000529 through 0000555,
 2   marked for identification
 3   .................................. 41:17
 4   LeConte Exhibit 6, document bearing Bates Nos. MSLT
 5   0000638 through 0000641, marked for
 6   identification................. 142:10
 7   LeConte Exhibit 7, document bearing Bates Nos. MSLT
 8   0000588 through 0000591, marked for
 9   identification................. 142:16
10   LeConte Exhibit 8, document bearing Bates Nos. MSLT
11   0000617 through 0000619, marked for
12   identification................. 149:4
13   LeConte Exhibit 9, document bearing Bates Nos. LUC
14   1123470 through 1123472, marked for
15   identification..................... 151:12
16   LeConte Exhibit 10, European Patent Specification EP 0
17   271 280 B1, marked for
18   identification..................... 155:10
19   LeConte Exhibit 11, letter to European Patent Office
20   dated November 23, 1992, marked for
21   identification........... 160:25
22
23   NOTE:  LeConte Exhibit 5 was not marked.
24
25
```

38 (Pages 146 to 147)

EASTWOOD-STEIN
deposition services & litigation support  (800) 514-2714
3f092d5f-c681-4673-afe2-d4693e0ec285

Exhibit 20
Page 417