AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

| Southern | DISTRICT OF | New York |

### SUBPOENA IN A CIVIL CASE

LUCENT TECHNOLOGIES INC.,
v.
MICROSOFT CORPORATION,

CASE NUMBER: [1] Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB); and
Case No. 03-CV-1108 B (CAB)

TO:     JP Morgan Chase & Co.
        270 Park Avenue
        New York, NY 10017

☐     YOU ARE COMMANDED to appear in the United Stated District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒     YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  This deposition may be taken via court reporter and videographer

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Fish & Richardson P.C. | August 23, 2007 |
| Citigroup Center - 52nd Floor | 10:00 a.m |
| 153 East 53rd Street |  |
| New York, NY 10022-4611 |  |

☒     YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date and time specified below (list documents or objects):
Please see Attachment "A"

| PLACE | DATE AND TIME |
|---|---|
| Fish & Richardson P.C. | August 2, 2007 |
| Citigroup Center - 52nd Floor | 10:00 a.m. |
| 153 East 53rd Street |  |
| New York, NY 10022-4611 |  |

☐     YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]*<br>Attorney for Intervening Party MICROSOFT CORPORATION | July 9, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Owais A. Siddiqui, Fish & Richardson P.C., 12390 El Camino Real, San Diego, CA  92130 Tel. (858) 678-5070

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on the next page)

[1]  If action is pending in district other than district of issuance, state district under case number.

**Exhibit 25**
**Page 445**

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| SERVED | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fees.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**Exhibit 25**
**Page 446**

## ATTACHMENT A TO SUBPOENA

### DEFINITIONS

A.    "You," "Your," and "Chemical Bank" mean Chemical Banking Corp. and all its respective predecessors (merged, acquired, or otherwise), successors, subsidiaries, parents, sisters, partnerships, and affiliates, including but not limited to Chase Manhattan Corp., J.P. Morgan & Co., and J.P. Morgan Chase & Co., and all directors, officers, agents, employees, attorneys and other persons acting on their behalf.

B.    "Interactive Images" mean Interactive Images, Inc. of Woburn Massachusetts and all its respective predecessors (merged, acquired, or otherwise), successors, subsidiaries, parents, sisters, partnerships, and affiliates, including but not limited to Easel Corp., and all directors, officers, agents, employees, attorneys and other persons acting on their behalf.

C.    "Document" (or "documents") has the same broad meaning as in Rule 34 of the Federal Rules of Civil Procedure including, without limitation, documents stored in electronic form, such as electronic mail, computer source code, object code and microcode, and documents stored on any media accessible by electronic means. A comment or notation appearing on any "document," and not a part of the original text, is to be considered a separate "document." The term "document" also encompasses tangible things.

D.    "All documents" means any and all documents that might reasonably be located through a search of all locations reasonably likely to contain documents called for by this Request.

E.    "And" and "or" shall each be construed conjunctively or disjunctively, whichever makes the request more inclusive.

F.    "Any" and "all" shall be construed so as to make the request most inclusive.

G.    The singular form of a word shall be interpreted to include the plural form as well.

H.    Any pronoun shall be construed to encompass the masculine, feminine, and neuter genders so as to acquire the broadest possible meaning.

I.    The term "and/or" should be construed in the way that makes the request most inclusive.

J.    "Relating" (or "relate" or "relates" or "relating" or "related") to any given subject means identifying, describing, discussing, concerning, assessing, stating, reflecting, constituting, containing, embodying, tending to support or refute, or referring directly or indirectly to the particular subject matter identified.

K.    "Product" refers to any system, apparatus, method, device, software, and/or process.

1

**Exhibit 25**
**Page 447**

L.      "The Easel System" means the system described and pictured in Michael Tyler, *Touch Screens: Big Deal or No Deal?*, Datamation, January 1984, pp. 146-154 (enclosed as Attachment B) as well as all versions or iterations of that system.

M.      "Communication" (or "communications") means any transmission of information by one or more persons and/or between (or among) two or more persons by any means including telephone conversations, letters, telegrams, teletypes, telexes, telecopies, electronic mail, other computer linkups, written memoranda, and face-to-face conversations.

## INSTRUCTIONS

A.      This subpoena calls for you to produce all documents identified below under the heading "REQUESTS," that are within your possession, custody, or control, or are otherwise available to you.

B.      All documents that respond, in whole or in part, to any portion of this subpoena are to be produced in their entirety, without abbreviation or expurgation, including all attachments or other matter affixed thereto.

C.      Electronic records and computerized information that is produced must be readable with standard commercial software or must be accompanied by a description of the system from which it was derived sufficient to render such materials readable.

D.      All documents shall be produced either in the order and manner that they are kept in the usual course of business, or shall be organized and labeled to correspond with the categories of this subpoena.  Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label or other means of identification of such cover or container shall be attached to the document.  Documents attached to each other must not be separated.

E.      All documents must be produced, regardless of whether such documents are possessed directly by you or are possessed by any of your officers, directors, employees, agents, representatives, or attorneys.

F.      If any requested document has existed, but has been lost, destroyed, or is no longer within your possession, custody, or control, then identify the document, its author(s), the recipient(s) or addressee(s), the subject matter, and the content.  Further, if the document has been destroyed, state with particularity the date and circumstances surrounding the destruction, and identify the last known custodian of the document and each person who has knowledge of the destruction of any such document.

G.      As to any documents otherwise responsive to this subpoena that are withheld or not divulged based upon a claim of any privilege or work product: (a) state in a privilege log the nature of the claim of privilege and the holder of the privilege; (b) state in a privilege log all facts relied upon in support of the privilege; (c) in a privilege log, furnish a description of all documents withheld pursuant to the claim of privilege (to include, as

2

**Exhibit 25**
**Page 448**

to each withheld document, at least its title and general subject matter, date, author(s), person(s) for whom it was prepared, and person(s) to whom it was sent); and (d) identify in a privilege log all persons having knowledge of any facts relating to the claim of privilege. If the claim of privilege applies to only a portion of the document, produce the document with that portion clearly redacted (i.e., stamp the document with the word "REDACTED") and describe the redacted portion in a privilege log. In this log and as to each such document, provide the following: a) the nature of the document, b) the sender, c) the author(s), d) the recipient of each copy the document, e) the date of the document, f) a summary statement of the subject matter of the document in sufficient detail to permit a court to reach a determination as to the alleged privilege in the event of a motion to compel, and g) an indication of the basis for assertion of the alleged privilege.

H.      If subsequent to the date you produce documents responsive to this subpoena you discover or receive documents that are responsive to the requests herein, promptly produce all such additional documents to the full extent required by the Federal Rules of Civil Procedure and the Local Rules of the District Court.

I.      If, after exercising due diligence to secure the information requested, you cannot fully comply with a specific Request, or any part thereof, state the reason(s) for your inability to reply and respond to the fullest extent possible.

## DOCUMENTS TO BE PRODUCED

1.      Documents sufficient to identify all versions and/or revisions of the Easel System used by Chemical Bank before 1987.

2.      Documents sufficient to identify the number of the Easel Systems purchased or used by Chemical Bank before 1987.

3.      Documents sufficient to identify all persons who acted on behalf of Chemical Bank in any discussion or negotiations with Interactive Images that led to any use of the Easel System by Chemical Bank before 1987.

4.      Documents sufficient to identify all persons who acted on behalf of Interactive Images in any discussions or negotiations with Chemical Bank that led to the use of the Easel System by Chemical Bank before 1987.

5.      Documents sufficient to determine the dates on which Chemical Bank began using each version and/or revision of the Easel System.

6.      Documents sufficient to identify all persons, whether or not employees of Chemical Bank, who were responsible for developing applications for the Easel System for use by Chemical Bank before 1987.

7.      Documents sufficient to identify all persons, whether or not employees of Chemical Bank, who used an Easel System obtained by Chemical Bank before 1987.

3

**Exhibit 25**
**Page 449**

8.      All communications between Chemical Bank and Interactive Images related to the Easel System.

9.      All documents related to any contracts or other agreements that were entered into between Chemical Bank and Interactive Images.

10.     All documents related to the Easel System including but not limited to specifications, datasheets, application notes, testing reports, manuals, design documents, development documents, training materials, and installation guides

11.     All documents related to the use of the Easel System by Chemical Bank.

12.     Documents sufficient to determine the disposition of each of the Easel Systems purchased, obtained or used by Chemical Bank.

## TOPICS FOR DEPOSITION

1.      Chemical Bank's first use of the Easel System.

2.      Identification of all versions and/or revisions of the Easel System used by Chemical Bank before 1987.

3.      The number of the Easel Systems purchased or used by Chemical Bank before 1987.

4.      Identification of all persons who acted on behalf of Chemical Bank in any discussions or negotiations with Interactive Images that led to any use of the Easel System by Chemical Bank before 1987.

5.      Identification of all persons who acted on behalf of Interactive Images in any discussions or negotiations with Chemical Bank that led to the use of the Easel System by Chemical Bank before 1987.

6.      The dates on which Chemical Bank began using each version and/or revision of the Easel System.

7.      Identification of all persons, whether or not employees of Chemical Bank, who were responsible for developing applications for the Easel System for use by Chemical Bank before 1987.

8.      Identification of all persons, whether or not employees of Chemical Bank, who used an Easel System obtained by Chemical Bank before 1987.

9.      The design, operation, development and/or features all versions and/or revisions of the Easel System used by Chemical Bank before 1987.

4

**Exhibit 25**
**Page 450**

10.  The terms of any contracts or other agreements that were entered into between Chemical Bank and Interactive Images.

11.  Communications between Chemical Bank and Interactive Images related to the Easel System.

12.  Documents related to the Easel System including but not limited to specifications, datasheets, application notes, testing reports, manuals, design documents, development documents, training materials, and installation guides.

13.  Documents related to the use of the Easel System by Chemical Bank.

14.  The perceived needs fulfilled by Chemical Bank's use of Easel System.

15.  The disposition of each of the Easel Systems purchased, obtained or used by Chemical Bank.

5

Exhibit 25
Page 451

ATTACHMENT B

Exhibit 25
Page 452



**Exhibit 25**
**Page 453**

# DATAMATION®

JANUARY 1984/$4.00 U.S.A.
VOLUME 30 NUMBER 1
This issue, 176,845 copies

## FEATURES

### 38
**IN FOCUS**
High tech and high profits are at the heart of the pacemaker industry, explains Janet Raloff in "Keeping Pace."

### 96
**THE MICRO VS. THE APPLICATIONS LOGJAM**
Gary D. Brown
and Donald H. Sefton
Personal computers may relieve the data processing department's burden—or just add to the demand.

### 108
**COBOL DUMPED**
Scott G. Abbey
Fourth generation languages, training, and management support are one MIS department's secrets to success.

### 118
**DIALING DILEMMAS**
A DATAMATION staff report
Users and competitors react to AT&T deregulation with concern over costs, confusion over service, and some confidence in the future.

### 129
**SURVIVAL OF THE SWIFTEST**
Willie Schatz
Specialized common carriers must adapt to deregulation or be forced out of the telecom race.

### 137
**THE INFOCENTER EXPERIENCE**
Richard T. Johnson
How Exxon developed a resource to provide consulting, training, and technical assistance to end users.

### 146
**TOUCH SCREENS: BIG DEAL OR NO DEAL?**
Michael Tyler
The ultimate in user-friendly man/machine interfaces may be catching on in some applications, but there are still several drawbacks.

### 159
**DECISION-ORIENTED INFORMATION**
Victor E. Millar
Despite their desire to plan for the information age, most ceos are hesitant—so far.

### 166
**COMPUTER II, PART I**
Francis Bacon
"Now is the Winter of our Disconnect," declares Lord ATT in this Elizabethan Tragedy of Divestiture.



### 187
**DATA ADMINISTRATION: IT'S CRUCIAL**
Arvind D. Shah
As liaison and arbiter between end users and dp, a DA group could make a database work.

### 197
**WANTED: EXPERIENCED KAMIKAZE PILOTS**
Frank Sweet
The complexities of a shared database demand a data administrator who's totally dedicated and maybe a little crazy.

## NEWS IN PERSPECTIVE

48 **GOVERNMENT**
Politics and policies.

50 **ARTIFICIAL INTELLIGENCE**
Prolog vs. Lisp.
An eye on AI.

59 **MARKETING**
IBM's new NDD.
Dealing with DOD.

73 **TELECOMMUNICATIONS**
Of lions and lambs.
SNA to SNA.

78 **TECHNOLOGY**
British fish for chips.
Speaking in tongues.

84 **ACQUISITIONS**
Shopping spree at Crowntek.

85 **MAINFRAMES**
Elxsi system debuts

86 **NETWORKING**
P-System network software.

88 **USER EDUCATION**
Training for infocenters.

92 **BENCHMARKS**

## DEPARTMENTS

6 **LOOKING BACK**
13 **LOOK AHEAD**
18 **CALENDAR**
23 **LETTERS**
35 **EDITORIAL**
201 **PEOPLE**
205 **HARDWARE**
219 **SOFTWARE & SERVICES**
235 **SOURCE DATA**
248 **ON THE JOB**
253 **ADVERTISERS' INDEX**
254 **MARKETPLACE**
256 **READERS' FORUM**

## INTERNATIONAL 200-1

- 3 **GOING GLOBAL WITH WORLDWIDE NETS**
- 9 **MOVING INTO THE NETWORK MODE**
-11 **GETTING ON THE TDF TRACK**

## OEM SUPPLEMENT 201-1

- 3 **MY VENDOR, MY COMPETITOR**
- 9 **LISA'S FIRST DATE**
-13 **JUST WHAT THE DOCTOR ORDERED**

COVER ILLUSTRATION BY BOB WEBER

JANUARY 1984 **3**

July

or July 12.

idle

Boulevard Suite?
₁ 90024

READER CARD

Exhibit 25
Page 454



## From the cutting edge of NCR software engineering comes NCR/SNA Systems Network Architecture

If you are a computer manufacturer, or an OEM, there are two ways that you can implement SNA or X.25 on your systems:

- Do it yourself.
- Call NCR.

NCR systems engineers have developed portable communication products which can be easily implemented on a variety of processors and operating systems. These products allow for SNA communications, SNA network management and communication using X.25. Many of the products are immediately available, and could be ported onto most processors with minimum effort. And that's not all. NCR/SNA is backed by the resources and experience of an international company with a long background in data processing, and with the engineering technology that will keep it among the leaders.

In 1984, NCR will become 100 years young. If you are going to make a major investment in a strategic product, you'll want the innovative technology and service for which NCR has long been famous.

If you would like more information contact:

**NCR Corporation**
**11010 Torreyana Road**
**San Diego, California 92121**
**Phone (619) 452-1020**

If you are an NCR computer user, and would like to learn more about SNA implementation on NCR's Systems, contact your local Account Manager

**4** DATAMATION                **CIRCLE 6 ON READER CARD**

---

# DATAMATION

**Editor** Rebecca S Barna
**Senior Editor** Larry Marion
**News Editor** John W Verity
**Features Editor** Kenneth Klee
**Copy Editor** Florence Lazar
**Assistant News Editor** Michael Tyler
**Assistant Features Editor** Deborah Sojka
**Assistant Copy Editor** Harriet Sigerman
**Assistant Editor** Lauren D'Attilo
**Editorial Assistant** Donna Lyons
**Copy Assistant** Eric Brand
**Bureau Managers**
  **San Francisco** Edward K Yasaki
  **Los Angeles** Edith D Myers
  **Minneapolis** Jan Johnson
  **Boston** R Emmett Carlyle
  **Washington** Willie Schatz
**Advisory Board** Lowell Amdahl,
Howard Bromberg, Philip H Dorn,
Joseph Ferreira, Bruce W Hasenyager,
David Hebditch, John Imlay, Terry G. Mahn,
Angeline Pantages, Robert L Patrick,
Russell Pipe, Carl Reynolds, F G Withington,
Amy Wohl
**Contributing Editors** Pamela Archbold,
Laton McCartney, Hesh Wiener

**International Editor** Linda Runyan
**European Managing Editor** Paul Tate
**Technology Editor, Europe** Fred Lamond
**Foreign Correspondents** John Lamb,
London, James Etheridge, Paris, Peter Hidas,
Oslo, Norman Kemp, Sydney, Australia

**Art Director** Kenneth Surabian
**Assistant Art Director** Susan M Rasco
**Art Assistant** Catherine Kennedy
**Production Manager** Gecl McDonald
**Assistant Production Manager** Bettye Wright

**Publisher** James M Morris
**Executive Editor** John L Kirkley

**EDITORIAL OFFICES**
**Headquarters:** 875 Third Ave., New York, NY 10022 Phone (212) 605-9400 telex 429073 **New England:** 1 Chauncey St, RFD 2 Sandwich, MA 02563, (617) 888-6312. **Midwestern:** 3607 Garfield Ave S, Minneapolis, MN 55409, (612) 827-4664. **Western:** 1801 S. La Cienoga Blvd , Los Angeles, CA 90035, (213) 559-5111, 2680 Bayshore Frontage Rd., Suite 401, Mountain View CA 94043, (415) 965-8222 **International:** 130 Jermyn St , London SW1 4UJ England, (441) 839-3916 telex 914511, 13 Stanley Place, Budd Lake, NJ 07828 (201) 691 0392 telex 499-4308

**Circulation Vice President** Joseph J Zaccaria
**Circulation Manager** Mary Agnes Glenister
**Operations Manager** Patricia Adamo
**Research Director** Laurie Schnepf

## Technical Publishing

**DB** The Dun & Bradstreet Corporation

**VBPA** Circulation audited by Business Publications Audit

**ABP** Member American Business Press, Inc

DATAMATION (ISSN 0011-6963) Magazine is issued monthly on or about the first day of every month Published by Technical Publishing a company of The Dun and Bradstreet Corp , John K Abely, President Executive advertising, editorial offices, and subscription departments 875 Third Ave New York, NY 10022 Published at Lincoln, Nebr Annual subscription rates U S and possessions, $42; Canada $60, Japan, Australia, New Zealand $100, Europe $90 air freight, $190 air mail All other countries $90 surface $190 air mail Reduced rate for qualified U S students, public and school libraries $30 Single copy $4 in U S Special Datamation/Dataguide issue $25 Sole agent for all subscriptions outside the U S A and Canada is J B Tratsart, Ltd 154 A Greenford Road Harrow Middlesex HA13QT, England, (01)422 8295 or 422-2456 No subscription agency is authorized by us to solicit or take orders for subscriptions Second class postage paid at New York, NY 10001 and at additional mailing offices ®Copyright 1984 by Technical Publishing Co , a Division of Dun-Donnelley Publishing Corp , a company of The Dun and Bradstreet Corp All rights reserved 'Datamation' registered trademark of Technical Publishing Company ® Microfilm copies of Datamation may be obtained from University Microfilms, A Xerox Company 300 No 7eeb Road Ann Arbor, Michigan 48106 Printed by Foote & Davies/Mid America POSTMASTER Send address changes to Datamation 875 Third Avenue, New York, NY 10022

**Touch-sensitive terminals may be very sexy in the office, but whether they actually stimulate people to use computers is open to doubt.**

# TOUCH SCREENS: BIG DEAL OR NO DEAL?

## by Michael Tyler

Chemical Bank's foreign exchange trading room is in a small corner on the sixth floor of the bank's lower Manhattan office building. In that room, some 30 traders virtually live on the telephone, buying and selling the currencies of the world. Each trader has about half a dozen crt terminals stacked in front of him, looking dangerously unstable and about to come crashing down on the mountain of paper that covers the remainder of the desk area. The terminals provide the latest foreign currency rates, stock market figures, business news, and other pertinent information.

The exchange moves quickly. When the right price for a certain currency is within reach, the trader must pounce with the speed of a leopard or wind up losing money. When he has the price he wants, he needs to telephone the broker he feels is in the best position to find a willing trade partner, negotiate the terms of the deal—amount, price, method of payment, etc.—and then record that information for posting on the exchange's ticker.

Yet for all the speed of the exchange, and all the computer terminals teetering atop the traders' desks, the Chemical Bank foreign exchange department is often overwhelmed by the slow, manual method by which deals are entered into the bank's computers and posted on the exchange, says Anthony P.R. Herriott, senior operations officer of the bank's treasury division. When a trader completes a deal, Herriott says, he is required to fill out a form listing the particulars of the deal and place it on a conveyor belt to another section of the room. There, data entry clerks receive the trade forms and key them into a 10-year-old Arbat system, which is connected to a PDP-11/70 across the street. The deal will be posted on the exchange after the PDP receives this information.

The process takes about 15 minutes from the time the trader completes the deal until the time he can see it posted on the ticker. That system worked well enough in 1973, when the exchange handled some 100 trades a day, Herriott says. The trader had enough time to fill out the form and place it securely on the conveyor, so that few trades were lost for very long. Now, says bank vice president John M. Wigzell, the same traders handle 1,000 trades a day, and often deal so quickly that they cannot write down all their trades on separate slips of paper. The result is that they keep a running list on a scratch pad, which intermediaries must then rewrite and stick on the conveyor; with a little luck, the paper reaches the other end and the data entry clerks key it correctly into the system. "We need a better system just to stay in the game," Herriott says.

A few miles uptown, Merrill Lynch and Co.'s Advanced Technology Development Department is developing new ways for the financial services firm's branch offices to improve the quality of information that reaches clients. The group is looking at videodisks, portable computers, teletext, touch-screen technologies, and just about anything else that may give the company a strategic advantage, says systems analyst David Rossien. Right now Rossien is examining several ways to provide clients with direct access to Merrill Lynch's databases in a controlled manner, so that they cannot make unauthorized entries or typographical errors.

Enter a small startup from Woburn, Mass., called Interactive Images Inc. Its first product—and its only product for the foreseeable future, according to president and founder Leonard I. Hafetz—is a hardware/ software combination called Easel that might best be described as a user's front end to a computer terminal. It comes in several versions, each of which ultimately boils down to a color monitor with a touch-sensitive screen and a lot of software.

Both Chemical Bank and Merrill Lynch have acquired beta test Easels and are developing dedicated applications for the product. For each firm, the key factor in choosing Easel was the touch-sensitive screen. Indeed, more and more users are turning to touch-sensitive crts as "ergonomic" user interfaces. Says T.S. Springer, a senior associate with the Springer Associates consulting firm in St. Charles, Ill., "Manufacturers are realizing that computer devices are moving out of the clerical areas and into the managerial and executive areas, where keyboarding is not recognized as a high-status activity. The result is that manufacturers and users are turning to alternative methods of interacting with the computer." Fortunately, he says, the types of computer interactions often found on these levels lend themselves well to such alternatives. On the other hand, clerical functions such as word processing and data entry rely more on the keyboard.

The advent of touch-sensitive screens as alternatives to the keyboard has been heralded for several years, but only in the past few months have users and manufacturers begun to take them seriously. Easel was introduced last June, and the Hewlett-Packard HP 150—the first personal computer with a touch-sensitive screen—premiered in October. The sudden movement to touch-sensitive screens has raised the expectations of vendors such as Carroll Touch Technology, a Champaign, Ill., maker of touch screens. The day after the HP 150 was announced, Carroll Touch ceo Arthur B. Carroll told the *New York Times*, "I had a companywide celebration. I struggled for 10 years to get a stamp of approval on touch technology and they just did it."

**SCREENS' PAST A STRUGGLE**  What Hewlett-Packard's announcement holds for the future of touch screens is arguable, but the past has indeed been a struggle. In the decade since touch screens first made their appearance in commercial products, business has grown slowly to a current industry volume of $10 million annually, Carroll says. Bart Goodmandson, the marketing manager at Sierracin Transflex, another touch panel vendor, tags the market at closer to $30 million; either way, the industry is microscopic.

Yet even for such a small industry, there is no shortage of vendors or technologies. About a dozen vendors currently provide touch systems based on any of four different touch technologies. The HP 150 uses an optical system, in which a user's finger interrupts crossing beams of infrared light. The beams are generated by LEDs just in front of the screen on two sides, and detected by pho-

Exhibit 25
Page 456



:d as a high-sta
t manufacturers
rnative methods
ter.'' Fortunate
mputer interac-
vels lend them-
es. On the other
h as word pro-
y more on the

ensitive screens
'd has been her-
only in the past
anufacturers be-
Easel was intro-
rlett-Packard HP
mputer with a
niered in Octo-
touch-sensitive
tions of vendors
ology, a Cham-
:reens. The day
unced, Carroll
l told the *New*
nywide celebra-
o get a stamp of
y and they just

wlett-Packard's
ent holds for
f touch screens
, but the past
In the decade
e their appear-
, business has
istry volume of
oll says. Bart
g manager at
uch panel ven-
to $30 million;
icroscopic.
:mall industry,
ors or technol-
currently pro-
iny of four dif-
HP 150 uses an
'='s finger inter-
red light. The
just in front of
:tected by pho-

Exhibit 25
Page 457

## About a dozen vendors provide touch-sensitive systems based on any of four technologies.

tosensors on the other two sides. The intersection of a vertical and a horizontal beam is a touch point.

A similar technology uses acoustic surface waves. Acoustic signals travel along a curved glass overlay that conforms to the shape of the crt. When the user touches the screen, his finger interrupts the echo pattern and a controller interprets the interruption to indicate which point on the screen was touched. TSD Display Products of Bohemia, N Y., manufactures this type of device.

The third technology might best be called a capacitive sensing system, such as is found on AT&T Information Systems' touch-sensitive terminal. These products use a thin, transparent material that is fused onto predetermined areas of the crt face. When a user touches one of the areas, the capacitive value of that particular section changes, indicating that a touch has been made. The AT&T terminal has some 30 such areas.

The fourth technology, which is used on the Easel and Sierracin Transflex products, can be called a resistance membrane approach. A set of parallel electrodes is etched onto a sheet of Mylar; then, two of these sheets are stretched across the crt at right angles to each other, creating a grid of electrodes. When a finger presses on the outer of the two Mylar sheets, the sheets touch and short-circuit a pair of electrodes.

While all four technologies are designed for the same function, significant differences exist. The resolution—how many distinct areas the user can touch—differs dramatically for each approach. The smallest touch-sensitive area on the AT&T capacitive sensing terminal, for example, is about half an inch wide by an inch deep. Infrared systems are limited by the size of LEDs and photodetectors; the HP 150 uses a grid of 40 beams across by 27 down, which divides the 12-inch monitor into touchable areas about a quarter of an inch square. Acoustical methods provide similar resolutions. Resistive membrance touch panels, however, offer significantly higher resolutions, to the point where they can replace digitizing tablets. Easel's touchable resolution is 960 by 720 pixels, and a resistive membrane touch panel made by Elographics, in Oak Ridge, Tenn., can obtain a touchable resolution of 4,000 by 4,000—16 million distinct touchable areas, compared to 30 on the AT&T terminal.

Other differences exist as well. Optical, acoustic, and resistive membrane techniques can accept a finger, a pen, or any other device; capacitive sensing systems require a human finger with a known electrical charge. And with resistive membrane and capacitive sensing systems, the user must actually touch the screen with something, while for the other technologies merely pointing from a very

close distance is fine.

After evaluating the technologies available, both Merrill Lynch and Chemical Bank chose the Easel system, which adds an authoring system, a programming language, and other software to a resistive membrane approach. A software feature that attracted both companies to Easel is a utility that allows programmers to disable areas of the screen at any time, much as a software program might disable keys on the keyboard. Both firms are using a cpu and monitor supplied by Interactive Images Inc., Easel's maker, although versions are currently available for the IBM Personal Computer and for mainframes running software from Applied Data Research in Princeton, N.J.

**INVESTOR INQUIRY SYSTEM** Merrill Lynch is working on a client inquiry system through which clients will be able to walk into a branch office and find out how their investments are doing and what other sources of investment might do. The Easel terminal would be tied into a Quotron or some other stock service, and would provide each client with the price of any stock or investment in which the client has an interest. Nonclients could query the prices of a couple of stocks to whet their appetites, but no more. "One of the things that Merrill Lynch sells to its customers is information and the access to information," Rossien says. "We don't want to give it away."

The firm's application takes advantage of Easel's selective touch sensitivity by restricting the kinds of input available to the customer; since there is no keyboard, the customer must follow the screen's directions and cannot tamper with the system or obtain unauthorized information.

The Merrill Lynch application is experimental. "We have one Easel, and it's on an approval basis," Rossien says. "If it doesn't work to our satisfaction, we'll return it to Interactive Images." If the product is approved by Rossien's group, it will be installed in a single branch in New York for a six-month tryout. If it is successful there, it will be offered to other branches, without obligation to accept any technology coming out of Merrill Lynch's advanced technology development labs.

Chemical Bank, on the other hand, is fully committed to converting its foreign exchange trading to Easel; it has attempted other ways of automating the process and consistently been dissatisfied, says Herriott.

"We tried electronic pens, tablets, voice input, you name it. But the tablets demand too much precision on the part of the trader, and the voice input products we tried couldn't separate the speaker from all the

noise in the room."

His colleague Wigzell adds, "We were convinced that the only way to automate was to have the trader key in each trade. But the unfriendliness and structure of the keyboard is a big problem. We tried to use conventional means, but we need a breakout technology."

The bank is in the process of implementing a two-phase strategy that it feels will accomplish the breakout. The plan employs Easel workstations programmed in the bank's London office. Each workstation's screen is divided roughly in half vertically. Large touch-sensitive boxes at the top of the screen invite the user to declare the current transaction a "buy" or a "sell"; at the bottom, similar boxes let the user deal, service, cancel, log out, or lock out their screens. The right half of the screen lists key information about the current transaction, including buyer, seller bank, currency, exchange rate (in dollars and the foreign currency), broker, bank customer, exchange location, and method of payment.

When the trader touches the screen in one of these areas, a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to choose the information needed on the right. For instance, when the user hits the "broker" cell on the right, a list of brokers appears on the left; the trader then hits the name of the broker to be involved in the current trade, and that information is entered into the system. For exchange rates and other numerical data, the user hits the proper cell on the right and then types in the numeric data on the keypad that appears on the left. In this way, an entire transaction can be completed directly on the workstation. (A QWERTY layout can be called up on the left for entry of nonstandard or rare names—an infrequently traded currency, for example.)

In the first phase of Chemical's plan, the Easel workstations will replace only the Arbat data entry system, while the rest of the trading system remains in effect. Wigzell says. Traders will still create blizzards of paper, which will then be re-written by intermediaries onto proper forms and sent along the conveyor to the data entry area. There, data entry clerks will enter the data on the Easel system. The primary gains in this phase of the operation are accuracy in listing trades and independence from other bank areas sharing the Arbat system, Herriott says.

In the second, more ambitious stage of the plan, the Easels will be installed on the traders' desks alongside the various other crts. The trader can then talk on the phone with a broker or customer and simultaneously enter the transaction information directly into the system. Once a trade is complete, Easel

**Pr**

**A fla**

When it c
means re
At 3M, re
compute
in. We're
from com
3M diske
over the
confiden
Look in tl
the 3M d
London,

**Exhibit 25**
**Page 458**

can send it to the PDP-11 and out to the ticker. No more scratch paper, intermediaries, conveyor belts, data entry, or 15-minute lag between the transaction and its posting.

## INSTANT FEEDBACK ON TICKER

Reducing the number of transactions lost on the floor beneath the conveyor belt and providing virtually instant feedback on the exchange ticker are two advantages that appeal to traders, according to S. Waite Rawls, the bank senior vice president in charge of the New York trading operation. The system also provides other advantages to bank management, he says, some of which the traders may also appreciate.

Easel workstations used in the trading room, for example, will include cells that indicate what the trader's customer and trading limitations are, and how close he is to those limits. The trader can then incorporate this information, previously unavailable online, when making decisions about deals. "The faster and the better our traders can analyze the information at their disposal, the more money the bank can make," Rawls says. "Automation now is not a way of saving money but a weapon for profit."

Easel is also a way of managing the traders, which may not sit well with these independent-minded, free-spirited people. Managers can keep track of how individual traders are performing, Herriott says, and use the selective touch-sensitive facility to lock traders off their terminals if they are doing poorly. "We can finally establish some management control," he says. "We can police the traders and cut our losses." The same central control facility will enable trainees to begin trading in a controlled environment where their inexperience cannot cost the bank too much money; when the average amount of each transaction is $3 million, even a few minor errors can cost the bank a bundle.

Other users have begun integrating touch-sensitive screens into less traditional fields than banking and finance. Walt Disney's Epcot Center, several Manhattan office buildings, and many business hotels throughout the country use them as informational directories. People walk in off the street and ask the computer where a particular restaurant, exhibit, or office is. These information requests are particularly amenable to menu operation, and therefore to touch screens. For example, the crt could ask the user to touch a box labeled "restaurants," "night clubs," "theaters," or "sports," and then present a screen with more information on the chosen area.

Because of their usefulness to computer neophytes who are merely looking for information or following a menu, says Richard Peterson of Input, a market research firm



One of Chemical Bank's traders interacting with computer via touch screen.

in Saddle Brook, N.J., "the MIS reaction has been very favorable. A touch screen is a very effective vehicle to get people into a computer system."

Touch screens are also catching on in applications where the user simply does not have the time to hunt for keys, even if he is computer literate and uses computers all the time. Chemical Bank's traders, with their crts heaped precipitously atop their desks, certainly are computer literate, but they do not have the time to use a keyboard accurately. The American Stock Exchange in New York uses a similar system, in which a specialist can execute a trade by touching the order as it comes up on the screen. The user then touches the price and broker information, and the trade is completed.

Applications requiring rugged equipment that is amenable to menu-driven software are also prime targets for touch screens. Goodmanson of Sierracin Transflex reports a system his company developed with Litton and Westinghouse for the military. Generals operating command posts behind the front lines in a battle situation can deploy troops,

tanks, and other forces using a touch-sensitive screen. Hafetz of Interactive Images notes that touch panels work well in industrial process control applications. In both of these applications, the potential for dirt and grime to pollute a keyboard is reduced since touch panels can be more hardy.

## DRAWBACKS OF TOUCH PANELS

Yet touch panels are not without their drawbacks, and these may prove fatal to the fledgling industry. Parallax—in which the actual touch-sensitive area does not align exactly with the crt's image of where it should be—affects all touch-sensitive systems, but it is more of a factor in acoustic and infrared systems because the sensitive areas of those technologies are farther away from the crt face on which the image is seen. Unless the user sits directly in front of the screen at eye level, the area he thinks he has touched may not be the area he did in fact touch.

Capacitive sensing and resistive membrane touch panels are in effect part of the crt face, not separate from them, so the

## "People will always touch the screen. You have to ask what the cost of random interactions with the screen will be."

parallax effect is reduced; yet even with these technologies the thickness of the crt's face causes some parallax. Moreover, critics charge that resistive membranes have been known to slide slightly from their original location, also causing parallax.

The reliability of the various technologies has also been questioned. Acoustical systems are extremely sensitive and can be thrown off by dirt or small scratches in the surface of the crt screen. With optical systems, a pack of cigarettes falling from the top of the terminal can break the light beams as easily as an intentional touch, producing the same result as smashing a book against several keys on a keyboard. Capacitive sensing systems are inflexible; because the touch areas are fixed in size and location by the manufacturer, it is more difficult to modify software for touch input. In addition, critics claim that these systems do not hold up well in environments marked by temperature and humidity fluctuations. Finally, resistive membrane touch panels, because of the properties of Mylar, block out light from the crt, reducing the visibility and clarity of the screen itself. The resistive membrane overlays are also more delicate than the crt's glass face or other touch panel technologies, and can be damaged easily by careless users.

And users are careless, more so than they may realize. T.S. Springer of Springer Associates recalls that when IBM brought out an antireflection coating for its crts a few years ago, people touched the screen and got the residue on their fingers. The end result was not less glare but rainbows on every screen. "People will always touch the screen, whether it is touch sensitive or not," he says. "They point out information to a colleague, or point to the screen to compare specific items to a printout, or whatever. Manufacturers have to be aware of this and ask what the cost of random interactions with the screen will be."

Another potential drawback is that human interaction with touch panel crts is even more direct than it is with keyboard-based crts. While this may not bother managers who have been using terminals and personal computers happily for several years, it may scare away the very neophytes that touch terminals are supposed to attract. Says Paul Nesdore, an analyst with Datapro in Delran, N.J., "If a user isn't going to like a keyboard, he's not going to like actually having to touch the screen. You know, think about the radiation and the fear of injury and all that." (No such complaints have yet been registered, according to Janice Blood, a spokesperson for 9 to 5, the National Association of Working Women.)

Yet another negative factor is price. Touch panels, not including the crt, cost up to

$1,000 each; no significant price differences exist among the four technologies. Joe Kelly, another Datapro analyst, says, "Terminals are too cheap and too laden with other features to support touch panels."

Many terminal makers agree, and have shied away from adding touch panels to their products. Burt Hochfeld, vice president of Raytheon Data Systems, says, "They're just too expensive. If we could buy a touch screen and make money on it, we would be doing it. The applications are there, but right now it's too expensive."

But perhaps the most important drawback to touch-sensitive terminals, at least in terms of gaining widespread acceptance, is the inherent restriction the technology places on which applications can be run. Says Rossien of Merrill Lynch, "Some applications make more sense than others, and some make less sense. One of the things we're doing is seeing whether applications we would want to use will make sense." Consequently, he adds, his company is moving cautiously on Easel and may eventually drop it entirely.

Says Kelly of Datapro, "Touch panels are only for very specialized applications. They have to be menu-driven, and they are slow. The currently available applications are as a result quite simplistic compared to what's available for a keyboard."

Springer adds, "You have to display meaningful information on the screen so that people can respond to it. It becomes difficult to replace the keyboard in applications like word processing, but it can be very good in replacing the special function keys."

**WORK WELL WITH MICROS** On some personal computer applications, touch screens can work well.
Several microcomputer applications software vendors have already announced versions of their products that can take advantage of the touch screen on the HP 150. Peterson of Input notes, "You need to have the keyboard. You can use the two together very well. The touch screen with a keyboard can make a micro very easy to use, and yet very versatile."

In comparison, the touch screen's success in mainframe-based systems is more uncertain. Richard Telesca, a consultant with Aetna Life and Casualty in Hartford, Conn., says that his company experimented with Easel but dropped the product. "We weren't satisfied with the interface to the software we already have. It's too difficult to fit a touch screen to interface our existing CMS software; you need a system designed to work with touch to begin with."

Rossien of Merrill Lynch complains that touch screens present additional problems for programmers accustomed to work-

ing on traditional mainframe applications. "You really need intelligent software design, Easel, or other touch-sensitive products, demands a different mentality in programming. You have to know everything the user can possibly want to do at any time and be prepared to handle it in some way. When you lock out everything but the prescribed menu items and there is no keyboard to write a command, the user cannot get the system to do anything but what's presented. If he has a legitimate need for something else then you've failed in your software design."

The combination of these drawbacks and outside influences may doom the touch-sensitive terminal, analysts fear. Kelly says, "The touch screen's main advantage is for users who are unfamiliar with a keyboard and unwilling to become more familiar. But with microcomputers all over the place and at all levels of a corporation, people are more comfortable on the keyboard. That eliminates the main competitive advantage of the touch screen. They've been around a while, and they will continue to be around, but I don't think there's much interest in them."

His colleague Nesdore is even more pessimistic: "I just don't think the concept can make it today."

Springer notes that touch screens, even in applications designed for computer neophytes or computerphobes, may be eclipsed by other technologies. "Touch screens, I think, are only a stopping point in the evolution to voice input. Touch is currently a more sophisticated and well-developed technology than voice input, but voice input is more versatile and promising. When voice input comes around, touch screens will no longer be needed."

Even touch technology's greatest proponents admit that the future is not as bright as it once seemed. Chemical Bank, in plunging forward with Easel, clearly is optimistic about its effectiveness in automating the bank's foreign exchange area, and eventually, all similar transaction-oriented areas. Even still, vice president Rawls says, Chemical does not see Easel as an effective long-term strategy. "We'll be rolling it in over the next year and a half, but I wouldn't put even a five-year life span on it. I think it will be obsolete by then." The system can handle upwards of 2,000 to 3,000 trades per day—triple the current rate—but Rawls says that amount may not be sufficient and that the Easel system may not be able to deliver more because of touch technology's inherent slowness. "We may be on the leading edge for a few minutes, but not for long unless we keep going to new technology. Touch screens aren't going to be the newest technology for long, and we have to prepare for what comes next." ✳

Exhibit 25
Page 460