1  James S. Blackburn (State Bar No. 169134)
   ARNOLD & PORTER LLP
2  777 South Figueroa Street, 44th Floor
   Los Angeles, California 90017-5844
3  Telephone: (213) 243-4000
   Facsimile: (213) 243-4199
4

5  Joseph A. Micallef (admitted *pro hac vice*)
   ARNOLD & PORTER LLP
   555 Twelfth Street, N.W.
6  Washington, D.C. 20004-1206
   Telephone: (202) 942-5000
7  Facsimile: (202) 942-5999

8  Joel M. Freed (admitted *pro hac vice*)
   McDERMOTT WILL & EMERY LLP
9  600 13th Street, N.W.
   Washington, D.C. 20005-3096
10 Telephone: (202) 756-8000
   Facsimile: (202) 756-8087
11
   Attorneys for *Dell Inc.*
12

13                    **UNITED STATES DISTRICT COURT**

14                    **SOUTHERN DISTRICT OF CALIFORNIA**

15

16 LUCENT TECHNOLOGIES INC. and         )   Case No. 07-CV-2000-H (CAB)
   MULTIMEDIA PATENT TRUST,             )   consisting of matters severed from
17                                      )   consolidated cases:
              Plaintiffs and Counterclaim-defendants, )   Case No. 02-CV-2060-B (CAB)
18                                      )   Case No. 03-CV-0699-B (CAB)
              v.                        )   Case No. 03-CV-1108-B (CAB)
19                                      )
   GATEWAY, INC. AND GATEWAY            )   **REPLY TO LUCENT'S OPPOSITION**
20 COUNTRY STORES LLC, GATEWAY          )   **TO DELL'S MOTION FOR SUMMARY**
   COMPANIES, INC., GATEWAY             )   **JUDGMENT OF INVALIDITY OF**
21 MANUFACTURING LLC and                )   **CLAIMS 1-3 OF U.S. PATENT NO.**
   COWABUNGA ENTERPRISES, INC.,         )   **4,439,759 TO FLEMING ET AL.**
22                                      )
              Defendants and Counter-claimants, )
23                                      )   Judge Marilyn L. Huff
   and                                  )
24                                      )   Hearing: January 8, 2008, 9:30 a.m.
                                        )   Location: Courtroom 13, 5th Floor
25 MICROSOFT CORPORATION,               )
                                        )
26            Intervener and Counter-claimant, )
                                        )
27

28

| | |
|---|---|
| 1 | MICROSOFT CORPORATION, |
| 2 | Plaintiff and Counter-defendant, |
| 3 | v. |
| 4 | LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, |
| 5 | |
| 6 | Defendants and Counter-claimants, |
| 7 | LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, |
| 8 | |
| 9 | Plaintiffs and Counterclaim-defendants, |
| 10 | v. |
| 11 | DELL INC., |
| 12 | Defendant and Counter-claimant. |

## I.     INTRODUCTION

Lucent's Opposition demonstrates that in order for it to distinguish the NASA Final Report from claims 1-3 of the Fleming patent, it must take positions that are contrary not only to the patent and the claim construction, but also to Lucent's own expert, Mr. Richter.

There is no doubt that the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions of the NASA Final Report specify a color data value. *See* Lucent Opp. at 17. That it does so by floating point numbers is not foreclosed by the patent or claim construction. Lucent nevertheless argues that using floating point numbers is not direct specification because the floating point numbers need to be converted to integers. *See* Lucent Opp. at 16. But the "directly specified" requirement has nothing to do with conversion from one number format to another. Rather, as stated in Dell's Motion (and undisputed by Lucent), the "directly specified" requirement is used in the specification and claims to distinguish specification by color data values from color specified as indexes to a color memory. *See* Dell Br. at 2. Mr. Richter himself acknowledges this fact in his declaration. *See* Richter Decl. at ¶ 9 (Docket Ent. 151). Further undisputed is that nothing in the conversion of floating point numbers to integers changes the color specification from a direct color mode to an indexing mode. As such, there is no dispute that the NASA Final Report discloses directly specifying color data values as required by the first mode.

With respect to its other argument, that the NASA Final Report does not disclose an "in-use background color," Lucent's Opposition confirms that the claim construction must be rewritten in order for Lucent to prevail. As stated in the Court's construction, an in-use background color is a color that will be used as the background color *for* subsequently received text and graphics commands—not *by* them. *See* Ex. 12[1] at 315, 320 (Markman Order). Lucent attempts to cast this distinction aside as "wordplay." *See* Lucent Opp. at 20. But by substituting "for" with "by," Lucent is adding an additional requirement that an "in-use background" color is a background color that is used by a drawing command itself. That additional requirement is found nowhere in the claim

---

[1] Unless otherwise noted, "Ex. __" refers to exhibits attached to the declaration of James S. Blackburn filed in support of Dell's motion for summary judgment (Docket Ent. 76) and in support of Dell's reply brief (filed concurrently).

- 1 -

1  construction. Under the proper view of the claim construction, it is undisputed that the NASA Final
2  Report discloses a color used as the background color for subsequently received drawing commands
3  (i.e., an "in-use background color").

4  Lucent's Opposition also demonstrates there is no genuine issue, even under Lucent's
5  erroneous view of the claim, that these features would have been obvious, since Lucent does not
6  dispute that modifying the system of the NASA Final Report to include specification of color data
7  values by integers, and an "in-use background color" (as reinterpreted by Lucent) would have been
8  variations "within the public grasp," and therefore obvious. *Bonito Boats, Inc. v. Thunder Craft*
9  *Boats, Inc.*, 489 U.S. 141, 156 (1989).[2]

10  As the record indisputably demonstrates that the NASA Final Report satisfies the "directly
11  specified" requirement of the first mode and the "in-use background color" requirement of the third
12  mode, Lucent's last line of defense is to assert, erroneously, that the NASA Final Report is not prior
13  art. Specifically, Lucent asserts that a printout of a record of the NASA Final Report maintained in
14  the Online Computer Library Center ("OCLC") database and relied on by George Washington
15  University Library in the ordinary course of its business should be excluded. According to Lucent,
16  this exclusion is mandated because Ms. Jean A. Pec, Head of Collections Management Services at
17  George Washington University, did not create or maintain the OCLC printout and was not an
18  employee of OCLC. *See* Lucent Opp. at 12. Lucent's argument misses the mark.

19  There is no requirement to establish when and by whom the OCLC printout was prepared in
20  order for it to constitute a business record of George Washington University subject to the hearsay
21  exception. *United States v. Ray*, 930 F.2d 1368, 1371 (9th Cir. 1990). Moreover, Ms. Pec can
22  qualify the printout as a business record because she is a "qualified witness," a term that is "broadly
23  interpreted to require only that the witness understand the record-keeping system." *Id*. Ms. Pec's
24  almost thirty years of constant experience with OCLC, and George Washington University Library's

---

[2] The instant motion, contrary to Lucent's assertions, is proper and should not be stricken. *See* Lucent Opp. at 1 n.1. That the additional prior art search to support obviousness cases led to the discovery of the NASA Final Report, should not preclude Dell from asserting that claims 1-3 are invalid as a matter of law in view of this reference. Indeed, as observed by the Federal Circuit, "[i]t is well settled that 'anticipation is the epitome of obviousness.'" *In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002) (citations omitted).

- 2 -

1  undisputed reliance on these records in the ordinary course of its business, leave no doubt that Ms. Pec

2  is a "qualified witness" who can establish foundation for the OCLC printout.

3  Lucent additionally asserts that the affidavit of Ms. Pec should be excluded because Ms. Pec

4  was not an employee of George Washington University Library in 1980 and 1981, and purportedly

5  has no knowledge of library procedures during that time frame. *See* Lucent Opp. at 11. But this

6  assertion is not sufficient to exclude her affidavit. "[A] declarant can testify about practices or

7  procedures in place before the witness was employed with the organization about which he is relating

8  information." *Los Angeles Times Communications, LLC v. Department of the Army*, 442 F. Supp. 2d

9  880, 886 (C.D. Cal. 2006) (citing *United States v. Thompson*, 559 F.2d 552, 554 (9th Cir. 1977)).

10 Moreover, Ms. Pec testified that as the Head of Collections Management Services, she had to and did,

11 investigate library procedures that were in place in the early 1980s. *See* Ex. 51 at 41-42 (Deposition

12 of Jean Pec, Dated November 8, 2007 ("Pec Dep.") at 39:11-40:4; 40:17-20). As such, Ms. Pec

13 clearly has personal knowledge of the library procedures during that time frame, and her affidavit,

14 therefore, should not be excluded.

15 The OCLC printout and Ms. Pec's affidavit not only constitute admissible evidence, but also

16 demonstrate that the NASA Final Report was a printed publication at least as early as September 30,

17 1980, prior to the May 19, 1981 filing date of the Fleming patent. Lucent disputes this conclusion, but

18 it does so under the wrong standard governing whether a reference is a printed publication, as

19 demonstrated below. To the extent, however, that Lucent's Opposition raises issues of fact regarding

20 the public accessibility of the NASA Final Report, the Court should at least grant partial summary

21 judgment that the NASA Final Report discloses all the elements of claims 1-3, as there is no genuine

22 issue that the NASA Final Report discloses the first and third modes, leaving for trial only the issue of

23 availability of the NASA Final Report as a printed publication.

24 **II.   ARGUMENT**

25 **A.   The NASA Final Report Indisputably Satisfies the First Mode of Access**

26 There is no dispute that the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions of

- 3 -

1   the NASA Final Report specify (i.e., "call for"[3]) a color data value. *See* Lucent Opp. at 17. There

2   also is no dispute that nothing in the patent forecloses direct specification using floating point

3   numbers. Further, as stated in Dell's Motion (and undisputed by Lucent), the "directly specified"

4   requirement is used in the specification and claims to distinguish specification by color data values

5   from color specified as indexes to a color memory. *See* Dell Br. at 2. Not only is this undisputed, but

6   Mr. Richter also acknowledged this fact in his declaration:

> The frame buffer stores for each pixel a number that identifies the
> color associated with the pixel. There are two ways that colors can be
> represented by the number in a pixel – ***either as a direct color value
> or as an index into a color map***.

Richter Decl. at ¶ 9 (emphasis added) (Docket Ent. 151). Furthermore, it is undisputed that nothing in the conversion of floating point numbers to integers changes the color specification from a direct color mode to an indexing mode. As such, there is no dispute that the NASA Final Report discloses directly specifying color data values as required by the first mode.

Lucent nevertheless argues that direct specification is missing from the NASA Final Report because the floating point numbers need to be converted to integers. *See* Lucent Opp. at 16. But the "directly specified" requirement has nothing to do with conversion of one number format to another. Indeed, Lucent's arguments are based on Mr. Richter's erroneous "significant conversion" theory. That is, direct specification "requires specifying in some number system that doesn't require significant conversion." Ex. 11 at 294 (Richter Dep. at 244:10-14). But Mr. Richter himself admits that there is no support for this theory in the patent or the claim construction.

> Q   **** What in the patent and in that Markman order tells us
> whether it's too much conversion or not too much conversion?
>
> MR. MARINA:   Objection. Calls for a legal conclusion.
>
> A   ***I don't know that there's anything that specifically points this
> out.*** We've already discussed that. It's an issue of what is directly
> specified as a color data value and what is not directly specified as a
> color data value.

Ex. 11 at 306-307 (Richter Dep. at 257:19-258:3) (emphasis added). Accordingly, Lucent's position,

---
[3] *See* Ex. 12 at 315, 320 (Markman Order).

- 4 -

based on nothing in the patent and the claim construction, simply should not distract the Court from the unmistakable conclusion that the NASA Final Report discloses direct specification.

But even under Lucent's erroneous position, it is undisputed that modifying the system of the NASA Final Report to implement direct specification using integers rather than floating point numbers would have been obvious. According to Lucent, one of ordinary skill would not have made this modification because "eliminating floating point specification" would not have been obvious. *See* Lucent Opp. at 22. But this argument does not save the day for Lucent. Mr. Richter testified that it was easier to use integers, *see* Ex. 11 at 297-298.1 (Richter Dep. at 248:11-250:6), and there is no doubt that the NASA Final Report discloses converting from floating point numbers to integers. *See* Ex. 10 at 280 (Richter Report at ¶ 46). Under these facts—which are not in dispute—as a matter of law, direct specification using integers would be readily "within the public grasp," and therefore obvious. *Bonito Boats*, 141 U.S. at 156.

### B. The NASA Final Report Indisputably Satisfies the Third Mode of Access

In order for Lucent to prevail on its position that the NASA Final Report is missing an "in-use background color" it must rewrite the Court's claim construction—something it cannot do. As stated in the Court's construction, an in-use background color is "a color that will be used as the background color *for* subsequently received text and graphics commands." *See* Ex. 12 at 315, 320 (Markman Order) (emphasis added). But Lucent maintains that in-use background colors are "colors that are drawn *by* subsequently received drawing commands." *See* Lucent Opp. at 20 (emphasis added). Lucent attempts to cast this distinction aside as "wordplay" but it simply cannot do so. *See id.* By substituting "for" with "by," Lucent is adding an additional requirement that an "in-use background" color is a background color that is used by a drawing command itself. *See, e.g.*, *id.* But this additional requirement is simply found nowhere in the claim construction.

Moreover, under the proper view of the claim construction, it is undisputed that the NASA Final Report discloses an "in-use background color." Indeed, Lucent does not dispute that the NASA Final Report discloses setting a background color, with subsequently received text and graphics drawing commands drawing over the background color. *See* Lucent Opp. at 18; Ex. 11 at 300 (Richter Dep. at 254:1-12). This disclosure is consistent with the patent specification which states:

- 5 -

"[i]n color mode 2 [i.e., the claimed third mode], text characters will be drawn in the in-use foreground color over the in-use background color." Ex. 8 at 102 (Fleming Pat. at 6:62-64). There is no doubt, therefore, that the NASA Final Report discloses a color used as the background color for subsequently received drawing commands (i.e., an "in-use background color").

Additionally, even under Lucent's erroneous view of "in-use background color," it is undisputed that modifying the system of the NASA Final Report to implement this feature would have been obvious. Mr. Richter does not dispute that the NASA Final Report discloses an in-use foreground color and a background color. *See* Dell Br. at 13. Because these facts are not in dispute, the Court should find that as a matter of law, modifying the system of the NASA Final Report to implement an "in-use background color" would have been an obvious variation, since the "in-use" characteristic was already used in that system.

### C. The OCLC Printout and the Pec Affidavit Should Not Be Excluded

Lucent's last line of defense is to assert that the NASA Final Report is not prior art. In doing so, Lucent seeks to exclude clearly admissible evidence establishing that the NASA Final Report is a printed publication. *See* Lucent Opp. at § IV.B.

Specifically, Lucent asserts that the OCLC printout should be excluded because Ms. Pec is unable to qualify the OCLC as a business record because she did not create or maintain the OCLC printout and was not an employee of OCLC. *See* Lucent Opp. at 12. Lucent's argument is irrelevant. There is no requirement to establish when and by whom the OCLC printout was prepared in order for it to constitute a business record of George Washington University Library subject to the hearsay exception. *Ray*, 930 F.2d at 1370. ("There is no requirement that the government establish when and by whom the documents were prepared."). Nor is there a requirement that the OCLC printout or database have been created by George Washington Library for it to constitute a business record of the Library because the Library nevertheless relies on the records and has a substantial interest in their accuracy. *See United States v. Childs*, 5 F.3d 1328, 1333-34 & n.3 (9th Cir. 1993). Ms Pec's affidavit unambiguously states that "[i]n the daily and ordinary course of the Library's operations, I and other Library employees would accept and rely on the date appearing in the 'Entered' field of [the

- 6 -

1  OCLC printout] as the date on which the Final Report was catalogued by a CMS employee and

2  entered into the OCLC database." Ex. 14 at 411 (Pec Decl. at ¶ 13).

3      Moreover, a "qualified witness" can establish foundation for business records—a term

4  "broadly interpreted to require only that the witness understand the record-keeping system." *Ray*, 930

5  F.2d at 1370. Under this standard, Ms. Pec undoubtedly is such a "qualified witness." Indeed, Ms.

6  Pec testified that since 1979 she constantly had experience with OCLC in her professional

7  responsibilities, which included personally cataloging and supervising others to catalog documents

8  into the OCLC database.

> Q   And is it true that from 1979 until the current day today, you've constantly had experience with OCLC in your professional responsibilities?
>
> A   Yes, it is.
>
> Q   And you mentioned that your current position at GW Gelman Library is head of the collection management services?
>
> A   Uh-huh, yes, it is.
>
> Q   And forgive me if this was asked earlier, but I don't think it was. Do you personally catalog documents into the OCLC?
>
> A   Yes, I do.
>
> Q   And do you also supervise others who catalog documents of OCLC?
>
> A   Yes, I do.
>
> Q   During your time at Notre Dame, '79 to '93, did you personally catalog documents in OCLC?
>
> A   Yes, I did.
>
> Q   And at any time during that 1979 to 1993 period, did you supervise others who cataloged documents into OCLC?
>
> A   Yes, I did.

Ex. 51 at 52-53 (Pec Dep. at 112:8-113:6). Accordingly, because Ms. Pec is a "qualified witness," she can in fact qualify the OCLC printout as a business record.

- 7 -

Furthermore, Lucent's other ground for exclusion of the OCLC printout is that "something in the record was changed." *See* Lucent Opp. at 5. Lucent's attack based on such purported ambiguity is insufficient. Indeed, "freedom from ambiguity" is not a requirement of admissibility. *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999).

Additionally, Lucent asserts that Ms. Pec's affidavit should be excluded because she was not an employee of George Washington University Library in 1980 and 1981, and according to Lucent therefore, has no knowledge of library procedures. *See* Lucent Opp. at 11. But this assertion is again not sufficient to exclude her affidavit. Indeed, "a declarant can testify about practices or procedures in place before the witness was employed with the organization about which he is relating information." *Los Angeles Times*, 442 F. Supp. 2d at 886; *Thompson*, 559 F.2d at 554. Moreover, Ms. Pec testified that as the Head of Collections Management Services, she had to, and did, investigate library procedures that were in place in the early 1980s[4]:

> Q   Are you aware whether CMS was handling the cataloging for special collections in the early 1980s?
>
> A   Yes, I am.
>
> Q   And was CMS handling the cataloging for special collections in the early 1980s?
>
> A   As far as I know, yes.
>
> Q   And how do you know that?
>
> A   I know that because as head of the department, when I came, I asked people what were you doing, and what have you done as -- in my role as department head.
>
> Q   Did you specifically ask what had been going on more than a decade prior to your joining the library?
>
> A   Yes, because you need to know procedures and what might have changed or what might not have changed.

---

[4] In this regard, the *Ajinomoto* case cited by Lucent is inapposite because the witness there was not even a member of the library personnel, much less the Head of Collections Management Services. *See Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 1998 W.L. 151411 (No. 95-218-SLR) at *120 (D. Del. Mar. 13, 1998).

- 8 -

\* \* \*

> Q  Do the cataloging procedures that you use at The George Washington University change over time?
>
> A  Cataloging procedures, no.

Ex. 51 at 41-42 (Pec Dep. at 39:11-40:4; 40:17-20).  Thus, Ms. Pec clearly has personal knowledge of the library procedures during that time frame, and her affidavit should therefore not be excluded.  *See Los Angeles Times*, 442 F. Supp. 2d at 886; *Thompson*, 559 F.2d at 554; *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1330 (9th Cir. 2000) ("Personal knowledge can be inferred from an affiant's position.").

**D.  Because the NASA Final Report Discloses the First and Third Modes of Access, the Court Should at Least Grant Partial Summary Judgment that the NASA Final Report Satisfies all the Elements of Claims 1-3**

The Pec affidavit and the OCLC printout not only are admissible, but demonstrate that the NASA Final Report was publicly available at least as early as September 30, 1980, prior to the May 19, 1981 filing date of the Fleming patent.  *See* Dell Br. at 5.  Lucent disputes this conclusion, but relies on the wrong standard for whether a reference is a "printed publication."  Specifically, Lucent contends that the "key" to determining whether the NASA Final Report is a printed publication is whether it was indexed, cataloged, and shelved.  *See* Lucent Opp. at 8.  The Federal Circuit, however, expressly rejected this contention.  *See In re Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004) ("[T]he appellants' argument that 'distribution and/or indexing' are the key components to a 'printed publication' inquiry fails to properly reflect what our precedent stands for.").  "Indeed, the key inquiry is whether or not a reference has been made 'publicly accessible.'" *Id.*

Not only does Lucent argue under an erroneous standard, it also ignores testimony that contradicts its positions.  For example, Lucent argues that no interested member of the public would have been able to access the Special Collections Department to obtain the NASA Final Report.  *See* Lucent Opp. at 14.  But this argument ignores Ms. Pec's testimony that patrons simply have to ask a staff member to retrieve material housed in Special Collections.  *See* Ex. 51 at 45 (Pec Dep. at 54:6-9).  Similarly, Lucent argues that OCLC records were not accessible to the public, but Ms. Pec again testified that to gain access to the OCLC terminal, a person would simply have to "ask a staff member."  *See id.* at 48-49 (Pec Dep. at 65:13-66:5).  Furthermore, Lucent's argument that subject

- 9 -

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases:
Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)

matter searching for the NASA Final Report was not available in the early 1980s[5] ignores the fact that during that time frame searching for the NASA Final Report by key words in the title was available. *See id.* at 56 (Pec Dep. at 122:16-20). Because the title of the NASA Final Report includes subject matter-related terms such as "Raster," "Graphics," and "Display," searching in this manner would have been meaningful.

As such, the NASA Final Report was publicly accessible, contrary to Lucent's arguments—based as they are, on an erroneous standard. To the extent, however, that Lucent's Opposition raises issues of fact as to the public accessibility of the NASA Final Report, Dell respectfully requests that the Court grant at least partial summary judgment that the NASA Final Report satisfies all the elements of claims 1-3, as there is no dispute that the NASA Final Report discloses the claimed first and third modes of access, leaving for trial only the issue of availability of the NASA Final Report as a printed publication.

### III. CONCLUSION

Based on the foregoing, Dell respectfully requests that the Court grant summary judgment that the asserted claims of the Fleming patent are invalid. At a minimum, the Court should grant partial summary judgment that the NASA Final Report satisfies all the elements of claims 1-3.[6]

December 21, 2007

ARNOLD & PORTER LLP
James S. Blackburn
Joseph A. Micallef

McDERMOTT WILL & EMERY LLP
Joel M. Freed

Attorneys for Dell Inc.

By: /s/James S. Blackburn
    James S. Blackburn
    james.blackburn@aporter.com

---

[5] In furtherance of this argument, Lucent contends that "George Washington University did not become a member of OCLC until 1987." Lucent Opp. at 14. To support its contention, Lucent cites to an email (Ex. 2 at 51 of the Declaration of James E. Marina in Support of Lucent's Oppositions to Defendants' Motions for Summary Judgment of Invalidity of Claims 1-3 of the Fleming '759 Patent) purportedly from Larry Olszewski to an attorney at Kirkland & Ellis stating: "GeorgeWashingtonUniversitybecame [sic] a member in February, 1987." Thus, Lucent is relying on this email for the truth of the matters asserted. This email, therefore, clearly constitutes inadmissible hearsay, and should be excluded.

[6] Gateway, Inc. also joins in this Reply for all the of the reasons stated herein.

- 10 -

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases:
Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 11 -

Case No. 07-CV-2000-H (CAB) consisting of matters severed from consolidated cases:
Case No. 02-CV-2060-B (CAB); Case No. 03-CV-0699-B (CAB); Case No. 03-CV-1108-B (CAB)