1   James S. Blackburn (State Bar No. 169134)
    ARNOLD & PORTER LLP
2   777 South Figueroa Street, 44th Floor
    Los Angeles, California  90017-5844
3   Telephone:  (213) 243-4000
    Facsimile:  (213) 243-4199
4
    Joseph A. Micallef (admitted *pro hac vice*)
5   ARNOLD & PORTER LLP
    555 Twelfth Street, N.W.
6   Washington, D.C.  20004-1206
    Telephone:  (202) 942-5000
7   Facsimile:  (202) 942-5999
8   Joel M. Freed (admitted *pro hac vice*)
    McDERMOTT WILL & EMERY LLP
9   600 13th Street, N.W.
    Washington, D.C.  20005-3096
10  Telephone:  (202) 756-8000
    Facsimile:  (202) 756-8087
11
    Attorneys for *Dell Inc.*
12

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15

16  LUCENT TECHNOLOGIES INC.  and          )   Case No. 07-CV-2000-H (CAB)
    MULTIMEDIA PATENT TRUST,               )   consisting of matters severed from
17                                         )   consolidated cases:
          Plaintiffs and Counterclaim-defendants, )   Case No. 02-CV-2060-B (CAB)
18                                         )   Case No. 03-CV-0699-B (CAB)
          v.                               )   Case No. 03-CV-1108-B (CAB)
19                                         )
    GATEWAY, INC. AND GATEWAY              )   **DECLARATION OF JAMES S.**
20  COUNTRY STORES LLC, GATEWAY            )   **BLACKBURN IN SUPPORT OF DELL**
    COMPANIES, INC., GATEWAY               )   **INC.'S REPLIES IN SUPPORT OF ITS**
21  MANUFACTURING LLC and                  )   **MOTIONS FOR SUMMARY**
    COWABUNGA ENTERPRISES, INC.,           )   **JUDGMENT OF INVALIDITY ON THE**
22                                         )   **ASSERTED CLAIMS OF U.S. PATENT**
          Defendants and Counter-claimants, )   **NOS. 4,958,226, 4,383,272, 4,439,759, AND**
23                                         )   **4,763,356**
    and                                    )
24                                         )   Judge Marilyn L. Huff
    MICROSOFT CORPORATION,                 )
25                                         )   Hearing:  January 8, 2008, 9:30 a.m.
          Intervener and Counter-claimant,  )   Location: Courtroom 13, 5th Floor
26                                         )
                                           )
27
28

1    MICROSOFT CORPORATION,                    )
                                              )
2            Plaintiff and Counter-defendant,  )
                                              )
3    v.                                        )
                                              )
4    LUCENT TECHNOLOGIES INC. and             )
     MULTIMEDIA PATENT TRUST,                 )
5                                              )
             Defendants and Counter-claimants, )
6                                              )

7    LUCENT TECHNOLOGIES INC. and             )
     MULTIMEDIA PATENT TRUST,                 )
8                                              )
             Plaintiffs and Counterclaim-defendants, )
9                                              )
10   v.                                        )
                                              )
11   DELL INC.,                                )
                                              )
12           Defendant and Counter-claimant.   )

I, James S. Blackburn, declare as follows:

1.     I am an attorney and a partner of the law firm of Arnold & Porter LLP, counsel for defendant Dell Inc. ("Dell").  I make this declaration in support of Dell Inc.'s Replies in Support of its Motions for Summary Judgment of Invalidity on the Asserted Claims of U.S. Patent Nos. 4,958,226, 4,383,272, 4,439,759, and 4,763,356, which are filed concurrently with this declaration. Unless otherwise stated herein, I have personal knowledge of the facts set forth below and, if called as a witness, could and would competently testify thereto.

2.     Attached hereto as Exhibit 50 is a true and correct copy of Non-Confidential Excerpts of the Expert Report of Edward J. Delp III, dated March 31, 2006.

3.     Attached hereto as Exhibit 51 is a true and correct copy of Excerpts of the Video Deposition of Jean A. Pec, dated November 8, 2007.

4.     Attached hereto as Exhibit 52 is a true and correct copy of Excerpts of the Transcript of Motion Hearing Before the Honorable Rudi M. Brewster, dated May 11, 2007.

5.     Attached hereto as Exhibit 53 is a true and correct copy of the Declaration of Mr. Bruce Tognazinni in Support of Lucent's Opposition to Gateway's Motion for Summary Judgment of Invalidity of Claims 19 & 21 of U.S. Patent No. 4,763,356, dated April 11, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of December at Los Angeles, California.


By:   s/ James S. Blackburn
      James S. Blackburn
      Attorney for Dell Inc.

- 1 -

1

**EXHIBITS TABLE OF CONTENTS**

2

| **Exhibit** | **Document** | **Page No.** |
|---|---|---|
| 50 | Non-Confidential Excerpts of the Expert Report of Edward J. Delp III, dated March 31, 2006 | 4 |
| 51 | Excerpts of the Video Deposition of Jean A. Pec, dated November 8, 2007 | 39 |
| 52 | Excerpts of the Transcript of Motion Hearing Before the Honorable Rudi M. Brewster, dated May 11, 2007 | 58 |
| 53 | Declaration of Mr. Bruce Tognazinni in Support of Lucent's Opposition to Gateway's Motion for Summary Judgment of Invalidity of Claims 19 & 21 of U.S. Patent No. 4,763,356, dated April 11, 2007 | 64 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIS PAGE INTENTIONALLY LEFT BLANK**

Exhibit 50

John E. Gartman (SBN 152300)
Juanita R. Brooks (SBN 75934)
Christopher S. Marchese (SBN 170239)
Roger A. Denning (SBN 228998)
Fish & Richardson P.C.
12390 El Camino Real
San Diego, California 92130
Telephone:  (858) 678-5070
Facsimile:   (858) 678-5099

Stephen P. McGrath (SBN 202696)
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052
Telephone: (425) 882-8080
Facsimile: (425) 936-7329

Attorneys for Intervener/Counter-claimant
and Plaintiff/Counter-defendant MICROSOFT CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., | Case No. 02-CV-2060 B (CAB) consolidated with |
|       Plaintiff and Counterclaim-defendant, | Case No. 03-CV-0699 B (CAB); and Case No. 03-CV-1108 B (CAB) |
|     v. | |
| GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | **EXPERT REPORT OF EDWARD J. DELP III** |
|     Defendants and Counter-claimants, | **CONFIDENTIAL – OUTSIDE COUNSEL ONLY INFORMATION** |
|     and | |
| MICROSOFT CORPORATION, | |
|     Intervenor and Counter-claimant. | |
| MICROSOFT CORPORATION, | |
|     Plaintiff and Counter-defendant, | |
|   v. | |
| LUCENT TECHNOLOGIES INC., | |
|     Defendant and Counter-claimant, | |

1

2

3

4

5

6

LUCENT TECHNOLOGIES INC.,

      Plaintiffs,

  v.

DELL INC.,

      Defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    <u>ASSIGNMENT</u>

1.    I, Edward J. Delp III, am the Silicon Valley Professor of Electrical and Computer Engineering and Professor of Biomedical Engineering, School of Electrical Computer Engineering and School of Biomedical Engineering at Purdue University and an expert in the field of video compression technology.  I have been retained as an expert by Defendants Microsoft Corporation ("Microsoft"), Gateway, Inc. ("Gateway"), and Dell, Inc. ("Dell") to consult on various technical issues concerning the above-referenced action.  This report sets forth my opinions concerning technical issues that are relevant to the validity and enforceability of U.S. Patent No. 4,383,272 (the "'272 patent") and U.S. Patent No. 4,958,226 (the "'226 patent") (collectively "the Asserted Patents"), which have been asserted by Plaintiff Lucent Technologies, Inc. ("Lucent" or "Plaintiff").  This report addresses only issues concerning validity and enforceability.  I expect to address issues regarding infringement in subsequent reports, as necessary.

# II.    <u>QUALIFICATIONS</u>

2.    I am a Full Professor in the School of Electrical and Computer Engineering at Purdue University.  I received my Bachelor of Science degree in electrical engineering from the University of Cincinnati in 1973; my Master of Science degree from the University of Cincinnati in 1975; and my Ph.D. in electrical engineering from Purdue University in 1979.  My expertise includes the processing and coding of image signals, digital signal processing, and in particular, video compression techniques and systems.

3.    As a professor at Purdue University, the University of Michigan, and the Tampere University of Technology in Finland, I have performed extensive research relating to video compression techniques.  Over the last seven years, I have supervised the research and preparation of fifteen Ph.D. theses relating to topics in video compression and image processing. As part of my continuing research in the field of video compression, I have studied new developments in the field of video coding, analyzed the publications of other leaders in this field, and participated in industry organizations chartered to study the coding of images and video.

4.    My experience in the field of video compression includes over 25 years of directed research, as well as the materials taught in my classes at Purdue University, the University of Michigan, and the Tampere University of Technology.  I have been studying subject matter relating to image and video processing since approximately 1983, in connection with grants provided by the National Science Foundation, the National Institutes of Health, the Department of Defense, and various corporations, including Texas Instruments, Motorola, and Nokia.  My total research funding over the years is in the millions of dollars.  I also have been elected a fellow of the Institute of Electrical and Electronics Engineers, the Society for Imaging Science and Technology, and the International Society for Optical Engineering (SPIE).

5.    A copy of my CV is attached hereto as Exhibit A.

## III.    COMPENSATION

6.    I am being compensated for my work on this litigation at my standard rate of $400.00 per hour.  No part of my compensation is contingent upon the outcome of this litigation or any issue which may be determined in the course of this litigation.

## IV.    INFORMATION CONSIDERED

7.    I have considered the following information in forming my opinions expressed in this expert report:

- The '272 and '226 Patents.

- The prosecution history of the '226 Patent.

- Markman presentations and briefs for the '272 and '226 Patents.

- Lucent's validity contentions regarding the '272 and '226 Patents.

- Defendants' invalidity contentions for the '272 and '226 Patents.

- Various portions of the deposition transcripts of the following individuals:
  Dr. Haskell, Mr. Schaphorst, Mr. Ericsson, Dr. Hill, Ms. Jenkins,
  Ms. Lewis, Ms. Coates, Mr. Kaske, and Dr. Jain.

- The Court's claim construction orders.

- All other documents cited herein and in the accompanying claim charts.

4                      Case No. 02-CV-2060 B (CAB)

Exhibit 50  Page 7

8.      I reserve the right to supplement my report in light of any additional fact discovery, opinions by Plaintiff's experts, and/or trial testimony.  I understand that at least Dr. Girod will provide additional testimony as a fact witness in this case.  I also reserve the right to provide rebuttal opinions and testimony in response to Plaintiff's experts, and rebuttal testimony in response to any of Plaintiff's fact witnesses.  Further, I reserve the right to use animations, demonstratives, enlargements of actual exhibits, and other information in order to illustrate my opinions.

## V.    PRIOR TESTIMONY

9.      In the preceding four years, I provided expert testimony at a sentencing hearing in the case *United States of America v. Seifert, Brian*, IP02-CR-0012-01-M/F, regarding computer imaging technology.

## VI.    OPINIONS AND CONCLUSIONS

### A.    Summary

10.      Based upon the information I have considered, it is my opinion that claims 13 and 22 of the '272 patent are invalid in view of certain prior art and invalid for failure to disclose the best mode.  It also is my opinion that claim 12 of the '226 patent is indefinite and therefore invalid, invalid in view of certain prior art, and invalid for failure to disclose the best mode.

### B.    Relevant Legal Principles

11.      I have been told that statutorily and judicially created rules must be considered in analyzing the validity of a patent.  I will not offer opinions of law as I am not an attorney.  I have, however, been asked to consider at least the following principles in preparing this report.

- It is my understanding that invalidity must be proved by clear and convincing evidence, and that is the standard I have used throughout my report.

- It is my understanding that each patent claim is to be considered separately for purposes of invalidity.

- It is my understanding that a person shall not be entitled to a patent if the claimed invention was known or used by others in this country, or patented

1    or described in a printed publication in this or a foreign country, before the

2    invention thereof by the applicant for patent.

3    •   It is my understanding that a person shall not be entitled to a patent if the

4    claimed invention was patented or described in a printed publication in this

5    or a foreign country, or in public use or on sale in this country, more than

6    one year prior to the date of the application for patent in the United States.

7    •   It is my understanding that a patent claim is invalid as "anticipated" if each

8    and every feature of the claim is found, expressly or inherently, in a single

9    prior art reference or product.  Claim limitations that are not expressly

10    found in a prior art reference are inherent if the prior art necessarily

11    functions in accordance with, or includes, the claim limitations.  It is

12    acceptable to examine evidence outside the prior art reference (extrinsic

13    evidence) in determining whether a feature, while not expressly discussed

14    in the reference, is necessarily present in it.

15    •   It is my understanding that a patent claim is invalid as "obvious" if, in view

16    of a prior art reference or a combination of prior art references, it would

17    have been obvious to a person of ordinary skill in the art at the time of the

18    invention, taking into account:  (a) the scope and content of the prior art;

19    (b) the differences between the prior art and the claim under consideration;

20    and (c) the level of ordinary skill in the art.

21    •   It is my understanding that two or more prior art references or products

22    may be combined to show that a claim as a whole would have been

23    obvious to a person of ordinary skill in the art at the time of the invention,

24    if there is a "motivation," "suggestion," or "teaching" in the prior art to

25    combine the references to produce the claimed invention.  It is my

26    understanding that the motivation, suggestion, or teaching can be explicit

27    or implicit, can come from knowledge generally available to one of

28    ordinary skill in the art, and can come from the nature of the problem to be

solved.  The test for an implicit motivation, suggestion, or teaching is what the combined teachings, knowledge of one of ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art.  The problem examined is not the specific problem solved by the invention but the general problem that confronted the inventor before the invention was made.

- It is my understanding that to rebut a showing of obviousness based on prior art, Lucent may attempt to show "secondary considerations" of non-obviousness over the prior art, which include:  (a) a long felt need for the claimed invention, this is, whether the field had long been searching unsuccessfully for a solution to the problem ultimately solved by the patented invention; (b) commercial success of the claimed invention, that is, whether commercial embodiments of the claimed invention were a success in the marketplace by achieving some significant market share or generating significant revenue, and that success is attributable to the claimed invention; (c) unexpected results or properties of the claimed invention; and (d) copying of the claimed invention by others.

- It is my understanding that, in order for Lucent to establish any of the secondary considerations of non-obviousness, Lucent must show a nexus between that secondary consideration and the claimed invention.  I have not included opinions regarding secondary considerations of non-obviousness in this report because I understand that it is Lucent's burden to make a showing of secondary considerations.  If Lucent or Lucent's expert should assert the presence of secondary considerations of non-obviousness, I will provide a report addressing Lucent's assertions.  I am informed that, pursuant to Court order, I am permitted to provide such a report by May 31, 2006.

1       •   It is my understanding that an inventor is required to disclose the best

2       mode, known to the inventor at the time the application is filed, for

3       practicing the claimed invention.  It is my understanding that failure by an

4       applicant to properly disclose the best mode need not rise to the level of

5       active concealment or grossly inequitable conduct in order to invalidate a

6       patent.

7       •   It is my understanding that a claim may be invalid if it is "indefinite."  The

8       following quote is from the United States patent statute concerning the

9       definiteness requirement:  "The specification shall conclude with one or

10      more claims particularly pointing out and distinctly claiming the subject

11      matter which the applicant regards as the invention."  I am informed that

12      the test for whether a claim meets the definiteness requirement is whether

13      one skilled in the art would understand the bounds of the claim when read

14      in light of the specification.

15      •   It is my understanding that patent claims can be written in a form known as

16      "means plus function."  The following quote is from the United States

17      patent statute concerning means plus function claims:  "An element in a

18      claim for a combination may be expressed as a means or step for

19      performing a specified function without the recital of structure, material, or

20      acts in support thereof, and such claim shall be construed to cover the

21      corresponding structure, material, or acts described in the specification and

22      equivalents thereof."  It is my understanding that means plus function claim

23      elements must meet the requirement of definiteness, which I discussed

24      above.  I am informed that, if the patent's specification does not contain an

25      adequate disclosure of structure corresponding to the function of the means

26      plus function element, the claim is indefinite.  I understand that this issue is

27      analyzed in view of the understanding of one of ordinary skill in the art.

28

- I am informed that prior art is to be analyzed, as stated above, from the perspective of "one of ordinary skill in the art" at the time the invention was made.

- It is my understanding that the Court has, in this case, interpreted the asserted claims of the '272 and '226 patents. Accordingly, in the preparation of this report, I have adhered to the constructions set forth in the Court's *Superseding Order Construing Claims For United States Patent Number 4,383,272* signed on August 15, 2005 and the Court's *Order Construing Claims For United States Patent Number 4,958,226* signed on July 13, 2005. Copies of these Orders are attached hereto as Exhibits D and E.

12.    I expect to continue to develop my opinions discussed in this report. I also reserve the right to supplement my opinions based on information obtained from additional discovery or from Plaintiff's experts, as indicated above.

**C.    Technology Background of the '272 Patent**

13.    If called at trial, I may testify concerning the field of technology to which the '272 and '226 patents relate. I also may testify regarding the scope and content of the '272 and '226 patents as they would be understood by one of ordinary skill in the relevant field.

14.    A considerable amount of information is required to represent an image. Therefore, research into the compression of images and video signals was already being performed in the early 1950's. At that time, a host of engineers and scientists were conducting studies regarding the statistical nature of television signals. The goal of these studies was to apply principles from information theory and source coding to the transmission of image signals, and more particularly television signals, in order to devise transmission methods capable of reducing the amount of information that had to be transmitted to a receiver. For example, researchers investigated the use of first, second, and third-order statistics to determine whether images could be more efficiently represented using correlations that exist between intensity

coding techniques.  In my opinion, it would have been obvious to include a DCT in the encoder presented in the Micke Thesis, and therefore also an inverse DCT in a corresponding decoder.  It is my opinion that this prior art reference is enabling, in that it places the alleged invention in the possession of the person of ordinary skill in the art through an enabling disclosure.  I am informed that this enablement determination must be made by considering the reference itself, together with the knowledge of the person of ordinary skill in the art.  That is the standard I have applied.

181.    Moreover, the Micke Thesis references the article *Advances in Picture Coding* by Dr. H. G. Musmann, which was published in April 1985.  *Id*. at GW-LT 255084 and MSLT_0004911-MSLT_0004936.  *Advances in Picture Coding* discloses that use of Discrete Cosine Transform ("DCT") is advantageous in coding natural pictures.  *See Advances in Picture Coding* at 537.  *Advances in Picture Coding* further discloses that DCT is clearly superior to at least the Walsh Transform in terms of data compression.  *Id*. at 539.  As such, in my opinion, it would have been obvious to include the DCT described in *Advances in Picture Coding* as the transform coding technique suggested by the Micke Thesis.  Therefore, it is my opinion that each and every element of claim 12 is included in the Micke Thesis, taken alone or in combination with *Advances in Picture Coding*.

### 3.     §102 – U.S. Patent No. 4,849,810 to Ericsson

182.    It is my opinion that every element required by claim 12 of the Haskell patent is included, either explicitly or inherently, in U.S. Patent No. 4,849,810 to Ericsson ("the Ericsson patent") (*e.g.*, MSLT_0042584-MSLT_0042598).  Therefore the Ericsson patent anticipates Claim 12.  The Ericsson patent adds important information that was not before the Examiner in any of the documents in the record.  A full analysis of this reference is included in my claim charts, which are attached hereto as Exhibit C.

183.    Claim 12 is directed to "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from interpolated blocks and codes that describe deviations from interpolated blocks…."  The Ericsson patent discloses a decoder circuit responsive to coded video signals where the video signals comprise successive

1   frames. *See, e.g.,* Fig. 3; col. 2, lines 53-58. Each of the frames includes a plurality of blocks.

2   *See, e.g.*, col. 5, line 59 - col. 6, line 2. The video signals are coded using various methods,

3   including the discrete cosine transform, or DCT, method. *See, e.g.*, col. 6, lines 31-32 ("One

4   preferred lossy compression circuitry employs a discrete cosine transform …"); *see also* col. 7,

5   lines 40-47; col. 10, lines 14-16; col. 5, lines 30-34.

6          184.   The coded video signals include codes that describe deviations from approximated

7   blocks. *See, e.g.*, col. 12, line 67 - col. 13, line 2; col. 18, lines 18-21 (top level difference image

8   signal "representing the error" from predicted blocks); Fig. 12 (output of arithmetic encoder 520).

9   The coded video signals also include codes that describe deviations from interpolated blocks.

10  *See, e.g.*, col. 13, lines 30-31; col. 18, lines 25-28 (lower level difference image signal

11  "representing the error" from blocks that have been interpolated by interpolation circuitry 526 and

12  527 of Fig. 12); Fig. 12 (output of vector quantization circuit 536).

13         185.   Additionally, Claim 12 requires "means for developing block approximations from

14  said codes that describe deviations from approximated blocks…." I am informed that the Court

15  has determined that this element of Claim 12 is in means-plus-function format, where the function

16  is "developing block approximations from said codes that describe deviations from approximated

17  blocks." The Court construed "block approximations" as "the combinations of predicted blocks

18  with differences between the actual blocks and the predicted blocks." The corresponding

19  structure identified by the Court for this claim element is Decoder 22, DCT$^{-1}$ 24, Adder 27, and

20  Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function,

21  citing Haskell Fig. 2; col. 4, lines 3-10, 26-32; and col. 4, line 63 - col. 5, line 7.

22         186.   The decoder of Figure 3 of the Ericsson patent includes circuitry for performing

23  the function of developing block approximations (that is, the combination of predicted blocks

24  [called a "warped image" in the Ericsson patent[2]] with differences between actual blocks and the

25  predicted blocks) from the codes that describe deviations from approximated blocks [called a

26

27

28  _____

        [2] *See, e.g.*, col. 12, lines 22-24 ("Referring now to FIG. 10, the estimated receiver image over
    line 51 (often referred to as the 'warped' image) …").

1  "difference image" in the Ericsson patent][3]. *See, e.g.*, Fig. 3; col. 18, lines 13-22 ("At the top

2  level, the quantized difference image is decoded and added to the warped image at that level (in

3  selective adder 100 which includes decimation circuitry)."); *see also* col. 8, lines 6-52.

4       187.    The circuitry disclosed in the Ericsson patent for performing this function includes

5  channel decoder circuitry 70.  *See* Fig. 3; col. 8, lines 6-12 ("At the receiver 21, referring to FIG.

6  3, the data from the channel is decoded by a channel decoder circuitry 70 and the resulting

7  receiver error reconstruction signal over lines 72 and receiver coded motion signal representation

8  over lines 74 are delivered to reconstruction circuitry 76, motion compensator 99, and

9  reconstruction circuitry 78 respectively.").  The structure further includes reconstruction circuits

10  76 and 78, which include inverse DCT circuitry, *i.e.*, a $DCT^{-1}$.  *See, e.g.*, col. 8, lines 12-17 ("The

11  reconstruction circuitries 76 and 78 each provide for decoding the codes employed by the

12  transmitter to effect the operations performed by reconstruction circuitries 48 and 34,

13  respectively, of the transmitter, as described in more detail hereinafter."); col. 10, lines 20-22 ("In

14  this circumstance, the reconstruction circuitry 34 then employs the inverse discrete cosine

15  transform as is well known in the art."); col. 7, lines 52-55 ("The error reconstruction signal is

16  also sent to the reconstruction apparatus 48 which provides an operation which is the inverse to

17  that imposed by the lossy compressor 46."); col. 6, lines 31-32; col. 7, lines 40-47.

18       188.    The structure also includes Adder 100, *see* Figure 3, and shift circuitry, as included

19  in motion compensation loop 80 of Figure 3.  *See, e.g.*, col. 9, lines 36-49:

20               The full motion compensation circuits 42 and 80, using incoming
                 frame image data from frame buffers 44 and 98 respectively and the
21               motion field interpolator output data, effect, in the transmitter,
                 generation of the estimated receiver image over lines 51, and in the
22               receiver, the received estimated image over lines 82.  The motion
                 compensation circuitry maps each output pixel location to a
23               location in the previous frame as indicated by the displacement
                 vector value associated with that output pixel location.  The
24               displacement vectors are specified by the motion field interpolation
                 circuitry associated therewith.  In particular, referring to FIG. 4, this
25               is the output of vector interpolator 134.
26

27 ─────────────
          [3] *See, e.g.*, col. 3, lines 25-30 ("In another aspect of the invention, the method features the
28  steps of forming a difference image representing, on a pixel-bypixel [sic] basis, the difference
    between a predicted image data for a current image frame and an uncoded current image data
    representing the uncoded current image frame.").

1    189.    The Ericsson patent discloses a device for developing blocks of image information

2    from predicted blocks and codes that describe deviations from predicted blocks, such as

3    prediction error information using structure – decoder 70, reconstruction circuits 76 and 78, adder

4    100, and the shift circuitry of motion compensation loop 80 – that is identical or at least

5    equivalent to the corresponding structure of this limitation of Claim 12.

6    190.    Claim 12 also requires "means responsive to said block approximations and to said

7    codes that describe deviations from interpolated blocks to develop said interpolated blocks."  I am

8    informed that the Court has determined that this element of Claim 12 is in means-plus-function

9    format, where the function is "to develop said interpolated blocks responsive to said block

10    approximations and to said codes that describe deviations from interpolated blocks."  The

11    corresponding structure identified by the Court for this claim element is Decoder 25, DCT$^{-1}$ 34,

12    Adder 35, Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these

13    elements related to the claimed function, citing Haskell Fig. 2; col. 4, lines 63-65; and col. 5, lines

14    7-23.  The structure and inputs that correspond to these elements is at Haskell col. 4, lines 38-50.

15    191.    The Ericsson patent discloses a device for developing interpolated blocks

16    responsive to predictive blocks that have been combined with codes describing deviations from

17    predicted blocks, such as prediction error information, and to codes that describe deviations from

18    interpolated blocks.  Ericsson also discloses in one of the patents that it incorporates by reference

19    a system that performs temporal frame interpolation by scaling the motion vectors for a predictive

20    frame, just as described in the Haskell patent.  *See* col. 1, line 65 - col. 2, line 4.

21    192.    I note that the interpolation in the Ericsson patent is intraframe interpolation.

22    Claim 12, however, refers only to "interpolated blocks" and does not specify any particular type

23    of interpolation.

24    193.    The receiver of Figure 3 includes circuitry for performing the function of

25    developing interpolated blocks responsive to said block approximations and to said codes that

26    describe deviations from interpolated blocks.  *See, e.g.*, col. 18, lines 22-28 ("The lower levels are

27    then reconstructed (by adder 100) by first forming the prediction using the transmitted blur

28    information available over lines 84 from reconstruction circuitry 76 and then decoding the

84    Case No. 02-CV-2060 B (CAB)

**Exhibit 50  Page 16**

1   difference image and selectively adding it to the prediction image to form a new reconstructed

2   image for that level."); col. 13, lines 27-31.

3       194.    The circuitry disclosed in the Ericsson patent for performing this function includes

4   decoder 70. *See, e.g.*, Figure 3; col. 8, lines 6-12. The circuitry further includes reconstruction

5   circuits 76 and 78, which include DCT$^{-1}$ circuits. *See, e.g.*, col. 8, lines 12-17; col. 10, lines 20-

6   22; col. 7, lines 52-55; col. 6, lines 31-32; col. 7, lines 40-47.

7       195.    The circuitry also includes Adder 100, *see* Figure 3, and Shift Circuitry, as

8   included in motion compensation loop 80 of Figure 3. *See, e.g.*, col. 9, lines 36-49. The circuitry

9   further includes interpolation circuits 526 and 527 of Figure 12. *See, e.g.*, col. 15, lines 23-41;

10  col. 5, lines 5-6 ("FIG. 12 is a detailed electrical block diagram of lossy compressor 46 according

11  to the invention."); col. 18, lines 45-49 ("Looking in more detail at the generation of the

12  resolution pyramids and decoding thereof [in the decoder of Figure 3], the process follows the

13  inverse of the method used in lossy compressor 46. Thus since the receiver decoding process

14  follows the encoding process of the transmitter, ...."). Interpolation circuits 526 and 527 perform

15  the same function as Averager 32 in the Haskell patent.

16      196.    The Ericsson patent discloses a device for developing interpolated blocks

17  responsive to predicted blocks that have been combined with codes describing deviations from

18  predicted blocks, such as prediction error information, and to codes that describe deviations from

19  interpolated blocks using structure – decoder 70, reconstruction circuits 76 and 78, adder 100, the

20  shift circuitry of motion compensation loop 80, and interpolation circuits 526 and 527 – that is

21  identical or at least equivalent to the corresponding structure of this limitation of Claim 12. It is

22  my opinion that the Ericsson patent is enabling, in that it places the alleged invention in the

23  possession of the person of ordinary skill in the art through an enabling disclosure. I am informed

24  that this enablement determination must be made by considering the reference itself, together

25  with the knowledge of the person of ordinary skill in the art. That is the standard I have applied.

26          **4.     §103 – U.S. Patent No. 4,727,422 to Hinman**

27      197.    It is my opinion that each element required by claim 12 of the Haskell patent is

28  included, either explicitly or inherently, in U.S. Patent No. 4,727,422 to Hinman ("the Hinman

1     patent") (*e.g.*, MSLT_0001034-MSLT_0001051) with the exception of the transmission of "codes

2     that describe deviations from interpolated blocks." Because the transmission of such codes, *i.e.*,

3     interpolation error, was a technique well known in the art, and those of ordinary skill in the art

4     would have been motivated to combine such codes with the teachings of the Hinman patent, the

5     Hinman patent in combination with any one of those references renders claim 12 obvious. A full

6     analysis of the Hinman patent is included in my claim charts, which are attached hereto as Exhibit

7     C.

8          198.    Claim 12 is directed to "[a] circuit responsive to coded video signals where the

9     video signals comprise successive frames and each frame includes a plurality of blocks…." The

10     Hinman patent discloses "a receiver having construction circuitry for constructing an error image

11     representation from a received error reconstruction signal, circuitry for constructing a motion

12     field measure for the image from a received coded motion signal representation, and circuitry

13     responsive to the received error image representation and the receiver motion field measure for

14     generating a reconstructed image sequence." Col. 3, lines 34-42. In the Hinman patent the video

15     signals comprise successive frames, s*ee, e.g.*, col. 4, line 65 - col. 5, line 3, where each frame

16     includes a plurality of blocks, *see, e.g.*, col. 5, lines 19-21. Therefore, the Hinman patent

17     discloses a circuit responsive to coded video signals where the video signals comprise successive

18     frames and each frame includes a plurality of blocks.

19          199.    Claim 12 also requires that the coded video signals comprise codes that describe

20     deviations from approximated blocks and codes that describe deviations from interpolated blocks.

21     The Hinman patent discloses codes that describe deviations from approximated blocks. *See* col.

22     3, lines 12-16 and 34-49; col. 4, lines 59-64; and Fig. 1.

23          200.    While the Hinman patent does not disclose the use of coded video signals that

24     comprise codes that describe deviations from interpolated blocks, as will be discussed below in

25     detail, such codes were well known in the art and those of ordinary skill in the art would have

26     been motivated to combine such codes with the teachings of the Hinman patent.

27          201.    Additionally, Claim 12 requires "means for developing block approximations from

28     said codes that describe deviations from approximated blocks…." I am informed that the Court

has determined that this element of Claim 12 is in means-plus-function format, where the function is "developing block approximations from said codes that describe deviations from approximated blocks." The Court construed "block approximations" as "the combinations of predicted blocks with differences between the actual blocks and the predicted blocks." The corresponding structure identified by the Court for this claim element is Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function, citing Haskell Fig. 2; col. 4, lines 3-10, 26-32; and col. 4, line 63 - col. 5, line 7.

202.    The Hinman patent describes a system that employs motion compensated prediction, motion compensated interpolation, and DCT coding of prediction error on a block basis. The structures described in the Hinman patent are extremely similar and equivalent to the structures identified by the Court in its claim construction order. The Hinman patent discloses a receiver with channel decoder circuitry 70 for decoding data received from the transmitter. Col. 7, lines 9-42; Figs. 3 and 6. Error reconstruction circuitry 76 receives the error reconstruction signal from decoder circuitry 70. *Id.* The output of reconstruction circuitry 76 is delivered to recovery loop 80, in which motion compensating signals are added by adder 100 to the error image representation to produce a reconstructed receiver signal. *Id.*

203.    Reconstruction circuits 76 and 78 in the receiver necessarily operates in the same manner as reconstruction circuitry 48 in the transmitter. Reconstruction circuitry 48 provides the inverse operation of lossy compressor 46. Col. 6, lines 47-49. The Hinman patent states that one preferred lossy compression method would be the discrete cosine transform. Col 5, lines 59-60. In such an implementation both reconstruction circuitry 48 and reconstruction circuits 76 and 78 would perform the inverse discrete cosine transform ($DCT^{-1}$). In the Hinman patent motion compensator 99 performs the identical function as Shift Circuit 26. *See* col. 7, lines 9-42; Fig. 3.

204.    The Hinman patent discloses a device for developing blocks of image information from predicted blocks and codes that describe deviations from predicted blocks, such as prediction error information using structure – decoder 70, reconstruction circuits 76 and 78, adder 100, and motion compensator 99 – that is identical or at least equivalent to the corresponding structure of this limitation of Claim 12.

205.    Claim 12 also requires "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."  I am informed that the Court has determined that this element of Claim 12 is in means-plus-function format, where the function is "to develop said interpolated blocks responsive to said block approximations and to said codes that describe deviations from interpolated blocks."  The corresponding structure identified by the Court for this claim element is Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function, citing Haskell Fig. 2; col. 4, lines 63-65; and col. 5, lines 7-23.  The structure and inputs that correspond to these elements is at Haskell col. 4, lines 38-50.

206.    The Hinman patent describes a system that employs motion compensated interpolation.  The structures described in the Hinman patent are extremely similar and equivalent to the structures identified by the Court in its claim construction order.  The Hinman patent discloses a receiver with channel decoder circuitry 70 for decoding data received from the transmitter.  Col. 7, lines 9-42; Figs. 3 and 6.  Error reconstruction circuitry 76 receives the error reconstruction signal from decoder circuitry 70.  *Id.*  In the decoder the reconstructed receiver signal is sent to temporal frame interpolator 88 which interpolates to create one or more frames between those actually transmitted.  *Id.*; col. 9, lines 37-58.

207.    The Hinman patent does not disclose the transmission of interpolation deviation codes, *i.e.*, interpolation error.  In my opinion, however, that modification would have been obvious to one of skill in the art.  Specifically, it was well known prior to September 1989 that motion compensation frame error resulting from uncorrected interpolation would cause jerkiness and other artifacts in the decoded video.  *See, e.g.*, Haskell patent, col. 2, lines 29-37; U.S. Patent No. 4,771,331 to Bierling, col. 15, lines 29-32; U.S. Patent No. 4,788,589 to Kondo, col. 1, lines 28-30; U.S. Patent No. 4,890,160 to Thomas, col. 10, lines 39-40.

208.    It was also well known that this problem could be corrected by transmitting interpolation deviation codes, *i.e.*, interpolation error, to the decoder, thus improving the visual quality of the video.  In his 1988 book *Digital Pictures Representation and Compression* ("Digital Pictures") (*e.g.*, MSLT_0039291-MSLT_0039893), Dr. Haskell states that because

1   motion compensated interpolation could produce artifacts and other inaccurate results, techniques

2   had been devised to send additional information to a decoder when large interpolation errors were

3   identified in the transmitter.  *See* Digital Pictures at 473.  *See also* R. F. W. Pease, *Conditional*

4   *Vertical Subsampling – A Technique to Assist in the Coding of Television Signals*, Bell Sys. Tech.

5   J., Vol. 51, No. 4, 787-802, April 1972 at 797 (indicating that the transmission of interpolation

6   error would improve image quality) (*e.g.*, DELL 315827-DELL 315842); Haskell Dep. 209:3-6

7   and 211:22 - 212:19; and Picture Coding at 401.

8       209.    The problem of interpolation artifacts was well-known in the art, and the solution

9   was also well-known.  In fact the technique of sending interpolation deviation codes, i.e.,

10  interpolation error, to the receiver was in widespread use by those working in this field.  *See, e.g.*,

11  Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of

12  Broadcast Quality Television Pictures," Second Int'l Conf. on Image Processing, Vol. 265, 242-

13  47, June 24-26, 1986 at 243-44 (DELL 318140-318147); Yashima, et al., *A Highly Efficient*

14  *Coding Method for HDTV Signals*, Proc. of the IEEE, Vol. 1, 0125-29, June 1987

15  (MSLT_0239770 - MSLT_0239774); H.261 Document #22; H.261 Document #43; H.261

16  Document #81; the Micke Thesis; U.S. Patent No. 4,858,005 to Lodge at Col. 4, line 58, et seq.,

17  and claims 10-13 among others (MSLT_0041957-MSLT_0041971); U.S. Patent No. 3,736,373 to

18  Pease (MSLT_0233823 – MSLT_0233834); U.S. Patent No. 4,202,011 to Koga (MSLT_0241074

19  - MSLT_0241080); and U.S. Patent 4,979,020 to Isnardi (MSLT_0233778 – MSLT_0233822).

20      210.    The cited passage from Digital Pictures adds important information beyond what

21  was considered by the Examiner in any of the documents in the record.  Specifically, none of the

22  documents in the record disclose the transmission of interpolation error, or of any other type of

23  "codes that describe deviations from interpolated blocks" in the claimed context.  As discussed

24  above the Hinman patent, which was considered by the Examiner, disclosed each element of

25  Claim 12 except for the use of such codes.  Digital Pictures – authored by the inventor of the '226

26  patent himself – therefore adds exactly what was missing from the information before the

27  Examiner and would have quite plainly rendered claim 12 obvious.  I further note that statements

28  made in the Background of the Invention and Summary of the Invention sections of the '226

1  patent are refuted by what is disclosed in Digital Pictures and could not have been made if Digital

2  Pictures had been disclosed to the Examiner.  *See* col. 2, lines 18-46.

3          **5.    § 103 (Obviousness)**

4          211.    To the extent that claim 12 of the '226 patent is not anticipated by the references I

5  have already discussed, it is my opinion that claim 12 would have been obvious to those of

6  ordinary skill.  In particular, there existed a "baseline" set of references which teach the coding

7  concepts of motion compensated forward prediction, prediction error, and motion compensated

8  temporal interpolation.  In addition, a second set of prior art references teach the use of temporal

9  interpolation deviation codes, *i.e.*, interpolation error.  Finally, those in the art would have been

10  motivated to combine the references from these two sets because interpolation error was a known

11  solution to the problem of visual artifacts in temporally interpolated frames.

12          **A.    It Was Known In The Art To Combine Motion Compensated Forward**
               **Prediction, Prediction Error, and Motion Compensated Temporal**
13              **Interpolation**

14          212.    The prior art is clear that it was known to combine the coding techniques of

15  motion compensated prediction, prediction error, and motion compensated temporal interpolation.

16  These references include U.S. Patent No. 4,575,756 to Furukawa (*e.g.*, LUC1053535-

17  LUC1053550) ("'756 patent") and U.S. Patent No. 4,727,422 to Hinman (*e.g.*, MSLT_0041642-

18  MSLT_0041659) ("'422 patent").  Similarly, to the extent that Lucent contends that MPEG

19  decoders possess the same or equivalent structures to those claimed by the '226 patent, these

20  references also teach the same or equivalent structures.  As such, these references serve as

21  convenient "baseline" references for the obviousness inquiry.  I note that while I discuss both the

22  '756 patent and '422 patent as "baseline" references in my analysis, in my opinion an obvious

23  combination may be formed with either of these patents or a combination of them in conjunction

24  with one or more references from the second set of prior art, which I discuss below.  My opinion

25  regarding the contents of these two references is accurately set forth in the attached claim charts.

26  However, with respect to the '756 patent, I make the following comments.

27          213.    The '756 patent expressly describes the decoder as being comprised of "circuit[s]."

28  *See, e.g.*, '756 Patent at Col. 8:17, 25, and 33.  The video codes include a prediction error signal.

1        I declare under penalty of perjury under the laws of the United States of America that this

2    report on behalf of Defendants is true and correct.  Executed this 31st day of March 2006 in San

3    Diego, California.

4

5                     By: _____

6                         Edward J. Delp III, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

K.     STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING
METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES ("ERICSSON") |
|---|---|
| A circuit [*any path that can carry electrical current*] responsive to coded video signals where the video signals comprise successive frames [*one frame following another; consecutive frames*] and each frame includes a plurality of blocks [*sets of pixels (picture elements also called pels) that constitute a portion of a frame*] and where the coded [*change from one form of representation to another*] video signals comprise codes that describe deviations from approximated blocks [*predicted blocks*] and codes that describe deviations [*differences*] from interpolated blocks, comprising: | **Ericsson discloses a device that is responsive to coded video signals where the video signals comprise successive frames, each frame including a plurality of blocks, and the coded video signals comprise codes that describe deviations from predicted blocks and codes that describe deviations from interpolated blocks.**<br><br>*See, e.g.,* "The invention relates to a method and apparatus for encoding interframe error data in an image transmission system, and in particular, in a motion compensation image transmission system, for transmitting a sequence of image frames from a transmitter station to a receiver station."  [Col. 2, lines 53-58; Fig. 3.]<br><br>"Typically, and in the illustrated embodiment, the motion estimator uses a region matching technique between non-overlapping blocks of the previous and present input images...."  [Col. 5, line 59 - col.6, line 2.]<br><br>"One preferred lossy compression circuitry employs a discrete cosine transform...." [Col. 6, lines 31-32.]<br><br>"A channel encoder 18 channel encodes the outputs of the error circuitry 14 and motion estimation and coding circuitry 16 and passes the thus encoded data onto a channel 20 for transmission to a receiver 21." [Col. 5, lines 30-34.]<br><br>"The difference image, representing the error at that top level, is quantized and the quantized information is directed to the encoder 18 for transmission to the receiver."  [Col. 12, line 67 – col. 13, line 2.]  [*See also* Fig. 12, output of arithmetic encoder 520.]<br><br>"At the top level, the quantized difference image is decoded and added to the warped image at that level (in selective adder 100 which includes decimation circuitry)." [Col. 18, lines 18-21.] |

74

Exhibit 50  Page 24<br>EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226 CLAIM 12 | STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES ("ERICSSON") |
|---|---|
| | "Thereafter, the steps for generating the difference signal at this lower level are the same as those at the top level, that is, the current level prediction image is subtracted from the current level original image and that difference is quantized and transmitted to the receiver." [Col. 13, lines 27-31.]<br><br>"The lower levels are then reconstructed (by adder 100) by first forming the prediction using the transmitted blur information available over lines 84 from reconstruction circuitry 76 and then decoding the difference image and selectively adding it to the prediction image to form a newly reconstructed image for that level." [Col. 18, lines 22-28.] [*See also* Fig. 12, output of vector quantization circuit 536.] |
| means for developing block approximations [*the combinations of predicted blocks with differences between the actual blocks and the predicted blocks*] from said codes that describe deviations from approximated blocks; and<br><br>Function: The function is developing block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks] from said codes that describe deviations from approximated blocks.<br><br>Corresponding structure: Decoder 22, DCT⁻¹ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 3-10, 26-32, Col. 4, line 63 to Col. 5, line 7). | **Ericsson discloses a device for developing blocks of image information from predicted blocks and codes that describe deviations from predicted blocks, such as prediction error information.**<br><br>*See, e.g.*, "Referring to FIG. 3, at the receiver, the transmitted and coded data is decoded and the new frame generated. In particular, the data representing the resolution pyramids is decoded by reconstruction circuitry 76 level by level from the top of the pyramid down to the bottom. At the top level, the quantized difference image is decoded and added to the warped image at that level (in selective adder 100 which includes decimation circuitry). Thereby, the output image at the top level is reconstructed." [Col. 18, lines 13-22; Fig. 3.]<br><br>"At the receiver 21, referring to FIG. 3, the data from the channel is decoded by a channel decoder circuitry 70 and the resulting receiver error reconstruction signal over lines 72 and receiver coded motion signal representation over lines 74 are delivered to reconstruction circuitry 76, motion compensator 99, and reconstruction circuitry 78 respectively. The reconstruction circuitries 76 and 78 each provide for decoding the codes employed by the transmitter to effect the operations performed by |

75

**Exhibit 50  Page 25**
EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES ("ERICSSON") |
|---|---|
| | reconstruction circuitries 48 and 34 respectively, of the transmitter,...." [Col. 8, lines 6-52.] |
| | "In this circumstance, the reconstruction circuitry 34 then employs the inverse discrete cosine transform as is well known in the art."  [Col. 10, lines 20-22.] |
| | "The error reconstruction signal is also sent to the reconstruction apparatus 48 which provides an operation which is the inverse to that imposed by the lossy compressor 46." [Col. 7, lines 52-55.] |
| | "One preferred lossy compression circuitry employs a discrete cosine transform...." [Col. 6, lines 31-32.] |
| | "The lossy compressor 46 in the above referenced Ericsson patent application is a two-dimensional block encoder which employs a quantizer having a uniform quantization step size; and the output of the block transform can be advantageously further reduced in bandwidth and encoded according to the process described above in connection with the lossy compressor 28."  [Col. 7, lines 40-47.] |
| | "The output of the motion compensator, representing the expected receiver image in the absence of an error correction, corresponds to the signal over lines 51 in the transmitter, and is delivered to the adder 100 for combination with the output of the error reconstruction circuitry over lines 84."  [Col. 8, lines 35-40; Fig. 3.] |
| | "The full motion compensation circuits 42 and 80, using incoming frame image data from frame buffers 44 and 98 respectively and the motion field interpolator output data, effect, in the transmitter, generation of the estimated receiver image over lines 51, and in the receiver, the received estimated image over lines 82.  The motion compensation circuitry maps each output pixel location to a location in the previous frame as indicated by the displacement vector value associated with that output pixel location.  The displacement vectors are specified by the motion field interpolation circuitry associated therewith.  In particular, referring to FIG. |

76

Exhibit 50  Page 26<br>EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226 CLAIM 12 | STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES ("ERICSSON") |
|---|---|
| | 4, this is the output of vector interpolator 134." [Col. 9, lines 36-49; FIG. 3.] |
| means responsive to said block approximations [*the combinations of predicted blocks with differences between the actual blocks and the predicted blocks*] and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.<br><br>Function: The function is to develop said interpolated blocks responsive to said block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks] and to said codes that describe deviations from interpolated blocks.<br><br><u>Corresponding structure</u>:  Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 63-65; Col. 5, lines 7-23 [description of the structure and inputs that correspond to these elements is at Col. 4, lines 38-50]). | **Ericsson discloses a device for developing interpolated blocks responsive to predicted blocks that have been combined with codes describing deviations from predicted blocks, such as prediction error information, and to codes that describe deviations from interpolated blocks.**<br><br>*See, e.g.*, "The lower levels are then reconstructed (by adder 100) by first forming the prediction using the transmitted blur information available over lines 84 from reconstruction circuitry 76 and then decoding the difference image and selectively adding it to the prediction image to form a new reconstructed image for that level."  [Col. 18, lines 22-28; FIG. 3.]<br><br>"Thereafter, the steps for generating the difference signal at this lower level are the same as those at the top level, this is, the current level prediction image is subtracted from the current level original image and that difference is quantized and transmitted to the receiver."  [Col. 13, lines 27-31.]<br><br>"At the receiver 21, referring to FIG. 3, the data from the channel is decoded by a channel decoder circuitry 70 and the resulting receiver error reconstruction signal over lines 72 and receiver coded motion signal representation over lines 74 are delivered to reconstruction circuitry 76, motion compensator 99, and reconstruction circuitry 78 respectively."  [Col. 8, lines 6-12; FIG. 3.]<br><br>"The reconstruction circuitries 76 and 78 each provide for decoding the codes employed by the transmitter to effect the operations performed by reconstruction circuitries 48 and 34, respectively, of the transmitter, as described in more detail hereinafter."  [Col. 8, lines 12-17.]<br><br>"In this circumstance, the reconstruction circuitry 34 then employs the inverse discrete cosine transform |

77

**Exhibit 50  Page 27**<br>EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES ("ERICSSON") |
|---|---|
| | as is well known in the art." [Col. 10, lines 20-22.]<br><br>"The error reconstruction signal is also sent to the reconstruction apparatus 48 which provides an operation which is the inverse to that imposed by the lossy compressor 46."  [Col. 7, lines 52-55.]<br><br>"One preferred lossy compression circuitry employs a discrete cosine transform…." [Col. 6, lines 31-32.]<br><br>"The lossy compressor 46 in the above referenced Ericsson patent application is a two-dimensional block encoder which employs a quantizer having a uniform quantization step size; and the output of the block transform can be advantageously further reduced in bandwidth and encoded according to the process described above in connection with the lossy compressor 28."  [Col. 7, lines 40-47.]<br><br>"The output of the motion compensator, representing the expected receiver image in the absence of an error correction, corresponds to the signal over lines 51 in the transmitter, and is delivered to the adder 100 for combination with the output of the error reconstruction circuitry over lines 84."  [Col. 8, lines 35-40; Fig. 3.]<br><br>"The full motion compensation circuits 42 and 80, using incoming frame image data from frame buffers 44 and 98 respectively and the motion field interpolator output data, effect, in the transmitter, generation of the estimated receiver image over lines 51, and in the receiver, the received estimated image over lines 82.  The motion compensation circuitry maps each output pixel location to a location in the previous frame as indicated by the displacement vector value associated with that output pixel location.  The displacement vectors are specified by the motion field interpolation circuitry associated therewith.  In particular, referring to FIG. 4, this is the output of vector interpolator 134." [Col. 9, lines 36-49; FIG. 3.]<br><br>"Considering the lower levels in more detail, the prediction image is generated by combining the |

Exhibit 50  Page 28<br>EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | STAFFAN ERICSSON, U.S. PATENT NO. 4,849,810, HIERARCHICAL ENCODING METHOD AND APPARATUS FOR EFFICIENTLY COMMUNICATING IMAGE SEQUENCES ("ERICSSON") |
|---|---|
|  | warped image at the current level with the output and warped images from the next higher level. Specifically, the interpolation error of the warped image is generated using the warped image 524 at the current level and an interpolated version of the warped image from the next higher level (interpolated by circuitry 526). That interpolation error is thus the difference between the current level warped image and the same image that has been decimated and interpolated. As noted above, it contains the details of the warped image that were lost in the decimation to form the next higher level image. The output image from the next higher level is then interpolated at interpolation circuitry 527 to obtain an image at the current level. Thereafter, the warped interpolation error over line 528 is conditionally added by adder 530 to the interpolated output image to form the prediction." [Col. 15, lines 23-41; FIG. 12.]<br><br>"FIG. 12 is a detailed electrical block diagram of lossy compressor 46 according to the invention." [Col. 5, lines 5-6.]<br><br>"Looking in more detail at the generation of the resolution pyramids and decoding thereof [in the decoder of Figure 3], the process follows the inverse of the method used in lossy compressor 46. Thus, since the receiver decoding process follows the encoding process of the transmitter,…." [Col. 18, lines 45-49.] |

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

O.    U.S. PATENT NO. 4,727,422 (HINMAN)

| U.S. PATENT NO. 4,958,226 CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
| A circuit [*any path that can carry electrical current*] responsive to coded video signals where the video signals comprise successive frames [*one frame following another; consecutive frames*] and each frame includes a plurality of blocks [*sets of pixels (picture elements also called pels) that constitute a portion of a frame*] and where the coded [*change from one form of representation to another*] video signals comprise codes that describe deviations from approximated blocks [*predicted blocks*] and codes that describe deviations [*differences*] from interpolated blocks, comprising: | Hinman discloses a device that is responsive to coded video signals where the video signals comprise successive frames, each frame including a plurality of blocks, and the coded video signals comprise codes that describe deviations from predicted blocks and codes that describe deviations from interpolated blocks.

*See, e.g.*, "An image sequence transmission method and apparatus transmit a sequence of images over a communications channel to a receiver. The transmitter has circuitry for estimating, for successive images of the sequence, a measure of the motion displacement vector field for block regions of an image. The transmitter further has coding circuitry for representing each sequentially generated measure as a coded motion vector field, circuitry for generating an error reconstruction signal using the coded motion vector field, and coding circuitry for transmitting the coded motion vector field and the error reconstruction signal over the channel. The error signal generation circuitry has, in particular a motion reconstruction circuit for generating motion reconstruction displacement signals for each block of an image in response to the coded motion vector field, and a motion vector field interpolator for generating from the motion vector field decoded signals, displacement signals for each picture element of the image. A motion compensation circuit responds to the displacement vectors for each image for modifying a receiver estimated image thereby constructing the image which the receiver is expected to generate." Hinman, Abstract.

"The invention relates to an image sequence transmission system for transmitting a sequence of images over a communications channel. This system has estimating circuitry for estimating, for successive images of the sequence, a measure of the motion displacement of block regions of an image |

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226<br>CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
| | and further has coding circuitry for representing the generated measures of an image as a coded motion signal representation. This system further has circuitry for generating, using the coded motion signal representation, an error reconstruction signal; and for transmitting the error reconstruction signal and the coded motion signal representation over the channel.  An improved error signal generating circuitry features a motion reconstruction circuitry for generating motion reconstruction displacement signals for each block of the image in response to the coded motion signal representation; a motion field interpolator for generating, in response to the displacement signals, a displacement vector for each picture element of the image; and a motion compensator responsive to the motion field interpolator for modifying a receiver estimated previous image for constructing an estimated receiver image." Hinman, Col. 3, ll. 5-28.<br><br>"In another aspect, the system further has a receiver having construction circuitry for constructing an error image representation from a received error reconstruction signal, circuitry for constructing a motion field measure for the image from a received coded motion signal representation, and circuitry responsive to the received error image representation and the receiver motion field measure for generating a reconstructed image sequence. The receiver further features a receiver motion field interpolator for generating, in response to the received coded motion signal representation, a displacement vector for each picture element of an image to be constructed, and a receiver motion compensation loop responsive to the motion field interpolator and the error constructing circuitry for generating an image sequence." Hinman, Col. 3, ll. 34-49.<br><br>"The transmitter has an error signal circuitry 14 and a motion estimation and coding circuitry 16. A channel encoder 18 codes the outputs of the error circuitry 14 and motion estimation and coding |

**Exhibit 50  Page 31**
EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226 CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
| | circuitry 16 and passes the thus encoded data onto a channel 20 for transmission to a receiver 21." Hinman, Col. 4, ll. 59-64; Fig. 1.<br><br>"At the receiver 21, referring to FIG. 3, the data from the channel is decoded by a channel decoder circuitry 70 and the resulting receiver error reconstruction signal over lines 72 and receiver coded motion signal representation over lines 74 are delivered to reconstruction circuitries 76 and 78 respectively. The output of the error reconstruction circuitry 76 is delivered to a recovery loop 80 in which motion compensating signals over lines 82 are added to the error image representation over lines 84 to produce a reconstructed receiver signal over lines 86. That signal is delivered to a temporal frame interpolator 88, which can add one or more frames between the successive received frames over line 86, for delivery to a digital-to-analog circuitry 90 and from there to a monitor 92 for viewing.  The frame interpolator 88 interpolates in the temporal domain in accordance with motion reconstruction signals received over lines 94. Those signals are generated by a motion field interpolator 96 corresponding to the motion field interpolator 38 of the FIG. 2. That motion field interpolator, as noted above, provides a motion vector for each picture element of the image and hence allows the frame interpolator to accurately predict what the image would have been at any selected time between received frames. The reconstructed receiver images over lines 86 are successively stored in a frame buffer 98 and are delivered to a motion compensator 99 which also receives signals from the motion field interpolator 96. The output of the motion compensator, representing the expected receiver image in the absence of an error correction, corresponds to the signal over lines 56 in the transmitter, and is delivered to the adder 100 for combination with the output of the error reconstruction circuitry over lines 84." Hinman, Col. 7, ll. 9-42; Fig. 3. |

113

Exhibit 50  Page 32
EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226 CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
| | "The output of the transmitter motion field interpolator 38, or the receiver motion field interpolator 96 (which operates 5 in a manner identical to that of interpolator 38,) is directed to the full motion compensation circuitry 42 in the transmitter and to the full motion compensation circuitry 80 and frame interpolation circuitry 88 in the receiver." Hinman, Col. 9, ll. 3-9.

"In the illustrated embodiment of the invention, the receiver also employs the output of motion field interpolator to create one or more frames between those which are actually transmitted. In accordance with this aspect of the invention, the temporal frame interpolator 88, in the illustrated embodiment, receives the values of the motion field interpolation circuitry to determine the image values for a frame positioned in time, in the particular illustrated embodiment, one-half the distance between the transmitted and received frames. In the illustrated embodiment, this function is performed by halving the output displacement vectors from the motion field interpolator 96. Thus, if a picture element, from one transmitted frame to the next, were displaced two pixel positions in the X direction and 4 pixel positions in the Y direction, the temporal frame interpolator would provide an intermediate frame wherein that picture element was displaced one position in the X direction and two positions in the Y direction. In this manner, a frame half way between two received frames can be added to the picture image sequence to provide a better visual rendition." Hinman, Col. 9, ll. 37-58. |
| means for developing block approximations [*the combinations of predicted blocks with differences between the actual blocks and the predicted blocks*] from said codes that describe deviations from approximated blocks; and

<u>Function</u>: The function is developing block approximations [the combinations of predicted blocks with differences | Hinman discloses a device for developing blocks of image information from predicted blocks and codes that describe deviations from predicted blocks, such as prediction error information.

*See, e.g.,* "Thus the lossy compressor circuitry 28 is employed for coding the motion vector field available over lines 32, and provides, over lines 30, a coded motion signal representative of the motion vectors. This output of the lossy compressor, as |

114

Exhibit 50  Page 33
EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
| between the actual blocks and the predicted blocks] from said codes that describe deviations from approximated blocks.<br><br>Corresponding structure:  Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 3-10, 26-32, Col. 4, line 63 to Col. 5, line 7). | noted above, will not, upon decoding, exactly reproduce the signals over lines 32 (which provide the measure of motion displacement) and, therefore, have some error signal associated with them. Nevertheless, the reduction in the data requirements of a lossy compressor, when compared to, for example, a PCM exact coding method, are so substantial, that the use of a lossy compressor is a significant advance in the art. One preferred lossy compression circuitry employs a discrete cosine transform and the circuitry incorporates a processing method described in co-pending application, U.S. Ser. No. 740,806, entitled Method and System for Adapting a Digitized Signal Processing System for Block Processing With Minimal Blocking Artifacts and filed on even data herewith. The inventor is Henrique Malvar. That application, assigned to the assignee of the present application, is incorporated herein, in its entirety, by reference." Hinman, Col. 5, ll. 47-68.<br><br>"The motion reconstruction signal is applied to a motion compensation apparatus 42 which forms part of an error reconstruction loop 43. The error reconstruction loop includes a frame buffer 44, a lossy compression circuitry 46, and a reconstruction circuitry 48. The input to the lossy compression circuitry 46, over lines 50, is the error signal which is to be transmitted to the receiver. That error signal is coded to reduce its bandwidth and the resulting signal, the error reconstruction signal over lines 52, is delivered to the channel encoder 18. The lossy compressor 46 can be any of the two-dimensional block encoders such as a transform or DPCM encoder, and is preferably the encoder described in Malvar's co-pending application Ser. No. 740,806, referred to above. The error reconstruction signal is also sent to the reconstruction apparatus 48 which provides the inverse operation of the lossy compressor 46.  There results, therefore, at the output of the reconstruction apparatus 48, an error reconstruction image over lines 54.  The error reconstruction image is added to the expected |

115

**Exhibit 50  Page 34**<br>EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226 CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
|  | output of the motion compensator, (which is the estimated receiver image over lines 56) and the resulting signal, an estimated previous receiver image (the predicted receiver image for the previous frame), is stored in the frame buffer 44." Hinman, Col. 6, ll. 32-56; Fig. 5.<br><br>"At the receiver 21, referring to FIG. 3, the data from the channel is decoded by a channel decoder circuitry 70 and the resulting receiver error reconstruction signal over lines 72 and receiver coded motion signal representation over lines 74 are delivered to reconstruction circuitries 76 and 78 respectively. The output of the error reconstruction circuitry 76 is delivered to a recovery loop 80 in which motion compensating signals over lines 82 are added to the error image representation over lines 84 to produce a reconstructed receiver signal over lines 86. That signal is delivered to a temporal frame interpolator 88, which can add one or more frames between the successive received frames over line 86, for delivery to a digital-to-analog circuitry 90 and from there to a monitor 92 for viewing.  The frame interpolator 88 interpolates in the temporal domain in accordance with motion reconstruction signals received over lines 94. Those signals are generated by a motion field interpolator 96 corresponding to the motion field interpolator 38 of the FIG. 2. That motion field interpolator, as noted above, provides a motion vector for each picture element of the image and hence allows the frame interpolator to accurately predict what the image would have been at any selected time between received frames. The reconstructed receiver images over lines 86 are successively stored in a frame buffer 98 and are delivered to a motion compensator 99 which also receives signals from the motion field interpolator 96. The output of the motion compensator, representing the expected receiver image in the absence of an error correction, corresponds to the signal over lines 56 in the transmitter, and is delivered to the adder 100 for combination with the output of the error |

116

**Exhibit 50  Page 35**
EXHIBIT C

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
|  | reconstruction circuitry over lines 84." Hinman, Col. 7, ll. 9-42; Fig. 3; Fig. 6. |
| means responsive to said block approximations [*the combinations of predicted blocks with differences between the actual blocks and the predicted blocks*] and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.<br><br>Function: The function is to develop said interpolated blocks responsive to said block approximations [*the combinations of predicted blocks with differences between the actual blocks and the predicted blocks*] and to said codes that describe deviations from interpolated blocks.<br><br>Corresponding structure: Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 63-65; Col. 5, lines 7-23 [description of the structure and inputs that correspond to these elements is at Col. 4, lines 38-50]). | Hinman discloses a device for developing interpolated blocks responsive to predicted blocks that have been combined with codes describing deviations from predicted blocks, such as prediction error information, and to codes that describe deviations from interpolated blocks. To the extent that motion vectors do not qualify as codes that describe deviations from interpolated blocks, it would have been an obvious modification to transmit and decode such codes to develop interpolated blocks. See Dell's Third Supplemental Response to Lucent's Interrogatory No. 1 and Second Supplemental Response to Interrogatory No. 3.<br><br>*See, e.g.*, "Thus the lossy compressor circuitry 28 is employed for coding the motion vector field available over lines 32, and provides, over lines 30, a coded motion signal representative of the motion vectors. This output of the lossy compressor, as noted above, will not, upon decoding, exactly reproduce the signals over lines 32 (which provide the measure of motion displacement) and, therefore, have some error signal associated with them. Nevertheless, the reduction in the data requirements of a lossy compressor, when compared to, for example, a PCM exact coding method, are so substantial, that the use of a lossy compressor is a significant advance in the art. One preferred lossy compression circuitry employs a discrete cosine transform and the circuitry incorporates a processing method described in co-pending application, U.S. Ser. No. 740,806, entitled Method and System for Adapting a Digitized Signal Processing System for Block Processing With Minimal Blocking Artifacts and filed on even data herewith. The inventor is Henrique Malvar. That application, assigned to the assignee of the present application, is incorporated herein, in its entirety, by reference." Hinman, Col. 5, ll. 47-68. |

| U.S. PATENT NO. 4,958,226<br>CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
| | "That signal is delivered to a temporal frame interpolator 88, which can add one or more frames between the successive received frames over line 86, for delivery to a digital-to-analog circuitry 90 and from there to a monitor 92 for viewing.<br><br>The frame interpolator 88 interpolates in the temporal domain in accordance with motion reconstruction signals received over lines 94. Those signals are generated by a motion field interpolator 96 corresponding to the motion field interpolator 38 of the FIG. 2. That motion field interpolator, as noted above, provides a motion vector for each picture element of the image and hence allows the frame interpolator to accurately predict what the image would have been at any selected time between received frames. The reconstructed receiver images over lines 86 are successively stored in a frame buffer 98 and are delivered to a motion compensator 99 which also receives signals from the motion field interpolator 96. The output of the motion compensator, representing the expected receiver image in the absence of an error correction, corresponds to the signal over lines 56 in the transmitter, and is delivered to the adder 100 for combination with the output of the error reconstruction circuitry over lines 84." Hinman, Col. 7, ll. 9-42; Fig. 3; Fig. 6.<br><br>"In the illustrated embodiment of the invention, the receiver also employs the output of motion field interpolator to create one or more frames between those which are actually transmitted. In accordance with this aspect of the invention, the temporal frame interpolator 88, in the illustrated embodiment, receives the values of the motion field interpolation circuitry to determine the image values for a frame positioned in time, in the particular illustrated embodiment, one-half the distance between the transmitted and received frames. In the illustrated embodiment, this function is performed by halving the output displacement vectors from the motion field interpolator 96. Thus, if a picture element, |

118

Exhibit 50  Page 37
EXHIBIT C

INVALIDITY ANALYSIS FOR U.S. PATENT NO. 4,958,226

| U.S. PATENT NO. 4,958,226<br><br>CLAIM 12 | U.S. PATENT NO. 4,727,422 (HINMAN) |
|---|---|
|  | from one transmitted frame to the next, were displaced two pixel positions in the X direction and 4 pixel positions in the Y direction, the temporal frame interpolator would provide an intermediate frame wherein that picture element was displaced one position in the X direction and two positions in the Y direction. In this manner, a frame half way between two received frames can be added to the picture image sequence to provide a better visual rendition." Hinman, Col. 9, ll. 37-58. |

Exhibit 50  Page 38
EXHIBIT C

Exhibit 51

1            JEAN A. PEC

2        UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF COLUMBIA

4

5

6   - - - - - - - - - - - x

7   LUCENT TECHNOLOGIES,   :

8   INCORPORATED, ET AL., :

9        Plaintiffs,   :    Case Number

10      vs.             :    07-CV-2000 HCAD

11   GATEWAY INTERNATIONAL,:

12   INCORPORATED, ET AL., :

13        Defendants.   :

14   - - - - - - - - - - - x

15

16        VIDEO DEPOSITION OF JEAN A. PEC

17

18

19            Washington, DC

20            Thursday, November 8, 2007

21

22

23   REPORTED BY:

24      CARMEN SMITH

25

Exhibit 51  Page 39

1                    JEAN A. PEC

2     is a not common term to be used for cataloging

3     departments but -- at least among my colleagues.  It

4     was probably department -- the name of the

5     department before it became collection management

6     services was probably the cataloging department.

7          Q    Was it already called collection

8     management services when you began working at George

9     Washington?

10         A    Yes, it was.

11         Q    How does the special collections at George

12    Washington library department fit in with the

13    library structure that you discussed so far?

14              MR. NEWBY:  Objection; lack of foundation.

15              THE WITNESS:  Special collections

16    department houses the rarer materials owned by the

17    university libraries.  It also houses copies of all

18    the dissertations and theses.  It houses copies of

19    many of the university's publications.  It also has

20    a collection of Washingtoniana amongst its

21    collections.

22              It is physically housed within Gelman

23    Library.  It's a department of Gelman Library.  The

24    cataloging for that department, however, is done

25    within collections management services.

Exhibit 51  Page 40

1               JEAN A. PEC

2          BY MR. GILMAN:

3     Q     So would the special collections

4     department include archival material that you

5     described earlier?

6     A     Archives, I believe, is an adjunct to it.

7     Q     And are you aware whether CMS has always

8     handled the cataloging for the special collections?

9     A     As far as I know, yes, it has, because

10    that's what I was told when I was hired.

11    Q     Are you aware whether CMS was handling the

12    cataloging for special collections in the early

13    1980s?

14    A     Yes, I am.

15    Q     And was CMS handling the cataloging for

16    special collections in the early 1980s?

17    A     As far as I know, yes.

18    Q     And how do you know that?

19    A     I know that because as head of the

20    department, when I came, I asked people what were

21    you doing, and what have you done as -- in my role

22    as department head.

23    Q     Did you specifically ask what had been

24    going on more than a decade prior to your joining

25    the library?

Page 40

                        JEAN A. PEC

1
2      A    Yes, because you need to know procedures

3   and what might have changed or what might not have

4   changed.

5      Q    Are there formal procedure material

6   manuals, books, things of that nature?

7      A    No.

8      Q    And this is true today and in your --

9   throughout the course of your experience with George

10  Washington?

11     A    Uh-huh.  Yes, it is.

12     Q    Do the procedures ever change over time?

13          MR. NEWBY:  Objection to the form; vague.

14  You keep referring to "procedures."

15          THE WITNESS:  Do which procedures change?

16          BY MR. GILMAN:

17     Q    Do the cataloging procedures that you use

18  at The George Washington University change over

19  time?

20     A    Cataloging procedures, no.

21     Q    Has any of the software or utilities you

22  use to catalog material changed since you've been a

23  member of George Washington University?

24     A    I answered that earlier.

25     Q    So during the course of your work at

1              JEAN A. PEC

2    George Washington, the software that you've used to

3    enter cataloging information has changed?

4              MR. NEWBY:  Objection to form; "software"

5    is vague.

6              THE WITNESS:  The software which supported

7    Aladdin changed.  OCLC software is still OCLC.

8              BY MR. GILMAN:

9         Q    So the OCLC software that's used today is

10   identical to that used in the 1990s?

11        A    It is the same utility.

12        Q    Is the interface identical?

13        A    The interface actually has changed.

14        Q    And has it changed periodically over the

15   time that you've used OCLC?  Has it been updated to

16   be more user friendly, things of that nature?

17             MR. NEWBY:  Objection to form; vague,

18   "periodically."  What time period?

19             THE WITNESS:  OCLC changed its interface

20   several years ago, but everything is still based on

21   the MARC language.

22             BY MR. GILMAN:

23        Q    Has OCLC changed to incorporate more

24   information as the MARC system has changed to

25   incorporate more information?

1                    JEAN A. PEC

2    materials are over specific heights, they are

3    shelved in other areas.

4        Q    Is that indicated on the call number

5    somehow or in the collections?

6        A    It's indicated in the bibliographic

7    record.  And if the document were larger than the

8    specific -- over the specifications, then the

9    location would be a slightly different location.

10       Q    If it were too big to fit on the shelf

11   with the rest of the material, there would be

12   oversized?

13       A    It would be oversized.

14       Q    Other than the oversized designation, the

15   collections designation and the call number, are

16   there any other indications as to the location of

17   the physical document?

18       A    Actually, if the document were checked out

19   to someone, the catalog would say that it was

20   charged out, and that would indicate that it is not

21   at the library.

22       Q    Other than that designation, are there any

23   other designations that would indicate the physical

24   location?

25       A    Not that I can think of at this time.

Exhibit 51  Page 44

Page 54

1            JEAN A. PEC

2        Q    Do you know how material from the special

3    collections department is accessed by library

4    patrons?

5            MR. NEWBY:  Objection; vague.  "Accessed."

6            THE WITNESS:  I know that the special

7    collection material is not out on open shelves, that

8    patrons have to ask for a staff member to retrieve

9    the material for them.

10            BY MR. GILMAN:

11        Q    What do you mean by "open shelves"?

12        A    If you go into the stacks of a library, if

13    you can go into them, they're open.  If you are not

14    allowed in, then it's not open access.

15        Q    Is there a corresponding term for things

16    that are not open shelved?  Are they close shelved?

17        A    In some libraries they could be closed --

18    they could be call that.  In Gelman, they're in

19    special collections.

20        Q    In general, with Gelman Library, who can

21    access the library?  Is it open to all members of

22    the public?

23        A    No, it is not.

24        Q    Who is allowed access to Gelman Library?

25        A    I don't specifically know everyone who is

**Exhibit 51  Page 45**

1                     JEAN A. PEC

2    allowed.  I know that students -- current students,

3    faculty and staff, members of the Friends of the

4    Library are allowed access.  Patrons who wish to

5    view government documents are also allowed access to

6    the building.

7         Q    What did you mean by "Friends of the

8    Library"?

9         A    The Friends of the Library is a -- a

10   support -- "support" is the wrong word.  I'll have

11   to explain that.

12             Friends of the Library is an organization

13   formed to provide fiscal as well as -- "moral" is

14   the wrong word -- support to the library.  Friends

15   of the Library are -- may be former graduates.  They

16   may be former faculty members.  They may be -- they

17   are members of the community who are interested in

18   the library, in its collections and seeing that they

19   are -- that they are supported, furthered, provide

20   extra fiscal support.

21             It's something that you pay to become.

22        Q    Do you know how much one would pay to

23   become a friend of the library?

24        A    No, I don't.

25        Q    How would -- or would a general member of

**Exhibit 51  Page 46**

1                  JEAN A. PEC
2    transferred back into the database, and/or, back in
3    1980, order catalog cards.
4        Q    So in the 1980/'81 time frame, physical
5    catalog cards would be ordered from OCLC?
6        A    Yes.
7        Q    And I'm imagining today it's done
8    electronically?
9        A    Yes.
10       Q    As part of accessing OCLC, a person would
11   have to enter a log-in, you said?
12       A    Yes, whether they're -- if they're a
13   cataloging staff, they need to enter a log-in.  If
14   they were an interlibrary loan staff member, they
15   need to enter a log-in.
16       Q    Is there a password associated with this
17   too?  Or a unique log-in that presumably means
18   you're somebody authorized to access OCLC?
19       A    Yes.
20       Q    Do you know if this is done today through
21   a Web site or through the Internet?
22       A    The -- it's now done all on the Internet.
23       Q    And at some point, was it done through
24   dedicated terminals or --
25       A    Yes, it was.

1          JEAN A. PEC

2      Q    Do you know when it switched from

3   dedicated terminals to a more general Internet

4   connection?

5      A    In Gelman Library, we switched in, let's

6   see, 19 -- depended upon the development of personal

7   computers and what we would have available,

8   somewhere in the mid-1990s.

9      Q    Before that, there was a specific

10  dedicated terminal for access --

11     A    Yes, there was.  There was in 1993 when I

12  arrived.

13     Q    And would that terminal also be used to

14  access records on OCLC -- would have been used to

15  access records on OCLC?

16     A    Yes.

17     Q    To access records, would you also need to

18  enter a log-in?

19     A    Yes.

20     Q    And persons with a log-in to access

21  records would also have been this trained library

22  staff?

23     A    Yes.

24     Q    So assuming I were a GW student and could

25  go into Gelman Library at the time, I would not have

**Exhibit 51  Page 48**

1                    JEAN A. PEC

2    been able to walk up to the terminal and start using

3    it?

4          A    That is correct.  You would ask a staff

5    member.

6          Q    Do you know what the policies or

7    procedures were for determining who should have

8    log-ins to OCLC in the early 1980s at George

9    Washington?

10         A    No, I don't know specific policies.

11         Q    Do you know the identity of the persons

12   that had access to OCLC in the early 1980s at George

13   Washington?

14         A    No, I don't.

15         Q    Do you know whether the procedures that

16   you're aware of for George Washington University

17   regarding the access for OCLC were generally

18   equivalent to those at other libraries?

19         A    Yes, I -- they were equivalent, I would

20   say.

21         Q    So in the time frame when there were

22   dedicated terminals in other libraries, it would be

23   a similar process that there would be a log-in or an

24   ID and that specific individuals would have log-ins

25   to access OCLC?

Exhibit 51  Page 49

Page 67

1                          JEAN A. PEC

2        A    That is correct.

3        Q    I may have already asked this, but do you

4    know when George Washington became a member of OCLC?

5        A    You did ask that, and I don't specifically

6    know, except it was at least in 1980.

7        Q    And you know that from the OCLC entry,

8    such as the one that was attached to your affidavit?

9        A    Yes.

10       Q    Do you know whether other users of OCLC

11   outside of George Washington can access George

12   Washington's entries that they have uploaded to

13   OCLC?

14       A    Yes, they can.

15       Q    Is it possible for a library or other

16   institution to use OCLC privately for their own

17   cataloging needs?

18       A    What do you mean by the term "privately"?

19   I'm sorry.

20       Q    Without allowing other institutions to

21   access the records that they have loaded.  In other

22   words, just to use it as a tool for their own

23   cataloging.

24       A    As far as I know, that's not possible.

25   It's a shared database.

Exhibit 51  Page 50

Page 111

JEAN A. PEC

1

2    given this morning, I'd just like to remind you, for

3    my sake, that if I ask something that's unclear,

4    please ask me to make it more clear.

5        A    Of course.

6        Q    Okay.  I'd like to ask the court reporter

7    to mark this document as Exhibit Number 5, notice of

8    subpoena and deposition of Ms. Jean A. Pec.

9            (Pec Exhibit 5 identified.)

10           MR. NEWBY:

11       Q    Ms. Pec, if you can take a brief moment to

12   examine what's been marked as Pec Exhibit 5.  And

13   Ms. Pec, do you understand, as you are here, in

14   addition to being here in response to Lucent's

15   subpoena, that you are also here in response to

16   Dell's subpoena, that you would be here today to

17   answer deposition questions?

18       A    Yes.

19       Q    Now, Ms. Pec, in this morning's testimony,

20   you testified that you were at the Notre Dame

21   library from 1979 to 1993?

22       A    Yes.

23       Q    Is that correct?

24       A    Yeah, that is correct.

25       Q    Okay.  And you said during that entire

JEAN A. PEC

1

2  period, that you dealt with or used or supervised

3  others that used the OCLC database; is that correct?

4      A    That is correct.

5      Q    So is 1979 the earliest date at which you

6  had experience with OCLC?

7      A    Yes, it is.

8      Q    And is it true that from 1979 until the

9  current day today, you've constantly had experience

10 with OCLC in your professional responsibilities?

11     A    Yes, it is.

12     Q    And you mentioned that your current

13 position at GW Gelman Library is head of the

14 collection management services?

15     A    Uh-huh, yes, it is.

16     Q    And forgive me if this was asked earlier,

17 but I don't think it was.  Do you personally catalog

18 documents into the OCLC?

19     A    Yes, I do.

20     Q    And do you also supervise others who

21 catalog documents of OCLC?

22     A    Yes, I do.

23     Q    During your time at Notre Dame, '79

24 to '93, did you personally catalog documents in

25 OCLC?

Exhibit 51  Page 52

1          JEAN A. PEC

2      A    Yes, I did.

3      Q    And at any time during that 1979 to 1993

4  period, did you supervise others who cataloged

5  documents into OCLC?

6      A    Yes, I did.

7      Q    Now, also earlier this morning, you

8  mentioned the fact that there is a -- correct me if

9  I'm saying it wrong -- the WRLC, which includes all

10  three libraries at George Washington University?

11      A    No, Washington research library

12  association, WRLC, does not include the law library

13  or Himmelfarb, the medical library.  Reference from

14  Jacob Burns, the law library, are in the catalog,

15  but those two libraries do not belong to the

16  Washington Research Library Consortium.

17      Q    Do all the documents that the medical

18  library and law library possess, are they cataloged

19  in OCLC, are you aware of whether or not they are

20  cataloged in OCLC?

21      A    I could make an assumption.

22      Q    I'm not asking you for assumption.

23      A    No, no.

24      Q    I'm asking for your knowledge.

25      A    No.  Knowledge, no.

Exhibit 51  Page 53

1          JEAN A. PEC

2     Q     Thank you.  Now, speaking of Aladdin,

3  which I understand -- I understood your earlier

4  testimony to be the system -- the other system.

5     A     The name of the catalog.

6     Q     The catalog at Gelman?

7     A     Yes.

8     Q     Is that accessible by only individuals at

9  the university library or from anyone on the World

10  Wide Web, on the Internet in the world?

11     A     It's actually accessible over the

12  Internet.

13     Q     So it's accessible by anyone who has the

14  World Wide Web?

15     A     Yes.

16     Q     And how long has Aladdin been in place at

17  George Washington University?

18     A     Aladdin was in place before I got there.

19  I believe I was already asked when.  At this point

20  of the day, after all of this questioning, I

21  honestly can't tell you when.

22     Q     Understood.  Now, again talking about OCLC

23  and the use of OCLC at GW University.

24     A     Yes.

25     Q     Are you aware of any instance between 1980

Exhibit 51  Page 54

1                   JEAN A. PEC

2    2 to the replaced line at the top.

3         A    Yes.

4         Q    And you indicated that that means

5    something on this form changed or was added; is that

6    correct?

7         A    Probably, yes.

8         Q    Is it possible that the information at

9    that line 090 was such a thing that was changed?

10             MR. SMITH:  Object to the form.

11             THE WITNESS:  That -- to me that would be

12   improbable.

13             BY MR. NEWBY:

14        Q    Is it possible?

15        A    It is possible.

16        Q    Going back to Pec Exhibit Number 2, what

17   is the information indicated at line 650?

18        A    That is the subject heading, the topical

19   subject heading, in the form used by the Library of

20   Congress.  That's what all -- that's what the zero

21   means.  Computer graphics is what the cataloger

22   determined the work itself to be about.

23        Q    So it's a cataloger that determines the

24   subject matter?

25        A    The subject -- yes, the subject heading

Exhibit 51  Page 55

1           JEAN A. PEC

2    used in the record and then a call number that would

3    be reflective of that.

4        Q    And is it OCLC database searchable by that

5    subject matter?

6        A    It is now searchable by subject matter.  I

7    don't know if it was searchable by subject matter

8    always.

9        Q    What is your earliest knowledge of it

10   being searchable by subject matter?  What date is

11   the earliest?

12       A    I would have to estimate subject --

13       Q    To your knowledge.

14       A    Sometime in the 1990s for subject

15   searching.

16       Q    And OCLC is searchable by other fields

17   here; is that correct?

18       A    Yes.  It's -- as far as I know, it has

19   always been searchable by the author and by the

20   title, which is in the 245 field.

21       Q    If you would please refer back to your

22   affidavit at Pec Exhibit Number 4.  After the

23   questions I've just asked you, do you see a need to

24   change any of your testimony in your affidavit,

25   notwithstanding the one change that you mentioned

**Exhibit 51  Page 56**

Page 123

1                          JEAN A. PEC

2    earlier regarding the MARC system?

3        A    No, I do not see a need to change it.

4        Q    Is there any doubt that the testimony in

5    your affidavit and your testimony today regarding

6    the cataloging procedures at GW University is

7    correct?

8        A    I have no doubt.

9             MR. NEWBY:  Those are all my questions.

10            MR. GILMAN:  I think I might have five

11   questions to follow up on, very quickly.

12                         EXAMINATION

13            BY MR. GILMAN:

14       Q    Is it correct that WRLC was created on or

15   about 1987, to the best of your knowledge?

16       A    I don't know when the Washington Research

17   Library Association was created.

18       Q    Would it surprise you that their Web site

19   lists their creation date as 1987?

20       A    It would not surprise me, no.

21       Q    Do you know whether the Aladdin system was

22   available over the Internet as of 1990?

23       A    I don't believe it was, because I don't

24   believe people were using the Internet in that way

25   in 1990.

Exhibit 52

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4  LUCENT TECHNOLOGIES,           )  Case No. 02CV2060-B(CAB)
                                  )          Consolidated with
5           Plaintiff,            )          03CV0699-B(CAB)
                                  )          03CV1108-B(CAB)
6  vs.                            )          Related to:
                                  )          06CV0684-B(CAB)
7  GATEWAY, INC., et al.,         )
                                  )  San Diego, California
8           Defendants.           )
   _____)  Friday,
9                                    May 11, 2007
                                     9:00 a.m.

10

11                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE RUDI M. BREWSTER
12                 UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 For the Plaintiff:
                              JOHN DESMARAIS, ESQ.
15                            ROBERT A. APPLEBY, ESQ.
                              JAMES MARINA, ESQ.
16                            Kirkland & Ellis, LLP.
                              153 East 53rd Street
17                            New York, New York 10022
                              (212) 909-3189
18
   For the Defendant:         W. BRYAN FARNEY, ESQ.
19                            JEFFREY B. PLIES, ESQ.
                              ANDREW N. THOMASES, ESQ.
20                            JOSHUA WALSH-BENSON, ESQ.
                              Dechert, LLP
21                            300 West Sixth Street
                              Suite 1850
22                            Austin, Texas 78701
                              (512) 394-3000

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Echo Reporting, Inc.*

**Exhibit 52  Page 58**

48

1    that.  The expert can say, you don't need motivation,

2    teaching and suggestion, but here we've got it or we don't

3    got it or he doesn't even need to mention it.  But, they

4    don't need a new opinion.  They don't need new prior art.

5    They don't need new obviousness combinations, which is where

6    they're trying to go with this.

7             THE COURT:  Well, now, I'm not so sure.  I'm not

8    so sure about that, because I'm just -- I'm just thinking,

9    if I were the Defendant, if I now -- if I now were not

10   hampered in finding prior art, by finding prior art to which

11   there was some teaching or some more obvious motivation to

12   reach out, now if I'm ready to -- I'm going to go out into

13   Tulle's and East Jesus and grab some over here, Timbuktu and

14   grab something over there, and God knows where and grab

15   something over there.  And then find some expert somewhere

16   to say, well, those are just obvious, the prior art that

17   should have been taken into account, and they don't have

18   that.  They haven't gone to Timbuktu and East Jesus because

19   they had to look for teaching and motivation.

20            So, I think that their chance to use it in your

21   description of what they're doing, to let them obfuscate a

22   little more, I think the Court's given them that license to

23   do that.

24            MR. FREED:  Your Honor, in addition to that, the

25   Court has given us --

*Echo Reporting, Inc.*

**Exhibit 52  Page 58.1**

49

1    MR. DESMARAIS:  I disagree with that, your Honor.

2  I don't think KSR had anything to do with that.

3    MR. FARNEY:  Mr. Desmarais is the only patent

4  attorney in the country that doesn't think that case changed

5  the law.

6    MR. DESMARAIS:  That's actually not true.

7    THE COURT:  I'm sorry, what?

8    MR. FARNEY:  He's the only patent attorney in the

9  country who thinks KSR didn't change the law.

10    MR. DESMARAIS:  That's actually not true, your

11 Honor.

12    THE COURT:  Well, and he wouldn't be saying it if

13 he were sitting over here.

14    MR. FARNEY:  That's exactly right.

15    MR. DESMARAIS:  Your Honor, just to be clear --

16    MR. FARNEY:  But, I admire him for the argument he

17 made.  It wasn't bad.

18    THE COURT:  I'm aware of that.  I'm aware of that.

19    MR. DESMARAIS:  Just to be clear, I'm not the only

20 one.  I was a the Federal Circuit.

21    MR. FARNEY:  Mr. Appleby agrees with him.

22    MR. DESMARAIS:  I was at the Federal Circuit on

23 Wednesday and Judge Lory (phonetic) agrees with me.  We had

24 an argument about --

25    THE COURT:  I agree with you, too.  I'm just

**Exhibit 52  Page 59**

50

1    pointing out -- I'm just pointing out, having agreed with

2    what you say, I still say, if I were representing the

3    Defendant, I would now take another look at that prior art

4    and see if we can't find some more prior art as to which may

5    not have been within the teaching or the motivation.

6         MR. FARNEY:  Not only that, your Honor, the

7    Federal Circuit has already now issued their first case post

8    KSR and they specifically found that the Plaintiff had not

9    shown that the patent, the combination didn't yield an

10   unpredictable result, citing KSR as standard that would have

11   not been used prior to KSR.  I mean, the Federal Circuit got

12   the message from the Supreme Court loud and clear, and it's

13   changing the standard of the law.

14        MR. DESMARAIS:  But, they didn't say it changed

15   the law.  That decision does not say KSR changed the law.

16        MR. FREED:  Well, whether they said it changed the

17   law or not, your Honor, what they did was acknowledge one

18   big change by the KSR court, and that is, if I have a bunch

19   of references and I have a claim to the combination of A, B,

20   C, D and E, and I can point to A, B, C, D and E, wherever

21   they are in the references and say that they're doing the

22   same things in the references as they're doing in that

23   claim, I don't need to talk about motivation.  The end of

24   the ball game there.  It then becomes their burden to deal

25   with that issue.  That's exactly what this new case at the

*Echo Reporting, Inc.*

**Exhibit 52  Page 60**

51

1  Federal Circuit applied after KSR, because KSR couldn't have

2  been more plain.  If you have things that are in the prior

3  art doing the same thing in the patented invention, maybe in

4  a different combination, but doing what they did before,

5  it's going to be a cold day in Hades before that's going to

6  be a valid patent.  They didn't quite say that --

7          MR. DESMARAIS:  That's not what it said.

8          MR. FREED:  They didn't quite say that.  They said

9  some words that were very close to that.  They said it will

10  be a very --

11          THE COURT:  It's a chilly day in purgatory.

12          MR. FREED:  Yeah, something like that.

13          MR. DESMARAIS:  That's not true.  If you read the

14  decision, they actually said someone skilled in the art

15  would have to look at that prior art and know to combine it.

16  They don't use the word teaching and suggestion, but they

17  did say that somebody skilled in the art would have to look

18  at the prior art.  They'd have to be in the same field, and

19  they'd have to be expected to combine it.

20          MR. FARNEY:  They said the combination had to

21  yield an unpredictable result, which was clearly not the

22  standard before.  That was something the Federal Circuit had

23  squarely rejected before.

24          MR. FREED:  If it's not yielding an unpredictable

25  result, forget about it.

*Echo Reporting, Inc.*

**Exhibit 52  Page 61**

52

1    MR. FARNEY:  It's clearly changed the law.

2  There's just no two ways about it, although I admire

3  Ms. Desmarais for a creative argument.

4    MR. DESMARAIS:  Talk to Judge Lory.  He agrees

5  with me.

6    THE COURT:  Let's get to the chase.  Whether he's

7  right or wrong, whether you're right or wrong or whether I'm

8  right or wrong really isn't the point.  The point right now

9  is, what do I feel needs to be done to try this case fairly

10 and give everybody the due process that they're entitled to,

11 and I think that I'm required to give the Defendants the

12 opportunity to take another look at their prior art and see

13 whether there are any other prior art references that could

14 have been invoked before but weren't, and they want to bring

15 them into the game now.  And I think they're entitled to

16 that, And if they -- and also, I think both sides are

17 entitled to depose experts on -- I mean, to get reports from

18 them, and depositions.

19    MR. FREED:  Your Honor, we're also entitled to

20 take a new look at the art we already brought forward to be

21 able to say that that art has things in it that are in the

22 claims and it's doing the same thing in the claims as it is

23 in that art.  And we can say that, whereas, before, we had

24 to focus on whether there was a motivation or not to do

25 that.  Now, we don't have to focus on that.  We could say,

*Echo Reporting, Inc.*

**Exhibit 52  Page 62**

53

even as to the art we're already using, that elements A, B,

C, D and E are found in the prior art.  They're found in the

claims and they're doing the same thing.

THE COURT:  Well, I think you could have said that

before.  I would have said that before.

MR. FREED:  We couldn't, your Honor.  We --

motivation before.  Now, we don't have to have a motivation.

MR. FARNEY:  There may be different combinations

we can make as well.

MR. FREED:  We couldn't do that before without a

motivation.  Now, we can do it without the motivation.

THE COURT:  Well, but even -- but, logically, if

before you cited it and you said there was a motivation,

you've already cited it and you've relied on it, but all you

could say now is not only did we cite it, not only did we

say there was motivation, which there was, we don't even

have to show motivation.

MR. FREED:  -- even pointed to the things in

there, and relied on them because of the fact that we

didn't -- when we had to look for motivation.  Maybe we'll

point to different things in the same art.

THE COURT:  Well, now, you're just -- that's

another way of saying you found prior art.  That's all

you're saying.

MR. FARNEY:  Right.  I think the point is, if we

Exhibit 53

Case 3:02-cv-02060-B-CAB    Document 1491    Filed 12/13/2007    Page 72 of 74

1

2

3

4

5

6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

7

LUCENT TECHNOLOGIES INC.,

8
                      Plaintiff,

9
          v.

10  GATEWAY, INC., GATEWAY COUNTRY
    STORES LLC, GATEWAY COMPANIES,
11  INC., GATEWAY MANUFACTURING LLC
    and COWABUNGA ENTERPRISES, INC.,

12
                      Defendants,

13          and

14  MICROSOFT CORPORATION,

15                      Intervener.

16

17

18

19  MICROSOFT CORPORATION,

20                      Plaintiff,
          v.

21  LUCENT TECHNOLOGIES INC.,

22                      Defendant.

23  LUCENT TECHNOLOGIES INC.,

24                      Plaintiff,
          v.

25

26  DELL INC.,

27                      Defendant.

28

Case No. 02-CV-2060-B (CAB)
consolidated with
Case No. 03-CV-0699-B (CAB)
Case No. 03-CV-1108-B (CAB)

**DECLARATION OF MR. BRUCE
TOGNAZZINI IN SUPPORT OF
LUCENT'S OPPOSITION TO
GATEWAY'S MOTION FOR
SUMMARY JUDGMENT OF
INVALIDITY OF CLAIMS 19 & 21 OF
U.S. PATENT NO. 4,763,356**

Date:          April 27, 2007
Time:          9:00 A.M.
Courtroom:     2
Judge:         Hon. Rudi M. Brewster

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO
GATEWAY'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

Case Nos. 02-CV-2060-B (CAB),
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 4
Page 000121

**Exhibit 53  Page 64**

I, Bruce Tognazzini, hereby declare as follows:

1.    I have been retained as an expert in this case by counsel for Lucent Technologies Inc. ("Lucent"). If called to testify as a witness, I could and would competently testify to the truth of each statement herein.

2.    I have been informed that a true and correct copy of the May 12, 2006 Expert Report of Bruce Tognazzini Relating To The Expert Report Of … Dale Buscaino Re Lucent's Day Patent ("Invalidity Report"), that I prepared in connection with this case has been attached as an Exhibit to the Declaration of Eric D. Hayes in support of Lucent's Opposition to Gateway's Motion for Summary Judgment of Invalidity of Claims 19 & 21 of U.S. Patent 4,763,356 ("the '356 patent"), which motion claims that the '356 patent claims are rendered obvious and otherwise invalid by a magazine article ("the Tyler Article") that was first produced the week before last, on March 29, 2007.

3.    My Invalidity Report is based on this Court's existing claim constructions, and accurately reflects my invalidity opinions in this case and the bases therefore, and thus I incorporate this report as it relates to invalidity of the '356 patent, as if the applicable sections were stated fully herein. A summary of my credentials is set forth in my Invalidity Report.

4.    I understand that Gateway's motion contends that claims 19 & 21 of the '356 patent are rendered obvious or otherwise invalid by the Tyler Article that was only recently disclosed to Lucent. However, I understand that Gateway's late production of the Tyler Article and its motion is based upon a newly-proposed claim construction of the phrase "concurrently displayed" that has not been adopted by this Court. I disagree with this newly-proposed claim construction, which requires that a tool be brought up "automatically" and "simultaneous" with the appearance of an indicator in a field.

5.    I have not had a chance to supplement my expert reports based on any new claim construction of the '356 patent, nor have I had an opportunity to provide any opinions based on this proposed claim construction. I have not had an opportunity to review any expert report or testimony submitted by defendants based on this revised claim construction.

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO GATEWAY'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

1

Case Nos. 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 4
Page 000122

**Exhibit 53   Page 65**

1   6.  The Tyler Article was only very recently disclosed to Lucent in this litigation.  Thus,

2 I have had only a limited opportunity to review the Tyler Article, and have not seen the Easel system

3 described in the article.  I have not had an opportunity to review any expert report or testimony

4 submitted by defendants' experts regarding the Tyler Article, or any obviousness or invalidity

5 analysis made by defendants' experts regarding the Tyler Article, nor have I had the opportunity to

6 review any such reports or testimony.

7   7.  Based on my limited review of the Tyler Article, however, the article does not appear

8 to disclose each and every limitation of claims 19 and 21 of the '356 patent.  Nor does it render the

9 claims obvious.

10  8.  I note that the Tyler Article is a magazine article.  It is not an instruction manual or

11 any other type of technical document regarding the Easel system mentioned in the article.  This four-

12 page article does not appear to show whether the Easel system discloses many of the claim

13 limitations required by claims 19 and 21 of the '356 patent.

14  9.  For example, the Tyler Article does not appear to disclose any "predefined tools

15 associated with said one of said fields."  This Court has construed that phrase to mean "a tool

16 specified by the system as an appropriate tool for filling in the information called for by that field."

17 The Tyler Article does not appear to disclose whether the Easel system has any "menu of

18 alternatives" tool, or any "tool adapted to allow said user to compose said information" as required

19 by the claims.  The Taylor Article does not disclose whether the "list of brokers" and "QWERTY

20 layout" mentioned in the Tyler Article are "predefined tools associated with said one of said fields"

21 and otherwise satisfy the Court's claim construction.

22  10.  The Tyler Article also does not appear to disclose any tools that are "concurrently"

23 displayed, which this Court has construed to mean "displaying at the same time, as by a window

24 overlaying the form."  The single screen-shot picture in the Tyler Article appears to show a side-by-

25 side tiling type of display, similar to that disclosed by the Xerox Star system.  It does not appear to

26 disclose any "window overlaying" the form, or any other type of "windowing" technology.

27

28

---

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO
GATEWAY'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

2

Case Nos. 02-CV-2060-B (CAB),
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 4
Page 000123

**Exhibit 53  Page 66**

1       I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.

3

4   Executed on

5

6   April 11, 2007                                               Bruce Tognazzini

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TOGNAZZINI DECLARATION ISO LUCENT'S OPPOSITION TO         3         Case Nos. 02-CV-2060-B (CAB),
GATEWAY'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY         03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)
OF CLAIM 19 & 21 OF U.S. PATENT NO. 4,763,356

**Exhibit 53  Page 67**

Exhibit 4
Page 000124