Page 1

1           UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3     - - - - - - - - - - - - - - - - - -

4   LUCENT TECHNOLOGIES INC., and   ) CASE NO.

5   MULTIMEDIA PATENT TRUST,        ) 07-CV-2000 H (CAB)

6           Plaintiffs,             )   consolidated with

7   vs.                             ) 02-CV-2060 B (CAB)

8   GATEWAY, INC., et al.,          ) 03-CV-699 B (CAB)

9           Defendants,             ) 03-CV-1108 B (CAB)

10   and                            )

11   DELL INC.,                     )

12           Defendant,             )

13   and                            )

14   MICROSOFT CORPORATION,         )

15           Intervenor.            )

16     - - - - - - - - - - - - - - - - - -

17   AND RELATED CROSS-ACTIONS.     )

18     - - - - - - - - - - - - - - - - - -

19           DEPOSITION OF MICHAEL TYLER

20           THURSDAY, DECEMBER 27, 2007

21

22       BY:  MELINDA M. IBANEZ, CSR NO. 10686, CRP

23

24

25

**EXHIBIT 23 PAGE 472**

1

2

3

4

5

6

7

8

9

10     Deposition of MICHAEL TYLER, taken on behalf of

11    LUCENT TECHNOLOGIES, at One Maritime Plaza, Suite

12    2300, San Francisco, California, commencing at 10:11

13    a.m., THURSDAY, DECEMBER 27, 2007, before Melinda M.

14    Ibanez, Certified Shorthand Reporter No. 10686,

15    pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 23 PAGE 473**

```
1    APPEARANCES OF COUNSEL:

2    FOR LUCENT TECHNOLOGIES, INC.:

3        KIRKLAND & ELLIS LLP

4        BY:  ERIC D. HAYES, ATTORNEY AT LAW

5        200 East Randolph Drive

6        Chicago, Illinois 60601

7        Telephone:  (312) 660-9725

8

9    FOR GATEWAY, INC., et al. and THE WITNESS:

10       DECHERT LLP

11       BY:  JONATHAN D. BAKER, ATTORNEY AT LAW

12       2440 W. El Camino Real, Suite 700

13       Mountain View, California 94040-1499

14       Telephone:  (650) 813-4800

15

16   FOR MICROSOFT CORPORATION and THE WITNESS:

17       FISH & RICHARDSON P.C.

18       BY:  LARA S. GARNER, ATTORNEY AT LAW

19       12390 El Camino Real

20       San Diego, California 92130-2081

21       Telephone:  (858) 678-5070

22

23   ALSO PRESENT:

24       BRIAN MONROE, VIDEOGRAPHER

25
```

**EXHIBIT 23 PAGE 474**

Page 4

1                         INDEX

2     THURSDAY, DECEMBER 27, 2007

3     MICHAEL TYLER                              Page

4     PROCEEDINGS                                  6

5         Examination by MR. HAYES                7

6     AFTERNOON SESSION                          107

7         Examination resumed by MR. HAYES      107

8         Examination by MR. BAKER              124

9         Further examination by MR. HAYES      156

10

11                        -oOo-

12

13       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

14                   PAGE   LINE

15                    54     24

16

17

18

19

20

21

22

23

24

25

EXHIBIT 23 PAGE 475

Page 5

```
 1                    EXHIBITS

 2   ,Number              Description              Page

 3   Exhibit 1   Article entitled "TOUCH SCREENS:  BIG DEAL

 4       OR NO DEAL?" from Datamation magazine

 5       dated January 1984 - 9 pages                20

 6

 7   Exhibit 2   Photostatic copy of photograph - 1 page

 8                                                   69

 9   Exhibit 20  Article entitled "TOUCH SCREENS:  BIG DEAL

10       OR NO DEAL?" from Datamation magazine

11       dated January 1984 - 10 pages              124

12

13   Exhibit 21  Article entitled "TOUCH SCREENS:  BIG DEAL

14       OR NO DEAL?" from Datamation magazine

15       dated January 1984 - 9 pages               124

16

17   Exhibit 22  Photostatic copy of photograph - 1 page

18                                                  124

19

20

21

22

23

24

25
```

1                        MICHAEL TYLER

2          THURSDAY, DECEMBER 27, 2007; 10:11 A.M.

3                           -oOo-

4        THE VIDEOGRAPHER:  Here begins DVD number 1 in

5    the deposition of Michael Tyler in the matter of

6    Lucent Technologies, Incorporated versus Gateway,

7    Incorporated, et al., in the United States District

8    Court, Southern District of California, Case Number

9    07-CV-2000 H (CAB).

10          Today's date is December 27th, 2007.  The

11   time on the video monitor is 10:11 a.m.

12          The video operator today is Brian Monroe,

13   employed by Behmke Reporting & Video Services,

14   located at 160 Spear Street, Suite 300,

15   San Francisco, California.

16          This video deposition is taking place at

17   One Maritime Plaza, Suite 2300, San Francisco,

18   California, and was noticed by Eric Hayes, Esquire,

19   of Kirkland & Ellis.

20          Counsel, please voice identify yourselves

21   and state whom you represent.

22      MR. HAYES:  This is Eric Hayes from the law firm

23   of Kirkland & Ellis LLP on behalf of Lucent

24   Technologies, Incorporated.

25      MR. BAKER:  This is Jonathan Baker from Dechert

**EXHIBIT 23 PAGE 477**

```
 1                    MICHAEL TYLER

 2    LLP on behalf of the Gateway parties, as well as for

 3    Mr. Michael Tyler.

 4        MS. GARNER:  Lara Garner of Fish & Richardson on

 5    behalf of Microsoft and Mr. Tyler.

 6        THE VIDEOGRAPHER:  The court reporter today is

 7    Melinda Ibanez, certified shorthand reporter

 8    contracted by Behmke Reporting & Video Services.

 9            Would the court reporter please swear in the

10    witness.

11            (The witness was duly sworn.)

12        THE VIDEOGRAPHER:  Please begin.

13                    -oOo-

14                    MICHAEL TYLER,

15    having been first duly sworn, testified as follows:

16                    EXAMINATION

17    BY MR. HAYES:

18        Q.  Mr. Tyler, good morning.

19        MS. GARNER:  Excuse me, Eric.  Sorry.  Just

20    before we get started, I'd like to put on the record

21    that Microsoft will join in Gateway's objections.

22        MR. BAKER:  And I'd like to put on the record

23    that Gateway will join in Microsoft's objections.

24        MR. HAYES:  Okay.  Thanks.

25        Q.  Mr. Tyler, good morning.
```

**EXHIBIT 23 PAGE 478**

Page 8

1                        MICHAEL TYLER

2          Would you please state your name and address

3    for the record.

4        A.   My name is Michael Tyler, at 1915 Straits

5    View Drive, Tiburon, California.

6        Q.   Have you been deposed before?

7        A.   No, I have not.

8        Q.   Okay.  So we'll take a minute to go over a

9    few of the ground rules.

10       A.   Okay.

11       Q.   Today I'll be asking the questions and

12   you'll be answering the questions, and occasionally

13   Mr. Baker or Ms. Garner will be objecting to the

14   questions.

15          It's important that only one of us speak at

16   a time because the court reporter has to take down

17   everything that's said.

18       A.   Mm-hmm.

19       Q.   So I'll do my best to not interrupt you, and

20   I'd ask that you wait until I'm done with my question

21   until you answer the question.

22          Fair enough?

23       A.   Fair enough.

24       Q.   Okay.  It's important that you hear and

25   understand my questions today.  If you don't hear or

Page 9

1                    MICHAEL TYLER

2   understand my questions, will you let me know?

3       A.   I will.

4       Q.   Okay.  It's also important that you give

5   audible answers.  As I said, the court reporter has

6   to take down everything that you say, so instead of

7   shaking your head or giving uh-huh, it's important

8   that you just give audible answers.  Okay?

9       A.   That's fair.

10           Is my normal speaking voice loud enough?

11      THE REPORTER:  It is.

12      THE WITNESS:  Okay.

13  BY MR. HAYES:

14      Q.   We'll take breaks throughout the day

15  periodically, when the tape runs out or every hour or

16  something.

17           If you need a break, just let me know.  I'll

18  be happy to take a break.

19      A.   Okay.

20      Q.   I would ask that if there's a pending

21  question that you answer the question before we take

22  a break.

23      A.   Okay.

24      Q.   Okay.  Is there any reason that you can't

25  answer my questions truthfully?

1                    MICHAEL TYLER

2       A.    None that I'm aware of, no.

3       Q.    Okay.  Are you represented here today?

4       A.    I am represented by Mr. Baker from Dechert

5  and by Ms. Garner from Fish & Richardson.

6       Q.    Do you have an understanding of when that

7  representation started?

8       A.    That representation started in early October

9  of this year.

10      Q.    October of 2007?

11      A.    Yes.

12      Q.    Is there any type of written agreement

13  memorializing when that representation started?

14      A.    Yes.  I signed a letter, and each of them

15  has also signed a letter of representation.

16      Q.    Okay.  So there will be some questions today

17  that I may ask that would call for attorney-client

18  communications, and your attorneys may instruct you

19  not to answer.

20            There also may be some questions that I ask

21  prior to when that representation started that they

22  may not also object to, so we'll work through that as

23  it goes.

24            I'm entitled to an answer to all my

25  questions today unless your attorneys specifically

EXHIBIT 23 PAGE 481

1                    MICHAEL TYLER

2    instruct you not to answer the question.

3         Do you understand that?

4    A.    Yes, I do.

5    Q.    Okay.  So I'm going to spend a little bit of

6    time now going through your work experience, and what

7    I'd like to do is we'll just start with your present

8    employment, if you're employed, and then just kind of

9    work back --

10   A.    Okay.

11   Q.    -- on the timeline.

12        Are you currently employed?

13   A.    I am currently self-employed.

14   Q.    What -- what is it that you do at --

15   A.    I manage an investment-management company

16   called West Shore Investment Management LLC.

17   Q.    Is that West Shore?

18   A.    West Shore, two words, Investment Management

19   LLC.

20   Q.    And are you the owner and manager of that

21   company?

22   A.    Yes, I am.

23   Q.    And just a brief description of what it is

24   you do as the owner and manager of this West Shore

25   Investment --

EXHIBIT 23 PAGE 482

1                    MICHAEL TYLER

2       A.    I provide investment-management services for

3    a hedge fund that invests in telecommunications and

4    information areas.

5       Q.    And how long have you been doing that?

6       A.    I've been doing that since 2005.

7       Q.    What was it that you were doing before you

8    started this West Shore Investment Management in

9    2005?

10      A.    Before that I was a employee and later

11   partner of Wellington Management Company LLP in

12   Boston, where I was working as a securities analyst

13   and portfolio manager, again, for an

14   investment-management company.

15      Q.    And for how long were you doing that?

16      A.    I did that for 16 years.

17      Q.    So when was it that you started that?

18      A.    I started in, I think, February of '87 and

19   retired in mid-2002.  And then I had a required

20   contractual noncompete agreement that kept me on the

21   sidelines for a while.

22      Q.    So is it fair to say from approximately 2002

23   to 2005 you were under that noncompete agreement?

24      A.    2002 through '04.

25      Q.    Okay.

**EXHIBIT 23 PAGE 483**

1                    MICHAEL TYLER

2      A.   I started West Shore as a business in late

3   '04 and began managing the portfolio on January of

4   '05.

5      Q.   Prior to Wellington Management Company, in

6   '87, what were you doing?

7      A.   I was in business school at Harvard Business

8   School for the two years, mid-'85 through mid-'87.

9   And before that I worked from the time I graduated

10  college in June of '82 through, roughly, June of '85

11  at Datamation magazine in New York.

12          (Reporter interruption.)

13     THE WITNESS:  D-a-t-a-m-a-t-i-o-n, one word.

14  BY MR. HAYES:

15     Q.   So is it fair to say that you graduated

16  college in roughly '82 and started at Datamation

17  then?

18     A.   Yes.

19          (Proceedings interrupted.)

20     UNIDENTIFIED SPEAKER:  There's a computer here

21  that might be on the network that's not supposed to

22  be on the network?

23     MR. HAYES:  Let's take a break for a second.

24     THE VIDEOGRAPHER:  Going off the record, the time

25  is 10:19 a.m.

**EXHIBIT 23 PAGE 484**

1                    MICHAEL TYLER

2            (Discussion off the record.)

3       THE VIDEOGRAPHER:  We're back on the record, the

4   time is 10:20 a.m.

5            Please begin.

6   BY MR. HAYES:

7       Q.   Mr. Tyler, before we went off the record I

8   think we were -- we were talking about the 1982 time

9   frame.

10           You said in '82 you graduated from college;

11   is that right?

12      A.   I graduated from college in June 1982.

13      Q.   Where was that you went to college?

14      A.   Princeton University.

15      Q.   What was your degree in?

16      A.   My degree was in psychology.

17      Q.   So do you have any other degrees in addition

18   to your psychology degree from Princeton or your MBA

19   from Harvard?

20      A.   No.  That's all I have.

21      Q.   And you started at Datamation magazine in

22   June of '82 and you worked there through

23   approximately 1985; is that correct?

24      A.   Yes.

25      Q.   What was your first position at Datamation

EXHIBIT 23 PAGE 485

1                    MICHAEL TYLER

2    magazine in June of '82?

3        A.    I started as the new products editor, new

4    products editor.

5        Q.    Tell me a little bit about that job, what

6    specifically your responsibilities were on a

7    day-to-day basis.

8        A.    Essentially, my responsibility was to pay

9    attention to what was happening in the

10   information-systems, computers, data-processing

11   industry, broadly speaking, to identify new products

12   as they came to the marketplace, to find the ones

13   that were interesting to Datamation's readers and to

14   write -- write about them, essentially, to discuss

15   their features, to discuss what they could do, what

16   they couldn't do, compare and contrast many different

17   models of similar kinds of both hardware and software

18   and publish a column and section each -- in each

19   issue, one for hardware, one for software.

20       Q.    You mentioned, I think -- I didn't keep

21   track or -- provide articles of -- on topics that

22   were interesting to Datamation readers.

23       A.    Yes.

24       Q.    What was the typical Datamation reader?

25       A.    Datamation was targeted toward the corporate

1                    MICHAEL TYLER

2    or what's now called enterprise

3    management-information-systems professional; in other

4    words, people who were engaged in using

5    management-information-systems computers and similar

6    technologies for the purposes of operating their

7    businesses.

8        Q.    So would you draw a distinction between

9    those that were engaged in using and those that were

10   engaged in designing management information systems?

11       A.    For all intents -- they are different

12   people, obviously, but Datamation's readership

13   included very substantial portions of both

14   communities.

15       Q.    Okay.

16       A.    Obviously, the people designing MIS, or

17   management information systems, were clearly

18   interested in seeing what their competitors were

19   doing.  And users of information systems wanted to

20   know both what new products were available and -- as

21   well as what their competitors and peers in the

22   corporate world or in the government world were doing

23   with -- with computer technology.

24       Q.    And how long were you in the new products

25   editor position?

EXHIBIT 23 PAGE 487

Page 17

1                    MICHAEL TYLER

2       A.   I was there about a year, I believe.   I

3  don't remember exactly when I was promoted, but,

4  roughly speaking, a year.

5            It was a great education to learn everything

6  about computer technology at that time.

7       Q.   And what position were you promoted to?

8       A.   I was then promoted to assistant news

9  editor, which was the second ranking position within

10  the news department.

11      Q.   Tell me a little bit about your

12  responsibilities as the assistant news editor.

13      A.   I was responsible for reporting and writing

14  at least one news story a month and for coordinating

15  and leading the other, roughly, six bureau chiefs

16  around the country as they were developing and

17  reporting stories that they were writing, and then

18  editing their stories as well.

19      Q.   How long were you in that position?

20      A.   I was in that position from the time I was

21  promoted, which was roughly summer of 1983, through

22  the time I left Datamation in roughly June of 1985.

23      Q.   So for the roughly three years, or whatever,

24  that you were at Datamation magazine, did you just

25  have the two titles, news -- let me see -- new

**EXHIBIT 23 PAGE 488**

Page 18

1                        MICHAEL TYLER

2    products editor and assistant news editor?

3         A.    Those were my only formal titles.

4              In, I believe, fall of 1984, although I

5    could be off by a bit, the news editor left to take

6    another job at a different company, and I became the

7    effectively acting news editor with complete

8    authority over the department, but I don't think I

9    ever got the official title, nor did I particularly

10   care.

11        Q.    The approximate three years you were at

12   Datamation magazine, approximately how many articles

13   did you author?

14        A.    Uhm, let's see.  Datamation was monthly.

15   From the time I started through midway into -- into

16   1984, so that's about 18 issues, give or take, and

17   then it was semi-monthly for the next 18 months or

18   so, so that would be another 30-some-odd issues.

19   That's -- give or take, I was there for around 50

20   issues.  So I would have authored probably about 30

21   to 50 news articles or feature articles, as well as

22   about 20 or so hardware columns and 20 or so software

23   columns.

24              Those are very approximate numbers.  I

25   haven't ever tried to count them.

**EXHIBIT 23 PAGE 489**

1                    MICHAEL TYLER

2      Q.    That's fine.

3            And then did you --

4            Does that include any -- or any articles you

5    might have co-authored as well?

6      A.    Yeah.  I can't recall working with any other

7    authors, but I may -- I may have.  I just don't

8    remember.

9      Q.    And then approximately how many articles did

10   you review or edit in your time at Datamation?

11     A.    As the assistant news editor for a roughly

12   18-month, give or take a few months, period, there

13   were about five to seven news articles in each issue,

14   and so -- I'm sorry, roughly two years that I was the

15   news editor.  The first six months were monthly, and

16   then the next 18 or so were semi-monthly.  So that

17   would be roughly around 40 or so issues for which I

18   was the assistant news editor, each of which had

19   about five to seven articles.  So that would be well

20   over 200 articles that I was deeply involved in the

21   development, reporting and/or editing process.

22     Q.    So it's fair to say you were the author of

23   roughly 30 to 50 articles, 20 hardware columns,

24   roughly 20 software columns, and then deeply involved

25   in well over 200 other articles, right?

EXHIBIT 23 PAGE 490

1                    MICHAEL TYLER

2      A.   Yes, that's a fair statement.

3      Q.   Since leaving Datamation magazine, have you

4  been involved in writing any other articles

5  throughout your career?

6      A.   For wide distribution, no.  However, my

7  responsibilities at Wellington Management for

8  16 years involved writing up what are called research

9  reports, which are essentially articles targeted at

10  Wellington's portfolio managers to discuss and

11  describe companies in which Wellington was

12  considering investments and to reach conclusions as

13  to making advice whether Wellington ought to be

14  buying or selling such -- such companies.

15          So I've been writing professionally my

16  entire career.

17      Q.   Okay.

18      A.   And to this day I write at least one monthly

19  article or -- or letter to investors for my current

20  business.

21      MR. HAYES:  Can you mark this as Tyler Deposition

22  Exhibit 1.

23          (Exhibit No. 1 was marked for

24          identification.)

25  BY MR. HAYES:

EXHIBIT 23 PAGE 491

Page 21

1                    MICHAEL TYLER

2      Q.   Mr. Tyler, the court reporter has handed you

3  what's been marked as Tyler Deposition Exhibit 1.  In

4  the bottom right corner this document bears a

5  production number MSLT_1228716 through MSLT_1228724.

6  It's a copy of the Datamation magazine article, which

7  actually starts on MSLT_1228719, titled "Touch

8  Screens:  Big Deal or No Deal?" by Michael Tyler.

9           Mr. Tyler, are you familiar with this

10 article?

11     A.   Oh, yes.

12     Q.   When was the last time that you read this

13 article?

14     A.   I reread it relatively recently.

15     Q.   Okay.  I assume --

16     A.   In the last couple weeks.

17     Q.   I assume you reread it relatively recently

18 in connection with this --

19     A.   Absolutely.

20     Q.   -- case.

21     A.   Otherwise, I probably would not have read it

22 in quite some time.

23     Q.   Okay.  That's my next question.

24           Since reading it for this case, when,

25 approximately, was the last time that you read this

**EXHIBIT 23 PAGE 492**

Page 22

1                    MICHAEL TYLER

2    article?

3        A.    Probably not long after it came out.    I

4    probably -- every year or so while I was at

5    Datamation I would review everything I had done up to

6    that point to think about whether there might be

7    interesting follow-up ideas, but I don't think I

8    would have read it much after I was in business

9    school.

10       Q.    Okay.  So is it fair to say, then -- you

11   were in business school the, roughly, '85 time frame.

12   Is it fair to say you -- with the exception of

13   reading it for this --

14       A.    Mm-hmm.

15       Q.    -- case recently, that you most likely did

16   not read this article since '85?

17       A.    Yeah, that's fair.

18       Q.    Okay.  Now, on MSLT_1228719, the first page

19   of this article, it lists you, Michael Tyler, as the

20   author.

21             Did you do all the -- the writing of this

22   article?

23       A.    I did all of the research and writing of the

24   article.

25       Q.    Did you have any assistance from anyone else

EXHIBIT 23 PAGE 493

Page 23

1                    MICHAEL TYLER

2    at Datamation in preparing this article?

3        A.   Not in preparation.  I'm sure that I

4    submitted it to the features editor, who,

5    undoubtedly, did a normal editing process on it.

6             But in terms of the preparation, it was

7    entirely mine.

8        Q.   Do you remember the features editor's name?

9        A.   Kenneth Klee, K-l-e-e.

10        Q.   Did you have any help in doing the

11    background research to prepare this article?

12        A.   No.  That -- that was my specialty.  That's

13    what I did.

14        Q.   So it's fair to say you did all the research

15    and all the writing for this article?

16        A.   Yes.

17        Q.   What was the --

18             How did the idea for this article come

19    about?

20        A.   Well, having been the new products editor

21    not that long earlier, I was still very much in the

22    flow of new products coming into the marketplace and

23    paying attention to what was happening in the MIS, or

24    management information systems, field.  I also was

25    frequently speaking with vendors of such equipment,

EXHIBIT 23 PAGE 494

Page 24

                    MICHAEL TYLER

 1

 2   as well as customers.

 3         Datamation was well connected with its

 4   readers.  So I was able to pay attention to what was

 5   happening.  And every month we would have a story

 6   conference with the other editors and reporters

 7   shooting ideas back and forth.  This article most

 8   likely came about from one or a series of press

 9   releases introducing new products that I would have

10   received and said, gee, that looks interesting, I

11   think -- I've noticed a few of these have come out

12   lately, let's investigate, and gone from that into

13   exploring which companies were providing touch-screen

14   technology and exploring how they were being used.

15         And that's how -- I -- I frequently had

16   several different story ideas under development at

17   any given time, because you never knew which one

18   would turn out to be an interesting and worthy story

19   and which one was more or less a dead end.

20     Q.   Okay.  I think you said "a few of these have

21   come out lately" and you thought that was

22   interesting.

23         When you said "these," what specifically

24   were you referring to?

25     A.   Touch-sensitive technology, whether that was

EXHIBIT 23 PAGE 495

1                    MICHAEL TYLER

2    in the form of a writing tablet, which is a

3    long-since obsolete technology, or several different

4    kinds of touch-sensitive computer screens.  Several

5    of them which are referenced in that article had been

6    relatively recent product introductions at the time.

7        Q.   What was it you were hoping to convey to the

8    readers with this article?

9        A.   Put yourself back in 1984.  ATMs still did

10   not have the touch-screen technology that we use

11   today.  You had to push a regular keyboard.  And the

12   same was true for virtually anything else.

13        So this was potentially a revolutionary idea

14   of how to interact with a computer system.  It

15   promised to be more user friendly, more comfortable

16   for the average person to use, and so promised a very

17   exciting innovation in computer technology.

18        And when I saw several of these coming out,

19   as a -- just as a consumer, I said, wow, this looks

20   really fun, and as a reporter and editor, I said this

21   could be a very interesting story to -- to learn

22   about this and to be in front of it.

23        Q.   Now, I think you used the words "potentially

24   a revolutionary idea."  Were you referring to

25   touch-screen technology when you said that?

**EXHIBIT 23 PAGE 496**

Page 26

1                    MICHAEL TYLER

2       A.   I was speaking about the -- the concept of

3   how people interacted with their computer systems.

4   It had been entirely through keyboards.  And at the

5   time not everybody was a touch typist.  It wasn't

6   always taught to people in high school, or whenever

7   it's taught these days.  And so whether it was

8   through a writing tablet or a touch-sensitive screen

9   or possibly even other ways -- this was also about

10  the time that Apple was developing the Lisa computer,

11  which was the forerunner of the Macintosh, and at --

12  Xerox's Palo Alto Research Park was developing a lot

13  of point-and-click and mouse technologies that we all

14  take for granted today, but at the time were quite

15  new and also were a new innovation in how you used

16  computers.

17       So the user interface was potentially

18  revolutionary, not specifically one individual way,

19  but any of them could have been.

20       Q.   Okay.  Did you at the time understand the

21  technology behind touch-sensitive screens?

22       A.   Well enough, yes.

23       Q.   Okay.  Did you do any research into kind of

24  how they worked?

25       A.   Well, it does say in the article -- it

Page 27

1                    MICHAEL TYLER

2  describes four different ways in which

3  touch-sensitive screens worked.  And, technically

4  speaking, it wasn't always by touch.  It may have

5  been by breaking a sound wave or -- or temperature

6  related.  But I did at that time speak with the

7  engineers who were made available to me by the

8  companies who were developing these technologies to

9  get a good functional understanding.

10        I am not an engineer by background, and I

11 don't pretend to know all of the semiconductors or

12 thermal things or whatever else was involved, but nor

13 were Datamation's readers.  So my job was to -- to

14 understand the functionality of what was being done,

15 what was being accomplished and to have a working

16 understanding of how it was being done, not

17 necessarily to the engineering or physics or

18 chemistry level, but to the point that -- that you

19 and I could talk about it reasonably knowledgeably.

20    Q.   Okay.  As you saw these kind of press

21 releases and whatnot that were coming out about

22 touch-sensitive screens that kind of seemed to stir

23 your interest in this technology, what was the next

24 step you -- you took in getting your information for

25 this article?

1                          MICHAEL TYLER

2        A.    I began to contact the people who were

3    involved.  Every press release that I've ever seen

4    will always have a contact name at the bottom of it,

5    the person that -- at a company that you should call

6    for information.  And I started calling some of them

7    and setting up telephone interviews initially with

8    the people who the companies thought would be most

9    helpful to me.  They may have been marketing.  They

10   may have been engineering.  Whatever.

11            And in -- since I was based in New York, I

12   asked several of those companies if they might make

13   available to me an opportunity to see these things in

14   use, and, as it turns out, there were a couple that I

15   was able to visit firsthand and look at and even use.

16       Q.    And what were the couple companies that --

17   or businesses you got to visit firsthand?

18       A.    I visited Merrill Lynch, and I also visited

19   Chemical Bank, both of which had systems that were in

20   use.

21            (Reporter interruption.)

22       THE WITNESS:  Chemical Bank.

23   BY MR. HAYES:

24       Q.    What companies --

25            Did you try to contact or visit some other

**EXHIBIT 23 PAGE 499**

1                    MICHAEL TYLER

2    companies that -- that weren't interested in meeting

3    with you?

4        A.    You know, I don't remember anybody saying

5    no.

6           And for the purposes of writing an article

7    that was already going to stretch over several pages,

8    I did not need to be exhaustive.  So as soon as I

9    found a couple of companies that were using -- using

10   the system and were deploying it in a production

11   mode, I was able to say this is -- this is a good

12   focus of the story, I don't need to go much beyond

13   that.

14       Q.    Okay.  Did you have any contacts at either

15   Merrill Lynch or Chemical Bank that you used to kind

16   of get your foot in the door or did you -- did you

17   just talk to the folks that you had seen in these

18   press releases?

19       A.    The easiest way in, frankly, is when a

20   vendor has a product that it wants to publicize, they

21   would -- if I asked them, they would frequently make

22   available a customer who is using a product.

23           And I believe that that was the case here,

24   where I would call the company -- Easel was the

25   company in particular -- and I'd say, "I'd like to

1                      MICHAEL TYLER

2    see this in use."

3            They said, "Terrific.  We've got two

4    customers in New York who are using it.  Would you

5    like to meet them?"

6            And I said, "Yes, of course, I'd like to

7    meet them."  And then they were able to organize

8    that, that meeting.

9        Q.   So you worked through Easel to get your foot

10   in the door at Chemical Bank; is that right?

11       A.   As far as I remember, that's correct.

12       Q.   Okay.  Who was it that you talked to at

13   Easel?  Do you remember?  That was a long time ago.

14       A.   No, I don't remember specific names.  I'm

15   sorry.

16       Q.   Do you remember any specific names at either

17   Chemical Bank or Merrill Lynch?

18       A.   I believe the guy was Robert or Bob Long, I

19   think was -- was the guy's name at Chemical whom I

20   spoke with, but I don't remember.  He was more the --

21   the actually putting-together side.

22            And then the gentleman who I spoke with

23   within the bank, i.e., in the -- in the

24   foreign-exchange-trading area, is the person whom I

25   quoted in the article on several occasions, because

**EXHIBIT 23 PAGE 501**

Page 31

1                        MICHAEL TYLER

2    he was the user of the technology, and to me, and to

3    Datamation's readers, using the technology was more

4    interesting than trying to figure out precisely how

5    it was done.

6        Q.   And you mentioned that person's name is

7    here.  Do you remember who that was at Chemical Bank?

8        A.   I don't remember offhand.  Let me just -- it

9    is in the article.  Let me just find that for you.

10            (Witness reviewing document.)

11       Q.   Is it Anthony Herriott?

12       MR. BAKER:  Where are you looking, Counsel?

13       MR. HAYES:  I'm looking on the first page, the

14   first column.

15       THE WITNESS:  Yes, the first page of the article,

16   in the first column, partway down, Anthony Herriott

17   was the operations officer and treasury.  I did speak

18   with him extensively.  I met him in person, and he

19   was the primary person who described how the Easel

20   system was used at Chemical.

21   BY MR. HAYES:

22       Q.   And was it either Mr. Long or Mr. Herriott

23   that you first spoke with at Chemical to arrange your

24   visit?

25       A.   Chances are the visit was arranged by the

**EXHIBIT 23 PAGE 502**

1                    MICHAEL TYLER

2    people at Easel, who would have coordinated each of

3    our schedules to find a time that we could all meet.

4            I did speak with Mr. Herriott by telephone

5    first before actually meeting him.

6        Q.   When you went to Chemical Bank, were there

7    folks from Easel there as well?

8        A.   Yes.

9        Q.   Do you remember who, any of the names of

10   those folks?

11       A.   I -- I don't remember the name.

12           Typically, when I would attend a

13   demonstration such as this -- and I did many of

14   them -- there would be myself and occasionally a

15   reporter from another magazine or newspaper, although

16   Datamation preferred to have exclusives, and a

17   company -- a representative of the company whose

18   the -- technology or product was being featured, in

19   this case Easel, and at least one representative of

20   the company -- the customer company that was using

21   the technology.  So typically at least one

22   representative of each of those companies would be

23   present.

24           Occasionally, if there was a

25   public-relations agency involved, there might have

1      MICHAEL TYLER

2  Q. Do you remember approximately how long --

3 approximately how long before the article was

4 published that you would have been at Chemical Bank?

5  A. That demonstrates -- in fact, the entire

6 reporting process took place in, roughly speaking,

7 September through October of 1983.  It couldn't have

8 been any later than about November 15th at the very

9 latest because of Datamation's production schedule.

10  Q. The meeting at Chemical Bank couldn't have

11 been any later than November --

12  A. Could not possibly have been later than

13 that.

14  Q. So sometime during September or October,

15 most likely, of '83 you were at Chemical Bank?

16  A. Correct.

17  Q. Do you remember the specific building or

18 location you went to at Chemical Bank?

19  A. Chemical Bank's headquarters were on Park

20 Avenue in midtown --

21   (Reporter interruption.)

22  THE WITNESS:  Were on Park Avenue, midtown

23 Manhattan, on the east side of the street, and I

24 forget exactly which block.  And I'm virtually

25 certain that it was held there.

**EXHIBIT 23 PAGE 505**

Page 35

1                    MICHAEL TYLER

2   BY MR. HAYES:

3       Q.   You're virtually certain that your meeting

4   with Chemical Bank --

5       A.   Was held at --

6       Q.   -- their --

7       A.   That's correct.

8       Q.   -- headquarters in New York?

9       A.   I'm virtually certain.  It's been a long

10  time ago, but I -- I know I've met with Chemical in

11  that building.

12      Q.   Okay.  Did you ever meet with Chemical Bank

13  for any other articles or any other reasons?

14      A.   Don't remember --

15      Q.   Okay.

16      A.   -- to be honest.

17      Q.   Do you remember, when you visited that day,

18  did you have to go through security to get in the

19  building?

20      A.   Oh, I have no clue whatsoever.

21      Q.   Okay.  You don't remember if you had a

22  security badge or --

23      A.   I -- I have no idea.  That was -- I wouldn't

24  remember that detail.

25      Q.   Okay.  Do you remember approximately how

**EXHIBIT 23 PAGE 506**

1                    MICHAEL TYLER

2    long you were at Chemical Bank that day?

3        A.    I would guess probably in the vicinity of an

4    hour, maybe two hours.  I don't remember exactly.

5        Q.    Do you remember taking any pictures that day

6    when you were there?

7        A.    I did not.  I'm not a photographer.

8        Q.    Did you have a photographer with you?

9        A.    I'm not sure.  I know there's a photograph

10   in the magazine article that we're talking about.

11   That photograph may have been taken by a Datamation

12   staff photographer or it may have been taken by Easel

13   and then supplied to us.  Quite frequently vendors do

14   supply photographs of their equipment if -- if they

15   want those photographs used.

16       Q.    Okay.  I'm sorry.  The copy I've given you

17   isn't very clear, but do you remember who the person

18   is in the picture in the article?  And it's on

19   MSLT_1228721.

20       A.    It's just a black blotch on this one.

21       Q.    All right.

22       A.    I -- I couldn't say.

23       Q.    Okay.  I think I brought it.

24             Well, unfortunately, I don't have it --

25       A.    It may have been Mr. Long, because I recall

EXHIBIT 23 PAGE 507

1                    MICHAEL TYLER

2    that he was probably leading the demonstration, but

3    it may not have been, because that picture may not

4    have been taken at exactly the same time that I was

5    seeing the demonstration.

6        Q.    Okay.  Just for your information, we took

7    Mr. Long's deposition recently, and he confirmed that

8    that was him in the picture.

9        A.    Okay.

10       Q.    Do you remember anyone else that would have

11   been doing the demonstration that day at Chemical

12   Bank of the actual system?

13       A.    No, I don't remember.  I don't think -- I --

14   as far as I know, there probably weren't, but I don't

15   remember for sure.

16       Q.    So you don't remember if anyone else

17   demonstrated the system other than Mr. Long?

18       A.    I do not remember.

19       Q.    Was your meeting that day at Chemical Bank

20   prearranged?

21       A.    I'm sure it was.

22       Q.    And was your purpose there that day at

23   Chemical Bank to get information to write this

24   article?

25       A.    Yes.  It was -- it was specifically for this

EXHIBIT 23 PAGE 508

Page 38

1                    MICHAEL TYLER

2    article which was under development and to see a

3    touch-screen technology in use at a company that was

4    quite representative of who Datamation's readers

5    were, doing something that was practical and that

6    many of its readers would find to be an interesting

7    and worthwhile application.

8        Q.    Okay.  Do you remember anything about the

9    room that you were actually in that you -- to view

10   the --

11       A.    No.  I --

12       Q.    No?

13       A.    No, I would -- I don't think -- I wouldn't

14   pay attention to that.

15       Q.    Was it actually on the trading floor at the

16   time, the system that you viewed?

17       A.    I don't remember, but I -- I would be

18   surprised, because banks tend to be fairly careful

19   about security on their trading floors.

20           More likely, it might have been in the

21   training room that they would have used the same

22   system that they showed me to train their traders on.

23       Q.    Okay.  I just --

24       A.    But that's speculation.  I really don't

25   remember exactly.

EXHIBIT 23 PAGE 509

Page 39

1                    MICHAEL TYLER

2       Q.   If I could call your attention to the very

3  beginning of your article, on MSLT_1228719, in the

4  first paragraph, about halfway down, you mention --

5       A.   Right.

6       Q.   -- "Each trader has about a half dozen crt

7  terminals stacked in front of him, looking

8  dangerously unstable and about to" --

9       A.   Yes.

10      Q.   -- "come crashing down on the mountain of

11 paper that covers the remainder of the desk area."

12           There you're talking about the system that

13 they were currently using; is that right?

14      A.   Yes.  As far as I remember, yes.

15      Q.   And that system that they were currently

16 using was different than the Easel system that you

17 described later in the article, correct?

18      A.   As far as I remember, yes.

19      Q.   Do you have any memory of whether or not

20 they were actually using the Easel system to make

21 live trades at the time?

22      A.   I remember that -- that they were in the

23 process of rolling it out.  I don't remember whether

24 they had rolled it out and everybody was using it or

25 only a few people were using it.

**EXHIBIT 23 PAGE 510**

Page 40

1                          MICHAEL TYLER

2            So I honestly couldn't tell you whether what

3    was -- what I was describing in that first paragraph

4    was including the Easel system.  I don't believe it

5    was, but I'm not certain.

6        Q.    Okay.

7        A.    And, also, I realize I was confusing

8    Chemical with Chase in a previous discussion, and so

9    I -- when I was talking about which building I was

10   in.  I would have to say that when I mentioned

11   midtown, I -- I think that was a different building.

12       Q.    Okay.  And what made you kind of remember

13   the difference?

14       A.    Well, when I was thinking about it, I

15   realized that back then, most of Manhattan's stock

16   exchange and foreign exchange and bonds and all that

17   stuff was still downtown.  Since then, it's moved

18   uptown.  And as an investor for many years, I've been

19   to many of the midtown locations, so . . .

20       Q.    Okay.  So now having remembered that, what

21   you described to me was most likely Chase and not

22   Chemical, do you remember any specific --

23       A.    No.  I'm saying the building I remember.

24            That has nothing to do with what I saw

25   inside at Chemical.

1                         MICHAEL TYLER

2        Q.    Okay.

3        A.    I have no idea what Chase did as a customer

4    of information technology.

5        Q.    Okay.  So do you remember any more details

6    about Chemical Bank's building or location now?

7        A.    I -- I think that physical geography is

8    probably not my strong point.

9        Q.    Okay.  Fine.  Fair enough.

10            In the second column of the first page of

11   your article, MSL_1228719, in the second full

12   paragraph that starts "Enter a small startup" --

13       A.    Mm-hmm.

14       Q.    -- you talk about a gentleman named Leonard

15   I. Hafetz.

16       A.    Yes.

17       Q.    Do you remember who that was?

18       A.    He was the head of a company called

19   Interactive Images, which was the maker of the Easel

20   system that I was describing in the article.

21       Q.    Was Mr. Hafetz present at the meeting the

22   day at Chemical Bank?

23       A.    I don't remember.

24       Q.    Okay.  Moving down that column to the final

25   full paragraph that starts "Both Chemical Bank and

Page 42

1                          MICHAEL TYLER

2    Merrill" --

3         A.    Mm-hmm.

4         Q.    Second line, you say "have acquired beta

5    test Easels."

6         A.    Yes.

7         Q.    Does that help you remember whether or not

8    they had actually started using the Easel system when

9    you visited?

10        A.    When you have a beta test, as a customer,

11   you won't have rolled it out to the entire user base,

12   but you may very well have rolled it out to some of

13   the users to see in production was it working

14   successfully and, if it wasn't, where the problems

15   were.

16        Q.    Okay.

17        A.    So it -- it's -- at the time that the

18   interview took place, they may have had some systems

19   in use for actual live trading.  It's plausible they

20   did not, that they were just at the beginning of that

21   process, but I -- I would think that, based on the

22   language that I used, i.e., "have acquired," that

23   they had already had a few systems at least in actual

24   use, making live trades.

25        Q.    But you're not 100 percent sure whether or

EXHIBIT 23 PAGE 513

1                    MICHAEL TYLER

2    not --

3        A.    I'm not a hundred percent sure of that.

4        Q.    On the next page, which is MSLT_1228720, at

5    the bottom, in the column all the way to the right,

6    in the fourth full paragraph, you say, "In the first

7    phase of Chemical Bank's plan, the Easel workstations

8    will replace only the Arbat data entry system."

9             Does that suggest that they hadn't started

10   the first phase yet?

11       A.    It suggests -- no, it doesn't suggest that

12   at all.

13       Q.    Okay.

14       A.    It suggests that the first phase, when it's

15   completed, would have done so for all of the trading

16   systems.

17       Q.    Okay.

18       A.    They may very well have started that phase

19   in the way that I wrote the article.

20       Q.    But at least suggests they hadn't completed

21   the first phase of implementing these Easel

22   workstations?  Would you agree with that?

23       A.    I would agree that they -- yes, as I said,

24   it was a beta test, so that also suggests they had

25   not completely installed it across the entire

Page 44

1                    MICHAEL TYLER

2   system -- across the entire user base.

3       Q.    Okay.  Do you remember that day that you

4   were at Chemical Bank seeing actually -- any actual

5   trades made with the Easel system?

6       A.    In the sense of trades that were for real

7   money?

8       Q.    Yeah, for real money.

9       A.    I would not have been made privy to that.

10          Did I see the demonstration do things that

11  were it tied into the real system would have been for

12  real money?  Yes.

13          But I did not attempt to -- to verify that

14  this demonstration I saw was connected to a real live

15  trading platform and that real dollars were changing

16  hands.

17      Q.    So you just don't know whether or not the

18  demonstration you saw was a real live trade for real

19  money or just for demonstration purposes?

20      A.    I would have to imagine it was for

21  demonstration purposes only.

22      Q.    Okay.

23      A.    Because Chemical Bank's business -- or at

24  least that portion of their business was foreign

25  trading.  They're not going to conduct a live trade

Page 45

1                     MICHAEL TYLER

2    just to show me how technology works.

3          But they might very well have set up -- and

4    probably did set up -- dummy accounts so that it

5    looked for all the world like a live trade, was tied

6    into the live system, but was keyed to account

7    numbers that didn't exist so that the bank's own

8    balance sheet and the bank's own assets and

9    liabilities were not actually being affected.

10        Q.   Okay.  Now, when you say tied into the real

11   system, what -- what system are you referring to?

12        A.   The back-end platform -- the back-end actual

13   trading system that connected to other brokers and

14   that actually transferred assets back and forth.

15        Q.   Did you see that back-end system the day

16   that you were there?

17        A.   I doubt it.  I don't think I would have been

18   interested.  I was really interested in the front-end

19   system.

20        Q.   Okay.  And what, in your words, constituted

21   the front-end system?

22        A.   The front end is -- is the stuff that you or

23   I, as users of technology, would use.  That's a

24   generic term within the -- the computer-information

25   industry.

Page 46

1                           MICHAEL TYLER

2              So I was interested in looking at what was

3      on the desk, what the trader would be using and

4      seeing, that one screen which the user would be able

5      to manipulate in order to conduct a trade.

6              What happened at the other end of the wires

7      to actually effect the trade was a separate issue

8      entirely.

9         Q.   Did you look inside?  And by that I mean did

10     you open up the front-end system at all and look

11     inside at the technology?

12        A.   You mean like unscrew the --

13        Q.   Yeah.

14        A.   No.

15        Q.   Okay.  So is it fair to say you just -- you

16     just watched the front end in operation, you didn't

17     actually open it up and look at the technology

18     inside?

19        MR. BAKER:  Objection, vague and ambiguous.

20              You mean after opening up the computer

21     hardware?  Is that --

22        MR. HAYES:  Yeah.

23        MR. BAKER:  -- what you're asking about?

24        MR. HAYES:  I'm just saying --

25        THE WITNESS:  No.  I didn't -- nobody in my

**EXHIBIT 23 PAGE 517**

1                          MICHAEL TYLER

2      presence physically unscrewed the cover and showed me

3      what was on the inside.

4              But I was able to use my own fingers or

5      direct somebody else sitting at the keyboard or at

6      the -- at the screen to push various buttons that

7      were not part of a script, but were entirely created

8      of my own volition, let's see what happens if we --

9      instead of doing whatever it was that they were going

10     to show me, what would happen if you wanted to sell

11     Mexican pesos or some other currency that wasn't part

12     of the, quote-unquote, official demonstration because

13     I'm a curious guy, and I was interested in seeing

14     what happens in a -- when you go off script, so to

15     speak.

16             I also wanted to verify for my own purposes

17     that this was actually a real system and not just a

18     fancy program that would make it look like it was

19     doing something.

20             As an editor and as someone who is dealing

21     with new products quite frequently in the computer

22     business, I knew that there was a term called

23     vaporware, which meant things that were promised but

24     not yet delivered, and that you could very easily rig

25     up a system to make it look like it's functional.

EXHIBIT 23 PAGE 518

1                          MICHAEL TYLER

2      BY MR. HAYES:

3          Q.   Sure.

4          A.   And there's just a man behind the curtain,

5      you know, like from the Wizard of Oz, doing a very

6      small set of things that they had ready at that time.

7               I don't like -- and I never did like --

8      reporting that as if it were ready, so I always went

9      to the step, as a matter of common reporting

10     practice, to engage in an off-the-cuff transaction

11     that nobody had prepared for, including me.

12         Q.   Would you be surprised to know that Mr. Long

13     testified that this Easel system never went into

14     production at Chemical Bank?

15         A.   It doesn't particularly surprise me.

16         Q.   And why is that?

17         A.   There are a lot of things that people beta

18     test all over the place, and some of them are

19     successful and are used, and some of them aren't.

20         Q.   Okay.

21         A.   And it could be for any number of reasons.

22     It could be for functionality; it could be that when

23     you try to scale up something from a beta test to a

24     full scale, it doesn't work as well; it could be for

25     cost.  It could be for any number of reasons.

EXHIBIT 23 PAGE 519

Page 49

1                    MICHAEL TYLER

2        Q.  Do you remember anything about the

3    functionality of the Easel system?

4        MR. BAKER:  Objection.  It's kind of overbroad

5    and vague.

6        THE WITNESS:  I remember what it was supposed to

7    do, and I remember, roughly speaking, how you did it,

8    yeah.

9    BY MR. HAYES:

10       Q.  Do you remember whether, in your opinion,

11   you thought it did what it was supposed to do

12   efficiently or not?

13       A.  "Efficiently" is a very difficult word,

14   especially since we are here in 2007, looking back 24

15   years --

16       Q.  Sure.

17       A.  -- 23 years at technology that at the time

18   was cutting edge, but, you know, you can't compare it

19   to what -- what they use today.

20       Q.  Okay.  You don't remember whether you had an

21   opinion of the system's functionality at the time?

22       A.  I thought it was quite interesting and --

23   and quite worthwhile.

24       Q.  I think you mentioned earlier that you --

25   you either watched it operate or you asked somebody

**EXHIBIT 23 PAGE 520**

Page 50

1                    MICHAEL TYLER

2    to do specific functions on the machine; is that

3    right?

4        A.   Yes.

5        Q.   Do you remember whether or not you actually

6    operated it yourself?

7        A.   I don't remember whether I actually pushed

8    the buttons or not or whether I -- I simply pointed

9    at something and said, "Let's try to do this."

10       Q.   And when you were pointing at something,

11   asking them whether -- or to "try this," is that just

12   different types of features you wanted to see?  Is

13   that right?

14       A.   Yeah.  Or -- or a second example of the

15   same -- that they -- I don't remember precisely which

16   currency I wanted to see traded or what happens if

17   you hit a different broker from the one that they

18   suggested or whatever, but basically the -- the

19   intention was to -- let's see what happens if you go

20   off script a little bit.

21       Q.   Okay.

22       A.   Try something different.

23       Q.   And were you doing that for your kind of

24   research and reporting?

25       A.   Yes.  I wanted to verify that this was a

Page 51

1                        MICHAEL TYLER

2    functional system, and I wanted to understand better,

3    as a user of the system, what the experience would be

4    like.

5        Q.   When you say what the experience would be

6    like, are you talking about the user's experience?

7        A.   Yes, yeah.  If I were pretending to be a

8    foreign-exchange trader instead of being a magazine

9    reporter, what would it be like to effect

10   transactions using a touch-sensitive screen instead

11   of using handwriting and paper and keyboard entry.

12       Q.   Did you talk to any foreign -- actual

13   foreign-exchange traders there at Chemical Bank

14   during your visit?

15       A.   I don't believe so, but I can't remember.

16       Q.   Okay.  While you were at Chemical Bank that

17   day, were you escorted at all times?

18       A.   I would imagine so.

19       Q.   Do you remember at all the -- having a

20   chance to kind of wander around by yourself and look

21   around without an escort?

22       A.   Again, banks generally tend not to like you

23   to do that, so I doubt it.

24       Q.   Right.  Okay.

25            Did you or your magazine pay Chemical Bank

EXHIBIT 23 PAGE 522

1                       MICHAEL TYLER

2     any money for your visit --

3          A.    No.

4          Q.    -- or --

5                No.

6          A.    Datamation never paid for access.

7          Q.    Was there anyone outside of Datamation

8     magazine or Chemical Bank aware of the meeting that

9     was going on the day you were there?

10         MR. BAKER:  Objection.  I think he testified

11    there may have been other people there as well, so --

12    asked and answered, misstates prior testimony.

13    BY MR. HAYES:

14         Q.    I'm not trying to misstate your prior

15    testimony.

16         A.    No.  I --

17         Q.    I'm saying outside of Chemical Bank or Easel

18    or Datamation, are you aware of anyone that was -- or

19    had knowledge of the meeting that was going on

20    that --

21         A.    I --

22         Q.    -- day?

23         A.    I have no personal knowledge.

24                Whether any of the other participants told

25    their friends, relatives, lawyers, bankers, who

EXHIBIT 23 PAGE 523

Page 53

                         MICHAEL TYLER

1    knows.

2    Q.    Okay.  Any reason to think that anyone would

3    have publicized the fact that you were going to have

4    a meeting that day?

5    A.    Speculation.  I mean maybe Easel wanted it

6    known that a reputable magazine like Datamation was

7    looking at their product.  But it's pure speculation.

8    I have no idea.

9    Q.    Okay.  Did you take any notes that day that

10   you were at Chemical Bank?

11   A.    I'm sure I did.  I always took notes.

12   Q.    Do you still have those notes?

13   A.    Not a chance.

14   Q.    Where do you think those notes might be?

15   A.    Unfortunately, in a landfill somewhere in

16   Staten Island.  I -- I've relocated my home many

17   times over the years, and I doubt very much I would

18   have taken anything with me from Datamation anyway.

19         And Datamation moved from midtown to

20   downtown, then up to Massachusetts over the course of

21   its corporate life, so I couldn't begin to guess

22   where -- where those pieces of paper went.

23   Q.    Okay.  Does Datamation exist today?

24   A.    No, it does not.

Page 54

1                          MICHAEL TYLER

2      Q.   Is there any follow-on magazine that -- that

3  Datamation merged into or morphed into?

4      A.   I don't know.

5           Technical Publishing was at one point bought

6  by the -- which was the publishing company, had been

7  owned by Dun & Bradstreet, was then sold to -- I

8  think to a British company, Reed Elsevier, maybe

9  French, something like that, which is when they moved

10 up to Massachusetts.

11          And I have no idea what happened to it after

12 that.  Never paid attention.

13     Q.   Okay.  Do you have any legal experience?

14     A.   Am I a lawyer?  No.

15     Q.   Or any -- any other involvement in legal

16 matters through the years?

17     A.   I have -- I've retained lawyers from time to

18 time for my current business and to buy and sell real

19 estate and something, but --

20     Q.   Sure.

21     A.   You know, just run-of-the-mill stuff.

22     Q.   Okay.  You've never been deposed before?

23     A.   No.

24     Q.   Have defendants or anyone asked you to come

25 to the trial in this case?

**EXHIBIT 23 PAGE 525**

Page 55

1                    MICHAEL TYLER

2        MR. BAKER:  Just a minute.  I think I'm going to

3    object.  I mean it sounds to me like that's calling

4    for attorney-client privilege.

5             To the extent that -- I'll advise the

6    witness not to answer that question if it requires

7    the disclosure of any attorney-client communications.

8        MR. HAYES:  I'll rephrase my question.

9        Q.   Would you be willing to come to the trial in

10   this case to testify?

11       A.   I don't know.  It depends on what's going

12   on.  I manage a very small company.  I am very much

13   tied into the stock market, so I need to be paying

14   attention to the market most of the time, and it's --

15   it's a fairly substantial exception for me to have

16   come here today during market hours to speak with

17   you.

18            So I have not really considered whether or

19   not I would be willing to.

20       Q.   Why were you willing to come here today?

21       A.   As a courtesy to both sides.

22            If -- you know, it's flattering to know that

23   an article I wrote a long time ago is relevant to a

24   trial happening today, and so I was invited to come,

25   and I said okay.

Page 56

1                MICHAEL TYLER

2      Q.    Are you being paid for your time today?

3      A.    I am being paid.

4      Q.    How much are you being paid?

5      A.    I am being paid, I think, the same rate that

6   I would charge anybody else for any other business

7   that I do, which is 350 an hour.

8      Q.    Okay.  Let's take a break.

9      A.    Okay.

10      THE VIDEOGRAPHER:  Going off the record, the time

11   is 11:09 a.m.

12           (Recess taken.)

13      THE VIDEOGRAPHER:  Back on the record, the time

14   is 11:22 a.m.

15           Please begin.

16   BY MR. HAYES:

17      Q.    Mr. Tyler, earlier this morning I think we

18   established that separate from your preparation for

19   this deposition, it had been a number of years since

20   you had read your Datamation article.

21      A.    That's correct.

22      MR. BAKER:  Objection, misstates the testimony.

23   BY MR. HAYES:

24      Q.    I'm not trying to misstate your testimony.

25           Has it --

EXHIBIT 23 PAGE 527

Page 57

1                    MICHAEL TYLER

2          Have you reviewed or thought about the Easel

3     system at any time recently?

4      A.   Other than in terms of rereading the article

5     and -- and relatively recently, not really.

6      Q.   I think you mentioned that you were being

7     paid for your time here today.

8          Is there a written consultancy agreement or

9     something that you're abiding by for your work in

10    this case?

11     A.   How do you mean written consultancy

12    agreement?

13          I signed a -- a letter that said that they

14    would pay me and -- for my time, and so I'll keep

15    track of how much time I expend here and then invoice

16    them for it.

17     Q.   Okay.  Is that letter you're referring to or

18    that agreement you're referring to different than the

19    written agreement we talked about earlier today that

20    set forth the fact that these folks are representing

21    you?

22     A.   I think it is.

23          Yes?

24          Yeah.

25     Q.   So there --

Page 58

1              MICHAEL TYLER

2         Are there two separate agreements that

3    you --

4         A.   Yes.

5         Q.   -- signed?  Okay.

6         Just for the record, we'll ask for a copy of

7    those, and I'll follow up with written requests

8    later.

9         MR. BAKER:  Yeah, please send us a written

10   request.

11        MR. HAYES:  Sure.

12        Q.   Would you have been willing to testify today

13   without being paid?

14        A.   Yeah.  I mean I'm a capitalist.  I

15   understand the value of my time, and I have a duty to

16   my investors who are in my company, so I can't just

17   go doing things randomly.  But if I needed to testify

18   and I were not being paid, I would still testify.

19        I honestly have no interest at all in the

20   outcome of this case, but I find it fascinating that

21   an article I wrote a long time ago is of -- is of

22   current interest, so I'm intrigued.

23        Q.   Okay.  Earlier today we were talking a

24   little bit about your -- your meeting at Chemical

25   Bank and how it came about.

EXHIBIT 23 PAGE 529

Page 59

1                    MICHAEL TYLER

2          Were you invited by either Easel or -- Easel

3    company or Chemical Bank to come and look at the

4    Chemical Bank Easel system?

5       A.   Well, yeah.  I didn't just barge in.

6       Q.   Okay.  Would you consider that a private

7    invitation?

8       A.   It was private in the sense that I was the

9    only reporter present at the time.  They may very

10   well have issued comparable invitations to other

11   journalists, and they certainly knew full well that

12   the only purpose of my doing so was that I was

13   reporting a story that would be published in a

14   national magazine.

15      Q.   But for your visit, you would consider your

16   invitation private?

17      A.   My personal showing?

18      Q.   Yes.

19      MR. BAKER:  I'm going to object to the extent it

20   calls for a legal objection.

21      THE WITNESS:  I don't know if there's particular

22   meaning to the word "private."

23          They -- I -- I asked to see -- I asked Easel

24   to see some version in some use somewhere, and they

25   complied with my request and if -- invited me to go

EXHIBIT 23 PAGE 530

Page 60

1                    MICHAEL TYLER

2    down and look at Chemical.

3         I don't know -- I'm really confused as to

4    what you're -- you're driving at.

5    BY MR. HAYES:

6    Q.   And I'm not --

7         Just your understanding of private

8    invitation I'm just asking.  So I'm not trying to

9    confuse you in any way.  So that's fine.

10   A.   They were not -- they were not holding it on

11   the stage of Carnegie Hall for anybody to walk in, if

12   that's what you mean.

13   Q.   Sure.  Okay.

14        Do you know the difference between -- let me

15   start over.

16        Are you familiar with the term

17   "foreign-exchange front end"?

18   A.   Yes.

19   Q.   And what is your understanding of the

20   "foreign-exchange front end"?

21   A.   To me, that's a generic term.  I understand

22   that that's the monicker by which Chemical referred

23   to the system that they were showing me, but it's

24   really more of a generic term.  Foreign exchange is

25   what it's designed to do.

EXHIBIT 23 PAGE 531

Page 61

1                      MICHAEL TYLER

2        Q.    Okay.

3        A.    Front end similarly means the part that you,

4    the trader, would be interfacing with, as opposed to

5    the back end, where the exchange is actually --

6    trading currencies or doing whatever it is that banks

7    do with their business.

8        Q.    I think -- if my memory serves me, I don't

9    think you used the term "foreign-exchange front end"

10    in your article.

11        A.    I don't believe I used that term

12    specifically.

13        Q.    And I think you said you used the term

14    "Easel"; is that correct?

15        A.    Yes.  Easel was a brand name.

16        Q.    What was the difference between Easel and

17    foreign-exchange front end?

18        A.    Easel was the hardware system that was

19    receptive to touch, that you would -- that could

20    detect your touching the computer -- computer screen

21    and the software that went with that, which was both

22    a development tool for applications to developers,

23    including Chemical and, presumably, others, as well

24    as the system that could recognize that if I touched

25    the screen 3 inches from the top and 4 inches from

EXHIBIT 23 PAGE 532

1                      MICHAEL TYLER

2    the right edge, that it knew I touched the screen

3    3 inches from the top and 4 inches from the right

4    edge and it would actually know what was being

5    displayed at that time at that particular point so

6    that it knew what I was trying to communicate.  So it

7    was -- it was both a hardware and software system.

8    That was what Easel was.

9              The front end -- the foreign-exchange front

10   end was Chemical Bank's application of the Easel

11   technology for a specific purpose, namely to enable

12   traders to -- to enter and transact foreign-exchange

13   transactions.

14       Q.   And your article is about the Easel system,

15   and not foreign-exchange front end, correct?

16       MR. BAKER:  Objection, misstates the record.

17   BY MR. HAYES:

18       Q.   Well, you --

19       A.   The article is about what's in the article.

20       Q.   Okay.

21       A.   I -- the -- the theme of it was the growing

22   use of touch-sensitive screens in modern commerce.

23       Q.   Mm-hmm.

24       A.   One very prominent example was that it was

25   used in foreign-exchange trading as a substantial

EXHIBIT 23 PAGE 533

Page 63

```
 1                    MICHAEL TYLER
 2    advance over what had been the previous way of doing
 3    things.
 4        Q.   So you --
 5             So what's in your article is describing the
 6    Easel system and the foreign-exchange front end; is
 7    that right?
 8        A.   In effect, I describe both, yes.
 9        Q.   How would I --
10             How would a reader know, in your -- in
11    reading your article, when you are distinguishing --
12    or when you're talking about the Easel system and
13    when you're talking about the foreign-exchange front
14    end?
15        A.   Well, because when I talk about the Easel
16    system, I talk about it explicitly.
17             And then when I talk about the
18    foreign-exchange front end -- I'm just trying to find
19    the exact quotation, but there's a point at which I
20    said Chemical Bank and Merrill Lynch are using this
21    technology for their own ends, and then I described
22    what those banks are doing with it.
23             So I clearly describe what is -- what Easel
24    did and what is what the customers did.
25        Q.   Okay.
```

**EXHIBIT 23 PAGE 534**

Page 64

1                        MICHAEL TYLER

2        A.    It's reasonably clear language in the

3    article.

4        Q.    Okay.  So just so I understand you, when

5    you're talking about what it was that Merrill

6    specifically was doing or Chemical was specifically

7    doing, in that context, you're talking about the

8    foreign-exchange front end?

9        A.    In the case of Chemical, what Chemical did

10   was they took the existing platform, in effect, the

11   hardware and software product that Easel -- or,

12   actually, Interactive Images, but the Easel product

13   system was, and they used the tools that the Easel

14   system included in order to create an application for

15   Chemical Bank in the same way that if I were to use

16   Microsoft Excel to build a spreadsheet to enable me

17   to evaluate potential investments or in the same way

18   that if you were to use Microsoft Word to create a

19   template so that every time you file a case or

20   something it had the same headers, let's say, or the

21   same to and from columns and whatever, and -- you

22   know, I don't know what your legal documents look

23   like, but presumably they all look the same.  And so

24   that's an application or a template that your law

25   firm would have put on top of a common product like

**EXHIBIT 23 PAGE 535**

Page 65

1                  MICHAEL TYLER

2    Microsoft Word.

3           This was essentially the same thing.  The

4    common product here was the Easel hardware and

5    software.  Chemical Bank was able to create a

6    template on top of that for their unique application,

7    or for what they uniquely were trying to do at that

8    time.

9      Q.   Okay.  So if I could call your attention to

10   the actual article, the first page, MSLT_1228719, in

11   that middle column, second full paragraph, when you

12   say "is a hardware/software combination called

13   Easel," that's -- that's essentially what you're

14   referring to when you say Easel, correct?

15     A.   I'm sorry.  I was looking at the wrong

16   paragraph.  Let me just read it -- review that.

17          (Witness reviewing document.)

18          Yes, exactly.

19     Q.   Okay.  Mr. Tyler, did you prepare for

20   today's deposition?

21     A.   I reread the article.

22     Q.   In addition to rereading the article, did

23   you do anything in preparing for today's deposition?

24     MR. BAKER:  Let me just caution the witness not

25   to disclose any attorney-client communications in the

EXHIBIT 23 PAGE 536

1                          MICHAEL TYLER

2     course of answering the question.

3     BY MR. HAYES:

4         Q.    You can just answer that yes or no.

5              Did you do anything other than reading the

6     article to prepare for today's deposition?

7         A.    I reread the article and -- and -- yes.

8         Q.    Approximately how many hours did you spend

9     preparing for today's deposition?

10        A.    I don't recall the exact number.  Not much.

11        Q.    Less than two?

12        A.    I don't recall.  Probably.

13        Q.    When did you do that preparation?

14        A.    Very recently.  In the last couple days.

15        Q.    Okay.  Separate from your article, did you

16    review any other documents in preparing for today's

17    deposition?

18        A.    No.

19        Q.    Did you have an actual copy of the

20    Datamation article in your files at home?

21        A.    No, I do not.

22        Q.    Do you have any knowledge of any of the

23    particulars of the legal case that this deposition

24    pertains to today?

25        A.    Honestly, in only the vaguest terms, that

EXHIBIT 23 PAGE 537

1                    MICHAEL TYLER

2    it's a patent dispute of some sort.

3        Q.   Okay.  Do you have any understanding of the

4    term "on-screen tool" in the context of computer-user

5    interfaces?

6        A.   What that would mean, as I understand it, is

7    something that you're looking at on the screen that

8    enables you to accomplish a function of -- of some

9    sort.

10            I don't believe it has a very specific legal

11   or other meaning.

12       Q.   Okay.  Do you have any understanding of the

13   term "associated with," in the context of a tool

14   being associated with an information field on a

15   screen?

16       MS. GARNER:  Objection to the extent it calls for

17   a legal conclusion.

18   BY MR. HAYES:

19       Q.   I'm just asking, yes or no, if you have

20   any --

21       A.   I don't --

22       Q.   -- understanding.

23       A.   -- know any legal understanding of any of

24   these terms.

25            But as one common person talking to another,

Page 68

1                    MICHAEL TYLER

2   if I'm doing something using a tool that affects

3   something else, then it would be associated with that

4   something else.  Or if it's affected by something

5   else, then they're associated with.

6           But that -- that's to me just common

7   English.  I'm not trying to read anything more

8   particular into it.

9       Q.   Okay.  Do you have any understanding of the

10  term "composition tool" in the context of on-screen

11  computer tools?

12      MS. GARNER:  Objection to the extent it calls for

13  a legal conclusion.

14      THE WITNESS:  A composition tool could be -- I

15  guess you'd call it a computer keyboard or an

16  on-screen keyboard on an Etch A Sketch.  Or I mean

17  I'm not sure exactly where you're going with that, to

18  be honest, but a tool is anything that you would use

19  to -- to create something with.

20  BY MR. HAYES:

21      Q.   Have you reviewed or studied any of the

22  patents that are in this case?

23      A.   No.  I am not a patent attorney.  I'm not an

24  attorney of any sort.  And I have no knowledge of any

25  patents in this -- related to this or, frankly,

1          MICHAEL TYLER

2    anything else.

3        MR. HAYES:  Okay.  Can we mark this as the Tyler

4    Deposition Exhibit Number 2.

5            (Exhibit No. 2 was marked for

6            identification.)

7    BY MR. HAYES:

8        Q.    Mr. Tyler, the court reporter has handed you

9    what's been marked as the Tyler Deposition Exhibit

10   Number 2, which I'll represent to you is a clearer

11   picture of the picture that appears on MSLT_1228724.

12       A.    Okay.

13       Q.    Did you take that picture?

14       A.    No.  As I told you earlier, I am not a

15   photographer.

16       Q.    Do you have any idea who that might be

17   sitting there at the computer, whose hand that might

18   be in that picture?

19       A.    Well, I believe -- just as you were

20   speaking, I was comparing it to the photograph on the

21   magazine page.  I can't read the magazine page, but

22   it's MSLT_1228721.  I think that's just an

23   enlargement of the same photograph, so I would

24   imagine it's the subject -- the person sitting in

25   that photograph.

EXHIBIT 23 PAGE 540

1      MICHAEL TYLER

2      Q.   Mr. Long testified at his deposition that

3   that was, in fact, him demonstrating the Easel

4   system.

5      A.   I have no reason to doubt that.

6      Q.   Okay.  Now, having looked at this picture,

7   does that bring back any memories of any of the

8   specific operations or functionality of the Easel

9   system that were demonstrated to you at your meeting

10  at Chemical Bank that day back in September or

11  October of '83?

12     A.   You mean the Easel system or the Chemical

13  Bank system -- or the Chemical Bank application?

14     Q.   I'll let you refer to it as however you'd

15  like to refer to it.

16     A.   Okay.  Well, they are -- there were, in a

17  way, two simultaneous description -- demonstrations

18  going on.  One was the touch-sensitive Easel system,

19  and the other was what Chemical Bank was doing with

20  it.  And it's hard to demonstrate a platform or a

21  product like Easel without having some kind of

22  application on it, in the same way that you can't

23  really demonstrate Microsoft Word without actually

24  typing words into the system.

25          So allowing some -- some ambiguity in that

EXHIBIT 23 PAGE 541

Page 71

1                         MICHAEL TYLER

2     respect, I was witnessing a demonstration of the

3     front end -- the foreign-exchange front end using

4     Easel technology, as far as I knew, in realtime, and

5     I was able to instruct the demonstrator, Mr. Long, to

6     push certain buttons and to see what happened when --

7     when I say push buttons, I mean touch the screen in

8     certain areas -- and to see for myself what happened

9     on the screen as a result.

10         Q.    Okay.  So are you distinguishing between the

11    specific application that Chemical Bank used as its

12    foreign-exchange front end and the Easel system

13    provided by Interactive Images' solutions?

14         A.    The -- I am not a lawyer.  I can't

15    distinguish precisely who owns which piece of that.

16              What I was looking at was -- was an

17    integrated system that enabled a trader to create and

18    execute a foreign-exchange transaction.

19         Q.    Okay.

20         A.    And I understood that the hardware was

21    primarily Easel -- or Interactive Images'

22    contribution and that the software-development tool

23    was primarily Easel's and that that enabled Chemical

24    to put the words "Buy" or "Sell" or put the keyboard

25    on, whatever, but I wouldn't try to make any legal

EXHIBIT 23 PAGE 542

1                    MICHAEL TYLER

2    distinction as to which aspect of it belongs to which

3    company.  That's beyond my expertise or -- legally or

4    otherwise.

5        Q.  Yeah.  I'm not asking you to make any of

6    that distinction.

7            I just want to make sure it's clear so

8    when -- clear in your magazine article so when you're

9    referring to the Easel system we know specifically

10   what it is you're talking about and then when you're

11   referring to the specific applications that Merrill

12   or --

13       A.  Mm-hmm.

14       Q.  -- or Chemical were using, we can make that

15   distinction.

16       A.  Okay.

17       MR. BAKER:  I'm going to object.  I'm not sure if

18   that's a question.

19           If there's a particular passage you want to

20   ask him about, I think that's fine.

21   BY MR. HAYES:

22       Q.  So I'll just ask the question:  In your

23   magazine article, what is the best way to distinguish

24   between Easel system and foreign-exchange front end?

25       MR. BAKER:  Objection, it assumes facts not in

1                    MICHAEL TYLER

2  evidence, and it's vague and ambiguous.

3      MR. HAYES:  I'll withdraw that question, and I'll

4  ask a different question.

5      Q.   Does your magazine article --

6           And by that I'm referring to what's been

7  marked as Tyler --

8      A.   Right, understood.

9      Q.   -- Exhibit Number 1.

10          -- describe the foreign-exchange front end?

11     A.   It describes the functionality of it.  It

12  describes what a trader could do with it, in other

13  words.

14     Q.   Okay.  And maybe -- maybe, I think, what

15  would be easiest to do is just to ask you -- I'll

16  give you a pen, and just do a quick read, and if you

17  would just circle the parts of your article that are

18  describing the functionality of foreign-exchange

19  front end.

20          Is that fair?

21     A.   Okay.

22     Q.   Okay.  And just take your time.

23     A.   (Witness reviewing document.)

24          So I think there are two sections that --

25  so, actually, one large section which describes the

Page 74

1                    MICHAEL TYLER

2    way that Chemical Bank has been using -- or had been

3    using at the time the -- the Easel technology and

4    describing the functionality of their front end,

5    which would be beginning on the third column of

6    MSLT_1228720 and the, I guess, second full paragraph

7    beginning "The bank is in the process of implementing

8    a two-phase strategy" and running through to the --

9    roughly two-thirds of the way down the next page,

10   ending at "even a few minor errors can cost the bank

11   a bundle."

12        Q.   Okay.

13        A.   That one fairly long section describes

14   initially what actually is happening when a customer

15   uses the system -- or when -- when a trader uses the

16   system and then describes what Chemical Bank is

17   intending to do and what it's intending to

18   accomplish.

19        Q.   Okay.  Thank you.  I appreciate that.

20             So now I'd like to switch over for a couple

21   minutes and talk about the actual touch-sensitive

22   technology at the time.

23             And I'd like to call your attention to

24   MSLT_1228720, left-hand column, third full paragraph,

25   which starts, "The fourth technology."

EXHIBIT 23 PAGE 545

Page 75

1                      MICHAEL TYLER

2        A.    Yes.

3        Q.    Okay.  And it says, "which is used on the

4    Easel and the" -- I'm not going to try to pronounce

5    it -- "Sierracin Transflex products."

6        A.    Mm-hmm.

7        Q.    And that specific touch-sensitive technology

8    is a resistive membrane; is that right?

9        A.    Yes.

10       Q.    Okay.  Then I would like to have you turn

11   over to the next page, MSLT_1228721, far right

12   column, heading "Drawbacks of Touch Panels."

13       A.    Mm-hmm.

14       Q.    Do you see that?

15       A.    Yes, I do.

16       Q.    And I think you start with the first issue

17   there of parallax.

18             Do you see that?

19       A.    Yes.

20       Q.    Was parallax a -- an issue or a problem with

21   the Easel system?

22       A.    Basically, no.

23             Because the Easel system was a membrane that

24   was directly affixed to the screen, the distance from

25   the membrane, the touch-sensitive aspect, to the

1                    MICHAEL TYLER

2    glass that was displaying the words on the screen,

3    let's say, was very small in comparison to some of

4    the other technologies which involved infrared beams,

5    which may have been a quarter to an eighth of an inch

6    away from the screen.  And if you're not looking

7    absolutely dead on, straight at it, that quarter to

8    an eighth of an inch could make a difference.

9            So parallax was generally not a drawback.

10   Q.   Okay.  If I could ask you to turn over to

11   the next page, MSLT_1228722, the first full paragraph

12   starts, "The reliability of the various technologies

13   has also been questioned."

14   A.   Yes.

15   Q.   Were there reliability issues of the

16   touch-sensitive technology on the Easel system?

17   A.   Were there reliability problems?

18   Q.   Yes.

19   A.   Meaning have users reported existing

20   problems?  Not to my knowledge.

21           There, theoretically, were potential

22   problems, which I discuss later in the same

23   paragraph, but I had not at that -- at the time that

24   I wrote that article, I had not heard in the course

25   of my reporting any actual problems that took place.

EXHIBIT 23 PAGE 547

1          MICHAEL TYLER

2     Q.   So these problems you're describing here on

3   MSLT_1228722 about the reliability of the various

4   touch-sensitive technologies are more theoretical in

5   nature?

6     A.   Yes.  That's why I said "can be damaged" --

7   I did not say have been reported to be damaged -- in

8   the last line of that paragraph.

9     Q.   About halfway through that paragraph you say

10   "Capacitive sensing systems are inflexible."  What

11   did you mean by that?

12     A.   Meaning that -- if you think about a

13   touch-sensitive screen, the way any of them work,

14   conceptually, is that there is something that can

15   sense where your finger is horizontally on the screen

16   and where your finger is vertically on the screen

17   and -- and hit that, in effect, geographic coordinate

18   and say, okay, I know where your finger is.

19     Q.   Mm-hmm.

20     A.   In the capacitive-sensing system, as I

21   remember it, the cells, or the area within the screen

22   that would be defined as if you hit anywhere in this

23   area it means this --

24     Q.   Mm-hmm.

25     A.   -- were fixed in size and shape.

EXHIBIT 23 PAGE 548

Page 78

MICHAEL TYLER

1

2      Whereas in some of the other technologies,

3  you could vary that.  So that, for example, in the

4  photograph that you showed me, some of those cells,

5  in effect, are different sizes and shapes than others

6  and can be changed if the customer or if the vendor

7  wanted to.

8      Q.   So I'd like to --

9      I think you mentioned the photograph that I

10 showed you, and I'd like to, just so the record is

11 clear, specifically refer to that as what's been

12 marked as Exhibit 2.

13     A.   Exhibit 2.

14     Q.   And I think you used the word "cell."

15     Can you just describe or point to me some

16 examples of cells in that Exhibit 2.

17     A.   Yes.

18     And I have to say I -- I don't remember that

19 being a common term at the time.  It may or may not

20 have been.  But because I use Microsoft Excel all the

21 time, I think in terms of -- of cells.  It's the same

22 basic idea.

23     So, for example, on this photograph, there

24 are six rectangles at the bottom of the screen, five

25 of which are -- are brightly lit and one isn't.

1                          MICHAEL TYLER

2      Q.    Okay.

3      A.    Each of those is a cell.

4      Q.    Okay.

5      A.    There's a keyboard shown on the left side of

6   the screen.  Each letter is its own cell, and so on.

7      Q.    Okay.

8      A.    And that -- that's -- as I say, that -- I

9   don't think that's a technical term.  That's just the

10  way I refer to it.

11     Q.    Okay.  So turning back -- I'm sorry to ask

12  you to jump around.

13           Turning back to what's been marked as

14  Exhibit 1, which is your --

15     A.    Yes.

16     Q.    -- article, I just had gone through some of

17  what you described as the theoretical issues with

18  touch-sensitive technology at the time.

19           Are you aware of whether Easel or

20  Interactive Images was dealing with any of these

21  touch-sensitive issues on their Easel system at the

22  time?

23     A.    I was not aware of any problems that they

24  had at the time.

25     Q.    Okay.  The system that you viewed at

**EXHIBIT 23 PAGE 550**

Page 80

1               MICHAEL TYLER

2   Chemical Bank, the Easel system that you viewed at

3   Chemical Bank in September/October of '83, was that a

4   prototype system?

5       A.   It was described as a beta-test system.

6   Beta test is not prototype.

7       Q.   And what's the --

8            And what, in your opinion, is the difference

9   between beta test and a prototype?

10      A.   A prototype is something that there's

11  probably only one of.  It's -- may be just a shell or

12  a shape.  It may have something more going on.  But

13  it's used to give the people working within the

14  manufacturer an idea of what they're working with, so

15  that -- you know, you'll see, for example, prototype

16  cars at a car show.  That's one example.

17           A beta-test version is considerably farther

18  along in its development.  It's one step away from

19  being sold to the general public as a full-production

20  model.

21      Q.   Okay.  Would you be surprised to know that

22  Mr. Long referred to the system at Chemical Bank as a

23  prototype?

24      A.   I would have been surprised since I describe

25  it in the article as a beta-test version.  He may or

1                    MICHAEL TYLER

2   may not have been using -- it may be a prototype to

3   him.  And the -- and the foreign-exchange front end

4   may have been a prototype versus the Easel being a

5   beta test.  So I'm not sure that he and I are

6   necessarily referring to the same thing, and I'm not

7   sure that he and I are necessarily using the words in

8   exactly the same way.

9       Q.   Okay.  That brings up a great point.

10           So would you have considered the

11  foreign-exchange front end you saw at Chemical Bank

12  that day -- and by that I mean separate from the

13  Easel system --

14      A.   Right.

15      Q.   Would you have considered the

16  foreign-exchange front end you saw at Chemical Bank

17  that day in September/October of '83 a prototype?

18      A.   I don't -- I don't necessarily think that I

19  was in a position to know.

20           When -- if you mean prototype in the sense

21  of a product that really wasn't there, no, it was not

22  a prototype.  It was functional.

23      Q.   Okay.

24      A.   And so in that sense it was not a prototype.

25           Whether this was the first one that they had

EXHIBIT 23 PAGE 552

Page 82

1              MICHAEL TYLER

2    done, that I would -- that I could believe.

3        Q.    Okay.

4        A.    Was it one -- it's -- so the terminology is

5    a little vague.

6        Q.    And I'm just using prototype as you kind of

7    described it a few minutes ago in your testimony.

8    I'm not trying to add any special meaning to it.

9              So would -- would you draw a distinction in

10   the phase of development between the Easel system

11   that you describe and the foreign-exchange front-end

12   system that you describe in the article?

13       A.    I was not enough of an expert in

14   foreign-exchange trading to know whether Chemical had

15   bought 20 or 30 or 50 or 1 of the Easel product.  I

16   was not aware of whether they had been training a

17   dozen trainers on it or had trained none or had

18   practically everybody ready to go.

19             I was, for the purposes of the article,

20   primarily interested in discussing the merits of

21   touch-screen technology.

22       Q.    Okay.

23       A.    So I was interested in showing how it could

24   be and was being used, but I didn't really need to go

25   into a great deal of detail about how many people or

Page 83

1                    MICHAEL TYLER

2    at what stage of development the Chemical piece was,

3    because that was somewhat less of direct relevance to

4    the readers of the magazine.

5        Q.    So is it fair to say, then, you wouldn't be

6    in a position to say one way or another whether

7    Mr. Long's description of the foreign-exchange front

8    end as a prototype was correct or not?

9        MS. GARNER:  Objection to the extent that the

10   witness would be speculating as to what Mr. Long

11   meant by the word "prototype."

12       THE WITNESS:  You'd have to ask him what he meant

13   by the word "prototype."

14            To me it's -- it's a pointless distinction.

15   BY MR. HAYES:

16       Q.    And I'm not asking -- I'm not asking you to

17   somehow speculate about what Mr. Long knew or not.

18            I'm just asking you whether it would be fair

19   to say, sitting here today, you're not in a position,

20   based on your knowledge, to say one way or the other

21   whether Mr. Long's description of the

22   foreign-exchange front end as a prototype was correct

23   or not?

24       MR. BAKER:  Same objection.

25       THE WITNESS:  Yeah.  I -- I just -- I don't want

Page 84

1                        MICHAEL TYLER

2    to get into the use of the word "prototype."  And

3    I'll explain why.

4            Most of what Chemical was doing was actually

5    software driven, because the hardware was the Easel

6    system.

7    BY MR. HAYES:

8        Q.    Mm-hmm.

9        A.    There was an Easel software that went with

10   it.

11           But the specific definition of how you

12   define certain cells or certain spaces on the screen

13   to be these particular, quote-unquote, buttons versus

14   others is malleable.  That was part of the appeal of

15   the system to -- to Chemical Bank.

16           So the functionality was very real.  And

17   because it's software, it was very easily replicable

18   on any Easel that they wanted to get.  They could

19   have made it a production model instantaneously if

20   they wished.

21           So I don't really want to get into was it a

22   prototype, as in did they decide to change the order

23   of the keys on the keyboard or a prototype in some

24   other way.  I don't see the point.

25           It was a functional system.  It worked.  It

EXHIBIT 23 PAGE 555

Page 85

1                    MICHAEL TYLER

2   did what it was supposed to do.

3      Q.   Okay.  So can you answer my question,

4   sitting here today, whether you're in a position to

5   say one way or the other whether the foreign-exchange

6   front end was a prototype when you viewed it that day

7   in September/October of '83 at Chemical Bank?

8      MR. BAKER:  Objection, asked and answered, calls

9   for speculation.

10     MS. GARNER:  Vague.

11     THE WITNESS:  The system that I saw was a

12  functional operating system that did what it was

13  supposed to do.

14         What Chemical Bank was going to do with it,

15  whether Chemical Bank wanted to change that or not,

16  was not particularly of interest to me.

17  BY MR. HAYES:

18     Q.   But you can't say, sitting here today, one

19  way or the other whether the foreign-exchange front

20  end was a prototype or not the day you saw it in

21  September or October of '83?

22     MR. BAKER:  Same objection.

23     THE WITNESS:  I think I've been very clear about

24  that.  The word "prototype" is really, to my -- to my

25  way of thinking, not a relevant term.

EXHIBIT 23 PAGE 556

Page 86

1                    MICHAEL TYLER

2   BY MR. HAYES:

3       Q.    Not a relevant term to the foreign-exchange

4   front end?

5       A.    To what I was trying to accomplish in the

6   article.

7       Q.    So you didn't consider whether or not the

8   foreign-exchange front end was a prototype or not

9   that day?

10      MS. GARNER:  Same objection.

11      THE WITNESS:  I -- it feels to me as if you're

12  asking me for a legal use of the term "prototype,"

13  which I am not a lawyer, I don't know a legal

14  definition of what is or isn't a prototype, and I

15  don't know and didn't know then how extensively this

16  application had already been deployed versus was

17  planned to be deployed, whether it was going to be

18  modified or not modified.

19          What I did know and reported on accurately

20  was that it was a functional system that did what it

21  was supposed to do, was hardy enough that I could

22  give it changes and -- or do things, quote-unquote,

23  off script that were not part of the demonstration

24  and it still did what it was supposed to do.  It

25  worked.

EXHIBIT 23 PAGE 557

Page 87

1                    MICHAEL TYLER

2    BY MR. HAYES:

3        Q.   Sure.

4             So, based on your understanding of

5    "prototype," you didn't consider that day whether or

6    not the foreign-exchange front end was a prototype or

7    not?

8        MR. BAKER:  Objection, Counsel.  He's already

9    answered your question a couple of times.  It seems

10   like we're kind of spinning our wheels here on this.

11       THE WITNESS:  It didn't occur to me to care what

12   specific terminology they applied at Chemical Bank to

13   whether it was a prototype.

14            It was clearly something that they had

15   planned to implement and roll out in two phases, as I

16   described in the article, and they had begun that

17   process, to the extent that I saw a real live system

18   that they were quite capable of training traders on.

19            Whether they had or not, I don't know.  I

20   didn't know then.

21   BY MR. HAYES:

22       Q.   Would you consider a system that a company

23   was planning on rolling out in two phases but had not

24   yet done so in its prototype or experimental state?

25       MS. GARNER:  Objection, calls for speculation,

Page 88

1                    MICHAEL TYLER

2    vague.

3       THE WITNESS:  Theoretically, that's possible, but

4    it's also possible, in fact more likely, that by the

5    time you get to a specific roll-out plan that you've

6    probably got something pretty close to production

7    level that can be rolled out in a reliable way over a

8    larger user base, but I -- the answer is it could be

9    anything.

10   BY MR. HAYES:

11      Q.   Sure.

12           Sitting here today, now knowing that

13   Chemical Bank did, in fact, not roll it out, does

14   that at all color your opinion on whether or not the

15   system you saw that day, the foreign exchange

16   front-end system you saw that day, September/October

17   of '83, was a prototype?

18      A.   No.

19           I mean I could have bought a Ford Mustang

20   and -- you know, commonly available car.  You just

21   walk into the dealer and get it.  And I could have

22   thought to myself, well, I may roll this out to all

23   of my employees, give every one of them a Ford

24   Mustang.  And then I may have thought the better of

25   it and said, you know, that doesn't convey the image

EXHIBIT 23 PAGE 559

Page 89

MICHAEL TYLER

1

2  I want my company to have or, my goodness, those are

3  expensive, that's too much -- that's going to cost

4  too much or the gas mileage isn't good and chosen not

5  to.  It doesn't make the Mustang a prototype.

6        People choose to roll out or not roll out

7  programs and -- and things for any number of reasons

8  at any time in a project's development.

9     Q.   What --

10        In your example you just gave, what would

11  make the Mustang a prototype?

12     MS. GARNER:  Objection, calls for speculation.

13     THE WITNESS:  If, let's say, that -- well, the --

14  put yourself in 1961, three years before the Mustang

15  was officially released as a product.  If they sold

16  me some molded plastic in the general shape that we

17  all recognize today as a Ford Mustang, with nothing

18  in it except Fred Flintstone pedaling as fast as he

19  can, that might have been considered a prototype.

20  I . . .

21  BY MR. HAYES:

22     Q.   Okay.  So, sitting here today, you just

23  don't know one way or the other whether the

24  foreign-exchange front end that you saw that day in

25  September/October '83 at Chemical Bank was a

EXHIBIT 23 PAGE 560

Page 90

1                    MICHAEL TYLER

2    prototype or not?

3       MR. BAKER:  Object --

4       MS. GARNER:  Objection, vague, calls for

5    speculation, asked and answered.

6       THE WITNESS:  It was not a relevant consideration

7    to me.

8            It was clear to me that Chemical intended to

9    roll it out.  It was also clear to me that this

10   product worked and was functional and, therefore,

11   could have been rolled out very imminently had they

12   chosen to.

13           You can -- you can call that whatever you

14   like.

15   BY MR. HAYES:

16      Q.   Okay.  So it's fair to say whether the

17   foreign-exchange front end that day in

18   September/October of '83 was a prototype or not just

19   wasn't a relevant consideration of yours?

20      MR. BAKER:  Come on, Counsel.  You've asked the

21   same question like six or seven or eight times, and

22   you've got an answer.  Maybe you don't like the

23   answer, but I think it's time to move on.

24           So objection, asked and answered, calls for

25   speculation and --

1                    MICHAEL TYLER

2        THE WITNESS:  The product was --

3        MR. BAKER:  -- vague and ambiguous.

4        THE WITNESS:  The product was capable of being

5    rolled out if they wanted to.  I don't care what you

6    call that.

7    BY MR. HAYES:

8        Q.   Okay.

9        A.   It was not a pie in the sky.  It was not a

10   flow chart.  It was not a piece of plastic with

11   nothing going on underneath.

12            It was a real thing.

13       Q.   Was the Easel system that you saw that day a

14   prototype?

15       MR. BAKER:  Same objections.

16       THE WITNESS:  The Easel system was described in

17   the article as a beta test.  The Easel system that --

18   excuse me.

19            The Easel system that Merrill and Chemical

20   used is described in the article as a beta-test

21   system.

22            Easel is also described in the article as

23   having several versions of their product available,

24   and I don't at this time remember exactly how many

25   versions or which ones may or may not have been in

EXHIBIT 23 PAGE 562

Page 92

1              MICHAEL TYLER

2  beta test versus full production, but none of that

3  would count as a -- a prototype in the way that I

4  described the word earlier.

5  BY MR. HAYES:

6      Q.   Did you --

7      A.   But, again, a prototype to me is not a

8  useful word in discussing products.

9      Q.   Why is that?

10     A.   Because it can mean -- it's too ambiguous.

11  It can mean anything.

12          And I'm not a lawyer.  So if there's a legal

13  meaning to the term, then it's especially useless for

14  me to try to discuss that, that word.

15     Q.   So in the many magazine articles that you

16  wrote through the years that you described earlier,

17  is it fair to say that you never used the term

18  "prototype"?

19     MR. BAKER:  Objection, misstates the testimony.

20     THE WITNESS:  I strongly doubt that I could -- I

21  couldn't remember, out of all those articles, ever

22  using it or not using it.

23  BY MR. HAYES:

24     Q.   Sitting here today, you said -- I think you

25  said the word "prototype" is useless.  So it's fair

EXHIBIT 23 PAGE 563

Page 93

1                          MICHAEL TYLER

2    to say that you probably didn't use a useless word in

3    your magazine articles, correct?

4         MR. BAKER:  Objection, argumentative, misstates

5    the testimony.

6         THE WITNESS:  There are a lot of words in the

7    English language that you can use without specific

8    legal meaning and without being explicitly clear

9    about what you're talking about that might convey a

10   range of possibilities.

11            Am I the world's perfect writer?  Do I

12   always use exactly the most narrow and specific word

13   that I intend or do I occasionally use a broader term

14   that might simply indicate this isn't yet available

15   for everybody to walk into their local auto

16   dealership and buy?

17            I don't remember what I wrote in such detail

18   over -- over my entire writing career.

19   BY MR. HAYES:

20        Q.   But based on what --

21            Based on what you've testified to today,

22   you -- would it be fair to say you'd be surprised to

23   find the word "prototype" in any of your magazine

24   articles?

25        A.   No, I wouldn't say that at all.

EXHIBIT 23 PAGE 564

Page 94

1                    MICHAEL TYLER

2          First of all, we're talking today, 2007,

3    about how would I describe a system today, using

4    today's terminology.

5          Q.    Right.

6          A.    What terminology I used in 1983, 1984, 1985

7    may or may not have been the same, because people's

8    writing styles and understandings of the world at

9    large evolve over time.

10          So I -- I would make no representation as to

11   whether or not I ever used that term and what

12   specifically -- what specific legal meaning, if any,

13   it had at that time.

14          Q.    I'm not asking you today to give any legal

15   conclusions or any -- answer questions based on any

16   legal meaning of the word "prototype."

17          I'm just asking you to answer questions

18   based on what your understanding as --

19          A.    Mm-hmm.

20          Q.    -- a magazine article writer and editor at

21   the time would have used that -- that word.

22          So -- so is it fair to say, sitting here

23   today, you can't answer my question of whether or not

24   the foreign-exchange front-end system that you saw in

25   September/October of '83 was a prototype in your

Page 95

1                    MICHAEL TYLER

2    understanding of that word?

3        A.   The --

4        MR. BAKER:  Objections -- same objections, calls

5    for speculation, misstates his testimony and calls

6    for legal conclusion.

7        THE WITNESS:  The product that I saw in

8    demonstration was one that was functional, it did

9    what it was supposed to do, it was software-driven

10   and, therefore, could be very easily replicated

11   across a large number of computer screens as quickly

12   as Chemical wished to buy them and deploy them.

13            So as far as I was concerned, this was a --

14   an actual physical operating system that was ready

15   for deployment if Chemical wanted to deploy it at

16   that time.

17            Whether they did or didn't, whether they

18   opted to make changes or not, whether those changes

19   were based on technology or based on the user's

20   experience, ergonomics, so to speak, or whether they

21   made no changes, none of that to me really reflected

22   any relevance to an article about touch-screen

23   technology and may or may not have had any bearing on

24   whether Mr. Long called it a prototype, since his

25   perspective was necessarily different from mine.

EXHIBIT 23 PAGE 566

Page 96

1                    MICHAEL TYLER

2          But as far as I was concerned, this was a

3    technology and a product that was ready for the

4    market.

5    BY MR. HAYES:

6       Q.   Okay.  Sitting here today, can you answer my

7    question yes or no, whether the foreign-exchange

8    front-end system that you saw in September and

9    October of '83 was a prototype?

10      MR. BAKER:  Okay.  Come on, Counsel.  This is

11   starting to verge on harassment of the witness.

12   You've asked him the same question over and over at

13   least seven or eight times.  He's answered your

14   question over and over.  And yet you insist to keep

15   asking the same question, and you're starting to

16   harass the witness.  I think it's time to wrap this

17   up and move on to a new topic.  I mean we can't spend

18   all day having you ask him the same question over and

19   over.  So can you please move on to a new topic.

20   He's already answered your question.

21      THE WITNESS:  I -- honestly, I feel I have

22   answered the question as thoroughly and carefully as

23   I could.

24          The world sometimes doesn't evolve into

25   yes-or-no questions, especially if you don't

EXHIBIT 23 PAGE 567

Page 97

1                    MICHAEL TYLER

2    really -- that's what I need to say on that.

3    BY MR. HAYES:

4        Q.   Okay.  Fair enough.

5             I think earlier today you -- you talked

6    about the actual demonstration of the Easel system

7    that you saw at Chemical Bank back in September and

8    October of '83.

9             Did you actually use the system that day?

10       A.   Was I personally pushing the -- touching the

11   screen?

12            I don't remember if I personally physically

13   touched the screen or if I directed the demonstrator

14   to push the screen, but I did cause the screen -- one

15   way or the other, whether it was me pushing it or

16   somebody else touching the screen, I did say things

17   to the effect of I'd like to see what happens when

18   you do a sale transaction or I'd like to see

19   something in Mexican pesos, or let's try it in

20   British pounds, which, conventionally, is actually

21   traded the reverse of most other currencies; in other

22   words, we think of dollars per pound as opposed to,

23   let's say, Hungarian forints -- dollars per forint.

24   It's reversed.

25            So I am -- I am quite certain I would have

EXHIBIT 23 PAGE 568

Page 98

1                    MICHAEL TYLER

2    tested the system inasmuch as asked -- either

3    directly or asking the demonstrator to do things that

4    were not part of the standard script.

5        Q.   Had you given the demonstrator a standard

6    script to use --

7        A.   No, no.

8        Q.   No?

9        A.   No, I never do that.

10       Q.   So there was --

11       A.   They may have had their own script that they

12   wanted to demonstrate.  They're welcome to do that.

13   And I was quite happy, as I always am, to interrupt,

14   to say, "That's interesting.  Now show me what

15   happens when you do this instead."

16       Q.   Okay.  Did you --

17       A.   And I never prepare people in advance for

18   that.

19       Q.   Did you see a standard script or anything --

20       A.   I did not see a --

21       Q.   -- outline --

22       A.   I did not see anybody holding a standard

23   script or -- they may have, may not have memorized

24   one.  I have no idea.

25       Q.   Okay.  Separate from the

EXHIBIT 23 PAGE 569

Page 99

1                    MICHAEL TYLER

2    touchscreen-technology specifics that you described

3    in the article, are you familiar with any of the

4    other hardware-technology specifics of the Easel

5    system?

6         A.    Meaning?

7         Q.    The processor, the memory.

8         A.    No.    That was not of interest to me.    All I

9    was interested in was the touch sensitivity of it.

10        Q.    Okay.    Are you aware or familiar with any of

11   the software algorithms in the Easel system and/or

12   the foreign-exchange front end?

13        A.    I am not an engineer.    I made no attempt to

14   actually look at the individual lines of code, if

15   that's what you mean.

16        Q.    Okay.

17        A.    I was interested in what can it do, because

18   Datamation readers were interested in how can -- if

19   you're going to spend several pages of a magazine

20   talking about touch-sensitive screens, how can I

21   deploy that in my company to be useful.

22             So they don't care what the algorithms are.

23   They care about seeing the examples of application.

24        Q.    So is it fair to say that your article,

25   which has been marked as Exhibit 1 today, doesn't

**EXHIBIT 23 PAGE 570**

1                    MICHAEL TYLER

2    describe in any detail the specific software

3    algorithms in either the Easel system or the

4    foreign-exchange front end?

5        A.   It doesn't describe the technical lines of

6    code that under -- that underlay that, but it did

7    describe in some detail what would happen if you did

8    action -- this particular action, what the

9    consequence was.  So there -- there was a clear

10   logical flow of how a transaction was entered

11   described in this article.

12       Q.   Okay.  Separate from the technical

13   description of the touch-screen technologies, is it

14   fair to say there's -- there's -- there's no detailed

15   description of the -- any of the hardware in the

16   Easel system?

17       A.   It describes the hardware very briefly.  I'm

18   not sure I can find it instantaneously, but the -- it

19   has a hardware/software combination that comes in

20   several versions, reading from the first page of the

21   article, and later in the article, in describing

22   the -- in the paragraph you referenced earlier about

23   the Easel and Sierracin Transflex products, it does

24   describe a little bit about the use of electrodes on

25   a sheet of Mylar -- this is on page 1228720, the

1                    MICHAEL TYLER

2    first column where it starts "The fourth technology."

3             So there is some basic description of the

4    hardware that's involved, but there's not a lot of

5    detail.

6        Q.    That last section you just pointed me to,

7    when you were talking about the Sierracin Transflex

8    product that's on MSLT_1228720, is that referring to

9    the touchscreen-hardware technology?

10       A.    Yes.   Where I talk about the set of parallel

11   electrodes etched onto a sheet of Mylar, "two of

12   those sheets are stretched across the crt at right

13   angles to each other, creating a grid of electrodes,"

14   that does describe the touch sensitivity.

15       Q.    Okay.   Is there any description in your

16   article which has been marked as Exhibit 1 of how the

17   Easel system and/or the foreign-exchange front end

18   would actually store the data regarding the currency

19   transactions in its system?

20       A.    That's actually a back-end transaction, so

21   it wouldn't have been part of this article.

22       Q.    Okay.

23       A.    Data storage is not the same as -- the front

24   end is data entry and reflection or giving back to

25   the user.

EXHIBIT 23 PAGE 572

Page 102

1                    MICHAEL TYLER

2         But the actual storage is a back end.

3    Q.    Okay.  You mentioned earlier that you may

4    have -- or most likely directed someone to

5    demonstrate -- or go off script, a demonstration of

6    the functionality of the foreign-exchange front end.

7         Do you remember any of the specifics about

8    what you might have asked them to demonstrate?

9    A.    I don't believe I said most likely as to

10   whether it was me or some -- or me directing someone

11   else, just to be clear.

12   Q.    Sure.

13   A.    I'm sorry.  The question?

14   Q.    Do you remember any of the specifics about

15   the demonstration of the foreign-exchange front end

16   on that day in September or October of 1983?

17   A.    I remember being shown how it worked and

18   being walked through a transaction, and I remember

19   asking questions to show me other examples or to show

20   me what -- various what-if scenarios.

21        Do I remember specifically what currency we

22   were talking about or other details -- you know, what

23   the exchange rate was?  No, I don't.

24   Q.    Okay.  Do you have any knowledge of the

25   specific type of processor that the Easel system

EXHIBIT 23 PAGE 573

1                          MICHAEL TYLER

2    used?

3        A.   I don't remember.  It may or may not say in

4    the article, but I don't remember.

5        Q.   Do you have any knowledge on what a PDP-11

6    intelligent terminal is?

7        A.   PDP-11 was a minicomputer manufactured by

8    Digital Equipment, and PDP-11 was -- well, PDP-11 was

9    the minicomputer.  The terminal was the user

10   interface, which looked like a television screen with

11   a keyboard.

12       Q.   The --

13       A.   That was a very, very common piece of

14   hardware at that time.

15       Q.   The Easel system that was demonstrated to

16   you back in September/October of '83, was that a

17   stand-alone system or was that networked?

18       A.   I -- when you say "networked," to what?

19       Q.   A network to any other type of bigger

20   system.

21       A.   It was -- as far as -- as far as I know, you

22   couldn't execute a live trade on it using -- they

23   wouldn't let me actually spend the bank's money.

24            But was it connected to other computers or

25   to the bank's back-end systems?  I can't say for sure

EXHIBIT 23 PAGE 574

1                    MICHAEL TYLER

2    one way or the other.

3        Q.   Okay.  Do you have any knowledge of what

4    type of programming language the Easel system used?

5        A.   Not off the top of my head, no.

6        Q.   How about any knowledge of the program

7    language that the foreign-exchange front end used?

8        A.   I couldn't even begin to guess -- well,

9    actually, that's not quite accurate.

10            The foreign-exchange front end used the

11   Easel development tool, and, to some degree, the

12   Easel development tool can be considered program

13   language.

14       Q.   Okay.

15       A.   But, beyond that, I -- I couldn't say.

16       Q.   Okay.  I'd like to call your attention to

17   what's been marked as Exhibit 2.

18       A.   Mm-hmm.

19       Q.   See on the -- on the left-hand side of the

20   screen there are a number of cells that include

21   the -- the letters of the alphabet?  Do you see

22   those?

23       A.   Yes.

24       Q.   At any time when you were looking at the

25   Easel system, was that -- were those cells that are

EXHIBIT 23 PAGE 575

1                    MICHAEL TYLER

2   depicting the letters of the alphabet not present?

3        A.   Yes.  If I didn't need to be typing in entry

4   using letters of the alphabet -- if, for example, I

5   needed to type in numbers -- that would be replaced

6   by a numeric keypad.

7        Q.   Okay.

8        A.   Or if I were -- if I had activated something

9   that required me to choose from a menu of selections,

10  the menu would have appeared in that space.

11       Q.   What's your definition of a menu of

12  selections?

13       MS. GARNER:  Objection to the extent it calls

14  fora legal conclusion.

15  BY MR. HAYES:

16       Q.   As you just -- as you just used it.

17       A.   In the way that people discuss menu-driven

18  software in today's computers.  In other words, if I

19  had done something on the right-hand side that

20  required me then to make a choice, a choice of

21  broker, let's say, or a choice of different bank

22  customers or something, then that list would have

23  come up on the left side for me to choose from among

24  that list.

25       Q.   I think you mentioned earlier -- you used

EXHIBIT 23 PAGE 576

Page 106

MICHAEL TYLER

1

2   the term "cell" or "cells" in your article because

3   you are an Excel user and you were familiar with that

4   term; is that right?

5       A.   Yeah.   It's lower case, not a specific term

6   of art, but meaning, you know, one area that -- that

7   in this case you can push anywhere within that area

8   and it does the same thing.

9       Q.   Okay.   Do you distinguish between cell and

10  button?

11      A.   I was using them interchangeably.

12      Q.   Okay.

13      A.   Uhm -- yeah.

14      MR. HAYES:   We've got to take a break because of

15  the tape is running out of time.

16      THE VIDEOGRAPHER:   This marks the end of DVD

17  number 1 in the deposition of Michael Tyler.   Going

18  off the record, the time is 12:26 p.m.

19          (The deposition proceedings adjourned for

20          the lunch recess at 12:26 p.m.)

21

22

23

24

25

EXHIBIT 23 PAGE 577

1              MICHAEL TYLER

2            AFTERNOON SESSION

3      THURSDAY, DECEMBER 27, 2007; 12:56

4                  -oOo-

5      THE VIDEOGRAPHER:  Here marks the beginning of

6  DVD number 2 in the deposition of Michael Tyler.

7  Going on the record, the time is 12:56 p.m.

8        Please begin.

9                  -oOo-

10            EXAMINATION RESUMED

11  BY MR. HAYES:

12      Q.   Mr. Tyler, I'd like to call your attention

13  to what's been marked as Exhibit 1, specifically

14  page 154 of the magazine, which bears Bates number

15  MSLT_1228722.

16      A.   Okay.

17      Q.   In the right-hand column, first full

18  paragraph starts, "The combination of these drawbacks

19  and outside influences may doom the touch-sensitive

20  terminal," and then right at the end of that

21  paragraph, "They've been around a while, and they

22  will continue to be around, but I don't think there's

23  much interest in them."

24        Then the next paragraph says, "His colleague

25  Nesdore is even more pessimistic:  'I just don't

EXHIBIT 23 PAGE 578

1                     MICHAEL TYLER

2    think the concept can make it today.'"

3         Do you remember why Mr. Nesdore thought that

4    this concept of touch-sensitive screens could not

5    make it at the time in -- when you wrote the article?

6    A.    Well, when you're writing an article, you

7    try to find -- as a journalist, you try to find

8    people who have different points of view to make it

9    an interesting story, basically, and there were many

10   reasons that people might have considered

11   touch-sensitive technology to be, economically, not a

12   successful product over time.  They could have

13   thought, well, you know, this will never get cheap

14   enough to use on a large production volume.  They may

15   have said you can never get -- find enough

16   resolution, in other words, small enough cells.  Or

17   they may have said the problems with what you touch

18   and what the computer thinks you're touching may not

19   always be lined up properly, what I described as

20   parallax.  Or they may have said, you know, these

21   things just aren't very hardy, they break for

22   whatever reason.  Who knows.

23         But when you're -- and I'm putting myself in

24   1983, when a lot of those issues hadn't been

25   resolved.  People didn't know whether -- whether this

**EXHIBIT 23 PAGE 579**

1          MICHAEL TYLER

2    technology would be successful or not, but there were

3    good reasons to believe that there would be problems

4    to overcome.

5        Q.    Did you talk to Mr. Long at all that day

6    back in September/October '83 about whether or not he

7    thought this concept of touch-sensitive screens

8    would -- would make it?

9        A.    I don't believe so.

10       Q.    Okay.

11       A.    I believe he, most likely, was quite

12   optimistic since he was described -- or at least his

13   company was described as being committed to moving

14   forward with it.

15       Q.    So would you be surprised to know that when

16   he testified in his deposition within the last couple

17   weeks he said that touch screens just weren't

18   feasible and were never, therefore, implemented at

19   Chemical Bank?

20       A.    I think that it's quite common that a

21   department like information systems investigates many

22   different possible technologies and systems that it

23   will use, some of which it will adopt and roll out

24   across an entire corporation, and many of which it

25   chooses not to for any number of reasons.  They may

EXHIBIT 23 PAGE 580

Page 110

1                    MICHAEL TYLER

2    not work well, they may work fine but cost too much

3    money, they may work fine in small numbers, but not

4    in big numbers.

5         So, no, it doesn't really surprise me that

6    something that I wrote about that he seems -- or his

7    company seemed committed to may in the end not be

8    something that they did.

9    Q.    Did Mr. Long -- or did you have any

10   conversations with Mr. Long that day back in

11   September/October '83 about any issues with the Easel

12   system that needed to be resolved in their system?

13   And when I say "their," Chemical Bank's system.

14   A.    No.   I understand your question.

15        And I don't recall that kind of

16   conversation.   They may well have been thinking about

17   is the exact screen layout what they want or do they

18   need to change the price point that they buy it from

19   the vendor or do they want -- there are a million

20   things they could have been thinking about.

21   Q.    Do you know whether or not any additional

22   changes were made to the system to resolve any issues

23   after you viewed it on that day in September/October

24   of '83?

25   A.    After the publication of the article, I did

EXHIBIT 23 PAGE 581

1                    MICHAEL TYLER

2   not do any further research or reporting on it, so I

3   have no idea what they may have -- may or may not

4   have done since then.

5        Q.   Would you be surprised to know that Mr. Long

6   testified that they did make additional changes to

7   the system after the demonstration to you in October

8   or September of '83?

9        A.   Would I be surprised that they did make

10  changes?

11       Q.   Yeah.

12       A.   No, I wouldn't be surprised at all.

13       Q.   Why is that?

14       A.   That's what information systems departments

15  do.  They always change.  Technology is evolving.

16  You go from version 1 to version 1.1, 1.2, version 2,

17  eventually, if it's a big change, but that's --

18  that's how -- how companies evolve and how

19  applications get better and better over time.

20       Q.   Okay.  Changing subjects a little bit now, I

21  think this morning, when we were talking about how

22  you kind of started off in writing this article, you

23  said that you had seen -- or a press release or

24  something that got you interested in touch screens.

25            Do you remember any specific press release

EXHIBIT 23 PAGE 582

1                    MICHAEL TYLER

2    about the Easel -- specific Easel system?

3        A.    I don't remember a specific release.  I have

4    a hard time imagining how I would have found out

5    about it other than seeing it either in a release

6    from the Easel company or from Interactive Images or

7    from a comparable company or provider to Easel or a

8    customer of Easel's or in some other way referencing

9    them.

10       Q.    Okay.

11       A.    A lot of -- a lot of pieces of paper crossed

12   my desk then.

13       Q.    Okay.  Have you talked to Mr. Robert Long

14   since your meeting at Chemical Bank back in

15   September/October of '83?

16       A.    It's possible I spoke with him in the

17   immediate period thereafter to -- meaning before

18   publication, just to clarify a question or two.  I

19   don't remember doing so, but it's theoretically

20   possible.

21            I know for a fact I have not spoken with him

22   in the many years since then.

23       Q.    Okay.  When was the first time you were

24   contacted by anybody about this case?

25       A.    Earlier this year, and I couldn't pin down

1                    MICHAEL TYLER

2  exactly when, but probably in the summer.

3      Q.   Summer of 2007?

4      A.   Of -- summer of 2007 is my best guess.

5      Q.   Do you remember who it was that first

6  contacted you?

7      A.   The attorney Brian Atkinson from Dechert.

8      Q.   So I want to talk about your conversations

9  with any of the other attorneys in this case before

10  you agreed to have them represent you.

11           Is that fair?

12      A.   I don't understand attorney-client privilege

13  the way that a lawyer would understand it, so I will

14  ask my representation to tell me when I am gearing

15  potentially into ground I shouldn't cover.

16      Q.   Fair enough.

17      MR. BAKER:  Whatever questions he asks you, you

18  can disclose communications before the

19  attorney-client --

20      THE WITNESS:  Okay.

21      MR. BAKER:  -- relationship started.

22           But, you know, after the attorney-client

23  relationship started, then those would be

24  protected --

25      THE WITNESS:  Okay.

EXHIBIT 23 PAGE 584

1                           MICHAEL TYLER

2        MR. BAKER:  -- under the privilege.

3   BY MR. HAYES:

4        Q.   And I'm not going to try to attempt to ask

5   you any questions about after the attorney-client --

6        A.   Okay.

7        Q.   -- relationship started, because I

8   realize --

9        A.   Mm-hmm.

10        Q.   -- I'm not entitled to those answers.

11             Do you remember the general subject of that

12   first call you had with Mr. Brian Atkinson in the

13   summer of 2007?

14        A.   He was curious as to whether I was the

15   Michael Tyler who had written that article in

16   Datamation, and I verified that I was that -- that

17   person.

18             And he asked me if I had any notes or other

19   documentation surrounding that, and I told him

20   exactly the same thing that I told you, namely, that

21   that was a long time ago, many moves ago for me, many

22   moves ago for Datamation, so, no, there was no

23   additional documentation I could offer.

24        Q.   Okay.  So when was the second time you were

25   contacted or communicated with any of the lawyers in

EXHIBIT 23 PAGE 585

1                     MICHAEL TYLER

2    this case?

3        A.   I may be conflating several conversations

4    into one, based on voice mails going back and forth,

5    whatever, but as far as I know, the issue lay dormant

6    until Mr. Atkinson reached me in October and began

7    the discussion that led to my accepting their

8    representation.

9        Q.   Okay.  Approximately how many communications

10   did you have with the lawyers prior to October of

11   2007?

12       A.   At most, a small handful, maybe one -- maybe

13   one or two of any substance.

14       Q.   Okay.

15       A.   You know, and I'm -- I'm excluding voice

16   mails "Hi, this is Michael calling you back," or

17   whatever.

18       Q.   Sure.

19       A.   Okay.

20       Q.   So one or -- one or two of substance;

21   otherwise, just working out logistics and trying to

22   get ahold of you, those types of things?

23       A.   That was including -- that's what I mean by

24   substance.

25       Q.   Okay.

EXHIBIT 23 PAGE 586

Page 116

                         MICHAEL TYLER

1

2    A.   I mean there was practically essentially no

3    communication, other than my acknowledging, yeah, I

4    did write the article and, no, there's no documentary

5    backup.

6    Q.   Okay.  Did you exchange any emails or any

7    type of written communication with any of the lawyers

8    prior to October of 2007 when your representation

9    began?

10   A.   I don't remember.  I don't think so.  I

11   think the first email that I would have received from

12   Dechert -- and I know I didn't send them anything.

13        I think the first email I would have

14   received would have included the representation

15   letter and maybe a letter either -- an email at the

16   same time which might have included the actual

17   article.

18   Q.   Okay.  Did you have any communications,

19   written or otherwise, with any other lawyers than

20   Dechert lawyers?

21   A.   I received a voice mail from you, I think.

22   Q.   Okay.

23   A.   And I think that's the only other one that I

24   can think of.

25   Q.   Did you return my voice mail or attempt to

Page 117

1                     MICHAEL TYLER

2    get ahold of me?

3        A.    No, I didn't.

4        Q.    And why was that?

5        A.    Because when I received the voice mail from

6    you and had previously gotten a -- the brief

7    communication from -- from Mr. Atkinson earlier, I

8    realized that there actually is a real lawsuit here

9    and that what I had written might be of relevance and

10   not something really tangential, and at that point I

11   decided to not do anything until I understood a

12   little bit better who was representing whom and how I

13   wanted to proceed.

14       Q.    Okay.  And when you say how you wanted to

15   proceed, what do you mean by that?

16       A.    It occurred to me that I might be invited to

17   testify by either side and -- or I might be

18   subpoenaed by either side, and so I realized that

19   there were a range of options available to me at that

20   point.

21       Q.    And why did you pick the option that you

22   chose?

23       A.    I think it became clear that I was likely to

24   be subpoenaed.  It also became clear that I would

25   need legal representation.  And when Mr. Atkinson

EXHIBIT 23 PAGE 588

MICHAEL TYLER

1

2  offered to represent me legally, I felt that that was

3  something in good conscience I could accept and then

4  feel like I was able to testify knowing that I had

5  legal representation.

6      Q.   Did you need to know any of the particulars

7  of the case at any level before you could decide how

8  you wanted to proceed?

9      A.   I knew that it was a patent case, and I knew

10  that -- I guess it was Gateway and Lucent were

11  involved in it.

12          I really had no knowledge of any more detail

13  than that.

14      Q.   So you didn't at all --

15      A.   Well, I knew it was about touch-sensitive

16  technology, because that was the article that was

17  referenced.

18      Q.   Okay.  Did you ask any questions of

19  Mr. Atkinson or any other Dechert lawyers -- and,

20  again, prior to you -- October 2007, about the

21  substance or the merits of the case in any way?

22      A.   No.

23      Q.   So what factors did you consider in

24  determining whether you would be represented by the

25  Dechert lawyers?

EXHIBIT 23 PAGE 589

1                     MICHAEL TYLER

2     A.    As opposed to?

3     Q.    Maybe being represented by the Lucent

4  lawyers and responding to my phone call.

5     A.    That's an interesting question.

6          I think that I had had a fairly friendly

7  conversation with Mr. Atkinson the first time I spoke

8  with him.  We chatted a bit about how he found me and

9  so on after all those years and so on, and he seemed

10  to be a reputable person who I felt was trustworthy

11  and would not put me in a position of compromising my

12  integrity in any way.

13          I had no judgment about you one way or the

14  other.  I wasn't entirely sure, to be honest, whose

15  side you were on or who was really suing whom or

16  whatever, but since I was becoming aware that there

17  was a lawsuit going on and that it might be a more

18  involved event than I expected, and here was somebody

19  who had expressed some personal interest, I thought,

20  okay, I'm just not going to make my life hard.

21     Q.    Okay.  That's good.  You saved me from

22  asking my question of whether you thought I wasn't

23  friendly.  So I won't go there.

24          I need to work on my phone-message skills.

25          So during any of the one or two substantive

EXHIBIT 23 PAGE 590

MICHAEL TYLER

1

2   conversations that you had with the Dechert lawyers

3   prior to October of '07, did you ever discuss the

4   patent or patents at issue in this case?

5       A.   Well, I'm -- I'm not a patent attorney, so

6   it would have been a kind-of-wasted-on-me discussion.

7            I was aware that there was apparently some

8   patents regarding touch-screen technology that

9   somebody was suing somebody over.

10      Q.   Okay.

11      A.   It was not until -- during the period before

12  I was represented, I wasn't even clear who was suing

13  whom, but I knew there was a lawsuit and it was about

14  touch-screen patents of some sort.

15      Q.   Okay.  Did you ever discuss the subject of

16  "prior art"?

17      MR. BAKER:  I assume you mean prior to the

18  beginning of any attorney-client --

19      MR. HAYES:  Yeah.

20           Again, all --

21      THE WITNESS:  I understood that.

22      MR. HAYES:  -- my questions now are prior to

23  October of 2007.

24      THE WITNESS:  I don't remember whether it was

25  made explicit or not in this conversation, but I got

EXHIBIT 23 PAGE 591

Page 121

1                    MICHAEL TYLER

2   the general idea that there may have been something

3   in an article that I had written which might be used

4   by one side or the other regarding "prior art," which

5   is a term that I had some vague sense, from watching

6   TV shows, meant something related to patents.

7   BY MR. HAYES:

8       Q.   Okay.  What is your understanding sitting

9   here today of the meaning of "prior art"?

10      A.   As a casual person, not as a lawyer, it

11  would refer to some kind of technology or product or

12  something that was -- that existed prior to some

13  other company staking a patent claim on it.

14      Q.   Okay.  So did you ever talk to any of the

15  Dechert lawyers, again, prior to October 2007, on

16  whether or not your article was prior art to a patent

17  or any of the patents at issue in this case?

18      A.   I don't think so.  I think they wanted to --

19  I think they had indicated to me that they were

20  interested in the article.

21      Q.   Okay.

22      A.   And in anything I knew about it.

23           But I don't think that they discussed any

24  detail as to -- I say "they."  It was actually only

25  Mr. Atkinson.

**EXHIBIT 23 PAGE 592**

Page 122

MICHAEL TYLER

1

2    Q.    Mm-hmm.

3    A.    I don't think that he discussed any detail

4    of what specifically might have been relevant about

5    the article or whether it was used to corroborate or

6    to contradict or anything else.  I did not get into

7    that level of detail.

8    Q.    Okay.

9    A.    I, frankly, at that point thought this is

10    very amusing, but I've got better things to do with

11    my time.

12    Q.    Sure.  Fair enough.

13          Did you ever do any analysis on whether or

14    not your article disclosed what was in a patent or

15    patents at issue in this case?

16    A.    No.  I'm not a patent lawyer.  I never

17    attempted to examine what patents existed either then

18    or now.

19    Q.    Okay.  Did you ever have any conversations

20    about what product or products are accused of

21    infringing a patent or patents at issue in this case?

22    A.    No.

23    MR. BAKER:  Again, you're asking about before the

24    attorney-client relationship?

25    THE WITNESS:  With that -- everything I'm saying

Page 123

1                        MICHAEL TYLER

2    here is -- is in this initial conversation before

3    being represented.  The answer was no.

4    BY MR. HAYES:

5        Q.   Okay.  Besides Mr. Atkinson, was there any

6    other lawyers or anyone you can remember that you

7    talked to prior to October of '07 about this case?

8        A.   No.

9             It's possible Mr. Baker may have chimed in

10   on a voice mail at some point.  I don't think so.

11       Q.   Okay.

12       A.   And I -- I'm quite certain there were no

13   other law firms, just the -- the two firms

14   represented here.  And, as far as I know, it was just

15   that one or two conversations with Mr. Atkinson.

16       Q.   Okay.  Is it fair to say that you haven't

17   performed any invalidity or infringement analysis in

18   this case?

19       A.   I don't even know what those are.

20       Q.   Okay.  Fair enough.  Fair enough.

21            I don't know if I've asked this or not:  Are

22   you aware of any -- what the accused products are in

23   this case?

24       A.   No, I'm not.

25       MR. HAYES:  With that, I think I'm done for now.

Page 124

1                      MICHAEL TYLER

2        MR. BAKER:  Okay.  Should we go off the record

3   for a moment or two?

4        MR. HAYES:  Okay.

5        THE VIDEOGRAPHER:  Going off the record, the time

6   is 1:16 p.m.

7             (Discussion off the record.)

8             (Exhibit Nos. 20 through 22 were marked for

9             identification.)

10       THE VIDEOGRAPHER:  We're back on the record.  The

11  time is 1:21 p.m.

12            Please begin.

13                       -oOo-

14                    EXAMINATION

15  BY MR. BAKER:

16       Q.   Could you please tell us your name.

17       A.   My name is Michael Tyler.

18       Q.   Mr. Tyler, what was your job back in 1983?

19       A.   I was the -- in 1983, I was the first new

20  products editor and, later, assistant news editor of

21  Datamation magazine.

22       Q.   And what were your job responsibilities?

23       A.   As new products editor, it was to review all

24  of the new products hardware and software that

25  affected computers and information systems in the

Page 125

1                          MICHAEL TYLER

2    corporate environment as they came out to the -- to

3    be used by corporations.

4               As assistant news editor, I was also

5    responsible for reporting -- developing, reporting

6    and writing news articles on a very frequent basis

7    and later editing other people's articles as well.

8        Q.   What years did you work at Datamation

9    magazine?

10       A.   I worked there from June of 1982 -- or

11   July -- from summer of 1982 through summer of 1985.

12       Q.   While you were working at Datamation

13   magazine, did you ever have an opportunity to see a

14   demonstration of a Chemical Bank computer system for

15   currency trading?

16       A.   Yes.

17       MR. HAYES:  Objection, leading question.

18       THE WITNESS:  I saw many demonstrations of many

19   things while I was there.  One of them was a

20   foreign-exchange trading system that -- at Chemical.

21   BY MR. BAKER:

22       Q.   What, if any, opportunity did you have to --

23            Just to rephrase the question, what, if any,

24   opportunity did you ever have to view a Chemical Bank

25   computer system during your period working at

Page 126

1                           MICHAEL TYLER

2      Datamation magazine?

3          MR. HAYES:  Same objection.

4          THE WITNESS:  There was a period in the late

5      summer, early fall of 1983 when I was writing --

6      developing and writing and reporting an article on

7      touch-sensitive-screen technology, in which I was

8      able to -- to see a touch-sensitive system

9      demonstrated at Chemical Bank.

10     BY MR. BAKER:

11         Q.   And can you describe the circumstances that

12     led you to see a demonstration of the Chemical Bank

13     currency trading system.

14         A.   In the course of reporting this article on

15     touch-sensitive screens, I spoke with several of the

16     manufacturers and vendors of those systems and asked

17     to see them in operation so that I would understand

18     how they would be used and how customers more broadly

19     might be able to think about using them.

20              And one of the vendors, a company called

21     Interactive Images, did connect me with Chemical

22     Bank, and I believe with Merrill Lynch as well, to

23     see demonstrations of that -- of their product in

24     operation.

25         Q.   Mr. Tyler, let me show you a document that's

EXHIBIT 23 PAGE 597

Page 127

1                         MICHAEL TYLER

2    been marked as Exhibit Number 20 and ask you whether

3    you recognize this document.

4         A.    I do recognize it.

5         Q.    And what is it?

6         A.    This is a photocopy of the front cover and

7    several pages of Datamation magazine's January 1984

8    issue.

9         Q.    And what --

10               What's contained within this document?

11        A.    You've got the front cover, the table of

12   contents, a page with an advertisement and the

13   masthead showing who the various editors and

14   reporters were and then what looks to be the full

15   text of an article entitled "Touch Screens:  Big Deal

16   or No Deal?" which I wrote and was published in that

17   magazine, and a couple photographs in the back.

18        Q.    And how do you recognize this document?

19        A.    Because I created it.  I wrote the article.

20   I remember that -- the headline.  I see my byline,

21   and I recognize that as -- as the typeface and -- and

22   graphic design of Datamation magazine.  I know that

23   to be genuine.

24        Q.    And what's the date of this article?

25        A.    This was in the January 1984 issue.

1                        MICHAEL TYLER

2        Q.   Let me show you another document that's been

3    marked as Exhibit Number 21 and ask you the same

4    question, as to whether you, first of all, recognize

5    this document.

6        A.   I do recognize it.  Let me just page through

7    it.

8             (Witness reviewing document.)

9        Q.   When you get a chance, can you just tell us

10   generally what that exhibit is.

11       A.   Yeah.  Give me a moment, please.

12            (Witness reviewing document.)

13            The second document you gave me is exactly

14   the same as the first, although the pages are in a

15   slightly different order.

16       Q.   So it's another copy of the same --

17       A.   Yeah.

18       Q.   -- article?

19            And do you recognize it --

20            How do you recognize this document?

21       A.   Well, it's -- it's Datamation magazine.  I

22   worked there for three years.  I know what it looks

23   like.  And, in fact, I quite remember the artwork

24   both on the cover and on the inside, as well as the

25   article that I wrote.

Page 129

MICHAEL TYLER

1

2    Q.    Okay.  Let me show you another exhibit,

3    actually a photograph that's been marked as Exhibit

4    Number 22.

5    A.    Okay.

6    Q.    And let me ask you do you recognize this

7    photograph?

8    A.    I do recognize this photograph.  I believe

9    it's a -- an enlargement of the photograph that's on

10   page 152 of the magazine, or at least an enlargement

11   of a portion of that photograph.

12   Q.    And how do you recognize this photograph?

13   A.    Well, I can compare it to the magazine and

14   see that it's exactly the same thing.

15   Q.    And does this photograph fairly and

16   accurately show a screen shot of the Chemical Bank

17   currency trading system as it existed during the

18   demonstration you referred to in the fall of 1983?

19   A.    Yes, it does.

20   Q.    I'd like to ask you some questions about the

21   operation of the Chemical Bank system --

22   A.    Okay.

23   Q.    -- with reference to the photograph.

24         And if you can hold up the photograph, that

25   may help --

1                    MICHAEL TYLER

2      A.    I will.

3      Q.    -- your testimony.

4            Can you explain what is shown on the right

5    half of the screen in this photograph.

6      A.    Sure.  So --

7      MR. HAYES:  Objection, vague, calls for a

8    narrative.

9      THE WITNESS:  If I can hold the screen like this,

10   is that okay?

11           Can you see that?

12     THE VIDEOGRAPHER:  Mm-hmm.

13     THE WITNESS:  Okay.  So what I described in the

14   article and what you can see here is that if you look

15   where the pencil is, you can, roughly speaking,

16   divide the screen vertically there.

17           And just for the purposes of discussion and

18   guiding the reader through the operation of this

19   system, I could then talk about what's happening on

20   the right side versus what was happening on the left

21   side.

22           And so on the right side you can see the

23   lighter -- what's shown on this photograph as

24   lighter-colored -- those are words (indicating) --

25   are essentially labels that could be used, and it's a

EXHIBIT 23 PAGE 601

1                    MICHAEL TYLER

2    little difficult to read, but that one says "Buy" and

3    "Sell" --

4            (Reporter interruption.)

5        THE WITNESS:  It says, "Buy," B-u-y, "Sell,"

6    S-e-l-l.  There's one that's called "U.S. Rate,"

7    something that says "Broker," something that says

8    "Customer" and "Location," and so on.

9            And those are just labels that would

10   correspond to a foreign-exchange transaction that

11   previously had been done using paper based or some

12   other technology.  It's the standard elements you

13   would need to fill in on -- on any kind of

14   transaction report.

15           To the right of that, it's a little

16   difficult to see, but there are some words printed in

17   a darker color, which might have been orange in real

18   life, as opposed to yellow or something like that

19   (indicating), which are the actual value or the

20   actual data.

21           So, for example, if it says "Location," the

22   darker print might say New York.  Or if it were to

23   say "Customer," then the darker print would actually

24   have the name of the bank's customer for this

25   particular transaction.

EXHIBIT 23 PAGE 602

1                    MICHAEL TYLER

2   BY MR. BAKER:

3       Q.   Now, did the Chemical Bank system include a

4   "Broker" field?

5       A.   It --

6       MR. HAYES:  Objection --

7       THE WITNESS:  -- did.

8       MR. HAYES:  Objection, lacks foundation.

9       THE WITNESS:  As I described a moment ago, there

10  are several of these labels (indicating) on the

11  lighter-colored ink on the right side -- the

12  lighter-colored display on the right side, one of

13  which does have the word "Broker," which would

14  indicate that the space next to that would show the

15  specific broker through which this particular

16  transaction would have been effected.

17  BY MR. BAKER:

18      Q.   What happened when the user selected the

19  "Broker" field?

20      A.   If the user were to touch the word "Broker"

21  (indicating), then two things happened:  The first is

22  that the word "Broker" itself would change color.  I

23  don't remember offhand if it got simply brighter and

24  bolder or if it turned a different color, but it did

25  something immediately which told you, the user, that

MICHAEL TYLER

1    it recognized that you wanted to do something with

2    "Broker" and that you didn't mishit and hit something

3    else instead.

4         Secondly, on the left-hand side, where

5    currently there's -- there's a keyboard shown,

6    instead of showing a keyboard, it would have shown a

7    list of all the brokers that Chemical Bank did

8    business with so that you could then reach over and

9    touch one of them and that "Broker" would then be

10   selected, and it would then show up -- on the

11   right-hand side, in the darker print here, next to

12   the word "Broker," it would have then shown the

13   broker that you selected.

14   Q.   And does your article describe the operation

15   of the "Broker" field?

16   MR. HAYES:  Objection, vague, lacks foundation.

17   THE WITNESS:  The article does not specifically

18   say this is the software code that happens.

19        What the article does say in detail is --

20   and you'll find this on -- the magazine, page 148, in

21   the third column, about halfway down that column,

22   does describe what happens if you were to touch the

23   screen where it says "Broker."

24   BY MR. BAKER:

EXHIBIT 23 PAGE 604

Page 134

MICHAEL TYLER

1    Q.  And what does it say about what happens when

2  you touch the "Broker" field?

3    A.  What it says is when the user hits the

4  "Broker" cell, as I just -- as I just showed, on the

5  right, a list of brokers appears on the left.  Then

6  the trader hits the name of the broker to be involved

7  in the current trade, and that information is entered

8  into the system, meaning that the computer

9  acknowledge -- will then know that you want to trade

10  with that particular broker, and simultaneously it

11  shows you that on the right side of the screen so

12  that you know that the button you pushed was received

13  correctly by the computer.  Because if you thought

14  you were pushing Merrill Lynch, but your finger

15  slipped and you hit some other broker instead, it

16  would show the wrong broker's name and you would then

17  need to go back and say nope, made a mistake, redo

18  it.

19    Q.  Okay.  Let me ask you about the "Exchange

20  Rate" field.  Did the Chemical Bank system include an

21  "Exchange Rate" field?

22    MR. HAYES:  Objection, leading.

23    THE WITNESS:  The Chemical Bank system included

24  several labels down the left-hand side of the right

EXHIBIT 23 PAGE 605

1                        MICHAEL TYLER

2    section of the screen, some of them were the "Buy" --

3    said "Buy," meaning who is the buyer here.  Some --

4    or one said "Sell," who is the seller in this

5    particular transaction.

6              There was one for "Exchange Rate."  In fact,

7    I believe that the "Exchange Rate" was quoted both

8    ways; for example, both dollars -- U.S. dollars per

9    British pound and British pounds per U.S. dollar.  It

10   also showed the total value of the transaction, the

11   number of dollars being traded, as well as,

12   therefore, the number of, let's say, British pounds.

13   It's not just -- you're not just buying one at a

14   time.

15             It shows the "Broker."  It shows who the

16   customer is, which institution you're doing this on

17   behalf of, who the broker is, as we said, the

18   location of where the trade is actually taking place,

19   and so on.

20             So there are -- there are quite a few items

21   that a trader, in the course of executing a trade,

22   needed to identify.

23   BY MR. BAKER:

24        Q.   Okay.  So focusing specifically on the

25   "Exchange Rate" field, can you describe what happened

EXHIBIT 23 PAGE 606

Page 136

1                        MICHAEL TYLER

2    when the user selected the "Exchange Rate" field.

3         A.   Sure.

4              If you were to hit the "Exchange Rate"

5    button, or cell -- if you touched the computer in

6    that area, then the next step would be that the

7    computer wants you to tell it, excuse me -- excuse me

8    for a moment.

9              (Witness drinking water.)

10             If you were to touch the screen where it

11   says "Exchange Rate," then the next step is the

12   computer would want to know, okay, what exchange

13   rate; for example -- and I'm not a currency trader,

14   so I have no idea whether these numbers make any real

15   sense, but let's say you wanted to buy British pounds

16   and you wanted to pay $1.61 per British pound, but

17   you weren't willing to pay $1.62 per British pound,

18   that's more money than you think it's worth -- and

19   banks really do operate on tenths of pennies, let

20   alone actual cents.  Since you can't write in by hand

21   1/6th whatever, you would touch the word "Exchange

22   Rate," and then on the left side a keypad would come

23   up, or a visual representation of a keypad, which

24   would have the numbers 1 -- zero through 9 on it, and

25   probably a decimal point and maybe a dollar sign or a

**EXHIBIT 23 PAGE 607**

1                          MICHAEL TYLER

2    couple other things, and then you would be able to,

3    on the left-hand side of the screen, touch 1.62,

4    let's say, or 1.61, whatever the number was, click an

5    "Enter" key, as you would on -- on an ATM today, and

6    then the number you put in would show up on the right

7    side in the darker color next to the "Exchange Rate"

8    label so that you knew that the computer had

9    understood you're buying at $1.61 and not $1.62 or

10   not at some other number.

11       Q.   And what does your article say about the

12   operation of the "Exchange Rate" field?

13       MR. HAYES:  Objection, vague.

14       THE WITNESS:  I'll just read you what is actually

15   in the article, and make of it what you wish.

16            It says, "For exchange rates and other

17   numerical data" -- and, again, I'm reading from the

18   third column halfway down on page 148.  "For exchange

19   rates and other numerical data, the user hits the

20   proper cell on the right and then types in the

21   numeric data on the keypad that appears on the left.

22   In this way an entire transaction can be completed

23   directly on the workstation."

24   BY MR. BAKER:

25       Q.   Okay.  Mr. Tyler, I'd like to change topics

EXHIBIT 23 PAGE 608

MICHAEL TYLER

1

2  for a moment and ask you about whether you have any

3  financial interest in the outcome of this case?

4      A.   None whatsoever.  It makes no difference to

5  me, from a financial or any other point of view, what

6  the outcome of this case is.

7      Q.   Are you receiving any reimbursement for your

8  time or expenses in this case?

9      A.   I am being reimbursed for my time.  I have

10  incurred no expenses, and I don't expect to.

11      Q.   And how is your reimbursement rate

12  determined?

13      A.   It was determined simply as the average

14  compensation per hour that I've received from work

15  over the last five years, just plain and simple

16  average as I would get for any other work.

17      Q.   Is your reimbursement dependent on the

18  content of your testimony or the outcome of the case?

19      A.   No, it is not, and I would never agree to

20  that.

21      Q.   And can you explain why are you being

22  reimbursed for your time.

23      A.   I'm a professional investor and capitalist,

24  and I believe that my time has value.  This is

25  professional work for me.  It relates to work I did

EXHIBIT 23 PAGE 609

1                    MICHAEL TYLER

2    for my career at that time, and I think it's only

3    fair and appropriate that I be paid for work that I'm

4    doing.

5        Q.    Okay.  Let me --

6        A.    It's taking me away from my current work,

7    for that matter.

8        Q.    Okay.  Let me turn back to the Datamation

9    article and ask you some general questions about

10   Datamation.

11           Could -- first of all, could you just

12   explain what is Datamation magazine?

13       A.    Datamation magazine was launched in 1957 at

14   the beginning of the computer age, or close enough to

15   it.  Its purpose in life was to target the corporate

16   executives who managed computer systems for their

17   corporations or for large government entities or

18   similar entities, what would today be called the

19   enterprise space.

20           Specifically, the magazine was aiming at --

21   to report on the management of information and how

22   companies did that and how vendors created systems

23   that enabled companies to do so.  So it was a -- very

24   management driven, very focused on the large

25   corporate space, large companies, banks,

Page 140

1                        MICHAEL TYLER

2    manufacturers, that kind of company, as well as the

3    providers of these systems.

4        Q.   And what was the representation of

5    Datamation magazine back in 1984?

6        A.   I don't like to brag, but it was -- it was

7    the preeminent publication at that time for the

8    enterprise or corporate space.

9             It also controlled its circulation, meaning

10   that you had to qualify in order to receive the

11   magazine.  It wasn't available on newsstands.

12            It was nationally available.  It had -- it

13   was open to anybody who was sufficiently connected to

14   their company's information systems department or to

15   vendors and developers of communication -- of

16   equipment, so it -- its reputation was quite good.

17       Q.   And approximately how many subscribers did

18   Datamation magazine have back in January of 1984?

19       A.   I don't remember the exact number.  I

20   believe it was in the general vicinity of around a

21   hundred thousand, give or take a fairly wide range.

22       Q.   Now, did any companies in the

23   financial-services industry read Datamation magazine

24   in 1984?

25       MR. HAYES:  Objection, calls for speculation.

1                    MICHAEL TYLER

2        THE WITNESS:  I do know that --

3        MR. BAKER:  Let me --

4        THE WITNESS:  Okay.

5        MR. BAKER:  Let me just rephrase the question.

6        Q.   Were there any companies in the

7   financial-services industry that were subscribers to

8   Datamation magazine in 1984?

9        MR. HAYES:  Same objection.

10       THE WITNESS:  Let me put it this way:

11  Financial-services companies are among the most

12  intensive users of information systems anywhere on

13  the planet, because when money is your only product,

14  the information regarding that is both highly

15  sensitive and highly important and needs to be very

16  reliable and very quickly available.

17            So banks, investment banks,

18  financial-services firms of all types are among the

19  most intensive users of management information

20  systems and always have been, and since Datamation

21  was aimed at the corporate users of information

22  systems, banks and the like were a fairly large

23  percentage of Datamation's subscriber base.

24            And because it was controlled circulation,

25  we knew exactly who read the magazine.  We knew

EXHIBIT 23 PAGE 612

                    MICHAEL TYLER

1  exactly what portion of the companies -- of the

2  magazine's readership was in financial services and

3  at what level within the organization.

4       Now, I don't remember any of that myself.

5  It's 20-some-odd years ago, and I wasn't on the

6  business side, per se, but they collected that

7  information for advertising, to set advertising

8  rates, and -- and it was known, and, yes, banks were

9  very substantial portions of the subscriber base.

10 BY MR. BAKER:

11      Q.   And at the time were you personally aware of

12 the characteristics of the subscriber base of

13 Datamation magazine?

14      A.   Oh, yes.  I knew who -- who -- who I was

15 writing to.

16      Any writer ought to know who they're writing

17 to.

18      Q.   And what was the basis for your knowledge?

19      A.   I had seen the advertising presentations

20 that Datamation would have made to its advertisers so

21 that I knew the statistics at that time, or at least

22 I had been shown the statistics to show roughly what

23 their advertising base looks like.

24      This was not particularly guarded

1                    MICHAEL TYLER

2    information.

3        Q.   Now, have you heard of a company called

4    Solomon Brothers?

5        A.   Yes, I have.

6        Q.   What kind of business was --

7        A.   Solomon Brothers no longer exists.  It's now

8    part of CitiGroup.

9             At the time, Solomon was an independent

10   company, as far as I know.  It was engaged as a

11   investment bank, meaning it provided advice and

12   counsel of a financial and economic basis to large

13   corporations.  It helped them issue stock and issue

14   bonds.  Solomon was known at the time as one of the

15   largest bond trading companies and one of the largest

16   foreign-exchange trading companies that -- those were

17   among its specialties.

18       Q.   Now, were people at Solomon Brothers a

19   subscriber to Datamation magazine in 1984?

20       MR. HAYES:  Objection to the extent it calls for

21   speculation.

22       THE WITNESS:  People at every major commercial

23   and investment bank subscribed to Datamation in 1984,

24   and that would include Solomon.

25   BY MR. BAKER:

EXHIBIT 23 PAGE 614

Page 144

MICHAEL TYLER

1

2      Q.   What kind of person at Solomon Brothers

3  would have been a reader of Datamation magazine?

4      MR. HAYES:  Objection, vague, calls for

5  speculation.

6      THE WITNESS:  Datamation aimed to talk to a vice

7  president or director level, as well as the -- what

8  was only then becoming known as the chief information

9  officer.  In fact, Datamation helped popularize that

10 term.

11         It was not aimed at the person who wrote the

12 software code or the person who created the detailed

13 innards of a system, but it was aimed at someone who

14 was able to say, for example, "Did you see what our

15 competitor over there is doing?  That's pretty

16 interesting.  Why can't we do that?"  And then direct

17 someone to get it done.

18 BY MR. BAKER:

19     Q.   So you may have already addressed this, but

20 could you just explain why did companies like Solomon

21 Brothers subscribe to Datamation magazine?

22     A.   I think there are essentially two major

23 reasons why any corporation would subscribe to

24 Datamation, and then there's a separate group of --

25 of customers -- of subscribers, namely the providers

**EXHIBIT 23 PAGE 615**

Page 145

1                           MICHAEL TYLER

2       of information systems, meaning the computer

3       manufacturers, software companies.  So let's put them

4       aside for the moment.

5            Corporate readers, such as banks and auto

6       manufacturers and trading companies and government

7       agencies and so on, subscribe for two basic reasons:

8       One, they want to know what is current in their field

9       so that they are staying up to date with product and

10      technology trends; and, two, they'd like to know what

11      their customers -- what their competitors are doing.

12           And so if Ford read an article that showed

13      what GM was doing in its computer room, Ford would

14      have a lot of interest in that.  They may or may not

15      do something, but they'd sure be interested.

16           And, likewise, the manufacturers and

17      software companies and other providers of information

18      services and products used Datamation to keep current

19      on what their competitors and suppliers and customers

20      were doing in this field so that they could, again,

21      stay current and know what -- what was happening

22      around them.

23      Q.  Now, do you know whether AT&T Bell Labs was

24      a subscriber to Datamation magazine back in 1984?

25      MR. HAYES:  Objection to the extent it calls for

EXHIBIT 23 PAGE 616

1                    MICHAEL TYLER

2    speculation.

3         THE WITNESS:  I don't know the name of any

4    specific person who would have been a subscriber or

5    not, but I do know that AT&T Bell Labs was a

6    subscriber -- or at least people at AT&T Bell Labs

7    were subscribers.

8              They were -- because they were local -- they

9    were in New Jersey, we were in New York -- we

10   frequently discussed story ideas with them and we

11   knew that they were a very talented group of people.

12             You can find them as sources of stories

13   throughout Datamation.

14   BY MR. BAKER:

15        Q.   And you may have already touched on this,

16   but could you explain a little further why do

17   companies like AT&T Bell Labs subscribe to Datamation

18   magazine?

19        A.   They wanted to know what their competitors

20   are doing, as providers of information systems.  They

21   want to know what is current in the field, and to

22   some degree they want to toot their own horn too.

23   And they want to see what their customers are

24   demanding as well.

25        Q.   Turning back to the article that you wrote

EXHIBIT 23 PAGE 617

Page 147

1                        MICHAEL TYLER

2    for a moment, which is Exhibit 20, can you explain

3    when would subscribers have received this issue of

4    Datamation magazine?

5        A.    This issue is dated January 1984.  They

6    would have received that toward the tail end of

7    December.  Or possibly with the Christmas holidays

8    and all, they might have received it in early January

9    of 1984.  So tail end December '83 to very early

10   January '84.

11       Q.    Okay.  Let me shift topics a little bit

12   and -- and talk further about the demonstration of

13   the Chemical Bank system, which you had mentioned

14   previously.

15            First of all, when did that demonstration

16   take place?

17       A.    That demonstration took place most likely

18   in -- in September or October of 1983.

19       Q.    And where did the demonstration of the

20   Chemical Bank system take place?

21       A.    It took place at Chemical Bank's facility in

22   New York.

23       Q.    And what was the purpose of the

24   demonstration?

25       A.    Quite simply, to show me this particular

Page 148

1                              MICHAEL TYLER

2    application of touch-sensitive technology.

3          It was quite clear that I had initiated it,

4    in the form of asking the -- the people who made

5    Easel -- I had asked them to see their product in

6    use.

7          They knew that I was developing a story

8    on -- reporting a story for a publication.  And

9    everybody else knew that the whole purpose of my

10   going there was to flesh out the reporting for a

11   story that would appear in Datamation magazine.

12   Q.   And what was your -- your role or your

13   involvement in the actual demonstration?

14   A.    I -- well, I was the audience, so to speak.

15   They were -- they were showing me what it could do.

16         But I was also a very interactive audience

17   member, asking them to show me things that weren't

18   necessarily going to be part of their demonstration,

19   but that I was curious about and that I wanted to --

20   to test to make sure that what I was being shown

21   wasn't just some -- some pretty little picture, but

22   actually was a fully functional product.

23   Q.   And who else was present at the

24   demonstration?

25   A.    There was at least one representative of the

1                        MICHAEL TYLER

2   Interactive Images company that makes Easel.  There

3   was a demonstrator from Chemical Bank.  And I

4   believe, but I can't be certain, that there was also

5   one other higher-level person at Chemical Bank, whose

6   primary reason was to discuss not just how it was

7   created, but why Chemical wanted to use it and -- and

8   also make sure I didn't ask things that I wasn't

9   allowed to ask.

10      Q.   Now, when Chemical Bank demonstrated the

11   system to you, did they know that you were going to

12   be writing an article about their currency-trading

13   system?

14      A.   Absolutely, positively.

15      I -- Datamation was a very well-known

16   publication, especially among the people who would be

17   involved in a demonstration of technology.  It was

18   well understood that I was a reporter, not an

19   advertising executive or anybody else, and that what

20   I was doing was reporting a story that would be

21   published.

22      Q.   Do you recall there being any

23   confidentiality agreement regarding the

24   demonstration?

25      A.   I am quite certain there was none.

EXHIBIT 23 PAGE 620

1                     MICHAEL TYLER

2       Q.    And were there any restrictions on what you

3   could say about the system that you saw?

4       A.    No.   They -- everybody understood that when

5   a reporter is on the case, so to speak, they are free

6   to write what they see.

7             There are times today that a press agent

8   will say you can't ask so-and-so about such and such

9   or you can't discuss, you know, where a celebrity

10  lives in any detail, or something like that.

11            But in the trade press, none of that ever

12  applied, so I was -- everyone knew that I was

13  completely free to use anything that I saw, and they

14  knew exactly that this would be published no earlier

15  than, let's say, December or January of that -- that

16  winter.

17      Q.    Can you describe generally what features you

18  saw demonstrated.

19      A.    What I saw demonstrated was the complete

20  execution of a trade, a foreign-exchange transaction,

21  from the time that the trader received a phone call,

22  let's say, some customer said I want you to buy "X"

23  number of dollars' worth of "Y" currency, how that

24  would be implemented, how that would be entered into

25  the system, what kind of feedback the trader got and

1                    MICHAEL TYLER

2    how it would show up as an executed trade and then

3    how the trader could also go through his history of

4    previously executed trades.

5        Q.   What about the operation of the -- the

6    "Broker" field?

7        A.   I was able to see that -- as part of this

8    demonstration, when it came to time enter the

9    "Broker" who would be executing the transaction, that

10   if -- if you touched the section of the screen

11   labeled "Broker," the list of brokers did, in fact,

12   come up.  You were able to touch the name of the

13   broker you wanted to use.  That name was somehow

14   captured by the system and reflected back on the

15   screen on the right-hand section next to the word

16   "Broker."

17       Q.   And what about the "Exchange Rate" field?

18       A.   Essentially the same thing.  When you

19   touched the "Exchange Rate" field to enter the

20   exchange rate, instead of a list of brokers coming up

21   on the left, a numeric keypad came up on the left.

22   You could type in the exchange rate that you wanted

23   and then hit the enter key, and you could -- you

24   could and did make clear whether you were talking

25   about dollars per currency, per foreign currency or

Page 152

1                         MICHAEL TYLER

2    foreign-currency unit per dollar.

3        Q.   And does your article accurately describe

4    the features that you saw demonstrated that day?

5        A.   Yes.

6        Q.   And did the user interface work properly

7    during the demonstration?

8        MR. HAYES:  Objection, vague as to "properly."

9        THE WITNESS:  The user interface that I saw

10   worked exactly as I described it in the article.

11            There were no period -- there was no time

12   that I could remember that you would have pushed or

13   touched one section of the screen and what was

14   supposed to happen didn't happen.  If there were,

15   that would have been newsworthy, would have made it

16   into the article, there would have been a little

17   sentence somewhere saying, well, when the system is

18   completed and when the bugs are ironed out, then

19   blah, blah, blah is supposed to happen, but during a

20   demonstration for a reporter recently, they still had

21   a few problems.  I would have said something like

22   that if there were problems.

23            There were none.  It worked perfectly.

24   BY MR. BAKER:

25       Q.   So just to be clear, did you see any

Page 153

1                      MICHAEL TYLER

2    problems or errors or any -- anything like that

3    during the demonstration?

4        A.   No, I did not.

5             It's possible that somebody may have

6    mistyped a number or something and hit the backspace

7    key, but that -- that's a user problem.  That's not a

8    machine problem.  The machine worked fine.

9        MR. BAKER:  Okay.  Thank you very much,

10   Mr. Tyler.

11       THE WITNESS:  You're welcome.

12       MR. HAYES:  Just a few follow-up questions.

13       MR. BAKER:  Just a minute.  Can we just go off

14   the record for a second?

15       MR. HAYES:  Sure.

16       THE VIDEOGRAPHER:  Going off the record, the time

17   is 1:54 p.m.

18            (Recess taken.)

19       THE VIDEOGRAPHER:  We're back on the record.  The

20   time is 1:57 p.m.

21            Please begin.

22   BY MR. BAKER:

23       Q.   Mr. Tyler, you may recall that Lucent's

24   counsel asked you a few questions about an issue of

25   parallax.

1                    MICHAEL TYLER

2         Do you remember that?

3     A.    Yes.

4     Q.    I was wondering if you could please clarify

5   whether parallax was a problem -- or to what extent

6   it was a problem with resistive-membrane-based touch

7   screens.

8     A.    There are four different kinds of -- of

9   touch screens that I describe in the article, which

10  use a variety of different technologies.

11        Of the four, there were two that I described

12  that the touch-screen membrane or -- or a material

13  was directly affixed to the glass of the display

14  screen, one of those being resistive membrane.  Those

15  have the least problem with parallax, because the

16  distance between what is on the inside of the glass

17  of the computer to the distance -- to the outside of

18  where you'd actually touch it was the smallest.

19        Things that involved infrared rays or other

20  things would be farther -- sticking out farther into

21  the room, so to speak, and thus create more of a

22  parallax problem.

23        So I don't really think, in my own judgment,

24  that parallax was really going to be an issue for any

25  of those technologies, but it was the least relevant

EXHIBIT 23 PAGE 625

1          MICHAEL TYLER

2   for the -- for the resistive memory.

3        Q.   What does your article say about the issue

4   of parallax as it relates to the resistive-membrane

5   technology?

6        A.   At the bottom of what's magazine page 152,

7   it says, "Capacitive sensing and resistive membrane

8   touch panels" -- those are two different kinds of

9   technology -- "are in effect part of the crt face,"

10  in other words, it's physically attached to the glass

11  of -- of the computer screen, not separate from them,

12  "so the parallax effect is reduced; yet even with

13  these technologies the thickness of the crt's face

14  causes some parallax," in other words, the glass of

15  the computer screen itself does have some depth to

16  it, so there would be some parallax, it says.  And

17  "Moreover, critics charge that resistive membranes

18  have been known to slide slightly from their original

19  location, also causing parallax."

20       Q.   And do you agree with what you wrote in the

21  article about the parallax and the resistive-membrane

22  technology?

23       A.   I think that was -- I think that was a fair

24  representation.

25       MR. BAKER:  Okay.  Thank you very much.  No

EXHIBIT 23 PAGE 626

Page 156

1                    MICHAEL TYLER

2    further questions.

3        MR. HAYES:  Just a few follow-up questions,

4    Mr. Tyler.

5                        -oOo-

6                    FURTHER EXAMINATION

7    BY MR. HAYES:

8        Q.   Do any of your answers in response to

9    Mr. Baker's questions here today in any way change

10   any of your answers from earlier today in response to

11   my questions?

12       A.   I'm not aware of any inconsistency and --

13   and if -- if you think there is any, then please let

14   me know.

15       Q.   No, I'm not suggesting that there is.  I

16   just want to know was it -- was it your intent --

17   intent in answering Mr. Baker's questions today in

18   any way to change any of your answers from earlier

19   today in response to my questions?

20       A.   I responded to all questions to the best of

21   my ability and with as much accuracy as I could, so I

22   don't think that the questions that either of you

23   asked would have influenced the other.

24       Q.   Okay.  If you could please turn to what's

25   been marked as Exhibit 20, which is a copy of your

**EXHIBIT 23 PAGE 627**

1                         MICHAEL TYLER

2    Datamation magazine which bears Bates numbers GW-LT

3    422215 through 422224.  And I'd particularly like to

4    call your attention to the last two pages of this

5    exhibit, which bear Bates numbers GW-LT 422223,

6    422224.

7         A.    Yes.

8         Q.    These appear to be blow-ups of a picture

9    that was included in your article, correct?

10        A.    Correct.

11        Q.    Were these blow-ups included with the

12   distribution of the original magazine article in

13   1984?

14        A.    No, they weren't.

15              The original magazine, though, was obviously

16   a much better resolution and a clear color photograph

17   as opposed to the black-and-white photocopy.

18        Q.    I understand that maybe there -- that

19   they're being included today because they're a little

20   bit clearer than --

21        A.    Right.

22        Q.    -- and bigger than the -- than the picture

23   that's in the magazine, but I just wanted to be clear

24   that these two blow-ups were, in fact, not included

25   with the magazine that was distributed in 1984.

**EXHIBIT 23 PAGE 628**

Page 158

1                    MICHAEL TYLER

2       A.   They were not, which is actually why in the

3    text of the article I spent a couple of paragraphs

4    describing what you can actually see on this screen

5    in the blow-up.

6       Q.   Okay.  If you would turn to what's been

7    marked as Exhibit 21, and the same -- I'm going to

8    ask you the same question again about the last two

9    pages.

10          Again, this exhibit is marked MSLT_1228716

11   through MSLT_1228724.  And, again, the last two pages

12   appear to be blow-ups of the pictures that were

13   included in the original magazine article, and my

14   question then is were these blow-ups on MSLT_1228723

15   and 1228724 included in the original distribution of

16   the magazine article in 1984?

17      A.   Page MSLT_1228723 was included exactly as

18   shown.  That's a different picture from the one we

19   were discussing a moment ago.

20      Q.   Mm-hmm.

21      A.   And that was essentially a pose created,

22   designed just to -- to attract the reader's

23   attention.

24          The next page, 1228724, is, again, an

25   enlargement of the actual photograph which was shown

1              MICHAEL TYLER

2    in the magazine on -- magazine page 152, which was

3    Exhibit 1228721.

4        Q.   Okay.  But it wasn't -- wasn't, in fact,

5    included in the original distribution of the

6    magazine, correct?

7        A.   The enlargement was not, that's correct.

8        Q.   Okay.  I'd now like to call your attention

9    to what was marked as Exhibit 22.

10            In response to some of Mr. Baker's questions

11   earlier, I think you -- you went through a

12   description of the functionality of this screen.

13       A.   Yes.

14       Q.   Is that accurate, yes?

15       A.   Yes.

16       Q.   And is it fair to say that your description

17   of the functionality of this screen was based on

18   either your magazine article or your memory from 23

19   or 24 years ago?

20       A.   Yes.  It -- my description of the screen was

21   based on my memory of using the screen and seeing it

22   demonstrated, confirmed by reading in the magazine

23   what I had reported at the time.

24            The -- the magazine article was a

25   contemporaneous description of exactly what I had

Page 160

1                        MICHAEL TYLER

2    seen at that time.

3        Q.  And to the extent that you expanded upon

4    what was written in the article or added any

5    additional description, that additional testimony of

6    yours sitting here today was based on your memory

7    from 23 or 24 years ago; is that correct?

8        A.  It was based on -- you know, there are a lot

9    of things that you see in -- in any given instance,

10   and for me the ones that were interesting were the

11   technology and the application.  So I didn't really

12   pay attention to what color the room was or whether

13   the -- the person sitting next to me was young or old

14   or anything else, but I was really having fun with

15   what the system could do, and so that made a much

16   deeper impression to me than -- than other aspects of

17   the demonstration might have.

18       Q.  But that impression on your mind of -- of

19   the -- what the system could do happened 23 or 24

20   years ago, correct?

21       A.  Well, the demonstration was in, let's call

22   it, the early fall of -- of 1983, so, yeah, 24 years,

23   roughly.

24       Q.  Okay.  I think you said earlier that

25   Datamation magazine, in your opinion, was considered

**EXHIBIT 23 PAGE 631**

1                         MICHAEL TYLER

2   a preeminent magazine; is that right?

3        A.    That is correct.

4        Q.    And what do you base that opinion on?

5        A.    Its advertising rates were higher than for

6   any competitive publication, it had been around

7   longer, it was -- its readership base was at a higher

8   level within the corporate hierarchy than for many of

9   its competitive magazines, and, frankly, the more

10  subtle anecdotal pieces fit into place as well.  When

11  there were -- for example, when a press conference

12  was held and a company had six seats at the dais

13  table to sit next to the CEO, Datamation almost

14  always got one of those seats, just as an -- as an

15  example.

16       Q.    I think you testified earlier, in response

17  to a question from Mr. Baker, that you knew that AT&T

18  Bell Labs were subscribers of Datamation magazine; is

19  that correct?

20       A.    Yes.

21       Q.    What was that answer based on?

22       A.    It was based on having spoken -- to in the

23  course of my reporting on various stories over the

24  years or having seen other reporters talking to --

25  Bell Labs and speaking to people at industry

EXHIBIT 23 PAGE 632

Page 162

1                          MICHAEL TYLER

2    conferences and conventions, reporting stories and so

3    on.  There were people I came across who worked at

4    AT&T Bell Labs and subscribed to Datamation.

5        Q.   So is it fair to say that that answer was

6    based on conversations you had had with AT&T and/or

7    Bell Labs employees?

8        A.   Among other things, yes.

9        Q.   What are the other things?

10       A.   Knowing that just as every major commercial

11   bank, every major investment bank was -- had people

12   in it who subscribed to Datamation, so, too, every

13   major provider of data processing, information

14   systems, computers, terminals, software, all of

15   them -- virtually every major company had customers

16   who had readers of Datamation within them.

17       Q.   You said you sometimes conversed with or

18   maybe talked to folks at AT&T Bell Labs about

19   articles or an article you were preparing for

20   Datamation magazine; is that correct?

21       A.   Yes, it is.

22       Q.   Did you ever visit AT&T or Bell Labs

23   facilities into New Jersey?

24       A.   I -- once or twice, yes.

25       Q.   When you were there, did you see a copy of

Page 163

1                    MICHAEL TYLER

2    Datamation magazine with an AT&T or Bell Labs address

3    on it?

4        A.   To say the least, that would not have been

5    something I paid attention to.

6        Q.   So is it fair to say your answer is no?

7        A.   My answer is I may or may not have --

8        MR. BAKER:  Objection.

9        THE WITNESS:  -- seen it, but I sure as heck

10   wouldn't remember one way or the other.

11   BY MR. HAYES:

12       Q.   Okay.  So you have no --

13            You have no memory of seeing a Datamation

14   magazine addressed to AT&T or Bell Labs?

15       A.   No.

16            And I wouldn't imagine people typically

17   leave that out on their desk to say, hey, look, we

18   read your magazine, you know.

19       Q.   I think you testified earlier that when you

20   saw the demonstration of the Easel foreign-exchange

21   front end --

22       A.   I'm sorry.  Could I just ask you to --

23   interrupt for one moment and then ask your question?

24       Q.   Yeah.

25       A.   I just want to look at something first.

EXHIBIT 23 PAGE 634

Page 164

1              MICHAEL TYLER

2         (Witness reviewing document.)

3         Okay.  I was just double checking something.

4    Go ahead.

5    Q.   I think you testified earlier, in response

6    to one of Mr. Baker's questions, that when you

7    observed the foreign-exchange front end and/or Easel

8    operating that day at the Chemical Bank in September

9    or October of '83, you didn't see any problems or

10   errors with its operation; is that correct?

11   A.   That's correct.

12   Q.   Is it possible that there was functionality

13   from the system that you didn't see that might have

14   had errors?

15   A.   That is always possible.

16        When you do a demonstration of a technology,

17   you can't possibly hit every single button in every

18   single sequence that's conceivable of.  That would

19   take forever.

20        That's why in testing these products

21   companies do simulations as opposed to rigorous

22   every-last-possibility kind of testing.  And that's

23   true for demonstrations as well.

24   Q.   I think you mentioned earlier that

25   oftentimes when you went out to watch these

EXHIBIT 23 PAGE 635

Page 165

MICHAEL TYLER

1

2    demonstrations that the demonstrators had a script

3    that they most wanted you to see; is that correct?

4         A.    No, I didn't say that.

5              I said they may have had a script which may

6    have been in their head or it may have been written

7    down, but they -- if someone is demonstrating a

8    product to you, they clearly want to show off what

9    they think are the best features of their product, so

10   they make sure to do so.

11             And as a potential user of a product or as

12   someone reporting on that, I want to see more of it

13   than that and I want to see what happens when you do

14   something unusual, in the same way that if I'm going

15   to test drive a vehicle that I'm about to purchase,

16   I'm going to want to do something that the showroom

17   salesman probably didn't want me to do with the car,

18   but I'm going to do it anyway.

19        Q.    Right.

20             In your opinion, you know, would it have

21   been logical to assume that the demonstrators wanted

22   to show off the best features and not the problems or

23   errors with the system?

24        A.    That's certainly what I would imagine a

25   demonstrator would want to show off.

EXHIBIT 23 PAGE 636

Page 166

1                        MICHAEL TYLER

2              It's not the only thing that I saw, though.

3         Q.   Fair enough.

4              What knowledge did you have of any one of

5    the subscribers to Datamation magazine having

6    actually read this article that was marked as

7    Exhibit 1, 20 and 21 today?

8         A.   I don't have personal firsthand knowledge

9    that anybody outside Datamation read it or didn't

10   read it, but I do know that Datamation regularly

11   surveyed its subscriber base to gather information

12   about which departments and which specific articles

13   were read in aggregate by percentages of readers and

14   cross-tabbed against various types of positions they

15   held within their -- their companies and so on as

16   part of its market research so that it could sell ads

17   to a known -- to a known audience or for a known

18   readership audience.

19        Q.   If Lucent asked you to come to trial in this

20   case, would you be willing to come?

21        A.   If the trial were in San Francisco, I could

22   probably work it out reasonably easily.

23             I don't believe that's the case, and let's

24   cross that bridge when and if we get to it.

25             That's really a function of I have a

Page 167

1                    MICHAEL TYLER

2    business to manage and I owe my investors and my

3    customers the duty of my care to them.

4        MR. HAYES:  Fair enough.  I don't have any more

5    questions.

6        MR. BAKER:  I have just one follow-up question.

7            Mr. Tyler, did the features of the Chemical

8    Bank currency trading system that you saw

9    demonstrated appear to work properly during the

10   demonstration?

11       THE WITNESS:  Yes.  All of the features that I

12   saw demonstrated or that I asked to be

13   shown/demonstrated did appear to work perfectly.

14       MR. BAKER:  Okay.  No further questions.

15       THE VIDEOGRAPHER:  This concludes the deposition

16   of Michael Taylor -- or Michael Tyler.  The number of

17   DVDs used was two.

18           The original DVDs will be retained at TSG

19   Reporting, located at 747 Third Avenue, 28th Floor,

20   New York, New York 10017.

21           Going off the record, the time is 2:14 p.m.

22           (The deposition proceedings concluded at

23           2:14 p.m.)

24               - - - - - - - - - - - - - - -

25                    MICHAEL TYLER

Page 168

1                        MICHAEL TYLER

2    STATE OF CALIFORNIA         )

3                               )     ss

4    COUNTY OF SAN MATEO         )

5           I hereby certify that the witness in the

6    foregoing deposition of MICHAEL TYLER, was by me duly

7    sworn to testify to the truth, the whole truth and

8    nothing but the truth, in the within-entitled cause;

9    that said deposition was taken at the time and place

10   herein named; that the deposition is a true record of

11   the witness' testimony as reported by me, a duly

12   certified shorthand reporter and a disinterested

13   person, and was thereafter transcribed into

14   typewriting by computer.

15          I further certify that I am not interested

16   in the outcome of the said action, nor connected

17   with, nor related to any of the parties in said

18   action, nor to their respective counsel.

19          IN WITNESS WHEREOF, I have hereunto set my

20   hand this 28th day of December, 2007.

21

22

              - - - - - - - - - - - - - - -
23            MELINDA M. IBANEZ, CSR #10686

24            STATE OF CALIFORNIA

25

EXHIBIT 23 PAGE 639

Page 169

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5        1.  To clarify the record.

6        2.  To conform to the facts.

7        3.  To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                    _____

EXHIBIT 23 PAGE 640