1  James S. Blackburn (State Bar No. 169134)
   ARNOLD & PORTER LLP
2  777 South Figueroa Street, 44th Floor
   Los Angeles, California  90017-5844
3  Telephone:  (213) 243-4000
   Facsimile:  (213) 243-4199
4
   Joseph A. Micallef (admitted *pro hac vice*)
5  ARNOLD & PORTER LLP
   555 Twelfth Street, N.W.
6  Washington, D.C.  20004-1206
   Telephone:  (202) 942-5000
7  Facsimile:  (202) 942-5999
8  Joel M. Freed (admitted *pro hac vice*)
   McDERMOTT WILL & EMERY LLP
9  600 13th Street, N.W.
   Washington, D.C.  20005-3096
10 Telephone:  (202) 756-8000
   Facsimile:  (202) 756-8087
11
   Attorneys for *Dell Inc.*
12

13            UNITED STATES DISTRICT COURT

14           SOUTHERN DISTRICT OF CALIFORNIA

15

16 LUCENT TECHNOLOGIES INC.  and          )   Case No. 07-CV-2000-H (CAB)
   MULTIMEDIA PATENT TRUST,               )   consisting of matters severed from
17                                        )   consolidated cases:
          Plaintiffs and Counterclaim-defendants, )  Case No. 02-CV-2060-B (CAB)
18                                        )   Case No. 03-CV-0699-B (CAB)
       v.                                 )   Case No. 03-CV-1108-B (CAB)
19                                        )
   GATEWAY, INC. AND GATEWAY              )   **DECLARATION OF JAMES S.**
20 COUNTRY STORES LLC, GATEWAY            )   **BLACKBURN IN SUPPORT OF DELL**
   COMPANIES, INC., GATEWAY               )   **INC.'S MOTIONS IN LIMINE NOS. 1-5**
21 MANUFACTURING LLC and                  )
   COWABUNGA ENTERPRISES, INC.,           )   Judge Marilyn L. Huff
22                                        )
          Defendants and Counter-claimants, )  Hearing:  February 11, 2008, 10:30 a.m.
23                                        )   Location: Courtroom 13, 5th Floor
   and                                    )
24                                        )
   MICROSOFT CORPORATION,                 )
25                                        )
          Intervener and Counter-claimant, )
26 _____)

27

28

1    MICROSOFT CORPORATION,                    )
                                               )
2              Plaintiff and Counter-defendant,)
                                               )
3    v.                                        )
                                               )
4    LUCENT TECHNOLOGIES INC. and              )
     MULTIMEDIA PATENT TRUST,                  )
5                                              )
               Defendants and Counter-claimants,)
6                                              )
                                               )
7    LUCENT TECHNOLOGIES INC. and              )
     MULTIMEDIA PATENT TRUST,                  )
8                                              )
               Plaintiffs and Counterclaim-defendants,)
9                                              )
                                               )
10   v.                                        )
                                               )
11   DELL INC.,                                )
                                               )
12             Defendant and Counter-claimant. )
                                               )
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, James S. Blackburn, declare as follows:

2       1.    I am an attorney and a partner of the law firm of Arnold & Porter LLP, counsel for

3    defendant Dell Inc. ("Dell").  I make this declaration in support of Dell Inc.'s Motions in Limine

4    Nos. 1-5, which are filed concurrently with this declaration.  Unless otherwise stated herein, I have

5    personal knowledge of the facts set forth below and, if called as a witness, could and would

6    competently testify thereto.

7       2.    Attached hereto as Exhibit 1 is a true and correct copy of the Order on Motions in

8    Limine for the Group 4 Trial Concerning U.S. Patent Nos. 4,763,356 and 5,347,295

9    [Docket No. 1737] dated April 30, 2007;

10      3.    Attached hereto as Exhibit 2 is a true and correct copy of the Case Management

11   Order [Docket No. 3] dated October 17, 2007;

12      4.    Attached hereto as Exhibit 3 is a true and correct copy of Lucent's Response to the

13   Third Set of Interrogatories from Gateway, Inc. to Lucent Technologies Inc. (Nos. 6-17) dated

14   January 11, 2006;

15      5.    Attached hereto as Exhibit 4 is a true and correct copy *Sandisk Corp. v. ST*

16   *Microelectronics, Inc.,* 480 F.3d 1372, 1375 n.1 (Fed. Cir. 2007);

17      6.    Attached hereto as Exhibit 5 is a true and correct copy of the Order on Microsoft's

18   Motions for Judgment as a Matter of Law and New Trial [Docket No. 1975] dated August 6, 2007;

19      7.    Attached hereto as Exhibit 6 is a true and correct copy of the Expert Report of Roger

20   S. Smith Regarding Damages Issues Pertaining to Lucent User Interface Patents dated March 31,

21   2006 **[Filed Under Seal]**;

22      8.    Attached hereto as Exhibit 7 is a true and correct copy of the Expert Report of Roger

23   S. Smith Regarding Damages Issues Pertaining to Lucent Video Coding Patents dated March 31,

24   2006 **[Filed Under Seal]**;

25      9.    Attached hereto as Exhibit 8 is a true and correct copy of the Expert Report of Roger

26   S. Smith Regarding Damages Issues Pertaining to Lucent '759 Fleming Patent dated March 31,

27   2006 **[Filed Under Seal]**;

28

1        10.    Attached hereto as Exhibit 9 is a true and correct copy of excerpts of the deposition

2  of Roger S. Smith taken January 4, 2008 **[Filed Under Seal]**;

3        11.    Attached hereto as Exhibit 10 is a true and correct copy of the Second Supplemental

4  Expert Report of Roger S. Smith Regarding Damages Issues dated November 7, 2007 **[Filed Under**

5  **Seal]**;

6        12.    Attached hereto as Exhibit 11 is a true and correct copy of the Order Following

7  Discovery Conference [Docket No. 384] dated January 10, 2006;

8        13.    Attached hereto as Exhibit 12 is a true and correct copy of the Order Re Xbox 360

9  Discovery [Docket No. 390] dated January 19, 2006;

10        14.    Attached hereto as Exhibit 13 is a true and correct copy of Expert Report of Brian W.

11  Napper Regarding Video Coding Patent dated May 12, 2006 **[Filed Under Seal]**;

12        15.    Attached hereto as Exhibit 14 is a true and correct copy of the Expert Report of

13  David P. Kaplan Related to Video Coding Patents dated May 12, 2006 **[Filed Under Seal]**;

14        16.    Attached hereto as Exhibit 15 is a true and correct copy of Microsoft Corporation's

15  Notice of Motion and Motion in Limine No. 4: Lucent Should Be Precluded From Presenting A

16  Damages Model Based on the Price of Third Party Computers Rather Than Microsoft's Software

17  dated December 11, 2006 **[Filed Under Seal]**;

18        17.    Attached hereto as Exhibit 16 is a true and correct copy of Microsoft Corporation's

19  Group 4 Motion in Limine No. 6: Lucent  Should be Precluded from Presenting an Entire Market

20  Value Theory of Damages at Trial [Docket No. 1283] dated March 29, 2007;

21        18.    Attached hereto as Exhibit 17 is a true and correct copy of the Agreement dated as of

22  June 1, 1988 between International Business Machines Corporation and Dell Computer Corporation

23  produced with Bates range DELL345057-95 **[Filed Under Seal]**;

24        19.    Attached hereto as Exhibit 18 is a true and correct copy of an Agreement dated as of

25  May 1, 1990 between International Business Machines Corporation and Gateway 2000, Inc. with

26  Amendments produced with Bates range GTWY420176-220 **[Filed Under Seal]**;

27

28

1    20.    Attached hereto as Exhibit 19 is a true and correct copy of the Supplemental Expert

2    Report of Brian W. Napper Regarding Video Coding Patent 4,958,226 and Patents 4,763,356 and

3    5,347,295 dated January 9, 2008 **[Filed Under Seal]**;

4    21.    Attached hereto as Exhibit 20 is a true and correct copy of the Order Construing

5    Claims for United States Patent Number 4,439,759 [Docket No. 371] dated November 16, 2005;

6    22.    Attached hereto as Exhibit 21 is a true and correct copy of Lucent's Opposition to

7    Dell's Motion for Summary Judgment of Invalidity of Claims 1-3 of U.S. Patent No. 4,439,759 to

8    Fleming et al. [Docket No. 146] dated December 14, 2007.

9    23.    Attached hereto as Exhibit 22 is a true and correct copy of excerpts of the deposition

10    of Jake Richter taken November 14, 2007;

11    24.    Attached hereto as Exhibit 23 is a true and correct copy of the Supplemental Rebuttal

12    Expert Report of Jake Richter dated October 12, 2007;

13    25.    Attached hereto as Exhibit 24 is a true and correct copy of U.S. Patent No. 4,439,759

14    to Fleming et al produced with Bates range LUC 002224-43; and

15    26.    Attached hereto as Exhibit 25 is a true and correct copy of the Scheduling Order for

16    Groups 1, 4, 5 and 6 Patents [Docket No. 1876] dated June 7, 2007.

17    27.    Attached hereto as Exhibit 26 is a true and correct copy of the Second Supplemental

18    Expert Report of Wayne A. Hoeberlein re Damages for User Interface Patents and Day '356 Patent

19    Calculations, dated January 25, 2007 **[Filed Under Seal]**.

20    28.    Attached hereto as Exhibit 27 is a true and correct copy of excerpts of the Transcript

21    of Hearing before Judge Brewster, dated April 27, 2007.

22    29.    Attached hereto as Exhibit 28 is a true and correct copy of the Declaration of Bernd

23    Girod in Support of Multimedia Patent Trust's Oppositions to Dell's Video Coding Summary

24    Judgment Motions [Docket No. 144] dated December 14, 2007.

25    30.    Attached hereto as Exhibit 29 is a true and correct copy of the Supplemental Rebuttal

26    Expert Report of Professor Bernd Girod Regarding Validity of Lucent's 4,383,272 and 4,958,226

27    Patents, dated October 12, 2007.

28

- 3 -

31. Attached hereto as Exhibit 30 is a true and correct copy of excerpts of the deposition transcript of Bernd Girod, taken November 20, 2007.

32. Attached hereto as Exhibit 31 is a true and correct copy of the Second Modified Scheduling Order and Extension of Discovery [Docket No. 388], dated January 11, 2006.

33. Attached hereto as Exhibit 32 is a true and correct copy of a letter from Michael Stacy to Elizabeth T. Bernard dated October 26, 2005.

34. Attached hereto as Exhibit 33 is a true and correct copy of an e-mail from Thomas Wischer to Jon Hohenthaner dated March 29, 2006.

35. Attached hereto as Exhibit 34 is a true and correct copy of Expert Report of Wayne A. Hoeberlein re Damages for User Interface Patents dated March 31, 2006 **[Filed Under Seal]**.

36. Attached hereto as Exhibit 35 is a true and correct copy of a letter from Ben Harjo to Jon Hohenthaner dated March 8, 2005.

37. Attached hereto as Exhibit 36 is a true and correct copy of a letter from Ben Harjo to Joseph Loy dated December 27, 2005.

38. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of January 2008 at Los Angeles, California.

By: _James Black_____
James S. Blackburn
Attorney for Dell Inc.

- 4 -

1

# EXHIBITS TABLE OF CONTENTS

2

| Exhibit | Document | Page No. |
|---------|----------|----------|
| 1 | Order on Motions in Limine for the Group 4 Trial Concerning U.S. Patent Nos. 4,763,356 and 5,347,295 [Docket No. 1737] dated April 30, 2007 | 8 |
| 2 | Case Management Order [Docket No. 3] dated October 17, 2007 | 17 |
| 3 | Lucent's Response to the Third Set of Interrogatories from Gateway, Inc. to Lucent Technologies Inc. (Nos. 6-17) dated January 11, 2006 | 21 |
| 4 | *Sandisk Corp. v. ST Microelectronics, Inc.,* 480 F.3d 1372, 1375 n.1 (Fed. Cir. 2007) | 37 |
| 5 | Order on Microsoft's Motions for Judgment as a Matter of Law and New Trial [Docket No. 1975] dated August 6, 2007 | 63 |
| 6 | Expert Report of Roger S. Smith Regarding Damages Issues Pertaining to Lucent User Interface Patents dated March 31, 2006 **[Filed Under Seal]** | 106 |
| 7 | Expert Report of Roger S. Smith Regarding Damages Issues Pertaining to Lucent Video Coding Patents dated March 31, 2006 **[Filed Under Seal]** | 191 |
| 8 | Expert Report of Roger S. Smith Regarding Damages Issues Pertaining to Lucent '759 Fleming Patent dated March 31, 2006 **[Filed Under Seal]** | 248 |
| 9 | Excerpts of the deposition of Roger S. Smith taken January 4, 2008 **[Filed Under Seal]** | 289 |
| 10 | Second Supplemental Expert Report of Roger S. Smith Regarding Damages Issues dated November 7, 2007 **[Filed Under Seal]** | 344 |
| 11 | Order Following Discovery Conference [Docket No. 384] dated January 10, 2006 | 352 |
| 12 | Order Re Xbox 360 Discovery [Docket No. 390] dated January 19, 2006 | 354 |
| 13 | Expert Report of Brian W. Napper Regarding Video Coding Patent dated May 12, 2006 **[Filed Under Seal]** | 356 |
| 14 | Expert Report of David P. Kaplan Related to Video Coding Patents dated May 12, 2006 **[Filed Under Seal]** | 429 |
| 15 | Microsoft Corporation's Notice of Motion and Motion in Limine No. 4: Lucent Should Be Precluded From Presenting A Damages Model Based on the Price of Third Party Computers Rather Than Microsoft's Software dated December 11, 2006 **[Filed Under Seal]** | 523 |
| 16 | Microsoft Corporation's Group 4 Motion in Limine No. 6: Lucent Should be Precluded from Presenting an Entire Market Value Theory of Damages at Trial [Docket No. 1283] dated March 29, 2007 | 557 |
| 17 | Agreement dated as of June 1, 1988 between International Business Machines Corporation and Dell Computer Corporation produced with Bates range DELL345057-95 **[Filed Under Seal]** | 565 |

- 5 -

18    Agreement dated as of May 1, 1990 between International Business Machines Corporation and Gateway 2000, Inc. with Amendments produced with Bates range GTWY420176-220 **[Filed Under Seal]** ................. 604

19    Supplemental Expert Report of Brian W. Napper Regarding Video Coding Patent 4,958,226 and Patents 4,763,356 and 5,347,295 dated January 9, 2008 **[Filed Under Seal]** ......................................................................... 649

20    Order Construing Claims for United States Patent Number 4,439,759 [Docket No. 371] dated November 16, 2005 ...................................................... 717

21    Lucent's Opposition to Dell's Motion for Summary Judgment of Invalidity of Claims 1-3 of U.S. Patent No. 4,439,759 to Fleming et al. [Docket No. 146] dated December 14, 2007........................................................ 726

22    Excerpts of the deposition of Jake Richter taken November 14, 2007 ............... 755

23    Supplemental Rebuttal Expert Report of Jake Richter dated October 12, 2007.......................................................................................... 761

24    U.S. Patent No. 4,439,759 to Fleming et al produced with Bates range LUC 002224-43 ............................................................................................... 769

25    Scheduling Order for Groups 1, 4, 5 and 6 Patents [Docket No. 1876] dated June 7, 2007............................................................................................. 789

26    Second Supplemental Expert Report of Wayne A. Hoeberlein re Damages for User Interface Patents and Day '356 Patent Calculations, dated January 25, 2007 **[Filed Under Seal]** .............................................................................. 792

27    Excerpts of the Transcript of Hearing before Judge Brewster, dated April 27, 2007........................................................................................... 896

28    Declaration of Bernd Girod in Support of Multimedia Patent Trust's Oppositions to Dell's Video Coding Summary Judgment Motions [Docket No. 144] dated December 14, 2007........................................................ 902

29    Supplemental Rebuttal Expert Report of Professor Bernd Girod Regarding Validity of Lucent's 4,383,272 and 4,958,226 Patents, dated October 12, 2007.......................................................................................... 930

30    Excerpts of the deposition transcript of Bernd Girod, taken November 20, 2007 ................................................................................... 964

31    Second Modified Scheduling Order and Extension of Discovery [Docket No. 388], dated January 11, 2006........................................................ 970

32    Letter from Michael Stacy to Elizabeth T. Bernard dated October 26, 2005 ..... 973

33    Email from Thomas Wischer to Jon Hohenthaner dated March 29, 2006.......... 974

34    Expert Report of Wayne A. Hoeberlein re Damages for User Interface Patents dated March 31, 2006 **[Filed Under Seal[** .............................................. 975

35    Letter from Ben Harjo to Jon Hohenthaner dated March 8, 2005 ................... 1081

- 6 -

36       Letter from Ben Harjo to Joseph Loy dated December 27, 2005 ..................... 1082

Exhibit 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

      Plaintiff and Counterclaim-defendant,

v.

GATEWAY, INC. and GATEWAY
COUNTRY STORES LLC, GATEWAY
COMPANIES, INC., GATEWAY
MANUFACTURING LLC and
COWABUNGA ENTERPRISES, INC.,

      Defendants and Counter-claimants,

and

MICROSOFT CORPORATION,

      Intervenor and Counter-claimant,

_____

MICROSOFT CORPORATION,

      Plaintiff and Counterclaim-defendant,

v.

LUCENT TECHNOLOGIES INC.,

      Defendant and Counter-claimant

_____

LUCENT TECHNOLOGIES INC.,

      Plaintiff,

v.

DELL, INC.,

      Defendant.

_____

**Civil No:** 02CV2060-B(CAB)
consolidated with
**Civil No:** 03CV0699-B (CAB) and
**Civil No:** 03CV1108-B (CAB)

**ORDER ON MOTIONS IN LIMINE FOR
THE GROUP 4 TRIAL CONCERNING
U.S. PATENT NOS. 4,763,356 AND
5,347,295**

02CV2060-B (CAB)

Exhibit 1  Page 8

1   The parties have submitted motions in limine for the upcoming trial on Group 4

2   patents, U.S. Patent Nos. 4,763,356 ("the '356 patent) and 5,347,295 ("the '295 patent).

3   Having reviewed the briefs submitted by the parties in support and in opposition to the

4   motions, as well as oral arguments presented to the Court on April 27, 2007, the Court

5   hereby rules on the motions as follows:

6

| No. | Motion in limine | Ruling |
|-----|------------------|--------|
| Microsoft[1] No. 1 [1337] | Exclude evidence or argument regarding Microsoft's valuations, revenues and cash reserves | **GRANTED-IN-PART** as to general valuation evidence and argument; **DENIED-IN-PART** as to evidence and argument regarding the profitability of the products themselves and the divisions making the products. |
| Microsoft No. 2 [1333] | Preclude Lucent from offering evidence of indemnification between Microsoft and its customers | **DENIED-IN-PART** as to letters and communications; **GRANTED-IN-PART** as to customer agreements made prior to notice of infringement. |
| Microsoft No. 3 [1336] | Preclude Lucent from mentioning any other legal proceedings involving Microsoft | **GRANTED**; however, prior transcripts and admissions can be used for impeachment with no mention of the actual proceedings. |
| Microsoft No. 4 [1281] | Preclude Lucent from referencing any unaccused Microsoft products | **DENIED** |
| Microsoft No. 5 [1282] | Preclude Lucent from presenting a joint and several theory of damages at trial | **DENIED** |

_____

[1] Dell has joined Microsoft's motions nos.1, 2, 4, 6-8, 10-13, and 16-19. [docket no. 1332];Gateway has joined Microsoft's motions  nos. 2-4, 6-8,10, 11, 13, 15-17 and 19 [docket no. 1403].

2

**Exhibit 1  Page 9**

| Microsoft<br>No. 6<br>[1283]<br><br>Dell<br>No. 14<br>[1313]<br><br>Gateway<br>No. 3<br>[1274] | Preclude Lucent from presenting an entire market value theory at trial<br><br>Exclude evidence or testimony of the entire market value rule<br><br>Lucent Should Be Precluded from Seeking Damages for the Day Patent on the Entire Computer | **GRANTED-IN-PART/DENIED-IN-PART;** Lucent may not present any evidence that the royalty base is the cost of the computer unless it can lay a foundation that sales of the computer would be commercial infeasible without the accused features of the software (Quicken, Money, Outlook). |
|---|---|---|
| Microsoft<br>No. 7<br>[1335] | Preclude Lucent from any factual allegations regarding the '295 patent unsupported by its 2/20/06 infringement contentions | **GRANTED-IN-PART** as to contentions of direct and contributory infringement<br><br>**DENIED-IN-PART** as to: Electromagnetic digitizer; equivalents for corresponding structures in means-plus-function claims; and gestures accused |
| Microsoft<br>No. 8<br>[1284] | Preclude Lucent from having either of its damage experts endorsing the work of the other | **GRANTED**<br>An expert may use the calculations of another but he may not vouch for those calculations. |
| Microsoft<br>No. 9<br>[1285] | Preclude Lucent from presenting evidence or argument regarding willfulness | **DENIED** |
| Microsoft<br>No. 10<br>[1286] | Preclude Lucent from mentioning the existence and contents of draft expert reports | **GRANTED** |
| Microsoft<br>No. 11<br>[1287] | Preclude Lucent from discussing the value of its cross-licenses | **DENIED**<br>Experts may testify as to the desirability of the cross-licenses but not monetary figures. |
| Microsoft<br>No. 12<br>[1288] | Preclude Lucent from introducing evidence or argument regarding Microsoft's foreign sales and contributory infringement | **DEFERRED;** hearing on this motion will be rescheduled in light of the recent Supreme Court decision in <u>Microsoft Corp. v. At&T Corp</u>. |
| Microsoft<br>No. 13<br>[1289] | Preclude arguments or evidence regarding infringement of the '295 or '356 patents under the doctrine of equivalents | **GRANTED** |

3

**Exhibit 1  Page 10**

| Microsoft No. 14 [1290] | Preclude Lucent from relying on Microsoft's claims of noninfringement to show date of actual notice of infringement | **GRANTED** |
|---|---|---|
| Microsoft No. 15 [1334] | Preclude Lucent from mentioning the Microsoft-Stac agreement | **GRANTED** except that the agreement can be used for impeachment if Microsoft takes the position that it never makes a certain type of agreement |
| Microsoft No. 16 [1291] | Preclude Lucent from misstating the scope of a license resulting from the Georgia-Pacific analysis | **GRANTED;** the hypothetical negotiation must focus on a license relevant to the scope of the infringement at issue. |
| Microsoft No. 17 [1292] | Preclude Lucent from relying on or introducing through its damages experts the Les Nouvelles article | **DENIED** |
| Microsoft No. 18 [1293] | Preclude Lucent from introducing novels and previous litigation concerning Microsoft and Go corporation | **GRANTED** as to the novels "Start up" and "Barbarians led by Bill Gates." **GRANTED** as to the Go litigation with the caveat that admissions may be used with no mention of the litigation. |
| Microsoft No. 19 [1295] | Preclude Lucent from presenting evidence or testimony regarding infringement of the '295 patent based on non-corresponding structure | **DENIED;** the Court's Markman Order as issued March 2, 2004 will be used at trial. |
| Dell[2] No. 1 [1300] | Preclude Lucent from relying on Mr. Tognazzini's testimony on secondary considerations of obviousness with respect to the '356 patent | **DENIED** |
| Dell No. 2 [1301] | Preclude Lucent from relying on Dell's knowledge or belief to prove actual pre-suit notice with respect to the '356 patent | **GRANTED-IN-PART;** This evidence may only be used for impeachment or corroboration. |

---

[2] Microsoft has joined Dell's motions nos. 1, 5-9, 12-15, 18 and 19 [docket no. 1299]; Gateway has joined Dell's motions nos. 1, 5, 6, 8-15, 17-19 [docket no. 1403].

4

**Exhibit 1  Page 11**

| Dell<br>No. 3<br>[1302]<br><br>Gateway<br>No. 6<br>[1276] | Preclude Lucent from relying on communications that do not identify the '356 patent to prove actual notice<br><br>Preclude Lucent from Presenting Evidence or Argument that Documents and Testimony Not Identifying U.S. Patent No. 4,763,356 or U.S. Patent No. 5,347,295 Allegedly Support Lucent's Actual Notice Contentions | **GRANTED-IN-PART/DENIED-IN-PART**; while multiple communications may be combined to show actual notice, these communications must each refer to the relevant patents accused (by patent number) to be admissible on actual notice. |
|---|---|---|
| Dell<br>No. 4<br>[1303] | Preclude Lucent from relying on a notice date earlier than Feb. 20, 2003 with respect to the '295 patent | **GRANTED** |
| Dell<br>No. 5<br>[1304] | Lucent and its expert Jean Renard Ward should be precluded from asserting that the accused Palm-based PDAs do not have a front-mounted digitizer | **GRANTED** |
| Dell<br>No. 6<br>[1305] | Preclude Ward from testifying regarding infringement of the accused Palm-based PDAs | **GRANTED** |
| Dell<br>No. 7<br>[1306] | Preclude Lucent from introducing any evidence or argument that the alleged infringement of the '295 (Agulnick) patent was willful | **GRANTED** |
| Dell<br>No. 8<br>[1307] | Preclude Lucent from relying on Mr. Ward's testimony on secondary considerations of nonobviousness | **DENIED** |
| Dell<br>No. 9<br>[1308] | FRE408 does not preclude Dell's reliance on Lucent's licensing documents | **DENIED** |
| Dell<br>No. 10<br>[1309] | Dell should be permitted to introduce evidence regarding the extent and number of Lucent's other patent claims against Dell's products | **GRANTED** to the extent that at the hypothetical negotiation the parties would know and consider other patents that would might be licensed together; however, no mention may be made of the trials or the verdicts thereon. |

5

**Exhibit 1  Page 12**

| Dell No. 11 [1310] | Preclude Lucent from referencing Dell's lack of an opinion of counsel | **DENIED**; The lack of an opinion of counsel is admissible but no adverse inference may be drawn therefrom |
|---|---|---|
| Dell No. 12 [1311] | Exclude the expert testimony of Roger Smith on the '295 patent | **DENIED** |
| Dell No. 13 [1312] | Exclude expert testimony of Roger Smith on the '356 patent | **DENIED** |
| Dell No. 15 [1314] | Preclude Lucent's damages expert Roger Smith from asserting that Dell benefits from convoyed sales | **GRANTED** |
| Dell No. 16 [1316] | Preclude Lucent from introducing any evidence or argument that the alleged infringement of the Day Patent (the '356 patent) is willful | **DENIED** |
| Dell No. 17 [1318] | Exclude untimely opinions of Lucent's expert Jean Renard Ward regarding the '295 patent | **GRANTED** |
| Dell No. 18 [1320]  Gateway No. 1 [1272] | Exclude damages testimony on quicken and money because of Wayne Hoeberlein's untimely second supplemental expert report  Preclude Lucent from Providing Any Testimony or Argument at Trial Regarding Damages Based on Gateway's Sales of Quicken and Money Due to the Untimely Disclosure of Wayne A. Hoeberlein's Second Supplemental Expert Report | **DENIED;** however, any supplemental reports submitted after the close of expert discovery are admissible only for the portions that incorporate the tardy production of documents from Dell and Gateway. |
| Dell No. 19 [1321] | Preclude Lucent from accusing computer systems that do not include a touch sensitive screen of infringing claim 21 of the Day patent (the '356 patent) | **GRANTED** |

6

**Exhibit 1  Page 13**

| Gateway[3] No. 2 [1273] | Exclude Testimony, Evidence or Argument that Quicken New User Edition and Microsoft Money Should Be Included in the Royalty Base for the Day Patent (the '356 patent) | **DENIED** |
|---|---|---|
| Gateway No. 4 [1361] | Preclude Lucent from presenting Roger Smith's testimony regarding IBM and industry royalty rates | **DENIED** |
| Gateway No. 5 [1275] | Exclude Roger S. Smith's Testimony Regarding Damages for Gateway's Alleged Infringement of the Day Patent (the '356 patent) | **DENIED** |
| Gateway No. 7 [1277] | Preclude Lucent from Presenting Evidence or Argument Regarding Willful Infringement of the '295 patent | **GRANTED** |
| Gateway No. 8 [1278] | Precluded from Presenting Evidence or Argument Regarding Gateway's Alleged Willful Infringement of the '356 patent | **DENIED** |
| Gateway No. 9 [1279] | Exclude Any and All Evidence and Arguments Related to Litigation Misconduct During the Liability Phase of these Proceedings | **GRANTED;** this issue will not be presented in the jury-phase of the trial. |
| Gateway No. 10 [1280] | Lucent Should be Precluded from Arguing at Trial Infringement of the '295 Patent by Palm or Pocket PC Devices Based Upon a Rear-Mounted Digitizer | **GRANTED** |

---

[3] Dell has joined Gateway's motions nos. 1-5 and 9-10 [docket no. 1331]; Microsoft has joined motion nos. 1-5, 7, 8, and 10 [docket no. 1298].

7

**Exhibit 1  Page 14**

| Lucent No. 1 [1315] | Preclude Evidence, Testimony or Argument Concerning Lucent's Assertion and the Court's Dismissal of Certain Claims Against the Defendants Alleging Infringement of the '956, '356, '295 and '131 patents | **GRANTED-IN-PART**; **DENIED-IN-PART** as to damages calculations only. |
|---|---|---|
| Lucent No. 2 [1317] | Defendants from Presenting any Undisclosed Evidence Regarding Software Distribution Abroad and Argument that the Facts Disclosed are Different than <u>Elos v. Microsoft</u> and <u>AT&T v. Microsoft</u> | **GRANTED**; Microsoft is limited to its verified response. |
| Lucent No. 3 [1379] | Preclude Microsoft from eliciting expert testimony concerning purported surveys | **GRANTED** |
| Lucent No. 4 [1380] | Preclude expert testimony of David Kaplan that Dell and Gateway are not liable for damages | **GRANTED-IN-PART**; Kaplan cannot testify that Dell/Gateway are not liable but he can testify as to whether Dell and Gateway would have relied on Microsoft to make a license with Lucent or whether Microsoft would have indemnified as considerations in a hypothetical negotiation. |
| Lucent No. 5 [1319] | Exclude Evidence or Argument Regarding Unrelated Legal Matters | **GRANTED**; Use of prior transcripts/admissions without mentioning the prior case is permissible. |
| Lucent No. 6 [1381] | Preclude expert testimony regarding allegations of non-infringing alternatives | **GRANTED** as to testimony by Mr. Napper. |
| Lucent No. 7 [1322] | Preclude Defendants from Presenting Evidence and Argument Regarding Past and Future Trials | **GRANTED-IN-PART**; testimony, transcripts, and admissions may be used without mention of the trials. |
| Lucent No. 8 [1382] | Preclude defendants from presenting evidence and argument regarding settlement negotiations | **GRANTED** |

8

**Exhibit 1  Page 15**

| Lucent No. 9 [1323] | Exclude Evidence or Argument Regarding Lucent's Market Capitalization, Licensing Revenues and "Valuation" | **GRANTED**; however, revenue/sales of relevant products for the Georgia-Pacific factors are admissible. |
|---|---|---|
| Lucent No. 10 [1396] | Preclude Defendants from Presenting Evidence or Argument Regarding a Reference First Produced on March 29, 2007 | **GRANTED** |
| | | |

**IT IS SO ORDERED**

DATED:  April 30, 2007

Hon. Rudi M. Brewster
United States Senior District Court Judge

cc:  Hon. Cathy Ann Bencivengo
      United States Magistrate Judge

      All Counsel of Record

9

**Exhibit 1  Page 16**

Exhibit 2

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   LUCENT TECHNOLOGIES, INC. and              CASE NO. 07-CV-2000-H (CAB)
     MULTIMEDIA PATENT TRUST                     consisting of matters severed from
12                                               consolidated cases:
             Plaintiffs and Counter-             CASE NO. 02-CV-2060-B (CAB)
13           Defendants,                         CASE NO. 03-CV-0699-B (CAB)
                                                 CASE NO. 03-CV-1108-B (CAB)
14           vs.
                                                 **CASE MANAGEMENT**
15   GATEWAY, INC., *et al*.                     **ORDER**

16           Defendants and Counterclaimants.

17   and

18   MICROSOFT CORPORATION,

19           Intervenor and Counterclaimant

20   AND RELATED CLAIMS

21

22
             On October 16, 2007, Judge Brewster signed an order severing certain matters
23
     from cases 02-CV-2060-B (CAB), 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB),
24
     thus creating this case.  (Doc. No. 1.)  The case was then randomly drawn to Judge
25
     Houston.  On October 17, 2007, the case was reassigned to Judge Huff pursuant to the
26
     low number rule, Local Rule 40.1.
27
     ///
28
     ///

                                    - 1 -                          02cv2060

                             **Exhibit 2  Page 17**

1   <u>Prior Dates Remain Set</u>

2        Accordingly, the Court **ORDERS that all prior dates set before Judge Huff**

3   **in 02-CV-2060-B (CAB) remain as set** unless otherwise ordered, including but not

4   limited to dates for any hearing, pre-trial conference, or trial.  (<u>See, e.g.</u>, 02-CV-2060,

5   Doc. Nos. 1876, 2054.)  In particular, the Court reminds the parties that the hearing on

6   motions for partial summary judgment of no willful infringement **remains set for**

7   **<u>October 19, 2007 at 1:30 PM</u>** or as soon thereafter as the Court can call the case.

8

9   <u>Adoption of Previous Orders</u>

10       The Court **ADOPTS** all orders from 02-CV-2060-B (CAB) to the extent they

11  apply to the severed matters.

12

13  <u>Filing Procedures</u>

14       Regarding filing procedures, the Court **ORDERS** that the **parties promptly file**

15  in this case **copies of the pending motions for partial summary judgment of no**

16  **willful infringement** that were effectively severed by Judge Brewster's order **and any**

17  **related documents supporting or opposing the motion,** provided, however, that the

18  parties **need not resubmit sealed filings**.  (<u>See</u> Doc. No. 1 (listing pending motions).)

19  Where the parties filed both redacted and sealed versions, they may file only the

20  redacted version in the docket for this case.  The parties **may refer to the prior docket**

21  **to the extent relevant to the severed matters**.  Thus, the parties **need not refile other**

22  **documents previously filed in 02-CV-2060-B** except as ordered by the Court.  For all

23  future filings, the parties should **file documents related to the severed matters only**

24  **in 07-CV-2000-H** unless otherwise ordered.  The parties **should not file documents**

25  **in 07-CV-2000-H if they do not related to severed matters**.  This may include filings

26  related to bills of costs, pending appeals, or other matters that Judge Brewster's ordered

27  retained for 02-CV-2060-B.

28

Motions in Limine:

     Microsoft previously filed a motion in limine to preclude evidence regarding foreign sales and contributory infringement. (02-CV-2060 Doc. No. 1288.) The Court deferred this motion in light of a then pending Supreme Court decision. (02-CV-2060 Doc. No. 1737.) The Court sets the following schedule for motions in limine:

•    The parties shall file any motions in limine on or before **January 14, 2008**. If it wishes to continue with its pending motion, Microsoft shall submit a revised memorandum of points and authorities at that time.

•    Opposition briefs to motions in limine are due on or before **January 28, 2008**

•    Reply briefs, if any, are due on or before **February 4, 2008**.

•    The Court shall hold a hearing on motions in limine on **February 11, 2008 at 10:30 AM** or as soon thereafter as the Court can call the case.

Pre-Trial Status Conference:

     In addition to any dates set, the Court sets a pre-trial status conference for **Feburary 19, 2008 at 10:30 AM** or as soon thereafter as the Court can call the case. At an appropriate time before trial, the Court will also issue orders concerning time limits, deadlines for jury questionnaires, or other trial logistics.

Pending Requests to File Documents Under Seal:

     There are two pending requests to file documents under seal. Although filed in 02-CV-2060-B (CAB), these requests pertain to the summary judgment hearing on willful infringement and thus were effectively severed to become part of this case. (See 02-CV-2060 Doc. No. 2136, 2138-2.) The Court **GRANTS** these requests as they now relate to 07-CV-2000-H (CAB) .

     Accordingly, Gateway may file the following under seal in this case:

•    Exhibit 4, excerpts from the deposition of Stephen Samuels, taken on March 3, 2006.

     Microsoft may file the following under seal in this case:

**Exhibit 2  Page 19**

1    •    Reply in Support of Microsoft's Motion for Partial Summary Judgment of No

2        Willful Infringement of The Asserted Claims of U.S. Patent NOS. 4,958,226;

3        4,383,272; 5,347,295; and 4,763,356.

4    •    Exhibit 1, a true and correct copy of excerpts from the deposition transcript of

5        Kenneth Rubenstein, Ph.D. taken May 4, 2006.

6    •    Exhibit 3, a true and correct copy of the First Supplemental Rebuttal Expert

7        Report of Edward J. Delp, III dated June 5, 2006.

8    •    Exhibit 4, a true and correct copy of the Expert Report of Edward J. Delp, III

9        dated March 31, 2006.

10

11   Equipment Requests

12        Dell's counsel submitted a motion to bring two laptops into the Courtroom for the

13   October 19, 2007 hearing at 1:30 PM. (02-CV-2060 Doc. No. 2130.) As previously

14   ordered, parties **do not need to file written motions to request permission to bring**

15   **equipment into Judge Huff's courtroom**, and may simply contact chambers by phone

16   in a timely fashion. (See 02-CV-2060 Doc. No. 2128.) The Court **GRANTS** this

17   request, but encourages the parties not to file written motions in the future. Counsel

18   wishing to bring equipment should call chambers at least **two court days** before the

19   hearing and ask to speak to Judge Huff's assistant who will then make appropriate

20   arrangements for access to the Courtroom. The parties should use reasonable judgment,

21   however, and contact chambers sooner if the request is likely to require significant

22   alteration of the courtroom setup.

23        **IT IS SO ORDERED.**

24   DATED:  October 18, 2007

25

26        MARILYN L. HUFF, District Judge
         UNITED STATES DISTRICT COURT

27

28   COPIES TO:
     All parties of record.

                                    - 4 -                                    02cv2060

                              **Exhibit 2  Page 20**

Exhibit 3

1   Jane Hahn, SBN 125203
    Alison P. Adema, SBN 149285
2   HAHN & ADEMA
    501 West Broadway, Suite 1730
3   San Diego, California 92101-3595
    Telephone: (619) 235-2100
4   Facsimile: (619) 235-2101

5   Attorneys for *Lucent Technologies Inc.*

6   *Additional counsel listed on the last page*

7

8                    UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11  LUCENT TECHNOLOGIES INC.,

12                    Plaintiff,                    Case No. 02-CV-2060-B (CAB)
                                                    consolidated with
13               v.                                 Case No. 03-CV-0699-B (CAB)
                                                    Case No. 03-CV-1108-B (CAB)
14  GATEWAY, INC., GATEWAY COUNTRY
    STORES LLC, GATEWAY COMPANIES,
15  INC., GATEWAY MANUFACTURING LLC
    and COWABUNGA ENTERPRISES, INC.,               **LUCENT'S RESPONSE TO THE**
16                                                  **THIRD SET OF**
                      Defendants,                   **INTERROGATORIES FROM**
17               and                                **GATEWAY, INC. TO LUCENT**
                                                    **TECHNOLOGIES INC. (NOS. 6-17)**
18  MICROSOFT CORPORATION,

19                    Intervener.

20  MICROSOFT CORPORATION,

21                    Plaintiff,

22               v.

23  LUCENT TECHNOLOGIES INC.,

24                    Defendant.

25  LUCENT TECHNOLOGIES INC.,

26                    Plaintiff,

27               v.

28  DELL INC.,

                      Defendant.

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES                    Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)          03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 21**

1         Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Lucent makes the following

2   objections and responses to the Third Set of Interrogatories From Gateway, Inc. to Lucent

3   Technologies Inc. (Nos. 6-17).  Lucent reserves the right to supplement or amend these objections

4   and responses to the extent allowed by the Federal Rules of Civil Procedure and the Local Rules of

5   this Court.

6   <div align="center">**GENERAL OBJECTIONS**</div>

7         Lucent incorporates by reference, to the extent applicable, its general objections to the First

8   Set of Interrogatories from Microsoft, Dell, and Gateway, which apply to each interrogatory

9   regardless of whether the general objections are specifically incorporated into the specific objections

10  and responses below.

11  <div align="center">**SPECIFIC OBJECTIONS AND RESPONSES**</div>

12  **INTERROGATORY NO. 6:**

13        For each of the patents-in-suit identify when, how, and under what circumstances Lucent first

14  provided Gateway with actual notice of infringement in accordance with 35 U.S.C. 287(a), including

15  an identification of all documents and individuals that Lucent will rely upon to prove these facts.

16  **RESPONSE TO INTERROGATORY NO. 6:**

17        Lucent objects to this interrogatory as being compound and containing multiple subparts that

18  should count toward the total number of interrogatories allowed by this Court's scheduling order and

19  the parties' Joint Discovery Plan.  Lucent further objects to this interrogatory to the extent it seeks

20  information protected by the attorney-client privilege, the work-product doctrine, and any other

21  applicable privilege or immunity.  Lucent further objects to this interrogatory as overbroad and

22  unduly burdensome.  More specifically, Gateway and Lucent engaged in many communications over

23  a period of years relating to the licensing of Lucent patents and Gateway's infringement of these

24  patents.  Gateway and Lucent were both parties to these discussions and Gateway has equal

25  knowledge of the communications between the parties.  Lucent specifically objects to this

26  interrogatory as overly broad and unduly burdensome to the extent it seeks a recitation of the many

27  communications in which both parties engaged, the identification of "all documents and individuals"

28  that relate to such communications.  Lucent also objects to this interrogatory as premature as it seeks

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES        2        Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)        03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 22**

1  contentions before the completion of fact discovery and Lucent reserves its right to modify,

2  supplement or otherwise update its response after appropriate discovery has been completed.

3       Subject to and without waiving these specific and its General Objections, Lucent responds

4  that Gateway received actual notice of infringement of each of the patents-in-suit as outlined below.

5       With respect to the Netravali '272 patent, Lucent provided Gateway with notice of its

6  infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters

7  between, among others, Joseph Braski, James Tierney, David Rosenblatt and David Padnes for

8  Lucent and George Clark, Mark Borgman and Michael Grubbs for Gateway.  Lucent confirmed its

9  assertions to Gateway in a letter dated May 7, 1998 from Tierney to Clark.  (LUC 1000208-211)

10  The assertions in the above meeting and letter qualify as actual notice because they identified the

11  patent, communicated Lucent's assertion that Gateway computer products infringed this patent, and

12  proposed negotiations toward a license to abate Gateway's infringement.

13       With respect to the Haskell '226 patent, Lucent provided Gateway with notice of its

14  infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters

15  between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and

16  Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from

17  Tierney to Clark.  (LUC 1000208-211)  The assertions in the above meeting and letter qualify as

18  actual notice because they identified the patent, communicated Lucent's assertion that Gateway

19  computer products infringed this patent, and proposed negotiations toward a license to abate

20  Gateway's infringement.

21       With respect to the Jayant '676 patent, Lucent provided Gateway with notice of its

22  infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters

23  between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and

24  Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from

25  Tierney to Clark.  (LUC 1000208-211)  The assertions in the above meeting and letter qualify as

26  actual notice because they identified the patent, communicated Lucent's assertion that Gateway

27  computer products infringed this patent, and proposed negotiations toward a license to abate

28  Gateway's infringement.

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          3          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                   03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 23**

1    With respect to the Atal '954 patent, Lucent provided Gateway with notice of its infringement

2  by at least as early as July 17, 2001 in correspondence from Samuels to, among others, Mark Walker

3  (LUC 18694, 1000229, 1053144).  The assertions in such correspondence qualify as actual notice

4  because they identified the patent, communicated Lucent's assertion that Gateway computer

5  products infringed this patent, and proposed negotiations toward a license to abate Gateway's

6  infringement.

7    With respect to the Ketchum '781 patent, Lucent provided Gateway with notice of its

8  infringement by at least as early as July 17, 2001 in correspondence from Samuels to, among others,

9  Walker (LUC 18694, 1000229, 1053144).  The assertions in such correspondence qualify as actual

10  notice because they identified the patent, communicated Lucent's assertion that Gateway computer

11  products infringed this patent, and proposed negotiations toward a license to abate Gateway's

12  infringement.

13    With respect to the Torok '956 patent, Lucent provided Gateway with notice of its

14  infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters

15  between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and

16  Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from

17  Tierney to Clark.  (LUC 1000208-211)  The assertions in the above meeting and letter qualify as

18  actual notice because they identified the patent, communicated Lucent's assertion that Gateway

19  computer products infringed this patent, and proposed negotiations toward a license to abate

20  Gateway's infringement.

21    With respect to the Agulnick '295 patent, Lucent informed Gateway on July 14, 2003 via

22  letter from Maxine Graham to Steven Daniels that Lucent was adding allegations of infringement to

23  the action filed on June 20, 2002.  This notice to amend the complaint serves as notice of Gateway's

24  infringement pursuant to 35 U.S.C. section 287.

25    With respect to the Day '356 patent, Lucent provided Gateway with notice of its infringement

26  by at least as early as August 7, 2001 during a telephone conference including, among others,

27  Samuels and Indyk from Lucent and Walker and Richard Gilly for Gateway.  The assertions in that

28  conference qualify as actual notice because they identified the patent, communicated Lucent's

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          4          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                 03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 3  Page 24

1  assertion that Gateway computer products infringed this patent, and proposed negotiations toward a

2  license to abate Gateway's infringement.

3       With respect to the Doughty '956 patent, Lucent provided Gateway with notice of its

4  infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters

5  between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and

6  Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from

7  Tierney to Clark.  (LUC 1000208-211)  The assertions in the above meeting and letter qualify as

8  actual notice because they identified the patent, communicated Lucent's assertion that Gateway

9  computer products infringed this patent, and proposed negotiations toward a license to abate

10  Gateway's infringement.

11       With respect to the Fleming '759 patent, Lucent provided Gateway with notice of its

12  infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters

13  between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and

14  Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from

15  Tierney to Clark.  (LUC 1000208-211)  The assertions in the above meeting and letter qualify as

16  actual notice because they identified the patent, communicated Lucent's assertion that Gateway

17  computer products infringed this patent, and proposed negotiations toward a license to abate

18  Gateway's infringement.

19       The individuals referenced above including James Tierney, Joseph Braski, Stephen Samuels,

20  David Rosenblatt, David Padnes, Eugene Indyk, George Clark, Michael Grubbs, Mark Borgman,

21  Mark Walker, and Richard Gilly have information regarding Lucent's notice of infringement

22  provided to Gateway.  While there are many documents that may be relevant to Gateway's receipt of

23  notice (all of which Lucent will not identify here), Lucent directs Gateway to the following

24  document production ranges: LUC 018694, LUC 031552, LUC 032039, LUC 032042, LUC 047538,

25  LUC 1000208-209, LUC 1000214-215, LUC 1000225, LUC 1000229, LUC 1000467-469, LUC

26  1000493-494, LUC 1053144, GW-LT 121664, GW-LT 121671-672.

27

28

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES    5    Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)    03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 3  Page 25

1    **INTERROGATORY NO. 7:**

2          For each of the Patents-in Suit, identify those products sold in the United States by Lucent

3    prior to June 6, 2002, that practice the claims of the patent, the timeframe for when each of these

4    products was sold, and a description of whether all of these products were marked with the patent

5    number.

6    **RESPONSE TO INTERROGATORY NO. 7:**

7          Lucent objects to this interrogatory as being compound and containing multiple subparts that

8    should count toward the total number of interrogatories allowed by this Court's scheduling order and

9    the parties' Joint Discovery Plan.  Lucent further objects to this interrogatory to the extent it seeks

10   information protected by the attorney-client privilege, the work-product doctrine, and any other

11   applicable privilege or immunity.  Lucent further objects to this interrogatory as overbroad and

12   unduly burdensome.  Lucent further objects to the extent that such discovery is subject to the prior

13   directions of Magistrate Bencivengo.  On the December 19, 2005 telephone conference, Magistrate

14   Bencivengo preliminarily indicated that she would not permit generalized discovery relating to

15   Lucent products embodying the patents-in-suit.  On the January 6, 2006 telephone conference,

16   Magistrate Bencivengo indicated that Lucent should provide a list of Lucent products that are known

17   to be compliant with certain standards, that, if practiced, Lucent asserts would necessarily result in

18   the infringement of any patent-in-suit.  Lucent will provide that list and any other discovery that the

19   Magistrate deems to be appropriate in this litigation.  Lucent further objects to the extent the request

20   calls for information not already in the possession, custody, or control of Lucent.  Lucent further

21   objects to this request as overly broad, unduly burdensome and not reasonably calculated to lead to

22   the discovery of admissible evidence, to the extent that Lucent has previously agreed that it will not

23   rely upon marking to establish constructive notice of its patents in this litigation.

24   **INTERROGATORY NO. 8:**

25          For each U.S. Patent No. 4,317,956 (Torok); 4,617,676 (Jayant); 4,910,781 (Ketchum); and

26   4,701,954 (Atal) describe with particularity whether Lucent is seeking both a royalty from Microsoft

27   for each sale of an allegedly infringing product to Gateway and a separate royalty from Gateway for

28   each allegedly infringing resale of the same product to Gateway's customers and, if so, the factual

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          6          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 26**

1  and legal bases for Lucent's position that it is entitled to receive a royalty from both Microsoft and

2  Gateway for these two sales of the same accused product.

3  **RESPONSE TO INTERROGATORY NO. 8:**

4        Lucent objects to this interrogatory as being compound and containing multiple subparts that

5  should count toward the total number of interrogatories allowed by this Court's scheduling order and

6  the parties' Joint Discovery Plan. Lucent further objects to this interrogatory to the extent it seeks

7  information protected by the attorney-client privilege, the work-product doctrine, and any other

8  applicable privilege or immunity. Lucent further objects to this interrogatory as overbroad and

9  unduly burdensome. Lucent further objects to the interrogatory as vague and ambiguous with

10  respect to "with particularity," "each allegedly infringing resale of the same product" and "two sales

11  of the same accused product." Lucent further objects to this interrogatory to the extent it seeks

12  expert opinions or conclusions before the close of fact discovery and/or the dates established for the

13  service of expert reports. Subject to and without waiving these specific and its General Objections,

14  Lucent responds that it will not seek to recover two royalty payments for the sale or distribution of

15  the same accused product.

16  **INTERROGATORY NO. 9:**

17        Describe with particularity all factual and legal bases upon which Lucent relies to show that

18  it is entitled to an injunction against Gateway for products accused of infringing U.S. Pat. No.

19  4,958,226 (Haskell) even though Lucent represented to the ISO's Information Technology Task

20  Force (ITTF) that it would grant a license on reasonable and non-discriminatory terms for the

21  practice of the standards ISO/IEC 11172 and 13818.

22  **RESPONSE TO INTERROGATORY NO. 9:**

23        Lucent objects to this interrogatory as being compound and containing multiple subparts that

24  should count toward the total number of interrogatories allowed by this Court's scheduling order and

25  the parties' Joint Discovery Plan. Lucent further objects to this interrogatory to the extent it seeks

26  information protected by the attorney-client privilege, the work-product doctrine, and any other

27  applicable privilege or immunity. Lucent further objects to this interrogatory as overbroad and

28  unduly burdensome to the extent it purports to require a description of "all factual and legal bases."

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          7          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                    03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 27**

1   Lucent further objects to this interrogatory as vague and ambiguous as to the phrase "describe with

2   particularity." Lucent further objects to this interrogatory to the extent it mischaracterizes statements

3   made by Lucent or its predecessor AT&T to the ISO/IEC. Copies of representations AT&T made to

4   the ISO/IEC relating to the ISO/IEC standards 11172 and 13818 may be found, for example, at LUC

5   1136842 and LUC 1042300. Lucent further objects to this interrogatory to the extent it

6   mischaracterizes the relevant case law. Lucent further objects to this interrogatory as premature as it

7   seeks contentions before the completion of fact discovery and Lucent reserves its right to modify,

8   supplement or otherwise update its response after appropriate discovery has been completed.

9       Subject to and without waiving these specific and its General Objections, Lucent responds as

10  follows:

11      Lucent incorporates by reference its responses to Interrogatories from Microsoft, Dell, and

12  Gateway, to Lucent Technologies, Inc. (Nos. 2-3), for the factual and legal bases that Gateway has

13  infringed this patent. The grant of "injunctive relief against an infringer is the norm" in patent cases.

14  *KSM Fastening Sys., Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1524 (Fed. Cir. 1985). The Federal

15  Circuit has held "that an injunction should issue once infringement has been established unless there

16  is a sufficient reason for denying it." *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275,

17  1281 (Fed. Cir. 1988). It is Gateway's burden to establish a "sufficient reason for denying" an

18  injunction. *See id.*

19      Copies of representations AT&T made to the ISO/IEC relating to the ISO/IEC standards

20  11172 and 13818 may be found, for example, at LUC 1136842 and LUC 1042300. Further, a copy

21  of representations AT&T made to the ITU relating to the H.262 standard may be found, for example,

22  at LUC 1030214-15. Lucent has fulfilled the commitments AT&T made to the ISO/IEC by offering

23  Gateway a license to the Haskell patent and negotiating in good-faith for a period of years to come to

24  a licensing agreement, but Gateway refused to take a license. Lucent contends that it would be

25  inequitable to allow Gateway to continue infringing when it refuses to take a license.

26      Furthermore, the only legal support cited by Gateway in response to Lucent's Interrogatory

27  No. 9 is incorporated by reference from Microsoft's responses to Lucent's Interrogatory No. 9 and

28  provides no support for denying a permanent injunction. Both of the cases cited by Microsoft, and

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES                    8                    Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                                     03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 28**

1    incorporated by reference by Gateway, address the issue of whether a stay of a permanent injunction

2    should be granted pending an appeal.  *See E.I. DuPont de Nemours & Co., v. Phillips Petroleum Co.*,

3    835 F.2d 177, 278 (Fed. Cir. 1987); *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 897 F.2d

4    511, 512 (Fed. Cir. 1990).  Accordingly, these cases do not support denying a permanent injunction.

5    To the contrary, in both cases a permanent injunction had in fact been granted and the only issue

6    being addressed was whether or not that injunction should be stayed pending appeal.

7    **INTERROGATORY NO. 10:**

8        For the 5,347,295 (Agulnick) and 4,763,356 (Day) patents, identify all products evaluated or

9    analyzed by Lucent regarding alleged infringement of the patent-in-suit up until the present,

10   including, where applicable, the version number of any software or operating system evaluated or

11   analyzed.

12   **RESPONSE TO INTERROGATORY NO. 10:**

13       Lucent objects to this interrogatory to the extent that it seeks information protected by the

14   attorney-client privilege, the work-product doctrine or any other applicable privilege or immunity.

15       Subject to its general and specific objections, Lucent responds that, all evaluation and

16   analysis by Lucent regarding the alleged infringement of the patents-in-suit up until the present,

17   including the identification of the specific products and version numbers evaluated and analyzed, is

18   protected by the attorney-client privilege and the work-product doctrine.  Accordingly, such

19   information will not be disclosed.

20   **INTERROGATORY NO. 11:**

21       For each of the patents-in-suit, identify all parties whom Lucent has licensed to practice the

22   asserted patent, and when such parties became licensed.

23   **RESPONSE TO INTERROGATORY NO. 11:**

24       Lucent objects to this interrogatory as being compound and containing multiple subparts that

25   should count toward the total number of interrogatories allowed by this Court's scheduling order and

26   the parties' Joint Discovery Plan.  Lucent further objects to this interrogatory to the extent it seeks

27   information protected by the attorney-client privilege, the work-product doctrine, and any other

28   applicable privilege or immunity.  Lucent further objects to this interrogatory as vague and

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          9          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)          03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 29**

1  ambiguous as to the phrases "licensed to practice." Lucent further objects to this interrogatory as

2  overbroad and unduly burdensome to the extent it purports to require an identification of any license

3  that could be possessed by any party to any patent-in-suit by virtue of any mechanism whatsoever.

4       Subject to and without waiving these specific and its General Objections, Lucent responds, in

5  accordance with Federal Rule of Civil Procedure 33(d), that Lucent patent license agreements that

6  specifically reference patents-in-suit can be found at production numbers: LUC 1046732-1046746;

7  LUC 1046816-1046828; LUC 1062036-1062049; LUC 1062299-1062313; LUC 1062326-1062339;

8  LUC 1062270-1062284; LUC 1062285-1062298; LUC 1062252-1062269; LUC 1062218-1062233;

9  LUC 1062234-1062251; LUC 1061983-1061997; LUC 1062202-1062217; LUC 1062186-1062201;

10  LUC 1062170-1062185; LUC 1062153-1062169; LUC 1122293-1122307; LUC 1068668-1068685;

11  LUC 1062121-1062137; LUC 1062107-1062120; LUC 1062094-1062106; LUC 1062080-1062093;

12  LUC 1062065-1062079; LUC 1061965-1061978; LUC 1061945-1061962; LUC 1061979-1061982;

13  LUC 1062022-1062035; LUC 1062340-1062343; LUC 1068371-1068385; LUC 1003271-1003285;

14  LUC 1068460-1068481; LUC 11127464-1127481; LUC 1278670-1278682; LUC 1065335-

15  1065351; LUC 1279698-1279713; LUC 1065352-1065366; LUC 024761-024772; LUC 1005448-

16  1005457; LUC 1065425-1065437; LUC 1065411-1065424; LUC 1065441-1065454; LUC 1065513-

17  1065528; LUC 1065397-1065410; LUC 1113695-1113713; LUC 1068686-1068700; LUC 1282626-

18  1282639; and LUC 1282640-1282661.

19  **INTERROGATORY NO. 12:**

20       Identify all discussions and communications with Intuit, Inc., including its predecessors and

21  related companies, from 1996 to the present regarding the licensing or potential licensing of any

22  Lucent patents, including an identification of the date of such discussions, the patents involved, the

23  persons involved in the discussions, and the outcome of the discussions.

24  **RESPONSE TO INTERROGATORY NO. 12:**

25       Lucent objects to this interrogatory as being compound and containing multiple subparts that

26  should count toward the total number of interrogatories allowed by this Court's scheduling order and

27  the parties' Joint Discovery Plan. Lucent further objects to this interrogatory to the extent it seeks

28  information protected by the attorney-client privilege, the work-product doctrine, and any other

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES    10    Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)    03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 30**

1  applicable privilege or immunity. Lucent further objects to this interrogatory as overbroad and

2  unduly burdensome. Lucent particularly objects to the extent the interrogatory seeks identification

3  of "all" discussions and communications relating to "any" Lucent patents. Lucent further objections

4  to this interrogatory as vague and ambiguous with respect to "outcome." Lucent further objects to

5  this interrogatory as irrelevant to the extent it seeks identification of discussions and

6  communications occurring after the filing of the present lawsuit and to the extent that any

7  discussions and communications are ongoing.

8         Subject to its general and specific objections, and based upon a reasonable inquiry to date,

9  Lucent responds as follows: from 1996 to the filing of the present lawsuit, there were no substantive

10 discussions or communications between Lucent and Intuit, Inc. regarding the licensing or potential

11 licensing of any Lucent patents.

12 **INTERROGATORY NO. 13:**

13        Identify all discussions and communications with Palm, Inc., including its predecessors and

14 related companies, from 1996 to the present regarding the licensing or potential licensing of any

15 Lucent patents, including an identification of the date of such discussions, the patents involved, the

16 persons involved in the discussions, and the outcome of the discussions.

17 **RESPONSE TO INTERROGATORY NO. 13:**

18        Lucent objects to this interrogatory as being compound and containing multiple subparts that

19 should count toward the total number of interrogatories allowed by this Court's scheduling order and

20 the parties' Joint Discovery Plan. Lucent further objects to this interrogatory to the extent it seeks

21 information protected by the attorney-client privilege, the work-product doctrine, and any other

22 applicable privilege or immunity. Lucent further objects to this interrogatory as overbroad and

23 unduly burdensome. Lucent particularly objects to the extent the interrogatory seeks identification

24 of "all" discussions and communications relating to "any" Lucent patents. Lucent further objections

25 to this interrogatory as vague and ambiguous with respect to "outcome." Lucent further objects to

26 this interrogatory as irrelevant to the extent it seeks identification of discussions and

27 communications occurring after the filing of the present lawsuit and to the extent that any

28 discussions and communications are ongoing.

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          11          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                    03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 31**

1    Subject to and without waiving these specific and its General Objections, Lucent responds, in

2  accordance with Federal Rule of Civil Procedure 33(d), with the identification of the following

3  documents: LUC 1046670-1046701; LUC 1055848-1055852; LUC 1055853-1055872; LUC

4  1055874-1055875; LUC 1055876-LUC 1055878; LUC 1055879; LUC 1055880-1055883; LUC

5  1055884-1055915; LUC 1056052-1056099; LUC 1056100-1056102; LUC 1072727-1072758; LUC

6  1072774-1072805; LUC 1075229-1075232; LUC 1075233-1075235; LUC 1075236-1075237; LUC

7  1075238-1075239; LUC 1075240-1075247; LUC 1075248-1075249; LUC 1076192-1076220; LUC

8  1076254; LUC 1076255-1076258; LUC 1076259-1076260; LUC 1076261; LUC 1076262; LUC

9  1076263; LUC 1076264-1076269; LUC 1076270-1076274; LUC 1076275-1076279; LUC 1076280-

10  1076284; LUC 1076285-1076289; LUC 1076290-1076293; LUC 1076294-1076297; LUC 1076298-

11  1076301; LUC 1076302-1076305; LUC 1076306-1076309; LUC 1076310-1076312; LUC 1076313-

12  1076315; LUC 1076316-1076318; LUC 1076319; LUC 1076320; LUC 1076321-1076324; LUC

13  1076325-1076326; LUC 1126382-1126385; LUC 1126386-1126388; LUC 1126389-1126390; LUC

14  1126393; and LUC 1281840-1281841.

15  **INTERROGATORY NO. 14:**

16    Identify all discussions and communications with PalmSource, Inc., including its

17  predecessors and related companies, from 1996 to the present regarding the licensing or potential

18  licensing of any Lucent patents, including an identification of the date of such discussions, the

19  patents involved, the persons involved in the discussions, and the outcome of the discussions.

20  **RESPONSE TO INTERROGATORY NO. 14:**

21    Lucent objects to this interrogatory as being compound and containing multiple subparts that

22  should count toward the total number of interrogatories allowed by this Court's scheduling order and

23  the parties' Joint Discovery Plan.  Lucent further objects to this interrogatory to the extent it seeks

24  information protected by the attorney-client privilege, the work-product doctrine, and any other

25  applicable privilege or immunity.  Lucent further objects to this interrogatory as overbroad and

26  unduly burdensome.  Lucent particularly objects to the extent the interrogatory seeks identification

27  of "all" discussions and communications relating to "any" Lucent patents.  Lucent further objections

28  to this interrogatory as vague and ambiguous with respect to "outcome."  Lucent further objects to

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES       12       Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)              03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 32**

1    this interrogatory as overbroad, unduly burdensome, not reasonably calculated to lead to the

2    discovery of admissible evidence and irrelevant to the extent it seeks identification of discussions

3    and communications occurring after the filing of the present lawsuit and to the extent that any

4    discussions and communications are on-going.  Subject to Lucent's general and specific objections,

5    Lucent responds to this interrogatory by incorporating Lucent's response to Interrogatory No. 13.

6    **INTERROGATORY NO. 15:**

7            For each of the patents-in-suit, identify the value ascribed to the patent by Lucent or AT&T

8    upon transfer of the patent to Lucent and identify any documents that discuss or relate to this

9    valuation.

10   **RESPONSE TO INTERROGATORY NO. 15:**

11           Lucent objects to this interrogatory as being compound and containing multiple subparts that

12   should count toward the total number of interrogatories allowed by this Court's scheduling order and

13   the parties' Joint Discovery Plan.  Lucent further objects to this interrogatory to the extent it seeks

14   information protected by the attorney-client privilege, the work-product doctrine, and any other

15   applicable privilege or immunity.  Lucent further objects to this interrogatory as overbroad and

16   unduly burdensome.  Lucent further objects to the extent the request calls for information not already

17   in the possession, custody, or control of Lucent.

18           Subject to and without waiving these specific and its General Objections, Lucent responds

19   that it is unaware of any valuation performed that attributes value to any particular patent-in-suit.

20   **INTERROGATORY NO. 16:**

21           Identify the value ascribed by AT&T to patents that were originally assigned to Go

22   Corporation and that were subsequently acquired by AT&T and identify any documents that discuss

23   or relate to this valuation.

24   **RESPONSE TO INTERROGATORY NO. 16:**

25           Lucent objects to this interrogatory to the extent it seeks information protected by the

26   attorney-client privilege, the work-product doctrine, and any other applicable privilege or immunity.

27   Lucent further objects to this interrogatory to the extent is seeks information not in the possession,

28   custody or control of Lucent Technologies Inc.  Lucent further objects to this interrogatory to the

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES        13        Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)                03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 33**

1  extent it seeks confidential information of third-parties.  Lucent further objects to this interrogatory

2  as overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of

3  admissible evidence to the extent it seeks information regarding patents not at issue in this case.

4         Subject to its general and specific objections, and based upon a reasonable inquiry to date,

5  Lucent responds that it is not aware of any valuation by AT&T of the patents that were originally

6  assigned to GO Corporation and that were subsequently acquired by AT&T.  AT&T performed

7  and/or reviewed valuations and analyses regarding the personal communicators market and EO, Inc.

8  and GO Corporation products, including GO's PenPoint software (*see, e.g.* LUC 1129502-1130157,

9  LUC 1085998-10860010) and GO Corporation presented its assets, including intellectual property,

10  to AT&T.  (LUC 1238079-1238104).

11  **INTERROGATORY NO. 17:**

12         For each of the patents-in-suit in which Lucent has asserted a method claim, describe with

13  particularity all the facts and evidence that Lucent relies upon to show that Gateway has induced

14  infringement of these method claims.

15  **RESPONSE TO INTERROGATORY NO. 17:**

16         Lucent objects to this interrogatory as being compound and containing multiple subparts that

17  should count toward the total number of interrogatories allowed by this Court's scheduling order and

18  the parties' Joint Discovery Plan.  Lucent further objects to this interrogatory to the extent it seeks

19  information protected by the attorney-client privilege, the work-product doctrine, and any other

20  applicable privilege or immunity.  Lucent further objects to this interrogatory as overbroad and

21  unduly burdensome.  Lucent cannot possibly cite "all facts and evidence." Lucent further objects to

22  this interrogatory as premature as discovery is ongoing.  Subject to and without waiving these

23  specific and its General Objections, Lucent refers Gateway to Lucent's response to Defendants'

24  Interrogatory number 2.  As per Magistrate Bencivengo's ruling, Lucent will update its infringement

25  contentions on January 27, 2005, or at such other time as the Magistrate directs.

26

27

28

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES     14     Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)          03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

**Exhibit 3  Page 34**

1  Dated:  January 11, 2006

2

3  By:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lucent Technologies Inc.*

John M. Desmarais (admitted *pro hac vice*)
Robert A. Appleby (admitted *pro hac vice*)
Jordan N. Malz (admitted *pro hac vice*)
Elizabeth T. Bernard (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Jane Hahn, SBN 125203
Alison P. Adema, SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1730
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

Attorneys for *Lucent Technologies Inc.*

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (Nos.6-17)     15     Case Nos. 02-CV-2060-B (CAB),
03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 3  Page 35

1

**CERTIFICATE OF SERVICE**

2
    I hereby certify that on this 11th day of January 2006, a copy of the foregoing LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES FROM GATEWAY, INC. TO LUCENT TECHNOLOGIES INC. (NOS. 6-17) was served on counsel for Gateway, Microsoft and Dell as follows:

3

4

5    **FACSIMILE**                          **FACSIMILE**
     John E. Gartman                         James S. Blackburn
6    Christopher S. Marchese                 ARNOLD & PORTER LLP
     FISH & RICHARDSON P.C.                  777 South Figueroa Street, 44th Floor
7    12390 El Camino Real                    Los Angeles, CA  90017
     San Diego, California  92130            Telephone:  213-243-4000
8    Telephone:  858-678-5070                Facsimile:   213-243-4199
     Facsimile:   858-678-5099

9    **EMAIL**                               **EMAIL**
     marchese@fr.com                         joel_freed@aporter.com
10   mcdonough@fr.com                        sidney_rosenzweig@aporter.com
     rodriguez@fr.com

11

12   Attorneys for *Microsoft Corp.*        Attorneys for *Dell Inc.*

13

14   **FACSIMILE**
     David J. Zubkoff
15   SELTZER, CAPLAN, MCMAHON & VITEK
     750 "B" Street, Suite 2100
16   San Diego, California 92101
     Telephone:  619-685-3003
17   Facsimile:   619-702-6827

18   **EMAIL**
     bfarney@deweyballantine.com
19   ahewgley@deweyballantine.com

20   Attorneys for *Gateway, Inc., et al.*

21

22

23

24

25

26

27

28

LUCENT'S RESPONSE TO THE THIRD SET OF INTERROGATORIES          16          Case Nos. 02-CV-2060-B (CAB),
FROM GATEWAY INC. TO LUCENT TECHNOLOGIES INC. (NOS.6-17)          03-CV-0699-B (CAB), and 03-CV-1108-B (CAB)

Exhibit 3  Page 36

Exhibit 4

480 F.3d 1372                                                                                          Page 1
480 F.3d 1372, 82 U.S.P.Q.2d 1173
**(Cite as: 480 F.3d 1372)**

SanDisk Corp. v. STMicroelectronics, Inc.
C.A.Fed. (Cal.),2007.

United States Court of Appeals,Federal Circuit.
SANDISK CORPORATION, Plaintiff-Appellant,
v.
STMICROELECTRONICS, INC., Defendant-Appellee,
andSTMicroelectronics NV, Defendant.
**No. 05-1300.**

March 26, 2007.
Rehearing and Rehearing En Banc Denied June 8,
2007.

**Background:** Competitor brought action against patent holder seeking declaratory judgment of non-infringement and invalidity. The United States District Court for the Northern District of California, Jeremy Fogel, J., dismissed action. Competitor appealed.

**Holdings:** The Court of Appeals, Linn, Circuit Judge, held that:

(1) Article III case or controversy existed which gave rise to declaratory judgment jurisdiction, and

(2) statement by patent holder, that it would not sue competitor, did not eliminate justiciable controversy created by actions of patent holder.

Vacated and remanded.

Bryson, Circuit Judge, filed opinion concurring in the result.

West Headnotes

**[1] Federal Courts 170B ⚖️755**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent

      170BVIII(K)1 In General
       170Bk754 Review Dependent on Whether Questions Are of Law or of Fact
        170Bk755 k. Particular Cases. Most Cited Cases
For purposes of Article III, a Court of Appeals reviews a dismissal of a patent claim for lack of an actual controversy upon a particular set of facts as a question of law subject to plenary appellate review. U.S.C.A. Const. Art. 3, § 1 et seq.

**[2] Declaratory Judgment 118A ⚖️235**

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
     118AII(L) Patents
      118Ak231 Patents
       118Ak235 k. Patent Licenses and Assignments. Most Cited Cases

Federal Courts 170B ⚖️13

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
      170Bk12 Case or Controversy Requirement

       170Bk13 k. Particular Cases or Questions, Justiciable Controversy. Most Cited Cases
Article III case or controversy existed which gave rise to declaratory judgment jurisdiction, where patent holder sought right to royalty under its patents based on specific, identified activity by competitor and competitor maintained that it could proceed in its conduct without payment of royalties to patent holder. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 2201(a).

**[3] Declaratory Judgment 118A ⚖️235**

118A Declaratory Judgment
   118AII Subjects of Declaratory Relief
     118AII(L) Patents
      118Ak231 Patents
       118Ak235 k. Patent Licenses and Assignments. Most Cited Cases

480 F.3d 1372, 82 U.S.P.Q.2d 1173
**(Cite as: 480 F.3d 1372)**

In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee; however, Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 2201(a).

**[4] Declaratory Judgment 118A ⟳233**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(L) Patents
            118Ak231 Patents
                118Ak233 k. Infringement of Patents.
Most Cited Cases
Where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 2201(a).

**[5] Declaratory Judgment 118A ⟳234**

118A Declaratory Judgment
    118AII Subjects of Declaratory Relief
        118AII(L) Patents
            118Ak231 Patents
                118Ak234 k. Claim of Infringement as
Condition Precedent. Most Cited Cases
Statement by patent holder, that it would not sue competitor, did not eliminate justiciable controversy created by actions of patent holder, since patent holder engaged in course of conduct, of studying and considering infringement by competitor and communicating that determination to competitor,

that showed preparedness and willingness to enforce its patent rights despite its statement. 28 U.S.C.A. § 2201(a).

**[6] Declaratory Judgment 118A ⟳361.1**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(F) Hearing and Determination
            118Ak361 Dismissal Before Hearing
                118Ak361.1 k. In General. Most Cited
Cases
Although a district court is given the discretion, in declaratory judgment actions, to dismiss the case, there are boundaries to that discretion; when there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal. 28 U.S.C.A. § 2201(a).

**[7] Declaratory Judgment 118A ⟳361.1**

118A Declaratory Judgment
    118AIII Proceedings
        118AIII(F) Hearing and Determination
            118Ak361 Dismissal Before Hearing
                118Ak361.1 k. In General. Most Cited
Cases
The exercise of discretion to dismiss a case seeking declaratory judgment must be supported by a sound basis for refusing to adjudicate an actual controversy. 28 U.S.C.A. § 2201(a).

*1373 Michael A. Ladra, Wilson Sonsini Goodrich & Rosati, of Palo Alto, California, argued for plaintiff-appellant. With him on the brief were James C. Yoon and Julie M. Holloway.
Edward V. Anderson, Sidley Austin Brown & Wood, LLP, of San Francisco, California, argued for defendant-appellee. With him on the brief were Russell L. Johnson, Georgia K. Van Zanten, Philip W. Woo, Matthew L. McCarthy, Peter Suen; and Kathi A. Cover, of Washington, DC.

Before BRYSON, LINN, and DYK, Circuit Judges.

*1374 LINN, Circuit Judge.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 38

480 F.3d 1372, 82 U.S.P.Q.2d 1173
**(Cite as: 480 F.3d 1372)**

SanDisk Corporation ("SanDisk") appeals from a decision of the U.S. District Court for the Northern District of California granting STMicroelectronics' ("ST's") motion to dismiss SanDisk's second through twenty-ninth claims relating to declaratory judgment of noninfringement and invalidity for failure to present an actual controversy. *See SanDisk Corp. v. STMicroelectronics, Inc.,* No. 04-CV-04379 (N.D.Cal. Jan. 20, 2005). Because the district court erred in dismissing the declaratory judgment claims for lack of subject matter jurisdiction, we vacate the judgment and remand the case to the district court.

## I. BACKGROUND

SanDisk is in the flash memory storage market and owns several patents related to flash memory storage products. ST, traditionally in the market of semiconductor integrated circuits, more recently entered the flash memory market and has a sizeable portfolio of patents related to flash memory storage products. On April 16, 2004, ST's vice president of intellectual property and licensing, Lisa Jorgenson ("Jorgenson"), sent a letter to SanDisk's chief executive officer requesting a meeting to discuss a cross-license agreement. The letter listed eight patents owned by ST that Jorgenson believed "may be of interest" to SanDisk. *SanDisk,* slip op. at 2; Letter from Jorgenson to SanDisk (Apr. 16, 2004). On April 28, 2004, SanDisk responded that it would need time to review the listed patents and would be in touch in several weeks to discuss the possibility of meeting in June.

On July 12, 2004, having heard nothing further from SanDisk, Jorgenson sent a letter to SanDisk reiterating her request to meet in July to discuss a cross-license agreement and listing four additional ST patents that "may also be of interest" to SanDisk. *SanDisk,* slip op. at 2; Letter from Jorgenson to SanDisk (July 12, 2004). On July 21, 2004, SanDisk's chief intellectual property counsel and senior director, E. Earle Thompson ("Thompson"), responded to ST's letter by informing Jorgenson of his "understanding that both sides wish to continue

... friendly discussions" such as those between the business representatives in May and June. *SanDisk,* slip op. at 2-3; Letter from Thompson to Jorgenson (July 21, 2004). The discussions of May and June that Thompson referred to were discussions among managers and vice presidents of SanDisk and ST at business meetings held on May 18, 2004, and June 9, 2004, to explore the possibility of ST's selling flash memory products to SanDisk. The business meetings were unrelated to any patents. Thompson also requested that Jorgenson join the next business meeting on August 5, 2005. On July 27, 2004, Jorgenson replied, again urging a meeting with Thompson, noting that it was "best to separate the business discussions from the patent license discussions." *SanDisk,* slip op. at 3; Letter from Jorgenson to Thompson (July 27, 2004).

On August 5, 2004, when the business representatives next met, SanDisk presented an analysis of three of its patents and orally offered ST a license. ST declined to present an analysis of any of its patents, stating instead that any patent and licensing issues should be discussed in a separate meeting with Jorgenson. Later that same day, Thompson wrote a letter to Jorgenson objecting to separating business and intellectual property issues and stating that "[i]t has been SanDisk's hope and desire to enter into a mutually beneficial discussion without the rattling of sabers." *SanDisk,* slip op. at 4; Letter from Thompson to Jorgenson (Aug. 5, 2004). **\*1375** On August 11, 2004, Jorgenson replied, stating that it was her understanding that the parties were going to have a licensing/intellectual property meeting later that month "to discuss the possibility for a patent cross-license." Letter from Jorgenson to Thompson (Aug. 11, 2004). She said that SanDisk should come to that meeting prepared to present an analysis of the three SanDisk patents it identified during the August 5th business meeting, as well as "any infringement analyses of an ST device or need for ST to have a license to these patents." *Id.* She also said that ST would be prepared at that meeting to discuss the twelve patents identified in her prior letters. In closing, Jorgenson said that ST was "look[ing] forward to open and frank discussions with SanDisk concerning fair

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 39

and reasonable terms for a broad cross-license agreement." *Id.*

On August 27, 2004, the licensing meeting was held. Jorgenson, two ST licensing attorneys, and three technical experts retained by ST to perform the infringement analyses of SanDisk's products, attended on behalf of ST. Thompson and an engineer attended on behalf of SanDisk. At the meeting, Jorgenson requested that the parties' discussions be treated as "settlement discussions" under Federal Rule of Evidence 408.[FN1] *SanDisk,* slip op. at 5. ST then presented a slide show which compared statistics regarding SanDisk's and ST's patent portfolios, revenue, and research and development expenses, and listed SanDisk's various "unlicensed activities." *Id.* This slide show was followed by a four- to five-hour presentation by ST's technical experts, during which they identified and discussed the specific claims of each patent and alleged that they were infringed by SanDisk. According to Thompson, the presentation by ST's technical experts included "mapp[ing] the elements of each of the allegedly infringed claims to the aspects of the accused SanDisk products alleged to practice the elements." *Id.* Thompson declares that "the experts liberally referred to SanDisk's (alleged) infringement of [ST's] products." *Id.,* slip op. at 5-6. SanDisk's engineer then made a presentation, describing several of SanDisk's patents and analyzing how a semiconductor chip product sold by ST infringes. *Id.,* slip op. at 6.

> FN1. To avoid the risk of a declaratory judgment action, ST could have sought SanDisk's agreement to the terms of a suitable confidentiality agreement. The record before us reflects that the parties did not enter into such an agreement. Rather, ST sought to condition its open licensing discussions and the infringement study on adherence to Federal Rule of Evidence 408. That rule expressly relates to evidence of efforts toward compromising or attempting to compromise a claim in litigation and does not prevent SanDisk from relying on the licensing discussions and infringement

study to support its claims. *See* Fed.R.Evid. 408. Furthermore, ST's presentation was made outside the context of litigation, and there is nothing on the record to indicate that it could be properly considered an "offer" to settle a claim which was then in dispute. *See, e.g., Deere & Co. v. Int'l Harvester Co.,* 710 F.2d 1551, 1556-57 (Fed.Cir.1983).

At the end of the meeting, Jorgenson handed Thompson a packet of materials containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing how elements of ST's patent claims cover SanDisk's products. According to SanDisk, Jorgenson indicated (in words to this effect):

I know that this is material that would allow SanDisk to DJ [ST] on. We have had some internal discussions on whether I should be giving you a copy of these materials in light of that fact. But I have decided that I will go ahead and give you these materials.

**\*1376** *Id.* Jorgenson further told Thompson that "ST has absolutely no plan whatsoever to sue SanDisk." *Id.* Thompson responded to Jorgenson that "SanDisk is not going to sue you on Monday" and that another meeting might be appropriate. *Id.*

On September 1, 2004, Jorgenson wrote to Thompson, enclosing copies of ST's general slide presentation from the August meeting and also enclosing a hard copy booklet containing each of the engineering reports "for each claim on all products where ST demonstrated coverage by the 14 ST patents to-date [sic]." *Id.;* Letter from Jorgenson to Thompson (Sept. 1, 2004). Jorgenson requested that SanDisk provide ST with a copy of SanDisk's presentation and information about the three SanDisk patents presented. On September 8, 2004, Thompson replied by e-mail, confirming receipt of the package from ST, attaching a copy of SanDisk's presentation, indicating it was his "personal feeling ... that we have got to trust one another during these negotiations," and seeking a non-disclosure agree-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 40

480 F.3d 1372
480 F.3d 1372, 82 U.S.P.Q.2d 1173
**(Cite as: 480 F.3d 1372)**

ment. *SanDisk,* slip op. at 6-7; E-mail from Thompson to Jorgenson (Sept. 8, 2004). Thompson also wrote "I still owe you the rates quoted." *Id.*

On September 15, 2004, Thompson again corresponded with Jorgenson, this time by letter, enclosing a confidential version of SanDisk's cross licensing offer, which noted that the offer would expire on September 27, 2004. *SanDisk,* slip op. at 7; Letter from Thompson to Jorgenson (Sept. 15, 2004). Jorgenson destroyed this confidential offer and did not retain a copy, and, on September 16, 2004, sent Thompson an e-mail requesting that a non-confidential version be sent for ST's consideration. *SanDisk,* slip op. at 7; E-mail from Jorgenson to Thompson (Sept. 16, 2004). SanDisk refused to send a non-confidential version. Instead, on September 27, 2004, Thompson offered to send another confidential version, or to communicate the offer orally. E-mail from Thompson to Jorgenson (Sept. 27, 2004). Thompson also indicated that SanDisk did not need additional information regarding ST's patents because SanDisk was "quite comfortable with its position" and that it was "time to let our business people talk and see if a peaceful resolution is possible." *Id.* On September 28, 2004, Jorgenson repeated her request for a written non-confidential version of SanDisk's licensing offer. *SanDisk,* slip op. at 7-8; E-mail from Jorgenson to Thompson (Sept. 28, 2004). The following day, Thompson e-mailed Jorgenson another confidential version of SanDisk's offer. *SanDisk,* slip op. at 8.

On October 15, 2004, after several further e-mails and phone calls between the business representatives trying to establish another meeting, SanDisk filed the instant lawsuit. SanDisk alleged infringement of one of its patents and sought a declaratory judgment of noninfringement and invalidity of the fourteen ST patents that had been discussed during the cross licensing negotiations. On December 3, 2004, ST filed a motion to dismiss SanDisk's declaratory judgment claims for lack of subject matter jurisdiction, maintaining that there was no actual controversy at the time SanDisk filed its complaint.

The district court granted ST's motion to dismiss, holding that no actual controversy existed for purposes of the Declaratory Judgment Act because SanDisk did not have an objectively reasonable apprehension of suit, even though it may have subjectively believed that ST would bring an infringement suit. *See id.,* slip op. at 14. The district court reasoned that "SanDisk has presented no evidence that ST threatened it with litigation at any time during the parties' negotiations, nor has SanDisk shown other conduct by ST rising **\*1377** to a level sufficient to indicate an intent on the part of ST to initiate an infringement action." *Id.* The district court found that the studied and determined infringement analyses that ST presented to SanDisk did not constitute the requisite "express charges [of infringement] carrying with them the threat of enforcement." *Id.,* slip op. at 14-15. The district court also found that the totality of the circumstances did not evince an actual controversy because ST told SanDisk that it did not intend to sue SanDisk for infringement. *Id.,* slip op. at 15-16. In a footnote, the court indicated that, as an alternative basis for its ruling, even if it did have jurisdiction, it would exercise its discretion and decline to hear the case. *Id.,* slip op. at 17 n. 30.

SanDisk appealed the dismissal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2000).

## II. DISCUSSION

### A. Standard of Review

[1] For purposes of Article III, this court reviews a dismissal of a patent claim for lack of an actual controversy upon a particular set of facts as a question of law subject to plenary appellate review. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735 (Fed.Cir.1988). This court reviews the underlying factual findings for clear error. *Gen-Probe Inc. v. Vysis, Inc.,* 359 F.3d 1376, 1379 (Fed.Cir.2004).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 41

## B. Analysis

[2] SanDisk argues that the district court erred as a matter of law by requiring an express accusation of patent infringement coupled with an explicit threat of judicial enforcement to support declaratory judgment jurisdiction, and that, under the correct legal standard articulated by this court in *Arrowhead*, 846 F.2d at 736, the facts of this case illustrate that SanDisk's apprehension of an infringement suit was objectively reasonable. SanDisk asserts that the infringement analysis presented by ST and its experts at the August 27, 2004 licensing meeting constituted an allegation of infringement and that the totality of the circumstances shows that ST's conduct gave rise to an actual case or controversy. SanDisk further points out that negotiations regarding licensing had ceased by the time SanDisk filed its claims for declaratory judgment.

ST counters that the district court applied the correct legal standard and argues that SanDisk ignores the line of cases that have followed and interpreted *Arrowhead*. ST asserts that the cases following *Arrowhead* reveal that the bare mention of infringement, particularly during license negotiations, is not sufficient to meet the standard set forth in *Arrowhead*. ST asserts that its conduct at the August 27, 2004 licensing meeting was to strengthen its position during licensing negotiations and that, under the totality of the circumstances, SanDisk has not shown that ST's conduct gave rise to declaratory judgment jurisdiction. Moreover, ST argues that the district court did not abuse its discretion when it concluded, as an alternative basis for its ruling, that it would exercise discretion to decline to decide SanDisk's claims.

### 1. Case or Controversy

The first question we address is whether the facts alleged in this case show that there is a case or controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

The Declaratory Judgment Act provides, in relevant part, that

[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate **\*1378** pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The "actual controversy" requirement of the Declaratory Judgment Act is rooted in Article III of the Constitution, which provides for federal jurisdiction over only "cases and controversies." Thus, our jurisdiction extends only to matters that are Article III cases or controversies.

The Supreme Court, in the context of a patent license dispute, recently examined Article III's case or controversy requirement as it relates to the Declaratory Judgment Act. *See MedImmune, Inc. v. Genentech, Inc.,* ---U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). In *MedImmune*, the Supreme Court considered "whether Article III's limitation of federal courts' jurisdiction to 'Cases' and 'Controversies,' reflected in the 'actual controversy' requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), requires a patent licensee to terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed." *Id.* at 767.

The Supreme Court began its analysis with the recognition that, where threatened action by government is concerned, [the Court] do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat-for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*Id.* at 772. The Supreme Court quoted its earlier decision in *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), where the Court stated that "the question in each case is whether the facts al-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 42

leged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 127 S.Ct. at 771. The Supreme Court emphasized that Article III requires that the dispute at issue be " 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' *Id.* (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). The Supreme Court stated that, when faced with a genuine threat of enforcement that the government will penalize a certain private action, Article III"d[oes] not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action." *Id.* at 772 (citations omitted). As the Supreme Court noted, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id.* (quotation marks omitted). The Supreme Court clarified that, although a declaratory judgment plaintiff may eliminate an "imminent threat of harm by simply not doing what he claimed the right to do[,] ... [t]hat did not preclude subject-matter jurisdiction [where] the threat-eliminating behavior was effectively coerced." *Id.*"The dilemma posed by that coercion-putting the challenger to the choice between abandoning his rights or risking prosecution-is a dilemma that it was the very purpose of the Declaratory *1379 Judgment Act to ameliorate." *Id.* at 773 (internal quotation marks omitted).

The Supreme Court then applied these principles to the facts of the case and remarked that "the requirements of [a] case or controversy are met where payment of a claim is demanded as of right and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Id.* (internal quotation marks omitted). The Supreme Court held that "[t]he rule

that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business, before seeking a declaration of its actively contested legal rights finds no support in Article III."*Id.* at 775.

With regard to patent disputes, prior to *MedImmune,* this court articulated a two-part test that first considers whether conduct by the patentee creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and second examines whether conduct by the declaratory judgment plaintiff amounts to infringing activity or demonstrates concrete steps taken with the intent to conduct such activity. *See Arrowhead,* 846 F.2d at 736. The Supreme Court, in *MedImmune,* addressed the "reasonable apprehension of suit" aspect of this court's two-part test and concluded that it conflicts with *Aetna Life Insurance* and *Maryland Casualty,* and is in tension with *Cardinal Chemical Co. v. Morton International, Inc.,* 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). *See MedImmune,* 127 S.Ct. at 774 n. 11.

In *Aetna Life Insurance,* an insurer sought a declaratory judgment that the insured was not relieved of his duty to continue to pay insurance premiums and that, since the insured had stopped making the payments, the insurance policy had lapsed. In that case, the Supreme Court first upheld the constitutionality of the federal Declaratory Judgment Act. 300 U.S. at 240-41, 57 S.Ct. 461. The Supreme Court then held that, although the insured party gave no indication that he would file suit, *id.* at 239, 57 S.Ct. 461, the case nevertheless presented a controversy under Article III because the parties had taken adverse positions with regard to their obligations, each side presenting a concrete claim of a specific right-the insured claiming that he had become disabled and therefore was relieved of making insurance premium payments and the insurer claiming that the insured was not disabled and that the failure to make payments caused the policy to lapse, *id.* at 244, 57 S.Ct. 461. Similarly, in *Maryland Casualty,* the declaratory judgment plaintiff, an insurance company which had agreed to indem-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 43

nify and defend the insured against actions brought by third parties against the insured, sought a declaration that it had no duty to defend or to indemnify the insured. 312 U.S. at 272, 61 S.Ct. 510. In that case, the insured could not have sued the declaratory judgment plaintiff without first obtaining a judgment against the third party and the underlying action against the third party "[a]pparently ... ha[d] not proceeded to judgment." Id. at 271, 61 S.Ct. 510. Nevertheless, the Supreme Court held that "[i]t is clear that there is an actual controversy between petitioner and the insured" since the insured was in the process of seeking a judgment and had a statutory right to proceed against the declaratory judgment plaintiff if such judgment were obtained and not satisfied. Id. at 274, 61 S.Ct. 510. Finally, in *Cardinal Chemical*, the Supreme Court held that this court's affirmance of a judgment of noninfringement does not necessarily moot a declaratory judgment **\*1380** counterclaim of patent invalidity. 508 U.S. at 98, 113 S.Ct. 1967. The Supreme Court's rationale for holding that the declaratory judgment action can proceed consistent with Article III was that a contrary result would create the potential for relitigation or uncertainty with regard to the validity of patents and would be contrary to *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test.[FN2] The Court first noted that "the continuation of royalty payments makes what would otherwise be an imminent threat at least remote, if not nonexistent.... Petitioner's own acts, in other words, eliminate the imminent threat of harm." *MedImmune*, 127 S.Ct. at 772. The Court nonetheless concluded that declaratory judgment jurisdiction existed relying in particular on its earlier decision in *Altvater v. Freeman*, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943). There, the patentee brought suit to enjoin patent infringement, and the accused infringer filed declaratory judgment counterclaims of invalidity. The district court found that there was no infringement and that the patent was invalid. Id. at 362, 63 S.Ct. 1115. The

appellate court affirmed the finding of noninfringement but vacated the finding of invalidity as moot. Id. The Supreme Court held that the declaratory judgment counterclaims were not mooted by the finding of noninfringement. Id. at 365-66, 63 S.Ct. 1115. In finding declaratory judgment jurisdiction in *MedImmune*, the Court specifically addressed and rejected our reasonable apprehension test:

> FN2. In this case, we address only the first prong of this court's two-part test. There is no dispute that the second prong is met. We therefore leave to another day the effect of *MedImmune*, if any, on the second prong.

[e]ven if *Altvater* could be distinguished as an "injunction" case, it would still contradict the Federal Circuit's "reasonable apprehension of suit" test (or, in its evolved form, the "reasonable apprehension of imminent suit" test, *Teva Pharm. USA, Inc. v. Pfizer, Inc.*, 395 U.S. 1324, 1333 (2005)). A licensee who pays royalties under compulsion of an injunction has no more apprehension of imminent harm than a licensee who pays royalties for fear of treble damages and an injunction fatal to his business. The reasonable-apprehension-of-suit test also conflicts with our decisions in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), where jurisdiction obtained even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured; and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 81 L.Ed. 617 (1937), where jurisdiction obtained even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit. It is also in tension with *Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), which held that appellate affirmation of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity.

*MedImmune*, 127 S.Ct. at 774 n. 11.

Exhibit 4  Page 44

[3][4] The Supreme Court in MedImmune addressed declaratory judgment jurisdiction in the context of a signed license. In the context of conduct prior to the existence of a license, declaratory **\*1381** judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee. But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. We need not define the outer boundaries of declaratory judgment jurisdiction, which will depend on the application of the principles of declaratory judgment jurisdiction to the facts and circumstances of each case. We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights. *See id. Contra* Cygnus Therapeutics Sys. v. ALZA Corp., 92 F.3d 1153 (Fed.Cir.1996) (holding that declaratory judgment jurisdiction was not supported where the "patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in arguably infringing activity").

Our holding is consistent with decisions of other courts in various cases unrelated to patent licensing. *See, e.g.,* Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1085 (9th Cir.2000) (finding declaratory judgment jurisdiction based on trademark owner's cease and desist letter despite the fact that trademark owner offered to waive all trademark infringement and related claims); GNB Battery Tech., Inc. v. Gould, Inc., 65 F.3d 615, 620 (7th Cir.1995) (finding declaratory judgment jurisdiction where declaratory judgment plaintiff filed

action in anticipation of potential action by the defendant based on new legislation although the defendant had not indicated whether or when it may act); Kunkel v. Cont'l Cas. Co., 866 F.2d 1269, 1274 (10th Cir.1989) (affirming exercise of declaratory judgment jurisdiction over suit seeking declaratory judgment for determination of value of insurance coverage even though existence of coverage remained dependent upon the outcome of a collateral action and noting that "[t]he contingent nature of the right or obligation in controversy will not bar a litigant from seeking declaratory relief when the circumstances reveal a need for present adjudication"); *see also* IMS Health, Inc. v. Vality Tech., Inc., 59 F.Supp.2d 454 (E.D.Pa.1999) (holding that requirements for declaratory judgment jurisdiction were satisfied where copyright holder had not indicated it was going to file suit but had taken positions and made demands such that the declaratory judgment plaintiff justifiably believed that copyright holder might take such action in the future and noting that "[i]t is quite possible for two parties to simultaneously consider nonlitigious settlement of a dispute, while at the same time maintaining an awareness that either settlement is improbable or that litigation is equally likely"); N. Shore Gas Co. v. Salomon, Inc., 896 F.Supp. 786, 789-90 (N.D.Ill.1995) (finding declaratory judgment jurisdiction where plaintiff, "rather than wait an indefinite time to be sued," filed suit after the settlement discussions came to an impasse); J. Lyons & Co. Ltd. v. Republic of Tea, Inc., 892 F.Supp. 486 (S.D.N.Y.1995) (dismissing trademark holder's later-filed infringement action in favor of previously filed declaratory judgment actions **\*1382** where declaratory judgment plaintiffs had received cease and desist letters and no settlement appeared agreeable, despite the fact that trademark holder did not give actual notice of litigation); Kmart Corp. v. Key Indus., Inc., 877 F.Supp. 1048, 1055 (E.D.Mich.1994) (holding that ongoing settlement negotiations did not require dismissal of declaratory judgment action where the evidence indicated that the trademark holder would accept no settlement short of total capitulation); Agridyne Tech., Inc. v. W.R. Grace & Co., 863 F.Supp. 1522 (D.Utah

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 45

1994) (refusing to dismiss declaratory judgment action where plaintiff justifiably believed that further settlement negotiations would be fruitless).

Under the facts alleged in this case, SanDisk has established an Article III case or controversy that gives rise to declaratory judgment jurisdiction. ST sought a right to a royalty under its patents based on specific, identified activity by SanDisk. For example, at the August 27, 2004 licensing meeting, ST presented, as part of the "license negotiations," a thorough infringement analysis presented by seasoned litigation experts, detailing that one or more claims of its patents read on one or more of SanDisk's identified products. At that meeting, ST presented SanDisk with a detailed presentation which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents. During discussions, the experts liberally referred to SanDisk's present, ongoing infringement of ST's patents and the need for SanDisk to license those patents. ST also gave SanDisk a packet of materials, over 300 pages in length, containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing a detailed infringement analysis of SanDisk's products. ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted the right to a royalty based on this determination. SanDisk, on the other hand, maintained that it could proceed in its conduct without the payment of royalties to ST. These facts evince that the conditions of creating "a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" were fulfilled. *Md. Cas.,* 312 U.S. at 273, 61 S.Ct. 510. SanDisk need not "bet the farm," so to speak, and risk a suit for infringement by cutting off licensing discussions FN3 and continuing in the identified activity before seeking a declaration of its legal rights. *See MedImmune,* 127 S.Ct. at 774 n. 11. *Contra Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051 (Fed.Cir.1995) ("When there are proposed or ongoing license ne-

gotiations, a litigation controversy normally does not arise until the negotiations have broken down.").

> FN3. Although the district court found that licensing negotiations had not been terminated, we note that SanDisk in fact declined to participate in further negotiations, effectively bringing them to an end. Regardless, however, a party to licensing negotiations is of course within its rights to terminate negotiations when it appears that they will be unproductive.

### 2. Promise Not to Sue

[5] We next address whether Jorgenson's direct and unequivocal statement that "ST has absolutely no plan whatsoever to sue SanDisk" eliminates any actual controversy and renders SanDisk's declaratory judgment claims moot.

We decline to hold that Jorgenson's statement that ST would not sue SanDisk **\*1383** eliminates the justiciable controversy created by ST's actions, because ST has engaged in a course of conduct that shows a preparedness and willingness to enforce its patent rights despite Jorgenson's statement. Having approached SanDisk, having made a studied and considered determination of infringement by SanDisk, having communicated that determination to SanDisk, and then saying that it does not intend to sue, ST is engaging in the kinds of "extra-judicial patent enforcement with scare-the-customer-and-run tactics" that the Declaratory Judgment Act was intended to obviate. *Arrowhead,* 846 F.2d at 735. ST's statement that it does not intend to sue does not moot the actual controversy created by its acts. *See Md. Cas.,* 312 U.S. at 273, 61 S.Ct. 510 (jurisdiction obtained even though the defendant could not have sued the declaratory judgment plaintiff).

### 3. District Court's Discretion

[6][7] Although the district court is given the discretion, in declaratory judgment actions, to dis-

miss the case, there are boundaries to that discretion. *See* *Wilton v. Seven Falls Co.,* 515 U.S. 277, 289, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). "When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." *Genentech v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993). Furthermore, the exercise of discretion must be supported by a sound basis for refusing to adjudicate an actual controversy. *See* *Elecs. for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1345 (Fed.Cir.2005); *Capo, Inc. v. Dioptics Med. Prod., Inc.,* 387 F.3d 1352, 1357 (Fed.Cir.2004).

In this case, the district court noted, without explanation in a footnote, that "[a]s an alternative basis for its ruling, the Court concludes that even if it had subject matter jurisdiction over the instant claims, it would exercise its discretion and decline to decide them." *SanDisk,* slip op. at 17 n. 30. That decision, however, was made in the context of our "reasonable apprehension" precedent without the benefit of the Supreme Court's views in *MedImmune.* Given the change reflected in *MedImmune* and our holding in this case, we discern little basis for the district court's refusal to hear the case and expect that in the absence of additional facts, the case will be entertained on the merits on remand.

CONCLUSION

For the above reasons, we conclude that the dismissal was improperly granted. The dismissal is vacated, and the case is remanded for further proceedings consistent with this opinion.

*VACATED and REMANDED*

COSTS

Costs are awarded to SanDisk.

Opinion concurring in the result filed by Circuit Judge BRYSON.BRYSON, Circuit Judge, concurring in the result.

Under our law, as things stood before the Supreme Court's decision in *MedImmune,* the district court's order in this case was correct. ST, the patentee, had offered a license to SanDisk, but had not threatened suit and had sought to continue licensing negotiations. Although ST had made a detailed showing as to why it believed SanDisk's products were within the scope of its patent rights, there is nothing exceptional in that. In the typical case, we would expect competent patent counsel who offers a license to another party to be prepared to demonstrate why ***1384** such a license is required. By the time the suit was brought, ST had done nothing to give SanDisk cause to be in reasonable apprehension of suit, and in fact ST had expressly stated that it did not intend to sue SanDisk. In short, ST was simply availing itself of the safe haven our cases had created for patentees to offer licenses without opening themselves up to expensive litigation. *See, e.g.,* *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1054 (Fed.Cir.1995); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir.1992).

The decision in *MedImmune* dealt with a narrow issue: whether a declaratory judgment action can be brought by a patent licensee without terminating the licensing agreement. Footnote 11 of the *MedImmune* opinion, however, went further and criticized this court's "reasonable apprehension of suit" test for declaratory judgment jurisdiction. I agree with the court that the footnote calls our case law into question and would appear to make declaratory judgments more readily available to parties who are approached by patentees seeking to license their patents. In particular, the reasoning of the *MedImmune* footnote seems to require us to hold that the district court in this case had jurisdiction to entertain SanDisk's declaratory judgment action. For that reason I concur in the judgment of the court in this case reversing the jurisdictional dismissal of the complaint.

I think it is important, however, to point out the implications of the footnote in *MedImmune* as ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

480 F.3d 1372   Page 12
480 F.3d 1372, 82 U.S.P.Q.2d 1173
**(Cite as: 480 F.3d 1372)**

plied here, because the implications are broader than one might suppose from reading the court's opinion in this case. While noting that it is not necessary to define the outer boundaries of declaratory judgment jurisdiction, the court holds that "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license," the party may bring a declaratory judgment action. Applying that principle, the court concludes that in this case, where "ST sought a right to a royalty under its patents based on specific, identified activity by SanDisk," an Article III case or controversy has arisen.

In practical application, the new test will not be confined to cases with facts similar to this one. If a patentee offers a license for a fee, the offer typically will be accompanied by a suggestion that the other party's conduct is within the scope of the patentee's patent rights, or it will be apparent that the patentee believes that to be the case. Offers to license a patent are not requests for gratuitous contributions to the patentee; the rationale underlying a license offer is the patentee's express or implied suggestion that the other party's current or planned conduct falls within the scope of the patent. Therefore, it would appear that under the court's standard virtually any invitation to take a paid license relating to the prospective licensee's activities would give rise to an Article III case or controversy if the prospective licensee elects to assert that its conduct does not fall within the scope of the patent. Indeed, as the court makes clear, even a representation by the patentee that it does not propose to file suit against the prospective licensee will not suffice to avoid the risk that the patentee will face a declaratory judgment action. And if there is any uncertainty on that score, all the prospective licensee has to do in order to dispel any doubt is to inquire of the patentee whether the patentee believes its activities are within the scope of the patent. If the patentee says "no," it will have made a damaging admission that will make it very hard ever to litigate the issue, and thus **\*1385** will effectively end its licensing efforts. If it says "yes" or equivocates, it will have satisfied

the court's test and will have set itself up for a declaratory judgment lawsuit.

For these reasons, I see nothing about the particular facts surrounding this licensing negotiation in this case that triggers SanDisk's right to bring a declaratory judgment action under the new standard. The court emphasizes that ST made a "detailed presentation [to SanDisk] which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents." The court summarizes ST's presentation by stating that "ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted a right to a royalty based on this determination" and that SanDisk "maintained that it could proceed in its conduct without the payment of royalties to ST." Those facts, the court concludes, evinced a sufficient controversy to entitle SanDisk to institute its declaratory judgment suit.

But what is the significance of those facts? The court's legal test does not suggest that the case would come out differently if ST had been less forthcoming about why it believed SanDisk should take a license, or even if ST had simply contacted SanDisk, provided copies of its patents, and suggested that SanDisk consider taking a license. I doubt the court would hold that there was no controversy in that setting, as long as SanDisk was prepared to assert that it believed its products were not within the scope of ST's valid patent rights. If SanDisk's lawyers had any question about whether this court would permit them to seek a declaratory judgment under those circumstances, they could readily resolve that question by sending a "put up or shut up" response to ST's licensing offer-asking ST to state expressly whether it regarded SanDisk's products to be within the scope of ST's patents and to identify with particularity how SanDisk's products read on particular claims of those patents. Any response by ST would either end its licensing efforts or expose it to a declaratory judgment action.[FN1]

> FN1. The court suggests that ST could have avoided the risk of a declaratory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 48

480 F.3d 1372, 82 U.S.P.Q.2d 1173 Page 13
480 F.3d 1372, 82 U.S.P.Q.2d 1173
**(Cite as: 480 F.3d 1372)**

judgment action by obtaining a suitable confidentiality agreement. The problem with that suggestion is that it would normally work only when it was not needed-only a party that was not interested in bringing a declaratory judgment action would enter into such an agreement. A party that contemplates bringing a declaratory judgment action or at least keeping that option open would have no incentive to enter into such an agreement.

In sum, the rule adopted by the court in this case will effect a sweeping change in our law regarding declaratory judgment jurisdiction. Despite the references in the court's opinion to the particular facts of this case, I see no practical stopping point short of allowing declaratory judgment actions in virtually any case in which the recipient of an invitation to take a patent license elects to dispute the need for a license and then to sue the patentee. Although I have reservations about the wisdom of embarking on such a course, I agree with the court that a fair reading of footnote 11 of the Supreme Court's opinion in *MedImmune* compels that result, and I therefore concur in the judgment reversing the district court's dismissal order in this case.[FN2]

FN2. Although I agree that the judgment must be reversed, I take issue with the scope of the remand insofar as it applies to the district court's exercise of its discretion to decline to entertain this action as a discretionary matter. I would allow the district court to reconsider that issue based on all the circumstances, not just "additional facts" not previously before the district court, as the terms of this court's remand seem to require. Thus, for example, the fact that the parties are engaged in a parallel infringement action in another district court is an important factor in the district court's decision on whether to allow SanDisk's declaratory suit to proceed at this time. *See Intermedics Infusaid, Inc. v. Regents of Univ. of Minn., 804 F.2d 129*

(Fed.Cir.1986) (pending action in another jurisdiction is sufficient ground on which to stay declaratory suit). The district court should be free on remand to consider that factor in determining how to exercise its discretion, even though the pendency of that parallel action is not an "additional fact" that was not before the court at the time of its earlier decision.

C.A.Fed. (Cal.),2007.
SanDisk Corp. v. STMicroelectronics, Inc.
480 F.3d 1372, 82 U.S.P.Q.2d 1173

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit 4  Page 49

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4   Page 50

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 51

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 52

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 53

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 54

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 55

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 56

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 57

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 58

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 59

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 60

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 61

**THIS PAGE INTENTIONALLY LEFT BLANK.**

Exhibit 4  Page 62

Exhibit 5

1

2                  **UNITED STATES DISTRICT COURT**

3                  **SOUTHERN DISTRICT OF CALIFORNIA**

4

5    LUCENT TECHNOLOGIES INC.,

6           Plaintiff and Counterclaim-defendant,

7    v.

8    GATEWAY, INC. and GATEWAY
     COUNTRY STORES LLC, GATEWAY
     COMPANIES, INC., GATEWAY
9    MANUFACTURING LLC and
     COWABUNGA ENTERPRISES, INC.,

10          Defendants and Counter-claimants,          **Civil No:** 02CV2060-B(CAB)
                                                        consolidated with
11   and                                                **Civil No:** 03CV0699-B (CAB) and
                                                        **Civil No:** 03CV1108-B (CAB)
12   MICROSOFT CORPORATION,

13          Intervenor and Counter-claimant,            **ORDER ON MICROSOFT'S MOTIONS
                                                        FOR JUDGMENT AS A MATTER OF
14                                                      LAW AND NEW TRIAL AND
     _____                  LUCENT'S MOTION TO ALTER OR
15                                                      AMEND THE JUDGMENT
     MICROSOFT CORPORATION,                            REGARDING U.S. PATENT NOS.
16                                                      5,341,457 AND RE 39,080**
            Plaintiff and Counterclaim-defendant,
17
     v.
18
     LUCENT TECHNOLOGIES INC.,
19
            Defendant and Counter-claimant
20
     _____
21
     LUCENT TECHNOLOGIES INC.,
22
            Plaintiff,
23
     v.
24
     DELL, INC.,
25
            Defendant.
26
     _____
27

28
                                                        02CV2060-B (CAB)

                        **Exhibit 5  Page 63**

1    **I.     INTRODUCTION**

2        On January 29, 2007, a jury trial commenced in case no. 02cv2060 on issues

3    pertaining to audio coding patents U.S. Patent Nos. 5,341,457 and RE 39,080 ("the '457

4    patent" and "the '080 patent," respectively).  On February 22, 2007, the jury returned a

5    verdict in favor of Plaintiff Lucent Technologies, Inc. ("Lucent") finding the patents valid

6    and infringed by Defendant Microsoft Corporation ("Microsoft").

7        Following the trial, the Court also ruled on the non-jury issues of standing and

8    Microsoft's license defense.  These rulings were based on the jury's finding that the work

9    incorporated into U.S. Patent No. 5,627,938 ("the '938 patent"), the patent on which the

10   reissue '080 patent is based, was not performed on or after April 1989.  The Court held that

11   the '080 reissue patent is not co-owned by Fraunhofer; Lucent is sole owner of the '080

12   patent and has standing to sue for infringement.  The Court also ruled that the Fraunhofer-

13   Microsoft Agreement did not confer a license to Microsoft to practice the'080 patent.

14       Microsoft now moves the Court for judgment as a matter of law under Fed. R. Civ.

15   P. 50(b) on the following issues: (1) no infringement of the '457 patent; (2) no infringement

16   the '080 patent; (3) the '080 patent is not "existing work" under the AT&T-Fraunhofer

17   Agreement; (4) invalidity; and (5) damages.  In addition, Microsoft moves the Court to

18   amend its judgment under Fed. R. Civ. P. 52(b) regarding Lucent's standing and

19   Microsoft's license defense.  Microsoft also moves for a new trial on related issues

20   including: (1) infringement; (2) the categorization of the '080 patent as "Existing

21   Work";(3) invalidity; and (4) damages.

22   **II.    STANDARD OF LAW**

23       **A.     Judgment as a Matter of Law**

24       A motion for judgment as a matter of law must be denied, and a jury verdict upheld,

25   if the judgment is supported by substantial evidence.  Johnson v. Paradise Valley Unified

26   School District, 251 F.3d 1222, 1227 (9th Cir. 2001).  Substantial evidence is evidence

27   adequate to support the jury's conclusion, even if it is possible to draw a contrary

28                                          2

**Exhibit 5  Page 64**

1  conclusion from the same evidence." Id.  The Court must review the record as a whole but

2  disregard all evidence favorable to the moving party that the jury is not required to believe.

3  Id.  All reasonable inferences must be drawn in the light most favorable to the nonmoving

4  party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).

5      **B.**    **New Trial**

6        The power of the court to grant a new trial under Fed. R Civ. P. 59(a) is "confided

7  almost entirely to the exercise of discretion on the part of the trial court." Murphy v. City of

8  Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) (quoting Allied Chem. Corp. v. Daiflon,

9  Inc., 449 U.S. 33, 36 (1980)).  Unlike a motion for judgment as a matter of law, "[t]he

10  judge can weigh the evidence and assess the credibility of witnesses, and need not view the

11  evidence from the perspective most favorable to the prevailing party." Landes Const. Co.,

12  Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987); Molski v. M.J. Cable,

13  Inc., 481 F.3d 724, 729 (9th Cir. 2007) ("the district court has the duty to weigh the

14  evidence as the court") (internal quotations omitted).  The district court should "set aside

15  the verdict of the jury, even though supported by substantial evidence, where, in the court's

16  conscientious opinion, the verdict is contrary to the clear weight of the evidence." Molski,

17  481 F.3d at 729.; see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d

18  814, 819 (9th Cir. 2001) ("a trial court may grant a new trial if the verdict is contrary to the

19  clear weight of the evidence . . . or to prevent, in the sound discretion of the trial court, a

20  miscarriage of justice").  In general, a court should grant a new trial only when it "is left

21  with the definite and firm conviction that a mistake has been committed." Landes Constr.,

22  833 F.2d at 1372. "[A] district court may not grant a new trial simply because it would have

23  arrived at a different verdict." Silver Sage Partners, 251 F.3d at 819.

24  **III.**    **OWNERSHIP AND LICENSE OF THE '080 PATENT**

25        Among the affirmative defenses raised by Microsoft, two related to the ownership of

26  the '080 patent.  Microsoft asserted that the '080 patent was co-owned by Fraunhofer

27  Gesellschaft ("Fraunhofer"), a German research company.  As such, Microsoft contended

28                                             3

**Exhibit 5  Page 65**

1    that Lucent lacked standing to bring suit against Microsoft for infringement of the '080

2    patent.   Microsoft also asserted the defense of license, contending that it had a license from

3    Fraunhofer to practice the '080 patent. These affirmative defenses were addressed in two

4    parts at trial.  The jury heard evidence on the factual question of whether any work

5    performed during the period of collaboration between AT&T and Fraunhofer had been

6    incorporated into any of the claims of U.S. Patent No. 5,627,938 ("the '938 patent") which

7    then was reissued as the '080 patent.  The Special Verdict Form included a "Special

8    Question" on this issue: "Has Microsoft proven by a preponderance of the evidence that

9    work was performed on or after April 1989 which was incorporated into any of the claims

10   of the '938 patent?  Please answer yes or no."  The jury answered "no."  Based then on the

11   jury's factual finding, the Court ruled that under the 1989 research agreement between

12   AT&T and Fraunhofer ("the JDA"), Fraunhofer was not a co-owner of the '938 patent or

13   the '080 reissue patent.  Therefore, Lucent had standing to sue and the defense of license

14   was not available to Microsoft.  Microsoft now challenges the jury's findings and the

15   Court's subsequent rulings on a number of grounds.

16        **A.      Exclusion of Deposition Testimony from Mr. Restaino and Mr. Devilliers**

17        At trial on February 12, Microsoft attempted to play two video-taped depositions

18   before the jury to which Lucent objected.  (Trial Tr. vol. X, 17:6-24:7, Feb. 12, 2007.)  The

19   first was the deposition of Mr. Restaino from AT&T and the other was the deposition of

20   Mr. DeVilliers from Creative Labs.  Mr. Restaino was to testify about AT&T's view of the

21   rights under the JDA.  (Id. at 18:4-18.)  The Court ruled that AT&T's opinions of Lucent's

22   duties under the agreement were not relevant.  (Id. at 19:16-24.)  Mr. DeVilliers was to

23   testify about Lucent 's reticence in its negotiations with Creative Labs to discuss Lucent's

24   rights under the JDA.  (Id. at 20: 8-16, 21:18-25.)  The Court ruled that this latter testimony

25   was collateral, lacking relevance and confusing to the jury.  (Id. at 23:2-6.)

26        Microsoft now argues that the exclusion of these depositions was in error because

27   the jury was entitled to hear how AT&T and Lucent viewed the JDA.  The Court, however,

28                                                4

**Exhibit 5  Page 66**

finds no error or prejudice in the exclusions.  First, Microsoft incorrectly asserts that the Court's reason for the exclusion of  the testimony was because it was deemed "not credible" and that credibility should have been a question for the jury.  This is belied by the record; the Court excluded the testimony as not relevant and/or prejudicial.  Microsoft confuses "credibility" with "admissibility."  Admissibility is a question for the court, not the jury. Fed. R. Evid. 104.  Additionally, Microsoft has not pointed to any jury issue on which this evidence would have been relevant.  The interpretation of the JDA was a question left to the Court, not the jury.  Therefore, the Court **DENIES** Microsoft's motion for a new trial on this ground.

### B.      New Work Versus Existing Technology Under the JDA

The JDA between Fraunhofer and AT&T covered collaborative work during the period of the stay of Karlheinz Brandenburg at AT&T.  (DX 6489 at 2.)  This period began in April 1989 and ended in June 1990.  (Trial Tr. vol. VI, 192:15-17, Feb. 5, 2007.)  All work done on digital audio coding during this period was classified as "New Work" and would be jointly owned by AT&T and Fraunhofer.  (DX 6489 at 2, 3 § 1.)  In 1991, the period covering New Work was extended by AT&T and Fraunhofer to cover work that continued after the expiration of the JDA and the departure of Brandenburg.  ("the extension letter," DX5616.)  The parties agreed to extend the period indefinitely, until one of the parties gave notice to terminate the arrangement.  (Id.)  No evidence was presented that the parties ever terminated the agreement.  Hence, the combined effect of the JDA and the extension letter defines the period of New Work as beginning in April 1989 at the arrival of Brandenburg and continuing indefinitely thereafter.

In the instant trial, Lucent and Microsoft agreed to present the factual question of New Work to the jury by asking whether or not work performed on or after April 1989 was incorporated into any of the claims of the '938 patent. (Special Verdict Form; Tr. Chambers Feb. 7, 2007, 173:12-24; Trial Tr. vol. XII, 90:7-22, Feb. 14, 2007.)  Microsoft's prima facie case relied on the description of the work in the '938 patent specification.  The '938

5

**Exhibit 5  Page 67**

1  patent was applied for on September 22, 1994 and claimed priority as a continuation of

2  application serial no. 844,811 to March 2, 1992. This dated the work described and

3  claimed therein to 1992. Lucent argued that the claims of the '938 patent were described in

4  the '457 patent specification filed in 1988; this placed the date of this work before the April

5  1989 dividing line in the JDA.[1] Lucent also presented testimony of Mr. Johnston, the

6  inventor of the '938 patent, on work he had performed on or around 1988.

7        Microsoft now contends that there was insufficient evidence on which the jury could

8  have found that the work encompassed in claims 2 and 4 of the '938 patent was not

9  performed on or after April 1989.

10              **1.    Claim 2**

11       Claim 2 is a dependent claim which includes the method of claim 1 and adds the

12  limitation "wherein the set of frequency coefficients are MDCT coefficients." Microsoft

13  contends that MDCT (modified discrete cosine transform) coefficients are nowhere

14  mentioned in the '457 patent and thus this patent and its date of filing cannot provide

15  evidence that the work embodied in claim 2 was performed before April 1989.

16       Regarding the disclosure of the claimed method using an MDCT, Lucent argues that

17  sufficient evidence was presented on this point in the form of testimony of witnesses and

18  statements in the '938 patent specification showing that MDCT coefficients were well

19  known in the art. It contends that because the '457 patent describes time to frequency

20  transforms and an MDCT is a type of such transform, one of ordinary skill in the art would

21  understand the '457 to include the method set forth in claim 2 of the '938 patent.

22       This contention is problematic. First, as a matter of law, claim 2 cannot claim

23  _____

24       [1] The '080 patent claims priority as a continuation-in-part (CIP) to an application filed in
    February 1992 which was a continuation of an application filed in December 1988. This latter 1988
25  application issued as the '457 patent. Claims in a CIP application may have different priority dates,
    but only those supported by the parent application are entitled to the earlier filing date. Waldemar
26  Link v. Osteonics Corp., 32 F.3d 556, 558-59 (Fed. Cir. 1994) (noting that the priority date for each
    claim is not memorialized by the patent office; when a dispute arises the Court must determine the
27  proper date for each claim at issue).

28                                6

Exhibit 5  Page 68

priority to the '457 patent based on the evidence presented at trial.  The '457 specification
does not mention MDCTs.  Dr. Jayant's testimony stated only that MDCTs were known at
the time of the '457 patent.  (Trial Tr. vol. XI, 101:4-11, Feb. 13, 2007.)  He also testified
that one of ordinary skill in the art would have recognized that the claimed methods could
have been implemented with an MDCT and would have been able to do so without undue
specification.  (Id. at 101:12-24.)  This testimony does not demonstrate that the method of
claim 2 was sufficiently described in the '457 patent. "A description which renders obvious
the invention for which an earlier filing date is sought is not sufficient."  Lockwood v.
American Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997).   A demonstration of
obviousness is not sufficient to show the inventor "possessed" the invention.  Id.

Second, simply because one of skill in the art may have been able to implement
claim 2 from the '457 patent specification and the knowledge in the art as to MDCTs, does
not lead to the conclusion that the inventor of the '938 patent, Johnston, performed such
work as of the filing date of the '457 patent.  On this topic, Johnston testified that he did
not perform this work before the collaborative period of the AT&T-Fraunhofer agreement
began:

> Q     Who taught you about an MDCT?
> A     Well, I hadn't heard of it until I saw Karlheinz's
> paper, and then I had sort of looked at it before Karlheinz
> came, but when Karlheinz came and sat down and explained it,
> that was when I really learned about it. It was the first
> time I actually got my hands on it practically.
> Q     In other words, in 1989?
> A     Yeah.
> Q     Okay. And did you have any understanding from Doctor
> Karlheinz -- Doctor Brandenburg at the time you did the work
> on the 457 patent?
> A     No. I hadn't heard of the MDCT at all. Apparently the
> publication was out, but I hadn't spotted it.

(Trial Tr. vol. VI, 36:13-25, Feb 5, 2007.)  Although Lucent argues that the jury could have
disregarded this testimony, there was no other evidence of record that the work was
performed prior to April 1989.  The only other evidence of the work encompassed by claim

7

Exhibit 5  Page 69

2 was the '938 specification itself, with a date of 1992.[2]  Therefore, the jury's finding that

claim 2 was not performed on or after April 1989 is not supported by sufficient evidence;

the Court therefore **GRANTS** judgment as a matter of law on this ground.  Additionally,

because the jury's verdict was against the clear weight of the evidence, in the alternative,

the Court **GRANTS** a new trial on this issue.

### 2.    Claim 4

In the Markman hearing preceding trial, the Court construed the means for receiving

and the means for converting as set forth in claim 4 to require the same corresponding

structure:

> Structure: (as described in the ['938] specification at Col. 23:59 - Col. 24:1)[3], a
> digital signal processor (DSP), a DSP with software, VLSI hardware embodiments,
> or hybrid DSP/VLSI embodiments.

These corresponding structures (DSP and VLS1) do not appear in the '457 specification;

they appear for the first time in the '938 patent specification filed in 1992.  At trial,

however, Lucent's expert Dr. Jayant testified in a conclusory fashion that this

corresponding structure was disclosed in the '457 specification.  (Trial Tr. vol. XI, 110:12-

18, Feb. 13, 2007.)   He did not, however, indicate where these structures could be found in

the '457 specification.  Instead, Jayant's testimony took two paths - both insufficient as a

matter of law to demonstrate that the written description in the '457 patent could provide a

1988 priority date for claim 4.

First, Jayant testified that the two "means" could be found in Figure 7 of the '457

patent, labeled as boxes 72 and 76.  He indicated that box 76 was where the bitstream came

---

[2] Lucent's argument that the reference in Figure 2 of the '080 patent to MDCTs as prior art with a reference to a publication dated 1987 does not change this analysis.  This reference does not indicate one way or the other whether Johnston performed or even conceived of his method using MDCTs before April 1989. The specification of the '080 patent is based on applications filed in 1992 and 1994. At most, it suggests that on or around 1992 or 1994, Johnston knew of MDCTs and had considered their use in his claimed method.

[3] The reference to the '938 specification corresponds to Col. 24:18-24 in the '080 reissue specification.

8

**Exhibit 5  Page 70**

into the decoder and was unpacked; box 72 transformed frequency information into a time wave form. (Id. at 109:5-15, 110:1-11.)  He did not identify these boxes as "structures." Figure 7 of the '457 patent identifies only function and does not describe any structures that carry out these functions.  Moreover, even if boxes 72 and 76 could themselves arguably represent a structure, Lucent did not present any evidence through Jayant or any other witnesses to show that such structure was the same or equivalent to the corresponding structure for claim 4 as construed by the Court.

Second, Jayant's testimony that one of skill in the art would know that the DSP/VLS1 structures could be used for implementing the means for receiving and converting functions (id. at 110:19-111:6) also is insufficient.  "[S]tructure supporting a means-plus-function claim under § 112, ¶ 6 must appear in the specification . . . [the] consideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification.  Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1212 (Fed. Cir. 2003); Biomedino, LLC v. Waters Technologies Corp., - - F.3d - -, 2007 WL 1732121, *5 (Fed. Cir. June 18, 2007).

Dr. Jayant's legally unsupportable opinions cannot support the jury's verdict.  See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.");  Tronzo v. Biomet, Inc.,156 F.3d 1154, 1159 (Fed. Cir.1998) (expert testimony that was either contradicted by the patent specification itself and/or incorrect based on the applicable law was insufficient to support the jury's verdict on written description and priority date).

As with claim 2, the disclosure of the '938 patent establishes a prima facie case that the corresponding structure for claim 4 was first described therein and thus entitled to a date no earlier than 1992.  Having excluded Dr. Jayant's testimony on claim 4, there is no

9

Exhibit 5  Page 71

1    other evidence that rebuts this prima facie showing.  The only other evidence relied on by

2    Lucent, the inventor Mr. Johnston's testimony, does not indicate that the work incorporated

3    in claim 4 was performed prior to April 1989.  Johnston testified that he constructed his

4    perceptual transform (PXFM) decoder software by April 2, 1987 (Trial Tr. vol. VI, 97:5-

5    11, Feb. 5, 2007.)  Johnston testified only that his constructed PXFM performed the

6    functionality related to the decoder described in the '457 patent; he did not testify as to

7    whether his constructed decoder had the DSP and/or VLS1 corresponding structures.

8    Lucent's argument that several experts testified as to the existence of DSPs before April

9    1989 is of no avail, nor is the evidence that Johnston may have known about DSPs in some

10   general context (but not in the context of his invention). The question is not whether the

11   inventor *could* have constructed the decoder with the corresponding structure but whether

12   he did.

13        Because the only evidence of work involving the decoder constructed with the DSP

14   and/or VLSI corresponding structure appeared in the '938 specification as filed September

15   22, 1994 (priority date March 2, 1992), there was insufficient evidence to support the jury's

16   verdict that claim 4 was performed before April 1989.  Therefore, Microsoft's motion for

17   judgment as a matter of law on this issue is **GRANTED**.  Additionally, because the jury's

18   verdict was against the clear weight of the evidence, in the alternative, the Court **GRANTS**

19   a new trial on this issue.

20        **C.    Ownership of the '080 Patent**

21        Having determined that claims 2 and 4 were performed on or after April 1989, under

22   the JDA, these claims constitute "New Work." The question then turns to the ownership

23   rights of this work as it stands incorporated into the '938 and '080 patents.  The JDA

24   contains the following relevant provisions on ownership of New Work:

25        All New Work is treated as joint work. The intellectual property rights to that work
         will be jointly owned by AT&T and FhG.  Each party has the nonexclusive right to
26        make use of the results of New Work (including intellectual property rights), and
         may grant nonexclusive licenses to others to use the results of such New Work.

27

28                                            10

**Exhibit 5  Page 72**

1    (DX 6489 at 3 § 1.)

2         The parties will consult with each other regarding the filing of patent applications on
       New Work including New Work reflected in the above-mentioned transmittals and
3         papers proposed for publication.  Each party will have the first opportunity to file
       patent applications for New Work done primarily by its employees, but if a party
4         declines the opportunity to file any such patent application, or after filing any patent
       application chooses not to proceed further in attempting to secure a patent, the other
5         party may elect to do so.  Each party will ensure that its employees, and others
       cooperating with it in New Work cooperate with the other party in filing all patent
6         applications.

7    (Id. at 3 § 2.)  Based on these passages and the context of the agreement, the JDA

8    evidences an intent to share ownership of New Work, including work on which patent

9    applications would be filed.

10         The '938 and '080 patents encompassing the jointly owned New Work also contains

11   two additional claims (claims 1 and 3) that are not New Work.[4]   These claims are classified

12   as "Existing Technology" under the JDA, defined as Digital Audio Coding Work before the

13   beginning of the period of Brandenburg's stay at AT&T (before April 1989) as described in

14   Attachments A and B to the JDA.  (Id. at 2.)  The JDA addresses Existing Technology

15   under licensing provisions:

16         Existing AT&T Technology and Existing FhG Technology, including related patents
       and patent applications will be available under license to the other party, subject to
17         the terms of a perpetual nonexclusive. royalty-free license between AT&T and FhG.

18   (Id. at 3 § 3.)  The JDA also envisioned that Fraunhofer would have rights to sublicense

19   AT&T's Existing Technology to third parties only under defined circumstances.[5]  (Id. at 3

20   §§ 5, 6.)

21         The JDA does not contain any explicit provisions for newly filed patents and/or

22

23         [4] The '938 patent contains claims 1-4.  The '080 patent contains claims 1, 3 and 4; Lucent
24   removed claim 2 from the '080 patent during prosecution of the reissue application.  At trial,
     Microsoft did not show that claims 1 and 3 were not entitled to the earliest priority date of the '080
25   patent (1988).  The evidence indicated that these claims were performed by Johnston prior to the
     collaboration with Fraunhofer and could claim priority to the '457 patent.  The '457 patent was
26   defined as Existing Technology under the JDA.  (Id. at 2, Attachment A.)

27         [5] These circumstances have previously been determined not to apply to the Fraunhofer-
     Microsoft agreements covering the technology at issue here.

28                                          11

Exhibit 5  Page 73

patent applications that contain both New Work and Existing Technology.  Under <u>Pope Mfg. Co. v. Gormully & Jeffery Mfg. Co.</u>, 144 U.S. 248, 252 (1892), a patentee can not split up ownership of an existing patent by assigning separate claims to different parties.  Hence, the JDA cannot readily be interpreted to split the '938 and/or '080 patents into "New Work" (claims 2 and 4) owned by both AT&T and Fraunhofer and "Existing Technology" (claims 1 and 3) owned solely by AT&T, without coming into conflict with <u>Pope</u>.

Lucent argues that the JDA should be interpreted to provide full ownership of the '938 and '080 patents to AT&T and give only licensing rights on the New Work to Fraunhofer.  It argues that the sentence dictating "joint ownership" over New Work does not give Fraunhofer true ownership rights because the subsequent sentence provides Fraunhofer only with the right to use the New Work, not make it or sell it.  (<u>See</u> DX 6489 at 3 § 1.)  This position is unpersuasive.  The JDA does not divide the rights to make, use and sell between the parties.  It only provides the rights "to make use" to both parties.  Interpreting this phrase as only the right to use would suggest that neither party could make or sell technology encompassing the New Work, a result that is nonsensical.  Additionally, the JDA states that the parties may "make use of" intellectual property rights to the New Work and that the parties envisioned that rights to New Work would be memorialized in patent applications filed on the New Work.  (<u>Id.</u> at 3 §§ 1, 2.)  Intellectual property rights (*e.g.*, patent ownership) on New Work would include rights to make, use and sell.  There is nothing to suggest that the JDA did not intend for these intellectual property rights of making, using and selling the New Work to flow to both parties.

The circumstances here have many parallels with those of <u>Israel Bio-Engineering Project v. Amgen, Inc.</u>, 475 F.3d 1256, 1263-64 (Fed. Cir. 2007).  In that case, two parties executed a series of agreements regarding a joint research and development project which provided ownership of work performed during the joint project to one party and all work done subsequent to the joint project to the other.  <u>Id.</u> at 1259-1260.  A patent was filed

12

Exhibit 5  Page 74

1    containing three claims: one claim encompassed work done as part of the joint project; the

2    other two claims encompassed later work.  Id. at 1261.  Since ownership attaches to the

3    patent as a whole, the Court found that neither party could have sole ownership of the

4    patent.  Id. at 1267-68.  Instead, the two parties each had undivided co-ownership interest.[6]

5    Id. at 1268.   Furthermore, the Court refused the suggestion that because one party had filed

6    all the claims together, that party forfeited all ownership rights to the joint work

7    incorporated therein.  Instead, the only thing forfeited was either parties' right to

8    exclusivity to any of the work encompassed in the claims of the patent.  Id. at 1267.

9        Similarly here, by filing claims to New Work in the same application as claims to

10   Existing Technology, the patent is jointly owned by AT&T and Fraunhofer.  AT&T cannot

11   cause Fraunhofer to forfeit its ownership rights to New Work simply by filing AT&T's

12   Existing Technology in the same patent application.  If anything is forfeited, it is AT&T's

13   rights to exclusive ownership of the entire '938 patent.  AT&T forfeited that right when it

14   chose to file all four claims in one application.  Lucent made a similar decision when it

15   applied for the reissue that became the '080 patent and chose to keep claim four in the same

16   application with claims one and three, all with one priority claim.  The Court therefore

17   **FINDS** that under the JDA, the '938 patent and its reissue, the '080 patent, are jointly

18   owned by AT&T and Fraunhofer.

19       **D.    Lucent's Standing**

20       "An action for infringement must join as plaintiffs all co-owners."  Ethicon, Inc. v.

21   U.S. Surgical Corp., 135 F.3d 1456, 1467 (Fed. Cir. 1998).  Since Fraunhofer is a co-owner

22   of the '080 patent and it is not joined in the instant suit, Lucent lacks standing to sue

23   _____

24       [6]  Although the situation in Israel also concerned joint inventors, that difference does not
     render the comparison to the instant circumstances inapplicable.  Here, the situation created by the
25   filing of New Work and Existing Work into a single patent is much like the filing of a patent with
     more than one inventor, where all the inventors did not contribute to each and every claim.   Even
26   though Johnston is a single inventor, there are two "personas": Johnston with AT&T as the sole owner
     of his Existing Technology and Johnston with joint owners AT&T and Fraunhofer to his New Work.
27   The filing of an application with these two "personas" renders the same result as filing with multiple
     inventors - each assignee is a joint owner of the whole patent.

28                                         13

Exhibit 5  Page 75

1    Microsoft for infringement on this patent.  The Court therefore **DISMISSES** under Fed. R.

2    Civ. P. 12(b)(1) Lucent's claims on the '080 patent in their entirety and **AMENDS** its Rule

3    52(b) judgment accordingly.

4          Although Lucent could potentially amend its complaint to join all co-owners in the

5    suit and establish standing**,** as discussed below**,** it appears from the record that Fraunhofer

6    has granted a license to Microsoft.  Absent any challenge of this license, even if Lucent

7    could establish standing, Microsoft would not be liable to Lucent or any other co-owner of

8    the '080 patent.

9          **E.**      **Microsoft's License Defense**

10         In 1997, Microsoft entered into a software agreement with Fraunhofer.  (PX34.)

11   This agreement provided Microsoft with the codecs which were incorporated into Windows

12   Media Player and are now at issue in the instant suit.  (Id. at § 4.1.)  The agreement also

13   granted to Microsoft licenses to patents owned by Fraunhofer necessary to exercise the

14   software licencing rights provided therein.  (Id. at § 4.2.)  Because the '938 patent and

15   therefore the '080 patent is jointly owned by AT&T and Fraunhofer, to the extent the '080

16   patent is necessary to the performance of the Windows Media Player functions accused

17   herein,  Microsoft, through its agreement with Fraunhofer has a license to the '080 patent.

18   See Schering Corp. v. Roussel-UCLAF SA., 104 F.3d 341, 344 (Fed. Cir. 1997) ("Each

19   co-owner's ownership rights carry with them the right to license others, a right that also

20   does not require the consent of any other co-owner.").  Microsoft as a licensee cannot be

21   liable for infringement of the '080 patent.  35 U.S.C. § 271.  Therefore, the Court **FINDS**

22   that Microsoft has prevailed on its licensing defense and is **NOT LIABLE** for infringement

23   of the '080 patent.  The Court **AMENDS** its Rule 52(b) judgment accordingly.

24   **IV.**    **INFRINGEMENT OF THE '457 PATENT**

25         **A.**      **Direct Infringement**

26         Microsoft argues that no reasonable jury could have found on the evidence presented

27   at trial that the back-up HQ encoder of the Windows Media Player infringed the claims of

28                           14

**Exhibit 5  Page 76**

1    the '457 patent because there was no evidence that the HQ encoder had ever performed the

2    claimed methods.

3        To prove infringement of a methods claim (such as claims 1 and 5 of the '457

4    patent), there must be sufficient evidence that establishes the device is capable of

5    performing the method and that *it indeed performs that method.*  Joy Technologies, Inc. v.

6    Flakt, Inc., 6 F.3d 770, 775 (Fed. Cir. 1993) ("A method claim is directly infringed only by

7    one practicing the patented method"); see also Ormco Corp. v. Align Technology, Inc., 463

8    F.3d 1299, 1311 n. 12 (Fed. Cir. 2006).

9        There was no direct evidence that the HQ encoder performed the patented methods

10   presented at trial.  Even Lucent's expert, Dr. Polish, testified that he had never observed the

11   HQ encoder running, he had not made a CD encoded by the HQ encoder, and he could not

12   explain how a user would select and run the HQ encoder (over the default fast encoder).

13   (Trial Tr. vol. III, 198:1-199:5, 200:18-24, Jan. 31, 2007.)  Instead, Lucent argues that its

14   proof of infringement centered on circumstantial evidence that the HQ encoder would run

15   automatically when the fast encoder failed and therefore carry out the claims of the '457

16   patent.

17       Circumstantial evidence may be sufficient in some circumstances to prove direct

18   infringement.  Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed.

19   Cir.1986) ("circumstantial evidence of extensive puzzle sales, dissemination of an

20   instruction sheet teaching the method of restoring the preselected pattern with each puzzle,

21   and the availability of a solution booklet on how to solve the puzzle" was sufficient to show

22   direct infringement of patented method claims to solve the Rubik's cube).  On other facts,

23   circumstantial evidence may be insufficient.  E-Pass Technologies, Inc. v. 3Com Corp., 473

24   F.3d 1213, 1222 (Fed. Cir. 2007) (each step of the claimed method was only taught in

25   isolation such that too much speculation was needed to conclude that any customer had

26   ever performed the steps of the method in the order claimed in the patent).

27       Here, the evidence regarding the functioning of the HQ encoder presented an

28                                        15

Exhibit 5  Page 77

interesting dilemma.  According to Lucent's expert Dr. Polish, the HQ encoder would initialize and run if the default fast encoder of Windows Media Player failed.  (Trial Tr. vol. III, 139:13-16; 142:16-20, Jan. 31, 2007.)  This analysis was based on his review of the source code.  (Id. at 139:17-20, 141:15-24.)  Dr. Polish opined that four types of errors would cause the fast encoder to fail. (Id. at 144:7-145:4.)  Although he testified that in his opinion, these errors occur in practice, (id. at 146:7-9), he did not know at what rate such errors occurred, nor had he ever observed such errors  (id. at 145:23-146:6, 185:8-25, 196:2-14).  He also testified that errors that would cause the fast encoder to fail would not cause the HQ to also fail because the two encoders used different initialization tests.  (Id. at 146:17-147:9.) Again, this analysis was based on an examination of the source code; Dr. Polish had never seen it happen in practice, nor reproduced it himself.  (Id. at 185:1-186:5.)  No other witness testified to having observed the HQ encoder perform, nor was there any tangible evidence of such performance.  Tellingly, when Lucent's expert was asked if he had tested his theories, he replied in the negative.  Although he had available to him a debugger which he successfully used to test the fast encoder's functions as they pertained to the claims of the other patent in suit, the '080 patent (id. at 159:16-160:2), he never attempted to use the same debugger to test for the failure of fast encoder or the running of the HQ encoder  (id. at 197:7-13).  Furthermore, although he admitted he could have built an apparatus to test for the errors that would make the fast encoder fail and trigger the HQ encoder, he chose not to do so.  (Id. at 197:14-19.)   When asked if he could even explain to the jury how he would go about making the HQ encoder work, he replied that he could not (Id. at 198:6-17; see also id. at 199:4-5 ("If I could tell you how to do it, I could have done it myself.").)

In essence, Lucent offered circumstantial evidence that proved at most that the HQ encoder was possibly *capable of* running. What it failed to show, circumstantially or

16

Exhibit 5  Page 78

1    otherwise, was that HQ had actually ever run and performed the claimed method.[7]  This

2    evidence is insufficient as a matter of law to demonstrate infringement of a methods claim.

3    While Lucent argues that "the record was replete with evidence that the HQ encoder will be

4    invoked as a result of common conditions that occur routinely in practice," as the Federal

5    Circuit noted in  E-Pass Technologies, Inc. v. 3Com Corp., 473 F.3d 1213, 1223 (Fed. Cir.

6    2007), if it was so common and so routine, certainly Lucent could have introduced

7    evidence of at least one instance where the HQ encoder had run.

8         The instant circumstances differ from those of Moleculon, on which Lucent relies.

9    In that case, there was no question that if a user followed the instruction manual, the

10   Rubik's cube puzzle would be solved.  Witness testimony established that, in addition to

11   the circumstantial evidence of instructions to solve the puzzle, many people had been

12   observed solving the accused Rubik's cube.  Moleculon Research Corp. v. CBS, Inc., 594

13   F. Supp. 1420, 1440 (D.C. Del. 1984), overruled by Moleculon, 793 F.2d 1261 (Fed.

14   Cir.1986).  In contrast, here, although according to the source code the HQ encoder could

15   infringe the claimed methods if it ran, the evidence established only uncertainty and

16   speculation as to whether it had ever run even once.  Like the circumstances in E-Pass, 473

17   F.3d at 1222, where the accused personal digital assistant (PDA) could perform many

18   functions other than the claimed method, here, even according to Lucent's expert, a

19   computer running Windows Media Player is running dozens of processes, with thousands

20   of instructions, "there may be bugs.  There may not be bugs.  There's all kinds of things

21   that could be happening."  (Trial Tr. vol. III, 183:20-184:5.)[8]

22

23        [7] The Court considers here the evidence under the standard for judgment as matter of law.
     There also was evidence at trial from Microsoft to refute Lucent's theories. However, the jury was not
24   required to believe Microsoft's expert, nor accord him the same weight as Lucent's expert.

25        [8] The Court also finds Lucent's argument unavailing that simply because the HQ encoder is
     in Windows Media Player as a backup, it must perform the claimed methods.  Whether or not
26   Microsoft may have intended or attempted to perform the claimed methods with the HQ encoder, the
     key question is whether the accused software did perform. "Attempted infringement" does not create
27   liability.

28                                        17

Exhibit 5  Page 79

1    Given this amount of speculation, the Court finds that Lucent failed to meet its

2    burden to demonstrate by a preponderance of the evidence, direct or circumstantial,

3    performance of the methods claims of the '457 patent by the HQ encoder.  Therefore the

4    Court **GRANTS** judgment as a matter of law that the HQ encoder does not infringe claims

5    1 and 5 of the '457 patent.  In the alternative, the Court **GRANTS** a new trial as to

6    infringement of these claims.  Based on the level of speculation and uncertainty, as well as

7    the lack of any attempt by Lucent or its experts to demonstrate the failure of the fast

8    encoder and/or the performance of the HQ encoder, the Court finds that the jury's verdict

9    of infringement was against the clear weight of the evidence.

10    The remaining claim of the '457 patent at issue, claim 10, is a product-by-process

11    claim.  The case law is divided on whether this type of claim is treated as a product claim

12    or more like a methods claim.  In Scripps Clinic & Research Foundation v. Genentech, Inc.,

13    927 F.2d 1565, 1583 (Fed. Cir. 1991), one panel of the Federal Circuit ruled that products

14    by process claims "are not limited to product prepared by the process set forth in the

15    claims."  One year later in Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834,

16    846 -847 (Fed. Cir. 1992), another Federal Circuit panel ruled "process terms in

17    product-by-process claims serve as limitations in determining infringement."  While

18    seemingly in contradiction, this Court resolved the issue relative to the '457 patent based

19    on the context of the claim at issue.  Claim 10 reads "A storage medium manufactured in

20    accordance with a process comprising the steps of:" and then lists several steps defining the

21    process.  Ignoring the process steps would leave only "a storage medium" as the claimed

22    product, an untenable position since storage media were well known in the art as of the

23    '457 patent.  Thus, the Court concluded that claim 10 was limited by these process steps

24    and instructed the jury that "[a] product-by-process claim is a product or 'apparatus' claim

25    that is further defined by one or more steps of a process used to make the product."

26    (Court's Jury Instruction No. 33; docket no. 1168.)

27    Lucent argues that the jury's verdict of infringement of this claim is supported by

28                                          18

**Exhibit 5  Page 80**

sufficient evidence because it proved that a computer loaded with Microsoft's Windows Media Player is capable of carrying out these process steps.  While generally, to infringe a product claim, the accused device need only be capable of infringement, this determination may depend on the claim language.  In <u>Intel Corp. v. U.S. Intern. Trade Com'n</u>, 946 F.2d 821, 832 (Fed. Cir. 1991), the  use of the phrases "programm *able* selection means" and "whereby *when* said alternate addressing mode is selected" led the Court to conclude that the device need only be capable of operating in such a manner rather than requiring proof of such actual operation.  In contrast, in <u>Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 424 F.3d 1293, 1310-12 (Fed. Cir. 2005), the Court found the term "operatively joined" to be a structural limitation such that an accused device would only infringe if it actually was joined, but not if it was simply "capable of" being joined.

Here, the claim language resembles that in <u>Cross Medical</u>.  Claim 10 uses the term "manufactur*ed* in accordance with a process comprising" indicating that to infringe the claim, the accused storage medium must have been made using the process, rather than one that is made in another manner but capable of carrying out the process.  There was no evidence at trial that anyone had ever made anything with the claimed process.[9]  As Lucent's expert admitted, he had not even attempted to make the HQ encoder run, let alone derive a storage medium product (such as a CD with an mp3 file) made by the HQ encoder. Therefore, the Court finds that as a matter of law, the evidence presented at trial cannot support a finding of infringement of claim 10.  Microsoft's motion for judgment as a matter of law of no infringement of claim 10 is **GRANTED**.

Alternatively, the Court also **GRANTS** Microsoft's motion for a new trial on the infringement of claim 10.  The new trial is granted on two grounds.  First, for the same reasons as found for claims 1 and 5, the clear weight of the evidence does not support the jury's finding of infringement of claim 10.  Second, the Court finds that there was a conflict

---

[9] The process steps of claim 10 are essentially the method steps set out in claim 1.

19

Exhibit 5  Page 81

in the jury instructions which may have provided an erroneous standard for the jury. Although the Court's Jury Instruction No. 32 correctly instructed the jury that "[i]n order to literally infringe a product-by-process claim, you must find that each step of the process is literally performed in making the accused product," the Court's Jury Instruction No. 33, instructed "[a]n accused product may be found to infringe a product-by-process-claim if the accused product is manufactured so that it is capable of using the steps of the process as they are recited in the claim." (See Court's Jury Instructions; docket no. 1168.) The jury may have therefore decided the question of infringement of claim 10 on the erroneous standard set out in the latter instruction.

### B.    Indirect Infringement

"Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." Joy Technologies, Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993). In light of the Court's rulings on no direct infringement, the Court therefore **GRANTS** judgment as a matter of law and in the alternative, a new trial on indirect infringement. Although Microsoft raises other grounds in its motions, the Court need not and does not address them here.

## V.    INFRINGEMENT OF THE '080 PATENT

Although as analyzed herein, Lucent lacks standing to sue for infringement of the '080 patent and Microsoft has a license through its agreement with Fraunhofer to practice the '080 patent with regards to the accused encoders, the Court alternatively rules herein on Microsoft's motions for judgment as a matter of law and for new trial pertaining to infringement issues, as well as invalidity and damages issues on the '080 patent.

### A.    Claim Construction

Microsoft contends that the Court's claim construction of the element (c) in claim 1 of the '080 patent was overly broad and therefore a new trial is warranted. Element (c) reads:

(c) using a rate loop processor in an iterative fashion to determine a set of

20

Exhibit 5  Page 82

1

2

> quantization step size coefficients for use in encoding the set of frequency coefficients, said set of quantization step size coefficients determined by using the masking threshold and an absolute hearing threshold;

3    Microsoft argues that the Court's claim construction encompassed combining the masking

4    threshold and absolute hearing threshold as an "input" to the rate loop.  It argues that the

5    prosecution history required the "use" of both thresholds within the rate loop itself.

6         This issue was considered during the Markman hearings and the Court ruled that the

7    claim was not limited to the use of both thresholds within the rate loop. Microsoft has

8    provided no new arguments on this point.  It simply asserts the issue here to preserve it for

9    appeal.  Therefore, the Court **DENIES** Microsoft's motion for a new trial on this ground.

10        **B.    Direct Infringement**

11        Microsoft contends in cursory fashion that there was insufficient evidence for the

12   jury to have concluded that the pbThresholdQuiet of the accused products meets the

13   Court's claim construction for an absolute hearing threshold (AHT) in the '080 patent

14   claims.  Microsoft argues that its expert testified to just the opposite, that pbThresholdQuiet

15   was not the AHT of the patent.  Lucent, however, points to testimony of its own expert that

16   pbThresholdQuiet is an AHT.  Additionally, Lucent points to the cross-examination of

17   Microsoft's expert where Lucent used the expert's own report to impeach him; the report

18   stated that pbThresholdQuiet is an AHT.  The Court finds that the jury had sufficient

19   evidence on which it could have based its finding of infringement.

20        Microsoft also argues that the Court's refusal to allow reference to the judgment in

21   the Dolby case (a suit on the predecessor '938 patent against Dolby's technology)

22   prejudiced Microsoft's ability to show non-infringement.  At the hearing on Lucent's

23   motions in limine, the Court excluded the findings in Dolby as hearsay, although it allowed

24   the parties to use statements made in that case by witnesses or parties for purposes of

25   impeachment. (Transcript in limine Hr'g, 113:7-9; 114:21-115:1, Jan. 3, 2007.)  Microsoft

26   has not offered an exclusion, exemption or exception to hearsay under the rules of evidence

27   which would suggest that this decision was in error.  Furthermore, Microsoft primarily

28                                              21

**Exhibit 5  Page 83**

1    argued in its opposition to this motion in limine that the evidence was relevant to

2    willfulness and/or impeachment of witnesses, not as direct evidence of non-infringement.[10]

3    Thus, the exclusion was not in error and there was no prejudice to Microsoft.  Microsoft's

4    motions for judgment as a matter or law and for a new trial on the issue of direct

5    infringement of the '080 patent are **DENIED**.

6         **C.    Contributory Infringement by All of the Accused Encoders**

7         Microsoft argues that the jury's findings on contributory infringement are wrong and

8    against the clear weight of the evidence in light of the recent holding by the Supreme Court

9    in Microsoft Corp. v. AT & T Corp., 127 S. Ct. 1746, 1750 (2007).   Microsoft contends

10   that the AT&T holding addressing foreign sales under 35 U.S.C. § 271(f) also should be

11   applied to infringement under § 271(c) for domestic sales.

12        This Court has no reason to interpret AT&T so expansively.  One of the key

13   concerns regarding § 271(f) is the effect of U.S. patent law on extraterritorial activities.

14   "The traditional understanding that our patent law operates only domestically and does not

15   extend to foreign activities . . . is embedded in the Patent Act itself, which provides that a

16   patent confers exclusive rights in an invention within the United States."  Id. at 1758

17   (internal quotations and citation omitted).  This concern does not infect § 271(c).  While

18   domestic patent laws more readily govern facilitation and inducement of infringement, §

19   271(f) is limited to components supplied for a combination that will be made outside the

20   United States.

21        There is no precedent for limiting the scope of § 271(c) to the limits placed on §

22   271(f).  Just as the Supreme Court declined to remedy potential inconsistencies or

23   loopholes in the patent laws and left such issues for Congress to address, here too, this

24   Court leaves the legislature to consider whether supplying software as an "intangible"

25

26        [10] (See Transcript in limine Hr'g, 113:10-19, Jan. 3, 2007.)  Microsoft prevailed on the issue
     of willfulness at trial, regardless of the exclusion.  With respect to infringement and validity issues,

27   Microsoft primarily argued the Dolby case was relevant because of the inconsistent positions taken
     by Lucent and its witnesses.  The Court permitted the use of testimony from Dolby for these purposes.

28                                          22

**Exhibit 5  Page 84**

1  should be exempted from § 271(c).  Microsoft's motion for a new trial on contributory

2  infringement is **DENIED**.

3       **D.       Indirect Infringement by the Cyberlink Encoder**

4       Microsoft challenges the sufficiency of the evidence for the jury's verdict on

5  contributory infringement and inducing infringement of the '080 patent by the Cyberlink

6  plug-in encoder.  Regarding contributory infringement, Microsoft, in a cursory fashion,

7  contends that Lucent failed to introduce sufficient evidence because Windows Media

8  Player with the Cyberlink plug-in encoder has substantial noninfringing uses.  The Court,

9  however, finds no evidence of any other uses for the Cyberlink plug-in encoder in the

10  record.  Simply packaging the Cyberlink plug-in encoder with the Windows Media Player,

11  a device that itself has many other functions, does not insulate the encoder from

12  infringement.  Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 945 (Fed. Cir.

13  1990) (the addition of features to a patented device or the addition of functions to a device

14  performing a patented method does not avoid direct infringement).[11]  Therefore,

15  Microsoft's motions for judgment as a matter of law and for a new trial as to contributory

16  infringement by the Cyberlink plug-in are **DENIED**.

17       As for inducing infringement,  Microsoft contends that the element of specific intent

18  was not met because there was no evidence that Microsoft knew how the Cyberlink product

19  functioned and additionally, that there was little or no evidence of inducement other than a

20  website link.  As to the website, evidence and testimony was presented showing that

21  Microsoft advertised its products with a link to the Cyberlink plug-in to provide users with

22  their choice of features; thus a jury could conclude that such advertising was sufficient

23  encouragement and/or instructions for inducement.

24

25       [11]  This is not the circumstances present in Hodosh v. Block Drug Co., Inc., 833 F.2d 1575,
26  1578 (Fed. Cir.1987) and Aquatex Industries, Inc. v. Techniche Solutions, 419 F.3d 1374, 1380 n.*
   * (Fed. Cir.2005), where a patented product incorporated a staple ingredient (and hence selling the
27  staple was not contributory infringement).  Here, the Cyberlink Plug-in is not a staple, and
   incorporating it into Windows Media Player does not somehow "convert" it into a staple ingredient.

28                                          23

**Exhibit 5  Page 85**

However, the Court finds that there was insufficient evidence to show that Microsoft had any knowledge that the Cyberlink encoder was an infringing device. The testimony pointed to by Lucent on this issue demonstrates only that the binary code (machine code) was provided to Microsoft by the Cyberlink Corporation; the source code was not provided. (Trial Tr. vol. X, 26:22-27:4, Feb. 12, 2007.) Lucent does not point to any evidence or testimony that would explain how Microsoft should have known from the binary code that the Cyberlink plug-in infringed the '080 patent. According to the testimony of the witness from Cyberlink, the function of the encoder with regard to encoding mp3 files was never discussed with Microsoft. (Id. at 27:24-28:23.) Therefore, as to inducing infringement as it relates to Windows Media Player with Cyberlink plug-in, the Court finds that there was insufficient evidence to demonstrate that Microsoft knew or should have known that its aid or encouragement would cause the infringement of the '080 patent; judgment as a matter of law on this issue is **GRANTED**. Alternatively, because the jury's verdict was against the clear weight of the evidence, the Court **GRANTS** a new trial on this issue.

## VI.    INVALIDITY DEFENSES

### A.    Anticipation/Obviousness of the '080 Patent:  the OCF Paper

Microsoft contends that Lucent failed to present any evidence to rebut Microsoft's prima facie case that the OCF Paper rendered claim 4 of the '080 patent anticipated and/or obvious. However, as Lucent argues, the jury may have reached its verdict because Microsoft failed to demonstrate invalidity by clear and convincing evidence and/or because Lucent's expert Dr. Jayant provided amble rebuttal evidence.

Microsoft's expert Dr. Brandenburg testified that claim 4 (a means-plus-function claim) had several overlapping elements with claim 1 (Trial Tr. vol. VII, 88:16-89:2, Feb. 6, 2007.) These overlapping elements were analyzed in detail with regard to claim 1. (Id. at 78:19-87:4.) In contrast, Brandenburg addressed the means-plus -function element of claim 4, which is not an element in claim 1, in only a cursory fashion. (Id. at 91:4-13.) Although he testified about function of this element, he did not opine where the

24

**Exhibit 5  Page 86**

1   corresponding structure could be found in the prior art.  Absent this testimony, the jury may

2   have found his analysis lacking.

3        As for rebuttal evidence, Lucent's expert Dr. Jayant testified that elements (c) and

4   (d) of claim 1 were not found in the OCF paper, nor was it obvious to combine other art to

5   arrive at these claim limitations. (Trial Tr. vol. XI, 78:24-90:4, Feb 13, 2007.)  As

6   explained above, these claim limitations overlapped those of claim 4 and would thus be

7   missing in both claims.  Therefore, the Court finds that there was ample evidence in the

8   record to support the jury's findings that the OCF Paper did not anticipate the '080 patent

9   or render it obvious.  Microsoft's motions for judgment as a matter of law and a new trial

10  on this issue are **DENIED**.

11       **B.    Failure to Swear Behind Low Bit Rate Paper**

12       Microsoft also contends that a jury could not have found the '080 patent valid in

13  view of the Low Bit Rate Paper.  It claims that Lucent failed to provide any evidence to

14  swear behind this reference and thus, the Low Bit Rate Paper was definitively prior art.

15       As for the status of the paper as prior art, Microsoft contends that all the evidence

16  establishing the date of invention of the '080 patent came from the uncorroborated

17  testimony of the inventor Johnston.  In response, Lucent points to the corroborating

18  evidence  of a technical memo and a publication by Johnston.[12]  Irrespective of the

19  corroboration issue, however, as discussed supra, Johnston's testimony and supporting

20  documentation cannot support a priority date of 1988 for all of the claims of the '080

21  patent.  In particular, they do not establish a date of invention earlier than the '938 patent

22  itself for claim 4 which contains specific corresponding structure for the means-plus-

---

24  [12] As to the technical memo, it has Johnston's signature and also an additional unlabeled
    "signature." (PX128.) Lucent claims it is Dr. Jayant's signature and Microsoft has not challenged this
25  assertion.  This latter signature acts as the necessary corroboration to establish a date of invention.
    See
26  Finnigan Corp. v. International Trade Com'n, 180 F.3d 1354, 1369 (Fed. Cir. 1999)(establishing that
    "corroboration is required of any witness whose testimony alone is asserted to invalidate a patent,
27  regardless of his or her level of interest" and distinguishing prior cases such as Thomson, S.A. v.
    Quixote Corp., 166 F.3d 1172, 1176 (Fed. Cir. 1999) which stated otherwise).

28                                      25

**Exhibit 5  Page 87**

1    function limitations. Therefore, the Low Bit Rate Paper which was published before the

2    '938 patent may be considered prior art at least for claim 4.

3         Even so, Microsoft's contention that a jury could have only found that this reference

4    anticipates the '080 patent meets with problems. First, as Lucent points out, Microsoft had

5    the burden to demonstrate anticipation by clear and convincing evidence. Dr. Strawn,

6    Microsoft's only witness on this topic, did not opine on claims 1 and 3 and only offered

7    conclusory testimony as to claim 4, simply "checking off" on a chart that each element of

8    the claim was present in the reference.[13]  (Trial Tr. vol. VIII, 200:3 - 205:4, Feb. 7, 2007.)

9    This testimony alone cannot be considered substantial evidence put before the jury. See

10   Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1152 (Fed. Cir. 2004)

11   ("[T]estimony concerning anticipation . . . must identify each claim element, state the

12   witnesses' interpretation of the claim element, and explain in detail how each claim element

13   is disclosed in the prior art reference. The testimony is insufficient if it is merely

14   conclusory." (quoting Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315-16 (Fed.

15   Cir.2002))).  The Court thus finds that the jury's verdict was supported by substantial

16   evidence and **DENIES** Microsoft's motion for judgment as a matter of law on this ground.

17        **C.    Exclusion of Mr. Johnston's Testimony**

18        Microsoft asserts that it wished, but was not permitted, to elicit Johnston's testimony

19   that Lucent's interpretation of the '080 patent claims was over-broad and rendered the

20   patent invalid. It argues that this exclusion substantially prejudiced the outcome against

21   Microsoft.

22        The Court finds that this exclusion was not in error and did not result in any

23   prejudice. First, as to the scope of Johnston's testimony, at the motions in limine hearing

24   before trial, Microsoft told the Court that Johnston would not be giving an opinion on

25

26        [13] While Strawn also testified that this analysis was covered in his expert report, he did not
27   further elaborate to say whether the report was also equally as conclusory or more detailed, nor was
     the report put into evidence. (Trial Tr. vol. VIII, 205:10-12, Feb. 7, 2007.)

28                                              26

**Exhibit 5  Page 88**

invalidity; he would testify as a fact witness on issues such as the circumstances

surrounding the filing of the reissue application.  (Transcript in limine Hr'g, 26:23-27:12,

Jan 3. 2007.)  To the extent Microsoft wished to elicit additional testimony at trial, it should

have raised this in a timely manner, especially in light of its prior statement to the Court.

Second, while Microsoft argues that an inventor's testimony may be used to

invalidate a patent, the relevance of Johnston's possible testimony on this issue is

questionable at best.  An inventor's subjective opinion as to the interpretation of the claims

is no longer relevant. "[O]nce the patent issues, the claims and written description must be

viewed objectively, from the standpoint of a person of skill in the art."  Solomon v.

Kimberly-Clark Corp., 216 F.3d 1372, 1380 (Fed. Cir. 2000).  Here, Johnston was not

designated as an expert witness and thus could not offer opinions as to invalidity.   Further,

Microsoft has not indicated any facts that Johnston would have offered that would have

possibly changed the outcome here.

Third, Microsoft's primary objective for Johnston's testimony as expressed during

the motions in limine hearing and at side-bar during trial was to elicit facts regarding the

circumstances of the reissue application that could be relevant to inequitable conduct in

procuring the patent or the reissue.  (Transcript in limine Hr'g, 26:23- 27:12, Jan 3. 2007;

Trial Tr. vol. VI, 73:8-79:13, Feb. 5, 2007.)  The Court permitted this testimony at trial and

therefore Microsoft suffered no prejudice on this issue..  (Trial Tr. vol. VI, 83:13-84:5, Feb.

5, 2007.)  Therefore, the motion for a new trial on this ground is **DENIED**.

### D.    Impact of KSR Intern. Co. v. Teleflex Inc.

Based on the recent U.S. Supreme Court's ruling in KSR Intern. Co. v. Teleflex Inc.,

127 S. Ct. 1727 (2007), Microsoft moves for judgment as a matter of law and/or new trial

on obviousness.[14]   Having considered the evidence presented at trial and the instructions

---

[14]  The decision in KSR issued on April 30, 2007, almost two months after the verdict in the instant Group 2 trial.  Since this trial remains here on direct review, KSR's holding applies.  See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 90 (1993) ("[the Supreme] Court's application of a rule of federal law to the parties before the Court requires every court to give retroactive effect to

27

Exhibit 5  Page 89

given to the jury on obviousness, the Court finds that neither judgment as a matter of law or a new trial is warranted. The standard used at trial was consistent with <u>KSR</u> and Microsoft has not persuaded the Court that the obviousness analysis would have proceeded any differently had the ruling in <u>KSR</u> been available at the time of the trial.

The Court's instructions to the jury did not require an explicit teaching or suggestion to combine:

> In deciding whether to combine what is described in various items of prior art, you **may consider whether or not there was some motivation or suggestion** for a skilled person to make the combination covered by the patent claims. The motivation or suggestion to combine the teachings of different prior art references **may be found either explicitly or implicitly** in the references themselves **or in the knowledge generally available** to one of ordinary skill in the art.

(Court's Jury Instruction No. 51; docket no.1168 (emphasis added)). Although Microsoft argues that the instruction should have explicitly stated that a suggestion or motivation to combine was not required, <u>KSR</u> does not completely remove these considerations from the analysis: "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." <u>KSR</u>, 127 S. Ct. at 1741. A reason for the combination is still an important consideration, even though it need not be a rigid formula, nor "a formalistic conception":

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

<u>Id.</u> at 1740 -1741. <u>KSR</u> also reaffirmed familiar principles set out in <u>Graham v. John Deere Co. of Kansas City</u>, 383 U.S. 1, 17-18 (1966). <u>KSR</u>, 127 S. Ct. at 1739. The jury instructions here mirrored these <u>Graham</u> factors, and did not require a rigid or explicit teaching, suggestion or motivation to combine. The jury therefore considered the obviousness question under instructions compatible with <u>KSR</u>.

---

that decision").

28

Exhibit 5  Page 90

1    Microsoft's contentions that the testimony from Dr. Jayant (Lucent's expert) was in

2    contradiction with the <u>KSR</u> standard are unfounded.   Jayant stated that he disagreed with

3    the conclusion of Microsoft's expert, who had opined that the citation of the book on

4    psychoacoustics within the OCF paper would lead one of ordinary skill in the art to

5    combine the two to result in the invention of the '080 patent:

6        . . . what you're letting the reader know in the OCF paper is that there's this book that
         exists on psycho-acoustics. And that, by itself, doesn't mean that it teaches the reader
7        to go into that book and look at one particular part in the book that indeed goes into
         absolute thresholds and so on, let alone put everything together to come up with the
8        inventions of the claims of the 080 patent.

9    (Trial Tr. vol. XI, 89:22-90:4, Feb. 13, 2007.)  This testimony is not in contradiction with

10   <u>KSR</u> which requires more than simply combining previously known elements from the

11   prior art.  <u>KSR</u>, 127 S. Ct. at 1741.  Jayant's reference to the impermissible use of hindsight

12   analysis also is not in contradiction with <u>KSR</u>.  "A factfinder should be aware, of course, of

13   the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex

14   post reasoning." <u>Id.</u> at 1742

15   Finally, the Court is unpersuaded that <u>KSR</u>'s "broad implications" warrant

16   reopening discovery and searching for new prior art.  Although Microsoft points out that

17   this Court allowed reopening of discovery in Groups 4 and 5, the circumstances differ here.

18   Groups 4 and 5 had not started trial before the <u>KSR</u> ruling came out, whereas the Group 2

19   trial has been completed.  Additionally, an examination of district court and Federal Circuit

20   rulings on obviousness since the <u>KSR</u> decision does not support Microsoft's requested

21   upheaval.[15]  In sum, Microsoft has not offered any meritorious reason why obviousness on

22

23        [15] <u>See e.g.</u>, <u>Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd.</u>, - - F.3d - - , 2007 WL
     1839698, *4 (Fed. Cir. June 28, 2007) (finding that the district court's analysis of obviousness using
24   the <u>Graham</u> factors was consistent with an analysis under <u>KSR</u>); <u>Leapfrog Enterprises, Inc. v.</u>
     <u>Fisher-Price, Inc.</u>, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (affirming the district court's finding that
25   reasons in the industry to combine elements were sufficient to show obviousness); <u>Sundance, Inc. v.</u>
     <u>De Monte Fabricating, Ltd.</u>, 2007 WL 1655423, *2 (E.D. Mich. June 7, 2007) (denying judgment as
26   a matter of law and/or new trial because the jury's obviousness determination did not use a rigid TSM
     test and thus was consistent with <u>KSR</u>); <u>Stryker Trauma S.A. v. Synthes</u> (USA), 2007 WL 1959231,
27   *6  n.6 (D. N.J. June 29, 2007) (finding that substantial evidence supported the jury's verdict of no
     obviousness because there was no evidence the jury applied a rigid "TSM" test and sufficient evidence

28                                                29

Exhibit 5  Page 91

the '080 patent should be re-tried or why the jury's verdict as to non-obviousness of the '080 patent was not support by sufficient evidence. Therefore, the motions for judgment as a matter of law and for a new trial on obviousness are **DENIED**.

Regarding the '457 patent, an obviousness defense was not pursued by Microsoft at summary judgment or at trial.[16] Microsoft made a tactical choice not to pursue this defense; it has made no showing that the defense was discarded because of the rigid TSM test or some other factor changed by KSR. Microsoft should not get another "bite at the apple" simply because it might have chosen a different strategy if KSR had already been decided. Case law is always a moving target and a party must keep that in mind when making tactical decisions. Therefore, the motion for a new trial on these grounds regarding the '457 patent also is **DENIED**.

## VII. DAMAGES

By statute, the damages for infringement are set at an amount "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." An award of damages by the jury "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." Monsanto Co. v. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (quoting Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1580 (Fed. Cir.1992)).

Microsoft sets forth several grounds on which it argues that the jury's damages verdict should be overturned as a matter of law and/or a new trial should be granted: (1) the royalty rate and the royalty base used to calculate a reasonable royalty; (2) the lack of consistency of the jury's numeric calculations; (3) the impact of the Supreme Court's recent holding in Microsoft Corp. v. AT & T Corp., 127 S. Ct. 1746 (2007); and (4) the sway of

---

that the verdict was supported with an analysis using only the Graham factors).

[16] At summary judgment Microsoft put forth only anticipation on this patent; it was denied because of issues of fact. Microsoft did not pursue even this invalidity defense at trial.

30

**Exhibit 5  Page 92**

passion and prejudice on the jury.  These are each reviewed below.

### A.     The Royalty Base - Application of the Entire Market Value Rule

Lucent presented a damages model based on a reasonable royalty for the patent; the model presented was a 0.5% royalty rate applied to the average price of a personal computer over the relevant years.  Microsoft now argues that there was insufficient evidence to support the application of the entire market value rule on which Lucent predicated the royalty base on the cost of the entire computer.

The entire market value rule is applicable where patented and unpatented components are sold together as a functional unit "so as to produce a desired end product or result." Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1550 (Fed. Cir. 1995). Moreover, the patented component must be "the basis for customer demand or "substantially create the value of the component parts." Id. at 1549.

Two major problems arise in applying the entire market value rule here.  The first is the failure of the evidence to establish a link between the cost of the *computers* (rather than the operating system, Windows Media Player, the MP3 codec or some other "unit") and the customer demand or value of the patented technology.  The second and probably even more troublesome problem is the failure to establish that the patented features themselves produced any customer demand or value of the product.

The accused products were the HQ and fast encoders present in Windows Media Player.  Lucent failed to establish at trial that a commercial necessity and/or desirability of these features was required in computers.  Instead, Lucent established at most that there was a desirability that personal computers carry MP3 capabilities.  Thobias Jones, a software design engineer at Microsoft, testified that MP3 was a popular request from users who desired Windows Media Player. (Trial Tr. vol. IV, 14:1-13, Feb. 1, 2007.)  Dell representative Leonard Zwik testified that Windows Media Player was an integrated function of the computer's operating system and that Dell would not sell a Windows operating system without Windows Media Player.  (Id. at 72:5-73:1.)  He also testified that

31

Exhibit 5  Page 93

1  there was no customer demand for the version of Windows (XP-N) that lacked Windows

2  Media Player. (Id. 73:2-74:10.)  Witness David Fester, general manager of the Microsoft

3  Windows Digital Media Division testified that MP3 was a feature which attracted users to

4  Windows Media Player.  (Id. at 85:23-86:7).  Finally, Microsoft employee Geoff Harris,

5  responsible for the development of the Windows Media Player product, testified that there

6  was a market need and consumer demand for MP3 encoding capabilities. (Id. at 112:16-

7  113:2.)  The sum of this evidence establishes at most a market demand for an operating

8  system containing Windows Media Player with MP3 capabilities.  It does not establish that

9  the demand for *computers* is based on Microsoft's Windows Media Player and/or MP3

10 technology.

11         Even more problematically, however, is the lack of evidence showing that the

12 patented features set forth in the claims of the '457 and/or '080 patents were the basis for

13 customer demand and/or the substantial value of the product sold.  Importantly, neither the

14 '457 patent nor the '080 patent covers MP3 capability per se.  Rather, each patent relates to

15 a particular *feature* of MP3 capability.[17]  Hence, to apply the entire market value rule, the

16 evidence must show that these features were the basis of the customer demand or

17 substantially created the value of the product.  See e.g., Fonar Corp. v. General Elec. Co.,

18 107 F.3d 1543, 1549, 1553 (Fed. Cir. 1997) (the multi-angle oblique (MAO) imaging

19 feature claimed in the patent was emphasized as a selling feature in the device found to

20 infringe and thus a reasonable royalty was correctly based on the cost of the entire device);

21 Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1361 (Fed. Cir. 2001) (entire loudspeaker cost

22 was the proper royalty base where the patented feature functioned as one unit with the other

23 _____

24         [17] Lucent's own witness Dr. Jayant, testified that MP3 technology originated from many
       sources and is composed of many features, including the bit stream syntax (how the bit stream is
25     interpreted and meaningfully decoded to play back the audio signal), features of the decoder and some
       features of the encoder.  (Trial Tr. vol. II, 121:11-23, 123:2-22, Jan. 30, 2007.)  In contrast, the claims
26     at issue related to only particular features that could be used in conjunction with MP3 encoders.  The
       '457 patent relates to the methods of audio coding using a tonality value and a masking threshold.  The
27     '080 patent relates to methods and apparatus for audio coding which incorporates the use of an
       absolute hearing threshold in conjunction with a masking threshold.

28                                               32

Exhibit 5  Page 94

1   components to provide the desired audible performance, the patented feature improved the

2   performance of the loudspeaker, and the improved performance was the basis for the

3   customer demand); Tec Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1362 (Fed.

4   Cir. 1999) (damages based on entire assembly of motor, radiator and condensor where the

5   performance of the whole assembly was important to the customer, the fan was required for

6   the assembly and the patented method of balancing the fan was critical to the function of

7   the assembly and important to customer demand for the assembly); compare e.g., Imonex

8   Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1380 (Fed.

9   Cir. 2005) (insufficient evidence for the entire market rule where the patented feature,

10  which differentiated which coins were put into the machine, was not shown to be the basis

11  for the customer demand of the entire laundry machine); Medtronic, Inc. v. Catalyst

12  Research Corp., 547 F. Supp. 401, 414 (D.C. Minn. 1982) (the cost of entire pacemaker

13  could not be the royalty base where value of the pacemaker was not substantially due to the

14  patented features of the battery).

15         Here, the Court finds no evidence adduced at trial that establishes that the patented

16  features of either the '457 or the '080 patents were critical to MP3 or that they established

17  the basis for the customer demand or value of MP3, let alone were critical or provided

18  value to the whole computer.  The evidence cited by Lucent from the trial record shows

19  only that MP3 capabilities *overall* were a commercially important feature.  According to

20  Lucent's expert Dr. Jayant, MP3 technology originated from many sources and the MP3

21  standard specifies many aspects of audio compression.  (Trial Tr. vol. II, 121:11-123-22,

22  Jan 30, 2007.)  Although Jayant pointed out what he considered important in the MP3, the

23  key technology he identified related to the decoding of the bit stream syntax (which allows

24  decoders from different manufactures to interpret and play back the audio signal); he did

25

26

27

28
                                        33

**Exhibit 5  Page 95**

not identify either the invention of the '080 patent or the '457 patent as critical to MP3.[18] (Id. at 123:2-22.) Additionally, the evidence demonstrated that although the inventions of these patents could be used with the MP3 standard, they were not required or critical to practice the MP3 standard.

Finally, Lucent's assertion that even absent application of the entire market value rule, the use of the computers as a royalty base was correct because Microsoft has joint and several liability for Dell's and Gateway's infringement, is misplaced. Although an indirect infringer may be liable for all damages attributable to infringing sales, Water Tech., 850 F.2d 660, 669 (Fed. Cir. 1988); Glenayre v. Jackson, 443 F.3d 851 (Fed. Cir. 2006), simply because Dell and Gateway sell computers does not automatically designate the computer as the royalty base. The same foundation for application of the entire market value rule would have been required even if Lucent had been in direct litigation with Dell and Gateway. In the absence of this nexus, Lucent may only recover damages for the value of the patented technology itself, regardless of the named defendant.[19]

In sum, the Court finds that there was insufficient evidence to establish the required nexus between the patented features and the value of the entire computer and therefore, the jury's application of the entire market value rule to the computer was unsupported as a matter of law. On this basis, Microsoft's motion for judgment as a matter of law on the damages award is **GRANTED**. Lacking sufficient evidence to establish the proper royalty

---

[18] Additionally, although Lucent point to the testimony of Microsoft's witness Dr. Brandenburg as evidence that the patented features were essentially MP3, this testimony established at best that the technology which improved upon the '457 patent, set forth in U.S. Patent No. 5,040,217 ("the '217 patent"), was incorporated as an optional psychoacoustic model in the MP3 standard. He testified that the '217 patent was the basis of AT&T's (along with other companies') submission to the MP3 standard (ASPEC submission). According to Brandenburg, the '938 patent (on which the '080 reissue patent is based) was not even around when this submission was made. (Trial Tr. vol. VII, 13:2-17, 15:10-17, Feb. 6, 2007.) He also stated that this technology was optional for the MP3 standard. (Id. at 191:4-11.)

[19] Aside from the issue of the entire market value rule, Microsoft disputes generally that Lucent offered sufficient evidence of any value of the accused HQ and fast encoders to justify the $1.53 billion verdict. Since this issue is intertwined with the establishment of a proper royalty base on which a new trial is granted, the issue need not and is not further addressed here.

34

Exhibit 5  Page 96

1    base (both what the base would be and its cost) from the evidence at trial, the Court also

2    **GRANTS** a new trial to determine damages.

3        **B.    Royalty Rate**

4        Microsoft contends that there was insufficient evidence for the 0.5% royalty rate

5    utilized by the jury in the damage award.  Since, as explained herein, the base used in the

6    reasonable royalty calculation must be reconsidered, this will likely influence selection and

7    therefore require reconsideration of the royalty rate.  However, the Court considers some of

8    the issues pertaining specifically to the royalty rate here.

9        Under Georgia Pacific, a hypothetical negotiation may consider royalties received

10   for the patents in suit and licenses for comparable technologies.  Georgia-Pacific Corp. v.

11   U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (D.C.N.Y. 1970).  The parties presented

12   differing perspectives on these factors.  Lucent focused on a single license it had made for

13   the '457 and '080 patents, the knowledge of its licensing expert obtained from his

14   experiences licensing IBM's hardware technology and a single royalty-bearing agreement

15   made by Microsoft.  Microsoft's evidence concentrated on recent licenses it had made with

16   SISVEL (Societa Italiana Per Lo Sviluppo Dell Electtronica) for MP3 technology,

17   Microsoft's agreements with Fraunhofer for the HQ and fast encoder software and

18   Microsoft's agreements with other companies exchanging other software technologies.

19   Each perspective had its strengths and weaknesses, and yet, the overall result offered the

20   jury very little guidance in setting a royalty rate applicable to the technology and parties at

21   hand.

22       With regard to Lucent's license of the technologies in suit here, it had only a single

23   example of a royalty-based license (PX 1532; Trial Tr. vol. IV, 161:1-162:8, 163:8-14, Feb.

24   1, 2007) and this was made on a scale far smaller than would be relevant here.[20]  See

25   _____

26       [20] Lucent's expert Roger Smith testified that although the patents in suit had been licensed to
     a number of players in the industry (e.g., IBM, HP, Sony),  these licenses were all broad cross licenses
27   from which it was difficult to discern the value of the instant patents.  (Trial Tr. vol. IV,159:20 -
     160:25, Feb. 1, 2007.)  The single license example (the Nel-Tech license), although offering a 1%

28                                                35

Exhibit 5  Page 97

1  Unisplay, S.A. v. American Electronic Sign Co., Inc., 69 F.3d 512, 519 (Fed. Cir. 1995)

2  (evidence of licensing proposals and agreements probative but insufficient because the

3  scale of the license was not comparable).  Lucent's expert Roger Smith testified that

4  Lucent's "best licensing practices" document specified  a 1-5% royalty rate assessed on the

5  product sold.   (Trial Tr. vol. IV,155:20-156:9, Feb. 1, 2007.)  He also testified about

6  internal Lucent documents which indicated that Lucent intended to license its MPEG and

7  audio standard patents at 0.5%.  (Id. at 156:22 - 157:4, 157:25-158:19.)  Whether these

8  rates were ever implemented and could be considered an established rate was not apparent

9  from the record. See Trell v. Marlee Electronics Corp., 912 F.2d 1443, 1446 (Fed. Cir.

10 1990) ("for a royalty to be established, it must be paid by such a number of persons as to

11 indicate a general acquiescence in its reasonableness by those who have occasion to use the

12 invention"); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983)

13 ("mere offers to license" without actual consummated licenses are insufficient to show an

14 "established" royalty rate for the technology).

15      Smith also testified that 1% royalty to use IBM's products was the norm in the

16 computer industry.  However, such licenses (see e.g., PX1560) were hardware licenses, not

17 licenses for software or features of software comparable to the products in suit.  Other than

18 IBM's hardware licenses, Smith referred to the industry norm set out in an article (PX

19 1505), but again this was a survey of royalties for computer hardware; the article did not

20 address the software industry, let alone any connection to the MP3 technology at hand here.

21 Smith did not explain why the same royalty rate would apply in licensing the technology at

22 suit here.

23 ─────────────────────

24 royalty on MP3 products incorporating the instant patents, generated only $1450 in its first quarter.
(Id. at 163:6-14.)  Moreover, this license was entered into between Lucent and NelTech in 2005, two

25 years after the initiation of the instant suit (Trial Tr. vol. V, 26:19-27:1, Feb. 2, 2007.)  The date of
the hypothetical negotiation is set just before the infringement began.  Panduit Corp. v. Stahlin Bros.

26 Fibre Works, Inc., 575 F.2d 1152, 1158 (Fed. Cir. 1978).  Lucent's expert asserted that his calculations
were based on a hypothetical negotiations date of 1988 (Trial Tr. vol. IV, 150:2-5, Feb. 1, 2007);

27 although he claimed that if Microsoft's model of a date at 1997 or 2004 was used, his calculations
would not change. (Id. at 150:6-19)

28                                36

Exhibit 5  Page 98

1       Lucent also had a single example of royalty rate based agreements between

2 Microsoft and another company; the Microsoft-Stac agreement was offered by Smith as an

3 example of a 1-2% royalty-bearing agreement. (Id. at 174:2-9; PX1534.) Most of

4 Microsoft's agreements were for lump sum payments (see e.g., Trial Tr. vol. IV, 170:11-20,

5 172:5-11, and 172:3-7, Feb. 1, 2007) and were categorized by Smith as software licenses

6 with narrower rights than a patent license (id. at 168:16-169:13).

7       Microsoft, on the other hand, brought forward two sets of agreements related to MP3

8 technology. One set was composed of two agreements executed between Microsoft and

9 Fraunhofer for the very software code at issue in the infringement here. Microsoft paid a

10 total of $16 million. (PX34, PX36.) These agreements were criticized by Lucent's expert

11 as software agreements with only the minimum patent rights necessary to use the licensed

12 code. (Trial Tr. vol. V, 6:23-7:16, Feb. 2, 2007.) The agreements did not grant any rights to

13 use Fraunhofer's patents for technologies divorced from the source and object code

14 provided with the license. The hypothetical negotiation here was not necessarily limited to

15 a patent license for only specific software code. See Trell v. Marlee Electronics Corp., 912

16 F.2d 1443, 1447 (Fed. Cir. 1990) ("A particular fee is not the correct measure of damages

17 unless that which is provided by the patentee to its licensees for that fee is commensurate

18 with that which the defendant has appropriated." (quoting Bandag, Inc. v. Gerrard Tire Co.,

19 Inc., 704 F.2d 1578, 1582 (Fed. Cir.1983))).

20       The second agreement was between Microsoft, Audi MPEG and SISVEL (Societa

21 Italiana Per Lo Sviluppo Dell Electtronica) concerning rights to a group of patents for audio

22 coding. (DX 6715.) The royalty was $0.30 per software copy with a maximum of $5.625

23 million payment. (Id. § 4.02.) The relevance of this agreement to the hypothetical

24 negotiation is questionable, as the SISVEL agreement was executed in November 2006,

25 only a few months before the commencement of the instant trial. See Panduit Corp. v.

26 Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (Fed. Cir.1978) (the hypothetical

27 negotiation is set just before the date of infringement).

28

<center>37</center>

**Exhibit 5  Page 99**

1    In sum, it is not so much that the jury lacked any evidence on which to base a

2   reasonable royalty rate, but that the evidence provided limited guidance.  The Court cannot

3   definitively conclude that there was insufficient evidence on which a reasonable jury could

4   have reached the 0.5% royalty rate stated in the verdict form and as such Microsoft's

5   motion for judgment as a matter of law on this ground is **DENIED**.  However, the Court

6   **GRANTS** Microsoft's motion for a new trial.  The Court finds that the jury's verdict was

7   against the clear weight of the evidence; although a plethora of licensing agreements were

8   admitted into evidence, the majority of these which advocated a royalty rate in the 0.5%

9   range lacked sufficient relevance to the technology at issue here, the relevant date of the

10  hypothetical negotiation and/or the scope of a license that would be negotiated between

11  these parties.  Moreover, since the royalty base must be redetermined, the royalty rate

12  dependent thereon also should be reconsidered.

13      **C.    Inconsistency of the Verdict**

14      The jury awarded $769 million for infringement on each patent.  According to the

15  Special Verdict Form, it used a 0.5% royalty rate.  Microsoft argues that the jury verdict is

16  inconsistent with the evidence presented at trial:  If the average selling price of the

17  computer is $1128 (see PX3134), a 0.5% royalty would yield $5.64 per computer.  Applied

18  to the 130.5 million units sold with the HQ encoder, the total should be approximately $736

19  million for the '457 patent; applied to the 272 million infringing units for the '080 patent.

20  yields $1.53 billion for this patent. (See DX6099.)  Adding the damages for the two patents

21  could have yielded a jury verdict of $2.269 billion.

22      The jury was not required to report on the verdict form the number of infringing

23  units it took into consideration in its calculations.  Moreover, whether the jury followed

24  Microsoft's logic or chose to arrive at a reasonable royalty based on other factors and/or

25  adjustments to this simple calculation is unknown.  A plethora of payments and sums

26  related to other licenses was in evidence in addition to the summary slides of the parties'

27  damages models.  Absent a view into the "black-box" of the jury's decision making

28

38

**Exhibit 5  Page 100**

1   process, the Court cannot say that the jury's verdict was inconsistent or without the support

2   of sufficient evidence.  Moreover, while it might be permissible in some circumstances to

3   rationalize the damages verdict such that adjustments by the Court could be made, the other

4   issues affecting the damages verdict here make this consideration moot.  Therefore, the

5   Court **DENIES** Microsoft's motions for judgment as a matter of law and for a new trial on

6   this ground.

7       **D.**    **Impact of the Supreme Court's Ruling in <u>Microsoft Corp. v. AT & T</u>**
            **<u>Corp.</u>**

8         Microsoft argues that the $1.53 billion damages includes foreign sales which is

9   inconsistent with the very recent decision in <u>Microsoft Corp. v. AT & T Corp.</u>, 127 S. Ct.

10  1746, 1750 (2007), regarding the inapplicability of § 271(f) to software sent overseas on a

11  master disc (or electronically) for reproduction and sale because foreign sales of Windows

12  Media Player were included in the damages verdict here.

13        In <u>AT&T</u>, the Supreme Court held that "a copy of Windows, not Windows in the

14  abstract, qualifies as a 'component' under § 271(f)."  <u>Id.</u> at 1756.  It also held that

15  "components" under § 271(f) did not include copies of software installed on computers

16  where the copies themselves were not supplied from the United States.  <u>Id.</u> at 1757.

17        In the instant case, the Special Verdict Form did not separately list damages for U.S.

18  and foreign sales.  Additionally problematic, the damages covered infringement of both

19  apparatus and methods claims of the '457 and '080 patents.[21]  <u>AT&T</u> expressly limited its

20  holding to apparatus claims:

21          We need not address whether software in the abstract, or any other intangible, can

22          ever be a component under § 271(f). If an intangible method or process, for instance,
            qualifies as a "patented invention" under § 271(f) (a question as to which we express

23          no opinion), the combinable components of that invention might be intangible as

24          well. The invention before us, however, AT & T's speech-processing computer, is a
            tangible thing.

25

26        ————————————

27        [21] The '457 patent and the '080 patent each had three claims at issue; of the total six claims,
    four were methods claims.

28                                39

**Exhibit 5  Page 101**

Id. at 1756 n.13. Even if this Court declines to consider here whether AT&T should be extended to apply to the methods claims and applies the holding to the apparatus claims, the problem is not solved. The lack of transparency as to how the jury arrived at the numbers for its damages verdict makes any attempt at "subtracting out" foreign sales nearly impossible. Moreover, the parties have not pointed to any evidence that separated damages calculated for infringing methods claims versus apparatus claims of the patents. Hence, the Court has no guidance as to how even the damages for the foreign sales related to only apparatus claims could be removed.

The Court, however, need not and does not address this mountain of difficulties given the insufficient evidence to support the damages verdict as it stands now, *i.e.*, the inapplicability of the entire market value rule to the computer as the royalty base. Once the reasonable royalty base and rate are properly addressed, these remaining challenges can be rectified in the presentation of the evidence, jury instructions and a new verdict form in the new trial. The Court therefore defers the consideration on the impact of AT&T on the damages award until such time. Therefore, Microsoft's motions for judgment as a matter of law and for a new trial on this issue are **DENIED AS MOOT**.

### E. Passion and Prejudice

Microsoft next argues that the $1.53 billion damages award was driven by the jury's passion and prejudice against Microsoft as a high earning large company. Microsoft points to statements made by Lucent in its closing argument referring to Microsoft's "80% plus profit" and references to revenue from computer sales of $38-$61 billion (when Microsoft did not even sell the computers). Microsoft also argues that the inclusion of foreign sales interjected prejudice into the damages calculation. It contends that Lucent's argument to the jury that Microsoft distributed millions of copies of the software around the world and made billions of dollars biased the jury and improperly inflated considerations under

40

**Exhibit 5  Page 102**

<u>Georgia Pacific</u>.[22]

Microsoft's contentions are pure speculation.  Other than isolated statements made in Lucent's opening and closing statements, there is no evidence that would suggest that the verdict was inflated by passion or prejudice.  Simply the large number of units sold, the lack of royalty evidence other than something in the 0.5-1% range, and the use of the computer as the base price provides a possible reasoning for the jury's damages verdict. The Court cannot say that passion and prejudice necessarily played any role in reaching the amount of damages, rather than the jury's simple acceptance of Lucent's sums at face-value.  On this ground, Microsoft's motion for a new trial is **DENIED**.

## VIII.   CONCLUSION

For the reasons herein, the Court rules as follows on Microsoft's grounds for judgment as a matter of law and/or new trial:

**Liability on the '457 Patent**

|  |  |
|---|---|
| No direct infringement | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| No indirect infringement | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |

**Ownership of the '080 Patent**

|  |  |
|---|---|
| Claims 2 and 4 are New Work | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| Fraunhofer is a co-owner<br>of the '080 patent | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| Lucent lacks standing | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| Microsoft's license defense | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |

---

[22] The record does not indicate that Microsoft objected to any of these statements during trial.

41

Exhibit 5  Page 103

## Liability on the '080 Patent

|  |  |
|---|---|
| Incorrect claim construction | DENIED as to new trial*[23] |
| No direct infringement | DENIED as to judgment as a matter of law and new trial |
| No contributory infringement | DENIED as to judgment as a matter of law and new trial |
| No inducing Infringement | GRANTED judgment as a matter of law Alternatively, GRANTED new trial |

## Invalidity

|  |  |
|---|---|
| Obviousness -Impact of KSR | DENIED as to judgment as a matter of law and new trial |
| Anticipation - OCF paper | DENIED as to judgment as a matter of law and new trial |
| Anticipation - low bit rate paper | DENIED as to judgment as a matter of law and new trial |
| Exclusion of Johnston's testimony | DENIED as to new trial* |
| Exclusion of deposition testimony of Restaino and deVilliers | DENIED as to new trial* |

## Damages

|  |  |
|---|---|
| Royalty base - entire market value | GRANTED judgment as a matter of law, GRANTED new trial |
| Royalty rate | DENIED as to judgment as a matter of law, GRANTED new trial |
| Inconsistent verdict | DENIED as to judgment as a matter of law and new trial |
| Impact of AT&T | DENIED AS MOOT |
| Passion/prejudice | DENIED as to new trial* |

//
//

---

[23] Microsoft moved only for new trial and not judgment as a matter of law on those issues marked with an asterisk (*).

42

**Exhibit 5  Page 104**

1    The net result of the rulings above results in a judgment under Fed. R. Civ. P. 54(b)

2   in favor of Microsoft and against Lucent with costs to Microsoft, terminating the case as it

3   pertains to these two patents, U.S. Patent Nos. 5,341,457 and RE 39,080..

4    In light of these rulings, Lucent's motion to amend or alter the judgement under Fed.

5   R. Civ. P. 59(e) regarding supplemental damages, prejudgment and post judgment interest,

6   and a permanent injunction is **DENIED AS MOOT** since Lucent is no longer the

7   prevailing party.

8

9    **IT IS SO ORDERED.**

10

11   DATED:  August 6, 2007

12

13                                          Hon. Rudi M. Brewster
                                            United States Senior District Court Judge

14

15   cc:  Hon. Cathy Ann Bencivengo
16        United States Magistrate Judge

17        All Counsel of Record

18

19

20

21

22

23

24

25

26

27

28                                        43

**Exhibit 5  Page 105**

Exhibit 6

Confidential – Filed
Under Seal

Exhibit 7

Confidential – Filed
Under Seal

Exhibit 8

Confidential – Filed
Under Seal

Exhibit 9

Confidential – Filed
Under Seal

Exhibit 10

Confidential – Filed
Under Seal

Exhibit 11

FILED

2006 JAN 10 AM 9: 40

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| LUCENT TECHNOLOGIES, INC., | Civil No.   02cv2060-B (CAB) |
|---|---|
| Plaintiff, | |
| v. | **ORDER FOLLOWING DISCOVERY CONFERENCE** |
| GATEWAY, INC.; GATEWAY COUNTRY STORES LLC; MICROSOFT CORPORATION; and DELL, INC., | |
| Defendants. | |

On January 6, 2006, the Court held a telephonic discovery conference. Based upon the parties' letter briefs and discussions during the conference, IT IS HEREBY ORDERED:

1.     In addition to the orders the Court issued during the conference regarding specific deposition notices, the Court vacated the April 8, 2005 Case Management Order and set the following dates for discovery and expert exchanges:

| Supplement Infringement and Invalidity Contentions Supplement Interrogatory Responses re: affirmative defenses | 1/27/06 |
|---|---|
| Fact Discovery Cutoff | 2/24/06 |
| Expert Designation | 2/17/06 |
| Rebuttal Expert Designation | 3/3/06 |
| Exchange Expert Reports | 3/31/06 |
| Exchange Rebuttal Expert Reports | 5/12/06 |
| Expert Discovery Cutoff | 7/7/06 |

384

02cv2060

**Exhibit 11  Page 352**

1     2.      Further, Lucent shall provide Defendants with a list of products made by or for

2 Lucent that are compliant with industry standards that are the subject matter of patents at issue in this

3 litigation on or before **January 20, 2006**.

4     3.      The extension of the fact discovery cutoff is intended to allow the parties to complete

5 outstanding discovery.  The parties are not permitted to use this extension to open new avenues of

6 discovery.  The parties may only propound new discovery requests, including subpoenas to third

7 parties, as needed to follow up on information provided in response to existing discovery requests.

8

9 DATED: _Jan 9, 2006_

                                                **CATHY ANN BENCIVENGO**

10                                               United States Magistrate Judge

11 cc:    The Honorable Rudi. M. Brewster
         All parties

- 2 -

02cv2060

**Exhibit 11  Page 353**

Exhibit 12

FILED

06 JAN 19 PM 2:54

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10   LUCENT TECHNOLOGIES, INC.,          Civil No.   02cv2060-B (CAB)

11                          Plaintiff,

12              v.                        **ORDER RE Xbox 360 DISCOVERY**

13   GATEWAY, INC.; GATEWAY COUNTRY
     STORES LLC; MICROSOFT
14   CORPORATION; and DELL, INC.,

15                          Defendants.

16        On January 11, 2006, the Court held a telephonic discovery conference and requested

17   proposed schedules from Lucent and Microsoft regarding the management of discovery related to the

18   Xbox 360. Both parties submitted proposed schedules on January 17, 2006. Having considered the

19   current discovery, pretrial and trial schedule in the matter and the submissions of counsel, IT IS

20   HEREBY ORDERED:

21        1.    The Court sets the following dates for discovery and expert exchanges specific to the

22   Microsoft Xbox 360 product:

| Microsoft to complete production of Xbox 360 source code | 3/31/06 |
|---|---|
| Microsoft to complete production of other Xbox 360 documents | 4/28/06 |
| Xbox 360 Fact Discovery Cutoff | 6/9/06 |
| Expert Designation | 6/23/06 |
| Rebuttal Expert Designation | 7/7/06 |
| Exchange Expert Reports | 7/21/06 |

390

1

Exhibit 12 Page 354

02cv2060

| Exchange Rebuttal Expert Reports | 8/11/06 |
|---|---|
| Expert Discovery Cutoff | 9/1/06 |

This extension of the fact discovery and expert exchanges is solely to permit discovery regarding the Xbox 360.

DATED: 1/19/06

CATHY ANN BENCIVENGO
United States Magistrate Judge

cc:    The Honorable Rudi. M. Brewster
       All parties

- 2 -

02cv2060

**Exhibit 12  Page 355**

Exhibit 13

Confidential – Filed
Under Seal

# Exhibit 14

# Confidential – Filed Under Seal

Exhibit 15

Confidential – Filed
Under Seal

Exhibit 16

```
 1   John E. Gartman (SBN 152300)
     Juanita R. Brooks (SBN 75934)
 2   Roger A. Denning (SBN 228998)
     Shekhar Vyas (SBN 229853)
 3   Fish & Richardson P.C.
     12390 El Camino Real
 4   San Diego, California  92130
     Telephone:    (858) 678-5070
 5   Facsimile:    (858) 678-5099

 6   Stephen P. McGrath (SBN 202696)
     Microsoft Corporation
 7   One Microsoft Way
     Redmond, WA  98052
 8   Telephone:    (425) 882-8080
     Facsimile:    (425) 936-7329
 9
     Attorneys for Intervenor/Counter-claimant
10   and Plaintiff/Counter-defendant
     MICROSOFT CORPORATION
11
     Additional counsel listed on signature page
12
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST, | Case No. 02-CV-2060 B (CAB) consolidated with Case No. 03-CV-0699 B (CAB) and Case No. 03-CV-1108 B (CAB) |
| Plaintiffs and Counterclaim-defendants, | |
| v. | **MICROSOFT CORPORATION'S GROUP 4 MOTION *IN LIMINE* NO. 6: LUCENT SHOULD BE PRECLUDED FROM PRESENTING AN ENTIRE MARKET VALUE THEORY OF DAMAGES AT TRIAL** |
| GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | |
| Defendants and Counter-claimants, | Date:        April 27, 2007 |
| and | Time:        9:00 a.m. |
| MICROSOFT CORPORATION, | Courtroom:   2 |
| Intervenor and Counter-claimant, | Judge:       Hon. Rudi M. Brewster |
| MICROSOFT CORPORATION, | |
| Plaintiff and Counter-defendant, | |
| v. | |
| LUCENT TECHNOLOGIES INC., | |
| Defendant and Counter-claimant, | |

**Exhibit 16  Page 557**

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,

      Plaintiff,

v.

DELL, INC.,

      Defendant.

Case No. 02-CV-2060 B (CAB)

Exhibit 16  Page 558

## I.    INTRODUCTION[1]

Hoping to improperly inflate damages, Lucent has suggested it is entitled to seek recovery based on the price of computers running Microsoft's accused software rather than the price of the software itself under the "entire market value rule."  But Lucent's theory lacks any factual support in this case; there is no evidence whatsoever that the patent-related features here form the basis for customer demand for the entire product, as required by the rule.  Moreover, after repeatedly and successfully[2] contending in the Group 2 (Audio) trial that MP3 technology was the basis for consumer demand for computer systems, Lucent should be judicially estopped in this case from contending the alleged '295 and '356 inventions are the basis for consumer demand.  Moreover, allowing Lucent to present the exorbitant results of its flawed damages theories to the jury risks severely and unfairly prejudicing Microsoft.  Accordingly, Microsoft requests that the Court preclude Lucent from presenting its entire market value theory of damages at trial.

## II.   ARGUMENT

### A.    Lucent Should Be Precluded from Presenting an Entire Market Value Theory in this Trial.

#### 1.    Lucent Has No Evidentiary Basis For Proceeding Under the Entire Market Value Rule with Respect to the Group 4 (User Interface) Patents.

In special cases, a patentee may seek to recover damages based on the value of an entire product when only a component of that product is patented under the "entire market value rule."  *See, e.g., Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005).  To do so, the patentee must demonstrate *inter alia* that "'the patent related feature is *the* basis for customer demand'" for the entire product.  *Id.* (emphasis added)  Here, Lucent's first damages expert, Roger Smith, has defined the royalty base as including "computer systems."  But neither Mr. Smith nor Mr. Hoeberlein can cite any evidence suggesting demand for

---

[1]    Dell, Inc. joins Microsoft Corporation in this motion.

[2]    Microsoft objected to Lucent's suggestion in Group 2 (Audio) that MP3 technology was the basis for consumer demand for computers, but Lucent was allowed to present its theory at trial and ultimately the jury awarded damages based on the price of computers.  While Microsoft still maintains its objections to Lucent's theory and proof in Group 2 (Audio), Microsoft also objects to the presentation of that theory here on its original grounds as well as the additional basis of Lucent's inconsistency between the two trials.

"computer systems" is premised upon the alleged inventions of the '356 and '295 patents, *i.e.*, the use of on-screen tools to fill fields and gesture recognition.

The Federal Circuit has previously affirmed a district court's preclusion of an entire market value theory where, as here, the record is devoid of any evidence about the basis of customer demand. *Imonex*, 408 F.3d at 1380 ("Without any evident record that the patented features were *the* basis for customer demand for the laundry machines as a whole, the trial court properly foreclosed further evidence on this unsupported theory.") (emphasis added). That result is not surprising since, as this Court has recognized, "[a]lthough an exercise in approximation, th[e] damages] analysis must be based on 'sound economic and factual predicates.'" *Integra Lifesciences I, Ltd. v. Merck KGaA*, No. CV 1307-B(AJB), 2004 WL 2284001, *4 (S.D. Cal. Sept. 7, 2004). Here, because Lucent has no factual support whatsoever to justify application of the entire market value rule, preclusion of that theory is appropriate.

### 2. Lucent Should Be Judicially Estopped from Arguing that the '295 and '356 Patents Form the Basis for Consumer Demand for Computers.

For Lucent to present an entire market value theory of damages in this case, Lucent and its witnesses will have to directly contradict the positions they took in this Court with respect to the Group 2 (Audio) patents. Having succeeded on the entire market value issue with respect to both Microsoft's motion *in limine* and at the Group 2 (Audio) trial, Lucent should be estopped from contradicting itself at the Group 4 (User Interface) trial. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) (setting forth three factors for judicial estoppel: (1) party's later position must be clearly inconsistent with its earlier position; (2) the court must have relied on, or accepted, the party's previous, inconsistent position; and (3) the party asserting the inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped).

When Microsoft moved *in limine* to preclude Lucent from presenting an entire market value rule theory at the Group 2 (Audio) trial, Lucent's counsel contended to this Court in its papers and argument that the MP3 inventions of the '938 and '080 patents formed the basis for consumer demand for computers:

1         To the contrary, there is ample evidence that the patented MP3
        features were *the* basis of customer demand for computer systems
2         as a whole.

3 [NOL Ex. H (Lucent Opp'n to Microsoft Mot. *in Limine* No. 4)(Docket No. 713),
at 4 (emphasis added).]

4

5         Now we also could argue that it's an entire market value case
        which is because – and we have lots of proof of this as outlined in
        the brief – because *Microsoft's customers were demanding MP3*
6         *capabilities and weren't buying computers without it,* Microsoft
        had to put it in in some – some extent. We have very good proof
7         of this, that it's driving the sales. Computers with the MP3 players
        are the ones that are selling.

8

9 [NOL Ex. I (1/3/07 Group 2 (Audio) Pretrial Hr'g Tr. at 251:2-9)(emphasis
added).]

10         We have extensive proof in our briefs talking about how
        [Microsoft's] own salespeople, senior people testified that the
11         *customers were demanding the MP3 capability. They couldn't*
        *sell computers without them.* In Europe, they had to take out the
12         MP3 functionality, and the computer sales went through the floor.

13 [*Id.* at 267:7-12 (emphasis added).] Based at least in part on these representations, the Court

14 denied Microsoft's motion *in limine* and allowed Lucent to present its entire market value theory at

15 the Group 2 (Audio) trial.

16         To pursue an entire market value theory at the Group 4 (User Interface) trial, Lucent will

17 necessarily have to contradict its position from the Group 2 (Audio) pretrial hearing. If MP3 is

18 *the* basis for customer demand for computers, as Lucent claimed, the alleged inventions here

19 cannot be, and vice-versa. In light of the Court's ruling on Microsoft's Group 2 (Audio) motion *in*

20 *limine* and the jury's verdict, the first two elements of judicial estoppel are satisfied.

21         There can also be no dispute that allowing Lucent to assume a contradictory position here

22 regarding the basis for consumer demand for computers would unfairly prejudice Microsoft.

23 Indeed, if Lucent were allowed to present another entire market value theory to another jury by

24 arguing that the patents-in-suit here are actually *the* basis for consumer demand, Microsoft would

25 be forced to combat this fallacy by informing this jury that another jury had previously awarded

26 $1.5 billion in another case based on another entire market value theory. In other words, the only

27 cure available would still kill the patient. Accordingly, Lucent should be precluded from

28 presenting an entire market value theory in the Group 4 (User Interface) trial.

**B.  Lucent's Damages Numbers – Improperly Inflated by an Order of Magnitude – Would Severely Prejudice Microsoft if Presented to the Jury.**

Beyond the legal impropriety of Lucent's damages model, the Court will appreciate that presenting an inflated damages number could psychologically affect the jury, causing it to award a higher amount than is proper or appropriate.  This inflation effect is exactly what Lucent is seeking by presenting damages totals at least one order of magnitude higher than they should be.  Given all of the problems associated with Lucent's approach, the probative value of Lucent's opinions related to this model pale in comparison to the risk of prejudice to Microsoft.  That risk is exacerbated by the fact that such "evidence" will come from experts whom the jury is at an inherent disadvantage in evaluating.  *See, e.g., Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (stating that because "[e]xpert evidence can be…quite misleading…the judge in weighing possible prejudice against probative force under Rule 403…exercises more control over experts than over lay witnesses.").

## III.  CONCLUSION

Lucent should be precluded and judicially estopped from presenting an entire market value theory in this trial where it lacks supporting evidence and doing so would directly contradict Lucent's position in the last trial.  If shown to the jury, Lucent's inflated, improper, and exorbitant totals would unfairly prejudice Microsoft under Rule 403.  Accordingly, Microsoft requests that the Court preclude Lucent from presenting its entire market value theory of damages at trial.

Dated:  March 29, 2007

FISH & RICHARDSON P.C.


By:   /s/ Juanita R. Brooks
     Juanita R. Brooks (SBN 75934)

Attorneys for Intervenor/Counter-claimant
and Plaintiff/Counter-defendant
MICROSOFT CORPORATION

10717922.doc

1 | *Additional Counsel:*

2 | James S. Blackburn (SBN 169134)
Arnold & Porter LLP
3 | 777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
4 | Telephone: (213) 243-4000
5 | Facsimile: (213) 243-4199

6 | Joseph Micallef (admitted *Pro Hac Vice*)
Ali R. Sharifahmadian (admitted *Pro Hac Vice*)
7 | Matthew Bathon (admitted *Pro Hac Vice*)
Arnold & Porter LLP
8 | 555 Twelfth Street, N.W.
9 | Washington, D.C. 20004-1206
Telephone: (202) 942-5000
10 | Facsimile: (202) 942-5999

11 | Joel Freed, Esq. (admitted *Pro Hac Vice*)
McDermott Will & Emery LLP
12 | 600 13th Street, N.W.
13 | Washington, DC 20005-3096
Telephone: (202) 756-8080
14 | Facsimile: (202) 756-8087

15 | Attorneys for Defendant
DELL, INC.
16 |

17 | David J. Zubkoff (SBN 149488)
Seltzer, Caplan, McMahon & Vitek
18 | 2100 Symphony Towers
750 B Street, Suite 2100
19 | San Diego, CA 92101
Telephone: (619) 685-3003
20 | Facsimile: (619) 702-6827

21 | Bryan Farney (admitted *Pro Hac Vice*)
22 | Steven R. Daniels (SBN 235398)
Jeffrey B. Plies (admitted *Pro Hac Vice*)
23 | DECHERT LLP
300 W. Sixth Street, Suite 1850
24 | Austin, TX 78701
Telephone: (512) 394-3000
25 | Facsimile: (512) 394-3001

26 | Attorneys for Defendants/Counter-claimants
GATEWAY, INC. and
27 | GATEWAY COUNTRY STORES LLC

28 |

Case 3:02-cv-02060-B-CAB Document 283 Filed 03/29/2007 Page 8 of 8

1

## CERTIFICATE OF SERVICE

2

3       The undersigned hereby certifies that a true and correct copy of the above and foregoing

4   document has been served on March 29, 2007 to all counsel of record who are deemed to have

5   consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any

6   other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

7

8                                /s/Juanita R. Brooks_____
                                 Juanita R. Brooks
9                                brooks@fr.com

10                               Attorney for Intervenor/Counter-claimant
                                 and Plaintiff/Counter-defendant
11                               MICROSOFT CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 17

Confidential – Filed
Under Seal

Exhibit 18

Confidential – Filed
Under Seal

Exhibit 19

Confidential – Filed
Under Seal

Exhibit 20

FILED

05 NOV 16  AM 10: 55

DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES, INC.,

               Plaintiff,

v.

GATEWAY, INC AND GATEWAY COUNTRY STORES LLC; and, MICROSOFT CORPORATION; and, DELL, INC.,

               Defendants.

Civil No: 02CV2060-B(WMc); 03CV0699-B(WMc); 03CV1108-B(WMc)

**ORDER CONSTRUING CLAIMS FOR UNITED STATES PATENT NUMBER 4,439,759**

Before the Court is the matter of claims construction for U.S. Patent Number 4,439,759 ("the '759 Patent") in the above titled cases for patent infringement.[1]  Pursuant to _Markman v. Westview Instruments, Inc._, 517 U.S. 370 (1996), the Court conducted a

_____

[1]Lucent originally filed two separate patent infringement actions, one against Defendant Gateway (02CV2060), and a second against Defendant Dell (03CV1108). Microsoft intervened in the action filed by Lucent against Gateway.  Microsoft also filed a declaratory judgment action against Lucent (03CV0699) and Lucent filed counterclaims for patent infringement against Microsoft in that action.  On July 7, 2003, the Court entered an order consolidating these three cases.  There are a total of 15 different patents involved in these three cases collectively.

1

37/

Exhibit 20  Page 717

1  Markman hearing regarding construction of the disputed claim terms for the '759 Patent on
2  July 6 and 7, 2005. Plaintiff Lucent Technologies, Inc. ("Lucent") was represented by the
3  Kirkland & Ellis law firm, Defendant Gateway Inc. ("Gateway") was represented by the
4  Dewey Ballantine law firm, Defendant Microsoft Corporation ("Microsoft") was
5  represented by the law firm of Fish and Richardson and Defendant Dell, Inc. ("Dell") was
6  represented by the Arnold and Porter law firm.

7      The purpose of the Markman hearing was for the Court, with the assistance of the
8  parties, to prepare jury instructions interpreting the pertinent claims for all claim terms at
9  issue in the '759 Patent. Additionally, the Court and the parties prepared a "case glossary"
10  for terms found in the claims and the specification for the '759 Patent, considered to be
11  technical in nature and which a jury of laypersons would not understand clearly without
12  specific definition. As the case advances, the parties may request additional terms to be
13  added to the glossary to further facilitate the jury's understanding of the disputed claims.

14      After careful consideration of the parties' arguments and the applicable statutes and
15  case law, the Court **HEREBY CONSTRUES** all claim terms in dispute in the '759 Patent
16  and **ISSUES** the relevant jury instructions as written in exhibit A, attached hereto. Further,
17  the Court **HEREBY DEFINES** all pertinent technical terms as written in exhibit B,
18  attached hereto.

19

20      IT IS SO ORDERED.

21  DATED:  _11-15-05_          _____

22                          UNITED STATES SENIOR DISTRICT JUDGE

23

24  cc:  All Parties
25      The Honorable William McCurine, Jr., United States Magistrate Judge

26

27

28                          2                  02cv2060; 03cv0699; 03cv1108

**Exhibit 20  Page 718**

**EXHIBIT A[2]**
**UNITED STATES PATENT NUMBER 4,439,759**

| VERBATIM CLAIM LANGUAGE | COURT'S CLAIM CONSTRUCTION |
|---|---|
| **CLAIM 1**<br>In a digital image display system: | **CLAIM 1**<br>In a digital image **display system** [*hardware and software, needed to achieve a visible representation of information in a data-processing system*]: |
| a memory for storing color data values; | a **memory** [*a color map that stores a table of color data values indexed by numbers*] for storing **color data values** [*color components of a particular color (such as the red, green and blue (RGB) color components)*]; |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | processing means responsive to a **predetermined command and data sequence** [*a command and data pattern having a known encoded meaning*] **comprising** [*including, but not limited to*] at least one command, the processing means **decoding** [*interpreting*] the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of **modes of access to** [*manners of retrieving*] color data values, the modes comprising<br><br>"Processing Means"<br>**Function:**<br>The function of this element is decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values |

---

[2]All terms appearing in bold face type and underlined have been construed by the court and appear with their definitions in the glossary in Exhibit B. The definition for each construed term appears in italics after its first use in the patent.

02CV2060; 03CV0699; 03CV1108

Exhibit 20  Page 719

| | Structure: |
|---|---|
| | Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (*See*, Col.5, line 60 - Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43). |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | a first **mode of access** [*manner of retrieving*] wherein an **in-use foreground color** [*a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed*] is directly **specified as** [*called for by*] a **color data value**; |
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | a second **mode of access** wherein the **in-use foreground color** is **specified as** an index into the **color memory** [*a color map that stores a table of color data values indexed by numbers*]; and |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | a third **mode of access** wherein the **in-use foreground color** and an **in-use background color** [*a color that will be used as the background color for subsequently received text and graphics drawing commands until changed*] are **specified as** indexes into the **color memory**; and |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | display means responsive to the processing means, the display means displaying the colors associated with the **color data values** accessed by the selected mode.<br><br>"Display means"<br>**Function:**<br>The function of this element is displaying the colors associated with the color data values |

| | | |
|---|---|---|
| 1 | | accessed by the selected mode |
| 2 | | |
| 3 | | **Structures:** |
| 4 | | (1) monitor; |
| | | (2) television set; |
| 5 | | (3) video projection system; |
| 6 | | (4) a liquid crystal display; or |
| 7 | | (5) an LED display (*See e.g.*, Col. 4, lines 50-55). |
| 8 | **CLAIM 2** | **CLAIM 2** |
| 9 | A digital image display system comprising: | A digital image **display system** comprising: |
| 10 | a color memory for storing color data values; | a **color memory** for storing **color data values**; |
| 11 | processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and | processing means responsive to **predetermined command and data sequences**, the processing means, responsive to a first command, selecting a **mode of access** to the **color memory**; and responsive to a second command, **setting** [*storing*] a **color data value** in the **color memory**; and |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | "Processing means" |
| 18 | | **Function:** |
| 19 | | The function of this element is: |
| | | (a) selecting a mode of access to the color memory; and |
| 20 | | (b) setting a color data value in the color memory. |
| 21 | | **Structure:** |
| 22 | | (a) structure for selecting a mode of access to the color memory is: |
| 23 | | Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 301-303; Fig. 4: boxes 401-405, 407, 408, and 411 (*See*, Col.5, line 60 - Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

5

| | |
|---|---|
| | the background and foreground color"), and lines 33-43)); |
| | (b) structure for setting a color data value in the color memory is: |
| | Data processor 1 programmed to perform the algorithm shown in Fig. 5: boxes 501, 504, 506, 508, and 510 (*See*, Col. 7, lines 14-17 (except for "or (2) in color mode 0, for setting"), Col. 7, lines 53-64 (except for "The sequence of boxes 504, 506, 508, and 510 is")). |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | display means responsive to the processing means, the display means displaying a color associated with the **color data value** accessed by the selected mode.<br><br>"Display means"<br>Function:<br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode<br><br>Structures:<br>(1) monitor;<br>(2) television set;<br>(3) video projection system;<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.*, Col. 4, lines 50-55). |

6                    02CV2060; 03CV0699; 03CV1108

**Exhibit 20  Page 722**

| CLAIM 3 | CLAIM 3 |
|---|---|
| A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory. | A **display system** as recited in claim 2, wherein the processing means responsive to a second command **sets** plural **color data values** in **color memory**.<br><br>"Processing means":<br>**Function:**<br>The function of this element is sets plural color data values in color memory.<br><br>**Structure:**<br>Data processor 1 programmed to perform the algorithm of Fig. 5, Boxes 501, 504, 506, 508 and 510 and the line exiting box 510 (*See* Col. 7 Lns. 14-17 [except for "or (2) in color mode 0, for setting"], Col. 7, Lns. 53-65). |
| CLAIM 4 | CLAIM 4 |
| In a video image display system having a color memory, a method for displaying a color image in a terminal independent manner responsive to commands and data received from a command and data source, the method comprising the steps of: | In a video image **display system** having a **color memory**, a method for displaying a color image in a **terminal independent manner** [*meaning that terminals having varying color capabilities are able to receive common input information and each terminal provides a color display that within its capabilities most closely matches that input information*] responsive to commands and data received from a command and data source, the method comprising the steps of: |
| receiving commands and data from the command and data source; | receiving commands and data from the command and data source; |
| reading a first command for selecting a mode of access to the color memory, and responsive to data following the first command, selecting the mode of access to the color memory; | reading a first command for selecting a **mode of access** to the **color memory**, and **responsive to data following the first command** [*taking some action based on the data following the first command*], selecting the **mode of access** to the **color memory**; |

7

**Exhibit 20  Page 723**

| | |
|---|---|
| reading a second command for setting color data values in the color memory and, responsive to data following the second command, setting the color data values in the color memory, | reading a second command for setting **color data values** in the **color memory** and, **responsive to data following the second command** [*taking some action based on the data following the second command*], **setting** the **color data values** in the **color memory**, |
| reading a third command for accessing color data values in the color memory, and | reading a third command for **accessing** [*retrieving*] **color data values** in the **color memory**, and |
| displaying a color image associated with the color data values accessed by the third command on a video display terminal. | displaying a color image associated with the **color data values accessed** [*retrieved*] by the third command on a video display terminal. |

8

**Exhibit 20  Page 724**

## EXHIBIT B

## GLOSSARY FOR UNITED STATES PATENT NUMBER 4,439,759

| TERM | DEFINITION |
|------|------------|
| color data value | color component of a particular color (such as the red, green and blue (RGB) color components) |
| color memory | a color map that stores a table of color data values indexed by numbers |
| comprising | including, but not limited to |
| decoding | interpreting |
| display system | hardware and software needed to achieve a visible representation of information in a data-processing system |
| in-use background color | a color that will be used as the background color for subsequently received text and graphics drawing commands until changed |
| in-use foreground color | a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed |
| memory | a color map that stores a table of color data values indexed by numbers |
| mode of access | manner of retrieving |
| predetermined command and data sequence | a command and data pattern having a known encoded meaning |
| responsive to data following the first command | taking some action based on the data following the first command |
| setting | storing |
| specified as | called for by |
| terminal independent manner | meaning that terminals having varying color capabilities are able to receive common input information and each terminal provides a color display that within its capabilities most closely matches that input information |

**Exhibit 20  Page 725**

Exhibit 21

David A. Hahn (SBN 125784)
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone: (619) 235-2100
Facsimile: (619) 235-2101

Attorneys for Plaintiff *Lucent Technologies Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST,<br><br>Plaintiff,<br>v.<br><br>GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.,<br><br>Defendants,<br>and<br><br>MICROSOFT CORPORATION,<br><br>Intervener. | Case No. 07-CV-2000-H (CAB)<br><br>consisting of matters severed from consolidated cases:<br><br>Case No. 02-CV-2060 B (CAB)<br>Case No. 03-CV-0699 B (CAB)<br>Case No. 03-CV-1108 B (CAB)<br><br>**LUCENT'S OPPOSITION TO DELL'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.**<br><br>Date:        January 7, 2008<br>Time:        10:30 A.M.<br>Courtroom:   13<br>Judge:       Hon. Marilyn L. Huff |
| MICROSOFT CORPORATION,<br><br>Plaintiff,<br>v.<br><br>LUCENT TECHNOLOGIES INC.,<br><br>Defendant. | |
| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST,<br><br>Plaintiff,<br>v.<br><br>DELL INC.,<br><br>Defendant. | |

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 726**

1

**TABLE OF CONTENTS**

2
Page

3    I.      INTRODUCTION ...........................................................................................1

4    II.     BACKGROUND ............................................................................................2

5            A.      Technical Background. ....................................................................2

6            B.      The Fleming '759 Patent. ................................................................2

7            C.      The Asserted Claims Of The '759 Patent. ......................................2

8            D.      The NASA Report. ..........................................................................2

9            E.      The Pec Affidavit. ...........................................................................3

10   III.    LEGAL STANDARDS .................................................................................6

11           A.      Summary Judgment. ........................................................................6

12           B.      Anticipation. ....................................................................................7

13           C.      Obviousness. ....................................................................................8

14   IV.     ARGUMENT ................................................................................................9

15           A.      A Genuine Factual Dispute Exists As To Whether The NASA Report Was A
16                   Printed Publication As Of The Filing Date Of The Fleming '759 Patent. ...................9

17           B.      Dell's "Evidence" Is Unreliable And Should Be Excluded. ........................10

18           C.      Dell Has Failed to Prove That The NASA Report Was Publicly Accessible
19                   Before May 19, 1981. ................................................................12

20   V.      Even If The NASA Report Is Prior Art, Dell Has Failed To Prove The NASA Report
21           Invalidates The Asserted Claims Of The Fleming '759 Patent. .............................16

22           A.      The NASA Report Does Not Anticipate Claims 1-3. .................................16

23           B.      Ample Evidence Establishes A Genuine Dispute Concerning The Alleged
                     Obviousness Of Claims 1-3 Of The Fleming '759 Patent. ..........................21

24   VI.     CONCLUSION ..........................................................................................24

25

26

27

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR                    i                    Case No. 07-CV-2000-H (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

**Exhibit 21 Page 727**

# TABLE OF AUTHORITIES

**Cases**

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
   C.A. No. 95-218-SLR,
   1998 U.S. Dist. LEXIS 3833 (D. Del. Mar. 13, 1998) ....................................... 9, 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................................... 7

*ATD Corp. v. Lydall, Inc.*,
   159 F.3d 534 (Fed. Cir. 1998) ........................................................................ 7

*Beyene v. Coleman Sec. Servs., Inc.*,
   854 F.2d 1179 (9th Cir. 1988) ........................................................................ 14

*Carella v. Starlight Archery and Pro Line Co.*,
   804 F.2d 135 (Fed. Cir. 1986) ........................................................................ 8

*Caterpillar Inc. v. Deere & Co.*,
   224 F.3d 1374 (Fed. Cir. 2000) ...................................................................... 7

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................... 6

*Constr. Tech., Inc. v. The Lockformer Co., Inc.*,
   86 Civ. 0457 (JSM), 88 Civ. 0742 (JSM),
   990 U.S. Dist. LEXIS 20000 (S.D.N.Y. November 2, 1990) ........................... 16

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*,
   501 F.3d 1254 (Fed. Cir. 2007) ...................................................................... 10

*Elan Pharm., Inc. v. Mayo Found. for Medical Ed. and Res.*,
   346 F.3d 1051 (Fed. Cir. 2003) ...................................................................... 7

*Eli Lilly and Co. v. Barr Labs., Inc.*,
   251 F.3d 955 (Fed. Cir. 2001) ........................................................................ 9

*Exxon Corp. v. Mobil Oil Corp.*,
   C.A. No. H-96-3795,
   1998 U.S. Dist. LEXIS 17555 (S.D. Tex. Aug. 13, 1998) ............................... 16

*Forest Labs., Inc. v. Ivax Pharms., Inc.*,
   501 F.3d 1263 (Fed. Cir. 2007) ...................................................................... 10

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   365 F.3d 1054 (Fed. Cir. 2004) ...................................................................... 9

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ............................................................................................. 10

*In re Cronyn*,
   890 F.2d 1158 (Fed. Cir. 1989) ................................................................. 9, 15

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

ii

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 728**

*In re Hall*,
    781 F.2d 897 (Fed. Cir. 1986)............................................................................. 8

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006)........................................................................... 11

*In re Wyer*,
    655 F.2d 221 (C.C.P.A. 1981) ............................................................................ 8

*KSR Int'l Co. v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007)..................................................................... 10, 11, 26

*Lucent Tech. Inc. v. Gateway*,
    02-CV-2060 B (CAB),
    2007 U.S. Dist. LEXIS 46863 (S.D. Cal. June 27, 2007) ................................... 8

*Northern Telecom, Inc. v. Datapoint Corp.*,
    908 F.2d 931 (Fed. Cir. 1990) ....................................................................... 9, 17

*Orr v. Bank of Am.*
    285 F.3d 764 (9th Cir. 2002) ............................................................................ 14

*Pfizer, Inc. v. Apotex, Inc*,
    480 F.3d 1348 (Fed. Cir. 2007)........................................................................ 10

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007)........................................................................ 11

*Philips Elecs. & Pharm. Indus. Corp. v. Thermal & Elec. Indus., Inc.*,
    450 F.2d 1164 (3d Cir. 1971) ............................................................................ 8

*RCA Corp. v. Data Gen. Corp.*,
    701 F. Supp. 456 (D. Del. 1988) ...................................................................... 17

*Richardson v. Suzuki Motor Co., Ltd.*,
    868 F.2d 1226 (Fed. Cir. 1989)......................................................................... 7

*Schumer v. Laboratory Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002)......................................................................... 9

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007)........................................................................ 11

*United States v. Boyce*,
    148 F. Supp. 2d 1069 (S.D. Cal. 2001)............................................................. 6


**Statutes**

35 U.S.C. § 103(a) .................................................................................................. 8

Fed. R. Civ. P. 56(c) .............................................................................................. 6

LUCENT'S OPPOSITION TO DELL'S MOTION FOR             iii             Case No. 07-CV-2000-H (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

**Exhibit 21 Page 729**

Fed. R. Civ. P. 56(e) ................................................................................................ 12

Fed. R. Evid. 801(c) ................................................................................................ 12

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3
OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

iv

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 730**

1    **I.      INTRODUCTION**

2         Dell's motion for summary judgment of invalidity of claims 1-3 of the Fleming '759 Patent is

3    based on a reference — the NASA Report — that is not prior art to the Fleming '759 Patent.  On that

4    basis alone, Dell's motion for summary judgment fails.[1]

5         Dell bears the burden of proving — by clear and convincing evidence — that the NASA

6    Report qualified as a prior-art printed publication under 35 U.S.C. § 102 before May 19, 1981, when

7    the Fleming '759 Patent was filed.  To meet this heavy burden, Dell must prove that the NASA

8    Report was publicly accessible by that date, which means that Dell must prove that a member of the

9    public could both locate and physically obtain the NASA Report.  Dell, however, has come forward

10   with no competent evidence to prove either of these requirements.  Rather, the only "evidence" that

11   Dell proffers is a conclusory affidavit from a librarian at the library at George Washington University

12   — where the only known copy of the NASA Report currently resides — who has no relevant personal

13   knowledge about the NASA Report or the policies and procedures at George Washington University

14   library before 1993, more than a decade too late.

15        When the facts are fully exposed, it is clear that Dell has failed to adduce *prima facie* evidence

16   that the NASA Report is prior art.  First, within the George Washington University library, the NASA

17   Report is located in a Special Collections Department that is not accessible to members of the public.

18   Second, as of the filing date of the Fleming '759 Patent, the NASA Report was not indexed by subject

19   matter, and therefore it would have been impossible for someone to find unless that person were

20   already aware of its existence.  Thus, at a minimum, a genuine factual dispute exists as to whether a

21   member of the public could both locate and physically obtain the NASA Report as of the filing date of

22   the Fleming '759 Patent, and therefore as to whether it qualifies as a prior-art printed publication

23   under 35 U.S.C. § 102.

24

25   _____
     [1] The primary basis for Dell's motion is alleged anticipation, with alleged obviousness asserted only
26   as a fallback position.  But after the *KSR* decision, Judge Brewster permitted Defendants to search for
     additional prior art only to support their obviousness cases, not to search for additional prior art in
27   order to make additional anticipation arguments.  Dell's motion should therefore be stricken.

28
LUCENT'S OPPOSITION TO DELL'S MOTION FOR                1                Case No. 07-CV-2000-H (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

Exhibit 21 Page 731

Even if the NASA Report qualifies as prior art, however, Dell's motion for summary judgment still fails. Dell argues that the NASA Report anticipates claims 1-3 of the Fleming '759 Patent. But in making this argument, Dell improperly rewrites claim 1 to delete the word "directly" from the first mode of access, and also ignores the Court's claim construction for the term "in-use background color." When the NASA Report is compared to the actual claim language and the correct claim construction, it is clear that the NASA Report does not disclose all of the elements of claims 1-3, and therefore could not anticipate. Realizing the weakness of its position, Dell seeks to supply the missing elements with an obviousness argument. But Dell's obviousness contention is based entirely on attorney argument, and is unsupported by any competent expert opinion. Lucent's expert, on the other hand, has opined that claims 1-3 would not have been obvious in view of the NASA Report. Dell's motion for summary judgment should, accordingly, be denied.

## II.     BACKGROUND

### A.     Technical Background.

Lucent incorporates by reference the Technical Background discussion from Section II.A of Lucent's Opposition To Gateway's Motion For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming) as if fully set forth herein.

### B.     The Fleming '759 Patent.

Lucent incorporates by reference the discussion of the Fleming '759 Patent from Section II.B of Lucent's Opposition To Gateway's Motion For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming) as if fully set forth herein.

### C.     The Asserted Claims Of The '759 Patent.

Lucent incorporates by reference the discussion of the Asserted Claims of the Fleming '759 Patent from Section II.C of Lucent's Opposition To Gateway's Motion For Partial Summary Judgment Of Invalidity Of U.S. Patent No. 4,439,759 (Fleming) as if fully set forth herein.

### D.     The NASA Report.

The NASA Report (Blackburn Dec. Ex. 9) purportedly describes the particular implementation of a display system, known as the CORE system, at George Washington University.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

2

Case No. 07-CV-2000-H (CAB)

Exhibit 21 Page 732

1  The only known copy of the NASA Report is held in the Special Collections Department of the

2  Melvin Gelman Library at George Washington University (the "Library").  (*Id*.)  The Special

3  Collections Department of the Library is restricted only to Library personnel, and is thus not open to

4  members of the public.  (Ex. 1 at 57:23-58:2.)[2]  And the materials held within the Special Collections

5  Department cannot be checked out or sent outside of the library.  (Ex. 1 at 58:3-15, 61:7-13.)

6  **E.  The Pec Affidavit.**

7  In attempting to prove that the NASA Report is prior art, Dell has submitted an Affidavit from

8  Jean A. Pec, the Head of Collections Management Services for the Library.  (Blackburn Dec. Ex. 14.)

9  In her Affidavit, Ms. Pec purports to opine that the NASA Report was available in the Library to

10  members of the public as of September 1980.

11  During her deposition, however, Ms. Pec made clear that she did not start working at the

12  Library until 1993 — ***twelve years after*** the filing date of the Fleming '759 Patent — and that she did

13  not talk to anyone else at the Library who might have worked at the Library during the relevant

14  timeframe about the purported facts set forth in her Affidavit:

> Q.  Had you ever worked for George Washington University or any of its libraries before February 1993?
>
> A.  No.
>
> *        *        *
>
> Q.  In preparing your affidavit, did you talk to other library employees or other employees of George Washington University regarding the facts set forth in your affidavit?
>
> A.  No.

22  (Ex. 1, at 12:22-25, 33:18-22.)  Ms. Pec also clarified that her Affidavit was actually drafted by

23  attorneys for Dell, and that she had only looked at her Affidavit for "a minute or so" before signing:

> Q.  Do you know who created [your] affidavit?
>
> A.  I do not remember the names of people, no.

[2] Unless otherwise indicated, references herein to "Ex." refer to the Declaration Of James E. Marina In Support Of Lucent's Oppositions To Defendants' Motions For Summary Judgment Of Invalidity Of Claims 1-3 Of The Fleming '759 Patent filed concurrently herewith.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

3

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 733**

Q.  Did you see drafts of that affidavit before the version that you signed?

A.  No.

Q.  Did you discuss the language that was going to be included in that affidavit?

A.  No.

\* \* \*

Q.  Had you seen any of the language that appeared in the affidavit before you signed it?

A.  Had I seen it written?  No.

\* \* \*

Q.  And did you review this affidavit to assure that it was accurate and truthful before you signed it?

A.  I looked through it.

Q.  How much time did you spend looking at the document?

A.  Looking at the affidavit?

Q.  At the affidavit.

A.  *I probably spent a minute or so*, however long it takes one to scan through.

(Ex. 1 at 36:6-37:3, 90:19-91:4.)

Ms. Pec further made clear that at least some of the averments in her Affidavit were based *solely* on representations by Dell's counsel.  (*See, e.g.*, Ex. 1 at 119:9-120:2.)  And she made clear that the only basis for her opinion that the NASA Report was purportedly first available in the Library in September 1980 was a printout from the Online Computer Library Center ("OCLC") — a third-party library service —  regarding the NASA Report.  (Ex. 1 at 90:2-6.)  But while the OCLC printout contains an "entered" date that purportedly reflects when the Library acquired the NASA Report, Ms. Pec testified that she had no personal knowledge as to how this "entered" date was generated or maintained:

Q.  Have you ever worked for OCLC?

LUCENT'S OPPOSITION TO DELL'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.    4    Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 734**

1    A.  Have I ever been an employee of OCLC?  No.

2                               *        *        *

3    Q.  And you're not personally involved in how OCLC maintains its
     databases?
4
     A. No, I am not.
5
     Q.  And you're not aware of the physical equipment they use, their
6    methodology, their processes and procedures?

7    A. As such, no.

8                               *        *        *

9    Q.  [W]ho creates the information that's provided in the "entered" field?

10   A.  The computer at OCLC creates that.

11   Q. And do you know how the computer at OCLC creates the date?

12   A.  No, I don't, sir.

13   (Ex. 1 at 63:3-4, 78:24-79:21.)  Ms. Pec also testified that the OCLC printout she was relying upon

14   had been altered by an unknown third party since this litigation began:

15   Q.  Does that mean that the record was replaced on March 22, 2004?

16   A.  Yes, it does.  It means something in the record was changed, but I
     couldn't tell you what, and I couldn't tell you who.
17
                                *        *        *
18
     Q.  So you don't know whether it was George Washington or somebody
19   outside of George Washington who did that?

20   A.  I have no idea.

21                              *        *        *

22   Q.  Do you know which fields or which information [were altered] in
     2004?
23
     A.  No, I don't.
24
     (Ex. 1 at 82:18-22, 85:20-23, 87:3-6.)
25
     Mr. Pec further testified that the OCLC database is not available to members of the public:
26
     Q:  To access [OCLC] records, would you also need to enter a log in?
27

28
     LUCENT'S OPPOSITION TO DELL'S MOTION FOR              5                    Case No. 07-CV-2000-H (CAB)
     SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
     U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

**Exhibit 21 Page 735**

1    A: Yes.

2              *       *       *

3    Q: So assuming I were a GW student and could go into Gelman Library
4    at the time, I would not have been able to walk up to the  [OCLC]
     terminal and start using it?

5    A: That is correct . . .

6  (Ex. 1 at 65:17-66:5.)  Furthermore, Larry Olszewski, a Director of OCLC, has indicated that the

7  Library did not join OCLC until 1987 (Ex. 1 at 89:6-24; Ex. 2), and Ms. Pec admitted that she has no

8  evidence to the contrary.  (Ex. 1 at 29:7-15; 83:11-84:2.)

9       Ms. Pec also testified that subject-matter searching of OCLC records did not become available

10 until the 1990's. (Ex. 1 at 122:4-20, 124:20-125:19.)  Thus, a member of the public interested in

11 "computer graphics" — the subject matter field entered on the OCLC printout for the NASA Report

12 — in 1981 would not have been able to locate the NASA Report by subject-matter searching the

13 OCLC database, and could only have known to seek the NASA Report from the Library if previously

14 informed of its existence.

15 **III.   LEGAL STANDARDS**

16     **A.    Summary Judgment.**

17       Summary judgment is appropriate only where "the pleadings, depositions, answers to

18 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

19 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

20 law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *accord* Fed. R. Civ. P. 56(c).  Where, as

21 here, "the moving party bears the burden of proof at trial, it cannot obtain summary judgment unless it

22 presents evidence so compelling that no rational jury would fail to award judgment for the moving

23 party." *United States v. Boyce*, 148 F. Supp. 2d 1069, 1080 (S.D. Cal. 2001).  Furthermore, "[w]hen

24 ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all

25 justifiable inferences are to be drawn in the nonmovant's favor." *Caterpillar Inc. v. Deere & Co.*, 224

26 F.3d 1374, 1379 (Fed. Cir. 2000).

27       A summary judgment determination must also be guided by the appropriate burden of proof.

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR   6   Case No. 07-CV-2000-H (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

**Exhibit 21 Page 736**

1    If the Court determines that a reasonable jury applying the proper burden of proof — in this case

2    clear-and-convincing evidence — could find for the nonmovant, then there exists a genuine issue of

3    material fact that precludes granting of summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477

4    U.S. 242, 255 (1986).

5           **B.    Anticipation.**

6           "A patent is invalid for anticipation when the same device or method, having all of the

7    elements and limitations contained in the claims, is described in a single prior art reference." *ATD*

8    *Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed. Cir. 1998).   "Every element of the claimed invention

9    must be literally present, arranged as in the claim." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d

10   1226, 1236 (Fed. Cir. 1989).  Furthermore, "[t]o serve as an anticipating reference, the reference must

11   enable that which it is asserted to anticipate." *Elan Pharm., Inc. v. Mayo Found. for Medical Ed. and*

12   *Res.*, 346 F.3d 1051, 1054 (Fed. Cir. 2003).   "Whether an invention is anticipated is a question of

13   fact." *Id.*

14          Whether a document qualifies as a printed publication for prior art purposes "depends on the

15   accessibility of the document 'to the extent that persons interested and ordinarily skilled in the subject

16   matter or art, exercising reasonable diligence, can locate it.'" *Lucent Tech. Inc. v. Gateway*, 02-CV-

17   2060 B (CAB), 2007 U.S. Dist. LEXIS 46863, at *15 (S.D. Cal. June 27, 2007) (quoting *In re Wyer*,

18   655 F.2d 221, 226 (C.C.P.A. 1981)); *In re Hall,* 781 F.2d 897, 898-99 (Fed. Cir. 1986) ("Because

19   there are many ways in which a reference may be disseminated to the interested public, 'public

20   accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed

21   publication.'").  "[O]ne who wishes to characterize the information, in whatever form it may be, as a

22   'printed publication' . . . should produce sufficient proof of its dissemination or that it has otherwise

23   been available and accessible to persons concerned with the art to which the document relates and

24   thus most likely avail themselves of its contents." *Carella v. Starlight Archery and Pro Line Co.*, 804

25   F.2d 135, 139 (Fed. Cir. 1986) (quoting *In re Wyer*, 655 F.2d 221, 227 (C.C.P.A. 1981) (quoting

26   *Philips Elecs. & Pharm. Indus. Corp. v. Thermal & Elec. Indus., Inc.*, 450 F.2d 1164, 1171 (3d Cir.

27   1971)).

28

**Exhibit 21 Page 737**

1    Where the public accessibility of a thesis, dissertation, or similar document is at issue, courts

2    look not only to whether the document was shelved in a public library, but also whether it was

3    "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989);

4    *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, C.A. No. 95-218-SLR, 1998 U.S. Dist. LEXIS 3833,

5    at *119 (D. Del. Mar. 13, 1998) ("The key to determining whether the [alleged prior art] thesis was

6    publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.").

7    Dell bears the burden of proving, by clear and convincing evidence, that the NASA Report was

8    publicly accessible before May 19, 1981.  *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931,

9    936-37 (Fed. Cir. 1990); *see Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1058

10   (Fed. Cir. 2004).

11       **C.    Obviousness.**

12       Because every patent is presumed valid, accused infringers face a "high burden of showing

13   invalidity on summary judgment."  *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1315 (Fed.

14   Cir. 2002).  "[A] moving party seeking to invalidate a patent at summary judgment must submit such

15   ***clear and convincing evidence*** of invalidity so that no reasonable jury could find otherwise." *Eli*

16   *Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (emphasis added).  If evidence is

17   presented establishing a *prima facie* case of invalidity, the nonmovant must come forward with

18   evidence sufficient to support a finding of validity, but "the ultimate burden of proving invalidity

19   remains with the challenger throughout the litigation."  *Pfizer, Inc. v. Apotex, Inc,*  480 F.3d 1348,

20   1360 (Fed. Cir. 2007).

21       A claimed invention can be found obvious only "if the differences between the subject matter

22   sought to be patented and the prior art are such that the subject matter as a whole would have been

23   obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. §

24   103(a).  Obviousness is ultimately a question of law based on underlying determinations of fact.

25   *Forest Labs., Inc. v. Ivax Pharms., Inc.*, 501 F.3d 1263, 1269 (Fed. Cir. 2007).  The underlying factual

26   issues to be considered in an obviousness analysis that must be considered by the trier of fact include:

27   (1) the scope and content of the prior art;  (2) the level of ordinary skill in the art;  (3) the differences

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR                    8                    Case No. 07-CV-2000-H (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

**Exhibit 21 Page 738**

1   between the claimed invention and the prior art; and (4) objective indicia of nonobviousness."

2   *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).  Earlier this year, the

3   United States Supreme Court reaffirmed the primacy of those factors in determining whether a patent

4   is invalid for obviousness.  *See KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007) (citing

5   *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

6   "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements;

7   instead, there must be some articulated reasoning with some rational underpinning to support the legal

8   conclusion of obviousness."  *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed.

9   Cir. 2006)).  Thus, "the burden falls on the patent challenger to show by clear and convincing evidence

10  that a person of ordinary skill in the art would have had reason to attempt to make the composition or

11  device, or carry out the claimed process, and would have had a reasonable expectation of success in

12  doing so."  *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007)

13  (citing, *inter alia*, *KSR*, 127 S. Ct. at 1740).

14  In that regard, the Supreme Court has "acknowledged the importance of identifying 'a reason

15  that would have prompted a person of ordinary skill in the relevant field to combine the elements in

16  the way the claimed new invention does' in an obviousness determination."  *Takeda Chem. Indus.,*

17  *Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 127 S. Ct. at

18  1731).  Accordingly, "a patent . . . is not proved obvious merely by demonstrating that each of its

19  elements was, independently, known in the prior art."  *KSR*, 127 S. Ct. at 1731.  For example,

20  "combining elements that work together 'in an unexpected and fruitful manner' would not have been

21  obvious."  *PharmaStem*, 491 F.3d at 1360 (quoting *KSR*, 127 S. Ct. at 1740).  Moreover, "when the

22  prior art teaches away from combining certain known elements, discovery of a successful means of

23  combining them is more likely to be nonobvious."  *KSR*, 127 S.Ct at 1740.

24  **IV.   ARGUMENT**

25      **A.   A Genuine Factual Dispute Exists As To Whether The NASA Report Was A
    Printed Publication As Of The Filing Date Of The Fleming '759 Patent.**

26

27      Dell bears the burden of proving by clear and convincing evidence that the NASA Report is a

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

9

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 739**

1    prior-art printed publication. *Northern Telecom*, 908 F.2d at 936-37.  To show that the NASA Report

2    is a prior-art printed publication, Dell must prove all of the following facts: 1) that the NASA Report

3    physically existed within the Library before May 19, 1981[3]; 2) that the NASA Report was catalogued

4    and meaningfully indexed by subject matter before May 19, 1981; 3) that an interested member of the

5    public could have learned of the NASA Report's existence before May 19, 1981; and 4) that such a

6    member of the public could have accessed the NASA Report within the private Special Collections

7    Department of the Library before May 19, 1981.  The lack of any of these elements would be fatal to

8    Dell's motion.  The lack of all of them confirms that the NASA Report is not prior art.

9    **B.    Dell's "Evidence" Is Unreliable And Should Be Excluded.**

10        As a threshold matter, the evidence submitted by Dell to prove prior publication of the NASA

11   Report, the Pec Affidavit and the attached OCLC printout, is unreliable and should be excluded.  With

12   respect to the Pec Affidavit, Ms. Pec has no firsthand knowledge of when the NASA Report was first

13   cataloged and shelved, or where the report was first shelved.  In fact, Ms. Pec testified at her

14   deposition that she has never even seen the original NASA Report.  (Ex. 1 at 69:5-13.)  While Ms.

15   Pec may be able to provide evidence of general library practices in effect since her employment at the

16   Library in 1993, she is unable to provide evidence of the general library practice during the relevant

17   time period:

> Q.  Have you had any specific conversations regarding what policies
> and procedures were used in 1980 and 1981 to catalog special collection
> material at George Washington University?
>
> A.  No.
>
> Q: Once the material was returned to special collection, do you know
> where it would be shelved or maintained?
>
> A.  No, I don't.
>
> *        *        *
>
> Q. And have you done any investigation into the specific policies and
> procedures in place in 1980 and '81 regarding when a document such as

[3] For purposes of this motion only, Lucent is assuming the invention date of the claims 1-3 of the Fleming '759 Patent is the filing date of the patent, May 19, 1981.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

10

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 740**

[the NASA Report] would have been returned to the special collections department?

A.  You've asked similar questions earlier, and no, I have not done any research into that.

Q.  And by "research," just to clarify, you haven't spoken to anybody on the subject?

A.  No.

Q.  And you haven't looked at any documents on the subject?

A.  No.

(Ex. 1 at 102:4-17.)  This case is analogous to *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, which found on similar facts that a witness did not have sufficient knowledge to establish when a thesis was indexed, cataloged and, shelved:

> Dr. Tribe had no first-hand knowledge of the procedures employed by the university libraries, being a doctoral candidate not a member of the library personnel.  ***Moreover, he was not present at the university for most of the 1977 to 1978 period; consequently, he admitted that there were 'many details of the cataloging with which [he] would not be familiar.'  Thus, his testimony is speculative and not probative of general indexing, cataloging, and shelving procedures in the University of Melbourne libraries at issue.***

1998 U.S. Dist. LEXIS 3833, at *120.  Thus, even though Ms. Pec is a current employee of the Library, she was not an employee during the relevant time period, nor was she present during the relevant time period.  She has no knowledge of the specific catalog and shelving policies and procedures in place in 1980 and 1981. Therefore, her testimony, like the testimony at issue in *Ajinomoto*, "is speculative and not probative of general indexing, cataloging, and shelving procedures" in the Library during the relevant time period.  The Pec Affidavit cannot support Dell's allegation that the NASA Report is prior art.

With respect to the OCLC printout attached to Ms. Pec's Affidavit, the printout is hearsay without any exception and is therefore inadmissible.  It is well settled that "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am.,* 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)).  Dell is relying on the OCLC printout for the truth of the maters

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

11

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 741**

recited therein, rendering the OCLC printout hearsay.  *See* Fed. R. Evid. 801(c).  Absent a narrow range of exceptions, hearsay is inadmissible.  Dell has failed to present evidence that any of those exceptions apply.

For example, Ms. Pec's testimony demonstrates her inability to qualify the OCLC printout as a business record under Fed. R. Evid. 803(6).  Ms. Pec stated during her deposition that she had nothing to do with the creation or maintenance of the OCLC printout, and indeed she is not even an employee of OCLC:

> Q.  Okay.  Just to make sure that I have it clear, this [OCLC printout] was accessed from a database maintained by OCLC?
>
> A. Yes.
>
> Q. And you're not personally involved in how OCLC maintains its databases?
>
> A. No, I am not.
>
> Q. You're not aware of the physical equipment they use, their methodology, their processes and procedures?
>
> A.  As such, no.

(Ex. 1 at 78:20-79:6.)

The inadmissibility of hearsay is grounded on the unreliability of such testimony.  The accuracy of its contents cannot be subject to cross-examination or otherwise investigated.  These considerations are especially apt in the present situation where the OCLC printout was altered in some way after the commencement of this litigation.  (*See* § I.A, *supra*.)  Neither which aspects have been altered nor the party responsible for the alteration are known.  (*Id.*)  Such unreliability reinforces the propriety of the legal requirement that the hearsay OCLC printout be excluded from evidence.

**C.    Dell Has Failed to Prove That The NASA Report Was Publicly Accessible Before May 19, 1981.**

If Ms. Pec's Affidavit and the OCLC printout are struck from evidence as they should be, Dell's motion fails *a priori*.  But even if the Pec Affidavit and the OCLC printout are considered on this motion, Dell has still failed to prove that the NASA Report is a prior-art printed publication.  Dell has failed to offer evidence that interested members of the public could have located the NASA

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

12

Case No. 07-CV-2000-H (CAB)

Exhibit 21 Page 742

1    Report in 1981 or that they could have accessed the NASA Report once aware of its existence.  This

2    lack of public availability defeats Dell's motion.

### 1.    A Member Of The Public Could Not Have Located The NASA Report Before May 19, 1981.

A document within a library cannot be a printed publication if it is not "catalogued or indexed

in any meaningful way."  *In re Cronyn*, 890 F.2d at 1161.  This requires more than just indexing by an

author's name and the work's title; it requires research aids which bear a relationship to the ***subject***

***matter*** of the document.  *Id.*  As the party asserting the affirmative defense of invalidity, Dell bears

the burden of proving this subject-matter indexing by clear and convincing evidence.

But Dell has offered no evidence that members of the public could have found the NASA

Report in any index or catalogue in 1981.  First, the OCLC printout, to the extent it comprises

evidence of subject-matter indexing of the NASA Report, was not accessible to the public.  As Ms.

Pec testified, OCLC records required user names and passwords to access and were only available on

dedicated terminals whose use was limited to specific library personnel.  (*See* § I.B, *supra*.)  Without

access to OCLC, an interested member of the public would have had no means of discovering the

NASA Report's existence in 1981.  *See Exxon Corp. v. Mobil Oil Corp.*, C.A. No. H-96-3795, 1998

U.S. Dist. LEXIS 17555, at *29-30 (S.D. Tex. 1ug. 13, 1998) (finding that a thesis was not prior art

where there was no publicly accessible index that referenced the thesis).

But even if members of the public had access to OCLC, that would not cure the defect in

cataloguing.  Notwithstanding the averments in her Affidavit, Ms. Pec testified during her deposition

that subject matter searching for the NASA Report was ***not*** available until long after the relevant

1980-81 time period:

Q.  What is your earliest knowledge of it being searchable by subject matter? What date is earliest?

A.  I would have to estimate subject --

Q.  To your knowledge

A.  Sometime in the 1990s for subject searching.

(Ex. 1 at 122:9-15.)  Ms. Pec's counsel even examined her during her deposition to make clear that

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

13

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 743**

any implication to the contrary — that the NASA Report was indexed by subject matter in 1981 — was a misreading of the Affidavit.  (Ex. 1 at 124:20-125:19.)  Moreover, George Washington University did not become a member of OCLC until 1987.  (Ex. 2.)

Dell has thus failed to adduce any evidence of subject-mater indexing of the NASA Report during the relevant time frame.  Dell has therefore failed to carry its burden of proof for summary judgment.

### 2. The NASA Report Was Not Physically Accessible Before May 19, 1981.

In addition to requiring subject-matter indexing, courts have held that a document must be physically accessible to the public to constitute a printed publication.  *See Constr. Tech., Inc. v. The Lockformer Co., Inc.*, 86 Civ. 0457 (JSM), 88 Civ. 0742 (JSM), 1990 U.S. Dist. LEXIS 20000, at *17-18 (S.D.N.Y. November 2, 1990) (holding that theses that were cataloged but not physically accessible to the public are not "printed publications"); *RCA Corp. v. Data Gen. Corp.*, 701 F. Supp. 456, 468 (D. Del. 1988).

As discussed above, the Special Collections Department of the Library is closed to the public. Even if an interested member of the public were to have learned of the existence of the NASA Report prior to May 19, 1981, that person would have been unable to enter the Special Collections Department, a closed stack portion of the Library that did not allow non-staff members to enter and did not allow its holdings to leave the Library.  (*See* § I.C, *supra.*)  And Ms. Pec was unable to provide any evidence regarding how access could be accomplished:

> Q.  If someone who was physically at Gelman Library went to the special collections department to request access to material, do you understand what the policies or criteria would be for granting access to that individual?
>
> A.  No, I don't.

(Ex. 1 at 62:3-8.)  Such limited access defeats Dell's assertion that the NASA Report constitutes prior art.  *See Northern Telecom*, 908 F.2d at 936-37 (Fed Cir. 1990) (holding that a document within a library that was restricted to authorized personal did not constitute prior art).  Thus, even if the NASA Report had been sufficiently catalogued, this limited physical access to the NASA Report would

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

14

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 744**

prevent it from constituting prior art.

### 3.    No Evidence Exists That The NASA Report Was Shelved In The Library Before May 19, 1981.

There is also no evidence as to when the NASA Report was first shelved in the library.  A document's existence within a library is not sufficient to qualify the document as prior art if its processing is not complete, *i.e.*, if the document is not yet shelved.  *See In re Bayer*, 568 F.2d 1357, 1362 (C.C.P.A 1978) (explaining that a thesis, whose processing was not completed by the critical date was not a printed publication).  Thus, even if subject-matter indexing existed in 1981, there is no evidence as to whether the NASA Report would have been present at the proper physical location before May 19, 1981.

Ms. Pec testified that she did not know the timeframe for cataloging and shelving documents in the Special Collections Department in the 1980-1981 timeframe:

> Q.  Regarding the special collections department, are you aware for the 1980 to 1981 time frame how long it took them to process a document when they got it back from CMS or the equivalent entity in those days?
>
> A.  No, I'm not personally aware.
>
> Q.  Do you know how long it would have taken for that item to end up on the shelves, once it had been cataloged?
>
> A.  No, I'm not personally aware of how long it would take to have shelved the document.

(Ex. 1 at 105:4-14.)  Thus, no evidence exists of when the NASA Report was actually placed on the shelves within the Special Collections Department of the Library.  Ms. Pec's Affidavit, based upon the hearsay OCLC printout, cannot cure this defect:

> Q.  Do you know in the 1980/81 time frame, how long it would have taken for a card catalog entry to be generated by OCLC and sent to a library after the information was uploaded into OCLC?
>
> A.  No, I don't.
>
> *        *        *
>
> Q.  Just a few follow-up questions on what we've discussed today.
>
> Are you aware in the 1980/1981 time frame for OCLC how long between an entry was created to when it would be available to other

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

15

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 745**

1        users of the system?

2            A.  No, I'm not specifically aware.

3    (Ex. 1 at 82:6-10, 104:23-105:3.)

4        In view of the foregoing, it is clear that Dell has not even come close to meeting its clear-and-

5    convincing burden of proving that the NASA Report is a prior-art printed publication.  Dell's motion

6    for summary judgment should therefore be denied.

7    **V.    Even If The NASA Report Is Prior Art, Dell Has Failed To Prove That The NASA
     Report Invalidates The Asserted Claims Of The Fleming '759 Patent.**

8
     **A.    The NASA Report Does Not Anticipate Claims 1-3.**

9        Dell contends that the NASA Report anticipates claims 1-3 of the Fleming '759 Patent.  As set

10   forth below, however, the NASA Report, even if prior art, fails to disclose the first and third modes of

11   access of claim 1, and therefore does not anticipate claims 1-3.

12           **1.    The NASA Report Does Not Disclose The First Mode Of Access Of Claim
               1.**

13
14       Dell contends that the first mode of access of claim 1 (which is also required by claims 2 and

15   3) — "wherein an in-use color is ***directly*** specified as a color data value" — is satisfied by the

16   SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions described in the NASA Report.  It is

17   undisputed that the operands of these functions — R, G, B and C1, C2, and C3 — ultimately call for a

18   particular color.  But it is also undisputed that these operands are floating point, or real, numbers that

19   ***must be converted to integers*** before the display system can interpret them as color data values.

20   Thus, while these functions call for a particular color, they do not ***directly*** do so, as the plain language

21   of claim 1 requires.  (Richter Dec. ¶ 39.)

22       Indeed, James Foley, one of the authors of the NASA Report, testified:

23           Q.  Okay.  So I understand this,  then, so when it comes time to specify
             -- when it comes time for the application, for  them to specify an R, G,
24           B value, that value is specified as floating point, right?

25           A.  That's correct.

26           Q.  But in order to work with the hardware, ***that floating point needs
             to be converted into an integer at some point***?

27

28

**Exhibit 21 Page 746**

1    A.  Correct.

2    [Objection omitted]

3    A. It needs to go through -- ***it needs to be converted into a integer by means of a multiply and round***.

4
5    (Thomases Dec. Ex. 17 at 94.)   Thus, because of this intermediate conversion step that is necessary

6    for the display system to understand the operands of the SET_CURRENT_COLOR (R,G,B) and

     SET_COLOR functions as color data values, these functions do not directly specify color.

7
     Dell's arguments to the contrary are unavailing.  First, Dell argues that the first mode of access

8    of claim 1 is satisfied by the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions because

9    these functions "call for" a particular color in accordance with the Court's claim construction for the

10   phrase "specified by."  But Dell misses the point.  There is no dispute that the operands of

11   SET_CURRENT_COLOR (R,G,B) and SET_COLOR call for a particular color.  There is also no

12   dispute, however, that they do not ***directly*** call for a particular color as claim 1 requires.  Rather, they

13   must first be converted from floating point to integer form through at least a multiply and round

14   procedure so that they can be processed by the system.  The colors are therefore not directly specified.

15   (Richter Dec. ¶ 39.)

16   Second, Dell argues that this interpretation is "squarely at odds" with the patent.  (Dell Br. 10.)

17   But this argument is not only incorrect, it is irrelevant.  The Fleming '759 Patent clearly discloses

18   direct color specification through the use of integers.  For example, in discussing the color selection

19   process in mode 0 — which corresponds to the first mode of access of claim 1 — the patent indicates

20   that the specified RGB value is compared to the RGB values in the color memory and the color is set

21   to the closest match in the color memory.  (Col. 7, lns. 25-34.)  And the RGB values in the color

22   memory are described as binary integers.  (*See, e.g.,* col. 5, lns. 37-41.)

23   But more importantly, ***it is the claim language***, not the specification, that defines the scope of

24   the invention.  At bottom, Dell's argument is that the word "directly" in the first mode of access is

25   superfluous and should be read out of the claim, so that in the first mode of access "an in-use color is

26   ~~directly~~ specified as a color data value."  Dell's attempt to delete the word "directly" from claim 1

27
28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.                    17                    Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 747**

should be rejected.[4]

In view of the foregoing, the NASA Report does not disclose the first mode of access of claim 1, and therefore cannot anticipate claim 1. Because claims 2 and 3 also require the first mode of access of claim 1 by virtue of the Court's corresponding structure for the mode selecting function of those claims, the NASA Report also does not anticipate claims 2 and 3.

### 2. The NASA Report Does Not Disclose The Third Mode Of Access Of Claim 1.

Dell also contends that the NASA Report discloses the third of mode of access of claim 1 (which is also required by claims 2 and 3) — "wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory" — via the SET_BACKGROUND_COLOR_INDEX (INDEX) and SET BACKGROUND INDEX functions. These functions, however, do not specify an in-use background color as construed by the Court: "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." (Thomases Dec. Ex. 4.)

The SET_BACKGROUND_COLOR_INDEX (INDEX) and SET BACKGROUND INDEX functions set the background of the ***entire screen*** to the specified index value after the issuance of a NEWFRAME command. (Richter Dec. ¶ 41; Thomases Dec. Ex. 16 at 165, 175; Thomases Dec. Ex. 17 at 151-52.) After the background color of the screen has been set, subsequently received text and graphics drawing commands draw in a ***foreground color only*** — referred to as the "stroke" portion of the character — over the previously set background color of the entire screen. As Dr. Wedig testified:

Q. Will you agree that the command that's drawing the O is not

---

[4] Dell's attempt to rely on the NASA Report's reference to direct color specification and Dr. Foley's testimony concerning direct color specification is irrelevant. The issue is not whether the NASA Report or Dr. Foley refer to the type of color specification used with the SET_CURRENT_COLOR (R,G,B) and SET_COLOR functions as direct color specification. Rather, the issue is how those functions actually specify color in view of the claims and the Court's construction. And as discussed above, they do not do so directly as required by claim 1. Nor is Dell's argument that the draft Bell Home Information System Provision Standard (Blackburn Dec. Ex. 17) refers to a color value "represent[ing] a binary fraction" relevant. First, "representing" a binary fraction and actually being a binary fraction are not the same thing. More importantly however, it is the claims and the Court's construction that determine the scope of the claimed invention, not documents that evidence conception of the invention.

**Exhibit 21 Page 748**

1    drawing in that background color, correct?

2    [OBJECTION OMITTED]

3    A.  The command for setting -- for drawing an O in a Core-based
     system draws the -- what -- maybe we can agree on calling it the stroke
4    portion of it, the actual portion that you see of the physical letter.

5    (Thomases Dec. Ex. 16 at 176.)  Dr. Wedig further testified that the NASA Report ***does not disclose***

6    ***any*** text or graphics drawing commands that draw in a background color.  Rather, the background of

7    the entire color is specified, a NEWFRAME command is issued to set the color of the entire screen,

8    and then text and graphics are drawn using only the foreground color:

9    Q.   Can you tell me if the NASA Final Report discloses an actual text
     or graphics command that draws not only the stroke portion, but the
10   background portion?

11   [OBJECTION OMITTED]

12   A.  (Reviewing document.) Well, that -- that would be accomplished
     by setting the  background, issuing the new frame, then issuing the --
13   the text or graphics command.  So it requires a combination of
     commands.  It's not a single command.

14
     (Thomases Dec. Ex. 16 at 177.)
15
          To draw a character with a background color in the purported implementation CORE system
16
     described by the NASA Report, one would have to set the foreground color to the desired background
17
     color, and then draw a small rectangle on the screen.  One would then reset the foreground color to
18
     the desired color of the character, and then draw that character in that foreground color over the
19
     previously drawn rectangle:
20
     Q.  For example, if I wanted to draw the letter "O" on a blue back -- on
21   a screen that has a blue background, where the strike is black and the
     portion within was yellow, could I do that?
22
     A.  Okay, so again, the question was --
23
     Q.  Could I do that?
24
     A.  I could do that by drawing a little rectangle of the background
25   color and then putting the text on top of that.

26   (Thomases Dec. Ex. 17 at 39-40.)

27        Thus, in the purported implementation of the CORE system described by the NASA Report,

28
LUCENT'S OPPOSITION TO DELL'S MOTION FOR                    19                     Case No. 07-CV-2000-H (CAB)
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

**Exhibit 21 Page 749**

only a foreground color can be used for subsequently received text and graphics drawing commands. The text and graphics drawing commands draw in foreground color over the previously set or default background color of the entire screen, whatever that color may be and without regard to what the color may be. Because the text and graphics drawing commands draw only in a foreground color over a previously set background color, *no background color is used for these commands*.

Dell argues that Lucent is relying on an erroneous reading of the Court's construction, because the Court's construction only requires that the in-use background color be used "for" subsequently received text and graphics drawing commands, not "by" them. But this is just wordplay. As a matter of common sense, if a drawing command does not draw in a background color, then a background color is not used for that *command*. A background color may independently form the background of the text or graphics that is drawn by the command, *but it is not used for the command itself*, which is what the Court's claim construction requires.[5]

Moreover, Defendants admitted during the claim construction hearing in this case that in-use foreground and background colors are colors that are drawn by subsequently received drawing commands:

> So when the terminal processor *receives the draw command*, what it does is it looks to see *what the current foreground and background colors are, you know, the in-use foreground and in-use background colors*, and it will *write into video memory* in the particular pixels that the host computer tells it to draw in certain color information. And it'll *set the foreground color for character and video memory to two and the background color to seven*.

(Ex. 11 at 230-31.) This is also consistent with the Summary of the Invention of the Fleming '759 Patent, which states that "[t]hese in-use drawing colors may be *applied* by subsequently received text and graphics drawing commands." (Fleming '759 Patent, col. 1, lns. 61-63.) Finally, Dell's technical expert admitted in his original expert report on the issue of alleged invalidity that an in-use

---

[5] Dell's argument that the draft Bell Home Information System Provision Standard (Blackburn Dec. Ex. 17) discloses a point drawing command that does not draw in a background color is irrelevant, since there is no background associated with a point. More importantly however, as discussed previously, it is the claims and the Court's construction that determine the scope of the claimed invention, not documents that evidence conception of the invention.

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3 OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

20

Case No. 07-CV-2000-H (CAB)

Exhibit 21 Page 750

background color is written into the video memory (frame buffer) along with the in-use foreground

color by the same drawing command at the same time:

> In many image display systems, the idea of foreground and background color is  used to help specify the image on the display.  The application program issues a command to the image display system and instructs the system that a foreground color is to be used for subsequent drawing commands.  ***The user can also issue command that particular background color is to be used for all future drawing commands. Then, whenever a command to draw an object with foreground and background characteristics is issued, the previously specified foreground and background colors are used to determine the Pixel values in Video Memory to create the object on the display***.

(Ex. 12, ¶ 14.)

In view of the foregoing, it is clear that the NASA Report does not disclose an "in-use

background" color as construed by the Court, and therefore does not anticipate claims 1-3 of the

Fleming '759 Patent.

### B.    Ample Evidence Establishes A Genuine Dispute Concerning The Alleged Obviousness Of Claims 1-3 Of The Fleming '759 Patent.

Realizing that its anticipation case fails, Dell retreats to an obviousness argument.  First, Dell

contends that to the extent the NASA Report does not disclose direct color specification, it would

have been obvious to modify the system described in the NASA Report to include direct color

specification.  Second, Dell contends that to the extent the NASA Report does not disclose an in-use

background color, it would have been obvious to modify the system described in the NASA Report to

include an in-use background color.  But genuine factual disputes exist as to whether or not these

elements would have been obvious to one of ordinary skill in the art, precluding summary judgment.

With respect to the issue of direct color specification, Dell raises for the first time in its brief

the argument that it would have been obvious to modify the system described in the NASA Report to

include color specification through the use of integer RGB values.  But Dell offers ***no expert opinion***

in support of this new argument, and instead relies solely on attorney argument.  It is Mr. Richter's

opinion, however, that modifying the system described in the NASA Report to specify colors using

integer RGB values would not have been obvious to one of ordinary skill in the art.  (Richter Dec.

¶ 40.)  As Mr. Richter explains in his Declaration, the use of floating point specification gives the

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

21

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 751**

system described in the NASA Report increased flexibility, in that using floating point specification enables color to be specified without regard to the actual color depth, *i.e.*, the number of bits of R, G, and B, required by different types of graphics hardware that could be used with the system.  (*Id.*)  A conversion could then be used to convert to the appropriate color depth.  (*Id.*)  Thus, in Mr. Richter's opinion, eliminating floating point specification from a flexible system to make a less flexible system would not have been something that was obvious to one of ordinary skill in the art, but in fact would have completely counterintuitive.  (*Id.*)

With respect to Dell's contention that it would have been obvious to modify the system of the NASA Report to include an in-use background color, Dell relies on attorney argument and a conclusory expert opinion from Dr. Wedig.  The following is the sum total of Dr. Wedig's opinion on this issue:

> To the extent that Lucent or its expert assert that the NASA Final Report does not disclose the "in-use background color" element, it is my opinion that a person of ordinary skill in the art would have knowledge of systems that had the ability to set the background color of individual characters or graphic primitives by index to a color memory. *See, for example*, The Application of The Intercolor 8000 Terminal To Thematic Cartography, James R. Carter, Siggraph '76, July 14-16, 1976 at p. 163; Ramtek 9000 Series Graphic Display System Programming Manual at p. 3-21; Antiope Specification, pp. 6-7. Therefore, at a minimum, the NASA Final Report, in view of the knowledge of a person of ordinary skill would render this claim obvious.

(Thomases Dec. Ex.15, ¶ 88.)   As the foregoing make clear, Dr. Wedig's opinion is that it would have been obvious to modify the NASA Report to include an in-use background color because purportedly "a person of ordinary skill in the art would have knowledge of systems that had the ability to set the background color of individual characters or graphic primitives by index to a color memory."  But Dr. Wedig ***provides no explanation*** as to why one of ordinary skill in the art would have been led to make the suggested combination.  Dr. Wedig's opinion amounts to an argument that using an in-use background color in connection with the system described in the NASA Report would have been obvious to one of ordinary skill in the art merely because background colors were known in the art.  This conclusory opinion is not only inadequate for Gateway to carry its summary judgment

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

22

Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 752**

1    burden here, but it is contrary to *KSR*'s admonition that "[a] patent . . . is not proved obvious merely

2    by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S.

3    Ct. at 1731.

4         In contrast, Mr. Richter has opined that, given the fact that the system described in the NASA

5    Report, which uses stroke commands as discussed above, ***has no text or graphics drawing commands***

6    that could make use of a background color, one of ordinary skill in the art would not have been led to

7    combine an in-use background color with the NASA Report system.  (Richter Dec. ¶ 40; Richter Dec.

8    Ex. 1, ¶ 48; Richter Dec. Ex. 2, ¶ 13.)  Indeed, since no commands in the NASA Report system could

9    use a background color, such a combination would have been inoperative.

10        Realizing the deficiency of the opinion set forth in his report, Dr. Wedig tried to remedy his

11   opinion during his deposition:

12        Q.  Okay.  You don't explain, though, why, in your opinion, one of
          ordinary skill in the art might take the system talked about in the
13        NASA Final Report and add the ability to set the background color of
          individual characters or graphic primitives by index to a color
14        memory, right?

15        [OBJECTION OMITTED]

16        A.  Yeah, I said that I think that that is just something that would be
          obvious to one of ordinary skill.  You -- all of the pieces are there, and
17        it's a -- it's a non -- I think a noncreative step to -- to take it the final --
          the final -- the final step; that is, the in-use background color, first of
18        all, as I said, I believe it's already taught, but even if the Court feels
          that it's not directly taught,  that it would be obvious to one of ordinary
19        skill that you could create a background -- create an in-use background
          color by using an index to a color memory, because this is just
20        something that would have been knowledgeable to one of ordinary
          skill.

21
22   (Wedig Tr. 180.)  In response to this newly proffered opinion that the addition of an in-use

23   background color would not have been a creative step — which still does not explain why someone of

     ordinary skill in the art would have been led to make the asserted combination — Mr. Richter
24
     submitted a supplemental report prior to his deposition, and upon which he was questioned at his
25
     deposition, indicating his opinion that the proposed combination would have been creative.  (Richter
26
     Dec. Ex. 2 ¶ 13.)  Mr. Richter reiterated his previously expressed opinion that adding an in-use color
27

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.

23                                    Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 753**

1   to a stroke-based system that could not make use of such a color would make no sense from a

2   technical perspective, and therefore would not have been a predicable combination leading to

3   predicable results.  (*Id.*; Thomases Dec. Ex. 5 at 610-614.)  Mr. Richter also pointed out that

4   developers of the CORE System, who were leaders in the field of computer graphics in the late 1970's

5   and early 1980's, did not include an in-use background color in the version of the CORE system

6   described in the NASA Report, demonstrating that there were no particular design or market demands

7   for an in-use background color or the ability to specify such a color.  (*Id.*)

8           In view of the foregoing, it is clear that a genuine dispute exists as to whether claims 1-3 of the

9   Fleming '759 Patent would have been obvious in view of the NASA Report.

10  **VI.    CONCLUSION**

11          For all the foregoing reasons, Lucent respectfully requests that the Court deny Dell's motion

12  for summary judgment that claim 1, 2, and 3 of the Fleming '759 patent are invalid.

13

14  Dated:  December 14, 2007                    By:    _____s/David A. Hahn_____

15                                               David A. Hahn (SBN 125784)
                                                 HAHN & ADEMA
16                                               501 West Broadway, Suite 1600
                                                 San Diego, California  92101-3595
17                                               Telephone:  (619) 235-2100
                                                 Facsimile:  (619) 235-2101
18
                                                 John M. Desmarais (admitted *pro hac vice*)
19                                               Robert A. Appleby (admitted *pro hac vice*)
                                                 James E. Marina (admitted *pro hac vice*)
20                                               KIRKLAND & ELLIS LLP
                                                 153 East 53rd Street
21                                               New York, New York  10022
                                                 Telephone:  (212) 446-4800
22                                               Facsimile:  (212) 446-4900

23                                               Attorneys for *Lucent Technologies Inc.*

24

25

26

27

28

LUCENT'S OPPOSITION TO DELL'S MOTION FOR
SUMMARY JUDGMENT OF INVALIDITY OF CLAIMS 1-3  OF
U.S. PATENT NO. 4,439,759 TO FLEMING ET AL.          24          Case No. 07-CV-2000-H (CAB)

**Exhibit 21 Page 754**

Exhibit 22

Page 1

1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF CALIFORNIA
3                          - - -
4    LUCENT TECHNOLOGIES INC.,        )
                                      )
5              Plaintiff,             )
                                      )
6         Vs.                         )
                                      )
7    GATEWAY, INC., GATEWAY COUNTRY   )
     STORES LLC, GATEWAY COMPANIES,   )
8    INC., GATEWAY MANUFACTURING LLC ) Case No. 02-CV-2060B(CAB)
     and COWABUNGA ENTERPRISES, INC.,)        consolidated with
9                                     ) Case No. 03-CV-0699B(CAB)
              Defendants.            ) Case No. 03-CV-1108B(CAB)
10                                    )
         and                         )
11                                    )
     MICROSOFT CORPORATION,           )
12                                    )
              Intervener.            )
13   _____)
                                      )
14   AND RELATED CROSS-ACTIONS.       )
     _____)
15
16
17              DEPOSITION OF JAKE RICHTER
18                     TAKEN ON
19            WEDNESDAY, NOVEMBER 14, 2007
20
21
22
23
24   Reported by:   LISA RAE SOMMERHAUSER
25                  CSR NO. 10985

Page 2

```
 1                 UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF CALIFORNIA
 3                          - - -
 4   LUCENT TECHNOLOGIES INC.,      )
                                    )
 5              Plaintiff,          )
                                    ) Case No. 02-CV-2060B(CAB)
 6        Vs.                       )          consolidated with
                                    ) Case No. 03-CV-0699B(CAB)
 7   GATEWAY, INC., GATEWAY COUNTRY ) Case No. 03-CV-1108B(CAB)
     STORES LLC, GATEWAY COMPANIES, )
 8   INC., GATEWAY MANUFACTURING LLC )
     and COWABUNGA ENTERPRISES, INC.,)
 9                                  )
              Defendants.           )
10                                  )
        and                         )
11                                  )
     MICROSOFT CORPORATION,         )
12                                  )
              Intervener.           )
13   _____)
                                    )
14   MICROSOFT CORPORATION,         )
                                    )
15              Plaintiff,          )
                                    )
16        v.                        )
                                    )
17   LUCENT TECHNOLOGIES INC.,      )
                                    )
18              Defendant.          )
     _____)
19                                  )
     LUCENT TECHNOLOGIES INC.,      )
20                                  )
              Plaintiff,            )
21                                  )
        v.                          )
22                                  )
     DELL INC.,                     )
23                                  )
              Defendant.            )
24   _____)
25
```

**Exhibit 22  Page 756**

Page 3

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3                            - - -

4    LUCENT TECHNOLOGIES INC.,         )
                                       )
5              Plaintiff,              )
                                       ) Case No. 02-CV-2060B(CAB)
6         Vs.                          )        consolidated with
                                       ) Case No. 03-CV-0699B(CAB)
7    GATEWAY, INC., GATEWAY COUNTRY    ) Case No. 03-CV-1108B(CAB)
     STORES LLC, GATEWAY COMPANIES,    )
8    INC., GATEWAY MANUFACTURING LLC   )
     and COWABUNGA ENTERPRISES, INC.,  )
9                                      )
              Defendants.              )
10                                     )
          and                          )
11                                     )
     MICROSOFT CORPORATION,            )
12                                     )
              Intervener.              )
13   _____)
                                       )
14   AND RELATED CROSS-ACTIONS.        )
     _____)

15

16

17          Deposition of JAKE RICHTER, taken on behalf of

18   the Defendants, at Loews Santa Monica Beach Hotel, 1700

19   Ocean Avenue, Santa Monica, California, commencing at

20   1:10 p.m., Wednesday, November 14, 2007, before Lisa Rae

21   Sommerhauser, CSR No. 10985.

22

23

24

25

Exhibit 22  Page 757

Page 254

1    Q    So what's the New Frame?

2    A    The New Frame function -- because Appendix A

3  as I understand it is basically a modification to, I

4  guess, the previous core interface.  Basically the New

5  Frame function causes the display that's being drawn to

6  be cleared.  And then in the case of the background, set

7  background color function, would go and fill the screen

8  with the specified color.  And if you're working in a

9  segmented system where your list of drawing commands

10 have already been, I guess, put into a segment or

11 display list, then that would be redrawn over the top of

12 that.

13    Q    I'm going to ask you to take a look at one

14 page, Dr. Wedig's supplemental expert report which I

15 think was marked as Exhibit 100 at his deposition, the

16 Wedig deposition.  I'm not going to mark it here because

17 it's just killing trees.  And I only have one question.

18 So it's page 30 of that.

19    THE WITNESS:  Is that okay with you?

20    MR. MARINA:  That's okay with me.  I just need a

21 copy of it.

22 BY MR. MICALLEF:

23    Q    Here.  I opened it to page 30.

24    A    Okay.

25    Q    Near the top of page 30 at about line 5

Page 255

1    there's a sentence that says, "Once a New Frame command

2    is received, the color identified by the index into the

3    color memory will be used as the background color for

4    subsequently received text and graphics drawing

5    commands." Do you see that sentence?

6         A    I do.

7         Q    Do you agree with that sentence?

8         A    Not exactly.

9         Q    In what way do you disagree?

10        A    Basically once a new frame command is

11   received, the color identified by the index into the

12   color memory is the background color for the entire

13   screen. And there's basically no -- it's not an in-use

14   background color because it's not used by the individual

15   functions.

16        Q    By that you mean it's not actively drawn on

17   the screen by the individual functions?

18        A    Correct, correct.

19        Q    Okay. That's all I was going to ask you about

20   that. Thank you.

21             So if I understand the NASA final report, that

22   this background back color and index into the background

23   color is stored in memory when the set background color

24   command is used, some index is stored in memory

25   somewhere. Does that make sense?

Page 256

1        A    Well, the index that you would specify with a

2    set background, I guess it would -- it would have to be

3    with a set background color index function.  Is that

4    what that said, the Wedig reference?

5        Q    Strike that.  Strike that.

6             Let me mark -- I'd like to mark as Exhibit 23

7    a document bearing Bates Nos. LUC 003903 through 004026.

8    It's an extra page.

9             (Defendants' Exhibit 23 was marked for

10                identification.)

11   THE WITNESS:  How much more time on tape?

12   VIDEO OPERATOR:  Seven minutes.

13   MR. MICALLEF:  Why don't we take a quick break.

14   VIDEO OPERATOR:  This marks the end of Tape No. 3

15   in the deposition of Jake Richter.  Going off the

16   record.  The time is 8:20.

17             (Recess taken.)

18   VIDEO OPERATOR:  We're back on the record.  Here

19   begins Videotape No. 4 in the deposition of Jake

20   Richter.  The time is 8:25.

21   BY MR. MICALLEF:

22        Q    I want to go back to this idea of significant

23   conversion; conversion that would in your view

24   demonstrate that certain color data values are not

25   directly specifying a color.  Would it be a significant

Exhibit 23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

        Plaintiff,

    v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES,
INC., GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,

        Defendants,
   and

MICROSOFT CORPORATION,

        Intervener.

MICROSOFT CORPORATION,

        Plaintiff,

    v.

LUCENT TECHNOLOGIES INC.,

        Defendant.

LUCENT TECHNOLOGIES INC.,

        Plaintiff,

    v.

DELL INC.,

        Defendant.

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

# SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER

## October 12, 2007

**Introduction**

1.  I submit this Supplemental Expert Report in response to the "Supplemental Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent No, 4,439,759" dated September 14, 2007.  I have read Dr. Wedig's supplemental report and, as explained below, it is my opinion that none of the references cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-3 of U.S. Patent No. 4,439,759 ("the '759 patent").

**The Court's Claim Construction Order**

2.  I have reviewed the Court's November 15, 2005 claim construction Order concerning the '759 patent and have used the constructions set forth in that Order in forming my opinions set forth in this Supplement Expert Report.

**Validity - Legal Principles**

*Presumption of Validity*

3.  I have been informed that each claim of an issued patent is presumed to be valid.  I further understand that a party challenging a patent's validity must present clear and convincing evidence to overcome the presumption that an issued patent is valid.

*Anticipation*

4.  I have been informed that a patent claim is invalid for anticipation only if a single prior art reference discloses each and every element of the claim exactly and as arranged as set forth in the claim.  The prior art reference must be a publicly accessible printed publication and include a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed invention, but also to make and use it without undue experimentation.  I understand that a reference that fails to disclose expressly one or more elements of the patent

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 1

Exhbit 23  Page 762

claim may nevertheless anticipate the claim if the missing elements are disclosed inherently. I

further understand that an element is disclosed inherently only if it is necessarily present in the

process or product described in the prior art reference. Elements that may or may not be present

based on the express disclosure of a reference are not inherently disclosed.

***Obviousness***

    5.  I have been informed that, since my last report, the Supreme Court has clarified the

legal standards for invalidity due to obviousness. I have also been informed that the Supreme

Court confirmed that, while identification of a teaching, suggestion, or motivation to combine

prior art references is no longer strictly required to demonstrate obviousness, the principles set

forth in my May 12, 2006 Expert Report otherwise remain valid. I understand that the

fundamental question remains whether the claimed invention would have been obvious to a

person of ordinary skill in the art, taking into account (1) the scope and content of the prior art,

(2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill

in the art, and (4) any secondary considerations of nonobviousness.

    6.  I have been informed that the Supreme Court provided further guidance concerning

the obviousness analysis. Specifically, I have been informed that obviousness is not established

by simply combining previously known elements from the prior art. A patent composed of

several elements is not proved obvious merely by demonstrating that each of its elements was,

independently, known in the prior art. I understand that it can be important to identify a reason,

such as a teaching, suggestion or motivation, that would have prompted a person of ordinary skill

in the relevant field to combine the elements in the way the claimed new invention does. I

understand that the Supreme Court has cautioned that in identifying such a reason, the analysis

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 2

Exhbit 23  Page 763

need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

7.   I have also been informed that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.  I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.  I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results.  I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

8.   I have also been informed that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill.  I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has good reason to pursue the known options.  I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

9. I have also been informed that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious. I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

10. I have also been informed that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious. I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

11. I have also been informed that obviousness of a patent cannot properly be established through hindsight, and that elements from different prior art references, or different embodiments of a single prior art reference, cannot be selected to create the claimed invention using the invention itself as a roadmap. I understand that the claimed invention as a whole must be compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through hindsight which would not have been combined absent the inventors' insight.

12. I have also been informed that secondary considerations of nonobviousness must be considered in addition to the primary considerations of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art. I have also been informed that secondary considerations of nonobviousness may include commercial success of products or processes using the invention, long felt need for the invention, failure of others to make the invention, industry acceptance of the invention, licensing of the

invention, copying of the invention by others, initial skepticism aimed at the invention, statements of acclaim for the invention, and unexpected results achieved by the invention.

*Level Of Ordinary Skill In The Art*

13.  As I previously opined in this case, a person of ordinary skill in the art pertinent to the '759 patent in the early 1980s would have had at least a Bachelor of Science degree in electrical engineering, computer engineering, or computer science with at least 2 years of experience in the field of computer graphics, or, alternatively, a person of ordinary skill in the art would have been an engineer holding a Master of Science degree in electrical engineering, computer engineering, or computer science who had pursued a course of study relating to computer graphics technology.

**Analysis**

14.  I have reviewed Dr. Wedig's supplemental report and the references he discusses therein, and, as discussed in further detail below, it is my opinion that none of the references cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-3 of the '759 patent.  Further, my discussion of these references herein is not an agreement or admission that any particular reference constitutes prior art.

15.  Dr. Wedig refers in his report to conversations he had with James Foley and Douglas O'Brien.  Dr. Wedig, however, did not provide a transcript of those conversations or otherwise reveal in his report the content of his conversations with Mr. Foley and Mr. O'Brien.  I have therefore not been afforded an opportunity to respond to what Dr. Wedig was told by Mr. Foley or Mr. O'Brien.

16. Dr. Wedig also lists nearly 300 references in Exhibit 1 of his supplemental report, but he discusses only a handful of those references in the body of his report and in the claim charts attached as Exhibits 2-4. To the extent Dr. Wedig is permitted to provide an opinion on references not discussed in his supplemental report, I reserve the right to further supplement this report in response and to provide responsive opinions at trial.

17. In the section of his report "State of the Art as of the Time of the Alleged Invention," Dr. Wedig opines that "each of the elements of the Asserted Claims were known in the prior art." Dr. Wedig then goes on to discuss a number of references, but never explains how those reference purportedly disclose each of the elements of claims 1-3 of the '759 patent. In fact, as discussed below, none of the references cited by Dr. Wedig, alone or in combination, disclose all of the elements of claims 1-3 of the '759 patent. Further, as discussed in connection with the particular prior art combinations relied upon by Dr. Wedig, I disagree with the purported motivations to combine set forth in paragraph 23 of his report.

18. I also reiterate and incorporate by reference my previous opinions set forth in my May 12, 2006 Rebuttal Report, which remain unchanged in view of the recent Supreme Court guidance on the issue of obviousness.

***Recommendation S.100, "International Information Exchange for Interactive Videotex"***

19. I have reviewed "Recommendation S.100" cited by Dr. Wedig in his supplemental report, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how Recommendation S.100 discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how Recommendation S.100 provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions, but also to

make and use them. It is my opinion that Recommendation S.100 neither anticipates nor renders obvious, alone or in combination with the Crowther reference also cited by Dr. Wedig, claims 1-3 of the '759 patent.

20. First, Recommendation S.100 does not disclose "a memory for storing color data values," which the Court construed as "a color map that stores a table of color data values indexed by numbers." Dr. Wedig points to section 9.3.2 of Recommendation S.100 as purportedly disclosing "a memory for storing color data values," but that section merely refers to "a colour table." Section 9.3.2 provides no indication or suggestion that that "colour table" is "a color map that stores a table of color data values indexed by numbers." Furthermore, Recommendation S.100 is clear that the colors described in the document are direct colors, not indexed colors. When colors in Recommendation S.100 are specified, they are specified by specifying bit values b1, b2, and b3, where b1 is the red component, b2 is the green component, and b3 is the blue component. (*See, e.g,* Section 9.3.1; Fig. 7/S.100.)

21. Second, Recommendation S.100 does not disclose the second mode of access of claim 1, "wherein the in-use foreground color is specified as an index into the color memory." As discussed above, Recommendation S.100 does not disclose the color memory required by the claimed invention, and therefore does not disclose any indexed color modes.

22. Dr. Wedig asserts that "the alphamosaic parallel mode specified in Recommendation S.100 was known to have been taken from the French Antiope system," but provides no substantive evidence to support his assertion. The "Preliminary Specification for the ANTIOPE Teletext System" ("Antiope Specification") cited by Dr. Wedig, and upon which Dr. Wedig relies, makes no reference to an "alphamosaic parallel mode," and also makes clear that the

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 7

Exhbit 23  Page 768

system described in the Antiope Specification was a system in which color data was directly specified, and not one in which indexed colors were used. (*See, e.g.,* ¶ 5.2.) Furthermore, while the '759 patent states that "the Antiope terminal developed by the French CCETT employ[s] a technique for specifying both a foreground color and a background color by indexing a permanent read-only color memory," the '759 patent does not state that the "permanent read-only color memory" in this particular version of the Antiope system is "a color map that stores a table of color data values indexed by numbers." Furthermore, the '759 patent does not state that the Antiope system used in-use foreground and background colors.

23. Third, Recommendation S.100 does not disclose the third mode of access of claim 1, "wherein the in-use foreground color and in-use background color are specified as indexes into the color memory," where "in-use background color" is defined as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." As an initial matter, as discussed above, Recommendation S.100 does not disclose the use of indexed color. Moreover, Recommendation S.100 does not disclose the use of an in-use background color. Dr. Wedig cites to pages 181 and 184, but nothing on those pages indicates the use of an in-use background color. While Section 5.4.2.2.10 discusses displaying characters "on a background of the colour indicated," Section 5.4.2.2.10 does not indicate that the color of the background "will be used as the background color for subsequently received text and graphics drawing commands until changed."

24. Dr. Wedig also points to Section 1.2.4 as disclosing the three required modes of access. But Section 1.2.4 discusses four possible options for representing pictorial information, and does not disclose modes of access within the meaning of the Claim 1 as construed by the

Court. Furthermore, as discussed above, Recommendation S.100 only discloses the use of direct color, and therefore Recommendation S.100 at most could only disclose a single mode of access, and not a plurality of modes as required by claim 1.

25. Fifth, because Recommendation S.100 does not disclose the three modes of access required by claim 1, it necessarily does not disclose the processing means or display means of claim 1, which require the three modes of access. Furthermore, Dr. Wedig fails to explain how Recommendation S.100 discloses the corresponding structure identified by the Court for the processing means of claim 1. Additionally, even if Recommendation S.100 disclosed each element of claim 1, it is my opinion that the disclosure contained in Recommendation S.100 would not by itself enable one of ordinary skill in the art to make or use the claimed invention without undue experimentation. Recommendation S.100 is an inter-networking protocol recommendation that provides no substantive guidance on how to implement a digital image display system.

26. Recommendation S.100 also fails to anticipate or render obvious Claims 2 and 3. First, based on the Court's claim construction, claims 2 and 3 require a color memory, the three modes of access of claim 1, and the corresponding structure of claim 1. As discussed above, Recommendation S.100 does not disclose these claim elements. Second, because Recommendation S.100 does not disclose a color memory, it necessarily does not disclose setting colors in the color memory, which is required by each of claims 2 and 3.

27. Dr. Wedig cites to page 711 of the Crowther reference as disclosing the setting of color data values in a color memory, and combines Crowther with Recommendation S.100 . Dr.

Wedig, however, fails to explain how Crowther purportedly discloses the corresponding structure for the setting function of the processing means of claims 2 and 3.

28. Moreover, one of ordinary skill in the art would not have been led to combine Recommendation S.100 with Crowther. Dr. Wedig argues that "Recommendation S.100 provides reasons to employ a writable color memory where it suggests 'redefining the colour table," and that "[a] person of ordinary skill in the art would have had reason to look to Crowther for details on exactly how to implement this suggested feature because Crowther teaches how to implement this very same feature in a videotex system." But the premise of this argument is incorrect, because, as discussed above, Recommendation S.100 provides no indication or suggestion that that "colour table" is "a color map that stores a table of color data values indexed by numbers." Dr. Wedig is therefore incorrect when he states that "both references suggest color display enhancements for videotex terminals having color maps" and that "both of these references were concerned with videotex terminals . . . wherein color data values may be accessed via index values into a color memory."

29. I also disagree with Dr. Wedig's opinions that "the trends toward higher resolution display, a wider range of colors, and decreasing costs of memory also provided reasons to combine the teachings of Recommendation S.100 and Crowther." To the extent Crowther discloses a color memory within the meaning of the claims, these trends would teach away from the use of a color memory, since a higher resolution display, a wider range of colors, and decreasing costs of memory weigh in favor of direct color and against indexed color.

30. Dr. Wedig also states that Crowther "was well known to those in the videotex community, as was Recommendation S.100," but provides no basis for that assertion other than

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 10

Exhibit 3   Page 768.3

speculation. Dr. Wedig states that the "Crowther paper was presented at the 1980 Spring Conference on videotex topics," but there is no evidence that Crowther was actually presented at the 1980 Spring Conference. Further, the subject of the 1980 Spring Conference appears to have been consumer electronics, not videotex topics.

31. I also disagree with Dr. Wedig's opinion that "[t]he addition of the methodology described in Crowther (for 'adaptively' defining the colors in a color map by transmitting codes as part of DRCS data) to the videotex system specified by Recommendation S.100 led to results that could have been predicted by a person of ordinary skill in the art prior to the time of the alleged invention" and the other statements in paragraph 53 of Dr. Wedig's report. First, there is no evidence that a system that combined Crowther with Recommendation S.100 was ever developed. Second, Recommendation S.100 does not disclose a color memory within the meaning of the Court's construction, and thus combining Crowther with Recommendation S.100 would not lead to predictable results. Third, Recommendation S.100 and Crowther address different aspects of DRCS, and thus one or ordinary skill in the art would not be led to combine these references simply because they both mention DRCS.

32. Accordingly, for at least these reasons, it is my opinion that Recommendation S.100 does not anticipate or render obvious, alone or in combination with Crowther, claims 1-3 of the '759 Patent.

### CRC Technical Note No. 699-E, "Picture Description Instructions PDI for the Telidon Videotex System"

33. I have reviewed "CRC Technical Note No. 699-E, Picture Description Instructions PDI for the Telidon Videotex System" ("CRC 699-E") cited by Dr. Wedig in his supplemental report, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how CRC

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 11

Exhibit 3   Page 768.4

699-E discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how CRC 699-E provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that CRC 699-E neither anticipates nor renders obvious, alone or in combination with the Antiope Specification or Crowther, claims 1-3 of the '759 patent.

34. First, CRC 699-E does not disclose "a memory for storing color data values," which the Court construed as "a color map that stores a table of color data values indexed by numbers." Dr. Wedig cites to page 70 of CRC 699-E, but page 70 merely makes reference to a "Color Lookup." CRC 699-E does not disclose a color map that stores a table of color data values indexed by numbers. Moreover, to the extent CRC 699-E discloses a color map that stores a table of color data values indexed by numbers, page 70 of CRC 699-E teaches away from the use of a color map due to cost concerns. Dr. Wedig also cites to page 50 of CRC 699-E. But page 50 merely mentions "colour reference tables" without explaining what those tables are or how they were to be used. Further, Dr. Wedig states that "[a]llocating a specific bit in the TONAL CONTROL status flag and specifically indicating that it should be used to enable a 'colour reference table' teaches one of ordinary skill in the art a memory for storing color data values," but the four forms on page 50 teach one of ordinary skill in the art such bit is not reserved.

35. Second, CRC 699-E does not disclose the second mode of access of claim 1, "wherein the in-use foreground color is specified as an index into the color memory." As discussed above, CRC 699-E does not disclose a color memory, and therefore does not disclose any indexed color modes. Dr. Wedig also cites to the Antiope Specification as disclosing the use of indexed color, but as discussed above the Antiope Specification discloses a direct color system

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 12

Exhibit 3   Page 768.5

and not an indexed color system.  (*See* ¶ 5.2.)  Moreover, Telidon, which is described in CRC

699-E, and Antiope were competing technologies that both used direct color and had different

and potentially conflicting underlying technologies, and in my opinion one of ordinary skill

would have not been led to combine these two systems.  For example, the Antiope Specification

targeted a fixed resolution terminal with significant graphics limitations, while the CRC 699-E

targeted variable resolutions and higher end graphics capabilities, and combining the two as Dr.

Wedig suggests would not have made sense from a technical perspective and would not have led

to predictable results.

     36.  Third, CRC 699-E does not disclose the third mode of access of claim 1, "wherein

the in-use foreground color and in-use background color are specified as indexes into the color

memory," where "in-use background color" is defined as "a color that will be used as the

background color for subsequently received text and graphics drawing commands until changed."

As an initial matter, as discussed above, CRC 699-E does not disclose the use of indexed color.

Moreover, CRC 699-E does not disclose the use of an in-use background color.  Dr. Wedig also

cites to Recommendation S.100 and the Antiope Specification, but neither of those references

uses indexed color or discloses "a color that will be used as the background color for

subsequently received text and graphics drawing commands until changed."  Recommendation

S.100 is discussed above.  In the Antiope Specification, the background color needs to be re-set

at the start of each row.  Thus the background color is not "a color that will be used as the

background color for subsequently received text and graphics drawing commands until changed."

Additionally, as discussed above, the Antiope Specification does not disclose indexed color.

Moreover, even if Recommendation S.100 or the Antiope Specification disclosed an in-use

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 13

Exhibit 3   Page 768.6

background color, one of ordinary skill in the art would not have been led to combine these references with CRC 699-E because the PDI instructions disclosed in CRC 699-E have no requirement of an in-use background color and for the reasons discussed above.

37. I also disagree with Dr. Wedig's statement that "a person of ordinary skill in the art could have predicted that the specification of foreground and background colors using an index into a color map in the Antiope system would perform the same function in the manner used in the Telidon system specified by CRC 699-E," given the fact that the Antiope Specification does not disclose "the specification of foreground and background colors using an index into a color map" and that Telidon and Antiope had different underyling technologies.

38. I also disagree with Dr. Wedig's opinion that "[t]he trend toward higher resolution display and a wider range of colors, along with the decreasing cost of memory also would have prompted persons of ordinary skill in the art to employ the technique of specifying foreground and background colors using an index into a color map (as taught by the Antiope Specification) in a selectable mode of operation on the Telidon system." First, the Antiope Specification does not teach "the technique of specifying foreground and background colors using an index into a color map." Second, even if it did, these trends would teach away from the use of a color memory, since a higher resolution display, a wider range of colors, and decreasing costs of memory weigh in favor of direct color and against indexed color.

39. Fourth, Dr. Wedig points to the TONAL CONTROL status flag in CRC 699-E as evidence of the required modes of access, but the TONAL CONTROL status flag only selects between grey scale and color, and does not select different modes of access as required by the claimed invention and the Court's construction. Furthermore, CRC 699-E only discloses the use

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 14

Exhibit 3   Page 768.7

of direct color, and therefore CRC 699-E at most could only disclose a single mode of access, and not a plurality of modes as required by Claim 1.

40. Fifth, because CRC 699-E and the Antiope Specification do not disclose the three modes of access required by claim 1, they necessarily do not disclose the processing means or display means of claim 1, which also require the three modes of access. Furthermore, Dr. Wedig fails to explain how these references purportedly disclose the corresponding structure identified by the Court for the processing means of claim 1.

41. CRC 699-E also fails to anticipate or render obvious claims 2 and 3. First, based on the Court's claim construction, claims 2 and 3 require a color memory, the three modes of access of claim 1, and the corresponding structure of claim 1. As discussed above, however, CRC 699-E and the Antiope Specification do not disclose these claim requirements. Second, because CRC 699-E and the Antiope Specification do not disclose a color memory, they necessarily do not disclose setting colors in the color memory, which is required by each of claims 2 and 3. Dr. Wedig also fails to explain how CRC 699-E or the Antiope Specification purportedly disclose the corresponding structure for the setting function of the processing means of claims 2 and 3.

42. Dr. Wedig also cites to Crowther as disclosing "a command for setting or storing a color data value in color memory." Dr. Wedig, however, fails to explain how Crowther purportedly discloses the corresponding structure for the setting function of the processing means of claims 2 and 3.

43. Dr. Wedig also states that "[t]he same reasons discussed above with respect to Recommendation S.100 and Crowther, and with respect to CRC 699-E and Antiope also apply to

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 15

Exhibit 23  Page 768.8

the combination of CRC 699-E and [Crowther]." I disagree for the same reasons discussed above.

44. Accordingly, for at least these reasons, it is my opinion that CRC 699-E does not anticipate or render obvious, alone or in combination with the Antiope Specification, Recommendation S.100, or Crowther, claims 1-3 of the '759 Patent.

### Final Report - NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display

45. I have reviewed the "Final Report - NASA Grant NSG 1508, Extension of the CORE Graphics System for Raster Graphics Display" ("NASA Report") cited by Dr. Wedig, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to explain how the NASA Report discloses, whether expressly or inherently, all of the elements of claims 1-3 of the '759 patent, or how the NASA Report provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that the NASA Report neither anticipates nor renders obvious claims 1-3 of the '759 patent.

46. With respect to claim 1, the NASA Report fails to disclose the first and third modes of access required by claim 1. Dr. Wedig points to the function SET_CURRENT_COLOR (R,G, B) as evidence that the NASA Report discloses the first mode of access. But claim 1 requires that in the first mode of access an in-use foreground color be directly specified as a color data value. The NASA Report indicates, however, that R, G, and B in the SET_CURRENT_COLOR (R,G, B) function are floating point numbers in the range of 0 to 1, which need to be converted to integers in order to be processed by the system. As such, the NASA Report does not disclose

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 16

Exhibit 23  Page 768.9

direct specification of color data values. Dr. Wedig also points to SET COLOR function. But the SET COLOR function also takes real (floating point) parameters rather than integers, and thus does not directly specify color data values either.

47. Dr. Wedig points to the SET_BACKGROUND_COLOR_INDEX (INDEX) function as evidence that the NASA Report discloses the third mode of access of claim 1. In pointing to this function, however, Dr. Wedig ignores the Court's construction of "in-use background color" as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." The NASA Report states at page 20 of Appendix A that the color set by the SET_BACKGROUND_COLOR_INDEX (INDEX) function does not take effect until a NEWFRAME occurs. The color set by this function is thus not "used as the background color for subsequently received text and graphics drawing commands until changed," and is therefore not an in-use background color. Dr. Wedig also points to the device-dependent SET BACKGROUND INDEX function discussed in Appendix C of the NASA Report as evidence of the third mode of access, but Appendix C does not indicate that the color set by that function is an in-use background color as defined by the Court. Moreover, the device-dependent SET BACKGROUND INDEX function is intended to be called when a user program calls the device-independent SET_BACKGROUND_COLOR_INDEX (INDEX) function of Appendix A, and therefore it too would not take effect until a NEWFRAME occurs. (*See, e.g.,* Section 2 of Appendix C.)

48. Dr. Wedig also argues that it would have been obvious to one of ordinary skill in the art to add an in-use background color to the system described in the NASA Report, but the NASA report does not disclose any actual text or drawing commands that use a background

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 17

Exhibit 23  Page 768.10

color.  Thus, one of ordinary skill in the art would not have been motivated to add an in-use background color to a system that could not make use of such a color. Furthermore, the references that Dr. Wedig cites to do not disclose an in-use background color as defined by the Court.  The Carter reference at page 163 mentions background colors, but it does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed."  Similarly, the Ramtek manual at page 3-21 refers to a background flag which inverts the polarity of incoming binary data, but it does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed."  The Antiope Specification at pages 6-7 discusses background colors, but it likewise does not disclose a color that is "used as the background color for subsequently received text and graphics drawing commands until changed," as discussed above.

49. Because the NASA Report does not disclose all three modes of access required by claim 1, it necessarily does not disclose the processing means or display means of claim 1, which require the three modes of access.

50. With respect to claims 2 and 3 of the '759 patent, the Court's claim construction for these claims requires the three modes of access and the corresponding structure of claim 1. Because the NASA Report fails to disclose those elements of claim 1, it also fails to anticipate or render obvious claims 2 and 3.

51. Accordingly, for at least these reasons, it is my opinion that the NASA Report does not anticipate or render obvious claims 1-3 of the '759 patent.

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)
Page 18

Exhibit 23  Page 768.11

### Documents and Other Materials Reviewed

52. My understanding of the '759 patent is based on my review of the patent, the asserted claims, the patent prosecution history, the prior art cited in the Patent Office, the Court's Claim Construction Order, and on my professional experience in the field of display technology over the last 29 years.

53. In preparing this report, I reviewed the supplement report of Dr. Wedig, the references discussed in Dr. Wedig's supplemental report, my May 12, 2006 Rebuttal Expert Report, the '759 patent and file history, and the Court's claim construction order.

54. To aid my testimony at trial, I may rely on any or all of these materials, including those referenced in this report as examples, as well as other materials that I have considered. I may also rely at trial on demonstrative exhibits, summary exhibits, testimonial aids, animations, sample code, demonstrations, and the like in support of my testimony to illustrate the bases of my opinions.

### Compensation

55. My company is charging a rate of $250 per hour plus expenses for my work on this case. My compensation is in no way contingent on the content of my testimony or the outcome of this litigation.

### Other Testimony

56. In the last four years I testified by deposition as an expert in the matter of Grandeye Ltd. vs. IPIX Corporation, Civil Action No 2:05 CV 134 (WDK) (TEM) (United States District Court, Eastern District of Virginia), and in this case.

Jake Richter – Supplemental Rebuttal Expert Report – October 12, 2007
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)
Page 19

Exhibit 23  Page 768.12

October 12, 2007

By      _____

                                        Jake Richter

Exhibit 23  Page 768.13

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, a copy of the foregoing SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JAKE RICHTER was served on counsel for Microsoft, Dell, and Gateway as follows:

**EMAIL**

Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile:  858-678-5099
marchese@fr.com
srodriguez@fr.com

Attorneys for *Microsoft Corp.*

**EMAIL**

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Dell Inc.*

**EMAIL**

Jeffrey Plies
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
jeff.plies@dechert.com

Attorneys for *Gateway, Inc., et al.*

Exhibit 24

# United States Patent [19]

## Fleming et al.

[11]     **4,439,759**

[45]     **Mar. 27, 1984**

[54] **TERMINAL INDEPENDENT COLOR MEMORY FOR A DIGITAL IMAGE DISPLAY SYSTEM**

[75] Inventors: **James R. Fleming**, Indianapolis, Ind.; **William A. Frezza**, North Brunswick; **Gerald S. Soloway**, Holmdel, both of N.J.

[73] Assignee: **Bell Telephone Laboratories, Incorporated**, Murray Hill, N.J.

[21] Appl. No.: **265,195**

[22] Filed: **May 19, 1981**

[51] Int. Cl.³ ................................................ G09G 1/16
[52] U.S. Cl. .................................... 340/703; 340/723; 340/750
[58] Field of Search ................ 340/703, 701, 717, 747, 340/750, 726, 709, 723

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,422,419 | 1/1969 | Mathews et al. | 340/736 |
| 4,091,374 | 5/1978 | Müller et al. | 340/717 |
| 4,233,601 | 11/1980 | Hankins et al. | 340/703 |

4,342,029  7/1982  Hofmanis et al. ................. 340/703

*Primary Examiner*—Marshall M. Curtis
*Attorney, Agent, or Firm*—H. L. Newman

[57]     **ABSTRACT**

The present terminal independent color memory for a digital image display system provides for inter-system compatability, color display systems generally having varying modes of access to color memories, varying color memory capacities, and features such as blinking implemented in varying ways. The data processor (1) of the present system may access color memory (6a) of video controller (6) or color values stored in permanent memory (9) or random access memory (10), responsive to the same command language. The present data processor (1) is also capable of entering color data values comprising color hues and gray levels into color memory for use in a terminal independent manner. Multiple process chained blinking from a particular color to a particular color is also provided by the present processor, the several processes in time-delayed relationship to one another.

10 Claims, 14 Drawing Figures



LUC 002224

**Exhibit 24  Page 769**



FIG. 1

LUC 002225

Exhibit 24  Page 770

U.S. Patent    Mar. 27, 1984    Sheet 2 of 11    4,439,759

FIG. 2



FIG. 3



LUC 002226

**Exhibit 24  Page 771**

FIG. 4



LUC 002227

Exhibit 24  Page 772

U.S. Patent    Mar. 27, 1984    Sheet 4 of 11    4,439,759

*FIG. 5*



LUC 002228

**Exhibit 24  Page 773**

U.S. Patent    Mar. 27, 1984    Sheet 5 of 11    4,439,759



LUC 002229

**Exhibit 24  Page 774**

U.S. Patent     Mar. 27, 1984     Sheet 6 of 11     4,439,759



FIG. 10

FIG. 8

LUC 002230

Exhibit 24  Page 775

FIG. 9





LUC 002231

Exhibit 24  Page 776

*FIG. II*



LUC 002232

**Exhibit 24  Page 777**

U.S. Patent     Mar. 27, 1984     Sheet 9 of 11     4,439,759

*FIG. 12*



ADD BLINK PROCESS

\* FPIAL - FIRST PROCESS IN ACTIVE LIST

LUC 002233

Exhibit 24  Page 778

U.S. Patent    Mar. 27, 1984    Sheet 10 of 11    4,439,759



FIG. 7

U.S. Patent    Mar. 27, 1984    Sheet 11 of 11    4,439,759

FIG. 14



LUC 002235

**Exhibit 24  Page 780**

4,439,759

1

## TERMINAL INDEPENDENT COLOR MEMORY FOR A DIGITAL IMAGE DISPLAY SYSTEM

### BACKGROUND OF THE INVETNION

#### 1. Technical Field

This invention relates to digital image display systems and, more particularly, to a terminal independent color memory for such systems.

#### 2. Description of the Prior Art

Methods and apparatus for providing color digital images on video display screens are well known. A problem, however, has arisen in that compatability among digital display systems has been made difficult by the great variety of methods and apparatus for providing the color images. For example, the Picture Description Instructions PDI for the Telidon Videotex System, CRC Technical Note No. 696-E, developed by the Canadian Department of Communications describes a specific color value selection method: a direct selection of data values for the primary colors—red, green and blue. The Prestel videotex customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and a background color by indexing a permanent read-only color memory.

In the art of color computer graphics, the terminal manufacturers generally employ a color look-up table called a color map indexed by a binary number. The application of a color map expands the repertory of available colors for display. In particular, the Tektronix 4027 terminal is capable of providing 8 colors for direct use from the 64 possible color values that may be loaded into its color map. Other features such as blinking may be provided by such terminals; however, the various methods and apparatus for providing such features are similarly incompatible.

With the advent of videotex, also known as viewdata, and teletext services wherein a customer is able to access a remote host computer and associated data base with a digital image display terminal, there has arisen a need to solve the above-described problems from employing incompatible terminals. There remains a requirement for a terminal-independent color memory for a digital image display system.

### SUMMARY OF THE INVENTION

The above-stated problems and related problems of incompatability among digital image display systems are solved by the principles of the present terminal independent color memory. Processing means are provided for accessing color data in a terminal independent manner, regardless of the size of color memory or its permanent or semi-permanent nature. In accordance with the present invention, the known modes of color access are incorporated into the present algorithm for selecting a particular mode of color memory access, for setting a particular color in a color map memory table or for setting foreground or background in-use drawing color. These in-use drawing colors may be applied by subsequently received text and graphics drawing commands. In a system having a permanent color memory, the algorithm selects the closest color to the desired color hue from the permanent color selection table.

An algorithm for loading the present color memory selects a gray scale equally spaced between black and white and hue data values equally spaced about a

2

hue circle wherein the primary colors are located in 120 degree relationship. In this manner, a host computer is able upon initialization of the present terminal independent color memory to predict the configuration of a particular color map memory table and the color composition of a digital image or frame of information for display.

An algorithm for providing color blinking by means of a linked list of multiple processes is provided. The on and off intervals of blink-from colors and blink-to colors may be specified. In addition, the delay between processes is selectable. Simple animation is possible with the present technique. For example, a ball may appear to bounce across an image, a river may appear to flow or stars may appear to twinkle.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a general block diagram of a digital image display system which may employ the principles of the present invention, the system being exemplary of arrangements for color processing;

FIG. 2 is an operational diagram of the process for selecting a color data value from a color map memory table for display of particular picture element data;

FIGS. 3, 4, and 5 are flow diagrams of a method for accessing color data values for display regardless of the mode of access employed by a particular digital image display system in accordance with the present invention;

FIG. 6 is a representation of a color hue circle wherein the primary colors—red, green and blue—are located at 120 degrees, 240 degrees and 360 degrees respectively;

FIG. 7 is an exemplary table of color data values selected in accordance with a method for initializing a color map memory table in a terminal independent manner in accordance with the present invention;

FIGS. 8 through 14 generally depict the present method for poviding multiple processes of color blinking in accordance with the present invention;

FIG. 8 is a depiction of the contents of a memory block associated with a particular blink process;

FIG. 9 comprises blink process tables indicating the logical connection of linked lists of active and free process blocks as depicted in FIG. 8;

FIG. 10 is an actual depiction of an active blink process table comprising a plurality of process blocks as depicted in FIG. 8;

FIG. 11 is a flowchart diagram of an algorithm for providing multiple process color blinking;

FIG. 12 is a flowchart diagram of an algorithm for adding a new process to the active blink process table of FIG. 10;

FIG. 13 is an exemplary timing diagram and color tables for a color blink comprising three processes; and

FIG. 14 is an exemplary blink process table similar to that depicted in FIG. 9 whose process memory block entry values are shown relative to a particular point in the timing diagram of FIG. 13.

### DETAILED DESCRIPTION

Referring more particularly to FIG. 1, there is shown a general block diagram of a digital image display system employing the principles of the present invention. The digital image display system comprises a data processor 1 having bidirectional access to a processor data bus 2. A separate timing generator 3 may provide the

LUC 002236

**Exhibit 24  Page 781**

4,439,759

3

clock signals required on the processor data bus 2; however, in some systems, the timing generator capability is provided by data processor 1. The timing generator 3 may also provide the timing signals on a video data bus 8 for use by video memory 4, and by a video controller 6. The video controller 6 operates video display 7 responsive to the picture element data received over the video data bus 8. The picture element comprises a binary index for selecting color data values from color map memory 6a. Complete digital images or frames 5 of picture element information are sequentially displayed in color by video display 7.

Data processor 1 may be a microprocessor comprising program or read-only memory 9 and scratch pad or random access memory 10. In a viewdata or teletext terminal which may be located in a residential home, it is desirable that data processor 1 be as small as possible; accordingly, a microprocessor may be assumed.

Data processor 1 responds to user input from a keyboard 18, keypad 19, joystick 20, floppy disc 21, light pen or other data input device known in the art through peripheral device interface 17. In accordance with known technology, data processor 1 may program the video memory 4, the timing generator 3 and the video controller 6 to the proper modes of operation which will allow maximum flexibility in remotely reconfiguring the terminal operating characteristics.

In its application with a viewdata or teletext terminal, the data processor 1 may also respond to input provided from a remote or centralized data base such as one located at a television broadcast station or a provider of viewdata services. Such inputs are provided through communications interface 12. In the case of teletext services, a TV broadcast signal 16 is received at receiver 14 and provided to interface 12. In the case of viewdata services, data is provided over a communications line 15 through a data modulator/demodulator 13 to interface 12. Input/output controller 11 under user control provides selectable access to the various data input and output arrangements.

Processor data bus 2 is a bi-directional conduit through which the data processor 1 controls the video memory 4, the timing generator 3 and the video controller 6. Several bus structures may be adapted for use in the present invention. One example is the INTEL Corp. Multibus. Whichever specific bus structure is chosen, the bus generally comprises address capability, a data path and control lines which may include interrupt, reset, clock (for synchronous use), wait (for asynchronous use), and bus request lines.

The timing generator 3 may comprise a chain of programmable logic circuits, digital dividers and counters for providing required timing signal outputs. For operation of the video data bus 8, a number of different timing signals are required. Horizontal and vertical drive signals are provided in accordance with horizontal and field rates respectively. A dot clock signal is provided at the dot frequency (picture element or pel rate) of the system. An odd/even field signal indicates if the odd or even field is to be displayed in an interlaced system. A composite blanking signal indicates if video is being displayed or if vertical or horizontal retrace is occurring. Also, a group clock signal or other signals may be provided. The group clock signal indicates when to access data for a new group of picture element data from memory. For example, picture element data in video memory having a slow access time may be serially provided in groups of 4, 8 or 16 picture elements.

4

On the other hand, a parallel data transmission scheme is possible, potentially increasing the requirements for leads of video data bus 8.

Video controller 6 accepts digital image information from the video data bus 8, pel-by-pel, and converts the digital information, if necessary, to analog form for presentation on video display 7. The video controller comprises three components: (1) color map memory 6a; (2) digital to analog conversion and sample and hold circuits (not shown), if required by video display 7; and (3) a standard composite video encoder (not shown), for example, for providing NTSC standard video or red, green, blue (RGB) outputs.

Color map memory 6a comprises a color map memory table in random access memory indexed by a binary number component of pel data entering the video controller 6 by way of video data bus 8. For example, if four bits of color data are compiled per picture element, 16 color choices are directly accessible from color map memory table 6a. Each color data value indexed may comprise, for example, 12 bits of RGB data, the domain of possible data values in this case being 4096 possible values. The color map memory 6a may be loaded and updated from the large repertory of possible choices by the data processor 1 under local or remote control.

The application of color map memory 6a provides flexibility and greater color capacity than other color memory means. However, other color memory means are known in the art. Permanent memory 9 of data processor 1 may contain a directly accessible color table. Selections of color data values from permanent memory 9 are transferred to color map memory 6a for subsequent use. Also, random access or semi-permanent memory 10 of data processor 1 may contain a color memory, color data similarly being transferrable to color map memory 6a. Various modes of access to color memory, wherever located, in a digital image display system, are employed by the providers of viewdata and teletext services. Means for providing terminal independent color memory will be subsequently discussed in connection with FIGS. 3–14.

The color memory RGB output may be provided to three separate digital to analog converters, one for each primary color. In accordance with techniques generally known in the art, the RGB output may enter a monitor video display 7 directly, may be converted to a composite video signal for input to a monitor video display 7 or modulated to a particular RF frequency for input through the antenna lead-in of a television set display 7.

Video display 7, as previously discussed, may either be a monitor or a television set. In reference to the previous discussion, it may additionally comprise other forms of video display known in the art including a video projection system, a liquid crystal display or an LED display. The list is not intended to be inclusive and, if another standard format of input video signal is required, the principles of the present invention assume the capability of video controller 6 for providing such a standard video signal.

The video memory 4 comprises random access memory for storage of video picture element information for display. In particular, video memory 4 generally accepts input from the data processor 1 in the form of an image comprising digitized picture element information. The video memory 4 stores the information until rearrangement of data occurs and periodically passes the pel information over video data bus 8 to the video controller 6 on command of data processor 1. As previ-

LUC 002237

Exhibit 24  Page 782

4,439,759

5

ously indicated, the pel data comprises binary data employed to index a particular color entry in color map memory 6a.

The video data bus 8 connects the timing generator 3 and the video controller 4 to the video controller 6. It comprises the following types of leads: data leads for picture element information which is used for indexing into the color map memory 6a of video controller 6, and timing leads for providing video timing and control. The six timing and control leads include the previously mentioned horizontal and vertical drive signals, the dot clock, the field signal, the composite blanking signal and the group clock signal.

Referring more particularly to FIG. 2, an operational diagram is shown which depicts how a binary number component of picture element data stored in a planar bit memory 4 indexes color map memory 6a so that primary color data values for a video signal are provided for video display. Similar reference characters have been employed in FIGS. 2 through 14 wherever possible and in the subsequent discussions wherever possible. In addition, the first numeral of reference characters employed in FIGS. 2 through 14 relates to the location where the referenced element first appears.

In the depicted example a color map memory table of 16 colors is shown. The capacity or domain of the color map memory table may comprise, for example, four bits each of red, green and blue data. The total twelve bit capacity then relates to 4096 possible colors. Accordingly, each of the 16 tabular values indexed may comprise 12 bits of RGB data.

In the depicted example, picture element data 201 comprises, in addition to coordinate data of the location in a particular image or frame 5 for display, the binary index value representing the color that picture element 201 is to be. Binary index value 1011 representing the twelfth entry in the color map memory table may, for example, represent color data value 0011 1111 0000; 0011 being red data; 1111 being green data, and 0000 being blue data. The RGB data value, as previously discussed, illuminates the particular coordinate location in the particular in-use color in frame 5 of display 7.

Upon command of a host computer remotely provided by a teletext or videotex service provider, the color map memory table of 16 colors may be specifically loaded in combination with video processor 1 and the subsequently described software algorithms locally stored in program memory 9. Under control of local keyboard input, the data processor 1 may also specifically load the color map memory table. In accordance with the present invention, either the host computer or the local user may directly load colors into color map memory 6a from permanent memory 9 or from a semi-permanent memory 10 with color data values for use.

Referring to FIGS. 3, 4, and 5, flow diagrams are depicted of a method or algorithm for accessing color memory 6a in a terminal independent manner and for setting the depicted actual character in-use color if possible. FIG. 3 particularly represents a command decoding process. If a first particular command is found, then the flow diagram of FIG. 4 is performed within data processor 1. If a second particular command is found, then the flow diagram of FIG. 5 is preformed. Other commands or operation codes (opcodes) are interpreted by the command decoder algorithm depicted in FIG. 3. These other commands may include commands to perform the subsequently described blinking

6

process or other text or graphic drawing processes. The commands will be hereinafter referred to as opcodes.

Referring particularly to FIG. 3, the data processor is instructed in box 301 of the opcode decoder algorithm to attempt to locate the next opcode. The opcode may be remotely received from a host computer or locally received through the peripheral device interface 17. At decision box 302, the data processor 1 determines if the opcode entered is one for selecting a mode of color memory access. At box 303, transfer is effected to the algorithm for the mode selection process shown in FIG. 4 if there is a match. If there is not a match, the data processor determines at decision box 304 whether the opcode entered is one for setting a color data value. At box 305, transfer is effected to the algorithm for the color setting process shown in FIG. 5 if there is a match. In a similar manner, the entered opcode may be compared with other valid opcodes 306 and the entire opcode decoding process repeated.

Referring to FIG. 4, an algorithm for selecting a mode from a plurality of modes of color memory access and for setting foreground and background in-use colors for two of these modes is shown in flowchart form. Having transferred control to box 401 of the algorithm of FIG. 4 in the operation of the flowchart of FIG. 3, the data processor 1 now interprets the operands or data following the opcode. In general, it is presumed that an opcode will always be followed by a sequence of operands or data entrys or a new opcode. Accordingly, in the process depicted in FIG. 4, the data operands are interpreted and, as a result, the mode of access and the background and foreground color set if possible.

In particular at box 402, the first data operand is recovered if possible. If a box 403 an operand is located, another attempt is made at box 404 to locate a second operand. If at box 407 a second operand is found, the color mode of access is set at box 411 to mode 2. In other words, the color mode is determined by the number of operands following the opcode for selecting the mode of access. Accordingly, when no operands are found, the color mode is set at box 405 to mode 0. If one operand is found, the color mode is set at box 408 to mode 1.

In color mode 0, besides setting the color mode, it may be necessary in systems employing random access color memory 10 to reinitialize color map memory 6a to a default set of color data values. Accordingly block 406 suggests this activity if it may be performed. Color mode 0 of the present terminal independent color memory is adapted for use in digital image display systems employing a direct color selection process either from permanent or semi-permanent color memory.

After setting the color modes to 1 or 2 at blocks 408 or 411 respectively, the foreground and background in-use drawing colors are set. If foreground and background colors may be set in color mode 0, the subsequently described algorithm of FIG. 5 performs this feature. In color mode 1, only picture element data of the actual character in video memory 4 is drawn in the current in-use foreground color without illuminating adjoining picture element data in a background color. In color mode 2, text characters will be drawn in the in-use foreground color over the in-use background color. In other words, a character may fill a rectangular field on display 7. The actual character is illuminated in foreground color as in color mode 1, and the rectangular field surrounding the actual character is filled with the current in-use background color.

LUC 002238

Exhibit 24  Page 783

7

4,439,759

8

Therefore, in color mode 1, the foreground color is set at box 409 to the value of the first operand. At box 410, the background color is set to a data value representing "invisible" or no color. In color mode 2 the data processor compares the first and second operands entered. If the two operands are equal, then it is assumed that it is desired to only change the background in-use color and not the foreground color. Otherwise, the foreground color is set at box 414 and the background color is set at box 413 to the first and second operands respectively. Control is returned at box 415 to the opcode decoder program upon the completion of the color access algorithm.

Referring to FIG. 5, an algorithm in flowchart form is depicted (1) in color modes 1 or 2, for setting the color data values in color map memory 6a in a terminal independent manner or (2) in color mode 0, for setting foreground and background colors. At decision box 502, the data processor determines if color mode 0 has been previously entered. It is assumed that, before the opcode for setting a color data value is entered, the select color access mode opcode has been read and acted upon in accordance with the flowcharts of FIGS. 3 and 4.

If the color access mode at decision box 502 is 0, then the first operand is located if possible at box 503. If the operand is located at decision box 505 then a second operand is located if possible at box 507.

If a second operand was not successfully located at decision box 509, then the foreground color and the background color will be modified at boxes 512 and 514 respectively. At box 512, the foreground color is set to the index of the closest match of the first operand and a color value from the color map memory table 6a. At box 514, the background color is set to an "invisible" color. "Invisible" is intended to describe the process of depositing pel values in video memory 4 only at the character or graphics drawing command locations corresponding to the foreground of the resulting image and not over-writing those corresponding to the background.

If a second operand has been successfully located at decision box 509 then a check is made at decision box 511 to see if both operands are equal. If the first operand and second operand are equal, then by convention only the background color is set at box 515. If the two operands are not equal at decision box 511 then the foreground color is set at box 513 and the background color is subsequently set at box 515. As in the case of a single operand, the foreground color and the background color are set to the index of the closest matched color in the color map memory table 6a.

If the color mode was not 0 at decision box 502 then the color map memory table 6a will be loaded with colors specified by subsequent operands. The current in use foreground color index will indicate the first potential color map memory table entry to be changed. INDEX is set to the current in-use foreground color index at box 501. An attempt is made to get an RGB operand at box 504 if possible. If the operand is found at decision box 506, then the RGB operand is loaded into the color map memory table 6a at the location determined by INDEX. The INDEX is then incremented at box 510. The sequence of boxes 504, 506, 508, and 510 is repeated as long as operands are available.

Referring to FIG. 6, a color hue circle is shown wherein the primary colors—red, green, and blue—are located at 120 degrees, 240 degrees, and 360 degrees.

Upon the operation of the box 406 of FIG. 4 and on other occasions in the operation of a digital image display system, for example, an explicit resetting operation, it is appropriate to initialize or establish color map memory table 6a regardless of the number of possible entries and in a predictable fashion. Accordingly, a method is provided whereby one half of the color map memory is filled with a gray scale whose values are equally spaced between black and white and the other half of color map memory 6a is filled with a color hue scale whose values are spaced about a hue circle of 360 degrees.

In particular, if the number of bits of a binary number index into a particular color map 6a is defined as N, then the number of entries in the color map is $2^N$. Then the quantity $2^N/2$ of entires comprise gray scale values and the quantity $2^N/2$ of entires comprise color hue values.

The capacity or domain of the color map memory table 6a may be defined as comprising M bits of data. Then, the quantity M/3 bits of data may represent data for each primary color—red, green, and blue. In general, the relationship between M and N may be maintained that M be greater than or equal to three times the quantity N-1.

By way of example, if a particular color map memory is indexed by a 4 bit binary index value, then 8 gray scale levels and 8 hues are loaded upon request into color map memory table 6a. The quantity M then should be greater than or equal to 9:3 bits each of red, green, and blue data.

The gray scale is found particularly as a binary number in this example between 000 000 000 and 111 111 111 and generally is represented by the binary result of the equation: $P_1 = k/(I-1)$ where I represents the decimal number of gray scale levels, generally $2^N/2$, k, a quantity between 0 . . . I-1, is the particular entry in the map desired, and $P_1$ is the binary result for a primary color—r—red, green, and blue. It is most convenient if, in the operation of data processor 1, the result is normalized and rounded to the nearest M/3 bits. The value for all the primary colors is set equal to this last.

Referring briefly to FIG. 7, an exemplary color map memory table is shown. In accordance with the above method, the first eight values are shown initialized to gray scale levels in a gray scale 706 between 000 000 000 at address 704 with the binary index value 0000 and value 111 111 111 at address 704 with the binary index value 0111.

To provide the color hue values, data processor 1 must first calculate the angle of a desired color hue h. If n entries are required then the result of the calculation (j−1) times 360 degrees divided by n (wherein j is an integer between 1 and n) provides the angle of h. In FIG. 6, if eight hue data values are desired then by way of example, color data values are desired for 45 degrees, at location 611, 90 degrees at location 612, 135 degrees at location 613, and so on about the color hue circle.

In general, the data processor must particularly locate the location of the closest primary color angle to the desired angle, the next closest primary color and the furthest primary color from the desired angle. In particular, for the example of color value 611 at 45 degrees, then the primary color blue is the closest primary color at location 601 or 360 degrees. This result may be appropriately established in temporary memory as variable $P_1$. The next closest primary color to the exemplary desired color hue is red at location 603 or 120 degrees. This result may be appropriately established in

LUC 002239

Exhibit 24  Page 784

4,439,759

9

temporary memory as variable $P_2$. The furthest primary color from the exemplary desired color hue is green at location 605 or 240 degrees. This result may be established in temporary memory as variable $P_3$.

The results $P_1$, $P_2$, and $P_3$ of this calculation are then employed generally to establish the color data values for the primary colors—red, green and blue. As it is known that $P_1$ is blue in the particular example under discussion, the blue data value in binary form is set in color map memory as all 1 bits. As it is known that $P_3$ is green, the green data value is set in color map memory as all 0 bits.

In the case of $P_2$, data processor 1 is instructed to calculate the binary result of the equation:

$$P_2 = \left| \frac{\langle h - \langle P_3 \rangle}{60^\circ} \right|$$

As it is known that $P_2$ is red, the red data value is set in color map memory to the binary result of the above calculation. As with the gray level calculation, it is generally appropriate that the result be rounded to the nearest M/3 data bits in length after normalizing the result.

Referring again to FIG. 7, the color hue data values are entered in address locations 1000 to 1111 in the depicted exemplary color map memory table. In particular, the above exemplary calculation for a hue at 45 degrees on the hue circle of FIG. 6 is located at address 1001. As previously indicated, the blue data value is all 1 bits or 111; the green value is all 0 bits or 000, and the red value is given by the binary result 101.

Referring to FIG. 8, there is shown a depiction of a memory block associated with a particular process identifying its parameters. Each time a blink process is initiated, a blink process block must be established in memory which stores the relevant parameters associated with that particular blink process. The first entry 801 in the block stores the LINK value, which is a pointer to the starting address of another blink process block. If the process is actively blinking, then the LINK value will point to the next active process block. If the process is INACTIVE, then the LINK value will point to the next FREE process block.

The second entry 802 in the block stores the current STATUS of the blink process. The status can be either INACTIVE, ON, or OFF (the latter two of which are considered active states).

The third entry 803 is used to store the BLINK-FROM COLOR, which is a binary number index that acts as an index into the color map memory table. This index number is extracted from the operand following the blink opcode representing the color blinking process and does not change throughout the life of the process.

The fourth entry 804 is used to store the SAVE COLOR, which is an RGB value and not a binary index that is periodically copied out of the color map memory table in a manner that will be described subsequently.

The fifth entry 805 is used to store the BLINK-TO COLOR which is a binary number that acts as an index into the color map memory table. This number is also extracted from the operand following the blink process opcode and does not change throughout the life of the process.

The sixth entry 806 stores the ON TIME and the seventh entry 807 stores the OFF TIME, both of which are most conveniently numbers between 1 and 64 that represent time intervals in fractions of a second. These

10

are also extracted from the operand following the blink process opcode and do not change throughout the life of the process.

The eighth entry 808 stores the CURRENT COUNT which is also a number that represents a time interval. This number is updated regularly as the process is executed.

FIG. 9 gives a logical view of how the linked blink process blocks are treated. There are two linked lists kept in memory. The first contains all of the active process blocks and the second contains all of the INACTIVE or free process blocks. The memory occupied by the INACTIVE process blocks is available for use by new blink processes, and hence this list is called the FREE list. The head 901 of the ACTIVE list is a single pointer that contains the address in memory of the beginning of the process block of the most recently received active blink process 902. The LINK entry in this block in turn points to the beginning of the next most recently received active blink process 903, and so on to the beginning of block 904, block 905 through the entire list of process blocks that contain active blink processes. The displaced appearance of the blink process blocks is intended to represent their random appearance in memory. The last process block on the list contains a LINK value NULL indicating the end of the list. The head of the FREE list 910 is a single pointer that contains the address in memory of the beginning of the process block of the first inactive blink process 911. The LINK entry in this block points to the beginning of the next inactive process block 912 and so on to the beginning of block 913, block 914 through the remainder of the inactive process blocks. When the system is initialized, as well as any time that there are no currently active blink processes, all of the available blocks of memory allocated to the blink feature are on the FREE list.

When a new blink process is initiated, more particularly described in the discussion of FIG. 12, the first block in FREE list 911 is made available for use. When this happens, the head of the FREE list pointer 910 is changed to the address of the beginning of the next free block 912. Also, the head of the ACTIVE list pointer 901 is changed to the address of the beginning of the block 911 just allocated, and the LINK pointer within block 911 is changed to the address of the beginning of what was the most recently received active blink process block 902. The new active process block 911 is then loaded with the relevant parameters of the blink process being defined.

FIG. 10 shows the actual organization within memory of blink process blocks. The first entry 1001 and the second entry 1002 store the head of the ACTIVE list pointer and the head of the FREE list pointer, respectively. Process blocks are stored in sequential memory locations 1003 through 1010 or until the capacity allocated within memory 10 is reached. These locations do not necessarily correspond to the order in which the blocks appear on the linked lists.

FIG. 11 shows a flow diagram for TICK, the primary blink processing subroutine. TICK is periodically called from a main control program, typically every 1/10th second. This subroutine goes through, examines, and updates each process block (and the color map memory table if necessary) in the ACTIVE list starting with the most recently received blink process block and proceeding to the last.

LUC 002240

Exhibit 24  Page 785

4,439,759

| 11 | 12 |

Activity block 1101 with which the TICK subroutine begins sets the value of an internal status variable PTR to the address stored in the head of the ACTIVE list. (This, as described previously, points to the most recently received active process block.) Activity block 1102 initiates a loop, whose steps comprise blocks 1103 through 1117, that is exited only when it returns a PTR value of NULL. The first step in the loop, activity block 1103, subtracts one from the COUNT of the process block pointed to by PTR. Decision block 1104 then checks the value of COUNT to see if it is equal to or less than zero. If it is not, then control action proceeds through block 1109 (by passing blocks 1106 through 1116) to activity block 1117, which changes PTR to the address stored in the LINK entry of the process block pointed to by PTR or, in other words, the current process. Control then loops back to activity block 1103 as long as PTR does not have the value NULL. If the COUNT is less than or equal to zero, then control proceeds through block 1105 to decision block 1106. Decision block 1106 checks the value of STATUS in the current process block. If STATUS is on, then control proceeds through block 1108 to activity block 1111. If STATUS off, then control proceeds through block 1107 to activity block 1110.

Activity block 1111 takes the RGB value stored in SAVE COLOR of the current process block and writes it into the color map memory table entry indicated by the index stored in the FROM COLOR entry in that process block. Control then passes to activity block 1112, which sets the COUNT entry of the current process block to the contents of the OFF TIME entry of that block.

Activity block 1116 then sets the STATUS of that process block to OFF before control passes to activity block 1117, whose action has been described previously.

Activity block 1110 copies the RGB value from the color map entry indicated by the index stored in the FROM COLOR entry of the current process block into the SAVE COLOR entry of that process block. Activity block 1113 then copies the RGB value from the color map entry indicated by the index stored in the TO COLOR entry of the current process block into the color map entry indicated by the index stored in the FROM COLOR entry of that process block. Activity block 1114 then sets the COUNT entry to the value stored in the ON entry. Finally Activity block 1115 sets the STATUS entry to ON before control is passed to Activity block 1117, whose action has been described previously.

When the loop is finally exited, that is, when PTR returns the value NULL, the subroutine TICK is complete and control returns to the main control program.

In the previous discussion, the assumption was made that an active process list already had been established.

FIG. 12 is a flow diagram illustrating how one active blink process is added to the active list. Since only one active process is allowed for the ordered pair of FROM COLOR (FC) and TO COLOR (TC), the current list of active process blocks must be searched to determine if a process is active for a given pair. This search is indicated in box 1201. If the ordered pair (FC, TC), is found in the currently active process blocks then that block is made INACTIVE and is removed from the linked list as indicated in box 1206. When box 1205 is encountered an attempt is made to obtain a free process block from the previously described FREE list. At decision box

1207 a check is made to see if a free block was successfully obtained. If no block was obtained then the entire set of possible blocks must have been already allocated to ACTIVE processes and therefore no addition can be made, so the entire process addition procedure is exited.

If a free process block is obtained then it must be initialized as illustrated in box 1210. The new process always begins with a STATUS of OFF which guarantees that the first transition will be OFF-to-ON as previously stated.

The FROM COLOR, TO COLOR and ON and OFF TIME'S are also initialized in box 1210 from data obtained from the operand entered following the blink process opcode.

The phase delay (PD) is an offset from the next OFF-to-ON transition of the most recently received active process (that is, the process of the head of the ACTIVE process list). The head of the ACTIVE list is checked at decision box 1211 in case the list is empty. If the list is empty, then phase delay does not apply and the CURRENT COUNT in the new process block is set to the OFF TIME as indicated in box 1219.

If an active process exists then two situations arise, either the process is currently ON or OFF. The STATUS of the proces is checked in decision box 1214. If the process is ON then the next OFF-to-ON transition will occure when the CURRENT COUNT reaches the interval of time represented by OFF TIME expires. Therefore, the total time to the next OFF-to-ON transition will be the CURRENT COUNT plus the OFF TIME. In order to synchronize the new process to the most recently received active process, its CURRENT COUNT is set to the time until the next OFF-to-ON transition plus any phase delay as shown in box 1210.

If the last active process has a STATUS of OFF, then the next OFF-to-ON transition will occur at a total time equal to CURRENT COUNT. The new process is therefore synchronized to that transition simply by setting the new process CURRENT COUNT to the CURRENT COUNT of the most recently received process plus any indicated phase delay.

In all cases once the complete process block is initialized, it is added to the active process list as shown in BOX 1220. The ADD NEW PROCESS returns control to the main control program.

Referring to FIG. 13, exemplary color tables and a timing diagram are illustrated for three active blink processes. Successive representations of an eight entry color table are illustrated in table 1301. Time is indicated by time line 1312. A legend 1311 indicates the assumed color values of color table 1301. The information that was used to establish the three blink processes is as shown in Table 1.

TABLE 1

| PROCESS 1 | | |
|---|---|---|
| Arrival Time | T = 0 | |
| FROM COLOR | 6 | |
| TO COLOR | 3 | |
| ON TIME | 2 | |
| OFF TIME | 2 | |
| PHASE DELAY | 3 | |
| PROCESS 2 | | |
| Arrival Time | T = 5 | |
| FROM COLOR | 7 | |
| TO COLOR | 4 | |
| ON TIME | 1 | |
| OFF TIME | 2 | |
| PHASE DELAY | 1 | |
| PROCESS 3 | | |

LUC 002241

Exhibit 24  Page 786

4,439,759

**13**

TABLE 1-continued

| Arrival Time | T = 10 |
|---|---|
| FROM COLOR | 3 |
| TO COLOR | 7 |
| ON TIME | 5 |
| OFF TIME | 5 |
| PHASE DELAY | 1 |

The color table 1301 at time T = 0 contains the color value white in entry 1, the color value red in entry 3, the color value green in entry 6 and the color value blue in entry 7. The other entries may contain color values but are not important in this example.

Process 1 arrives at time T = 0 and assuming no active processes already exist, process 1 is activated with a STATUS of OFF (1304). The phase delay that was specified for process 1 is not relevant because no active blink processes existed when the information for process 1 arrived at time T = 0.

When process 1 is activated the CURRENT COUNT is set to the OFF TIME which is equal to 2 and therefore an OFF-to-ON transition will occur at time T = 2 (1313).

When the OFF-to-ON transition occurs, the color value in the color table indexed by the FROM COLOR, which is equal to 7, is saved in the process block in the SAVE COLOR entry 1302. The color value saved is blue shown by the entry 1315. After the FROM COLOR is saved, the contents of the color table indexed by the TO COLOR is copied to the color table entry indexed by the FROM COLOR. This results in the color value red in entry 3 at 1316 to be copied to entry 7 at 1317.

As a result of this change, any picture elements which were previously displayed using the color value stored 35 in color map entry 7 will immediately change from blue to red. The STATUS of process 1 will be set to ON and the CURRENT COUNT will be set to the ON TIME which is equal to 2. An ON-to-OFF transition will occur at time T = 4 referenced by character 1314. At that transition the previously saved color 1315 is restored in the color table at the entry indexed by the FROM COLOR, which is equal to 7, and referenced by character 1318. The STATUS is again set to OFF and the CURRENT COUNT is set to the OFF TIME which is equal to 2. The above sequence is repeated as long as the process is active.

Process 2 arrives at time T = 5 which is after process 1 has been activated. Process 2 is started with a STATUS of OFF and must be synchronized with the next OFF-to-ON transition of process 1. Since at time T = 5 the STATUS of process 1 is OFF then the time to the next OFF-to-ON transition will be equal to 1, which is the CURRENT COUNT of process 1. A phase delay of 1 was specified with process 2 so the OFF TIME of process 2 is set to the sum of the CURRENT COUNT of process 1 plus the phase delay of process 2, which equals 2. This setting results in the first OFF-to-ON transition occurring at time T = 7 referenced by character 1319. Process 2 then begins the color save, copy and restore sequence previously described for process 1.

Process 3 arrives at time T = 14 and must be synchronized to process 2. The next OFF-to-ON transition of process 2 occurs at time T = 13, and, because of the phase delay of 1, the first OFF-to-ON transition for process 3 will occur at time T = 14, referenced by character 1321. As with process 1 and 2, the save, copy and restore sequence will continue for process 3 until

**14**

changed by either another specification for the same ordered pair of FROM COLOR and TO COLOR or a general resetting procedure.

It should be noted that when colors are copied from one entry in the color table to another that an interaction between processes can result. This is illustrated at time T = 13 and T = 14. At time T = 13, process 2 makes an OFF-to-ON transition referenced by character 1320. The color white is copied to color table entry 7 as referenced by 1324. At time T = 14, process 1 makes an OFF-to-ON transition as referenced by 1322. At that transition, the SAVE COLOR, referenced by 1325, is white because of the previous copy operation performed by process 2 at time T = 13. This interaction of colors between processes is useful for simple animation and complex blinking sequences.

FIG. 14 illustrates the state of the three process blocks at time T = 15.

What is claimed is:

1. In a digital image display system:
   a memory for storing color data values;
   processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising
   a first mode of access wherein an in-use foreground color is directly specified as a color data value;
   a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and
   a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and
   display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode.

2. A digital image display system comprising:
   a color memory for storing color data values;
   processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and
   display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode.

3. A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory.

4. In a video image display system having a color memory, a method for displaying a color image in a terminal independent manner responsive to commands and data received from a command and data source, the method comprising the steps of:
   receiving commands and data from the command and data source;
   reading a first command for selecting a mode of access to the color memory, and responsive to data following the first command, selecting the mode of access to the color memory;
   reading a second command for setting color data values in the color memory and, responsive to data

LUC 002242

Exhibit 24  Page 787

4,439,759

15

following the second command, setting the color data values in the color memory,

reading a third command for accessing color data values in the color memory, and

displaying a color image associated with the color data values accessed by the third command on a video display terminal.

5. A digital image display system comprising:

a color map memory for storing color data values;

processing means for storing color data values in the color map memory and accessing color data values stored in the color map memory, the color data values comprising $2^N/2$ gray level data values equally spaced between black and white, where N is the number of bits in a color entry address of the color map memory and the processing means storing the gray level data values in one half of the color map memory, the color data values further comprising $2^N/2$ hue data values equally spaced about a 360 degree hue circle wherein primary colors red, green, and blue are located in 120 degree relationship to one another and the processing means storing the hue data values in another half of the color map memory, the processing means upon command accessing color data values stored in the color map memory; and

display means responsive to the processing means for displaying an image associated with accessed color data values.

6. A digital image display system comprising:

a color map memory for storing color data values;

processing means for storing hue color data values in the color map memory and accessing color data values stored in the color map memory, the hues being equally spaced about a 360 degree hue circle wherein primary colors red, green, and blue are located in 120 degree relationship to one another, and where h is a desired hue color data value, n is a desired number of hue color data values, angle of h is determined by $(j-1) \times 360$ degrees divided by n, where j is an integer between 1 and n, $P_1$ is the closest primary color to the angle of h, $P_2$ is the next closest primary color to the angle of h, and $P_3$ is the furthest primary color from the angle of h, the identity of $P_1$, $P_2$, and $P_3$ being assigned among the primary colors, the processing means setting the binary value of $P_1$ in the color map memory as all 1 bits, setting the binary value of $P_3$ in the color map memory as all 0 bits, and setting in the color

16

map memory the normalized and rounded binary value of $P_2$ resulting from the equation:

$$P_2 = \frac{<h - <P_1}{60°}$$

and upon command accessing color data values stored in the color map memory; and

display means responsive to the processing means for displaying an image associated with accessed color data values.

7. A digital image display system comprising:

a color memory for storing color data values;

processing means responsive to a particular command and data sequence providing a blinking of certain picture element data from one particular color to another particular color specified by the data sequence to another particular color specified by the data sequence by periodically changing color data values in the color memory, multiple color blinking processes being provided responsive to multiple commands, each process subsequent to a first process being in delay relationship to the next previous process; and

a display means for displaying the multiple color blinking responsive to the processing means.

8. A display system as recited in claim 7 wherein the processing means determines the time interval each particular color is displayed during a blinking cycle responsive to the command and data sequence.

9. In a digital image display system having a color memory, a method for providing a blinking of certain picture element data from one particular color to another particular color, the color blinking method initiated by the reception of a particular command and data sequence, the color blinking method characterized by the steps of:

specifying multiple color blinking processes, each color blinking process including providing a blinking of certain picture element data from one particular color specified by the data sequence to another particular color specified by the data sequence by periodically changing color data values in the color memory;

specifying a delay interval, if desired, between the processes; and

displaying the multiple color blinking.

10. A method for providing color blinking as recited in claim 9 further characterized by the steps of specifying a particular time interval a particular color is displayed during a blinking cycle of a particular color blinking process.

* * * * *

55

60

65

LUC 002243

Exhibit 24  Page 788

Exhibit 25

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10   LUCENT TECHNOLOGIES, INC.,              Civil No.   02cv2060-B (CAB)

11                              Plaintiff,

12              v.                           **SCHEDULING ORDER FOR GROUPS
                                             1, 4, 5 AND 6 PATENTS**
13   GATEWAY, INC.; GATEWAY COUNTRY
     STORES LLC; MICROSOFT
14   CORPORATION; and DELL, INC.,

15                              Defendants.

16   And related counterclaims.

17        On June 6, 2007, the Court held a discovery conference to discuss the scheduling of motions,

18   pre-trial and trial schedules for the remaining patents in this case.  After considering input from

19   counsel, the Court sets the following schedule:

20        1.    On **June 19 and 20, 2007**, at **9:00 a.m.**, motions for summary judgment on the Group

21   1/6 patents, excluding those involving issues of obviousness, shall be heard before Judge Brewster.

22        2.    On **September 6, 2007**, at **9:00 a.m.**, motions regarding the trust/licensing, which

23   will address Plaintiff's continued standing to assert the Group 1/6 patents, shall be heard before

24   Judge Brewster.

25        3.    On or before **September 14, 2007**, Defendants shall serve their supplemental expert

26   reports on the obviousness defense for the Groups 1/6, 4 and 5 patents.

27        4.    On or before **October 12, 2007**, Plaintiff shall serve its supplemental rebuttal expert

28   report on the obviousness defense.

                                        - 1 -                              02cv2060

                                  **Exhibit 25  Page 789**

5.      On or before **November 9, 2007**, expert depositions on the supplemental reports shall be completed.

6.      On or before **November 30, 2007**, Defendants shall file opening briefs on the obviousness defense as it relates to the Groups 1/6, 4 and 5 patents.

7.      On or before **December 14, 2007**, Plaintiff shall file opposition briefs on the obviousness defense.

8.      On or before **December 21, 2007**, Defendants shall file reply briefs on the obviousness defense.

9.      On **January 7, 2008**, at **10:30 a.m.,** the motion for summary judgment on the obviousness defense shall be heard before Judge Huff.

10.     On or before **January 14, 2008**, all parties shall file Memoranda of Contentions of Fact and Law in compliance with Local Rule 16.1(f)(2), as it relates to the Groups 1/6, 4 and 5 patents.

11.     On or before **January 14, 2008**, all parties shall fully comply with the Pretrial Disclosure requirements of Fed. R. Civ. P. 26(a)(3), as it relates to the Groups 1/6, 4 and 5 patents. **Failure to comply with these disclosures requirements could result in evidence preclusion or other sanctions under Fed. R. Civ. P. 37.**

12.     On or before **January 21, 2008**, counsel shall meet together and take the action required by Local Rule 16.1(f)(4). At this meeting, counsel shall discuss and attempt to enter into stipulations and agreements resulting in simplification of the triable issues. Counsel shall exchange copies and/or display all exhibits other than those to be used for impeachment. The exhibits shall be prepared in accordance with Local Rule 16.1(f)(4)(c). Counsel shall note any objections they have to any other parties' Pretrial Disclosures under Fed. R. Civ. P. 26(a)(3). Counsel shall cooperate in the preparation of the proposed pretrial conference order.

13.     On or before **January 28, 2008**, the proposed final pretrial conference order, including objections they have to any other parties' Fed. R. Civ. P. 26(a)(3) Pretrial Disclosures shall be prepared, served and lodged with the Clerk of the Court, and shall be in the form prescribed in and in compliance with Local Rule 16.1 (f)(6). Counsel shall also bring a court copy of the pretrial

1   order to the pretrial conference.

2        14.    The final pretrial conference shall be held before the **Honorable Marilyn L. Huff**,

3   United States District Court Judge, on **February 4, 2008**, at **10:30 a.m.**

4        15.    The trial on the Groups 1/6, 4 and 5 patents shall commence on **February 20, 2008**,

5   at **9:00 a.m.**

6        16.    The dates and times set forth herein will not be modified except for good cause

7   shown.

8        17.    Plaintiff's counsel shall serve a copy of this order on all parties that enter this case

9   hereafter.

10       **IT IS SO ORDERED.**

11

12   DATED:  June 7, 2007

13   _____

14   **CATHY ANN BENCIVENGO**
     United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

**Exhibit 25  Page 791**

# Exhibit 26

# Confidential – Filed Under Seal

Exhibit 27

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4  LUCENT TECHNOLOGIES,          )  Case No. 02CV2060-B(CAB)
                                 )           Consolidated with
5            Plaintiff,          )           03CV0699-B(CAB)
                                 )           03CV1108-B(CAB)
6  vs.                           )           Related to:
                                 )           06CV0684-B(CAB)
7  GATEWAY, INC., et al.,        )
                                 )  San Diego, California
8            Defendants.         )
   _____)  Friday,
9                                   April 27, 2007
                                    9:00 a.m.
10

11                TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE RUDI M. BREWSTER
12                UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 For the Plaintiff:
                                 JOHN DESMARAIS, ESQ.
15                               PAUL A. BONDOR, ESQ.
                                 GREGORY F. CORBETT, ESQ.
16                               ERIC HAYES, ESQ.
                                 Kirkland & Ellis, LLP.
17                               153 East 53rd Street
                                 New York, New York 10022
18                               (212) 909-3189

19 For the Defendant:            JONATHAN BAKER, ESQ.
                                 STEVE R. DANIELS, ESQ.
20                               W. BRYAN FARNEY, ESQ.
                                 Dechert, LLP
21                               300 West Sixth Street
                                 Suite 1850
22                               Austin, Texas 78701
                                 (512) 394-3000
23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Echo Reporting, Inc.*

**Exhibit 27  Page 896**

ii

1  APPEARANCES (Cont'd.)

2  For MicroSoft:                    JOHN GARTMAN, ESQ.
                                     JUANITA A. BROOKS, ESQ.
3                                    ROGER A. DENNING, ESQ.
                                     JOSEPH P. REID, ESQ.
4                                    Fish & Richardson
                                     4350 La Jolla Village Drive
5                                    Suite 500
                                     San Diego, California 92122
6                                    (858) 678-5070

7  For Dell:                         JOEL FREED, ESQ.
                                     ALI R. SHARIFAHMADIAN, ESQ.
8                                    Arnold & Porter
                                     555 Twelfth Street, NW
9                                    Washington, DC 20004
                                     (202) 942-5000
10
   Transcript Ordered by:           JOHN GARTMAN, ESQ.
11
   Court Recorder:                   Jennie Hinkle
12                                   United States District Court
                                     940 Front Street
13                                   San Diego, California  92101

14 Transcriber:                      Carol Abbott
                                     Echo Reporting, Inc.
15                                   6336 Greenwich Drive
                                     Suite B
16                                   San Diego, California  92122
                                     (858) 453-7590
17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**Exhibit 27  Page 897**

133

1 have -- the element's got to be there, either in a -- letter

2 or together.  So, that's the ruling.

3

4        MR. DESMARAIS:  Agreed, your Honor, and we'll live

5 by the ruling.

6        MR. FARNEY:  Your Honor, just for some

7 clarification on that, because they say they'll abide by the

8 ruling.  I think, implicit in that ruling is, when you're

9 cobbling, some of the old stuff that you're trying to cobble

10 to the new stuff at least has to be relevant to the patent

11 we're talking about.  In other words, you can't --

12        THE COURT:  It's all got to be -- it's all -- I've

13 just said, it's got to be on the patent we're talking about.

14        MR. FARNEY:  So, if the old stuff is not related

15 to --

16        THE COURT:  If it's a portfolio of patents and

17 then he says, here's the notice that you're infringing,

18 that's not going to do it.  You've got to identify 356

19 specifically somewhere.  And if it's identified -- here's

20 another thing.  If the 356 is clearly identified in the

21 group of portfolio, and then you come back to the letter and

22 say, this notice is you're infringing our patents or our

23 patent, but you don't say which one, not adequate.

24        MR. DESMARAIS:  We're all in agreement, your

25 Honor, and we'll live by that.

*Echo Reporting, Inc.*

**Exhibit 27  Page 898**

134

1          THE COURT:  So, that's number three, and that's

2  also -- it's related to Gateway's number 6, I believe.

3          MR. BONDOR:  That's right, essentially the same.

4          THE COURT:  Same.  Okay, now, we're on Dell number

5  18, which I think is related to Gateway number 1, and that's

6  exclude damages testimony on Quicken and Money because of

7  Wayne Hoberlein's untimely second supplemental expert

8  report.  Now, this is the one, I'm led to believe from the

9  briefs that there was late production of figures, and then a

10  late report after that late production.  Let me give you the

11  rule.  I'm going to give you the rule.  This is not a

12  summary judgment motion.  Any late discovery of numbers

13  which can be the subject of an expert witness's testimony

14  may be followed by a supplemental report by the expert on

15  those late-produced numbers.

16          MR. FARNEY:  That last part is the important part.

17          THE COURT:  Well, that's the only part --

18          MR. FARNEY:  Because what they added was something

19  not related to the late numbers.

20          THE COURT:  If the supplemental report goes beyond

21  the late production, that which goes beyond is, should we

22  say, recapture or something?

23          MR. DESMARAIS:  No, don't mention that.

24          THE COURT:  Yeah, it's not going to come in.  It's

25  not going to come in.

*Echo Reporting, Inc.*

**Exhibit 27  Page 899**

135

1        MR. BAKER:  I understand, your Honor.  Well, your
2 Honor, what's going on here is that all --
3        THE COURT:  It's not going to come in.  The
4 supplemental report must be limited to the tardy production
5 which energized the late report.  Isn't that clear enough?
6      (Speaking all at once.)
7        MR. BAKER:  Your Honor, this is our motion.  Your
8 Honor, if I could address this first.  This is our motion.
9        THE COURT:  I don't -- I'm not ruling that the
10 expert report did or didn't, because I haven't seen it.  I'm
11 giving you the rule of law.  Isn't that easy enough to
12 follow?  Don't tell me -- don't tell me that it does this or
13 doesn't do that.  I don't care.
14        MR. BAKER:  I think it's perfectly clear, because
15 they --
16        THE COURT:  I don't care.  I've given you the rule
17 of law.
18        MR. BAKER:  No, I think your rule is perfectly
19 clear.  The problem is Lucent -- Lucent has the problem --
20        THE COURT:  There will be nothing, this expert
21 report, if there is one that follows the late production of
22 figures, it will be limited to those figures, nothing
23 beyond.
24        MR. DESMARAIS:  Yes, and we're willing to live
25 with that.

*Echo Reporting, Inc.*

**Exhibit 27  Page 900**

136

1          THE COURT:  That's the rule.

2          MR. FARNEY:  Let me ask you this.

3          MR. BONDOR:  Oh, no, another one of these.

4          MR. FARNEY:  This is the only question I have.

5 His report, this report we're talking about, which came six

6 months after the allegedly late production, for the first

7 time mentioned Quicken and Money.  The late production

8 was -- it had a few pages extra on -- 18 pages, additional

9 pages --

10          THE COURT:  Is there any problem with what I said?

11          MR. FARNEY:  Well, the question is can they put in

12 evidence on Quicken and Money if his report, his last report

13 was the first time Quicken and Money were mentioned?

14          MR. BONDOR:  That's the only thing that report is

15 directed to.

16          MR. FARNEY:  And the late production had nothing

17 to do with it.

18          THE COURT:  How can you ask that question?

19          MR. FARNEY:  Because I know they're going to do

20 it, because of what you just said.  That's why I'm trying to

21 get clarification here instead of in the middle of the trial

22 in front of the jury.

23          THE COURT:  I don't know how much more clear I can

24 be, Mr. Farney.

25          MR. FARNEY:  You can tell them they can't put in

*Echo Reporting, Inc.*

**Exhibit 27  Page 901**

Exhibit 28

1   David A. Hahn (SBN 125784)
    HAHN & ADEMA
2   501 West Broadway, Suite 1600
    San Diego, California 92101-3595
3   Telephone: (619) 235-2100
    Facsimile: (619) 235-2101
4
    Attorney for Plaintiffs *Lucent Technologies Inc.*
5   and *Multimedia Patent Trust*
    (*Additional counsel listed on the last page*)
6

7

8                       **UNITED STATES DISTRICT COURT**

9                      **SOUTHERN DISTRICT OF CALIFORNIA**

10
    LUCENT TECHNOLOGIES INC. and
11  MULTIMEDIA PATENT TRUST,                    Case No. 07-CV-2000-H (CAB)

12                    Plaintiff,                consisting of matters severed from
                 v.                             consolidated cases:
13
    GATEWAY, INC., GATEWAY COUNTRY              Case No. 02-CV-2060 B (CAB)
14  STORES LLC, GATEWAY COMPANIES,              Case No. 03-CV-0699 B (CAB)
    INC., GATEWAY MANUFACTURING LLC             Case No. 03-CV-1108 B (CAB)
15  and COWABUNGA ENTERPRISES, INC.,
                                                **DECLARATION OF BERND GIROD**
16                    Defendants,               **IN SUPPORT OF MULTIMEDIA**
                 and                            **PATENT TRUST'S OPPOSITIONS**
17                                              **TO DELL'S VIDEO CODING**
    MICROSOFT CORPORATION,                      **SUMMARY JUDGMENT MOTIONS**
18
                     Intervener.                Date:        January 7, 2008
19  ─────────────────────────────────          Time:        10:30 A.M.
    MICROSOFT CORPORATION,                      Courtroom:   13
20                                              Judge:       Hon. Marilyn L. Huff
                      Plaintiff,
21               v.

22  LUCENT TECHNOLOGIES INC.,

23                    Defendant.
    ─────────────────────────────────
24  LUCENT TECHNOLOGIES INC. and
    MULTIMEDIA PATENT TRUST,
25
                      Plaintiff,
26               v.

27  DELL INC.,

28                    Defendant.

**Exhibit 28  Page 902**

I, Bernd Girod, hereby declare as follows:

## I.  Introduction

1.      I submit this declaration in support of Multimedia Patent Trust's oppositions to Dell's motions for summary judgment concerning U.S. Patent No. 4,383,272 ("Netravali") and 4,958,226 ("Haskell").  If called to testify as a witness, I could and would testify to the truth of each statement herein.

2.      I am currently a tenured Full Professor of Electrical Engineering in the Information Systems Laboratory of Stanford University, California.  I also hold a courtesy appointment with the Stanford Department of Computer Science.  I direct the Stanford Center for Image Systems Engineering (SCIEN) and the Max-Planck Center for Visual Computing and Communication at Stanford.

3.      My research interests include video signal compression and networked multimedia systems, and I head the Image, Video, and Multimedia Systems Group in the Information Systems Laboratory to carry out research in this area.  My teaching in the Stanford Department of Electrical Engineering includes a graduate-level course in Digital Image Processing, a graduate-level course in Image and Video Compression, as well as a two-course sequence "Image Communication," also for graduate students in Electrical Engineering.  As part of these courses, video compression in general, and the MPEG video compression standards in particular, are discussed in detail.

4.      I have more than 25 years of experience in the area of video compression. During that time, I have authored or co-authored over 400 scientific publications, the majority of them related to video compression. I am inventor of more than 20 patents, with several others pending. Again, most of my patents relate to video compression. A list of my publications is contained in Appendix B to this report. I was elected Fellow of the IEEE in 1998, I received the Technical Achievement Award of the European Signal Processing Society EURASIP in 2004, and I was elected Member of the German Academy of Sciences Leopoldina in 2007.

**Exhibit 28  Page 903**

5.      I have been trained as an electrical engineer, with a Master of Science degree in Electrical Engineering from Georgia Institute of Technology, Atlanta, GA, USA, awarded in 1980, and a doctorate in Electrical Engineering from the University of Hannover, Germany, in 1987.

## II. Background Technology

### A.      Digital Video

6.      Analog television broadcasting was introduced in the United States in the late 1930s, and then, in 1954, extended to the NTSC (National Television System Committee) color television system that is still in use today.  In the 1980s and 1990s, a transition began from conventional analog video technology to digital video technology.  The first television studios with digital technology were built in the 1980s.  Digital video signals, such as those stored on a DVD, contain information defining many separate pictures, or frames, that produce the illusion of motion when viewed in rapid succession.

7.      The digital representation of a video signal is fundamentally different from an analog representation of a video signal.  In an analog signal representation, the brightness and the color of the moving image is represented by some aspect of an electrical waveform, typically the amplitude of a voltage, which varies continuously.  For example, brighter parts along a scan line may result in a higher voltage, while darker parts may result in a lower voltage.  The space-time continuous brightness and color distribution on the target of a video camera is sampled along the time axis and in vertical direction, but along a scan line it is not sampled, but continuous, both in horizontal direction and in amplitude.  A digital signal, however, must be discrete in both space dimensions and the time dimension, as well as in amplitude, so it can be represented by a stream of binary numbers. The resulting individual samples along a scan line are referred to as picture elements, in short *pels* or *pixels*.  Digital video has pixels, while analog video does not.

### B.      Digital Video Compression

8.      The bit-rate of a digital television studio signal of 166 Mbps is too high for economical storage and transmission.  It is therefore important to reduce the bit-rate required for digital video signals for most transmission or storage applications.  Technology that achieves this is referred to as "video compression" or "video coding."

9.     We distinguish *lossless compression* and *lossy compression*.   With lossless compression, every single bit representing the samples of the digital signal must be reconstructed perfectly.  Lossless compression is used, for example, for fax transmission or medical images.  For lossless video coding the achievable compression is rather limited.  For video signals, practically all applications utilize lossy compression schemes.

10.     With lossy compression, some deviation of the decoded image from the original is acceptable.  The reconstructed video at the decoder is not identical to the original, but it is usually very close.  The deviation is referred to in the art as *distortion*.  Such distortion is acceptable, if the human visual system does not perceive it, or can tolerate it for a given application.  Further, the digital input to an encoder is already an imperfect representation of a real-world scene, due to camera noise, sampling, and quantization, hence a bit-exact, lossless transmission would be wasteful.   Lossy compression of video can achieve much higher compression than lossless compression.  MPEG video compression, which shall be discussed in more detail in the following, is a lossy compression technique.

11.     Compression techniques generally exploit what is known in the art as *statistical redundancy*.  That means that they take advantage of typical patterns in the signal and describe frequently occurring patterns efficiently, *i.e.*, with few bits.  Patterns that are found infrequently in video signals, on the other hand, require more bits.  On average, the bit-rate is reduced.

12.     Video compression techniques that exploit redundancy within a single frame are called "intraframe compression" techniques.   Once common intraframe compression technique applies a *transform* to square blocks of pixels in the original image to obtain a representation of each block of the original image by an array of numbers, the *transform coefficients*.  There are as many transform coefficients in a block as there were pixels in the original image block, and by applying the corresponding inverse transform, the original pixels can be reconstructed without distortion.  The purpose of the transform is to represent the pixel values in a different domain, such that statistical dependencies among the individual numbers are greatly reduced.   This simplifies further compression.  The *Discrete Cosine Transform* (DCT) has been found to be particularly efficient for

**Exhibit 28  Page 905**

images and video, and it is therefore widely used today.  MPEG-1, MPEG-2 and WMV-9 each employ a DCT or a transform very similar to the DCT.

13.     The transform coefficients are typically quantized (*i.e.*, rounded to the next representative value) to reduce the required bit-rate.  The quantization process is not reversible and therefore gives rise to lossy compression.

14.     The quantized coefficients are typically encoded with a *variable length code* that assigns short code word lengths to likely values or combination of values and long code word lengths to unlikely values or combination of values.

15.     To decode the compressed image, first the variable length code words are decoded. Note that variable length coding can be inverted without loss.  Then, DCT coefficients are reconstructed from the decoded code words, and the inverse block-wise transform, for example, the *Inverse DCT*, is applied to the transform coefficients to obtain reconstructed pixel values.  The reconstructed pixel values deviate from the original pixels, due to the quantization of the transform coefficients.  If the quantization is sufficiently fine, the deviation between the original and the reconstructed pixels is very small.

16.     Nearby frames in a video sequence are often very similar.  In fact, when viewed side-by-side, they may appear almost indistinguishable.  This is because nearby frames typically show the same objects at slightly shifted positions in the image.  Video compression techniques that exploit this redundancy between frames are called "interframe compression" techniques.  Substantial data compression can be achieved by exploiting the frame-to-frame similarities in a video sequence using interframe coding techniques.

17.     Modern video compression systems use an interframe compression technique called "motion-compensated prediction" to exploit the similarities between nearby video frames.  The idea of motion-compensated prediction is to apply an estimate of the displacement that objects have undergone from one frame to the next.  The displacement estimate itself is derived through a separate process called *motion estimation*.  If the displacement estimate is accurate, then pixel information in a current frame can be predicted accurately by applying the displacement estimate to a previous frame.  In practice, this is not always the case, because uncovered background in the

1    image, lighting changes, changes in surface appearance, noise, and many effects other than object

2    displacement may cause frame-to-frame change in video sequences.

3        18.    The prediction error signal can be interpreted as an image, and although it is not

4    suitable for viewing, it can be compressed using a block-wise transform, as described above.  Video

5    compression using motion compensated prediction and transform coding is commonly called

6    *motion-compensated hybrid coding*.  A motion-compensated hybrid coder does not use the original

7    version of the previous frame as the basis for motion-compensated prediction, because that original

8    frame is not available at the decoder.  The decoder only has a decoded and reconstructed version of

9    the previous frame available, which differs from the original signal by quantization errors due to

10   lossy compression.

11       19.    For the proper operation of the motion-compensated hybrid coder, it is important that

12   identical motion-compensated prediction signals are subtracted at the encoder and then added back

13   in again at the decoder.  To achieve this, the encoder contains a replica of the decoder.  Just like the

14   decoder, it adds the decoded reconstructed prediction error signal to the motion-compensated

15   prediction signal, to generate the reconstructed frame that appears at the output of the decoder.  The

16   reconstructed frame, rather than the original frame, serves as input to the motion-compensated

17   predictor, just like in the decoder.

18       20.    Many modern video compression systems also use an interframe compression

19   technique called *motion-compensated interpolation* to exploit the similarities between nearby video

20   frames.  Motion compensated interpolation predicts pixel information in a current frame by

21   averaging pixel information obtained from preceding and subsequent frames.  The pixel information

22   used in the averaging process is obtained using motion compensated prediction as described above.

23   In the case of motion compensated interpolation, however, two displacement estimates are used —

24   one based on a previous frame, and another based on a subsequent frame — to generate forward and

25   backward predictions.  The two predictions are then averaged.

26

27

28

1    **III. Level Of Ordinary Skill In The Art**

2        21.    In my opinion, a person of ordinary skill in the art of video compression throughout

3    the 1980s would have had at least a Bachelor of Science degree in electrical engineering or a related

4    field and 2 years experience working in the area of video compression systems.

5    **IV. The Patents-In-Suit**

6        **A.**    **U.S. Patent No. 4,383,272 ("Netravali")**

7        22.    U.S. Patent No. 4,383,272 is entitled "Video Signal Interpolation Using Motion

8    Estimation." The inventors recognized that existing interframe interpolation techniques often caused

9    "blurring and other objectionable distortion" (Netravali, 1:43-44), particularly for objects "with high

10   degree of details […] moving quickly in the field of view of the television camera." (Netravali,

11   1:39-41). The inventors overcame the limitations of the prior art by applying motion compensation

12   to interframe interpolation of pixel intensities.

13       23.    Specifically, the methods and circuits disclosed in the Netravali '272 patent

14   reconstruct the intensities of pixels in a picture using interframe interpolation. The locations of the

15   pixels used for interpolation ("reference pixels") correspond to locations at which the same object is

16   expected to be in preceding and succeeding versions of the picture.

17       **B.**    **U.S. Patent No. 4,958,226 ("Haskell")**

18       24.    US Patent No. 4,958,226 ("Haskell") is entitled "Conditional Motion Compensated

19   Interpolation of Digital Motion Video." It is related to encoders and decoders for interframe video

20   compression with motion compensation. The inventors considered the limitations of prior motion-

21   compensated hybrid coding systems. The inventors noted that "experimental results show that when

22   the images of successive blocks do not represent translational motion, the reproduced image may be

23   worse than with frame repeating. Although it has been observed that this degradation is caused by a

24   relatively few pels that do not conform to the assumption of translational motion, putting these pels

25   in the wrong place creates highly visible artifacts." (Haskell, 2:29-37).

26       25.    The inventors describe specific encoder and decoder circuitry for overcoming the

27   limitations of prior motion-compensated hybrid coding systems. The encoder contains novel

28   circuitry for compressing video using motion-compensated prediction and motion-compensated

interpolation. The decoder has specific structures capable of reconstructing predictively encoded blocks in response to codes that describe prediction error, and also has specific structures capable of reconstructing interpolated blocks in response to codes that describe interpolation error.

## V.  Validity Analysis

26.     Counsel for MPT has informed me that a patent claim is invalid for obviousness if the invention described in the claim would have been obvious to a person of ordinary skill in the art at the time the invention was made.  I understand that the fundamental question in an obviousness analysis is whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness.

27.     Counsel for MPT has also informed me that multiple references can be combined with one another, or with the knowledge of a person of ordinary skill in the art, to render a claim obvious.  Counsel has also informed me that obviousness is not established simply because all of the elements of a patent claim can be found in the prior art, but that there must be a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.

28.     Counsel for MPT has informed me that the Supreme Court provided further guidance concerning the obviousness analysis.  Specifically, counsel for MPT has informed me that obviousness is not established by simply combining previously known elements from the prior art. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.  I understand that it can be important to identify a reason, such as a teaching suggestion or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.  I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

29.     Counsel for MPT has informed me that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.  I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.  I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results.  I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

30.     Counsel for MPT has informed me that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill.  I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has good reason to pursue the known options. I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

31.     Counsel for MPT has also informed me that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious.  I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

32.     Counsel for MPT has also informed me that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious.  I

1   understand that an invention is not necessarily rendered obvious simply because it was obvious to try

2   a certain combination.

3       33.     Counsel for MPT has also informed me that obviousness of a patent cannot properly

4   be established through hindsight, and that elements from different prior art references, or different

5   embodiments of a single prior art reference, cannot be selected to create the claimed invention using

6   the invention itself as a roadmap.  I understand that the claimed invention as a whole must be

7   compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through

8   hindsight which would not have been combined absent the inventors' insight.

9       34.     Counsel for MPT has informed me that secondary considerations of nonobviousness

10  must be considered in addition to the primary considerations of the scope and content of the prior art,

11  the differences between the prior art and the claims at issue, and the level of ordinary skill in the art.

12  Counsel for MPT has also informed me that secondary considerations of nonobviousness may

13  include commercial success of products or processes using the invention, long felt need for the

14  invention, failure of others to make the invention, industry acceptance of the invention, licensing of

15  the invention, copying of the invention by others, initial skepticism aimed at the invention,

16  statements of acclaim for the invention, and unexpected results achieved by the invention.

17      35.     Counsel for MPT has informed me that the granting of a request for reexamination by

18  the Patent Office does not establish a likelihood of patent invalidity.  I understand that the grant of a

19  request for reexamination is not probative of patentability.  I understand that the Patent Office will

20  grant a request for reexamination if it raises "a substantial new question of patentability."  I further

21  understand that this is a low standard to meet in practice because the Patent Office historically grants

22  over 90% of requests for reexamination.  I further understand that reexaminations historically less

23  than 10% of those reexaminations result in a determination of invalidity.

24      **A.     Netravali**

25      **1.  Gabor & Hill**

26      36.     I understand that Dell contends that the article "Television Band Compression By

27  Contour Interpolation," by D. Gabor and P. C. J. Hill ("Gabor & Hill") renders Claim 13 of

28  Netravali invalid as obvious.  I disagree.  In my opinion, Netravali is not obvious in view of Gabor &

Hill.  Based on my review of the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and certain secondary considerations of nonobviousness, in my opinion, a person of ordinary skill in the art would not have found it obvious to modify the teachings of Gabor & Hill to arrive at the invention of Netravali Claim 13.

37.    Gabor & Hill describes an experimental system for reducing the width of the frequency band ("band compression") required for transmission of analog television signals.  The authors suggest the omission of television fields or frames in regular intervals which can then be reinserted at the receiver by interpolation from transmitted fields or frames.  They propose a method of "contour interpolation," which controls the combination of two analog signals derived by horizontal scanning of two separate lines of stored fields or frames:

> *"In the method of contour interpolation the two [scanning] spots run with equal speed v until one of them reaches an edge, i.e.  a position where the intensity changes at more than a certain predetermined rate.  Here it stops, while the other spot, which has not yet reached the contour, moves on with a speed 2v, so that the interpolated spot, midway between the two, moves on with constant velocity v. This continues until the second spot has also reached the contour, after which the retarded spot gradually catches up with the other until both move again with the same speed v. . . .  [T]he interpolated intensity I is formed as the arithmetical mean of the two intensities, but weighted with the velocities [...]"*

(Ex. 9 at MSLT_0001230.)  The "contour interpolation" technique produces an analog signal corresponding to the intensity of the line being interpolated.

38.    Gabor & Hill does not disclose all of the limitations of Netravali Claim 13 as construed by the Court.  Gabor & Hill does not disclose "[a] method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture" as required by the language of Claim 13.  Digital video has pixels (or pels), while analog video does not.  Pixels or pels are samples along the scan lines of a video signal.  Gabor & Hill describes a system that operates entirely in the analog domain and does not sample the television signal along scan lines in the horizontal dimension.

39.     Gabor & Hill does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions" as required by the claim language.  A person of ordinary skill in the art reading Claim 13 in light of the specification would understand that the phrase "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations" requires processing of intensity information for pels sampled in the temporal, vertical, and horizontal dimensions.

40.     As explained above, Gabor & Hill describes a system that operates entirely in the analog domain, and does not sample in the horizontal dimension to generate pels with intensities at discrete locations.  Without pel intensities it is not possible to "determine[] by interpolation intensities of pels . . . in accordance with intensities of pels in related locations," as recited in Claim 13.  Gabor & Hill therefore does not determine intensities of pels.  It also does not perform any operation in accordance with intensities of pels in related locations in preceding and succeeding versions of the picture to be interpolated.  To the extent that it performs interpolation at all, Gabor & Hill interpolates scan line signals, not pels.

41.     Dr. Delp has opined that a person of ordinary skill in the art during the relevant time frame would have understood the term "picture element" to mean any area on a television or computer screen.  I disagree.  In my opinion, Dr. Delp fails to consider the context of the Netravali invention when proposing his definition.  In the context of the video processing inventions described in Netravali, there are no operations performed on the intensities of "picture elements" as defined by Dr. Delp (i.e., any "area of a picture on a television or computer screen"). (Delp Obviousness Report § 33).  Rather, interpolation is performed for intensities of picture elements that are samples in the temporal, horizontal, and vertical dimensions, also referred to in the art as "pixels."

42.     I understand that Dell contends that it would be an obvious advance over the prior art to implement the Gabor & Hill system in the digital domain, and in a way that results in "determining by interpolation intensities of pels . . . in accordance with intensities of pels in related locations."  I disagree.  A person of skill in the art would have had no reason, and would not have been prompted, to implement the obsolete mechanical-optical system of Gabor & Hill in the digital

1   domain.  Nor would a person of ordinary skill in the art have expected such efforts at digital

2   implementation to have been successful or productive.

3        43.   Further, the Court has construed "related locations" to mean "locations at which the

4   same object is expected to be."  For temporal interpolation, Gabor & Hill interpolates signals only

5   between the same scan line in two versions of the picture.  Thus it does not disclose interpolation

6   from locations at which the same object is expected to be.  Moreover, Gabor & Hill only considers

7   contours, i.e., "position[s] where the intensity changes by more than a certain predetermined rate"

8   along a scan line of an analog television signal.  (MSLT_0001230.)  It is well known that the

9   location where objects are expected to be cannot be represented by considering only the thresholded

10   intensity gradient in the horizontal direction.  Furthermore, I disagree with Dr. Delp's conclusion

11   that a person of ordinary skill in the art would be able to expand on the principles in Gabor & Hill to

12   search for motion in the vertical direction.

13        44.   In my opinion, the interrelated teachings in the prior art would not have provided a

14   person of skill in the art with a reason to modify the teachings of Gabor & Hill to arrive at the

15   invention of Netravali Claim 13.  Contrary to Dr. Delp's view, the general goal of developing more

16   efficient coding systems does not demonstrate specific design or market needs in the pertinent field

17   that would have rendered the invention of Claim 13 obvious.  The invention of Claim 13 was not

18   simply a combination of known techniques.

19        45.   There were a large number of beneficial video coding techniques available at the

20   time.  Theoretically, a person skilled in the art could have attempted to form all possible

21   combinations of video coding techniques that had been reported as improving compression and/or

22   video quality.  However, such an exercise goes far beyond a routine pursuit of a finite number of

23   predictable solutions that would place the invention of Claim 13 within the grasp of a person of

24   ordinary skill in the art.  Furthermore, in my opinion, it would require more than common sense and

25   knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 13.

26        46.   In addition, the performance of a video coder critically depends on the way the

27   constituent elements are combined and artfully optimized as a whole.  An efficient video coder

28   cannot simply be built by combining known building blocks.  Among other problems, the

1   performance of a certain combination of elements can usually not be readily predicted but requires

2   extended experimentation.  In my opinion, Dr. Delp's analysis uses hindsight to selectively modify

3   the teachings of Gabor & Hill in an attempt to point out all the elements required by the Court's

4   construction of Netravali Claim 13.

5       47.   I further disagree with Dr. Delp that Dr. Gabor's receipt of the Nobel Prize has any

6   bearing on the issue of obviousness.

7       48.   Dr. Delp relies heavily on the Patent Office's decision to reexamine claim 13 of

8   Netravali.  Counsel for MPT has informed me that the grant of a request for reexamination is not

9   evidence of invalidity.  Counsel for MPT has also informed me that the document on which Dr. Delp

10  relies, '272 Reexam (MSLT_1234186 - MSLT_1234201), is the result of a unilateral proceeding in

11  which MPT was not involved.  I understand that MPT was therefore not provided an opportunity to

12  refute the significance of the prior art references presented to the examiner in the Patent Office.

13  Counsel for MPT has also informed me that the PTO's reexamination decision turned on the

14  assumption that "the teaching of the intensity value being interpolated from preceding and

15  succeeding versions of the picture was not present in the prosecution of the application which

16  became the '272 patent."  That assumption is false because the Background section of Netravali

17  itself notes that fixed and adaptive techniques for interframe interpolation (although without motion

18  compensation) were known in the art.  Under these circumstances, the decision to reexamine Claim

19  13 of Netravali should not have any bearing on the question of obviousness and does not undermine

20  my prior validity analysis in any way.

21      **2.  Secondary Considerations**

22      49.   In my opinion, several secondary considerations confirm my opinion that the

23  invention described in Netravali Claim 13 is nonobvious.  First, products that use the claimed

24  inventions have been highly successful in the marketplace.  The claimed inventions are used in

25  numerous video coding standards, including MPEG-1, MPEG-2, VC-1, and others.  The Netravali

26  invention has contributed to the success of products based on these standards by reducing the bit-rate

27  needed to transmit or store video bitstreams for a broad range of applications.  In my experience,

28

1    other video coding technologies that do not use the claimed inventions have not been as

2    commercially successful.

3        50.    Licenses showing industry respect for the claimed inventions also support my

4    conclusion that Claim 13 is nonobvious.  I have reviewed several of Lucent's licensing agreements

5    that specifically identify Netravali.  I have also reviewed several Lucent licensing negotiation

6    documents which refer to Netravali, indicating that Netravali has been a focal point of negotiations

7    for broader licenses with third parties.

8        51.    Finally, statements of acclaim by others support my conclusion that the invention of

9    Claim 13 was nonobvious.  For example, the Research and Development Council of New Jersey

10   awarded Arun Netravali and John Robbins the 1996 Thomas Alva Edison Patent Award for

11   outstanding research and development in the state of New Jersey, as reflected in Netravali.  (ROBB

12   000001).

13       **B.**      **Haskell**

14       **1.  General Knowledge In The Art**

15       52.    Dr. Delp opines that a set of video coding methods combining the use of prediction,

16   motion estimation, motion vectors, and DCT coding of the difference signal were generally known

17   in the art at the time of the Haskell invention, as well as a separate set of video coding methods using

18   transmission of interpolation error.  He further opines that motion-compensated interpolation was

19   generally known at that time along with the problem of visual artifacts in frames obtained by

20   motion-compensated interpolation. Because, in his opinion, the transmission of "interpolation

21   deviation codes" was a known solution to the known problem of visual artifacts in interpolated

22   frames, Dr. Delp contends that a person skilled in the art would have been motivated to combine the

23   prior art methods, and that Claim 12 of Haskell is therefore invalid for obviousness.  I disagree.  In

24   my opinion, Dr. Delp's analysis uses hindsight to selectively combine portions of the known art in

25   an attempt to point out all the elements required by the Court's construction of Haskell Claim 12.

26       53.    There were a large number of beneficial video coding techniques available at the

27   time.   Theoretically, a person skilled in the art could have attempted to form all possible

28   combinations of video coding techniques that had been reported as improving compression and/or

video quality.  However, such an exercise goes far beyond a routine pursuit of a finite number of predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art.  Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

54.     Dr. Delp contends that a person skilled in the art would have been motivated to combine prior art methods to arrive at the invention of Claim 12 in order to eliminate visual artifacts in interpolated video sequences.  I disagree.  None of the references on which Dr. Delp relies to identify the problem of visual artifacts in motion-compensated frames suggest that transmission of interpolation error, as opposed to one of many other potential solutions, could eliminate visual artifacts. In fact, since motion compensation artifacts were usually caused by a failure of the motion estimator to extract the true motion of an object, a person of ordinary skill would have typically looked for ways to improve the reliability and accuracy of the motion estimator to eliminate visual artifacts.  In addition, or alternatively, a person of ordinary skill might have considered sending a flag to instruct the receiver to omit motion-compensated interpolation and use frame repetition instead, as, e.g., suggested in Japanese patent application 1-163059 (MSLT_1234116 – MSLT_1234130). Oddly, Dr. Delp cites this document to support his theory of near simultaneous invention, even though it teaches away from the Haskell invention. The Delp Obviousness Report offers no convincing evidence to suggest that a person of skill in the art would recognize that transmission of transform-coded interpolation errors, as opposed to one of many other potential solutions, could eliminate the problem.

55.     Dr. Delp also opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 can be established because certain of his references, such as the Ericsson '914 Patent, utilize motion compensated interpolation.  I disagree. This is not a situation in which common sense would dictate that a person of skill in the art employ a predictable solution to respond to design needs or market pressures. The options were too numerous.  There were a large number of beneficial video coding techniques available at the time.  The fact that a particular video coding technique, in this case motion compensated interpolation, could be combined with a variety of other

1 techniques provides no reason to combine any particular subset of those techniques, let alone a
2 subset that embodies the limitations of Haskell Claim 12.

3      56.     Dr. Delp also opines that a motivation to combine prior art to arrive at the invention
4 of Haskell Claim 12 can be established because the coding and transmission of prediction errors and
5 interpolation errors are conceptually similar, and the coding and transmission of a prediction error to
6 maintain picture quality was known in the art. I disagree. Dr. Delp identifies nothing that would
7 have suggested to a person of ordinary skill in the art that transmission of interpolation error blocks
8 would be beneficial in a system that already used the transmission of prediction errors.

9      57.     Finally, Dr. Delp opines that a motivation to combine prior art to arrive at the
10 invention of Haskell Claim 12 is provided by the emergence of CD-ROM technology. I disagree.
11 While CD-ROM technology may have offered a person skilled in the art more latitude in trading off
12 bit-rate, video quality, and system delay, CD-ROM technology provided no guidance or reason
13 whatsoever to combine prior art teachings to arrive at the invention of Haskell Claim 12.

14      **2.  Bidirectional Prediction**

15      58.     Dr. Delp has opined that bidirectional prediction followed by averaging and addition
16 of interpolation error were known in the art, and that the invention of Claim 12 is simply a
17 combination of prior art techniques used in the same manner in which they were used by the prior art
18 to achieve predictable results. As explained in the following section, I disagree. In my opinion, Dr.
19 Delp relies on hindsight to contend that it would have been obvious to combine certain abstract
20 "techniques," without demonstrating any reason for a person of ordinary skill in the art to make the
21 specific combination of such techniques described in Claim 12, let alone using the specific
22 corresponding structures identified by the Court.

23      59.     In his attempt to show that bidirectional prediction is an obvious variation of
24 unidirectional prediction, Dr. Delp speculates that "a person of ordinary skill in the art could do
25 "backward" prediction" by using "the exact same techniques and structures used for forward
26 prediction." I disagree. The recursive structure of a predictive decoder requires that the coder at least
27 obeys constraints posed by causality, otherwise the bitstream cannot be decoded. For example, one
28 cannot simply encode every frame in a sequence by predicting it from the following "future" frame,

1   as Dr. Delp appears to assert. At least some frames have to be predicted in forward direction, while

2   skipping in-between frames with backward prediction. Today, with the benefit of hindsight, such

3   considerations are well understood. However, at the time of the Haskell invention, the structures

4   needed to implement such a system, their interconnection, or their control would not have been

5   obvious to a person of ordinary skill. Nor would the step from backward prediction to bidirectional

6   prediction be obvious, as Dr. Delp asserts.

### 3.   Claim 12 is Not a Predictable Combination of Techniques Known in the Prior Art

7   60.   Dr. Delp has opined that the various coding techniques covered by Haskell Claim 12

8   were well known in the prior art prior to the filing of the application for the Haskell patent. Dr. Delp

9   has also opined that it was well known in the art to combine these various coding techniques, and he

10  discusses several references that he believes disclose the use of such techniques in combination. I

11  disagree with Dr. Delp's characterization of these references, as discussed below.

12  61.   In addition, I disagree with Dr. Delp's opinion that the obviousness of the invention

13  described in Claim 12 can be demonstrated by reducing the invention to a "combination" of

14  elemental video coding technologies performing their known functions.   Dr. Delp asserts that

15  structures used to implement various video coding techniques at the time of the Haskell invention,

16  such as "adders, decoders, DCT-1, shift circuits, averagers" were "combinable to perform the coding

17  techniques of claim 12 in a manner that required no change in their respective functions." I disagree.

18  The performance of a video coder critically depends on the way the constituent elements are

19  combined and artfully optimized as a whole.   An efficient video coder cannot simply be built by

20  combining known building blocks. Among other problems, the performance of a certain combination

21  of elements can usually not be readily predicted but requires extended experimentation.

22  62.   To the extent that Claim 12 can be considered a combination claim, it describes a

23  combination of two particular means that have defined structure and perform specific functions.  By

24  focusing on individual components of those means, rather than the means as a whole, Dr. Delp fails

25  to demonstrate that either of those means was known in the art.  Nor does he demonstrate any reason

26  why it would have been obvious to combine the two means as set forth in Claim 12.   A person of

27  ordinary skill would also not have been able to predict the performance of the Haskell invention as

Dr. Delp asserts. For example, Haskell reports that "**<u>Experimentally</u>**, it has been found that interpolating every other frame is quite beneficial." (Haskell, col. 3: 43-44, emphasis added) or "the **<u>observation</u>** that the volume of the frame interpolation code increase with increased use of the frame interpolation code so one could quickly reach a point of 'diminishing returns' in the use of interpolation code." (Haskell, col. 3: 38-42, emphasis added). This illustrates that the Haskell invention required extended experimentation and observation of the performance, since its results were not even predictable to the inventors themselves, let alone to a person of ordinary skill in the art.

63.    I also disagree with Dr. Delp's opinion that design incentives and market forces would have motivated a person of ordinary skill in the art to arrive at the invention of Claim 12.  In my opinion, Dr. Delp does little more than note that a demand for better video compression existed, that the invention of Claim 12 discloses an improved decoder for video compression, and then conclude that the invention would therefore have been obvious.  I disagree.  In the absence of any specific design incentive or market force driving the particular combination of decoding means set forth in Claim 12, in my opinion Dr. Delp's analysis relies on impermissible hindsight.

a.    **The PictureTel References**

64.    I understand that Dell contends that the combination of references Dell refers to as the "PictureTel Patents" renders the Haskell Claim 12 obvious. I disagree. In my opinion, Haskell Claim 12 is not obvious in view of the PictureTel Patents.  Based on my review of the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, and certain secondary considerations of nonobviousness, in my opinion, a person of ordinary skill in the art would not have found it obvious to modify the teachings of the PictureTel patenst to arrive at the invention Haskell Claim 12.  In my opinion, a person of skill in the art would not have been motivated to combine or modify the teachings of those references in the manner that Dell suggests.  Furthermore, even if combined, the PictureTel Patents do not disclose all of the limitations of the claim language as construed by the Court.

65.     The "PictureTel Patents" identified by Dell are seven patents reflecting product developments performed at PictureTel Corporation in the late 1980s.  Some of the PictureTel Patents share common inventors and cross-reference one another.

66.     Collectively, the PictureTel Patents can be viewed as describing the evolution of a video compression system.  The original system is described in the earliest-filed PictureTel Patent — U.S. Patent 4,703,350 ("the Hinman '350 patent") — and employs a motion-compensated hybrid coding scheme along with a form of interframe interpolation for post-processing, but without any form of interpolation error codes.

67.     The next five PictureTel Patents address certain features and/or relatively minor modifications of the Hinman '350 Patent system: U.S. Patent No. 4,727,422 ("the Hinman '422 Patent"), which focuses on the lossy compressor of the Hinman '350 Patent system; U.S. Patent No. 4,661,849 ("the Hinman '849 Patent"), which focuses on the motion estimator of the Hinman '350 Patent system; U.S. Patent No. 4,794,455 ("the Ericsson '455 Patent"), which adds an adaptive loop filter to the Hinman '350 Patent system; U.S. Patent No. 4,754,492 ("the Malvar '492 Patent"), which adds an overlapping block transform to the Hinman '350 Patent system; and U.S. Patent No. 4,816,914 ("the Ericsson '914 Patent"), which adds quadtree encoding of transform coefficients to the Hinman '350 Patent system.  As with the Hinman '350 Patent itself, none of these PictureTel Patents describes any form of interpolation error codes.

68.     The seventh, and last-filed, PictureTel Patent describes a substantial modification of the motion-compensated hybrid coding scheme described in the first six PictureTel Patents.  Rather than performing transform coding of the prediction error, U.S. Patent No. 4,849,810 ("the Ericsson '810 Patent") employs a "hierarchical vector quantization" coding technique that uses a pyramid decomposition followed by vector quantization instead of a blockwise transform to exploit spatial correlations within a frame and thereby achieve intraframe compression. Motion compensated prediction is carried out adaptively at each level of  the spatial resolution pyramid. At the same time, the system of the Ericsson '810 Patent eliminates the post-decoder interframe interpolation employed by the system of the Hinman '350 Patent.  Accordingly, the Ericsson '810 Patent system

1    performs no interframe interpolation, let alone interframe interpolation in conjunction with coded
2    interpolation error signals.

3         69.    Dr. Delp's claim charts purport to demonstrate that every element required by Claim
4    12 of Haskell is included, either explicitly or inherently, in the Picture Tel patents.  Dr. Delp uses the
5    Ericsson '914 Patent as a "primary example" of the teachings of the PictureTel Patents.  Dr. Delp
6    identifies no relevant teachings of the other PictureTel Patents that are not also taught by the
7    Ericsson '914 Patent.  Furthermore, in my opinion, none of the other PictureTel Patents disclose the
8    elements of Claim 12 that are missing from the Ericsson '914 Patent.  Accordingly, like Dr. Delp, I
9    address the teachings of the PictureTel Patents herein primarily by reference to the Ericsson '914
10   Patent.

11        70.    The PictureTel Patents, as demonstrated by the Ericsson '914 Patent, do not disclose
12   all of the limitations of the claim language as construed by the Court.  The Ericsson '914 Patent does
13   not disclose "[a] circuit responsive to coded video signals where the video signals comprise
14   successive frames and each frame includes a plurality of blocks and where the coded video signals
15   comprise codes that describe deviations from approximated blocks and codes that describe
16   deviations from interpolated blocks."  For example, the Ericsson '914 Patent fails to disclose the
17   claimed "codes that describe deviations from interpolated blocks," "interpolated blocks," or "means
18   responsive to said block approximations and to said codes that describe deviations from interpolated
19   blocks to develop said interpolated blocks." The Ericsson '914 Patent discloses no structure that
20   performs the required function of developing interpolated blocks using block approximations and
21   codes that describe deviations from interpolated blocks.  Furthermore, the Ericsson '914 Patent
22   discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35,
23   Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.  As such, the Ericsson '914 Patent
24   does not disclose the claimed combination of "means for developing block approximations from said
25   codes that describe deviations from approximated blocks" and "means responsive to said block
26   approximations and to said codes that describe deviations from interpolated blocks to develop said
27   interpolated blocks."

28

71.    As noted above, the system described in the Ericsson '810 Patent makes significant modifications to the system described in the six earlier PictureTel Patents.  None of those differences, however, compensate for the elements missing from the collective teachings of the PictureTel Patents.  The Ericsson '810 Patent does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks."  For example, the Ericsson '810 Patent discloses neither "codes that describe deviations from approximated blocks," nor "interpolated blocks" nor "codes that describe deviations from interpolated blocks."  The Ericsson '810 Patent discloses no circuitry that responds to a video signal comprising "blocks" of any kind, as construed by the Court.  The Court's claim construction requires that a block be "a set of pixels that constitute a portion of a frame." In the Ericsson '810 Patent compression, is carried in a resolution pyramid.  Also, motion compensation ("warping") is not carried out a blockwise manner.  Furthermore, the Ericsson '810 Patent discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell.  Likewise, the Ericsson '810 Patent discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell, or any component thereof.

72.    In sum, even if combined, the PictureTel references do not disclose all elements of Claim 12.  For example, the PictureTel references nowhere disclose blockwise coding of motion-compensated interframe interpolation errors, and therefore disclose no "codes that describe deviations from interpolated blocks" or "means responsive to . . . codes that describe deviations from interpolated blocks to develop said interpolated blocks."  Nor do they discloses circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.

73.    It is my opinion that the PictureTel Patents as a whole would have taught a person of ordinary skill in the art to abandon interframe interpolation entirely in favor of a resolution pyramid

compression scheme disclosed in the Ericsson '810 Patent.  The PictureTel references therefore teach away from the inventive solution of Claim 12.

74.    Dr. Delp has opined that a person of skill in the art would have recognized reasons to combine the disclosures of the individual PictureTel Patents in some way that deviates from the Hinman '350 patent system because they had a common assignee, overlapping inventors, and related subject matter.  I disagree. Even if such factors would motivate a person in the art to collect and combine several references, a reason to consult various references in the abstract is not the same thing as a reason to combine the teachings of the references in a specific manner.

75.    In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of several patents in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12.  Theoretically, a person skilled in the art could have attempted to form all possible combinations of video coding techniques disclosed in the seven PictureTel References.  However, such an exercise goes far beyond a routine pursuit of a finite number of identified, predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art.  Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12 based on the teachings of the PictureTel references.

**b.    Document No. 81**

76.    I understand that Dell contends that CCITT Document No. 81 discloses the use of interpolation error codes as a solution to the problem of visible artifacts in interpolated video.  In my opinion, the available evidence does not support the conclusion that documents prepared by the CCITT SGXV Specialists Group were printed publications before the filing date of September 27, 1989, let alone the critical date of September 27, 1988.  I have reviewed the documents and deposition testimony referenced by Dr. Delp in his reports, and those materials fail to support his characterization of the CCITT SGXV Specialists Group documents.  I have seen no evidence that the documents were presented at non-confidential meetings, or distributed outside of the working group.  My recollection from working in the field at the time is that the Okubo Group was a closed organization.  Meetings were open only to the members and invited observers.  The testimony of

1    Richard Schaphorst, a member of the Okubo Group, is consistent with my recollection.  (Schaphorst

2    Deposition at 30-32, 101-02, 174.)  Accordingly, in my opinion, there is no evidence that a person of

3    ordinary skill in the art, through reasonable diligence, could have located and accessed the CCITT

4    SGXV Specialists Group documents before September 27, 1989.

5            77.    Document No. 81 does not disclose "[a]  circuit responsive to coded video signals

6    where the video signals comprise successive frames and each frame includes a plurality of blocks

7    and where the coded video signals comprise codes that describe deviations from approximated

8    blocks and codes that describe deviations from interpolated blocks."  For example, Document No. 81

9    does not disclose a system that operates in a blockwise manner.  It neither discloses "approximated

10   blocks," nor "codes that describe deviations from approximated blocks," nor "interpolated blocks,"

11   nor "codes that describe deviations from interpolated blocks."

12           78.    Document No. 81 does not disclose the claimed "means for developing block

13   approximations from said codes that describe deviations from approximated blocks."  Document No.

14   81 discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder

15   27, and Shift Circuit 26 as disclosed in Haskell, at least because Document No. 81 fails to disclose

16   any equivalent to $DCT^{-1}$ 24 or Decoder 22.  The coding of prediction error in Document No. 81 does

17   not involve a transform.  In Figure 1, for example, the output of the coding unit *3 is added directly

18   to the motion-compensated prediction signal.  This is only possible if the bits at the output of coding

19   unit *3 can represent the prediction error directly, and neither a transform nor variable-length coding

20   is used. Document No. 81 implies the use of fixed codeword lengths and uniform quantization of the

21   prediction error directly.

22           79.    Dr. Delp opines that Document No. 81 discloses the use of a DCT because it refers to

23   "any sort of adaptive control of DCT with sophisticated hardware."  I disagree.  Read in context, the

24   portion of Document No. 81 quoted by Dr. Delp distinguishes the use of a DCT from the coding

25   scheme proposed by the authors.  In fact, Document No. 81 expressly teaches away from using a

26   DCT in that coding scheme, because it discusses CMI as an alternative to the use of a DCT and notes

27   that each requires additional hardware.

28

**Exhibit 28  Page 925**

80.     Document No. 81 does not disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."  Document No. 81 discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Furthermore, Document No. 81 discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell, at least because Document No. 81 fails to disclose any equivalent to $DCT^{-1}$ 34, Decoder 22, or Adder 35.

### c.     Micke Thesis

81.     I understand that Dell contends that the Diploma thesis "Vergleich eines prädiktiven und eines interpolativen bewegungskompensierenden Codierverfahrens für Fernsehbildsignale" ("Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals") by Thomas Micke (the "Micke Thesis") demonstrates a motivation to modify the teachings of the PictureTel Patents to arrive at the invention of Haskell Claim 12.  I disagree.  It is my opinion that the Micke Thesis does not qualify as prior art, and does not compensate for the missing teachings of the PictureTel Patents.

82.     Dr. Delp contends that the Micke Thesis qualifies as a prior art printed publication because the Micke Thesis is cited in a 1987 article authored by me, and because a copy of Micke was shelved in the library of the Institut für Theoretische Nachrichtentechnik und Informationsverarbeitung (TNT) at the University of Hanover.  In my opinion, the available evidence does not support the conclusion that the Micke thesis was a printed publication before the filing date of September 27, 1989, or the critical date of September 27, 1988.  I have seen no evidence, and Dr. Delp does not appear to contend, that copies of the Micke Thesis were actually disseminated to the public before September 27, 1989.

83.     Furthermore, I do not believe that the materials (and alleged conversation) cited by Dr. Delp support his conclusion that the Micke Thesis was publicly accessible in the relevant time frame.  At the time, I worked at TNT as a member of the research staff, and I recall the TNT library where theses were shelved.  To the best of my recollection, the TNT library was not open to the

1  general public. Diploma theses were indexed chronologically, but not by subject matter. Consistent

2  with my recollection, the index cards on which Dr. Delp relies simply list theses in the order that

3  they were completed.  Accordingly, in my opinion, there is no evidence that a person of ordinary

4  skill in the art, through reasonable diligence, could have located and accessed the Micke Thesis

5  before September 27, 1989.

6  84.   The Micke Thesis is a study to establish performance bounds for motion compensated

7  predictive coding and motion-compensated interpolative coding.  The bounds are information-

8  theoretic bounds based on a mathematical analysis and supported by statistical measurements

9  performed in computer simulations with digitized video sequences.  As is well known in the art,

10 information theoretic bounds are non-constructive, *i.e.*, they do not provide a blueprint of how to

11 build a system that actually achieves these performance bounds or comes close to them.

12 85.   The Micke Thesis does not disclose "[a] circuit responsive to coded video signals

13 where the video signals comprise successive frames and each frame includes a plurality of blocks

14 and where the coded video signals comprise codes that describe deviations from approximated

15 blocks and codes that describe deviations from interpolated blocks."  For example, the Micke Thesis

16 discloses no circuitry that responds to a video signal comprising "deviations from interpolated

17 blocks."

18 86.   The Micke Thesis does not disclose the claimed "means for developing block

19 approximations from said codes that describe deviations from approximated blocks." The Micke

20 thesis discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT$^{-1}$ 24,

21 Adder 27, and Shift Circuit 26 as disclosed in Haskell, at least because the Micke Thesis fails to

22 disclose any equivalent to DCT$^{-1}$ 24 or Decoder 22.

23 87.   The Micke Thesis does not disclose the claimed "means responsive to said block

24 approximations and to said codes that describe deviations from interpolated blocks to develop said

25 interpolated blocks." The Micke Thesis discloses no structure that performs the required function of

26 developing interpolated blocks using block approximations and codes that describe deviations from

27 interpolated blocks. Furthermore, the Micke Thesis discloses no circuitry or structure equivalent to

28 the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as

disclosed in Haskell, at least because the Micke Thesis fails to disclose any equivalent to $DCT^{-1}$ 34, Decoder 22, or Adder 35.

88.     In addition, Dr. Delp suggests that the disclosure of computer code to implement the coder in the Micke Thesis renders obvious the specific decoder of Haskell Claim 12. I disagree. The statistical measurements of the Micke Thesis do not require a complete video coder implementation, and, in fact, the computer code provided in the Micke Thesis is not a complete video encoder.  Since the Micke Thesis does not disclose a complete video coder implementation, it cannot possibly provide the information necessary for one of ordinary skill in the art to develop a compatible decoder, as Dr. Delp suggests.

### d.     Digital Pictures

89.     I understand that Dell contends that the textbook "Digital Pictures" by Arun Netravali and Barry Haskell demonstrates a motivation to modify the teachings of the PictureTel Patents to arrive at the invention of Haskell Claim 12.  I disagree.  It is my opinion that Digital Pictures does not compensate for the missing teachings of the PictureTel Patents.  Contrary to Dr. Delp's opinion, Digital Pictures does not disclose the use of interpolation error codes as a solution to the problem of visible artifacts in interpolated video.

### e.     Secondary Considerations Demonstrating Nonobviousness

90.     In my opinion, several secondary considerations confirm my opinion that the invention described in Haskell Claim 12 is nonobvious.  First, products that use the claimed invention have been highly successful in the marketplace.  The claimed invention is used in numerous video coding standards, including MPEG-1, MPEG-2, WMV-9, VC-1, and others.  The Haskell invention has contributed to the success of these products by reducing the bandwidth needed to transmit, or by reducing the quantity of storage needed to store, high-quality video bitstreams.  In my experience, other video coding technologies that do not use the claimed invention have not been as commercially successful.

91.     Licenses showing industry respect for the claimed invention also support my conclusion that Claim 12 is nonobvious.  I have reviewed several of Lucent's licensing agreements that specifically identify Haskell.  I have also reviewed several Lucent licensing negotiation

1    documents which refer to Haskell, indicating that Haskell has been a focal point of negotiations for

2    broader licenses with third parties.

3         92.    Finally, Dr. Delp himself identifies several references that purportedly identify the

4    visual artifact problem solved by the invention of Claim 12, but fail to propose the inventive

5    solution.  The failure of others to arrive at the invention of Claim 12 provides further objective

6    evidence of nonobviousness. Moreover, the failure of Dr. Delp's "near simultaneous invention"

7    references to disclose the invention of Haskell Claim 12, or any combination of decoding block

8    approximations using prediction error and interpolated blocks using interpolation error, confirms my

9    opinion that the Haskell Claim 12 invention was not obvious.

10

11   **VI. Signature**

12        I declare under penalty of perjury under the laws of the United States that the foregoing is

13   true and correct and that this declaration was executed on this 14th day of December 2007 at

14   Stanford, California.

15

16

17                          By:

18

19                          

20

21

22

23

24

25

26

27

28

Exhibit 29

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,
      Plaintiffs,
    v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES, INC.
GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,
      Defendants.

And
MICROSOFT CORPORATION,
      Intervener.

Case No. 02-CV-2060 B (CAB)

consolidated with

Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

MICROSOFT CORPORATION,
      Plaintiff,
    v.
LUCENT TECHNOLOGIES INC., and
MULTIMEDIA PATENT TRUST,
      Defendants.

LUCENT TECHNOLOGIES INC., and
MULTIMEDIA PATENT TRUST,
      Plaintiffs,
    v.
DELL INC.,
      Defendant.

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF PROFESSOR BERND GIROD REGARDING VALIDITY OF LUCENT'S 4,383,272 AND 4,958,226 PATENTS

Exhibit 29  Page 930

# TABLE OF CONTENTS

Page

1. Scope of the Report.................................................................................. 3
2. Qualifications........................................................................................... 3
3. Other Cases ............................................................................................. 3
4. Compensation .......................................................................................... 3
5. Review and Use of Documents and Other Materials............................... 4
6. Review of Video Compression Technology ............................................ 4
7. Legal Principles ...................................................................................... 4
8. Level of Ordinary Skill in the Art .......................................................... 7
9. Validity of US Patent 4,383,272 ("Netravali")...................................... 8
   9.1 Gabor & Hill/Gabor (Nonobviousness) ............................................. 8
   9.2 Gabor & Hill/Hill Thesis (Nonobviousness) .................................... 11
   9.3 Picture Coding/Gabor & Hill (Nonobviousness)............................... 13
   9.4 Picture Coding/Limb & Pease (Nonobviousness) ............................ 14
   9.5 Secondary Considerations Demonstrating Nonobviousness ............ 15
10. Validity of US Patent 4,958,226 ("Haskell")....................................... 16
   10.1 General Knowledge In The Art........................................................ 16
   10.2 Bidirectional Prediction ................................................................. 19
   10.3 Claim 12 is Not a Predictable Combination of Techniques Known in the
   Prior Art ............................................................................................. 20
   10.4 Secondary Considerations Demonstrating Nonobviousness ......................... 32
11. Signature ............................................................................................. 33

Exhibit 29  Page 931

## 1. SCOPE OF THE REPORT

I have been asked by Kirkland & Ellis LLP, counsel for Lucent Technologies Inc. ("Lucent") and the Multimedia Patent Trust ("MPT"), to provide my opinions as a technical expert in the field of video compression concerning the validity of Claim 13 of U.S. Patent No. 4,383,272 entitled "Video Signal Interpolation Using Motion Estimation" ("Netravali") and Claim 12 of U.S. Patent No. 4,958,226 entitled "Conditional Motion Compensated Interpolation of Digital Motion Video" ("Haskell").

I previously submitted reports on May 12, 2006 and August 11, 2006 regarding the validity of Netravali and Haskell. I have been asked to consider and respond to certain opinions expressed in the September 14, 2007 report of Edward J. Delp III ("Delp Report"). The bases for my opinions are detailed in this report. I anticipate providing testimony at trial regarding my opinions discussed herein.

## 2. QUALIFICATIONS

In my March 31, 2006 Expert Report, I summarized my qualifications to render expert opinions in the area of video compression.

## 3. OTHER CASES

In my March 31, 2006 Expert Report, I provided a list of other cases in which I have provided testimony.

## 4. COMPENSATION

I am being paid my standard consulting fee of $700 per hour for my services, in addition to a monthly retainer and reimbursement of out-of-pocket expenses. I have no financial or business interests in Lucent, MPT, Gateway, Dell, or Microsoft. My compensation is not in any way dependent on the outcome of the litigation.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 3 -

**Exhibit 29  Page 932**

## 5. REVIEW AND USE OF DOCUMENTS AND OTHER MATERIALS

In preparation of this report, I have considered the documents referenced in my prior reports, the September 14, 2007 report of Edward J. Delp. III (including all exhibits and materials cited), Microsoft's Eighth Supplemental Response to Lucent's First Set of Interrogatories (No. 1), and all of the materials referenced in this report. I reserve the right to supplement this report to address any additional information or discovery that may become available.

## 6. REVIEW OF VIDEO COMPRESSION TECHNOLOGY

In my March 31, 2006 Expert Report, I provided a general review of video compression technology.

## 7. LEGAL PRINCIPLES

Counsel for MPT has informed me that, since my last report, the Supreme Court has clarified the legal standards for invalidity due to obviousness. Counsel for MPT has informed me that the Supreme Court confirmed that, while identification of a teaching, suggestion, or motivation to combine prior art references is no longer strictly required to demonstrate obviousness, the principles set forth in my May 12, 2006 Expert Report otherwise remain valid. I understand that the fundamental question remains whether the claimed invention would have been obvious to a person of ordinary skill in the art, taking into account (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any secondary considerations of nonobviousness. Having considered my previous opinions in light of the Supreme Court's clarification of the legal standards for invalidity due to obviousness, as explained to me by counsel for MPT, my ultimate conclusions concerning the nonobviousness of Netravali and Haskell have not changed.

Counsel for MPT has informed me that the Supreme Court provided further guidance concerning the obviousness analysis. Specifically, counsel for MPT has informed me

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 933**

that obviousness is not established by simply combining previously known elements from the prior art. A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. I understand that it can be important to identify a reason, such as a teaching suggestion or motivation, that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. I understand that the Supreme Court has cautioned that in identifying such a reason, the analysis need not seek out precise teachings in the prior art directed to the specific subject matter of the challenged claim.

Counsel for MPT has informed me that it will often be necessary for a court to look to interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue. I understand that any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed. I understand that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. I understand that the combination of familiar elements according to known methods may be obvious when it does no more than yield predictable results. I also understand that a claim is not invalid as obvious if it is more than the predictable use of prior art elements according to their established functions.

Counsel for MPT has informed me that if a technique has been used to improve one device, and a person of ordinary skill in the art could recognize that it would improve similar devices in the same way, application of the technique to similar devices is likely to be obvious unless its actual application in that context is beyond his or her skill. I understand that if design needs or market pressures urge solution to a problem, and there are a finite number of identified, predictable solutions, then a person of ordinary skill has

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 5 -

Exhibit 29  Page 934

good reason to pursue the known options. I understand that under these circumstances, the combination of elements of prior art may be considered a matter of common sense and may demonstrate obviousness.

Counsel for MPT has also informed me that if the prior art teaches away from combining known elements in the manner claimed by the invention at issue, discovering a successful way to combine them is less likely to be obvious. I understand that similar subject matter may not be sufficient motivation for a person of skill in the art to combine references if the references have conflicting elements.

Counsel for MPT has also informed me that a motivation to conduct further testing or research that may lead to the claimed invention does not necessarily render a claim obvious. I understand that an invention is not necessarily rendered obvious simply because it was obvious to try a certain combination.

Counsel for MPT has also informed me that obviousness of a patent cannot properly be established through hindsight, and that elements from different prior art references, or different embodiments of a single prior art reference, cannot be selected to create the claimed invention using the invention itself as a roadmap. I understand that the claimed invention as a whole must be compared to the prior art as a whole, and courts must avoid aggregating pieces of prior art through hindsight which would not have been combined absent the inventors' insight.

Counsel for MPT has informed me that secondary considerations of nonobviousness must be considered in addition to the primary considerations of the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art. Counsel for MPT has also informed me that secondary considerations of nonobviousness may include commercial success of products or processes using the invention, long felt need for the invention, failure of others to make the invention, industry acceptance of the invention, licensing of the invention, copying of

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 29  Page 935

the invention by others, initial skepticism aimed at the invention, statements of acclaim for the invention, and unexpected results achieved by the invention.

Counsel for MPT has informed me that the granting of a request for reexamination by the Patent Office does not establish a likelihood of patent invalidity. I understand that the grant of a request for reexamination is not probative of patentability. I understand that the Patent Office will grant a request for reexamination if it raises "a substantial new question of patentability." I further understand that this is a low standard to meet in practice because the Patent Office historically grants over 90% of requests for reexamination.

## 8. LEVEL OF ORDINARY SKILL IN THE ART

In my opinion, a person of ordinary skill in the art of video compression throughout the 1980s would have had at least a Bachelor of Science degree in electrical engineering or a related field and 2 years experience working in the area of video compression systems.

Dr. Delp has opined that, as of 1981, it was known that interpolation could be done adaptively, for example, by selecting the locations from which to interpolate as a function of motion. While the section "Background of the Invention" of Netravali acknowledges that both fixed and adaptive interpolation techniques were known, to the extent that Dr. Delp contends that it was known in the art to select corresponding locations, i.e., locations where the same object is expected to be, I disagree. The prior art did not disclose selection of corresponding locations for interpolation as a function of the displacement of objects in the picture.

Dr. Delp has also opined that the prior art to Haskell expressly suggested combining video coding techniques, identified the problem of visual artifacts in motion compensated interpolated frames, and therefore "provided a motivation to combine any known solution

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 936**

of interpolation deviation codes." Delp Report, § 19. I disagree for the reasons set forth below in my discussion of Haskell.

## 9. VALIDITY OF US PATENT 4,383,272 ("NETRAVALI")

In my March 31, 2006 Expert Report, I provided a background discussion of Netravali. In my May 12, 2006 Expert Report, I provided my anticipation analysis and opinions concerning the validity of Netravali. I continue to believe that Netravali is valid and not anticipated. I have been asked to specifically consider issues regarding the obviousness of Claim 13.

### 9.1 Gabor & Hill/Gabor (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Gabor & Hill with Gabor. To the extent that Dr. Delp contends that the combination of Gabor & Hill with Gabor renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to modify the teachings of Gabor & Hill and Gabor in the manner that Dr. Delp suggests. Furthermore, even if combined, Gabor & Hill and Gabor do not disclose all of the limitations of the claim language as construed by the Court.

#### 9.1.1 No Reasons to Combine

In my opinion, the interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Gabor & Hill with Gabor. Contrary to Dr. Delp's view, the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. The invention of Claim 13 was not simply a combination of known techniques. I disagree with Dr. Delp that Dr. Gabor's receipt of the Nobel Prize has any bearing on the issue of obviousness or even the alleged motivation to combine Dr. Gabor's references. In my opinion, Dr. Delp's analysis uses

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 937**

hindsight to selectively modify the teachings of Gabor & Hill and Gabor in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

### 9.1.2 Combination Does Not Disclose All Limitations of Claim 13

Dr. Delp appears to agree with me that all of the relevant teachings of Gabor & Hill are also found within the Gabor Article. Since all the relevant teachings of Gabor are included in Gabor & Hill as well, the combination of Gabor & Hill with Gabor does not broaden the teachings of Gabor & Hill. Therefore, the combination of Gabor & Hill with Gabor fails to render obvious Netravali Claim 13 for at least the reason that Gabor & Hill with Gabor fails to disclose all of the elements of that claim. Below, I highlight some of the reasons why Gabor & Hill and Gabor, whether taken independently or combined, do not disclose all of the elements of Claim 13.

Gabor & Hill does not disclose "[a] method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture" as required by the language of Claim 13. Digital video has pixels (or pels), while analog video does not. Pixels or pels are samples along the scan lines of a video signal. Gabor & Hill describes a system that operates entirely in the analog domain and does not sample the television signal along scan lines in the horizontal dimension.

Gabor & Hill does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions" as required by the claim language. A person of ordinary skill in the art reading Claim 13 in light of the specification would understand that the phrase "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations" requires processing of intensity information for pels sampled in the temporal, vertical, and horizontal dimensions.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 29  Page 938

As explained above, Gabor & Hill describes a system that operates entirely in the analog domain, and does not sample in the horizontal dimension to generate pels with intensities at discrete locations. Without pel intensities it is not possible to "determine[] by interpolation intensities of pels . . . in accordance with intensities of pels in related locations," as recited in Claim 13. Gabor & Hill therefore does not determine intensities of pels. It also does not perform any operation in accordance with intensities of pels in related locations in preceding and succeeding versions of the picture to be interpolated. To the extent that it performs interpolation at all, Gabor & Hill interpolates scan line signals, not pels.

Dr. Delp has opined that a person of ordinary skill in the art during the relevant time frame would have understood the term "picture element" to mean any area on a television or computer screen. I disagree. In my opinion, Dr. Delp fails to consider the context of the Netravali invention when proposing his definition. In the context of the video processing inventions described in Netravali, there are no operations performed on the intensities of "picture elements" as defined by Dr. Delp (i.e., any "area of a picture on a television or computer screen" Delp Report § 33). Rather, interpolation is performed for intensities of picture elements that are samples in the temporal, horizontal, and vertical dimensions, also referred to in the art as "pixels."

Further, the Court has construed "related locations" to mean "locations at which the same object is expected to be." For temporal interpolation, Gabor & Hill interpolates signals only between the same scan line in two versions of the picture. Thus it does not disclose interpolation from locations at which the same object is expected to be. Moreover, Gabor & Hill only considers contours, i.e., "position[s] where the intensity changes by more than a certain predetermined rate" along a scan line of an analog television signal. (MSLT_0001230.) It is well known that the location where objects are expected to be cannot be represented by considering only the thresholded intensity gradient in the horizontal direction. Furthermore, I disagree with Dr. Delp's conclusion

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 10 -

**Exhibit 29  Page 939**

that a person of ordinary skill in the art would be able to expand on the principles in Gabor & Hill to search for motion in the vertical direction.

Dr. Delp relies heavily on the Patent Office's decision to reexamine claim 13 of Netravali. Counsel for MPT has informed me that the grant of a request for reexamination is not evidence of invalidity. Counsel for MPT has also informed me that the document on which Dr. Delp relies, '272 Reexam (MSLT_1234186 - MSLT_1234201), is the result of a unilateral proceeding in which MPT was not involved. I understand that MPT was therefore not provided an opportunity to refute the significance of the prior art references presented to the examiner in the Patent Office. Counsel for MPT has also informed me that the PTO's reexamination decision turned on the assumption that "the teaching of the intensity value being interpolated from preceding and succeeding versions of the picture was not present in the prosecution of the application which became the '272 patent." That assumption is false because the Background section of Netravali itself notes that fixed and adaptive techniques for interframe interpolation (although without motion compensation) were known in the art. Under these circumstances, the decision to reexamine Claim 13 of Netravali should not have any bearing on the question of obviousness and does not undermine my prior validity analysis in any way.

### 9.2 Gabor & Hill/Hill Thesis (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Gabor & Hill with the Hill Thesis. To the extent that Dr. Delp contends that the combination of Gabor & Hill with the Hill Thesis renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to modify the teachings of Gabor & Hill and the Hill Thesis in the manner that Dr. Delp suggests. Furthermore, even if combined, Gabor & Hill and the Hill Thesis do not disclose all of the limitations of the claim language as construed by the Court.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 940**

### 9.2.1 No Reasons to Combine

The interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Gabor & Hill with the Hill Thesis. Contrary to Dr. Delp's view, in my opinion the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. The invention of Claim 13 was not simply a combination of known techniques. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of Gabor & Hill and the Hill Thesis in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

### 9.2.2 Combination Does Not Disclose All Limitations of Claim 13

As I discussed in my May 12, 2006 Expert Report, I have seen no clear evidence that the Hill thesis was publicly available before the filing of the Netravali patent application. I have seen no evidence to establish the date or time frame when the Hill thesis was catalogued in any publicly accessible library or otherwise publicly available. I have seen no clear evidence that the Hill thesis was catalogued or indexed by subject matter in a manner that would have permitted a person of ordinary skill in the art of video compression in the 1980s to locate the thesis.

So far, Dr. Delp has failed to point out any relevant teachings that are found in the Hill Thesis, but not in Gabor & Hill. If all the relevant teachings of the Hill Thesis are included in Gabor & Hill as well, the combination of Gabor & Hill with the Hill Thesis does not broaden the teachings of Gabor & Hill. As explained above, Gabor & Hill fails to disclose all of the elements of Claim 13. For the same reasons discussed above for Gabor & Hill, the Hill Thesis does not disclose all elements of Claim 13 because it describes a system that does not sample the television signal along scan lines, does not determine by interpolation the intensities of pels, and does not perform any operations

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 941**

based on locations where the same object is expected to be. Therefore, the combination of Gabor & Hill with the Hill Thesis fails to render obvious Netravali Claim 13 for at least the reason that Gabor & Hill with Hill fails to disclose all of the elements of that claim.

Additionally, Dr. Delp's invalidity analysis relies heavily on the Patent Office's decision to reexamine Claim 13 of Netravali. For the reasons discussed above, the decision to reexamine Claim 13 of Netravali should not have any bearing on the question of obviousness and does not undermine my prior validity analysis in any way.

### 9.3 Picture Coding/Gabor & Hill (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Picture Coding with Gabor & Hill. To the extent that Dr. Delp contends that the combination of Picture Coding with Gabor & Hill renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to combine the teachings of Picture Coding and Gabor & Hill in the manner that Dr. Delp suggests. Furthermore, even if combined, Picture Coding and Gabor & Hill do not disclose all of the limitations of the claim language as construed by the Court.

#### 9.3.1 No Reasons to Combine

The interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Picture Coding with Gabor & Hill. Contrary to Dr. Delp's view, in my opinion the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. The invention of Claim 13 was not simply a combination of known techniques. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of Gabor & Hill and Picture Coding in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 13 -

**Exhibit 29  Page 942**

### 9.3.2 Combination Does Not Disclose All Limitations of Claim 13

As described above and in my May 12, 2006 Expert Report, neither Picture Coding nor Gabor & Hill teaches "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions." The combination of Picture Coding with Gabor & Hill therefore fails to disclose all of the elements of Netravali Claim 13.

Additionally, Dr. Delp's invalidity analysis relies heavily on the Patent Office's decision to reexamine Claim 13 of Netravali. For the reasons discussed above, the decision to reexamine Claim 13 of Netravali should not have any bearing on the question of obviousness and does not undermine my prior validity analysis in any way.

### 9.4 Picture Coding/Limb & Pease (Nonobviousness)

Dr. Delp has opined that it would have been obvious to combine the teachings of Picture Coding with Limb & Pease. To the extent that Dr. Delp contends that the combination of Picture Coding with Limb & Pease renders obvious Claim 13 of Netravali, I disagree. In my opinion, it would not have been obvious for a person of skill in the art to combine the teachings of Picture Coding and Limb & Pease in the manner that Dr. Delp suggests. Furthermore, even if combined, Picture Coding and Limb & Pease do not disclose all of the limitations of the claim language as construed by the Court.

### 9.4.1 No Reasons to Combine

The interrelated teachings in the prior art would not have provided a person of skill in the art with a reason to combine Picture Coding with Limb & Pease. Contrary to Dr. Delp's view, in my opinion the general goal of developing more efficient coding systems does not demonstrate specific design or market needs in the pertinent field that would have rendered the invention of Claim 13 obvious. In my opinion, the invention of Claim 13 was not simply a combination of known techniques. I disagree with Dr. Delp that

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 14 -

**Exhibit 29  Page 943**

common authorship and subject matter would motivate a person of skill in the art to combine the Picture Coding and Limb & Pease references. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of Picture Coding and Limb & Pease in an attempt to point out all the elements required by the Court's construction of Netravali Claim 13.

### 9.4.2 Combination Does Not Disclose All Limitations of Claim 13

As described in my May 12, 2006 Expert Report, neither Picture Coding nor Limb & Pease teaches "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions." The combination of Picture Coding with Limb & Pease therefore fails to disclose all of the elements of Netravali Claim 13.

In addition, I disagree with Dr. Delp that Limb & Pease teaches the interpolation technique described in Claim 13. Limb & Pease does not disclose "interpolating the intensities of pels in locations where the same object is expected be."

### 9.5 Secondary Considerations Demonstrating Nonobviousness

In my opinion, several secondary considerations confirm my opinion that the invention described in Netravali Claim 13 is nonobvious. First, products that use the claimed inventions have been highly successful in the marketplace. The claimed inventions are used in numerous video coding standards, including MPEG-1, MPEG-2, VC-1, and others. The Netravali invention has contributed to the success of products based on these standards by reducing the bit-rate needed to transmit or store video bitstreams for a broad range of applications. In my experience, other video coding technologies that do not use the claimed inventions have not been as commercially successful.

Licenses showing industry respect for the claimed inventions also support my conclusion that Claim 13 is nonobvious. I have reviewed several of Lucent's licensing

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 944**

agreements that specifically identify Netravali. I have also reviewed several Lucent licensing negotiation documents which refer to Netravali, indicating that Netravali has been a focal point of negotiations for broader licenses with third parties.

Finally, statements of acclaim by others support my conclusion that the invention of Claim 13 was nonobvious. For example, the Research and Development Council of New Jersey awarded Arun Netravali and John Robbins the 1996 Thomas Alva Edison Patent Award for outstanding research and development in the state of New Jersey, as reflected in Netravali. ROBB 000001.

## 10. VALIDITY OF US PATENT 4,958,226 ("HASKELL")

In my March 31, 2006 Expert Report, I provided a background discussion of Haskell. In my May 12, 2006 Expert Report, I provided my anticipation analysis and opinions concerning the validity of Haskell. I continue to believe that Haskell is valid and not anticipated. Haskell contains 12 claims. I have been asked to specifically consider issues regarding the obviousness of Claim 12.

### 10.1 General Knowledge In The Art

Dr. Delp opines that a set of video coding methods combining the use of prediction, motion estimation, motion vectors, and DCT coding of the difference signal were generally known in the art at the time of the Haskell invention, as well as a separate set of video coding methods using transmission of interpolation error. He further opines that motion-compensated interpolation was generally known at that time along with the problem of visual artifacts in frames obtained by motion-compensated interpolation. Because, in his opinion, the transmission of "interpolation deviation codes" was a known solution to the known problem of visual artifacts in interpolated frames, Dr. Delp contends that a person skilled in the art would have been motivated to combine the prior art methods, and that Claim 12 of Haskell is therefore invalid for obviousness. I disagree. In my opinion, Dr. Delp's analysis uses hindsight to selectively combine portions of the

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 945**

known art in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12.

Dr. Delp opines that there are certain "baseline" references in the prior art that "teach the coding concepts of motion compensated forward prediction, prediction error, and motion-compensated temporal interpolation." He offers a set of references in the text and footnote of page 19 of his report to show that "the concept of using motion compensated prediction and DCT error coding was well known by one skilled in the art" prior to Haskell. Apparently these references are examples of his "baseline" references. He then offers a second set of references in the text and footnote of page 20 to show that bidirectional prediction and "the advantage to be gained from employing bidirectional prediction error such as interpolation error" were also known in the art. Dr. Delp then suggests that "Claim 12 is therefore simply a combination of these well-known, prior art techniques, used in the same manner in which they were used by the prior art to achieve predictable results." I disagree.

Even if one assumes that Dr. Delp's first and second sets of references were generally known in the art, and known to be potentially beneficial towards better compression and/or better video quality, there were a large number of beneficial video coding techniques available at the time. Theoretically, a person skilled in the art could have attempted to form all possible combinations of video coding techniques that had been reported as improving compression and/or video quality. However, such an exercise goes far beyond a routine pursuit of a finite number of predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art. Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

Dr. Delp contends that a person skilled in the art would have been motivated to combine prior art methods to arrive at the invention of Claim 12 in order to eliminate visual artifacts in interpolated video sequences. I disagree. None of the references on

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 946**

which Dr. Delp relies to identify the problem of visual artifacts in motion-compensated frames suggest that transmission of interpolation error, as opposed to one of many other potential solutions, could eliminate visual artifacts. In fact, since motion compensation artifacts were usually caused by a failure of the motion estimator to extract the true motion of an object, a person of ordinary skill would have typically looked for ways to improve the reliability and accuracy of the motion estimator to eliminate visual artifacts. In addition, or alternatively, a person of ordinary skill might have considered sending a flag to instruct the receiver to omit motion-compensated interpolation and use frame repetition instead, as, e.g., suggested in Japanese patent application 1-163059 (MSLT_1234116 – MSLT_1234130). Oddly, Dr. Delp cites this document to support his theory of near simultaneous invention, even though it teaches away from the Haskell invention. The Delp Report offers no convincing evidence to suggest that a person of skill in the art would recognize that transmission of transform-coded interpolation errors, as opposed to one of many other potential solutions, could eliminate the problem.

Dr. Delp also opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 can be established because certain of his references, such as the Ericsson '914 Patent, utilize motion compensated interpolation. I disagree. This is not a situation in which common sense would dictate that a person of skill in the art employ a predictable solution to respond to design needs or market pressures. The options were too numerous. There were a large number of beneficial video coding techniques available at the time. The fact that a particular video coding technique, in this case motion compensated interpolation, could be combined with a variety of other techniques provides no reason to combine any particular subset of those techniques, let alone a subset that embodies the limitations of Haskell Claim 12.

Dr. Delp also opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 can be established because the coding and transmission of prediction errors and interpolation errors are conceptually similar, and the coding and transmission of a prediction error to maintain picture quality was known in the art. I disagree. Dr.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 947**

Delp identifies nothing that would have suggested to a person of ordinary skill in the art that transmission of interpolation error blocks would be beneficial in a system that already used the transmission of prediction errors. In addition, I note that Dr. Delp's opinion is inconsistent with the prosecution history of Haskell Claim 12. During that prosecution, the examiner considered Hinman, which in Dr. Delp's opinion discloses all of the limitations of Haskell Claim 12 except "codes that describe deviations from interpolated blocks." The examiner also considered references that in his opinion disclosed the transmission of prediction errors. Nevertheless, the examiner ultimately concluded that it would not have been obvious to combine such references to arrive at the invention of Claim 12.

Finally, Dr. Delp opines that a motivation to combine prior art to arrive at the invention of Haskell Claim 12 is provided by the emergence of CD-ROM technology. I disagree. While CD-ROM technology may have offered a person skilled in the art more latitude in trading off bit-rate, video quality, and system delay, CD-ROM technology provided no guidance or reason whatsoever to combine prior art teachings to arrive at the invention of Haskell Claim 12.

## 10.2 Bidirectional Prediction

Dr. Delp has opined that bidirectional prediction followed by averaging and addition of interpolation error were known in the art, and that the invention of Claim 12 is simply a combination of prior art techniques used in the same manner in which they were used by the prior art to achieve predictable results. As explained in the following section, I disagree. In my opinion, Dr. Delp relies on hindsight to contend that it would have been obvious to combine certain abstract "techniques," without demonstrating any reason for a person of ordinary skill in the art to make the specific combination of such techniques described in Claim 12, let alone using the specific corresponding structures identified by the Court.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 948**

In his attempt to show that bidirectional prediction is an obvious variation of unidirectional prediction, Dr. Delp speculates that "a person of ordinary skill in the art could do "backward" prediction" by using "the exact same techniques and structures used for forward prediction." I disagree. The recursive structure of a predictive decoder requires that the coder at least obeys constraints posed by causality, otherwise the bitstream cannot be decoded. For example, one cannot simply encode every frame in a sequence by predicting it from the following "future" frame, as Dr. Delp appears to assert. At least some frames have to be predicted in forward direction, while skipping in-between frames with backward prediction. Today, with the benefit of hindsight, such considerations are well understood. However, at the time of the Haskell invention, the structures needed to implement such a system, their interconnection, or their control would not have been obvious to a person of ordinary skill. Nor would the step from backward prediction to bidirectional prediction be obvious, as Dr. Delp asserts.

## 10.3 Claim 12 is Not a Predictable Combination of Techniques Known in the Prior Art

Dr. Delp has opined that the various coding techniques covered by Haskell Claim 12 were well known in the prior art prior to the filing of the application for the Haskell patent. Dr. Delp has also opined that it was well known in the art to combine these various coding techniques, and he discusses several references that he believes disclose the use of such techniques in combination. I disagree with Dr. Delp's characterization of these references, as discussed below.

In addition, I disagree with Dr. Delp's opinion that the obviousness of the invention described in Claim 12 can be demonstrated by reducing the invention to a "combination" of elemental video coding technologies performing their known functions. Dr. Delp asserts that structures used to implement various video coding techniques at the time of the Haskell invention, such as "adders, decoders, DCT-1, shift circuits, averagers" were "combinable to perform the coding techniques of claim 12 in a manner that required no change in their respective functions." I disagree. The performance of a video coder

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 20 -

**Exhibit 29  Page 949**

critically depends on the way the constituent elements are combined and artfully optimized as a whole. An efficient video coder cannot simply be built by combining known building blocks. Among other problems, the performance of a certain combination of elements can usually not be readily predicted but requires extended experimentation.

To the extent that Claim 12 can be considered a combination claim, it describes a combination of two particular means that have defined structure and perform specific functions. By focusing on individual components of those means, rather than the means as a whole, Dr. Delp fails to demonstrate that either of those means was known in the art. Nor does he demonstrate any reason why it would have been obvious to combine the two means as set forth in Claim 12. A person of ordinary skill would also not have been able to predict the performance of the Haskell invention as Dr. Delp asserts. For example, Haskell reports that "**Experimentally**, it has been found that interpolating every other frame is quite beneficial." (Haskell, col. 3: 43-44, emphasis added) or "the **observation** that the volume of the frame interpolation code increase with increased use of the frame interpolation code so one could quickly reach a point of 'diminishing returns' in the use of interpolation code." (Haskell, col. 3: 38-42, emphasis added). This illustrates that the Haskell invention required extended experimentation and observation of the performance, since its results were not even predictable to the inventors themselves, let alone to a person of ordinary skill in the art.

I also disagree with Dr. Delp's opinion that design incentives and market forces would have motivated a person of ordinary skill in the art to arrive at the invention of Claim 12. In my opinion, Dr. Delp does little more than note that a demand for better video compression existed, that the invention of Claim 12 discloses an improved decoder for video compression, and then conclude that the invention would therefore have been obvious. I disagree. In the absence of any specific design incentive or market force driving the particular combination of decoding means set forth in Claim 12, in my opinion Dr. Delp's analysis relies on impermissible hindsight.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 21 -

**Exhibit 29  Page 950**

### 10.3.1 Document Nos. 22, 43, 60, 78, 81, and/or 103R

In the section of his report entitled "The H.261 Submissions," Dr. Delp suggests that *"claim 12 of the '226 patent simply rearranges the elements and techniques disclosed by the H.261 submissions with each technique performing the same function it had been known to perform and with the system of techniques yielding unsurprising results."* (Delp Report, § 92). As discussed in Section 10.1 of my May 12, 2006 report, I have seen no proof that the H.261 submissions qualify as prior art.

To the extent that Dr. Delp contends that the combination of H.261 submissions renders obvious Claim 12 of Haskell, I disagree. In my opinion, a person of skill in the art would not have seen reason to combine the teachings of the H.261 submissions in the manner that Dr. Delp suggests. Furthermore, even if combined, the submissions do not disclose all of the limitations of the claim language as construed by the Court. Nor would a person of skill in the art, using common sense, have combined the teachings of the submissions.

In my opinion, Dr. Delp ignores the competitive reality of the submission process of the H.261 standardization. All the documents cited by Dr. Delp were submitted during the first "divergence" phase of the H.261 standardization. (*See* § 10.1 May 12, 2006 Girod Expert Report). No attempt was made during that time to achieve convergence among competing proposals. In my opinion, Dr. Delp's analysis uses hindsight to select elements of competing proposals to CCITT SGXV in an attempt to point out all the structures required by the Court's construction of Haskell Claim 12. Nothing in the references, the nature of the problem, or the knowledge of a person having ordinary skill in the art suggests that a person of skill in the art would have recognized that the prior art elements could be combined as suggested by Dr. Delp. In fact, because of the competing nature of the various proposals, a person of ordinary skill in the art would consider them as alternatives instead of synergistic contributions. If a person of ordinary skill would have been able to readily combine the competing proposals, the two extended

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 951**

convergence phases of the H.261 standardization process would not have been needed. The combined duration of the convergence phases of about 3 years clearly shows that competing proposals cannot be combined with predictable results. Extended experimentation is required, which in the H.261 standardization process manifested itself in a progression of 8 "reference models" gradually improved over the course of more than 3 years.

Furthermore, during the development of the ITU-T Recommendation H.261, nearly 600 separate documents, covering a wide range of different video coding technologies, were submitted to CCITT SGXV Specialists Group. Theoretically, a person skilled in the art could have attempted every possible combination of the numerous technologies and circuits discussed in the CCITT SGXV Specialists Group documents. However, such an exercise goes far beyond a routine pursuit of a finite number of predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art. In my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

Even if Dr. Delp is correct in his assumption that a person of skill in the art would have been motivated to combine these references, the combination does not satisfy every limitation of Haskell Claim 12. My May 12, 2006 Expert Report discusses each of the references and their combinations in detail and I incorporate those discussions by reference here.

### 10.3.2 Micke Thesis

Dr. Delp has opined that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in the Diploma thesis "Vergleich eines prädiktiven und eines interpolativen bewegungskompensierenden Codierverfahrens für Fernsehbildsignale" ("Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals") by Thomas Micke (the "Micke Thesis"), and that therefore the Micke Thesis anticipates Haskell Claim 12. I

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 23 -

**Exhibit 29  Page 952**

disagree. It is still my opinion that the Micke Thesis does not qualify as prior art and does not anticipate Haskell Claim 12. I incorporate by reference the discussion of the Micke Thesis from § 10.5 of my May 12, 2006 Expert Report.

As explained in my May 12, 2006 Expert Report, the Micke thesis fails to disclose several elements of Claim 12 of Haskell. To the extent that Dr. Delp contends that *Advances in Picture Coding* by H.G. Musmann et al. supplies the missing elements by disclosing the use of a DCT, I disagree. Furthermore, in my opinion, it would not have been obvious for a person of skill in the art to modify the teachings of the Micke Thesis, in light of the Musmann article or otherwise, to arrive at the invention of Claim 12. Given the large number of video coding techniques available at the time, there was no specific design need, market pressure, or other reason to combine the teachings of the Micke Thesis with any specific technique known in the art to arrive at the invention of Claim 12.

**10.3.3 The PictureTel References**

In the section of his report entitled "The PictureTel References," Dr. Delp has opined that the combination of references he refers to as the "PictureTel References" renders the Haskell Claim 12 obvious. I disagree. In my opinion, a person of skill in the art would not have been motivated to combine the teachings of those references in the manner that Dr. Delp suggests. Furthermore, even if combined, the PictureTel references do not disclose all of the limitations of the claim language as construed by the Court.

Dr. Delp has opined that a person of skill in the art would have recognized reasons to combine the inventions of individual patents because they had a common assignee, overlapping inventors, and related subject matter. I disagree. Even if such factors would motivate a person in the art to collect and combine several references, a reason to consult various references in the abstract is not the same thing as a reason to combine the teachings of the references in a specific manner. In my opinion, Dr. Delp's analysis uses hindsight to selectively modify the teachings of several patents in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12. Theoretically,

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 953**

a person skilled in the art could have attempted to form all possible combinations of video coding techniques disclosed in the divergent teachings of the seven PictureTel References. However, such an exercise goes far beyond a routine pursuit of a finite number of identified, predictable solutions that would place the invention of claim 12 within the grasp of a person of ordinary skill in the art. Furthermore, in my opinion, it would require more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12 based on the teachings of the PictureTel references.

Dr. Delp's claim charts also purport to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in U.S. Patent No. 4,816,914 to S. Ericsson ("the Ericsson '914 patent"). I disagree. In my opinion, the Ericsson '914 patent does not disclose all of the elements of Haskell Claim 12.

In particular, the Ericsson '914 patent does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, the Ericsson '914 patent fails to disclose the claimed "codes that describe deviations from interpolated blocks," "interpolated blocks," or "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." The Ericsson '914 patent discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Furthermore, the Ericsson '914 patent discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell. As such, the Ericsson '914 patent does not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 25 -

Exhibit 29  Page 954

"means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

Even if combined, the PictureTel references do not disclose all elements of Claim 12. For example, the PictureTel references nowhere disclose blockwise coding of motion-compensated interframe interpolation errors. Dr. Delp glosses over this missing limitation by concluding that the use of interpolation error was an obvious variation of the prior art. I disagree. In my opinion, Dr. Delp's analysis uses hindsight to selectively combine portions of the known art in an attempt to point out all the elements required by the Court's construction of Haskell Claim 12. Furthermore, as discussed above, Dr. Delp identifies nothing that would have suggested to a person of ordinary skill in the art that transmission of interpolation error blocks would be beneficial in a system that already used the transmission of prediction errors. In addition, I note that Dr. Delp's opinion is inconsistent with the prosecution history of Haskell Claim 12. During that prosecution, the examiner considered Hinman, which in Dr. Delp's opinion discloses all of the limitations of Haskell Claim 12 except "codes that describe deviations from interpolated blocks." The examiner also considered references that in his opinion disclosed the transmission of prediction errors. Nevertheless, the examiner ultimately concluded that it would not have been obvious to combine such references to arrive at the invention of Claim 12.

Lastly, Dr. Delp refers to the combination of the PictureTel references with Digital Pictures, but offers no reason why these references should be combined.

### 10.3.4 Near Simultaneous Invention

Dr. Delp's claim charts attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in U.S. Patent No. 5,113,255 to A. Nagata et al. ("Nagata"), Matsushita's submission for the MPEG-1 standard ("Matsushita"), Bellcore's submission for the MPEG-1 standard ("Bellcore"), Sony's October 2, 1989 MPEG submission titled "Description of The Proposed Coding

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 955**

Algorithm" ("Sony"), Philips' 1989 MPEG submission titled "The Full Motion System" ("Philips"), U.S. Patent No. 4,985,768 to K. Sugiyama ("Sugiyama/US"), Japanese patent application 1-11587 ("Sugiyama/JP") and an article by Paul Roos and Max. A. Viergever titled "Interframe vs. intraframe compression of image sequences" ("Roos") and that therefore Nagata, Matsushita, Bellcore, Sony, Philips, Sugiyama/US, Sugiyma/JP, and Roos provide evidence of simultaneous, independent invention of Haskell Claim 12. I disagree.

Documents produced in this case indicate that the inventors conceived of the invention of Haskell Claim 12 by March 1989, when Dr. Haskell proposed conditional motion compensated interpolation for incorporation into the CCITT SGXV reference model. Dr. Atul Puri, Haskell's co-inventor, gave a talk about conditional motion compensated interpolation at the Second International Workshop on 64 kbit/s Coding of Moving Video, held in Hannover, Germany, September 4-6, 1989. A 2-page summary of his talk is included in the conference proceedings. MSLT_0234009-11. Nagata, Bellcore, Matsushita, Sony, Philips, Sugiyama/US, and Roos are all from a later date. Dr. Delp does not cite any evidence that Nagata, Bellcore, Matsushita, Sony, Philips, Sugiyama/US, and Roos were indeed independently developed and did not benefit from Haskell's prior invention.

### The Nagata Applications

Dr. Delp's claim charts attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in three Japanese patent applications (1-118004, 1-163059, and 1-169320) cited in U.S. Patent No. 5,113,255 to A. Nagata et al. ("Nagata"). I disagree. In my opinion, the three patent applications, whether taken alone or together, do not disclose all of the elements of Haskell Claim 12.

I note that U.S. Patent No. 5,113,255 discloses substantial new material not contained in the any of the cited Japanese patent applications. For example, the three Japanese applications nowhere mention and, in fact, teach away from, the use of a DCT or an

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 956**

IDCT circuit, or any other form of block-wise transform coding. For that reason alone, each of the Japanese applications would fail to disclose the Haskell invention. However, other elements of Claim 12 required by the Court are not disclosed either.

In particular, those patent applications do not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, those patent applications fail to disclose the claimed "block approximations," "codes that describe deviations from approximated blocks," and "means for developing block approximations from said codes that describe deviations from approximated blocks." The applications disclose no structure that performs the required function of developing block approximations from said codes that describe deviations from approximated blocks. The applications disclose no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. In addition, the applications fail to disclose the claimed "interpolated blocks," "codes that describe deviations from interpolated blocks," and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." The applications disclose no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Furthermore, the applications disclose no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell. As such, the applications also do not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

Exhibit 29  Page 957

### Sugiyama/US and Sugiyama/JP

Dr. Delp's claim charts also attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in U.S. Patent No. 4,985,768 to K. Sugiyama ("Sugiyama/US") and Japanese patent application 1-11587 ("Sugiyama/JP"; MSLT_1235588-MSLT_1235601), cited by Sugiyama/US as a priority reference. I disagree. In my opinion, neither Sugiyama/US nor Sugiyama/JP discloses all of the elements of Haskell Claim 12.

I note that Sugiyama/US discloses material not contained in Sugiyama/JP. As the US application was filed in 1990, after the invention of Haskell had become publicly known, Dr. Delp's discussion of Sugiyama/US does not appear to be relevant with respect to near simultaneous invention to the extent that the material was not already disclosed in Sugiyama/JP. I therefore focus on Sugiyama/JP in the following. The analysis and conclusions similarly apply to Sugiyama/US, and, in my opinion, neither Sugiyama/US, nor Sugiyama/JP disclose all of the elements of Haskell Claim 12.

One reason why Sugiyama/JP does not disclose all the elements of Haskell Claim 12 is that the reference does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." Furthermore, Sugiyama/JP does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks." Sugiyama/JP discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. In addition, Sugiyama/JP fails to disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Sugiyama/JP discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 29 -

Exhibit 29  Page 958

39, and Averager 32 as disclosed in Haskell. Sugiyama/JP also does not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

### Sony

Dr. Delp's claim charts also attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in Sony's October 2, 1989 MPEG proposal titled "Description of The Proposed Coding Algorithm" ("Sony"). I disagree. In my opinion, Sony does not disclose all of the elements of Haskell Claim 12.

In particular, Sony does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, Sony discloses no "approximated blocks" and "codes that describe deviations from approximated blocks."

Sony also does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks." Sony discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Furthermore, Sony discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell.

Furthermore, Sony does not disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Sony discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Finally, Sony discloses no circuitry or

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 30 -

Exhibit 29  Page 959

structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.

## Philips

Dr. Delp's claim charts also attempt to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in Philips' 1989 MPEG submission titled "The Full Motion System" ("Philips"). I disagree. In my opinion, Philips does not disclose all of the elements of Haskell Claim 12.

In particular, Philips does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, Philips discloses no "interpolated blocks" or "codes that describe deviations from interpolated blocks."

Philips does not disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Philips discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Furthermore, Philips discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.

## Roos

Dr. Delp's claim charts also purport to demonstrate that every element required by Claim 12 of Haskell is included, either explicitly or inherently, in an article by Paul Roos and Max A. Viergever titled "Interframe vs. intraframe compression of image sequences" ("Roos"). I disagree. In my opinion, Roos does not disclose all of the elements of Haskell Claim 12.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

- 31 -

Exhibit 29  Page 960

In particular, Roos does not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." For example, Roos does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks." Roos discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. In addition, Roos fails to disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Roos discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell. Roos also does not disclose the claimed combination of "means for developing block approximations from said codes that describe deviations from approximated blocks" and "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

**10.4 Secondary Considerations Demonstrating Nonobviousness**

In my opinion, several secondary considerations confirm my opinion that the invention described in Haskell Claim 12 is nonobvious. First, products that use the claimed invention have been highly successful in the marketplace. The claimed invention is used in numerous video coding standards, including MPEG-1, MPEG-2, WMV-9, VC-1, and others. The Haskell invention has contributed to the success of these products by reducing the bandwidth needed to transmit, or by reducing the quantity of storage needed to store, high-quality video bitstreams. In my experience, other video coding technologies that do not use the claimed invention have not been as commercially successful.

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 961**

Licenses showing industry respect for the claimed invention also support my conclusion that Claim 12 is nonobvious. I have reviewed several of Lucent's licensing agreements that specifically identify Haskell. I have also reviewed several Lucent licensing negotiation documents which refer to Haskell, indicating that Haskell has been a focal point of negotiations for broader licenses with third parties.

Finally, Dr. Delp himself identifies several references that purportedly identify the visual artifact problem solved by the invention of Claim 12, but fail to propose the inventive solution. The failure of others to arrive at the invention of Claim 12 provides further objective evidence of nonobviousness. Moreover, the failure of Dr. Delp's "near simultaneous invention" references to disclose the invention of Haskell Claim 12, or any combination of decoding block approximations using prediction error and interpolated blocks using interpolation error, confirms my opinion that the Haskell Claim 12 invention was not obvious.

## 11. SIGNATURE

Stanford, California, October 12, 2007

*[signature]*

SUPPLEMENTAL VALIDITY REPORT - PROF. BERND GIROD – OCTOBER 12, 2007

**Exhibit 29  Page 962**

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of October, 2007, a copy of the foregoing SUPPLEMENTAL REBUTTAL EXPERT REPORT OF PROFESSOR BERND GIROD REGARDING VALIDITY OF LUCENT'S 4,383,272 AND 4,958,226 PATENTS was served on counsel for Gateway, Microsoft and Dell as follows:

**EMAIL**
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099
marchese@fr.com
srodriguez@fr.com

**EMAIL**
Ali Sharifahmadian
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
Telephone: 202-942-5000
Facsimile: 202-942-5999
ali_sharifahmadian@aporter.com

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Microsoft Corp.*

Attorneys for *Dell Inc.*

**EMAIL**
W. Bryan Farney
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
bryan.farney@dechert.com

Attorneys for *Gateway, Inc., et al.*

Exhibit 29  Page 963

Exhibit 30

BERND GIROD, PH.D.                                                November 23, 2007

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--oOo--


LUCENT TECHNOLOGIES INC., and

MULTIMEDIA PATENT TRUST,


      Plaintiffs,


vs.                                   No. 02-CV-2060 B (CAB)

                                   consolidated with

GATEWAY, INC., GATEWAY COUNTRY          No. 03-CV-0699 B (CAB)

STORES LLC, GATEWAY COMPANIES,          No. 03-CV-1108 B (CAB)

INC., GATEWAY MANUFACTURING LLC,

and COWABUNGA ENTERPRISES, INC.,

           Defendants.

and


MICROSOFT CORPORATION,


      Intervener,

_____/

AND RELATED CROSS ACTIONS.

_____/


          Videotaped Deposition of

            BERND GIROD, PH.D.

        _____

        Tuesday, November 20, 2007



Reported by:

Leslie Rockwood

CSR No. 3462

Job No. 77606

Esquire Deposition Services          505 Sansome street, Suite 502     San Francisco, California 94111
Phone (415) 288-4280                       800-770-3363                       Fax (415) 288-4286

Exhibit 30  Page 964

BERND GIROD, PH.D.                                                  November 23, 2007

                                                                         Page 2

```
 1                         APPEARANCES:
 2
 3     For LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST:
 4             Michael P. Stadnick
                  -and-
 5             Jennifer J. Schmidt
               Kirkland & Ellis LLP
 6             153 East 53rd Street
               New York, New York 10022-4611
 7             (212) 446-4946
 8
       For GATEWAY:
 9
               Jeffrey B. Plies
10             Dechert LLP
               300 West 6th Street, Suite 1850
11             Austin, Texas 78701
               (512) 394-3000
12
13
       For MICROSOFT CORPORATION:
14
               Christopher Marchese
15                -and-
               Thomas N. Millikan
16             Fish & Richardson, P.C.
               12390 El Camino Real
17             San Diego, California 92130-2081
               (858) 678-4749
18
19     For DELL INC.:
20             Joseph A. Micallef
               Arnold & Porter LLP
21             555 Twelfth Street, NW
               Washington, DC 20004-1206
22             (202) 942-5721
23
       Also present:  Donovan Bauer, Videographer
24
25
```

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                      800-770-3363                          Fax (415) 288-4286

**Exhibit 30  Page 965**

BERND GIROD, PH.D.                                          November 23, 2007

Page 159

1          THE WITNESS:  That would be my presumption.

2          Q.  BY MR. MICALLEF:  Do you have any idea why

3    MPT did not provide your arguments as to validity to the

4    patent office?

5          MR. STADNICK:  Argumentative, assumes facts.

6          THE WITNESS:  I don't know whether MPT had

7    the opportunity to provide these arguments to the patent

8    office, and if they had a choice to make, why they would

9    decide one way or another.

10         Q.  BY MR. MICALLEF:  No idea?

11         A.  No.

12         Q.  Can you lay your hand on the Markman order

13   for the Haskell patent?

14         A.  I would be happy to do that if you would give

15   it to me.

16         MR. STADNICK:  We've been going over an hour.

17   Let's take a break.  We've also been going over four

18   hours.  You told me very few questions.

19         MR. MICALLEF:  This is the last thing I've

20   got to do and then I'm done.

21         MR. STADNICK:  Well, if it takes as long as

22   the last thing you just did, we're going to take a break

23   now, and I'll decide whether we're going longer than four

24   hours.  Because, frankly, both of you have spent a lot of

25   time today examining this witness on something you've

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                      800-770-3363                           Fax (415) 288-4286

Exhibit 30  Page 966

BERND GIROD, PH.D.                                                    November 23, 2007

Page 160

 1   already examined him on.  We had an agreement --

 2              MR. MICALLEF:  Can I do this.

 3              MR. STADNICK:  How long is it going to take?

 4              MR. MICALLEF:  Very short period of time.

 5   Very, very short period of time.

 6              MR. STADNICK:  Give me a number.  How many

 7   minutes have you got.  Then let's take a break.

 8              MR. MICALLEF:  I don't know.  It depends on

 9   him.

10              MR. STADNICK:  Then I need a break.

11              THE VIDEOGRAPHER:  Off the record, the time

12   is 5:41.

13              (Recess.)

14              THE VIDEOGRAPHER:  Back on the record, the

15   time is 5:46.

16         Q.  BY MR. MICALLEF:  Dr. Girod, I've handed you

17   a copy of the Court's Markman order --

18              MR. STADNICK:  Do you have a copy?  I'm

19   sorry.

20              MR. MICALLEF:  Sure (indicating).

21         Q.  I've handed you a copy of the Court's Markman

22   order for the Haskell patent, order construing claims for

23   United States Patent Number 4,958,226, just so the

24   record's clear.

25              And my question to you is:  Can you tell me

Esquire Deposition Services          505 Sansome street, Suite 502          San Francisco, California 94111
Phone (415) 288-4280                     800-770-3363                          Fax (415) 288-4286

Exhibit 30  Page 967

BERND GIROD, PH.D.                                          November 23, 2007

Page 161

1    what part of the claim, in your view, requires coding of

2    interpolation error?

3                    MR. STADNICK:  Objection.  Argumentative.

4                    MR. MICALLEF:  Well --

5                    THE WITNESS:  Seems like --

6                    MR. MICALLEF:  Excuse me.  Before you answer,

7    let me ask about that objection.  I'm not so sure I

8    understand that objection.  What's argumentative about

9    it?

10                   MR. STADNICK:  It's a decoder claim.  No

11   claim requires decoding.

12                   Q.  BY MR. MICALLEF:  Well, let me ask it, then,

13   that way:  Do you believe any part of this claim requires

14   coding of interpolation error?

15                   A.  Well, certainly in the claim construction

16   provided by the Court, the term "coding of interpolation

17   error" is not mentioned.

18                   Q.  Are you done?

19                   A.  Yes.

20                   Q.  Well, my question was:  Do you think that any

21   part of the claim requires coding of interpolation error,

22   whether construed by the Court or not?

23                   MR. STADNICK:  Objection.  Vague.

24                   THE WITNESS:  No part of this claim requires

25   coding of interpolation errors.

Esquire Deposition Services                 505 Sansome street, Suite 502              San Francisco, California 94111
Phone (415) 288-4280                              800-770-3363                              Fax (415) 288-4286

Exhibit 30  Page 968

BERND GIROD, PH.D.                                              November 23, 2007

Page 162

1        Q.  BY MR. MICALLEF:  So this claim could be

2   satisfied without ever coding interpolation error in any

3   manner?

4              MR. STADNICK:  Objection.  Vague.

5        Q.  BY MR. MICALLEF:  Correct?  Strike that.

6              Let me ask you a different question.

7              You know what a means-plus-function claim

8   element is; correct?

9        A.  Correct.

10       Q.  And you understand that such a claim element

11  literally covers any -- or the structure disclosed in the

12  specification for performing the claims function and

13  equivalent thereof; right?

14       A.  I understand that.

15       Q.  Did you consider, in coming to your opinions,

16  what might be obvious in view of equivalence of the

17  structures disclosed in the Haskell patent?

18       A.  I looked at the structures and, of course,

19  also the functions of the claim elements and considered

20  obviousness.

21       Q.  You looked at the structures in the Haskell

22  patent?

23       A.  Yes.

24       Q.  For that obviousness analysis?

25       A.  Yes.

Esquire Deposition Services          505 Sansome street, Suite 502       San Francisco, California 94111
Phone (415) 288-4280                        800-770-3363                       Fax (415) 288-4286

Exhibit 30  Page 969

Exhibit 31

FILED

2005 JAN 12  AM 9: 07

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   LUCENT TECHNOLOGIES, INC.,              Civil No: 02CV2060-B(CAB);
                                                        03CV0699-B(CAB);
12                                                      03CV1108-B(CAB)

13                    Plaintiff,
                                              **SECOND MODIFIED
14   v.                                       SCHEDULING ORDER AND
                                              EXTENSION OF DISCOVERY**
15   GATEWAY, INC AND GATEWAY
     COUNTRY STORES LLC; and,
16   MICROSOFT CORPORATION; and, DELL,
     INC.,
17
                      Defendants.
18

19

20

21

22

23

24

25

26

27

28

                        _3 88_                                    1

**Exhibit 31  Page 970**

1    After further consultation with the parties the Court hereby modifies its December 8,

2  2005 Modified Scheduling Order as follows:

3    The Court has determined that the patents at issue in this case will be tried in the

4  following groupings with the following schedule:

5  **-Group 1: "Video Coding Patents"**

6  Patents at issue: U.S. Patents **4,383,272** and **4,958,226**
   Last Day to File any Summary Judgment Motions: **August 4, 2006**

7  Hearing Date for Summary Judgment Motions: **September 8, 2006** at 9:00 a.m.
   Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **November**

8  **1, 2006** at 10:30 a.m.

9  Trial: **November 20-December 14, 2006** at 9:00 a.m.

10 **-Group 2: "Audio Coding Patents"**

11 Patents at issue: U.S. Patents **5,341,457** and **5,627,938**
   Last Day to File any Summary Judgment Motions: **September 29, 2006**

12 Hearing Date for Summary Judgment Motions: **November 3, 2006** at 9:00 a.m.

13 Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **January 4,**
   **2007** at 9:00 a.m.

14 Trial: **January 22-February 15, 2007** at 9:00 a.m.

15
   **-Group 3: "Speech Coding Patents"**

16 Patents at issue: U.S. Patents **4,617,676**; **4,910, 781**; and **4,701,954**

17 Last Day to File any Summary Judgment Motions: **December 4, 2006**
   Hearing Date for Summary Judgment Motions: **January 8, 2007** at 9:00 a.m.

18 Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **February**
   **23, 2007** at 9:00 a.m.

19 Trial: **March 19-April 12, 2007** at 9:00 a.m.

20
   **-Group 4: "User Interface Patents"**

21 Patents at issue: U.S. Patents **4,763,356**; **5,649,131**; **5,347,295**; and **4,317,956**

22 Last Day to File any Summary Judgment Motions: **January 26, 2007**
   Hearing Date for Summary Judgment Motions: **March 2, 2007** at 9:00 a.m.

23 Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **April 27,**
   **2007** at 9:00 a.m.

24 Trial: **May 21-June 14, 2007** at 9:00 a.m.

25
   **-Group 5: "Fleming and Doughty Patents"**

26 Patents at issue: U.S. Patents **4,439,759** and **4,582,956**

27 Last Day to File any Summary Judgment Motions: **March 29, 2007**

28
                                        2                    02CV2060; 03CV0699; 03CV1108

**Exhibit 31  Page 971**

1

Hearing Date for Summary Judgment Motions: **May 4, 2007** at 9:00 a.m.

2

Final Pre-trial Conference and Hearing Date for any *in limine* Motions: **June 29, 2007** at 9:00 a.m.

3

Trial: **July 16-August 9, 2007** at 9:00 a.m.

4

5    Any brief filed in opposition to a motion for summary judgment shall be submitted

6    not later than 14 calendar days after the motion for summary judgment is filed. Any reply

7    brief filed in response to an opposition brief shall be filed not later than 7 calendar days

8    after the opposition brief is filed. All parties shall hand deliver copies of any motion for

9    summary judgment, opposition brief, or reply brief, along with all supporting documents, to

10   chambers on the day they are filed.

11   The Court holds that plaintiff Lucent Technologies, Inc. ("Lucent") will not be

12   allowed to assert claims for infringement of U.S. Patent Number 5,227,878 (the "'878

13   patent") in the current action. This decision is without prejudice to Lucent filing a separate

14   action alleging infringement of the '878 patent by any of the defendants in this action, and

15   in that event any discovery obtained in this case relevant to the '878 case shall be usable as

16   though obtained in the later filed '878 case.

17   The Court further holds that Lucent shall be allowed to obtain additional discovery

18   from Microsoft Corporation regarding the "X-box 360". The Magistrate Judge shall

19   determine the scope and timing of such discovery. The Court declines at this time to set a

20   trial schedule regarding any allegations of patent infringement involving the "X-box 360".

21

22   **IT IS SO ORDERED**.

DATED: _1-11-06_

23                                UNITED STATES SENIOR DISTRICT JUDGE

24

25   cc:    All Parties

26          The Honorable Cathy Ann Bencivengo, United States Magistrate Judge

27

28                                3                    02CV2060; 03CV0699; 03CV1108

**Exhibit 31  Page 972**

Exhibit 32

# ARNOLD & PORTER LLP

October 26, 2005

*VIA FEDERAL EXPRESS*

Elizabeth T. Bernard, Esq.
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

Re:    *Lucent Techs. Inc. v. Dell Inc. et al.* (S.D. Cal.)

Dear Ms. Bernard,

Enclosed please find one CD containing documents bearing production numbers DELL 311855 - DELL 312107 as well as documents that were originally produced as slipsheets and are now being produced at the request of Sidney Rosenzweig. Please call Mr. Rosenzweig at 202.942.6451 if you have any questions regarding this matter. Thank you.

Sincerely,

Michael Stacy
Legal Assistant

Washington, DC     New York     London     Brussels     Los Angeles     Century City     Northern Virginia     Denver

Exhibit 32  Page 973

# Exhibit 33



**Thomas Wischer/Spec/DC/ArnoldAndPorter**
DC - 327   202-942-6450

03/29/2006 02:52 PM

To    jon_hohenthaner@ny.kirkland.com

cc

bcc   Anthony Schall/LglSup/DC/ArnoldAndPorter

Subject   Lucent v. Gateway, et al

Mr. Hohenthaner,

Enclosed please find Dell document production bearing Bates numbers DELL345587 - DELL345600.



DELL345587-345600.zip

Exhibit 33  Page 974

Exhibit 34

Confidential – Filed
Under Seal

# Exhibit 35

# FISH & RICHARDSON P.C.

225 Franklin Street
Boston, Massachusetts
02110-2804

Telephone
617 542-5070

Facsimile
617 542-8906

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA FACSIMILE AND U.S. MAIL**

March 8, 2005

Jon T. Hohenthaner, Esq.
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:     <u>Lucent v. Gateway Inc., et al.</u>
        USDC-S.D. Cal. – 02-CV-2060 B (WMC), consolidated with
        Case No. 03-CV-06699-B (WMC) and Case No. 03-CV-1108-B (WMC)

Dear Mr. Hohenthaner:

Please be advised that documents bearing bates numbers MSLT_0604692 through
MSLT_0609018 are available for inspection and/or coping at Fish & Richard's
San Diego office.

Thank you for your attention to this matter. Please call if you have any questions.

Very truly yours,

Ben Harjo
Senior Litigation Paralegal

Exhibit 35  Page 1081

Exhibit 36

# FISH & RICHARDSON P.C.

12390 El Camino Real
San Diego, California
92130

Telephone
858 678-5070

Facsimile
858 678-5099

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

<u>VIA FACSIMILE</u>

December 27, 2005

**FR**

AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Joseph A. Loy.
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Re:   <u>Lucent v. Gateway Inc., et al.</u>
      USDC-S.D. Cal. – 02-CV-2060 B (WMC), consolidated with
      Case No. 03-CV-06699-B (WMC) and Case No. 03-CV-1108-B (WMC)

Dear Mr. Loy:

Please be advised that documents bearing bates numbers MSLT_1015031 through MSLT_1015999 are available for inspection and/or coping at Fish & Richardson's San Diego office.

Thank you  for your attention to this matter. Please call if you have any questions.

Very truly yours,

Ben Harjo
Senior Litigation Paralegal

Exhibit 36   Page 1082

# FISH & RICHARDSON P.C.

12390 El Camino Real
San Diego, California
92130

Telephone
858 678-5070

Facsimile
858 678-5099

Web Site
www.fr.com

**Date**  December 27, 2005

**To**   Joseph A. Loy, Esq.
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Telephone: (212) 446-4800

**Facsimile number**  (212) 446-4900

**From**  Ben Harjo

**Re**   Lucent v. Gateway Inc., et al.
USDC-S.D. Cal. – 02-CV-2060 B (WMC)

**Number of pages including this page**  2

**Message**

NOTE: This facsimile is intended for the addressee only and may contain privileged or confidential information.  If you have received this facsimile in error, please immediately call us collect at 858 678-5070 to arrange for its return.  Thank you.

Exhibit 36   Page 1083