W. Bryan Farney, Esq. (*Pro Hac Vice*)
Jeffrey B. Plies, Esq. (*Pro Hac Vice*)
DECHERT LLP
300 W. Sixth Street, Suite 1850
Austin, Texas 78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001

David J. Zubkoff, Esq. (SBN 149488)
SELTZER CAPLAN McMAHON VITEK
A Law Corporation
750 "B" Street, Suite 2100
San Diego, California 92101
Telephone: (619) 685-3003
Facsimile: (619) 702-6827

Attorneys for Defendants and Counter-Claimants:
GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES, INC.,
GATEWAY MANUFACTURING LLC, AND
COWABUNGA ENTERPRISES, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., | Case 07-CV-2000 (MLH) |
| Plaintiff and Counter-Defendant, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF GATEWAY'S MOTIONS IN LIMINE** |
| v. | |
| GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | Date: February 11, 2008<br>Time: 10:30 a.m.<br>Courtroom: 13<br>Judge: Hon. Marilyn L. Huff |
| Defendants and Counter-Claimants, | |
| and | |
| MICROSOFT CORPORATION, | |
| Intervener and Counter-Claimant. | |
| AND CONSOLIDATED CASES | |

# TABLE OF MOTIONS

I.  MOTION IN LIMINE NO. 1:  PRECLUDE THE REASONABLE ROYALTY OPINIONS OF ROGER S. SMITH......................................................................... 1

    A.  The Court Already Rejected Smith's Original Opinions. .................................. 2

    B.  Smith's Primary Position In His Belated New Report Should Be Under The Doctrines Of Collateral Estoppel And Law Of The Case ................................. 4

    C.  Smith's Alternative Position In His New Opinion Should Be Precluded Under The Doctrines Of Collateral Estoppel And Law Of The Case, And On Grounds That It Is Wholly Unreliable And Speculative .................................................. 4

        1.  Smith's belated second alternative opinion, formed to avoid this Court's prior rulings, is barred by collateral estoppel and law of the case ...................... 4

        2.  Smith's belated alternative opinions, formed in an attempt to avoid this Court's prior rulings, is wholly unreliable and should also be precluded on that basis .......................................................................................... 6

II.  MOTION IN LIMINE NO. 2:  EXCLUDE THE LICENSES GATEWAY AND DELL ENTERED INTO WITH IBM AS ALLEGED REASONABLE ROYALTY EVIDENCE......... 7

III.  MOTION IN LIMINE NO. 3:  PRECLUDE EVIDENCE OR ARGUMENT REGARDING KENNETH RUBENSTEIN'S OPINIONS ABOUT THE VIDEO-CODING PATENTS...........8

    A.  Rubenstein's Opinion Letter Is Hearsay To Which No Exception Applies ..................... 9

    B.  Rubenstein's Opinions Are Inadmissible Under Fed. R. Evid. 702 ................................ 9

    C.  Rubenstein's Opinions Do Not Constitute Permissible Lay Opinion Testimony............ 10

    D.  Using Lucent's "Licensing Expert," Roger Smith, As A Conduit For Rubenstein's Opinions Violates Rule 703 ....................................................................... .11

    E.  The Rubenstein Letter Should Be Excluded Under Rule 403. ....................................... ..12

IV.  MOTION IN LIMINE NO. 4:  PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANALYSIS OF GDI SOURCE CODE IN AN EFFORT TO SUPPORT HIS INFRINGEMENT OPINIONS...................................................................12

V.  MOTION IN LIMINE NO. 5:  PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANY TESTIMONY OR OPINION RAISED IN HIS UNTIMELY DECLARATION...................................................................................13

VI.  MOTION IN LIMINE NO. 6:  PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANY TESTIMONY OR OPINION REGARDING CONCEPTION, DILIGENCE OR REDUCTION TO PRACTICE....................................................15

Gateway's Group 4 Motion in Limine No. 3:                                      Case Nos. 07-CV-2000 (MLH)
Lucent Should Be Precluded From Seeking Damages For the Day
Patent on the Entire Computer
                                    i

VII.  MOTION IN LIMINE NO. 7:  PRECLUDE LUCENT'S EXPERT ON THE FLEMING  '759 PATENT FROM PROVIDING ANY TESTIMONY REGARDING SECONDARY CONSIDERATIONS…………………………………………………………………15

VIII.  MOTION IN LIMINE NO. 8:  PRECLUDE EVIDENCE OR ARGUMENT OF  INDIRECT INFRINGEMENT OF DAY PATENT BY QUICKEN NEW USER EDITION………………17

    A.  Lucent Cannot Show That Gateway Necessarily Infringes Claim 19 Of The Day Patent..................................................................................................................... 17

    B.  Lucent Has Failed To Provide Any Evidence, Circumstantial Or Otherwise, Of Specific Instances Of Direct Infringement .................................................... 18

IX.  MOTION IN LIMINE NO. 9:  PRECLUDE LUCENT'S EXPERT FROM TESTIFYING REGARDING GATEWAY WEB PAGES THAT HAVE NEVER BEEN ADEQUATELY  IDENTIFIED OR PRODUCED ...................................................... 20

X.  MOTION IN LIMINE NO. 10:  PRECLUDE LUCENT FROM OFFERING EVIDENCE OR ARGUMENT OF CONCEPTION OR REDUCTION TO PRACTICE PRIOR TO THE FILING DATE OF THE DAY '356 PATENT .................................................. 21

XI.  MOTION IN LIMINE NO. 11:  PRECLUDE LUCENT AND ITS EXPERT FROM OFFERING LEGALLY IRRELEVANT EVIDENCE AND ARGUMENT REGARDING ALLEGED PRIOR ART TO THE DAY '356 PATENT ........................................... 22

XII.  MOTION IN LIMINE NO. 12:  PRECLUDE TESTIMONY OR ARGUMENT CONTRARY TO THE COURT'S CLAIM CONSTRUCTION OF THE DAY '356 PATENT .......................................................................................................... 23

# I. MOTION IN LIMINE NO. 1: PRECLUDE THE REASONABLE ROYALTY OPINIONS OF ROGER S. SMITH

Gateway moves in limine[1] to preclude Lucent from offering Roger S. Smith's opinions as to a reasonable royalty for licensing the patents in suit. Smith's original set of opinions in this case served as the basis for his testimony in the first trial. But his damages opinions were rejected by this Court in post-trial motions, and the damages verdict was reversed.[2] As a consequence, Smith recently, and improperly, proposed an *entirely different ("alternative") set of opinions*. *See* Ex. A[3], Second Supp. Smith Report at 1. In his belated supplemental report, Smith presents two distinct damages theories—as his <u>first</u> (primary) opinion, he merely reurges his original opinion in the event this Court reverses its earlier post-trialing ruling; but as his <u>second</u> (alternative) opinion, he introduces a new "reasonable royalty" theory applying a different royalty rate to a different royalty base.

In his original reports and again as his primary opinions in his belated supplemental report, Smith proffers the following damages opinions:[4]

- <u>Video Patents</u> – 0.5% **on the entire computer** containing relevant software (i.e., Windows, but not less than $1.50 per entire computer;

- <u>Day Patent</u> – 1% **on the entire computer** for any computer that included accused software, such as Microsoft Money and others; and

- <u>Fleming Patent</u> – 1% **on the entire computer** but not less than $2.00 per computer.

In his new report, Smith now offers the following damages opinion:[5]

- <u>Video Patents</u> – $1.50 **on the entire computer**;

- <u>Day Patent</u> – 8% on the retail sales price of the software containing the feature (such as Microsoft Money); and

- <u>Fleming Patent</u> – 8% on the retail sales price of the software containing the feature (such as Microsoft Windows).

The first option Smith presented, simply his earlier rejected testimony, must necessarily be precluded on the straightforward application of the doctrine of collateral estoppel and law of the case. The newly proposed alternative option must also be precluded. In addition to the fact it was provided too late in

---

[1] Dell, Inc. joins in all of Gateway's motions *in limine*; Microsoft joins Gateway's motions *in limine* Nos. 1-3 & 9-12.
[2] *Lucent Technologies Inc. v. Gateway, Inc.*, 509 F. Supp.2d 912 (S.D. Cal. Aug. 6, 2007) ("JMOL Order").
[3] All lettered exhibits are Confidential and attached to Gateway's Notice of Lodgment submitted to the Court under seal contemporaneously with this motion and are cited in the text as "Ex. __."
[4] *See* Ex. C, "Common Elements In The First And Second Opinions Of Lucent's damages Expert Roger Smith."
[5] *See* Ex. A.

Gateway's Group 4 Motion in Limine No. 3:
Lucent Should Be Precluded From Seeking Damages For the Day Patent on the Entire Computer
Case Nos. 07-CV-2000 (MLH)
1

1 violation of the discovery order in this case, it suffers from the same flaws as the first opinion, and

2 suffers from additional admissibility flaws.

3     **A.    The Court Already Rejected Smith's Original Opinions.**

4     Smith concedes that the first alternative set forth in his belated supplemental report is simply the

5 same as his original opinions. Those original opinions use the entire computer as the royalty base,

6 though the infringing feature may only be a small part of the computer. This is referred to as the "Entire

7 Market Value" Rule ("EMV Rule").[6] Even Smith has had to acknowledge that this Court has concluded

8 that "use of the entire infringing computer system as a base for the reasonable royalty constituted an

9 application of the entire market value rule, and ***the evidence in the case did not permit use of the rule***."

10 Ex. A at 1 (emphasis added). Specifically, the Court held that Smith's opinions, and the evidence he

11 cited, could not establish the required "link between the cost of the *computers* (rather than the operating

12 system . . . or some other 'unit') and the customer demand or value of the patented technology" and was

13 thus against the weight of the evidence and contrary to law. JMOL Order at 936-37.

14     The second ground upon which this Court rejected the first Smith opinion was that it relied upon

15 inadequate evidence. The Court found Smith's assertion that the royalty *rate* should be 0.5% of the

16 price of the entire computer, and that this was less than a purported industry standard rate of 1%, to be

17 unsupported by the scant evidence of record. The Court addressed the evidence cited, and then gave the

18 reasons for rejecting it, as follows:

19 •    Smith's testimony on Lucent's "best licensing practices" and alleged plans to license MPEG and
20      audio-coding patents at 0.5% were too tenuous. JMOL Order at 939 (citing *Hanson v. Alpine*
     *Valley Ski Area*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) holding that "mere offers to license"
21      without actual consummated licenses are insufficient to show an "established" royalty rate);

22 •    Smith's testimony about royalty rates that IBM had used in licensing its hardware in the late-
     1980s when Smith was employed as an IBM in-house lawyer were "hardware licenses, not
23      licenses for software or features of software comparable to the products in suit." *Id.*

24 These flaws, and misapplication of the EMV Rule, apply equally to Smith's belated "alternative"

25 opinions.

26

27 ─────────────
[6]The entire market value rule ("EMV rule") applies only where the evidence shows that (1) patented and unpatented
28 components are sold together as a functional unit "so as to produce a desired end product or result;" and (2) the patented component is "the basis for customer demand or 'substantially create the value of the component parts.'" *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549-50 (Fed. Cir. 1995) (citations omitted).

### B. Smith's Primary Position In His Belated New Report Should Be Precluded Under The Doctrines Of Collateral Estoppel And Law Of The Case.

The first of the two alternative opinions Smith now espouses, which is simply the same as his original theory, fails to satisfy the test for applying the EMV rule for identical reasons and rests equally on inadequate evidence. Lucent is barred by the doctrine of collateral estoppel from relitigating the "reasonable royalty" theory that has already been fully adjudicated and rejected.[7] Lucent cannot dispute that its first damages model was "actually litigated and decided in a former proceeding" in which Lucent had a "full and fair opportunity" to participate. Likewise, Lucent cannot dispute that the JMOL Order, which decided the insufficiency of Lucent's damages model, is a valid, "final" judgment. Moreover, the insufficiency of Lucent's damages model was clearly "necessary" to the JMOL Order.[8] Finally, although the Group II and the forthcoming trial involve different patents and at least some different accused devices and software products, the damages issues (reasonable royalty base *and* rate) do not just "substantially overlap," as issue preclusion requires, they are based on ***precisely the same*** evidence and fundamentally flawed arguments addressed in the JMOL Order.[9] Having had a full, fair opportunity to litigate Smith's first/primary reasonable royalty theory, Lucent must be precluded from revisiting it.[10]

The law of the case doctrine also precludes Lucent from relitigating its legally insufficient damages theory. *See Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). Although a court may depart from the law of the case in limited circumstances inapplicable here, failure to apply the law of the case doctrine *absent* those circumstances is an abuse of discretion. *Id*. at 155. The unreliability of Lucent's "reasonable royalty" model has been *expressly* decided—not just decided "by necessary implication," which would have been sufficient. *See id*. Lucent, bound by the law of the case, should not be

---

[7] *See Kamilche Co., v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995); *Security People, Inc. v. Medeco Security Locks, Inc.*, 59 F. Supp.2d 1040, 1044 (N.D. Cal. 1999) (plaintiff barred from relitigating infringement even though intervening settlement included request that summary judgment order regarding infringement be vacated).

[8] *See Masson v. The New Yorker Magazine, Inc.*, 85 F.3d 1394, 1400 (9th Cir. 1996); *Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir. 1988) (quoting 18 C. Wright, A. Miller & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4433, at 308 (1981) for the "established" legal principle that "a final judgment retains all of its *res judicata* consequences pending decision of the appeal"). *See also United States v. Weems*, 49 F.3d 528, 532 (9th Cir. 1995); *see also Pettaway v. Plummer*, 943 F.2d 1041, 1044 (9th Cir. 1991) ("[t]he primary purpose of the rule ... is to ensure that the finder of fact in the first case took sufficient care in determining the issue").

[9] *See* Restatement (Second) of Judgments § 27 cmt. c(1); *see also Kamilche*, 53 F.3d at 1062-62 (finding an issue "identical" to that decided in a prior case though two cases were brought under distinct legal theories and the issue was presented differently in the second case); *Shapely v. Nevada Board of State Prison Commissioners*, 766 F.2d 404, 408 (9th Cir. 1985) (noting preclusive effect of issue in subsequent suits based on different claims); *see also* Ex. C.

[10] *See Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*, 402 U.S. 313, 334 (1971) (emphasizing that preclusion is particularly important in patent litigation because it "is a very costly process").

permitted to relitigate the damages opinions that this Court already has rejected, and which are simply repeated verbatim as the first alternative in Smith's new damages expert report.

### C. Smith's Alternative Position In His New Opinion Should Be Precluded Under The Doctrines Of Collateral Estoppel And Law Of The Case, And On Grounds That It Is Wholly Unreliable And Speculative.

#### 1. Smith's belated second alternative opinion, formed to avoid this Court's prior rulings, is barred by collateral estoppel and law of the case.

In his first report regarding the video coding patents, Smith opined that Lucent's "Best Licensing Practices" required licensing those patents for 0.5% of the price of the computer, with a minimum royalty of $1.50.[11] Now, in his belated alternative opinion he simply says that the royalty would be a flat $1.50 per unit. The basis for this second "new" opinion? Absolutely nothing. In his deposition, Smith simply pointed to the *same* Lucent document used to justify his first opinion. But this Court has already rejected—not just by implication, but **expressly—**Smith's reliance on this "evidence." In the JMOL Order, the Court noted that Smith "testified about internal Lucent documents which indicated that Lucent intended to license its **MPEG [video]** and audio standard patents at 0.5% . . . . Whether these rates were ever implemented and could be considered an established rate was not apparent from the record." JMOL Order at 938-39 (emphasis added). Further, the Court held that he document Smith relied on reflected nothing more than "mere offers to license" that could not stand as evidence of an established royalty rate. *Id.* (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) ("mere offers to license" without actual consummated licenses are insufficient to show an "established" royalty rate for the technology)). Moreover, Smith conceded in his most recent deposition that, because the $1.50 rate derived from a formula applying a 0.5% royalty rate to the price of the entire computer, it necessarily turned on the EMV rule, which as noted has been held to not apply in this case. Ex. B at 176:15-177:15.

Smith's skeletal new opinions as to the Fleming and Day patents are that, *if* Lucent is bound by this Court's JMOL rulings, *then* Smith believes that, alternatively, the parties would have agreed on a royalty of 8% of the "fair market value of the patented portion of the computer system." *See* Ex. A at 1-2. But the only support for Smith's new 8% theory is the ***same two IBM licenses***—containing an 8%

---

[11] Smith's "proof" of Lucent's "best practices" is one document: the "MPEG Video Negotiators Sheet," LUC 127978-979. *See* Ex. D.

royalty rate explicitly **related to manufacturing costs**—that he claimed supported the 1% rate in his first reports. *See* Ex. B at 49:10-19. Yet Smith testified that he "instructed" Hoeberlein, who calculated the damages from Smith's royalties "not to use the underlying manufacturing cost of the software or the computer system" as required by the IBM licenses—that is, Smith simply selected one part of the formula and discarded the rest. *Id*. at 204:21-5. Moreover, Lucent relies **only** on Smith's alleged personal knowledge of licensing practices to support Smith's first (1%) opinion and yet Smith admits that there is absolutely **no evidence** that any licensee, including Gateway or Dell, *ever* paid royalties based on Smith's alternative royalty theory or that Lucent ever considered such a royalty as part of a legitimate licensing policy. *See id.* at 37:17-38:21. Indeed, Smith himself previously denigrated the 8% rate he now appropriates, stating it had never been seriously considered in the industry. *See id.* at 40:19-41:25.

Additionally, the 8% calculation suffers from the same flawed application of the EMV rule that caused the Court to reject Smith's first opinions. Although some of Smith's "alternative" opinions involve a seemingly narrower base, that base is still **unrelated** to the value of the discrete patented features when the EMV rule requires evidence of a **clear nexus**. *See* Ex. 1,[12] "Entire Market Value Rule Evidence Chart." Again, Smith merely **assumes**, without any evidentiary basis, that the patented feature drives the sale of the entire "patented product" on which his proffered alternative royalty is based.[13] Finally, the product price on which the alternative royalty is allegedly based is unsupported and is contrary to the IBM licenses themselves, which requires consideration of manufacturing costs. Thus, even if the 8% royalty *rate* were supported by the record (which it is not), the *base* Smith uses in his

---

[12] All numbered exhibits are attached to the Declaration of Jeffrey B. Plies, filed electronically with this motion and are cited in the text as "Ex. __."

[13] Lucent claims that the modes patented in Fleming, which it claims comprise a part of Windows, drive the sale of the entire computer. However, there is no evidence to support this assertion and, indeed, there is no evidence even that the alleged patented modes even drive the sale of Windows. Windows has many features that do not even use the patented modes and, of course, computers have many, many uses beyond simply running Windows. Similarly, the on-screen tools in Quicken can be disabled at the option of the user, and Quicken can, of course be used without ever using those tools. (Doc. 1495-2, Case 02-2060, Flannery Decl. in Support of Opp. to MSJ, 4/13/07 at ¶ 10). Moreover, there is **no** evidence that **any** consumer **ever** bought Quicken solely because of the allegedly patented tools; indeed, most of the accused units on which Lucent seeks a royalty were preloaded on Gateway computers absent any customer request, so the tools **cannot** have driven the sale of those units. Likewise, there is **no** evidence that the patented features of the video-coding patents drove the sale of Windows Media Player or any other relevant software.

alternative is still absurdly inflated and entirely unsubstantiated.[14]

In short, Smith admits he relies upon the *same* two IBM licenses and the *same* alleged knowledge of IBM hardware licensing, and concedes that his second opinions do not rest on new or additional facts. Ex. B at 174:11-175:21. This Court has already found the evidence upon which Smith relies to be "too tenuous" to apply to the case at bar. Straightforward application of the doctrines of collateral estoppel and law of the case should require rejecting the new theory as well. Moreover, in each case, the video coding patents, Day patent, and the Fleming patent, Smith's new alternative opinion also violates the EMV rule. With respect to the royalty *base*, Smith seeks to apply his unsupported royalty rate not to the whole computer, but to the entire "product" containing the patented feature. Yet again, however, Smith has absolutely no evidence to rely on to establish the "link between the cost of the [patented product] . . . and the customer demand or value of the patented technology." JMOL Order at 935. Thus, because there is no discernible difference between Smith's first and second opinions, when seen in light of the Court's JMOL Order, the doctrines of collateral estoppel and law of the case preclude Lucent and Smith from presenting either at trial.[15]

> **2.** **Smith's belated alternative opinions, formed in an attempt to avoid this Court's prior rulings, is wholly unreliable and should also be precluded on that basis.**

Independent of any application of collateral estoppel or law of the case doctrine, Smith's second "alternative" opinions should also be rejected as wholly unreliable. In short, Smith rendered one set of opinions based on evidence that the Court rejected as against the weight of the evidence and contrary to law. He now submits a new theory, sixteen months after the close of expert discovery, which is not based on any new evidence, and not based on any change in the law, but instead is based on the same evidence and rendered only because the previous one was rejected under existing law. This belated report is inadmissible. That he can render two independent damages opinions from the same evidence

---

[14] For instance, for a time Gateway provided Quicken New User Edition *free and preloaded* to all buying its computers. Gateway neither paid Intuit nor charged its customers for the product. No record evidence supports the assumption that Gateway would ever have agreed to pay a royalty that assigned a value of approximately $80 to 100% of its products when, for the vast majority of these products, it received *nothing* in exchange. Using a $200 value for Windows or a $28 value for Money suffers from similar flaws, as no evidence exists that Gateway ever paid Microsoft or received from its customers anything approaching that amount for Windows.

[15] A detailed comparison of Smith's first and second opinions can be found in Ex. C, "Common Elements In The First And Second Opinions Of Lucent's Damages Expert Roger Smith."

renders Smith unreliable and his opinions should be barred on that basis alone. *See Schudel v. General Electric Co.*, 35 Fed. Appx. 484, 488 (9th Cir. 2002) (affirming decision not to permit a retrial because expert testimony, revised to address problems that arose after the initial trial, was, by virtue of being revised, "*fatally undermined*," unreliable, and inadmissible) (emphasis added).

Because Smith's primary and "alternative" reasonable royalty opinions are profoundly misleading, confusing, unfairly prejudicial, and legally unfounded, they must be precluded.

## II. MOTION IN LIMINE NO. 2: EXCLUDE THE LICENSES GATEWAY AND DELL ENTERED INTO WITH IBM AS ALLEGED REASONABLE ROYALTY EVIDENCE

Gateway further moves for the exclusion of the computer hardware licenses between Gateway and IBM, Ex. 2, and Dell and IBM, Ex. 3, which Lucent intends to offer as evidence of an alleged industry standard reasonable royalty related to the *Lucent* patents in suit.

As noted above in Motion in Limine No. 1, Judge Brewster has already held that the Dell and Gateway licenses with IBM are irrelevant and insufficient to support Lucent's expert's first reasonable royalty analysis. JMOL Order at 940. It is thus appropriate with respect to this first opinion to exclude these licenses as irrelevant and likely only to confuse the issues and mislead the jury. FED. R. EVID. 403; *see, e.g., United States v. Sua*, 307 F.3d 1150, 1153 (9th Cir. 2002); *Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996). Now, however, Smith has submitted his belated "supplemental" opinion relying on *these same licenses* purportedly to support an "alternative theory" that the reasonable royalty should be 8% of the value of the "patented portion" of the accused products. These licenses are even less relevant and more likely to confuse in this context than using them for Smith's first opinion would have been for the following reasons:

First, Lucent and Smith have forcefully asserted that these licenses are evidence that the 1% per product royalty rate that formed the basis of Smith's first opinion was the alleged "industry standard" royalty rate, *to the exclusion of any other rate*. Permitting them now to argue equally forcefully that these same licenses are evidence of an 8% royalty rate would quite simply beggar logic. Such an argument can serve virtually no purpose *other than* to confuse and mislead the jury and to waste enormous amounts of trial time as the Defendants work to unravel the tangle of contradictions and inconsistencies between Smith's two opinions.

Second, Smith himself concedes that he does not know of *any* party who at *any* time ever agreed to pay the 8% royalty rate for *any* product, much less for products similar to the products at issue in this suit. Thus, the licenses cannot in any sense stand for the proposition that this 8% rate would ever have been considered reasonable by any company in the industry. Under these circumstances, jury confusion and unfair prejudice seem inevitable.

Third, Smith testified that he instructed Hoeberlein, Lucent's other damages expert, to ignore the royalty calculation set out in the IBM licenses and "not to use the underlying manufacturing cost of the software or the computer system"—that is, Smith simply selected one part of the formula and discarded the rest.[16] Ex. B at 24:2-27:2; 204:21-205:5. Thus, allowing Lucent to present these two licenses as purported evidence that Hoeberlein's royalty calculations are reasonable would be a misrepresentation that would mislead the jury because the licenses ***do not*** support Hoeberlein's calculation method, nor does ***any other evidence in the record***. Again, reversing the effect of this misrepresentation will result in confusion, undue prejudice and a tremendous waste of time.

Fourth, the Gateway license was executed with IBM in May 1990, and the Dell agreement was entered in June 1988—so the agreements were executed six and eight years, respectively, before the time for the hypothetical negotiation relating to any one of the four remaining patents-in-suit.[17] *See* JMOL Order at 939. Moreover, both of these agreements were superseded by later agreements amending the royalty rate. S*ee* Ex. B at 36:8-22. Thus, the licenses cannot be representative of the royalty that would have been agreed upon at the relevant time, nor can they be considered evidence of the royalty that would have prevailed throughout the life of the hypothetical license. Again, the licenses are not relevant and can serve only to confuse the issues and mislead the jury.

---

[16] A particularly egregious example of this appears in Hoeberlein's calculation of damages for the Day patent. Lucent contends that an aspect of the graphic display of Microsoft's Outlook software infringes. However, in calculating the royalty, Hoeberlein assessed an 8% royalty on the entire <u>retail</u> sales price of Microsoft Office, which is a suite of software products including Microsoft Word and Microsoft Powerpoint. Hoeberlein makes no attempt to determine the actual part of the sales price that can be attributed to Outlook, nor to assess the actual selling price for this product by Gateway.

[17] According to Smith's initial expert reports in this case, the following are the dates when the parties' hypothetical license negotiations would have taken place for each of the remaining patents-in-suit: (a) the '356 Day Patent (August 1996 for Microsoft, February 1997 for Dell and September 1997 for Gateway); (b) the '759 Fleming patent ("mid 1995" for all defendants); (c) the '226 Haskell patent ("in or about 1996" for all defendants); and (d) the '272 Netravali patent ("in or about 1996" for all defendants).

Therefore, the Dell and Gateway licenses with IBM should be excluded and Smith and Lucent should be precluded from mentioning them at trial.

## III. MOTION IN LIMINE NO. 3: PRECLUDE EVIDENCE OR ARGUMENT REGARDING KENNETH RUBENSTEIN'S OPINIONS ABOUT THE VIDEO-CODING PATENTS

Nearly twelve years ago, Kenneth Rubenstein, an attorney involved with the licensing consortium MPEG LA, prepared a letter to Lucent that characterized the two asserted video patents as being allegedly "essential" to the MPEG-2 video compression standard. Ex. E, Rubenstein letter dated 10/31/96, LUC 1141382-403. Although Rubenstein has never been shown to be a technical expert in video coding and did not have this court's claim constructions available at the time the letter was prepared, Lucent intends to introduce this letter or have its experts refer to it[18] in the hope that the jury will then view the asserted patents as "essential" to the MPEG-2 standard, and thus, that the Defendants' MPEG-2 products infringe these patents. Testimony or argument relating to the Rubenstein letter should be excluded, however, under Fed. R. Evid. 802, 702, 701, 703, and 403.

### A. Rubenstein's Opinion Letter Is Hearsay To Which No Exception Applies.

The Rubenstein letter is an out-of-court statement Lucent would like to offer for the truth of the matter asserted—*i.e.*, that its video-coding patents are "essential" to MPEG. But hearsay is inadmissible unless a valid exception applies. *See* Fed. R. Evid. 803. None applies here. In particular, the Rubenstein letter is neither a business record made and kept in the ordinary course nor possesses the necessary hallmarks of trustworthiness. When deposed, Rubenstein stated that the purpose of the letter was to "satisfy the concerns" of Lucent to facilitate its continued participation in the forming of MPEG LA. Ex. F, K. Rubenstein 05/04/06 Depo. at 106:1-107:18*; see also id.* at 130:13-131:7 (letter was to satisfy Lucent's "concerns and issues"); 132:15-133:2 (same). Moreover, Rubenstein expressly testified that preparing the letter was *not* "normal policy" but instead an "exception" to the way in which business was normally conducted. *Id.* at 107:2-18; 131:2-7. In sum, the letter was prepared under extraordinary circumstances by an entrepreneur trying to encourage Lucent to participate in the MPEG LA licensing consortium. Under such circumstances, the Rubenstein letter is plainly not a business

---

[18] Lucent has also tried to use its damages expert, Roger Smith, as an illicit conduit for the opinions in the Rubenstein letter. *See* Ex. C at 03/31/06 Expert Report Of Roger S. Smith Regarding Damages Issues Pertaining To Lucent Video Coding Patents, p. 11 n.16 & n.18.

1 record and lacks the hallmarks of reliability associated with exceptions to the hearsay rule. *See, e.g.,*

2 *McEuin v. Crown Equipment Corp.*, 328 F.3d 1028, 1034 (9th Cir. 2003) (finding "independent

3 engineering reports" properly excluded "as inadmissible hearsay").

4     **B.**      **Rubenstein's Opinions Are Inadmissible Under Fed. R. Evid. 702.**

5     The Rubenstein letter includes a technical analysis in which the claims of the video patents are

6 applied against the MPEG-2 technical standard. No party, however, has designated Rubenstein as an

7 expert as Fed. R. Civ. P. 26(a)(2)(A) requires. Moreover, there is no evidence that Rubenstein has even

8 ordinary skill in the art, let alone expertise in video coding. According to Lucent's own technical expert,

9 "a person of *ordinary* skill in the art of video compression throughout the 1980s would have had *at least*

10 a Bachelor of Science degree in electrical engineering or a related field *and* 2 years experience in the

11 area of video compression systems." Ex. G, Rebuttal Expert Report Of Professor Bernd Girod

12 Regarding Validity Of Lucent's 4,383,373 And 4,958,226 Patents at 9. In contrast, Rubenstein has

13 degrees in physics and law, and since the 1980s he has worked principally as a lawyer. Ex. F at 10:15-

14 11:13. Since Rubenstein does not even satisfy Lucent's expert's notion of a person of "ordinary skill,"

15 Lucent cannot demonstrate that he is an *expert* sufficiently qualified by "knowledge, skill, experience,

16 training, or education" to opine about video compression technology as required by Fed. R. Evid. 702.

17     Additionally, even if Rubenstein were an expert in video coding, it is clear that his opinions are

18 also prohibited by Fed. R. Evid. 702 because they are not based on sufficient facts or data and are the

19 product of unreliable principles and methods. In particular, an analysis as to whether a patent claim

20 reads upon an accused product or process must take into account a *court's determination* as to "the

21 scope and meaning of the asserted claims." *Lacks Indus., Inc. v. McKechnie Vehicle Components USA,*

22 *Inc*., 322 F.3d 1335, 1341 (Fed. Cir. 2003). Here, Rubenstein did not and could not apply this Court's

23 claim construction orders when he prepared his opinions in 1996, and as a result, his opinions are

24 inherently unreliable.

25     **C.**      **Rubenstein's Opinions Do Not Constitute Permissible Lay Opinion Testimony.**

26     Lucent cannot evade the dictates of Rule 702 by invoking Rule 701, which only permits lay

27 witness opinion testimony that is "***not*** based on scientific, technical, or other specialized knowledge

28 within the scope of Rule 702." Fed. R. Evid. 701 (emphasis added). Indeed, Rule 701 has been

amended "***to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded*** through the simple expedient of proffering an expert in lay witness clothing.... [A] witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701, Adv. Comm. Notes (2000) (emphasis added). Proper lay opinion testimony—mostly "first-hand sensory observations"—is admissible *only* to assist the fact-finder in understanding the *facts*, "not to provide specialized explanations or interpretations that an untrained (lay person) could not make if perceiving the same acts or events." *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). Thus, Rubenstein's "specialized opinions" cannot be shoehorned into evidence through Rule 701.

### D. Using Lucent's "Licensing Expert," Roger Smith, As A Conduit For Rubenstein's Opinions Violates Rule 703.

In his expert report, Smith cites to the Rubenstein letter and states: "I understand that this patent has been determined by an independent expert to be essential to the practice of the MPEG-2 standards." Ex. C at 03/31/06 Smith Video Report, p. 11. Lucent should be prevented from attempting to introduce either the Rubenstein letter or its conclusions, by using Smith, its damages expert, as a conduit. Indeed, Smith's reliance on the Rubenstein letter is prohibited because it is plainly ***not*** the type of evidence "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" of damages. Fed. R. Evid. 703. Smith's reliance on the Rubenstein letter is gratuitous, unnecessary, and improper for at least four additional reasons. First, damages experts must *assume infringement*. Thus, whether or not a third-party individual believes the patents are "essential" is utterly irrelevant to Smith's opinions as to what the reasonably royalty rate and base should be. Second, as set forth above, Smith has no basis for knowing or assuming that Rubenstein is a qualified technical expert in the field of video-coding technology. Third, it is unreasonable for Smith to rely on the opinion of an individual who did not use the Court's claim constructions in forming his opinions about whether the MPEG-2 standard is covered by the asserted claims. Fourth, Smith cannot act as a conduit for the opinion of another purported expert, and he certainly cannot cloak with the mantle of expertise the conclusion of one who clearly is *not* an expert in the relevant subject matter. *See, e.g., Dura Automotive Systems of Indiana, Inc. v. CTS Corp*., 285 F.3d 609, 613 (7th Cir. 2002) (error to permit one specialist to "parrot" the opinion of an expert in a different field); *United States v. Grey Bear*, 883 F.2d 1382,

1392 (8th Cir. 1989) (hearsay rules may not be circumvented "by testifying that other experts, not present in the courtroom, corroborate his views").  In sum, Smith cannot allude to the Rubenstein letter in any way without offending Rule 703.

**E.     The Rubenstein Letter Should Be Excluded Under Rule 403.**

If Lucent is allowed to introduce or refer to the Rubenstein letter, the results would be unfairly prejudicial to the Defendants.  There is a strong likelihood that the jury will infer from Rubenstein's affiliation with MPEG-LA that the asserted patents are "essential" to the practice of the MPEG-2 standard and hence that the Defendant's MPEG-2 products infringe the asserted patents.  Moreover, exclusion of the letter presents no prejudice to Lucent since it has its own technical expert, Dr. Bernd Girod, who can present Lucent's infringement case to the jury.

**IV.     MOTION IN LIMINE NO. 4:  PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANALYSIS OF GDI SOURCE CODE IN AN EFFORT TO SUPPORT HIS INFRINGEMENT OPINIONS**

On March 31, 2006, Lucent served the expert report of Jake Richter, in which Lucent was obligated to proffer a complete statement of all of Richter's opinions on infringement of the '759 patent and all bases and reasons supporting such opinions. Despite the fact that, prior to proffering Richter's report, Lucent had possession of relevant source code for the Microsoft Windows Graphical Device Interface ("GDI") accused of infringement, Lucent's Combined Opposition To Defendants' Motions for Summary Judgment Re U.S. Patent No. 4,439,759 ("Lucent Opp.") at 12, fn. 6, filed Under Seal in Case 02-2060 on 04/12/07, Richter did not discuss or analyze any GDI source code in his report or his infringement claim charts.  Moreover, in the more than 400 pages of exhibits attached to Richter's report, he did not attach even one page of source code produced in this case.

The first time Richter ever mentioned having reviewed the GDI source code was in a declaration he submitted on April 12, 2007, in support of Lucent's opposition to a motion for summary judgment on noninfringement.  *See* Doc. 1423-1, Case 02-2060, 04/12/07 Richter Declaration at ¶ 23.  This declaration was submitted over a year after Richter was obligated to provide all of the bases and reasons supporting his infringement contentions.

Lucent provides no excuse for this severe lapse in Richter's expert report, except to assert that in the hundreds of items listed in the "List of Materials Reviewed and Considered" attached as Exhibit B to

his report there was an entry that referenced the "Deposition Transcript of Kenneth Sykes and Exhibits" and that some source code was used as an exhibit at that deposition. Lucent Opp. at 12, fn. 6. Under no stretch of imagination can such an obscure and abstruse "reference" be deemed "a complete statement of all opinions to be expressed and the basis and reasons therefore," as required by Rule 26(a)(2)(B). Indeed, it would be contrary to the policy of the Federal Rules if Lucent were permitted to "hide the ball" with respect to a key opinion allegedly supporting its infringement contention by burying the support for that opinion in an exhibit to a deposition cited in passing in the "materials reviewed" list attached as an exhibit to Richter's expert report. *See* Fed. R. Civ. P. 26(a)(2) Advisory Committee's Note (1993 amendment).

Thus, Richter cannot provide any testimony analyzing the GDI source code, as any such analysis has never been previously disclosed—even in Richter's untimely declaration. Similarly, any attempt by Lucent (or by Richter) to legitimize Richter's infringement opinions by arguing that such opinions are supported by Richter's analysis of the GDI source code is entirely untimely and objectionable. In fact, Lucent never made Richter available for deposition on the issues raised in his untimely declaration, and even prevented questioning about infringement issues when Richter was deposed on invalidity issues on November 14, 2007. *See* Ex. 4, J. Richter 11/14/07 Depo. at 380:5-10.

Were Richter permitted to provide analysis of the GDI source at trial, the Prejudice to Gateway would be extreme; Lucent has provided no reason for its gross negligence in excluding an analysis of the source code as a basis of its infringement contentions in Richter's expert report. Indeed, Lucent has not and cannot provide substantial justification for Richter's failure to even mention much less analyze the GDI source code in his expert report, especially when Lucent has admitted that it obtained the source code during discovery. *See* Lucent Opp. at 12 n.6. Because Richter's failure to analyze the GDI source code in his expert report was neither justified nor harmless, Richter should be precluded from testifying at trial that the GDI source code supports his infringement opinions.

## V.    MOTION IN LIMINE NO. 5:  PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANY TESTIMONY OR OPINION RAISED IN HIS UNTIMELY DECLARATION

With respect to all of the asserted claims of the '759 patent, Lucent and its expert admit that the accused products do not have the same structure (algorithm) as the corresponding structure identified in

the Court's Claim Construction Order. Instead, Lucent and its expert assert that the structure in the accused product is equivalent under § 112, ¶ 6. As the Federal Circuit has explained, proof of structural equivalence requires a particular showing:

> Under § 112, ¶ 6 equivalence, functional identity is required. … The content of the test for insubstantial differences under § 112, ¶ 6 thus reduces to "way" and "result." That is, the statutory equivalence analysis ***requires*** a determination of whether the "way" the assertedly substitute structure performs the claimed function, and the ***"result"*** of that performance, is substantially different from the "way" the claimed function is performed by the "corresponding structure, acts, or materials described in the specification," or its ***"result."*** Structural equivalence under § 112, ¶ 6 is met only if the differences are insubstantial; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way ***to achieve substantially the same result*** as the corresponding structure described in the specification.

*Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (citations omitted) (emphasis added). In his expert report, Richter provides only one two-sentence opinion regarding the substantial similarity between the corresponding structure disclosed in the '759 patent and the structure of the accused products. In paragraph 81 of his report, Richter states, "The corresponding structure disclosed in the '759 patent uses a quantitative analysis of the data in the command and data sequence to select the mode, whereas the Accused Products use a qualitative analysis. In my opinion, the difference between a qualitative and quantitative evaluation of the data in a command and data sequence is insubstantial." *See* ¶ 22, Jake Richter 03/31/06 Expert Report, filed Under Seal in Case 02-2060 on 04/12/07. Nowhere in his report does Richter explain what he means by "qualitative" or "quantitative" analysis nor does he describe how the differences between these types of analyses is "insubstantial."

In the face of a summary judgment motion on noninfringement, Lucent realized that Richter's opinions on this issue were grossly deficient, thus Lucent submitted a new and untimely declaration from Richter in which he provided new testimony in an effort to establish equivalence under § 112, ¶ 6. Defendants Gateway and Dell formally objected to Richter's untimely declaration, arguing that it expressed new opinions that fell outside the scope of the opinions previously put forth in his expert report. Although the Court ruled that the declaration did not offer new opinions, the Court specifically held that Richter's declaration was only "admissible for consideration in regards to the instant summary judgment motions." *See* Doc. 1814, Case 02-2060, Order Re Defendants' Summary Judgment Motions of Non-Infringement at 4. Thus, the Court did not rule that the Richter's declaration was incorporated

into his expert report. Lucent itself also failed to incorporate any of Richter's analysis from his declaration into any supplemental expert report. Additionally, Lucent never made Richter available for deposition on these issues. In fact, when Gateway recently deposed Richter regarding invalidity issues, Lucent's counsel prevented Richter from answering any questions regarding infringement. *See* Ex. 4 at 380:5-10 ("Mr. Marina: Are you trying to—are you going back to the—this deposition is limited to his second supplemental report—or his supplemental rebuttal report. It sounds to me like you're trying to revisit infringement issues. I just want to get the ground rules straight").

The only opinion in Richter's expert report regarding the structural equivalence of the asserted claims and the accused products is a two-sentence, conclusory statement. Richter never provided any further explanation in an expert report under Rule 26, and Gateway was not permitted to question Richter on the testimony provided in his untimely declaration. This has severely prejudiced Gateway because it has been unable to determine the basis for Richter's opinion. Moreover, Lucent provided no substantial justification for Richter's failure to elaborate on his structural equivalence opinion in an expert report. Accordingly, Lucent should be precluded from introducing any expert testimony at trial that was raised for the first time in Richter's untimely declaration.

## VI. MOTION IN LIMINE NO. 6: PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANY TESTIMONY OR OPINION REGARDING CONCEPTION, DILIGENCE OR REDUCTION TO PRACTICE

Nowhere in any expert report does Richter opine on conception, reduction to practice, or diligence with respect to any asserted claim of the '759 patent. Thus, Richter must be precluded from testifying with respect to these issues at trial. Fed. R. Evid. 403; Fed. R. Civ. P. 26(a)(2)(B).

## VII. MOTION IN LIMINE NO. 7: PRECLUDE LUCENT'S EXPERT ON THE FLEMING '759 PATENT FROM PROVIDING ANY TESTIMONY REGARDING SECONDARY CONSIDERATIONS

Richter never provided any independent opinion regarding secondary considerations; instead, he merely adopted a two-sentence interrogatory response provided by Lucent. Ex. 5, Rebuttal Expert of Jake Richter, 05/12/06 at ¶ 149. In that interrogatory response, Lucent contends the Fleming '759 patent has enjoyed "industry acceptance" because it "forms the basis of the color display capabilities specified by the North American Presentation Level Protocal (sic) Syntax (NAPLPS)," which was supposedly widely adopted. Ex. 6, Lucent's Second Supp. Response to Dell, Inc.'s Interrogatory No. 14, 02/22/06.

1   However, even if this factual contention were correct (which it is not), Lucent, and therefore, Richter,

2   has offered no evidence suggesting that the Fleming '759 patent, in particular, drove the supposed

3   "industry acceptance" of NAPLPS. *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed.

4   Cir. 1999) (patentee bears the burden of establishing a nexus between the claimed features and the

5   secondary consideration of non-obviousness); *Standard Mfg. Co., Inc. v. U.S.*, 25 Cl. Ct. 1, 78 (1991)

6   ("[T]he Federal Circuit has stated clearly that the nexus is a required condition to the relevancy of the

7   objective evidence.").

8          Where, as here, the patent is—when considered in the light most favorable to Lucent—just one

9   part of the NAPLPS standard, Lucent must present prima facie evidence of a nexus between the patent

10  and the alleged industry adoption.  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387,

11  1392 (Fed. Cir. 1988); *Sjolund v. Musland*, 847 F.2d 1573, 1582 (Fed. Cir. 1988) (jury not entitled to

12  infer success due to patented invention when the evidence showed that other factors were responsible).[19]

13  However, Lucent has presented absolutely no evidence of the required nexus.  Thus, permitting Lucent

14  to argue that alleged industry adoption of NAPLPS is a secondary consideration of nonobviousness will

15  mislead the jury, confuse the issues, and waste trial time.  This conclusion gains even more force when

16  one considers that the Defendants have put forth evidence of several other, even more plausible reasons

17  for any acceptance of NAPLPS.  For example:

18  •      AT&T's monopoly power at the time it was lobbying for the adoption of the standard could
        strongly have contributed to the alleged adoption. *Cable Electric Product, Inc. v. Genmark, Inc*.,
19      770 F.2d 1015, 1027 (Fed. Cir. 1985) (success must be tied to the claimed invention and not to
        economic and commercial factors).

20  •      At least three other patents covered the NAPLPS standard, and the technology claimed in those
21      patents, or even unpatented technology, could have caused alleged adoption.  *See* Ex. 7,
        "Videotex Battle Lines Are Formed"; Ex. 8, U.S. Patent Nos. 4,439,761; 4,396,989; 4,454,593.

22  •      AT&T, Lucent's predecessor, agreed to license all four patents royalty free, thereby encouraging
23      adoption of the standard without risk of suit. Ex. 9, Computerworld 3/28/83, AT&T Agrees to
        License Videotex Technology Free.

24

25

26

27

28

---

[19] Other courts have refused to draw a nexus between a particular patent and the secondary consideration when the product at issue is covered by more than one patent. *American Standard, Inc. v. York Intern. Corp.,* 244 F.Supp.2d 990 (W.D. Wis. 2002)*; see also Polaroid Corp. v. Eastman Kodak Co.*, 641 F.Supp. 828, 833 (D. Mass. 1986).

1    Thus, Lucent's has no opinion and no evidence to support any argument related to secondary

2    considerations, and it would be prejudicial and contrary to the disclosure requirements to permit Lucent

3    to introduce such testimony for the first time at trial. Fed. R. Evid. 403; Fed. R. Civ. P. 26(a)(2)(B).

4    **VIII.  MOTION IN LIMINE NO. 8:  PRECLUDE EVIDENCE OR ARGUMENT OF**
     **INDIRECT INFRINGEMENT OF DAY PATENT BY QUICKEN NEW USER EDITION**

5    To prove inducement or contributory infringement, Lucent must establish that Gateway's

6    customers *directly* infringed these claims by actually performing the claimed method. *See Dynacore*

7    *Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1277 (Fed. Cir. 2004) ("'absent direct

8    infringement of the claims of a Patent, there can be neither contributory infringement nor inducement of

9    infringement.'") (citation omitted); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773-74 (Fed. Cir. 1993)

10   ("[A] method or process claim is directly infringed only when the process is performed. . . . Liability for

11   either active inducement of infringement or for contributory infringement is dependent upon the

12   existence of direct infringement."); *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir.

13   2006) ("the patentee always has the burden to show direct infringement for each instance of indirect

14   infringement."). Thus, Lucent must prove that a Gateway customer used Quicken New User Edition

15   ("QNUE") to perform *every step* of method claim 19 (the only asserted claim) in order to show direct

16   infringement. Further, proof of such infringement requires that a "patentee must either point to [1]

17   specific instances of direct infringement or [2] show that the accused device necessarily infringes the

18   patent in suit." *Acco Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307, 1313 (Fed. Cir.

19   2007). Lucent has no evidence on either point so any indirect infringement argument would confuse the

20   issues and mislead the jury. FED. R. EVID. 403.

21   **A.    Lucent Cannot Show That Gateway Necessarily Infringes Claim 19 Of The Day**
     **Patent.**

22

23   Lucent theorizes that a Gateway customer may have directly infringed method claim 19 of the

24   Day Patent by using the QNUE pre-loaded on Gateway computers. However, QNUE was provided free

25   of charge and without the customer's request. Thus, before even reaching the question of whether

26   QNUE *necessarily* infringes the Day patent, Lucent must show that Gateway customers actually even

27   knew they had QNUE on their computers and that they then actually chose to use it. There is no

28   evidence in the record on either of these points. To the extent that a Gateway customer *ever even used*

QNUE (or any other version of Quicken for that matter), Lucent cannot prove that such use necessarily infringes method claim 19 of the Day patent. *Acco Brands, Inc.*, 501 F.3d at 1313.

Indeed, there is strong evidence to the contrary. With respect to Quicken, Lucent asserts that the use of the menu, calculator, and calendar tools in the Checkbook Register module infringes claim 19. *See* Doc. 1367, Case 02-2060, 04/02/07 Lucent Brief in Support of Its MSJ Re '356 Patent at 16-19. However, there are numerous uses of Quicken that do not even involve the Checkbook register or its on-screen tools. For example, Quicken provides online banking, budgeting, scheduled bill payments, and report generation, none of which implicate the Checkbook register. *See* ¶ 58, Dale E. Buscaino 05/12/06 Expert Report filed Under Seal in Case 02-2060 on 04/16/07. Moreover, the user can disable the allegedly infringing on-screen tools, thereby providing a non-infringing use for the Checkbook Register itself. *See* Doc. 1495-2, Case 02-2060 at ¶ 10. Thus, even if there were evidence that customers actually used QNUE (which there is not), there is no evidence that QNUE (or any version of Quicken) necessarily infringes.

Finally, Lucent cannot show that Gateway's computers themselves necessarily infringe claim 19 of the Day patent. Gateway's computers are general purpose computing devices that have hundreds of non-infringing uses having nothing to do with Quicken or method claim 19 of the Day patent. *E-Pass Technologies, Inc. v. 3COM Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (finding no direct infringement by a general purpose PDA with numerous non-infringing uses and no evidence of actual direct infringement). They do not necessarily infringe the Day patent.

### B. Lucent Has Failed To Provide Any Evidence, Circumstantial Or Otherwise, Of Specific Instances Of Direct Infringement.

Having failed to provide any evidence that Gateway computers with QNUE installed necessarily infringe the Day patent, Lucent must now prove "specific instances of direct infringement" in order to maintain a claim for indirect infringement. *Acco*, 501 F.3d at 1313. However, Lucent has not and cannot provide any such evidence, circumstantial or otherwise, so its argument regarding contributory infringement and inducement with respect to the Day patent is unfounded and must be barred from the jury. *Id.*; *Dynacore Holdings Corp.*, 363 F.3d at 1277 (requiring that a plaintiff point to a specific act of direct infringement rather than relying on the theoretical possibility of infringement in order to

1  demonstrate indirect infringement); *E-Pass Technologies, Inc.*, 473 F.3d at 1222.

2  Lucent will claim to have circumstantial evidence of indirect infringement because its expert has

3  asserted that Gateway's website contained a link to instructions for Quicken Deluxe 2000. *See* pages 7,

4  43-45, 59-60, 106-107 of B. Tognazzini 03/31/06 Expert Report filed Under Seal in Case 02-2060 on

5  04/16/07. Lucent will claim this supports a conclusion that some customer somewhere must have

6  performed the infringing method of claim 19. However, this speculative argument for direct

7  infringement has been made before to the Federal Circuit and *denied*. In *E-Pass Technologies, Inc. v.*

8  *3COM Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007), the defendants sold general-purpose computing

9  devices, much like Gateway's computers, that were allegedly capable of performing the claimed

10  method, but which could also be used for a variety of other purposes. *Id.* In addition, as in this case,

11  there were instructions that allegedly taught an infringing method. In finding for the defendant, the

12  Federal Circuit ruled that such evidence was insufficient to establish that the customers actually

13  performed the claimed method. *Id.* The court held that, "[i]f, as E-Pass argues, it is 'unfathomable' that

14  no user in possession of one of the accused devices and its manual has practiced the accused method, E-

15  Pass should have had no difficulty in meeting its burden of proof and in introducing testimony of even

16  one such user." *Id.* at 1222-23 (emphasis added).

17  Here, Lucent's only indirect infringement argument is that at least one Gateway customer must

18  have used Quicken to perform the asserted method. Such an argument is simply too speculative to be

19  presented to the jury.[20] *Dynacore Holdings Corp.*, 363 F.3d at 1277 (finding no direct infringement

20  when the plaintiff "raise[s] little other than a theoretical possibility or metaphysical doubt").

21  Moreover, Lucent fails utterly to demonstrate "specific instances" of direct infringement as

22  required under *Acco Brands, Inc.* Rather, the circumstantial evidence provided creates only a general

23  impression that one instance of infringement possibly could have occurred. Lucent proffers *no* evidence

24  of "specific instances of direct infringement." *Acco Brands, Inc.*, 501 F.3d at 1313. As noted, Lucent

25

26  [20] Lucent may also attempt to assert that their expert, Bruce Tognazzini, will testify that he actually performed the steps of the claimed method on a computer with Quicken software thereby proving a specific instance of direct infringement. Tognazzini

27  Rep. at 7, 43-45, 59-60, filed Under Seal with the Court in Case 02-2060 on 04/16/07. However, such evidence, if proffered, would be completely inadequate. *Acco Brands, Inc.*, 501 F.3d at 1313. (stating that plaintiff's expert's testimony that he

28  used the accused device in an infringing manner failed to prove a "specific instances of direct infringement."); *See also Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004).

has no evidence that Gateway's customers were even aware of the presence of QNUE on their computers, let alone that Gateway's customers ever actually used this software *and* used the software in such a way as to use the features alleged to infringe. Significantly, Lucent took no discovery from Gateway customers. Lucent cannot now be permitted to argue indirect infringement by QNUE because it will confuse the issues, mislead the jury, and unfairly prejudice Gateway. FED. R. EVID. 403.

## IX. MOTION IN LIMINE NO. 9: PRECLUDE LUCENT'S EXPERT FROM TESTIFYING REGARDING GATEWAY WEB PAGES THAT HAVE NEVER BEEN ADEQUATELY IDENTIFIED OR PRODUCED

Gateway respectfully moves this Court for an order precluding Lucent from presenting any evidence or argument at trial relating to the web pages cited in the Tognazzini Expert Report Relating To Gateway's Infringement of the Day patent dated March 31,2006, allegedly to establish indirect infringement by Gateway. The allegedly infringing software includes Quicken, MS Money and MS Outlook.

In an attempt to establish indirect infringement of the Day patent, Lucent relies upon the opinion of Tognazzini to establish Gateway's "knowledge and intent regarding the use of systems and software sold." *See* Section VII (D), B. Tognazzini 03/31/06 Expert Report filed Under Seal in Case 02-2060 on 04/16/07. Tognazzini, however, rests his opinion solely on the conclusory assertion that "Gateway intend[s] for users to install and use the software that forms part of the accused devices." *Id.* at ¶ 352. The only evidence Tognazzini cites in support of these opinions are URL addresses for web pages allegedly associated with Gateway. *See* ¶ 352 fn 48. However, Lucent has steadfastly refused to produce printouts of the web pages Tognazzini actually considered and relied upon in forming his opinion despite Gateway's repeated requests for their production and despite an agreement between the parties to produce any documents, not previously produced, that were relied upon by their experts. Ex. 10, 01/19/07 S. Daniels Letter to J. Hohenthaner; Ex. 11, 01/23/07 E. Hayes Letter to S. Daniels; Ex. 12, 01/24/07 S. Daniels Letter to E. Hayes; Ex. 12, 01/25/07 E. Hayes Letter to S. Daniels.

Lucent's failure to produce printouts of the actual web pages that ostensibly form the basis of Tognazzini's opinion and to provide basic information regarding the web pages, such as when they were posted and, if posted, when they were last updated (*see* Exs. 10– 13), violates not only its agreement with Gateway but also its disclosure obligations. Worse, Lucent's refusal to produce the web pages

Tognazzini relied on makes it impossible for Gateway to assess whether the web pages are relevant to Lucent's indirect infringement claims and to defend against Lucent's assertion that Gateway possessed the requisite intent necessary to establish indirect infringement of the Day patent. As such, Lucent should be prohibited from admitting any evidence or arguments related to the web pages relied upon by Tognazzini.

Permitting Lucent's expert to testify regarding the contents of these alleged web pages, without requiring Lucent actually to produce the pages themselves will inevitably result in misleading the jury, confusing the issues, and unfairly prejudicing Gateway. Lucent's expert should be precluded from making any reference to these alleged web pages, which form the exclusive basis for his opinion on alleged indirect infringement of the Day patent.

## X. MOTION IN LIMINE NO. 10: PRECLUDE LUCENT FROM OFFERING EVIDENCE OR ARGUMENT OF CONCEPTION OR REDUCTION TO PRACTICE PRIOR TO THE FILING DATE OF THE DAY PATENT

Gateway moves *in limine* under Fed. R. Civ. Proc. 37(c)(1) and Fed. R. Evid. 403 to preclude Lucent from offering any evidence or argument that the invention disclosed in the Day patent was conceived or reduced to practice prior to the filing date. It is a well-settled principle of patent law that, in order for a patent claim to be entitled to a conception or reduction-to-practice date earlier than the filing date, the earlier date must be supported by corroborating evidence. *Sandt Technology Ltd. v. Resco Metal & Plastics Corp.,* 264 F.3d 1344, 1350 (Fed. Cir. 2001) ("It is well-established in our case law that a party claiming his own prior inventorship must proffer evidence corroborating his testimony."); *Cooper v. Goldfarb*, 154 F.3d 1321, 1330 (Fed. Cir. 1998) ("In order to establish an actual reduction to practice, an inventor's testimony must be corroborated by independent evidence.").

The Day patent application was filed on December 11, 1986. Lucent has alleged that the purported invention disclosed in this application "was conceived at least as early as March 22, 1985 and reduced to practice at least as early as December 11, 1986." *See* Ex. 14, Lucent's Second Supp. Response to Interrogatory No. 4 from Microsoft, Dell, and Gateway, 2/06/06 at 5:21-22. To date[21] Lucent has failed, however, to disclose **any** evidence corroborating a conception or reduction to practice

---

[21] The deadline for fact discovery regarding the Day patent was February 24, 2006, and the deadline for expert discovery was July 7, 2006. See Doc. 384, Case 02-2060, Order Following Discovery Conference, January 9, 2006.

earlier than the filing date.  The closest Lucent has come is the conclusory statement in its interrogatory response that "documents demonstrating the conception, reduction to practice, and/or diligence include the patent and corresponding file history."  *See id.* at 5:23-24.  A review of the Day patent and file history, however, reveals that *none* of these documents even allude to (much less corroborate) a prior conception or reduction to practice.  Indeed, Lucent's own technical expert, Tognazzini, has testified that his opinion regarding the validity of the Day patent assumes an invention date "at the end of 1986."  *See* Ex. 15, B. Tognazzini 11/20/07 Depo. at 49:1-11.

Having failed to disclose any evidence that might corroborate earlier conception or reduction to practice, Lucent is prohibited under Fed. R. Civ. Proc. 37(c)(1) from introducing such evidence at trial.  *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1118 (C.D. Cal. 2002) ("[A] preclusion sanction shall be imposed unless the party failing to disclose the information acted with substantial justification or the failure to disclose was harmless.").  The burden of showing substantial justification and harmlessness rests squarely on Lucent.  *Cambridge Electronics Corp. v. MGA Electronics Inc.*, 227 F.R.D. 313, 324 (C.D. Cal. 2004).

Furthermore, because corroborating evidence is a prerequisite for proving earlier conception or reduction to practice, and because any such corroborative evidence for the Day patent is precluded by 37(c)(1), Lucent cannot legally sustain an assertion of an earlier date.  Therefore, ***any*** testimony or argument by Lucent regarding earlier conception or reduction to practice would be time-wasting, confusing, misleading, and unfairly prejudicial, and should be precluded under Fed. R. Evid. 403.

## XI.   MOTION IN LIMINE NO. 11:  PRECLUDE LUCENT AND ITS EXPERT FROM OFFERING LEGALLY IRRELEVANT EVIDENCE AND ARGUMENT REGARDING ALLEGED PRIOR ART TO THE DAY PATENT

Gateway also moves in limine to preclude Lucent and Lucent's expert, Tognazzini, from offering misleading and legally irrelevant testimony and arguments regarding the Foreign Exchange Front End ("FXFE") and the Tyler article prior art references.  Lucent makes several legally irrelevant and therefore misleading arguments regarding FXFE and the Tyler article:  (1) that the system was a prototype, (2) that the system and article were not enabling, (3) that the demonstration was not public because it was not open to the general public and Tyler never used the system himself, and (4) that the system was never commercialized.  Allowing this testimony and argument will likely mislead the jury

1    into believing it is relevant to the validity of the patent, which it is not, thereby creating confusion and

2    unfair prejudice to Gateway.  Lucent's arguments should be excluded under both FRE 402 and 403.

3            First, Lucent and Tognazini repeatedly refer to the FXFE system as "unfinished," "incomplete,"

4    a "prototype," a "beta-test," or an "experimental" system.  *See, e.g.,* Doc. 157, Case 07-2000, Lucent's

5    Opposition to Defendants' MSJ Re '356 Patent at 11-12 and Doc. 158-11, Case 07-2000, Tognazini

6    Declaration at ¶ 61.  Whether or not FXFE is a prototype or beta-test version has no effect on the public

7    use inquiry.  The Federal Circuit has found a public use even when the prior art device was a prototype

8    or still under development.[22]  Lucent's insinuations to the contrary are legally irrelevant and should be

9    excluded.

10           Second, Lucent has argued that the FXFE demonstration and the Tyler article are not enabling.

11   Doc. 157, Case 07-2000 at 14.  Tognazzini, however, has not provided any opinion, in his expert reports

12   or otherwise, that the Tyler Article and FXFE are not enabling.  Moreover, the Federal Circuit has made

13   clear that a prior public use need not be enabling.[23]  The Federal Circuit also held that prior art

14   publications need not be enabling when used as obviousness references because they are prior art for

15   whatever they disclose.[24]  Thus, whether FXFE and the Tyler article are "enabling" is entirely irrelevant

16   and Lucent should not be allowed to confuse the jury with these allegations.  Since Tognazzini has not

17   provided any opinion on enablement of FXFE or Tyler, he should not be allowed to present any

18   testimony on this issue at trial.[25]

19           Third, Lucent has argued that FXFE was shown in a "private" meeting.  Doc. 157, Case 07-2000

20   at 13.  This characterization would unfairly mislead the jury by suggesting that the demonstration was

21   not "public" under the "public use" standard, which is not true.  Whether or not an alleged use

22   constitutes a "public use" turns upon whether there is an "expectation of confidentiality" surrounding the

23

24   ─────────────────────────
     [22]  *See Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1481 (Fed. Cir. 1986) ("Also, the fact that minor
25   modifications were made and a third prototype built subsequent to the Osborne demonstration does not raise a material issue
     of fact in this instance.").  *See also Eolas* Tech. *Inc. v. Microsoft*, 399 F.3d 1325, 1333 (Fed. Cir. 2005); *Netscape Comm.*
26   *Corp. v. Konrad*, 295 F.3d 1315, 1321 (Fed. Cir. 2002).
     [23]  *See, e.g., In re Epstein*, 32 F.3d 1559, 1567-68, (Fed. Cir.1994) ("Beyond this 'in public use or on sale' finding, there is no
27   requirement for an enablement-type inquiry.").
     [24]  *See Amgen Inc. v. Hoechst Marion* Roussel*, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003) ("enablement of the prior art is not
28   a requirement to prove invalidity under § 103.").
     [25]  *02 Continental Lab. Prods., Inc. v. Medax Intl., Inc.*, 195 F.R.D. 675, 676 (S.D. Cal. 2000) (exclusion for failure to disclose
     expert evidence is generally "automatic and mandatory").

prior art use.[26] Here, the undisputed evidence shows that the demonstration was made for Tyler in order to *publicize* FXFE in an article, and that article was in fact *published* as the Tyler article. *See* Ex. 16, M. Tyler 12/27/07 Depo. at 149:10-150:16; Doc. 157-9, Case 07-2000, R. Long 12/10/07 Depo. at 113:19-25. Thus, Lucent's characterization of this plainly public use as a "private demonstration" is legally incorrect and irrelevant and would unfairly confuse and mislead the jury.

Fourth, Lucent and Tognazzini argue that FXFE was never commercialized, another legally irrelevant point. Doc. 157, Case 07-2000 at 13 and Doc. 158-11, Case 07-2000 at ¶ 61. The Federal Circuit has never required a device to be fully finished and commercialized before the use of that device can be a public use.[27] Lucent's irrelevant evidence and argument related to the Day '356 patent should therefore be precluded.

## XII. MOTION IN LIMINE NO. 12: PRECLUDE TESTIMONY OR ARGUMENT CONTRARY TO THE COURT'S CLAIM CONSTRUCTION OF THE DAY '356 PATENT

Gateway further moves in limine to preclude Lucent, and Lucent's expert, Tognazzini, from making arguments or presenting testimony that is contrary to this Court's claim construction of the Day '356 patent. In some cases, Lucent continues to make arguments regarding the claim construction that have been rejected by the Court. Allowing the jury to hear such arguments would be misleading and unfairly prejudicial. Specifically, Lucent makes three arguments contrary to the Court's claim construction that should be precluded: (1) that there must be a window overlaying the form; (2) that the tools must be supplied by the application rather than the operating system; and (3) that the computer's display must be in a bit-mapped mode rather than an alphanumeric mode.

First, Lucent and Tognazzini incorrectly assert that FXFE does not satisfy claim 19 because the Court construed "concurrently displaying" as meaning "displaying at the same time, as by a window overlaying the form," so the Court requires that there be a window overlaying the form. Doc. 157, Case 07-2000 at 18; Doc. 157-11, Case 07-2000 at ¶ 54. The Court previously considered and *explicitly rejected* this *exact* argument:

---

[26] *See, e.g., Adenta GMBH v. Orthoarm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007) (defining public use as "any public use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.") (citations omitted).

[27] *See, e.g., Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1481 (Fed. Cir. 1986) ("There is no requirement that an invention function perfectly in order to be reduced to practice or considered as on sale or in public use.") (citations omitted).

> Lucent also argues that the tools in Apple Lisa are not concurrently displayed because the numbers pad and tape window are side-by-side rather than one overlaying the other. This argument fails. Although the Court provided the definition of concurrently displaying to include the example "as by a window overlaying the form," that phrase is an example of the definition of "displaying at the same time." **The Court's construction does not exclude side-by-side displays such as those present in Apple Lisa**.

Doc. 1795, Case 02-2000, Order Denying Cross-Motions Re '356 Patent at 7 n.3 (emphasis added). Thus, Lucent's continued assertion of this argument is contrary to this Court's construction, and therefore irrelevant, misleading, and confusing to the jury.

Second, Lucent and Tognazzini argue that the FXFE prior art does not disclose the limitation "predefined tool[s] associated with said one of said fields" because there is no indication that the on-screen keyboard shown in the Tyler article was provided by the application program rather than the operating system. Doc. 157, Case 07-2000 at 16; Doc. 157-11 at ¶ 56. Nothing in the claim or the Court's claim construction requires the method steps be performed by an application program rather than the operating system. Such unsupported argument contrary to claim language and the Court's claim construction is irrelevant, misleading, and confusing.

Third, Lucent and Tognazzini argue that "a tool adapted to allow said user to compose said information" requires operation in a bit-mapped mode rather than an alphanumeric mode because the Court's claim construction requires "a graphical keyboard tool or a graphical number keypad tool." Doc. 157, Case 07-2000 at 18, 25; Doc. 158-11, Case 07-2000 at ¶ 59.[28] Yet the Court's use of the term "graphical" in the construction only requires an on-screen representation of a keyboard rather than a physical keyboard on a desk. Nothing in the claim or the Court's claim construction suggests the narrow reading urged by Lucent, and allowing such irrelevant argument will only confuse and mislead the jury.

Dated: January 14, 2007                    DECHERT LLP


                                           By:    /s/*Jeffrey B. Plies*_____
                                                  Jeffrey B. Plies

                                           ATTORNEYS FOR DEFENDANTS AND

---

[28] This argument does not appear in any of Tognazzini's expert reports and was not disclosed to Gateway until after he was deposed. This prejudicially deprived Gateway of the opportunity to depose Tognazzini on this issue and should be stricken on this basis alone.

COUNTER-CLAIMANTS: GATEWAY, INC.,
GATEWAY COUNTRY STORES LLC, GATEWAY
COMPANIES, INC., GATEWAY
MANUFACTURING LLC, AND COWABUNGA
ENTERPRISES, INC.