# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC.,

    Plaintiff,

  v.

GATEWAY, INC., GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES,
INC., GATEWAY MANUFACTURING LLC
and COWABUNGA ENTERPRISES, INC.,

    Defendants,
  and

MICROSOFT CORPORATION,

    Intervener.

---

MICROSOFT CORPORATION,

    Plaintiff,
  v.

LUCENT TECHNOLOGIES INC.,

    Defendant.

---

LUCENT TECHNOLOGIES INC.,

    Plaintiff,

  v.

DELL INC.,

    Defendant.

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB)
Case No. 03-CV-1108 B (CAB)

## REBUTTAL EXPERT REPORT OF JAKE RICHTER

### May 12, 2006

Exhibit 5 Page 1

**Introduction**

1.   I submit this Report in response to the "Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent No, 4,439,759" dated March 31, 2006.  I have read Dr. Wedig's report and, as explained below, it is my opinion that none of the references cited by Dr. Wedig, alone or in combination, anticipate or render obvious claims 1-4 of U.S. Patent No. 4,439,759 ("the '759 patent").

2.   I also submit this report in response to the "Expert Report of the Honorable Gerald J. Mossinghoff on U.S. Patent No. 4,439,759 Granted to Fleming et al." dated March 31, 2006.  I have read Mr. Mossinghoff's report and, as explained below, it is my opinion that the SIGGRAPH report (referred to herein as "GSPC-2") discussed by Mr. Mossinghoff was not material to the patentability of the '759 patent.

**Qualifications**

3.   My background and qualifications are described in my March 31, 2006 Expert Report regarding Dell's and Gateway's infringement of the '759 patent, which I incorporate by reference herein.

**Technology Background**

4.   As set forth in my March 31, 2006 Report, I expect to testify at trial as an expert witness with respect to display technology.  I expect to testify concerning the structure and operation of display hardware and software and provide a tutorial on these subjects.  I also expect to provide a tutorial on the history and development of display technology.

5.   I have also reviewed Dr. Wedig's technical background discussion, and I take issue with a number of points he makes in that section.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 1
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 2

6. For example, in paragraph 10 of his report, Dr. Wedig asserts that by using an 8-bit per pixel frame buffer or video memory, 256 predefined colors can be displayed on the screen, and that by employing a color map, this "limitation can be relaxed." Dr. Wedig misses the key point of using a color map. A graphics hardware designer at the time of filing of the '759 patent application could offer a much broader range of color options by providing a deeper frame buffer (*e.g.*, 24 bits per pixel with 8 bits per each of red, green, and blue, for 16,777,216 million possible colors where each pixel of a display could conceivably have a unique color). The problem with this approach, however, was that a deeper frame buffer typically resulted in significantly increased cost, complexity, and reduced resolution. Use of a color map was a desirable alternative because it provided a reasonable compromise between cost and display flexibility. A color map, however, does not increase the number of colors that are displayable on the screen at any one time.

7. In paragraph 11 of his report, Dr. Wedig states that "A Color Map holds the colors currently being displayed on the display screen of an image display system…" This is incorrect. A color map holds color data values that may be displayed on the display screen of an image display system as a result of a color look-up or translation of data from the frame buffer, but there is no requirement that all the color data values in a color map be displayed or used. Dr. Wedig appears to be confusing video memory (or frame buffer) with a color map.

8. Dr. Wedig's conclusion at the end of in paragraph 11 that "A Color Memory provides a way to display more possible colors than would be possible with only the Video Memory" is also incorrect, as indicated above. A color memory does not increase the number of colors

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 2
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 3

displayable from a video memory or frame buffer. If the color memory is editable, it merely allows the displayable colors to be chosen from a potentially broader palette of colors.

9. In paragraph 14 of his report, Dr. Wedig attempts to equate an in-use color with a color "that is to be used for all future drawing commands." But this definition is inconsistent with the Court's constructions for "in-use foreground color" and "in-use background color" as colors that will be used by subsequently received text and graphics drawings commands until changed.

**The '759 Patent**

10. In my March 31, 2006 Report, I provide a background discussion of the '759 patent. I incorporate that discussion by reference herein.

11. I also read Dr. Wedig's discussion of the '759 patent, and disagree with a number of the points he makes.

12. For example, in paragraph 16 of his report, Dr. Wedig states that the '759 patent "discusses that the problem of incompatible Color Memories across various manufacturers of these graphics display systems provides the motivation for the development of a terminal-independent Color Memory." (*See also, e.g.,* Wedig report paragraph 13). However, as discussed in my March 31, 2006 Report and in the '759 patent itself (*see* col. 1), the '759 patent addresses larger incompatibility problems with video display systems.

13. In paragraph 17 of his report, Dr. Wedig states that "For example, in one disclosed mode, indices into a Color Map for the foreground and background colors are specified to determine which particular Color Data Values are accessed for displaying the foreground and background portions of the displayed object." But this ignores the Court's constructions for "in-

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 3
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 4

use foregound color" and "in-use background color," which require that the colors be used for subsequently received text and graphics drawing commands until changed, and not "object display" commands. Dr. Wedig makes this mistake in paragraphs 18 and 19 as well.

14. In paragraph 18 of his report, Dr. Wedig states that the modes of access of claim 1 of the '759 patent are "modes of access to the Color Data Values in the Color Memory." Claim 1, however, does not require that a mode of access be a mode of access to the color memory, and this argument was rejected by the Court at the claim construction hearing. (*See* July 6, 2005 Hearing Tr. at 68-72.)

15. In paragraph 19 of his report, Dr. Wedig states that, in relation to the second mode of access of claim 1, a color value is specified by a particular entry or index in the color memory. This is not correct. The in-use color is specified by an index into the color memory. This index value is used for drawing text or graphics into the frame buffer, and is then later used during display update to present a particular color related to that index value when a pixel with that index value is to be displayed from the frame buffer.

**The Court's Claim Construction Order**

16. I have reviewed the Court's November 15, 2005 claim construction Order concerning the '759 patent and have used the constructions set forth in that Order in forming my opinions in this case.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 4
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 5

## Validity - Legal Principles

*Presumption of Validity*

17. I have been informed by counsel that each claim of an issued patent is presumed to be valid. I further understand that a party challenging a patent's validity must present clear and convincing evidence to overcome the presumption that an issued patent is valid.

*Anticipation*

18. I have been informed by counsel that a patent claim is invalid for anticipation only if a single prior art reference discloses each and every element of the claim exactly and as arranged as set forth in the claim. The prior art reference must be a publicly accessible printed publication and include a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them without undue experimentation. I understand that a reference that fails to disclose expressly one or more elements of the patent claim may nevertheless anticipate the claim if the missing elements are disclosed inherently. I further understand that an element is disclosed inherently only if it is necessarily present in the process or product described in the prior art reference. Elements that may or may not be present based on the express disclosure of a reference are not inherently disclosed.

*Obviousness*

19. I have been informed by counsel that a patent claim is invalid for obviousness if the invention described in the claim would have been obvious to a person of ordinary skill in the art at the time the invention was made. I understand that multiple references can be combined with one another, or with the knowledge of a person of ordinary skill in the art, to render a claim

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 5
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 6

obvious. I also understand that obviousness is not established simply because all of the elements of a patent claim can be found in the prior art. Rather, the prior art (or the knowledge of a person of ordinary skill in the art) must provide some motivation or suggestion to combine those elements in the same way that a patent claim combines them, and must also suggest that the combination would have a reasonable likelihood of success. It is not sufficient that the references are in the same general field. I further understand that obviousness cannot properly be established through hindsight, and that elements from different references, or different embodiments of a single reference, cannot be picked and chosen to create the claimed invention using the patent itself as a roadmap.

20. I have also been informed by counsel that an obviousness analysis requires consideration of the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the art, and any secondary considerations of nonobviousness. I understand that secondary considerations of nonobviousness may include commercial success of products or processes using the invention, long felt need for the invention, failure of others to make the invention, industry acceptance of the invention, licensing of the invention, copying of the invention by others, initial skepticism aimed at the invention, and unexpected results achieved by the invention.

*Written Description, Enablement, and Best Mode*

21. I have been informed by counsel that a patent's written description must support the claims to demonstrate the inventor possessed the invention at the time the patent application was filed. I have been informed by counsel that a patent's written description must also enable one of ordinary skill in the art at the time of the patent application was filed to make and use the claimed

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 6
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 7

invention. I understand that a written description is considered to be enabling even though some experimentation may be required to make and use the invention, so long as that experimentation is not undue. I further understand that, in assessing enablement, a patent specification need not disclose what is already known to a person of ordinary skill in the art.

22. I have also been informed by counsel that the best mode for carrying out the invention claimed in a patent contemplated by the inventor at the time of the application must be disclosed in the patent application. I also understand that an inventor is not required to disclose the best mode for all aspects of an invention's commercial use or to disclose an unclaimed element of the invention when the element is not necessary to the operation of the claimed invention. I also understand that later discovered modes need not be added to an application in progress or to an issued patent.

### Level Of Ordinary Skill In The Art

23. As indicated above, many of the grounds for invalidity of a patent are based on the knowledge of one of ordinary skill in the pertinent art. A person of ordinary skill in the art pertinent to the '759 patent in the early 1980s would have had at least a Bachelor of Science degree in electrical engineering, computer engineering, or computer science with at least 2 years of experience in the field of computer graphics, or, alternatively, a person of ordinary skill in the art would be an engineer holding a Master of Science degree in electrical engineering, computer engineering, or computer science who has pursued a course of study relating to computer graphics technology. Dr. Wedig and I appear to be in agreement on this issue. The only difference is my addition of a computer science degree, which is directly pertinent to the '759 patent.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 7
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 8

*Materiality*

24. I understand that patent applicants have a duty to disclose to the examiner and the United States Patent and Trademark Office information of which they are aware that is material to the determination of patentability of the application.

## Analysis

25. I have reviewed Dr. Wedig's report and the references he cites, and, as discussed in further detail below, it is my opinion that none of the references cited by Dr. Wedig anticipate or render obvious claims 1-4 of the '759 patent.

26. I note that in paragraph 23 of his report, Dr. Wedig states that "if the art on which I have based that conclusion did not put the claimed concepts precisely within the public grasp, then the art makes the claims so obvious that the claims readily could be within the public grasp." Dr. Wedig has provided no analysis in support of this statement. Should Dr. Wedig be permitted to offer any such analysis at trial, I reserve the right to offer rebuttal testimony.

27. I also note that Dr. Wedig has not offered an opinion on Dell's and Gateway's best mode and written description defenses, which are alleged in Defendants' responses to Lucent Interrogatory No. 1. Should Dr. Wedig be permitted to offer an opinion on these defenses at trial, I reserve the right to offer rebuttal testimony. Additionally, I have reviewed the Defendants' contentions, the '759 patent, its file history, the inventor and prosecuting attorney depositions, and the documents cited by the Defendants, and see no evidence of a written description or best mode violation.

28. I also note that Dr. Wedig has not offered an opinion on Dell's and Gateway's counterclaims relating to VESA VBE. Should Dr. Wedig be permitted to offer an opinion on

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 8
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 9

these counterclaims at trial, I reserve the right to offer rebuttal testimony. Additionally, it is my opinion that the '759 patent is not essential to practice of the VESA VBE standard. For example, the VESA VBE standard does not address in-use foreground or background colors and does not require the same or equivalent corresponding structure as the asserted claims of the '759 patent.

**Foley et al.: "Raster Graphics Extensions to the Graphics Compatibility System (GCS)"**

29. I have reviewed the "Raster Graphics Extensions to the Graphics Compatibility System (GCS)" reference ("Foley") cited by Dr. Wedig, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to describe how Foley discloses, whether expressly or inherently, all of the elements of claims 1-4 of the '759 patent, or how Foley provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that Foley neither anticipates nor renders obvious (alone or in combination with any other references cited by Dr. Wedig) claims 1-4 of the '759 patent.

30. As an initial matter, in paragraph 25 of his report, Dr. Wedig attempts to combine Foley with two other later-published papers (discussed in the next section), one of them co-written by Foley, to create a single piece of prior art. I disagree with Dr. Wedig. These references on their face are three distinct papers and constitute three different publications. Dr. Wedig also states that Foley makes reference to these later-published papers at page 4 of Foley, but the references on page 4 of Foley refer merely to Parts II and III of Foley itself. I also note that the two other later-published papers focus solely on the "Core system." The Foley reference, however, as indicated on its cover and in its introduction, is addressed to a different graphics

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 9
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 10

interface, namely the "Graphics Compatibility System" – GCS, and more particularly, the 3D version of GCS, known as GCS-3D (*see* Foley, p. 3).

31. Also, in paragraphs 29 and 30 of his report, Dr. Wedig discusses Lucent's infringement contentions and states that certain commands "do not change how Color Data Values is [sic] accessed from Color Memory as access to Color Memory is taught in the '759 specification and required by Claim 1" and he appears to question whether GDI commands can "define a mode of access." Dr. Wedig raises these same points in his discussion of other references as well. As detailed in my March 31st Report, however, the Accused Products include all of the elements of claims 1-3 of the '759 patent as construed by the Court.

32. With respect to claim 1, Foley fails to disclose the three modes of access required by claim 1. Dr. Wedig points to the function SET_CURRENT_COLOR(R,G,B) defined by Foley at page 39 as disclosing the first mode of access wherein an in-use foreground color is directly specified as a color data value. The Court construed the term "in-use foreground color" as "a color that will be used as the foreground color for subsequently received text and drawing commands until changed." Foley nowhere discloses, however, that the RGB value set by the SET_CURRENT_COLOR(R,G,B) command will be used as the foreground color for subsequently received text and drawing commands until changed. Indeed, nowhere does Foley disclose a color that is used as the foreground color for subsequently received text and graphics commands until changed, nor does Foley identify text or graphics commands that would make use of an in-use foreground color.

33. Dr. Wedig also suggests that the SET_CURRENT_INTENSITY(INTENSITY) function also discloses the first mode of access of claim 1. But Foley makes clear that "intensity"

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 10
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 11

refers to gray scale or gray level functionality, and not a color mode of operation (*see* Foley p. 54, where calling the SET_CURRENT_INTENSITY() function will return an error when the selected view surface is color rather than gray level). The claims of the '759 patent require color.

34. Dr. Wedig points to the SET_CURRENT_COLOR_INDEX(I) function as disclosing the second mode of access of claim 1. However, as discussed above, Foley does not disclose any color that is used as the foreground color for subsequently received text and graphics commands until changed, nor does Foley identify any text or drawing commands that would utilize such a color.

35. Dr. Wedig also points to the SET_CURRENT_INTENSITY_INDEX(I) function as disclosing the second mode of access. However, as I have described above, intensity is a gray level function, and not a color function.

36. For the third mode of access of claim 1, which requires that both an in-use foreground color and an in-use background color be specified as indexes into the color memory, Dr. Wedig points to the SET_BACKGROUND_COLOR_INDEX(INDEX) function (Foley p. 65) as disclosing an in-use background color. In pointing to this function, however, Dr. Wedig ignores the Court's construction of "in-use background color" as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." Foley states at pages 14 and 65 that the SET_BACKGROUND_COLOR_INDEX(INDEX) function sets a static, global background color with which the entire frame in Foley is painted when a newframe request occurs and upon which certain data is then overdrawn: "The global background color (intensity) is set to the color (intensity) with the index of INDEX. This action

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 11
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 12

does not take effect until a newframe occures [sic]." Foley does not disclose a mode of access in which an in-use background color is specified and utilized.

37. Dr. Wedig also again confuses gray levels of intensity with color when he proposes that the SET_BACKGROUND_INTENSITY_INDEX(INDEX) function discloses the third mode of access of claim 1 of the '759 patent. As I discussed above, intensity is a gray-scale concept, not a color concept.

38. Dr. Wedig also does not demonstrate how his purported third mode of access is separate and distinct from his purported second mode of access, in that any drawing done in his purported third mode of access would appear just as it would in the purported second mode of access.

39. Even assuming Foley discloses the three modes of access of claim 1, which it does not, Foley does not disclose any predetermined command and data sequence for selecting any of the modes. Dr. Wedig contends that Foley discloses multiple "display modes" that "implement various hidden surface algorithms" and points to the SELECT_VIEW_SURFACE, SET_DISPLAY_MODE, and SET_VIEW_SURFACE_OVERLAY_MODE functions, and other functions in Exhibit 2. There is no indication in Foley, and Dr. Wedig provides no explanation, as to how these functions select any of the three purported modes of access identified by Dr. Wedig. Indeed, the claims of the '759 patent are not related to view surfaces and do not deal with 3D hidden surface removal techniques or polygonal mesh rendering, and I do not understand why Dr. Wedig believes these functions are even relevant.

40. Because Foley does not disclose the three modes of access required by claim 1 or any predetermined command and data sequence for selecting those modes, it necessarily does not

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 12
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 13

disclose the processing means or display means of claim 1 since they require the three modes of access.

41. Dr. Wedig states in paragraph 35 of his report that "...neither the patent nor Foley disclose nesting commands within commands as do the commands accused by Lucent in Lucent's infringement contentions." It is unclear to me what Dr. Wedig means by this as he provides no elaboration. As detailed in my March 31 Report on infringement, the Accused Products include each element of claims 1-3 as construed by the Court. Dr. Wedig makes this same argument with respect to other references, and he is mistaken for the same reasons.

42. Dr. Wedig addresses claim 2 of the '759 patent in paragraph 37 of his report. Because Foley fails to disclose the three modes of access of claim 1, it does not anticipate claim 2 because the same three modes of access are required by claim 2. The processing means for selecting in claim 2 requires the same structure as it does for the processing means of claim 1:

> Data processor 1 programmed to perform the algorithm shown in Fig. 3: boxes 301-303; Fig. 4: boxes 401-405, 407, 408, and 411 (*See*, Col.5, line 60 - Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), and lines 33-43))

43. Boxes 401-405, 407, 408, and 411 of Fig. 4 of the '759 patent select the three modes of access of claim 1. Hence, the three modes of access of claim 1 are required by claim 2. As discussed above, however, Foley does not disclose the three modes of access. Furthermore, even assuming that these modes of access were disclosed by Foley, which they are not, Foley does not disclose any predetermined command and data sequences for selecting any of the purported modes of access to color memory identified by Dr. Wedig as required by claim 2..

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 13
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 14

44. Because Foley does not disclose the modes of access required by claim 2, it necessarily does not disclose the processing means for selecting or the display means of claim 2.

45. With respect to the processing means for setting of claim 2, Dr. Wedig points to the functions REDEFINE_COLOR_INDEX and REDEFINE_INTENSITY_INDEX (Foley, p. 62-63) as commands that store a color data value in color memory. Additionally, in his Exhibit 2 Dr. Wedig points to the SET_VERTEX_COLORS_BY_INDEX function. As previously discussed, intensities are gray levels, so the REDEFINE_INTENSITY_INDEX function is irrelevant. With respect to the SET_VERTEX_COLORS_BY_INDEX function, as I described above, this function explicitly sets the colors for predefined polygonal vertices and has nothing to do with color memory.

46. With respect to dependent claim 3, in addition to not disclosing all of the elements of claim 2 from which claim 3 depends, Foley does not disclose a second command that sets plural color data values in color memory. The examples Dr. Wedig gives in his report, DEFINE_VERTEX_COLORS_BY_INDEX and DEFINE_VERTEX_INTENSITIES_BY_INDEX, are not set forth in Foley. It appears that Dr. Wedig may have intended to point to the SET_VERTEX_COLORS_BY_INDEX and SET_VERTEX_INTENSITIES_BY_INDEX functions. These functions, however, are irrelevant as they have nothing to do setting color data values in color memory. The SET_VERTEX_COLORS_BY_INDEX function explicitly sets the colors for predefined vertices of a polygon, and has nothing to do with setting color data values in color memory. The SET_VERTEX_INTENSITIES_BY_INDEX function, is an intensity-based function, and

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 14
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 15

therefore a gray level function and not a color function as required by the claims at issue. Neither of these functions accept color data values as input.

47. With respect to claim 3, in Exhibit 2 Dr. Wedig points to the REDEFINE_COLOR_INDEX function as constituting a second command that sets plural color data values in color memory. For the same reasons discussed above with respect to claim 2, this function does not meet this element of claim 3. Furthermore, the REDEFINE_COLOR_INDEX function does not set plural color data values.

48. In paragraph 39 of his report, Dr. Wedig attempts to combine Foley with a later-published paper contributed to by Foley ("GSPC-2," discussed below) to provide additional evidence of a command that sets plural color data values in the color memory. But these are two separate references, neither of which discloses the three modes of access of claim 1 that are also required by claims 2 and 3.

49. Turning to claim 4, Dr. Wedig points to the SET_CURRENT_COLOR(R,G,B) function as disclosing the second step of that claim. However, Dr. Wedig earlier opined that this function directly sets the in-use foreground color (a premise I have also shown to be unsupported), and it does not select a mode of access to the color memory.

50. Dr. Wedig also suggests that the SET_CURRENT_COLOR_INDEX(I) function might suffice to meet the requirements of this element, but this function also does not does not select a mode of access to the color memory.

51. Dr. Wedig also points to the SELECT_VIEW_SURFACE(SURFACE_NAME, COLOR) function, but this function only selects between a monochrome and a color logical view surface. Additionally, he points to the SET_DISPLAY_MODE(MODE) function, but this

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 15
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 16

function only allows for the selection of a polygon rendering mode – fast mode (draw contours only), hidden line mode, or hidden surface mode. Dr. Wedig also points to the SET_VIEW_SURFACE_OVERLAY_ MODE(MODE) function, but this function allows for the selection of a mode of combination between pixels in the frame buffer and new ones being drawn into the frame buffer.

52. Foley also fails to disclose the third step of claim 4. Dr. Wedig proposes that the REDEFINE_COLOR_INDEX(I, R, G, B) function discloses this step, but this function does not set multiple values in the color memory as required by claim 4. Dr. Wedig again also tries to combine Foley with a later-published reference (GSPC-2), but as discussed below GSPC-2 also does not disclose the third step of claim 4.

53. Foley also fails to disclose the fourth step of claim 4, reading a third command for accessing (retrieving) color data values in the color memory. Dr. Wedig only identifies two functions in his report: SET_VERTEX_COLORS(R_ARRAY, G_ARRAY, B_ARRAY) and SET_VERTEX_COLORS_BY_INDEX(INDEX_ARRAY, N). But these functions store color values associated with individual vertices given by a POLYGON or POLYGON_EDGE_LIST command. They do not in any way retrieve color data values in the color memory. In Exhibit 2 Dr. Wedig also points to a number of other functions as supposedly disclosing this step, including: INQUIRE_VERTEX_COLORS(R_ARRAY, G_ARRAY, B_ARRAY), INQUIRE_VERTEX_COLORS_BY_INDEX(INDEX_ARRAY, N), SET_CURRENT_COLOR(R,G,B), SET_CURRENT_INTENSITY_INDEX(I), SET_BACKGROUND_COLOR_INDEX(INDEX), and

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 16
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 17

SET_BACKGROUND_INTENSITY(INTENSITY).  None of these functions, however, access a color memory as required by claim 4.

54. Dr. Wedig also references in paragraph 43 of his report the SET_VERTEX_COLORS and SET_VERTEX_COLORS_BY_INDEX functions, but these functions store color values associated with individual vertices given by a POLYGON or POLYGON_EDGE_LIST command, and are used to render shaded polygons where the displayed colors are interpolated between all vertex colors based on a rendered pixel's distance from each vertex, resulting in a polygon being rendered with varying colors instead of a constant color.  These commands do not select a mode of access to color data values wherein an in-use foreground or background color is specified as an index into the color memory (or otherwise for that matter) in accordance with the Court's claim construction Order.

55. Dr. Wedig also contends that the SET_CURRENT_COLOR_INDEX(I) function or the REDEFINE_COLOR_INDEX(I,R,G,B) functions disclose the fourth step, but Foley does not disclose these functions operating on multiple sets of color data values in a color memory.

56. Because Foley fails to disclose the fourth step of claim 4, it is also fails to disclose the fifth step of claim 4 which references the fourth step.

57. Dr. Wedig also asserts that Foley may be combined with U.S. Patent No. 4,213,189 to Mueller ("Mueller") to render obvious claims 1 and 4 of the '759 patent (*see* paragraph 105 of the Wedig Report). As discussed below in the Mueller section, combining Foley with Mueller does not render claims 1 and 4 obvious.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 17
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 18

58. Accordingly, for at least these reasons, it is my opinion that Foley does not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 1-4 of the '759 patent.

### *Foley et al.: "Some Raster Graphics Extensions to the CORE System" and "Status Report of the Graphic Standard Planning Committee"*

59. I have reviewed "Some Raster Graphics Extensions to the CORE System" (referred to by Dr. Wedig as "GSPC-1")[1] and "Status Report of the Graphic Standards Planning Committee" (referred to as "GSPC-2"), as well as Dr. Wedig's analyses of these references. GSPC-1 and GSPC-2 are the later-published references, one of which was co-authored by Foley, that Dr. Wedig argues should be combined with Foley to form a single reference.

60. Dr. Wedig fails to describe how GSPC-1 and GSPC-2 disclose, whether expressly or inherently, all of the elements of claims 1-4 of the '759 patent, or how GSPC-1 and GSPC-2 provide a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. In my opinion GSPC-1 and GSPC-2 do not anticipate or render obvious (alone or in combination with any other references cited by Dr. Wedig) claims 1-4 of the '759 patent

61. As an initial matter, Dr. Wedig contends that GSPC-1 and GSPC-2 constitute a single publication for purposes of an anticipation analysis. I disagree. GSPC-1 and GSPC-2 are separate and distinct articles that were published in separate issues of the same journal, and hence constitute two separate publications. I further note that Dr. Wedig appears to concede that

---

[1] To avoid confusion, I will use the shorthand names for the references cited in Dr. Wedig's report. I believe, however, that referring to "Some Raster Graphics Extensions to the CORE System" as a "GSPC" document is

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 18
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 19

GSPC-1 does not anticipate any of the claims at issue, and that GSPC-2 does not anticipate at least claim 1. Thus, I view Dr. Wedig's analysis of these references as an obviousness analysis with respect to these claims, not an anticipation analysis. But regardless of whether these two papers are one or two publications, they do not invalidate claims 1-4 of the '759 patent.

62. GSPC-1 and GSPC-2 do not disclose the three modes of access of claim 1. In paragraph 54 of his report, Dr. Wedig claims that the first mode of access of claim 1, wherein an in-use foreground color is directly specified as a color data value, is disclosed in the GSPC-2 reference.[2] The GSPC-2 reference not only does not disclose the first mode of access, but it actually teaches away from using color data values for drawing text and graphics. For example, on page III-27, the GSPC-2 reference not only expressly rejects the use of direct color, but it expressly rejects the combination of direct color and indexed color as required by the claims of the '759 patent.

63. Dr. Wedig also points to the GSPC-1 reference, stating that the function SET_CURRENT_COLOR[R,G,B] defined in GSPC-1 on page 19 discloses a first mode of access wherein an in-use foreground color is directly specified as a color data value. However, the Court construed the term "in-use foreground color" as "a color that will be used as the foreground color for subsequently received text and drawing commands until changed." The GSPC-1 and GSPC-2 references nowhere disclose that the RGB value set by the SET_CURRENT_COLOR[R,G,B] command will be used as the foreground color for subsequently received text and drawing commands until changed.

---

misleading as to its origin because it does not originate from the Graphics Standards Planning Committee (GSPC) as does the other document referenced in this section.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 19
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 20

64. Furthermore, the text discussing the SET_CURRENT_COLOR function on page 19 of the GSPC-1 reference does not discuss color look-up tables as Dr. Wedig contends. It refers instead to "color sets." I have searched the entire GSPC-2 document in detail and found not a single reference to "color set," leading me to understand that "color set" is some sort of abstraction unique to GSPC-1, separate from the look-up tables described in GSPC-2. Further supporting this understanding is that the GSPC-2 reference discusses only color attribute functions which are specific to particular graphics primitives. Dr. Wedig himself provides an example of this in a subsequent paragraph where he discusses the SET_FILL_INDEX function.

65. For the second mode of access of claim 1, Dr. Wedig points to page 3[3] of GSPC-2, which merely states that "The display may include one or more look up tables, used to generate color and/or gray-scale images." But GSPC-2 provides no discussion of modes of access to color data values stored in the optional look up tables.

66. Dr. Wedig also suggests that the SET_CURRENT_COLOR_INDEX[I] function in GSPC-1 (page 19) discloses the second mode of access of claim 1. The GSPC-1 reference does not disclose a color that is used as the foreground color for subsequently received text and graphics commands until changed. As discussed above, there is no indication in GSPC-2 that the "color sets" of GSPC-1 are the same as the look-up tables described in GSPC-2. Further, Dr. Wedig fails to identify any text or drawing commands that use the color set by this function as an in-use foreground color.

---

[2] Dr. Wedig cites to "GSPC-2, p. 3." This page contains no support for Dr. Wedig's assertion. It appears that Dr. Wedig may have meant to cite to page III-3 and I will base my analysis on this assumption.

[3] As with the first mode of access, here Dr. Wedig apparently mistakenly cites to "GSPC-2, p. 3" which does not support his assertion. My analysis assumes that he meant to refer to page III-3.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 20
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 21

67. For the third mode of access of claim 1, which requires that both an in-use foreground color and an in-use background color be specified as indexes into the color memory, Dr. Wedig points to the SET_BACKGROUND_INDEX(INDEX) function (GSPC-2, p. III-18). But as discussed in connection with the Foley reference, this type of function does not involve an in-use background color in the sense of claim 1, but instead involves a static, global background color with which the entire frame in GSPC-2 is painted when a new-frame action occurs (*see, e.g.*, pp. II-92 , III-18, and IV-4 of GSPC-2) and upon which certain data are then overdrawn. This global background color in GSPC-2 affects all drawn objects equally – different objects cannot have different backgrounds in GSPC-2. In fact, neither GSPC-2 nor GSPC-1 even contemplates a mode of access in which both an in-use foreground and an in-use background color are utilized as required by claim 1, nor do they describe any types of objects or primitives in which a background color is explicitly used when drawing that object or primitive.

68. Furthermore, Dr. Wedig does not demonstrate how his purported third mode of access is separate and distinct from his second mode of access, in that any drawing done in the purported third mode of access in GSPC-2 would appear just as it would in his second mode of access.

69. Even assuming that GSPC-1 and GSPC-2 disclose the three modes of access of claim 1, which they do not, GSPC-1 and GSPC-2 do not disclose any predetermined command and data sequences for selecting any of those modes. In paragraph 49 of his report, Dr. Wedig claims that a number of functions discussed in GSPC-2 can select different modes of access to the "Color Memory" as he has defined that term. With respect to the SET_COLOR_MODEL function, regardless of what Dr. Wedig means by "use of different modes of access to the Color Memory,"

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 21
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 22

this function does not select a mode of access to color data values. The SET_COLOR_MODEL function determines how color data values are interpreted – either as RGB or HLS. In either case, there are still three components, of the same range of magnitude (as indicated by the GSPC-2 functions which take color component data and do not care if it is RGB or HLS). In fact, RGB and HLS are equivalent color models in that one can mathematically translate between the two color models, as documented in pages III-6-III-7 and III-37-III-38 of GSPC-2. In any case, the mode of access (manner of retrieving) to the color of memory is not changed by this function. With respect to the INITIALIZE_VIEW_SURFACE function, only one single mode can be set that supports color (GSPC-2, p. III-17). The other option for this function is "intensity," which the GSPC-2 document makes clear is a grey-scale mode, and thus, as I have discussed earlier, not a color mode as required by all of the claims at issue. Dr. Wedig also points to the SET_DISPLAY_MODE function as a way to select different modes of access to "Color Memory," but this function only allows for the selection of a polygon rendering mode, which is not a mode of access to either color memory or color data values. Further, there is no indication in Foley, and Dr. Wedig provides no explanation, as to how any of these functions select any of the three purported modes of access of claim 1 identified by Dr Wedig.

70. Because GSPC-1 and GSPC-2 do not disclose all required modes of access or any predetermined command and data sequences for selecting those modes, they also necessarily do not disclose the processing means and display means of claim 1.

71. In paragraph 58 of his report, Dr. Wedig addresses claim 2 of the '759 patent. The Court's claim construction Order specifically requires the same structure for the processing means for selecting of claim 2 as for the processing means of claim 1, and thus claim 2 requires

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 22
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 23

all three modes of access of claim 1. As discussed above, however, neither GSPC-1 nor GSPC-2 discloses all three modes of access of claim 1. The DEFINE_STANDARD_COLOR_INDICES, DEFINE_COLOR_INDEX and DEFINE_COLOR_INDICES functions that Dr. Wedig points to do not disclose the three required modes of access. Furthermore, even assuming that the three required modes of access were disclosed by GSPC-1 or GSPC-2, as discussed above with respect to claim 1, these references do not disclose any predetermined command and data sequences for selecting any of the purported modes of access to color memory identified by Dr. Wedig.

72. With respect to the processing means for setting of claim 2, in paragraph 58 of his report and in his Exhibit 3, Dr. Wedig points to the functions DEFINE_INTENSITY_INDEX, DEFINE_INTENSITY_INDICES, DEFINE_COLOR_INDEX, DEFINE_COLOR_INDICES, SET_BACKGROUND_INDEX, and DEFINE_STANDARD_COLOR_INDICES as storing a color data value in color memory. As previously discussed, intensities are grey levels and not color, and the function descriptions of DEFINE_INTENSITY_INDEX and DEFINE_INTENSITY_INDICES indicate that the functions returns an error if used with a color view surface. The SET_BACKGROUND_INDEX does not set a color data value in the color memory but instead sets a static, global index (representing a color or an intensity) for the view surface not covered by the image of a visible output primitive when a newframe request occurs. (GSPC-2, p. III-18).

73. In paragraph 59 of his report and in his Exhibit 3, Dr. Wedig addresses claim 3 of the '759 patent in light of the GSPC-2 reference. No mention is made of the GSPC-1 reference. In this paragraph Dr. Wedig asserts that the functions DEFINE_COLOR_INDICES and DEFINE_INTENSITY_INDICES (GSPC-2, pp. III-21 - III-22) are second commands that set

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 23
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 24

plural color data values in color memory. As previously discussed, intensities are grey levels and not color, as the function description of DEFINE_INTENSITY_INDICES indicates that the function returns an error if used with a color view surface. With respect to the DEFINE_COLOR_INDICES and DEFINE_STANDARD_COLOR_INDICES functions, the required structure of claim 2 (and hence of claim 3) is still not disclosed (*see* claim 2 analysis above). Additionally with respect to DEFINE_STANDARD_COLOR_INDICES, this function does not set multiple color data values in the color memory as required by the claim. This function uses a formula and a single color parameter set to populate an entire look-up table, not the multiple operands corresponding to plural color data values required by the structure of claim 3.

74. With respect to claim 4, Dr. Wedig contends that the second step of claim 4, reading a first command for selecting a mode of access to the color memory, is disclosed by the SET_COLOR_MODEL(MODEL) function from GSPC-2 (p. III-18). This function does not select a mode of access to the color memory, however. As discussed above, the SET_COLOR_MODEL function selects how color data values are interpreted – either as RGB or HLS.

75. Dr. Wedig also suggests that the INDEX_TABLES array, as well as the GLOBAL_COLORS and COLOR_TYPE variables, could be used to select a mode of access to the color memory. INDEX_TABLES, GLOBAL_COLORS, and COLOR_TYPE are all set as the result of an inquiry of the Core system's state, and reading data is not selecting a mode of access to the color memory.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 24
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 25

76. For the same step, Dr. Wedig also points to the

INITIALIZE_VIEW_SURFACE(SURFACE_NAME, TYPE) function, but this function selects

between a monochrome or color logical view surface. He also points to the

SET_DISPLAY_MODE(MODE) function, but this function allows for the selection of a polygon

rendering mode. Neither of these functions selects a mode of access to the color memory.

77. For the third step of claim 4, Dr. Wedig points to the

DEFINE_COLOR_INDEX(SURFACE_NAME, I, C1, C2, C3),

DEFINE_COLOR_INDICES(SURFACE_NAME, I1, I2, C1_ARRAY, C2_ARRAY,

C3_ARRAY), DEFINE_STANDARD_COLOR_INDICES(SURFACE_NAME, L1, L2, L3,

LOW1, LOW2, LOW4, HIGH1, HIGH2, HIGH3),

DEFINE_INTENSITY_INDEX(SURFACE_NAME, I, INTENSITY), and

DEFINE_INTENSITY_INDICES(SURFACE_NAME, I1, I2, I_ARRAY) functions, but as I

have already shown, intensity-oriented functions such as the latter two are irrelevant in the

context of the claims of the '759 patent. With respect to the three color functions, it is not clear

that they operate on the same color memory as the functions pointed to by Dr. Wedig's for the

other elements of this claim.  Furthermore, the DEFINE_COLOR_INDEX function cited by Dr.

Wedig only sets one color data value set, and not the multiple color data values required by the

second step.

78. With respect to the fourth step of claim 4, reading a third command for accessing

color data values in the color memory is required, this step is not disclosed in GSPC-1 or GSPC-

2. The functions Dr. Wedig points to include SET_VERTEX_INDICES(VERTEX_INDICES,

N), SET_BACKGROUND_INDEX(INDEX), POLYGON_ABS_2, POLYGON_ABS_3,

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 25
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 26

POLYGON_REL_2, and POLYGON_REL_3. None of these functions are "third commands for accessing [retrieving] color data values in the color memory," as, at the very least, none of these functions deals with color data values.

79. Dr. Wedig also points to the INQUIRE_COLOR_INDICES(SURFACE_NAME, I1, I2, C1_ARRAY, C2_ARRAY, C3_ARRAY) function, but it is not clear that this function operates on the same color look-up table or color memory as the other functions Dr. Wedig points to for the other elements of this claim.

80. Because the fourth step of claim 4 is not disclosed in GSPC-1 or GSPC-2, the fifth step, which references the fourth step, is also not disclosed.

81. Accordingly, for at least these reasons, it is my opinion that GSPC-1 and GSPC-2 do not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 1-4 of the '759 patent.

82. I understand from reading the expert report of Mr. Mossinghoff that he believes that the inventors or prosecuting attorneys breached the duty of candor and good faith to the Patent Office by not disclosing GSPC-2 during prosecution. It is my opinion, however, that GSPC-2 was not material to patentability of any claims of the '759 patent. First, as indicated above, GSPC-2 does not disclose all of the elements of claims 2-4. Second, Dr. Wedig and Mr. Mossinghoff take issue with an argument made during prosecution that "Hofmanis does not disclose or suggest a two command sequence for selecting a mode of color memory access and setting color data value or values in color memory as described in claims 3, 5, and 6," and argue that this argument could not have been made if GSPC-2 had been before the Examiner. I disagree. As discussed above, like Hofmanis, GSPC-2 simply "does not disclose or suggest a

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 26
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 27

two command sequence for selecting a mode of color memory access and setting color data value or values in color memory as described in [issued claims 2, 3, and 4]." The '759 patent, its prosecution history, and the Court's claim construction Order make clear claims 2-4 require selection of a mode of access to color memory from plural modes of access. Indeed, the reason for allowance of claims 2-4 given by the Examiner was the plural modes of access. (*See* November 3, 1983 Examiner Interview Summary Record.) As discussed above, however, GSPC-2 simply does not disclose plural modes of access from which a mode of access to the color memory can be selected.

### *"AED 512 Color Graphics Terminal – Terminal Command Protocol" and "AED 512 Color Graphics & Imaging Terminal"*

83. I have reviewed "AED 512 Color Graphics Terminal – Terminal Command Protocol" ("AED512") and "AED512 Color Graphics & Imaging Terminal" ("AED512-2"), as well as Dr. Wedig's analyses of these references. Dr. Wedig fails to describe how AED512 and AED512-2 disclose, whether expressly or inherently, all of the elements of claims 1-4 of the '759 patent, or how AED512 and AED512-2 provide a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that AED512 and AED512-2 do not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 1-4 of the '759 patent

84. As an initial matter, there is no evidence that AED512 and AED512-2 constitute printed publications under the patent law. Dr. Wedig contends that AED512 was accessible to members of the public prior to the inventions of the '759 patent, but does not provide any support for this assertion regarding public accessibility.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 27
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 28

85. Further, I see no basis for combining AED512 and AED512-2 as a single reference. On their face they are two separate documents, and it is unclear that the reference in AED512-2 to "Appendix 1 AED 512 Terminal Command Protocol" is a reference specifically to AED512, and even if so that does not mean that the two references should be combined. I also note that although Dr. Wedig states that he believes that the AED512 reference by itself suffices to support his opinions regarding the invalidity of claims 1-4, in his claim charts he cites both references as a combination, and also cites them by different names. The publication he refers to as AED512 (as defined above) is called "AED 512 Protocol" in the claim charts, and the publication he refers to as AED512-2 (as defined above) is called "AED 512" in the claim charts.

86. In any event, regardless of whether AED512 and AED512-2 are considered individually or in combination, they do not invalidate claims 1-4 of the '759 patent.

87. AED512 and AED512-2 do not disclose all three modes of access required by claim 1. In paragraph 75 of his report, Dr. Wedig states that AED512 discloses the first mode of access element of claim 1, and then he claims that this is actually accomplished by first loading a color data value into the color memory at a particular index using AED512's SCT command (page TCP-2), and then issuing a separate SEC command (page TCP-2) with the index value previously specified to set the in-use foreground color. (I note that the claim chart, Exhibit 4, does not include this second command (SEC) in discussing the first mode of access and instead only references it with respect to the second mode of access.) But this is not directly specifying a color data value. In fact, the AED512 reference does not disclose directly specifying an in-use foreground color. Furthermore, Dr. Wedig's assertion that this interpretation is similar to GDI commands is incorrect. The GDI command for setting color palette entries is not referenced in

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 28
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 29

my infringement analysis with respect claim 1 and instead is only cited with respect to claims 2 and 3.

88. Dr. Wedig in his claim chart (Exhibit 4) also suggests that the AED512 WRD command (p. TCP-9) discloses the first mode of access. But there is no detail in either the AED512 or AED512-2 references to indicate that the WRD function involves a mode of access where an in-use foreground color for subsequently received text and graphics drawing commands until changed is directly specified as a color data value.

89. Furthermore, Dr. Wedig does not demonstrate how his purported second mode of access is separate and distinct from his purported first mode of access, in that any drawing done in the purported second mode of access in AED512 would appear just as it would in the first mode of access he describes.

90. For the third mode of access element of claim 1, which requires both an in-use foreground and an in-use background color to be specified as indexes into the color memory, Dr. Wedig points to the SBC function (p. TCP-2). As set forth in the Court's claim construction Order, the in-use background color is "A color that will be used as the background color for subsequently received text and graphics drawing commands until changed." Page TCP-2 of AED512-2 states in reference to the SBC function, however:

> SBC color
>> Set background color. The entire memory will be erased to this color after a form feed (12 decimal). Characters backspaced over will be erased to this color by the character generator. During reset this color is set to value 0.

91. This excerpt demonstrates that the SBC color is not an in-use background color in the sense of claim 1, but instead is a static, global background color with which the entire memory is

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 29
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 30

filled when a form feed is requested. This global background color affects all drawn objects equally – different drawn objects cannot have different backgrounds. In fact, neither AED512 nor AED512-2 contemplates a mode of access in which both an in-use foreground and an in-use background color are utilized for drawing commands, and neither describes any types of objects or primitives in which an in-use background color is used.

92. Furthermore, Dr. Wedig does not demonstrate how his purported third mode of access is separate and distinct from his purported second mode of access, in that any drawing done in the purported third mode of access in AED512 would appear just as it would in the second mode of access he describes.

93. Evening assuming AED512 and AED512-2 disclose all three required modes of access of claim1, which they do not, they do not disclose any predetermined command and data sequences for selecting the modes identified by Dr. Wedig. In his claim chart for AED512 and AED512-2 (Exhibit 4), Dr. Wedig includes a number of functions that purportedly select different modes of access to color data values. The SCT command (page TCP-2), SEC (set current color, p. TCP-2), SBC (set global background color, p. TCP-2), and WRD (write raster direct (p. TCP-9) commands do not select a mode of access to color data values, none of these functions is involved in selecting the manner of retrieving colors as required by the claim.

94. Because AED512 and AED512-2 do not disclose all three modes of access of claim 1 or any predetermined command and data sequences for selecting the modes, they also necessarily do not disclose the processing means for selecting and display means of claim 1as mentioned previously.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 30
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 31

95. With respect to claims 2 and 3, because AED512 and AED512-2 do not disclose all three modes of access of claim 1 or any predetermined command and data sequences for selecting any of mode of access to color memory, they cannot invalidate claims 2 and 3 of the '759 patent either, as discussed above. Additionally, because AED512 and AED512-2 do not disclose these modes of access, they necessarily do not disclose the processing means for selecting or display means of claims 2 and 3.

96. Regarding claim 4, Dr. Wedig points to the AED512 specified Tektronix Emulation mode of operation as well as the Superoam mode as evidence that AED512 discloses the second step of claim 4. Nothing in the AED512 or AED512-2 references, however, indicates that the Tektronix Emulation mode (*see* p. TCP-5, p. TCP-7) selects a mode of access to the color memory from a plurality of modes. With respect to the Superoam mode (p. TCP-9), AED512 states that it continues to use the existing color memory, accessed by the least significant two bits of the operand: "After enabling of Superoam, the terminal will interpret coordinates in the range 0, 1023, rather than 0, 511. All commands referring to memory planes will have operands clipped to the least significant 2 bits." Thus, Superoam does not select a mode of access to the color memory, but stays in the already active mode.

97. With respect to the fourth step of claim 4 of the '759 patent, accessing color data values in the color memory is required. The functions Dr. Wedig points to as disclosing this step include SBC (set global background color, p. TCP-2), SEC (set current color, p. TCP-2), and WRD (write raster direct (p. TCP-9). None of these functions access[retrieve] color data values in the color memory, however.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 31
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 32

98. In addition, claim 4 requires terminal independence. The AED512 and AED512-2 references describe a very particular type of hardware implementation, and thus Dr. Wedig's argument that this reference reflects terminal independence is misplaced.

99. Accordingly, for at least these reasons, it is my opinion that AED512 and AED512-2 do not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 1-4 of the '759 patent.

**Sloan et al.: "Color Map Techniques"**

100.    I have reviewed the "Color Map Techniques" article by Sloan *et al.* ("Sloan") cited by Dr. Wedig, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to describe how Sloan discloses, whether expressly or inherently, all of the elements of claims 2-3 of the '759 patent, or how Sloan provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that Sloan neither anticipates nor renders obvious claims 2-3 of the '759 patent (Dr. Wedig is not asserting Sloan against claims 1 and 4).

101.    As an initial matter, it is unclear whether Dr. Wedig is making an anticipation or obviousness argument with respect to Sloan. I also note that Sloan was cited and considered by the Patent Office. (*See, e.g.,* '759 Patent Prosecution History; LUC 1114522, LUC 1111095-096, LUC 1114443, LUC 1114535). Thus, the Patent Office has already determined that Sloan does not invalidate at least claims 1-4.

102.    In his analysis of claims 2 and 3, Dr. Wedig ignores the corresponding structure for the processing means for selecting a mode of access to the color memory, which requires the

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 32
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 33

three modes of access of claim 1. Sloan, however, does not disclose the three mode of access of claim 1, and therefore does not invalidate claim 2 (or claim 3 which depends from claim 2).

103.    Because Sloan does not disclose the required three modes of access, it necessarily does not disclose the processing means or display means of claim 2 since they depend on the existence of the three modes of access.

104.    Sloan also does not disclose any command and data sequences as required by claims 2 and 3. At best, Dr. Wedig appears to be inferring that there must be command and data sequences in Sloan. Command and data sequences are not inherently disclosed in Sloan, however. One alternative way of updating a color memory without using a predetermined command and data sequence, for example, could include writing the color data values to be stored in the color memory to other memory in the device (*e.g.*, a frame buffer), and some automatic process (*e.g.*, triggered by a vertical refresh) forces a transfer of that frame buffer resident data into the actual color memory.

105.    With respect to claim 3, Dr. Wedig provides no analysis for the statement in his claim chart (Exhibit 5) claiming that "it would be obvious to one of skill in the art of computer graphics to include the ability to set plural entries a [sic] color map entry in light of the level of skill in the art of computer graphics and the available prior art including that presented by Gateway." I disagree with Dr. Wedig. It would not have been obvious at the time of the inventions of claims 2 and 3 to set plural entries in a color memory as recited by claim 3. Many graphics hardware devices only permitted setting one entry at a time and a number of references, including some cited by Dr. Wedig, demonstrate that the inclusion of a command that sets plural color data values in color memory as recited by the claim would not have been obvious at the

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 33
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 34

time of the invention. (*See, e.g.*, my analysis regarding claim 3 for the ADI and Kanade references).

106.    Accordingly, for at least these reasons, it is my opinion that Sloan does not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 2-3 of the '759 patent.

### Ramtek: "9000 Series Graphic Display System Programming Manual"

107.    I have reviewed the "Ramtek Programming Manual 9000 Series (RM 9100, 9200, 9300) Graphic Display System" reference ("Ramtek") cited by Dr. Wedig and Dr. Wedig's analysis of that reference. Dr. Wedig fails to describe how Ramtek discloses, whether expressly or inherently, all of the elements of claims 2-4 of the '759 patent, or how Ramtek provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that Ramtek neither anticipates nor renders obvious claims 2-4 of the '759 patent (Dr. Wedig is not asserting Ramtek against claim 1).

108.    As an initial matter, it is not clear to me that Ramtek is a printed publication. There is no evidence as to who this document may have been distributed to, when it was distributed, or how many copies may have been in circulation. Furthermore, I note that the Ramtek reference states (inside cover page) that distribution of the reference is limited and proprietary and not to be distributed without the approval of the company: "The information contained herein is the property of Ramtek and shall neither be reproduced in whole or in part without Ramtek prior written approval." This leads me to believe that the Ramtek reference was not publicly accessible at the relevant time.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 34
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 35

109.    Ramtek does not disclose the three modes of access of claim 1 (nor does Dr. Wedig even attempt to demonstrate that it does), and therefore Ramtek does not invalidate claims 2 or 3 of the '759 patent, which require all three modes as discussed above.

110.    Further, Ramtek does not disclose any predetermined command and data sequences for "selecting a mode of access to the color memory" as required by claims 2 and 3. In paragraph 87 of his report and in his claim chart (Exhibit 6), Dr. Wedig merely points to a number of pages in Ramtek that describe Display Data Types and Data Modes. These pages, however, do not disclose any command and data sequence that selects a mode of access to the color memory.

111.    Because Ramtek does not disclose the modes of access required by claim 2 and 3 or any predetermined command and data sequence for selecting a mode of access to the color memory, it necessarily does not disclose the processing means or display means of claims 2 and 3 either.

112.    With respect to claim 4, as discussed above Ramtek does not disclose any commands for selecting a mode of access to the color memory in response to data following the command (second step of claim 4). Ramtek also fails to identify the step of retrieving color data values from the color memory (fourth step of claim 4). Dr. Wedig merely points to various pages in the Ramtek manual, but the second and fourth steps of claim 4 are not disclosed.

113.    Because Ramtek does not disclose the fourth step of claim 4, it also does not disclose the fifth step of claim 4 which references the fourth step.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 35
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 36

114.    In addition, claim 4 requires terminal independence. The Ramtek reference describes a very particular type of hardware implementation, and thus Dr. Wedig's argument that this reference reflects terminal independence is misplaced.

115.    Accordingly, for at least these reasons, it is my opinion that Ramtek does not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 2-4 of the '759 patent.

### *ADI: "LIGHT 50 User's Manual"*

116.    I have reviewed the "ADI User's Guide – LIGHT 50" reference ("ADI") cited by Dr. Wedig, as well as Dr. Wedig's analysis of this reference. Dr. Wedig fails to describe how ADI discloses, whether expressly or inherently, all of the elements of claims 2-4 of the '759 patent, or how ADI provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. It is my opinion that ADI neither anticipates nor renders obvious (alone or in combination with any other references cited by Dr. Wedig) claims 2-4 of the '759 patent (Dr. Wedig does not assert ADI against claim 1).

117.    As with Ramtek, there is no evidence that ADI constitutes a printed publication. Also as with Ramtek, ADI does not disclose the three modes of access of claim 1, and therefore does not invalidate claims 2 or 3, which require the three modes of access of claim 1.

118.    Furthermore, even assuming that these modes of access are disclosed by ADI, ADI does not disclose any predetermined command and data sequences for selecting a mode of access to the color memory as required by claims 2 and 3. Dr. Wedig identifies the "$F" as

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 36
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 37

"setting various modes such as trace mode, display enable, clipping or various overlay modes" (ADI, p. 22) and XY command as" select[ing] a particular Color Memory" (ADI, p. 36-37, 50-51). The "$F" command is used to set 32 possible flags associated with an Image Control Block, not to select a mode of access to color memory. The XY command just selects a particular video lookup table; it does not select a mode of access to the color memory.

119.    Additionally with respect to claim 3, the "E" command cited by Dr. Wedig does not appear to set multiple color data values in the color memory. The "E" command relies on a single operand, not the multiple operands corresponding to plural color data values required by claim 3.

120.    Regarding claim 4, Dr. Wedig points to the ADI "F" command (p. 22) as satisfying the second step of claim 4, but I have reviewed ADI and this command does not select a mode of access to the color memory as required by claim 4.

121.    With respect to the third step of claim 4, Dr. Wedig fails to show a second command in ADI for setting multiple color data values in the color memory, as I have discussed above with respect to claim 3.

122.    With respect to the fourth step of claim 4, Dr. Wedig fails to disclose retrieving color data values in the color memory. Again, Dr. Wedig points to the ADI "XY" and "F" commands in his report and his Exhibit 7 respectively but not consistently. The ADI reference, in any event, gives no indication how these commands might be used to meet this required step of claim 4.

123.    Because ADI does not disclose the fourth step of claim 4, it also does not disclose the fifth step of claim 4, which references the fourth step.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 37
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 38

124. In addition, claim 4 requires terminal independence. The ADI reference describes a very particular type of hardware implementation, and thus Dr. Wedig's argument that this reference reflects terminal independence is misplaced.

125. Accordingly, for at least these reasons, it is my opinion that ADI does not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 2-4 of the '759 patent.

**Mueller: U.S. Patent No. 4,213,189**

126. I have reviewed U.S. Patent No. 4,213,189 to Mueller *et al.* ("Mueller") and Dr. Wedig's analysis of Mueller. Dr. Wedig appears to contend that Mueller anticipates claims 2 and 3 of the '759 patent and in combination with Foley renders obvious claims 1 and 4 of the '759 patent. Dr. Wedig fails to describe how Mueller discloses, whether expressly or inherently, all of the elements of claims 2-3 of the '759 patent, or how Mueller provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them. Dr. Wedig also fails to describe how Mueller and Foley render claims 1 and 4 obvious. It is my opinion that Mueller neither anticipates claims or renders obvious (alone or in combination with any other references cited by Dr. Wedig) claims 1-4 of the '759 patent.

127. With respect to claim 1, Mueller, like Foley, fails to disclose the three modes of access required by claim 1. Regarding the first mode, wherein an in-use foreground color is directly specified as a color data value, Dr. Wedig merely describes via excerpts from Mueller how the hardware might output information to the display. Nowhere does Mueller, however,

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 38
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 39

disclose a first mode of access in which an in-use foreground color is directly specified as a color data value.

128.    Dr. Wedig points to a table in Mueller (column 20, line 60 to column 21, line 8), and related text, as proof that Mueller discloses the second and third modes of access of claim 1. However, Dr. Wedig appears to be misdirected by Mueller's use of the terms "foreground" and "background." The aforementioned table is merely another kind of look-up table akin to a color memory, and for the exemplary character shown in Fig. 5C of Mueller, a separate request and processing has to occur to plot each of the pixels of the character in the desired color, be it one of the four so-called "foreground," four so-called "background," or four so-called "edge" colors.

129.    Claim 1, however, requires that the in-use foreground color (second and third modes of access) and an in-use background color (third mode of access) each be specified as a single color via a single index value. In Mueller, however, a separate value needs to be specified for each individual pixel being drawn - there is no concept of an "in-use" color. Second, Mueller does not disclose any text and graphics drawing commands that will make use of any in-use foreground or background colors. Instead, in Mueller data that will ultimately represent "text" is sent to the Mueller device one point at a time to construct the final text character via the symbol generator 20 (see, e.g., column 11, lines 49-56). There are no graphics drawing commands at all disclosed in the Mueller patent.

130.    For this reason, among others, one of ordinary skill in the art would not be motivated to combine Mueller with Foley. Foley addresses a high level function-based interface for general purpose graphics hardware capable of both a wide range of colors as well as display and generation of 3D and 2D graphics primitives, whereas Mueller is oriented to a narrowly

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 39
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 40

focused home entertainment computer implementation with limited pixel-based graphics capabilities.

131.    Furthermore, Dr. Wedig's argument that the book "Principles of Interactive Computer Graphics," second edition, by William M. Newman and Robert F. Sproull ("Newman"), provides the motivation to combine Foley and Mueller is unpersuasive and misplaced, in my opinion. Dr. Wedig makes a point in his motivation argument that the Newman book expressly references the "Core system," which it does. However, as indicated on the cover and introduction to Foley, the Foley reference is addressed to a different graphics interface, namely the "Graphics Compatibility System" – GCS, and more particularly, the 3D version of GCS, known as GCS-3D (*see* Foley, p. 3). The only apparent relationship here between Core and GCS is that they are share some basic concepts (*see* Foley, p. 3). Mueller does not address 3D graphics at all. As Foley focuses on raster graphics extensions to GCS-3D, it is clear that these two references address very different topics in computer graphics, and contrary to Dr. Wedig's assertions, there would be no motivation to one of skill in the art to combine the two references.

132.    There is also no distinction between the second and third modes of access identified by Dr. Wedig, despite the requirement of claim 1 that the second and third modes of access be separate modes.

133.    Mueller also does not disclose any predetermined command and data sequences from selecting one of a plurality of modes of access to color data values required by claim 1 (nor does Mueller disclose any predetermined command and data sequences for "selecting a mode of access to the color memory" as required by claims 2 and 3). Dr. Wedig's citations with respect to this element do not refer to command and data sequences for selecting one of a plurality of

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 40
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 41

modes of access, instead the cites consist solely of a generic explanation of how a microprocessor operates, *i.e.* how a microprocessor fetches its instructions from RAM.

134.    Because Mueller does not disclose the three modes of access required by claim 1 or any predetermined command and data sequences for selecting those modes, it necessarily does not disclose the processing means or display means of claim 1.

135.    Because Mueller does not disclose the three modes of access of claim 1, or the processing or display means for selecting those modes, it necessarily does not anticipate claims 2 and 3 either, as discussed above in relation to other references cited by Dr. Wedig.

136.    Mueller also fails to disclose any of the command and data sequences required by claims 2 and 3, and Dr. Wedig is unable to point to any. In paragraph 109 of his report, Dr. Wedig points to a statement in Mueller that refers to a color memory being changed from time-to-time as disclosing this element. There is no disclosure in Mueller, however, that describes this updating of the color memory being accomplished by a command and data sequence. The only example of this given in Mueller is limited to color data in the color memory being loaded from the RAM during the vertical scan I/O time slot (and possibly loading that RAM from a tape drive). (*See* Mueller, col. 19:34-47; 28:51-29:18). This process occurs without outside intervention or commands and there is no indication in Mueller that any color values are set in a color memory via a command and data sequence.

137.    Regarding claim 4, Dr. Wedig argues that claim 4 is rendered obvious by combination of Mueller with Foley. With respect to the second step of claim 1, neither Mueller nor Foley (as discussed above) disclose a first command for selecting a mode of access to the color memory.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 41
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 42

138.    With respect to the third step of claim 4, like Foley, Mueller fails to disclose a second command for setting multiple color data values in the color memory , or even a mode of access to the color memory.

139.    With respect to the fourth step of claim 4, like Foley, Mueller does not disclose accessing color data values in the color memory, and Dr. Wedig merely points to various parts of the specification of Mueller that do not reference such accessing. Two of "commands" Dr. Wedig points to as disclosing this command include PAINT DOT and LOAD NEW COLOR POINTERS are actually processes and are not commands for accessing color data values in the color memory as required by claim 4. Dr. Wedig also points to "reading a tape storage unit to loading a memory," but this loading task also cannot be construed as accessing color data values in the color memory.

140.    Because Mueller does not disclose the fourth step of claim 4, it also does not disclose the fifth step of claim 4 that references the fourth step.

141.    In addition, claim 4 requires terminal independence. Mueller describes a very particular type of hardware implementation, and thus Dr. Wedig's argument that this reference reflects terminal independence is misplaced.

142.    As I discuss above, one of ordinary skill in the art would not be motivated to combine Mueller with Foley. But even if such motivation existed, combining Mueller with Foley does nothing to further Dr. Wedig's invalidity assertion with respect to claim 4 or any other claims.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 42
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 43

143.    Accordingly, for at least these reasons, it is my opinion that Mueller does not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 1-4 of the '759 patent.

**Kanade: "Image I/O Device for Image Processing: Color TV Display and TV Camera Input"**

144.    I have reviewed "Image I/O Device for Image Processing: Color TV Display and TV Camera Input" purportedly written by Toshiyuki Sakai and Isao Kanada[4] ("Kanade"), as well as Dr. Wedig's analysis of this reference.  Dr. Wedig fails to describe how Kanade discloses, whether expressly or inherently, all of the elements of claims 2-3 of the '759 patent, or how Kanade provides a description adequate to enable a person of ordinary skill in the art to not only comprehend the claimed inventions but also to make and use them.  It is my opinion that Kanade does not anticipate or render obvious claims 2 and 3 of the '759 patent, nor does it render claims 2 and 3 obvious when combined with other separate publications allegedly by the same author(s) or with any other references cited by Dr. Wedig (Dr. Wedig does not assert Kanade against claims 1 and 4).

145.    Regarding claims 2 and 3, Kanade fails to disclose the three modes of access of claim 1, which are required by claims 2 and 3 as discussed previously.  Because Kanade does not disclose the modes of access required by claim 2, it necessarily does not disclose the processing means or display means of claim 2 either.  Furthermore, even assuming that these modes of access were disclosed, Kanade does not disclose any predetermined command and data sequence for selecting a mode of access to the color memory as required by claims 2 and 3.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 43
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 44

146.     Kanade also fails to disclose any command and data sequences for updating color values in a color memory as required by claims 2 and 3.  Dr. Wedig appears to argue for inherent disclosure, but such command and data sequences are not necessarily present in the system described by Kanade.  For example, the color data values to be stored in the color memory could be written to other memory (*e.g.* frame buffer) in the device, and some automatic process (*e.g.* triggered by a vertical refresh) could force a transfer of that frame buffer resident data into the actual color memory.

147.     The footnotes of Dr. Wedig's claim chart further asserts that Kanade could be combined with one or two other articles allegedly co-authored by at least one of the authors of the Kanade reference, and purportedly discussing exactly the same hardware, as a single anticipatory reference.  But even if true, these are separate articles written by different groups of authors at different times, and thus constitute separate publications (to the extent all of the references were actually published).  But even if the references are combined for only an obviousness analysis, they all still fail to disclose all of the elements of claims 2 and 3 of the '759 patent for the same reasons the Kanade reference alone fails to disclose all of the elements of these claims.

148.     Accordingly, for at least these reasons, it is my opinion that the Kanade reference does not anticipate or render obvious (alone or in combination with any other reference cited by Dr. Wedig) claims 2-3 of the '759 patent.

---

[4] The translation of the article from Japanese into English provided by Defendants refers to the authors as Toshiyuki Sakai and Isao Kanada, and makes no reference to Takeo Kanade.

Jake Richter – Rebuttal Expert Report – May 12, 2006 -- Page 44
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 45

*Secondary Considerations of Nonobviousness*

149.    I have reviewed Lucent's responses to Dell's Interrogatory No. 14 dealing with the issue of secondary considerations non-obviousness, and I agree with the conclusions contained within those interrogatory responses to the extent they pertain to the '759 patent.

*Documents and Other Materials Reviewed*

150.    My understanding of the '759 patent is based on my review of the patent, the asserted claims, the patent prosecution history, the prior art cited in the Patent Office, the Court's Claim Construction Order, and on my professional experience in the field of display technology over the last 28 years.

151.    In addition to the Wedig and Mossinghoff reports regarding the '759 patent, I have read the cited references contained within those reports, the Defendants' contentions, and additional materials, as listed in Exhibit A.

152.    To aid my testimony at trial, I may rely on any or all of these materials, including those referenced in this report as examples, as well as other materials that I have considered.  I may also rely at trial on demonstrative exhibits, summary exhibits, testimonial aids, animations, sample code, demonstrations, and the like in support of my testimony to illustrate the bases of my opinions.

*Compensation*

153.    My company is charging a rate of $250 per hour plus expenses for my work on this case.  My compensation is in no way contingent on the content of my testimony or the outcome of this litigation.

Jake Richter – Rebuttal Expert Report – May 12, 2006 – Page 45
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 46

***Other Testimony***

153.    In the last four years I testified by deposition as an expert in the matter of

Grandeye Ltd.  vs.  IPIX Corporation, Civil Action No 2:05 CV 134 (WDK) (TEM) (United

States District Court, Eastern District of Virginia).

May 12, 2006

By    _____

 Jake Richter

Jake Richter – Rebuttal Expert Report -- May 12, 2006 – Page 46
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 47

## Exhibit A

### List Of Materials Reviewed And Considered

- Fleming '759 prosecution history and cited prior art
- Order Construing Claims for United States Patent No. 4,439,759, November 16, 2005
- Hearing Transcripts for Claim Construction of United States Patent Number 4,439,759
- Deposition Transcript of James Fleming and Exhibits
- Deposition Transcript of William Frezza and Exhibits
- Deposition Transcript of Gerald Soloway and Exhibits
- Deposition Transcript of Thomas H. Jackson and Exhibits
- Deposition Transcript of Harry Newman and Exhibits
- Deposition Transcript of James Benster and Exhibits
- Deposition Transcript of Takeo Kanade and Exhibits
- Lucent's Responses to Dell's Interrogatory No. 14
- Dell's invalidity contentions regarding United States Patent No. 4,439,759
- Gateway's invalidity contentions regarding United States Patent No. 4,439,759
- Dell's unenforceability contentions regarding United States Patent No. 4,439,759
- Gateway's unenforceability contentions regarding United States Patent No. 4,439,759
- DELL 313144-DELL 313172
- DELL 313180-DELL 313186
- DELL 313180-DELL 313186
- DELL 314729-DELL 314739
- DELL 329813-DELL 330344
- DELL 337453-DELL 337460
- FLEMING 000001-FLEMING 000175
- FLEMING 000427-FLEMING 000543
- FLEMING 002071-FLEMING 002072
- FLEMING 002073-FLEMING 002074
- FLEMING 002822-FLEMING 002823
- FLEMING 002828-FLEMING 002830
- FREZZA 00014-FREZZA 00032
- FREZZA 00067-FREZZA 00073
- FREZZA 00094-FREZZA 00101
- FREZZA 00102-FREZZA 00105
- FREZZA 00106-FREZZA 00167
- FREZZA 00168-FREZZA 00225
- FREZZA 00226-FREZZA 00252
- FREZZA 00253-FREZZA 00286
- FREZZA 00287-FREZZA 00403
- FREZZA 00691-FREZZA 01098
- GW-LT 0261327-GW-LT 0261506
- GW-LT 0261507-GW-LT 0261785

Jake Richter – Rebuttal Expert Report – May 12, 2006
Case No. 02-CV-2060 B (CAB) consolidated with
Case No. 03-CV-699 B (CAB) and Case No. 03-CV-1108 B (CAB)

Exhibit 5 Page 48

- GW-LT 0262069-GW-LT 0262188
- GW-LT 0410672-GW-LT 0410686
- GW-LT 253733-GW-LT 253738
- LUC 003903-LUC 004026
- LUC 004035-LUC 004041
- LUC 004305-LUC 004346
- LUC 004347-LUC 004385
- LUC 012166-LUC 012246
- LUC 013715-LUC 013738
- LUC 013739-LUC 013768
- LUC 013752-LUC 013759
- LUC 013760-LUC 013768
- Expert Report of Dr. Robert G. Wedig on the Invalidity of U.S. Patent No, 4,439,759, dated March 31, 2006 (including all exhibits thereto and documents cited therein)
- Expert Report of the Honorable Gerald J. Mossinghoff on U.S. Patent No. 4,439,759 Granted to Fleming et al., dated March 31, 2006 (including all exhibits thereto and documents cited therein)
- Other documents referenced or cited in this report.

Jake Richter – Rebuttal Expert Report – May 12, 2006
Case No.  02-CV-2060 B (CAB) consolidated with
Case No.  03-CV-699 B (CAB) and Case No.  03-CV-1108 B (CAB)

Exhibit 5 Page 49

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2006, a copy of the foregoing REBUTTAL EXPERT REPORT OF JAKE RICHTER was served on counsel for Microsoft, Dell, and Gateway as follows:

**EMAIL**
Christopher S. Marchese
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: 858-678-5070
Facsimile: 858-678-5099
marchese@fr.com
srodriguez@fr.com

**EMAIL**
Sidney Rosenzweig
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
Telephone: 202-942-5000
Facsimile: 202-942-5999
sidney_rosenzweig@aporter.com

Joel Freed
McDERMOTT, WILL & EMORY
600 13th Street, N.W.
Washington, DC 20005-3096
Tel:    202-756-8000
Fax:    202-756-8087
jfreed@mwe.com

Attorneys for *Microsoft Corp.*

Attorneys for *Dell Inc.*

**EMAIL**
W. Bryan Farney
DECHERT LLP
106 East 6th Street, Suite 800
Austin, Texas 78701
Tel:    512-394-3000
Fax:    512-394-3001
jeff.plies@dechert.com
bryan.farney@dechert.com
lawrence.fluker@dechert.com

Attorneys for *Gateway, Inc., et al.*

Exhibit 5 Page 50