UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA
--------------------------------X
LUCENT TECHNOLOGIES, INC.          :
and MULTIMEDIA PATENT TRUST,       :
          Plaintiffs              :    Case No:
              -vs-                :    07-CV-2000-H (CAB)
GATEWAY, INC., GATEWAY            :
COUNTRY STORES, LLC, GATEWAY      :    Consisting of
COMPANIES, INC., GATEWAY          :    matters severed
MANUFACTURING, LLC, and           :    from consolidated
COWABUNGA ENTERPRISES, INC.,       :    cases:
          Defendants              :
and                               :
                                  :    Case No.
MICROSOFT CORPORATION,            :    02-CV-2060 B (CAB)
          Intervener              :    Case No.
---------------------------       :    03-CV-0699 B (CAB)
MICROSOFT CORPORATION,            :    Case No.
          Plaintiff               :    03-CV-1108 B (CAB)
              -vs-                :
LUCENT TECHNOLOGIES, INC.         :
          Defendant               :
---------------------------       :
LUCENT TECHNOLOGIES, INC.         :
and MULTIMEDIA PATENT TRUST,       :    Pages 1 - 279
          Plaintiffs              :
              -vs-                :
DELL, INC.,                       :
          Defendant               :
                                  :
--------------------------------X

Videotape Deposition of Bruce Tognazzini
Washington, D.C.
Tuesday, November 20, 2007

Reported by:  Kathleen M. Vaglica, RMR
Job No:  184311

Exhibit 15   Page 1

Page 2

```
1
2
3
4
5              November 20, 2007
6                (9:13 a.m.)
7
8  Deposition of Bruce Tognazzini, held at the offices
9  of:
10
11     Kirkland & Ellis, LLP
12     655 15th Street, N.W.
13     Washington, D.C. 20005
14
15
16 Pursuant to notice, before Kathleen M. Vaglica, RMR,
17 a Notary Public in and for the District of Columbia.
18
19
20
21
22
```

Page 4

```
1  COUNSEL FOR GATEWAY
2     JONATHAN D. BAKER, ESQUIRE
3     Dechert, LLP
4     2440 W. El Camino Real
5     Suite 700
6     Mountain View, CA  94040-1499
7     (650) 813-4800
8
9  COUNSEL FOR DELL
10    JOHN NEWBY, ESQUIRE
11    SCOTT BORDER, ESQUIRE
12    Arnold & Porter
13    555 12th Street, N.W.
14    Washington, D.C.  20004-1206
15    (202) 942-5893
16
17
18
19
20
21
22
```

Page 3

A P P E A R A N C E S

```
3
4  COUNSEL FOR LUCENT
5     GREGORY F. CORBETT, ESQUIRE
6     Kirkland & Ellis, LLP
7     655 15th Street, N.W.
8     Washington, D.C. 20005
9     (202) 879-5296
10
11    ERIC D. HAYES, ESQUIRE
12    Kirkland & Ellis, LLP
13    200 E. Randolph Drive
14    Chicago, IL  60601
15    (312) 861-2480
16
17 COUNSEL FOR MICROSOFT
18    LARA S. GARNER, ESQUIRE
19    Fish & Richardson, P.C.
20    12390 El Camino Real
21    San Diego, CA  92130-2081
22    (858) 678-4332
```

Page 5

CONTENTS

```
3  EXAMINATION OF BRUCE TOGNAZZINI        PAGE
4  BY MS. GARNER                8
5  BY MR. BAKER               164
6  BY MR. NEWBY               261
```

E X H I B I T S

```
NUMBER                     PAGE

1, 2  Expert Report of Bruce Tognazzini    10
      to the Second Supplemental Expert
and 3 Report of Dale Buscaino, Expert
      Report of Bruce Tognazzini
      Relating to the Expert Report of
      John P.J. Kelly, Ph.D., and U.S.
      Patent 4,763,356
4     Second Supplemental Expert Report   35
      of Dale Buscaino Re Invalidity of
      U.S. Patent 4,763,356
5     PC Magazine Article Pages           74
6     Copy of Deposition Transcript of    78
      Bruce Tognazzini of 6/27/06

7     Claim Construction Order            78

8     Order Denying Plaintiff's and       78
      Defendants' Cross-Motions
      Regarding the Invalidity of U.S.
      Patent '356
```

Page 6

9    Screen Shots       102

10    Pages from Book written by Bruce    117
     Tognazzini

11    Datamation Tyler article      126

12    Photocopy of Photograph      127

13    U.S. Patent 4,756,706       248

---

Page 7

1          P R O C E E D I N G S

2      THE VIDEOGRAPHER: Good morning. Here

3 begins Videotape Number 1 of the deposition of Bruce

4 Tognazzini in the matter of Lucent Technologies

5 versus Gateway Incorporated and Microsoft

6 Corporation in the U.S. District Court, Southern

7 District of California, Case Number which is

8 07-CV-2000. Today's date is November 20, 2007, and

9 the time on the monitor is 9:13. The deposition is

10 being taken at 655 15th Street, Northwest,

11 Washington, D.C. It was made at the request of the

12 Lara S. Garner, law offices of Fish & Richardson.

13 The videographer is Steve Schaal here on behalf of

14 Esquire Deposition Services located at 1020 19th

15 Street, Northwest, Washington, D.C. Would counsel

16 please identify yourself and state whom you

17 represent.

18      MS. GARNER: Lara Garner with Fish &

19 Richardson for Microsoft.

20      MR. BAKER: Jonathan Baker from Dechert

21 for Gateway.

22      MR. NEWBY: John Newby with Arnold &

---

Page 8

1 Porter for Dell. With me is Scott Border.

2      MR. CORBETT: Gregory Corbett with Kirland

3 & Ellis on behalf of Lucent, and with me is Eric

4 Hayes also from Kirland & Ellis.

5      THE VIDEOGRAPHER: Will the Court reporter

6 please swear in the witness.

7      Thereupon,

8         BRUCE TOGNAZZINI,

9 a witness, called for examination by counsel for the

10 Defendant and, after having been sworn by the

11 notary, was examined and testified as follows:

12      THE VIDEOGRAPHER: Counsel may proceed.

13 EXAMINATION BY COUNSEL FOR THE DEFENDANT, MICROSOFT

14 BY MS. GARNER:

15     Q. Good morning.

16     A. Good morning.

17     Q. You've been deposed at least once before;

18 is that right?

19     A. Yes.

20     Q. More times than that?

21     A. Yes.

22     Q. Are you pretty familiar with the

---

Page 9

1 formalities of a deposition?

2     A. Overall.

3     Q. I'll just remind you of a few things.

4 Please answer verbally so the Court reporter can

5 take down your answer. Nods of the head are

6 difficult to record. If you have, if you would like

7 to take a break, we can do so at any time. I only

8 ask that, if there's a question pending, that you

9 answer it before we take a break. Just let me know.

10      You understand that I'm entitled to your

11 full and complete answer at the time that I ask the

12 question?

13     A. I understand that I'm to give you my

14 understanding at the time you ask the question.

15     Q. Okay.

16     A. There are times when I will remember

17 something later.

18     Q. Okay. And then you can just follow up if

19 that's the case. Please let me know if you remember

20 something later, and you want to add to your answer.

21     A. Okay.

22     Q. If I ask you a question and it's not

**Exhibit 15  Page 3**

Page 10

1 clear, please let me know, and I'll be happy to try
2 to rephrase it or clarify it.
3    A.  Okay.
4    Q.  And, if you don't ask me for a
5 clarification, I'm going to assume that you
6 understood the question.  Is that okay?
7    A.  Well, you may assume that, but there may
8 be times when I didn't understand the question.
9    Q.  But, if you think you didn't understand
10 the question, you'll let me know.
11    A.  Yes.
12    Q.  Okay.  I want to mark a few exhibits,
13 please.
14        (Tognazzini Exhibit Nos. 1, 2 and 3,
15 Expert Report of Bruce Tognazzini to the Second
16 Supplemental Expert Report of Dale Buscaino, Expert
17 Report of Bruce Tognazzini Relating to the Expert
18 Report of John P.J. Kelly, Ph.D., and U.S. Patent
19 4,763,356, were marked for identification.)
20 BY MS. GARNER:
21    Q.  The Court reporter has handed you a few
22 exhibits.  Can you take a look at Exhibit 1, the

Page 11

1 exhibit marked as Exhibit 1?
2    A.  Okay.
3    Q.  Do you recognize that?
4    A.  Yes.
5    Q.  What is it?
6    A.  It's the Expert Report of Bruce Tognazzini
7 Relating to the Second Supplemental Expert Report of
8 Dale Buscaino Re Lucent's Day Patent.
9    Q.  And you submitted that report in this
10 case; is that right?
11    A.  That's correct.
12    Q.  And Exhibit 2, could you take a look at
13 that one.  Do you recognize Exhibit 2?
14    A.  Yes, I do.
15    Q.  What is that?
16    A.  I'm sorry.
17    Q.  What is Exhibit 2?
18    A.  The Expert Report of Bruce Tognazzini
19 Relating to the Expert Report of John P.J. Kelly,
20 Ph.D. Re Lucent's Torok Patent and to the Expert
21 Report of Dale Buscaino's Re Day Patent.
22    Q.  And you submitted that report in this case

Page 12

1 as well; is that right?
2    A.  That is correct.
3    Q.  Finally, Exhibit 3, could you take a look
4 at that?
5    A.  Okay.
6    Q.  That's a patent I think you're familiar
7 with; is that right?
8    A.  This is the Day patent.
9    Q.  So is it all right with you if I call it
10 the Day or the '356 patent for purposes of this
11 deposition?
12    A.  Yes.
13    Q.  In Exhibit 1, if you'll turn to the first
14 page, you indicate in your report that you haven't
15 provided testimony in other matters over the past
16 four years; is that correct?
17    A.  That is correct.
18    Q.  Could you take a look at page six of your
19 report, Exhibit 1?  And in paragraph 23 you indicate
20 that you addressed the level of ordinary skill in
21 the art in your previous report.  Does that refer to
22 Exhibit 2?

Page 13

1    A.  It would refer to Exhibit 2, yes.
2    Q.  Okay.  Could you take a look at Exhibit 2,
3 then?  And on page six of that report there's a
4 section heading Number IV, "Level of Ordinary Skill
5 in the Art."
6    A.  Yes.
7    Q.  Is that the section to which you were
8 referring in your first, in Exhibit 1?
9    A.  That is correct.
10    Q.  Have you reviewed these reports recently?
11    A.  Yes and no.
12    Q.  Please explain.
13    A.  Well, I have reviewed the second report
14 extensively, and I've glanced through the first
15 report, but I have not make an extensive rereview of
16 the first report.
17    Q.  And how long has it been since you
18 extensively reviewed the first report?
19    A.  Since May.
20    Q.  May of?
21    A.  Of 2007.
22    Q.  What did you do to prepare for the

**Exhibit 15  Page 4**

Page 14

1  deposition?
2     A.  I read Dale Buscaino's, the transcript of
3  his deposition of a couple weeks ago.  I reviewed
4  this report.  I reviewed the prior art that is
5  connected with this report and his recent report.
6     Q.  By this report you're referring to
7  Exhibit 1?
8     A.  The second report.
9     Q.  Anything else that you did to prepare for
10 the deposition?
11    A.  I met with the Kirkland lawyers.
12    Q.  When did you do that?
13    A.  Sunday and Monday.
14    Q.  For about how long a time did you spend
15 with them?
16    A.  A few hours on Sunday and pretty much of
17 the day yesterday.
18    Q.  Taking into account Exhibits 1 and 2, do
19 those reports contain all of your opinions regarding
20 the validity of the Day patent?
21    A.  They do contain all of the opinions.
22    Q.  All of the opinions that you have?

Page 15

1     A.  That I have as I'm sitting here now.
2     Q.  And do you intend to supplement that?
3     A.  It's hard for me to say whether I intend
4  to supplement them.
5     Q.  Do you have any plans to right now?
6     A.  There are outstanding issues.  If those
7  are addressed, I would expect that I'll probably be
8  called upon to offer additional opinions.
9     Q.  What outstanding issues are you referring
10 to?
11    A.  Well, for example, there's a Mr. Long I
12 think it is in England who Mr. Buscaino has spoken
13 with whom I've had no opportunity to speak with, nor
14 has he been deposed, as far as I know.  Mr. Buscaino
15 has depended on his conversations with Mr. Long to
16 make certain statements that I have been in no
17 position to review or form opinions on myself, and I
18 would expect at such a time as Mr. Long is contacted
19 through some means that might arise to my issuing
20 further opinions.
21        There's also a piece of software which
22 Mr. Buscaino reviewed, but did not, that was not

Page 16

1  made available to Lucent, and at such a time as I'm
2  able to review that software that might arise to
3  further opinions.
4     Q.  What software is that?
5     A.  It's the Macintosh version of Your Money
6  Manager.
7     Q.  Is that the only version of Your Money
8  Manager that you haven't reviewed?
9     A.  Well, no, but that's the only system on
10 which Your Money Manager purportedly ran that I
11 haven't seen a version of money manager, Your Money
12 Manager on.  In other words, version, every -- they
13 may be coming out with new versions every six
14 months, but I have looked at a version as supplied
15 to me for MS DOS and for Commodore.  I have not seen
16 a version, any version running on the Mac.
17    Q.  In addition to the Mac Your Money Manager
18 and possible information from Mr. Long, are there
19 any other issues that you expect to opine on?
20    A.  Well, I'm not sure exactly what the legal
21 edges of opining are.  There are matters that came
22 up in Mr. Buscaino's deposition that would cause me

Page 17

1  to want to provide further material on some of my
2  opinions, not to change them in any way, but to
3  further explain them, give more information.
4     Q.  What issues are those?
5     A.  Well, for example, the, in the issue of
6  Your Money Manager the definition of a pointing
7  device.
8     Q.  You think that your report regarding a
9  pointing device was unclear?
10       MR. CORBETT:  Objection.
11 Mischaracterizes.
12       THE WITNESS:  No, I don't think it was
13 unclear at all.  I think his explanation of a
14 pointing device was, was completely 100 percent
15 wrong.
16 BY MS. GARNER:
17    Q.  And what additional information do you
18 think you would provide?
19    A.  I would provide an overwhelming amount of
20 material that the definition of a pointing device
21 has been a defined term recognized throughout the
22 industry over the course of most of the last 40 plus

**Exhibit 15  Page 5**

Page 18

1 years. And, when I provided my report, I had no
2 idea that Mr. Buscaino would completely redefine
3 pointing device to mean something entirely different
4 from the recognized standard of what a pointing
5 device is, so there was no reason for me to go into
6 great lengths in discussing a completely settled,
7 universal definition.
8    Q.  You said that definition was, that's been
9 a defined term for 40 years. When do you think that
10 became a defined term, pointing device?
11    A.  As I sit here now, because I have not done
12 the research, pointing devices have been recognized
13 as a separate class from keyboards since at least
14 1963. Now, I cannot tell you at this point when
15 the, the term connected to that class arose. It was
16 certainly there by the mid-1970s when I began
17 working with pointing devices, mid to late 1970s,
18 but, whether the term arose in 1963 or shortly
19 thereafter, whether it arose in 1970 or something, I
20 can't tell you.
21        The concept was there from at least 1963
22 as this being a separate class, and it may, in fact,

Page 19

1 go all the way back to the 1940's. And, at this
2 point, I just don't know, but certainly it has been
3 settled and universally understood, codified in
4 government definitions, etc., from, for decades.
5    Q.  When you say pointing devices are a
6 separate class, what do you mean? Separate from
7 what?
8    A.  The two primary classes and perhaps only
9 classes, but the two primary classes of manual input
10 devices are keyboards and pointing devices.
11 Keyboards includes both keyboards and key pads.
12    Q.  Can you point to something without using a
13 pointing device?
14        MR. CORBETT: Objection. Vague.
15 BY MS. GARNER:
16    Q.  In the context of computers.
17    A.  There are video systems that recognize the
18 presence of the human finger so that, in fact, the
19 human finger becomes a pointing device, so, at that
20 point, you really are using a pointing device that
21 fits all the criteria, but the finger itself becomes
22 the object that you use to point to objects as

Page 20

1 opposed to a stylus, as opposed to a mouse, etc.,
2 but that, that's not a typical situation. Those are
3 usually universally lab experimental systems.
4    Q.  Is a digitizer a pointing device?
5        MR. CORBETT: Objection. Vague.
6 Foundation.
7        THE WITNESS: A digitizer is typically, a
8 digitizer can be used as a pointing device.
9 BY MS. GARNER:
10    Q.  And it can also be in the keyboard class;
11 is that right?
12    A.  No.
13    Q.  So --
14    A.  It would typically show up on a list of
15 pointing devices, and it can be used for pointing at
16 things. It can also be used for accepting input,
17 but that doesn't give it then the characteristics of
18 a keyboard. It's still a digitizer, so it would
19 generally -- when I have seen it on lists, it's on
20 the pointing device side of the page, not the
21 keyboard side of the page.
22    Q.  Is a mouse a pointing device?

Page 21

1    A.  Yes.
2    Q.  Is a joy stick a pointing device?
3    A.  A joy stick is a pointing device.
4    Q.  Can any of those devices that we've named
5 so far, a joy stick a mouse or a digitizer, be used
6 also with a keyboard?
7        MR. CORBETT: Objection. Vague.
8 Compound.
9 BY MS. GARNER:
10    Q.  Or a keypad?
11        MR. CORBETT: Same objection.
12        THE WITNESS: They can be used in
13 conjunction with a keyboard or a keypad.
14 BY MS. GARNER:
15    Q.  Okay.
16    A.  But, I mean, I'm not quite sure what
17 you're asking me because that's kind of meaningless.
18 Anything can be used with anything.
19    Q.  Okay.
20    A.  I mean, you can also wear high-heeled
21 shoes while using a keyboard.
22    Q.  Okay. So we've got a mouse as a pointing

**Exhibit 15  Page 6**

1   device, a digitizer as a pointing device and a --
2   what was the other one? Joy stick as a pointing
3   device. How about that little button in the middle
4   of my laptop keyboard that I can push around? What
5   do you call that?
6       A.  That is a pointing device which is
7   mounted, but distinct from the keyboard that
8   surrounds it.
9       Q.  Okay. And how about, there's a pad in
10  front of that that I can just move my finger around
11  on my laptop?
12      MR. CORBETT: Objection.
13  BY MS. GARNER:
14      Q.  Are you familiar with those devices?
15      MR. CORBETT: Objection. Vague.
16      THE WITNESS: If you're referring to a
17  touch pad, I am familiar with those devices.
18  BY MS. GARNER:
19      Q.  Does that sound like I'm talking about the
20  same thing you are? There's a flat spot on my
21  laptop in front of the keyboard, and I can just move
22  my finger around on it.

1       A.  That's a touch pad that you are
2   describing.
3       Q.  Is that a pointing device?
4       A.  Yes, it is. That again is separate and
5   distinct from the keyboard, even though it may be
6   located close to the keyboard.
7       Q.  What is the definition of a pointing
8   device?
9       MR. CORBETT: Objection. Vague.
10      THE WITNESS: I can give you, I can supply
11  you with a standard definition. I don't have that
12  at my fingertips. If you want me to give you a
13  tentative definition, I can give that to you.
14  BY MS. GARNER:
15      Q.  What do you mean by tentative?
16      A.  Well, as I said, it's an established term.
17  It's got an established definition. I don't have
18  that definition in front of me, because you'll
19  recall at the beginning of this I talked about this
20  is an area that I think I may need to further expand
21  on. I have not yet further expanded on it, so now
22  you're asking me to further expand on it without

1   taking the time to, to prepare proper --
2       Q.  Okay. I wouldn't ask you to do that. You
3   said you couldn't give me the standard definition,
4   but how about your definition?
5       A.  A pointing device is a device that allows
6   the user to -- well, stepping back one step further,
7   before pointing devices, one had screens with text
8   and what's known as a carrot, which is the text
9   cursor. What was added with pointing devices was a
10  new object on the screen called the pointer so that,
11  for example, if you were using a word processor, you
12  have typically a blinking cursor or vertical bar or
13  something indicating where, if you type a key on the
14  keyboard, the character is going to be placed.
15  That's the carrot. Then separate and distinct from
16  that you have a symbol, typically an arrow, which is
17  floating around the screen which is tied directly to
18  movements of the pointing device to indicate to the
19  system the area of interest of the user.
20      The user moves over an object that can
21  respond to the pointing device, clicks down, and the
22  computer then reacts to that command. So you have

1   the text carrot, you have the pointing device symbol
2   separate and distinct, and pointing devices have to
3   do with moving that pointer.
4       Q.  Could the pointer be a highlight?
5       MR. CORBETT: Objection. Vague. Asked
6   and answered.
7       THE WITNESS: I have never seen in my
8   experience the pointer be a highlight. That, that
9   particular method of displaying an area of interest
10  had already been used by, for text carrots, and it
11  would cause confusion with users, and I've never
12  seen anybody attempt to do that.
13  BY MS. GARNER:
14      Q.  With lists in DOS you can typically
15  highlight one of the selections; is that right?
16      MR. CORBETT: Objection. Foundation.
17  Vague.
18      THE WITNESS: That's, if they give you the
19  ability to select from a list, highlighting is often
20  used.
21  BY MS. GARNER:
22      Q.  To let you know which of the options is

**Exhibit 15  Page 7**

Page 26

1  selected; is that right?
2     A.  That's correct.
3        MR. CORBETT:  Same objection.
4  BY MS. GARNER:
5     Q.  And you can change the selection by using
6  the arrow keys on the keyboard usually; is that
7  right?
8        MR. CORBETT:  Objection.
9  BY MS. GARNER:
10    Q.  Or at least sometimes?
11       MR. CORBETT:  Objection.  Vague.
12  Foundation.  Incomplete hypothetical.
13       THE WITNESS:  You can move the -- now this
14  is in a text system.  You're moving the text
15  highlighting through the use of the cursor keys.
16  BY MS. GARNER:
17    Q.  So that up and down arrow keys on my
18  keyboard.  I could move up and down to select
19  different text?
20       MR. CORBETT:  Objection.  Vague.
21  Foundation.  Incomplete hypothetical.
22       THE WITNESS:  To select a different entry,

Page 27

1  that's correct.
2  BY MS. GARNER:
3     Q.  So, if the first item in a list were
4  selected and I wanted to move down to the last item
5  on the list, I could do that using the keyboard; is
6  that right?
7        MR. CORBETT:  Same objection.
8        THE WITNESS:  If the programmer has given
9  you that facility, that's correct.  However, that
10  does not make the keyboard a pointing device because
11  there's no pointer.
12  BY MS. GARNER:
13    Q.  Other than the pointing devices we've
14  talked about so far, can you think of any others?
15    A.  Again, in YMM Mr. Buscaino spent a fair
16  amount of time on the relative difficulty of adding
17  a mouse to YMM, and again there were areas that I
18  thought everyone knew the technical limitations of
19  carrying out that complex a task that, apparently,
20  Mr. Buscaino is unaware of, so I would expect to add
21  material explaining the extreme difficulties and the
22  lack of value and, in fact, damage that would occur

Page 28

1  to YMM had one added a mouse.  And one specific area
2  of that is that YMM was a text-based application,
3  which Mr. Buscaino spoke of it being a graphical,
4  used the word "graphical" several times, and, in
5  fact, it's a text mode application with, which has
6  significant limitations as to what one can add and
7  how difficult it is to add to such an interface with
8  such an underlying technology.
9     Q.  In addition to the pointing devices that
10  we've talked about so far, can you think of any
11  other pointing devices?
12    A.  Again, I can't give you an exhaustive
13  list, but there are gloves that again in effect turn
14  the human finger, the human hand into the pointing
15  device, but in this case there's a physical object
16  that you wear on your hand as opposed to a video
17  system that's interpreting a position of the hand.
18  There are various 3D-pointing devices.  There are --
19  I don't remember whether styluses came up, but styli
20  can be used as pointing devices.  A touch screen is
21  a, is a pointing device in that the person touches
22  various areas of the screen to indicate where the

Page 29

1  user is pointing, and the screen itself is capable
2  of discriminating the location of the finger.  And
3  there are others.
4     Q.  Have you ever seen a voice-actuated device
5  that would move a cursor based on vocal commands?
6     A.  Yes.
7     Q.  Is that a pointing device?
8        MR. CORBETT:  Objection.  Vague.
9        THE WITNESS:  It would, typical pointing
10  device is going to have a manual component to it;
11  that is the hand is involved or the feet or the
12  knees or some portion of the body is physically
13  moving.  So it would depend on how strict one got
14  with the definition as to whether one would
15  enable -- I would see voice typically as being in a
16  different class, as a more abstract kind of device.
17  There's a physicality to pointing devices.
18  BY MS. GARNER:
19    Q.  But that doesn't distinguish pointing
20  devices from keyboards, does it?
21       MR. CORBETT:  Objection.  Vague.  Asked
22  and answered.

Exhibit 15  Page 8

**Page 30**

1  THE WITNESS: Well, you're now asking
2  about a, something outside of the arena of manual
3  devices, so you're getting into, we're no longer
4  dividing manual devices into two groups as has
5  traditionally been done. Now, we're moving to a
6  third kind of input based on voice recognition I'm
7  assuming from your question, and that's not a manual
8  device at all. So that would not help discriminate
9  among manual devices.
10 BY MS. GARNER:
11     Q. Okay. I think I understand, so tell me if
12 there's correct. There's a big class called manual
13 input devices, and that class is divided up into
14 keyboards and everything else, and the everything
15 else category is pointing devices? Does that sound
16 about right?
17     MR. CORBETT: Objection. Vague.
18 Mischaracterizes.
19     THE WITNESS: What I can tell you is that,
20 when you see standardized lists of manual pointing
21 devices, there will typically be a column labeled
22 keyboards or something equivalent to that, and there

**Page 31**

1  will be typically a column labeled pointing devices,
2  and the keyboards and the key pads are on the
3  keyboard side, and the pointing devices are on the
4  pointing device side, and there's a very distinct
5  separation.
6      Now, whether someone could come up with a
7  third class, I can't tell you, and I don't know what
8  would populate that third class, but there are only
9  two classes that I have typically seen over the last
10 35 years that I've been in this business, and those
11 are keyboard key pads and pointing devices, and
12 they've always been separate and distinct.
13 BY MS. GARNER:
14     Q. And is it true that you can only point to
15 something on the screen using a pointing device?
16     MR. CORBETT: Objection. Vague.
17 Mischaracterizes.
18     THE WITNESS: Under the definition of
19 pointing, that is true because pointing is a defined
20 term.
21 BY MS. GARNER:
22     Q. And how is pointing defined?

**Page 32**

1      A. It's defined pretty much as – well,
2  again, let me say that you are now, you've now spent
3  about 20 minutes getting me to opine on something
4  that I started out by telling you I needed to
5  research before I opined on it, so this is all
6  subject to significant revision, and, actually, I
7  think I've just kind of reached the edge of what I'm
8  prepared to talk about given that I prefaced it with
9  the fact that I'm not prepared to talk about it.
10     Q. Can you give me your definition of
11 pointing?
12     MR. CORBETT: Objection. Asked and
13 answered.
14     THE WITNESS: My definition of pointing is
15 irrelevant. It's the established, standard
16 definition that's relevant. There is an
17 established, standard definition. I will be happy
18 to produce that to you, but for me to sit here and
19 try to duplicate that standard, established
20 definition doesn't seem particularly useful. And,
21 again, I'm perfectly prepared to offer an opinion on
22 that standard, established definition, but, as I

**Page 33**

1  told you at the beginning, I have not yet looked
2  into that. This is simply a subject that was, that
3  came, that arose because of Mr. Buscaino's clearly
4  going against the standard, established definition.
5  BY MS. GARNER:
6      Q. That definition that's established in the
7  field of human computer interaction; is that right?
8      A. That's right.
9      Q. And you're an expert in the field of human
10 computer interaction; is that right?
11     A. That's correct.
12     Q. Can you give me your definition as an
13 expert in HCI, if it's all right if I call it that,
14 HCI, can you give me your definition of a pointing
15 device as an expert in HCI?
16     MR. CORBETT: Objection. Asked and
17 answered several times.
18     MS. GARNER: I will retract that question,
19 actually. That's not exactly what I wanted to ask.
20 BY MS. GARNER:
21     Q. Can I call it HCI? Is that all right with
22 you?

**Exhibit 15  Page 9**

Page 34

1    A. Yes, that's fine.
2    Q. As an expert in HCI, can you tell me what
3  is your definition of pointing?
4        MR. CORBETT: Objection. Asked and
5  answered.
6        THE WITNESS: It's the use of a pointing
7  device to point to a, indicate to the system my area
8  of current interest.
9  BY MS. GARNER:
10    Q. If I indicate to the system --
11    A. And there -- I'm sorry. And there's a,
12  and I do so by the physical movement of my hand in
13  at least X, Y and perhaps Z in order to indicate
14  that as opposed to entering abstractions.
15    Q. So, if I indicate to the system my area of
16  current interest by a physical motion of my hand in
17  X, Y at least and perhaps Z to indicate that I do
18  that without using a pointing device, that doesn't
19  count as pointing; is that right?
20    A. That's correct.
21        MR. CORBETT: Objection. Vague.
22  Mischaracterizes.

Page 35

1        THE WITNESS: And another feature of this
2  is that, unless the finger itself is the pointing
3  device, there is typically a moving pointer on the
4  display to indicate the movement of the person's
5  hand and/or finger as they are making this motion,
6  and that object on the screen is called a pointer.
7        MS. GARNER: I'd like to enter Exhibit 4.
8        (Tognazzini Exhibit No. 4, Second
9  Supplemental Expert Report of Dale Buscaino Re
10  Invalidity of U.S. Patent 4,763,356, was marked for
11  identification.)
12  BY MS. GARNER:
13    Q. Do you have Exhibit 4 before you?
14    A. Yes, I do.
15    Q. That's Mr. Buscaino's report. I think
16  that's the report you were responding to in your
17  most recent report; is that right?
18    A. That's correct.
19    Q. Could you take a look at paragraph 48 on
20  page 11 of that report?
21    A. Okay.
22    Q. At the end of paragraph 48 -- well, why

Page 36

1  don't you read all of paragraph 48?
2    A. Out loud?
3    Q. No. Just read it to yourself, please.
4    A. (Witness reviews document.) Okay.
5    Q. Mr. Buscaino opined that the user could
6  use Your Money Manager's on-screen calculator to
7  compose an amount to be entered by pointing to the
8  display keys of the on-screen calculator; is that
9  right?
10    A. That's what he opined.
11    Q. And you disagree with that?
12    A. Strongly.
13    Q. But you feel that you didn't address that
14  in your report; is that right?
15        MR. CORBETT: Objection.
16  Mischaracterizes.
17        THE WITNESS: I did address it. I
18  addressed the issue at the last sentence of my
19  paragraph 40 in Exhibit 1, my Second Supplemental
20  Report.
21  BY MS. GARNER:
22    Q. So you were aware that Mr. Buscaino had

Page 37

1  that opinion when you served your report, and you
2  opined contrary to his opinion; is that right?
3        MR. CORBETT: Objection.
4  Mischaracterizes.
5        THE WITNESS: In Mr. Buscaino's report,
6  paragraph 48, he does not make the claim -- he makes
7  no claim as to how one would point to the display
8  keys of the on-screen calculator in the sentence
9  that we were discussing. I could not imagine how he
10  thought you were going to point to those keys, and I
11  would have never imagined he would claim that
12  pressing a key on a keyboard was somehow pointing to
13  a key, so that's why I say that I would, while
14  changing no opinions, might find it necessary to
15  further add explanation because of this completely
16  idiosyncratic interpretation of the meaning of
17  pressing a key as somehow pointing.
18  BY MS. GARNER:
19    Q. In addition to the issue of pointing and
20  the difficulty of adding a mouse to Your Money
21  Manager, were there other issues that you'd like to
22  respond to that you didn't when you read

**Exhibit 15   Page 10**

Page 38

1 Mr. Buscaino's deposition?
2    A.  Well, if the difficulty of adding a mouse
3 includes the text mode that we discussed earlier,
4 that's, those are the things that, as I'm sitting
5 here right now, that I recall.  It's not necessarily
6 the entire universe of things that I would want to
7 respond to.
8    Q.  Is it fair to say that it surprised you
9 that Mr. Buscaino opined that using the keyboard
10 counted as pointing?
11    MR. CORBETT:  Objection.  Vague.
12    THE WITNESS:  Well, that's asking me what
13 my emotions were at the time, and he had been
14 straying far from the normal path of HCI for some
15 time, so by that point I'm not sure how surprised I
16 was that he would say something like that.
17 BY MS. GARNER:
18    Q.  Would you be surprised if someone that you
19 considered an expert in HCI used pointing to refer
20 to something that you did using a keyboard?
21    MR. CORBETT:  Objection.  Vague.
22    THE WITNESS:  Not everyone is under oath

Page 39

1 as an expert witness when they speak.  People can
2 sometimes speak loosely, so that, if someone in the
3 ordinary course of conversation used the word
4 "pointing" incorrectly, it would not shock me.  When
5 someone who's purporting to be an expert in order to
6 help their client says something that goes against
7 40 years of settled definition and concept to come
8 up with something completely off the wall like that,
9 that's a different situation from someone in a
10 casual conversation trying to get a point across to
11 a colleague in the least amount of time as possible.
12 BY MS. GARNER:
13    Q.  So in trying to get your point across it
14 might be that even an expert would use pointing to
15 refer to something that was done using a keyboard;
16 is that right?
17    MR. CORBETT:  Objection.  Vague.
18 Mischaracterizes.
19    THE WITNESS:  That I would be surprised
20 at.
21 BY MS. GARNER:
22    Q.  Okay.  How about not an expert in HCI, but

Page 40

1 a computer programmer?  Would you be surprised if a
2 computer programmer said pointing and meant using a
3 keyboard to move a cursor around?
4    MR. CORBETT:  Same objection.
5    THE WITNESS:  Again, it would depend on
6 the context, not if a computer programmer is holding
7 themselves out to be an HCI expert.  But, again,
8 terms can be occasionally used loosely among
9 colleagues and an in informal situations.  If I saw
10 that in a document, I would call the, that to the
11 attention of the programmer involved.  If I heard it
12 in a casual conversation, I would probably still
13 correct them just because there's such a profound
14 and important conceptual difference, but it
15 wouldn't, it wouldn't shock me.
16 BY MS. GARNER:
17    Q.  And if a, in a paper or I think you said
18 in a paper you would be surprised to see that, but,
19 if a computer programmer were writing a paper and
20 told you up front for the purposes of this paper,
21 when I say pointing, I'm going to include using the
22 keyboard buttons, would that surprise you?

Page 41

1    MR. CORBETT:  Objection.  Vague.
2 Ambiguous.  Complete hypothetical.
3    THE WITNESS:  I don't know whether it
4 would surprise me.  It would cause me to sit down
5 with him and have a long talk, and his paper would
6 not have such sloppy terminology.
7 BY MS. GARNER:
8    Q.  So, in addition to, so you identified two
9 issues that arose with respect to Mr. Buscaino's
10 deposition, the pointing device and the difficulty
11 of adding a mouse to Your Money Manager which
12 includes the text mode operation of Your Money
13 Manager, and then you identified a few other issues
14 not related to Mr. Buscaino's deposition, Mr. Long
15 and some software for the Mac, Your Money Manager
16 software for the Mac.  Were there any other issues
17 that you thought you needed to opine on that you
18 didn't include in your report?
19    MR. CORBETT:  Objection.  Mischaracterizes
20 the testimony.
21    THE WITNESS:  There may be other issues.
22 These are the ones that particularly stuck out in my

Exhibit 15  Page 11

Page 42

1 mind.
2 BY MS. GARNER:
3    Q.  And did you have plans to submit an
4 additional report in regard to those issues?
5    A.  That I don't, I can't tell you.  I don't
6 mean that I don't want to tell you.  I just don't
7 know.
8    Q.  Have you talked to lawyers from Kirland &
9 Ellis about submitting such a report?
10    A.  No.
11    Q.  Has anybody asked you to submit such a
12 report?
13    A.  Not at this time.
14    Q.  Has anybody said they may potentially want
15 you to submit such a report?
16    MR. CORBETT:  I'm going to caution the
17 witness not to reveal any communications with
18 attorneys under the terms of the agreement in this
19 case.  To the extent you can answer, do so.
20    THE WITNESS:  I understand that Mr. Long
21 will be contacted, and that, that, and I don't know
22 what's going on with the Mac software.  I have to

Page 43

1 assume that, if either of those things take place,
2 that I would be called upon to offer further
3 opinions and that some of these other items -- the
4 fact is I just don't know, but that's all.
5 BY MS. GARNER:
6    Q.  I think you said that you think that you
7 might supplement your report, but you didn't expect
8 to change any of your opinions; is that right?
9    MR. CORBETT:  Objection.
10 Mischaracterizes.  Asked and answered.
11    THE WITNESS:  There was nothing I read in
12 Mr. Buscaino's deposition that would cause me to
13 change any of my opinions.
14 BY MS. GARNER:
15    Q.  I'd like to switch gears a little bit and
16 refer you back to page six of Exhibit 2.  At
17 paragraph 28 you start your discussion of the level
18 of ordinary skill in the art.
19    A.  Yes.
20    Q.  And the art in question here you've
21 identified as human computer interaction; is that
22 right?

Page 44

1    A.  That's correct.
2    Q.  The patentees of the Day patent didn't
3 identify their field as human computer interaction,
4 did they?
5    MR. CORBETT:  I'm going to object at this
6 point that this is, you're referring to his initial
7 report, and it's beyond the scope of this
8 supplemental report and supplemental deposition, and
9 this issue may have already been addressed in the
10 prior deposition.  I'll allow a little leeway here,
11 but, you know, this is not meant to be a redo of the
12 previous deposition.
13    THE WITNESS:  While the field of HCI
14 existed at the time of this patent, it had not yet
15 taken on that name, so these people would not have
16 identified themselves as such.  The patent, however,
17 is in the field of human computer interaction very
18 clearly.
19 BY MS. GARNER:
20    Q.  How does the field of human computer
21 interaction relate to the field of data entry
22 systems?

Page 45

1    MR. CORBETT:  Objection.  Vague.
2    THE WITNESS:  Well, I'm not aware of a
3 field of data entry systems.  Field by my
4 understanding occurs, refers to vocation, and a data
5 entry system is not a vocation.
6 BY MS. GARNER:
7    Q.  Okay.  Actually, I might have misspoke.
8 Take a look at the patent on Column 1 at the top.
9 The Day patent indicates the field of the invention
10 relates to data entry arrangements.  Could you tell
11 me how the field of human computer interaction
12 relates to the field of data entry arrangement?
13    A.  I'm sorry.  What --
14    Q.  I'm sorry.  Column 1 at the very top.
15 It's on MSLT 547.
16    MR. CORBETT:  Let me put the same
17 objection as to beyond the scope of the supplemental
18 deposition.
19    THE WITNESS:  Okay.  Data entry
20 arrangements refers to the human computer
21 interaction design of a data entry system.  These
22 arrangements are the arrangements of screens and

**Exhibit 15   Page 12**

Page 46

1 objects on screens to facilitate people being able
2 to enter information into a computer which is human
3 computer interaction.
4 BY MS. GARNER:
5     Q.  So do I understand you to say that the
6 field of data entry arrangements is the same thing
7 as the field of HCI?
8         MR. CORBETT:  Objection.
9 Mischaracterizes.
10        THE WITNESS:  The field of HCI is bigger
11 because it goes beyond just data entry, but, when
12 you speak of data entry arrangements, you are
13 speaking of the human computer interaction design of
14 a data entry system.
15 BY MS. GARNER:
16     Q.  So is the field of data entry arrangements
17 a subset of the field of HCI?
18        MR. CORBETT:  Objection.  Vague.  Beyond
19 the scope.
20        THE WITNESS:  I think that would be a fair
21 characterization.
22 BY MS. GARNER:

Page 47

1     Q.  In paragraph 29 you talk about what HCI
2 was like --
3     A.  I'm sorry.  Are we back at Exhibit --
4     Q.  I'm sorry.  Exhibit 2, paragraph 29.  You
5 refer to HCI at the time of the '356 patent's
6 invention, and you talk a little bit about that; is
7 that right?
8     A.  That's correct.
9     Q.  What time is that?  What time did you
10 refer to when you wrote your reports?
11        MR. CORBETT:  I'm going to object again.
12 We're still referring back to his first report.
13 Beyond the scope of supplemental report,
14 supplemental deposition to the extent he's already
15 given testimony on this in the first deposition.
16 I'll give a little more leeway, but if we can move
17 on to the subjects of the supplemental deposition
18 and supplemental report.
19        THE WITNESS:  I don't have the date of
20 filing for the Torok patent, but, essentially, it
21 was the period of time that included the data filing
22 of the Torok patent and the data filing of the Day

Page 48

1 patents.  And I believe the Torok patent was
2 earlier.
3 BY MS. GARNER:
4     Q.  So with respect just to the Day patent,
5 when you considered the state of the art with regard
6 to the Day patent, what time frame, the state of the
7 art at the time of the '356 patent invention, what
8 time frame were you considering?
9     A.  December 11, 1986, the filing date of the
10 patent and the period that preceded it.
11     Q.  How long a period preceding?
12        MR. CORBETT:  Objection.  Vague.  Asked
13 and answered.
14        THE WITNESS:  Well, again, I don't have
15 before me the filing date of the Torok patent or at
16 least I don't think I have it before me, so I can't
17 tell you that.  On the other hand, things were
18 improving, so that, essentially, they only would
19 have been worse in the earlier date than what I'm
20 suggesting here.  Okay.  It does say here around
21 1980 at the time of the '956 patent, so it is
22 covering that full time, so 1980 to 1986.

Page 49

1 BY MS. GARNER:
2     Q.  So, when you considered whether or not
3 something, whether or not the Day patent was
4 obvious, you considered what was going on in HCI in
5 1980; is that right?
6        MR. CORBETT:  Objection.  Mischaracterizes
7 his testimony.
8        THE WITNESS:  No, that is not correct.
9 When I consider what was obvious in terms of the Day
10 patent, I considered what was going on at the end of
11 1986.
12 BY MS. GARNER:
13     Q.  And what was going on in HCI in 1986?
14        MR. CORBETT:  Objection.  Vague.
15        THE WITNESS:  Well, in general terms there
16 was one computer system out there that had a mouse
17 as a standard part of the system, the Macintosh, and
18 there were many, many, many, many others that did
19 not, including a wide variety of, as I recall at
20 this time, and, again, I'm just working from memory,
21 a wide variety of companies making MS DOS compatible
22 machines.

Exhibit 15   Page 13

Page 50

1      In addition to several other models of
2  Apples that did not ship with a mouse, there was an
3  initial release of Windows that was available at the
4  time, but was not, had almost no market penetration
5  because it didn't work particularly well and because
6  there were — people typically didn't have a mouse,
7  so, essentially, it was a world still populated by
8  MS DOS and other menu-driven navigational interface
9  systems while over in the corner there was this
10 emerging mouse-based technology going on. There was
11 also great hostility between the two camps.
12 BY MS. GARNER:
13     Q.  The mouse guys and the keyboard guys?
14     A.  Yes.
15     Q.  Other than that distinction, mice and
16 keyboards, were there any other changes going on in
17 the field of HCI in 1986?
18         MR. CORBETT:  Objection.  Vague.
19 Ambiguous.  Overbroad.
20         THE WITNESS:  That was the revolutionary
21 change.  There were evolutionary trends going on as
22 computers became more powerful, etc.

Page 51

1  BY MS. GARNER:
2      Q.  What kinds of evolutionary trends?
3      A.  Well, as you -- nothing, actually, there
4  wasn't too much that happened during this era.
5  About 1990 computers finally began to get up to
6  sufficient speed to begin to do new things, so this
7  was kind of an era where the text navigational menu
8  driven interfaces were at their peak trying to hang
9  on while the mouse was making inroads.  The mouse
10 systems were very weak at the time, which is why the
11 text systems were doing so well, and it would be
12 several more years before the horsepower really, of
13 the computers themselves got up there enough to
14 support the beginnings of the kinds of elaborate
15 software that we have today on mouse-based systems.
16     So you had one, the new camp, the mouse
17 camp in its infancy working, struggling to get every
18 last cycle out of the microprocessors and so forth
19 to support this much more elaborate interface, and
20 meanwhile you had these mature text-based systems
21 that were very efficient for the kind of work they
22 did carrying out much more complex tasks typically

Page 52

1  than the mouse-based systems, and it wouldn't be for
2  several more years again before these things took
3  over.
4      In terms of Windows, Microsoft was trying
5  to copy Apple always interface.  They got it wrong.
6  They got it wrong.  They got it wrong.  About
7  version three they began to get it right, but that
8  didn't come up until around 1990, which was, I
9  believe, the first time that any MS DOS machine
10 included a mouse in the box.  So you had a, just
11 a — the Macintosh came out in 1984 with great
12 splash and then there was this kind of quiet period
13 as the hardware caught up with the vision of the
14 software that lasted up until about 1990.
15     Q.  So the Macintosh, the first computer with
16 a mouse standard, that came out in January of 1984;
17 is that right?
18         MR. CORBETT:  Objection.  Vague.
19 Mischaracterizes.
20         THE WITNESS:  Well, you, and compound
21 because the Mac was not the first computer with a
22 mouse.

Page 53

1  BY MS. GARNER:
2      Q.  Okay.  What was the first computer with a
3  mouse?
4      A.  The Xerox Star.
5      Q.  And you said in 1986 there was one
6  computer with a mouse standard.  What computer were
7  you referring to?
8      A.  The Macintosh.
9      Q.  The Star had a mouse at that point?
10     A.  The Star had died a bad death.
11     Q.  By what date?
12     A.  I think -- well, I'd have to look into it,
13 but I think by 1983.  I think so.  At any rate, it
14 never -- they sold very few machines ever, so it
15 never, never achieved profitability.  It never
16 achieved success.
17     Q.  But the Macintosh did?
18     A.  Ultimately.
19     Q.  And it was introduced in January of 1984;
20 is that right?
21     A.  Yes.
22     Q.  I think we all remember the Super Bowl

**Exhibit 15   Page 14**

**Page 54**

1  commercial. Well, some of us are old enough to
2  remember the Super Bowl commercial. And you, when
3  you bought a Macintosh in 1984, it came with a
4  mouse; is that right?
5      A.  That's correct.
6      Q.  Could you use a mouse with any other
7  computer in 1984?
8      MR. CORBETT: Objection. Vague. Calls
9  for narrative.
10     THE WITNESS: You could use it with an
11 Apple Lisa.
12 BY MS. GARNER:
13     Q.  Any others?
14     A.  I don't know of any others in 1984. There
15 may have been some, certainly nothing with any
16 practical software on it.
17     Q.  You said in your report that you used Your
18 Money Manager, and you tried to use it with a mouse;
19 is that right? I'll refer you to paragraph 42 on
20 page 11.
21     A.  Okay.
22     Q.  "When I attempted to run YMM referring to

**Page 55**

1  Your Money Manager on a computer with a mouse."
2      A.  That's correct.
3      Q.  What kind of computer was that?
4      A.  That was an MS DOS; it was running MS DOS.
5  I can't tell you as I'm sitting here today what
6  brand of computer it was.
7      Q.  So IBM PC?
8      A.  It was a PC or a PC compatible.
9      Q.  Do you know what the vintage was?
10     MR. CORBETT: Objection. Vague.
11 BY MS. GARNER:
12     Q.  About what time frame that computer was
13 from?
14     MR. CORBETT: Objection. Vague. Asked
15 and answered.
16     THE WITNESS: And, as I'm sitting here
17 today, I don't recall.
18 BY MS. GARNER:
19     Q.  Was that your machine?
20     A.  No.
21     Q.  Whose was it?
22     A.  Well, I really don't recall at what point

**Page 56**

1  I saw that.
2      Q.  Mr. Buscaino submitted his report on
3  September 14, 2007, and you submitted yours on
4  October 12, 2007. Do you think you looked at that
5  machine in between those dates?
6      A.  I did look at that machine. I did look at
7  that software between those dates.
8      Q.  On this IBM PC-compatible computer?
9      A.  On an IBM PC-compatible computer.
10     Q.  Where was that?
11     A.  That would have been at the offices of
12 Kirland & Ellis.
13     Q.  Here in D.C.?
14     A.  I'm sorry. I live on the road all but
15 about three months a year, and sometimes -- I
16 believe that was in San Francisco.
17     Q.  So that computer was provided to you by
18 Kirland & Ellis; is that right?
19     A.  That's correct.
20     Q.  Did you install Your Money Manager on the
21 computer?
22     A.  I believe I was there at the time; I

**Page 57**

1  witnessed the installation, as I recall. I didn't
2  physically put the disks in the machine.
3      Q.  The computer had a mouse?
4      A.  The computer had a mouse.
5      Q.  What kind of mouse? Do you know the
6  brand?
7      A.  No.
8      Q.  Did you install the mouse?
9      A.  No.
10     Q.  Had some software drivers or something
11 that supported the mouse?
12     A.  Yes.
13     Q.  Did you try to operate the mouse in other
14 applications besides Your Money Manager?
15     A.  Yes.
16     Q.  What other applications?
17     A.  The Desktop Manager. At least that. I'm
18 sorry. The File Manager rather than the Desktop
19 Manager, so at least that, and I don't recall what
20 others, but the mouse was operating in a normal
21 fashion. It was responding to X, Y, Z and click.
22 Or X, Y and click. I'm sorry. Turning it into 3D.

15 (Pages 54 to 57)

**Exhibit 15  Page 15**

Q. You for sure used it in File Manager. What is that?
A. That's the desktop for opening and closing other applications and so forth. In a windowing system that's generally considered an application. From the system's point of view that's just another application, and at that level it worked just fine.
Q. So let's see. This is an IBM compatible PC, so, when it started up, it had a C prompt or a DOS prompt; is that right?
MR. CORBETT: Objection. Asked and answered. Mischaracterizes.
THE WITNESS: Well, it depends on how you start it up.
BY MS. GARNER:
Q. I'm asking the one that you started up.
A. Right.
Q. Did it have a C prompt or a DOS prompt?
A. When I was going to use YMM, yes.
Q. And how did you get to this File Manager program?
A. By typing in the name of the program.

Q. What is the name of the program?
A. I don't recall.
Q. Is it a separate application that was installed on the machine?
A. The program?
Q. Yes, The File Manager program.
A. I'm not sure what it otherwise would be, so I'm not quite sure how to answer that, whether there's a --
Q. So The File Manager program was a separate application that you accessed by typing its name at the C prompt, but you don't remember the name of the program; is that right?
A. No, I'm sorry. The File Manager is at the, within Windows.
Q. What version of Windows was that?
A. I don't recall. It was not Vista. It was probably XP, but -- when I was using YMM itself, I was within MS DOS, so I didn't particularly take note of what the windowing system was.
Q. Did you use the mouse with any other programs that you can recall on that machine?

MR. CORBETT: Objection. Asked and answered.
THE WITNESS: I don't recall.
BY MS. GARNER:
Q. Would you characterize the transition from text-based machines to graphical based machines with mice that we have today as a paradigm shift?
MR. CORBETT: Objection. Vague. Calls for narrative.
THE WITNESS: Well, because you've included the word "with mice", I would agree with that.
BY MS. GARNER:
Q. So the shift from, without a mouse to with a mouse is a paradigm shift; is that right?
MR. CORBETT: Objection. Mischaracterizes.
THE WITNESS: That's an important component of it.
BY MS. GARNER:
Q. What are the other components?
A. Well, the paradigm shift is a shift from

the system in control, the user required to navigate what in the parlance is called the black cave with menus acting as sign boards and required to do tasks in sequence to a system where the lights are on, the user sits in one place, and the work is brought to the user. The user is in control. And one of the, one of the important components of this approach is the user having a pointing device that it can point to objects of interest.
Q. When did that paradigm shift start?
A. Well, that paradigm shift started in 1948.
Q. What happened in 1948 that you think is the start of that paradigm shift?
A. There was a gentleman by the name of Doug Engelbart who decided that, rather than human beings being a peripheral to a computer as they were at the time, if you need data entry, you hire somebody to type stuff into the computer, etc., that computers should be a peripheral to the person.
Q. When was the first mouse used on a computer?
MR. CORBETT: Objection. Vague.

Page 62

1    THE WITNESS: Mouse was invented by Doug
2 Engelbart in approximately 1963.
3 BY MS. GARNER:
4    Q.  And when was the mouse first available? I
5 think you said on the Xerox Star?
6    A.  Xerox Star was released in 1980.
7    Q.  And today would you say that almost all
8 computers include a mouse or a pointing device?
9    MR. CORBETT: Objection. Vague.
10    THE WITNESS: Actually, if you mean
11 general purpose computers, that's true. Most
12 computers don't include a pointing device because
13 most computers are Blackberries and cell phones and
14 microwave ovens and digital video recorders and so
15 forth, but, if you're talking about general purpose
16 computers, particularly for productivity, they
17 include a pointing device.
18 BY MS. GARNER:
19    Q.  Did you use an earlier, a very early
20 version of Windows on the computer that Kirland &
21 Ellis provided to you?
22    MR. CORBETT: Objection. Vague. Asked

Page 63

1 and answered.
2    THE WITNESS: I don't recall what version
3 of Windows I was using, but it was familiar to me,
4 so it was not a very early version of Windows.
5 BY MS. GARNER:
6    Q.  Are you unfamiliar with early versions of
7 Windows?
8    A.  Well, I haven't seen them since the time
9 frame of the Day patent.
10    Q.  Mr. Buscaino opined on Windows Version
11 1.01 with respect to a composition tool, didn't he,
12 in his report? Do you remember that? I can point
13 you to it. It's Exhibit 4. Take a look at page 30.
14 Actually, start on 27. Under heading 2, "Microsoft
15 Windows 1.01."
16    A.  I see that.
17    Q.  And then on page 30 under heading 2 also,
18 but that would be heading 2E, it discusses Microsoft
19 Windows 1.01. Do you see that?
20    A.  Yes.
21    Q.  When's the last time you reviewed Windows
22 1.01?

Page 64

1    MR. CORBETT: Objection. Vague. Asked
2 and answered.
3    THE WITNESS: Well, I looked at Windows
4 1.01 to see how much copying had been done from the
5 Mac interface shortly after it came out, and I don't
6 really remember the last time I laid eyes on it.
7 BY MS. GARNER:
8    Q.  At least ten years ago?
9    MR. CORBETT: Objection. Vague.
10 Mischaracterizes. Asked and answered.
11    THE WITNESS: It's hard for me to say. I
12 don't have any specific recollection of anything
13 within the last ten years.
14 BY MS. GARNER:
15    Q.  You didn't review it for purposes of your
16 reports in this case then?
17    A.  No, I did not.
18    MR. CORBETT: Objection.
19 Mischaracterizes. Asked and answered.
20 BY MS. GARNER:
21    Q.  You have no opinions about whether Windows
22 1.01 contains a composition tool or not?

Page 65

1    MR. CORBETT: Objection.
2 Mischaracterizes. Asked and answered.
3    THE WITNESS: As I'm sitting here today, I
4 don't recall providing an opinion on that subject.
5 BY MS. GARNER:
6    Q.  As you're sitting here today, do you have
7 an opinion on that subject?
8    A.  If it's in my report, I have an opinion.
9    Q.  Okay. And if it's not?
10    A.  If it's not, I don't.
11    Q.  But you don't remember reviewing Windows
12 1.01 for the purposes of preparing your report?
13    A.  That's correct.
14    MR. CORBETT: Objection. Asked and
15 answered. Mischaracterizes.
16 BY MS. GARNER:
17    Q.  Could you take a look at your report
18 Exhibit 1 on page three? Paragraph nine indicates
19 that you examined some devices in San Diego I think
20 in my office of Fish & Richardson in 2006, and then
21 you said you also independently examined certain
22 actual software relied upon by Mr. Buscaino. Do you

**Exhibit 15   Page 17**

Page 66

1 see that?
2    A.  Yes.
3    Q.  You didn't rely on, or excuse me.  You
4 didn't independently examine all of the software
5 that Mr. Buscaino relied on; is that a fair
6 statement?
7        MR. CORBETT:  Objection.
8 Mischaracterizes.
9        THE WITNESS:  I can't give you an answer
10 to that.
11 BY MS. GARNER:
12    Q.  Well, at least with respect to Microsoft
13 Windows 1.01 you didn't examine independently
14 Microsoft Windows 1.01?
15    A.  Well, now you're refreshing my memory, but
16 perhaps it was in the room, and perhaps I looked at
17 it.  So now I'm not sure whether I reviewed it or
18 not.
19    Q.  Okay.  What software do you remember
20 reviewing that you were referring to in making that
21 statement?
22    A.  Well, as I sit here now, I specifically

Page 67

1 remember the Xerox Star, the Apple Lisa, and an HP,
2 early HP screen with, that you could touch the
3 screen.  It wasn't exactly touch sensitive, but it
4 had an analogue to that, and there were other things
5 that I reviewed, and I don't remember what they
6 were.  Those stood out.
7    Q.  That was back in April of 2006; is that
8 right?
9    A.  That's correct.
10    Q.  And then between Mr. Buscaino's second
11 supplemental report in September and your responsive
12 report in October, you reviewed some more software;
13 is that right?
14    A.  That's correct.
15    Q.  What pieces of software do you remember
16 reviewing during that period of time?
17        MR. CORBETT:  Objection.
18 Mischaracterizes.  Asked and answered.
19        THE WITNESS:  I, what I reviewed included
20 YMM, Your Money Manager for MS DOS, Your Money
21 Manager for Commodore, and insofar as software, as I
22 recall, that was the only actual software that I

Page 68

1 reviewed.  Something may come out during the day,
2 but that's all I recall at this point.
3 BY MS. GARNER:
4    Q.  And you reviewed that, the MS DOS version
5 on a machine that Kirland & Ellis provided to you?
6    A.  That's correct.
7        MR. CORBETT:  Objection.  Asked and
8 answered.
9 BY MS. GARNER:
10    Q.  Did you examine it on any other machine?
11        MR. CORBETT:  Objection.  Asked and
12 answered.
13        THE WITNESS:  Yes.
14 BY MS. GARNER:
15    Q.  What other machine?
16    A.  I, I'm sorry.  Could you, could you ask
17 the question again?  'Cause I'm not sure I got it.
18        MS. GARNER:  Sure.  Want to read back the
19 question, please?
20        (The reporter read back as requested.)
21        THE WITNESS:  Okay.
22        MR. CORBETT:  Same objection.

Page 69

1        THE WITNESS:  I reviewed it subsequently,
2 but I don't know whether it was on the same machine
3 or a different machine.
4 BY MS. GARNER:
5    Q.  Also IBM PC?  The different, if it was a
6 different machine, was it also an IBM PC?
7        MR. CORBETT:  Objection.  Asked and
8 answered.
9        THE WITNESS:  Well, I don't think I stated
10 it was an IBM PC.
11 BY MS. GARNER:
12    Q.  Or compatible?
13    A.  Or compatible, yes.
14    Q.  Okay.
15    A.  You are asking me about the MS DOS
16 version, so --
17    Q.  I am.  And you didn't review it, for
18 example, in a DOS emulator on a modern machine; is
19 that right?
20        MR. CORBETT:  Objection.  Asked and
21 answered.  Mischaracterizes.
22        THE WITNESS:  Well, my field is HCI, and

**Exhibit 15  Page 18**

Page 70

1  you're asking me a question that has to do with the
2  internal architecture of Windows. I don't know that
3  Windows has a DOS emulator as opposed to access to
4  DOS, so I don't quite know how to answer your
5  question.
6  BY MS. GARNER:
7      Q.  Okay. Let me put it a different way then.
8  The machine on which you, the IBM PC compatible
9  machine on which you reviewed Your Money Manager, do
10 you think it was a modern machine or one from the
11 time period at which Your Money Manager software
12 first became available?
13     MR. CORBETT: Objection. Vague.
14 Ambiguous. Mischaracterizes. Asked and answered.
15     THE WITNESS: The second time I looked at
16 it it was a modern machine, and I don't really
17 remember the first machine, so --
18 BY MS. GARNER:
19     Q.  So the second time the computer was
20 running a version of Windows, and you got a separate
21 DOS window in which you ran the program, does that
22 sound right?

Page 71

1      A.  That's correct.
2      Q.  And the first time I think you said the
3  machine started up, and there was a DOS prompt. Did
4  I misunderstand that?
5      MR. CORBETT: Objection.
6  Mischaracterizes. Vague.
7      THE WITNESS: When I was prepared to run
8  YMM, there was a DOS prompt. However, Windows was
9  running on that system.
10 BY MS. GARNER:
11     Q.  So it was a DOS window in a Windows
12 program; is that right?
13     MR. CORBETT: Objection.
14 Mischaracterizes.
15     THE WITNESS: Well, again, I don't know.
16 I think at least earlier on you just simply got
17 below Windows to DOS which was lying underneath, and
18 I don't know what the current situation is, but,
19 yes, I was running in DOS on a system that also had
20 Windows.
21     MR. CORBETT: We've been going about two
22 hours. Does it make sense to take a break?

Page 72

1      MS. GARNER: That's fine. Break.
2      THE VIDEOGRAPHER: Going off the record at
3  10:52:33. We're off the record.
4      (Whereupon, a short recess was taken.)
5      THE VIDEOGRAPHER: Going on the record at
6  11:03:10. End of Tape 1. Going off the record at
7  11:03:15.
8      (Discussion held off the record.)
9      THE VIDEOGRAPHER: We're going back on the
10 record. The time is 11:18. This marks the
11 beginning of Videotape Number 2 of the deposition of
12 Bruce Tognazzini being taken at 655 15th Street,
13 Northwest, Washington, D.C. The Videographer is
14 Steve Schaal here on behalf of Esquire Deposition
15 Services located at 1020 19th Street, Northwest,
16 Washington, D.C. Counsel may proceed.
17 BY MS. GARNER:
18     Q.  Before the break, we were talking about
19 your review of Your Money Manager, and you said you
20 had reviewed it on a Commodore?
21     A.  That's correct.
22     Q.  Was that your Commodore machine?

Page 73

1      A.  It was not.
2      Q.  Where did you get that machine?
3      A.  I saw it at the offices of Kirland &
4  Ellis.
5      Q.  Back in 1986 at the time of the Day
6  patent, mice were available for IBC PC's or
7  PC-compatible computers?
8      A.  One could buy a mouse that could plug into
9  an IBM PC compatible?
10     Q.  From just one company?
11     A.  I don't know.
12     Q.  Do you know of any companies that sold
13 mice for IBM compatible PC's in 1986?
14     A.  No.
15     Q.  When was the first mouse available for an
16 IBM PC-compatible computer?
17     MR. CORBETT: Objection. Vague.
18     THE WITNESS: I can't tell you that.
19 BY MS. GARNER:
20     Q.  You know they were available by 1986, but
21 you don't know how much before that they were
22 available; is that right?

**Exhibit 15   Page 19**

Page 74

1    A.  That's correct.
2        (Tognazzini Exhibit No. 5, PC Magazine
3    Article Pages, was marked for identification.)
4    BY MS. GARNER:
5    Q.  The Court reporter has handed you what's
6    been marked as Exhibit 5 which is some copies of
7    pages from a magazine called PC.  If you'll turn to
8    the second page toward the bottom, the title page
9    says "December of 1983"; is that right?
10   A.  That's correct.
11   Q.  And then if you'll take a look at the ad,
12   which is the two pages following that.
13       MR. CORBETT:  Objection to the extent this
14   hasn't been produced.  Has this been produced?
15       MS. GARNER:  No.
16   BY MS. GARNER:
17   Q.  This is an ad for a mouse to be used with
18   Microsoft Word on an IBM PC; is that right?
19       MR. CORBETT:  Object, again, to the extent
20   this hasn't been produced.  The witness hasn't seen
21   it, hasn't been relied on by any experts in this
22   case.  First time the witness has seen this.

Page 75

1        THE WITNESS:  I'm sorry.  What was the
2    question?
3        MS. GARNER:  Can we have the question read
4    back?
5        (The reporter read back as requested.)
6        MR. CORBETT:  Same objections.
7        THE WITNESS:  No.
8    BY MS. GARNER:
9    Q.  How is that wrong?
10   A.  It's an ad for a word processor.
11   Q.  That makes reference to a mouse to be used
12   with Word on an IBM PC?
13   A.  That's correct.
14   Q.  And IBM PC's operating systems were MS
15   DOS; is that right?
16       MR. CORBETT:  Objection.  Vague.
17       THE WITNESS:  IBM PC's used an operating
18   system called MS DOS.
19   BY MS. GARNER:
20   Q.  Did you know that mice were available for
21   use on IBM PC's in 1983?
22       MR. CORBETT:  Objection.  Vague.

Page 76

1        THE WITNESS:  Well, I'm not quite sure
2    what you mean by available for use.  This talks
3    about a dedicated device for a single application or
4    system.  It's not talking about a general purpose
5    device that would work on anything other than this
6    one program.
7    BY MS. GARNER:
8    Q.  Did you know before today that someone in
9    1983, in December of 1983, was selling a mouse that
10   was intended for use with an IBM PC?
11       MR. CORBETT:  Objection.  Foundation.  I'm
12   going to object to all questions related to this
13   reference to the extent it wasn't produced.  None of
14   the experts have looked at it before today or formed
15   any opinions related to this document.
16       THE WITNESS:  From what I draw from this
17   ad, they were not selling a mouse.
18   BY MS. GARNER:
19   Q.  Before today did you know whether a mouse
20   was available that was intended for use with an IBM
21   PC in December of 1983?
22       MR. CORBETT:  Same objections.

Page 77

1        THE WITNESS:  If you're asking me whether
2    sitting here today I recalled that, I didn't recall
3    exactly when a mouse could have been used under
4    something on an IBM PC.
5    BY MS. GARNER:
6    Q.  You didn't recall exactly when -- what do
7    you think the time frame was of the first use, the
8    first time mice became available for use with IBM
9    PC's?
10       MR. CORBETT:  Objection.  Asked and
11   answered.
12       THE WITNESS:  I did not recall exactly
13   when a mouse could have been used with an IBM PC.
14   BY MS. GARNER:
15   Q.  I understand that you don't remember
16   exactly when.  Do you remember generally the time
17   frame at which mice became available that were
18   intended for use with IBM PC's?
19   A.  Well, I don't know how much after this or
20   before this that might have occurred.  In this case,
21   this is not intended for use with IBM PC's per se,
22   but with a specific dedicated application.

**Exhibit 15    Page 20**

Page 78

1    Q.  If you know, what is the general time
2  frame at which mice became available that were
3  intended for use with IBM PC's?
4    A.  I do not know.
5      MR. CORBETT: Objection. Vague. Asked
6  and answered.
7  BY MS. GARNER:
8    Q.  Could you take a look at page two of your
9  report, Exhibit 1, and review paragraph seven,
10  please?
11    A.  Yes, I have reviewed it.
12      (Tognazzini Exhibit No. 6, Copy of
13  Deposition Transcript of Bruce Tognazzini of
14  6/27/06, was marked for identification.)
15      (Tognazzini Exhibit No. 7, Claim
16  Construction Order, was marked for identification.)
17      (Tognazzini Exhibit No. 8, Order Denying
18  Plaintiff's and Defendants' Cross-Motions Regarding
19  the Invalidity of U.S. Patent '356, was marked for
20  identification.)
21  BY MS. GARNER:
22    Q.  Could you take a look at Exhibit 7 that's

Page 79

1  been given to you? I think it's this one over here.
2    A.  Okay.
3    Q.  And that's the Court claim construction
4  order. Do you remember seeing that before?
5    A.  Yes.
6    Q.  Could you take a look at page eight of the
7  order? Do you see under Claim 19 in the second
8  element that says "displaying on said display a
9  plurality of information fields"?
10    A.  Yes.
11    Q.  What is your understanding of information
12  field?
13    A.  An information field is a field on to
14  which you can enter information and read the
15  results.
16    Q.  In the next element the Court construed
17  concurrently displaying -- you can see the Court's
18  construction on the right-hand side -- as
19  "displaying at the same time as by a window
20  overlaying the form." Do you see that?
21    A.  Yes, I do.
22    Q.  Do you remember at your last deposition

Page 80

1  talking about the Xerox Star with relation to this
2  construction and the fact that the Xerox Star
3  windows were tiled? I'll just ask you if you
4  remember without consulting the deposition. We can
5  take a look at that in a minute.
6    A.  I remember in general terms.
7    Q.  Okay. Maybe you can take a look at the
8  deposition on page 166. Why don't you just review
9  page 166 and anything before or after it that you'd
10  like to for context, and let me know when you're
11  done with that.
12      MR. CORBETT: I'm going to object again to
13  the extent you're asking him questions about his
14  earlier deposition. The scope of this deposition is
15  limited to Mr. Buscaino's supplemental report, and,
16  to the extent the questions are directed at that,
17  it's fine, but, to the extent you are asking for a
18  redo or rehash of things that were and should have
19  been discussed in the first deposition, I'm going to
20  object to that.
21      THE WITNESS: Okay.
22  BY MS. GARNER:

Page 81

1    Q.  Do you remember opining with respect to
2  the Apple Lisa -- why don't I actually direct you to
3  Exhibit 2, page 40, please. Do you have page 40
4  there?
5    A.  I'm sorry. I'm looking at paragraph 40.
6    Q.  Sorry about that. It's paragraph 160.
7  And do you see there about halfway through that
8  paragraph when you're talking about the Lisa
9  calculator, and you say 'The calculator cannot be
10  all things at once. The Court's construction
11  interprets concurrently displaying as displaying at
12  the same time, as by a window overlaying the form.
13  Mr. Buscaino's example of this single entity
14  existing in a single window does not meet the
15  Court's definition." Do you remember opining on
16  that?
17    A.  Yes.
18    Q.  Now, I'm going to ask you to take a look
19  at a whole 'nother exhibit again. Sorry about that.
20  And that would be Exhibit Number 8. Exhibit
21  Number 8 is the Court's order -- I'm missing a page.
22  Oh, here it is -- dated May 15, 2007. It's the

Page 82

1  Order Denying Plaintiff's and Defendant's Cross -
2  Motions Regarding the Invalidity of U.S. Patent
3  Number 4,763,356. Do you remember having reviewed
4  this order before?
5      A.  Yes.
6      Q.  And could you take a look at page seven?
7  In Footnote 3 the Court's order says, "Lucent also
8  argues that the tools in Apple Lisa are not
9  concurrently displayed because the numbers pad and
10  tape window are side-by-side rather than one
11  overlaying the other. This argument fails.
12  Although the Court provided the definition of
13  concurrently displaying to include the example as by
14  a window overlaying the form, that phrase is an
15  example of the definition of displaying at the same
16  time. The Court's construction does not exclude
17  side-by-side displays such as those present in Apple
18  Lisa."
19      Do you understand that the Court
20  determines the meaning of claim terms?
21      MR. CORBETT: Objection. Calls for a
22  legal conclusion.

Page 83

1      THE WITNESS: I believe that the Court
2  determines the claim terms.
3  BY MS. GARNER:
4      Q.  And do you think that the Court's
5  statement in Footnote 3 clarifies the Court's claim
6  term with regard to something that you were unclear
7  about during your last deposition?
8      MR. CORBETT: Objection. Vague. Calls
9  for a legal conclusion.
10      THE WITNESS: I do not understand the
11  legal ramifications of clarification, so my
12  understanding is that the claim term was not
13  modified, that it still stands.
14  BY MS. GARNER:
15      Q.  And you understand that the Court said
16  that the second half of that claim term, as by a
17  window overlaying the form, is an example only; is
18  that right?
19      MR. CORBETT: Objection.
20  Mischaracterizes. Calls for a legal conclusion.
21      THE WITNESS: I'm not, I don't have, I'm
22  not a lawyer, and I don't know the ramifications of

Page 84

1  a footnote when the original definition was not
2  altered.
3  BY MS. GARNER:
4      Q.  So, during your deposition, you said that
5  you didn't know how far you could take the Court's
6  claim construction, whether you -- you knew that it
7  would include overlays, but you didn't know if it
8  would include more than that; is that right?
9      MR. CORBETT: Objection.
10  Mischaracterizes, and again the question is related
11  to his first deposition which is outside of the
12  scope of this deposition.
13      THE WITNESS: I'm sorry. Could you give
14  me the page numbers?
15  BY MS. GARNER:
16      Q.  Sure. It was on page 166.
17      A.  And what was the question again?
18      (The reporter read back as requested.)
19      MR. CORBETT: Same objection.
20      THE WITNESS: What I stated was I'm not
21  sure what the Court had in mind beyond having a
22  window overlaying a form.

Page 85

1  BY MS. GARNER:
2      Q.  And does the Court's statement in Footnote
3  3 help you out with that regard?
4      MR. CORBETT: Objection. Calls for a
5  legal conclusion.
6      THE WITNESS: I would say it's another
7  factor to be considered, but that it's not, that, as
8  far as I know, it did not clear -- change the
9  original definition, and the footnote itself is not
10  particularly illuminating.
11  BY MS. GARNER:
12      Q.  Do you think the footnote contradicts the
13  Court's claim construction?
14      MR. CORBETT: Objection. Vague.
15  Mischaracterizes. Calls for a legal conclusion.
16  Also object to the extent that Exhibit 7 is not the
17  most recent version of the Court's claim
18  construction.
19      THE WITNESS: Could I have the question
20  again?
21      (The reporter read back as requested.)
22      THE WITNESS: Well, I'm not a lawyer, so

**Exhibit 15   Page 22**

Page 86

1  I'm not sure at what point something contradicts,
2  but I would, I'm not really prepared to give you a
3  legal answer on that.
4  BY MS. GARNER:
5      Q.  Okay, but not a legal answer.  Do you
6  think that Footnote 3 is consistent with the Court's
7  claim construction on, with respect to the term
8  "concurrently displaying"?
9          MR. CORBETT:  Objection.  Vague.  Asked
10 and answered.  Calls for a legal conclusion.
11         THE WITNESS:  Well, from the standpoint of
12 an HCI person, Footnote 3 is self-inconsistent, so
13 it's hard to figure out how one might apply it.
14 BY MS. GARNER:
15     Q.  How is it inconsistent?
16     A.  Well, it's speaking of two windows in the
17 case of the numbers pad and the taped window, but
18 they are not windows, so exactly what the Court had
19 in mind is unclear.
20 BY MS. GARNER:
21     Q.  Okay.  Aside from the reference to Apple
22 Lisa, the sentence that the Court's construction

Page 87

1  does not exclude side-by-side displays, does that
2  help clarify things for you with regard to that?
3      A.  Well, a display is an entire screen in a
4  physical box, so this again is not what the Court
5  intended, and, therefore, it's hard for me to
6  interpret much from what they said.
7      Q.  Is it fair to say you don't understand
8  what Footnote 3 means?
9          MR. CORBETT:  Objection.
10 Mischaracterizes.
11         THE WITNESS:  I don't understand the legal
12 ramifications of Footnote 3 and how they might act
13 upon the still standing definition of concurrently
14 displaying as displaying at the same time by a
15 window overlaying the form.
16 BY MS. GARNER:
17     Q.  Take a look again at page seven.  In the
18 last sentence that begins on that page it says,
19 "Lucent also argues that Xerox Star displays the
20 tools side-by-side with the form rather" --
21     A.  I'm sorry.  I'm not quite sure where you
22 are.

Page 88

1      Q.  I'm sorry.  Page seven of the Court's or
2  the, Exhibit 8, the very last sentence that begins
3  on that page.
4      A.  Oh, okay.
5      Q.  Do you see that?  "Lucent argues that
6  Xerox Star displays the tools side-by-side with the
7  form, rather than as an overlaying; as explained
8  above, this arrangement is not excluded from the
9  definition of concurrently displaying."  Did you
10 consider that when you formulated your opinions in
11 this most recent report?
12     A.  Yes.
13     Q.  Did that change your conclusions as to
14 whether tools can be tiled instead of overlays?
15         MR. CORBETT:  Objection.  Vague.
16         THE WITNESS:  I think, my recollection of
17 the cases that arose were instances of things that
18 were not tools, and it was also in regards to
19 windows and it, as I recall that -- now I don't
20 remember each and every thing that happened in the
21 earlier deposition and each and every statement in
22 my earlier report.  It did not affect my opinions in

Page 89

1  this latest report.
2  BY MS. GARNER:
3      Q.  Did reading the Court's order, Exhibit 7,
4  impact or change your opinion with regard to whether
5  tiling instead of overlaying meets the Court's
6  construction of concurrently displaying?
7          MR. CORBETT:  Objection.  Vague.  Asked
8  and answered. .
9          THE WITNESS:  Well, it says that this
10 arrangement is not excluded.  It doesn't say that it
11 is included, so I would assume it's still a question
12 of fact.  All I can tell you is that there's nothing
13 in this document that I'm aware of that in any way
14 affected any of my opinions in my earlier reports or
15 my current report.
16 BY MS. GARNER:
17     Q.  Sitting here today, do you understand the
18 Court's construction concurrently displaying,
19 displaying at the same time as by a window
20 overlaying the form to include tools that are tiled
21 rather than overlaid?
22         MR. CORBETT:  Objection.  Vague.  Asked

23  (Pages 86 to 89)

**Exhibit 15   Page 23**

Page 90

1  and answered. Calls for a legal conclusion.
2      THE WITNESS: Well, again, I'm not a
3  lawyer, but I haven't read such a statement
4  anywhere, nor have any of my ultimate opinions
5  depended on that particular fact.
6  BY MS. GARNER:
7      Q.  Let me ask it a slightly different way.
8  Sitting here today, do you understand the Court's
9  construction concurrently displaying displaying at
10  the same time as by a window overlaying the form not
11  to exclude tiling rather than overlaying?
12      MR. CORBETT: Objection. Vague. Asked
13  and answered.
14      THE WITNESS: I really don't have the
15  legal background to tell you whether this footnote
16  and this sentence in a Summary Judgment Motion which
17  apparently did not change the language of definition
18  of concurrently displaying, what the full
19  ramifications are, but, again, I will tell you that
20  my, my opinions in regard to this case are not
21  affected by this document.
22  BY MS. GARNER:

Page 91

1      Q.  By this document you mean the Court's
2  order, Exhibit 7?
3      A.  By the particular wording that you picked
4  out of the Court order.
5      Q.  So you understand that you as an expert
6  are to apply the Court's construction to the facts
7  in drawing your conclusions; is that right?
8      MR. CORBETT: Again, objection. Vague.
9  Object to the extent Exhibit 7 is not the most
10  recent version of the Court's claim construction.
11      THE WITNESS: I am to apply the Court's
12  claim constructions in reaching my opinions.
13  BY MS. GARNER:
14      Q.  And, as you sit here today, do you
15  understand the definition of concurrently displaying
16  to exclude tools that are tiled rather than
17  displayed as overlays?
18      MR. CORBETT: Objection. Vague. Asked
19  and answered several times.
20      THE WITNESS: The Court has stated Lucent
21  also argues that Xerox Star displays the tools
22  side-by-side with the form rather than as an overlay

Page 92

1  as explained above. This arrangement is not
2  excluded from the definition of concurrently
3  displaying. I mean, the words speak for themselves.
4  BY MS. GARNER:
5      Q.  So do you understand the definition of
6  concurrently displaying not to exclude displaying
7  side-by-side? And is that the definition that you
8  applied in forming your opinions?
9      MR. CORBETT: Objection. Compound.
10  Vague.
11      THE WITNESS: Again, I'm not a lawyer, so
12  I don't know how when the definition remained
13  unchanged exactly this impinges on it, but, again, I
14  did not depend on an absence of excluding in forming
15  my opinions. So, in other words -- that's all.
16  BY MS. GARNER:
17      Q.  I'm not sure I understood your answer.
18      MR. CORBETT: Objection. Is there a
19  question pending?
20  BY MS. GARNER:
21      Q.  You were about to clarify it maybe. Could
22  you do that for me?

Page 93

1      A.  I believe you're asking me for a legal
2  conclusion, and I'm not prepared to give you one.
3      Q.  Okay. I'm asking you for your application
4  of this term exactly as it's written right here to
5  the facts of this case. When you apply this term,
6  concurrently displaying, to the facts of this case,
7  did you apply it as excluding displaying
8  side-by-side rather than overlaying?
9      MR. CORBETT: Objection. Vague and asked
10  and answered.
11      THE WITNESS: The conclusions I reached in
12  forming my opinions are not changed by either
13  including or excluding the side-by-side possibility.
14  BY MS. GARNER:
15      Q.  So it never came up?
16      MR. CORBETT: Objection.
17  Mischaracterizes.
18      THE WITNESS: It did come up, which,
19  whether the Court ultimately, whether there's
20  ultimately a finding of fact that it's excluded or
21  included does not change my opinions. So it was
22  something that was considered, but it was not

24  (Pages 90 to 93)

**Exhibit 15    Page 24**

Page 94

1 something that my opinions hinged on in any way.
2 BY MS. GARNER:
3     Q.   Did you ever say, did you ever come to the
4 conclusion that a piece of prior art didn't meet the
5 concurrently displaying limitation because the tool
6 was tiled or displayed side-by-side?
7         MR. CORBETT: Objection. Vague.
8         THE WITNESS: Well, I'd have to reread --
9 BY MS. GARNER:
10     Q.   Well, we'll go through the report later
11 then. Could you take a look at Exhibit 1, your most
12 recent expert report?
13     A.   Okay.
14     Q.   On page three, please. On page three at
15 paragraph ten your report states "I understand that
16 based upon certain rulings in this case that only
17 Claims 19 and 21 remain at issue at this time."
18 What is your understanding of why only Claims 19 and
19 21 remain at issue?
20     A.   'Cause that's what the Court has said.
21     Q.   How did you come to that conclusion?
22         MR. CORBETT: Objection. Vague. Caution

Page 95

1 the witness not to discuss communications with
2 counsel. To the extent you can answer otherwise, go
3 ahead.
4         THE WITNESS: I cannot answer otherwise.
5 BY MS. GARNER:
6     Q.   Then I'll withdraw the question. Could
7 you take a look at that same exhibit on page seven?
8 Paragraph 29 states, "I also understand that, if the
9 prior art teaches a way away from combining known
10 elements in the matter claimed by the invention at
11 issue, discovering a successful way to combine them
12 is less likely to be obvious." What is your
13 understanding of what teaches a way means?
14     A.   There are, there is an element or elements
15 that would cause a person of ordinary skill in the
16 art to avoid making the innovation rather than
17 attracting them to make the innovation.
18     Q.   So one way might be for a reference that
19 was a patent to say that's a bad way to do things?
20 Does that make sense to you?
21     A.   Perhaps. I don't think I've seen that in
22 a patent, but --

Page 96

1     Q.   So, if a technical journal said we tried
2 this and it didn't work out so well, that might be
3 an example of teaching a way, do you think?
4     A.   Yes.
5     Q.   And how would a piece of software teach a
6 way?
7         MR. CORBETT: Objection. Vague.
8         THE WITNESS: A piece of software could
9 teach a way by being as efficient as possible in its
10 current embodiment.
11 BY MS. GARNER:
12     Q.   So do you think it's fair to say that --
13 let me start my question over. Do you know what the
14 term "porting" means with respect to software?
15         MR. CORBETT: Objection. Vague.
16         THE WITNESS: I know the generally
17 accepted use of it.
18 BY MS. GARNER:
19     Q.   Could you say what your understanding is?
20     A.   To port a piece of software is to move it
21 from one operating system to another.
22     Q.   So, if a piece of software was highly

Page 97

1 efficient or as efficient as possible in a
2 particular operating system, would that teach a way
3 from porting it to another operating system?
4         MR. CORBETT: Objection. Vague.
5 Incomplete hypothetical.
6         THE WITNESS: Not typically.
7 BY MS. GARNER:
8     Q.   Could you take a look at your report on
9 page eight under "Validity Analysis." Paragraph 35
10 says, "For each claim of the '365 patent asserted
11 against Microsoft, Gateway and/or Dell I discuss
12 limitations of the claim that are not present or
13 taught in the prior art alone or in combination as
14 asserted by Mr. Buscaino." Do you see that?
15     A.   Yes.
16     Q.   And does this report contain your complete
17 opinions regarding the limitations of the claims
18 that are not present in the software that you, or in
19 the prior art references that you talk about in this
20 report?
21         MR. CORBETT: Objection. Vague.
22 Mischaracterizes. Report speaks for itself.

**Exhibit 15    Page 25**

Page 98

1    THE WITNESS: I would say that that's not
2  true. There are, what it says is what it says. I
3  discuss the limitations of the claims that are not
4  present or taught in the prior art or in
5  combination; that doesn't mean there aren't other
6  limitations that are not present or taught.
7  BY MS. GARNER:
8    Q. You may have -- presently today do you
9  have opinions of limitations that are not taught
10  that you didn't set out in this report?
11    A. I do not have opinions.
12    Q. Okay. So all of the opinions that you
13  have regarding the limitations of the claims that
14  are not present or taught in the prior art alone or
15  in combination as asserted by Mr. Buscaino, all of
16  your opinions in that regard are in this report; is
17  that right?
18    A. As I sit here today --
19    Q. Okay.
20    A. -- yeah.
21    Q. And on page nine, could you take a look
22  at, I'd like to start talking a little more about

Page 99

1  the Your Money Manager software. You said that the
2  Your Money Manager software assumed a system with no
3  pointing device or touch entry; is that right?
4    A. That's correct.
5    Q. But pointing devices were available for
6  the system that Your Money Manager was intended for;
7  is that right?
8    MR. CORBETT: Objection.
9  Mischaracterizes. Vague.
10    THE WITNESS: I'm sorry. Can you repeat
11  the question?
12    MS. GARNER: Sure.
13  BY MS. GARNER:
14    Q. Pointing devices were available for the
15  system that Your Money Manager was intended for use
16  on; is that right?
17    MR. CORBETT: Same objection.
18    THE WITNESS: Yes. There were some
19  specialized pointing devices for game use and so
20  forth.
21  BY MS. GARNER:
22    Q. Were their mice?

Page 100

1    MR. CORBETT: Objection. Vague.
2    THE WITNESS: I don't know at the time
3  Your Money Manager was released whether there was a
4  general purpose mouse available or not.
5  BY MS. GARNER:
6    Q. Do you remember the date of the Your Money
7  Manager software that you reviewed?
8    A. No.
9    MR. CORBETT: I'll just inform counsel I
10  got an e-mail that lunch has been delivered, so, at
11  any time you want to take a break, lunch is waiting.
12    MS. GARNER: Well, we're not very far into
13  Your Money Manager. We could stop here, a
14  convenient point.
15    THE VIDEOGRAPHER: Going off the record at
16  12:09:30.
17    (Whereupon, a lunch recess was taken.)
18    THE VIDEOGRAPHER: Going back on the
19  record at 1:05:47. Counsel may proceed.
20  BY MS. GARNER:
21    Q. Thank you. Before lunch we were talking
22  about Your Money Manager, and, if you could turn

Page 101

1  back to page nine of Exhibit 1, your most recent
2  expert report.
3    A. Okay.
4    Q. In paragraph 39 you said that "The MS DOS
5  approach is one of the system-in-control with the
6  user wandering through a labyrinth of menus." Did
7  you find a labyrinth of menus in the Your Money
8  Manager program?
9    A. I found a series of menus that follow the
10  MS DOS approach. The depth of the labyrinth is
11  going to depend on the complexity of the
12  application.
13    Q. And was Your Money Manager deep enough to
14  be considered a labyrinth in your mind?
15    MR. CORBETT: Objection. Asked and
16  answered.
17    THE WITNESS: That's the general structure
18  of MS DOS programs, and, unlike a graphical user
19  interface program, things were not brought to the
20  use of the user as expect to follow the menus to the
21  desired objects.
22  BY MS. GARNER:

**Exhibit 15    Page 26**

Page 102

1    Q.  Take a look at page ten of your report.
2  Starting at the first complete sentence, you said
3  "The on-screen calculator of Your Money Manager is
4  not a tool within the meaning of the Court's
5  construction; it does not permit a user to compose
6  information by pointing to display keys." Can you
7  tell me what you mean by that?
8    A.  In Exhibit 7, page ten, Glossary of Terms,
9  "A tool adapted to allow said user to compose said
10  information means a graphical keyboard tool or a
11  graphical numbered keypad tool which allows the user
12  to compose information by pointing to the display
13  keys of that tool." That's what I meant by that.
14    Q.  How does that apply to Your Money Manager?
15  How does Your Money Manager not permit a user to
16  compose information by pointing to display keys with
17  respect to the on-screen calculator?
18    A.  Well, there are no, there's no means of
19  pointing to anything, and the on-screen calculator
20  doesn't have display keys.
21    (Tognazzini Exhibit No. 9, Screen Shots,
22  was marked for identification.)

Page 103

1  BY MS. GARNER:
2    Q.  The Court reporter has handed you what's
3  been marked as Exhibit 9.  These are some screen
4  shots that were an exhibit to Mr. Buscaino's report.
5  Do you remember seeing these screen shots?
6    A.  I have seen a different version of screen
7  shots.
8    Q.  Could you look at the second to the last
9  page in that exhibit?  Does that exhibit show the
10  on-screen calculator of Your Money Manager?
11    A.  It shows the on-screen calculator of Your
12  Money Manager.
13    Q.  Is that consistent with what you remember
14  having used Your Money Manager software?
15    A.  I'm sorry.  Could you say that again?
16    Q.  Is that photo of a screen shot consistent
17  with what you remember Your Money Manager looked
18  like when you used it?
19    A.  That is consistent with what it looked
20  like.
21    Q.  Did you, did Your Money Manager work with
22  a mouse at all in your experience?

Page 104

1    MR. CORBETT: Objection. Vague.
2    THE WITNESS: I think you'd have to define
3  work with.
4  BY MS. GARNER:
5    Q.  Okay.  Why don't I give you an example.
6  Did you try to move the on-screen calculator around
7  on the screen using the mouse?
8    A.  I'm not sure I was able to get that far.
9  I tried moving anything using the mouse, and there
10  was no effect of the mouse.  And I believe we're
11  talking here about Your Money Manager on MS DOS.
12    Q.  That's right.
13    A.  Okay.  I don't recall any effect of the
14  mouse whatsoever.
15    Q.  You tried pointing to the display keys
16  with the mouse?
17    A.  I attempted to use the mouse, and there
18  was nothing to point with.
19    Q.  So you didn't see a cursor on the screen
20  when you moved the mouse around; is that right?
21    MR. CORBETT: Objection.
22  Mischaracterizes.

Page 105

1    THE WITNESS: I did see a cursor on the
2  screen.  I saw a text cursor in a text field.  There
3  was no mouse pointer.
4  BY MS. GARNER:
5    Q.  Okay.  So you didn't see a mouse pointer
6  on the screen when you were using Your Money
7  Manager?
8    A.  That's correct.
9    Q.  And moving the mouse around didn't, in
10  your experience, have any effect on the operation of
11  Your Money Manager; is that right?
12    A.  That's my recollection as I sit here, and
13  I believe that's what I -- well, let me see what I
14  said in my report.  It's my recollection that it had
15  no effect.  It's my recollection that Mr. Buscaino
16  testified it had no effect, so I, I have no
17  information that it had any effect at all.
18    Q.  Looking again at that screen shot, the
19  on-screen calculator looks like sort of a graphical
20  representation of what a physical calculator looks
21  like.  Do you agree with that?
22    A.  I would disagree that it's a graphical

**Exhibit 15   Page 27**

Page 106

1  representation. This is a text-driven display. It,
2  it's a text representation.
3      Q.  And those little numbers with squares
4  around them, are those, do you think, intended to
5  represent calculator keys?
6      MR. CORBETT:  Objection. Vague.
7      THE WITNESS:  I would suggest not.
8  BY MS. GARNER:
9      Q.  And why is that?
10     A.  Because a calculator has a readout, and
11  this does not have a readout.
12     Q.  Do you see up in the top corner where it
13  says 98.99?
14     A.  Oh, I'm sorry. Yes. What you've just
15  said does refresh my memory. It does not have an
16  apparent readout field, so, but, so you're asking me
17  about the entire thing as outlined by the yellow
18  line as opposed to the, just the keypad part of it?
19     Q.  Why don't I ask a different question.
20     A.  Okay.
21     Q.  Do you think that those numbers, zero
22  through nine with little squares around them, were

Page 107

1  intended to be a representation of calculator keys?
2      A.  I don't know that I have an opinion as to
3  whether those are calculator keys or numeric keypad
4  keys.
5      Q.  But one or the other?
6      A.  I think that's fair.
7      Q.  Okay. So, when you say the on-screen
8  calculator does not have display keys, what did you
9  mean by that? I'm looking at paragraph ten or,
10  excuse me, page ten of your expert report.
11     A.  Yes. Well, again, going back to Exhibit
12  B, Glossary of Terms, within Exhibit 7 of today's
13  exhibits, the Court has construed a tool adapted to
14  allow said use of the composed said information
15  means a graphical keyboard tool or a graphical
16  keypad number keypad tool which allows the user to
17  compose information by pointing to the display keys
18  of that tool. I interpret display keys in that
19  context to refer to targets of pointing, and there
20  are no targets of pointing in this application, so,
21  therefore, these are not display keys. I would not
22  interpret those as display keys as construed by the

Page 108

1  Court. Again, I'm not a lawyer, but that's what it
2  means to me.
3      Q.  So your opinion in paragraph ten -- excuse
4  me -- paragraph 40 that the on-screen calculator
5  doesn't have display keys is based on the fact that
6  you can't point to the numbers on the screen; is
7  that right?
8      MR. CORBETT:  Objection. Mischaracterizes
9  his statement.
10     THE WITNESS:  The fact that these symbols
11  on the screen are not targets for a pointing device.
12  BY MS. GARNER:
13     Q.  On page 11 of your expert report,
14  paragraph 42, you indicated that the Your Money
15  Manager on-screen calculator doesn't have an enter
16  button or transfer mechanism. Do you see that about
17  halfway through the paragraph 42?
18     A.  Yes.
19     Q.  When you used Your Money Manager, were you
20  able to transfer a number from the calculator to one
21  of the fields on the payment screen?
22     A.  I believe so.

Page 109

1      Q.  How did you do that?
2      A.  It has been several weeks since I did it,
3  so I don't recall exactly what key I pressed.
4      Q.  You pressed a key to transfer the number
5  from the calculator to the payments form?
6      A.  I believe I did.
7      Q.  And does the Court's claim construction
8  require there to be an enter button on the
9  composition tool?
10     MR. CORBETT:  Objection. Calls for a
11  legal conclusion.
12     THE WITNESS:  I think one can infer that
13  being able to create the information and yet have no
14  means to move it from a tool into the program that
15  calls it as shown in the Day patent would not be a
16  particularly useful function, so there -- one
17  doesn't necessarily need an enter key in every
18  single tool, but in this case there has to be a
19  means of moving the information from this matrix
20  into the original field.
21  BY MS. GARNER:
22     Q.  And you were able to do that?

Page 110

1    A.  I was able to do that.

2    Q.  The next --

3    A.  But I was not able to do that with the
4  mouse.

5    Q.  Does the claim require that you be able to
6  do that with a mouse?

7    A.  The system will be of no particular value
8  if some mechanism was not given to ultimately move
9  the information.

10    Q.  Like a button on the physical keyboard?

11    MR. CORBETT:  Objection.
12  Mischaracterizes.

13    THE WITNESS:  Well, at that point, you no
14  longer have a mouse-driven interface for that
15  function.

16  BY MS. GARNER:

17    Q.  Does the claim require that for the
18  function of moving the number from the calculator to
19  the payment field you use a mouse?

20    A.  I think to the extent that composition of
21  information incorporates -- I think you're asking me
22  for a legal conclusion, and I can't tell you where

Page 111

1  the edge is here, whether one can create the entry
2  and then be forced to use a keyboard interface to
3  enter it, whether that -- I don't know.  That's not
4  the way I would design a mouse-driven interface to
5  require the user at some point to abandon the mouse
6  and return to the keyboard.

7    Q.  But you don't know if that's a requirement
8  of Claim 19 of the '356 patent; is that right?

9    MR. CORBETT:  Objection.
10  Mischaracterizes.  Asked and answered.

11    THE WITNESS:  Well, let me see what else
12  it says about composing.  I don't think sitting here
13  today I have an opinion on that.

14  BY MS. GARNER:

15    Q.  Fair enough.  Moving on in paragraph 42,
16  your report states, "Thus it would not be obvious to
17  one of ordinary skill in the art to add all these
18  missing features to Your Money Manager."  I take you
19  to be referring to the fact that you can't point to
20  the display keys and that it, Your Money Manager
21  on-screen calculator doesn't have an enter button.
22  Are these all these missing features or are there

Page 112

1  others I didn't notice?

2    MR. CORBETT:  Objection.
3  Mischaracterizes.  Compound.  Report speaks for
4  itself.

5    THE WITNESS:  This tool cannot be used
6  with a mouse without having display keys with which
7  a user can interact, would need to be redesigned to
8  permit a user to interact with the on-screen
9  calculator using a mouse.  Additional elements would
10  have to be added to the on-screen calculator.  For
11  example, there's no enter button or transfer
12  mechanism to allow the user to transfer the
13  information from the on-screen calculator to an
14  information field.  Are you asking me whether that's
15  all that's missing?

16  BY MS. GARNER:

17    Q.  Yes.

18    A.  There's no clear button.  There's no clear
19  all button.

20    Q.  Are these features that would have to be
21  added to the on-screen calculator in order to meet
22  the claim limitation?

Page 113

1    A.  These are features that would have to be
2  added in order to make it a mouse-driven object.

3    Q.  And is, does the '356 patent require that
4  the object be mouse driven?

5    MR. CORBETT:  Objection.  Asked and
6  answered.  Mischaracterizes.  Calls for legal
7  conclusion.

8    THE WITNESS:  As I've told you, I'm not a
9  lawyer, and I can't opine at this time as I'm
10  sitting here today on some issues you're raising
11  about whether having an incomplete object is
12  sufficient or not.  I can tell you insofar as human
13  computer interaction that having a calculator that
14  is supposed to be mouse driven that gives you no way
15  to clear or clear all or enter information is very
16  poor design and just isn't done.

17  BY MS. GARNER:

18    Q.  Okay.  So, aside from whether the
19  on-screen calculator was poorly designed or not,
20  you've identified -- I'm just trying to make sure I
21  understand your report.  You've identified two
22  things that you think are deficiencies with regard

29  (Pages 110 to 113)

Exhibit 15   Page 29

## Page 114

1  to the on-screen calculator. My understanding is
2  that you've identified that the display keys are not
3  interactive; that is they don't allow a user to
4  point to them, and that the calculator doesn't have
5  an enter button. Are there other things that you've
6  identified here in your report, other missing
7  features that you've identified here in your report
8  or are those the missing features?
9     A.  Well, I would take issue with what you
10  just said because it doesn't have much to do with
11  what I said. There are no display keys.
12     Q.  Okay.
13     A.  So you would have to have at minimum the
14  following targets: Zero, one, two, three, four,
15  five, six, seven, eight, nine, plus, minus, divide,
16  multiply, and that would only be to get the numbers
17  up there. If you actually wanted to use the
18  numbers, you'd have to have enter. If you wanted to
19  be able to correct errors, you'd have to have clear,
20  and it would be nice to have clear all. You also
21  need a way of closing this object. So, essentially,
22  of the targets necessary to turn this into a visual

## Page 115

1  calculator 100 percent of them are missing.
2     Q.  Okay. But aside from turning this into
3  a --
4     A.  A graphical --
5     Q.  -- a graphical calculator --
6     A.  A graphical tool as defined by the Court.
7     Q.  I'd like to know what we need to do to
8  this on-screen calculator so that it meets the
9  limitations of Claim 19, aside from what other
10  design elements you would make, what other changes
11  you would make to it. In order to meet Claim 19,
12  it's my understanding of your report that you said,
13  one, it doesn't have display keys, and, two, it
14  doesn't have an enter button. Is that, am I
15  understanding your report right, or is there
16  something in the text here that I'm missing?
17     MR. CORBETT: Objection. Vague.
18  Compound. Mischaracterizes. Asked and answered.
19     THE WITNESS: It doesn't respond to a
20  mouse. It doesn't respond to any pointing device.
21  BY MS. GARNER:
22     Q.  Is that part of not having display keys?

## Page 116

1     MR. CORBETT: Same objection.
2     THE WITNESS: That's part of a tool
3  adapted to allow said user to compose said
4  information means a graphical keyboard tool or a
5  graphical number keypad tool which allows the user
6  to compose information by pointing to the display
7  keys of that tool. One cannot point. Therefore,
8  the tool as it is now has no relationship to the
9  definition of the tool or this object on the screen
10  has no object on the screen to the definition of a
11  tool as laid out by the Court.
12  BY MS. GARNER:
13     Q.  Is keyboarding faster than mousing?
14     MR. CORBETT: Objection. Vague.
15     THE WITNESS: It depends on the task, the
16  user and the efficiency of the design.
17  BY MS. GARNER:
18     Q.  Do you know of studies that have tested
19  the proposition that mousing is faster than
20  keyboarding?
21     A.  Yes.
22     Q.  What have they concluded?

## Page 117

1     A.  They have concluded that it depends on the
2  task, the user, and the efficiency of the design.
3     (Tognazzini Exhibit No. 10, Pages from
4  Book written by Bruce Tognazzini, was marked for
5  identification.)
6  BY MS. GARNER:
7     Q.  The reporter has handed you Exhibit 10.
8  Do you recognize it?
9     A.  Yes, I do.
10     Q.  Is this a book you wrote, some pages from
11  a book you wrote?
12     A.  That's correct.
13     Q.  Did you say on page 27 that, "Since users
14  do experience the illusion that keyboarding is
15  faster, there's market pressure to supply them with
16  shortcuts, even when shortcuts will actually slow
17  them down"?
18     A.  That's very much taken out of context,
19  but, yes, I did say that.
20     Q.  And, in your experience, do people type
21  numbers and operators, for example, plus and minus
22  using the shift keys, etc., as fast as they type

Page 118

1 words?

2     MR. CORBETT: Objection. Vague.

3     THE WITNESS: To the extent that a number

4 is an entity and a word is an entity, the number

5 would be typed faster.

6 BY MS. GARNER:

7     Q.   So, if an expression were a mathematical

8 expression that included operators and operands that

9 was the same number of key strokes as a word, which

10 do you think would typically be typed faster by the

11 average user?

12     A.   By the average user --

13     MR. CORBETT: Objection. Vague.

14 Incomplete hypothetical.

15     THE WITNESS: In the situation of a

16 complex series of numbers versus a known word, a

17 word would, by a touch typist -- well, typically,

18 people are going to be able to type numbers faster,

19 words faster than numbers. The exception is a

20 numeric keypad people can be highly efficient on.

21 BY MS. GARNER:

22     Q.   On page 12 you said that numerous systems

Page 119

1 with the keyboard-based interface used in the older

2 and soon-to-be-obsolete DOS system. When did the MS

3 DOS system become obsolete?

4     MR. CORBETT: Objection. Form.

5     THE WITNESS: Well, I think it might

6 depend on where you want to draw the line on

7 obsolescence, and I couldn't really give you a date

8 on it, but by the time of the Day patent MS DOS was

9 on, its days were numbered. The mouse was growing

10 and taking over market share. Probably a Windows 3,

11 which came out, I think, in 1990, was the first

12 version that really worked well, and that, that was

13 the time about when the manufacturers started,

14 computer manufacturers started putting mice in the

15 box. That's when the curve really started to rise

16 on mouse-driven systems rather than MS DOS.

17 BY MS. GARNER:

18     Q.   So about four years after the Day patent;

19 is that right?

20     A.   Well, again, this was a trend, and I'm

21 sure there are people that are still using MS DOS

22 applications today. As of a few years ago, there

Page 120

1 were people still using vacuum tube computers, so

2 these things tend to die slowly.

3     Q.   You've written some programs in your

4 career?

5     A.   Yes.

6     Q.   When's the last time you wrote a program?

7     A.   Probably three or four years ago.

8     Q.   Have you ever ported a software

9 application from one operating system to another?

10     MR. CORBETT: Objection. Vague.

11     THE WITNESS: I don't recall.

12 BY MS. GARNER:

13     Q.   In your report on page 12 just after the

14 reference to the soon-to-be-obsolete MS DOS system,

15 "Further, one of ordinary skill in the art would not

16 have considered adding a mouse-based interface to

17 Your Money Manager because Your Money Manager was

18 optimized for the keyboard-driven MS DOS system."

19 Did you consider in forming your opinions whether

20 someone who is thinking about writing a different

21 piece of software for a different system would have

22 incorporated the teachings of both Your Money

Page 121

1 Manager and some other reference that taught a

2 composition tool that included the ability to point

3 to display keys?

4     A.   I did consider other systems.

5     Q.   And did you include your opinions in that

6 regard here in this report?

7     A.   Yes, I do.

8     Q.   Can you point me to them, please?

9     A.   The third line on page 12, "At the

10 relevant time, the developers of mouse or

11 pointer-driven systems were mining mouse-driven

12 systems such as the Apple Macintosh for ideas, not

13 MS DOS applications optimized for keyboard use."

14     Q.   So that person who was considering making

15 mouse-based application wouldn't even have

16 considered Your Money Manager, wouldn't have looked

17 at it; is that right?

18     MR. CORBETT: Objection.

19 Mischaracterizes.

20     THE WITNESS: There were good and

21 sufficient reasons not to look back at the past when

22 creating revolutionary new designs. The exemplars

Exhibit 15   Page 31

Page 122

1  of the time were primarily the Apple Macintosh, not
2  that old MS DOS application.
3  BY MS. GARNER:
4      Q.  So any person of ordinary skill in the art
5  in 1986 thinking of developing his own software
6  application would not have looked to the teachings
7  of Your Money Manager; is that your position?
8      MR. CORBETT:  Objection.
9  Mischaracterizes.
10     THE WITNESS:  I'm not saying it couldn't
11 have happened, but, when they looked at it, there
12 were going to be so many reasons not to do it that,
13 even if they have looked at it, they would have
14 abandoned the attempt.  I mean, you spoke of how
15 someone can type a word faster than a number, which
16 is true if they happen to be a touch typist with
17 letters, but are not a touch typist with numbers,
18 but here's a situation where someone hunting and
19 pecking with numbers, which is very likely going to
20 be faster than the same person hunting and pecking
21 with letters, is going to just bury somebody trying
22 to click those numbers by pointing subsequently to

Page 123

1  each and every number on a calculator, so, you know,
2  you don't take an interface that has been optimized
3  and well designed within the framework of MS DOS to
4  be used by a keyboard and suddenly slow it, it and
5  the user way down just to shove a mouse in there.
6  BY MS. GARNER:
7      Q.  Would that same person of ordinary skill
8  in the art have considered, perhaps, the other
9  teachings of Your Money Manager, for example,
10 displaying a plurality of information fields?
11     MR. CORBETT:  Objection.  Vague.
12 Mischaracterizes.  Incomplete hypothetical.
13     THE WITNESS:  I don't believe this is a
14 good exemplar for building a revolutionary kind of
15 software.  This is a good exemplar of a mature
16 pregraphical user interface design.  It is not a
17 good exemplar, a good framework from which to begin
18 drawing lessons for going into the future, but
19 rather into the past.
20 BY MS. GARNER:
21     Q.  What field is Your Money Manager in?
22     MR. CORBETT:  Objection.  Vague.

Page 124

1      THE WITNESS:  Well, it's finance.
2  BY MS. GARNER:
3      Q.  And how does that compare to the field of
4  art of the Day patent?
5      MR. CORBETT:  Objection.  Vague.
6      THE WITNESS:  Orthogonally.
7  BY MS. GARNER:
8      Q.  Is it your position that Your Money
9  Manager is not in the field of art of the Day
10 patent?
11     MR. CORBETT:  Objection.  Vague.
12 Mischaracterizes.
13     THE WITNESS:  The interface of Your Money
14 Manager is in the field of human computer
15 interaction.
16 BY MS. GARNER:
17     Q.  Okay.  I would like to talk a little bit
18 about the Foreign Exchange Front End in the Tyler
19 reference that, your discussion of which begins on
20 page 14 of your report.  You noted in your report
21 that the Tyler reference doesn't refer to Foreign
22 Exchange Front End.  Can we agree to call whatever

Page 125

1  machine Tyler was talking about by the moniker
2  Foreign Exchange Front End?
3      MR. CORBETT:  Objection.  Form.
4      THE WITNESS:  I think that calls for a
5  legal conclusion.  I don't know whether we can agree
6  or not.
7  BY MS. GARNER:
8      Q.  Can you agree with me for the purposes of
9  this deposition that, when I say Foreign Exchange
10 Front End, I'm talking about the machine that Tyler
11 was talking about in his article?
12     MR. CORBETT:  Objection.  Form.  Assumes
13 facts.  Foundation.
14     THE WITNESS:  We can do that as long as
15 you understand the only thing I have opinions on
16 here and the only thing I'm prepared to talk about
17 today is the Tyler article, not the Foreign Exchange
18 Front End.
19 BY MS. GARNER:
20     Q.  The Tyler article is talking about a
21 machine that was demonstrated in New York; is that
22 your understanding of the Tyler article?

**Exhibit 15   Page 32**

Page 126

1    A.  The Tyler article is talking about a
2  number of things, among which was a system
3  demonstrated in New York that was, that at least
4  contained a layer called Easel.
5    Q.  And it performed some functions that Tyler
6  talked about in his report; is that fair?
7    A.  Well, he didn't have a report.
8    Q.  Excuse me.  In his article?
9    A.  Article, yes.
10   Q.  And he said that that machine was
11  demonstrated in New York on the floor of an
12  exchange; is that right?
13       MR. CORBETT:  Objection.
14  Mischaracterizes.  Assumes facts.  Reference speaks
15  for itself.
16       (Tognazzini Exhibit No. 11, Datamation
17  Tyler article, was marked for identification.)
18  BY MS. GARNER:
19   Q.  I'll withdraw the question.  Let's just
20  talk about this article for a little bit.  The
21  machine that the article talks about, the Chemical
22  Bank machine that the article talks about that you

Page 127

1  indicated includes an Easel layer, I need a
2  shorthand for that.  Can we call it the Tyler
3  machine?
4    A.  Yes.
5    Q.  Okay.  The Tyler machine had a user
6  interface; is that right?
7    A.  Yes.
8    Q.  In what field of art was the user
9  interface on the Tyler machine?
10       MR. CORBETT:  Objection.  Vague.
11       THE WITNESS:  It would have roughly been
12  in human computer interaction.
13  BY MS. GARNER:
14   Q.  And in reading Mr. Tyler's description of
15  the Tyler machine, did you understand it to be in a
16  user in control vernacular as you've used that term?
17       MR. CORBETT:  Objection.  Vague.
18       THE WITNESS:  I didn't form an opinion on
19  that.
20       (Tognazzini Exhibit No. 12, Photocopy of
21  Photograph, was marked for identification.)
22       THE REPORTER:  This is 12.

Page 128

1  BY MS. GARNER:
2    Q.  Your understanding of the Tyler machine on
3  the basis of the Tyler article, in your
4  understanding did the Tyler machine have a plurality
5  of information fields on its display?
6       MR. CORBETT:  Objection.  Vague.
7       THE WITNESS:  I don't believe I came to an
8  opinion on that.  The Tyler article is quite vague,
9  and there's not a lot of information there.
10  BY MS. GARNER:
11   Q.  You couldn't reach a conclusion, one way
12  or another, as to whether it displayed a plurality
13  of information fields?
14       MR. CORBETT:  Objection.
15  Mischaracterizes.
16       THE WITNESS:  I believe I didn't come to a
17  conclusion.
18  BY MS. GARNER:
19   Q.  So, if you take a look at the Tyler
20  article on the third to the last page of the
21  article, in the third column, second full paragraph
22  toward the bottom --

Page 129

1    A.  This is page 154?
2    Q.  Looks like 148.  Third to the last page.
3    A.  Oh, third to the last.  Sorry.
4    Q.  Tyler says, "The right half of the screen
5  lists key information about the current transaction
6  including buyer bank, seller bank, currency,
7  exchange rate, broker, bank customer, exchange
8  location and method of payment."  Goes on to say,
9  "When the trader touches the screen in any one of
10  these areas, a list of potentially valid entries or
11  a numeric keypad appear on the left half inviting
12  the user to choose the information needed on the
13  right."  As a person of ordinary skill in the art,
14  does that disclose a plurality of information
15  fields?
16       MS. GARNER:  Objection.  Incomplete
17  hypothetical.  Assumes facts.  Vague.
18       THE WITNESS:  Claim 19 suggests that
19  information fields can have information inserted
20  into them, and I don't know from this article that
21  these information fields can have information
22  inserted into them.

**Exhibit 15   Page 33**

Page 130

1  BY MS. GARNER:
2      Q.  Okay.  So the article says that the list
3  of potentially valid entries or numeric keypad
4  invite the user to choose the information that's
5  needed on the right.  What does that mean to you?
6      A.  I would say it's ambiguous.  And please
7  understand I'm not trying to be difficult.  The
8  problem is that I have not seen the system.  I have
9  not seen documentation for the system.  I have not
10  had a chance to talk to Mr. Long.  As far as I know,
11  Kirland & Ellis has not deposed Mr. Long, so I'm
12  working on a few sentences written by a reporter for
13  a magazine aimed at managers with no particular
14  technical training to try to extract, and a
15  photograph, the best photograph of which is largely
16  unintelligible, to try to extract the rules of a
17  dynamic interface, and I can't do it.  There's just
18  not enough information here.
19      Q.  So do I understand you to say that a
20  person of ordinary skill in the art reading what I
21  just read to you would not understand Tyler to
22  disclose a plurality of information fields?

Page 131

1      A.  I'm saying that the situation, the
2  documentation of the Tyler article with the
3  illustration as, as it's been presented to me today
4  is not sufficient for me to tell you whether these
5  are read-write fields, whether when you enter
6  something into it, it ends up echoed over on the
7  side or simply a little checklist of here's things
8  you're supposed to make sure you enter into the
9  system.  It could be the original article had a
10  clearer illustration.  I don't know.  I'm just
11  telling you that I'm working here with very little
12  information, and I do not want to form opinions that
13  are incorrect because I don't have sufficient
14  material.
15      Q.  So, when Tyler says, for instance, when
16  the user hits the, quote, broker, end quote, cell on
17  the right, a list of brokers appears on the left,
18  you don't understand his reference to cell to mean
19  information field?
20      MR. CORBETT:  Objection.
21  Mischaracterizes.
22      THE WITNESS:  Cell is not a typical term

Page 132

1  used in HCI, so I understand he's hit a target, but,
2  whether that target is the word "broker" or not, I
3  have no way of knowing.
4  BY MS. GARNER:
5      Q.  Tyler goes on to say, "For exchange rates
6  and other numerical data the user hits the proper
7  cell on the right and then types in the numeric data
8  on the keypad that appears on the left."  Again,
9  considering that Mr. Tyler described the Tyler
10  machine as providing information tools on the left
11  that provide information needed on the right, you
12  don't understand Tyler to be, the Tyler reference to
13  disclose a plurality of information fields?
14      MR. CORBETT:  Objection.  Vague and
15  ambiguous.  Compound.  Incomplete hypothetical.
16      THE WITNESS:  Again, you have the
17  advantage of me.  Your person has talked to Long.  I
18  have not.  I'm trying to work with a reproduction of
19  a 20-plus-year-old magazine article written by a
20  reporter for managers.  I do not want to sit here
21  today and speculate on this interface given that,
22  apparently, we're going to be going to be able to have a, well,

Page 133

1  Lucent's going to be able to have a deposition with
2  Mr. Long or I'm going to be given the opportunity to
3  talk to him to get the kind of information that
4  Mr. Buscaino got, I don't want to sit here on the
5  record and speculate based on unintelligible
6  documents how the system works.
7  BY MS. GARNER:
8      Q.  Okay.  I'm actually not asking you for
9  speculation.  I'm asking you to take the position of
10  a person of ordinary skill in the art and read those
11  paragraphs and tell me if that person of ordinary
12  skill in the art would understand or not Tyler to
13  disclose a plurality of information fields?
14      A.  I think there --
15      MR. CORBETT:  Objection.  Asked and
16  answered.
17      THE WITNESS:  I think there are at least
18  two possible interpretations.  One of them is a
19  plurality, a series of information fields, and the
20  other one is not.
21  BY MS. GARNER:
22      Q.  And a person of ordinary skill in the art

34  (Pages 130 to 133)

Exhibit 15   Page 34

Page 134

1  would come to that conclusion, that there were those
2  two options when reading this?
3          MR. CORBETT: Objection.
4  Mischaracterizes.
5          THE WITNESS: Again, when reading what I'm
6  being presented with, which is a reproduction,
7  supposed to be original, with the original
8  illustration, so, you know, again, this is not, this
9  article is not aimed at HCI designers in order that
10 they could copy this. This was aimed at IT managers
11 to get them to, excited about buying these kinds of
12 products.
13 BY MS. GARNER:
14     Q. Aside from the question of to whom the
15 article was directed, if a person of ordinary skill
16 in the art of HCI were to read this article, would
17 he or she come to the conclusion that Tyler
18 disclosed one of two possibilities, the two
19 possibilities that you identified a few minutes ago?
20         MR. CORBETT: Objection. And just so it's
21 clear for the record, Mr. Tognazzini, through
22 counsel for Lucent did ask to speak to Mr. Long in

Page 135

1  an informal telephone conversation, and we were told
2  by counsel for Defendants that that would not be
3  allowed and that we would need to depose him, so
4  we're working on setting up that deposition.
5          THE WITNESS: So the two possibilities I
6  have outlined are that, Number 1 is a plurality --
7  I've always been able to say that word before. It's
8  a plurality of fields, and the second possibility is
9  it's not a plurality of fields, and, yes, it's one
10 of those two possibilities.
11 BY MS. GARNER:
12     Q. And a person of ordinary skill in the art
13 reading this article would conclude that it was one
14 of those two possibilities. Do you agree with that?
15         MR. CORBETT: Objection.
16 Mischaracterizes.
17         THE WITNESS: Those are the only two
18 possibilities in the universe.
19 BY MS. GARNER:
20     Q. When you say it was not a plurality of
21 information fields, can you describe what that other
22 possibility is like?

Page 136

1          MR. CORBETT: Objection. Vague.
2          THE WITNESS: Well, now you're asking me
3  truly to speculate, so I can see in this photograph
4  a list of options, and so maybe these are just
5  simply options available, and I don't mean options
6  in the financial sense, but options, they are
7  targets that someone can touch which say I now want
8  to enter how many shares have we bought. I now want
9  to enter how many shares to be sold. If those are
10 just simply targets described as cells by Mr. Tyler,
11 then there are no information fields involved.
12 BY MS. GARNER:
13     Q. And how would the user know which ones
14 have been filled out already and which ones had not?
15     A. That is not revealed in this article.
16     Q. So the, Mr. Tyler says the right half of
17 the screen lists key information about the current
18 transaction including, and then it lists the various
19 kinds of information, customer name, seller bank
20 name, etc. As a person of ordinary skill in the
21 art, a person of ordinary skill in the art reading
22 this would not understand how a person using this

Page 137

1  system could determine which cells had been filled
2  out and which had not?
3          MR. CORBETT: Objection.
4  Mischaracterizes. Vague.
5          THE WITNESS: Could you tell me where you
6  just read that?
7  BY MS. GARNER:
8      Q. Yes. At the second full paragraph toward
9  the end, "The right half of the screen lists key
10 information about the current transaction, including
11 buyer bank, seller bank, currency, exchange rate."
12     A. Okay. So, whether one acts on this, that
13 information directly or whether one just simply
14 enters the information on the other side of the
15 screen is going to determine whether that's just a
16 field of read only information as opposed to a
17 series of information inputs.
18     Q. Even given that Tyler said the user could
19 choose information needed on the right? That
20 doesn't clarify things for you?
21     A. There's the display of information, and
22 there are many applications that have displays of

**Exhibit 15   Page 35**

Page 138

1  information, but don't give you a direct way to
2  input information into that display. Everything is
3  done indirectly.
4      Q. How do you mean indirectly?
5      A. That the information -- well, as Tyler
6  says here, he doesn't say it goes into those, into a
7  series of fields on the other side of the screen.
8  He says it goes into the system.
9      Q. But he says it's needed on the right,
10 doesn't he?
11     MR. CORBETT: Objection.
12 Mischaracterizes.
13     THE WITNESS: Needed on the right is quite
14 indistinct.
15 BY MS. GARNER:
16     Q. You don't know what a person of ordinary
17 skill would interpret that to mean?
18     MR. CORBETT: Objection.
19 Mischaracterizes.
20     THE WITNESS: Well, again, I haven't seen
21 the system. I haven't had contact with Mr. Long.
22 You're asking me to speculate with an absolute

Page 139

1  minimal amount of information, and there are -- I
2  believe someone of ordinary skill in the art could
3  read this article and could imagine a variety of
4  systems from the little bit of information in this
5  article.
6  BY MS. GARNER:
7      Q. What additional information would you need
8  in order to determine whether the Tyler machine had
9  a plurality of information fields?
10     A. That's the information I would need. I
11 would need to understand that these are, that
12 there's a series of read-write fields over here that
13 one touches on the current data and that that opens
14 up in such a way as to allow the inputting of
15 information, etc., as defined by the Court. So, and
16 I'm not trying to suggest to you that it doesn't
17 happen. I'm just suggesting to you that I have not
18 seen enough information in this one tiny little
19 document by a reporter to tell me whether it has it.
20     Q. You think Tyler was trying to get across
21 how the machine operated?
22     MR. CORBETT: Objection. Vague. Assumes

Page 140

1  facts.
2      THE WITNESS: I think -- well, Tyler was
3  trying to get across a whole bunch of things in this
4  article, and I don't think he was attempting to
5  mislead someone, if that's what you're suggesting by
6  your question, but I think he was trying to give
7  people a taste of what this, this touch screen
8  device felt like to use. I also don't know whether
9  he's using a prototype, an incomplete prototype, a
10 production system, whether what we're looking at is
11 vaporware that never existed.
12 BY MS. GARNER:
13     Q. Does any of that matter?
14     MR. CORBETT: Objection. Vague.
15     THE WITNESS: Insofar as the Tyler article
16 itself stands on its own as prior art, I'm not
17 versed in the law enough to tell you whether that
18 matters. Insofar as whether it would enable someone
19 of ordinary skill in the art to build what you are
20 calling FXFE, it matters very much, because, if FXFE
21 never actually existed, it would be hard for someone
22 to build it.

Page 141

1  BY MS. GARNER:
2      Q. It would be hard? Would it be impossible?
3      MR. CORBETT: Objection. Form. Vague.
4      THE WITNESS: That would depend on why it
5  was never built, because maybe it was never built
6  because, in fact, the technology in this era
7  actually wasn't up to the task. It's much easier to
8  create a demo than a working product.
9  BY MS. GARNER:
10     Q. So you're saying you're skeptical as to
11 whether or not there was a machine that did what
12 Tyler says it did in this article?
13     MR. CORBETT: Objection.
14 Mischaracterizes.
15     THE WITNESS: Again, I have not seen the
16 system. I have not talked to Robert Long. I have
17 not been permitted to talk to Robert Long. You are
18 trying to get me on the record for making a bunch of
19 statements before I've seen the actual system, and
20 I'm not comfortable with that. So I have no opinion
21 as to whether this thing was actually built or not.
22     MS. GARNER: I think we need to change

36 (Pages 138 to 141)

**Exhibit 15    Page 36**

Page 142

1  tapes. We're going to go off the record.
2      THE VIDEOGRAPHER: Going off the record at
3  2:12:49. End of Tape 2. We're off the record.
4      (Whereupon, a short recess was taken.)
5      THE VIDEOGRAPHER: We're going back on the
6  record. The time is 2:28:14. This marks the
7  beginning of Videotape Number 3 in the deposition --
8  I'm sorry -- Videotape Number 3 in the deposition of
9  Bruce Tognazzini.
10     THE WITNESS: By the end of the day,
11  you'll have it perfect.
12     THE VIDEOGRAPHER: Taken at 655 15th
13  Street, Northwest, Washington, D.C. The
14  videographer is Steve Schaal here on behalf of
15  Esquire Deposition Services located at 1020,19th
16  Street, Northwest, Washington, D.C. Counsel may
17  proceed.
18     MS. GARNER: Thank you.
19  BY MS. GARNER:
20     Q. Could you take a look again at Exhibit 1,
21  your most recent expert report, and turn to page 16.
22     A. I'm sorry. 16?

Page 143

1      Q. 16, yes. Paragraph 56. In part it
2  states, "The Tyler article certainly does not
3  disclose a system that uses any predefined tool
4  associated with an information field that is
5  specified by the system as an appropriate tool for
6  filling in the information called for by such
7  information field." What do you mean by that?
8      A. Well, I mean exactly what it says.
9      Q. So, when the Tyler article says, when a
10  trader touches the screen in any one of these areas,
11  a list of potentially valid entries invites the user
12  to choose information needed on the right, you don't
13  understand that to describe a system that provides
14  predefined tools for filling in information called
15  for by the field?
16     MR. CORBETT: Objection.
17  Mischaracterizes.
18     MS. GARNER: I think the Tyler article is
19  over there, if that's what you're looking for.
20     THE WITNESS: No. Actually, I'm looking
21  for the Court's instructions. There it is. Now I'm
22  looking for the Tyler article. So, first of all, we

Page 144

1  don't know of any association between a tool and an
2  information field because we don't know of the
3  presence of any information fields as we discussed
4  earlier. We know that the trader touches one of
5  these words on the screen such as broker as opposed
6  to there being an information field associated with
7  broker that the user touches in order to change the
8  data in that information field.
9  BY MS. GARNER:
10     Q. So would you agree that whatever the
11  trader touches on the screen is associated with the
12  list of information, the list of potential entries
13  that pops up? Is there an association between
14  whatever the user touches on the right and the list
15  of entries that pops up on the left?
16     A. I have to call into question, you're
17  indicating that something pops up on the left.
18     Q. Okay. How about appears on the left which
19  is what Tyler says? A list of potentially valid
20  entries or a numeric keypad appears on the left half
21  inviting the user to choose the information needed
22  on the right.

Page 145

1      A. I also have some doubts about his
2  reporting of the keypad appearing on the left. So
3  from looking at the screen, the screen is somewhat
4  in conflict with his description of the action of
5  the application.
6      Q. Okay. Let's focus, if you don't mind, on
7  what he says in that paragraph on the, that we've
8  been referring to. When a trader -- let's focus on
9  just the list of potentially valid entries. That
10  might be one of the things that appears on the left.
11     A. Okay.
12     Q. And invites the user to choose the
13  information needed on the right. Would you agree
14  there's an association between whatever thing it is
15  that the user touches on the right and the list of
16  potentially valid entries that appears on the left?
17     MR. CORBETT: Objection. Vague.
18     THE WITNESS: When the broker hits -- I'm
19  sorry. When the trader hits the broker cell on the
20  right, according to the article, a list of brokers
21  appears on the left. So, given that this is a
22  persistent list, the contents of that list would

**Exhibit 15   Page 37**

Page 146

1  change in response to his touching the word "broker"
2  or however one triggers this, quote, broker cell,
3  end quote, on the right, so there is a -- my problem
4  here is I believe the word "association" has been
5  legally defined in this case, and I, not being a
6  lawyer, I don't want to suggest -- I will say
7  there's a connection, but I don't know whether it
8  arises to the level of an association as defined by
9  this patent and as construed by the Court because
10 there's no tool on the left side, and given that
11 there's no tool I don't know that one can claim
12 there's an association. At least there's no
13 evidence of a tool.
14 BY MS. GARNER:
15    Q.  Why would a list of potentially valid
16 entries not be a tool?
17    A.  One can have a list of potentially valid
18 entries in a pop-up menu. That's not, from my
19 understanding, anywhere near what the Court has
20 described as a tool.
21    Q.  What is a tool in your understanding?
22    A.  A predefined tool associated with said one

Page 147

1  of said fields refers to a tool specified by the
2  system as an appropriate tool for filling in the
3  information called for by that field. From the
4  standpoint of human computer interaction, the tools
5  as defined by the Day patent would be distinct
6  entities, objects that the user would perceive as a
7  separate and distinct entity.
8     Q.  And, if, when the user touches part of the
9  screen, a list appears on the right, would the user
10 perceive it as a distinct entity?
11    MR. CORBETT: Objection. Vague.
12 Incomplete hypothetical.
13    THE WITNESS: I would need to -- well, if
14 you're speaking specifically of this system, I would
15 need to know more about what Tyler describes as
16 appearing. If it's merely changing the content of a
17 persistent list on the right, then the user would
18 not see that as a separate and distinct entity from
19 the exact same list that had different content a
20 microsecond before then.
21 BY MS. GARNER:
22    Q.  And, based on the Court's construction of

Page 148

1  a predefined tool that you just read, you understand
2  that construction to require a distinct entity; is
3  that right?
4     MR. CORBETT: Objection.
5  Mischaracterizes.
6  BY MS. GARNER:
7     Q.  Or excuse me. A separate and distinct
8  entity; is that right?
9     MR. CORBETT: Same objection.
10    THE WITNESS: I don't believe that's what
11 I testified to. I am not aware of the Court
12 defining tool as separate and distinct from what's
13 in this document.
14 BY MS. GARNER:
15    Q.  That's what I'm referring to, the Court's
16 claim construction. Does the Court's claim
17 construction require that the tool, in order to be a
18 tool, be a separate and distinct entity?
19    A.  The Court speaks of a tool in terms of
20 windows, and there are no apparent windows in this
21 application. A window is a way of clearly defining
22 a separate and distinct entity.

Page 149

1     Q.  So I think in your answer you're referring
2  to the Court's construction of concurrently
3  displaying, displaying at the same time as by a
4  window overlaying the form?
5     A.  I'm referring to that, as well as the
6  clarification in the Exhibit 8.
7     Q.  The Court in Exhibit 8 says as by a window
8  overlaying the form is an example of displaying at
9  the same time. Is that what the Court said?
10    A.  Yes.
11    Q.  But not the only way you can display at
12 the same time; is that right? Or is that what the
13 Court was trying to get across?
14    MR. CORBETT: Objection. Mischaracterizes
15 his testimony.
16    THE WITNESS: Well, I think you're asking
17 me for a legal conclusion there.
18 BY MS. GARNER:
19    Q.  You're relying on what the Court said in
20 Footnote 3, and I want to understand what your
21 understanding is of what the Court said in Footnote
22 3?

**Exhibit 15   Page 38**

Page 150

1    A.  Footnote 3 says, "Lucent also argues that
2  tools in Apple Lisa are not concurrently displayed
3  because the numbers pad and tape windows are
4  side-by-side rather than overlaying the other.  This
5  arguments fails, although the Court provided the
6  definition of concurrently displaying to include the
7  example as by a window overlaying the form.  That
8  phrase is an example of a definition of displaying
9  at the same time.  The Court's construction does not
10  exclude side-by-side displays such as those present
11  in the Apple Lisa.
12      The Court, rightly or wrongly, is
13  interpreting what they saw in the Apple Lisa as
14  windows, so, regardless of whether one looks at the
15  Court construction or the footnote, the Court is
16  still discussing windows.  There's no window.
17     Q.  So my understanding of what the Court said
18  is there's a number pad, and then there's a tape
19  window.  I don't think he called those both windows,
20  do you?  Why don't you take a look at it again?
21      MR. CORBETT:  Objection.
22  Mischaracterizes.  Argumentative.

Page 151

1      THE WITNESS:  Well, there's no such
2  interface element as a pad.  And the fact is that
3  the object in question was a window, the calculator.
4  BY MS. GARNER:
5     Q.  Is it your understanding of the Court's
6  claim construction, that in order to be a tool the
7  thing has to be displayed in a window?
8     A.  I have seen nothing in the Court's claim
9  constructions that indicates that it can just be
10  someplace on the display that's not movable, that's
11  not perceived as an entity, that's just kind of,
12  let's just draw a line around it and call it a tool.
13     Q.  And did you see something in the Court's
14  claim construction that rules that out?
15     A.  I have seen nothing in the claims
16  construction that rules that in.
17     Q.  How about out?
18      MR. CORBETT:  Objection.  Vague.  Asked
19  and answered.
20      THE WITNESS:  I would have to be a lawyer
21  to be able to answer that question.  I'm sorry.
22  BY MS. GARNER:

Page 152

1     Q.  Do you know how to apply the Court's claim
2  construction?
3     A.  I believe so.
4     Q.  And can you apply it to determine whether
5  or not what you just described constitutes a tool?
6     A.  Well, I've just described a whole bunch of
7  things, so -- I'm sorry.  I don't know how to
8  respond to that question.  What I've just
9  described -- oh, in terms of just drawing a circle
10  around something in a screen and announcing a tool,
11  that's not a tool.
12     Q.  How about if it's a list of potentially
13  valid entries?
14      MR. CORBETT:  Objection.  Vague.
15      THE WITNESS:  That's not of and by itself
16  a tool.
17  BY MS. GARNER:
18     Q.  What else does it need to be a tool?
19      MR. CORBETT:  Objection.  Incomplete
20  hypothetical.
21      THE WITNESS:  It needs to be, it needs to
22  be associated with a field -- well, let me read it

Page 153

1  to you.  "Predefined tool associated with said one
2  of said fields refers to a tool specified by the
3  system as an appropriate tool for filling in the
4  information called for by that field."
5  BY MS. GARNER:
6     Q.  And what would that list of potentially
7  valid entries with a circle around it need in
8  addition in order to meet the Court's claim
9  construction?
10     A.  It would have to be associated with a
11  field.  It would have to be one of a series of
12  predefined tools.  It would have to be able to
13  operate to supply the information the kind
14  identified for said one field said tool being
15  selected from a group of predefined tools including
16  a tool adapted to supply an individual entry from a
17  menu of alternatives and at least a tool adapted to
18  allow said user to compose said information.
19     Q.  With respect to what you just described, a
20  list of potentially valid entries with a circle
21  around it, are potentially valid entries appropriate
22  for filling in the information called for by the

**Exhibit 15   Page 39**

Page 154

1  field?

2      MR. CORBETT:  Objection.  Vague.

3  Incomplete hypothetical.

4  BY MS. GARNER:

5      Q.  Does potentially valid and the type of

6  information called for by the field mean the same

7  thing?

8      MR. CORBETT:  Same objection.

9      THE WITNESS:  No, not entirely.

10  BY MS. GARNER:

11      Q.  How are they different?

12      A.  Well, potentially valid can be a subset of

13  the type of information called for by the field.

14  For example, if they want to know a person's age,

15  the type of information called for by the field is

16  numeric, but potentially valid entries would not go

17  below zero, and they would not go over about 130.

18      Q.  Great.  So sounds like potentially valid

19  entry would always be the type of information called

20  for by the field.  Do you agree with that?

21      MR. CORBETT:  Objection.

22  Mischaracterizes.  And also object to the entire

Page 155

1  line of questioning related to the Court's claim

2  construction.  Again, this is a deposition that's

3  supposed to be related to a supplemental rebuttal

4  report on obviousness on references that were

5  produced recently by your expert.  To the extent you

6  want to ask questions related to supplemental

7  report, that's fine, but, to the extent you're going

8  over claim construction issues to which he testified

9  in his first deposition last year, I think that's

10  beyond the scope of this deposition.

11      MS. GARNER:  I think I'll restate the

12  question, if it's all right with you.

13  BY MS. GARNER:

14      Q.  Would a potentially valid entry be the

15  kind of information called for by the field?

16      MR. CORBETT:  Same objection.

17      THE WITNESS:  I'm sorry.  We've been going

18  around this long enough that I forget where the term

19  "potentially valid entry" came from.

20      MS. GARNER:  Came from the Tyler

21  reference.

22      THE WITNESS:  Oh, oh, okay.  A list of

Page 156

1  potentially valid entries is the sort of thing you

2  find in, in menus of alternatives, regardless of

3  whether those menus are contained in tools or other

4  kinds of objects in the interface.

5  BY MS. GARNER:

6      Q.  On page 16 of your report in paragraph 58

7  you say with regard to the tools or with regard to,

8  according to layout and the numeric keypad disclosed

9  in Tyler that there's no evidence that there's,

10  associated with specific information fields and are

11  not instead system level tools.  What is a system

12  level tool?

13      A.  Well, that would be a tool that, that's

14  one thing that could be other than being associated

15  with a field.  This, this keyboard could be supplied

16  by Easel rather than being supplied by a higher

17  level application that you have referred to as FXFE.

18  That would make it a system level tool.

19      Q.  What do you understand Easel to be?

20      A.  I want to be careful here, because again

21  I've read Mr. Buscaino's deposition in the mean

22  time, but have not been able to confirm any of the

Page 157

1  information in it, so it's still to me an open

2  question exactly where Easel stops and any specific

3  application written on top of Easel starts, but --

4      Q.  So maybe I could just clarify something.

5  Do you understand Easel to be more on the order of

6  an operating system?

7      A.  It's a layer, so it either is the

8  operating system itself or it's a, a layer which

9  lies on top of the operating system and below the

10  applications.

11      Q.  And, if it's either one of those things,

12  the operating system or intermediate layer, but not

13  the application, then these tools would not be

14  predefined tools as described in the Day patent; is

15  that correct?

16      A.  I think that, that it is highly doubtful

17  that they would be, unless there's much more

18  information than is appearing in the Tyler article

19  that would lead me to that.

20      Q.  What more information would you need?

21      A.  If these tools are always available to the

22  user, then they are not associated with a field, if

**Exhibit 15    Page 40**

Page 158

1  there's a field, so we're going back -- there's just
2  so little here. You're asking me to speculate.
3  Because this is a touch sensitive system and there
4  is no physical keyboard, as we've seen in the prior
5  art, when you have that kind of system, the system
6  supplies a keyboard, system supplies a numeric
7  keypad 'cause these are fundamental objects needed
8  for entering data. So there's no reason to believe,
9  based on the Tyler article, that these are anything
10 other than system level tools that do not have a
11 direct association with the labels or list of
12 functions or whatever these things are over on the
13 other side, and I'm not going to characterize them
14 because I don't know what they are.
15     Q. If the tool is part of the operating
16 system, is it because of that fact not a tool for
17 the purposes of the '356 patent?
18     MR. CORBETT: Objection. Vague.
19 Incomplete hypothetical.
20     THE WITNESS: That would lead one skilled
21 in the art to assume a lack of association.
22 BY MS. GARNER:

Page 159

1     Q. Is that a yes? Are operating system level
2  tools by that very fact not tools for the purposes
3  of the '356 patent?
4     MR. CORBETT: Same objection and asked and
5  answered.
6     THE WITNESS: Tools of this nature,
7  there's no reason for a field to take away the E key
8  because none of the things you might want to type
9  have an E in them. They are just going to supply
10 the tool. They are going to allow the tool to be on
11 the screen, so this is not the kind of a tool that
12 is going to be customized by the particular
13 application.
14     This is, this appears to be a system level
15 tool that would be typically universally available
16 when using Easel applications. There's a
17 possibility that a given Easel application having no
18 need whatsoever for this tool could make it
19 disappear, but it would typically be persistent,
20 and, therefore, it doesn't have the characteristics
21 that the Court has construed of association with one
22 of said fields.

Page 160

1  BY MS. GARNER:
2     Q. I think I understand what you're saying,
3  and that's with regard to the two more, I'll call
4  them generic kinds of tools. I hope that that
5  doesn't cause an issue. I hope that that doesn't
6  cause an issue. The keyboard tool and the numeric
7  keypad tool as compared to the list of brokers,
8  those are system level tools, the keypad and the
9  numeric pad, as opposed to the list of potential
10 brokers?
11     MR. CORBETT: Objection.
12 BY MS. GARNER:
13     Q. Is that accurate?
14     MR. CORBETT: Objection. Vague.
15 Compound. Mischaracterizes. Asked and answered.
16     THE WITNESS: The only thing I would
17 suggest is that I have no information to indicate
18 that they are other than system level tools, and,
19 again, I have not spoken with Mr. Long. I have not
20 seen any documentation on the system. There's
21 nothing in the Tyler article which indicates
22 anything but that they are system level tools.

Page 161

1  BY MS. GARNER:
2     Q. So, if the keyboard is part of the
3  operating system available to lots of different
4  applications, but it comes up when you push the
5  customer field, is it a system level tool?
6     MR. CORBETT: Objection. Vague.
7  Incomplete hypothetical.
8     THE WITNESS: I would certainly want to
9  see the system dynamically operating to, to satisfy
10 myself whether it's coming up or whether it has
11 merely had something masking it, so that's -- it
12 sounds like a simple question. It's actually a
13 complex question in the area of human computer
14 interaction. If it's just simply there all the time
15 that you can't see it, then it's not really coming
16 up in response to, and, if it's a system level tool
17 that is universally available on the system, unless
18 inhibited and you remove the inhibitor, I'm not sure
19 that would arise either to the level of an
20 association. You're just simply removing whatever
21 is keeping the user from being able to get at it.
22 BY MS. GARNER:

**Exhibit 15   Page 41**

Page 162

1    Q.  What does it mean that a tool might be
2  there all the time; you just can't see it?
3    A.  Well, this goes into the user experience
4  of the system, and, whether the tool is loaded into
5  memory, it's available; it's a standard tool, but
6  you have the ability to mask it on the screen either
7  by having someone, something cover it or by having
8  it blank out.  Just turning it on and off when --
9  again, there's just nothing here.  There's nothing
10 here that indicates that this is anything right now
11 but a persistent object that's always present.  And
12 there's some evidence that it is a persistent object
13 that's always present.
14   Q.  Is that true with respect to the numeric
15 keypad, too?
16   A.  The numeric keypad is probably an
17 alternative -- well, there again I'm speculating.  I
18 want to see the system, and then I can talk about
19 the system.
20   Q.  Is there evidence from the picture in
21 front of you, Exhibit 12, that the numeric keypad
22 isn't ever present?

Page 163

1    A.  Isn't ever present?
2    MR. CORBETT:  Objection.
3  BY MS. GARNER:
4    Q.  Is not ever present?
5    MR. CORBETT:  Objection.  Vague.
6  BY MS. GARNER:
7    Q.  Do you see it in the picture?
8    MR. CORBETT:  Same objection.
9    THE WITNESS:  It just depends on what
10 we're looking at here.  If we are looking at a tool
11 which consists of a keyboard keypad, and we're
12 seeing the keyboard right now, and one can flip it
13 to see the keypad, then there's one tool.  And it's
14 a system level tool, so it just depends on how it
15 was implemented and who implemented it as to what
16 they were attempting to provide.
17 BY MS. GARNER:
18   Q.  Would you need to know whether it was part
19 of the operating system to make a determination as
20 to whether it was a tool for the purposes of the
21 '356 patent?
22   A.  Whether it is a standard object that is

Page 164

1  supplied by the operating system would be a strong
2  indicator.  It's not limited to that.
3    MS. GARNER:  I think we should take a
4  five-minute break, if that's all right.
5    THE VIDEOGRAPHER:  Going off the record at
6  3:01:42.
7    (Whereupon, a short recess was taken.)
8    THE VIDEOGRAPHER:  Going back on the
9  record.  The time is 3:14:48.  Counsel may proceed.
10   MS. GARNER:  I have no further questions,
11 but I think my colleagues do.
12   EXAMINATION BY COUNSEL FOR GATEWAY
13 BY MR. BAKER:
14   Q.  Good afternoon, Mr. Tognazzini.
15   A.  Good afternoon.
16   Q.  I'm Jonathan Baker representing Gateway in
17 this matter, and I'd like to start by asking you
18 some questions about the Apple Macintosh.  Did you
19 work on the development of the user interface for
20 the Apple MacIntosh?
21   A.  Very early on and not very much.
22   Q.  Do you know when the Apple Macintosh was

Page 165

1  introduced to the market?
2    A.  January 24, 1984.
3    Q.  And did the Apple Macintosh include an
4  on-screen calculator?
5    A.  Yes, it did.  It included a desk accessory
6  calculator.
7    Q.  And could the on-screen calculator be
8  controlled by the physical keyboard?
9    A.  Yes, it could.
10   Q.  And could the on-screen calculator be
11 controlled by the mouse?
12   A.  Yes, it could.
13   Q.  What was the motivation for allowing the
14 on-screen calculator to be controlled by the mouse?
15   MR. CORBETT:  Objection.  Form.
16   THE WITNESS:  Primarily completeness.  It
17 was a mouse-based system, and it seemed
18 inappropriate to block people from using the mouse.
19 It also provided a, it was a, it was a way of
20 demoing the system to use desk accessories, so one
21 didn't want to be, a salesperson didn't want to be
22 halfway through a demo and have to explain to the

**Exhibit 15   Page 42**

Page 166

1  customer why you couldn't use this thing with a
2  mouse, even though it was very, very slow compared
3  to the keys.
4  BY MR. BAKER:
5      Q.  Were there any advantages of including the
6  mouse control for the calculator?
7      A.  The, well, there was the sales advantage.
8  Insofar as users there were potentially users with
9  significant handicaps such as having only a single
10  hand who might have found value from it, but not
11  for, not for regular users.
12      Q.  Can you think of any other advantages?
13      A.  No, not as I'm sitting here right now.
14      Q.  Okay.  I'd like to turn now to your expert
15  report, Exhibit Number 1.  Could you please turn to
16  page nine and take a look at paragraph 40?  And,
17  actually, the language I'd like to ask you about
18  appears on the top of page ten in that same
19  paragraph, 40.  And in the first full sentence on
20  that page you say "it does not permit a user to
21  compose information by pointing to display keys."
22  Do you see that?

Page 167

1      A.  Yes.
2      Q.  What do you mean by display keys?
3      A.  Well, reading from Exhibit B, the Glossary
4  of Terms, which was part of Exhibit Tognazzini 7
5  today, the claims construction, a tool adapted to
6  allow said user to compose said information means a
7  graphical keyboard tool or a graphical numbered
8  keypad tool which allows the user to compose
9  information by pointing to the display keys of that
10  tool.  So it's in that context that I use the term
11  display keys.
12      Q.  My question to you is what does display
13  keys mean?
14      A.  What I interpret that to mean is targets
15  for pointer acquisition one displays on the computer
16  screen -- the only thing a pointing device can touch
17  are those things on a computer screen that are
18  touchable, and virtually without exception all those
19  touchable areas are made visually apparent and set
20  off as distinct entities so that the user knows what
21  targets are available to them.  In the case of a
22  calculator such as the Macintosh calculator you

Page 168

1  mentioned it has an array of keys which are targets
2  for the mouse which are displayed on the screen as
3  targets for the mouse.  And that's my interpretation
4  of the Court's construction, so in the case of YMM
5  there is no mouse support or other pointing device
6  support.  It's just got a text array of numbers that
7  one cannot interact with in any way, and, therefore,
8  these are not display keys as suggested in a Court
9  construction.
10      Q.  So would it be fair to say then in your
11  opinion it displays a key, but it's not a display
12  key?
13          MR. CORBETT:  Objection.
14  Mischaracterizes.
15          THE WITNESS:  It displays an array of
16  numbers.
17  BY MR. BAKER:
18      Q.  But, in your opinion, those are not
19  display keys because they are not a target for a
20  mouse to click on?
21      A.  That's correct.
22      Q.  Now, what's the basis for your

Page 169

1  understanding of the meaning of display keys?
2      A.  The Court's construction.
3      Q.  Well, the Court just uses the word
4  "display keys."  Is there something outside of that
5  construction you're relying on to interpret the
6  meaning of the term "display keys"?
7      A.  Well, about 35 years doing human computer
8  interaction design.  I've attempted to map the
9  Court's construction onto the field of human
10  computer interaction.
11      Q.  So, no particular documents.  Just your
12  experience having worked in the field of HCI?
13          MR. CORBETT:  Objection.
14  Mischaracterizes.
15          THE WITNESS:  Yes, it does mischaracterize
16  my mere experience, but the term "display keys" is
17  not common parlance in human computer interaction,
18  so it's necessary to interpret what the Court is
19  saying in terms of human computer interaction, and,
20  since the Court is specifically talking about
21  pointing to, they are talking about targets, and,
22  therefore, display keys must be in the Court's mind

Page 170

1  targets, and there are no targets on this screen.
2  BY MR. BAKER:
3     Q.  So maybe I misunderstood your prior answer
4  then, but is there something outside of the claim
5  construction order that you are relying on to
6  understand the meaning of display keys?
7        MR. CORBETT:  Objection.  Vague.  Asked
8  and answered.
9        THE WITNESS:  I think the claim
10 construction speaks for itself and is clear, so I
11 felt no need to go outside of it.
12 BY MR. BAKER:
13    Q.  Okay.  If you look at the last sentence in
14 this paragraph 40, it says "The on-screen calculator
15 does not have display keys or anything by which a
16 user could point to display keys."  Do you see that
17 in the last sentence?
18    A.  Yes.
19    Q.  What do you mean by the word "point"?
20    A.  To point is an activity carried out with a
21 pointing device on a computer, and it literally
22 means to — well, in the, insofar as the common

Page 171

1  meaning it means to actually physically point at
2  something in the computer environment, so one can't
3  point because there's nothing to point with.
4     Q.  Okay.  You're kind of using the word
5  "point" in defining point.  Is there any way to
6  define "point" without using the word "point"?
7        MR. CORBETT:  Objection.  Asked and
8  answered.
9        THE WITNESS:  I talked this morning about
10 pointing devices and what they are, and that they
11 are used typically to move what's called a pointer
12 around the screen to indicate to the system the area
13 of or the object of interest to the computer before
14 clicking, which is the second half, point and click.
15 So it's to identify a target of interest that one
16 points, and to identify the target of interest one
17 carries out a physical movement in X and Y of the
18 hand or whatever is being used to drive the pointing
19 device in order to indicate that area of interest.
20 And, when one has superimposed the pointer over the
21 area of interest, one is pointing at the area of
22 interest.

Page 172

1  BY MR. BAKER:
2     Q.  Now, what's the basis for your
3  understanding of the meaning of the word "point" in
4  this context?
5     A.  Well, it's been common parlance in the HCI
6  community at least since 1980 that I recall and
7  probably a good deal before that.
8     Q.  So, other than the common parlance, is
9  there anything else you are relying on?
10    A.  Well, okay.  Let me tighten that up a bit.
11 I mean that it's a standardized term within the HCI
12 community with a formal and commonly and universally
13 understood meaning to it.  It's not a kind of a
14 throw-away term that sometimes means this and
15 sometimes means that.  It's a very formal term and
16 is at the very heart of point and click interfaces
17 which is what graphical user interfaces are.
18    Q.  And where would you look to find that
19 understood meaning of the word "point"?
20    A.  I would type it into Google along with the
21 word "computer", and you'll probably get a couple
22 million hits on it.

Page 173

1     Q.  Well, within the HCI field you may feel
2  there's some lexicon of terminology.  Just someplace
3  you can go to look to find authoritative meaning for
4  the word "point."
5     A.  Well, again, this is something that I was
6  not originally prepared to talk about because I had
7  no idea that Mr. Buscaino had an idiosyncratic
8  interpretation of the word, so there are a number of
9  references that I would be able to turn to to show
10 the overwhelming universality of this interpretation
11 that I'm suggesting today.
12    Q.  And what kind of references are those?
13    A.  There are technical dictionaries.  There
14 are standards committees for the government that
15 have, have — well, I'm not sure what the legal term
16 is for what they've done, but they've defined them
17 at a federal level.  So, I mean, there's a wide
18 variety, and, if called upon, I shall find some of
19 them.  But, again, it was the last thing imagined
20 that he would decide that, other than waving a
21 keyboard around in the room like this, that a
22 keyboard would be considered a pointing device

44  (Pages 170 to 173)

**Exhibit 15   Page 44**

Page 174

1 because it's just simply not.
2    Q.  Because you think the term has a well
3 understood meaning in the field of HCI?
4    A.  I know it has a well understood, universal
5 meaning.
6    Q.  And that's the meaning of your client here
7 in your report?
8    A.  That's, yes. I'm not, again, I'm not
9 spouting a dictionary term right now, but the, what
10 I have suggested in my report, what I'm saying now
11 is the commonly held meaning of pointing.
12    Q.  Mr. Tognazzini, I'd like to ask you some
13 questions now about the YMM software and how that
14 relates to the limitations of Claim 19, and you may
15 want to refer to the Court's claim construction
16 order to help you with this.  So I'd like to start
17 with the preamble of Claim 19.  Does the YMM
18 software disclose a method for use in a computer
19 system?  Or include a method for use in a computer
20 system?
21    A.  I don't believe I expressed an opinion on
22 that, but let me have a look.  I have not expressed

Page 175

1 an opinion on that.
2    Q.  Okay.  Let me ask it this way.  Is Your
3 Money Manager software intended for use on a
4 computer?
5    A.  I'm only hesitating because I'm not a
6 lawyer, and I understand that sometimes you ask
7 trick questions, so, to the extent that what you
8 asked me is in clear English, I believe that
9 software is intended to be run on a computer system.
10    Q.  Okay.  And I appreciate your answer.  I'm
11 not trying to trick you here.  Just trying to ask
12 straight forward questions, so don't feel like you
13 have to look through the layers into the meaning of
14 my questions.
15    A.  Okay.
16    Q.  Let me ask you another hopefully straight
17 forward question.  Is Your Money Manager software
18 intended for use in a computer system with a
19 display?
20    A.  Again, I didn't form an opinion on that.
21 It doesn't fulfill Claim 19 overall, and I, since I
22 didn't form an opinion, I'm not really prepared to

Page 176

1 start forming opinions now off the cuff in general.
2    Q.  Well, you've seen the software in
3 operation; right?
4    A.  Yes, I have.
5    Q.  And it displays information on a screen?
6    A.  Yes.
7    Q.  So wouldn't it be fair to say that the
8 software is intended for use with a display so that
9 it can display information?
10       MR. CORBETT:  Objection.  Asked and
11 answered.
12       THE WITNESS:  I don't know how far I can
13 go in offering new opinions in the middle of a
14 deposition and what kind of limiting factors they
15 have on the fact that Claim 19 does not have all the
16 necessary elements.
17 BY MR. BAKER:
18    Q.  I'm just trying to take it step by step
19 and see where we have a disagreement, where we agree
20 and didn't agree.  I didn't think we'd have a
21 dispute about displays because it seems pretty clear
22 there's a display, but let me just ask the question

Page 177

1 again.  Is the Your Money Manager software intended
2 for use in a computer with a display?
3       MR. CORBETT:  Objection.  Asked and
4 answered.
5       THE WITNESS:  Again, I didn't form an
6 opinion, and I don't want to start forming opinions
7 now in the middle of a deposition.
8 BY MR. BAKER:
9    Q.  Well, are you able to answer the question?
10    A.  Again, I don't know what the legal
11 ramifications are of beginning to agree with various
12 elements of Claim 19 when I'm on the record as
13 saying that Claim 19 does not have the necessary
14 elements, so I'm uncomfortable.
15    Q.  All right.  Well, I appreciate that you're
16 uncomfortable.  I mean, you have said that certain
17 elements are not there, and we'll certainly get to
18 those, but I'm trying to figure out which elements
19 you would agree are there.  And it sounds like you
20 haven't previously, you know, prepared an opinion on
21 this, but being an expert in HCI I would hope you
22 could answer, be able to answer the question about

Page 178

1 whether software like YMM is intended for use with a
2 display?
3         MR. CORBETT: Objection. Asked and
4 answered.
5 BY MR. BAKER:
6     Q. So do you think you can answer the
7 question?
8     A. I think probably the usual mode of using
9 YMM was with a display.
10     Q. Okay. Let me turn to the next limitation
11 then. Does the YMM software perform the steps of
12 displaying on said display a plurality of
13 information fields?
14     A. If you can bring it up and I can go
15 through it for a while, I might be able to -- I
16 mean, the actual software, not pictures of it, I
17 might be able to start forming new opinions, but
18 it's one thing to say it comes up on a display.
19 It's another thing to start forming new opinions
20 about what it does and doesn't have.
21     Q. So, if you saw a picture of the display,
22 would you be able to answer my question?

Page 179

1     A. Well, I think the software running is
2 better evidence of the software than a picture of
3 the software, so --
4     Q. All right. Let me ask you this. You've
5 reviewed the software running; is that right?
6     A. Yes, I have.
7     Q. And you are aware that Mr. Buscaino had
8 opined that it met all the limitations of the claim;
9 is that right?
10     A. That's my recollection as I sit here.
11     Q. And you were trying to determine whether
12 or not you agreed with his conclusions or disagreed
13 with his conclusions?
14     A. Well, I spent my time on the portion of
15 Claim 19 having to do with the tool adapted and
16 didn't offer an opinion on the rest of it.
17     Q. Did you consider whether the YMM software
18 met the displaying limitation?
19     A. I didn't formally consider it, and I
20 didn't deliver an opinion on it.
21     Q. Did you think about it, though?
22         MR. CORBETT: Objection. Vague.

Page 180

1         THE WITNESS: I can't tell you.
2 BY MR. BAKER:
3     Q. Why can't you tell me?
4     A. I don't mean I'm withholding it from you.
5 I just don't remember whether I looked at that
6 particular aspect of it or not. It was clear to me
7 from the beginning that it clearly did not meet the
8 particular step that we were talking about, and
9 that's where I put my time and energy into looking
10 at that and seeing whether, in fact, it did, and, if
11 not, why it didn't and whether it almost did or not,
12 but, I mean, it radically didn't as it turned out.
13 So that was, that was where my effort became
14 concentrated.
15     Q. So do you have an opinion regarding
16 whether or not the YMM software performs a step of
17 displaying on said display a plurality of
18 information fields?
19     A. As I am sitting here right now, there's no
20 opinion in my report, and I do not want to create an
21 opinion on the fly.
22     Q. So you don't have an opinion right now on

Page 181

1 that limitation?
2     A. That's correct.
3     Q. What about the next limitation? Did you
4 consider whether the Your Money Manager software
5 forms a step of identifying for each field a kind of
6 information to be inserted therein?
7     A. I did not form an opinion on that.
8     Q. Did you consider whether it met that
9 limitation?
10     A. I don't think I exhaustively went through
11 each field to see whether it met the limitation or
12 not.
13     Q. Did you consider any fields?
14         MR. CORBETT: Objection. Form.
15         THE WITNESS: Well, there were, I did
16 notice one or two that it wasn't clear that they
17 didn't indicate, but how extensive it was I don't
18 know.
19 BY MR. BAKER:
20     Q. Were there any fields that you found in
21 the Your Money Manager software that did identify
22 the kind of information to be inserted therein?

Page 182

1    A.   There was some, yes.

2    Q.   And which fields were those?

3    A.   Well, again, I'm just working from memory,
4  but date and amount would have a common meaning to
5  people and understanding of -- well, amount would be
6  better.  Date did not necessarily indicate what
7  format or may or may not have indicated what format
8  it should be.

9    Q.   What about the account field?

10    A.   Certainly a new user would have no idea
11  what to put in there.

12    Q.   What about an experienced user of the
13  software?

14    A.   Experienced user would have learned what
15  to put in there, but the label itself wouldn't have
16  told them what to put in there.

17    Q.   What do you think that label would have
18  meant to a new user?

19    A.   Checking, savings or charge account of the
20  department store.  It's got a very specialized
21  meaning within YMM, and some other financial
22  software, but --

Page 183

1    Q.   So, if someone read the user manual for
2  the software, would they understand what account
3  meant?

4    A.   Yes.

5    Q.   And, if they had used the software for
6  some limited period of time, would they understand
7  what the term "account" meant?

8    A.   They would understand it, but at that
9  point the word "account" would have become a symbol
10  as opposed to an identifier that identifies for each
11  field a kind of information to be inserted therein.
12  The word "amount" is commonly understood.  I'm
13  supposed to enter a dollar figure.  The word
14  "account" is open to interpretation, and even when
15  you learn it, it's not actually account.  It's the
16  account number or something along those lines.

17    Same thing with the word "check" next to
18  it.  You don't enter the check into the box labeled
19  "check."  You enter a number.  There's no connection
20  between that label and the kind of information to be
21  inserted therein, but, again, I didn't go into that.

22    Q.   Well, so what's your understanding then of

Page 184

1  what the identifier has to tell the user in order to
2  meet this limitation?

3    A.   The identifier for each field a kind of
4  information to be inserted therein, and all I can
5  tell you is what it says on the page.  I did not
6  form an opinion as to how these labels fit in there.

7    Q.   Would the user have to understand exactly
8  what kind of information was supposed to be entered
9  into that field in order to meet this limitation?

10    MR. CORBETT:  Objection.  Vague.

11    THE WITNESS:  I don't think that's
12  necessarily true.  And, again, I didn't form an
13  opinion just because I didn't get into these issues.

14  BY MR. BAKER:

15    Q.   I understand, but for account, for
16  example, you said a user could think it's checkings
17  or savings or some other type of account rather than
18  account codes.  I'm trying to understand how that
19  example informs your understanding of the
20  requirements of this limitation.

21    A.   It doesn't inform my understandings, and
22  that's why I didn't form an opinion on this or,

Page 185

1  actually, that's the cart before the horse.  I
2  didn't form an opinion on this.  Therefore, I didn't
3  go into this issue and that, that wouldn't
4  necessarily inform my understanding of this issue.
5  There are many fields in many programs with
6  identifiers that are not immediately obvious to all
7  users, so --

8    Q.   And, if it were not immediately obvious to
9  a user, would that mean it would not satisfy the
10  limitation?

11    A.   I don't believe that's correct.  So in
12  this instance I'm more talking about the fact that
13  they came up with a bad design rather than something
14  that would necessarily be within or without scope of
15  Claim 19.

16    Q.   Well, if a label were subject to multiple
17  interpretations, in your opinion, would that mean it
18  would not identify for each field a kind of
19  information to be inserted therein?

20    A.   No.

21    MR. CORBETT:  Objection.  Incomplete
22  hypothetical.

**Exhibit 15   Page 47**

Page 186

BY MR. BAKER:

2  Q. So what are you saying?

3  A. I'm just saying those particular labels in
4  YMM are not well chosen, and I did not form an
5  opinion on this issue.

6  Q. And in particular account label is not
7  well chosen because different users could understand
8  it differently?

9  A. That's correct.

10  Q. And for that reason it does not identify
11  for each field a kind of information to be inserted
12  therein?

13  MR. CORBETT: Objection.
14  Mischaracterizes.

15  THE WITNESS: That's what I am not saying.
16  I am not saying that. I'm saying that it's not well
17  chosen, and you're attempting to get me to create
18  opinions on the fly, and I'm really not going to do
19  that.

20  BY MR. BAKER:

21  Q. I thought you were explaining that
22  problem, why it was not well chosen, as somehow

Page 187

1  relevant to the claim limitation?

2  A. At some point an identifier would become
3  so poorly chosen that one would have no idea what,
4  how to proceed forward, and at some point an
5  identifier is no longer an identifier. Where that
6  point is I have not been asked to give an opinion,
7  and, nor have I given one.

8  Q. Well, do you have a sense right now as to
9  whether the account field is sufficiently clear that
10  it would qualify as an identifier?

11  MR. CORBETT: Objection. Asked and
12  answered.

13  THE WITNESS: No, I don't. And one of the
14  factors would be the users. This was typically used
15  by professionals, and, therefore, they might have
16  more of a chance of understanding it, but, again,
17  this is exactly the sort of issue I didn't get into
18  because I didn't offer an opinion on this.

19  BY MR. BAKER:

20  Q. Okay. So let me, I think it's probably
21  clear by now. Let me see if I can confirm it. Do
22  you have an opinion now as to whether or not the YMM

Page 188

1  software meets the identifying for each field the
2  kind of information to be inserted therein
3  limitation?

4  A. No.

5  MR. CORBETT: Objection. Asked and
6  answered.

7  BY MR. BAKER:

8  Q. Okay. Let me move on to the next
9  limitation. Does the YMM software perform the step
10  of indicating a particular one of said information
11  fields into which information is to be inserted?

12  A. Again, this is something -- let's see.
13  Where did I – I did not offer an opinion on that.

14  Q. So do you have an opinion today whether
15  the YMM software meets that limitation?

16  A. No.

17  Q. Do you have an opinion on whether the YMM
18  software meets the limitation of concurrently
19  displaying a predefined tool?

20  A. No.

21  Q. Do you have an opinion on whether the YMM
22  software meets the limitation of associated with

Page 189

1  said one of said fields?

2  A. No.

3  Q. Do you have an opinion on whether the YMM
4  software meets the limitation of said predefined
5  tool being operable to supply information of the
6  kind identified for said one field?

7  A. No.

8  Q. Do you have an opinion on whether the YMM
9  software meets the limitation of said tool being
10  selected from a group of predefined tools including
11  a tool adapted to supply an individual entry from a
12  menu of alternatives?

13  A. No.

14  Q. And do you have an opinion on whether the
15  YMM software meets the limitation of at least a tool
16  adapted to allow said user to compose said
17  information?

18  A. Yes.

19  Q. And do you have an opinion on whether the
20  YMM software meets the limitation of inserting in
21  said one field information that is derived as a
22  result of said user operating said display tool?

Page 190

1    A.  No.
2    Q.  Okay.  Now, we've been talking thus far
3  about the YMM software.  If I ask you all the same
4  questions about the YMM user manual, would your
5  answer be the same as with respect to the software?
6    A.  Yes.  Insofar as whether or not I have an
7  opinion, yes, as I'm sitting here today.
8    Q.  Okay.  So, if I understand this correctly,
9  the only limitation that you've expressed an opinion
10  on is the, at least a tool adapted to allow said
11  user to compose said information limitation with
12  respect to the YMM software and the YMM manual?
13    A.  I have only discussed a tool adapted to
14  allow said user to compose said information.
15    Q.  So that's the only limitation you've
16  formed an opinion on?
17    A.  That's correct.
18    Q.  Mr. Tognazzini, I'd like to ask you some
19  questions now about MS DOS-based systems more
20  generally.  Did any MS DOS-based systems use a mouse
21  before December of 1986?
22    MR. CORBETT:  Objection.  Vague.

Page 191

1    THE WITNESS:  I don't have direct evidence
2  one way or the other.
3  BY MR. BAKER:
4    Q.  So you don't know?
5    A.  Yes.
6    Q.  Have you ever heard of something called
7  the serial mouse?
8    A.  How do you spell it?
9    MR. CORBETT:  Objection.  Foundation.
10  Vague.
11    MR. BAKER:  S-E-R-I-A-L.
12    THE WITNESS:  I don't recall that.
13  BY MR. BAKER:
14    Q.  If a person of skill in the art wanted to
15  add mouse support to YMM, what would need to be
16  added?
17    MR. CORBETT:  Objection.  Vague.
18  Incomplete hypothetical.  Foundation.  Assumes
19  facts.
20    THE WITNESS:  Well, it would greatly
21  depend on how one went about it and what level of
22  mouse support one wanted to add, and that's a very,

Page 192

1  very broad question, so I —
2  BY MR. BAKER:
3    Q.  Okay.  Suppose you wanted to add mouse
4  support just for the on-screen calculator feature of
5  Your Money Manager.  What would need to be added to
6  the software to accomplish that?
7    MR. CORBETT:  Same objection.
8    THE WITNESS:  One would need to add --
9  okay.  We're talking about an application that ran
10  in text mode on a very slow computer back in the
11  mid-1980s.  To add support for a mouse pointer in
12  text mode on a computer that does not otherwise
13  support it requires coming up with a customized
14  character set, may require changes to the logic in
15  the chips of the computer, will certainly require a
16  mouse, will certainly require mouse drivers and will
17  require, typically require extensive changes to the
18  software.  When one completes all this, one will now
19  be selling a product which requires more memory or,
20  if you've hit the maximum amount of memory, that
21  your customers have now has less functionality
22  because you've had to remove functionality to make

Page 193

1  room for all of this.  You're going to have a very,
2  very small installed base of people that have the
3  necessary systems to be able to use such a text
4  pointer, and your customers, in addition to buying a
5  product from you, are going to have to buy a product
6  from the mouse manufacturer and buy one or more
7  products from software people to make the whole
8  system work, so you've now tremendously limited your
9  potential marketplace, and you've now created a
10  product that is less efficient than the one you
11  started with.
12    On the other hand, if you want to do this
13  in graphics, you can avoid any steps that can be
14  required in creating a text-based mouse.  Thereby
15  you get around the logic board problems and the
16  character set problems, and you put it into graphics
17  mode.  As soon as you put it into graphics mode, in
18  that era you would typically experience an
19  eight-fold decrease in the overall speed of your
20  application.  So your application is now running at
21  extremely slow speed.  Everything the user does is
22  going to be in slow motion, and you won't be able to

49 (Pages 190 to 193)

Exhibit 15   Page 49

Page 194

1  create a viable commercial product.
2      Typically, the systems then also had to
3  take hold of that graphics screen area out of main
4  memory so that, again, you have just shrunk the
5  possible size of your application, and you may have
6  to cut out as much as 50 percent of the
7  functionality of your application depending on how
8  much of a typical user's memory you're requiring for
9  your system.
10     Q.  So at the time, let's say December 1986,
11 the ability to implement a graphics mode version of
12 YMM that had mouse support was limited by the
13 computer speed and by memory constraints?
14     MR. CORBETT:  Same objection, plus
15 mischaracterizes, plus calls for narration.
16     THE WITNESS:  I believe I mentioned a
17 number of factors beyond that including the
18 economics and the reduction in productivity and the
19 fact that your customers had to go spend maybe three
20 times as much money to get a working product, but
21 they are giving two-thirds of it to other companies
22 in order to provide, to buy peripherals.

Page 195

1  BY MR. BAKER:
2      Q.  If a person skilled in the art wanted to
3  implement the mouse change in text mode, you said
4  that you might need to come up with custom character
5  set.  Could you explain why that would be the case?
6      A.  You have to have a mouse pointer which is
7  of a particular shape, typically an arrow, which is
8  facing up and to the left.  That character is not
9  necessarily available in a character set.  It's
10 built into the computer in that era.  So, if you
11 have a built-in character set, you have to modify
12 it.
13     Q.  So you would need to modify it so you
14 could have the character that would serve as the
15 pointer on the screen?
16     A.  That character and all the other necessary
17 characters to build a functioning text user
18 interface, TUI, and analogue of a graphical user
19 interface.
20     Q.  What are the other necessary characters?
21     A.  Various bars and shapes that one can build
22 menus out of and so forth.

Page 196

1      Q.  Could a person skilled in the art have
2  added those characters to a character set?
3      A.  Yes.
4      Q.  You also mentioned some changes to logic
5  chips.
6      A.  But let me just clarify that.  It's a
7  major undertaking.  It's a huge undertaking, and it
8  has to be done at the, by the computer manufacturer,
9  and it requires revamping.  It requires the release
10 of a new model of the computer and pretty much cuts
11 off any possibility of retrofitting because of the
12 extensiveness of the changes.
13     Q.  Well, why is it a huge undertaking?
14     A.  Because changes to chips on the logic
15 board are not trivial.
16     Q.  I thought we were talking about the custom
17 character set.  Is that related to the logic chips?
18     A.  My experience in this area has been that
19 one has to also change at least one logic chip in
20 order to carry it off.
21     Q.  So is that what makes it a huge
22 undertaking is the need to change some hardware?

Page 197

1      MR. CORBETT:  Objection.
2  Mischaracterizes.
3      THE WITNESS:  When you change the
4  hardware, when you change the character set, a lot
5  of people's software no longer functions properly.
6  So now all your developers have to go out and
7  release new software, even though there was nothing
8  wrong with the old software.  So it's a logistical
9  nightmare, and it's a big deal.
10 BY MR. BAKER:
11     Q.  Why would you need to make a change to a
12 logic chip?
13     MR. CORBETT:  Objection.  Vague.
14     THE WITNESS:  It depends on the current
15 architecture of the machine, the current machine, as
16 to what changes you have to make.  I've only done
17 this once.  I had to change the logic.  Whether in a
18 different machine one would not have to do that, I
19 can't tell you.
20 BY MR. BAKER:
21     Q.  When you say you've done this once, what
22 are you referring to?

Page 198

1    A.  The Apple 2C in which I put a mousing
2  system in text mode, and it required extensive
3  changes.
4    Q.  Could you just explain a little more what
5  the problem was you were addressing in that project?
6    A.  Well --
7    Q.  Explain a little more about what you were
8  doing with respect to the Apple 2C as relates to
9  this topic.
10   A.  I was designing a mousing system that
11 would work in text mode in order to not have the
12 eight-fold decrease in speed that occurs in graphics
13 mode.  And, in order to do that, I had to create a
14 custom character set.  I had to change a logic chip
15 so that it would point to the custom character set
16 when that custom character set was addressed, and,
17 when that happened, there were a whole bunch of
18 software applications that broke.  And so then I had
19 to work with all the developers to bring out new
20 releases of, with the affected developers to bring
21 out new releases of their software so that it
22 worked.  And it was a gigantic undertaking, and it

Page 199

1  was anything but trivial to add the mouse to the
2  Apple 2C.
3    Q.  So the Apple 2C was a system that
4  originally did not have mouse support?
5    A.  Actually, the Apple 2C did originally have
6  mouse support.  It was the new model, so it was
7  coming out on a new model.
8    Q.  So you were working on mouse support for
9  the initial launch of the Apple 2C?
10   A.  That's correct.  The Apple 2C was the
11 latest model in the Apple 2 series.  Therefore, I
12 was starting out with a, with the predecessor to it
13 and making the necessary changes to support the
14 mouse on the new model.
15   Q.  So the predecessor did not support the
16 mouse?
17   A.  That's correct.
18   Q.  And you were adding mouse support to the
19 predecessor for purposes of developing the Apple 2C?
20   A.  Yes.  In essence, yes.
21   Q.  And were you successful in adding mouse
22 support for the Apple 2C?

Page 200

1    A.  Yes, but it took six months of my life.
2    Q.  Would it be easier to include mouse
3  support in a software program if you're starting
4  from scratch?
5      MR. CORBETT:  Objection.  Vague.  Calls
6  for an incomplete hypothetical.
7      THE WITNESS:  Well, again, the two
8  possible ways of driving this program are text and
9  graphics, and graphics at that time was typically
10 inherently eight times slower, so, if you were
11 starting, you could just move to a graphics
12 environment as long as you didn't mind your users
13 waiting around for the entire course of the
14 application while things were happening in slow
15 motion.
16 BY MR. BAKER:
17   Q.  Why was the operation so slow in graphics
18 mode?
19   A.  Because you had to address every single
20 pixel on the screen instead of every group of eight
21 pixels, so you were slamming a whole bunch more
22 bytes onto the screen with that system than you were

Page 201

1  in the case of the text mode where the text
2  characters all are already fully formed, and you
3  just simply ship it to the screen with a piece of
4  hardware, send it out.  The microprocessor is
5  putting out one bit after the other after the other.
6    Q.  Did the performance improve in the
7  graphics mode after computers got faster?
8    A.  As computers got faster, graphics mode got
9  faster, which is why graphics-based applications
10 really didn't take off until the computers did get
11 faster.
12   Q.  In December of 1986 were there any
13 computer mouses available in the market for use with
14 an IBM PC?
15     MR. CORBETT:  Objection.  Vague.  Asked
16 and answered.
17     THE WITNESS:  To my knowledge, there were
18 mice available for the IBM PC.  Whether they worked
19 on top of MS DOS, whether they took over the whole
20 computer and essentially were primarily their own
21 operating system, I don't know.
22 BY MR. BAKER:

Exhibit 15  Page 51

Page 202

1    Q.  And for those mice that were available in
2  December of 1986 for the IBM PC were there mice
3  drivers also available for use with those mice?
4    A.  To the best of my knowledge, yes.
5  However, the installed base of such mice was very
6  low, and to create a program that required such a
7  device significantly limited your market.
8    Q.  If you could please take a look at
9  paragraph 41.  The last full sentence on the bottom
10  of page ten says, "This is typically done as a
11  completely new design without reference to that
12  which came before."  Do you see that?
13    A.  Yes, I do.
14    Q.  What do you mean when you say without
15  reference to that which came before?
16    A.  The graphical user interfaces are a
17  paradigm shift, as I've discussed earlier today.
18  The user is in control.  It's a nonnavigational
19  system where the information is brought to the user
20  instead of the user wandering through the labyrinth
21  of menus that MS DOS represented, and my experience
22  working with developers was that, if a developer

Page 203

1  just simply embraced the new paradigm completely and
2  immersed themselves in it, that they had no trouble
3  creating their first graphical user interface
4  program.  And, if they kept mentally trying to map
5  the new paradigm onto that which they already knew,
6  they just had failure after failure after failure.
7    Q.  So it's your opinion that a developer
8  developing a mouse-based system would not have
9  referred back to MS DOS based systems for ideas
10  about user interfaces?
11    MR. CORBETT:  Objection.
12  Mischaracterizes.
13    THE WITNESS:  Typically, the more you
14  looked back at MS DOS the more problem you were
15  going to have creating an effective graphical user
16  interface application.
17  BY MR. BAKER:
18    Q.  Okay.  But you're saying here in your
19  opinion that a developer would not have looked at
20  that MS DOS based, you know, prior art systems?
21    MR. CORBETT:  Objection.
22  Mischaracterizes.

Page 204

1    THE WITNESS:  That's typically true.
2  BY MR. BAKER:
3    Q.  And is that part of your opinion as to why
4  it would not have been obvious to modify YMM to
5  include mouse support?
6    A.  Well, I think modifying YMM to include
7  mouse support may be a different question.
8    Q.  All right.  Let me ask the question a
9  different way.  Is that part of your opinion as to
10  why a developer would not have taken ideas from YMM
11  and combined it with a mouse?
12    MR. CORBETT:  Objection.  Vague.
13  Mischaracterizes.
14    THE WITNESS:  A developer would not, a
15  developer who wanted to be successful in creating a
16  graphical interface typically needed to isolate
17  themselves for at least a good period of time which
18  might run into a few years from the ideas embodied
19  in MS DOS applications in order to be able to move
20  over into what for many was a very difficult
21  transition into this new space.
22  BY MR. BAKER:

Page 205

1    Q.  Okay.  I don't think you really answered
2  my question, which is I'm trying to understand
3  whether you're saying that it would not have been
4  obvious to combine the ideas of Your Money Manager
5  interface with a mouse-based control because people
6  developing mouse-based systems would not have looked
7  to MS DOS-based software for ideas; is that part of
8  your opinion?
9    A.  Part of my opinion is that during this era
10  of people developing mouse-based graphical user
11  interface point-and-click applications were not
12  using MS DOS applications as a source of ideas.
13  That's not my only argument, but that is one
14  argument.
15    Q.  In the next sentence in paragraph 41 you
16  say, "This explains why neither Quicken or Home
17  Accountant or any other personal finance programs
18  built on the work of YMM."  Do you see that?
19    A.  Yes.
20    Q.  Why do you say that none of those programs
21  built on the work of YMM?
22    A.  Well, I have seen nothing in either

**Exhibit 15   Page 52**

Page 206

1  companies' applications in the graphical user
2  interface arena that can be seen to have been
3  derived from YMM.
4      Q.  What do you mean by that?
5      A.  I mean that if you -- well, I mean what I
6  just said. I see no evidence of anything either in
7  Home Accountant or in Quicken under Mac or Windows
8  that appears to have been derived from YMM.
9      Q.  What kind of evidence would you be looking
10 for?
11     MR. CORBETT: Objection. Vague. Calls
12 for incomplete hypothetical.
13     THE WITNESS: I'd be looking for the
14 portions of the program that no longer work with a
15 mouse, but to be more serious about it, I just don't
16 see any of the lessons of YMM transferring over into
17 those applications.
18 BY MR. BAKER:
19     Q.  Could you give me an example of what you
20 are talking about?
21     A.  It's hard to give an example of what
22 doesn't exist.

Page 207

1      Q.  Well, what would it, what evidence would
2  you see if it were the case that one of those
3  programs did build on the work of YMM?
4      MR. CORBETT: Objection. Asked and
5  answered. Vague. Calls for incomplete
6  hypothetical.
7      THE WITNESS: Well, for example, if the
8  user were no longer in control, if the user were
9  forced into a series of menus, then I would see that
10 they might have looked at YMM for guidance in how to
11 build a graphical user interface.
12 BY MR. BAKER:
13     Q.  Before December 1986, are you aware of any
14 software programs that were modified to include
15 support for a mouse?
16     A.  Yes.
17     Q.  Okay. What systems are you aware of?
18     A.  I'm aware of programs for the -- well,
19 actually, to answer your question would be no. I
20 don't know -- it depends on what you mean. I'm
21 afraid you're going to have to tell me what you mean
22 by modifying.

Page 208

1      Q.  Well, I mean it very generally. I mean
2  any, any existing system that had to be, you know,
3  revised or changed to add in mouse support.
4      A.  I knew of companies that created brand new
5  instantiations of applications, actually usually
6  with a new brand name as well, but I don't know if
7  people who just kind of went in and bolted a mouse
8  to the side of their application.
9      Q.  And the new instantiations, are you
10 talking about -- what programs are you thinking of?
11     A.  Microsoft had a word processor on the
12 Apple Macintosh. It was a graphical user interface
13 from the ground up.
14     Q.  What was the name of that program?
15     A.  Word. I'm trying to remember. There were
16 a lot, there was a lot of software in that era that
17 was really written, purpose built for the Mac such
18 as Mac Write, Mac Draw, Mac Paint and so forth, but
19 there were other programs written by third-party
20 developers. I can't give you any kind of a list
21 right now off the top of my head.
22     Q.  But the programs you're talking about,

Page 209

1  those were modifications of preexisting software
2  that didn't have mouse support?
3      A.  Oh, I would suggest to you those were
4  total rewrites. They just started over. People
5  that tried to port generally failed, and there were
6  such ports that they, they couldn't sell them, and
7  they disappeared almost immediately. I don't
8  remember any of those names.
9      Q.  The complete rewrites you're talking
10 about, those were systems that had been previously
11 released without mouse support and had to be
12 completely rewritten to include mouse support?
13     MR. CORBETT: Objection.
14 Mischaracterizes.
15     THE WITNESS: They had to be completely
16 rewritten in order to become graphical user
17 interphases using the new paradigm.
18 BY MR. BAKER:
19     Q.  You also mentioned before the Apple 2C
20 involved adding mouse support. Were there any other
21 examples you can think of that involved revising
22 some existing software or existing computer to add

**Exhibit 15   Page 53**

Page 210

1 mouse support?
2    A.  I know that Commodore added a sort of a
3 mouse somewhere around this era.  It was actually
4 just generating the same -- it was acting as a joy
5 stick which meant that, as long as you kept moving
6 the mouse this way, it was the same as pushing the
7 joy stick this way.  It wasn't a true, it didn't act
8 as a true mouse.  So that existed, and I just, I was
9 not dealing with the PC world at that time, so I
10 just don't know what was going on in the PC world at
11 that time except that it wasn't until 1990 that a
12 manufacturer included the mouse in the box, which is
13 the first time which you can really start putting
14 applications on the shelf with the expectation that
15 anyone can buy them and run them without going
16 through a lot of economic hardship.
17    Q.  When you say 1990 was the first time that
18 a mouse was in the box, are you talking about the
19 IBM PC's and compatibles?
20    A.  That's correct.
21    Q.  Are you familiar with the Apple Lisa?
22    A.  Yes.

Page 211

1    Q.  When was that computer introduced?
2    A.  1981.
3    Q.  And did that include a mouse?
4    A.  Yes.
5    Q.  And was that a modification of an earlier
6 computer that did not have a mouse?
7    A.  No, it was not.
8    Q.  The Apple Macintosh was introduced in
9 1984?
10    A.  That's correct.
11    Q.  And that included a mouse?
12    A.  Yes, it did.
13    Q.  Are you familiar with the Atari ST?
14    A.  I recall the Atari ST.
15    Q.  Do you know when that was introduced?
16    A.  No.
17    Q.  Is it possible it was introduced in 1985?
18    A.  I couldn't tell you one way or the other.
19    Q.  Did the Atari ST include a mouse?
20    A.  I couldn't tell you that one way or the
21 other.
22    Q.  Are you familiar with the Commodore Amiga?

Page 212

1    A.  Yes.
2    Q.  Was that introduced in 1985?
3    A.  That I couldn't tell you.
4    Q.  Did the Commodore Amiga include a mouse?
5    A.  I don't know.  I remember that they had a
6 keyboard-driven interface.  I'd be kind of surprised
7 if there was a mouse in the box, but there could
8 have been.  I don't know.
9    Q.  Are you familiar with the software called
10 Microsoft Windows 1.0?
11    A.  Yes.
12    Q.  Was that introduced in 1985?
13    A.  I believe it was, yes.
14    Q.  Did that include support for a mouse?
15    A.  Yes, it did.
16    Q.  And did that come with a mouse?
17    A.  That I don't know.
18    Q.  Are you familiar with software called GEOS
19 for the Commodore 64?
20    A.  Yes.
21    Q.  Did that include a mouse?
22    A.  I don't know.

Page 213

1    Q.  Was the GEOS for the Commodore 64
2 introduced in 1985?
3    A.  I don't know.  And collectively you're
4 talking about a whole bunch of systems with very
5 little market share.
6    Q.  Was the Apple Macintosh the most
7 significant computer in the 1984 through '86 time
8 period that had a mouse?
9    A.  Yes.
10    Q.  And was the Macintosh well known in the
11 industry?
12    A.  Yes.
13    Q.  Would it be fair to say that the computer
14 industry was moving toward the use of mouses in the
15 time of '84-'86 time period?
16        MR. CORBETT:  Objection.  Vague.
17        THE WITNESS:  They were moving towards it,
18 but they didn't get there until 1990.  That's when
19 it began to ramp up.
20 BY MR. BAKER:
21    Q.  What happened in 1990?
22    A.  Confluence of Windows 3 coming out which

**Exhibit 15  Page 54**

Page 214

1  was the first version of Windows.  It was really
2  useful, along with the manufacturers putting the
3  mouse in the box, along with the computers having
4  reached a power level sufficient to really support
5  mouseware in a bit map graphics environment.
6      Q.  Are you familiar with the IBM PS2
7  computer?
8      A.  I recall the PS2.
9      Q.  Do you know when that was introduced?
10     A.  No, I couldn't tell you without looking it
11  up.
12     Q.  Did the IBM PS2 come with a mouse?
13     A.  That I couldn't tell you.  Again, I
14  don't -- I was not working with IBM computers then.
15  I don't remember the sequence.
16         MR. CORBETT:  Object to the extent this
17  line of references you have been discussing to the
18  extent that any of them did not appear in
19  Mr. Buscaino's report.  Just make that clear for the
20  record.
21         THE WITNESS:  And also assuming, when you
22  say with a mouse, that it was packed in the box with

Page 215

1  each and every computer because there's a big
2  difference between a mouse being available versus a
3  mouse being in the box.
4  BY MR. BAKER:
5      Q.  Are you familiar with the term PS2 mouse?
6         MR. CORBETT:  Same objection.
7         THE WITNESS:  That may ring a bell.  I'm
8  not sure.
9  BY MR. BAKER:
10     Q.  Do you know what it means?
11     A.  Well, I could speculate that it's a mouse
12  for the PS2, but I don't, sitting here today, I
13  don't remember.
14     Q.  But you don't know whether the IBM PS2
15  came with a mouse in the box?
16     A.  That's correct.
17     Q.  If a person of skill in the art in 1985
18  wanted to write a personal finance program from
19  scratch, would that person have been able to include
20  mouse support?
21         MR. CORBETT:  Objection.  Vague.
22  Foundation.  Calls for incomplete hypothetical.

Page 216

1  Assumes facts.
2         THE WITNESS:  Well, one would have to
3  divide those people into people that wanted to make
4  money versus those that didn't.  If one wanted to do
5  that and make money, probably one would put it on
6  the Macintosh because that's where the installed
7  base and the necessary hardware was.  If one didn't
8  want to make money, then it might be very attractive
9  to put it on a slow computer that had to run in bit
10  map graphics in order to support it.
11  BY MR. BAKER:
12     Q.  Okay.  If one decided to develop it on a
13  Macintosh platform, would a person of skill in the
14  art in 1985 have been able to include mouse support
15  in the personal financial program?
16     A.  Yes, I think that's fair to say.
17         MR. CORBETT:  We've been going for an hour
18  and 15.  Is this a good time for a break?
19         MR. BAKER:  Sure.  Let's take a break
20  right now.  That would be great.
21         THE VIDEOGRAPHER:  Going off the record at
22  4:32:02.

Page 217

1         (Whereupon, a short recess was taken.)
2         THE VIDEOGRAPHER:  Going on the record at
3  4:41:44.  End of Tape 3.  Going off the record at
4  4:41:30.  Off the record.
5         (Discussion held off the record.)
6         THE VIDEOGRAPHER:  We are going back on
7  the record.  The time is 4:56:59.  This marks the
8  beginning of Videotape Number 4 of the deposition of
9  Bruce Tognazzini --
10        THE WITNESS:  Close.
11        THE VIDEOGRAPHER:  -- which is being taken
12  at 655 15th Street, Northwest, Washington, D.C.  The
13  videographer is Steve Schaal here on behalf of
14  Esquire Deposition Services located at 1020 19th
15  Street, Washington, D.C.  Counsel may proceed.
16  BY MR. BAKER:
17     Q.  Mr. Tognazzini, suppose you have a
18  software program with an on-screen calculator that
19  can be controlled by the physical keyboard.  Are
20  there any advantages to adding mouse-based control
21  of the on-screen calculator?
22        MR. CORBETT:  Objection.  Vague.  Calls

Exhibit 15   Page 55

**Page 218**

1 for incomplete hypothetical.

2 THE WITNESS: Other than the advantage

3 that I spoke of earlier of perhaps making it a

4 better demo for selling the mouse-based computer,

5 there's no particular advantage to it. In fact,

6 you're going to suffer a significant slowdown in

7 productivity if you attempt to use it with a mouse.

8 BY MR. BAKER:

9 Q. So, other than that, you can't think of

10 any other advantages to adding the mouse-based

11 control of the on-screen calculator?

12 A. Not as I'm sitting here today or right

13 now.

14 Q. Is there any value to adding mouse-based

15 control to the calculator?

16 MR. CORBETT: Objection. Vague.

17 THE WITNESS: Other than the value I just

18 suggested, no.

19 BY MR. BAKER:

20 Q. It sounds like that's a fairly limited

21 value?

22 A. That's a very limited value and

**Page 219**

1 considering that there are all kinds of down sides,

2 it's certainly not worth it, unless you're trying to

3 sell a computer with a mouse. And even then that,

4 that was an important thing on the Lisa in 1981,

5 that we had these little desk accessories you could

6 click on. It just kind of got some inertia going on

7 the Mac and so forth and we continued, but it was

8 generally a bad thing having that support.

9 Q. If you did add mouse-based control of a

10 calculator to a program such as Your Money Manager,

11 would you get any results that would not have been

12 expected by a person of skill in the art?

13 MR. CORBETT: Objection. Vague. Calls

14 for legal conclusion. Incomplete hypothetical.

15 THE WITNESS: Like the wrong answer?

16 BY MR. BAKER:

17 Q. No, I don't mean in terms of the numeric

18 calculations. Is there anything in the user

19 interface experience that would be different if

20 someone couldn't have predicted that it would work

21 the way it's working?

22 MR. CORBETT: Objection. Vague.

**Page 220**

1 Compound. Assumes facts. Incomplete hypothetical.

2 Calls for speculation.

3 THE WITNESS: I think someone skilled in

4 the art would have recognized before ever starting

5 out that they were going to be slowing productivity.

6 They certainly would have recognized at least

7 shortly after starting out how complex a task it had

8 the potential to become, so I don't think there

9 would have been any surprises.

10 BY MR. BAKER:

11 Q. You mentioned before that you had done

12 some development work on the Apple 2C involving

13 adding mouse support. What year were you doing that

14 work?

15 A. That was 1983 and 1984.

16 Q. Okay. I'd like to shift gears now to talk

17 about the Tyler article. That's Exhibit Number 11.

18 Actually, let me ask you a question that doesn't

19 involve actually looking at the reference. Just a

20 general question about the state of the industry.

21 In 1985 was there any reason why a user interface

22 designer would want to provide an indication

**Page 221**

1 regarding which field a user had selected?

2 MR. CORBETT: Objection. Vague.

3 THE WITNESS: It would depend on the

4 overall design of the software.

5 BY MR. BAKER:

6 Q. And what do you mean by that?

7 A. I mean in some, in some designs it might

8 have been desirable, and some designs it could have

9 been counterproductive.

10 Q. Okay. What designs would it have been

11 desirable?

12 A. In a design where, for example, a casual

13 user indicates, touches a field to begin working on

14 it, then goes to lunch, then returns from lunch,

15 wants to continue working; it's useful to have an

16 indicator so that the person knows exactly what

17 field is currently active.

18 Q. Other than going off to lunch, can you

19 think of any other situations where it would be

20 advantageous to provide indications of a selected

21 field?

22 A. When you have a high error system, there

**Exhibit 15   Page 56**

Page 222

1  are times when a user may think they've touched one
2  field, but they've touched another field, so it can
3  become important that you keep the user aware, that
4  you inform the user as to what the system is
5  interpreting their, their touch to mean or their
6  pointing to mean.
7      Q.  Did the Macintosh provide any indication
8  of what field a user had selected?
9          MR. CORBETT: Objection. Vague.
10         THE WITNESS: It would have again depended
11 on the specific application, so the system did not,
12 the underlying system didn't provide or not provide
13 that, but many applications did provide that.
14 BY MR. BAKER:
15     Q.  And why did those applications that
16 provided an indication provide an indication?
17     A.  Well, I'd have to go through them one by
18 one and interpret for you the most likely reasons.
19     Q.  Just based on your knowledge and
20 experience, can you give me a couple of examples of
21 why you think they would have included an
22 indication?

Page 223

1      A.  Well, I've given you a couple of examples
2  already of higher systems and systems where someone
3  may, their attention may drift during the course of
4  their task that they no longer remember where they
5  were working. It's not a bad thing to do in
6  general. It's just not necessarily a requirement in
7  every case, and, again, there are instances where
8  you don't want to do it.
9      Q.  Are there certain applications where it
10 was common to provide feedback to the user to let
11 them know which field they had selected?
12         MR. CORBETT: Objection. Vague and
13 ambiguous.
14         THE WITNESS: Well, an application,
15 properly designed application is either going to do
16 it on a consistent basis or not do it at all. So an
17 application that's doing it on a consistent basis,
18 it would have provided, but, sitting here today, I'm not
19 sure I can start rattling off the names of
20 applications.
21 BY MR. BAKER:
22     Q.  But, in your opinion, was it fairly common

Page 224

1  in 1985 to provide an indication of a selected
2  field?
3          MR. CORBETT: Objection. Vague as to
4  common.
5          THE WITNESS: It was a technique that was
6  used.
7  BY MR. BAKER:
8      Q.  Was it a technique that was taught in the
9  HCI schools in 1985?
10     A.  I would have to go back and review
11 materials to tell you that.
12     Q.  Was it a technique that a person of skill
13 in the art would have been aware of in 1985?
14     A.  I think that is probably a fair statement.
15     Q.  In 1985 what are the different ways in
16 which user interfaces provided an indication of a
17 selected field?
18     A.  One could -- well, the most likely way
19 would be to highlight the field itself. That was
20 really the typical way to do it was to highlight the
21 contents of the field, the current contents of the
22 field.

Page 225

1      Q.  But were there any other techniques that
2  you're aware of?
3      A.  There may have been, but that's what I
4  recall sitting here today. Also you could have had
5  a text cursor in the current active field.
6      Q.  Is it your opinion that the Tyler article
7  does not disclose the limitation of indicating a
8  selected field?
9          MR. CORBETT: Objection. Asked and
10 answered.
11         THE WITNESS: I did not find any
12 indication of such a disclosure.
13 BY MR. BAKER:
14     Q.  If a person of skill in the art added an
15 indication of the selected field the system
16 disclosed in Tyler, would that result in any results
17 that would not have been expected by a person of
18 skill in the art?
19         MR. CORBETT: Objection. Vague.
20 Incomplete hypothetical. Compound.
21         THE WITNESS: Well, you're, first of all,
22 assuming there's a selected field to add it to.

Page 226

1  BY MR. BAKER:
2      Q.  Okay. Assuming there is a selected field.
3      A.  So, assuming that the, assuming there's a
4  selected field, the problem again is there's so
5  little information here I don't know what else is
6  going on, and whether that kind of indication would
7  clash with some other communication with the user
8  thereby requiring an alternate form of indication
9  and whether the alternate form would be
10  misinterpreted by people – there's just nothing
11  here, so I can't help you, unless you want me to
12  start making things up.
13      Q.  It sounds like, as you're sitting here
14  today, you're not aware of anything specific that
15  would be an unexpected result from adding in an
16  indication of a selected field?
17      MR. CORBETT:  Objection. Mischaracterizes
18  his statement.
19      THE WITNESS:  I'm -- well, again, I didn't
20  find any active fields, and so, therefore, I can't
21  respond to what might or might not happen adding
22  indicators to active fields that I can't find in

Page 227

1  this documentation, namely, the Tyler article.
2  BY MR. BAKER:
3      Q.  So do you have an opinion as to whether
4  adding an indication of a selected field to the
5  Tyler system would produce any unexpected results?
6      A.  I don't know that there is a selected
7  field.
8      Q.  So then you don't have any opinion on it?
9      MR. CORBETT:  Objection. Mischaracterizes
10  his testimony.
11      THE WITNESS:  Based on the material I've
12  seen, I don't have an opinion on that. That may
13  change if I get more information on the system
14  itself in the future.
15  BY MR. BAKER:
16      Q.  Okay. Could you please turn to paragraph
17  56 of Exhibit 1? And do you see the last sentence
18  which starts, "The Tyler article certainly does not
19  disclose a system"?
20      A.  Yes.
21      Q.  Okay. I'd like to go through that
22  sentence with you and try to understand exactly what

Page 228

1  it is that you believe Tyler does not disclose. So
2  the first thing you say is it does not disclose a
3  system that uses any predefined tool. Do you
4  believe that Tyler does not disclose any system, a
5  system that uses any predefined tool?
6      A.  Yes.
7      MR. CORBETT:  Objection. Vague.
8  BY MR. BAKER:
9      Q.  Why do you believe -- what's the basis for
10  your opinion that Tyler does not disclose a
11  predefined tool?
12      A.  I found no evidence of a predefined tool
13  as construed by the Court.
14      Q.  What is your understanding of the meaning
15  of a predefined tool?
16      A.  Predefined tools associated with said one
17  of said fields refers to a tool specified by the
18  system as an appropriate tool for filling in the
19  information called for by that field.
20      Q.  Is that your understanding of the word
21  "predefined tool" by itself or is that your
22  understanding of the whole phrase?

Page 229

1      MR. CORBETT:  Objection. Vague.
2  BY MR. BAKER:
3      Q.  Let me rephrase that. The Court in that
4  sentence is construing the entire phrase. Do you
5  have an understanding of the words "predefined tool"
6  by themselves?
7      MR. CORBETT:  Objection. Asked and
8  answered.
9      THE WITNESS:  Well, the second half of
10  that says refers to a tool, so I assume that's the
11  Court's construction of what a predefined tool is as
12  one specified by the system as an appropriate tool
13  for filling in the information called for by that
14  field and that it further has to be associated with
15  said, one of said fields.
16  BY MR. BAKER:
17      Q.  Does Tyler disclose any tools?
18      MR. CORBETT:  Objection. Asked and
19  answered.
20      THE WITNESS:  It's -- I do not find
21  anything in Tyler that leads to an interpretation
22  that there were tools.

**Exhibit 15   Page 58**

Page 230

1  BY MR. BAKER:
2      Q.  What's your understanding of the meaning
3  of the word "tool"?
4          MR. CORBETT:  Objection.  Asked and
5  answered.
6          THE WITNESS:  Well, to go over it again,
7  the Court has defined it —
8  BY MR. BAKER:
9      Q.  I'm just asking you for the word "tool" by
10 itself.
11         MR. CORBETT:  The witness was in the
12 middle of an answer.
13         THE WITNESS:  So what do I do now?  The
14 Court hasn't addressed the word "tool" except within
15 the context of predefined tools as associated with
16 said one of said fields.  Tool is not used in this
17 way within the field of human computer interaction.
18 In general from looking at the '357 patent, plus
19 this information, I see it as an object that the
20 user will perceive as being associated with a field
21 as we have talked about, and that is separate from
22 the balance of the screen as seen as a separate

Page 231

1  object, and that is tied to the calling field.
2  BY MR. BAKER:
3      Q.  What do you mean by tied to a calling
4  field?
5      A.  By what the Court means, tool specified by
6  the system as an appropriate tool for filling in the
7  information called for by that field.  The field is
8  specifying the tool, and I really can't tell you
9  beyond what's stated in the Court's construction.
10     Q.  Let me ask you a more specific question.
11 Is the list of brokers a predefined tool associated
12 with the broker field?
13     A.  I found no evidence of that.
14     Q.  Why not?
15     A.  I found no evidence of a separate object
16 containing a list that is unique to that field that
17 called it.
18     Q.  I'm just trying to understand what you're
19 saying.  It seems like Tyler says, when you press
20 broker, a list of brokers pops up.  What more would
21 you need to know in order to be able to conclude
22 that that list of brokers is a predefined tool

Page 232

1  associated with the broker field?
2          MR. CORBETT:  Objection.  Mischaracterizes
3  and incomplete hypothetical.
4          THE WITNESS:  First of all, Tyler would
5  have to say that it's a tool that pops up, which he
6  clearly does not say, so everything else in your
7  question kind of doesn't fit after that.
8  BY MR. BAKER:
9      Q.  Okay.  Let me ask the question again
10 because Tyler does say -- I'll use the word
11 "appears."  Tyler discloses that, when the user
12 presses broker, a broker list appears.  What else
13 would you need to know in order to be able to
14 conclude that the broker list is a predefined tool
15 associated with the broker field?
16         MR. CORBETT:  Objection.  Assumes facts.
17 Mischaracterizes the reference.  Incomplete
18 hypothetical.
19         THE WITNESS:  There appears to be a region
20 of the screen that's given over to a scrolling list.
21 If that region is persistent, for example, then the
22 fact that the contents of that scrolling list change

Page 233

1  in no way arises to a, a separate and distinct tool
2  for the varying contents of that region.
3  BY MR. BAKER:
4      Q.  Why is it that, if it's persistently
5  displayed, it doesn't meet the requirements?
6      A.  Because it's not a series of tools then.
7  It's just a scrolling list area.  It's a data area,
8  and the data changes.  That's true in any
9  application that has changing data.
10     Q.  So what else would it have to do in order
11 to qualify as a tool?
12         MR. CORBETT:  Objection.  Vague.
13 Incomplete hypothetical.  Assumes facts.
14         THE WITNESS:  Again, you know, this
15 article is very much incomplete.  There's nothing
16 here to indicate to me that there are tools as the
17 Court has construed them present on this screen, and
18 I have to sit here and speculate about what I would
19 do to this screen in order to turn these various
20 areas of the screen into separate tools, and doing
21 so might very well damage the usability of the
22 screen and doing so, and I'm not really prepared to

Page 234

1  speculate on that.
2  BY MR. BAKER:
3      Q.  Is the numeric keypad discussed in Tyler a
4  predefined tool associated with the exchange rate
5  field?
6          MR. CORBETT:  Objection.  Vague.  Asked
7  and answered.  The report speaks for itself.
8          THE WITNESS:  The article does not
9  indicate the relationship between the numeric keypad
10 and the, quote, proper cell, end quote.
11 BY MR. BAKER:
12     Q.  What do you mean by that?
13     A.  Well, if it's a system level tool, then,
14 in fact, it's not associated with the field.
15     Q.  What do you mean by a system level tool?
16         MR. CORBETT:  Objection.  Asked and
17 answered.
18         THE WITNESS:  If that tool is being
19 supplied as we see that a keyboard instantiation of
20 it is being supplied whole and complete by the
21 system, that would make it a system level tool.
22 BY MR. BAKER:

Page 235

1      Q.  Can a system level tool be associated with
2  a field?
3          MR. CORBETT:  Objection.  Vague.  Asked
4  and answered.
5          THE WITNESS:  We're talking about a
6  composition tool here, and I would have to see some
7  evidence of how that association was being formed.
8  BY MR. BAKER:
9      Q.  So is there some type of association that
10 could be used with a system tool that would make it
11 associated with the field?
12         MR. CORBETT:  Objection.  Mischaracterizes
13 his statement.
14         THE WITNESS:  There are tools using the
15 term formally within computer science within
16 graphical user interfaces.  There are menu tools and
17 so forth.  With these tools the system supplies a
18 blank tool, and the developer populates it with the
19 information the developer needs and then displays
20 it.  That tool is significantly modified by the
21 developer, and essentially it's now become a unique
22 tool for that developer as opposed to a general

Page 236

1  purpose tool being brought all the way up to the
2  surface by the system.  That's, that kind of tool is
3  not relevant in Tyler, and so this gets into a very
4  broad area of computer science.
5      Q.  So, if, if a system brought up a system
6  level tool that was fully specified by the
7  underlying operating system, could that system tool
8  be associated with that field because it was brought
9  up in response to touching that field?
10     A.  I would have to examine the software on a
11 case-by-case basis to tell you whether I thought
12 that was occurring, and offhand I can't sit here and
13 speculate.
14     Q.  Assuming it is occurring, if a user
15 presses field and a tool is then automatically
16 displayed which had been fully specified at the
17 system level, would that tool be associated with
18 that field?
19         MR. CORBETT:  Objection.  Vague.
20 Incomplete hypothetical.  Assumes facts.
21 Foundation.
22         THE WITNESS:  Again, I don't feel

Page 237

1  comfortable sitting here speculating on issues like
2  that without seeing something.  I've seen nothing in
3  Tyler that suggests that.
4  BY MR. BAKER:
5      Q.  Do you have an opinion on that issue?
6      A.  On what issue?
7      Q.  On my hypothetical.
8      A.  I don't think I can give an opinion on the
9  hypothetical issue in the absence of some actual
10 system.
11     Q.  So let me just be sure I'm clear.  Do you
12 have an opinion as to whether a system that brought
13 up a system level tool in response to a user
14 touching a field and that system level tool has been
15 fully specified by the system, whether that tool
16 would be associated with that field?
17         MR. CORBETT:  Objection.
18 BY MR. BAKER:
19     Q.  Do you have an opinion on that?
20         MR. CORBETT:  Objection.  Vague.
21 Ambiguous.  Asked and answered.  Incomplete
22 hypothetical.

**Exhibit 15   Page 60**

Page 238

1      THE WITNESS: Only to the extent that I
2  think it's going to depend on the system involved,
3  so I wouldn't rule it out in every single case, but
4  I would look more carefully when someone is using a
5  system level tool, particularly one which is purely
6  a substitute for a physical keyboard by virtue of
7  the fact there is no physical keyboard, there is no
8  physical numeric pad as to what level of
9  association, if any, might exist.
10 BY MR. BAKER:
11     Q.  What more would you need to know?
12     A.  I would, I would want to see the way the
13 software worked dynamically in order to come to that
14 conclusion.
15     Q.  What would it have to do dynamically in
16 order to conclude that it's associated?
17     A.  I can't tell you that. That's why I would
18 have to see it dynamically.
19     Q.  Is the QWERTY keyboard a predefined tool
20 associated with one of the fields disclosed in
21 Tyler?
22     MR. CORBETT: Objection. Asked and

Page 239

1  answered.
2      THE WITNESS: I found no evidence of that.
3  BY MR. BAKER:
4      Q.  And is that for the same reasons we've
5  been discussing?
6      A.  Yes.
7      Q.  Is the list of brokers a tool specified by
8  the system as an appropriate tool for filling in
9  information called for by the broker field?
10     MR. CORBETT: Objection. Asked and
11 answered.
12     THE WITNESS: I found no information to
13 lead me to believe that that was a tool.
14 BY MR. BAKER:
15     Q.  Is that your only disagreement with the
16 statement is whether or not it's a tool?
17     A.  Well, given that it's not a tool, given
18 that that particular region of the screen may be
19 used repeatedly for different lists so that the
20 region is not even dedicated, there's no choosing it
21 from a group of predefined tools, I don't see that
22 it fulfills any of that.

Page 240

1      Q.  I'm just asking you about the part that
2  says a tool specified by the system as an
3  appropriate tool for filling in the information
4  called for by the broker field. I understand that
5  you're, have raised an issue about whether it's a
6  tool or not, but, other than that, is there any
7  aspect of that limitation that you believe is not
8  satisfied by the list of brokers?
9      MR. CORBETT: Objection. Asked and
10 answered.
11     THE WITNESS: Well, I don't know if there
12 are any fields over there per the Court's
13 definition. I don't know that it's filling in
14 information as called for by the Court. It's just
15 very little material here to begin to extract rules
16 from in the Tyler article.
17 BY MR. BAKER:
18     Q.  If a tool is not a system level tool, what
19 other kinds of categories of tools could it be?
20     MR. CORBETT: Objection. Vague.
21     THE WITNESS: Well, again, the Court is
22 using tool in a specialized fashion that's not

Page 241

1  generally used in human computer interaction, but I
2  could see a tool being, a system level tool being an
3  application level tool or being a field level tool,
4  and out of those three only a field level tool would
5  fulfill the requirement because the field level is
6  the association.
7  BY MR. BAKER:
8      Q.  So what do you mean by a field level tool?
9      A.  I mean that it's a tool specified by the
10 system as an appropriate tool for filling in the
11 information called for by that field.
12     Q.  And what's an application level tool?
13     A.  It would be a tool which is the same
14 regardless of what field one might be operating
15 upon. That would be the simplest definition of it.
16     Q.  So, for example, a number keypad that
17 doesn't change, always the same, it would be an
18 application level tool?
19     MR. CORBETT: Objection.
20 Mischaracterizes. Incomplete hypothetical.
21     THE WITNESS: If you want me to answer
22 that, I'm going to have to go back and read the Day

Exhibit 15   Page 61

Page 242

1  patent and read a lot of other information. I'm
2  happy to do that, but --
3  BY MR. BAKER:
4      Q.  Can you think of an example of an
5  application level tool?
6      A.  Not as I'm sitting here right now.
7      Q.  Earlier today you talked about whether or
8  not Tyler disclosed a plurality of fields, and you
9  said that there were, that was a possibility, but
10 there are also other possibilities. What were the
11 other possibilities that you were thinking about if
12 it's not a plurality of fields?
13     MR. CORBETT: Objection.
14 Mischaracterizes.
15     THE WITNESS: Well, what I see on the
16 illustration are certain words on the right-hand
17 side of the screen, and, according to the text,
18 something on that right side of the screen can be
19 touched which he refers to as a cell, C-E-L-L, and
20 exactly what that is I can't tell. That's all I can
21 tell you is there are words on the right side of the
22 screen, and at least some of those words or some of

Page 243

1  the boxes those words are in or something on that
2  side of the screen can be touched.
3  BY MR. BAKER:
4      Q.  And, if what can be touched is actually
5  the value itself, then that would be a field?
6      A.  I don't know that there are any values. I
7  can't read anything other than the text in white and
8  not even all of that.
9      Q.  I'm trying to understand, you know, what
10 you mean by field and not a field. My understanding
11 was, if you can actually touch the value itself and
12 change that, that makes it a field?
13     A.  Well, not necessarily if you can't
14 actually open that field and work within it.
15     Q.  What do you mean by open it and work
16 within it?
17     A.  Well, typically a field, a read-write
18 field you can touch, and then you can edit the
19 field. If what we have is a bunch of words, and
20 then we have some data kind of spread around there,
21 but you can't actually do anything with that data
22 directly, then I don't think that arises to the

Page 244

1  level of an information field. That's just a
2  display of data.
3      Q.  What do you mean by do something directly
4  with the field?
5      A.  Open it up and work in it.
6      Q.  And what does that mean, to open it up and
7  work within it?
8      A.  Well, for example, in YMM you click on
9  amount, that field, and you can then enter the
10 amount in that field. I don't know whether you can
11 do that over here. I don't know what you can do
12 over here 'cause this is two paragraphs or so of a
13 multipage article about touch screens, and you're
14 trying to get me to extract an entire human
15 interface on an experimental system that I've never
16 seen and have not had access to information about
17 other than this.
18     Q.  I guess what I'm trying to understand, if
19 they are not fields, how else could this possibly
20 work?
21     MR. CORBETT: Objection. Vague.
22     THE WITNESS: Well, they can just be a

Page 245

1  display of data.
2  BY MR. BAKER:
3      Q.  Okay.
4      A.  I can't tell you how it could possibly
5  work because I can't see what's here, so you're
6  asking me to speculate again.
7      Q.  Tyler talks about entering data into the
8  system, and the right side of the screen displays
9  key information about the transaction. I mean, if
10 those aren't fields, how else, you know, would a
11 person of skill in the art understand this interface
12 to operate?
13     A.  Well, you don't have fields in a PDF
14 document, but it's still displaying information.
15 There are many places where you don't have fields,
16 but you have a display of information.
17     Q.  But how would the information be entered
18 into the system in Tyler if it's not through the
19 fields?
20     MR. CORBETT: Object. Asked and answered.
21 Mischaracterizes.
22     THE WITNESS: As far as I can tell from

Exhibit 15  Page 62

Page 246

1  Tyler, you don't enter information into the fields.
2  BY MR. BAKER:
3     Q.  How do you enter information?
4     A.  Well, how accurate this is to the actual
5  system I don't know, but, for example, it says, when
6  the trader touches the screen in one of these areas,
7  it lists potentially valid entries or a numeric
8  keypad appears on the left half inviting the user to
9  choose information needed on the right.  For
10 instance, when the broker hits the broker cell on
11 the right, a list of brokers appears on the left.
12 Trader then hits the name of the broker to be
13 involved in the current trade, and that information
14 is entered into the system.  So there's no
15 interaction that I see there between any kind of an
16 information field on the right and the entry of the
17 broker information.
18    Q.  And why is that?
19    A.  Because there's no mention of an
20 information field.
21    Q.  Is that because it could be that the user
22 is touching the label broker rather than the value

Page 247

1  itself?
2     MR. CORBETT:  Objection.  Vague.
3  Mischaracterizes the reference.  Mischaracterizes
4  the witness' statement.
5     THE WITNESS:  There are a number of
6  possibilities of how that's carried out, and it's
7  not specified in this article intended for IT
8  managers.
9  BY MR. BAKER:
10    Q.  Earlier today you mentioned there's some
11 conflict between what Tyler says and what the
12 figures show.  Can you explain what you meant by
13 that?
14    A.  Well, what we see on the screen are on the
15 right.  On the left side are two areas, one
16 containing a scrolling list and one containing a
17 QWERTY keyboard.  One would expect from reading the
18 Tyler article that one would see one or the other of
19 those, but not both of them.  So it's not clear to
20 me how reliable a record of what he saw has been
21 captured in this article.
22    Q.  Okay.  I'd like to turn now to another

Page 248

1  reference, which has been referred to as the Kern or
2  '706 reference.  Let me ask the Court reporter to
3  mark this as the next exhibit.
4     (Tognazzini Exhibit No. 13, U.S. Patent
5  4,756,706, was marked for identification.)
6  BY MR. BAKER:
7     Q.  Mr. Tognazzini, you're looking at what's
8  been marked as Exhibit Number 13.
9     A.  Yes.
10    Q.  And this is U.S. Patent 4,756,706?
11    A.  That's what it says, yes.
12    Q.  It has also been referred to as the Kern
13 patent?
14    A.  Yes.
15    Q.  Have you reviewed this patent before?
16    A.  Yes, I have.
17    Q.  And you've looked at Figure 7 before?
18    A.  Yes, I have.
19    Q.  And have you reviewed the discussion of
20 Figure 7 that's at the bottom of Column 7?
21    A.  Yes.
22    Q.  Okay.  So does the system disclosed in the

Page 249

1  Kern patent -- let me rephrase the question.  In the
2  system disclosed in the Kern patent, if the user
3  presses the volume button, does the system display
4  the word "volume" on entry line 214?
5     MR. CORBETT:  Objection.  Vague.
6  Foundation.
7     THE WITNESS:  Could I hear the question?
8     (The reporter read back as requested.)
9     THE WITNESS:  Yes, it does.
10    MR. BAKER:  That line, by the way, is also
11 described as line 213 elsewhere.
12 BY MR. BAKER:
13    Q.  In the system described in the Kern
14 patent, if the user pushes the rate button, does the
15 system display the word "rate" on line 214?
16    A.  Well, the patent specifically says, while
17 pressing volume, shows volume, so I will interpret
18 from that that pressing rate shows rate.
19    Q.  In the system disclosed in the Kern
20 patent, if the user pushes the time button, does the
21 system display the time on entry line 214?
22    A.  Again, based on that, it would.

Page 250

1    Q.  In the system disclosed in the Kern
2  patent, if the user presses the volume button and
3  then uses the on-screen keypad 220 to enter a value,
4  does that value appear on the entry line 214?
5      MR. CORBETT:  Objection.  Vague and the
6  reference speaks for itself.
7      THE WITNESS:  Actually, it doesn't because
8  you said that if the user enters it and entering it
9  is a process of pressing bar 224 which causes it to
10  disappear from line 214 rather than appear.
11  BY MR. BAKER:
12    Q.  Okay.  Well, I wasn't actually getting up
13  to the entry bar 224.  Let me back up and ask the
14  question again.  If, in the system disclosed in the
15  Kern patent, if the user presses the volume button
16  and then uses the on-screen keypad 220 to type in a
17  value, does a value appear on entry line 214?
18    A.  Yes, it does.
19    Q.  And, if the user then presses entry bar
20  224, does that value get substituted in place of the
21  question mark in the row labeled volume instead of
22  216?

Page 251

1    A.  In the row labeled volume, yes, although
2  I'm not sure I would characterize it as a row, but
3  I'll give you that.
4    Q.  So the entered number gets inserted into
5  the location on the screen following the word
6  "volume"?
7    A.  Yes.
8    Q.  Would a user follow the same sequence of
9  events in order to enter information for the rate?
10    A.  Yes.
11    Q.  And the entered rate volume would show up
12  in the location labeled rate?
13    A.  Yes.
14    Q.  And would a user follow the same sequence
15  of events in order to enter information for the
16  time?
17    A.  Roughly, although time has two fields, but
18  roughly the same sequence.
19    Q.  And the entered time value would show up
20  in the location following the labeled time?
21    A.  Yes.
22    Q.  Let me ask you to turn to paragraph 72 of

Page 252

1  Exhibit 1, your report.  In this paragraph you say,
2  "All buttons are available on a given screen from
3  the moment that screen is displayed."
4    A.  I'm sorry.  I'm looking at the wrong
5  paragraph.  I thought you said 17.
6    Q.  I'm sorry.  72.
7    A.  72.  Excuse me.  Okay.
8    Q.  The second to last sentence you say,
9  "Rather, all buttons are available on a given screen
10  from the moment that screen is displayed."  Do you
11  see that?
12    A.  Yes.
13    Q.  Why does it matter that the buttons are
14  displayed from the moment the screen is displayed?
15    A.  Well, there's, this is just a screen.
16  There is no concept of tool, tools, either one or
17  more tools involved here.  It's just the screen with
18  objects on it.
19    Q.  Is that because it's not displayed as a
20  separate and distinct entity?
21      MR. CORBETT:  Objection.
22  Mischaracterizes.  Asked and answered.

Page 253

1      THE WITNESS:  It's not displayed as a
2  separate and distinct entity.  It doesn't appear and
3  disappear in relationship to what you're doing on
4  the screen.  It's just a screen.  It's just a
5  simple, very primitive screen.
6  BY MR. BAKER:
7    Q.  Okay.  You also say in the last sentence,
8  "There is no association between the buttons and the
9  single entry line field."  Why do you say that, that
10  there's no association?
11    A.  Because it's predefined tools associated
12  with said one of said field refers to a tool
13  specified by the system as an appropriate tool for
14  filling in the information called for by that field,
15  and in this case there's no tool.  There's just some
16  buttons on the screen, and, when you press the
17  buttons on the screen, they do what you would expect
18  the buttons to do.  They are not being called up in
19  relationship to a series of predefined fields.  It's
20  just a screen with a single field and a bunch of
21  buttons.
22    Q.  Okay.  But in the last sentence there in

Page 254

1 72 you don't say the word "tool." You say there's
2 no association between the buttons and the single
3 entry line field, so my question to you is what's
4 the basis for your statement there?
5      MR. CORBETT: Objection. Asked and
6 answered.
7 BY MR. BAKER:
8      Q. Is there something other than just the
9 fact it's not a tool you're trying to get at in that
10 sentence?
11      A. I believe so. The patent and the Court's
12 construction of the patent talk about a series of
13 tools, and the importance of that is that there are
14 tools that are specialized to work with some fields
15 and not others, and in this case there's only one
16 field. There is no tool. Again, we've got a system
17 that doesn't have a physical keyboard. It must have
18 whatever keys are required resident on the screen
19 itself, and so it has those keys as resident on the
20 screen, but there's no particular association
21 between them and the field. They are just talking
22 to the system like any physical keypad or keyboard

Page 255

1 would talk to the system.
2      Q. Why are you saying there's no association
3 in that situation?
4      A. Well, there's no more association there
5 than there would be between a physical keypad and a
6 single field. That's, those buttons are talking to
7 the system. Whether those buttons are physical
8 buttons or buttons on the screen, the field is not
9 somehow invoking those buttons to arise. They are
10 there 100 percent of the time. They don't arise or
11 become active because the user touched the field.
12 The user doesn't touch the field. The user touches
13 another button. There's just no connection between
14 that field in terms of the Court's construction and
15 those buttons.
16      Q. In paragraph 76 you use the phrase, the
17 very end, a screen level array. Can you explain
18 what you mean by a screen level array?
19      A. Figure 7 shows a screen. When that screen
20 first appears, it looks like Figure 7. With the
21 exception of changing the question marks to data
22 entries later on, if that screen is left up for the

Page 256

1 next 99 years, it looks like Figure 7. Those
2 buttons on that screen are associated with that
3 screen. They are not associated with anything but
4 that screen, and they have no connection, and, in
5 fact, to some extent it's the other way around.
6 Those buttons drive the data entry field rather than
7 the other way around.
8      Q. So I'm sorry. What do you mean by screen
9 level array then?
10      A. I mean that it's on the screen. It's
11 part, it's embedded in the screen. It's just a part
12 of the screen like any other part of the screen.
13      Q. As opposed to being a tool?
14      A. As opposed to being a tool.
15      Q. And a tool would appear and disappear as
16 needed?
17      MR. CORBETT: Objection. Asked and
18 answered. Mischaracterizes.
19      THE WITNESS: One characteristic of a tool
20 can be that it appears and disappears as invoked by
21 the field.
22 BY MR. BAKER:

Page 257

1      Q. Could a tool be persistently displayed?
2      MR. CORBETT: Objection. Vague.
3      THE WITNESS: When one has a series of
4 predefined tools allowing the tools to be
5 persistently displayed can cause significant human
6 computer interaction problems because people will be
7 drawn to the wrong tool at the wrong time. So such
8 a tool would probably be highly problematic. It
9 also uses up screen real estate which is usually at
10 a premium.
11 BY MR. BAKER:
12      Q. But it would still qualify as a tool, even
13 if it's kind of a bad idea to do it that way?
14      MR. CORBETT: Objection.
15 Mischaracterizes.
16      THE WITNESS: I haven't seen an instance
17 of a tool other than a system level array, I haven't
18 seen an instance of a tool as contemplated in the
19 Day patent, that, that just hung around like that
20 that I can recall at the moment.
21 BY MR. BAKER:
22      Q. But, if a tool or an on-screen object met

65 (Pages 254 to 257)

Exhibit 15    Page 65

Page 258

1  all of your requirements for a tool, but it was
2  persistently displayed, would you consider that to
3  be a tool?
4       MR. CORBETT: Objection. Vague. Asked
5  and answered. Incomplete hypothetical.
6       THE WITNESS: I would have to see that
7  instance and I would -- answering a hypothetical, I
8  think it would probably fail because there are bad
9  ideas, and then there are really bad ideas, and, if
10 you have designed a piece of software which is going
11 to cause an extremely high error rate among users, I
12 mean, at some point kind of getting into silly
13 season, if you want me to speculate on whether you
14 could create an atrocious piece of software that's
15 going to cause all your users to fail, then I could
16 come up with some wild designs.
17 BY MR. BAKER:
18      Q.  I guess all I'm asking is the fact that
19 something could be persistently displayed
20 disqualifies something from being a tool?
21      MR. CORBETT: Objection. Vague. Same
22 objections.

Page 259

1       THE WITNESS: I think it calls it into
2  question, and I would want to understand the
3  circumstances and the motivation for it because of
4  the fact that it is, according to the Court's
5  construction and according to the Day patent,
6  supposed to maintain an association with fields that
7  other tools maintain with other fields, and,
8  therefore, it would seem to me on a hypothetical
9  level that it would very likely be highly
10 problematic.
11      Now, in this case, this is not arising
12 anywhere close to the level of a tool. These are
13 just buttons on a display that does not otherwise
14 have physical buttons, and, of course, they are
15 persistent because they are essentially modeling a
16 physical device onto a very small touch screen.
17 BY MR. BAKER:
18      Q.  Mr. Tognazzini, have you reviewed Figure
19 11 of this patent?
20      A.  Yes, I have.
21      Q.  And have you reviewed the discussion of
22 Figure 11 that begins in paragraph in Column 9, Line

Page 260

1  8? The question is have you reviewed that,
2  Mr. Tognazzini?
3       A.  Yes.
4       Q.  In the system disclosed in the current
5  patent, if the user is on the screen shown Figure 11
6  and presses one of the four occlusion pressure
7  values in 262, does that selected value appear on
8  the entry line 214?
9       MR. CORBETT: Objection. Vague. The
10 reference speaks for itself.
11      THE WITNESS: The patent doesn't
12 explicitly say that. However, it implies that.
13 BY MR. BAKER:
14      Q.  Okay. If the user then presses entry bar
15 224, does that entered value get shown in the row
16 labeled "occlusion pressure max" that's at Line 216?
17      MR. CORBETT: Same objection.
18      THE WITNESS: One can infer that from the
19 other behaviors of the program, but, again, I don't
20 see that it explicitly says that.
21 BY MR. BAKER:
22      Q.  That would be the natural inference of

Page 261

1  what the patent says?
2       MR. CORBETT: Objection.
3  Mischaracterizes.
4       THE WITNESS: I think one could infer
5  that.
6       MR. BAKER: Okay. Let's take a short
7  break right now and go off the record.
8       THE VIDEOGRAPHER: Going off the record at
9  6:10:22.
10      (Whereupon, a short recess was taken.)
11      THE VIDEOGRAPHER: Going back on the
12 record at 6:27. Counsel may proceed.
13      MR. BAKER: I am going to pass the
14 microphone on to my colleague from Arnold & Porter.
15      EXAMINATION BY COUNSEL FOR DELL
16 BY MR. NEWBY:
17      Q.  Hi, Mr. Tognazzini. I'm John Newby
18 representing Dell.
19      A.  Hi.
20      Q.  In your report at Exhibit 1 did you write
21 this report?
22      A.  Yes.

Page 262

1    Q.  Did you type all the words as they are
2  presented here in the report?
3    A.  No, I did not.
4    Q.  Who typed the words in the report?
5    A.  I typed some of the words, and Lucent's
6  counsel typed some of the words as dictated by me.
7    Q.  Do you recall which portion of the report
8  that you specifically typed?
9    A.  No.  Sitting here today, I don't remember
10  because it was rather fluid, and I apologize.  I'm
11  not looking at you because I'm looking at the
12  camera, and you're so far off to the side --
13    Q.  Okay.  Do you recall the subjects within
14  your report that you specifically typed into your
15  report?
16    A.  No.  I would type for a while, and then I
17  would get tired of typing, and then one of the
18  lawyers would act as typist as I dictated for a
19  while and so forth.
20    Q.  So there were several drafts of this
21  report?
22    MR. CORBETT:  Objection.

Page 263

1  Mischaracterizes.
2    THE WITNESS:  That's not what I was
3  attempting to convey.  It was a pretty continuous
4  process, but I didn't spend the entire time sitting
5  there typing.
6    MR. CORBETT:  Also at this point I'd
7  caution the witness per the parties' agreement as to
8  communications between counsel and experts it also
9  covers the existence of drafts and communications in
10  the preparation of reports.
11  BY MR. NEWBY:
12    Q.  Could you please turn to paragraphs 26
13  through 31 of your report at Exhibit 1, please?  And
14  in paragraph 26 the first sentence reads, "Counsel
15  has informed me that, since my last report, the
16  Supreme Court has clarified the legal standards for
17  invalidity due to obviousness."  Who wrote this
18  paragraph 26?
19    A.  This paragraph would have been largely
20  written or entirely written by the attorneys in
21  conjunction with the work through this material
22  giving me an understanding of what was being

Page 264

1  included in the paragraph, but, because this is
2  strictly to do with legal, I was not in a position
3  as an expert on human computer interaction to
4  compose this paragraph.
5    Q.  Is that the same answer you would have as
6  far as who wrote the paragraphs for paragraphs 27
7  through 31?  Please feel free to look at those
8  paragraphs.
9    A.  That's correct.
10    Q.  And going back to paragraph 26, mentioning
11  that Supreme Court has clarified the legal standards
12  for invalidity due to obviousness, is the only
13  source of your knowledge regarding that fact your
14  discussions with counsel?
15    A.  I read headlines in the newspapers at the
16  time, but they didn't, what I read at that time
17  didn't contain the information pertaining to the
18  actual change, but rather that a change had or had
19  the clarification that there had been a
20  clarification, but not what the nature of that
21  clarification was.
22    Q.  Do you recall which newspapers you read?

Page 265

1    A.  I was, I was in London at the time, so it
2  probably would have been the London Times.
3    Q.  Any others?
4    A.  It's -- that was quite a few months ago,
5  so I can't tell you.
6    Q.  Do these paragraphs 26 through 31
7  summarize your understanding of the new rules of
8  obviousness as announced by the new Supreme Court
9  rule?
10    A.  Well, you've characterized it as new
11  rules.
12    Q.  You said the Supreme Court rule clarified
13  the law on obviousness?
14    A.  That's correct.
15    Q.  And do these paragraphs summarize your
16  understanding of that clarification?
17    A.  Yes, they do.
18    Q.  Do you have an understanding of how the
19  clarification differs from the prior rule or law on
20  obviousness as explained in your previous expert
21  report?
22    MR. CORBETT:  Objection to the extent it's

**Exhibit 15   Page 67**

Page 266

1  calling for legal conclusions.
2        THE WITNESS: I understand at least one
3  factor is that the Supreme Court has cautioned that
4  in identifying such a reason the analysis need not
5  seek out precise teachings in the prior art directed
6  to the specific subject matter of the challenged
7  claim. However, it's also my understanding that the
8  clarification was, that essentially there were two
9  simultaneous interpretations somehow and that the
10  Supreme Court clarified it as to which one should be
11  used and that we had, that my opinions on
12  obviousness were predicated on the clarified
13  standard, did not depend on the other standard of
14  obviousness so that the net result was it did not
15  affect any of my opinions.
16  BY MR. NEWBY:
17        Q.  And can you give me any specifics about
18  what those two standards were?
19        MR. CORBETT: Objection to the extent it
20  calls for a legal conclusion, and the report speaks
21  for itself.
22        THE WITNESS: I can quote you this line.

Page 267

1  "Counsel has informed me that the Supreme Court
2  confirmed that, while identification of the
3  teachings, suggestion or motivation to combine prior
4  art references is no longer strictly required to
5  demonstrate obviousness, the principles set forth in
6  my previous report remain valid. I understand the
7  fundamental question remains whether the claimed
8  invention would have been obvious to a person of
9  ordinary skill in the art taking into account the
10  scope and content of the prior art, the differences
11  between the prior art and the claimed invention, the
12  level of ordinary skill in the art and any secondary
13  considerations of nonobviousness."
14  BY MR. NEWBY:
15        Q.  Which paragraph were you reading from?
16        A.  I'm sorry. Paragraph 26.
17        Q.  Of Exhibit 1?
18        A.  Of Exhibit 1.
19        Q.  You mentioned earlier today in forming
20  your opinions you actually use and operated Your
21  Money Manager; is that correct?
22        A.  That's correct.

Page 268

1        Q.  Did Your Money Manager operate as
2  advertised?
3        MR. CORBETT: Objection. Vague.
4  BY MR. NEWBY:
5        Q.  Did not function as per the instruction
6  manual said it would?
7        A.  It appeared to function as the instruction
8  manual suggested.
9        Q.  Were there any glitches that you
10  experienced in your operation of Your Money Manager
11  that you recall?
12        A.  Nothing crashed. I did not go page by
13  page through the instruction manual and test whether
14  that manual was completely accurate in each and
15  every description.
16        Q.  But what you did use worked according to
17  the manual?
18        A.  Yes.
19        Q.  And how about your operation of Xerox
20  Star?
21        A.  Well, it worked according to those areas
22  of the manual that I looked at so --

Page 269

1        Q.  Sure.
2        A.  -- incomplete sets on both sides.
3        Q.  I apologize for interrupting. How about
4  operation of Xerox Star? Did it work as advertised?
5        MR. CORBETT: Objection to the extent
6  getting into references related to the earlier
7  deposition, and I believe he was already deposed; in
8  his first deposition he made it to the operation of
9  Xerox Star.
10  BY MR. NEWBY:
11        Q.  You can answer the question.
12        A.  I don't recall looking at the Xerox Star
13  manual very extensively.
14        Q.  Standing alone your operation of Xerox
15  Star, even without looking at the operation manual,
16  did you run into any problems or glitches with the
17  program or the system as you were using it?
18        MR. CORBETT: Same objection.
19        THE WITNESS: Well, it was more foreign to
20  me than I expected it to be, but it's been a lot of
21  years in between, but I'm not quite sure what you
22  mean by a glitch.

**Exhibit 15   Page 68**

Page 270

BY MR. NEWBY:

1  Q.  Did it operate – strike that.  How about
2  the Kerns patent, Exhibit 13?  Is there any reason
3  why a person of ordinary skill would not be able to
4  practice that patent?
5      MR. CORBETT:  Objection.  Vague.  Calls
6  for a legal conclusion.  Assumes facts.
7      THE WITNESS:  As I'm sitting here now, I
8  don't know of a specific, but I didn't, I didn't
9  really analyze the Kerns patent in light of being
10 able to implement it based on the completeness of
11 the specification.
12 BY MR. NEWBY:
13     Q.  Now, you earlier testified that you tested
14 Your Money Manager on a Windows based system with MS
15 DOS?
16     A.  Yes.
17     Q.  And you also testified that that Windows
18 operating system was possibly Vista or some other
19 more current form of the Windows operating system?
20     MR. CORBETT:  Objection.  Mischaracterizes
21 his prior testimony.

Page 271

1      THE WITNESS:  Actually I testified that it
2  wasn't Vista.  I have seen it on an XP, I believe,
3  but I have also refreshed my memory as things have
4  come up during the day like the visit down to San
5  Diego which started me thinking about older systems
6  that I had seen, and, in fact, I did see it, I have
7  seen it running under Windows 1.01 or 1.1, so I did,
8  in fact, see it on an old system running under the
9  old original Windows.
10 BY MR. NEWBY:
11     Q.  And, as your memory has been refreshed,
12 when exactly did you see that Windows 1.01 system in
13 operation with Your Money Manager?
14     A.  Sorry.  That would have been in late
15 September.
16     Q.  Of this year?
17     A.  Of this year, yes.
18     Q.  And that system again was provided by
19 Kirland & Ellis counsel, or was it your system that
20 you used?
21     A.  It was provided to me by counsel.
22     Q.  Going back to your report, Exhibit 1,

Page 272

1  paragraph 46, if you could please refer to paragraph
2  46.  If you can read at the second paragraph towards
3  the end, we're talking about the Tyler reference.
4  "Although the Tyler article discloses that such
5  screen, it fails to disclose the ability to write in
6  a bit map graphics field as contemplated by this
7  claim limitation."  What does it mean to write?
8      MR. CORBETT:  Objection.  Vague.
9      THE WITNESS:  So I'm referring to the
10 Tognazzini 7, the Court constructions on Claim 21.
11 It says, "A bit map graphics field refers to a field
12 under which a user is to enter information by
13 writing on a touch sensitive screen using a stylus."
14 BY MR. NEWBY:
15     Q.  And in that context what does to write
16 mean?
17     MR. CORBETT:  Objection.  Vague.
18     THE WITNESS:  Well, again I'm not a
19 lawyer, so I'm not quite sure how to answer that.  I
20 can tell you what the Day patent talks about, what
21 it's referring to in terms of writing in a bit map
22 screen.

Page 273

1  BY MR. NEWBY:
2      Q.  What is it referring to, the Day patent?
3      A.  It's referring to having an input field
4  which is a bit map; a bit map is output, not input,
5  okay, so a bit map, we were talking earlier today
6  about the difference between text-generated screens
7  and bit-map screens, and a bit-map screen or a
8  bit-map field, the computer is able to individually
9  address every single little square box on the
10 screen, every little square, so writing into such a
11 field as envisioned by the Day patent, based on my
12 memory, is a matter of using a stylus, applying it
13 to a touch sensitive screen such that what you
14 write, as you are describing the stylus over the
15 screen, the screen is reflecting your writing by
16 lighting up a trail of pixels behind the movement of
17 the stylus.
18     Q.  And those pixels can be in the form of a
19 word or a number that's written on the screen?
20     A.  That or a drawing or anything.
21     Q.  A symbol perhaps?
22     A.  A symbol.

**Exhibit 15   Page 69**

Page 274

1    Q.  Punctuation mark?
2    A.  Yes.
3    Q.  For instance, an exclamation mark or a
4  period?
5    A.  Yes.
6    Q.  Going back to your report on the very last
7  page of your report, Exhibit 1, page 35.  Actually,
8  backing up to page 34, page 35.  Your Section 8,
9  "Secondary Consideration of Nonobviousness", did you
10  also -- strike that.  Did you write this Section 8
11  of your report?
12    A.  I wrote the majority of Section 8.
13    Q.  Which paragraphs of Section 8 did you
14  write?
15    A.  110 through 114.
16    Q.  And how did you come to understand what
17  secondary considerations are in the context of the
18  law of nonobviousness?
19    MR. CORBETT:  Again, same caution
20  regarding communications between counsel, but to the
21  extent you can answer the question.
22    THE WITNESS:  It was through communication

Page 275

1  with counsel.
2    MR. NEWBY:  I have no further questions.
3    MR. CORBETT:  I have no questions at this
4  time.
5    THE VIDEOGRAPHER:  This concludes today's
6  proceedings of the deposition of Bruce Tognazzini.
7  Total number of tapes is four.  We're going off the
8  record.  The time is 6:49:14.
9    (Whereupon, signature not having been
10  waived, the taking of the deposition concluded at
11  6:49 p.m.)
12       *   *   *
13
14
15
16
17
18
19
20
21
22

Page 276

1       ACKNOWLEDGMENT OF DEPONENT
2
3  I, Bruce Tognazzini, do hereby acknowledge I have
4  read and examined the foregoing pages of testimony,
5  and the same is a true, correct and complete
6  transcription of the testimony given by me, and any
7  changes and/or corrections, if any, appear in the
8  attached errata sheet signed by me.
9
10
11
_____      _____
12  Signature            Date
13
14
15
16
17
18
19
20
21
22

Page 277

1       CERTIFICATE OF NOTARY PUBLIC
2    I, Kathleen M. Vaglica, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotype and thereafter reduced to typewriting
8  under my direction; that said deposition is a true
9  record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by any of the parties to the action in which this
12  deposition was taken; and, further, that I am not a
13  relative or employee of any attorney or counsel
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of the action.
16
17
18       Notary Public in and for
19       District of Columbia
20
21  My Commission Expires:
22  February 15, 2011

70  (Pages 274 to 277)

Exhibit 15   Page 70

Page 278

```
 1
 2   November 26, 2007
 3
     Gregory F. Corbett, Esquire
 4   Kirkland & Ellis, LLP
     655 15th Street, N.W.
 5   Washington, D.C. 20005
 6
     Re: Lucent Technologies v. Gateway and Microsoft
 7      and Dell
        Deposition of: Bruce Tognazzini
 8
     Dear Mr. Corbett:
 9
        Enclosed for review is your copy of the
10   above-referenced deposition. Please have the
     deponent read the copy of the transcript and sign
11   the enclosed certificate of deponent. Also enclosed
     is an errata sheet which the deponent should use to
12   note corrections and the reasons for such
     corrections. This and any additional errata sheets
13   should be signed and dated by the deponent.
14      The deponent has thirty days in which to read
     and sign the transcript. After the deponent has
15   reviewed the copy of the transcript, please return
     the certificate of deponent and any errata sheets to
16   1020 19th Street, Northwest, Suite 620, Washington,
     D.C. 20006.
17
     Sincerely,
18
19
     Kathleen M. Vaglica, RMR
20
21
22
```

Page 279

```
 1   ESQUIRE DEPOSITION SERVICES
     1020 19th Street, Northwest
 2   Suite 620
     Washington, D.C. 20006
 3
 4          ERRATA SHEET
 5
     Case Name: Lucent Technologies v. Gateway and
 6   Microsoft and Dell
     Witness Name: Bruce Tognazzini
 7   Deposition Date: November 20, 2007
     Job No: 184311
 8
     Page No. Line No. Change
 9
10
11
12
13
14
15
16
17
18
19
20
21   _____      _____
        Signature           Date
22
```

**Exhibit 15   Page 71**