UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - -

LUCENT TECHNOLOGIES INC., and    ) CASE NO.

MULTIMEDIA PATENT TRUST,         ) 07-CV-2000 H (CAB)

       Plaintiffs,               )    consolidated with

vs.                              ) 02-CV-2060 B (CAB)

GATEWAY, INC., et al.,           ) 03-CV-699 B (CAB)

       Defendants,               ) 03-CV-1108 B (CAB)

and                              )

DELL INC.,                       )

       Defendant,                )

and                              )

MICROSOFT CORPORATION,           )

       Intervenor.               )

- - - - - - - - - - - - - - - - -

AND RELATED CROSS-ACTIONS.       )

- - - - - - - - - - - - - - - - -

DEPOSITION OF MICHAEL TYLER

THURSDAY, DECEMBER 27, 2007

BY:  MELINDA M. IBANEZ, CSR NO. 10686, CRP

Exhibit 16   Page 1

Page 2

```
1
2
3
4
5
6
7
8
9
10      Deposition of MICHAEL TYLER, taken on behalf of
11   LUCENT TECHNOLOGIES, at One Maritime Plaza, Suite
12   2300, San Francisco, California, commencing at 10:11
13   a.m., THURSDAY, DECEMBER 27, 2007, before Melinda M.
14   Ibanez, Certified Shorthand Reporter No. 10686,
15   pursuant to Notice.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              INDEX
2   THURSDAY, DECEMBER 27, 2007
3   MICHAEL TYLER                    Page
4   PROCEEDINGS                      6
5     Examination by MR. HAYES          7
6   AFTERNOON SESSION                107
7     Examination resumed by MR. HAYES    107
8     Examination by MR. BAKER          124
9     Further examination by MR. HAYES    156
10
11        -oOo-
12
13   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
14        PAGE  LINE
15         54   24
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1   APPEARANCES OF COUNSEL:
2   FOR LUCENT TECHNOLOGIES, INC.:
3     KIRKLAND & ELLIS LLP
4     BY: ERIC D. HAYES, ATTORNEY AT LAW
5     200 East Randolph Drive
6     Chicago, Illinois 60601
7     Telephone: (312) 660-9725
8
9   FOR GATEWAY, INC., et al. and THE WITNESS:
10     DECHERT LLP
11     BY: JONATHAN D. BAKER, ATTORNEY AT LAW
12     2440 W. El Camino Real, Suite 700
13     Mountain View, California 94040-1499
14     Telephone: (650) 813-4800
15
16   FOR MICROSOFT CORPORATION and THE WITNESS:
17     FISH & RICHARDSON P.C.
18     BY: LARA S. GARNER, ATTORNEY AT LAW
19     12390 El Camino Real
20     San Diego, California 92130-2081
21     Telephone: (858) 678-5070
22
23   ALSO PRESENT:
24     BRIAN MONROE, VIDEOGRAPHER
25
```

Page 5

```
1              EXHIBITS
2   ,Number       Description        Page
3   Exhibit 1  Article entitled "TOUCH SCREENS: BIG DEAL
4     OR NO DEAL?" from Datamation magazine
5     dated January 1984 - 9 pages        20
6
7   Exhibit 2  Photostatic copy of photograph - 1 page
8                    69
9   Exhibit 20  Article entitled "TOUCH SCREENS: BIG DEAL
10     OR NO DEAL?" from Datamation magazine
11     dated January 1984 - 10 pages       124
12
13   Exhibit 21  Article entitled "TOUCH SCREENS: BIG DEAL
14     OR NO DEAL?" from Datamation magazine
15     dated January 1984 - 9 pages        124
16
17   Exhibit 22  Photostatic copy of photograph - 1 page
18                    124
19
20
21
22
23
24
25
```

**Exhibit 16   Page 2**

Page 6

MICHAEL TYLER

1
2    THURSDAY, DECEMBER 27, 2007; 10:11 A.M.
3            -oOo-
4    THE VIDEOGRAPHER: Here begins DVD number 1 in
5    the deposition of Michael Tyler in the matter of
6    Lucent Technologies, Incorporated versus Gateway,
7    Incorporated, et al., in the United States District
8    Court, Southern District of California, Case Number
9    07-CV-2000 H (CAB).
10    Today's date is December 27th, 2007. The
11    time on the video monitor is 10:11 a.m.
12    The video operator today is Brian Monroe,
13    employed by Behmke Reporting & Video Services,
14    located at 160 Spear Street, Suite 300,
15    San Francisco, California.
16    This video deposition is taking place at
17    One Maritime Plaza, Suite 2300, San Francisco,
18    California, and was noticed by Eric Hayes, Esquire,
19    of Kirkland & Ellis.
20    Counsel, please voice identify yourselves
21    and state whom you represent.
22    MR. HAYES: This is Eric Hayes from the law firm
23    of Kirkland & Ellis LLP on behalf of Lucent
24    Technologies, Incorporated.
25    MR. BAKER: This is Jonathan Baker from Dechert

Page 7

MICHAEL TYLER

1
2    LLP on behalf of the Gateway parties, as well as for
3    Mr. Michael Tyler.
4    MS. GARNER: Lara Garner of Fish & Richardson on
5    behalf of Microsoft and Mr. Tyler.
6    THE VIDEOGRAPHER: The court reporter today is
7    Melinda Ibanez, certified shorthand reporter
8    contracted by Behmke Reporting & Video Services.
9    Would the court reporter please swear in the
10    witness.
11    (The witness was duly sworn.)
12    THE VIDEOGRAPHER: Please begin.
13            -oOo-
14    MICHAEL TYLER,
15    having been first duly sworn, testified as follows:
16    EXAMINATION
17    BY MR. HAYES:
18    Q.  Mr. Tyler, good morning.
19    MS. GARNER: Excuse me, Eric. Sorry. Just
20    before we get started, I'd like to put on the record
21    that Microsoft will join in Gateway's objections.
22    MR. BAKER: And I'd like to put on the record
23    that Gateway will join in Microsoft's objections.
24    MR. HAYES: Okay. Thanks.
25    Q.  Mr. Tyler, good morning.

Page 8

MICHAEL TYLER

1
2    Q.  Would you please state your name and address
3    for the record.
4    A.  My name is Michael Tyler, at 1915 Straits
5    View Drive, Tiburon, California.
6    Q.  Have you been deposed before?
7    A.  No, I have not.
8    Q.  Okay. So we'll take a minute to go over a
9    few of the ground rules.
10    A.  Okay.
11    Q.  Today I'll be asking the questions and
12    you'll be answering the questions, and occasionally
13    Mr. Baker or Ms. Garner will be objecting to the
14    questions.
15    It's important that only one of us speak at
16    a time because the court reporter has to take down
17    everything that's said.
18    A.  Mm-hmm.
19    Q.  So I'll do my best to not interrupt you, and
20    I'd ask that you wait until I'm done with my question
21    until you answer the question.
22    Fair enough?
23    A.  Fair enough.
24    Q.  Okay. It's important that you hear and
25    understand my questions today. If you don't hear or

Page 9

MICHAEL TYLER

1
2    understand my questions, will you let me know?
3    A.  I will.
4    Q.  Okay. It's also important that you give
5    audible answers. As I said, the court reporter has
6    to take down everything that you say, so instead of
7    shaking your head or giving uh-huh, it's important
8    that you just give audible answers. Okay?
9    A.  That's fair.
10    Is my normal speaking voice loud enough?
11    THE REPORTER: It is.
12    THE WITNESS: Okay.
13    BY MR. HAYES:
14    Q.  We'll take breaks throughout the day
15    periodically, when the tape runs out or every hour or
16    something.
17    If you need a break, just let me know. I'll
18    be happy to take a break.
19    A.  Okay.
20    Q.  I would ask that if there's a pending
21    question that you answer the question before we take
22    a break.
23    A.  Okay.
24    Q.  Okay. Is there any reason that you can't
25    answer my questions truthfully?

**Exhibit 16    Page 3**

Page 10

MICHAEL TYLER

A. None that I'm aware of, no.

Q. Okay. Are you represented here today?

A. I am represented by Mr. Baker from Dechert and by Ms. Garner from Fish & Richardson.

Q. Do you have an understanding of when that representation started?

A. That representation started in early October of this year.

Q. October of 2007?

A. Yes.

Q. Is there any type of written agreement memorializing when that representation started?

A. Yes. I signed a letter, and each of them has also signed a letter of representation.

Q. Okay. So there will be some questions today that I may ask that would call for attorney-client communications, and your attorneys may instruct you not to answer.

There also may be some questions that I ask prior to when that representation started that they may not also object to, so we'll work through that as it goes.

I'm entitled to an answer to all my questions today unless your attorneys specifically

Page 11

MICHAEL TYLER

instruct you not to answer the question.

Do you understand that?

A. Yes, I do.

Q. Okay. So I'm going to spend a little bit of time now going through your work experience, and what I'd like to do is we'll just start with your present employment, if you're employed, and then just kind of work back --

A. Okay.

Q. -- on the timeline.

Are you currently employed?

A. I am currently self-employed.

Q. What -- what is it that you do at --

A. I manage an investment-management company called West Shore Investment Management LLC.

Q. Is that West Shore?

A. West Shore, two words, Investment Management LLC.

Q. And are you the owner and manager of that company?

A. Yes, I am.

Q. And just a brief description of what it is you do as the owner and manager of this West Shore Investment --

Page 12

MICHAEL TYLER

A. I provide investment-management services for a hedge fund that invests in telecommunications and information areas.

Q. And how long have you been doing that?

A. I've been doing that since 2005.

Q. What was it that you were doing before you started this West Shore Investment Management in 2005?

A. Before that I was a employee and later partner of Wellington Management Company LLP in Boston, where I was working as a securities analyst and portfolio manager, again, for an investment-management company.

Q. And for how long were you doing that?

A. I did that for 16 years.

Q. So when was it that you started that?

A. I started in, I think, February of '87 and retired in mid-2002. And then I had a required contractual noncompete agreement that kept me on the sidelines for a while.

Q. So is it fair to say from approximately 2002 to 2005 you were under that noncompete agreement?

A. 2002 through '04.

Q. Okay.

Page 13

MICHAEL TYLER

A. I started West Shore as a business in late '04 and began managing the portfolio on January of '05.

Q. Prior to Wellington Management Company, in '87, what were you doing?

A. I was in business school at Harvard Business School for the two years, mid-'85 through mid-'87. And before that I worked from the time I graduated college in June of '82 through, roughly, June of '85 at Datamation magazine in New York.

(Reporter interruption.)

THE WITNESS: D-a-t-a-m-a-t-i-o-n, one word.

BY MR. HAYES:

Q. So is it fair to say that you graduated college in roughly '82 and started at Datamation then?

A. Yes.

(Proceedings interrupted.)

UNIDENTIFIED SPEAKER: There's a computer here that might be on the network that's not supposed to be on the network?

MR. HAYES: Let's take a break for a second.

THE VIDEOGRAPHER: Going off the record, the time is 10:19 a.m.

**Exhibit 16  Page 4**

Page 14

MICHAEL TYLER

1   MICHAEL TYLER
2   (Discussion off the record.)
3   THE VIDEOGRAPHER: We're back on the record, the
4   time is 10:20 a.m.
5   Please begin.
6   BY MR. HAYES:
7   Q. Mr. Tyler, before we went off the record I
8   think we were -- we were talking about the 1982 time
9   frame.
10   You said in '82 you graduated from college;
11   is that right?
12   A. I graduated from college in June 1982.
13   Q. Where was that you went to college?
14   A. Princeton University.
15   Q. What was your degree in?
16   A. My degree was in psychology.
17   Q. So do you have any other degrees in addition
18   to your psychology degree from Princeton or your MBA
19   from Harvard?
20   A. No. That's all I have.
21   Q. And you started at Datamation magazine in
22   June of '82 and you worked there through
23   approximately 1985; is that correct?
24   A. Yes.
25   Q. What was your first position at Datamation

Page 15

MICHAEL TYLER

1   MICHAEL TYLER
2   magazine in June of '82?
3   A. I started as the new products editor, new
4   products editor.
5   Q. Tell me a little bit about that job, what
6   specifically your responsibilities were on a
7   day-to-day basis.
8   A. Essentially, my responsibility was to pay
9   attention to what was happening in the
10   information-systems, computers, data-processing
11   industry, broadly speaking, to identify new products
12   as they came to the marketplace, to find the ones
13   that were interesting to Datamation's readers and to
14   write -- write about them, essentially, to discuss
15   their features, to discuss what they could do, what
16   they couldn't do, compare and contrast many different
17   models of similar kinds of both hardware and software
18   and publish a column and section each -- in each
19   issue, one for hardware, one for software.
20   Q. You mentioned, I think -- I didn't keep
21   track or -- provide articles of -- on topics that
22   were interesting to Datamation readers.
23   A. Yes.
24   Q. What was the typical Datamation reader?
25   A. Datamation was targeted toward the corporate

Page 16

MICHAEL TYLER

1   MICHAEL TYLER
2   or what's now called enterprise
3   management-information-systems professional; in other
4   words, people who were engaged in using
5   management-information-systems computers and similar
6   technologies for the purposes of operating their
7   businesses.
8   Q. So would you draw a distinction between
9   those that were engaged in using and those that were
10   engaged in designing management information systems?
11   A. For all intents -- they are different
12   people, obviously, but Datamation's readership
13   included very substantial portions of both
14   communities.
15   Q. Okay.
16   A. Obviously, the people designing MIS, or
17   management information systems, were clearly
18   interested in seeing what their competitors were
19   doing. And users of information systems wanted to
20   know both what new products were available and -- as
21   well as what their competitors and peers in the
22   corporate world or in the government world were doing
23   with -- with computer technology.
24   Q. And how long were you in the new products
25   editor position?

Page 17

MICHAEL TYLER

1   MICHAEL TYLER
2   A. I was there about a year, I believe. I
3   don't remember exactly when I was promoted, but,
4   roughly speaking, a year.
5   It was a great education to learn everything
6   about computer technology at that time.
7   Q. And what position were you promoted to?
8   A. I was then promoted to assistant news
9   editor, which was the second ranking position within
10   the news department.
11   Q. Tell me a little bit about your
12   responsibilities as the assistant news editor.
13   A. I was responsible for reporting and writing
14   at least one news story a month and for coordinating
15   and leading the other, roughly, six bureau chiefs
16   around the country as they were developing and
17   reporting stories that they were writing, and then
18   editing their stories as well.
19   Q. How long were you in that position?
20   A. I was in that position from the time I was
21   promoted, which was roughly summer of 1983, through
22   the time I left Datamation in roughly June of 1985.
23   Q. So for the roughly three years, or whatever,
24   that you were at Datamation magazine, did you just
25   have the two titles, news -- let me see -- new

**Exhibit 16   Page 5**

Page 18

MICHAEL TYLER

2  products editor and assistant news editor?
3    A.  Those were my only formal titles.
4      In, I believe, fall of 1984, although I
5  could be off by a bit, the news editor left to take
6  another job at a different company, and I became the
7  effectively acting news editor with complete
8  authority over the department, but I don't think I
9  ever got the official title, nor did I particularly
10  care.
11    Q.  The approximate three years you were at
12  Datamation magazine, approximately how many articles
13  did you author?
14    A.  Uhm, let's see.  Datamation was monthly.
15  From the time I started through midway into -- into
16  1984, so that's about 18 issues, give or take, and
17  then it was semi-monthly for the next 18 months or
18  so, so that would be another 30-some-odd issues.
19  That's -- give or take, I was there for around 50
20  issues.  So I would have authored probably about 30
21  to 50 news articles or feature articles, as well as
22  about 20 or so hardware columns and 20 or so software
23  columns.
24      Those are very approximate numbers.  I
25  haven't ever tried to count them.

Page 19

MICHAEL TYLER

2    Q.  That's fine.
3      And then did you --
4      Does that include any -- or any articles you
5  might have co-authored as well?
6    A.  Yeah.  I can't recall working with any other
7  authors, but I may -- I may have.  I just don't
8  remember.
9    Q.  And then approximately how many articles did
10  you review or edit in your time at Datamation?
11    A.  As the assistant news editor for a roughly
12  18-month, give or take a few months, period, there
13  were about five to seven news articles in each issue,
14  and so -- I'm sorry, roughly two years that I was the
15  news editor.  The first six months were monthly, and
16  then the next 18 or so were semi-monthly.  So that
17  would be roughly around 40 or so issues for which I
18  was the assistant news editor, each of which had
19  about five to seven articles.  So that would be well
20  over 200 articles that I was deeply involved in the
21  development, reporting and/or editing process.
22    Q.  So it's fair to say you were the author of
23  roughly 30 to 50 articles, 20 hardware columns,
24  roughly 20 software columns, and then deeply involved
25  in well over 200 other articles, right?

Page 20

MICHAEL TYLER

2    A.  Yes, that's a fair statement.
3    Q.  Since leaving Datamation magazine, have you
4  been involved in writing any other articles
5  throughout your career?
6    A.  For wide distribution, no.  However, my
7  responsibilities at Wellington Management for
8  16 years involved writing up what are called research
9  reports, which are essentially articles targeted at
10  Wellington's portfolio managers to discuss and
11  describe companies in which Wellington was
12  considering investments and to reach conclusions as
13  to making advice whether Wellington ought to be
14  buying or selling such -- such companies.
15      So I've been writing professionally my
16  entire career.
17    Q.  Okay.
18    A.  And to this day I write at least one monthly
19  article or -- or letter to investors for my current
20  business.
21    MR. HAYES:  Can you mark this as Tyler Deposition
22  Exhibit 1.
23      (Exhibit No. 1 was marked for
24      identification.)
25  BY MR. HAYES:

Page 21

MICHAEL TYLER

2    Q.  Mr. Tyler, the court reporter has handed you
3  what's been marked as Tyler Deposition Exhibit 1.  In
4  the bottom right corner this document bears a
5  production number MSLT_1228716 through MSLT_1228724.
6  It's a copy of the Datamation magazine article, which
7  actually starts on MSLT_1228719, titled "Touch
8  Screens: Big Deal or No Deal?" by Michael Tyler.
9      Mr. Tyler, are you familiar with this
10  article?
11    A.  Oh, yes.
12    Q.  When was the last time that you read this
13  article?
14    A.  I reread it relatively recently.
15    Q.  Okay.  I assume --
16    A.  In the last couple weeks.
17    Q.  I assume you reread it relatively recently
18  in connection with this --
19    A.  Absolutely.
20    Q.  -- case.
21    A.  Otherwise, I probably would not have read it
22  in quite some time.
23    Q.  Okay.  That's my next question.
24      Since reading it for this case, when,
25  approximately, was the last time that you read this

Page 22

1          MICHAEL TYLER
2  article?
3      A.  Probably not long after it came out.  I
4  probably -- every year or so while I was at
5  Datamation I would review everything I had done up to
6  that point to think about whether there might be
7  interesting follow-up ideas, but I don't think I
8  would have read it much after I was in business
9  school.
10     Q.  Okay.  So is it fair to say, then -- you
11 were in business school the, roughly, '85 time frame.
12 Is it fair to say you -- with the exception of
13 reading it for this --
14     A.  Mm-hmm.
15     Q.  -- case recently, that you most likely did
16 not read this article since '85?
17     A.  Yeah, that's fair.
18     Q.  Okay.  Now, on MSLT_1228719, the first page
19 of this article, it lists you, Michael Tyler, as the
20 author.
21         Did you do all the -- the writing of this
22 article?
23     A.  I did all of the research and writing of the
24 article.
25     Q.  Did you have any assistance from anyone else

Page 23

1          MICHAEL TYLER
2  at Datamation in preparing this article?
3      A.  Not in preparation.  I'm sure that I
4  submitted it to the features editor, who,
5  undoubtedly, did a normal editing process on it.
6          But in terms of the preparation, it was
7  entirely mine.
8      Q.  Do you remember the features editor's name?
9      A.  Kenneth Klee, K-l-e-e.
10     Q.  Did you have any help in doing the
11 background research to prepare this article?
12     A.  No.  That -- that was my specialty.  That's
13 what I did.
14     Q.  So it's fair to say you did all the research
15 and all the writing for this article?
16     A.  Yes.
17     Q.  What was the --
18         How did the idea for this article come
19 about?
20     A.  Well, having been the new products editor
21 not that long earlier, I was still very much in the
22 flow of new products coming into the marketplace and
23 paying attention to what was happening in the MIS, or
24 management information systems, field.  I also was
25 frequently speaking with vendors of such equipment,

Page 24

1          MICHAEL TYLER
2  as well as customers.
3          Datamation was well connected with its
4  readers.  So I was able to pay attention to what was
5  happening.  And every month we would have a story
6  conference with the other editors and reporters
7  shooting ideas back and forth.  This article most
8  likely came about from one or a series of press
9  releases introducing new products that I would have
10 received and said, gee, that looks interesting, I
11 think -- I've noticed a few of these have come out
12 lately, let's investigate, and gone from that into
13 exploring which companies were providing touch-screen
14 technology and exploring how they were being used.
15         And that's how -- I -- I frequently had
16 several different story ideas under development at
17 any given time, because you never knew which one
18 would turn out to be an interesting and worthy story
19 and which one was more or less a dead end.
20     Q.  Okay.  I think you said "a few of these have
21 come out lately" and you thought that was
22 interesting.
23         When you said "these," what specifically
24 were you referring to?
25     A.  Touch-sensitive technology, whether that was

Page 25

1          MICHAEL TYLER
2  in the form of a writing tablet, which is a
3  long-since obsolete technology, or several different
4  kinds of touch-sensitive computer screens.  Several
5  of them which are referenced in that article had been
6  relatively recent product introductions at the time.
7      Q.  What was it you were hoping to convey to the
8  readers with this article?
9      A.  Put yourself back in 1984.  ATMs still did
10 not have the touch-screen technology that we use
11 today.  You had to push a regular keyboard.  And the
12 same was true for virtually anything else.
13         So this was potentially a revolutionary idea
14 of how to interact with a computer system.  It
15 promised to be more user friendly, more comfortable
16 for the average person to use, and so promised a very
17 exciting innovation in computer technology.
18         And when I saw several of these coming out,
19 as a -- just as a consumer, I said, wow, this looks
20 really fun, and as a reporter and editor, I said this
21 could be a very interesting story to -- to learn
22 about this and to be in front of it.
23     Q.  Now, I think you used the words "potentially
24 a revolutionary idea."  Were you referring to
25 touch-screen technology when you said that?

Page 26

MICHAEL TYLER

1
2  A. I was speaking about the — the concept of
3  how people interacted with their computer systems.
4  It had been entirely through keyboards. And at the
5  time not everybody was a touch typist. It wasn't
6  always taught to people in high school, or whenever
7  it's taught these days. And so whether it was
8  through a writing tablet or a touch-sensitive screen
9  or possibly even other ways -- this was also about
10 the time that Apple was developing the Lisa computer,
11 which was the forerunner of the Macintosh, and at —
12 Xerox's Palo Alto Research Park was developing a lot
13 of point-and-click and mouse technologies that we all
14 take for granted today, but at the time were quite
15 new and also were a new innovation in how you used
16 computers.
17     So the user interface was potentially
18 revolutionary, not specifically one individual way,
19 but any of them could have been.
20 Q. Okay. Did you at the time understand the
21 technology behind touch-sensitive screens?
22 A. Well enough, yes.
23 Q. Okay. Did you do any research into kind of
24 how they worked?
25 A. Well, it does say in the article -- it

Page 27

MICHAEL TYLER

1
2  describes four different ways in which
3  touch-sensitive screens worked. And, technically
4  speaking, it wasn't always by touch. It may have
5  been by breaking a sound wave or -- or temperature
6  related. But I did at that time speak with the
7  engineers who were made available to me by the
8  companies who were developing these technologies to
9  get a good functional understanding.
10     I am not an engineer by background, and I
11 don't pretend to know all of the semiconductors or
12 thermal things or whatever else was involved, but nor
13 were Datamation's readers. So my job was to -- to
14 understand the functionality of what was being done,
15 what was being accomplished and to have a working
16 understanding of how it was being done, not
17 necessarily to the engineering or physics or
18 chemistry level, but to the point that -- that you
19 and I could talk about it reasonably knowledgeably.
20 Q. Okay. As you saw these kind of press
21 releases and whatnot that were coming out about
22 touch-sensitive screens that kind of seemed to stir
23 your interest in this technology, what was the next
24 step you -- you took in getting your information for
25 this article?

Page 28

MICHAEL TYLER

1
2  A. I began to contact the people who were
3  involved. Every press release that I've ever seen
4  will always have a contact name at the bottom of it,
5  the person that -- at a company that you should call
6  for information. And I started calling some of them
7  and setting up telephone interviews initially with
8  the people who the companies thought would be most
9  helpful to me. They may have been marketing. They
10 may have been engineering. Whatever.
11     And in -- since I was based in New York, I
12 asked several of those companies if they might make
13 available to me an opportunity to see these things in
14 use, and, as it turns out, there were a couple that I
15 was able to visit firsthand and look at and even use.
16 Q. And what were the couple companies that —
17 or businesses you got to visit firsthand?
18 A. I visited Merrill Lynch, and I also visited
19 Chemical Bank, both of which had systems that were in
20 use.
21     (Reporter interruption.)
22 THE WITNESS: Chemical Bank.
23 BY MR. HAYES:
24 Q. What companies --
25     Did you try to contact or visit some other

Page 29

MICHAEL TYLER

1
2  companies that -- that weren't interested in meeting
3  with you?
4  A. You know, I don't remember anybody saying
5  no.
6      And for the purposes of writing an article
7  that was already going to stretch over several pages,
8  I did not need to be exhaustive. So as soon as I
9  found a couple of companies that were using -- using
10 the system and were deploying it in a production
11 mode, I was able to say this is -- this is a good
12 focus of the story, I don't need to go much beyond
13 that.
14 Q. Okay. Did you have any contacts at either
15 Merrill Lynch or Chemical Bank that you used to kind
16 of get your foot in the door or did you -- did you
17 just talk to the folks that you had seen in these
18 press releases?
19 A. The easiest way in, frankly, is when a
20 vendor has a product that it wants to publicize, they
21 would -- if I asked them, they would frequently make
22 available a customer who is using a product.
23     And I believe that that was the case here,
24 where I would call the company -- Easel was the
25 company in particular -- and I'd say, "I'd like to

**Exhibit 16   Page 8**

Page 30

MICHAEL TYLER

1 see this in use."
2        They said, "Terrific. We've got two
3 customers in New York who are using it. Would you
4 like to meet them?"
5        And I said, "Yes, of course, I'd like to
6 meet them." And then they were able to organize
7 that, that meeting.
8    Q.   So you worked through Easel to get your foot
9 in the door at Chemical Bank; is that right?
10    A.   As far as I remember, that's correct.
11    Q.   Okay. Who was it that you talked to at
12 Easel? Do you remember? That was a long time ago.
13    A.   No, I don't remember specific names. I'm
14 sorry.
15    Q.   Do you remember any specific names at either
16 Chemical Bank or Merrill Lynch?
17    A.   I believe the guy was Robert or Bob Long, I
18 think was -- was the guy's name at Chemical whom I
19 spoke with, but I don't remember. He was more the --
20 the actually putting-together side.
21        And then the gentleman who I spoke with
22 within the bank, i.e., in the -- in the
23 foreign-exchange-trading area, is the person whom I
24 quoted in the article on several occasions, because

Page 31

MICHAEL TYLER

1 he was the user of the technology, and to me, and to
2 Datamation's readers, using the technology was more
3 interesting than trying to figure out precisely how
4 it was done.
5    Q.   And you mentioned that person's name is
6 here. Do you remember who that was at Chemical Bank?
7    A.   I don't remember offhand. Let me just -- it
8 is in the article. Let me just find that for you.
9        (Witness reviewing document.)
10    Q.   Is it Anthony Herriott?
11    MR. BAKER: Where are you looking, Counsel?
12    MR. HAYES: I'm looking on the first page, the
13 first column.
14    THE WITNESS: Yes, the first page of the article,
15 in the first column, partway down, Anthony Herriott
16 was the operations officer and treasury. I did speak
17 with him extensively. I met him in person, and he
18 was the primary person who described how the Easel
19 system was used at Chemical.
20 BY MR. HAYES:
21    Q.   And was it either Mr. Long or Mr. Herriott
22 that you first spoke with at Chemical to arrange your
23 visit?
24    A.   Chances are the visit was arranged by the

Page 32

MICHAEL TYLER

1 people at Easel, who would have coordinated each of
2 our schedules to find a time that we could all meet.
3    Q.   I did speak with Mr. Herriott by telephone
4 first before actually meeting him.
5    Q.   When you went to Chemical Bank, were there
6 folks from Easel there as well?
7    A.   Yes.
8    Q.   Do you remember who, any of the names of
9 those folks?
10    A.   I -- I don't remember the name.
11        Typically, when I would attend a
12 demonstration such as this -- and I did many of
13 them -- there would be myself and occasionally a
14 reporter from another magazine or newspaper, although
15 Datamation preferred to have exclusives, and a
16 company -- a representative of the company whose
17 the -- technology or product was being featured, in
18 this case Easel, and at least one representative of
19 the company -- the customer company that was using
20 the technology. So typically at least one
21 representative of each of those companies would be
22 present.
23        Occasionally, if there was a
24 public-relations agency involved, there might have

Page 33

MICHAEL TYLER

1 been an agency person as well.
2    Q.   Okay. Do you remember in this case, when
3 you were at Chemical Bank, were there any other
4 reporters from any other --
5    A.   No, this was not -- this was Datamation
6 only.
7        They may have later in the same day or
8 earlier in the same day or -- or at the same time
9 done similar demos with other people. I have no
10 idea.
11    Q.   Okay. Do you remember approximately how
12 many Chemical Bank folks were present at your viewing
13 or your meeting?
14    A.   I doubt more than two. Probably just
15 Mr. Herriott and Mr. Long.
16    Q.   So is it fair to say there were
17 approximately two folks from Chemical Bank, you, and
18 then at least one or more people from Easel company,
19 but you can't remember their names at present, at
20 your meeting at Chemical Bank?
21    A.   That's correct.
22    Q.   I think this article was published
23 January -- this is January '84.
24    A.   Yes.

**Exhibit 16  Page 9**

Page 34

MICHAEL TYLER

1
2    Q.  Do you remember approximately how long --
3  approximately how long before the article was
4  published that you would have been at Chemical Bank?
5    A.  That demonstrates -- in fact, the entire
6  reporting process took place in, roughly speaking,
7  September through October of 1983.  It couldn't have
8  been any later than about November 15th at the very
9  latest because of Datamation's production schedule.
10    Q.  The meeting at Chemical Bank couldn't have
11  been any later than November --
12    A.  Could not possibly have been later than
13  that.
14    Q.  So sometime during September or October,
15  most likely, of '83 you were at Chemical Bank?
16    A.  Correct.
17    Q.  Do you remember the specific building or
18  location you went to at Chemical Bank?
19    A.  Chemical Bank's headquarters were on Park
20  Avenue in midtown --
21      (Reporter interruption.)
22    THE WITNESS:  Were on Park Avenue, midtown
23  Manhattan, on the east side of the street, and I
24  forget exactly which block.  And I'm virtually
25  certain that it was held there.

Page 35

MICHAEL TYLER

1
2  BY MR. HAYES:
3    Q.  You're virtually certain that your meeting
4  with Chemical Bank --
5    A.  Was held at --
6    Q.  -- their --
7    A.  That's correct.
8    Q.  -- headquarters in New York?
9    A.  I'm virtually certain.  It's been a long
10  time ago, but I -- I know I've met with Chemical in
11  that building.
12    Q.  Okay.  Did you ever meet with Chemical Bank
13  for any other articles or any other reasons?
14    A.  Don't remember --
15    Q.  Okay.
16    A.  -- to be honest.
17    Q.  Do you remember, when you visited that day,
18  did you have to go through security to get in the
19  building?
20    A.  Oh, I have no clue whatsoever.
21    Q.  Okay.  You don't remember if you had a
22  security badge or --
23    A.  I -- I have no idea.  That was -- I wouldn't
24  remember that detail.
25    Q.  Okay.  Do you remember approximately how

Page 36

MICHAEL TYLER

1
2  long you were at Chemical Bank that day?
3    A.  I would guess probably in the vicinity of an
4  hour, maybe two hours.  I don't remember exactly.
5    Q.  Do you remember taking any pictures that day
6  when you were there?
7    A.  I did not.  I'm not a photographer.
8    Q.  Did you have a photographer with you?
9    A.  I'm not sure.  I know there's a photograph
10  in the magazine article that we're talking about.
11  That photograph may have been taken by a Datamation
12  staff photographer or it may have been taken by Easel
13  and then supplied to us.  Quite frequently vendors do
14  supply photographs of their equipment if -- if they
15  want those photographs used.
16    Q.  Okay.  I'm sorry.  The copy I've given you
17  isn't very clear, but do you remember who the person
18  is in the picture in the article?  And it's on
19  MSLT_1228721.
20    A.  It's just a black blotch on this one.
21    Q.  All right.
22    A.  I -- I couldn't say.
23    Q.  Okay.  I think I brought it.
24      Well, unfortunately, I don't have it --
25    A.  It may have been Mr. Long, because I recall

Page 37

MICHAEL TYLER

1
2  that he was probably leading the demonstration, but
3  it may not have been, because that picture may not
4  have been taken at exactly the same time that I was
5  seeing the demonstration.
6    Q.  Okay.  Just for your information, we took
7  Mr. Long's deposition recently, and he confirmed that
8  that was him in the picture.
9    A.  Okay.
10    Q.  Do you remember anyone else that would have
11  been doing the demonstration that day at Chemical
12  Bank of the actual system?
13    A.  No, I don't remember.  I don't think -- I --
14  as far as I know, there probably weren't, but I don't
15  remember for sure.
16    Q.  So you don't remember if anyone else
17  demonstrated the system other than Mr. Long?
18    A.  I do not remember.
19    Q.  Was your meeting that day at Chemical Bank
20  prearranged?
21    A.  I'm sure it was.
22    Q.  And was your purpose there that day at
23  Chemical Bank to get information to write this
24  article?
25    A.  Yes.  It was -- it was specifically for this

**Exhibit 16   Page 10**

MICHAEL TYLER

1 article which was under development and to see a
2 touch-screen technology in use at a company that was
3 quite representative of who Datamation's readers
4 were, doing something that was practical and that
5 many of its readers would find to be an interesting
6 and worthwhile application.
7    Q.  Okay.  Do you remember anything about the
8 room that you were actually in that you -- to view
9 the --
10   A.  No.  I --
11   Q.  No?
12   A.  No, I would -- I don't think -- I wouldn't
13 pay attention to that.
14   Q.  Was it actually on the trading floor at the
15 time, the system that you viewed?
16   A.  I don't remember, but I -- I would be
17 surprised, because banks tend to be fairly careful
18 about security on their trading floors.
19     More likely, it might have been in the
20 training room that they would have used the same
21 system that they showed me to train their traders on.
22   Q.  Okay.  I just --
23   A.  But that's speculation.  I really don't
24 remember exactly.

MICHAEL TYLER

1    Q.  If I could call your attention to the very
2 beginning of your article, on MSLT_1228719, in the
3 first paragraph, about halfway down, you mention --
4    A.  Right.
5    Q.  -- "Each trader has about a half dozen crt
6 terminals stacked in front of him, looking
7 dangerously unstable and about to" --
8    A.  Yes.
9    Q.  -- "come crashing down on the mountain of
10 paper that covers the remainder of the desk area."
11     There you're talking about the system that
12 they were currently using; is that right?
13   A.  Yes.  As far as I remember, yes.
14   Q.  And that system that they were currently
15 using was different than the Easel system that you
16 described later in the article, correct?
17   A.  As far as I remember, yes.
18   Q.  Do you have any memory of whether or not
19 they were actually using the Easel system to make
20 live trades at the time?
21   A.  I remember that -- that they were in the
22 process of rolling it out.  I don't remember whether
23 they had rolled it out and everybody was using it or
24 only a few people were using it.

MICHAEL TYLER

1    So I honestly couldn't tell you whether what
2 was -- what I was describing in that first paragraph
3 was including the Easel system.  I don't believe it
4 was, but I'm not certain.
5    Q.  Okay.
6    A.  And, also, I realize I was confusing
7 Chemical with Chase in a previous discussion, and so
8 I -- when I was talking about which building I was
9 in.  I would have to say that when I mentioned
10 midtown, I -- I think that was a different building.
11   Q.  Okay.  And what made you kind of remember
12 the difference?
13   A.  Well, when I was thinking about it, I
14 realized that back then, most of Manhattan's stock
15 exchange and foreign exchange and bonds and all that
16 stuff was still downtown.  Since then, it's moved
17 uptown.  And as an investor for many years, I've been
18 to many of the midtown locations, so . . .
19   Q.  Okay.  So now having remembered that, what
20 you described to me was most likely Chase and not
21 Chemical, do you remember any specific --
22   A.  No.  I'm saying the building I remember.
23    That has nothing to do with what I saw
24 inside at Chemical.

MICHAEL TYLER

1    Q.  Okay.
2    A.  I have no idea what Chase did as a customer
3 of information technology.
4    Q.  Okay.  So do you remember any more details
5 about Chemical Bank's building or location now?
6    A.  I -- I think that physical geography is
7 probably not my strong point.
8    Q.  Okay.  Fine.  Fair enough.
9    In the second column of the first page of
10 your article, MSL_1228719, in the second full
11 paragraph that starts "Enter a small startup" --
12   A.  Mm-hmm.
13   Q.  -- you talk about a gentleman named Leonard
14 I. Hafetz.
15   A.  Yes.
16   Q.  Do you remember who that was?
17   A.  He was the head of a company called
18 Interactive Images, which was the maker of the Easel
19 system that I was describing in the article.
20   Q.  Was Mr. Hafetz present at the meeting the
21 day at Chemical Bank?
22   A.  I don't remember.
23   Q.  Okay.  Moving down that column to the final
24 full paragraph that starts "Both Chemical Bank and

**Exhibit 16   Page 11**

Page 42

MICHAEL TYLER

2 Merrill" --
3    A.  Mm-hmm.
4    Q.  Second line, you say "have acquired beta
5 test Easels."
6    A.  Yes.
7    Q.  Does that help you remember whether or not
8 they had actually started using the Easel system when
9 you visited?
10    A.  When you have a beta test, as a customer,
11 you won't have rolled it out to the entire user base,
12 but you may very well have rolled it out to some of
13 the users to see in production was it working
14 successfully and, if it wasn't, where the problems
15 were.
16    Q.  Okay.
17    A.  So it -- it's -- at the time that the
18 interview took place, they may have had some systems
19 in use for actual live trading.  It's plausible they
20 did not, that they were just at the beginning of that
21 process, but I -- I would think that, based on the
22 language that I used, i.e., "have acquired," that
23 they had already had a few systems at least in actual
24 use, making live trades.
25    Q.  But you're not 100 percent sure whether or

Page 43

MICHAEL TYLER

2 not --
3    A.  I'm not a hundred percent sure of that.
4    Q.  On the next page, which is MSLT_1228720, at
5 the bottom, in the column all the way to the right,
6 in the fourth full paragraph, you say, "In the first
7 phase of Chemical Bank's plan, the Easel workstations
8 will replace only the Arbat data entry system."
9        Does that suggest that they hadn't started
10 the first phase yet?
11    A.  It suggests -- no, it doesn't suggest that
12 at all.
13    Q.  Okay.
14    A.  It suggests that the first phase, when it's
15 completed, would have done so for all of the trading
16 systems.
17    Q.  Okay.
18    A.  They may very well have started that phase
19 in the way that I wrote the article.
20    Q.  But at least suggests they hadn't completed
21 the first phase of implementing these Easel
22 workstations?  Would you agree with that?
23    A.  I would agree that they -- yes, as I said,
24 it was a beta test, so that also suggests they had
25 not completely installed it across the entire

Page 44

MICHAEL TYLER

2 system -- across the entire user base.
3    Q.  Okay.  Do you remember that day that you
4 were at Chemical Bank seeing actually -- any actual
5 trades made with the Easel system?
6    A.  In the sense of trades that were for real
7 money?
8    Q.  Yeah, for real money.
9    A.  I would not have been made privy to that.
10        Did I see the demonstration do things that
11 were it tied into the real system would have been for
12 real money?  Yes.
13        But I did not attempt to -- to verify that
14 this demonstration I saw was connected to a real live
15 trading platform and that real dollars were changing
16 hands.
17    Q.  So you just don't know whether or not the
18 demonstration you saw was a real live trade for real
19 money or just for demonstration purposes?
20    A.  I would have to imagine it was for
21 demonstration purposes only.
22    Q.  Okay.
23    A.  Because Chemical Bank's business -- or at
24 least that portion of their business was foreign
25 trading.  They're not going to conduct a live trade

Page 45

MICHAEL TYLER

2 just to show me how technology works.
3        But they might very well have set up -- and
4 probably did set up -- dummy accounts so that it
5 looked for all the world like a live trade, was tied
6 into the live system, but was keyed to account
7 numbers that didn't exist so that the bank's own
8 balance sheet and the bank's own assets and
9 liabilities were not actually being affected.
10    Q.  Okay.  Now, when you say tied into the real
11 system, what -- what system are you referring to?
12    A.  The back-end platform -- the back-end actual
13 trading system that connected to other brokers and
14 that actually transferred assets back and forth.
15    Q.  Did you see that back-end system the day
16 that you were there?
17    A.  I doubt it.  I don't think I would have been
18 interested.  I was really interested in the front-end
19 system.
20    Q.  Okay.  And what, in your words, constituted
21 the front-end system?
22    A.  The front end is -- is the stuff that you or
23 I, as users of technology, would use.  That's a
24 generic term within the -- the computer-information
25 industry.

**Exhibit 16  Page 12**

MICHAEL TYLER

1
2    So I was interested in looking at what was
3  on the desk, what the trader would be using and
4  seeing, that one screen which the user would be able
5  to manipulate in order to conduct a trade.
6        What happened at the other end of the wires
7  to actually effect the trade was a separate issue
8  entirely.
9     Q.  Did you look inside? And by that I mean did
10  you open up the front-end system at all and look
11  inside at the technology?
12    A.  You mean like unscrew the --
13    Q.  Yeah.
14    A.  No.
15    Q.  Okay. So is it fair to say you just -- you
16  just watched the front end in operation, you didn't
17  actually open it up and look at the technology
18  inside?
19    MR. BAKER: Objection, vague and ambiguous.
20        You mean after opening up the computer
21  hardware? Is that --
22    MR. HAYES: Yeah.
23    MR. BAKER: -- what you're asking about?
24    MR. HAYES: I'm just saying --
25    THE WITNESS: No. I didn't -- nobody in my

MICHAEL TYLER

1
2  presence physically unscrewed the cover and showed me
3  what was on the inside.
4        But I was able to use my own fingers or
5  direct somebody else sitting at the keyboard or at
6  the -- at the screen to push various buttons that
7  were not part of a script, but were entirely created
8  of my own volition, let's see what happens if we --
9  instead of doing whatever it was that they were going
10  to show me, what would happen if you wanted to sell
11  Mexican pesos or some other currency that wasn't part
12  of the, quote-unquote, official demonstration because
13  I'm a curious guy, and I was interested in seeing
14  what happens in a -- when you go off script, so to
15  speak.
16        I also wanted to verify for my own purposes
17  that this was actually a real system and not just a
18  fancy program that would make it look like it was
19  doing something.
20        As an editor and as someone who is dealing
21  with new products quite frequently in the computer
22  business, I knew that there was a term called
23  vaporware, which meant things that were promised but
24  not yet delivered, and that you could very easily rig
25  up a system to make it look like it's functional.

MICHAEL TYLER

1
2  BY MR. HAYES:
3    Q.  Sure.
4    A.  And there's just a man behind the curtain,
5  you know, like from the Wizard of Oz, doing a very
6  small set of things that they had ready at that time.
7        I don't like -- and I never did like --
8  reporting that as if it were ready, so I always went
9  to the step, as a matter of common reporting
10  practice, to engage in an off-the-cuff transaction
11  that nobody had prepared for, including me.
12    Q.  Would you be surprised to know that Mr. Long
13  testified that this Easel system never went into
14  production at Chemical Bank?
15    A.  It doesn't particularly surprise me.
16    Q.  And why is that?
17    A.  There are a lot of things that people beta
18  test all over the place, and some of them are
19  successful and are used, and some of them aren't.
20    Q.  Okay.
21    A.  And it could be for any number of reasons.
22  It could be for functionality; it could be that when
23  you try to scale up something from a beta test to a
24  full scale, it doesn't work as well; it could be for
25  cost. It could be for any number of reasons.

MICHAEL TYLER

1
2    Q.  Do you remember anything about the
3  functionality of the Easel system?
4    MR. BAKER: Objection. It's kind of overbroad
5  and vague.
6    THE WITNESS: I remember what it was supposed to
7  do, and I remember, roughly speaking, how you did it,
8  yeah.
9  BY MR. HAYES:
10    Q.  Do you remember whether, in your opinion,
11  you thought it did what it was supposed to do
12  efficiently or not?
13    A.  "Efficiently" is a very difficult word,
14  especially since we are here in 2007, looking back 24
15  years --
16    Q.  Sure.
17    A.  -- 23 years at technology that at the time
18  was cutting edge, but, you know, you can't compare it
19  to what -- what they use today.
20    Q.  Okay. You don't remember whether you had an
21  opinion of the system's functionality at the time?
22    A.  I thought it was quite interesting and --
23  and quite worthwhile.
24    Q.  I think you mentioned earlier that you --
25  you either watched it operate or you asked somebody

Exhibit 16   Page 13

Page 50

MICHAEL TYLER

1  to do specific functions on the machine; is that
2  right?
3     A.  Yes.
4     Q.  Do you remember whether or not you actually
5  operated it yourself?
6     A.  I don't remember whether I actually pushed
7  the buttons or not or whether I -- I simply pointed
8  at something and said, "Let's try to do this."
9     Q.  And when you were pointing at something,
10  asking them whether -- or to "try this," is that just
11  different types of features you wanted to see?  Is
12  that right?
13     A.  Yeah.  Or -- or a second example of the
14  same -- that they -- I don't remember precisely which
15  currency I wanted to see traded or what happens if
16  you hit a different broker from the one that they
17  suggested or whatever, but basically the -- the
18  intention was to -- let's see what happens if you go
19  off script a little bit.
20     Q.  Okay.
21     A.  Try something different.
22     Q.  And were you doing that for your kind of
23  research and reporting?
24     A.  Yes.  I wanted to verify that this was a
25

Page 51

MICHAEL TYLER

1  functional system, and I wanted to understand better,
2  as a user of the system, what the experience would be
3  like.
4     Q.  When you say what the experience would be
5  like, are you talking about the user's experience?
6     A.  Yes, yeah.  If I were pretending to be a
7  foreign-exchange trader instead of being a magazine
8  reporter, what would it be like to effect
9  transactions using a touch-sensitive screen instead
10  of using handwriting and paper and keyboard entry.
11     Q.  Did you talk to any foreign -- actual
12  foreign-exchange traders there at Chemical Bank
13  during your visit?
14     A.  I don't believe so, but I can't remember.
15     Q.  Okay.  While you were at Chemical Bank that
16  day, were you escorted at all times?
17     A.  I would imagine so.
18     Q.  Do you remember at all the -- having a
19  chance to kind of wander around by yourself and look
20  around without an escort?
21     A.  Again, banks generally tend not to like you
22  to do that, so I doubt it.
23     Q.  Right.  Okay.
24        Did you or your magazine pay Chemical Bank
25

Page 52

MICHAEL TYLER

1  any money for your visit --
2     A.  No.
3     Q.  -- or --
4        No.
5     A.  Datamation never paid for access.
6     Q.  Was there anyone outside of Datamation
7  magazine or Chemical Bank aware of the meeting that
8  was going on the day you were there?
9     MR. BAKER:  Objection.  I think he testified
10  there may have been other people there as well, so --
11  asked and answered, misstates prior testimony.
12  BY MR. HAYES:
13     Q.  I'm not trying to misstate your prior
14  testimony.
15     A.  No.  I --
16     Q.  I'm saying outside of Chemical Bank or Easel
17  or Datamation, are you aware of anyone that was -- or
18  had knowledge of the meeting that was going on
19  that --
20     A.  I --
21     Q.  -- day?
22     A.  I have no personal knowledge.
23        Whether any of the other participants told
24  their friends, relatives, lawyers, bankers, who
25

Page 53

MICHAEL TYLER

1  knows.
2     Q.  Okay.  Any reason to think that anyone would
3  have publicized the fact that you were going to have
4  a meeting that day?
5     A.  Speculation.  I mean maybe Easel wanted it
6  known that a reputable magazine like Datamation was
7  looking at their product.  But it's pure speculation.
8  I have no idea.
9     Q.  Okay.  Did you take any notes that day that
10  you were at Chemical Bank?
11     A.  I'm sure I did.  I always took notes.
12     Q.  Do you still have those notes?
13     A.  Not a chance.
14     Q.  Where do you think those notes might be?
15     A.  Unfortunately, in a landfill somewhere in
16  Staten Island.  I -- I've relocated my home many
17  times over the years, and I doubt very much I would
18  have taken anything with me from Datamation anyway.
19        And Datamation moved from midtown to
20  downtown, then up to Massachusetts over the course of
21  its corporate life, so I couldn't begin to guess
22  where -- where those pieces of paper went.
23     Q.  Okay.  Does Datamation exist today?
24     A.  No, it does not.
25

14  (Pages 50 to 53)

**Exhibit 16   Page 14**

Page 54

MICHAEL TYLER

1              MICHAEL TYLER
2    Q.  Is there any follow-on magazine that -- that
3 Datamation merged into or morphed into?
4    A.  I don't know.
5        Technical Publishing was at one point bought
6 by the -- which was the publishing company, had been
7 owned by Dun & Bradstreet, was then sold to -- I
8 think to a British company, Reed Elsevier, maybe
9 French, something like that, which is when they moved
10 up to Massachusetts.
11        And I have no idea what happened to it after
12 that. Never paid attention.
13    Q.  Okay. Do you have any legal experience?
14    A.  Am I a lawyer? No.
15    Q.  Or any -- any other involvement in legal
16 matters through the years?
17    A.  I have -- I've retained lawyers from time to
18 time for my current business and to buy and sell real
19 estate and something, but --
20    Q.  Sure.
21    A.  You know, just run-of-the-mill stuff.
22    Q.  Okay. You've never been deposed before?
23    A.  No.
24    Q.  Have defendants or anyone asked you to come
25 to the trial in this case?

Page 55

MICHAEL TYLER

1              MICHAEL TYLER
2    MR. BAKER: Just a minute. I think I'm going to
3 object. I mean it sounds to me like that's calling
4 for attorney-client privilege.
5        To the extent that -- I'll advise the
6 witness not to answer that question if it requires
7 the disclosure of any attorney-client communications.
8    MR. HAYES: I'll rephrase my question.
9    Q.  Would you be willing to come to the trial in
10 this case to testify?
11    A.  I don't know. It depends on what's going
12 on. I manage a very small company. I am very much
13 tied into the stock market, so I need to be paying
14 attention to the market most of the time, and it's --
15 it's a fairly substantial exception for me to have
16 come here today during market hours to speak with
17 you.
18        So I have not really considered whether or
19 not I would be willing to.
20    Q.  Why were you willing to come here today?
21    A.  As a courtesy to both sides.
22        If -- you know, it's flattering to know that
23 an article I wrote a long time ago is relevant to a
24 trial happening today, and so I was invited to come,
25 and I said okay.

Page 56

MICHAEL TYLER

1              MICHAEL TYLER
2    Q.  Are you being paid for your time today?
3    A.  I am being paid.
4    Q.  How much are you being paid?
5    A.  I am being paid, I think, the same rate that
6 I would charge anybody else for any other business
7 that I do, which is 350 an hour.
8    Q.  Okay. Let's take a break.
9    A.  Okay.
10    THE VIDEOGRAPHER: Going off the record, the time
11 is 11:09 a.m.
12        (Recess taken.)
13    THE VIDEOGRAPHER: Back on the record, the time
14 is 11:22 a.m.
15        Please begin.
16 BY MR. HAYES:
17    Q.  Mr. Tyler, earlier this morning I think we
18 established that separate from your preparation for
19 this deposition, it had been a number of years since
20 you had read your Datamation article.
21    A.  That's correct.
22    MR. BAKER: Objection, misstates the testimony.
23 BY MR. HAYES:
24    Q.  I'm not trying to misstate your testimony.
25        Has it --

Page 57

MICHAEL TYLER

1              MICHAEL TYLER
2        Have you reviewed or thought about the Easel
3 system at any time recently?
4    A.  Other than in terms of rereading the article
5 and -- and relatively recently, not really.
6    Q.  I think you mentioned that you were being
7 paid for your time here today.
8        Is there a written consultancy agreement or
9 something that you're abiding by for your work in
10 this case?
11    A.  How do you mean written consultancy
12 agreement?
13        I signed a -- a letter that said that they
14 would pay me and -- for my time, and so I'll keep
15 track of how much time I expend here and then invoice
16 them for it.
17    Q.  Okay. Is that letter you're referring to or
18 that agreement you're referring to different than the
19 written agreement we talked about earlier today that
20 set forth the fact that these folks are representing
21 you?
22    A.  I think it is.
23        Yes?
24        Yeah.
25    Q.  So there --

15 (Pages 54 to 57)

Exhibit 16  Page 15

Page 58

MICHAEL TYLER

2  Are there two separate agreements that
3  you --
4  A.  Yes.
5  Q.  -- signed?  Okay.
6  Just for the record, we'll ask for a copy of
7  those, and I'll follow up with written requests
8  later.
9  MR. BAKER:  Yeah, please send us a written
10 request.
11 MR. HAYES:  Sure.
12 Q.  Would you have been willing to testify today
13 without being paid?
14 A.  Yeah.  I mean I'm a capitalist.  I
15 understand the value of my time, and I have a duty to
16 my investors who are in my company, so I can't just
17 go doing things randomly.  But if I needed to testify
18 and I were not being paid, I would still testify.
19 I honestly have no interest at all in the
20 outcome of this case, but I find it fascinating that
21 an article I wrote a long time ago is of -- is of
22 current interest, so I'm intrigued.
23 Q.  Okay.  Earlier today we were talking a
24 little bit about your -- your meeting at Chemical
25 Bank and how it came about.

Page 59

MICHAEL TYLER

2  Were you invited by either Easel or -- Easel
3  company or Chemical Bank to come and look at the
4  Chemical Bank Easel system?
5  A.  Well, yeah.  I didn't just barge in.
6  Q.  Okay.  Would you consider that a private
7  invitation?
8  A.  It was private in the sense that I was the
9  only reporter present at the time.  They may very
10 well have issued comparable invitations to other
11 journalists, and they certainly knew full well that
12 the only purpose of my doing so was that I was
13 reporting a story that would be published in a
14 national magazine.
15 Q.  But for your visit, you would consider your
16 invitation private?
17 A.  My personal showing?
18 Q.  Yes.
19 MR. BAKER:  I'm going to object to the extent it
20 calls for a legal objection.
21 THE WITNESS:  I don't know if there's particular
22 meaning to the word "private."
23 They -- I -- I asked to see -- I asked Easel
24 to see some version in some use somewhere, and they
25 complied with my request and if -- invited me to go

Page 60

MICHAEL TYLER

2  down and look at Chemical.
3  I don't know -- I'm really confused as to
4  what you're -- you're driving at.
5  BY MR. HAYES:
6  Q.  And I'm not --
7  Just your understanding of private
8  invitation I'm just asking.  So I'm not trying to
9  confuse you in any way.  So that's fine.
10 A.  They were not -- they were not holding it on
11 the stage of Carnegie Hall for anybody to walk in, if
12 that's what you mean.
13 Q.  Sure.  Okay.
14 Do you know the difference between -- let me
15 start over.
16 Are you familiar with the term
17 "foreign-exchange front end"?
18 A.  Yes.
19 Q.  And what is your understanding of the
20 "foreign-exchange front end"?
21 A.  To me, that's a generic term.  I understand
22 that that's the moniker by which Chemical referred
23 to the system that they were showing me, but it's
24 really more of a generic term.  Foreign exchange is
25 what it's designed to do.

Page 61

MICHAEL TYLER

2  Q.  Okay.
3  A.  Front end similarly means the part that you,
4  the trader, would be interfacing with, as opposed to
5  the back end, where the exchange is actually --
6  trading currencies or doing whatever it is that banks
7  do with their business.
8  Q.  I think -- if my memory serves me, I don't
9  think you used the term "foreign-exchange front end"
10 in your article.
11 A.  I don't believe I used that term
12 specifically.
13 Q.  And I think you said you used the term
14 "Easel"; is that correct?
15 A.  Yes.  Easel was a brand name.
16 Q.  What was the difference between Easel and
17 foreign-exchange front end?
18 A.  Easel was the hardware system that was
19 receptive to touch, that you would -- that could
20 detect your touching the computer -- computer screen
21 and the software that went with that, which was both
22 a development tool for applications to developers,
23 including Chemical and, presumably, others, as well
24 as the system that could recognize that if I touched
25 the screen 3 inches from the top and 4 inches from

MICHAEL TYLER

1    the right edge, that it knew I touched the screen
2    3 inches from the top and 4 inches from the right
3    edge and it would actually know what was being
4    displayed at that time at that particular point so
5    that it knew what I was trying to communicate. So it
6    was -- it was both a hardware and software system.
7    That was what Easel was.
8        The front end -- the foreign-exchange front
9    end was Chemical Bank's application of the Easel
10   technology for a specific purpose, namely to enable
11   traders to -- to enter and transact foreign-exchange
12   transactions.
13       Q.  And your article is about the Easel system,
14   and not foreign-exchange front end, correct?
15       MR. BAKER:  Objection, misstates the record.
16   BY MR. HAYES:
17       Q.  Well, you --
18       A.  The article is about what's in the article.
19       Q.  Okay.
20       A.  I -- the -- the theme of it was the growing
21   use of touch-sensitive screens in modern commerce.
22       Q.  Mm-hmm.
23       A.  One very prominent example was that it was
24   used in foreign-exchange trading as a substantial

MICHAEL TYLER

1    advance over what had been the previous way of doing
2    things.
3        Q.  So you --
4        So what's in your article is describing the
5    Easel system and the foreign-exchange front end; is
6    that right?
7        A.  In effect, I describe both, yes.
8        Q.  How would I --
9        How would a reader know, in your -- in
10   reading your article, when you are distinguishing --
11   or when you're talking about the Easel system and
12   when you're talking about the foreign-exchange front
13   end?
14       A.  Well, because when I talk about the Easel
15   system, I talk about it explicitly.
16       And then when I talk about the
17   foreign-exchange front end -- I'm just trying to find
18   the exact quotation, but there's a point at which I
19   said Chemical Bank and Merrill Lynch are using this
20   technology for their own ends, and then I described
21   what those banks are doing with it.
22       So I clearly describe what is -- what Easel
23   did and what is what the customers did.
24       Q.  Okay.

MICHAEL TYLER

1        A.  It's reasonably clear language in the
2    article.
3        Q.  Okay.  So just so I understand you, when
4    you're talking about what it was that Merrill
5    specifically was doing or Chemical specifically
6    doing, in that context, you're talking about the
7    foreign-exchange front end?
8        A.  In the case of Chemical, what Chemical did
9    was they took the existing platform, in effect, the
10   hardware and software product that Easel -- or,
11   actually, Interactive Images, but the Easel product
12   system was, and they used the tools that the Easel
13   system included in order to create an application for
14   Chemical Bank in the same way that if I were to use
15   Microsoft Excel to build a spreadsheet to enable me
16   to evaluate potential investments or in the same way
17   that if you were to use Microsoft Word to create a
18   template so that every time you file a case or
19   something it had the same headers, let's say, or the
20   same to and from columns and whatever, and -- you
21   know, I don't know what your legal documents look
22   like, but presumably they all look the same. And so
23   that's an application or a template that your law
24   firm would have put on top of a common product like

MICHAEL TYLER

1    Microsoft Word.
2        This was essentially the same thing.  The
3    common product here was the Easel hardware and
4    software. Chemical Bank was able to create a
5    template on top of that for their unique application,
6    or for what they uniquely were trying to do at that
7    time.
8        Q.  Okay.  So if I could call your attention to
9    the actual article, the first page, MSLT_1228719, in
10   that middle column, second full paragraph, when you
11   say "is a hardware/software combination called
12   Easel," that's -- that's essentially what you're
13   referring to when you say Easel, correct?
14       A.  I'm sorry.  I was looking at the wrong
15   paragraph. Let me just read it -- review that.
16       (Witness reviewing document.)
17       Yes, exactly.
18       Q.  Okay.  Mr. Tyler, did you prepare for
19   today's deposition?
20       A.  I reread the article.
21       Q.  In addition to rereading the article, did
22   you do anything in preparing for today's deposition?
23       MR. BAKER:  Let me just caution the witness not
24   to disclose any attorney-client communications in the

Exhibit 16   Page 17

Page 66

MICHAEL TYLER

1  course of answering the question.
2  BY MR. HAYES:
3      Q.  You can just answer that yes or no.
4      Did you do anything other than reading the
5  article to prepare for today's deposition?
6      A.  I reread the article and -- and -- yes.
7      Q.  Approximately how many hours did you spend
8  preparing for today's deposition?
9      A.  I don't recall the exact number.  Not much.
10     Q.  Less than two?
11     A.  I don't recall.  Probably.
12     Q.  When did you do that preparation?
13     A.  Very recently.  In the last couple days.
14     Q.  Okay.  Separate from your article, did you
15  review any other documents in preparing for today's
16  deposition?
17     A.  No.
18     Q.  Did you have an actual copy of the
19  Datamation article in your files at home?
20     A.  No, I do not.
21     Q.  Do you have any knowledge of any of the
22  particulars of the legal case that this deposition
23  pertains to today?
24     A.  Honestly, in only the vaguest terms, that

Page 67

MICHAEL TYLER

1  it's a patent dispute of some sort.
2      Q.  Okay.  Do you have any understanding of the
3  term "on-screen tool" in the context of computer-user
4  interfaces?
5      A.  What that would mean, as I understand it, is
6  something that you're looking at on the screen that
7  enables you to accomplish a function of -- of some
8  sort.
9      I don't believe it has a very specific legal
10  or other meaning.
11     Q.  Okay.  Do you have any understanding of the
12  term "associated with," in the context of a tool
13  being associated with an information field on a
14  screen?
15     MS. GARNER:  Objection to the extent it calls for
16  a legal conclusion.
17     BY MR. HAYES:
18     Q.  I'm just asking, yes or no, if you have
19  any --
20     A.  I don't --
21     Q.  -- understanding.
22     A.  -- know any legal understanding of any of
23  these terms.
24     But as one common person talking to another,

Page 68

MICHAEL TYLER

1  if I'm doing something using a tool that affects
2  something else, then it would be associated with that
3  something else.  Or if it's affected by something
4  else, then they're associated with.
5      But that -- that's to me just common
6  English.  I'm not trying to read anything more
7  particular into it.
8      Q.  Okay.  Do you have any understanding of the
9  term "composition tool" in the context of on-screen
10  computer tools?
11     MS. GARNER:  Objection to the extent it calls for
12  a legal conclusion.
13     THE WITNESS:  A composition tool could be -- I
14  guess you'd call it a computer keyboard or an
15  on-screen keyboard on an Etch A Sketch.  Or I mean
16  I'm not sure exactly where you're going with that, to
17  be honest, but a tool is anything that you would use
18  to -- to create something with.
19     BY MR. HAYES:
20     Q.  Have you reviewed or studied any of the
21  patents that are in this case?
22     A.  No.  I am not a patent attorney.  I'm not an
23  attorney of any sort.  And I have no knowledge of any
24  patents in this -- related to this or, frankly,

Page 69

MICHAEL TYLER

1  anything else.
2      MR. HAYES:  Okay.  Can we mark this as the Tyler
3  Deposition Exhibit Number 2.
4      (Exhibit No. 2 was marked for
5      identification.)
6  BY MR. HAYES:
7      Q.  Mr. Tyler, the court reporter has handed you
8  what's been marked as the Tyler Deposition Exhibit
9  Number 2, which I'll represent to you is a clearer
10  picture of the picture that appears on MSLT_1228724.
11     A.  Okay.
12     Q.  Did you take that picture?
13     A.  No.  As I told you earlier, I am not a
14  photographer.
15     Q.  Do you have any idea who that might be
16  sitting there at the computer, whose hand that might
17  be in that picture?
18     A.  Well, I believe -- just as you were
19  speaking, I was comparing it to the photograph on the
20  magazine page.  I can't read the magazine page, but
21  it's MSLT_1228721.  I think that's just an
22  enlargement of the same photograph, so I would
23  imagine it's the subject -- the person sitting in
24  that photograph.

Page 70

MICHAEL TYLER

1           MICHAEL TYLER
2   Q.  Mr. Long testified at his deposition that
3 that was, in fact, him demonstrating the Easel
4 system.
5   A.  I have no reason to doubt that.
6   Q.  Okay.  Now, having looked at this picture,
7 does that bring back any memories of any of the
8 specific operations or functionality of the Easel
9 system that were demonstrated to you at your meeting
10 at Chemical Bank that day back in September or
11 October of '83?
12   A.  You mean the Easel system or the Chemical
13 Bank system -- or the Chemical Bank application?
14   Q.  I'll let you refer to it as however you'd
15 like to refer to it.
16   A.  Okay.  Well, they are -- there were, in a
17 way, two simultaneous description -- demonstrations
18 going on.  One was the touch-sensitive Easel system,
19 and the other was what Chemical Bank was doing with
20 it.  And it's hard to demonstrate a platform or a
21 product like Easel without having some kind of
22 application on it, in the same way that you can't
23 really demonstrate Microsoft Word without actually
24 typing words into the system.
25   So allowing some -- some ambiguity in that

Page 71

MICHAEL TYLER

1           MICHAEL TYLER
2 respect, I was witnessing a demonstration of the
3 front end -- the foreign-exchange front end using
4 Easel technology, as far as I knew, in realtime, and
5 I was able to instruct the demonstrator, Mr. Long, to
6 push certain buttons and to see what happened when --
7 when I say push buttons, I mean touch the screen in
8 certain areas -- and to see for myself what happened
9 on the screen as a result.
10   Q.  Okay.  So are you distinguishing between the
11 specific application that Chemical Bank used as its
12 foreign-exchange front end and the Easel system
13 provided by Interactive Images' solutions?
14   A.  The -- I am not a lawyer.  I can't
15 distinguish precisely who owns which piece of that.
16   What I was looking at was -- was an
17 integrated system that enabled a trader to create and
18 execute a foreign-exchange transaction.
19   Q.  Okay.
20   A.  And I understood that the hardware was
21 primarily Easel -- or Interactive Images'
22 contribution and that the software-development tool
23 was primarily Easel's and that that enabled Chemical
24 to put the words "Buy" or "Sell" or put the keyboard
25 on, whatever, but I wouldn't try to make any legal

Page 72

MICHAEL TYLER

1           MICHAEL TYLER
2 distinction as to which aspect of it belongs to which
3 company.  That's beyond my expertise or -- legally or
4 otherwise.
5   Q.  Yeah.  I'm not asking you to make any of
6 that distinction.
7   I just want to make sure it's clear so
8 when -- clear in your magazine article so when you're
9 referring to the Easel system we know specifically
10 what it is you're talking about and then when you're
11 referring to the specific applications that Merrill
12 or --
13   A.  Mm-hmm.
14   Q.  -- or Chemical were using, we can make that
15 distinction.
16   A.  Okay.
17   MR. BAKER:  I'm going to object.  I'm not sure if
18 that's a question.
19   If there's a particular passage you want to
20 ask him about, I think that's fine.
21 BY MR. HAYES:
22   Q.  So I'll just ask the question:  In your
23 magazine article, what is the best way to distinguish
24 between Easel system and foreign-exchange front end?
25   MR. BAKER:  Objection, it assumes facts not in

Page 73

MICHAEL TYLER

1           MICHAEL TYLER
2 evidence, and it's vague and ambiguous.
3   MR. HAYES:  I'll withdraw that question, and I'll
4 ask a different question.
5   Q.  Does your magazine article --
6   And by that I'm referring to what's been
7 marked as Tyler --
8   A.  Right, understood.
9   Q.  -- Exhibit Number 1.
10   -- describe the foreign-exchange front end?
11   A.  It describes the functionality of it.  It
12 describes what a trader could do with it, in other
13 words.
14   Q.  Okay.  And maybe -- maybe, I think, what
15 would be easiest to do is just to ask you -- I'll
16 give you a pen, and just do a quick read, and if you
17 would just circle the parts of your article that are
18 describing the functionality of foreign-exchange
19 front end.
20   Is that fair?
21   A.  Okay.
22   Q.  Okay.  And just take your time.
23   A.  (Witness reviewing document.)
24   So I think there are two sections that --
25 so, actually, one large section which describes the

**Exhibit 16   Page 19**

MICHAEL TYLER

1    MICHAEL TYLER
2  way that Chemical Bank has been using -- or had been
3  using at the time the -- the Easel technology and
4  describing the functionality of their front end,
5  which would be beginning on the third column of
6  MSLT_1228720 and the, I guess, second full paragraph
7  beginning "The bank is in the process of implementing
8  a two-phase strategy" and running through to the --
9  roughly two-thirds of the way down the next page,
10  ending at "even a few minor errors can cost the bank
11  a bundle."
12    Q.  Okay.
13    A.  That one fairly long section describes
14  initially what actually is happening when a customer
15  uses the system -- or when -- when a trader uses the
16  system and then describes what Chemical Bank is
17  intending to do and what it's intending to
18  accomplish.
19    Q.  Okay.  Thank you.  I appreciate that.
20    So now I'd like to switch over for a couple
21  minutes and talk about the actual touch-sensitive
22  technology at the time.
23    And I'd like to call your attention to
24  MSLT_1228720, left-hand column, third full paragraph,
25  which starts, "The fourth technology."

1    MICHAEL TYLER
2    A.  Yes.
3    Q.  Okay.  And it says, "which is used on the
4  Easel and the" -- I'm not going to try to pronounce
5  it -- "Sierracin Transflex products."
6    A.  Mm-hmm.
7    Q.  And that specific touch-sensitive technology
8  is a resistive membrane; is that right?
9    A.  Yes.
10    Q.  Okay.  Then I would like to have you turn
11  over to the next page, MSLT_1228721, far right
12  column, heading "Drawbacks of Touch Panels."
13    A.  Mm-hmm.
14    Q.  Do you see that?
15    A.  Yes, I do.
16    Q.  And I think you start with the first issue
17  there of parallax.
18    Do you see that?
19    A.  Yes.
20    Q.  Was parallax a -- an issue or a problem with
21  the Easel system?
22    A.  Basically, no.
23    Because the Easel system was a membrane that
24  was directly affixed to the screen, the distance from
25  the membrane, the touch-sensitive aspect, to the

1    MICHAEL TYLER
2  glass that was displaying the words on the screen,
3  let's say, was very small in comparison to some of
4  the other technologies which involved infrared beams,
5  which may have been a quarter to an eighth of an inch
6  away from the screen.  And if you're not looking
7  absolutely dead on, straight at it, that quarter to
8  an eighth of an inch could make a difference.
9    So parallax was generally not a drawback.
10    Q.  Okay.  If I could ask you to turn over to
11  the next page, MSLT_1228722, the first full paragraph
12  starts, "The reliability of the various technologies
13  has also been questioned."
14    A.  Yes.
15    Q.  Were there reliability issues of the
16  touch-sensitive technology on the Easel system?
17    A.  Were there reliability problems?
18    Q.  Yes.
19    A.  Meaning have users reported existing
20  problems?  Not to my knowledge.
21    There, theoretically, were potential
22  problems, which I discuss later in the same
23  paragraph, but I had not at that -- at the time that
24  I wrote that article, I had not heard in the course
25  of my reporting any actual problems that took place.

1    MICHAEL TYLER
2    Q.  So these problems you're describing here on
3  MSLT_1228722 about the reliability of the various
4  touch-sensitive technologies are more theoretical in
5  nature?
6    A.  Yes.  That's why I said "can be damaged" --
7  I did not say have been reported to be damaged -- in
8  the last line of that paragraph.
9    Q.  About halfway through that paragraph you say
10  "Capacitive sensing systems are inflexible."  What
11  did you mean by that?
12    A.  Meaning that -- if you think about a
13  touch-sensitive screen, the way any of them work,
14  conceptually, is that there is something that can
15  sense where your finger is horizontally on the screen
16  and where your finger is vertically on the screen
17  and -- and hit that, in effect, geographic coordinate
18  and say, okay, I know where your finger is.
19    Q.  Mm-hmm.
20    A.  In the capacitive-sensing system, as I
21  remember it, the cells, or the area within the screen
22  that would be defined as if you hit anywhere in this
23  area it means this --
24    Q.  Mm-hmm.
25    A.  -- were fixed in size and shape.

Exhibit 16  Page 20

Page 78

MICHAEL TYLER

1    MICHAEL TYLER
2    Whereas in some of the other technologies,
3    you could vary that. So that, for example, in the
4    photograph that you showed me, some of those cells,
5    in effect, are different sizes and shapes than others
6    and can be changed if the customer or if the vendor
7    wanted to.
8    Q. So I'd like to --
9        I think you mentioned the photograph that I
10   showed you, and I'd like to, just so the record is
11   clear, specifically refer to that as what's been
12   marked as Exhibit 2.
13   A. Exhibit 2.
14   Q. And I think you used the word "cell."
15       Can you just describe or point to me some
16   examples of cells in that Exhibit 2.
17   A. Yes.
18       And I have to say I -- I don't remember that
19   being a common term at the time. It may or may not
20   have been. But because I use Microsoft Excel all the
21   time, I think in terms of -- of cells. It's the same
22   basic idea.
23       So, for example, on this photograph, there
24   are six rectangles at the bottom of the screen, five
25   of which are -- are brightly lit and one isn't.

Page 79

MICHAEL TYLER

1    MICHAEL TYLER
2    Q. Okay.
3    A. Each of those is a cell.
4    Q. Okay.
5    A. There's a keyboard shown on the left side of
6    the screen. Each letter is its own cell, and so on.
7    Q. Okay.
8    A. And that -- that's -- as I say, that -- I
9    don't think that's a technical term. That's just the
10   way I refer to it.
11   Q. Okay. So turning back -- I'm sorry to ask
12   you to jump around.
13       Turning back to what's been marked as
14   Exhibit 1, which is your --
15   A. Yes.
16   Q. -- article, I just had gone through some of
17   what you described as the theoretical issues with
18   touch-sensitive technology at the time.
19       Are you aware of whether Easel or
20   Interactive Images was dealing with any of these
21   touch-sensitive issues on their Easel system at the
22   time?
23   A. I was not aware of any problems that they
24   had at the time.
25   Q. Okay. The system that you viewed at

Page 80

MICHAEL TYLER

1    Chemical Bank, the Easel system that you viewed at
2    Chemical Bank in September/October of '83, was that a
3    prototype system?
4    A. It was described as a beta-test system.
5    Beta test is not prototype.
6    Q. And what's the --
7        And what, in your opinion, is the difference
8    between beta test and a prototype?
9    A. A prototype is something that there's
10   probably only one of. It's -- may be just a shell or
11   a shape. It may have something more going on. But
12   it's used to give the people working within the
13   manufacturer an idea of what they're working with, so
14   that -- you know, you'll see, for example, prototype
15   cars at a car show. That's one example.
16       A beta-test version is considerably farther
17   along in its development. It's one step away from
18   being sold to the general public as a full-production
19   model.
20   Q. Okay. Would you be surprised to know that
21   Mr. Long referred to the system at Chemical Bank as a
22   prototype?
23   A. I would have been surprised since I describe
24   it in the article as a beta-test version. He may or

Page 81

MICHAEL TYLER

1    MICHAEL TYLER
2    may not have been using -- it may be a prototype to
3    him. And the -- and the foreign-exchange front end
4    may have been a prototype versus the Easel being a
5    beta test. So I'm not sure that he and I are
6    necessarily referring to the same thing, and I'm not
7    sure that he and I are necessarily using the words in
8    exactly the same way.
9    Q. Okay. That brings up a great point.
10       So would you have considered the
11   foreign-exchange front end you saw at Chemical Bank
12   that day -- and by that I mean separate from the
13   Easel system --
14   A. Right.
15   Q. Would you have considered the
16   foreign-exchange front end you saw at Chemical Bank
17   that day in September/October of '83 a prototype?
18   A. I don't -- I don't necessarily think that I
19   was in a position to know.
20       When -- if you mean prototype in the sense
21   of a product that really wasn't there, no, it was not
22   a prototype. It was functional.
23   Q. Okay.
24   A. And so in that sense it was not a prototype.
25   Whether this was the first one that they had

21 (Pages 78 to 81)

Exhibit 16  Page 21

Page 82

MICHAEL TYLER

1    MICHAEL TYLER
2  done, that I would -- that I could believe.
3    Q.  Okay.
4    A.  Was it one -- it's -- so the terminology is
5  a little vague.
6    Q.  And I'm just using prototype as you kind of
7  described it a few minutes ago in your testimony.
8  I'm not trying to add any special meaning to it.
9    So would -- would you draw a distinction in
10 the phase of development between the Easel system
11 that you describe and the foreign-exchange front-end
12 system that you describe in the article?
13    A.  I was not enough of an expert in
14 foreign-exchange trading to know whether Chemical had
15 bought 20 or 30 or 50 or 1 of the Easel product.  I
16 was not aware of whether they had been training a
17 dozen trainers on it or had trained none or had
18 practically everybody ready to go.
19    I was, for the purposes of the article,
20 primarily interested in discussing the merits of
21 touch-screen technology.
22    Q.  Okay.
23    A.  So I was interested in showing how it could
24 be and was being used, but I didn't really need to go
25 into a great deal of detail about how many people or

Page 83

1    MICHAEL TYLER
2  at what stage of development the Chemical piece was,
3  because that was somewhat less of direct relevance to
4  the readers of the magazine.
5    Q.  So is it fair to say, then, you wouldn't be
6  in a position to say one way or another whether
7  Mr. Long's description of the foreign-exchange front
8  end as a prototype was correct or not?
9    MS. GARNER:  Objection to the extent that the
10 witness would be speculating as to what Mr. Long
11 meant by the word "prototype."
12    THE WITNESS:  You'd have to ask him what he meant
13 by the word "prototype."
14    To me it's -- it's a pointless distinction.
15 BY MR. HAYES:
16    Q.  And I'm not asking -- I'm not asking you to
17 somehow speculate about what Mr. Long knew or not.
18    I'm just asking you whether it would be fair
19 to say, sitting here today, you're not in a position,
20 based on your knowledge, to say one way or the other
21 whether Mr. Long's description of the
22 foreign-exchange front end as a prototype was correct
23 or not?
24    MR. BAKER:  Same objection.
25    THE WITNESS:  Yeah.  I -- I just -- I don't want

Page 84

MICHAEL TYLER

1    MICHAEL TYLER
2  to get into the use of the word "prototype."  And
3  I'll explain why.
4    Most of what Chemical was doing was actually
5  software driven, because the hardware was the Easel
6  system.
7  BY MR. HAYES:
8    Q.  Mm-hmm.
9    A.  There was an Easel software that went with
10 it.
11    But the specific definition of how you
12 define certain cells or certain spaces on the screen
13 to be these particular, quote-unquote, buttons versus
14 others is malleable.  That was part of the appeal of
15 the system to -- to Chemical Bank.
16    So the functionality was very real.  And
17 because it's software, it was very easily replicable
18 on any Easel that they wanted to get.  They could
19 have made it a production model instantaneously if
20 they wished.
21    So I don't really want to get into was it a
22 prototype, as in did they decide to change the order
23 of the keys on the keyboard or a prototype in some
24 other way.  I don't see the point.
25    It was a functional system.  It worked.  It

Page 85

1    MICHAEL TYLER
2  did what it was supposed to do.
3    Q.  Okay.  So can you answer my question,
4  sitting here today, whether you're in a position to
5  say one way or the other whether the foreign-exchange
6  front end was a prototype when you viewed it that day
7  in September/October of '83 at Chemical Bank?
8    MR. BAKER:  Objection, asked and answered, calls
9  for speculation.
10    MS. GARNER:  Vague.
11    THE WITNESS:  The system that I saw was a
12 functional operating system that did what it was
13 supposed to do.
14    What Chemical Bank was going to do with it,
15 whether Chemical Bank wanted to change that or not,
16 was not particularly of interest to me.
17 BY MR. HAYES:
18    Q.  But you can't say, sitting here today, one
19 way or the other whether the foreign-exchange front
20 end was a prototype or not the day you saw it in
21 September or October of '83?
22    MR. BAKER:  Same objection.
23    THE WITNESS:  I think I've been very clear about
24 that.  The word "prototype" is really, to my -- to my
25 way of thinking, not a relevant term.

**Exhibit 16   Page 22**

MICHAEL TYLER

1 BY MR. HAYES:
2     Q.   Not a relevant term to the foreign-exchange
3 front end?
4     A.   To what I was trying to accomplish in the
5 article.
6     Q.   So you didn't consider whether or not the
7 foreign-exchange front end was a prototype or not
8 that day?
9     MS. GARNER:   Same objection.
10     THE WITNESS:   I -- it feels to me as if you're
11 asking me for a legal use of the term "prototype,"
12 which I am not a lawyer, I don't know a legal
13 definition of what is or isn't a prototype, and I
14 don't know and didn't know then how extensively this
15 application had already been deployed versus was
16 planned to be deployed, whether it was going to be
17 modified or not modified.
18     What I did know and reported on accurately
19 was that it was a functional system that did what it
20 was supposed to do, was hardy enough that I could
21 give it changes and -- or do things, quote-unquote,
22 off script that were not part of the demonstration
23 and it still did what it was supposed to do.  It
24 worked.

MICHAEL TYLER

1 BY MR. HAYES:
2     Q.   Sure.
3     So, based on your understanding of
4 "prototype," you didn't consider that day whether or
5 not the foreign-exchange front end was a prototype or
6 not?
7     MR. BAKER:   Objection, Counsel.  He's already
8 answered your question a couple of times.  It seems
9 like we're kind of spinning our wheels here on this.
10     THE WITNESS:   It didn't occur to me to care what
11 specific terminology they applied at Chemical Bank to
12 whether it was a prototype.
13     It was clearly something that they had
14 planned to implement and roll out in two phases, as I
15 described in the article, and they had begun that
16 process, to the extent that I saw a real live system
17 that they were quite capable of training traders on.
18     Whether they had or not, I don't know.  I
19 didn't know then.
20 BY MR. HAYES:
21     Q.   Would you consider a system that a company
22 was planning on rolling out in two phases but had not
23 yet done so in its prototype or experimental state?
24     MS. GARNER:   Objection, calls for speculation,

MICHAEL TYLER

1 vague.
2     THE WITNESS:   Theoretically, that's possible, but
3 it's also possible, in fact more likely, that by the
4 time you get to a specific roll-out plan that you've
5 probably got something pretty close to production
6 level that can be rolled out in a reliable way over a
7 larger user base, but I -- the answer is it could be
8 anything.
9 BY MR. HAYES:
10     Q.   Sure.
11     Sitting here today, now knowing that
12 Chemical Bank did, in fact, not roll it out, does
13 that at all color your opinion on whether or not the
14 system you saw that day, the foreign exchange
15 front-end system you saw that day, September/October
16 of '83, was a prototype?
17     A.   No.
18     I mean I could have bought a Ford Mustang
19 and -- you know, commonly available car.  You just
20 walk into the dealer and get it.  And I could have
21 thought to myself, well, I may roll this out to all
22 of my employees, give every one of them a Ford
23 Mustang.  And then I may have thought the better of
24 it and said, you know, that doesn't convey the image

MICHAEL TYLER

1 I want my company to have or, my goodness, those are
2 expensive, that's too much -- that's going to cost
3 too much or the gas mileage isn't good and chosen not
4 to.  It doesn't make the Mustang a prototype.
5     People choose to roll out or not roll out
6 programs and -- and things for any number of reasons
7 at any time in a project's development.
8     Q.   What --
9     In your example you just gave, what would
10 make the Mustang a prototype?
11     MS. GARNER:   Objection, calls for speculation.
12     THE WITNESS:   If, let's say, that -- well, the --
13 put yourself in 1961, three years before the Mustang
14 was officially released as a product.  If they sold
15 me some molded plastic in the general shape that we
16 all recognize today as a Ford Mustang, with nothing
17 in it except Fred Flintstone pedaling as fast as he
18 can, that might have been considered a prototype.
19 I . . .
20 BY MR. HAYES:
21     Q.   Okay.  So, sitting here today, you just
22 don't know one way or the other whether the
23 foreign-exchange front end that you saw that day in
24 September/October '83 at Chemical Bank was a

Page 90

MICHAEL TYLER

1        MICHAEL TYLER
2 prototype or not?
3   MR. BAKER: Object --
4   MS. GARNER: Objection, vague, calls for
5 speculation, asked and answered.
6   THE WITNESS: It was not a relevant consideration
7 to me.
8     It was clear to me that Chemical intended to
9 roll it out. It was also clear to me that this
10 product worked and was functional and, therefore,
11 could have been rolled out very imminently had they
12 chosen to.
13     You can -- you can call that whatever you
14 like.
15 BY MR. HAYES:
16   Q.  Okay. So it's fair to say whether the
17 foreign-exchange front end that day in
18 September/October of '83 was a prototype or not just
19 wasn't a relevant consideration of yours?
20   MR. BAKER: Come on, Counsel. You've asked the
21 same question like six or seven or eight times, and
22 you've got an answer. Maybe you don't like the
23 answer, but I think it's time to move on.
24     So objection, asked and answered, calls for
25 speculation and --

Page 91

MICHAEL TYLER

1        MICHAEL TYLER
2   THE WITNESS: The product was --
3   MR. BAKER: -- vague and ambiguous.
4   THE WITNESS: The product was capable of being
5 rolled out if they wanted to. I don't care what you
6 call that.
7 BY MR. HAYES:
8   Q.  Okay.
9   A.  It was not a pie in the sky. It was not a
10 flow chart. It was not a piece of plastic with
11 nothing going on underneath.
12     It was a real thing.
13   Q.  Was the Easel system that you saw that day a
14 prototype?
15   MR. BAKER: Same objections.
16   THE WITNESS: The Easel system was described in
17 the article as a beta test. The Easel system that --
18 excuse me.
19     The Easel system that Merrill and Chemical
20 used is described in the article as a beta-test
21 system.
22     Easel is also described in the article as
23 having several versions of their product available,
24 and I don't at this time remember exactly how many
25 versions or which ones may or may not have been in

Page 92

MICHAEL TYLER

1        MICHAEL TYLER
2 beta test versus full production, but none of that
3 would count as a -- a prototype in the way that I
4 described the word earlier.
5 BY MR. HAYES:
6   Q.  Did you --
7   A.  But, again, a prototype to me is not a
8 useful word in discussing products.
9   Q.  Why is that?
10   A.  Because it can mean -- it's too ambiguous.
11 It can mean anything.
12     And I'm not a lawyer. So if there's a legal
13 meaning to the term, then it's especially useless for
14 me to try to discuss that, that word.
15   Q.  So in the many magazine articles that you
16 wrote through the years that you described earlier,
17 is it fair to say that you never used the term
18 "prototype"?
19   MR. BAKER: Objection, misstates the testimony.
20   THE WITNESS: I strongly doubt that I could -- I
21 couldn't remember, out of all those articles, ever
22 using it or not using it.
23 BY MR. HAYES:
24   Q.  Sitting here today, you said -- I think you
25 said the word "prototype" is useless. So it's fair

Page 93

MICHAEL TYLER

1        MICHAEL TYLER
2 to say that you probably didn't use a useless word in
3 your magazine articles, correct?
4   MR. BAKER: Objection, argumentative, misstates
5 the testimony.
6   THE WITNESS: There are a lot of words in the
7 English language that you can use without specific
8 legal meaning and without being explicitly clear
9 about what you're talking about that might convey a
10 range of possibilities.
11     Am I the world's perfect writer? Do I
12 always use exactly the most narrow and specific word
13 that I intend or do I occasionally use a broader term
14 that might simply indicate this isn't yet available
15 for everybody to walk into their local auto
16 dealership and buy?
17     I don't remember what I wrote in such detail
18 over -- over my entire writing career.
19 BY MR. HAYES:
20   Q.  But based on what --
21     Based on what you've testified to today,
22 you -- would it be fair to say you'd be surprised to
23 find the word "prototype" in any of your magazine
24 articles?
25   A.  No, I wouldn't say that at all.

**Exhibit 16   Page 24**

Page 94

MICHAEL TYLER

1
2      First of all, we're talking today, 2007,
3  about how would I describe a system today, using
4  today's terminology.
5      Q.  Right.
6      A.  What terminology I used in 1983, 1984, 1985
7  may or may not have been the same, because people's
8  writing styles and understandings of the world at
9  large evolve over time.
10      So I — I would make no representation as to
11  whether or not I ever used that term and what
12  specifically -- what specific legal meaning, if any,
13  it had at that time.
14      Q.  I'm not asking you today to give any legal
15  conclusions or any — answer questions based on any
16  legal meaning of the word "prototype."
17      I'm just asking you to answer questions
18  based on what your understanding as --
19      A.  Mm-hmm.
20      Q.  -- a magazine article writer and editor at
21  the time would have used that -- that word.
22      So -- so is it fair to say, sitting here
23  today, you can't answer my question of whether or not
24  the foreign-exchange front-end system that you saw in
25  September/October of '83 was a prototype in your

Page 95

MICHAEL TYLER

1
2  understanding of that word?
3      A.  The --
4      MR. BAKER:  Objections — same objections, calls
5  for speculation, misstates his testimony and calls
6  for legal conclusion.
7      THE WITNESS:  The product that I saw in
8  demonstration was one that was functional, it did
9  what it was supposed to do, it was software-driven
10  and, therefore, could be very easily replicated
11  across a large number of computer screens as quickly
12  as Chemical wished to buy them and deploy them.
13      So as far as I was concerned, this was a --
14  an actual physical operating system that was ready
15  for deployment if Chemical wanted to deploy it at
16  that time.
17      Whether they did or didn't, whether they
18  opted to make changes or not, whether those changes
19  were based on technology or based on the user's
20  experience, ergonomics, so to speak, or whether they
21  made no changes, none of that to me really reflected
22  any relevance to an article about touch-screen
23  technology and may or may not have had any bearing on
24  whether Mr. Long called it a prototype, since his
25  perspective was necessarily different from mine.

Page 96

MICHAEL TYLER

1
2      But as far as I was concerned, this was a
3  technology and a product that was ready for the
4  market.
5  BY MR. HAYES:
6      Q.  Okay.  Sitting here today, can you answer my
7  question yes or no, whether the foreign-exchange
8  front-end system that you saw in September and
9  October of '83 was a prototype?
10      MR. BAKER:  Okay.  Come on, Counsel.  This is
11  starting to verge on harassment of the witness.
12  You've asked him the same question over and over at
13  least seven or eight times.  He's answered your
14  question over and over.  And yet you insist to keep
15  asking the same question, and you're starting to
16  harass the witness.  I think it's time to wrap this
17  up and move on to a new topic.  I mean we can't spend
18  all day having you ask him the same question over and
19  over.  So can you please move on to a new topic.
20  He's already answered your question.
21      THE WITNESS:  I -- honestly, I feel I have
22  answered the question as thoroughly and carefully as
23  I could.
24      The world sometimes doesn't evolve into
25  yes-or-no questions, especially if you don't

Page 97

MICHAEL TYLER

1
2  really -- that's what I need to say on that.
3  BY MR. HAYES:
4      Q.  Okay.  Fair enough.
5      I think earlier today you — you talked
6  about the actual demonstration of the Easel system
7  that you saw at Chemical Bank back in September and
8  October of '83.
9      Did you actually use the system that day?
10      A.  Was I personally pushing the — touching the
11  screen?
12      I don't remember if I personally physically
13  touched the screen or if I directed the demonstrator
14  to push the screen, but I did cause the screen -- one
15  way or the other, whether it was me pushing it or
16  somebody else touching the screen, I did say things
17  to the effect of I'd like to see what happens when
18  you do a sale transaction or I'd like to see
19  something in Mexican pesos, or let's try it in
20  British pounds, which, conventionally, is actually
21  traded the reverse of most other currencies; in other
22  words, we think of dollars per pound as opposed to,
23  let's say, Hungarian forints -- dollars per forint.
24  It's reversed.
25      So I am -- I am quite certain I would have

**Exhibit 16   Page 25**

Page 98

MICHAEL TYLER

1
2 tested the system inasmuch as asked -- either
3 directly or asking the demonstrator to do things that
4 were not part of the standard script.
5    Q.  Had you given the demonstrator a standard
6 script to use --
7    A.  No, no.
8    Q.  No?
9    A.  No, I never do that.
10    Q.  So there was --
11    A.  They may have had their own script that they
12 wanted to demonstrate.  They're welcome to do that.
13 And I was quite happy, as I always am, to interrupt,
14 to say, "That's interesting.  Now show me what
15 happens when you do this instead."
16    Q.  Okay.  Did you --
17    A.  And I never prepare people in advance for
18 that.
19    Q.  Did you see a standard script or anything --
20    A.  I did not see a --
21    Q.  -- outline --
22    A.  I did not see anybody holding a standard
23 script or -- they may have, may not have memorized
24 one.  I have no idea.
25    Q.  Okay.  Separate from the

Page 99

MICHAEL TYLER

1
2 touchscreen-technology specifics that you described
3 in the article, are you familiar with any of the
4 other hardware-technology specifics of the Easel
5 system?
6    A.  Meaning?
7    Q.  The processor, the memory.
8    A.  No.  That was not of interest to me.  All I
9 was interested in was the touch sensitivity of it.
10    Q.  Okay.  Are you aware or familiar with any of
11 the software algorithms in the Easel system and/or
12 the foreign-exchange front end?
13    A.  I am not an engineer.  I made no attempt to
14 actually look at the individual lines of code, if
15 that's what you mean.
16    Q.  Okay.
17    A.  I was interested in what can it do, because
18 Datamation readers were interested in how can -- if
19 you're going to spend several pages of a magazine
20 talking about touch-sensitive screens, how can I
21 deploy that in my company to be useful.
22       So they don't care what the algorithms are.
23 They care about seeing the examples of application.
24    Q.  So is it fair to say that your article,
25 which has been marked as Exhibit 1 today, doesn't

Page 100

MICHAEL TYLER

1
2 describe in any detail the specific software
3 algorithms in either the Easel system or the
4 foreign-exchange front end?
5    A.  It doesn't describe the technical lines of
6 code that under -- that underlay that, but it did
7 describe in some detail what would happen if you did
8 action -- this particular action, what the
9 consequence was.  So there -- there was a clear
10 logical flow of how a transaction was entered
11 described in this article.
12    Q.  Okay.  Separate from the technical
13 description of the touch-screen technologies, is it
14 fair to say there's -- there's -- there's no detailed
15 description of the -- any of the hardware in the
16 Easel system?
17    A.  It describes the hardware very briefly.  I'm
18 not sure I can find it instantaneously, but the -- it
19 has a hardware/software combination that comes in
20 several versions, reading from the first page of the
21 article, and later in the article, in describing
22 the -- in the paragraph you referenced earlier about
23 the Easel and Sierracin Transflex products, it does
24 describe a little bit about the use of electrodes on
25 a sheet of Mylar -- this is on page 1228720, the

Page 101

MICHAEL TYLER

1
2 first column where it starts "The fourth technology."
3       So there is some basic description of the
4 hardware that's involved, but there's not a lot of
5 detail.
6    Q.  That last section you just pointed me to,
7 when you were talking about the Sierracin Transflex
8 product that's on MSLT_1228720, is that referring to
9 the touchscreen-hardware technology?
10    A.  Yes.  Where I talk about the set of parallel
11 electrodes etched onto a sheet of Mylar, "two of
12 those sheets are stretched across the crt at right
13 angles to each other, creating a grid of electrodes,"
14 that does describe the touch sensitivity.
15    Q.  Okay.  Is there any description in your
16 article which has been marked as Exhibit 1 of how the
17 Easel system and/or the foreign-exchange front end
18 would actually store the data regarding the currency
19 transactions in its system?
20    A.  That's actually a back-end transaction, so
21 it wouldn't have been part of this article.
22    Q.  Okay.
23    A.  Data storage is not the same as -- the front
24 end is data entry and reflection or giving back to
25 the user.

**Exhibit 16   Page 26**

Page 102

MICHAEL TYLER

2 But the actual storage is a back end.
3 Q. Okay. You mentioned earlier that you may
4 have -- or most likely directed someone to
5 demonstrate -- or go off script, a demonstration of
6 the functionality of the foreign-exchange front end.
7 Do you remember any of the specifics about
8 what you might have asked them to demonstrate?
9 A. I don't believe I said most likely as to
10 whether it was me or some -- or me directing someone
11 else, just to be clear.
12 Q. Sure.
13 A. I'm sorry. The question?
14 Q. Do you remember any of the specifics about
15 the demonstration of the foreign-exchange front end
16 on that day in September or October of 1983?
17 A. I remember being shown how it worked and
18 being walked through a transaction, and I remember
19 asking questions to show me other examples or to show
20 me what -- various what-if scenarios.
21 Do I remember specifically what currency we
22 were talking about or other details -- you know, what
23 the exchange rate was? No, I don't.
24 Q. Okay. Do you have any knowledge of the
25 specific type of processor that the Easel system

Page 103

MICHAEL TYLER

2 used?
3 A. I don't remember. It may or may not say in
4 the article, but I don't remember.
5 Q. Do you have any knowledge on what a PDP-11
6 intelligent terminal is?
7 A. PDP-11 was a minicomputer manufactured by
8 Digital Equipment, and PDP-11 was -- well, PDP-11 was
9 the minicomputer. The terminal was the user
10 interface, which looked like a television screen with
11 a keyboard.
12 Q. The --
13 A. That was a very, very common piece of
14 hardware at that time.
15 Q. The Easel system that was demonstrated to
16 you back in September/October of '83, was that a
17 stand-alone system or was that networked?
18 A. I -- when you say "networked," to what?
19 Q. A network to any other type of bigger
20 system.
21 A. It was -- as far as -- as far as I know, you
22 couldn't execute a live trade on it using -- they
23 wouldn't let me actually spend the bank's money.
24 But was it connected to other computers or
25 to the bank's back-end systems? I can't say for sure

Page 104

MICHAEL TYLER

2 one way or the other.
3 Q. Okay. Do you have any knowledge of what
4 type of programming language the Easel system used?
5 A. Not off the top of my head, no.
6 Q. How about any knowledge of the program
7 language that the foreign-exchange front end used?
8 A. I couldn't even begin to guess -- well,
9 actually, that's not quite accurate.
10 The foreign-exchange front end used the
11 Easel development tool, and, to some degree, the
12 Easel development tool can be considered program
13 language.
14 Q. Okay.
15 A. But, beyond that, I -- I couldn't say.
16 Q. Okay. I'd like to call your attention to
17 what's been marked as Exhibit 2.
18 A. Mm-hmm.
19 Q. See on the -- on the left-hand side of the
20 screen there are a number of cells that include
21 the -- the letters of the alphabet? Do you see
22 those?
23 A. Yes.
24 Q. At any time when you were looking at the
25 Easel system, was that -- were those cells that are

Page 105

MICHAEL TYLER

2 depicting the letters of the alphabet not present?
3 A. Yes. If I didn't need to be typing in entry
4 using letters of the alphabet -- if, for example, I
5 needed to type in numbers -- that would be replaced
6 by a numeric keypad.
7 Q. Okay.
8 A. Or if I were -- if I had activated something
9 that required me to choose from a menu of selections,
10 the menu would have appeared in that space.
11 Q. What's your definition of a menu of
12 selections?
13 MS. GARNER: Objection to the extent it calls
14 fora legal conclusion.
15 BY MR. HAYES:
16 Q. As you just -- as you just used it.
17 A. In the way that people discuss menu-driven
18 software in today's computers. In other words, if I
19 had done something on the right-hand side that
20 required me then to make a choice, a choice of
21 broker, let's say, or a choice of different bank
22 customers or something, then that list would have
23 come up on the left side for me to choose from among
24 that list.
25 Q. I think you mentioned earlier -- you used

**Exhibit 16   Page 27**

Page 106

MICHAEL TYLER

1  the term "cell" or "cells" in your article because
2  you are an Excel user and you were familiar with that
3  term; is that right?
4     A.  Yeah.  It's lower case, not a specific term
5  of art, but meaning, you know, one area that -- that
6  in this case you can push anywhere within that area
7  and it does the same thing.
8     Q.  Okay.  Do you distinguish between cell and
9  button?
10    A.  I was using them interchangeably.
11    Q.  Okay.
12    A.  Uhm -- yeah.
13    MR. HAYES:  We've got to take a break because of
14 the tape is running out of time.
15    THE VIDEOGRAPHER:  This marks the end of DVD
16 number 1 in the deposition of Michael Tyler.  Going
17 off the record, the time is 12:26 p.m.
18       (The deposition proceedings adjourned for
19       the lunch recess at 12:26 p.m.)
20
21
22
23
24
25

Page 107

MICHAEL TYLER

1       AFTERNOON SESSION
2     THURSDAY, DECEMBER 27, 2007; 12:56
3             -oOo-
4     THE VIDEOGRAPHER:  Here marks the beginning of
5  DVD number 2 in the deposition of Michael Tyler.
6  Going on the record, the time is 12:56 p.m.
7       Please begin.
8             -oOo-
9       EXAMINATION RESUMED
10 BY MR. HAYES:
11    Q.  Mr. Tyler, I'd like to call your attention
12 to what's been marked as Exhibit 1, specifically
13 page 154 of the magazine, which bears Bates number
14 MSLT_1228722.
15    A.  Okay.
16    Q.  In the right-hand column, first full
17 paragraph starts, "The combination of these drawbacks
18 and outside influences may doom the touch-sensitive
19 terminal," and then right at the end of that
20 paragraph, "They've been around a while, and they
21 will continue to be around, but I don't think there's
22 much interest in them."
23       Then the next paragraph says, "His colleague
24 Nesdore is even more pessimistic:  'I just don't

Page 108

MICHAEL TYLER

1  think the concept can make it today.'"
2       Do you remember why Mr. Nesdore thought that
3  this concept of touch-sensitive screens could not
4  make it at the time in -- when you wrote the article?
5     A.  Well, when you're writing an article, you
6  try to find -- as a journalist, you try to find
7  people who have different points of view to make it
8  an interesting story, basically, and there were many
9  reasons that people might have considered
10 touch-sensitive technology to be, economically, not a
11 successful product over time.  They could have
12 thought, well, you know, this will never get cheap
13 enough to use on a large production volume.  They may
14 have said you can never get -- find enough
15 resolution, in other words, small enough cells.  Or
16 they may have said the problems with what you touch
17 and what the computer thinks you're touching may not
18 always be lined up properly, what I described as
19 parallax.  Or they may have said, you know, these
20 things just aren't very hardy, they break for
21 whatever reason.  Who knows.
22       But when you're -- and I'm putting myself in
23 1983, when a lot of those issues hadn't been
24 resolved.  People didn't know whether -- whether this

Page 109

MICHAEL TYLER

1  technology would be successful or not, but there were
2  good reasons to believe that there would be problems
3  to overcome.
4     Q.  Did you talk to Mr. Long at all that day
5  back in September/October '83 about whether or not he
6  thought this concept of touch-sensitive screens
7  would -- would make it?
8     A.  I don't believe so.
9     Q.  Okay.
10    A.  I believe he, most likely, was quite
11 optimistic since he was described -- or at least his
12 company was described as being committed to moving
13 forward with it.
14    Q.  So would you be surprised to know that when
15 he testified in his deposition within the last couple
16 weeks he said that touch screens just weren't
17 feasible and were never, therefore, implemented at
18 Chemical Bank?
19    A.  I think that it's quite common that a
20 department like information systems investigates many
21 different possible technologies and systems that it
22 will use, some of which it will adopt and roll out
23 across an entire corporation, and many of which it
24 chooses not to for any number of reasons.  They may

Page 110

MICHAEL TYLER

1  not work well, they may work fine but cost too much
2  money, they may work fine in small numbers, but not
3  in big numbers.
4      So, no, it doesn't really surprise me that
5  something that I wrote about that he seems -- or his
6  company seemed committed to may in the end not be
7  something that they did.
8  Q.  Did Mr. Long -- or did you have any
9  conversations with Mr. Long that day back in
10 September/October '83 about any issues with the Easel
11 system that needed to be resolved in their system?
12 And when I say "their," Chemical Bank's system.
13 A.  No.  I understand your question.
14     And I don't recall that kind of
15 conversation.  They may well have been thinking about
16 is the exact screen layout what they want or do they
17 need to change the price point that they buy it from
18 the vendor or do they want -- there are a million
19 things they could have been thinking about.
20 Q.  Do you know whether or not any additional
21 changes were made to the system to resolve any issues
22 after you viewed it on that day in September/October
23 of '83?
24 A.  After the publication of the article, I did

Page 111

MICHAEL TYLER

1  not do any further research or reporting on it, so I
2  have no idea what they may have — may or may not
3  have done since then.
4  Q.  Would you be surprised to know that Mr. Long
5  testified that they did make additional changes to
6  the system after the demonstration to you in October
7  or September of '83?
8  A.  Would I be surprised that they did make
9  changes?
10 Q.  Yeah.
11 A.  No, I wouldn't be surprised at all.
12 Q.  Why is that?
13 A.  That's what information systems departments
14 do.  They always change.  Technology is evolving.
15 You go from version 1 to version 1.1, 1.2, version 2,
16 eventually, if it's a big change, but that's --
17 that's how -- how companies evolve and how
18 applications get better and better over time.
19 Q.  Okay.  Changing subjects a little bit now, I
20 think this morning, when we were talking about how
21 you kind of started off in writing this article, you
22 said that you had seen -- or a press release or
23 something that got you interested in touch screens.
24     Do you remember any specific press release

Page 112

MICHAEL TYLER

1  about the Easel -- specific Easel system?
2  A.  I don't remember a specific release.  I have
3  a hard time imagining how I would have found out
4  about it other than seeing it either in a release
5  from the Easel company or from Interactive Images or
6  from a comparable company or provider to Easel or a
7  customer of Easel's or in some other way referencing
8  them.
9  Q.  Okay.
10 A.  A lot of -- a lot of pieces of paper crossed
11 my desk then.
12 Q.  Okay.  Have you talked to Mr. Robert Long
13 since your meeting at Chemical Bank back in
14 September/October of '83?
15 A.  It's possible I spoke with him in the
16 immediate period thereafter to -- meaning before
17 publication, just to clarify a question or two.  I
18 don't remember doing so, but it's theoretically
19 possible.
20     I know for a fact I have not spoken with him
21 in the many years since then.
22 Q.  Okay.  When was the first time you were
23 contacted by anybody about this case?
24 A.  Earlier this year, and I couldn't pin down

Page 113

MICHAEL TYLER

1  exactly when, but probably in the summer.
2  Q.  Summer of 2007?
3  A.  Of -- summer of 2007 is my best guess.
4  Q.  Do you remember who it was that first
5  contacted you?
6  A.  The attorney Brian Atkinson from Dechert.
7  Q.  So I want to talk about your conversations
8  with any of the other attorneys in this case before
9  you agreed to have them represent you.
10     Is that fair?
11 A.  I don't understand attorney-client privilege
12 the way that a lawyer would understand it, so I will
13 ask my representation to tell me when I am gearing
14 potentially into ground I shouldn't cover.
15 Q.  Fair enough.
16 MR. BAKER:  Whatever questions he asks you, you
17 can disclose communications before the
18 attorney-client --
19 THE WITNESS:  Okay.
20 MR. BAKER:  -- relationship started.
21     But, you know, after the attorney-client
22 relationship started, then those would be
23 protected --
24 THE WITNESS:  Okay.

Page 114

MICHAEL TYLER

1     MR. BAKER: -- under the privilege.
2     BY MR. HAYES:
3     Q.  And I'm not going to try to attempt to ask
4  you any questions about after the attorney-client --
5     A.  Okay.
6     Q.  -- relationship started, because I
7  realize --
8     A.  Mm-hmm.
9     Q.  -- I'm not entitled to those answers.
10       Do you remember the general subject of that
11  first call you had with Mr. Brian Atkinson in the
12  summer of 2007?
13    A.  He was curious as to whether I was the
14  Michael Tyler who had written that article in
15  Datamation, and I verified that I was that -- that
16  person.
17       And he asked me if I had any notes or other
18  documentation surrounding that, and I told him
19  exactly the same thing that I told you, namely, that
20  that was a long time ago, many moves ago for me, many
21  moves ago for Datamation, so, no, there was no
22  additional documentation I could offer.
23    Q.  Okay.  So when was the second time you were
24  contacted or communicated with any of the lawyers in

Page 115

MICHAEL TYLER

1  this case?
2     A.  I may be conflating several conversations
3  into one, based on voice mails going back and forth,
4  whatever, but as far as I know, the issue lay dormant
5  until Mr. Atkinson reached me in October and began
6  the discussion that led to my accepting their
7  representation.
8     Q.  Okay.  Approximately how many communications
9  did you have with the lawyers prior to October of
10  2007?
11    A.  At most, a small handful, maybe one -- maybe
12  one or two of any substance.
13    Q.  Okay.
14    A.  You know, and I'm -- I'm excluding voice
15  mails "Hi, this is Michael calling you back," or
16  whatever.
17    Q.  Sure.
18    A.  Okay.
19    Q.  So one or -- one or two of substance;
20  otherwise, just working out logistics and trying to
21  get ahold of you, those types of things?
22    A.  That was including -- that's what I mean by
23  substance.
24    Q.  Okay.

Page 116

MICHAEL TYLER

1     A.  I mean there was practically essentially no
2  communication, other than my acknowledging, yeah, I
3  did write the article and, no, there's no documentary
4  backup.
5     Q.  Okay.  Did you exchange any emails or any
6  type of written communication with any of the lawyers
7  prior to October of 2007 when your representation
8  began?
9     A.  I don't remember.  I don't think so.  I
10  think the first email that I would have received from
11  Dechert -- and I know I didn't send them anything.
12       I think the first email I would have
13  received would have included the representation
14  letter and maybe a letter either -- an email at the
15  same time which might have included the actual
16  article.
17    Q.  Okay.  Did you have any communications,
18  written or otherwise, with any other lawyers than
19  Dechert lawyers?
20    A.  I received a voice mail from you, I think.
21    Q.  Okay.
22    A.  And I think that's the only other one that I
23  can think of.
24    Q.  Did you return my voice mail or attempt to

Page 117

MICHAEL TYLER

1  get ahold of me?
2     A.  No, I didn't.
3     Q.  And why was that?
4     A.  Because when I received the voice mail from
5  you and had previously gotten a -- the brief
6  communication from -- from Mr. Atkinson earlier, I
7  realized that there actually is a real lawsuit here
8  and that what I had written might be of relevance and
9  not something really tangential, and at that point I
10  decided to not do anything until I understood a
11  little bit better who was representing whom and how I
12  wanted to proceed.
13    Q.  Okay.  And when you say how you wanted to
14  proceed, what do you mean by that?
15    A.  It occurred to me that I might be invited to
16  testify by either side and -- or I might be
17  subpoenaed by either side, and so I realized that
18  there were a range of options available to me at that
19  point.
20    Q.  And why did you pick the option that you
21  chose?
22    A.  I think it became clear that I was likely to
23  be subpoenaed.  It also became clear that I would
24  need legal representation.  And when Mr. Atkinson

**Exhibit 16   Page 30**

MICHAEL TYLER

1  MICHAEL TYLER
2  offered to represent me legally, I felt that that was
3  something in good conscience I could accept and then
4  feel like I was able to testify knowing that I had
5  legal representation.
6      Q.  Did you need to know any of the particulars
7  of the case at any level before you could decide how
8  you wanted to proceed?
9      A.  I knew that it was a patent case, and I knew
10 that -- I guess it was Gateway and Lucent were
11 involved in it.
12     I really had no knowledge of any more detail
13 than that.
14     Q.  So you didn't at all --
15     A.  Well, I knew it was about touch-sensitive
16 technology, because that was the article that was
17 referenced.
18     Q.  Okay.  Did you ask any questions of
19 Mr. Atkinson or any other Dechert lawyers — and,
20 again, prior to you -- October 2007, about the
21 substance or the merits of the case in any way?
22     A.  No.
23     Q.  So what factors did you consider in
24 determining whether you would be represented by the
25 Dechert lawyers?

1  MICHAEL TYLER
2      A.  As opposed to?
3      Q.  Maybe being represented by the Lucent
4  lawyers and responding to my phone call.
5      A.  That's an interesting question.
6      I think that I had had a fairly friendly
7  conversation with Mr. Atkinson the first time I spoke
8  with him.  We chatted a bit about how he found me and
9  so on after all those years and so on, and he seemed
10 to be a reputable person who I felt was trustworthy
11 and would not put me in a position of compromising my
12 integrity in any way.
13     I had no judgment about you one way or the
14 other.  I wasn't entirely sure, to be honest, whose
15 side you were on or who was really suing whom or
16 whatever, but since I was becoming aware that there
17 was a lawsuit going on and that it might be a more
18 involved event than I expected, and here was somebody
19 who had expressed some personal interest, I thought,
20 okay, I'm just not going to make my life hard.
21     Q.  Okay.  That's good.  You saved me from
22 asking my question of whether you thought I wasn't
23 friendly.  So I won't go there.
24     I need to work on my phone-message skills.
25     So during any of the one or two substantive

1  MICHAEL TYLER
2  conversations that you had with the Dechert lawyers
3  prior to October of '07, did you ever discuss the
4  patent or patents at issue in this case?
5      A.  Well, I'm -- I'm not a patent attorney, so
6  it would have been a kind-of-wasted-on-me discussion.
7      I was aware that there was apparently some
8  patents regarding touch-screen technology that
9  somebody was suing somebody over.
10     Q.  Okay.
11     A.  It was not until -- during the period before
12 I was represented, I wasn't even clear who was suing
13 whom, but I knew there was a lawsuit and it was about
14 touch-screen patents of some sort.
15     Q.  Okay.  Did you ever discuss the subject of
16 "prior art"?
17     MR. BAKER:  I assume you mean prior to the
18 beginning of any attorney-client --
19     MR. HAYES:  Yeah.
20     Again, all --
21     THE WITNESS:  I understood that.
22     MR. HAYES:  -- my questions now are prior to
23 October of 2007.
24     THE WITNESS:  I don't remember whether it was
25 made explicit or not in this conversation, but I got

1  MICHAEL TYLER
2  the general idea that there may have been something
3  in an article that I had written which might be used
4  by one side or the other regarding "prior art," which
5  is a term that I had some vague sense, from watching
6  TV shows, meant something related to patents.
7  BY MR. HAYES:
8      Q.  Okay.  What is your understanding sitting
9  here today of the meaning of "prior art"?
10     A.  As a casual person, not as a lawyer, it
11 would refer to some kind of technology or product or
12 something that was -- that existed prior to some
13 other company staking a patent claim on it.
14     Q.  Okay.  So did you ever talk to any of the
15 Dechert lawyers, again, prior to October 2007, on
16 whether or not your article was prior art to a patent
17 or any of the patents at issue in this case?
18     A.  I don't think so.  I think they wanted to --
19 I think they had indicated to me that they were
20 interested in the article.
21     Q.  Okay.
22     A.  And in anything I knew about it.
23     But I don't think that they discussed any
24 detail as to -- I say "they."  It was actually only
25 Mr. Atkinson.

Exhibit 16   Page 31

Page 122

MICHAEL TYLER

2  Q.  Mm-hmm.
3  A.  I don't think that he discussed any detail
4  of what specifically might have been relevant about
5  the article or whether it was used to corroborate or
6  to contradict or anything else.  I did not get into
7  that level of detail.
8  Q.  Okay.
9  A.  I, frankly, at that point thought this is
10  very amusing, but I've got better things to do with
11  my time.
12  Q.  Sure.  Fair enough.
13  Did you ever do any analysis on whether or
14  not your article disclosed what was in a patent or
15  patents at issue in this case?
16  A.  No.  I'm not a patent lawyer.  I never
17  attempted to examine what patents existed either then
18  or now.
19  Q.  Okay.  Did you ever have any conversations
20  about what product or products are accused of
21  infringing a patent or patents at issue in this case?
22  A.  No.
23  MR. BAKER:  Again, you're asking about before the
24  attorney-client relationship?
25  THE WITNESS:  With that -- everything I'm saying

Page 123

MICHAEL TYLER

1  here is -- is in this initial conversation before
2  being represented.  The answer was no.
4  BY MR. HAYES:
5  Q.  Okay.  Besides Mr. Atkinson, was there any
6  other lawyers or anyone you can remember that you
7  talked to prior to October of '07 about this case?
8  A.  No.
9  It's possible Mr. Baker may have chimed in
10  on a voice mail at some point.  I don't think so.
11  Q.  Okay.
12  A.  And I -- I'm quite certain there were no
13  other law firms, just the -- the two firms
14  represented here.  And, as far as I know, it was just
15  that one or two conversations with Mr. Atkinson.
16  Q.  Okay.  Is it fair to say that you haven't
17  performed any invalidity or infringement analysis in
18  this case?
19  A.  I don't even know what those are.
20  Q.  Okay.  Fair enough.  Fair enough.
21  I don't know if I've asked this or not:  Are
22  you aware of any -- what the accused products are in
23  this case?
24  A.  No, I'm not.
25  MR. HAYES:  With that, I think I'm done for now.

Page 124

MICHAEL TYLER

2  MR. BAKER:  Okay.  Should we go off the record
3  for a moment or two?
4  MR. HAYES:  Okay.
5  THE VIDEOGRAPHER:  Going off the record, the time
6  is 1:16 p.m.
7  (Discussion off the record.)
8  (Exhibit Nos. 20 through 22 were marked for
9  identification.)
10  THE VIDEOGRAPHER:  We're back on the record.  The
11  time is 1:21 p.m.
12  Please begin.
13  -oOo-
14  EXAMINATION
15  BY MR. BAKER:
16  Q.  Could you please tell us your name.
17  A.  My name is Michael Tyler.
18  Q.  Mr. Tyler, what was your job back in 1983?
19  A.  I was the -- in 1983, I was the first new
20  products editor and, later, assistant news editor of
21  Datamation magazine.
22  Q.  And what were your job responsibilities?
23  A.  As new products editor, it was to review all
24  of the new products hardware and software that
25  affected computers and information systems in the

Page 125

MICHAEL TYLER

1  corporate environment as they came out to the -- to
2  be used by corporations.
3  As assistant news editor, I was also
4  responsible for reporting -- developing, reporting
5  and writing news articles on a very frequent basis
6  and later editing other people's articles as well.
7  Q.  What years did you work at Datamation
8  magazine?
9  A.  I worked there from June of 1982 -- or
10  July -- from summer of 1982 through summer of 1985.
11  Q.  While you were working at Datamation
12  magazine, did you ever have an opportunity to see a
13  demonstration of a Chemical Bank computer system for
14  currency trading?
15  A.  Yes.
16  MR. HAYES:  Objection, leading question.
17  THE WITNESS:  I saw many demonstrations of many
18  things while I was there.  One of them was a
19  foreign-exchange trading system that -- at Chemical.
20  BY MR. BAKER:
21  Q.  What, if any, opportunity did you have to --
22  Just to rephrase the question, what, if any,
23  opportunity did you ever have to view a Chemical Bank
24  computer system during your period working at

**Exhibit 16  Page 32**

Page 126

MICHAEL TYLER

1          MICHAEL TYLER
2   Datamation magazine?
3       MR. HAYES: Same objection.
4       THE WITNESS: There was a period in the late
5   summer, early fall of 1983 when I was writing --
6   developing and writing and reporting an article on
7   touch-sensitive-screen technology, in which I was
8   able to -- to see a touch-sensitive system
9   demonstrated at Chemical Bank.
10  BY MR. BAKER:
11      Q.  And can you describe the circumstances that
12  led you to see a demonstration of the Chemical Bank
13  currency trading system.
14      A.  In the course of reporting this article on
15  touch-sensitive screens, I spoke with several of the
16  manufacturers and vendors of those systems and asked
17  to see them in operation so that I would understand
18  how they would be used and how customers more broadly
19  might be able to think about using them.
20          And one of the vendors, a company called
21  Interactive Images, did connect me with Chemical
22  Bank, and I believe with Merrill Lynch as well, to
23  see demonstrations of that -- of their product in
24  operation.
25      Q.  Mr. Tyler, let me show you a document that's

Page 127

MICHAEL TYLER

1          MICHAEL TYLER
2   been marked as Exhibit Number 20 and ask you whether
3   you recognize this document.
4       A.  I do recognize it.
5       Q.  And what is it?
6       A.  This is a photocopy of the front cover and
7   several pages of Datamation magazine's January 1984
8   issue.
9       Q.  And what --
10          What's contained within this document?
11      A.  You've got the front cover, the table of
12  contents, a page with an advertisement and the
13  masthead showing who the various editors and
14  reporters were and then what looks to be the full
15  text of an article entitled "Touch Screens: Big Deal
16  or No Deal?" which I wrote and was published in that
17  magazine, and a couple photographs in the back.
18      Q.  And how do you recognize this document?
19      A.  Because I created it. I wrote the article.
20  I remember that -- the headline. I see my byline,
21  and I recognize that as -- as the typeface and -- and
22  graphic design of Datamation magazine. I know that
23  to be genuine.
24      Q.  And what's the date of this article?
25      A.  This was in the January 1984 issue.

Page 128

MICHAEL TYLER

1          MICHAEL TYLER
2       Q.  Let me show you another document that's been
3   marked as Exhibit Number 21 and ask you the same
4   question, as to whether you, first of all, recognize
5   this document.
6       A.  I do recognize it. Let me just page through
7   it.
8           (Witness reviewing document.)
9       Q.  When you get a chance, can you just tell us
10  generally what that exhibit is.
11      A.  Yeah. Give me a moment, please.
12          (Witness reviewing document.)
13          The second document you gave me is exactly
14  the same as the first, although the pages are in a
15  slightly different order.
16      Q.  So it's another copy of the same --
17      A.  Yeah.
18      Q.  -- article?
19          And do you recognize it --
20          How do you recognize this document?
21      A.  Well, it's -- it's Datamation magazine. I
22  worked there for three years. I know what it looks
23  like. And, in fact, I quite remember the artwork
24  both on the cover and on the inside, as well as the
25  article that I wrote.

Page 129

MICHAEL TYLER

1          MICHAEL TYLER
2       Q.  Okay. Let me show you another exhibit,
3   actually a photograph that's been marked as Exhibit
4   Number 22.
5       A.  Okay.
6       Q.  And let me ask you do you recognize this
7   photograph?
8       A.  I do recognize this photograph. I believe
9   it's a -- an enlargement of the photograph that's on
10  page 152 of the magazine, or at least an enlargement
11  of a portion of that photograph.
12      Q.  And how do you recognize this photograph?
13      A.  Well, I can compare it to the magazine and
14  see that it's exactly the same thing.
15      Q.  And does this photograph fairly and
16  accurately show a screen shot of the Chemical Bank
17  currency trading system as it existed during the
18  demonstration you referred to in the fall of 1983?
19      A.  Yes, it does.
20      Q.  I'd like to ask you some questions about the
21  operation of the Chemical Bank system --
22      A.  Okay.
23      Q.  -- with reference to the photograph.
24          And if you can hold up the photograph, that
25  may help --

**Exhibit 16   Page 33**

MICHAEL TYLER

1    A. I will.
2    Q. -- your testimony.
3        Can you explain what is shown on the right
4    half of the screen in this photograph.
5    A. Sure. So --
6    MR. HAYES: Objection, vague, calls for a
7    narrative.
8    THE WITNESS: If I can hold the screen like this,
9    is that okay?
10       Can you see that?
11   THE VIDEOGRAPHER: Mm-hmm.
12   THE WITNESS: Okay. So what I described in the
13   article and what you can see here is that if you look
14   where the pencil is, you can, roughly speaking,
15   divide the screen vertically there.
16       And just for the purposes of discussion and
17   guiding the reader through the operation of this
18   system, I could then talk about what's happening on
19   the right side versus what was happening on the left
20   side.
21       And so on the right side you can see the
22   lighter -- what's shown on this photograph as
23   lighter-colored -- those are words (indicating) --
24   are essentially labels that could be used, and it's a

MICHAEL TYLER

1    little difficult to read, but that one says "Buy" and
2    "Sell" --
3    (Reporter interruption.)
4    THE WITNESS: It says, "Buy," B-u-y, "Sell,"
5    S-e-l-l. There's one that's called "U.S. Rate,"
6    something that says "Broker," something that says
7    "Customer" and "Location," and so on.
8        And those are just labels that would
9    correspond to a foreign-exchange transaction that
10   previously had been done using paper based or some
11   other technology. It's the standard elements you
12   would need to fill in on -- on any kind of
13   transaction report.
14       To the right of that, it's a little
15   difficult to see, but there are some words printed in
16   a darker color, which might have been orange in real
17   life, as opposed to yellow or something like that
18   (indicating), which are the actual value or the
19   actual data.
20       So, for example, if it says "Location," the
21   darker print might say New York. Or if it were to
22   say "Customer," then the darker print would actually
23   have the name of the bank's customer for this
24   particular transaction.

MICHAEL TYLER

1    BY MR. BAKER:
2    Q. Now, did the Chemical Bank system include a
3    "Broker" field?
4    A. It --
5    MR. HAYES: Objection --
6    THE WITNESS: -- did.
7    MR. HAYES: Objection, lacks foundation.
8    THE WITNESS: As I described a moment ago, there
9    are several of these labels (indicating) on the
10   lighter-colored ink on the right side -- the
11   lighter-colored display on the right side, one of
12   which does have the word "Broker," which would
13   indicate that the space next to that would show the
14   specific broker through which this particular
15   transaction would have been effected.
16   BY MR. BAKER:
17   Q. What happened when the user selected the
18   "Broker" field?
19   A. If the user were to touch the word "Broker"
20   (indicating), then two things happened: The first is
21   that the word "Broker" itself would change color. I
22   don't remember offhand if it got simply brighter and
23   bolder or if it turned a different color, but it did
24   something immediately which told you, the user, that

MICHAEL TYLER

1    it recognized that you wanted to do something with
2    "Broker" and that you didn't mishit and hit something
3    else instead.
4        Secondly, on the left-hand side, where
5    currently there's -- there's a keyboard shown,
6    instead of showing a keyboard, it would have shown a
7    list of all the brokers that Chemical Bank did
8    business with so that you could then reach over and
9    touch one of them and that "Broker" would then be
10   selected, and it would then show up -- on the
11   right-hand side, in the darker print here, next to
12   the word "Broker," it would have then shown to
13   broker that you selected.
14   Q. And does your article describe the operation
15   of the "Broker" field?
16   MR. HAYES: Objection, vague, lacks foundation.
17   THE WITNESS: The article does not specifically
18   say this is the software code that happens.
19       What the article does say in detail is --
20   and you'll find this on -- the magazine, page 148, in
21   the third column, about halfway down that column,
22   does describe what happens if you were to touch the
23   screen where it says "Broker."
24   BY MR. BAKER:

**Exhibit 16   Page 34**

Page 134

MICHAEL TYLER

1
2  Q.  And what does it say about what happens when
3  you touch the "Broker" field?
4  A.  What it says is when the user hits the
5  "Broker" cell, as I just -- as I just showed, on the
6  right, a list of brokers appears on the left.  Then
7  the trader hits the name of the broker to be involved
8  in the current trade, and that information is entered
9  into the system, meaning that the computer
10  acknowledge -- will then know that you want to trade
11  with that particular broker, and simultaneously it
12  shows you that on the right side of the screen so
13  that you know that the button you pushed was received
14  correctly by the computer.  Because if you thought
15  you were pushing Merrill Lynch, but your finger
16  slipped and you hit some other broker instead, it
17  would show the wrong broker's name and you would then
18  need to go back and say nope, made a mistake, redo
19  it.
20  Q.  Okay.  Let me ask you about the "Exchange
21  Rate" field.  Did the Chemical Bank system include an
22  "Exchange Rate" field?
23  MR. HAYES:  Objection, leading.
24  THE WITNESS:  The Chemical Bank system included
25  several labels down the left-hand side of the right

Page 135

MICHAEL TYLER

1
2  section of the screen, some of them were the "Buy" --
3  said "Buy," meaning who is the buyer here.  Some --
4  or one said "Sell," who is the seller in this
5  particular transaction.
6  There was one for "Exchange Rate."  In fact,
7  I believe the "Exchange Rate" was quoted both
8  ways; for example, both dollars -- U.S. dollars per
9  British pound and British pounds per U.S. dollar.  It
10  also showed the total value of the transaction, the
11  number of dollars being traded, as well as,
12  therefore, the number of, let's say, British pounds.
13  It's not just -- you're not just buying one at a
14  time.
15  It shows the "Broker."  It shows who the
16  customer is, which institution you're doing this on
17  behalf of, who the broker is, as we said, the
18  location of where the trade is actually taking place,
19  and so on.
20  So there are -- there are quite a few items
21  that a trader, in the course of executing a trade,
22  needed to identify.
23  BY MR. BAKER:
24  Q.  Okay.  So focusing specifically on the
25  "Exchange Rate" field, can you describe what happened

Page 136

MICHAEL TYLER

1
2  when the user selected the "Exchange Rate" field.
3  A.  Sure.
4  If you were to hit the "Exchange Rate"
5  button, or cell -- if you touched the computer in
6  that area, then the next step would be that the
7  computer wants you to tell it, excuse me -- excuse me
8  for a moment.
9  (Witness drinking water.)
10  If you were to touch the screen where it
11  says "Exchange Rate," then the next step is the
12  computer would want to know, okay, what exchange
13  rate; for example -- and I'm not a currency trader,
14  so I have no idea whether these numbers make any real
15  sense, but let's say you wanted to buy British pounds
16  and you wanted to pay $1.61 per British pound, but
17  you weren't willing to pay $1.62 per British pound,
18  that's more money than you think it's worth -- and
19  banks really do operate on tenths of pennies, let
20  alone actual cents.  Since you can't write in by hand
21  1/6th whatever, you would touch the word "Exchange
22  Rate," and then on the left side a keypad would come
23  up, or a visual representation of a keypad, which
24  would have the numbers 1 -- zero through 9 on it, and
25  probably a decimal point and maybe a dollar sign or a

Page 137

MICHAEL TYLER

1
2  couple other things, and then you would be able to,
3  on the left-hand side of the screen, touch 1.62,
4  let's say, or 1.61, whatever the number was, click an
5  "Enter" key, as you would on -- on an ATM today, and
6  then the number you put in would show up on the right
7  side in the darker color next to the "Exchange Rate"
8  label so that you knew that the computer had
9  understood you're buying at $1.61 and not $1.62 or
10  not at some other number.
11  Q.  And what does your article say about the
12  operation of the "Exchange Rate" field?
13  MR. HAYES:  Objection, vague.
14  THE WITNESS:  I'll just read you what is actually
15  in the article, and make of it what you wish.
16  It says, "For exchange rates and other
17  numerical data" -- and, again, I'm reading from the
18  third column halfway down on page 148.  "For exchange
19  rates and other numerical data, the user hits the
20  proper cell on the right and then types in the
21  numeric data on the keypad that appears on the left.
22  In this way an entire transaction can be completed
23  directly on the workstation."
24  BY MR. BAKER:
25  Q.  Okay.  Mr. Tyler, I'd like to change topics

**Exhibit 16   Page 35**

MICHAEL TYLER

1
2  for a moment and ask you about whether you have any
3  financial interest in the outcome of this case?
4      A.  None whatsoever.  It makes no difference to
5  me, from a financial or any other point of view, what
6  the outcome of this case is.
7      Q.  Are you receiving any reimbursement for your
8  time or expenses in this case?
9      A.  I am being reimbursed for my time.  I have
10  incurred no expenses, and I don't expect to.
11      Q.  And how is your reimbursement rate
12  determined?
13      A.  It was determined simply as the average
14  compensation per hour that I've received from work
15  over the last five years, just plain and simple
16  average as I would get for any other work.
17      Q.  Is your reimbursement dependent on the
18  content of your testimony or the outcome of the case?
19      A.  No, it is not, and I would never agree to
20  that.
21      Q.  And can you explain why are you being
22  reimbursed for your time.
23      A.  I'm a professional investor and capitalist,
24  and I believe that my time has value.  This is
25  professional work for me.  It relates to work I did

MICHAEL TYLER

1
2  for my career at that time, and I think it's only
3  fair and appropriate that I be paid for work that I'm
4  doing.
5      Q.  Okay.  Let me --
6      A.  It's taking me away from my current work,
7  for that matter.
8      Q.  Okay.  Let me turn back to the Datamation
9  article and ask you some general questions about
10  Datamation.
11      Could -- first of all, could you just
12  explain what is Datamation magazine?
13      A.  Datamation magazine was launched in 1957 at
14  the beginning of the computer age, or close enough to
15  it.  Its purpose in life was to target the corporate
16  executives who managed computer systems for their
17  corporations or for large government entities or
18  similar entities, what would today be called the
19  enterprise space.
20      Specifically, the magazine was aiming at --
21  to report on the management of information and how
22  companies did that and how vendors created systems
23  that enabled companies to do so.  So it was a -- very
24  management driven, very focused on the large
25  corporate space, large companies, banks,

MICHAEL TYLER

1
2  manufacturers, that kind of company, as well as the
3  providers of these systems.
4      Q.  And what was the representation of
5  Datamation magazine back in 1984?
6      A.  I don't like to brag, but it was -- it was
7  the preeminent publication at that time for the
8  enterprise or corporate space.
9      It also controlled its circulation, meaning
10  that you had to qualify in order to receive the
11  magazine.  It wasn't available on newsstands.
12      It was nationally available.  It had -- it
13  was open to anybody who was sufficiently connected to
14  their company's information systems department or to
15  vendors and developers of communication -- of
16  equipment, so it -- its reputation was quite good.
17      Q.  And approximately how many subscribers did
18  Datamation magazine have back in January of 1984?
19      A.  I don't remember the exact number.  I
20  believe it was in the general vicinity of around a
21  hundred thousand, give or take a fairly wide range.
22      Q.  Now, did any companies in the
23  financial-services industry read Datamation magazine
24  in 1984?
25      MR. HAYES:  Objection, calls for speculation.

MICHAEL TYLER

1
2      THE WITNESS:  I do know that --
3      MR. BAKER:  Let me --
4      THE WITNESS:  Okay.
5      MR. BAKER:  Let me just rephrase the question.
6      Q.  Were there any companies in the
7  financial-services industry that were subscribers to
8  Datamation magazine in 1984?
9      MR. HAYES:  Same objection.
10      THE WITNESS:  Let me put it this way:
11  Financial-services companies are among the most
12  intensive users of information systems anywhere on
13  the planet, because when money is your only product,
14  the information regarding that is both highly
15  sensitive and highly important and needs to be very
16  reliable and very quickly available.
17      So banks, investment banks,
18  financial-services firms of all types are among the
19  most intensive users of management information
20  systems and always have been, and since Datamation
21  was aimed at the corporate users of information
22  systems, banks and the like were a fairly large
23  percentage of Datamation's subscriber base.
24      And because it was controlled circulation,
25  we knew exactly who read the magazine.  We knew

**Exhibit 16   Page 36**

MICHAEL TYLER

1  exactly what portion of the companies -- of the
2  magazine's readership was in financial services and
3  at what level within the organization.
4       Now, I don't remember any of that myself.
5  It's 20-some-odd years ago, and I wasn't on the
6  business side, per se, but they collected that
7  information for advertising, to set advertising
8  rates, and -- and it was known, and, yes, banks were
9  very substantial portions of the subscriber base.
10 BY MR. BAKER:
11      Q.  And at the time were you personally aware of
12 the characteristics of the subscriber base of
13 Datamation magazine?
14      A.  Oh, yes.  I knew who -- who -- who I was
15 writing to.
16      Any writer ought to know who they're writing
17 to.
18      Q.  And what was the basis for your knowledge?
19      A.  I had seen the advertising presentations
20 that Datamation would have made to its advertisers so
21 that I knew the statistics at that time, or at least
22 I had been shown the statistics to show roughly what
23 their advertising base looks like.
24      This was not particularly guarded

MICHAEL TYLER

1  information.
2       Q.  Now, have you heard of a company called
3  Solomon Brothers?
4       A.  Yes, I have.
5       Q.  What kind of business was --
6       A.  Solomon Brothers no longer exists.  It's now
7  part of CitiGroup.
8       At the time, Solomon was an independent
9  company, as far as I know.  It was engaged as a
10 investment bank, meaning it provided advice and
11 counsel of a financial and economic basis to large
12 corporations.  It helped them issue stock and issue
13 bonds.  Solomon was known at the time as one of the
14 largest bond trading companies and one of the largest
15 foreign-exchange trading companies that -- those were
16 among its specialties.
17      Q.  Now, were people at Solomon Brothers a
18 subscriber to Datamation magazine in 1984?
19      MR. HAYES:  Objection to the extent it calls for
20 speculation.
21      THE WITNESS:  People at every major commercial
22 and investment bank subscribed to Datamation in 1984,
23 and that would include Solomon.
24 BY MR. BAKER:

MICHAEL TYLER

1       Q.  What kind of person at Solomon Brothers
2  would have been a reader of Datamation magazine?
3       MR. HAYES:  Objection, vague, calls for
4  speculation.
5       THE WITNESS:  Datamation aimed to talk to a vice
6  president or director level, as well as the -- what
7  was only then becoming known as the chief information
8  officer.  In fact, Datamation helped popularize that
9  term.
10      It was not aimed at the person who wrote the
11 software code or the person who created the detailed
12 innards of a system, but it was aimed at someone who
13 was able to say, for example, "Did you see what our
14 competitor over there is doing?  That's pretty
15 interesting.  Why can't we do that?"  And then direct
16 someone to get it done.
17 BY MR. BAKER:
18      Q.  So you may have already addressed this, but
19 could you just explain why did companies like Solomon
20 Brothers subscribe to Datamation magazine?
21      A.  I think there are essentially two major
22 reasons why any corporation would subscribe to
23 Datamation, and then there's a separate group of --
24 of customers -- of subscribers, namely the providers

MICHAEL TYLER

1  of information systems, meaning the computer
2  manufacturers, software companies.  So let's put them
3  aside for the moment.
4       Corporate readers, such as banks and auto
5  manufacturers and trading companies and government
6  agencies and so on, subscribe for two basic reasons:
7  One, they want to know what is current in their field
8  so that they are staying up to date with product and
9  technology trends; and, two, they'd like to know what
10 their customers -- what their competitors are doing.
11      And so if Ford read an article that showed
12 what GM was doing in its computer room, Ford would
13 have a lot of interest in that.  They may or may not
14 do something, but they'd sure be interested.
15      And, likewise, the manufacturers and
16 software companies and other providers of information
17 services and products used Datamation to keep current
18 on what their competitors and suppliers and customers
19 were doing in this field so that they could, again,
20 stay current and know what -- what was happening
21 around them.
22      Q.  Now, do you know whether AT&T Bell Labs was
23 a subscriber to Datamation magazine back in 1984?
24      MR. HAYES:  Objection to the extent it calls for

MICHAEL TYLER

1       MICHAEL TYLER
2  speculation.
3    THE WITNESS: I don't know the name of any
4  specific person who would have been a subscriber or
5  not, but I do know that AT&T Bell Labs was a
6  subscriber -- or at least people at AT&T Bell Labs
7  were subscribers.
8     They were -- because they were local -- they
9  were in New Jersey, we were in New York -- we
10  frequently discussed story ideas with them and we
11  knew that they were a very talented group of people.
12    You can find them as sources of stories
13  throughout Datamation.
14  BY MR. BAKER:
15    Q.  And you may have already touched on this,
16  but could you explain a little further why do
17  companies like AT&T Bell Labs subscribe to Datamation
18  magazine?
19    A.  They wanted to know what their competitors
20  are doing, as providers of information systems.  They
21  want to know what is current in the field, and to
22  some degree they want to toot their own horn too.
23  And they want to see what their customers are
24  demanding as well.
25    Q.  Turning back to the article that you wrote

MICHAEL TYLER

1       MICHAEL TYLER
2  for a moment, which is Exhibit 20, can you explain
3  when would subscribers have received this issue of
4  Datamation magazine?
5    A.  This issue is dated January 1984.  They
6  would have received that toward the tail end of
7  December.  Or possibly with the Christmas holidays
8  and all, they might have received it in early January
9  of 1984.  So tail end December '83 to very early
10  January '84.
11    Q.  Okay.  Let me shift topics a little bit
12  and -- and talk further about the demonstration of
13  the Chemical Bank system, which you had mentioned
14  previously.
15    First of all, when did that demonstration
16  take place?
17    A.  That demonstration took place most likely
18  in -- in September or October of 1983.
19    Q.  And where did the demonstration of the
20  Chemical Bank system take place?
21    A.  It took place at Chemical Bank's facility in
22  New York.
23    Q.  And what was the purpose of the
24  demonstration?
25    A.  Quite simply, to show me this particular

MICHAEL TYLER

1       MICHAEL TYLER
2  application of touch-sensitive technology.
3    It was quite clear that I had initiated it,
4  in the form of asking the -- the people who made
5  Easel -- I had asked them to see their product in
6  use.
7    They knew that I was developing a story
8  on -- reporting a story for a publication.  And
9  everybody else knew that the whole purpose of my
10  going there was to flesh out the reporting for a
11  story that would appear in Datamation magazine.
12    Q.  And what was your -- your role or your
13  involvement in the actual demonstration?
14    A.  I -- well, I was the audience, so to speak.
15  They were -- they were showing me what it could do.
16    But I was also a very interactive audience
17  member, asking them to show me things that weren't
18  necessarily going to be part of their demonstration,
19  but that I was curious about and that I wanted to --
20  to test to make sure that what I was being shown
21  wasn't just some -- some pretty little picture, but
22  actually was a fully functional product.
23    Q.  And who else was present at the
24  demonstration?
25    A.  There was at least one representative of the

MICHAEL TYLER

1       MICHAEL TYLER
2  Interactive Images company that makes Easel.  There
3  was a demonstrator from Chemical Bank.  And I
4  believe, but I can't be certain, that there was also
5  one other higher-level person at Chemical Bank, whose
6  primary reason was to discuss not just how it was
7  created, but why Chemical wanted to use it and -- and
8  also make sure I didn't ask things that I wasn't
9  allowed to ask.
10    Q.  Now, when Chemical Bank demonstrated the
11  system to you, did they know that you were going to
12  be writing an article about their currency-trading
13  system?
14    A.  Absolutely, positively.
15    I -- Datamation was a very well-known
16  publication, especially among the people who would be
17  involved in a demonstration of technology.  It was
18  well understood that I was a reporter, not an
19  advertising executive or anybody else, and that what
20  I was doing was reporting a story that would be
21  published.
22    Q.  Do you recall there being any
23  confidentiality agreement regarding the
24  demonstration?
25    A.  I am quite certain there was none.

**Exhibit 16   Page 38**

Page 150

MICHAEL TYLER

1
2    Q.   And were there any restrictions on what you
3    could say about the system that you saw?
4    A.   No.  They -- everybody understood that when
5    a reporter is on the case, so to speak, they are free
6    to write what they see.
7         There are times today that a press agent
8    will say you can't ask so-and-so about such and such
9    or you can't discuss, you know, where a celebrity
10   lives in any detail, or something like that.
11        But in the trade press, none of that ever
12   applied, so I was -- everyone knew that I was
13   completely free to use anything that I saw, and they
14   knew exactly that this would be published no earlier
15   than, let's say, December or January of that -- that
16   winter.
17   Q.   Can you describe generally what features you
18   saw demonstrated.
19   A.   What I saw demonstrated was the complete
20   execution of a trade, a foreign-exchange transaction,
21   from the time that the trader received a phone call,
22   let's say, some customer said I want you to buy "X"
23   number of dollars' worth of "Y" currency, how that
24   would be implemented, how that would be entered into
25   the system, what kind of feedback the trader got and

Page 151

MICHAEL TYLER

1
2    how it would show up as an executed trade and then
3    how the trader could also go through his history of
4    previously executed trades.
5    Q.   What about the operation of the -- the
6    "Broker" field?
7    A.   I was able to see that -- as part of this
8    demonstration, when it came to time enter the
9    "Broker" who would be executing the transaction, that
10   if -- if you touched the section of the screen
11   labeled "Broker," the list of brokers did, in fact,
12   come up.  You were able to touch the name of the
13   broker you wanted to use.  That name was somehow
14   captured by the system and reflected back on the
15   screen on the right-hand section next to the word
16   "Broker."
17   Q.   And what about the "Exchange Rate" field?
18   A.   Essentially the same thing.  When you
19   touched the "Exchange Rate" field to enter the
20   exchange rate, instead of a list of brokers coming up
21   on the left, a numeric keypad came up on the left.
22   You could type in the exchange rate that you wanted
23   and then hit the enter key, and you could -- you
24   could and did make clear whether you were talking
25   about dollars per currency, per foreign currency or

Page 152

MICHAEL TYLER

1
2    foreign-currency unit per dollar.
3    Q.   And does your article accurately describe
4    the features that you saw demonstrated that day?
5    A.   Yes.
6    Q.   And did the user interface work properly
7    during the demonstration?
8    MR. HAYES:  Objection, vague as to "properly."
9    THE WITNESS:  The user interface that I saw
10   worked exactly as I described it in the article.
11        There were no period -- there was no time
12   that I could remember that you would have pushed or
13   touched one section of the screen and what was
14   supposed to happen didn't happen.  If there were,
15   that would have been newsworthy, would have made it
16   into the article, there would have been a little
17   sentence somewhere saying, well, when the system is
18   completed and when the bugs are ironed out, then
19   blah, blah, blah is supposed to happen, but during a
20   demonstration for a reporter present, they still had
21   a few problems.  I would have said something like
22   that if there were problems.
23        There were none.  It worked perfectly.
24   BY MR. BAKER:
25   Q.   So just to be clear, did you see any

Page 153

MICHAEL TYLER

1
2    problems or errors or any -- anything like that
3    during the demonstration?
4    A.   No, I did not.
5         It's possible that somebody may have
6    mistyped a number or something and hit the backspace
7    key, but that -- that's a user problem.  That's not a
8    machine problem.  The machine worked fine.
9    MR. BAKER:  Okay.  Thank you very much,
10   Mr. Tyler.
11   THE WITNESS:  You're welcome.
12   MR. HAYES:  Just a few follow-up questions.
13   MR. BAKER:  Just a minute.  Can we just go off
14   the record for a second?
15   MR. HAYES:  Sure.
16   THE VIDEOGRAPHER:  Going off the record, the time
17   is 1:54 p.m.
18        (Recess taken.)
19   THE VIDEOGRAPHER:  We're back on the record.  The
20   time is 1:57 p.m.
21        Please begin.
22   BY MR. BAKER:
23   Q.   Mr. Tyler, you may recall that Lucent's
24   counsel asked you a few questions about an issue of
25   parallax.

**Exhibit 16  Page 39**

Page 154

MICHAEL TYLER

2 Do you remember that?

3 A. Yes.

4 Q. I was wondering if you could please clarify
5 whether parallax was a problem -- or to what extent
6 it was a problem with resistive-membrane-based touch
7 screens.

8 A. There are four different kinds of -- of
9 touch screens that I describe in the article, which
10 use a variety of different technologies.

11 Of the four, there were two that I described
12 that the touch-screen membrane or -- or a material
13 was directly affixed to the glass of the display
14 screen, one of those being resistive membrane. Those
15 have the least problem with parallax, because the
16 distance between what is on the inside of the glass
17 of the computer to the distance -- to the outside of
18 where you'd actually touch it was the smallest.

19 Things that involved infrared rays or other
20 things would be farther -- sticking out farther into
21 the room, so to speak, and thus create more of a
22 parallax problem.

23 So I don't really think, in my own judgment,
24 that parallax was really going to be an issue for any
25 of those technologies, but it was the least relevant

Page 155

MICHAEL TYLER

2 for the -- for the resistive memory.

3 Q. What does your article say about the issue
4 of parallax as it relates to the resistive-membrane
5 technology?

6 A. At the bottom of what's magazine page 152,
7 it says, "Capacitive sensing and resistive membrane
8 touch panels" -- those are two different kinds of
9 technology -- "are in effect part of the crt face,"
10 in other words, it's physically attached to the glass
11 of -- of the computer screen, not separate from them,
12 "so the parallax effect is reduced; yet even with
13 these technologies the thickness of the crt's face
14 causes some parallax," in other words, the glass of
15 the computer screen itself does have some depth to
16 it, so there would be some parallax, it says. And
17 "Moreover, critics charge that resistive membranes
18 have been known to slide slightly from their original
19 location, also causing parallax."

20 Q. And do you agree with what you wrote in the
21 article about the parallax and the resistive-membrane
22 technology?

23 A. I think that was -- I think that was a fair
24 representation.

25 MR. BAKER: Okay. Thank you very much. No

Page 156

MICHAEL TYLER

2 further questions.

3 MR. HAYES: Just a few follow-up questions,
4 Mr. Tyler.

5 -oOo-

6 FURTHER EXAMINATION

7 BY MR. HAYES:

8 Q. Do any of your answers in response to
9 Mr. Baker's questions here today in any way change
10 any of your answers from earlier today in response to
11 my questions?

12 A. I'm not aware of any inconsistency and --
13 and if -- if you think there is any, then please let
14 me know.

15 Q. No, I'm not suggesting that there is. I
16 just want to know was it -- was it your intent --
17 intent in answering Mr. Baker's questions today in
18 any way to change any of your answers from earlier
19 today in response to my questions?

20 A. I responded to all questions to the best of
21 my ability and with as much accuracy as I could, so I
22 don't think that the questions that either of you
23 asked would have influenced the other.

24 Q. Okay. If you could please turn to what's
25 been marked as Exhibit 20, which is a copy of your

Page 157

MICHAEL TYLER

2 Datamation magazine which bears Bates numbers GW-LT
3 422215 through 422224. And I'd particularly like to
4 call your attention to the last two pages of this
5 exhibit, which bear Bates numbers GW-LT 422223,
6 422224.

7 A. Yes.

8 Q. These appear to be blow-ups of a picture
9 that was included in your article, correct?

10 A. Correct.

11 Q. Were these blow-ups included with the
12 distribution of the original magazine article in
13 1984?

14 A. No, they weren't.

15 The original magazine, though, was obviously
16 a much better resolution and a clear color photograph
17 as opposed to the black-and-white photocopy.

18 Q. I understand that maybe there -- that
19 they're being included today because they're a little
20 bit clearer than --

21 A. Right.

22 Q. -- and bigger than the -- than the picture
23 that's in the magazine, but I just wanted to be clear
24 that these two blow-ups were, in fact, not included
25 with the magazine that was distributed in 1984.

**Exhibit 16   Page 40**

MICHAEL TYLER

1  A.  They were not, which is actually why in the
2  text of the article I spent a couple of paragraphs
3  describing what you can actually see on this screen
4  in the blow-up.
5  Q.  Okay.  If you would turn to what's been
6  marked as Exhibit 21, and the same -- I'm going to
7  ask you the same question again about the last two
8  pages.
9      Again, this exhibit is marked MSLT_1228716
10  through MSLT_1228724.  And, again, the last two pages
11  appear to be blow-ups of the pictures that were
12  included in the original magazine article, and my
13  question then is were these blow-ups on MSLT_1228723
14  and 1228724 included in the original distribution of
15  the magazine article in 1984?
16  A.  Page MSLT_1228723 was included exactly as
17  shown.  That's a different picture from the one we
18  were discussing a moment ago.
19  Q.  Mm-hmm.
20  A.  And that was essentially a pose created,
21  designed just to -- to attract the reader's
22  attention.
23      The next page, 1228724, is, again, an
24  enlargement of the actual photograph which was shown

MICHAEL TYLER

1  in the magazine on -- magazine page 152, which was
2  Exhibit 1228721.
3  Q.  Okay.  But it wasn't -- wasn't, in fact,
4  included in the original distribution of the
5  magazine, correct?
6  A.  The enlargement was not, that's correct.
7  Q.  Okay.  I'd now like to call your attention
8  to what was marked as Exhibit 22.
9      In response to some of Mr. Baker's questions
10  earlier, I think you -- you went through a
11  description of the functionality of this screen.
12  A.  Yes.
13  Q.  Is that accurate, yes?
14  A.  Yes.
15  Q.  And is it fair to say that your description
16  of the functionality of this screen was based on
17  either your magazine article or your memory from 23
18  or 24 years ago?
19  A.  Yes.  It -- my description of the screen was
20  based on my memory of using the screen and seeing it
21  demonstrated, confirmed by reading in the magazine
22  what I had reported at the time.
23      The -- the magazine article was a
24  contemporaneous description of exactly what I had

MICHAEL TYLER

1  seen at that time.
2  Q.  And to the extent that you expanded upon
3  what was written in the article or added any
4  additional description, that additional testimony of
5  yours sitting here today was based on your memory
6  from 23 or 24 years ago; is that correct?
7  A.  It was based on -- you know, there are a lot
8  of things that you see in -- in any given instance,
9  and for me the ones that were interesting were the
10  technology and the application.  So I didn't really
11  pay attention to what color the room was or whether
12  the -- the person sitting next to me was young or old
13  or anything else, but I was really having fun with
14  what the system could do, and so that made a much
15  deeper impression to me than -- than other aspects of
16  the demonstration might have.
17  Q.  But that impression on your mind of -- of
18  the -- what the system could do happened 23 or 24
19  years ago, correct?
20  A.  Well, the demonstration was in, let's call
21  it, the early fall of -- of 1983, so, yeah, 24 years,
22  roughly.
23  Q.  Okay.  I think you said earlier that
24  Datamation magazine, in your opinion, was considered

MICHAEL TYLER

1  a preeminent magazine; is that right?
2  A.  That is correct.
3  Q.  And what do you base that opinion on?
4  A.  Its advertising rates were higher than for
5  any competitive publication, it had been around
6  longer, it was -- its readership base was at a higher
7  level within the corporate hierarchy than for many of
8  its competitive magazines, and, frankly, the more
9  subtle anecdotal pieces fit into place as well.  When
10  there were -- for example, when a press conference
11  was held and a company had six seats at the dais
12  table to sit next to the CEO, Datamation almost
13  always got one of those seats, just as an -- as an
14  example.
15  Q.  I think you testified earlier, in response
16  to a question from Mr. Baker, that you knew that AT&T
17  Bell Labs were subscribers of Datamation magazine; is
18  that correct?
19  A.  Yes.
20  Q.  What was that answer based on?
21  A.  It was based on having spoken -- to in the
22  course of my reporting on various stories over the
23  years or having seen other reporters talking to --
24  Bell Labs and speaking to people at industry

Exhibit 16  Page 41

Page 162

MICHAEL TYLER

1    conferences and conventions, reporting stories and so
2    on. There were people I came across who worked at
3    AT&T Bell Labs and subscribed to Datamation.
4    Q. So is it fair to say that that answer was
5    based on conversations you had had with AT&T and/or
6    Bell Labs employees?
7    A. Among other things, yes.
8    Q. What are the other things?
9    A. Knowing that just as every major commercial
10   bank, every major investment bank was -- had people
11   in it who subscribed to Datamation, so, too, every
12   major provider of data processing, information
13   systems, computers, terminals, software, all of
14   them -- virtually every major company had customers
15   who had readers of Datamation within them.
16   Q. You said you sometimes conversed with or
17   maybe talked to folks at AT&T Bell Labs about
18   articles or an article you were preparing for
19   Datamation magazine; is that correct?
20   A. Yes, it is.
21   Q. Did you ever visit AT&T or Bell Labs
22   facilities into New Jersey?
23   A. I -- once or twice, yes.
24   Q. When you were there, did you see a copy of

Page 163

MICHAEL TYLER

1    Datamation magazine with an AT&T or Bell Labs address
2    on it?
3    A. To say the least, that would not have been
4    something I paid attention to.
5    Q. So is it fair to say your answer is no?
6    A. My answer is I may or may not have --
7    MR. BAKER: Objection.
8    THE WITNESS: -- seen it, but I sure as heck
9    wouldn't remember one way or the other.
10   BY MR. HAYES:
11   Q. Okay. So you have no --
12   You have no memory of seeing a Datamation
13   magazine addressed to AT&T or Bell Labs?
14   A. No.
15   And I wouldn't imagine people typically
16   leave that out on their desk to say, hey, look, we
17   read your magazine, you know.
18   Q. I think you testified earlier that when you
19   saw the demonstration of the Easel foreign-exchange
20   front end --
21   A. I'm sorry. Could I just ask you to --
22   interrupt for one moment and then ask your question?
23   Q. Yeah.
24   A. I just want to look at something first.

Page 164

MICHAEL TYLER

1    (Witness reviewing document.)
2    Okay. I was just double checking something.
3    Go ahead.
4    Q. I think you testified earlier, in response
5    to one of Mr. Baker's questions, that when you
6    observed the foreign-exchange front end and/or Easel
7    operating that day at the Chemical Bank in September
8    or October of '83, you didn't see any problems or
9    errors with its operation; is that correct?
10   A. That's correct.
11   Q. Is it possible that there was functionality
12   from the system that you didn't see that might have
13   had errors?
14   A. That is always possible.
15   When you do a demonstration of a technology,
16   you can't possibly hit every single button in every
17   single sequence that's conceivable of. That would
18   take forever.
19   That's why in testing these products
20   companies do simulations as opposed to rigorous
21   every-last-possibility kind of testing. And that's
22   true for demonstrations as well.
23   Q. I think you mentioned earlier that
24   oftentimes when you went out to watch these

Page 165

MICHAEL TYLER

1    demonstrations that the demonstrators had a script
2    that they most wanted you to see; is that correct?
3    A. No, I didn't say that.
4    I said they may have had a script which may
5    have been in their head or it may have been written
6    down, but they -- if someone is demonstrating a
7    product to you, they clearly want to show off what
8    they think are the best features of their product, so
9    they make sure to do so.
10   And as a potential user of a product or as
11   someone reporting on that, I want to see more of it
12   than that and I want to see what happens when you do
13   something unusual, in the same way that if I'm going
14   to test drive a vehicle that I'm about to purchase,
15   I'm going to want to do something that the showroom
16   salesman probably didn't want me to do with the car,
17   but I'm going to do it anyway.
18   Q. Right.
19   In your opinion, you know, would it have
20   been logical to assume that the demonstrators wanted
21   to show off the best features and not the problems or
22   errors with the system?
23   A. That's certainly what I would imagine a
24   demonstrator would want to show off.

**Exhibit 16   Page 42**

Page 166

MICHAEL TYLER

2 It's not the only thing that I saw, though.
3 Q. Fair enough.
4 What knowledge did you have of any one of
5 the subscribers to Datamation magazine having
6 actually read this article that was marked as
7 Exhibit 1, 20 and 21 today?
8 A. I don't have personal firsthand knowledge
9 that anybody outside Datamation read it or didn't
10 read it, but I do know that Datamation regularly
11 surveyed its subscriber base to gather information
12 about which departments and which specific articles
13 were read in aggregate by percentages of readers and
14 cross-tabbed against various types of positions they
15 held within their -- their companies and so on as
16 part of its market research so that it could sell ads
17 to a known -- to a known audience or for a known
18 readership audience.
19 Q. If Lucent asked you to come to trial in this
20 case, would you be willing to come?
21 A. If the trial were in San Francisco, I could
22 probably work it out reasonably easily.
23 I don't believe that's the case, and let's
24 cross that bridge when and if we get to it.
25 That's really a function of I have a

Page 167

MICHAEL TYLER

2 business to manage and I owe my investors and my
3 customers the duty of my care to them.
4 MR. HAYES: Fair enough. I don't have any more
5 questions.
6 MR. BAKER: I have just one follow-up question.
7 Mr. Tyler, did the features of the Chemical
8 Bank currency trading system that you saw
9 demonstrated appear to work properly during the
10 demonstration?
11 THE WITNESS: Yes. All of the features that I
12 saw demonstrated or that I asked to be
13 shown/demonstrated did appear to work perfectly.
14 MR. BAKER: Okay. No further questions.
15 THE VIDEOGRAPHER: This concludes the deposition
16 of Michael Taylor -- or Michael Tyler. The number of
17 DVDs used was two.
18 The original DVDs will be retained at TSG
19 Reporting, located at 747 Third Avenue, 28th Floor,
20 New York, New York 10017.
21 Going off the record, the time is 2:14 p.m.
22 (The deposition proceedings concluded at
23 2:14 p.m.)
24 ----------------
25 MICHAEL TYLER

Page 168

MICHAEL TYLER

2 STATE OF CALIFORNIA          )
3                              )  ss
4 COUNTY OF SAN MATEO          )
5 I hereby certify that the witness in the
6 foregoing deposition of MICHAEL TYLER, was by me duly
7 sworn to testify to the truth, the whole truth and
8 nothing but the truth, in the within-entitled cause;
9 that said deposition was taken at the time and place
10 herein named; that the deposition is a true record of
11 the witness' testimony as reported by me, a duly
12 certified shorthand reporter and a disinterested
13 person, and was thereafter transcribed into
14 typewriting by computer.
15 I further certify that I am not interested
16 in the outcome of the said action, nor connected
17 with, nor related to any of the parties in said
18 action, nor to their respective counsel.
19 IN WITNESS WHEREOF, I have hereunto set my
20 hand this 28th day of December, 2007.
21
22
----------------
23 MELINDA M. IBANEZ, CSR #10686
24 STATE OF CALIFORNIA
25

Page 169

1 NAME OF CASE:
2 DATE OF DEPOSITION:
3 NAME OF WITNESS:
4 Reason Codes:
5 1. To clarify the record.
6 2. To conform to the facts.
7 3. To correct transcription errors.
8 Page _____ Line _____ Reason _____
9 From _____ to _____
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25

**Exhibit 16   Page 43**