

David A. Hahn, SBN 125784
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone (619) 235-2100
Facsimile  (619) 235-2101

Attorneys for *Lucent Technologies Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,

      Plaintiffs and Counterclaim-Defendants,

      v.

GATEWAY, INC. and GATEWAY COUNTRY
STORES LLC, GATEWAY COMPANIES, INC.,
GATEWAY MANUFACTURING LLC and
COWABUNGA ENTERPRISES, INC.,

      Defendants and Counter-claimants,

and

MICROSOFT CORPORATION,

      Intervenor and Counter-claimant,

MICROSOFT CORPORATION,

      Plaintiff and Counter-Defendant,

      v.

LUCENT TECHNOLOGIES INC.,

      Defendant and Counter-claimant.,

LUCENT TECHNOLOGIES INC. and
MULTIMEDIA PATENT TRUST,

      Plaintiffs,
      v.

DELL INC.,

      Defendant.

Case No. 07-CV-2000 H (CAB)
consisting of matters severed from
consolidated cases:
02-CV-2060 B (CAB)
03-CV-0699 B (CAB)
03-CV-1108 B (CAB)

**LUCENT'S MEMORANDUM OF
CONTENTIONS OF FACT AND
LAW**

Date:      February 20, 2008
Time:      9:00 A.M.
Courtroom:  13, 5th Floor

Honorable Marilyn L. Huff

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................1

LUCENT'S CONTENTIONS OF MATERIAL FACT ...........................................1

I.      The Parties .........................................................................................1

II.     The Fleming '759 Patent......................................................................3

        A.      The Teaching Of The Asserted Claims Of The Fleming '759 Patent.....................3

        B.      Infringement Of The Asserted Claims Of The Fleming '759 Patent.....................6

        C.      Validity Of The Asserted Claims Of The Fleming '759 Patent...........................23

        D.      Enforceability Of The Asserted Claims Of The Fleming '759 Patent.................28

III.    The Day '356 Patent ..........................................................................30

        A.      The Teaching Of The Asserted Claims Of The Day '356 Patent .........................30

        B.      Infringement Of The Asserted Claims Of The Day '356 Patent .........................35

        C.      Validity Of The Asserted Claims Of The Day '356 Patent. ...............................51

IV.     The Agulnick '295 Patent ..................................................................57

        A.      The Teaching Of The Asserted Claims Of The '295 Patent................................57

        B.      Infringement of the Asserted Claims Of The Agulnick '295 Patent ....................59

        C.      Validity of the Asserted Claims of the Agulnick '295 Patent .............................72

V.      Validity Of Multimedia Patent Trust ...................................................78

        A.      Lucent's Decision Not To Participate In MPEG-LA....................................78

        B.      Lucent's Attempts To License The Defendants To The Video Coding Patents....79

        C.      Alcatel Makes An Independent Decision To Join MPEG LA ...............................79

        D.      Lucent's Merger With Alcatel ...................................................................80

        E.      The Formation Of MPT ...........................................................................82

        F.      The Structure And Operation Of MPT ......................................................84

VI.     Damages...........................................................................................86

        A.      Damages For Infringement Of The Fleming '759 Patent ..................................89

        B.      Damages For Infringement Of The Day '356 Patent.........................................92

        C.      Damages For Infringement Of The Agulnick '295 Patent..................................95

POINTS OF LAW ............................................................................................98

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                                 i

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

VII.  Issues On Which Lucent Bears The Burden Of Proof ......................................................98
        A.    Infringement.................................................................................................98
        B.    Damages.....................................................................................................104
VIII.  Issues On Which Defendants Bear The Burden Of Proof ...............................................110
        A.    Validity .....................................................................................................110
        B.    Enforceability............................................................................................127
        C.    Trust-Related State-Law Claims ...............................................................132

ABANDONED ISSUES ..............................................................................................................136

EXHIBITS TO BE OFFERED BY LUCENT ............................................................................136

WITNESSES TO BE OFFERED BY LUCENT ........................................................................136

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT    ii    Case No. 07-CV-2000 H (CAB), consisting of matters severed
AND LAW                                                          from consolidated cases:  02-CV-2060 B (CAB),
                                                                 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1

2

# TABLE OF AUTHORITIES

3

CASES

4

*A.B. Dick Co. v. Burroughs Corp.,*
   713 F.2d 700 (Fed. Cir. 1983)................................................................................99

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
   960 F.2d 1020 (Fed. Cir. 1992).......................................................................*passim*

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.,*
   828 F. Supp. 1386 (E.D. Wis. 1993), *aff'd,* 52 F.3d 1062 (Fed. Cir. 1995).........128

*ACS Hospital Sys., Inc. v. Montefiore Hospital,*
   732 F.2d 1572 (Fed. Cir. 1984)...........................................................................109

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.,*
   1996 WL 621830 (D. Del. Oct. 21, 1996), *aff'd,* 228 F.3d 1338 (Fed. Cir. 2000)...............109

*Ajinomoto Co. v. Archer-Daniels-Midland Co.,*
   1998 WL 151411 (D. Del. Mar. 13, 1998) .............................................113, 114

*Akron Polymer Container Corp. v. Exxel Container, Inc.,*
   148 F.3d 1380 (Fed. Cir. 1998)...........................................................................126

*Alpex Computer Corp. v. Nintendo Co. Ltd.,*
   102 F.3d 1214 (Fed. Cir. 1996)............................................................................98

*Am. Standard Inc. v. Pfizer Inc.,*
   722 F.Supp. 86 (D. Del. 1989).............................................................................114

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
   725 F.2d 1350 (Fed. Cir. 1984)..................................................................109, 110

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
   314 F.3d 1313 (Fed. Cir. 2003)...........................................................................111

*Amstar Corp. v. Envirotech Corp.,*
   730 F.2d 1476 (Fed. Cir. 1984), *cert. denied,* 469 U.S. 924 (1984).....................99

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.,*
   776 F.2d 281 (Fed. Cir. 1985).............................................................................122

*Atlas Powder Co. v. E.I. DuPont De Nemours,*
   750 F.2d 1569 (Fed. Cir. 1984)...........................................................................111

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

i

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Autogiro Co. of Am. v. United States*,
    384 F.2d 391 (Ct. Cl. 1967) ................................................................................96

*Bandag, Inc. v. Gerrard Tire Co.*,
    704 F.2d 1578 (Fed. Cir. 1983) ..........................................................................107

*Bardin v. Daimler-Chrysler Corp.*,
    39 Cal. Rptr. 3d 634 (Cal. Ct. App. 2006) .........................................................133

*Beckman Instruments, Inc. v. LKB Produkter AB*,
    892 F.2d 1547 (Fed. Cir. 1989) ..........................................................................108

*Bell Communications Research Inc. v. Vitalink Communications Corp.*,
    55 F.3d 615 (Fed. Cir. 1995) ..............................................................................100

*In re Ben Franklin Assocs.*,
    186 F.3d 301 (3d Cir. 1999) ...............................................................................131

*Bio-Technology Gen. CgM. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996) ............................................................................130

*Bowen v. Ziasun Tech., Inc.*,
    11 Cal. Rptr. 3d 522 (Cal. App. Ct. 2004) .........................................................133

*Brucklemeyer v. Ground Heaters, Inc.*,
    445 F.3d 1374 (Fed. Cir. 2006) ..........................................................................114

*Budde v. Harley-Davidson, Inc.*,
    250 F.3d 1369 (Fed. Cir. 2001) ..........................................................................109

*Burroughs Wellcome Co. v. Barr Lab., Inc.*,
    40 F.3d 1223 (Fed. Cir. 1994) ............................................................................116

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
    157 F.3d 1340 (Fed. Cir. 1998) ..........................................................................126

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998) ..........................................................................100

*Catalina Lighting, Inc v. Lamps Plus, Inc.*,
    295 F.3d 1277 (Fed. Cir. 2002) ..........................................................................126

*Coleman v. Dines*,
    754 F.2d 353 (Fed. Cir. 1985) .....................................................................113, 129

*Colorado v. New Mexico*,
    467 U.S. 310 (1984) ............................................................................................109

*Constant v. Advanced Micro-Devices, Inc.*,
    848 F.2d 1560 (Fed. Cir. 1988) ..........................................................................114

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW
                                        ii
Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Continental Can Co. v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991)..................................................................120, 123

*Cooper v. Goldfarb*,
    154 F.3d 1321 (Fed. Cir. 1998)...........................................................................*passim*

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
    868 F.2d 1251 (Fed. Cir. 1989)....................................................................96, 97

*Correge v. Murphy*,
    705 F.2d 1326 (Fed. Cir. 1983)..................................................................................119

*Credle v. Bond*,
    25 F.3d 1566 (Fed. Cir. 1994)....................................................................................124

*In re Cronyn*,
    890 F.2d 1158 (Fed. Cir. 1989)........................................................................113, 114

*Crown Operations Int'l Ltd. v. Solutia, Inc.*,
    289 F.3d 1367 (Fed. Cir. 2002)........................................................................111, 120

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001)..................................................................................104

*Cytologix Corp, v. Ventana Med. Sys.*,
    424 F.3d 1168 (Fed. Cir. 2005)....................................................................................98

*Daugherty v. Am. Honda Motor Co.*,
    51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2007)..............................................................133

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988)........................................................................122, 123

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
    257 F.3d 1364 (Fed. Cir. 2001)....................................................................................99

*Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*,
    720 F. Supp. 397 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990) ...........................98, 101

*DSU Medical Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006) (*en banc*) ............................................................101

*Eagle Comtronics, Inc. v. Arrow Communications Labs., Inc.*,
    305 F.3d 1303 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003)....................100

*eBay Inc. v. MercExchange, L.L.C.*,
    126 S.Ct 1837 (U.S. 2006)..........................................................................................106

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001)....................................................................................97

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW
iii
Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*,
   168 F.3d 28 (Fed.Cir.1999)..................................................................................125

*In re Elsner*,
   381 F.3d 1125 (Fed. Cir. 2004)...........................................................................114

*Enzo Life Sciences, Inc. v. Digene Corp.*,
   270 F.Supp.2d 484 (D. Del. 2003)......................................................................125

*Estee Lauder v. L'Oreal, S.A.*,
   129 F.3d 588 (Fed. Cir. 1997)......................................................................117, 118

*Exxon Research and Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001)...........................................................................124

*Finnigan Corp. v. Int'l Trade Comm'n*,
   180 F.3d 1354 (Fed. Cir. 1999)....................................................................109, 116

*Foster v. Am. Mach. & Foundry Co.*,
   492 F.2d 1317 (2d Cir. 1974)..............................................................................106

*In re Fritch*,
   972 F.2d 1260 (Fed. Cir. 1992)...........................................................................121

*Fujikawa v. Wattanasin*,
   93 F.3d 1559 (Fed. Cir. 1996).............................................................................118

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
   60 F.3d 770 (Fed. Cir. 1995)...............................................................................128

*General Motors Corp. v. Devex Corp.*,
   461 U.S. 648 (1983).............................................................................................105

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970).....................................................................104

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
   45 F.3d 1550 (Fed. Cir. 1995).............................................................................120

*Glaxo Inc. v. Novopharm Ltd.*,
   52 F.3d 1043 (Fed. Cir. 1995).............................................................................110

*Glenayre Elec., Inc. v. Jackson*,
   443 F.3d 851 (Fed. Cir. 2006).............................................................................104

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966)........................................................................................... *passim*

*Hahn v. Wong*,
   892 F.2d 1028 (Fed. Cir. 1989)...........................................................................116

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW
iv
Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*,
   906 A.2d 218 (Del. Ch. 2006)..............................................................................131

*In re Hayes Microcomputer Prods. Patent Litig.*,
   982 F.2d 1527 (Fed. Cir. 1992)..............................................................................96

*Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.*,
   1996 WL 680243 (N.D.Ill. 1996) ........................................................................126

*Heighley v. J.C. Penney Life Ins. Co.*,
   257 F. Supp. 2d 1241 (C.D. Cal. 2003) ...............................................................133

*Hemstreet v. Computer Entry Sys. Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992)............................................................................129

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
   909 F.2d 1464 (Fed. Cir. 1990)............................................................................102

*Hilgraeve Corp. v. Symantec Corp.*,
   265 F.3d 1336 (Fed. Cir. 2001)..............................................................................96

*Hoechst Celanese Corp. v. BP Chemicals Ltd.*,78
   F.3d 1575 (Fed. Cir. 1996) ..................................................................................110

*Horwath v. Lee*,
   564 F.2d 948 (C.C.P.A. 1977) .............................................................................119

*Hybritech Inc. v. Monclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986)...........................................................109, 112, 113

*Imagexpo L.L.C. v. Microsoft Corp.*,
   284 F. Supp. 2d 365 (E.D. Va. 2003) ..................................................................102

*IMX, Inc. v. Lendingtree, LLC*,
   No. Civ.03 1067 SLR, 2007 WL 1232184 (D. Del. April 25, 2007)...................105

*Innovative Scuba Concepts, Inc. v. Feder Industries, Inc.*,
   26 F.3d 1112 (Fed. Cir. 1994)..............................................................................112

*Int'l Glass Co. v. United States*,
   408 F.2d 395 (Ct. Cl. 1969) .................................................................................119

*Intel Corp., v. U.S. Int'l Trade Comm'n*,
   946 F.2d 821 (Fed. Cir. 1991)..............................................................................109

*Intel Corp. v. Via Technologies., Inc.*,
   319 F.3d 1357 (Fed. Cir. 2003)............................................................................124

*Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.*,
   708 F. Supp. 1423 (D. Del. 1989)........................................................................129

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Intervet Am., Inc. v. Kee-Vet Lab., Inc.*,
   887 F.2d 1050,1055 (Fed. Cir. 1989)............................................................................97, 98

*Itron, Inc. v. Benghiat*,
   No. Civ.99-501....................................................................................................................105

*Izumi Prods. Co. v. Kononklijke Philips Elec N.V.*,
   315 F. Supp. 2d 589 (D. Del. 2004)..................................................................................115

*Johns Hopkins Univ. v. Cellpro*,
   894 F. Supp. 819 (D. Del. 1995).......................................................................................101

*Jones v. Hardy*,
   727 F.2d 1524 (Fed. Cir. 1984)...................................................................................97, 109

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006)...........................................................................................121

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
   177 F.3d 968 (Fed. Cir. 1999).............................................................................................97

*Kemco Sales, Inc. v. Control Papers Co.*,
   208 F.3d 1352 (Fed. Cir. 2000)...........................................................................................97

*Kimberly-Clark Corp. v. Johnson & Johnson*,
   745 F.2d 1437 (Fed. Cir. 1984).........................................................................................118

*King Instruments Corp. v. Perego*,
   65 F.3d 941 (Fed. Cir. 1995).............................................................................................103

*Kingsdown Medical Consultants v. Hollister Inc.*,
   863 F.2d 867 (Fed. Cir. 1988)...........................................................................................125

*In re Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004).........................................................................................114

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004).........................................................................................110

*Kopp, Inc. v. United Tech., Inc.*,
   539 A.2d 309 (N.J. Super. 1988) ......................................................................................134

*In re Kotzab*,
   217 F.3d 1365 (Fed. Cir. 2000).........................................................................................121

*Kridl v. McCormick*,
   105 F.3d 1446 (Fed. Cir. 1997).................................................................................116, 117

*KSR Int'l. Co. v. Teleflex Inc.*,
   --- U.S. ---, 127 S. Ct. 1727 (2007)...................................................................120, 121, 122

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

vi

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Laitram Corp. v. Rexnord, Inc.*,
  939 F.2d 1533 (Fed. Cir. 1991)..............................................99

*Lamorte Burns & Co. v. Walters*,
  770 A.2d 1158 (N.J. 2001)..............................................134

*Leopold v. Tuttle*,
  549 A.2d 151 (Pa. Super. 1988)..............................................132

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004)..............................................99

*Lisle Corp., v. A.J. Mfg. Co.*,
  No. 02 C 7024, 2004 WL 765872 (N.D. Ill. April 7, 2004) ..............................................105

*Lock v. Schreppler*,
  426 A.2d. 856 (Del. Super. Ct. 1981) ..............................................132

*Lozano v. AT&T Wireless Servs.*,
  504 F.3d 718 (9th Cir. 2007) ..............................................133

*Lucent Technologies Inc. v. Newbridge Networks Corp.*,
  168 F. Supp. 2d 181 (D. Del. 2001)..............................................102

*Lutzker v. Plet*,
  843 F.2d 1364 (Fed. Cir. 1988)..............................................118

*Mahurkar* v. *C.R. Bard Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996)..............................................112, 113, 115, 117

*Manville Sales Corp. v. Paramount Sys., Inc.*,
  917 F.2d 544 (Fed. Cir. 1990)..............................................101

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ..............................................97, 98

*McGinley v. Franklin Sports, Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001)..............................................109, 110, 120

*Med. Alert Ambulance, Inc. v. Atl. Health Sys., Inc.*,
  2007 WL 2297335 (D.N.J. Aug. 6, 2007) ..............................................134

*Metro. Wire Corp. v. Falcon Prods. Inc.*,
  528 F. Supp. 897 (E.D. Pa. 1981) ..............................................127

*Meyers v. Brooks Shoe, Inc.*,
  912 F.2d 1459 (Fed. Cir. 1990), *overruled* ..............................................129

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*,
  No. CV-S-97-1383-EJW, 2001 WL 34778689 (D. Nev. Aug. 2, 2001) ..............................................105

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                    vii

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Miles Lab., Inc. v. Shandon Inc.*,
   997 F.2d 870 (Fed. Cir. 1993).........................................................................................124

*Minco. Inc. v. Combustion Eng'g. Inc.*,
   903 F. Supp. 1204 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) .......................128

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orhopaedics, Inc.*,
   976 F.2d (Fed. Cir. 1992)...................................................................................97, 110

*Moleculon Research Corp. v. CBS, Inc.*,
   793 F.2d 1261 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987).....................99, 101, 102

*Motorola, Inc. v. Interdigital Tech. Corp.*,
   121 F.3d 1461 (Fed. Cir. 1997).....................................................................................111

*nCube v. Sea Change Int'l, Inc.*,
   313 F. Supp. 2d 361 (D. Del. 2004)...............................................................................102

*Newkirk v. Lulejian*,
   825 F.2d 1581 (Fed. Cir. 1987).....................................................................................118

*North Am. Vaccine, Inc. v. American Cyanamid Co.*,
   7 F.3d 1571 (Fed. Cir. 1993).........................................................................................124

*Northern Telecom Inc. v. Datapoint Corp.*,
   23 U.S.P.Q.2d 1881 (N.D. Tex. 1992)...........................................................................129

*Oak Indus., Inc. v. Zenith Electronics Corp.*,
   726 F. Supp. 1525 (N.D. Ill. 1989) ...............................................................................119

*Odetics Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999)...............................................................................99, 100

*Okajima v. Bourdeau*,
   261 F.3d 1350 (Fed. Cir. 2001).....................................................................................120

*Oney v. Ratliff*,
   182 F.3d 893 (Fed. Cir. 1999).......................................................................................109

*Paice LLC v. Toyota Motor Corp.*,
   No. 2:04-CV-211-DF, 2006 WL 2385139 (E.D. Tex. Aug. 16, 2006)................................107

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
   745 F.2d 11 (Fed. Cir. 1984).........................................................................................100

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
   83 F.2d 931 (Fed. Cir. 1987)...........................................................................................99

*Pentec, Inc. v. Graphic Controls Corp.*,
   776 F.2d 309 (Fed. Cir. 1985).......................................................................................122

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

viii

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Playtex Products, Inc. v. Procter & Bamgle Co.*,
    400 F.3d 901 (Fed. Cir. 2005)................................................................97

*Potash Co. of Am. v. International Minerals & Chem. Corp.*,
    213 F.2d 153 (10th Cir. 1954) ............................................................129

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
    75 F.3d 1558 (Fed. Cir. 1996)............................................................111

*Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*,
    803 F.2d 1170 (Fed. Cir. 1986)..........................................................102

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993).................................................112, 113

*R2 Med. Sys., Inc. v. Katecho, Inc.*,
    931 F. Supp. 1397 (N.D. Ill.1996) ......................................................129

*Ralston Purina Co. v. Far-Mar-Co*,
    772 F.2d 1570 (Fed. Cir. 1985)..........................................................108

*RCA Corp. v. Data Gener. Corp.*,
    701 F. Supp. 456 (D. Del. 1988).........................................................128

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992)..............................................................98

*Refac Int'l, Ltd. v. IBM*,
    798 F.2d 459 (Fed. Cir. 1986)............................................................102

*Regents of University of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997)..........................................................125

*Richardson v. Suzuki Motor Co., Ltd.*,
    868 F.2d 1226 (Fed. Cir. 1989).................................................110, 111

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995).................................................103, 105

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000)............................................................122

*Scognamillo v. Credit Suisse First Boston, LLC*,
    No. C03-2061 THE, 2005 U.S. Dist. LEXIS 20221 (N.D. Cal. Aug. 25, 2005)...................133

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991).................................................110, 125

*Seal-Flex, Inc. v. Athletic Track & Court Construction*,
    172 F.3d 836 (Fed. Cir. 1999).................................................96, 98

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW
ix
Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Sewall v. Walters,*
   21 F.3d 411 (Fed Cir. 1994)......................................................................112, 117

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,*
   758 F.2d 613 (Fed. Cir. 1985).................................................................106, 124

*Speedplay Inc. v. Bebop Inc.,*
   211 F.3d 1245 (Fed. Cir. 2000)......................................................................126

*SRI Int'l, Inc. v. Advanced Tech. Lab., Inc.,*
   127 F.3d 1462 (Fed. Cir. 1997).................................................................107, 108

*SRI Intern. v. Matsushita Elec. Corp.,*
   775 F.2d 1107 (Fed. Cir. 1985)........................................................................98

*Stephenson v. Capano Dev., Inc.,*
   462 A.2d 1069 (Del. 1983) .............................................................................132

*Stiftung v. Renishaw PLC,*
   945 F.2d 1173 (Fed. Cir. 1991)........................................................................99

*Stratoflex, Inc. v. Aeroquip Corp.,*
   713 F.2d 1530 (Fed. Cir. 1983)......................................................................122

*Stryker Corp. v. Davol, Inc.,*
   75 F. Supp. 2d 741 (W.D. Mich. 1999) ..........................................................100

*Stryker Corp. v. Davol, Inc.,*
   75 F. Supp. 2d 746 (W.D. Mich. 1999) .....................................................105, 106

*Symbol Techs., Inc. v. Opticon, Inc.,*
   935 F.2d 1569 (Fed. Cir. 1991)......................................................................123

*Takeda Chem. Indus., LTD v. Alphapharm PTY., Ltd.,*
   492 F.3d 1350 (Fed. Cir. 2007).................................................................120, 121

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.,*
   192 F.3d 1353 (Fed. Cir. 1999)......................................................................105

*Teleflex, Inc. v. Ficosa N. Am. Corp.,*
   299 F.3d 1313 (Fed. Cir. 2002)......................................................................111

*Terarecon, Inc. v Fovia, Inc.,*
   2006 WL 2691405 (N.D. Cal. Sep. 20, 2006) ................................................133

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n.,*
   988 F.2d 1165 (Fed. Cir. 1993)......................................................................123

*The Liposome Co. v. Vestar Inc.,*
   36 U.S.P.Q.2d 1295 (D. Del. 1994)................................................................124

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                          x          Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                            from consolidated cases: 02-CV-2060 B (CAB),
                                                            03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Union Oil Co. v. Atlantic Richfield Co.*,
   208 F.3d 989 (Fed. Cir. 2000)..................................................................................97

*Unisplay S.A. v. American Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995)..................................................................................104

*United States v. Adam*,
   383 U.S. 39 (1966)..................................................................................................121

*Valutron N.V. v. NCR Corp.*,
   33 U.S.P.Q. 2d 1986 (S.D. Ohio 1992), *aff'd without op.*, 5 F.3d 1506 (Fed. Cir. 1993).....128

*Vess v. Ciba-Geigy Corp., USA*,
   317 F.3d 1097 (9th Cir. 2003) ...............................................................................133

*Voda v. Cordis Corp.*,
   No. CIV-03-1512-L, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006)..........................106, 107

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
   721 F.2d 1540 (Fed. Cir. 1983)..............................................................................119

*Wafer Shave, Inc. v. Gillette Co.*,
   857 F. Supp. 112 (D. Mass. 1993), *aff'd without op.*, 26 F.3d 140 (Fed. Cir. 1994)............128

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
   901 A.2d 106 (Del. 2006) .......................................................................................132

*Wang Lab., Inc. v. Mitsubishi Elec. Am. Inc.*,
   30 U.S.P.Q.2d 1241 (C.D. Cal. 1993)......................................................................112

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997)..........................................................................................100, 101

*Water Tech. Corp. v. Calco, Ltd.*,
   850 F.2d 660 (Fed. Cir. 1988).................................................................................101

*Woodland Trust v. Flowertree Nursery, Inc.*,
   148 F.3d 1368 (Fed. Cir. 1998).......................................................................113, 115

*Z4 Technologies, Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007)...............................................................................113

*z4 Techs., Inc. v. Microsoft Corp.*,
   434 F. Supp. 2d 437 (E.D. Tex. 2006)...............................................................106, 107

*Zenith Lab., Inc. v. Bristol-Myers Squibb Co.*,
   19 F.3d 1418 (Fed. Cir. 1994).................................................................................98

**STATUTES**

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

xi

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

6 Del. Code Ann. § 1301(3) and (4) ........................................................................131

Del. Code Ann. § 1304(a)(1) ...................................................................................131

Del. Code Ann. § 1304(a)(2) ...................................................................................130

6 Del. Code Ann. § 1305(a) and (b).........................................................................131

12 Del. Code Ann. § 3806(a) .....................................................................................82

28 U.S.C. § 1961 .....................................................................................................105

28 U.S.C. § 2201 .....................................................................................................107

35 U.S.C. § 102 ..................................................................................................*passim*

35 U.S.C. § 103.............................................................................................120, 121

35 U.S.C. § 112 ..................................................................................................*passim*

35 U.S.C. § 271(a) .............................................................................................*passim*

35 U.S.C. §  271(b) .................................................................................................101

35 U.S.C. § 271(c) .............................................................................................*passim*

35 U.S.C. § 271(f) .............................................................................................36, 37

35 U.S.C. § 282 ..................................................................................................*passim*

35 U.S.C. § 283 .......................................................................................................106

35 U.S.C. § 284........................................................................................103, 105

35 U.S.C. § 285 .......................................................................................................108

35 U.S.C. § 286 .......................................................................................................127

35 U.S.C. § 287 ................................................................................................85, 107

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

xii

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

# INTRODUCTION

Under Local Rule 16.1(f)(2) and this Court's scheduling orders, Lucent Technologies Inc. ("Lucent") hereby submits its Memorandum of Contentions of Fact and Law, which include its pretrial disclosures under Federal Rule of Civil Procedure 26(a)(3). Lucent also incorporates by reference its briefs on summary judgment concerning the Fleming '759 patent, the Day '356 patent, the Agulnick '295 patent, and trust-related claims and defenses.

Lucent notes that it has prepared this Memorandum without the benefit of any pretrial disclosures from the Defendants. Accordingly, Lucent reserves the right to amend or supplement this Memorandum in response to Defendants' disclosures.

## LUCENT'S CONTENTIONS OF MATERIAL FACT

### I.    The Parties

1.    Lucent is a corporation organized under the laws of the state of Delaware with its principal place of business at 600 Mountain Avenue, Murray Hill, NJ 07974. On November 30, 2006, Lucent became a wholly owned subsidiary (now indirect) of Alcatel SA, a corporation organized under the laws of the Republic of France. On the same day, Alcatel SA changed its name to Alcatel-Lucent.

2.    Lucent, now doing business under the umbrella of Alcatel-Lucent, is a leading global supplier of communications equipment, including data, software, voice, and wireless-networking technologies. Researchers at Lucent's Bell Laboratories have developed a wide variety of key innovations that have greatly enhanced the capabilities and utility of personal computers. Common features such as video display, video compression and decompression, and user interfaces have all benefited from Lucent's research and development efforts.

3.    Lucent owns U.S. Patent No. 4,439,759 ("the Fleming '759 patent"); U.S. Patent No. 4,763,356 ("the Day '356 patent"); and 5,347,295 ("the Agulnick '295 patent"), with the right to sue for past infringement.

1    4.   Multimedia Patent Trust ("MPT") is a Delaware Statutory Trust organized under the

2    Delaware Statutory Trust Act, 12 Del. C. §§ 3801 *et seq.*, having as trustee Mr. Gerard A. deBlasi,

3    an individual having a business address of 991 Route 22 West, Bridgewater, NJ 08807.

4    5.   MPT was formed on November 28, 2006 pursuant to a Trust Agreement executed on

5    November 21, 2006.  On November 28, 2006, Lucent and MPT executed a Patent Assignment by

6    which Lucent assigned its entire right, title, and interest in and to the Trust Patents, along with the

7    right to sue for past infringement (including all current and future claims and causes of action).  The

8    Trust Patents include U.S. Patent No. 4,383,272 ("the Netravali '272 patent") and U.S. Patent No.

9    4,958,226 ("the Haskell '226 patent").  On October 1, 2007 this Court held as a matter of law that

10    this assignment was valid and effective.  *See* October 1, 2007 Order.

11    6.   Microsoft Corporation is a corporation organized under the laws of the state of

12    Washington with its principal place of business at One Microsoft Way, Redmond, Washington

13    98052.  Microsoft makes, uses, sells, and offers for sale in the United States, and imports into the

14    United States, software for computer systems, components, and accessories.

15    7.   Dell Inc. is a corporation organized under the laws of the state of Delaware with its

16    principal place of business at One Dell Way, Round Rock, Texas 78682.  Dell makes, uses, sells,

17    and offers for sale in the United States, and imports into the United States, computer systems,

18    components, software, and accessories.

19    8.   Gateway, Inc. is a company organized under the laws of the state of Delaware with its

20    principal place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

21    9.   Gateway Country Stores LLC is a company organized under the laws of the state of

22    Delaware with its principal place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

23    10.  Gateway Companies, Inc. is a company organized under the laws of the state of Delaware

24    with a place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

11. Gateway Manufacturing LLC is a company organized under the laws of the state of Delaware with a place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

12. Cowabunga Enterprises, Inc. is a company organized under the laws of the state of Delaware with a place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

13. Gateway, Inc.; Gateway Country Stores LLC; Gateway Companies, Inc.; Gateway Manufacturing LLC; and Cowabunga Enterprises, Inc. (collectively, "Gateway") make, use, sell, and offer for sale in the United States, and import into the United States, computer systems, components, software, and accessories.

## II.    The Fleming '759 Patent

### A.    The Teaching Of The Asserted Claims Of The Fleming '759 Patent

14. Lucent is the owner of the Fleming '759 patent with the right to sue for past infringement.

15. The Fleming '759 patent relates to a digital image display system that makes use of three modes of access to color data values, one where color is directly specified and two others where colors are specified as indexes into a color memory.  (*See, e.g.,* '759 patent, claim 1)  The inventions of the Fleming '759 patent provide display device independence that enables content providers to create graphics content portable to a variety of display devices regardless of the particular hardware configuration of the devices.

16.  Before the inventions of the Fleming '759 patent in the early 1980's, most commercial information display systems were textual in nature, representing information solely using text characters.  The desire to present information graphically on such display systems led to the use of blocky graphical characters called "block mosaics" from which extremely crude graphical imagery could be constructed.  These initial systems required specific display hardware configurations, and content was therefore limited to those configurations, with each vendor having their own specific,

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                          3                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                          from consolidated cases:  02-CV-2060 B (CAB),
                                                                                          03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  fixed configuration incompatible with that of other vendors.  Display devices tended to be single

2  function, single resolution devices, operating in a particular manner and no other.  If one wanted to

3  increase the resolution or increase the number of colors, one had to physically modify the hardware.

4      17. Recognizing the limitations of these systems, the inventors of the Fleming '759 patent

5  invented the technology of the Fleming '759 patent at AT&T Bell Labs.  One application for the

6  inventions of the Fleming '759 patent was videotex systems.  As the Fleming '759 patent explains,

7  videotex systems enabled customers to access a remote host computer and associated database with a

8  digital image display terminal.  (Fleming '759 patent, col. 1, lns. 39-42)  The technology of the

9  Fleming '759 patent became the basis of the North American Presentation Layer Protocol Syntax

10  (NAPLPS), the display device independent videotex protocol used in North America that allowed

11  content providers to create graphics content portable across any device that supported the protocol.

12      18. Asserted claim 1 of the Fleming '759 patent reads as follows:

13      1. In a digital image display system:

14      a memory for storing color data values;

15      processing means responsive to a predetermined command and data
16      sequence comprising at least one command, the processing means
17      decoding the predetermined command and data sequence, the
18      predetermined command and data sequence selecting one of a plurality of
19      modes of access to color data values, the modes comprising

20      a first mode of access wherein an in-use foreground color is directly
21      specified as a color data value;

22      a second mode of access wherein the in-use foreground color is specified
23      as an index into the color memory; and

24      a third mode of access wherein the in-use foreground color and an in-use
25      background color are specified as indexes into the color memory; and

26      display means responsive to the processing means, the display means
27      displaying the colors associated with the color data values accessed by the
28      selected mode.

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT    4    Case No. 07-CV-2000 H (CAB), consisting of matters severed
AND LAW                                              from consolidated cases:  02-CV-2060 B (CAB),
                                                     03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

19. Claim 1 thus includes a number of different elements.  First, claim 1 includes a memory, or color memory, for storing color data values.   Second, claim 1 includes a processing means responsive to a predetermined command and data sequence comprising at least one command, which selects one of a plurality of modes of access to color data values.  In a first mode of access, an in-use foreground color is directly specified as a color data value; in a second mode of access, the in-use foreground color is specified as an index into a color memory; and in a third mode of access, the in-use foreground color and an in-use background color are specified as indexes into the color memory. The court construed the terms "memory" and  "color memory" as "a color map that stores a table of color data values indexed by numbers," construed the term "in-use foreground color" as "a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed," and construed the term "in-use background color" as "a color that will be used as the background color for subsequently received text and graphics drawing commands until changed." The court also construed the "processing means" to have the following corresponding structure under 35 U.S.C. § 112, ¶ 6:

> Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (See, Col.5, line 60 - Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43)

20. Asserted claim 2 of the Fleming '759 patent reads as follows:

> 2. A digital image display system comprising:
>
> a color memory for storing color data values;
>
> processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value in the color memory; and

display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode.

21. Claim 2 includes a color memory as claim 1, and also includes a processing means responsive to predetermined command and data sequences that selects a mode of access to the color memory and sets a color data value in the color memory.  The Court construed the corresponding structure for the mode-selecting function of claim 2 to be the same as the corresponding structure for the mode-selecting function of claim 1.  The Court construed the corresponding structure for the color-setting function of claim 2 as follows:

Data processor 1 programmed to perform the algorithm shown in Fig.  5: boxes 501, 504, 506, 508, and 510 (See, Col.  7, lines 1except for "The 4-17 (except for "or (2) in color mode 0, for setting"), Col.  7, lines 53-64 (sequence of boxes 501, 504, 506, 508, and 510 is")).

22. Asserted claim 3 depends from claim 2 and includes the following additional limitation: "wherein the processing means responsive to a second command sets plural color data values in color memory."  The Court construed the corresponding structure for the color-setting function of claim 3 as:

Data processor 1 programmed to perform the algorithm shown in Fig. 5: Boxes 501, 504, 506, 508, and 510 and the line exiting box 510 (See, Col.  7 Lns. 14-17 [except for "or (2) in color mode 0, for setting"], Col.  7, lines 53-65.

**B.    Infringement Of The Asserted Claims Of The Fleming '759 Patent**

23. Lucent contends that all computer systems made, used, sold or offered for sale in the United States, or imported into the United States, by Gateway and Dell between 1998 and May 19, 2001, and that included a Windows operating system (collectively the "Accused Products") contained each and every element of claims 1 through 3 of the '759 patent and therefore literally infringed those claims.  Additionally, Dell and Gateway induced and contributed to the infringement of claims 1-3 to the extent they sold computers without displays.  These computers as sold included

all of the elements of claims 1-3 other than a display, but were ready for connection, and were intended by Gateway or Dell to be connected, to a standard display, and therefore constituted, and were known by Dell and Gateway to constitute, a material part of the invention especially made and adapted for use in an infringement of claims 1-3 with no substantial noninfringing uses.  Dell and Gateway also encouraged their customers to connect their computers to displays.  Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

24. Regarding claim 1, each of the Accused Products includes one or more color memories that store one or more color look-up tables, for example a color look-up table stored in memory in the graphics subsystem, or in system memory as a Windows system or logical palette.  Each of the Accused Products also includes a processor (*e.g.*, the CPU) that can select, based on predetermined BIOS and GDI command and data sequences, one of three modes of access to color data values:  a first mode wherein the in-use foreground color is directly specified as a color data value; a second mode wherein the in-use foreground color is specified as an index into the color memory; and a third mode wherein the in-use foreground and background colors are specified as indexes into the color memory.  These predetermined command and data sequences include patterns of BIOS functions and register values, or Windows GDI commands and parameters.  The Accused Products also include, or are intended to be used with, a display for displaying the colors associated with the mode selected by the processor.  Regarding claims 2 and 3, each of the Accused Products can also set one or more color data values in a color memory in response to BIOS or GDI command and data sequences.

25. Dells' infringement is more particularly explained in the following claim charts, and in the March 31, 2006 Expert Report of Jake Richter:

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| 1.  In a digital image display system: | The Accused Products are digital image display systems.  The Accused Products are compatible with the video |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| | graphics array (VGA) standard (*see, e.g.,* DELL 171883-84, 184294, DELL 260275-76; LUC 1246197-198, LUC 1246170, LUC 1248250, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320, MSLT_0123091; Decker Tr. at 73-80, 85-86, 99, 121, 222-223; Chiappini Tr. at 2050-2051, Chiappini Exs. 4-8; Louie Tr. at 53-54, Louie Exs. 7-25; NVIDIA 00024, 00145, 00285; CREATIVE 000025-26, 000055-56, 000090, 000116, 000135, 000155; Bjernfalk Ex. 6; INTEL 00663, 00677, 01180) and include the Windows Graphics Device Interface (GDI). (*See, e.g.,* DELL 171883-84, DELL 184294, DELL 260276, DELL 232419, DELL 272230, DELL 231100-03; LUC 1246197-98, LUC 1283987-89, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320, MSLT_0123091; Decker Tr. at 64-71; Sykes Tr. at 71; Wong Tr. at 23; Wong Ex. 2.) |
| a memory for storing color data values; | The Accused Products include a graphics subsystem having at least one color map memory. (*See, e.g.,* DELL 184650, 260239; Decker Tr. at 98-100, 123-124; LUC 1288923.) This memory includes a color map that stores a table of color data values (*e.g.,* the red, green, and blue (RGB) color components) indexed by numbers. For example, the Accused Products store color look-up tables or palettes in memory in the video hardware or in system memory as Windows system or logical palettes. (*Id.; see also, e.g.,* LUC 1281057, 1283964; Sykes Tr. at 155-161, 171-173; Wong Tr. at 67-72.) |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | The Accused Products include a processor, such as a central processor and/or a graphics processor, responsive to predetermined command and data sequences, for selecting one of a plurality of modes of access to color data values. (*See, e.g.,* DELL 262572, 264688, 266914.) These predetermined command and data sequences include patterns of BIOS interrupt commands and register values, or GDI commands and parameters, executed by a processor in the infringing system running BIOS or Microsoft Windows. (*Id.; see, e.g.,* Decker Tr. at 91-96; LUC 1281049-81, LUC 1288921-22.) This structure is equivalent to the corresponding structure for the processing means disclosed in the patent specification (a data processor programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4), and any differences are insubstantial. In the Accused Products, a processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to select one of a number of different modes of access to color data values, thus |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
|  | performing the claimed function. For example, the Accused Products support numerous display modes, such as various indexed color, direct color, true color, and alphanumeric display modes. (*See, e.g.,* Decker Tr. at 86-88, 90-91, 100-101; LUC 1270873, LUC 1273246, LUC 1278107-09, LUC 1281046-82, LUC 1288921-22.) These display modes constitute modes of access to color data values because they determine manners of retrieving color data values from memory. The Accused Products include various predetermined command and data sequences for selecting one of the available display modes, for example, through the BIOS software, Microsoft GDI software, and/or video device driver software. For example, the BIOS "Set Video Mode" command may be specified with Interrupt 10h with the AH register set to 00h, in which the data value in the AL register specifies the mode number. (*See, e.g.,* LUC 1273246-50.) As another example, the VESA "Set Extended Video Mode" command may be specified by an application using routines similar to the "SetVBEMode" subroutine in the VESA VBE specification, in which the display mode is specified as a parameter to the subroutine, for example, the value "mode" in the call SetVBEMode(mode). (*See, e.g.,* GW-LT 263528-29, GW-LT 263544; *see also, e.g.*, VESA BIOS Extension (VBE) Core Functions Standard, Version: 3.0, Sep. 16, 1998 at LUC 1278107-09, LUC 1278129-32.) As another example, the Windows command "ChangeDisplaySettings" may be used to select a display mode specified by the "lpDevMode" parameter. (*See, e.g.,* LUC 1281046-48; *see also, e.g.,* "ChangeDisplaySettingsEx" at LUC 1281059-62.) Different modes of access to color data values may also be selected with GDI command and data sequences that specify colors as RGB values or index values, including sequences that use the "SetBkMode," "SetBkColor," "SetTextColor," "SetDCPenColor," or "SetDCBrushColor" commands. (*See, e.g.,* LUC 1281049-81; Sykes Exs. 7-10.) Exemplary illustrations of the above command and data sequences are described below. |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | The Accused Products include a mode of access to color data values in which an in-use foreground color may be directly specified as a color data value. For example, a sequence of GDI commands may be executed in Windows that specifies an in-use foreground color as an RGB color value with the "SetTextColor," "SetDCBrushColor," and "SetDCPenColor" GDI commands. (*See, e.g.,* LUC 1281049-081.) One exemplary GDI command and data |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| | sequence includes the following pattern where a transparent background is set and an in-use foreground color with the RGB values "150,100,200" is specified:<br><br>    SetBkMode(hdc, TRANSPARENT );<br>    SetTextColor(hdc, PALETTERGB( 150, 100, 200))<br><br>Any text drawn after the in-use foreground color is set using either of the exemplary command and data sequences above, via the TextOut() function of Windows for example, will be drawn using the directly specified in-use foreground color of 150, 100, 200 (R,G,B) until changed.  Discovery provided by Dell, Microsoft, and Gateway demonstrate that the Accused Products support these GDI commands and this mode of access.  (*See, e.g.,* Decker Tr.  at 69-70, 146-147; Sykes Tr.  at 71, 184; Sykes Exs.  7-10; Wong Tr.  at 23; Wong Ex.  2; Pike Tr.  at 42-43; Anderson Tr.  at 141-144.) |
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | The Accused Products also include a mode of access to color data values in which an in-use foreground color may be specified as an index into the color memory.  For example, in a 256-color graphics display mode, the "Write Character and Attribute" BIOS command, specified with Interrupt 10h with the AH register set to 09h, specifies an in-use foreground color in the BL register as an index value into the color memory.  (*See, e.g.,* LUC 1270448-53, 1270467, 1273246-50, 1273252-53.)  Similarly, in a 16-color graphics display mode operating in write-mode 3, an in-use foreground color is specified as an index value when loaded into the Set-Reset Register.  (*See, e.g.,* LUC 1270507-08, 1270513-14.)  As another example, a Windows program may execute a sequence of GDI commands that specifies an in-use foreground color as an index value into the color memory with GDI commands such as "SetTextColor," "SetDCBrushColor," or "SetDCPenColor." (*See, e.g.,* LUC 1281049-81; Sykes Tr.  at 183-184, 189; Wong Tr.  at 94.)  One exemplary GDI command and data sequence includes the following pattern where a transparent background is set and an in-use foreground color with an index value "3" is specified:<br><br>    SetBkMode(hdc, TRANSPARENT );<br>    SetTextColor(hdc, PALETTEINDEX( 3 ))<br><br>Any text drawn after the in-use foreground color is set using the exemplary command and data sequence above, via the TextOut() function of Windows for example, will be drawn using the specified in-use foreground color that has an index of 3 until changed.  Discovery provided by Dell, Microsoft, and Gateway demonstrate that the Accused Products support these GDI commands and this mode of access.  (*See, e.g.,* |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| | Decker Tr. at 69-70, 146-147; Sykes Tr. at 71, 184; Sykes Exs. 7-10; Wong Tr. at 23; Wong Ex. 2; Pike Tr. at 42-43; Anderson Tr. at 141-144.) |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | The Accused Products also include a mode of access to color data values in which an in-use foreground color and an in-use background color are specified as indexes into the color memory. For example, in an alphanumeric VGA display mode, the "Write Character and Attribute" BIOS command, specified with Interrupt 10h with the AH register set to 09h, specifies an in-use foreground color and an in-use background color as index values into the color memory. (*See, e.g.,* LUC 1270445-47, 1270456, 1273246-50, 1273252-53.) As another example, a Windows program may execute a sequence of GDI commands that specifies in-use foreground and background colors as index values into the color memory with GDI commands such as "SetBkMode", "SetBkColor", or "SetTextColor." (*See, e.g.,* LUC 1281049-081; Sykes Tr. at 183-184,187-189.) One exemplary GDI command and data sequence includes the following pattern where an opaque background is set and in-use foreground and background colors are specified with index values of "3" and "6" respectively:<br>   SetBkMode(hdc, OPAQUE );<br>   SetTextColor(hdc, PALETTEINDEX( 3 ));<br>   SetBkColor(hdc, PALETTEINDEX( 6 ) )<br>Any text drawn after the in-use foreground and background colors are set using the exemplary command and data sequence above, via the TextOut() function of Windows for example, will be drawn using the specified in-use foreground color that has an index of 3 and the specified in-use background color that has an index of 6 until changed. Discovery provided by Dell, Microsoft, and Gateway demonstrate that the Accused Products support these GDI commands and this mode of access. (*See, e.g.,* Decker Tr. at 69-70, 146-147; Sykes Tr. at 71, 184-190; Sykes Exs. 7-10; Wong Tr. at 23; Wong Ex. 2; Pike Tr. at 42-43; Anderson Tr. at 141-144.) |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | The Accused Products include a display that is the same as a computer monitor, TV, video projection system, LCD, or an LED display, that is responsive to the processing means, and that displays the colors associated with the color data values accessed by the selected mode. (*See, e.g.,* Dell's Second Supplemental Response to Lucent's Interrogatory No. 17; DELL 182996, DELL 263038; LUC 1048717-788; Decker Tr. at 223.) |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| 2. A digital image display system comprising: | The Accused Products are digital image display systems. The Accused Products are compatible with the video graphics array (VGA) standard (*see, e.g.,* DELL 171883-84, 184294, DELL 260275-76; LUC 1246197-198, LUC 1246170, LUC 1248250, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320, MSLT_0123091; Decker Tr. at 73-80, 85-86, 99, 121, 222-223; Chiappini Tr. at 2050-2051, Chiappini Exs. 4-8; Louie Tr. at 53-54, Louie Exs. 7-25; NVIDIA 00024, 00145, 00285; CREATIVE 000025-26, 000055-56, 000090, 000116, 000135, 000155; Bjernfalk Ex. 6; INTEL 00663, 00677, 01180) and include the Windows Graphics Device Interface (GDI). (*See, e.g.,* DELL 171883-84, DELL 184294, DELL 260276, DELL 232419, DELL 272230, DELL 231100-03; LUC 1246197-98, LUC 1283987-89, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320, MSLT_0123091; Decker Tr. at 64-71; Sykes Tr. at 71; Wong Tr. at 23; Wong Ex. 2.) |
| a color memory for storing color data values; | The Accused Products include a graphics subsystem having at least one color map memory. (*See, e.g.,* DELL 184650, DELL 260239; Decker Tr. at 98-100, 123-124; LUC 1288923.) This memory includes a color map that stores a table of color data values (*e.g.,* the red, green, and blue (RGB) color components) indexed by numbers. For example, the Accused Products store color look-up tables or palettes in memory in the video hardware or in system memory as Windows system or logical palettes. (*Id.; see also, e.g.,* LUC 1281057, LUC 1283964; Sykes Tr. at 155-161, 171-173; Wong Tr. at 67-72.) |
| processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; | The Accused Products include a processor, such as a central processor and/or a graphics processor that, responsive to predetermined command and data sequences, selects a mode of access to color memory. (*See, e.g.,* DELL 262572, DELL 264688, DELL 266914.) These predetermined command and data sequences include patterns of BIOS interrupt commands and register values, or GDI commands and parameters, executed by a processor in the infringing system running BIOS or Microsoft Windows. (*Id.; see, e.g.,* Decker Tr. at 91-96; LUC 1281049-81, LUC 1288921-22.) This structure is equivalent to the corresponding structure disclosed in the patent specification (a data processor programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4), and any differences are insubstantial. In the Accused Products, a processor runs an algorithm that decodes the software commands and |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| | evaluates the associated data sequences to select one of a number of different modes of access to color data values. In response to a first command, the processor selects one of a number of different modes of access to the color memory, thus performing the claimed function. For example, the Accused Products support numerous display modes, such as various indexed color and alphanumeric display modes. (*See, e.g.*, Decker Tr. at 86-88, 90-91, 100-101; LUC 1270873, LUC 1273246, LUC 1278107-09, LUC 1281046-82; LUC 1288921-22.) These display modes constitute modes of access to color memory because they determine manners of retrieving color data values from color memory. The Accused Products include various command and data sequences for selecting one of the available display modes, including, for example, through Microsoft operating system software, BIOS software, and/or video device driver software. For example, the BIOS "Set Video Mode" command may be specified with Interrupt 10h with the AH register set to 00h, in which the data value in the AL register specifies the mode number. (*See, e.g.*, LUC 1273246-50.) As another example, the VESA "Set Extended Video Mode" command may be specified by an application using routines similar to the "SetVBEMode" subroutine in the VESA VBE specification, in which the display mode is specified as a parameter to the subroutine, for example, the value "mode" in the call SetVBEMode(mode). (*See, e.g.*, GW-LT 263528-29, 263544; *see also, e.g.*, VESA BIOS Extension (VBE) Core Functions Standard, Version: 3.0, Sep. 16, 1998 at LUC 1278107-09, LUC 1278129-32.) As another example, the Windows command "ChangeDisplaySettings" may be used to select a display mode specified by the "lpDevMode" parameter. (*See, e.g.*, LUC 1281046-48; *see also, e.g.*, "ChangeDisplaySettingsEx" at LUC 1281059-62.) Different modes of access may also be selected with GDI command and data sequences that specify colors as RGB values or index values, including sequences that use the "SetBkMode," "SetBkColor," "SetTextColor," "SetDCPenColor," or "SetDCBrushColor" commands. (*See, e.g.*, LUC 1281049-81; Sykes Exs. 7-10.) |
| and responsive to a second command, setting a color data value in the color memory; and | In response to a second command and data sequence the processor sets a color data value in the color memory. The Accused Products the processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to set a color data value in the color memory. This structure is equivalent to the corresponding structure disclosed in the patent specification |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| | (a data processor programmed to perform the algorithm shown in boxes 501, 504, 506, 508, and 510 of Figure 5), and any differences are insubstantial. In the Accused Products, a processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to set a color data value in the color memory, thus performing the claimed function. For example, the BIOS "Set Individual Palette Register" command may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 00h. (*See, e.g.,* LUC 1273255-59.) The "Set Individual Palette Register" command sets an individual color palette register with a color data value. Alternatively, the BIOS "Set All Palette Registers and Overscan Register" command may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 02h. (*Id.*) The "Set All Palette Registers and Overscan Registers" command sets the color palette with color data values. Alternatively, the BIOS "Set Block of Color Registers" command may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 12h. (*Id.*) The "Set Block of Color Registers" command sets one or more color registers with color data values. Another example is the GDI "SetPaletteEntries" command which can set an individual palette entry with a color data value specified by the "*lppe" parameter. (*See, e.g.,* LUC 1281057.) |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | The Accused Products include a display that is the same as a computer monitor, TV, video projection system, LCD, or an LED display, that is responsive to the processing means, and that displays the colors associated with the color data values accessed by the selected mode. (*See, e.g.,* Dell's Second Supplemental Response to Lucent's Interrogatory No. 17; DELL 182996, DELL 263038; LUC 1048717-788; Decker Tr. at 223.) |

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
| 3. A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory. | *See* Claim 2 Chart above. In response to the second command, the processor may set plural color data values in the color memory. This structure is at least equivalent to the corresponding structure disclosed in the patent specification (a data processor programmed to perform the algorithm of boxes 501, 504, 506, 508, 510, and the line exiting box 510 of Figure 5), and any differences are insubstantial. In the Accused Products a processor runs an algorithm that |

14

| U.S. Patent No. 4,439,759 | Dell Accused Products |
|---|---|
|  | decodes the software commands and evaluates the associated data sequences to set plural color data values in the color memory.  For example, the BIOS "Set All Palette Registers and Overscan Register" instruction may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 02h.  (*See, e.g.,* LUC 1273255-59.)  The "Set All Palette Registers and Overscan Registers" instruction sets the color palette with color data values.  (*See, e.g.,* LUC 1273255-59.)  Alternatively, the BIOS "Set Block of Color Registers" instruction may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 12h.  (*See, e.g.,* LUC 1273255-59.)  The "Set Block of Color Registers" instruction sets one or more color registers with color data values.  Another example is the GDI "SetPaletteEntries" command which can set plural palette entries with a color data values specified by the "*lppe" parameter.  (*See, e.g.,* LUC 1281057.) |

26. Gateway's infringement is more particularly explained in the following claim charts, and in the March 31, 2006 Expert Report of Jake Richter:

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| 1.  In a digital image display system: | The Accused Products are digital image display systems.  The Accused Products are compatible with the video graphics array (VGA) standard (*see, e.g.,* GW-LT 120249, GW-LT 150159, GW-LT 150655-56, GW-LT 148840-41, GW-LT 046945, GW-LT 049095, GW-LT 131188, GW-LT 140886; LUC 1246197-198, LUC 1246170, LUC 1248250, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320; Decker Tr.  at 85-86, 222-223; Schindler Tr.  at 220-222; Chiappini Tr.  at 2050-2051, Chiappini Exs. 4-8; Louie Tr.  at 53-54, Louie Exs.  7-25; NVIDIA 00024, 00145, 00285; CREATIVE 000025-26, 000055-56, 000090, 000116, 000135, 000155; Bjernfalk Ex.  6; INTEL 00663, 00677, 01180) and include the Windows Graphics Device Interface (GDI).  (*See, e.g.,* GW-LT 120290, GW-LT 148840-41, GW-LT 150160-62, GW-LT 150656, GW-LT 049095, GW-LT 007367;  LUC 1246197-98, LUC 1283990-93, LUC 1283997-99, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320; Anderson Tr.  at 55-57, 140-144; Chiappini Tr.  at 2080-2081; Sykes Tr.  at 71; Wong Tr.  at 23; Wong Ex.  2.) |
| a memory for storing color data values; | The Accused Products include a graphics subsystem having at least one color map memory.  (*See, e.g.,* GW-LT 122438, |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| | 122136, 120304, 110524; Decker Tr. at 98-100, 123-124; LUC 1288923.) This memory includes a color map that stores a table of color data values (*e.g.*, the red, green, and blue (RGB) color components) indexed by numbers. For example, the Accused Products store color look-up tables or palettes in memory in the video hardware or in system memory as Windows system or logical palettes. (*Id.; see also, e.g.*, LUC 1281057, 1283964; Sykes Tr. at 155-161, 171-173; Wong Tr. at 67-72.) |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | The Accused Products include a processor, such as a central processor and/or a graphics processor, responsive to predetermined command and data sequences, for selecting one of a plurality of modes of access to color data values. (*See, e.g.*, GW-LT 120304, GW-LT 110524; LUC 009531; Anderson Tr. at 157.) These predetermined command and data sequences include patterns of BIOS interrupt commands and register values, or GDI commands and parameters, executed by a processor in the infringing system running BIOS or Microsoft Windows. (*Id.; see, e.g.*, GW-LT 218860, GW-LT 120290; Anderson Tr. at 55-57, 141, 172-173; Decker Tr. at 91-96; LUC 1281049-81, LUC 1288921-22.) This structure is equivalent to the corresponding structure for the processing means disclosed in the patent specification (a data processor programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4), and any differences are insubstantial. In the Accused Products, a processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to select one of a number of different modes of access to color data values, thus performing the claimed function. For example, the Accused Products support numerous display modes, such as various indexed color, direct color, true color, and alphanumeric display modes. (*See, e.g.,* Decker Tr. at 86-88, 90-91, 100-101; LUC 1270873, LUC 1273246, LUC 1278107-09, LUC 1281046-82, LUC 1288921-22.) These display modes constitute modes of access to color data values because they determine manners of retrieving color data values from memory. The Accused Products include various predetermined command and data sequences for selecting one of the available display modes, for example, through the BIOS software, Microsoft GDI software, and/or video device driver software. For example, the BIOS "Set Video Mode" command may be specified with Interrupt 10h with the AH register set to 00h, in which the data value in the AL |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| | register specifies the mode number. (*See, e.g.,* LUC 1273246-50.) As another example, the VESA "Set Extended Video Mode" command may be specified by an application using routines similar to the "SetVBEMode" subroutine in the VESA VBE specification, in which the display mode is specified as a parameter to the subroutine, for example, the value "mode" in the call SetVBEMode(mode). (*See, e.g.,* GW-LT 263528-29, GW-LT 263544; *see also, e.g.*, VESA BIOS Extension (VBE) Core Functions Standard, Version: 3.0, Sep. 16, 1998 at LUC 1278107-09, LUC 1278129-32.) As another example, the Windows command "ChangeDisplaySettings" may be used to select a display mode specified by the "lpDevMode" parameter. (*See, e.g.,* LUC 1281046-48; *see also, e.g.*, "ChangeDisplaySettingsEx" at LUC 1281059-62.) Different modes of access to color data values may also be selected with GDI command and data sequences that specify colors as RGB values or index values, including sequences that use the "SetBkMode," "SetBkColor," "SetTextColor," "SetDCPenColor," or "SetDCBrushColor" commands. (*See, e.g.*, LUC 1281049-81; Sykes Exs. 7-10.) Exemplary illustrations of the above command and data sequences are described below. |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | The Accused Products include a mode of access to color data values in which an in-use foreground color may be directly specified as a color data value. For example, a sequence of GDI commands may be executed in Windows that specifies an in-use foreground color as an RGB color value with the "SetTextColor," "SetDCBrushColor," and "SetDCPenColor" GDI commands. (*See, e.g.,* LUC 1281049-081.) One exemplary GDI command and data sequence includes the following pattern where a transparent background is set and an in-use foreground color with the RGB values "150,100,200" is specified:<br><br>   SetBkMode(hdc, TRANSPARENT );<br>   SetTextColor(hdc, PALETTERGB( 150, 100, 200))<br><br>Any text drawn after the in-use foreground color is set using either of the exemplary command and data sequences above, via the TextOut() function of Windows for example, will be drawn using the directly specified in-use foreground color of 150, 100, 200 (R,G,B) until changed. Discovery provided by Gateway, Microsoft, and Dell demonstrate that the Accused Products support these GDI commands and this mode of access. (*See, e.g.,* Anderson Tr. at 141-144; Sykes Tr. at 71, 184; Sykes Exs. 7-10; Wong Tr. at 23; Wong Ex. 2; Pike Tr. at 42-43; Decker Tr. at 69-70, 146-147.) |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | The Accused Products also include a mode of access to color data values in which an in-use foreground color may be specified as an index into the color memory.  For example, in a 256-color graphics display mode, the "Write Character and Attribute" BIOS command, specified with Interrupt 10h with the AH register set to 09h, specifies an in-use foreground color in the BL register as an index value into the color memory.  (*See, e.g.,* LUC 1270448-53, 1270467, 1273246-50, 1273252-53.)  Similarly, in a 16-color graphics display mode operating in write-mode 3, an in-use foreground color is specified as an index value when loaded into the Set-Reset Register.  (*See, e.g.,* LUC 1270507-08, 1270513-14.)  As another example, a Windows program may execute a sequence of GDI commands that specifies an in-use foreground color as an index value into the color memory with GDI commands such as "SetTextColor," "SetDCBrushColor," or "SetDCPenColor." (*See, e.g.,* LUC 1281049-81; Sykes Tr.  at 183-184, 189; Wong Tr.  at 94.)  One exemplary GDI command and data sequence includes the following pattern where a transparent background is set and an in-use foreground color with an index value "3" is specified: <br><br>    SetBkMode(hdc, TRANSPARENT ); <br>    SetTextColor(hdc, PALETTEINDEX( 3 )) <br><br> Any text drawn after the in-use foreground color is set using the exemplary command and data sequence above, via the TextOut() function of Windows for example, will be drawn using the specified in-use foreground color that has an index of 3 until changed.  Discovery provided by Gateway, Microsoft, and Dell demonstrate that the Accused Products support these GDI commands and this mode of access. (*See, e.g.,* Anderson Tr.  at 141-144; Sykes Tr.  at 71, 184; Sykes Exs.  7-10; Wong Tr.  at 23; Wong Ex.  2; Pike Tr.  at 42-43; Decker Tr.  at 69-70, 146-147.) |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | The Accused Products also include a mode of access to color data values in which an in-use foreground color and an in-use background color are specified as indexes into the color memory.  For example, in an alphanumeric VGA display mode, the "Write Character and Attribute" BIOS command, specified with Interrupt 10h with the AH register set to 09h, specifies an in-use foreground color and an in-use background color as index values into the color memory. (*See, e.g.,* LUC 1270445-47, 1270456, 1273246-50, 1273252-53.) As another example, a Windows program may execute a sequence of GDI commands that specifies in-use foreground and background colors as index values into the |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
|  | color memory with GDI commands such as "SetBkMode", "SetBkColor", or "SetTextColor." (*See, e.g.,* LUC 1281049-081; Sykes Tr. at 183-184,187-189.) One exemplary GDI command and data sequence includes the following pattern where an opaque background is set and in-use foreground and background colors are specified with index values of "3" and "6" respectively:<br>SetBkMode(hdc, OPAQUE );<br>SetTextColor(hdc, PALETTEINDEX( 3 ));<br>SetBkColor(hdc, PALETTEINDEX( 6 ) )<br>Any text drawn after the in-use foreground and background colors are set using the exemplary command and data sequence above, via the TextOut() function of Windows for example, will be drawn using the specified in-use foreground color that has an index of 3 and the specified in-use background color that has an index of 6 until changed. Discovery provided by Gateway, Microsoft, and Dell demonstrate that the Accused Products support these GDI commands and this mode of access. (*See, e.g.,* Anderson Tr. at 141-144; Sykes Tr. at 71, 184; Sykes Exs. 7-10; Wong Tr. at 23; Wong Ex. 2; Pike Tr. at 42-43; Decker Tr. at 69-70, 146-147.) |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | The Accused Products include a display that is the same as a computer monitor, TV, video projection system, LCD, or an LED display, that is responsive to the processing means, and that displays the colors associated with the color data values accessed by the selected mode. (*See, e.g.,* Gateway's Third Supplemental Response to Lucent's Interrogatory No. 16; GW-LT 120252; LUC 009531, 010904, 011337; Decker Tr. at 223.) |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| 2. A digital image display system comprising: | The Accused Products are digital image display systems. The Accused Products are compatible with the video graphics array (VGA) standard (*see, e.g.,* GW-LT 120249, GW-LT 150159, GW-LT 150655-56, GW-LT 148840-41, GW-LT 046945, GW-LT 049095, GW-LT 131188, GW-LT 140886; LUC 1246197-198, LUC 1246170, LUC 1248250, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320; Decker Tr. at 85-86, 222-223; Schindler Tr. at 220-222; Chiappini Tr. at 2050-2051, Chiappini Exs. 4-8; Louie Tr. at 53-54, Louie Exs. 7-25; NVIDIA 00024, 00145, 00285; CREATIVE 000025-26, 000055-56, 000090, 000116, 000135, 000155; Bjernfalk Ex. 6; INTEL 00663, |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| | 00677, 01180) and include the Windows Graphics Device Interface (GDI).  (*See, e.g.,* GW-LT 120290, GW-LT 148840-41, GW-LT 150160-62, GW-LT 150656, GW-LT 049095, GW-LT 007367;  LUC 1246197-98, LUC 1283990-93, LUC 1283997-99, LUC 1284006, LUC 1284865, LUC 1285849; MSLT_1061320; Anderson Tr.  at 55-57, 140-144; Chiappini Tr.  at 2080-2081; Sykes Tr.  at 71; Wong Tr.  at 23; Wong Ex.  2.) |
| a color memory for storing color data values; | The Accused Products include a graphics subsystem having at least one color map memory.  (*See, e.g.,* GW-LT 122438, GW-LT 122136, GW-LT 120304, GW-LT 110524; Decker Tr.  at 98-100, 123-124; LUC 1288923.) This memory includes a color map that stores a table of color data values (*e.g.,* the red, green, and blue (RGB) color components) indexed by numbers.  For example, the Accused Products store color look-up tables or palettes in memory in the video hardware or in system memory as Windows system or logical palettes.  (*Id.; see also, e.g.,* LUC 1281057, LUC 1283964;  Sykes Tr.  at 155-161, 171-173; Wong Tr.  at 67-72.) |
| processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; | The Accused Products include a processor, such as a central processor and/or a graphics processor that, responsive to predetermined command and data sequences, selects a mode of access to color memory.  (*See, e.g.,* GW-LT 120304, GW-LT 110524; LUC 009531; Anderson Tr.  at 157.)  These predetermined command and data sequences include patterns of BIOS interrupt commands and register values, or GDI commands and parameters, executed by a processor in the infringing system running BIOS or Microsoft Windows.  (*Id.; see, e.g.,* GW-LT 218860, GW-LT 120290; Anderson Tr.  at 55-57, 141, 172-173; Decker Tr.  at 91-96; LUC 1281049-81, LUC 1288921-22.)  This structure is equivalent to the corresponding structure disclosed in the patent specification (a data processor programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4), and any differences are insubstantial.  In the Accused Products, a processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to select one of a number of different modes of access to color data values. In response to a first command, the processor selects one of a number of different modes of access to the color memory, thus performing the claimed function.  For example, the Accused Products support numerous display modes, such as various indexed color and alphanumeric display modes.  (*See, e.g.,* Decker Tr.  at 86-88, 90-91, 100- |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| | 101; LUC 1270873, LUC 1273246, LUC 1278107-09, LUC 1281046-82, LUC 1288921-22.) These display modes constitute modes of access to color memory because they determine manners of retrieving color data values from color memory. The Accused Products include various command and data sequences for selecting one of the available display modes, including, for example, through Microsoft operating system software, BIOS software, and/or video device driver software. For example, the BIOS "Set Video Mode" command may be specified with Interrupt 10h with the AH register set to 00h, in which the data value in the AL register specifies the mode number. (*See, e.g.*, LUC 1273246-50.) As another example, the VESA "Set Extended Video Mode" command may be specified by an application using routines similar to the "SetVBEMode" subroutine in the VESA VBE specification, in which the display mode is specified as a parameter to the subroutine, for example, the value "mode" in the call SetVBEMode(mode). (*See, e.g.*, GW-LT 263528-29, 263544; *see also, e.g.*, VESA BIOS Extension (VBE) Core Functions Standard, Version: 3.0, Sep. 16, 1998 at LUC 1278107-09, LUC 1278129-32.) As another example, the Windows command "ChangeDisplaySettings" may be used to select a display mode specified by the "lpDevMode" parameter. (*See, e.g.*, LUC 1281046-48; *see also, e.g.*, "ChangeDisplaySettingsEx" at LUC 1281059-62.) Different modes of access may also be selected with GDI command and data sequences that specify colors as RGB values or index values, including sequences that use the "SetBkMode," "SetBkColor," "SetTextColor," "SetDCPenColor," or "SetDCBrushColor" commands. (*See, e.g.*, LUC 1281049-81; Sykes Exs. 7-10.) |
| and responsive to a second command, setting a color data value in the color memory; and | In response to a second command and data sequence the processor sets a color data value in the color memory. The Accused Products the processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to set a color data value in the color memory. This structure is equivalent to the corresponding structure disclosed in the patent specification (a data processor programmed to perform the algorithm shown in boxes 501, 504, 506, 508, and 510 of Figure 5), and any differences are insubstantial. In the Accused Products, a processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to set a color data value in the color memory, thus performing the claimed function. For example, the BIOS |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
|  | "Set Individual Palette Register" command may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 00h. (*See, e.g.,* LUC 1273255-59.) The "Set Individual Palette Register" command sets an individual color palette register with a color data value. Alternatively, the BIOS "Set All Palette Registers and Overscan Register" command may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 02h. (*Id.*) The "Set All Palette Registers and Overscan Registers" command sets the color palette with color data values. Alternatively, the BIOS "Set Block of Color Registers" command may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 12h. (*Id.*) The "Set Block of Color Registers" command sets one or more color registers with color data values. Another example is the GDI "SetPaletteEntries" command which can set an individual palette entry with a color data value specified by the "*lppe" parameter. (*See, e.g.,* LUC 1281057.) |
| display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode. | The Accused Products include a display that is the same as a computer monitor, TV, video projection system, LCD, or an LED display, that is responsive to the processing means, and that displays the colors associated with the color data values accessed by the selected mode. (*See, e.g.,* Gateway's Third Supplemental Response to Lucent's Interrogatory No. 16; GW-LT 120252; LUC 1048717-788; Decker Tr. at 223.) |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
| 3. A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory. | *See* Claim 2 Chart above. In response to the second command, the processor may set plural color data values in the color memory. This structure is at least equivalent to the corresponding structure disclosed in the patent specification (a data processor programmed to perform the algorithm of boxes 501, 504, 506, 508, 510, and the line exiting box 510 of Figure 5), and any differences are insubstantial. In the Accused Products a processor runs an algorithm that decodes the software commands and evaluates the associated data sequences to set plural color data values in the color memory. For example, the BIOS "Set All Palette Registers and Overscan Register" instruction may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 02h. (*See, e.g.,* LUC 1273255-59.) The "Set All Palette Registers and Overscan Registers" instruction sets the color palette with color data values. |

| U.S. Patent No. 4,439,759 | Gateway Accused Products |
|---|---|
|  | (*See, e.g.,* LUC 1273255-59.)  Alternatively, the BIOS "Set Block of Color Registers" instruction may be specified with Interrupt 10h with the AH register set to 10h and the AL register set to 12h.  (*See, e.g.,* LUC 1273255-59.)  The "Set Block of Color Registers" instruction sets one or more color registers with color data values.  Another example is the GDI "SetPaletteEntries" command which can set plural palette entries with a color data values specified by the "*lppe" parameter.  (*See, e.g.,* LUC 1281057.) |

### C.    Validity Of The Asserted Claims Of The Fleming '759 Patent

27. Defendants contend that claims 1-3 of the Fleming '759 patent are anticipated or rendered obvious by a number of references.  As an initial matter, Defendants must prove by clear-and-convincing evidence that each of the references upon which they rely qualifies as prior art under 35 U.S.C. § 102.  To the extent Defendants can carry their burden on this issue, claims 1-3 of the Fleming '759 patent are not anticipated by or obvious in view of the references relied upon by Defendants.  Lucent's validity positions are set forth in detail in the Rebuttal Expert Report of Jake Richter dated May 12, 2006, the Supplemental Rebuttal Expert Report of Jake Richter dated October 12, 2007, and the Second Supplemental Rebuttal Expert Report of Jake Richter dated November 12, 2007.  None of the prior art references relied upon by Defendants — alone or in combination — disclose all three modes of access of claim 1, which are also required by claims 2 and 3 by virtue of the Court's construction of the "processing means" of those claims, or numerous other required elements of those claims.  Nor would such elements have been obvious to one of ordinary skill in the art.

28. A person of ordinary skill in the art pertinent to the Fleming '759 patent in the early 1980s would have had at least a Bachelor of Science degree in electrical engineering, computer engineering, or computer science with at least 2 years of experience in the field of computer

1   graphics, or, alternatively, a person of ordinary skill in the art would have been an engineer holding a

2   Master of Science degree in electrical engineering, computer engineering, or computer science who

3   had pursued a course of study relating to computer graphics technology.

4        29.  Defendants rely on "Raster Graphics Extensions to the Graphics Compatibility System

5   (GCS)" ("Foley").  But Foley fails to disclose any of the three modes of access of claim 1.  Foley

6   also fails to disclose the processing means and display means of claim 1, the processing means of

7   claims 2 and 3, or the setting of plural values in a color memory as required by claim 3.

8
9        30. Defendants also rely on "Some Raster Graphics Extensions to the CORE System"

10  (referred to by Dr. Wedig as "GSPC-1") and "Status Report of the Graphic Standards Planning

11  Committee" (referred to as "GSPC-2").  Like Foley, however, GSPC-1 and GSPC-2 do not disclose

12  the three modes of access of claim 1, the processing means and display means of claim 1, or the

13  processing means of claims 2 and 3.

14
15       31. Defendants also rely on "AED 512 Color Graphics Terminal – Terminal Command

16  Protocol" ("AED512") and "AED512 Color Graphics & Imaging Terminal" ("AED512-2")  But

17  AED512 and AED512-2 do not disclose the three modes of access of claim 1, the processing means

18  and display means of claim 1, or the processing means or display means of claims 2 and 3.

19       32.  Defendants also rely on an article titled  "Color Map Techniques" ("Sloan") with respect

20  to claims 2 and 3.  But Sloan does not disclose the three modes of access of claim 1, and therefore

21  does not disclose the processing means or display means of claim 2, which require the three modes

22  of access of claim 1.  Sloan also does not disclose any command and data sequences as required by

23  claims 2 and 3, nor does it render obvious any of those command and data sequences.

24
25       33. Defendants also rely on the "Ramtek Programming Manual 9000 Series (RM 9100, 9200,

26  9300) Graphic Display System" ("Ramtek") with respect to claims 2 and 3.  But Ramtek does not

27  disclose the three modes of access of claim 1, and therefore also does not disclose the processing

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                          24                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                              from consolidated cases:  02-CV-2060 B (CAB),
                                                                                              03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

means or display means of claim 2.  Further, Ramtek does not disclose any predetermined command and data sequences for "selecting a mode of access to a color memory" as required by claims 2 and 3.

34. Defendants also rely on "ADI User's Guide – LIGHT 50" ("ADI").  ADI does not disclose the three modes of access of claim 1, and therefore does not invalidate claims 2 or 3, which require the three modes of access of claim 1.  ADI also does not disclose any predetermined command and data sequences for selecting a mode of access to a color memory as required by claims 2 and 3, or the processing and display means of claims 2 and 3.  ADI also does not disclose the setting of multiple color data values in a color memory.

35. Defendants also rely on U.S. Patent No. 4,213,189 to Mueller *et al.* ("Mueller"), contending that Mueller anticipates claims 2 and 3 of the '759 patent and in combination with Foley renders obvious claim 1.  Mueller, like Foley, fails to disclose the three modes of access required by claim 1, at least because it fails to disclose direct color specification, in-use colors, or any text and graphics drawing commands that could make use of any in-use foreground or background colors.  Mueller also does not disclose any predetermined command and data sequences for selecting one of a plurality of modes of access to color data values required by claim 1, nor does Mueller disclose any predetermined command and data sequences for "selecting a mode of access to the color memory" as required by claims 2 and 3.  Mueller also does not disclose the processing means or display means of claims 1-3, or the command and data sequences required by claims 2 and 3.  One of ordinary skill in the art would also not have been led to combine Mueller and Foley as suggested by Defendants given their different subject matter.

36.  Defendants also rely on "Image I/O Device for Image Processing: Color TV Display and TV Camera Input" purportedly written by Toshiyuki Sakai and Isao Kanade ("Kanade") with respect to claims 2 and 3.  Kanade fails to disclose the three modes of access of claim 1, which are required

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

25

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  by claims 2 and 3 as discussed previously.  Because Kanade does not disclose the modes of access

2  required by claim 2, it necessarily does not disclose the processing means or display means of claim

3  2 either.  Furthermore, even assuming that these modes of access were disclosed, Kanade does not

4  disclose any predetermined command and data sequence for selecting a mode of access to the color

5  memory as required by claims 2 and 3.  Kanade also fails to disclose any command and data

6  sequences for setting color values in a color memory as required by claims 2 and 3.  Defendants also

7  rely on other articles allegedly co-authored by at least one of the authors of the Kanade reference,

8  but those articles fail to disclose all of the elements of claims 2 and 3 for the same reasons the

9  Kanade alone fails to disclose all of the elements of claims 2 and 3.

10

11      37. Defendants also contend that claims 1-3 are anticipated or rendered obvious by

12  Recommendation S.100.  Recommendation S.100 does not disclose a color memory or the use of

13  indexed color specification, and therefore does not disclose the second and third modes of access

14  required by claim1 (and claims 2 and 3).  Recommendation S.100 also fails to disclose an in-use

15  background color.  Defendants seek to supply these missing elements from alleged admissions in the

16  patent concerning the Antiope and Prestel systems, but there is no admission in the patent that the

17  second and third modes of access are prior art.  Further, even if the second and third modes were

18  prior art, the particular combination of claim 1 would have not have been obvious to one of ordinary

19  skill in the art, given the fact that systems that combined direct and indexed color specification were

20  unpredictable, as well as market and design trends that weighed against a combination of indexed

21  color and direct color specification.  There would also have been no reasonable expectation of

22  success had the combination been attempted.  With respect to claims 2 and 3, Recommendation

23  S.100 fails to disclose a color memory, and thus does not disclose setting color data values in a color

24  memory.  Defendants seek to combine the Recommendation S.100 with an article by Crowther, but

25  one of ordinary skill in the art would not have been led to combine Crowther with Recommendation

26

27

28

26          Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

S.100 given the fact that Recommendation S.100 does not disclose a color memory and given the market and design trends against the combination of direct color and indexed color specification. Further, neither Recommendation S.100 nor Crowther discloses identical or equivalent corresponding structure for the color-setting functions of claims 2 and 3, nor would such structure have been obvious.

38. Defendants also contend that "CRC Technical Note No. 699-E, Picture Description Instructions PDI for the Telidon Videotex System" ("CRC 699-E") renders obvious claims 1-3 in combination with the Antope Specification. But neither CRC 699-E nor the Antiope Specification discloses the required color memory of claim 1, nor do they disclose the second and third modes of access of claim 1. Furthermore, one of ordinary skill in the art would not have been led to combine CRC 699-E with Antiope given their fundamentally different underlying technologies and the market trends at the time. Defendants also seek to invalidate claims 2-3 by combining CRC 699-E and the Antiope Specification and Crowther, but none of these references disclose the corresponding structure for the setting function of the processing means of claims 2 and 3. Nor would one of ordinary skill in the art have been led to combine these references for the same reasons discussed above with respect to the combination of Crowther and Recommendation S.100.

39. Defendants also contend that claims 1-3 are anticipated by or rendered obvious in view of the NASA Report. The NASA Report was not published prior to the invention date of the Fleming '759 patent, and is therefore not prior art. Further, the NASA Report fails to disclose the first and third modes of access required by claims 1-3, and those modes would not have been obvious to one of ordinary skill in the art.

40. Secondary considerations of non-obviousness also support a finding that the asserted claims of the Fleming '759 patent are not invalid for obviousness, including the industry acceptance of the patented Fleming technology during the years following its invention. The Fleming '759

1  Patent forms the basis of the color display capabilities specified by the North American Presentation

2  Level Protocal Syntax (NAPLPS) which was widely adopted shortly after and in the years following

3  the inventions.

4      41. On December 17, 2007, almost two years after the close of fact discovery in this case,

5  Defendants served a supplemental response to Lucent Interrogatory No. 1, alleging that claims 1-3 of

6  the Fleming patent are invalid "under 35 U.S.C. § 102(f) and/or 102(f)/103 because the persons

7  named on the face of the patent did not invent the subject matter claimed in the Fleming Patent

8  and/or the subject matter claimed in the Fleming Patent is obvious in view of subject matter

9  
10  presented to the persons named on the face of the Fleming Patent." Defendants' untimely invalidity

11  theories — which, in any event, are without merit — have prejudiced Lucent, and Lucent has

12  therefore moved *in limine* to preclude Defendants from pursuing these theories at trial.

13  **D.    Enforceability Of The Asserted Claims Of The Fleming '759 Patent**

14  
15      42. Defendants contend that claims of the Fleming '759 patent are unenforceable due to

16  inequitable conduct. Defendants contend that the inventors or prosecuting attorneys of the Fleming

17  '759 patent breached the duty of candor and good faith to the Patent Office by not disclosing GSPC-

18  2 during prosecution. GSPC-2, however, is not material to the patentability of the claims of the

19  Fleming '759 patent. Further, there is no evidence that anyone associated with the prosecution of the

20  Fleming '759 patent was aware of GSPC-2 or the allegedly material information in GSPC-2 during

21  
22  prosecution, nor is there any evidence of intent to withhold GSPC-2 on the part of anyone associated

23  with the prosecution of the Fleming '759 patent.

24      43. The Patent Office's granting of a reexamination does not render GSPC-2 or any other

25  reference material. The Patent Office historically grants over 90% of requests for reexamination.

26  Only a small fraction of reexamined patent claims have historically been determined to be

27  
28  unpatentable.

44. Defendants also asserted during fact discovery a number of other inequitable conduct theories, including theories based on U.S. Patent No. 4,262,302, "Principles of Interactive Computer Graphics" by Newman and Sproull, "Color Table Animation" by Richard Shoup, and unidentified materials in unidentified "draft standards and documents authored by the inventors of the '759 patent." Defendants, however, abandoned these additional theories during expert discovery. None of these references is material to the patentability of the claims of the Fleming '759 patent, there is no evidence that anyone associated with the prosecution of the Fleming '759 patent was aware of these references or their alleged materiality, and there is no evidence of any intent to withhold any of these references from the Patent Office on the part of anyone associated with the prosecution of the Fleming '759 patent.

45. On October 9, 2007, almost two years after the close of fact discovery in this case, Defendants served a supplemental response to Lucent Interrogatory No. 2 disclosing for the first time a theory that the Fleming '759 patent is unenforceable because of the alleged failure of the inventors or prosecuting attorneys to disclose Recommendation S.100 to the Patent Office. This theory is untimely, however, and Lucent has filed a motion *in limine* to preclude it. Moreover, Recommendation S.100 was not material to the patentability of the claims of the Fleming '759 patent, there is no evidence that anyone associated with the prosecution of the Fleming '759 patent was aware of the alleged materiality of Recommendation S.100, and there is no evidence of any intent to withhold Recommendation S.100 from the Patent Office on the part of anyone associated with the prosecution of the Fleming '759 patent.

46. On December 17, 2007, almost two years after the close of fact discovery in this case, Defendants served a supplemental response to Lucent Interrogatory No. 2 asserting four new grounds of unenforceability. First, Defendants contend that "Lucent lacks standing to enforce the Fleming Patent as a sole plaintiff because of its lack of complete ownership of the Fleming Patent,"

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

29

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases: 02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  citing the alleged co-ownership by alleged co-inventor and Gateway consultant Douglas O'Brien.

2  Second, Defendants contend that "because all of the owners of the Fleming Patent are not joined as

3  plaintiffs in this suit, this Court lacks jurisdiction to hear Lucent's suit to enforce the Fleming '759

4  Patent."  Third, Defendants contend that "[t]he Fleming Patent is also unenforceable due to the

5  inequitable conduct of [the inventors].  Specifically, none of the named inventors disclosed to the

6  United States Patent and Trademark Office that claims 1-3 of the Fleming '759 Patent were at least

7  partially derived by Mr. O'Brien."  And fourth, Defendants contend that "the Fleming Patent is

8  unenforceable due to [the inventors'] failure to disclose that Mr. O'Brien was at least a joint inventor

9

10 of the alleged invention claimed in Claims 1-3 of the Fleming Patent."  Defendants' untimely

11 unenforceability theories — which are, in any event, without merit — have prejudiced Lucent, and

12 Lucent therefore has moved *in limine* to preclude Defendants from pursuing these theories at trial.

13 **III.     The Day '356 Patent**

14
        **A.      The Teaching Of The Asserted Claims Of The Day '356 Patent**
15

16      47. Lucent is the owner of the Day '356 patent with the right to sue for past infringement.

17      48. The Day '356 patent relates to form entry systems that use certain types of overlaid or

18 pop-up window tools that are associated with information fields of the form entry system.  The

19 inventions of the Day '356 patent allow a user to point to or touch the on-screen display keys of the

20
   predefined tools, such that the information selected or composed by the tool would be inserted into
21
22 the proper associated information field.

23      49. These types of on-screen tools were novel and pioneering inventions.  Before the

24 inventions of the Day '356 patent in the early 1980's, computer users would generally need to

25 manually move between data entry fields, and manually input data into each field, for example, by

26
   using a computer keyboard.  ('356 Patent at 1:8-22)  People such as securities traders, sales people,
27
28 and nurses spent an inordinate amount of time on a daily basis manually inputting information into

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                     30          Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                        from consolidated cases:  02-CV-2060 B (CAB),
                                                        03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1   electronic forms.  *Id.*  Thus, the inventors of the '356 patent identified a need for more user-friendly

2   and time-saving data-entry interfaces.  ('356 Patent at 1:24-48)

3       50. As a result, the inventors of the '356 patent conceived of many of the time-saving

4   computer pop-up windows and overlay data-entry tools that we take for granted today.  ('356 Patent

5   at cols. 15-18)  The invention of the '356 patent used graphical displays and menus—like the

6   graphical window displays now used in many Microsoft Windows applications.  The '356 patent

7   specification describes some of the user-friendly and time-saving aspects of the invention with

8   respect to entering information into a hypothetical automobile sales form:

9

10        When a form is first brought up on panel 15, one of the fields in the form is
          illustratively highlighted and, in accordance with the invention, the predefined tool

11        for filling in that field is concurrently displayed illustratively as a window overlaying
          the form.  ('356 Patent at 3:42-46)

12

13      51. To meet these identified needs, the inventors of the '356 patent conceived of a time-

14  saving form-entry system that uses predefined data entry tools that are associated with respective

15  data information fields.  ('356 Patent at cols. 15-18)  After pointing to or selecting a field for data

16  entry, the form-entry system allows for the display of a predefined tool that is associated with that

17  field in a separate and overlaying window.  Figure 3, below, shows an example of a predefined

18  tool—here, a menu—associated with the "Model" field of a hypothetical form entry system used by

19

20  a car salesman:



Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

52. Another critical time-saving aspect described in the '356 patent is that one may simply "point to one of the entries" on the pop-up tool "overlay (window)," after which, the form entry system may "bring[] up the corresponding tool" pop-up window predefined for that field. ('356 Patent at 3:63-4:2)  The '356 patent discloses a "keyboard tool" that can be used to enter text data, and a "number entry tool" that can be used to enter numeric data.  ('356 Patent at 4:25; 5:3-5 and Figs. 5 and 7)  The '356 patent also discloses other similar tools such as date composition tools.  *Id.* The '356 patent discloses how these different tools may be used, for example, the '356 patent discloses that the user may "point" to various fields to bring up the appropriate predefined and associated tool.  ('356 Patent at 4:35)  In the sample car salesman form shown in the '356 patent, when "the user points" at various fields, he may point and select entries such as the "CONVERTIBLE model" automobile.  (*Id.* at 3:64)

53. Likewise, when the "Customer Name" field is pointed to or selected, the form-entry system may bring up a keyboard tool which was the predefined tool associated with that field.  ('356 Patent at 5:3-5)  The salesperson would then point to the appropriate letters, spell the name, and then point to the "E/S" (enter/skip) key, which would cause the name to be input into the "Customer Name" field.  ('356 Patent at 5:12-15)  Similarly, the '356 patent discloses a number entry tool that may be used to compose numerical data.  ('356 Patent at 4:13-56)  For example, when the "Quantity" field is pointed to or selected, the form-entry system may bring up a number entry tool which was the predefined tool associated with that field.  *Id.*  The salesperson would then point to the appropriate number, compose a number, and then point to the "E" (enter) or "E/S" (enter/skip) key, which would cause the number to be input into the "Quantity" field.  *Id.*  Figures 5 and 7 below show examples of keyboard and number entry tools:

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

32

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)



54. The '356 patent makes clear that some of the time-saving aspects of the invention include the ability of the user to (1) "point" to display key buttons or fields on the screen to call up the associated predefined tools in overlaid windows, and (2) "point" to display key buttons or selections on the overlaid tools that cause the selection to be entered into the appropriate field in the form entry system. ('356 Patent at cols. 3-7)

55. Asserted claim 19 of the Day '356 patent reads as follows:

> 1. A method for use in a computer having a display comprising the steps of
>
> displaying on said display a plurality of information fields,
>
> identifying for each field a kind of information to be inserted therein,
>
> indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields,
>
> said predefined tool being operable to supply information of the kind identified for said one field,
>
> said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and

inserting in said one field information that is derived as a result of said user operating said displayed tool.

56. Claim 19 thus includes a number of different elements. First, claim 19 is a method claim—not an apparatus or structure claim. Accordingly, claim 19 may be infringed by showing that one practices the claimed steps by using a form entry system that incorporates the claimed elements. Second, the claim makes clear that the method is practiced on a computer having a display—thus requiring a computer device and display to practice this claim. Third, claim 19 makes clear that there must be displayed a "plurality of information fields" such as the information fields used in form entry programs and applications. Fourth, the claim requires that the system "identify[]" the information fields used in the form entry system, for example by using field labels, words, or otherwise. Fifth, the claim requires that the form entry system "indicat[e]" which field information is to be inserted into—or in other words, which field is active. The active field may be indicated, for example, by a blinking cursor or highlighted text.

57. Next, the claim requires a predefined tool that is "concurrently displayed" with the form entry system when the tool is selected for the appropriate information field. The court construed the term "concurrently displaying" to mean "displaying at the same time, as by a window overlaying the form." The court construed the phrase "predefined tool associated with said one of said fields" to mean "a tool specified by the system as an appropriate tool for filling in the information called for by that field." Accordingly, the claim requires the tool to be (1) predefined by the form entry system, (2) associated with an information field, and (3) specified by the form entry system as an appropriate tool for providing information called for by that field.

58. Further, the claim requires that the form entry system must use "a group" of such predefined tools, whereby at least one tool is a "menu of alternatives" tool, and whereby at least one tool is a "tool adapted to allow said user to compose said information"—or composition tool. The court construed the latter phrase to mean "a graphical keyboard tool or a graphical number keypad

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

34

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases: 02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

tool, which allows the user to compose information by pointing to the display keys of that tool." In other words, the claim requires a composition tool that (1) is either an on-screen keyboard or number keypad (such as a calendar or calculator), (2) is graphical (as opposed to text-based), and (3) allows a user to compose information by pointing to the display keys—or onscreen buttons—of the composition tool.

59. Finally, the claim requires that the tool "insert[]" the appropriate information into the appropriate information field.

60. Asserted claim 21 of the Day '356 patent reads as follows:

> 21.  The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field.

61. Thus, claim 21 includes the same form entry system and tool requirements of claim 19, and also requires at least one information field to be "a field into which a user is to enter information by writing on a touch sensitive screen by using a stylus" as construed by the court.

**B.    Infringement Of The Asserted Claims Of The Day '356 Patent**

62. Lucent contends that Microsoft indirectly infringes claim 19, under 35 U.S.C. § 271(b) and (c), by making, using, selling, offering for sale in the United States, distributing, and/or importing into the United States, Microsoft Money and Microsoft Outlook software (including Microsoft Outlook with Business Manager) to be run on computer systems, as well as by making, using, selling, offering for sale in the United States, distributing, and/or importing into the United States, Microsoft Windows Mobile (or Pocket PC operating system) software, and Microsoft Word Mobile (or Pocket Word) software to be run on Pocket PC, PDA, and/or smartphone devices. Lucent contends that Microsoft induces infringement of claim 19 by supplying these products to customers and providing manuals, tutorials, help files, documentation, and other product support to customers that provide information on how to use these products, including the accused capabilities.

This software, as sold, when run as intended on a computer or device with a display, leads to the practice of all of the elements of claim 19. Microsoft encouraged its customers to run this software on a computer or device with display as intended. Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement. Lucent further contends that Microsoft's sale, offer to sell, and/or importation of this software contributes to the infringement of claim 19, as the software constitutes a material or apparatus for use in practicing a patented process, constituting a material part of the invention, and Microsoft knew that the infringing components of such software, used as intended, were especially made for use in practicing a patented process, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

63. Lucent also contends that Microsoft indirectly infringes claim 19 under 35 U.S.C. § 271(f) by inducing or contributing to the use of software and computers containing such software in a manner outside the United States that would infringe under 35 U.S.C. § 271(a) if in the United States.

64. Lucent also contends that Microsoft indirectly infringes claim 21, under 35 U.S.C. § 271(b) and (c), by making, using, selling, offering for sale in the United States, distributing, and/or importing into the United States, Microsoft Windows Mobile (or Pocket PC operating system) software, and Microsoft Word Mobile (or Pocket Word) software to be run on Pocket PC, PDA, or smartphone devices, as well as Microsoft Money and/or Microsoft Outlook software to be run on Tablet PCs or stylus-based devices. Lucent contends that Microsoft induces infringement of claim 21 by supplying these products to customers and providing manuals, tutorials, help files, documentation, and other product support to customers that provide information on how to use these products, including the accused capabilities. Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

Lucent further contends that Microsoft's sale, offer to sell, and/or importation of this software contributes to the infringement of claim 21, as the software constitutes a component for use in practicing a patented process, constituting a material part of the invention, and Microsoft knew that the infringing components of such software, used as intended, were especially made for use in practicing a patented process, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

65. Lucent also contends that Microsoft indirectly infringes claim 21 of the '356 patent under 35 U.S.C. § 271(f) by inducing or contributing to the use of software and computers containing such software in a manner outside the United States that would infringe under 35 U.S.C. § 271(a) if in the United States.

66. Lucent contends that Dell and Gateway indirectly infringe claim 19, under 35 U.S.C. § 271(b) and (c), by making, using, selling, offering for sale in the United States, distributing, and/or importing into the United States, computer systems, computer devices, and/or smartphones running Microsoft Money software, Microsoft Outlook software (including Microsoft Outlook with Business Manager), Intuit Quicken software, Windows Mobile (or Pocket PC operating system) software, and Microsoft Word Mobile (or Pocket Word) software. Lucent contends that Dell and Gateway induce infringement of claim 19 by supplying these products to customers and providing manuals, tutorials, help files, documentation, and other product support to customers that provide information on how to use these products, including the accused capabilities. This software, as sold, when run as intended on a computer or device with a display, leads to the practice of all of the elements of claim 19. Dell and Gateway encouraged their customers to run this software on a computer or device with display as intended. Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and they acted with affirmative intent to cause direct infringement. Lucent further contends that Dell and Gateway's sale, offer to sell, and/or importation of this software

contributes to the infringement of claim 19, as the software constitutes a material or apparatus for use in practicing a patented process, constituting a material part of the invention, and Dell and Gateway knew that the infringing components of such software, used as intended, were especially made for use in practicing a patented process, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

67. Lucent also contends that Dell and Gateway indirectly infringe claim 21, under 35 U.S.C. § 271(b) and (c), by making, using, selling, offering for sale in the United States, distributing, and/or importing into the United States, computer devices, PDAs, and/or smartphones running Microsoft Windows Mobile (or Pocket PC operating system) software, and/or Microsoft Word Mobile (or Pocket Word) software, as well as Tablet PCs or stylus-based devices running Microsoft Money, Microsoft Outlook, and/or Intuit Quicken software. Lucent contends that Dell and Gateway induce infringement of claim 21 by supplying these products to customers and providing manuals, tutorials, help files, documentation, and other product support to customers that provide information on how to use these products, including the accused capabilities. Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and they acted with affirmative intent to cause direct infringement. Lucent further contends that Dell and Gateway's sale, offer to sell, and/or importation of this software contributes to the infringement of claim 21, as the software constitutes a component for use in practicing a patented process, constituting a material part of the invention, and Dell and Gateway knew that the infringing components of such software, used as intended, were especially made for use in practicing a patented process, and are not a staple article or commodity of commerce suitable for substantial noninfringing use.

68. Defendants' infringement is more particularly explained below and in the following claim charts, and in the March 31, 2006 Expert Report of Bruce Tognazzini.

38

69. **Microsoft Money, running on a computer system.**  Microsoft Money is a software application that provides tools to allow users to manage finances.  At the most basic level, Money provides tools to organize and track a user's finances.  For example, Money provides spreadsheets, ledgers, and other accounting tools to help users manage accounts and bills.  Money is set up to facilitate easy and efficient entry of financial data.  Once the data is entered, Money helps organize the data into an organized and easy to use format.  Money provides a graphical user interface for users to enter data.  For example, in the Accounts feature, Money provides a transaction entry form, with a plethora of information fields into which users may enter their information.  Money also provides a number of tools associated with the information fields to facilitate the data entry.  For example, Money provides a drop down menu tool for use with the "Categories" field, a calendar tool for use with the "Date" field, and a calculator tool for use with the "Amount" field.  By way of example, and without limitation to evidence establishing infringement, the following claim chart more particularly describes how Microsoft Money, running on a computer, infringes claims 19 and 21.

| '356 Patent Claim 19 | Microsoft Money |
|---|---|
| 19.  A method for use in a computer having a display comprising the steps of | Microsoft Money software is an arrangement for use in a computer with a display, which performs a method.  *See for example,* Microsoft Money software produced at MSLT_0962767-68, MSLT_0962770-72, and MSLT_0959120-25, for use in a computer with a computer monitor, *e.g.,* a display. |
| displaying on said display a plurality of information fields, | Microsoft Money displays the transaction form.  *See, e.g.,* J.S. Stamps Dep. Tr. 38.  The form has a plurality of information fields, such as "NUM," "DATE," "PAYEE," "PAYMENT," "DEPOSIT," etc.  *See, e.g., Id.* 39-40. |

| '356 Patent Claim 19 | Microsoft Money |
|---|---|
| identifying for each field a kind of information to be inserted therein, | Each field has a heading, which identifies the kind of information to be inserted therein. *See, e.g., Id.* 42 (stating that a user would input a date for the transaction in the "DATE" field and input the amount of the transaction in the amount field, etc.). |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | Microsoft Money is a software program for use in a computer.  Money provides a blinking cursor, a dotted border, and/or highlighted text to indicate a particular information field into which information will be inserted. *See, e.g., Id.* 47-48.<br><br>Money provides a tool appropriate for filling in the type of information needed for the field.  For example, Money provides a calendar tool for filling in the date, a number keypad/calculator tool for filling in numbers, and a list of related possible items to fill in various other fields. *See, e.g., Id.* 43 (stating that Money provides a number pad/calculator tool to fill in the AMOUNT field, a calendar tool to fill in the DATE field, and a list of related possible items to select to fill in the NUM field).   In this way, Money provides a group of predefined tools, such as those described above, for use with various fields in the transaction  form.  Also, the list of related items to select provides an individual entry from a menu, and the number pad/calculator and/or calendar tools allow the user to compose information.<br><br>Microsoft Money displays the tools above at the same time as displaying the transaction form, whereas the tools overlay the transaction form. *See, e.g.,* J.S. Stamps Dep. Tr. 87-88, Ex. 2, p. 19. |

| '356 Patent Claim 19 | Microsoft Money |
|---|---|
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | Microsoft Money provides, for example, a number pad/calculator tool, which inserts the information derived as a result of a user using the tool, e.g., when a user clicks with a mouse pointer on the number "1" of the number pad, a "1" would get entered into the active field associated with the tool. *See, e.g., Id.* 63-64. Once the information fields are filled in the transaction form, the information can be transferred to a second set of fields in the ledger form by simply hitting the "enter" key. *See, e.g., Id.* 46.<br><br>Microsoft Money is a software program for use in a computer having an algorithm to facilitate the above-described steps. |

| '356 Patent Claim 21 | Microsoft Money |
|---|---|
| 21. The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | Versions of Microsoft Money run on Windows XP Tablet PC edition, which when used with, e.g., a tablet PC, are capable of receiving information, in other words, working with Tablet PC and the handwriting recognition on a tablet PC. *See, e.g., Id.* 75. |

70. Defendants' infringement with respect to Money is more particularly explained in the March 31, 2006 Expert Report of Bruce Tognazzini.

71. **Microsoft Outlook, running on a computer system.** Microsoft Outlook is a software application promoted as Microsoft's "personal information manager and communications program." Microsoft claims that "Outlook 2003 provides an integrated solution for managing and organizing e-mail messages, schedules, tasks, notes, contacts, and other information. Outlook 2003 delivers innovations you can use to manage your communications, organize your work, and work better with others—all from one place." By way of example, and without limitation to evidence establishing

infringement, the following claim chart more particularly describes how Microsoft Outlook, running on a computer, infringes claims 19 and 21.

| '356 Patent Claim 19 | Microsoft Outlook |
|---|---|
| 19.  A method for use in a computer having a display comprising the steps of | Microsoft Outlook software includes a method for use in a computer having a user interface, e.g., a computer monitor display. *See, e.g.,* Microsoft Outlook software produced at MSLT_0959121, MSLT_0959126, for use in a computer with a computer monitor. |
| displaying on said display a plurality of information fields, | Microsoft Outlook displays a pattern, e.g., the Appointment Creation form having a plurality of information fields.  *See, e.g.,* W. Kennedy Rough Dep. Tr., Ex. 2.   The information fields include, e.g., a start time field, with a label in front of the field to indicate to the user the kind of information to be inserted in the field.  *See., e.g., Id.*, Ex. 2, p. 4. |
| identifying for each field a kind of information to be inserted therein, | The Appointment Creation form has a plurality of other information fields, such as "Subject," "Location," etc.  Outlook precedes each information field with an identifier or label that identifies a kind of information to be inserted into each field, such as "Subject," "Location," etc.  *See, e.g., Id.* 48. |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | Microsoft Outlook indicates a particular one of said information fields into which information is to be inserted by, for example, a very light dotted line surrounding the field, a highlighted field, and a blinking overstrike bar (cursor).  *See, e.g., Id.* 27-28.

Outlook concurrently displays, for example, a calendar composition tool, associated with the Appointment Creation form date field.  *See, e.g., Id.*, Ex. 2, p. 4. The calendar composition tool allows a user to compose information by pointing to various selections on the tool with a mouse pointer, such as day, month, and year. |

| '356 Patent Claim 19 | Microsoft Outlook |
|---|---|
| | Outlook also provides on the Appointment Creation field a time drop down menu associated with the time field.  *See, e.g., Id.* 32, Ex. 2, p. 4.  The time drop down is adapted to supply an individual entry from a menu of alternatives.  To do so, a user would click using the mouse on the drop down area that is next to the time field and select a time from the list that is shown. *See, e.g., Id.* 33, Ex. 2, p. 6.<br><br>The Outlook tools discussed above, the calendar composition tool and drop down menu, appear as an overlay image on the Appointment Creation form, in other words, the tools are displayed concurrently with the underlying form.  *See, e.g., Id.* 57.<br><br>Outlook is designed for use with a computer, having a microprocessor, hard disk, memory management circuitry, ROM, and a display.<br><br>Versions of Outlook are compatible with a Tablet PC having a touch sensitive screen, and an on-screen graphical keyboard.  The graphical keyboard allows a user to compose information.  *See, e.g., Id.* 19, 23, 31. |

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

43

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

| '356 Patent Claim 19 | Microsoft Outlook |
|---|---|
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | As discussed above, Outlook provides, e.g., a calendar composition tool, and a drop down menu. Both tools, when operated properly, provide means for inserting information from the tool into the field. For example, the calendar composition tool inserts the date into the associated field when the user, using, for example, a mouse pointer, clicks on the date button for the desired date. In a similar way, the drop down menu inserts the information chosen with by the user using the mouse clicker into the associated field. <br><br> Also, when used with a Tablet PC, Outlook receives information from the system indicating that a particular key was pressed on the graphical keyboard, and the information is inserted into the associated field. *See, e.g., Id.* 54. |

| '356 Patent Claim 21 | Microsoft Outlook |
|---|---|
| 21. The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | Versions of Microsoft Outlook are usable or in other words compatible with a Tablet PC having a touch sensitive screen and accept input from a user using a pen or stylus on a bit map graphics field. *See, e.g., Id.* 19, 58. Bit map graphics fields allow a user to compose information by writing on the field, with for example, a stylus. |

72. Defendants' infringement with respect to Outlook is more particularly explained in the March 31, 2006 Expert Report of Bruce Tognazzini.

73. **Windows Mobile (or Pocket PC operating system), running on a Pocket PC, smartphone, or other PDA device.** Pocket PC and/or Windows Mobile for Pocket PC is the operating system software which is designed to run on palmtop computing devices such as smartphones and PDAs. Microsoft states that "Windows Mobile software powers advanced, easy-

to-use devices that allow you to send and receive e-mail, browse the Internet, and work on mobile versions of familiar Office software." By way of example, and without limitation to evidence establishing infringement, the following claim chart more particularly describes how Microsoft Windows Mobile, running on Pocket PC, smartphone, PDA, or other computer devices, infringes claims 19 and 21.

| '356 Patent Claim 19 | Windows Mobile |
|---|---|
| 19. A method for use in a computer having a display comprising the steps of | Windows Mobile OS is an arrangement for use in a PDA or other hand held device such as a Pocket PC or smartphone, and performs a method. |
| displaying on said display a plurality of information fields, | Windows Mobile Calendar appointment entry form provides a number of information fields, such as "Subject," "Location," "Starts," "Sensitivity," etc. |
| identifying for each field a kind of information to be inserted therein, | Each field is preceded by an identifying word that identifies the kind of information to be inserted into each field, such as "Subject," "Location," "Starts," "Sensitivity," etc. |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | Windows Mobile uses, for example, a blinking cursor or highlighted text to indicate the particular field into which info is to be inserted. Concurrently, the calendar offers a drop down menu for the field, a drop down calendar, or displays at the bottom of the screen additional tools, such as a keyboard, block recognizer, or letter recognizer. Pocket PC concurrently displays a predefined tool such as a calendar or a drop-down menu or a letter recognizer or block recognizer as appropriate tools for filling in dates or the appropriate information for the associated field. Further, for example, the drop down menu supplies an individual entry from a menu of alternatives and the keyboard, block recognizer, or letter recognizer allow the user to compose information. |

| '356 Patent Claim 19 | Windows Mobile |
|---|---|
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | Windows Mobile is designed for use with a PDA, or other hand held device such as a Pocket PC or smartphone.  Pocket PCs include, for example, a microprocessor and controller.  When a user utilizes one of the tools mentioned above, the information derived from using the tool is inserted from the tool into a field.  For example, once the user taps on a date in the Calendar tool, the date selected is inputted into the field.  Additionally, for example, a drop down menu provides information for the field that is associated with it once the user taps on a selection from the list with the stylus. |

| '356 Patent Claim 19 | Windows Mobile |
|---|---|
| 21.  The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | As discussed above, Windows Mobile is designed for use with a PDA or other Pocket PC  or smartphone device.  PDA, Pocket PC, and smartphone devices include a display with a touch-sensitive screen overlaying the display.  Such devices include, for example, a letter recognizer and/or a block recognizer, which are bit map graphics fields allowing the user to compose information by writing with a stylus. |

74. Defendants' infringement with respect to Windows Mobile is more particularly explained in the March 31, 2006 Expert Report of Bruce Tognazzini.

75. **Word Mobile (or Pocket Word), running on a Pocket PC, smartphone, or other PDA device.**   Pocket Word and/or Word Mobile for Windows Mobile is a word processing application for use with Pocket PC devices.  Pocket Word provides users, for example, the ability to create and edit documents.  Microsoft states that, "Similar to the popular desktop application you know so well, Pocket Word is a handy way to view and edit Microsoft Word attachments that you receive in e-mail."  By way of example, and without limitation to evidence establishing

infringement, the following claim chart more particularly describes how Microsoft Word Mobile, running on Pocket PC, smartphone, PDA, or other computer devices, infringes claims 19 and 21.

| '356 Patent Claim 19 | Pocket Word |
|---|---|
| 19. A method for use in a computer having a display comprising the steps of | Microsoft Pocket Word software is a method for use in a computer having a user interface, e.g., a computer monitor display associated therewith. |
| displaying on said display a plurality of information fields, | Microsoft Pocket Word has a Format dialogue window for displaying on a display with numerous information fields, e.g., "Font," and "Size" identified by a heading to indicate the kind of information for that field. *See, e.g.,* M. Nielson Dep. Tr. 30-31, 33, 67-68. |
| identifying for each field a kind of information to be inserted therein, | Microsoft Pocket Word has a Format dialogue window for displaying on a display with numerous information fields, e.g., "Font," and "Size" identified by a heading to indicate the kind of information for that field. *See, e.g.,* M. Nielson Dep. Tr. 30-31, 33, 67-68. |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | Pocket Word highlights the field to indicate a particular one of the fields into which the information is going to be inserted. *See, e.g., Id.* 36-37, 67.<br><br>Pocket Word provides a drop down tool associated with the font field in the format dialogue. The drop down town is adapted to supply an individual entry from a menu of alternatives. *See, e.g., Id.* 39. When a d |

| '356 Patent Claim 19 | Pocket Word |
|---|---|
|  | Pocket Word displays on, for example, the Font dialogue window, through a sub-routine call, an on-screen graphical keyboard, adapted to allow a user to compose information. *See, e.g., Id.* 31-32. In the same way, Pocket Word provides an on-screen graphical number pad. *See, e.g., Id.* 35, 59. |
|  | When the drop down tool or the on-screen graphical keyboard or number pad appear, the font dialogue,  or background, does not disappear.  Accordingly, the tools are concurrently displayed with the menu. *See, e.g., Id.* 83-84. |
|  | Pocket Word also provides a transcriber tool, which allows a user to use the stylus to write on the screen, and that information is converted into virtual keys to input the data into information fields. *See, e.g., Id.* 75-76. |
|  | The graphical keyboard provides a user the means to compose information by, for example, using a stylus and tapping on a letter on the keyboard. *See, e.g., Id.* 42-47. |
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | Pocket Word inserts the information from the tool automatically into the field when the user, for example, taps the screen with the stylus, hits return on the electronic keyboard, or taps the okay button. *See, e.g., Id.* 67-68. |
|  | Pocket Word is designed for use with, for example, a PDA, smartphone, or other hand held device.  The PDA provides a microprocessor and controller necessary to run the Pocket Word software. |

| '356 Patent Claim 19 | Pocket Word |
|---|---|
| 21.  The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | As mentioned above, Pocket Word is sold for use with a PDA, smartphone, or other hand held device such as a Pocket PC.  A Pocket PC provides, for example, a touch sensitive screen, with a letter recognizer and/or a block recognizer, also known as a bit map graphics field.  A letter recognizer or a block recognizer allow a user to compose information by writing on the bit map field.  *See, e.g., Id.* 69-70, 82. |

76. Defendants' infringement with respect to Word Mobile is more particularly explained in the March 31, 2006 Expert Report of Bruce Tognazzini.

77. **Intuit Quicken, running on a computer system.**  Intuit Quicken is a software application that provides tools to allow users to manage finances. Quicken provides tools to organize and track a user's finances.  For example, Quicken provides spreadsheets, ledgers, and other accounting tools to help users manage accounts and bills.  Quicken is set up to facilitate easy and efficient entry of financial data.  Once the data is entered,  Quicken helps organize the data into an organized and easy to use format.   Quicken provides a graphical user interface for users to enter data.  For example, Quicken provides a transaction entry form, with a plethora of information fields into which users may enter their information.  Quicken also provides a number of tools associated with the information fields to facilitate the data entry.  For example, Quicken provides a drop down menu tool for use with the "Category" field, a calendar tool for use with the "Date" field, and a calculator tool for use with the "Amount" field.  By way of example, and without limitation to evidence establishing infringement, the following claim chart more particularly describes how Intuit Quicken, running on a computer, infringes claims 19 and 21.

| '356 Patent Claim 19 | Intuit Quicken |
|---|---|
| 19.  A method for use in a computer having a display comprising the steps of | As programmed with Intuit Quicken, a Gateway computer with a display performs a method comprising the following steps. |

| '356 Patent Claim 19 | Intuit Quicken |
|---|---|
| displaying on said display a plurality of information fields, | As programmed with Intuit Quicken, the computer displays an account register with multiple information fields, such as the check number, the date of payment, the person paid, the amount paid, the category of payment, etc. |
| identifying for each field a kind of information to be inserted therein, | As programmed with Intuit Quicken, the computer identifies the kind of information to be inserted into each field, such as by the labels "Number," "Date," "Pay to," "Amount," "Category," etc. |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | As programmed with Intuit Quicken, the computer indicates which field is active and displays at the same time the tool for filling in that field. For example, the computer highlights the active "Category" field and displays at the same time a drop-down menu with category information, such as "Bank Charges," "Clothing," "Dry Cleaning," etc. The tool is selected from a group of predefined tools, such as a calendar, a calculator, and a drop-down menu. A drop-down menu supplies an individual entry from a list of entries for filling in that field. There is also a tool that allows a user to compose information. For example, the calculator tool allows a user to calculate an amount for the "Amount" field. |
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | As programmed with Intuit Quicken, the computer inserts into the active field information that is derived from a user operating a tool. For example, when the user operates the calendar tool, the computer inserts a date into the "Date" field. |

| '356 Patent Claim 19 | Intuit Quicken |
|---|---|
| 21. The method set forth in claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | As programmed with Intuit Quicken, a computer with a touch screen displays an information field as a bit-mapped-graphics field. |

78. Defendants' infringement with respect to Quicken is more particularly explained in the March 31, 2006 Expert Report of Bruce Tognazzini.

**C.    Validity Of The Asserted Claims Of The Day '356 Patent.**

79. Defendants contend that claims 19 and 21 of the Day '356 patent are anticipated or rendered obvious by a number of references.  As an initial matter, defendants must prove by clear-and-convincing evidence that each of the references upon which they rely qualifies as prior art under 35 U.S.C. § 102.  To the extent defendants can carry their burden on this issue, claims 19 and 21 of the Day '356 patent are not invalid in view of the references cited by defendants.  Lucent's validity positions are set forth in detail in the rebuttal expert report of Bruce Tognazzini dated May 12, 2006, the supplemental rebuttal expert report of Bruce Tognazzini dated October 12, 2007, the declaration of Bruce Tognazzini dated December 14, 2007, and any other relevant declarations and/or deposition testimony.  In summary, none of the prior art references relied upon by defendants — alone or in combination — disclose all of the limitations of claim 19, which are also required by claim 21.

80.  None of the references cited by defendants, alone or in combination, anticipate or render obvious to one of ordinary skill in the art claims 19 or 21 of the Day '356 patent.  At the time of the invention of the '356 patent in the mid 1980s, a person of ordinary skill in the art pertinent to the Day '356 patent would have had three to five years working in the area of human-computer interaction, or specific training at one of two primary "schools" where one could have learned graphical user interface design, namely Xerox Palo Alto Research Center (Xerox PARC) and Apple Computer, Inc.

81.  For example, defendants rely on "The Home Accountant and Financial Planner" for the Apple Macintosh computer ("Home Accountant").  But the Home Accountant fails to disclose any "predefined tool associated with said one of said fields" as construed by this court to require the concurrent display of "a tool specified by the system as an appropriate tool for filling in the

1   information called for by that field." Nor would it have been obvious to one of ordinary skill in the

2   art to modify the teachings of the Home Accountant alone, or with the teachings of any other prior

3   art references, to arrive at the claimed inventions of the '356 patent.

4   82. Defendants also rely on the "Xerox Star" system. Like Home Accountant, the Xerox Star

5   system fails to disclose any "predefined tool associated with said one of said fields" as construed by

6   this court to require the concurrent display of "a tool specified by the system as an appropriate tool

7   for filling in the information called for by that field." Nor does Xerox Star disclose any "tool

8   adapted to supply an individual entry from a menu of alternatives." Further, the Xerox Star uses an

9   
10  older system of "tiling," where display objects are laid side-by-side and cannot be windowed or

11  otherwise concurrently displayed. Nor would it have been obvious to one of ordinary skill in the art

12  to modify the teachings of the Xerox Star alone, or with the teachings of any other prior art

13  references, to arrive at the claimed inventions of the '356 patent.

14  83. Defendants also rely on the "Apple Lisa" computer system. Again, like Home

15  Accountant and Xerox Star, the Apple Lisa system fails to disclose any "predefined tool associated

16  with said one of said fields" as construed by this court to require the concurrent display of "a tool

17  specified by the system as an appropriate tool for filling in the information called for by that field."

18  
19  Nor would it have been obvious to one of ordinary skill in the art to modify the teachings of the

20  Apple Lisa alone, or with the teachings of any other prior art references, to arrive at the claimed

21  inventions of the '356 patent.

22  84. Defendants also contend that the '356 patent is rendered obvious by the Meridian M3000

23  Touchphone, although defendants fail to identify which claim limitations they contend are present or

24  missing in the M3000. However, the M3000 does not render claim 19 or 21 obvious or otherwise

25  invalid. The M3000 was an obscure touch-screen telephone missing most of the limitations of the

26  
27  asserted claims, including any "predefined tool associated with said one of said fields" as construed

28

by this court to require the concurrent display of "a tool specified by the system as an appropriate

tool for filling in the information called for by that field."  It would not have been obvious to one of

ordinary skill in the art to modify the teachings of the M3000 alone, or with the teachings of any

other prior art references to arrive at the claimed inventions of the '356 patent.

85. Defendants also contend that the '356 patent is rendered obvious by the HP 150 system,

although defendants fail to identify which claim limitations they contend are present or missing in

the HP 150.  However, the HP 150 does not render claim 19 or 21 obvious or otherwise invalid.

The HP 150 is missing several limitations, including any "predefined tool associated with said one of

said fields" as construed by this court to require the concurrent display of "a tool specified by the

system as an appropriate tool for filling in the information called for by that field."  It would not

have been obvious to one of ordinary skill in the art to modify the teachings of the HP 150 alone, or

with the teachings of any other prior art references, to arrive at the claimed inventions of the '356

patent.

86. Defendants also point to various other references that they contend disclose "writing on a

bit mapped graphics field" such as the "Koalapad" and disclosures in IEEE Spectrum, vol. 21, no.1,

January 1984.  However, defendants fail to identify which claim limitations they contend are present

or missing in these references.  These references do not render claim 19 or 21 obvious or otherwise

invalid.  These references are missing several limitations, including any "predefined tool associated

with said one of said fields" as construed by this court to require the concurrent display of "a tool

specified by the system as an appropriate tool for filling in the information called for by that field."

It would not have been obvious to one of ordinary skill in the art to modify the teachings of the

Koalapad or disclosures in IEEE Spectrum, vol. 21, no.1, January 1984, alone, or with the teachings

of any other prior art references, to arrive at the claimed inventions of the '356 patent.

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                    53                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

87. Defendants also contend that the '356 patent is rendered obvious by the "Your Money Manager" financial program designed for the IBM PC ("YMM"), in combination with other references. However, YMM does not disclose any "tool adapted to allow said user to compose said information" as construed by this court to require "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool." Nor would it have been obvious to one of ordinary skill in the art to modify the teachings of YMM alone, or with the teachings of any other prior art references, to arrive at the claimed inventions of the '356 patent.

88. Defendants also contend that the '356 patent is rendered obvious by a system purportedly developed by Chemical Bank called "Foreign Exchange Front End" ("FXFE") as purportedly described in an article ("the Tyler Article"), in combination with other references. FXFE is not prior art because it was not publicly used in the United States prior to the invention of the '356 patent. Moreover, FXFE does not disclose each of the limitations of the asserted claim, including "indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields" as construed by this court. Nor would it have been obvious to one of ordinary skill in the art to modify the teachings of FXFE or the Tyler Article alone, or with the teachings of any other prior art references, to arrive at the claimed inventions of the '356 patent.

89. Defendants also contend that the '356 patent is rendered obvious by U.S. Patent 4,756,706, ("the '706 patent") in combination with other references. However, the '706 patent does not disclose several limitations, including any "indicat[ors]" or any "tool adapted to allow said user to compose said information" as construed by this court to require "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool." Nor would it have been obvious to one of ordinary skill in the art to

1  modify the teachings of the '706 patent alone, or with the teachings of any other prior art references,

2  to arrive at the claimed inventions of the '356 patent.

3      90. Defendants also contend that the '356 patent is rendered obvious by Japanese Publication

4  No. JP 60-50589 ("the Japanese '589 reference") in combination with other references.  However,

5  the Japanese '589 reference does not disclose several limitations, including any "indicat[ors]" or any

6  "tool adapted to allow said user to compose said information" as construed by this court to require "a

7  graphical keyboard tool or a graphical number keypad tool, which allows the user to compose

8  information by pointing to the display keys of that tool."  Nor would it have been obvious to one of

9  ordinary skill in the art to modify the teachings of the Japanese '589 reference alone, or with the

10  teachings of any other prior art references, to arrive at the claimed inventions of the '356 patent.

11  

12      91. Defendants also point to various other references that they contend disclose "indicating

13  information fields" such as Microsoft Windows 1.01, an IBM Technical Disclosure Bulletin, a

14  reference by Pickering entitled "Touch Sensitive Screens," a reference by Newman & Sproul entitled

15  "Principles of Interactive Computer Graphics," and a reference by Moreland entitled "Human

16  Factors Guidelines."  However, defendants fail to identify which claim limitations they contend are

17  present or missing in these references.  These references do not render claim 19 or 21 obvious or

18  otherwise invalid.  These references are missing virtually all of the claim limitations, including any

19  "predefined tool associated with said one of said fields" as construed by this court to require the

20  concurrent display of "a tool specified by the system as an appropriate tool for filling in the

21  information called for by that field."  It would not have been obvious to one of ordinary skill in the

22  art to modify the teachings of any of these unrelated references, alone, or with the teachings of any

23  other prior art references, to arrive at the claimed inventions of the '356 patent.

24  

25  

26      92. Defendants also point to various other references that they contend disclose "menu tools"

27  such as Microsoft Windows 1.01 and a reference by Pickering entitled "Touch Sensitive Screens."

28

1    However, defendants fail to identify which claim limitations they contend are present or missing in

2    these references.  These references do not render claim 19 or 21 obvious or otherwise invalid.  These

3    references are missing virtually all of the claim limitations, including any "predefined tool associated

4    with said one of said fields" as construed by this court to require the concurrent display of "a tool

5    specified by the system as an appropriate tool for filling in the information called for by that field."

6    Objects such as the scrolling lists in Microsoft Windows 1.01 or the "menu list" disclosed in the

7    Pickering reference do not have the attributes of the claimed tools.  It would not have been obvious

8    to one of ordinary skill in the art to modify the teachings of any of these unrelated references, alone,

9
     or with the teachings of any other prior art references, to arrive at the claimed inventions of the '356
10
     patent.
11

12          93. Defendants also point to various other references that they contend disclose "composition

13   tools" such as Microsoft Windows 1.01, certain Xerox patents, a Xerox manual, U.S. Patent No.

14   4,587,630, U.S. Patent No. 4,509,526, U.S. Patent No. 4,570,217,  and a Donkey Kong Arcade

15   game.  However, defendants fail to identify which claim limitations they contend are present or

16   missing in these references.  These references do not render claim 19 or 21 obvious or otherwise

17   invalid.  These references are missing virtually all of the claim limitations, including any "predefined

18   tool associated with said one of said fields" as construed by this court to require the concurrent

19   display of "a tool specified by the system as an appropriate tool for filling in the information called

20   for by that field."  For example, the Xerox references disclose only screen-level or frame-level

21   composition objects.  Likewise, the "soft keyboard" discussed in the '630 patent, the "alphanumeric

22
     keyboard" discussed in the '526 patent, and the "keypad" discussed in the '217 patent are all screen-
23
     level composition objects, not composition tools within the meaning of the '356 patent.  And the on-
24
     screen calculator in Windows 1.01 was not predefined by any form entry system or associated with
25

26   any information fields.  It would not have been obvious to one of ordinary skill in the art to modify

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                     56          Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                        from consolidated cases:  02-CV-2060 B (CAB),
                                                                                        03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

the teachings of any of these unrelated references, alone, or with the teachings of any other prior art references, to arrive at the claimed inventions of the '356 patent.

94. Secondary considerations of non-obviousness also support a finding that the asserted claims of the Day '356 patent are not invalid for obviousness, including the industry acceptance of the patented technology during the years following its invention. The pre-defined and associated on-screen tools of the '356 patent are widely used and commercially successful, for example, in Microsoft applications such as Microsoft Outlook, Microsoft Money, and other programs.  The identification and long-felt need of a known problem, and the skepticism and failure of others to succeed at arriving at the invention of the '356 patent are other identified considerations.

95. Defendants rely on various other references and combinations to allege that the asserted claims of the '356 patent are obvious.  However, none of these combinations render claim 19 or 21 obvious for the additional reasons discussed in the rebuttal expert report of Bruce Tognazzini dated May 12, 2006, the supplemental rebuttal expert report of Bruce Tognazzini dated October 12, 2007, the declaration of Bruce Tognazzini dated December 14, 2007, and any other relevant declarations and/or deposition testimony.

96. On November 30, 2007, almost two years after the close of fact discovery in this case, defendants alleged that claim 19 of the Day '356 patent is invalid for anticipation under 35 U.S.C. §§ 102(b) and 102(g).  Defendants' untimely anticipation theories—which, in any event, are without merit and beyond the scope of supplemental obviousness discovery— have prejudiced Lucent, and Lucent therefore has moved *in limine* to preclude Defendants from pursuing these theories at trial.

## IV.    The Agulnick '295 Patent

### A.    The Teaching Of The Asserted Claims Of The '295 Patent

97. Lucent is the owner of the Agulnick '295 patent with the right to sue for past infringement.

98. The Agulnick '295 patent discloses technology relating to a pen computer or tablet pc and the use of gestures for controlling the computer. At the time of the '295 patent invention, most computers were operated, with rare exception, by a keyboard and a mouse. Pen-based computers, where the user inputs information by marking on the screen with a stylus, had been introduced, but the technology was unrefined and the operation and design presented many challenges. People in the industry were addressing the problem of handwriting to replace the keyboard for text input inside specific applications, but no one had considered controlling the computer overall with a stylus and gestures, let alone the many problems presented by such a concept.

99. The '295 patent disclosed a new class of computer that is controlled by a stylus executing gestures on the computer screen. (Ex. 3, '295 Patent Abstract; col. 1:6-9; FIG. 1) For example, the computer is controllable both inside applications and at the operating system level through gestures and printed characters drawn on the display screen using the electronic stylus. (*Id.* at col. 7:4-6) This new type of computer used an electronically sensed pen or stylus and digitizer to track the location of the pen or stylus as the primary input device. (*Id.*) The primary means of controlling the computer was a set of numerous gestures drawn with the stylus over almost any object visible on the display and recognized by a handwriting recognition algorithm. (*Id.* at col. 3:22-24)

100. The claims of the '295 patent cover many different inventions covering different aspects and features of a pen computer system. For instance, one of the elements of independent claim 1 requires "implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used." The court has construed this to mean "the system's designs allow[s] use of a single set of gestures for identical executable commands at both the operating system level and the application level." Additionally, one of the elements of independent claim 39 requires "recognizing at least a first gesture, a second gesture, and a third gesture comprising said

1  first and second gestures," which, generally speaking, relates to a type of compound gesture

2  recognition.  Independent claim 41 requires a "detecting means for detecting a direction of motion of

3  the creation of said gesture," which, again generally speaking, relates to a type of directional gesture

4  recognition.  The dependent claims similarly claim various aspects of a pen computer system,

5  including, by way of example, a "means for detecting proximity of the stylus tip to the screen"

6  (claim 3) and a "means . . . for displaying on said screen a shape representing the actual gesture

7  made by a user" (claim 6).

8

9      101.    Further details regarding what each of the asserted claims of the Agulnick '295 patent

10  covers is set forth below in Section IV.B.

11      **B.    Infringement of the Asserted Claims Of The Agulnick '295 Patent**

12

13      102.    Lucent contends that Microsoft, Dell, and Gateway directly and/or indirectly infringe

14  claims 1, 3, 4, 6, 12, 39-41, 43, and 46 of U.S. Patent No. 5,347,295 ("the '295 patent") under 35

15  U.S.C. §§ 271(a) and (b) by (1) making and/or using Windows XP Tablet PC Edition operating

16  system software and/or computers containing such software; (2) selling and/or distributing software

17  and/or computers containing such software to end users; (3) encouraging end users to use such

18  products; and (4) providing manuals, tutorials, help files, and other product support to users utilizing

19  the accused capabilities of such products.

20

21      103.    Lucent contends that Microsoft induces infringement of the asserted claims of the

22  '295 patent by supplying Windows XP Tablet PC Edition operating system software, for use with

23  stylus-based computing devices such as Tablet PCs, to customers and providing manuals, tutorials,

24  help files, documentation, and other product support to customers that provide information on how

25  to use these products, including the accused capabilities.  This software, as sold, when run as

26  intended on a Tablet PC computer, leads to the practice of all of the elements of the asserted claims

27  of the '295 patent.  Microsoft encouraged its customers to run this software on Tablet PCs as

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                    59                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                       from consolidated cases:  02-CV-2060 B (CAB),
                                                                                       03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    intended.  Microsoft knew, or should have known, that its actions would induce actual

2    infringements, and acted with affirmative intent to cause direct infringement.

3        104.    Lucent contends that Dell and Gateway directly infringe the asserted claims of the

4    '295 patent by making, using, selling, offering for sale in the United States, distributing, and/or

5    importing into the United States, stylus-based computing devices such as Tablet PC computer

6    systems running Windows XP Tablet PC Edition operating system software.  Lucent contends that

7    Dell and Gateway induce infringement of the asserted claims of the '295 patent by supplying Tablet

8    PC computers running Windows XP Tablet PC Edition operating system software to customers and

9    providing manuals, tutorials, help files, documentation, and other product support to customers that

10   provide information on how to use these products, including the accused capabilities.  The Tablet PC

11   computers running Windows XP Tablet PC Edition operating system software, as sold, running as

12   intended in normal use, lead to the practice of all of the elements of the asserted claims of the '295

13   patent.  Dell and Gateway encouraged its customers to use the Tablet PC computers running this

14   software as intended.  Dell and Gateway knew, or should have known, that their actions would

15   induce actual infringements, and acted with affirmative intent to cause direct infringement.

16
17
18       105.    The accused products for the Agulnick '295 Patent include: Microsoft Windows XP

19   Tablet PC edition software and computers containing such software, all of which Lucent contends

20   are stylus-based computers controlled by gestures. Lucent contends that Microsoft Windows Tablet

21   PC Edition Operating System software running on a Tablet PC device infringes the '295 patent.

22       106.    Defendants' infringement is explained below, set forth by each of the asserted

23   independent claim families: (a) Claim 1 Family (claims 1, 3, 4, 6, and 12), (b) Claim 39 Family

24   (claims 39 and 40), and (c) Claim 41 Family (claims 41, 43, and 46). Defendants' infringement is

25   more particularly explained in the claim charts attached as Exhibit A, and in the March 31, 2006

26   Expert Report of Jean Renard Ward.

27
28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                          60            Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                              from consolidated cases:  02-CV-2060 B (CAB),
                                                                              03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

### 1. Claim 1 Family

107.    Asserted claim 1 of the Agulnick '295 patent reads as follows:

1. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:

first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;

second detecting means coupled to said computer for detecting a departure of the stylus tip from the screen;

means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip;

means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape;

means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.

108.    The Court has construed the above 35 U.S.C. § 112, ¶6 "means" limitations, including the appropriate function as well as the appropriate corresponding structure.

109.    The first two limitations of claim 1 are straightforward — the claim requires a "first detecting means" for the function of *detecting* a "stroke" of the stylus tip in contact with the screen, and a "second detecting means" for the function of detecting a departure of the stylus tip from the screen.  The Court identified a pen position digitizer as the appropriate corresponding structure.

110.    The next two limitations of claim 1 are related to *defining* and *recognizing* "gestures"—which the Court has construed to mean "a symbol or mark."  First, the claim requires a means for "defining termination of a gesture" in response to the departure of the stylus tip from the

screen.  The Court identified a pen position digitizer as well as a pen position digitizer co-processor as the appropriate corresponding structure.  Next, the claim requires a means for "recognizing a plurality of said gestures" whereby such recognition includes "comparing each said gesture to at least one predefined shape."  The Court identified a pen position digitizer co-processor programmed with certain handwriting recognition algorithms as the appropriate corresponding structure.

111.    The final limitation of claim 1 is related to ***implementing*** the recognized gestures by performing some predetermined action associated with the recognized gestures and shapes.  Significantly, the claim requires that the predetermined action is determined by the ***context*** in which the gesture was used—specifically, a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.  In other words, the final limitation requires that the entire computer system be controlled by gestures at both the ***operating system*** and ***application*** level.  The Court's construction clarified that this limitation "claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level."  The Court identified a CPU programmed with algorithms for implementing gestures as the appropriate corresponding structure.

112.    The dependent claims of the claim 1 family include additional limitations.  For example, dependent claims 3 and 12 require the notion of "***proximity***" sensing, whereby the system detects "proximity of the stylus tip to the screen" even when it is not in direct contact.  Dependent claim 4 requires a detecting means for ***detecting the direction of motion*** of the stylus tip.  Dependent claim 6 requires the system to display back on the screen a shape representing the gesture made by the user.

113.    Tablet PC devices infringe the claim 1 family of claims of the '295 patent.  Tablet PC devices include Microsoft Windows Tablet PC Edition Operating System software for controlling

62

1   the computer system. Tablet PC devices also include a screen for displaying information and a stylus

2   with a tip for inputting information into the Tablet PC.

3        114.    Tablet PC devices include a pen position digitizer—electromagnetic digitizer—which

4   detects when the stylus tip is in contact with the screen.  The tablet and/or stylus includes a switch or

5   other means for detecting when the stylus tip is in contact with the screen.  A force transducer,

6   sometimes referred to as a pressure sensor, is an example of such a switch. Tablet PC Edition

7   software running on the device detects a stroke or strokes from the point in time when the stylus

8   touches the screen, through all its motion, until the time the stylus leaves the screen.  The digitizer

9   included with Tablet PC devices also detects a departure of the stylus tip from the screen.  The stylus

10  tip has departed contact with the screen when the digitizer no longer provides position information to

11  the computer, or when a force-sensing transducer or a switch or equivalent functionality indicates

12  that the stylus tip has departed contact from the screen.

13       115.    A Tablet PC device includes the pen position digitizer mentioned above and also a

14  co-processor or virtualization thereof which determines the specific coordinates of the stylus tip

15  position. Tablet PC devices include a pen position digitizer and a co-processor or virtualization

16  thereof which performs the function of defining termination of a gesture comprising at least one

17  stroke in response to the departure of the stylus tip from the screen.  Software on the computer uses

18  the departure of the stylus tip from the screen as a signal that the gesture has terminated.  The

19  transition from the state of detecting that the stylus is in contact with the screen, to the state that is

20  not, is used by software on the Tablet PC to determine that the stylus tip has departed the screen.

21       116.    The pen position co-processor is implemented in Tablet PC devices as a software

22  virtualization of hardware.  Modern CPUs in Tablet PC devices are sufficiently capable that they can

23  handle running the software run on both the main processor (CPU 50 in the '295 patent) and the pen

24  position digitizer co-processor 90 described in the '295 patent.  Accordingly, the corresponding

structure (the CPUs in Tablet PC devices) is identical to pen position digitizer co processor 90; each are computational hardware programmed to interpret stylus movements as gestures (or other, non-gesture inputs). If for some reason the fact that program execution and gesture recognition algorithms were performed on different processing cores, this difference makes no difference to operation, is insubstantial, and thus the structures are at a minimum equivalent. The Tablet PC gesture recognition code programs the general purpose CPUs of Tablet PC devices to define termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen. This implementation of software running on a CPU is at a minimum the equivalent to Pen position digitizer co processor 90.

117.    Tablet PC devices include a pen position digitizer, and a pen position digitizer co-processor or virtualization thereof. The devices include Tablet PC Edition software, which includes recognition software for comparing the actual gesture to a predefined shape, which is based on a definition of the properties of that pre-defined shape. Tablet PC Edition software includes two recognizers or recognition modules, one of which makes a comparison of an actual gesture with definitions of specific pre-defined shapes based on rules, and a second which utilizes neural network or similar technology which makes a comparison with shapes.

118.    The gesture recognition algorithms used in Tablet PC devices are identical structures to alternatives described in "Automatic Recognition of the Handprinted Characters -- The State of Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980, one of the three references cited by the Court's claim construction as corresponding structure for this limitation. The "rule-based" component is identical in structure to the relatively rigid structural recognizers described in the reference. The "neural net" recognizer is identical in structure to the adaptive and learning nets types of recognizers described in the reference. Tablet PC devices programmed with the software described above recognize numerous gestures. Tablet PC devices perform specific

predetermined actions in response to a specific gesture in which the action is further defined in terms of the context in which the gesture is used. There are numerous examples of such gestures used by the Tablet PC.

119.    Tablet PC devices allow for the entire computer system be controlled by gestures at both the operating system and application level. Tablet PCs implement predetermined actions based on the context in which the gesture is used, including a first context in which the action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. For example, at the operating system level, the system recognizes the "Tap" and "Double Tap" gestures to operate in one context such as locating and launching applications. At the application level, such as a word processing application, the system recognizes those same gestures in a second context, such as to select and highlight text. There are other gestures that are recognized in one context at the operating system leval and a second context at the application level, such the "Drag" gesture.

120.    With respect to dependent claims 3 and 12, Tablet PC devices include a digitizer with the functionality of "hover," which is a terminology for technology for sensing proximity of the stylus tip to the screen and the position of the stylus tip over the screen when the stylus tip is sufficiently near the screen but not in contact with the screen. The stylus in a Tablet PC device may include a radio frequency inductor/capacitor circuit and switch. The Tablet PC software further provides an indicator, for example a special cursor whose presence and motion indicates the position that is reported for the stylus in proximity near or over the display. This cursor is independent of and visually distinct from other cursors such as the cursor for text input location in a word processing document or text field. When the stylus is out of proximity range, the digitizer does not report the position of the stylus. Further, when the stylus is out of proximity range, software in the Tablet PC device no longer updates, changes or repositions the special cursor whose motion indicates the

65

proximity of the stylus. The fact that this special cursor is no longer moving in response to motion of the stylus indicates that the stylus is no longer in proximity. Thus the display of the indicator has been terminated.

121. With respect to dependent claim 4, software on the Tablet PC CPU or co-processor determines the direction of motion of the stylus based on the changes in the position in a sequence of points. The recognizers make use of this information to determine the direction of motion of the gesture. For example, a horizontal stroke gesture made left to right may be identified by the recognizer as the gesture "Right" and is further associated with the predetermined action of "space", whereas an identical horizontal stroke gesture made in the direction from right to left may be identified by the recognizer as the gesture "Left" and is associated with the predetermined action of "backspace."

122. With respect to dependent claim 6, Tablet PC devices further display on the screen a visible representation of the actual gesture or mark made by the user when the user writes a stroke or gesture in the form of electronic ink. An example of this functionality is exhibited by the Soft Input Panel. For example, in the boxed or "combed" mode, the display shows a representation of the gesture consisting of all the electronic ink marked in the area until the user lifts the stylus or the gesture is completed. For example, making a "Scratchout" gesture or other gesture in the Soft Input Panel shows a representation of the actual gesture in the form of electronic ink. This representation may then be removed and replaced by a character if the gesture was a handwriting character gesture.

## 2. Claim 39 Family

123. Asserted claim 39 of the Agulnick '295 patent reads as follows:

> 39. An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:
>
> detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;

means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and

implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture.

124.    As with claim 1, the Court has construed the above 35 U.S.C. § 112, ¶6 "means" limitations, including the appropriate function as well as the appropriate corresponding structure.

125.    The first two limitations of claim 39 are similar to those in claim 1 - the claim requires a "detecting means" for the function of *detecting* a "stroke" of the stylus tip in contact with the screen.  The Court identified a pen position digitizer as the appropriate corresponding structure.

126.    The next limitation of claim 39 — again similar to claim 1 — is related to *recognizing* gestures.  The first part of this limitation requires a means for "recognizing" a gesture whereby such recognition includes "comparing said gesture to at least one predefined shape."  The Court identified a pen position digitizer co-processor programmed with certain handwriting recognition algorithms as the appropriate corresponding structure.  This limitation further requires that the system recognize at least a "first" gesture, a "second" gesture, and a "third" gesture "*comprising said first and second gestures*."  The parties have referred to this as the "compound gesture" requirement.

127.    The final limitation of claim 39 — like claim 1 — is related to *implementing* the recognized gestures by performing some predetermined action associated with each of the "first," "second," and "third" gestures.  This limitation recognizes that the "third" gesture is the "compound gesture" (combination of the first two gestures), and requires a different predetermined action.  The

1  Court identified a CPU programmed with algorithms for implementing gestures as the appropriate

2  corresponding structure.

3      128.    The dependent claim of the claim 39 family include additional limitations.

4  Dependent claim 40 claims the situation where the shapes of the "first" and "second" gestures are

5  substantially identical.

6      129.    Tablet PC devices infringe the claim 39 family of claims of the '295 patent.  The

7  claim 39 family of claims include many of the same limitations of the claim 1 family. This section

8  addresses the limitations not addressed above with respect to the claim 1 family. The claim charts

9  attached as Exhibit A and March 31, 2006 Expert Report of Jean Renard Ward further explain

10  Defendants' infringement.

11

12      130.    Tablet PC devices include Tablet PC Edition software which determines termination

13  of a gesture through a combination of the stylus tip departing contact with the screen, and/or leaving

14  the active area of the touch screen, and/or a timeout after the stylus tip has left the touch screen or

15  gone out of the active area, or the stylus going out of proximity with the digitizer or screen, which

16  are functionalities described in the '295 patent.

17

18      131.    As mentioned above with respect to the claim 1 family, Tablet PC devices recognize

19  numerous gestures including a first gesture, a second gesture, and a third gesture comprising the first

20  two gestures which has come to be referred to as compound gestures in the context of the claim 39

21  family. For example, Tablet PC devices recognize the "Tap," "DoubleTap," "Up," "Down," and

22  "UpDown" gestures. Tablet PC devices perform different predetermined actions for each of these

23  separate gestures.  And with respect to dependent claim 40, some of these compound gestures

24  include circumstances where the first and second gestures are substantially identical.

25

26          **3.    Claim 41 Family**

27      132.    Asserted claim 41 of the Agulnick '295 patent reads as follows:

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT      68      Case No. 07-CV-2000 H (CAB), consisting of matters severed
AND LAW                                                                       from consolidated cases:  02-CV-2060 B (CAB),
                                                                              03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

41.  An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:

first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;

means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen:

second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and

implementing means coupled to said computer for implementing said recognized gesture, said implementing means including means for performing a predetermined action associated with said predefined shape.

133.    As with claim 1, the Court has construed the above 35 U.S.C. § 112, ¶6 "means" limitations, including the appropriate function as well as the appropriate corresponding structure.

134.    The first two limitations of claim 41 are similar to those in claims 1 and 39 — the claim requires a "detecting means" for the function of ***detecting*** a "stroke" of the stylus tip in contact with the screen.  The Court identified a pen position digitizer as the appropriate corresponding structure.

135.    The next limitation of claim 41 — again similar to claims 1 and 39 — is related to ***recognizing*** gestures.  The first part of this limitation requires a means for "recognizing" a gesture whereby such recognition includes "comparing said gesture to at least one predefined shape."  The Court identified a pen position digitizer co-processor programmed with certain handwriting recognition algorithms as the appropriate corresponding structure.

136.    The next limitation of claim 41 is a second detecting means for detecting the direction of motion of the creation of the gesture, where the predefined shape of the recognized gesture also

represents the direction of motion.  The Court identified a pen position digitizer and pen position digitizer co-processor as the appropriate corresponding structures.

137.    The final limitation of claim 41 — like claim 1 — is related to *implementing* the recognized gestures by performing some predetermined action associated with the predefined shape and gesture.  The Court identified a CPU programmed with algorithms for implementing gestures as the appropriate corresponding structure.

138.    The dependent claims of the claim 41 family include additional limitations.  For example, dependent claim 43 (like dependent claim 6) requires the system to display back on the screen a shape representing the gesture made by the user.  And dependent claim 46 requires that the direction of the motion be associated with a predetermined action.

139.    Tablet PC devices infringe the claim 41 family of claims of the '295 patent.  The claim 41 family of claims includes many of the same limitations of the claim 1 and 39 families. This section addresses the limitations not addressed above with respect to the claim 1 and 39 families. The claim charts attached as Exhibit A and March 31, 2006 Expert Report of Jean Renard Ward further explain Defendants' infringement.

140.    Tablet PC Edition software includes an element referred to as the SIP ("Soft Input Panel") which defines a special area on the screen.  When the Soft Input Panel, specifically in the non-boxed "combless" mode, is operational, gestures such as a "Right", which is associated with the predetermined action of the character "space", the gesture being a horizontal mark made left to right, must be made within this special area, which is the same area of the screen.  The same gesture made outside of this area, and thus not in the same area, such as in the text area of a word processing application, will not be recognized as the gesture "Right", or will not perform the predetermined action of a "space."  Further, the "Scratchout" gesture if made in this special area, which is the same area of the screen, will be recognized as a gesture for erasing ink and text but the same gesture made

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

70

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  in the area of the word processing document will not be so recognized, or in any case does not carry

2  out the same predetermined action.

3      141.    In the Soft Input Panel functionality of a Tablet PC device, a horizontal stroke gesture

4  made from left to right is recognized as the gesture "Right" and is associated with the predetermined

5  action of the character "space," whereas an identical horizontal stroke gesture made from right to left

6  is recognized as the gesture "Left" and is associated with the predetermined action of the character

7  "backspace."

8

9      142.    With respect to dependent claim 43 (as with dependent claim 6), Tablet PC devices

10  further display on the screen a visible representation of the actual gesture or mark made by the user

11  when the user writes a stroke or gesture in the form of electronic ink.  An example of this

12  functionality is exhibited by the Soft Input Panel.  For example, in the boxed or "combed" mode, the

13  display shows a representation of the gesture consisting of all the electronic ink marked in the area

14  until the user lifts the stylus or the gesture is completed.  For example, making a "Scratchout"

15  gesture or other gesture in the Soft Input Panel shows a representation of the actual gesture in the

16  form of electronic ink. This representation may then be removed and replaced by a character if the

17

18  gesture was a handwriting character gesture.

19      143.    With respect to dependent claim 46, software on the Tablet PC CPU or co-processor

20  determines the direction of motion of the stylus based on the changes in the position in a sequence of

21  points.  The recognizers make use of this information to determine the direction of motion of the

22  gesture.  For example, a horizontal stroke gesture made left to right may be identified by the

23  recognizer as the gesture "Right" and is further associated with the predetermined action of "space",

24  whereas an identical horizontal stroke gesture made in the direction from right to left may be

25  identified by the recognizer as the gesture "Left" and is associated with the predetermined action of

26  "backspace."  Likewise, the "UpRightLong" gesture is recognized and associated with the

27

28

1    predetermined action of inserting a tab character, whereas the "DownLeftLong" gesture (identical

2    but made in a different direction) is associated with the predetermined action of inserting a new line.

3         **C.**    **Validity of the Asserted Claims of the Agulnick '295 Patent**

4         144.    Defendants claim that the asserted claims of the Agulnick '295 Patent are anticipated

5    or rendered obvious by a number of references either alone or in combination. As an initial matter,

6    Defendants must prove by clear and convincing evidence that each of the references upon which

7    they rely qualifies as prior art under 35 U.S.C. § 102. To the extent that Defendants can carry their

8
9    burden on this issue, the asserted claims of the Agulnick '295 Patent are not invalid in view of the

10   references cited by Defendants.

11        145.    A person of ordinary skill in the art at the time of the invention would have a BS

12   degree in computer science or equivalent technical knowledge, plus 2-4 years experience in software

13   development including at least 2 years experience in pen computing development.

14
15        146.    Lucent's validity positions are set forth in detail in the Rebuttal Expert Report of Mr.

16   Jean Renard Ward dated May 12, 2006 and the Supplemental Rebuttal Expert Report of Mr. Jean

17   Renard Ward dated October 12, 2007.  As set forth below, none of the prior art references relied on

18   by Defendants—alone or in combination—anticipate and/or render obvious the asserted claims of

19   the '295 patent.

20             **1.**    **The Kim Paper**

21        147.    The Kim Paper is a description of text editing technology. The Kim Paper does not

22   disclose controlling the operating system with gestures. The Kim Paper does not disclose working on

23   operating system objects with gestures. The Kim Paper does not disclose compound gestures

24   combining a first gesture and a second gesture because it refers only to single stroke gestures and

25   single gestures. The Kim Paper does not disclose the composition of a first gesture and a second

26   gestures into a third gesture. The Kim Paper does not disclose the corresponding structure (pen

27

28

     72     Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

position digitizer co-processor) necessary to perform the functions of defining termination of a gesture and recognizing a plurality of gestures. It would not have been obvious to modify the teachings of the Kim Paper alone, or with the teachings of any of the many references suggested by defendants, to arrive at the claimed invention.

## 2.    PLI

148.    Defendants rely on four separate sources, three papers and a video when they refer to the Paper-Like Interface System ("PLI"). These four separate sources discussing the Paper-Like Interface System describe different applications, employ different recognizers, are not by the same authors, and describe different capabilities and different user interface designs. The three papers describe only the application set forth in each.

149.    The PLI references are a description of a small number of separate editing applications, such as text editing for word processing, text editing for a spreadsheet application, and musical notation editing. The PLI references do not disclose working on operating system objects with gestures. The PLI references do not disclose compound gestures combining a first gesture and a second gesture but instead refer to a dialogue interpreter for composing command sequences by grammar. The PLI references refer to single stroke gestures and single gestures. The PLI references do not disclose the composition of a first gesture and a second gesture into a third gesture. The PLI references do not disclose the corresponding structure (pen position digitizer co-processor) necessary to perform the functions of defining termination of a gesture and recognizing a plurality of gestures. It would not have been obvious to modify the PLI references alone, or with the teachings of any of the many references suggested by the defendants, to arrive at the claimed invention.

## 3.    FIDS

150.    Defendants appear to rely on two separate sources, the FIDS paper and the Proof Correction Standard - SFS 2324 ("SFS 2324") when they refer to FIDS.  The FIDS paper and SFS

1    2324 are separate sources, one discussing a flat-panel interactive display system and the other a set

2    of Finish national proofreading standards.

3    151.    The Flat Panel Interactive Display System reference ("FIDS") describes a prototype

4    tablet (flat panel display with front-mounted digitizer) and a prototype text editing application.

5    FIDS does not disclose working on operating system objects with gestures.  FIDS does not disclose

6    compound gestures.  FIDS does not disclose the corresponding structure (pen position digitizer co-

7    processor) necessary to perform the functions of defining termination of a gesture and recognizing a

8    plurality of gestures. It would not have been obvious to modify FIDS alone, or with the teachings of

9    
10   any of the many references suggested by Defendants, to arrive at the claimed invention.

11   **4.    Oed & Doster**

12   152.    The Oed paper and the Doster paper are two references and are separate sources, one

13   discussing a user friendly man-machine interface and the other discussing word processing. The Oed

14   and Doster references describe a prototype consisting of a separate tablet and display for input into

15   application programs (e.g. word processing) as a replacement for a keyboard. The Oed & Doster

16   references do not disclose working on operating system objects with gestures. The Oed & Doster

17   references do not disclose compound gestures. And they do not disclose the corresponding structure

18   
19   (pen position digitizer co-processor) necessary to perform the functions of defining termination of a

20   gesture and recognizing a plurality of gestures. It would not have been obvious to modify the Oed &

21   Doster references alone, or with the teachings of any of the many other references suggested by

22   Defendants, to arrive at the claimed invention.

23   
24   **5.    Inagaki**

25   153.    Inagaki does not disclose an apparatus for controlling a computer system within the

26   meaning of the '295 patent. Specifically, Inagaki fails to disclose a single integrated screen for

27   displaying the stroke of the stylus tip in contact with the screen. Inagaki fails to disclose means

28   
LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT    74    Case No. 07-CV-2000 H (CAB), consisting of matters severed
AND LAW                                                                from consolidated cases:  02-CV-2060 B (CAB),
                                                                       03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

coupled to said computer for detecting a stroke of the stylus tip in contact with the screen. Inagaki fails to disclose means coupled to said computer for comparing said gesture to at least one predefined shape. Further, Inagaki does not disclose the function of detecting a stroke of the stylus tip in contact with the screen. It would not have been obvious to modify Inagaki alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

### 6.    Coleman

154.    Coleman does not disclose means coupled to said computer for recognizing a gesture … "said recognizing means including means for comparing said gesture to at least one predefined shape." Coleman does not disclose means for detecting a stroke or for recognizing a gesture within the meaning of the '295 patent. Coleman fails to disclose a pen position digitizer co-processor programmed with the various recognition techniques set forth in the Court's claim construction for recognizing a gesture. It would not have been obvious to modify Coleman alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

### 7.    Sklarew

155.    Sklarew was considered by the patent Examiner of the '295 patent who determined that Sklarew did not invalidate any of the asserted claims. Sklarew does not disclose an apparatus for controlling a computer system within the meaning of the '295 patent. Sklarew does not disclose a third gesture comprising said first and second gestures, or compound gestures. It would not have been obvious to modify Sklarew alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

75

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

### 8.    Admitted Known Systems

156.    Defendants discuss an undefined group of alleged prior art references they refer to as "Admitted Known Systems." To the extent these systems are those referred to in the specification of the Agulnick '295 patent, these systems were considered by the patent Examiner of the '295 patent who concluded none of these alone or in combination invalidated any of the asserted claims of the '295 patent. It would not have been obvious to modify any of these Admitted Known Systems, alone or in combination with other systems, to arrive at the claimed invention.

### 9.    Macintosh Computer With A MicroTouch UnMouse

157.    The Macintosh computer with an UnMouse fails to disclose: a stylus which acts on the screen for displaying information; detecting a stroke of the stylus tip in contact with the screen; detecting a departure of the stylus tip from the screen; termination of gestures comprising at least one stroke in response to said departure of the stylus tip; a recognition of gestures; recognizing a plurality of gestures; comparison of gestures to at least one predefined shape; any handwriting recognition algorithm in any of the references set forth in the Court's Claim Construction Order; implementing recognized gestures; performing predetermined actions associated with a predefined shape; performing the function of predetermined actions being determined by the context in which the gesture is used; executing predetermined actions on operating system level objects in response to gestures; executing predetermined actions on application level objects in response to gestures; and strokes which are drawing movements. It would not have been obvious to modify the Macintosh and UnMouse alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

### 10.    Casio PF-8000 Calculator

158.    The Casio PF-8000 fails to disclose a single integrated screen for displaying information as well as for receiving the stroke of the stylus tip in contact with the same screen. The

Casio PF-8000 does not perform the function of detecting a stroke of the stylus tip in contact with the screen. The Casio PF-8000 fails to disclose a pen-position digitizer. It would not have been obvious to modify the Casio PF-8000 alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

### 11.    More Patent (4,839,634)

159.    The '634 patent was considered by the patent Examiner of the '295 patent who must have determined that the '634 patent did not invalidate any of the asserted claims. The '634 patent fails to disclose defining termination of a gesture as set forth by the Court's claim construction. The character recognition algorithm as disclosed by the '634 patent does not fall within the realm of recognizers referenced by the Court's claim construction. Further, the '634 patent fails to disclose performing an action in response to a gesture in the context of an operating system level object. It would not have been obvious to modify the '634 patent alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

### 12.    X Window System User's Guide

160.    The X Windows reference fails to disclose a stylus having a tip for inputting information. X Windows does not include a recognizer that falls within the Court's claim construction. X Windows fails to disclose the operation of a gesture executed on an operating system level object. X Windows does not disclose gesture within the meaning of the '295 patent because there is no comparison with predefined shapes. X Windows does not disclose recognition of direction of motion of a gesture. Additionally, because there are no gestures disclosed by X Windows, there can be no first gesture, or second gesture, and therefore no compound gestures. It would not have been obvious to modify X Windows alone, or with the teachings of any of the many other references suggested by Defendants, to arrive at the claimed invention.

161.    Secondary considerations of non-obviousness also support a finding that the asserted claims of the Agulnick '295 patent are not invalid for obviousness, including the industry acceptance of the patented technology during the years following its invention, the recognized problem and need, and the failure of others to succeed.

## V.    Validity Of Multimedia Patent Trust

### A.    Lucent's Decision Not To Participate In MPEG-LA

162.    MPEG LA is a licensing association that licenses a pool of some patents deemed "essential" to the MPEG-2 compressed video standard.  MPEG LA was formed in the mid-1990s by a group of independent companies, each of which voluntarily contributed its MPEG-2 essential patents to the patent pool.  Thereafter, additional companies joined MPEG LA, contributing their MPEG-2 essential patents as well.  MPEG LA offers companies an MPEG-2 Patent Portfolio License that provides a license to all patents in the pool for purposes of practicing the MPEG-2 standard.

163.    Although Lucent participated in the working group of independent companies that initially investigated the formation of an MPEG-2 patent pool, Lucent never became a member of MPEG LA.  Determining that the pool's expected licensing terms would undervalue Lucent's MPEG-2 essential patents, Lucent made a public business decision not to join MPEG LA when it was formed in 1997, and instead chose to license its MPEG-2 video-coding patents independently.

164.    The defendants have contended that Lucent's decision not to join MPEG LA constitutes unclean hands.  Lucent, however, was under no obligation to join. The companies that decided to pool their patents had no authority to force others to join, and, in fact, Justice Department authorization was required for the pool's creation.  Lucent's decision not to join was in all respects proper and cannot be argued to be an unconscionable act, let alone one that bears an immediate and necessary relation to the claims here or that affects the equities between the parties to this litigation.

78

**B.    Lucent's Attempts To License The Defendants To The Video Coding Patents**

165.    After Lucent's public decision not to join MPEG LA, Lucent approached a number of potential licensees to license its video-coding patents, including Dell and Gateway.  Lucent first approached Gateway in April 1998 and Dell in September 1998.  In both cases, this first assertion led to several years of licensing negotiations, which ultimately proved unsuccessful.  Lucent filed suit against Gateway in 2002 and against Dell in 2003.  Lucent filed suit against Microsoft in 2003, after Microsoft intervened in the Gateway action.

166.    After Lucent initiated negotiations, each of the defendants took MPEG-2 Patent Portfolio Licenses from MPEG LA.  Dell Products, L.P. took a license in December 2001 and Gateway, Inc. in January 2002.  Because Lucent was not a member of MPEG LA, neither Dell nor Gateway received a license to any Lucent patent by virtue of its MPEG LA Portfolio License.  Neither company had any expectation that it would ever receive such a license through MPEG LA.  Neither company suggested during its negotiations or during this litigation before the Lucent/Alcatel merger that MPEG LA had provided it a license to any Lucent patent.

167.    Microsoft did not take a Patent Portfolio License until February 2006, nearly three years after its litigation with Lucent had begun.  Microsoft did not receive a license from MPEG LA to any Lucent patent.  Microsoft had no expectation that it would ever do so.

**C.    Alcatel Makes An Independent Decision To Join MPEG LA**

168.    Before 2006, Alcatel SA was one of Lucent's primary competitors; it had no affiliation with Lucent.  Although Alcatel was not an original member of MPEG LA, in March 2003 it made its own independent business decision to join that organization.  In doing so, it contributed its MPEG-2 essential patents to the MPEG LA patent pool.  To join MPEG LA, Alcatel entered a number of agreements, including an "Agreement Among Licensors."  Under that Agreement, Alcatel

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

79

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  agreed to grant a license to any MPEG-2 essential patent that the "Party and its Affiliate(s) . . .

2  presently or in the future, have the right to license or sublicense."

3      **D.    Lucent's Merger With Alcatel**

4      169.    Over three years after Alcatel joined MPEG LA — on April 2, 2006 — Alcatel and

5  Lucent announced their intention to enter a reverse triangular merger in which Lucent would become

6  a wholly owned subsidiary of Alcatel.  On that date, Alcatel and Lucent entered into a Merger

7  Agreement.  Although the Agreement included certain reciprocal covenants from Lucent and

8  Alcatel, the Agreement expressly permitted Lucent and Alcatel to conduct their businesses in the

9

10  ordinary course without the consent of the other party, including transferring assets, entering into

11  contracts, and settling litigations.  Except for shareholders in certain circumstances, the Agreement

12  expressly disavowed any alleged third-party beneficiary.

13      170.    In an SEC proxy statement filed April 7, 2006, Lucent stated that "the way the

14  proposed merger is structured, all of the patents will continue to be owned by Lucent and its

15  subsidiaries."  That paragraph represents that Alcatel and Lucent did not intend Lucent to transfer its

16  patent portfolio to Alcatel upon completion of the merger.  To the contrary, Lucent, albeit as a

17

18  subsidiary of Alcatel, would continue to own its pre-existing Bell Labs portfolio.  Consistent with

19  that representation, Lucent owns the Bell Labs patent portfolio today.  The statement in the SEC

20  proxy statement was true when made. It remains true today — the statement made no representation

21  about transfer of individual patents.

22      171.    In another SEC statement filed April 4, 2006, Lucent stated that "[t]he 2 companies

23  will combine their patent portfolios and by doing so will reinforce their strengths in innovation and

24  the valuation of their technologies through patent licensing.   We intend to continue and strengthen

25

26  further their efforts in new patents creation."   This statement was true when made and remains true

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                    80                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1   today. While Lucent and Alcatel continue to own the patents they respectively brought with them

2   into the merger, the two portfolios have in fact been combined for licensing purposes.

3     172. Shortly after entering the Merger Agreement, each company began to assess the

4   potential impact of its merger partner's pre-existing contractual obligations on its ongoing business.

5   In this process, Lucent became concerned that certain Lucent video-coding and wireless patents

6   might become subject to Alcatel's pre-existing licensing obligations upon completion of the merger,

7   and thereby substantially devalued.

8   

9     173. At the same time, the defendants were also considering the impact of Alcatel's

10  contractual obligations. Soon after the potential merger was announced, the defendants moved the

11  Court to stay the Group 1 video-coding trial until after the completion of the merger, arguing that by

12  virtue of Alcatel's MPEG LA agreements, Lucent's video-coding patents would be swept into the

13  MPEG LA patent pool upon completion of the merger. The defendants argued that not only would

14  they become licensed to these patents going forward, but that the merger would also extinguish all

15  past liability on these patents and render moot nearly a decade of licensing negotiations and

16  litigation.

17  

18    174. During an August 14, 2007 hearing with the Court on the defendants' stay request,

19  Lucent explained that even if the merger were to be completed with Lucent still owning the Video

20  Coding Patents-in-Suit, that circumstance would not completely extinguish the defendants' liability.

21  As Lucent's counsel noted, although the MPEG LA patent license covered MPEG-2 products,

22  Lucent was also accusing MPEG-1 and WMV-9 products not covered by the MPEG LA agreements.

23  Lucent's counsel also pointed out a number of provisions of the MPEG LA agreement that could

24  prevent the Video Coding Patents-in-Suit from becoming part of the MPEG LA patent pool.

25  Lucent's counsel also informed the Court and the defendants that steps were being taken such that

26  the Video Coding Patents-in-Suit would not become part of the MPEG LA patent pool, and offered

27  

28

1    to provide the Court with an explanatory declaration.  The defendants opposed Lucent's request to

2    submit a declaration and refused to receive this information, arguing that any such information

3    would be useless until after the merger closed.

4        175.    Had the defendants permitted Lucent to submit its proposed declaration, they would

5    have learned that Lucent was considering at least two options to avoid the loss of value of its video-

6    coding patents potentially subject to Alcatel's MPEG LA agreements:  an outright sale of the patents

7    to a third party or the assignment of the patents to an irrevocable trust.

8

9        176.    Defendants had no reasonable expectation to a license to the Netravali '272 or

10   Haskell '226 patents by virtue of the Lucent/Alcatel merger.

11   **E.      The Formation Of MPT**

12       177.    Lucent ultimately chose the latter option, forming Multimedia Patent Trust before

13   completion of the merger.  On November 28, 2006 — while Lucent was an independent company,

14   with no obligation to MPEG LA — Lucent assigned nine video-coding and wireless patents to the

15   Trust, including the Netravali '272 and Haskell '226 patents.   Lucent gave up control of these

16   patents, leaving it to the Trust to preserve and maximize their value.  When Lucent became an

17   Alcatel subsidiary on November 30, 2006, Lucent did not own these patents.

18

19       178.    At the time of the transfer Lucent had no obligation to MPEG LA.  The defendants

20   were not creditors of Lucent.  To the contrary, Lucent was a creditor of each of the defendants, who

21   were liable to Lucent for patent infringement of the video-coding patents.

22       179.    As the Court has already held as a matter of law, MPT took the patents free of any

23   obligation to Alcatel and free of Alcatel's obligations to MPEG LA.  Defendants are not licensed to

24   the Netravali '272 and Haskell '226 patents, have no claim to a license, and have never had any

25   claim to a license.  Defendants were not present or future creditors at the time Lucent assigned the

26   patents to MPT.

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                          82                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

180.    Lucent had no actual intent to hinder, delay, or defraud a creditor in assigning the video-coding patents to MPT.  To the contrary, Lucent assigned those patents to preserve their value and the value of the infringement claims in this lawsuit — which have been pending for years — for its shareholders.

181.    Lucent breached no obligation in assigning the video-coding patents to MPT, nor committed any act contrary to law of accepted standards of morality.

182.    Lucent was not insolvent at the time of the patent assigment to MPT, it did not become insolvent as a result of the assignment, and MPT did not have reasonable cause to believe that Lucent was insolvent or became insolvent as a result of the assigment.

183.    Lucent received reasonably equivalent value for its patent assignment to MPT.

184.    Lucent was not engaged and was not about to be engaged in a business or a transaction for which Lucent's remaining assets were unreasonably small in relation to the business or transaction.

185.    Lucent did not intend to incur, and did not believe and reasonably should not have believed, that it would incur debts beyond its ability to pay as they became due.

186.    MPT was not an insider of Lucent and Lucent did not assigment the patents to MPT for an antecedent debt.

187.    After the merger closed — as defendants had requested — Lucent informed the Court and the parties of the formation of Multimedia Patent Trust and the assignment of the Video Coding Patents-in-Suit.  On January 26, 2007, this Court substituted Multimedia Patent Trust for Lucent as plaintiff for those patents under Fed. R. Civ. P. 25(c).

188.    Multimedia Patent Trust is an irrevocable Delaware Statutory Trust.  Lucent is the settlor of the trust, and Lucent and Lucent Technologies Foundation, a nonprofit Delaware corporation, are the named beneficiaries of the trust.

83

189.    The formation of Multimedia Patent Trust and transfer of the Video Coding Patents-in-Suit to Multimedia Patent Trust were valid and lawful.

190.    Defendants have not suffered any injury or damages as a result of Lucent's formation of MPT and assignment of the patents to MPT.

191.    Defendants continue to enjoy the same benefits of their MPEG LA licenses that they enjoyed before the formation of MPT and Lucent's assignment of patents to MPT.

192.    Lucent made no misrepresentation to the SEC, DOJ, or FTC concerning the formation of the Trust or the assignment of patents to the Trust.  Nor did Lucent engage in any conduct likely to deceive consumers regarding the video-coding patents.

F.    **The Structure And Operation Of MPT**

193.    The Trust Agreement  — the trust's governing instrument under 12 Del. Code Ann. § 3806(a) — establishes three categories of trustees, each with specifically enumerated duties and powers:  a Licensing Trustee, a Litigation Trustee, and an Administrative Trustee.  The Licensing Trustee has "the responsibility to maximize the value of Trust assets primarily through the licensing of Trust Patents" and the "exclusive right" to license the Trust patents.  Its duties and powers are set forth in Section 5.1(a).  The Litigation Trustee has "the exclusive power to initiate, prosecute, defend, negotiate and settle . . . patent infringement and other Trust litigation," and its duties and powers are set forth in Section 5.1(b).  The Administrative Trustee serves an administrative role, having duties such as preparing reports, making payments of income or principal to the beneficiaries, executing and filing documents with the Delaware Secretary of State, investing funds received on behalf of Multimedia Patent Trust, and making payments to the Licensing Trustee, Litigation Trustee, and Trust Advisor for services rendered and reasonable expenses incurred, as set forth in Section 5.1(c).  Gerard A. deBlasi — a former Lucent in-house counsel who left the company in 2001 and is now Executive Vice President of IPValue, an intellectual property licensing company —

84

1   is the Licensing Trustee and the Litigation Trustee, and Wilmington Trust Company is the

2   Administrative Trustee.

3       194.    The Trust Agreement also establishes the fiduciary role of Trust Advisor.  Although

4   Lucent may appoint the Trust Advisor, it may not appoint Lucent itself, any Lucent affiliate, or any

5   director, officer, employee of, or any person subordinate to, Lucent or any Lucent affiliate.  The

6   Trust Advisor's appointment is for a one-year term, which can be renewed for additional one-year

7   terms.  Lucent cannot terminate a Trust Advisor during his or her term.

8       195.    Section 6.1(e) sets forth the powers of the Trust Advisor, which include directing

9

10  distributions of principal in accordance with Section 3.2, removing any trustee in accordance with

11  Section 4.3, appointing successor trustees in accordance with Section 4.4, approving invoices for

12  services rendered and expenditures incurred by the trustees, approving litigation settlements, and

13  monitoring the Licensing Trustee and Litigation Trustee at the Trust Advisor's discretion.  Laura

14  Kaster is the current Trust Advisor.  Ms. Kaster has never been a Lucent employee.  And although

15  she was a former in-house counsel at AT&T, she took that position after AT&T had divested Lucent

16

17  in 1996.

18      196.    The Trust Advisor may remove a trustee, with or without cause, and appoint

19  successor trustees at any time.  In contrast, Lucent may remove a trustee, but can exercise that right

20  no more than once per calendar year, and has no power to appoint successor trustees.  Under the

21  Trust Agreement, Lucent has no right to make decisions on behalf of Multimedia Patent Trust or to

22  direct any of the trustees or the Trust Advisor to make specific decisions on behalf of Multimedia

23  Patent Trust.

24

25      197.    MPT is an entity independent of Lucent and operates independently of Lucent.

26

27

28

## VI.    Damages

198.    With respect to the Fleming '759 patent, Lucent provided Gateway with notice of its infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from Tierney to Clark.  Lucent provided notice to Dell of its infringement at least as early as October 20, 1998 at a meeting between, among others, Braski and Tierney for Lucent and Garrana and Roberts for Dell.  The assertions were repeated in detail on December 16, 1998 in a follow-up meeting which also involved David Rosenblatt on behalf of Lucent.  Lucent has not asserted the Fleming '759 patent against Microsoft in this litigation.

199.    With respect to the Day '356 patent, Lucent provided Gateway with notice of its infringement by at least as early as August 7, 2001 during a telephone conference including, among others, Samuels and Indyk from Lucent and Walker and Gilly for Gateway.  Lucent provided notice to Dell of its infringement by at least as early as July 31, 2001 at a meeting in Austin, Texas between, among others, Samuels for Lucent and Garrana for Dell.  Lucent's assertions were explained again at a follow-up meeting on January 10, 2002.  Although Microsoft was aware of infringement beforehand by virtue of its indemnification obligations to accused computer manufacturers, Lucent provided additional notice of infringement to Microsoft on January 13, 2003 in a letter from Lucent's licensing agent to Dan Crouse of Microsoft.  On March 12, 2003, Lucent's agent presented in detail allegations of infringement against Microsoft products to Microsoft.  On March 18, 2003, Microsoft intervened in the original action against Gateway and brought declaratory judgment claims with respect to the alleged infringement of this patent.  At the very latest, Microsoft's filing is effective notice for damages purposes under 35 U.S.C. § 287.

200.    With respect to the Agulnick '295 patent, Lucent informed Gateway on July 14, 2003 via letter from Maxine Graham to Steven Daniels that Lucent was adding allegations of infringement to the action filed on June 20, 2002.  This notice to amend the complaint serves as notice of Gateway's infringement pursuant to 35 U.S.C. § 287.  Lucent's filing of its complaint against Dell on February 20, 2003 serves as notice of Dell's infringement pursuant to 35 U.S.C. § 287.  Although Microsoft was aware of infringement beforehand by virtue of its indemnification obligations to accused computer manufacturers, Lucent provided additional notice of infringement to Microsoft on January 13, 2003 in a letter from Lucent's licensing agent to Dan Crouse of Microsoft.  On March 12, 2003, Lucent's agent presented in detail allegations of infringement against Microsoft products to Microsoft.

201.    Each of the patents-in-suit relate to aspects of information handling.

202.    For many years, IBM, was and continues to be very active in licensing patents and other intellectual property.  IBM's patent licensing practices have become guideposts in the information handling industry and have formed the basis for the licensing practices of many other companies in the industry, including Lucent.

203.    IBM's licensing rates have been modified several times, but since the late 1980s they have been set, for information handling devices and systems, at 1% of the licensee's selling price of apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%.  This 1% per patent concept has become a generally accepted standard in the industry.

204.    Lucent, headquartered in Murray Hill, New Jersey, is a global supplier of telecommunications technology and equipment.  Lucent was formed in 1996 as a spin-off from AT&T and includes the world-renowned Bell Laboratories.  Backed by research and development at Bell Laboratories, Lucent has generated key innovations that have enhanced the capabilities and

1    utility of personal computers.  Lucent's customer base includes communications service providers,

2    governments and enterprises worldwide.

3        205.    Following the spin-off, Lucent became the owner of nearly 25,000 patents.   The

4    patents-in-suit are among the many patents resulting from research and development at Bell

5    Laboratories, and/or fostered by the investment of Lucent and its predecessors.

6        206.    To support the pioneering work of Bell Laboratories, Lucent has spent billions of

7    dollars in research and development each year.   Lucent has an intellectual property department that

8    acquires, manages and "creates value" from Lucent's broad portfolio of intellectual property.

9    

10   Lucent derives significant revenue from licensing its patents, including the patents-in-suit.

11       207.    Like IBM, Lucent and its predecessor, AT&T, have engaged in patent licensing in an

12   organized way.  This practice has varied to some extent over the years, and at the time of Lucent's

13   formation, IBM's model had been selected.   With the exception of some special programs, that

14   practice has continued to the present day.  With respect to Lucent's granting of licenses, Lucent

15   generally requires its licensees to provide a royalty free grant back in substantially all patent licenses

16   it grants.  It is Lucent's policy to respect the IP rights of others.  However, given the strength of

17   Lucent's patent portfolio, it does not often enter into license agreements where it has to make a net

18   

19   payment to another entity.

20       208.    Dell and Gateway are manufacturers and distributors of, among other things, personal

21   computer systems and related hardware and software.  Microsoft sells, among other things, operating

22   systems and various other software programs that operate with computer systems.   All of these

23   companies have engaged in licensing of various intellectual property assets in conjunction with the

24   operation of their businesses.  License agreements produced by the parties in this action reveal that

25   Dell, Gateway and Microsoft were generally grantees or, in the case of cross-licenses, the paying

26   

27   party.

28   

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                                88        Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                       from consolidated cases:  02-CV-2060 B (CAB),
                                                                                       03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

209.    While Dell has entered into patent license agreements on an *ad hoc* basis, Dell has no standard licensing practice. Gateway also enters into license agreements on an *ad hoc* basis and does not have any standard practice.  Similarly, Microsoft does not have a standard practice.   The policy currently in effect states that Microsoft will generally license its patents at "fair and reasonable terms" and that royalty rates will "follow industry norms".

210.    Lucent is not a competitor of any of the three defendants, but rather derives revenue by licensing patents in the field to manufacturers such as Dell, Gateway and Microsoft.  Lucent's investment in research and technology, as well as the significant level of invention that emanated from its Bell Laboratories, were well known in the industry.

A.    **Damages For Infringement Of The Fleming '759 Patent**

211.    Dell commenced infringement of the Fleming '759 patent in or about mid-1995 when it began selling computer systems that incorporated Windows 95.

212.    Gateway commenced infringement of the Fleming '759 patent in or about mid-1995 when it began selling computer systems that incorporated Windows 95.

213.    The *Georgia-Pacific* hypothetical negotiation is assumed to occur in the context of patents that are known to be infringed and valid.  Although in real world negotiations the parties typically may compromise on a lesser royalty than would otherwise be applicable due to the possibility that the patents being discussed are either not infringed or invalid, in the hypothetical negotiation, no such discount is appropriate because the patents are assumed to be valid and infringed.

214.    At the time of the hypothetical negotiation in or around mid-1995, Lucent had an established policy with respect to patent licensing.  Specifically, it was Lucent's policy to grant licenses under its patents at rates of 1% of the fair market value of a covered product per patent up to

1  a maximum of 5%.  The policy contemplated that the licensee would make a royalty-free grant back
2  of a patent license to Lucent.

3          215.    Each of the defendants have made substantial royalty payments for patent licenses.
4  For example, Dell in 1988 and Gateway in 1990 entered into license agreements with IBM  that
5  included the IBM royalty approach of 1% per patent  at 1% of the licensee's selling price of
6  apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%.  Those
7  agreements also included an alternative royalty option of a running royalty of 8% on the fair market
8  value of the patented portion of the licensed product.  The general purpose of that provision was to
9  provide an approximate apportionment of the fair market value of the licensed technology in the
10 context of the normal product.  Each of those agreements was followed by subsequent agreements
11 that included very large balancing payments to IBM from Dell and Gateway.  Dell and Gateway are
12 parties to other notable license agreements including Dell's and Gateway's license agreements with
13 Texas Instruments, and Dell's license agreement with Tulip.

14         216.    The patented technology of the Fleming '759 patent is necessary to the Windows
15
16 GDI, without which Windows would not be able to display information to computer users, and
17 would not function as a commercially viable operating system.  Dell and Gateway regarded the
18 patented technology as commercially critical, as evident from the fact that they installed them on
19 essentially all the computers they sell due to competitor and customer demand.
20
21         217.    With respect to the Fleming '759 patent, Lucent is entitled to damages adequate to
22 compensate for the defendants' infringement, but in no event less than a reasonable royalty.  The
23 appropriate reasonable royalty for defendants' infringement of the Fleming '759 patent, the bases
24 therefor, and the calculations of that royalty are set forth in further detail in the expert reports of
25 Roger Smith and Wayne Hoeberlein (along with any additional supplemental reports).  Specifically,
26
27 applying the relevant *Georgia-Pacific* factors in light of applicable licensing practices and policies,
28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                          90                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                        from consolidated cases:  02-CV-2060 B (CAB),
                                                                                        03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1   and in light of the documents and licenses produced by the parties in this action, the reasonable

2   royalty adequate to compensate for defendants' infringement of the Fleming '759 patent should be

3   calculated as a 1% royalty based on the selling price of the infringing system (based in particular on

4   Lucent's licensing policy of 1% per patent, as derived from IBM's influential licensing policies and

5   practices).  Alternatively, in the event that the entire market value rule is deemed to prevent the

6   parties to the hypothetical negotiation from agreeing to their preferred rate and royalty base of the

7   infringing device, the reasonable royalty should instead be calculated as an 8% royalty based on the

8   fair market value of the accused software.  That latter calculation is based on an alternative royalty

9   option offered by IBM—as was well-known in the industry and reflected in license agreements with

10  Gateway and Dell—that calculated the royalty as a percentage of the value of the 'patented portion'

11  of the licensed product rather than the value of the complete licensed product.  Finally, as reflected

12  in certain Lucent licensing documentation, the applicable per-unit minimum royalty in connection

13  with the Fleming patent in any event should be no less than $2.00.

14  

15      218.    Lucent also seeks an accounting of damages attributable to defendants' continuing

16  infringement through and until expiration of the Fleming '759 patent, including any and all

17  additional infringing products and periods not included in defendants' damages-related document

18  productions to date.  Lucent also seeks pre-judgment and post-judgment interest on all damages.

19  

20      219.    Lucent did not unreasonably delay in bringing suit against Dell or Gateway from the

21  time it first learned (or should of have learned) of the infringement.  Any alleged delay was justified

22  including due to ongoing efforts by Lucent to reach licensing agreements with the parties and other

23  third-parties and other litigations involving Lucent's assertion of the patent.  Defendants have

24  suffered no economic, evidentiary, or other prejudice as a result of any alleged delay.

25  

26  

27  

28  

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                        91        Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                         from consolidated cases:  02-CV-2060 B (CAB),
                                                         03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

### B.     Damages For Infringement Of The Day '356 Patent

220.     Microsoft commenced infringement of the '356 Day patent in about August of 1996 when it began selling Microsoft Money Version 5.0.

221.     Dell commenced infringement of the Day '356 patent in or about February of 1997 when it began including Microsoft Office 97, which contains Microsoft Outlook 97, in its computers.

222.     Gateway commenced infringement of the Day '356 patent on about September 30, 1997 when it began including Microsoft Pro Office 97, which contains Microsoft Outlook 97, in its computers.

223.     The *Georgia-Pacific* hypothetical negotiation is assumed to occur in the context of patents that are known to be infringed and valid.  Although in real world negotiations the parties typically may compromise on a lesser royalty than would otherwise be applicable due to the possibility that the patents being discussed are either not infringed or invalid, in the hypothetical negotiation, no such discount is appropriate because the patents are assumed to be valid and infringed.

224.     At the time of the hypothetical negotiations in 1996 and 1997, Lucent had an established policy with respect to patent licensing.  Specifically, it was Lucent's policy to grant licenses under its patents at rates of 1% of the fair market value of a covered product per patent up to a maximum of 5%.  The policy contemplated that the licensee would make a royalty-free grant back of a patent license to Lucent.

225.     Each of the defendants have made substantial royalty payments for patent licenses. For example, Dell in 1988 and Gateway in 1990 entered into license agreements with IBM  that included the IBM royalty approach of 1% per patent  at 1% of the licensee's selling price of apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%.  Those

agreements also included an alternative royalty option of a running royalty of 8% on the fair market value of the patented portion of the licensed product. The general purpose of that provision was to provide an approximate apportionment of the fair market value of the licensed technology in the context of the normal product. Each of those agreements was followed by subsequent agreements that included very large balancing payments to IBM from Dell and Gateway. Dell and Gateway are parties to other notable license agreements including Dell's and Gateway's license agreements with Texas Instruments, and Dell's license agreement with Tulip. Similarly, Microsoft has agreed to pay substantial royalties, including running royalties, for rights under the patents of others, including Stac Electronics, Apple, Hewlett-Packard, and Inprise.

226. The defendants benefits from derivative or convoyed sales from their ability to sell software which infringes the '356 Day patent and from their sales of infringing computer systems.

227. The '356 Day patent provides a form-entry system that utilizes certain tools, such as menu, date and time, and composition tools, to facilitate the entry of information into the fields of computerized forms. The patented technology enables the user to rapidly enter data into the fields of a computerized form and largely eliminates the time-consuming and error-prone task of manual data entry. The products that infringe the '356 Day patent have been and continue to be successful, profitable and popular. For instance, Microsoft has included Microsoft Outlook in every version of Office it has sold, and according to Microsoft, Microsoft Outlook helps substantiate the value of Microsoft Office and is included in Microsoft Office in response to customer needs. The other accused products are similarly successful, profitable, and popular.

228. The accused products incorporate the form-entry technology of the '356 Day patent through the use of drop-down menus and calendars, and are promoted by defendants as easy to use. For example, Microsoft Outlook allows users to enter data into forms and has product documentation and marketing materials that refer to the fact that Microsoft Outlook has form-entry-

type features.   In addition, Microsoft promotes and publicizes the calendaring features of Microsoft

Outlook in a variety of ways and many customers use Microsoft Outlook's calendaring feature.

Similarly, Microsoft has promoted Microsoft Money as being "easy and efficient" and featuring "an

elegant, intuitive user interface."  Similarly, features utilizing the patented technology of the Day

'356 Patent are pervasive in the accused software, and the ordinary intended use of that software

makes use of that patented technology.  For instance, with respect to Intuit Quicken, an accounting

product, the technology of the Day '356 patent features in the forms for each accounting program

entry made by a user.

229.     With respect to the Day '356 patent, Lucent is entitled to damages adequate to

compensate for the defendants' infringement, but in no event less than a reasonable royalty.  The

appropriate reasonable royalty for defendants' infringement of the Day '356 Patent, the bases

therefor, and the calculations of that royalty are set forth in further detail in the expert reports of

Roger Smith and Wayne Hoeberlein (along with any additional supplemental reports).  Specifically,

applying the relevant *Georgia-Pacific* factors in light of applicable licensing practices and policies,

and in light of the documents and licenses produced by the parties in this action, the reasonable

royalty adequate to compensate for defendants' infringement of the Day '356 Patent should be

calculated as a 1% royalty based on the selling price of the infringing system (based in particular on

Lucent's licensing policy of 1% per patent, as derived from IBM's influential licensing policies and

practices).  Alternatively, in the event that the entire market value rule is deemed to prevent the

parties to the hypothetical negotiation from agreeing to their preferred rate and royalty base of the

infringing device, the reasonable royalty should instead be calculated as an 8% royalty based on the

fair market value of the accused software.  That latter calculation is based on an alternative royalty

option offered by IBM—as was well-known in the industry and reflected in license agreements with

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                    94                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                            from consolidated cases:  02-CV-2060 B (CAB),
                                                                                            03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

Gateway and Dell—that calculated the royalty as a percentage of the value of the 'patented portion' of the licensed product rather than the value of the complete licensed product.

230.    Lucent also seeks an accounting of damages attributable to defendants' continuing infringement through and until expiration of the Day '356 patent, including any and all additional infringing products and periods not included in defendants' damages-related document productions to date.  Lucent also seeks pre-judgment and post-judgment interest on all damages.

## C.    Damages For Infringement Of The Agulnick '295 Patent

231.    Defendants commenced infringement of the Agulnick '295 patent in approximately 2002 when they began selling Windows XP Tablet PC Edition operating system software, and/or computers including that software.

232.    The *Georgia-Pacific* hypothetical negotiation is assumed to occur in the context of patents that are known to be infringed and valid.  Although in real world negotiations the parties typically may compromise on a lesser royalty than would otherwise be applicable due to the possibility that the patents being discussed are either not infringed or invalid, in the hypothetical negotiation, no such discount is appropriate because the patents are assumed to be valid and infringed.

233.    At the time of the hypothetical negotiations in approximately 2002, Lucent had an established policy with respect to patent licensing.  Specifically, it was Lucent's policy to grant licenses under its patents at rates of 1% of the fair market value of a covered product per patent up to a maximum of 5%.  The policy contemplated that the licensee would make a royalty-free grant back of a patent license to Lucent.

234.    Each of the defendants have made substantial royalty payments for patent licenses.  For example, Dell in 1988 and Gateway in 1990 entered into license agreements with IBM  that included the IBM royalty approach of 1% per patent  at 1% of the licensee's selling price of

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

95

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%. Those

agreements also included an alternative royalty option of a running royalty of 8% on the fair market

value of the patented portion of the licensed product. The general purpose of that provision was to

provide an approximate apportionment of the fair market value of the licensed technology in the

context of the normal product. Each of those agreements was followed by subsequent agreements

that included very large balancing payments to IBM from Dell and Gateway. Dell and Gateway are

parties to other notable license agreements including Dell's and Gateway's license agreements with

Texas Instruments, and Dell's license agreement with Tulip. Similarly, Microsoft has agreed to pay

substantial royalties, including running royalties, for rights under the patents of others, including

Stac Electronics, Apple, Hewlett-Packard, and Inprise.

235.    The defendants benefits from derivative or convoyed sales from their ability to sell

software which infringes the Agulnick '295 patent and from their sales of infringing computer

systems.

236.    The use of a stylus input provided for by the '295 Agulnick patent in the defendants'

infringing systems provides substantial benefits to users. The patented technology of the Agulnick

'295 Patent provides intuitive control of tablet PCs, PDAs and other handheld devices through the

use of a position-sensitive stylus (i.e., pen-like device) and gestures, as opposed to a keyboard or

mouse/tracking device at a fixed work station. For tablet-based and/or handheld computing, use of

the Agulnick '295 Patent technology is essential to a commercially viable product. In particular,

stylus-based devices, which are typically of reduced-size and do not always have keyboards, need

the stylus functionality to operate. Use of the stylus system and associated gestures are central to the

use of PDAs and tablet PCs. The '295 Agulnick patent therefore provides substantial value to the

end users of such computer systems, and enable defendants to meet consumer demand for devices

with that functionality.

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

96

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases: 02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

237.    Defendants' products accept stylus input, and are advertised as such.  The products that infringe the Agulnick '295 patent have been and continue to be successful, profitable and popular.

238.    With respect to the Agulnick '295 patent, Lucent is entitled to damages adequate to compensate for the defendants' infringement, but in no event less than a reasonable royalty.  The appropriate reasonable royalty for defendants' infringement of the Agulnick '295 patent, the bases therefor, and the calculations of that royalty are set forth in further detail in the expert reports of Roger Smith and Wayne Hoeberlein (along with any additional supplemental reports).  Specifically, applying the relevant *Georgia-Pacific* factors in light of applicable licensing practices and policies, and in light of the documents and licenses produced by the parties in this action, the reasonable royalty adequate to compensate for defendants' infringement of the Agulnick '295 patent should be calculated as a 1% royalty based on the selling price of the infringing system (based in particular on Lucent's licensing policy of 1% per patent, as derived from IBM's influential licensing policies and practices).

239.    Lucent also seeks an accounting of damages attributable to defendants' continuing infringement through and until entry of an injunction enjoining that infringement in this action, including any and all additional infringing products and periods not included in defendants' damages-related document productions to date.  Lucent also seeks pre-judgment and post-judgment interest on all damages and a compulsory ongoing reasonable royalty to be paid by the defendants if the Court's judgment does not enjoin defendants' continued infringement.

**POINTS OF LAW**

**VII.    Issues On Which Lucent Bears The Burden Of Proof**

    **A.    Infringement**

        **1.    Direct Infringement**

240.    35 U.S.C. § 271(a) states:

> Except as otherwise provided in this title, whoever without authority
> makes, uses, offers to sell, or sells any patented invention, within the
> United States or imports into the United States any patented invention
> during the term of the patent therefor, infringes the patent.

241.    Infringement is a question of fact. *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001); *In re Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d 1527, 1541 (Fed. Cir. 1992). "The [patent owner] has the burden of proving infringement by a preponderance of the evidence." *Id*; *see Seal-Flex, Inc. v. Athletic Track & Court Construction*, 172 F.3d 836, 842 (Fed. Cir. 1999).

242.    The claims of the patent define the scope of the patented invention. "'The claims . . . provide the concise formal definition of the invention.'" *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989) (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 395-96 (Ct. Cl. 1967)). The claims provide "the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works*, 868 F.2d at 1257.

243.    "It is well-established that each claim in a patent constitutes a separate invention." *Union Oil Co. v. Atlantic Richfield Co.*, 208 F.3d 989, 1003 (Fed. Cir. 2000); *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984). "A patent is infringed if a single claim is infringed." *Intervet Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050,1055 (Fed. Cir. 1989). "A determination of patent infringement under 35 U.S.C. § 271(a) requires a two step analysis — first, the language of the claim at issue must be interpreted to define its proper scope and, second, the evidence before the

court must be examined to ascertain whether the claim has been infringed, whether the claim 'reads on' the accused product or process. The first inquiry is a question of law for the court while the second is a question of fact." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orhopaedics, Inc.*, 976 F.2d at 1559, 1570 (Fed. Cir. 1992).

244.    A patent claim defines the scope of a patentee's statutory protection. *Playtex Products, Inc. v. Procter & Bamgle Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005). The proper construction of terms and phrases within a patent claim is a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The Court's construction governs the jury's ultimate determination of whether the patent claim has been infringed. *Id.* Here, the Court has issued claim-construction Orders for the Fleming '759 patent, Day '356 patent, and Agulnick '295 patent. (D.I. 371, D.I. 1552, D.I. 172, all in 02-CV-2060)

245.    "After claim construction, the next step in an infringement analysis is comparing the properly construed claims with the allegedly infringing devices or methods. This comparison is a question of fact." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1369 (Fed. Cir. 2001) (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000)); *see also Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999) ("The second step of the infringement analysis, i.e., comparing the properly construed claims to the device accused of infringing, is a question of fact.").

246.    Infringement occurs when each limitation of a properly interpreted claim is found in the accused product or process. *Seal-Flex*, 172 F.3d at 842; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir. 1992), *abrogated on other grounds*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (en banc). "It is axiomatic that the parameters of a patent right are defined by the claims of the patent, and that if the accused matter falls within the claims, literal

1    infringement is made out." *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F. Supp. 397,

2    405 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990).

3        247.    "Infringement . . . is determined by comparing an accused product not with a

4    preferred embodiment described in the specification . . . but with the properly and previously

5    construed claims in suit." *SRI Intern. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir.

6    1985).  "[C]laims are infringed, not specifications." *Id.*  The Federal Circuit has repeatedly stated

7    that "it is error for a court to compare in its infringement analysis the accused product or process

8    with the patentee's commercial embodiment or other version of the product or process; the only

9    
10   proper comparison is with the claims of the patent." *Zenith Lab., Inc. v. Bristol-Myers Squibb Co.*,

11   19 F.3d 1418, 1423 (Fed. Cir. 1994); *Intervet Am.*, 887 F.2d at 1055.

12       248.    To establish infringement of a "means plus function" claim under 35 U.S.C. § 112,

13   paragraph 6, the patentee must prove:  (1) that the accused product performs the function recited in

14   
15   each "means plus function" claim limitation; and (2) that the accused product does so using a

16   structure that is identical or equivalent to the structure disclosed in the specification for performing

17   the claimed function, as construed by the Court.  *Cytologix Corp, v. Ventana Med. Sys.*, 424 F.3d

18   1168, 1178 (Fed. Cir. 2005); *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1222 (Fed.

19   Cir. 1996); *Laitram Corp. v.  Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991); *Pennwalt Corp.*

20   *v. Durand-Wayland, Inc.*, 83 F.2d 931, 933-34 (Fed. Cir. 1987).

21       249.    The individual components, if any, of an overall structure that corresponds to the

22   claimed function are not claim limitations. Rather, the claim limitation is the overall structure

23   corresponding to the claimed function.  *Odetics Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268

24   
25   (Fed. Cir. 1999) (emphasis added).

26       250.    If each element recited in the claims is found in the accused product, the

27   manufacturer of the accused product cannot avoid infringement merely by adding additional

elements. *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) (quoting *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983)) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment."). "Making improvements on a patented invention by adding features to a claim device beyond those recited in the patent does not avoid infringement." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004); *see also Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) (citation omitted), *cert. denied*, 469 U.S. 924 (1984) ("An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent."). Similarly, an accused method "does not avoid literally infringing a method claim . . . simply because it employs *additional* steps." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380 (Fed. Cir. 2001) (emphasis in original) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987)). The structure is viewed as a whole — its individual elements are not claim limitations. *Odetics Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) ("The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the ***overall*** structure corresponding to the claimed function.") (emphasis added).

251.    Additionally, an accused product infringes even if it does not always infringe when it is used. *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998) ("Even assuming that Nu-Kote's video establishes that its cartridge will not infringe under a

1    particular set of controlled circumstances . . . this has little bearing on whether its cartridge will

2    avoid infringement under other foreseeable operating conditions.")

3    252.    "An accused product that 'imperfectly' or 'sometimes, but not always' embodies a

4    claimed element or method nonetheless infringes." *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 741,

5    743 (W.D. Mich. 1999) (quoting *Bell Communications Research Inc. v. Vitalink Communications

6    Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995)), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000); *Paper

7    Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984) ("That the

8    machine was not operated in its optimum mode is inconsequential: imperfect practice of an invention

9    does not avoid willful infringement.").

10

11    253.    "[A] product or process that does not literally infringe upon the express terms of a

12    patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of

13    the accused product or process and the claimed elements of the patented invention."

14    *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).  Equivalence is found

15    where there are "insubstantial differences" between the accused product or process and the elements

16    of the patent claims.  *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1517

17    (Fed. Cir. 1996), *rev'd on other grounds*, 520 U.S. 17 (1997); *see also Eagle Comtronics, Inc. v.

18    Arrow Communications Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002), *cert. denied*, 537 U.S.

19    1172 (2003).  "[T]he proper time for evaluating equivalence . . . is at the time of infringement, not at

20    the time the patent was issued." *Warner-Jenkinson*, 520 U.S. at 37.  "The better view . . . is that

21    intent plays no role in the application of the doctrine of equivalents." *Id.* at 36.

22

23    **2.    Inducement of Infringement**

24    254.    35 U.S.C. § 271(b) states:

25        Whoever actively induces infringement of a patent shall be liable as an
        infringer.

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                              102                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                            from consolidated cases:  02-CV-2060 B (CAB),
                                                                            03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

255. To establish liability under Section 271(b), a patent holder must prove that once the defendant knew of the patent they "'actively and knowingly aid[ed] and abet[ed] another's direct infringement.'" *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc*) (quoting *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988)) (emphasis in original). To prove inducement, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Id.* at 17 (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)) (emphasis in original). "The requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs.*, 850 F.2d at 669; *see also Drexelbrook Controls v. Magnetrol Intern., Inc.*, 720 F.Supp. 397, 407 (D. Del. 1989). "'While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.'" *DSU*, 471 F.3d at 1305 (quoting *Water Tech.*, 850 F.2d at 668.)

256. In order to induce infringement "the actions of the party said to have been induced to infringe [must] constitute direct infringement." *Johns Hopkins Univ. v. Cellpro*, 894 F. Supp. 819, 835 (D. Del. 1995). Direct infringement, however, may be inferred from circumstantial proof. *Moleculon Research*, 793 F.2d at 1272 (holding that patentee satisfied its burden of showing direct infringement with circumstantial evidence of extensive sales and dissemination of an instruction sheet teaching the patented method); Oxford Gene Tech., 444 F. Supp. 2d at 464 (citing *Moleculon Research*, citing *Moleculon Research, v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)); *nCube v. Sea Change Int'l, Inc.*, 313 F. Supp. 2d 361, 375 (D. Del. 2004) (same); *Lucent Technologies Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 208-09 (D. Del. 2001) (finding that evidence of sales of the accused products and distribution of product manuals containing instructions on how to configure the products in an infringing manner constituted adequate circumstantial evidence that there was direct infringement).

### 3.    Contributory Infringement

257.    35 U.S.C. § 271(c) states in pertinent part:

> Whoever sells a component of . . . manufacture . . . or a material or
> apparatus for use in practicing a patented process, constituting a
> material part of the invention, knowing the same to be especially made
> or especially adapted for use in an infringement of such patent, and not
> a staple article or commodity of commerce suitable for substantial
> noninfringing use, shall be liable as a contributory infringer.

258.    To establish contributory infringement under Section 271(c), only proof of a

defendant's knowledge, and not intent, that his activity causes infringement is required.  *See*

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, (Fed. Cir. 1990).  Section 271(c)

further requires a showing that a product useful in carrying out a patented method is not a staple

article suitable for substantial noninfringing use.  *See Preemption Devices, Inc. v. Minnesota Mining*

*& Mfg. Co.*, 803 F.2d 1170 (Fed. Cir. 1986).   Additional functions in a patented device which are

performed simultaneously with the patented method do not substantiate a non-infringing use for the

purposes of § 271(c).  *Imagexpo L.L.C. v. Microsoft Corp.,* 284 F. Supp. 2d 365, 368 (E.D. Va.

2003).  Though proof of "direct infringement is essential to proving contributory infringement,"

*Refac Int'l, Ltd. v. IBM*, 798 F.2d 459, 460 (Fed. Cir. 1986), as with inducing infringement, such

proof may be circumstantial in nature.  *See Moleculon Research,* 793 F.2d at 1272.

## B.    Damages

### 1.    Damages

259.    35 U.S.C. §  284 states in pertinent part:

> Upon finding for the claimant the court shall award the claimant
> damages adequate to compensate for the infringement, but in no event
> less than a reasonable royalty for the use made of the invention by the
> infringer, together with interest and costs as fixed by the court.

260.    The assessment of damages is a question of fact, and is decided by the jury when trial

is to a jury.  "Section 284 imposes no limitation on the types of harm resulting from infringement

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

104

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

that the statute will redress.  The section's broad language awards damages for any injury as long as it resulted from the infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

261.    Under 35 U.S.C. § 284, Lucent is entitled to damages adequate to compensate for the infringement, but in no event less than a reasonable royalty.  "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).  "The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Id.*

262.    The following evidentiary facts may be relevant to the determination of the amount of a reasonable royalty for a patent license:  (1) the royalties received by the patentee for the licensing of a patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the licensee for use of other patents comparable to the patent in suit; (3) the nature and scope of the license, as exclusive or non-exclusive or as territory restricted or non-restricted; (4) the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors or inventor/promoter; (6) the extent of derivative or convoyed sales for either the licensee or licensor; (7) the duration of the patent and the term of the license; (8) the established profitability of the product made under the patent; (9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; (10) the nature of the patented invention including the character of the commercial embodiment and the benefits to those who have used the invention; (11) the extent to which the infringer has made

use of the invention; (12) the portion of the profit or of the selling price that may be customary in the

particular business or in comparable businesses to allow for the use of the invention or analogous

inventions; (13) the portion of the realizable profit that should be credited to the invention as

distinguished from non-patented elements, the manufacturing process, business risks, or significant

features or improvements added by the infringer; (14) the opinion testimony of qualified experts,

and; (15) the amount that a licensor and a licensee would have agreed upon if both had been

reasonably and voluntarily trying to reach an agreement. *Unisplay S.A. v. American Elec. Sign Co.*,

69 F.3d 512, 517 n.7 (Fed. Cir. 1995) (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*,

318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

263.    "A party that induces or contributes to infringement is jointly and severally liable

with the direct infringer for all general damages." *Crystal Semiconductor Corp. v. Tritech

Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001); *see also Glenayre Elec., Inc. v.

Jackson*, 443 F.3d 851, 858-89 (Fed. Cir. 2006). ("Where a patentee alleges that a manufacturer

contributes to and induces infringement by its customers simply because it sells infringing products

to its customers, damages assessed for indirect infringement normally will be the same as damages

that would be assessed had the patentee sued and obtained a judgment against the

customers….Indeed, in most cases damages assessed for indirect infringement will be equal to

damages assessed for the underlying direct infringement.")

264.    The entire market value rule "permits recovery of damages based on the value of the

entire apparatus containing several features, where the patent related feature is the basis for customer

demand." *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999). "The entire

market value rule is appropriate where both the patented and unpatented components together are

'analogous to components of a single assembly,' 'parts of a complete machine,' or 'constitute a

functional unit,' but not where the unpatented components have essentially no functional

1  relationship to the patented invention and . . . may have been sold with an infringing device only as a

2  matter of convenience or business advantage.'" *Tec Air*, 192 F.3d at 1362 (citing *Rite-Hite*, 56 F.3d

3  at 1550).

4      265.    Once damages are quantified, "prejudgment interest should be awarded under § 284

5  absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*,

6  461 U.S. 648, 657 (1983).  Similarly, judgment interest should be awarded under 28 U.S.C. § 1961.

7      266.    It is "standard practice" in patent infringement actions to order a post-verdict

8  accounting for any infringing sales not included in the jury's verdict.  *Mikohn Gaming Corp. v.*

9  *Acres Gaming, Inc.,* No. CV-S-97-1383-EJW, 2001 WL 34778689, at *18 (D. Nev. Aug. 2, 2001);

10  *see also IMX, Inc. v. Lendingtree, LLC,* No. Civ.03 1067 SLR, 2007 WL 1232184, at *2 (D. Del.

11  April 25, 2007) (ordering accounting for defendant's continued infringing activities during trial);

12  *Lisle Corp., v. A.J. Mfg. Co.*, No. 02 C 7024, 2004 WL 765872, at *1 (N.D. Ill. April 7, 2004)

13  (granting plaintiff's request to include an accounting for sales through injunction); *Itron, Inc. v.*

14  *Benghiat*, No. Civ.99-501 (JRT/FLN), 2003 WL 22037710, at *15 (D. Minn. Aug. 29, 2003)

15  ("Courts 'routinely grant motions for further accounting' where the jury did not consider certain

16  periods of infringing activity."); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 746, 748 (W.D. Mich.

17  1999) (granting accounting for period between the verdict and entry of a permanent injunction).  In

18  determining the amount of supplemental damages, courts apply the reasonable royalty rate

19  determined by the jury in reaching the verdict.  *See id*. at 747.

20      267.    35 U.S.C. § 283 provides that "[t]he several courts having jurisdiction of cases under

21  this title may grant injunctions in accordance with the principles of equity to prevent the violation of

22  any rights secured by patent, on such terms as the court deems reasonable."  Under "well-established

23  principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a

24  court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct 1837, 1839 (U.S. 2006).

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

107

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

To meet this burden, the patentee must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id*.

268.    Courts have granted a compulsory license where the defendant continues to infringe the patents-in-suit following the judgment, and under circumstances in which a permanent injunction was said to be inappropriate. *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co*., 758 F.2d 613, 628 (Fed. Cir. 1985) (affirming district court grant of a compulsory license at jury-determined royalty rate for continuing sales); *Foster v. Am. Mach. & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir. 1974) (affirming district court grant of a compulsory license in form of royalties); *Voda v. Cordis Corp.*, No. CIV-03-1512-L, 2006 WL 2570614, at *6 (W.D. Okla. Sept. 5, 2006) (finding that where the defendant continues to infringe post-verdict, the court must fashion a remedy for the continuing harm to the patentee); *z4 Techs., Inc. v. Microsoft Corp*., 434 F. Supp. 2d 437, 441 (E.D. Tex. 2006) (finding that the patentee could be compensated for Microsoft's future infringement by calculating a reasonable royalty for Microsoft's continued use).  The courts have recognized that the rate of such a license can easily be determined where the jury has made a clear determination of the reasonable royalty due to the infringement.  *z4 Techs, Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 442 (E.D. Tex. 2006) (finding that the calculation of future damages can be based on the same reasonable royalty calculation used by the jury at trial and by referring to Microsoft's internal records showing sales of infringing products); *Voda*, 2006 WL 2570614, at *6 (finding that post-verdict damages are "simple mathematical calculations based on defendant's sales" and ordering defendant to file quarterly sales reports); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 WL 2385139, at *5 (E.D. Tex. Aug. 16, 2006) (finding that the patentee's losses from defendant's

1   postjudgment sales of infringing products can be remedied by monetary damages in accordance with

2   the reasonable royalty set by the jury); *see also Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293,

3   1314-16 (Fed. Cir. 2007).

4          **2.    Notice**

5          269.    "35 U.S.C. § 287 prescribes that, on penalty of having their damages limited to times

6   subsequent to actual notice, patentees and their agents shall mark any "patented *article*," thereby

7   giving notice "to the public that the same is patented."  (Emphasis ours)  In addition to the clear

8   language of the statute, it is, as noted by the district court, also settled in the case law that the notice

9   requirement of this statute does not apply where the patent is directed to a process or method."

10

11  *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983).

12         270.    "The criteria for actual notice under [35 U.S.C.] § 287(a) are not coextensive with the

13  criteria for filing a declaratory judgment action.  These statutory purposes are distinct, serve different

14  policies, and are governed by different laws. The requirement of actual notice under §  287(a) is

15  designed to assure that the recipient knew of the adverse patent during the period in which liability

16  accrues, when constructive notice by marking is absent.  Actual notice may be achieved without

17  creating a case of actual controversy in terms of  28 U.S.C. § 2201."  *SRI Int'l, Inc. v. Advanced*

18

19  *Tech. Lab., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

20         271.    "It is not controlling whether the patentee threatens suit, demands cessation of

21  infringement, or offers a license under the patent."  *Id.*  "The offering of a license is actual notice."

22  *Ralston Purina Co. v. Far-Mar-Co*, 772 F.2d 1570, 1577 (Fed. Cir. 1985).  "Thus, the actual notice

23  requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and

24  the activity that is believed to be an infringement, accompanied by a proposal to abate the

25  infringement, whether by license or otherwise."  *SRI*, 127 F.3d at 1470.  "When the patentee has

26

27  notified a perceived infringer of a specified patent that a license may be needed, the sufficiency of

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                      109            Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                           from consolidated cases:  02-CV-2060 B (CAB),
                                                           03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    the notice under § 287(a) is not negated if the proposed remedy is a license instead of cessation of

2    activity." *Id.*

3            **3.      Attorneys' Fees**

4            272.    The patent statute authorizes the Court "in exceptional cases" to award "reasonable

5    attorney fees to the prevailing party." 35 U.S.C. § 285.  A court may hold a case "exceptional" even

6    though the infringer was not guilty of willful infringement.  For example, in *Beckman Instruments,*

7    *Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed. Cir. 1989), the Federal Circuit held that the district

8    court did not commit clear error in finding the case "exceptional" because of the infringer's "strategy

9    
10   of vexatious activity." *Id.* at 1551-53.

11   **VIII.   Issues On Which Defendants Bear The Burden Of Proof**

12       **A.     Validity**

13

14       273.    35 U.S.C. § 282 states in pertinent part:

15           A patent shall be presumed valid.  Each claim of a patent (whether in
16           independent, dependent, or multiple dependent form) shall be
             presumed valid independently of the validity of other claims;
17           dependent or multiple dependent claims shall be presumed valid even
             though dependent upon an invalid claim. . . . The burden of
18           establishing invalidity of a patent or any claim thereof shall rest on the
             party asserting such invalidity.

19       274.    "A patent is presumed valid."  *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999).

20
21   "One who challenges a patent's validity must prove invalidity by clear and convincing evidence."

22   *Id.* (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999)); *see also*

23   *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) ("Because the claims of a

24   patent are afforded a statutory presumption of validity, overcoming the presumption of validity

25   requires that any facts supporting a holding of invalidity must be proved by clear and convincing

26   evidence.").  "Clear and convincing evidence has been described as evidence which proves in the

27   mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are highly

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                          110            Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                from consolidated cases:  02-CV-2060 B (CAB),
                                                                03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    probable." *Intel Corp., v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting

2    *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (other citation omitted).

3       275.    "[T]he burden of persuasion is and remains always upon the party asserting

4    invalidity." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir.

5    1984) (emphasis in original).  "The presumption of validity is never . . . weakened," *ACS Hospital*

6    *Sys., Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1574-75 (Fed. Cir. 1984) (emphasis in original),

7    and "remains intact and on the challenger through the litigation, and the clear and convincing

8    standard does not change." *Hybritech Inc. v. Monclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.

9

10   Cir. 1986).  "It is not necessary that a district court declare a patent 'valid.'  In a proper case, it is

11   necessary only to hold that the patent challenger failed to carry the burden assigned to it by 35

12   U.S.C. § 282." *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984); *Ajinomoto Co., Inc. v.*

13   *Archer-Daniels-Midland Co.*, 1996 WL 621830, at *5 (D. Del. Oct. 21, 1996), *aff'd*, 228 F.3d 1338

14   (Fed. Cir. 2000).

15

16      276.    Defendant's burden is "especially heavy" when the art relied on at trial was

17   considered by the Patent Office.  *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed.

18   Cir. 2001).  In that case, the party asserting invalidity "has the added burden of overcoming the

19   deference that is due to a qualified government agency presumed to have properly done its job,

20   which includes one or more examiners who are assumed to have some expertise in interpreting the

21   references and to be familiar from their work with the level of skill in the art and whose duty it is to

22   issue only valid patents." *Id.* (citing *American Hoist & Derrick Co.* 725 F.2d at 1359).

23

24      277.    The grant of a request for reexamination is not probative of unpatentability.  *Hoechst*

25   *Celanese Corp. v. BP Chemicals Ltd.*,78 F.3d 1575, 1584 (Fed. Cir. 1996).

26

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                          111        Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                            from consolidated cases:  02-CV-2060 B (CAB),
                                                            03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

### 1. Anticipation

278.    Anticipation is a question of fact that must proved by clear and convincing evidence. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995).  The burden of proving anticipation by clear and convincing evidence rests with the party asserting invalidity.  *See Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1151 (Fed. Cir. 2004).

279.    "A party asserting that a patent claim is anticipated under 35 U.S.C. § 102 'must demonstrate, among other things, identity of invention.'"  *Minnesota Mining & Mfg. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed. Cir. 1992).  "Identity of invention is a question of fact, and one who seeks such a finding must show that each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice."  *Id.*

280.    "Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference. . . .  There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention.  *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991) (citations omitted).  "Every element of the claimed invention must be literally present [in the single prior art reference], arranged as in the claim . . . .  The identical invention must be shown in as complete detail as is contained in the patent claim."  *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) (citation omitted).  "[A]nticipation does not permit an additional reference to supply a missing claim limitation."  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002).  Absence from the reference of any claimed element negates anticipation.  *Atlas Powder Co. v. E.I. DuPont De Nemours*, 750 F.2d 1569, 1573-74 (Fed. Cir. 1984).

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

112

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

281.    "A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled." *Amgen Inc. v. Hoescht Marion Roussel, Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). "To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the art to make the anticipating subject matter." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996).

282.    "For a prior art reference to anticipate a claim, the reference must disclose each and every element of the claim with sufficient clarity to prove its existence in the prior art." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). "Although this disclosure requirement presupposes the knowledge of one skilled in the art of the claimed invention, that presumed knowledge does not grant a license to read into the prior art reference teachings that are not there. An expert's conclusory testimony, unsupported by the documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself." *Id.* "Every element of the claimed invention must be literally present [in a single prior art reference], arranged as in the claim. The identical invention must be shown in as complete detail as is contained in the patent claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) (citations omitted). "An anticipating reference must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention." *Crown Operations Int'l Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002).

### a.    **Pre-Filing Date of Invention**

283.    A patent is presumed valid and an infringer bears the burden of establishing invalidity of the patent. *Innovative Scuba Concepts, Inc.* v. *Feder Industries, Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994). The date when a patent application is filed is presumed to be the date of invention. *Wang Lab., Inc. v. Mitsubishi Elec. Am. Inc.*, 30 U.S.P.Q.2d 1241, 1246 (C.D. Cal. 1993). However,

1    when an infringer cites a reference with an effective date prior to the patentee's application date in

2    order to show invalidity of the patent, and the patentee claims a pre-filing date of invention in order

3    to avoid the cited reference, the infringer must prove by clear and convincing evidence that the

4    patentee is not entitled to the pre-filing date of invention.  *Mahurkar* v. *C.R. Bard Inc.*, 79 F.3d 1572,

5    1578 (Fed. Cir. 1996); *Innovative Scuba Concepts, Inc. v. Feder Inds, Inc.*, 26 F.3d, 1112 1115 (Fed.

6    Cir. 1994).  A patentee is entitled to a date of conception as a date of the invention if it is established

7    that the inventor acted with due diligence in reducing the invention to practice.  *Price v. Symsek*, 988

8    F.2d 1187, 1190 (Fed. Cir. 1993).

9

10       284.    Conception is the "formation in the mind of the inventor, of a definite and permanent

11   idea of the complete and operative invention, as it is hereafter to be applied in practice."  *Hybritech*

12   *Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986).  Conception is complete

13   only when the idea is so clearly defined in the inventor's mind that only ordinary skill in the art

14   would be necessary to reduce the invention to practice, without unduly extensive research and

15   experimentation.  *Sewall v. Walters*, 21 F.3d 411, 415 (Fed Cir. 1994).

16

17       285.    The Federal Circuit adheres to the "rule of reason" and "totality of the circumstances"

18   standard for corroborating evidence.  *E.g., Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993).

19   "The rule suggests a reasoned examination, analysis and evaluation of all pertinent evidence so that a

20   sound determination of the credibility of the inventor's story may be reached . . . . The rule of

21   reason, however, does not dispense with the requirement for some evidence of independent

22   corroboration."  *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985).  When assessing

23   corroborating evidence, "[a]n evaluation of all pertinent evidence must be made so that a sound

24   determination of the credibility of the inventor's story may be reached."  *Price*, 988 F.2d at 1195.

25

26       286.    "'In order to establish an actual reduction to practice, the inventor must prove that:

27   (1) he constructed an embodiment or performed a process that met all the limitations . . . and (2) he

28

determined that the invention would work for its intended purpose.'" *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998)).  "Constructive reduction to practice occurs when a patent application on the claimed invention is filed."  *Hybritech*, 802 F.2d at 1376.

### b.    35 U.S.C. § 102(a),(b)

287.    "[I]n order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public."  *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998).  "[P]rior knowledge or use by others may invalidate a patent under § 102(a) if the prior knowledge or use was accessible to the public."  *Id.*  Where the public accessibility of a student thesis or other library paper is at issue, courts look not only to whether the thesis was shelved in a public library, but also whether the thesis was "cataloged or indexed in a meaningful way."  *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989);  *Ajinomoto Co. v. Archer-Daniels-Midland Co.* 1998 WL 151411 (D. Del. Mar. 13, 1998) ("The key to determining whether the [alleged prior art] thesis was publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.")

288.    "[U]nder Section 102(a), a document is prior art only when published before the invention date."  *Mahurkar*, 79 F.3d at 1576.  To constitute a publication, a document must be publicly accessible.  A document is publicly accessible if it is "'disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.'"  *Brucklemeyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006) (citations omitted).

289.    In determining whether a reference qualifies as a "printed publication" under § 102(b), "the key inquiry is whether or not a reference has been made 'publicly accessible.'"  *In re*

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

115

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). "[A]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." *In re Elsner*, 381 F.3d 1125, 1131 (Fed. Cir. 2004), *quoting Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988). Where the public accessibility of a student thesis is at issue, courts look not only to whether the thesis was shelved in a public library, but also whether the thesis was "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989); *Ajinomoto Co. v. Archer-Daniels-Midland Co.* 1998 WL 151411 (D. Del. Mar. 13, 1998) ("The key to determining whether the [alleged prior art] thesis was publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.")

290.    Under Section 102(b), any description of the claimed invention in a printed publication prior to the critical date, *i.e.*, one year before the effective filing date of the patent, is a statutory bar. *See* 35 U.S.C. § 102(b). Courts apply the same standards for determining whether a document is a printed publication and whether an invention is described in a printed publication under both 35 U.S.C. § 102(a) and § 102(b). *See, e.g.*, 2-6 Chisum on Patents § 6.02[4] (2006).

291.    "In addition to identity of invention, anticipation [under § 102] requires that the prior art reference must be enabling, thus 'placing the allegedly disclosed matter in the possession of the public.'" *Am. Standard Inc. v. Pfizer Inc.*, 722 F.Supp. 86, 109 (D. Del. 1989) (citation omitted).

### c.    35 U.S.C. § 102(g)

292.    Under 35 U.S.C. § 102(g), a patent claim is anticipated if the claimed invention was first made by in the United States by someone other than the inventor who did not abandon, suppress, or conceal the invention. 35 U.S.C. § 102(g)(2). The person who first reduces an invention to practice is *prima facie* the first inventor. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). However, the first to conceive of an invention but second to reduce to practice will be deemed the first inventor if he was diligent in reducing the invention to practice. *Id.*

293.    There are two ways to establish reduction to practice of an invention:  constructive reduction to practice and actual reduction to practice.  The date of constructive reduction to practice of an invention is simply the filing date of a patent application that includes a claim covering the invention.  *See Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).  Actual reduction to practice, on the other hand, requires proof that:  (1) the inventor constructed an embodiment or performed a process that met all of the claim limitations; and (2) the inventor determined that the invention would work for its intended purpose.  *Id*. at 1327.  By statute, where a party is asserting invalidity of a patent — including under 35 U.S.C. § 102(g) — the party must prove reduction to practice of the alleged prior invention by clear and convincing evidence.  35 U.S.C. § 282; *see also Izumi Prods. Co. v. Kononklijke Philips Elec N.V.*, 315 F. Supp. 2d 589, 608 (D. Del. 2004) ("the party alleging prior invention must establish prior invention by clear and convincing evidence").

294.    Where an allegation of actual reduction to practice is based on inventor testimony, such testimony must be corroborated by independent evidence.  *See Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("Throughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence.")  Inventor testimony concerning alleged invalidating activity must be corroborated whether or not the inventor is a party to the action.  *See Finnigan Corp. v. United States Int'l Trade Comm.*, 180 F.3d 1354, 1367-68 (Fed. Cir. 1999).  Independent corroborating evidence "may consist of testimony of a witness, other than an inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor."  *Hahn v. Wong*, 892 F.2d 1028, 1032-33 (Fed. Cir. 1989).

295.    For activity of "another" to be prior art against a patentee's claims under § 102(g), the other's activity must satisfy the requirements of § 102(g) for making an invention.  "[P]riority of

invention [under § 102(g)] goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). "Priority therefore depends upon conception and reduction to practice.  Priority, conception, and reduction to practice are questions of law which are based on subsidiary factual finding." *Id.*

296.  "Conception is the formation 'in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is therefore to be applied in practice.'" *Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997) (citations omitted).  "Conception is the touchstone of inventorship, the completion of the mental part of invention . . . .  Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994) (citations omitted).

297.  "A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice." *Cooper*, 154 F.3d at 1327.  "In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the [claim]; and (2) he determined that the invention would work for its intended purpose." *Id.*

298.  "Depending on the character of the invention and the problem it solves, determining that the invention will work for its intended purpose may require testing.  When testing is necessary, the embodiment relied upon as evidence of priority must actually work for its intended purpose.  In addition, the inventor must contemporaneously appreciate that the embodiment worked and that it met all the limitations of the [claim]." *Id.* (citations omitted).  Where an invention "'includes a

structural feature recited as a positive limitation, conception and reduction to practice of that invention require a contemporaneous recognition of that feature.'" *Id.* at 1328 (citations omitted).

299.    "In the United States, the person who first reduces an invention to practice is '*prima facie* the first and true inventor.'" *Mahurkar*, 79 F.3d at 1577 (citation omitted).

300.    "Conception, and consequently inventorship, are questions of law . . . ." *Sewall*, 21 F.3d at 415." Conception must be proved by corroborating evidence which shows that the inventor disclosed to others his 'complete thought expressed in such clear terms as to enable those skilled in the art' to make the invention." *Kridl*, 105 F.3d at 1449-50 (citations omitted). "However 'there is no single formula that must be followed in proving corroboration.'" *Id.* (citation omitted). "Under a rule of reason analysis, an inventor's uncorroborated testimony that he conceived a utility for his invention may be accepted if there exists other corroborated evidence to indicate that the inventor's testimony is credible." *Id.* at 1451. "Under a rule of reason analysis, '[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached.'" *Mahurkar*, 79 F.3d at 1577 (citation omitted).

301.    "Reduction to practice follows conception." *Id.* at 1578. "Reduction to practice is ultimately a legal question, which is based on underlying factual determinations." *Estee Lauder v. L'Oreal, S.A.*, 129 F.3d 588, 592 (Fed. Cir. 1997).

302.    "[A]ctual reduction to practice, which constitutes in law the final phase of invention, cannot be established absent a showing of practical utility." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1563 (Fed. Cir. 1996). "It is well established . . . that proof of actual reduction to practice requires demonstration that the embodiment relied upon as evidence of priority actually worked for its intended purpose." *Newkirk v. Lulejian*, 825 F.2d 1581, 1582 (Fed. Cir. 1987). "To prove actual reduction to practice, an inventor must establish that he "'actually prepared the composition and

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

119

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

knew it would work.'" *Estee Lauder*, 129 F.3d at 592 (citations omitted).  "[R]eduction to practice requires 'the discovery that an invention actually works.'"  *Id.*  (citation omitted).

303.    "[W]here testing is required to establish utility . . . [there must] be some recognition of successful testing prior to the critical date for an invention to be reduced to practice . . . ."  *Id.* at 593.  "[A] reduction to practice does not occur until an inventor, or perhaps his agent, knows that the invention will work for its intended purpose."  *Id.*  "[W]hen testing is necessary to establish utility, there must be recognition and appreciation that the tests were successful for reduction to practice to occur."  *Id.* at 594-95.  "While evidence of in-house testing may be *prima facie* evidence of conception, reduction to practice requires that an invention be sufficiently tested to demonstrate that it will work for its intended purpose."  *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1445 (Fed. Cir. 1984).  "'When the invention has not quite passed beyond experiment and has not quite attained certainty and has fallen short of demonstrating the capacity to produce the desired result, the invention itself is still inchoate.'"  *Id.* (citation omitted).

304.    One who challenges a patent under 35 U.S.C. § 102(g) must show that the alleged prior invention was not "abandoned, suppressed, or concealed."  "'[W]hether there was suppression [or] concealment under the statute is an ultimate conclusion of law.'"  *Lutzker v. Plet*, 843 F.2d 1364, 1366 (Fed. Cir. 1988) (citation omitted).  The party asserting that a patent is invalid under § 102(g) bears the burden of proving by clear and convincing evidence that the alleged prior invention was not abandoned, suppressed or concealed.  *Oak Indus., Inc. v. Zenith Electronics Corp.*, 726 F. Supp. 1525, 1530-31 (N.D. Ill. 1989).

305.    "'The courts have consistently held that an invention, though completed, is deemed abandoned, suppressed, or concealed if, within a reasonable time after completion, no steps are taken to make the invention publicly known.'"  *Correge v. Murphy*, 705 F.2d 1326, 1330 (Fed. Cir. 1983) (citation omitted).  "[F]ailure to file a patent application; to describe the invention in a publicly

disseminated document; or to use the invention publicly have been held to constitute abandonment, suppression or concealment." *Int'l Glass Co. v. United States*, 408 F.2d 395, 403 (Ct. Cl. 1969) (citations omitted).  "[S]ome step is required to be taken by the prior inventor which allows the public to learn of the method to satisfy section 102(g) (even if the inventors wanted to keep the invention secret)." *Levi Strauss & Co. v. Golden Trade, S.r.L.*, Nos. 92 CIV. 1667 (RPP), 90 CIV. 6291 (RPP), 90 CIV. 6292 (RPP), 1995 WL 710822, at *18 (S.D.N.Y. Dec. 1, 1995).

306.    A prior method or process is deemed suppressed or concealed if kept secret even if the product of that process is disclosed to the public. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983).  "As between a prior inventor who benefits from a process by selling its product but suppresses, conceals, or otherwise keeps the process from the public, and a later inventor who promptly files a patent application from which the public will gain a disclosure of the process, the law favors the latter." *Id.*  "[I]t is the simple rule that the property right shall reside in the second inventor who disclosed and not in the first inventor who concealed, *i.e.*, the law prefers and will reward earlier disclosure over earlier invention." *Horwath v. Lee*, 564 F.2d 948, 950 (C.C.P.A. 1977).

307.    A prior process is considered suppressed or concealed when it is kept secret and a purchaser of a product would not be able to "discover the process merely by looking at the product." *Levi Strauss*, 1995 WL 710822, at *18.

### 2.    Obviousness

308.    35 U.S.C. § 103 states in pertinent part:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. patentability shall not be negatived by the manner in which the invention was made.

309.    Obviousness is a question of law based upon underlying questions of facts. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354 (Fed. Cir. 2001); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991).

310.    "Invalidity based on obviousness of a duly issued patent must be established by clear and convincing evidence." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1555 (Fed. Cir. 1995); *Takeda Chem. Indus., LTD v. Alphapharm PTY., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). "Throughout the obviousness determination, a patent retains its statutory presumption of validity, see 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001); *Takeda*, 492 F.3d at 1355.

311.    The underlying factual issues to be considered in an obviousness analysis include "four general types, all of which must be considered by the trier of fact:  (1) the scope and content of the prior art;  (2) the level of ordinary skill in the art;  (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002).  The United States Supreme Court reaffirmed the primacy of those factors in determining whether a patent is invalid for obviousness. *See KSR Int'l. Co. v. Teleflex Inc.*, --- U.S. ---, 127 S. Ct. 1727, 1734 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).  "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.  Against this background the obviousness or nonobviousness of the subject matter is determined." *Id*. (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

122

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

312.    "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *KSR*, 127 S.Ct. at 1740 (citing *United States v. Adam*, 383 U.S. 39 (1966)).

313.    "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  The Supreme Court in *KSR* "acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does' in an obviousness determination." *Takeda*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 127 S. Ct. at 1731).  "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *KSR*, 127 S.Ct. at 1741; *see also In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000). ("[I]dentification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention.").  Indeed, "a patent is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art."  *KSR*, 127 S. Ct. at 1731.  That is, decomposing an invention into its constituent elements, finding each element in the prior art, and then claiming that it is easy to reassemble these elements into the invention, is a forbidden *ex post* analysis.  *E.g.*, *In re Fritch* , 972 F.2d 1260, 1265-66 (Fed. Cir. 1992).

314.    "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."  *KSR*, 127 S. Ct. at 1734 (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985); *Pentec,*

*Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985). "[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983). "The commercial response to an invention is significant to determinations of obviousness, and is entitled to fair weight." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed. Cir. 1988). "The rationale for giving weight to the so-called 'secondary considerations' is that they provide objective evidence of how the patented device is viewed in the marketplace, by those directly interested in the product." *Id.*

315.    "When a patentee asserts that commercial success supports its contention of nonobviousness, there must of course be a sufficient relationship between the commercial success and the patented invention. The term 'nexus' is often used, in this context, to designate a legally and factually sufficient connection between the proven success and the patented invention, such that the objective evidence should be considered in the determination of nonobviousness. The burden of proof as to this connection or nexus resides with the patentee." *Id.* at 1392.

316.    "In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus . . . . A *prima facie* case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Id.*

317.    "When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . . It is thus the task of the challenger to

adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Id.* at 1393.

318.    "[W]hen differences that may appear technologically minor nonetheless have a practical impact, particularly in a crowded field, the decision maker must consider the obviousness of the new structure in this light.  Such objective indicia as commercial success, or filling an existing need, illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made." *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1273 (Fed. Cir. 1991).

319.    "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n.*, 988 F.2d 1165, 1178 (Fed. Cir. 1993).

320.    "Nonobviousness is suggested by the failure of others to 'find a solution to the problem which the patent[s] in question purport[ ] to solve.  Such evidence shows indirectly the presence of a significant defect [in the prior art] . . . .'" *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578-79 (Fed. Cir. 1991) (citation omitted).

321.    In light of the above principles, and against the factual record in this case, defendants cannot meet their burden of showing that the asserted claims of any of the Fleming '759, Day '356, or Agulnick '295 patents are obvious.

### 3.    Definiteness

322.    35 U.S.C. § 112, Para. 2 states:

> The specification shall conclude with one or more claims particularly
> pointing out and distinctly claiming the subject matter which the
> applicant regards as his invention.

323.    "Compliance with the second paragraph of section 112 is generally a question of law . . . ." *Shatterproof Glass Corp.  v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985).

1  The accused infringer has the burden of showing by clear and convincing evidence that the claims

2  are invalid for indefiniteness under § 112, second paragraph.  *North Am. Vaccine, Inc. v. American*

3  *Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993).  "A determination of claim indefiniteness is a

4  legal conclusion that is drawn from the Court's performance of its duty as the construer of patent

5  claims."  *Intel Corp. v. Via Technologies., Inc.*, 319 F.3d 1357, 1365 (Fed. Cir. 2003) (quoting

6  Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir.

7  1998)).

8

9      324.    "Determining whether a claim is indefinite requires an analysis of 'whether one

10  skilled in the art would understand the bounds of the claim when read in light of the specification . . .

11  .  If the claims read in light of the specification reasonably apprize those skilled in the art of the

12  scope of the invention, [section] 112 demands no more.'"  *Credle v. Bond*, 25 F.3d 1566, 1576

13  (Fed. Cir. 1994) (citing *Miles Lab., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)).  "To

14  determine whether a claim is indefinite, the court looks to whether one of skill in the art, after

15  reviewing the claims and the specification, would understand what is being claimed."  *The Liposome*

16  *Co. v. Vestar Inc.*, 36 U.S.P.Q.2d 1295, 1315 (D. Del. 1994). *See also Exxon Research and Eng'g*

17  *Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  There is no objective criteria used to

18  determine whether a claim is definite.  Rather, "[t]he amount of detail required to be included in

19  claims depends on the particular invention and the prior art . . . ."  *Shatterproof Glass*, 758 F.2d at

20  624.  Courts can require only that the claim language be "as precise as the subject matter permits."

21  *Id.*

22      325.    The asserted claims of the Fleming '759, Day '356, and Agulnick '295 patents are not

23

24  indefinite, as evidenced by the Court's construction of those claims.

25

26

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                                            126                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                                                       from consolidated cases:  02-CV-2060 B (CAB),
                                                                                                       03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

**B.**    **Enforceability**

1.    **Inequitable Conduct**

326.    Defendants have not alleged inequitable conduct concerning the Day '356 and Agulnick '295 patents, only the Fleming '759 patent.

327.    To establish that inequitable conduct occurred in the prosecution of a patent, the party raising the issue must prove by clear and convincing evidence that: (1) the information is material; (2) the knowledge of the information and its materiality can be charged to the patent applicant; and (3) the patent applicant's failure to disclose the information (or submission of false information) resulted from an intent to mislead the United States Patent and Trademark Office ("PTO").  *See Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988); *Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F.Supp.2d 484, 489 (D. Del. 2003) (JJF).  Inequitable conduct is an equitable defense; thus, the ultimate question of whether inequitable conduct has occurred is a question for the Court, not a jury.  *See Kingsdown Medical*, 863 F.2d at 876.

328.    "Information is deemed material if there is a substantial likelihood that a reasonable Examiner would have considered the material important in deciding whether to issue the application as a patent." *Enzo Life Sciences*, 270 F.Supp.2d at 489 (citing *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 31 (Fed.Cir.1999)).

329.    But a reference cannot be considered material if it is merely cumulative to other references that were already before the examiner, *i.e.*, "if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the USPTO." *See Regents of University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997); *Scripps Clinic & Research Foundation v. Genetech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("A reference that is simply cumulative to other references does not meet the threshold of materiality that is predicate to a holding of inequitable conduct.")  *See Heidelberg Harris, Inc. v. Mitsubishi Heavy*

*Industries, Ltd.,* 1996 WL 680243, at *6 (N.D.Ill. 1996) (holding references cited in another

reference already before the Examiner to be cumulative).

330.    Additionally, "[a] party alleging that a patent is unenforceable because of the

patentee's failure to disclose material information to the PTO must offer clear and convincing

evidence that the patentee intended to mislead the PTO.  [citation omitted]  The omission must be

made with the specific intent to mislead, not merely from carelessness in the performance of a duty."

*Speedplay Inc. v. Bebop Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000); *Akron Polymer Container Corp.*

*v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Without a factual basis to establish

a threshold level of deceitful intent, the inequitable conduct analysis is at an end.").

331.    Intent to deceive cannot be inferred solely from the fact that information was not

disclosed to the examiner; there must be an independent factual basis for a finding a deceptive intent.

*See Catalina Lighting, Inc v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288-89 (Fed. Cir. 2002); *C.R. Bard,*

*Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998) ("Deceptive intent is not inferred

simply because information was in existence that was not presented to the examiner.").

### 2.    Laches

332.    This Court has already granted summary judgment of no laches with respect to the

Day '356 and Agulnick '295 patents.

333.    The equitable issue of laches is for the Court, not the jury, to decide.  *A.C. Aukerman*

*Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992).

334.    Laches is an equitable defense, the application of which falls within the sound

discretion of the Court.  *Aukerman*, 960 F.2d at 1028.  To establish laches, the defendant must prove

by a preponderance of the evidence that (1) the plaintiff delayed filing suit for an unreasonable and

inexcusable length of time from the time the plaintiff knew or reasonably should have known of its

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW

128

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant.

2    *Id.* at 1032.  A successful laches defense only bars pre-filing damages.  *Id.* at 1028

3        335.    Because laches is an equitable defense, courts have "borrowed" the six-year damages

4    limitation period set out in 35 U.S.C. § 286 as a guideline for determining when a claim should be

5    equitably barred.  *Id.* at 1034.  The six-year limitation period for laches begins with a patentee's

6    actual or constructive knowledge of the alleged infringement and then counts forward.  *Id.*  If the

7    patentee had knowledge of the infringement more than six years before bringing suit, the law

8    imposes a rebuttal presumption of laches which "has the effect of shifting the burden of going

9    forward with evidence, not the burden of persuasion."  *Id.* at 1028.  The presumption disappears if

10   the patentee can introduce sufficient evidence to create a genuine issue that rebuts any of the laches

11   factors.  *Id.* at 1038.  Once the laches presumption disappears, the burden of going forward with the

12   evidence and the burden of persuasion rest on the defendant.  *Id.* at 1038-39.

13

14       336.    Any "delay" in filing suit must be measured from the point in time when the patentee

15   knew or should have know of the infringement, not merely the accused products.  *Aukerman*, 960

16   F.2d at 1032; *Metro. Wire Corp. v. Falcon Prods. Inc.*, 528 F. Supp. 897, 902 & n.4 (E.D. Pa. 1981)

17   (knowledge of accused products by corporate employees not relevant to laches where it could not be

18   shown that employees had "detailed knowledge" of the patent-in-suit and basis for claim of

19   infringement).

20

21       337.    Assuming that the presumption of laches arises, "the patentee may offer proof

22   directed to rebutting the laches factors. Such evidence may be directed to showing either that the

23   patentee's delay was reasonable or that the defendant suffered no prejudice or both. By raising a

24   genuine issue respecting either factual element of a laches defense, the presumption of laches is

25   overcome."  *Aukerman*, 960 F.2d at 1038 (citations omitted).

26

27

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

129

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

338.    The Federal Circuit imposes a duty upon courts to "consider and weigh any justification offered by the plaintiff for its delay" in filing an infringement suit.  *Id.* at 1033.  The Federal Circuit has recognized "negotiations with the accused" infringer and considered the "extent of infringement" to determine whether the patentee's delay was justifiable.  *Id.*

339.    It is well settled that bilateral licensing negotiations, that are progressing and appear to have a fair chance of success, excuse a patentee's delay in filing suit.  *Id.* at 1033; *RCA Corp. v. Data Gener. Corp.*, 701 F. Supp. 456, 476 (D. Del. 1988).  Accordingly, the laches period for the duration of negotiations is tolled and excluded from the calculation of the laches period.  *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 127-28 (D. Mass. 1993),  *aff'd without op.*, 26 F.3d 140 (Fed. Cir. 1994); *Valutron N.V. v. NCR Corp.*, 33 U.S.P.Q. 2d 1986, 1991-93 (S.D. Ohio 1992), *aff'd without op.*, 5 F.3d 1506 (Fed. Cir. 1993).

340.    The second element of laches requires that defendant demonstrate that it suffered "material prejudice" as a result of the plaintiff's alleged delay in filing suit.  *Aukerman*, 960 F.2d at 1033.  The prejudice may be either economic or evidentiary.  *Id.*

341.    To establish material economic prejudice, the defendant must prove that there is a nexus between its investment and the plaintiff's alleged delay in filing suit.  "[T]he court's inquiry is not whether there is evidence of capital investment. Rather, the key is whether there is a nexus between the delay and the infringer's decision to expand the infringing activity. . . . *No economic prejudice can be established if this nexus is absent*."  *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1395 (E.D. Wis. 1993) (emphasis added), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995) (reversing summary judgment of laches because lower court did not require proof of a nexus between the investment and the delay); *Minco. Inc. v. Combustion Eng'g. Inc.*, 903 F. Supp. 1204, 1221 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) (denying laches where defendant

unable to show expenditures attributable to delay, as opposed to routine business expansion);

*Northern Telecom Inc. v. Datapoint Corp.*, 23 U.S.P.Q.2d 1881, 1893 (N.D. Tex. 1992); *see also*

*Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992); *R2 Med. Sys., Inc. v.*

*Katecho, Inc.*, 931 F. Supp. 1397, 1408 (N.D. Ill.1996). Moreover, damages arising from the alleged

infringer's continuing sales of the challenged device that would have been avoided by an earlier suit

do not establish material prejudice. To prove economic harm, a mere change in position by

investing in production of the challenged device during the period of delay is insufficient. "If such

damages necessarily constituted prejudice, then practically every patent claim would establish

material prejudice." *Id.* "It is not enough that the alleged infringer changed his position — i.e.,

invested in production of the allegedly infringing device. The change must be because of and as a

result of the delay, not simply a business decision to capitalize on a market opportunity." *Hemstreet*,

972 F.2d at 1294; *see also Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1463 (Fed. Cir. 1990) (no

economic prejudice shown because the defendant would have continued the development and sales

activities regardless of what the patentee "did or did not do"), *overruled in part on other grounds*,

*Aukerman,* 960 F.2d 1020 (Fed. Cir. 1992).

342. Courts consistently reject a defendant's laches defense when "the party which

advances the defense of laches is responsible for the delay or contributes substantially to it." *Potash*

*Co. of Am. v. International Minerals & Chem. Corp.*, 213 F.2d 153, 155 (10th Cir. 1954); *see also*

*Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.*, 708 F. Supp. 1423, 1439 (D. Del. 1989)

(laches denied "where the one asserting the defense of laches was responsible for the plaintiff's

delay"); *Coleman*, 619 F. Supp. at 955.

### 3.    Unclean Hands

343. This Court has already granted summary judgment of no unclean hands with respect

to the Day '356 and Agulnick '295 patents.

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT
AND LAW                                    131                     Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                           from consolidated cases:  02-CV-2060 B (CAB),
                                                                           03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

344.    The defendant then has the burden to demonstrate the plaintiff's inequitable conduct and must also demonstrate that the plaintiff's inequitable conduct is immediately and necessarily related to the equity that the plaintiff seeks in the litigation. *Bio-Technology Gen. CgM. v. Genentech, Inc.*, 80 F.3d 1553, 1565 (Fed. Cir. 1996). The unclean hands doctrine only applies where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation. *Id.*

### C.    Trust-Related State-Law Claims

#### 1.    Delaware Uniform Fraudulent Transfers Act

345.    Each of the Defendants alleges that Lucent violated the Delaware Uniform Fraudulent Transfer Act, 6 Del. Code Ann. §§ 1301 *et seq.* ("DUFTA"), when Lucent created Multimedia Patent Trust and assigned the Video Coding Patents-in-Suit to the Trust on November 28, 2006.

346.    Claims under DUFTA can be premised on either Section 1304 or Section 1305 of the Act. Under Section 1304(a)(1), which addresses actual fraud, "a transfer made or obligation incurred by a ***debtor*** is fraudulent as to a ***creditor***, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor." 6. Del. Code Ann. § 1304(a)(1) (emphasis added). Section 1304(a)(2), on the other hand, addresses constructive fraud, and deems fraudulent as to a ***creditor*** a transfer made by a ***debtor*** that is made "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 6. Del. Code Ann. § 1304(a)(2).

347.    Section 1305, which is limited to alleged claims that arose before the purported fraudulent transfer was made, deems that a transfer "by a ***debtor*** is fraudulent as to a ***creditor***" where "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation," or where "the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent."  6 Del. Code Ann. § 1305(a) and (b) (emphasis added)

348.    Under DUFTA, a creditor is "a person who has a claim against a debtor," where "claim" is defined as a "right to ***payment***, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  6 Del. Code Ann. § 1301(3) and (4) (emphasis added).

349.    An obligation not reducible to a monetary payment cannot constitute a "claim."  In *Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218 (Del. Ch. 2006), the court found that preferred shareholders were ***not*** creditors of the corporation because, even though the corporation owed them contractual legal obligations, their preferred shares provided no guaranteed right of ***payment***.  *Id.* at 224, 230.  And this holding is consistent with the holding of the Third Circuit in *In re Ben Franklin Assocs.*, 186 F.3d 301 (3d Cir. 1999), which found that an equitable right to reinstatement in a partnership was not a "claim" under the Bankruptcy Code because it was ***not reducible to a monetary payment***.  *Id.* at 304-05, 308.  Thus, to qualify as a creditor, a plaintiff must have a claim to the transferor's ***money***:

> The operative phrase in the definition is 'right to payment.  Unless the plaintiff has a legal 'right,' he does not hold a 'claim' and, therefore, is not a 'creditor.'  Granted, 'claim' can be, and often is, broadly construed to encompass virtually very type of demand raised by a plaintiff, regardless of the legal theory employed.  While such broad construction may be acceptable in common parlance, it is inappropriate under UFTA. . . .  ***[T]he only people who are 'creditors' are those who have a 'right' to a***

*transferor's money, and the only persons who are restrained by UFTA are 'debtors' who are 'liable on a claim.'*

JOHN E. SULLIVAN III, FUTURE CREDITORS AND FRAUDULENT TRANSFERS: WHEN A CLAIMANT DOESN'T HAVE A CLAIM, WHEN A TRANSFER ISN'T A TRANSFER, WHEN FRAUD DOESN'T STAY FRAUDULENT, AND OTHER IMPORTANT LIMITS TO FRAUDULENT TRANSFERS LAW FOR THE ASSET PROTECTION PLANNER, 22 DEL. J. CORP. L. 955, 976-77 (1977).

350.    Consistent with DUFTA's requirement that a creditor have a right to **payment**, a "'future creditor' does not exist unless a conveying party can reasonably foresee incurring **the costs** of a claim or judgment at the time of the conveyance." *Leopold v. Tuttle*, 549 A.2d 151, 154 (Pa. Super. 1988).

### 2.    Common-Law Fraud

351.    The elements of common law fraud under Delaware law are: 1) a false representation, usually one of fact; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006).  Fraud may also occur through deliberate concealment of material facts. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).  But whether a fraud claim is based on false representation or deliberate concealment, "both require an intentional deception of the plaintiff by the defendant, which the plaintiff relies upon to his detriment." *See, e.g.*, *Lock v. Schreppler*, 426 A.2d 856, 861 (Del. Super. Ct. 1981).

### 3.    California Business and Professions Code § 17200 *et seq.*

352.    California Business and Professions Code § 17200 *et seq.* ("Section 17200") defines "unfair competition" as including "any unlawful, unfair or fraudulent business act or practice."  Cal Bus. & Prof. Code § 17200.  Because Gateway's Section 17200 claim against Lucent is grounded in

1    the fraud prong of Section 17200, Gateway must prove that Lucent made a misrepresentation, and

2    that the public, *i.e.*, consumers, are likely to be deceived by Lucent's misrepresentation. *Vess v.*

3    *Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *see Terarecon, Inc. v Fovia, Inc.*,

4    2006 WL 2691405 at *2 (N.D. Cal. Sep. 20, 2006); *Bardin v. Daimler-Chrysler Corp.*, 39 Cal. Rptr.

5    3d 634, 636 (Cal. Ct. App. 2006). In *Bardin*, a Section 17200 fraud claim was dismissed because the

6    Defendants asserted unsupported, conclusory statements that the public was likely to be deceived.

7    *Id.* at 647-48; *see Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 127-28 (Cal. Ct. App.

8    2007) (dismissing a Section 17200 claim where complainant failed to show that the defendant "gave

9    any information . . . which could have the likely effect of misleading the public. . .").

10

11        353.    Therefore, to prevail on its Section 17200 claim, Gateway must "demonstrate by

12    extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead

13    consumers." *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260 (C.D. Cal. 2003).

14        354.    Statements made to the SEC, even if false or misleading, *cannot form the basis of a*

15    *Section 17200 claim*; section 17200 does not apply to securities transactions as a matter of law. *See,*

16    *e.g., Bowen v. Ziasun Tech., Inc.*, 11 Cal. Rptr. 3d 522, 533 (Cal. App. Ct. 2004); *Scognamillo v.*

17    *Credit Suisse First Boston, LLC*, No. C03-2061 THE, 2005 U.S. Dist. LEXIS 20221, at *36-*37

18    (N.D. Cal. Aug. 25, 2005).

19

20        355.    Under recently enacted Proposition 64, to have standing a Section 17200 plaintiff

21    must suffer (1) injury in fact and (2) pecuniary loss, both as a result of the alleged unfair

22    competition. *See, e.g., Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 731-32 (9th Cir. 2007).

23

24            **4.    Tortious Interference With Prospective Economic Advantage**

25        356.    The elements of a claim for tortuous interference with prospective economic

26    advantage or business expectancy are (1) an economic relationship containing the probability of

27    future economic benefit to plaintiff; (2) knowledge by defendant of the relationship; (3) intentional

28

LUCENT'S MEMORANDUM OF CONTENTIONS OF FACT    135    Case No. 07-CV-2000 H (CAB), consisting of matters severed
AND LAW                                                                              from consolidated cases: 02-CV-2060 B (CAB),
                                                                                     03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1   acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship;

2   and (5) damages to plaintiff proximately caused by defendants' acts.  *Med. Alert Ambulance, Inc. v.*

3   *Atl. Health Sys., Inc.,* 2007 WL 2297335, *14 (D.N.J. Aug. 6, 2007).

4        357.    To sustain a claim for tortious interference with prospective economic advantage,

5   Defendants must prove malice, "harm [that] was inflicted intentionally and without justification of

6   excuse."  *Lamorte Burns & Co. v. Walters,* 770 A.2d 1158, 1170 (N.J. 2001).  The act of

7   interference must be independently wrongful: "conduct that is fraudulent, dishonest, or illegal and

8   thereby interferes with a competitor's economic advantage."  *Id.*

9        358.    The alleged malicious conduct must be both injurious and transgressive of generally

10  accepted standards of common morality and of law."  *Id.* at 1170-71.  Conduct that is not wrongful

11  or in breach of an obligation is not malicious — "[t]hat which one has a right to do cannot become a

12  tort when it is done."  *Kopp, Inc. v. United Tech., Inc.,* 539 A.2d 309, 315 (N.J. Super. 1988).

### ABANDONED ISSUES

     359.    Lucent has not abandoned any issues raised by its pleadings.

### EXHIBITS TO BE OFFERED BY LUCENT

     360.    Lucent incorporates by reference *Plaintiffs' Combined Trial Exhibit List*, filed

concurrently herewith.

### WITNESSES TO BE OFFERED BY LUCENT

     361.    Lucent incorporates by reference *Plaintiffs' Combined Trial Witness List*, filed

concurrently herewith.

Dated:  January 14, 2008

By:  _____ s/David A. Hahn _____
David A. Hahn, SBN 125784
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

John M. Desmarais (admitted *pro hac vice*)
Robert A. Appleby (admitted *pro hac vice*)
James Marina (admitted *pro hac vice*)
Michael P. Stadnick (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Attorneys for *Lucent Technologies Inc.*