

1  David A. Hahn, SBN 125784
   HAHN & ADEMA
2  501 West Broadway, Suite 1600
   San Diego, California 92101-3595
3  Telephone (619) 235-2100
   Facsimile  (619) 235-2101

4  Attorneys for *Multimedia Patent Trust*

5              **UNITED STATES DISTRICT COURT**
6            **SOUTHERN DISTRICT OF CALIFORNIA**

7  LUCENT TECHNOLOGIES INC. and
   MULTIMEDIA PATENT TRUST,

8        Plaintiffs and Counterclaim-Defendants,

9
   v.
10

11  GATEWAY, INC. and GATEWAY COUNTRY
    STORES LLC, GATEWAY COMPANIES, INC.,
12  GATEWAY MANUFACTURING LLC and
    COWABUNGA ENTERPRISES, INC.,
13
         Defendants and Counter-claimants,
14

15  and

16  MICROSOFT CORPORATION,

17       Intervenor and Counter-claimant,

18  MICROSOFT CORPORATION,

19       Plaintiff and Counter-Defendant,

20
    v.
21

    LUCENT TECHNOLOGIES INC.,
22
         Defendant and Counter-claimant.,
23  LUCENT TECHNOLOGIES INC. and
    MULTIMEDIA PATENT TRUST,
24
         Plaintiffs,
25  v.

26  DELL INC.,

27       Defendant.

28

Case No. 07-CV-2000 H (CAB)
consisting of matters severed from
consolidated cases:
02-CV-2060 B (CAB)
03-CV-0699 B (CAB)
03-CV-1108 B (CAB)

**MULTIMEDIA PATENT TRUST'S
MEMORANDUM OF
CONTENTIONS OF FACT AND
LAW**

Date:            February 20, 2008
Time:            9:00 A.M.
Courtroom:       13, 5th Floor

Honorable Marilyn L. Huff

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ..............................................................................................................1

MPT'S CONTENTIONS OF MATERIAL FACT ............................................................1

I.      The Parties ...........................................................................................................1

II.     The Netravali '272 Patent ...................................................................................3

        A.      The Teaching Of The Asserted Claim Of The Netravali '272 Patent ....................3

        B.      Infringement Of The Asserted Claim Of The Netravali '272 Patent ......................4

                1.      Mediamatics MPEG-1 Decoder ................................................4
                2.      Cyberlink MPEG-2 Decoder .....................................................6
                3.      Intervideo MPEG-2 Decoder ....................................................9

        C.      Validity Of The Asserted Claim Of The Netravali '272 Patent ...........................12

III.    The Haskell '226 Patent ....................................................................................18

        A.      The Teaching Of The Asserted Claim Of The Haskell '226 Patent .....................18

        B.      Infringement Of The Asserted Claim Of The Haskell '226 Patent ......................19

                1.      Mediamatics MPEG-1 Decoder ..............................................19
                2.      Cyberlink MPEG-2 Decoder ...................................................22
                3.      Intervideo MPEG-2 Decoder ..................................................25
                4.      Xbox 360 MPEG-2 Decoder ....................................................29
                5.      WMV-9 Main Profile Decoder ................................................31
                6.      WMV-9 Advanced Profile Decoder .........................................35
                7.      Xbox 360 WMV-9/VC-1 Decoder ..........................................38
                8.      VC-1 32-Bit Decoder ...............................................................41
                9.      VC-1 64-Bit Decoder ...............................................................42
                10.     Windows Media Player 11 WMV-9/VC-1 Decoder ...................42
                11.     Vista WMV-9/VC-1 Decoder ..................................................43

        C.      Validity Of The Asserted Claim Of The Haskell '226 Patent ..............................45

IV.     Validity Of Multimedia Patent Trust ..............................................................59

        A.      Lucent's Decision Not To Participate In MPEG-LA ...........................................59

        B.      Lucent's Attempts To License The Defendants To The Netravali '272 and
                Haskell '226 Patents ...........................................................................................60

        C.      Alcatel Makes An Independent Decision To Join MPEG LA ..............................60

        D.      Lucent's Merger With Alcatel .............................................................................61

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW                                                  i                Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                     from consolidated cases:  02-CV-2060 B (CAB),
                                                                     03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

E.    The Formation Of MPT ................................................................63

F.    The Structure And Operation Of MPT .........................................65

V.    Damages For The Netravali '272 And Haskell '226 Patents............................67

POINTS OF LAW ................................................................................................76

I.    Issues On Which MPT Bears The Burden Of Proof.........................................76

      A.    Infringement..........................................................................76

            1.    Direct Infringement.................................................76
            2.    Inducement of Infringement ...................................81
            3.    Contributory Infringement .....................................82

      B.    Damages................................................................................83

            1.    Damages...................................................................83
            2.    Notice.......................................................................87
            3.    Attorneys' Fees .......................................................88

II.   Issues On Which Defendants Bears The Burden Of Proof.............................88

      A.    Validity .................................................................................88

            1.    Anticipation.............................................................90
            2.    Obviousness ..........................................................100

      B.    Enforceability......................................................................105

            1.    Inequitable Conduct ..............................................105
            2.    Laches.....................................................................107
            3.    Unclean Hands .......................................................110

      C.    Trust-Related State-Law Claims ........................................111

            1.    Delaware Uniform Fraudulent Transfers Act ............111
            2.    Common-Law Fraud...............................................113
            3.    California Business and Professions Code § 17200 *et seq.* .........113
            4.    Tortious Interference With Prospective Economic Advantage ...114

ABANDONED ISSUES.......................................................................................115

EXHIBITS TO BE OFFERED BY MPT ...........................................................115

WITNESSES TO BE OFFERED BY MPT .........................................................115

1

# TABLE OF AUTHORITIES

2

3 CASES

4 *A.B. Dick Co. v. Burroughs Corp.*,
   713 F.2d 700 (Fed. Cir. 1983).................................................................................79

5
6 *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
   960 F.2d 1020 (Fed. Cir. 1992).................................................................107, 108, 109

7 *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
   828 F. Supp. 1386 (E.D. Wis. 1993), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995)........................109
8
9 *ACS Hospital Sys., Inc. v. Montefiore Hospital*,
   732 F.2d 1572 (Fed. Cir. 1984)................................................................................89

10
11 *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*,
   1996 WL 621830 (D. Del. Oct. 21, 1996), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000).................89

12 *Ajinomoto Co. v. Archer-Daniels-Midland Co.*
   1998 WL 151411 (D. Del. Mar. 13, 1998) ....................................................................93, 94

13
14 *Akron Polymer Container Corp. v. Exxel Container, Inc.*,
   148 F.3d 1380 (Fed. Cir. 1998)................................................................................106

15 *Alpex Computer Corp. v. Nintendo Co. Ltd.*,
   102 F.3d 1214 (Fed. Cir. 1996)................................................................................79
16
17 *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
   725 F.2d 1350 (Fed. Cir. 1984)................................................................................89, 90

18 *Am. Standard Inc. v. Pfizer Inc.*,
   722 F. Supp. 86 (D. Del. 1989)................................................................................94
19
20 *Amgen Inc. v. Hoescht Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)................................................................................91

21 *Amstar Corp. v. Envirotech Corp.*,
   730 F.2d 1476 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 924 (1984)................................80
22
23 *Aptix Corp. v. Quickturn Design Sys., Inc.*,
   269 F.3d 1369 (Fed. Cir. 2001)................................................................................110

24 *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
   776 F.2d 281 (Fed. Cir. 1985)................................................................................102
25
26 *Atlas Powder Co. v. E.I. DuPont De Nemours*,
   750 F.2d 1569 (Fed. Cir. 1984)................................................................................91

27

28

*Autogiro Co. of Am. v. United States*,
  384 F.2d 391 (Ct. Cl. 1967) ........................................................................................77

*Bandag, Inc. v. Gerrard Tire Co.*,
  704 F.2d 1578 (Fed. Cir. 1983) ...................................................................................87

*Bardin v. Daimler-Chrysler Corp.*,
  39 Cal. Rptr. 3d 634 (Cal. Ct. App. 2006) .................................................................114

*Beckman Instruments, Inc. v. LKB Produkter AB*,
  892 F.2d 1547 (Fed. Cir. 1989) ...................................................................................88

*Bell Communications Research Inc. v. Vitalink Communications Corp.*,
  55 F.3d 615 (Fed. Cir. 1995) .......................................................................................80

*In re Ben Franklin Assocs.*,
  186 F.3d 301 (3d Cir. 1999) .......................................................................................112

*Bio-Technology Gen. CgM. v. Genentech, Inc.*,
  80 F.3d 1553 (Fed. Cir. 1996) ...................................................................................110

*Bowen v. Ziasun Tech., Inc.*,
  11 Cal. Rptr. 3d 522 (Cal. App. Ct. 2004) .................................................................114

*Brucklemeyer v. Ground Heaters, Inc.*,
  445 F.3d 1374 (Fed. Cir. 2006) ...................................................................................94

*Budde v. Harley-Davidson, Inc.*,
  250 F.3d 1369 (Fed. Cir. 2001) ...................................................................................89

*Burroughs Wellcome Co. v. Barr Lab., Inc.*,
  40 F.3d 1223 (Fed. Cir. 1994) .....................................................................................96

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998) .................................................................................106

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*,
  134 F.3d 1085 (Fed. Cir. 1998) ...................................................................................80

*Catalina Lighting, Inc v. Lamps Plus, Inc.*,
  295 F.3d 1277 (Fed. Cir. 2002) .................................................................................106

*Coleman v. Dines*,
  754 F.2d 353 (Fed. Cir. 1985) .............................................................................92, 110

*Colorado v. New Mexico*,
  467 U.S. 310 (1984) .....................................................................................................89

*Constant v. Advanced Micro-Devices, Inc.*,
  848 F.2d 1560 (Fed. Cir. 1988) ...................................................................................94

*Continental Can Co. v. Monsanto Co.*,
  948 F.2d 1264 (Fed. Cir. 1991) ...........................................................................100, 103

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW

ii

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Cooper v. Goldfarb*,
   154 F.3d 1321 (Fed. Cir. 1998)..............................................................93, 95, 96, 97

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
   868 F.2d 1251 (Fed. Cir. 1989).........................................................................77

*Correge v. Murphy*,
   705 F.2d 1326 (Fed. Cir. 1983).........................................................................99

*Credle v. Bond*,
   25 F.3d 1566 (Fed. Cir. 1994)..........................................................................104

*In re Cronyn*,
   890 F.2d 1158 (Fed. Cir. 1989).....................................................................93, 94

*Crown Operations Int'l Ltd. V. Solutia, Inc.*,
   289 F.3d 1367 (Fed. Cir. 2002)..................................................................91, 100

*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001).........................................................................84

*Cytologix Corp, v. Ventana Med. Sys.*,
   424 F.3d 1168 (Fed. Cir. 2005).........................................................................79

*Daugherty v. Am. Honda Motor Co.*,
   51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2007) ....................................................114

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
   851 F.2d 1387 (Fed. Cir. 1988)..................................................................102, 103

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
   257 F.3d 1364 (Fed. Cir. 2001).........................................................................80

*Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*,
   720 F. Supp. 397 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990) ...........78, 81

*DSU Medical Corp. v. JMS Co., Ltd.*,
   471 F.3d 1293 (Fed. Cir. 2006) (*en banc*) .....................................................81

*Eagle Comtronics, Inc. v. Arrow Communications Labs., Inc.*,
   305 F.3d 1303 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003)......................81

*eBay Inc. v. MercExchange, L.L.C.*,
   126 S.Ct 1837 (U.S. 2006).................................................................................86

*Ecolab, Inc. v. Envirochem, Inc.*,
   264 F.3d 1358 (Fed. Cir. 2001).........................................................................78

*Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*,
   168 F.3d 28 (Fed.Cir.1999)..............................................................................105

*In re Elsner*,
   381 F.3d 1125 (Fed. Cir. 2004).........................................................................94

*Enzo Life Sciences, Inc. v. Digene Corp.*,
   270 F.Supp.2d 484 (D. Del. 2003)................................................................105

*Estee Lauder v. L'Oreal, S.A.*,
   129 F.3d 588 (Fed. Cir. 1997)..............................................................97, 98

*Exxon Research and Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001)................................................................104

*Finnigan Corp. v. Int'l Trade Comm'n*,
   180 F.3d 1354 (Fed. Cir. 1999)............................................................89, 95

*Foster v. Am. Mach. & Foundry Co.*,
   492 F.2d 1317 (2d Cir. 1974)......................................................................86

*In re Fritch*
   , 972 F.2d 1260 (Fed. Cir. 1992).................................................................102

*Fujikawa v. Wattanasin*,
   93 F.3d 1559 (Fed. Cir. 1996)......................................................................98

*Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*,
   60 F.3d 770 (Fed. Cir. 1995)......................................................................109

*Gaudiosi v. Mellon*,
   269 F.2d 873 (3d Cir. 1959)......................................................................110

*General Motors Corp. v. Devex Corp.*,
   461 U.S. 648 (1983)......................................................................................85

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)............................................................84

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
   45 F.3d 1550 (Fed. Cir. 1995)....................................................................100

*Glaxo Inc. v. Novopharm Ltd.*,
   52 F.3d 1043 (Fed. Cir. 1995)......................................................................90

*Glenayre Elec., Inc. v. Jackson*,
   443 F.3d 851 (Fed. Cir. 2006)......................................................................84

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966).....................................................................101, 102, 112

*Hahn v. Wong*,
   892 F.2d 1028 (Fed. Cir. 1989)....................................................................96

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*,
   906 A.2d 218 (Del. Ch. 2006)....................................................................112

*In re Hayes Microcomputer Prods. Patent Litig.*,
   982 F.2d 1527 (Fed. Cir. 1992).............................................................76, 77

*Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.,*
    1996 WL 680243 (N.D.Ill. 1996) ...................................................................106

*Heighley v. J.C. Penney Life Ins. Co.,*
    257 F. Supp. 2d 1241 (C.D. Cal. 2003) .........................................................114

*Hemstreet v. Computer Entry Sys. Corp.,*
    972 F.2d 1290 (Fed. Cir. 1992)......................................................................109

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,*
    909 F.2d 1464 (Fed. Cir. 1990).......................................................................82

*Hilgraeve Corp. v. Symantec Corp.,*
    265 F.3d 1336 (Fed. Cir. 2001).......................................................................76

*Hoechst Celanese Corp. v. BP Chemicals Ltd.,*78
    F.3d 1575 (Fed. Cir. 1996) .............................................................................90

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,*
    398 F. Supp. 2d 305 (D. Del. 2005)...............................................................110

*Horwath v. Lee,*
    564 F.2d 948 (C.C.P.A. 1977) .........................................................................99

*Hybritech Inc. v. Monclonal Antibodies, Inc.,*
    802 F.2d 1367 (Fed. Cir. 1986)...........................................................89, 92, 93

*Imagexpo L.L.C. v. Microsoft Corp.,*
    284 F. Supp. 2d 365 (E.D. Va. 2003) .............................................................82

*IMX, Inc. v. Lendingtree, LLC,*
    No. Civ.03 1067 SLR, 2007 WL 1232184 (D. Del. April 25, 2007)....................85

*Innovative Scuba Concepts, Inc.* v. *Feder Industries, Inc.,*
    26 F.3d 1112 (Fed. Cir. 1994)........................................................................92

*Int'l Glass Co. v. United States,*
    408 F.2d 395 (Ct. Cl. 1969) ...........................................................................99

*Intel Corp., v. U.S. Int'l Trade Comm'n,*
    946 F.2d 821 (Fed. Cir. 1991)........................................................................89

*Intel Corp. v. Via Technologies., Inc.,*
    319 F.3d 1357 (Fed. Cir. 2003).....................................................................104

*Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.,*
    708 F. Supp. 1423 (D. Del. 1989)..................................................................110

*Intervet Am., Inc. v. Kee-Vet Lab., Inc.,*
    887 F.2d 1050,1055 (Fed. Cir. 1989)........................................................77, 79

*Itron, Inc. v. Benghiat,*
    No. Civ.99-501..............................................................................................85

*Izumi Prods. Co. v. Kononklijke Philips Elec N.V.*,
   315 F. Supp. 2d 589 (D. Del. 2004)...............................................................................95

*Johns Hopkins Univ. v. Cellpro*,
   894 F. Supp. 819 (D. Del. 1995)...................................................................................81

*Jones v. Hardy*,
   727 F.2d 1524 (Fed. Cir. 1984)...........................................................................77, 89

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006)....................................................................................101

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
   177 F.3d 968 (Fed. Cir. 1999)......................................................................................78

*Kemco Sales, Inc. v. Control Papers Co.*,
   208 F.3d 1352 (Fed. Cir. 2000)....................................................................................78

*Kimberly-Clark Corp. v. Johnson & Johnson*,
   745 F.2d 1437 (Fed. Cir. 1984)....................................................................................98

*King Instruments Corp. v. Perego*,
   65 F.3d 941 (Fed. Cir. 1995)........................................................................................83

*Kingsdown Medical Consultants v. Hollister Inc.*,
   863 F.2d 867 (Fed. Cir. 1988)....................................................................................105

*In re Klopfenstein*,
   380 F.3d 1345 (Fed. Cir. 2004)....................................................................................94

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004)....................................................................................90

*Kopp, Inc. v. United Tech., Inc.*,
   539 A.2d 309 (N.J. Super. 1988).................................................................................115

*In re Kotzab*,
   217 F.3d 1365 (Fed. Cir. 2000)..................................................................................101

*Kridl v. McCormick*,
   105 F.3d 1446 (Fed. Cir. 1997)..............................................................................96, 97

*KSR Int'l. Co. v. Teleflex Inc.*,
   --- U.S. ---, 127 S. Ct. 1727 (2007)....................................................................101, 102

*Laitram Corp. v. Rexnord, Inc.*,
   939 F.2d 1533 (Fed. Cir. 1991)....................................................................................79

*Lamorte Burns & Co. v. Walters*,
   770 A.2d 1158 (N.J. 2001).........................................................................................115

*Leopold v. Tuttle*,
   549 A.2d 151 (Pa. Super. 1988).................................................................................113

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
   382 F.3d 1354 (Fed. Cir. 2004)......................................................................................79

*Lisle Corp., v. A.J. Mfg. Co.*,
   No. 02 C 7024, 2004 WL 765872 (N.D. Ill. April 7, 2004) ...................................85

*Lock v. Schreppler*,
   426 A.2d. 856 (Del. Super. Ct. 1981) .........................................................................113

*Lozano v. AT&T Wireless Servs.*,
   504 F.3d 718 (9th Cir. 2007) ........................................................................................114

*Lucent Technologies Inc. v. Newbridge Networks Corp.*,
   168 F. Supp. 2d 181 (D. Del. 2001)..............................................................................82

*Lutzker v. Plet*,
   843 F.2d 1364 (Fed. Cir. 1988) .....................................................................................98

*Mahurkar* v. *C.R. Bard Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996)............................................................................... *passim*

*Manville Sales Corp. v. Paramount Sys., Inc.*,
   917 F.2d 544 (Fed. Cir. 1990)........................................................................................81

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) .................................77, 78

*McGinley v. Franklin Sports, Inc.*,
   262 F.3d 1339 (Fed. Cir. 2001)........................................................................89, 90, 100

*Med. Alert Ambulance, Inc. v. Atl. Health Sys., Inc.*,
   2007 WL 2297335 (D.N.J. Aug. 6, 2007) .................................................................114

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*,
   288 F. Supp. 2d 601 (D. Del. 2003)............................................................................106

*Metro. Wire Corp. v. Falcon Prods. Inc.*,
   528 F. Supp. 897 (E.D. Pa. 1981)................................................................................107

*Meyers v. Brooks Shoe, Inc.*,
   912 F.2d 1459 (Fed. Cir. 1990), *overruled* ................................................................109

*Mikohn Gaming Corp. v. Acres Gaming, Inc.*,
   No. CV-S-97-1383-EJW, 2001 WL 34778689 (D. Nev. Aug. 2, 2001) ................85

*Miles Lab., Inc. v. Shandon Inc.*,
   997 F.2d 870 (Fed. Cir. 1993)......................................................................................104

*Minco. Inc. v. Combustion Eng'g. Inc.*,
   903 F. Supp. 1204 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) ......109

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orhopaedics, Inc.*,
   976 F.2d (Fed. Cir. 1992)...........................................................................................77, 90

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases: 02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Moleculon Research Corp. v. CBS, Inc.*,
 793 F.2d 1261 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987)..........................80, 82, 83

*Motorola, Inc. v. Interdigital Tech. Corp.*,
 121 F.3d 1461 (Fed. Cir. 1997)...................................................................................................91

*nCube v. Sea Change Int'l, Inc.*,
 313 F. Supp. 2d 361 (D. Del. 2004)............................................................................................82

*Newkirk v. Lulejian*,
 825 F.2d 1581 (Fed. Cir. 1987)...................................................................................................98

*North Am. Vaccine, Inc. v. Am. Cyanamid Co.*,
 7 F.3d 1571 (Fed. Cir. 1993)....................................................................................................104

*Northern Telecom Inc. v. Datapoint Corp.*,
 23 U.S.P.Q.2d 1881 (N.D. Tex. 1992).......................................................................................109

*Oak Indus., Inc. v. Zenith Electronics Corp.*,
 726 F. Supp. 1525 (N.D. Ill. 1989) ............................................................................................99

*Odetics Inc. v. Storage Tech. Corp.*,
 185 F.3d 1259 (Fed. Cir. 1999)...................................................................................................79

*Okajima v. Bourdeau*,
 261 F.3d 1350 (Fed. Cir. 2001).................................................................................................100

*Oney v. Ratliff*,
 182 F.3d 893 (Fed. Cir. 1999).....................................................................................................89

*Paice LLC v. Toyota Motor Corp.*,
 No. 2:04-CV-211-DF, 2006 WL 2385139 (E.D. Tex. Aug. 16, 2006)......................................87

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
 745 F.2d 11 (Fed. Cir. 1984).......................................................................................................80

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
 83 F.2d 931 (Fed. Cir. 1987).......................................................................................................79

*Pentec, Inc. v. Graphic Controls Corp.*,
 776 F.2d 309 (Fed. Cir. 1985)...................................................................................................102

*Playtex Products, Inc. v. Procter & Bamgle Co.*,
 400 F.3d 901 (Fed. Cir. 2005).....................................................................................................77

*Potash Co. of Am. v. Int'l Minerals & Chem. Corp.*,
 213 F.2d 153 (10th Cir. 1954)...................................................................................................109

*PPG Indus., Inc. v. Guardian Indus. Corp.*,
 75 F.3d 1558 (Fed. Cir. 1996).....................................................................................................91

*Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*,
 803 F.2d 1170 (Fed. Cir. 1986)...................................................................................................82

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW
viii
Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*Price v. Symsek,*
    988 F.2d 1187 (Fed. Cir. 1993)................................................................92, 93

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.,*
    989 F. Supp. 547 (D. Del. 1997)...............................................................99

*R2 Med. Sys., Inc. v. Katecho, Inc.,*
    931 F. Supp. 1397 (N.D. Ill.1996) ...........................................................109

*Ralston Purina Co. v. Far-Mar-Co,*
    772 F.2d 1570 (Fed. Cir. 1985)................................................................88

*RCA Corp. v. Data Gener. Corp.,*
    701 F. Supp. 456 (D. Del. 1988)...............................................................108

*Read Corp. v. Portec, Inc.,*
    970 F.2d 816 (Fed. Cir. 1992)..................................................................78

*Refac Int'l, Ltd. v. IBM,*
    798 F.2d 459 (Fed. Cir. 1986)..................................................................83

*Regents of University of California v. Eli Lilly & Co.,*
    119 F.3d 1559 (Fed. Cir. 1997)................................................................106

*Richardson v. Suzuki Motor Co., Ltd.,*
    868 F.2d 1226 (Fed. Cir. 1989)................................................................90, 91

*Ristvedt-Johnson, Inc. v. Brandt, Inc.,*
    805 F. Supp. 549 (N.D. Ill. 1992) ............................................................110

*Rite-Hite Corp. v. Kelley Co.,*
    56 F.3d 1538 (Fed. Cir. 1995)..................................................................83, 85

*Ruiz v. A.B. Chance Co.,*
    234 F.3d 654 (Fed. Cir. 2000)..................................................................102

*Scognamillo v. Credit Suisse First Boston, LLC,*
    No. C03-2061 THE, 2005 U.S. Dist. LEXIS 20221 (N.D. Cal. Aug. 25, 2005).................114

*Scripps Clinic & Research Found. v. Genentech, Inc.,*
    927 F.2d 1565 (Fed. Cir. 1991)................................................................90, 106

*Seal-Flex, Inc. v. Athletic Track & Court Construction,*
    172 F.3d 836 (Fed. Cir. 1999)..................................................................77, 78

*Sewall v. Walters,*
    21 F.3d 411 (Fed Cir. 1994).....................................................................92, 97

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,*
    758 F.2d 613 (Fed. Cir. 1985)..................................................................86, 104, 105

*Speedplay Inc. v. Bebop Inc.,*
    211 F.3d 1245 (Fed. Cir. 2000)................................................................106

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW
       ix       Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases: 02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

*SRI Int'l, Inc. v. Advanced Tech. Lab., Inc.*,
    127 F.3d 1462 (Fed. Cir. 1997)..................................................................................87, 88

*SRI Intern. v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985).........................................................................................78

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983).............................................................................................113

*Stiftung v. Renishaw PLC*,
    945 F.2d 1173 (Fed. Cir. 1991).........................................................................................79

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983).......................................................................................102

*Stryker Corp. v. Davol, Inc.*,
    75 F. Supp. 2d 741 (W.D. Mich. 1999) ............................................................................80

*Stryker Corp. v. Davol, Inc.*,
    75 F. Supp. 2d 746 (W.D. Mich. 1999) ......................................................................85, 86

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991).......................................................................................103

*Takeda Chem. Indus., LTD v. Alphapharm PTY., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007)................................................................................100, 101

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999).........................................................................................85

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002).........................................................................................91

*Terarecon, Inc. v Fovia, Inc.*,
    2006 WL 2691405 (N.D. Cal. Sep. 20, 2006) ................................................................113

*Texas Instruments, Inc. v. United States Int'l Trade Comm'n.*,
    988 F.2d 1165 (Fed. Cir. 1993).......................................................................................103

*The Liposome Co. v. Vestar Inc.*,
    36 U.S.P.Q.2d 1295 (D. Del. 1994).................................................................................104

*Union Oil Co. v. Atlantic Richfield Co.*,
    208 F.3d 989 (Fed. Cir. 2000)...........................................................................................77

*Unisplay S.A. v. Am. Elec. Sign Co.*,
    69 F.3d 512 (Fed. Cir. 1995).............................................................................................84

*United States v. Adam*,
    383 U.S. 39 (1966)...........................................................................................................101

*Valutron N.V. v. NCR Corp.*,
    33 U.S.P.Q. 2d 1986 (S.D. Ohio 1992), *aff'd without op.*, 5 F.3d 1506 (Fed. Cir. 1993).....108

*Vess v. Ciba-Geigy Corp., USA,*
    317 F.3d 1097 (9th Cir. 2003) .......................................................................113

*Voda v. Cordis Corp.,*
    No. CIV-03-1512-L, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006) ..............86, 87

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.,*
    721 F.2d 1540 (Fed. Cir. 1983).......................................................................99

*Wafer Shave, Inc. v. Gillette Co.,*
    857 F. Supp. 112 (D. Mass. 1993), *aff'd without op.,* 26 F.3d 140 (Fed. Cir. 1994).............108

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,*
    901 A.2d 106 (Del. 2006) .............................................................................113

*Wang Lab., Inc.* v. *Mitsubishi Elec. Am. Inc.,*
    30 U.S.P.Q.2d 1241 (C.D. Cal. 1993)..............................................................92

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997)...............................................................................80, 81

*Water Techs. Corp. v. Calco, Ltd.,*
    850 F.2d 660 (Fed. Cir. 1988).........................................................................81

*Woodland Trust v. Flowertree Nursery, Inc.,*
    148 F.3d 1368 (Fed. Cir. 1998).................................................................93, 95

*z4 Technologies, Inc. v. Microsoft Corp.,*
    507 F.3d 1340 (Fed. Cir. 2007).......................................................................93

*z4 Techs., Inc. v. Microsoft Corp.,*
    434 F. Supp. 2d 437 (E.D. Tex. 2006) .........................................................86, 87

*Zenith Lab., Inc. v. Bristol-Myers Squibb Co.,*
    19 F.3d 1418 (Fed. Cir. 1994).........................................................................79

STATUTES

6 Del. Code Ann. § 1301(3) and (4) ....................................................................112

Del. Code Ann. § 1304(a)(1) ..............................................................................111

Del. Code Ann. § 1304(a)(2) ..............................................................................111

6 Del. Code Ann. § 1305(a) and (b)......................................................................112

12 Del. Code Ann. § 3806(a) ...............................................................................65

28 U.S.C. § 1961..............................................................................................85

28 U.S.C. § 2201..............................................................................................87

35 U.S.C. § 102.........................................................................................*passim*

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW

xi

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases: 02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

35 U.S.C. § 103 .................................................................................................100, 101

35 U.S.C. § 112 ...................................................................................................79, 104

35 U.S.C. § 271(a) ................................................................................................76, 77

35 U.S.C. § 271(b) ......................................................................................................81

35 U.S.C. § 271(c) ......................................................................................................82

35 U.S.C. § 282 ...............................................................................88, 89, 95, 100

35 U.S.C. § 283 ..........................................................................................................86

35 U.S.C. § 284 ....................................................................................................83, 85

35 U.S.C. § 285 ..........................................................................................................88

35 U.S.C. § 286 ........................................................................................................107

35 U.S.C. § 287 ....................................................................................................68, 87

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Under Local Rule 16.1(f)(2) and this Court's scheduling orders, Multimedia Patent Trust ("MPT") hereby submits its Memorandum of Contentions of Fact and Law, which include its pretrial disclosures under Federal Rule of Civil Procedure 26(a)(3). MPT also incorporates by reference its briefs on summary judgment concerning the Haskell '226 patent, the Netravali '272 patent, and trust-related claims and defenses.

MPT notes that it has prepared this Memorandum without the benefit of pretrial disclosures from the Defendants. Accordingly, MPT reserves the right to amend or supplement this Memorandum in response to Defendants' disclosures.

**MPT'S CONTENTIONS OF MATERIAL FACT**

**I.      The Parties**

1.      MPT is a Delaware Statutory Trust organized under the Delaware Statutory Trust Act, 12 Del. C. §§ 3801 *et seq.*, having as trustee Mr. Gerard A. deBlasi, an individual having a business address of 991 Route 22 West, Bridgewater, NJ 08807.

2.      MPT was formed on November 28, 2006 pursuant to a Trust Agreement executed on November 21, 2006. On November 28, 2006, Lucent Technologies Inc. ("Lucent") and MPT executed a Patent Assignment by which Lucent assigned its entire right, title, and interest in and to the Trust Patents, along with the right to sue for past infringement (including all current and future claims and causes of action). The Trust Patents include U.S. Patent No. 4,383,272 ("the Netravali '272 patent") and U.S. Patent No. 4,958,226 ("the Haskell '226 patent"). On October 1, 2007 this Court held as a matter of law that this assignment was valid and effective. *See* October 1, 2007 Order. Thus, MPT owns the Netravali '272 and Haskell '226 patents with the right to sue for past infringement.

3.    Lucent is a corporation organized under the laws of the state of Delaware with its principal place of business at 600 Mountain Avenue, Murray Hill, NJ 07974.  On November 30, 2006, Lucent became a wholly owned subsidiary (now indirect) of Alcatel SA, a corporation organized under the laws of the Republic of France.  On the same day, Alcatel SA changed its name to Alcatel-Lucent.

4.    Microsoft Corporation is a corporation organized under the laws of the state of Washington with its principal place of business at One Microsoft Way, Redmond, Washington 98052.  Microsoft makes, uses, sells, and offers for sale in the United States, and imports into the United States, software for computer systems, components, and accessories.

5.    Dell Inc. is a corporation organized under the laws of the state of Delaware with its principal place of business at One Dell Way, Round Rock, Texas 78682.  Dell makes, uses, sells, and offers for sale in the United States, and imports into the United States, computer systems, components, software, and accessories.

6.    Gateway, Inc. is a company organized under the laws of the state of Delaware with its principal place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

7.    Gateway Country Stores LLC is a company organized under the laws of the state of Delaware with its principal place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

8.    Gateway Companies, Inc. is a company organized under the laws of the state of Delaware with a place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

9.    Gateway Manufacturing LLC is a company organized under the laws of the state of Delaware with a place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

10. Cowabunga Enterprises, Inc. is a company organized under the laws of the state of Delaware with a place of business at 7565 Irvine Center Drive, Irvine, CA 92618.

11. Gateway, Inc.; Gateway Country Stores LLC; Gateway Companies, Inc.; Gateway Manufacturing LLC; and Cowabunga Enterprises, Inc. (collectively, "Gateway") make, use, sell, and offer for sale in the United States, and import into the United States, computer systems, components, software, and accessories.

## II.    The Netravali '272 Patent

### A.    The Teaching Of The Asserted Claim Of The Netravali '272 Patent

12. The Netravali '272 patent is entitled "Video Signal Interpolation Using Motion Estimation." The Netravali '272 patent generally relates to methods and systems for compressing and decompressing video using motion-compensated interframe interpolation. For example, while not limited to this application, the Netravali '272 patent discusses the transmission of video where individual pictures in a video sequence are dropped at the transmitter and recovered at the receiver by interpolation from preceding and succeeding pictures. The Netravali '272 patent teaches that prior art interpolation methods could be improved by taking into account the movement of objects in the video sequence when selecting the pixels that are used for interpolation.

13. Asserted Claim 13 of the Netravali '272 patent is directed to a method of reconstructing pixel information through interframe interpolation:

> A method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture including the step of determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions, characterized in that
>
> said determining step includes selecting said related locations as a function of the displacement of objects in said picture.

14. Specifically, the method of Claim 13 determines intensity values for pixels in a picture that is being reconstructed by interpolation using intensity values for pixels in preceding and succeeding pictures. The pixels that are used as inputs for the interpolation process are selected as a function of the displacement — *i.e.*, movement — of objects between pictures in the video sequence.

**B.    Infringement Of The Asserted Claim Of The Netravali '272 Patent**

**1.    Mediamatics MPEG-1 Decoder**

15. The Mediamatics MPEG-1 Decoder is a software program for decoding MPEG-1 bit streams.  Microsoft has shipped the Mediamatics MPEG-1 Decoder as part of its ActiveMovie and DirectShow software since 1996.  A version of ActiveMovie and/or DirectShow, along with the Mediamatics MPEG-1 Decoder, has shipped with every version of the Microsoft Windows operating system since Windows 95B.

16. Microsoft's Windows Media Player, Windows Media Encoder, and MovieMaker software products use the Mediamatics MPEG-1 Decoder to play back MPEG-1 video.  All versions of the Windows operating system since Windows 95, with the exception of Windows NT 3.51, have shipped with at least Windows Media Player.

17. All Dell and Gateway computers that have shipped with Windows 95B or a subsequent version of the Windows operating system — including virtually all Dell and Gateway personal computers that have shipped since 1996 — have also included the Mediamatics MPEG-1 Decoder and Windows Media Player.

18. Dell and Gateway customers directly infringe Claim 13 of the Netravali '272 patent when they play MPEG-1 video content using Windows Media Player software (or other media player software that calls the Mediamatics MPEG-1 Decoder) on Dell and Gateway computers.

19. Dell and Gateway have induced their customers to infringe Claim 13 of the Netravali '272 patent by selling computers with the Windows operating system and Windows Media Player software (or other media player software capable of calling the Mediamatics MPEG-1 Decoder), informing their customers about the MPEG-1 decoding capabilities of the accused Dell and Gateway computer products, and by providing their customers with instructions how to use the accused computer products to play back MPEG-1 video.  Dell and Gateway knew, or should have known,

that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

20. When used to decode MPEG-1 video, the Mediamatics MPEG-1 Decoder performs (either literally or equivalently) "a method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture." When the Mediamatics MPEG-1 Decoder runs on any computer hardware, such as the accused Dell or Gateway products, it decodes MPEG-1 video bit streams which contain B-Pictures with macroblocks encoded with bidirectional prediction. To decode such macroblocks, the Mediamatics MPEG-1 Decoder estimates the pixel intensities in a picture by applying motion compensation to a previous reference frame and a future reference frame and averaging two motion-compensated signals. Therefore, the Mediamatics MPEG-1 Decoder estimates pixel intensities in accordance with information defining intensities of pels in preceding and succeeding versions of the picture.

21. When used to decode MPEG-1 video, the Mediamatics MPEG-1 Decoder performs (either literally or equivalently) the step of "determining by interpolation intensities of pels in [a] picture in accordance with intensities of pels in related locations in . . . preceding and succeeding versions." The Mediamatics MPEG-1 Decoder generates a prediction signal for macroblocks encoded with bidirectional prediction by motion-compensated interpolation between the past and future reference frames. Those reference frames are "preceding and succeeding versions" of the current picture. In order to achieve the lowest MPEG-1 bit-rate for a desired picture quality, motion compensation interpolates between locations at which the same object is expected to be.

22. When used to decode MPEG-1 video, the Mediamatics MPEG-1 Decoder performs (either literally or equivalently) the step of "selecting . . . said related locations as a function of the displacement of objects in said picture." The Mediamatics MPEG-1 Decoder selects the pixel values

in past and future reference frames for motion-compensated interpolation as a function of the change of position of the objects between the past reference frame and the future reference frame. For B-pictures, an MPEG-1 encoder carries out motion estimation to estimate the displacement of objects from the current frame to the past reference frame and the current frame to the future reference frame. For macroblocks encoded with bidirectional prediction, forward and backward motion vectors representing the displacement of objects are transmitted in the MPEG-1 bit stream on a macroblock-by-macroblock basis. When decoding bidirectional-predicted macroblocks, the Mediamatics MPEG-1 Decoder therefore selects "said related locations as a function of the displacement of objects in said picture."

23. Transmission of forward and backward motion vectors is not substantially different from scaling of a single motion vector within the context the method of Claim 13 of the Netravali '272 patent. Both perform the same function, in substantially the same way, to achieve substantially the same result. Forward and backward motion vectors are generally not "independent," as they are often both derived from the same continuous motion of the same object.

24. A more detailed discussion of the operation of the elements of the Mediamatics MPEG-1 Decoder that perform the method of Claim 13 of the Netravali '272 patent is provided below in the context of comparison to Claim 12 of the Haskell '226 patent. That discussion is incorporated into this section by reference. In addition, further details concerning infringement of Claim 13 of the Netravali '272 patent by Dell and Gateway computers that ship with the Mediamatics MPEG-1 Decoder can be found in the March 31, 2006 expert report of Professor Bernd Girod.

## 2. Cyberlink MPEG-2 Decoder

25. The Cyberlink MPEG-2 Decoder is a software program for decoding MPEG-2 bit streams. Cyberlink products that incorporate the Cyberlink MPEG-2 Decoder include the Cyberlink PowerDVD software DVD player and the Cyberlink PowerDVD SE and PowerPack plug-in

products for Windows Media Player.  Both Dell and Gateway sell computers with Cyberlink PowerDVD software installed.

26. Microsoft has actively promoted Cyberlink PowerPack plug-in products for Windows Media Player, and provides links both on its website and in the Windows Media Player application itself for customers to purchase and download those plug-in products.

27. Dell and Gateway customers infringe Claim 13 of the Netravali '272 patent when they play DVD movies using Cyberlink PowerDVD software on Dell and Gateway computers.

28. Dell and Gateway have induced their customers to infringe Claim 13 of the Netravali patent by selling computers with the Cyberlink PowerDVD software DVD player, informing their customers about the DVD playback and/or MPEG-2 decoding capabilities of the accused Dell and Gateway computer products with the Cyberlink PowerDVD software DVD player, and by providing their customers with instructions how to use the accused computer products to play back MPEG-2 video, including DVD movies.  Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

29. When used to decode MPEG-2 video, the Cyberlink MPEG-2 Decoder performs (either literally or equivalently) "a method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture."  When the Cyberlink MPEG-2 Decoder runs on any computer hardware, such as the accused Dell or Gateway products, it decodes MPEG-2 video bit streams which contain B-Pictures with macroblocks encoded with bidirectional prediction.  To decode such macroblocks, the Cyberlink MPEG-2 Decoder estimates the pixel intensities in a picture by applying motion compensation to a previous reference frame or reference field and a future reference frame or reference field and averaging two motion-compensated signals.  Therefore, the Cyberlink MPEG-2

1    Decoder estimates pixel intensities in accordance with information defining intensities of pels in

2    preceding and succeeding versions of the picture.

3         30. When used to decode MPEG-2 video, the Cyberlink MPEG-2 Decoder performs (either

4    literally or equivalently) the step of "determining by interpolation intensities of pels in [a] picture in

5    accordance with intensities of pels in related locations in . . . preceding and succeeding versions."

6    The Cyberlink MPEG-2 Decoder generates a prediction signal for macroblocks encoded with

7    bidirectional prediction by motion-compensated interpolation between the past and future reference

8    frames or fields.  These reference frames or fields are "said preceding and succeeding versions" of

9    the current picture.  In order to achieve the lowest MPEG-2 bit-rate for a desired picture quality,

10   motion compensation interpolates between locations at which the same object is expected to be.

11

12        31. When used to decode MPEG-2 video, the Cyberlink MPEG-2 Decoder performs (either

13   literally or equivalently) the step of "selecting . . . said related locations as a function of the

14   displacement of objects in said picture."  The Cyberlink MPEG-2 Decoder selects the pixel values in

15   past and future reference frames or fields for motion-compensated interpolation as a function of the

16   change of position of the objects between the past reference frame or field and the future reference

17   frame or field.  For B-pictures, an MPEG-2 encoder carries out motion estimation to estimate the

18   displacements from the current frame (or field) to the past reference frame (or field) and the current

19   frame (or field) to the future reference frame (or field).  For macroblocks encoded with bidirectional

20   prediction, forward and backward motion vectors representing the displacement of objects are

21   transmitted in the MPEG-2 bit stream on a macroblock-by-macroblock basis.  When decoding

22   bidirectional-predicted macroblocks, the Cyberlink MPEG-2 Decoder therefore selects "said related

23   locations as a function of the displacement of objects in said picture."

24

25        32. Transmission of forward and backward motion vectors is not substantially different from

26   scaling of a single motion vector within the context the method of Claim 13 of the Netravali '272

27

28

1   patent.  Both perform the same function, in substantially the same way, to achieve substantially the

2   same result.  Forward and backward motion vectors are generally not "independent," as they are

3   often both derived from the same continuous motion of the same object.

4       33.  A more detailed discussion of the operation of the elements of the Cyberlink MPEG-2

5   Decoder that perform the method of Claim 13 of the Netravali '272 patent is provided below in the

6   context of comparison to Claim 12 of the Haskell '226 patent.  That discussion is incorporated into

7   this section by reference.  In addition, further details concerning infringement of Claim 13 of the

8   Netravali '272 patent by Dell and Gateway computers that ship with the Cyberlink MPEG-2

9
10  Decoder can be found in the March 31, 2006 expert report of Professor Bernd Girod.

11              **3.      Intervideo MPEG-2 Decoder**

12      34. The Intervideo MPEG-2 Decoder is a software program for decoding MPEG-2 bit

13  streams.  Intervideo products that incorporate the Intervideo MPEG-2 Decoder include the

14  Intervideo WinDVD software DVD player and the Intervideo DVD XPack plug-in products for

15  Windows Media Player.  Both Dell and Gateway have sold computers with Intervideo WinDVD

16
17  software installed.

18      35. Microsoft has actively promoted Intervideo DVD XPack plug-in products for Windows

19  Media Player, and provides links both on its website (*e.g.*, www.microsoft.com/windows

20  /windowsmedia/mp10/getmore/plugins.aspx) and in the Windows Media Player application itself for

21  customers to purchase and download those plug-in products.

22
23      36. Dell and Gateway customers infringe Claim 13 of the Netravali '272 patent when they

24  play DVD movies using Intervideo WinDVD software on Dell and Gateway computers.

25      37. Dell and Gateway have induced their customers to infringe Claim 13 of the Netravali

26  patent by selling computers with the Intervideo WinDVD software DVD player, informing their

27  customers about the DVD playback and/or MPEG-2 decoding capabilities of the accused Dell and

28

Gateway computer products with the Intervideo WinDVD software DVD player, and by providing their customers with instructions how to use the accused computer products to play back MPEG-2 video, including DVD movies. Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

38. The Intervideo MPEG-2 decoder implements the main profile, main level of ISO/IEC International Standard 13818-2, and can decode bit streams compliant with the main profile, main level of that standard.

39. When used to decode MPEG-2 video, the Intervideo MPEG-2 Decoder performs (either literally or equivalently) "a method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture." When the Intervideo MPEG-2 Decoder runs on any computer hardware, such as the accused Dell or Gateway products, it decodes MPEG-2 video bit streams which contain B-Pictures with macroblocks encoded with bidirectional prediction. To decode such macroblocks, the Intervideo MPEG-2 Decoder estimates the pixel intensities in a picture by applying motion compensation to a previous reference frame or reference field and a future reference frame or reference field and averaging two motion-compensated signals. Therefore, the Intervideo MPEG-2 Decoder estimates pixel intensities in accordance with information defining intensities of pels in preceding and succeeding versions of the picture.

40. When used to decode MPEG-2 video, the Intervideo MPEG-2 Decoder performs (either literally or equivalently) the step of "determining by interpolation intensities of pels in [a] picture in accordance with intensities of pels in related locations in . . . preceding and succeeding versions." The Intervideo MPEG-2 Decoder generates a prediction signal for macroblocks encoded with bidirectional prediction by motion-compensated interpolation between the past and future reference frames or fields. These reference frames or fields are "said preceding and succeeding versions" of

the current picture.  In order to achieve the lowest MPEG-2 bit-rate for a desired picture quality, motion compensation interpolates between locations at which the same object is expected to be.

41.  When used to decode MPEG-2 video, the Intervideo MPEG-2 Decoder performs (either literally or equivalently) the step of "selecting . . . said related locations as a function of the displacement of objects in said picture."  The Intervideo MPEG-2 Decoder selects the pixel values in past and future reference frames or fields for motion-compensated interpolation as a function of the change of position of the objects between the past reference frame or field and the future reference frame or field.  For B-pictures, an MPEG-2 encoder carries out motion estimation to estimate the displacements from the current frame (or field) to the past reference frame (or field) and the current frame (or field) to the future reference frame (or field).  For macroblocks encoded with bidirectional prediction, forward and backward motion vectors representing the displacement of objects are transmitted in the MPEG-2 bit stream on a macroblock-by-macroblock basis.  When decoding bidirectional-predicted macroblocks, the Intervideo MPEG-2 Decoder therefore selects "said related locations as a function of the displacement of objects in said picture."

42.  Transmission of forward and backward motion vectors is not substantially different from scaling of a single motion vector within the context the method of Claim 13 of the Netravali '272 patent.  Both perform the same function, in substantially the same way, to achieve substantially the same result.  Forward and backward motion vectors are generally not "independent," as they are often both derived from the same continuous motion of the same object.

43.  A more detailed discussion of the operation of the elements of the Intervideo MPEG-2 Decoder that perform the method of Claim 13 of the Netravali '272 patent is provided below in the context of comparison to Claim 12 of the Haskell '226 patent.  That discussion is incorporated into this section by reference.  In addition, further details concerning infringement of Claim 13 of the

1  Netravali '272 patent by Dell and Gateway computers that ship with the Intervideo MPEG-2

2  Decoder can be found in the May 25, 2006 expert report of Professor Bernd Girod.

3  **C.    Validity Of The Asserted Claim Of The Netravali '272 Patent**

4  44. The defendants contend that Claim 13 of the Netravali '272 patent is anticipated or

5  rendered obvious by the prior art.  As an initial matter, the defendants must prove by clear-and-

6  convincing evidence that each of the references, disclosures, and alleged prior inventions upon

7  which they rely qualifies as prior art under 35 U.S.C. § 102.  To the extent the defendants can carry

8  their burden on this issue, Claim 13 of the Netravali '272 Patent is not invalid in view of the art cited

9

10  by the defendants.

11  45. MPT's validity positions are set forth in detail in the May 12, 2006 and October 12, 2007

12  expert reports of Professor Bernd Girod.  In summary, no prior art relied upon by the defendants

13  discloses motion compensated interframe interpolation of pixel intensity information.  Furthermore,

14  none of the art cited by Defendants, alone or in combination, renders obvious to one of ordinary skill

15  in the art the motion-compensated interpolation invention of Claim 13 of the Netravali '272 patent.

16

17  46. A person of ordinary skill in the art of video compression throughout the 1980s would

18  have had the equivalent of a Bachelor of Science degree in electrical engineering or a related field

19  and 2 years experience working in the area of video compression systems.

20  47. The defendants rely on the article "Television Band Compression By Contour

21  Interpolation," by D. Gabor and P. C. J. Hill ("Gabor & Hill").  Gabor & Hill does not disclose

22  "estimating the intensities of elements (pels) in a picture."  Gabor & Hill does not disclose any

23  operation performed "in accordance with information defining intensities of pels in preceding and

24  succeeding versions of the picture."  Gabor & Hill does not disclose interpolation of intensities of

25  pels at "related locations," *i.e.*, locations where the same object is expected to be in preceding and

26

27

28

1    succeeding versions of the picture. Gabor & Hill is not material prior art to Claim 13 of the

2    Netravali '272 patent.

3        48. The defendants rely on the article D. Gabor, "Television Compression By Contour

4    Interpolation," Supplemento al Volume XIII, Serie X, Del Nuovo Cimento, 1959 ("Gabor"). Gabor

5    does not disclose "estimating the intensities of elements (pels) in a picture." Gabor does not disclose

6    any operation performed "in accordance with information defining intensities of pels in preceding

7    and succeeding versions of the picture." Gabor does not disclose interpolation of intensities of pels

8    at "related locations," *i.e.*, locations where the same object is expected to be in preceding and

9

10    succeeding versions of the picture.

11        49. The defendants rely on the thesis "Television Bandwidth Compression By Interpolation,"

12    by P. C. J. Hill ("the Hill thesis"). The Hill thesis is not prior art to Claim 13 of the Netravali '272

13    patent. The Hill thesis does not disclose "estimating the intensities of elements (pels) in a picture."

14    The Hill thesis does not disclose any operation performed "in accordance with information defining

15    intensities of pels in preceding and succeeding versions of the picture." The Hill thesis does not

16    disclose interpolation of intensities of pels at "related locations," *i.e.*, locations where the same

17    object is expected to be in preceding and succeeding versions of the picture.

18

19        50. The defendants rely on the thesis "Interframe Adaptive Data Compression Techniques for

20    Images," by Jaswant R. Jain ("the Jain thesis"). The Jain thesis is not prior art to Claim 13 of the

21    Netravali '272 patent.

22

23        51. The defendants rely on the survey article "Picture Coding: A Review," by Arun N.

24    Netravali and John O. Limb ("Picture Coding"). Picture Coding does not disclose "determining by

25    interpolation intensities of pels in said picture in accordance with intensities of pels in related

26    locations in said preceding and succeeding versions." Picture Coding does not disclose interpolation

27    of intensities of pels at "related locations," *i.e.*, locations where the same object is expected to be in

28

1   preceding and succeeding versions of the picture. Picture Coding is not material prior art to Claim

2   13 of the Netravali '272 patent.

3       52. The defendants rely on the article "A Simple Interframe Coder For Video Telephony," by

4   John O. Limb and R. F. W. Pease ("Limb & Pease"). Limb & Pease does not disclose "determining

5   by interpolation intensities of pels in said picture in accordance with intensities of pels in related

6   locations in said preceding and succeeding versions." Limb & Pease does not disclose interpolation

7   of intensities of pels at "related locations," *i.e.*, locations where the same object is expected to be in

8   preceding and succeeding versions of the picture. Limb & Pease is not material prior art to Claim

9

10  13 of the Netravali '272 patent.

11      53. The defendants rely on the article "A Low Bit-Rate Interframe Coder For

12  Videotelephone," by Barry G. Haskell *et al*. ("Haskell I"). Haskell I does not disclose "estimating

13  the intensities of elements (pels) in a picture in accordance with information defining intensities of

14  pels in preceding and succeeding versions of the picture," "determining by interpolation intensities

15  of pels in said picture in accordance with intensities of pels in related locations in said preceding and

16  succeeding versions," or "selecting said related locations as a function of the displacement of objects

17  in said picture."

18

19      54. The defendants rely on the article "Interframe Coding of Videotelephone Pictures," by

20  Barry G. Haskell *et al*. ("Haskell II"). Haskell II does not disclose "estimating the intensities of

21  elements (pels) in a picture in accordance with information defining intensities of pels in preceding

22  and succeeding versions of the picture," "determining by interpolation intensities of pels in said

23  picture in accordance with intensities of pels in related locations in said preceding and succeeding

24  versions," or "selecting said related locations as a function of the displacement of objects in said

25  picture."

26

27

28

55. The defendants rely on the article "Combining Intraframe and Frame-to-Frame Coding for Television," by John O. Limb *et al*. ("Limb").  Limb does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions" or "selecting said related locations as a function of the displacement of objects in said picture."

56. The defendants rely on the article "Conditional Vertical Subsampling – A Technique to Assist in the Coding of Television Signals," by R.F.W. Pease ("Pease").  Pease does not disclose "estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture," "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions," or "selecting said related locations as a function of the displacement of objects in said picture."

57. The defendants rely on the combination of Gabor & Hill with the article "Statistics of Television Signals" by E. R. Kretzmer, Bell System Technical Journal, vol. XXXI, July 1952 ("Kretzmer").  The combination does not disclose "estimating the intensities of elements (pels) in a picture."  The combination does not disclose any operation performed "in accordance with information defining intensities of pels in preceding and succeeding versions of the picture."  The combination does not disclose interpolation of intensities of pels at "related locations," *i.e.*, locations where the same object is expected to be in preceding and succeeding versions of the picture.  A person of ordinary skill in the art would have seen no reason to modify the teachings of Gabor & Hill and Kretzmer in the manner proposed by the defendants.

58. The defendants rely on the combination of Gabor & Hill with Gabor.  The combination does not disclose "estimating the intensities of elements (pels) in a picture."  The combination does not disclose any operation performed "in accordance with information defining intensities of pels in

preceding and succeeding versions of the picture." The combination does not disclose interpolation of intensities of pels at "related locations," *i.e.*, locations where the same object is expected to be in preceding and succeeding versions of the picture. A person of ordinary skill in the art would have seen no reason to modify the teachings of Gabor & Hill and Gabor in the manner proposed by the defendants.

59. The defendants rely on the combination of Gabor & Hill with the Hill thesis. The combination does not disclose "estimating the intensities of elements (pels) in a picture." The combination does not disclose any operation performed "in accordance with information defining intensities of pels in preceding and succeeding versions of the picture." The combination does not disclose interpolation of intensities of pels at "related locations," *i.e.*, locations where the same object is expected to be in preceding and succeeding versions of the picture. A person of ordinary skill in the art would have seen no reason to modify the teachings of Gabor & Hill and the Hill thesis in the manner proposed by the defendants.

60. The defendants rely on the combination of Picture Coding with Gabor & Hill. The combination does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions." A person of ordinary skill in the art would have seen no reason to modify the teachings of Picture Coding and Gabor & Hill in the manner proposed by the defendants.

61. The defendants rely on the combination of Picture Coding with Limb & Pease. The combination does not disclose "determining by interpolation intensities of pels in said picture in accordance with intensities of pels in related locations in said preceding and succeeding versions." A person of ordinary skill in the art would have seen no reason to modify the teachings of Picture Coding and Limb & Pease in the manner proposed by the defendants.

62. The invention of Claim 13 of the Netravali '272 patent was not simply a combination of known techniques.

63. Products that use the invention of Claim 13 of the Netravali '272 patent have been highly successful in the marketplace. The claimed invention is used in numerous video coding standards, including MPEG-1, MPEG-2, WMV-9, VC-1, and others. The invention has contributed to the success of those products by reducing the bandwidth needed to transmit, or by reducing the quantity of storage needed to store, high-quality video bit streams. Other video coding technologies that do not use the claimed invention have not been as commercially successful.

64. Licenses showing industry respect for the claimed invention also support the conclusion that Claim 13 is nonobvious. Several of Lucent's licensing agreements specifically identify the Netravali '272 patent. The Netravali '272 patent has also been a focal point of negotiations for broader licenses with third parties.

65. Statements of acclaim by others for the claimed invention also support the conclusion that the invention of Claims 13 is nonobvious. The Research and Development Council of New Jersey awarded Arun Netravali and John Robbins the 1996 Thomas Alva Edison Patent Award for outstanding research and development in the state of New Jersey, as reflected in the Netravali '272 patent.

66. The Patent Office historically grants over 90% of requests for reexamination. Only a small fraction of reexamined patent claims have historically been determined to be unpatentable.

67. The defendants allege that persons responsible for the prosecution of the Netravali '272 patent committed inequitable conduct by concealing Gabor & Hill, Picture Coding, and Limb & Pease from the Patent Office. None of those references, whether taken alone or in combination, is material prior art to the Netravali '272 patent. Those references are cumulative of other art that was

1  before the Patent Examiner.  Nobody involved in the prosecution of the Netravali '272 patent

2  withheld any of those references from the Patent Office with intent to deceive the Patent Office.

3  **III.    The Haskell '226 Patent**

4      **A.    The Teaching Of The Asserted Claim Of The Haskell '226 Patent**

5      68. The Haskell '226 patent is entitled "Conditional Motion Compensated Interpolation of

6  Digital Motion Video."  The Haskell '226 patent describes methods and structures for block-based

7  interframe video compression with motion compensation.  The inventors considered the limitations

8  of motion-compensated hybrid coding using block-wise motion compensation for prediction from

9

10 the previous frame and block-wise transform coding of the residual prediction error, and proposed a

11 novel block-based compression scheme for overcoming those limitations.

12     69. Asserted Claim 12 of the Haskell '226 patent is directed to an apparatus for decoding

13 coded video signals using two claimed structures:

14
15       A circuit responsive to coded video signals where the video signals comprise
         successive frames and each frame includes a plurality of blocks and where the coded
         video signals comprise codes that describe deviations from approximated blocks and
16       codes that describe deviations from interpolated blocks, comprising:

17       means for developing block approximations from said codes that describe deviations
18       from approximated blocks; and

19       means responsive to said block approximations and to said codes that describe
         deviations from interpolated blocks to develop said interpolated blocks.
20

21     70. The coded video signals of Claim 12 contain block-based codes representing interframe

22 prediction error and block-based codes representing interframe interpolation error.  The first claimed

23 structure uses block-based codes representing interframe prediction error to form a motion-

24 compensated, unidirectionally predicted estimate of blocks of pixels.  The second claimed structure

25 uses (1) block-based codes representing interframe interpolation error and (2) motion-compensated,

26 unidirectionally predicted estimates of blocks of pixels to form motion-compensated, bidirectionally

27 predicted estimates of blocks of pixels.

28

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW                                                    18              Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                       from consolidated cases:  02-CV-2060 B (CAB),
                                                                       03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

**B.     Infringement Of The Asserted Claim Of The Haskell '226 Patent**

**1.     Mediamatics MPEG-1 Decoder**

71. The Mediamatics MPEG-1 Decoder is a software program for decoding MPEG-1 bit streams.  Microsoft has shipped the Mediamatics MPEG-1 Decoder as part of its ActiveMovie and DirectShow software since 1996.  A version of ActiveMovie and/or DirectShow, along with the Mediamatics MPEG-1 Decoder, has shipped with every version of the Microsoft Windows operating system since Windows 95B.

72. Microsoft's Windows Media Player, Windows Media Encoder, and MovieMaker software products use the Mediamatics MPEG-1 Decoder to play back MPEG-1 video.  All versions of the Windows operating system since Windows 95, with the exception of Windows NT 3.51, have shipped with at least Windows Media Player.

73. All Dell and Gateway computers that have shipped with Windows 95B or a subsequent version of the Windows operating system — including virtually all Dell and Gateway personal computers that have shipped since 1996 — have also included the Mediamatics MPEG-1 Decoder and Windows Media Player.

74. Dell and Gateway directly infringe Claim 12 of the Haskell '226 patent by making and selling computers with the Windows operating system.

75. Dell and Gateway customers directly infringe Claim 12 of the Haskell '226 patent when they play MPEG-1 video content using Windows Media Player software, or another media player software capable of calling the Mediamatics MPEG-1 Decoder, on Dell and Gateway computers.

76. Dell and Gateway have induced their customers to infringe Claim 12 of the Haskell '226 patent by selling computers with the Windows operating system and Windows Media player software (or another media player software capable of calling the Mediamatics MPEG-1 Decoder), informing their customers about the MPEG-1 decoding capabilities of the accused Dell and Gateway

computer products, and by providing their customers with instructions how to use the accused computer products to play back MPEG-1 video. Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

77. Microsoft has induced its OEM customers, including Dell and Gateway, to infringe Claim 12 of the Haskell '226 patent by providing them with Windows operating system software and encouraging them to install Windows on the computer products that they sell to end users. This software has no use other than to be installed on a computer. With Windows, and hence the Mediamatics MPEG-1 Decoder, installed, such computers become circuits that meet all of the limitations of Claim 12 of the Haskell '226 patent. Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

78. Microsoft contributes to the infringement of its OEM customers, including Dell and Gateway, by providing them with Windows operating system software and encouraging them to install Windows on the computer products that they sell to end users. The Mediamatics MPEG-1 Decoder is not useful unless it is installed on a computer. The Mediamatics MPEG-1 Decoder embodies a material part of the claimed invention, is specifically adapted for use in an infringing circuit, and has no substantial noninfringing uses. Microsoft knows that the Mediamatics MPEG-1 Decoder is especially made or adapted for use in infringing claim 12 of the Haskell '226 patent.

79. A computer installed with the Mediamatics MPEG-1 Decoder comprises "a circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." The Mediamatics MPEG-1 Decoder is not useful unless it is installed on a computer. Such

computers, including the accused Dell and Gateway computers, include hardware and software. The hardware contains electrical circuits, which are "paths that can carry an electrical current." The Mediamatics MPEG-1 Decoder decodes compressed MPEG-1 video bit streams, which are coded video signals comprising consecutive pictures. Each MPEG-1 picture includes 8x8 blocks and macroblocks. Both are "blocks" as construed by the Court, because a block/macroblock is a set of pixels that constitute a portion of a frame. MPEG-1 bit streams contain coded blocks/macroblocks which "describe" prediction errors ("deviations from approximated blocks") and coded blocks/macroblocks which "describe" interpolation errors for bidirectional-predicted macroblocks in B-Pictures ("deviations from interpolated blocks").

80. A computer installed with the Mediamatics MPEG-1 Decoder comprises a "means for developing block approximations from said codes that describe deviations from approximated blocks." MPEG-1 bit streams contain predictively encoded blocks/macroblocks. When decoding such MPEG-1 bit streams, the Mediamatics MPEG-1 Decoder performs an addition (a "combination") of predicted blocks/macroblocks with prediction error blocks/macroblocks ("deviations from approximated blocks"). The prediction error blocks/macroblocks are described by bits encoded according to the MPEG-1 Standard ("said codes that describe deviations from approximated blocks"). A computer installed with the Mediamatics MPEG-1 Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function).

81. A computer installed with the Mediamatics MPEG-1 Decoder comprises a "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." MPEG-1 bit streams contain blocks/macroblocks

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

21

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases: 02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

encoded with bidirectional prediction which uses predictively coded blocks/macroblocks in past or future P-Pictures as references.  When decoding such bidirectional-predicted blocks/macroblocks, the Mediamatics MPEG-1 Decoder decodes an encoded interpolation error block/macroblock ("deviations from interpolated blocks") by run-level decoding, dequantizing DCT coefficient values, and applying an inverse DCT to reconstruct the interpolation error in the pixel domain.  The interpolation error is then added to an bidirectionally predicted block/macroblock which in turn is based on predictively encoded blocks/macroblocks in a P-Picture ( "said block approximation").  A computer installed with the Mediamatics MPEG-1 Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, $DCT^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

82. Motion vectors are encoded in MPEG-1 using lossless compression.  Therefore, the motion vectors at encoder and decoder are the same.  Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

83. Further details concerning infringement of Claim 12 of the Haskell '226 patent by computers that ship with the Mediamatics MPEG-1 Decoder can be found in the March 31, 2006 expert report of Professor Bernd Girod.

## 2.    Cyberlink MPEG-2 Decoder

84. The Cyberlink MPEG-2 Decoder is a software program for decoding MPEG-2 bit streams.  Cyberlink products that incorporate the Cyberlink MPEG-2 Decoder include the Cyberlink PowerDVD software DVD player and the Cyberlink PowerDVD SE and PowerPack plug-in products for Windows Media Player.  Both Dell and Gateway sell computers with Cyberlink PowerDVD software installed.

85. Microsoft has actively promoted Cyberlink Power DVD SE and PowerPack plug-in products for Windows Media Player, and provides links both on its website and in the Windows Media Player application itself for customers to purchase and download those plug-in products.

86. Dell and Gateway customers directly infringe the Haskell '226 patent when they play DVD movies using Cyberlink PowerDVD software on Dell and Gateway computers.

87. Dell and Gateway directly infringe the Haskell '226 patent by making and selling computers with the Cyberlink PowerDVD software DVD player. Dell and Gateway also have induced infringement of the Haskell '226 patent by informing their customers about the DVD playback and/or MPEG-2 decoding capabilities of the accused Dell and Gateway computer products with the Cyberlink PowerDVD software DVD player, and by providing their customers with instructions how to use the accused computer products to play back MPEG-2 video, including DVD movies. Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

88. Microsoft has induced users of Windows Media Player to infringe the Haskell '226 patent by distributing Windows Media Player software, encouraging and aiding Cyberlink in developing the Cyberlink PowerDVD SE and PowerPack plug-in products for Windows Media Player, and encouraging end users to download and install those programs. For example, Microsoft has induced users of Windows Media Player to make and use a circuit that infringes the Haskell '226 patent by promoting the Cyberlink PowerDVD SE and PowerPack plug-in products for Windows Media Player, and by providing links on its website through which those products can be purchased and downloaded. Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

89. A computer installed with the Cyberlink MPEG-2 Decoder comprises "a circuit responsive to coded video signals where the video signals comprise successive frames and each

1   frame includes a plurality of blocks and where the coded video signals comprise codes that describe

2   deviations from approximated blocks and codes that describe deviations from interpolated blocks."

3   The Cyberlink MPEG-2 Decoder is not useful unless it is installed on a computer. Such computers,

4   including the accused Dell and Gateway computers, include hardware and software. The hardware

5   contains electrical circuits, which are "paths that can carry an electrical current." The Cyberlink

6   MPEG-2 Decoder decodes compressed MPEG-2 video bit streams, which are coded video signals

7   comprising consecutive pictures. Each MPEG-2 picture includes 8x8 blocks and macroblocks. Both

8   are "blocks" as construed by the Court, because a block/macroblock is a set of pixels that constitute

9   a portion of a frame. MPEG-2 bit streams contain coded blocks/macroblocks which "describe"

10  prediction errors ("deviations from approximated blocks") and coded blocks/macroblocks which

11  "describe" interpolation errors for bidirectional-predicted macroblocks in B-Pictures ("deviations

12  from interpolated blocks").

13  

14          90. A computer installed with the Cyberlink MPEG-2 Decoder comprises a "means for

15  developing block approximations from said codes that describe deviations from approximated

16  blocks." MPEG-2 bit streams contain predictively encoded blocks/macroblocks. When decoding

17  such MPEG-2 bit streams, the Cyberlink MPEG-2 Decoder performs an addition (a "combination")

18  of predicted blocks/macroblocks with prediction error blocks/macroblocks ("deviations from

19  approximated blocks"). The prediction error blocks/macroblocks are described by bits encoded

20  according to the MPEG-2 Standard ("said codes that describe deviations from approximated

21  blocks"). A computer installed with the Cyberlink MPEG-2 Decoder contains structures which,

22  taken as a whole, perform the claimed function (or substantially the same function) in substantially

23  the same way, to achieve substantially the same result, as the corresponding structure identified in

24  the Court's claim construction (Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all

25  inputs and outputs of these elements related to the claimed function).

91. A computer installed with the Cyberlink MPEG-2 Decoder comprises a "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." MPEG-2 bit streams contain blocks/macroblocks encoded with bidirectional prediction which uses predictively coded blocks/macroblocks in past or future P-Pictures as references. When decoding such bidirectional-predicted blocks/macroblocks, the Cyberlink MPEG-2 Decoder decode an encoded interpolation error block/macroblock ("deviations from interpolated blocks") by run-level decoding, dequantizing DCT coefficient values, and applying an inverse DCT to reconstruct the interpolation error in the pixel domain. The interpolation error is then added to an bidirectionally predicted block/macroblock which in turn is based on predictively encoded blocks/macroblocks in a P-Picture ( "said block approximation"). A computer installed with the Cyberlink MPEG-2 Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

92. Motion vectors are encoded in MPEG-2 using lossless compression. Therefore, the motion vectors at encoder and decoder are the same. Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

93. Further details concerning infringement of Claim 12 of the Haskell '226 patent by computers that ship with the Cyberlink MPEG-2 Decoder can be found in the March 31, 2006 expert report of Professor Bernd Girod.

### 3.    Intervideo MPEG-2 Decoder

94. The Intervideo MPEG-2 Decoder is a software program for decoding MPEG-2 bit streams. Intervideo products that incorporate the Intervideo MPEG-2 Decoder include the

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

25

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases: 02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

Intervideo WinDVD software DVD player and the Intervideo DVD XPack plug-in products for Windows Media Player.  Both Dell and Gateway have sold computers with Intervideo WinDVD software installed.

95. Microsoft has actively promoted Intervideo DVD XPack plug-in products for Windows Media Player, and provides links both on its website (e.g., www.microsoft.com/windows /windowsmedia/mp10/getmore/plugins.aspx) and in the Windows Media Player application itself for customers to purchase and download those plug-in products.

96.  Dell and Gateway customers directly infringe the Haskell '226 patent when they play DVD movies using Intervideo WinDVD software DVD player software on Dell and Gateway computers.

97. Dell and Gateway directly infringe the Haskell '226 patent by making and selling computers with the Intervideo WinDVD software DVD player.  Dell and Gateway also have induced infringement of the Haskell '226 patent by informing their customers about the DVD playback and/or MPEG-2 decoding capabilities of the accused Dell and Gateway computer products with the Intervideo WinDVD software DVD player, and by providing their customers with  instructions how to use the accused computer products to play back MPEG-2 video, including DVD movies.  Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

98. Microsoft has induced users of Windows Media Player to infringe the Haskell '226 patent by distributing Windows Media Player software, encouraging and aiding Intervideo in developing the Intervideo DVD XPack plug-in products for Windows Media Player, and encouraging end users to download and install those programs.  For example, Microsoft has induced users of Windows Media Player to make and use a circuit that infringes the Haskell '226 patent by promoting the Intervideo DVD XPack plug-in products for Windows Media Player, and by

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW                                      26                     Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1   providing links on its website through which those products can be purchased and downloaded.

2   Microsoft knew, or should have known, that its actions would induce actual infringements, and acted

3   with affirmative intent to cause direct infringement.

4       99. A computer installed with the Intervideo MPEG-2 Decoder comprises "a circuit

5   responsive to coded video signals where the video signals comprise successive frames and each

6   frame includes a plurality of blocks and where the coded video signals comprise codes that describe

7   deviations from approximated blocks and codes that describe deviations from interpolated blocks."

8   The Intervideo MPEG-2 Decoder is not useful unless it is installed on a computer.  Such computers,

9

10  including the accused Dell and Gateway computers, include hardware and software.  The hardware

11  contains electrical circuits, which are "paths that can carry an electrical current."  The Intervideo

12  MPEG-2 Decoder decodes compressed MPEG-2 video bit streams, which are coded video signals

13  comprising consecutive pictures.  Each MPEG-2 picture includes 8x8 blocks and macroblocks.  Both

14  are "blocks" as construed by the Court, because a block/macroblock is a set of pixels that constitute

15  a portion of a frame.  MPEG-2 bit streams contain coded blocks/macroblocks which "describe"

16  prediction errors ("deviations from approximated blocks") and coded blocks/macroblocks which

17  "describe" interpolation errors for bidirectional-predicted macroblocks in B-Pictures ("deviations

18

19  from interpolated blocks").

20      100.    A computer installed with the Intervideo MPEG-2 Decoder comprises a "means for

21  developing block approximations from said codes that describe deviations from approximated

22  blocks."  MPEG-2 bit streams contain predictively encoded blocks/macroblocks.  When decoding

23  such MPEG-2 bit streams, the Intervideo MPEG-2 Decoder performs an addition (a "combination")

24  of predicted blocks/macroblocks with prediction error blocks/macroblocks ("deviations from

25  approximated blocks").  The prediction error blocks/macroblocks are described by bits encoded

26

27  according to the MPEG-2 Standard ("said codes that describe deviations from approximated

28

blocks"). The Intervideo MPEG-2 Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function).

101. A computer installed with the Intervideo MPEG-2 Decoder comprises a "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." MPEG-2 bit streams contain blocks/macroblocks encoded with bidirectional prediction which uses predictively coded blocks/macroblocks in past or future P-Pictures as references. When decoding such bidirectional-predicted blocks/macroblocks, the Intervideo MPEG-2 Decoder decode an encoded interpolation error block/macroblock ("deviations from interpolated blocks") by run-level decoding, dequantizing DCT coefficient values, and applying an inverse DCT to reconstruct the interpolation error in the pixel domain. The interpolation error is then added to an bidirectionally predicted block/macroblock which in turn is based on predictively encoded blocks/macroblocks in a P-Picture ( "said block approximation"). The Intervideo MPEG-2 Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

102. Motion vectors are encoded in MPEG-2 using lossless compression. Therefore, the motion vectors at encoder and decoder are the same. Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

103.    Further details concerning infringement of Claim 12 of the Haskell '226 patent by computers that ship with the Intervideo MPEG-2 Decoder can be found in the May 25, 2006 expert report of Professor Bernd Girod.

### 4.    Xbox 360 MPEG-2 Decoder

104.    The Xbox 360 Premium and Core systems are video game consoles sold by Microsoft.  The Xbox 360 Premium and Core video game consoles are capable of playing DVDs "out of the box" because they ship with a software MPEG-2 decoder ("Xbox 360 MPEG-2 Decoder") stored in the non-volatile memory ("console flash") of the video game console.

105.    Microsoft directly infringes the Haskell '226 patent by making and selling the Xbox 360 Premium and Core systems.  Microsoft likewise has induced its customers to infringe the Haskell '226 patent by selling the Xbox 360 Premium and Core systems, by informing their customers about the MPEG-2 decoding/DVD playback capabilities of the Xbox 360 Premium and Core systems, and by providing their customers with instructions how to use the Xbox 360 Premium and Core systems to play back MPEG-2/DVD video.  Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

106.    The Xbox 360 Premium and Core systems comprise "a circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks."  The Xbox 360 Premium and Core systems decode compressed MPEG-2 video bit streams, which are coded video signals comprising consecutive pictures.  Each MPEG-2 picture includes 8x8 blocks and macroblocks.  Both are "blocks" as construed by the Court, because a block/macroblock is a set of pixels that constitute a portion of a frame.  MPEG-2 bit streams contain coded blocks/macroblocks

which "describe" prediction errors ("deviations from approximated blocks") and coded

blocks/macroblocks which "describe" interpolation errors for bidirectional-predicted macroblocks in

B-Pictures ("deviations from interpolated blocks").

107.    The Xbox 360 Premium and Core systems comprise a "means for developing block

approximations from said codes that describe deviations from approximated blocks."  MPEG-2 bit

streams contain predictively encoded blocks/macroblocks.  When decoding such MPEG-2 bit

streams, the Xbox 360 Premium and Core systems perform an addition (a "combination") of

predicted blocks/macroblocks with prediction error blocks/macroblocks ("deviations from

approximated blocks").  The prediction error blocks/macroblocks are described by bits encoded

according to the MPEG-2 Standard ("said codes that describe deviations from approximated

blocks").  The Xbox 360 Premium and Core systems contain structures which, taken as a whole,

perform the claimed function (or substantially the same function) in substantially the same way, to

achieve substantially the same result, as the corresponding structure identified in the Court's claim

construction (Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs

of these elements related to the claimed function).

108.    The Xbox 360 Premium and Core systems comprise a "means responsive to said

block approximations and to said codes that describe deviations from interpolated blocks to develop

said interpolated blocks."  MPEG-2 bit streams contain blocks/macroblocks encoded with

bidirectional prediction which uses predictively coded blocks/macroblocks in past or future P-

Pictures as references.  When decoding such bidirectional-predicted blocks/macroblocks, the Xbox

360 Premium and Core systems decode an encoded interpolation error block/macroblock

("deviations from interpolated blocks") by run-level decoding, dequantizing DCT coefficient values,

and applying an inverse DCT to reconstruct the interpolation error in the pixel domain.  The

interpolation error is then added to an bidirectionally predicted block/macroblock which in turn is

based on predictively encoded blocks/macroblocks in a P-Picture ("said block approximation").  The Xbox 360 Premium and Core systems contain structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

109.    Motion vectors are encoded in MPEG-2 using lossless compression.  Therefore, the motion vectors at encoder and decoder are the same.  Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

110.    Further details concerning infringement of Claim 12 of the Haskell '226 patent by the Xbox 360 Premium and Core systems can be found in the July 21, 2006 expert report of Professor Bernd Girod.

### 5.    WMV-9 Main Profile Decoder

111.    The WMV-9 Main Decoder is proprietary software capable of decoding Microsoft WMV-9 Simple and Main Profile bit streams.  All of Microsoft's Windows Media Player 9 and Windows Media Player 10 software products have been bundled with the WMV-9 Main Decoder.  All Dell and Gateway computers that have shipped with Windows Media Player 9 or Windows Media Player 10 have also included the WMV-9 Main Decoder.  Microsoft's Windows Media Player 9 and 10 products can use the WMV-9 Main Decoder to play back WMV-9 video.

112.    Dell and Gateway directly infringe Claim 12 of the Haskell '226 patent by making and selling computers with Windows Media Player 10 software, which also includes the WMV-9 Main Decoder.

113.    Dell and Gateway have induced their customers to infringe Claim 12 of the Haskell '226 patent by selling computers with Windows Media Player 10 software, by informing their

customers about the WMV-9 decoding capabilities of the accused Dell and Gateway computer products, and by providing their customers with instructions how to use the accused computer products to play back WMV-9 video. Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

114.    Microsoft has induced its OEM customers, including Dell and Gateway, to infringe Claim 12 of the Haskell '226 patent by providing them with Windows Media Player 10 software, which also includes the WMV-9 Main Decoder. This software has no use other than to be installed on a computer. With Windows Player 9 or Windows Media Player 10 software, and hence the WMV-9 Main Decoder, installed, such computers become circuits that meet all of the limitations of Claim 12 of the Haskell '226 patent. Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

115.    Microsoft contributes to the infringement of its OEM customers, including Dell and Gateway, by providing them with Windows Media Player 9 and 10 software and encouraging them to install Windows Media Player 9 and/or 10 on the computer products that they sell to end users. The WMV-9 Main Decoder is not useful unless it is installed on a computer. The WMV-9 Main Decoder embodies a material part of the claimed invention, is specifically adapted for use in an infringing circuit, and has no substantial noninfringing uses. Microsoft knows that the WMV-9 Main Decoder is especially made or adapted for use in infringing claim 12 of the Haskell '226 patent.

116.    The WMV-9 Main Decoder is compliant with the main and simple profiles of the SMPTE VC-1 standard.

117.    A computer installed with the WMV-9 Main Decoder comprises "a circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes

a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks." The WMV-9 Main Decoder is not useful unless it is installed on a computer. Such computers, including the accused Dell and Gateway computers, include hardware and software. The hardware contains electrical circuits, which are "paths that can carry an electrical current." The WMV-9 Main Decoder decodes compressed Main Profile WMV-9 video bit streams, which are coded video signals comprising consecutive pictures. Each WMV-9 picture includes blocks and macroblocks. Both are "blocks" as construed by the Court, because a block/macroblock is a set of pixels that constitute a portion of a frame. Main Profile WMV-9 bit streams contain coded blocks/macroblocks which "describe" prediction errors ("deviations from approximated blocks") and coded blocks/macroblocks which "describe" interpolation errors for bidirectional-predicted macroblocks in B-Pictures ("deviations from interpolated blocks").

118.    A computer installed with the WMV-9 Main Decoder comprises a "means for developing block approximations from said codes that describe deviations from approximated blocks." Main Profile WMV-9 bit streams contain predictively encoded blocks/macroblocks. When decoding such Main Profile WMV-9 bit streams, the WMV-9 Main Decoder performs an addition (a "combination") of predicted blocks/macroblocks with prediction error blocks/macroblocks ("deviations from approximated blocks"). The prediction error blocks/macroblocks are described by bits encoded according to the VC-1 Standard ("said codes that describe deviations from approximated blocks"). A computer installed with the WMV-9 Main Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function).

119.     A computer installed with the WMV-9 Main Decoder comprises a "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."  Main Profile WMV-9 bit streams contain blocks/macroblocks encoded with bidirectional prediction which uses predictively coded blocks/macroblocks in past or future P-Pictures as references.  When decoding such bidirectional-predicted blocks/macroblocks, the WMV-9 Main Decoder decode an encoded interpolation error block/macroblock ("deviations from interpolated blocks") by run-level decoding, dequantizing DCT coefficient values, and applying an inverse DCT to reconstruct the interpolation error in the pixel domain.  The interpolation error is then added to an bidirectionally predicted block/macroblock which in turn is based on predictively encoded blocks/macroblocks in a P-Picture ( "said block approximation").  A computer installed with the WMV-9 Main Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, $DCT^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

120.     Motion vectors are encoded in WMV-9/VC-1 using lossless compression.  Therefore, the motion vectors at encoder and decoder are the same.  Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

121.     The inverse transform of WMV-9/VC-1 and the $DCT^{-1}$ 24 and 34 of Haskell are identical in their functions and substantially similar in the numerical results produced.  The WMV-9/VC-1 transform approximates a DCT, and is insubstantially different, if not identical, to an IDCT.

122.     Further details concerning infringement of Claim 12 of the Haskell '226 patent by computers that ship with the WMV-9 Main Decoder can be found in the March 31, 2006 expert report of Professor Bernd Girod.

### 6.    WMV-9 Advanced Profile Decoder

123.    The WMV-9 Advanced Decoder is proprietary software capable of decoding Microsoft WMV-9 Simple, Main, and Advanced Profile bit streams.  All of Microsoft's Windows Media Player 10 software products have been bundled with the WMV-9 Advanced Decoder.  All Dell and Gateway computers that have shipped with Windows Media Player 10 have also included the WMV-9 Advanced Decoder.   Microsoft's Windows Media Player 10 product can use the WMV-9 Advanced Decoder to play back WMV-9 video.

124.    Dell and Gateway directly infringe Claim 12 of the Haskell '226 patent by making and selling computers with Windows Media Player 10 software, which also includes the WMV-9 Advanced Decoder.

125.    Dell and Gateway have induced their customers to infringe Claim 12 of the Haskell '226 patent by selling computers with Windows Media Player 10 software, by informing their customers about the WMV-9 decoding capabilities of the accused Dell and Gateway computer products, and by providing their customers with instructions how to use the accused computer products to play back WMV-9 video.  Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

126.    Microsoft has induced its OEM customers, including Dell and Gateway, to infringe Claim 12 of the Haskell '226 patent by providing them with Windows Media Player 10 software, which also includes the WMV-9 Advanced Decoder.   This software has no use other than to be installed on a computer.  With Windows Player 9 or Windows Media Player 10 software, and hence the WMV-9 Advanced Decoder, installed, such computers become circuits that meet all of the limitations of Claim 12 of the Haskell '226 patent.  Microsoft knew, or should have known, that its

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

35

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    actions would induce actual infringements, and acted with affirmative intent to cause direct

2    infringement.

3    127.    Microsoft contributes to the infringement of its OEM customers, including Dell and

4    Gateway, by providing them with Windows Media Player 9 and 10 software and encouraging them

5    to install Windows Media Player 9 and/or 10 on the computer products that they sell to end users.

6    The WMV-9 Advanced Decoder is not useful unless it is installed on a computer.  The WMV-9

7    Advanced Decoder embodies a material part of the claimed invention, is specifically adapted for use

8    in an infringing circuit, and has no substantial noninfringing uses.  Microsoft knows that the WMV-9

9    Advanced Decoder is especially made or adapted for use in infringing claim 12 of the Haskell '226

10   patent.

11

12   128.    The WMV-9 Advanced Decoder is compliant with the advanced profile of the

13   SMPTE VC-1 standard as it existed when the WMV-9 Advanced Decoder was released.

14   129.    A computer installed with the WMV-9 Advanced Decoder comprises "a circuit

15   responsive to coded video signals where the video signals comprise successive frames and each

16   frame includes a plurality of blocks and where the coded video signals comprise codes that describe

17   deviations from approximated blocks and codes that describe deviations from interpolated blocks."

18   The WMV-9 Advanced Decoder is not useful unless it is installed on a computer.  Such computers,

19   including the accused Dell and Gateway computers, include hardware and software.  The hardware

20   contains electrical circuits, which are "paths that can carry an electrical current."  The WMV-9

21   Advanced Decoder decodes compressed Advanced Profile WMV-9 video bit streams, which are

22   coded video signals comprising consecutive pictures.  Each WMV-9 picture includes blocks and

23   macroblocks.  Both are "blocks" as construed by the Court, because a block/macroblock is a set of

24   pixels that constitute a portion of a frame.  Advanced Profile WMV-9 bit streams contain coded

25   blocks/macroblocks which "describe" prediction errors ("deviations from approximated blocks") and

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW                                                    36                Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                                               from consolidated cases:  02-CV-2060 B (CAB),
                                                                               03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  coded blocks/macroblocks which "describe" interpolation errors for bidirectional-predicted

2  macroblocks in B-Pictures ("deviations from interpolated blocks").

3      130.    A computer installed with the WMV-9 Advanced Decoder comprises a "means for

4  developing block approximations from said codes that describe deviations from approximated

5  blocks."  Advanced Profile WMV-9 bit streams contain predictively encoded blocks/macroblocks.

6  When decoding such Advanced Profile WMV-9 bit streams, the WMV-9 Advanced Decoder

7  performs an addition (a "combination") of predicted blocks/macroblocks with prediction error

8  blocks/macroblocks ("deviations from approximated blocks").  The prediction error

9

10  blocks/macroblocks are described by bits encoded according to the VC-1 Standard ("said codes that

11  describe deviations from approximated blocks").  A computer installed with the WMV-9 Advanced

12  Decoder contains structures which, taken as a whole, perform the claimed function (or substantially

13  the same function) in substantially the same way, to achieve substantially the same result, as the

14  corresponding structure identified in the Court's claim construction (Decoder 22, DCT$^{-1}$ 24, Adder

15  27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed

16

17  function).

18      131.    A computer installed with the WMV-9 Advanced Decoder comprises a "means

19  responsive to said block approximations and to said codes that describe deviations from interpolated

20  blocks to develop said interpolated blocks."  Advanced Profile WMV-9 bit streams contain

21  blocks/macroblocks encoded with bidirectional prediction which uses predictively coded

22  blocks/macroblocks in past or future P-Pictures as references.  When decoding such bidirectional-

23

24  predicted blocks/macroblocks, the WMV-9 Advanced Decoder decode an encoded interpolation

25  error block/macroblock ("deviations from interpolated blocks") by run-level decoding, dequantizing

26  DCT coefficient values, and applying an inverse DCT to reconstruct the interpolation error in the

27  pixel domain.  The interpolation error is then added to an bidirectionally predicted block/macroblock

28

which in turn is based on predictively encoded blocks/macroblocks in a P-Picture ("said block approximation").  A computer installed with the WMV-9 Advanced Decoder contains structures which, taken as a whole, perform the claimed function (or substantially the same function)  function in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

132.    Motion vectors are encoded in WMV-9/VC-1 using lossless compression.  Therefore, the motion vectors at encoder and decoder are the same.  Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

133.    The inverse transform of WMV-9/VC-1 and the DCT$^{-1}$ 24 and 34 of Haskell are identical in their functions and substantially similar in the numerical results produced.  The WMV-9/VC-1 transform approximates a DCT, and is insubstantially different, if not identical, to an IDCT.

134.    Further details concerning infringement of Claim 12 of the Haskell '226 patent by computers that ship with the WMV-9 Advanced Decoder can be found in the March 31, 2006 expert report of Professor Bernd Girod.

**7.    Xbox 360 WMV-9/VC-1 Decoder**

135.    The Xbox 360 Premium and Core systems sold by Microsoft ship with a software WMV-9/VC-1 decoder ("Xbox 360 WMV-9/VC-1 Decoder") stored in the non-volatile memory ("console flash") of the video game console.  The Xbox 360 WMV-9/VC-1 Decoder supports the Main and Advanced Profiles of WMV-9/VC-1.  For the purpose of analyzing infringement of Claim 12 of the Haskell '226 patent, the source code for the Xbox 360 WMV-9/VC-1 Decoder is functionally identical to the source code for the Main Profile WMV-9 Decoder.   The Xbox 360 WMV-9/VC-1 Decoder infringes Claim 12 of Haskell for the same reasons set forth above.

136.    Microsoft directly infringes the Haskell '226 patent by making and selling the Xbox 360 Premium and Core systems.  Microsoft likewise has induced its customers to infringe the Haskell '226 patent by selling the Xbox 360 Premium and Core systems, by informing their customers about the WMV-9/VC-1 playback capabilities of the Xbox 360 Premium and Core systems, and by providing their customers with instructions how to use the Xbox 360 Premium and Core systems to play back WMV-9/VC-1 video.  Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

137.    The Xbox 360 Premium and Core systems comprise "a circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks."  The Xbox 360 Premium and Core systems decode compressed Main and Advanced Profile WMV-9/VC-1 video bit streams, which are coded video signals comprising consecutive pictures.  Each Main or Advanced Profile WMV-9/VC-1 picture includes blocks and macroblocks.  Both are "blocks" as construed by the Court, because a block/macroblock is a set of pixels that constitute a portion of a frame.  Main and Advanced Profile WMV-9/VC-1 bit streams contain coded blocks/macroblocks which "describe" prediction errors ("deviations from approximated blocks") and coded blocks/macroblocks which "describe" interpolation errors for bidirectional-predicted macroblocks in B-Pictures ("deviations from interpolated blocks").

138.    The Xbox 360 Premium and Core systems comprise a "means for developing block approximations from said codes that describe deviations from approximated blocks."  Main and Advanced Profile WMV-9/VC-1 bit streams contain predictively encoded blocks/macroblocks.  When decoding such Main or Advanced Profile WMV-9/VC-1 bit streams, the Xbox 360 Premium

and Core systems perform an addition (a "combination") of predicted blocks/macroblocks with prediction error blocks/macroblocks ("deviations from approximated blocks"). The prediction error blocks/macroblocks are described by bits encoded according to the VC-1 Standard ("said codes that describe deviations from approximated blocks"). The Xbox 360 Premium and Core systems contain structures which, taken as a whole, perform the claimed function (or substantially the same function) function in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function).

139.     The Xbox 360 Premium and Core systems comprise a "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks." Main and Advanced Profile WMV-9/VC-1 bit streams contain blocks/macroblocks encoded with bidirectional prediction which uses predictively coded blocks/macroblocks in past or future P-Pictures as references. When decoding such bidirectional-predicted blocks/macroblocks, the Xbox 360 Premium and Core systems decode an encoded interpolation error block/macroblock ("deviations from interpolated blocks") by run-level decoding, dequantizing DCT coefficient values, and applying an inverse DCT to reconstruct the interpolation error in the pixel domain. The interpolation error is then added to an bidirectionally predicted block/macroblock which in turn is based on predictively encoded blocks/macroblocks in a P-Picture ( "said block approximation"). The Xbox 360 Premium and Core systems contain structures which, taken as a whole, perform the claimed function (or substantially the same function) in substantially the same way, to achieve substantially the same result, as the corresponding structure identified in the Court's claim construction (Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuit 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function).

140.    Motion vectors are encoded in WMV-9/VC-1 using lossless compression.  Therefore, the motion vectors at encoder and decoder are the same.  Since both forward and backward vectors are derived from the motion of an inert object, they are usually not independent.

141.    The inverse transform of WMV-9/VC-1 and the DCT$^{-1}$ 24 and 34 of Haskell are identical in their functions and substantially similar in the numerical results produced.  The WMV-9/VC-1 transform approximates a DCT, and is insubstantially different, if not identical, to an IDCT.

142.    Further details concerning infringement of Claim 12 of the Haskell '226 patent by the Xbox 360 Premium and Core systems can be found in the July 21, 2006 expert report of Professor Bernd Girod.

### 8.    VC-1 32-Bit Decoder

143.    The VC-1 32-Bit Decoder is proprietary software capable of decoding Microsoft WMV-9/VC-1 Simple, Main, and Advanced Profile bit streams.  Microsoft made the VC-1 32-Bit Decoder available for download in late 2005.  The VC-1 32-Bit Decoder is a "relatively minor update" of the WMV-9 Advanced Decoder that has been modified for bug fixes and to support the Advanced Profile as defined by the final VC-1 standard.  Microsoft's Windows Media Player software product can automatically download the VC-1 32-Bit Decoder when it is presented with a WMV-9/VC-1 Advanced Profile bit stream.

144.    The VC-1 32-Bit Decoder is compliant with the Simple, Main, and Advanced Profiles of the VC-1 standard.  With respect to the Simple and Main Profiles, the VC-1 32-Bit Decoder is functionally identical to the WMV-9 Main Decoder.  The VC-1 32-Bit Decoder therefore infringes Claim 12 of the Haskell '226 patent for the same reasons that the WMV-9 Main Decoder infringes Claim 12 of the Haskell '226 patent, as set forth above.

### 9.    VC-1 64-Bit Decoder

145.    The VC-1 64-Bit Decoder is proprietary software capable of decoding Microsoft WMV-9/VC-1 Simple, Main, and Advanced Profile bit streams.  Microsoft made the VC-1 64-Bit Decoder available for download in late 2005.  The VC-1 64-Bit Decoder is a "relatively minor update" of the WMV-9 Advanced Decoder that has been modified to run on 64-bit processors.

146.    The VC-1 64-Bit Decoder is compliant with the Simple, Main, and Advanced Profiles of the VC-1 standard.  With respect to the Simple and Main Profiles, the VC-1 64-Bit Decoder is functionally identical to the WMV-9 Main Decoder. The VC-1 64-Bit Decoder therefore infringes Claim 12 of the Haskell '226 patent for the same reasons that the WMV-9 Main Decoder infringes Claim 12 of the Haskell '226 patent, as set forth above.

### 10.    Windows Media Player 11 WMV-9/VC-1 Decoder

147.    The VC-1 decoder that ships with Windows Media Player 11 is virtually identical to the VC-1 decoder that shipped with Windows Media Player 10.  The VC-1 decoder that ships with Windows Media Player 11 uses the same core WMV-9/VC-1 decoding algorithm as the VC-1 decoder that shipped with Windows Media Player 10.  The Windows Media Player 11 VC-1 Decoder therefore infringes Claim 12 of the Haskell '226 patent for the same reasons that the WMV-9 Main Decoder and WMV-9 Advanced Decoder infringe Claim 12 of the Haskell '226 patent, as set forth above.

148.    Dell and Gateway directly infringe Claim 12 of the Haskell '226 patent by making and selling computers with Windows Media Player 11 software, which also includes the Windows Media Player 11 VC-1 Decoder.

149.    Dell and Gateway have induced their customers to infringe Claim 12 of the Haskell '226 patent by selling computers with Windows Media Player 11 software, by informing their customers about the VC-1 decoding capabilities of the accused Dell and Gateway computer

products, and by providing their customers with instructions how to use the accused computer products to play back VC-1 video.  Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

150.    Microsoft has induced its OEM customers, including Dell and Gateway, to infringe Claim 12 of the Haskell '226 patent by providing them with Windows Media Player 11 software, which also includes the Windows Media Player 11 VC-1 Decoder.   This software has no use other than to be installed on a computer.  With Windows Player 11 software, and hence the Windows Media Player 11 VC-1 Decoder, installed, such computers become circuits that meet all of the limitations of Claim 12 of the Haskell '226 patent.  Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

151.    Microsoft contributes to the infringement of its OEM customers, including Dell and Gateway, by providing them with Windows Media Player 11 software and encouraging them to install Windows Media Player 11 on the computer products that they sell to end users.  The Windows Media Player 11 VC-1 Decoder is not useful unless it is installed on a computer.  The Windows Media Player 11 VC-1 Decoder embodies a material part of the claimed invention, is specifically adapted for use in an infringing circuit, and has no substantial noninfringing uses.  Microsoft knows that the Windows Media Player 11 VC-1 Decoder is especially made or adapted for use in infringing claim 12 of the Haskell '226 patent.

### 11.    Vista WMV-9/VC-1 Decoder

152.    The VC-1 decoder that ships with the Vista operating system uses the same core WMV-9/VC-1 decoding algorithm as the VC-1 decoder that shipped with Windows Media Player 11, and therefore the same core WMV-9/VC-1 decoding algorithm as the VC-1 decoder that shipped with Windows Media Player 10.  The Vista VC-1 Decoder infringes Claim 12 of the Haskell '226

patent for the same reasons that the WMV-9 Main Decoder and WMV-9 Advanced Decoder infringe Claim 12 of the Haskell '226 patent, as set forth above.

153.    Dell and Gateway directly infringe Claim 12 of the Haskell '226 patent by making and selling computers with the Vista operating system, which also includes the Vista VC-1 Decoder.

154.    Dell and Gateway have induced their customers to infringe Claim 12 of the Haskell '226 patent by selling computers with the Vista operating system, by informing their customers about the VC-1 decoding capabilities of the accused Dell and Gateway computer products, and by providing their customers with instructions how to use the accused computer products to play back VC-1 video.  Dell and Gateway knew, or should have known, that their actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

155.    Microsoft has induced its OEM customers, including Dell and Gateway, to infringe Claim 12 of the Haskell '226 patent by providing them with the Vista operating system, which also includes the Vista VC-1 Decoder.   This software has no use other than to be installed on a computer.  With the Vista operating system, and hence the Vista VC-1 Decoder, installed, such computers become circuits that meet all of the limitations of Claim 12 of the Haskell '226 patent. Microsoft knew, or should have known, that its actions would induce actual infringements, and acted with affirmative intent to cause direct infringement.

156.    Microsoft contributes to the infringement of its OEM customers, including Dell and Gateway, by providing them with the Vista operating system and encouraging them to install the Vista operating system on the computer products that they sell to end users.  The Vista VC-1 Decoder is not useful unless it is installed on a computer.  The Vista VC-1 Decoder embodies a material part of the claimed invention, is specifically adapted for use in an infringing circuit, and has no substantial noninfringing uses.  Microsoft knows that the Vista VC-1 Decoder is especially made or adapted for use in infringing claim 12 of the Haskell '226 patent.

## C.    Validity Of The Asserted Claim Of The Haskell '226 Patent

157.    The defendants contend that Claim 12 of the Haskell '226 patent is anticipated or rendered obvious by the prior art.  As an initial matter, the defendants must prove by clear-and-convincing evidence that each of the references, disclosures, and alleged prior inventions upon which they rely qualifies as prior art under 35 U.S.C. § 102.  To the extent the defendants can carry their burden on this issue, Claim 12 of the Haskell '226 patent is not invalid in view of the art cited by the defendants.

158.    MPT's validity positions are set forth in detail in the May 12, 2006 and October 12, 2007 expert reports of Professor Bernd Girod.  In summary, no prior art relied upon by the defendants discloses the use of block-based, motion-motion-compensated interframe interpolation error.  No prior art relied upon by the defendants discloses a combination of means for performing the functions of the two means-plus-function elements of Claim 12, let alone using structure identical or equivalent to that identified by the Court as corresponding structures for those elements.  Furthermore, none of the art cited by the defendants, alone or in combination, renders obvious to one of ordinary skill in the art the invention of Claim 12 of the Haskell '226 patent.

159.    A person of ordinary skill in the art of video compression throughout the 1980s would have had the equivalent of a Bachelor of Science degree in electrical engineering or a related field and 2 years experience working in the area of video compression systems.

160.    The defendants rely on the CCITT document titled "Comments on Conditional Motion Compensated Frame Interpolation," submitted by NTT, KDD, NEC and Fujitsu ("Document No. 81").  Document No. 81 is not prior art to the Haskell '226 patent.  Document No. 81 does not disclose "approximated blocks," "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks."  Document No. 81 discloses no structure that performs the required function of developing block approximations

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

45

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

from codes that describe deviations from approximated blocks. Document No. 81 discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Document No. 81 discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Document No. 81 discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent. Document No. 81 expressly teaches away from using block-based coding of error information. Document No. 81 fails to provide sufficient information to allow a person of ordinary skill in the art to practice Claim 12 of the Haskell '226 patent without undue experimentation. A person of ordinary skill in the art would not have seen a reason to modify the teachings of Document No. 81 to arrive at the invention of Claim 12. Document No. 81 is not material prior art to Claim 12 of the Haskell '226 patent.

161.    The defendants rely on the CCITT document titled "Investigation of Basic Coding Algorithm for the Standard 384 kbit/s Codec," prepared by NTT, KDD, NEC and Fujitsu ("Document No. 22"). Document No. 22 is not prior art to the Haskell '226 patent. Document No. 22 does not disclose "approximated blocks," "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks." Document No. 22 discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Document No. 22 discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Document No. 22 discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Document No. 22

46

discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

162.    The defendants rely on the CCITT document titled "Candidates for Subrate Coding Algorithm," prepared by NTT, KDD, NEC and Fujitsu ("Document No. 43").  Document No. 43 is not prior art to the Haskell '226 patent.  Document No. 43 does not disclose "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks."  Document No. 43 discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks.  Document No. 43 discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Document No. 43 discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Document No. 43 discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

163.    The defendants rely on the CCITT document titled "A Proposal for Generic Structure of n x 384 kbits/s Codec," submitted by NTT, KDD, NEC and Fujitsu ("Document No. 78"). Document No. 78 is not prior art to the Haskell '226 patent.  Document No. 78 discloses no "interpolated blocks" or "codes that describe deviations from interpolated blocks."  Document No. 78 discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Document No. 78 discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

164.    The defendants rely on the thesis "Vergleich eines prädiktiven und eines interpolativen bewegungskompensierenden Codierverfahrens für Fernsehbildsignale" ("Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals") by Thomas Micke ("the Micke Thesis").  The Micke thesis is not prior art to the Haskell '226 patent.  The Micke Thesis discloses no circuitry that responds to a video signal comprising "deviations from approximated blocks" and "deviations from interpolated blocks."  The Micke Thesis does not disclose a means for developing block approximations from codes that describe deviations from approximated blocks.  The Micke thesis discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT$^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in Claim 12 of the Haskell '226 patent.  The Micke Thesis discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  The Micke Thesis discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Claim 12 of the Haskell '226 patent.  The Micke Thesis fails to provide sufficient information to allow one skilled in the art to practice Claim 12 of the Haskell '226 patent without undue experimentation.  A person of ordinary skill in the art would not have seen a reason to modify the teachings of the Micke thesis to arrive at the invention of Claim 12.

165.    The defendants rely on U.S. Patent No. 4,849,810 to Staffan Ericsson ("the Ericsson '810 patent").  The Ericsson '810 patent does not disclose "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks."  The Ericsson '810 patent discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell.  The Ericsson '810 patent discloses no structure that performs the function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  The Ericsson

'810 patent discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent. A person of ordinary skill in the art would not have seen a reason to modify the teachings of the Ericsson '810 patent thesis to arrive at the invention of Claim 12.

166.    The defendants rely on U.S. Patent No. 4,727,422 to Brian L. Hinman ("the Hinman '422 patent"). The Hinman '422 patent does not disclose "interpolated blocks" or "codes that describe deviations from interpolated blocks." The Hinman '422 patent discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in Haskell. The Hinman '422 patent discloses no structure that performs the function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. The Hinman '422 patent discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent. A person of ordinary skill in the art would not have seen a reason to modify the teachings of the Hinman '422 patent thesis to arrive at the invention of Claim 12.

167.    The defendants rely on the article "A Highly Efficient Coding Method For HDTV Signals," by Yoshiyuki Yashima *et al*. ("Yashima"). Yashima discloses no "interpolated blocks" or "codes that describe deviations from interpolated blocks." Yashima discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Yashima discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Yashima discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

168.    The defendants rely on the text "Digital Pictures, Representation & Compression," by Arun N. Netravali and Barry G. Haskell ("Digital Pictures").  Digital Pictures discloses no "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks."  Digital Pictures discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks."    Digital Pictures discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent.  Digital Pictures discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Digital Pictures discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.  Digital Pictures is not material prior art to Claim 12 of the Haskell '226 patent.

169.    The defendants rely on the article "Interframe Coding of 525-Line Monochrome Television at 1.5 Mbits/s," by Barry G. Haskell *et al*. ("Interframe Coding").  Interframe Coding discloses no "approximated blocks," "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks."  Interframe Coding discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks.  Interframe Coding discloses no circuitry or structure equivalent to the combination of Decoder 22, $DCT^{-1}$ 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Interframe Coding discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Interframe Coding discloses no circuitry or structure equivalent to the combination of Decoder 25, $DCT^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

170.     The defendants rely on the article "A Hybrid Interpolative and Predictive Code for Embedded Transmission of Broadcast Quality Television Pictures," by N.K. Lodge ("Lodge I"). Lodge I discloses no "codes that describe deviations from approximated blocks" or "codes that describe deviations from interpolated blocks." Lodge I discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Lodge I discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Lodge I discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Lodge I discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

171.     The defendants rely on U.S. Patent No. 4,858,005 to N.K. Lodge ("Lodge II"). Lodge II discloses no "codes that describe deviations from approximated blocks" or "codes that describe deviations from interpolated blocks." Lodge II discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Lodge II discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Lodge II discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Lodge II discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

172.     The defendants rely on Picture Coding. Picture Coding discloses no "approximated blocks," "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks." Picture Coding discloses no structure that

performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Picture Coding discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Picture Coding discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Picture Coding discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

173.    The defendants rely on Jain. Jain discloses no "interpolated blocks" or "codes that describe deviations from interpolated blocks." Jain discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Jain discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks. Jain discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

174.    The defendants rely on the article "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," by Masayuki Tanimoto and Takashi Mori ("Tanimoto"). Tanimoto discloses no "approximated blocks," "codes that describe deviations from approximated blocks," "interpolated blocks," or "codes that describe deviations from interpolated blocks." Tanimoto discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks. Tanimoto discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent. Tanimoto discloses no structure that performs the required function of developing interpolated blocks using block approximations and

1  codes that describe deviations from interpolated blocks.  Tanimoto discloses no circuitry or structure

2  equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and

3  Averager 32 as disclosed in the Haskell '226 patent.

4       175.    The defendants rely on U.S. Patent No. 4,575,756 to A. Furukawa ("Furukawa").

5  Furukawa discloses no "interpolated blocks" or "codes that describe deviations from interpolated

6  blocks."  Furukawa discloses no circuitry or structure equivalent to the combination of Decoder 22,

7  DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent.  Furukawa

8  discloses no structure that performs the required function of developing interpolated blocks using

9
10 block approximations and codes that describe deviations from interpolated blocks.  Furukawa

11 discloses no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder

12 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

13      176.    The defendants rely on three Japanese patent applications (1-118004, 1-163059, and

14 1-169320) cited in U.S. Patent No. 5,113,255 to A. Nagata *et al*. ("Nagata").  Those patent

15 applications fail to disclose the claimed "block approximations," "codes that describe deviations

16 from approximated blocks," and "means for developing block approximations from said codes that

17 describe deviations from approximated blocks."  The applications disclose no structure that performs

18 the required function of developing block approximations from said codes that describe deviations

19 from approximated blocks.  The applications disclose no circuitry or structure equivalent to the

20 combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell

21
22 '226 patent.  The applications disclose no structure that performs the required function of developing

23 interpolated blocks using block approximations and codes that describe deviations from interpolated

24 blocks.  The applications disclose no circuitry or structure equivalent to the combination of Decoder

25 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226

26
27 patent.

28

177.    The defendants rely on U.S. Patent No. 4,985,768 to K. Sugiyama ("Sugiyama/US") and Japanese patent application 1-11587 ("Sugiyama/JP") (collectively, "the Sugiyama references"). The Sugiyama references do not disclose "[a] circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks."  The Sugiyama references do not disclose a "means for developing block approximations from said codes that describe deviations from approximated blocks."  The Sugiyama references disclose no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent.  The Sugiyama references fail to disclose the claimed "means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks."   The Sugiyama references disclose no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

178.    The defendants rely on Sony's October 2, 1989 MPEG proposal titled "Description of The Proposed Coding Algorithm" ("Sony").  Sony discloses no "approximated blocks" and "codes that describe deviations from approximated blocks."  Sony does not disclose the claimed "means for developing block approximations from said codes that describe deviations from approximated blocks."  Sony discloses no structure that performs the required function of developing block approximations from codes that describe deviations from approximated blocks.  Sony discloses no circuitry or structure equivalent to the combination of Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent.  Sony discloses no structure that performs the required function of developing interpolated blocks using block approximations and codes that describe deviations from interpolated blocks.  Sony discloses no circuitry or structure equivalent to

1    the combination of Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as

2    disclosed in the Haskell '226 patent.

3        179.    The defendants rely on Philips' 1989 MPEG submission titled "The Full Motion

4    System" ("Philips").  Philips discloses no "interpolated blocks" or "codes that describe deviations

5    from interpolated blocks."  Philips discloses no structure that performs the required function of

6    developing interpolated blocks using block approximations and codes that describe deviations from

7    interpolated blocks.  Philips discloses no circuitry or structure equivalent to the combination of

8    Decoder 25, DCT-1 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in the

9
10   Haskell '226 patent.

11       180.    The defendants rely on an article by Paul Roos and Max A. Viergever titled

12   "Interframe vs. intraframe compression of image sequences" ("Roos").  Roos does not disclose the

13   claimed "means for developing block approximations from said codes that describe deviations from

14   approximated blocks."  Roos discloses no circuitry or structure equivalent to the combination of

15   Decoder 22, DCT-1 24, Adder 27, and Shift Circuit 26 as disclosed in the Haskell '226 patent.  Roos

16   fails to disclose the claimed "means responsive to said block approximations and to said codes that

17   describe deviations from interpolated blocks to develop said interpolated blocks."   Roos discloses

18   no circuitry or structure equivalent to the combination of Decoder 25, DCT-1 34, Adder 35, Shift

19
20   Circuits 31 and 39, and Averager 32 as disclosed in the Haskell '226 patent.

21       181.    The defendants rely on the combination of Document No. 81 and Document No. 78.

22   Neither document is prior art to the Haskell '226 patent.  The combination does not disclose

23   "interpolated blocks" or "codes that describe deviations from interpolated blocks."  The combination

24   discloses no structure that performs the required function of developing interpolated blocks using

25   block approximations and codes that describe deviations from interpolated blocks.  Furthermore,

26
27   Document No. 78 and Document No. 81 disclose no circuitry or structure equivalent to the

28

1    combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as

2    disclosed in Haskell.  A person of ordinary skill in the art would have seen no reason to modify the

3    teachings of Document No. 81 and Document No. 78 in the manner proposed by the defendants.

4        182.    The defendants rely on the combination of CCITT Document Nos. 22, 43, 60, 78, 81,

5    and/or 103R.  None of those documents are prior art to the Haskell '226 patent.  The combination

6    does not disclose "interpolated blocks" or "codes that describe deviations from interpolated blocks."

7    The combination discloses no structure that performs the required function of developing

8    interpolated blocks using block approximations and codes that describe deviations from interpolated

9    blocks.  Furthermore, the combination discloses no circuitry or structure equivalent to the

10    combination of Decoder 25, DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as

11    disclosed in Haskell.  A person of ordinary skill in the art would have seen no reason to modify the

12    teachings of the CCITT documents in the manner proposed by the defendants.

13        183.    The defendants rely on the combination of the Ericsson '810 patent, the Hinman '422

14    patent, and five other patents assigned to PictureTel Corporation (U.S. Patent No. 4,703,350, U.S.

15    Patent No. 4,661,849, U.S. Patent No. 4,794,455, U.S. Patent No. 4,754,492, and U.S. Patent No.

16    4,816,914) (collectively, "the PictureTel patents").  The combination does not disclose "interpolated

17    blocks" or "codes that describe deviations from interpolated blocks."  The combination discloses no

18    structure that performs the required function of developing interpolated blocks using block

19    approximations and codes that describe deviations from interpolated blocks.  Furthermore, the

20    PictureTel patents disclose no circuitry or structure equivalent to the combination of Decoder 25,

21    DCT$^{-1}$ 34, Adder 35, Shift Circuits 31 and 39, and Averager 32 as disclosed in Haskell.  A person of

22    ordinary skill in the art would have seen no reason to modify the teachings of the PictureTel patents

23    in the manner proposed by the defendants.

184.     The fact that a particular video coding technique, in this case motion compensated interpolation, could be combined with a variety of other techniques provides no reason to combine any particular subset of those techniques, let alone a subset that embodies the limitations of Haskell Claim 12.  A large number of beneficial video coding techniques were available at the time of the invention of Claim 12 of the Haskell '226 patent.  Any attempt to form all possible combinations of video coding techniques that had been reported as improving compression and/or video quality would have gone far beyond a routine pursuit of a finite number of predictable solutions that would place the invention of Claim 12 within the grasp of a person of ordinary skill in the art.  It would have required more than common sense and knowledge of the prior art for a person of ordinary skill to arrive at the invention of Claim 12.

185.     The performance of a video coder critically depends on the way the constituent elements are combined and artfully optimized as a whole.  An efficient video coder cannot simply be built by combining known building blocks. Among other problems, the performance of a certain combination of elements can usually not be readily predicted but requires extended experimentation.

186.     A person of ordinary skill would also not have been able to predict the performance of the invention of Claim 12 of the Haskell '226 patent invention.  The invention of Claim 12 of the Haskell '226 patent required extended experimentation and observation of the performance.

187.     At the time of the invention of Claim 12 of the Haskell '226 patent, motion compensation artifacts were usually caused by a failure of the motion estimator to extract the true motion of an object.  A person of ordinary skill would therefore have typically looked for ways to improve the reliability and accuracy of the motion estimator to eliminate visual artifacts.  In addition, or alternatively, a person of ordinary skill might have considered sending a flag to instruct the receiver to omit motion-compensated interpolation and use frame repetition instead.

188.    The recursive structure of a predictive decoder requires that the coder at least obeys constraints posed by causality, otherwise the bit stream cannot be decoded.  At least some frames have to be predicted in forward direction, while skipping in-between frames with backward prediction.  At the time of the invention of Claim 12 of the Haskell '226 patent, the structures needed to implement such a system, their interconnection, or their control would not have been obvious to a person of ordinary skill.  Nor would the step from backward prediction to bidirectional prediction be obvious.

189.    No design incentives or market forces would have motivated a person of ordinary skill in the art to arrive at the invention of Claim 12 of the Haskell '226 patent.

190.    Products that use the invention of Claim 12 of the Haskell '226 patent have been highly successful in the marketplace.  The claimed invention is used in numerous video coding standards, including MPEG-1, MPEG-2, WMV-9, VC-1, and others.  The invention has contributed to the success of these products by reducing the bandwidth needed to transmit, or by reducing the quantity of storage needed to store, high-quality video bit streams.  Other video coding technologies that do not use the claimed invention have not been as commercially successful.

191.    Several of Lucent's licensing agreements specifically identify the Haskell '226 patent.  The Haskell '226 patent has been a focal point of negotiations for broader licenses with third parties.

192.    The Patent Office historically grants over 90% of requests for reexamination.  Only a small fraction of reexamined patent claims have historically been determined to be unpatentable.

193.    The defendants allege that persons responsible for the prosecution of the Haskell '226 patent committed inequitable conduct by concealing Document No. 81 and Digital Pictures from the Patent Office.  Neither of those references, whether taken alone or in combination, is material prior art to the Haskell '226 patent.  Those references are cumulative of other art that was before the

1  Patent Examiner.  Nobody involved in the prosecution of the Haskell '226 patent withheld either of

2  those references from the Patent Office with intent to deceive the Patent Office.

3  **IV.     Validity Of Multimedia Patent Trust**

4          **A.     Lucent's Decision Not To Participate In MPEG-LA**

5          194.     MPEG LA is a licensing association that licenses a pool of some patents deemed

6  "essential" to the MPEG-2 compressed video standard.  MPEG LA was formed in the mid-1990s by

7  a group of independent companies, each of which voluntarily contributed its MPEG-2 essential

8  patents to the patent pool.  Thereafter, additional companies joined MPEG LA, contributing their

9  MPEG-2 essential patents as well.  MPEG LA offers companies an MPEG-2 Patent Portfolio

10  License that provides a license to all patents in the pool for purposes of practicing the MPEG-2

11  standard.

12

13          195.     Although Lucent participated in the working group of independent companies that

14  initially investigated the formation of an MPEG-2 patent pool, Lucent never became a member of

15  MPEG LA.  Determining that the pool's expected licensing terms would undervalue Lucent's

16  MPEG-2 essential patents, Lucent made a public business decision not to join MPEG LA when it

17  was formed in 1997, and instead chose to license its MPEG-2 video-coding patents independently.

18

19          196.     The defendants have contended that Lucent's decision not to join MPEG LA

20  constitutes unclean hands.  Lucent, however, was under no obligation to join. The companies that

21  decided to pool their patents had no authority to force others to join, and, in fact, Justice Department

22  authorization was required for the pool's creation.  Lucent's decision not to join was in all respects

23  proper and cannot be argued to be an unconscionable act, let alone one that bears an immediate and

24  necessary relation to the claims here or that affects the equities between the parties to this litigation.

25

26

27

28

### B.    Lucent's Attempts To License The Defendants To The Netravali '272 and Haskell '226 Patents

197.    After Lucent's public decision not to join MPEG LA, Lucent approached a number of potential licensees to license its video-coding patents, including Dell and Gateway.  Lucent first approached Gateway in April 1998 and Dell in September 1998.  In both cases, this first assertion led to several years of licensing negotiations, which ultimately proved unsuccessful.  Lucent filed suit against Gateway in 2002 and against Dell in 2003.  Lucent filed suit against Microsoft in 2003, after Microsoft intervened in the Gateway action.

198.    After Lucent initiated negotiations, each of the defendants took MPEG-2 Patent Portfolio Licenses from MPEG LA.  Dell Products, L.P. took a license in December 2001 and Gateway, Inc. in January 2002.  Because Lucent was not a member of MPEG LA, neither Dell nor Gateway received a license to any Lucent patent by virtue of its MPEG LA Portfolio License. Neither company had any expectation that it would ever receive such a license through MPEG LA. Neither company suggested during its negotiations or during this litigation before the Lucent/Alcatel merger that MPEG LA had provided it a license to any Lucent patent.

199.    Microsoft did not take a Patent Portfolio License until February 2006, nearly three years after its litigation with Lucent had begun.  Microsoft did not receive a license from MPEG LA to any Lucent patent.  Microsoft had no expectation that it would ever do so.

### C.    Alcatel Makes An Independent Decision To Join MPEG LA

200.    Before 2006, Alcatel SA was one of Lucent's primary competitors; it had no affiliation with Lucent.  Although Alcatel was not an original member of MPEG LA, in March 2003 it made its own independent business decision to join that organization.  In doing so, it contributed its MPEG-2 essential patents to the MPEG LA patent pool.  To join MPEG LA, Alcatel entered a number of agreements, including an "Agreement Among Licensors."  Under that Agreement, Alcatel

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

60

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases:  02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    agreed to grant a license to any MPEG-2 essential patent that the "Party and its Affiliate(s) . . .

2    presently or in the future, have the right to license or sublicense."

3        **D.    Lucent's Merger With Alcatel**

4        201.    Over three years after Alcatel joined MPEG LA — on April 2, 2006 — Alcatel and

5    Lucent announced their intention to enter a reverse triangular merger in which Lucent would become

6    a wholly owned subsidiary of Alcatel.  On that date, Alcatel and Lucent entered into a Merger

7    Agreement.  Although the Agreement included certain reciprocal covenants from Lucent and

8    Alcatel, the Agreement expressly permitted Lucent and Alcatel to conduct their businesses in the

9    ordinary course without the consent of the other party, including transferring assets, entering into

10   contracts, and settling litigations.  Except for shareholders in certain circumstances, the Agreement

11   expressly disavowed any alleged third-party beneficiary.

12       202.    In an SEC proxy statement filed April 7, 2006, Lucent stated that "the way the

13   proposed merger is structured, all of the patents will continue to be owned by Lucent and its

14   subsidiaries."  That paragraph represents that Alcatel and Lucent did not intend Lucent to transfer its

15   patent portfolio to Alcatel upon completion of the merger.  To the contrary, Lucent, albeit as a

16   subsidiary of Alcatel, would continue to own its pre-existing Bell Labs portfolio.  Consistent with

17   that representation, Lucent owns the Bell Labs patent portfolio today.  The statement in the SEC

18   proxy statement was true when made. It remains true today — the statement made no representation

19   about transfer of individual patents.

20       203.    In another SEC statement filed April 4, 2006, Lucent stated that "[t]he 2 companies

21   will combine their patent portfolios and by doing so will reinforce their strengths in innovation and

22   the valuation of their technologies through patent licensing.   We intend to continue and strengthen

23   further their efforts in new patents creation."   This statement was true when made and remains true

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW                                        61         Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                      from consolidated cases:  02-CV-2060 B (CAB),
                                                      03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    today.  While Lucent and Alcatel continue to own the patents they respectively brought with them

2    into the merger, the two portfolios have in fact been combined for licensing purposes.

3        204.    Shortly after entering the Merger Agreement, each company began to assess the

4    potential impact of its merger partner's pre-existing contractual obligations on its ongoing business.

5    In this process, Lucent became concerned that certain Lucent video-coding and wireless patents

6    might become subject to Alcatel's pre-existing licensing obligations upon completion of the merger,

7    and thereby substantially devalued.

8

9        205.    At the same time, the defendants were also considering the impact of Alcatel's

10   contractual obligations.  Soon after the potential merger was announced, the defendants moved the

11   Court to stay the Group 1 video-coding trial until after the completion of the merger, arguing that by

12   virtue of Alcatel's MPEG LA agreements, Lucent's video-coding patents would be swept into the

13   MPEG LA patent pool upon completion of the merger.  The defendants argued that not only would

14   they become licensed to these patents going forward, but that the merger would also extinguish all

15   past liability on these patents and render moot nearly a decade of licensing negotiations and

16   litigation.

17

18       206.    During an August 14, 2007 hearing with the Court on the defendants' stay request,

19   Lucent explained that even if the merger were to be completed with Lucent still owning the Video

20   Coding Patents-in-Suit, that circumstance would not completely extinguish the defendants' liability.

21   As Lucent's counsel noted, although the MPEG LA patent license covered MPEG-2 products,

22   Lucent was also accusing MPEG-1 and WMV-9 products not covered by the MPEG LA agreements.

23   Lucent's counsel also pointed out a number of provisions of the MPEG LA agreement that could

24   prevent the Video Coding Patents-in-Suit from becoming part of the MPEG LA patent pool.

25   Lucent's counsel also informed the Court and the defendants that steps were being taken such that

26   the Video Coding Patents-in-Suit would not become part of the MPEG LA patent pool, and offered

27

28

1   to provide the Court with an explanatory declaration.  The defendants opposed Lucent's request to

2   submit a declaration and refused to receive this information, arguing that any such information

3   would be useless until after the merger closed.

4       207.    Had the defendants permitted Lucent to submit its proposed declaration, they would

5   have learned that Lucent was considering at least two options to avoid the loss of value of its video-

6   coding patents potentially subject to Alcatel's MPEG LA agreements:  an outright sale of the patents

7   to a third party or the assignment of the patents to an irrevocable trust.

8       208.    Defendants had no reasonable expectation to a license to the Netravali '272 or

9   Haskell '226 patents by virtue of the Lucent/Alcatel merger.

10

11      **E.     The Formation Of MPT**

12      209.    Lucent ultimately chose the latter option, forming Multimedia Patent Trust before

13  completion of the merger.  On November 28, 2006 — while Lucent was an independent company,

14  with no obligation to MPEG LA — Lucent assigned nine video-coding and wireless patents to the

15  Trust, including the Netravali '272 and Haskell '226 Patents.   Lucent gave up control of these

16  patents, leaving it to the Trust to preserve and maximize their value.  When Lucent became an

17  Alcatel subsidiary on November 30, 2006, Lucent did not own these patents.

18

19      210.    At the time of the transfer Lucent had no obligation to MPEG LA.  The defendants

20  were not creditors of Lucent.  To the contrary, Lucent was a creditor of each of the defendants, who

21  were liable to Lucent for patent infringement of the video-coding patents.

22      211.    As the Court has already held as a matter of law, MPT took the patents free of any

23  obligation to Alcatel and free of Alcatel's obligations to MPEG LA.  Defendants are not licensed to

24  the Netravali '272 and Haskell '226 patents, have no claim to a license, and have never had any

25  claim to a license.  Defendants were not present or future creditors at the time Lucent assigned the

26  patents to MPT.

27

28

Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

212.    Lucent had no actual intent to hinder, delay, or defraud a creditor in assigning the video-coding patents to MPT.  To the contrary, Lucent assigned those patents to preserve their value and the value of the infringement claims in this lawsuit — which have been pending for years — for its shareholders.

213.    Lucent breached no obligation in assigning the video-coding patents to MPT, nor committed any act contrary to law of accepted standards of morality.

214.    Lucent was not insolvent at the time of the patent assignment to MPT, it did not become insolvent as a result of the assignment, and MPT did not have reasonable cause to believe that Lucent was insolvent or became insolvent as a result of the assignment.

215.    Lucent received reasonably equivalent value for its patent assignment to MPT.

216.    Lucent was not engaged and was not about to be engaged in a business or a transaction for which Lucent's remaining assets were unreasonably small in relation to the business or transaction.

217.    Lucent did not intend to incur, and did not believe and reasonably should not have believed, that it would incur debts beyond its ability to pay as they became due.

218.    MPT was not an insider of Lucent and Lucent did not assignment the patents to MPT for an antecedent debt.

219.    After the merger closed — as defendants had requested — Lucent informed the Court and the parties of the formation of Multimedia Patent Trust and the assignment of the Video Coding Patents-in-Suit.  On January 26, 2007, this Court substituted Multimedia Patent Trust for Lucent as plaintiff for those patents under Fed. R. Civ. P. 25(c).

220.    Multimedia Patent Trust is an irrevocable Delaware Statutory Trust.  Lucent is the settlor of the trust, and Lucent and Lucent Technologies Foundation, a nonprofit Delaware corporation, are the named beneficiaries of the trust.

221.   The formation of Multimedia Patent Trust and transfer of the Video Coding Patents-in-Suit to Multimedia Patent Trust were valid and lawful.

222.   Defendants have not suffered any injury or damages as a result of Lucent's formation of MPT and assignment of the patents to MPT.

223.   Defendants continue to enjoy the same benefits of their MPEG LA licenses that they enjoyed before the formation of MPT and Lucent's assignment of patents to MPT.

224.   Lucent made no misrepresentation to the SEC, DOJ, or FTC concerning the formation of the Trust or the assignment of patents to the Trust. Nor did Lucent engage in any conduct likely to deceive consumers regarding the video-coding patents.

**F.    The Structure And Operation Of MPT**

225.   The Trust Agreement — the trust's governing instrument under 12 Del. Code Ann. § 3806(a) — establishes three categories of trustees, each with specifically enumerated duties and powers: a Licensing Trustee, a Litigation Trustee, and an Administrative Trustee. The Licensing Trustee has "the responsibility to maximize the value of Trust assets primarily through the licensing of Trust Patents" and the "exclusive right" to license the Trust patents. Its duties and powers are set forth in Section 5.1(a). The Litigation Trustee has "the exclusive power to initiate, prosecute, defend, negotiate and settle . . . patent infringement and other Trust litigation," and its duties and powers are set forth in Section 5.1(b). The Administrative Trustee serves an administrative role, having duties such as preparing reports, making payments of income or principal to the beneficiaries, executing and filing documents with the Delaware Secretary of State, investing funds received on behalf of Multimedia Patent Trust, and making payments to the Licensing Trustee, Litigation Trustee, and Trust Advisor for services rendered and reasonable expenses incurred, as set forth in Section 5.1(c). Gerard A. deBlasi — a former Lucent in-house counsel who left the company in 2001 and is now Executive Vice President of IPValue, an intellectual property licensing company —

is the Licensing Trustee and the Litigation Trustee, and Wilmington Trust Company is the Administrative Trustee.

226.    The Trust Agreement also establishes the fiduciary role of Trust Advisor.  Although Lucent may appoint the Trust Advisor, it may not appoint Lucent itself, any Lucent affiliate, or any director, officer, employee of, or any person subordinate to, Lucent or any Lucent affiliate.  The Trust Advisor's appointment is for a one-year term, which can be renewed for additional one-year terms.  Lucent cannot terminate a Trust Advisor during his or her term.

227.    Section 6.1(e) sets forth the powers of the Trust Advisor, which include directing distributions of principal in accordance with Section 3.2, removing any trustee in accordance with Section 4.3, appointing successor trustees in accordance with Section 4.4, approving invoices for services rendered and expenditures incurred by the trustees, approving litigation settlements, and monitoring the Licensing Trustee and Litigation Trustee at the Trust Advisor's discretion.  Laura Kaster is the current Trust Advisor.  Ms. Kaster has never been a Lucent employee.  And although she was a former in-house counsel at AT&T, she took that position after AT&T had divested Lucent in 1996.

228.    The Trust Advisor may remove a trustee, with or without cause, and appoint successor trustees at any time.  In contrast, Lucent may remove a trustee, but can exercise that right no more than once per calendar year, and has no power to appoint successor trustees.  Under the Trust Agreement, Lucent has no right to make decisions on behalf of Multimedia Patent Trust or to direct any of the trustees or the Trust Advisor to make specific decisions on behalf of Multimedia Patent Trust.

229.    MPT is an entity independent of Lucent and operates independently of Lucent.

## V.    Damages For The Netravali '272 And Haskell '226 Patents

230.    With respect to the Netravali '272 patent, Lucent provided Gateway with notice of its infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters between, among others, Joseph Braski, James Tierney, David Rosenblatt and David Padnes for Lucent and George Clark, Mark Borgman and Michael Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from Tierney to Clark.  Lucent provided notice to Dell of its infringement at least as early as October 20, 1998 at an meeting between, among others, Braski and Tierney for Lucent and Henry Garrana and Diana Roberts for Dell.  The assertions were repeated in detail on December 16, 1998 in a follow-up meeting which also involved David Rosenblatt on behalf of Lucent.  Lucent has not asserted the Netravali '272 patent against Microsoft in this litigation.

231.    With respect to the Haskell '226 patent, Lucent provided Gateway with notice of its infringement by at least as early as April 2, 1998 at an in-person meeting at Gateway's Headquarters between, among others, Braski, Tierney, Rosenblatt and Padnes for Lucent and Clark, Borgman and Grubbs for Gateway.  Lucent confirmed its assertions to Gateway in a letter dated May 7, 1998 from Tierney to Clark.  Lucent provided notice to Dell of its infringement at least as early as October 20, 1998 at a meeting between, among others, Braski and Tierney for Lucent and Henry Garrana and Diane Roberts for Dell.  The assertions were repeated in detail on December 16, 1998 in a follow-up meeting which also involved David Rosenblatt on behalf of Lucent.  Although Microsoft was aware of infringement beforehand by virtue of its indemnification obligations to accused computer manufacturers, Lucent provided additional notice of infringement to Microsoft on January 13, 2003 in a letter from Lucent's licensing agent to Dan Crouse of Microsoft.  Aware of the accusations Lucent had made against computer manufacturers incorporating Microsoft products, Microsoft intervened in the original action against Gateway and brought declaratory judgment claims with

respect to the alleged infringement of this patent on March 18, 2003. At the latest, Microsoft's filing is effective notice for damages purposes under 35 U.S.C. § 287.

232.    Each of the patents-in-suit related to aspects of information handling.

233.    For many years, IBM, was and continues to be very active in licensing patents and other intellectual property. IBM's patent licensing practices have become guideposts in the information handling industry and have formed the basis for the licensing practices of many other companies in the industry, including Lucent.

234.    IBM's licensing rates have been modified several times, but since the late 1980s they have been set, for information handling devices and systems, at 1% of the licensee's selling price of apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%. This 1% per patent concept has become a generally accepted standard in the industry.

235.    Lucent, headquartered in Murray Hill, New Jersey, is a global supplier of telecommunications technology and equipment. Lucent was formed in 1996 as a spin-off from AT&T and includes the world-renowned Bell Laboratories. Backed by research and development at Bell Laboratories, Lucent has generated key innovations that have enhanced the capabilities and utility of personal computers. Lucent's customer base includes communications service providers, governments and enterprises worldwide.

236.    Following the spin-off, Lucent became the owner of nearly 25,000 patents. The patents-in-suit are among the many patents resulting from research and development at Bell Laboratories.

237.    To support the pioneering work of Bell Laboratories, Lucent has spent billions of dollars in research and development each year. Lucent has an intellectual property department that acquires, manages and "creates value" from Lucent's broad portfolio of intellectual property. Lucent derives significant revenue from licensing its patents, including the patents-in-suit.

238.    Like IBM, Lucent and its predecessor, AT&T, have engaged in patent licensing in an organized way.  This practice has varied to some extent over the years, and at the time of Lucent's formation, IBM's model had been selected.   With the exception of some special programs, that practice has continued to the present day.  With respect to Lucent's granting of licenses, Lucent generally requires its licensees to provide a royalty free grant back in substantially all patent licenses it grants.  It is Lucent's policy to respect the IP rights of others.  However, given the strength of Lucent's patent portfolio, it does not often enter into license agreements where it has to make a net payment to another entity.

239.    Dell and Gateway are manufacturers and distributors of, among other things, personal computer systems and related hardware and software.  Microsoft sells, among other things, operating systems and various other software programs that operate with computer systems.   All of these companies have engaged in licensing of various intellectual property assets in conjunction with the operation of their businesses.  License agreements produced by the parties in this action reveal that Dell, Gateway and Microsoft were generally grantees or, in the case of cross-licenses, the paying party.

240.    While Dell has entered into patent license agreements on an ad hoc basis, Dell has no standard licensing practice. Gateway also enters into license agreements on an ad hoc basis and does not have any standard practice.  Similarly, Microsoft does not have a standard practice.   The policy currently in effect states that Microsoft will generally license its patents at "fair and reasonable terms" and that royalty rates will "follow industry norms".

241.    Lucent is not a competitor of any of the three defendants, but rather derives revenue by licensing patents in the field to manufacturers such as Dell, Gateway and Microsoft.  Lucent's investment in research and technology, as well as the significant level of invention that emanated from its Bell Laboratories, were well known in the industry.

242.    Microsoft commenced inducing infringement of the '226 Haskell Patent in or about 1996 when it began selling operating systems that had features that utilized MPEG-1 video decoding.

243.    Dell commenced infringement of the '226 Haskell patent and '272 Netravali Patent in or about 1996 when it began selling computer systems and other products with Microsoft operating systems that had features that utilized MPEG-1 video decoding.

244.    Gateway commenced infringement of the '226 Haskell Patent and '272 Netravali Patent in or about 1996 when it began selling computer systems and other products with Microsoft operating systems that had features that utilized MPEG-1 video decoding.

245.    The *Georgia-Pacific* hypothetical negotiation is assumed to occur in the context of patents that are known to be infringed and valid.  Although in real world negotiations the parties typically may compromise on a lesser royalty than would otherwise be applicable due to the possibility that the patents being discussed are either not infringed or invalid, in the hypothetical negotiation, no such discount is appropriate because the patents are assumed to be valid and infringed.

246.    At the time of the hypothetical negotiation in or around 1996, MPT did not exist.  But Lucent, the owner of the patents at that time, had an established policy with respect to patent licensing.  Specifically, it was Lucent's policy to grant licenses under its patents at rates of 1% of the fair market value of a covered product per patent up to a maximum of 5%.  The policy contemplated that the licensee would make a royalty-free grant back of a patent license to Lucent.

247.    Lucent would have commenced the hypothetical negotiation with a demand based on its 1% per patent model.  Since two patents were involved, the rate would have been 2% for each of Dell and Gateway and 1% for Microsoft.  In accordance with Lucent's policy, this rate would have been offered subject to a royalty free license back to Lucent from each of the licensees at least under

patents related to those in the grant out.  Since the *Georgia-Pacific* methodology supposes only a one-way license, Lucent could be expected to have sought rates greater than 1% per patent.  However, since the value of any patents the prospective licensees might have had in their portfolios that would have been of interest to Lucent is not known, a conservative assumption would be that 1% per patent would have been the starting point.

248.    In the general timeframe of the hypothetical negotiations, Lucent had formulated a licensing program for its MPEG-related patents, including the '226 Haskell patent and '272 Netravali Patent.  That program provided that Lucent's "MPEG essential" video coding patents would be licensed at 0.5% of the selling price of complete products employing the patents, with a minimum royalty of $1.50 per product.  The program also contemplated a five-year term license.

249.    In addition, Lucent licensed MPEG-related patents to several licensees.   Although many of those agreements were cross-licenses not limited to the MPEG patents at issue here, they demonstrate demand for Lucent's MPEG patents.

250.    Each of the defendants have made substantial royalty payments for patent licenses.  For example, Dell in 1988 and Gateway in 1990 entered into license agreements with IBM  that included the IBM royalty approach of 1% per patent  at 1% of the licensee's selling price of apparatus employing an IBM patent, for each patent employed, up to a maximum of 5%.  Each of those agreements was followed by subsequent agreements that included very large balancing payments to IBM from Dell and Gateway.  Dell and Gateway are parties to other notable license agreements including Dell's and Gateway's license agreements with Texas Instruments, and Dell's license agreement with Tulip.  Similarly, Microsoft has agreed to pay substantial royalties, including running royalties, for rights under the patents of others, including Stac Electronics,  Apple, Hewlett-Packard, and Inprise.

251.    In May of 1996, the MPEG LA consortium was formed to launch a program to license a pool of patents relating to the MPEG-2 standard.   In 1997, MPEG LA began to license its MPEG-2 patent pool at a royalty rate at that time was $4.00 for each decoder consumer product using MPEG-2.   Before the United States Department of Justice and the Federal Trade Commission, MPEG LA's CEO, Baryn Futa, stated that "[s]ince each patent is essential, the royalty rate and thus the value is the same whether a licensee uses one or more patents."  Gateway, Dell and Microsoft eventually licensed MPEG-2 technology from MPEG LA.  The licensing histories of Gateway, Dell and Microsoft confirm that the rates under Lucent's MPEG program would not have been objectionable to Dell, Gateway or Microsoft as willing licensees.

252.    Video coding is one of the features that Microsoft has advertised to encourage purchases of, and upgrades to, its new Windows operating systems.   The use by its customers of the Windows operating systems that contain the software relevant to the Lucent patents under consideration also has an effect of promoting sales of other Microsoft products.  Without operating systems including features such as Windows Media Player, Microsoft could lose part of the desktop and notebook computer system market.   Microsoft would lose revenue not only from its Windows business, but the many software products that run on the Windows operating systems.

253.    Microsoft operating systems containing features and functionalities relevant to the patents-in-suit are sold in substantially every Dell and Gateway desktop and notebook computer sold since the date of the hypothetical negotiation.   These features and functionalities are now considered "basic" to and an "important" feature of the operating system.   The use by Dell and Gateway's customers of infringing computer systems has the effect of promoting derivative or convoyed sales of other Dell and Gateway products.  In addition, DVD playback capability was an important commercial feature that Dell and Gateway needed to include in their systems in order for those systems to remain competitive.  Without incorporating such features and functionality, Dell and

1    Gateway stand to lose revenues not only from sales of computer systems but from peripherals and

2    accessories.

3        254.    Products using the technology disclosed in the '272 Netravali and '226 Haskell

4    patents enjoyed great commercial success, due in significant part to the existence of the features

5    enabled by use of the patents.  In selling the accused products and systems, the defendants promoted

6    the capabilities and the programs that enabled them, and those programs have been popular and well-

7    received, and they were introduced by defendants to meet the needs of customers and to stay

8    competitive.  Defendants' products incorporating the patented technology have been hugely

9    commercially successful.

10

11       255.    In order to be commercially successful, defendants' products needed to comply with

12   the MPEG-1 standard and incorporate Lucent's patented technology.  In particular, that technology

13   was necessary to permit defendants' customers to play high quality streaming video content on

14   desktop, laptop, and pocket computers.  Defendants regarded these features as commercially critical,

15   as evident from the fact that they installed them on essentially all the computers they sell due to

16   competitor and customer demand.   Moreover, the defendants have promoted the benefits of video

17   compression and MPEG capability.

18

19       256.    Similarly, defendants regard MPEG-2 compliant features such as DVD playback as

20   commercially important, as evident for example from each defendants' product offerings:  all of

21   Dell's computers provide DVD playback functionality, and Gateway sells substantially all of its

22   computers installed with software containing MPEG decoders.  Both Dell and Gateway regard this

23   patented technology as important and worked with software manufacturers packs to meet customer

24   demand for DVD playback and MPEG-2 capability.   The defendants have also promoted the

25   importance of DVD playback and MPEG-2 capability, and have acknowledged both that it was

26

27

28

1   important to have a DVD software solution operational with Windows systems and that there is no

2   commercial alternative to MPEG-2 today.

3        257.    Microsoft, Gateway, and Dell similarly regard WMV-9 as commercially important,

4   and have incorporated WMV-9 capabilities into their products.

5        258.    With respect to the Haskell '226 Patent and the Netravali '272 Patent (the "Video

6   Coding Patents"), Lucent is entitled to damages adequate to compensate for the defendants'

7   infringement, but in no event less than a reasonable royalty.  The appropriate reasonable royalty for

8   defendants' infringement of the Video Coding Patents, the bases therefor, and the calculations of that

9   

10  royalty are set forth in further detail in the expert reports of Roger Smith and Wayne Hoeberlein

11  (along with any additional supplemental reports).  Specifically, applying the relevant *Georgia-*

12  *Pacific* factors in light of applicable licensing practices and policies, and in light of the documents

13  and licenses produced by the parties in this action, the reasonable royalty adequate to compensate for

14  defendants' infringement of the Video Coding Patents should be calculated as a 0.5% royalty based

15  on the selling price of the infringing system or $1.50 per unit, whichever is greater (based in

16  particular on Lucent's MPEG-related licensing program).  Alternatively, in the event that the entire

17  

18  market value rule is deemed to prevent the parties to the hypothetical negotiation from agreeing to

19  their preferred rate and royalty base of the infringing device, the reasonable royalty should instead be

20  calculated simply as a flat per-unit royalty of $1.50 per unit.

21       259.    Lucent also seeks an accounting of damages attributable to defendants' continuing

22  infringement through and until entry of an injunction enjoining that infringement in this action,

23  including any and all additional infringing products and periods not included in defendants'

24  damages-related document productions to date.  Lucent also seeks pre-judgment and post-judgment

25  interest on all damages and a compulsory ongoing reasonable royalty to be paid by the defendants if

26  the Court's judgment does not enjoin defendants' continued infringement.

27  

28

260. No commercially acceptable noninfringing alternatives to the invention of Claim 12 of the Haskell '226 patent have been available at any relevant time.

261. The Indeo codec was not a noninfringing alternative that the defendants could have selected as a "viable" and "adequate substitute" for MPEG-2 codecs in 1996. The Indeo codec technology was developed for platforms with very limited computational power and provided an inferior picture quality, when compared to MPEG-2 at the same bit-rate. By 1996, the computational limitations that had motivated the Indeo development had largely disappeared due to the rapid evolution of processor technology, and the more complex decoding of MPEG-2 video on personal computers had become practical.

262. The superior performance of MPEG-2 video led end users to prefer MPEG-2 video over Indeo video. That demand, in turn, led content providers to favor the MPEG-2 format. While Microsoft, Dell, and Gateway could theoretically have chosen to provide the Indeo codec rather than an MPEG-2 codec in their products, that choice would have put them at a significant competitive disadvantage relative to their competitors who were providing MPEG-2 decoding capabilities.

263. The DigiCipher I codec was not a noninfringing alternative that the defendants could have selected as a "viable" and "adequate substitute" for MPEG-2 codecs in 1996. While the original DigiCipher codec (DigiCipher I) did not employ bidirectional prediction, the codec was later revised to include that functionality in accordance with the MPEG-2 Main Profile (DigiCipher II).

264. DigiCipher I provided an inferior picture quality when compared to MPEG-2 video at the same bit-rate, largely due to its failure to implement bidirectional prediction. The superior image quality of MPEG-2 video led end users to prefer MPEG-2 over DigiCipher I which, in turn, led content providers to favor the MPEG-2 format. While Microsoft, Dell, and Gateway could theoretically have chosen to provide the DigiCipher I codec rather than an MPEG-2 codec in their

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

75

Case No. 07-CV-2000 H (CAB), consisting of matters severed from consolidated cases: 02-CV-2060 B (CAB), 03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  products, that choice would have put them at a significant competitive disadvantage relative to their

2  competitors who were providing MPEG-2 decoding capabilities.

3      265.    For the same reasons, the DigiCipher I codec was not a viable alternative to the

4  WMV-9/VC-1 codec.

5      266.    Microsoft could not have developed a successful version of the WMV-9/VC-1 codec

6  using a wavelet transform.  While wavelet video coding is an active area of research, past attempts to

7  develop wavelet video codecs that outperform DCT-based motion-compensated hybrid codecs have

8

9  not been successful.  No commercial video decoders using a wavelet transform exist today.

10     267.    Lucent did not unreasonably delay in bringing suit against Microsoft, Dell, or

11  Gateway from the time it first learned (or should have learned) of the infringement.  Any alleged

12  delay was justified including due to by ongoing efforts by Lucent to reach licensing agreements with

13  the parties and other third-parties, licensing efforts and other litigations involving Lucent's assertion

14  of the patents.  Defendants have suffered no economic, evidentiary, or other prejudice as a result of

15  any alleged delay.

16

17                              **POINTS OF LAW**

18  **I.    Issues On Which MPT Bears The Burden Of Proof**

19          **A.    Infringement**

20                  **1.    Direct Infringement**

21      268.    35 U.S.C. §  271(a) states:

22

23          Except as otherwise provided in this title, whoever without authority
            makes, uses, offers to sell, or sells any patented invention, within the
24          United States or imports into the United States any patented invention
            during the term of the patent therefor, infringes the patent.

25      269.    Infringement is a question of fact.  *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d

26  1336, 1341 (Fed. Cir. 2001); *In re Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d 1527, 1541

27

28  (Fed. Cir. 1992).  "The [patent owner] has the burden of proving infringement by a preponderance of

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW                                    76          Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                   from consolidated cases:  02-CV-2060 B (CAB),
                                                   03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1  the evidence." *Id*; *see Seal-Flex, Inc. v. Athletic Track & Court Construction*, 172 F.3d 836, 842

2  (Fed. Cir. 1999).

3      270.   The claims of the patent define the scope of the patented invention. "The claims . . .

4  provide the concise formal definition of the invention." *Corning Glass Works v. Sumitomo Elec.*

5  *U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989) (quoting *Autogiro Co. of Am. v. United States*,

6  384 F.2d 391, 395-96 (Ct. Cl. 1967)). The claims provide "the metes and bounds of the right which

7  the patent confers on the patentee to exclude others from making, using, or selling the protected

8  invention." *Corning Glass Works*, 868 F.2d at 1257.

9

10     271.   "It is well-established that each claim in a patent constitutes a separate invention."

11 *Union Oil Co. v. Atlantic Richfield Co.*, 208 F.3d 989, 1003 (Fed. Cir. 2000); *Jones v. Hardy*,

12 727 F.2d 1524, 1528 (Fed. Cir. 1984). "A patent is infringed if a single claim is infringed." *Intervet*

13 *Am., Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050,1055 (Fed. Cir. 1989). "A determination of patent

14 infringement under 35 U.S.C. § 271(a) requires a two step analysis — first, the language of the

15 claim at issue must be interpreted to define its proper scope and, second, the evidence before the

16 court must be examined to ascertain whether the claim has been infringed, whether the claim 'reads

17 on' the accused product or process. The first inquiry is a question of law for the court while the

18

19 second is a question of fact." *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orhopaedics,*

20 *Inc.*, 976 F.2d at 1559, 1570 (Fed. Cir. 1992).

21     272.   A patent claim defines the scope of a patentee's statutory protection. *Playtex*

22 *Products, Inc. v. Procter & Bamgle Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005). The proper

23 construction of terms and phrases within a patent claim is a question of law. *See Markman v.*

24 *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The

25 Court's construction governs the jury's ultimate determination of whether the patent claim has been

26

27 infringed. *Id.* Here, the Court has issued claim-construction Orders for both the Netravali '272 and

28

Haskell '226 patents, which are incorporated herein by reference.  (*See* D.I. 311, Order Construing Claims For United States Patent Number 4,958,226; D.I. 329, Superceding Order Construing Claims For United States Patent Number 4,383,272.)

273.    "After claim construction, the next step in an infringement analysis is comparing the properly construed claims with the allegedly infringing devices or methods.  This comparison is a question of fact."  *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1369 (Fed. Cir. 2001) (citing *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000)); *see also Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 974 (Fed. Cir. 1999) ("The second step of the infringement analysis, i.e., comparing the properly construed claims to the device accused of infringing, is a question of fact.").

274.    Infringement occurs when each limitation of a properly interpreted claim is found in the accused product or process.  *Seal-Flex*, 172 F.3d at 842; *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed. Cir. 1992), *abrogated on other grounds*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995) (en banc).  "It is axiomatic that the parameters of a patent right are defined by the claims of the patent, and that if the accused matter falls within the claims, literal infringement is made out."  *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F. Supp. 397, 405 (D. Del. 1989), *aff'd*, 904 F.2d 45 (Fed. Cir. 1990).

275.    "Infringement . . . is determined by comparing an accused product not with a preferred embodiment described in the specification . . . but with the properly and previously construed claims in suit."  *SRI Intern. v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).  "[C]laims are infringed, not specifications."  *Id*.  The Federal Circuit has repeatedly stated that "it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only

1    proper comparison is with the claims of the patent." *Zenith Lab., Inc. v. Bristol-Myers Squibb Co.*,

2    19 F.3d 1418, 1423 (Fed. Cir. 1994); *Intervet Am.*, 887 F.2d at 1055.

3    276.    To establish infringement of a "means plus function" claim under 35 U.S.C. § 112, ¶

4    6, the patentee must prove:  (1) that the accused product performs the function recited in each

5    "means plus function" claim limitation; and (2) that the accused product does so using a structure

6    that is identical or equivalent to the structure disclosed in the specification for performing the

7    claimed function, as construed by the Court.  *Cytologix Corp, v. Ventana Med. Sys.*, 424 F.3d 1168,

8    1178 (Fed. Cir. 2005); *Alpex Computer Corp. v. Nintendo Co. Ltd.*, 102 F.3d 1214, 1222 (Fed. Cir.

9    1996); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991); *Pennwalt Corp. v.*

10   *Durand-Wayland, Inc.*, 83 F.2d 931, 933-34 (Fed. Cir. 1987).

11   277.    The individual components, if any, of an overall structure that corresponds to the

12   claimed function are not claim limitations. Rather, the claim limitation is the overall structure

13   corresponding to the claimed function.  *Odetics Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268

14   (Fed. Cir. 1999) (emphasis added).

15   278.    If each element recited in the claims is found in the accused product, the

16   manufacturer of the accused product cannot avoid infringement merely by adding additional

17   elements.  *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) (quoting *A.B. Dick Co. v.*

18   *Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983)) ("It is fundamental that one cannot avoid

19   infringement merely by adding elements if each element recited in the claims is found in the accused

20   device.  For example, a pencil structurally infringing a patent claim would not become noninfringing

21   when incorporated into a complex machine that limits or controls what the pencil can write.  Neither

22   would infringement be negated simply because the patentee failed to contemplate use of the pencil in

23   that environment.").  "Making improvements on a patented invention by adding features to a claim

24   device beyond those recited in the patent does not avoid infringement." *Lighting World, Inc. v.*

*Birchwood Lighting, Inc.*, 382 F.3d 1354, 1365 (Fed. Cir. 2004); *see also Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) (citation omitted), *cert. denied*, 469 U.S. 924 (1984) ("'An accused device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent.'").  Similarly, an accused method "does not avoid literally infringing a method claim . . . simply because it employs *additional* steps."  *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1380 (Fed. Cir. 2001) (emphasis in original) (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1030 (1987)).

279.    Additionally, an accused product infringes even if it does not always infringe when it is used.  *See Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1089 (Fed. Cir. 1998) ("Even assuming that Nu-Kote's video establishes that its cartridge will not infringe under a particular set of controlled circumstances . . . this has little bearing on whether its cartridge will avoid infringement under other foreseeable operating conditions.")

280.    "An accused product that 'imperfectly' or 'sometimes, but not always' embodies a claimed element or method nonetheless infringes."  *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 741, 743 (W.D. Mich. 1999) (quoting *Bell Communications Research Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995)), *aff'd*, 234 F.3d 1252 (Fed. Cir. 2000); *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984) ("That the machine was not operated in its optimum mode is inconsequential: imperfect practice of an invention does not avoid willful infringement.").

281.    "[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997).  Equivalence is found

where there are "insubstantial differences" between the accused product or process and the elements of the patent claims. *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1517 (Fed. Cir. 1996), *rev'd on other grounds*, 520 U.S. 17 (1997); *see also Eagle Comtronics, Inc. v. Arrow Communications Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1172 (2003). "[T]he proper time for evaluating equivalence . . . is at the time of infringement, not at the time the patent was issued." *Warner-Jenkinson*, 520 U.S. at 37. "The better view . . . is that intent plays no role in the application of the doctrine of equivalents." *Id.* at 36.

### 2.    Inducement of Infringement

282.    35 U.S.C. § 271(b) states:'

> Whoever actively induces infringement of a patent shall be liable as an infringer.

283.    To establish liability under Section 271(b), a patent holder must prove that once the defendant knew of the patent they "'actively and knowingly aid[ed] and abet[ed] another's direct infringement.'" *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc*) (quoting *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988)) (emphasis in original).  To prove inducement, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Id.* at 17 (quoting *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)) (emphasis in original).  "The requisite intent to induce infringement may be inferred from all of the circumstances." *Water Techs.*, 850 F.2d at 669; *see also Drexelbrook Controls*, 720 F. Supp. at 407.  "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *DSU*, 471 F.3d at 1305 (quoting *Water Tech.*, 850 F.2d at 668.)

284.    In order to induce infringement "the actions of the party said to have been induced to infringe [must] constitute direct infringement." *Johns Hopkins Univ. v. Cellpro,* 894 F. Supp. 819,

835 (D. Del. 1995). Direct infringement, however, may be inferred from circumstantial proof. *Moleculon Research*, 793 F.2d at 1272 (holding that patentee satisfied its burden of showing direct infringement with circumstantial evidence of extensive sales and dissemination of an instruction sheet teaching the patented method); *Oxford Gene Tech.*, 444 F. Supp. 2d at 464 (citing *Moleculon Research*, 793 F.2d at 1272); *nCube v. Sea Change Int'l, Inc.*, 313 F. Supp. 2d 361, 375 (D. Del. 2004) (same); *Lucent Technologies Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 208-09 (D. Del. 2001) (finding that evidence of sales of the accused products and distribution of product manuals containing instructions on how to configure the products in an infringing manner constituted adequate circumstantial evidence that there was direct infringement).

### 3. Contributory Infringement

285.    35 U.S.C. § 271(c) states in pertinent part:

> Whoever sells a component of . . . manufacture . . . or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

286.    To establish contributory infringement under Section 271(c), only proof of a defendant's knowledge, and not intent, that his activity causes infringement is required. *See Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990). Section 271(c) further requires a showing that a product useful in carrying out a patented method is not a staple article suitable for substantial noninfringing use. *See Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 803 F.2d 1170 (Fed. Cir. 1986). Additional functions in a patented device which are performed simultaneously with the patented method do not substantiate a non-infringing use for the purposes of § 271(c). *Imagexpo L.L.C. v. Microsoft Corp.*, 284 F. Supp. 2d 365, 368 (E.D. Va. 2003). Though proof of "direct infringement is essential to proving contributory infringement,"

1   *Refac Int'l, Ltd. v. IBM*, 798 F.2d 459, 460 (Fed. Cir. 1986), as with inducing infringement, such

2   proof may be circumstantial in nature.  *See Moleculon Research,* 793 F.2d at 1272.

3       **B.     Damages**

4           **1.     Damages**

5       287.   35 U.S.C. §  284 states in pertinent part:

6
            Upon finding for the claimant the court shall award the claimant
7           damages adequate to compensate for the infringement, but in no event
            less than a reasonable royalty for the use made of the invention by the
8           infringer, together with interest and costs as fixed by the court.

9       288.   The assessment of damages is a question of fact, and is decided by the jury when trial

10  is to a jury.  "Section 284 imposes no limitation on the types of harm resulting from infringement

11  that the statute will redress.  The section's broad language awards damages for any injury as long as

12  it resulted from the infringement."  *King Instruments Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir.

13
14  1995).

15      289.   Under 35 U.S.C. § 284, MPT is entitled to damages adequate to compensate for the

16  infringement, but in no event less than a reasonable royalty.  "The royalty may be based upon an

17  established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations

18  between the plaintiff and defendant."  *Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538, 1554 (Fed. Cir.

19
20  1995).  "The hypothetical negotiation requires the court to envision the terms of a licensing

21  agreement reached as the result of a supposed meeting between the patentee and the infringer at the

22  time infringement began."  *Id.*

23      290.    The following evidentiary facts may be relevant to the determination of the amount of

24  a reasonable royalty for a patent license:  (1) the royalties received by the patentee for the licensing

25  of a patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the

26  licensee for use of other patents comparable to the patent in suit; (3) the nature and scope of the

27  license, as exclusive or non-exclusive or as territory restricted or non-restricted; (4) the licensor's
28

established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors or inventor/promoter; (6) the extent of derivative or convoyed sales for either the licensee or licensor; (7) the duration of the patent and the term of the license; (8) the established profitability of the product made under the patent; (9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; (10) the nature of the patented invention including the character of the commercial embodiment and the benefits to those who have used the invention; (11) the extent to which the infringer has made use of the invention; (12) the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; (14) the opinion testimony of qualified experts, and; (15) the amount that a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement. *Unisplay S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995) (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

291.  "A party that induces or contributes to infringement is jointly and severally liable with the direct infringer for all general damages." *Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001); *see also Glenayre Elec., Inc. v. Jackson*, 443 F.3d 851, 858-89 (Fed. Cir. 2006) ("Where a patentee alleges that a manufacturer contributes to and induces infringement by its customers simply because it sells infringing products to its customers, damages assessed for indirect infringement normally will be the same as damages

that would be assessed had the patentee sued and obtained a judgment against the

customers….Indeed, in most cases damages assessed for indirect infringement will be equal to

damages assessed for the underlying direct infringement.")

292.    The entire market value rule "permits recovery of damages based on the value of the

entire apparatus containing several features, where the patent related feature is the basis for customer

demand." *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999).  "The entire

market value rule is appropriate where both the patented and unpatented components together are

'analogous to components of a single assembly,' 'parts of a complete machine,' or 'constitute a

functional unit,' but not where the unpatented components have essentially no functional

relationship to the patented invention and . . . may have been sold with an infringing device only as a

matter of convenience or business advantage.'" *Id.* at 1362 (citing *Rite-Hite*, 56 F.3d at 1550).

293.    Once damages are quantified, "prejudgment interest should be awarded under § 284

absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*,

461 U.S. 648, 657 (1983).  Similarly, judgment interest should be awarded under 28 U.S.C. § 1961.

294.    It is "standard practice" in patent infringement actions to order a post-verdict

accounting for any infringing sales not included in the jury's verdict.  *Mikohn Gaming Corp. v.*

*Acres Gaming, Inc.,* No. CV-S-97-1383-EJW, 2001 WL 34778689, at *18 (D. Nev. Aug. 2, 2001);

*see also IMX, Inc. v. Lendingtree, LLC,* No. Civ.03 1067 SLR, 2007 WL 1232184, at *2 (D. Del.

April 25, 2007) (ordering accounting for defendant's continued infringing activities during trial);

*Lisle Corp., v. A.J. Mfg. Co.*, No. 02 C 7024, 2004 WL 765872, at *1 (N.D. Ill. April 7, 2004)

(granting plaintiff's request to include an accounting for sales through injunction); *Itron, Inc. v.*

*Benghiat*, No. Civ.99-501 (JRT/FLN), 2003 WL 22037710, at *15 (D. Minn. Aug. 29, 2003)

("Courts 'routinely grant motions for further accounting' where the jury did not consider certain

periods of infringing activity."); *Stryker Corp. v. Davol, Inc.*, 75 F. Supp. 2d 746, 748 (W.D. Mich.

1  1999) (granting accounting for period between the verdict and entry of a permanent injunction).  In

2  determining the amount of supplemental damages, courts apply the reasonable royalty rate

3  determined by the jury in reaching the verdict.  *See id.* at 747.

4      295.    35 U.S.C. § 283 provides that "[t]he several courts having jurisdiction of cases under

5  this title may grant injunctions in accordance with the principles of equity to prevent the violation of

6  any rights secured by patent, on such terms as the court deems reasonable."  Under "well-established

7  principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a

8  court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct 1837, 1839 (U.S. 2006).

9

10  To meet this burden, the patentee must demonstrate: "(1) that it has suffered an irreparable injury;

11  (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the

12  injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy

13  in equity is warranted; and (4) that the public interest would not be disserved by a permanent

14  injunction."  *Id.*

15

16      296.    Courts have granted a compulsory license where the defendant continues to infringe

17  the patents-in-suit following the judgment, and under circumstances in which a permanent injunction

18  was said to be inappropriate.  *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d

19  613, 628 (Fed. Cir. 1985) (affirming district court grant of a compulsory license at jury-determined

20  royalty rate for continuing sales); *Foster v. Am. Mach. & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir.

21  1974) (affirming district court grant of a compulsory license in form of royalties); *Voda v. Cordis*

22  *Corp.*, No. CIV-03-1512-L, 2006 WL 2570614, at *6 (W.D. Okla. Sept. 5, 2006) (finding that where

23  the defendant continues to infringe post-verdict, the court must fashion a remedy for the continuing

24  harm to the patentee); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 441 (E.D. Tex. 2006)

25  (finding that the patentee could be compensated for Microsoft's future infringement by calculating a

26

27  reasonable royalty for Microsoft's continued use).  The courts have recognized that the rate of such a

28

1  license can easily be determined where, as here, the jury has made a clear determination of the

2  reasonable royalty due to the infringement.  *Id.* at 442 (finding that the calculation of future damages

3  can be based on the same reasonable royalty calculation used by the jury at trial and by referring to

4  Microsoft's internal records showing sales of infringing products); *Voda*, 2006 WL 2570614, at *6

5  (finding that post-verdict damages are "simple mathematical calculations based on defendant's

6  sales" and ordering defendant to file quarterly sales reports); *Paice LLC v. Toyota Motor Corp.*, No.

7  2:04-CV-211-DF, 2006 WL 2385139, at *5 (E.D. Tex. Aug. 16, 2006) (finding that the patentee's

8  losses from defendant's postjudgment sales of infringing products can be remedied by monetary

9

10  damages in accordance with the reasonable royalty set by the jury); *see also Paice LLC v. Toyota*

11  *Motor Corp.*, 504 F.3d 1293, 1314-16 (Fed. Cir. 2007).

12  **2.    Notice**

13  297.    "35 U.S.C. § 287 prescribes that, on penalty of having their damages limited to times

14  subsequent to actual notice, patentees and their agents shall mark any "patented *article*," thereby

15  giving notice "to the public that the same is patented."  (Emphasis ours) In addition to the clear

16  language of the statute, it is, as noted by the district court, also settled in the case law that the notice

17  requirement of this statute does not apply where the patent is directed to a process or method."

18

19  *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983).

20  298.    "The criteria for actual notice under  [35 U.S.C.] § 287(a) are not coextensive with

21  the criteria for filing a declaratory judgment action.  These statutory purposes are distinct, serve

22  different policies, and are governed by different laws. The requirement of actual notice under §

23  287(a) is designed to assure that the recipient knew of the adverse patent during the period in which

24

25  liability accrues, when constructive notice by marking is absent.  Actual notice may be achieved

26  without creating a case of actual controversy in terms of 28 U.S.C. § 2201."  *SRI Int'l, Inc. v.*

27  *Advanced Tech. Lab., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997).

28

299.    "It is not controlling whether the patentee threatens suit, demands cessation of infringement, or offers a license under the patent." *Id.*  "The offering of a license is actual notice." *Ralston Purina Co. v. Far-Mar-Co*, 772 F.2d 1570, 1577 (Fed. Cir. 1985).  "Thus, the actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." *SRI*, 127 F.3d at 1470.  "When the patentee has notified a perceived infringer of a specified patent that a license may be needed, the sufficiency of the notice under § 287(a) is not negated if the proposed remedy is a license instead of cessation of activity." *Id.*

### 3.    Attorneys' Fees

The patent statute authorizes the Court "in exceptional cases" to award "reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.  A court may hold a case "exceptional" even though the infringer was not guilty of willful infringement.  For example, in *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547 (Fed. Cir. 1989), the Federal Circuit held that the district court did not commit clear error in finding the case "exceptional" because of the infringer's "strategy of vexatious activity."  *Id.* at 1551-53.

## II.    Issues On Which Defendants Bear The Burden Of Proof

### A.    Validity

300.    35 U.S.C. § 282 states in pertinent part:

> A patent shall be presumed valid.  Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

301.    "A patent is presumed valid." *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999). "One who challenges a patent's validity must prove invalidity by clear and convincing evidence." *Id.* (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1365 (Fed. Cir. 1999)); *see also Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001) ("Because the claims of a patent are afforded a statutory presumption of validity, overcoming the presumption of validity requires that any facts supporting a holding of invalidity must be proved by clear and convincing evidence."). "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contentions are highly probable." *Intel Corp., v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (other citation omitted).

302.    "[T]he burden of persuasion is and remains always upon the party asserting invalidity." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir. 1984) (emphasis in original). "The presumption of validity is never . . . weakened", *ACS Hospital Sys., Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1574-75 (Fed. Cir. 1984) (emphasis in original), and "remains intact and on the challenger through the litigation, and the clear and convincing standard does not change." *Hybritech Inc. v. Monclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986). "It is not necessary that a district court declare a patent 'valid.' In a proper case, it is necessary only to hold that the patent challenger failed to carry the burden assigned to it by 35 U.S.C. § 282." *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984); *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 1996 WL 621830, at *5 (D. Del. Oct. 21, 1996), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000).

303.    Defendant's burden is "especially heavy" when the art relied on at trial was considered by the Patent Office. *See McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353 (Fed. Cir. 2001). In that case, the party asserting invalidity "has the added burden of overcoming the

1  deference that is due to a qualified government agency presumed to have properly done its job,

2  which includes one or more examiners who are assumed to have some expertise in interpreting the

3  references and to be familiar from their work with the level of skill in the art and whose duty it is to

4  issue only valid patents." *Id.* (citing *Am. Hoist & Derrick Co.* 725 F.2d at 1359).

5      304.    The grant of a request for reexamination is not probative of unpatentability.  *Hoechst*

6  *Celanese Corp. v. BP Chemicals Ltd.*,78 F.3d 1575, 1584 (Fed. Cir. 1996).

7          **1.    Anticipation**

8

9      305.    Anticipation is a question of fact that must proved by clear and convincing evidence.

10 *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995).  The burden of proving

11 anticipation by clear and convincing evidence rests with the party asserting invalidity.  *See Koito*

12 *Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1151 (Fed. Cir. 2004).

13     306.    "A party asserting that a patent claim is anticipated under 35 U.S.C. § 102 'must

14 demonstrate, among other things, identity of invention.'"  *Minnesota Mining & Mfg. v. Johnson &*

15 *Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed. Cir. 1992).  "Identity of invention is a

16 question of fact, and one who seeks such a finding must show that each element of the claim in issue

17

18 is found, either expressly or under principles of inherency, in a single prior art reference, or that the

19 claimed invention was previously known or embodied in a single prior art device or practice."  *Id.*

20     307.    "Invalidity for anticipation requires that all of the elements and limitations of the

21 claim are found within a single prior art reference. . . .  There must be no difference between the

22 claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of

23

24 the invention.  *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir.

25 1991) (citations omitted).  "Every element of the claimed invention must be literally present [in the

26 single prior art reference], arranged as in the claim . . . .  The identical invention must be shown in as

27 complete detail as is contained in the patent claim."  *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d

28

1226, 1236 (Fed. Cir. 1989) (citation omitted). "[A]nticipation does not permit an additional

reference to supply a missing claim limitation." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d

1313, 1335 (Fed. Cir. 2002). Absence from the reference of any claimed element negates

anticipation. *Atlas Powder Co. v. E.I. DuPont De Nemours*, 750 F.2d 1569, 1573-74 (Fed. Cir.

1984).

308. "A claimed invention cannot be anticipated by a prior art reference if the allegedly

anticipatory disclosures cited as prior art are not enabled." *Amgen Inc. v. Hoescht Marion Roussel,*

*Inc.*, 314 F.3d 1313, 1354 (Fed. Cir. 2003). "To anticipate a claim, a reference must disclose every

element of the challenged claim and enable one skilled in the art to make the anticipating subject

matter." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566 (Fed. Cir. 1996).

309. "For a prior art reference to anticipate a claim, the reference must disclose each and

every element of the claim with sufficient clarity to prove its existence in the prior art." *Motorola,*

*Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997). "Although this disclosure

requirement presupposes the knowledge of one skilled in the art of the claimed invention, that

presumed knowledge does not grant a license to read into the prior art reference teachings that are

not there. An expert's conclusory testimony, unsupported by the documentary evidence, cannot

supplant the requirement of anticipatory disclosure in the prior art reference itself." *Id.* "Every

element of the claimed invention must be literally present [in a single prior art reference], arranged

as in the claim. The identical invention must be shown in as complete detail as is contained in the

patent claim." *Richardson*, 868 F.2d at 1236 (citations omitted). "An anticipating reference must

describe the patented subject matter with sufficient clarity and detail to establish that the subject

matter existed in the prior art and that such existence would be recognized by persons of ordinary

skill in the field of the invention." *Crown Operations Int'l Ltd. V. Solutia, Inc.*, 289 F.3d 1367, 1375

(Fed. Cir. 2002).

### a. Pre-Filing Date of Invention

310.    A patent is presumed valid and an infringer bears the burden of establishing invalidity of the patent. *Innovative Scuba Concepts, Inc.* v. *Feder Industries, Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994).  The date when a patent application is filed is presumed to be the date of invention. *Wang Lab., Inc.* v. *Mitsubishi Elec. Am. Inc.*, 30 U.S.P.Q.2d 1241, 1246 (C.D. Cal. 1993).  However, when an infringer cites a reference with an effective date prior to the patentee's application date in order to show invalidity of the patent, and the patentee claims a pre-filing date of invention in order to avoid the cited reference, the infringer must prove by clear and convincing evidence that the patentee is not entitled to the pre-filing date of invention. *Mahurkar* v. *C.R. Bard Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996); *Innovative Scuba*, 26 F.3d at 1115.  A patentee is entitled to a date of conception as a date of the invention if it is established that the inventor acted with due diligence in reducing the invention to practice.  *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993).

311.    Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986).  Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill in the art would be necessary to reduce the invention to practice, without unduly extensive research and experimentation.  *Sewall v. Walters*, 21 F.3d 411, 415 (Fed Cir. 1994).

312.    The Federal Circuit adheres to the "rule of reason" and "totality of the circumstances" standard for corroborating evidence. *E.g., Price*, 988 F.2d at 1195 (Fed. Cir. 1993).  "The rule suggests a reasoned examination, analysis and evaluation of all pertinent evidence so that a sound determination of the credibility of the inventor's story may be reached . . . . The rule of reason, however, does not dispense with the requirement for some evidence of independent corroboration." *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985).  When assessing corroborating evidence,

"[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195.

313.    "In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations . . . and (2) he determined that the invention would work for its intended purpose." *z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (quoting *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998)).  "Constructive reduction to practice occurs when a patent application on the claimed invention is filed." *Hybritech*, 802 F.2d at 1376.

### b.    35 U.S.C. § 102(a), (b)

314.    "[I]n order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998).  "[P]rior knowledge or use by others may invalidate a patent under § 102(a) if the prior knowledge or use was accessible to the public." *Id*.  Where the public accessibility of a student thesis or other library paper is at issue, courts look not only to whether the thesis was shelved in a public library, but also whether the thesis was "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989);  *Ajinomoto Co. v. Archer-Daniels-Midland Co.* 1998 WL 151411 (D. Del. Mar. 13, 1998) ("The key to determining whether the [alleged prior art] thesis was publicly available is whether the thesis was indexed, cataloged, and shelved on the critical date.")

315.    "[U]nder Section 102(a), a document is prior art only when published before the invention date." *Mahurkar*, 79 F.3d at 1576.  To constitute a publication, a document must be publicly accessible.  A document is publicly accessible if it is "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials

1   of the claimed invention without need of further research or experimentation." *Brucklemeyer v.*

2   *Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006) (citations omitted).

3   316.   In determining whether a reference qualifies as a "printed publication" under §

4   102(b), "the key inquiry is whether or not a reference has been made 'publicly accessible.'" *In re*

5   *Klopfenstein*, 380 F.3d 1345, 1348 (Fed. Cir. 2004). "[A]ccessibility goes to the issue of whether

6   interested members of the relevant public could obtain the information if they wanted to." *In re*

7   *Elsner*, 381 F.3d 1125, 1131 (Fed. Cir. 2004), *quoting Constant v. Advanced Micro-Devices, Inc.*,

8   848 F.2d 1560, 1569 (Fed. Cir. 1988). Where the public accessibility of a student thesis is at issue,

9   courts look not only to whether the thesis was shelved in a public library, but also whether the thesis

10   was "cataloged or indexed in a meaningful way." *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir.

11   1989); *Ajinomoto Co. v. Archer-Daniels-Midland Co.* 1998 WL 151411 (D. Del. Mar. 13, 1998)

12   ("The key to determining whether the [alleged prior art] thesis was publicly available is whether the

13   thesis was indexed, cataloged, and shelved on the critical date.")

14

15   317.   Under Section 102(b), any description of the claimed invention in a printed

16   publication prior to the critical date, *i.e.*, one year before the effective filing date of the patent, is a

17

18   statutory bar. *See* 35 U.S.C. § 102(b). Courts apply the same standards for determining whether a

19   document is a printed publication and whether an invention is described in a printed publication

20   under both 35 U.S.C. § 102(a) and § 102(b). *See, e.g.*, 2-6 Chisum on Patents § 6.02[4] (2006).

21   318.   "In addition to identity of invention, anticipation [under § 102] requires that the prior

22   art reference must be enabling, thus 'placing the allegedly disclosed matter in the possession of the

23   public.'" *Am. Standard Inc. v. Pfizer Inc.*, 722 F. Supp. 86, 109 (D. Del. 1989) (citation omitted).

24

25   **c.    35 U.S.C. § 102(g)**

26   319.   Under 35 U.S.C. § 102(g), a patent claim is anticipated if the claimed invention was

27   first made by in the United States by someone other than the inventor who did not abandon,

28

1    suppress, or conceal the invention.  35 U.S.C. § 102(g)(2).  The person who first reduces an

2    invention to practice is *prima facie* the first inventor.  *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d

3    1572, 1577  (Fed. Cir. 1996).  However, the first to conceive of an invention but second to reduce to

4    practice will be deemed the first inventor if he was diligent in reducing the invention to practice.  *Id.*

5        320.    There are two ways to establish reduction to practice of an invention:  constructive

6    reduction to practice and actual reduction to practice.  The date of constructive reduction to practice

7    of an invention is simply the filing date of a patent application that includes a claim covering the

8    invention.  *See Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).  Actual reduction to

9

10   practice, on the other hand, requires proof that:  (1) the inventor constructed an embodiment or

11   performed a process that met all of the claim limitations; and (2) the inventor determined that the

12   invention would work for its intended purpose.  *Id.* at 1327.  By statute, where a party is asserting

13   invalidity of a patent — including under 35 U.S.C. § 102(g) — the party must prove reduction to

14   practice of the alleged prior invention by clear and convincing evidence.  35 U.S.C. § 282; *see also*

15
     *Izumi Prods. Co. v. Kononklijke Philips Elec N.V.*, 315 F. Supp. 2d 589, 608 (D. Del. 2004) ("the
16

17   party alleging prior invention must establish prior invention by clear and convincing evidence").

18       321.    Where an allegation of actual reduction to practice is based on inventor testimony,

19   such testimony must be corroborated by independent evidence.  *See Woodland Trust v. Flowertree*

20   *Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998) ("Throughout the history of the determination of

21   patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is

22   regarded with skepticism, and as a result, such inventor testimony must be supported by some type

23
     of corroborating evidence.")  Inventor testimony concerning alleged invalidating activity must be
24

25   corroborated whether or not the inventor is a party to the action.  *See Finnigan Corp. v. United*

26   *States Int'l Trade Comm.*, 180 F.3d 1354, 1367-68 (Fed. Cir. 1999).  Independent corroborating

27   evidence "may consist of testimony of a witness, other than an inventor, to the actual reduction to

28

practice or it may consist of evidence of surrounding facts and circumstances independent of

information received from the inventor." *Hahn v. Wong*, 892 F.2d 1028, 1032-33 (Fed. Cir. 1989).

322.    For activity of "another" to be prior art against a patentee's claims under § 102(g), the

other's activity must satisfy the requirements of § 102(g) for making an invention. "[P]riority of

invention [under § 102(g)] goes to the first party to reduce an invention to practice unless the other

party can show that it was the first to conceive of the invention and that it exercised reasonable

diligence in later reducing that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327

(Fed. Cir. 1998). "Priority therefore depends upon conception and reduction to practice. Priority,

conception, and reduction to practice are questions of law which are based on subsidiary factual

finding." Id.

323.    "Conception is the formation 'in the mind of the inventor of a definite and permanent

idea of the complete and operative invention, as it is therefore to be applied in practice.'" *Kridl v.*

*McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997) (citations omitted). "Conception is the

touchstone of inventorship, the completion of the mental part of invention . . . . Conception is

complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill

would be necessary to reduce the invention to practice, without extensive research or

experimentation." *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994)

(citations omitted).

324.    "A reduction to practice can be either a constructive reduction to practice, which

occurs when a patent application is filed, or an actual reduction to practice." *Cooper*, 154 F.3d at

1327. "In order to establish an actual reduction to practice, the inventor must prove that: (1) he

constructed an embodiment or performed a process that met all the limitations of the [claim]; and (2)

he determined that the invention would work for its intended purpose." Id.

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW                    96                    Case No. 07-CV-2000 H (CAB), consisting of matters severed
from consolidated cases:  02-CV-2060 B (CAB),
03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

325.    "Depending on the character of the invention and the problem it solves, determining that the invention will work for its intended purpose may require testing.  When testing is necessary, the embodiment relied upon as evidence of priority must actually work for its intended purpose.  In addition, the inventor must contemporaneously appreciate that the embodiment worked and that it met all the limitations of the [claim]."  *Id.* (citations omitted).  Where an invention "'includes a structural feature recited as a positive limitation, conception and reduction to practice of that invention require a contemporaneous recognition of that feature.'"  *Id.* at 1328 (citations omitted).

326.    "In the United States, the person who first reduces an invention to practice is '*prima facie* the first and true inventor.'"  *Mahurkar*, 79 F.3d at 1577 (citation omitted).  "However, the person 'who first conceives, and, in a mental sense, first invents . . . may date his patentable invention back to the time of its conception, if he connects the conception with its reduction to practice by reasonable diligence on his part, so that they are substantially one continuous act.'"  *Id.* (citation omitted).  "Stated otherwise, priority of invention 'goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.'"  *Id.* (citation omitted).

327.    "Conception, and consequently inventorship, are questions of law . . . ."  *Sewall*, 21 F.3d at 415.  "Conception must be proved by corroborating evidence which shows that the inventor disclosed to others his 'complete thought expressed in such clear terms as to enable those skilled in the art' to make the invention."  *Kridl*, 105 F.3d at 1449-50 (citations omitted).

328.    "Reduction to practice follows conception."  *Id.* at 1578.  "Reduction to practice is ultimately a legal question, which is based on underlying factual determinations."  *Estee Lauder v. L'Oreal, S.A.*, 129 F.3d 588, 592 (Fed. Cir. 1997).

329.    "[A]ctual reduction to practice, which constitutes in law the final phase of invention, cannot be established absent a showing of practical utility." *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1563 (Fed. Cir. 1996).  "It is well established . . . that proof of actual reduction to practice requires demonstration that the embodiment relied upon as evidence of priority actually worked for its intended purpose." *Newkirk v. Lulejian*, 825 F.2d 1581, 1582 (Fed. Cir. 1987).  "To prove actual reduction to practice, an inventor must establish that he 'actually prepared the composition and knew it would work.'" *Estee Lauder*, 129 F.3d at 592 (citations omitted).  "[R]eduction to practice requires 'the discovery that an invention actually works.'" *Id.*  (citation omitted).

330.    "[W]here testing is required to establish utility . . . [there must] be some recognition of successful testing prior to the critical date for an invention to be reduced to practice . . . ." *Id.* at 593.  "[A] reduction to practice does not occur until an inventor, or perhaps his agent, knows that the invention will work for its intended purpose." *Id.*  "[W]hen testing is necessary to establish utility, there must be recognition and appreciation that the tests were successful for reduction to practice to occur." *Id.* at 594-95.  "While evidence of in-house testing may be *prima facie* evidence of conception, reduction to practice requires that an invention be sufficiently tested to demonstrate that it will work for its intended purpose." *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1445 (Fed. Cir. 1984).  "When the invention has not quite passed beyond experiment and has not quite attained certainty and has fallen short of demonstrating the capacity to produce the desired result, the invention itself is still inchoate." *Id.* (citation omitted).

331.    One who challenges a patent under 35 U.S.C. § 102(g) must show that the alleged prior invention was not "abandoned, suppressed, or concealed." "'[W]hether there was suppression [or] concealment under the statute is an ultimate conclusion of law.'" *Lutzker v. Plet*, 843 F.2d 1364, 1366 (Fed. Cir. 1988) (citation omitted).  The party asserting that a patent is invalid under § 102(g) bears the burden of proving by clear and convincing evidence that the alleged prior

invention was not abandoned, suppressed or concealed. *Oak Indus., Inc. v. Zenith Electronics Corp.*, 726 F. Supp. 1525, 1530-31 (N.D. Ill. 1989); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 582 (D. Del. 1997).

332.    "'The courts have consistently held that an invention, though completed, is deemed abandoned, suppressed, or concealed if, within a reasonable time after completion, no steps are taken to make the invention publicly known.'" *Correge v. Murphy*, 705 F.2d 1326, 1330 (Fed. Cir. 1983) (citation omitted). "[F]ailure to file a patent application; to describe the invention in a publicly disseminated document; or to use the invention publicly have been held to constitute abandonment, suppression or concealment." *Int'l Glass Co. v. United States*, 408 F.2d 395, 403 (Ct. Cl. 1969) (citations omitted). "[S]ome step is required to be taken by the prior inventor which allows the public to learn of the method to satisfy section 102(g) (even if the inventors wanted to keep the invention secret)." *Levi Strauss & Co. v. Golden Trade, S.r.L.*, Nos. 92 CIV. 1667 (RPP), 90 CIV. 6291 (RPP), 90 CIV. 6292 (RPP), 1995 WL 710822, at *18 (S.D.N.Y. Dec. 1, 1995).

333.    A prior method or process is deemed suppressed or concealed if kept secret even if the product of that process is disclosed to the public. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983). "As between a prior inventor who benefits from a process by selling its product but suppresses, conceals, or otherwise keeps the process from the public, and a later inventor who promptly files a patent application from which the public will gain a disclosure of the process, the law favors the latter." *Id.* "[I]t is the simple rule that the property right shall reside in the second inventor who disclosed and not in the first inventor who concealed, *i.e.*, the law prefers and will reward earlier disclosure over earlier invention." *Horwath v. Lee*, 564 F.2d 948, 950 (C.C.P.A. 1977).

334.    A prior process is considered suppressed or concealed when it is kept secret and a purchaser of a product would not be able to "discover the process merely by looking at the product." *Levi Strauss*, 1995 WL 710822, at *18.

## 2.    Obviousness

335.    35 U.S.C. § 103 states in pertinent part:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

336.    Obviousness is a question of law based upon underlying questions of facts. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354 (Fed. Cir. 2001); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991).

337.    "Invalidity based on obviousness of a duly issued patent must be established by clear and convincing evidence." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1555 (Fed. Cir. 1995); *Takeda Chem. Indus., LTD v. Alphapharm PTY., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007).  "Throughout the obviousness determination, a patent retains its statutory presumption of validity, see 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed. Cir. 2001); *Takeda*, 492 F.3d at 1355.

338.    The underlying factual issues to be considered in an obviousness analysis include "four general types, all of which must be considered by the trier of fact:  (1) the scope and content of the prior art;  (2) the level of ordinary skill in the art;  (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Crown Operations Int'l, Ltd. v. Solutia Inc.*. 289 F.3d 1367, 1376 (Fed. Cir. 2002).  The United States Supreme Court

reaffirmed the primacy of those factors in determining whether a patent is invalid for obviousness. *See KSR Int'l. Co. v. Teleflex Inc.*, --- U.S. ---, 127 S. Ct. 1727, 1734 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)). "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined." *Id.* (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

339. "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." *KSR*, 127 S.Ct. at 1740 (citing *United States v. Adam*, 383 U.S. 39 (1966)).

340. "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 127 S. Ct. at 1741 (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). The Supreme Court in *KSR* "acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does' in an obviousness determination." *Takeda*, 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (quoting *KSR*, 127 S. Ct. at 1731). "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR*, 127 S.Ct. at 1741; *see also In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000) ("[I]dentification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention."). Indeed, "a patent is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 127 S. Ct. at 1731. That is, decomposing an invention into its constituent elements, finding each element in the prior art, and

101

1   then claiming that it is easy to reassemble these elements into the invention, is a forbidden *ex post*

2   analysis.  *E.g.*, *In re Fritch*, 972 F.2d 1260, 1265-66 (Fed. Cir. 1992).

3        341.   "Such secondary considerations as commercial success, long felt but unsolved needs,

4   failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of

5   the subject matter sought to be patented."  *KSR*, 127 S. Ct. at 1734 (quoting *Graham v. John Deere*

6   *Co.*, 383 U.S. 1, 17-18 (1966)); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000);

7   *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985); *Pentec,*

8   *Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985).  "[E]vidence of secondary

9   considerations may often be the most probative and cogent evidence in the record.  It may often

10  establish that an invention appearing to have been obvious in light of the prior art was not.  It is to be

11  considered as part of all the evidence, not just when the decisionmaker remains in doubt after

12  reviewing the art."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

13  "The commercial response to an invention is significant to determinations of obviousness, and is

14  entitled to fair weight."  *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391

15  (Fed. Cir. 1988).  "The rationale for giving weight to the so-called 'secondary considerations' is that

16  they provide objective evidence of how the patented device is viewed in the marketplace, by those

17  directly interested in the product."  *Id.*

18

19

20       342.   "When a patentee asserts that commercial success supports its contention of

21  nonobviousness, there must of course be a sufficient relationship between the commercial success

22  and the patented invention.  The term 'nexus' is often used, in this context, to designate a legally and

23  factually sufficient connection between the proven success and the patented invention, such that the

24  objective evidence should be considered in the determination of nonobviousness.  The burden of

25  proof as to this connection or nexus resides with the patentee."  *Id.* at 1392.

26

27

28

343.    "In meeting its burden of proof, the patentee in the first instance bears the burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus . . . . A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent."  *Id*.

344.    "When the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . . It is thus the task of the challenger to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention, such as advertising, superior workmanship, etc."  *Id.* at 1393.

345.    "[W]hen differences that may appear technologically minor nonetheless have a practical impact, particularly in a crowded field, the decision maker must consider the obviousness of the new structure in this light.  Such objective indicia as commercial success, or filling an existing need, illuminate the technological and commercial environment of the inventor, and aid in understanding the state of the art at the time the invention was made."  *Continental Can*, 948 F.2d at 1273.

346.    "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem."  *Texas Instruments, Inc. v. United States Int'l Trade Comm'n.*, 988 F.2d 1165, 1178 (Fed. Cir. 1993).

347.    "Nonobviousness is suggested by the failure of others to 'find a solution to the problem which the patent[s] in question purport[ ] to solve.  Such evidence shows indirectly the presence of a significant defect [in the prior art] . . . .'"  *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578-79 (Fed. Cir. 1991) (citation omitted).

348.    In light of the above principles, and against the factual record in this case, defendants cannot meet their burden of showing that the asserted claim of either the Netravali '272 or Haskell '226 patent is obvious.

### a.    **Definiteness**

349.    35 U.S.C. § 112, Para. 2 states:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

350.    "Compliance with the second paragraph of section 112 is generally a question of law . . . ." *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985). The accused infringer has the burden of showing by clear and convincing evidence that the claims are invalid for indefiniteness under § 112, second paragraph. *North Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993). "A determination of claim indefiniteness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." *Intel Corp. v. Via Technologies., Inc.*, 319 F.3d 1357, 1365 (Fed. Cir. 2003) (quoting Personalized Media Communications, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998)).

351.    "Determining whether a claim is indefinite requires an analysis of 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification . . . . If the claims read in light of the specification reasonably apprize those skilled in the art of the scope of the invention, [section] 112 demands no more.'" *Credle v. Bond*, 25 F.3d 1566, 1576 (Fed. Cir. 1994) (citing *Miles Lab., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)). "To determine whether a claim is indefinite, the court looks to whether one of skill in the art, after reviewing the claims and the specification, would understand what is being claimed." *The Liposome Co. v. Vestar Inc.*, 36 U.S.P.Q.2d 1295, 1315 (D. Del. 1994). *See also Exxon Research and Eng'g*

*Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). There is no objective criteria used to determine whether a claim is definite. Rather, "[t]he amount of detail required to be included in claims depends on the particular invention and the prior art . . . ." *Shatterproof Glass*, 758 F.2d at 624. Courts can require only that the claim language be "as precise as the subject matter permits." *Id.*

352.    Claim 12 of the Haskell '226 is not indefinite, as evidenced by the Court's construction of that claim.

## B.    Enforceability

### 1.    Inequitable Conduct

353.    To establish that inequitable conduct occurred in the prosecution of a patent, the party raising the issue must prove by clear and convincing evidence that: (1) the information is material; (2) the knowledge of the information and its materiality can be charged to the patent applicant; and (3) the patent applicant's failure to disclose the information (or submission of false information) resulted from an intent to mislead the United States Patent and Trademark Office ("PTO"). *See Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 872 (Fed. Cir. 1988); *Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F.Supp.2d 484, 489 (D. Del. 2003) (JJF). Inequitable conduct is an equitable defense; thus, the ultimate question of whether inequitable conduct has occurred is a question for the Court, not a jury. *See Kingsdown Medical,* 863 F.2d at 876.

354.    "Information is deemed material if there is a substantial likelihood that a reasonable Examiner would have considered the material important in deciding whether to issue the application as a patent." *Enzo Life Sciences*, 270 F.Supp.2d at 489 (citing *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 31 (Fed.Cir.1999)).

355.    But a reference cannot be considered material if it is merely cumulative to other references that were already before the examiner, *i.e.*, "if the reference teaches no more than what a

reasonable examiner would consider to be taught by the prior art already before the USPTO." *See Regents of University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75 (Fed. Cir. 1997); *Scripps Clinic & Research Foundation v. Genetech, Inc.*, 927 F.2d 1565, 1582 (Fed. Cir. 1991) ("A reference that is simply cumulative to other references does not meet the threshold of materiality that is predicate to a holding of inequitable conduct.") *See Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries, Ltd.,* 1996 WL 680243, at *6 (N.D.Ill. 1996) (holding references cited in another reference already before the Examiner to be cumulative).

356.     Additionally, "[a] party alleging that a patent is unenforceable because of the patentee's failure to disclose material information to the PTO must offer clear and convincing evidence that the patentee intended to mislead the PTO.  [citation omitted]  The omission must be made with the specific intent to mislead, not merely from carelessness in the performance of a duty." *Speedplay Inc. v. Bebop Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000); *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Without a factual basis to establish a threshold level of deceitful intent, the inequitable conduct analysis is at an end."); *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 288 F. Supp. 2d 601, 633 (D. Del. 2003) ("In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the Applicant made a deliberate decision to withhold a known reference.").

357.     Intent to deceive cannot be inferred solely from the fact that information was not disclosed to the examiner; there must be an independent factual basis for a finding a deceptive intent. *See Catalina Lighting, Inc v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288-89 (Fed. Cir. 2002); *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1365 (Fed. Cir. 1998) ("Deceptive intent is not inferred simply because information was in existence that was not presented to the examiner.").

## 2. Laches

358.    The equitable issue of laches is for the Court, not the jury, to decide.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992).

359.    Laches is an equitable defense, the application of which falls within the sound discretion of the Court.  *Aukerman*, 960 F.2d at 1028.  To establish laches, the defendant must prove by a preponderance of the evidence that (1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant. *Id*. at 1032.  A successful laches defense only bars pre-filing damages.  *Id*. at 1028.

360.    Because laches is an equitable defense, courts have "borrowed" the six-year damages limitation period set out in 35 U.S.C. § 286 as a guideline for determining when a claim should be equitably barred.  *Aukerman*, 960 F.2d at 1034.  The six-year limitation period for laches begins with a patentee's actual or constructive knowledge of the alleged infringement and then counts forward. *Id*.  If the patentee had knowledge of the infringement more than six years before bringing suit, the law imposes a rebuttal presumption of laches which "has the effect of shifting the burden of going forward with evidence, not the burden of persuasion."  *Id*. at 1028.  The presumption disappears if the patentee can introduce sufficient evidence to create a genuine issue that rebuts any of the laches factors.  *Id*. at 1038.  Once the laches presumption disappears, the burden of going forward with the evidence and the burden of persuasion rest on the defendant.  *Id*. at 1038-39.

361.    Any "delay" in filing suit must be measured from the point in time when the patentee knew or should have know of the infringement, not merely the accused products.  *Aukerman*, 960 F.2d at 1032; *Metro. Wire Corp. v. Falcon Prods. Inc.*, 528 F. Supp. 897, 902 & n.4 (E.D. Pa. 1981) (knowledge of accused products by corporate employees not relevant to laches where it could not be

shown that employees had "detailed knowledge" of the patent-in-suit and basis for claim of infringement).

362.    Assuming that the presumption of laches arises, "the patentee may offer proof directed to rebutting the laches factors.  Such evidence may be directed to showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both.  By raising a genuine issue respecting either factual element of a laches defense, the presumption of laches is overcome."  *Aukerman*, 960 F.2d at 1038 (citations omitted).

363.    The Federal Circuit imposes a duty upon courts to "consider and weigh any justification offered by the plaintiff for its delay" in filing an infringement suit.  *Id.* at 1033.  The Federal Circuit has recognized "negotiations with the accused" infringer and considered the "extent of infringement" to determine whether the patentee's delay was justifiable.  *Id.*

364.    It is well settled that bilateral licensing negotiations, that are progressing and appear to have a fair chance of success, excuse a patentee's delay in filing suit.  *Aukerman*, 960 F.2d at 1033; *RCA Corp. v. Data Gener. Corp.*, 701 F. Supp. 456, 476 (D. Del. 1988).  Accordingly, the laches period for the duration of negotiations is tolled and excluded from the calculation of the laches period.  *Wafer Shave, Inc. v. Gillette Co.*, 857 F. Supp. 112, 127-28 (D. Mass. 1993), *aff'd without op.*, 26 F.3d 140 (Fed. Cir. 1994); *Valutron N.V. v. NCR Corp.*, 33 U.S.P.Q. 2d 1986, 1991-93 (S.D. Ohio 1992), *aff'd without op.*, 5 F.3d 1506 (Fed. Cir. 1993).

365.    The second element of laches requires that defendant demonstrate that it suffered "material prejudice" as a result of the plaintiff's alleged delay in filing suit.  *Aukerman*, 960 F.2d at 1033.  The prejudice may be either economic or evidentiary.  *Id.*

366.    To establish material economic prejudice, the defendant must prove that there is a nexus between its investment and the plaintiff's alleged delay in filing suit.  "[T]he court's inquiry is not whether there is evidence of capital investment. Rather, the key is whether there is a nexus

between the delay and the infringer's decision to expand the infringing activity . . . . *No economic prejudice can be established if this nexus is absent.*"  *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1395 (E.D. Wis. 1993) (emphasis added), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995); *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995) (reversing summary judgment of laches because lower court did not require proof of a nexus between the investment and the delay); *Minco. Inc. v. Combustion Eng'g. Inc.*, 903 F. Supp. 1204, 1221 (E.D. Tenn. 1995), *aff'd*, 95 F.3d 1109 (Fed. Cir. 1996) (denying laches where defendant unable to show expenditures attributable to delay, as opposed to routine business expansion); *Northern Telecom Inc. v. Datapoint Corp.*, 23 U.S.P.Q.2d 1881, 1893 (N.D. Tex. 1992); *see also Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992); *R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1408 (N.D. Ill.1996).  Moreover, damages arising from the alleged infringer's continuing sales of the challenged device that would have been avoided by an earlier suit do not establish material prejudice.  To prove economic harm, a mere change in position by investing in production of the challenged device during the period of delay is insufficient.  "If such damages necessarily constituted prejudice, then practically every patent claim would establish material prejudice."  *Id.*  "It is not enough that the alleged infringer changed his position — i.e., invested in production of the allegedly infringing device.  The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity."  *Hemstreet*, 972 F.2d at 1294; *see also Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1463 (Fed. Cir. 1990) (no economic prejudice shown because the defendant would have continued the development and sales activities regardless of what the patentee "did or did not do"), *overruled in part on other grounds*, *Aukerman,* 960 F.2d 1020 (Fed. Cir. 1992).

367.    Courts consistently reject a defendant's laches defense when "the party which advances the defense of laches is responsible for the delay or contributes substantially to it."  *Potash*

1   *Co. of Am. v. Int'l Minerals & Chem. Corp.*, 213 F.2d 153, 155 (10th Cir. 1954); *see also Intertech*

2   *Licensing Corp. v. Brown & Sharpe Mfg. Co.*, 708 F. Supp. 1423, 1439 (D. Del. 1989) (laches

3   denied "where the one asserting the defense of laches was responsible for the plaintiff's delay");

4   *Coleman*, 619 F. Supp. at 955.

5               **3.    Unclean Hands**

6   368.    In patent cases, "acts warranting application of the unclean hands doctrine must rise

7   to the level of unconscionability." *Ristvedt-Johnson, Inc. v. Brandt, Inc.*, 805 F. Supp. 549, 556

8   (N.D. Ill. 1992).  Accordingly, to prevail on the defense of unclean hands, a defendant must show

9   that the patentee "conducted itself as to shock the moral sensibilities" or engaged in conduct

10  "offensive to the dictates of natural justice." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,

11  398 F. Supp. 2d 305, 310 (D. Del. 2005), quoting *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269

12  F.3d 1369, 1375 (Fed. Cir. 2001) and *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959).

13  369.    The defendant then has the burden to demonstrate that the plaintiff's inequitable

14  conduct is immediately and necessarily related to the equity that the plaintiff seeks in the litigation.

15  *Bio-Technology Gen. CgM. v. Genentech, Inc.*, 80 F.3d 1553, 1565 (Fed. Cir. 1996).  The unclean

16  hands doctrine only applies where some unconscionable act of one coming for relief has immediate

17  and necessary relation to the equity that he seeks in respect of the matter in litigation. *Id.*

18

19

20

21

22

23

24

25

26

27

28

**C.    Trust-Related State-Law Claims[1]**

**1.    Delaware Uniform Fraudulent Transfers Act**

370.    Each of the Defendants alleges that Lucent violated the Delaware Uniform Fraudulent Transfer Act, 6 Del. Code Ann. §§ 1301 *et seq*. ("DUFTA"), when Lucent created Multimedia Patent Trust and assigned the Video Coding Patents-in-Suit to the Trust on November 28, 2006.

371.    Claims under DUFTA can be premised on either Section 1304 or Section 1305 of the Act.  Under Section 1304(a)(1), which addresses actual fraud, "a transfer made or obligation incurred by a ***debtor*** is fraudulent as to a ***creditor***, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of the debtor."  6. Del. Code Ann. § 1304(a)(1) (emphasis added).  Section 1304(a)(2), on the other hand, addresses constructive fraud, and deems fraudulent as to a ***creditor*** a transfer made by a ***debtor*** that is made "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  6. Del. Code Ann. § 1304(a)(2).

372.    Section 1305, which is limited to alleged claims that arose before the purported fraudulent transfer was made, deems that a transfer "by a ***debtor*** is fraudulent as to a ***creditor***" where "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent

---

[1]    These claims are ostensibly asserted against Lucent. At least some of these claims, however, seek invalidation of the Trust or of the Patent Assignment to the Trust.  For this reason, and to the extent asserted against MPT, MPT includes these claims here.

1    value in exchange for the transfer or obligation and the debtor was insolvent at that time or the

2    debtor became insolvent as a result of the transfer or obligation," or where "the transfer was made to

3    an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable

4    cause to believe that the debtor was insolvent."  6 Del. Code Ann. § 1305(a) and (b) (emphasis

5    added)

6        373.    Under DUFTA, a creditor is "a person who has a claim against a debtor," where

7    "claim" is defined as a "right to *payment*, whether or not the right is reduced to judgment, liquidated,

8    unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured

9    or unsecured."  6 Del. Code Ann. § 1301(3) and (4) (emphasis added).

10

11       374.    An obligation not reducible to a monetary payment cannot constitute a "claim."  In

12   *Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218 (Del. Ch.

13   2006), the court found that preferred shareholders were *not* creditors of the corporation because,

14   even though the corporation owed them contractual legal obligations, their preferred shares provided

15   no guaranteed right of *payment*.  *Id.* at 224, 230.  And this holding is consistent with the holding of

16   the Third Circuit in *In re Ben Franklin Assocs.*, 186 F.3d 301 (3d Cir. 1999), which found that an

17   equitable right to reinstatement in a partnership was not a "claim" under the Bankruptcy Code

18   because it was *not reducible to a monetary payment*.  *Id.* at 304-05, 308.  Thus, to qualify as a

19   creditor, a plaintiff must have a claim to the transferor's *money*:

20

21       The operative phrase in the definition is 'right to payment.  Unless the plaintiff has a
         legal 'right,' he does not hold a 'claim' and, therefore, is not a 'creditor.'  Granted,
22       'claim' can be, and often is, broadly construed to encompass virtually very type of
         demand raised by a plaintiff, regardless of the legal theory employed.  While such
23       broad construction may be acceptable in common parlance, it is inappropriate under
         UFTA. . . .  *[T]he only people who are 'creditors' are those who have a 'right' to a*
24       *transferor's money, and the only persons who are restrained by UFTA are 'debtors'*
         *who are 'liable on a claim.'*
25

26

27   JOHN E. SULLIVAN III, FUTURE CREDITORS AND FRAUDULENT TRANSFERS: WHEN A CLAIMANT

28   DOESN'T HAVE A CLAIM, WHEN A TRANSFER ISN'T A TRANSFER, WHEN FRAUD DOESN'T STAY

MPT'S MEMORANDUM OF CONTENTIONS OF FACT AND
LAW                                        112        Case No. 07-CV-2000 H (CAB), consisting of matters severed
                                                       from consolidated cases:  02-CV-2060 B (CAB),
                                                       03-CV-0699 B (CAB), 03-CV-1108 B (CAB)

1    FRAUDULENT, AND OTHER IMPORTANT LIMITS TO FRAUDULENT TRANSFERS LAW FOR THE ASSET

2    PROTECTION PLANNER, 22 DEL. J. CORP. L. 955, 976-77 (1977).

3          375.    Consistent with DUFTA's requirement that a creditor have a right to **payment**, a

4    "'future creditor' does not exist unless a conveying party can reasonably foresee incurring **the costs**

5    of a claim or judgment at the time of the conveyance." *Leopold v. Tuttle*, 549 A.2d 151, 154 (Pa.

6    Super. 1988).

7

8                    **2.       Common-Law Fraud**

9          376.    The elements of common law fraud under Delaware law are: 1) a false representation,

10   usually one of fact; 2) the defendant's knowledge or belief that the representation was false, or was

11   made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain

12   from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation;

13   and 5) damage to the plaintiff as a result of such reliance. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,

14   901 A.2d 106, 115 (Del. 2006).  Fraud may also occur through deliberate concealment of material

15   facts. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).  But whether a fraud

16

17   claim is based on false representation or deliberate concealment, "both require an intentional

18   deception of the plaintiff by the defendant, which the plaintiff relies upon to his detriment." *See,*

19   *e.g.*, *Lock v. Schreppler*, 426 A.2d 856, 861 (Del. Super. Ct. 1981).

20

21                  **3.       California Business and Professions Code § 17200 *et seq.***

22         377.    California Business and Professions Code § 17200 *et seq.* ("Section 17200") defines

23   "unfair competition" as including "any unlawful, unfair or fraudulent business act or practice."  Cal

24   Bus. & Prof. Code § 17200.  Because Gateway's Section 17200 claim against Lucent is grounded in

25   the fraud prong of Section 17200, Gateway must prove that Lucent made a misrepresentation, and

26   that the public, *i.e.*, consumers, are likely to be deceived by Lucent's misrepresentation. *Vess v.*

27   *Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *see Terarecon, Inc. v Fovia, Inc.*,

28

2006 WL 2691405 at *2 (N.D. Cal. Sep. 20, 2006); *Bardin v. Daimler-Chrysler Corp.*, 39 Cal. Rptr. 3d 634, 636 (Cal. Ct. App. 2006).  In *Bardin*, a Section 17200 fraud claim was dismissed because the Defendants asserted unsupported, conclusory statements that the public was likely to be deceived. *Id.*  at 647-48; *see Daugherty v. Am. Honda Motor Co.*, 51 Cal. Rptr. 3d 118, 127-28 (Cal. Ct. App. 2007) (dismissing a Section 17200 claim where complainant failed to show that the defendant "gave any information . . . which could have the likely effect of misleading the public. . .").

378.    Therefore, to prevail on its Section 17200 claim, Gateway must "demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers."  *Heighley v. J.C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1260 (C.D. Cal. 2003).

379.    Statements made to the SEC, even if false or misleading, ***cannot form the basis of a Section 17200 claim***; section 17200 does not apply to securities transactions as a matter of law.  *See, e.g., Bowen v. Ziasun Tech., Inc.*, 11 Cal. Rptr. 3d 522, 533 (Cal. App. Ct. 2004); *Scognamillo v. Credit Suisse First Boston, LLC*, No. C03-2061 THE, 2005 U.S. Dist. LEXIS 20221, at *36-*37 (N.D. Cal. Aug. 25, 2005).

380.    Under recently enacted Proposition 64, to have standing a Section 17200 plaintiff must suffer (1) injury in fact and (2) pecuniary loss, both as a result of the alleged unfair competition.  *See, e.g., Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 731-32 (9th Cir. 2007).

### 4.    Tortious Interference With Prospective Economic Advantage

381.    The elements of a claim for tortuous interference with prospective economic advantage or business expectancy are (1) an economic relationship containing the probability of future economic benefit to plaintiff; (2) knowledge by defendant of the relationship; (3) intentional acts by the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to plaintiff proximately caused by defendants' acts.  *Med. Alert Ambulance, Inc. v. Atl. Health Sys., Inc.,* 2007 WL 2297335, *14 (D.N.J. Aug. 6, 2007).

382.    To sustain a claim for tortious interference with prospective economic advantage, Defendants must prove malice, "harm [that] was inflicted intentionally and without justification of excuse." *Lamorte Burns & Co. v. Walters,* 770 A.2d 1158, 1170 (N.J. 2001).  The act of interference must be independently wrongful: "conduct that is fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage." *Id.*

383.    The alleged malicious conduct must be both injurious and transgressive of generally accepted standards of common morality and of law." *Id.* at 1170-71.  Conduct that is not wrongful or in breach of an obligation is not malicious — "[t]hat which one has a right to do cannot become a tort when it is done." *Kopp, Inc. v. United Tech., Inc.,* 539 A.2d 309, 315 (N.J. Super. 1988).

**ABANDONED ISSUES**

384.    MPT has not abandoned any issues raised by its pleadings.

**EXHIBITS TO BE OFFERED BY MPT**

385.    MPT incorporates by reference *Plaintiffs' Combined Trial Exhibit List*, filed concurrently herewith.

**WITNESSES TO BE OFFERED BY MPT**

386.    MPT incorporates by reference *Plaintiffs' Combined Trial Witness List*, filed concurrently herewith.

Dated:  January 14, 2008

Respectfully submitted,

By:    _____s/David A. Hahn_____
David A. Hahn, SBN 125784
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California  92101-3595
Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

John M. Desmarais (admitted *pro hac vice*)
Robert A. Appleby (admitted *pro hac vice*)
James Marina (admitted *pro hac vice*)
Michael P. Stadnick (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Attorneys for *Multimedia Patent Trust*