# SCHMIDT DECLARATION

# EXHIBIT 23



John E. Gartman (SBN 152300)
Juanita R. Brooks (SBN 75934)
Roger A. Denning (SBN 228998)
Christopher S. Marchese (SBN 170239)
Thomas N. Millikan (SBN 234430)
Fish & Richardson P.C.
12390 El Camino Real
San Diego, California 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Stephen P. McGrath (SBN 202696)
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052
Telephone: (425) 882-8080
Facsimile: (425) 936-7329

Attorneys for Intervenor/Counter-claimant
and Plaintiff/Counter-defendant
MICROSOFT CORPORATION

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST,

Plaintiff and Counterclaim-defendant,

v.

GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.,

Defendants and Counter-claimants,

and

MICROSOFT CORPORATION,

Intervenor and Counter-claimant,

MICROSOFT CORPORATION,

Plaintiff and Counter-defendant,

v.

LUCENT TECHNOLOGIES INC.,

Defendant and Counter-claimant,

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB) and
Case No. 03-CV-1108 B (CAB)

**EIGHTH SUPPLEMENTAL RESPONSE TO LUCENT'S FIRST SET OF INTERROGATORIES (NO. 1)**

| LUCENT TECHNOLOGIES INC. and MULTIMEDIA PATENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>DELL, INC.,<br><br>Defendant. |
|---|

Microsoft Corporation ("Microsoft") hereby responds to Lucent Technologies Inc.'s ("Lucent") First Set of Interrogatories to Microsoft (the "Interrogatories") as follows:

**GENERAL STATEMENTS**

A. Microsoft incorporates by reference each and every General Objection set forth below into each and every specific response. From time to time, a specific response may repeat a General Objection for emphasis or some other reason. The failure to include any General Objection in any specific response does not constitute a waiver of any General Objection to that request.

B. By responding to Lucent's Interrogatories, Microsoft does not waive any objection that may be applicable to: (1) the use, for any purpose, by Lucent of any information or documents given in response to Lucent's Interrogatories; or (2) the admissibility, privilege, relevancy, authenticity, or materiality of any of the information or other documents to any issue in the case. Microsoft expressly reserves the right to object to the use of these responses, the subject matter contained herein, or the documents produced in connection herewith during any subsequent proceeding, including the trial of this or any other action.

C. Microsoft's responses to Lucent's Interrogatories are made to the best of Microsoft's present knowledge, information, and belief. Discovery in this case continues and Microsoft's investigation is ongoing. Accordingly, Microsoft reserves the right to supplement or amend this response as discovery in this matter progresses, should future discovery or investigation indicate that supplementation or amendment is necessary. Microsoft also reserves the right to produce or use any documents produced and/or discovered after service of this response in support of or in opposition to any motion, in depositions, or at trial.

D. By stating that it will produce documents or provide information in response to any particular interrogatory, Microsoft makes no representation that any such documents or information exist.

E. Microsoft incorporates herein by reference all of its prior responses to Lucent's first, second, third, fourth, and fifth set of interrogatories (nos. 1, 2, 20, and 28) and the associated claim charts attached thereto. In addition, discovery is ongoing and Microsoft reserves the right to supplement its responses to Lucent's interrogatories.

**GENERAL OBJECTIONS**

A. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks information protected from disclosure by the attorney-client privilege, information protected from disclosure by the work-product doctrine, trial preparation materials protected under Fed. R. Civ. P. 26(b)(3), or information protected from disclosure by the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and/or any other applicable privilege, immunity, protection, statute, or case law. The inadvertent identification or production of any such information or documents is not a waiver of any privilege, immunity, or protection. Microsoft will not list on any privilege log any item protected by any privilege, immunity, or protection that occurred on or after June 6, 2002, in connection with or in relation to this litigation, except for items Microsoft may from time to time decide to include on such log. This includes confidential communications seeking or providing legal advice between Microsoft (or its agents) and attorneys (or their agents) representing Microsoft in connection with such representation. It also includes work product performed by Microsoft (or its agents) or its attorneys (or their agents) on or after June 6, 2002, in connection with investigating Lucent's allegations in this action.

B. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks information already in Lucent's possession, or information that is a matter of public record or otherwise equally available to Lucent.

C. Microsoft objects to each interrogatory in the Interrogatories, and to the Definitions and Instructions contained in the Interrogatories, to the extent they seek to impose obligations upon Microsoft that are additional to, different from, inconsistent with, greater than, and/or not

authorized by the Federal Rules of Civil Procedure, the Local Rules of the United States Court for the Southern District of California, applicable Chambers' Rules, applicable court orders, or stipulations or agreements of the parties. In responding to the Interrogatories, Microsoft will comply with the obligations imposed by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of California, applicable Chambers' Rules, applicable court orders, and stipulations or agreements of the parties.

D. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks information and/or the production of documents that Microsoft is under an obligation to any third party not to disclose, including information or documents that would require Microsoft to breach a confidential contract, protective order, settlement, or other duty to a third party to maintain confidentiality.

E. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks the same information or documents: (1) requested by one or more of Lucent's other interrogatories or any document request served by Lucent at any time in this case, including Lucent's First Set of Document Requests; or (2) already produced in Microsoft's Rule 26(a)(1) Initial Disclosures. To the extent Microsoft agrees to produce information or documents, it will do so only once, regardless of the number of interrogatories or document requests to which it is responsive.

F. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks information irrelevant to any claim or defense, or not reasonably calculated to lead to the discovery of admissible evidence. Such irrelevant information includes, but is not limited to, interrogatories that request information or the production of documents and things beyond the relevant temporal and/or geographic scope of this matter.

G. Microsoft objects to each interrogatory in the Interrogatories to the extent it is compound, or includes the use of discrete subparts, in violation of Fed. R. Civ. P. 33. Microsoft objects to the interrogatories to the extent they exceed the permissible number, including all parts and subparts.

H. Microsoft objects to each interrogatory in the Interrogatories to the extent it is premature at this early stage of litigation. Such premature requests include, without limitation, the

request that Microsoft "explain in detail all factual and legal bases" for its contentions. Microsoft's responses to at least some of these interrogatories require discovery from Lucent and third parties.

I. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks discovery of materials within the scope of Fed. R. Civ. P. 26(b)(4)(A), and therefore constitutes an improper and premature attempt to conduct discovery of expert opinion.

J. Microsoft objects to each interrogatory in the Interrogatories to the extent it purports to attribute any special or unusual meaning to any technical terms or phrases.

K. Microsoft objects to each interrogatory in the Interrogatories to the extent it calls for information or for the production of documents and/or things that are not within Microsoft's possession, custody, or control, or calls for Microsoft to prepare documents and/or things that do not exist.

L. Microsoft objects to each interrogatory in the Interrogatories to the extent it is overly broad, unduly burdensome, oppressive, or constitutes an abuse of process, particularly when the cost necessary to investigate is high compared to Lucent's need for the information.

M. Microsoft objects to each interrogatory in the Interrogatories using "relating to," "related to," or "relates to," as well as Lucent's definition of these terms, to the extent they are used in a manner that renders the interrogatory overly broad, oppressive, unduly burdensome, vague, or ambiguous, or requires Microsoft to engage in speculation.

N. Consistent with Fed. R. Civ. P. 33(d), Microsoft objects to providing responses to interrogatories where the information can be derived from documents that are being produced, and where the burden to derive such information is substantially the same for Lucent as it is for Microsoft.

O. Microsoft objects to each interrogatory in the Interrogatories, and to the Definitions and Instructions contained in the Interrogatories, to the extent the Definitions and Instructions purport to alter the plain meaning and/or scope of any specific interrogatory, on the ground that such alteration renders the interrogatory vague, ambiguous, overly broad, and uncertain.

P. Microsoft objects to each interrogatory in the Interrogatories on the ground that it is overly broad, oppressive, unduly burdensome, seeks information that is not relevant to any claim

or defense, and is not reasonably calculated to lead to the discovery of admissible evidence, to the extent it relates to patents and/or claims that Lucent has not asserted in this action. Microsoft will respond to each interrogatory in the Interrogatories only with regard to those claims it understands to be asserted in this action.

Q. Microsoft objects to each interrogatory in the Interrogatories to the extent it seeks legal conclusions, legal analysis, or trial theories. Microsoft further objects to each interrogatory in the Interrogatories to the extent that it presents questions of pure law.

R. Microsoft objects to each interrogatory in the Interrogatories to the extent it purports to require Microsoft to search for and identify "any" and "all" information. Consistent with its obligations under the Federal Rules of Civil Procedure and subject to its objections, Microsoft will identify responsive, non-privileged information to the extent such information exists and is located after a reasonable search.

S. Microsoft objects to the definition of "Patents-In-Suit" to the extent Lucent seeks to include patents that Lucent has not asserted against Microsoft or Microsoft products in this consolidated action.

**SPECIFIC RESPONSES TO INTERROGATORY NO. 1**

INTERROGATORY NO. 1:

For each Asserted Claim of each Patent-In-Suit, Identify all factual and legal bases for Microsoft's contention that such claim is invalid, including without limitation, a specific identification of all Prior Art and/or combinations of Prior Art upon which Microsoft relies, and a description in claim chart form on an element-by-element basis of how such Prior Art and/or combinations of Prior Art support such contention.

RESPONSE TO INTERROGATORY NO. 1 (EIGHTH SUPPLEMENTAL RESPONSE):

Microsoft hereby incorporates by reference each and every one of its General Objections and further objects on the specific grounds set forth below.

Microsoft objects to this Interrogatory to the extent it seeks information and/or the production of documents that Microsoft is under an obligation to third parties not to disclose.

Microsoft objects to this Interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege, work-product doctrine, or any other applicable privilege, immunity, or protection.

Microsoft objects that this Interrogatory is compound and contains multiple subparts that should count towards the total number of interrogatories allowed under the Federal Rules of Civil Procedure because, among other reasons, it requests Microsoft to explain all invalidity contentions for each of the Patents-In-Suit. By counting these as separate interrogatories, Microsoft is not representing that it will provide a substantive response to each separate interrogatory.

Microsoft objects to this Interrogatory on the ground that the phrases "all factual and legal bases" and "a specific identification of all Prior Art and/or combinations of Prior Art upon which Microsoft relies" render the request vague, ambiguous, overly broad, oppressive, and unduly burdensome.

Microsoft objects to this Interrogatory on the ground that the request that Microsoft identify, with regard to its prior art invalidity contentions, "a specific identification of all Prior Art and/or combinations of Prior Art upon which Microsoft relies, and a description in claim chart form on an element-by-element basis of how such Prior Art and/or combinations of Prior Art support such contention[s]" is unduly burdensome in view of Lucent's current infringement contentions.

Microsoft objects to this Interrogatory on the ground that the Interrogatory seeks legal conclusions or presents questions of pure law. For example, the Interrogatory requests that Microsoft "Identify all . . . legal bases" for its invalidity contentions.

Microsoft objects to this interrogatory on the ground that it is overly broad, oppressive, and unduly burdensome to the extent it requests a separate claim chart on an element-by-element basis for each asserted claim of each Patent-In-Suit.

Microsoft objects to this Interrogatory on the ground that it is overly broad, oppressive, unduly burdensome, seeks information that is not relevant to any claim or defense, and is not reasonably calculated to lead to the discovery of admissible evidence to the extent it relates to

patents and/or claims that Lucent has not asserted in this action. Microsoft will respond to this interrogatory only with regard to those claims it understands to be asserted in this action.

Microsoft incorporates herein by reference all of its prior responses to Lucent's first, second, third, fourth, and fifth set of interrogatories for interrogatory number one and the associated claim charts attached thereto.

Subject to and without waiving the foregoing General Objections and specific objections, and to the extent Microsoft understands this interrogatory, Microsoft supplements its prior responses with the following response.

**U.S. Patent 4,958,226**

The '226 Patent is invalid for failing, in several ways, to comply with one or more of the requirements of the Patent Laws, 35 U.S.C. § 101 et seq. (including without limitation 35 U.S.C. §§ 102, 103, and/or 112). Chart form analyses are presented as Exhibit A to this supplemental response.

Microsoft incorporates by reference the reasoning and conclusions set forth in the March 31, 2006 Expert Report of Edward J. Delp III, May 30, 2007 First Supplemental Expert Report of Edward J. Delp III Invalidity of the '272 and '226 Patents – Secondary Considerations; and September 14, 2007 Expert Report of Edward J. Delp III Regarding Obviousness. Microsoft further incorporates by reference the depositions of Mr. Edward J. Delp III taken June 30, 2006 and to be taken.

The functions and structures used in claim 12 of the '226 patent were well known in the art. At the time the '226 patent was filed, persons of ordinary skill in the art frequently discussed and presented codec ideas in terms of what collection of coding techniques were employed. Such techniques included such things as: transform coding, motion compensated prediction, variable length coding, quantizing, etc. A sample listing of the patents and publications that disclosed the functions and structures used in claim 12 is presented in Exhibit A.

Furthermore, all of the techniques used in claim 12 were also disclosed in the H.261 submissions, including H.261 document numbers 22, 43, 78, 81, and 103R. Several reasons existed to combine the teachings of the H.261 documents, including the fact that document

numbers 22, 43, 78, 81, and 103R were proposals for the same standard, were presented within one year of each other, have common sponsors or authors, and internally reference each other. The reason to combine also comes from the purpose of the H.261 group – to create better video. Additional analysis of the H.261 documents is set forth in the expert reports of Edward J. Delp listed above.

In the mid- to late-1980's, inventors at PictureTel Corporation were awarded a number of patents, for example: U. S. Patent No. 4,816,914; U. S. Patent No. 4,794,455; U.S. Patent No. 4,849,810; U.S. Patent No. 4,703,350; U.S. Patent No. 4,727422; U.S. Patent No. 4,661,849; and U.S. Patent No. 4,754,492. Claim 12 of the '226 patent is invalid as obvious in view of the body of work disclosed in these references. Several reasons existed in the prior art to combine the teachings of the PictureTel references. They all relate to the same subject matter and share many of the same figures and much of the same written description They also include over-lapping inventors and a common assignee. Moreover, the patents include cross-references to one another and incorporate each other by reference. Additional analysis of the combination of the PictureTel references is set forth in the expert reports of Edward J. Delp listed above.

To the extent that Lucent contends that every element of claim 12 is not included, either explicitly or inherently, in the thesis "Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals" by Thomas Micke ("the Micke Thesis"), it would have been obvious to modify the teachings of the Micke Thesis with the article "Advances in Picture Coding" by Dr. H. G. Mussman. Several reasons existed to combine the teachings of the Micke Thesis with Advances in Picture Coding, including a motivation to improve the video coding techniques disclosed in the Micke Thesis, the Micke Thesis's citation of Advances in Picture Coding, and Micke and Dr. Mussman's affiliation with the same university and the reputation of Dr. Mussman. Additional analysis of the Micke Thesis and Advances in Picture Coding is set forth in the expert reports of Edward J. Delp listed above.

To the extent Lucent contends that any asserted reference does not invalidate claim 12 of the '226 patent because it does not disclose the transmission or decoding of interpolation error, such use of interpolation error, or similar information describing differences from interpolated

blocks, would have been an obvious modification to one of ordinary skill in the art and such people would have been motivated to use such technology. Haskell's own textbook describes one motivation to use such information, namely because at times interpolation creates unavoidable inaccuracies, the transmission of side information - including interpolation error and other codes that describe deviations from interpolated blocks - is necessary. See, e.g., Netravali and Haskell, "Digital Pictures, Representation and Compression" at 472-73; Haskell Depo Tr. at 200-05.

Other references in the prior art provide additional motivation. The transmission of "correctional information" describing errors in the decoder and for improving the quality of a decoded picture was a well-known technique and useful in correcting errors. See Haskell, "Frame Replenishment Coding of Television," Nomograph Image Transmission Techniques, W. K. Pratt (Ed.), New York, Academic, 1979, at 204. And others in the prior art had expressly suggested that, where interpolation is to be used at the decoder, the quality of the interpolation could be improved by checking the interpolation at the encoder and transmitting interpolation error. E.g., Pease, "Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals," Bell System Technical Journal, Vol. 51, No. 4, 787-802, April 1972 at 797; Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE Vol 68 No 3 at 401; Lodge, "A hybrid interpolative and predictive code for the embedded transmission of broadcast quality television pictures," Second International Conference on Image Processing, vol. 265, 242-247 at 243 & 244; U.S. Patent No. 4,858,005 to Lodge at col. 4, l. 58 et seq. and claim 10-13 among others. Yashima, et al., A "Highly Efficient Coding Method for HDTV Signals," Proceedings of the IEEE vol. 1, 125-129, furthermore, analyzed various types of prediction which employed the transmission of error. He concluded that the use of interpolative prediction with the transmission of interpolation error was best, particularly when employed in a hybrid system also employing some other type of prediction. Id. at 128.

Indeed, the fact that many references in the same field of endeavor as the '226 patent employ the transmission of interpolation error is further evidence that one of ordinary skill in the art would have been motivated to do so as well. See, e.g., Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE, Vol. 68, No. 3, March 1980 at 401; J.O. Limb, et al.,

"Combining Intraframe and Frame-to-Frame Coding For Television," The Bell System Technical Journal, Vol. 53, No. 6, July-August 1974 at 1152-53; Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Pictures," Second International Conference on Image Processing, Vol. 265, pp. 242-247; Netravali et al., "Digital Pictures: Representation and Compression," Plenum Press, New York, 1988; Tanimoto, et al., "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Trans. Of IEICE, Vol. E.70, No. 7, July 1987 at 611-12; Yashima, et al., "A Highly Efficient Coding Method for HDTV Signals," Proceedings of the IEEE, Vol. 1, June 8, 1987; USP 4,202,011 (Koga) at ABSTRACT et seq.; USP 4,675,733 (Tanimoto), e.g., col. 6, ll. 61-64; USP 4,855,811 ((Isnardi), e.g., col. 8, ll. 56-66; USP 4,858,005 (Lodge), e.g., col. 4, ll..58-68; USP 4,849,810 (Ericsson), e.g., col. 13, ll. 30-31, col. 18, ll. 25-28 & Fig. 12; Miche, Comparison of Predictive And Interpolative Motion Compensating Coding Method For Video Signals, Univ. of Hanover, Inst. Of Theoretical Comm. Engr. And Info. Proc., April 1986.

To the extent Lucent contends that any reference does not invalidate claim 12 of the '226 patent because of a failure to disclose or suggest the use of discrete cosine transform technology, the use of such technology would have been an obvious modification to those of ordinary skill in the art and such people would have been motivated to use such technology because of the potential for reducing the number of bits required to be transmitted to the decoder. See, e.g., Netravali and Haskell, "Digital Pictures, Representation and Compression" at 400-14, and the many additional references that suggest the use of such technology in the same field of endeavor or which deal with related subject matter, such as U.S. Patent No. 4,727,422 to Hinman, USP 4,849,810 (Ericsson); Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE, Vol. 68, No. 3, March 1980 at 392;

To the extent Lucent contends that any reference does not invalidate claim 12 of the '226 patent because of a failure to disclose or suggest the coding of image information on a block basis, the use of such coding would have been an obvious modification to those of ordinary skill in the art and such people would have been motivated to use such technology because of the potential for reducing the number of bits required to be transmitted to the decoder. See, e.g., Netravali and

Haskell, "Digital Pictures, Representation and Compression" at 152 et seq., and the many additional references that suggest the use of such coding in the same field of endeavor or which deal with related subject matter, such as U.S. Patent No. 4,727,422 to Hinman; USP 4,849,810 (Ericsson); Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE, Vol. 68, No. 3, March 1980 at 392.

To the extent Lucent contends that any reference does not invalidate claim 12 of the '226 patent because of a failure to disclose or suggest motion compensation, the use of motion compensation would have been an obvious modification to those of ordinary skill in the art and such people would have been motivated to use such technology because of the potential for reducing the number of bits required to be transmitted to the decoder. See, e.g., Netravali and Haskell, "Digital Pictures, Representation and Compression" at 334 et seq. & 354 et seq., & 472 et seq., and the many additional references that suggest the use of such coding in the same field of endeavor or which deal with related subject matter, such as U.S. Patent No. 4,727,422 to Hinman, Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE, Vol. 68, No. 3, March 1980 at 382-83 & 397.

Furthermore, numerous examples of others in the art independently arriving at the same apparatus claimed by claim 12 shows that claim 12 is invalid for obviousness. U.S. Patent No. 5,113,255 ("Nagata") cites three Japanese patent applications as establishing a basis for a foreign filing date of May 11, 1989. Claim charts of the three Japanese patent applications cited by Nagata are presented in Exhibit A. MPEG submissions by other companies, including Sony and Philips, show that other inventors and companies conceived of the apparatus claimed by claim 12. Claim charts of Sony and Philips's submissions are presented in Exhibit A. Further, U.S. Patent No. 4,985,768 ("Sugiyama") discloses every element of claim 12. A claim chart of Sugiyama is presented in Exhibit A Sugiyama also claims priority to a Japanese patent application, which was filed on January 20, 1989 and discloses each element of claim 12. A claim chart of Sugiyama's Japanese application is presented in Exhibit A.

Additional support for the bases for anticipation and/or obviousness of the asserted claims of this patent by the identified references and systems can be found in Microsoft's previous responses to this interrogatory and the claim charts associated therewith.

**U.S. Patent 4,383,272**

The '272 Patent is invalid for failing, in several ways, to comply with one or more of the requirements of the Patent Laws, 35 U.S.C. § 101 *et seq.* (including without limitation 35 U.S.C. §§ 102, 103, and/or 112). Chart form analyses are presented as Exhibit A to this supplemental response.

Microsoft incorporates by reference the reasoning and conclusions set forth in the March 31, 2006 Expert Report of Edward J. Delp III, May 30, 2007 First Supplemental Expert Report of Edward J. Delp III Invalidity of the '272 and '226 Patents – Secondary Considerations; and September 14, 2007 Expert Report of Edward J. Delp III Regarding Obviousness. Microsoft further incorporates by reference the depositions of Mr. Edward J. Delp III taken June 30, 2006 and to be taken.

To the extent Lucent contends that any reference does not invalidate the asserted claims of the '272 patent because it does not teach selecting interpolation locations as a function of displacement, doing so would have been an obvious modification in view of various references that are in the same field of endeavor and deal with related subject matter, such as Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE, Vol. 68, No. 3, March 1980 at 397; Gabor and J Hill, Television band compression by contour interpolation", IEEE, Vol. 108, Part B, 303-315, at 305-06. Several reasons existed in the art to combine Picture Coding with Gabor & Hill. For example, Picture Coding describes Gabor & Hill as disclosing a known technique for digitally encoding picture material, Picture Coding describes several market and design needs that would motivate people in the art to combine those techniques – such as the need for more compression, and Picture Coding describes that combining known techniques was a common way to improve picture quality.

Moreover, before the '272 patent was filed it was well-known in the art that taking motion into account when using interpolation was a more effective and efficient type of compression than

simple interpolation. Netravali et al., "Picture Coding - A Review," Proceedings of the IEEE, Vol. 68, No. 3, March 1980 at 397; Gabor and J Hill, Television band compression by contour interpolation", IEEE, Vol. 108, Part B, 303-315, at 305-06; BG Haskell and Mounts and Candy, Interframe coding of Videotelephone Pictures", Proceedings of the IEEE, Vol 60 No 7 at 795-96; Pease, Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals, Bell System Technical Journal, Vol. 51, No. 4, 787-802, April 1972 passim & at 797. Furthermore, the Patent Office recently decided to reexamine claim 13 of the '272 patent in view of Picture Coding. *See* '272 Reexam (MSLT_1234186 - MSLT_1234201.

Additionally, the combination of Gabor & Hill and the article Television Compression by Contour Interpolation by Dennis Gabor ("Gabor & Hill"), which was published in Supplement to Al Volume XIII, Series X, Del Nuovo Cimento, 1959, also renders claim 13 of the '272 patent obvious. Several reasons existed to combine Gabor & Hill with the Gabor Article, including the fact that they share an author in common, they cross-reference each other, and both are geared towards solving similar problems. For identical reasons it would have been obvious to combine Gabor & Hill with the Hill Thesis. Additional analysis of the combination of Gabor & Hill with the Gabor Article and Gabor & Hill with the Hill Thesis is set forth in the expert reports of Edward J. Delp listed above.

The combination of the article A Simple Interframe Coder for Video Telephony by J. O. Limb and R. F. W. Pease ("Limb & Pease") with Picture Coding also renders claim 13 of the '272 patent invalid as obvious. Several reasons exist to combine Limb & Pease with Picture Coding, including the design and market needs to develop better video coding, John O. Limb is an author of both, and both articles describe video techniques for use in video telephone systems. Additional analysis of Limb & Pease with Picture coding is set forth in the expert reports of Edward J. Delp listed above.

Several others had developed such a system in the same time frame, which is further evidence of obviousness. *See* Bergmann, Motion-adaptive interpolation of eliminated TV-fields", Picture Coding Symposium, Montreal Canada, 116-117; Lippmann, Continuous Movement Regeneration in Low-frame Rate Aerial Images", Proc. IEEE Int. Conf. On Electronic Image



Exhibit 23
Page 000424

Processing, Conf. Publ. No. 214, 194-198; Jain, Interface Adaptive Data Compression Techniques for Images", State University of New York at Buffalo, 23-47; J.R. Jain, A.K. Jain, Interframe Adaptive Data Compression Techniques for Images", California University, Davis Signal and Image Processing Lab, ADA078841, Aug. 1979; J. Jain and A. Jain, Displacement Measurement and its Application in Interframe Image Coding", IEEE Transactions On Communications, vol. COM-29, No. 12, pp. 1799-1808; Gabor and J Hill, Television band compression by contour interpolation", IEEE, Vol. 108, Part B, 303-315, at 305-06.

To the extent Lucent contends that any reference does not invalidate the asserted claims of the ‘272 patent because it does not teach an object-based technique, and to the extent it is not the same thing, such a technique would have been obvious from any technique by which displacement is estimated by consideration of an edge of an object.

Additional support for the bases for anticipation and/or obviousness of the asserted claims of this patent by the identified references and systems can be found in Microsoft’s previous responses to this interrogatory and the claim charts associated therewith.

**U.S. Patent 4,763,356**

The '356 Patent is invalid for failing, in several ways, to comply with one or more of the requirements of the Patent Laws, 35 U.S.C. § 101 *et seq.* (including without limitation 35 U.S.C. §§ 102, 103, and/or 112). Chart form analyses are presented as Exhibit A to this supplemental response.

Microsoft incorporates by reference the conclusions and reasoning therefore set forth in the March 31, 2006 Expert Report of Mr. Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356, May 30, 2007 Expert Report of Mr. Dale E. Buscaino re Secondary Considerations of Non-Obviousness Regarding United States Patent No. 4,763,356, and April 10, 2007 Supplemental Expert Report of Mr. Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356 and September 14, 2007 Second Supplemental Expert Report of Mr. Dale E. Buscaino re Invalidity of United States Patent No. 4,763,356. Microsoft further incorporates by reference the depositions of Mr. Dale E. Buscaino taken June 29, 2006 and to be taken.

To the extent that Lucent contends that any reference does not invalidate the asserted claims of the '356 patent because it does not teach indicating a particular one of said information fields into which information is to be inserted, doing so would have been an obvious modification in view of various references and systems that are in the same field of endeavor and deal with related subject matter, such as Home Accountant and Financial Planner for the Macintosh; the Xerox Star; Japanese Patent Application No. 61-187024; Apple Lisa; Your Money Manager; United States Patent No. 4,756,706; Microsoft Windows version 1.01; and Carter, Non-Sequential Cursor Movement on Data Entry Display Terminal, IBM Technical Disclosure Bulletin. Moreover, there was a reason to combine these references because at the time it was well known that graphical indications to the user were helpful to reduce the user's uncertainty about the effects of his actions and that cursor feedback was an indispensable part of the input process. *See e.g.*, William M. Newman & Robert F. Sproul, Principles of Interactive Computer Graphics (2d ed. 1979) at 160-61; *see also* Pickering, Touch-Sensitive Screens: The Technologies and Their Application at 261; *see also* Morland, Human factors guidelines for terminal interface design.

To the extent that Lucent contends that any reference does not invalidate the asserted claims of the '356 patent because it does not teach a tool adapted to supply an individual entry from a menu of alternatives, doing so would have been an obvious modification in view of various references and systems that are in the same field of endeavor and deal with related subject matter, such as Home Accountant and Financial Planner for the Macintosh; the Xerox Star; Japanese Patent Application No. 61-187024; Your Money Manager; Foreign Exchange Front End ("FXFE"); Michael Tyler, *Touch Screens: Big Deal or No Deal?*, DATAMATION, January 1984, pp. 146-154 ("Tyler"); United States Patent No. 4,756,706; Japanese Patent Publication No. JP 60-50589; Microsoft Windows version 1.01; and Pickering, Touch-Sensitive Screens: The Technologies and Their Application. Moreover, there was a reason to combine these references because at the time it was well known that a user can enter information more efficiently with a list of alternatives than, for example, with an on-screen keyboard. As stated in Tyler, the keyboard QWERTY layout is an alternative to the menu tools: "[a] QWERTY layout can be called up on the

left for entry of nonstandard or rare names - an infrequently traded currency, for example." MSLT-1228720.

To the extent that Lucent contends that any reference does not invalidate the asserted claims of the '356 patent because it does not teach a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool, doing so would have been obvious modification in view of various references and systems that are in the same field of endeavor and deal with related subject matter, such as Home Accountant and Financial Planner for the Macintosh; the Xerox Star; Your Money Manager; Foreign Exchange Front End ("FXFE"); Michael Tyler, Touch Screens: Big Deal or No Deal?, DATAMATION, January 1984, pp. 146-154 ("Tyler"); Microsoft Windows version 1.01; United States Patent No. 4,332,464; European Patent Application No. 0 030 160; Xerox 5700 Electronic Printing System Reference Manual; United States Patent No. 4,587,630; United States Patent No. 4,509,526; United States Patent No. 4,570,217; and Donkey Kong Arcade Game. Moreover, there was a reason to combine these references because at the time it was well known that any time menus of alternatives are provided by the system, the menus will need to be updated periodically. A composition tool is an obvious solution for a menu that has become out of date, or otherwise does not include the user's desired information, as expressly stated in Tyler: "[a] QWERTY layout can be called up on the left for entry of nonstandard or rare names - an infrequently traded currency, for example." MSLT-1228720.

To the extent that Lucent contends that any reference does not invalidate the asserted claims of the '356 patent because it does not teach bit mapped graphics fields adapted to allow said user to compose the information by writing on the bit mapped graphics field, doing so would have been an obvious modification in view of various references and systems that are in the same field of endeavor and deal with related subject matter, such as Foreign Exchange Front End ("FXFE"); Michael Tyler, Touch Screens: Big Deal or No Deal?, DATAMATION, January 1984, pp. 146-154; and United States Patent No. 4,757,549.

Moreover, there was a reason to combine these references because at the time it was well known that there were advantages to the use of a stylus for certain applications. The smaller size

of the tip of a stylus as compared to that of a human finger allows discrimination between smaller adjacent areas of the touch screen.

Additional support for the bases for anticipation and/or obviousness of the asserted claims of this patent by the identified references and systems can be found in Microsoft's previous responses to this interrogatory and the claim charts associated therewith.

**U.S. Patent No. 5,347,295**

The Agulnick '295 Patent is invalid for failing, in several ways, to comply with one or more of the requirements of the Patent Laws, 35 U.S.C. § 101 *et seq.* (including without limitation 35 U.S.C. §§ 102, 103, and/or 112). Chart form analyses are presented as Exhibit A to this supplemental response.

Microsoft incorporates by reference the conclusions and reasoning therefor set forth in the March 31, 2006 Invalidity Expert Report of John P. J. Kelly, PhD regarding United States Patent No. 5,347,295, the May 30, 2006 Rebuttal Expert Report of John P. J. Kelly, PhD on Secondary Considerations of Non-Obviousness Regarding United States Patent No. 5,347,295, and the September 14, 2007 Supplemental Expert Report Of John P. J. Kelly, PhD On Invalidity Of United States Patent No. 5,347,295. Microsoft further incorporates by reference the depositions of John P. J. Kelly, PhD taken July 6 and 7, 2006 and to be taken.

At least claims 1, 3, 4, 6 and 12 are obvious over the Kim Paper[1] in view of Taguchi[2] and Levine.[3] At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and Buxton.[4] At least claim 39 is obvious over the Kim Paper in view of Taguchi and FIDS.[5] At least

---

1 "On-Line Gesture Recognition By Feature Analysis" by Joonki Kim was published in 1988 in the Proceedings of Vision Interface '88 at pp. 51-55 [MSLT_1231069-MSLT_1231075] (hereinafter "Kim Paper"). This publication contains the proceedings of a conference that took place at the Edmonton Convention Centre on June 6-10, 1988.

2 U.S. Patent No. 4,845,478, entitled "Coordinate Input Device with Display," [MSLT_1231379-MSLT_1231391], was issued to Taguchi and Yamanami and assigned to Wacom Co. Ltd. (hereinafter "Taguchi"). The date of issue was July 4, 1989.

3 U.S. Patent No. 5,060,135, entitled "Apparatus For Manipulating Documents In A Data Processing System Utilizing Reduced Images Of Sheets Of Information Which Are Movable," [MSLT_1232286-MSLT_1232314], was issued to Levine, et al. and assigned to Wang Laboratories, Inc, (hereinafter "Levine"). The filing date was Nov. 1, 1988 and the date of issue was Oct. 22, 1991

4 "The Evolution of the SSSP Score Editing Tools" by William Buxton, Richard Sniderman, William Reeves, S Anand Patel and Ronald Baecker [MSLT_1232392-MSLT 1232406] (hereinafter "Buxton") was published in the *Computer Music Journal*, vol. 3, no. 4 in 1979.

5 A Flat Panel Interactive Display System is described in an article by Arto Kankaanpaa entitled "FIDS – A Flat-Panel Interactive Display System," [MSLT_1230903-MSLT_1230914] (hereinafter "FIDS Paper"). This article

claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and the Advanced Display System.[6] At least claims 41 and 43 are obvious over the Kim Paper in view of Taguchi. At least claim 46 is obvious over the Kim Paper in view of Taguchi and Coleman.[7]

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine the Kim Paper with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (*e.g.*, reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of the Kim Paper with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Kim Paper and Taguchi.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Levine. Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining the Kim Paper with Levine. The resulting combination would have yielded no more than what one would expect from such an

---

was published in the proceedings of the IEEE conference on Computer Graphics and Applications in March 1988. As used herein, the term "FIDS" refers to the FIDS Paper in view of SFS 2324. As used herein, "SFS 2324" means the translation [MSLT_1232720-MSLT_1232723] of the 1972 version of "Proof Correction Standard – SFS 2324" set forth by the Finish Standards Association.

[6] The paper "An Advanced Display System with Natural Interactivity" by Arto Kankaanpaa [MSLT_1231060-MSLT_1231066] was published in *Eurographics 86: Proceedings of the European Computer Graphics Conference and Exhibition*, pp. 185-193, 1986 (hereinafter "Advanced Display System"). The author, Arto Kankaanpaa, is also the author of the FIDS Paper.

[7] The paper "Text Editing On A Graphic Display Device Using Hand-Drawn Proofreader's Symbols" by Michael L. Coleman [MSLT_1230606-MSLT_1230612] (hereinafter "Coleman") was published in 1969 in "Pertinent

arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with the Kim Paper. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Kim Paper and Levine.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Buxton. Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of the Kim Paper. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the *char-rec* gestures of Buxton would not necessarily be affected by the combination of Buxton with the Kim Paper. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Kim Paper and Buxton.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Coleman. Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of the Kim Paper. For example,

---

Concepts in Computer Graphics," Proceedings of the Second University of Illinois Conference on Computer

scrolling is an operation that is commonly performed in spreadsheets because the data contained in the spreadsheet usually cannot all be displayed on the screen at the same time. The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of the Kim Paper. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Kim Paper and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with the Kim Paper. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Kim Paper and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with FIDS. Among other features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of the Kim Paper. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination would involve simply the addition of a text editor software application to the computer system of the Kim Paper. For instance, implementation of gestures such as the correction marks of the FIDS Paper's Table 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with the Kim Paper. Moreover, given the level of ordinary skill in the art,

Graphics, M. Faiman and J. Nievergelt, editors, at pp. 283-290.

one of ordinary skill would have been able to implement the combination of the Kim Paper and FIDS.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Advanced Display System. Among other features, Advanced Display System disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Advanced Display System to the stylus-based user interface of the Kim Paper. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination would involve simply the addition of a text editor software application to the computer system of the Kim Paper. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with the Kim Paper. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Kim Paper and Advanced Display System.

For purposes of this supplemental response, "Paper-Like Interface System" refers to the following:

- Ellozy, H.A., Jameson, D. H., Kelley, J., Kosinski, P. R., Levin, B., Pulido, G., Sacks, M., Van Deusen, M. S. and Wolf, C.G. "The Paper-Like Interface," ACM CHI 1989, VOL. II [VIDEO DISC 1 - MSLT_0971856] is a videotaped demonstration of the Paper-Like Interface System (hereinafter "PLI Video");

- Wolf, C.G., Rhyne, J.R. and Ellozy, H.A. "The Paper-Like Interface" in Designing And Using Human-Computer Interfaces And Knowledge Based Systems, Proceedings Of The Third International Conference On Human-

Computer Interaction, Sept. 18-22, 1989, pp. 494-501 [MSLT 1059916-MSLT_1059925] (hereinafter "PLI Paper");

- Chow, D. and Kim, J. "Paper Like Interface for Educational Applications," National Educational Computing Conference '89, Boston, Massachusetts, June 20-22, 1989, pp. 337-344 [MSLT 1073277-MSLT_1073286] (hereinafter "PLI for Education");
- Kim, J. "On-Line Gesture Recognition By Feature Analysis," Proceedings of Vision Interface '88, June 1988, pp 51-55 [MSLT_1231069- MSLT_1231075] (hereinafter "Kim Paper").

Source code for an X-Window implementation of the Paper-Like Interface was contributed to the X Consortium. The modification date of xpli.README (description of the contributed source code) and xpli.tar.Z (archive containing the source code) is Oct. 3, 1991. These files are available on the internet at ftp://ftp.x.org/R5contrib/. [MSLT_1233222-MSLT_1233863]

At least claims 1, 3, 4, 6 and 12 are obvious over the Paper-Like Interface System in view of Taguchi and Levine. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and Buxton. At least claim 39 is obvious over the Paper-Like Interface System in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and the Advanced Display System. At least claims 41 and 43 are obvious over the Paper-Like Interface System in view of Taguchi. At least claim 46 is obvious over the Paper-Like Interface System in view of Taguchi and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine the Paper-Like Interface System with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (*e.g.*, reduced parallax, improved durability and

optical clarity), it would be obvious to one of skill in the art to combine the Paper-Like Interface System with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Taguchi.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Levine. Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining the Paper-Like Interface System with Levine. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone because the Paper-Like Interface provides an interface that allows one to control a computer using handwriting and gestures. For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Levine.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Buxton. Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of the Paper-Like Interface System, especially in view of the musical

composition features depicted in the PLI Video [see, *e.g.*, PLI Video at minutes 0:04-0:24] and discussed in the PLI Paper [see, *e.g.*, PLI Paper at pp. 498-499]. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the *char-rec* gestures of Buxton would not necessarily be affected by the combination of Buxton with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Buxton.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Coleman. Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of the Paper-Like Interface. For example, scrolling is an operation that is commonly performed in spreadsheets because the data contained in the spreadsheet usually cannot all be displayed on the screen at the same time. The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of the Paper-Like Interface System. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with the Paper-Like Interface System. Moreover, given the level

of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with FIDS. Among other features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of the Paper-Like Interface. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the Paper-Like Interface System. For instance, implementation of gestures such as the correction marks of the FIDS Paper's Table 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and FIDS.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Advanced Display System. Among other features, Advanced Display System disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Advanced Display System to the stylus-based user interface of the Paper-Like Interface System. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each

gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the Paper-Like Interface System. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Advanced Display System.

At least claims 1, 3, 4 and 12 are obvious over FIDS in view of Taguchi and Levine. At least claim 6 is obvious over FIDS in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over FIDS in view of Taguchi. At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Advanced Display System. At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Buxton. At least claim 41 is obvious over FIDS in view of Taguchi. At least claims 43 and 46 are obvious over FIDS in view of Taguchi and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine FIDS with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g., reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine FIDS with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of FIDS and Taguchi.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Levine. Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of

ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining FIDS with Levine. In fact, the FIDS Paper discusses the wide variety of programs that would benefit from inclusion in FIDS. The FIDS Paper specifically mentions using FIDS as the basis of a user interface management system (UIMS) and mentions that one benefit of a UIMS is a consistent user interface. [See, *e.g.*, FIDS Paper at p. 76 (MSLT_1230908)]. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. FIDS and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with FIDS. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of FIDS and Levine.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Advanced Display System. Among other features, Advanced Display System discloses a stylus-based computer system for inputting and editing text. One of ordinary skill in the art would have seen the obvious benefits in adding the Advanced Display System's gestures to the stylus-based user interface of FIDS. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. FIDS and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the correction marks of FIDS Tables 3 and 4 would not necessarily be affected by the combination of FIDS with the Advanced Display System. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to

implement the combination of FIDS and Advanced Display System. In addition, one of ordinary skill in the art would be motivated to combine FIDS and Advanced Display System because both were developed and written about by the same person, A. Kankaanpaa. Both based their editing gestures on the SFS2324 proof correction standard.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Buxton. Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of FIDS. In fact, the FIDS Paper lists a number of applications that could benefit from the FIDS design including other types of editors that use graphics and direct manipulation. The *char-rec* score editor falls squarely within this category. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. FIDS and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the *char-rec* gestures of Buxton would not necessarily be affected by the combination of Buxton with FIDS. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of FIDS and Buxton.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Coleman. Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of FIDS. In fact, the FIDS Paper lists Coleman as "the first editing system using proofreading symbols" and states that it was more limited than FIDS because it did not have the "possibilities offered by the FIDS hardware." [See FIDS Paper at p. 77 (MSLT_1230909)]. There are also similarities between the gestures and

gesture recognition algorithms of FIDS and Coleman. In addition, scrolling is an operation that is commonly performed in text editing programs because the data contained in the document usually cannot all be displayed on the screen at the same time. The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of FIDS. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. FIDS and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with FIDS. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of FIDS and Coleman.

At least claims 1, 3, 4 and 12 are obvious over Oed and Doster[8] in view of Taguchi and Levine. At least claim 6 is obvious over Oed and Doster in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over Oed and Doster in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over Oed and Doster in view of Taguchi and Advanced Display System. At least claims 39, 40 are obvious over Oed and Doster in view of Taguchi and Buxton. At least claim 41 is obvious over Oed and Doster in view of Taguchi. At least claims 43, and 46 are obvious over Oed and Doster in view of Taguchi and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Oed and Doster with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an

---

[8] Richard Oed and Wolfgang Doster developed a stylus-based personal computer with a user friendly man-machine interface (hereinafter "Oed and Doster"). The following publications by Richard Oed and Wolfgang Doster describe the system:

- Oed, R. and Doster, W. "On-line Script Recognition - A User-friendly Man-Machine Interface," Proceedings of the COMPLAINT 85 Conference on Computer-Aided Technologies, pp. 741-743, 1985 [MSLT_1231122-MSLT_1231126] (hereinafter "Oed Paper").

external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g., reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of Oed and Doster with the behind-the-display digitizer of Taguchi. In fact, Oed and Doster use a tablet based on magnetostrictive technology, the same technology used by Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Oed and Doster and Taguchi.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Levine. Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. In fact, both of the Oed and Doster references say that their system "allows any application program to be operated" using gestures. [See, *e.g.*, Oed Paper at p. 743 (MSLT_1231126)]. The Oed Paper states that one technique to allow any application to use gestures is to make on-line script recognition part of the operating system. [See, *e.g.*, Oed Paper at p. 742 (MSLT_1231125)]. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining Oed and Doster with Levine. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with Oed and Doster. Moreover, given the

---

▪ Doster, W. and Oed, R. "Word Processing with On-line Script Recognition," IEEE Micro, pp. 36-43, 1984 [MSLT_1233214-MSLT_1233221] (hereinafter "Doster Paper").



Exhibit 23
Page 000441

level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Oed and Doster and Levine.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Buxton. Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of Oed and Doster. In fact, both of the Oed and Doster references say that their system "allows any application program to be operated" using gestures. [See, *e.g.*, Oed Paper at p. 743 (MSLT_1231126)]. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone because the combination provides merely the addition of a music score editor software application to Oed and Doster. For instance, implementation of gestures such as the *char-rec* gestures of Buxton would not necessarily be affected by the combination of Buxton with Oed and Doster. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Oed and Doster and Buxton.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Coleman. Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of Oed and Doster. For example, scrolling is an operation that is commonly performed in text editing programs because the data contained in the document usually cannot all be displayed on the screen at the same time. The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of Oed and Doster. The resulting combination would have yielded no more than what one would expect

from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone because Oed and Doster specifically allows the user to define additional gestures and assign any desired meaning to those gestures. For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with Oed and Doster. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Oed and Doster and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with FIDS. Among other features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of Oed and Doster. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because Oed and Doster specifically allows the user to define additional gestures and assign any desired meaning to those gestures. For instance, implementation of gestures such as the correction marks of the FIDS Paper's Tables 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with Oed and Doster. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Oed and Doster and FIDS.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Advanced Display System. Among other features, Advanced Display System disclosed a stylus-based computer system that implements

gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Advanced Display System to the stylus-based user interface of Oed and Doster. For example, inserting a page break is a common operation in text editor programs. The "new page" gesture of Advanced Display System would be useful in the context of Oed and Doster. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because Oed and Doster specifically allows the user to define additional gestures and assign any desired meaning to those gestures. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with the Oed and Doster. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of the Oed and Doster and Advanced Display System.

At least claims 39, 40, 41 and 43 are obvious over Inagaki[9] in view of Taguchi. At least claim 46 is obvious over Inagaki in view of Taguchi and the Casio PF-8000.[10] One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Inagaki with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (*e.g.*,

---

[9] U.S. Patent No. 4,578,811, entitled "Key-In Device," was issued to Inagaki and assigned to Casio Computer Co. Ltd. [MSLT_ 1232251-MSLT_1232274] (hereinafter "Inagaki"). The date of issue was March 25, 1986.

[10] *See, e.g.*, Casio PF-8000 operation manual [MSLT_0971098-MSLT_0971107]. A Casio PF-8000 system was made available to Lucent for inspection over one and a half years ago. *See* February 22, 2006, letter from Owais Siddiqui, counsel for Microsoft, to Jon Hohenthaner, counsel for Lucent.



Exhibit 23
Page 000444

reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of Inagaki with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Inagaki and Taguchi.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Inagaki with the Casio PF-8000. Among other features, the Casio PF-8000 discloses associating the direction of creation of a gesture with its action, and one of ordinary skill would recognize that such features in the Casio PF-8000's stylus-based computer system could improve other stylus-based computer systems. In addition, Inagaki and the Casio PF-8000 describe very similar devices, and the Inagaki patent is assigned to Casio. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining Inagaki with the Casio PF-8000. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Inagaki and its gestures would have performed just as before, with the simple addition of the Casio PF-8000's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the "—" gesture of the Casio PF-8000 would not necessarily be affected by the combination of the Casio PF-8000 with Inagaki. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Inagaki and the Casio PF-8000.

At least claims 41, 43 and 46 are obvious over Coleman in view of Taguchi. One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Coleman with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g.,

reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of Coleman with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Coleman and Taguchi.

At least claims 39 and 40 are obvious over Sklarew[11] in view of Taguchi and Buxton. At least claim 39 is obvious over Sklarew in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over Sklarew in view of Taguchi and the Advanced Display System. At least claims 41, 43 and 46 are obvious over Sklarew in view of Taguchi and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Sklarew with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or separate from the display (as by an external digitizing tablet). It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (*e.g.*, reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine Sklarew with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Sklarew and Taguchi.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with Buxton. Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of Sklarew, especially since Sklarew explicitly mentions musical composition as a useful application of the invention [see, *e.g.*, Sklarew at 22:35-36]. The resulting combination would have yielded

---

[11] U.S. Patent No. 4,972,496, entitled "Handwritten Keyboardless Entry Computer System," was issued to Sklarew and assigned to Grid Systems Corp. [MSLT_1230446-MSLT_1230485] (hereinafter "Sklarew"). The date of filing was March 24, 1987, and the date of issue was November 20, 1990.

no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Sklarew and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone because the combination provides merely the addition of a music score editor software application to the computer system of Sklarew. For instance, implementation of gestures such as the *char-rec* gestures of Buxton would not necessarily be affected by the combination of Buxton with Sklarew. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Sklarew and Buxton.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with Coleman. Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of Sklarew. For example, scrolling is an operation that is commonly performed in text editing applications because usually not all of the text can be displayed on the screen at the same time. The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of Sklarew. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Sklarew and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with Sklarew. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Sklarew and Coleman.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with FIDS. Among other features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of Sklarew. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Sklarew and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the computer system of Sklarew. For instance, implementation of gestures such as the correction marks of the FIDS Paper's Table 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with Sklarew. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Sklarew and FIDS.

One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with Advanced Display System. Among other features, Advanced Display System disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Advanced Display System to the stylus-based user interface of Sklarew. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Sklarew and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the computer system of Sklarew. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3

would not necessarily be affected by the combination of Advanced Display System with Sklarew. Moreover, given the level of ordinary skill in the art, one of ordinary skill would have been able to implement the combination of Sklarew and Advanced Display System.

Additional support for the bases for anticipation and/or obviousness of the asserted claims of this patent by the identified references and systems can be found in Microsoft's previous responses to this interrogatory and the claim charts associated therewith.

Microsoft incorporates herein by reference Dell's Supplemental Responses to Lucent's Interrogatory No. 1, which is being served concurrently herewith.

Dated: October 5, 2007

FISH & RICHARDSON P.C.

By: [signature]

John E. Gartman (SBN 152300)
Juanita R. Brooks (SBN 75934)
Roger A. Denning (SBN 228998)
Christopher S. Marchese (SBN 170239)
Thomas N. Millikan (SBN 234430)

Attorneys for Intervenor/Counter-claimant and Plaintiff/Counter-defendant MICROSOFT CORPORATION

**PROOF OF SERVICE**

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

The certify that a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4. Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

On October 5, 2007, I caused a copy of the following document(s):

**EIGHTH SUPPLEMENTAL RESPONSE TO LUCENT'S FIRST SET OF INTERROGATORIES (NO. 1**

to be served on the interested parties in this action as follows:

Alison P. Adema
Hahn & Adema
501 West Broadway, Suite 1600
San Diego, CA 92101
Telephone: (619) 235-2100
Facsimile: (619) 235-2101
***VIA FACSIMILE & ELECTRONIC MAIL***

Attorneys for Plaintiffs
MULTIMEDIA PATENT TRUST;
LUCENT TECHNOLOGIES INC.

Email: aadema@hahnadema.com

David J. Zubkoff
Seltzer, Caplan, McMahon & Vitek
2100 Symphony Towers
750 B Street, Suite 2100
San Diego, CA 92101
Telephone: (619) 685-3003
Facsimile: (619) 702-6827
***VIA FACSIMILE & ELECTRONIC MAIL***

Attorneys for Defendants
GATEWAY, INC. and GATEWAY COUNTRY STORES LLC

Email: zubkoff@scmv.com

James S. Blackburn
Arnold & Porter LLP - (L.A.)
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
***VIA FACSIMILE & ELECTRONIC MAIL***

Attorneys for Defendant
DELL INC.

Email: james_blackburn@aporter.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct. Executed on October 5, 2007, at San Diego, California.

Alma Truax-Padilla

**COURTESY COPIES BY ELECTRONIC MAIL TO:**

Trial Counsel For Multimedia/Lucent:
John M. Desmarais/Paul Bondor/Michael Stadnick/Gregory Corbett
Kirkland & Ellis LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
E-mail: jdesmarais@kirkland.com; pbondor@kirkland.com; gcorbett@kirkland.com; mstadnick@kirkland.com; jmafale@kirkland.com

Trial Counsel for Gateway:
Bryan Farney / Steven R. Daniels / Jeffrey B. Plies / Lawrence Fluker
DECHERT LLP
300 W. Sixth Street, Suite 1850
Austin, TX 78701
Email: bryan.farney@dechert.com; steven.daniels@dechert.com; jeff.plies@dechert.com; lawrence.fluker@dechert.com

Trial Counsel for Dell:
Ali R. Sharifahmadian, Esq.
Matthew Bathon, Esq.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
E-mail: ali_sharifahmadian@aporter.com; Matthew_Bathon@aporter.com; Thomas_Wischer@aporter.com

Trial Counsel for Dell:
Joel Freed, Esq.
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005-3096
Email: jfreed@mwe.com

Courtesy Emails include:

| | | |
|---|---|---|
| [ ] | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |
| XX | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email, except for exhibits. Exhibits were over 50 pages long. As per our service agreement, a hard copy will follow via overnight mail. |