# SCHMIDT DECLARATION
# EXHIBIT 45

1

2

3

4

5

6

7

8

9

10

11

12

13

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

14  LUCENT TECHNOLOGIES INC. and
    MULTIMEDIA PATENT TRUST,

15                Plaintiffs and Counterclaim-defendants,

16      v.

17  GATEWAY, INC. and GATEWAY COUNTRY
    STORES LLC, GATEWAY COMPANIES,
18  INC., GATEWAY MANUFACTURING LLC
    and COWABUNGA ENTERPRISES, INC.,
19

20                Defendants and Counter-claimants,

21          and

22  MICROSOFT CORPORATION,

23                Intervenor and Counter-claimant.

24  MICROSOFT CORPORATION,

25                Plaintiff and Counter-defendant,

26      v.

27  LUCENT TECHNOLOGIES INC. and
    MULTIMEDIA PATENT TRUST,
28

Case No. 02-CV-2060 B (CAB)
consolidated with
Case No. 03-CV-0699 B (CAB); and
Case No. 03-CV-1108 B (CAB)

**EXPERT REPORT OF
EDWARD J. DELP III REGARDING
OBVIOUSNESS**

1

Exhibit 45
Page 000756

1

Defendants and Counter-claimants,

2

LUCENT TECHNOLOGIES INC. and
3  MULTIMEDIA PATENT TRUST,

4            Plaintiffs and Counterclaim-defendants,

5    v.

6  DELL INC.,

7            Defendants and Counter-claimants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 45
Page 000757

## I.     **ASSIGNMENT**

1.         I, Edward J. Delp III, am the Silicon Valley Professor of Electrical and Computer Engineering and Professor of Biomedical Engineering, School of Electrical Computer Engineering and School of Biomedical Engineering at Purdue University and an expert in the field of video compression technology.  I have been retained as an expert by Defendants Microsoft Corporation ("Microsoft"), Gateway, Inc. ("Gateway"), and Dell Inc. ("Dell") to consult on various technical issues concerning the above-referenced action.  This report sets forth my opinions concerning technical issues that are relevant to the validity and enforceability of U.S. Patent No. 4,383,272 (the "'272 patent") and U.S. Patent No. 4,958,226 (the "'226 patent") (collectively "the Asserted Patents"), which have been asserted by Plaintiff Multimedia Patent Trust ("MPT" or "Plaintiff").

2.         I previously issued reports on March 31, 2006, May 30, 2006, and July 21, 2006 regarding the invalidity of the '272 and '226 patents.  My previous reports addressed the issues of anticipation and obviousness, and I expressly adopt the statements and conclusions set forth in those reports in this report.  It is my understanding, however, that the law regarding obviousness changed after that report.  Consequently, this report sets forth additional opinions regarding the obviousness of the '272 and '226 patents.

## II.     **QUALIFICATIONS**

3.         My qualifications are detailed in my previous reports.

## III.    **COMPENSATION**

4.         I am being compensated for my work on this litigation at my standard rate of $400.00 per hour.  No part of my compensation is contingent upon the outcome of this litigation or any issue that may be determined in the course of this litigation.

Exhibit 45
Page 000758

1  **IV.     INFORMATION CONSIDERED**

2       5.      I have considered the following information in forming my opinions expressed

3  in this expert report:

4       • The '272 and '226 Patents.

5       • The prosecution history of the '226 and '272 Patents.

6       • Markman presentations and briefs for the '272 and '226 Patents.

7       • MPT's validity contentions regarding the '272 and '226 Patents.

8       • Defendants' invalidity contentions for the '272 and '226 Patents.

9       • Various portions of the deposition transcripts of the following individuals:

10      Dr. Haskell, Mr. Schaphorst, Mr. Ericsson, Dr. Hill, Ms. Jenkins,

11      Ms. Lewis, Ms. Coates, Mr. Kaske, and Dr. Jain.

12      • The Court's claim construction orders.

13      • All documents cited in my previous reports and the previous reports of

14      MPT's expert, Prof. Bernd Girod.

15      • The Supreme Court's opinion in KSR v. Teleflex.

16      • All other documents cited in this report and in the accompanying claim

17      charts.

18      6.      I reserve the right to supplement my report in light of any additional fact

19  discovery, opinions by Plaintiffs' experts, and/or trial testimony.  I also reserve the right to

20  provide rebuttal opinions and testimony in response to Plaintiffs' experts, and rebuttal testimony

21  in response to any of Plaintiffs' fact witnesses.  Further, I reserve the right to use animations,

22  demonstratives, enlargements of actual exhibits, and other information in order to illustrate my

23  opinions.

24

25  **V.     PRIOR TESTIMONY**

26      7.      In the preceding four years, I provided expert testimony at a sentencing hearing

27  in the case *United States of America v. Seifert, Brian*, IP02-CR-0012-01-M/F, regarding computer

28

Exhibit 45
Page 000759

1  imaging technology and gave a deposition in *Polycom, INC. And Polycom Israel, LTD., vs.*

2  *Codian LTD. and Codian I.*, Civil Action No. 2:05-CV-520.

3

4  **VI.    OPINIONS AND CONCLUSIONS**

5      **A.    Summary**

6      8.    Based upon the information I have considered, it is my opinion that claim 13 of

7  the '272 patent is obvious in view of certain prior art.  It also is my opinion that claim 12 of the

8  '226 patent is obvious in view of certain prior art.

9      **B.    Relevant Legal Principles**

10      9.    I will not offer opinions of law as I am not an attorney.  However, I have been

11  informed of several principles concerning patent validity, which I used in arriving at my

12  conclusions.

13          •    I incorporate here by reference the legal principles set forth at ¶ 11 of my

14              March 31, 2006 Delp Expert Report, on issues of validity related to the

15              '272 and '226 patents.

16          •    I am informed that legal principles regarding invalidity of a claim due to

17              obviousness were clarified by the U.S. Supreme Court after I wrote my

18              earlier reports.  I am informed that the principles described in ¶11 of my

19              March 31, 2006 and July 21, 2006 expert reports (relating to a

20              "motivation," "suggestion," or "teaching" in the prior art to combine

21              references to produce the claimed alleged invention) remain an appropriate

22              approach in a validity analysis.  I understand, however, that the U.S.

23              Supreme Court clarified that additional principles may also be applied in

24              such an analysis.  I set forth some such additional principles below.

25          •    I am informed that the combination of familiar elements according to

26              known methods is likely to be obvious when it does no more than yield

27              predictable results.  In other words, when a claim simply arranges prior art

28              elements with each performing the same function it had been known to

Exhibit 45
Page 000760
                    5                    Case No. 02-CV-2060 B (CAB)

perform and yields no more than one would expect from such an arrangement, such a combination is obvious. Moreover, when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination is likely to be obvious unless the combination yields an unpredictable result. I am informed that a corollary principle is that when the prior art teaches away from combining certain known elements, a claim directed to a discovery of a successful means of combining them is more likely to be non-obvious.

- I am informed that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If one of ordinary skill in the art can implement a predictable variation, such a variation is likely unpatentable. For the same reason, if a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. One question to consider is whether the improvement is more than the predictable use of prior art elements according to their established functions.

- I am informed that it may be often be necessary, in a validity analysis, to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by one of ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

- I am informed that a validity analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim; it is appropriate to take account of the inferences and creative steps that one of

Exhibit 45
Page 000761

6                    Case No. 02-CV-2060 B (CAB)

1       ordinary skill in the art would employ.  I understand that a person of

2       ordinary skill is also a person of ordinary creativity.

3   •   I understand that a claim composed of several elements is not proved

4       obvious merely by demonstrating that each element was, independently,

5       known in the prior art.  I understand that it can be important to identify a

6       reason that would have prompted a person of ordinary skill in the relevant

7       field to combine the elements in the way the claimed new invention does.

8       Therefore, I am informed that, in determining whether a claimed

9       combination is obvious, the correct question is whether the combination

10      was obvious to one of ordinary skill in the art.  I am told that one of the

11      ways in which subject matter can be proved obvious is by noting that there

12      existed at the time of invention a known problem for which there was an

13      obvious solution encompassed by the patent's claims.  I understand that

14      any need or problem known in the field of endeavor at the time of alleged

15      invention and addressed by the patent can provide a reason for combining

16      the elements in the manner claimed.

17  •   I am informed that one should not assume that a person of ordinary skill in

18      the art attempting to solve a problem will be led only to those elements of

19      prior art designed to solve the same problem.  Instead, I understand that

20      since familiar items may have obvious uses beyond their primary purposes,

21      in many cases one of ordinary skill in the art will be able to fit the

22      teachings of multiple prior art references together like pieces of a puzzle.

23  •   I am informed that, when there is a design need or market pressure to solve

24      a problem and there are a finite number of identified, predictable solutions,

25      one of ordinary skill in the art has good reason to pursue the known options

26      within his or her technical grasp.  If this leads to the anticipated success, it

27      is likely the product not of innovation but of ordinary skill and common

28

Exhibit 45
Page 000762

7                          Case No. 02-CV-2060 B (CAB)

1         sense, I understand that, in such an instance, the fact that the combination

2         was obvious to try may show that the combination is obvious.

3      •    I am informed that, when determining whether a claimed combination is

4         obvious, the correct analysis is not whether one of ordinary skill in the art,

5         writing on a blank slate, would have chosen the particular combination of

6         elements described in the claim. Instead, I understand the correct analysis

7         considers whether one of ordinary skill, facing the wide range of needs

8         created by developments in the field of endeavor, would have seen a

9         benefit to selecting the combination claimed.

10     10.    I expect to continue to develop my opinions discussed in this report. I also

11 reserve the right to supplement my opinions based on information obtained from additional

12 discovery or from Plaintiffs' experts, as indicated above.

13     **C.**    **Level of Ordinary Skill in the Art**

14         **1.**    **The Level of Skill Relevant to the '272 Patent**

15     11.    In my opinion, with regard to the '272 patent, one of ordinary skill in the art

16 would have been a person with a bachelor of science degree in electrical or computer engineering,

17 or a related field, and the equivalent of two years of experience in working with video

18 compression systems and methods. A person with a master of science degree in electrical or

19 computer engineering, or a related field, who pursued a course of study relating to video

20 compression technology also would be a person of ordinary skill in the art.

21     12.    As of 1981, the use of interpolation to recreate missing pictures was well

22 known. *See* March 31, 2006 Expert Report at pp. 14-45.

23     13.    Motion estimation using, for example, the recursive technique was also known

24 as of 1981. *See* Picture Coding: A Review ("Picture Coding") (*e.g.*, MSLT_0001623-

25 MSLT_0001663) at 383; and U.S. Patent No. 4,218,703.

26     14.    Further, it also was known that interpolation could be done adaptively, for

27 example, by selecting the locations from which to interpolate as a function of motion. *See* Picture

28 Coding at 382-383; *A Simple Interframe Coder for Video Telephony by J. O. Limb and R. F. W.*

Exhibit 45
Page 000763

    Case No. 02-CV-2060 B (CAB)

*Pease* ("Limb & Pease") (*e.g.*, MSLT_0001254-MSLT_0001265) at 1879-80; *see also* March 31, 2006 Expert Report at pp. 14-15.

### 2.    The Level of Skill Relevant to the '226 Patent

15.    In my opinion, with regard to the '226 patent, one of ordinary skill in the art would have been a person with a bachelor of science degree in electrical or computer engineering, or a related field, and the equivalent of two years of experience in working with video compression systems and methods.  A person with a master of science degree in electrical or computer engineering, or a related field, who pursued a course of study relating to video compression technology also would be a person of ordinary skill in the art.

16.    The background section of the '226 patent makes clear that the use of prediction, motion estimation, motion vectors, and DCT coding of the difference signal were well known in the art prior to the '226 patent.  *See* '226 patent, Col. 1, lines 21-58.

17.    The background section of the '226 patent also makes clear that the use of "Motion Compensated Interpolation," which uses the "Motion Vectors" from the predicted blocks to average the immediately previous and following blocks of pels, was well known in the art prior to the '226 patent.  *See* '226 patent, Col. 2, lines 18-29.

18.    As I noted in my previous report at ¶¶ 227-230, the prior art expressly suggested combining video coding techniques.

19.    Paragraphs 231-236 of my previous report explain that the prior art expressly identified the problem of visual artifacts in motion compensated interpolated frames and thus provided a motivation to combine any known solution of interpolation deviation codes.

20.    The numerous prior art references described in my earlier report demonstrate that the use of difference codes or error codes, such as temporal interpolation error, was well known to one of ordinary skill in the art.  *See, e.g.,* March 31, 2006 Expert Report at ¶¶ 217-225. The prior art transmitted interpolation deviation codes for motion compensated temporally interpolated frames.  March 31, 2006 Expert Report at ¶ 237.

21.    Moreover, the similarity of prediction error to interpolation error would have suggested the use of interpolation error for interpolated frames.  *Id.* at ¶¶ 238-240.

Exhibit 45
Page 000764                                    9                    Case No. 02-CV-2060 B (CAB)

1    22.    In addition the advent of CD-ROM applications provided yet another motivation

2    to combine video coding techniques in the prior art to arrive at claim 12.  *Id.* at 241.

3

4    **D.    Invalidity of the '272 Patent**

5    23.    Based on the information I have considered, it is my opinion that claim 13 of the

6    '272 patent is invalid as obvious in view of certain prior art.  In my previous report I set forth my

7    anticipation analysis regarding claim 13 of the '272 patent.  I continue to believe that claim 13 of

8    the '272 patent is invalid as anticipated, and I incorporate my anticipation analysis from that

9    report here.  In this report I will address issues regarding the obviousness of claim 13 of the '272

10    patent.  I have addressed MPT's prior non-obviousness assertions below.

11    24.    Since my last report, I have been provided a document from the United States

12    Patent & Trademark Office indicating that the Office has decided to reexamine the patentability

13    of claim 13 of the '272 patent based on certain of the references discussed in this and my earlier

14    report.  *See* '272 Reexam (MSLT_1234186 - MSLT_1234201).  I believe that the Patent Office's

15    decision confirms my earlier opinion that claim 13 is invalid over those references, and also

16    confirms the opinions set forth in this report.

17    **1.    Picture Coding and Gabor & Hill**

18    25.    In my opinion claim 13 of the '272 patent is invalid as obvious in view of

19    *Picture Coding: A Review* ("Picture Coding"), by Arun N. Netravali and John O. Limb, which

20    was published in The Institute of Electrical and Electronics Engineers, Volume 68, Number 3, in

21    March 1980, and the article *Television Band Compression by Contour Interpolation*, by Prof D.

22    Gabor and P. C. J. Hill ("Gabor & Hill") (*e.g.*, MSLT_0001228-MSLT_0001240).

23    **a.    Several Reasons Existed in the Art to Combine Picture Coding
           and Gabor & Hill**

24

25    26.    Several reasons existed in the prior art to combine the teachings of Picture

26    Coding and Gabor & Hill.  Picture Coding describes itself as "a review of techniques used for

27    digital encoding of picture material."  Picture Coding, Abstract.  The Gabor & Hill reference,

28    along with the other references cited in Picture Coding, is therefore described by the authors as

disclosing a known technique for digital encoding picture material.  Picture Coding also groups

Exhibit 45
Page 000765                          10                    Case No. 02-CV-2060 B (CAB)

1   the known techniques into several distinct categories, describes several examples of combinations

2   of the various categories, and explicitly notes that there are many different combinations of

3   techniques in those categories known in the art, *e.g.*, Picture Coding at 379, suggesting to those in

4   the art that combinations of the various cited techniques may be desirable.

5        27.    Picture Coding also describes several market and design needs that would

6   motivate people in the coding arts to combine the various known techniques, such as the need for

7   more efficient video coding to "free valuable spectrum space" and the expanding use of video

8   coding in (at the time) emerging technologies such as facsimile, satellite communications, and

9   military applications.  Picture Coding at 366.

10       28.    Picture Coding itself therefore demonstrates that there were design and market

11  needs in the prior art to develop better coding systems, and the combination of known techniques,

12  which was a typical and accepted practice, was a common way to develop such systems.

                    **b.    The Combination of Picture Coding and Gabor & Hill Satisfies
13                          Every Limitation of Claim 13 of the '272 Patent Even Under
14                          MPT's View of the Claim and the Evidence**

15       29.    As set forth in my previous report, it is my opinion that every element required

16  by claim 13 of the '272 patent is included, either explicitly or inherently, in Picture Coding.  *See*

17  March 31, 2006 Expert Report at ¶¶ 76-86.  I also believe that the Patent Office's decision to

18  reexamine claim 13 of the '272 patent in view of Picture Coding confirms that opinion.  '272

19  Reexam at 7.

20       30.    It also remains my opinion that every element required by claim 13 of the '272

21  patent is included, either explicitly or inherently, in Gabor & Hill.  *See id.* at ¶¶ 27-35.  I further

22  believe that the Patent Office's decision to reexamine claim 13 of the '272 patent in view of

23  Gabor & Hill confirms that opinion.  '272 Reexam at 8.

24       31.    In Prof. Girod's rebuttal to my invalidity report, he maintains that Gabor & Hill

25  is limited to analog implementations and as such is distinguishable from the '272 patent.  The

26  decision of the Patent Office to reexamine claim 13 undercuts Prof. Girod's argument, since the

27  examiner in the Patent Office would not have believed that Gabor & Hill created a significant

28  validity issue as to claim 13 if Prof. Girod were correct.

Exhibit 45
Page 000766                          11                    Case No. 02-CV-2060 B (CAB)

32.    I also note that although claim 13 requires "pels," this requirement does not limit the claim to digital implementations or to a digital representation of the claimed pels. According to the Court's claim construction, "pels" means "picture elements," also referred to as pixels." Exhibit I, August 16, 2005 '272 Superceding Markman Order at 3. That construction does not require digital implementations. I further note that the '272 patent does not even use the word "digital," and nothing raised during the prosecution of the underlying patent application imposed any such requirement.

33.    Indeed the phrase "picture element" would be understood by those of ordinary skill in the art at the relevant time to mean an area of a picture on a television or computer screen, as is demonstrated by various sources published around the time of the purported invention. For example the 1977 IEEE Standard Dictionary of Electrical and Electronics Terms defines "picture element" as "[t]he smallest area of a television picture capable of being delineated by an electric signal passed through the system or part thereof," and the 1976 McGraw-Hill Dictionary of Scientific and Technical Terms defines "picture element" as "any segment of a scanning line, the dimension of which along the line is exactly equal to the nominal line width; the area which is being explored at any instant in the scanning process."

34.    Moreover, Gabor & Hill itself uses the phrase "picture element" at page 313. Accordingly, the term "picture element" has long been used by those of skill in the relevant art to mean nothing more than an area of a picture. *See, e.g.*, E. R. Kretzmer's 1952 paper that describes an analog television picture as "an array of approximately 210,000 dots, 500 vertically, 420 horizontally, corresponding, respectively, to the 500 scanning lines and 420 resolvable *picture elements* per line of the standard television raster." Kretzmer, E. R., "Statistics of Television Signals," The Bell Systems Technical Journal, pp. 276-88 (July 1952) at 276-77 (emphasis added) (DELL 317256-68). *See also* the 1956 paper by William F. Schreiber, a leader in the field of video compression, that describes analog television and states that there "are about 200,000 *picture elements* in a standard television frame." Schreiber, W. F., "The Measurement of Third Order Probability Distributions of Television Signals," Institute of Radio Engineers Transactions on Information Theory, Vol. 1-T2, 3, p. 289-300 (September 1956) at 289 (emphasis

Exhibit 45
Page 000767                                    12                    Case No. 02-CV-2060 B (CAB)

1    added) (DELL 315454-65). There is no dispute that standard television in the 1950's was not

2    digital.

3        35.    I do not believe that Gabor & Hill is limited to analog implementations. *See*

4    *e.g.*, the discussion of data rates on pages 303-04 of Gabor & Hill ("[o]ur object in discussing this

5    ideal picture transmission system in some detail is rather to point out that the estimates of

6    potential compression based on contrasting the 50 bits/sec of visual intake with the 3-5 X $10^7$

7    bits/sec of television channels . . ."; "[i]f these probabilities were equal, i.e. $p_i = 1/N$, they would

8    require $\log_2 N$ bits/sign for their transmission . . ."). Bits/sec is clearly a reference to digital data

9    and digital encoding.

10        36.    I also note that the United States Patent and Trademark Office has agreed to

11   reexamine claim 13 of the '272 patent. *See*, '272 Reexam. In its determination to institute that

12   reexamination, the examiner agreed that Gabor & Hill discloses a digital technique. *Id.* at 7-8.

13        37.    Even if Prof. Girod's position that Gabor & Hill only described analog

14   implementations is correct, claim 13 would still be invalid as obvious. It was well known in the

15   prior art to the '272 patent that analog techniques could be employed in a digital world. Picture

16   Coding, for example, expressly states that it is desirable to implement video encoding digitally.

17   *See* Picture Coding, Abstract ("A bright future for new systems is forecasted based on emerging

18   new concepts, technology of integrated circuits and the need to digitize in a variety of contexts.");

19   *id.* at 403 ("Looking to the future we could expect television scenes with perhaps twice the

20   vertical resolution of the current standard. . . . An upgrading of the picture could be easily

21   handled within a digital framework." Moreover, Picture Coding describes numerous digital

22   coding techniques, including numerous articles authored by Netravali himself. *See, e.g.*, Picture

23   Coding at 406 *citing* A. N. Netravali & J. A. Stuller, "Motion Compensated Transform Coding,"

24   Bell Systems Technical Journal, 1703-18, September 1979 (LUC1037198-LUC1037213); and A.

25   N. Netravali, "Interpolative Picture Coding Using a Subjective Criterion," IEEE Transactions on

26   Communications, vol. COM-25, 503-08, May 1977 (LUC0010310-LUC0010315). *See also*

27   March 31, 2006 Expert Report at ¶¶ 40-42.

28

Exhibit 45
Page 000768                              13                    Case No. 02-CV-2060 B (CAB)

38.    Additionally by 1981, video coding was almost universally performed in the digital domain.

39.    Moreover, the prior art that was before the examiner included two prior patents by Netravali, each of which disclosed both motion estimation and interpolation in the digital domain.  It was commonplace to replace older mechanical devices with devices utilizing modern electronics.  Therefore, it would have been obvious to a person of ordinary skill in the art to implement the system disclosed in Gabor & Hill using the digital techniques disclosed by Picture Coding.

40.    Prof. Girod also states that he believes that Gabor & Hill does not interpolate from locations at which the same object is expected to be because it only discloses interpolation in the horizontal direction.  Again, the Patent Office's decision to reexamine claim 13 undercuts Prof. Girod's conclusion.

41.    I also disagree with Prof. Girod.  There is nothing in claim 13, the '272 specification, or the Court's claim construction that requires pels to be searched in the vertical direction.  In fact, Gabor & Hill simply recognized that "changes from one picture to the next come about mostly by the horizontal motion of objects."  *See* Gabor & Hill at 303.  Thus, Gabor & Hill teach searching the pels of a picture along the horizontal scan lines, which also corresponds to the manner in which television images were transmitted and displayed.  Although Gabor & Hill teach searching pels in a horizontal direction, the interpolation taught by Gabor & Hill also accounts for motion in the vertical direction.  Further, a person of ordinary skill in the art would be able to expand upon the principles in Gabor & Hill to search for motion in the vertical direction.  Prof. Girod has identified nothing in Gabor & Hill that would strictly limit its teachings to horizontal interpolation.

### 2.    Gabor & Hill and the Gabor Article

42.    The combination of Gabor & Hill and the article *Television Compression by Contour Interpolation* by Dennis Gabor ("Gabor & Hill"), which was published in Supplemento Al Volume XIII, Serie X, Del Nuovo Cimento, 1959, also renders claim 13 of the '272 patent obvious.

Exhibit 45
Page 000769

### a. Several Reasons Existed in the Art to Combine Gabor & Hill and the Gabor Article

43.     Several reasons also existed in the prior art to combine the teachings of Gabor & Hill and the Gabor Article.  As noted above in the discussion of Picture Coding, there were design and market needs in the prior art to develop better coding systems and the combination of known techniques, which was a typical and accepted practice, was a common way to develop such systems.

44.     Moreover, the fact that both of these references have a common author would have suggested their combination to those skilled in the art, since it would be natural for a particular scientist to publish modifications and enhancements to his earlier work.  Indeed, the fact that Dr. Gabor was a renowned, Nobel Prize-winning scientist working in this field would be a further reason to gather and combine all his works on the subject in order to get the full benefit of the thinking of a man who had been honored in such a way.

45.     Further, Gabor & Hill credits Gabor with the initial description of contour interpolation, stating "[i]t was with this application in view that one of the authors (D. G.)[21] proposed transmitting only one field out of two, and constructing the missing interlaced field by a method called 'contour interpolation', which is superior both to repetition and 'linear interpolation'."  *See* Gabor & Hill at 305.  This is yet another reason to combine the Gabor Article with Gabor & Hill.

### b. The Combination of Gabor & Hill and the Gabor Article Satisfies Every Limitation of Claim 13 of the '272 Patent Even Under MPT's View of The Claim and The Evidence

46.     As set forth in my previous report, it is my opinion that the Gabor Article independently discloses, explicitly or inherently, every element required by claim 13 of the '272 patent.  *See* March 31, 2006 Expert Report at ¶¶ 43-49.  Prof. Girod has admitted that all of the relevant teachings of Gabor & Hill are also found within the Gabor Article.  May 12, 2006 Girod Report at 19.  I agree, and my discussion above with regard to Gabor & Hill applies equally to the Gabor Article.  It is my opinion that Gabor & Hill and the Gabor Article, taken individually or together, satisfy every limitation of claim 13, rendering that claim invalid as obvious.

Exhibit 45
Page 000770

**3.     Gabor & Hill and the Hill Thesis**

47.     The combination of Gabor & Hill and the thesis *Television Bandwidth Compression by Interpolation* by Peter C. J. Hill ("Hill Thesis") (*e.g.*, MSLT_0959127-MSLT_0959392), which was made available through the Imperial College of London as early as 1960, also renders claim 13 of the '272 patent obvious.

**a.     Several Reasons Existed in the Art to Combine Gabor & Hill and The Hill Thesis**

48.     Several reasons also existed in the prior art to combine the teachings of Gabor & Hill and the Hill Thesis.  As noted above in the discussion of Picture Coding, there were design and market needs in the prior art to develop better coding systems, and the combination of known techniques, which was a typical and accepted practice, was a common way to develop such systems.

49.     Also as noted above, the fact that both of these references have a common author would have suggested their combination to those of skill in the art, since it would be natural for a particular scientist to publish modifications and enhancements to his earlier work.

50.     The Hill Thesis was prepared by P. C. J. Hill and supervised by Dr. Gabor, the authors of Gabor & Hill.  Further, the Hill Thesis and Gabor & Hill relate to identical subject matter.  Additionally, the Hill Thesis and Gabor & Hill both reference Television Compression by Contour Interpolation, by Dr. Gabor.  *See* Hill Thesis at 17.  Therefore, one of skill in the art had several reasons to combine the teachings of the Hill Thesis with Gabor & Hill and/or Gabor.

**b.     The Combination of Gabor & Hill and The Hill Thesis Satisfies Every Limitation of Claim 13 of the '272 Patent Even Under MPT's View of The Claim and The Evidence**

51.     As set forth in my previous report, it is my opinion that the Hill Thesis independently discloses, explicitly or inherently, every element required by claim 13 of the '272 patent.  *See* March 31, 2006 Expert Report at ¶¶ 50-59.  Prof. Girod has taken the position that the Hill Thesis does not anticipate claim 13 of the '272 patent for the same reasons that Prof. Girod argues that claim 13 is not anticipated by Gabor & Hill.  I disagree, and my discussion above with regard to Gabor & Hill applies equally to the Hill Thesis.  It is my opinion that the combination of

Exhibit 45
Page 000771

16                          Case No. 02-CV-2060 B (CAB)

Gabor & Hill and the Hill Thesis satisfies every limitation of claim 13, rendering that claim invalid as obvious.

### 4.     Limb & Pease and Picture Coding

52.     The combination of the article *A Simple Interframe Coder for Video Telephony* by J. O. Limb and R. F. W. Pease ("Limb & Pease") with Picture Coding also renders claim 13 of the '272 patent invalid as obvious.

#### a.     Several Reasons Existed in the Art to Combine Limb & Pease and Picture Coding

53.     As noted above in the discussion of Picture Coding, there were design and market needs in the prior art to develop better coding systems and the combination of known techniques, which was a typical and accepted practice, was a common way to develop such systems.

54.     John O. Limb is an author of both Limb & Pease and also of Picture Coding. As noted above, the fact that both of these references have a common author would have suggested to the those of skill in the art that they should be combined, since it would be natural for a particular scientist to publish modifications and enhancements to his earlier work.

55.     Further, both articles describe image and video signal coding methods for use in video telephone systems. Additionally, both Limb & Pease and Picture Coding reference the article *Television Coding Using Two-Dimensional Spatial Prediction* by D. J. Connor, R. F. W. Pease, and W. G. Scholes, Bell Syst. Tech. J., vol. 50, pp. 1049-1061, Mar. 1971 (*e.g.*, MSLT_0232570-MSLT_0232582). Therefore, based on the commonality between these references and the knowledge of one of ordinary skill in the art, it is my opinion there were numerous reasons for one of skill in the art to combine Limb & Pease with Picture Coding.

#### b.     The Combination of Limb & Pease and Picture Coding Satisfies Every Limitation of Claim 13 of the '272 Patent Even Under MPT's View of The Claim and The Evidence

56.     Picture Coding discloses developing an estimate of the displacement of objects in the picture with respect to related and/or corresponding locations. For example, Picture Coding indicates that predictive frame-to-frame coding can be implemented such that the

Exhibit 45
Page 000772

1    movement objects can be accounted for if an estimate of their translation is available.  *See* Picture

2    Coding at 382.  Picture Coding identifies this type of coding approach as motion compensated

3    prediction.  *Id*. at 382-383.  Further, Picture Coding suggests that "[o]ne set of techniques

4    developed by Limb and Murphy [100], and Rocca [101] obtain an estimate of translation in a

5    block of pels, whereas techniques developed by Netravali et al. [102], [103], [104], recursively

6    adjust the translational estimate at every pel or at every small block of pels."  *Id*. at 383.  Thus,

7    Picture Coding discloses several methods for determining an estimate of the displacement of

8    objects in a picture, including the recursive technique disclosed in the '272 patent.  As the

9    quotation from Picture Coding makes clear, the recursive technique was well-known in the prior

10   art.  Indeed, the '272 patent cites to Netravali's own earlier patent, U.S. Patent No. 4,218,703, for

11   "[f]urther details concerning the recursive displacement estimation technique described herein."

12   '272 patent, col. 4:60-63.  In my opinion, the displacement estimation techniques disclosed in

13   Picture Coding could be used in combination with the interpolation techniques taught by Limb &

14   Pease.  Therefore, claim 13 of the '272 patent is also rendered obvious by the combination of

15   Limb & Pease and Picture Coding.

16                **5.    Summary**

17        57.    Accordingly, based on all of the above, I conclude that claim 13 of the '272

18   patent is invalid for obviousness.

19        **E.    Invalidity of the '226 Patent**

20        58.    Based on the information I have considered, it is my opinion that claim 12 of the

21   '226 patent is invalid as anticipated and obvious in view of certain prior art.  In my previous

22   report I set forth my anticipation analysis regarding claim 12 of the '226 patent.  I continue to

23   believe that claim 12 of the '226 patent is invalid as anticipated, and I incorporate my anticipation

24   analysis from that report here.  In this report I will address issues regarding the obviousness of

25   claim 12 of the '226 patent raised by MPT.

26        59.    In my opinion certain references in the prior art to the '226 patent can be

27   considered "baseline" references.  Such baseline references teach the coding concepts of motion

28   compensated forward prediction, prediction error, and motion compensated temporal

Exhibit 45
Page 000773                                  18                    Case No. 02-CV-2060 B (CAB)

interpolation. Other prior art references teach the use of temporal interpolation deviation codes, *e.g.*, interpolation error. Those in the art would have been motivated to combine the references from these two sets because interpolation error was a known solution to the problem of visual artifacts in temporally interpolated frames.

60.     In this report I will address issues regarding the obviousness of claim 12 of the '226 patent.

### 1.     Bidirectional Prediction is an Obvious Variation of Unidirectional Prediction

61.     The concept of using motion compensated prediction and DCT error coding was well known by one skilled in the art prior to the filing of the '226 patent for increasing the coding efficiency in video coding. *See, e.g.* H.261 Document #78 (MSLT_0625858-MSLT_0625869).[1] This method is done in "one temporal direction" in that one "predicts" a future frame from a past frame and then codes the difference. *Id.* Prediction involves motion estimation, the computation of motion vectors, and the DCT coding of the prediction error. *Id.*. This method is known as forward prediction. Indeed, in the Background of the Haskell patent, the inventors admit that motion compensated prediction and the DCT coding of prediction error are well-known in the prior art. '226 Patent, Cols. 1-2.

62.     A person of ordinary skill in the art would know that these techniques could be used in either temporal direction. A person of ordinary skill in the art could do "backward" prediction where one predicts a past frame from a future frame. "Backward prediction" would require the exact same techniques and structures used for forward prediction. One skilled in art could combine both directions and do bi-directional prediction, *i.e.* both forward and backward prediction, and average the results. This is identical to motion compensated interpolation as described as the invention in the '226 patent.

---

[1] *See* Hinman '350 patent (MSLT_0044219-MSLT_0044237), col. 7, lines 2-6; Ericsson '810 patent (MSLT_0042584-MSLT_0042598), col. 7, lines 40-47 and col. 10, lines 14-16 ; Steffan Ericsson, "Fixed and Adaptive Predictors for Hybrid Predictive/Transform Coding," IEEE Transactions on Communications, Vol. COM-33, No. 12, December 1985, 1291, 1293 (MSLT_0040200-MSLT_0040212); Arun N. Netravali & Barry G. Haskell, *Digital Pictures: Representation and Compression* 400 (1988) (MSLT_0039291-MSLT_0039893); U.S. Patent

Exhibit 45
Page 000774                                        19                    Case No. 02-CV-2060 B (CAB)

63.    Moreover, the Background of the Invention section of the '226 Patent describes how averaging the motion-compensated pixels from forward and backward frames was suggested by the prior art. '226 Patent, col. 2, ll. 18-29. And bidirectional prediction was also known at the time, *see*, *e.g.*, Ericsson '914 patent (MSLT_0639600-MSLT_0639642), col. 8, line 60 - col. 9, line 5 and col. 11, lines 6-27, as was the advantage to be gained from employing bidirectional prediction error such as interpolation error. H.261 Document #81, H.261 Document #103R, Ericsson '914 patent, col. 11, lines 46-48. [2]

64.    Claim 12 is therefore simply a combination of these well-known, prior art techniques, used in the same manner in which they were used by the prior art to achieve predictable results.

## 2.    The Functions and Structures Used in Claim 12 Were Well Known in the Art

65.    It is useful to think of most video codecs as being a collection of several different coding functions or techniques. At the time the '226 patent was filed, persons of ordinary skill in the art frequently discussed and presented codec ideas in terms of what collection of coding techniques were employed. Such techniques included such things as: transform coding, motion compensated prediction, variable length coding, quantizing, etc.

66.    In general, codec ideas were often not presented or described in conjunction with details on how to implement the proposed techniques. Instead, codecs were frequently described with high-level block diagrams and flow charts that set forth the functional blocks and coding techniques employed by the codec. At the time the '226 patent was filed, it was relatively uncommon to provide actual circuit diagrams (as opposed to block diagrams) or source code

---

No. 4,833,535 (MSLT_0044413-MSLT_0044442) to Ozeki, et al., at col. 8, lines 7-9; col. 13, line 60 - col. 14, line 2.

[2] *See also* N K Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality Television Pictures," Second Int'l Conference on Image Processing and Its Applications, Vol. 265, 24-26 June 1986, 242, 243-245 (DELL 318140-318147); Yoshiyuki Yashima & Katsutoshi Sawada, "A Highly Efficient Coding Method for HDTV Signals," Proceedings of the IEEE, Vol. 1, June 8, 1987, 0125, 0126(MSLT_0239770-MSLT_0239776); U.S. Patent No. 4,858,005 to Lodge at col. 4, line 41 - col. 5, line 2; col. 9, line 61 - col. 10, line 5; and col. 11, line 65 - col. 12, line 2 (MSLT_0041957-MSLT_0041971); Masayuki Tanimoto, "A Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Transactions of the IEICE, Vol. E.70, No. 7,

Exhibit 45
Page 000775                                    20                    Case No. 02-CV-2060 B (CAB)

1    when presenting codec ideas to other researchers in the video coding community.  There were

2    several reasons for this.

3           67.     First, by the time the '226 patent was filed, codecs were frequently implemented

4    in software.  Since the mathematics and programming techniques needed to program the various

5    coding techniques and functions were well known, researchers did not typically include source

6    code or programming details for how to implement their codec ideas.  Second, in the case of

7    codecs implemented in hardware, the circuitry needed to perform most coding techniques was

8    well known and readily available.  Thus, most researchers would not provide circuit diagrams

9    when describing their proposed codecs or research.

10          68.     The '226 patent itself is a good example of this.  In particular, Figures 1 and 2

11    would have been understood by those of ordinary skill in the art to be essentially functional block

12    diagrams.  The functions and coding techniques exemplified by each block in the figures, and

13    described in the written description, would be implemented in software or by hardware circuitry

14    in accordance with well known programming techniques or available circuitry.  For this reason,

15    the inventors of the '226 patent did not provide a source code listings or detailed circuit diagrams.

16    In other words, Haskell intended that people of ordinary skill in the art would understand his

17    disclosure based largely on a functional block diagram.

18          69.     Additionally, at the time of the filing of the '226 patent, researchers in the field

19    of video coding often described only the encoder portion of their proposed codecs.  The reason

20    for this was that the encoder was frequently a superset of the decoder and it was understood that

21    the decoder would include mirror image components that would inverse the functions performed

22    by the encoder.  Thus, by describing the encoder, the architecture of the decoder would also be

23    inherently understood.  For instance, if the encoder performed motion estimation and generated

24    interframe motion vectors, then the decoder would have been understood to include a circuit or

25    software code that would perform motion compensation.  Similarly, if the encoder used a

26    subtractor to generate prediction or interpolation error, it would have been understood that the

27    decoder would include an adder circuit or software code.  Additionally, if an encoder was

28

July 1987, 611, 611-12 (MSLT_0004955-MSLT_0004957); Ericsson '810 patent, col. 7, lines

Exhibit 45
Page 000776

described as using a discrete cosine transform on blocks of pels or blocks of error signal, it would have been understood that the decoder would have included software code or circuitry to perform the inverse DCT operation on the pel data. Further, if the encoder was described as using a "coder" circuit or software code, then one of ordinary skill would have appreciated that the decoder must possess a "decoder" circuit or software code for performing the inverse operation. The '226 patent itself recognizes the mirror-image nature of encoders and decoders. See '226 patent at 4:63-5:10.

70. Below, I set forth the various coding techniques included within claim 12 under the court's claim construction and provide my opinion as to the existence of these techniques, and the structures that implement then, in the prior art.

### 3. Motion-Compensated Prediction

71. Claim 12 includes the limitation "means for developing block approximations from said codes that describe deviations from said codes that describe deviations from approximated blocks." The court has identified corresponding structure that includes Shift Circuit 26. Notably, the claimed function of this limitation and the identification of Shift Circuit 26 are indicative of a coding technique known in the art as motion compensated prediction. This technique uses motion vectors computed by an encoder to shift blocks of pels from a preceding frame in order to generate an estimate of a succeeding frame.

72. Motion compensated prediction was well-known in the art long before the filing of the '226 patent. As I have opined previously, this technique is described by the Hinman '422 patent (MSLT_0041642-MSLT_0041659) and Furukawa '756 patent (LUC1053535-LUC1053550). It is also described by the book Digital Pictures in figures 6.6.7 and 6.6.10, as well as in by the other PictureTel patents. I note that the '226 patent itself acknowledges that motion compensated prediction was in the prior art when it describes "conventional motion compensated predictive coding" in the patent's Background of the Invention section. '226 Patent at 1:21-45.

33-40; col. 12, lines 8-13; and col. 13, lines 11-13.

Exhibit 45
Page 000777

73.     The corresponding structure identified by the Court for this limitation includes Shift Circuit 26 and col. 4 lines 3-10, wherein the Shift Circuit uses a motion vector to translationally shift a block of pels from the present frame in order to generate a prediction of the next frame.   At the time of the filing of the '226 patent, it was well known how to implement motion compensated prediction using either computer code or hardware circuitry.  I note that several prior art patents refer to the use of "shift" circuit or means to translate pels from one frame to another using a motion vector.  *See* U.S. Patent No. 4,307,420 (MSLT_0043619-MSLT_0043655) at Figs. 11, 14, 8:35-60, 9:10-33.  *See also* U.S. Patent Nos. 4,837,632 (GW-LT 262189-GW-LT 262235) at FIG. 28, 30:9-38; 4,862,267 at FIGS. 2-3, 9:42-10:66 (MSLT_0241739-MSLT_0241761); 5,161,001 (GW-LT 262287-GW-LT 262295) at FIG. 5, 6:50-63; 5,027,206 (GW-LT 262279-GW-LT 262286) at FIG. 2, 4:44-62, 6:66-7:10.  However, because it was so well known that shift circuits and their equivalents could be used to translate blocks of pels from one frame to another using a motion vector, express reference to them was often omitted.  Instead, their presence was implied when the codec described the use of "motion compensation" or "motion estimation."  *See, e.g.*, U.S. Patent No. 4,821,119  (MSLT_0041879-MSLT_0041892) at FIG. 3, 5:3-31   (describing use of "Interframe Predictor With Motion Compensation" to generate a motion vector to indicate the "shift" in position of a block of pels between frames).

### 4.     Prediction Error

74.     Once a predicted frame is generated at the decoder utilizing the technique of motion compensated prediction, an error signal is often added to the prediction in order to make the final frame match the original frame more closely.  At the encoder, this error signal is generated by taking the motion compensated prediction of the next frame and subtracting it from the original frame in a subtractor in order to generate a difference or error signal.  At the decoder, this prediction error signal is necessarily added to the predicted frame using an adder circuit in order to make the final prediction for the succeeding frame.  The use of prediction error was well known in the prior art and is described in both the Hinman '422 patent (and the other PictureTel

Exhibit 45
Page 000778

23                    Case No. 02-CV-2060 B (CAB)

1  patents) and Furukawa '756 patents. This is also acknowledged by the '226 patent itself at 1:46-

2  56.

3       75.     As part of the corresponding structure, the court identified Adder 27, which is

4  the structure responsible for applying the prediction error to the motion compensated frame. The

5  use of an adder structure or software routine was well known to those of ordinary skill in the art

6  for the purpose of adding prediction error to a frame at a video decoder. For instance, such an

7  adder is shown in figure 6.6.10 of Digital Pictures, wherein the error signal is generated by the

8  subtractor in the encoder of figure 6.6.7. Other prior art shows encoders with a subtractor for

9  generating a prediction error signal. One of ordinary skill in the art would have readily

10  appreciated that a corresponding decoder would include an adder circuit for applying this error

11  signal to the block approximations. See, e.g., U.S. Patent No. 4,821,119 at Fig 3 (showing

12  subtractor 307 for generating prediction error).

13       **5.     DCT of Prediction Error**

14       76.     In order to achieve even greater compression efficiency, it was common in the

15  prior art to combine motion compensated prediction and prediction error with transform coding, a

16  technique known as "hybrid coding." With hybrid coding, the error signal for a block of pels was

17  frequently transformed into a matrix of coefficients using a discrete cosine transform (DCT).

18  Again, the '226 patent acknowledges that this technique was "typical" in the prior art. *See* '226

19  patent at 1:56-58 ("Coding of this difference is typically performed by means of the 'Discrete

20  Cosine Transform' (DCT).").

21       77.     In its claim construction, the court identified corresponding structure DCT$^{-1}$ 24,

22  which is the structure responsible for undoing the DCT process and changing the DCT

23  coefficients at the decoder back into intensity differences that can be added to the predicted

24  frame. The use of a circuit or software for performing inverse DCT operations was well known at

25  the time. Indeed, the routines for doing such transforms were known since the 1970's. Like the

26  '226 patent itself, several prior art references depict the use of such a transform such as block 24.

27  *See* Digital Pictures at p. 538 ("DCT") and Figure 6.6.10 ("T-1"). *See also* U.S. Patent No.

28  4,821,119 at FIG. 3, 311, 5:57-60 ("A two-dimensional transformer 311, such as a discrete cosine

Exhibit 45
Page 000779

1   transformer well known in the art, transforms each 4x4 block into a 4x4 block of transform

2   coefficients."); '422 at FIG. 2 (Lossy Compressor 46), 5:59-65, 6:32-56.

3                    **6.    Decoding of Prediction Error**

4        78.    After the pels of an error signal have been transformed at the encoder, the digital

5   data representing the signal must sometimes go through some additional formatting or processing

6   before they are output onto the transmission channel.  This additional "coding" may simply be to

7   format the signal into the proper syntax or may include the use of additional compression

8   techniques.  For instance two additional compression techniques that was widely used in the prior

9   art are known as variable length coding and run length coding.

10       79.    For the '226 patent, the court has identified a corresponding structure that

11  includes Decoder 22.  The '226 patent, however is silent as to what the exact purpose of this

12  decoder is.  Nevertheless, decoder circuits for performing inverse run length coding and variable

13  length coding were well known in the art and in my opinion plainly teach this structure. *See, e.g.*,

14  Digital Pictures at 6.6.10 ("VL Decode"); U.S. Patent No. 4,821,119 at FIG. 3, 7:45-47 (decoder

15  uses "entropy decoder" to reverse entropy coder 315).

16                   **7.    Motion Compensated Interpolation**

17       80.    The second limitation of claim 12 reads "means responsive to said block

18  approximations and to said codes that describe deviations from interpolated blocks to develop

19  said interpolated blocks."  In my opinion, this limitation includes the coding technique frequently

20  referred to in the art as motion-compensated interpolation.  Like motion-compensated prediction,

21  motion compensated interpolation uses motion vectors to translate pels from one frame to

22  another.  There are two principal differences.  First, interpolation also translates pels from a future

23  frame into the current frame, not just from the previous frame into the current frame.  Thus, two

24  Shift Circuits or their equivalents are required, one for the preceding frame and one for the

25  succeeding frame.  Second, interpolation requires the use of an averager in order to make sure

26  that the pels of the interpolated frame have the same intensities as the pels in the preceding and

27  succeeding frames.  Indeed, the term "interpolation" itself implies an averaging process.

28

Exhibit 45
Page 000780                              25                    Case No. 02-CV-2060 B (CAB)

81.    The concept of motion-compensated interpolation was well known in the prior art and has been described by me previously with respect to the Hinman '422 and, Furukawa '756 patents, H.261 documents, and Micke thesis.  Once again, the '226 patent itself acknowledges that motion-compensated interpolation was a technique that was already known in the art.  '226 patent at 2:18-29.

82.    As corresponding structure, the court identified Shift Circuits 31 and 39 as well as Averager 32.  As discussed above it was well known that shift circuits could be used to translate pels from one frame to another.  Further, one of ordinary skill in the art would have readily appreciated that it would take two such circuits for a codec employing motion compensated interpolation – one for the preceding frame and one for the succeeding frame.  In addition, one of ordinary skill in the art would have appreciated that a decoder implementing frame interpolation would need to have used an averager such as Averager 32 in order to normalize the pel intensity values for the interpolated frame.  Otherwise, the interpolated frames would be much brighter than the surrounding frames.  Indeed temporal frame averagers are expressly described in prior art references such as: U.S. Pat. No. 3,736,373 (MSLT_0233823-MSLT_0233834) at FIG. 2, 258, 12:56-61.

83.    Because of the knowledge and understanding on the part of those of ordinary skill in the art, most prior art references do not specifically depict the use of two shift circuits and an averager.  Because these structures are implied, the prior art often simply uses a box in a block diagram entitled "Interpolator."  *See, e.g.*, Hinman '422 ("Frame Interpolator 88"); Furukawa '756 ("Interpolator 41"); Koga '011 ("Interpolator 106") (MSLT_0241074-MSLT_0241080); H.261 Doc. No. 81 ("Motion Interpolative Prediction") (MSLT_0625891-MSLT_0625894); H.261 Doc. No. 22 ("Motion compensated interpolative prediction") (MSLT_0625465-MSLT_0625469); H.261 Doc. No. 43 ("Motion-compensated interpolative predictor") (MSLT_0625571-MSLT_0625585).

### 8.    Interpolation Error

84.    In my opinion, the second limitation of claim 12 also includes the concept of what is commonly referred to as "interpolation error."  Further, it is my opinion that the addition

Exhibit 45
Page 000781

1  of interpolation error appears to be the feature that the inventors of the '226 patent believed to be

2  novel. *See* '226 patent at 2:25-54.

3          85.      As in the case of unidirectional forward prediction, errors can arise when pels

4  are bidirectionally interpolated. Such errors occur when the interpolated pels fail to accurately

5  reproduce the color and intensity of the corresponding pels in the original image. These errors in

6  the interpolated pels can objectively result in a lower signal-to-noise ratio and subjectively

7  manifest themselves as visible artifacts. As explained earlier, it was known in the art to compute

8  and transmit a prediction error signal that could be added to the predicted frame at the decoder so

9  as to improve the quality of the image. For this same reason, it was also known in the art that

10  errors resulting from interframe interpolation could also be minimized by transmitting an

11  interpolation error signal. Pertinent references are discussed elsewhere in my report and include:

12  U.S. Patent Nos. 3,736,373, 4,202,011, 4,979,020, 4,858,005; H.261 Doc. Nos. 22, 43, and 81,

13  and the Micke thesis.

14          86.      The court's corresponding structure included an Adder 35 for adding the

15  interpolation error signal to the estimate for the interpolated frame. As in the case of prediction

16  error, those of ordinary skill in the art would have known that a decoder utilizing the coding

17  technique of interpolation error would have necessarily possessed an adder circuit or equivalent

18  for combining the interpolation error with the estimated interpolated frame. Such circuits are

19  expressly shown in U.S. Patent No. 3,736,373 at FIG. 2, 258, 13:3-12. Adder circuits are also

20  clearly implied by descriptions of encoders that use a subtractor at the encoder to generate the

21  interpolation error signal. *See, e.g.*, Koga '011 at FIG. 3, 107.

22          **9.      DCT of Interpolation Error**

23          87.      The court's corresponding structure includes the $DCT^{-1}$ 34, which is used to

24  perform an inverse DCT operation on the interpolation error so that it can then be added to the

25  estimated interpolated frame. Interpolation error benefits from the additional compression

26  afforded by DCT in the same manner as prediction error. Further, prediction error and

27  interpolation error are treated the same way both mathematically and conceptually. Thus, to the

28  extent that one of ordinary skill were designing a codec that employs the technique of

Exhibit 45
Page 000782                                    27                          Case No. 02-CV-2060 B (CAB)

1    interpolation error, he would have also been motivated to DCT this interpolation error for the

2    same reasons it was known to be desirable to DCT the prediction error. As set forth above,

3    numerous prior art references teach that prediction error should undergo DCT.  Thus, one of

4    ordinary skill in the art designing a codec utilizing interpolation error would have been motivated

5    to include an inverse DCT circuit or software routine equivalent to DCT$^{-1}$ 34.

### 10.    Decoding of Interpolation Error

7        88.        The court's corresponding structure included Decoder 25, which decodes the

8    incoming interpolation error signal.  As stated above, the '226 patent is vague regarding the

9    purpose of this decoder.  It was known before the filing of the '226 patent that an encoder may in

10   its final coding stages employ run length coding or variable length coding as well as perform

11   formatting operations on the data before transmission.  Any of these could be considered

12   "coding" operations that would require a Decoder 25 at the receiver.  As in the case of DCT, if a

13   codec design was going to employ run length coding or variable length coding for the prediction

14   error, then the codec designer would also be motivated to provide this same coding for the

15   interpolation error.  Once again, the interpolation error would benefit in the same manner as the

16   prediction error and would be handled in the same way. Because the prior art clearly discloses the

17   use of such coding of prediction error, one of ordinary skill would have been motivated to include

18   a similar decoder for the interpolation error.  I note that several references expressly teach the use

19   of a coding unit at the encoder for interpolation error and thus necessarily teach the use of a

20   corresponding decoder for the interpolation error (*i.e.*, a Decoder 25) at the receiver. *See, e.g.*,

21   H.261 Doc. No. 81 ("Coding Unit"); H.261 Doc. No. 22 ("Entropy coding").

### 11.    Summary

23       89.        As set forth above, all the various coding techniques covered by claim 12 were

24   well known in the prior art prior to the filing of the patent application for the '226 patent.  Those

25   of ordinary skill in the art also were well aware of how to implement each of these coding

26   techniques.  Further, the particular corresponding structures identified by the court for

27   implementing each of these coding techniques also were well-known (*i.e.*, adders, decoders,

28   DCT-1, shift circuits, averagers)  Notably, all of these structures are old and familiar elements in

Exhibit 45
Page 000783                                    28                    Case No. 02-CV-2060 B (CAB)

1   the art and were combinable to perform the coding techniques of claim 12 in a manner that

2   required no change in their respective functions.  The operation of these structures to perform the

3   claimed functions would have yielded no more than predictable results.

4         90.        Moreover, as explained in my report it was simply the happenstance of new

5   design incentives and market forces that blossomed in the late 1980's that created the

6   circumstances under which the alleged invention materialized.  In particular, the advent of CD-

7   ROM applications created an incentive to generate video coders that operated at 1-1.5 Mbps.

8   Offering a significantly higher data rate than the approximately 64 kbps available to video

9   teleconferencing applications, there existed enough data to efficiently utilize interpolation error to

10  generate high quality video at this new target data rate.  Since interpolation error and the

11  structures needed to implement it were already conceptually well known in the art, it required no

12  inventiveness to simply add it to motion compensated interpolation coders that were also well

13  known, and were known to be improved by the use of interpolation error.  Indeed, as set forth in

14  more detail elsewhere in my report, numerous investigators independently developed coders

15  covered by claim 12 at nearly the same time as Haskell and Puri.  This suggests that there was

16  already a known solution to the problem of achieving high quality video at 1-1.5 Mbps, and this

17  known solution (*i.e.*, interpolation error combined with motion compensated predictive and

18  interpolative coding) was immediately employed by many investigators as soon as the market

19  targeted the problem of achieving high quality video with a CD ROM.

20        **A.    It Was Known In The Art To Combine Motion Compensated Forward**
              **Prediction, Prediction Error, and Motion Compensated Temporal**
21            **Interpolation**

22        91.        As I stated in my previous report, it was known in the prior art of the '226

23  patent to combine the coding techniques of motion compensated prediction, prediction error,

24  motion compensated temporal interpolation and interpolation error.  March 31, 2006 Expert

25  Report at ¶¶ 45-90.  The prior art includes several references that disclose the use of such

26  techniques in various combinations, as well as structures for carrying out those techniques.  Such

27  references include U.S. Patent No. 4,575,756 to Furukawa  ("'756 patent") and U.S. Patent No.

28  4,727,422 to Hinman ("'422 patent"), submissions to the CCITT Specialist Group submissions

Exhibit 45
Page 000784                                29                    Case No. 02-CV-2060 B (CAB)

1  (H.261), Lodge, etc.  These references include the same structures as the '226 patent, or at least

2  structures that are only slightly – insubstantially – different.  A full analysis of the relevant prior

3  art is presented in my previous report.

### 1.    The H.261 Submissions

5      92.      The H.261 submissions were presented at a series of meetings starting around

6  1995 and disclose techniques for coding video.  The H.261 submissions demonstrate that all of

7  the coding techniques and structures disclosed in the '226 patent and claimed in claim 12 were

8  known to persons of ordinary skill in the art long before the '226 patent was filed.  Further, claim

9  12 of the '226 patent simply rearranges the elements and techniques disclosed by the H.261

10  submissions with each technique performing the same function it had been known to perform and

11  with the system of techniques yielding unsurprising results.

12      93.      Numerous H.261 documents disclose the techniques claimed by claim 12.  For

13  example,  H.261 Document #22 is entitled, "Investigation of Basic Coding Algorithm for the

14  Standard 384 kbit/s Codec" and was submitted in April of 1985.  As discussed in my previous

15  report, Document #22 discloses each and every technique in claim 12.  *See* March 31, 2006

16  Expert Report at 59- 62.  H.261 Document #43 is entitled, Candidates for Subrate Coding

17  Algorithm, and was submitted in September of 1985.  As discussed in my previous report,

18  Document #43 discloses each and every technique and structure in claim 12.  *See* March 31, 2006

19  Expert Report at 63- 68.  H.261 Document #60 (MSLT_0625730-MSLT_0625735) is entitled,

20  "Generic Structure of 384 x nkibts/s Codec,"  and was submitted in January of 1985.  Document

21  #60 describes the block based techniques used in several other documents.  *See* March 31, 2006

22  Expert Report at 68-69.  Document #78 (MSLT_0625858-MSLT_0625869) is entitled "A

23  Proposal for Generic Structure of n x 384 kbits/s Codec." Document #81 is entitled "Comments

24  on Conditional Motion Compensated Frame Interpolation.  Both were presented at the same

25  meeting in March of 1986.  Document #81 discloses each and every element of claim 12 and,

26  together with Document #78 also render claim 12 obvious.  *See* March 31, 2006 Expert Report at

27  46-58.  Document #103R (MSLT_0626009-MSLT_0626045) is entitled "Report of the Fifth

28  Meeting in Tokyo (March 25-28, 1986)."  Document #103R summarizes the March 1986

Exhibit 45
Page 000785                                      30                    Case No. 02-CV-2060 B (CAB)

meeting where Document #78 and #81 were presented, provides important details regarding the algorithms and techniques presented with those documents, and links them together. *See* March 31, 2006 Expert report at 69-71.

> a.     **Several Reasons Existed in the Art to Combine The H.261 Submissions**

94.     Several reasons existed in the prior art to combine the H.261 documents.  To begin, they were all submissions to the body developing the H.261 standard.  The submissions I referenced cover only 100 submissions and were introduced within roughly the first year of the collaboration.  Moreover, as discussed in my previous report, some of the documents internally reference each other and create explicit and inherent combinations.  *See* March 31, 2006 Expert Report at ¶¶ 45-71 and ¶ 154.  Several of the documents were presented at the same meeting.  *Id.* at ¶ 150.  These combinations satisfy the more stringent requirement of showing a teaching, suggestion, or motivation to combine and thus would have been obvious to a person of ordinary skill in the art to combine.

95.     The H.261 documents as a collection would have been obvious to combine. Another  reason to combine comes from the purpose of the H.261 group – to create better video compression.  Thus any combination of known compression techniques that leads to better video compressions would have been obvious to try.   The nature of the standards development process itself creates a motivation to combine the H.261 documents because each document was not intended by the submitter or understood by the standards body to be a stand alone reference. Rather, the collection of documents were intended to describe the entirety of the system. *See, e.g.,* Ex. A to Prof. Girod's May 12, 2006 Expert Report at 140, S . Okubo, "Reference Model Methodology - A Tool for the Collaborative Creation of Video Coding Standards" ("Development of a new video coding standard can generally be separated into three phases; "divergence," "convergence," and "verification/optimization.").

96.     Starting with Document #22, which lists all of the elemental video compression techniques used in claim 12, and following through the rest of the H.261 documents, various combinations of those techniques are proposed, tested, and demonstrated to the H.261 members.

Exhibit 45
Page 000786

1   There were design and market needs in the prior art to develop better coding systems and the

2   combination of known techniques, which was a typical and accepted practice, was a common way

3   to develop such systems.  The H.261 documents demonstrate this pattern of combining known

4   techniques.

5        97.      Also, several of these references have a common set of authors.  NTT, KDD,

6   NEC, and Fujitsu were the source of many of these documents.  Thus a person of ordinary skill in

7   the art, examining these references would look to combine them since it would be natural for a

8   particular scientist or company to publish modifications and enhancements to his earlier work.

9            **b.      The Combination of The H.261 Submissions Satisfies Every
             Limitation of Claim 12 of the '226 Patent Even Under MPT's
10           View of The Claim and The Evidence**

11

12       98.      The H.261 documents depict the video compression techniques that a person of

13  ordinary skill in the art would be aware of as early as 1985.  The H.261 documents were targeted

14  to an audience with a basic understanding of video compression coming from various continents,

15  companies, and educational backgrounds.  Thus, a person of ordinary skill in the art would have a

16  basic understanding of block-based processing, motion estimation, motion compensation, DCT

17  coding of error, shift circuits, prediction, and interpolation.  *See, e.g.,* Document #22.

18       99.      Document #22 was presented as a starting point of "elemental technologies" that

19  would provide the building blocks for the H.261 encoder and decoder.  *See, e.g.* Document #22.

20  These elemental technologies included: DCTs, Inter-frame prediction, motion compensated

21  prediction, motion compensated interpolative prediction, entropy coding, and DCT coding of

22  error.  *See* Document #22.  Subsequent documents and submissions built on these elemental

23  technologies in different configurations to arrive at different codecs.  *See, e.g.,* Document #43,

24  Document #78, and Document #81.  For example, Document #43, teaches

25  "interpolative/extrapolative prediction coding with motion-compensated interframe prediction"

26  and "discrete cosine transform coding with motion-compensated interframe prediction."

27  Document #81 teaches "conditional motion-compensated interpolation" with the transmission of

28  interpolation error.  *See* Document #103R at 11.

Exhibit 45
Page 000787                                    32                    Case No. 02-CV-2060 B (CAB)

1    100.    Thus, the H.261 documents demonstrate that people of ordinary skill were

2    capable of using these elemental technologies in different configurations. And the contributors to

3    H.261 used these elemental technologies like pieces of a puzzle that they fit together. Claim 12

4    of the '226 patent presents a simple variation of these known elemental technologies that was

5    obvious to try for a person of ordinary skill using ordinary creativity and was, in fact, tried by

6    contributors to H.261.

7    101.    I understand that Prof. Girod asserts that I have employed impermissible

8    hindsight in identifying particular parts of the H.261 submissions that satisfy claim 12. It is my

9    understanding, however, that an obviousness analysis does not need to seek out precise teachings

10   directed to the specific subject matter of the challenged claim in order to demonstrate

11   obviousness. Instead, one can take account of inferences and creative steps that a person of

12   ordinary skill in the art might employ. Moreover, the techniques disclosed in the H.261

13   submissions were predicable variations of each other and had been used to improve various

14   coding systems in the past.

15   102.    I also understand Prof. Girod does not believe that these submissions are prior

16   art publications. I have addressed the evidence of publication in my earlier report. March 31,

17   2006 Expert Report at ¶ 104.

18   103.    I also understand that Prof. Girod believes that the H.261 submissions are

19   missing several aspects of the claim, such as operation in a block-wise manner, use of a discrete

20   cosine transform, coding the output of the coder (and decoding the signal at the decoder), and the

21   use of an adder. He is incorrect. Document #103R specifically states that the March 1986

22   meeting agreed on a fixed size block of eight by eight pels. Document #103R at 7. Other H.261

23   submissions demonstrate that block-wise coding was envisioned. *See, e.g.*, Document #78.

24   104.    Similarly, Document #103R states that it was agreed at the same March 1986

25   meeting to, at least provisionally, adopt the use of the DCT. Again, other H.261 Documents

26   confirm that agreement. *See, e.g.*, Documents #78 and 83.

27

28

Exhibit 45
Page 000788

33                                Case No. 02-CV-2060 B (CAB)

105.    As far as the decoder 22, Document #103R also discusses the use of adaptive quantization and adaptive variable length coding schemes, which would necessarily require a coder at the transmitter and a related decoder at the receiver.

106.    Finally, since Document #81 discloses the creation of both prediction error and interpolative error through the usual subtraction of predictions from video information, *see* Figure 1, it would have been obvious to anyone in this art that those errors would be added to the predictions created by the decoder.  Use of an adder, therefore, would have been required and thus obvious.

107.    Additional information concerning how the H.261 submissions satisfy every element of claim 12 is provided in the claim charts attached to this and my previous reports.

## 2.    Micke Thesis

108.    As set forth in my previous report at ¶¶155-181, it is my opinion that every element required by claim 12 of the '226 patent is included, either explicitly or inherently, in the thesis *Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals* by Thomas Micke ("the Micke Thesis").  *See, e.g.*, GW-LT 255132-326; GW-LT 255053-131.  Further, my previous report discussed combining the Micke Thesis with the article *Advances in Picture Coding* by Dr. H. G. Musmann (MSLT_0004911-MSLT_0004936).  March 31, 2006 Expert Report at ¶181.  *Advances in Picture Coding* discloses that use of Discrete Cosine Transform ("DCT") for coding natural pictures.

109.    As discussed above, it was well known in the art to use a DCT to code error, either prediction error or interpolation error, prior to the critical date.  The use of a DCT to code error in the '226 patent is a case of a structure simply performing the same function it has been known to perform.  Likewise, the use of a decoder and adder in the '226 patent was well known in the art prior to the critical date.

110.    Prof. Girod asserts in his rebuttal report that the Micke Thesis is not prior art because the library at the Institute for Theoretical Communications Engineering and Information Processing at the University of Hanover ("TNT") , where a copy of the Micke Thesis was stored, was closed to the public and thus the Micke Thesis was not "publicly available" prior to the

Exhibit 45
Page 000789

34                Case No. 02-CV-2060 B (CAB)

1    critical date. I disagree. As discussed in my March 31, 2006 Expert Report, Dr. Musmann, who

2    is the head of TNT, stated that the library was open to the public. See March 31, 2006 Expert

3    Report at ¶155. Likewise, Mr. Thomas Wehberg, who was responsible for the administration of

4    TNT, including the library, stated that the TNT library was open to the public during the relevant

5    time frame. *See* November 13, 2006 Declaration of Thomas Wehberg (Exhibit K) and August 22,

6    2007 Declaration of Thomas Wehberg (MSLT_1234202 - MSLT_1234204).

### 3.    The PictureTel References

8        111.    In the mid- to late-1980's, PictureTel Corporation was actively working to

9    develop methods and equipment to perform video encoding and decoding. During the course of

10   that development, inventors at PictureTel were awarded a number of patents. *See, e.g.*, U. S.

11   Patent No. 4,816,914 ("the Ericsson '914 patent"); U. S. Patent No. 4,794,455 ("the Ericsson '455

12   patent"); U.S. Patent No. 4,849,810 to Ericsson ("the Ericsson '810 patent"); U.S. Patent No.

13   4,703,350 to Hinman ("the Hinman '350 patent"), U.S. Patent No. 4,727422 to Hinman ("the

14   Hinman '422 patent"); U.S. Patent No. 4,661,849 to Hinman ("the Hinman '849 patent")

15   (MSLT_0241629-MSLT_0241646); and U.S. Patent No. 4,754,492 to Malvar ("the Malvar

16   patent") (MSLT_1234205 - MSLT_1234227). I will refer to these references collectively as "the

17   PictureTel references." It is my opinion that claim 12 of the '226 patent is invalid as obvious in

18   view of the body of work disclosed in these references.

### a.    Several Reasons Existed in the Art to Combine The PictureTel Patents and Digital Video

20       112.    Several reasons existed in the prior art to combine the teachings of the

21   PictureTel references. They all relate to the same subject matter and share many of the same

22   figures and much of the same written description They also include over-lapping inventors and a

23   common assignee. Moreover, the patents include cross-references to one another and incorporate

24   each other by reference.[3]

---

[3] For example, the Ericsson '914 patent incorporates by reference both the Hinman patent and the
Malvar patent. *See* Ericsson '914 patent, col. 1, line 65 - col. 2, line 4; col. 6, lines 31-40.
Similarly, the Hinman '350 patent incorporates by reference the Malvar patent. *See* Hinman
'350 patent, col. 10, lines 59-66.

Exhibit 45
Page 000790

1    113.    For at least these reasons, one of skill in the art would have known that the

2  teachings from any one of the PictureTel patents or the Hinman Thesis could apply to and would

3  be related to the other PictureTel patents, and would have therefore had good reason to combine

4  them.

5

6          **b.     The Combination of The PictureTel References Satisfies Every
                    Limitation of Claim 12 of the '226 Patent Even Under MPT's
7                   View of The Claim and The Evidence**

8    114.    As shown in the attached claim chart (in which I have used the Ericsson '914

9  patent as a primary example), the PictureTel references disclose a system that includes motion

10  compensated prediction with prediction error, motion compensated interpolation and the coding

11  of error codes using the DCT.  Exhibit H, Ericsson '914 Patent; March 31, 2006 Expert Report at

12  pp. 81-85.  Accordingly, as set out in more detail in the attached chart, the PictureTel references

13  render claim 12 of the '226 patent invalid for obviousness.

14    115.    I also note that it was well-known in the prior art that when ***inter***frame

15  interpolation was employed, the interpolation might be inaccurate, therefore causing the

16  interpolation error to be large.  In such situations it was known that side information (*i.e.*, "codes

17  that describe deviations from interpolated blocks") would necessarily have to be transmitted to

18  the receiver.  Indeed, Mr. Haskell's own textbook explicitly makes this point in a section entitled

19  "Motion Adaptive Interpolation":

20          In this as well as other interpolation schemes, since at times the
             interpolation may be in accurate, techniques have been devised
21          where the quality of interpolation is checked at the transmitter, and
             if the interpolation error is larger than a threshold, side information
22          is transmitted to the receiver.  It appears that due to unavoidable
             inaccuracies of the displacement estimator (e.g. complex
23          translational and rotational motion) and the segmentation process,
             such side information would be necessary to reduce artifacts that
24          may otherwise be introduced due to faulty interpolation.

25

26  Digital Pictures at 473.

27    116.    It was well-known and a common practice in the prior art, where interpolation of

28  video signals was employed, to check the quality of the interpolation at the transmitter, and if the

interpolation error was above a threshold, code and transmit the interpolation error to the

Exhibit 45
Page 000791                                  36                    Case No. 02-CV-2060 B (CAB)

1   transmitter. *See, e.g.*, U.S. Patent No. 4,858,005 to Lodge at col. 4, lines 58-63); Picture Coding

2   at 400-01; John O. Limb, et al., "Combining Intraframe and Frame-to-Frame Coding for

3   Television," The Bell System Technical Journal, Vol. 53, No. 6, July-August 1974 at 1137

4   (DELL 315875-893); N K Lodge, "A Hybrid Interpolative and Predictive Code for the Embedded

5   Transmission of Broadcast Quality Television Pictures," Second Int'l Conference on Image

6   Processing and Its Applications, Vol. 265, 24-26 June 19896, 242, 243; Masayuki Tanimoto, "A

7   Hybrid Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding,"

8   Transacations of the IEICE, Vol. E.70, No. 7, July 1987, 611, 611-12.[4]

9       117.    I understand Prof. Girod asserts that at least certain PictureTel patents do not

10  disclose the use of a DCT to encode error, do not perform in a blockwise manner, do not disclose

11  interframe interpolation, and disclose a coder that is different from the one in the '226 patent.

12      118.    First, there is no question that the system described in the PictureTel patents

13  operates in a blockwise manner. See, for example, the Ericsson '914 patent Abstract, which

14  specifically discusses blocks in an image frame.   The PictureTel patents have many such

15  references to coding in a blockwise manner, which was, in any event, a technique well-known at

16  the time.

17      119.    As for the use of the DCT to encode error, again the Ericsson '914 patent

18  expressly states that the lossy compression circuitry 46 used to encode the error "can employ a

19  discrete cosine transform."  Col. 11, lines 46-48.

20      120.    The Ericsson '914 patent, for example, also performs interframe interpolation.  See

21  Fig. 6; col. 8, line 60 - col. 9, line 5; col. 11, lines 6-27.

22

23  ───────────────

[4] Indeed, systems that employ both "codes that describe deviations from approximated blocks"
24  (*e.g.*, prediction error) and "codes that describe deviations from interpolated blocks" (*e.g.*,
    interpolation error) were well-known in the prior art.  *See* N K Lodge, "A Hybrid
25  Interpolative and Predictive Code for the Embedded Transmission of Broadcast Quality
    Television Pictures," Second Int'l Conference on Image Processing and Its Applications, Vol.
26  265, 24-26 June 1986, 242, 243-245; Yoshiyuki Yashima & Katsutoshi Sawada, "A Highly
    Efficient Coding Method for HDTV Signals," Proceedings of the IEEE, Vol. 1, June 8, 1987,
27  0125, 0126; U.S. Patent No. 4,858,005 to Lodge at col. 4, line 41 - col. 5, line 2; col. 9, line
    61 - col. 10, line 5; and col. 11, line 65 - col. 12, line 2; Masayuki Tanimoto, "A Hybrid
28  Scheme of Subsampled DPCM and Interpolative DPCM for the HDTV Coding," Transactions
    of the IEICE, Vol. E.70, No. 7, July 1987, 611, 611-12; Ericsson '810 patent, col. 7, lines 33-
    40; col. 12, lines 8-13; and col. 13, lines 11-13.

Exhibit 45
Page 000792                                                37                       Case No. 02-CV-2060 B (CAB)

121.     As to decoder 22 of the '226 patent, I note that the '226 patent doesn't describe the decoder at all and merely says that related coder at the transmitter is a "bits coder." '226 Patent at col. 4, ll 16-18.  So whatever extra characteristics is reading into that structure were not disclosed in the '226 patent and therefore are not limitations of claim 12.  Instead, any type of "bits decoder" would satisfy that component of the corresponding structure, and the PictureTel patents clearly include such decoders.  *See, e.g.*, Ericsson '914 patent, Fig. 3.

122.     I understand that Prof. Girod has also suggested that the PictureTel patents do not disclose interframe interpolation error.  But they do disclose interframe interpolation and the use of interpolation error and, in any event, as noted above, the use of interpolation error was just an obvious variation, well-known to those of ordinary skill in the art.

### 4.     Near Simultaneous Invention

123.     I have been informed that certain printed publications that do not legally qualify as prior art under the patent statutes may nevertheless be relevant to the obviousness inquiry.  In particular, it is my understanding that references that demonstrate that others in the art independently arrived at the same claimed apparatus near the same point in time may be suggestive that such a combination was obvious at the time to those of ordinary skill in the art.  After reviewing many printed publications, and to the extent that the anticipatory references that I have already discussed are found not to be prior art and/or not to anticipate, it is my opinion that there are several publications which demonstrate near simultaneous development of the apparatus claimed by claim 12 of the '226 patent.

124.     My March 31, 2006 Expert Report disclosed several references that demonstrate near simultaneous invention, including MPEG submissions by Bellcore and Matsushita, and U.S. Patent No. 5,113,255 ("Nagata") (MSLT_0233099-MSLT_0233110).  March 31, 2006 Expert Report at ¶¶ 243.

125.     In response to these references, Prof. Girod asserts that Haskell first disclosed the invention of claim 12 to the CCITT SGXV group via Document #490 in March 1989, followed by another disclosure by Dr. Puri in September of 1989 at a conference in Hanover.  May 12, 2006 Girod Report at pg. 76.  Prof. Girod also asserts that I did not cite "any evidence

Exhibit 45
Page 000793                                    38                    Case No. 02-CV-2060 B (CAB)

1   that Nagata, Bellcore, and Matsushita were indeed independently developed and did not benefit

2   from Haskell's prior invention." *Id.* Prof. Girod is asking me to prove a negative – that Nagata,

3   Bellcore and Matsushita did not copy their technology from Haskell. But Document #490 fails to

4   disclose numerous claim elements, including a circuit, IDCTs, shift circuits, an adder, or an

5   averager. If those elements are necessary to anticipate or render obvious claim 12, then certainly

6   they are required to enable a person of ordinary skill in the art to practice claim 12. Thus, Dr.

7   Haskell's presentation of Document #490 is incomplete at best. Further, Prof. Girod cites no

8   evidence that Nagata, Bellcore, or Matsushita "copied" their technology from Dr. Haskell without

9   attribution or attended either the CCITT SGXV conference or the Hanover conference.

10       126.    Further, the Nagata patent cites three Japanese patent applications under its

11   Foreign Application Priority Data section that date back to the first half of 1989. The Nagata

12   patent lists those three references as 1-118004 (*e.g.*, MSLT_1234159 - MSLT_1234175), 1-

13   163059 (*e.g.*, MSLT_1234116 - MSLT_1234131), and 1-169320 (*e.g.*, MSLT_1234132 -

14   MSLT_1234158). An examination of those three Japanese patent applications shows that Nagata

15   conceived and disclosed of every element of claim 12 as early as May 11, 1989. My analysis

16   regarding the three Japanese patent applications are disclosed in Exhibits D, E, and F. While I

17   need not rely on these references for my obviousness analysis, I note that these references

18   nevertheless confirm my opinion that claim 12 would have been obvious to those of ordinary

19   skill. My opinion regarding the content of these publications is accurately reflected in my claim

20   charts.

21       127.    Several other references also demonstrate that other inventors and companies

22   invented what is claimed by claim 12. These references including Sony's MPEG submissions

23   (*e.g.*, GW-LT 272773-272840), Philip's MPEG submission (*e.g.* GW-LT 027230-027272), U.S.

24   Patent No. 4,985,768 ("Sugiyama"), and an article entitled "Interframe vs. intraframe

25   compression of image sequences," by Paul Roos' and Max A. Viergever, (GW-LT 265179-83).

26   Claim charts for these three references are attached to my report as Exhibits A, B, C and G.

27       128.    Further, the Sugiyama Patent claims priority to Japanese application 1-11587

28   (*e.g.* MSLT_1234183-MSLT_1234184, MSLT_1235588-MSLT_1235602), which was filed on

Exhibit 45
Page 000794

39                    Case No. 02-CV-2060 B (CAB)

1  January 20, 1989 – well before Drs. Haskell or Puri's purported presentation of conditional

2  motion compensated interpolation.  The claim chart for 1-11587 is attached as Exhibits J and

3  shows how the elements of claim 12 are met by 1-11587.  It also is my opinion that every element

4  required by claim 12 of the '226 patent is included, either explicitly or inherently, in the Sugiyama

5  patent.  Additional analysis of this reference is included in my claim charts, which are attached

6  hereto as Exhibit C.

7      129.    Claim 12 is directed to "[a] circuit responsive to coded video signals where the

8  video signals comprise successive frames and each frame includes a plurality of blocks and where

9  the coded video signals comprise codes that describe deviations from approximated blocks and

10  codes that describe deviations from interpolated blocks…."  Figures 1, 2, 4, 6, and 7 all present

11  circuits.

12      130.    The Sugiyama patent presents a system responsive to coded video signals,

13  wherein the video signals comprise successive frames and each frame includes a plurality of

14  blocks.  The Sugiyama patent indicates that:

15      **In an inter-frame predictive encoding system, reference frames are set. The
       reference frames are separated at equal intervals**. The reference frames are
16      selected from successively inputted frames of a video signal. **Each of the
       reference frames is encoded**. A prediction signal for a dependent frame between
17      the reference frames is generated on the basis of a signal of the reference frames
       which precedes and follows the dependent frame respectively.  A signal of the
18      dependent frame is generated on the basis of the prediction signal corresponding
       thereto. An error of the predicting of the signal of the dependent frame is encoded.
19

20  See Sugiyama patent Abstract (emphasis added). Therefore, the Sugiyama patent discloses a

21  system that is responsive to coded video signals, wherein the video signals comprise successive

22  frames.

23      131.    Additionally, the Sugiyama patent discloses the use of block-based coding.  The

24  Sugiyama patent indicates that a "motion vector detector 140 detects motion vectors from the

25  current independent frame signal and the preceding independent frame in a known way such as a

26  block matching method."  '768 at 12:48-51.  The block-based coding method of Sugiyama

27  utilizes blocks of 8x8 or 16x16 pixels in determining motion vectors.  '768 at 12:61-66.

28  Therefore, the Sugiyama patent also discloses that each frame includes a plurality of blocks.

Exhibit 45
Page 000795                    40              Case No. 02-CV-2060 B (CAB)

132.     The Sugiyama patent further discloses that the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks.  The Court construed the term deviations to mean "differences" and the term approximated blocks to mean "predicted blocks".  The Sugiyama patent teaches that the coded video signals include both prediction error signals and interpolation error signals.  For example, the Sugiyama patent teaches that a coder "subtract a prediction digital signal from the digitized video signal to generate a prediction error (difference) signal."  '768 at 2:38-41.  Further, the Sugiyama patent describes an implementation in which dependent frames are interpolated "by prediction using the preceding and subsequent" reference frames.  '768 4:15-30.  The Sugiyama patent also explains that "[a]n adder 25 adds the prediction error and a one-frame preceding prediction signal, generating a digitized video signal" at the decoder.  '768 at 3:42-44.  Therefore, the coded video signal includes errors – deviations – derived from both predictive coding and interpolative coding.  Further, Sugiyama explains that the prediction signals are determined on a block basis using motion vectors.  The Sugiyama patent states that the prediction signal is created from motion vectors controlling position shifters 134 and 135.  '768 at 12:21-42.  The Sugiyama patent further states that "the motion vector detector 140 includes RAMs 153 and 154" where "[e]ach of the signals stored in the RAMs 153 and 154 is divided into … blocks of 8x8 or 16x16 pixels."  '768 at 12:55-65.  Sugiyama also teaches encoding the prediction error signals by subjecting the prediction error signals to an orthogonal transform device 103, quantizing the result using quantizer 104, and encoding the quantized result using a variable length code, such as Huffman codes, in encoder 105.  '768 at 11:30-40.  Therefore, the Sugiyama patent teaches that the coded video signals include codes that describe deviations from approximated blocks – prediction error – and codes that describe deviations from interpolated blocks – interpolation error.

133.     Claim 12 requires "means for developing block approximations from said codes that describe deviations from approximated blocks…."  I am informed that the Court has determined that this element of Claim 12 is in means-plus-function format, where the function is "developing block approximations from said codes that describe deviations from approximated

Exhibit 45
Page 000796                                     41                    Case No. 02-CV-2060 B (CAB)

1   blocks." The Court construed "block approximations" as "the combinations of predicted blocks

2   with differences between the actual blocks and the predicted blocks." The corresponding

3   structure identified by the Court for this claim element is Decoder 22, DCT-1 24, Adder 27, and

4   Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function,

5   citing '226 patent Fig. 2; Col. 4, lines 3-10, 26-32; and Col. 4, line 63 - Col. 5, line 7.

6       134.    The Sugiyama patent discloses developing block approximations from codes

7   that describe deviations from approximated blocks. Figures 1 and 2 generally describe

8   developing block approximations from codes that describe deviations from approximated blocks.

9   Further, the Sugiyama patent discloses that a decoder receives coded variable-length digital data

10  containing a prediction error signal. '768 at 3:28-42. The coded variable-length digital data is

11  decoded into fixed-length data, de-quantized, and inverse transformed into a prediction error

12  signal. *Id.* Sugiyama further discloses that an adder 25 in the decoder "adds the prediction error

13  and a one-frame preceding prediction signal, generating a digitized video signal." '768 at 3:42-

14  44. Sugiyama also discloses an adder 41 for adding the prediction error (dependent frame signal)

15  to a prediction signal. '768 at 8:7-9, 35-37. Either or both of the adders 25 and 41 alone or in

16  combination correspond to the Adder 27 of the '226 patent. Therefore, the Sugiyama patent

17  discloses that codes that describe deviations from approximated blocks are decoded and used to

18  form a digital video signal corresponding to the claimed block approximations.

19      135.    As discussed above, Sugiyama discloses performing the function of developing

20  block approximations from said codes that describe deviations from approximated blocks.

21  Additionally, Sugiyama discloses the corresponding structures for performing this function.

22  Sugiyama discloses a decoder 22 for converting variable-length data into fixed length data

23  corresponding to the Decoder 22 of the '226 patent. '768 at 3:33-34, 7:65-67. Sugiyama

24  discloses an inverse orthogonal transform device 24 for performing an inverse transform

25  corresponding to the inverse discrete cosine transform (DCT-1) 24 of the '226 patent. '768 at

26  3:37-40, 8:2-5. Sugiyama also discloses an adder 41 for adding the prediction error (dependent

27  frame signal) to a prediction signal corresponding to the Adder 27 of the '226 patent. '768 at 8:7-

28  9, 35-37. Sugiyama further discloses shift circuit 135 for producing the prediction signal

Exhibit 45
Page 000797                                42                    Case No. 02-CV-2060 B (CAB)

1    corresponding to Shift Circuit 26 of the '226 patent.  '768 at 12:3-9.  Therefore, Sugiyama

2    discloses all of the corresponding structure identified by the Court for this claim element.

3        136.    Claim 12 also requires "means responsive to said block approximations and to

4    said codes that describe deviations from interpolated blocks to develop said interpolated blocks."

5    I am informed that the Court has determined that this element of Claim 12 is in means-plus-

6    function format, where the function is "to develop said interpolated blocks responsive to said

7    block approximations and to said codes that describe deviations from interpolated blocks."  The

8    corresponding structure identified by the Court for this claim element is Decoder 25, DCT-1 34,

9    Adder 35, Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these

10   elements related to the claimed function, citing '226 patent Fig. 2; Col. 4, lines 63-65; and Col. 5,

11   lines 7-23.  The structure and inputs that correspond to these elements is at '226 patent col. 4,

12   lines 38-50.

13       137.    The Sugiyama patent discloses developing interpolated blocks responsive to

14   block approximations and to codes that describe deviations from interpolated blocks.  Figures 4,

15   6, and 7 generally describe developing interpolated blocks responsive to block approximations

16   and to codes that describe deviations from interpolated blocks.  For example, the Sugiyama patent

17   discloses that a decoder receives coded variable-length digital data containing a prediction error

18   signal.  '768 at 3:28-42.  The coded variable-length digital data is decoded into fixed-length data,

19   de-quantized, and inverse transformed into a prediction error signal.  Id.  Sugiyama further

20   discloses that an adder 41 in the decoder adds a prediction error signal (deviations from

21   interpolated blocks) to a prediction signal (block approximations discussed above) to form a

22   digitized video signal of a dependent frame.  '768 at 8:35-37.  Therefore, the Sugiyama patent

23   discloses that the block approximations discussed above and codes that describe deviations from

24   interpolated blocks are decoded and used to form a digital video signal of a dependent frame

25   corresponding to the claimed interpolated blocks.

26       138.    As discussed above, Sugiyama discloses performing the function of developing

27   interpolated blocks responsive to block approximations and to codes that describe deviations from

28   interpolated blocks.  Additionally, Sugiyama discloses the corresponding structures for

Exhibit 45
Page 000798                                43                Case No. 02-CV-2060 B (CAB)

1   performing this function.  Sugiyama discloses a decoder 22 for converting variable-length data

2   into fixed length data corresponding to the Decoder 25 of the '226 patent.  '768 at 3:33-34, 7:65-

3   67.  Sugiyama discloses an inverse orthogonal transform device 24 for performing an inverse

4   transform corresponding to the inverse discrete cosine transform (DCT-1) 34 of the '226 patent.

5   '768 at 3:37-40, 8:2-5.  Sugiyama also discloses an adder 41 for adding the prediction error

6   (dependent frame signal) to a prediction signal corresponding to the Adder 35 of the '226 patent.

7   '768 at 8:7-9, 35-37.  Sugiyama further discloses shift circuits 134 and 135 for shifting the current

8   and preceding reference frames corresponding to Shift Circuits 31 and 39 of the '226 patent.  '768

9   at 12:3-9.  Sugiyama further discloses multipliers 137 and 138 for weighting the outputs of shift

10  circuits 134 and 135 and adder 139 for summing the weighted outputs of shift circuits 134 and

11  135.  '768 at 12:33-40.  The multipliers 137 and 138 are used to weight each of the outputs of the

12  shift circuit based upon their contribution to the current frame, for example, each of the current

13  and preceding frames may have equal weights of one half (1/2).  *Id.*  Therefore, the multipliers

14  137 and 138 along with adder 139 correspond to Averager 32 of the '226 patent.  Therefore,

15  Sugiyama discloses all of the corresponding structure identified by the Court for this claim

16  element.

17         139.    Therefore, it is my opinion that each and every element of claim 12 is included

18  in the Sugiyama patent.  While I need not rely on these references for my obviousness analysis, I

19  note that these references nevertheless confirm my opinion that claim 12 would have been

20  obvious to those of ordinary skill.  My opinion regarding the content of these publications is

21  accurately reflected in my claim charts.

22         140.    Finally, the sheer number of individuals and companies that developed what is

23  allegedly recited by claim 12 supports my opinion that claim 12 is obvious in view of the prior

24  art.

25              **5.    Summary**

26         141.    Accordingly, based on all of the above, I conclude that claim 12 of the '226

27  patent is invalid for obviousness.

28

Exhibit 45
Page 000799                                    44                    Case No. 02-CV-2060 B (CAB)

1    I declare under penalty of perjury under the laws of the United States of America that this

2 report on behalf of Defendants is true and correct.  Executed this 14th day of September 2007 in

3 West Lafayette, Indiana.

4

5                                                    By: _Edward J. Delp III_

6                                                          Edward J. Delp, III, Ph.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 45
Page 000800

1

**PROOF OF SERVICE**

2      I am employed in the County of San Diego. My business address is Fish & Richardson
P.C., 12390 El Camino Real, San Diego, California 92130.  I am over the age of 18 and not a
3  party to the foregoing action.

4      I am readily familiar with the business practice at my place of business for collection and
processing of correspondence for personal delivery, for mailing with U.S. Postal Service, for
5  facsimile, and for overnight delivery by Federal Express, Express Mail, or other overnight service.

6      On September 14, 2007, I caused a copy of the following document(s):

7      **EXPERT REPORT OF EDWARD J. DELP III REGARDING OBVIOUSNESS**

8  to be served on the interested parties in this action by placing a true and correct copy thereof,
enclosed in a sealed envelope, and addressed as follows:

9

10     Jane Hahn                                  Attorneys for Plaintiffs
       Alison P. Adema                            LUCENT TECHNOLOGIES INC. and
       Hahn & Adema                               MULTIMEDIA PATENT TRUST
11     501 West Broadway, Suite 1730
       San Diego, CA  92101                       Email: janehahn@hahnadema.com
12     Telephone:  (619) 235-2100                  aadema@hahnadema.com
       Facsimile:  (619) 235-2101
13     *VIA OVERNIGHT & ELECTRONIC MAIL*

14     David J. Zubkoff                           Attorneys for Defendants
       Seltzer, Caplan, McMahon & Vitek          GATEWAY, INC. and GATEWAY
15     2100 Symphony Towers                       COUNTRY STORES LLC
       750 B Street, Suite 2100
16     San Diego, CA  92101                       Email: zubkoff@scmv.com
       Telephone:  (619) 685-3003
17     Facsimile:  (619) 702-6827
       *VIA OVERNIGHT & ELECTRONIC MAIL*
18

19     James S. Blackburn                         Attorneys for Defendant
       Arnold & Porter LLP - (L.A.)               DELL INC.
       777 S. Figueroa Street, 44th Floor
20     Los Angeles, CA  90017                     Email: james_blackburn@aporter.com
       Telephone:  (213) 243-4000
21     Facsimile:  (213) 243-4199
       *VIA OVERNIGHT & ELECTRONIC MAIL*
22

23     I declare that I am employed in the office of a member of the bar of this Court at whose
direction the service was made.

24     I declare under penalty of perjury that the above is true and correct.  Executed on
25  September 14, 2007, at San Diego, California.

26                                              */s/ Alma Truax-Padilla*
                                                Alma Truax-Padilla

27

28

Exhibit 45
Page 000801                                     2                    Case No. 02-CV-2060 B (CAB)

1  **COURTESY COPIES BY ELECTRONIC MAIL TO**:

2  Trial Counsel For Lucent and Multimedia Patent Trust:
   Jon T. Hohenthaner/Alan Kellman/James Bailey
3  Kirkland & Ellis LLP
   Citicorp Center
4  153 East 53rd Street
   New York, NY 10022-4675
5  E-mail:      jhohenthaner@kirkland.com; akellman@kirkland.com; jbailey@kirkland.com
6
   Trial Counsel for Gateway:
7  Bryan Farney / Jeffrey B. Plies / Lawrence Fluker
   DECHERT LLP
8  106 East 6th Street, Ste. 800
   Austin, TX 78701
9  Email:      bryan.farney@dechert.com; jeff.plies@dechert.com; lawrence.fluker@decher.com

10 Trial Counsel for Dell:
   Joseph A. Micallef
11 Arnold & Porter LLP
   555 Twelfth Street, N.W.
12 Washington, D.C. 20004-1206
   E-mail:      joseph_micallef@aporter.com
13

14 Trial Counsel for Dell:
   Joel Freed, Esq.
15 McDermott Will & Emery LLP
   600 13th Street, N.W.
16 Washington, DC 20005-3096
   Email:      jfreed@mwe.com
17

18

19 Courtesy Emails include:

20 | | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |

21

22 | XX | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email, except for exhibits.  Exhibits were over 50 pages long.  As per our service agreement, a hard copy will follow via overnight mail |

23

24

25

26

27

28

Exhibit 45
Page 000802                                3                    Case No. 02-CV-2060 B (CAB)