# SCHMIDT DECLARATION
# EXHIBIT 51

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

9 | LUCENT TECHNOLOGIES INC., and MULTIMEDIA PATENT TRUST, | CASE No. 02-CV-2060 B (CAB)

10 | | consolidated with

CASE No. 03-CV-699 B (CAB)

Plaintiff and Counter Defendants, | CASE No. 03-CV-1108 B (CAB)

11

vs.

12

13 | GATEWAY, INC., GATEWAY COUNTRY STORES LLC, GATEWAY, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC.

**SUPPLEMENTAL EXPERT REPORT OF DR. ROBERT G. WEDIG ON THE INVALIDITY OF U.S. PATENT NUMBER 4,439,759**

14

15

Defendants and Counter-Claimants

16

and

17

DELL INC.,

18

Defendant and Counter-Claimant.

19

And

20

MICROSOFT CORPORATION

21

Intervener and Counter-Claimant

22

23

24

25

26

27

28

-1-

Exhibit 51
Page 000877

1          I, Dr. Robert G. Wedig, state as follows:

2    **I.        INTRODUCTION.**

3          1.        I previously submitted an expert report in this matter titled "Expert Report of Dr.

4    Robert G. Wedig on the Invalidity of U.S. Patent Number 4,439,759. ("Wedig Invalidity Report").

5    In that report I provided my background and expertise in these matters, my compensation and my

6    curriculum vitae including a list of publications, all of which I incorporate herein by reference.

7    Furthermore, I have previously submitted a second expert report in this matter titled "Rebuttal

8    Report of Dr. Robert G. Wedig on the Noninfringement of U.S. Patent Number 4,439,759.

9    ("Wedig Noninfringement Report") in which I rebut the findings of Mr. Jake Richter documented

10   in his expert report "Expert Report of Jake Richter" dated March 31, 2006 ("Richter Infringement

11   Report").  I understand that Mr. Richter has also written a report titled "Rebuttal Expert Report of

12   Jake Richter" dated May 12, 2006 ("Richter Validity Report") in which he rebuts my initial Wedig

13   Invalidity Report.  On May 30, 2006, I submitted a third report entitled "Report of Dr. Robert G.

14   Wedig on Secondary Considerations of U.S. Patent Number 4,439,759. ("Wedig Report On

15   Secondary Considerations")

16         2.        It is my understanding that Lucent is now only asserting claims 1-3 of U.S. Patent

17   Number 4,439,759 (the "`759 Patent").  (Wedig Noninfringement Report, ¶ 31).  Should Lucent

18   reassert infringement of claim 4 of the '759 Patent, I reserve the right to update my invalidity

19   opinions to address that claim.  In my Wedig Invalidity Report, I expressed my opinion that claims

20   1-3 of the `759 Patent (the "Asserted Claims") are invalid as being obvious over a number of prior

21   art references.  I have been informed that since the time I submitted my Invalidity Report and my

22   Report On Secondary Considerations, there have been some changes in the law relating to the non-

23   obviousness requirement for patents.  I have been asked to review additional evidence, and to

24   further analyze the validity of the Asserted Claims under revised legal standards pertaining to the

25   non-obviousness requirement.

26         3.        In the preparation of this report, I continue to adhere to the claim construction of

27   the '759 patent as set forth in United States District Judge Rudi M. Brewster's Memorandum and

28   Order signed on November 11, 2005.  ("Court's Claim Construction").   A table showing this

-2-

Exhibit 51
Page 000878

1  claim construction was provided in my Wedig Invalidity Report.  In preparing this report, I also

2  assume the same level of ordinary skill in the art that I previously specified.  (Wedig Invalidity

3  Report, ¶ 22).  In preparing this report, I have reviewed and relied on the documents referenced in

4  Wedig Invalidity Report, Wedig Noninfringement Report, Richter's Infringement Report and my

5  Wedig Report on Secondary Considerations.  I have also received and reviewed the documents

6  listed in Exhibit 1 attached to this report. I write this report of my own personal knowledge, and if

7  called as a witness, I could and would testify competently to the facts thereto.

8  **II.      THE QUESTION OF OBVIOUSNESS**

9          4.      I would like to make clear that I will not offer opinions of the law as I am not an

10  attorney.  However, I am informed of several principles concerning patent validity and invalidity,

11  which I used in my analysis of the prior art and which assisted me in arriving at my conclusions.

12          5.      In approaching the question of whether or not the Asserted Claims of the `759

13  Patent are obvious over the prior art, I was instructed to: (1) determine the scope and content of the

14  prior art; (2) ascertain the differences between the prior art and the asserted claims; and (3)

15  determine the level of ordinary skill in the art to which the `759 patent pertains.  My understanding

16  of the scope and content of the prior art is based on my review of documents and things cited in

17  this report or cited in Exhibit 1 to this report, as well as documents cited in my other reports.  My

18  opinion on the ordinary level of skill in the art was expressed in my Wedig Invalidity Report.

19  (Wedig Invalidity Report, ¶ 22).   My analysis of how the prior art affects the validity of the

20  Asserted Claims is summarized in the charts attached hereto as Exhibits 2 – 4, and also in the

21  sections that follow.  As explained in further detail below, I have identified combinations of prior

22  art references that I believe render the Asserted Claims obvious.

23          6.      I am informed that legal principles regarding invalidity of a claim due to

24  obviousness were clarified by the U.S. Supreme Court after I wrote my Wedig Invalidity Report.  I

25  am informed that the principles described in paragraph 7 of the Wedig Invalidity Report (relating

26  to a "motivation," "suggestion," or "teaching" in the prior art to combine references to produce the

27  claimed alleged invention) remain an appropriate approach in a validity analysis.  I am informed,

28  however, that the U.S. Supreme Court clarified that additional principles may also be applied in

-3-

Exhibit 51
Page 000879

1   such an analysis. I set forth some such additional principles below.

2   7.    I am informed that when a claim simply arranges prior art elements with each

3   performing the same function it had been known to perform and yields no more than one would

4   expect from such an arrangement, such a combination is obvious. When a claim recites a structure

5   already known in the prior art that is altered by the mere substitution of one element for another

6   known in the field, the claim is obvious if the combination yields merely a predictable result. I am

7   informed that a corollary principle is that when the prior art teaches away from combining certain

8   known elements, a claim directed to a discovery of a successful means of combining them is more

9   likely to be nonobvious.

10   8.    I am informed that when a work is available in one field of endeavor, design

11   incentives and other market forces can prompt variations of it, either in the same field or a

12   different one. If one of ordinary skill in the art can implement a predictable variation, such a

13   variation is likely unpatentable. For the same reason, if a technique has been used to improve one

14   device, and one of ordinary skill in the art would recognize that it would improve similar devices

15   in the same way, using the technique is obvious unless its actual application is beyond his or her

16   skill. One question to consider is whether the improvement is more than the predictable use of

17   prior art elements according to their established functions.

18   9.    I am informed that it may often be necessary, in a validity analysis, to look to

19   interrelated teachings of multiple patents; the effects of demands known to the design community

20   or present in the marketplace; and the background knowledge possessed by one of ordinary skill in

21   the art, all in order to determine whether there was an apparent reason to combine the known

22   elements in the fashion claimed by the patent at issue.

23   10.    I am informed that a validity analysis need not seek out precise teachings directed

24   to the specific subject matter of the challenged claim; it is appropriate to take account of the

25   interferences and creative steps that one of ordinary skill in the art would employ. A person of

26   ordinary skill is also a person of ordinary creativity.

27   11.    I am informed that, in determining whether a claimed combination is obvious, the

28   correct question is whether the combination was obvious to one of ordinary skill in the art. Any

-4-

Exhibit 51
Page 000880

need or problem known in the field of endeavor at the time of alleged invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

12.    I am informed that, because it is common sense that familiar items may have obvious uses beyond their primary purposes, in many cases one of ordinary skill in the art will be able to fit the teachings of multiple prior art references together like pieces of a puzzle.

13.    I am informed that, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, one of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product of ordinary skill and common sense, and the fact that the combination was obvious to try may show that a claim directed to the combination would be invalid for obviousness.

14.    I am informed that a correct validity analysis does not consider whether one of ordinary skill in the art, writing on a blank slate, would have selected a particular combination.  Rather, a correct analysis considers whether one of ordinary skill, facing the wide range of needs created by developments in the field, would have seen an obvious benefit to selecting a particular combination.

15.    I am informed that in order to rebut a showing of obviousness over the prior art, Lucent may attempt to show "secondary considerations" of non-obviousness.  I have not included opinions on secondary considerations of non-obviousness in this report but I have done so in Wedig Report On Secondary Considerations.  If Lucent or Lucent's expert should assert the presence of secondary considerations of non-obviousness, I may provide a report addressing Lucent's assertions.

III.    STATE OF THE ART AS OF THE TIME OF THE ALLEGED INVENTION.

16.    As mentioned above, I am informed that I must consider the scope and content of the prior art to the `759 patent.  To this end, I have reviewed a large amount of prior art, and I have also had conversations with Dr. James Foley and Mr. Douglas O'Brien.  As explained below, it is clear that each of the elements of the Asserted Claims were known in the prior art.  Claim 1 of the `Fleming `759 Patent recites:

-5-

Exhibit 51
Page 000881

In a digital image display system:

a memory for storing color data values;

processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising

a first mode of access wherein an in-use foreground color is directly specified as a color data value;

a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and

a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and

display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode.

`759 Patent, 14:20-40.

17.    Claim 2 recites:

A digital image display system comprising:

a color memory for storing color data values;

processing means responsive to predetermined command and data sequences, the processing means, responsive to a first command, selecting a mode of access to the color memory; and responsive to a second command, setting a color data value  in the color memory; and

display means responsive to the processing means, the display means displaying a color associated with the color data value accessed by the selected mode.

`759 Patent, 14:41-52.

18.    Claim 3 recites:

A display system as recited in claim 2, wherein the processing means responsive to a second command sets plural color data values in color memory.

`759 Patent, 14:53-55.

19.    The Fleming `759 Patent acknowledges that "videotex" systems constituted prior art to the alleged invention. `759 Patent, 1:11-46.  Videotex systems allow for retrieving information via a telephone line, and displaying images on a display device (*e.g.,* a television). *See* "Videotex, The New Television/Telephone Information Services," Roger Woolfe, © 1980 (the

-6-

Exhibit 51
Page 000882

1    "VIDEOTEX TEXTBOOK") at pp. 16-19.  The Fleming `759 Patent explains that known prior art

2    videotex systems were previously developed in Britain (*i.e.,* Prestel), France (*i.e.,* Antiope) and

3    Canada (*i.e.,* Telidon).  `759 Patent, 1:10-46.  The Fleming `759 Patent also acknowledges that the

4    prior art Telidon system specified colors directly using color data values (*e.g.,* values representing

5    red, green and blue color components), while the prior art Prestel and Antiope systems specified

6    colors indirectly using an index into a color memory (*i.e.,* color map that stores a table of color

7    data values indexed by numbers).  `759 Patent, 1:10-35.

8         20.    The Fleming `759 Patent also explains that prior art display systems using color

9    maps (*e.g.,* the Tektronix 4027) were commercially available.  `759 Patent, 1:28-39.   A 1979

10   textbook on graphics systems describes the implementation of color maps using both read only

11   memory ("ROM") and read-write memory ("RAM").   *See* Principles Of Interactive Computer

12   Graphics, Second Edition, William M. Newman and Robert F. Sproull, McGraw-Hill, © 1979

13   ("Newman & Sproull"), pp. 279-280.  It was also well understood by 1979 that a color map could

14   be used for animation.  *See, e.g.,* Color Table Animation, Richard Shoup, ACM, ©1979

15   ("Shoup").  This technique took advantage of the ability to dynamically change the set of color

16   values stored in a read-write memory color map.  Id. The idea of dynamically changing the set of

17   color values stored in a read-write memory color map had also been used in videotex systems.

18   *See, e.g.,* "Dynamically Redefinable Character Sets - D.R.C.S.," G.O. Crowther, IEEE

19   Transactions on Consumer Electronics, Volume CE-26,  Issue 4,  Nov. 1980, pp. 707- 716

20   ("Crowther").

21        21.    Systems capable of displaying both foreground and background colors were also

22   well known before the time of the alleged invention.  VIDEOTEX TEXTBOOK at pp. 27-28; see

23   also Preliminary Specification for the Antiope® Teletext System, by C. Schwartz, B. Marti, and A.

24   Poignet, 1977 (the "Antiope Specification") at pp. 3, 6-7; "Final Report – NASA Grant NSG 1508,

25   Extension of the Core Graphics System for Raster Graphics Display" (the "NASA Final Report")

26   at Appendix B, pp 2, 13, Figure 2; Appendix C, pp. 16-18; Recommendation S.100: "'International

27   Information Exchange for Interactive Videotex," CCITT Yellow Book, Vol. VII, Geneva,

28   Switzerland, Nov. 21, 1980 ("Recommendation S.100") at p. 198.  In such systems, the text or

Exhibit 51
Page 000883

1    graphics can be displayed in a first color (*i.e.,* the "foreground color") on top of a background

2    painted in a second color (*i.e.,* the "background color").  Id.  The concepts of an in-use foreground

3    color (*i.e.,* a color that will be used as the foreground color for subsequently received text and

4    graphics drawing commands until changed) and an in-use background color (*i.e.,* a color that will

5    be used as the background color for subsequently received text and graphics drawing commands

6    until changed) were also very well known before the time of the alleged invention.  Id.

7         22.  It was also understood prior to the alleged invention that background and

8    foreground colors could be specified both directly and/or indirectly in different modes of

9    operations of a single digital image display system.  *See* Recommendation S.100, pp. 166-167;

10   "Picture Description Instructions PDI for the Telidon Videotex System," H.G. Bown, C.D.

11   O'Brien, W. Sawchuk, J.R. Storey, CRC Technical Note No. 699-E, Ottawa, Canada, Nov. 1979

12   ("CRC 699-E"), pp. 41-42, 49-50 and 70;  and NASA Final Report, Appendix A, pp. 4-5, 20;

13   Appendix C, 21-7 – 21-8.

14        23.  Based on the literature I have reviewed all of the above-described functions and

15   features of image display systems were well known in the field prior to the alleged invention.

16   There were many different reasons to combine these functions and features including known

17   problems already solved, various design incentives, industry trends, and market forces such as:

18       • **terminal independence** (*see, e.g.,* CRC 699-E, pp. 2, 4)

19       • **forward and backward compatibility** (*see, e.g.,* CRC 699-E, pp. 2, 4)

20       • **international videotex standardization** (*see, e.g.,* Recommendation S.100)

21       • **demand for higher resolution display, and a wider range of colors** (*see*
22         Recommendation S.100, pp. 197-198; *see also* "International Videotex
23         Standardization: A Canadian View Of Progress Towards the Wired World," Smirle et
         al., Viewdata and Videotex, 1980-81, ©1980, pp. 271-280 , pp. 274-275)

24       • **cost of memory** (Videotex System Planning, Costa and Marsh, © 1979, p. 339).

25   IV.  **ADDITIONAL OPINIONS REGARDING INVALIDITY OF CLAIMS 1 – 3 OF**

26       **THE '759 PATENT**

27        24.  I hereby incorporate by reference all of my previously provided opinions regarding

28

-8-

Exhibit 51
Page 000884

obviousness of the Asserted Claims. *See* Wedig Invalidity Report. I have applied the above-described revised legal principles, regarding invalidity of a claim due to obviousness, to the prior art considered in my Wedig Invalidity Report, and my conclusions regarding obviousness are unchanged (or even stronger) in light of the revised legal principles.

25.     I have reviewed multiple additional pieces of prior art and it is my opinion that, under Lucent's application of the claim language in its infringement contentions, the Asserted Claims are anticipated and/or at least obvious in view of the following combinations of prior art references:

- Claim 1, if not anticipated is at least rendered obvious in view of Recommendation S.100
- Claims 2 and 3 are obvious in view of Recommendation S.100 alone or in combination with Crowther.

- Claim 1 is obvious in view of CRC 699-E in combination with the Antiope Specification
- Claims 2 and 3 are obvious in view of CRC 699-E in combination with the Antiope Specification and Crowther.

- Claims 1, 2 and 3, if not anticipated are at least rendered obvious in view of the NASA Final report.

A.      **Claims 1-3 of the '759 Patent are Obvious in view of Recommendation S.100 Alone or In Combination With Crowther**

26.     It is my opinion that claim 1 of the '759 patent, if not anticipated is at least obvious in view of Recommendation S.100.   It is also my opinion that claims 2-3 of the '759 patent are obvious based on Recommendation S.100 alone or in combination with Crowther.  A chart form analysis of the Asserted Claims as they relate to S.100 and Crowther is provided as Exhibit 2 to this report.  I will now review and elaborate on this analysis.

27.     The '759 patent indicates that prior to the alleged invention, methods and apparatus for providing color digital images on video display screens had become well known.  ('759 patent, col. 1:11-12).  The Fleming '759 patent explains that "[a] problem, however, has arisen in that compatibility among digital display systems has been made difficult by the great variety of methods and apparatus for providing color images." ('759 patent, col. 1: 12-16).  The patent states that the Telidon system uses "a direct selection of data values for the primary colors – red, green

-9-

Exhibit 51
Page 000885

1  and blue." (Id., 1:16-22). It also discloses that the Prestel and Antiope systems both specified

2  foreground and background colors by indexing a permanent read-only color memory. (Id.,1: 22-

3  27). Fleming et al. supposedly solve the problem of using incompatible terminals by providing a

4  terminal-independent color memory. (Id.,1: 39-46). However, this problem had already been

5  solved, and a system satisfying the Asserted Claims had already been developed at least in the

6  manner that Lucent applies the Asserted Claims to the defendants' systems. It is clear to one of

7  ordinary skill in the art that Recommendation S.100 describes a standard for an image processing

8  system that operates in one mode similar to a Telidon system performing direct color display, and

9  in another mode similar to an Antiope system performing indirect color display using an index into

10  a color memory, thereby solving the problem of "employing incompatible terminals" through the

11  use of a terminal-independent color memory  (Id.).

12      28.    Recommendation S.100 states that "it is desirable that terminal equipment

13  compatibility should exist between broadcast teletext systems for general reception and public

14  network-based data systems." (Recommendation S.100, p. 165). It is clear to one of ordinary skill

15  in the art that Recommendation S.100 was written to provide compatibility between a number of

16  existing Videotex systems. Id.

17          **1.    Claim 1, if Not Anticipated, is At Least Obvious in View of**

18      **Recommendation S.100**

19      29.    Recommendation S.100 "describes the characteristics of coded information that is

20  exchanged between countries participating in the international interactive Videotex service … and

21  defines the display features corresponding to its various elements" thereby disclosing a digital

22  image display system. (Id., p. 166). Recommendation S.100 also discloses a memory for storing

23  Color Data Values. (Id., p. 198). This memory is a Color Memory that contains Color Data

24  Values used to provide color information for the display screen.

25      30.    By way of explanation, Recommendation S.100 provides four options for

26  representing pictorial information. These are alphamosaic character sets, a geometric system,

27  dynamically redefinable character sets and photographic representation. (Recommendation S.100,

28  page 166).

-10-

Exhibit 51
Page 000886

31.    One of ordinary skill in the art would recognize that each of these options correspond to existing videotex systems available at the time the standard was drafted. For example, the alphamosaic parallel mode specified in Recommendation S.100 was known to have been taken from the French Antiope system, and the alphageometric mode specified in Recommendation S.100 was known to have been taken from the Canadian Telidon system. *See, e.g.*, "Telidon, A Review," Bown et al., IEEE Communications Magazine, pp. 22-28, © 1981 ("Telidon, A Review") at p. 22; *see also* "A Perspective On The Development Of Videotex In North America," O'Brien et al., IEEE Journal On Selected Areas in Communications, Vol. SAC-1. No. 2, February 1983 ("Perspective On The Development Of Videotex") at p. 261. I understand that the French developers of Antiope and the Canadian developers of Telidon actually participated in the drafting of Recommendation S.100, and that they each advocated for adoption of their respective videotex systems as options in the standard. (Discussion with C.D. O'Brien, Sept. 11, 2001).

32.    As Fleming et al. admitted to the Patent Office in the background section of the patent, it was well known to one of ordinary skill in the art prior to 1981 that the Antiope system used a color memory:

> "The Prestel videotex customer terminal developed by the British Post Office and the Antiope terminal developed by the French CCETT employ a technique for specifying both a foreground and background color by indexing a permanent read-only color memory."

('759 patent, Col. 1:22-27).

33.    Furthermore, Recommendation S.100 itself discusses the use of a writable Color Memory as an enhancement to the basic recommendation.

> "The ability to simulate motion (*i.e.* animation) is a potential enhancement that can be achieved by several means. These include: … b) dynamically altering the colour of portions of the display image, making them appear or disappear by **redefining the colour table** (an image disappears when its colour is set to the same colour as the surrounding area)."

(Recommendation S.100, page 198).

-11-

Exhibit 51
Page 000887

1    Therefore, given the knowledge of one of ordinary skill in the art and the explicit citation to a

2    color memory, it is clear that Recommendation S.100 discloses a color memory that contains

3    Color Data Values.

4         34.     At least according to the Lucent's interpretation of the claims as applied in its

5    infringement analysis, Recommendation S.100 discloses a processing means responsive to a

6    command and data sequence comprising at least one command, the processing means decoding the

7    command and data sequence, the command and data sequence selecting one of a plurality of

8    modes of access to color data values.  If this claim limitation is applied in the manner alleged by

9    Lucent in its infringement contentions and the Richter Infringement Report, then the structure of

10   the processing means disclosed in Recommendation S.100 is the same or equivalent to the

11   structure identified in the Court's claim construction order.

12        35.     A processing means is necessarily required to process the coded information

13   defined by Recommendation S.100.  The coded information is command and data sequences used

14   by the processor to produce the digital display.  The processing means selects from a plurality of

15   modes of access to color data values including an alphamosaic, alphageometric, dynamically

16   redefinable character sets and photographic representation:

17              "1.2.4  For the international service, four different options for
18              representing pictorial information have been recognized:
                     a) mosaic character sets:
19                   b) geometric System:
                     c) dynamically redefinable character sets;
20                   d) photographic representation."

21              (Recommendation S.100, page 166).

22        36.     Recommendation S.100 teaches a videotex terminal capable of operating in the

23   alphamosaic mode upon receiving a particular sequence of commands and data:

24              2.2 Designation and invocation in the context of the alphamosaic option

25              2.2.1 Two different modes for the alphamosaic option have been identified.
                They differ in their display control sets. These control sets are designated
26              as the Cl set by control sequences of the form ESC 2/2 (F) where F is
                assigned by ISO. (A registration of these sets must be requested by
27              CCITT.) Individual controls are represented by ESC F1 sequences.

28

-12-

Exhibit 51
Page 000888

2.2.2 The mosaic graphics set is designated (in the parallel mode) as the G1 set by an escape sequence of the form ESC 2/9 (F) or ESC 2/13 (F) to be allocated by ISO.

(Recommendation S.100 at p. 167).

37.     Recommendation S.100 also teaches a videotex terminal capable of operating in the alphageometric mode upon receiving another sequence of commands and data:

2.3 Designation and invocation in the context of the alpha-geometric option

2.3.1 The alpha-geometric coding scheme is to be designated and invoked by the escape sequence ESC 2/5 (5/x) in accordance with paragraph 5.3.8 of ISO 2022 [1] standard. This designates and invokes a complete code with interpretation as follows.

2.3.2 All the meanings and interpretation of Recommendation V.3 [3] and ISO 2022 [1] remain the same, including CO, GO and G2 with the exception of SI and SO. The codes of the 01 set and their meanings and interpretations are as described in § 6.

2.3.3 The designation and invocation of the complete code by the, sequence ESC 2/5 (5/x) is to be terminated only by ESC 2/9 (F) or ESC 2/13 (F), designating a normal GI set.

(Recommendation S.100 at p. 167).

38.     Recommendation S.100 also indicates that "these four options are not mutually exclusive and it is possible that systems may develop using two or more options." (Id.)  Therefore, it is clear that the Recommendation S.100 provides the teaching for displaying information using different modes of display with the possibility that one terminal design may implement two or more modes for display.  Persons of ordinary skill in the art recognized that these options could be combined in a single terminal.  For example, the Videotex Report Series stated:

Of course, it is possible for the different graphic methods to be combined.  For example, Prestel has demonstrated alphamosaic and photographic images (of restricted size) on the same page.  Antiope and Telidon have performed similarly.  At present it is still not clear which method, or combination of methods, will prove to be the most widely acceptable.

See Videotex: The Key Issues, Videotex Report Series, Report No. 1, Butler Cox & Partners Limited, July 1980 ("Videotex Key Issues"), p. 29 citing CCITT Draft Recommendation Sg No. 164E: "The International Information Exchange for Interactive Videotex," Paris, November 1979.

39.     In my previous expert report, I reviewed Lucent's infringement position as it relates to the required "predetermined command and data sequence" for selecting modes of access to Color Data Values in claim 1.  (Wedig Noninfringement Report, ¶ 29-32).  I incorporate that

-13-

Exhibit 51
Page 000889

1    discussion to this report so I will not repeat it here.  However, to summarize, to the extent that that

2    Lucent believes that it has identified accused structure for satisfying the "processing means"

3    element, Recommendation S.100 discloses structure that would satisfy that element in the same

4    manner that Lucent contends it is satisfied by the accused products, in that Recommendation S.100

5    discloses a processor responsive to commands and parameters selecting modes of access to Color

6    Data Values which is the basis for Lucent's identification of supposedly satisfying structure.

7        40.    Recommendation S.100 discloses a first mode of access to Color Data Values from

8    the Color Memory wherein an in-use foreground color is directly specified as a Color Data Value.

9    It was well known to those of ordinary skill in the art prior to 1981 that the alphageometric mode,

10   which was taken from the Canadian Telidon system, used a direct selection of color data values.

11   (Recommendation S.100, pp. 185-196)   This fact is acknowledged in the Fleming `759 Patent.

12   ('759 patent, Col. 1:16-22).  Entering the alphageometric mode is described in Recommendation

13   S.100 as being performed with the command and data sequence ESC 2/5 (5/x). (Recommendation

14   S.100, page 167).

15       41.    When operating in the alphageometric mode, the directly specified in-use

16   foreground color is used as the foreground color for subsequently received text and graphics

17   drawing commands until changed.  The in-use foreground color is specified by the

18   CONTROL(VALUE) command.  This command is followed by a data sequence which specifies

19   the color data value where the green, red and blue color components are specified in order of

20   decreasing levels of intensity.  (Recommendation S.100, page 192).

21       42.    Recommendation S.100 discloses a second mode of access in which the in-use

22   foreground color is specified as an index into the color memory.  It was well known to one of

23   ordinary skill in the art prior to 1981 that the parallel mode of the alphamosaic option described in

24   Recommendation S.100 was taken from Antiope.  (Recommendation S.100, pp. 179-185).  It was

25   also well known to those of ordinary skill in the art prior to 1981 that the Antiope system used a

26   color memory as confirmed by the '759 patent.  ('759 patent, Col. 1:22-27).  Furthermore,

27   Recommendation S.100 discloses as an enhancement a read/write memory for storing color data

28   values.  (Id., p. 198).  Entering the alphamosaic mode is described in Recommendation S.100 as

-14-

Exhibit 51
Page 000890

1   being performed with the command and data sequence ESC 2/9 (F) or ESC 2/13 (F).

2   (Recommendation S.100, page 167).

3         43.     In the parallel form of the alphamosaic mode, codes 4/0 – 4/7 are used for

4   specifying the in-use foreground color.  (Recommendation S.100, page 181).  The command and

5   data sequence indicates that it "Causes the following characters to be written in the colour

6   indicated."  (Recommendation S.100, page 183).   In the parallel form of the alphamosaic mode,

7   the colors are specified as simple 7 bit values indicating the color such as yellow, magenta, etc.

8   These color data operands are indexes into a color memory of a compatible Antiope system.

9   Furthermore, although unnecessary to satisfy the claim, the parallel mode also has a transparent

10  background command that causes all succeeding characters to be displayed with the underlying

11  background of the character unchanged.  (Id., p. 184).

12        44.     Recommendation S.100 also discloses a third mode of access wherein an in-use

13  foreground color and an in-use background color are specified as indices into the Color Memory.

14  Recommendation S.100 discloses a mode of access wherein the in-use foreground color is

15  specified as an index into the Color Memory.  (See above).  Furthermore, Recommendation S.100

16  discloses a mode of access wherein the in-use background color is specified as an index into the

17  Color Memory.

18        45.     In the parallel mode of the alphamosaic option, the background color is specified as

19  a code which one of ordinary skill in the art would understand to be an index to a color table using

20  command code 5/0 – 5/7.  (Id., p. 181).  Because the parallel mode of the alphamosaic option is

21  based on the Antiope system, and because the Antiope system was known to have been

22  implemented using a color memory, and because the codes 5/0 – 5/7 are not color components

23  themselves, it was clear to one of ordinary skill in the art that the background command specifies

24  an index into a color memory.

25        46.     Recommendation S.100 also discloses a display means responsive to the processing

26  means, the display means displaying the colors associated with the Color Data Values accessed by

27  the selected mode.  The display means disclosed in Recommendation S.100 is the same or

28  equivalent structure of a computer monitor, TV, video projection system, LCD or an LED display

-15-

Exhibit 51
Page 000891

1   disclosed in the '759 patent.  ('759 patent, Col. 4:50-55).  Recommendation S.100 states:

2
        "Videotex systems are text communication systems having in
3       addition the capability of a given level of pictorial representation
        and a repertoire of display attributes.  **The text and the pictures**
4       **obtained are intended to be displayed using the current**
        **television (TV) raster standards of the different countries**."
5
        (Recommendation S.100, p. 166, emphasis added).
6
    As such, Recommendation S.100 discloses a display means responsive to the processing means.
7
    Id.  Based on the foregoing, Recommendation S.100 makes obvious claim 1 of the '759 patent.
8
                **2.      Claims 2 and 3 are Obvious in View of Recommendation S.100 Alone**
9
        **or in Combination with Crowther**
10
                47.     Recommendation S.100 discloses a digital image display system, a Color Memory
11
    for storing Color Data Values and a processing means responsive to predetermined commands and
12
    data, the processing means, responsive to a first command, selecting a mode of access to the Color
13
    Memory.   Each of these is disclosed by Recommendation S.100 as discussed above in relation to
14
    claim 1.  Claim 2 additionally calls for "a second command, setting a color data value in the color
15
    memory."  Recommendation S.100 makes obvious this second command in its discussion of the
16
    enhancements to Recommendation S.100 to implement animation.  Recommendation S.100 states:
17
         "The ability to simulate motion (*i.e.* animation) is a potential
18       enhancement that can be achieved by several means. These include:
         … b) dynamically altering the colour of portions of the display
19       image, making them appear or disappear by **redefining the colour**
         **table (an image disappears when its colour is set to the same**
20       **colour as the surrounding area**)."  (Recommendation S.100, p.
         198 [emphasis added]).
21
                48.     In order to set the color of an image to be the same color as the surrounding area, it
22
    is necessary for the processor to receive and process a command that changes the value in the
23
    color memory.  Such a command would be a second command for setting a color data value in the
24
    color memory.
25
                49.     Furthermore, the combination of Recommendation S.100 and Crowther makes clear
26
    that a color map may be used to add to the number of available colors that can be displayed on a
27
    Videotex system.  Crowther discusses an enhancement to videotex systems whereby additional
28

                                        -16-

Exhibit 51
Page 000892

1   character sets can be downloaded to display terminals.  Additionally, Crowther teaches that in

2   addition to new character fonts, color data values can be downloaded to a color memory to provide

3   new color possibilities for the newly downloaded characters.  Crowther states:

4           "To achieve the adaptive colours it is proposed to transmit codes as
            part of the D.R.C.S. data defining the colours to be employed in the
5           particular picture.  The 16 colours would be coded simply by
            allocating either 4 levels (2 bits) or 16 levels (4 bits) of intensity for
6           each of the three primary colors.  These codes of the 16 pre-defined
            colours would be stored in memory as shown in Figure 4."
7           (Crowther, page 711).

8   Figure 4 of Crowther is a color memory as reproduced below.



"ADAPTIVE COLOUR MODE"

Figure 4

20          50.     Loading the color table in the Crowther extension to the videotex system requires a

21  command which would act as the second command.  As such, Crowther discloses "a second

22  command, setting a color data value in the color memory."  Since Recommendation S.100 in

23  combination with Crowther discloses each of the claim elements of claim 2, these two references

24  taken together also make obvious claim 2 of the '759 patent.  Recommendation S.100 provides

25  reasons to employ a writable color memory where it suggests "redefining the colour table."  (Id.,

26  page 198).  A person of ordinary skill in the art would have had reason to look to Crowther for

27  details on exactly how to implement this suggested feature because Crowther teaches how to

28  implement this very same feature in a videotex system.  Furthermore, the fact that

-17-

Exhibit 51
Page 000893

1    Recommendation S.100 and Crowther both discuss use of dynamically redefinable character sets

2    ("DRCS") techniques in videotex systems also would have motivated a person of ordinary skill in

3    the art to choose Crowther's specific implementation for achieving the function of "redefining the

4    colour table" as suggested in Recommendation S.100.  (Id., page 196-197).

5         51.    In addition, both references suggest color display enhancements for videotex

6    terminals having color maps.  Recommendation S.100 at p. 198; Crowther at p. 710-711.  In

7    addition, both of these references were concerned with videotex terminals capable of operating in

8    an alphamosaic mode wherein color data values (for both foreground and background) may be

9    accessed via index values into a color map.  (Recommendation S.100 at pp. 172-185; Crowther at

10   p. 709-711).

11        52.    The Crowther paper was presented at the 1980 Spring Conference on videotex

12   topics.  (Crowther p. 707).  As such, this paper was well known to those in the videotex

13   community, as was Recommendation S.100.  Based on the fact that these two references were both

14   well known in the videotex community, and the fact that both references were targeted at least in

15   part at the same narrow videotex topics, a person of ordinary skill in the art would have had

16   reasons to combine the teachings of the two references to arrive at the system described in claim 2.

17   In addition, the trends toward higher resolution display, a wider range of colors, and decreasing

18   costs of memory also provided reasons to combine the teachings of Recommendation S.100 and

19   Crowther.

20        53.    The addition of the methodology described in Crowther (for "adaptively" defining

21   the colors in a color map by transmitting codes as part of DRCS data) to the videotex system

22   specified by Recommendation S.100 led to results that could have been predicted by a person of

23   ordinary skill in the art prior to the time of the alleged invention.  The coding scheme described by

24   the Crowther paper would perform the same function, and yield the same results, in the videotex

25   system specified by Recommendation S.100 as it would in any other prior art videotex system

26   capable of operating in an alphamosaic mode wherein color data values (for both foreground and

27   background) may be accessed via index values into a color map.

28        54.    Moreover, Recommendation S.100 discloses the display means of claim 2 as

-18-

Exhibit 51
Page 000894

1    discussed above.

2        55.    Claim 3 adds that the processing means is responsive to a second command which

3    sets plural Color Data Values in Color Memory.  Recommendation S.100 makes obvious to one of

4    ordinary skill in the art this second command.  Recommendation S.100 discloses a writable color

5    memory as an enhancement to the basic system as previously discussed.  (Recommendation S.100,

6    page 198).  In recommending that an image can disappear when its color is set as the same color as

7    the surrounding area, it is obvious to one of ordinary skill in the art that if the image is made up of

8    multiple colors, it will be necessary to redefine multiple color table entries in order to accomplish

9    this masking operation.  Performing this write of multiple data values in the color memory would

10   need to be directed by a command.  This command would act as the second command.  As

11   Recommendation S.100 teaches each of the elements of claim 3, Recommendation S.100 makes

12   obvious Claim 3 of the '759 patent.

13       56.    Furthermore, Crowther when combined with Recommendation S.100 makes clear

14   that a processing means may be responsive to a second command to set plural color data values in

15   color memory. As previously discussed, Crowther teaches a writable color memory.   (Crowther,

16   p. 710).  Crowther also teaches that multiple colors can be transmitted as codes to load the color

17   memory.  (Id., p. 711).  Loading multiple values in the color table in the Crowthers extension to

18   the videotex system requires a command.  This command can act as the second command of the

19   claim.  As Recommendation S.100 in combination with Crowther discloses each of the claim

20   elements of claim 3, these two references taken together also make obvious claim 3 of the '759

21   patent.  The same reasons for combining the teachings of Recommendation S.100 and Crowther to

22   arrive at the system described in claim 2 also apply to combine these references to arrive at the

23   system described in claim 3.

24       **B.    Claims 1-3 Of The `759 Patent Are Obvious in View of CRC 699-E In**

25              **Combination with Antiope and Crowther**

26       57.    It is my opinion that claim 1 of the Fleming `759 Patent is obvious in view of CRC

27   699-E alone or in combination with the Antiope Specification.  It is also my opinion that claims 2

28   and 3 are obvious in view of CRC 699-E in combination with the Antiope Specification and

-19-

Exhibit 51
Page 000895

1    Crowther.  A chart form analysis of how these references make obvious claims 1-3 of the '759

2    patent is presented in Exhibit 3 to this report.  I will now review and elaborate on this analysis.

3        **1.    Claim 1 is Obvious in view of CRC 699-E in Combination with the**

4    **Antiope Specification**

5        58.    CRC 699-E describes the Telidon Videotex system.  The Telidon system was

6    designed to display information received from a central database and displayed on a domestic

7    home television receiver using a micro-computer. (CRC 699-E, page 1).  This is exactly the same

8    type of system disclosed in the '759 patent for which the patent is intended to be used. ('759

9    patent, col. 1:39-46).

10        59.    CRC 699-E discloses a memory for storing color data values.  CRC 699-E teaches

11    that a color memory could be used with the Telidon system but that it was not included in the

12    initial trial system because it was not cost effective to implement this hardware at that time.  (CRC

13    699-E, page 70).  CRC 699-E also discloses how the color memory would be activated in the

14    design by setting bit b2 of the TONAL CONTROL status command.  (Id., pp. 49-50).   Allocating

15    a specific bit and specifically indicating that it should be used to enable a color map memory

16    discloses to a person with ordinary skill in the art a memory for storing color data values.

17        60.    CRC 699-E also discloses a processing means responsive to predetermined

18    commands and data comprising at least one command.  CRC Technical note No. 699-E teaches a

19    processing means in the form of a micro-computer.   (CRC 699-E, p. 1).  CRC 699-E discloses that

20    the processing means decodes the predetermined commands and data and selects one of a plurality

21    of modes of access to Color Data Values.  In particular, the flag field of the TONAL CONTROL

22    selects between color versus grayscale display and envisions selecting between direct versus

23    indirect color selection. (Id., pp. 49-50).

24        61.    As I said, I have previously reviewed Lucent's infringement position as it relates to

25    the required "predetermined command and data sequence" for selecting modes of access to Color

26    Data Values in claim 1.  (Wedig Noninfringement Report, ¶ 29-32).  To the extent that Lucent

27    believes that it has identified accused structure for satisfying the "processing means" element,

28    CRC No. 699-E discloses structure that would satisfy that element in the same manner that Lucent

-20-

Exhibit 51
Page 000896

1   contends it is satisfied by the accused products, in that CRC No. 699-E discloses a processor

2   responsive to commands and parameters selecting modes of access to Color Data Values which is

3   the basis for Lucent's identification of supposedly satisfying structure.  Furthermore, whereas the

4   commands identified in Lucent's infringement contentions do not select a mode of access to Color

5   Data Values and are not, in any event, a command and data *sequence* to which the system

6   responds, the predetermined command and data sequence taught by the CRC No. 699-E follow the

7   teachings of the patent specification in that CRC 699-E allows for a variable number of parameters

8   after the initial command code which changes the way the command is interpreted.

9
             "The flag field of the command is used to indicate whether the byte
10           represents a command opcode or data associated with the
             command. The flag field is 0 for opcodes and 1 for numeric data.
11           The number of bytes in the code sequence associated with a
             particular drawing command is determined from the flag field.  A
12           command's domain begins by its opcode byte and terminates either
             by the start of the following opcode byte or by an SO, SI, SS or
13           ESC character."

14           (CRC 699-E, p. 11)

15          62.    Also to the extent that Lucent contends infringement due to GDI commands that

16   allegedly define different modes of access, CRC 699-E discloses commands for setting modes of

17   access to Color Data Values that are as similar as or more similar to commands disclosed in the

18   '759 patent using structure that is as similar as or more similar to the structure disclosed in the

19   '759 patent.  These modes of access are discussed in relation to first, second and third mode

20   below.

21          63.    CRC 699-E discloses a first mode of access to Color Data Values from the Color

22   Memory wherein an in-use foreground color is directly specified as a Color Data Value.  The

23   VALUE form of the CONTROL opcode directly specifies the color to be used as the in-use

24   foreground color.  (CRC 699-E, page 41)  The specified in-use foreground color is a color data

25   value because it specifies the triplets of values for the three primary colours GREEN, RED and

26   BLUE for a particular color.  (CRC 699-E, page 42)

27          64.    CRC 699-E discloses a second mode of access in which the in-use foreground color

28

                                        -21-

Exhibit 51
Page 000897

1    is specified as an index into the color memory.  First, as discussed above, CRC 699-E discloses the

2    use of a color memory.   (Id., p. 70).  Furthermore, CRC 699-E allocates a bit for invoking a future

3    use of the color memory. (Id., p. 50).  Also, CRC 699-E discloses the four modes of the TONAL

4    CONTROL Command which includes direct color, direct grayscale, indirect color and indirect

5    grayscale.  These are shown in CRC 699-E in the figure at the bottom of page 50 with direct color

6    selection shown in the upper left, direct grayscale shown in the lower left, indirect color in the

7    upper right and indirect grayscale shown in the lower right of the figure.



(CRC 699-E, page 50).

16    65.    One of ordinary skill in the art would understand that if a videotex system based on

17    the teachings of CRC 699-E were to include a color memory as suggested and bit 2 were set to

18    enable the indirect color specification, then the in-use foreground color could be specified using an

19    index into the color memory.  (CRC 699-E, page 41).  Moreover, the Antiope videotex system had

20    the ability to specify an in-use foreground color as an index into color memory.  (Antiope

21    Specification, pp. 6 -7).  Thus, CRC 699-E in combination with the Antiope Specification also

22    discloses this mode of access.

23    66.    Furthermore, CRC 699-E in combination with the Antiope Specification also

24    discloses a mode of access wherein an in-use foreground color and an in-use background color are

25    specified as indices into the Color Memory.  CRC 699-E discloses a mode of access wherein the

26    in-use foreground color is specified as an index into the Color Memory.  (See above).  The

27    Antiope Specification discloses a mode of access wherein the in-use background color is specified

-22-

Exhibit 51
Page 000898

1  as an index into the Color Memory.   (Antiope Specification, pp. 6 -7).

2          67.      As previously discussed, CRC 699-E teaches extending the capabilities of the

3  Telidon system to include a color memory, and the specification allocates a bit for enabling this

4  memory.  The Antiope Specification was known to one of ordinary skill in the art to display colors

5  by using a color memory.  ('759 patent, 1:22-27).  The Antiope Specification also teaches

6  commands for specifying the in-use background color.  The Antiope Specification teaches one set

7  of commands for specifying the in-use background color of the alphanumeric characters, and a

8  second set of commands for specifying the alphamosaic characters.  Referring to Figure 7, the

9  Antiope Specification teaches a set of commands for specifying the in-use background color of

10  alphanumeric characters:

11          "In the event that the background color and the character color are
           specified independently, the codes being used to transmit the
12          background color in the release sequence are the first eight in
           column 6.  The binary elements b1, b2 and b3 of these codes have
13          the same meaning as those of the codes transmitting the color of the
           character."
14

15          (Antiope Specification, p. 7).

16          68. The Antiope Specification also teaches specifying the in-use background color of

17  semi-graphical characters.

18          "As was noted above, the functions of reversed background, double
           height and double length do not apply to the semi-graphical
19          characters in Figure 3.

20          In this case, the binary elements b2, b3 and b6 of the transmitted
21          code are allocated to the specification of the background color.
           There is a correspondence between these binary elements and the
22          primary colors R, G, B of the received signal."

23          (Antiope Specification, p. 7).

24          69.      Because CRC 699-E teaches extending the specification to include a color memory,

25  and because one of ordinary skill in the art understood that Antiope used an index to a color

26  memory to specify an in-use background color, then the combination of CRC 699-E and the

27  Antiope Specification teaches a mode of access wherein the in-use foreground color and an in-use

28

-23-

Exhibit 51
Page 000899

1    background color are specified as indices into the color memory.

2        70.    CRC 699-E discloses a display means responsive to the processing means, the

3    display means displaying the colors associated with the Color Data Values accessed by the

4    selected mode.  The display means disclosed in CRC 699-E is the same or equivalent structure of

5    a computer monitor, TV, video projection system, LCD or an LED display disclosed in the '759

6    patent.  ('759 patent, Col. 4:50-55).  CRC 699-E states, for example:

7
        "The Telidon Videotex system is a method by which information
8            can be accessed from central data bases by the general public.  By
        the use of a domestic home television receiver augmented by a
9            micro-computer controlled interface device a user can access pages
        over graphical and textual information over a public common
10           carrier communication facility such as the telephone network, a
        cable television line or the data may be even encoded into unused
11           space in a broadcast television signal."

12       (CRC 699-E, p. 1)

13       71.    Based on the foregoing, it is my opinion that the combination of CRC 699-E and

14   the Antiope Specification teaches all of the elements of claim 1 of the '759 patent.  A person of

15   ordinary skill in the art would have had many reasons to combine the teachings of CRC 699-E and

16   the Antiope Specification prior to the alleged invention.  First, the trends toward international

17   videotex standardization and terminal independence would have motivated a person of ordinary

18   skill in the art to combine the teachings of these references to use a terminal operative to work

19   with Telidon in one mode, and with Antiope in a second mode.  Indeed, the Videotex Report

20   Series stated in 1980 that:

21           "Of course, **it is possible for the different graphic methods to be combined**.  For
22           example, Prestel has demonstrated alphamosaic and photographic images (of restricted
        size) on the same page.  **Antiope and Telidon have performed similarly**.  At present it is
23           still not clear which method, or combination of methods, will prove to be the most widely
        acceptable."

24       Videotex Key Issues, p. 29 *citing* CCITT Draft Recommendation Sg No. 164E

25       (emphasis added).

26       72.    In addition, a person of ordinary skill in the art could have predicted that the

27   specification of foreground and background colors using an index into a color map in the Antiope

28
               -24-

Exhibit 51
Page 000900

1  system would perform the same function in the manner used in the Telidon system specified by

2  CRC 699-E.  The trend toward higher resolution display and a wider range of colors, along with

3  the decreasing cost of memory also would have prompted persons of ordinary skill in the art to

4  employ the technique of specifying foreground and background colors using an index into a color

5  map (as taught by the Antiope Specification) in a selectable mode of operation in the Telidon

6  system.

7       **2.**     **Claims 2 and 3 are Obvious in View of CRC 699-E in Combination**

8  **with the Antiope Specification and Crowther**

9       73.     In addition to the elements recited in claim 1, claim 2 calls for "a second command,

10  setting a color data value in the Color Memory."  The combination of CRC 699-E and the Antiope

11  Specification discloses all the elements of claim 2 except for a command for setting or storing a

12  color data value in color memory.   However, Crowther teaches that a color map may be used to

13  help add to the number of available colors that can be displayed on a Videotex system.  As

14  discussed above in more detail, Crowther teaches:

15       "In its simplest form the four bits can be used to define one of the
16       eight colours and two levels of intensity.  However, it is felt that by
     a simple extension of the system the four bits could be employed to
17       define up to sixteen adaptively defined colours."

18       (Crowther, p. 710).

19  Colors can only be "adaptively defined" if they can be written and changed.  The necessary

20  command for loading the color table in Crowther would act as the second command.  Because

21  CRC 699-E in combination with the Antiope Specification and Crowther discloses this claim

22  limitation and the other claim limitations already discussed in relation to claim 1, the combination

23  of these references makes obvious claim 2 of the '759 patent.

24       74.     There are many reasons to combine the teachings of these references.  The same

25  reasons discussed above with respect to Recommendation S.100 and Crowther, and with respect to

26  CRC 699-E and Antiope also apply to the combination of CRC 699-E and Antiope.

27       75.     Claim 3 adds that the processing means must be responsive to a command for

28  setting plural Color Data Values in Color Memory.  CRC 699-E and the Antiope Specification

-25-

Exhibit 51
Page 000901

1  when combined with Crowther makes obvious to one of ordinary skill in the art a second

2  command for setting plural color data values in color memory.  As previously discussed, Crowther

3  discloses a color memory composed of "adaptively defined colours."  Crowther also discloses that

4  to initialize the color memory, the colors are downloaded to the terminal.  (Crowther, page 711,

5  "To achieve the adaptive colours it is proposed to transmit codes as part of the D.R.C.S. data

6  defining the colours to be employed in the particular picture.")  The command that loads the color

7  values into the color memory is the second command of claim 3.  Therefore, CRC 699-E when

8  combined with Antiope and Crowther makes obvious Claim 3.

9       76.    The same reasons to combine these references for claim 2 also apply to claim 3.

10      **C.    The NASA Final Report Anticipates Or At Least Makes Obvious Claims 1-3**

11           **of the `759 Patent**

12      77.    I have reviewed the technical paper titled "Final Report – NASA Grant NSG 1508,

13  Extension of the Core Graphics System for Raster Graphics Display".  ("NASA Final Report").

14  The NASA Final Report is made up of three parts.  The first part is a defined set of raster

15  extensions to the Core System developed by ACM/Siggraph and makes up Appendix A.  The

16  second part is a paper of the proposed extensions disseminated at Siggraph '79, the annual

17  computer graphics conference held in 1979.  This section makes up Appendix B.  The final section

18  is a description of George Washington University's implementation of the Core System to

19  accommodate the proposed Core Extensions.  This section makes up Appendix C.

20      78.    The NASA Final Report anticipates or at least renders obvious claims 1 - 3 of the

21  '759 patent.  A chart form analysis of how this paper anticipates or at least renders obvious claims

22  1 – 3 of the '759 patent is presented in Exhibit 4 to this report.  I will now review and elaborate on

23  this analysis.

24      **1.    The NASA Final Report Anticipates Or At Least Makes Obvious**

25      **Claim 1**

26      79.    The NASA Final Report describes the raster extensions to the Core System and an

27  implementation of the Core System at George Washington University.  The Core System with the

28  raster extensions provides a design specification for a terminal independent language designed to

Exhibit 51
Page 000902

1    be used on a digital image display system capable of providing a visible representation of

2    information in a data-processing system.  (NASA Final Report, Appendix B, page 2).

3        80.    The NASA Final Report discloses a memory for storing color data values.  The

4    Color Data Values are stored in the Color Memory as components of particular colors such as Red,

5    Green, and Blue.  The NASA Final Report explains that on the device level, there are three ways

6    of specifying color. (NASA Final Report, Appendix C, page 21-2)  Choice B specifies a "color

7    look-up table" or Color Memory.  Therefore, the NASA Final Report discloses a Color Memory.

8    The NASA Final Report also discloses that color data values are stored in the Color Memory as

9    components of particular colors such as Red, Green, and Blue. (NASA Final Report, Appendix C,

10   page 16).

11       81.    The NASA Final Report also discloses a processing means responsive to

12   predetermined commands and data comprising at least one command, the processing means

13   decoding the predetermined commands and data, the predetermined commands and data selecting

14   one of a plurality of modes of access to Color Data Values.  The commands and data sequences

15   disclosed in the NASA Final Report specify if the image display system is to display color or

16   intensity and whether the color or intensity is to be displayed directly or indirectly through the

17   color memory.  These mode selections may be made by setting the TYPE and MODE parameters

18   of the "INITIALIZE_VIEW_SURFACE" command.  (NASA Final Report, page 21-3).

19   Furthermore, the NASA Final Report also discloses selecting modes of access associated with the

20   foreground and background color selection as discussed below.  (NASA Final Report, Appendix

21   C, page 17-18).  To the extent that Lucent contends infringement due to GDI commands that

22   supposedly define different modes of access, the NASA Final Report discloses commands for

23   setting modes of access to Color Data Values that are as similar as or more similar to commands

24   disclosed in the '759 patent using structure that is as similar as or more similar to the structure

25   disclosed in the '759 patent.   These modes of access are discussed in relation to first, second and

26   third mode below.

27       82.    NASA Final Report discloses two related commands for satisfying the first mode of

28   access to Color Data Values from the Color Memory wherein an in-use foreground color is

-27-

Exhibit 51
Page 000903

1    directly specified as a Color Data Value.  The Raster graphics extensions to the Core Systems

2    described in Appendix A to the NASA Final Report discloses the "SET_CURRENT_COLOR

3    (R,G, B)" command to directly specify the in-use foreground color.  This command finds the

4    Color Data Value in the Color Memory that has the closest color match to the operand.  The index

5    in Color Memory of this Color Data value becomes the current color index for the in-use

6    foreground color.  All subsequently generated output primitives will be displayed with the in-use

7    foreground color associated with the index until changed. (NASA Final Report, Appendix A, page

8    4).  An output primitive is a text or graphics drawing command.  Appendix A of the NASA Report

9    was meant to be used in conjunction with the original GSPC CORE Specification titled "Status

10   Report of the Graphics Standards Planning Committee," Computer Graphics, Vol. 11, No. 3, Fall

11   1977.  ("1977 GSPC Report") with section numbering scheme following the original 1977 GSPC

12   Report (NASA Final Report, Appendix A, preface).  1977 GSPC Report has a section titled

13   "OUTPUT PRIMITIVES" which defines text and graphics drawing commands such as

14   "TEXT(CHARACTER_STRING)" and "LINE_ABS_2."  (1977 GSPC Report, II-19, II-20).

15         83.    The Core system was designed to generate output primitives including text.  (1977

16   GSPC Report, pp. II-16-18).  The system allows graphics applications to define primitive

17   attributes including color.  (Id., p. II-16).  In the Core system, the "primitive attributes are

18   specified modally; that is, all output primitives created between changes to a current attribute

19   value will have their appearance affected in the same way (with respect to that attribute)."  (Id., p.

20   II-8).  The color attribute applies to all output primitives.  (Id., p. II-17, II-25).  So, for example, if

21   a color attribute was set to "red," then all subsequent text and drawing commands would render

22   primitives in red until the color attribute is changed.  Id.  The SET_CURRENT_COLOR

23   command "sets the current system-maintained attribute value" for the color attribute.  (Id., II-32).

24         84.    Furthermore, Appendix C of the NASA Final Report discloses the "SET COLOR"

25   command that directly sets the color of succeeding output primitives until changed.  The NASA

26   Final Report discloses that for devices with direct color specification, the in-use foreground color

27   of subsequent displayed objects will use the closest match of the specified color data value.

28   (NASA Final Report, Appendix C, page 21-7).

-28-

Exhibit 51
Page 000904

85.     It is interesting to note that the method used by SET_CURRENT_COLOR and SET_COLOR for directly specifying the Color Data Value and finding a Color Memory entry which has the best match is how the "mode 0" is described to operate in the '759 patent.  ('759 patent, col. 7:32-34, "At box 512, the foreground color is set to the index of the closest match of the first operand and a color value from the color map memory table 6a.").  Likewise, the NASA Final Report discloses that if the exact Color Data Value is not available in the Color Memory, the closest approximate Color Data Value is used.  (NASA Final Report, Appendix B, page 12, "The color attribute for output primitives is specified in one of two ways:  by value and by index.  The function SET_CURRENT_COLOR [R,G,B] specifies the current value of the color attribute.  If the exact [R,G,B] triple specified in not included in the active color set, then a best fit to an available triple is used.").

86.     The NASA Final Report discloses a second mode of access in which the in-use foreground color is specified as an index into color memory.  The in-use foreground color is used as foreground color for subsequently received text and graphics drawing commands until changed.  The Raster graphics extensions to the Core Systems described in Appendix A to the NASA Final Report discloses the "SET_CURRENT_COLOR_INDEX (I)" command to specify the in-use foreground color as an index into the color memory.  All subsequently generated output primitives are then displayed with the color associated with the index. (NASA Final Report, Appendix A, page 5).  Again, output primitives are text and graphics drawing commands as defined in the 1977 GSPC Report.  (1977 GSPC Report, II-19, II-20).

87.     Furthermore, Appendix C of the NASA Final Report discloses the "SET_INDEX" command specify the in-use foreground color as an index into the color memory for subsequently received "output primitives" until changed where "output primitives" are defined to be text and graphics drawing commands as shown in 1977 GPSC Report.  (NASA Final Report, Appendix C, page 21-8). (1977 GSPC Report, II-19, II-20).   Either of these two commands selects a second mode of access in which the in-use foreground color is specified as an index into color memory.

88.     The NASA Final Report also discloses a third mode of access wherein an in-use foreground color and an in-use background color are specified as indices into the Color Memory.

-29-

Exhibit 51
Page 000905

1   The NASA Final Report discloses a mode of access wherein the in-use foreground color is

2   specified as an index into the Color Memory.  (See above).  Appendix A to the NASA Final

3   Report also discloses the "SET_BACKGROUND_COLOR_INDEX (INDEX)" command to

4   specify the in-use background color as an index into the color memory.  (NASA Final Report,

5   Appendix A, page 20).  Once a NEWFRAME command is received, the color identified by the

6   index into the color memory will be used as the background color for subsequently received text

7   and graphics drawing commands.  Furthermore, Appendix C of the NASA Final Report discloses

8   the "SET BACKGROUND INDEX" command to specify the in-use background color as an

9   index into the color memory until changed.   (NASA Final Report, Appendix C, page 21-8).

10  Notably, the description of this command does not mention a requirement for a NEWFRAME

11  command.  To the extent that the commands identified by Lucent in its infringement contentions

12  satisfy the court's claim construction, the commands disclosed by the NASA Final Report also

13  satisfy it since the NASA Final Report commands and data are as similar as or more similar to the

14  patented commands and data than those commands and data accused by Lucent.  To the extent

15  that Lucent or its expert assert that the NASA Final Report does not disclose the "in-use

16  background color" element, it is my opinion that a person of ordinary skill in the art would have

17  knowledge of systems that had the ability to set the background color of individual characters or

18  graphic primitives by index to a color memory.  *See, for example*, The Application of The

19  Intercolor 8000 Terminal To Thematic Cartography, James R. Carter, Siggraph '76, July 14-16,

20  1976 at p. 163; Ramtek 9000 Series Graphic Display System Programming Manual at p. 3-21;

21  Antiope Specification, pp. 6-7.  Therefore, at a minimum, the NASA Final Report, in view of the

22  knowledge of a person of ordinary skill would render this claim obvious.

23       89.    The NASA Final Report discloses a display means responsive to the processing

24  means, the display means displaying the colors associated with the Color Data Values accessed

25  by the selected mode.  The display means disclosed in NASA Final Report is the same or

26  equivalent structure of a computer monitor, TV, video projection system, LCD or an LED display

27  disclosed in the '759 patent.  ('759 patent, Col. 4:50-55).  The NASA Final Report states, for

28  example, that

-30-

Exhibit 51
Page 000906

"[t]he image display system reads the refresh buffer in synchronism with a TV raster, using the pixel values to control the color or intensity of points on the display screen. An optional look-up table in the image display system can dynamically assign intensities or colors to pixel values. There is a 1-1 correspondence between pixels in the refresh buffer and points on the display screen (some contemporary raster systems do not impose this restriction.)"

(NASA Final Report, Appendix B, page 2).

90.    Based on the foregoing, the NASA Final Report discloses all of the elements of claim 1 of the '759 patent.

**2.      The NASA Final Report Anticipates Or At Least Makes Obvious Claims 2 and 3**

91.    As discussed above, the NASA Final Report discloses a digital image display system, a Color Memory for storing Color Data Values and a processing means responsive to predetermined commands and data, the processing means, responsive to a first command, selecting a mode of access to the Color Data Values, and display means.   Each of these claim limitations is disclosed by NASA Final Report as discussed above in relation to claim 1.   Claim 2 additionally calls for "a second command, setting a color data value in the Color Memory."   The NASA Final Report discloses, or renders obvious, all the claim limitations of Claim 2 including a command for setting or storing a Color Data Value in Color Memory.

92.    The NASA Final Report also discloses a processing means responsive to a second command setting a color data value in the color memory.   Appendix A to the NASA Final Report discloses the "REDEFINE_COLOR (I,R,G,B)" command for setting a color data value in the color memory.   (NASA Final Report, Appendix A, page 14).   Furthermore, Appendix C of the NASA Final Report discloses the command "DEFINE COLOR INDICES" which sets multiple color memory entries.   In that this command can store multiple color data values in the color memory, it can also store one color data value in the color memory when the two integer parameters are the same value.   (NASA Final Report, Appendix C, page 21-8).   Because the NASA Final Report discloses this claim limitation and the other claim limitations already discussed in relation to claim 1, NASA Final Report discloses all of the elements of claim 2 of the '759 patent.

-31-

Exhibit 51
Page 000907

93.     Claim 3 adds that the processing means must be responsive to a command for setting plural Color Data Values in Color Memory.  The NASA Final Report discloses the command "DEFINE COLOR INDICES" which sets multiple color data values in the color memory when I2 is greater than I1.   (NASA Final Report, Appendix C, page 21-8).  This command defines all the Color Data Values to use within a range of Color Memory entries.  This command sets plural Color Data Values in the Color Memory as required by Claim 3.  Therefore, NASA Final Report discloses all of the elements of Claim 3 of the '759 patent.

## V.     NO CONCEPTION OF THE CLAIMS ON THE DATE LUCENT CONTENDS

94.     It has been explained to me that art dated before the application filing date of a patent is not prior art if the inventor conceived of the invention before the date of the prior art and exercised reasonable diligence from just before the date of the prior art up to the date of the inventor's reduction to practice.  In the present case, I understand that Lucent contends that the subject matter recited in the asserted claims of the `759 Patent was conceived at least as early as February 25, 1980.  As explained below, I have seen no evidence to support this contention.

95.     I have reviewed a portion of Lucent's Second Supplemental Response to Interrogatory No. 4 from Microsoft, Dell and Gateway, served on February 6, 2006, which relates to conception and reduction to practice of the `759 Patent ("Lucent's Second Supplemental Response to Interrogatory No. 4").  More specifically, I reviewed the portion that reads as follows:

> **U.S. Patent No. 4,439,759 ("Fleming"):** The claimed invention was **conceived at least as early as February 25, 1980,** as reflected by at least **LUC 004305-46,** and reduced to practice at least as early as the filing date of May 19, 1981.  Pursuant to Federal Rule of Civil Procedure 33(d), documents demonstrating the conception, reduction to practice, and/or diligence include the patent and corresponding file history, and Lucent business records bearing production numbers **LUC 003903-004026; LUC 004035-004041; LUC 004305-004346; and LUC 004347-004385.**  Deposition testimony demonstrating the conception, reduction to practice, and/or diligence includes the **testimony of James Fleming (e.g., Dep. Tr. at 71-78, 85-91, 158-159, 175.178, 185-187), and Gerald Soloway (e.g., Dep. Tr. at 89.92).**  Lucent reserves the right to supplement or amend its response to this interogatory as discovery and Lucent's investigation in this case proceed, or in the event that defendants present any prior art that would put the facts, dates, and circumstances related to the conception, reduction to practice, and diligence relating to this patent into issue in this case.  (Lucent's Second Supplemental Response to Interrogatory No. 4, p. 4 [emphasis added].)

96.     I have also reviewed the deposition transcripts of Fleming and Soloway.  In

Exhibit 51
Page 000908

addition, I have reviewed the following documents cited by Lucent in support of an early

conception of the Asserted Claims of the Fleming Patent:

- Bell Laboratories Technical Memorandum entitled "Home Information System (HIS) Terminal Proposal," by W.A. Frezza, S.D. Hoskins, R.R. Meyer, and W.S. Stoddard, dated February 25, 1980 (LUC 004305-46) (the "February 25, 1980 Memorandum");

- Bell Laboratories Technical Memorandum entitled "Home Information System (HIS) Application Level Code Sets," by W.A. Frezza, dated April 18, 1980 (LUC 004347-004385) (the "April 18, 1980 Memorandum");

- Bell Laboratories document entitled "HIS Market Trial," dated March 18, 1981 (LUC 004035-004041) (the "March 18, 1981 Memo"); and

- Bell Laboratories document entitled "Draft Home Information System Presentation Level Protocol Specification," dated April 14, 1981 (LUC 003903-004026) (the "April 14, 1981 Draft PLP Specification").

97.    I have been asked to form an opinion as to whether or not the above-identified

evidence supports Lucent's contention that the material recited in the asserted claims was

conceived on February 25, 1980.  It has also been explained to me that conception of an invention

is complete when the inventor has formed the idea of how to make and use every aspect of the

claimed invention, and all that is required is that it be made without the need for any further

inventive effort.  In light of this instruction, I have compared the elements of the Asserted Claims

to the documents identified above.

98.    Contrary to Lucent's contentions, the February 25, 1980 Memorandum

demonstrates that Fleming et al. had not formed the ideas defined in the asserted claims of the `759

Patent as of February 25, 1980.  This document appears to have been written by Frezza and others,

and it was distributed to Fleming and Soloway, but there is no evidence that Soloway contributed

to it.  (February 25, 1980 Memorandum, LUC 004305-4306).

99.    While the February 25, 1980 Memorandum discusses color lookup tables, it does

not contain any discussion of a mode of access where color data values are directly specified.

There is certainly no teaching of the specific "processing means" element of claim 1 required to

satisfy the specific requirements of claim 1:

processing means responsive to a predetermined command and data
sequence  comprising at least one command, the processing means decoding
the predetermined  command and data sequence, the predetermined

-33-

Exhibit 51
Page 000909

command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising

a first mode of access wherein an in-use foreground color is directly specified  as a color data value;

a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and

a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and

`759 Patent, claim 1, 14:22-29.

100.    I understand that the processing means element has been interpreted as a means-plus-function claim in accordance with section 112, paragraph 6.  I also understand that the function of this element is "decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values."  I understand that the court has determined the structure of this element to be "Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403,404, 405,407,408, and 411 of Figure 4 (See, Col.5, line 60- Col.6, line 19, Cof.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24-29, 29-32 (except for "and the background and foreground color"), lines 33-43).

101.    In my opinion, the February 25, 1980 Memorandum fails to demonstrate conception of the function or the structure of at least the "processing means" recited in claim 1 of the `759 Patent.  The Memorandum contains no mention of a function wherein "color is directly specified as a color data value," no mention of multiple "modes of access to color data values," and no mention of a "predetermined command and data sequence."  In addition, the Memorandum contains no mention of any structure even remotely similar to the structure identified by the Court as corresponding with the "processing means."  Moreover, the Memorandum actually demonstrates that the applicants had yet to settle on any coding scheme (*i.e.,* "predetermined command and data sequence") where it states "a detailed protocol and transmission coding scheme specification must be developed, taking into account the most recent activities in the standard areas as well as the conceivable HIS network configurations."  February 25, 1980 Memorandum,

-34-

Exhibit 51
Page 000910

1    LUC 004331.

2    102.    For all of the same reasons described above, the February 25, 1980 Memorandum

3    does not demonstrate conception of the function or the structure of the "processing means" recited

4    in claim 2.  Most importantly, because the February 25, 1980 does not contemplate any more than

5    one mode of access to color data values, it does not contemplate "selecting a mode of access to the

6    color memory."

7    103.    Contrary to Lucent's contentions, the April 18, 1980 Memorandum demonstrates

8    that Fleming et al. had not formed the ideas defined in the asserted claims of the `759 Patent as of

9    April 18, 1980.  This document appears to have been written by Frezza, and although it was

10   distributed to Fleming and Soloway, there is no indication that Fleming and Soloway contributed

11   to it.  (April 18, 1980 Memorandum, LUC 004347-4348).

12   104.    The April 18, 1980 Memorandum suggests that in the time period following the

13   February 25, 1980 Memorandum, Frezza focused on developing a coding scheme for performing

14   the same functions described in the February 25, 1980 Memorandum.  Like the earlier memo, the

15   April 18, 1980 Memorandum describes specifying colors using index values into a color table, but

16   fails to describe direct specification of color data values.  Id., LUC 004356-4357.

17   105.    Even if some portion of the April 18, 1980 Memorandum could be read to imply an

18   understanding of the possibility of using direct color specification, there is no teaching of the

19   structure and function of the "processing means" recited in claims 1 and 2.  The Memorandum

20   contains no mention of a function wherein "color is directly specified as a color data value," and

21   no mention of multiple "modes of access to color data values."   In addition, the Memorandum

22   contains no mention of any structure even remotely similar to the ones identified by the Court as

23   corresponding with the "processing means" recited in claims 1 and 2.

24   106.    The March 18, 1981 Memo does not demonstrate conception of any of the elements

25   of the asserted claims of the `759 Patent.  This memo provided schedules for the Documentation

26   and Customer Terminal segments of the HIS market Trial project.  (March 18, 1981

27   Memorandum, LUC 004035).  It did not provide any technical discussion of the proposed terminal

28   design and it surely did not provide any disclosure of a "processing means" as recited in claims 1

-35-

Exhibit 51
Page 000911

1   and 2 of the '759 patent. Lucent has not explained how this document could even be relevant to

2   conception and it is my opinion that it does not relate to the conception of the '759 patent in any

3   way.

4   **VI.    ADDITIONAL INFORMATION AND EXHIBITS**

5         107.    The opinions in this Report are based upon my consideration of the materials I have

6   reviewed to date. Should additional information become available, the information and opinions

7   presented herein may be supplemented or amended. At trial, I may use graphics, animations,

8   pictures, demonstrations, and/or other audio/visual aids to explain the technical issues relevant of

9   this case.

10        I declare under penalty of perjury under the laws of the United States of America that the

11  foregoing is true and correct. Executed this 14th day of September 2007 at Sunnyvale, California.

12

13

14

15

16                                          DR. ROBERT G. WEDIG

17

18

19

20

21

22

23

24

25

26

27

28

-36-

Exhibit 51
Page 000912