# SCHMIDT DECLARATION EXHIBIT 53

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC., | Case No. 02-CV-2060 B (CAB) consolidated with Case No. 03-CV-0699 B (CAB); and Case No. 03-CV-1108 B (CAB) |
|       Plaintiff and Counterclaim-defendant, | |
| v. | **SUPPLEMENTAL EXPERT REPORT OF JOHN P. J. KELLY, Ph.D. ON INVALIDITY OF UNITED STATES PATENT NO. 5,347,295** |
| GATEWAY, INC. and GATEWAY COUNTRY STORES LLC, GATEWAY COMPANIES, INC., GATEWAY MANUFACTURING LLC and COWABUNGA ENTERPRISES, INC., | [Fed. R. Civ. Proc. 26(a)(2)] |
|       Defendants and Counter-claimants, | |
|       and | |
| MICROSOFT CORPORATION, | |
|       Intervenor and Counter-claimant. | |

| |
|---|
| MICROSOFT CORPORATION, |
|       Plaintiff and Counter-defendant, |
| v. |
| LUCENT TECHNOLOGIES INC., |
|       Defendant and Counter-claimant, |
| LUCENT TECHNOLOGIES INC., |
|       Plaintiffs, |
| v. |
| DELL INC. |
|       Defendant. |

EXPERT REPORT of DR. JOHN P. J. KELLY
Civil File No. 00-2253 MJD/JGL

Exhibit 53
Page 000987

**Table of Contents**

I.   Introduction ........................................................................................................... 6
    A.   Background ...................................................................................................... 6
    B.   Materials Considered ....................................................................................... 7
    C.   The Court's Construction ................................................................................. 7
    D.   Applicable Legal Principles ............................................................................. 8
    E.   Summary of Opinions in this report ............................................................... 11
II.  U.S. Patent No. 4,845,478 (Taguchi et al.) ....................................................... 14
    A.   Reference ........................................................................................................ 14
    B.   Description ...................................................................................................... 14
III. U.S. Patent No. 5,060,135 (Levine, et al.) ......................................................... 23
    A.   Reference ........................................................................................................ 23
    B.   Description ...................................................................................................... 23
    C.   Wang Freestyle Video .................................................................................... 30
    D.   Other References ............................................................................................. 31
IV.  Buxton Paper ....................................................................................................... 33
    A.   Reference ........................................................................................................ 33
    B.   Description ...................................................................................................... 33
V.   Coleman Paper ..................................................................................................... 40
    A.   Reference ........................................................................................................ 40
    B.   Description ...................................................................................................... 40
        1.   Computer System .................................................................................... 40
        2.   Detecting A Stroke Of The Stylus Tip .................................................... 41
        3.   Recognizing Gestures .............................................................................. 42
        4.   Implementing Gestures ............................................................................ 46
        5.   Detecting Direction Of Motion Of A Gesture ......................................... 48
        6.   Direction of Motion Of A Gesture Is Associated With A Predetermined Action ........ 49
        7.   Displaying Actual Shape Of A Gesture ................................................... 49
VI.  Kim Paper ............................................................................................................ 51
    A.   Reference ........................................................................................................ 51
    B.   Description ...................................................................................................... 51
        1.   Computer System .................................................................................... 51
        2.   Detecting A Stroke Of The Stylus Tip .................................................... 52
        3.   Detecting A Departure Of The Stylus Tip ............................................... 53
        4.   Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip .................................................... 53
        5.   Recognizing Gestures .............................................................................. 54
        6.   Implementing Gestures ............................................................................ 59
        7.   Stylus Proximity Detection ..................................................................... 61
        8.   Detecting Direction Of Motion Of A Gesture ......................................... 61
        9.   Displaying Actual Shape Of A Gesture ................................................... 62
VII. Paper-Like Interface System ............................................................................... 63
    A.   References ....................................................................................................... 63
    B.   Description ...................................................................................................... 65

1.      Computer System....................................................................................... 65
2.      Applications ............................................................................................... 69
3.      Detecting A Stroke Of The Stylus Tip....................................................... 76
4.      Detecting A Departure Of The Stylus Tip ................................................. 76
5.      Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip............................................................................... 77
6.      Recognizing Gestures ................................................................................ 78
7.      Implementing Gestures .............................................................................. 80
8.      Stylus Proximity Detection ........................................................................ 81
9.      Detecting Direction Of Motion Of A Gesture ........................................... 82
10.     Displaying Actual Shape Of A Gesture ..................................................... 83
VIII.   FIDS ..................................................................................................................... 84
A.      Reference ........................................................................................................... 84
B.      Description ........................................................................................................ 84
1.      Computer System....................................................................................... 84
2.      Detecting A Stroke Of The Stylus Tip....................................................... 86
3.      Detecting A Departure Of The Stylus Tip ................................................. 87
4.      Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip............................................................................... 88
5.      Recognizing Gestures ................................................................................ 88
6.      Implementing Gestures .............................................................................. 94
7.      Detecting Direction Of Motion Of A Gesture ........................................... 95
C.      Proof Correction Standard SFS 2324 ............................................................... 96
IX.     Advanced Display System ................................................................................... 98
X.      Oed and Doster .................................................................................................. 101
A.      References ........................................................................................................ 101
B.      Description ...................................................................................................... 102
1.      Computer System..................................................................................... 102
2.      Detecting A Stroke Of The Stylus Tip..................................................... 104
3.      Detecting A Departure Of The Stylus Tip ............................................... 105
4.      Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip............................................................................. 106
5.      Recognizing Gestures .............................................................................. 106
6.      Implementing Gestures ............................................................................ 113
7.      Stylus Proximity Detection ...................................................................... 115
8.      Detecting Direction Of Motion Of A Gesture ......................................... 116
XI.     U.S. Patent 4,578,811 (Inagaki)........................................................................ 118
A.      Reference ......................................................................................................... 118
B.      Description ...................................................................................................... 118
1.      Overview .................................................................................................. 118
2.      Detecting A Stroke Of The Stylus Tip..................................................... 122
3.      Recognizing Gestures .............................................................................. 122
4.      Implementing Gestures ............................................................................ 127
5.      Detecting Direction Of motion Of A gesture........................................... 128

XII.   The Asserted Claims Of The '295 Patent Are Invalid As Being Obvious .................... 131
  A.   Court's Claim Construction ............................................................................ 131
  B.   The Kim Paper ................................................................................................ 139
     1.   Claim 1 ................................................................................................. 144
     2.   Claim 3 ................................................................................................. 146
     3.   Claim 4 ................................................................................................. 147
     4.   Claim 6 ................................................................................................. 148
     5.   Claim 12 ............................................................................................... 148
     6.   Claim 39 ............................................................................................... 149
     7.   Claim 40 ............................................................................................... 150
     8.   Claim 41 ............................................................................................... 151
     9.   Claim 43 ............................................................................................... 152
    10.     Claim 46 ............................................................................................ 153
  C.   The Paper-Like Interface System ................................................................... 153
     1.   Claim 1 ................................................................................................. 158
     2.   Claim 3 ................................................................................................. 160
     3.   Claim 4 ................................................................................................. 161
     4.   Claim 6 ................................................................................................. 162
     5.   Claim 12 ............................................................................................... 162
     6.   Claim 39 ............................................................................................... 163
     7.   Claim 40 ............................................................................................... 164
     8.   Claim 41 ............................................................................................... 165
     9.   Claim 43 ............................................................................................... 166
    10.     Claim 46 ............................................................................................ 167
  D.   FIDS ................................................................................................................ 167
     1.   Claim 1 ................................................................................................. 171
     2.   Claim 3 ................................................................................................. 174
     3.   Claim 4 ................................................................................................. 174
     4.   Claim 6 ................................................................................................. 175
     5.   Claim 12 ............................................................................................... 175
     6.   Claim 39 ............................................................................................... 175
     7.   Claim 40 ............................................................................................... 177
     8.   Claim 41 ............................................................................................... 177
     9.   Claim 43 ............................................................................................... 179
    10.     Claim 46 ............................................................................................ 179
  E.   Oed and Doster ............................................................................................... 180
     1.   Claim 1 ................................................................................................. 185
     2.   Claim 3 ................................................................................................. 187
     3.   Claim 4 ................................................................................................. 188
     4.   Claim 6 ................................................................................................. 188
     5.   Claim 12 ............................................................................................... 189
     6.   Claim 39 ............................................................................................... 189
     7.   Claim 40 ............................................................................................... 191
     8.   Claim 41 ............................................................................................... 191

9. Claim 43 ................................................................................................... 193
10. Claim 46 ................................................................................................. 193
F. Inagaki ............................................................................................................ 194
1. Claim 39 ................................................................................................... 195
2. Claim 40 ................................................................................................... 196
3. Claim 41 ................................................................................................... 197
4. Claim 43 ................................................................................................... 198
5. Claim 46 ................................................................................................... 199
G. Coleman ......................................................................................................... 199
1. Claim 41 ................................................................................................... 200
2. Claim 43 ................................................................................................... 201
3. Claim 46 ................................................................................................... 202
H. U.S. Patent No. 4,972,496 ("Sklarew") ......................................................... 202
1. Claim 39 ................................................................................................... 206
2. Claim 40 ................................................................................................... 207
3. Claim 41 ................................................................................................... 208
4. Claim 43 ................................................................................................... 210
5. Claim 46 ................................................................................................... 210

Exhibit 53
Page 000991

# I.    Introduction

I, JOHN P. J. KELLY, state the following:

1.     I have been retained by counsel for Microsoft Corporation, Dell Incorporated and Gateway Incorporated (collectively "Defendants") to provide assistance in the above-captioned case, which I understand to be a patent infringement case involving United States Patent No. Patent 5,347,295.

2.     I have been retained to serve as a technical expert witness.  I am the principal of Kelly Computing, Inc. (d/b/a Kelly And Associates), 830 Park Lane, Santa Barbara, CA 93108.  I previously submitted an expert report on issues of validity dated March 31, 2006, an expert report on issues of infringement dated May 12, 2006, and an expert report on alleged secondary considerations of non-obviousness dated May 30, 2006.  I am submitting this report as a supplement to my previous reports.

## A.    BACKGROUND

3.     My background is detailed in my March 31, 2006 expert report on issues relating to validity and is incorporated herein by reference.  I expect to testify regarding my background, qualifications, and experience relevant to the issues in this litigation.

Exhibit 53
Page 000992

B.    **MATERIALS CONSIDERED**

4.    I have reviewed and relied upon United States Patent No. 5,347,295 (the "'295 patent") and its file history.

5.    I have reviewed and relied upon all the materials cited in this report.

6.    I have relied on my own background, knowledge and experience relating to the subject matter of the '295 patent.

7.    I have previously reviewed and considered the documents cited in my report on issues of validity dated March 31, 2006 ("Kelly Invalidity Report"), my rebuttal expert report on alleged secondary considerations of non-obviousness dated May 30, 2006, as well as documents cited in exhibits attached to those reports.

**8.**    I have reviewed and considered the expert report of Jean Renard Ward dated March 31, 2006, and Mr. Ward's deposition transcript dated June 15, 2006."

C.    **THE COURT'S CONSTRUCTION**

9.    As with my previous report on issues of validity, and in marked contrast to the approach I took in my report on issues of non-infringement, I assume that the Plaintiff's interpretation of the Court's claim construction order is accurate.

Exhibit 53
Page 000993

D.     APPLICABLE LEGAL PRINCIPLES

10.     I will not offer opinions of law as I am not an attorney.  However, I have been informed of several principles concerning patent validity, which I used in arriving at my conclusions.

11.     I incorporate here by reference the legal principles set forth at ¶¶ 15-24 of the Kelly Invalidity Report.

12.     I am informed that legal principles regarding invalidity of a claim due to obviousness were clarified by the U.S. Supreme Court after I wrote the Kelly Invalidity report. I am informed that the principles described in paragraph 19 of that report (relating to a "motivation," "suggestion," or "teaching" in the prior art to combine references to produce the claimed alleged invention) remain an appropriate approach in a validity analysis.  I understand, however, that the U.S. Supreme Court clarified that additional principles may also be applied in such an analysis.  I set forth some such additional principles below.

13.     I am informed that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  In other words, when a claim simply arranges prior art elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, such a combination is obvious.  Moreover, when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination is likely to be obvious unless the combination yields an unpredictable result.  I am informed that a corollary principle is that when the prior

Exhibit 53
Page 000994

art teaches away from combining certain known elements, a claim directed to a discovery of a successful means of combining them is more likely to be non-obvious.

14.     I am informed that when a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one.  If one of ordinary skill in the art can implement a predictable variation, such a variation is likely unpatentable.  For the same reason, if a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.  One question to consider is whether the improvement is more than the predictable use of prior art elements according to their established functions.

15.     I am informed that it may be often be necessary, in a validity analysis, to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by one of ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

16.     I am informed that a validity analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim; it is appropriate to take account of the inferences and creative steps that one of ordinary skill in the art would employ.  I understand that a person of ordinary skill is also a person of ordinary creativity.

17.     I understand that a claim composed of several elements is not proved obvious merely by demonstrating that each element was, independently, known in the prior art. I understand that it can be important to identify a reason that would have prompted a person of

Exhibit 53
Page 000995

ordinary skill in the relevant field to combine the elements in the way the claimed new

invention does.  Therefore, I am informed, in determining whether a claimed combination is

obvious, the correct question is whether the combination was obvious to one of ordinary skill

in the art.  I am told that one of the ways in which subject matter can be proved obvious is by

noting that there existed at the time of invention a known problem for which there was an

obvious solution encompassed by the patent's claims.  I understand that any need or problem

known in the field of endeavor at the time of alleged invention and addressed by the patent can

provide a reason for combining the elements in the manner claimed.

      18.     I am informed that one should not assume that a person of ordinary skill in

the art attempting to solve a problem will be led only to those elements of prior art designed to

solve the same problem.  Instead, I understand that since familiar items may have obvious uses

beyond their primary purposes, in many cases one of ordinary skill in the art will be able to fit

the teachings of multiple prior art references together like pieces of a puzzle.

      19.     I am informed that, when there is a design need or market pressure to

solve a problem and there are a finite number of identified, predictable solutions, one of

ordinary skill in the art has good reason to pursue the known options within his or her technical

grasp.  If this leads to the anticipated success, it is likely the product not of innovation but of

ordinary skill and common sense,  I understand that, in such an instance, the fact that the

combination was obvious to try may show that the combination is obvious.

      20.     I am informed that, when determining whether a claimed combination is

obvious, the correct analysis is not whether one of ordinary skill in the art, writing on a blank

slate, would have chosen the particular combination of elements described in the claim.

Exhibit 53
Page 000996

Instead, I understand the correct analysis considers whether one of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to selecting the combination claimed.

      **E.**     **SUMMARY OF OPINIONS IN THIS REPORT**

        21.      In this report, I have laid out my opinions regarding the obviousness of the claims 1, 3, 4, 6, 12, 39, 40, 41, 43 and 46 of the '295 patent. These opinions include:

        22.      At least claims 1, 3, 4, 6 and 12 are obvious over the Kim Paper in view of Taguchi and Levine. At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and Buxton. At least claim 39 is obvious over the Kim Paper in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and the Advanced Display System. At least claims 41 and 43 are obvious over the Kim Paper in view of Taguchi. At least claim 46 is obvious over the Kim Paper in view of Taguchi and Coleman. [See § XII.B]

        23.      At least claims 1, 3, 4, 6, and 12 are obvious over the Paper-Like Interface System in view of Taguchi and Levine. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and Buxton. At least claim 39 is obvious over the Paper-Like Interface System in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and the Advanced Display System. At least claims 41 and 43 are obvious over the Paper-Like Interface System in view of Taguchi. At least claim 46 is obvious over the Paper-Like Interface System in view of Taguchi and Coleman. [See § XII.C]

Exhibit 53
Page 000997

24.     At least claims 1, 3, 4, and 12 are obvious over FIDS in view of Taguchi and Levine.  At least claim 6 is obvious over FIDS in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over FIDS in view of Taguchi.  At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Advanced Display System.  At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Buxton.  At least claim 41 is obvious over FIDS in view of Taguchi.  At least claims 43 and 46 are obvious over FIDS in view of Taguchi and Coleman.  [See § XII.D]

25.     At least claims 1, 3, 4 and 12 are obvious over Oed and Doster in view of Taguchi and Levine.  At least claim 6 is obvious over Oed and Doster in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over Oed and Doster in view of Taguchi and FIDS.  At least claims 39 and 40 are obvious over Oed and Doster in view of Taguchi and Advanced Display System.  At least claims 39, 40 are obvious over Oed and Doster in view of Taguchi and Buxton.  At least claim 41 is obvious over Oed and Doster in view of Taguchi.  At least claims 43, and 46 are obvious over Oed and Doster in view of Taguchi and Coleman. [See § XII.E]

26.     At least claims 39, 40, 41 and 43 are obvious over Inagaki in view of Taguchi.  At least claim 46 is obvious over Inagaki in view of Taguchi and the Casio PF-8000. [See § XII.F]

27.     At least claims 41, 43 and 46 are obvious over Coleman in view of Taguchi.  [See § XII.G]

28.     At least claims 39 and 40 are obvious over Sklarew in view of Taguchi and Buxton.  At least claim 39 is obvious over Sklarew in view of Taguchi and FIDS.  At least

Exhibit 53
Page 000998

claims 39 and 40 are obvious over Sklarew in view of Taguchi and the Advanced Display

System.  At least claims 41, 43 and 46 are obvious over Sklarew in view of Taguchi and

Coleman.  [See § XII.H]

Exhibit 53
Page 000999

# II.    U.S. Patent No. 4,845,478 (Taguchi et al.)

### A.    REFERENCE

29.    U.S. Patent No. 4,845,478, entitled "Coordinate Input Device with Display," [MSLT_1231379-MSLT_1231391], was issued to Taguchi and Yamanami and assigned to Wacom Co. Ltd. (hereinafter "Taguchi").  The date of issue was July 4, 1989.

### B.    DESCRIPTION

30.    The patent describes an input device comprised of a display and a position sensing tablet [digitizer].  The device provides the capability of displaying position information upon a display that is superposed on the tablet (*i.e.*, a digitizer mounted behind the display):

> "Accordingly, it is a first object of the invention to provide a coordinate input device with a display, wherein the indicating of a position on a tablet is made by quite a simple operation from a position above and remote from the tablet, more particularly, from a position on a display superposed on the tablet."  [See Taguchi at 1:56-61]

31.    Figure 1 is a block diagram that illustrates the features of the device including the tablet, display, pulse generating circuitry, detection circuitry, and X and Y direction drivers.



**Figure 1. A block diagram of a computer system that incorporates the display/tablet combination of Taguchi. The stylus position detected by the tablet is output through controller 23 to computer 22. The display is updated by computer 22 using controller 30 in order to show the stylus position on the screen. [See Taguchi at Figs. 9 and 10].**

32.     The tablet is composed a number of parallel strips of magnetostrictive material in the X-direction and a number of parallel strips of magnetostrictive material in the Y-direction, forming a grid. [See Figure 2]. The magnetostrictive material may be an amorphous alloy, for example:

> "It is also preferred that the material has a small coercive force in order that it is not easily magnetized when approached by a magnet. Examples of amorphous alloys which can be suitably used are $Fe_{67}Co_{18}B_{14}Si_1$ (atomic %) and $Fe_{81}B_{13.5}Si_{3.5}C_2$ (atomic %) and the like." [See Taguchi at 4:25-30].

Each strip of magnetostrictive material in the grid is surrounded by a coil which is used to measure the magnetic field in the magnetostrictive material. [See Figure 3].



**Figure 2. This plan view of the tablet shows the vertical and horizontal strips of magnetostrictive material. [See Taguchi at Fig. 5].**

     33.    Taguchi makes use of the magnetostrictive material's ability to convert vibration energy to magnetic energy. The efficiency of this conversion is determined by the electro-mechanical coupling coefficient, which is a property of the magnetostrictive material. In addition, the electro-mechanical coupling coefficient can be temporarily increased by applying an external magnetic field to the magnetostrictive material. For example, a permanent magnet in a stylus can be used to apply an external magnetic field to a small area while the stylus is in proximity to the magnetostrictive material.

           "When a magnetostrictive vibration wave propagates through a magnetostrictive transmission medium, a part of the mechanical vibration energy thereof is converted into magnetic energy so as to cause a local change in the magnetic field at the position where the vibration wave actually is. The level of the change in the magnetic

Exhibit 53
Page 001002

field increased and decreases substantially in proportion to a coefficient of conversion from mechanical energy to electric energy. This coefficient will be referred to as "electro-mechanical coupling coefficient" hereinunder. The electro-mechanical coupling coefficient is maximized in a certain range of level of biasing magnetic field.

Therefore, if a magnetic bias of a level sufficient for increasing the electro-mechanical coupling coefficient is applied by a position indicating magnetism generator to a specific portion of a magnetostrictive transmission medium surrounded by a coil over substantially its entire length, a large change in the magnetic field is caused at the moment when that portion of the transmission medium is reached by the magnetostrictive vibration wave propagating through the transmission medium, so that a high voltage is induced in the coil by the magnetostrictive vibration wave at that moment. It is therefore, possible to determine the length of time required for the magnetostrictive vibration wave to reach the position indicated by the position indicating magnetism generator and, hence, the indicated position, by detecting the timing of the induction of the high voltage in the coil." [See Taguchi at 3:1-32]

34.     If a vibration wave is generated at one end of a strip of magnetostrictive material, as the wave travels along the strip vibration energy is converted to magnetic energy, which in turn generates a voltage in the coil. [See Figure 3]. The voltage can be measured as a function of time as the wave travels through the strip. If the stylus is not close to the strip, the electro-mechanical coupling coefficient is approximately constant from one end of the strip to the other, and therefore the voltage in the coil will be approximately constant. If the stylus is close to the strip, the electro-mechanical coupling coefficient will be increased in a small area of the strip, and the voltage in the coil will be larger as the vibration wave passes through the region under the stylus than when it passes through the rest of the strip. The elapsed time from the generation of the vibration wave to the detection of the increased voltage is used to calculate the stylus location.

Exhibit 53
Page 001003



**Figure 3. Detailed view of some horizontal magnetostrictive strips showing the coils (5a, 5b, 5c and 5d) and the detector circuitry (6). The stylus (7) is shown applying an external magnetic field to an area of one of the strips. [See Taguchi at Fig. 1].**

35.     Taguchi determines the location of the stylus as follows. Vibration waves are generated in the horizontal strips, and detector circuitry monitors the voltage in the coils wrapped around the horizontal strips to determine the X-coordinate of the stylus. Similarly, vibration waves are generated in the vertical strips, and detector circuitry monitors the voltage in the coils wrapped around the vertical strips to determine the Y-coordinate of the stylus. [See Figure 2].

"To achieve this object, the invention proposes the use of a tablet which is composed of a plurality of X-direction magnetostrictive transmission mediums arrayed in parallel, a plurality of Y-direction magnetostrictive transmission mediums arrayed in parallel and substantially perpendicular to the X-direction magnetostrictive transmission mediums, and first and second coils wound around these magnetostrictive transmission mediums. A pulse current is applied to one of the first and second coils so that a voltage is induced in the other array of magnetostrictive transmission mediums by a magnetostrictive vibration wave. When the magnetostrictive vibration wave reaches a position indicated by a position indicating magnetism generator, a voltage induced in the other coil is greatly increased. Therefore, it is possible to detect the indicated position as X- and Y- coordinate data by detecting the length of time between the moment at which the pulse current is applied until the moment at which an induced voltage in excess of a predetermined threshold value is detected." [See Taguchi at 1:62-68 and 2:1-13].

"Referring now to FIG. 1, it is assumed here that the position indicating bar magnet 7 is placed at a point on the magnetostrictive transmission medium 1a spaced by a distance l from the center of the X-direction first coil 2, with its N pole directed downward so as to apply (a magnetic field of a level large enough to cause an appreciable increase in the electro-mechanical coupling coefficient) to the portion of the magnetostrictive transmission medium 1a just beneath the magnet 7. When a pulse current is applied by the pulse current generator 3 to the X-direction first coil 2, the coil 2 generates a momentary change in magnetic field which in turn causes a magnetostrictive vibration wave in the portions of the magnetostrictive transmission mediums 1a to 1d surrounded by the X-direction first coil 2. The magnetostrictive vibration wave then propagates longitudinally through the magnetostrictive transmission mediums 1a to 1d at a propagation velocity peculiar to the material of the transmission mediums. The propagation velocity in this case is about 5000 m/s. During the propagation, conversion of a part of the mechanical vibration energy into magnetic energy is effected at each moment, in the portions where the vibration wave is at that moment. The conversion is made at an efficiency corresponding to the electro-mechanical coupling coefficient in those portions of the transmission mediums. As a result, a voltage is induced in the X-direction second coil 5." [See Taguchi at 5:45-68 and 6:1-3]

36.    The position indicating magnetism generator described in Taguchi is a pen-shaped object [stylus] that includes a cylindrical bar magnet and a signal generator which can be operated using a switch.  [See Figure 4].  Because the stylus is comprised of a permanent magnet, it does not have to be connected to the tablet by a cord.  [See, *e.g.*, Taguchi at Col. 3:63-68].  The signal generator located in the stylus creates an ultrasonic signal, which indicates that the tablet should detect the position of the stylus.

> "A position indicating magnetic generator 40 has a cylindrical magnetic body, i.e., the bar magnet 7, attached to one end of a pen-shaped vessel 41 to the other end of which is attached the transmitter 8.  The pen-shaped vessel 41 accommodates a signal generator 42 which is adapted to be operated by an operation switch 43 which can be operated from the outside of the pen-shaped vessel 41.  In operation, when the operation switch 42 is turned on, an oscillation circuit 44 including an AND circuit, inverter, resistors and a capacitor starts to oscillate so as to generate continuous pulse signals which indicate the commencement of measurement.  The pulse signals are amplified by an amplifier 45 and converted into an ultrasonic signal.  This ultrasonic signal is transmitted to the air and is received by the receiver 9."  [See Taguchi at 7:40-55]



**Figure 4.  The stylus is pen-shaped and includes a permanent magnet (7) and a signal generation circuit with a switch (43).  [See Taguchi at Fig. 7].**

37.    The position of the stylus relative to the tablet is also shown at the corresponding location on the display.  The trace of the stylus on the tablet can also be drawn on the display.  A computer system with the display/tablet combination of Taguchi could be used for such purposes as creating and edition documents.

> "A position signal based on the timing of the induced electromotive force in put to a computer and can be displayed via a driver, on a display unit having, for instance liquid crystal elements and electrodes arranged in a grid-like form."  [See Taguchi at 3:52-56]

> "… the position indicated on the tablet A is displayed at the corresponding position on the display unit B.  Thus, characters and patterns scribed on the tablet A by the position indicating bar magnet 7 from a position on or above the display unit B superposed on the tablet A is displayed as they are by luminescence on the display unit B.  Therefore, it is possible to correct and display on the display unit B a character input to the tablet A and to effect editing such as the insertion and deletion of characters and words, provided that a suitable editing device is connected between the display unit B and the computer 22."  [See Taguchi at 9:24-36]

"…according to the invention, it is possible to indicate a position on a tablet A from a position remote therefrom, i.e., by means of a position indicating magnetism generator from a position on or above a display unit B which is superposed on the tablet A. At the same time, the indicated position can be instantaneously displayed at the corresponding position on the display unit B."  [See Taguchi at 9:37-42]

Exhibit 53
Page 001008

# III.   U.S. Patent No. 5,060,135 (Levine, et al.)

### A.   REFERENCE

38.     U.S. Patent No. 5,060,135, entitled "Apparatus For Manipulating Documents In A Data Processing System Utilizing Reduced Images Of Sheets Of Information Which Are Movable," [MSLT_1232286-MSLT_1232314], was issued to Levine, *et al.* and assigned to Wang Laboratories, Inc, (hereinafter "Levine").  The filing date was Nov. 1, 1988 and the date of issue was Oct. 22, 1991.

### B.   DESCRIPTION

39.     Levine describes a computer system with a graphical user interface that mimics an office desk.  The system's graphical user interface to the operating system, which the patent describes as "desk view," displays miniaturized images of documents and icons corresponding to stapler, printer, mailbox, folder, *etc*., providing a pictorial representation of a physical office desk.  [See Figure 5].

> "A data processing system provides a desk view which serves as a graphical user interface to the system. The desk view displays detailed miniaturized images of all documents possessed by the user. The compressed document images are user stackable and are automatically stacked when the images overlap by a predefined amount. The predefined amount is user settable. The desk view also displays icons of operations for mailing, stapling, copying and printing of documents."  [See Levine at Abstract].

Exhibit 53
Page 001009



**Figure 5.  The desk view showing the inbox (63), printer application (72), notepad application (76), trash (74), documents (34) and other objects.  [See Levine at Fig. 2].**

40.      The computer system includes a keyboard, a display unit, a two-ended electronic stylus and an electronic tablet, all of which are connected to and controlled by the computer's processor.  [See Figure 6].

> "The foregoing and other features of the present invention are described in more detail and are more readily understood with reference to a data processing system which embodies the present invention and which is illustrated in FIG. 1a. The data processing system 20 includes a computer terminal 10 with a keyboard 12 and a display unit 18, a two-ended electronic stylus 14 and an electronic tablet 16, all of which are connected to and driven by a digital processor 22."  [See Levine at 8:43-51].



**Figure 6.  Computer system of Levine showing the processor (22), screen (18), digitizing tablet (16) and stylus (14).  [See Levine at Fig. 1a].**

41.     The user interacts with the items on the desk by moving the stylus on the tablet surface in order to perform operations such as selecting a displayed item, repositioning a displayed item, *etc*.  Although the tablet and screen are separate surfaces in Figure 6, Levine teaches that the tablet and the screen can be combined into a single unit, allowing the user to write directly on the display screen.

> "The stylus 14 is used on an upper planar surface of the tablet 16 to perform certain tasks such as repositioning displayed items, or selecting a displayed item for further processing. The actions of the stylus 14 on the surface of the tablet 16 are representatively displayed on the display unit 18 and the positions on the table have

a one-to-one correspondence with the view 26 displayed on the display unit 18. Thus as the user applies the stylus 14 to the tablet surface, an image representation of what the user is doing with the stylus is provided in the view 26 of display unit 18.

In the alternative, the tablet and display unit 18 may be a single unit such that the stylus 14 is operated directly on the screen of the display unit 18." [See Levine at 9:1-14].

An electronic tablet serves as a writing surface on which the stylus is used and spatially corresponds in a one-to-one fashion with the view exhibited on the monitor screen. Other surfaces including the monitor screen may alternatively serve as the writing surface." [See Levine at 2:29-34].

42.    The user interacts with the system by operating the stylus in at least four different ways. A first method of use is the "touch and lift" [tap] wherein a user touches and removes one end of the stylus on the tablet position corresponding to a displayed item in order to select the displayed item.

"The first method of use of the stylus, referred to as "touch and lift", enables the selection of a displayed item. One end of the stylus is touched on and removed from the position on the tablet corresponding to the position of a desired item displayed on the monitor screen as indicated by a cursor." [See Levine at 2:34-39].

43.    For example, a touch and lift in the desk view on an icon corresponding to an application such as "note pad" or "scanner" results in the selection of the application.

"The user selects an application by a touch and lift method of use of the stylus on the position corresponding to the respective icon in the case of the applications of "all done", "scanner" and "note pad"." [See Levine at 5:62-66].

44.    The same touch and lift can also be performed on objects in applications. For example, in the printer application a touch and lift on a number button selects the desired number of copies of a document for printing.  [See Figure 7].

Exhibit 53
Page 001012

"In the case of the printer or copier icon 72, 91, an illustration of pushbutton control panel 78 shown in FIG. 4 is displayed…. The pushbutton control 78 is displayed to prompt the user to enter the number of copies desired to be generated. To select a desired number, the user uses the "touch and lift" method of use of one end of stylus 14 on the tablet position corresponding to the illustrated button 82 which designates the desired number of copies." [See Levine at 21:3-13].



Figure 7.  The printer application window (78) contains buttons (82) for selecting the desired number of copies for printing using touch and lift.  [See Levine at Fig. 4].

45.     Furthermore, in a send-mail routine, the touch and lift on a tab of an

address book with lettered tabs, selects the letter indicated on the tab:

"When the send-mail routine is activated, processor 22 exhibits an illustration of a common address book 83 with lettered tabs 85

Exhibit 53
Page 001013

> arranged in alphabetical order along one side of the address book 83. To select a recipient of the document represented by the stamp 34 used to activate the send-mail routine, the user opens the address book 83 to the name of the desired recipient. This is accomplished by the user touching and lifting an end of stylus 14 on the tablet position, which corresponds to the screen position of the lettered tab 85 that indicates the first letter of the last name of the desired recipient. Upon such action, the selected tab 85 is illuminated in reverse video form to indicate to the user that the letter indicated on tab 85 has been selected." [See Levine at 15:51-64].

Touch and lift on the name of a person in the address book will select that person to receive the mail message.

> "The user selects a recipient's name, from the displayed page in the opened address book 83, by the touch and lift use of one end of stylus 14." [See Levine at 16:1-3].

46.    A second method of operation of the stylus is "touch and move" [drag]. In using the touch and move operation, a user places one end of the stylus on the tablet position corresponding to a displayed item and moves the stylus across the tablet surface, while maintaining contact with the tablet surface, to move the displayed item to a new position on the screen.

> "A 'touch and move' manner of operation enables the user to move a displayed item anywhere in the view 26 of display unit 18. The operation is invoked upon the user placing the writing tip end 30 or the erasure end 28 on the tablet surface and moving the stylus end 28, 30 while maintaining it in contact with the tablet surface for more than a preset number of pixels, for example, four pixels." [See Levine at 10:36-43].

47.    A third and a fourth manner of operating the stylus is used for annotations. In the third method of operation, the user writes with the writing tip of the stylus in a writing area – *e.g.*, inside a "note pad" document or the label of a desk view tray – in the same manner

Exhibit 53
Page 001014

as writing with a pen on a sheet of paper.  [See, *e.g.*, Levine at 2:49-53, 5:47-51].  The fourth

method of the use of stylus involves the use of the erasure end of the stylus in a manner similar

to the use of a pencil top eraser.  The erase operation is used for erasing markings generated by

the writing tip end.  [See, *e.g.*, Levine at 2:53-57].

48.     As shown above, Levine's touch and lift gesture is capable of

implementing identical executable commands at both the operating system level context and

the application level context.  In view of this, as well as of Levine's multiple manners of stylus

use described above, one of ordinary skill would recognize the advantage of using the same

stylus actions on both operating system level and application level objects to implement the

same command.  One of ordinary skill, who is also one of ordinary creativity, would see the

benefit of implementing other common functions using the same stylus action on both system

and application objects.  Deleting and creating (or inserting) objects are two examples.

49.     Another feature described in Levine is the detection of proximity of the

stylus tip to the surface of the tablet.  When either the writing end or the eraser end of the

stylus is brought into proximity to the tablet surface, a cursor is displayed on the monitor

screen in a position corresponding to the position of the stylus.  In one of the embodiments

described in Levine, a cursor that looks like a sharpened pencil tip is displayed when the

writing tip end is in proximity to the tablet and an erasure top cursor is displayed when the

erasure end of the stylus is in proximity with the tablet surface.

> "When either the writing tip end 30 or the eraser end 28 is in close
> proximity (about 2 centimeters or less) to the surface of the tablet
> 16, the writing tip 30 is sensed and indicated in the view 26 of
> display unit 18 by a cursor."  [See Levine at 9:30-34].

Exhibit 53
Page 001015

"In a preferred embodiment, a cursor replicating a sharpened pencil tip is displayed when a writing surface is displayed, and the writing tip end 30 of stylus 14 is in proximity of the tablet surface and thereafter used for writing. An erasure top cursor is displayed when the erasure end 28 of the stylus 14 is in proximity of the tablet surface and thereafter used for erasing."  [See Levine at 11:2-8].

50.    In addition, Levine teaches using the desk view with other applications, including word processors and spreadsheets.

"Also, the system desk may cooperate with application software other than the annotator. For example, the desk may serve as a filing system for conventional word processing and spreadsheet software."  [See Levine at 29:16-20].

### C.    WANG FREESTYLE VIDEO

51.    A 1988 videotaped demonstration of a product called Freestyle from Wang Laboratories, Inc., closely resembles the desk view of the Levine patent.  The demonstration is given by Dr. Stephen Levine, the first named inventor of the Levine patent. The video of the demonstration can be downloaded in two parts from Google video.  The URL for the first part [MSLT_1234098] is http://video.google.com/videoplay?docid=-1373804178481058208 (hereinafter "Freestyle-1").  The URL for the second part [MSLT_1234099] is http://video.google.com/videoplay?docid=6340489473007497127 (hereinafter "Freestyle-2").

52.    Freestyle is a computer-based system with a digitizing tablet, stylus, and display.  The user controls the system using gestures.  For example, the user can select system level objects, which include icons for documents and applications, from the desk view using a

Exhibit 53
Page 001016

touch and lift gesture [tap] on the digitizer position corresponding to the object. [See, *e.g.*, Freetyle-1 at minutes 7:35-7:45]. The video shows selecting the notepad application [see, *e.g.*, Freestyle-2 at minutes 6:28-6:34], a scanner application [see, *e.g.*, Freestyle-2 at minutes 3:00-3:16] and a document [see, *e.g.*, Freestyle-2 at minutes 4:08-4:12]. The application and document objects displayed on the desk view are operating system level objects because they can be manipulated by a user and are displayed outside the context of an application program.

53.     The same touch and lift gesture can also be performed in the context of an application. For example, the printer application displays a window containing buttons used to designate the number of copies. The user uses the touch and lift gesture on these buttons. [See, *e.g.*, Freestyle-2 at minutes 2:24-2:40]. As another example, the send-mail application is used to select the recipient of a mail message. The user first opens the address book to the name of the desired recipient by touching and lifting the lettered tab that indicates the first letter of the recipient's last name. Then the user touches and lifts the name of the recipient. [See, *e.g.*, Freestyle-2 at minutes 5:16 – 5:23]. The buttons, tabs, names, *etc.* in the printer and address book windows are application level objects because they can be manipulated by a user and are displayed within the context of an application program.

### D.     OTHER REFERENCES

54.     In addition to Levine, other references describe stylus-based systems with a graphical user interface capable of manipulating objects at the system and application levels including the Wang FreeStyle discussed above, the Mac-UnMouse system and the X Windows System User's Guide. The Kelly Invalidity Report discusses the Mac-UnMouse system and

the X Window System User's Guide, and I incorporate by reference those discussions.  Both

Mac-UnMouse and X Windows User's Guide also provide gestures (*e.g.*, tap and double tap)

that perform identical executable commands at the system level and the application level.  For

example, in the Mac-UnMouse computer system a click [tap] on an object—either a system

level object such as a folder icon, system disk icon, *etc*., or an application level object such as

an icon within a paint application's tool palette—selects the object by highlighting it.  [See,

*e.g.*, Inside Macintosh, Volumes I, II and III (1985), at p. I-31 (MSLT_0381441)].  A double

click [double tap] gesture on a folder in the Finder opens up a folder and displays its contents,

and a double click on a topic in the Home Accountant application's Help list opens up the topic

and displays the help contents on that topic.  In the remainder of this report, when I refer to

Levine as describing gestures used on system level and application level objects, it is to be

understood that these additional references also disclose this feature.

Exhibit 53
Page 001018

# IV.   Buxton Paper

### A.   REFERENCE

55.    "The Evolution of the SSSP Score Editing Tools" by William Buxton, Richard Sniderman, William Reeves, S anand Patel and Ronald Baecker [MSLT_1232392-MSLT 1232406] (hereinafter "Buxton") was published in the *Computer Music Journal*, vol. 3, no. 4 in 1979.

### B.   DESCRIPTION

56.    "This paper traces the evolution of score editing tools developed by the Structured Sound Synthesis Project (SSSP) at the University of Toronto."  [See Buxton at p. 14 (MSLT_1232394)].  Buxton discusses some of the issues involved in designing user interfaces, especially interactive graphics interfaces, used for music score editing applications.

> "The main area of SSSP activity has been the development of high level 'front-end' programs which would give the musically sophisticated (but technologically naïve) user a high degree of access to the potential offered by the computer-synthesizer combination.  Thus, the development of score editing tools was initiated even before such tools could be 'hooked up' to the synthesizer, and has proceeded continuously since."  [See Buxton at p. 15 (MSLT_1232395)].

57.    Buxton's  computer system included a graphics display and a digitizing tablet:

> "The hardware environment centers on a PDP-11/45 running under the UNIX time-sharing operating system (Ritchie and Thompson:

1974) and a digital sound synthesizer (Buxton, Fogels, Fedorkow,
Sasaki and Smith:  1978) with its own LSI-11.  The graphics
hardware includes a refresh, vector-drawing graphics display, a
digitizing tablet with accompanying cursor box, and a slider box."
[See Buxton at p. 14 (MSLT_1232394)].

58.    The interfaces described in Buxton use menus of various styles or hand-

drawn symbols.  For example, the user may use the tablet to position the cursor on an object

indicating the desired pitch, press a button on the cursor box to bring up the duration menu and

then drag the stylus across the tablet to select the duration as shown in Figure 8.

"It was also at this stage, that an interactive method of note input
was devised which has remained the major note input tool to date.
Figure 2a shows the note input tracking cross being positioned
over the desired pitch.  On depressing the button on the cursor, a
'marker note' symbol appears at the indicated pitch.  Concurrently,
the tracker is replaced by a sequence of notes.  This is shown in
Figure 2b.  This sequence of notes 'tracks' or follows the motion
of the cursor on the tablet.  The roles of the tracking-cross and the
menu are now reversed.  Instead of the conventional stationary
menu and moving pointing tool, we have a moving menu and a
stationary pointer.  By placing the note of the desired duration over
the marker note symbol (i.e. moving the menu), and releasing the
cursor button, a note is input.  This is shown in Figure 2c." [See
Buxton at p. 15 (MSLT_1232395)].

Exhibit 53
Page 001020



**Figure 8. A sequence of screens showing input of a note. [See Buxton at Fig. 15].**

59.     Alternatively, the pitch, duration, *etc.* may be selected by "hitting" buttons

on the display as shown in Figure 9.

> "Examine the menus as pictured in [Buxton] Figure 8. The user
> indicates the name, octave, accidental, and duration of a note by
> hitting the appropriate light buttons which are then intensified to
> indicate visually the choices made. When the desired choices have
> been made, the user hits the 'ENTER' button." [See Buxton at p.
> 20 (MSLT_1232400)].

Exhibit 53
Page 001021



**Figure 9. Using the *total menu technique* the user enters notes by selecting buttons on the display. [See Buxton at Fig. 8].**

60.     Buxton also describes a note input tool called "*char-rec*" that allows the user to input notes by drawing symbols on the digitizing tablet. The symbol as drawn by the user is displayed on the screen as electronic ink. [See Figure 10]. The character recognizer decodes the symbols to determine the duration of the note and then replaces the electronic ink with the musical symbol.

Exhibit 53
Page 001022

"*Char-rec* is a 'short-hand' technique which employs a character recognizer to decode a set of symbols ([Buxton] Figure 10) designed to represent notes of varying durations. To enter a note, the tracking-cross is placed over the desired pitch on the appropriate ladder and the cursor button is depressed. An 'ink trail' is laid down until the button is released during which interval the user draws the desired duration symbol. Based on the starting point of the symbol, and the shape of the symbol, the pitch and duration of the desired note are decoded." [See Buxton at p. 20 (MSLT_1232400)].



**Figure 10. Appending a sixteenth note with *char-rec*. [See Buxton at Fig. 11].**

61.    Buxton's note duration symbols are shown in Figure 11. Although many

of the symbols are drawn with one line segment longer than the others, the lengths of the line

segments are not important.  Instead, it is the direction changes in a symbol that are used by the character recognizer to decode the symbol:

> "The lengths of the line segments constituting a symbol are immaterial provided they are greater than a fairly small minimal size.  However, the directional changes in a symbol must be drawn distinctly to ensure correct recognition."  [See Buxton at p. 20 (MSLT_1232400)].

Consequently, some gestures are comprised of other gestures.  For example: the half note gesture comprises a whole note gesture and a quarter note gesture; the sixteenth note gesture comprises a eighth note gesture and a quarter note gesture; the thirty-secondth note gesture comprises an eighth note gesture and another eighth note gesture.



**Figure 11.  *Char-rec* duration symbols.  [See Buxton at Fig. 10].**

62.    In addition to note input, Buxton also discusses editing scores (*e.g.*, deleting notes and changing notes) and playing scores.  For example, a program called *scriva* allows the user to group together musical notes for further operations, including "delete" and "play" operations.  Using the cursor button, the user draws a circle around notes of interest. The circle is displayed on the screen as electronic ink.  [See Figure 12].

> "The concept of scope is built upon by providing various techniques to facilitate definition of groups of notes of interest, and by providing operators such as 'Delete' and 'Play' which act on

Exhibit 53
Page 001024

these defined groups.  One method of scope definition involves positioning the tracking cross over each note to be included, and then depressing the cursor button.  This is another application of the 'paint-pot' technique mentioned with respect to orchestration in *ludwig*.  Another method involves simply 'inking' a circle around notes of current interest as shown in [Buxton] Figure 15.  To exclude notes from within a larger circle, the user may draw yet another circle around those not to be included."  [See Buxton at p. 24 (MSLT_1232404)].



**Figure 12.  An example of selecting a group of notes for an operation (*i.e.*, scope definition) in *scriva*.  The outer circle includes the notes that it encloses.  The inner circle excludes the notes that it encloses.  [See Buxton at Fig. 15].**

# V.    Coleman Paper

### A.    REFERENCE

63.    The paper "Text Editing On A Graphic Display Device Using Hand-Drawn Proofreader's Symbols" by Michael L. Coleman [MSLT_1230606-MSLT_1230612] (hereinafter "Coleman") was published in 1969 in "Pertinent Concepts in Computer Graphics," Proceedings of the Second University of Illinois Conference on Computer Graphics, M. Faiman and J. Nievergelt, editors, at pp. 283-290.

### B.    DESCRIPTION

#### 1.    Computer System

64.    Coleman describes a text editing system comprising a CDC G-20 computer, a CRT for displaying text and graphics and a RAND tablet (with a stylus).  Since the computer system includes a display, it necessarily includes a display controller.  "The text editor consists of about 2800 machine code instructions for the Carnegie-Melon Graphic Display System, which uses the CDC G-20 computer.  It will display the user's text ten to twenty lines at a time…." [See Coleman at pp. 283-284 (MSLT_1230608-MSLT_1230609)]. The user enters text editing commands into the system by drawing proofreader's symbols on the tablet.  The symbols specify both the action and the portion of text upon which action is to be performed (scope).

65.    Previous text editing programs relied on keyboard entry of editing commands.  Not only is it cumbersome to identify the scope of an editing command in this

Exhibit 53
Page 001026

fashion, but users, *e.g.*, secretaries, were more familiar with proofreader's symbols than computer commands such as DELETE, ALTER, and INSERT.  "It was this which led to the designing and development of a text editing system in which the user can draw proofreader's symbols over text appearing on a Cathode Ray Tube (CRT), thus specifying simultaneously both the action desired and that portion of the text upon which the action is to be taken."  [See Coleman at p. 283 (MSLT_1230608)].

> "If a graphic display unit and a suitable input device, such as a light pen or RAND Tablet, are added, two important advantages are gained:
> 1.  The ability to rapidly display the updates of large portions of text;
> 2.  The ability to identify a piece of text by pointing (as with a light pen).  We can specify items by direct identification rather than by counting (using line numbers) or be retyping a piece of text (using context)."  [Coleman, at p. 283 (MSLT 1230608)]

As made clear in the above-quoted passage, Coleman teaches using either a RAND tablet or a light pen for input.

### 2.  Detecting A Stroke Of The Stylus Tip

66.    The text editing system described in Coleman detects a stroke of the stylus tip in contact with the screen [see, *e.g.*, claim 41 of the '295 patent].  "To perform editing, the user draws one of the nine allowable symbols on the RAND Tablet."  [See Coleman at p. 284 (MSLT_1230609)].  Figure 13 shows the allowable proofreader's symbols.  Each of the shown symbols is made using a stroke of the stylus in contact with the RAND tablet.  In addition, Coleman mentions the light pen as an alternative to the RAND tablet as discussed above.  [See Coleman at p. 283 (MSLT_1230608)].  In this case the light pen [stylus] draws directly on the surface of the display.



**Figure 13.  Recognized proofreader's symbols.  [See Coleman at Fig. 1 (MSLT 1230609)].**

### 3.    Recognizing Gestures

67.    The text editing system described in Coleman recognizes a gesture

comprising at least one stroke and an event indicating the termination of the gesture [see, *e.g.*,

Exhibit 53
Page 001028

claim 41 of the '295 patent].  Figure 13 shows the nine proofreader's symbols [gestures]

recognized by the text editing system.

> "To perform editing, the user draws one of the nine allowable
> symbols on the RAND Tablet.  The system recognizes the symbol,
> determines the strings of characters to be manipulated, and takes
> the appropriate action."  [See Coleman at p. 284
> (MSLT_1230609)].

Since these proofreader's symbols are each comprised of a single stroke, the departure of the

stylus from the RAND tablet indicates termination of the proofreader's symbol [gesture].

68.    The proofreader's symbols are recognized by first extracting the

characteristic features of the symbol such as maxima and minima of x and y.  The symbol is

then classified using a discrimination net as shown in Figure 14.  [See Coleman at p. 287

(MSLT_1230610)].  As shown, the input proofreader's symbol is recognized by applying a set

of rule-based tests for the characteristic features of the input proofreader's symbol.  To the

extent that recognizing a gesture by applying a set of rule-based tests can be considered to be

insignificantly different from recognizing a gesture by comparing it with a predefined shape, as

Lucent contends, Coleman discloses recognizing proofreader's symbols by comparing with a

predefined shape [see, *e.g.*, claim 41 of the '295 patent].



Figure 14.  Classification using rule-based discrimination algorithm.  [See Coleman at Fig. 2].

69.    The recognizer of the text editing system described in Coleman follows

the steps outlined in the article "Automatic Recognition of Handprinted Characters – The State

of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980

[MSLT_1233195-MSLT_1233213] (hereinafter "Automatic Recognition of Handprinted

Characters"). Table 1 presents a comparison of the two algorithms.

**Table 1: Comparison of the recognition algorithm of the text editing system described in Coleman with the handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.**

| Automatic Recognition of Handprinted Characters | Coleman |
|---|---|
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification". "The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc." [See Automatic Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | The recognition algorithm of the text editing system described in Coleman includes a feature extraction step:<br><br>"The system recognizes the symbols by first noting various characteristics of the symbol that was drawn, e.g., coordinates of the initial and final points, maxima and minima x and y." [See Coleman at p. 287 (MSLT_1230610)]. |
| Classification:<br>"Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ….. Classification is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]." [See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)]. | The recognition algorithm described in Coleman includes a classification step using a discrimination net as shown in Figure 14:<br><br>"These characteristics, combined with the net shown in Figure 2, are sufficient to discriminate between all symbols except the symbol for MOVE." [See Coleman at p. 287 (MSLT_1230610)]. |

70.     Furthermore, proofreader's symbols can be drawn such that each stroke of

the symbol is located in substantially the same area of the RAND tablet [see, *e.g.*, claim 41 of

the '295 patent].

### 4.  Implementing Gestures

71.     The text editing system described in Coleman implements each recognized gesture.  [See, *e.g.*, claim 41 of the '295 patent].  Each of the nine proofreader's symbols [gestures] is associated with a predetermined action.

72.     Symbol (a) in Coleman [see Figure 13], is a straight horizontal line drawn over text that should be replaced or deleted.

> "Figure 1(a) is the symbol for either an alteration or deletion of text.  The figure is drawn over the selected piece of text, crossing it out.  The system will erase the symbol, blink the selected text for verification, separate the text by opening a blank line, position the cursor in the center of the blank line, and enable the keyboard for the typing of characters.  The user now must examine the current situation and make one of two responses:
>
> 1.  Touch the pen somewhere in the center of the tablet.  This will delete the blank line and the blinking characters.
>
> 2.  Type in some characters in the keyboard.  These are automatically inserted into the blank line by the hardware, the text which follows being pushed across the scope face to make room.  If the pen is now touched to the tablet in the center, the new text will replace the old." [Coleman at p. 284 (MSLT_1230609)]

73.     Symbol (b) in Coleman [see Figure 13] is used to insert text.

> "Figure 1(b) is the symbol for an insertion.  The figure is drawn so the tip of the caret is just below the point at which the insertion is to take place.  The system will erase the symbol and replace it by a small blinking caret, separate the text by opening a blank line, position the cursor in the center of the blank line, and enable the keyboard for the typing of characters."  [Coleman at pp. 284-286 (MSLT_1230609-MSLT_1230610)]

74.     Symbol (c) in Coleman [see Figure 13] is used to interchange adjacent characters, words, or groups of words.

Exhibit 53
Page 001032

"Figure 1(c) is the symbol for an interchange. It may be used to interchange adjacent strings, either letters, groups of letters, words, or groups of words. If, after the interchange takes place, it is determined that it was done incorrectly, it may be cancelled by touching the pen to the lower right hand corner of the tablet." [Coleman at MSLT_1230610]

75.     Symbol (d) in Coleman [see Figure 13] is used to move a block of text.

The selected text block may be moved to another location on the screen or to a temporary location on the computer system's disk. Alternatively, text stored in the temporary buffer on the computer system's disk may be moved to a location on the screen.

"Figure 1(d) is the symbol for a move. The text to be moved is circled and the line is continued to a position just under the point at which the text is to be moved. If the line does not terminate near a character, the circled text is moved out to a temporary location on the disk. If the loop does not circle any text, the text on the disk (if any) is inserted at the point at which the line terminates. This is to provide the limited capability of moving a block of characters to a far removed position in the text." [Coleman at p. 286 (MSLT_1230610)]

76.     Symbol (e) in Coleman [see Figure 13] is used to remove excess spaces from the text.

"Figure 1(e), a cup, is the symbol to remove excess spaces. It is drawn under a line of characters with the ends of the symbol just below the characters with the ends of the symbol just below the characters bounding the spaces to be removed." [Coleman at p. 286 (MSLT_1230610)]

77.     Symbol (f) in Coleman [see Figure 13] is used insert spaces into the text.

"Figure 1(f) is the symbol to add a space. It is a line less than ¾ of an inch long. It is drawn at the position the space is to be inserted." [Coleman at p. 286 (MSLT_1230610)]

78.     Symbol (g) in Coleman [see Figure 13] is used to scroll the screen up 10 lines of text.

Exhibit 53
Page 001033

"Figure 1(g) is the symbol to move the text up 10 lines. It is a line drawn from the bottom of the screen towards the top, and is at least 1½ inches long. Text is removed from the upper part of the screen and new text is added to the bottom." [Coleman at p. 286 (MSLT_1230610)]

79.     Symbol (h) in Coleman [see Figure 13] is used to scroll the screen down 10 lines of text.

"Figure 1(h) is the symbol to move the text down 10 lines. It is a line drawn from the top of the screen towards the bottom, and is at least 1½ inches long. Text is removed from the lower part of the screen and is added to the top." [Coleman at p. 287 (MSLT_1230610)]

80.     Symbol (j) in Coleman [see Figure 13] is used to delete a block (*i.e.*, a group of whole lines) of text.

"Figure 1(j) is the symbol for a block delete. It is drawn from the first line of the text to be deleted to the last line, diagonally across the screen. After recognition, the text to be deleted will blink. Touching the pen to the tablet will delete the blinking text." [Coleman at p. 287 (MSLT_1230610)]

81.     Furthermore, the recognized proofreader's symbols are implemented by the computer system's processor programmed with the prior art algorithms of Coleman for the editor user interface. Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see, *e.g.*, '295 patent at Col. 4:32-41].

## 5.  Detecting Direction Of Motion Of A Gesture

82.     The text editing system described in Coleman detects the direction of motion of a gesture [see, *e.g.*, claim 41 of the '295 patent]. For example, symbol (g) in Figure 13 is a long vertical line drawn from the bottom of the RAND tablet towards the top whereas

symbol (h) in Figure 13 is a long vertical line drawn from the top of the RAND tablet towards the bottom. These symbols have different meanings. When drawn from bottom to top, the symbol indicates that the screen should be scrolled up 10 lines. On the other hand, when drawn from top to bottom, the symbol indicates that the screen should be scrolled down 10 lines.

> "Figure 1(g) is the symbol to move the text up 10 lines. It is a line drawn from the bottom of the screen towards the top...
>
> Figure 1(h) is the symbol to move the text down 10 lines. It is a line drawn from the top of the screen towards the bottom…" [See Coleman at pp. 286-287 (MSLT_1230610)]

To the extent that the rules used by the discrimination net (*e.g.*, YINIT > YEND) represent the shape of the gesture, the predefined shape also represents the direction of motion.

### 6. Direction of Motion Of A Gesture Is Associated With A Predetermined Action

83.    The text editing system described in Coleman recognizes a gesture wherein the direction of motion of the gesture is associated with a predetermined action [see, *e.g.*, claim 46 of the '295 patent]. As discussed above, drawing the proofreader's symbol (g) [gesture] shown in Figure 13, which is a vertical line drawn from the bottom of the screen towards the top, scrolls the text up 10 lines. On the other hand, the proofreader's symbol (h) shown in Figure 13, which is a vertical line drawn in the opposite direction from the top of the screen towards the bottom, scrolls the text down 10 lines.

### 7. Displaying Actual Shape Of A Gesture

84.    The text editing system described in Coleman displays on the screen a shape that represents the actual gesture made by the user [see, *e.g.*, claim 43 of the '295

Exhibit 53
Page 001035

patent]. The system displays electronic ink on the CRT as the user draws a proofreader's

symbol on the RAND tablet. After the gesture is interpreted the electronic ink is erased.

"It was this which led to the designing and development of a text editing system in which the user can draw proofreader's symbols over text appearing on a Cathode Ray Tube (CRT)…" [See Coleman at p. 283 (MSLT_1230608)].

"Figure 1(a) is the symbol for either an alteration or deletion of text. The figure is drawn over the selected piece of text, crossing it out. The system will erase the symbol, blink the selected text for verification, separate the text by opening a blank line, position the cursor in the center of the blank line, and enable the keyboard for the typing of characters." [See Coleman at p. 284 (MSLT_1230609)].

"Figure 1(b) is the symbol for an insertion. The figure is drawn so the tip of the caret is just below the point at which the insertion is to take place. The system will erase the symbol and replace it by a small blinking caret, separate the text by opening a blank line, position the cursor in the center of the blank line, and enable the keyboard for the typing of characters." [See Coleman at p.284 (MSLT_1230609)].

# VI.   Kim Paper

### A.   REFERENCE

85.    The paper "On-Line Gesture Recognition By Feature Analysis" by Joonki Kim was published in 1988 in the Proceedings of Vision Interface '88 at pp. 51-55 [MSLT_1231069-MSLT_1231075] (hereinafter "Kim Paper").  This publication contains the proceedings of a conference that took place at the Edmonton Convention Centre on June 6-10, 1988.

### B.   DESCRIPTION

#### 1.  Computer System

86.    The Kim Paper describes a computer system that includes a "keyboardless direct manipulation interface to a spreadsheet application."  [See Kim Paper at p. 51 (MSLT_1231071)].  "Instead of a keyboard and a separate screen, a specially made transparent tablet on top of a flat screen [5] is used as an input/output device.  With a cursor following the pen when the pen is close to the tablet surface and electronic ink trace when the pen is touching the surface, it is possible to make accurate marks on the screen-tablet combination…. The user enters text by writing and enters commands and operands by gestures directly on the tablet."  [See Kim Paper at pp. 51-52 (MSLT_1231071-MSLT_1231072)].  The tablet is a digitizer with a sampling rate "high enough to capture all important points."  [See Kim Paper at p. 52 (MSLT_1231072)].  The display can be an LCD display.  [See, *e.g.*, Kim Paper at p. 53

Exhibit 53
Page 001037

(MSLT_1231073)].  A computer system with a display would necessarily contain a display controller.

87.    The software components of the system (executed on the computer's processor) include a handwriting recognizer, a gesture recognizer and the interface between the recognizers and the applications:

> "Without a keyboard, both gesture recognition and handwriting recognition are necessary.  The fixed feature analysis gesture recognition developed in this paper and an adaptive handwriting recognition [6] are used."  [See, *e.g.*, Kim Paper at p. 52 (MSLT_1231072)].

> "The recognition algorithm … was implemented using the C programming language.  It consists of about 2000 lines of source code, and requires about 100KB of storage.  It runs on various computers and in either interactive or batch mode."  [See Kim Paper at p. 53 (MSLT_1231073)].

88.    Gestures are used to control the computer system:

> "The recognizer described in this paper recognizes basic gesture alphabet shapes. Another function [10] that understands the application and screen display information collects the gesture alphabet elements together to form a complete command and send [sic] it to the application (spreadsheet in our example) for execution."  [See Kim Paper at p. 52 (MSLT_1231072)].

## 2.    Detecting A Stroke Of The Stylus Tip

89.    The Kim Paper discloses means for detecting a stroke of the digitizing pen tip in contact with the screen.  [See, *e.g.*, claims 1, 39 and 41 of the '295 patent].  The display/tablet can sense whether the pen is close to the tablet surface or touching the tablet surface.

> "With a cursor following the pen when the pen is close to the tablet surface and electronic ink trace when the pen is touching the surface, it is possible to make accurate marks on the screen-tablet

combination." [See Kim Paper at pp. 51-52 (MSLT_1231071-
MSLT_1231072)].

When the pen is touching the tablet surface, a trace of the pen's movement across the surface is
displayed. This trace is called electronic ink. The sequence of points from pen down to pen up
is called a stroke. [See, *e.g.*, Kim Paper at p. 52 (MSLT_1231072)].

### 3.    Detecting A Departure Of The Stylus Tip

90.    The Kim Paper discloses means for detecting the departure of the
digitizing pen tip from the screen. [See, *e.g.*, claim 1 of the '295 patent]. First, the Kim Paper
states that electronic ink is produced "when the pen is touching" the surface of the
display/tablet package. [See, *e.g.*, Kim Paper at p. 52 (MSLT_1231072)]. Second, the Kim
Paper states that the sequence of points from pen down to pen up is called a stroke. [See, *e.g.*,
Kim Paper at p. 52 (MSLT_1231072)]. It follows, then, that the Kim Paper discloses detecting
the departure of the pen from the display.

### 4.    Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip

91.    The Kim Paper discloses means for defining the termination of a gesture
comprising at least one stroke in response to the departure of the digitizing pen tip from the
screen. [See, *e.g.*, claim 1 of the '295 patent]. The Kim Paper discloses using single stroke
gestures: "We simplified the problem by using single stroke gestures only." [See Kim Paper
at p. 52 (MSLT_1231072)]. Since a stroke is the sequence of points from pen down to pen up
[see Kim Paper at p. 52 (MSLT_1231072)], a single stroke gesture is terminated in response to
the departure of the stylus tip from the screen (*i.e.*, pen up).

### 5.   Recognizing Gestures

92.     The Kim Paper discloses means for recognizing a plurality of gestures.

[See, *e.g.*, claims 1, 39, 41 of the '295 patent].  The Kim Paper discloses using fixed shape and

varying shape gestures:

> "Based on a paper and pencil study of gestures [8,9], we selected a
> few representative shapes as the initial gesture alphabet (Figure 3).
> This alphabet is a mix of gestures that vary little (fixed shape) and
> gestures that vary in many ways (varying shape).  We simplified
> the problem by using single stroke gestures only.  This is not a
> major limitation for the small vocabulary set, but future systems
> should recognize multi-stroke gestures."  [See Kim Paper at p. 52
> (MSLT_1231072)].

The set of gestures are shown in Figure 15.  The fixed shape gestures include carets pointing up,

down, left and right, quarter boxes, the dot, and a capital sigma.  The varying shape gestures are

the editor's delete symbol, the arrowhead, the circle and the line.



**Figure 15.  Gestures shown in the Kim Paper[1].  [See Kim Paper at Fig. 3 (MSLT_1231075)].**

---

[1] While discussing misrecognition problems, the Kim Paper says of the dot [tap] gesture:  "A dot, written as a short line, can be recognized as a line gesture."  [See Kim Paper at p. 53 (MSLT_1231073)].

93.    As discussed above, the recognized gestures are comprised of a single stroke and the departure of the stylus from the screen indicates the termination of the gesture. [See, *e.g.*, claims 39, 41 of the '295 patent]

94.    The gesture recognition algorithm described in the Kim Paper is based on stroke direction:  "This is a fixed feature analysis system using directions and direction changes."  [See Kim Paper at p. 53 (MSLT_1231073)].  The gestures are recognized by comparing with gesture prototypes [predefined shapes] [see, *e.g.*, claims 1, 39, 41 of the '295 patent], which are defined in terms of the direction of motion.  [See, *e.g.*, Figure 16].



**Figure 16.  Prototypes for three gestures showing their definition in terms of stroke direction.  For example, the upside down caret ("v") drawn from left to right is a stroke that begins in direction 4 or 5 and then changes to direction 1 or 2.  Alternatively, when the gesture is drawn from right to left, it is a stroke that begins in direction 7 or 8 and then changes to direction 10 or 11.  [See Kim Paper at p. 53 (MSLT_1231073)].**

95.    "The recognition algorithm … was implemented using the C programming language.  It consists of about 2000 lines of source code, and requires about 100KB of storage. It runs on various computers and in either interactive or batch mode."  [See Kim Paper at p. 53 (MSLT_1231073)].

96.    The gesture recognizer of the Kim Paper follows the steps outlined in Automatic Recognition of Handprinted Characters [MSLT_1233195-MSLT_1233213].  It

Exhibit 53
Page 001041

performs preprocessing to determine the set of points necessary for recognition. Then the features of the gesture—namely, direction and direction changes—are extracted. Finally, the gesture is classified based on the extracted features. [See Table 2].

Exhibit 53
Page 001042

Table 2.  Comparison of the gesture recognition algorithm used by the Paper-Like Interface System with an algorithm discussed by the paper Automatic Recognition of Handprinted Characters.

| Automatic Recognition of Handprinted Characters | Kim Paper |
|---|---|
| Preprocessing:<br>"The purpose of preprocessing is to extract the relevant basic features to be used in the recognition process. In on-line character recognition, these features are generally points chosen from the drawing. In order to obtain these points, different classical algorithms may be employed, e.g.,<br>1) Smoothing by averaging a point with its neighbors.<br>2) Filtering by forcing a minimum distance between two consecutive points.<br>3) Angular segmentation by sampling a point as soon as the direction of the tangent to the drawing changes by a certain angle [16], [17].<br>4) Linear piecewise approximations and others [83]" [See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)]. | "Preprocessing<br>Generally, tablet sampling rate is set high enough to capture all important points [11]. Then, this highly sampled data is filtered to a reduced set of points necessary for recognition.  Over the years, filtering has evolved to include functions such as smoothing, wild point correction, hook removal, dot reduction and trim [12, 13, 14, 15].  A trim filter works on internal points of a stroke (from pen down to pen up), and selects the points necessary for recognition. Another way of looking at the trim function is piecewise linear approximation of a stroke." [See Kim Paper at p. 52 (MSLT_1231072)].<br><br>"Smoothing filter<br>Inaccuracy of the tablet, and digitization noise makes smooth lines wiggly.  A digital low pass filter [16] was used to remove wigglyness and produce smooth output." [See Kim Paper at p. 52 (MSLT_1231072)].<br><br>"Acceleration filter<br>We developed a new trim filter for gesture recognition [17].  It relies on pen dynamics, namely velocity and acceleration… When ac(i) [acceleration magnitude] is greater than a threshold, there is a significant change in speed, and/or direction.  Such a point is probably necessary for recognition and it is kept." [See Kim Paper at p. 52 (MSLT_1231072)].<br><br>"Direction filter A second-level filter based on directions is developed for gestures.  This filter is necessary because we use only 12 directions and hence introduce quantization noise.  After the second-level filter, for |

| Automatic Recognition of Handprinted Characters | Kim Paper |
|---|---|
| | example, a caret, which may had [sic] 30 points initially will usually be reduced to three points."<br>[See Kim Paper at p. 52 (MSLT_1231072)]. |
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification".<br>"The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc." [See Automatic Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | "Directions are used to recognize gestures for two main reasons. Recognition of handwritten characters using directions is well established, and we have developed a new algorithm that uses direction changes. We can use the same input characterization for both."<br>[See Kim Paper at MSLT_1231072].<br><br>"A new recognition system that recognizes gestures has been developed. This is a fixed feature analysis system using directions and direction changes."<br>[See Kim Paper at p. 53 (MSLT_1231073)]. |
| Classification:<br>"Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ….. Classification is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]" [See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)]. | "Fixed shape gestures can be recognized conveniently and speedily by direction analysis. Following is a list of example gesture shapes and directions under ideal conditions:<br><br>ʌV    Vᵉ    ((4\|5)(1\|2))\|((7\|8)(10\|11))<br>⌐    ⌐    ((9)(6))\|((12)(3))<br>⌐ʸ    ⌐    ((6)(9))\|((3)(12)).<br><br>A flow table with 12 inputs for each direction is used as a first stage recognition for fixed shape gestures. This first stage recognition can handle minor rotations and size variations, but not major gestural variations."<br>[See Kim Paper at pp. 52-53 (MSLT_1231072-MSLT_1231073)].<br><br>"When the first stage recognition fails, a second stage recognition is invoked. This second stage consists of codes tailored for each symbol and uses direction changes extensively. The delete symbol can be described as 4 or more vectors, total direction |

| Automatic Recognition of Handprinted Characters | Kim Paper |
|---|---|
| | change of 12, and beginning and ending tails." [See Kim Paper at p. 53 (MSLT_1231073)]. |

### 6. Implementing Gestures

97.     The Kim Paper discloses means for implementing each recognized gesture. [See, *e.g.*, claims 1, 39, 41 of the '295 patent]. Each gesture is associated with at least one action. For example, the delete symbol can be used to indicate a delete command. [See, *e.g.*, Figure 17]. Also, the caret gesture is used to insert space into a spreadsheet.

"In order to apply the gesture command to the spreadsheet, it is necessary to find the part of the display information marked by the gesture. For example, if the gesture is a caret, its tip coordinates are necessary to identify the part of the display which in turn identifies the location in the spreadsheet where space is to be inserted." [See Kim Paper at p. 52 (MSLT_1231072)].

In addition, a gesture may select the source or target of a spreadsheet command, or the gesture may execute a spreadsheet command.

"Usually, a gesture by itself does not make much sense. A number of gestures are put together to form a command just the way alphabet letters are put together to form a word. Usually, a gesture command consists of a command (like move), a source, and a target." [See Kim Paper at p. 52 (MSLT_1231072)].

The circle gesture can be used to indicate the scope of a command, for example, the source of a move command. The line can be used to indicate a move command. The arrowhead can be used to indicate the target of a move command. [See, *e.g.*, Figure 18].



**Figure 17. An example of scope and delete gestures used with the spreadsheet application. [See Kim Paper at p. 54 (MSLT_1231074)].**



**Figure 18. "Move command built from scope, line and arrowhead." [See Kim Paper at p. 55 (MSLT_1231075)].**

98.     Furthermore, the recognized gestures are implemented by the computer system's processor programmed with the prior art algorithms of the Kim Paper's spreadsheet user interface. Gestures are interpreted in the context in which they occur (*e.g.*, location on the screen and preceding/following gestures). Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see '295 patent at Col. 4:32-41].

### 7. Stylus Proximity Detection

99.     The Kim Paper discloses means to detect proximity of the digitizing pen tip to the screen and indicates the proximity of the digitizing pen tip to the screen.  [See, *e.g.*, claim 3 of the '295 patent].  The display/tablet can sense whether the pen is close to the tablet surface or touching the tablet surface.

> "With a cursor following the pen when the pen is close to the tablet surface and electronic ink trace when the pen is touching the surface, it is possible to make accurate marks on the screen-tablet combination."  [See Kim Paper at pp. 51-52 (MSLT_1231071-MSLT_1231072)].

When the pen is close to the tablet surface, a cursor is displayed.  [See, *e.g.*, Kim Paper at p. 51 (MSLT_1231071)].

100.     The Kim Paper further discloses means for terminating display of the indicator when the stylus tip departs from proximity to the screen.  [See, *e.g.*, claim 12 of the '295 patent].  Display of a cursor when the pen is in proximity to the tablet surface further implies that the cursor is removed when the pen leaves proximity.

### 8. Detecting Direction Of Motion Of A Gesture

101.     The Kim Paper discloses means for detecting the direction of motion of a gesture.  [See, *e.g.*, claims 4, 41 of the '295 patent].  The gesture recognition algorithm described in the Kim Paper is based on stroke direction:  "This is a fixed feature analysis system using directions and direction changes."  [See Kim Paper at p. 53 (MSLT_1231073)].  The gesture prototypes are defined in terms of the direction of motion as shown in Figure 16.

Thus, the gesture prototypes [predefined shapes] also represent the direction of motion.  [See, *e.g.*, claim 41 of the '295 patent].

### 9.  Displaying Actual Shape Of A Gesture

102.    The Kim Paper includes means for displaying the shape representing the actual gesture made by the user.  [See, *e.g.*, claims 6, 43 of the '295 patent].  The system displays "electronic ink" as the pen is moved across the tablet surface.  [See, *e.g.*, Kim Paper at pp. 52-53 (MSLT_1231072- MSLT_1231073)].

Exhibit 53
Page 001048

# VII.   Paper-Like Interface System

A.   <u>REFERENCES</u>[2]

103.    The Paper-Like Interface is a gesture-based interface for a computer

system that was developed by a research team at the IBM Thomas J. Watson Research Center.

The Paper-Like Interface "couples the convenience of pen and paper with the power of a

computer."  [See PLI Paper at p. 494 (MSLT 1059918)].  The Paper-Like Interface System was

an implementation of the gesture-based interface in a computer system.

104.    For purposes of this report, "Paper-Like Interface System" refers to the

following:

- Ellozy, H.A., Jameson, D. H., Kelley, J., Kosinski, P. R., Levin, B., Pulido, G., Sacks, M., Van Deusen, M. S. and Wolf, C.G. "The Paper-Like Interface," ACM CHI 1989, VOL. II [VIDEO DISC 1 - MSLT_0971856] is a videotaped demonstration of the Paper-Like Interface System (hereinafter "PLI Video");

- Wolf, C.G., Rhyne, J.R. and Ellozy, H.A. "The Paper-Like Interface" in Designing And Using Human-Computer Interfaces And Knowledge Based Systems, Proceedings Of The Third International Conference On Human-Computer Interaction, Sept. 18-22, 1989, pp. 494-501 [MSLT 1059916-MSLT_1059925) (hereinafter "PLI Paper");

---

[2] Source code for an X-Window implementation of the Paper-Like Interface was contributed to the X Consortium. The modification date of xpli.README (description of the contributed source code) and xpli.tar.Z (archive containing the source code) is Oct. 3, 1991.  These files are available on the internet at ftp://ftp.x.org/R5contrib/. [MSLT_1233222-MSLT_1233863]

- Chow, D. and Kim, J. "Paper Like Interface for Educational Applications," National Educational Computing Conference '89, Boston, Massachusetts, June 20-22, 1989, pp. 337-344 [MSLT 1073277-MSLT_1073286] (hereinafter "PLI for Education");

- Kim, J. "On-Line Gesture Recognition By Feature Analysis," Proceedings of Vision Interface '88, June 1988, pp 51-55 [MSLT_1231069- MSLT_1231075] (hereinafter "Kim Paper").

105.    The references make clear that they each describe aspects of the same Paper-Like Interface System.  For example, the PLI Video acknowledges several individuals, including all the authors of the PLI Paper, PLI for Education and the Kim Paper.  In addition, features described in the papers are depicted in the PLI Video.  For example, a stylus is used to write directly on the screen; electronic ink is displayed when the stylus writes on the screen; a cursor is displayed when the cursor close to but not touching the screen; handwriting is recognized; gestures are recognized and used to control the system; and applications include a spreadsheet, a sketch program, a music program and a math program.

106.    Furthermore, both the PLI Paper and PLI for Education cite the Kim Paper as the description of the gesture recognition algorithm used by the Paper-Like Interface System:

> "The two key software parts of the paper-like interface are the handmarking recognizers (Tappert, 1984; Kim, 1988)"  [See PLI Paper at p. 494 (MSLT_1059918)].

> "Gesture recognition requires a slightly different strategy [7] from our basic matching software…"  [See PLI for Education at p. 338 (MSLT_1073280)].

The reference cited as "Kim, 1988" in PLI Paper and as reference number 7 in PLI for Education is the Kim Paper.  Furthermore, the PLI Paper acknowledges the contributions of several people, including Doris Chow and Joonki Kim, the authors of PLI for Education: "The Paper-Like Interface described here is the product of the efforts of many people including Doris Chow, Joonki Kim…"  [See PLI Paper at p. 501 (MSLT_1059925)].

107.    In addition, the Kim Paper ties itself to the Paper-Like Interface System: "This recognition system is a part of a keyboardless direct manipulation interface to a spreadsheet application."  [See Kim Paper at p. 51 (MSLT_1231071)].  The other publications describing the Paper-Like Interface System all mention the Paper-Like Interface System's spreadsheet application.  The PLI Paper states that the first application used with the Paper-Like Interface System was a spreadsheet program (Lotus 1-2-3™).  [See PLI Paper at p. 496 (MSLTMLST_1059920)].  PLI for Education states that the Paper-Like Interface System was successfully applied to a spreadsheet application.  [See PLI for Education at p. 338 (MLST_1073280)].  The PLI Video shows the spreadsheet application in operation.  It follows, then, that the Kim Paper describes the gesture recognition algorithm and other features of the Paper-Like Interface System.

### B.    DESCRIPTION

#### 1.  Computer System

108.    The Paper-Like Interface system "hardware consists of a small computer, connected to a flat LCD display and a transparent tablet mounted together."  [See PLI for Education at pp. 337-338 (MSLT_1073279-MSLT_1073280); see also Figure 19].  (A

Exhibit 53
Page 001051

computer system with a display would necessarily contain a display controller.)  Although the computer was a floor-standing model that could fit under a desk, the developers envisioned a portable system that would combine "both the computer and display/writing component in a single package."  [See, *e.g.*, PLI for Education at p. 339 (MSLT_1073281);  PLI Video at minutes 5:46 – 6:40].  This display/tablet package is a combination of an LCD display and a transparent digitizing tablet.  The display has a resolution of 640 x 480.  [See, *e.g.*, PLI for Education at p. 338 (MSLT_1073280)].  The digitizing tablet has a spatial resolution of 200 points per inch and a temporal resolution of 84 samples per second.  [See, *e.g.*, PLI for Education at p. 338 (MSLT_1073280)].

109.    A pen [stylus] is attached to the display/tablet package by a cable.  [See, *e.g.*, PLI for Education at p. 338 (MSLT_1073280)].  The pen is used to input information into the computer by writing directly on the display/tablet package.

> "To enter data or commands a digitizing pen is used to write directly on a combination of digitizing tablet and liquid crystal display"  [See PLI Video at minutes 1:20 – 1:31].

Since the display and the digitizing tablet are combined into a single unit, there is a single surface used for both inputting and displaying information.  [See, *e.g.*, PLI Paper at p. 495 (MSLT_1059919); PLI for Education at pp. 337, 338;  Kim Paper at pp. 51-52 (MSLT_1231071- MSLT_1231072)].

Exhibit 53
Page 001052



**Figure 1. Hardware**

**Figure 19. Paper-Like Interface System hardware. The display/tablet package and stylus are attached to a computer. [See PLI for Education at Fig. 1].**

110.    The display/tablet can sense whether the pen is close to the tablet surface or touching the tablet surface. When the pen is close to the tablet surface, a cursor is displayed. [See, *e.g.*, Kim Paper at MSLT_1231071]. For example, in the PLI Video, when the user brings the digitizing pen tip in proximity with the screen, a "+" shaped mark is displayed close to the digitizing pen tip. [See, *e.g.*, PLI Video at minutes 0:21 – 0:25, 1:21, 1:25, 2:10 – 2:12, 2:28 – 2:33, 4:19 – 4:21, 5:38 – 5:39].

111.    When the pen is touching the tablet surface, a trace of the pen's movement across the surface is displayed. This trace is called electronic ink. [See, *e.g.*, PLI for Education at pp. 337-338 (MSLT_1073279-MSLT_1073280); Kim Paper at p. 52 (MSLT_1231072)]. For example, in the PLI Video, consider the drawing of an open-ended box in the Sketch Demo. The path traced by the digitizing pen in contact with the screen is displayed on the screen as long as the digitizing pen is in contact with the screen. When the digitizing pen is moved away from the screen, *i.e.*, the tip of the digitizing pen departs from the screen, the system stops tracing the path of the digitizing pen. [See PLI Video at minutes 2:15 – 2:22].

Exhibit 53
Page 001053

112.    The key software components of the PLI system (executed on the computer's processor) are the handmarking recognizers and the dialog interpreter.  [See, *e.g.*, PLI Paper at p. 494 (MSLT_1059918); PLI for Education at p. 338 (MSLT_1073280);  Kim Paper at p. 52 (MSLT_1231072)].  The points of a stroke are processed by the handmarking recognizers:

> "The handmarking recognizers convert handprinted text and other markings into symbol codes, just as the keyboard translates keypresses into symbol codes.  The handwriting recognizer is user-dependent.  It can be trained on the user's idiosyncratic style of writing for any symbol set.  The gesture recognizer recognizes a base set of gestures and can be trained to recognize new gestures or new variations of exiting gestures."  [See PLI Paper at pp. 494-495 (MSLT_1059918-MSLT_1059919)].

Subsequently, the recognized marks are interpreted by the dialog interpreter:

> "The handmarkings form a language, in which combinations of markings indicate actions to be taken (e.g. a caret followed by some handwritten text means insert the recognized text into the document at the point indicated by the caret).  The dialog interpreter defines this language and associates it with the corresponding commands to the computer application."  [See PLI Paper at pp. 494-495 (MSLT_1059918-MSLT_1059919)].

In addition to understanding the markings and associated commands for each application, the dialog interpreter understands the screen display in order to correlate the markings with the objects on the display.  For example, in the spreadsheet application, a column is inserted by drawing "a caret *in the column identifier area*."  [See PLI Paper at p. 496 (MSLT_1059920), emphasis added].

Exhibit 53
Page 001054

## 2. Applications

113.    The Paper-Like Interface System implemented a number of demonstration applications including a Lotus 1-2-3™ Demo (spreadsheet program) [see, *e.g.*, PLI Video at 3:15 – 4:40;  PLI Paper at pp. 496-497 (MSLT_1059920-MSLT_1059921)], a Sketch Demo program [see, *e.g.*, PLI Video at 2:11 – 2:33;  PLI Paper at pp. 497-498 (MSLT_1059921-1059922)], a Music Demo program [see, *e.g.*, PLI Video at 0:04 – 0:24;  PLI Paper at pp. 498-499 (MSLT_1059922-MSLT_1059922-MSLT_1059922-MSLT_1059923)], a Math Demo program [see, *e.g.*, PLI Video at 1:25 – 1:50;  PLI Paper at pp. 499-500 (MSLT_1059923-MSLT_1059923-MSLT_1059924)], a Learning to Write program [PLI for Education at pp. 339-340 (MSLT_1073281-MSLT_1073282)] and a Crossword Puzzle program [PLI for Education at p. 340 (MSLT_1073282)].

114.    The Lotus 1-2-3™ Demo application includes gestures for defining ranges, copying ranges, and performing such operations as summation, deletion, column insertion and row insertion.  [See, *e.g.*, PLI Video at minutes 3:15 – 4:40; PLI Paper at pp. 496-497 (MSLT_1059920-MSLT_1059921)].  For example, in the PLI Video, drawing the "v" gesture in the column selection area of the screen causes a column to be inserted into the spread sheet [see PLI Video at minutes 4:16 – 4:20].  As another example, the spreadsheet summation operation is made up of a scoping gesture and a summation gesture.  The scope is selected by drawing a line across the desired cells.  The sum is calculated by drawing a "Σ" gesture in the cell that will hold the sum.  [See, *e.g*., PLI Video at minutes 4:23 – 4:40; PLI Paper at p. 496 (MSLT_1059920)].

Exhibit 53
Page 001055



**Figure 20.  Predefined shapes used by Paper-Like Interface System in recognizing user gestures. [See PLI Video at minutes 3:15 – 4:40].**

115.    The Sketch Demo is used for drawing.  When the gesture recognizers are turned off, the sketching program allows users to draw freehand.  When the gesture recognizers are turned on, "hand-drawn marks are recognized and displayed in a regularized form."  [See PLI Paper at p. 497 (MSLT_1059921)].  The Sketch Demo recognizes such gestures as lines and circles.  [See, *e.g.*, PLI Paper at Fig. 4 (MSLT_1059922); PLI Video at minutes 5:23 – 5:26].  Although editing gestures are not included in the Sketch Demo, the PLI Paper states that they would be desirable for a fully functional sketching program.  [See PLI Paper at p. 498 (MSLT_1059922)].

116.    The Music Demo application allows a user to create a musical score and lyrics.  The musical symbols are written directly on the staff while the lyrics are written in an area below the staff.  In addition, the notes entered using the musical program can be played.  "The computer generates the note duration from the handwritten symbol and the pitch from its position on the staff."  [See PLI Paper at p. 499 (MSLT_1059923)].  "Thus, the appeal of an interactive gestural interface is multiplied when the output provides immediate, appropriate feedback.  This is one of the defining characteristics of a direct manipulation interface:  that the effects of operations on objects are immediately observable…"  [See PLI Paper at p. 499 (MSLT_1059923)].



**Figure 21. The Paper-Like Interface System's Music Demo program. The top staff shows the recognized musical notes and lyrics. The staff immediately under shows the gestures corresponding to the notes and lyrics. [See PLI Paper at Fig. 5 (MSLT_1059923)].**

117.    In addition, the Music Demo can be used to edit musical scores. [See, *e.g.*, PLI Paper at p. 499 (MSLT_1059923); PLI for Education at p. 340 (MSLT_1073282)]. Although the gestures for editing musical scores are not discussed in detail, PLI for Education does show a score with an "X" through one of the notes, and it separately discusses the use of the "X" mark as a gesture for deletion of text. [See, *e.g.*, PLI for Education at p. 338 (MSLT_1073280)1073281 and Fig. 9].

118.    The Math Demo application is used to enter and edit "two-dimensional mathematical expressions, containing superscripts, fractions and special symbols."  [See PLI Paper at pp. 499-500 (MSLT_1059923-MSLT_1059924)].  The user writes the formula freehand on the display/tablet combination.  Gestures such as integral signs are recognized after the pen is lifted from the display and inserted into the formatted equation.  Text is recognized after the user presses the "Enter" button whereupon the "Font symbols" corresponding to the input text are displayed on the screen.  [See, *e.g.*, PLI Video at minutes 5:02 – 5:15].

Exhibit 53
Page 001059



**Figure 22. Paper-Like Interface's Math Demo program. On the left is the equation written by the user. On the right is the formatted equation. Show at the bottom right is the "Enter" button. [See PLI Paper at Fig. 6 (MSLT_1059924)].**

119.    The mathematical equation can also be edited. For example, a single letter can be replaced by simply drawing the correct letter on top of the incorrect letter. The PLI Video shows replacing the letter "G" with the letter "D" in this way. [See PLI Video at minute 1:47 – 1:50].

120.    The Learning To Write program "is a tool for teaching children their first step in writing – letter formation." [See PLI for Education at p. 339 (MSLT_1073281)].

Template letters are displayed and the student traces over the template with the pen.  The

student's writing is then compared against the template:

> "1. Prepare writing material based on student's level of past
> accomplishment and speed.
>
> 2. Present writing material on the LCD screen in dotted line.
>
> 3. Start the ink for the student to follow with a pen (follow-me).
>
> 4. Student uses the pen to follow the electronic ink.  Display of
> student pen trace is different from follow-me ink.
>
> 5. As writing progresses, either at stroke or character level,
> compare the student writing with pre-stored prototypes and
> produce evaluation."  [See PLI for Education at p. 339
> (MSLT_1073281)].
>
> "As the strokes/characters are written, the input is compared
> against the prototype, and the program can measure the closeness
> of writing to the displayed material.  If the writing is out of range
> or exceeds some bound, the system gives audio and visual
> feedback to inform the student of his/her writing quality."  [See
> PLI for Education at p. 339 (MSLT_1073281)].

The Learning To Write program can show the direction and order in which the students should

write the strokes of characters.  [See also PLI for Education at p. 340 (MSLT_1073282)].  The

Paper-Like Interface System can thus help address a deficiency of the traditional paper and

pencil approach to teaching letter formation.  Namely, the stroke order and direction actually

used by the student are not visible, after the fact, from the student's written work.  [See PLI for

Education at p. 339 (MSLT_1073281)].

      121.    PLI for Education discusses a number of possible variations of this

Learning To Write program.  For example, the student could write in a separate area of the

screen instead of over a template.  Or an entire hand-written composition could be evaluated by

the program instead of a single letter at a time.  Or the program could be used to teach

shorthand, musical notation or other writing systems instead of just the English alphabet. [See PLI for Education at p. 340 (MSLT_1073282)].

122.    The Crossword Puzzle program is used to drill a student on vocabulary. The program is used to generate the puzzle. The student then writes the answers into the appropriate boxes using the pen. The program recognizes the handwriting and can check the input against the correct answers. [See PLI for Education at p. 340 (MSLT_1073282)].

### 3.    Detecting A Stroke Of The Stylus Tip

123.    As I have already discussed, the Paper-Like Interface System detects a stroke of the digitizing pen tip in contact with the screen. [See, *e.g.*, claims 1, 39 and 41 of the '295 patent]. For example, in the PLI Video, a tap on the "Sketch Demo" button using the digitizing pen tip (a tap is a stroke as construed by the Court) opens up the "Sketch Demo" application [see PLI Video at minutes 2:11 – 2:17]. Accordingly, the Paper-Like Interface System possesses the means to detect a tap of the digitizing pen tip in contact with the screen. Similarly, in the PLI Video, when a horizontal stroke is made with the digitizing pen tip in contact with the screen, a horizontal line is displayed on the screen. [See PLI Video at minutes 4:35 – 4:40].

### 4.    Detecting A Departure Of The Stylus Tip

124.    As I have already discussed, the Paper-Like Interface System detects the departure of the digitizing pen tip from the screen. [See, *e.g.*, claim 1 of the '295 patent]. For example, in the PLI Video, consider the drawing of an open-ended box on the screen. The path traced by the digitizing pen in contact with the screen is displayed on the screen as long as the

Exhibit 53
Page 001062

digitizing pen is in contact with the screen. When the digitizing pen is moved away from the screen, *i.e.*, the tip of the digitizing pen departs from the screen, the system stops tracing the path of the digitizing pen. [See PLI Video at minutes 2:15 – 2:22]. Accordingly, the Paper-Like Interface System includes means to detect the departure of the digitizing pen tip from the screen.

### 5.   Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip

125.   As I have already discussed, the Paper-Like Interface System includes means for defining the termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen tip from the screen. [See, *e.g.*, claim 1 of the '295 patent]. For example, in the PLI Video, consider the drawing of the "v" gesture, in the context of a Lotus 1-2-3™ spread sheet application. The "v" gesture is a single stroke gesture [see PLI Video, at minutes 4:16 – 4:20], therefore comprising at least one stroke. When the user moves the digitizing pen away from the screen after drawing the "v", a column is inserted into the Lotus 1-2-3™ spread sheet [see PLI Video at minutes 4:16 – 4:20], indicating that the Paper-Like Interface has detected the termination of the "v" gesture in response to the departure of the digitizing pen away from the screen. Accordingly, the Paper-Like Interface System possesses a means for defining the termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen tip from the screen.

126.   Another way of terminating the input gesture is shown in the Math Demo program [see PLI Video at minutes 5:02 – 5:15]. The user inputs a mathematical equation and presses the "Enter" button, upon which the "Font symbols" corresponding to the input equation

are displayed on the screen.  This indicates that the input is terminated when a specific region of the display (a button) is touched.

### 6.  Recognizing Gestures

127.    As I have already discussed, the Paper-Like Interface System recognizes a plurality of gestures.  [See, *e.g.*, claims 1, 39, 41 of the '295 patent].  For example, Figure 20 shows a plurality of predefined shapes corresponding to gestures that are recognized by the Paper-Like Interface System in the context of a Lotus 1-2-3™ spreadsheet application.  In the PLI Video, when a user draws gestures corresponding to these shapes, the system recognizes these gestures and performs the actions associated with these gestures.  For example, drawing of the "Σ" gesture performs summation of a selected row of data in a Lotus 1-2-3™ spreadsheet application [see PLI Video at minutes 4:35 – 4:41]; drawing of the "ν" gesture inserts a column in a Lotus 1-2-3™ spreadsheet application [see PLI Video at minutes 4:16 – 4:21]; and drawing of the ">" gesture copies a selected column of data in a Lotus 1-2-3™ spreadsheet application [see PLI Video at minutes 3:52 – 3:57].

128.    The Paper-Like Interface System's handwriting recognition algorithm is a point by point comparison of a stroke to a character prototype [predefined shape].  Table 3 compares this algorithm with the template matching algorithm discussed in Automatic Recognition of Handprinted Characters.

Exhibit 53
Page 001064

Table 3.  Comparison of the handwriting recognition algorithm used by the Paper-Like Interface System with an algorithm discussed by the paper Automatic Recognition of Handprinted Characters.

| Automatic Recognition of Handprinted Characters | Paper-Like Interface System |
|---|---|
| Template Matching and Correlations:<br>"It simply matches the similarity between the input character and the stored references by matching and correlating points or groups of points in the frame."<br>[See Automatic Recognition of Handprinted Characters at pp. 480 (MSLT_1233206)]. | "When a stroke is written, our software compares it to a pre-stored set of strokes which serves as a good handwriting model. Models or prototypes are saved for each letter, and they can be created and changed as necessary.  This comparison of an unknown to known prototypes is called stroke matching, and produces distances (or scores) as output.  The name of the prototype that is closes to the unknown is the recognition result."<br>[See PLI for Education at p. 338 ( MSLT_1073280)].<br><br>"There are many ways of matching the strokes, each with different benefits.  One example is a point by point comparison of normalized coordinates."<br>[See PLI for Education at p. 338 (MSLT_1073280)]. |

129.    The gesture recognition algorithm of the Paper-Like Interface System is based on stroke direction:  "This is a fixed feature analysis system using directions and direction changes."  [See Kim Paper at p. 53 (MSLT_1231073)].  The gestures are recognized by comparing with gesture prototypes [predefined shapes] [see, *e.g.*, claims 1, 39, 41 of the '295 patent], which are defined in terms of the direction of motion.  [See, *e.g.*, Figure 16].

130.    The Paper-Like Interface System's gesture recognizer follows the steps outlined in the article Automatic Recognition of Handprinted Characters.  It performs preprocessing to determine the set of points necessary for recognition.  Then the features of the

gesture – namely, direction and direction changes – are extracted. Finally, the gesture is classified based on the extracted features. See Table 2 for a detailed comparison.

### 7. Implementing Gestures

131. As I have already discussed, the Paper-Like Interface System includes means for implementing each recognized gesture. [See, *e.g.*, claims 1, 39, 41 of the '295 patent]. The implementing means includes means for performing a predetermined action associated with each recognized gesture. For example, drawing of the "Σ" gesture performs summation of a selected row of data in a Lotus 1-2-3™ spreadsheet application [see PLI Video at minutes 4:35 – 4:41]; drawing of the "v" gesture inserts a column in a Lotus 1-2-3™ spreadsheet application [see PLI Video at minutes 4:16 – 4:21]; drawing of the ">" gesture copies a selected column of data in a Lotus 1-2-3™ spreadsheet application [see PLI Video at minutes 3:52 – 3:57].

132. For at least one of the gestures, the predetermined action is determined by the context in which the gesture is used. [See Claim 1 of the '295 patent; '295 File History 1992-05-26 Amendment (Tab 9) at 11-12, 15-16 (LUC 1050933-LUC 1050934, LUC 1050937-LUC 1050938)]. The context includes a first context in which the action is executed upon an operating system level object[3] and a second context in which the action is executed upon an application level object.[4] [See e.g., 2004-02-25 Claim Construction for US 5,347,295 at 5]. For example, in the PLI Video, a tap on the "Sketch Demo" application object using the digitizing pen opens up the "Sketch Demo" application. The "Sketch Demo" object is an

---

[3] I have been informed that the Court has construed the term "operating system level object" to mean: an object that can be manipulated by a user, which is displayed outside the context of an application program.

[4] I have been informed that the Court has construed the term "application level object" to mean: an object that can be manipulated by a user, which is displayed within the context of an application program.

Exhibit 53
Page 001066

operating system level object because it is an object that can be manipulated by a user and is displayed outside the context of an application program.  [See PLI Video at minutes 2:11 – 2:17].  The same tap gesture, when performed within the "Sketch demo" application, results in the selection of a menu item.  [See PLI Video at minutes 2:21 – 2:27].  In this case, the menu is an application level object because it can be manipulated by a user and is displayed within the context of the "Sketch Demo" application.

133.    To the extent that disclosure of GUI elements in "Andrew: A Distributed Personal Computing Environment", Communications of the ACM, March 1986, [MSLT_474326-MSLT_474343] (hereinafter "**Andrew**") pertains to the implementation of gestures, the Paper-like Interface discloses means to implement gestures as disclosed by Andrew.  For example, the Paper-like Interface discloses the use of GUI elements such as buttons in a Math demo program [see PLI Video at minutes 5:02 – 5:15] that corresponds to the GUI elements (such as buttons) disclosed in **Andrew**.

### 8.  Stylus Proximity Detection

134.    As I have already discussed, the Paper-Like Interface System includes means to detect proximity of the digitizing pen tip to the screen and indicates the proximity of the digitizing pen tip to the screen.  [See, *e.g.*, claim 3 of the '295 patent].  For example, in the PLI Video, when the user brings the digitizing pen tip in proximity with the screen, a "+" shaped mark is displayed close to the digitizing pen tip on the screen indicating that the system has detected the digitizing pen tip in proximity with the screen.  As the user moves the digitizing pen tip over the screen in close proximity, the "+" shaped mark follows the digitizing pen tip.  [See, *e.g.*, PLI Video at minutes 0:21 – 0:25, 1:21, 1:25, 2:10 – 2:12, 2:28 – 2:33, 4:19

Exhibit 53
Page 001067

– 4:21, 5:38 – 5:39]. The Kim Paper also states that the Paper-Like Interface System displays a cursor "when the pen is close to the tablet" [see Kim Paper at p. 51 (MSLT_1231071)].

135.    As can be seen in the video, the indicator displaying proximity is terminated when the stylus moves out of proximity of the screen. [See, *e.g.*, claim 12 of the '295]

### 9. Detecting Direction Of Motion Of A Gesture

136.    As I have already discussed, the Paper-Like Interface System includes means to detect the direction of motion of a stroke. [See, *e.g.*, claims 4 and 41 of the '295 patent]. PLI for Education discusses the benefits of using the direction of motion for presentation and evaluation of handwriting. One shortcoming of traditional pencil and paper writing exercises is that, since both the instructional materials and the student's handwriting are static images, "stroke order and direction are not visible." This can be overcome by the Paper-Like Interface. The Learning To Write program uses "dynamic presentation capability to show direction and order of strokes" with follow-me ink. [See PLI for Education at p. 340 ( MSLT_1073282)]. As the student copies the stroke order and direction during a writing exercise, the Learning To Write program evaluates the student's work. [See PLI for Education at p. 339 (MSLT_1073281)].

137.    In order to use the direction of motion of the student's strokes to achieve the desired educational benefits, the stored character prototypes must also store the direction of motion:

> "Writing material, in the style to be taught, is presented on the LCD screen. Students trace over or copy the display. The stroke matching software that we developed for handwriting recognition

can be used productively to compare the student's writing against the desired writing." [See PLI for Education at p. 339 (MSLT_1073281)].

Thus, in order to evaluate the "stroke order and direction" of the student's writing, this information must be stored with the prototypes for the desired writing style.

138. The gesture recognition algorithm used by the Paper-Like Interface System is based on stroke direction. "This is a fixed feature analysis system using directions and direction changes." [See Kim Paper at p. 53 (MSLT_1231073)]. The gesture prototypes are defined in terms of the direction of motion as shown in Figure 16. Thus, the gesture prototypes [predefined shapes] also represent the direction of motion. [See, *e.g.*, claim 41 of the '295 patent].

**10. Displaying Actual Shape Of A Gesture**

139. As I have already discussed, the Paper-Like Interface System includes means for displaying the shape representing the actual gesture made by the user. [See, *e.g.*, claims 6, 43 of the '295 patent]. "As the pen glides on the top surface of the display/tablet package, electronic ink is produced and a pen trace appears on the display." [See PLI for Education at p. 337 (MSLT_1073279)]. For example, in the PLI Video when the user makes a horizontal line gesture, a horizontal line is displayed on the screen [see PLI Video at minutes 4:35 – 4:40].

Exhibit 53
Page 001069

# VIII. FIDS

## A.    REFERENCE

140.    A Flat Panel Interactive Display System is described in an article by Arto Kankaanpaa entitled "FIDS – A Flat-Panel Interactive Display System," [MSLT_1230903-MSLT_1230914] (hereinafter "FIDS Paper").  This article was published in the proceedings of the IEEE conference on Computer Graphics and Applications in March 1988.  As used herein, the term "FIDS" refers to the FIDS Paper in view of SFS 2324 (described in subsection C below)

## B.    DESCRIPTION

### 1.  Computer System

141.    FIDS discloses a prototype computer system developed at Nokia Information Systems to investigate new approaches to human-computer interaction and, more particularly, new methods of inputting information into the computer.

> "At Nokia Information Systems, we have investigated some new approaches to human-computer interaction—especially new methods to input information into the computer—and combined some advanced existing technologies to form a solution that offers a natural way to communicate with the computer.  [See FIDS Paper at p. 71 (MSLT_1230903)1230907p. 71].

142.    The system "was based on the development of a display system that allows people to work with the computer in the same way that they work with pen and paper."

Exhibit 53
Page 001070

[See FIDS Paper at p. 81 (MSLT_1230913)].  Accordingly, FIDS discloses an apparatus for controlling a computer system.

143.    FIDS [see Figure 23] discloses a Nokia PC [computer], an electroluminescent (EL) flat panel display [screen for displaying information] with a resistive touch panel on top of the display and a touch pen [stylus] connected to the touch panel for inputting information into the Nokia PC.

> "The prototype display system consists of an electroluminescent flat panel and a resistive touch screen on top of the display. Connected to the touch screen is a touch pen for input. These components were implemented on an existing workstation, the Nokia PC, for evaluation."  [See FIDS Paper at p. 81 (MSLT_1230913)]



**Figure 23.  FIDS Prototype System.  [See FIDS Paper at Fig. 3 (MSLT_1230906)].**

144.    The Nokia PC is an 80186-based microcomputer workstation.  The EL display hardware is the Finlux MDM512.256-11 Matrix Display Module made by Lohja Corporation, Finland.  It is connected to the IDC186 graphics controller of the Nokia PC.  The IDC186 is a bitmapped graphics display controller, which contains an Intel 80186

Exhibit 53
Page 001071

microprocessor.  A resistive touch panel from Sun-Flex is used on the top of the display

hardware and is connected to the Nokia PC through a controller card.  [See FIDS Paper at p. 74

(MSLT_1230906)].

### 2.  Detecting A Stroke Of The Stylus Tip

145.    FIDS discloses detecting a stroke of the stylus tip in contact with the

screen [see, *e.g.*, claims 39 and 41 of the '295 patent].  FIDS discloses a text editing

application that uses correction marks drawn directly on the display for editing.

> "A text editor using the standard proof correction marks was
> implemented. The marks are drawn with the touch pen directly
> onto the display for identification by pattern recognition
> algorithms."  [See FIDS Paper at p. 81 (MSLT_1230913)].

Table 4 and Table 5 show the implemented correction marks, the operations associated with the

correction marks such as INSERT, DELETE, REPLACE, *etc.*, and how the marks are applied to

the basic text objects such as WORD, LINE, *etc.*

**Table 4.  Implemented correction marks in the text editing application.  [See FIDS Paper at Fig. 5 (MSLT_1230909)].**



**Table 5.  The use of correction marks for editing operations applied to basic text objects.  [See FIDS Paper at Table 3 (MSLT_1230909)].**



146.    As shown, each correction mark drawn on the display screen consists of at least one stroke.  Thus, FIDS discloses detecting a stroke of the stylus tip in contact with the screen.

### 3.    Detecting A Departure Of The Stylus Tip

147.    FIDS discloses means for detecting the departure of the digitizing pen tip from the screen.  [See, *e.g.*, claim 1 of the '295 patent].  First, the FIDS Paper states that the marks are drawn on the display.  [See, *e.g.* FIDS Paper at p. 81 (MSLT_1230913)].  Second, the features used to recognize a gesture include the "starting point and ending point of each stroke."  [See, *e.g.*, FIDS Paper at p. 77 (MSLT_1230909)].  Thus, FIDS discloses detecting the departure of the pen from the display.

Exhibit 53
Page 001073

### 4. Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip

148.    FIDS discloses means for defining the termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen tip from the screen.  [See, *e.g.*, claim 1 of the '295 patent].  FIDS discloses recognizing both single stroke and multi stroke gestures [see Table 4].  As discussed above, FIDS discloses detecting the departure of the stylus from the screen for each stroke of a gesture and recording the coordinates of the point at which that event occurred as the ending point of a stroke.  [See ¶ 147] Accordingly, the departure of the stylus from the screen indicates the termination of a stroke.  In addition, the gesture recognition algorithm in Figure 25 shows that recognition begins only after all strokes of a gesture have been entered   Consequently, one of ordinary skill in the art would recognize that FIDS discloses determining the termination of a gesture based on an algorithm that corresponds to at least an algorithm based on timeout or on touching a part of the screen.

### 5. Recognizing Gestures

149.    FIDS discloses recognizing a plurality of gestures [see, *e.g.*, claims 39 and 41 of the '295 patent].  As discussed above, FIDS discloses a text editing application that uses correction marks [gestures] drawn directly on the display for editing.  The correction marks are recognized using known character recognition methods.

> "For recognition of the editing marks drawn on the display, methods used in character recognition were adapted.  A simple algorithm differentiates between the marks, according to the method shown in Figure 6."  [FIDS Paper at p. 77 (MSLT_1230909)]

> "A text editor using the standard proof correction marks was implemented. The marks are drawn with the touch pen directly

onto the display for identification by pattern recognition algorithms." [See FIDS Paper at p. 81 (MSLT_1230913)]

150.    FIDS discloses comparing a gesture to at least one predefined shape [see, *e.g.*, claims 39 and 41 of the '295 patent]. FIDS discloses a simple editing mark recognition algorithm [see Figure 24] wherein stroke features of the input editing mark are extracted and compared with the features of the reference marks (the set of editing marks that are recognized) using a decision tree [see Figure 25]:

> "For recognition of the editing marks drawn on the display, methods used in character recognition were adapted. A simple algorithm differentiates between the marks, according to the method shown in Figure 6.
>
> First some filtering removes faulty coordinates in the beginning of a stroke. Then characteristic features are extracted. These include starting point and ending point of each stroke, minimum and maximum x and y values, and direction angles at the beginning of a stroke. Finally, a decision tree is applied to classify the marks. The decision tree is shown in Figure 7." [See FIDS Paper at p. 77 (MSLT_1230909)].

As shown, the input editing mark is recognized by applying a set of rule-based tests for the characteristic features of the editing mark. To the extent that recognizing a gesture by applying a set of rule-based tests can be considered to be insignificantly different from recognizing a gesture by comparing it with a predefined shape, as Lucent contends, FIDS discloses recognizing editing marks by comparing with a predefined shape [see, *e.g.*, claim 41 of the '295 patent].

Exhibit 53
Page 001075



**Figure 24.  Editing mark recognition algorithm.  [See FIDS Paper at Fig. 6 (MSLT_1230910)].**

Exhibit 53
Page 001076



**Figure 25. Decision tree used in the editing mark recognition algorithm. [See FIDS Paper at Fig. 7 (MSLT_1230911)].**

151.    As discussed previously, FIDS discloses a simple editing mark recognition algorithm that corresponds to a handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters. Table 6 presents a step-by-step comparison of the two algorithms.

Exhibit 53
Page 001077

**Table 6.  Comparison of the editing mark algorithm employed in FIDS with the handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.**

| Automatic Recognition of Handprinted Characters | FIDS |
|---|---|
| Preprocessing:<br>"The purpose of preprocessing is to extract the relevant basic features to be used in the recognition process. In on-line character recognition, these features are generally points chosen from the drawing. In order to obtain these points, different classical algorithms may be employed, e.g.,<br>1) Smoothing by averaging a point with its neighbors.<br>2) Filtering by forcing a minimum distance between two consecutive points.<br>3) Angular segmentation by sampling a point as soon as the direction of the tangent to the drawing changes by a certain angle [16], [17].<br>4) Linear piecewise approximations and others [83]"<br>[See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)]. | The FIDS mark recognition algorithm includes preprocessing:<br><br>"First some filtering removes faulty coordinates in the beginning of a stroke." [See FIDS Paper at p. 77 (MSLT_1230909)].<br><br>See also "Smoothing and Filtering", shown in Fig. 6 of the FIDS Paper. |
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification"."The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc." [See Automatic Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | The FIDS mark recognition algorithm includes a feature extraction step:<br><br>"Then characteristic features are extracted. These include starting point and ending point of each stroke, minimum and maximum x and y values, and direction angles at the beginning of a stroke." [See FIDS Paper at p. 77 ( MSLT_1230909)].<br><br>See also "Feature Extraction", shown in Fig. 6 of the FIDS Paper. |
| Classification:<br>"Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier | The FIDS mark recognition algorithm includes a classification step using a decision tree:<br><br>"Finally, a decision tree is applied to classify the marks. The decision tree is shown in Figure 7." [See FIDS Paper at p. 77 (MSLT_1230909)]. |

Exhibit 53
Page 001078

| Automatic Recognition of Handprinted Characters | FIDS |
|---|---|
| descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ….. Classification is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]" [See Automatic Recognition of Handprinted Characters at p. 480 (MSLT)_1233206]]. | See also "Classification using a decision tree", shown in Fig. 6 of the FIDS Paper.<br><br>See also FIDS Paper at Fig. 7. |

152.    Furthermore, the FIDS Paper states that more advanced algorithms using the direction angles of the point sequences forming the strokes of an editing mark as a feature could be used for mark recognition [see FIDS Paper at pp. 77-78 (MSLT_1230909-MSLT_1230910].  Since the direction angles of the point sequences forming the strokes of an editing mark constitute the shape of the input editing mark, the input editing mark would be recognized by comparing the direction angles of the point sequences forming the strokes [shape] of the input mark with the corresponding feature of the reference marks [predefined shapes].

153.    FIDS also discloses recognizing a first gesture, a second gesture and a third gesture comprising the first and second gestures [see, *e.g.*, claim 39 of the '295 patent]. For example, consider, the MARK DELETE, MARK and DELETE correction marks.  The MARK DELETE correction mark (third gesture) is comprised of a MARK correction mark (first gesture) and a DELETE correction mark (second gesture).  [See § VIII.B.2].

154.    Correction marks can be used so that each stroke of the mark is located in substantially the same area of the screen [see, *e.g.*, claim 41 of the '295 patent].

Exhibit 53
Page 001079

### 6.   Implementing Gestures

155.     FIDS discloses implementing each recognized gesture and performing a predetermined action associated with each recognized gesture [see, *e.g.*, claims 39 and 41 of the '295 patent].  As discussed previously, FIDS discloses a text editing application that uses correction marks [gestures] drawn directly on the display for editing.  Table 4 and Table 5 show some correction marks disclosed by FIDS, the operations [predetermined actions] associated with the recognized correction marks (such as INSERT, DELETE, REPLACE, *etc*.), and how the marks are applied to the basic text objects such as WORD, LINE, *etc*.

156.     Accordingly, the recognized first, second and third gestures [see ¶ 153] are associated with predetermined actions.  As shown in Table 5, the MARK gesture is used for operations such as MOVE, COPY and TRANSPOSE of Line or Paragraph.  Similarly, the table shows the use of DELETE gesture for deleting a character, word or sentence.  As a matter of common sense, it is inherent that the predetermined action associated with the MARK DELETE gesture is marking and deleting text.

157.     As previously discussed, FIDS discloses a system equipped with a processor.  Recognized correction marks are implemented by the processor programmed with the prior art algorithms of FIDS for the Grafix user interface.  Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see '295 patent at Col. 4:32-41].

Exhibit 53
Page 001080

### 7.   Detecting Direction Of Motion Of A Gesture

158.    FIDS discloses detecting the direction of motion of creation of a gesture. The predefined shape of the recognized gesture also represents the direction of motion of the gesture [see, *e.g.*, claim 41 of the '295 patent].

159.    As discussed previously in ¶ 150, FIDS discloses a simple editing mark [gesture] recognition algorithm wherein stroke features—*e.g.*, the direction angle at the beginning of a stroke—of the input editing mark are extracted and compared with the features of the reference marks (the set of editing marks that are recognized) using a decision tree.  As discussed in ¶ 152, the FIDS Paper discloses that advanced algorithms can recognize a mark by analyzing the direction angles of the mark's strokes.

160.    The direction angles of the point sequences of the strokes forming an editing mark indicate the direction of motion of creation of the editing mark.  It follows, then, that FIDS discloses detecting the direction of motion of creation of an editing mark.

161.    As discussed in ¶ 152, the direction angles of the point sequences forming the strokes of an editing mark constitute the shape of the input editing mark, and hence recognition of the input editing mark would inherently involve the comparison of the direction angles of the point sequences forming the strokes feature [shape] of the input mark with the corresponding feature of the reference marks [predefined shapes].  It follows, then, that the predefined shape corresponding to the input editing mark also represents the direction of motion.

Exhibit 53
Page 001081

## C.    PROOF CORRECTION STANDARD SFS 2324

162.    The FIDS Paper cites to a 1972 version of "Proof Correction Standard – SFS 2324" set forth by the Finish Standards Association.  A translated version of the document is available at [MSLT_1232720-MSLT_1232723].  In my discussion I refer to this translated version as "SFS 2324".

163.    SFS 2324 discloses a number of proofreader's marks for editing a document, and it is the source of the marks described in the FIDS Paper.  [See FIDS Paper at p. 76 (MSLT_1230908)].  In addition to those explicitly described in the FIDS Paper, SFS 2324 describes several other proofreader's marks, and as a matter of common sense, it would have been obvious to one of ordinary skill to add these additional correction marks to those explicitly disclosed in the FIDS Paper and to recognize and implant these additional marks in the same way as in the FIDS Paper.  [See §§ § VIII.B.5 and VIII.B.6].

164.    SFS 2324 discloses a first gesture, a second gesture and a third gesture comprising the first and second gestures [see, *e.g.*, claim 39 of the '295 patent].  For example, consider, the marks for Increase Line Space (see item 7.1 in Figure 26), Decrease Line Space (see item 7.2 in Figure 26), and Straighten Line (see item 7.3 in Figure 26).  The second-depicted Increase Line Space mark (third gesture) is comprised of the first-depicted Increase Line Space mark (first gesture) and the Straighten Line mark (second gesture).  Similarly, the second-depicted Decrease Line Space mark (third gesture) is comprised of the first-depicted Decrease Line Space mark (first gesture) and the Straighten Line mark (second gesture).

Exhibit 53
Page 001082



**Figure 26. A subset of proofreader's marks disclosed in SFS 2324. [See SFS 2324 at Page 3 (MSLT_1232722)]**

Exhibit 53
Page 001083

# IX.    Advanced Display System

165.    The paper "An Advanced Display System with Natural Interactivity" by Arto Kankaanpaa [MSLT_1231060-MSLT_1231066] was published in *Eurographics 86: Proceedings of the European Computer Graphics Conference and Exhibition*, pp. 185-193, 1986 (hereinafter "Advanced Display System").  The author, Arto Kankaanpaa, is also the author of the FIDS Paper.

166.    The Advanced Display System describes an experimental computer system that allows interactivity, as it is done with a pen and paper, by allowing the user to draw directly on the display surface using a pen-like device.  Figure 27 shows the hardware of the prototype system.  The display (electroluminescent flat panel display) and digitizing tablet (resistive touch sensitive panel) are combined into a single unit so that the user's attention is not divided between the display and the tablet.  The display/tablet is connected to a microcomputer having bit-mapped graphics capability that would be appropriate for a full-function office workstation.  A pen-like device with a conductive tip is used to directly draw on the display surface.

> "This paper describes an experimental display system that allows easy interaction with the graphics display.  The user uses a pen-like device to draw directly on the display surface.
>
> The system is based on an electroluminescent flat panel with a resistive touch-sensitive surface. A pen with a conductive tip is used for direct drawing. For evaluation the display system is connected to a powerful microcomputer having a true bit-mapped graphics capability."  [See Advanced Display System at p. 185 (MSLT_1231062)]

Exhibit 53
Page 001084



**Figure 27. The Advanced Display System hardware. [See Advanced Display System at Fig. 2].**

167.    The prototype system ran Windows from Microsoft Corporation as the operating system.  Prototype software was developed to use the features offered by the system's hardware, *i.e.*, writing directly on the display with a pen.  A word processing program, enhanced to include line graphics capability, was chosen.  The word processor was modified to allow limited text editing and formatting using standard proof correction marks. The symbols for correction were picked from a symbol menu, with the pen.

> "Because of the limited resources for this project, a ready-made operating environment was chosen as the basis for software development. The software chosen was the Windows package from Microsoft.
>
> …
>
> In this project we also wanted to develop some applications that would use the specific features offered by the design. The main prototype software is text processing software that has been enhanced to include line graphics.
>
> …

This hardware design makes it possible to do limited text editing and formatting in the most natural way known by almost every person: standard proof correction marks…In the current version of the graphical editor, the symbols are picked with the pen from a symbol menu and identified at the moment of selection" [See Advanced Display System at pp. 188-189 (MSLT_1231064)].

168.     Figure 28 shows thirteen correction marks – labeled "a" to "m" – implemented for text editing, some of which are also shown and described in the FIDS Paper, which was also written by Arto Kankaanpaa.  Correction mark (f) "is used for deleting a block of text."  Correction mark (j) "is used for starting a new paragraph between two connected sentences."  Correction mark (k) is used "to start a new section (page)."  [See Advanced Display System at p. 190 (MSLT_1231065)].



**Figure 28.  Correction marks implemented by the Advanced Display System.  [See Advanced Display System Fig. 3 (MSLT_1231064)].**

169.     Correction mark (f) is a mark delete symbol (third gesture) comprising a mark symbol (first gesture) and a delete symbol (second gesture).  Correction mark (k) is a new page symbol (third gesture) comprising a new paragraph symbol (first gesture) and a second new paragraph symbol (second gesture).

# X.     Oed and Doster

### A.     REFERENCES

170.     Richard Oed and Wolfgang Doster developed a stylus-based personal computer with a user friendly man-machine interface (hereinafter "Oed and Doster").  The following publications by Richard Oed and Wolfgang Doster describe the system:

171.     Oed, R. and Doster, W. "On-line Script Recognition - A User-friendly Man-Machine Interface," Proceedings of the COMPINT 85 Conference on Computer-Aided Technologies, pp. 741-743, 1985 [MSLT_1231122-MSLT_1231126] (hereinafter "Oed Paper").

172.     Doster, W. and Oed, R. "Word Processing with On-line Script Recognition," IEEE Micro, pp. 36-43, 1984 [MSLT_1233214-MSLT_1233221] (hereinafter "Doster Paper").

The references make clear that they each describe aspects of the same system.  First, each paper was written by the same two authors.  Second, the Oed Paper refers the reader to the Doster Paper for details regarding the system of the Oed Paper.  While describing the symbol recognition algorithm used by their computer system, for example, the Oed Paper states, "One of the first steps is to decide which line segments … belong to the same symbol.  This step is called segmentation and is not considered here, it is described in /2/."  [See Oed Paper at p. 741 (MSLT_1231124)].  Reference number 2 is the Doster Paper.  Finally, both papers provide the same details for the system.  For example, the system is based on a personal computer with a graphics tablet and a display.  The graphics tablet produces stylus coordinates plus a flag that indicates if the stylus is touching the tablet.  Software running on this computer system allows

the graphics tablet to be used for pointing/selecting operations and for input of handwritten symbols. The system uses a multitasking operating system and implements the online script recognition system (OSR) as a separate process. The OSR receives data from the tablet, recognizes the handwritten symbols and places the corresponding commands into the keyboard buffer of the currently active program. The example used is the WordStar program for text editing. The system can recognize handwriting and allows users to define their own symbols and define the meanings of symbols. Handwritten input is first segmented and then each symbol is recognized. The script recognition is based on features such as the direction angles at points along the strokes. The input symbols are compared with reference symbols using a Euclidean distance measure. [See Oed Paper at pp. 741-743 (MSLT_1231124- MSLT_1231126), Doster Paper at pp. 36-43 (MSLT_1233214-MSLT_1233221)]

## B.  DESCRIPTION

### 1. Computer System

173.    The system of Oed and Doster is a personal computer including a screen for displaying information and a digitizing tablet and pen for inputting information into the computer. The computer includes a CPU and other standard peripherals. [See Figure 29]. The display and tablet are separate devices.

> "A standard graphics tablet /1/ was chosen and applied for collecting the input data.
>
> Writing on the tablet produces a stream of x,y-coordinates which is send [sic] to the connected computer." [See Oed Paper at p. 741 (MSLT_1231124]].
>
> "The different position of screen (vertical) and tablet (horizontal) is acceptable." [See Oed Paper at p. 743 (MSLT_1231126)].

Exhibit 53
Page 001088

Since the computer system includes a display, it necessarily includes a display controller.

> 174.    The tablet and pen are used to control the computer system.
>
> "Our intention is to implement a userfriendly combination capable of realizing pointing/selecting and handwriting input operations. The user shall be allowed to define his own set of (special, private) symbols, to attach to them deliberately either single ASCII characters or even sequences of ASCII characters or command strings."  [See Oed Paper at p. 741 (MSLT_1231124)].
>
> "The tablet-stylus combination allows the input of commands, cursor control, and the input of characters."  [Doster Paper at p. 36 (MSLT_1233214)].

A separate process called the online script recognition (OSR) program is used to process the tablet input and create commands for other programs running on the computer.  [See, *e.g.*, Oed Paper at pp. 742-743 (MSLT_1231125-MSLT_1231126); Doster Paper at p. 39 and Fig. 7 (MSLT_1233217, MSLT_1233219)].  Although the papers use the Wordstar word processing program as an example, any program can be controlled by the stylus in their system:  "This kind of integration allows any application program to be operated via OSR" [see Oed Paper at p. 743 (MSLT_1231126)]; "The solution presented here … represents a highly user-friendly approach to both text processing and other personal computer applications" [see Doster Paper at p. 43 (MSLT_1233221)].



**Figure 29. Computer system of Oed and Doster. [See Doster Paper at p. 37 (MSLT_1233215)].**

### 2. Detecting A Stroke Of The Stylus Tip

175.    The computer system of Oed and Doster includes means for detecting a stroke of the stylus tip in contact with the tablet [see, *e.g.*, claim 41 of the '295 patent]. The computer system detects a line segment [stroke] drawn on the tablet as a sequence of coordinates between pen down and pen up:

> "Writing on the tablet produces a stream of x,y-coordinates which is send [sic] to the connected computer. Attached flag information discriminates the states 'nearly touching' and 'touching'. Only coordinate pairs with the status information 'touching' are processed further." [See Oed Paper at p. 741 (MSLT_1231124)].

> "The input data for on-line script recognition is collected by means of the graphics tablet. The tablet consists of the tablet itself and a stylus; both represent a transmitter/receiver combination. Tablets of this kind may be constructed according to various physical principles. In out experimental system, we employed a magnetostrictive technique.

> When the stylus approaches the tablet's surface, its coordinates are calculated by measuring the transition times of traveling magnetic wave fronts; the coordinate data are then transmitted to the computer via a V.24 interface. When the stylus actually makes contact with the tablet's surface, a switch inside the stylus is actuated to set a flag." [Doster Paper at p. 37 (MSLT_1233215)].

Exhibit 53
Page 001090

"One of the first steps is to decide which line segments (a line segment is a sequence of coordinate pairs from touching the tablet until lifting the stylus) belong to the same symbol."  [See Oed Paper at p. 741 (MSLT_1231124)].

"The string of coordinates generated while the stylus is in contact with the tablet is called a connected-line segment, or CLS.  The number of CLSs may vary from character to character.  There exist characters with one CLS, e.g., the digit '2', and characters with more than one CLS, e.g., the digit '4', which usually consists of two CLSs."  [See Doster Paper at p. 38 (MSLT_1233216)].

176.     Even though the computer system has a separate screen and digitizer tablet, Oed and Doster recognized the importance of combining the tablet and the screen into a single unit:

"Nevertheless the ultimate goal in system development should be an implementation with a flat screen and an integrated transparent tablet for direct manipulation.  Both can be integrated horizontally into the user's desk."  [See Oed Paper at p. 743 (MSLT_1231126)].

With such an integrated display/tablet, the stylus would be used to draw directly on the screen. Therefore Oed and Doster teaches a computer system that detects a stroke of the stylus tip in contact with the screen.

### 3.  Detecting A Departure Of The Stylus Tip

177.     The computer system of Oed and Doster includes means for detecting the departure of the digitizing pen tip from the screen.  [See, *e.g.*, claim 1 of the '295 patent]. First, the information provided by the digitizer includes a flag that indicates if the pen is or is not touching.  [See, *e.g.*, Oed Paper at p. 741 (MSLT_1231124);  Doster Paper at p. 37 (MSLT_1233215)].  Second, a line segment [stroke] is the sequence of coordinates "from touching the tablet until lifting the stylus".  [See, *e.g.*, Oed Paper at p. 741 (MSLT_1231124);

Doster Paper at p. 38 (MSLT_1233216)].  Third, the Oed Paper teaches using an integrated

tablet and display.  [See X.B.2] Thus, Oed and Doster detects the departure of the pen from the

display.

### 4.  Defining Termination Of A Gesture Comprising At Least One Stroke In Response To Departure Of The Stylus Tip

178.    The computer system of Oed and Doster includes means for defining the

termination of a gesture comprising at least one stroke in response to the departure of the

digitizing pen tip from the screen.  [See, *e.g.*, claim 1 of the '295 patent].  Gesture termination

may be indicated in at least two ways.  First, gesture termination may be indicated by a timeout

event.  Second, gesture termination may be indicated by touching the "enter region" of the

tablet.

> "One of the first steps is to decide which line segments (a line segment is a sequence of coordinate pairs from touching the tablet until lifting the stylus) belong to the same symbol.  This step is called segmentation and is not considered here, it is described in /2/."  [See Oed Paper at p. 741 (MSLT_1231124)].

> "Tablet coordinates are passed to the interpretation program in the form of a continuous stream of coordinate pairs and flag bits… Interpretation of a string of coordinate pairs is initialized either automatically by time conditions or explicitly by activation of the 'enter region' of a menu field.  In any case, automatic interpretation starts if, after a predefined time period, no coordinates have been sent to the computer."  [See Doster Paper at p. 37 (MSLT_1233215)].

### 5.  Recognizing Gestures

179.    The computer system of Oed and Doster includes means for recognizing a

gesture comprising at least one stroke and an event indicating the termination of the gesture

[see, *e.g.*, claim 41 of the '295 patent]. Oed and Doster includes an on-line script recognition program (OSR) that recognizes symbols [gestures] input via the tablet:

> "After switching on the computer and loading the operating system, the on-line script recognition process is started. It remains active all the time as a parallel task. Any input via the tablet being recognized by the OSR results in an entry into the keyboard buffer of the application program." [See Oed Paper at p. 743 (MSLT_1231126)].

The OSR is run as a separate process in a multitasking environment. [See also Doster Paper at p. 39 (MSLT_1233217)].

180.  Some of the symbols comprise a single stroke while others comprise multiple strokes. For example, the recognized symbols include symbols such as α, β, γ [see, *e.g.*, Figure 32] and a set of editing symbols for use in the Wordstar text processing program [see, *e.g.*, Figure 30]:

> "The text processing program WordStar was chosen for some first experiments. Fig. 5 shows a small selection of the user defined symbols, their corresponding WordStar command sequences and their meanings. Needless to say that not only such typical editing commands are provided for the user but the full set of handwritten characters, allowing him to cause any reformatting, modification or text correction and insertion he likes." [See Oed Paper at p. 743, Figure 5 (MSLT_1231126)].



**Figure 30. Editing symbols of WordStar program [See Oed Paper at Fig. 5 (MSLT_1231126)].**

181.    The computer system disclosed in Oed and Doster can includes means for comparing a gesture to at least one predefined shape [see, *e.g.*, claim 41 of the '295 patent]. The strokes of the stylus are first grouped into characters (segmentation).

> "The string of coordinates generated while the stylus is in contact with the tablet is called a connected-line segment, or CLS. The number of CLSs may vary from character to character. There exist characters with one CLS, e.g., the digit '2', and characters with more than one CLS, e.g., the digit '4', which usually consists of two CLSs. A fundamental task, therefore, especially if a user writes more than one character at a time, is the grouping of the CLSs according to their corresponding character positions – that is, identifying which CLSs belong to one and the same character. This is called the segmentation process. A hierarchical segmentation procedure is applied. The first step is the selection of those subsets of the sets of CLSs whose smallest surrounding rectangles are touching or overlapping. The second step is to check these subsets to determine whether they really belong together or not. Among the elements of the subsets a direct distance measure between the corresponding CLSs is applied." [See Doster Paper at p. 38 (MSLT_1233216)].

> "For each CLS, there is a corresponding smallest surrounding rectangle. Additionally, a common rectangle is constructed for characters with more than one CLS. The location of the subrectangles within the common rectangle yields additional features for recognition." [See Doster Paper at p. 39 (MSLT_1233217)].

Although the Doster Paper provides a more detailed description of the segmentation algorithm, the Oed Paper summarizes the procedure. [See, *e.g.*, Oed Paper at pp. 741-742 and Fig. 2 (MSLT_1231124-MSLT_1231125)].

182.    The features of the strokes belonging to a single character are compared with the features of the reference symbols. Measurement vectors for the recognized symbols are stored as reference vectors [predefined shapes], where the vectors that are formed using the measurements of angle values of tangents at equal distances along the path of the each line

segment [stroke] of the symbol and the geometric information pertaining to the symbol such as the position of the smallest surrounding rectangles of each line segment within the smallest rectangle surrounding the symbol.  The geometric information is used only for symbols with multiple line segments.  The input symbol is recognized by comparing its measurement vector with the reference vectors using a simple Euclidean distance measure.  In order to cope with different writing styles a group of measurement vectors or an average of a group of measurement vectors could be stored as the reference vector for a symbol.

> "As measurements the angle values of tangential lines in equidistant locations along the pathlength of a line segment are used.  These measures form the measurement vector of a segment. If there are more than one line segment belonging to a symbol, then for each segment such a measurement vector is calculated. Additionally geometric information as position of the smallest surrounding rectangles of the line segments within the common smallest surrounding rectangle of the total symbol are used and complete the measurement vectors.
>
> …
>
> Geometric information as described above, is only necessary for symbols consisting of more than one line segment.
>
> …
>
> The measurement vectors of selected symbols are stored as reference vectors. It is possible to store more than one reference vector per class in order to cope with different writing styles. This technique results in linearly increasing requirements regarding storage and computing power, therefore, also the averaging of the reference symbols of the same meaning resulting in an averaged measurement vector is possible.
>
> For a first implementation on an IBM PC compatible computer a simple distance measuring approach is chosen. The distances in angles and in geometric locations are calculated and combined resulting in a confidence measure for each reference symbol with the same number of line segments as the symbol to be recognized."

[See Oed Paper at pp. 741-742, Figure 2 (MSLT_1231124-MSLT_1231125)].

While the Oed Paper provides a more detailed description of the recognition algorithm, the Doster Paper summarizes the procedure. [See, *e.g*., Doster Paper at p. 38-39 and Figs. 4-5 (MSLT_1233216-MSLT_1233217)].

183. As an illustration of the recognition algorithm employed by the OSR program, the Oed Paper shows the comparison of the measurement vector of the input symbol α, with the stored reference vectors corresponding to the symbols α, β and γ. [See Figure 31 and Figure 32].



**Figure 31. Input symbol α and its captured coordinate points. The angles of the tangents forming the measurement vector are shown by arrows pointing in the corresponding direction. [See Oed Paper at Fig. 1 (MSLT_1231124)].**



**Figure 32.  Comparison of the measurement vector for input symbol α, with the stored reference vectors corresponding to the classes α, β and γ.  The Euclidean distance measure is also shown.  [See Oed Paper at Fig. 3 (MSLT_1231125)].**

184.    For each of the symbols shown in Figure 30 and Figure 32, each stroke of the recognized symbol is located in the same area of the screen [see, *e.g.*, claim 41 of the '295 patent].

185.    The OSR program described in Oed and Doster corresponds to the handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.  Table 7 presents a comparison of the two algorithms.

**Table 7.  Comparison of the on-line script recognition algorithm in Oed and Doster with the handwriting recognition algorithm described in Automatic Recognition of Handprinted Characters.**

| Automatic Recognition of Handprinted Characters | Oed and Doster |
|---|---|
| "Preprocessing:<br>The purpose of preprocessing is to extract the relevant basic features to be used in the recognition process. In on-line character recognition, these features are generally points chosen from the drawing. In order to obtain these points, different classical algorithms may be employed, e.g.,<br>1) Smoothing by averaging a point with its neighbors.<br>2) Filtering by forcing a minimum distance between two consecutive points.<br>3) Angular segmentation by sampling a point as soon as the direction of the tangent to the drawing changes by a certain angle [16], [17].<br>4) Linear piecewise approximations and others [83]"<br>[See Automatic Recognition of Handprinted Characters at p. 480 (MSLT_1233206)].<br><br>"The block diagram of a typical optical reader is shown in Fig. 7. Input characters are read and digitized by an optical scanner. Each character is located and segmented from the data sheet or OCR form under software control of the computer.  The resulting matrix is then fed into a preprocessor for smoothing (e.g., filling of holes and breaks in line segments), elimination of noise (e.g., isolated dots), and size normalization."  [See Automatic Recognition of Handprinted Characters at p. 473 (MSLT_1233199)]. | The on-line script recognition program includes preprocessing steps:<br><br>"A reduction of the number of measurements is obtained by ignoring irrelevant points. Irrelevance means here points with a distance smaller than a given value. Additional reduction can be done by specific processing of the beginning and ending of lines. There often strokes can be irrelevant and be ignored as small hooks and duplicate strokes" [See Oed Paper at p. 741 (MSLT_1231124)]<br><br>"The next step is the normalization step. To become independent on writing speed and symbol size a normalization step is applied, resulting in always the same number of measurements" [See Oed Paper at p. 741 (MSLT_1231124)] |
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification"."The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc." [See Automatic | The on-line script recognition program includes a feature extraction step:<br><br>"As measurements the angle values of tangential lines in equidistant locations along the pathlength of a line segment are used. These measures form the measurement vector of a |

| Automatic Recognition of Handprinted Characters | Oed and Doster |
|---|---|
| Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | segment. If there are more than one line segment belonging to a symbol, then for each segment such a measurement vector is calculated. Additionally geometric information as position of the smallest surrounding rectangles of the line segments within the common smallest surrounding rectangle of the total symbol are used and complete the measurement vectors." [See Oed Paper at p. 741, Figs. 1-2 (MSLT_1231124)] |
| Classification: "Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ….. Classification is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]" [See Automatic Recognition of Handprinted Characters at pp. 480 (MSLT_1233206)]. | The on-line script recognition program includes a classification step: "The measurement vectors of selected symbols are stored as reference vectors…."For a first implementation on an IBM PC compatible computer a simple distance measuring approach is chosen. The distances in angles and in geometric locations are calculated and combined resulting in a confidence measure for each reference symbol with the same number of line segments as the symbol to be recognized. Fig. 3 shows a comparison of the input symbol of Fig. 1, and three stored references belonging to the three classes α, β, and γ. The decision is for the class with the smallest Euclidean distance." [See Oed Paper at p. 742, Figs. 1, 3 (MSLT_1231125)]. |

### 6. Implementing Gestures

186.    The computer system of Oed and Doster includes means for implementing each recognized gesture [see, *e.g.*, claim 41 of the '295 patent]. Oed and Doster use the keyboard buffer as a mailbox (or queue) for interprocess communication between the OSR and the application. When the OSR recognizes a symbol [gesture] drawn by the user on the tablet,

the OSR places the corresponding command string into the keyboard buffer. The application

receives and acts on the commands as if they had been entered using the keyboard.

> "The on-line script recognition is implemented as a parallel process (parallel to application programs) in a multitasking environment. The recognition result is transferred into the keyboard buffer of the application program. This program does not recognize at all whether the keyboard buffer is filled from keying in or from the on-line script recognition program." [Oed Paper at p. 742-743 (MSLT_1231125-MSLT_1231126)].

> "In such an arrangement, Task 1 is the word processing program, e.g., Wordstar, and Task 2 is the on-line script recognition program. The goal is to offer the user two parallel input channels: the keyboard and the tablet. To realize this, the on-line script recognition program, after recognizing one or more characters or symbols, has to write the corresponding sequence of characters into the keyboard buffer allocated to the other task (Wordstar). This sequence will imitate exactly any possible sequence entered through the keyboard." [See Doster Paper at p. 39 and Fig. 7 (MSLT_1233217)].

> 187.    The computer system of Oed and Doster performs a predetermined action

associated with each recognized gesture. For example, each of the symbols used in the

Wordstar text processing program are associated with an editing or formatting  command

[predetermined action]:

> "The text processing program WordStar was chosen for some first experiments. Fig. 5 shows a small selection of the user defined symbols, their corresponding WordStar command sequences and their meanings. Needless to say that not only such typical editing commands are provided for the user but the full set of handwritten characters, allowing him to cause any reformatting, modification or text correction and insertion he likes." [See Oed Paper at p. 743, Fig. 5 (MSLT_1231126)].

See, also Figure 30 above. In addition, the user can define new symbols and can define or

redefine the actions associated with symbols.

"If the user wants to define new symbols or change the meaning of a symbol then he simply switches from the application program to OSR and calls the modification mode. All operations can be performed using only the stylus and the tablet." [See Oed Paper at p. 743 (MSLT_1231126)].

"However, if the operator writes a special switching symbol on the tablet, he can transfer the screen from the Wordstar application program to the on-line script recognition program (and vice versa). When the physical screen is at the recognition program's disposal, written and recognized symbols are directly presented on the screen and not transferred to the keyboard buffer. This mode is used for testing on-line script recognition and for editing the reference character set (changing the labels, adding new reference characters, deleting old reference characters, and so on)." [See Doster Paper at pp. 42-43 (MSLT_1233220-MSLT_1233221)].

188.    The recognized gestures are implemented in a manner known to those of ordinary skill in the art for implementing gestures. For example, "Inside Macintosh" describes an event driven model for implementing actions performed by a user to control the computer. [See, *e.g.*, Inside Macintosh, Volumes I, II and III (1985), at pp. I−241−I−267 (MSLT_0381651- MSLT_0381677)] Oed and Doester pass events generated by the OSR to the application using a buffer. The Oed Paper also states that instead of using a separate process for the OSR, script recognition could be "part of [the] operating system" [see Oed Paper at p. 742 (MSLT_1231125)]. Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see '295 patent at Col. 4:32-41].

**7. Stylus Proximity Detection**

189.    The computer system of Oed and Doster includes means for detecting proximity of the stylus tip to the screen. [See, *e.g.*, claim 3 of the '295 patent]. The tablet is

Exhibit 53
Page 001101

based on magnetostrictive technology and detects the stylus location as the stylus moves into

proximity with the tablet.

> "Writing on the tablet produces a stream of x,y-coordinates which is send [sic] to the connected computer.  Attached flag information discriminates the states 'nearly touching' and 'touching'." [See Oed Paper at p. 741 (MSLT_1231124)].

> "When the stylus approaches the tablet's surface, its coordinates are calculated by measuring the transition times of traveling magnetic wave fronts;  the coordinate data are then transmitted to the computer via a V.24 interface.  When the stylus actually makes contact with the tablet's surface, a switch inside the stylus is actuated to set a flag."  [Doster Paper at p. 37 (MSLT_1233215)].

### 8.  Detecting Direction Of Motion Of A Gesture

190.    The computer system of Oed and Doster includes means for detecting the

direction of motion of creation of a gesture, and the predefined shape of the recognized gesture

represents the direction of motion of the gesture.  [See, *e.g.*, claim 41 of the '295 patent].

191.    As discussed previously in § X.B.3, the algorithm for recognizing input

symbols [gestures] includes extracting the measurement vector of the input symbol by

measuring the angle values of the tangents at equidistant locations along the path length of the

input symbol.  The measurement vector of the input symbol is compared with reference vectors

[predefined shapes], which are the measurement vectors of the recognized symbols.

192.    The angle values of the tangents at equidistant locations along the path

length of the input symbol indicate the direction of motion of creation of the symbol.  As an

example, Figure 31 depicts the direction angles for the symbol "α" as vectors, which shows the

direction of motion of the stylus at each point along the stroke.  Accordingly, the computer

system of Oed and Doster is able to detect the direction of motion of creation of a symbol.

And since the reference vector [predefined shape] corresponding to a recognized input symbol also includes the angle values at equidistant locations along the path length, the Oed and Doster's predefined shapes represent the direction of motion.  As an example, Figure 32 depicts the direction angles for the reference symbols for α, β and γ as vectors showing the direction of motion of the stylus at each point along the stroke.

# XI.  U.S. Patent 4,578,811 (Inagaki)

### A.  REFERENCE

193.    U.S. Patent No. 4,578,811, entitled "Key-In Device," was issued to Inagaki and assigned to Casio Computer Co. Ltd. [MSLT_ 1232251-MSLT_1232274] (hereinafter "Inagaki").  The date of issue was March 25, 1986.

### B.  DESCRIPTION

#### 1.  Overview

194.    Inagaki describes a device for inputting symbols, such as alphanumeric characters, into an electronic device.  Symbols are input by tracing the finger [stylus] on a matrix array of 5 × 6 keys.  The input symbols are recognized by a character recognition section and displayed on a LCD display.  Inagaki refers to this device as a "key-in device." Figure 33 illustrates the key-in device of the invention as incorporated into a calculator.

> "The display section 2, using liquid crystal display elements, can display numerals 0-9, alphabetic characters A-Z, and arithmetic symbols +, −, ×, and ÷." [See Inagaki at 2:48-50].

> "In a handwriting input mode, numerals 0-9, alphabetic characters A-Z, and the arithmetic symbols +, −, ×, and ÷ may be relatively displayed by tracing them on the 5 × 6 key array in the finger actuation section 4.  A character input by finger tracing is recognized by an internal circuit.  If the CAL key 5 is actuated and '5+2=' is written with the finger, the internal circuit recognizes these numerals and the arithmetic symbols, to calculate this formula and display its answer." [See Inagaki at 3:4-13].



**Figure 33.  Key-in device of Inagaki incorporated into a calculator.  [See Inagaki at Fig. 1].**

195.    Figure 34 shows the components of the key-in device.

"[T]he key judging section 11 in the calculation mode generates a
key code representing the function originally assigned to each key
and sends it to a control section 20.  In a handwriting mode, it
generates coordinate data of the operated data in the finger
actuation section 4 and sends it to a character recognition section
10."  [See Inagaki at 3:19-25].

Accordingly, the finger actuation section and the key judging section together correspond to a

pen position digitizer.  They sense the position of the finger on the finger actuation section and

report the <x,y> coordinates while the finger is in contact with the finger actuation section.

"The character recognition section 10 recognizes characters input
by the finger actuation section 4 on the basis of the coordinate
data, and sends the character data to the control section 20…  The
control section 20 executes various types of control operations on
the keyed in data or the character data.  For example, the control

section 20 controls the addressing of each register in a memory section 30, the data read from and written into the memory section 30, and the loading of key codes and character data into appropriate registers in the memory section 30… The memory section 30 includes a display register, a plurality of arithmetic registers and a plurality of memory registers (not shown). *The contents of the display register are sent, under the control of the control section 20, to the display section 2, where the contents are displayed in a usual manner.*" [See Inagaki at 3:25-42, emphasis added].

The control section thus corresponds to a display controller.



**Figure 34. Electronic circuitry of the key-in device [See Inagaki at Fig. 2]**

196.    The character recognition section includes a processor programmed with a

character recognition algorithm as evidenced by the discussion of the flow charts provided by

Inagaki:

> "In this case, the processor advances to step A26, to load '0' into
> register $P_Y$."  [See Inagaki at 9:27-28].

> "In step C21, the processor calculates the distances between the
> starting points and between the ending points of strokes in the X

and Y coordinates, and loads them into the registers D1-D4.  Then, the processor advances to step C22, to set '1' in the counter J."
[See Inagaki at 12:50-55].

## 2.  Detecting A Stroke Of The Stylus Tip

197.    The key-in device of Inagaki includes means for detecting a stroke of finger [stylus] tip in contact with the finger actuation section [see, *e.g.*, claims 39, 41 of the '295 patent].  As discussed above, the key judging section produces coordinate data when the user traces the desired character on the finger actuation section.

> "With such an arrangement, let us now assume that an operator traces or depicts a desired character with the finger on the finger actuation section 4 with a 5 × 6 matrix array, when the calculator is in the handwriting mode. In such a case, in response to the key actuation, the key judging section 11 produces coordinate data, which in turn is loaded into the input pattern memory 12 in the character recognition section 10….
>
> The stroke end data is used when the key judging section 11 judges that the succession of the key actuations has been interrupted."
> [See Inagaki at 5:7-34]

## 3.  Recognizing Gestures

198.    The key-in device of Inagaki includes means for recognizing a gesture comprising at least one stroke and an event indicating the termination of the gesture [see, *e.g.*, claims 39, 41 of the '295 patent].  As discussed in § XI.A, the key-in device includes a character recognition section that recognizes numerals 0-9, alphabetic characters A-Z, and arithmetic symbols +, −, ×, ÷ and = [gestures], that are input by tracing the finger on the finger actuation section.

199.    Departure of the finger [stylus] from the finger actuation section for a

predetermined period indicates the termination of an input character.

> "The character end data is used in making the judgement wherein,
> when the next key operation is absent for a predetermined period,
> the inputting of the character ends."  [See Inagaki at 5:34-37].

Thus, the input is terminated by a series of strokes followed by a final lift of the finger and lack

of contact for a predetermined period ("timeout").

200.    Input numerals, alphabetic characters, and arithmetic symbols are

recognized by comparing the stroke feature of the input character with a standard pattern

[predefined shape] stored in the memory [see, *e.g.*, claims 39, 41 of the '295 patent].

> "For character recognition, the first matching section 14 compares
> a stroke feature such as the first feature of the input character,
> which is detected by the first feature detecting section 13, to the
> stroke feature of the standard pattern. When, as the result of the
> comparison, a specific character fails to find its counter part, the
> result of the matching operation is sent to a second feature
> detecting section 16 and a second matching section 17. The second
> feature detecting section 16, when the first matching section 14
> fails to recognize the specific character, detects a direction feature
> as a second feature of the input pattern stored in the input pattern
> memory 12...The feature detected in then sent to the second
> matching section 17."  [See Inagaki at 4:32-53].

Figure 36 shows the details of the character recognition of the key-in device.



**Figure 35. Details of the character recognition section of the key-in device. [See Inagaki at Fig. 3].**

201.    The key-in device of Inagaki includes means for recognizing a first

gesture, a second gesture and a third gesture comprised of first and second gestures [see, *e.g.*,

Exhibit 53
Page 001110

claim 39 of the '295 patent]. In one example of such a set of gestures, the "+" arithmetic symbol represents the third gesture, the "–" arithmetic symbol represents the first gesture, and the gesture for inputting the numeral "1" represents the second gesture.

202. In another example of such set of gestures, the "="arithmetic symbol represents the third gesture, the "–" arithmetic symbol represents the first gesture, and the "–" arithmetic symbol represents the second gesture.

203. Each stroke of the recognized characters (numerals 0-9, alphabetic characters A-Z, and arithmetic symbols +, –, ×, ÷ and =) is located in the finger actuation section [see, *e.g.*, claim 41 of the '295 patent]. Each stroke of a symbol thus is located in substantially the same area of the digitizer.

204. The character recognition section of the key-in device follows the steps outlined in the article "Automatic Recognition of Handprinted Characters." The stroke features of the character are extracted. The character is classified based on the extracted features. Table 8 presents a comparison of the two algorithms.

Table 8.  Comparison of the character recognition algorithm employed in key-in device with the handwriting recognition algorithm described in "Automatic Recognition of Handprinted Characters"

| Automatic Recognition of Handprinted Characters | Key-In Device |
|---|---|
| Feature Extraction:<br>"Distinctive features are extracted from the preprocessed character for classification"."The features are elementary shapes which constitute the character, e.g., clockwise or counterclockwise curves, straight lines, cusps, etc"[See Automatic Recognition of Handprinted Characters at pp. 473, 480 (MSLT_1233199, MSLT_1233206)]. | The character recognition algorithm of the key-in device includes a feature extraction step:<br><br>"The coordinate data output from the key judging section 11 is sent to an input pattern memory 12. The memory 12 stores the coordinate data, stroke by stroke, for each character. The pattern data stored in the input pattern memory 12 is sent to a first feature detecting section 13. Then, the first feature detecting section 13 detects the stroke feature of each stroke of the input character, as a first feature."  [See Inagaki at 4:18-25].<br><br>"The second feature detecting section 16, when the first matching section 14 fails to recognize the specific character, detects a direction feature as a second feature of the input pattern stored in the input pattern memory 12.  The second feature detecting section 16 judges the relative position of a stroke, in relation to other strokes of the input character, using the starting and ending points of each stroke.  In a character of one stroke, its feature is detected on the basis of the distance between the starting and ending points.  In a character of two or more strokes, its feature is detected on the basis of the distances between the starting points and ending points." [See Inagaki at 4:40-52]. |
| Classification:<br>"Classification is achieved by dictionary lookup, [28], [51], [225], which can cope with distortions [102]. Decision tree [47] and analysis of the sequence of vectors with a finite automaton [44], may also be used; or even Bayesian classification on Fourier descriptors [9]. Another type of systems relies on the structural representation of characters [15], [79], [82], [94], [130] ..... Classification | The character recognition algorithm of key-in device includes a classification step.  The characters are classified by comparing the extracted stroke feature of the input character to a standard pattern stored in the memory:<br><br>"The first feature detected by the first feature detecting section 13 is sent to a first matching section 14.  The first matching section 14, in turn, compares the first feature to standard |

Exhibit 53
Page 001112

| Automatic Recognition of Handprinted Characters | Key-In Device |
|---|---|
| is generally done by means of a decision tree [79], [82], [130], or with the addition of a hierarchical combination of a dictionary [18]" "[See Automatic Recognition of Handprinted Characters at pp. 480 (MSLT_1233206)]. | patterns successively read out from a first standard pattern memory 15.  A stroke feature of the standard pattern has been stored in the first standard pattern memory 15."  [See Inagaki at 4:25-32].<br><br>"The feature detected in then sent to the second matching section 17.  For character recognition, the second matching section 17 successively compares the data from the second feature detecting section 16 and the first matching section 14 to a standard pattern having been pre-stored in a second standard pattern memory 18."  [See Inagaki at 4:52-58]. |

### 4.  Implementing Gestures

205.    The key-in device of Inagaki implements each recognized gesture  [see, *e.g.*, claims 39 and 41 of the '295 patent].  For example, the first, second and third gestures discussed above [see XI.B.3] are associated with predetermined actions.

206.    The "+", "–" and "1" symbols [gestures] are displayed on the liquid crystal display by tracing them on the finger actuation section.  Similarly, the "=" and "+" are displayed on the liquid crystal display by tracing them on the finger actuation section.

> "In a handwriting input mode, numerals 0-9, alphabetic characters A-Z, and the arithmetic symbols +, –, ×, and ÷ may be relatively displayed by tracing them on the $5 \times 6$ key array in the finger actuation section 4."  [See Inagaki at 3:4-8]

207.    The key-in device of Inagaki further includes means for recognizing and implementing first, second and third gestures wherein the shapes of the first and second gestures are substantially identical [see, *e.g.*, claim 40 of the '295 patent].

208.    In the case of the "+" arithmetic symbol, the shapes of the first and second gestures, discounting the direction of the gestures, are identical.  In the case of the "=" arithmetic symbol, the shapes of the first and second gestures are identical.

209.    The recognized gestures are implemented by the processor programmed with the prior art algorithms of Inagaki for the key-in device user interface.  Alternatively, one of ordinary skill in the art would be aware of many other prior art algorithms for implementing gestures, some of which are mentioned in the '295 patent [see '295 patent at Col. 4:32-41].

### 5.    Detecting Direction Of motion Of A gesture

210.    The key-in device described in Inagaki includes means for detecting the direction of motion of creation of a gesture where the predefined shape of the gesture also represents the direction of motion [see, *e.g.*, claim 41 of the '295 patent].  As shown in Figure 36 and Figure 37, for each stroke of the character, the key-in device detects the sequence of directions and direction changes on the X and Y-axis, as the stroke feature.  The stroke feature of the character is then compared with the stroke feature of a standard pattern in order to recognize the input character.  Thus, the standard pattern [predefined shape] corresponding to a character also represents the direction of motion.

> "Let us now consider the case wherein a character 'D', for example, is input by finger tracing with two strokes… Through a sequence of the key actuations, the key judging section 11 produces the coordinate data shown in FIG. 5.  In the first stroke shown in FIG. 4(a), for example, the coordinate data produced is '2,1' for actuation of the key ①; '2,2', for key ②, depression; and '1,2', for key ③ operation.  These items of coordinate data are successively produced from the key judging section 11.  The coordinate data, along with the final stroke end data for each stroke and the character end data for the final stroke, is written into the input pattern memory 12, for every stroke….  After the character

end data is written into the input pattern memory 12, the first feature detecting section 13 performs the detection of the stroke feature as the first feature of the input pattern. The stroke feature detected by the first feature detecting section 13 relates to the direction of the strokes of the input character and the time sequence of the strokes. The directions of the stroke are illustrated in FIG. 6. As shown, on the X-axis, '2' is assigned to the right direction, and '1' to the left direction. On the Y-axis, '1' is assigned to the up direction and '2' to the down direction…. Patterns of the stroke features of the input pattern of the 'D' in FIG. 5 are shown in FIGS. 7(a) and 7(b), respectively. In the case of the 'D', the stroke feature of the first stroke on the X-axis is not detected, since it has no extension in the width direction. The second stroke advances in the '2' direction and changes the direction to the '1' direction. The stroke feature on the X-axis is as shown in FIG. 7(a). On the Y-axis, the first stroke advances in the '2' direction, and the second stroke goes in the same direction. The Y-axis have the feature pattern shown in FIG. 7(b)." [See Inagaki at 5:15-67].

"The first feature detected by the first feature detecting section 13 is transferred to the first matching section 14. In the first matching section 14, the first feature is compared to the first standard pattern stored in the first standad [sic] pattern memory 15. The first standard pattern memory 15 has pre-stored the first standard pattern of each character, as shown in FIG. 9." [See Inagaki at 6:28-34].



**Figure 36. Stroke directions used to determine the first feature ("stroke feature"). On the X-axis, "2" is assigned to the right direction, and "1" to the left direction. On the Y-axis, "1" is assigned to the up direction and "2" to the down direction.**

211.



**Figure 37. Stroke features of the input character "D". The stroke feature on the X-axis is as shown in the left half of the figure while the stroke feature on the Y-axis is shown in the right half of the figure. Since the first stroke is vertical, no X-axis component is recorded. When drawing the second stroke, the finger first moves from left to right (the "2" direction) but then moves right to left (the "1" direction). On the Y-axis, both strokes are drawn from top to bottom (*i.e.*, the "2" direction).**

Exhibit 53
Page 001116

# XII.   The Asserted Claims Of The '295 Patent Are Invalid As Being Obvious

212.    In the Kelly Invalidity Report, I discuss why all the claims of the '295

patent asserted by Lucent are anticipated or obvious in view of several prior art references.   In

this section, I discuss additional grounds for invalidity of the asserted claims of the '295 patent.

### A.    COURT'S CLAIM CONSTRUCTION

213.    I understand that claim construction is ultimately a matter for the Court to

decide and, in fact, the Court has construed certain terms of the claims in an order dated

February 24, 2004.  Table 9 contains the asserted claims and the Court's construction.  The left

hand column of the table numbers the limitations of the claims for reference in subsequent

sections of this report.  The middle column is the claim language from the '295 patent.  The

right hand column is the Court's construction.

**Table 9.**

|   | Claim | Claim Construction |
|---|-------|--------------------|
| 1 | **Claim 1:** An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a **stylus** having a tip for inputting information into the computer, including: | As is.<br><br>**Stylus** - a pen-like object whose position and contact with a surface can be continuously detected electronically. |
| 1a | first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen; | Function: detecting a stroke of the stylus tip in contact with the screen.<br><br>Corresponding Structure: Pen position digitizer 20, |

Exhibit 53
Page 001117

| | | as shown in figs. 2 and 3 and described in the specification at Col. 6: 21 - 22; and Col 6: 53-68. **Stroke** - a single drawing movement, including a tap. **FIG. 2** "FIG. 2 is a cross-section of a notebook computer according to the present invention." **FIG. 3** "FIG. 3 is a block diagram of the computer's components." **6:21-22** "Mounted behind the display is the pen position digitizer 20." **6:53-68** "Although in certain designs (such as those that have been available from Grid Systems Corporation and Linus Technologies, Inc.), resistive, transparent digitizers have been mounted in front of the display, it is desirable to use a digitizer which does not require contact with the stylus. A digitizer based on non-contacting technology can be mounted behind the display, and thus eliminates one transparent layer above the display. |
|---|---|---|
| 1b | second detecting means coupled to said computer for detecting a departure of the stylus tip from the screen; | Function: detecting a departure of the stylus tip from the screen. Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6: 53-68. |
| 1c | means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip; | Function: defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen. Corresponding Structure: (1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6:53-68; and |

| | | (2) Pen position digitizer co-processor 90, with software that determines that a gesture is complete, as shown in fig. 3 and described in the specification at Col. 6: 36-37, Col.1:65 - Col.2:5, and Col. 17:1-14.<br><br>**Gesture** - a symbol or mark. |
|---|---|---|
| 1d | means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one pre-defined shape; | Function: recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following handwriting recognition algorithms:<br><br>(2) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980 (see Col 4:41-46); or<br><br>(3) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col. 5:1-6); or<br><br>(4) The Handwriting Translation Subsystem, disclosed in Appendix 1, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10 |
| 1e | means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a | Function: implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape<br><br>Corresponding Structure: CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56. |

| | | |
|---|---|---|
| | first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object. | This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level.<br><br>**Operating System Level Object** – an object that can be manipulated by a user, which is displayed outside the context of' an application program<br><br>**Application Level Object** - an object that can be manipulated by a user, which is displayed within the context of an application program. |
| 3 | **Claim 3:** The apparatus of claim 1, wherein said second detecting means includes means for detecting proximity of the stylus tip to the screen; and said apparatus further includes means coupled to said computer for displaying an indicator of the proximity of the stylus tip to the screen. | Function: detecting proximity of the stylus tip to the screen<br><br>Corresponding Structure: Complimentary electronic circuitry by which the proximity of the stylus tip to the computer is sensed, including:<br><br>(1) Stylus 4, including radio frequency inductor/capacitor circuit 42 and switch 44 (see Figs. 1-2; Col. 6:16-18; Col. 6: 26-31; Col. 1: 18-21; and Abstract); and<br><br>(2) Pen position digitizer 20, as shown in Figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:61-68.<br><br>Function: Displaying an indicator of the proximity of the stylus tip to the screen<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3; and Col. 6:33-34 and Col. 6:36-3 7)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6:20-21; and Col. 6:48-52). |
| 4 | **Claim 4:** The apparatus of claim 1, further including third detecting | Function: detecting a direction of motion of the gesture. |

Exhibit 53
Page 001120

| | | |
|---|---|---|
| | means for detecting a direction of motion of said gesture. | Corresponding Structure:<br>(1) Pen position digitizer 20 (see Figs. 2-3; Col. 6: 21-22; and Col. 6:53-68); and<br><br>(2) Pen position digitizer co-processor 90 (see Fig. 3 and Co16:36-37). |
| 6 | **Claim 6:** The apparatus of claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer. | Function: displaying on the screen a shape representing the actual gesture made by a user of the computer.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (See Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| 12 | **Claim 12:** The apparatus of claim 3, further including means for terminating display of said indicator when the stylus tip departs from proximity to the screen. | Function: terminating display of said indicator when the stylus tip departs from proximity to the screen<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3;Col. 6:20-21; and Col. 6:48-52). |
| 39 | **Claim 39:** An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including: | **Stylus** - a pen-like object whose position And contact with a surface can he continuously detected electronically. |
| 39a | detecting means coupled to said computer for detecting a stroke of the | Function: detecting a stroke of the stylus tip in contact with the screen. |

Exhibit 53<br>Page 001121

| | | |
|---|---|---|
| | stylus tip in contact with the screen; | Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21 - 22; and Col 6: 53-68.<br><br>**Stroke** - a single drawing movement, including a tap. |
| 39b | means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising said first and second gestures; and | **Gesture** - a symbol or mark<br><br>Function: recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising the first and second gestures.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below);<br><br>(2) Col. l:65 - Col. 2:5, and Col. 17:1-14; and<br><br>(3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col. 5: 1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10. |

| 39c | implementing means coupled to said computer for implementing each recognized gesture, said implementing means including means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture. | Function: implementing said recognized gesture which function includes the availability of using means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture.

Corresponding Structure:  CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56. |
|---|---|---|
| 40 | **Claim 40:** The apparatus of claim 39, wherein the shapes of said first and second gestures are substantially identical. | As is. |
| 41 | **Claim 41:** An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including: | **Stylus** - a pen-like object whose position and contact with a surface can he continuously detected electronically. |
| 41a | first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen; | Function: detecting a stroke of the stylus tip in contact with the screen.

Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21 - 22; and Col 6: 53-68.

**Stroke** - a single drawing movement, including a tap. |
| 41b | means coupled to said computer for recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, said recognizing means including means for comparing said gesture to at least one predefined shape, each stroke of said gesture being located in substantially the same area of the screen: | **Gesture** - a symbol or mark

Function: recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.

Corresponding Structure: |

| | | |
|---|---|---|
| | | (1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below);<br><br>(2) Col.l:65 - Col. 2:5, and Col. 17:1-14; and<br><br>(3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469- 487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col.5:1-6); or (5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10. |
| 41c | second detecting means for detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion; and | Function: detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion<br><br>Corresponding Structure:<br>(1) Pen position digitizer 20 (see Figs. 2-3; Col. 6: 21-22; and Col. 6:53-68); and<br><br>(2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37). |
| 41d | implementing means coupled to said computer for implementing said recognized gesture, said implementing means including means for performing a predetermined action associated with said predefined shape. | Function: implementing said recognized gesture which function includes the availability of using means for performing a predetermined action associated with said predefined shape<br><br>Corresponding Structure:  CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. |

| | | 4:32-41 and Col. 4:49-56. |
|---|---|---|
| 43 | **Claim 43:** The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a shape representing the actual gesture made by a user of the computer. | Function: displaying on the screen a shape representing the actual gesture made by a user of the computer.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| 46 | **Claim 46:** The apparatus of claim 41, wherein said direction of motion of said gesture is associated with said predetermined action. | As is. |

### B.    THE KIM PAPER

214.    At least claims 1, 3, 4, 6 and 12 are obvious over the Kim Paper in view of Taguchi and Levine.  At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and Buxton.  At least claim 39 is obvious over the Kim Paper in view of Taguchi and FIDS.  At least claims 39 and 40 are obvious over the Kim Paper in view of Taguchi and the Advanced Display System.  At least claims 41 and 43 are obvious over the Kim Paper in view of Taguchi.  At least claim 46 is obvious over the Kim Paper in view of Taguchi and Coleman. A chart form analysis is presented as Exhibit A to this report.  I will now review and elaborate on that analysis.

215.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine the Kim Paper with Taguchi.  Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display.  Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display:  behind the display, in front of the display, or separate from the display (as by an external digitizing tablet).  It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (*e.g.*, reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of the Kim Paper with the behind-the-display digitizer of Taguchi.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Kim Paper and Taguchi.

216.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Levine.  Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining the Kim Paper with Levine.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the

same functions it had been known to perform.  The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with the Kim Paper.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Kim Paper and Levine.

217.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Buxton.  Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of the Kim Paper.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the *char-rec* gestures of  Buxton would not necessarily be affected by the combination of Buxton with the Kim Paper.  Moreover, given the level of

ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Kim Paper and Buxton.

218.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Coleman.  Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of the Kim Paper.  For example, scrolling is an operation that is commonly performed in spreadsheets because the data contained in the spreadsheet usually cannot all be displayed on the screen at the same time.  The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of the Kim Paper.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The system of Kim Paper and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with the Kim Paper.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Kim Paper and Coleman.

219.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with FIDS.  Among other

Exhibit 53
Page 001128

features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of the Kim Paper.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The system of the Kim Paper and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features.  Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination would involve simply the addition of a text editor software application to the computer system of the Kim Paper.  For instance, implementation of gestures such as the correction marks of the FIDS Paper's Table 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with the Kim Paper.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Kim Paper and FIDS.

220.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Kim Paper with Advanced Display System.  Among other features, Advanced Display System disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Advanced Display System to the stylus-based user interface of the Kim Paper.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The

system of the Kim Paper and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination would involve simply the addition of a text editor software application to the computer system of the Kim Paper. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with the Kim Paper. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Kim Paper and Advanced Display System.

### 1. Claim 1

221. Claim 1 preamble: The Kim Paper describes an apparatus for controlling a computer system as discussed in § VI.B.1. The computer system described by the Kim Paper comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § VI.B.1.

222. Limitation 1a: The computer system described by the Kim Paper can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VI.B.2. The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §VI.B.1. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

223.     Limitation 1b:  The computer system described by the Kim Paper can detect a departure of the digitizing pen [stylus] tip from the screen as discussed in § VI.B.3. The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §§ VI.B.1 and VI.B.3.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

224.     Limitation 1c:  The computer system described by the Kim Paper can define termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen [stylus] tip from the screen as discussed in § VI.B.4.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §§ VI.B.1, and a processor [pen position digitizer co-processor] programmed with software that determines that a gesture is complete as discussed in § VI.B.4.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

225.     Limitation 1d:  The computer system described by the Kim Paper can recognize a plurality of said gestures and can compare each said gesture to at least one predefined shape.  See § VI.B.5.  The structure to perform this function is a processor programmed with a handwriting recognition algorithm.  Both the handwriting recognition and gesture recognition algorithms are prior art recognition algorithms that use techniques

Exhibit 53
Page 001131

disclosed in Automatic Recognition of Handprinted Characters.  See § VI.B.5.  In addition, during prosecution of the '295, the applicants argued that "[i]t is not crucial in the present invention which of the many available character recognition methods is used in connection with the microprocessor in order to carry out the invention."  [See, *e.g.* '295 File History 1992-05-26 Amendment (Tab 9) at 9(LUC 1050931)].

226.     Limitation 1e:  The computer system described by the Kim Paper can implement each said recognized gesture and can perform a predetermined action associated with each said predefined shape as discussed in § VI.B.6.  For at least one of the gestures, the predetermined action is determined by the context in which the gesture is used as discussed in § VI.B.6.  Furthermore, to the extent that one contends that the computer system described by the Kim Paper does not disclose the use of a single set of gestures for identical executable commands at both the operating system level and the application level, Levine describes the use of such a set of gestures as discussed in § III.  It would have been obvious to one of ordinary skill in the art to use a common set of gestures at both the operating system level and application level in view of Levine.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § III.

## 2.  Claim 3

227.     Claim 3 depends on the claim 1 and the analysis of claim 1 applies here.

228.     The computer system described in the Kim Paper can detect the proximity of the digitizing pen [stylus] tip to the screen and can display an indicator of the proximity of the digitizing pen [stylus] tip to the screen.  See § VI.B.7.  Furthermore, to the extent that one

Exhibit 53
Page 001132

contends that the computer system described in the Kim Paper does not disclose detecting proximity of the stylus tip to the screen and displaying an indicator of the proximity of the stylus tip to the screen, both Taguchi [see § II] and Levine [see § III] disclose proximity detection and displaying an indicator of proximity. The structure for performing this function is a stylus, a digitizing tablet [pen position digitizer], a processor [CPU and a pen position digitizer coprocessor] and a display controller. [see § VI.B]. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi. In addition, as the Examiner noted, it would have been obvious to one of ordinary skill that a system using a proximity sensing digitizer could display an indicator when the stylus is in proximity to it. [See e.g., '295 File History 1991-11-20 Office Action (Tab 6) at 5(LUC 1050915)

### 3. Claim 4

229. Claim 4 depends on the claim 1 and the analysis of claim 1 applies here.

230. The computer system described in the Kim Paper can detect the direction of motion of the gesture as discussed in § VI.B.8. The structure for performing this function is a digitizing tablet [pen position digitizer], a processor [pen position digitizer coprocessor]. See § VI.B. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

Exhibit 53
Page 001133

### 4.  Claim 6

231.    Claim 6 depends on the claim 1 and the analysis of claim 1 applies here.

232.    The computer system described in the Kim Paper can display on the screen a shape representing the actual gesture made by a user of the computer.  See § VI.B.9. The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display.  See § VI.B.

### 5.  Claim 12

233.    Claim 12 depends on the claim 1 and the analysis of claim 1 applies here.

234.    The computer system described in the Kim Paper can terminate display of said indicator when the digitizing pen [stylus] tip departs from proximity to the screen.  See § VI.B.7.  Furthermore, to the extent that one contends that the computer system described in the Kim Paper does not disclose detecting proximity of the stylus tip to the screen and displaying an indicator of the proximity of the stylus tip to the screen, both Taguchi [see § II] and Levine [see § III] disclose proximity detection and displaying an indicator of proximity.  It would have been obvious to one of ordinary skill in the art to use proximity detection and display an indicator in view of Taguchi and Levine.  Displaying of an indicator, when the pen is in proximity to the tablet surface further implies that the indicator is removed when the pen leaves proximity.  The structure for performing this function is a processor [pen position digitizer coprocessor] and a display controller.  [see § VI.B].

Exhibit 53
Page 001134

6.  **Claim 39**

235.    Claim 39 preamble:  The Kim Paper describes an apparatus for controlling

a computer system as discussed in § VI.B.  The computer system described in the Kim Paper

comprises a liquid crystal display [screen] for displaying information and a digitizing pen

[stylus] for inputting information into the computer as discussed in § VI.B.

236.    Limitation 39a:  The computer system described in the Kim Paper can

detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in

§ VI.B.2.  The structure to perform this function is a digitizing tablet [pen position digitizer] as

discussed in §VI.B.  Furthermore, Taguchi discusses a digitizer based on non contacting

technology that can be mounted behind the display as discussed in § II.  It would have been

obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology

that can be mounted behind the display in view of Taguchi.

237.    Limitation 39b:  The computer system described in the Kim Paper can

recognize a gesture comprising at least one stroke and an event indicating the termination of

the gesture, and can compare said gesture to at least one predefined shape.  See §§  VI.B.4 and

VI.B.5.  Furthermore, to the extent that one contends that the computer system described in the

Kim Paper does not recognize compound gestures – *i.e.*, a third gesture comprising a first and a

second gesture – both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It

would have been obvious to one of ordinary skill in the art to use compound gestures in view

of FIDS.  Alternatively, it would have been obvious to one of ordinary skill in the art to use

compound gestures in view of Buxton.  The structure for performing this function is a

Exhibit 53
Page 001135

processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VI.B, , VI.B.4, and VI.B.5.

238.    Limitation 39c:  The computer system described in the Kim Paper can implement each said recognized gesture and can perform a predetermined action associated with each said gesture as discussed in § VI.B.6.  Furthermore, to the extent that one contends that the computer system described in the Kim Paper does not implement compound gestures, both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It would have been obvious to one of ordinary skill in the art to implement compound gestures in view of Buxton.  Alternatively, it would have been obvious to one of ordinary skill in the art to implement compound gestures in view of FIDS.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § VI.B and VI.B.6.

**7. Claim 40**

239.    Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

240.    Advanced Display System [see § IX] describes compound gestures wherein the shapes of the first and second gestures are substantially identical.  Advanced Display System discloses a gesture for starting a new page (third gesture) that is comprised of a first and a second gesture that are both the gesture for starting a new paragraph.  Thus, the first and second gestures are substantially identical.  See § IX.

Exhibit 53
Page 001136

241.     Buxton discloses a gesture for a 1/32 note (third gesture) that is comprised of the gestures for two 1/8 notes (first and second gestures).  Thus, the first and second gestures are substantially identical.  See § IV.

**8.  Claim 41**

242.     Claim 41 preamble:  The Kim Paper describes an apparatus for controlling a computer system as discussed in § VI.B.  The computer system described in the Kim Paper comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § VI.B.

243.     Limitation 41a:  The computer system described in the Kim Paper can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VI.B.2.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VI.B.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

244.     Limitation 41b:  The computer system described in the Kim Paper can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.  See §§ VI.B.4, VI.B.5. The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm. See § VI.B, VI.B.4, and VI.B.5. .

Exhibit 53
Page 001137

245.    Limitation 41c:  The computer system described in the Kim Paper can detect a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion.  See § VI.B.8.  The structure to perform this function is a digitizing tablet [pen position digitizer] and a processor [pen position digitizer co-processor] as discussed in § VI.B.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

246.    Limitation 41d:  The computer system described in the Kim Paper can implement a recognized gesture and can perform a predetermined action associated with the predefined shape.  See § VI.B.6  The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ VI.B and VI.B.6.

**9.  Claim 43**

247.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

248.    The computer system described in the Kim Paper can display on the screen a shape representing the actual gesture made by a user of the computer.  See § VI.B.9.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display.  See § VI.B.

**10. Claim 46**

249.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

250.    Coleman discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action. See § V. Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of Coleman.

**C.    THE PAPER-LIKE INTERFACE SYSTEM**

251.    At least claims 1, 3, 4, 6 and 12 are obvious over the Paper-Like Interface System in view of Taguchi and Levine. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and Buxton. At least claim 39 is obvious over the Paper-Like Interface System in view of Taguchi and FIDS. At least claims 39 and 40 are obvious over the Paper-Like Interface System in view of Taguchi and the Advanced Display System. At least claims 41 and 43 are obvious over the Paper-Like Interface System in view of Taguchi. At least claim 46 is obvious over the Paper-Like Interface System in view of Taguchi and Coleman. A chart form analysis is presented as Exhibit B to this report. I will now review and elaborate on that analysis.

252.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine the Paper-Like Interface System with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible

Exhibit 53
Page 001139

locations for the placement of the digitizer with respect to the display:  behind the display, in

front of the display, or separate from the display (as by an external digitizing tablet).  It would

have been obvious for one of ordinary skill in the art to try each one of these finite alternatives,

and, seeing advantages of the placement of the digitizer behind the display (*e.g.*, reduced

parallax, improved durability and optical clarity), it would be obvious to one of skill in the art

to combine the Paper-Like Interface System with the behind-the-display digitizer of Taguchi.

Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of

ordinary skill would have been able to implement the combination of the Paper-Like Interface

System and Taguchi.

        253.    One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would also have known to combine the Paper-Like Interface System with Levine.

Among other features, Levine discloses implementing gestures in different computing

environments (*e.g.*, at the operating system level and at the application level) and sensing the

proximity of the stylus to the display, and one of ordinary skill would recognize that such

implementations in Levine's stylus-based computer system could improve other stylus-based

computer systems.  Accordingly, one of ordinary skill in the art would have seen an obvious

benefit to combining the Paper-Like Interface System with Levine.  The resulting combination

would have yielded no more than what one would expect from such an arrangement, with each

set of prior art features performing the same functions it had been known to perform.  The

Paper-Like Interface System and its gestures would have performed just as before, with the

simple addition of Levine's gestures and other user interface features.  Each gesture from each

prior art system would perform the same function as in its respective prior art system alone

Exhibit 53
Page 001140

because the Paper-Like Interface provides an interface that allows one to control a computer using handwriting and gestures. For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Levine.

254.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Buxton. Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of the Paper-Like Interface System, especially in view of the musical composition features depicted in the PLI Video [see, *e.g.*, PLI Video at minutes 0:04-0:24] and discussed in the PLI Paper [see, *e.g.*, PLI Paper at pp. 498-499]. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the *char-rec* gestures of Buxton would not necessarily be affected by the combination of Buxton with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art (discussed in my

Exhibit 53
Page 001141

previous report), one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Buxton.

255.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Coleman.  Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of the Paper-Like Interface.  For example, scrolling is an operation that is commonly performed in spreadsheets because the data contained in the spreadsheet usually cannot all be displayed on the screen at the same time.  The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of the Paper-Like Interface System. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with the Paper-Like Interface System.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Coleman.

Exhibit 53
Page 001142

256.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with FIDS. Among other features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of the Paper-Like Interface.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features.  Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the Paper-Like Interface System.  For instance, implementation of gestures such as the correction marks of the FIDS Paper's Table 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with the Paper-Like Interface System.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and FIDS.

257.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine the Paper-Like Interface System with Advanced Display System.  Among other features, Advanced Display System disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and

Exhibit 53
Page 001143

other capabilities of Advanced Display System to the stylus-based user interface of the Paper-Like Interface System. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The Paper-Like Interface System and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the Paper-Like Interface System. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with the Paper-Like Interface System. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Paper-Like Interface System and Advanced Display System.

### 1. Claim 1

258. Claim 1 preamble: The Paper-Like Interface System is an apparatus for controlling a computer system as discussed in § VII.B.1. The Paper-Like Interface System [computer system] comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § VII.B.1.

259. Limitation 1a: The Paper-Like Interface System can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VII.B.3. The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VII.B.1.

Exhibit 53
Page 001144

Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

260.    Limitation 1b:  The Paper-Like Interface System can detect a departure of the digitizing pen [stylus] tip from the screen as discussed in § VII.B.4.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

261.    Limitation 1c:  The Paper-Like Interface System can define termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen [stylus] tip from the screen as discussed in § VII.B.5.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VII.B.1, and a processor [pen position digitizer co-processor] programmed with software that determines that a gesture is complete as discussed in § VII.B.5.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

262.    Limitation 1d:  The Paper-Like Interface System can recognize a plurality of said gestures and can compare each said gesture to at least one predefined shape.  See

§ VII.B.6.  The structure to perform this function is a processor programmed with a handwriting recognition algorithm.  Both the handwriting recognition and gesture recognition algorithms are prior art recognition algorithms that use techniques disclosed in Automatic Recognition of Handprinted Characters.  See §§ VII.B.1 and VII.B.6.  In addition, during prosecution of the '295, the applicants argued that "[i]t is not crucial in the present invention which of the many available character recognition methods is used in connection with the microprocessor in order to carry out the invention."  [See, *e.g.*, '295 File History 1992-05-26 Amendment (Tab 9) at 9(LUC 1050931)].

263.    Limitation 1e:  The Paper-Like Interface System can implement each said recognized gesture and can perform a predetermined action associated with each said predefined shape as discussed in § VII.B.7.  For at least one of the gestures, the predetermined action is determined by the context in which the gesture is used as discussed in § VII.B.7.  Furthermore, to the extent that one contends that the Paper-Like Interface System does not disclose the use of a single set of gestures for identical executable commands at both the operating system level and the application level, Levine describes the use of such a set of gestures as discussed in § III.  It would have been obvious to one of ordinary skill in the art to use a common set of gestures at both the operating system level and application level in view of Levine.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § III.

### 2.  Claim 3

264.    Claim 3 depends on the claim 1 and the analysis of claim 1 applies here.

265.    The Paper-Like Interface System can detect the proximity of the digitizing pen [stylus] tip to the screen and can display an indicator of the proximity of the digitizing pen [stylus] tip to the screen.  See § VII.B.8.  Furthermore, to the extent that one contends that the Paper-Like Interface System does not disclose detecting proximity of the stylus tip to the screen and displaying an indicator of the proximity of the stylus tip to the screen, both Taguchi [see § II] and Levine [see § III] disclose proximity detection and displaying an indicator of proximity.  The structure for performing this function is a stylus, a digitizing tablet [pen position digitizer], a processor [CPU and a pen position digitizer coprocessor] and a display controller.  [see § VII.B.1].  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.  In addition, as the Examiner noted, it would have been obvious to one of ordinary skill that a system using a proximity sensing digitizer could display an indicator when the stylus is in proximity to it. [See e.g., '295 File History 1991-11-20 Office Action (Tab 6) at 5(LUC 1050915)].

### 3.  Claim 4

266.    Claim 4 depends on the claim 1 and the analysis of claim 1 applies here.

267.    The Paper-Like Interface System can detect the direction of motion of the gesture as discussed in § VII.B.9.  The structure for performing this function is a digitizing tablet [pen position digitizer], a processor [pen position digitizer coprocessor].  See § VII.B.1. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary

Exhibit 53
Page 001147

skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

### 4. Claim 6

268.    Claim 6 depends on the claim 1 and the analysis of claim 1 applies here.

269.    The Paper-Like Interface System can display on the screen a shape representing the actual gesture made by a user of the computer.  See § VII.B.10.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display.  See § VII.B.1.

### 5. Claim 12

270.    Claim 12 depends on the claim 1 and the analysis of claim 1 applies here.

271.    The Paper-Like Interface System can terminate display of said indicator when the digitizing pen [stylus] tip departs from proximity to the screen.  See § VII.B.8. Furthermore, to the extent that one contends that the Paper-Like Interface System does not disclose detecting proximity of the stylus tip to the screen and displaying an indicator of the proximity of the stylus tip to the screen, both Taguchi [see § II] and Levine [see § III] disclose proximity detection and displaying an indicator of proximity.  It would have been obvious to one of ordinary skill in the art to use proximity detection and display an indicator in view of Taguchi and Levine.  Displaying of an indicator, when the pen is in proximity to the tablet surface further implies that the indicator is removed when the pen leaves proximity.  The structure for performing this function is a processor [pen position digitizer coprocessor] and a display controller.  [see § VII.B.1].

Exhibit 53
Page 001148

### 6. Claim 39

272. Claim 39 preamble:  The Paper-Like Interface System is an apparatus for controlling a computer system as discussed in § VII.B.1.  The Paper-Like Interface System [computer system] comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § VII.B.1.

273. Limitation 39a:  The Paper-Like Interface System can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VII.B.3.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

274. Limitation 39b:  The Paper-Like Interface System can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape.  See §§  VII.B.5 and VII.B.6.  Furthermore, to the extent that one contends that the Paper-Like Interface System does not recognize compound gestures – *i.e.*, a third gesture comprising a first and a second gesture – both Buxton [see § IV] and FIDS [see § VIII ]describe compound gestures.  It would have been obvious to one of ordinary skill in the art to use compound gestures in view of FIDS.  Alternatively, it would have been obvious to one of ordinary skill in the art to use compound gestures in view of Buxton.  The structure for performing this function is a processor [pen

Exhibit 53
Page 001149

position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VII.B.1, VII.B.5 and VII.B.6.

275.    Limitation 39c:  The Paper-Like Interface System can implement each said recognized gesture and can perform a predetermined action associated with each said gesture as discussed in § VII.B.7.  Furthermore, to the extent that one contends that the Paper-Like Interface System does not implement compound gestures, both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It would have been obvious to one of ordinary skill in the art to implement compound gestures in view of Buxton.  Alternatively, it would have been obvious to one of ordinary skill in the art to implement compound gestures in view of FIDS.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ VII.B.1 and , VII.B.7.

### 7.  Claim 40

276.    Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

277.    Advanced Display System [see § IX] describes compound gestures wherein, the shapes of the first and second gestures are substantially identical.  Advanced Display System discloses a gesture for starting a new page (third gesture) that is comprised of a first and a second gesture that are both the gesture for starting a new paragraph.  Thus, the first and second gestures are substantially identical.  See § IX.

278.    Buxton discloses a gesture for a 1/32 note (third gesture) that is comprised of the gestures for two 1/8 notes (first and second gestures).  Thus, the first and second gestures are substantially identical.  See § IV.

### 8.  Claim 41

279.    Claim 41 preamble:  The Paper-Like Interface System is an apparatus for controlling a computer system as discussed in § VII.B.1.  The Paper-Like Interface System [computer system] comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § VII.B.1.

280.    Limitation 41a:  The Paper-Like Interface System can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VII.B.3.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

281.    Limitation 41b:  The Paper-Like Interface System can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.  See §§ VII.B.2,  VII.B.5, and VII.B.6.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VII.B.1, VII.B.5, VII.B.6.

282.    Limitation 41c:  The Paper-Like Interface System can detect a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion. See § VII.B.9.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §§ VII.B.1 and VII.B.3, and a processor [pen position digitizer co-processor] as discussed in § VII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

283.    Limitation 41d:  The Paper-Like Interface System can implement a recognized gesture and can perform a predetermined action associated with the predefined shape as discussed in VII.B.7.  The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ VII.B.1 and VII.B.7.

**9.  Claim 43**

284.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

285.    The Paper-Like Interface System can display on the screen a shape representing the actual gesture made by a user of the computer.  See § VII.B.10.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display.  See § VII.B.1.

Exhibit 53
Page 001152

### 10. Claim 46

286.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

287.    Coleman discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action. See § V. Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of Coleman.

### D.    **FIDS**

288.    At least claims 1, 3, 4 and 12 are obvious over FIDS in view of Taguchi and Levine. At least claim 6 is obvious over FIDS in view of Taguchi, Levine and Coleman. At least claim 39 is obvious over FIDS in view of Taguchi. At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Advanced Display System. At least claims 39 and 40 are obvious over FIDS in view of Taguchi and Buxton. At least claim 41 is obvious over FIDS in view of Taguchi. At least claims 43 and 46 are obvious over FIDS in view of Taguchi and Coleman. A chart form analysis is presented as Exhibit C to this report. I will now review and elaborate on that analysis.

289.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine FIDS with Taguchi. Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display. Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display: behind the display, in front of the display, or

Exhibit 53
Page 001153

separate from the display (as by an external digitizing tablet).  It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g., reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine FIDS with the behind-the-display digitizer of Taguchi.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of FIDS and Taguchi.

         290.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Levine.  Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining FIDS with Levine.  In fact, the FIDS Paper discusses the wide variety of programs that would benefit from inclusion in FIDS.  The FIDS Paper specifically mentions using FIDS as the basis of a user interface management system (UIMS) and mentions that one benefit of a UIMS is a consistent user interface.  [See, *e.g.*, FIDS Paper at p. 76 (MSLT_1230908)].  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  FIDS and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features.  Each gesture from each prior

Exhibit 53
Page 001154

art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with FIDS.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of FIDS and Levine.

291.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine FIDS with Advanced Display System.  Among other features, Advanced Display System discloses a stylus-based computer system for inputting and editing text.  One of ordinary skill in the art would have seen the obvious benefits in adding the Advanced Display System's gestures to the stylus-based user interface of FIDS.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  FIDS and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the correction marks of FIDS Tables 3 and 4 would not necessarily be affected by the combination of FIDS with the Advanced Display System.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of FIDS and Advanced Display System.  In addition, one of ordinary skill in the art would be motivated to combine FIDS and Advanced Display System because both were developed and

Exhibit 53
Page 001155

written about by the same person, A. Kankaanpaa.  Both based their editing gestures on the

SFS2324 proof correction standard.

292.     One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would also have known to combine FIDS with Buxton.  Among other features,

Buxton discloses stylus-based gestures in a user interface useful for musical composition and

music score editing.  One of ordinary skill in the art would have seen the obvious benefits in

adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-

based user interface of FIDS.  In fact, the FIDS Paper lists a number of applications that could

benefit from the FIDS design including other types of editors that use graphics and direct

manipulation.  The *char-rec* score editor falls squarely within this category.  The resulting

combination would have yielded no more than what one would expect from such an

arrangement, with each set of prior art features performing the same functions it had been

known to perform.  FIDS and its gestures would have performed just as before, with the simple

addition of Buxton's gestures and other user interface features.  Each gesture from each prior

art system would perform the same function as in its respective prior art system alone.  For

instance, implementation of gestures such as the *char-rec* gestures of  Buxton would not

necessarily be affected by the combination of Buxton with FIDS.  Moreover, given the level of

ordinary skill in the art (discussed in my previous report), one of ordinary skill would have

been able to implement the combination of FIDS and Buxton.

293.     One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would also have known to combine FIDS with Coleman.  Among other features,

Coleman discloses a stylus-based computer system that implements gestures to edit and

manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in

adding the gestures and other capabilities of Coleman to the stylus-based user interface of

FIDS.  In fact, the FIDS Paper lists Coleman as "the first editing system using proofreading

symbols" and states that it was more limited than FIDS because it did not have the

"possibilities offered by the FIDS hardware."  [See FIDS Paper at p. 77 (MSLT_1230909)].

There are also similarities between the gestures and gesture recognition algorithms of FIDS

and Coleman.  In addition, scrolling is an operation that is commonly performed in text editing

programs because the data contained in the document usually cannot all be displayed on the

screen at the same time.  The up/down gestures of Coleman, which are used for scrolling,

would be useful in the context of FIDS.  The resulting combination would have yielded no

more than what one would expect from such an arrangement, with each set of prior art features

performing the same functions it had been known to perform.  FIDS and its gestures would

have performed just as before, with the simple addition of Coleman's gestures and other user

interface features.  Each gesture from each prior art system would perform the same function

as in its respective prior art system alone.  For instance, implementation of gestures such as the

proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the

combination of Coleman with FIDS.  Moreover, given the level of ordinary skill in the art

(discussed in my previous report), one of ordinary skill would have been able to implement the

combination of FIDS and Coleman.

### 1.  Claim 1

294.    Claim 1 preamble:  FIDS includes an apparatus for controlling a computer

system as discussed in § VIII.B.1.  The computer system of FIDS comprises

electroluminescent (EL) flat panel display [screen] for displaying information and a touch pen [stylus] for inputting information into the computer as discussed in § VIII.B.1.

295.    Limitation 1a:  FIDS can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § VIII.B.2.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

296.    Limitation 1b:  FIDS can detect a departure of the digitizing pen [stylus] tip from the screen as discussed in § VIII.B.3.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

297.    Limitation 1c:  FIDS can define termination of a gesture comprising at least one stroke in response to the departure of the digitizing pen [stylus] tip from the screen as discussed in § VIII.B.4.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § VIII.B.1, and a processor [pen position digitizer co-processor] [see § VIII.B.1] programmed with software that determines that a gesture is complete as discussed in § VIII.B.4.  Furthermore, Taguchi discusses a digitizer based on non

contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

298.    Limitation 1d:  FIDS can recognize a plurality of said gestures and can compare each said gesture to at least one predefined shape.  See § VIII.B.5.  The structure to perform this function is a processor programmed with a handwriting recognition algorithm. The gesture recognition algorithm is a prior art recognition algorithms that use techniques disclosed in Automatic Recognition of Handprinted Characters.  See § VIII.B.5.  The FIDS Paper teaches that handwriting recognition could be advantageously included in FIDS and refers to several publications that discuss this subject.  [See, *e.g.*, FIDS Paper at p. 76-77].  In addition, during prosecution of the '295, the applicants argued that "[i]t is not crucial in the present invention which of the many available character recognition methods is used in connection with the microprocessor in order to carry out the invention."  [See, *e.g.* '295 File History 1992-05-26 Amendment (Tab 9) at 9(LUC 1050931)].

299.    Limitation 1e:  FIDS can implement each said recognized gesture and can perform a predetermined action associated with each said predefined shape as discussed in § VIII.B.6.  [See, *e.g.*, FIDS Paper at p. 76].  Furthermore, Levine describes the use of a single set of gestures for identical executable commands at both the operating system level and the application level as discussed in § III.  It would have been obvious to one of ordinary skill in the art to use a common set of gestures at both the operating system level and application level in view of Levine.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § III.

Exhibit 53
Page 001159

## 2. Claim 3

300.    Claim 3 depends on the claim 1 and the analysis of claim 1 applies here.

301.    Both Taguchi [see § II] and Levine [see § III] disclose proximity detection and displaying an indicator of proximity.  The structure for performing this function is a stylus, a digitizing tablet [pen position digitizer], a processor [CPU and a pen position digitizer coprocessor] and a display controller.  [See § VIII.B.1].  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.  In addition, as the Examiner noted, it would have been obvious to one of ordinary skill that a system using a proximity sensing digitizer could display an indicator when the stylus is in proximity to it.  [See e.g., '295 File History 1991-11-20 Office Action (Tab 6) at 5(LUC 1050915)].

## 3. Claim 4

302.    Claim 4 depends on the claim 1 and the analysis of claim 1 applies here.

303.    FIDS can detect the direction of motion of the gesture as discussed in § VIII.B.7.  The structure for performing this function is a digitizing tablet [pen position digitizer], a processor [pen position digitizer coprocessor].  See § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

### 4. Claim 6

304.    Claim 6 depends on the claim 1 and the analysis of claim 1 applies here.

305.    Coleman discloses displaying the actual shape of the gesture. Furthermore, Taguchi discloses displaying of the characters drawn on the screen using the stylus. See § II. Displaying the actual shape of the gesture in FIDS would have been obvious in view of Coleman. Alternatively, displaying the actual shape of the gesture in FIDS would have been obvious in view of Taguchi. The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and an electroluminescent (EL) flat panel display. See § VIII.B.1..

### 5. Claim 12

306.    Claim 12 depends on the claim 1 and the analysis of claim 1 applies here.

307.    Both Taguchi [see § II] and Levine [see § III] can terminate display of said indicator when the stylus tip departs from proximity to the screen. It would have been obvious to one of ordinary skill in the art to use proximity detection,, displaying of an indicator and furthermore terminating the display of the indicator in view of Taguchi and Levine. The structure for performing this function is a processor [pen position digitizer coprocessor] and a display controller. [see § VIII.B.1].

### 6. Claim 39

308.    Claim 39 preamble: FIDS includes an apparatus for controlling a computer system as discussed in § VIII.B.1. The computer system of FIDS comprises an

electroluminescent (EL) flat panel display [screen] for displaying information and a touch pen [stylus] for inputting information into the computer as discussed in § VIII.B.1.

309.    Limitation 39a:  FIDS can detect a stroke of the touch pen [stylus] tip in contact with the screen as discussed in § VIII.B.2  The structure to perform this function is a resistive touch panel [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

310.    Limitation 39b:  FIDS can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape.  See §§  VIII.B.4, VIII.B.5.  Furthermore, to the extent that one contends that FIDS does not recognize compound gestures – *i.e.*, a third gesture comprising a first and a second gesture –Buxton [see § IV] describes compound gestures.  It would have been obvious to one of ordinary skill in the art to use compound gestures in view of Buxton. Additionally, it would have been obvious to use compound gestures in view of Advanced Display System.  See § IX.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VIII.B.1, VIII.B.4, VIII.B.5, VIII.B.3.

311.    Limitation 39c:  FIDS can implement each said recognized gesture and can perform a predetermined action associated with each said gesture as discussed in § VIII.B.6.  Furthermore, to the extent that one contends that FIDS does not implement

Exhibit 53
Page 001162

compound gestures, Buxton [see § IV] describes compound gestures.  It would have been obvious to one of ordinary skill in the art to implement compound gestures in view of Buxton. It would have been further obvious to one of ordinary skill in the art to implement compound gestures in view of Advanced Display System.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ VIII.B.1, VIII.B.6.

### 7.  Claim 40

312.    Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

313.    The Advanced Display System discloses a gesture for starting a new page (third gesture) that is comprised of a first and a second gesture that are both the gesture for starting a new paragraph.  Thus, the first and second gestures are substantially identical.  See § IX.

314.    Buxton discloses a gesture for a 1/32 note (third gesture) that is comprised of the gestures for two 1/8 notes (first and second gestures).  Thus, the first and second gestures are substantially identical.  See § IV.

### 8.  Claim 41

315.    Claim 41 preamble:  FIDS includes an apparatus for controlling a computer system as discussed in § VIII.B.1.  The computer system disclosed in FIDS comprises an electroluminescent (EL) flat panel display [screen] for displaying information and a touch pen [stylus] for inputting information into the computer as discussed in § VIII.B.1.

316.    Limitation 41a:  FIDS can detect a stroke of the touch pen [stylus] tip in contact with the screen as discussed in § VIII.B.2  The structure to perform this function is a resistive touch panel [pen position digitizer] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

317.    Limitation 41b:  FIDS can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.  See §§ VIII.B.4, VIII.B.5.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ VIII.B.1, VIII.B.4, VIII.B.5.

318.    Limitation 41c:  FIDS can detect a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion as discussed in § VIII.B.7.  The structure to perform this function is a resistive touch panel [pen position digitizer] and a processor [pen position digitizer co-processor] as discussed in § VIII.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

Exhibit 53
Page 001164

319.    Limitation 41d:  FIDS can implement a recognized gesture and can

perform a predetermined action associated with the predefined shape.  See § VIII.B.6.  The

structure to perform this function is a processor [CPU] programmed with algorithms known to

persons skilled in the art for implementing gestures as discussed in §§ VIII.B.1, , VIII.B.6.

### 9.  Claim 43

320.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies

here.

321.    Coleman discloses displaying the actual shape of the gesture.

Furthermore, Taguchi discloses displaying of the characters drawn on the screen using the

stylus.  See § II.  Displaying the actual shape of the gesture in FIDS would have been obvious

in view of Coleman.  Alternatively, displaying the actual shape of the gesture in FIDS would

have been obvious in view of Taguchi.  The structure for performing this function is a

processor [CPU and a pen position digitizer coprocessor], a display controller and an

electroluminescent (EL) flat panel display.  See § VIII.B.1.

### 10. Claim 46

322.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies

here.

323.    Coleman discloses gestures where the direction of motion of the

recognized gesture is associated with a predetermined action.  See § V.  Furthermore, it would

have been obvious to one of ordinary skill in the art to associate the direction of motion with a

predetermined action in view of Coleman.

E.     OED AND DOSTER

324.     At least claims 1, 3, 4 and 12 are obvious over Oed and Doster in view of Taguchi and Levine.  At least claim 6 is obvious over Oed and Doster in view of Taguchi, Levine and Coleman.  At least claim 39 is obvious over Oed and Doster in view of Taguchi and FIDS.  At least claims 39 and 40 are obvious over Oed and Doster in view of Taguchi and Advanced Display System.  At least claims 39, 40 are obvious over Oed and Doster in view of Taguchi and Buxton.  At least claim 41 is obvious over Oed and Doster in view of Taguchi.  At least claims 43, and 46 are obvious over Oed and Doster in view of Taguchi and Coleman.  A chart form analysis is presented as Exhibit D to this report.  I will now review and elaborate on that analysis.

325.     One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Oed and Doster with Taguchi.  Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display.  Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display:  behind the display, in front of the display, or separate from the display (as by an external digitizing tablet).  It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g., reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of Oed and Doster with the behind-the-display digitizer of Taguchi.  In fact, Oed and Doster use a tablet based on magnetostrictive technology, the same technology used by Taguchi.  Moreover, given the level of ordinary skill in the art (discussed in my

Exhibit 53
Page 001166

previous report), one of ordinary skill would have been able to implement the combination of Oed and Doster and Taguchi.

326.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Levine.  Among other features, Levine discloses implementing gestures in different computing environments (*e.g.*, at the operating system level and at the application level) and sensing the proximity of the stylus to the display, and one of ordinary skill would recognize that such implementations in Levine's stylus-based computer system could improve other stylus-based computer systems.  In fact, both of the Oed and Doster references say that their system "allows any application program to be operated" using gestures.  [See, *e.g.*, Oed Paper at p. 743 (MSLT_1231126)].  The Oed Paper states that one technique to allow any application to use gestures is to make on-line script recognition part of the operating system.  [See, *e.g.*, Oed Paper at p. 742 (MSLT_1231125)].  Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining Oed and Doster with Levine.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  Oed and Doster and its gestures would have performed just as before, with the simple addition of Levine's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the "touch-and-lift" gesture of Levine would not necessarily be affected by the combination of Levine with Oed and Doster.  Moreover, given the level of ordinary skill in the

Exhibit 53
Page 001167

art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Oed and Doster and Levine.

327.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Buxton.  Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of Oed and Doster.  In fact, both of the Oed and Doster references say that their system "allows any application program to be operated" using gestures.  [See, *e.g.*, Oed Paper at p. 743 (MSLT_1231126)].  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  Oed and Doster and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone because the combination provides merely the addition of a music score editor software application to Oed and Doster.  For instance, implementation of gestures such as the *char-rec* gestures of  Buxton would not necessarily be affected by the combination of Buxton with Oed and Doster.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Oed and Doster and Buxton.

Exhibit 53
Page 001168

328.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Coleman.  Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of Oed and Doster.  For example, scrolling is an operation that is commonly performed in text editing programs because the data contained in the document usually cannot all be displayed on the screen at the same time.  The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of Oed and Doster.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  Oed and Doster and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone because Oed and Doster specifically allows the user to define additional gestures and assign any desired meaning to those gestures  [see § X.A].  For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with Oed and Doster.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Oed and Doster and Coleman.

329.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with FIDS.  Among other

Exhibit 53
Page 001169

features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of FIDS to the stylus-based user interface of Oed and Doster. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of FIDS's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because Oed and Doster specifically allows the user to define additional gestures and assign any desired meaning to those gestures. For instance, implementation of gestures such as the correction marks of the FIDS Paper's Tables 3 and Fig. 5 would not necessarily be affected by the combination of FIDS with Oed and Doster. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Oed and Doster and FIDS.

330.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Oed and Doster with Advanced Display System. Among other features, Advanced Display System disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text. One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Advanced Display System to the stylus-based user interface of Oed and Doster. For example, inserting a page break is a common operation in text editor programs. The "new page" gesture

of Advanced Display System would be useful in the context of Oed and Doster. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. Oed and Doster and its gestures would have performed just as before, with the simple addition of Advanced Display System's gestures and other user interface features. Each gesture from each prior art system would perform the same functions as in its respective prior art system alone because Oed and Doster specifically allows the user to define additional gestures and assign any desired meaning to those gestures. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with the Oed and Doster. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of the Oed and Doster and Advanced Display System.

## 1. Claim 1

331.    Claim 1 preamble: Oed and Doster is an apparatus for controlling a computer system as discussed in § X.B.1. The computer system of Oed and Doster comprises a display [screen] for displaying information and a stylus for inputting information into the computer as discussed in § X.B.1.

332.    Limitation 1a: The computer system of Oed and Doster can detect a stroke of the stylus tip in contact with the screen as discussed in § X.B.2. The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §§ X.B.1 and X.B.2. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can

be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

333.    Limitation 1b:  The computer system of Oed and Doster can detect a departure of the stylus tip from the screen as discussed in § X.B.3.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §§ X.B.1 and X.B.3. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

334.    Limitation 1c:  The computer system of Oed and Doster can define termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen as discussed in § X.B.4.  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in §§ X.B.1 and X.B.4, and a processor [pen position digitizer co-processor] programmed with software that determines that a gesture is complete as discussed in § X.B.4.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

335.    Limitation 1d:  The computer system of Oed and Doster can recognize a plurality of said gestures and can compare each said gesture to at least one predefined shape. See § X.B.5.  The structure to perform this function is a processor programmed with a

Exhibit 53
Page 001172

handwriting recognition algorithm. Both the handwriting recognition and gesture recognition algorithms are prior art recognition algorithms that use techniques disclosed in Automatic Recognition of Handprinted Characters. See § X.B.5. In addition, during prosecution of the '295, the applicants argued that "[i]t is not crucial in the present invention which of the many available character recognition methods is used in connection with the microprocessor in order to carry out the invention." [See, *e.g.* See e.g., '295 File History 1992-05-26 Amendment (Tab 9) at 9(LUC 1050931)].

336. Limitation 1e: The computer system of Oed and Doster can implement each said recognized gesture and can perform a predetermined action associated with each said predefined shape as discussed in § X.B.6. Levine describes the use of a single set of gestures for identical executable commands at both the operating system level and the application level as discussed in § III. It would have been obvious to one of ordinary skill in the art to use a common set of gestures at both the operating system level and application level in view of Levine. The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § III.

**2. Claim 3**

337. Claim 3 depends on the claim 1 and the analysis of claim 1 applies here.

338. The computer system of Oed and Doster can detect the proximity of the stylus tip to the screen. See § X.B.7. Furthermore, both Taguchi [see § II] and Levine [see § III] include proximity detection and displaying an indicator of proximity. The structure for performing this function is a stylus, a digitizing tablet [pen position digitizer], a processor [CPU and a pen position digitizer coprocessor] and a display controller. See § X.B.1. In

Exhibit 53
Page 001173

addition, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.  In addition, as the Examiner noted, it would have been obvious to one of ordinary skill that a system using a proximity sensing digitizer could display an indicator when the stylus is in proximity to it.  [See e.g., '295 File History 1991-11-20 Office Action (Tab 6) at 5(LUC 1050915)].

### 3.  Claim 4

339.    Claim 4 depends on the claim 1 and the analysis of claim 1 applies here.

340.    The computer system of Oed and Doster can detect the direction of motion of the gesture as discussed in § X.B.8.  The structure for performing this function is a digitizing tablet [pen position digitizer], a processor [pen position digitizer coprocessor].  See § X.B.1. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

### 4.  Claim 6

341.    Claim 6 depends on the claim 1 and the analysis of claim 1 applies here.

342.    Coleman discloses displaying the shape representing the actual gesture made by the user.  See § V.  Furthermore, Taguchi discloses displaying of the characters drawn on the screen using the stylus.  See § II.  It would have been obvious to one of ordinary skill in

Exhibit 53
Page 001174

the art to display the shape representing the actual gesture made by the user in view of Coleman. Alternatively, it would have been obvious to one of ordinary skill in the art to display the shape representing the actual gesture made by the user in view of Taguchi. The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display. See § X.B.1.

**5.   Claim 12**

343.    Claim 12 depends on the claim 1 and the analysis of claim 1 applies here.

344.    Both Taguchi [see § II] and Levine [see § III] can terminate display of said indicator when the stylus tip departs from proximity to the screen. It would have been obvious to one of ordinary skill in the art to use proximity detection, displaying an indicator and furthermore terminating the display of the indicator in view of Taguchi and Levine. The structure for performing this function is a processor [pen position digitizer coprocessor] and a display controller. See § X.B.1.

**6.   Claim 39**

345.    Claim 39 preamble:  Oed and Doster describe an apparatus for controlling a computer system as discussed in § X.B.1. The computer system of Oed and Doster comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § X.B.1.

346.    Limitation 39a:  The computer system of Oed and Doster can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § X.B.2  The structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in

Exhibit 53
Page 001175

§§ X.B.1 and X.B.2.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

347.    Limitation 39b:  The computer system of Oed and Doster can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape.  See §§ X.B.4 and X.B.5.  . Furthermore, to the extent that one contends that the computer system described by Oed and Doster does not recognize compound gestures – *i.e.*, a third gesture comprising a first and a second gesture – both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It would have been obvious to one of ordinary skill in the art to use compound gestures in view of FIDS.  Alternatively, it would have been obvious to one of ordinary skill in the art to use compound gestures in view of Buxton.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ X.B.1, X.B.4, X.B.5.

348.    Limitation 39c:  The computer system of Oed and Doster can implement each said recognized gesture and can perform a predetermined action associated with each said gesture as discussed in § X.B.6.  Furthermore, to the extent that one contends that the computer system described by Oed and Doster does not implement compound gestures, both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It would have been obvious to one of ordinary skill in the art to implement compound gestures in view of Buxton.  Alternatively, it would have been obvious to one of ordinary skill in the art to implement compound gestures

Exhibit 53
Page 001176

in view of FIDS.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ X.B.1, X.B.6.

### 7.  Claim 40

349.    Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

350.    Advanced Display System discloses a gesture for starting a new page (third gesture) that is comprised of a first and a second gesture that are both the gesture for starting a new paragraph.  Thus, the first and second gestures are substantially identical.  See § IX.

351.    Buxton discloses a gesture for a 1/32 note (third gesture) that is comprised of the gestures for two 1/8 notes (first and second gestures).  Thus, the first and second gestures are substantially identical.  See § IV.

### 8.  Claim 41

352.    Claim 41 preamble:  The computer system of Oed and Doster is an apparatus for controlling a computer system as discussed in § X.B.1.  The computer system described by Oed and Doster comprises a liquid crystal display [screen] for displaying information and a digitizing pen [stylus] for inputting information into the computer as discussed in § X.B.1.

353.    Limitation 41a:  The computer system of Oed and Doster can detect a stroke of the digitizing pen [stylus] tip in contact with the screen as discussed in § X.B.2.  The

structure to perform this function is a digitizing tablet [pen position digitizer] as discussed in § X.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

354.    Limitation 41b:  The computer system of Oed and Doster can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.  See §§ X.B.4 and X.B.5.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm. See §§ X.B.1, X.B.4, X.B.5.

355.    Limitation 41c:  The computer system of Oed and Doster can detect a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion.  See §X.B.8.  The structure to perform this function is a digitizing tablet [pen position digitizer] and a processor [pen position digitizer co-processor] as discussed in § X.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

356.    Limitation 41d:  The computer system of Oed and Doster can implement a recognized gesture and can perform a predetermined action associated with the predefined

shape.  See §§ X.B.6.  The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in § X.B.1, X.B.6.

### 9.  Claim 43

357.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

358.    Coleman discloses displaying the shape representing the actual gesture made by the user.  See § V.  Furthermore, Taguchi discloses displaying of the characters drawn on the screen using the stylus.  See § II.  It would have been obvious to one of ordinary skill in the art to display the shape representing the actual gesture made by the user in view of Coleman.  Alternatively, it would have been obvious to one of ordinary skill in the art to display the shape representing the actual gesture made by the user in view of Taguchi.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display.  See § X.B.1.

### 10.  Claim 46

359.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

360.    Coleman discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action.  See § V.  Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of Coleman.

Exhibit 53
Page 001179

F.    **INAGAKI**

361.    At least claims 39, 40, 41 and 43 are obvious over Inagaki in view of Taguchi.  At least claim 46 is obvious over Inagaki in view of Taguchi and the Casio PF-8000.[5] A chart form analysis is presented as Exhibit E to this report.  I will now review and elaborate on that analysis.

362.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Inagaki with Taguchi.  Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display.  Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display:  behind the display, in front of the display, or separate from the display (as by an external digitizing tablet).  It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (*e.g.*, reduced parallax, improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of Inagaki with the behind-the-display digitizer of Taguchi.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Inagaki and Taguchi.

363.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Inagaki with the Casio PF-8000.  Among other features, the Casio PF-8000 discloses associating the direction of creation of a gesture with its

---

[5] I incorporate here by reference my discussion of the Casio PF-8000 computer system in the Kelly Invalidity Report.

Exhibit 53
Page 001180

action, and one of ordinary skill would recognize that such features in the Casio PF-8000's stylus-based computer system could improve other stylus-based computer systems. In addition, Inagaki and the Casio PF-8000 describe very similar devices, and the Inagaki patent is assigned to Casio. Accordingly, one of ordinary skill in the art would have seen an obvious benefit to combining Inagaki with the Casio PF-8000. The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform. The system of Inagaki and its gestures would have performed just as before, with the simple addition of the Casio PF-8000's gestures and other user interface features. Each gesture from each prior art system would perform the same function as in its respective prior art system alone. For instance, implementation of gestures such as the "—" gesture of the Casio PF-8000 would not necessarily be affected by the combination of the Casio PF-8000 with Inagaki. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Inagaki and the Casio PF-8000.

### 1. Claim 39

364. Claim 39 preamble: Inagaki discloses an apparatus for controlling a computer system as discussed in § XI.B.1. The computer system disclosed in Inagaki comprises an LCD display [screen] for displaying information. A finger [stylus] is used for inputting information into the computer as discussed in § XI.B.1.

365. Limitation 39a: Inagaki discloses detecting a stroke of the finger [stylus] tip in contact with the finger actuation section as discussed in § XI.B.2. Furthermore, Taguchi discusses an integrated tablet and a display screen [see § II]. It would have been obvious to

one of ordinary skill in the art to write directly on the display screen in view of Taguchi. The structure to perform this function is a 5 × 6 matrix array and associated circuitry [pen position digitizer] as discussed in §§ XI.B.1 and XI.B.2. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

366.     Limitation 39b:  Inagaki discloses recognizing a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape. See § XI.B.3  Furthermore, Inagaki discloses recognizing compound gestures (*i.e.*, a third gesture comprising a first and a second gesture). See § XI.B.3. The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm. See §§ XI.B.1 and XI.B.3.

367.     Limitation 39c:  Inagaki discloses implementing each said recognized gesture and performing a predetermined action associated with each said gesture as discussed in § XI.B.4. The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ XI.B.1 and XI.B.4.

**2.  Claim 40**

368.     Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

Exhibit 53
Page 001182

369.    Inagaki discloses a "=" gesture for calculating a formula (third gesture) that is comprised of a first and a second gesture that are both the "-" gesture for subtraction. Thus, the first and second gestures are substantially identical.  See § XI.B.3See § XI.B.3 and XI.B.4.

### 3.  Claim 41

370.    Claim 41 preamble:  Inagaki discloses an apparatus for controlling a computer system as discussed in § XI.B.1.  The computer system disclosed in Inagaki comprises an LCD display [screen] for displaying information.  A finger [stylus] is used for inputting information into the computer as discussed in § XI.B.1.

371.    Limitation 41a:  Inagaki discloses detecting a stroke of the finger [stylus] tip in contact with the screen as discussed in § XI.B.2  The structure to perform this function is a 5 × 6 matrix array and associated circuitry [pen position digitizer] as discussed in §§ XI.B.1 and XI.B.2.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

372.    Limitation 41b:  Inagaki discloses recognizing a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen.  See § XI.B.3.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ XI.B.1 and XI.B.3.

373.    Limitation 41c:  Inagaki discloses detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion as discussed in § XI.B.5.  The structure to perform this function is a $5 \times 6$ matrix array and associated circuitry [pen position digitizer] and a processor [pen position digitizer co-processor] as discussed in § XI.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

374.    Limitation 41d:  Inagaki discloses implementing a recognized gesture and can perform a predetermined action associated with the predefined shape.  See § XI.B.4.  The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ XI.B.1 and XI.B.4.

### 4.  Claim 43

375.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

376.    Inagaki discloses displaying the actual shape of the gesture by displaying on the screen the recognized symbol.  See § XI.B.1.  Alternatively, Taguchi discloses display of characters drawn on the screen using the stylus.  See § II.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and an LCD display.  See § XI.B.1.

Exhibit 53
Page 001184

### 5. Claim 46

377.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

378.    The Casio PF-8000 includes gestures where the direction of motion of the recognized gesture is associated with a predetermined action.  For example, a horizontal line drawn from left to right produces a different action than a horizontal line drawn from right to left.  See the Kelly Invalidity Report at ¶ 69.  Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of the Casio PF-8000.

### G.    COLEMAN

379.    At least claims 41, 43 and 46 are obvious over Coleman in view of Taguchi.  A chart form analysis is presented as Exhibit F to this report.  I will now review and elaborate on that analysis.

380.    One of ordinary skill in the art at the time of the alleged invention of the '295 patent would have known to combine Coleman with Taguchi.  Among other features, Taguchi discloses a proximity-sensing digitizer placed behind the display.  Indeed, when considering a stylus-based system, there can be only three possible locations for the placement of the digitizer with respect to the display:  behind the display, in front of the display, or separate from the display (as by an external digitizing tablet).  It would have been obvious for one of ordinary skill in the art to try each one of these finite alternatives, and, seeing advantages of the placement of the digitizer behind the display (e.g., reduced parallax,

Exhibit 53
Page 001185

improved durability and optical clarity), it would be obvious to one of skill in the art to combine the system of Coleman with the behind-the-display digitizer of Taguchi. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Coleman and Taguchi.

### 1. Claim 41

381.    Claim 41 preamble: Coleman discloses an apparatus for controlling a computer system as discussed in § V.B.1. The computer system disclosed in Coleman comprises a CRT, which performs the same function as an LCD display, [screen] for displaying information. A RAND tablet and stylus is used for inputting information into the computer as discussed in § V.B.1.

382.    Limitation 41a: Coleman discloses detecting a stroke of the stylus tip in contact with the screen as discussed in § V.B.2. The structure to perform this function is a RAND tablet [pen position digitizer] as discussed in §§ V.B.1 and V.B.2. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

383.    Limitation 41b: Coleman discloses recognizing a gesture comprising at least one stroke and an event indicating the termination of the gesture and comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen. See § V.B.3. The structure for performing this

function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See §§ V.B.1 and V.B.3.

384.    Limitation 41c:  Coleman discloses detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion as discussed in § V.B.5.  The structure to perform this function is a RAND tablet [pen position digitizer] and a processor [pen position digitizer co-processor] as discussed in § V.B.1.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

385.    Limitation 41d:  Coleman discloses implementing a recognized gesture and can perform a predetermined action associated with the predefined shape.  See § V.B.4..  The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in §§ V.B.1 and V.B.4.

## 2.  Claim 43

386.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

387.    Coleman discloses displaying the shape representing the actual gesture made by the user.  See § V.B.7.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a CRT display.  See § V.B.1.

.

Exhibit 53
Page 001187

### 3.  Claim 46

388.  Claim 46 depends on the claim 41 and the analysis of claim 41 applies

here.

389.  Coleman discloses gestures where the direction of motion of the

recognized gesture is associated with a predetermined action.  See § V.B.6.


### H.    U.S. PATENT NO. 4,972,496 ("SKLAREW")[6]

390.  At least claims 39 and 40 are obvious over Sklarew in view of Taguchi

and Buxton.  At least claim 39 is obvious over Sklarew in view of Taguchi and FIDS.  At least

claims 39 and 40 are obvious over Sklarew in view of Taguchi and the Advanced Display

System.  At least claims 41, 43 and 46 are obvious over Sklarew in view of Taguchi and

Coleman.  A chart form analysis is presented as Exhibit G to this report.  I will now review and

elaborate on that analysis.

391.  One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would have known to combine Sklarew with Taguchi.  Among other features,

Taguchi discloses a proximity-sensing digitizer placed behind the display.  Indeed, when

considering a stylus-based system, there can be only three possible locations for the placement

of the digitizer with respect to the display:  behind the display, in front of the display, or

separate from the display (as by an external digitizing tablet).  It would have been obvious for

one of ordinary skill in the art to try each one of these finite alternatives, and, seeing

advantages of the placement of the digitizer behind the display (e.g., reduced parallax,

---

[6] I discussed Sklarew in the Kelly Invalidity report, and I incorporate by reference that discussion here.

improved durability and optical clarity), it would be obvious to one of skill in the art to combine Sklarew with the behind-the-display digitizer of Taguchi.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Sklarew and Taguchi.

392.     One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with Buxton.  Among other features, Buxton discloses stylus-based gestures in a user interface useful for musical composition and music score editing.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Buxton's stylus-based user interface to the stylus-based user interface of Sklarew, especially since Sklarew explicitly mentions musical composition as a useful application of the invention [see, *e.g.*, Sklarew at 22:35-36].  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The system of Sklarew and its gestures would have performed just as before, with the simple addition of Buxton's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone because the combination provides merely the addition of a music score editor software application to the computer system of Sklarew.  For instance, implementation of gestures such as the *char-rec* gestures of  Buxton would not necessarily be affected by the combination of Buxton with Sklarew.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Sklarew and Buxton.

Exhibit 53
Page 001189

393.     One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with Coleman.  Among other features, Coleman discloses a stylus-based computer system that implements gestures to edit and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in adding the gestures and other capabilities of Coleman to the stylus-based user interface of Sklarew.  For example, scrolling is an operation that is commonly performed in text editing applications because usually not all of the text can be displayed on the screen at the same time.  The up/down gestures of Coleman, which are used for scrolling, would be useful in the context of Sklarew.  The resulting combination would have yielded no more than what one would expect from such an arrangement, with each set of prior art features performing the same functions it had been known to perform.  The system of Sklarew and its gestures would have performed just as before, with the simple addition of Coleman's gestures and other user interface features.  Each gesture from each prior art system would perform the same function as in its respective prior art system alone.  For instance, implementation of gestures such as the proofreader's symbols in Coleman's Fig. 1 would not necessarily be affected by the combination of Coleman with Sklarew.  Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Sklarew and Coleman.

394.     One of ordinary skill in the art at the time of the alleged invention of the '295 patent would also have known to combine Sklarew with FIDS.  Among other features, FIDS disclosed a stylus-based computer system that implements gestures to input, edit, and manipulate text.  One of ordinary skill in the art would have seen the obvious benefits in

Exhibit 53
Page 001190

adding the gestures and other capabilities of FIDS to the stylus-based user interface of Sklarew.

The resulting combination would have yielded no more than what one would expect from such

an arrangement, with each set of prior art features performing the same functions it had been

known to perform.  The system of Sklarew and its gestures would have performed just as

before, with the simple addition of FIDS's gestures and other user interface features.  Each

gesture from each prior art system would perform the same functions as in its respective prior

art system alone because the combination provides merely the addition of a text editor software

application to the computer system of Sklarew.  For instance, implementation of gestures such

as the correction marks of the FIDS Paper's Table 3 and Fig. 5 would not necessarily be

affected by the combination of FIDS with Sklarew.  Moreover, given the level of ordinary skill

in the art (discussed in my previous report), one of ordinary skill would have been able to

implement the combination of Sklarew and FIDS.

　　　　　395.　　One of ordinary skill in the art at the time of the alleged invention of the

'295 patent would also have known to combine Sklarew with Advanced Display System.

Among other features, Advanced Display System disclosed a stylus-based computer system

that implements gestures to input, edit, and manipulate text.  One of ordinary skill in the art

would have seen the obvious benefits in adding the gestures and other capabilities of Advanced

Display System to the stylus-based user interface of Sklarew.  The resulting combination

would have yielded no more than what one would expect from such an arrangement, with each

set of prior art features performing the same functions it had been known to perform.  The

system of Sklarew and its gestures would have performed just as before, with the simple

addition of Advanced Display System's gestures and other user interface features.  Each

gesture from each prior art system would perform the same functions as in its respective prior art system alone because the combination provides merely the addition of a text editor software application to the computer system of Sklarew. For instance, implementation of gestures such as the correction marks of Advanced Display System's Fig. 3 would not necessarily be affected by the combination of Advanced Display System with Sklarew. Moreover, given the level of ordinary skill in the art (discussed in my previous report), one of ordinary skill would have been able to implement the combination of Sklarew and Advanced Display System.

### 1. Claim 39

396.    Claim 39 preamble: Sklarew describes an apparatus for controlling a computer system as discussed in the Kelly Invalidity Report at ¶ 109. The computer system described in Sklarew comprises a flat display [screen] for displaying information and a stylus for inputting information into the computer as discussed in the Kelly Invalidity Report at ¶ 109.

397.    Limitation 39a: The computer system described in Sklarew can detect a stroke of the stylus tip in contact with the screen as discussed in the Kelly Invalidity Report at ¶¶ 110-112. The structure to perform this function is a pen position digitizer as discussed in the Kelly Invalidity Report at ¶¶ 110-112. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

398.    Limitation 39b: The computer system described in Sklarew can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape. See the Kelly Invalidity Report

Exhibit 53
Page 001192

at ¶¶ 115-118, 121-126.  Furthermore, to the extent that one contends that the computer system described in Sklarew does not recognize compound gestures – *i.e.*, a third gesture comprising a first and a second gesture – both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It would have been obvious to one of ordinary skill in the art to use compound gestures in view of FIDS or in view of Buxton or in view of the Advanced Display System.  The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm.  See the Kelly Invalidity Report at ¶¶ 115-118, 125-126.

399.    Limitation 39c:  The computer system described in Sklarew can implement each said recognized gesture and can perform a predetermined action associated with each said gesture as discussed in the Kelly Invalidity Report at ¶¶ 129-131.  Furthermore, to the extent that one contends that the computer system described in Sklarew does not implement compound gestures, both Buxton [see § IV] and FIDS [see § VIII] describe compound gestures.  It would have been obvious to one of ordinary skill in the art to implement compound gestures in view of FIDS or in view of Buxton or in view of the Advanced Display System.  The structure for performing this function is a processor programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in the Kelly Invalidity Report at ¶¶ 132-133.

## 2.  Claim 40

400.    Claim 40 depends on the claim 39 and the analysis of claim 39 applies here.

Exhibit 53
Page 001193

401.    Advanced Display System discloses a gesture for starting a new page (third gesture) that is comprised of a first and a second gesture that are both the gesture for starting a new paragraph.  Thus, the first and second gestures are substantially identical.  See § VIII.

402.    Buxton discloses a gesture for a 1/32 note (third gesture) that is comprised of the gestures for two 1/8 notes (first and second gestures).  Thus, the first and second gestures are substantially identical.  See § IV.

### 3.    Claim 41

403.    Claim 41 preamble:  Sklarew describes an apparatus for controlling a computer system as discussed in the Kelly Invalidity Report at ¶ 109.  The computer system described in Sklarew comprises a flat display [screen] for displaying information and a stylus for inputting information into the computer as discussed in the Kelly Invalidity Report at ¶ 109.

404.    Limitation 41a:  The computer system described in Sklarew can detect a stroke of the stylus tip in contact with the screen as discussed in the Kelly Invalidity Report at ¶¶ 110-112.  The structure to perform this function is a pen position digitizer as discussed in the Kelly Invalidity Report at ¶¶ 110-112.  Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II.  It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

405.    Limitation 41b:  The computer system described in Sklarew can recognize a gesture comprising at least one stroke and an event indicating the termination of the gesture, and can compare said gesture to at least one predefined shape, where each stroke of said

Exhibit 53
Page 001194

gesture is located in substantially the same area of the screen. See the Kelly Invalidity Report at ¶¶ 115-118, 121-126. The structure for performing this function is a processor [pen position digitizer coprocessor] programmed with a gesture termination algorithm and a handwriting recognition algorithm. See the Kelly Invalidity Report at ¶¶ 115-118, 121-126.

406.    Limitation 41c: The computer system described in Sklarew can detect a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion. See the Kelly Invalidity Report at ¶¶ 136-137. The structure to perform this function is a pen position digitizer and a processor [pen position digitizer co-processor] as discussed in the Kelly Invalidity Report at ¶¶ 110-112. To the extent that one contends that the computer system described in Sklarew does not detect the direction of motion of the creation of gestures, Coleman [see § V.B.5] describes detecting the direction of motion. Furthermore, Taguchi discusses a digitizer based on non contacting technology that can be mounted behind the display as discussed in § II. It would have been obvious to one of ordinary skill in the art to use a digitizer based on non contacting technology that can be mounted behind the display in view of Taguchi.

407.    Limitation 41d: The computer system described in Sklarew can implement a recognized gesture and can perform a predetermined action associated with the predefined shape. The structure to perform this function is a processor [CPU] programmed with algorithms known to persons skilled in the art for implementing gestures as discussed in ¶¶ 132-133..

**4. Claim 43**

408.    Claim 43 depends on the claim 41 and the analysis of claim 41 applies here.

409.    The computer system described in Sklarew can display on the screen a shape representing the actual gesture made by a user of the computer.  See the Kelly Invalidity Report at ¶¶ 143.  The structure for performing this function is a processor [CPU and a pen position digitizer coprocessor], a display controller and a liquid crystal display.  See the Kelly Invalidity Report at ¶¶ 144.

**5. Claim 46**

410.    Claim 46 depends on the claim 41 and the analysis of claim 41 applies here.

411.    Sklarew discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action.  See the Kelly Invalidity Report at ¶¶ 142.  To the extent that one contends that Sklarew does not associate the direction of motion with a predetermined action, Coleman discloses gestures where the direction of motion of the recognized gesture is associated with a predetermined action.  See § V.  Furthermore, it would have been obvious to one of ordinary skill in the art to associate the direction of motion with a predetermined action in view of Coleman.

Executed on this 14th day of September, 2007 in Santa Barbara, California.

By _____

John P. J. Kelly

Exhibit 53
Page 001197

**PROOF OF SERVICE**

1
2
3        I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

4
5        The certify that a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4. Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

6
7        On September 14, 2007, I caused a copy of the following document(s):

8        **SUPPLEMENTAL EXPERT REPORT OF JOHN P. J. KELLY, Ph.D. ON INVALIDITY OF UNITED STATES PATENT NO. 5,347,295** [Fed. R. Civ. Proc. 26(a)(2)]

9        to be served on the interested parties in this action as follows:

10       Alison P. Adema                          Attorneys for Plaintiffs
         Hahn & Adema                             MULTIMEDIA PATENT TRUST;
11       501 West Broadway, Suite 1600            LUCENT TECHNOLOGIES INC.
         San Diego, CA  92101
12       Telephone:  (619) 235-2100               Email: aadema@hahnadema.com
         Facsimile:  (619) 235-2101
13       *VIA FACSIMILE & ELECTRONIC MAIL*

14       David J. Zubkoff                         Attorneys for Defendants
         Seltzer, Caplan, McMahon & Vitek         GATEWAY, INC. and GATEWAY
15       2100 Symphony Towers                     COUNTRY STORES LLC
         750 B Street, Suite 2100
16       San Diego, CA  92101                     Email: zubkoff@scmv.com
         Telephone:  (619) 685-3003
17       Facsimile:  (619) 702-6827
         *VIA FACSIMILE & ELECTRONIC MAIL*
18
         James S. Blackburn                       Attorneys for Defendant
19       Arnold & Porter LLP - (L.A.)             DELL INC.
         777 S. Figueroa Street, 44th Floor
20       Los Angeles, CA  90017                   Email: james_blackburn@aporter.com
         Telephone:  (213) 243-4000
21       Facsimile:  (213) 243-4199
         *VIA FACSIMILE & ELECTRONIC MAIL*
22
23       I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct. Executed on September 14, 2007, at San Diego, California.

24
25                                               _____
                                                 Susan Rodriguez
26
27
28

                                    3                    Case No. 02-CV-2060 B (CAB)

Exhibit 53
Page 001198

1

## COURTESY COPIES BY ELECTRONIC MAIL TO:

2

Trial Counsel For Multimedia/Lucent:
John M. Desmarais/Paul Bondor/Michael Stadnick/Gregory Corbett

3

Kirkland & Ellis LLP
Citicorp Center

4

153 East 53rd Street

5

New York, NY 10022-4675
E-mail: jdesmarais@kirkland.com; pbondor@kirkland.com; gcorbett@kirkland.com;

6

mstadnick@kirkland.com; jmafale@kirkland.com

7

Trial Counsel for Gateway:
Bryan Farney / Steven R. Daniels / Jeffrey B. Plies / Lawrence Fluker

8

DECHERT LLP
300 W. Sixth Street, Suite 1850

9

Austin, TX 78701
Email:       bryan.farney@dechert.com; steven.daniels@dechert.com;

10

jeff.plies@dechert.com; lawrence.fluker@dechert.com

11

Trial Counsel for Dell:
Ali R. Sharifahmadian, Esq.

12

Matthew Bathon, Esq.
Arnold & Porter LLP

13

555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

14

E-mail:       ali_sharifahmadian@aporter.com; Matthew_Bathon@aporter.com;

15

Thomas_Wischer@aporter.com

16

Trial Counsel for Dell:
Joel Freed, Esq.

17

McDermott Will & Emery LLP
600 13th Street, N.W.

18

Washington, DC 20005-3096
Email:       jfreed@mwe.com

19

20

Courtesy Emails include:

21

22

| | **All documents filed/served** | All Pleadings filed or served were included in the email along with any exhibits |

23

| XX | **Main Pleading documents (without exhibits)** | All Main Pleading documents were included in the email.  Exhibits were over 50 pages long.  As per our service agreement, a hard copy will follow via overnight mail |

24

25

26

27

28

Exhibit 53
Page 001199