# SCHMIDT DECLARATION EXHIBIT 85

| Applicant: | NETRAVALI, et al | | Docket No. | 075543-0017 | | Serial No. | |
|---|---|---|---|---|---|---|---|

Title: **VIDEO SIGNAL INTERPOLATION USING MOTION ESTIMATION** — Patent No. **4,383,272**

Date Sent: **7/12/2007** ☒ Hand Carried ☐ Fax ☐ Electronic ☐ Cert. of Mailing ☐ 1st Class Mail — Express Mail No. _____

☒ Transmittal Letter

New Patent App ☐ Utility ☐ Design ☐ Cont. ☐ CIP ☐ Div. ☐ PCT ☐ RCE ☐ Prov

☐ Other: _____

- _____ pages of Specification
- _____ pages of Claims
- _____ pages of Abstract
- _____ pages of Formal/Informal Drawings

☐ Small Entity ☐ Large Entity
☐ Declaration/Power of Attorney
☐ Recordation of Assignment/Security Agreement
☒ Information Disclosure Statement
- **1** Form PTO 1449
- **9** copies of cited references

☐ Preliminary Amendment
☐ Response to Missing Parts Notice
☐ Resp. to Notice to Correct App. Papers
☐ Certified Copy of Priority Doc.
☐ Claim for Convention Priority
☐ Response/Amendment to Office Action of _____
☐ Request for _____ month Extension of Time

☐ Letter submitting _____ pages of drawings
☐ Req. for Approval of Drawing Amendments
☐ Req. for Oral Hearing
☐ Not. of Appeal ☐ Appeal Brief ☐ Reply Brief
☐ Rule 312 Amendment/Letter
☐ Req. for Acknowledgement of Cited Art
☐ Issue Fee
☐ Publication Fee
☐ Req. for Certificate of Correction
☐ Maintenance Fee for _____ years after grant
☐ Fee Address Indication Form _____
☐ Terminal Disclaimer
☐ Petition to Commissioner
☒ Certificate of Service
☒ Other  Request for Ex Parte Reexam, including 14 Exhibits

| Check for | $ | ☒ | Charge Deposit Acct. 500417 | $ **2,520.00** | Atty Init. | **KLC** | Tkpr. # | **3324** | Secy. or PL: | **RGarrison** |
|---|---|---|---|---|---|---|---|---|---|---|

CMS Descrip.: **25-2,520.00** _____

THE PATENT AND TRADEMARK OFFICE DATE STAMPED HEREON IS ACKNOWLEDGEMENT THAT THE ITEMS, CHECKED ABOVE, WERE RECEIVED BY THE PTO ON THE DATE STAMPED.

---

| Applicant: | NETRAVALI, et al | | Docket No. | 075543-0017 | | Serial No. | |
|---|---|---|---|---|---|---|---|

Title: **VIDEO SIGNAL INTERPOLATION USING MOTION ESTIMATION** — Patent No. **4,383,272**

Date Sent: **7/12/2007** ☒ _____ ☐ Fax ☐ Electronic ☐ Cert. of Mailing ☐ 1st Class Mail — ☐ Express Mail No. _____

☒ Transmittal Letter

New Patent App ☐ Utility ☐ Design ☐ Cont. ☐ CIP ☐ Div. ☐ PCT ☐ RCE ☐ Prov

☐ Other: _____

- _____ pages of Specification
- _____ pages of Claims
- _____ pages of Abstract
- _____ pages of Formal/Informal Drawings

☐ Small Entity ☐ Large Entity
☐ Declaration/Power of Attorney
☐ Recordation of Assignment/Security Agreement
☒ Information Disclosure Statement
- **1** Form PTO 1449
- **9** copies of cited references

☐ Preliminary Amendment
☐ Response to Missing Parts Notice
☐ Resp. to Notice to Correct App. Papers
☐ Certified Copy of Priority Doc.
☐ Claim for Convention Priority
☐ Response/Amendment to Office Action of _____
☐ Request for _____ month Extension of Time

☐ Letter submitting _____ pages of drawings
☐ Req. for Approval of Drawing Amendments
☐ Req. for Oral Hearing
☐ Not. of Appeal ☐ Appeal Brief ☐ Reply Brief
☐ Rule 312 Amendment/Letter
☐ Req. for Acknowledgement of Cited Art
☐ Issue Fee
☐ Publication Fee
☐ Req. for Certificate of Correction
☐ Maintenance Fee for _____ years after grant
☐ Fee Address Indication Form _____
☐ Terminal Disclaimer
☐ Petition to Commissioner
☒ Certificate of Service
☒ Other  Request for Ex Parte Reexam, including 14 Exhibits

| Check for | $ | ☒ | Charge Deposit Acct. 500417 | $ **2,520.00** | Atty Init. | **KLC** | Tkpr. # | **3324** | Secy. or PL: | **R. Garrison** |
|---|---|---|---|---|---|---|---|---|---|---|

CMS Descrip.: **25-2,520.00** _____

THE PATENT AND TRADEMARK OFFICE DATE STAMPED HEREON IS ACKNOWLEDGEMENT THAT THE ITEMS, CHECKED ABOVE, WERE RECEIVED BY THE PTO ON THE DATE STAMPED.

Exhibit 85
Page 001639

Attorney Docket No. 75543-017

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the Reexamination of: ) | |
| ) | |
| NETRAVALI, et al. ) | |
| ) | |
| U.S. Patent No.: 4,383,272 ) | |
|     Filed:  April 13, 1981 ) | **Examiner:** |
|     Issue Date: May 10, 1983 ) | |
| ) | **Group Art Unit:** |
| **For:**   VIDEO SIGNAL INTERPOLATION ) | |
|       USING MOTION ESTIMATION ) | |
| ) | |
| Reexamination Proceeding ) | |
|     Control No.: ) | |
|     Filed: ) | |

Mail Stop Ex Parte Rexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

Transmitted herewith is a **REQUEST FOR** *EX PARTE* **REEXAMINATION OF U.S. PATENT NO. 4,383,272 UNDER 35 U.S.C. §§ 302-307 AND 37 C.F.R. § 1.510. Also enclosed are the following attachment(s):** [ ] Exhibits, Information Disclosure Statement, PTO-1449 and Certificate of Service.

☐    No additional fee is required.
☐    Applicant is entitled to small entity status under 37 CFR 1.27
☐            Also attached:

☒    Please charge my Deposit Account No. <u>500417</u> in the amount of $2,520.00.  An additional copy of this transmittal sheet is submitted herewith.

☒    The Commissioner is hereby authorized to charge payment of any fees associated with this communication or credit any overpayment, to Deposit Account No. 500417, including any filing fees under 37 CFR 1.16 for presentation of extra claims and any patent application processing fees under 37 CFR 1.17.

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

Kenneth L. Cage
Registration No. 26,151

600 13th Street, N.W.
Washington, DC  20005-3096
Phone:  202.756.8000 KLC:MAM/llg
Facsimile:  202.756.8087

**Please recognize our Customer No. 20277 as our correspondence address.**

**Date:  July 12, 2007**
WDC99 1421100-1.075543.0017

Exhibit 85
Page 001640

Attorney Docket No. 75543-017

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the Reexamination of: ) | |
| ) | |
| NETRAVALI, et al. ) | |
| ) | |
| U.S. Patent No.: 4,383,272 ) | Examiner: |
|     Filed: April 13, 1981 ) | |
|     Issue Date: May 10, 1983 ) | Group Art Unit: |
| ) | |
| For:   VIDEO SIGNAL INTERPOLATION ) | |
|     USING MOTION ESTIMATION ) | |
| ) | |
| Reexamination Proceeding ) | |
|     Control No.: ) | |
|     Filed: ) | |

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the foregoing Request for Ex Parte Reexamination of U.S. Patent

No. 4,383,272, Information Disclosure Statement, and PTO-1449 were served by first class mail

this 12th day of July, 2007 to:

<u>Counsel for Lucent</u>
Alison P. Adema
Hahn & Adema
501 West Broadway, Suite 1730
San Diego, CA 92101-3595

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

Kenneth L. Cage
Registration No. 26,131

600 13th Street, N.W.
Washington, DC 20005-3096
Phone: 202.756.8000 KLC:MAM/llg
Facsimile: 202.756.8087
**Date: July 12, 2007**
WDC99 1421106-1.075543.0017

**Please recognize our Customer No. 20277 as
our correspondence address.**

Exhibit 85
Page 001641

Attorney Docket No. 75543-017

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the Reexamination of: | ) |
| | ) |
| Netravali et al. | ) |
| | ) |
| U.S. Patent No.: 4,383,272 | ) |
|     Filed: April 13, 1981 | ) |
|     Issue Date: May 10, 1983 | ) |
| | ) |
| For:   VIDEO SIGNAL INTERPOLATION | ) |
|         USING MOTION ESTIMATION | ) |
| | ) |
| | ) |
| | ) |
| Reexamination Proceeding | ) |
|     Control No.: | ) |
|     Filed: | ) |

Examiner:

Group Art Unit:

---

## REQUEST FOR *EX PARTE* REEXAMINATION
## OF U.S. PATENT NO. 4,383,272
## UNDER 35 U.S.C. §§ 302-307 AND 37 C.F.R. § 1.510

Mail Stop Ex Parte Reexam
Honorable Commissioner For Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Exhibit 85
Page 001642

# TABLE OF CONTENTS

Page

I.    SUMMARY OF REEXAMINATION REQUEST .......................................................... 1

II.   SUMMARY OF THE '272 PATENT ...................................................................... 1

III.  PRIOR AND CURRENT PROCEEDINGS............................................................... 2

IV.   BASIS FOR REEXAMINATION .......................................................................... 2

     A.    Statement Pointing Out Substantial New Question Of Patentability.................... 3

         1.    Request For Reexamination .................................................................. 4
         2.    Identification Of Claims For Which Reexamination Is Requested
             And Explanation Of The Pertinency And Manner Of Applying The
             Cited Prior Art.................................................................................... 4

V.    THE APPLICABLE LEGAL STANDARDS ............................................................. 5

     A.    The Law of Anticipation.................................................................................. 5
     B.    The Law of Obviousness ................................................................................ 6

VI.   DISCUSSION OF THE PRIOR ART ..................................................................... 8

VII.  APPLICATION OF THE PRIOR ART TO THE CLAIMS .......................................... 12

VIII. CONCLUSION................................................................................................ 48

Exhibit 85
Page 001643

**EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| 1 | U.S. Patent No. 4,383,272 ("Video Signal Interpolation Using Motion Estimation", Arun N. Netravali, John D. Robbins, May 10, 1983) |
| 2 | August 15, 2005 Superceding Order Construing Claims for United States Patent Number 4,383,272 |
| 3 | D. Gabor, et al., *Television Band Compression By Contour Interpolation*, The Proceedings of the Institution of Electrical Engineers, Vol. 108, Part B, No. 39, May 1961 |
| 4 | J. O. Limb and R. F. W. Pease, *A Simple Interframe Coder For Video Telephony*, The Bell System Technical Journal, Vol. 50, No. 6, July-Aug., 1971 |
| 5 | Arun N. Netravali and John O. Limb, *Picture Coding: A Review*, Proceedings of the IEEE, Vol. 68, No. 3, Mar. 1980 |
| 6 | 1977 IEEE Standard Dictionary of Electrical and Electronics Terms |
| 7 | 1976 McGraw-Hill Dictionary of Scientific and Technical Terms |
| 8 | Kretzmer, E.R., "Statistics of Television Signals," The Bell Systems Technical Journal, pp. 276-88 (July 1952) |
| 9 | Schreiber, W. F., "The Measurement of Third Order Probability Distributions of Television Signals," Institute of Radio Engineers Transactions on Information Theory, Vol. 1-T2,3 (September 1956) |
| 10 | D. Gabor, *Television Compression by Contour Interpolation*, Supplemento Al Volume III, Serie X, Del Nuovo Cimento, 1959 |
| 11 | P. C. J. Hill, *Television Bandwidth Compression by Interpolation*, The Electrical Engineering Department, Imperial College London, March 1960 |
| 12 | Limb et al., *Exchange of Spatial and Temporal Resolution in Television Coding*, The Bell System Technical Journal, January 1971 |
| 13 | R. F. W. Pease, *Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals*, The Bell System Technical Journal, Vol. 51, No. 4, April 1972 |
| 14 | J. O. Limb, et al., *Combining Intraframe and Frame-to-Frame Coding for Television*, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974 |

Exhibit 85
Page 001644

REQUEST FOR *EX PARTE* REEXAMINATION
OF U.S. PATENT NO. 4,383,272
UNDER 35 U.S.C. §§ 302-307 AND 37 C.F.R. § 1.510

Mail Stop Ex Parte Reexam
Honorable Commissioner For Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

The undersigned respectfully requests reexamination of claim 13 of U.S. Pat. No. 4,383,272 (hereafter "the '272 patent") (Exhibit 1), titled "VIDEO SIGNAL INTERPOLATION USING MOTION ESTIMATION," which issued on May 10, 1983, to Arun N. Netravali and John D. Robbins, under the provisions of 35 U.S.C. § 302 *et seq.* The purported patent owner is Multimedia Patent Trust ("MPT").

## I.    SUMMARY OF REEXAMINATION REQUEST

This request for reexamination provides significant prior art, not previously considered by the USPTO, which raises a new question of patentability of claim 13 of the '272 patent. In particular, this new art anticipates or renders obvious claim 13.

The real party in interest making this request is Dell Inc. Thus, the "Requester" referred to herein should be considered Dell Inc.

## II.    SUMMARY OF THE '272 PATENT

The '272 patent relates to interpolation of video signals using motion estimation, and in particular relates to estimating information defining elements (pels) of a picture by interpolation using information from related locations in preceding and succeeding versions of the picture. ('272 patent at 1:7-8; abstract). An apparatus for estimating desired intensity information includes a recursive motion estimator for providing an indication of the displacement of objects. ('272 patent at 1:63-66).

- 1 -

Exhibit 85
Page 001645

Claim 13 is directed to a method of estimating the intensities of elements (pels) in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture. The method includes the step of determining by interpolation intensities of pels in the picture in accordance with intensities of pels in related locations in the preceding and succeeding versions. Further, the determining step includes selecting the related locations as a function of the displacement of objects in the picture.

## III.    PRIOR AND CONCURRENT PROCEEDINGS

The '272 patent issued from U.S. Patent application Serial Number 253,698 ("the '698 application"), filed April 13, 1981 and assigned to Bell Telephone Laboratories, Inc. The '272 patent issued on May 10, 1983, with claims 1-24. The '272 patent expired on April 13, 2001, twenty years from the date of filing of the '698 application.

The '272 patent is currently the subject of litigation before the United States District Court for the Southern District of California, where MPT has accused Requester of patent infringement, in a proceeding styled *Lucent Technologies Inc. and Multimedia Patent Trust v. Gateway, Inc. et al.*, Case No. 02-CV-2060 B (CAB) consolidated with Case Nos. 03-CV-699 B (CAB) and 03-CV-1108 B (CAB). Accordingly, even though more than six years has passed since the '272 patent expired on April 13, 2001, the timing of this request is still appropriate. *See* MPEP § 2211 ("if litigation is instituted within the period of the statute of limitations, requests for reexamination may be filed after the statute of limitations has expired, as long as the patent is still enforceable against someone").

## IV.    BASIS FOR REEXAMINATION

Reexamination of claim 13 is requested based on the prior art publications set forth in this request, or any other basis that the Commissioner may deem appropriate.

It is important to note that while the procedural rules in reexamination proceedings before the USPTO involving claims of an expired patent require that the examiner give the words of the claims "their ordinary and customary meaning", any statements to that effect by Requester in this

Exhibit 85
Page 001646

request are only made as a recognition that such a procedural tool is required in reexamination proceedings. Accordingly, any statements by Requester as to the "ordinary and customary meaning" of claim terms are not and should not be considered as any admission or estoppel that Requester agrees that such a claim construction is mandated for use before a Court of the United States. Requester has sought and obtained claim construction of claim 13 of the '272 patent in a *Markman* hearing before the Federal District Court where MPT has accused Requester of patent infringement. A copy of the Order of the August 15, 2005 Superceding Order Construing Claims for United States Patent Number 4,383,272 ("the *Markman* Order") is attached hereto as Exhibit 2, and is incorporated in the claim charts below.

The pertinency and manner of applying the cited prior art to each of the above claims for which reexamination is requested under 35 U.S.C. § 302 *et seq* and 37 C.F.R. § 1.510 is set forth below.

A.     **Statement Pointing Out Substantial New Question Of Patentability**

35 U.S.C. § 303(a) states, in part: "Within three months following the filing of a request for reexamination under the provisions of section 302 of this title, the Commissioner will determine whether a substantial new question of patentability affecting any claim of the patent concerned is raised by the request . . . ." 35 U.S.C. § 304 states as follows: "If, in a determination made under the provisions of subsection 303(a) of this title, the Commissioner finds that a substantial new question of patentability affecting any claim of a patent is raised, the determination will include an order for reexamination of the patent for resolution of the questions."

A substantial question of patentability is established by the following test:

> A prior art patent or printed publication raises a substantial question of patentability where there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not the claim is patentable.

MPEP § 2242. Certainly, if an Examiner would have rejected a claim based on the reference identified in this request, "there is a substantial likelihood that a reasonable Examiner would

- 3 -

Exhibit 85
Page 001647

consider the prior art patent or printed publication important in deciding whether or not the claim is patentable." *Id.* However, as stated in MPEP § 2242, it is not necessary that a "*prima facie*" case of unpatentability exist as to the claim in order for "a substantial new question of patentability" to be present as to the claim. Thus, "a substantial new question of patentability" as to a patent claim could be present even if the examiner would not necessarily reject the claim as either fully anticipated by, or obvious in view of, the prior patents or printed publications. As to the importance of the difference between "a substantial new question of patentability" and a "*prima facie*" case of unpatentability, *see generally In re Etter,* 756 F.2d 852, 857, n. 5, 225 USPQ 1,4 n.5 (Fed. Cir. 1985).

        **1.**     **Request For Reexamination**

This reexamination request relies on prior art not previously considered by the USPTO. Accordingly, Requester urges that a substantial new question of patentability is raised by this reexamination request.

        **2.**     **Identification Of Claims For Which Reexamination Is Requested And Explanation Of The Pertinency And Manner Of Applying The Cited Prior Art**

Claim 13 is anticipated by Gabor & Hill (Exhibit 3), Limb & Pease (Exhibit 4), and Picture Coding (Exhibit 5) as detailed in their respective claim charts below. Furthermore, claim 13 is obvious over Gabor & Hill, Limb & Pease, and Picture Coding either alone, or in combination with other prior art of record and/or the knowledge of one of ordinary skill in the art, as detailed in the claim charts below.

        **a.**     **During Reexamination Involving an Expired Patent, Claims Are To Be Given Their Ordinary and Customary Meaning in Determining Whether a Substantial New Question of Patentability is Present**

The statutory presumption of validity, 35 U.S.C. § 282, has no application in reexamination. *See* MPEP § 2258(I)(G), *citing In re Etter,* 756 F.2d 852, 225 USPQ 1 (Fed. Cir. 1985). According to MPEP § 2258(I)(G), "[i]n a reexamination proceeding involving claims of an expired patent, claim construction pursuant to the principle set forth by the court in *Phillips v.*

- 4 -

Exhibit 85
Page 001648

*AWH Corp.*, 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention) should be applied since the expired claims are not subject to amendment."

### b.    Ordinary and Customary Meanings of Claim Terms

In construing a claim term, the ordinary and customary meaning(s) as set forth in a dictionary or encyclopedia is the starting point. It may be necessary to refer to the special evidence of standard dictionaries, both to fully understand the meaning of the patent claim terms and to interpret the asserted prior art consistent with the knowledge of one of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) affirming *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-981 (Fed. Cir. 1995) (en banc), affirmed 517 U.S. 370 (1996).

In a lawsuit, the judge can enter a ruling as to the interpretation of various limitations of the claims of the patent-in-suit. However, as per MPEP § 2286, non-final decisions are not binding on the Patent Office with regard to a reexamination. As such, Requester believes that the Patent Office is required to interpret the claims of the '272 patent per MPEP § 2258(I)(G), *i.e.* giving the words of the claims their ordinary and customary meaning.

## V.    THE APPLICABLE LEGAL STANDARDS

### A.    The Law of Anticipation

Under 35 U.S.C. § 102, an invention must be "novel," *i.e.*, it must be new at the time the invention is made. A patent claim is anticipated under 35 U.S.C. § 102, and therefore invalid, if each element of the claim in issue can be found, either expressly described or under principles of inherency, in a single prior art reference. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760 (Fed. Cir. 1983). A "prior art reference" for purposes of the statute is subject matter that has been patented or described in a printed publication prior to the date of invention by the patentee or more

- 5 -

Exhibit 85
Page 001649

than one year prior to the application filing date, or in public use or on sale in the United States more than one year prior to the patent application filing date. Regarding the '272 patent, the critical date for determining whether a reference is prior art is April 13, 1980, since this date is one year prior to the filing date of the application that led to the '272 patent.

Pertinent language of § 102 is quoted as follows:

A person shall be entitled to a patent unless--

*****

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

*****

Novelty of claimed subject matter is judged by a comparison of the properly construed claim with a single piece of prior art. *Lindemann Mashinenfabrik v. American Hoist & Derrick*, 730 F.2d 1452, 1458 (Fed. Cir. 1984). A reference anticipates a claimed invention if it discloses the claimed invention "such that a skilled artisan could take its teachings in combination with his own knowledge of the particular art and be in possession of the invention." *In re Graves*, 69 F.3d 1147 (Fed. Cir. 1995) (*citing In re LeGrice*, 301 F.2d 929, 936 (CCPA 1962)); *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).

### B.    The Law of Obviousness

Even if a single prior art reference does not disclose each and every limitation of the claimed invention, the claim may still be invalid as obvious under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000) (affirming jury verdict that patent was obvious in light of art that was before the examiner), *quoting* 35 U.S.C. § 103(a) (1994). A determination of obviousness requires an "expansive and flexible approach." *KSR Int'l Co. v. Teleflex Inc.*, 127 S.

- 6 -

Exhibit 85
Page 001650

Ct. 1727, 1739 (2007). "[T]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," *id.*, thus the question is "whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 1740. Obviousness is based on underlying factual inquiries regarding "the scope and content of the prior art, the level of ordinary skill in the field of the invention, the differences between the claimed invention and the prior art, and any objective evidence of non-obviousness such as long-felt need, and commercial success." *Id.* (referring to the "*Graham* factors" as recited in *Graham v. John Deere*, 383 U.S. 1, 17 (1966)).

In *KSR*, the Supreme Court determined that the rigid application of the teaching-suggestion-motivation to combine test commonly applied by the Federal Circuit was inconsistent with the flexible approach to obviousness outlined in earlier Supreme Court cases such as *Graham v. John Deere. See KSR*, 1727 S. Ct. at 1739. Where the possible combinations and permutations are limited, obviousness may be established by "showing that the combination of elements was 'obvious to try.'" *Id.* at 1742. "When a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *Id.* at 1740 (*citing Sakraida v. AG Pro, Inc.*, 425 U.S. 273, 282 (1976)). "Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *KSR*, 1727 S. Ct. at 1741. The Court further stated that "[r]igid preventative rules that deny factfinders recourse to common sense...are neither necessary under our case law nor consistent with it." *Id.* at 1742-43.

Moreover, the presumption of patent validity is diminished, and Defendants' burden of proof more easily carried, when the invalidating prior art was not before the examiner. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359-60 (Fed. Cir. 1984).

Exhibit 85
Page 001651

## VI.  DISCUSSION OF THE PRIOR ART

### Gabor & Hill

This references is an article titled *Television Band Compression by Contour Interpolation*, by Prof. D. Gabor and P. C. J. Hill ("Gabor & Hill"), published in The Proceedings of The Institution of Electrical Engineers, Volume 108, Part B, Number 39, in May 1961.  Gabor & Hill describes a system that recreates missing images in a video sequence by interpolating intensities in preceding and succeeding images.  In the secondary embodiment described in Gabor & Hill, the specific locations in the preceding and succeeding pictures that are used for interpolation of moving objects are selected based on displacement estimates of objects in the picture.  *See, e.g.*, Gabor & Hill at 306 ("The principle has been explained in its application for constructing the missing field, but it is evidence that it is equally well applied to the interpolation of missing frames.").

Every element required by claim 13 of the '272 patent is included, either explicitly or inherently in Gabor & Hill.  As such, Gabor & Hill anticipates claim 13 of the '272 patent.  Moreover, Gabor & Hill adds important information beyond what was considered by the Examiner in any of the documents in the record during the original prosecution of the '272 patent.

MPT maintains that Gabor & Hill is purportedly limited to analog implementations and as such distinguishable from the '272 patent.  Requester notes, however, that although claim 13 requires "pels", this requirement does not limit the claim to digital implementations or to a digital representation of the claimed pels.  According to the *Markman* Order, "pels" means "picture elements, also referred to as pixels."  That construction does not require digital implementations.  Furthermore, the '272 patent does not even use the word "digital," and there was nothing during the prosecution of the underlying patent application that imposed any such requirement.  Indeed, the phrase "picture element" would be understood by those of ordinary skill in the art at the relevant time to mean an area of a picture on a television or computer screen, as is demonstrated by various sources published around the time of the purported

- 8 -

Exhibit 85
Page 001652

invention.[1]  Moreover, Gabor & Hill itself uses the phrase "picture element" at page 313.

Accordingly, the term "picture element" has long been used by those of skill in the relevant art to

mean nothing more than an area of a picture.[2]

Even if Gabor & Hill only described analog implementations,[3] the Gabor & Hill

disclosure would still anticipate or render obvious claim 13.  This is because it was well known

in the prior art to the '272 patent that analog techniques could be employed in a digital world.

For example, Netravali's own Picture Coding paper – which he never provided to the examiner –

describes numerous digital coding techniques, including numerous articles authored by Netravali

himself.  *See, e.g.*, Picture Coding at 406 *citing* A. N. Netravali & J. A. Stuller, "Motion

Compensated Transform Coding," Bell Systems Technical Journal, 1703-18, September 1979

and A. N. Netravali, "Interpolative Picture Coding Using a Subjective Criterion," IEEE

Transactions on Communications, vol. COM-25, 503-08, May 1977.[4]

As the Federal Circuit recently stated, "an obviousness determination is not the result of a

rigid formula," and that "common sense of those skilled in the art would demonstrate why some

---

[1] For example, the 1977 IEEE Standard Dictionary of Electrical and Electronics Terms (Exhibit 6), defines "picture element" as "[t]he smallest area of a television picture capable of being delineated by an electric signal passed through the system or part thereof"; 1976 McGraw-Hill Dictionary of Scientific and Technical Terms (Exhibit 7) defines "picture element" as "any segment of a scanning line, the dimension of which along the line is exactly equal to the nominal line width; the area which is being explored at any instant in the scanning process."

[2] *See, e.g.*, E. R. Kretzmer's 1952 paper that describes an analog television picture as "an array of approximately 210,000 dots, 500 vertically, 420 horizontally, corresponding, respectively, to the 500 scanning lines and 420 resolvable *picture elements* per line of the standard television raster."  Kretzmer, E.R., "Statistics of Television Signals," The Bell Systems Technical Journal, pp. 276-88 (July 1952) at 276-77 (emphasis added) (Exhibit 8).  *See also* the 1956 paper by William F. Schreiber, a leader in the field of video compression, which describes analog television and states that there "are about 200,000 *picture elements* in a standard television frame."  Schreiber, W. F., "The Measurement of Third Order Probability Distributions of Television Signals," Institute of Radio Engineers Transactions on Information Theory, Vol. 1-T2,3, p. 289-300 (September 1956), at 289 (emphasis added) (Exhibit 9).  There is no dispute that standard television in the 1950's was not digital.

[3] To be clear, Requester does not believe that Gabor & Hill is limited to analog implementations.  *See, e.g.*, the discussion of bit rates on pages 303-304 of Gabor & Hill ("[o]ur object in discussing this ideal picture transmission system in some detail is rather to point out that the estimates of potential compression based on contrasting the 50 bits/sec of visual information with the 3-5 X $10^7$ bits/sec of television channels…"; "[i]f these probabilities were equal, i.e. $p_i = 1/N$, they would require $\log_2 N$ bits/sign for their transmission…").

[4] Moreover, the prior art that was before the examiner were two prior patents by Netravali, each of which disclosed both motion estimation and interpolation in the digital domain.  *See KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007) ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its usual application is beyond his or her skill.").

Exhibit 85
Page 001653

combinations would have been obvious…" *Leapfrog Enter., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) (*citing KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct 1727, 1739 (2007)). The court in *Leapfrog* went on to state that "[a]ccomodating a prior art mechanical device that accomplishes that goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices. Applying modern electronics to older mechanical devices has been commonplace in recent years." *Id.* Likewise, Requester submits that implementing analog technology digitally has become commonplace.

### Limb & Pease

This reference is an article titled *A Simple Interframe Coder For Video Telephony* by J. O. Limb and R. F. W. Pease ("Limb & Pease"), published in The Bell System Technical Journal, Vol. 50, No. 6, July-August 1971. Every element required by claim 13 of the '272 patent is included, either explicitly or inherently, in Limb & Pease. Therefore, Limb & Pease anticipates claim 13. Moreover, Limb & Pease adds important information beyond what was considered by the Examiner in any of the documents in the record during the original prosecution of the '272 patent. Specifically, as with Gabor & Hill, none of the documents considered by the Examiner disclosed the selection of interpolation locations in different versions of a picture as a function of the displacement of objects in the picture.

### Picture Coding

This reference is an article titled *Picture Coding: A Review* ("Picture Coding"), by Arun N. Netravali and John O. Limb, published in The Institute of Electrical and Electronics Engineers, Volume 68, Number 3, in March 1980. Picture Coding discloses a method of interpolation described in Gabor & Hill, which "drops alternate fields and attempts to construct them by making movement of edges temporarily continuous, i.e., placing the edges in the dropped field at places dictated by their uniform motion between the adjacent transmitted field." Picture Coding at 397. As such, Picture Coding discloses interpolating the intensities of elements in a picture in accordance with intensities of elements in related locations of preceding and succeeding picture versions, wherein the related locations are selected as a function of the

- 10 -

Exhibit 85
Page 001654

displacement of objects in the picture. Netravali, however, failed to disclose Gabor & Hill to the

Examiner during the prosecution of the '272 patent.

Picture Coding further discloses an "Interpolative Frame-to-Frame Coder." *See id.* at

400. The basic coding scheme disclosed by Picture Coding is depicted in Figure 53:



Fig. 53. Arrangement of pels that make up a 3-dimensional 2 X 2 X 2 block for interpolative coder (from Limb and Bowen [207]).

*Id.* In describing Figure 53, Picture Coding states "the basic coding scheme was limited to

groups of four lines, consisting of pairs of consecutive lines in consecutive frames as shown in

Fig. 53(a). The group of four lines is subdivided into blocks of eight pels, as shown in Fig.

53(b)." *Id.* Further, Picture Coding discloses that "The key elements in a block, on which all of

the other elements depend are the A1's. These elements are DPCM coded along a line using the

previous A1 as a predictor. The coding of the remaining elements (B's, C's, D's) uses the four

surrounding A1's, two of which are in the next pair of lines which would not normally be coded

with the current block (Fig. 53(c))." *Id.*

Every element required by claim 13 of the '272 patent is included, either explicitly or

inherently, in Picture Coding and therefore this reference anticipates claim 13. Netravali,

- 11 -

Exhibit 85
Page 001655

however, failed to disclose his own paper to the Examiner during the original prosecution of the '272 patent. Moreover, Picture Coding adds important information beyond what was considered by the Examiner in any of the documents in the record during the original prosecution of the '272 patent. Specifically, as with Gabor & Hill and Limb & Pease, none of the documents considered by the Examiner disclosed the selection of interpolation locations in different versions of a picture as a function of the displacement of objects in the picture.

## VII.    APPLICATION OF THE PRIOR ART TO THE CLAIMS

It is believed that claim 13 is anticipated by Gabor & Hill, Limb & Pease, and Picture Coding. Further, claim 13 is obvious over Gabor & Hill, Limb & Pease, and Picture Coding either alone, or in combination with other prior art of record and/or the knowledge of one of ordinary skill in the art, as detailed in the claim charts below. The bolded terms in the left column are claim terms that have been construed in the *Markman* Order—with the Court's construction of these terms appearing in brackets and in italics.

### A.    D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39

| U.S. PATENT NO. 4,383,272 CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| A method of **estimating**[5] [*determining roughly the size, extent, or nature of*] the intensities of elements **(pels)** [*picture elements, also referred to as pixels*] in a **picture** [*an image that occupies a frame*] in accordance with information defining **intensities** [*values describing the different color components of a composite signal or combinations* | **Gabor & Hill teaches, discloses, and/or suggests a transmission method relating to video signals in which the intensities of elements in a picture are estimated in accordance with information defining the intensities of picture elements in preceding and succeeding versions of the picture.**<br><br>Gabor & Hill presents a video signal transmission method referred to as contour interpolation, which |

___

[5] Requester notes that claim 13 is not limited to estimating a particular type of motion, and would therefore include any motion, including horizontal motion. As noted by Gabor & Hill, "changes in our world are due to moving objects, and most movements are horizontal." (Gabor & Hill at 306).

- 12 -

Exhibit 85
Page 001656

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| *thereof*] of pels in preceding and succeeding versions of the picture including the step of, | involves transmitting only one interlaced field out of two, and constructing the missing interlaced field. Gabor & Hill at 305. In Fig. 1 of Gabor & Hill, "two diagrams show, in their first and third lines, the intensity distributions along two consecutive lines of a field which has been transmitted and received, while the middle line, which belongs to the interlaced field which was not transmitted, must be constructed in the receiver by some method of interpolation." *Id.* As explained, "[i]n the method of contour interpolation the two spots[6] run with equal speeds $v$ until one of them reaches an edge, i.e. a position where the intensity changes at more than a certain predetermined rate." *Id.*<br><br>In describing contour interpolation, Gabor & Hill discloses that "[b]and saving in television transmissions can be achieved by utilizing redundancies in single lines, between lines, between fields and between frames. The method of contour interpolation exploits the last two. It is based on the facts that (*a*) field and frame frequencies in conventional television transmission had to be chosen with a view to reducing flicker rather than for conveying more information, (*b*) the eye fixes mainly on contours which are usually the edges of objects, (*c*) these contours are usually smooth enough to allow interpolation over two line spacings, and (*d*) changes from one picture to the next come about mostly by the horizontal motion of objects which are sufficiently uniform to allow interpolation over at least two frame intervals." [p. 303] |

---

[6] These "spots" are the "picture elements". *See, e.g.*, 1976 McGraw-Hill Dictionary of Scientific and Technical Terms ("picture element" also known as "scanning spot").

[7] Again, these "picture points" are "picture elements". *See, e.g.*, 1976 McGraw-Hill Dictionary of Scientific and Technical Terms (defining "picture element" as "any segment of a scanning line, the dimension of which along the line is exactly equal to the nominal line width; the area which is being explored at any instant in the scanning process").

- 13 -

Exhibit 85<br>Page 001657

| U.S. PATENT NO. 4,383,272 CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | Further, Gabor & Hill states that "[t]here is almost no loss in information or picture quality if the interlaced frame is suppressed in the transmission and reconstructed in the receiver by interpolation between the lines of the transmitted field, and there is not much loss if only one field in four is transmitted." [p. 303] |
| | Gabor & Hill also discloses that the method of contour interpolation is equally applicable to the interpolation of missing fields and missing frames. *Id.* at 306.  Moreover, Gabor & Hill indicates that a missing picture is reconstructed by estimating the intensities of elements comprising the missing picture.  For example, Gabor & Hill discloses that the elements of a missing line can be reconstructed with reference to the intensities of elements in the corresponding line of a preceding and a succeeding picture.  *Id.* at 305.  Gabor & Hill also discloses that each line is comprised of elements, stating "[a]ssume, for instance, that we allow a searching time corresponding to 10 picture points,[7] which is about 1/50 of a line." *Id.*  A picture point represents an element and is characterized by an intensity value.  *Id.*  Further, the intensity value of a picture point is encoded using five binary digits (bits).  *Id.* at 304.  Therefore, Gabor & Hill teaches that the elements of one or more pictures can be reconstructed – or estimated – in accordance with information defining the intensities of elements in preceding and succeeding pictures. |
| | Gabor & Hill further discloses the following: |
| | "In the method of contour interpolation the reconstructed edges are as sharp as the originals and appear in their correct positions, i.e., in the positions which they would occupy if the edges were straight in small sections, and if their motion were uniform for short times. " [p. 303] |
| | "The two diagrams show, in their first and third |

- 14 -

Exhibit 85
Page 001658

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | lines, the intensity distributions along two consecutive lines of a field which has been transmitted and received, while the middle line, which belongs to the interlaced field which was not transmitted, must be constructed in the receiver by some method of interpolation." [pp. 304-5]<br><br>"In the method of contour interpolation the two spots run with equal speeds v until one of them reaches an edge, i.e. a position where the intensity changes at more than a certain predetermined rate." [p. 305]<br><br>"Our proposal for waveband reduction are based entirely on the exploitation of the correlations between consecutive fields and consecutive frames. These are independent of the correlations in the contents of single lines, and hence whatever gain is achievable by our system can be multiplied by a factor of 3-4 if it is combined with a line-by-line compression method. " [p. 305]<br><br>"At present, one can contemplate any sort of complicated information processing only in relay stations, which ultimately transmit standard interlaced fields to the home receivers.  It was with this application in view that one of the authors (D. G.) proposed transmitting only one field out of two, and constructing the missing interlaced field by a method called 'contour interpolation', which is superior both to repetition and 'linear interpolation'." [p. 305]<br><br>"The principle has been explained in its application for constructing the missing field, but it is evident that it can be equally well applied to the interpolation of missing frames.  In that case the upper and the lower lines in Fig. 1 represent the same line as in the interpolated frame.  There is again a good statistical reason for adopting this method of interpolation, based on the common observation that most of the changes in our world are due to moving objects, and most movements are |

- 15 -

Exhibit 85<br>Page 001659

| U.S. PATENT NO. 4,383,272<br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
|  | horizontal. The upper and lower intensity profiles, $I_1(x)$ and $I_2(x)$, represent the positions of the outline of a moving object, and the assumption is that the motion can be well enough approximated by linear displacement, i.e. constant speed of motion." [p. 306]<br><br>"A more serious limitation is that the interpolation method does not operate in the vertical direction. It is true that by far the greater part of movements is horizontal, but the movements of the mouth form an important exception. It therefore appears likely that $12 \cdot 5$ fields/sec (15 fields/sec with U.S. standards), i.e. a compression ratio of 4:1, will be the limit to which one can go without appreciable impairment in picture quality. " [p. 306]<br><br>"Fig. 2 shows two ways in which only one field in eight is transmitted, and the seven missing fields are reconstructed. In Fig. 2($a$) this is done by repeated midway interpolation. As soon as field 1 is received, field 2 can be constructed by contour interpolation between two consecutive lines. The interpolation of the others must wait until field 9 is received. From this and field 1 first the field 5 is constructed, by interpolation between their corresponding lines, and then the fields 3 and 7, by interpolating between fields 1-5 and fields 5-9, respectively. The even fields are constructed by interpolating between the lines of the odd fields." [p. 306]<br><br>"Fig. 2(b) shows the somewhat simpler method of 'proportional' interpolation. Corresponding lines in fields 3, 5 and 7 are reconstructed from those received in fields 1 and 9 by assuming that the movement of the edges was linear. This means that if, for instance, the scanning spot on line 1 stops and that on line 9 moves at double speed, the writing spot on line 3 will have to move at half speed. The intensity on this line will have to be the sum of $I_1$ and $I_9$, weighted in the ratio 3:1. As the writing spot |

- 16 -

Exhibit 85<br>Page 001660

| U.S. PATENT NO. 4,383,272<br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | moves at half-speed the total intensity must be halved, so that the previous intensity rule now changes to $I_3 ((3x_1 + x_9)/4) = 1/8 [3I_1(x_1) + I_9(x_9)]$." [p. 306]<br><br>"It is important to realize that contour interpolation, whether between fields or between frames, taps a source of redundancy quite independent of the one utilized in line-by-line rate-equalization methods, in which correlations between points in one line are exploited." [p. 306]<br><br>***See also*** **the following references, in combination with Gabor & Hill, to show obviousness of this element:**<br><br>    • **E. R. Kretzmer, *Statistics of Television Signals*, The Bell Systems Technical Journal, July 1952 (*see e.g.*, page 751)**<br><br>    • **D. Gabor, *Television Compression by Contour Interpolation*, Supplemento Al Volume III, Serie X, Del Nuovo Cimento, 1959 (Exhibit 10) (*see e.g.*, page 467)**<br><br>    • **P. C. J. Hill, *Television Bandwidth Compression by Interpolation*, The Electrical Engineering Department, Imperial College London, March 1960 (Exhibit 11) (*see e.g.*, pages 1-7, 17)**<br><br>**These references disclose compression of information associated with a video signal, including coding strategies.**<br><br>**It would have been obvious to combine each of these references with Gabor & Hill because Gabor & Hill cites to these references with respect to picture coding, and/or both Gabor & Hill and these references relate to the compression of video signals using contour interpolation.**<br><br>**In addition, these references were not considered by the Examiner during the original prosecution** |

- 17 -

Exhibit 85<br>Page 001661

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | of the '272 patent. |
| determining by interpolation intensities of pels in said picture in accordance with intensities of pels in **related locations** [*locations at which the same object is expected to be*] in said preceding and succeeding versions,<br><br>Construing the whole clause:<br>[*determining the intensity of pels in the picture by averaging the intensities of pels in related locations (locations at which the same object is expected to be) in the preceding and succeeding versions*], | **Gabor & Hill teaches, discloses, and/or suggests interpolating the intensities of picture elements in a picture in accordance with intensities of picture elements in related locations in preceding and succeeding versions of the picture.**<br><br>Gabor & Hill discloses interpolating the intensities of elements in missing pictures with respect to the intensities of elements in transmitted pictures. Further, Gabor & Hill discloses that "[b]and saving in television transmissions can be achieved by utilizing redundancies in single lines, between lines, between fields and between frames. The method of contour interpolation exploits the last two. [p. 303]. Thus, contour interpolation uses the redundancies between the elements comprising firlds and frames to reduce, through interpolation, the amount of information that must be transmitted to represent a video signal.<br><br>Gabor & Hill explains that, in performing interpolation, "[t]he intensity rule is that the interpolated intensity *I* is formed as the arithmetical mean of the two intensities, but *weighted with the velocities, i.e.,*<br><br>$$I\left[\tfrac{1}{2}(x_1 + x_2)\right] = \frac{v_1 I_1(x_1) + v_2 I_2(x_2)}{v_1 + v_2}$$<br><br>*Id.* at 305. "*The upper and lower intensity profiles, I₁(x) and I₂(x), represent the positions of the outline of a moving object…*" *Id.* at 306 (emphasis added). As such, the intensity of an element in the missing picture is interpolated from the intensities of corresponding elements at related locations in preceding and succeeding pictures. Additionally, Gabor & Hill discloses that, as a result of the method of contour interpolation, "[t]he interpolated edge then appears at the position which it would be if the contour in question were straight, which is the best estimate one can make in 2-point interpolation." |

- 18 -

Exhibit 85<br>Page 001662

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | *Id.* Therefore, through interpolation from the related locations, elements in the picture being reconstructed also are properly positioned.<br><br>"The principle has been explained in its application for constructing the missing field, but it is evident that it can be equally well applied to the interpolation of missing frames. In that case the upper and the lower lines in Fig. 1 represent the same line as in the interpolated frame. There is again a good statistical reason for adopting this method of interpolation, based on the common observation that most of the changes in our world are due to moving objects, and most movements are horizontal. The upper and lower intensity profiles, $I_1(x)$ and $I_2(x)$, represent the positions of the outline of a moving object, and the assumption is that the motion can be well enough approximated by linear displacement, i.e. constant speed of motion." [p. 306]<br><br>*See also* the following references, in combination with Gabor & Hill, to show obviousness of this element:<br><br>• E. R. Kretzmer, *Statistics of Television Signals*, The Bell Systems Technical Journal, July 1952 (*see e.g.*, page 751)<br><br>• D. Gabor, *Television Compression by Contour Interpolation*, Supplemento Al Volume III, Serie X, Del Nuovo Cimento, 1959 (*see e.g.*, page 467)<br><br>• P. C. J. Hill, *Television Bandwidth Compression by Interpolation*, The Electrical Engineering Department, Imperial College London, March 1960 (*see e.g.*, pages 18-26, 139, 199)<br><br>These references disclose compression of information associated with a video signal, including coding strategies. |

- 19 -

Exhibit 85<br>Page 001663

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | **It would have been obvious to combine each of these references with Gabor & Hill because Gabor & Hill cites to these references with respect to picture coding, and/or both Gabor & Hill and these references relate to the compression of video signals using contour interpolation.**<br><br>**In addition, these references were not considered by the Examiner during the original prosecution of the '272 patent.** |
| characterized in that said determining step includes selecting said related locations as a function of **the displacement of objects in said picture** [*the change of position of objects between said versions of the picture*]. | **Gabor & Hill teaches, discloses, and/or suggests selecting the related locations as a function of the displacement of objects in the picture.**<br><br>Gabor & Hill teaches selecting the related locations – the locations at which the object is expected to be – as a function of the displacement of objects in the picture. For example, Gabor & Hill discloses that in contour interpolation "…the two spots run with equal speeds $v$ until one of them reaches an edge, *i.e.* a position where the intensity changes at more than a certain predetermined rate. Here it stops, while the other spot, which has not yet reached the contour, moves on with a speed of $2v$, so that the interpolated spot, midway between the two, moves on with constant velocity $v$." [p.305] Therefore, Gabor & Hill employs scanning rate ratios, which can be modified based on the temporal distance between the reference pictures, to ensure the interpolated element is properly positioned.<br><br>Further, Gabor & Hill indicates that "…we allow a searching time corresponding to 10 picture points, which is about 1/50 of a line. If we leave out one frame in two, this means that the time interval between them will be 1/12.5 sec, *i.e.*, objects must not traverse more than one-quarter of the whole picture width in 1 sec." [p. 306]<br><br>As described by Gabor & Hill, when a contour – edge of an object – is detected in |

- 20 -

Exhibit 85<br>Page 001664

| U.S. PATENT NO. 4,383,272 CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | one of the reference pictures but not the other, the scanning process is accelerated in the other reference picture to locate the complementary contour. *Id.* In this manner, the related locations – *e.g.*, the contours – are identified in both of the reference frames. Gabor & Hill further discloses that, once the related locations have been identified, the scanning spot that had been stopped "… gradually catches up with the other, until both move again with the same speed *v*." *Id.* Thus, Gabor & Hill discloses interpolating the intensities of pels in a picture in accordance with intensities of pels in related locations of preceding and succeeding picture versions, wherein the related locations are selected as a function of the displacement of objects in the picture.<br><br>Gabor & Hill additionally disclose the following: "Fig. 2(b) shows the somewhat simpler method of 'proportional' interpolation. Corresponding lines in fields 3, 5 and 7 are reconstructed from those received in fields 1 and 9 by assuming that the movement of the edges was linear. This means that if, for instance, the scanning spot on line 1 stops and that on line 9 moves at double speed, the writing spot on line 3 will have to move at half speed. The intensity on this line will have to be the sum of $I_1$ and $I_9$, weighted in the ratio 3 : 1. As the writing spot moves at half-speed the total intensity must be halved, so that the previous intensity rule now changes to $I_3 ((3x_1 + x_9)/4) = 1/8 [3I_1(x_1) + I_9(x_9)]$." [p. 306]<br><br>"However, if the spot on line 9 stops first, the spot will move with 3/2 normal speed, and thus the factor at the right will have to be 3/8 instead of 1/8. The rule for line 7 will have to be similarly modified (with 1 and 9 interchanged), while the rule for line 5 is the one for midway interpolation." [p. 306]<br><br>***See also*** **the following references, in combination with Gabor & Hill, to show obviousness of this** |

- 21 -

Exhibit 85
Page 001665

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | D. GABOR, ET AL., *TELEVISION BAND COMPRESSION BY CONTOUR INTERPOLATION*, THE PROCEEDINGS OF THE INSTITUTION OF ELECTRICAL ENGINEERS, VOL. 108, PART B, NO. 39 ("GABOR & HILL") |
|---|---|
| | element:<br><br>• D. Gabor, *Television Compression by Contour Interpolation*, Supplemento Al Volume III, Serie X, Del Nuovo Cimento, 1959 (*see e.g.*, page 467)<br><br>• P. C. J. Hill, *Television Bandwidth Compression by Interpolation*, The Electrical Engineering Department, Imperial College London, March 1960 (*see e.g.*, pages 27, 31, 116, 139)<br><br>These references disclose compression of information associated with a video signal, including coding strategies.<br><br>It would have been obvious to combine each of these references with Gabor & Hill because Gabor & Hill cites to these references with respect to picture coding, and/or both Gabor & Hill and these references relate to the compression of video signals using contour interpolation.<br><br>In addition, these references were not considered by the Examiner during the original prosecution of the '272 patent. |

Exhibit 85
Page 001666

**B.     J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971**

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| A method of **estimating** [*determining roughly the size, extent, or nature of*] the intensities of elements **(pels)** [*picture elements, also referred to as pixels*] in a picture [*an image that occupies a frame*] in accordance with information defining **intensities** [*values describing the different color components of a composite signal or combinations thereof*] of pels in preceding and succeeding versions of the picture including the step of, | **Limb & Pease teaches, discloses, and/or suggests a transmission method relating to video signals in which the intensities of elements in a picture are estimated in accordance with information defining the intensities of picture elements in preceding and succeeding versions of the picture.**<br><br>Limb & Pease discloses "[h]ere, we describe a method of applying resolution exchange to a differentially quantized (DPCM) signal. The resulting channel capacity required for the subjectively satisfactory transmission of the differential signal is halved. The coder is simpler than most interframe coders and should not increase the sensitivity of the system to channels errors." [Page 1877.]<br><br>Limb & Pease goes on to explain that, in resolution exchange , when movement is not detected the image signal is transmitted at full spatial resolution by one-half the temporal resolution. *Id.* at 1878.<br><br>In addition, Limb & Pease discloses that "[i]n Fig. 1 we show an outline of a system which uses resolution exchange in conjunction with differential quantization of the signal. The output of the television camera is differentially quantized and fed to a movement detector which usually consists of a frame delay circuit, a difference and threshold circuit, and associated logic. When movement is not detected, that part of the picture being coded enjoys the full spatial sampling frequency but each line is only transmitted every second frame, i.e., the temporal sampling frequency is halved. When movement is detected, then the vertical sampling frequency is halved by transmitting only every second line of the picture. For a 2:1 interlaced scan this means transmitting every other field and so the temporal sampling frequency is raised to 30 Hz.<br><br>With respect to decoding, Limb & Pease discloses |

- 23 -

Exhibit 85<br>Page 001667

| U.S. PATENT NO. 4,383,272 CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
|  | "[a]t the receiver, when movement is not detected, alternate (sampled) lines in each field are decoded and displayed. In place of the unsampled lines in the field a temporal average of corresponding lines from neighboring sampled frames is formed and displayed." [Pages 1878-1879.] |
|  | Therefore, Limb & Pease discloses a method for estimating the intensities of pels in a picture in accordance with information defining intensities of pels in preceding and succeeding versions of the picture. |
|  | Claim 13 also requires estimating the intensities of pels in accordance with information defining intensities of pels in preceding and succeeding versions of the picture. Limb & Pease discloses that pel intensities from preceding and succeeding versions of the picture are used to form an estimate of pels in unsampled fields when movement is detected. *Id.* at 1879. Limb & Pease explains that "[i]n place of pels from the unsampled fields, an average is formed from the four nearest neighbors in the $y - t$ diagram, as shown in Fig. 2b. For example, pels in lines $(y, 1)$ are replaced with the average value of pels in lines $(y - 1, 0)$ $(y + 1, 0)$ $(y - 1, 2)$ and $(y + 1, 2)$. Thus, both spatial and temporal interpolation is used to form the new value in the unsampled field." *Id.* |
|  | In addition, Limb & Pease disclose the following: |
|  | "When movement is detected, pels from alternate sampled fields are received, decoded, and displayed. In place of pels from the unsampled fields, an average is formed from the four nearest neighbors in the $y - t$ diagram, as shown in Fig. 2b. For example, pels in lines $(y\text{-}1, 0)$ are replaced with the average value of pels in lines $(y\text{-}1, 0)$ $(y\text{+}1, 0)$ $(y\text{-}1, 2)$ and $(y\text{+}1, 2)$. Thus both spatial and temporal interpolation is used to form the new value in the unsampled field." [p. 1879] |
|  | "There are a number of ways in which the sampling |

- 24 -

Exhibit 85
Page 001668

| U.S. PATENT NO. 4,383,272 CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| | mode can be controlled. The subjectively ideal, but probably most difficult, method is to change to the appropriate mode as each element is encountered. Another method is to code the whole of one line in the same mode, while a further method is to code the whole field in the same mode. The method adopted in most of our experiments is to use one mode throughout each field. The transitions from stationary mode to moving mode can be made at the beginning of any field but the reverse transition is only permitted at the beginning of any even field, counting from after the change from stationary to moving mode. This is done to prevent data being generated at a greater rate during two consecutive fields than can be handled by the channel." [Pages 1880-1881.]

"The delay network at the transmitter (Fig. 1) converts the effectively halved bit rate to a continuous bit stream of half the original rate; a similar network at the receiver reconverts the continuous bit stream back to alternate fully sampled fields or frames. The operation of these networks is described more fully in Section IV." [Page 1881.]

"In the experimental system, movement is deemed to be present if, during any field, 512 or more pels exhibit a frame difference amplitude greater than 15 levels (out of 255). To return to the stationary mode, less than 512 picture elements must have a frame difference amplitude greater than 15 levels during the even field where the field number is counted from the field in which the transition is made to the moving mode." [Page 1884.]

"At the transmitter every second pel is delayed by one line period, or one field period (according to the mode), to bring about a constant bit rate. This delay can also be used by the movement detector for generating the required frame differences. Of course, the movement detector must now work on one-quarter as many points as before. But because |

Exhibit 85
Page 001669

| U.S. Patent No. 4,383,272<br><br>Claim 13 | J. O. Limb and R. F. W. Pease, *A Simple Interframe Coder For Video Telephony,* The Bell System Technical Journal, Vol. 50, No. 6, July-Aug., 1971 ("Limb & Pease") |
|---|---|
| | of the global nature of the decision and the large number of supra-threshold points required to change to the moving mode (512), reliable detection of movement could probably be performed with even less than this number of points. Thus, if the primary (EDQ) coder has an output bit rate of 6 Mb/s (or 200,000 bits per frame) a delay store of 50,000 bits (half a field) is required at the transmitter." [Pages 1884-1885.]<br><br>"At the receiver a similar delay is needed to convert the incoming constant bit rate to the required 6 Mb/s rate during alternate lines or fields and a frame memory of 200,000 bits is needed to store the pels required for display." [Page 1885.]<br><br>"There may be occasions when the primary coder uses pels from the previous line (in the same field) as well as from the present line for predicting the value of the current pel (see for example, Ref. 11). The stationary mode described above is now unsatisfactory because only every other line in each field is available at the receiver. We therefore modified the apparatus of Fig. 3 to evaluate a coder in which alternate frames are transmitted in the stationary mode and temporal interpolation is used to replace the unsampled frames. The moving mode is unchanged and whole fields are now left intact in both modes. The change from a stationary to a moving mode can now be made only at the end of a frame rather than at the end of a field, as before." [Page 1887.]<br><br>*See also* the following references, in combination with Limb & Pease, to show obviousness of this element:<br><br>• Limb et al. – *Exchange of Spatial and Temporal Resolution in Television Coding,* The Bell System Technical Journal, January 1971 (Exhibit 12) (*see e.g.,* pages 191-193)<br><br>• R. F. W. Pease, *Conditional Vertical* |

- 26 -

Exhibit 85<br>Page 001670

| U.S. PATENT NO. 4,383,272<br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
|  | *Subsampling - A Technique to Assist in the Coding of Television Signals*, The Bell System Technical Journal, Vol. 51, No. 4, April 1972 (Exhibit 13) (*see e.g.*, pages 787-790, 800)<br><br>• J. O. Limb, et al., *Combining Intraframe and Frame-to-Frame Coding for Television*, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974 (Exhibit 14) (*see e.g.*, pages 1152-53)<br><br>**These references disclose coding strategies associated with the transmission of a video signal, including methods for representing image information.**<br><br>**It would have been obvious to combine each of these references with Limb & Pease because these references relate to the compression of video signals.**<br><br>**In addition, these references were not considered by the Examiner during the original prosecution of the '272 patent.** |
| determining by interpolation intensities of pels in said picture in accordance with intensities of pels in **related locations** [*locations at which the same object is expected to be*] in said preceding and succeeding versions,<br><br>Construing the whole clause: [*determining the intensity of pels in the picture by averaging the intensities of pels in related locations (locations at which the same object is expected to be) in the preceding and succeeding versions*], | **Limb & Pease teaches, discloses, and/or suggests interpolating the intensities of picture elements in a picture in accordance with intensities of picture elements in related locations in preceding and succeeding versions of the picture.**<br><br>As discussed above, Limb & Pease discloses only transmitting every second line of the picture, or one field out of two, when movement is detected. *Id.* at 1879. Also as discussed above, Limb & Pease indicates that the elements of the missing field are reconstructed from elements in the preceding and succeeding versions of the picture. *Id.* When movement is detected, Limb & Pease discloses that the related locations are in the immediately preceding and succeeding fields at locations that are vertically displaced by one pel position in both directions, up and down, from the pel position in the |

- 27 -

Exhibit 85<br>Page 001671

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| | missing field. *Id.* at 1879-1880. |
| | Limb & Pease additionally disclose the following: |
| | "Here, we describe a method of applying resolution exchange to a differentially quantized (DPCM) signal. The resulting channel capacity required for the subjectively satisfactory transmission of the differential signal is halved. The coder is simpler than most interframe coders and should not increase the sensitivity of the system to channels errors." [Page 1877.] |
| | "In Fig. 1 we show an outline of a system which uses resolution exchange in conjunction with differential quantization of the signal. The output of the television camera is differentially quantized and fed to a movement detector which usually consists of a frame delay circuit, a difference and threshold circuit, and associated logic. When movement is not detected, that part of the picture being coded enjoys the full spatial sampling frequency but each line is only transmitted every second frame, i.e., the temporal sampling frequency is halved. When movement is detected, then the vertical sampling frequency is halved by transmitting only every second line of the picture. For a 2:1 interlaced scan this means transmitting every other field and so the temporal sampling frequency is raised to 30 Hz. |
| | At the receiver, when movement is not detected, alternate (sampled) lines in each field are decoded and displayed. In place of the unsampled lines in the field a temporal average of corresponding lines from neighboring sampled frames is formed and displayed." [Pages 1878-1879.] |
| | "When movement is detected, pels from alternate sampled fields are received, decoded, and displayed. In place of pels from the unsampled fields, an average is formed from the four nearest neighbors in the $y - t$ diagram, as shown in Fig. 2b. For example, pels in lines ($y$-1, 0) are replaced with the average value of pels in lines ($y$-1, 0) ($y$+1, 0) ($y$-1, 2) and |

- 28 -

Exhibit 85<br>Page 001672

| U.S. PATENT NO. 4,383,272 CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| | ($y$+1, 2).  Thus both spatial and temporal interpolation is used to form the new value in the unsampled field." [Page 1879.]

"Fig. 2c illustrates the line sampling pattern and the interpolation used when the system starts in the stationary mode (fields 0, 1, 2, 3, 4, 5) and switches to the moving mode (fields 6, 7, 8, 9) and then switches back again.  Also shown are the sequences of fields represented in the displayed picture.  In both modes the lines displayed correspond either directly to the temporal coordinate or indirectly by temporally averaging from fields temporally equidistant from the current field.  Near the changeovers some lines are misplaced temporally; for instance the unsampled lines of field 5 are replaced with lines from field 3 and 6 whose mean temporal position is 41/2.  Different weights could be assigned to the signals of fields 3 and 6, but for simplicity we decided to subjectively test the coder using equal weight for all averaging." [Page 1881.]

"There are a number of ways in which the sampling mode can be controlled.  The subjectively ideal, but probably most difficult, method is to change to the appropriate mode as each element is encountered. Another method is to code the whole of one line in the same mode, while a further method is to code the whole field in the same mode.  The method adopted in most of our experiments is to use one mode throughout each field.  The transitions from stationary mode to moving mode can be made at the beginning of any field but the reverse transition is only permitted at the beginning of any even field, counting from after the change from stationary to moving mode.  This is done to prevent data being generated at a greater rate during two consecutive fields than can be handled by the channel." [Pages 1880-1881.]

"The delay network at the transmitter (Fig. 1) converts the effectively halved bit rate to a continuous bit stream of half the original rate; a |

- 29 -

Exhibit 85
Page 001673

| U.S. PATENT NO. 4,383,272 CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
|  | similar network at the receiver reconverts the continuous bit stream back to alternate fully sampled fields or frames. The operation of these networks is described more fully in Section IV." [Page 1881.] |
|  | "In the experimental system, movement is deemed to be present if, during any field, 512 or more pels exhibit a frame difference amplitude greater than 15 levels (out of 255). To return to the stationary mode, less than 512 picture elements must have a frame difference amplitude greater than 15 levels during the even field where the field number is counted from the field in which the transition is made to the moving mode." [Page 1884.] |
|  | "At the transmitter every second pel is delayed by one line period, or one field period (according to the mode), to bring about a constant bit rate. This delay can also be used by the movement detector for generating the required frame differences. Of course, the movement detector must now work on one-quarter as many points as before. But because of the global nature of the decision and the large number of supra-threshold points required to change to the moving mode (512), reliable detection of movement could probably be performed with even less than this number of points. Thus, if the primary (EDQ) coder has an output bit rate of 6 Mb/s (or 200,000 bits per frame) a delay store of 50,000 bits (half a field) is required at the transmitter." [Pages 1884-1885.] |
|  | "At the receiver a similar delay is needed to convert the incoming constant bit rate to the required 6 Mb/s rate during alternate lines or fields and a frame memory of 200,000 bits is needed to store the pels required for display." [Page 1885.] |
|  | "There may be occasions when the primary coder uses pels from the previous line (in the same field) as well as from the present line for predicting the value of the current pel (see for example, Ref. 11). The stationary mode described above is now |

Exhibit 85
Page 001674

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| | unsatisfactory because only every other line in each field is available at the receiver. We therefore modified the apparatus of Fig. 3 to evaluate a coder in which alternate frames are transmitted in the stationary mode and temporal interpolation is used to replace the unsampled frames. The moving mode is unchanged and whole fields are now left intact in both modes. The change from a stationary to a moving mode can now be made only at the end of a frame rather than at the end of a field, as before." [Page 1887.]<br><br>*See also* the following references, in combination with Limb & Pease, to show obviousness of this element:<br><br>   • Limb et al. – *Exchange of Spatial and Temporal Resolution in Television Coding*, The Bell System Technical Journal, January 1971 (Exhibit 12) (*see e.g.*, pages 191-199)<br><br>   • R. F. W. Pease, *Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals*, The Bell System Technical Journal, Vol. 51, No. 4, April 1972 (Exhibit 13) (*see e.g.*, pages 787-790)<br><br>   • J. O. Limb, et al., *Combining Intraframe and Frame-to-Frame Coding for Television*, The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974 (Exhibit 14) (*see e.g.*, pages 1152-53)<br><br>These references disclose coding strategies associated with the transmission of a video signal, including methods for representing image information.<br><br>It would have been obvious to combine each of these references with Limb & Pease because these references relate to the compression of video signals. |

- 31 -

Exhibit 85
Page 001675

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
|  | **In addition, these references were not considered by the Examiner during the original prosecution of the '272 patent.** |
| characterized in that said determining step includes selecting said related locations as a function of **the displacement[8] of objects in said picture** [*the change of position of objects between said versions of the picture*]. | **Limb & Pease teaches, discloses, and/or suggests selecting the related locations as a function of the displacement of objects in the picture.**<br><br>Limb & Pease discloses that the locations used for interpolation vary depending on whether movement is detected. For example, Limb & Pease depicts stationary mode interpolation in Fig. 2(a) and discloses that "[i]n stationary mode we receive and display alternate lines in each field, i.e., lines 2, 3, 6, 7, 10, 11, ... in fields 2 and 3 lines 0, 1, 4, 5, 8, 9, ... in fields 4 and 5. The averaging is done only along the time (*t*) axis and so stationary pictures are displayed with the full resolution of the fully sampled picture." *Id.* at 1879-80 Therefore, if no movement of objects in the picture is detected, the related locations are selected based solely on temporal displacement, which is identified as two field periods in Fig. 2(a).<br><br>Alternately, Limb & Pease depicts moving mode interpolation in Fig. 2(b) and discloses that "[i]n place of pels from the unsampled fields, an average is formed from the four nearest neighbors in the $y - t$ diagram,...." *Id.* Fig. 2(b) shows that the related locations are selected from the immediately preceding and succeeding fields. *Id.* at 1880. Therefore, unlike stationary mode interpolation, the temporal displacement in moving mode interpolation is a single field period. Further, as discussed above, Fig. 2(b) shows that in moving mode the related locations also are vertically |

---

[8] It is the displacement of objects in the picture that represents movement. As such, displacement and movement are synonymous. Further, claim 13 does not specify how the selection of related locations performed in the determining step is related to the displacement of objects. Rather, the claim language indicates broadly that the related locations are selected as a function of the displacement of objects in the picture. This is clearly described by Limb & Pease.

Exhibit 85<br>Page 001676

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY*, THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| | displaced by one line – or one pel position – both up and down. *Id.* As such, the related locations used to interpolate the intensities of elements in the picture are selected as a function of the displacement of objects in the picture. If objects in the picture are not moving, a first set of related locations is selected for interpolation. If, however, objects in the picture are moving, a second set of related locations is selected for interpolation.<br><br>Limb & Pease additionally discloses the following:<br><br>"When movement is detected, pels from alternate sampled fields are received, decoded, and displayed. In place of pels from the unsampled fields, an average is formed from the four nearest neighbors in the $y - t$ diagram, as shown in Fig. 2b. For example, pels in lines ($y$-1, 0) are replaced with the average value of pels in lines ($y$-1, 0) ($y$+1, 0) ($y$-1, 2) and ($y$+1, 2). Thus both spatial and temporal interpolation is used to form the new value in the unsampled field." [Page 1879.]<br><br>"Fig. 2c illustrates the line sampling pattern and the interpolation used when the system starts in the stationary mode (fields 0, 1, 2, 3, 4, 5) and switches to the moving mode (fields 6, 7, 8, 9) and then switches back again. Also shown are the sequences of fields represented in the displayed picture. In both modes the lines displayed correspond either directly to the temporal coordinate or indirectly by temporally averaging from fields temporally equidistant from the current field. Near the changeovers some lines are misplaced temporally; for instance the unsampled lines of field 5 are replaced with lines from field 3 and 6 whose mean temporal position is 41/2. Different weights could be assigned to the signals of fields 3 and 6, but for simplicity we decided to subjectively test the coder using equal weight for all averaging." [Page 1881.]<br><br>***See also*** **the following references, in combination with Limb & Pease, to show obviousness of this** |

Exhibit 85<br>Page 001677

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | J. O. LIMB AND R. F. W. PEASE, *A SIMPLE INTERFRAME CODER FOR VIDEO TELEPHONY,* THE BELL SYSTEM TECHNICAL JOURNAL, VOL. 50, NO. 6, JULY-AUG., 1971 ("LIMB & PEASE") |
|---|---|
| | element:<br><br>• Limb et al. – *Exchange of Spatial and Temporal Resolution in Television Coding,* The Bell System Technical Journal, January 1971 (Exhibit 12) (*see e.g.,* pages 191-199)<br><br>• R. F. W. Pease, *Conditional Vertical Subsampling - A Technique to Assist in the Coding of Television Signals,* The Bell System Technical Journal, Vol. 51, No. 4, April 1972 (Exhibit 13) (*see e.g.,* pages 787-790, 800)<br><br>• J. O. Limb, et al., *Combining Intraframe and Frame-to-Frame Coding for Television,* The Bell System Technical Journal, Vol. 53, No. 6, July-Aug. 1974 (Exhibit 14) (*see e.g.,* pages 1143, 1151-53)<br><br>These references disclose coding strategies associated with the transmission of a video signal, including methods for representing image information.<br><br>It would have been obvious to combine each of these references with Limb & Pease because these references relate to the compression of video signals.<br><br>In addition, these references were not considered by the Examiner during the original prosecution of the '272 patent. |

Exhibit 85
Page 001678

C.    ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| A method of **estimating** [*determining roughly the size, extent, or nature of*] the intensities of elements **(pels)** [*picture elements, also referred to as pixels*] in a picture [*an image that occupies a frame*] in accordance with information defining **intensities** [*values describing the different color components of a composite signal or combinations thereof*] of pels in preceding and succeeding versions of the picture including the step of, | **Picture Coding teaches, discloses, and/or suggests a transmission method relating to video signals in which the intensities of elements in a picture are estimated in accordance with information defining the intensities of picture elements in preceding and succeeding versions of the picture.**<br><br>Picture Coding describes an "interpolative Frame-to-Frame Coder." *See id.* at 400. The basic coding scheme disclosed by Picture Coding is depicted in Figure 53. *Id.*<br><br>Picture Coding describes Figure 53, stating "the basic coding scheme was limited to groups of four lines, consisting of pairs of consecutive lines in consecutive frames as shown in Fig. 53(a). The group of four lines is subdivided into blocks of eight pels, as shown in Fig. 53(b)." *Id.* Further, Picture Coding discloses that "The key elements in a block, on which all of the other elements depend are the A1's. These elements are DPCM coded along a line using the previous A1 as a predictor. The coding of the remaining elements (B's, C's, D's) uses the four surrounding A1's, two of which are in the next pair of lines which would not normally be coded with the current block (Fig. 53(c))." *Id.*<br><br>Furthermore, Figure 53(a) depicts a series of frames along a temporal axis, where Frame 1 is the first frame, followed by Frame 2 and then Frame 1' in time. Picture Coding describes the coding of the middle frame, Frame 2, stating "[a] first test is made to see if it is permissible to interpolate all four elements [A2, B2, C2, D2] from frame 1 and frame 1'." *Id.* at 401. This test indicates that "[i]f the error of an individual pel, or if the average error of all four pels, is greater than a third threshold, then the block must be coded." *Id.* at 401. As such, this test inherently requires estimating the intensities of elements (pels) in a picture in accordance with information defining |

- 35 -

Exhibit 85<br>Page 001679

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
|  | intensities of pels in preceding and succeeding versions of the picture.<br><br>Further, Picture Coding teaches an improvement for this algorithm for "fast pans," which is known as conditional field interpolation. Picture Coding teaches that, "[i]n conditional field interpolation, the even frame is interpolated from the adjacent two lines in both the preceding and succeeding field. Only when this interpolated value differs by more than a threshold quantity from the value of the uncoded sample is additional information transmitted to improve the interpolation." *Id.*<br><br>Alternatively, Picture Coding teaches that interpolative coding techniques "have been studied extensively in the past for digital coding of pictures [187], [188] and that they can be divided into two classes: 'fixed and adaptive.'" *Id.* at 397. Picture Coding further describes fixed interpolative methods, disclosing "a fixed set of picture elements are selected for transmission and the rest are interpolated. Various types of samples can be chosen for transmission: as examples, one may transmit every alternative sample, one sample out of four, every alternate scan line, *every alternate field or frame*." *Id.* at 397 (emphasis added). Picture Coding also indicates that adaptive interpolation consists of three parts: "1) choosing certain points for transmission, 2) constructing the interpolation of nontransmitted pels, and 3) evaluating the interpolation error ...." *Id.* By the disclosed method, the number of points transmitted depends on the interpolation error. Picture Coding explains that if the error is below a certain threshold, fewer points are chosen for transmission, while a larger number of points are chosen for transmission if the error goes above the threshold. *Id.* Therefore, Picture Coding discloses a method of estimating the intensities of elements (pels) in a picture in accordance with information defining the intensities |

- 36 -

Exhibit 85<br>Page 001680

| U.S. PATENT NO. 4,383,272 CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | of elements in preceding and succeeding picture versions |
| | Picture Coding additionally discloses the following: |
| | "One of the basic considerations in designing the coding algorithm was to limit the tendency for error propagation, which is inherent in any coder using variable length codes and/or DPCM coding techniques. Therefore, the basic coding scheme was limited to groups of four lines, consisting of pairs of consecutive lines in consecutive frames as shown in Fig. 53(a). The group of four lines is subdivided into blocks of eight pels, as shown in Fig. 53(b). The key elements in a block, on which all of the other elements depend are the A1's. These elements are DPCM coded along a line using the previous A1 as a predictor. The coding of the remaining elements (B's, C's, D's) uses the four surrounding A1's, two of which are in the next pair of lines which would not normally be coded with the current block (Fig. 53(c)). For this reason, the DPCM coding of the A1's proceeds one line ahead of the coding of the remaining elements in the block. Since the A1 elements are critical to the coding (in a visual as well as informational sense), they are quite finely coded (32 levels). |
| | Once the A1 elements have been coded, the other three elements, B1, C1, and D1 are processed starting with C1. An average is found of the surrounding A1's and compared to C1. If the resulting error is less than a threshold, the average value is used, otherwise the error value is transmitted using a coarser DPCM coder (21 levels). When quantizing the error, quantizer levels less than the threshold will not be used. They are removed from the scale and the level containing the threshold becomes the first level and all other higher levels are adjusted downward accordingly [130]. As explained later, the threshold is determined from the coded A1 elements and thus need not be explicitly transmitted. The third and fourth points to be processed are B1 and D1 for which a switched |

Exhibit 85
Page 001681

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
|  | predictor is used. An estimated value for B1 is found from the average of either its horizontal (C1's) or vertical (A1's) neighbors, which ever pair has the least difference. Note that these neighboring points have been encoded at this point. If the interpolation error is less than a second threshold, the interpolated value is used, otherwise the error value is transmitted using the coarse DPCM quantizer as described for element C1. The method used for D1 is identical to that used for B1.<br><br>The corresponding part of the block in frame 2 (A2, B2, C2, D2) is then processed. A first test is made to see if it is permissible to interpolate all four elements from frame 1 and frame 1'. If the error of an individual pel, or if the average error of all four pels, is greater than a third threshold, then the block must be coded. First, the A2 pel is coded by transmitting a quantized correction to the value of A1 (fine quantizer). (A1 is more precisely known than the previous A2 pel from the same frame.) The other three pels (B2, C2, D2) are coded in precisely the same manner as the corresponding three pels in frame 1. If all four points in frame 2 can be interpolated, no additional data is required other than a single bit to designate coding or interpolation.<br><br>High detail areas have a masking effect so that a viewer is more tolerant of coding errors in these areas (Section III-D2). Therefore, the intraframe and interframe thresholds are made dependent upon an activity function derived from the amount of activity in the area being coded and designed to reflect the amount of local masking. In order to prevent buffer overflow during periods of peak activity the threshold range is made a function of the buffer state. When the buffer fills thresholds are raised and more picture elements are interpolated which in turn results in the use of shorter code words." [pp. 400-401]<br><br>"Interpolative coding techniques have been studied extensively in the past for digital coding of pictures [187], [188]. In general, they can be divided into |

- 38 -

Exhibit 85<br>Page 001682

| U.S. PATENT NO. 4,383,272 CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | two classes: fixed, and adaptive. In fixed interpolative methods, a fixed set of picture elements are selected for transmission and the rest are interpolated. Various types of samples can be chosen for transmission: as examples, one may transmit every alternative sample, one sample out of four, every alternate scan line, every alternate field or frame. The picture quality that results is a function of the number and type of samples that are dropped and the method of interpolation." [p. 397]
"Another method of interpolation is due to Gabor and Hill [192], which, for example, drops alternate fields and attempts to construct them by making movement of edges temporarily continuous, i.e., placing the edges in the dropped field at places dictated by their uniform motion between the adjacent transmitted field. Such a technique may be useful, but in practice it has been found to be rather difficult to implement, since it requires definition of edges and their motion. Several techniques have been used to transmit the pels from which other pels are derived. Predictive coding appears to be more common [193] due to its flexibility and simplicity.
Adaptive interpolative coding consists of three parts: 1) choosing certain points for transmission, 2) constructing the interpolation of nontransmitted pels, and 3) evaluating the interpolation error; if the error is below a certain threshold, then choosing fewer points for transmission; if it goes above threshold, then choosing a larger number of points for transmission. The fewest number of points that are needed to keep the interpolation error below the threshold is normally the desired characteristic." [p. 397]
"Criteria that are used for the decision to interpolate have traditionally been based on mean-square error [190]; but recently more sophisticated criteria, which may be closely related to human visual perception, have been used [193], [194]. Also adaptive two-dimensional interpolation has been used, which is helpful in decreasing the number of |

Exhibit 85
Page 001683

| U.S. Patent No. 4,383,272<br><br>Claim 13 | Arun N. Netravali and John O. Limb, *Picture Coding: A Review*, Proceedings of the IEEE, Vol. 68, No. 3, Mar. 1980 ("Picture Coding") |
|---|---|
| | pels transmitted [189]. It should be remember that, unlike in fixed interpolative coding, adaptive interpolative coding requires two kinds of information: 1) addresses of picture elements chosen for transmission[10] and 2) intensity values of picture elements chosen for transmission." [p. 397] |
| determining by interpolation intensities of pels in said picture in accordance with intensities of pels in **related locations** [*locations at which the same object is expected to be*] in said preceding and succeeding versions,<br><br>Construing the whole clause:<br>[*determining the intensity of pels in the picture by averaging the intensities of pels in related locations (locations at which the same object is expected to be) in the preceding and succeeding versions*], | **Picture Coding teaches, discloses, and/or suggests interpolating the intensities of picture elements in a picture in accordance with intensities of picture elements in related locations in preceding and succeeding versions of the picture.**<br><br>As discussed above, Picture Coding discloses that the elements of a frame need not be encoded if it is "permissible to interpolate all four elements" from the preceding and succeeding frames. *Id.* at 401. If the elements can be interpolated, then the elements are not coded or transmitted. Inherent in this system is the notion that the decoder will determine from the absence of encoded data that a frame was not encoded, and will interpolate the missing picture information.<br><br>The improvement for "fast pans" disclosed in Picture Coding also teaches interpolating the intensities of elements in a picture in accordance with the intensities of elements in related locations in preceding and succeeding picture versions. This improvement does not transmit "additional information" unless the "interpolated value differs by more than a threshold quantity from the value of the uncoded sample." *Id.* In circumstances where "additional information" is not transmitted for an entire even frame, that frame is interpolated using elements that occur in the preceding and succeeding frames. *Id.* The "fast pan" improvement is triggered by the motion occurring in the picture when the camera operator pans.<br><br>Alternatively, Picture Coding discloses a fixed interpolative coding technique where "every alternate field or frame" is transmitted |

- 40 -

Exhibit 85
Page 001684

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | and "the rest are interpolated." *Id.* at 397. By this method, for example, if the first and third frames are transmitted, the second frame will be interpolated using information from the preceding and succeeding versions of the frame. Therefore, Picture Coding teaches that the intensities of elements in a picture can be determined by interpolation in accordance with the intensities of elements in related locations in preceding and succeeding picture versions.<br><br>Picture Coding additionally discloses the following:<br><br>"One of the basic considerations in designing the coding algorithm was to limit the tendency for error propagation, which is inherent in any coder using variable length codes and/or DPCM coding techniques. Therefore, the basic coding scheme was limited to groups of four lines, consisting of pairs of consecutive lines in consecutive frames as shown in Fig. 53(a). The group of four lines is subdivided into blocks of eight pels, as shown in Fig. 53(b). The key elements in a block, on which all of the other elements depend are the A1's. These elements are DPCM coded along a line using the previous A1 as a predictor. The coding of the remaining elements (B's, C's, D's) uses the four surrounding A1's, two of which are in the next pair of lines which would not normally be coded with the current block (Fig. 53(c)). For this reason, the DPCM coding of the A1's proceeds one line ahead of the coding of the remaining elements in the block. Since the A1 elements are critical to the coding (in a visual as well as informational sense), they are quite finely coded (32 levels).<br><br>Once the A1 elements have been coded, the other three elements, B1, C1, and D1 are processed starting with C1. An average is found of the surrounding A1's and compared to C1. If the resulting error is less than a threshold, the average value is used, otherwise the error value is transmitted using a coarser DPCM coder (21 levels). |

- 41 -

Exhibit 85
Page 001685

| U.S. PATENT NO. 4,383,272 CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
|  | When quantizing the error, quantizer levels less than the threshold will not be used. They are removed from the scale and the level containing the threshold becomes the first level and all other higher levels are adjusted downward accordingly [130]. As explained later, the threshold is determined from the coded A1 elements and thus need not be explicitly transmitted. The third and fourth points to be processed are B1 and D1 for which a switched predictor is used. An estimated value for B1 is found from the average of either its horizontal (C1's) or vertical (A1's) neighbors, which ever pair has the least difference. Note that these neighboring points have been encoded at this point. If the interpolation error is less than a second threshold, the interpolated value is used, otherwise the error value is transmitted using the coarse DPCM quantizer as described for element C1. The method used for D1 is identical to that used for B1.

The corresponding part of the block in frame 2 (A2, B2, C2, D2) is then processed. A first test is made to see if it is permissible to interpolate all four elements from frame 1 and frame 1'. If the error of an individual pel, or if the average error of all four pels, is greater than a third threshold, then the block must be coded. First, the A2 pel is coded by transmitting a quantized correction to the value of A1 (fine quantizer). (A1 is more precisely known than the previous A2 pel from the same frame.) The other three pels (B2, C2, D2) are coded in precisely the same manner as the corresponding three pels in frame 1. If all four points in frame 2 can be interpolated, no additional data is required other than a single bit to designate coding or interpolation.

High detail areas have a masking effect so that a viewer is more tolerant of coding errors in these areas (Section III-D2). Therefore, the intraframe and interframe thresholds are made dependent upon an activity function derived from the amount of activity in the area being coded and designed to reflect the amount of local masking. In order to prevent buffer overflow during periods of peak |

- 42 -

Exhibit 85
Page 001686

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | activity the threshold range is made a function of the buffer state. When the buffer fills thresholds are raised and more picture elements are interpolated which in turn results in the use of shorter code words." [pp. 400-401]<br><br>"Interpolative coding techniques have been studied extensively in the past for digital coding of pictures [187], [188]. In general, they can be divided into two classes: fixed, and adaptive. In fixed interpolative methods, a fixed set of picture elements are selected for transmission and the rest are interpolated. Various types of samples can be chosen for transmission: as examples, one may transmit every alternative sample, one sample out of four, every alternate scan line, every alternate field or frame. The picture quality that results is a function of the number and type of samples that are dropped and the method of interpolation." [p. 397]<br><br>"Another method of interpolation is due to Gabor and Hill [192], which, for example, drops alternate fields and attempts to construct them by making movement of edges temporarily continuous, i.e., placing the edges in the dropped field at places dictated by their uniform motion between the adjacent transmitted field. Such a technique may be useful, but in practice it has been found to be rather difficult to implement, since it requires definition of edges and their motion. Several techniques have been used to transmit the pels from which other pels are derived. Predictive coding appears to be more common [193] due to its flexibility and simplicity.<br><br>Adaptive interpolative coding consists of three parts: 1) choosing certain points for transmission, 2) constructing the interpolation of nontransmitted pels, and 3) evaluating the interpolation error; if the error is below a certain threshold, then choosing fewer points for transmission; if it goes above threshold, then choosing a larger number of points for transmission. The fewest number of points that are needed to keep the interpolation error below the threshold is normally the desired characteristic." [p. |

Exhibit 85<br>Page 001687

| U.S. Patent No. 4,383,272<br>Claim 13 | Arun N. Netravali and John O. Limb, *Picture Coding: A Review*, Proceedings of the IEEE, Vol. 68, No. 3, Mar. 1980 ("Picture Coding") |
|---|---|
|  | 397] |
|  | "Criteria that are used for the decision to interpolate have traditionally been based on mean-square error [190]; but recently more sophisticated criteria, which may be closely related to human visual perception, have been used [193], [194].  Also adaptive two-dimensional interpolation has been used, which is helpful in decreasing the number of pels transmitted [189].  It should be remember that, unlike in fixed interpolative coding, adaptive interpolative coding requires two kinds of information: 1) addresses of picture elements chosen for transmission[10] and 2) intensity values of picture elements chosen for transmission."  [p. 397] |
| characterized in that said determining step includes selecting said related locations as a function of **the displacement of objects in said picture** [*the change of position of objects between said versions of the picture*]. | **Picture Coding teaches, discloses, and/or suggests selecting the related locations as a function of the displacement of objects in the picture.**<br><br>Picture Coding teaches selecting the related locations – the locations at which the object is expected to be – as a function of the displacement of objects in the picture.  Picture Coding states that "… one could divide the picture into distinct objects or sections of objects, identify textured regions and categories, and accurately track connected regions ….  Already computer simulation of a scheme *in which a local measure of velocity is calculated* in order to reduce prediction error is yielding reductions in bit rate of a third to a half that required for conditional replenishment schemes [102]."  *Id.* at 402 (emphasis added).  Therefore, Picture Coding discloses that related locations can be selected not only on the basis of the movement of objects in the picture, but also that individual objects or sections of objects can be identified.<br><br>Additionally, Picture Coding teaches methods of "motion compensated prediction" that select related locations based on the displacement of objects in a picture.  Specifically, Picture Coding indicates that "if there are objects moving in the field of view of a television |

- 44 -

Exhibit 85<br>Page 001688

| U.S. PATENT NO. 4,383,272 CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | camera and if an estimate of their translation is available, then more efficient predictive coding can be performed by taking differences of elements with respect to elements in the previous frame that are appropriately spatially translated." *Id.* at 382-83. Picture Coding also suggests several techniques for estimating the translation of a moving object, including, "Limb and Murphy [100], and Rocca [101] … and Netravali et al. [102], [103], [104]." *Id.* Thus, Picture Coding teaches the selection of elements based on the spatially translated motion of objects. Furthermore, Picture Coding also discloses a method of interpolation described (above) by Gabor & Hill, and cites that paper on page 397 and at reference [192] in the bibliography. Picture Coding describes Gabor & Hill as a system that "drops alternate fields and attempts to construct them by making movement of edges temporarily continuous, *i.e.*, placing the edges in the dropped field *at places dictated by their uniform motion* between the adjacent transmitted field." *Id.* at 397 (emphasis added). As such, Picture Coding discloses interpolating the intensities of elements in a picture in accordance with intensities of elements in related locations of preceding and succeeding picture versions, wherein the related locations are selected as a function of the displacement of objects in the picture. Picture Coding additionally discloses the following: "A new phase appears to be emerging in which more sophisticated parameters are being extracted from pictures. Rather than just calculating activity functions or measuring global speed, one could divide the picture into distinct objects or sections of objects, identify textured regions and categories, and accurately track connected regions. Perhaps 3-D representations of objects within a scene could be stored so that camera or object movements can be transmitted with just a few parameters. Already computer simulation of a scheme in which a local |

- 45 -

Exhibit 85
Page 001689

| U.S. PATENT No. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
|  | measure of velocity is calculated in order to reduce prediction error is yielding reductions in bit rate of a third to a half that required for conditional replenishment schemes [102]. To achieve this level of sophistication in real time (approximately 100 ns/pel), high speed calculations and large amounts of storage are required. However, with the prospect of 32-bit processors on a chip (albeit a large one) and with 64-kb RAM's already beginning to appear, image segmentation, identification and manipulation in real time may soon become economically possible. (It is primarily because of the speed requirements that microprocessors have had so little impact to date on the implementation of real-time coders.) [p. 402]<br><br>"Generalizations of Graham's rule have been made for frame-to-frame prediction, where one selects either a previous frame or an intraframe predictor, depending on surrounding information [95]. However, more successful adaptive predictors for frame-to-frame coding are the ones that take into account motion of objects. These are based on the notion that, if there are objects moving in the field of view of a television camera and if an estimate of their translation is available, then more efficient predictive coding can be performed by taking differences of elements with respect to elements in the previous frame that are appropriately spatially translated. Such prediction has been called motion compensated prediction [98], [99]. Its success obviously depends upon the amount of translational motion of objects in real television scenes and the ability of an algorithm to estimate translation with the accuracy that is desirable for good prediction. One set of techniques developed by Limb and Murphy [100], and Rocca [101] obtain an estimate of translation in a block of pels, whereas techniques developed by Netravali *et al.* [102], [103], [104], recursively adjust the translational estimate at every pel or at every small block of pels. Another approach to motion compensation is adaptive linear prediction by using elements in both the present and |

Exhibit 85
Page 001690

| U.S. PATENT NO. 4,383,272<br><br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | the previous frame (or field), which surround the element being encoded, and adapting the coefficients to minimize an intensity error function [105]. Such an approach is implementationally difficult and requires transmission of coefficients of the predictors.<br><br>Performance of motion-compensated prediction for video signals with initial quantization of 8 bit/sample is superior to the frame difference predictor by about one or two bits (entropy of the prediction error) depending upon the type of motion in the scene. A typical set of results for motion-compensated prediction is shown in Fig. 29 for a scene containing head and shoulders view of a person involved in an active conversation and occupying about 15-51 percent area of the picture. Four frames of this scene are shown in [102]. In terms of the total coder bit rate, the decrease due to motion compensation might be 20-70 percent [103]. With the cost of processing coming down, future coder implementations will certainly take advantage of this significant bit-rate reduction." [pp. 382-383]<br><br>"Another method of interpolation is due to Gabor and Hill [192], which, for example, drops alternate fields and attempts to construct them by making movement of edges temporarily continuous, i.e., placing the edges in the dropped field at places dictated by their uniform motion between the adjacent transmitted field. Such a technique may be useful, but in practice it has been found to be rather difficult to implement, since it requires definition of edges and their motion. Several techniques have been used to transmit the pels from which other pels are derived. Predictive coding appears to be more common [193] due to its flexibility and simplicity.<br><br>Adaptive interpolative coding consists of three parts: 1) choosing certain points for transmission, 2) constructing the interpolation of nontransmitted pels, and 3) evaluating the interpolation error; if the error is below a certain threshold, then choosing fewer points for transmission; if it goes above |

- 47 -

Exhibit 85<br>Page 001691

| U.S. PATENT NO. 4,383,272<br>CLAIM 13 | ARUN N. NETRAVALI AND JOHN O. LIMB, *PICTURE CODING: A REVIEW*, PROCEEDINGS OF THE IEEE, VOL. 68, NO. 3, MAR. 1980 ("PICTURE CODING") |
|---|---|
| | threshold, then choosing a larger number of points for transmission. The fewest number of points that are needed to keep the interpolation error below the threshold is normally the desired characteristic." [p. 397] |

## VII.    CONCLUSION

A substantial new question of patentability of claim 13 is raised in view of the prior art discussed above.

The Requester respectfully submits that the '272 patent be reexamined in view of the showing in this Request that a substantial new question of patentability is present.

Respectfully submitted,

McDERMOTT WILL & EMERY LLP

Kenneth L. Cage
Registration No. 26,151

**Please recognize our Customer No. 20277 as our correspondence address.**

600 13th Street, NW
Washington, D.C.  20005
Phone:  (202) 756-8000
Facsimile:  (202) 756-8087
Date:

- 48 -

Exhibit 85
Page 001692