# SCHMIDT DECLARATION
# EXHIBIT 117



# United States Patent and Trademark Office

PERFORMANCE AND ACCOUNTABILITY REPORT

FISCAL YEAR 2006



*Our Record-Breaking Year*

Exhibit 117
Page 002103

LUC 1314252

## FINANCIAL HIGHLIGHTS

| (Dollars In Thousands) | % Change 2006 over 2005 | September 30, 2006 | September 30, 2005 |
|---|---|---|---|
| Fund Balance with Treasury | 13.0% | $ 1,401,771 | $ 1,240,798 |
| Property, Plant, and Equipment, Net | 10.9% | 164,538 | 148,401 |
| Other Assets | (29.9)% | 13,987 | 19,950 |
| Total Assets | 12.1% | $ 1,580,296 | $ 1,409,149 |
| Deferred Revenue | 9.6% | $ 774,425 | $ 706,734 |
| Accounts Payable | 2.6% | 104,390 | 101,770 |
| Accrued Payroll, Benefits, and Leave | 11.7% | 101,368 | 90,727 |
| Other Liabilities | 10.9% | 102,115 | 92,088 |
| Total Liabilities | 9.2% | $ 1,082,298 | $ 991,319 |
| Net Position | 19.2% | 497,998 | 417,830 |
| Total Liabilities & Net Position Program | 12.1% | $ 1,580,296 | $ 1,409,149 |
| Total Program Cost | 6.3% | $ 1,514,169 | $ 1,424,028 |
| Total Earned Revenue | 16.1% | (1,594,437) | (1,372,807) |
| Net (Income)/Cost of Operations | (256.7)% | $ (80,268) | $ 51,221 |
| Budgetary Resources Available for Spending | 11.2% | $ 1,680,101 | $ 1,511,155 |
| Total Collections, Net | 48.7% | $ 151,818 | $ 102,126 |
| Federal Personnel | 11.2% | 8,189 | 7,363 |
| Disbursements by Electronic Funds Transfer (EFT) | — | 99% | 99% |
| On-Time Payments to Vendors | (2.0)% | 97% | 99% |

## PERFORMANCE HIGHLIGHTS

| Performance Measures | Target | Actual | Met/Not Met Score[1] |
|---|---|---|---|
| Patent Allowance Error Rate | 4.0% | 3.5% | ● |
| Patent In-Process Examination Compliance Rate | 86.0% | 90.0% | ● |
| Patent Average First Action Pendency (months) | 22.0 | 22.6 | ◐ |
| Patent Average Total Pendency (months) | 31.3 | 31.1 | ● |
| Patent Efficiency | $4,214 | $3,798 | ● |
| Trademark Final Action Deficiency Rate | 6.5% | 3.6% | ● |
| Trademark First Action Deficiency Rate | 6.5% | 4.3% | ● |
| Trademark First Action Pendency (months) | 5.3 | 4.8 | ● |
| Trademark Final Action Pendency (months) | 18.8 | 18.0 | ● |
| Trademark Efficiency | $635 | $565 | ● |
| Patent Applications Filed Electronically | 10.0% | 14.1%[2] | ● |
| Patent Applications Managed Electronically | 99.0% | 99.9% | ● |
| Trademark Applications Filed Electronically | 80.0% | 93.8% | ● |
| Trademark Applications Managed Electronically | 99.0% | 99.9% | ● |
| Intellectual Property Technical Activities/Countries Completed | 82/77 | 239/102 | ● ● |

[1] We are using three ratings for "met" or "not met." Green is for actually meeting or exceeding the target, Yellow indicates that the target is at least 75% met. Red indicates that the target was not met by at least 75%.

[2] This is preliminary data and is expected to be final by December 2006 and will be reported in the fiscal year (FY) 2007 PAR.

Exhibit 117
Page 002104

LUC 1314253

# TABLE OF CONTENTS

| | |
|---|---|
| **Message from the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office (USPTO)** | 3 |
| **Management's Discussion and Analysis** | 9 |
| Mission and Organization of the USPTO | 11 |
| Performance Goals and Results | 13 |
| Patent Performance | 16 |
| Trademark Performance | 24 |
| E-government and Intellectual Property Performance | 32 |
| Management Challenges | 49 |
| The President's Management Agenda | 50 |
| Management Assurances and Compliance with Laws and Regulations | 54 |
| Financial Highlights | 59 |
| **Financial Section** | 73 |
| Message from the Chief Financial Officer | 75 |
| Principal Financial Statements and Related Notes | 76 |
| Independent Auditors' Report | 99 |
| **Other Accompanying Information** | 107 |
| Management and Performance Challenges Identified by the Inspector General | 109 |
| The Nature of the Training Provided to USPTO Examiners | 111 |
| Fiscal Year 2006 USPTO Workload Tables | 117 |
| **Glossary of Acronyms and Abbreviation List** | 153 |

WEB ADDRESS FOR THE USPTO PERFORMANCE AND ACCOUNTABILITY REPORT

*http://www.uspto.gov/web/offices/com/annual/2006/index.html*

Exhibit 117
Page 002105

LUC 1314254



Exhibit 117
Page 002106

LUC 1314255

# MESSAGE FROM THE UNDER SECRETARY OF COMMERCE
# FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
# UNITED STATES PATENT AND TRADEMARK OFFICE

## FISCAL YEAR 2006: OUR RECORD-BREAKING YEAR

This year, President George W. Bush wrote, "In today's increasingly competitive world, improved enforcement of intellectual property rights is critical to establishing free and fair trade among nations and to protecting consumers and hardworking innovators."



World leaders are talking about intellectual property (IP) because it's becoming increasingly important to the world's economy. That's why it's critical that the United States Patent and Trademark Office (USPTO) continually improve and evolve to foster the growth and protection of our nation's valuable IP resources.

In 2006, the USPTO continued to improve the enforcement of IP rights in our nation and around the world. We led several initiatives to make our own country's system of IP protection even better. And we educated thousands of individuals, businesses, and other governments on the importance of protecting IP.

I am proud to say that fiscal year 2006 was a record-breaking year for the USPTO, in terms of quality, production, electronic filing, teleworking, electronic processing, and hiring.

These records reflect the hard work and sound decisions of more than 8,000 USPTO employees. Over the past four years, we have focused internally -- shining a bright light on our organization, raising the bar on our metrics and measures, and making system-wide improvements. We are now seeing the results of those efforts. While we'll continue improving our Agency, we are now working on our next strategic plan, focusing on the bigger picture of how IP and innovation are primary drivers of economic growth for our nation.



USPTO PERCENT OF GOALS MET

This chart tracks objective measures reported as required by statute in the *Government Performance and Results Act of 1993.*

Exhibit 117
Page 002107

3

LUC 1314256

## LEADING WITH PATENTS

Our Patent organization broke virtually every record this year -- in terms of improving quality, efficiency, e-filing, hiring, training, and hoteling. I am particularly proud of the improvements in quality. We had a record of more than 440,000 patent applications filed, and the lowest error rate in 20 years of 3.5 percent. As we define our new strategic plan going forward, we will continue to work with all interested parties to look for new ways to improve and measure quality even more effectively.



**Patent Examination Error Rate** *(Patent Allowance Error Rate)*
**Patent Applications Filed** *(Utility, Plant, Reissue, and Design)*

However, one challenge that remains is that the volume of patent applications continues to outpace our capacity to examine them. We have a pending application backlog of historic proportions. Patent pendency -- the amount of time a patent application is waiting before a patent is issued or abandoned -- now averages more than 31 months. To turn that corner and reduce the backlog of patent applications and the amount of wait-time for a patent examination, the USPTO is continuing and enhancing several initiatives, and proposing other necessary changes to the patent system as well.

### *Hire, train, retain, and hotel*

The USPTO hired a record 1,218 patent examiners in FY 2006, exceeding our hiring goal by more than 200 people. We also plan to hire 1,200 new examiners in FY 2007, representing another monumental increase.

To match this dramatic hiring, we tried a new way of training. We implemented a university approach to training new examiners, in which we teach them in classroom groups for eight months, rather than using our traditional one-on-one training model. This allowed us to deliver intensive training to the new examiners, while more experienced examiners and supervisors could focus on quality examination.

We implemented recruitment bonuses to hire and retain the talented engineers and scientists we need to examine our increasingly complex applications.

And we added the first 500 examiners to our hoteling program, providing them with the electronic access and equipment they need to do their jobs from remote locations. This gave the USPTO space to add examiners more quickly and cost-effectively. An added benefit for those hoteling has been the reduction of time spent commuting. We plan to add 500 more examiners to the hoteling program in the coming year, and we are piloting a work-at-home program for our technical support staff as well.

### *Implementing Electronic Filing System-Web*

Patents implemented the Electronic Filing System-Web (or EFS-Web), a user-friendly, Internet-based patent application and document submission solution. This system has already dramatically increased the electronic filing of patent applications from 1.5 percent per month to 33 percent per month.

Exhibit 117
Page 002108

LUC 1314257

### *Optimizing the patent process*

This year, we proposed rules changes regarding the examination of patent application claims, continuations, and information disclosure statements. Our executive team traveled the nation presenting the proposed rules to interested groups and asking for feedback and alternative solutions from our customers and stakeholders, including independent inventors.

Our goal in these proposed claims and continuations packages is to produce a more focused, higher-quality, and efficient examination. Our goal in the proposed changes to information disclosure statements is to provide the most relevant information to examiners as early as possible.

We also implemented a new accelerated patent examination procedure, which gives participating applicants a final decision on their application within 12 months from filing. This is in return for their providing an appropriate search of the prior art and an improved explanation of their claims and prior art found.

We will continue to work with all interested parties to ensure that we maintain and improve the world's best patent processes and procedures.

## LEADING WITH TRADEMARKS

In FY 2006, the Trademark organization also broke records in quality while increasing production. With more than 354,000 application classes filed, we had a final action error rate of only 3.6 percent. In fact, the Trademark organization exceeded all of its Agency performance targets for the first time since the *Government Performance and Results Act of 1993* mandated establishing Agency goals. Those goals include first and final action quality, production, application pendency, and efficiency.



TRADEMARK SUCCESS

● **Trademark Examination Error Rate** *(Trademark Final Action Deficiency)*
● **Trademark Applications Filed** *(including additional classes)*

### *Optimizing the trademark process*

We reduced first action pendency by 1.5 months. We increased by 25 percent our number of "disposals" (instances when trademarks are either registered, or the applicant abandons the application). We made significant progress on improving internal operations. We streamlined our process to further improve disposal pendency and quality. We documented workflows, adopted standardized practices, and retrained employees to enhance trademark consistency and quality.

### *Enhancing trademark e-filing*

Ninety-four percent of trademark applications were filed electronically this year, compared with 88 percent in FY 2005. We continued to enhance electronic filing by expanding the number and type of transactions offered on-line and by offering reduced fees to any applicant who files a complete application using our newer system, Trademark Electronic Application System-Plus.

### *Improving customer service and communications*

The Trademark organization provided more options to enhance the quality of application data in trademark systems and search results. And we expanded the hours of the Trademark call center, and added call center positions to improve service for all our customers.

Exhibit 117
Page 002109

5

LUC 1314258

### Expanding successful Trademark work-at-home program

The Trademark organization's work-at-home program for examining attorneys received the "Telework Program with Maximum Impact on Government Award" from the Telework Exchange. We expanded the work-at-home program to include 85 percent of all eligible employees. The Trademark work-at-home program is considered a "best practice" because of its success in addressing budgetary, space, retention, recruitment, and job satisfaction issues.

## LEADING WITH INTERNATIONAL RELATIONS AND ENFORCEMENT

In FY 2006, the USPTO communicated the importance of protecting and respecting IP, both domestically and internationally.

### Working with other U.S. Government agencies

As part of the Bush Administration's Strategy Targeting Organized Piracy (STOP!) initiative, the USPTO worked with other U.S. Government agencies to fight piracy and counterfeiting around the world. We collaborated on IP training, norm-setting, and enforcement efforts with our colleagues in the Departments of Commerce, Justice, and State; the Department of Homeland Security's Customs and Border Protection; the Copyright Office; and the Office of the United States Trade Representative (USTR). Together, we enhanced the domestic and international IP environment for American businesses.

### Working with individuals and businesses

As part of STOP!, the USPTO continued a communications campaign to educate small businesses about protecting their IP in the United States and abroad. We offered small-business conferences in San Diego, Northern Virginia, Columbus, Nashville, Minneapolis, and Providence.

Other USPTO conferences focused exclusively on the IP challenges of doing business in China. All conferences had strong attendance, and more than 90 percent of attendees rated them "Excellent" or "Good."



USPTO IP AWARENESS CONFERENCE RESULTS
*Percent of "Excellent" or "Good" Ratings by Attendees*

The USPTO continued to staff the STOP! hotline, 1-866-999-HALT, which lets callers receive information from our attorneys with regional expertise on IP rights and enforcement. This year, the hotline received 1,460 phone calls from people across America with a range of IP questions -- a 52 percent increase over FY 2005.

The STOP! gateway Web site, *www.stopfakes.gov*, was expanded to provide more specialized information, including USPTO-designed "IP toolkits" which help businesses protect their rights in other countries.

Exhibit 117
Page 002110

LUC 1314259

### *Working with other governments*

To strengthen global IP protection, the USPTO represented the United States in discussions and negotiations at the World Intellectual Property Organization (WIPO) throughout the year. Most notably, in March, the USPTO led a delegation to the WIPO Diplomatic Conference, which culminated in the adoption of the Singapore Treaty on the Law of Trademarks. The new treaty will help trademark applicants around the world receive better and faster responses.

The USPTO promoted IP protection in China. Through the Joint Commission on Commerce and Trade (JCCT) and its Intellectual Property Rights (IPR) Working Group, the USPTO and USTR negotiated another set of commitments from the Chinese Government to reduce counterfeiting and piracy. The USPTO signed a Work Plan for Strategic Cooperation with China's patent office, the State Intellectual Property Office, and hosted a delegation from the China Trademark Office to discuss improving trademark protections.

The USPTO conducted 17 Global Intellectual Property Academies for foreign government officials, including judges; prosecutors; police officers; customs officers; patent, trademark, and copyright officials; and policy makers. The USPTO also conducted IPR programs for government officials and private sector representatives around the world, including in Southeast Asia, India, China, the Middle East, North Africa, Latin America, Russia, Turkey, and others.

We placed IP experts in Brazil, China, Egypt, India, and Thailand to advocate improved IP protection for American businesses and to coordinate training to help stop piracy and counterfeiting abroad.

## CONCLUSION

We are confident that the USPTO's financial and performance data is complete, reliable, accurate, and consistent, as we improve our ability to measure progress toward performance objectives.

For the 14th consecutive year, we received an unqualified audit opinion on our annual financial statements. For financial reporting, the independent auditors did not identify any material weaknesses, reportable conditions, or instances of noncompliance. However, we are reporting one non-financial material weakness in information technology security.

During FY 2006, the USPTO lived up to our duty to strengthen intellectual property protection in the United States and around the world. Our vision means continually improving our own operations and preparing to become even more innovative for the future. With the leadership of President George W. Bush and Secretary of Commerce Carlos Gutierrez, I am confident we will continue to meet the challenges of the 21st century.

*Jon W. Dudas*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*
*November 6, 2006*

Exhibit 117
Page 002111

LUC 1314260

# 2005
# CERTIFICATE OF EXCELLENCE



Exhibit 117
Page 002112

LUC 1314261

# MANAGEMENT'S DISCUSSION *and* ANALYSIS



Exhibit 117
Page 002113

LUC 1314262



Exhibit 117
Page 002114

LUC 1314263

# MISSION AND ORGANIZATION OF THE USPTO

## MISSION STATEMENT

The USPTO's mission is to foster innovation and competitiveness by providing high quality and timely examination of patent and trademark applications, guiding domestic and international intellectual property policy, and delivering intellectual property information and education worldwide. Intellectual property includes inventions or creations embodied in the form of a patent, trademark, trade secret, or copyright.

For over 200 years, the core mission of the USPTO has remained the same: to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries (Article 1, Section 8 of the United States Constitution). American industry has flourished under this system of protection as new products have been invented, new uses for existing inventions have been discovered, and employment opportunities have been created for millions of Americans. Customers are protected against confusion and deception in the marketplace, and businesses are given the enhanced protection of trademark rights and notices of the trademark rights claimed by others. Patents and trademarks have long protected American creativity and ingenuity.



*USPTO Director Jon Dudas speaks to managers during a management retreat. USPTO leaders worked on the agency's strategic plan for 2007–2012, among other issues.*

The first patent was issued in 1790 for a method of making potash fertilizer and the oldest active trademark was originally registered in 1884 for SAMSON, a design for "cords, lines, and ropes."

The strength and vitality of our economy depends directly on effective mechanisms for protecting new ideas and investments in innovation and creativity. The continued demand for patents and trademarks underscores the ingenuity of American inventors and entrepreneurs. The USPTO is at the cutting edge of our nation's technological progress and achievement.

The primary services provided by the USPTO are examining patent and trademark applications, educating, and disseminating patent and trademark information. Through issuing patents, the USPTO encourages technological advancement by providing incentives to invent, invest in, and disclose new technology. Through registering trademarks, the USPTO assists businesses in protecting their investments, promoting quality goods and services, and safeguarding consumers against confusion and deception in the marketplace. In addition to the examination of applications to determine if they qualify for patent grants and trademark registrations, the USPTO provides technical advice and information to Executive Branch agencies on intellectual property matters and the trade-related aspects of intellectual property rights. The USPTO also works with governments of other countries to establish regulatory and enforcement mechanisms that meet international obligations relating to the protection of intellectual property.

Exhibit 137
Page 002115

11

LUC 1314264

## LOCATION, ORGANIZATIONAL STRUCTURE, AND WORKFORCE



*USPTO Director Jon Dudas congratulates Supervisory Patent Examiner Peter Paras, Jr. at an all-employee celebration of FY 2006, a record-breaking year.*

The USPTO is an agency of the United States (U.S.) within the Department of Commerce (DOC). The USPTO is headquartered in Alexandria, Virginia and has two storage facilities located in Alexandria and Springfield, Virginia, as well as leased storage space in Boyers, Pennsylvania. At the end of FY 2006, the USPTO workforce was comprised of 8,189 federal employees, including 4,779 patent examiners and 413 trademark examining attorneys, and 3,817 contract employees.

The USPTO has evolved into a unique government agency. Since 1991—under the Omnibus Budget Reconciliation Act (OBRA) of 1990—the USPTO has received fees from users to fund its operations. The USPTO is led by the Under Secretary of Commerce for Intellectual Property and Director of the USPTO who consults with the Patent Public Advisory Committee and Trademark Public Advisory Committee. The USPTO has two major business lines – Patents and Trademarks – as shown in the following organization chart:



*Fiscal year 2006 was a record-breaking year for the USPTO. For the third consecutive fiscal year, USPTO demonstrated consistent improvement in significant performance measures, including production and quality. In FY 2006, USPTO's employees led the agency to meet 90% of our Government Performance and Results Act of 1993 goals, and 94% of overall reported goals. USPTO is a performance-based organization—and we're proud that our emphasis on business-type metrics, goals, and an environment of accountability is leading us to historic successes. Of course, given USPTO's responsibilities as a steward of the public trust, a business model has practical limits. While private businesses operate to maximize profits, the USPTO does not seek to profit maximization as, for example, by cutting unprofitable cost centers. We focus on responsible and efficient management of resources to ensure we achieve our most important goal: quality examination of patent and trademark applications. We are quality driven – not profit driven – and continue to use the best aspects of business models to provide outstanding patent and trademark examination, processing, and services.*

Exhibit 117
Page 002116

LUC 1314265

# PERFORMANCE GOALS AND RESULTS

## USPTO STRATEGIC PLAN

The Government Performance and Results Act (GPRA) requires that agencies plan and measure the performance of their programs. In carrying out GPRA, the USPTO prepares a *Strategic Plan* and an annual performance report, which can be found on our website: http://www.uspto.gov/web/offices/com/strat21/index.htm. By design, the performance plan is linked to the budget submissions and reflects the priorities of the Under Secretary and the goals contained in the *21st Century Strategic Plan*. The budget can be found at: http://www.uspto.gov/web/offices/ac/comp/budg/index.html.

The USPTO began FY 2006 guided by the aggressive and far-reaching *21st Century Strategic Plan*. Technology is increasingly complex and customer demands for high quality products and services have escalated. At the same time, the number of pending patent applications in the world's examination pipeline continues to increase significantly. Congress has voiced concerns about the agency's ability to effectively fulfill the mission in the future if we continue to operate in a traditional manner. The *21st Century Strategic Plan* addresses these challenges and concerns. The *Plan* focuses our expertise on examination and leverages that expertise to provide customers with better products and services. Three long-term, cross-cutting strategic themes comprise the *Plan's* core:

- **Agility:** Address the 21st century economy by becoming a more agile organization—We will create a flexible organization and work processes that can handle the increasing expectations of our markets, the growing complexity and volume of our work, and the globalization that characterizes the 21st century economy. We will work, both bilaterally and multilaterally, with our partners to create a stronger, better-coordinated, and more streamlined framework for protecting intellectual property around the world. We will transform the USPTO workplace by radically reducing labor-intensive paper processing.

- **Capability:** Enhance quality through workforce and process improvements—We will make patent and trademark quality our highest priority by emphasizing quality in every component of this *Strategic Plan*. Through the timely issuance of high quality patents and trademark registrations, we will respond to market forces by promoting advances in technology, expanding business opportunities and creating jobs.

- **Productivity:** Accelerate processing times through focused examination—We will control patent and trademark pendency and recover our investments in people, processes, and technology.

The USPTO has developed supporting performance goals and measures to implement our strategic themes. The three supporting performance goals tracked through 16 measures include:

GOAL 1:   Improve the quality of patent products and services and optimize patent processing time.

GOAL 2:   Improve the quality of trademark products and services and optimize trademark processing time.

GOAL 3:   Create a more flexible organization through transitioning patent and trademark operations to an e-government environment and participate in intellectual property development worldwide.

In FY 2006 the USPTO assessed the progress made with the goals and initiatives of the *21st Century Strategic Plan*, as documented in our Interim Adjustment Document.  There is now a draft of the *Strategic Plan* that will cover fiscal years 2007 through 2012.  This *Plan* identifies objectives, initiatives, and performance measures and indicators that will enhance the degree of excellence or quality in every aspect of the patent and trademark processes – from the information we receive from applicants to the support provided to our own employees.

Exhibit 117
Page 002117

13

LUC 1314266

## PERFORMANCE DATA VERIFICATION AND VALIDATION

In accordance with GPRA requirements, the USPTO is committed to making certain that performance information reported is complete, accurate, and consistent. To ensure the highest quality data, the USPTO has developed a strategy to validate and verify the quality, reliability, and credibility of USPTO performance results and has undertaken the following:

*Accountability* – Responsibility for providing performance data lies with managers of USPTO programs. The USPTO holds program managers accountable for making certain procedures are in place to ensure the accuracy of data and the performance measurement sources are complete and reliable.

*Quality Control* – Automated systems and databases that collect, track, and store our performance indicators are monitored and maintained by management of USPTO programs, with systems support provided by the Chief Information Officer's organization. Each system, such as Patent Application Location and Monitoring (PALM) or Trademark Reporting and Monitoring (TRAM), incorporates internal program edits to control the accuracy of supporting data. The edits typically evaluate data for reasonableness, consistency, and accuracy. Cross-checks against other internal automated systems also provide assurances of data reasonableness and consistency. In addition to internal monitoring of each system, experts outside of the business units routinely monitor the data-collection methodology. The Chief Financial Officer's organization is responsible for monitoring the agency's performance, providing direction and support on data collection methodology and analysis, ensuring that data quality checks are in place, and reporting performance management data.

*Financial Statement Audit* – During the FY 2006 financial statement audit, various tests and reviews of the primary accounting system and internal controls were conducted, as required by the Chief Financial Officers' Act. In their FY 2006 report, the auditors reported no material weaknesses in internal controls or compliance violations. The auditors issued an unqualified opinion on the USPTO's FY 2006 financial statements. Additionally, as required by the Office of Management and Budget (OMB) Bulletin Number 06-03, the auditors reported that they had "obtained an understanding of the design of significant internal controls relating to the existence and completeness assertions" with respect to the performance measures reported in the Management's Discussion and Analysis section.

*Data Accuracy* – The USPTO conducts verification and validation of performance measures periodically to ensure quality, reliability, and credibility. At the beginning of each fiscal year, and at various points throughout the reporting or measurement period, sampling techniques and sample counts are reviewed and adjusted to ensure data are statistically reliable for making inferences about the population as a whole. Data analyses are also conducted to assist the business units in interpreting program data, such as the identification of statistically significant trends and underlying factors that may be impacting a specific performance indicator. For examination quality measures, the review programs themselves are assessed in terms of reviewer variability, data entry errors, and various potential biases.

## PERFORMANCE AUDITS AND EVALUATIONS

The Office of the Inspector General (OIG) contributes to the USPTO's efforts to assure audit and evaluation coordination and coverage of USPTO goals.

Two inspection reports were completed in FY 2006. In the first report, *"Management of Commerce's Federal Workers' Compensation Program Need Significant Improvements," IPE-17536/March 2006*, the OIG evaluated USPTO's Federal Employees' Compensation Act (FECA) program separately from their evaluation of the DOC since the USPTO manages its own workers' compensation personnel and duties under authority of the 1999 American Inventors Protection Act (AIPA). Based on the OIG's review of the FECA cases, USPTO processes most claims well within the ten days required by law; however, they did find some administrative and program weaknesses for example, that case management was inconsistent and policies, guidance, and training for supervisors was needed. The USPTO generally agrees with the findings and recommendations and has begun to work more closely with the Department of Labor to gain greater access to case information, creating Agency Administrative Orders on the Workers' Compensation Program, and planning FECA training in the current training courses for new supervisors. No program evaluations were performed in FY 2006.

Exhibit 117
Page 002118

LUC 1314267

The second OIG report, *"Commercial Service China Generally Performs Well But Opportunities Exist for Commerce to Better Coordinate Its Multiple China Operations,"* *IPE-17546/March 2006*, focused on the management of the Commercial Service's (CS) post in China, including its programmatic, financial, and administrative operations. OIG also reviewed other Commerce operations and interests in China, including those of the USPTO. The OIG recommended that USPTO develop regular standards and an IPR training program in cooperation with National Institute of Standards and Technology to ensure that CS officers and other staff attend the training. USPTO agreed with OIG's findings and is developing standards and an IPR training program in Beijing in conjunction with the standards officer for DOC at the Embassy in Beijing.

The performance of the USPTO's two major program activities was assessed in FY 2003 using the Program Assessment Rating Tool (PART). All programs that undergo a PART evaluation receive weighted scores in four categories: program purpose and design, strategic planning, program management and program results and accountability. By using in-depth performance questions, PART evaluates how well a program is meeting its intended objectives; how effectively and efficiently it is managed and how well the program achieves results. The Patent organization received a rating of "adequate" with a score of 68, and the Trademark organization received a rating of "moderately effective" with a score of 73. The USPTO continues to implement improvements and annually updates performance data, improvement plans, and funding information for both PART evaluations for the OMB. USPTO was not PARTed in FY 2006.

The Office of Personnel Management (OPM) issued two audit reports this year. The first OPM audit, dated January 2006, looked at how the USPTO carried out its personnel security and suitability programs. The report stated it was evident that the key members of the USPTO staff have a good understanding of personnel suitability, security, and investigations guidelines, although improvement is needed in certain areas to meet the OPM requirements, such as ensuring all position descriptions contain the final risk or sensitivity level, and include adjustments for the appropriate IT designation level. The USPTO responded that it will ensure that all members of the Office of Security will be fully informed of all investigative guidelines and procedures as mandated by Executive Orders and regulations for protecting the interests of national security and for investigating and adjudicating individuals for employment in the federal service.

The USPTO concurs with the recommendations in the second audit report that covered the key systems of strategic human capital management dated March 2006 and has taken steps to address recurring external recruitment issues. These steps include: issuance of a memorandum and formal training for selecting officials; briefings by the Chief Administrative Officer; and providing written guidance to managers on proper selection procedures.



*Members of the Performance and Accountability Report team accept the "Certificate of Excellence in Accountability Reporting Award" from the Association of Government Accountants for the USPTO Performance and Accountability Report for FY 2005.*

Exhibit 117
Page 002119

15

LUC 1314268

## PATENT PERFORMANCE

The core function of the Patent organization is the examination of an inventor's application for a patent. Patent examiners compare the claimed subject matter of an application to a large body of technological information to determine whether the claimed invention is new, useful, and non-obvious to someone knowledgeable in that subject matter. This process includes: the preparation of correspondence relating to the examination; answers on applications appealed to the Board of Patent Appeals and Interferences (BPAI); and interference proceedings to determine priority of invention. Additionally, examiners prepare Search Reports and International Preliminary Examination Reports for international applications filed under the Patent Cooperation Treaty (PCT).  PCT Operations and the PCT Legal Administration Office oversee the processing of international patent applications.

Activities essential to the patent process are performed by a number of offices within the Patent organization. At the front end, the Office of Initial Patent Examination (OIPE) performs an administrative review of newly filed applications, manages the recordation and electronic capture of documents, and collects fees.  In FY 2006, OIPE received over 417,000 Utility, Plant, and Reissue (UPR) patent applications, over 25,000 Design applications, and over 52,000 PCT applications. This represents an 8.7 percent increase over FY 2005 UPR filings; a 2.1 percent increase over FY 2005 design applications; and a 13 percent increase over FY 2005 PCT applications. Additionally, 121,307 provisional applications were received.

At the back end of the process, the Office of Patent Publications performs post-examination processing of allowed applications, disseminates issued patents to the public, and issues patents to successful applicants. In FY 2006, 164,115 UPR and 19,072 Design patents were granted.  This office also published 291,259 pending applications, as provided for in the AIPA.

The Search and Information Resources Administration (SIRA) works with the Office of the Chief Information Officer to identify and develop efficiencies in the patent examination process through the use of information technologies. This office acquires, maintains, and provides access to a vast array of scientific and technical literature for use in the examination process.  SIRA also implements and maintains classification schemes for the efficient retrieval of patent information and other documents residing in the search files.

The Office of Patent Quality Assurance performs a quality review function by conducting random sample reviews of both in-process and allowed applications.  Data gathered from these reviews are used to identify problems, provide feedback to examiners and supervisors, improve training, and represents a significant element of the Patent organization's commitment to quality in all areas of its operations.  The Office of Patent Training coordinates the development of curriculums and deployment of training throughout the Patent organization.

In 2006, the USPTO updated its *Strategic Plan* to reflect the dramatic changes in the agency's work environment and address emerging 21st century challenges and opportunities.  The USPTO's primary emphasis continues to be quality; for the Patent organization this translates to timely, consistent, and accurate examination of applications.  Optimizing patent quality and timeliness requires streamlined procedures, good inputs, and a highly skilled workforce.  The USPTO continues to strive to meet its performance goals through a number of strategies, including: hiring sufficient numbers of new patent examiners, delivering effective training, exploring work sharing with other patent offices, out-sourcing, leveraging advances in information technology (IT), streamlining procedures, and working with the applicant community to provide products that meet their needs while efficiently utilizing the office's resources.

Reducing patent pendency and decreasing the size of the work backlog requires a multi-faceted approach to attract, hire, train, and retain the highly effective examiners who are critical to meeting this goal.  In FY 2006, the USPTO hired 1,218 new patent examiners – 200 more than its hiring goal.  To successfully compete for the most talented and demanded individuals in the workforce, the Patent organization established a multi-pronged recruitment and retention program in 2006, beginning with the award of recruitment bonuses to individuals in difficult-to-fill areas of technology.

To support the aggressive hiring goal of at least 1,200 new examiners per year from fiscal years 2007 through 2012, the Patent organization redesigned its training program and piloted a comprehensive university style approach to training new examiners. Approximately half of the examiners hired in FY 2006 received training through the Patent Training Academy for up to eight consecutive months.  This program is designed to provide the participants with a strong foundation and more advanced skills when they enter

Exhibit 117
Page 002120

LUC 1314269



*Newly hired patent examiners attend the new USPTO Patent Training Academy, a university-style approach to teaching USPTO's new examiners. More than 1,200 new patent examiners began their careers at the USPTO in FY 2006 with this training program.*

the examination corps upon graduation. The curriculum combines large group lectures, specialized small group training and study, one-on-one spot assistance, and examination of real patent applications. The first training class under this program was initiated in January 2006, with training completed in September 2006. Additional classes began in May, June, July, and September.

To ensure that our primary patent examiners maintain the knowledge, skills, and abilities necessary to perform high quality examinations, the re-certification program was continued, with an additional one third of all primary examiners completing re-certification. All of the examiners who have been primary examiners for at least three years have been certified. In FY 2006, a new study tool was developed to help patent examiners prepare for the Practice and Procedure Exam. Junior examiners must successfully complete a certification and testing program prior to promotion to the level where they are given legal and negotiation authority. Both new and experienced first-line managers attended training to increase the effectiveness of work product reviews and to improve coaching skills.

The skills of the technical support staff are a vital component of supporting an efficient examination process. In FY 2006, the management initiated a learning opportunities program for Patents Technical Support Staff, providing over 2,000 free computer based courses to all patents technical support and administrative staff. The program also offers a series of lunchtime lectures to expand the employees' understanding and knowledge of the various business areas throughout the Patent organization.

Identification of the most relevant prior art is one component of a quality examination. In January 2006, the Patent organization commenced enhancement of its International Patent Classification (IPC) search capability, which will introduce the IPC into the U.S. patent classification system in specific areas. As this initiative is expanded to include additional technologies, examiners will benefit from enhanced search capabilities, mutual reliance on search results, and automatic enhancements to the IPC system developed by the USPTO in cooperation with other WIPO industrial property offices. Further improvements to the search process were made with the creation of 1,200 new search templates for examiners.

Following completion of a pilot for outsourcing the preparation of Search Reports for PCT applications to both private sector enterprises and the Australian Patent Office, a competitive bid was executed and contracts awarded for this service in FY 2006. The outsourcing of these reports will allow examiners more time to focus on the examination of national applications. A competitively sourced contract was also awarded for reclassification of patent search files.

In FY 2006, the USPTO expanded implementation of the Trilateral Document Access (TDA) initiative with the European Patent Office (EPO) to include the Japan Patent Office (JPO). TDA allows patent examiners to instantly view application document images for published applications in all three offices using existing viewing tools. As a result, a patent examiner may conveniently compare the foreign application documents to the application under review.

Exhibit 117
Page 002121

17

LUC 1314270



(BACK ROW) *USPTO Director Jon Dudas and Secretary of Commerce Carlos Gutierrez look on as* (FRONT ROW) *Dean Harts of 3M, April Sauders-Fuller of Fish & Richardson, and Felicia Metz of the University of Maryland file patent documents electronically at the March 16, 2006 launch of the USPTO's new Electronic Filing System-Web (EFS-Web).*

The Patent organization exceeded its goal of ten percent of applications filed electronically in FY 2006. To attain this goal, the Patent organization held multiple forums in 2005 with customer groups to gather requirements for the development of a system that would increase the use of electronic filing by identifying and addressing applicants' needs. The resulting design for a web-based system with Portable Document Format (PDF) attachments was piloted in late 2005 and released to the public in March 2006. The patent community's response to EFS-Web has been resoundingly positive as demonstrated by the steady increase in the receipt of electronic filings. The Patent organization continues to actively market the new system to ensure that applicants are familiar with the benefits of electronic filing.

In prior years, the Patent organization achieved its e-government objectives of providing all patent examiners, technical staff, and support staff the ability to work electronically from an image based system. Building on this capability in FY 2006, the Patent Hoteling Program (PHP) pilot was launched to allow participants to work-at-home with full remote access to all systems needed to perform their jobs. The PHP pilot involved testing multiple technical solutions to provide secure, reliable, and fast access to USPTO systems, as well as evaluating communications tools such as voice-over-Internet-Protocol and teleconferencing abilities to ensure that employees could work from remote locations as efficiently as from their offices. The program includes a 'hotel' component that permits participants to reserve workspace for required time spent in shared offices throughout the USPTO's Alexandria campus. In FY 2006, a total of 538 staff and 420 managers received comprehensive training on the use of remote access tools prior to receiving their USPTO-issued equipment and officially joining the program. Additionally, 361 supervisory patent examiners attended change management training to better adapt their management skills to the virtual office environment. As of fiscal year-end, 506 examiners are working from home, and feedback from a survey of participants has been overwhelmingly positive. This program provides a cost-effective means of expanding the examiner corps, improving the quality of life for many employees, and is an attractive benefit to both potential new hires and existing employees.

In FY 2006, the USPTO published various proposed rule changes aimed at improving the efficiency and effectiveness of the patent application and examination process. Some of the proposed returns would require more focused applications and better information from applicants thus improving quality by reducing the amount of rework performed. Proposed changes include requiring applicants to identify the most important claims to inventions, which facilitates a more focused examination of applications. Some of the rule reforms that the USPTO is considering will affect the examination process in the areas of continuations, claims, and Information Disclosure Statements (IDS).

Exhibit 117
Page 002122

LUC 1314271

As one step in creating an alternative examination system that better meets the public's needs and enables efficient use of USPTO resources, the Patent organization published procedures for patent applicants desiring a final decision within twelve months on whether their application for a patent will be granted or denied. To be eligible for this accelerated examination, applicants who file under this procedure are required to provide specific information so that review of the application can be completed rapidly and accurately.



*USPTO Director Jon Dudas congratulates the Patents Hoteling Program's first graduating class. Five-hundred patent examiners joined the hoteling program this year and began working from home, giving the USPTO more space for expansion and reducing the commute time for examiners.*

## QUALITY OF PATENTS

Specific performance results related to the Patent organization goals and measures are as follows:

---

**PERFORMANCE GOAL:** *Improve the quality of patent products and services and optimize patent processing time*

---

Strategically, quality will continue to be the Patent organization's number one priority. The Patent organization continues to improve the quality of its products and services using in-depth reviews of work in progress and enhanced end-process reviews to provide feedback to examiners on areas for improvement, targeted training, and safeguards to ensure competencies.

---

**MEASURE:** *Patent Allowance Error Rate*

---

### PATENT ALLOWANCE ERROR RATE

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | Office of Patent Quality Review Report. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | Automated systems, reports. |
| Verification: | Manual reports and analysis. |
| Data Limitations: | None. |

|          | FY 2003 | FY 2004 | FY 2005 | FY 2006    |
|----------|---------|---------|---------|------------|
| Target   | 4.0%    | 4.0%    | 4.0%    | 4.0%       |
| Actual   | 4.4%    | 5.3%    | 4.6%    | 3.5% met   |

**Discussion:** *Target met. The decline in the error rate indicates that the quality initiatives implemented in FY 2005 and FY 2006 have been effective.*

Exhibit 117
Page 002123

19

LUC 1314272



**MEASURE: Patent In-Process Examination Compliance Rate**

## PATENT IN-PROCESS EXAMINATION COMPLIANCE RATE



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | Office of Patent Quality Review Report. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | Automated systems, reports. |
| Verification: | Manual reports and analysis. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | — | Baseline | 84.0% | 86.0% |
| **Actual** | — | 82.0% | 86.2% | 90.0% met |

**Discussion:** Target met. The improvement of the in-process compliance rate indicates that the quality initiatives implemented in FY 2005 and FY 2006 are producing the desired results.

## PENDENCY

The two primary measures of Patent organization processing time are: (1) average first action pendency, which measures the average time in months from filing until an examiner's initial determination is made of the patentability of an invention; and (2) average total pendency, which measures the average time in months from filing until the application is issued as a patent or abandoned by the applicant. The USPTO is actively implementing strategies to reduce patent pendency and the backlog of applications awaiting examination such as increased hiring, proposed rule, and process changes. However, even with continued access to the funding required to successfully execute these strategies, pendency will continue to rise for a period of time, but not to the extent it would have if these actions were not taken.

Between fiscal years 1997 and 2006, the number of patent applications filed has increased 87 percent. Simultaneously, the complexity of applications has increased significantly, compounding the demand on limited resources. During most of these years, the Patent organization's ability to staff at the level necessary to keep pace with the ever-increasing volume of applications were significantly restricted by limited funding and hiring ceilings. While various means of improving efficiency such as automation and enhanced training have been employed in an effort to partially offset the shortage of examiners, the backlog of applications continued to grow, exceeding 700,000 in FY 2006.

In fiscal years 2005 and 2006 more than 2,000 examiners were hired and the Patent organization plans to hire 1,200 examiners each year from FY 2007 through FY 2012. The redesigned training programs will improve new examiners' initial skills, but optimum examiner efficiency is still a function of experience, and it will be several years before these new hires reach their full potential. Hiring and training alone will not solve the pendency problem—policy and operational changes are also required. For these reasons, the USPTO has identified realistic pendency goals reflective of the time frames necessary for the strategies to provide results.

Exhibit 117
Page 002124

LUC 1314273

**MEASURE:** *Patent Average First Action Pendency (months)*

## PATENT AVERAGE FIRST ACTION PENDENCY



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | PALM system. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | PALM, automated systems, reports. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the PALM system. Final test for reasonableness is performed internally by patent examiners, supervisors, and program management analysts. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | 18.4 | 20.2 | 21.3 | 22.0 |
| **Actual** | 18.3 | 20.2 | 21.1 | 22.6 *not met* |

**Discussion:** *Target not met. This target was not met because there were more older applications processed than planned. We expect to meet the goal next year through increased hiring efforts.*



*Chairman and CEO of Toshiba America Toru Uchiike* (LEFT) *and USPTO Director Jon Dudas* (CENTER LEFT) *observe a demonstration from Amy Hafer of her team's winning invention, "The Human Touch." The event was the ExploraVision Awards Program, one of the world's largest science and technology competitions for students (K-12th grade). It is sponsored by Toshiba America and administered by the National Science Teachers Association.*

Exhibit 117
Page 002125

21

LUC 1314274

**MEASURE:** *Patent Average Total Pendency (months)*

## PATENT AVERAGE TOTAL PENDENCY



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | PALM system. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | PALM, automated systems, reports. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the PALM system. Final test for reasonableness is performed internally by patent examiners, supervisors, and program management analysts. |
| Data Limitations: | None. |

|  | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | 27.7 | 29.8 | 31.0 | 31.3 |
| **Actual** | 26.7 | 27.6 | 29.1 | 31.1 *met* |

**Discussion:** *Target met.*

**MEASURE:** *Patent Efficiency*

This metric measures the relative cost-effectiveness of the entire patent examination process over time, or the efficiency with which the organization applies its resources to production. The per unit dollar figure is derived by totaling all costs, both direct and indirect, incurred to produce a patent product and dividing the sum by the number of product outputs. Costs include compensation of employees directly involved in processing and examining applications, patent management, appropriate shares of indirect labor supporting the process such as executive, legal, human resources, and administrative staffing costs. Operational and development costs for automated patent systems, space (lease-rent), utilities, and communication infrastructure costs are also included.

## PATENT EFFICIENCY



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data Source: | PALM system. |
| Frequency: | Daily input, quarterly reporting. |
| Data storage: | PALM, Data Warehouse, Activity Based Management (ABM) System. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in PALM, Momentum, ABM System. Quality control review of data by Activity Based Cost Accounting (ABC) System and Program Business Teams. |
| Data Limitations: | None. |

|  | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | $3,444 | $3,502 | $4,122 | $4,214 |
| **Actual** | $3,329 | $3,556 | $3,877 | $3,798 *met* |

**Discussion:** *Target met.*

Exhibit 117
Page 002126

LUC 1314275

## PATENT COMMISSIONER'S PERFORMANCE FOR FY 2006

The AIPA, Title VI, and Subtitle G, the Patent and Trademark Office Efficiency Act, established the USPTO as an agency of the United States, within the DOC, on March 29, 2000. The legislation provides for appointment of a Commissioner for Patents as the Chief Operating Officer for Patents, and a Commissioner for Trademarks as the Chief Operating Officer for Trademarks. It also requires that an annual performance agreement be established between the Commissioners and the Secretary of Commerce. The agreement outlines measurable goals and objectives for the organization. Based upon an evaluation of their performance as defined in the agreement, Commissioners may be rewarded a bonus of up to 50 percent of their base salary.



*Patent Commissioner John Doll helping to celebrate our record-breaking year.*

The Patent organization goals form the foundation for the Commissioner of Patents annual performance agreement. The agreement outlines measurable organizational goals and objectives for the Patent organization based on the performance goals and measures. These performance measures incorporate the milestones and objectives to achieve the following Patent goals: improve quality of examination, implement e-government initiatives, and achieve the lowest possible pendency. At the time of publication, no determination regarding a performance bonus for the Commissioner of Patents for FY 2006 had been made.

## THE PATENT ORGANIZATION – WHAT'S AHEAD

Building on the solid infrastructure of the *21st Century Strategic Plan* of 2002, in FY 2006 the USPTO identified additional strategies for achieving its goals that address the emerging challenges of the 21st century, such as the increasingly globalized business environment and its impact on both the patent process and its products. Rapid scientific advances in technologies not only contribute to the growing complexity of applications, but also increase world competition for individuals trained in these subject areas. The advent of electronic work environments has raised the bar on user expectations for accessing information and communicating, bringing the issues of secure and reliable electronic systems into focus as never before.

In FY 2007 and beyond, the Patent organization will continue to emphasize the importance of quality and timely examination. To build and retain the high-quality examiner corps needed, the Patent organization will enhance recruitment to hire 1,200 examiners a year from FY 2007 through FY 2012. Results of training provided through the Patent Training Academy will be evaluated, and modified as necessary to optimize employee acquisition of the skills necessary to efficiently complete a quality examination and effectively communicate with applicants.

## BOARD OF PATENT APPEALS AND INTERFERENCES

The BPAI had a very successful FY 2006. The average pendency for decided patent appeals continued to be less than six months. Similarly, the average pendency for interferences remained below 12 months. Furthermore, the final decisions in over 90 percent of all interferences were mailed within 24 months. During the course of the year, the BPAI was restructured to streamline the internal processing of both patent appeals and interferences. The Board also opened its oral hearings to the public for the first time. Additionally, the Board's e-government initiatives continued to progress. Patent appeals are now entirely processed electronically. The testing of the fully electronic interference filing and information system is currently underway. This automation effort is laying the groundwork for the implementation of the proposed post-grant review proceedings that are currently planned to be conducted in the future at the BPAI.

Exhibit 117
Page 002127

23

LUC 1314276

MANAGEMENT'S DISCUSSION AND ANALYSIS  |  *PERFORMANCE AND ACCOUNTABILITY REPORT: FISCAL YEAR 2006*

## TRADEMARK PERFORMANCE



*USPTO Director Jon Dudas thanks Trademark employees for advancing trademark service goals through their exceptional service to applicants.*

The Trademark organization demonstrated unprecedented performance results by exceeding all of its quality, timeliness, e-government, production, and efficiency targets for the fiscal year. The level of accomplishment for FY 2006 further improved upon the success achieved in FY 2005 when all but one performance measure was met. Significant progress was demonstrated by capitalizing on process improvements that are the result of many years of investment in people and IT that has changed how work is performed and information is communicated. Performance results further reflect the ability of Trademark's to deliver results that are consistent with the level of funding necessary to support operations with increases in filings and demand for services.

The USPTO continues to demonstrate progress towards achieving its e-government objectives which rely on electronic communications and financial incentives to offer market-based services and improve the availability and participation in the U.S. trademark system by providing access to information to more effectively serve an increasingly larger, global client-base. Electronic access increases the opportunity for filing for federal registration, which provides protection to business owners and consumers by providing notice of marks in use. Electronic filing and information systems serve customers in two very important ways: by improving the time and accessibility of information and by improving the quality of the initial application and therefore the quality of the data that is captured and shared in the publication and registration of trademarks.

The USPTO continues to maximize electronic tools to make the trademark registration process fully transparent to the public. Anyone with Internet access anywhere in the world can review documents in the official trademark application file, including all decisions made by trademark examining attorneys and their reasons for making them through the Trademark Document Retrieval system. The complete file contents of the pending inventory of applications are available electronically as well as 43 percent of registered trademarks in use.

The USPTO has discontinued the practice of creating and maintaining paper file copies of trademark applications and now relies exclusively on trademark data submitted or captured electronically to support trademark examination, publication of documents, and granting of registrations. An assessment of the workflow and mapping of the process was initiated to assess opportunities for process and cycle time improvement by examining changes that have been made in the process with the elimination of paper processing. A number of improvements has been made and will continue to be made in how internal operations are conducted that will further improve the efficiency of the process, provide better internal controls for tracking the status of correspondence, and identify the progress of work performed and completed. These changes in practice are recognition of the on-going progress that has been made in creating and using electronic records to process and examine applications filed for the registration of a trademark. A complete electronic records database covering all trademark pending applications, including on-going correspondence has been created by capturing the text and image of all new applications as they are filed. The database supports paperless examination as the source of application records used within the Office as well as those accessible to the public.

Electronic systems continued to be upgraded to increase the number and type of transactions that can be completed. Significant process changes and enhancements have been incorporated that provide the capability to manage all examiner actions and dockets in a completely electronic environment as well as manage the assignment of new applications. Changes were made in the past year to remove the pending paper file docket based on process changes that have eliminated the need for manual processing of files for transactions that are required to support the core examination function. Additional changes, which were the result of an internal assessment of the process, were made to streamline post publication operations, reducing cycle time. Together, these changes have improved workflow efficiency that has led to significant gains in reducing pendency and drastically reducing the number of paper files that are identified as lost or requests to reinstate an application due to office error.

Exhibit 117
Page 002128

LUC 1314277

Electronic communications make it possible to conduct a preliminary search prior to filing an application, determine the status of pending and registered trademarks, respond to office actions, access general information, examination manuals, treaties, laws and regulations, obtain weekly information on marks published, registered and renewed, file initial applications, and maintain a registered mark through the USPTO website. The USPTO publishes a weekly on-line Trademark Official Gazette that contains information covering several thousand marks and other office actions. The weekly publication is fully electronic; text and images that contain the layout are extracted from electronic records and sent to the Government Printing Office for printing registration certificates. The weekly Trademark Official Gazette, Registration Certificates, and Updated Registration Certificates for the five most recent weekly issues are available electronically from the USPTO website. The entire publication, including registration certificates, is available as a PDF file that can be downloaded via the Internet for free, providing expanded as well as more timely access to trademark information.

The USPTO continues to support improvements in electronic filing that result in greater use of electronic filing and communications. In the eight years since trademark electronic filing first became available, more than 959,118 applications, including more than 1,235,933 classes, have been filed for the registration of a trademark. Today, 93.8 percent of all new trademark applications are filed using the award-winning Trademark Electronic Application System (TEAS), an increase of six percent over FY 2005 results.

Over the past year, the Trademark organization has continued to enhance the features available to the public and worked to ensure the overall transformation of the Trademark organization as an effective e-government operation. Twenty-six electronic TEAS forms are available with new features added in the past year that increase the functionality of the forms and attachments. Applicants may now submit PDF attachments with electronically filed responses to office actions, a feature that was requested by the user community. Applicants may also access the Identification Manual when completing the basic application form. The availability and the convenience of accessing trademark related information via the Internet has improved our ability to provide timely, useful information. It has stimulated demand for more services and enabled more complete filings and responses while improving the efficiency of the examination process.

### Madrid Protocol

The process of registering trademarks in one or more of the 60 member countries has been greatly improved since the United States became a member of the Madrid Protocol on November 2, 2003. U.S. business owners are now able to file a single application with the USPTO in English, pay in U.S. dollars, and potentially have their mark protected in any or all of the countries that are members of the Protocol. Non-U.S. trademark owners of member countries may elect to seek an extension of protection of their international registration in the U.S. by filing through the International Bureau of WIPO. The USPTO received 3,131 international applications and 12,718 requests for extension of protection or subsequent designation containing 27,621 classes from the International Bureau under the Protocol in FY 2006.

### Trilateral Project

Representatives from the USPTO, the Office for Harmonization in the Internal Market (OHIM), the European Trademark Office, and the JPO, continue their work on the harmonization of identifications and classification project. The objective of the Trilateral Identification and Classification Manual Project is to make the trademark application and examination process easier by agreeing on the acceptability of certain identifications of goods and services for use in all three offices. The Trademark Identification Manual is updated to incorporate identifications for goods and services that have been accepted as a result of efforts through this project.

The USPTO implemented a secure website to enable representatives from USPTO, OHIM, and JPO, to add to, delete from, or modify the identifications of goods and services in preparation for the 9th edition of the Nice Agreement – an international agreement on classification of goods and services.

### Quality

The Trademark organization continues to see improvements in examination quality as reflected by the decrease in the first and final office action deficiency rate. The criteria for assessing quality expands on the issues that are considered for determining the quality of "in-process" first and final office actions as "excellent" and "deficient" to better reflect more meaningful and rigorous standards of quality. The information evaluated from the quality review results has been used to identify and better focus training to enhance

Exhibit 117
Page 002129

25

LUC 1314278

overall quality and to improve the consistency of examination. Nine new training modules and seven exam guides were prepared to address some of the reoccurring problems that were determined based on analyses of the reviews. Examiners are required to take a series of self-paced tutorials, as part of the USPTO's commitment to improve the quality of examination and ensure that all examiners possess the knowledge and skills necessary to perform their jobs.

## Customer Call Center

The USPTO operates a modern call center system with caller relationship management technology to enhance its effectiveness in handling and responding to caller inquiries. The system is a state-of-the-art web-based information system that enables agents to manage caller data, track problems, fulfill information requests, answer e-mails, and provide consistent information. Data is used to identify trends, track problem resolution, conduct root cause analysis, and take action to prevent and eliminate the reoccurrence of problems.



USPTO senior advisor for telework, Danette Campbell, testifies before the House Government Reform Subcommittee on Federal Workforce and Agency Organization at a hearing called, "Telecommuting: A 21st Century Solution to Traffic Jams and Tourism."

## Telecommuting

The USPTO continues to gain recognition as a leader in the federal government for its successful telecommuting program. The Trademark telecommuting program was designed so that examiners could perform the same work and access the same IT systems from home that they do in the Office. Examiners work from home for a majority of the workweek using an automated reservation system to assign office space on an as-needed basis. The program met its objective to greatly reduce office space requirements and costs. The Trademark program was expanded to include 220 examiners in the past year; 85 percent of the eligible examiners now take advantage of the program. The program continues to be expanded to include other employees throughout the Trademark organization. All eligible employees, including examiners, were working from home at least one day per week.

The USPTO's Trademark work-at-home program received the Telework Program with Maximum Impact on Government Award in 2006 for its extremely successful model telecommuting program by the Telework Exchange. The program was recognized as an innovative Telework prototype for how to incorporate measurable performance goals in evaluating the performance of its teleworkers. The Trademark hoteling program is considered a "best practice" due to its success in addressing budgetary, space, retention, recruitment, and job satisfaction issues that face all government agencies and contribute to popularity of the program.

## Filings

New application filings for trademark registration increased by nine percent in the past year. The USPTO received 275,790 trademark applications, including 354,775 classes for registration in FY 2006.

## Office Disposals

Total office disposals were 256,002 including 315,783 classes, 5.9 percent above plan and 25 percent above FY 2005. Registrations were 16.6 percent above plan and more than 30 percent above FY 2005 with 147,118 marks registered, including 188,899 classes.

Exhibit 117
Page 002130

LUC 1314279

*Pending Inventory*

Total trademark applications pending in the USPTO decreased by nearly five percent in FY 2006 to 474,241 with 634,087 classes. Twenty-six percent of the pending file inventory is in a post Notice of Allowance status awaiting the filing of a statement of use. The inventory of unexamined applications (prior to first office action) at the end of the year was 99,890, containing 123,986 classes; the number of unexamined files decreased 29 percent from the prior fiscal year with a decrease of 27.6 percent in the number of classes consistent with the increase in office disposals and reduction in pendency.

# TRADEMARK QUALITY

**PERFORMANCE GOAL:** *Improve the quality of trademark products and services and optimize trademark processing time*

The Trademark organization will continue to work towards the enhancement of quality assurance programs to include more-in-depth reviews of work in progress. This includes the implementation of in-process reviews that consider all elements of decision-making in evaluating examiner first and final office actions. The Trademark organization continues to work towards full automation of the management of its workflow to improve efficiency and reduce processing times. The following performance measures have been established to reflect the USPTO's success and progress in meeting these performance goals.

The Trademark organization implemented two new measures for assessing examination quality in 2004. These include an evaluation for all issues that could be considered deficient in making a first and final action substantive refusal. Evaluations are conducted on a random sample of applications to review the quality of the examiner's first office action and final action refusal. 2,415 files were reviewed with 4.3 percent of the files having at least one deficient substantive first action refusal. 2,508 files were reviewed with at least one issue determined for a final action deficiency rate of 3.6 percent.

**MEASURE:** *Trademark Final Action Deficiency Rate*



### DATA VALIDATION AND VERIFICATION

| | |
|---|---|
| Data source: | Office of Trademark Quality Review Report. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | Automated systems, reports. |
| Verification: | Manual reports and analysis. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | — | 5.0% | 5.0% | 6.5% |
| **Actual** | — | 5.8% | 5.9% | 3.6% *met* |

*Discussion: Target exceeded. The Trademark organization established an "in-process review" standard for assessing excellent and deficient work to create a more comprehensive meaningful and rigorous review of what constitutes quality. The results of an examiner's final refusal are reviewed for the quality of the substantive basis for decision-making, search strategy, evidence, and writing. The measure considers elements for review and evaluation with training targeted to topics that warrant improvement. Examiners are given specific feedback about excellent as well as deficient work to further improve quality. The target was exceeded because our numerous training efforts focusing on quality have had a more than additive effect. Also, quality improvements that first appeared in First Actions have now filtered through to Final Actions.*

Exhibit 117
Page 002131                                                        27

LUC 1314280

**MEASURE:** *Trademark First Action Deficiency Rate*

### FIRST ACTION DEFICIENCY RATE



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | Office of Trademark Quality Review Report. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | Automated systems, reports. |
| Verification: | Manual reports and analysis. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | — | 8.3% | 7.5% | 6.5% |
| **Actual** | — | 7.9% | 4.7% | 4.3% met |

***Discussion:*** *Target met. The Trademark organization established an "in-process review" standard for assessing excellent and deficient work to create a more comprehensive, meaningful and rigorous review of what constitutes quality. The results of an examiner's first action are reviewed for the quality of the substantive basis for decision-making, search strategy, evidence, and writing. The new measure considers more elements for review and evaluation with training targeted to topics that warrant improvement. Examiners are given specific feedback about excellent as well as deficient work to further improve quality. Quality results achieved exceeded the target set.*

## TRADEMARK PENDENCY

**MEASURE:** *Trademark Average First Action Pendency (months)*

This measure reflects the timeliness of the first office action as measured from the date of application filing to the first office action. The Trademark organization intends to reduce first action pendency to three months by FY 2008.

### TRADEMARK FIRST ACTION PENDENCY



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | TRAM system. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | TRAM, automated systems, reports. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system. Program management performs final test for reasonableness. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | 3.0 | 5.4 | 6.4 | 5.3 |
| **Actual** | 5.4 | 6.6 | 6.3 | 4.8 met |

***Discussion:*** *Target met.*

Exhibit 117
Page 002132

**LUC 1314281**

**MEASURE:** *Trademark Average Total Pendency (months)*

This measure reflects the timeliness related to the disposal of a trademark application as measured from the date of filing to registration, abandonment or issuance of a notice of allowance, including applications that are suspended awaiting further action or involved in inter partes proceedings. Disposal pendency, including suspended and inter partes cases, was 18.0 months. Excluding applications that were suspended or delayed for inter partes proceedings; disposal pendency was 15.5 months.

## TRADEMARK FINAL ACTION PENDENCY



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | TRAM system. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | TRAM, automated systems, reports. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system. Program management performs final test for reasonableness. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | 15.5 | 21.6 | 20.3 | 18.8 |
| **Actual** | 19.8 | 19.5 | 19.6 | 18.0 *met* |

*Discussion:* Target met.



*Trademark Assistance Center employee Zina Carithers fields calls from the public. The assistance center expanded its hours this year to better serve trademark applicants.*

Exhibit 117
Page 002133

29

LUC 1314282

**MEASURE:** *Trademark Efficiency*

This measure is a relative indicator of the efficiency of the trademark process as measured by the total cost of programs that support the examination and registration of trademarks compared to its core outputs or office disposals.



**TRADEMARK EFFICIENCY**

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | TRAM system, Momentum, ABM system. |
| Frequency: | Daily input, quarterly reporting. |
| Data storage: | TRAM, Data Warehouse, ABM system. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in TRAM, Momentum, ABM system. Quality control review of data by ABC system and program organization teams. |
| Data Limitations: | None. |

|  | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | $683 | $583 | $701 | $635 |
| **Actual** | $433 | $542 | $677 | $565 *met* |

*Discussion: Target met. The measure indicates the degree to which the program can operate within plan costs relative to outputs produced. The measure is calculated by dividing total USPTO expenses associated with the examination and processing of trademarks (including associated overhead and support expenses) by outputs (office disposals). It should be noted that this measure does not represent the average cost to process, examine, and register a trademark since office disposals are but one measure of USPTO products and services.*

## TRADEMARK COMMISSIONER'S PERFORMANCE FOR FY 2006

The AIPA, Title VI, Subtitle G, the Patent and Trademark Office Efficiency Act, established the USPTO as an agency of the U.S., within Commerce, on March 29, 2000. The legislation provides for appointment of a Commissioner for Patents as the Chief Operating Officer for Patents, and a Commissioner for Trademarks as the Chief Operating Officer for Trademarks. It also requires that an annual performance agreement be established between the Commissioners and the Secretary of Commerce. The agreement outlines measurable organizational goals and objectives for the organization. The Commissioners may be rewarded a bonus, based upon an evaluation of their performance as defined in the agreement, of up to 50 percent of their base salary.

The Trademark organization goals and the agency performance plan formed the foundation for the annual performance agreement between the Commissioner for Trademarks and the Secretary of Commerce, as required by the AIPA. The performance agreement outlined measurable organizational goals and objectives for the Trademark organization based on the above goals and performance measures. All nine of the trademark performance measures included in the agency performance plan were met for a score of 100 percent. The commissioner's performance for the past year had not been evaluated at the time that this report was completed.

Exhibit 117
Page 002134

LUC 1314283

## THE TRADEMARK ORGANIZATION – WHAT'S AHEAD

The Trademark organization will continue to move aggressively in the next year to continue to build upon the successes of the USPTO's *21st Century Strategic Plan* and move forward with the revision of the next five-year *Strategic Plan* by working with its constituencies to ensure the goals and objectives are aligned with their needs. Trademark's intends to continue to assess the efficiency of its operations as it proceeds with the incremental redesign of operations, which rely on e-government as the primary means of doing business with applicants and registrants, and, as the means for processing work inside the examining operation. In the next year Trademark's plans to:

- Continue to develop new forms and enhance existing TEAS forms to add functionality for the applicant and improve the efficiency of the process.

- Continue the enhancement and development of electronic systems and functionality to complete the incremental redesign of the trademark process.

- Continue to conduct assessments of the workflow and production process to identify options for improvements in how work is performed, reduce cycle time, and develop requirements to complete the electronic workflow process.

- Continue the development of training materials and documentation to address changes in process and practice; ensure all employees have the tools they need to perform their jobs.

The Trademark organization has achieved considerable success in implementing its business process re-engineering plan to move from primarily doing business with paper to doing business in an electronic environment. Completion of an electronic file management system, in addition to the currently available electronic filing and information systems permits:

- Reduction in cycle times by consolidating separate processes and eliminating the potential for lost or missing papers that create additional delays and poor service.

- Enhancements in the functionality and number of electronic filing options.

- The ability to offer a totally electronic filing and receiving process to handle applications from U.S. applicants seeking protection of their mark in foreign countries, and requests for protection of marks from foreign countries in the United States.

As paper records disappear from internal processes, the cost for handling applications and related materials, along with the reliance on increasing numbers of employees or contractors to handle increases in filings, will continue to be reduced. Data quality has improved as data is captured electronically to support examination and to publish documents and registrations. Electronic file management presents an opportunity for the USPTO to offer multiple options for filing that allow applicants to select the method of filing that best suits their business needs.

## TRADEMARK TRIAL AND APPEAL BOARD (TTAB)

The TTAB fell just shy of meeting its pendency goal for FY 2006. The goal was to issue final decisions and decisions on trial motions, on average, within ten weeks of the time they were submitted for decision. During FY 2006, the TTAB issued decisions, on average, in 10.9 weeks, although, for the last half of the fiscal year, the TTAB was nearly at goal, issuing decisions, on average, in 10.3 weeks. In FY 2006, the TTAB added an additional option to its suite of electronic filing forms. Now, parties may file confidential documents using the TTAB's electronic filing system, with assurance that these documents will remain accessible only to the TTAB and not to the public at large. For FY 2006, 91 percent of extensions of time to oppose were received and processed electronically, as were 70 percent of notices of opposition and 68 percent of petitions to cancel. During FY 2006, the TTAB launched a pilot program to permit one of its administrative trademark judges to work full-time from an alternate duty station in Dallas, Texas. The TTAB held several electronic oral hearings in the electronic courtroom it shares with the BPAI. The electronic courtroom permits parties to appear before the TTAB and BPAI from remote videoconferencing locations. To provide more legal guidance to the trademark bar and trademark examining attorneys, in FY 2006 the TTAB issued 55 of its decisions as citable precedents, a substantial increase over the number of citable decisions issued in recent years.

Exhibit 117
Page 002135

31

LUC 1314284

# E-GOVERNMENT AND INTELLECTUAL PROPERTY PERFORMANCE

## PERFORMANCE GOAL: *Create a more flexible organization through transitioning the patent and trademark processes to e-government operations and participating in intellectual property development worldwide*

The USPTO will continue to work with our intellectual property partners to improve the efficiency of our processing systems by increasing the number of applications and communications received and processed electronically, create more coordinated and streamlined work processes, and best position the USPTO for the globalization that characterizes the 21st century economy. The following performance measure has been established to reflect the USPTO's success and progress in meeting our *Strategic Plan* goals.

### MEASURE: *Patent Applications Filed Electronically*

The USPTO pledged to work with our intellectual property partners to improve the efficiency of our processing systems by increasing the number of applications and communications received and processed electronically. In response to input from the patent community, the Patent organization launched a web-based tool (EFS–Web) in FY 2006, which allows applicants to submit patent applications in a PDF. Acceptance of the new tool is reflected in the significant increase in applications filed electronically: in the last quarter of FY 2006, 28.7 percent of applications were filed electronically. The following performance measures have been established to reflect the USPTO's success and progress in meeting the *Strategic Plan* goals.



### PATENT APPLICATIONS FILED ELECTRONICALLY

**DATA VALIDATION AND VERIFICATION**

Data source: PALM system.
Frequency: Daily input, weekly reporting.
Data storage: PALM and automated systems.
Verification: Accuracy of supporting data is controlled through internal program edits in the PALM system and cross checks against other automated systems.
Data Limitations: None.

|  | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Target | 2.0% | 2.0% | 4.0% | 10.0% |
| Actual | 1.3% | 1.5% | 2.2% | 14.1[1] % met |

**Discussion:** *Target met. This measure indicates USPTO's support of, and applicants' willingness to operate in, an e-government environment and identifies the percentage of applications filed electronically.*

[1]*This number is preliminary. Data is expected to be finalized by December 2006 and will be reported in the FY 2007 PAR.*

Exhibit 117
Page 002136

LUC 1314285

### MEASURE: *Patent Applications Managed Electronically*

With implementation of the Image File Wrapper (IFW) system, the USPTO created a fully electronic patent application process, eliminating the movement of paper applications. All patent examiners, technical support staff, and adjunct users can access an electronic image of all patent applications. In 2006, the USPTO commenced the first phases of creation of a text-based process, which will facilitate increased automation of manual processes, improve accuracy, and support more refined electronic management of the patent process.



**PATENT APPLICATIONS MANAGED ELECTRONICALLY**

**DATA VALIDATION AND VERIFICATION**

Data source: PALM system.
Frequency: Daily input, weekly reporting.
Data storage: PALM and automated systems.
Verification: Accuracy of supporting data is controlled through internal program edits in the PALM system and cross checks against other automated systems.
Data Limitations: None.

|  | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | — | 70.0% | 90.0% | 99.0% |
| **Actual** | — | 88.0% | 96.7% | 99.9% *met* |

***Discussion:*** *Target met.*

### MEASURE: *Trademark Applications Filed Electronically*



**TRADEMARK APPLICATIONS FILED ELECTRONICALLY**

**DATA VALIDATION AND VERIFICATION**

Data source: TRAM system.
Frequency: Daily input, monthly reporting.
Data storage: TRAM and automated systems.
Verification: Accuracy of supporting data is controlled through internal program edits in the TRAM system and crosschecks against other automated systems.
Data Limitations: None.

|  | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | 80.0% | 65.0% | 70.0% | 80.0% |
| **Actual** | 57.5% | 73.0% | 88.0% | 93.8% *met* |

***Discussion:*** *Target met. The measure indicates USPTO's support of and applicants' willingness to operate in an e-government environment and identifies the percent of basic trademark applications filed electronically. The rate of filing trademark applications has progressed steadily over the years as a result of promotional events, increased number and type of applications and documents that may be filed electronically, improved functionality and enhancements, and financial incentives (lower fees) that have been made to appeal to more customers.*

Exhibit 117
Page 002137

33

LUC 1314286

**MEASURE:** *Trademark Applications Managed Electronically*

This measure was introduced in FY 2004 to demonstrate the progress the Trademark organization has made to examine and process applications in a completely electronic environment. Trademark's has captured nearly 100 percent of the application inventory as an electronic file record that includes text and image of the initial application and subsequent applicant and office correspondence for nearly 500,000 pending applications. Examining attorneys have been using the electronic record of the initial application to conduct their first office actions since July 2003 through a system that manages the workflow and their transactions. In July 2004, second and subsequent actions were added eliminating the need to use paper files to process and examine applications for the core examination function. Additional enhancements were made during FY 2005 and FY 2006 to improve the functionality and efficiency of the electronic system used by examining attorneys to manage their docket of pending work and take action on applications.



### TRADEMARK APPLICATIONS MANAGED ELECTRONICALLY

**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | TRAM system and Trademark Image Capture and Retrieval System database reports. |
| Frequency: | Daily input, monthly reporting. |
| Data storage: | TRAM and automated systems. |
| Verification: | Accuracy of supporting data is controlled through internal program edits in the TRAM system and crosschecks against other automated systems. |
| Data Limitations: | None. |

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Target | — | 80.0% | 99.0% | 99.0% |
| Actual | — | 98.0% | 99.9% | 99.9% met |

**Discussion:** *Target met. The measure indicates USPTO's progress towards conducting business in an e-government environment.*

34

Exhibit 117
Page 002138

**LUC 1314287**

*PERFORMANCE AND ACCOUNTABILITY REPORT: FISCAL YEAR 2006  |  MANAGEMENT'S DISCUSSION AND ANALYSIS*

**MEASURE:** *Intellectual Property Technical Assistance Activities/Countries Completed*

This measure was introduced in FY 2005 to demonstrate the number and variety of training and technical assistance activities provided to the intellectual property offices and staff of countries with developing economies in need of strengthening the protection of intellectual property rights as part of their economic and trade development. Attorney specialists from USPTO's Office of International Relations and Office of Enforcement provide country specific review of intellectual property laws, and recommend strengthened enforcement provisions along with training of judges, prosecutors, customs officials, and intellectual property office technical staff. Broader multilateral training programs, such as our intellectual property Enforcement Academy and the Visiting Scholars Program, are offered to representatives of a variety of countries throughout the year.

### INTELLECTUAL PROPERTY TECHNICAL ASSISTANCE ACTIVITIES/COUNTRIES COMPLETED



**DATA VALIDATION AND VERIFICATION**

| | |
|---|---|
| Data source: | Office of Congressional Relations, International Relations and Enforcement Activity Report. |
| Frequency: | Weekly input, monthly reporting. |
| Data storage: | Automated systems, reports. |
| Verification: | Manual reports and analysis. |
| Data Limitations: | None. |

### INTELLECTUAL PROPERTY TECHNICAL ASSISTANCE ACTIVITIES COMPLETED

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | — | — | 80 | 82 |
| **Actual** | — | — | 59 | 239 |

**Discussion:** *Exceeded Target. The Office of External Affairs greatly exceeded the target for the Intellectual Property Technical Assistance in FY 2006 because it significantly expanded the technical assistance training programs provided to foreign government officials under the USPTO Global Intellectual Property Academy (GIPA). Attorney specialists from the Office of International Relations and the Office of Enforcement conducted GIPA programs both at the USPTO Headquarters and in several developing countries and countries in transition to a market economy. Furthermore, these Offices provided technical advice and assistance in the form of legal experts giving reviews of developing countries' laws for the protection (patents, trademarks, copyrights, etc.) and enforcement (civil and administrative, provisional, border and criminal enforcement measures) of intellectual property in FY 2006. These reviews and advice on intellectual property laws occur in the context of accession to the World Trade Organization (WTO), in WTO Trade Policy Reviews, and in the context of administration of the "Special 301" provisions of the Trade Act of 1974, as amended. The reviews and legislative advice are aimed at improving deficiencies in the intellectual property laws of our trading partners.*

### INTELLECTUAL PROPERTY TECHNICAL ASSISTANCE COUNTRIES COMPLETED

| | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Target** | — | — | 75 | 77 |
| **Actual** | — | — | 142 | 102 |

**Discussion:** *Target met.*

Exhibit 117
Page 002139

35

LUC 1314288

*MANAGEMENT'S DISCUSSION AND ANALYSIS  /  PERFORMANCE AND ACCOUNTABILITY REPORT: FISCAL YEAR 2006*

## INTELLECTUAL PROPERTY POLICY AND LEADERSHIP PERFORMANCE

The DOC and the USPTO fully appreciate the crucial role of intellectual property development and protection in promoting the economic competitiveness of the United States. In addition to the examination and issuance of patents and trademarks, the USPTO is leading efforts to improve protection of the intellectual property of American innovators and creators on both the domestic and international levels.



*The USPTO distributed more than 10,000 "STOP FAKES" brochures to small businesses across the United States in FY 2006. As part of the Bush Administration's Strategy Targeting Organized Piracy! (STOP!) initiative, the USPTO also worked with other U.S. government agencies to fight piracy and counterfeiting around the world.*

***STOP! Initiative Provides Information to Businesses about Protecting Intellectual Property:*** The USPTO continued throughout FY 2006 working with other governmental agencies and the private sector on the STOP! initiative, which is the most comprehensive U.S. government-wide initiative created to combat trade in pirated and counterfeit goods. The initiative's goals are to stunt the growth of global trade in fake goods that threaten America's innovation and economy, the competitiveness of U.S. businesses, and the livelihood of their workers.

As part of STOP!, the USPTO manages a hotline (1-866-999-HALT) that helps small- and medium-sized businesses leverage U.S. Government resources to protect their intellectual property rights in the United States and abroad. Callers receive information from a staff of over three dozen intellectual property attorneys at the USPTO with expertise on how to secure patents, trademarks, and copyrights, and on enforcement of these rights throughout the world. In FY 2006, the USPTO Hotline received 1,460 calls including calls regarding counterfeiting and piracy concerns with respect to China and other countries.

***STOP! Works Around the World:*** The USPTO has established a link from its USPTO website to the DOC website *www.stopfakes.gov*, which provides in-depth information about the STOP! initiative. One key feature of the website is the country-specific "toolkits" that have been created by our overseas embassies to assist small- and medium-sized businesses to understand the atmosphere and how to protect and enforce their rights in a particular country. During FY 2006, toolkits for Brazil and Malaysia were added to those already in existence for China, Korea, Mexico, Taiwan, and Russia. Additional toolkits will be posted in FY 2007.

STOP! also seeks to increase global awareness of the risks and consequences of intellectual property theft through a section of its website, *www.stopfakes.gov/smallbusiness*, that is specifically designed and operated by the USPTO to answer common questions of small businesses so they can better identify and address their intellectual property protection needs. This information emphasizes the need for businesses to consider securing their trademark and patent rights on a country-by-country basis.

***STOP! Works for Small- and Medium-Sized Businesses:*** While counterfeiting and piracy pose a serious threat to all American businesses, small businesses are particularly at risk since they often lack the knowledge and expertise to effectively combat that theft. In addition, since small businesses typically do not have personnel or maintain large operations in other countries, theft of their intellectual property overseas can go undetected.

As part of the STOP! initiative in FY 2006, the USPTO continued its intensive national public awareness campaign by offering conferences targeting small- and medium-sized businesses where participants learned what intellectual property rights are, why they are important, and how to protect and enforce these rights. Six workshops were conducted throughout the country in FY 2006. The USPTO will continue to hold small-business outreach seminars in FY 2007 to give American businesses face-to-face contact with intellectual property experts.

Exhibit 117
Page 002140

**LUC 1314289**

**USPTO Efforts in China and Other Countries:** The USPTO also organized and conducted China intellectual property-focused programs in FY 2006 in four U.S. cities for companies with an established presence in China, companies contemplating entering China, and companies that simply want to know more about how to protect and enforce their intellectual property rights against counterfeiting and piracy in China. Topics included a review of recent laws and regulations promulgated by the Chinese government that affect protection and enforcement of intellectual property, what the U.S. Government is doing to improve intellectual property protection and enforcement in China, how to best protect business assets to avoid intellectual property problems, how to recognize product infringement, and steps to take if infringement occurs. Additional China intellectual property-focused programs are being planned for FY 2007. These will include expanded technical assistance programs for Chinese government officials and greater outreach to U.S. businesses.

The USPTO expanded its intellectual property awareness campaign in FY 2006 through its increased participation in U.S. Export Assistance Center (USEAC) programs, the federal government's program run by DOC's U.S. & Foreign and Commercial Service (U.S.&FCS), that promotes and assists businesses in exporting and financing U.S. goods and services worldwide. These programs allow the USPTO to reach a wide audience of small businesses and help them integrate intellectual property protection into their business strategy. Through these programs, the USPTO attorney-advisors provided personalized assistance to small- and medium-sized businesses in various cities throughout the U.S. with respect to the STOP! initiative, the resources on the *www.stopfakes.gov* website, and the need to consider securing patents and trademarks on a country-by-country basis. The USPTO plans to continue its partnership with the USEAC programs in FY 2007.

In FY 2006, in conjunction with DOC's U.S.&FCS and the Department of State, the USPTO placed attorney-advisor intellectual property experts in high-profile countries with serious intellectual property challenges. These individuals, posted in Bangkok, Thailand; New Delhi, India; Cairo, Egypt; Beijing, China; and Sao Paulo, Brazil, will support U.S. embassies and consulates on IPR issues, advocate U.S. intellectual property policies, coordinate training on IPR matters, and assist U.S. businesses that rely on IPR protection abroad. These five postings complement the USPTO attaché currently detailed in Beijing, China. The USPTO plans to continue expanding its overseas IPR initiative in FY 2007 by placing additional experts in Moscow, Russia and Guangzhou, China.

**GIPA Trains Foreign Officials in Intellectual Property Management:** The USPTO greatly increased its training and capacity-building initiatives on intellectual property protection and enforcement by creating the GIPA in FY 2005. Through GIPA, USPTO brings foreign government officials - including judges, prosecutors, police, customs officials, patent, trademark, and copyright officials and policy makers - to the United States to learn, discuss, and strategize about global IPR protection and enforcement.

In FY 2006, the USPTO conducted 17 GIPA programs for foreign officials at its headquarters in Alexandria, Virginia. One of these included an additional four-city study tour for 21 judges and prosecutors from seven different countries in the Middle East and Northern Africa that highlighted U.S. Government and private industry/rights holder initiatives to combat IPR theft and infringement. The program also provided the participants the opportunity to interact with U.S. judges, prosecutors, and private rights holders to learn more about the harm caused by IPR infringement. Another initiative, with 19 Middle Eastern and Northern African librarians and legal advisors participating, continued its program by touring seven U.S. cities where participants were provided information on how to modernize their libraries and implement library information management in their countries while balancing the needs for stronger intellectual property protection and enforcement to stimulate research and education. In FY 2007, the USPTO plans to conduct at least 21 such programs domestically as well as numerous other programs around the world. Through these GIPA programs, foreign government officials are equipped to improve protection and enforcement of intellectual property rights in their home countries through intellectual property rights practices.

**USPTO Advises the President on Intellectual Property Issues:** Under the AIPA of 1999 (Public Law 106-113), the USPTO is directed to advise the President, through the Secretary of Commerce and all federal agencies, on national and international intellectual property policy issues, including intellectual property protection in other nations. The USPTO is also authorized by the AIPA to provide guidance, conduct programs and studies, and otherwise interact with foreign intellectual property offices and international intergovernmental organizations on matters involving the protection of intellectual property.

Exhibit 117
Page 002141                                        37

LUC 1314290