

*USPTO Deputy Director Steve Pinkos speaks to attendees of the USPTO Intellectual Property Awareness Conference for small businesses in Nashville, Tennessee.*

Through the Offices of Congressional Relations, International Relations, and Enforcement, the USPTO: (1) helps negotiate and works with Congress to implement international intellectual property treaties and develop domestic intellectual property related legislation; (2) provides technical assistance to foreign governments that are looking to develop or improve their intellectual property laws and systems; (3) provides capacity-building training programs to foreign intellectual property officials on intellectual property enforcement; (4) advises the Department of State and the USTR on drafting and reviewing of intellectual property sections in bilateral and multilateral investment treaties and trade agreements; (5) advises the USTR and the Department of State on intellectual property issues in the WTO; (6) works with USTR, the Department of State, and American industry on the annual review of intellectual property protection and enforcement under the Special 301 provisions of the Trade Act of 1974; and (7) consults with the Department of Justice and other federal law enforcement entities who are responsible for intellectual property enforcement.

## INTELLECTUAL PROPERTY TREATIES/AGREEMENTS

**PCT Reform:** The USPTO continued to participate in WIPO's Working Group on Reform of the PCT in an effort to achieve a simpler, more cost-effective system. Major treaty reforms, based on a U.S. initiative, became effective on January 1, 2004. In FY 2006, the USPTO initiated discussions in two sessions of the Meeting of the International Authorities of pending proposals from the Working Group on Reform of the PCT. These discussions continue to refine the reforms initiated in 2004, including adoption of quality management standards for international searching and examining authorities. As a result of this effort, the PCT Assembly approved a number of outstanding reform proposals in FY 2006.

**Standing Committee on the Law of Patents (SCP) and Patent Law Harmonization:** The USPTO participated in WIPO's informal meeting of the SCP in an effort to agree to a work program for that body and move forward the discussions on substantive patent law harmonization. The United States maintained its strong support for the proposal, sometimes referred to as the "limited package." The proposal was introduced previously by the Trilateral Offices consisting of the USPTO, JPO, and EPO, to limit the discussions to prior-art related issues. Although a number of compromise proposals were considered, a work program was not adopted due to firm opposition from Brazil, Argentina, and a number of other member states. In FY 2006, the WIPO General Assembly raised the issue of the future work of the SCP and agreed that consultations would be held on this matter. In the interim, due to the advocacy of the United States, the members of the so-called "Group B+" continue progress on the limited package work program of patent law harmonization and have agreed to pursue work based on a compromise by the body Chair, with the view of reaching agreement in the near term.

**WIPO Internet Treaties:** The WIPO Copyright Treaty (WCT) and the WIPO Performances and Phonograms Treaty (WPPT), commonly known as the WIPO Internet Treaties, are designed to ensure international protection of copyrighted works, performances, and sound recordings in the digital environment. Over the last several years, the USPTO has worked to ensure the ratification and full implementation of the treaties, which entered into force in FY 2002. Currently, 59 countries are members of the WCT and 58 are members of the WPPT, helping to create a seamless web of protection for copyright works on-line.

**Standing Committee on the Law of Trademarks, Industrial Designs, and Geographical Indications (SCT):** The USPTO continued to promote United States Government policy goals within the discussions of the Standing Committee regarding future work items for the SCT now that the Trademark Law Treaty (TLT) reform efforts ended with a successful Diplomatic Conference in March of 2006. These

Exhibit 117
Page 002142

LUC 1314291

goals include expert discussions regarding geographical indications, opposition procedure best practices, and Article 6ter of the Paris Convention, all of which have been included on the future agenda of the SCT.

***Singapore Treaty on the Law of Trademarks:***  In March of 2006, a Diplomatic Conference of WIPO adopted the text of the Singapore Treaty on the Law of Trademarks. The USPTO represented the United States at the Diplomatic Conference and was one of 41 delegations to sign the treaty. The USPTO continues to work to ensure ratification of the treaty by the U.S. The Singapore Treaty updates the 1994 TLT to adapt to certain business realities. The TLT is designed to harmonize formalities and simplify procedures in the application for, registration, and renewal of trademarks by establishing maximum requirements that contracting parties can impose on trademark applicants and holders. The beneficial features of the 1994 TLT are included in the text of the Singapore Treaty in addition to improvements, such as allowing for national trademark offices to take advantage of electronic communication systems as an efficient and cost saving alternative to paper communications. License recordal provisions in the treaty will reduce the formalities trademark owners must face when doing business in a country that is a party to the Singapore Treaty requiring recordal and will reduce the damaging effects that can result from failure to record a license in those jurisdictions. In addition, the Assembly provisions create a more attractive treaty for WIPO member states since the Assembly can discuss matters relating to the regulations governing implementation of the treaty.

***Standing Committee on Copyright and Related Rights (SCCRR):***  The USPTO continued in FY 2006 to participate in the work of the SCCRR to develop its proposal on treaty language for a new WIPO treaty for the Protection of the Rights of Broadcasting, Cablecasting, and Webcasting Organizations. The SCCRR also monitored national developments in the legal protection of databases and reported on related developments in U.S. legislation.

***Free Trade Agreements (FTA):***  The USPTO is participating in FTA negotiations with several countries, including South Korea, Malaysia, Thailand, Ecuador, United Arab Emirates, and the Southern Africa Customs Union, composed of Botswana, Lesotho, Namibia, South Africa, and Swaziland. In these negotiations, the USPTO works with the USTR and delegations from each country to ensure that standards are created which build on the foundation established in the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIP) and other international agreements to protect intellectual property. In addition, the USPTO has been engaged in talks with our FTA trading partners, the most recent being El Salvador, Nicaragua, Honduras, Guatemala, and the Central America Free Trade Agreement – Dominican Republic (CAFTA-DR), to address the implementation of their FTA obligations. These implementation discussions serve to make certain that the IPR legislation of our new trading partners reflect the obligations found in the FTA. Moreover, the USPTO, in cooperation with the USTR, continues to monitor compliance with existing FTAs such as the United States FTA agreements with Australia, Chile, Bahrain, and Morocco.

***WTO/TRIPs:***  The USPTO actively participated in U.S. delegations to the WTO's Council for TRIPs of the WTO throughout FY 2006. The TRIPs Council continued to review the intellectual property regimes of numerous countries and advanced its discussions relating to traditional knowledge, genetic resources, technology transfer, and the protection of Geographical Indications (GI). Included were the negotiations for the establishment of a multilateral system of notification and registration of GI wines and spirits, and other issues. Although the ongoing round of multilateral trade negotiations in the WTO was suspended on July 24, 2006, the USPTO will remain actively involved in WTO intellectual property issues as discussions in the TRIPs Council continue.

***WIPO Intergovernmental Committee:***  The USPTO headed the U.S. delegation to the WIPO Intergovernmental Committee on Intellectual Property and Genetic Resources, Traditional Knowledge, and Folklore. The focus of U.S. efforts is to encourage developing countries to meet stated concerns about protecting genetic resources, traditional knowledge, and folklore either through current intellectual property regimes or through non-intellectual property laws. Progress has been made in the development of model contractual provisions and traditional knowledge databases. In FY 2006, the USPTO worked with the Australian, Canadian, and Japanese Patent Offices to block a proposed negotiation of treaty language on the misappropriation of traditional knowledge (TK) and traditional cultural expressions (TCE), and instead encouraged working toward common objectives and principles with respect to protection of TK and TCEs.

***International Science and Technology (S&T) Agreements:***  Throughout FY 2006, the USPTO continued working closely with the Department of State in the negotiation of cooperative S&T agreements with other countries, including provisions of the intellectual property annex to S&T agreements that ensure equitable allocation of rights to intellectual property created in the course of cooperative research.

Exhibit 117
Page 002143

39

LUC 1314292

## ENFORCEMENT

**Technical Assistance and Capacity-Building:** The USPTO participated in FTA negotiations and/or follow-up with Malaysia, Panama, Thailand, Andean Community, Oman, United Arab Emirates, South Korea, and Morocco by providing advice relating to enforcement obligations. Technical assistance was provided in the implementation of the Dominican Republic-Central America FTA and FTAs with Australia, Bahrain, Singapore, and Morocco. The Office of Enforcement assisted the USTR with the negotiation of trade and investment framework agreements with Malaysia, Brunei, Singapore, and the Philippines and provided comments, analyses,



*Examiners from the State Intellectual Property Office of China (SIPO) and their USPTO hosts meet as part of an examiner exchange program.*

and questions in connection with WTO TRIPs Council or Trade Policy Reviews. Within the context of WTO accession negotiations, the Office of Enforcement provided policy guidance to the USTR. Additionally, guidance and recommendations were provided to the USTR relating to the Special 301 review, FTA negotiations, and bilateral and multilateral negotiations.

The Office of Enforcement partnered with numerous international and non-governmental organizations in designing and delivering technical assistance programs including the Association of South East Asian Nations (ASEAN), United Nations Economic Commission for Europe (UNECE), International Intellectual Property Institute (IIPI), WIPO, Asia-Pacific Economic Cooperation (APEC), Secretariat for Central American Integration (SIECA), Bureau for International Narcotics and Law Enforcement Affairs (INL), and carried out a range of capacity-building programs under the auspices of the Middle East Partnership Initiative (MEPI). The Office of Enforcement analyzed IPR enforcement components, provisions, and ramifications in international documents, including position papers or proposed policy statements of the World Health Organization, WIPO, Organization for Economic Cooperation and Development, APEC, ASEAN, and the Caribbean Community and Common Market.

The Office of Enforcement increased technical assistance offered in China, with a focus on providing the provinces with capacity-building programs relating to civil, criminal, and border enforcement. Programs in China included: World Customs Organization Regional Forum, Shanghai; Criminal Copyright Enforcement Seminar in Guangzhou; Criminal Copyright Seminar, "How to File a Criminal Case," Beijing; and the Pearl River Delta Seminar on Intellectual Property Enforcement in southern China. The Office of Enforcement also participated in the following programs: the Ambassador's Roundtable Meeting and training, Beijing and Shanghai; U.S. Chamber IP Enforcement seminars in Guangzhou and Nanjing; meeting/training with local Chinese officials on IP Enforcement in Yiwu; a program with Temple University and Qinghua University on IP Enforcement for Chinese prosecutors in China, Beijing; American Chamber of Commerce Programs on IP Enforcement in Shanghai and Guangzhou; Trade Fair Enforcement and a Customs Training program, Guangzhou; and an automotive anti-counterfeiting seminar in Shanghai.

The USPTO, in coordination with IIPI, provided technical assistance in Russia for border enforcement officials in St. Petersburg and Vladivostok. These programs utilized a case study method involving discussions of problem solving exercises. Additional programs in Europe and Central Asia included: UNECE Intellectual Property Advisory Group consultations with Romania and Turkey; USPTO Intellectual Property Enforcement Conference in Azerbaijan; USPTO/IIPI Intellectual Property Border Enforcement Workshop for customs officials and judges in Russia; Commercial Law Development Program Workshop on the Implementation and Coordination of IP Border Enforcement for 35 customs officials from Russia and Ukraine; Intellectual Property Enforcement program for government officials in Lithuania; Intellectual Property Enforcement program for government officials from new European Union member states on copyright infringement in the digital environment in Estonia; a joint USPTO-Patent Office of the United Kingdom-Slovenian Intellectual Property Office workshop on IPR border and market enforcement in Slovenia; WIPO-UNECE-World Customs Organization Sub-regional Seminar on Enforcement of Intellectual Property Rights in Almaty, Kazakhstan; and an IPR roundtable in Madrid.

Exhibit 117
Page 002144

LUC 1314293

In Asia, the Office of Enforcement conducted intellectual property protection and enforcement programs that included: ASEAN-USPTO Workshop on Optical Media Regulation and Enforcement, Bangkok, Thailand; International Association for the Protection of Intellectual Property-Japan IPR Enforcement Symposia on Anti-Counterfeiting, Tokyo and Fukuoka, Japan; U.S.-Vietnam Trade Council Program in Ho Chi Minh City, Vietnam; U.S. Consulate-United States Vietnam Trade Council-Association of American Publishers Seminar on Copyright Licensing, Ho Chi Minh City, Vietnam; Support for Trade Acceleration Program Vietnam-KI Asia-IIPI Judicial Education Program on IPR Protection and Enforcement, Hanoi, Vietnam; ASEAN-USPTO Workshop on Effective Practices in Combating Trade in Counterfeit Hard Goods, Bangkok, Thailand; ASEAN-USPTO Seminar on IPR Capacity-Building for Small- and Medium-Size Enterprises in Bangkok, Thailand; Combating Internet Piracy, Taipei, Taiwan; Intellectual Property Enforcement Program for 28 judges from Vietnam in Ho Chi Minh City, Vietnam; USPTO/ASEAN and U.S. Department of Justice IP Enforcement Workshop for 56 customs and enforcement officials from ten Asian countries in Bangkok, Thailand; USPTO/IIPI Intellectual Property Enforcement program in Bangladesh; regional IPR Enforcement training for officials from ten Asian countries in Hong Kong; USPTO/ASEAN Workshop on IP Office Administration and Enforcement for 88 government officials from 12 countries in the Asian region in Bangkok, Thailand; intellectual property training program for the Thai IP Court in Bangkok, Thailand; IPR Enforcement program in Phnom Penh, Cambodia; lectures, meetings, and training on IPR issues in China throughout various cities in Japan; regional IPR Training for Law Enforcement Officials in Hong Kong; a training program on IPR Enforcement for 29 government officials in Jakarta, Indonesia; International IP Enforcement Training Event in Delhi, India; four IP Enforcement Training Seminars throughout India; and intellectual property protection and enforcement workshops and public awareness seminars in Ulaan Baatar, Mongolia.

In addition, the Office of Enforcement participated in the following programs: IP Judicial Education Program for 36 judges from four Asian countries in Bangkok, Thailand; meeting and training with government of Vietnam officials regarding amending intellectual property enforcement laws in Vietnam; WIPO Asia Pacific Regional Symposium on IP Enforcement for 120 officials from 22 countries in Kuala Lumpur, Malaysia; ASEAN Regional Workshop on IP Enforcement for prosecutors in Kuala Lumpur, Malaysia; ASEAN Workshop on Optical Media Piracy for 85 regional government officials in the Philippines; U.S. Government of Malaysia Roundtable event on IPR enforcement with government officials and business in Malaysia; and Judicial Education Workshop on IP Law and Civil Procedures with U. S. Agency for International Development for 70 judges in Vietnam.

Through partnership with MEPI, programs were provided that focused on a variety of enforcement issues including: IPR Enforcement Seminar for Kuwaiti officials in Kuwait; Workshop on IP Enforcement for 70 enforcement officials in Kuwait; USPTO/MEPI Border Enforcement seminar for over 20 Moroccan Customs officials in Casablanca, Morocco; and USPTO/MEPI IPR Enforcement program for copyright enforcement officials in Rabat, Morocco. The Office of Enforcement also participated in the following programs: USPTO/MEPI regional judicial workshop for judges on IP Enforcement in Dubai, United Arab Emirates; USPTO/MEPI regional workshop for prosecutors on IP Enforcement in Oman; and MEPI regional customs program for 43 government officials in Bahrain. In addition, a special program and study tour was conducted for Middle Eastern librarians and information legal advisors on copyright protection and library management in the digital environment.



*An international study group of 21 law enforcement officers, judges, and public prosecutors from the Middle East and Northern Africa attend a four-day training program at the USPTO on intellectual property rights enforcement. The USPTO held 17 Global IP Academies for foreign officials in FY 2006.*

Technical assistance programs were offered in Africa, which included: USPTO-IIPI Botswana program on Making IP Work for Development; and INL, Department of State/USPTO Program on Combating Counterfeit Medicines in Sub-Saharan Africa, Johannesburg.

In the Americas and Caribbean, the Office of Enforcement organized and/or participated in intellectual property protection and enforcement programs that included: a program on the Enforcement of Intellectual Property Rights at the border for

Exhibit 117
Page 002145                                                                    41

LUC 1314294

customs officials in Lima, Peru; USPTO/SIECA intellectual property training for judges and prosecutors from seven regional countries in Antigua, Guatemala; a conference for police and prosecutors in San Pedro Sula, Honduras; and a conference for Honduran diplomats in Tegucigalpa, Honduras focusing on intellectual property enforcement obligations under CAFTA-DR.

Several enforcement programs were conducted in the Washington, D.C. area for foreign officials including: USPTO Enforcement Academies; the USPTO-WIPO Academy for the Judiciary on the Enforcement of Intellectual Property Rights; a week-long Enforcement seminar followed by a study tour of the U.S. for 21 judges and prosecutors from countries throughout the Middle East and North Africa; and GIPA trainings and seminars on intellectual property enforcement including those for MEPI region and for CAFTA-DR countries plus Belize and Panama. In addition, the Office of Enforcement participated in the Department of State's International Visitors Programs. Training was also provided to U.S. Government officials whose portfolios include intellectual property issues, including briefing numerous offices of the U.S. Congress including authorizing and appropriation committees on intellectual property matters ranging from patent reform and trademark disputes, trade agreements, international intellectual property enforcement, and a two-day conference for U.S. Government personnel on intellectual property protection in China.

The USPTO also participated in conferences for U.S. businesses and industries that specifically were concerned with intellectual property enforcement. Some of these conferences included: the Motor Equipment Manufacturing Association's Meeting in Detroit; the International Anti Counterfeiting Coalition (IACC) Anti-Counterfeiting Summit in New York City; the American Intellectual Property Law Association Conference in Philadelphia; the U.S. Chamber of Commerce's Conference on Trade Roots in Seattle; the American Apparel and Footwear Association Anti-Counterfeiting Conference in New York City; the American Made Alliance's "The Buyer's Market of American Craft" trade show in Philadelphia; the National Confectioners Association Annual Meeting in Orlando; the National Association of Manufacturers Meeting in Chicago; an IACC Anti-Counterfeiting Conference in Toronto; and the International Trademark Association Conference in Toronto.

## TRILATERAL



Masaki Okamoto

*Patent examiners from the Japan Patent Office and the European Patent Office visit the USPTO through the Trilateral Examiner Exchange Program to learn more about how the USPTO operates and exchange ideas.*

***Patent Trilateral Offices:*** The USPTO, JPO, and EPO continued working together, building on a cooperative effort that began in 1983, to find mechanisms to streamline processing and avoid redundancies among the offices as well as for applicants.

In FY 2006, the USPTO and JPO implemented a one-year trial program known as the "Patent Prosecution Highway" which leverages fast-track patent examination procedures available in both offices to allow applicants in both countries to obtain corresponding patents faster and more efficiently. The program is an important step toward reducing duplication of searching through work-sharing as it permits each office to benefit from work previously done by the other office, in turn reducing examination workload and improving patent quality.

The USPTO successfully deployed the TDA system with the EPO and the JPO that permits examiners of the three offices electronic access to the contents of each office's published application files. This tool is an important component in facilitating work sharing activities.

The USPTO and EPO are working toward implementing a pilot for electronic priority document exchange. The system will allow for direct office-to-office transmission of priority documents that would streamline the process by eliminating the need for customers to request and mail these documents. Full implementation of both the USPTO and EPO exchange and the USPTO and JPO exchange is expected to occur in FY 2007.

At the request of the Industry Trilateral Group, the Trilateral Offices began working towards standardization of the formal aspects of patent applications to allow applicants to file in the same format for all three of the offices. This effort will allow for the implementation of the first step towards a phased approach to patent harmonization.

Exhibit 117
Page 002146

LUC 1314295

**Trademark Trilateral Offices:** The USPTO, together with the JPO and Europe's OHIM, continued its work on the Trademark Trilateral Identification Manual Project's list of identifications for goods and services that will be accepted in trademark applications filed in the three offices. This list of accepted identifications streamlines the trademark application process for those filing applications within the United States, Europe, and Japan.

## GEOGRAPHICAL INDICATIONS

**WTO GI Issues:** The USPTO actively works on GI issues in the WTO context including the WTO Agriculture Committee, TRIPs Council, and the WTO Dispute Settlement Body. Negotiations continue on establishing a multilateral system of notification and registration of GIs wines and spirits. The USPTO and other U.S. Government agencies do not support establishing a multilateral system that treats GIs differently from trademarks and undermines the existing protection for trademark rights. Discussions also continue regarding extension of higher-level protection to products other than wine and spirits. The United States opposes amending the TRIPs Agreement to change the level of protection for all GI products, as there has not been any demonstration that existing protection is inadequate. Also, the topic of GIs continues to be included in the modalities on the WTO Agriculture negotiations where generic terms (i.e., parmesan, feta, chablis) would be considered intellectual property of a particular region. In March 2005, the USPTO worked with the USTR to obtain a win at the WTO on a GI case against the European Communities (EC). The WTO Panel affirmed the U.S.' assertion that the EC regulations discriminate against foreign owners of GIs and that the EC cannot deny trademark owners their rights. The USPTO continues to work on an inter-agency basis to ensure that the domestic and export interests of U.S. trademark holders are not damaged through WTO proposals and national legislation of our trading partners.

## CHINA INITIATIVES

**Technical Assistance:** The USPTO continued technical assistance offered in China, with a focus on providing the provinces with capacity-building programs relating to civil, criminal, and border enforcement. In addition to enforcement programs, the USPTO hosted various seminars on substantive intellectual property issues, including a seminar on the protection of GIs through use of a trademark system in Beijing and Xiamen and a seminar on Traditional Knowledge and Genetic Resources with China's State Intellectual Property Office (SIPO) in Beijing and Kunming. In early FY 2007, the USPTO in coordination with JPO and EPO, will host a two-day conference on intellectual property protection and enforcement of pharmaceuticals.

**Diplomatic Initiatives:** In FY 2006, the USPTO strengthened its bilateral relationships with Chinese intellectual property offices. In February 2006, the USPTO signed a Work Plan for Strategic Cooperation with SIPO. The work plan is intended to increase office-to-office cooperation as a means to assist each office with reducing workloads and improving the quality of patent examination for the benefit of both Chinese and U.S. patent applicants. Both offices have already begun implementing the first phase of the work plan and are actively pursuing the next steps.



*Under Secretary Jon Dudas and Deputy Under Secretary Steve Pinkos meet with Chinese officials discussing intellectual property enforcement in China.*

In FY 2006, the USPTO hosted the head of the China Trademark Office and his delegation to discuss capacity building, improving administration and management of the China Trademark Office and the Trademark Review and Adjudication Board. Also discussed was improving trademark protection in China for foreign and Chinese brand owners. Also in FY 2006, Under Secretary Dudas met with the General Administration for Press and Publication (which includes China's copyright office) to discuss copyright issues, including how to improve China's newly-promulgated protections for copyrights on the Internet.

Exhibit 117
Page 002147

43

LUC 1314296



*USPTO IPR experts Dorian Mazurkevich, Minna Moezie, Jennifer Ness, and Dominic Keating were sworn into the U.S. Commercial Service on Sept. 18, 2006, as intellectual property rights commercial officers. They will be stationed at U.S. embassies around the world to promote IP rights and enforcement.*

**Training:** The USPTO hosted visiting Chinese delegations from both Beijing and from the provinces. The visitors have included Chinese officials from Shanghai and Guangzhou, as well as intellectual property officials from Guangdong, Hubei, and Zhejiang provinces. These officials visited the USPTO to learn about our legal system, the administrative procedures followed by the USPTO, how IPRs are protected and enforced in the U.S., and the functions and responsibilities of the USPTO and other U.S. Government intellectual property-related agencies.

During FY 2006, the USPTO also utilized GIPA to greatly expand USPTO-led training and capacity-building programs on IPR protection and enforcement. Through GIPA, the USPTO brings foreign government officials to the United States to learn and strategize about global IPR protection and enforcement issues facing the global economy. In FY 2006, several Chinese intellectual property officials participated in programs offered through GIPA, including the Copyright Program offered in August 2006.

**Diplomatic Negotiations:** In early FY 2006, Under Secretary Dudas led a U.S. interagency delegation to Beijing, China for the U.S.-China JCCT IPR Working Group meeting. The IPR Working Group, co-chaired on the U.S. side by the USTR and the USPTO, helped negotiate an additional set of commitments from the Chinese government to reduce counterfeiting and piracy in China. Later in FY 2006, Under Secretary Dudas took part in the 17th Plenary Session of the JCCT in Washington, DC. In August 2006, Deputy Under Secretary Pinkos led a U.S. interagency delegation to Beijing, China for another JCCT IPR Working Group meeting. The next meeting of the JCCT IPR Working Group is scheduled to take place in December 2006 in Washington, DC.

In early FY 2007, a delegation from the DOC is expected to participate in the Ambassador's Roundtable on IPR in China.

**Expert Posting:** During FY 2006, the USPTO posted an additional intellectual property expert in Beijing with the U.S.&FCS and another expert will be placed in Guangzhou in early FY 2007. This will supplement the work of USPTO's already existing intellectual property attaché who has been in Beijing since FY 2004. The new team of experts will expand the USPTO's program of providing in-country assistance to U.S. businesses facing intellectual property problems and work with local officials on efforts to curb piracy.

## CONGRESSIONAL ACTIVITY

During FY 2006, Under Secretary Dudas, Deputy Under Secretary Pinkos, and the USPTO's Offices of Congressional, International Relations, and Enforcement participated in numerous meetings, hearings, and briefings with members of Congress and staff relating to patent, trademark, and copyright issues including patent reform and intellectual property protection and enforcement. In addition, the USPTO was host to several congressional delegations throughout FY 2006 at its USPTO facilities. The Office of Congressional Relations furthered outreach between industry and government by meeting and working with property rights groups, business associations such as the U.S. Chamber of Commerce, and interested industry groups. The Offices of Congressional, International Relations, and Enforcement continued developing its intergovernmental partnerships with federal agencies, including Department of Justice, U.S. Customs and Border Protection, USTR, DOC, International Trade Administration, and Department of State.

**Patent Quality:** During FY 2006 Under Secretary Dudas testified on "Patent Quality Enhancement in the Information-Based Economy" and on "H.R. 5120, To Amend title 35, United States Code (USC), to conform certain filing provisions within the Patent and Trademark Office" before the House Judiciary Subcommittee on Courts, the Internet, and Intellectual Property. The ever-increasing importance of intellectual property in today's economy is putting greater pressures on the patent examination system. The USPTO has taken

Exhibit 117
Page 002148

LUC 1314297

important steps to improve patent quality and plans to propose additional changes that will have a positive impact. Under Secretary Dudas and the Office of Congressional Relations will continue working with Congress throughout FY 2007 to help ensure a quality-focused, efficient patent system that benefits all interested parties and the American economy.

***Strategy Targeting Organized Piracy!:*** Deputy Under Secretary Pinkos provided testimony to the Senate Committee on Homeland Security and Governmental Affair's Subcommittee on Oversight of Government Management, the Federal Workforce, and the District of Columbia on "STOP!: A Progress Report on Protecting and Enforcing Intellectual Property Rights Here and Abroad." The USPTO has made combating piracy and counterfeiting a top priority and will work with Congress, other federal agencies, and all other interested parties to ensure that the efforts are successful.

***Patenting of Tax Strategies:*** USPTO's General Counsel testified before the House Ways and Mean's Subcommittee on Select Revenue Measures on "Issues Relating to the Patenting of Tax Advice." Consistent with applicable law, the USPTO has issued patents on various business methods including those involving tax-planning strategies. This issue will be a topic of continued interest in FY 2007.

***Telework:*** USPTO's Senior Advisor for Telework testified before the House Government Reform's Subcommittee on Federal Workforce and Agency Organization on "Telecommuting: A 21st Century Solution to Traffic Jams and Tourism." During FY 2006, the Trademark work-at-home program received the "Telework Program with Maximum Impact on Government" award from the Telework Exchange for its extremely successful program with 80 percent of its eligible trademark attorneys working from home. The PHP was introduced in 2006 with 506 patent examiners participating in the program through the end of FY 2006. The USPTO will continue to serve as a role model and leader in promoting telework opportunities and programs throughout FY 2007.

***Patent Reform:*** Patent reform was the subject of several House and Senate subcommittee hearings during FY 2006 with various parties weighing in, including independent inventors, high tech companies, legal academics, pharmaceutical groups, software companies, economists, financial services representatives, and U.S. Government officials.

Various legislative initiatives offered in the House during FY 2005 and FY 2006 contained numerous provisions intended to overhaul the U.S. patent system by improving patent quality, limiting litigation abuses, and harmonizing the U.S. patent laws with those of our key trading partners. Some of the major proposals include a shift from a first-to-invent system to a first-inventor-to-file, the establishment of a post-grant opposition proceeding at the USPTO, the submission of prior art by third parties, a modified definition of prior art, expansion of the *inter partes* reexamination proceeding, a limitation on treble damages for willful infringement, a codification into law of an apportionment rule for calculating damages, allowance of assignee filing, the publication of all patent applications after 18 months, the elimination of the best mode requirement, a codification of duty of candor, the transfer of venue for certain patent cases, and broadening of the scope of prior user rights.

In August 2006, the Senate introduced its own version of patent reform legislation, which contains many of the provisions included in the various House versions, including first-inventor-to-file, post-grant review, a revised definition for prior art, assignee filing, apportionment of damages, willful infringement, prior user rights, *inter partes* reexamination, 18-month publication, third party submission of prior art, and venue. However, the Senate bill contains additional provisions, including the award of attorney's fees to the prevailing party, substantive rulemaking authority for the USPTO, and the right to an interlocutory appeal on claims construction.



*Elaine Gin, attorney-advisor in the USPTO Office of Enforcement, meets dog trainer, Neil Powell (LEFT), and Flo, the Motion Picture Association of America's DVD-sniffing dog. The MPAA hosted an event in Washington D.C. to launch its new program which uses specially trained dogs to help prevent the import and export of fake DVDs. A USPTO-sponsored enforcement class from around the world attended the launch.*

Exhibit 117
Page 002149

45

LUC 1314298

Under Secretary Dudas welcomes the discussion of reform initiatives and shares Congress' commitment to ensure the USPTO's policies and practices promote invention, disseminate new technologies, and reduce patent pendency. Discussions on patent reform initiatives to ensure the U.S. patent system remains the world's leader will resume in FY 2007.



*USPTO Director Jon Dudas talks to children at the Fort Hunt Elementary School in Alexandria, Virginia, about their ability to innovate and the concept of respecting others' intellectual property rights.*

**Piracy and Counterfeiting:** Under Secretary Dudas applauded the President's March 2006 signing of H.R. 32, the "Stop Counterfeiting in Manufactured Goods Act," that significantly strengthens U.S. anti-piracy and counterfeiting laws. This legislation provides for the mandatory destruction of counterfeit goods, the forfeiture of equipment used to manufacture or package counterfeit goods, prohibits trafficking in counterfeit labels, patches, tags or medallions that are unattached to goods, criminalizes the possession of counterfeit goods with the intent to sell or traffic in those goods, expands the definition of "traffic," and criminalizes the unauthorized import or export of goods bearing a counterfeit mark or copies of copyrighted works.

**Trademark Dilution:** The Trademark Dilution Revision Act of 2006 passed in FY 2006. The bill clarifies the standard for injunctive relief under the Federal Trademark Dilution Act of 1995 by providing the owner of a famous mark entitlement to injunctive relief against another person's use of a mark that is likely to cause dilution by blurring or tarnishment, regardless of actual confusion, competition, or economic injury. The legislation sets forth the definition of a "famous mark," as those "widely recognized by the general consuming public of the United States." The legislation also defines "dilution by blurring," and "dilution by tarnishment." Finally, the bill allows the owner of a famous mark to seek additional remedies if the defendant acted willfully.

**Pilot Program for Patent Judges:**  Legislation passed the House and was introduced in the Senate in FY 2006 that would establish a pilot program in certain U.S. district courts where judges would have the choice of opting-in to hear patent cases while maintaining random assignments. The goal of this bill is to enhance the expertise of district court judges who hear patent cases while avoiding forum shopping. These discussions are expected to continue in FY 2007.

The Office of Congressional Relations is a vital component of the USPTO that provides outreach and informational support to members of Congress, their staff, and congressional bodies including the House and Senate Judiciary Committees, the House and Senate Appropriations Committees, the House Government Reform Committee, the House Ways and Means Committee, the Joint Committee on Taxation, the House and Senate Small Business Committees, the Senate Committee on Homeland Security and Governmental Affairs, the House Committee on Education and the Workforce, the U.S. China Interparliamentary Exchange, the U.S.–China Economic and Security Review Commission, the Intellectual Property Caucus, and the Congressional International Anti-Piracy Caucus. During FY 2006, the Office of Congressional Relations reviewed and prepared analyses of numerous legislative proposals regarding intellectual property matters that originated in other Executive agencies or were proposed by members of Congress. In addition, Congressional Relations responded to and consulted with Congressional staff on hundreds of diverse constituent-related intellectual property issues throughout FY 2006.

Exhibit 117
Page 002150

LUC 1314299

## INTELLECTUAL PROPERTY POLICY DEVELOPMENTS AND DOMESTIC LITIGATION

Under USC § 2, the Under Secretary of Commerce for Intellectual Property and Director of the USPTO advises the President and other agencies on both domestic and international intellectual property policy.

In domestic litigation, the USPTO advises the Solicitor General of the United States on intellectual property matters before the Supreme Court in addition to defending cases in which the USPTO is sued for decisions it has rendered. This year, the USPTO assisted the Solicitor General in formulating the government's position before the Supreme Court in several important intellectual property cases. First, in *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837 (2006), the USPTO prepared a memorandum to the Department of Justice, recommending that the traditional four-factor injunction test should be applied in the patent context and helped the Solicitor General's Office prepare the government's *amicus curiae* brief advocating that position in favor of the petitioner. The USPTO also helped prepare the Solicitor General's Office for oral argument. The Supreme Court issued a unanimous decision and, as advocated by the government, reversed the Federal Circuit and remanded the case to the district court for application of the four-factor test.

Second, in *KSR International Co. v. Teleflex, Inc.*, No. 04-1350, the Supreme Court's invited the views of the government regarding whether to grant a petition for writ of *certiorari* to address whether the Federal Circuit misapplies the motivation-suggestion-teaching test for combining prior art references under 35 USC § 103 in light of the Supreme Court's precedent on obviousness. The USPTO assisted the Solicitor General's Office in formulating a recommendation, which the Supreme Court followed in granting *certiorari*. Thereafter, the USPTO assisted the Solicitor General's Office in preparing the government's *amicus curiae* brief on the merits, arguing that the Supreme Court should reverse Federal Circuit precedent and its application of the motivation-suggestion-teaching test as too stringent. Oral argument is presently pending and will be heard in FY 2007.

Third, in *SmithKline Beecham Corporation v. Apotex Corporation*, No. 05-489, the Supreme Court invited the views of the government regarding whether to grant a petition for writ of *certiorari* to address whether the Federal Circuit's finding of inherent anticipation conflicted with Supreme Court precedent. The USPTO provided a memorandum to the Department of Justice, indicating that the Federal Circuit decision did not conflict with precedent and thus recommending against the grant of *certiorari*. The USPTO also helped the Solicitor General's Office prepare the government's brief reflecting that position. The Supreme Court, following the government's suggestion, denied *certiorari*.

Fourth, in *Federal Trade Commission v. Schering-Plough Corporation*, No. 05-273, the Federal Trade Commission filed a petition for writ of *certiorari* pursuant to its independent litigating authority without the participation of the Solicitor General's Office. The Supreme Court invited the views of the government regarding whether to grant *certiorari* to address whether a settlement of pharmaceutical patent litigation wherein the patent holder makes a payment to a potential generic competitor violates antitrust laws. Upon request, the USPTO gave input to the Solicitor General's Office, and the Solicitor General's Office in turn filed a brief recommending against *certiorari*. Following the government's recommendation, the Supreme Court denied *certiorari*.

In addition to the USPTO's work before the Supreme Court, the USPTO appeared as a party in several important patent cases before the U.S. Court of Appeals for the Federal Circuit. As one example, the USPTO appeared as an appellee in *In re Kahn*, 441 F.3d 977 (Fed. Cir. 2006), a case involving the issue of obviousness, specifically, whether the BPAI correctly found that there was motivation to combine the prior art. In affirming the BPAI, the Federal Circuit addressed the origins of the motivation-suggestion-teaching test, noting that it was developed by the Court of Customs and Patent Appeals to pick up where the analogous art test set forth in *Graham v. John Deere Co.*, 383 U.S. 1 (1966), left off. The Federal Circuit also explained that the purpose of test is to guard against hindsight and to ensure predictable patentability determinations. Patent scholars have commented that the Federal Circuit's discussion of the motivation-suggestion-teaching test was made in reaction to the Supreme Court's grant of *certiorari* in *KSR International*.

Lastly, the Office of the Solicitor defended the USPTO in several civil actions before the trial courts. For example, in *Sony v. Dudas*, No. 05-1447, 2006 WL 1472462 (E.D. Va. May, 22, 2006), the USPTO defended the Office's decision (1) to suspend the *inter partes* reexamination of two patents, given that the validity of the two patents was pending before the Federal Circuit as a result of private litigation; and (2) not to reexamine every claim of a patent when the request for reexamination is for less than all the claims. The USPTO filed a motion for summary judgment before the U.S. District Court for the Eastern District of Virginia and argued the case. The District Court granted the USPTO's motion. It held that the USPTO did not abuse its discretion in finding "good cause" to suspend

Exhibit 117
Page 002151

LUC 1314300

the *inter partes* reexamination. It also held that the USPTO, in its discretion, may review claims for which reexamination was not requested, but that the USPTO is not required to do so when the request identifies less than all the claims.

As a further example, in *Michels v. United States*, No. 06-290, 2006 WL 2524040 (Fed. Cl. Sept. 1, 2006), plaintiffs sued the United States for an unconstitutional taking of their patents without just compensation in violation of the Fifth Amendment when their patents expired because they failed to pay the statutorily required maintenance fees under 35 USC § 41(b). The USPTO prepared a memorandum for the Department of Justice, recommending a motion to dismiss for failure to state a claim upon which relief could be granted. The USPTO in turn helped the Department of Justice to file the motion. The U.S. Court of Federal Claims granted the government's motion, agreeing with the government that the expiration of plaintiffs' patents for failure to pay maintenance fees did not constitute an unconstitutional taking.

## REGISTRATION

### Office of Enrollment and Discipline

The Office of Enrollment and Discipline (OED) had a very successful FY 2006. In the last three months of the fiscal year, OED experienced a 23 percent increase in applicants taking the fully implemented computerized testing of applicants for registration to practice in patent cases before the USPTO. Several important advantages of computerized testing that were expected have been realized. These include: steady-state, non-cyclical workflow in processing applications and preparing examination questions; and greater convenience for applicants scheduling examinations. Turnaround time for processing applications and examination results has been reduced. Applicants who take the examination via computer obtain their unofficial results on the day of the examination. In FY 2006, OED processed 3,662 applications concerning the registration examination. OED admitted 3,490 applicants to take the computerized registration examination and 31 applicants who took the examination in a paper format. OED registered 1,089 individuals as agents and 505 individuals as attorneys.

Sixty-two limited recognition numbers were issued to non-citizens of the United States. During the course of the year, OED also supported USPTO's Patents organization, with emphasis on assuring quality patent examination, by successfully administering promotion examinations for patent examiners and patent manager candidates. In FY 2006, OED continued to effectively protect members of the public. Upon OED's review of the applications for registration that were received, OED determined that information in 62 applications raised the issue of an applicant's present moral character. Three applicants were denied registration in decisions by the OED Director for lack of good moral character. One applicant withdrew the application after the OED Director issued a Show Cause requirement. OED either dismissed or closed the investigations regarding 35 candidates and proceeded with their registration. During the course of the year, OED received 155 grievances concerning possible misconduct by registered practitioners. OED opened 82 investigations. Forty-one grievances were dismissed, after thorough review and analysis, without investigation. OED closed 65 pending investigations through a combination of warning letters, memorandums for the Committee on Discipline, and closure for lack of probable cause to determine that a USPTO Disciplinary Rule had been violated.

Exhibit 117
Page 002152

LUC 1314301

# MANAGEMENT CHALLENGES

The Agency will achieve the vision of leading the world in intellectual property policy by optimizing patent and trademark quality and timeliness and improving intellectual property protection and enforcement domestically and abroad in concert with focused management priorities that encompass:

***Shift in Complexity of Filings / Sustained Emphasis on Quality*** — The USPTO must address the dual challenges of rising workloads and a shift of applications from traditional arts to more complex technologies. To address rising workloads the USPTO will continue to hire additional examiners and explore process changes. Quality was the most important component of the USPTO's *21st Century Strategic Plan*. Quality will be assured throughout the examination process with the implementation of several quality initiatives, including an enhanced Quality Assurance Program for end product reviews, in-process reviews, and the development of quality measures and performance targets in conjunction with external stakeholders.

***Electronic Workplace*** — The Patent and Trademark organizations are rapidly moving to eliminate paper documents from their processes. Electronic communications will be improved, encouraging more applicants to do business electronically with the delivery of web-based text and image systems. Both Patent and Trademark organizations have made significant progress in support of the long-term goal to create an e-government operation, and the Trademark organization now relies exclusively on trademark data submitted or captured electronically to support examination, publish documents, and issue registrations. However, this increased reliance on electronic systems presents challenges in storage and maintenance for data recovery in the event of an outage. Keeping systems robust and adaptable to continuous improvement is imperative.



*Patent examiner Miguel Taveras demonstrates the new dual-monitor setup, which helps patent examiners work more efficiently.*

***Strengthening IPR System*** — An effective IPR system is important to trade because it provides confidence to businesses that rights will be respected and that profits will be returned to IPR holders. The tremendous ingenuity of American inventors, coupled with a strong intellectual property system, encourages and rewards innovation and helps propel the economic and technological growth of our nation. The challenges include deepening the dialogue on global intellectual property policy, facilitating technical cooperation with foreign countries, surveying and exchanging information on the current status of IPR protection and administrative systems, and arriving at agreement on standards of enhanced intellectual property enforcement to include increased criminal and civil protection, as well as tighter controls on circumventing technological protection. Reaching bilateral and multilateral agreements will require all sides to openly communicate and strive toward a more global convergence of patent and trademark standards.

***Sustained Funding Stream*** — Permanent enactment of the fee changes made with the Consolidated Appropriations Act 2005, is necessary to provide a stable and predictable funding stream for the agency. In the United States, demands for products and services have created substantial workload challenges in the processing of patents. Permanent enactment of these fee changes and continued implementation of strategic initiatives will address these challenges. Long-term funding stability is essential to the creation of a predictable environment for planning purposes.

Exhibit 117
Page 002153

49

LUC 1314302

# THE PRESIDENT'S MANAGEMENT AGENDA (PMA)

The USPTO is committed to the objectives of the PMA, which is the President's strategy for improving the management and performance of the federal government. Each quarter OMB releases an executive scorecard that rates progress and overall status in each of the PMA initiatives. Agencies are scored green, yellow, or red on their status in achieving overall goals or long-term criteria, as well as their progress in implementing improvement plans. The success is evidenced by the progress we have made in improving the strategic management of human capital, competitive sourcing, improved financial performance, expanded e-government, and budget and performance integration.

## STRATEGIC MANAGEMENT OF HUMAN CAPITAL

In order to effectively carry out our mission, the USPTO needs to attract, hire, develop, and retain people with knowledge and skills in an increasing range and depth of technologies. The performance of the USPTO springs from the knowledge, energy, commitment, and professionalism of the people who work here. To build an outstanding performance-based organization, we must do an outstanding job of attracting, leading, and managing our people – our human capital.

The USPTO made excellent progress in the area of strategic management of human capital. The USPTO established, by Agency Administrative Order, the first ever Human Capital Council (HCC). This Council brings together leaders from the business units to work together and address the most pressing human capital challenges of the USPTO. The HCC is responsible for making recommendations to the Under Secretary and Director and the executive Management Council on USPTO-wide human capital policies, priorities, goals, objectives, and initiatives. Additionally, the HCC assesses workforce characteristics and future needs in order to align USPTO's human capital policies to meet mission goals.

The USPTO's recruitment program was a huge success. We hired 1,218 examiners for the Patent organization in FY 2006. We also added 87 examining attorneys to the Trademark organization. We have implemented a number of authorities, including pay flexibilities such as recruitment and retention incentives to attract and retain the best and brightest in hard-to-fill positions.



*Technology Center Director Janice Falcone welcomes newly hired patent examiners to the first class of the new USPTO Patent Training Academy.*

The USPTO established a new training program, the Patent Training Academy, for newly hired examiners with the goal to provide more effective and efficient training, reduce the one-on-one training burden faced by supervisors, and develop a more informed and productive class of examiners. The first training class under this program was initiated in January 2006, and completed the training in September 2006. Additional classes began in May, June, July, and September. We are in the process of evaluating the effectiveness of this program.

The USPTO continues to be a recognized leader in federal government Telework programs, and has received numerous awards for our accomplishments in this regard. In FY 2006, the USPTO received another award for the Telework program. The Telework Exchange recognized that the Trademark organization has created the model of an extremely successful telecommuting program for other government agencies, and awarded us the *Telework Program with Maximum Impact on Government.* At the beginning of FY 2006, we launched a hoteling program for patent examiners and provided participants the ability to work-at-home with complete access to online USPTO-provided resources. This program has resulted in space saving and better balance of work life for patent examiners.

Exhibit 117
Page 002154

LUC 1314303

In its September 18, 2006 issue of *Business Week*, the magazine named the USPTO as one of the 55 best places to launch a career. This is a guide, the magazine states, of employers that "really shine."

The USPTO continues to build on our success and has begun an effort to develop a comprehensive Strategic Human Capital Plan, taking into account the OPM's Human Capital Assessment and Accountability Framework to provide a consistent, comprehensive roadmap of human capital management for the USPTO.

## COMPETITIVE SOURCING

The USPTO is committed to achieving performance enhancements and cost-savings through competitive sourcing. In past years, the USPTO has competitively sourced many functions, such as payroll, mail processing/handling, clerical support, data transcription, systems maintenance and development, help desk support, etc. While preserving the inherently governmental responsibility for patentability determinations, the USPTO is committed to increasing total patent examiner output by competitively sourcing multiple patent functions. For example, PCT (international) Search, Reclassification, and Pre-Grant Publication Classification services were competitively sourced during FY 2006. The award of contracts to perform these functions will permit patent examiners to focus on reduction of patent application backlog and on improving the quality of determinations made during the patent review process.

## IMPROVED FINANCIAL PERFORMANCE

Again in FY 2006, the USPTO is in compliance with all federal accounting principles and standards and has encountered no instances of material weaknesses in internal controls or non-compliance with financial related laws and regulations. We will continue to maintain and strengthen our internal controls and improve the timeliness and usefulness of our financial management information. In fact, for FY 2006, the USPTO met all quarterly financial reporting requirements instituted by OMB. Again, the USPTO sustained its clean audit opinion, with FY 2006 marking the 14th consecutive unqualified audit opinion and the 10th consecutive year with no material weaknesses. The USPTO has a certified and accredited, fully integrated financial management system and uses a data warehouse to accommodate both financial and operational data. The data warehouse is used by managers for analyzing financial results and performance and by supervisory patent examiners for managing patent processing timeframes. The USPTO also operates a mature ABC system that captures costs of core mission activities and both direct and indirect costs for the entire Office. Managers use data from the ABC system to analyze the cost of operations when making decisions regarding improving processes, setting fees, or developing budget requirements.

## E-GOVERNMENT

The USPTO chooses IT projects that best support its mission and comply with its enterprise architecture. Individual projects are evaluated in the broader context of technical alignment with other IT systems, as well as the investment's impact to the USPTO IT portfolio's performance, as measured by cost, benefit, and risk. As part of the Capital Planning and Investment Control process, the USPTO prioritizes its investments and decides which projects will be funded in subsequent fiscal years. Once selected, each project is managed and monitored consistently throughout its life cycle. At key milestone dates, progress reviews are conducted to compare the project's status to planned benefit, cost, schedule technical efficiency, and effectiveness measures. All major IT system investments are included in the OMB Exhibit 53 and Exhibit 300 business cases.

The USPTO is accelerating deployment of critical automated information systems that will allow patent applicants to create, and USPTO internal users to process, electronic patent applications and follow-on papers more easily and accurately; reduce time required for processing and responding to customers; automate routine patent formalities tasks so that patent examiners can focus on the intellectual aspects of examination; and continuously improve quality throughout the processes. Additional benefits will be realized through reduced contractor costs, elimination of lost paper files, improved workflow tracking, and automated support functions to yield a higher quality product.

Exhibit 117
Page 002155

LUC 1314304

The Patent File Wrapper (PFW) is one major initiative under the Patent Automation program that will allow the USPTO to close an identified agency performance gap by implementing a text-based, integrated file wrapper system in the coming years. A new system is proposed that will adequately support the Office as the issues of an overwhelming increase in filings, an urgent need for many types of remote access, and quantum changes in the examined technologies are faced. The USPTO plans to develop and implement: Workflow, Intelligent Text Processing, and Content Management Systems. PFW development and implementation will significantly advance the automation and management control over several major patent examination processes from initial application receipt through final patent grant and publication.

During 2006, the USPTO deployed EFS-Web, the new patent electronic filing system for e-filing of documents with the USPTO. EFS-Web is a web-based tool that eliminates the need for special software and regular upgrades from the USPTO that were required to submit eXtensible Markup Language (XML) format electronic applications using the previous version of the EFS. EFS-Web provides users a simple, safe, and secure method for submitting initial and follow-on patent applications over the Internet as a PDF file, including PDF fillable forms such as the Application Data Sheet and the IDS. As a result, the filing of documents with the USPTO via EFS-Web can be done in less time and at a lower cost by avoiding printing, postage, and courier costs, as compared with paper filings. The time required to file documents via EFS-Web may depend, inter alia, on the speed of the user's Internet connection and the size of the PDF files being submitted. EFS-Web submissions are automatically processed through the USPTO, and an immediate notification is provided to the filer that their submission has been received by the USPTO. Opened to the public on March 16th, 2006, EFS-Web has proven a reliable success. In FY 2006, over 14 percent of all patent applications were filed using EFS-Web. The USPTO hopes to achieve 40 percent of all patent applications electronically in FY 2007.

The USPTO also provided patent applicants access to IFW contents for U.S. patent applications via Private Patent Application Information Retrieval (PAIR). Private PAIR is part of the USPTO's PAIR system, which is a safe, simple, and secure means that allows patent applicants to electronically view the status of their patent applications and download their patent material. PAIR also includes Public PAIR, which only displays issued or published application status to the general public. Registered users (patent applicants) of Private PAIR can view and download the electronic file wrapper in PDF format at no cost. In addition, Private PAIR includes a direct login feature that allows access to Private PAIR through a web browser window, rather than having to access through USPTO directly. As EFS-Web is integrated with Private and Public PAIR, a trusted filer (someone who has a Digital Certificate), can view EFS-Web submissions in Private PAIR within hours instead of days or weeks. In addition, Private PAIR includes a feature which provides an estimated date (in months) of issuance of a first office action.

In addition, in FY 2006, the USPTO provided patent applicants the ability to file petitions for accelerated examination. Applicants meeting published filing requirements, including the use of electronic filing, will receive final patentability decisions from an examiner within 12 months.

The Trademark Automation Program enhances the current manual trademark-application processes with electronic processing and improves the maintenance of all the records associated with trademark applications. By implementing the Trademark Automation Program, USPTO reduces operations costs, improves efficiency and quality through workload and process management, reduces pendency, increases visibility and control through improved management reporting capabilities, and supports the expansion of the Trademark work-at-home program. Trademark Automation enables improved access to USPTO information by internal users and the public and facilitates the international exchange of information and protection of intellectual property.

The USPTO is improving the processing of trademark applications and registrations and providing improved support for the staff. This includes managing work items with computer systems that enforce routing work items through optimized processes and facilitate prompt and efficient communication with internal and external customers. The electronic workflow system will provide a consistent user interface, extensible across functions; coordination of specialized system components via Web Services and a middle component; migration of business logic from the database servers to web services; and increase the level of integration of the Trademark systems. These functions provide increased system flexibility to easily and quickly adapt to changing technology and add new capabilities such as accepting PDF formatted forms and attachments, resulting in reduced software enhancement and maintenance costs.

TEAS provides trademark customers the ability to submit their trademark applications electronically over the Internet. TEAS supports the receipt of all Trademark forms electronically through standardized transactions using XML formatted data. In addition, TEAS was enhanced in FY 2006 to be able to accept PDF formatted documents.

Exhibit 117
Page 002156

LUC 1314305

The USPTO completed the development of the First Action System for Trademarks (FAST) 2.0 Automated Information System in September 2006 to provide Trademark Legal Instrument Examiners with the functionality to perform actions from a unified client interface interacting with many disparate USPTO data sources and subsystems. Specifically, FAST 2.0 provides faster processing of applications and other correspondence by reducing many manual processes, improves the quality of work produced by integration of support tools and enforcing defined processing work steps, provides more efficient management of caseloads, reduces the number of misrouted correspondences, and improves process visibility.

The USPTO made significant strides in FY 2006 to expand remote access to its employees in support of Telework initiatives by providing the technical and logistical support to implement a complete equipment setup in an employee's home or other remote location. Remote access involves providing USPTO equipment to employees to work-at-home so that they have the same capability as if they were working at the Alexandria campus. The Telework systems have many features to ensure security and the protection of sensitive data. The effective use of telecommuting will further provide for continued government operations during an emergency or disaster situation, increased efficiency and productivity in the federal government, and an increase in the quality of life of federal employees. The PHP was expanded in May 2006 to include all patent examiners who meet PHP telecommuting prerequisites as defined in the PHP Policy Guideline. The PHP was formerly open only to Patents Telework Program participants.

In May 2006, BPAI launched the USPTO's first official remote duty station. Under the new program, a senior BPAI judge and a work-at-home participant will conduct official USPTO functions via a remote workstation and will not be required to periodically report to work on the USPTO's Alexandria campus.

## BUDGET AND PERFORMANCE INTEGRATION

Since FY 1999, the USPTO has developed an annual corporate plan that links the annual performance plan and budget request such that resource requirements for continuing programs and new initiatives are aligned with outputs and performance goals. The USPTO is in the process of updating our *Strategic Plan*. The new *Plan* will build on the infrastructure developed in the previous *Plan* and outline specific strategies to meet the goals of optimizing patent and trademark quality and timeliness. We have refined the Agency's budget formulation process to better equate budgetary resources with both enterprise-wide strategic goals and individual organization performance targets. The annual integrated budget/performance plan is an effective and efficient way of establishing accountability of resources against performance. The agency routinely monitors program performance targets to ensure achievement of performance goals. Performance goals are evaluated regularly against stakeholder requirements, business conditions, and planned and actual resources available. Organizational goals and crosscutting performance measures are also included in senior executive members' performance appraisal plans to ensure alignment with agency mission, goals, and *Strategic Plan* objectives.

The USPTO achieved notable success in support of the PMA by attaining Green in the Budget and Performance Integration initiative.

Exhibit 112
Page 002157

53

LUC 1314306

# MANAGEMENT ASSURANCES AND COMPLIANCE
# WITH LAWS AND REGULATIONS

This section provides information on the USPTO's compliance with the following legislative mandates:

- Federal Managers' Financial Integrity Act
- Federal Financial Management Improvement Act (FFMIA)
- Federal Information Security Management Act
- Inspector General (IG) Act Amendments
- OMB Financial Management Indicators
- Prompt Payment Act
- Civil Monetary Penalty Act
- Debt Collection Improvement Act
- Biennial Review of Fees
- Improper Payments Information Act of 2002

## MANAGEMENT ASSURANCES

## FEDERAL MANAGERS' FINANCIAL INTEGRITY ACT

The FMFIA requires federal agencies to provide an annual statement of assurance regarding management controls and financial systems. The USPTO management is responsible for establishing and maintaining effective internal control and financial management systems that meet the objectives of the FMFIA. The objectives of internal control, as defined by the Government Accountability Office (GAO), are to ensure:

- Effectiveness and efficiency of operations;
- Reliability of financial reporting; and
- Compliance with laws and regulations.

The statement of assurance is provided below, which includes one Section 2 material weakness for IT security discussed in further detail in the Federal Information Security Management Act section below. This statement was based on the review and consideration of a wide variety of evaluations, control assessments, internal analyses, reconciliations, reports, and other information, including the DOC OIG audits, and the independent public accountants' opinion on the USPTO's financial statements and their reports on internal control and compliance with laws and regulations. In addition, USPTO is not identified on the GAO's High Risk List related to controls governing various areas.

Exhibit 117
Page 002158

LUC 1314307

On the basis of the USPTO's comprehensive internal control program during FY 2006, the USPTO can provide reasonable assurance that its internal control over the effectiveness and efficiency of operations and compliance with applicable laws and regulations as of September 30, 2006, was operating effectively, except for the one material weakness identified. Accordingly, I am pleased to certify with reasonable assurance, except for the one Federal Information Security Management Act material weakness regarding information technology security, that our agency's systems of internal control, taken as a whole, comply with Section 2 of the Federal Managers' Financial Integrity Act of 1982. Our agency also is in substantial compliance with applicable federal accounting standards and the U.S. Standard General Ledger at the transaction level and with federal financial system requirements. Accordingly, our agency fully complies with Section 4 of the Federal Managers' Financial Integrity Act of 1982, with no material non-conformances.

In addition, the USPTO conducted its assessment of the effectiveness of our agency's internal control over financial reporting, which includes safeguarding of assets and compliance with applicable laws and regulations, in accordance with OMB Circular A-123, *Management's Responsibility for Internal Control.* Based on the results of this evaluation, the USPTO provides reasonable assurance that its internal control over financial reporting as of June 30, 2006 was operating effectively and no material weaknesses were found in the design or operation of the internal control over financial reporting. In addition, no material weaknesses related to internal control over financial reporting were identified between July 1, 2006 and September 30, 2006.



Jon W. Dudas
*Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office
November 6, 2006*


## FEDERAL FINANCIAL MANAGEMENT IMPROVEMENT ACT

The FFMIA requires Federal agencies to report on agency substantial compliance with Federal financial management system requirements, standards promulgated by the Federal Accounting Standards Advisory Board, and the U.S. Standard General Ledger at the transaction level. The USPTO complied substantially with the FFMIA for FY 2006.


## OTHER COMPLIANCE WITH LAWS AND REGULATIONS


## FEDERAL INFORMATION SECURITY MANAGEMENT ACT

The USPTO continues to stay vigilant in reviewing administrative controls over information systems and is always seeking methods of improving our secure configuration. All mission and business systems are fully certified and accredited, with full authority to operate since September 2004, with the exception of the Network Perimeter, which has interim authority to operate. In conjunction with the DOC's continued emphasis on improving the certification and accreditation (C&A) process, the USPTO submitted the C&A package for the Network Perimeter, along with C&A packages for two contractor master systems new to the C&A process this fiscal year, to the DOC during the fourth quarter of FY 2006. The DOC did not consider the C&A packages to be of sufficient quality to be

Exhibit 117
Page 002159

55

LUC 1314308

MANAGEMENT'S DISCUSSION AND ANALYSIS | *PERFORMANCE AND ACCOUNTABILITY REPORT: FISCAL YEAR 2006*

provided to the OIG. As a result, the USPTO has declared a material weakness for IT Security in recognition of the need for compliance with Government guidance on IT Security and to reconfirm its commitment to the protection of our Nation's intellectual capital information systems.

While the USPTO IT Security Program has made significant strides within the past year, there remain several security areas that require improvement. Specific areas that require improvement include C&A of contractor systems, continuous monitoring of IT systems, and improvement of C&A packages for federal systems.

The USPTO implemented processes and procedures in the later part of FY 2006 and has taken immediate steps to remediate these weaknesses. The USPTO expects significant improvement in the near future. During FY 2007, the USPTO will continue to improve upon the C&A packages for the Network Perimeter, as well as for the contractor master systems. In addition, C&A activities for the remaining five contractor master systems new to the C&A process this fiscal year are scheduled for completion during FY 2007.

## INSPECTOR GENERAL ACT AMENDMENTS

The Inspector General Act, as amended, requires semi-annual reporting on IG audits and related activities, as well as any requisite agency follow-up. The report is required to provide information on the overall progress on audit follow-up and internal management controls, statistics on audit reports with disallowed costs, and statistics on audit reports with funds put to better use. The USPTO did not have audit reports with disallowed costs or funds put to better use.

The USPTO's follow-up actions on audit findings and recommendations are essential to improving the effectiveness and efficiency of our programs and operations. As of September 30, 2006, management had two recommendations outstanding from a report issued in FY 2004 (USPTO-BTD-16432-4-0001: "USPTO Needs Strong Office of Human Resources Management Capable of Addressing Current and Future Challenges"). No new reports had been issued during FY 2006. A summary of audit findings and recommendations follows.

| **STATUS OF IG ACT AMENDMENTS AUDIT RECOMMENDATIONS** *as of September 30, 2006* | | | | |
|---|---|---|---|---|
| **Report for Fiscal Year** | **Status** | **Recommendation** | **Action Plan** | **Completion Date** |
| FY 2004 | Open | Ensure that the USPTO works with Commerce and OPM to officially obtain delegated examining authority. | The USPTO has coordinated with OPM to grant us formal delegated examining authority status. The final decision is pending contingent on a follow-up audit scheduled for September 2006. | Estimated March 2007 |
| FY 2004 | Open | Ensure that the USPTO develops Office of Human Resources (OHR) organizational descriptions, policies, and procedures, in accordance with the intent of DOO 10-14. | The USPTO is continuing to work on the development of Agency Administrative Orders, policies, and Standard Operating Procedures. These documents cover all of the human resources functions and effectively establish a set of rules and procedures for providing OHR services. | Estimated October 2007 |

The estimated date of completion for the delegated examining authority was moved from last year to allow time to make corrections in response to a recent OPM audit.

The estimated date of completion for the organizational policies was moved from last year to allow time for development and approval of all agency administrative orders, policies, and standard operating procedures.

Exhibit 117
Page 002160

LUC 1314309

## OMB FINANCIAL MANAGEMENT INDICATORS

The OMB prescribes the use of quantitative indicators to monitor improvements in financial management. The USPTO tracks other financial performance measures as well. The table below shows the USPTO's performance during FY 2006 against performance targets established internally and by OMB and the government-wide Metric Tracking System (MTS):

| Financial Performance Measure | FY 2006 Target | FY 2006 Performance |
|---|---|---|
| Percentage of Timely Vendor Payments (MTS) | 98% | 97% |
| Percentage of Payroll by Electronic Transfer (OMB) | 90% | 99% |
| Percentage of Treasury Agency Locations Fully Reconciled (OMB) | 95% | 100% |
| Timely Reports to Central Agencies (OMB) | 95% | 100% |
| Audit Opinion on FY 2006 Financial Statements (OMB) | Unqualified | Unqualified |
| Material Weaknesses Reported by OIG (OMB) | None | None |
| Timely Posting of Inter-Agency Charges (USPTO) | 30 days | 29 days |
| Average Processing Time for Travel Payments (USPTO) | 8 days | 12 days |

## PROMPT PAYMENT ACT

The Prompt Payment Act requires Federal agencies to report on their efforts to make timely payments to vendors, including interest penalties for late payments. In FY 2006, the USPTO did not pay interest penalties on 97.2 percent of the 9,071 vendor invoices processed, representing payments of approximately $514.0 million. Of the 496 invoices that were not processed in a timely manner, the USPTO was required to pay interest penalties on 254 invoices, and was not required to pay interest penalties on 242 invoices, where the interest was calculated at less than $1. The USPTO paid only $60 in interest penalties for every million dollars disbursed in FY 2006. Virtually all recurring payments were processed by EFT in accordance with the EFT provisions of the Debt Collection Improvement Act of 1996.

## CIVIL MONETARY PENALTY ACT

There were no Civil Monetary Penalties assessed by the USPTO during FY 2006.

## DEBT COLLECTION IMPROVEMENT ACT

The Debt Collection Improvement Act prescribes standards for the administrative collection, compromise, suspension, and termination of Federal agency collection actions, and referral to the proper agency for litigation. Although the Act has no material effect on the USPTO since it operates with minimal delinquent debt, all debt more than 180 days old has been transferred to the U.S. Department of the Treasury for cross-servicing.

Exhibit 137
Page 002161

LUC 1314310

## BIENNIAL REVIEW OF FEES

The Chief Financial Officers Act of 1990 requires a biennial review of agency fees, rents, and other charges imposed for services and things of value it provides to specific beneficiaries as opposed to the American public in general. The objective of the review is to identify such activities and to begin charging fees, where permitted by law, and to periodically adjust existing fees to reflect current costs or market value so as to minimize general taxpayer subsidy of specialized services or things of value (such as rights or privileges) provided directly to identifiable non-Federal beneficiaries. The USPTO is a fully fee-funded agency without subsidy of general taxpayer revenue. For non-legislative fees, it uses ABC accounting to evaluate the costs of activities and determine if fees are set appropriately. When necessary, fees are adjusted to be consistent with the program and with the legislative requirement to recover full cost of the goods or services provided to the public.

## IMPROPER PAYMENTS INFORMATION ACT OF 2002

During FY 2006, the USPTO did not have any erroneous payments that exceeded the ten million dollar threshold. While our erroneous payments were only 0.06 percent of total disbursements and primarily related to inaccurate banking information, we plan to further reduce this percentage through our use of a government-wide Central Contractor Registration database maintained by the Department of Defense, which requires all government contractors to maintain current contact and banking information. The USPTO identifies overpayments and erroneous payments by reviewing (1) credit memos and refund checks issued by vendors or customers and (2) undelivered electronic payments returned by financial institutions.

| | Improper Payment Reduction Outlook *(Dollars in millions)* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY 2005 | | | FY 2006 | | | FY 2007 | | FY 2008 | | FY 2009 | |
| Program | Outlays | Improper Payment Percent | Improper Payment Dollars | Outlays | Improper Payment Percent | Improper Payment Dollars | Estimated Outlays | Improper Payment Percent | Estimated Outlays | Improper Payment Percent | Estimated Outlays | Improper Payment Percent |
| Patent | $ 1,247 | 0.18% | $ 2.21 | $ 1,335 | 0.06% | $ 0.82 | $ 1,593 | 0.00% | $ 1,642 | 0.00% | $ 1,692 | 0.00% |
| Trademark | 155 | 0.19% | 0.30 | 179 | 0.06% | 0.11 | 213 | 0.00% | 220 | 0.00% | 227 | 0.00% |
| Total | $ 1,402 | 0.18% | $ 2.51 | $ 1,514 | 0.06% | $ 0.93 | $ 1,806 | 0.00% | $ 1,862 | 0.00% | $ 1,919 | 0.00% |

| Summary of Recovery Audit Effort *(Dollars in millions)* | |
|---|---|
| **Amount subject to review** | $ 159.4 |
| *# of invoices* | 4,433 |
| **Actual amount reviewed** | $ 107.3 |
| *# of invoices* | 985 |

During FY 2005, the USPTO entered into an agreement with the DOC to use an existing contract for recovery audit services. The audit was limited to closed obligations greater than $0.1 million. Further excluded were grants, travel payments, purchase card transactions, inter-agency agreements, government bills of lading, and gift and bequest transactions.

The audit was completed in FY 2006 and resulted in three invoices that were identified as recoverable improper payments, which are insignificant. The improper payments identified of $0.1 million were recovered during FY 2006.

Exhibit 117
Page 002162

LUC 1314311

# FINANCIAL HIGHLIGHTS

The USPTO is a self-sufficient Federal agency that funds the cost of its operations through product and service fees paid by applicants for and owners of patents and trademarks. Over 84 percent of Patent and Trademark fees collected are set by statute. The USPTO uses ABC techniques to report costs incurred for operations. This cost information is used to establish non-statutory fees for products and services at an amount that recovers full costs, and is used as one factor in determining statutory fee amounts.

The following summary presents the USPTO's FY 2006 financial highlights for budgetary resources and requirements, along with results of operations. Details behind these highlights are included in the discussion of the USPTO's financial statements beginning on page 61.

## BUDGETARY RESOURCES AND REQUIREMENTS

The USPTO was provided appropriation authority to spend all planned fee collections in FY 2006. In the past, the appropriation authority was less than planned fee collections. When spending authority is less than fee collections, the additional fee collections are temporarily unavailable.

The following table presents the source of funds made available to the USPTO, and the use of such funds.

| Source and Status of Funds (Dollars in millions) | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| **Source of Funds:** | | | | |
| Unobligated Beginning Balance | $ 5.6 | $ 3.5 | $ 2.3 | $ 5.7 |
| Recovery of Prior Year Obligations | 5.9 | 10.4 | 7.6 | 9.1 |
| Spending Authority from Offsetting Collections | 1,194.7 | 1,321.7 | 1,504.2 | 1,665.4 |
| Non-Expenditure Transfer | -- | -- | -- | (0.1) |
| Net Increase in Unavailable Fees | (11.7) | (99.9) | -- | -- |
| Total Source of Funds | $ 1,194.5 | $ 1,235.7 | $ 1,514.1 | $ 1,680.1 |
| **Status of Funds:** | | | | |
| Obligations Incurred | $ 1,191.0 | $ 1,233.4 | $ 1,508.4 | $ 1,674.4 |
| Unobligated Balance, Available | 2.0 | 1.8 | 2.7 | 5.7 |
| Unobligated Balance, Unavailable | 1.5 | 0.5 | 3.0 | -- |
| Total Status of Funds | $ 1,194.5 | $ 1,235.7 | $ 1,514.1 | $ 1,680.1 |

Exhibit 117
Page 002163

59

LUC 1314312

During FY 2006, total budgetary resources available for spending increased 11.2 percent over the amount available in the preceding year. This significant increase in budgetary resources available for use is depicted by the graph to the right.

For the second year in a row, the USPTO was provided with full use of its fee collections. This allowed the USPTO continued flexibility towards meeting the goals of the *21st Century Strategic Plan*, including transitioning to a fully electronic operating environment, improving the quality of its services and products, and addressing patent and



trademark pendency. The additional funding has enabled the USPTO to substantially increase the number of patent and trademark examiners to assist in addressing the growing average complexity of patent applications and increasing workloads and to allocate additional resources towards protecting intellectual property in the United States and abroad. As a result, the USPTO was able to meet virtually all of the performance goals and continue reforms that assure intellectual property relevancy in a highly competitive, global marketplace.

## RESULTS OF OPERATIONS

The USPTO generated a net income of $80.2 million in FY 2006, an increase of $124.0 million over the net cost in FY 2003 of $43.8 million.

Typically, federal governmental agencies reflect a fiscal year gross cost of operations that exceed the total obligations incurred in that same fiscal year. This is due to including the costs of non-budgetary items, such as imputed costs. However, beginning in FY 2005, the USPTO's gross cost of operations was less than obligations incurred. This difference is partly due to a change in the method to recognize the cost of post-employment benefits. In prior years, the USPTO recognized an imputed financing source and corresponding expense to represent its share of the cost to the federal government of providing pension and post-retirement health and life insurance benefits to all eligible USPTO employees. Beginning in FY 2005, the USPTO is now using fees to fund the cost of post-retirement benefits, resulting in increased obligations of approximately $42.7 million each fiscal year.

Another contributing factor for the gross cost of operations being less than obligations incurred arises from decisions that were made to promote more efficient operations of the agency. As the USPTO receives no-year reimbursable appropriations, the agency was able to make optimal use of the funding structure during FY 2006 by realigning the period of performance for many contracts to increase effectiveness and by investing in several significant projects to advance the electronic operating environment, such as the PFW, disaster recovery, and technology improvements.

Due to the increase in pendency (the amount of time an application is waiting before a patent is issued or trademark is registered), the USPTO has been recognizing a steadily increasing deferred revenue liability for fees received prior to the revenue being earned. From FY 2003 through FY 2006, unearned patent fees increased 55.7 percent, with a 13.3 percent increase from FY 2005. In FY 2006, for each month patent pendency to first action increased, deferred revenue increased approximately $28.4 million, with a corresponding decrease in earned revenue. While unearned trademark fees increased $26.6 million over the past three years, unearned trademark fees decreased $11.8 million in FY 2006, a result of the increased staffing to address the backlog and the decrease in pendency. In addition to the 1,218 patent examiners and 87 trademark examining attorneys hired during FY 2006, the USPTO plans to continue hiring at least 1,200 new patent examiners each fiscal year through FY 2012, as well as implementing new operating practices, to reduce the backlog of unprocessed applications and reduce pendency.

Exhibit 117
Page 002164

LUC 1314313

## FINANCIAL STATEMENTS

The USPTO received an unqualified (clean) audit opinion from the independent public accounting firm of KPMG LLP on its FY 2006 financial statements, provided on pages 76 to 97. This is the 14th consecutive year that the USPTO received a clean opinion. Our unqualified audit opinion provides independent assurance to the public that the information presented in the USPTO financial statements is fairly presented, in all material respects, in conformity with accounting principles generally accepted in the United States of America. In addition, KPMG LLP reported no material weaknesses or reportable conditions in the USPTO's internal control, and no instances of non-compliance with laws and regulations affecting the financial statements.

The USPTO financial management process ensures that management decision-making information is dependable, internal controls over financial reporting are effective, and that compliance with laws and regulations is maintained. The preparation of these financial statements is a component of the USPTO's objective to continually improve the accuracy and usefulness of its financial management tools.

The following sections provide a discussion and analysis of the financial statements and related information.

## STATEMENT OF BUDGETARY RESOURCES

The following table displays the USPTO's total budgetary resources available for spending over the past four years. Also presented are the human resources that the USPTO has employed to respond to the increases in patent and trademark filings. In prior years, the budgetary resources available for spending did not include amounts that were not available through the end of the fiscal year that became available for spending at the beginning of the following fiscal year once apportioned by the OMB.

| Resources | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Budgetary Resources Available for Spending *(dollars in millions)* | $1,193.0 | $1,235.2 | $1,511.1 | $1,680.1 |
| *Percentage Change* | *4.0%* | *3.5%* | *22.3%* | *11.2%* |
| Patent Examiners | 3,579 | 3,681 | 4,177 | 4,779 |
| *Percentage Change* | *1.2%* | *2.8%* | *13.5%* | *14.4%* |
| Trademark Examining Attorneys | 256 | 286 | 357 | 413 |
| *Percentage Change* | *(0.8)%* | *11.7%* | *24.8%* | *15.7%* |

As evident from the above table, total budgetary resources available for spending increased significantly in FY 2006, a 11.2 percent increase over the prior fiscal year and a 40.8 percent increase over the past three fiscal years. Almost half of the increase in available budgetary resources was used to fund the increased cost of additional human capital to address the growing average complexity of patent applications and the increase in patent and trademark filings.

Exhibit 117
Page 002165                                                           61

LUC 1314314

| Filings | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Patent Filings | 355,418 | 378,984 | 409,532 | 443,652[1] |
| *Percentage Change* | *0.6%* | *6.6%* | *8.1%* | *8.3%* |
| Trademark Filings | 267,218 | 298,489 | 323,501 | 354,775 |
| *Percentage Change* | *3.2%* | *11.7%* | *8.4%* | *9.7%* |

[1] *Preliminary data*

The increase in available budgetary resources also allows the USPTO to apply additional funds towards the accomplishment of strategic goals and other initiatives that are associated with the performance goals contained in the *21st Century Strategic Plan* and the PMA. This year, in support of the overall USPTO goal of reducing pendency, the USPTO successfully competitively sourced PCT prior art searches, classification of patent documents, and patent reclassification functions. Competitive sourcing work in these areas will allow our internal resources to concentrate on other strategic goals and initiatives for more efficient management of our performance goals.

The USPTO fee collections did not exceed the fee appropriation of $1,683.1 million during FY 2006, therefore the USPTO was able to spend all $1,657.6 million of fees collected during the year. The USPTO did not meet planned fee collections primarily due to a decrease in the expected number of claims being filed per application and less issue fee collections due to focusing resources on reducing patent allowance error rates. The reduction in patent allowance error rates resulted from the recent quality initiatives implemented as a part of the continuing emphasis on patent quality. Although less than planned, the FY 2006 fee collections increased 10.7 percent over FY 2005 collections of $1,497.2 million, all of which was appropriated. This increase in collections is due to an increase in patent and trademark application filings, as well as an increase in maintenance fees received.

As defined earlier, temporarily unavailable fee collections occur when the USPTO is not appropriated the authority to spend all fees collected during a given year. During FY 2006, the USPTO did not collect any fee collections that were designated as temporarily unavailable. As a result, the $516.5 million in temporarily unavailable fee collections at the end of FY 2004 remained the same through FY 2006.

The table below illustrates amounts that Congress has appropriated to the USPTO over the past four fiscal years, as well as the cumulative unavailable fee collections.

| Temporary Unavailable Fee Collections (Dollars in millions) | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Fiscal year fee collections | $ 1,193.7 | $ 1,321.0 | $ 1,497.2 | $ 1,657.6 |
| Fiscal year collections appropriated | (1,015.2) | (1,222.5) | (1,497.2) | (1,657.6) |
| Reductions - Rescissions | — | 77.0 | — | — |
| Fiscal year unavailable collections | $ 178.5 | $ 175.5 | $ — | $ — |
| Prior year collections unavailable | 329.3 | 341.0 | 516.5 | 516.5 |
| Prior year collections subsequently appropriated | (166.8) | — | — | — |
| Cumulative temporarily unavailable fee collections | $ 341.0 | $ 516.5 | $ 516.5 | $ 516.5 |

In addition to these annual restrictions, collections of $233.5 million are unavailable in accordance with the OBRA of 1990, and deposited in a special fund receipt account at the U.S. Department of the Treasury.

Exhibit 117
Page 002166

LUC 1314315

## STATEMENT OF NET COST

The Statement of Net Cost presents the USPTO's results of operations by Patent and Trademark business areas. The following table presents the total USPTO's results of operations for the past four fiscal years. From fiscal years 2003 through 2005, the USPTO's operations resulted in a net cost. However, in FY 2006, the USPTO generated a net income of $80.2 million due to the increased maintenance fees received and revenue recognition of previously deferred revenue collected subsequent to the fee increase on December 8, 2004.

| Net (Cost)/Income *(Dollars in millions)* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Earned Revenue | $ 1,162.3 | $ 1,239.0 | $ 1,372.8 | $ 1,594.4 |
| Program Cost | (1,206.1) | (1,289.2) | (1,424.0) | (1,514.2) |
| Net (Cost)/Income | $ (43.8) | $ (50.2) | $ (51.2) | $ 80.2 |

The Statement of Net Cost compares fees earned to costs incurred during a specific period of time. It is not necessarily an indicator of net income or net cost over the life of a patent or trademark. Net income or net cost for the fiscal year is dependent upon the groups of work that have been completed over the various phases of the production life cycle. The net income calculation is based on fees earned during the fiscal year being reported, regardless of when those fees were collected. Maintenance fees also play a large part in whether a total net income or net cost is recognized. Maintenance fees collected in FY 2006 are a reflection of patent issue levels 3.5, 7.5, and 11.5 years ago, rather than a reflection of patents issued in FY 2006. Therefore, maintenance fees can have a significant impact on matching costs and revenue.

While the backlog for patent applications continues to increase, increasing deferred revenue and decreasing earned revenue, during FY 2006 the Patent organization disposed of 11.3 percent more applications than were disposed of during FY 2005. In addition, the separation of the patent application fee into a discrete filing fee, search fee, and examination fee during FY 2005 resulted in an increase of $24.3 million in fees, recognized immediately as earned revenue during FY 2006.

During FY 2006, while the number of trademark applications increased 9.7 percent over the prior year, the Trademark organization was able to significantly reduce its backlog and register 31.7 percent more trademarks over FY 2005. While additional costs were incurred in reducing the backlog, the Trademark organization was able to recognize a significant increase in revenue earned.

## EARNED REVENUE

The USPTO's earned revenue is derived from the fees collected for patent and trademark products and services. Fee collections are recognized as earned revenue when the activities to complete the work associated with the fee are completed. The following table presents the earned revenue for the past four years.

| Earned Revenue *(Dollars in Millions)* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Patent | $ 1,004.5 | $ 1,092.5 | $ 1,197.8 | $ 1,384.2 |
| *Percentage Change in Patent Earned Revenue* | *10.4%* | *8.8%* | *9.6%* | *15.6%* |
| Trademark | 157.8 | 146.5 | 175.0 | 210.2 |
| *Percentage Change in Trademark Earned Revenue* | *4.3%* | *(7.2)%* | *19.5%* | *20.1%* |
| Total Earned Revenue | $ 1,162.3 | $ 1,239.0 | $ 1,372.8 | $ 1,594.4 |
| *Percentage Change in Earned Revenue* | *9.5%* | *6.6%* | *10.8%* | *16.1%* |

Exhibit 117
Page 002167

63

LUC 1314316

MANAGEMENT'S DISCUSSION AND ANALYSIS  |  *PERFORMANCE AND ACCOUNTABILITY REPORT: FISCAL YEAR 2006*

Earned revenue totaled $1,594.4 million for FY 2006, an increase of $221.6 million, or 16.1 percent, over FY 2005 earned revenue of $1,372.8 million. Of revenue earned during FY 2006, $378.5 million related to fee collections that were deferred for revenue recognition in prior fiscal years, $493.6 million related to maintenance fees collected during FY 2006, which were considered earned immediately, $716.4 million related to work performed for fees collected during FY 2006, and $5.9 million were not fee-related.

The actions being taken to address the backlog of patent and trademark applications are evident, as the amount of revenue deferred during FY 2006 was only 17.9 percent greater than revenue earned from prior year fee collections, as compared to 38.8 percent during FY 2005.

Work performed for fees collected during FY 2006 increased $95.4 million over these same fees earned during FY 2005. This increase can primarily be attributed to $30.7 million in fees considered earned immediately, $32.5 million in earned patent filing fees, $17.9 million in earned trademark application fees, $7.0 million in earned patent issue fees, and $5.5 million in earned recording fees.

## PATENT

Traditionally, the major components of earned revenue derived from patent operations are maintenance fees, initial application fees for filing, search, and examination, and issue fees. These fees account for over 80 percent of total patent income. The following chart depicts the relationship among the most significant patent fee types.

Patent maintenance fees are the largest source of earned revenue by fee type. During FY 2006, maintenance fees collected increased $74.8 million, or 17.9 percent, over FY 2005. As they are recognized immediately as earned revenue, any fluctuations in the rates of renewal have a significant impact on the total earned revenue of the



USPTO. To some extent, renewals recoup costs incurred during the initial patent process. As shown below, the renewal rates for all three stages of maintenance fees have been increasing modestly over the last four years and the trend indicates that this growth pattern will continue.

| Patent Renewal Rates* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| First Stage | 86.8% | 91.9% | 83.1% | 93.1% |
| Second Stage | 61.1% | 65.7% | 65.4% | 69.2% |
| Third Stage | 42.9% | 43.8% | 45.0% | 44.4% |

**\* Note:** *The First Stage refers to the end of the 3rd year after the initial patent is issued; the Second Stage refers to the end of the 7th year after the initial patent is issued; and the Third Stage refers to the end of the 11th year after the initial patent is issued. For example, in FY 2006, 93.1 percent of the patents issued three years ago were renewed, 69.2 percent of the patents issued seven years ago were renewed, and 44.4 percent of the patents issued 11 years ago were renewed.*

Application fee revenue earned upon filing increased from $72.6 million in FY 2005 to $96.9 million in FY 2006, with the number of applications increasing from 409,532 to 443,652 over the same period, increases of 33.5 percent and 8.3 percent, respectively. The variance in the percentage increases is due to the fee structure change in FY 2005, with only ten months of these fees collected in FY 2005, as compared to a full 12 months in FY 2006. The USPTO's most recent estimates project an increase of 7.0 percent in patent applications filed beginning in FY 2007, and then 8.0 percent extending through FY 2012, which will contribute to the continued growth in earned fee revenue.

Exhibit 117
Page 002168

LUC 1314317

Earned issue fee revenue increased from $199.5 million in FY 2005 to $202.5 million in FY 2006, with the number of patents issued increasing from 165,483 to 183,187 over the same period, increases of 1.5 percent and 10.7 percent, respectively. The USPTO's most recent estimates project that patents issued will increase an average of 8.4 percent each fiscal year through FY 2012.

# TRADEMARK

Trademark fees are comprised of application filing, renewal services, and TTAB fees. Additional fees are charged for intent-to-use filed applications, as additional requirements must be met for registration. The accompanying chart depicts the relationship among the most significant trademark fee types.



FY 2006 TRADEMARK REVENUE BY FEE TYPE

- Use Based and Intent to Use Applications for Registration — 62.7%
- Other Intent to Use Fees — 12.9%
- Renewal Fees — 9.7%
- Services — 6.6%
- Trademark Trial and Appeal Board — 8.1%

Earned revenue for trademark applications increased from $101.5 million in FY 2005 to $131.7 million in FY 2006, with the number of trademarks registered increasing from 143,396 to 188,899 over the same period, increases of 29.8 percent and 31.7 percent, respectively. The FY 2007 President's Budget projects that trademark applications filed will continue to increase, which will contribute to the continued growth in earned fee revenue.

Trademark registration can be a recurring source of revenue. To some extent, renewal fees recoup costs incurred during the initial examination process. As shown below, the renewal rates for trademarks have remained fairly stable over the last four years, indicating continued earned revenue from this source. Further, in the USPTO's most recent estimates, earned revenue from trademark renewals is expected to continue in the future.

| Trademark Renewal Rates | FY 2003 | FY 2004 | FY 2005 | FY 2006[1] |
|---|---|---|---|---|
| Renewals | 29.6% | 28.7% | 28.6% | 24.0% |

**Note:** *The renewals occur every 10th year for trademarks registered after November 15, 1989. For trademarks issued or renewed before November 15, 1989, renewal will occur after the 20th year and the renewal will be for a ten-year period. For example, in FY 2006, 24.0 percent of the trademarks granted ten and 20 years ago were renewed.*

[1] *Preliminary data*

# PROGRAM COSTS

Program costs totaled $1,514.2 million for the year ended September 30, 2006, an increase of $90.2 million, or 6.3 percent, over FY 2005 program costs of $1,424.0 million. The USPTO's most significant program cost is personnel services and benefits, which traditionally comprise over half of USPTO's total program costs. Any significant change or fluctuation in staffing or pay rate directly impacts the change in total program costs from year to year. Total personnel services and benefits costs for the year ended September 30, 2006, were $883.4 million, an increase of $81.2 million, or 10.1 percent, over FY 2005 personnel services and benefits costs of $802.2 million. This change, 90.0 percent of the total increase in program costs, was a result of a 3.4 percent increase in the Federal



FY 2006 PROGRAM COSTS

- Personnel Costs — 53.3%
- Rent, Communication, and Utilities — 5.4%
- Printing — 4.8%
- Contractual Services — 14.0%
- Other — 2.0%
- Depreciation — 2.0%
- Allocated Costs — 18.5%

pay scale, combined with a net increase of 826 personnel, from 7,363 at the end of FY 2005 to 8,189 at the end of FY 2006.

Exhibit 117
Page 002169

LUC 1314318



The USPTO directs maximum resources to the priority functions of patent and trademark examination. For FY 2006, costs directly attributable to the Patent and Trademark business areas represent 81.5 percent of total USPTO costs. The remaining costs, representing support costs, are allocated to the business areas using ABC accounting.

## PATENT

Total costs for the Patent business unit increased $261.5 million, 24.3 percent, from FY 2003 through FY 2006. The following table presents the major components of Patent costs for the past four years.

| Patent Costs *(Dollars in millions)* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Personnel Costs | $ 566.3 | $ 603.6 | $ 646.5 | $ 718.3 |
| Contractual Services | 125.1 | 150.4 | 156.1 | 184.3 |
| Printing and Reproduction | 72.7 | 71.8 | 68.9 | 71.9 |
| Rent, Communications, and Utilities | 62.9 | 76.3 | 82.6 | 72.5 |
| Depreciation, Amortization, or Loss on Asset Disposition | 36.4 | 32.5 | 26.1 | 24.9 |
| Other | 18.8 | 21.3 | 25.7 | 26.7 |
| Direct Costs | 882.2 | 955.9 | 1,005.9 | 1,098.6 |
| Allocated Costs | 191.9 | 189.9 | 247.2 | 237.0 |
| Total Patent Costs | $ 1,074.1 | $ 1,145.8 | 1,253.1 | $1,335.6 |
| *Percentage Change in Patent Costs* | *5.1%* | *6.7%* | *9.4%* | *6.6%* |

The Patent organization's most significant program costs relate to personnel services, and account for 58.1 percent of the increase in total cost of Patent operations during the past three years. Patent personnel costs for the year ended September 30, 2006, were $718.3 million, an increase of $71.8 million, or 11.1 percent, over FY 2005 personnel costs of $646.5 million. Of the total USPTO-wide program costs increases during FY 2006, 79.5 percent of the 90.0 percent increase in personnel costs are attributable to the Patent organization. Rent, communications, and utilities, printing and reproduction, and contractual service costs represent 24.6 percent of the Patent program costs for FY 2006. Over the last three years, these costs increased in line with the overall increase in total Patent costs due to additional rental costs for the new USPTO headquarters in Alexandria, increases in the number of patents issued, and increased spending on indexing and scanning documents for the PFW. In addition, while rental costs increased 15.3 percent over the past three years, these costs decreased during FY 2006 by $10.1 million as the move to Alexandria has been completed.

Exhibit 117
Page 002170

LUC 1314319

Patent costs were spread over four main patent products: utility patents, design patents, plant patents, and PCT patents. Utility patents were further broken down into the technology of the utility patent. The cost percentages presented below are based on direct and indirect costs allocated to patent operations and are a function of the volume of applications processed in each product area.



FY 2006 PATENT COST BY PRODUCT

- Utility-Transportation
- Utility-Mechanical
- Utility-Computer and Electronic Commerce
- Utility-Communications
- Utility-Biotechnology
- Utility-Chemical
- Utility-Physics
- Design
- Plant
- PCT
- Other

## TRADEMARK

Total costs for the Trademark business unit increased $46.6 million, 35.3 percent, from FY 2003 through FY 2006. The following table shows the major components of Trademark costs for that period.

| Trademark Costs *(Dollars in millions)* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Personnel Costs | $    65.4 | $    72.6 | $    80.0 | $    89.5 |
| Contractual Services | 19.9 | 22.3 | 23.2 | 27.1 |
| Printing and Reproduction | 2.6 | 1.2 | 0.8 | 0.3 |
| Rent, Communications, and Utilities | 7.5 | 8.9 | 8.4 | 8.6 |
| Depreciation, Amortization, or Loss on Asset Disposition | 4.5 | 4.9 | 6.1 | 6.1 |
| Other | 3.5 | 4.4 | 3.7 | 3.6 |
| Direct Costs | 103.4 | 114.3 | 122.2 | 135.2 |
| Allocated Costs | 28.6 | 29.1 | 48.7 | 43.4 |
| Total Trademark Costs | $    132.0 | $    143.4 | $    170.9 | $    178.6 |
| *Percentage Change in Total Trademark Costs* | *(4.8%)* | *8.6%* | *19.2%* | *4.5%* |

The Trademark organization's most significant program costs relate to personnel services, and account for 51.7 percent of the increase in total cost of Trademark operations during the past three years. Of the total USPTO-wide program costs increases during FY 2006, 10.5 percent of the 90.0 percent increase in personnel costs are attributable to the Trademark organization. Contractual services have increased $7.2 million, which represents 15.5 percent of the increase in total Trademark costs over the past three years, primarily attributable to the increased costs associated with operating in a fully electronic environment.

Exhibit 117
Page: 002171                                                                    67

LUC 1314320

The Intent to Use cost includes costs related to examining both the application and the additional intent to use disclosures. The overall cost percentages presented below are based on both direct costs and indirect costs allocated to trademark operations and are a function of the volume of applications processed in each product area.



FY 2006 TRADEMARK COST BY PRODUCT

- Intent to Use Marks
- Madrid Protocol
- Use Based Marks
- Renewals
- Trademark Trial and Appeal Board
- Other Services

## BALANCE SHEET AND STATEMENT OF CHANGES IN NET POSITION

At the end of FY 2006, the USPTO's consolidated Balance Sheet presents total assets of $1,580.3 million, total liabilities of $1,082.3 million, and a net position of $498.0 million.

Total assets increased 37.2 percent over the last three years, resulting largely from the increase in Fund Balance with Treasury and Property, Plant, and Equipment. The following table shows the changes in assets during this period.

| Composition of USPTO Assets *(Dollars in millions)* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Cash | $ 11.4 | $ 11.9 | $ 8.8 | $ 6.8 |
| Fund Balance with Treasury | 985.6 | 1,135.2 | 1,240.8 | 1,401.8 |
| Property, Plant, and Equipment, Net | 117.4 | 137.3 | 148.4 | 164.5 |
| Accounts Receivable and Prepayments | 37.1 | 12.9 | 11.1 | 7.2 |
| Total Assets | $ 1,151.5 | $ 1,297.3 | 1,409.1 | $ 1,580.3 |
| *Percentage Change in Total Assets* | 5.1% | 12.7% | 8.6% | 12.1% |

Fund Balance with Treasury is the single largest asset on the Balance Sheet and represents 88.7 percent of total assets at the end of FY 2006. This asset is comprised of unpaid obligated funds of $554.9 million, temporarily unavailable fees of $516.5 million, unavailable special fund receipts under OBRA of $233.5 million, other funds held on deposit for customers of $91.2 million, and unobligated funds of $5.7 million.

The unavailable special fund receipts and the temporarily unavailable funds require Congressional appropriation before they will be available for USPTO's use. These funds, together with amounts obligated and held on deposit, represent 99.6 percent of the Fund Balance with Treasury.

The other major asset is property, plant, and equipment. The net balance of this asset has increased by $47.1 million during the past three years, with the acquisition values of property, plant, and equipment increasing by $110.0 million. Leasehold improvements to the consolidated headquarters in Alexandria of $69.8 million are expected to provide significant cost savings in the future. In addition, investments in IT software and software in development increased $38.9 million, in conjunction with enhancing the existing e-government capabilities in areas such as e-filing, application information retrieval, data and image capture, and web-based search systems.

Total liabilities increased from $991.3 million at the end of FY 2005 to $1,082.3 million at the end of FY 2006, representing an increase of $91.0 million, or 9.2 percent. The following table shows the change in liabilities during the past four years.

Exhibit 117
Page 002172

LUC 1314321

| Composition of USPTO Liabilities *(Dollars in millions)* | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Deferred Revenue | $ 504.2 | $ 579.6 | $ 706.7 | $ 774.4 |
| Accounts Payable | 80.1 | 77.3 | 101.8 | 104.4 |
| Accrued Payroll, Leave, and Benefits | 75.4 | 83.4 | 90.7 | 101.4 |
| Customer Deposit Accounts | 74.4 | 70.7 | 74.1 | 83.8 |
| Other Liabilities | 14.2 | 17.2 | 18.0 | 18.3 |
| Total Liabilities | $ 748.3 | $ 828.2 | $ 991.3 | $ 1,082.3 |
| *Percentage Change in Total Liabilities* | *9.3%* | *10.7%* | *19.7%* | *9.2%* |

The USPTO's deferred revenue is the largest liability on the Balance Sheet. The liability for deferred revenue is calculated by analyzing the process for completing each service provided. The percent incomplete based on the inventory of pending work is applied to fee collections to estimate the amount for deferred revenue liability.

At the end of FY 2006, deferred revenue liability was $774.4 million, representing an increase of $270.2 million, or 53.6 percent, over the past three years. The deferred revenue liability includes unearned patent and trademark fees, as well as undeposited checks. The unearned patent fees represented 89.5 percent of this liability. The following graph depicts the composition of the deferred revenue liability, in addition to the increase in this liability during each of the past four years.



Deferred revenue at the USPTO is largely impacted by the change in patent and trademark filings, changes in the first action pendency rates, and changes in fee rates. From FY 2003 through FY 2004, the percentage increase in deferred revenue is consistent with the percentage increases in the first action pendency months. However, in FY 2005 and FY 2006, the percentage change in first action pendency months was less than the percentage change in deferred revenue as a result of the increased fees associated with the unearned patent and trademark application filings. The following table depicts the changes in the filings and pendencies during the past four years.

Exhibit 117
Page 002173

69

LUC 1314322

| Filings and Pendencies | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Patent Filings | 355,418 | 378,984 | 409,532 | 443,652[1] |
| *Percentage Change in Patent Filings* | *0.6%* | *6.6%* | *8.1%* | *8.3%* |
| Patent First Action Pendency (months) | 18.3 | 20.2 | 21.1 | 22.6 |
| *Percentage Change in Patent First Action Pendency* | *9.6%* | *10.4%* | *4.5%* | *7.1%* |
| Total Patent Pendency (months) | 26.7 | 27.6 | 29.1 | 31.1 |
| *Percentage Change in Total Patent Pendency* | *11.3%* | *3.4%* | *5.4%* | *6.9%* |
| Trademark Filings | 267,218 | 298,489 | 323,501 | 354,775 |
| *Percentage Change in Trademark Filings* | *3.2%* | *11.7%* | *8.4%* | *9.7%* |
| Trademark First Action Pendency (months) | 5.4 | 6.6 | 6.3 | 4.8 |
| *Percentage Change in Trademark First Action Pendency* | *25.6%* | *22.2%* | *(4.5)%* | *(23.8)%* |
| Total Trademark Pendency (months) | 19.8 | 19.5 | 19.6 | 18.0 |
| *Percentage Change in Total Trademark Pendency* | *(0.5)%* | *(1.5)%* | *0.5%* | *(8.2)%* |

[1] *Preliminary data*

Deferred revenue associated with the patent process is expected to further increase. In the USPTO's most recent estimates, the number of patent applications filed in FY 2007 is expected to increase approximately 7.0 percent, followed by increases of 8.0 percent from FY 2008 through FY 2012, with first action pendency increasing to 23.9 months in FY 2009 and total pendency increasing to 33.9 months in FY 2010. Once the pendency starts to decrease in FY 2011, patent deferred revenue should in turn begin decreasing.

While the deferred revenue associated with the trademark process had been increasing, during FY 2006, trademark deferred revenue decreased by $11.8 million, or 13.6 percent, from FY 2005. This was consistent with trademark first action pendency decreasing to 4.8 months and total trademark pendency decreasing to 18.0 months. Estimates included in the USPTO's most recent estimates project this decrease to continue in FY 2007 when first action pendency decreases to 3.7 months and total pendency decreases to 17.3 months.

The Statement of Changes in Net Position presents the changes in the financial position of the USPTO due to results of operations and unexpended appropriations. The major components of the movement in net position are the net income or net cost for the year, and the post-retirement costs for USPTO employees. For FY 2004 and prior, the USPTO recognized an imputed financing source and corresponding expense to represent its share of the cost to the federal government of providing pension and post-retirement health and life insurance benefits to all eligible USPTO employees. Beginning in FY 2005, the USPTO is now funding the costs of post-retirement benefits and the pension liabilities, resulting in an expense using earned revenue in the statement of net cost, without an imputed financing source. The change in the net position during the past four years is presented in the following table.

| USPTO Net Position (Dollars in millions) | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
|---|---|---|---|---|
| Net Position | $ 403.2 | $ 469.1 | $ 417.8 | $ 498.0 |
| *Percentage Change in Net Position* | *(1.8)%* | *16.3%* | *(10.9)%* | *19.2%* |

The increase in net position from $417.8 million at the end of FY 2005 to $498.0 million at the end of FY 2006, or 19.2 percent, is attributable largely to the results of operations. The significant increase in net position during FY 2004 is attributable largely to the permanent rescission reversing to a temporarily unavailable reduction in budgetary resources for $75.6 million.

Exhibit 117
Page 002174

LUC 1314323

## LIMITATIONS

The USPTO has prepared its FY 2006 financial statements in accordance with the requirements of OMB Circular A-136, *Financial Reporting Requirements*, as amended, and guidance provided by the DOC.  OMB Circular A-136 incorporates the concepts and standards contained in the Statements of Federal Financial Accounting Concepts (SFFAC) and the Statements of Federal Financial Accounting Standards (SFFAS) recommended by the Federal Accounting Standards Advisory Board (FASAB) and approved by the Secretary of the Treasury, the Director of the OMB, and the Comptroller General.

On October 19, 1999, the American Institute of Certified Public Accountants Council designated the FASAB as the accounting standards-setting body for Federal government entities.  Therefore, the SFFAS constitute accounting principles generally accepted in the United States (GAAP) for the Federal government.  These concepts and standards have been set by FASAB to help Federal agencies comply with the requirements of the *Chief Financial Officers' Act of 1990*, as amended by the *Government Management Reform Act of 1994*.  These two Acts demand financial accountability from Federal agencies and require the integration of accounting, financial management, and cost accounting systems.

The financial data in this report and the financial statements that follow have been prepared from the accounting records of the USPTO in conformity with GAAP.  The USPTO's financial statements consist of the Balance Sheet, the Statement of Net Cost, the Statement of Changes in Net Position, the Statement of Budgetary Resources, the Statement of Financing, and the Statement of Cash Flows.  The financial statements were prepared pursuant to the requirements of 31 U.S.C. 3515 (b).  The following limitations apply to the preparation of the financial statements:

- While the statements are prepared from books and records in accordance with the formats prescribed by the OMB, the statements are in addition to the financial reports used to monitor and control budgetary resources, which are prepared from the same books and records.

- The statements should be read with the realization that the USPTO is a component of the U.S. Government, a sovereign entity. One implication is that unfunded liabilities cannot be liquidated without legislation that provides resources to do so.

In addition, certain information contained in this financial discussion and analysis and in other parts of this Performance and Accountability Report may be deemed forward-looking statements regarding events and financial trends that may affect future operating results and financial position.  Such statements may be identified by words such as "estimate," "project," "plan," "intend," "believe," "expect," "anticipate," or variations or negatives thereof or by similar or comparable words or phrases. Prospective statements are subject to risks and uncertainties that could cause actual results to differ materially from those expressed in the statements. Such risks and uncertainties include, but are not limited to, the following: changes in U.S. or international intellectual property laws; changes in U.S. or global economic conditions; the availability, hiring and retention of qualified staff employees; management of patent and trademark growth; Government regulations; disputes with labor organizations; and deployment of new technologies. The USPTO undertakes no obligation to publicly update these financial statements to reflect events or circumstances after the date hereof, or to reflect the occurrence of unanticipated events.

## MANAGEMENT RESPONSIBILITIES

USPTO management is responsible for the fair presentation of information contained in the principal financial statements, in conformity with GAAP, the requirements of OMB Circular A-136, and guidance provided by the DOC.  Management is also responsible for the fair presentation of the USPTO's performance measures in accordance with OMB requirements. The quality of the USPTO's internal control rests with management, as does the responsibility for identifying and complying with pertinent laws and regulations.

Exhibit 117
Page 002175

LUC 1314324

Exhibit 117
Page 002176

LUC 1314325

# | FINANCIAL SECTION



Exhibit 117
Page 002177

LUC 1314326



Exhibit 117
Page 002178

LUC 1314327

## MESSAGE FROM THE CHIEF FINANCIAL OFFICER



The USPTO continued its high standard of financial management and accountability reporting during FY 2006. As a result of the dedicated efforts of the financial management staff throughout the USPTO we have received an unqualified opinion on our financial statements for the 14th consecutive year. Along with the unqualified opinion, the auditors reported no material weaknesses or reportable conditions in the design and operation of the USPTO's system of internal control over financial reporting and our financial system complies with federal financial systems requirements. For the fourth consecutive year, the Association of Government Accountants awarded the USPTO the Certificate of Excellence in Accountability Reporting for our *FY 2005 Performance and Accountability Report.*

The most significant change in financial management this fiscal year was the new requirement for an annual assurance statement on the effectiveness of internal control over financial reporting, in accordance with the Office of Management and Budget's revised Circular A-123, *Management's Responsibility for Internal Control.* We enhanced our existing internal control review program and established a Senior Assessment Team and Senior Management Council comprised of managers and executives across the organization. Internal control evaluation permeated throughout the agency, which heightened awareness and continued to advance financial management at the USPTO. The evaluation included assessing internal controls at the process level for the material financial processes, as well as for the associated IT controls over financial management processes. Tests of these controls proved yet again that the USPTO should be proud of the internal control culture it has created.

Sound financial management continued to guide the USPTO in the analysis and review of major strategic initiatives during the past fiscal year. In conjunction with the overall USPTO goal of optimizing pendency, competitive sourcing efforts were focused in the areas of Patent Cooperation Treaty prior art searches, classification of patent documents, and patent reclassification functions. Competitive sourcing work in these areas will free our internal resources to focus on key government functions for more efficient management of our goals.

We will propose a new five-year *Strategic Plan* designed to foster American innovation and competitiveness at home and around the globe. This new *Plan* was drafted with input from the public and employees. We hope to publish the final *Plan* early in calendar year 2007, at which time it will be made available on our website. Full details on how the USPTO will implement the *Strategic Plan,* including funding and performance metrics, will be included in the USPTO's FY 2008 President's Budget.

We pride ourselves in providing our senior leadership and business units with high quality and timely financial reporting and program performance information to facilitate better decision-making. We continue to review financial management and related processes to identify areas for improvement in efficiency, financial and performance data integration, and internal controls to ensure unmatched reliability in financial activities.

Identified improvements will enhance capabilities to serve the public and USPTO's business units better and provide for timelier, more useful, and more accurate data for decision-making.

*Barry K. Hudson*

Barry K. Hudson
*Chief Financial Officer*
*November 6, 2006*

Exhibit 117
Page 002179

75

LUC 1314328

## PRINCIPAL FINANCIAL STATEMENTS AND RELATED NOTES

## UNITED STATES PATENT AND TRADEMARK OFFICE
## CONSOLIDATED BALANCE SHEETS

### As of September 30, 2006 and 2005

| (Dollars in Thousands) | 2006 | 2005 |
|---|---|---|
| **ASSETS** | | |
| Intragovernmental: | | |
| Fund Balance with Treasury (Note 2) | $ 1,401,771 | $ 1,240,798 |
| Accounts Receivable | — | 50 |
| Advances and Prepayments | 1,607 | 2,729 |
| Total Intragovernmental | 1,403,378 | 1,243,577 |
| Cash | 6,790 | 8,874 |
| Accounts Receivable, Net | 2,882 | 2,666 |
| Advances and Prepayments | 2,708 | 5,631 |
| Property, Plant, and Equipment, Net (Note 4) | 164,538 | 148,401 |
| Total Assets | $ 1,580,296 | $ 1,409,149 |
| **LIABILITIES** | | |
| Intragovernmental: | | |
| Accounts Payable | $ 12,165 | $ 5,163 |
| Accrued Payroll and Benefits | 6,174 | 5,409 |
| Accrued Post-employment Compensation | 1,563 | 1,367 |
| Customer Deposit Accounts (Note 3) | 4,498 | 4,230 |
| Total Intragovernmental | 24,400 | 16,169 |
| Accounts Payable | 92,225 | 96,607 |
| Accrued Payroll and Benefits | 51,382 | 46,221 |
| Accrued Leave | 43,812 | 39,097 |
| Customer Deposit Accounts (Note 3) | 78,309 | 69,844 |
| Patent Cooperation Treaty Account (Note 3) | 8,746 | 9,035 |
| Madrid Protocol Account (Note 3) | 279 | 334 |
| Deferred Revenue (Note 6) | 774,425 | 706,734 |
| Actuarial Liability (Note 7) | 7,470 | 7,278 |
| Contingent Liability (Note 15) | 250 | — |
| Total Liabilities (Note 5) | $ 1,082,298 | $ 991,319 |
| **NET POSITION** | | |
| Unexpended Appropriations—Earmarked Funds (Note 10) | $ 26 | $ 26 |
| Cumulative Results of Operations—Earmarked Funds (Note 10) | 497,972 | 417,804 |
| Total Net Position | $ 497,998 | $ 417,830 |
| Total Liabilities and Net Position | $ 1,580,296 | $ 1,409,149 |

The accompanying notes are an integral part of these financial statements.

Exhibit 117
Page 002180

LUC 1314329

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CONSOLIDATED STATEMENTS OF NET COST

**For the years ended September 30, 2006 and 2005**

| (Dollars in Thousands) | | 2006 | | 2005 |
|---|---|---|---|---|
| **Strategic Goal 1: Enhance Patent** | | | | |
| **Quality and Minimize Processing Time** | | | | |
| Total Program Cost | $ | 1,215,459 | $ | 1,149,793 |
| Total Program Earned Revenue | | (1,384,274) | | (1,197,781) |
| Net Program Income | | (168,815) | | (47,988) |
| | | | | |
| **Strategic Goal 2: Enhance Trademark** | | | | |
| **Quality and Minimize Processing Time** | | | | |
| Total Program Cost | | 154,798 | | 149,145 |
| Total Program Earned Revenue | | (210,163) | | (175,026) |
| Net Program Income | | (55,365) | | (25,881) |
| | | | | |
| **Strategic Goal 3: Create a Flexible Organization** | | | | |
| **through E-Government and Worldwide Intellectual Property** | | | | |
| Total Program Cost | | 143,912 | | 125,090 |
| Net (Income)/Cost from Operations (Note 11) | $ | (80,268) | $ | 51,221 |
| | | | | |
| **Total Entity** | | | | |
| Total Program Cost (Notes 12 and 13) | $ | 1,514,169 | $ | 1,424,028 |
| Total Earned Revenue | | (1,594,437) | | (1,372,807) |
| Net (Income)/Cost from Operations (Note 11) | $ | (80,268) | $ | 51,221 |

The accompanying notes are an integral part of these financial statements.

Exhibit 117
Page 002181

77

LUC 1314330