# SCHMIDT DECLARATION

# EXHIBIT 119

1   James S. Blackburn (State Bar No. 169134)
    ARNOLD & PORTER LLP
2   777 South Figueroa Street, 44th Floor
    Los Angeles, California 90017-5844
3   Telephone: (213) 243-4000
    Facsimile: (213) 243-4199
4
    Joel M. Freed (admitted *pro hac vice*)
5   McDERMOTT WILL & EMERY LLP
    600 Thirteenth Street, N.W.
6   Washington, D.C. 20005-3096
    Telephone: (202) 756-8000
7   Facsimile: (202) 756-8087
8
    Joseph A. Micallef (admitted *pro hac vice*)
9   ARNOLD & PORTER LLP
    555 Twelfth Street, N.W.
10  Washington, D.C. 20004-1206
    Telephone: (202) 942-5000
11  Facsimile: (202) 942-5999
12  Attorneys for Dell Inc.
13
14              UNITED STATES DISTRICT COURT
15              SOUTHERN DISTRICT OF CALIFORNIA
16
17  LUCENT TECHNOLOGIES, INC.,          )   Case No. 03-CV-1108 B (CAB)
                                        )   Master Case No. 02-CV-2060 B (CAB)
18      Plaintiff, counterclaim defendant, )
                                        )   **MEMORANDUM OF POINTS AND**
19      v.                              )   **AUTHORITIES IN SUPPORT OF**
                                        )   **MOTION OF DELL INC. FOR**
20  DELL INC.,                          )   **SUMMARY JUDGMENT ON THE**
                                        )   **ASSERTED CLAIM OF U.S. PATENT**
21      Defendant, counterclaim plaintiff. )   **NO. 4,958,226 TO HASKELL, ET AL.**
                                        )
22                                      )   Judge Rudi M. Brewster
                                        )
23                                      )   Hearing: September 29, 2006, 9:00 a.m.
                                        )   Location: Courtroom 2, 4th Floor
24  ──────────────────────────────     )
25
26          **FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**
27
28

Exhibit 119
Page 002274

1

# TABLE OF CONTENTS

2

3                                                                                   Page

4   I.     INTRODUCTION ................................................................................1

5   II.    STATEMENT OF UNDISPUTED FACTS .........................................2

6   III.   APPLICABLE LEGAL STANDARDS ...............................................7

7   IV.    ARGUMENT ........................................................................................8

8         A.    The Prior Art Ericsson Patent Invalidates Claim 12 ................8

9               1.    Ericsson Satisfies the Preamble Language of the Claim....................9

10              2.    Ericsson Satisfies the Means for Developing Block
11                       Approximations.................................................................10

12              3.    Ericsson Satisfies the Means …to Develop Said Interpolated
                         Blocks.................................................................................12

13        B.    Lucent Is Barred From Recovering Pre-Suit Damages.............14

14        C.    Lucent Has Advanced No Evidence That Sonic Products Can Form A
15                 Basis For Infringement..............................................................17

16  V.     CONCLUSION ..................................................................................18

17

18

19

20

21

22

23

24

25

26

27

28

- i -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02-CV-2060 B (CAB)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DELL INC. FOR SUMMARY
JUDGMENT ON THE ASSERTED CLAIM OF U.S. PATENT NO. 4,958,226 TO HASKELL, ET AL.

Exhibit 119
Page 002275

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*AT&T Corp., v. Microsoft Corp.,*
 290 F. Supp. 2d 409 (S.D.N.Y. 2003) ................................................................ 15

*Advanced Display Sys. Inc. v. Kent State Univ.,*
 212 F.3d 1272 (Fed. Cir. 2000) ......................................................................... 13

*Air Turbine Tech., Inc. v. Atlas Copco AB,*
 410 F.3d 701 (Fed. Cir. 2005) ............................................................................. 8

*Amsted Indus. Inc., v. Buckeye Steel Castings Co.,*
 24 F.3d 178 (Fed. Cir. 1994) ......................................................... 1, 2, 15, 16, 17

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ............................................................................................ 8

*Aventis Pharms., Inc. v. Barr Labs., Inc.,*
 335 F. Supp. 2d 558 (D.N.J. 2004) ................................................................... 14

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
 489 U.S. 141 (1989) ................................................................................ 1, 9, 14

*C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,*
 911 F.2d 670 (Fed. Cir. 1990) ............................................................................. 7

*Celeritas Techs. Ltd. v. Rockwell Int'l Corp.,*
 150 F.3d 1354 (Fed. Cir. 1998) ........................................................................... 8

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ............................................................................................ 8

*Eastman Kodak Co., v. Agfa-Gevaert N.V.,*
 No. 02-CV-6564T, 2004 WL 1529226 (W.D.N.Y. July 2, 2004) ........................ 15

*Gart v. Logitech, Inc.,*
 254 F.3d 1334 (Fed. Cir. 2001) ............................................................... 15, 16, 17

*Graham v. John Deere Co.,*
 383 U.S. 1 (1966) ............................................................................................... 9

*In re Saunders,*
 444 F.2d 599 (C.C.P.A. 1971) .......................................................................... 14

*Maxwell v. J. Baker, Inc.,*
 86 F.3d 1098 (Fed. Cir. 1996) .......................................................................... 15

*O.I. Corp. v. Tekmar Co.,*
 115 F.3d 1576 (Fed. Cir. 1997) ........................................................................ 16

- ii -

Exhibit 119
Page 002276

*Refac Elecs. Corp. v. A&B Beacon Bus. Machs. Corp.*,
    695 F. Supp. 753 (S.D.N.Y. 1988)..................................................................... 15

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001).......................................................................... 8

*Ultradent Prods., Inc. v. Life-Like Cosmetics, Inc.*,
    127 F.3d 1065 (Fed. Cir. 1997).......................................................................... 14

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*,
    308 F.3d 1167 (Fed. Cir. 2002).......................................................................... 8

**STATUTES**

35 U.S.C. § 102.......................................................................................................... 8

35 U.S.C. § 103 ......................................................................................................... 8

35 U.S.C. § 112.......................................................................................................... 3

35 U.S.C. § 287(a) ............................................................................................... 14, 15

Fed. R. Civ. Proc. 30(b)(6)........................................................................................ 17

- iii -

Exhibit 119
Page 002277

1    **I.    INTRODUCTION**

2    U.S. Patent No. 4,958,226 to Haskell, *et al.* ("the Haskell patent") "relates to … encoding

3    and decoding video signals of moving images." *See* Declaration of Joseph A. Micallef in Support

4    of Motion of Dell Inc. for Summary Judgment on the Asserted Claim of U.S. Patent No. 4,958,226

5    to Haskell, et al., ("Micallef Decl."), Ex. A at 6 (col. 1, lines 6-8). Claim 12, the sole claim at issue,

6    requires a circuit that responds to video signal "codes that describe deviations from approximated

7    blocks" and "codes that describe deviations from interpolated blocks." *Id.* at col. 6, lines 55-66.

8    Before the PTO Examiner, the inventors premised their assertion of patentability on the argument

9    that "a two-stage arrangement for developing interpolated blocks, using the two types of

10    information codes contained in the coded video signals, is suggested by neither of the references;

11    taken separately or together." Micallef Decl., Ex. B at 13.

12    However, the prior U.S. Patent No. 4,849,810 to Ericsson ("the Ericsson patent") was not

13    before the Examiner. The Ericsson patent is also directed to "encoding and decoding sequences of

14    image data," Micallef Decl., Ex. C at 24 (col.1, lines 7-12), and, as shown below, also discloses a

15    two-stage arrangement using both types of information codes called for by Haskell's claim 12.

16    Contrary contentions by Lucent and its expert do not raise any material factual issue. No

17    amount of argument can change Ericsson's disclosure of each and every element of claim 12

18    (including what the inventors incorrectly told the Examiner was missing from the prior art), or at the

19    least so much that claim 12 "could readily be deduced from publicly available material" by the

20    average artisan. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150 (1989). As

21    such, claim 12 is invalid, and this Court should so rule.

22    Separate and apart from its invalidity, the undisputed facts also establish that Lucent did not

23    give Dell actual notice of infringement of claim 12 sufficient to warrant any pre-suit damages.

24    "Actual notice requires the affirmative communication of a specific charge of infringement by a

25    specific accused product or device." *Amsted Indus. Inc., v. Buckeye Steel Castings Co.*, 24 F.3d

26    178, 187 (Fed. Cir. 1994). Here, Lucent's pre-suit communications focused not on any specific

27    Dell product or device but on the type of decoding involved, *i.e.*, decoding that involves MPEG

28

- 1 -

Exhibit 119
Page 002278

1    standards that Lucent says implicate the Haskell patent. So here, as in *Amsted*, this Court should

2    reject Lucent's claim "that the notice provision does not require the patentee to identify an accused

3    device, but only to inform the defendant of the type of product that would infringe." *Amsted*, 24

4    F.3d at 186. Consequently, any damages recoverable from Dell by Lucent are limited to purported

5    infringement after suit was filed.

6         Finally, Lucent has advanced no evidence from which a jury could find infringement by Dell

7    products based on certain video decoder software that Dell purchases from a company called

8    "Sonic." During discovery Dell identified two Sonic products that decode compressed video bit

9    streams and are included on some Dell computers. Lucent then sought discovery from Sonic and

10   received a substantial production of documents in response. But Lucent has not provided any

11   infringement contentions or expert report concerning Sonic products, which mandates summary

12   judgment against Lucent on that issue.

13

14   **II.    STATEMENT OF UNDISPUTED FACTS**

15        The Haskell patent describes a system for both encoding and decoding video signals, using

16   motion compensated prediction, interpolation, and block transform coding methods. The disclosed

17   encoder receives a sequence of frames of video information, each one consisting of a number of

18   "blocks."[1] Micallef Decl., Ex. A at 10 (col. 3, lines 12-16). The encoder creates predictions of

19   these frames, by motion compensated prediction and by interpolation. *Id.* at 10 (col. 3, line 61 - col.

20   4, line 62). The predictions are compared against the actual video data to generate error

21   information, which is encoded further by a channel coder and transmitted to the receiver. *Id.* at 10

22   (col. 4, lines 11-18 and lines 51-61). The encoded error information generated from blocks that

23   have been predicted is referred to in the claim as "codes that describe deviations from approximated

24   blocks." *Id.* at 11 (col. 6, lines 55-66). According to Lucent, the encoded error information

25   generated from blocks that have been interpolated is referred to in the claim as "codes that describe

26   _____

27   [1] The Court has interpreted the claim word "blocks" to mean "sets of pixels (picture elements also called pels) that constitute a portion of a frame." Micallef Decl., Ex. D at 75.

28

Exhibit 119
Page 002279

1    deviations from interpolated blocks." *Id.* Claim 12, the only asserted claim, is directed to a circuit

2    that responds to these two types of codes:[2]

> 12.    A circuit responsive to coded video signals where the video
> signals comprise successive frames and each frame includes a
> plurality of blocks and where the coded video signals comprise codes
> that describe deviations from approximated blocks and codes that
> describe deviations from interpolated blocks, comprising:
>
> means for developing block approximations from said codes that
> describe deviations from approximated blocks; and
>
> means responsive to said block approximations and to said codes that
> describe deviations from interpolated blocks to develop said
> interpolated blocks.

10    During prosecution of the Haskell patent before the Patent Office, this claim was initially

11   rejected for obviousness. Micallef Decl., Ex. E at 80-81. In response, the applicants argued that

12   their two-stage arrangement using the two different types of error codes distinguished their

13   invention from the prior art:

> Applicants respectfully traverse the conclusion that the cited
> teachings render claim 12 obvious. Claim 12 defines coded signals
> that comprise codes which "describe deviations from approximated
> blocks" and codes which "describe deviations from interpolated
> blocks". Neither the Netravali reference nor the Powell reference
> suggest such coded video signals. Claim 12 further defines a means
> for developing block approximations from those codes in the coded
> video signals that describes deviations from approximated blocks. It
> also defines means for developing interpolated blocks, from the block
> approximations, with the aid of those codes in the coded video signals
> that describe deviations from the interpolated blocks. **Such a two-
> stage arrangement for developing interpolated blocks, using the
> two types of information codes contained in the coded video
> signals, is suggested by neither of the references; taken separately
> or together**.

22   Micallef Decl., Ex. B at 12-13 (emphasis added). Based on the applicants' argument, the Examiner

23   allowed the claim. Micallef Decl., Ex. F. The Ericsson patent was not of record when that

24   argument was made (nor provided afterwards).

---

[2] This Court has construed various phrases in claim 12 and, pursuant to 35 U.S.C. § 112, ¶ 6 (2001),
has identified the function and corresponding structure of the two means elements of the claim. *See*
Micallef Decl., Ex. D.

- 3 -

Exhibit 119
Page 002280

1    The Ericsson patent discloses a system for both encoding and decoding video signals, using

2    motion compensated prediction, interpolation, and block transform coding methods.  Micallef Decl.,

3    Ex. C.  The encoder of Ericsson receives a sequence of frames of video information, each one

4    consisting of "non-overlapping blocks," *id.* at 26 (col. 5, line 61), and encodes those frames using,

5    among other things, circuits Ericsson refers to as "lossy compressors."  *Id.* at 26 (col. 6, lines 10-

6    18).  The encoder analyzes the motion occurring in the sequence on a block-basis, calculates motion

7    vectors to describe that motion, and encodes the motion vectors.  *Id.* at 26 (col. 5, line 35 - col. 6,

8    line 18).

9    The encoded motion vectors are transmitted to the receiver, but are also decoded locally in

10   the encoder and provided to a "motion compensator" circuit.  *Id.* at 28 (col. 9, lines 31-36).  The

11   motion compensator uses the motion vectors to form a prediction of a subsequent frame.  *Id.* at 28

12   (col. 9, lines 36-42).  The prediction is then compared against actual video information for the

13   predicted frame in order to calculate error between the actual video information and the prediction.

14   *Id.* at 27 (col. 7, lines 2-37).  The error is coded and transmitted to the receiver.  *Id.* at 27 (col. 7,

15   lines 37-40).

16   In his computation of the error, however, Ericsson makes several different types of error

17   calculations and transmits to the receiver several different types of error codes.  For example,

18   Ericsson takes both the original image and the predicted image – which Ericsson refers to as the

19   "warped" image – and "decimates" them both to create multiple lower resolution versions of each.[3]

20   He then compares the predicted (warped) version of the image to the actual image at each resolution

21   level, interpolating lower resolution versions of the image to re-create higher resolution versions of

22   the image.  These comparisons at each level produce error codes for each level.  The error codes for

23   each level are encoded and transmitted to the receiver.[4]

24   

25   [3] For example, in his described embodiment he starts with a frame having a resolution of 256x240.
He decimates the image several times to recreate similar images having resolutions at the 128x120,

26   64x60, 32x30, and 16x15 levels.  *See id.* at 20 (Figure 11).

27   [4] Ericsson begins by comparing the 16x15 predicted image to the 16x15 actual image.  *Id.* at 29
(col. 12, line 59 - col. 13, line 5); at 32 (col. 18, lines 18-21).  The resulting error produced is

28   encoded and transmitted to the receiver, which then adds this error to its own 16x15 predicted image to

(Footnote Cont'd on Following Page)

- 4 -

Exhibit 119
Page 002281

1    More specifically, Ericsson explains that his encoding method at the "top level" entails

2    prediction and the generation of a "difference image" representing the error between the predicted

3    image and the original image:

4            The 16x15 version of the warped image **is used as the prediction.**
             Recall that this corresponds to the image (decimated) that is created at
5            the receiver absent any additional information. **This top level**
             **prediction is subtracted from the 16x15 decimated top level image**
6            **of the original image. The difference image**, representing the error
             at that top level, is quantized and the quantized information is directed
7            to the encoder 18 for transmission to the receiver.

8    *Id.* at 29 (col. 12, line 62 - col. 13, line 2) (emphasis added).  As stated in the foregoing quote, the

9    difference image representing "top level" error is quantized and sent to the encoder 18 for

10   transmission to the receiver.

11   Once encoded, these error codes are "codes that describe deviations from approximated

12   blocks" because they are codes that describe differences from predicted sets of pixels that constitute

13   a portion of a frame.  And there is no doubt that Ericsson's receiver circuit responds to these codes.

14   In his later description, Ericsson states that "[r]eferring to FIG. 3, at the receiver, the transmitted

15   and coded data is decoded and the new frame generated." *Id.* at 32 (col. 18, lines 13-15).[5]

16   Similarly, the error codes created at the later levels represent differences from sets of pixels

17   that have been interpolated and therefore are "codes that describe deviations from interpolated

18

19   (Footnote Cont'd From Previous Page)

20   form a reconstructed image. *Id.*  Next, Ericsson creates a warped 32x30 image by interpolating the
     16x15 warped image information. *Id.* at 30 (col. 13, lines 6-42).  He then compares this
21   warped/interpolated 32x30 image with the original 32x30 image, and thereby calculates the error
     between them. *Id.*  This error is encoded and transmitted to the receiver, where it is also used to
22   create a reconstructed image. *Id.* at 30 (col. 13, lines 27-31); at 32 (col. 18, lines 13-30).  The
     process continues through the higher resolution images.

23   [5] *See also id.* at 32 (col. 18, lines 51-56):

24           The quantizer indices are decoded using the arithmetic decoder and **the**
             **quantized difference image** is reconstructed from the quantizer indices and
25           **is then added to the prediction image to give the top level output image**
             (corresponding to adder 522a and the output over lines 522 of the
26           transmitter).

27   (Emphasis added).

28
                                           - 5 -

Exhibit 119
Page 002282

1    blocks." Specifically, in order to compare predicted and actual images at different resolution levels,

2    Ericsson interpolates the lower resolution images (such as at a 16x15 resolution) to high resolution

3    images (such as at 32x30 resolution). Ericsson's encoder again calculates an error between

4    predicted and actual images at these resolutions, encodes the error and transmits it to the receiver:[6]

5    
6    > **At the lower levels**, the prediction version of the image is formed in a
>    different fashion. ...

7    > First, an interpolation error image is derived by interpolating the
8    > higher level warped image and subtracting it from the current level
>    warped image. ... **The higher level reconstructed image is then
>    interpolated to form an interpolated, reconstruction image at the
>    current level.** Finally, the warped interpolation error image is
9    > adaptively added to the interpolated reconstruction image to generate
>    the prediction image. However, as described below, the warped
10   > interpolation error image is used where it improves the prediction but
>    not otherwise. **This is decided on a block-by-block basis**, and the
11   > decisions are transmitted to the receiver as "side" information.
>    **Thereafter, the steps for generating the difference signal at this lower
12   > level are the same as those at the top level, that is, the current level
>    prediction image is subtracted from the current level original image and
13   > that difference is quantized and transmitted to the receiver.**

14   
15   *Id.* at 30 (col. 13, lines 6-31) (emphasis added). Figure 12 at 21 of the Ericsson patent, at the output

16   of box 536, shows that the lower level difference signal based on interpolation is sent to the encoder

17   18. As Ericsson states, "[a] channel encoder 18 channel encodes the outputs of the error circuitry

18   14 and motion estimation and coding circuitry 16 and passes the thus encoded data onto a channel

19   20 for transmission to a receiver 21." *Id.* at 26 (col. 5, lines 30-34). Thus, once the error at these

20   "lower levels" are encoded they are "codes that describe deviations from interpolated blocks"

21   because they represent differences from sets of pixels that have been interpolated.

22            Again there is no doubt that the Ericsson receiver is responsive to these codes. *Id.* at 32 (col.

23   18, lines 13-15) ("Referring to FIG. 3 at 16, at the receiver, the transmitted and coded data is

24   
25   
26   _____

27   [6] Ericsson refers to his lowest resolution image as his "top level." *Id.* at 29 (col. 12, lines 59-62).
     He therefore refers to higher resolution images as at "lower levels." *Id.* at 30 (col. 13, lines 6-7).
     This is depicted graphically in Figure 11 at 20 of the Ericsson patent.

28   
- 6 -

Exhibit 119
Page 002283

1   decoded and the new frame generated.")[7]

2       Accordingly, there can be no dispute that the Ericsson patent discloses the two types of

3   codes that figured so prominently during the prosecution of the Haskell patent. As demonstrated in

4   detail below, Ericsson also discloses each and every element of claim 12, as well.

5       Finally, Lucent and its expert have now advanced claim charts that purport to address how

6   structure in Dell's computers supposedly include the corresponding structure of claim 12 or

7   equivalents of that structure. All of Lucent's pre-suit communications concerning the Haskell

8   patent, however, addressed MPEG standards, not any specific Dell product or structure in it. Lucent

9   has not produced any such claim charts from before suit was filed. Moreover, the post-suit claim

10  charts do not address Sonic decoders. Thus, Lucent's pre-suit communications never gave Dell

11  actual notice of infringement sufficient to permit Lucent to receiver pre-suit damages, and the

12  evidence and contentions it has advanced during this suit provide no basis for a finding of

13  infringement by Dell based on the Sonic software that Dell bundles with its computers.

14

15  **III.     APPLICABLE LEGAL STANDARDS**

16      "Summary judgment is as appropriate in a patent case as it is in any other case." *C.R. Bard,*

17  *Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990). The Federal Rules

18  mandate summary judgment "against a party who fails to make a showing sufficient to establish the

19  _____

    [7] *See also id.* at 33 (col. 19, lines 1-14):

20
              **All [sic: At] the lower levels**, according to the preferred embodiment
21            of the invention, the vector quantized information is decoded first by
              decoding the gain values using the arithmetic decoder, and then, for the non-
22            zero values, decoding the shape indices. For every block with a gain
              quantizer index of one, a D1-bit word is extracted from the bit stream to
23            indicate the shape vector, while for blocks with an index greater than one, a
              D length bit word is extracted from the bit stream. **The difference image is**
24            **reconstructed** by taking the shape vector from the appropriate code book and
              scaling it by the gain value. This is done for each non-zero 4x4 pixel block.
25            **The output image is thereafter formed by adding this reconstructed**
              **difference to the prediction.** (This corresponds to the operation of the adder
26            540 of the transmitter.)

27  (Emphasis added).

28
                                          - 7 -

Exhibit 119
Page 002284

1  existence of an element essential to that party's case, and on which that party will bear the burden of

2  proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party shows a

3  *prima facie* case for summary judgment, the burden of production shifts to the nonmoving party to

4  present specific evidence of a genuine issue of fact for trial.  *Air Turbine Tech., Inc. v. Atlas Copco*

5  *AB*, 410 F.3d 701, 708 (Fed. Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

6  (1986)).

7

8  **IV.    ARGUMENT**

9      **A.    The Prior Art Ericsson Patent Invalidates Claim 12**

10     A patent claim lacks novelty and is invalid under 35 U.S.C. § 102 as anticipated "if each and

11 every limitation is found either expressly or inherently in a single prior art reference." *Celeritas*

12 *Techs. Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).  The party asserting

13 anticipation must prove it by clear and convincing evidence.  *Union Carbide Chems. & Plastics*

14 *Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1188 (Fed. Cir. 2002).  Although a question of fact,

15 anticipation is properly decided on summary judgment when there is no genuine issue of material

16 fact.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1327 (Fed. Cir. 2001).

17 Summary judgment is proper "if no reasonable jury could find that the patent is not anticipated."

18 *Id.*

19     Even where a single prior art reference does not disclose each and every element of the

20 claim, the claim must still pass the test of nonobviousness under 35 U.S.C. § 103 (2001).

21         The nonobviousness requirement extends the field of unpatentable
22         material beyond that which is known to the public under §102, to
        include that which could readily be deduced from publicly available
23         material by a person of ordinary skill in the pertinent field of
        endeavor.

24         ....

25         Both the novelty and the nonobviousness requirements of federal
        patent law are grounded in the notion that concepts within the public
26         grasp, or those so obvious that they readily could be, are the tools of
        creation available to all. They provide the baseline of free competition
27         upon which the patent system's incentive to creative effort depends.

28

-8-

Exhibit 119
Page 002285

1    *Bonito Boats*, 489 U.S. at 150 and 156.  Whether a patent claim would have been obvious is a

2    question of law.  *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

3    As set forth in the attached declaration of Edward J. Delp III ("Delp Report"), every element

4    required by claim 12 of the Haskell patent is disclosed in the Ericsson Patent.  *See* Micallef Decl.,

5    Ex. G at 167-171 (¶¶ 182-96) and the chart attached to the Delp Report as Exhibit C.  As

6    demonstrated there, Ericsson discloses a receiver circuit that responds to the error codes transmitted

7    by the Ericsson encoder in order to decode coded video signals.  *See id.*  The receiver employs

8    motion compensated prediction, interpolation and block transform decoding.  *See id.*  Moreover, as

9    demonstrated there, the Ericsson receiver discloses structure that is identical, or at least not

10   substantially different from, the structure identified by the Court as corresponding to the means

11   elements of claim 12.  *See id.*

12   In response Lucent through its expert asserts three arguments.  These arguments, however,

13   are legally erroneous and/or flatly contradicted by the undisputed and plain language of the Ericsson

14   patent.  They therefore fail to raise a material issue of fact.

15                    **1.    Ericsson Satisfies the Preamble Language of the Claim**

16   Lucent's expert argues that the Ericsson patent does not satisfy the preamble language of the

17   claims because "Ericsson discloses no circuitry that responds to a video signal comprising 'blocks'

18   of any kind, as construed by the Court."  Micallef Decl., Ex. H at 257.  As noted above, the Court

19   has interpreted the word "block" to mean "sets of pixels (picture elements also called pels) that

20   constitute a portion of a frame."  Micallef Decl., Ex. D.

21   Lucent's expert misreads the claim.  Claim 12 nowhere requires circuitry that responds to a

22   "video signal comprising blocks."  Rather, the claim requires circuitry responsive to coded video

23   signals, where the video signals comprise successive frames[8] and each frame includes blocks:

24

25   ─────────────────────────
     [8] Lucent does not argue that the Ericsson patent fails to satisfy the "successive frames" language of

26   the claims.  *See, e.g.*, Ericsson's Summary of the Invention, which states that his invention relates to
     a method and apparatus "in a motion compensation image transmission system, **for transmitting a**

27   **sequence of image frames** from a transmitter station to a receiver station," Micallef Decl., Ex. C at
     24, (col. 2, lines 53-58) (emphasis added).

28                                                  - 9 -

─────────────────────────

Exhibit 119
Page 002286

1            12.    A circuit responsive to coded video signals **where the video**
**signals comprise successive frames and each frame includes a**
2    **plurality of blocks** and where the coded video signals comprise
codes that describe deviations from approximated blocks and codes
3    that describe deviations from interpolated blocks ...

4    Micallef Decl., Ex. A at 11 (col. 6, lines 55-57) (emphasis added).  In short, the assertion by Lucent

5    that the claim requires that the coded video signals – *i.e.*, that which the claimed circuit responds to

6    – be divided into blocks is entirely unfounded.

7          In any event, Ericsson's patent unequivocally "features the steps of applying the hierarchical

8    encoding method to the data structures [of the current image frame] of a level **on a block-by-block**

9    **basis** ...."  Micallef Decl., Ex. C at 25, (col. 3, lines 5-17) (emphasis added).  He states that the

10    "lossy compressor" circuit that encodes the error data is "a two-dimensional block encoder," *id.* at

11    27 (col. 7, lines 40-47), and that his encoder produces "a motion displacement vector over lines 36

12    for each block region of the image," *id.* at 27 (col. 8, lines 55-58).[9]  It is therefore beyond doubt that

13    Ericsson's decoder (*i.e.*, the receiver he describes in his Figure 3) is "[a] circuit responsive to coded

14    video signals where the video signals comprise successive frames and each frame includes a

15    plurality of blocks."  Any contrary assertion simply ignores what Ericsson plainly states.

16          **2.    Ericsson Satisfies the Means for Developing Block Approximations**

17          Lucent's expert next argues that Ericsson does not disclose circuitry that is the same as or

18    equivalent to the combination of circuitry – Decoder 22, DCT$^{-1}$ 24, Adder 27 and Shift Circuit 26 –

19    that this Court has identified as corresponding structure for the "means for developing block

20    approximations" of the claim.  Micallef Decl., Ex. H at 258.  He bases his argument on the

21    misguided assertion that a "person of ordinary skill in the art would not think that channel decoding

22

23    [9] *See also id.* at 25 (col. 3, lines 66-68) (calling out "circuitry for applying the hierarchical encoding method to the data structures of a level **on a block-by-block basis**...") (emphasis added).
24    Furthermore, the Ericsson patent states that "in the illustrated embodiment, the motion estimator uses a region matching technique **between non-overlapping blocks of the previous and present**
25    **input images**," *id.* at 26 (col. 5, lines 59-62), and explicitly describes that "signals over lines 36 represent motion displacements **for groups or regions of elements, for example, the picture**
26    **elements of a 4x4 block,**" *id.* at 27 (col. 7, lines 16-18) (emphasis added).   In addition, the Ericsson patent expressly incorporates by reference the entirety of another patent directed to
27    "encoding the motion compensation data associated **with each of the blocks**," *id.* at 24 (col. 1, lines 65), *et seq.* (emphasis added).

28

                - 10 -

Exhibit 119
Page 002287

1  [of Ericsson] might be in any way related to the function performed by this claim element of

2  Haskell" because "channel coding protects against transmission errors introduced by the

3  transmission channel and is separate from compression" *Id.*

4      However, the very structure that the Court has identified includes just such channel coding

5  circuitry. Specifically, Decoder 22 of Haskell is nothing more than a "channel decoder." Haskell

6  himself explains that what Decoder 22 actually does is receive data from the channel buffer and

7  "decode" it.[10] That is exactly what the Decoder 70 of Ericsson is described as doing.[11] Thus, the

8  channel decoder of Ericsson is "related to the function performed by this claim element" to the

9  same extent that the channel decoder disclosed by Haskell and identified by the Court is.

10      Lucent's expert also argues that Ericsson does not disclose the required structure because his

11  disclosure does not include discrete cosine transform (or "DCT") circuitry *used in the manner it is*

12  *used in Haskell.* Micallef Decl., Ex. H at 258.

13      Notably, Lucent's expert does not dispute that Ericsson discloses use of the DCT. Nor could

14  he, since Ericsson expressly includes the DCT in his system.[12] Rather, he argues that Ericsson

15  discloses use of the DCT only in the "lossy compressor" circuit used to encode motion vectors, but

16  does not disclose using the DCT to encode the difference image signals – *i.e.*, the error codes that

17  are the "codes that describe deviations from approximated blocks." He bases this position on his

18  view that "the 'Lossy Compressor' cited here does not compress the video frame. It compresses the

19  motion vector field instead." Micallef Decl., Ex. H at 258.

20      That view stems from a misreading (or misrepresentation) of Ericsson's disclosure. What

21  Lucent's expert glosses over is that Ericsson discloses <u>two</u> separate "lossy compressors" – lossy

22  compressor 28 for encoding motion vectors and lossy compressor 46 for encoding the error codes.

[10] *See* Micallef Decl., Ex. A at 10-11 (col. 4, line 65 - col. 5, line 2) ("In particular, **the input is received in buffer 23** and is distributed therefrom based on the nature of the signals. Frame encoding code (e.g. corresponding to $F_{i-1}$ and $F_{i+1}$ **is sent to decoder 22** and therefrom to $DCT^{-1}$ 24, adder 27, memory 28 and shift circuit 26.") (emphasis added).

[11] *See* Micallef Decl., Ex. C at 27 (col. 8, lines 6-11) ("At the receiver 21, referring to FIG. 3 at 16, the data from the channel is decoded by a channel decoder circuitry 70...").

[12] *See* Micallef Decl., Ex. C at 28 (col. 10, lines 14-16) ("In the illustrated embodiment of the invention, the lossy compression circuitry 28 employs a discrete cosine transform.").

- 11 -

Exhibit 119
Page 002288

*See, e.g.*, Micallef Decl., Ex. C, Figure 2 at 17; at 29 (col. 12, line 6 - col. 13, line 42). While Ericsson expressly states that lossy compressor 28 (on which Lucent's expert focuses his argument about compression of the motion vector field) can employ the discrete cosine transform, *id.* at 26 (col. 6, lines 31-32), several paragraphs later Ericsson also states that Lossy Compressor 46 – **the one that encodes the error** – can employ the same (DCT) transform "processes described above in connection with the lossy compressor 28." *Compare id.*, at 26 (col. 6, lines 19-32 *with* col. 7, lines 4-47).[13] Thus, Ericsson discloses encoding of the error codes using the DCT, and Lucent's expert's conclusion otherwise is based on pretending that disclosure of a second DCT by Ericsson does not exist.[14]

### 3. Ericsson Satisfies the Means ...to Develop Said Interpolated Blocks

Finally, Lucent's expert asserts that Ericsson does not satisfy the "means ... to develop said interpolated blocks" of claim 12 because Ericsson supposedly discloses *the wrong kind* of interpolation. In this regard, he asserts that the claimed "interpolated blocks" are limited to a particular type of interpolation, namely, interframe interpolation: "In my opinion, a person skilled in the art reading Haskell claim 12 in light of the specification would understand the plain meaning of the term 'interpolated blocks' to refer to interframe interpolation: blocks of pels reconstructed using interpolation between a past frame or field and future frame or field of a video sequence." Micallef Decl., Ex. H at 257.

---

[13] This disclosure should be unsurprising, as even the background of the Haskell patent admits that in the prior art error codes were "typically" encoded using the DCT. *See* Micallef Decl., Ex. A at 9 (col. 1, lines 46-58).

[14] As observed above, Ericsson states that the receiver decodes the codes transmitted. *See* Micallef Decl., Ex. C at 27 (col. 8, lines 6-11). Included in the transmitted codes is the transform produced by the DCT. Ericsson further discloses that the receiver includes "reconstruction circuits" for decoding the codes used by the transmitter and that such circuits provide an operation that is the "inverse" of the coding provided at the lossy compressor 46 of the transmitter. *Id.* at 27 (col. 8, lines 12-17) ("The reconstruction circuitries 76 and 78 each provide for decoding the codes employed by the transmitter to effect the operations performed by reconstruction circuitries 48 and 34, respectively, of the transmitter, as described in more detail hereinafter."); at 27 (col. 7, lines 52-55) ("The error reconstruction signal is also sent to the reconstruction apparatus 48 which provides an operation which is the inverse to that imposed by the lossy compressor 46.").

1   Claim 12, however, merely says "interpolated blocks."  It does not specify interframe

2   interpolation.[15]  And Lucent's expert himself has agreed at his deposition that "interpolation" means

3   nothing more than an averaging process,[16] a process that even Lucent's expert cannot deny is

4   implemented by the Ericsson patent.

5   But even if the phrase "interpolated blocks" were limited to interframe interpolation, claim

6   12 would still be unpatentable over Ericsson.  Although Ericsson discloses intraframe interpolation

7   in its primary embodiment, Ericsson also specifically contemplates a "frame interpolator" that

8   "predict[s] what the image would have been **at any selected time between received frames**."

9   Micallef Decl., Ex. C at 27 (col. 8, lines 26-31) (emphasis added).  Thus, Ericsson does disclose

10  blocks that are created by interpolation "between a past frame … and future frame."

11  Moreover, Ericsson incorporates by reference the entirety of a related patent application

12  filed by Hinman.[17]  And Ericsson expressly states that his Figure 3 receiver circuitry can be

13  modified as described in the Hinman application.[18]  Hinman's receiver description may therefore be

14

---

15  [15] The interframe interpolation position that Lucent's expert now relies on is the same narrow
    interpretation for "interpolated blocks" that Lucent originally proposed but abandoned during the
16  *Markman* process.  *See* Micallef Decl., Ex. I at 305; Micallef Decl., Ex. J, September 9, 2004
    *Markman* hearing Tr. at 317-318 (249:13-250:3).

17  [16] *See* Micallef Decl., Ex. K Girod Depo. Tr. at 325-326 (238:21-239:2; 248:9-14) ("Interpolation
18  can be character -- you asked me, I think, whether I have characterized interpolation as averaging,
    and I've confirmed that, yes.").

19  [17] *See id.* at 24 (col. 1, line 68 - col. 2, line 2) ("Hinman, in his co-pending application U.S. Ser. No.
    740,898, filed June 3, 1985, the contents of which are incorporated herein, in their entirety, by
20  reference, describes a lossy coding method for encoding the motion-compensation displacement
    information.").

21  [18] *See id.* at 28 (col. 8, lines 41-44) ("The transmitter and receiver circuitries of FIGS. 2 and 3 can
22  be modified in a number of ways as described, for example, in co-pending applications Ser. No.
    740,898 and 001,326 referred to above.").  "Whether and to what extent material has been
23  incorporated by reference into a host document is a question of law."  *Advanced Display Sys. Inc. v.
    Kent State Univ.*, 212 F.3d 1272, 1283 (Fed. Cir. 2000).  Here, Hinman's frame interpolator circuit
24  is described as performing interpolation "in the temporal domain" to "predict what the image would
    have been at any selected time between received frames."  Micallef Decl., Ex. L at 341 (col. 7, lines
25  52-61).  Hinman further states that the frame interpolator creates the intermediate frames by "by
    halving the output displacement vectors from the motion field interpolator 96", *id.* at 342 (col. 9,
26  line 65 - col. 10, line 18), exactly the process disclosed in the Haskell patent for performing
    temporal interpolation.  *See* Micallef Decl., Ex. A at 10 (col. 4, lines 38-46).  Thus, the material
27  specifically incorporated by reference into the Ericsson patent also discloses the interframe
    interpolator that Lucent's expert argues should be required by Haskell's claim 12.

28

- 13 -

Exhibit 119
Page 002290

1   used for purposes of the anticipation analysis based on Ericsson. *See Aventis Pharms., Inc. v. Barr*

2   *Labs., Inc.*, 335 F. Supp. 2d 558, 583 (D.N.J. 2004) (where document is incorporated by reference

3   in its entirety into a prior art patent and the patent refers specifically to the document for purposes

4   of incorporating the needed material, the disclosure of the document may be used with the reference

5   for purposes of an anticipation analysis); *see also Ultradent Prods., Inc. v. Life-Like Cosmetics,*

6   *Inc.*, 127 F.3d 1065, 1069 (Fed. Cir. 1997).

7          In any case, even if there were no anticipation, Hinman and Ericsson together render claim

8   12 obvious. Hinman (which issued as U.S. Patent No. 4,703,350) is assigned to the same assignee

9   as is the Ericsson patent and contains many of the same drawings and much of the same descriptive

10  text. *Compare* Micallef Decl., Ex. L (at 330) *with* Micallef Decl., Ex. C (at 17). The transmitters of

11  these two patents, shown in Figure 2 of both, are identical. The receiver circuit of Ericsson's Figure

12  3 at 16 is nearly identical to the receiver circuit of Hinman, differing only in that Hinman

13  specifically depicts a "frame interpolator" circuit. *See* Micallef Decl., Ex. L, Figure 3 at 331. The

14  explicit reference in Ericsson to Hinman, and his incorporation of Hinman by reference, would have

15  been a clear motivation to combine the teachings of the two prior art references. *See In re*

16  *Saunders*, 444 F.2d 599, 603-04 (C.C.P.A. 1971). Together, they clearly place claim 12 within the

17  grasp of the skilled artisan. *Bonito Boats*, 489 U.S. at 150.

18          **B.     Lucent Is Barred From Recovering Pre-Suit Damages**

19          Even if Lucent were to prevail in its claim for infringement, Lucent would only be entitled

20  to damages for infringement occurring after the filing date of this action because Lucent did not

21  give Dell statutorily sufficient actual notice of infringement prior to filing suit. *See* 35 U.S.C.

22  § 287(a) (2001). Damages can be recovered based on marking or proper actual notice:

23              In the event of failure so to mark, no damages shall be recovered by
            the patentee in any action for infringement, except on proof that the
24          infringer was notified of the infringement and continued to infringe
            thereafter, in which event damages may be recovered only for
25          infringement occurring after such notice. Filing of an action for
            infringement shall constitute such notice.
26

27

28

- 14 -

Exhibit 119
Page 002291

1    *Id.* Here, Lucent asserts that it gave proper actual notice under the statute.[19]

2    Compliance with the statute is a question of fact. *Gart v. Logitech, Inc.*, 254 F.3d 1334,

3    1339 (Fed. Cir. 2001) (citing *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996)).

4    Nevertheless, this issue is properly decided upon summary judgment when no reasonable jury could

5    find that the patentee has satisfied the actual notice requirement. *Gart*, 254 F.3d at 1339.

6    Here, the undisputed facts establish that Lucent did not provide proper pre-suit notice to

7    Dell. There was no sufficient notice of infringement to satisfy Section 287 because there was no

8    specific charge of infringement by a specific accused product or device. *Amsted Indus. Inc. v.*

9    *Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994) ("Actual notice requires the

10   affirmative communication of a specific charge of infringement *by a specific accused product or*

11   *device*.") (emphasis added).[20]

12   Lucent's contention that sufficient notice was given to Dell in meetings held on October 20

13   and December 16, 1998, is without merit. *See* Micallef Decl., Ex. N at 367. All of Lucent's

14   rhetoric on those occasions was aimed solely at the MPEG standards. The testimony of James

15   Tierney, an employee of Lucent responsible for the licensing of its intellectual property who

16   attended the two meetings with Dell where the video patents were discussed (and Lucent's 30(b)(6)

17   witness on the issue) confirms as much.

18   THE WITNESS: ***But at the meeting all we told
them was the comparison of the claim to the standard and that
19   they said that they used the standard.

20

_____

21   [19] Marking is not at issue in this case, as Lucent has "agreed that it will not rely upon marking to
establish constructive notice of its patents in this litigation." Micallef Decl., Ex. M at 352.

22   [20] *See also AT&T Corp., v. Microsoft Corp.*, 290 F. Supp. 2d 409, 414 (S.D.N.Y. 2003) (finding no
23   actual notice where "letter did not mention Microsoft or identify a Microsoft product as infringing
the ... patent"); *Eastman Kodak Co., v. Agfa-Gevaert N.V.*, No. 02-CV-6564T, 2004 WL 1529226,
24   at *6 (W.D.N.Y. July 2, 2004) (finding actual notice only as to specifically mentioned products
despite defendant's admission that similar products might be implicated); *Refac Elecs. Corp. v.*
25   *A&B Beacon Bus. Machs. Corp.*, 695 F. Supp. 753, 755 (S.D.N.Y. 1988) (finding no actual notice
where plaintiff's letter merely notified defendant of plaintiff's patent but did not identify
26   defendant's infringing product); *cf. Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001)
(concluding that "reference to specific claims of the patent, a *specific product*, and the suggestion
27   that a license under the patent may be needed" was sufficient actual notice under the statute)
(emphasis added).

28

- 15 -

CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02-CV-2060 B (CAB)
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DELL INC. FOR SUMMARY
JUDGMENT ON THE ASSERTED CLAIM OF U.S. PATENT NO. 4,958,226 TO HASKELL, ET AL.

Exhibit 119
Page 002292

1        BY MR. FREED:

2            Q    And as far as you know, no one either knew or
      discussed how Dell was supposedly implementing the standard;
3        correct?

4            MR. SAMAY: Objection to form. Foundation.

5            THE WITNESS: As far as how they were utilizing the
      standard, their claim was that they were conforming with the
6        standard. That was the extent of it.

7  Micallef Decl., Ex. O, Tierney Depo. Tr. at 377-378 (41:11-42:1) (emphasis added).

8        Lucent's position is thus reminiscent of the position rejected by the Federal Circuit in

9  *Amsted*, where the plaintiff unsuccessfully argued "that the notice provision does not require the

10  patentee to identify an accused device, but only to inform the defendant of the type of product that

11  would infringe." 24 F.3d at 186. It should be rejected here as well.

12        Furthermore, Lucent's claim for damages is based solely on claim 12. But Mr. Tierney

13  plainly testified as follows:

14            Q    In your presentation, was there a specific -- any
      specific claims of any specific patents called out?
15

          A    Not to my recollection.
16

17  Micallef Decl., Ex. O, Tierney Depo. Tr. at 375 (15:10-20). As Mr. Tierney frankly admitted,

18  Lucent never explicitly tied any patent claims to any Dell product.[21] Indeed, Lucent studiously

19  avoided identifying any specific Dell product as an infringement or explaining how any Dell

20  product supposedly practiced the standard in a way that embodied structure which satisfied the

21  Haskell patent's claim 12.[22]

22  _____

23  [21] *See Gart,* 254 F.3d at 1347, where notice was found based on a 1995 letter to Logitech that
included a specific reference to claims of the patent and specific reference to Logitech's selling of
24  the TRACKMAN VISTA, but notice was not found regarding other unnamed products.

25  [22] Lucent may argue that it showed Dell claim charts prior to suit. No such claim charts have been
produced so they cannot be relied on to defeat summary judgment. In any event, to the extent that
they existed, they were apparently directed solely to the MPEG standard. Claim 12 presents means-
26  plus-function recitations. They are only satisfied by the presence of the corresponding structure of
the patent or equivalent structure – *i.e.,* not every way of performing the recited function is covered.
27  *See, e.g., O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1583 (Fed. Cir. 1997). Indeed, the "Decoding"
section of the MPEG-1 Standard states, "[t]he description that follows is a very brief overview of
28                                                (Footnote Cont'd on Following Page)

- 16 -

Exhibit 119
Page 002293

1
2

> There was the discussion of the claim versus the standard. And then there was the discussion that Dell said they had products compliant with the standard. So directly the Dell product to the claim, the answer would be no.

3

4   *Id.* at 377 (38:3-7).

5   As already mentioned, the Federal Circuit in *Amsted* was quite clear: "Actual notice requires

6   ... a specific charge of infringement...." 24 F.3d at 187. Here Lucent made no such charge.

7   Lucent is therefore barred from recovering any damages for infringement occurring before suit, and

8   summary judgment on that issue should be entered.[23]

9   **C.    Lucent Has Advanced No Evidence That Sonic Products Can Form A Basis For Infringement**

10  In this case Lucent asserts, among other things, that software in Dell's computers that

11  practices the MPEG-2 video coding standard infringes. During the course of this case Dell has sold

12  computers bundled with various software packages used for DVD decoding. Two such software

13  products Dell presently bundles with its computers come from a company called Sonic.[24]

14  During the course of discovery in this case Dell identified the Sonic products to Lucent as

15  products that may include MPEG-2 decoding functionality. *See* Micallef Decl., Ex. Q. Lucent

16  subsequently served a subpoena on Sonic and noticed a deposition of Sonic pursuant to Fed. R. Civ.

17  Proc. 30(b)(6). *See* Micallef Decl., Ex R. Sonic produced a significant number of documents in

18  response to Lucent's subpoena, but the deposition of Sonic did not take place.

19
20

---

21  (Footnote Cont'd From Previous Page)

22  one possible way of decoding a bitstream. Other decoders with different architectures are possible." Micallef Decl., Ex. P at 382.

23  [23] Given Lucent's approach during discovery, it is likely that in resisting this motion Lucent will seek to rely on deposition testimony of Dell employees concerning the Lucent/Dell meetings and

24  their aftermath. However, "[t]he correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge or understanding of the infringer." *Amsted*

25  *Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). "It is irrelevant ... whether the defendant ... knew of his own infringement." *Id.* "Therefore ... whether or not the

26  alleged infringer subjectively believed that the patentee's letter was a charge of infringement has no bearing on the adequacy of notice." *Gart*, 254 F.3d at 1346.

27  [24] The products are called "Sonic MyDVD" and "Sonic DVDit!", respectively. We refer to these products collectively as "the Sonic products."

28
- 17 -

Exhibit 119
Page 002294

1    Lucent has never identified any evidence of infringement by Dell based on any Sonic

2    product, despite being obligated to do so if it possessed such evidence.  More specifically, Dell's

3    written discovery required Lucent to identify the bases for its claims of infringement.  *See* Micallef

4    Decl., Ex. S.  And in an oral order during a discovery conference, Magistrate Bencivengo instructed

5    all parties that they would be precluded from relying at trial on any allegations not disclosed in

6    discovery responses served during the scheduled fact discovery period.  Nevertheless, Lucent's

7    discovery responses make no mention of Sonic, and fact discovery closed on February 24, 2006.

8    Indeed, even the expert report of Lucent's technical expert is completely silent when it comes to the

9    Sonic products.  *See* Micallef Decl., Ex. H.

10    Since Lucent has advanced no evidence or contentions of infringement based on the Sonic

11    products, at trial Lucent should be precluded from offering any such evidence.  Dell therefore is

12    entitled to summary judgment that its products do not infringe due to functionality provided by the

13    Sonic products.

14    The issue is not merely academic.  The Sonic software identified in Dell's discovery

15    responses is presently sold with certain Dell computers.  *See* Micallef Decl., Ex. T at 470-471.  The

16    question of Sonic's non-infringement therefore potentially effects many issues, including the correct

17    measure of damages in this case, Sonic's potential indemnity obligations to Dell, and the proper

18    scope of any permanent injunction or compulsory license the Court may order should Lucent

19    eventually prevail on its claims.  Dell therefore seeks clarity in what is and what is not at stake in

20    the case, and respectfully asks that the Court enter summary judgment in Dell's favor on this issue.

21

22    **V.    CONCLUSION**

23    Accordingly, for the reasons stated above Defendant Dell Inc. respectfully requests entry of

24    summary judgment of invalidity of claim 12 of the Haskell patent, summary judgment that Lucent

25

26

27

28
                                                    - 18 -

Exhibit 119
Page 002295

1    is not entitled to pre-suit damages for any infringement of claim 12, and summary judgment that

2    Dell's products do not infringe the Haskell patent based on the Sonic products.[25]

3

4    Dated: August 4, 2006                                    ARNOLD & PORTER LLP
                                                              McDERMOTT WILL & EMERY LLP
5

6

7                                              By: _____
                                                   Joseph A. Micallef
8                                                  Attorney for Dell Inc.

9    #1519329

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    _____
      [25] Dell also joins Microsoft and Gateway in requesting summary judgment of non-infringement of
27    claim 12 by the accused products and invalidity of claim 12, for the reasons advanced by those
      parties.
28
                                              - 19 -

                                              CASE NO. 03-CV-1108 B (CAB) – MASTER CASE NO. 02-CV-2060 B (CAB)
                        MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF DELL INC. FOR SUMMARY
                           JUDGMENT ON THE ASSERTED CLAIM OF U.S. PATENT NO. 4,958,226 TO HASKELL, ET AL.

Exhibit 119
Page 002296