# Exhibit 5
# to Decl. of John Gartman

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., <br><br>  Plaintiff, <br><br> v. <br><br> GATEWAY, INC.; GATEWAY COUNTRY STORES LLC; MICROSOFT CORPORATION; AND DELL, INC., <br><br> Defendants. | Case No. 02-CV-2060-B (CAB), consolidated with Case No. 03-CV-0699-B (CAB) and Case No. 03-CV-1108-B (CAB) <br><br> HON. RUDI M. BREWSTER |

**EXPERT REPORT OF JEAN RENARD WARD RELATING TO THE EXPERT REPORT OF JOHN P.J. KELLY, PH.D. RE LUCENT'S AGULNICK PATENT**

1.  I have been retained as a technical expert in this case by Lucent Technologies, Inc. ("Lucent") to provide my opinions regarding the contentions put forth by Microsoft Corporation, Gateway, Inc., and Dell, Inc. regarding the validity and other technical matters concerning certain claims of U.S. Patent No. 5,347,295 ("the '295 patent").

## I. QUALIFICATIONS AS AN EXPERT

2.  My background and qualifications are set forth in my Infringement Report.

3.  I have provided testimony in other matters as set forth in my Infringement Report.

## II. SCOPE OF STUDY AND OPINION

### A. Documents and Information Considered in Forming Opinions

4.  The following opinions and analysis are based upon a review of the '295 patent, the file history for the '295 patent, the prior art cited in the file history, the Kelly Report regarding the '295 patent ("the Kelly Report"), and the materials identified in the Kelly Report, including the devices, systems, and software.

EXHIBIT 5 PAGE 35

149. I note that I specifically requested an opportunity to examine the functioning X Windows device with tablet which would demonstrate the features pointed out by Dr. Kelly in his report, and which he stated (Kelly Report paragraph 26) that he would demonstrate as a working unit at trial. When I arrived at the laboratory at Fish & Richardson's offices in San Diego on April 25, 2006, the X Windows device was not available for my inspection. I specifically asked Ms. Lara Garner, attorney for Microsoft, about the whereabouts of the device with a tablet, so that I could examine certain behaviors of X Windows with a tablet. I asked Ms. Garner whether Dr. Kelly had ever (recently or in the past) used an X Windows device with tablet. Ms. Garner informed me that Dr. Kelly in fact did *not* have such a functioning X Windows device with tablet and had not relied upon an actual device in forming his opinion.

150. I further note that Dr. Kelly's opinion is that to the extent a "tablet" does not encompass a touch sensitive display system, Claims 1, 4, 39, 40, 41 and 46 are obvious over the X Window System User's Guide in view of touch sensitive display systems. I disagree with Dr. Kelly's opinion.

151. The X Windows system assumes a multiple-button pointing device. For example, the X Windows System User's guide 3rd Edition, May 1990 ("User's Guide"), refers specifically to the bindings of buttons 1, 2, and 3 of the pointing device. *See* User's Guide, 204-206. Based on my past experience as a user of X Windows (with a three-button mouse), and similar systems, X Windows may have been used with a tablet with a multi-button puck, but it is unlikely to have been used with a stylus or to have been reasonably functional with a stylus in any case because a stylus would not provide multiple buttons. Further, page 206 of the User's guide refers to a pointing device with 5 buttons. As is well known to users of X Windows, X Windows made use of multiple-button pointing devices for convenient access to multiple features, as noted on page

204 of the User's guide. A touch sensitive screen with a stylus, *e.g.*, a finger, has at most a virtualization of one button, the finger tip. It would therefore not be obvious to combine a touch screen with X Windows, and in fact the advantages of multiple-button input devices as set forth in the X Window's User's guide teach away from such a combination.

152. I further note that Dr. Kelly and I agree that the X Window System User's Guide fails to disclose a recognition algorithm as set forth by the Court in its February 24, 2004 Claim Construction Order. *See* Kelly Report 88.

### (1) Claim 1

153. The X Windows reference fails to disclose a stylus having a tip for inputting information. It is not obvious to use a stylus or touch screen for the reasons outlined above in ¶ 151. Further, Dr. Kelly's reference to MSLT-0525942 at paragraph 219 of his report and its equivalent reference in the earlier edition is incomplete. Immediately below the section quoted by Dr. Kelly is a clear reference to the specific functions performed by a first, second, and third pointer button, which are not present on a stylus nor can they be present on a touch sensitive screen mounted on the display. The specific page of the reference cited by Dr. Kelly clearly teaches away from using a stylus with X Windows.

154. Dr. Kelly admits that X Windows does not include a recognizer that falls within the limits set forth by the Court. It would not be obvious to combine a recognizer with X Windows for several reasons. For example, Dr. Kelly's referenced MSLT_0525942 contains an additional unmistakable reference to the Meta Key which must be present to be used in conjunction with the pointing device. Dr. Kelly describes no means for achieving a keyboard-less interface to a computer system, as he states at paragraph 230 in his report, through the use of gestures, most likely because one cannot simultaneously use the stylus for the input of a gesture or button actuation and for a virtualization of the Meta Key and the act of moving as

40

EXHIBIT 5 PAGE 37

described in the MSLT reference. *See also* my discussion with respect to mouse drivers versus ink data at ¶¶ 22-23.

155. X Windows fails to disclose the operation of a gesture executed on an operating system level object. The purported examples of gestures mentioned by Dr. Kelly in paragraphs 224-237 in his report are not gestures and there is no comparison with predefined shapes. For example, MSLT_0525958 clearly states that Dr. Kelly's example at paragraph 225 relates only to motion and location, not to a horizontal motion. A further reference to this fact is found at MSLT-0526076. I note further that Dr. Kelly mischaracterizes his quotation from the '295 patent at paragraph 239 of his report, as noted in ¶ 85.

    **(2)**    **Claim 4**

156. Claim 4 depends from claim 1, therefore my analysis above in ¶¶ 153-155 applies here.

157. Based on my knowledge as a past user of a X Windows system, and from the available references such as MSLT_0526076 it is clear that the motion involved need not be vertical or horizontal or indeed any particular shape. There is nothing about the predetermined actions of Dr. Kelly's examples that is specific to the direction of motion, only to the location of the button down and button up events.

    **(3)**    **Claim 39**

158. My analysis above in ¶¶ 153-155 applies here. Further, as there are no gestures, there can be no first, second, or third gesture.

    **(4)**    **Claim 40**

159. Claim 40 depends from claim 39, therefore my analysis above in ¶ 158 applies here. Additionally, because there is no first gesture, or second gesture, there cannot be substantially identical gestures.

### (5) Claim 41

160. My analysis above in ¶¶ 156-157 applies here. Further, Dr. Kelly's report contains no explanation of strokes of gestures being located in substantially the same are of the screen. Therefore, I conclude for this additional reason that this functionality is not present in X Windows nor rendered obvious.

### (6) Claim 46

161. Claim 46 depends from claim 41, therefore my analysis in ¶ 160 applies here. As there are no gestures, nor are gestures rendered obvious, there can be no predetermined action associated with a direction of motion of a gesture.

## VII. SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

162. I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success; Long-Felt But Unsolved Need and/or Failure of Others; and Industry Recognition.

163. The commercial success of the invention of claims of the '295 patent cannot be questioned. The ubiquitous use of a stylus and gestures to control, for example, PDAs, hand-held devices, and Pocket PCs indicates the benefits consumers reap through the efficient and effective means of controlling such devices with gestures.

164. On-line handwriting recognition has an extensive history. However, the focus of the vast majority of these efforts was on the replacement of the keyboard with direct handwriting input because until relatively recent times, the dominant form of computer input was a keyboard only and keyboarding skills were considered unusual, specialized, and awkward. The advent of the mouse, a simple pointing device, was a substantial improvement to human computer interaction, as is readily apparent to anyone who observes modern computer systems as

compared to dominant computer systems as of 1980. However, the keyboard remained necessary for text input. Although there were some systems which attempted to make use of a computer using only pointing input, with a mouse or a touch panel, these had only limited success in limited application areas, even with the use of a simulated keyboard displayed on the screen. One factor in their limited success was that in addition to the awkwardness of a virtual keyboard, the use of pointing input only or a predominantly pointing input had limited expressive power. Efforts to add pen functionality to a mouse centric OS such as the early versions of Pen Windows were not widely adopted and were in fact discontinued, a cycle which happened more than once. *See* Tablet PC Update by Geoff Walker, page A12, www.tabletpcmagazine.com, Spring 2002. It is the dramatic use of gestures for generally all computer control functions of the technology of the '295 patent, in a user interface metaphor with its reliance on gestures with the expressive power of the features claimed in the '295 patent, that truly dealt successfully with the goal of keyboard-less computer systems and thus achieved pen-computing.

165. Go Corporation received considerable recognition on a national level for its ground-breaking work. A brief review of any number of press reports at the time makes this abundantly clear. *See, e.g.,* LUC 1236376-83; LUC 1236384-87; LUC 1236394-97; LUC 1236463-66; LUC 1236509-526; LUC 1236600-640. Particularly descriptive is the record given by Marlin Eller, a long-time Microsoft employee and a senior technical leader in Microsoft's Pen Windows development group, in his book "Barbarians Led by Bill Gates" such as in Chapter 8 titled "Pen Ultimate Warfare" and Chapter 9 titled "GO-ing Down". Mr. Eller notes that Microsoft considered the GO pen computing system so compelling, that it was a serious threat to Microsoft's primary source of business revenue based on Microsoft's predominant position in

EXHIBIT 5 PAGE 40

operating systems (page 120), as the aspects of pen-computing in the GO system could motivate users to change to GO's operating system instead of Microsoft's in spite of the inconveniences and burdens to the user of using a second operating system (page 134). Still further evidence of the non-obviousness of the Agulnick patent technology was the commitment to develop a hardware product based on the technology. *See, e.g.,* LUC 1235464-67; LUC 1236535-38; LUC 1236539-46.

## VIII. COMPENSATION

166. I am being compensated at a rate of $250 per hour for my work in this matter, plus expenses. My compensation does not depend in any way on the conclusions or outcome of my analysis.

## IX. CONCLUSION

167. The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available.

EXHIBIT 5 PAGE 41

Dated: May 12, 2006

_____
Jean Renard Ward

EXHIBIT 5 PAGE 42