# Exhibit 6
# to Decl. of John Gartman

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC.,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>GATEWAY, INC.; GATEWAY COUNTRY STORES LLC; MICROSOFT CORPORATION; AND DELL, INC.,<br><br>　　　　Defendants. | Case No. 02-CV-2060-B (CAB), consolidated with Case No. 03-CV-0699-B (CAB) and Case No. 03-CV-1108-B (CAB)<br><br>HON. RUDI M. BREWSTER |

**EXPERT REPORT OF BRUCE TOGNAZZINI RELATING TO THE EXPERT REPORT OF JOHN P.J. KELLY, PH.D. RE LUCENT'S TOROK PATENT AND TO THE EXPERT REPORT OF DALE BUSCAINO RE LUCENT'S DAY PATENT**

1.　I have been retained as a technical expert in this case by Lucent Technologies, Inc. ("Lucent") to provide my opinions regarding the contentions put forth by Microsoft Corporation, Gateway, Inc., and Dell, Inc. regarding the validity and other technical matters concerning certain claims of U.S. Patent Nos. 4,317,956 ("the '956 patent") and 4,763,356 ("the '356 patent").

## I.　QUALIFICATIONS AS AN EXPERT

2.　My background and qualifications are set forth in my infringement report.

3.　I have not provided testimony in other matters over the past 4 years.

## II.　SCOPE OF STUDY AND OPINION

### A.　Documents and Information Considered in Forming Opinions

4.　With respect to the '956 patent, my opinions and analysis are based upon a review of the '956 patent, the file history for the '956 patent, the prior art cited in the file history, the Kelly Report regarding the '956 patent ("the Kelly Report"), and the materials identified in the

EXHIBIT 6 PAGE 43

### (1) Claim 1

180. Mr. Buscaino offers an example of a Personal Application Manager and discusses its "two fields." In fact the Personal Application Manager has only one field and it is neither of one of the ones discussed by Mr. Buscaino. This one input field lies above the information display region that Mr. Buscaino characterized as information fields. All work takes place in this one input field and is then transferred to the display area. There are no separate tools provided with this device. There are no tools for entering information into this field. Given that there is only one field, this is not even a form as set forth in the '356 patent.

### (2) Claim 2

181. Claim 2 depends from claim 1, therefore my analysis above in ¶ 180 applies here. Also, the HP 150 discloses no evidence of a tool that supplies transitory information. Rather here, the user supplies the sum total of all information.

### (3) Claim 4

182. Claim 4 depends from claim 1, therefore my analysis above in ¶ 180 applies here. Also, there is no keyboard tool. Mr. Buscaino puts forth no evidence that such a keyboard actually existed.

### (4) Claim 6

183. Claim 6 depends from claim 1, therefore my analysis above in ¶ 180 applies here.

### (5) Claim 7

184. Claim 7 depends from claim 1, therefore my analysis above in ¶ 180 applies here.

### (6) Claim 10

185. My analysis in ¶ 180 applies here. Based on my analysis, the HP 150 fails to disclose "means for displaying a plurality of information fields and for identifying the kind of information to be inserted therein"; the HP 150 fails to disclose "means for storing a plurality of

predefined tools associated with respective ones of said fields"; and the HP 150 also fails to disclose "means responsive to information being inserted in at least one of said fields for indicating another of said fields to be filled in."

### (7) Claim 11

186. Claim 11 depends from claim 10, therefore my analysis above in ¶ 185 applies here.

### (8) Claim 12

187. Claim 12 depends from claim 11, therefore my analysis above in ¶ 186 applies here. Also, there is no tool that displays information that is changed periodically.

### (9) Claim 13

188. Claim 13 depends from claim 10, therefore my analysis above in ¶ 185 applies here. The Financial Calculator to which Mr. Buscaino refers is a simulation of a complex HP-12C Handheld Calculator. It is a full-scale application in its own right and almost certainly would have taken up the entire available memory during operation prohibiting its use in conjunction with any other application and is, of course, not a tool inextricably tied to some associated fields in some other separate and distinct application, thereby failing the definition of a tool, as set forth in the '356 patent.

### (10) Claim 15

189. Claim 15 depends from claim 10, therefore my analysis above in ¶ 185 applies here.

### (11) Claim 16

190. Claim 16 depends from claim 10, therefore my analysis above in ¶ 185 applies here.

### (12) Claim 19

191. My analysis in ¶ 180 applies here. Based on my analysis, the HP 150 fails to disclose "displaying on said display a plurality of information fields"; the HP 150 fails to disclose "concurrently displaying a predefined tool associated with said one of said fields"; the HP 150 fails to disclose "a tool adapted to supply an individual entry from a menu of alternatives"; and the HP 150 also fails to disclose "at least a tool adapted to allow said user to compose information."

### (13) Claim 21

192. Claim 21 depends from claim 19, therefore my analysis above in ¶ 191 applies here.

### F. Prior Art References Disclosing Writing On A Bit Mapped Graphics Field

193. Mr. Buscaino has provided no prior art showing a form with an information field being "a bit mapped graphics field adapted to allow said user to compose said information by writing on said field." Prior art disclosing writing on a bit mapped graphics field is no more relevant than prior art disclosing typing on a keyboard or viewing output on a monitor. None of these underlying technologies result in, anticipate, or render obvious the '356 patent.

## IX. SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

194. I understand that the obviousness of a patent cannot be judged without considering the "secondary factors" or "secondary considerations" of non-obviousness. I understand that these factors include Commercial Success, Long-Felt But Unsolved Need and/or Failure of Others, and Industry Recognition.

195. At the time of the '956 patent, people in the field were attempting and failing to provide an effective means of remote collaboration. One camp of those working in the art were experimenting with a cursor generation system. Another camp was experimenting with a

47
EXHIBIT 6 PAGE 46

freehand drawing (blackboard) system. These two groups failed to identify or even see these two technologies as being related or that one could help solve the problem of the other. Several experimental systems facilitating remote collaboration had been tried for enabling remote collaboration. These had problems both because of their capabilities and because of a lack of understanding of how to provide an effective human interface.

196. With respect to the '356 patent, the computers of the day, e.g., the Xerox Star and Apple Lisa, were, by today's standard, ploddingly slow computers. They had tiny memories, less than 1000th that of a personal computer today, and ran more than 1000 times slower. When the Lisa was introduced in 1981, it took 45 seconds to just open a desk accessory like a clock in preparation for use. Inventions like the '356 patent with it's pop-up calendar were unthinkable, let alone obvious because of the lag that would have occurred while the data was painstakingly transferred from the hard disk to memory and massaged into a useful form before finally being presented. In that time, a user could easily glance at a paper desk calendar and then manually insert the information.

197. The Macintosh's introduction in 1984 actually made things worse. The Lisa's tiny hard disk was replaced by floppy disks, a far smaller, slower medium. The Mac's internal memory was so small that nothing more than essentials could reside in memory. Any time a special routine was needed for the program, the user would have to remove the disk holding the user's documents, replace it with the program disk, and swap back the document disk. Providing tools as per the '356 patent would have almost certainly resulted in the original Macintosh computers slowing to a crawl. The memory got marginally larger by 1985, but there was still no hard disk, and the extra memory was soon being used by the Switcher, enabling people to hold more than one application in memory at a time. By this time, both the Lisa and the Xerox Star

had been retired. No one had the hardware platform even capable of incorporating the '356 patent advantageously. Having failed numerous times in the past and knowing the shortcomings of the technology, those of us working in the art were interested only in those improvements that could be implemented successfully in the short term. Developers were, overwhelmingly, interested in using those tools that we at Apple were supplying, both because it made their development cycles shorter and because they faced their own memory and performance limitations. Developers were also struggling with learning the new and foreign technology that the Macintosh environment represented.

198.    Computer from the 1985 era continued to have a surprising number of "walls" that lie between those systems and any attempt at replicating the invention of the '356 patent. The accessories that were supplied were indirect. The user could open the standard calculator, but the numbers didn't magically float into place in an application. The user had to paste them there.

199.    We all knew there was a problem—people were clicking the mouse too often and "traveling" too far to assemble the information they needed—but we didn't know what to do about it within the tight confines of the hardware with which we had to work. Those in the art were trying but failing to make the user experience more efficient.

200.    The '356 inventors took a clever approach to solve this problem an overcome all the failures of others: They reduced the task actually being addressed by their experimental system to an absolute minimum, so that memory constraints no longer boxed them in, then made that user experience as efficient and pleasant as possible. http://www.macos.utah.edu/Documentation/MacOSXClasses/macosxone/macintosh.html#7

## X. COMPENSATION

201.  I am being compensated at a rate of $750 per hour for my first 50 hours of work on this report and $500 per hour for my work beyond the first 50 hours, plus expenses. My compensation does not depend in any way on the conclusions or outcome of my analysis.

## XI. CONCLUSION

202.  The opinions in this report are based upon the information presently available to me and are subject to modification and amendment as new information becomes available.

Dated: May 12, 2006

_____
Bruce Tognazzini

EXHIBIT 6 PAGE 50