# Exhibit 26
# to Decl. of John Gartman

COPY

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF CALIFORNIA

3

4   LUCENT TECHNOLOGIES,          )   Case No. 02CV2060-B(CAB)
                                  )        Consolidated with
5            Plaintiff,           )        03CV0699-B(CAB)
                                  )        03CV1108-B(CAB)
6   vs.                           )        Related to:
                                  )        06CV0684-B(CAB)
7   GATEWAY, INC., et al.,        )
                                  )   San Diego, California
8            Defendants.          )
    _____)   Thursday,
9                                     February 1, 2007
                                      9:00 a.m.
10
                                      VOLUME IV
11

12

13                    TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE RUDI M. BREWSTER
14          UNITED STATES DISTRICT JUDGE, and a jury

    APPEARANCES:
15
    For the Plaintiff:        JOHN DESMARAIS, ESQ.
16                            ROBERT A. APPLEBY, ESQ.
                              PAUL A. BONDOR, ESQ.
17                            EDWARD DONAVAN, ESQ.
                              Kirkland & Ellis, LLP.
18                            153 East 53rd Street
                              New York, New York 10022
19                            (212) 909-3189

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

Echo Reporting, Inc.

EXHIBIT 26 PAGE 370

IV-31

1   that he would not review the Windows

2   Media Player until it had that

3   functionality.

4        Q    And it was important for Microsoft

5   to have Walt Mossberg review its Windows

6   Media Player technology?

7        A    Yes.

8        Q    Why?

9        A    Because he's an influential end-

10  user.

11       Q    And as an influential end-user, he

12  could influence who would actually use

13  Windows Media Player?

14       A    I think that's the belief in

15  marketing, yes.

16       Q    That's Microsoft's belief?

17       A    That's correct."

18    (End playing videotaped deposition.)

19       MR. DESMARAIS:  Mr. Adams -- Adam Berns was

20 deposed again on September 28th, 2006, and we'll play a clip

21 from that deposition as well.  And that was on -- runs about

22 13 minutes.

23       MR. MELSHEIMER:  And Mr. Berns will also be here

24 live in Microsoft's case, your Honor.

25       THE COURT:  Very well.  Thank you.  Very well.

EXHIBIT 26 PAGE 371

1    (Begin playing videotaped deposition.

2         "Q    Let's turn to Topic 10.  Can you

3         tell me what the factual bases are for

4         Microsoft's contention that under 35 USC

5         Section 252 and the doctrine of absolute

6         and equitable intervening rights,

7         Microsoft is permitted and/or should be

8         permitted to continue practicing

9         processes not infringing any claim

10        and/or valid claim of the original pre-

11        reissued patent, but which Lucent claims

12        are infringing the Johnston 080 reissued

13        patent?

14        A    Yes.  The -- the factual basis is

15        that we took this '97 license that --

16        the '97 Microsoft/Thompson license and

17        then the 2004 license, both of which

18        gave us full rights to practice or to

19        do -- have an MP-3 functionality in the

20        Microsoft products.

21        Q    Is that all?

22        A    Yes.

23        Q    Is it your understanding that the

24        1997 license between Microsoft and

25        Thompson gave Microsoft full rights to

EXHIBIT 26 PAGE 372

IV-33

1    practice MP-3 functionality in Microsoft

2    products?

3    A    That's exactly correct.  I believe

4    that those two agreements gave us full

5    rights to practice MP-3 functionality in

6    our product.

7    Q    Putting aside the claim for a

8    moment, did you know before the 2004

9    Microsoft/Thompson MP-3 license

10   agreement was signed that Lucent was

11   asserting rights to MP-3 technology?

12   A    Yes.

13   Q    Did Microsoft understand that it

14   was obtaining the license to the 938

15   patent through the Thompson license

16   agreement?

17   A    We didn't understand that we were

18   taking a specific license to any

19   specification patent.  We were getting a

20   license for all of the patents we

21   needed.

22   Q    Did Microsoft believe that that

23   included the 938 patent?

24   A    We thought it encompassed all of

25   the patents that we needed.  And again,

IV-34

1    not specifically this patent or that

2    patent.  We thought we were getting all

3    of the necessary patents.

4        Q    Did Microsoft believe that the 938

5    patent was a necessary patent to

6    practice MP-3 technology?

7        A    I don't know.

8        Q    I'm sorry.  What investigation did

9    Microsoft undertake in order to

10   determine whether or not it was

11   receiving all the licenses that were

12   necessary to practice MP-3 technology?

13       A    Again, I think that the two kinds

14   of investigations that we did I think

15   were speaking to colleagues in the

16   licensing business, in the inbound

17   licensing business, number one.  And

18   number two, discussions that we had with

19   Thompson.

20       Q    Did Thompson specifically mention

21   during any of the discussions that

22   Thompson and Microsoft had that the 938

23   patent was included in either of the

24   1997 or 2004 license agreements?

25       A    We never spoke specifically about

IV-35

1   that patent, no.

2   Q    Did Thompson ever tell or suggest

3   to Microsoft that any of Lucent's

4   patents were included in the 1997 or

5   2004 license agreements?

6   A    They never specifically called out

7   any Lucent patents.

8   Q    So Thompson never called out the

9   938 patent in particular, correct?

10   A    Correct.

11   Q    And it never called out any other

12   Lucent patents, correct?

13   A    As part of the license, no.

14   Q    You qualified that as part of the

15   license.  Why did you make that

16   qualification?

17   A    I'm just saying we never spoke

18   specifically about any -- or we never

19   spoke about any specific patents as part

20   of the license.

21   Q    Other than Fraunhofer and Thompson

22   patents, did Microsoft have an

23   understanding that it was receiving

24   patent rights to any other company's

25   patents when it took the 1997 and 2004

IV-36

1    license agreements from Thompson?

2    A    No, those were the ones we needed.

3    Q    But Microsoft took -- undertook no

4    independent investigation to confirm

5    that understanding, correct?

6    A    Well, again, I think speaking with

7    other licensing -- folks in the

8    licensing business, I think is

9    independent investigation.

10    Q    As of the time of the signing of

11    the 2004 license agreement with

12    Thompson --

13    A    Yes.

14    Q    -- Microsoft was aware that Lucent

15    was asserting that Microsoft infringed

16    the 938 patent through MP-3 technology,

17    correct?

18    A    I'm deducing that that's correct

19    because you said that it started in

20    2003, so that would be a year before the

21    2004 agreement.

22    Q    When Microsoft was preparing to

23    sign the 2004 license agreement with

24    Thompson regarding MP-3 technology, did

25    Microsoft undertake any investigation of

EXHIBIT 26 PAGE 376

IV-37

1    the 938 patent to determine whether or

2    not Microsoft needed a license to that

3    patent to practice MP-3 technology?

4    A    Personally, not that I know of.

5    Q    You answered that question

6    personally not that you know of.  Are

7    you aware at all that Microsoft

8    undertook such an investigation?  Do you

9    have any awareness of such an

10    investigation being undertaken by

11    Microsoft?

12    A    I don't know of any.

13    Q    Okay.  I really don't have that

14    much to ask about it, but I want to make

15    sure that this Exhibit 24 that you have

16    in front of you, which is from your

17    previous deposition, that is the 1997

18    Microsoft/Thompson MP-3 license that

19    we've been discussing today; is that

20    correct?

21    A    That is correct, yes.

22    Q    Let me also hand you what was

23    previously marked as Exhibit 26 to your

24    February 15th, 2006 deposition, which I

25    believe is the 200-4 agreement that

EXHIBIT 26 PAGE 377

IV-38

1    we've been talking about.  And if you

2    can verify that for me, that would be

3    good.

4       A    That is correct.

5       Q    Let's take a look at Exhibit 26 to

6    your previous deposition, the 2004

7    license agreement.

8       A    Uh-huh.

9       Q    And specifically I want to turn

10   your attention to the back to Exhibit B.

11      A    Yep.

12      Q    Okay.  There under Item Number 2

13   it says, "Patents that Lucent claims to

14   hold."  Do you see that?

15      A    Yes.

16      Q    And in that list of patents Lucent

17   claims to hold is U.S. Patent Number

18   5,627,938, correct?

19      A    Yes.

20      Q    Did Microsoft  make any

21   independent investigation as to whether

22   or not the 938 patent was infringed by

23   the MP-3 technology that it was

24   acquiring from Thompson?

25      A    No.  Again, the -- the experts in

Echo Reporting, Inc.

EXHIBIT 26 PAGE 378

IV-39

1    this area feel that Thompson is the

2    licensing agent for these. And we

3    didn't feel like we had to go to anyone

4    else. And they told us that these were

5    a group of folks, and they bucketed them

6    all together as -- as, you know, bogus

7    claims.

8    Q    Even though Microsoft had that

9    confidence, Microsoft agreed to list in

10   the 2000 -- in the 2004 agreement a list

11   of patents that other parties claimed to

12   be infringed by the -- the MP-3

13   technology?

14   A    Microsoft didn't necessarily agree

15   to have them listed out. Microsoft

16   agreed that -- that -- that Thompson had

17   heard of other companies that might

18   have -- have -- or that were making some

19   kind of assertion. That's all.

20   Q    So let's make sure I understand

21   this. Microsoft in 2004 was looking to

22   acquire additional MP-3 rights and

23   software from Fraunhofer and Thompson,

24   correct?

25   A    Yes.

IV-40

1      Q    Microsoft was aware in 2004 that

2      Lucent was claiming that the 938 patent

3      would be infringed by MP-3 technology,

4      right?

5      A    That's correct.

6      Q    Thompson listed the 938 patent in

7      the 2004 agreement as a patent that

8      Lucent claims would be infringed by MP-3

9      technology, correct?

10     A    That is correct.  That it claims

11    Lucent.  That was your question, right?

12    Not that it was infringed, infringing.

13    That -- that Thompson -- that Lucent had

14    told Thompson that it might infringe.

15    That their implication might infringe.

16    Sorry.  That Fraunhofer's implementation

17    might infringe, that Thompson was

18    licensing.

19    Q    Thompson listed the 938 patent in

20    the 2004 Microsoft/Thompson agreement as

21    a patent that Lucent claims is infringed

22    by MP-3 technology?

23    A    Yes.

24    Q    It was Microsoft's understanding

25    in 2004, when it took a license from

EXHIBIT 26 PAGE 380

IV-41

1    Thompson regarding MP-3 technology that

2    it was taking all of the licenses that

3    it needed to take regarding MP-3

4    technology, correct?

5    A    That's correct.

6    Q    And that was based on what you've

7    told me, representations from Thompson,

8    correct?

9    A    Yes.

10    Q    Those representations are not

11    recorded in the 2004 agreement, correct?

12    A    That's correct.

13    Q    And Microsoft's understanding that

14    it was taking all the licenses it needed

15    to take regarding MP-3 technology was

16    also based on the general understanding

17    of the licensing community that Thompson

18    held all the patents that were

19    necessary --

20    A    I would say --

21    Q    -- for MP-3 technology?

22    A    Yes.  I would say not just the

23    licensing community.  The experts of the

24    licensing community felt and feel that

25    Thompson is the licensing agent for the

IV-42

1    necessary MP-3 patents.

2    Q    Did any of these experts tell you

3    or anyone else at Microsoft that the 938

4    patent's claims are invalid?

5    A    No one specifically told us

6    anything about that patent, to my

7    knowledge.

8    Q    And sitting here today, you're not

9    aware of any others within Microsoft who

10   have had discussions regarding the

11   validity or the enforceability of the

12   938 patent, correct?

13   A    Not that I am personally aware of.

14   Q    Again, talking about the experts,

15   the licensing experts that you've been

16   talking about, have any of these

17   licensing experts told you or anyone

18   else at Microsoft, to your knowledge,

19   that the 938 patent is unenforceable?

20   A    I haven't had a specific

21   discussion about that patent with

22   other -- with my peers.

23   Q    Earlier today you told me that you

24   are not aware of any specific reliance

25   by Microsoft on noninfringement,

EXHIBIT 26 PAGE 382

IV-43

1         invalidity or unenforceability of the

2         claims of the 938 patent when Microsoft

3         signed the 1997 and 2004 agreement,

4         correct?

5         A      Correct.

6         Q      Is there anyone at Microsoft who

7         knows of such reliance?

8         A      Not that I'm aware of."

9     (End playing videotaped deposition.)

10         MR. DESMARAIS:  Your Honor, at this time I'd like

11 to offer two discovery responses and publish them to the

12 jury.  One is Plaintiff's Exhibit 1872, which is an

13 interrogatory response directed to wilful infringement, and

14 140- -- Plaintiff's Exhibit 1408, which is also a Microsoft

15 response directed to this issue.

16         THE COURT:  Both of these numbers you're giving

17 me, are these exhibit numbers?

18         MR. DESMARAIS:  Plaintiff's exhibit numbers, yes.

19         THE COURT:  And they're both responses to requests

20 of interrogatories?

21         MR. MELSHEIMER:  No, your Honor.

22         MR. DESMARAIS:  One is a request -- one is a

23 response to a request for interrogatory, and one is a

24 discovery response in lieu of a deposition.

25         MR. MELSHEIMER:  One of them is an e-mail, your

IV-44

1  Honor, and one of them is an answer to an interrogatory.

2           THE COURT:  Okay.  Is 1872 the answer -- the

3  e-mail?

4           MR. MELSHEIMER:  1872 --

5           MR. DESMARAIS:  Yes.

6           MR. MELSHEIMER:  -- is --

7           MR. DESMARAIS:  No.  The interrogatory.

8           MR. MELSHEIMER:  -- is the answer to

9  interrogatory.  1408 is an e-mail.  I don't -- I don't think

10 the e-mail is properly part of the record, but I think we

11 can probably work out whatever -- whatever -- whatever

12 agreement he wants to work out.

13          MR. DESMARAIS:  I'm just going to read what you

14 said at Number 1.

15          MR. MELSHEIMER:  I didn't say that, but yes, okay.

16 Well, sure.  I mean, certainly it's true that we're not

17 going to be relying on any opinions of counsel in this case.

18 And that's what it says in this e-mail.

19          MR. DESMARAIS:  So I'd like to read exactly --

20          THE COURT:  That's 1408?

21          MR. DESMARAIS:  Yeah, 1408.

22          THE COURT:  All right.  1408 is received.  And

23 that's an e-mail from Microsoft to Lucent, right?

24          MR. DESMARAIS:  Yes, your Honor.

25          MR. MELSHEIMER:  Well, it's an e-mail from counsel

IV-45

1   to Lucent's lawyers in this --

2           THE COURT:  Oh, it's an e-mail from counsel for

3   Microsoft to counsel for Lucent.

4           MR. DESMARAIS:  Right.  During discovery for the

5   purposes of avoiding deposition, correct.  And what

6   Microsoft said in the e-mail --

7           MR. MELSHEIMER:  Well, you know, until it's in --

8   until it's in, we should be --

9           THE COURT:  Well, I've already admitted it.

10          MR. MELSHEIMER:  Okay.  All right.  Thank you,

11  your Honor.

12          THE COURT:  1408 is in evidence.

13          MR. DESMARAIS:  And what Microsoft said on the

14  issue of willful infringement is Microsoft will not be

15  relying on any opinions of counsel in this case.  And that

16  was specifically in relation to the defense to the charges

17  of willful infringement.

18          And then the interrogatory response, which I'd

19  like to publish, the question --

20          THE COURT:  You haven't put that into evidence

21  yet.  That's 1872?

22          MR. DESMARAIS:  Yes, your Honor.

23          THE COURT:  Now, what is this?  Is this a

24  pleading?

25          MR. DESMARAIS:  It's an interrogatory response

IV-46

1 about what their factual basis is for why they don't --

2          THE COURT:  All right.  That will be received into

3 evidence.  I think we should explain a little bit to the

4 jury.

5          MR. DESMARAIS:  If you would.

6          THE COURT:  There is a -- by now you can

7 understand that there are a number of ways that people can

8 get the information they need to pursue a lawsuit, and it's

9 called discovery.  It's a part of the lawsuit.  They file a

10 complaint, then you have a period of discovery, then you

11 have a period of taking all those depositions of the

12 witnesses, the expert witnesses, and then they have trial.

13          So you don't -- you don't go to trial until you've

14 got all the discovery.  You don't drive a car down the

15 street until you've built it.  So in this discovery, there

16 are a number of things that people can do to learn about

17 their adversary's position.  You know one of them very well

18 now, and that's deposition.  You just take their deposition.

19          Another way is you ask them questions in writing.

20 And we have a fancy word.  We call that an interrogatory.

21 So one party can serve another an interrogatory, and it's

22 nothing but a question.  But under the law, if they get that

23 interrogatory, they are required to answer that question

24 under oath.

25          So this exhibit -- and they both have done it back

Echo Reporting, Inc.

EXHIBIT 26 PAGE 386

IV-47

1  and forth.  Everybody does it in these cases.  And this is

2  one of these interrogatories, and he's going to be reading

3  from -- we've received into evidence this Exhibit 1872.  It

4  is an answer to an interrogatory.  No doubt the

5  interrogatory will be there as well as the answer.

6          MR. DESMARAIS:  Yes, your Honor.

7          THE COURT:  So you'll be able to see what the

8  question is.  This isn't Jeopardy.  I'll give you the

9  answer, and you figure out the question.  You'll get the

10 question and the answer.  And that's what this -- this is

11 one particular question and one particular answer.  You

12 should understand that there often are dozens of

13 interrogatory questions and answers that happen in the

14 lawsuit.  You're not going to get them all.  You're just

15 going to get one at the moment.

16          MR. DESMARAIS:  Thank you, your Honor.

17          So the question here --

18          THE COURT:  You should take that answer as if it's

19 testimony given under oath in the trial.

20          MR. DESMARAIS:  So the question here is

21 Interrogatory Number 21.

22              "For each asserted claim of each

23              patent in suit, identify all factual and

24              legal bases for Microsoft's contention

25              that it does not willfully infringe and

IV-48

1        has not willfully infringed each

2        claim" --

3       THE COURT:  Such claims.

4       MR. DESMARAIS:  Oh, I'm sorry.  Thank you.

5             -- "such claims, including without

6        limitation an identification and

7        description of how and when Microsoft

8        first became aware of each such asserted

9        patent."

10       And then the answer --

11       THE COURT:  Why don't we drop the lights.  That

12 might be easier to look at.

13       MR. DESMARAIS:  In the interim, Microsoft responds

14 that:

15         "Upon learning of Lucent's

16        contentions that Microsoft allegedly

17        infringed the patents in suit on or

18        about the dates identified in Lucent's

19        December 2005 letter, Microsoft acted in

20        good faith by at least retaining outside

21        counsel to defend against Lucent's suits

22        and claims as evidenced by the pleadings

23        and discovery in this case.  The patents

24        in suit are not infringed, invalid or

25        unenforceable.  Subject to and without

EXHIBIT 26 PAGE 388

IV-49

1    waiving the foregoing general objections

2    and specific objections and to the

3    extent Microsoft understands this

4    interrogatory, Microsoft responds that

5    Lucent, through its agent ThinkFire

6    informed Microsoft on January 13th, 2003

7    that ThinkFire believes patents are

8    utilized by Microsoft products.

9    Microsoft further responds that

10   Microsoft had awareness of the Johnston

11   patent on or around April 8th, 2003" --

12   Oh, the Hall patent.  I'm sorry.

13       -- "Hall patent are utilized by

14   Microsoft.  Microsoft further responds

15   that Microsoft had awareness of the

16   Johnston patent on or about April 8th,

17   2003.  Microsoft discovery in this case

18   has just begun, and Microsoft's

19   investigation is ongoing.  Microsoft

20   therefore reserves the right to

21   supplement or amend this response as

22   discovery in this matter progresses,

23   should further investigation indicate

24   that supplementation is necessary."

25   And this response was given on January 27th, 2006.

EXHIBIT 26 PAGE 389

IV-50

1          There's one other one here.

2          MR. MELSHEIMER:  And that has been admitted, your

3 Honor.  1872 is in evidence?

4          THE COURT:  Yes.  It's in evidence, right.

5          MR. DESMARAIS:  And I'd like to also read the

6 earlier response, which is 1873, to the same interrogatory.

7 And again, it's the same question.

8               "For each of the asserted claims of

9               each patent in suit, identify all

10              factual and legal bases for Microsoft's

11              contention that it does" --

12         THE COURT:  I'm sorry.  I don't know whether I

13 actually said -- this is received in evidence.

14         MR. MELSHEIMER:  Yes, your Honor.

15         MR. DESMARAIS:  Thank you, your Honor.

16              "For each asserted claim for each

17              patent in suit, identify all factual and

18              legal bases for Microsoft's contention

19              that it does not willfully infringe and

20              has not willfully infringed each

21              claim" --

22         THE COURT:  Such claims.

23         MR. DESMARAIS:  I did that again.  I'm sorry.

24              -- "such claims, including without

25              limitation an identification and

Echo Reporting, Inc.

EXHIBIT 26 PAGE 390

1    description of how and when Microsoft

2    first became aware of each such asserted

3    patent."

4    And the answer in this one was:

5        "Subject to and without waiving the

6    foregoing general objections and

7    specific objections, and to the extent

8    Microsoft understands its interrogatory,

9    Microsoft responds that Lucent, through

10    its agent ThinkFire, informed Microsoft

11    on January 13th, 2003 that ThinkFire

12    believes the Hall patents are utilized

13    by Microsoft products.

14        "Microsoft further responds that

15    Microsoft had awareness of the Johnston

16    patent on or around April 8th, 2003.

17    Microsoft discovery in this case has

18    just begun, and Microsoft's

19    investigation is ongoing.  Microsoft

20    therefore reserves the right to

21    supplement or amend this response in

22    discovery as claim construction in this

23    matter progresses, should future

24    investigation indicate supplementation

25    is necessary."

EXHIBIT 26 PAGE 391

IV-52

1       So this response was given to us on June 30th,
2  2004 by Mr. Gartman and Microsoft's legal team.
3       MR. MELSHEIMER:  Your Honor, just so it's clear --
4  I think the record is clear on this -- is that the first one
5  that was read was the later answer, and the second one he
6  read was the first answer.
7       THE COURT:  Correct.  What was the date of the
8  later one, which is the first one --
9       MR. MELSHEIMER:  The later one, your Honor, was
10  dated, I believe, January 2000 -- January 27th, 2006.
11       THE COURT:  Thank you.
12       MR. DESMARAIS:  That's right.
13       I'd also like to offer the documents that were
14  referenced in Mr. Berns' deposition, which -- the two
15  depositions which are Plaintiff's Trial Exhibits 16, 23, 34
16  and 36.
17       MR. MELSHEIMER:  Your Honor, I believe that those
18  are the Fraunhofer licenses that Microsoft had paid
19  Fraunhofer, Thompson licenses.  And we have no objection.
20       THE COURT:  These are all licenses between
21  Fraunhofer or Thompson and Microsoft?
22       MR. DESMARAIS:  No.  There are other things there
23  as well.  I think that was some of them.  There are -- these
24  are the documents that were referred to in the deposition.
25       THE COURT:  Well, it might --

Echo Reporting, Inc.

EXHIBIT 26 PAGE 392

IV-53

1          MR. DESMARAIS:  And one of them has to do -- the

2    Plaintiff's Exhibit 16 has to do with Cyberlink.  It doesn't

3    have anything to do with Fraunhofer.  Plaintiff's Exhibit

4    23, again, has to do with Windows XP.  It doesn't have

5    anything to do with Fraunhofer.

6          THE COURT:  Windows XP.

7          MR. DESMARAIS:  That's right.

8          THE COURT:  And 34?

9          MR. DESMARAIS:  Plaintiff's Exhibit 34 and 36 are

10   the two agreements.

11         MR. MELSHEIMER:  Thirty --

12         THE COURT:  These are both license agreements?

13         MR. MELSHEIMER:  Thirty-four and 36 are the

14   Fraunhofer license agreements.

15         MR. DESMARAIS:  Actually, to -- 34 is the

16   Fraunhofer license agreement.  Thirty-six is the Thompson

17   license agreement.

18         MR. MELSHEIMER:  Thompson.

19         THE COURT:  All right.  Thirty-four is the

20   Fraunhofer license, and 36 is the Thompson license.

21         MR. DESMARAIS:  That's right, your Honor.

22         THE COURT:  Those are all received.

23         MR. MELSHEIMER:  Thank you, your Honor.

24         MR. DESMARAIS:  We'll now play a short clip from

25   John Weresh, also a Microsoft employee.  And this runs about

EXHIBIT 26 PAGE 393

IV-54

1  four minutes.  Oh, the date.  Thank you.  The date is

2  November 25th, 2005.

3           THE CLERK:  Could you say his name again, please.

4           MR. DESMARAIS:  John Weresh.

5       (Begin playing videotaped deposition.)

6           "Q    And what is your understanding of

7           when Microsoft first became aware of

8           that patent, Exhibit 3, the Johnston

9           patent?

10          A    My understanding is that we became

11          aware of various of the patents that

12          we're discussing at different stages.

13          Basically, there were three groups of

14          patents that we became aware of.  One

15          group was two patents that were included

16          in a letter from Dell to Microsoft in

17          1999.  There was a second group of five

18          patents that were included in a letter

19          from Dell to Microsoft in 2002.  And

20          there were another two that we received

21          information from through Gateway as of

22          the filing of the lawsuit, I believe.

23          Q    Two patents in a letter from Dell

24          in 1999, correct?

25          A    Yes.

Echo Reporting, Inc.

EXHIBIT 26 PAGE 394

IV-55

1    Q    Five patents in a 2002 letter from

2    Dell, correct?

3    A    Yes.

4    Q    And two more patents when Gateway

5    got sued?

6    A    Yes.

7    Q    The piece of paper you have there

8    to your right, what do you have --

9    what's written on that?  Can I just see

10    it?

11    A    These are my notes that I used to

12    keep track of the Lucent patents as I

13    prepared for this deposition.

14    Q    I've premarked all of the patents

15    which we might throw out here in case we

16    need to reference them.  Why don't we go

17    ahead and mark this one, jumping to

18    Exhibit 12, the sticker that I have

19    available.  This is handwritten notes

20    that Mr. Weresh brought with him.

21    This is your handwriting, correct?

22    A    Yes.

23    Q    So there's two from the letter to

24    Dell in 1999, and that is -- one is the

25    226.  Would that be Exhibit 11, United

Echo Reporting, Inc.

EXHIBIT 26 PAGE 395

IV-56

1    States Patent 4,958,226 to Haskell that

2    you're referring to there? Letter from

3    Dell. Sorry.

4    A    Yes.

5    Q    And then the second patent number

6    is 938. Is your understanding that that

7    is, in fact, referring to Weresh Exhibit

8    3, the Johnston United States Patent

9    5,627,938 that I previously handed to

10   you?

11   A    Yes.

12   Q    And then at the bottom of Exhibit

13   12 of your notes, it says, "rest after

14   Gateway 457293." So that is patents

15   it's your understanding Microsoft became

16   aware of after Gateway was sued by

17   Lucent?

18   A    Yes.

19   Q    Just to be clear, 457 refers to

20   United States Patent 5,341, 457 to Hall

21   and Johnston that I've marked as Exhibit

22   4?

23   A    Yes.

24   Q    Let me mark as Exhibit 13 a

25   document with MSLT production numbers

IV-57

1        1065872.

2               Do you recognize Weresh 13?

3        A    Yes.

4        Q    Is that the 1999 letter from Dell

5        to Microsoft by which Microsoft became

6        aware of certain Lucent patents?

7        A    I believe so, yes.

8        Q    Do you know what actions, if any,

9        were taken by Microsoft after they

10       became aware of this?

11       A    Yes.

12       Q    What did they do?  Meaning

13       Microsoft.

14       A    There is a letter back to Ms.

15       Roberts subsequent to this one.

16       Q    Let's mark as Weresh Exhibit 14

17       MSLT-1065873 to 4, which we also

18       received last night.

19               Is that the letter you're referring

20       to?

21       A    Yes."

22     (End playing videotaped deposition.)

23          THE CLERK:  Counsel, I thought I heard you say

24 that this was the deposition of November 25th, '05.  The

25 screen said February 17th, '06.

EXHIBIT 26 PAGE 397

IV-58

1       THE COURT:  Would you tell us for the record the

2  date and the person --

3       MR. DESMARAIS:  Yes.  It's John Weresh, W-E-R-E-S-

4  H, and it was Volume 1 of his deposition, which is November

5  25th, 2005.

6       THE COURT:  November 25 --

7       MR. DESMARAIS:  2005.

8       THE COURT:  Thank you.

9       MR. DESMARAIS:  And I'll offer the Plaintiff's

10  Trial Exhibit 215 and 1404 and 78, which I think have all

11  been agreed to.

12       MR. MELSHEIMER:  No objection, your Honor.

13       THE COURT:  Okay.  Just for the -- for my records,

14  what is 215 concerning?

15       MR. DESMARAIS:  215 is the letter from Dell to

16  Microsoft alerting them about the 938 patent.

17       THE COURT:  Okay.  And the 1404?

18       MR. DESMARAIS:  Is a letter from Lucent's agent

19  ThinkFire alerting Microsoft to the 457 patent.

20       MR. MELSHEIMER:  Your Honor, we would also offer

21  an Exhibit 216.

22       THE COURT:  Okay.  Just one second.  I'll be right

23  with you.

24       MR. MELSHEIMER:  Thank you, your Honor.

25       THE COURT:  The third one, what is that one?

IV-59

1          MR. DESMARAIS:  That is another

2 Microsoft/Fraunhofer agreement.

3          THE COURT:  Is this a license agreement?

4          MR. DESMARAIS:  It's a CODEC software agreement,

5 right.

6          THE COURT:  Between who?

7          MR. DESMARAIS:  Microsoft and Fraunhofer.

8          THE COURT:  Okay.  Just a second.  Microsoft and

9 Fraunhofer.

10          MR. DESMARAIS:  That's right.

11          THE COURT:  Okay.  Those are all received.

12          Now, Mr. Melsheimer, you wanted to add something?

13          MR. MELSHEIMER:  Yes, your Honor.  There was an

14 Exhibit 216 discussed, which was a letter that I believe is

15 the other half of one of the letters that's already been

16 admitted.  We would move in Exhibit 216, which is a letter

17 regarding --

18          MR. DESMARAIS:  No objection, your Honor.

19          MR. MELSHEIMER:  -- Lucent patents.

20          THE COURT:  Is that a letter -- from whom and to

21 whom?

22          MR. DESMARAIS:  It was Microsoft's response to the

23 Dell letter.

24          THE COURT:  So it would be Microsoft to Dell.

25          MR. MELSHEIMER:  Yes.

Echo Reporting, Inc.

EXHIBIT 26 PAGE 399

IV-60

1          THE COURT:  Okay.  And that will be responding to

2  215.

3          MR. DESMARAIS:  That's correct, your Honor.

4          MR. MELSHEIMER:  Yes.

5          THE COURT:  All right.  216 is received.

6          MR. MELSHEIMER:  Just for completeness, your

7  Honor.  Thank you.

8          THE COURT:  Of course.  Right.

9          MR. DESMARAIS:  We'll next play a short clip from

10  John Schindler, S-C-H-I-N-D-L-E-R.

11          THE COURT:  How long is that one going to be?

12          MR. DESMARAIS:  Five minutes.  Do you want to take

13  a break?

14          THE COURT:  Well, the coffee just arrived.

15          MR. DESMARAIS:  Oh.

16          THE COURT:  And it probably won't get any warmer.

17          MR. DESMARAIS:  All right.

18          THE COURT:  Let's take our 15-minute recess at

19  this time.  Please remember the admonition.

20      (Proceedings recessed briefly.)

21          THE COURT:  All right.  You may continue, Mr.

22  Desmarais.

23          MR. DESMARAIS:  Thank you, your Honor.  Before the

24  break, we were about to play another deposition.  And let me

25  say for the record the Weresh deposition transcript was

Echo Reporting, Inc.

EXHIBIT 26 PAGE 400

IV-187

1  factors that have to do with the value of the technology,

2  the profitability of the products that are made with that

3  technology, the advantages of the technology, and the extent

4  to which the infringer has made use of the inventions and,

5  in addition, the portion of the realizable profit of the

6  products that it would be accounted for by this technology.

7  These are generally value and marketing factors and -- and I

8  did consider them.  I saw substantial testimony and the like

9  that would deal with this.

10 Q    Did you see any testimony in connection with the

11 importance of MP3 capabilities in the accused products?

12 A    I did.  I saw testimony of two of Microsoft's witnesses

13 that I thought was particularly relevant.

14 Q    Who in particular?

15 A    They were Geoff Harris and a Tobias Jones.  I think

16 both of them -- their testimony has been played.

17 Q    Have you prepared video clips of some of that

18 testimony?

19 A    I have.  I've prepared very short video clips from each

20 of them.

21        MR. BONDOR:  Could we play clip GH02, please.

22        (Video clip played.)

23             "Q    What were the corporate goals,

24        sir?

25             A    In this case it was clear to us

IV-188

1    and me as the representative in this

2    product that we needed to provide the

3    facility to encode MP3 files natively in

4    the Windows Media Player.

5    Q    Why?

6    A    It was a competitive need and

7    something that our customers were asking

8    for and requesting.

9    Q    So Microsoft customers were asking

10   for Microsoft to provide native MP3

11   encoding capabilities for Windows Media

12   Player?

13   A    Certainly as part of the

14   distribution of Windows Media Player,

15   yes."

16   MR. BONDOR:  Could you play TJ02, please.

17   (Video clip played.)

18   "Q    Do you know why Windows Media

19   Player 10 includes MP3 encoding

20   functionality?

21   A    Again, I don't know the -- I

22   wasn't involved in the decision making

23   for Windows Media Player 10.  We did

24   include as end product -- we wanted to

25   have encoding available out of the box.

Echo Reporting, Inc.

EXHIBIT 26 PAGE 402

IV-189

1      It was a popular request as opposed to

2      having a third party codec that they

3      needed to download.

4      Q      Popular request by whom?

5      A      By users."

6  BY MR. BONDOR:

7  Q    Did you rely on that testimony in reaching your

8  conclusions, Mr. Smith?

9  A    I did.  I relied on this testimony in reaching my

10  conclusion.

11  Q    Did you see any press coverage commenting on the

12  importance of MP3 capabilities in Windows Media Player?

13  A    I did.  I reviewed a press release, a joint press

14  release by Microsoft and Cyberlink.  I think that press

15  release has been admitted into evidence.

16  Q    Could you turn to tab 23 in your slide binder and take

17  a look at PX3155 and tell me what that is?

18  A    It is an excerpt from that press release.

19      MR. BONDOR:  Your Honor, I offer PX3155.

20      MR. SKENYON:  No objection.

21      THE COURT:  Very well.  3155 is received, press

22  release excerpt.  Is that October 22, 2001?  Is that what

23  I'm looking at down there?

24      THE WITNESS:  Yes, it is, your Honor.

25      THE COURT:  Is that the date of the press release?

Echo Reporting, Inc.

EXHIBIT 26 PAGE 403

IV-190

1        THE WITNESS:  That is my understanding that that

2   is the date of the press release.  Yes.

3        THE COURT:  Thank you.

4        THE CLERK:  Sir, is that a demonstrative or an

5   exhibit?

6        THE COURT:  No.  It's an exhibit, not

7   demonstrative.

8        THE CLERK:  Thank you, sir.

9   BY MR. BONDOR:

10  Q    Did you rely on that press release in reaching your

11  conclusions?

12  A    I did.  This press release indicates that Microsoft

13  thought it was of great importance to have MP3 encoding

14  capability in its product.  It didn't have that native

15  capability at this time.  So it relied on Cyberlink and

16  Intervideo to provide it, and one of the interesting things

17  in this press release is the statement by David Fester, the

18  general manager of Windows Digital Media Division, in which

19  he says Cyberlink specifically and Intervideo are helping to

20  make Windows XP the best and most complete digital media

21  experience on the PC.  He -- he also said that it is the

22  fastest growing media player.

23  Q    Now, what did you -- what conclusions did you draw from

24  the press release?

25  A    I concluded from the press release that MP3 encoding

IV-191

1 capability was a highly desirable and required feature in --

2 to be made available in the Windows operating system for

3 customers.

4 Q    Now, did you see any evidence relating to the

5 commercial importance of the particular features of Windows

6 accused in this case?

7 A    I did.  I reviewed a substantial amount of testimony by

8 the same David Fester who's mentioned here concerning the

9 importance of -- of Windows Media Player.

10 Q    And have you prepared video clips of that testimony?

11 A    I have.

12        MR. BONDOR:  Could we play DF01.

13    (Video clip played.)

14        "Q    Did Microsoft promote the fact

15        that Windows Media Player was a feature

16        of Windows?

17        A    Always.

18    MR. BONDOR:  And DF03.

19    (Video clip played.)

20        "Q    Did Microsoft introduce Windows

21        Media Player to meet the needs of its

22        customers?

23        A    Yes, absolutely.

24        Q    Did Microsoft introduce Windows

25        Media Player to stay competitive with

IV-192

1    other operating systems?

2    A    Yes."

3    MR. BONDOR:  DF08.

4    (Video clip played.)

5    "Q    Do know what features of Windows

6    Media Player (indiscernible) to users?

7    A    I recall one of the things that

8    was new was that you were able to RIP

9    CD's or record CD's to your computer.

10    You were able to transfer those -- that

11    recorded music on your computer to an

12    MP3 player or you're able to burn it to

13    a -- a CD.  Those are very appealing

14    features of the Windows Media Player."

15    MR. BONDOR:  DF04.

16    (Video clip played.)

17    "Q    How did Cyberlink help to make

18    Windows XP the best and most complete

19    digital medial experience on the PC?

20    A    Cyberlink specifically?

21    Q    Yes.

22    A    Cyberlink made an add-on to

23    Windows Media Player for Windows XP that

24    was called an MP3 add-on pack, and this

25    MP3 add-on pack enabled Windows Media

EXHIBIT 26 PAGE 406

IV-193

1     Player to RIP a CD or record a CD in

2     MP3."

3         MR. BONDOR:  DF02.

4   (Video clip played.)

5         "Q    How many downloads have there

6     been of Windows Media Player 10?

7         A    Somewhere north of 320,000,000.

8         Q    Is Windows Media Player 10 one of

9     the most popular downloads for

10    Microsoft?

11        A    It is."

12        MR. BONDOR:  And DF05.

13   (Video clip played.)

14        "Q    And you also said that there was

15    a music setting on the Windows Media

16    Player to determine whether Windows

17    Media Player was used more than other

18    players?

19        A    That's correct.

20        Q    What were the results of that

21    study?

22        A    That Windows Media Player was the

23    most widely used media player on the

24    Internet."

25 //

EXHIBIT 26 PAGE 407

IV-194

1 BY MR. BONDOR:

2 Q    And, Mr. Smith, did you rely on that testimony in

3 reaching your conclusion?

4 A    I did.

5 Q    And what did you learn from it?

6 A    This testimony convinced me that Windows Media Player

7 and its contained MP3 technology was very important to the

8 Microsoft Windows operating system and, indeed, a feature

9 that the customers required and that was supplied to meet

10 the customers' requirement, the customers' demand.

11 Q    And what about computer manufacturers?

12 A    I reviewed some testimony of one of Dell's employees

13 concerning this subject, yes.

14 Q    And who is that?

15 A    That was Lenny Zwik.

16 Q    And what did he say?

17 A    He said, in effect, that Dell would not consider buying

18 a Windows operating system that didn't have Windows Media

19 Player.

20 Q    And did you prepare a video clip of his testimony?

21 A    I did.

22        MR. BONDOR:  Could we play LZ01, please.

23        (Video clip played.)

24        "Q    Do you know if Dell would sell

25            Windows operating system without Windows

IV-195

1      Media Player?

2           A      No, Dell would not.

3           Q      So is it Dell's belief that there

4      would be no demand for the operating

5      system without Windows Media Player?

6           A      Yes."

7  BY MR. BONDOR:

8  Q      Did you rely on that testimony, Mr. Smith?

9  A      I did.

10 Q      And what did you conclude from it?

11 A      It confirmed the understanding that I had reached in

12 reviewing other testimony that Windows Media Player was a

13 necessary feature and an important feature of Microsoft

14 Windows.

15 Q      Mr. Smith, what is Windows XPN?

16 A      My understanding is that Windows XPN is Windows without

17 Windows Media Player.

18 Q      And did you see any documents about Windows XPN in this

19 case?

20 A      I did.  I reviewed a press release concerning it.

21 Q      Could you turn to tab 24 for me.

22 A      I have it, yes.

23 Q      What is that?

24 A      This is an excerpt from that press release.

25 Q      Would it assist your testimony today?

IV-196

1  A    It would be helpful I think to understand the case.

2           MR. BONDOR:  Your Honor, I offer Plaintiff's

3  Exhibit 3156 as a demonstrative.

4           MR. SKENYON:  No objection.

5           THE COURT:  Received as a demonstrative.

6           THE WITNESS:  You can see from the excerpt from

7  this press release that Windows minus Media Player was not a

8  big seller.  In fact, Sony and Dell, for example, said they

9  wouldn't sell a computer without Windows Media Player in its

10 operating system.  It just was a non-starter, XPN.

11 BY MR. BONDOR:

12 Q    Could you turn in your evidence binder to PX1551.

13 A    Yes, I have it.

14 Q    Is that the press release that you're referring to?

15 A    Yes, it is.

16          THE COURT:  What's the exhibit?

17          MR. BONDOR:  This is the underlying press release

18 that was the subject of the --

19          THE COURT:  I know.  What's the -- what's the

20 identification?

21          MR. BONDOR:  I beg your pardon.  1551R, your

22 Honor.

23          THE COURT:  Thank you.

24 BY MR. BONDOR:

25 Q    Did you rely upon it in reaching your conclusion?

IV-197

1 A    I did rely upon that, yes.

2        MR. BONDOR:  Your Honor, I offer Plaintiff's

3 Exhibit 1551R.

4        THE COURT:  It is received.

5 BY MR. BONDOR:

6 Q    Now, did you learn anything about Microsoft's views of

7 the nature of its Windows products?

8 A    I did.  I reviewed both testimony and documents that --

9 that suggest that the Windows Media Player or Windows

10 operating system with Media Player is an integrated product,

11 a holistic product, if you will, that is to be considered as

12 a whole and not -- not to be parsed up.

13 Q    And what led you to that conclusion?

14 A    Testimony, for example, of Mr. Geoff Harris on that

15 subject.

16 Q    And have you prepared a video clip of that testimony?

17 A    I have, yes.

18        MR. BONDOR:  Could we have clip GH01, please.

19    (Video clip played.)

20        "A     We believe that Windows, as

21        we've designed it, is a holistic product

22        and it should not be pulled apart.

23        Q     Windows Media Player being a part

24        of the Windows XP to operate?

25        A     Yes.

EXHIBIT 26 PAGE 411