# Exhibit 39
# to Decl. of John Gartman

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


LUCENT TECHNOLOGIES, INC.    )

    )

VS.    )    NO. 02-CV-2060B

    )

GATEWAY, INC.    )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

MARK WALKER

JANUARY 5, 2006

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL AND VIDEOTAPED DEPOSITION OF

MARK WALKER, produced as a witness at the instance of

the Plaintiff, and duly sworn, was taken in the

above-styled and numbered cause on the 5th of January,

2006, from 8:56 a.m. to 2:01 p.m., before

JANALYN REEVES, CSR in and for the State of Texas, at

the offices of DEWEY BALLANTINE, 401 Congress Avenue,

Suite 3200, Austin, Texas, pursuant to the Texas Rules

of Civil Procedure (and the provisions stated on the

record or attached therein).


JOB NO. 9989

EXHIBIT 39 PAGE 501

Page 54

```
1        A.  Those are the ones I recall.
2        Q.  Do you know who was contacted, if anyone, with
3   respect to MPEG?
4        A.  I believe that was the Ccubed.  I believe they
5   provided us with an MPEG decoder.
6        Q.  Do you know if that was a hardware or software
7   decoder?
8        A.  I believe that was a hardware decoder.
9        Q.  Do you know if any other company was contacted
10  with respect to MPEG?
11       A.  I don't recall.  There may have been a
12  software decoder, but I don't recall who that would
13  have been.
14       Q.  You mentioned Microsoft.  Was Microsoft
15  contacted in connection with your non-infringement
16  analysis?
17       A.  They were contacted, yes.
18       Q.  Do you know by whom?
19       A.  Someone in the supply chain management
20  organization.  I don't recall their name.
21       Q.  When you say "supply chain management
22  organization," what do you mean?
23       A.  It's the person who has -- had responsibility
24  for dealing directly with Microsoft on a day-to-day
25  basis as far as acquiring products.
```

Page 55

```
1        Q.  Do you know approximately when Microsoft was
2   contacted?
3        A.  No.
4        Q.  Was Microsoft contacted with respect to any
5   particular products or for some other reason?
6        A.  The one product I recall was Net Meeting,
7   because that was the subject of Lucent's presentations,
8   at least one of their presentations.
9        Q.  Any others?
10       A.  Not that I recall.
11       Q.  Do you know approximately how many suppliers
12  had been contacted?
13       A.  No.
14       Q.  Was there more than five?
15       A.  Possibly, but I don't recall.
16       Q.  Do you recall if any of the suppliers provided
17  you with any written materials?
18       A.  I don't recall very many written materials.
19       Q.  Do you recall any?
20       A.  It's possible they did.  I just -- I don't
21  recall.
22            MR. HOHENTHANER:  I think we have to
23  change the tape.  This is probably a good time for a
24  break.
25            THE VIDEOGRAPHER:  This is the end of
```

Page 56

```
1   Tape 1.  We're off the record at 10:15 a.m.
2        (Recess from 10:15 a.m. to 10:22 a.m.)
3            THE VIDEOGRAPHER:  This is the beginning
4   of Tape 2.  We're back on the record at 10:22 a.m.
5        Q.  (BY MR. HOHENTHANER)  Going back to the
6   Microsoft contact, do you know if Microsoft provided
7   Gateway with any written materials concerning
8   non-infringement?
9        A.  I'm not aware of any written materials.
10       Q.  And I apologize if I asked this earlier.  Do
11  you know who at Gateway was the one that contacted
12  Microsoft?
13       A.  I don't recall the person's name.
14       Q.  Do you know who at Microsoft was contacted?
15       A.  No.
16       Q.  While you were at Gateway, had you had any
17  contacts personally with Microsoft concerning
18  non-infringement use of its patents?
19            MR. PLIES:  You can answer that yes, no,
20  or I don't recall.
21            THE WITNESS:  I don't believe I do.
22       Q.  (BY MR. HOHENTHANER)  The suppliers that you
23  mentioned were contacted in connection with your
24  non-infringement analysis, did any of them provide any
25  opinions of non-infringement, whether written or oral?
```

Page 57

```
1            MR. PLIES:  Objection.  As phrased, it
2   calls for the contents of -- for this communications,
3   which I think might be subject to a joint interest or
4   joint defense privilege.  So, as phrased, I'm going to
5   instruct him not to answer.  But if you want to
6   rephrase it.
7            MR. HOHENTHANER:  Can you just let him
8   answer a yes or no question whether it was provided or
9   not?
10           MR. PLIES:  Well, plus, the way you
11  phrased it is, you assume what the conclusion was in
12  the question, so --
13           MR. HOHENTHANER:  I'll try to rephrase.
14       Q.  (BY MR. HOHENTHANER)  Did any of the suppliers
15  that you mentioned provide Gateway with any analysis,
16  written or oral, concerning infringement or
17  non-infringement of Lucent patents?
18       A.  Yes.
19       Q.  How many suppliers?
20       A.  I don't recall.
21       Q.  Do you recall personally communicating with
22  any of those suppliers that you were referring to
23  earlier?
24       A.  I participated in meetings with some of the
25  supplier representatives.
```

1    Q.  Did you have in-person meetings with these
2  suppliers?
3    A.  Yes.
4    Q.  How many suppliers did you have in-person
5  meetings with?
6    A.  I don't recall.
7    Q.  Approximately how many meetings are you
8  referring to?
9    A.  Maybe a half a dozen different meetings.  I
10  don't recall specifically.
11    Q.  During what approximate time frame?
12    A.  '99 through 2000, 2002.
13    Q.  So you had approximately six or so meetings
14  with suppliers between 1999 and 2002 concerning
15  Lucent's infringement allegations; is that correct?
16    A.  Yes.
17    Q.  Were these meetings all with different
18  suppliers, or did you have multiple meetings with any
19  individual supplier?
20    A.  I expect we had multiple meetings.  The basic
21  issue was understanding how the suppliers' products
22  operated so that we could compare those to patent
23  claims.  Sometimes that took more than one meeting.
24    Q.  And you don't recall ever receiving written
25  materials from the suppliers; is that correct?

1    A.  I don't recall, but we may have received
2  written or we may not have.
3    Q.  Do you recall any of the suppliers informing
4  Gateway whether it believes Gateway did or did not
5  infringe any one of Lucent's patents?
6        MR. PLIES:  I'm going to object as
7  phrased again because it goes to the contents of the
8  communications as I think are -- would be privileged
9  under a joint interest privilege.  But if you want to
10  rephrase or -- or establish that he even remembers
11  first and see if there's even an issue.
12    Q.  (BY MR. HOHENTHANER)  Do you --
13        MR. HOHENTHANER:  Let me just break it
14  down.  You instruct not to answer if you feel
15  appropriate, or you can answer it or not.
16    Q.  (BY MR. HOHENTHANER)  Do you recall any of the
17  suppliers informing Gateway that it did not infringe
18  any one of Lucent's patents?
19    A.  Yes.
20    Q.  Which supplier?
21    A.  I don't recall.  The suppliers are kind of
22  jumbled in my memory.  I know --
23    Q.  Do you recall -- I'm sorry?
24    A.  I know we had those discussions.
25    Q.  Do you recall which patents?

1    A.  No.  I believe they related to MPEG patents in
2  general, which were the majority of those patents.
3    Q.  Do you recall any of the suppliers informing
4  Gateway that it believed Gateway did not infringe any
5  of the non-MPEG-related patents?
6    A.  I don't recall either way.
7    Q.  Do you recall any of the suppliers informing
8  Gateway that it believed Gateway may infringe any of
9  the patents?
10    A.  I don't believe I was ever so informed.
11    Q.  And I believe from the supplier concerning
12  non-infringements of the MPEG-related patents, was that
13  from Ccubed?
14    A.  It may have been.
15    Q.  You're not sure?
16    A.  I'm not sure.
17    Q.  These meetings with the suppliers, do you know
18  if any of those meetings occurred with Microsoft?
19    A.  I don't recall a specific meeting with
20  Microsoft.
21        (Exhibit No. 8 marked)
22    Q.  (BY MR. HOHENTHANER)  The court reporter has
23  handed you what's been marked as Exhibit 8, a document
24  bearing Bates Nos. GW-LT122013 through 017.  Have you
25  seen Exhibit 8 before?

1    A.  I believe I have.
2    Q.  When do you recall last seeing Exhibit 8?
3    A.  I don't recall the last date.
4    Q.  And what is Exhibit 8?
5    A.  Appears to be a presentation that was made or
6  would have been made to Lucent.
7    Q.  Do you know who prepared Exhibit 8?
8    A.  I believe I may have prepared it.
9    Q.  What's the basis for that belief?
10    A.  It sounds familiar.
11    Q.  During the course of your negotiations with
12  Lucent while you were at Gateway, did anyone other than
13  yourself prepare presentations from the Gateway side?
14    A.  I don't recall.  Other people may have, but I
15  would have coordinated that preparation.
16    Q.  So any presentation that was provided to
17  Lucent you would have been involved with?
18    A.  Yes.
19    Q.  The presentation appears to refer to a meeting
20  of April 21st, 1999.  Do you know if there was, in
21  fact, a meeting on that day?
22    A.  I don't.
23    Q.  Do you know if this presentation was, in fact,
24  presented to Lucent?
25    A.  I expect that it was presented.

1  initial proposal?
2      A.  That's correct.
3          (Exhibit No. 10 marked)
4      Q.  (BY MR. HOHENTHANER)  The court reporter has
5  handed you what's been marked as Exhibit 10, a document
6  bearing Bates No. LUC016482 through 490.  Do you
7  recognize Exhibit 10?
8      A.  Well, it looks like an e-mail exchange, at
9  least one of which was originated by me.
10     Q.  There's reference to an August 3 meeting,
11 August 3rd, 1999.  Do you know if that meeting, in
12 fact, took place?
13     A.  I believe it did.
14     Q.  Was that an in-person or a telephonic meeting?
15     A.  I don't recall.  Actually, it talks about a
16 conference call, so probably telephone.
17     Q.  Do you know who participated in that meeting,
18 in that call?
19     A.  No.
20     Q.  Did you participate?
21     A.  I believe I did.
22     Q.  How long did that call last?
23     A.  I don't know.
24     Q.  Do you recall anyone else on that call from
25 the Gateway side other than yourself?

Page 78

1      Q.  Under Heading 1 there's a subheading,
2  "Issues" -- or "Issue Remains One of Balance" -- or --
3  I'm sorry -- "Issue Remains One of Balance of Values."
4  Do you see that?
5      A.  Uh-huh.
6      Q.  What did you mean by that statement?
7      A.  When entering into a cross license or business
8  relationship, there's frequently a balance and payment
9  based on who's contributing the most to the pot.
10     Q.  What was discussed with Lucent in that regard
11 on the phone call?
12     A.  I suspect we discussed an amount, but I don't
13 recall.
14     Q.  A couple lines below that on the proposed
15 agenda there's a statement, "Supplier analysis
16 continues."
17     A.  Uh-huh.
18     Q.  What did you mean by that?
19     A.  I understand this to the mean that the
20 suppliers were continuing to look into whether there
21 was any infringement of their product.
22     Q.  And what was, if anything, communicated to
23 Lucent in that regard in the telephone call?
24     A.  It appears from this it was communicated that
25 that work was not completed yet.

Page 80

1      A.  Well, it's likely that our outside counsel was
2  on the call.  I don't recall.
3      Q.  Who are you referring to?
4      A.  Richard Gilly.
5      Q.  Do you recall anyone in particular from the
6  Lucent side that was on that call?
7      A.  Jim Tierney appears to have been on the call.
8      Q.  Do you recall or are you just basing that on
9  the e-mail?
10     A.  I'm basing it on the e-mail.
11     Q.  Do you recall what Lucent said during that
12 phone call?
13     A.  No.
14     Q.  Do you recall what Gateway said or discussed
15 in that phone call?
16     A.  Based on this presentation, it looks like we
17 made a fairly detailed presentation on the reasons why
18 we didn't need a license to the Lucent technology.
19     Q.  The second page of Exhibit 10 at the top says
20 "Proposed Agenda."  Do you know who prepared this
21 proposed agenda?
22     A.  Looks like I did.
23     Q.  And was this agenda followed during the
24 telephone call?
25     A.  I expect it was.

Page 79

1      Q.  Below that there's a statement, "Issue is
2  non-infringement, not indemnity."
3          What did you mean by that statement?
4      A.  That the suppliers were actually looking at
5  whether or not their products infringed, and that they
6  believed they did not infringe.  There may have been
7  discussion -- from this it looks like there was a
8  discussion of whether we were talking to our suppliers
9  to indemnify Gateway for infringement versus talking to
10 them to explain why their products did not infringe.
11 So this was making it clear that we weren't arguing
12 over indemnity.  We were arguing that we were getting
13 information that supported non-infringement.
14     Q.  Had Gateway sought indemnity from any of the
15 suppliers during that time frame?
16     A.  If it was permitted by our contract we would
17 have.  But I don't recall.
18     Q.  Do you recall doing so?
19     A.  No, I don't recall.
20     Q.  Do you recall discussing that with any of your
21 suppliers?
22     A.  I did not discuss it personally.
23     Q.  Do you know if anyone else had?
24     A.  That would have been handled by the supplier
25 chain management function, so the people that

Page 81

1  interacted with the suppliers.
2      Q.  Do you believe any of those people did speak
3  with the suppliers regarding indemnification?
4      A.  I don't know.
5      Q.  Down below that Item 3 in the agenda for the
6  next meeting, that first point underneath, it says,
7  "Detail Technical Review of Various Patents by
8  Suppliers."  Which suppliers were you referring to?
9      A.  I don't know.
10     Q.  Do you know what sort of technical review
11 those suppliers were doing?
12     A.  I think they were going to explain their
13 non-infringement.
14     Q.  Was there a plan to have any of the suppliers
15 attend the next meeting, or how was that going to be
16 presented to Lucent?
17     A.  I would infer from this that the suppliers
18 were going to be presented.
19     Q.  Do you recall suppliers that were presenting
20 material to Lucent at a meeting -- or let me back up.
21 Do you recall suppliers ever being present at one of
22 your meetings with Lucent?
23     A.  I don't recall them being present.
24     Q.  Do you ever recall them being -- or
25 participating in a meeting by telephone conference?

Page 82

1      A.  I don't recall at this point.
2      Q.  On the next page of Exhibit 10, that would be
3  LUC016484, do you know who prepared this page?
4      A.  I expect that I prepared it.
5      Q.  The next -- the heading, "Caller ID/Doughty,"
6  it talks about modems and technology with the Lucent
7  technology for 3-Com, whose license are patented.
8          Did Gateway obtain modems from any other
9  suppliers?
10     A.  I don't know.
11     Q.  I'm sorry?
12     A.  I don't know.
13     Q.  Did you consider any other suppliers at that
14 time?
15     A.  My reading of this page is that we thought
16 this covered the waterfront, so that we either were
17 getting -- any modems that had this technology,
18 Caller ID technology, either came from Lucent or 3-Com.
19     Q.  If you had done -- let me back up.
20         Did you do a non-infringement analysis
21 with respect to the Doughty patent?
22         MR. PLIES:  Answer that yes, no, or you
23 don't recall.
24         THE WITNESS:  Yes.
25     Q.  (BY MR. HOHENTHANER)  Is it fair to say that

Page 83

1  none of this -- did you ever communicate an opinion of
2  non-infringement to Lucent concerning the Doughty
3  patent?
4      A.  Well, I think in this -- this case what we
5  communicated was that there's no need for a license,
6  that we had the right to use it.  So non-infringement
7  was irrelevant.
8      Q.  I'm sorry?
9      A.  So non-infringement was irrelevant in that
10 case.
11     Q.  Right.  So you communicated an opinion that
12 the technology you had was the license.  Is it fair to
13 say you've never communicated an opinion of
14 non-infringement concerning the Doughty patent?
15     A.  I don't recall any such presentation.
16     Q.  But you did do a non-infringement analysis; is
17 that correct?
18     A.  I believe we did a right to use analysis,
19 which would have included the issue of licensing and
20 non-infringement.  So we may have stopped that analysis
21 of licensing as opposed to getting into the detailed
22 non-infringement.
23     Q.  So you may not have done --
24     A.  So we may not have.
25     Q.  Did you explain in any way why you believed

Page 84

1  Gateway was licensed through 3-Com to practice the
2  Doughty patent?
3      A.  I believe we did.
4      Q.  What did you explain to Lucent in that regard?
5      A.  I don't know the details.
6      Q.  Let's skip down to the heading "AC3 Speaker
7  Systems/Johnston" in Exhibit 10 on Page LUC016484.
8  Next to "Status," it states, "Supplier complete
9  non-infringement analysis."
10         Do you see that?
11     A.  Uh-huh.
12     Q.  Do you know -- was this Dolby or some other
13 supplier?
14     A.  I don't think it was Dolby because Dolby just
15 controlled standards.  So there was someone else
16 involved.
17     Q.  Do you know who the supplier was?
18     A.  No, I don't.
19     Q.  Do you know when that non-infringement
20 analysis was started?
21     A.  Probably after receiving assertion from
22 Lucent.
23     Q.  Do you know if that analysis was ever
24 complete?
25     A.  I believe it was, but I have no specific

Page 85