1  John E. Gartman (SBN 152300)
   Juanita R. Brooks (SBN 75934)
2  John W. Thornburgh (SBN 154627)
   Roger A. Denning (SBN 228998)
3  Christopher S. Marchese (SBN 170239)
   Fish & Richardson P.C.
4  12390 El Camino Real
   San Diego, California  92130
5  Telephone:    (858) 678-5070
   Facsimile:     (858) 678-5099
6
   Stephen P. McGrath (SBN 202696)
7  Microsoft Corporation
   One Microsoft Way
8  Redmond, WA  98052
   Telephone:    (425) 882-8080
9  Facsimile:     (425) 936-7329

10 Attorneys for Intervenor/Counter-claimant
   and Plaintiff/Counter-defendant
11 MICROSOFT CORPORATION

12 *Additional Counsel Listed on the Last Page*

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15 | LUCENT TECHNOLOGIES INC. and | Case No. 07-CV-2000 H (CAB) |
   | MULTIMEDIA PATENT TRUST, | consisting of matters severed from |
16 | | consolidated cases: |
   | | 02-CV-2060 B (CAB) |
17 | Plaintiffs and Counterclaim-defendants, | 03-CV-0699 B (CAB) |
   | | 03-CV-1108 B (CAB) |
18 | v. | |
   | | |
19 | MICROSOFT CORPORATION, | |
   | | |
   | Intervenor and Counter-claimant, | |
20 | MICROSOFT CORPORATION, | **MICROSOFT'S MEMORANDUM OF** |
   | | **POINTS AND AUTHORITIES IN** |
21 | Plaintiff and Counter-defendant, | **SUPPORT OF ITS COMBINED** |
   | | **MOTION FOR JMOL, NEW TRIAL,** |
22 | v. | **OR REMITTITUR** |
   | | |
23 | LUCENT TECHNOLOGIES INC., | |
   | | |
24 | Defendant and Counter-claimant, | |
   | LUCENT TECHNOLOGIES INC. and | **Date:  June 6, 2008** |
25 | MULTIMEDIA PATENT TRUST, | **Time:  9:00 a.m.** |
   | | **Courtroom: 13** |
26 | Plaintiffs, | **Judge: Honorable Marilyn L. Huff** |
   | | |
27 | v. | |
   | | |
28 | DELL, INC., | |
   | Defendant and Counter-claimant. | |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................... 1

II.  LEGAL STANDARD ......................................................................................... 1

III.  THE '356 PATENT ............................................................................................ 3

    A.  No Reasonable Jury, Applying the Correct Legal Standard, Could
    Have Concluded that the '356 Patent Is Valid ....................................... 3

        1.  Claim 19 Was Anticipated By the Foreign Exchange Front
        End ................................................................................................ 3

            a.  FXFE Met Every Limitation of Claim 19 ..................................... 3

            b.  The FXFE Demonstration Three Years Before the
            Filing of the '356 Patent Was a Public Use Under §
            102(b) ......................................................................................... 7

            c.  FXFE Was Made in the United States and Was Not
            "Abandoned, Suppressed, or Concealed" Under §
            102(g) ......................................................................................... 8

        2.  The Asserted Claims Are Invalid In Light of the
        Datamation Article Describing the Foreign Exchange Front
        End ................................................................................................ 9

            a.  Claim 19 ..................................................................................... 9

            b.  Claim 21 ................................................................................... 11

        3.  The Asserted Claims Are Obvious In Light of J.K. Lasser's
        Your Money Manager Software ................................................... 11

    B.  No Reasonable Jury, Applying the Correct Legal Standard, Could
    Have Concluded that the '356 Patent Is Infringed .............................. 15

        1.  Since Microsoft Outlook Does Not Include a Composition
        Tool, It Cannot Be Used to Infringe Claim 19 or 21 of the
        '356 Patent ................................................................................ 15

        2.  Since Microsoft Windows Mobile Does Not Include a
        Composition Tool, It Cannot Infringe Claim 19 or 21 of the
        '356 Patent ................................................................................ 17

        3.  No Specific Acts of Infringement Using Any Microsoft
        Product Were Proven ................................................................... 17

        4.  Microsoft Cannot Contributorily Infringe ................................. 18

i

**TABLE OF CONTENTS (cont'd.)**

**Page**

      a.     Outlook ............................................................................... 18

      b.     Money .................................................................................. 18

      c.     Windows Mobile .................................................................. 19

    5.     Microsoft Does Not Induce Infringement Because
         Microsoft Does Not Have the Requisite Intent ..................................... 19

    6.     The Jury's Verdicts Regarding Infringement By Microsoft
         and Dell Are Facially Inconsistent ..................................................... 20

 C.    Incorrect Claim Construction Substantially Prejudiced Microsoft ..................... 20

 D.    Microsoft Is Entitled to a New Trial Because the Court's
     Instructions on Induced and Contributory Infringement Were
     Legally Incorrect .......................................................................................... 21

IV.   DAMAGES ON THE '356 PATENT ................................................................. 22

 A.    Lucent's Failure to Satisfy the Entire Market Value Rule with
     Respect to the Day '356 Patent Justifies Granting JMOL or New
     Trial ............................................................................................................ 22

    1.     The Entire Market Value Rule Precludes a Patentee from
         Taxing Unpatented Functionality in a Product Where the
         Patented Feature Is Not the Basis for Consumer Demand ..................... 22

    2.     The Entire Market Value Rule Precludes Lucent from
         Taxing the Accused Microsoft Software Programs, Which
         Include Thousands of Features in Addition to the Narrow
         Method of the '356 Patent .................................................................... 23

    3.     Lucent Provided No Evidence that the '356 Method Was
         the Basis for Consumer Demand for the Accused Programs ................. 27

 B.    It is Clear the Jury Applied the Entire Market Value Rule Though
     It Awarded a Lump Sum; If It Did Not, Its Verdict Must Be
     Rejected as Pure Speculation ........................................................................ 31

    1.     The Verdict Amount Is Most Consistent with Applying
         EMV to Software Sales ........................................................................ 32

    2.     The Verdict Amount Also Cannot Stand If It Is Just "Made
         Up" ...................................................................................................... 32

 C.    The Jury's Award of Over $357 Million Cannot Stand Given the
     Complete Absence of Evidence that the Claimed Method Was
     Actually Used .............................................................................................. 33

1

<u>**TABLE OF CONTENTS (cont'd.)**</u>

2
<u>**Page**</u>

3

D.    The Jury's Award of Over $357 Million Based on an 8% Royalty
Rate Was Grossly Excessive in Light of the License Agreements

4
and Royalty Rates in the Record......................................................... 36

5
1.    The Jury Could Not Reasonably Have Applied an 8% Rate ................. 36

6
2.    The Jury's $357 Million Total Is Grossly Excessive ............................ 38

7
V.    THE '295 PATENT ....................................................................................... 39

8
A.    Windows XP Tablet PC Does Not Compare a Tap to a Predefined
Shape and Therefore Cannot Infringe the '295 Patent....................... 39

9

10
B.    As a Matter of Law, Microsoft Cannot Indirectly Infringe the '295
Patent.................................................................................................... 40

11
C.    Microsoft Is Entitled to a New Trial on Infringement Because the
Jury Instruction on Means Plus Function Infringement was Legally

12
Incorrect ............................................................................................... 42

13
D.    Microsoft is Entitled to a New Trial Because Mr. Ward Testified
Far Beyond his Expert Report............................................................. 43

14

15
E.    Microsoft is Entitled to a New Trial Because of Erroneous Claim
Constructions ....................................................................................... 44

16
VI.    DAMAGES ON THE '295 PATENT ........................................................... 45

17
A.    The Jury's Award, Halving the Difference Between the Parties'
Numbers, Was Likely Based on Pure Speculation.............................. 45

18

19
B.    Lucent's Failure to Satisfy the Entire Market Value Rule with
Respect to the Agulnick '295 Patent Justifies Granting JMOL or

20
New Trial .............................................................................................. 45

21
VII.    THE '226 PATENT ....................................................................................... 48

22
VIII.    CONCLUSION.............................................................................................. 50

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

### CASES

4

*ACCO Brands, Inc. v. ABA Locks Manufacturer Co.*, 501 F.3d 1307 ............................. 17

5

*AT&T Corp. v. Microsoft Corp.*, 127 S.Ct. 1746 ......................................................... 19, 42

6

*Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176 ................................................ 2

7

*Al-Site Corp. v. VSI International, Inc.*, 174 F.3d 1308................................................... 42

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ............................................................. 2

9

*Atmel Corp. v. Information Storage Devices*, 198 F.3d 1374 .......................................... 44

10

*Baxter International, Inc. v. COBE Laboratories, Inc.*, 88 F.3d 1054 ............................. 7

11

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F.Supp.2d 1021 ................ 34, 35

12

*Checkpoint Systems, Inc. v. U.S. Intern. Trade Com'n*, 54 F.3d 756 ................................ 8

13

*City Solutions, Inc. v. Clear Channel Communications*, , 365 F.3d 835 .......................... 2

14

*DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293............................................. 2, 19, 21, 41

15

*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314................................................... 5

16

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H Patrick Co.*, 464 F.3d
   1356.................................................................................................................. 10

17

*Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263............................... 17, 34

18

*E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 ........................................... 17, 19, 34

19

*Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325 ................................................... 8

20

*In re Etter*, 756 F.2d 852 ........................................................................................... 14

21

*Exxon Research and Engineering Co. v. United States*, <u>265 </u>F.3d <u>1371</u> .......................... 48

22

*Fenner v. Dependable Trucking Co.*, 716 F.2d 598........................................................ 2

23

*Fonar Corp. v. Gen'l Electric Co.*, 107 F.3d 1543......................................................... 22

24

*Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368............................................... 32

25

*Gasperini v. Ctr. for Humanities*, 518 U.S. 415 .......................................................... 2

26

*Go Medical Industries Pty. Ltd. v. Inmed Corp.*, 471 F.3d 1264.................................... 33

27

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354 ..................................... 34

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3    *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, [15 L.Ed.2d 545].........................9

4    *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244.........................................48

5    *Harrington Manufacturing Co. v. Powell Manufacturing Co.*, 815 F.2d 1478 .................7

6    *Hodosh v. Block Drug Co.*, 833 F.2d 1575 (Fed. Cir. 1987), *cert denied*, 485 U.S.
        1007.......................................................................................................................18, 21
7

8    *Holmwood v. Sugavanam*, 948 F.2d 1236 .......................................................................8

9    *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 ........................................3

10   *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374......22

11   *Integra Lifesciences I, Ltd. v. Merck KGaA*, Case No. CV.96 CV 1307-B(AJB),
        2004 WL 2284001, 6 .........................................................................................33, 45

12   *KSR v. Teleflex Inc.*, 127 S.Ct. 1727 ................................................... 1, 10, 13, 14, 50

13   *Lucent Techs. Inc. v. Gateway, Inc.*, 509 F.Supp.2d 912 ..................................................33

14   *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517
        U.S. 370..................................................................................................................2
15

16   *Maxwell v. Kmart Corp.*, 880 F.Supp. 1323 ......................................................................8

17   *Monsanto v. David*, 516 F.3d 1009 ...................................................................................31

18   *Newell Companies, Inc. v. Kenney Manufacturing Co.*, 864 F.2d 757 ..............................9

19   *Oak Industrial, Inc. v. Zenith Electrics Corp.*, 726 F.Supp. 1525 ...................................34

20   *Oiness v. Walgreen Co.*, 88 F.3d 1025...............................................................................33

21   *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978 .....................................9

22   *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299.......................................................17, 34

23   *Orthopedic Equipment Co., Inc. v. U.S.*, 702 F.2d 1005..................................................14

24   *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888 ........................................1, 2

25   *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342.................................10, 11

26   *Price v. Symsek*, 988 F.2d 1187 ..................................................................................14, 15

27   *Process Control Corp . v. HydReclaim Corp.*, 190 F.3d 1350 ........................................49

28   *Reading & Bates Construction Co. v. Baker Energy*, 748 F.2d 645..................................9

# TABLE OF AUTHORITIES

**Page(s)**

*Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302 (Fed. Cir. 2002) ........................ 33

*Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344 ..................... 8

*Shockey v. Arcan Inc.*, 248 F.3d 1349 ............................................................. 33

*Snyder v. Freight, Const. Gen'l Drivers, Warehousemen & Helpers, Local No. 287*, 175 F.3d 680 ........................................................................................... 33

*Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569 ........................................... 9

*Trell v. Marlee Electronics Corp.*, 912 F.2d 1443 ............................................. 37

*Unisplay S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512 ........................... 37

*Weisgram v. Marley Co.*, 528 U.S. 440 ........................................................ 2

## STATUTES

35 U.S.C. §§ 101 .......................................................................... 49

35 U.S.C. § 102 ....................................................................... 7, 8, 9

35 U.S.C. § 112 .......................................................................... 48

35 U.S.C. § 271 .................................................................... 19, 41, 42

35 U.S.C. § 282 .......................................................................... 14

Fed. R. Civ. P. 26(a)(2)(B) ............................................................... 43

Fed. R. Civ. P. 50 ........................................................................ 1

1    **I.    INTRODUCTION**

2         Similar to the Group 2 Audio trial last year, Lucent convinced the jury in this case to award

3    it *half a billion dollars* (with interest) for minor features that it never even proved anyone has ever

4    used.  As in the Audio case, it did this by conflating its narrow patent claims with something more

5    important -- MP3 technology in Audio, calendaring or form filling in this case.  Thus, as in the

6    Audio case, Lucent misused the Entire Market Value Rule to grossly inflate damages.  And, as in

7    the Audio case, this Court stands as the final bulwark against Lucent's unsupported judgment.  As

8    in the Audio case, this Court should exercise its power, and its duty, to set aside the verdict.

9         The verdict is unsupported not only because of the excessive damages, but also because

10   Lucent's patents are invalid or not infringed.  For example, it is clear that all elements of claim 19

11   of the '356 patent are described in the Datamation article, with the arguable exception of an

12   "indicator" like a cursor.  Under *KSR v. Teleflex Inc.*, 127 S. Ct. 1727 (2007), which demands

13   application of "common sense," nothing could be more obvious than using a cursor to indicate

14   where data entry will occur on a computer.  Indeed, it would be unimaginable to have a computer

15   where data just appeared in a random location when one typed.  And since *KSR* also emphasizes

16   that the exercise of *judgment* about obviousness is a matter of law for the Court when, as here,

17   there are no underlying disputes of fact, JMOL is warranted.

18        In addition, Lucent prevailed on the obviousness issue by arguing false claim constructions

19   to the jury.  It told the jury that "concurrent" means "overlapping" when the Court had expressly

20   rejected that claim construction.  It told the jury that the claims require "graphics mode" when the

21   actual claim construction was "graphical keyboard."  At a minimum, Lucent's arguing these false

22   claim constructions requires a new trial.

23        By this motion, Microsoft seeks judgment as a matter of law under Rule 50(b) and/or a new

24   trial or remittitur under Rule 59.

25   **II.   LEGAL STANDARD**

26        District courts grant JMOL if, upon the record before the jury, reasonable jurors could not

27   have reached that verdict.  Fed. R. Civ. P. 50; *Perkin-Elmer Corp. v. Computervision Corp.*, 732

28   F.2d 888, 893 (Fed. Cir. 1984).  This rule "allows the trial court to remove cases or issues from the

1  jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'"

2  *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (quoting 9A C. Wright & A. Miller, Federal

3  Practice and Procedure §2521, p. 240 (2d ed. 1995)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

4  242 (1986) ("The trial judge must direct a verdict if, under the governing law, there can be but one

5  reasonable conclusion as to the verdict.").  In deciding whether to grant JMOL on any issue after a

6  jury has returned a verdict, the trial court determines whether substantial evidence exists in the

7  record to support the jury's verdict when the correct legal standard is applied.  *Markman v.*

8  *Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

9  Substantial evidence is the quantum of evidence that reasonable jurors would accept as adequate to

10  support the finding under review.  *Perkin-Elmer*, 732 F.2d at 893.

11        In deciding a motion for a new trial, in contrast to one for judgment as a matter of law, the

12  district court has broad discretion to weigh the evidence.  *See Air-Sea Forwarders, Inc. v. Air Asia*

13  *Co.*, 880 F.2d 176, 190 (9th Cir. 1989) ("The judge can weigh the evidence and assess the

14  credibility of witnesses, and need not view the evidence from the perspective most favorable to the

15  prevailing party" in ruling on a motion for a new trial.).  "A new trial is warranted where the verdict

16  is contrary to the clear weight of the evidence and the verdict results in the miscarriage of justice."

17  *City Solutions, Inc. v. Clear Channel Communications, ,* 365 F.3d 835, 843 (9th Cir. 2004).

18        A jury's award of damages cannot be sustained where "'the amount is grossly excessive or

19  monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'"

20  *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006) (en banc).  The trial court's

21  discretion to award a new trial "includes overturning verdicts for excessiveness and ordering a new

22  trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction

23  (remittitur)."  *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 433 (U.S. 1996).  "It is indeed

24  Hornbook law that a most usual ground for a Rule 59 motion is that the damages are excessive."

25  *Id.* at 438, n.22 (internal citation omitted).  When a district court decides that a new trial should be

26  had on the issue of damages, it "may grant defendant's motion for a new trial or deny the motion

27  conditional upon the prevailing party accepting a remittitur."  *See Fenner v. Dependable Trucking*

28  *Co.*, 716 F.2d 598, 603 (9th Cir. 1983).

## III.     THE '356 PATENT[1]

### A.     No Reasonable Jury, Applying the Correct Legal Standard, Could Have Concluded that the '356 Patent Is Valid

#### 1.     Claim 19 Was Anticipated By the Foreign Exchange Front End

The '356 patent resulted from a project at Lucent's predecessor, AT&T, called Slate.  [*See* Trial Tr. XII 116:6-117:22.[2]]  Slate began when the Wall Street trading firm, Salomon Brothers, asked AT&T to help develop a touch-screen system that would allow traders to enter deal tickets into a computer on the trading floor.  By January 1984, however, nearly three years before the filing date of the Day patent,[3] another financial services firm, Chemical Bank, had developed just such a touch-screen system that provided on-screen tools that allowed its currency traders to fill out trading forms using a touch-screen computer system rather than manually on slips of paper.  [Trial Ex. AOD at 148.]  Chemical Bank's system, using "Easel" hardware and software, was called the Foreign Exchange Front End ("FXFE") and was described in an article in Datamation Magazine in January of 1984.  [*See id; see also* Trial Tr. XIII-9:11-10:10; 22:10-23:5.]

#### a.     FXFE Met Every Limitation of Claim 19

The FXFE system met every limitation of claim 19 of the '356 patent and did so years before the application that resulted in the '356 patent was filed.  Claim 19, including the Court's claim construction, reads as follows:

> A method for use in a computer having a display comprising the steps of
>
> displaying on said display a plurality of information fields,
>
> identifying for each field a kind of information to be inserted therein,
>
> indicating a particular one of said information fields into which information is to be inserted and for **concurrently displaying** [*displaying at the same time, as by a window overlaying the form*] a

---

[1] This motion renews Microsoft's previous requests for judgment as a matter of law regarding the '356 patent.  [*See* Docket Nos. ("Dkt.") 619, 711, and 720.]

[2] Unless otherwise noted, all citations to the trial transcripts, trial exhibits, trial demonstratives ("PX" and "RDX") and other miscellaneous exhibits are attached to the accompanying Declaration of John W. Thornburgh.

[3] Lucent offered no evidence at trial that the Slate project or the '356 patent was conceived or reduced to practice prior to the filing date of the patent.  Indeed, Lucent conceded prior to trial that it would not attempt to prove prior invention.  [See Dkt. 366.]  As such, Lucent is not entitled to a date of invention prior to December 11, 1986 – the date of filing of the application that led to the '356 patent.  *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986).

**predefined tool associated with said one of said fields** [*a tool specified by the system as an appropriate tool for filling in the information called for by that field*], said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least **a tool adapted to allow said user to compose said information** [*a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool*], and

inserting in said one field information that is derived as a result of said user operating said displayed tool.

[*See* Trial Exs. 2 & 7.]

There is no dispute that the FXFE system met the limitation of a method for use in a computer having a display:  As the Datamation article described, "[t]he plan employs Easel **workstations** programmed in the bank's London office.  Each workstation's **screen** is divided roughly in half vertically."  [Trial Ex. AOD at 148 (emphasis added); Trial Ex. AOE.]  Lucent argued that the Datamation article made no mention of the name "Foreign Exchange Front End;" however, the article clearly states that it describes Chemical Bank's system.  [Trial Ex. AOD at 148; *see also* Trial Tr. XIII-17:4-17:15.]

There is similarly no dispute that FXFE displayed a plurality of fields and identified the kind of information to be inserted:  "The right half [of the screen] lists key information about the current transaction, including buyer bank, seller bank, currency, exchange rate (in dollars and foreign currency), broker, bank customer, exchange location, and method of payment…When the trader touches one of these areas, a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to choose the information needed on the right…In this way, an entire transaction can be completed directly on the workstation."  [Trial Ex. AOD at 148; Trial Ex. AOE.]

All the evidence presented confirms that FXFE met the limitation of indicating a particular field.  Robert Long, the project manager and chief lead architect of the FXFE system, testified as follows:

"Q.  And what would happen when they touched the word "broker"?
A.    Effectively three things would happen.  We would **highlight** the fact that they have touched "broker" on the screens, by way of feedback…We would **highlight** the field next to the broker, ready for

4                              Case No. 07-CV-2000 H (CAB)

1     -- to receive input."

2   [Trial Tr. XIII-8:11-8:20 (emphasis added).]  There is no evidence to the contrary.

3        There was also no evidence to contradict that FXFE concurrently displayed predefined

4   tools associated with the fields and "selected from a group of predefined tools."  As the

5   Datamation article described, "[w]hen the trader touches the screen in one of these areas, a list of

6   potentially valid entries or a numeric keypad appears on the left half, inviting the user to choose

7   the information needed on the right."  [Trial Ex. AOD at 148; Trial Ex. AOE; *see also* Trial Tr.

8   XIII-19:3-19:21.]  This behavior meets the Courts construction for "concurrently displaying,"

9   namely, "displaying at the same time, as by a window overlaying the form."  [Trial Ex. 7 at 9

10  (emphasis added).]

11       In an attempt to confuse the jury, Lucent argued, contrary to the Court's claim construction,

12  that "concurrent" display requires display in a window overlaying the form.  However, a window

13  overlaying the form is just *one example* of how this limitation can be met (the meaning of "as by").

14  According to the Court's actual claim construction, "concurrently" simply requires that the tool be

15  displayed "at the same time."  Indeed, Lucent made its misleading "overlapping" argument to the

16  jury even though the Court had previously expressly rejected this construction.  At the summary

17  judgment stage, the Court stated:   "Although the Court provided the definition of concurrently

18  displaying to include the example "as by a window overlaying the form," that phrase is an example

19  of the definition of "displaying at the same time."  The Court's construction does not exclude side-

20  by-side displays…."  [Ex. '356 MSJ Order at 7 fn. 3.] This is an issue of claim interpretation (a

21  matter of law) that has been, and should be again, resolved in Microsoft's favor on JMOL.  At a

22  minimum, Lucent's arguing rejected claim constructions to the jury requires a new trial.  *See*

23  *DeMarini Sports, Inc. v. Worth, Inc*., 239 F.3d 1314, 1331 (Fed. Cir. 2001) (expert opinion at odds

24  with court's claim construction is not "substantial evidence").

25       FXFE's displayed tools further met the limitation of "predefined tools associated with said

26  one of said fields," which the Court construed to "refer[] to a tool specified by the system as a

27  appropriate tool for filling in the information called for by that field."  As the Datamation article

28  notes, "when the user hits the "broker" cell on the right, a list of broker appears on the left"  [Trial

1 | Ex. AOD at 148; Trial Ex. AOE; *see also* Trial Tr. XIII-19:3-19:21.]

2 | In addition to the "list of broker" menu of alternatives ("list of potentially valid entries"),

3 | FXFE also included composition tools: "When the trader touches the screen in one of these areas,

4 | a list of potentially valid entries ***or a numeric keypad*** appears on the left half, inviting the user to

5 | choose the information needed on the right." [Trial Ex. AOD at 148 (emphasis added); Trial Ex.

6 | AOE.]

7 | The Court construed "a tool adapted to allow said user to compose said information" to

8 | mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to

9 | compose information by pointing to the display keys of that tool." The Datamation article

10 | describes FXFE as including such tools. "For exchange rates and other numeric data, the user hits

11 | the proper cell on the right and then types in the numeric data on the keypad that appears on the

12 | left." [Trial Ex. AOD at 148; Trial Ex. AOE.] In addition, another composition tool, an on-screen

13 | keyboard, could be called up if, for example, the user did not see the option he wanted in a menu of

14 | alternatives. "A QWERTY layout can be called up on the left for entry of nonstandard or rare

15 | names – an infrequently traded currency, for example." [Trial Ex. AOD at 148; Trial Ex. AOE.]

16 | There is also no question the FXFE tools were "graphical" -- that is, they were displayed on

17 | the screen. The on-screen keyboard is shown in the photograph of FXFE that was included in the

18 | Datamation article. [Trial Ex. AOE.]

19 | Lucent again attempted to confuse the jury by misstating the Court's claim construction,

20 | contending that the claim requires "graphics mode" as opposed to "text mode." To the contrary,

21 | the Court actually construed the required "tools" to be "a graphical keyboard tool or a graphical

22 | number keypad tool," *not* "graphics mode." Microsoft's expert also explained that the term

23 | "graphical" simply means that the claim is referring to on-screen tools, such as an on-screen

24 | keypad, rather than a real, physical keypad:

25 |         To be graphical means that it needs to be pictorial. And that's
        exactly what you see here. It's a picture of a physical keyboard.
26 |         And it's displayed on the screen. So when you're talking about
        something graphical, you're talking about a pictorial representation
27 |         that's displayed on the computer screen.

28 | [Trial Tr. at XII 96:10-96:15.] As with "concurrently," this is an issue of claim construction (a

1    matter of law) that should be resolved in Microsoft's favor on JMOL.  And again, at a minimum,

2    the fact that Lucent argued false claim constructions to the jury at least requires a new trial.

3            Finally, FXFE inserted in the field information derived from using the tool.  "For instance,

4    when the user hits the "broker" cell on the right, a list of broker appears on the left; the trader then

5    hits the name of the broker to be involved in the current trade, and that information is entered into

6    the system."  [Trial Ex. AOD at 148; Trial Ex. AOE.]  Mr. Long confirmed the operation of FXFE

7    in each of these respects.  [Trial Tr. XIII-6:20-9:10]  The FXFE system met every limitation of,

8    and hence anticipates, claim 19.

9            As described next, FXFE was also prior art to the '356 patent under either 35 U.S.C.

10    § 102(b) because it was a publicly used or under § 102(g) because it was made in the United States

11    and not abandoned, suppressed or concealed.

12

13                      **b.    The FXFE Demonstration Three Years Before the Filing of the
                             '356 Patent Was a Public Use Under § 102(b)**

14            In late 1983, Mr. Long demonstrated the FXFE system and its operation to Michael Tyler,

15    a reporter from Datamation magazine.  [Trial Tr. XIII-9:11-10:10; 22:10-23:5.]  Mr. Long testified

16    that FXFE was originally developed at Chemical Bank's offices in the United Kingdom, but was

17    brought to the United States for the demonstration to the press.  [*Id.* at 2:9-2:20.]

18            A patent claim is invalid if "the invention was ... in public use ... in this country, more than

19    one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b);

20    *Baxter Intl, Inc. v. COBE Laboratories, Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996) (affirming

21    summary judgment based on a use of invention in view of others "who were under no duty to

22    maintain it as confidential").

23            The FXFE demonstration was made without any agreement or expectation of

24    confidentiality.  [*See* Trial Tr. XIII-9:11-10:10; 31:5-32:10.]  To the contrary, expectation was that

25    Mr. Tyler would write an article for publication in Datamation magazine.  A demonstration to a

26    reporter without any confidentiality obligations constitutes a public use under §102(b).  *Harrington*

27    *Mfg. Co. v. Powell Mfg. Co.,* 815 F.2d 1478, 1479-80 (Fed. Cir. 1986) (finding that the

28    demonstration of a prototype of an invention to a journalist under no promise of secrecy who then

1  published an article constituted a public use); *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325,

2  1334 (Fed. Cir. 2005) (reversing a finding of validity under section 102(b) where the invention had

3  been demonstrated to two individuals without limitation, restriction or obligation of secrecy).

4         Thus, the demonstration of FXFE, made without any requirement of confidentiality, was a

5  public use under § 102(b).

6

7            **c.**     **FXFE Was Made in the United States and Was Not**
                     **"Abandoned, Suppressed, or Concealed" Under § 102(g)**

8         A patent claim is also invalid if "before such person's invention thereof, the invention was

9  made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35

10  U.S.C. § 102(g); *Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350

11  (Fed. Cir. 2001). Bringing the FXFE system to the U.S. for a demonstration also satisfies "this

12  country" under § 102(g). *Holmwood v. Sugavanam*, 948 F.2d 1236, 1238-40 (Fed. Cir. 1991)

13  (finding that the testing of a product in the United States was sufficient to meet the requirements of

14  102(g)); *Maxwell v. Kmart Corp.*, 880 F. Supp. 1323, 1334 (D. Minn. 1995).

15         Lucent argued that FXFE was abandoned by Chemical Bank because it did not become a

16  commercial product. As an initial matter, Mr. Long testified that Chemical Bank developed FXFE

17  for internal use and went into production with a version of FXFE that did not include the touch-

18  screen (not required for claim 19). [*See* Trial Ex. AOD; *see also* Trial Tr. XIII-4:17-4:23.]

19  Additionally, one "may seek to avoid a determination of abandonment by showing that he or she

20  marketed or sold a commercial embodiment of the invention or described the invention in a

21  publicly disseminated document." *Checkpoint Systems, Inc. v. U.S. Intern. Trade Com'n*, 54 F.3d

22  756, 762 (Fed. Cir. 1995). It is undisputed that FXFE was described in Datamation Magazine in

23  January of 1984 and that the issue in which it appeared was distributed to Datamation's nationwide

24  readership of approximately 100,000 subscribers. [*See* Trial Ex. AOD; *see also* Trial Tr. XII

25  120:8-120:13.]

26         Thus, FXFE is prior art under § 102(g) in addition to being prior art under § 102(b).

27

28

**2.    The Asserted Claims Are Invalid In Light of the Datamation Article Describing the Foreign Exchange Front End**

**a.    Claim 19**

All elements of claim 19 are anticipated by the FXFE system, as described above.  In addition, regardless of whether the FXFE *system* was invalidating, the 1984 Datamation *article* describing the FXFE system alone invalidates claim 19.  This article, published more than a year before the '356 patent was filed, is itself printed publication prior art under § 102(b).[4]

The question of obviousness requires analysis of the familiar Graham factors: the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and secondary considerations, otherwise known as objective indicia of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).[5]

The Datamation article describes every element of claim 19, with the arguable exception of the "indicating" limitation.  However, the Datamation article did disclose indicating because the photograph of the FXFE screen in the Datamation article shows an on-screen button that is highlighted to indicate that it has been selected.  [*See* Trial Ex. AOE.]  This disclosure of "indicating" is sufficient for anticipation (through the principle of inherency).  At a minimum it is sufficient for obviousness.

---

[4] In a clear attempt to mislead the jury, Lucent made much of the fact that Microsoft did not have a physical machine or source code to show the jury, but relied instead on the Datamation article.  This is directly contrary to § 102(b).  It is also not surprising that prior art to the expired Day patent – a patent that was filed more than 20 years ago in 1986 – is not readily available.  Regardless, claims 19 and 21 are method claims and their methods are clearly disclosed by the Datamation article.  For the purposes of an obviousness analysis, it is also immaterial whether the disclosure of the Datamation article was enabling.  Under § 103, a reference need not be enabling; it qualifies as a prior art, regardless, for whatever is disclosed therein.  *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578, (Fed.Cir.1991); *Reading & Bates Constr. Co. v. Baker Energy*, 748 F.2d 645, 652 (Fed.Cir.1984).

[5] As for secondary considerations, Lucent waived this issue by not arguing it at trial.  Lucent introduced no evidence that there are any secondary considerations supporting non-obviousness and no evidence of any nexus between any such considerations and its claimed invention.  *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 991 (Fed. Cir. 2006) (patentee must show "nexus" between secondary considerations and claimed invention).  Lucent bore the burden of coming forward with evidence to establish secondary considerations.  *Id.* (upholding summary judgment of invalidity where patentee failed to meet burden of producing evidence to show secondary considerations).  It failed to do so.  Moreover, as in this case where the underlying obviousness of the claimed combination is clear, secondary considerations cannot change the outcome.  *E.g.*, *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 -769 (Fed. Cir. 1988) (affirming summary judgment and finding strong case of obviousness even after taking into account the secondary considerations).

1    "The combination of familiar elements according to known methods is likely to be obvious

2    when it does no more than yield predictable result." *KSR,* 127 S. Ct. at 1739.  A person of skill in

3    the art[6] would have known that the user needed feedback to confirm which field had been selected.

4    [Trial Tr. at XIII-18:18-19:2.]  Mr. Long acknowledged that the inclusion of such feedback was

5    "absolutely common" in 1984.  (*Id.*)[7]  Indeed, every computer user knows that a computer must

6    somehow indicate where input will go (e.g., with a cursor).  Omitting such an indicator -- e.g.,

7    having data appear at a random location when the user types -- would be contrary to all experience.

8    In other words, because **common sense** demands an indicator, the required indicator is obvious.

9    *KSR*, 127 S. Ct. at 1742 ("it is likely the product not of innovation but of ordinary skill and

10   common sense"); *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H Patrick Co*., 464 F.3d

11   1356, 1367 (Fed. Cir. 2006) ("Our suggestion test is in actuality quite flexible and not only

12   permits, but requires, consideration of common knowledge and common sense").

13       In addition, to find obviousness, the Court must simply find that there was (1) a reason to

14   combine, and (2) a reasonable expectation of success in doing so.  *PharmaStem Therapeutics, Inc.*

15   *v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).  Here, the reason to combine an indicator

16   with the other elements in the Datamation article is clear -- the user needs some indication where

17   her input will go.  And of course a programmer would have every expectation of being able to

18   successfully program such an indicator, since indicators (such as cursors) had been used in

19   computers from the very beginning.

20       Finally, it must be emphasized that obviousness is a legal issue.  Where, as here, there are

21   no genuine disputes about material historical facts, exercise of **judgment** about obviousness is for

22   the Court.  *KSR*, 127 S. Ct. at 1742-43, 1745-46 (2007) (finding obviousness as a matter of law

23

24       [6] Lucent's expert did not offer an opinion regarding the qualifications of a person of ordinary
skill in the art of the '356 patent.  As such, it is undisputed that the person of ordinary skill in the

25   art of the '356 patent "would have had a degree in either computer science or electrical engineering
or some equivalent and would have had two to three years of experience working with data

26   arrangements such as what's described in the '356 patent."  [Trial Tr. XII 139:1-139:6.]  It is also
not disputed that Lucent's expert does not have the identified qualifications.  [Trial Tr. V-36:6-
36:10.]

27       [7] Mr. Long testified that FXFE did, in fact, "indicate[] a particular one of [the] information
28   fields into which information [was] to be inserted," and it is not disputed that the prior art software
J.K. Lasser's Your Money Manager, described below, includes a blinking cursor that similarly
"indicates" the active.  [Trial Ex. 7; Trial Tr. XII 153:4-153:15.]

1   over a contrary expert opinion); *PharmaStem*, 491 F.3d at 1347, 1350, 1359-67 (Fed. Cir. 2007)

2   (reversing denial of JMOL and finding obviousness as a matter of law).  Thus, this Court should

3   enter JMOL of obviousness.

### b.     Claim 21

5        Claim 21 is obvious in light of the Datamation article alone or in combination with United

6   States Patent No. 4,757,549 to Machart.  [Trial Ex. AZK.]  Claim 21 is dependant on Claim 19 and

7   adds the following limitation: "the step of displaying said pattern includes the step of displaying

8   one or more of said fields as a bit-mapped graphics field."  [Trial Ex. 2.]  The Court construed "bit-

9   mapped graphics field" to refer to "a field into which a user is to enter information by writing on a

10  touch sensitive screen using a stylus."  [Trial Ex. 7 at 9.]

11       The Datamation article describes FXFE's touch-screen as one that can accept input from a

12  stylus and has significantly high resolution that it can replace digitizing tablets.  "Resistive

13  membrane touch panels, however, offer significantly higher resolutions to the point where they can

14  replace digitizing tablets.  Easel's touchable resolution is 960 by 720…."  [Trial Ex. AOD at 148;

15  Trial Ex. AOE.]  "[R]esistive membrane techniques can accept a finger, a pen, or any other

16  device…."  [Trial Ex. AOD at 148, emphasis added.]  Thus the Datamation article renders claim

17  21 obvious.  In addition, if an express disclosure of ***handwriting*** (rather than merely accepting

18  input) were needed by one of ordinary skill in the art, it would have been obvious to combine the

19  teachings of the Datamation article with those of the Marchart patent which discloses capturing

20  handwriting.  [Trial Ex. AZK; *see also* Trial Tr. XII 142:4-143:4.]  Both claims 19 and 21 are

21  rendered obvious by the Datamation article.[8]

### 3.     The Asserted Claims Are Obvious In Light of J.K. Lasser's Your Money Manager Software

24       One of the products accused of infringement is Microsoft Money – a personal finance

---

26  [8] In addition, should the Court reach different results with respect to claims 19 and 21, remittitur or new trial on damages would be required since three Microsoft products were accused of infringing claim 19, but only Pocket PC was accused of infringing claim 21.  Pocket PC constituted only approximately 8% of the total units accused of infringement and, with an average actual sales price of $15.37, constituted only approximately 3% of the total revenue attributable to the accused products.  [PX6416; PX6418; PX6420; PX6424; PX6426; PX6428; PX6431; PX6433; PX6435.]

1  management program.  Lucent does not dispute that long before the filing date of the '356 patent,

2  another personal finance management program for use on IBM personal computers and compatible

3  computers ("IBM PC's") was on sale.  J.K. Lasser's Your Money Manager software ("YMM")

4  was on sale by March of 1985 – more than an year and a half before the application that led to the

5  '356 patent was filed.

6      It is undisputed that Your Money Manager discloses every limitation of claim 19 with the

7  arguable exception of the composition tool.  Yet Lucent's own expert admitted that the claimed

8  composition tool "seems obvious . . . because it's obvious."  [Trial Tr. V-63:10-63:20.]  In

9  addition, the particular composition tool described by the '356 patent would be an obvious

10  modification of YMM.  YMM *includes* an on-screen calculator – it displays an image on the

11  screen that represents a calculator and displays representations of keys for the numbers 0-9 which

12  the user can use to compose numbers.  [Trial Tr. XII 154:3-154:22.]  Rather than "pointing to"

13  those display keys, the user of the YMM on-screen calculator operates it by pressing the number

14  keys on the physical keyboard.  As the user types numbers on the physical keyboard, the numbers

15  on the displayed image change color and each number is entered into a display field on the

16  calculator, much like they would be on a physical calculator.  Thus the user composes a larger

17  number using the digits 0-9.  When the composition is complete, it is then inserted into the Amount

18  field in the Check Entry form.  [*Id.*]

19      It would have been a straightforward programming task to modify YMM in any of a variety

20  of ways to allow the user do this composition, as the Court's construction requires, "by pointing to

21  the display keys of that tool."  [Trial Ex. 7.]  The'356 patent itself explicitly defines the term

22  "points to" and *includes* in the definition the use of the physical keyboard:

23          The term 'points to' and the variants of that term as used herein is
           meant to include other terms *that are understood by the art* and
24          which define similar functions.  For example it includes such notions
           as moving a screen cursor to the location of the displayed text or to
25          an entry in a menu of entries and operating, for example, an enter
           key; as "touching" the screen as one would touch the touch screen 16
26          of panel 15; or *even as identifying particular displayed text or menu
           of entries using terminal buttons, for example, computer keyboard
27          buttons.*"

28  [Trial Ex. 2 at col. 3:23-3:33.]  Other YMM tools are operated by the user pointing to them.  For

1   example, the user may point to an individual entry in the Code List – which Lucent does not deny

2   is a menu of alternatives – by navigating up and down the list using the arrow keys on the physical

3   keyboard.  As the user does so, the current selection is highlighted.  It would have been obvious to

4   one of ordinary skill in the art of the '356 patent to modify the on-screen calculator to operate in

5   this manner and doing so would have provided a more uniform user experience – all of the tools

6   would operate in a similar manner.  [Trial Tr. XII 156:15-157:1.]  This would have met the

7   patent's definition "pointing to," in that it constitutes "identifying particular displayed text or menu

8   of entries using terminal buttons, for example, computer keyboard buttons."  [*Id.*]

9           Moreover, given the industry trend toward computer mouse-driven interfaces, it would

10  have been obvious to modify YMM for use with a computer mouse.  [Trial Exs. AJO, AJV, AJW,

11  AJX, AJY, and AJZ.]  The Code List menu of alternatives tool in YMM worked with a mouse;

12  scrolling up or down with a mouse caused the highlight designating the current selection to move

13  up or down the list.  [Trial Tr. XII-156:15-157:1.]  It would have been a straightforward

14  programming task to add that same functionality to the on-screen calculator.  Again, doing so

15  would have created a more uniform user experience and there was certainly a reason to provide

16  additional mouse functionality given the trend in software programs during the year and a half

17  between March of 1985 and December of 1986 when the '356 patent application was filed.  [Trial

18  Tr. XII 159:22-160:22.]  In other words, there was a clear reason to combine under *KSR*.

19          It also would have been a straightforward programming task for one of ordinary skill in the

20  art of the '356 patent to modify YMM in either of these ways to allow the user to use the on-screen

21  calculator by "pointing to the display keys of that tool."  [Trial Tr. XII 156:15-158:1.]  In other

22  words, there was at least a reasonable expectation of success under *KSR*.

23          There were also other software programs available at the time that included calculators that

24  were operated in exactly the manner required by the claim construction.  Composition tools that

25  were operated by "clicking" on their display keys with a mouse included the on-screen calculator

26  in Microsoft's own Windows version 1.01.  Windows was written for the very same IBM PCs that

27  Your Money Manager was written for, and Lucent does not dispute that it included a composition

28  tool, also an on-screen calculator, that was operated using a mouse by "clicking" on its display

1    keys.  [Dkt. 83-18; Trial Tr. XII 157:8-159:1.]

2           As was explained above, there is no requirement that an invalidating system run in

3    "graphics mode."  YMM's calculator appears on the screen as a picture, so it is "graphical."  In

4    addition, even if "graphics mode" were required, that is met by Windows 1.01.  DOS computers

5    are capable of running in either text mode or graphics mode, and Windows ran in graphics mode.

6    [Trial Tr. XII 207:15-207:20.]  YMM and Windows both ran on the DOS operating system – the

7    same operating system that the '356 patent recommends.  [Trial Ex. 2.]  A person of ordinary skill

8    in the art would have been motivated to combine the teachings of software programs written for

9    the same hardware and the same DOS operating system.  [Trial Tr. XII 159:22-161:9.]

10          Lucent's expert has no experience in programming for DOS.  [Trial Tr. XII 162:17-163:4;

11   Trial Tr. XVII-142:11-142:17.]  Moreover, he employed the wrong standard in his obviousness

12   analysis.  He considered only whether it would have been obvious to combine the actual prior art

13   software programs – rewriting YMM to make it a Windows program – rather than whether it

14   would have been obvious to combine the ***teachings*** of the two references.  [Trial Tr. XVII-123:19-

15   124:8.]  Lucent's expert's assertions regarding such a modification of YMM are, therefore,

16   "basically irrelevant."  *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985); *Orthopedic Equipment Co.,*

17   *Inc.* v. U.S., 702 F.2d 1005, 1013 (Fed. Cir. 1983) ("Claims may be obvious in view of a

18   combination of references, even if the features of one reference cannot be substituted physically

19   into the structure of the other reference.").  "What matters in the § 103 nonobviousness

20   determination is whether a person of ordinary skill in the art, having all of the teachings of the

21   references before him, is able to produce the structure defined by the claim."  *Id.*

22          The Court should grant judgment as a matter of law of obviousness.  At the minimum, the

23   Court should find the verdict contrary to the great weight of the evidence and order a new trial. [9]

24   _____

25          [9] In addition, *KSR* calls into question the very presumption of validity, since it demonstrates
     that the PTO itself applied the wrong obviousness test to the patents-in-suit.  Had the PTO applied
26   the *KSR* test, the patents-in-suit may well not have issued.  While 35 U.S.C. § 282 does establish a
     presumption of validity, it does not mandate the "clear and convincing" burden of proof.  This
27   burden of proof could and should be altered by the courts because of *KSR*.  *See KSR*, slip op. at 22-
     23 ("We need not reach the question whether the failure to disclose Asano during the prosecution
28   of Engelgau voids the presumption of validity given to issued patents, for claim 4 is obvious
     despite the presumption.  We nevertheless think it appropriate to note that the rationale underlying
     the presumption--that the PTO, in its expertise, has approved the claims--seems much diminished

1

2

### B.     No Reasonable Jury, Applying the Correct Legal Standard, Could Have Concluded that the '356 Patent Is Infringed

3    Microsoft is not accused of directly infringing any claim of the '356 patent.  [Ex. Verdict

4   Form.]  Lucent claims only that Microsoft induces and contributes to infringement by others.  Both

5   of these types of "indirect infringement," however, require heightened proof of elements such as

6   knowledge and intent, as well as proof of direct infringement, none of which Lucent provided.

7   JMOL or at least a new trial is required.

8

9

### 1.     Since Microsoft Outlook Does Not Include a Composition Tool, It Cannot Be Used to Infringe Claim 19 or 21 of the '356 Patent

10    There is no dispute regarding the operation of the Microsoft Outlook "date-picker" on-

11   screen tool.  The date-picker is a calendar tool that a user may call up to display one monthly

12   calendar page at a time.  [Trial Tr. XII-41:19-41:24.]  Lucent's expert, Mr. Tognazzini, and

13   Microsoft's expert, Mr. Buscaino, both agree that a date is inserted into a form using the date-

14   picker by clicking once with a mouse on the particular date to be entered.  [Trial Tr. XII-104:3-

15   105:12; Trial Tr. V-83:20-84:7.]  The complete date is then inserted into the form and the date-

16   picker erased from the screen.  [Trial Tr. XII-105:7-105:12.]  If the calendar page that is displayed

17   is not the appropriate one, the user may scroll through pages until the one she wants is displayed

18   before clicking once on the displayed date.  [*See id.*; Trial Tr. V-83:20-84:7.]

19    The question facing the Court is whether the date-picker meets the composition tool

20   limitation.  [Trial Ex. 2 at claim 19.]  Microsoft Outlook cannot infringe method claim 19 or its

21   dependent claim 21 because the date-picker does not meet this limitation, which was construed to

22   mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to

23   compose information by pointing to the display keys of that tool."  [Trial Ex. 7 at 9.]  Simply put,

24   Outlook does not include an on-screen keyboard or keypad, and thus cannot infringe.  [Trial Tr.

25   XII-105:13-105:21.]

26    In addition, as its name suggests, the "date-picker" allows a user only to *pick* dates.  It does

27

28   here.").  In turn, this would require a new trial since any deviation in the burden of proof is
     presumed prejudicial.  *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed.Cir.1993).

1    not allow the user to *compose* information.  [Trial Tr. XII-104:3-105:12.]  The user can only click

2    on the date she wants.  [*Id*.]  As soon as she does so, the tool closes and the date appears

3    highlighted in the 'Start time' field.  [Trial Tr. XII-41:19-41:24.]  She cannot choose the

4    appearance of the selected date.  [*Id*.]  It is displayed as a three character weekday signifier

5    followed by the date in the following format:  dd/mm/yyyy.  [*Id*.]  The user cannot compose, for

6    example 'Wednesday March 28, 2007' or '28 Mar 07' or any other possible composition.  [Trial

7    Tr. XII-102:21-104:2.]  She is bound to the format provided.

8         The date-picker presents an array of options, from which the user can choose only one, as

9    compared to a composition tool which the user can use to input anything she wants, along with

10   some indication when she is finished composing.  Composition tools permit the flexibility that the

11   date-picker lacks.  The '356 patent describes a composition tool as follows:

12

13           The number entry tool 60 [shown in Figure 5 below] operates similar
             to a standard hand-held calculator in which the user composes a
             string of numbers by touching individual ones of the displayed

14           buttons of tool 60, for example the button labeled 0 (zero), as though
             the user were touching the number buttons on a hand-held calculator

15           or the number buttons on a computer keyboard.

16   [Trial Ex. 2 at col. 4:18-4:24 and Figure 5.]  The Enter or Enter/Skip keys, numbers 65 and 66

17   respectively in Figure 5, allow the user to signal to the system that her composition is complete.

18   (*See* Trial Ex. 2 at col. 4:30-4:40.)  A menu of alternatives, on the other hand, although more

19   limited in terms of user selection, can insert the selection and close as soon as the user has made

20   her selection, just like the date-picker.  [Trial Ex. 2 at col. 3:51-4:2.]

21         Claim 19 requires **both** a menu of alternatives tool and a composition tool.  [Trial Ex. 2.]

22   In order to infringe, an accused product must have both tool types.  [*Id*.]  The date-picker is the

23   only tool Lucent's expert identified as meeting the composition tool limitation.  [Trial Tr. VI-3:4-

24   3:8.]  But his position was equivocal.  He took the middle-ground position that the date-picker was

25   **both** a composition tool **and** a menu of alternatives.  [Trial Tr. V-231:23-233:25.]  This is

26   untenable.  The date-picker does not meet the requirement of a tool adapted to allow a user to

27   compose information, and Lucent has not identified any other tool in Outlook that meets this

28   limitation.  Therefore, Outlook cannot be used to perform the method of claims 19 or 21.

1

### 2.     Since Microsoft Windows Mobile Does Not Include a Composition Tool, It Cannot Infringe Claim 19 or 21 of the '356 Patent

The Windows Mobile keyboard is the only tool Lucent identified in the Windows Mobile operating system that it contends meets the composition tool limitation.  [Trial Tr. V-154:23-156:7.]  However, the Windows Mobile keyboard is admittedly an operating system-level tool.  [Trial Tr. VI-58:17-59:1.]  As such, the Windows Mobile keyboard does not meet the limitation of "a predefined tool associated with said one of said fields."  It is not provided by the accused calculator application which includes the appointment form with a plurality of fields.  [*Id.*]  Rather it is provided at the operating system level for use across many different applications and is not associated with any field of the plurality of fields, a point that Lucent itself has made in distinguishing prior art.  [Ex. 5/12/06 Tognazzini Report at ¶125.]

### 3.     No Specific Acts of Infringement Using Any Microsoft Product Were Proven

No evidence was presented of ***any*** use of the accused method, much less the frequency with which users perform the method.  Lucent's expert acknowledged that data can be entered without practicing the accused method – by typing out the entry in the conventional, acknowledged prior art, manner using the physical keyboard without displaying any accused on-screen tools.  [Trial Ex. 2 at col. 1:15-1:18; Trial Tr. VI-43:7-44:2.]  He further acknowledged that such user would not infringe either claim 19 or 21.  [Trial Tr. VI-43:7-44:2.]

In order to prove inducement, Lucent must prove specific acts of direct infringement.  "A patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit."  *See ACCO Brands, Inc. v. ABA Locks Mfr. C*o., 501 F.3d 1307, 1313 (Fed. Cir. 2007) (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1275-76 (Fed. Cir. 2004)). Lucent has done neither.

Because both of the asserted claims of the '356 patent are method claims, Lucent must show that users of the products performed "all of the steps of the claimed method together…."  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007).  "Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use" *See Ormco Corp. v. Align Tech., Inc*., 463 F.3d 1299, 1311 (Fed. Cir. 2006).  All

1  that Lucent has shown, however, is that the tools accused of infringing the '356 patent exist in the

2  accused products.  Lucent presented no evidence that anyone ever actually used those tools in an

3  infringing way.  Lucent also cannot show that the accused products necessarily infringe.  Because

4  Lucent did not meet its burden to show direct infringement of the '356 patent, judgment as a matter

5  of law should be granted in favor of Microsoft.

6                    **4.      Microsoft Cannot Contributorily Infringe**

7          Even Lucent's expert acknowledges that there are ways of using the accused products

8  without practicing the methods of the '356 patent.  [Trial Tr. VI-43:7-44:2.]  These admitted non-

9  infringing uses are substantial, barring contributory infringement.   Indeed, all of the accused

10  products – Microsoft Outlook, Microsoft Money, and Pocket PC/Windows Mobile – have literally

11  thousands of substantial non-infringing uses.   [Trial Tr. VI-60:6-62:1.]   And the Court must

12  properly focus the analysis on the products sold by defendant.  "[T]he thing sold must not be a

13  staple article or commodity of commerce suitable for substantial noninfringing use."  *Hodosh v.*

14  *Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987), *cert denied*, 485 U.S. 1007 (1988).

15                              **a.      Outlook**

16          It is undisputed that users can send e-mail, create to-do lists, manage contacts, and create

17  notes – all without ever opening the allegedly infringing New Appointment Form.  (Trial Tr. VI-

18  36:21-44:2.)  But users can even create new appointments without practicing the method identified

19  by Lucent as infringing.  It is undisputed that any method of creating an appointment that does not

20  make use of the date-picker tool does not infringe.  [Trial Tr. VI-43:7-44:2.]  Appointments can be

21  created directly in the calendar without using the New Appointment form at all.  [Trial Tr. XII-

22  34:22-35:21.]  And even if the New Appointment form is used, if the user simply enters dates

23  using the physical keyboard rather than the date-picker that use does not infringe as was confirmed

24  by Lucent's expert.  [Trial Tr. VI-43:7-44:2.]

25                              **b.      Money**

26          The only use of Microsoft Money that Lucent identified as infringing the methods of the

27  '356 patent is the use of the Transaction form.  [Trial Tr. V-91:12-92:7; Trial Tr. XII-106:5-

28  106:12.]  But Lucent's expert acknowledged that that very form can be filled out using the physical

1   keyboard and even Lucent acknowledges that if on-screen tools are not employed, the use does not

2   infringe.  [Trial Tr. XII-109:13-112:24; Trial Tr. VI-43:7-44:2.]  Additionally, Microsoft

3   encourages its customers to use online services which provide for downloads of transactions

4   directly from financial institutions.  [Trial Ex. 629; Trial Tr. XII-107:20-108:6.]  Downloading

5   transactions eliminates the necessity of entering them one at a time through the Transaction form

6   and thus eliminates any possibility of performance of the accused method.  [*Id.*]

### c.    Windows Mobile

8   Microsoft Windows Mobile is an operating system for use in mobile (hand-held) devices

9   such as Pocket PC's.  [Trial Tr. V-88:15-88:20; Trial Tr. XII-112:25-114:4.]  As an operating

10   system it has countless uses that do not involve the calendar application that is accused of

11   infringement.  [*Id.*; Trial Tr. V-148:6-148:22.][10]

### 5.    Microsoft Does Not Induce Infringement Because Microsoft Does Not Have the Requisite Intent

14   Microsoft does not teach its customers to practice the methods of claims 19 or 21.  Because

15   both of the asserted claims of the '356 patent are method claims, to prove inducement, Lucent must

16   show that Microsoft specifically intends for users to practice the methods of claims 19 and 21.  *See*

17   *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc).  It is not enough

18   to show that "defendants taught their customers each step of the claimed method in isolation."  *E-*

19   *Pass*, 473 F.3d at 1222.  Instead, Lucent must show that Microsoft specifically induced its

20   customers to perform "all of the steps of the claimed method together, [] in the required order."  *Id.*

21   (noting that the devices accused in *E-Pass* were "general-purpose computing devices that can be

22   used for a variety of purposes and in a variety of ways").  Lucent's only evidence of inducement on

---

24   [10] In addition, it is not even conceivable that Microsoft could contributorily infringe the '356
25   patent, given that the only claims at issue are method claims.  To contributorily infringe, a party
must supply a component of a machine or composition, or a material or apparatus for use in a
process.  35 U.S.C. 271(c).  Thus, for a method claim, all that applies is supplying a material or
26   apparatus for use in a process.  *Id.*  Microsoft does neither.  It simply provides intangible software,
which is neither a material nor an apparatus, to computer manufacturers (such as Dell) who then
27   make and sell computers.  *See AT&T Corp. v. Microsoft Corp.*, 127 S.Ct. 1746, 1755-56 (2007).  It
is only these computers that could potentially contributorily infringe the '356 patent, yet the jury
found that Dell did not infringe, making the verdict facially inconsistent, as discussed below.
28   Microsoft also objected to the jury instructions, which are inconsistent with the statute.  [Dkt. 527
at 22; Dkt. 619]  JMOL or a new trial is required.

1  the '356 patent, however, consists of general marketing materials and help files that tell customers

2  generally about the features of the accused products.  [*See, e.g.*, Trial Tr. V-137:8-138:21; Trial

3  Exs. 501, 626, 1138B, 1139B; ; Trial Tr. VI-36:13-20.]  None of these materials teach customers to

4  use the specific features accused of infringement; they certainly do not require users to perform the

5  specific acts claimed.  The supposed evidence Lucent cites does not state one way or the other how

6  users must enter data.  Users can enter dates, numbers and text in ways that Lucent admits do not

7  infringe the '356 patent, for example, by using a keyboard.  [*See id.* at 43:7-44:2.]

8        As was noted above, not only does Microsoft not teach the accused methods, but in some

9  cases Microsoft encourages its customers to use an alternative method of entering data that is not

10  accused of infringement.  For example, Microsoft encourages customers to enter information into

11  Money by downloading it over the Internet – avoiding the use of the Money Transaction form.

12  [Trial Ex. 629; Trial Tr. XII-107:20-108:6.]  Similarly, Microsoft provides tutorials that teach

13  alternative methods of selecting dates that do not involve use of the date-picker.  *[See* Trial Exs.

14  1111-1134, 1166; see also Trial Tr. XII-34:1-41:8.]  With regard to Microsoft Windows Mobile,

15  Lucent provided no evidence that Microsoft teaches users to practice the particular method of

16  entering calendar appointments that is alleged to infringe.

17

18  **6.    The Jury's Verdicts Regarding Infringement By Microsoft and Dell Are Facially Inconsistent**

19        Both Microsoft and Dell were accused only of indirect infringement on the basis of use of

20  exactly the same products.  [Ex. Verdict Form).]  Yet the jury found that Microsoft infringes and

21  Dell does not.  (*Id.*)  The only way one party could infringe and not the other is if one had

22  knowledge or intent and the other did not.  Yet that clearly is not the case here, given that the

23  purported evidence of knowledge and intent – instruction and marketing materials – was the same

24  for both parties.  [*See, e.g.,* Trial Tr. V-137:8-138:21.]  It is clear that the jury was confused about

25  the elements of indirect infringement.  For this reason alone, Microsoft is entitled a new trial.

26  **C.    Incorrect Claim Construction Substantially Prejudiced Microsoft**

27        Microsoft was substantially prejudiced by the '356 patent's overly broad claim

28  construction.  But for this broad construction, Lucent could not have asserted infringement.  The

1  term "concurrently displaying" was construed as "displaying at the same time, as by a window

2  overlaying the form." [Trial Ex. 7 at 9.] There is no question that "concurrently" means "at the

3  same time." However, as Microsoft demonstrated in its *Markman* brief, in the context of this claim

4  "concurrently" also means "automatically." [*See, e.g.*, Dkt. 1364.] Microsoft preserves its

5  position on this issue. If the Court adopts Microsoft's claim construction, at a minimum a new trial

6  is required. Lucent introduced no evidence that Microsoft's accused products infringe under

7  Microsoft's construction. [*See also* Trial Exs. 832, 1111-1134, 1136-1140, 1163-1164, 1166.]

8

9  **D.    Microsoft Is Entitled to a New Trial Because the Court's Instructions on Induced and Contributory Infringement Were Legally Incorrect[11]**

10  Lucent accused Microsoft of induced and contributory infringement for both the '295 and

11  '356 patents. [Ex. Verdict Form]. The jury instructions on these issues, however, were incorrect.

12  First, for contributory infringement, Microsoft argued that the jury instructions should state

13  that, "the **thing sold** must not be a staple article or commodity of commerce suitable for substantial

14  noninfringing use." [Dkt. 527 (Defendants' Proposed Jury Instruction 3.5); Dkt. 598 (Defendants'

15  Bench Memorandum re Jury Instructions)]. Rather than focusing on the thing sold, however, the

16  contributory infringement instruction focused the jury on whether "the component" had a

17  substantial non-infringing use. [Dkt. 636 (Order Regarding Proposed Jury Instructions); Ex. Jury

18  Instructions at no. 22.] This was legal error warranting a new trial on infringement. *See Hodosh v.*

19  *Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987). Further, Microsoft's request to have the

20  jury specify whether it found induced infringement on the one hand or contributory infringement

21  on the other was declined [Trial Tr. XI-208:4-13], and therefore it is not possible to correct this

22  error short of a new trial.

23  Second, for induced infringement, Microsoft argued during trial that the instruction should

24  focus on whether Microsoft had the intent to cause an infringement, not merely an intent to cause

25  the encouraged acts. [Dkt. 527; Dkt. 598.] The final instruction instead said that one element of

26  inducement is whether, "the person has an *intent to cause the encouraged acts*." [Dkt. 636; Ex.

27  Jury Instructions at no. 21.] This was legal error warranting a new trial on infringement. *See DSU*

28  ---
[11] This section applies to both the '356 patent and the '295 patent though it is presented here in the '356 section of Microsoft's brief.

1  *Medical Corp. v. JMS Co*., 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc).

2  **IV.    DAMAGES ON THE '356 PATENT**

3  > **A.    Lucent's Failure to Satisfy the Entire Market Value Rule with Respect to the Day '356 Patent Justifies Granting JMOL or New Trial**

4  Finally conceding that its primary damages theory of 0.5% of computer prices ran afoul of

5  the Entire Market Value ("EMV") Rule, Lucent abandoned that approach at trial and instead

6  sought 8% of the retail price of Microsoft's accused software products.  Although Lucent was

7  successful in inducing the jury to apply its requested 8%, the '356 verdict is legally flawed for

8  **exactly** the same reason that plagued its computer theory, *i.e.*, Lucent failed to satisfy the Entire

9  Market Value Rule with respect to Microsoft's software.[12]

10  > **1.    The Entire Market Value Rule Precludes a Patentee from Taxing Unpatented Functionality in a Product Where the Patented Feature Is Not the Basis for Consumer Demand**

11

12  "The entire market value rule is applicable where patented and unpatented components are

13  sold together as a functional unit 'so as to produce a desired end product or result.'" [Ex. Group 2

14  Order at 31:8-10 (quoting *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1550 (Fed. Cir.

15  1995)).]  To collect royalties based on the entire market value of a product, the patented portion

16  must be "the basis for customer demand or substantially create the value of the component parts."

17  [*Id.* at 31:11-12 (quoting *Rite Hite*, 56 F.3d at 1549); *see also Imonex Servs., Inc. v. W.H.*

18  *Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379 (Fed. Cir. 2005) ("Without any

19  evident record that the patented features were the basis for customer demand for the laundry

20  machines as a whole, the trial court properly foreclosed further evidence on this unsupported

21  theory."); *Fonar Corp. v. Gen'l Elec. Co.*, 107 F.3d 1543, 1552 (Fed. Cir. 1997) (clarifying that

22  Entire Market Value Rule may only be applied "when *the patented feature* is the basis for

23  customer demand for the entire machine.").]  Accordingly, this Court has paraphrased the Entire

24  Market Value inquiry as whether the device being considered for the royalty base would be

25  "commercially infeasible" without the patented technology.  [*See, e.g.*, Ex. Mots. *in Limine* Order

26  re '356 and '295 at 3.]

27  In this regard, it should also be recalled that, in February 2007, Microsoft and Lucent

28  _____

[12] The fact that the jury awarded a lump sum also does not change this analysis, as discussed in Section IV.B below.

1    participated in a trial on the Group 2 Audio patents where this same issue arose.  There, Lucent

2    contended the two audio compression patents-in-suit were so important to Microsoft, its computer

3    manufacturer customers, and purchasers of computers that Microsoft would have agreed to pay

4    0.5% of the purported average computer price as a royalty.  Confused by Lucent's rhetoric, the jury

5    awarded $1.53 billion, the largest verdict in the history of patent litigation.  In its post-trial

6    motions, Microsoft demonstrated that Lucent's failed to tie demand for computers to the inventions

7    of the two patents-in-suit.  In particular, Microsoft explained how the two patents did not cover

8    MP3 technology generally, but rather were just two narrow encoding/decoding techniques.

9    Ultimately, this Court agreed that "Lucent established at most that there was a desirability that

10   personal computers carry MP3 capabilities," while there was a compete "lack of evidence showing

11   the patented features . . . were the basis for customer demand and/or the substantial value of the

12   product sold."  [*See* Ex. Group 2 JMOL Order at 31:21-22, 32:11-13.]  Consequently, this Court

13   granted JMOL and a new trial on the issue of the entire market value rule.[13]  [*Id.* at 34:15-35:2.]

14            **2.**      **The Entire Market Value Rule Precludes Lucent from Taxing the**
                        **Accused Microsoft Software Programs, Which Include Thousands of**
15                      **Features in Addition to the Narrow Method of the '356 Patent**

16            Lucent's approach to the '356 patent closely resembled its effort in the Group 2 Audio trial.

17   Specifically, Lucent took an extremely narrow invention, attempted to mischaracterize and broaden

18   it to the point where the jury would confuse it with broader features and/or the product itself, and

19   then had its damages expert declare the product itself to be the appropriate "royalty base."  As with

20   the computers at issue in Audio, the accused software programs have "patented and unpatented

21   components [that] are sold together as a functional unit," but are so complex and feature-rich that

22   one cannot ascribe the entire value of any of the programs to just the '356 patented method.

23            As discussed above, claims 19 and 21 of the '356 patent are narrow method claims that

24   require the use of a combination of specific tool types to fill information fields in a computerized

25   form.  Nevertheless, Lucent's technical expert, Mr. Tognazzini, repeatedly conflated these narrow,

26   specific methods with the broader ability to use computerized forms or to use the accused

27   programs.  [*See, e.g.*, Trial Tr. V-57:21-24, 102:17-103:11, 110:8-111:2, 136:7-21, 139:15-140:7.]

28   _____
            [13] The Court also granted JMOL and/or new trial on several other issues, including a new trial
     on the issue of Lucent's 0.5% royalty rate.  [*Id.* at 42.]

1   Lucent's damages expert, Roger Smith, continued this practice during his examination, for

2   example referring at every opportunity to "form entry" and "calendaring," as if the '356 patent

3   claimed those broad abilities generally instead of merely a narrow method for using specific on-

4   screen tools.  [*See, e.g.*, Trial Tr. IX-53:7-19, 122:13-18, 126:24-127:7, 129:15-19, 133:1-3,

5   133:23-134:11.]  Mr. Smith even conflated the patented functionality with the products themselves.

6   [*See, e.g.*, Trial Tr. IX-56:4-9 (suggesting Microsoft "considered these products important"),

7   122:19-22 ("It's a patent on the use of Outlook in connection with a computer.").]  Utilizing this

8   improper focus, Mr. Smith concluded that the appropriate royalty base was the retail price of the

9   entire accused software programs.[14]

10      Despite these efforts to confuse the jury, Microsoft contrasted the narrow '356 claims with

11  the full breadth of the functionality of the accused programs.  First, on cross examination, both of

12  Lucent's experts were forced to make key concessions.  Mr. Tognazzini admitted that, to infringe,

13  one must perform the exact steps of the method claimed in the patent, not just fill computerized

14  forms.  [Trial Tr. V-203:10-204:6, 235:19-236:2; Trial Tr. VI-62:4-22.]  He also acknowledged

15  both the long list of things involved with computers and the accused software that the '356

16  inventors did not invent, such as e-mail, tracking personal contacts and tasks, or computerized

17  money management, as well as some of the many ways you can use the accused software without

18  infringing.  [Trial Tr. VI-36:17-44:6, 45:11-49:16, 60:6-24; *see also generally* Trial Tr. VI-50:17-

19  62:22.]  Moreover, Mr. Tognazzini conceded that the only tool he could identify as the

20  "composition tool" required for the '356 method was the "date picker," *i.e.*, the small, pull-down

21  calendar for picking dates for appointments and so forth.  [Trial Tr. VI-3:13-4:20.]  Mr. Smith

22  similarly conceded that the '356 patent "isn't just the ability to fill out forms" but rather is "a

23  specific method for filling out forms that requires every single limitation" of the asserted claims

24  "to be met."  [Trial Tr. IX-129:23-130:2; *see also generally* Trial Tr. IX-127:25-130:5.]  Mr. Smith

25

26  ──────────────────
    [14] In a feint inspired by the Court's overturning of the Group 2 Audio verdict, Mr. Smith
    couched his application of the royalty to Microsoft's software retail prices in a way that suggested
27  he was moving away from the Entire Market Value Rule.  [*See, e.g.*, Trial Tr. IX-45:19-46:14.]  In
    particular, he attempted to label Microsoft's software the "patented portion" of the "computer
    system" performing the infringement.  [*See, e.g.*, Trial Tr. IX-47:10-48:11.]  Irrespective of
28  Mr. Smith's characterizations, however, Lucent's application of a royalty on the price of the entire
    software program is an application of the Entire Market Value Rule at the software level.  [*Id.*]

also agreed that the only alleged "composition tool" identified by Lucent in Microsoft Outlook was the date picker. [Trial Tr. IX-129:4-131:19.] Ultimately, after admitting that the '356 method was not implicated by a number of the features of the accused products [Trial Tr. IX-132:18-134:16), Mr. Smith conceded that he had not analyzed the non-patented functionality within the accused programs, despite being obligated by the *Georgia-Pacific* factors to do so. [*Id.* at 134:17-135:12.]

During its own case, Microsoft was able to illustrate, through testimony, documents, graphics, and demonstrations, how insignificant the '356 method is compared to the full range of its products' functionality. William Kennedy, Microsoft's General Manager for the Outlook product, addressed Outlook's capabilities. First, Mr. Kennedy demonstrated the different categories of functionality within Outlook for the jury: e-mail [Trial Tr. at XII 28:3-32:22], contacts, notes, tasks [Trial Tr. XII 32:23-33:25], and calendaring [Trial Tr. XII 34:1-42:6.]. In particular, Mr. Kennedy demonstrated the date picker for the jury, as well as the many other ways a user can pick a date in lieu of using the date picker. [Trial Tr. XII 39:22-43:1.] For example, a user can type a date, such as "3/19." [Trial Tr. XII 40:2-11.] Outlook also recognizes words that a user might enter to refer to dates, such as "today," "next Monday," "third Friday in April," or the names of holidays like "Christmas." [Trial Tr. XII 40:12-41:13.] To put the date picker in technical perspective, Mr. Kennedy explained how only one half to one tenth of one percent of Outlook's eight million lines of code was related to the date picker. [Trial Tr. XII 49:21-50:5.] For practical perspective, Mr. Kennedy discussed the overall number and various levels of the features in Outlook, so many that he himself is still discovering new ones within the program after nine years of working on it. [Trial Tr. XII 55:22-56:23, 58:8-59:21.] Finally, Mr. Kennedy summarized the customer research Microsoft has performed with respect to Outlook. [Trial Tr. XII 52:13-54:23.] E-mail, is by far the most utilized aspect of Outlook, ***not*** the calendar, and many people prefer to use alternatives to electronic calendaring such as paper calendars. [Trial Tr. XII 53:6-23.] Moreover, among the thousands of usability tests Microsoft has run and the tens of thousands of suggestions Microsoft has received, Mr. Kennedy could not remember a single one regarding the date picker. [Trial Tr. XII 54:7-23.]

Microsoft's technical expert, Dale Buscaino, addressed the operation of Microsoft Money.

1  To begin, Mr. Buscaino showed that Exhibit 629, an overview of Money which Lucent's expert

2  had said promoted the ease of use of on-screen tools, actually discouraged entering data by hand in

3  favor of connecting via the Internet and allowing the Money program to download financial

4  information automatically.  [Trial Tr. XII 107:9-109:1.]  Next, Mr. Buscaino demonstrated the

5  Money program.  [Trial Tr. XII 109:2-112:24.]  In particular, Mr. Buscaino showed the jury how

6  fields could be populated with data without ever using the on-screen tools that Lucent contended

7  were necessary to perform the '356 method.  [Id.]  For example, Money automatically fills certain

8  fields with information that it expects a user will want, such as the next check number in series and

9  the current date.  [Trial Tr. XII 110:9-111:9.]  In addition, a user can always manually type the

10  information using a physical keyboard, and in many cases Money will automatically recognize and

11  finish the information, such as a payee name, so that the user will not be required to type every

12  single character.[15]  [Trial Tr. XII 111:10-112:19.]

13      While no witness demonstrated all of the functionality of Microsoft's Pocket PC product,

14  the record was clear that Pocket PC is an operating system for handheld devices.  [Trial Tr. V-

15  88:15-22, 148:14-22; Trial Tr. IX-66:23-67:1, Trial Tr. XVI-194:18-196:12.]  Thus, just as the

16  Windows operating system controls hundreds if not thousands of things going on inside a

17  computer [Trial Tr. III-62:12-22, Trial Tr. XVI-80:21-81:11; RDX531], Pocket PC manages all of

18  the functionality of the handheld device on which it is installed.  As such, using the on-screen

19  keyboard—which is provided by the operating system generally for use with any program—to fill

20  fields is just one miniscule part of Pocket PC's functionality.  [See, e.g., Trial Tr. XII 113:6-114:1.]

21      Microsoft's final witness, its damages expert Brian Napper, reiterated the disparity

22  between the narrowness of the '356 method and the broad functionality in Microsoft's products as

23  part of his own Georgia-Pacific analysis.  [See generally Trial Tr. XVI-196:24-203:17.]  In

24  particular, Mr. Napper showed the jury RDX600, which depicts where the date picker feature

25  resides within the overall framework of Outlook and Office.  [RDX600; Trial Tr. XVI-202:12-

26  203:17.)]  Given the evidence regarding the narrow nature of the '356 asserted claims on the one

27

28      [15] As discussed in detail above, Mr. Tognazzini, Lucent's own expert, conceded that using a manual keyboard to populate form fields with data would not infringe the '356 patent.  [See, e.g., Trial Tr. VI-48:2-5, 49:12-16.]

1  hand and the broad functionality of the accused software programs on the other, Lucent's effort to

2  assess a royalty on the retail price of each entire program was an improper attempt to apply the

3  Entire Market Value Rule.

4

5          **3.    Lucent Provided No Evidence that the '356 Method Was the Basis for Consumer Demand for the Accused Programs**

6          Knowing both the complexity of Microsoft's accused programs and Lucent's history of

7  attempting to confuse narrow features with their broader context to obtain exorbitant royalties, this

8  Court even expressed its own doubts prior to trial regarding Lucent's ability to satisfy its burden of

9  proof.  Specifically, at its motion *in limine* hearing, the Court noted:

10

11         On the issue of the entire market value, ***I'm highly skeptical as to the Day patent, that that's going to be able to support the basis for consumer demand***.  The rest I think -- so I'm not going to

12         exclude it, but I'm going to -- you'd have to establish it.  And recognizing that while I'm most skeptical as to Day, I have some

13         questions about the others, that at some point I'm going to have to instruct the jury as to what the measure of damages is.  And if you're saying to the – if your expert is saying, well, here's the total

14         measure of damages and the Court says, you can't get that, then that's something that hopefully you have a backup theory on.

15

16  [Ex. 2/8/08 Hrng Tr. at 160:2-13 (emphasis added).]  The Court's concerns were extremely

17  prescient: although Lucent replaced computers as its royalty base with Microsoft's own software

18  programs, Lucent's switch from .5% of entire computer sales to 8% of entire software sales was

19  simply a sleight of hand to achieve the same result.  Lucent's expert Mr. Smith conceded that he

20  (and IBM before him) chose the 8% rate to keep the end result the same.  [Trial Tr. VIII-188:20-

21  190:7; Trial Tr. IX-50:12-51:2, 51:8-15; PX6340.] In other words, while Lucent superficially

22  "changed" the base in an effort to avoid this Court's Group 2 Audio ruling, it kept the end result

23  the same by increasing the royalty rate a corresponding amount.

24          In addition, Lucent's "new" approach did nothing to fill the void of evidence regarding

25  customer demand for the narrow method of the '356 patent.  As discussed above, Lucent's expert

26  Smith was forced to admit the narrow scope of the '356 claims on cross-examination.  [Trial Tr.

27  IX-129:4-131:19, 132:18-134:16.]  But even in his direct examination, Mr. Smith was only able to

28  cite two categories of "evidence" regarding the "commercial importance" of the '356 patent, both

1   of which are easily distinguished.  [Trial Tr. IX-53:2-6.]  First, Mr. Smith repeatedly noted his

2   reliance on Mr. Tognazzini's statement that the '356 method was "central" to the accused products.

3   [Trial Tr. IX-53:7-15, 59:15-20, 66:6-13, 122:23-25, 126:15-23, 129:9-14, 132:7-15, 133:23-134:1,

4   273:6-10.]  But, when pressed on cross examination, Lucent's own expert Mr. Smith conceded that

5   the specific '356 method was ***not*** "central" to the products, but rather form filling ability ***generally***

6   was central to the products.  [Trial Tr. IX-129:15-130:5, 133:23-134:16.]  As such, Mr. Smith's

7   opinion regarding "centrality" does nothing to establish that the '356 method is the basis for

8   customer demand.

9          Mr. Smith's only other category of "evidence" about the purported "commercial

10  importance" of the '356 method consisted of testimony and documents related to marketing of the

11  accused software.  [*See, e.g.*, Trial Tr. IX-53:2-6; *see generally* Trial Tr. IX-53-62, 65-68.]  With

12  respect to Outlook, this "marketing evidence" consisted of four snippets from Microsoft employee

13  Takeshi Numoto's deposition.[16]  [*See generally* Trial Tr. IX-53:16-56:9.]  But these eleven total

14  lines of testimony said ***nothing*** about the '356 method's usage, desirability, or importance.  One

15  snippet merely confirms that Outlook is included in the Office suite and advertised as such.

16  [PX6379 (quoting Numoto deposition at 69:21-70:05).]  Another states that Outlook was included

17  in Office to create a value proposition at the suite level.  [PX6378 (quoting Numoto deposition at

18  133:24, 134:2-3).]  The final two excerpts, just like the "evidence" Lucent relied upon in the Group

19  2 Audio case, address at most calendaring ***generally*** within Outlook, ***not*** the use of the specific

20  '356 method to pick a date.  [Trial Tr. IX-53:20-56:2; PX6375 ("Q. In your experience working

21  with Microsoft Office, has Microsoft ever publicized ***the calendaring features of Outlook***? A.

22  From time to time, I believe we have.") (emphasis added); PX6377 ("Q. Does Microsoft have an

23  understanding as to whether its customers use ***the calendaring feature of Outlook***? A. I don't

24  know whether we actually have specific usage stats of how many customers use the calendaring

25  feature.  We know many customers use them, but we don't know how many or what percentage.")

26  (emphasis added).]  Not surprisingly, then, on cross examination Mr. Smith was unable to answer

27  _____

28  [16] The text of the deposition excerpts Lucent presented by video were not transcribed into the
    record, but Lucent replicated the testimony on demonstrative slides provided during Mr. Smith's
    testimony.

affirmatively the ultimate Entire Market Value question, *i.e.*, whether the '356 method is the basis

for customers purchasing Outlook:

> Q Okay. Let's break it down then to just Outlook. You've been here through the whole trial or you read the transcripts if you weren't here. And you're aware, are you not, sir, that not one witness, not one shred of evidence, not one document ever showed that anyone ever bought Outlook because it had a date picker?

> A I don't recall one way or another about that evidence quite frankly.

> Q Okay. So is your answer *you don't recall seeing any evidence that anybody anywhere at any time ever bought Outlook*, be it an equipment manufacturer or an individual consumer, bought Outlook *because it had a date picker*?

> A No. *I can agree with your statement*, but I'm not sure the relevance of it.

[Trial Tr. IX-136:16-137:4 (emphasis added).)

Lucent's "marketing evidence" regarding Microsoft Money was even more tenuous. As

with Outlook, Lucent introduced several deposition excerpts, this time from Microsoft Product

Unit Manager Russell Paul-Jones. [Trial Tr. IX-56:10-59:20.] But, once again, these five excerpts

did not discuss demand for the '356 method. Rather, Mr. Paul-Jones merely testified that

Microsoft had advertised Money as being "easy to use" and that its overall user interface had

received praise.[17] Lucent introduced a single press release regarding Microsoft Money containing

similar content. [PX5158 (stating that Microsoft Money is "[k]nown for its ease of use and

---

[17] PX6381 ("Q. You mentioned earlier that Microsoft promotes Money as being easy to use; is that right? A. Microsoft has promoted Money as being easy to use."); PX6382 ("Q. Can you give me examples of some things Microsoft said about Money and its promotional activities? A. In a direct mail, e-mail piece we might say it's easy to use. Q. Does Microsoft promote Microsoft Money has being easy to use in other types of promotional activities as well? A. Yes. It would – it has in the past been on our box material. It has been a talking point with reviewers. Those are specific examples I can recall."); PX6383 ("Q. At least however, for Microsoft Money for Windows 95 operating system Microsoft did promote the user interface of Microsoft Money; is that fair? A. This document does promote the elegant, inuitive user interface."); PX6384 ("Q. So Microsoft has promoted that Microsoft Money has a more intuitive user interface than Quicken; is that correct? A. This promotional material includes a statement by Quicken users that it has a more intuitive interface, yes. Q. In Microsoft's promotional activities Microsoft has in fact promoted its user interface, has it not? A. It has promoted particularly with respect to the Microsoft Money for Windows 95 user interface. And this document for Microsoft Money 97, the Quicken users are mentioning the intuitive interface."); PX6385 ("Q. Does Microsoft believe it's important for its products to be user friendly? A. We believe that ease of use of the features is always a factor in the design of those features.").

1  intuitive product design").]  Although Mr. Smith summarized these pieces of "marketing evidence"

2  by saying that "[t]he ease-of-use feature, the elegant user interface feature is something that

3  Microsoft promotes substantially," that conclusion was simply insufficient.  [Trial Tr. IX-61:3-8.]

4  Indeed, given that even Lucent's expert Tognazzini confirmed that ease of use needed to relate to

5  the '356 method to be relevant [Trial Tr. V-203:16-204:6] and that the '356 patent had not invented

6  form-filling or computer user interfaces [Trial Tr. V-203:20-22, VI 62:4-22], Lucent's generalized

7  "marketing evidence" did nothing to satisfy its burden to link demand for the Money program to

8  the '356 patented technology.

9       Lucent and its expert Mr. Smith provided the least "marketing evidence" with respect to

10  Pocket PC.  [Trial Tr. IX-61:9-24, 65:13-68:19.]  Mr. Smith presented a single press release, in

11  which he highlighted statements that the Pocket PC operating system included versions of Outlook,

12  Word, Excel, and Money, as well as the generic statement that "Pocket PCs offer customers the

13  best way to connect to their most essential information."  [Trial Tr. IX-65:13-66:5; PX5163.]  In

14  addition, Lucent played a single deposition excerpt from Dell Chief Technology Officer Kevin

15  Kettler.  The excerpt had nothing to do with the '356 patent whatsoever; instead, it related strictly

16  to the potential market for handheld computing devices generally.  [PX6388]  Thus, once again

17  Lucent completely failed to link demand for handheld devices or the Pocket PC operating system

18  to the '356 method.

19       Ultimately, Lucent's approach to damages in this case closely resembled the Audio case:

20  attempt to expand an extremely narrow patent by confusing it with broader functionality and the

21  products that allegedly include it, and then seek damages on the entire value of the products based

22  on evidence regarding the importance of or demand for the broader functionality or the products

23  themselves rather than the patented technology.  That Lucent sought damages on computers in

24  Group 2 and software programs here cannot alter the fact that Lucent's entire damages theory is

25  essentially a shell game.  Lucent hopes to tax unpatented functionality in products that have

26  thousands of features in order to obtain a large damages award, but the Entire Market Value Rule

27  strictly prohibits such an approach.  Damages on the entire market value of a product can only be

28  recovered where the patented technology is the basis for demand for the product, *i.e.*, the product

would be commercially infeasible without the technology.  Here, there is not a shred of evidence that Microsoft Outlook, an e-mail program that also manages a user's address book, tasks, and calendar, Microsoft Money, a money management program for organizing one's finances, or Pocket PC, an entire operating system for handheld devices, would be commercially infeasible without the narrow method of the '356 patent.  Given that Lucent's approach to damages improperly and impermissibly violated this core tenet of the Entire Market Value Rule, the jury's $357 million award is grossly excessive and against the clear weight of the evidence.  No reasonable jury, applying the correct legal standard and considering the complete lack of evidence regarding customer demand for the '356 patented method, could possibly have awarded Lucent $357 million.  Accordingly, the Court should issue JMOL or a new trial on damages.

**B.    It is Clear the Jury Applied the Entire Market Value Rule Though It Awarded a Lump Sum; If It Did Not, Its Verdict Must Be Rejected as Pure Speculation**

Although the jury labeled its '356 award a "lump sum," the $357 million amount indicates that the jury either: (1) calculated the "lump sum" by applying Lucent's proposed 8% rate to the entire price of Microsoft's software (using OEM and retail prices), or (2) calculated an approximate midpoint between Lucent and Microsoft's damages opinions.  Circumstances about the verdict indicate the former alternative is more likely, and this is a clear application of the Entire Market Rule.  Indeed, Lucent's expert Mr. Smith told the jury that one way to calculate a "lump sum" was merely to calculate the value of a running royalty, which Lucent based on the EMV of Microsoft's software.  [Trial Tr. IX-70:11-71:9.]

On the other hand, even if the jury "split the baby," the verdict still represents application of the EMV Rule because one of the inputs in the jury's average (Lucent's) was based on the EMV Rule, necessarily making the final calculation dependent on the EMV Rule and thus improper.  *See Monsanto v. David*, 516 F.3d 1009, 1017-19 (Fed. Cir. 2008) (reversing award based on averaging the differing calculations of the experts because one of the expert calculations was improperly grounded).

Moreover, if Lucent argues that the jury's lump sum is not based on EMV at all, but is rather just "made up," the law does not permit such a speculative verdict to stand.

1.    **The Verdict Amount Is Most Consistent with Applying EMV to Software Sales**

The jury's $357 million verdict does not match either party's damages number, but it is consistent with applying Lucent's 8% rate to the sales of Microsoft's software.  The jury heard on several occasions from both parties' witnesses that 85% of Microsoft's sales are to original equipment manufacturers ("OEMs"), while the remaining 15% flow through the retail channel. [*See, e.g.*, Trial Tr. IX-153:16-154:11; Trial Tr. XVI-192:10-19.]  While Lucent's experts contended royalties should be based exclusively on Microsoft's higher retail prices, Microsoft's expert argued that its actual average sales prices were more appropriate.  [*Compare* Trial Tr. IX-45:8-18, *with* Trial Tr. IX-153:7-161:22, Trial Tr. XVI-191:25-196:23.]  The jury had both sets of prices at its disposal.  [PX6420; PX6428; PX6435; RDX122; Trial Ex. IJH.]

This is significant because the verdict amount is consistent with using OEM prices 85% of the time and retail prices 15% of the time, and using Lucent's 8% rate.  Indeed, applying this method to the sales data in the record, including all of Microsoft's sales and half of Dell's, yields damages of $358,835,648, extremely close to the actual number the jury provided.  [PX6416; PX6418; PX6420; PX6424; PX6426; PX6428; PX6431; PX6433; PX6435.]

By contrast, simply averaging Microsoft's proposed lump sum of $6.5 million [Trial Tr. XVI-206:6-207:5] with Lucent's requested total running royalty of $687 million [PX6442] yields $346.75 million -- which is $10 million different than the verdict.

Thus, it is most likely that the verdict is based on applying EMV to software sales, using OEM prices 85% of the time and retail prices 15% of the time.  On the other hand, if the jury actually just split the baby between Microsoft's proposed lump sum and Lucent's running royalty, that would still be based on EMV because Lucent's number is based on EMV.  Thus, either way, the verdict is based on EMV, and the Court should grant JMOL or a new trial as discussed above.

2.    **The Verdict Amount Also Cannot Stand If It Is Just "Made Up"**

Alternatively, if the jury simply made up an amount (including by splitting the baby), that result cannot stand either.  While the jury is not bound to fully accept the damages position articulated by either party, *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005), this Court has recognized that it is of "fundamental importance to the damages

1 determination . . . that it be based on 'sound **economic and factual predicates**.'" *Integra*

2 *Lifesciences I, Ltd. v. Merck KGaA*, Case No. CV.96 CV 1307-B(AJB), 2004 WL 2284001, *6

3 (S.D. Cal. Sept. 7, 2004) (quoting *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311

4 (Fed. Cir. 2002)) (emphasis in Court's quotation). Accordingly, a damages finding must be

5 supported by substantial evidence, not be grossly excessive, and not be based on speculation and

6 guesswork. *Id.* (citing *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385

7 (Fed.Cir.2001)).

8          Merely picking a number that happens to be a midpoint between the two parties' positions -

9 - or picking another number out of thin air -- does not involve any kind of factual or economic

10 analysis, nor does it find any support in the record. *See also Go Medical Industries Pty. Ltd. v.*

11 *Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006) (affirming reduction of a royalty damages

12 award as speculative because the rate used by the plaintiff's expert was "arbitrarily pulled out of

13 the air"); *Shockey v. Arcan Inc.*, 248 F.3d 1349, 1361-64 (Fed. Cir. 2001); *Oiness v. Walgreen Co.*,

14 88 F.3d 1025, 1029-30 (Fed. Cir. 1996).

15          Thus, if the Court finds the verdict based on speculation rather than EMV, the Court should

16 still order a new trial. *See Snyder v. Freight, Const. Gen'l Drivers, Warehousemen & Helpers,*

17 *Local No. 287*, 175 F.3d 680, 689 (9th Cir. 1999). Alternatively, under the principles of remittitur,

18 the Court could also reduce the damages to $6.5 million -- the only non-EMV lump sum supported

19 by the record evidence. [Trial Tr. XVI-203:18-208:15.]

20
21          **C.      The Jury's Award of Over $357 Million Cannot Stand Given the Complete
                      Absence of Evidence that the Claimed Method Was Actually Used**

22          A new trial is warranted when a jury awards an outrageous amount not supported by the

23 evidence. *Snyder*, 175 F.3d at 689 ("Where an award of damages is 'grossly excessive or

24 monstrous, clearly not supported by the evidence, or only based on speculation or guesswork,' and

25 gives rise to an inference that 'passion and prejudice' tainted the jury's finding of liability, a new

26 trial may be in order." (citations omitted)); *Lucent Techs. Inc. v. Gateway, Inc.*, 509 F. Supp. 2d

27 912, 935 (S.D. Cal. 2007). Here, the jury's award of over $357 million is grossly excessive, not

28 based on reasonable or sound economic predicates, and contrary to common sense given the

1  complete absence of any evidence that the patented method has ever been used.

2  　　　As discussed above, Lucent must prove specific acts of direct infringement to demonstrate

3  indirect infringement.  Moreover, as even Lucent's own witnesses admitted, because both asserted

4  '356 claims are method claims, to prove direct infringement Lucent was required to show that

5  users of the products had performed all of the steps of the claimed method together.  *See, e.g.*,

6  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007); *Ormco Corp. v. Align*

7  *Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the

8  claimed process is performed, not by the sale of an apparatus that is capable of infringing use.").

9  Lucent's failure to provide any evidence of actual usage of the '356 method dooms not just its

10  proof of infringement, but also its request for damages.

11  　　　Damages for vicarious liability are available only to the extent of direct liability.  Even

12  when indirect infringement has been established, damages are still limited to the sale of products

13  actually used to directly infringe, and are not available for sales of products never used in an

14  infringing manner.  *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1372 (Fed. Cir.

15  2006).  "There can be no cognizable lost sale on which to base a damages award under the patent

16  laws without an act of infringement to warrant it."  *Id.* at 1373.  This item-by-item requirement is

17  particularly important where, as here, the accused "product" has substantial non-infringing uses—

18  meaning that direct infringement by customers is not inevitable.  In such cases, the patentee is only

19  entitled to pursue damages for actual infringing uses.  *Dynacore Holdings Corp. v. U.S. Philips*

20  *Corp.*, 363 F.3d 1263, 1275-76 (Fed. Cir. 2004) ("[The patentee] must therefore either demonstrate

21  that [the accused products] necessarily infringe the [patent], or point to a specific instance of direct

22  infringement and restrict its suit to liability stemming from that specific instance."); *see also Oak*

23  *Indus., Inc. v. Zenith Elecs. Corp.*, 726 F. Supp. 1525, 1543 (N.D.Ill. 1989) (granting summary

24  judgment for defendant to limit plaintiff's damages to cable converters shown to have practiced the

25  patented method, rather than all converters that were capable of performing the method).

26  　　　An instructive example is *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418

27  F. Supp. 2d 1021 (S.D. Ind. 2006).  There, defendant St. Jude's pacemakers were accused of

28  practicing a particular, patented method of cardioversion, a type of electrical therapy for abnormal

1    heart rhythms.  *Id.* at 1024-25.  But, the accused products had to be programmed to perform any

2    function, and therefore were equally capable of infringing and noninfringing uses.  *Id.* at 1040.

3    Relying on evidence that the accused devices were capable of infringing and that St. Jude had

4    instructed physicians how to program them to function in an infringing manner, patentee CPI

5    sought damages on all of defendant's products.  *Id.* at 1040-41.  The court refused to apply such a

6    model, however, finding that "[n]one of these facts are sufficient to impose liability (and therefore

7    damages) for every device sold."  *Id.* at 1041.  Indeed, emphasizing the "clear distinction between

8    method and apparatus claims," *id.*, the court held that "damages for infringement . . . are limited to

9    only those devices that can be shown to have executed the claimed method of cardioversion during

10   the relevant infringement period."  *Id.* at 1042.

11            Here, Lucent's "proof" is much like the plaintiff's in *Cardiac Pacemakers*.  The '356

12   patent covers only a narrow method for using on-screen tools to fill computerized forms.  While

13   Microsoft disputes that the accused products contain the required tools, even if they do, everyone

14   including Lucent's own experts acknowledge that one can use the accused products in a

15   noninfringing manner.  [Trial Tr. VI-36:17-44:6, 45:11-49:16; Trial Tr. IX-122:13-126:10,

16   126:24-127:19, 224:17-23.]  Indeed, Microsoft demonstrated to the jury multiple ways to avoid

17   infringement.  [Trial Tr. XII 39:22-43:1, 109:2-112:24.]  Accordingly, Lucent may only recover

18   for those instances of direct infringement it can actually demonstrate.  By failing to demonstrate

19   ***any*** instances of the '356 method being practiced, Lucent has forfeited its ability to recover ***any***

20   damages.  [*See, e.g.*, Trial Tr. IX-221:12-228:20 (Mr. Smith admitting he had seen no evidence of

21   actual usage of the '356 method).]

22            Given the complete absence of evidence regarding use of the '356 method, the jury's $357

23   million award is grossly excessive and against the clear weight of the evidence.  No reasonable

24   jury, applying the correct standard in the face of Lucent's failure or proof, could possibly have

25   awarded Lucent $357 million.  Put another way, even if EMV were otherwise proper in this case

26   (which it is not), Lucent failed to apply it properly in this case because it failed to justify inclusion

27   of *all* units of Microsoft's accused software when it had no evidence of the extent to which the

28   accused method had been used -- or even that it had been used at all.  Accordingly, the Court

1    should issue JMOL, a new trial on damages, or remittitur to $6.5 million (the only supported

2    damages number).

D.    **The Jury's Award of Over $357 Million Based on an 8% Royalty Rate Was**
      **Grossly Excessive in Light of the License Agreements and Royalty Rates in the**
      **Record**

5        Throughout trial, the jury was exposed to numerous licenses and pieces of financial

6    information presented by both sides.  In light of the totality of this evidence, neither the 8% rate the

7    jury apparently applied nor the overall total amount of damages was reasonable.

1.    **The Jury Could Not Reasonably Have Applied an 8% Rate**

9        As Lucent's expert, Roger Smith, readily admitted on both direct and cross-examination,

10   there were no Lucent licenses that established a rate for the '356 patent.  [Trial Tr. IX-52:3-11,

11   146:20-147:11.]  Indeed, Lucent could not point to a single license, other than its portfolio-wide

12   cross-licenses, that even included the '356 patent.  [*Id.*]  Accordingly, both sides were forced to

13   advocate their proposed royalty rate based on "comparable" licenses.

14       Mr. Smith's only documentary "support" for Lucent's proposed 8% royalty rate were two

15   licenses IBM had entered into with Dell and Gateway, respectively.[18]  [PX5140, PX5141.]  But

16   these licenses could not have formed a rational basis for the jury to apply an 8% rate in this case.

17   First and foremost, as Mr. Smith was forced to admit on cross-examination, neither IBM nor its

18   patents are involved here; the hypothetical negotiation would have involved only Lucent,

19   Microsoft, and the '356 patent.  [Trial Tr. IX-92:5-22.]  Accordingly, the IBM licenses are

20   completely irrelevant to the *Georgia-Pacific* analysis.

21       Moreover, although Mr. Smith contended that IBM's 1% policy had become an "industry

22   norm,"[19] even he admitted that the 8% rate/royalty portion had not become any kind of standard or

23   norm.  [Trial Tr. X-49:15-21.]  Indeed, although he argued that Lucent had adopted IBM's

24   licensing policy, Mr. Smith could only point to a ***single*** Lucent license that included any kind of

25   _____

26       [18] Although Mr. Smith introduced an unsigned IBM "template" license and suggested that companies other than Dell and Gateway had taken such a license [PX5172; Trial Tr. IX-246:18-247:8], the Dell and Gateway licenses are the only ones in the record.  But even if one considers

27   other, unspecified licenses into which IBM may have entered, they are plagued by the same flaws as the Dell and Gateway agreements.

28       [19] Microsoft strenuously disagrees with this characterization, which the Court also rejected in Audio.

1    "royalty portion," the 1998 Lucent-Acer agreement.  [Trial Tr. X-37:19-40:1, 43:1-16; PX5183.][20]

2    Making matters worse, the rate applied to the "royalty portion" in the Lucent-Acer license was ***not***

3    8%.  [PX5183 at LUC1127470.]  Rather, the rate was 2%, and that 2% provided rights to virtually

4    all of Lucent's patent portfolio, not just a single, narrow patent like the '356 patent.[21]  [*Id.*]

5         Even if one considers the IBM licenses with Dell and Gateway, however, facts about those

6    licenses indicate they are not appropriately comparable to the situation here.  The licenses were

7    signed in 1988 and 1990, twenty years ago and nearly a decade before the hypothetical negotiation.

8    [PX5140; PX5141.]  Nor were these licenses to just any patents.  Henry Garrana, Dell's in-house

9    counsel explained to the jury that the IBM patents were so fundamental to making a computer that

10   Dell could not have existed as a company had it not taken the IBM license.  [Trial Tr. XIII-108:20-

11   109:22.]  Accordingly, IBM had far greater negotiating leverage regarding the terms of its licenses

12   with Dell and Gateway than Lucent would have had in the hypothetical negotiation with Microsoft,

13   whose products can function and sell perfectly well without the narrow '356 method.  [*Id.*]  In

14   addition, shortly after it signed the original IBM license, but still well before the hypothetical

15   negotiation, Dell negotiated a superseding, lump sum licenses with IBM.  [PX 5142.]  And,

16   perhaps most importantly, Mr. Smith chose not to apply the actual royalty formula from the IBM

17   licenses themselves, but rather applied 8% to Microsoft's retail prices based on his belief about the

18   "intent" of those agreements.  [Trial Tr. X-44:5-49:4.]

19        Considering the lack of support for an 8% royalty rate, the jury's award applying that rate is

20   grossly excessive and against the clear weight of the evidence.  No reasonable jury could possibly

21   have awarded applied an 8% royalty rate given the evidence presented.  Again, put another way,

22   even if EMV were proper (which it is not), Lucent applied it improperly by using an unsustainable

---

23   [20] This single license is insufficient to demonstrate an established policy.  *Unisplay S.A. v.*
24   *American Electronic Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (evidence of licensing
     proposals and agreements probative but insufficient because the license scope was not
25   comparable); *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990) ("for a
     royalty to be established, it must be paid by such a number of persons as to indicate a general
26   acquiescence in its reasonableness by those who have occasion to use the invention").
27   [21] Section 2.02(a) of the 1998 Lucent-Acer license, which settled litigation between them,
     included a running royalty of $2.50 for computers including the patents at issue in their lawsuit.
28   *Id.*  In addition, section 2.02(b) of the license provided an option by which Acer could use any
     patent from the remainder of Lucent's portfolio for computers in exchange for paying 2% on the
     "royalty portion."  [*Id.*]

1   rate.  Accordingly, the Court should issue JMOL, a new trial on damages, or remittitur.

2              **2.       The Jury's $357 Million Total Is Grossly Excessive**

3              In addition to the problems with the jury applying an 8% rate, the jury's overall damages

4   award of over $357 million was grossly excessive and unreasonable in light of the evidence.

5   Indeed, the $357 million the jury awarded dwarfed the dollar figure associated with every single

6   license mentioned during trial.  For example, Lucent introduced three Microsoft licenses, one each

7   with Apple, Inprise, and Hewlett-Packard.  [PX5150-52.]  Each of these licenses provided

8   Microsoft with rights to the other company's complete portfolio of patents.  [*Id.*]  Yet, the

9   payments associated with these licenses were just $93 million, $100 million, and $80 million,

10  respectively.  [*Id.*]  Having paid $93 million to obtain rights to Apple's entire patent portfolio,

11  would Microsoft really be willing to pay Lucent over $357 million for the rights to just the narrow

12  '356 patent?

13             IBM's 1993 follow-up agreement with Dell also betrays the exorbitance of the verdict.  As

14  discussed above, Dell believed it could not exist as a company without rights to IBM's patents.

15  [Trial Tr. XIII-108:20-109:22.]  Yet, when it entered into the 1993 follow-up agreement with IBM,

16  Dell paid "only" $290 million for lifetime rights to the entire IBM portfolio.[22]  [PX5142.]  Thus,

17  according to the jury, the right to practice ***only*** the narrow '356 method is worth nearly ***$70 million***

18  ***more*** than the right to practice ***all*** of IBM's fundamental computing patents.  Such a verdict simply

19  makes no sense.

20             When all of the record evidence is considered, the jury's $357 million total is grossly

21  excessive and against the clear weight of the evidence.  No reasonable jury could possibly have

22  awarded Lucent $357 million for the narrow '356 method given the other licenses in the record.

23  Accordingly, the Court should issue JMOL or a new trial on damages.

24

25  _____

26  [22] In an effort to downplay Dell's payment to IBM, which was dwarfed by the results of his
    own "reasonable royalty analysis," Mr. Smith suggested that the $290 million reflected just the
    difference in value between IBM and Dell's patent portfolios.  [Trial Tr. IX-22:22-23:25.]  In other
27  words, Mr. Smith implied that the Dell portfolio was so valuable that the IBM portfolio, by itself,
    was worth far more than $290 million.  But Mr. Smith's suggestion was directly contradicted by
28  former Lucent licensing executive James Tierney, who testified that Lucent did not see Dell's
    patents as being particularly valuable.  [Trial Tr. VIII-29:11-30:12.]

**V.    THE '295 PATENT[23]**

    **A.    Windows XP Tablet PC Does Not Compare a Tap to a Predefined Shape and Therefore Cannot Infringe the '295 Patent**

The jury in this case found that Tablet PC Computers installed with Windows XP Tablet PC Edition Operating System infringe claim 1 of the '295 patent.[24]  [Ex. Verdict Form.]  Claim 1 of the '295 patent requires a "recognizing means" that recognizes a plurality of gestures by "comparing each said gesture to at least one predefined shape."  [Trial Ex. 1 at claim 1.]  Lucent only identified one gesture as meeting every limitation of claim 1 of the '295 patent: the tap gesture.  [Trial Tr. VII-69:5-14.]

All of the parties are in complete agreement over how the accused Tablet PC devices actually recognize a tap gesture.  Both Lucent's expert, Mr. Ward, and Defendants' expert, Dr. Kelly, testified that the Tablet PC software performs two tests to determine if a gesture is a tap – the software considers: (1) the size of the gesture (i.e., was the gesture small), and (2) the length of the gesture (i.e., was the gesture short).  [*See* Trial Tr. VI-260:1-19; Trial Tr. XIII-244:7-247:23.]  Tablet PC cannot infringe because comparing a gesture to a predefined *size* is not the same as comparing a gesture to a predefined *shape*, as required by claim 1 of the '295 patent.

The first named inventor for the '295 patent, Todd Agulnick, described the way his software recognized gestures by comparing those gestures to predefined shapes.  He stated that his software performed a "matching process" that compared gestures with "kind of an internal database of characters and their relevant features."  [Trial Tr. XIV-75:1-78:14.]  Lucent identified no such collection or database of predefined shapes in the Tablet PC software.  Indeed, Microsoft's expert showed that Tablet PC does not compare gestures to *predefined* shapes to identify tap gestures – it treats *any* shape as a tap gesture, so long as it is small and short.  [Trial Tr. XIII-249:5-23.]  Lucent's  expert never challenged that analysis.  [Trial Tr. XVII-262:21-264:10.]  Given the agreement between the experts, no reasonable jury could have concluded otherwise.

Realizing that Microsoft does not meet this claim limitation, Lucent argued for the first

---

[23]    This motion renews Microsoft's previous requests for judgment as a matter of law regarding the '295 patent.  [*See* Dkt. 619; Dkt. 711; Dkt. 720.]

[24]    Lucent listed dozens of claims of the '295 patent as asserted in the Pretrial Order, but only asserted claim 1 of the '295 patent at trial.  [Ex. Verdict Form.]  Lucent never alleged that Microsoft directly infringed the '295 patent; Lucent's theories were always limited to induced and contributory infringement.  [*Id*.]

1    time during Microsoft's case that the predefined shape of a tap is a "dot" a user *sees on the screen*

2    when they make a tap.  [*See* Trial Tr. XIV-67:15-68:24.]  Lucent repeated this argument during its

3    closing.  [*See* Trial Tr. XVIII-187:15-188:7; Trial Tr. XIX-133:23-134:25.]  This interpretation of

4    the claim language is contrary to the patent and to this Court's claim construction for several

5    reasons.  First, what the computer *shows on the screen* has absolutely nothing to do with a

6    predefined shape that a computer might use to *identify* a gesture.  The claim language says that the

7    "comparing" step is performed by the "recognizing means," which the Court defined as the

8    digitizer, not the screen display.  [Trial Ex. 6.]  Lucent's own expert agreed that the digitizer, not

9    the screen, is what actually records the series of points that make up a gesture.  [Trial Tr. VI-214:9-

10   215:1; Trial Tr. XVII-265:22-266:7.]  Moreover, there are separate, dependant claims that cover

11   what the computer actually displays on the screen.  [*See* Trial Ex. 1 at claims 5 and 6.]  Interpreting

12   the "predefined shape" in Claim 1 to cover displays would render these claims superfluous.

13         Finally, Lucent's expert admitted on cross-examination that Tablet PC does not even draw

14   a dot on the screen when a user makes a tap.  [*See* Trial Tr. XVII-267:8-21.]  Lucent could not find

15   a comparison to a predefined shape for a tap in the Tablet PC source code, and even when it tried

16   to point to a graphic on the screen, its argument was contradicted by its own expert.  No reasonable

17   jury could have found that Microsoft infringes claim 1 of the '295 patent, and the Court should

18   grant judgment as a matter of law that Tablet PC does not infringe.  Alternatively, the Court should

19   grant a new trial on infringement because of Lucent's decision to ignore the Court's claim

20   construction that the predefined shape in the '295 patent is what is recognized by the digitizer, not

21   what may be drawn on the screen.

22         **B.     As a Matter of Law, Microsoft Cannot Indirectly Infringe the '295 Patent**

23         In an Order dated March 8, 2007, the Court granted summary judgment that various stylus-

24   driven computer devices do not infringe the '295 patent because those products use front-mounted

25   rather than rear-mounted digitizers.  [*See* Ex. '295 MSJ Order.]  The Court determined that only

26   rear-mounted digitizers can infringe the '295 patent because the patent requires a stylus in contact

27   with a computer screen, not a stylus in contact with a front-mounted digitizer.  [*Id.*]  Microsoft

28   does not manufacture Tablet PC computers, and thus does not construct Tablet PC's with either

front- or rear-mounted digitizers. This is why Lucent did not accuse Microsoft of directly

infringing the '295 patent. Lucent did, however, accuse Microsoft of inducing and contributing to

infringement because, according to Lucent, Microsoft "induced" manufacturers to use rear-

mounted digitizers, and "knew" that there were no other non-infringing alternatives.

No reasonable jury could have found that Lucent proved the elements of induced or

contributory infringement. To prove inducement, Lucent must show that Microsoft specifically

intends for manufacturers to infringe the '295 patent, which means Microsoft must specifically

intend for manufacturers to use rear-mounted digitizers. *See DSU*, 471 F.3d at 1305. Similarly,

for contributory infringement, Microsoft must know that its accused product is "especially made"

or "especially adapted" for infringement. *See* 35 U.S.C. § 271(c). No reasonable jury could find

that either of these requirements is met.

Lucent's primary argument at trial was that Microsoft's hardware requirements "induce"

manufacturers to use rear-mounted digitizers, (Trial Tr. VII-2:24-3:16), yet Lucent's expert Ward

admitted that the hardware requirements do not actually state that they require rear-mounted

digitizers. [*Id*. at 59:8-60:19; Trial Ex. 749.] Instead, Mr. Ward argued that Microsoft induced the

use of rear-mounted digitizers because, in his words, the only digitizers "commercially available"

at the time that could meet the Microsoft hardware requirements (including, most importantly, the

"proximity detection" requirement) were rear-mounted. [Trial Tr. VII-59:8-60:19.]

Mr. Ward changed this testimony on cross-examination, however, when faced with his own

prior deposition testimony that he was, "aware of other digitizers which would use a front-mounted

surface and which were commercially available at the time of this patent which would also meet

the functionality requirements of providing proximity…" [*Id*. at 61:22-62:22]. Faced with a clear

inconsistency, Mr. Ward admitted on cross that there was at least one type of digitizer known in

the art as early as 1994 that was front-mounted and that could perform proximity detection, as

required by Microsoft's hardware specification. [*Id*. at 62:25-65:20]. Microsoft's hardware

requirements are agnostic about whether manufacturers should use that known technology, or any

other known technology, either front- or rear-mounted. No reasonable jury could infer "specific

intent" from this evidence. Indeed, Lucent admits that there are Tablet PC computers on the

1  market today (and since late 2007) that have front-mounted, proximity-sensing digitizers that do

2  not infringe the '295 patent.  [*Id.* at 73:11-20].  No reasonable jury could believe that Microsoft

3  "specifically intended" for manufacturers to use rear-mounted digitizers, and then in late 2007

4  somehow lost that specific intent *without changing a single hardware requirement*, especially

5  where such front-mounted digitizers were known and commercially available at least as early as

6  1994.  Similarly, no reasonable jury could find that Microsoft knew that its products had no

7  substantial non-infringing uses when there is proof that its software is used in computers with

8  front-mounted digitizers that by Lucent's own admission do not infringe the '295 patent.

9  Even beyond its uses in Tablet PC devices with front-mounted digitizers, the accused

10  Tablet PC operating system has many other substantial non-infringing uses.  It can recognize

11  dozens of gestures that Lucent did not accuse of infringement.  [See Trial Tr. VII-32:1-33:19.]

12  Even the accused tap gesture does not even allegedly infringe unless it is used in the specific way

13  that Mr. Ward described.  [Trial Tr. VI-273:2-275:13.]  For these reasons, the Court should grant

14  JMOL or at least a new trial under the great weight standard.[25]

15

16  **C.    Microsoft Is Entitled to a New Trial on Infringement Because the Jury Instruction on Means Plus Function Infringement was Legally Incorrect**

17  On April 30, 2007, the Court granted a motion *in limine* excluding all doctrine of

18  equivalents arguments for the '295 patent.  [*See* Ex. Mots. *in Limine* Order re '356 and '295.]

19  Because the '295 patent includes several means-plus-function claim limitations, this should have

20  limited Lucent to identifying structures that were, "available at the time of the issuance of the

21  claim."  *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999).  Microsoft relied

22  on this ruling in preparing for and presenting its case at trial.  Then, at the very end of trial, on

23  March 26, 2008, the Court adopted a jury instruction that expanded the scope of Lucent's means-

24  plus-function infringement theories to cover after-arising structures.  [Ex. Jury Instructions at no.

25  19.]  The Court never stated that it was overturning its prior motion *in limine* ruling excluding the

26

27  [25] In addition, similar to the '356 patent, Microsoft cannot possibly contributorily infringe the '295 patent because Microsoft's software cannot be a component of a patented invention under 35 U.S.C. § 271(c).  The accused infringers are PC users.  The "component" being supplied to them is a physical computer, and that component is being supplied by computer manufacturers, not Microsoft.  *See AT&T Corp.*, 127 S.Ct. at 1755-56.

28

1    doctrine of equivalents, and Microsoft timely objected to this new instruction. [*See* Dkt. 697.]

2          Because of this erroneous instruction, Microsoft could not point out in closing and the jury

3    could not consider the places where Lucent's expert clearly relied on after-arising structures to

4    show infringement of the '295 patent. For example, Lucent's expert admitted that Tablet PC

5    devices do not have a pen-position digitizer co-processor, as required by claim 1 of the '295 patent,

6    and that the CPU structure in the Tablet PC that Lucent accused of satisfying the pen-position

7    coprocessor structural limitation was after-developed technology. [*See* Trial Tr. VI-240:20-

8    243:10.] Because of the erroneous instruction, the jury had no chance to consider this potential

9    non-infringement argument. Microsoft is therefore entitled to a new trial on infringement where

10   the Court can either enforce its prior motion *in limine* ruling, or allow Microsoft to prepare a

11   defense to new doctrine of equivalents arguments that were previously excluded. Alternatively,

12   the Court should grant judgment as a matter of law that Microsoft does not infringe the '295 patent

13   because Lucent's infringement theory is premised on after-arising technology in violation of the

14   Court's earlier motion *in limine* ruling.

15

16        **D.    Microsoft is Entitled to a New Trial Because Mr. Ward Testified Far Beyond his Expert Report**

17         The Federal Rules require that an expert report contain "a complete statement of all

18   opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P.

19   26(a)(2)(B)(i). During his direct testimony, and over Microsoft's objection, Lucent's expert Mr.

20   Ward opined at length about his "code analysis" describing how the Tablet PC software allegedly

21   recognizes tap gestures. [*See* Trial Tr. VI-257:1-261:25.] Mr. Ward did not provide any such

22   "code analysis" in his expert report, and indeed during his deposition when he was asked whether

23   he performed such an analysis he confirmed that he did not. [Ex. Ward Depo. Tr. at 9:22-10:9 ("Q.

24   Did you determine the size and exact criteria [for detecting a tap] when you did your expert report?

25   A. From the source code? No, I did not.").]

26         Mr. Ward also testified during direct, again over Microsoft's objection, that in his opinion

27   the tap gesture in Tablet PC performed the same executable commands at both the operating

28   system and the application level, as required by the Court's construction of Claim 1 of the '295

patent. [Trial Tr. VI-273:2-275:13.] Again, Mr. Ward did not provide this opinion in his expert

report and, indeed, he said exactly the opposite: that a tap gesture performed different operations at

the operating system and application level. [Ex. 3/31/06 Ward Report at 39-40.] Mr. Ward

confirmed during his deposition that his "tap" discussion did not describe the same commands at

the operating system and application level. [Ex. Ward Depo Tr. at 197:14-198:14.] It is difficult

to understand why Lucent's expert ignored the Court's claim construction in his expert report, but

the proper remedy once he recognized this mistake was to serve a supplemental report using the

correct claim construction, not to provide new opinions for the first time during trial.

Microsoft noted its Rule 26 objections during trial, and the Court stated that it would

consider these motions at a later date. [Trial Tr. VI-257:6-258:9.] Microsoft renews that objection

now, and asks that the Court grant a new trial on infringement where it can limit Mr. Ward to the

opinions fairly disclosed in his expert reports.


### E.    Microsoft is Entitled to a New Trial Because of Erroneous Claim Constructions

Claim 1 requires, "means coupled to said computer for recognizing a plurality of said

gestures, said recognizing means including means for comparing each said gesture to at least one

predefined shape." For the corresponding structure, the Court identified a processor running

handwriting recognition algorithms described in three sources, two of which were external to the

patent. [Trial Ex. 6]. External structures, however, cannot be corresponding structures. *See Atmel*

*Corp. v. Information Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). The Defendants

raised this issue during *Markman,* but the Court rejected their arguments. [*See* Ex. 2/3/04

Markman Hrng Tr. at 252:2-272:5.] Because Lucent's entire infringement theory was premised on

Defendants' using these external structures [*see* Trial Tr. VI-254:15-261:25], Microsoft is entitled

to judgment as a matter of law that it does not infringe or, alternatively, a new trial using the

correct claim construction that excludes these external structures.

Claim 1 also requires, "second detecting means coupled to said computer for detecting a

departure of the stylus tip from the screen," and "means coupled to said computer for defining

1    termination of a gesture comprising at least one stroke in response to said departure of the stylus

2    tip." This language, properly construed, requires using proximity detection to terminate a gesture.

3    [*See* Ex. MS Claim Construction Br. at 39] Lucent failed to present evidence that Tablet PC

4    devices so use proximity detection, and in fact stated that the Tablet PC uses two alternate methods

5    for detecting termination that do not require proximity: "cursor up" and "time out" termination.

6    [*See* Trial Tr. VI-244:12-245:25.] Microsoft is entitled to judgment as a matter of law that it does

7    not infringe or, alternatively, a new trial using the correct claim construction.

8    **VI.    DAMAGES ON THE '295 PATENT**

9        **A.    The Jury's Award, Halving the Difference Between the Parties' Numbers, Was
             Likely Based on Pure Speculation**

10        At trial, Lucent and its two damages experts demanded $15.2 million in running royalties

11    on sales of Microsoft's Windows XP Tablet product for alleged infringement of the '295 patent.

12    Microsoft's expert, Brian Napper, contended that an appropriate lump sum royalty for the '295

13    patent would have been $5.5 million. The jury awarded a $10.35 million lump sum, the ***exact***

14    midpoint between the two parties' numbers. Thus, the most likely explanation is that the jury

15    merely attempted to "split the difference" when it came to the '295 patent. Unfortunately, as

16    discussed above, such a methodology amounts to nothing more than selecting a number at random;

17    without any underlying factual basis, this speculative verdict cannot stand. *Integra*, 2004 WL

18    2284001 at *6. Moreover, it makes no sense to split the difference between two expert's damages

19    amounts when one is based on past lump sum licenses not tied to units sold and the other is based

20    on a per unit royalty calculation. Whatever else may be said about "compromise" verdicts, such a

21    midpoint result here is an irrational conclusion.

22        Thus, if the Court finds that the jury intended to grant a lump sum damages award, it should

23    either remit the jury's award to $5.5 million, the highest amount supported by the evidence, or

24    order a new trial on damages.

25

26        **B.    Lucent's Failure to Satisfy the Entire Market Value Rule with Respect to the
             Agulnick '295 Patent Justifies Granting JMOL or New Trial**

27        Should the Court find that the jury's '295 verdict was somehow rooted in Lucent's running

28    royalty methodology, the Court should strike the award for violating the Entire Market Value Rule.

1    Like the '356 patent, the '295 is a narrow patent.  In fact, Lucent's own technical expert,

2   Jean Ward, conceded on cross examination that the '295 patent had not invented: notebook

3   computers, stylus input, the display, its protective layer, digitizers to sense the stylus, handwriting

4   recognition, or the idea of using simple stroke or multi-stroke gestures to control a computer.

5   [Trial Tr. VII-5:13-6:1, 8:20-23, 9:10-20, 11:11-19, 13:20-24, 16:13-16, 17:7-11.]  Rather, all the

6   '295 patent invented was the ability to recognize gestures by comparing them to a predefined

7   shape, and Lucent was only able to identify a single gesture meeting every limitation of '295

8   claim 1, the tap gesture.  [Trial Tr. VII-69:5-14.]

9    Despite these clear admissions about everything in a Tablet computer that was ***not*** invented

10  by the '295 patent, Lucent's damages expert, Roger Smith insisted that a 1% royalty should be

11  applied to the entire Tablet computer.  [Trial Tr. IX-29:8-32:14.]  Indeed, even when he was

12  confronted with Mr. Ward's concessions regarding what was not in the claims, Mr. Smith clung to

13  the idea that the '295 patent covered the entire Tablet computer.  For example, Mr. Smith testified:

14          Q Did you get kind of the sense, though, that that was the patented
            invention was the ability to have a tap that was read at the
15          operating system level the same way that it was read at the
            application system level?

16
            A Oh, no. No. I got the impression that the patent ***covered the***
17          ***tablet P.C. and the stylus activity that created gestures and so on***.

18  [Trial Tr. IX-102:1-7 (emphasis added).]   Mr. Smith made similar statements throughout his

19  testimony.  [*See, e.g.*, Trial Tr. IX-33:18-34:3, 35:25-36:6, 44:14-19, 96:3-8, 102:1-7, 107:10-13,

20  109:11-25, 112:16-23, 114:18-115:4, 237:4-7, 240:22-25.]

21          Consistent with Mr. Smith's misunderstanding, he presented "marketing evidence" that was

22  focused on aspects of Tablet computers ***other than*** the narrow '295 invention.  The most blatant

23  example was PX5206A, a Gateway advertisement for Tablet and notebook computers.  With

24  respect to the Tablet computer, the advertisement proclaims: "Type on it.  Write on it.  Write

25  directly on the screen and your notes are translated into digital text.  The top swivels for screen

26  display and with a thin and light design it goes where you go."  [PX5206A]  But this type of

27  handwriting recognition capability has nothing to do with the '295 invention; Mr. Ward conceded

28  as much.  Nonetheless, Mr. Smith testified as follows:

1

> Q Specifically does [PX5206A] refer to the -- any of the functionality that's implicated by the Agolnick [sic] patent?

2

3

> A It does. It shows in the drawing -- I guess you don't see it, but it shows that you can actually draw on the face of the tube. And it says, "Type on it, write on it. Write directly on the screen, and your notes are translated into digital text." That is the tablet P.C.

4

5 [Trial Tr. IX-35:25-36:6.]    Thus, just as it did with respect to the '356 patent, Lucent used

6 Mr. Smith to confuse the jury into thinking the '295 patent was something beyond its narrow

7 claimed use of the tap gesture at both the operating system and application levels.    PX5206A

8 makes clear that any customer demand for Tablet computers stems from handwriting recognition

9 and/or the small size of the computer, *not* the '295 patent.    The four deposition excerpts Lucent

10 played were similarly flawed in focus, addressing the desirability of handheld computers and

11 stylus input for them *generally*.    [PX6369 ("Q. Do you have an understanding as to why Microsoft

12 allows Word to receive stylus input on Tablet PCs? A. Because we think that this technology of

13 stylus input on a Tablet PC that we would call Ink is something we would want – we would want

14 for all the adopted.    And Office would want to help extend that experience to Office customers.

15 Q. What do you mean by "Ink"? A. The input on a Tablet PC with the stylus is often, in a

16 shorthand, referred to as the "Ink feature," in marketing shorthand."); PX6370 ("Q. Why does

17 Microsoft promote the fact that Outlook 2002 enables users to utilize Tablet PC's Ink feature?

18 A. Being able to support our customers in – in sort of broad information-worker-type scenarios

19 when they're mobile, maybe with a portable computer like a Tablet PC, is definitely a scenario

20 that we're interested in. Q. Why is Microsoft interested in that type of scenario? A. Because we

21 that that to support – better tool support for our customers working in more mobile scenarios is

22 something that we're increasingly seeing."); PX6371 ("Q. Well, let me ask it this way: Why did

23 Dell choose to sell handheld devices that included a Stylus? A. The – assuming your definition of

24 Stylus again, just so we're clear on this is the notion of a pencil-like device being used with a

25 touch screen, the – that feature and function was one that had been developed as part of PDA

26 architectures and that's one that customers were looking for as a means to input into devices; it

27 was a common means at the time and it was a desired feature by customers."); PX6372 ("Q. Do

28 you know why Dell chose to enter the handheld market? A. The time we were reviewing customer

1   requirements in this space we anticipated a significant – significant demand moving forward for

2   handheld devices.  When I say 'significant,' significant is a relative statement; significant relative

3   to where it was at that time and place.  We made a decision to go ahead and move into this

4   marketplace based on customer requests.  At that time there was also competitive products in the

5   marketplace from HP and Compaq in that space as well.").]  Taken together, **none** of Lucent's

6   "marketing evidence" provided any indication that the '295 patent was the basis for customer

7   demand, whether that be for Microsoft's XP Tablet operating system or the Tablet computers on

8   which it was designed to run.

9       In light of this evidence, the jury's verdict is grossly excessive and against the clear weight

10  of the evidence.  No reasonable jury, correctly applying the Entire Market Value Rule, could

11  possibly have awarded Lucent $10.35 million for the narrow '295 invention.  Accordingly, the

12  Court should issue JMOL or a new trial on damages.

13  **VII.    THE '226 PATENT[26]**

14      Although Microsoft prevailed on the '226 patent at trial, it also wishes to preserve an

15  alternate ground for judgment in its favor on the '226 patent:  asserted claim 12 is invalid as

16  indefinite under 35 U.S.C. §112, ¶ 2.

17      Section 112 requires that "[t]he specification shall conclude with one or more claims

18  particularly pointing out and distinctly claiming the subject matter which the applicant regards as

19  his invention."  Indefiniteness is a question of law to be determined by the court in its capacity as

20  the construer of patent claims. *See Exxon Research and Engineering Co. v. United States,* 265 F.3d

21  1371, 1376 (Fed.Cir.2001).  "The common thread in all . . . cases [involving indefiniteness] is that

22  claims were held indefinite only where a person of ordinary skill in the art could not determine the

23  bounds of the claims, i.e., the claims were insolubly ambiguous." *Halliburton Energy Servs., Inc.*

24  *v. M-I LLC,* 514 F.3d 1244, 1249 (Fed. Cir. 2008).  The only way claim 12 makes any sense is if

25  the term "interpolated blocks" is construed to mean one thing in some instances and something

26  entirely different in other instances.  But the Federal Circuit has made it clear that multiple

27  instances of the same term in the same claim must be construed consistently, even if this renders

28

---

[26] This motion renews all of Microsoft's previous requests for judgment as a matter of law
regarding the '226 patent.  [*See* Dkts. 620 and 712.]

1  the claim "nonsensical" and invalid under 35 U.S.C. §§ 101 and 112.  *See Process Control Corp*.

2  *v. HydReclaim Corp.*, 190 F.3d 1350, 1357-59 (Fed . Cir.1999).  Accordingly, claim 12's

3  nonsensical and inconsistent use of the term "interpolated blocks" renders it invalid.

4       Claim 12 requires "a circuit responsive to coded video signals where the video signals

5  comprise… codes that describe deviations from interpolated blocks."  [Trial Ex. 3 at 6:55-66.]

6  Figure 1's encoder describes the process that creates the coded video signals, including the coded

7  video signals that comprise "deviations from interpolated blocks."  [Trial Ex. 3 at 3:49, 4:51-62.]

8  The output of averager 17 is an interpolated prediction that represents the "interpolated blocks" of

9  claim 12.  [Trial Ex. 3 at 4:47-50.]    To create the interpolation error or "deviations from

10  interpolated blocks," subtractor 43 takes the difference of the actual blocks in frame memory 16,

11  and the interpolated blocks output from averager 17.  [Trial Ex. 3 at 4:51-59.]  The output of

12  subtractor 43 represents the "deviations from interpolated blocks."  Thus, the term "interpolated

13  blocks" in the clause "deviations from interpolated blocks" means the output of averager 17.  [Trial

14  Ex. 3 at 4:49-50.]

15       The second means limitation of claim 12 requires "means responsive to said block

16  approximations and to ***said codes that describe deviations from interpolated blocks*** to develop

17  ***said interpolated blocks***." [Trial Ex. 3 (emphasis added).]  In figure 2, which describes a decoder,

18  the output of $DCT^{-1}$ 34 represents the "deviations from interpolated blocks" in the second means

19  limitations.  [Trial Ex. 3 at 5:11-19.]  And averager 32 operates in the same manner as averager 17,

20  and provides "interpolated blocks."  [Trial Ex. 3 at 5:7-10.]  But the second means element of

21  claim 12 requires that the decoder "develop said interpolated blocks" using the "deviations from

22  interpolated blocks."  And averager 32, which "develops said interpolated blocks," does not use the

23  "deviations from interpolated blocks" as an input.  So the second means element of claim 12 does

24  not consistently use the term "interpolated blocks."

25       The other interpretation of "interpolated blocks" in the second means element is also

26  inconsistent.  The other interpretation is that the output of adder 35 is the "interpolated blocks" in

27  the second means element of claim 12.  This proposal satisfies the requirement that the decoder

28  "develop said interpolated blocks" using the "deviations from interpolated blocks" because adder

1  35 uses the "deviations from interpolated blocks" as an input. But this interpretation is

2  inconsistent with the specification, which calls output of averager 32 the "interpolative prediction."

3  [Trial Ex. 3 at 4:47-50.] It is also inconsistent with the rest of claim 12 because the "deviations

4  from interpolated blocks" were never created "from" the interpolated blocks that are output from

5  adder 35.

6        The flaw in the second means limitation also sharply contrasts with the first means

7  limitation. The first means limitation explicitly uses two different terms: "approximated blocks" to

8  mean without differences, and "block approximations" to mean with differences. [See Trial Ex.3 at

9  6:61-63, Ex. `226 Markman Order at 6.] The first means limitation illustrates that the inventors

10  knew how to use different terms to represent blocks with or without deviations and thus a person of

11  ordinary skill, reading claim 12 would expect the inventors to use different terms to describe

12  interpolated blocks with deviations and interpolated blocks without deviations. Instead, the

13  inventors used interpolated blocks to mean with and without deviations so a person of ordinary

14  skill is left to wonder which interpretation was intended and what exactly is claimed.

15        Claim 12 is inconsistent, nonsensical, and thus invalid for indefiniteness.

16  **VIII.  CONCLUSION**

17        The Court should exercise its power and duty to set aside the jury's verdict on the '356 and

18  '295 patents. Among other things, this verdict cannot be sustained because the damages are

19  grossly excessive and contrary to law. EMV cannot be used because the accused features do not

20  drive the sale of Microsoft's software, and Lucent also failed to prove extent of infringing use (for

21  its royalty base) and failed to justify its high 8% rate. Liability on the '356 patent should likewise

22  be set aside because, *inter alia*, the claims are obvious under *KSR* and Lucent used the wrong claim

23  construction, both matters of law. The Court should enter JMOL on these patents in Microsoft's

24  favor, or at least order a new trial or enter a remittitur. As for the '226 patent, the jury's verdict

25  should be sustained, but the Court should enter judgment in Microsoft's favor on the additional

26  ground of indefiniteness.

27

28

1   Dated:  May 5, 2008                              FISH & RICHARDSON P.C.

2

3
                                                     By:  /s/ John W. Thornburgh
4                                                        John W. Thornburgh (SBN 154627)
                                                         thornburgh@fr.com
5
                                                     Attorney for Intervenor/Counter-claimant
6                                                    and Plaintiff/Counter-defendant
                                                     MICROSOFT CORPORATION
7   *Additional Counsel:*

8   Joseph P. Reid (SBN 211082)
9   Lara S. Garner (SBN 234701)
    Thomas Millikan (SBN 234430)
10  Fish & Richardson P.C.
    12390 El Camino Real
11  San Diego, California  92130
    Telephone:      (858) 678-5070
12  Facsimile:      (858) 678-5099

13
    Jonathan J. Lamberson (SBN 239107)
14  Fish & Richardson P.C.
    500 Arguello Street, Suite 500
15  Redwood City, CA  94063
    Telephone:      (650) 839-5070
16  Facsimile:      (650) 839-5071

17  10830841.doc

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 5, 2008 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

/s/ John W. Thornburgh
John W. Thornburgh
thornburgh@fr.com

Attorney for Intervenor/Counter-claimant
and Plaintiff/Counter-defendant
MICROSOFT CORPORATION