1   David A. Hahn (SBN 125784)
    HAHN & ADEMA
2   501 West Broadway, Suite 1600
    San Diego, CA 92101-3595
3   Telephone:    (619) 235-2100
    Facsimile:    (619) 235-2101
4
    *Attorney for Lucent Technologies Inc.*
5

6

7                   **UNITED STATES DISTRICT COURT**
                  **SOUTHERN DISTRICT OF CALIFORNIA**
8

9   LUCENT TECHNOLOGIES INC. and            Case No. 07-CV-2000 H (CAB)
    MULTIMEDIA PATENT TRUST,                consisting of matters severed from consolidated
10                                          cases:
             Plaintiffs and Counterclaim-defendants,   02-CV-2060 B (CAB)
11                                          03-CV-0699 B (CAB)
                                            03-CV-1108 B (CAB)
    v.
12
    MICROSOFT CORPORATION,                  **LUCENT'S MEMORANDUM OF POINTS**
13                                          **AND AUTHORITIES IN OPPOSITION TO**
             Intervenor and Counter-claimant,   **MICROSOFT'S COMBINED MOTIONS**
14                                          **FOR JUDGMENT AS A MATTER OF**
                                            **LAW, NEW TRIAL, OR REMITTITUR**
15
                                            **Date:        June 13, 2008**
16                                          **Courtroom:   13**
                                            **Judge:       Honorable Marilyn L. Huff**
17

18  MICROSOFT CORPORATION,

19           Plaintiff and Counter-defendant,

20  v.

21  LUCENT TECHNOLOGIES INC.,

22           Defendant and Counter-claimant,

23  LUCENT TECHNOLOGIES INC. and
    MULTIMEDIA PATENT TRUST,
24           Plaintiffs,

25  v.

26  DELL, INC.,
             Defendant.
27

28

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION .................................................................1

II.  LEGAL STANDARDS ..........................................................1

   A.   Judgment as a Matter of Law...........................................1

   B.   New Trial ..................................................................1

III. THE '356 PATENT:  VALIDITY AND INFRINGEMENT .....................2

   A.   The Jury Reasonably Found that Defendants Failed to Prove that Claims 19 and 21 of the '356 Patent are Invalid....................................2

      1.   The Jury Was Entitled to Disregard the Uncorroborated Testimony of Microsoft's Paid Fact Witness Regarding the FXFE System ...........3

      2.   Substantial Evidence Exists that FXFE Was Not Publicly Used Under §§ 102(b) or 102(g), and Was Therefore Not Prior Art....................4

      3.   The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Anticipate Claim 19. ................................................5

         a.   The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Meet the "*indicating*" Step ...........................6

         b.   The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Meet the "*inserting*" Step or Have "*information fields*" ...................................................................7

         c.   The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Have "*graphical*" Tools ...............................7

         d.   The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Meet the Step of "*concurrently displaying*"...............8

      4.   The Jury Was Reasonably Entitled to Find that Neither the FXFE System Nor the Datamation Article Rendered Obvious Claim 19 or 21 of the '356 Patent.....................................................9

      5.   The Jury Reasonably Found that YMM Did Not Render Obvious Claim 19..........................................................................10

         a.   The Jury Was Reasonably Entitled to Find that YMM did Not Have "*display keys*" or Allow for "*pointing to the display keys*" ........10

         b.   The Jury Was Reasonably Entitled to Find that YMM did Not Have "*graphical*" tools ....................................................11

c.    The Jury Was Reasonably Entitled to Find that YMM Did Not Render Claim 19 Obvious.................................................................11

B.    Lucent Presented Substantial Evidence From Which the Jury Reasonably Concluded that Microsoft Infringes the '356 Patent. .................................................12

1.    Lucent Presented Substantial Evidence that Microsoft Outlook Includes a Composition Tool......................................................................................13

2.    Lucent Presented Substantial Evidence that Windows Mobile Includes a Composition Tool......................................................................................14

3.    Lucent Has Shown Specific Acts of Direct Infringement. .............................15

4.    Lucent Presented Substantial Evidence of Contributory Infringement. ..........16

a.    Lucent Presented Substantial Evidence that Microsoft Contributes to Infringement by Supplying Microsoft Outlook............18

b.    Lucent Presented Substantial Evidence that Microsoft Contributes to Infringement by Supplying Microsoft Money and Windows Mobile....................................................................19

c.    Software is a Component, Material, or Apparatus Under 35 U.S.C. § 271(c). ...............................................................19

5.    Lucent Presented Substantial Evidence of Microsoft's Intent to Induce Infringement of the '356 Patent.................................................................20

a.    Microsoft Intends for Money to be Used in an Infringing Manner. .......................................................................22

b.    Microsoft Intends for Outlook to be Used in an Infringing Manner. .......................................................................24

c.    Microsoft Intends for Windows Mobile to be Used in an Infringing Manner...................................................................25

6.    The Jury's Verdicts Regarding Infringement by Microsoft and Dell are Not Inconsistent and Microsoft is Not Entitled to a New Trial. .....................27

C.    This Court Properly Construed the Claims of the '356 Patent and Microsoft is Not Entitled to a New Trial.........................................................................27

D.    This Court's Jury Instructions on Induced and Contributory Infringement Were Correct and Microsoft is Not Entitled to a New Trial. ...............................................28

1.    This Court's Jury Instructions Contributory Infringement Were Correct. .......28

2.    This Court's Jury Instructions on Induced Infringement Were Correct..........29

IV.    THE '295 PATENT:  INFRINGEMENT...................................................................30

    A.    Lucent Presented Substantial Evidence that Windows XP Tablet PC Compares a Tap to a Predefined Shape.......................................................................30

    B.    Lucent Presented Substantial Evidence that Microsoft Induced and Contributed to the Infringement of Claim 1 of the '295 Patent.......................................................31

        1.    Lucent Presented Substantial Evidence That Microsoft Induced Infringement....................................................................................31

        2.    Lucent Presented Substantial Evidence That Microsoft Contributed to Infringement....................................................................................32

    C.    This Court's Jury Instruction on Means-Plus-Function Infringement was Correct and Microsoft is Not Entitled to a New Trial. ...................................................34

    D.    Mr. Ward Did Not Testify Beyond His Expert Report and Microsoft is Not Entitled to a New Trial.......................................................................................35

    E.    Microsoft is Not Entitled to a New Trial Based On This Court's Claim Construction..............................................................................................36

V.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S LUMP-SUM DAMAGES AWARDS. ................................................................................................38

    A.    Substantial Evidence Supports the Jury's Damages Verdict.........................................38

    B.    The Entire Market Value Rule Does Not Justify Granting JMOL or New Trial on the Jury's Damages Verdict.......................................................................42

        1.    The Entire Market Value is Not Applicable in This Case. .............................42

        2.    Even Under Proper Application of the Entire Market Value Rule, Substantial Evidence Supports Use of the Accused Software and Computer System as the Royalty Base. .........................................................45

    C.    Damages for the '356 Patent Should Not Be Limited to the Extent to Which Lucent has Demonstrated Specific Instances of Infringement. ...................................47

    D.    A Jury Award Based On an 8% Royalty for the '356 Patent is Supported by the Evidence...............................................................................................49

    E.    The Size of the Jury's Award for the '356 Patent is Not "Grossly Excessive" Warranting Judgment as a Matter of Law, a New Trial or a Remittitur....................50

VI.    CONCLUSION........................................................................................................50

iii

1

## TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Acco Brands, Inc. v. ABA Locks Mfr. Co.*,
    501 F.3d 1307 (Fed. Cir. 2007)................................................................16

5

*Al-Site Corp. v. VSI Int'l, Inc.*,
    174 F.3d 1308 n.2 (Fed. Cir. 1999)..........................................................34

6

7

*American Seating Co. v. USSC Group, Inc.*,
    2005 WL 1224603, *5-6 ...........................................................................5

8

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
    406 F.3d 1365 (Fed. Cir. 2005).................................................................15

9

10

*Atmel Corp. v. Information Storage Devices*,
    198 F.3d 1374 (Fed. Cir. 1999)............................................................36, 37

11

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*,
    386 F.3d 1371 (Fed. Cir. 2004).................................................................5

12

13

*BJ Servs. Co. v. Halliburten Energy Servs., Inc.*,
    338 F.3d 1368 (Fed. Cir. 2003).................................................................3

14

*Black & Decker v. Bosch*,
    2006 WL 3883286, at *3 (N.D. Ill. Dec. 18, 2006)...................................47

15

16

*Bose Corp. v. JBL Inc.*,
    274 F.3d 1354 (Fed. Cir. 2001).................................................................46

17

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
    977 F.2d 1555 (Fed. Cir. 1992).................................................................39

18

19

*Budde v. Harley Davidson*,
    250 F.3d 1369 (Fed. Cir. 2001).................................................................37

20

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    418 F. Supp. 2d 1021 (S.D. Ind. 2006)....................................................48

21

22

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
    145 F.3d 1303 (Fed. Cir. 1998)........................................................22, 35, 47

23

*Construction Tech., Inc. v. Cybermation, Inc.*,
    965 F. Supp. 416 (S.D.N.Y. 1997)...........................................................20

24

25

*Corning Inc. v. SRU Biosystems*,
    400 F. Supp. 2d 653 (D. Del. 2005)..........................................................21

26

*Creo Prods., Inc. v. Presstek, Inc.*,
    305 F.3d 1337 (Fed. Cir. 2002).............................................................37, 38

27

28

*Cross Medical Prods. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005).................................................................22

*Default Proof Credit Card Sys.*,
  412 F.3d 1291 (Fed. Cir. 2005)...........................................................................37

*Dennison Manufacturing Co. v. Ben Clements and Sons, Inc.*,
  467 F. Supp. 391 (S.D.N.Y. 1979).......................................................................22

*DSU Medical Corp. v. JMS Co.*,
  471 F.3d 1293 (Fed. Cir. 2006)......................................................................20, 29

*Eli Lilly and Co. v. Barr Lab., Inc.*,
  251 F.3d 955 (Fed. Cir. 2001).............................................................................6

*Eolas Techs. Inc. v. Microsoft Corp.*,
  No. 99 C 0626, 2004 WL 170334, at *2................................................................44

*Eolas Techs., Inc. v. Microsoft Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005)..........................................................................20

*E-Pass Techs., Inc. v. 3Com Corp.*,
  473 F.3d 1213 (Fed. Cir. 2007)......................................................................16, 21

*Finisair Corp. v. DirecTV Group, Inc.*,
  Nos. 2007-1023, 2007-1024, 2008 WL 1757675 (Fed. Cir. Apr. 18, 2008) ...........................10

*Finnegan Corp. v. Int'l Trade Com'n*,
  180 F.3d 1354 (Fed. Cir. 1999).............................................................................4

*Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*,
  394 F.3d 1368 (Fed. Cir. 2005)..........................................................................39

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970).......................................................................42

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006)......................................................................15, 16

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966).........................................................................................10

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)..........................................................................45

*Harrington Mfg. Co. v. Powell Mfg. Co.*,
  815 F.2d 1478 (Fed. Cir. 1986)............................................................................5

*Hilgraeve Corp. v. Symantec Corp.*,
  265 F.3d 1336 (Fed. Cir. 2001)..........................................................................22

*Hilgraeve, Inc. v. Symantec Corp.*,
  272 F. Supp. 2d 613 (E.D. Mich. 2003)...................................................................47

*Hodosh v. Block Drug Co.*,
  833 F.2d 1575 (Fed. Cir. 1987), *cert denied*, 485 U.S. 1007 (1988)....................................18

*Imagexpo, L.L.C. v. Microsoft Corp.*,
  284 F. Supp. 2d 365 (E.D. Va. 2003).....................................................................29

v

*Imonex Services, Inc. v. W. H. Munzprufer Dietmar Trenner GMBH*,
    408 F.3d 1374 (Fed. Cir. 2005)..................................................................45

*In re Dossel*,
    115 F.3d 942 (Fed. Cir. 1997)..................................................................37

*In re Wertheim*,
    646 F.2d 527 (CCPA 1981) .......................................................................4

*Intel Corp. v. Via Techs., Inc.*,
    319 F.3d 1357 (Fed. Cir. 2003)................................................................37

*Interactive Pictures Corp. v. Infinite Pictures Corp.*,
    274 F.3d 1371 (Fed. Cir. 2001)................................................................45

*Jenkins v. Union Pac. R. Co.*,
    22 F.3d 206, 210 (9th Cir. 1994) ...............................................................2

*Johnson v. Paradise Valley Unified Sch. Dist.*,
    251 F.3d 1222 (9th Cir. 2001) ...................................................................1

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
    292 F.3d 7283 (Fed. Cir. 2002)..................................................................4

*Kemco Sales, Inc. v. Control Papers Co.*,
    208 F.3d 1352 (Fed. Cir. 2000)................................................................35

*KSR Intern. Co. v. Teleflex Inc.*,
    127 S.Ct. 1727 (2007)...............................................................................10

*LaLonde v. County of Riverside*,
    204 F.3d 947 (9th Cir. 2000) .....................................................................1

*Lewmar Marine, Inc. v. Barient, Inc.*,
    827 F.2d 744 (Fed. Cir. 1987)....................................................................6

*Linear Technology Corp. v. Impala Linear Corp.*,
    379 F.3d 1311 (Fed. Cir. 2004)................................................................21

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
    449 F.3d 1209 (Fed. Cir. 2006)................................................................22

*Lucent Techs. Inc. v. Gateway, Inc.*,
    509 F. Supp. 2d 912 (S.D. Cal. 2007)......................................................17

*Lucent Techs. Inc. v. Gateway, Inc.*,
    537 F. Supp. 2d 1095 ...........................................................4, 18, 20, 29

*Lucent Techs. Inc. v. Microsoft Corp.*,
    Case No. 06-CV-0684-H (CAB)...............................................................46

*Lummus Indus., Inc. v. D.M. & E. Corp.*,
    862 F.2d 267 (Fed. Cir. 1988)..................................................................28

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)....................................................................31

*MGM Studios Inc. v. Grokster, Ltd.,*
　　545 U.S. 913 (2005).................................................................................21

*Micro Chem., Inc. v. Lextron, Inc.,*
　　317 F.3d 1387 (Fed. Cir. 2003)...................................................................38

*Microsoft Corp. v. AT&T Corp.,*
　　- U.S - , 127 S. Ct. 1746 (U.S. 2007)...........................................................20

*Moleculon Research Corp. v. CBS, Inc.,*
　　793 F.2d 1261 (Fed. Cir. 1986).......................................................15, 16, 21

*Monsanto Co. v. Ralph,*
　　382 F.3d 1374 (Fed. Cir. 2004)...................................................................38

*Motionless Keyboard Co. v. Microsoft Corp.,*
　　486 F.3d 1376 (Fed. Cir. 2007).....................................................................5

*National Instruments Corp. v. The Mathworks, Inc.,*
　　113 F. App'x 895 (Fed. Cir. 2004)..........................................................21, 22

*Oak Indus., Inc. v. Zenith Elec. Corp.,*
　　697 F. Supp. 988 (N.D. Ill. 1988)................................................................29

*Pavao v. Pagay,*
　　307 F.3d 915 (9th Cir. 2002) .......................................................................1

*Philips Elecs. N. Am. Corp. v. Contec Corp,*
　　411 F. Supp. 2d 470 (D. Del. 2006)..............................................................48

*Philips Elecs. N. Am. Corp. v. Contec Corp.,*
　　177 F. App'x 981 (Fed. Cir. 2006).........................................................47, 48

*Philips Elecs. N. Am. Corp. v. Contrec Corp.,*
　　411 F. Supp. 2d 470 (D. Del. 2006).....................................................17, 18, 29

*Pickholtz v. Rainbow Techs., Inc.,*
　　260 F. Supp. 2d 980 (N.D. Cal. 2003) ..........................................................20

*Pierce v. Multnomah Cty.,*
　　76 F.3d 1032 (9th Cir.1996) ........................................................................1

*PPG Indus. v. Guardian Indus.,*
　　156 F.3d 1351 (Fed. Cir. 1998).....................................................................8

*Reeves v. Sanderson Plumbing Prods., Inc.,*
　　530 U.S. 133 (2000)...................................................................................1

*S3 Inc. v. nVIDIA,*
　　259 F.3d 1364 (Fed. Cir. 2001).....................................................................37

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,*
　　932 F.2d 1453 (Fed. Cir. 1991).....................................................................44

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,*
　　926 F.2d 1161 (Fed. Cir. 1991).....................................................................39

*Snellman v. Ricoh Co., Ltd.*,
    862 F.2d 283 (Fed. Cir. 1988)..................................................................................45

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989)..............................................................................43

*Symantec Corp. v. Computer Asssociates Int'l, Inc.*,
    2008 WL 1012443 (Fed. Cir. Apr. 11, 2008) ....................................................16, 47

*Tec Air, Inc. v. Denso Mfg. Mich. Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999)..............................................................................46

*Techs., Inc. v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007)..............................................................................21

*Texas Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002)................................................................................4

*Toner for Toner v. Lederle Labs.*,
    828 F.2d 510 (9th Cir. 1987) ..................................................................................27

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
    374 F.3d 115 (Fed. Cir. 2004)..................................................................................4

*United States v. Real Property Located at 20832 Big Rock Drive, Malibu*,
    51 F.3d 1402 (9th Cir. 1995) ..................................................................................28

*Weinar v. Rollform Inc.*,
    744 F.2d 797 (Fed. Cir. 1984)..................................................................................2

*Woodland Trust v. Flowertree Nursery Inc.*,
    148 F.3d 1368 (Fed. Cir. 1998)............................................................................4, 5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ................................................................................................45

**STATUTES**

35 U.S.C. § 271(c) ...............................................................................17, 19, 20, 34

35 U.S.C. § 271(d)(1) .................................................................................................18

35 U.S.C. § 271(f) ...............................................................................................19, 20

**OTHER AUTHORITIES**

Wright & Miller, Federal Practice and Procedure § 2505 ........................................28

**RULES**

Fed. R. Civ. P. 50(a)(1).............................................................................................1

I.    **INTRODUCTION**

After 19 days of trial held over more than five weeks, and after several days of deliberation, the jury in this case returned a verdict holding Microsoft liable for infringing the asserted claims of Lucent's '356 and '295 patents, finding those claims valid, and awarding appropriate damages. Microsoft now asks this Court to set aside that verdict because it does not like the result.  But the jury's verdict regarding the '356 and '295 patents is fully supported by the trial record and comports with the clear weight of the evidence and the controlling law.  Accordingly, no basis exists for judgment as a matter of law, new trial, or remittitur, and Microsoft's motions should be denied.

II.    **LEGAL STANDARDS**

A.    **Judgment as a Matter of Law**

The Court may grant judgment as a matter of law only where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).  The Court plays a "limited role in reviewing a jury's factual findings." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).  JMOL is not appropriate except on the rarest occasions when "the evidence permits only one reasonable conclusion." *See, e.g., LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000).  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  In ruling on a motion for JMOL, the court is not to make credibility determinations or weigh evidence, and should "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.  "If conflicting inferences may be drawn from the facts," then JMOL is not appropriate. *See, e.g., Pierce v. Multnomah County*, 76 F.3d 1032, 1037 (9th Cir. 1996) (internal quotations omitted).

B.    **New Trial**

"A trial court may grant a new trial only if the verdict is against the clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict." *Pavao*, 307 F.3d at 918.  Further, "an error in jury instructions does not require reversal if it is more

1  probable than not that the error was harmless." *Jenkins v. Union Pac. R. Co.*, 22 F.3d 206, 210 (9th

2  Cir. 1994).  An error is harmless unless it "prejudicially affected the verdict."  *Weinar v. Rollform*

3  *Inc.*, 744 F.2d 797, 808 (Fed. Cir. 1984).

4  **III.    THE '356 PATENT:  VALIDITY AND INFRINGEMENT**

5        **A.    The Jury Reasonably Found that Defendants Failed to Prove that Claims 19 and 21 of the '356 Patent are Invalid.**

6        The trial record fully supports several different and independent bases by which the jury was

7  reasonably entitled to find the '356 patent not invalid.  As an initial matter, Microsoft

8  mischaracterizes the nature of the evidence regarding the purported Foreign Exchange Front End

9  ("FXFE") system.  Microsoft presented virtually no evidence about the FXFE system—no device; no

10 technical documentation; no software code.  *See infra* Section III.A.1.  The only evidence presented

11 by Microsoft about the FXFE system was the testimony of its paid fact witness, which was

12 uncorroborated with respect to several critical issues.  *Id.*  On this failure of evidence alone, the jury

13 was entitled to disregard the FXFE system as an invalidating reference.  *Id.*  Lucent also presented

14 substantial evidence negating defendants' claim that the FXFE system was publicly used in the

15 United States.  *See infra* Section III.A.2.  On this basis, the jury was reasonably entitled to find that

16 the FXFE system did not constitute prior art for purposes of anticipation or obviousness.  *Id.*

17       Microsoft also mischaracterizes the nature of the FXFE system and the timeline with respect

18 to the invention of the '356 patent and the alleged prior art FXFE system.  (MB at 3)  AT&T's Slate

19 project, which led to the invention of the '356 patent, began in 1983, ***before*** the development of the

20 FXFE system.  *See infra* Section III.A.3.  The FXFE system (to the extent it could be understood

21 from the limited evidence) was a system that did not include many of the inventive aspects of the '356

22 patent claims.  *Id.*  In this context, Lucent presented substantial evidence that the FXFE system was

23 missing several critical limitations, and the jury was therefore reasonably entitled to conclude that the

24 FXFE system did not anticipate or render obvious the asserted claims of the '356 patent.  *Id.*

25       With respect to the Datamation Article, Microsoft concedes that it does not disclose at least

26 the "indicating" limitation.  (MB at 9)  And contrary to Microsoft's assertions that this was the only

27 missing step, the record contains substantial evidence that the Datamation Article does not disclose

28 other critical limitations (*see infra* Section III.A.3) and that the invention of the '356 patent was not

obvious in light of the Datamation Article. *See infra* Section III.A.4. Thus, the jury was reasonably entitled to conclude that the Datamation Article did not render obvious the asserted claims. *Id.*

Finally, regarding J.K. Lasser's Your Money Manager ("YMM") software program, Microsoft admits that it does not disclose a "composition tool." (MB at 12) Substantial evidence exists that YMM does not disclose other critical limitations, and that the invention of the '356 patent was not obvious in light of YMM. *See infra* Section III.A.5. Thus, the jury was reasonably entitled to conclude that YMM did not render obvious the asserted claims of the '356 patent. *Id.*

### 1. The Jury Was Entitled to Disregard the Uncorroborated Testimony of Microsoft's Paid Fact Witness Regarding the FXFE System

Microsoft's evidence regarding the so-called FXFE system was virtually non-existent. Indeed, Microsoft failed to present the FXFE system in any form (working or non-working) or any technical documentation whatsoever regarding the operation of the alleged FXFE system. It is undisputed that neither Microsoft's expert nor Lucent's expert was ever able to inspect, review, use, or test any FXFE system. (3/18/08 Tr. at 195:8-19, 197:24-199:4; 3/26/08 Tr. at 110:18-111:11)[1] The entirety of Microsoft's evidence with respect to the FXFE system was based on a short, general-purpose, non-technical magazine article ("the Datamation Article") about an incomplete, experimental prototype version of an "Easel" system (the article never mentions "Foreign Exchange Front End") and the uncorroborated and scripted testimony of defendants' paid fact witness, Mr. Long, who was recalling events from more than 20 years ago. (3/18/08 Tr. at 185:12-195:19; 3/19/08 Tr. at 13:3-12; *see also* DX AOD; PX 1728) Microsoft relied almost exclusively on Mr. Long's uncorroborated testimony to supposedly fill in many missing gaps about missing claim limitations and how the purported FXFE system worked. (3/18/08 Tr. at 183:6-185:15; PX 1728)

Microsoft's failure of evidence in this regard is critical in the context of determining patent validity, despite its suggestion to the contrary (MB at 9 n.4), as such uncorroborated testimony is insufficient to find invalidity.[2] In this context, the jury was certainly entitled to weigh the credibility,

---

[1] All exhibits refer to the exhibits to the Declaration of Elizabeth T. Bernard filed concurrently herewith.

[2] *See BJ Servs. Co. v. Halliburten Energy Servs., Inc.*, 338 F.3d 1368, 1373 (Fed. Cir. 2003) ("Uncorroborated testimony alone cannot constitute clear and convincing proof."); *Texas Digital Sys.,* (Continued…)

memory, and bias of Mr. Long, disregard his uncorroborated testimony regarding several critical elements, and reasonably determine that Microsoft had failed to present clear and convincing evidence that the FXFE system met each and every limitation of claim 19 of the '356 patent. *Id.*

## 2. Substantial Evidence Exists that FXFE Was Not Publicly Used Under §§ 102(b) or 102(g), and Was Therefore Not Prior Art.

It is undisputed that the FXFE *system* can neither anticipate nor serve as prior art for purposes of an obviousness analysis if it was not publicly used in the United States under §§ 102(b) or 102(g).[3] Substantial evidence exists that FXFE was not publicly used in the United States, and the jury was therefore reasonably entitled to determine that the FXFE system was not prior art and could not invalidate the asserted claims of the '356 patent.

It is undisputed that the FXFE system was developed entirely in the United Kingdom. (3/18/08 Tr. at 201:4-6; 3/19/08 Tr. at 11:2-5; 3/26/08 Tr. at 111:12-14)  Thus, to satisfy the public

---

*Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1217 (Fed. Cir. 2002) ("[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest."); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737-43 (Fed. Cir. 2002) ("Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information."); *Finnegan Corp. v. Int'l Trade Com'n*, 180 F.3d 1354, 1366-70 (Fed. Cir. 1999) ("Mere testimony concerning invalidating activities is received with further skepticism because such activities are normally documented by tangible evidence such as devices."); *see also TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157-1160 (Fed. Cir. 2004) (the jury is entitled to weigh the credibility and reject or "discredit the testimony" of paid fact witnesses, including one "who testified as fact witnesses [and] received compensation from Microsoft" and who testified about alleged prior art from "over 18 years ago")).

Nor can two paragraphs from the Datamation Article (an article that does not even mention "Foreign Exchange Front End") serve to corroborate Mr. Long's testimony regarding the limitations that Microsoft contends were not missing from the article, as "that article is ambiguous at best." *Finnigan,* 180 F.3d at 1369-70.

[3] Section 102(b) requires public use of the invention in the United States. *See Woodland Trust v. Flowertree Nursery Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) (In order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been "accessible to the public."). Section 102(g) requires that the invention was "made in this country by another inventor who had not abandoned, suppressed, or concealed it."  There is no dispute in this case that the experimental prototype version of FXFE was abandoned.  (3/18/08 Tr. at 204:22-205:25; 3/26/08 Tr. at 112:19-22).  Moreover, because the FXFE system is not prior art under Section 102, it cannot be considered as part of an obviousness analysis under Section 103.  *See, e.g., Lucent Techs. Inc. v. Gateway, Inc.*, 537 F. Supp. 2d 1095, 1110 n.4 (S.D. Cal. Jan. 17, 2008) ("Prior art for section 103 purposes" is generally established by "the prior art named in section 102.") (*citing In re Wertheim*, 646 F.2d 527, 523-33 (CCPA 1981).

use requirement and qualify as prior art under §§ 102 and 103, Microsoft relied on a single demonstration of an incomplete, experimental prototype version of the FXFE system in New York. (3/18/08 Tr. at 201:7-19; 3/26/08 Tr. at 111:15-18)  However, Lucent presented substantial evidence showing that this single demonstration was not accessible to the public, as it was done privately within Chemical Bank's offices, with an invitation only to Mr. Tyler, and there was no evidence that members of the public were invited to attend, or that anyone actually used the prototype demonstrator.  (3/18/08 Tr. at 201:20-204:10; 3/19/08 Tr. at 11:14-21; 3/26/08 Tr. at 111:19-112:10) Lucent also presented substantial evidence—indeed, it was undisputed—that the experimental prototype FXFE system was then promptly abandoned, never sold, and never commercialized. (3/18/08 Tr. at 204:22-205:25; 3/26/08 Tr. at 109:8-110:1; 112:11-113:2; *see also Woodland Trust v. Flowertree Nursery Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) (use must be "accessible to the public"); 35 U.S.C. § 102(g) (requiring that the invention was "made in this country by another inventor who had not abandoned … it"))[4]  Accordingly, there was sufficient evidence from which the jury could have reasonably concluded that Microsoft failed to present clear and convincing evidence that the FXFE system was publicly used in the United States and abandoned, and thus find that it did not constitute prior art under §§ 102 and 103.

### 3. The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Anticipate Claim 19.

At trial, Microsoft had the burden of proving that Lucent's patents were invalid by ***clear and convincing*** evidence.  *See, e.g., Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir.

---

[4]  Microsoft also erroneously suggests that a "demonstration to a reporter … constitutes public use." (MB at 7, *citing Harrington Mfg. Co. v. Powell Mfg. Co.*, 815 F.2d 1478, 1479-80 (Fed. Cir. 1986)) But no such blanket rule exists.  Indeed, the Federal Circuit has made clear that a determination of public use requires an examination of "the totality of the circumstances."  *See, e.g., Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379-81 (Fed. Cir. 2004).  In *Bernhardt*, the Federal Circuit reversed a judgment of invalidity based on the pre-market demonstration of a device to customers and members of the press.  *Id.*  Significantly, the Federal Circuit looked at several factors including the extent of public access, whether members of the public actually used the device, and the extent of such use.  *Id.*; *see also Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007) (reversing judgment of public use where alleged prior art device was only visually inspected and tested "one time" and was "never connected to be used in the normal course of business"); *American Seating Co. v. USSC Group, Inc.*, 2005 WL 1224603, *5-6 (W.D. Mich. May 23, 2005) (despite absence of confidentiality agreement, the demonstration of single prototype is not public use).

2001) ("[A] moving party seeking to invalidate a patent … must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise.").  Anticipation "requires the presence in a single prior art disclosure of each and every element of a claimed invention." *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987).  Substantial evidence exists that the FXFE system was missing several claim limitations, and the jury was reasonably entitled to find that it did not anticipate claim 19.

As mentioned above, Microsoft mischaracterizes the nature of the FXFE system and the invention of the '356 patent.  Lucent presented evidence that the Slate project, which led to the invention of the '356 patent, began in 1983, ***before*** the development of the FXFE system.  (3/26/08 Tr. at 151:9-15, 152:12-153:1, 154:16-155:11)  The FXFE system (to the extent it could be understood from the limited evidence) was a "more primitive kind of system" that was outdated, "slower," and "abandoned," and which did not include many of the inventive aspects of the '356 patent claims.  (3/26/08 Tr. at 112:19-22, 114:2-6, 116:14-117:11)  In this context, as discussed below, substantial evidence exists that the FXFE system was missing several elements required by claim 19 of the '356 patent, including "indicators," "inserting" into information fields, "information fields," "concurrently displaying," and the use of "graphical" tools.  Based on the absence of any one of these limitations, the jury was entitled to find that the FXFE system did not anticipate claim 19.

### a. The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Meet the "*indicating*" Step

Claim 19 requires the form entry system to have a way of "indicating" which field is active and into which information is to be inserted.  (PX 2)  At trial, Microsoft's expert admitted that the Datamation Article does not disclose this element.  (3/18/08 Tr. at 181:24-182:8)  Thus, Microsoft relied only on the uncorroborated deposition testimony of Mr. Long to supply this missing element. *Id.*  As discussed above, the uncorroborated testimony of Mr. Long is insufficient to prove anticipation, and the jury was entitled to disregard his testimony.  *See supra* Section III.A.1.  Accordingly, the jury was reasonably entitled to find that the FXFE system did not present this element and did not anticipate claim 19.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.    The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Meet the "*inserting*" Step or Have "*information fields*"**

Claim 19 requires that the form entry system "insert[] in said one field information that is derived as a result of said user operating said displayed tool."  (PX 2)  At trial, Microsoft's expert admitted that the Datamation Article does not disclose that information entered into an FXFE broker cell is inserted into an information fields; rather the Datamation Article states only that information is entered "into the system."  (3/18/08 Tr. at 181:4-181:23; DX AOD at GW-LT 422220)  Likewise, Microsoft's expert admitted that the Datamation Article does not disclose the use of "information fields."  (3/18/08 Tr. at 180:21-181:23)  Again, Microsoft relied on Mr. Long's testimony to supply these missing elements.  *Id.*  And again, such uncorroborated testimony is insufficient to prove anticipation, and the jury was entitled to disregard his testimony.  *See supra* Section III.A.1.  Accordingly, the jury was reasonably entitled to find that the FXFE system did not present these elements and did not anticipate claim 19.

**c.    The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Have "*graphical*" Tools**

Claim 19 requires that there be a "tool adapted to allow said user to compose said information," which this Court has construed to mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."  (PX 2; PX 7 at 9)  Substantial evidence exists that the FXFE system did not use "graphical" tools.  (3/26/08 Tr. at 113:12-18)  The parties' experts explained the differences between using "text-mode" versus "graphics-mode" in a computer system—"text mode" in a computer allows only for the display of text "but no graphical images."  (*Id.* at 113:17-18, 120:6-15)  Lucent's expert, Mr. Tognazzini testified that there was "no evidence that the FXFE  system was anything other than a text-based system" and did not disclose any "graphical" tools.  *Id.*   Microsoft's expert also admitted that there was no evidence that FXFE worked in "graphics mode."  (3/18/08 Tr. at 180:15-18)  Accordingly, the jury was reasonably entitled to find that the FXFE system did not include this element and did not anticipate claim 19.[5]

---

[5]  Microsoft suggests that this Court should have further defined the word "graphical" to mean "pictorial" in order to support its contrived invalidity position.  (MB at 6)  But this Court's claim (Continued…)

1

### d. The Jury Was Reasonably Entitled to Find that the FXFE System Did Not Meet the Step of "*concurrently displaying*"

Claim 19 requires the form entry system to have a way of "concurrently displaying a predefined tool associated with said one of said fields," which this Court has construed to mean "displaying at the same time, as by a window overlaying the form."  (PX 2; PX 7 at 9)  At trial, Lucent presented substantial evidence that the FXFE system did not use overlaid windows—*or any type of windows or windowing technology*—a fact that was not disputed by Mr. Long.  (3/18/08 Tr. at 179:8-180:6; 3/26/08 Tr. at 113:25-114:10, 115:18-116:10)

Microsoft now repeats its argument that this Court's construction should be broadened to support its invalidity position.  (MB at 5)  But Microsoft's suggestion that the claim should be broadened beyond windows and overlaid tools would vitiate the understanding relied on by the parties since the *Markman* hearing in 2003.  Indeed, at the *Markman* hearing this Court stated:

> **Concurrently displaying means displaying the overlay** on a display of the form.
> **Concurrently displaying means displaying the overlay** on a display of the form.

(9/23/03 Hr'g. Tr. at 45) (repeated twice by this Court)  This Court's construction is supported throughout the '356 patent which discloses **only overlaying windowing** technology—not the older static-screen technology used in the FXFE system.  (PX 2 abstract and 1:29-37, 2:62-64, 3:42-46, 3:48-51, 7:8-10; *see also* PX 6532-6535)  Indeed, this Court again rejected Microsoft's argument made during summary judgment proceedings:

> Lucent argues that "concurrently displaying" should require display of an overlay, or window, on the form … there is a factual question of whether the FXFE system involved "concurrently displaying" within the meaning of the claims.

---

construction is entirely consistent with the patent specification, which discloses graphical tools throughout—in the context of a computer graphical user interface—drawn and displayed at the pixel level.  (PX 2 at 2:44, 8:55-67, cols. 9-12, figs. 2-10)  Moreover, Microsoft's request to further construe a well-understood term used in this Court's claim construction is unfounded in the law, because "after the court has defined the claim with whatever specificity and precision is warranted … the task of determining whether the construed claim reads on the accused product is for the finder of fact."  *PPG Indus. v. Guardian Indus.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998).  Indeed, in rejecting defendants' summary judgment motion on invalidity, this Court has already (correctly) determined that the question of "whether [FXFE] was truly a 'graphical' system"—whether the FXFE system meets this limitation is—is a question for the jury.  [D.I. 285 at 21]

[D.I. 285 at 22][6]  Accordingly, the jury was reasonably entitled to find that the FXFE system did not present this element and did not anticipate claim 19.

### 4.    The Jury Was Reasonably Entitled to Find that Neither the FXFE System Nor the Datamation Article Rendered Obvious Claim 19 or 21 of the '356 Patent.

As discussed above, substantial evidence exists by which the jury was entitled to find that the FXFE system did not disclose any of several required claim limitations.  *See supra* Section III.A.3. And with respect to the Datamation Article, Microsoft concedes that it does not disclose the "indicating" limitation.  (3/18/08 Tr. at 181:24-182:8)  Substantial evidence also existed showing that the Datamation Article does not disclose the "inserting" step, the use of "information fields," the use of "graphical" tools, or the ability to "concurrently display" tools.  (*see supra* Section III.A.3)

In the context of these missing limitations, Lucent introduced substantial proof to rebut any assertion that it would have been obvious to modify the FXFE system, or use the teachings of the Datamation Article, to arrive at the claimed invention.  (3/26/08 Tr. at 116:14-117:11)  For example, Mr. Tognazzini testified that one of ordinary skill in the art would not have been motivated to add these missing elements, at a minimum, because of the slow speed of the experimental version of the FXFE system.  *Id.*  Further, Microsoft did not present any evidence or reason that one of ordinary skill in the art would have been motivated to add "inserting" into information fields, "graphical" tools, or "concurrently displaying" (windows) to the FXFE system.  Indeed, Mr. Tognazzini testified that adding windows, graphics, and indicators would have slowed down the system, and in fact, the experimental version of the FXFE system "taught against" making such modifications in light of the "speed issues" that ultimately led to the abandonment of the prototype FXFE system.  *Id.*

Moreover, although the ultimate determination of obviousness is a question of law; it is a question based on "underlying findings of fact, whether explicit or implicit within the [jury's] verdict." *See, e.g., Finisar Corp. v. DirecTV Group, Inc.*, --F.3d--, Nos. 2007-1023, 2007-1024, 2008

---

[6]  Microsoft's suggestion that this Court somehow changed its claim construction in a footnote is wrong.  (MB at 5)  The Court's footnote from its May 15, 2007, summary judgment order is entirely consistent with, and does not change, its construction.  [Civ. No. 02-2060 D.I. 1795 at 7 n.3]  It is certainly possible to use overlaying windowing technology, yet place windows in a "side-by-side" manner as recognized in the Court's footnote.  *Id.*  But what the Court's construction does not encompass is older static-display technology that does not allow for displaying windows at all.

WL 1757675, at *14 (Fed. Cir. Apr. 18, 2008).  Such underlying findings of fact include the "scope and content of the prior art, the differences between the prior art and the claims at issue, [and] the level of ordinary skill in the pertinent art."  *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).  Here, those underlying facts were plainly disputed by the parties and their experts.  In such a situation, the determination of obviousness turns on the jury's implicit findings of fact in reaching its verdict that the patent claims were not rendered obvious.  *KSR Int'l. Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1733 (2007) (finding obviousness as a matter of law only where these underlying facts were undisputed).  On this record, the jury could have reasonably determined that neither the FXFE system nor the Datamation Article rendered obvious claims 19 and 21 of the '356 patent.

5.    **The Jury Reasonably Found that YMM Did Not Render Obvious Claim 19.**

Microsoft also contended at trial that YMM rendered obvious claim 19 of the '356 patent.  (3/18/08 Tr. at 164:2-8)  But the YMM program was representative of the very keyboard-driven, manual, and non-graphical systems over which the invention of the '356 patent improved.  (PX 2 at col. 1, Background of the Invention) (describing the invention of the '356 patent as an improvement over "manual method[s] of filling in a form" which relied on the "keyboard")  Indeed, Microsoft's expert admitted at trial that YMM does not disclose ***several required elements*** of the "tool adapted to allow said user to compose said information," which this Court construed to mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."  (PX 7 at 9)

a.    **The Jury Was Reasonably Entitled to Find that YMM did Not Have "*display keys*" or Allow for "*pointing to the display keys*"**

For example, Microsoft's expert admitted at trial that YMM does not allow a user to "point to display keys," that it was designed exclusively for keyboard use, and that it was not designed to work with a mouse or have onscreen display keys.  (3/18/08 Tr. at 209:4-213:25; 3/26/08 Tr. at 121:10-123:5)  Indeed, substantial evidence exists further showing that YMM does not disclose the use of "display keys" at all.  (3/26/08 Tr. at 118:18-119:10)  For example, Mr. Tognazzini explained that "they're not display keys … [n]ot only because you can't point to them, but this is not a graphical system."  *Id.*  In other words, what was displayed on the screen in YMM were not "active" keys that

could be pointed to, but rather, just a reconfigured display of keys pressed on the physical keyboard with "no way to point to these numbers in this grid." (*Id.* at 118:4-119:10) Indeed, Lucent offered substantial evidence that the so-called "onscreen calculator" did not allow a user to compose information. (3/26/08 Tr. at 121:10-17) ("Q: It doesn't have anything to do with composing the information, right? A: No, it doesn't.") Accordingly, the jury was reasonably entitled to find that YMM did not disclose this element.

### b.    The Jury Was Reasonably Entitled to Find that YMM did Not Have "*graphical*" tools

Further, it was undisputed that YMM operated in "text mode" and did not have "graphical" tools. (3/18/08 Tr. at 207:21-208:20; 3/26/08 Tr. at 119:11-121:5) Substantial evidence (including Microsoft's own Computer Dictionary) exists showing that "text mode" in a computer allows only for the display of text "***but no graphical images***."[7] (3/26/08 Tr. at 120:6-15) (emphasis added) Accordingly, the jury was reasonably entitled to find that YMM did not disclose this element.

### c.    The Jury Was Reasonably Entitled to Find that YMM Did Not Render Claim 19 Obvious

Lucent also introduced substantial evidence to rebut any assertion that it would have been obvious to arrive at the invention of claim 19 in light of YMM, either on its own, or in combination with a mouse, arrow keys, or other programs such as Windows 1.01.[8] (3/26/08 Tr. at 123:6-129:8, 144:16-147:4, 156:14-160:19) For example, Lucent's expert discussed how, at the relevant time in 1986, Windows 1.01 was not a viable operating system and had no third-party application support.

---

[7]  Microsoft repeats its argument that this Court should have further defined the word "graphical" to mean "a picture" in order to support its contrived invalidity position. (MB at 14) But as explained above, this Court's claim construction is entirely consistent with the patent specification, which discloses throughout graphical tools—in the sense of a computer graphical user interface—drawn and displayed at the pixel level. (PX 2 at 2:44, 8:55-67, cols. 9-12; *see also PPG Indus.*, 156 F.3d at 1355 ("[A]fter the court has defined the claim with whatever specificity and precision is warranted … the task of determining whether the construed claim reads on the accused product is for the finder of fact."); D.I. 285 at 21 (deciding that "whether [FXFE] was truly a 'graphical' system"—whether the FXFE system meets this limitation is—is a question for the jury")).

[8]  Microsoft's assertion that Mr. Tognazzini used the wrong standard in his obviousness analysis is wrong. (MB at 14) Mr. Tognazzini properly considered whether it would have been obvious to one of ordinary skill in the art to arrive at the invention of claim 19 *in light of* the prior art YMM reference on its own, or in combination with a mouse, arrow keys, or other programs such as Windows 1.01, based on the state of the art at the time. (3/26/08 Tr. at 123:6-129:8, 156:14-160:19)

(*Id*. at 123:19-129:5; PX 5661-5667)  Mr. Tognazzini explained that one of ordinary skill in the art would not have been motivated to modify YMM in light of Windows 1.01 to arrive at the invention of claim 19 of the '356 patent.  *Id*.  In fact, Mr. Tognazzini explained that system speed limitations at the time and the absence of overlapping windows in Windows 1.01 would have *taught away* from such a combination.  *Id*.  Likewise, Mr. Tognazzini explained that, due to speed limitations and efficiencies at the time, there would have been no reason to modify YMM to work with mouse functionality in DOS, or modify its use of arrow keys, such that YMM would have onscreen "display keys" and the ability to point to onscreen "display keys" and otherwise meet the claim limitations. (3/26/08 Tr. at 123:6-129:8, 144:16-147:4, 156:14-160:19)

Indeed, Lucent also presented testimony from the original YMM software designer, Mr. Jones, who confirmed that YMM was designed to be used with a keyboard, and not with a mouse, and that from a technical point of view, back at the relevant time, one could not combine YMM with Windows 1.01.  (3/18/08 Tr. at 213:25-216:19; 3/26/08 Tr. at 160:9-19)  Moreover, Mr. Jones also testified that "from both a technical and business standpoint, it made no sense to even consider [mouse functionality]" for YMM.  (3/18/08 Tr. at 213:25-216:19; 3/26/08 Tr. at 160:9-19) Lucent also presented rebuttal evidence that Microsoft's so-called evidence of YMM mouse functionality was a simulation—not true mouse functionality—and did not allow for "pointing to the display keys."  (3/26/08 Tr. at 145:8-146:14, 156:25-158:21)  On this record, the jury could have reasonably determined that YMM did not render obvious claims 19 and 21 of the '356 patent.

**B.    Lucent Presented Substantial Evidence From Which the Jury Reasonably Concluded that Microsoft Infringes the '356 Patent.**

As discussed below, Lucent presented substantial evidence at trial that Microsoft contributed to and induced infringement of claims 19 and 21 of the '356 patent based on its sale of the Microsoft Outlook, Microsoft Money, and Windows Mobile software products.  (2/27/08 Tr. at 87:17-174:7) Other than the "composition tool," Microsoft does not dispute that Outlook and Windows Mobile practice each and every step of claim 19 (and claim 21 for Windows Mobile).  (MB at 15-17) Microsoft does not dispute that Microsoft Money practices each and every step of claim 19.

12

1

### 1. Lucent Presented Substantial Evidence that Microsoft Outlook Includes a Composition Tool.

As discussed above, claim 19 of the '356 patent requires a "tool adapted to allow said user to compose said information" which this Court has construed to mean "a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool."  (PX 7 at 9)  As Lucent's expert, Mr. Tognazzini, testified, a tool "which allows the user to compose information," is a tool that allows for the "ability to compose" or "the ability to build" or "the ability to combine."  (2/27/08 Tr. at 80:16-84:18)

At trial, Lucent presented substantial evidence that the Microsoft Outlook calendar tool is such a graphical keyboard or number keypad composition tool that "allows the user to compose information."  Id.  Despite Microsoft's desire to mischaracterize the Outlook calendar tool as a menu or list tool, substantial evidence exists demonstrating otherwise—the tool allows a user to first select a month and year, and then combine that selection with a specific day of the month to ultimately build or compose a complete date.  (Id. at 131:1-133:4)  Indeed, the ordinary meaning of "compose" as used in the Court's claim construction is "combining" or to "put together."  (2/28/08 Tr. at 111:5-112:11)  Mr. Tognazzini further explained that because there are more than one million possible dates that could be composed using the Outlook calendar tool, it was not practical to use a list or menu tool to display a list of dates from which to choose; instead the Outlook calendar tool allows a user to more easily compose or build a complete date from the constituent parts, by selecting a month and combining it with a selected day.  (2/27/08 Tr. at 135:22-136:6).  Mr. Tognazzini also explained that the Outlook calendar tool is different from a menu of alternatives type tool, because one first selects a month and year, and "then you're selecting the day … you are assembling a series of pieces of information."  (2/28/08 Tr. at 107:15-108:19)  Mr. Tognazzini further explained that the Outlook calendar tool works by "combining of pieces of information … building an answer through this combination."  (Id. at 108:24-109:11).  Lucent also presented a video demonstration of the Outlook calendar tool, showing that it is necessarily a composition tool because it works when a user first selects a month and year, and then combines or puts that together with a specific day to form a complete date.  (2/28/08 Tr. at 117:11-118:12, 162:2-4; PX 6291, 6295).  Lucent also introduced versions of the actual Outlook software and screenshots showing that the calendar tool works by

13

allowing the user to first choose a month and combine that selection with a day to compose a complete date. (*e.g.* PX 697, 1135-1140, 1138B, 1139B, 6230)

Indeed, Microsoft's own witnesses admitted that the Outlook calendar tool is a composition tool. For example, Mr. Kennedy confirmed that the calendar tool works when a user first selects a month and year, and then selects a specific day, and finally by putting together those selections, a complete date is composed. (3/18/08 Tr. at 73:7-76:20; 3/26/08 Tr. at 102:21-104:3) Similarly, Microsoft's own expert, Mr. Buscaino, also admitted that "a composition tool allows a user to put together parts or putting together parts." (3/18/08 Tr. at 174:18-175:9; 3/26/08 Tr. at 104:4-105:1)

Contrary to Microsoft's assertions, "a graphical number keypad tool" is not limited to the "number entry tool 60" shown in Figure 5 of the '356 patent specification. (2/27/08 Tr. at 218:25-219:14) Rather, as Mr. Tognazzini explained, the patent discloses different types of "graphical number keypad tools" of "similar" format, including a number pad, a calculator, and a "date pad" tool, all of which are considered different types of "graphical number keypad tools." *Id.* ("The date pad … has a format that is similar to the number pad….") Therefore, as Mr. Tognazzini explained, the Outlook calendar tool was also a type of "graphical number keypad tool." *Id.*

### 2.    Lucent Presented Substantial Evidence that Windows Mobile Includes a Composition Tool.

Lucent likewise presented substantial evidence that Windows Mobile includes a composition tool. Indeed, Mr. Tognazzini testified that Windows Mobile included "several" composition tools, including both a pop-up onscreen keyboard and a calendar composition tool similar to the Outlook calendar tool. (2/27/08 Tr. at 152:17-22; 154:20-156:4; *see also* PX 6244-47, 6536) Mr. Tognazzini testified and demonstrated that the Windows Mobile onscreen keyboard works by allowing a user to point or touch the onscreen display keys, which would place the corresponding keyboard characters into the active information field. *Id.*

Microsoft's only argument regarding the Windows Mobile onscreen keyboard is its contention that that is not "associated with said one of said fields" as required by claim 19. (MB at 17) However, Mr. Tognazzini showed how the Windows Mobile keyboard is plainly associated with whichever field is currently active by inserting characters into that field. (2/27/08 Tr. at 154:20-156:4; 3/26/08 Tr. at 107:18-108:23; *see also* PX 6536) Lucent presented substantial

14

evidence that the Windows Mobile keyboard input "goes directly into the field as you are typing," and the active field is associated with the input from the onscreen keyboard.  (*Id.*; *see also* PX 651; PX 1507 (describing how Windows Mobile uses the onscreen keyboard to insert information into the active fields))  Lucent also introduced working versions of Windows Mobile running on PDA devices and screenshots that show that Windows Mobile has multiple composition tools in addition to the onscreen keyboard, including a calendar composition tool (similar to the Outlook calendar tool) and a number-pad tool.  (*See, e.g.,* PX 702-724, 831, 832, 832A, 832B, 1160, 1163, 1163A, 1164, 6244-47)

### 3.    Lucent Has Shown Specific Acts of Direct Infringement.

As recognized by this Court in ruling on jury instructions, Lucent may prove infringement, including specific acts of direct infringement, with circumstantial evidence.  [D.I. 636 at 10] (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986))  And as discussed at length, *infra,* in Section III.B.5, Lucent presented substantial evidence that Microsoft intended for its customers to use the accused products in an infringing manner and that the normal and intended use of the accused products involves the use of the accused features and performance of the claimed method.  Lucent also presented ample evidence discussed, *infra*, in Section III.B.5, that Microsoft encouraged acts of direct infringement by encouraging others, through tutorials, instruction, help files, web pages, and other materials, to use the accused products in an infringing manner.

The evidence presented by Lucent is more than sufficient to establish infringing use of the accused products by defendants' customers.  *See, e.g., Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1363 (Fed. Cir. 2006) ("We reject [defendant's] argument that [patentee] could not rely on the instruction sheets to prove acts of direct infringement by end-users."); *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1377 (Fed. Cir. 2005) (finding "strong circumstantial evidence" of infringing use where instruction manuals taught how to perform the claimed method); *Moleculon*, 793 F.2d at 1272 (upholding district court determination that circumstantial evidence of extensive sales and dissemination of instructions satisfied burden of showing direct infringement).

Microsoft's reliance on the *Acco* and *E-Pass* cases (MB at 17) is misplaced, as Microsoft

again disregards that direct infringement may be proven by circumstantial evidence.[9]  *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008); *Moleculon*, 793 F.2d at 1272.  The Federal Circuit has recently rejected Microsoft's argument, reaffirming that a patentee is not required to present direct evidence of specific acts of direct infringement.  *See, e.g., Symantec*, 522 F.3d at 1293 (holding that "***even though Symantec has not produced [direct] evidence that any particular customer has directly infringed***" there can still be a showing of infringement because "direct evidence of infringement, as opposed to circumstantial evidence, is not necessary") (emphasis added); *Golden Blount*, 438 F.3d at 1363.

Here, like in *Moleculon*, Lucent has not only presented evidence of extensive Microsoft sales, but Lucent has also presented evidence of instructions, help files, and other materials where Microsoft instructed its customers to use the accused software in an infringing manner—the normal and intended use of the accused products.  *See infra* references cited in Section III.B.5.  Here, unlike the circumstances in both *E-Pass* and *Acco*, the normal and intended use of the accused products and tools is infringing.  Lucent was entitled to rely on circumstantial evidence to prove that specific acts of direct infringement occurred through the normal and intended use of the accused products, which were admittedly sold to millions of customers.  Moreover, Lucent also presented evidence and testimony of Microsoft's employees, including testimony that they were aware of specific acts of direct infringement based on the products accused of infringing the '356 patent.  (*See, e.g.,* 3/12/08 Tr. at 54:17-18) ("We know many customers use" the calendaring features of Outlook.).

### 4.    Lucent Presented Substantial Evidence of Contributory Infringement.

To prove that a defendant contributed to infringement, a patentee must show that a defendant "offers to sell or sells within the United States … a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process,

---

[9]  Moreover, the facts of *Acco and E-Pass* are very different.  In *E-Pass*, the method at issue required a very specific set of programming steps to be performed in a very specific order on a multi-function credit-card like device, and no evidence existed that the defendant had ever instructed its customers to perform the specified steps in the specified order.  *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1216 (Fed. Cir. 2007).  And *Acco* is also inapposite, as the intended use of the accused device in that case was non-infringing, and the accused party specifically instructed its customers to use the system in a non-infringing manner.  *Acco Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).

1
2
3

constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c).[10]

4
5
6
7
8
9
10
11
12
13
14
15

The sole basis for Microsoft's position that it does not contribute to infringement is a legal argument already rejected multiple times by this Court. Microsoft suggests that there are non-infringing uses for the accused software products *as a whole*. But this Court already rejected Microsoft's argument, recognizing that "contributory liability may be based on supplying a *component* especially adapted to infringe a patent," even if that component is included with other non-infringing components. [D.I. 636 at 3] (emphasis added) "Otherwise, a Defendant *could always avoid liability* on contributory infringement" just by including an infringing component with some non-infringing components. *Id.* (emphasis added); *see also Philips Elecs. N. Am. Corp. v. Contrec Corp.*, 411 F. Supp. 2d 470, 476 (D. Del. 2006). This Court also solidly rejected Microsoft's argument after the previous Group 2 Audio trial, holding that "the Cyberlink Plug-in is not a staple, and incorporating it into Windows Media Player does not somehow 'convert' it into a staple ingredient." *Lucent Techs. Inc. v. Gateway, Inc.*, 509 F. Supp. 2d 912, 930 n.11 (S.D. Cal. 2007).

16
17
18
19
20
21

In other words, Microsoft cannot escape contributory liability by packaging its accused software programs with non-infringing components or features. The accused tools and form-entry systems are not staple articles of commerce, and incorporating them into software programs cannot somehow convert them into staple ingredients. Moreover, the fact that there may be additional, non-infringing ways of using the accused software programs *as a whole* does not preclude contributory infringement where—as is the case here—***there are no non-infringing uses of the***

22
23
24
25
26
27
28

---

[10] Lucent presented substantial evidence as to each element of contributory infringement for each accused product. (2/27/08 Tr. at 87:17-174:7) Microsoft does not dispute any element other than substantial non-infringing use. (MB at 18-19) Overwhelming evidence exists that the accused tools in the accused software products are a material part of the invention of claim 19, and they are especially made to be used in a manner that infringes. Lucent presented substantial evidence that by using the accused composition and menu tools, one necessarily infringes claim 19 because the accused software products necessarily include the other steps of claim 19, such as information fields, field labels, field indicators, and inserting information into fields. (*See, e.g.,* for Outlook, 2/27/08 Tr. at 122:8-137:11, 141:25-142:8; PX 1138B, 1139B, 6223-31; for Money, 2/27/08 Tr. at 90:19-102:16; PX 6207-14; for Windows Mobile, 2/27/08 Tr. at 148:6-161:20; PX 6240-49)

17

*accused components*.  *Id.*  Other courts have also soundly rejected Microsoft's faulty argument.  For example, in *Philips*, the defendants argued that the addition of a noninfringing method to their URC was enough to give their device a substantial noninfringing use, even though it included the patented method.  *Philips*, 411 F. Supp. 2d at 476.  The Court found such an argument "legally flawed."  *Id.*  The Court stated that "it would indeed violate the 'logic of the patent laws' to allow a potential infringer to avoid liability for contributory infringement by simply adding a noninfringing function to a device that practices the patented method." *Id.*[11]  Here, the infringing tools are not staple articles, and as discussed below, Lucent presented substantial evidence that the infringing tools have no substantial non-infringing uses.  Microsoft failed to offer any relevant contrary evidence.

### a.    Lucent Presented Substantial Evidence that Microsoft Contributes to Infringement by Supplying Microsoft Outlook.

Lucent presented overwhelming evidence showing that there are no substantial non-infringing uses for the component tools in Outlook, because, for example, the menu tools and calendar composition tool components, when used, *necessarily result in infringing use* of the claimed method because Outlook includes the other steps of claim 19, such as information fields, field labels, field indicators, and inserting information into fields.  (2/27/08 Tr. at 122:8-136:6; PX 6223-31)  Further, Microsoft presented no evidence that these components—the infringing features and tools of Outlook—are staple articles of commerce.[12]  They are not, because they were "specifically designed"

---

[11]  Microsoft's' reliance on the *Hodosh* case is misplaced.  In *Hodosh*, the Federal Circuit addressed a patent covering a method of desensitizing teeth.  *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1576 (Fed. Cir. 1987).  There, the defendant was accused of contributing to the infringement of the patent by selling certain toothpastes.  *Id.* at 1576-77.  Because there was "no dispute" that use of defendant's toothpaste infringed, the defendant attempted to rebut the contributory-infringement charge by arguing that an ingredient of its toothpastes—potassium nitrate—was a staple article capable of substantial noninfringing uses.  *Id.*  But this Court has already distinguished *Hodosh* from the circumstances present here.  *Lucent Techs.*, 509 F. Supp. 2d at 930 n.11 ("This is not the circumstances present in *Hodosh* … where a patented product incorporated a staple ingredient.").  Microsoft's reliance on the *Hodosh* case is also misplaced because *Hodosh* was an interlocutory appeal limited to the issue of patent misuse.  *Hodosh*, 833 F.2d at 1578.  In that case, the misuse inquiry focused on the mixture of toothpaste sold because the misuse statute required it, and the misuse claim was premised on selling the mixture.  *Id.* at 1577-79; *see also* 35 U.S.C. § 271(d)(1).

[12]  Microsoft suggests that there are non-infringing uses for Microsoft Outlook, *as a whole*, such as sending email and managing tasks.  (MB at 18)  However, as discussed above, Microsoft's focus on the entire software product, *as a whole*, is misplaced.  *Philips*, 411 F. Supp. 2d at 476; *Lucent Techs.*, (Continued…)

to be used in Outlook.  (*Id*. at 137:1-3)  Thus, the jury reasonably concluded that by providing Outlook and the infringing components incorporated therein, Microsoft contributed to the infringement of claim 19.

>  **b.    Lucent Presented Substantial Evidence that Microsoft Contributes to Infringement by Supplying Microsoft Money and Windows Mobile.**

Lucent likewise showed that there are no substantial non-infringing uses for Microsoft Money and Windows Mobile because, for example, the menu tools and composition tools of Money and Windows Mobile, when used, ***necessarily result in infringing use*** of the claimed method because the accused programs include the other steps of claim 19, such as information fields, field labels, field indicators, and inserting information into fields.  (*See, e.g.,* for Money, 2/27/08 Tr. at 90:19-102:16; PX 6207-14; for Windows Mobile, 2/27/08 Tr. at 148:6-161:20; PX 6240-49)  And again, Microsoft presented no evidence that these components—the infringing features and tools of Money or Windows Mobile—are staple articles of commerce.[13]  They are not, because they were "specifically designed" to be used in Money (*Id*. at 103:20-23) and Windows Mobile (*Id*. at 162:9-163:2).  For example, Mr. Tognazzini explained that the onscreen keyboard component of Windows Mobile has no "other use other than entering information into the fields" in an infringing manner.  (*Id*. at 169:10-16)  Thus, the jury reasonably concluded that by providing Money and Windows Mobile, Microsoft contributed to the infringement of claims 19 and 21 of the '356 patent.

>  **c.    Software is a Component, Material, or Apparatus Under 35 U.S.C. § 271(c).**

Microsoft erroneously suggests, in two footnotes, that software is not a component, material, or apparatus for use in a process under 35 U.S.C. § 271(c).  (MB at 19 n.10, 42 n.25)  But Microsoft misinterprets the Supreme Court's *AT&T* opinion and misstates the law.  As an initial matter, contributory infringement under § 271(c) was neither at issue nor addressed in the *AT&T* opinion.  Instead, the issues presented in *AT&T* related solely to § 271(f) and extraterritorial infringement.

---

509 F. Supp. at 930 n.11; D.I. 636 at 3.

[13]  Microsoft suggests that there are non-infringing uses for Microsoft Money and Windows Mobile ***as a whole***.  (MB at 19.)  But again, as discussed above, Microsoft fails to focus on the ***components*** of the software that are especially adapted for infringement.  *See supra* Section III.B.4.

1
2
3
4
5

Indeed, in that context, the Supreme Court expressly recognized that software is indeed a "component" under § 271(f). *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746, 1755 (2007), *citing Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1339 (Fed. Cir. 2005). This Court and other courts have also rejected Microsoft's argument, recognizing that software may constitute a basis of contributory infringement under § 271(c).[14]

6

### 5. Lucent Presented Substantial Evidence of Microsoft's Intent to Induce Infringement of the '356 Patent.

7
8
9
10
11
12
13
14
15
16
17
18
19

Contrary to Microsoft's assertion (MB at 19), Lucent presented overwhelming evidence that Microsoft induces infringement of claims 19 and 21. As an initial matter, Microsoft misstates the proper legal standard. Sitting *en banc*, the Federal Circuit clarified the standard for specific intent to induce infringement, holding that "[i]t must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he ***knew or should have known*** his actions would induce actual infringements." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (emphasis added). Indeed, in ruling on its jury instruction regarding this issue, this Court recently rejected Microsoft's attempts to mischaracterize the law of inducement. [D.I. 636 at 2] This Court recognized that one induces infringement if that person "***knows or should have known*** that the encouraged acts constituted infringement" and intended to cause infringement, and adopted a model instruction consistent with *DSU*. *Id.* (emphasis added)

20
21
22
23
24

As set forth below, Lucent presented substantial evidence to support the jury's verdict that Microsoft induces infringement. Lucent demonstrated that Microsoft encouraged others to engage in acts that constituted direct infringement of the '356 patent, that Microsoft knew or should have known that the encouraged acts constituted infringement, and that Microsoft specifically intended to cause

25
26
27
28

---

[14]  *Lucent Techs.*, 509 F. Supp. at 930 ("[T]his Court leaves the legislature to consider whether supplying software as an 'intangible' should be exempted from § 271(c)."); *see also Pickholtz v. Rainbow Techs., Inc.*, 260 F. Supp. 2d 980, 988 (N.D. Cal. 2003) (holding that software may be an infringing component under § 271(c)); *Construction Tech., Inc. v. Cybermation, Inc.*, 965 F. Supp. 416, 437 (S.D.N.Y. 1997) (same).

the infringement and the encouraged acts.  Lucent also demonstrated that Microsoft was aware of the '356 patent, and Microsoft's inducement took place during the time the '356 patent was in force.[15]

For each of the accused products of the '356 patent, Lucent presented ample evidence that the normal and intended use of those products infringes the asserted claims of the '356 patent.  Lucent also presented substantial evidence that Microsoft encouraged others, through tutorials, instruction, help files, web pages, and other materials, to use the accused products in an infringing manner.  *See infra* this section.  Direct evidence is not required to prove liability—***circumstantial evidence is sufficient*** to prove infringement, including intent to induce infringement.  *See Moleculon*, 793 F.2d at 1272 ("[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive"); *see also Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326-27 (Fed. Cir. 2004) (intent to induce infringement of method claim may be shown by "sparse and not altogether clear" circumstantial evidence); *Nat. Instruments Corp. v. The MathWorks, Inc.*, 113 F. App'x 895, 898-99 (Fed. Cir. 2004) (same); *Corning Inc. v. SRU Biosys.*, 400 F. Supp. 2d 653, 665 (D. Del. 2005) (same).  Accordingly, sufficient evidence exists to establish that Microsoft intended to induce infringement of the '356 patent through infringing use of the accused products.

Lucent presented evidence of instruction and tutorials that specifically teach Microsoft's customers to use the software in an infringing manner—evidence such as "advertising" or "instructing" demonstrate an "affirmative intent that the product be used to infringe."[16]  *See, e.g., MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005).  Further, Lucent is entitled to "prove direct infringement or inducement of infringement by either direct or circumstantial evidence" and

---

[15]  Lucent presented substantial evidence that Microsoft has been aware of the '356 patent for several years.  Lucent presented substantial evidence that Microsoft had knowledge of the '356 patent at least as early as April 15, 2002, and also that Lucent asserted the '356 patent against Microsoft at least as early as January 13, 2003.  (3/11/08 Tr. at 119:4-23; PX 367; 3/13/08 Tr. at 107:15-108:16; PX 254)

[16]  Defendants cite *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007), and suggest that Lucent has failed to present evidence that defendants specifically induced infringement of each step of claim 19 of the '356 patent.  (MB at 19)  Microsoft's reliance on *E-Pass*, however, is misplaced, as the method at issue in that case required a very specific set of programming steps to be performed in a very specific order on a multi-function credit-card like device, and no evidence existed that the defendant had instructed its customers to perform the specified steps in the specified order.  *Id.* at 1216.  Here, however, Lucent presented substantial evidence that the normal and intended use of the accused products involves the use of the infringing tools.

Case No. 07-CV-2000-H (CAB)

lack of direct evidence of specific inducement "does not render the case presented to the jury unreasonable." *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219-20 (Fed. Cir.) *cert. denied*, 127 S. Ct. 599 (2006); *see also Nat'l Instruments. Corp.* 113 F. App'x at 898 (circumstantial evidence and training materials that induce performance of an infringing method "presents substantial evidence for the jury to find … induced infringement").[17]

### a.    Microsoft Intends for Money to be Used in an Infringing Manner.

Lucent presented substantial evidence that use of Microsoft Money performs each and every step of claim 19. (2/27/08 Tr. at 90:19-102:16) Indeed, at trial, Microsoft did not contend otherwise. (3/26/08 Tr. at 105:7-14).

Lucent also presented substantial evidence that use of the infringing features is important in Microsoft Money, that Microsoft values the infringing features, that the normal and intended use of Money involved use of the infringing features, and that Microsoft encouraged and intended users to infringe by using the infringing features. (2/27/08 Tr. at 102:17-103:16, 104:16-111:2, 112:9-117:15; 2/28/08 Tr. at 89:20-91:1, 143:10-17; 3/12/08 Tr. at 53:2-19, 56:10-61:8) Significantly, Lucent showed that the normal and intended use of Money involves the use of the menu tools and composition tools, which use necessarily results in infringement of the claimed method because Money admittedly includes the other limitations of claim 19, such as information fields, field labels,

---

[17] Moreover, where the normal and intended use of an accused product involves an infringing use, a patentee may prove induced infringement where the defendant intends for the accused product to be used in such a normal and intended manner. *See, e.g., Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307, 1311-1312 (Fed. Cir. 1998) (affirming summary judgment of induced infringement of method claim where "normal commercial use" of accused product met claim limitations); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1314 (Fed. Cir. 2005) (recognizing that "a reasonable juror could find" induced infringement where accused product was "designed … to function" in an infringing manner); *Nat'l Instruments*, 113 Fed. Appx. at 898-99 (affirming jury verdict finding induced infringement of method claim based on "circumstantial evidence" that accused software "was designed to infringe during its normal use"); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343-44 (Fed. Cir. 2001) (holding that the sale of software may constitute induced infringement of a method claim, even where the software "is capable of non-infringing modes of operation;" the probative inquiry is the "normal operation of the accused [software] products"); *Dennison Mfg. Co. v. Ben Clements & Sons, Inc.*, 467 F. Supp. 391, 428 (S.D.N.Y. 1979) ("The fact that defendant does not actually instruct the ultimate users of the product in its use does not prevent our finding active inducement of infringement [of method claims], since the intended manner or use of the product is readily apparent.").

indicators, and the insertion of information into fields.  (2/27/08 Tr. at 90:19-102:16; PX 6207-14)

For example, Mr. Tognazzini testified that the infringing tools of Money, including the composition tools, are "very important" to its operation.  (2/27/08 Tr. at 102:22-104:15)  And after reviewing thousands of pages of Microsoft documents and webpages, Mr. Tognazzini testified that using the infringing tools is "central" and "very important" to the normal and intended operation of Money.  (2/27/08 Tr. at 102:17-103:16)  Mr. Tognazzini testified that Microsoft not only promoted the "ease of use" of the programs, but also "teach[es] how to use these [infringing] tools.  And even within the teaching, they're promoting their use."  (2/27/08 Tr. at 104:24-105:1)

Lucent also showed that Microsoft provided instruction, tutorials, help files, web pages, and other materials directing users to use Money in an infringing manner, that the normal and intended use of Money involves the infringing tools, and that Microsoft valued and marketed the infringing features.  (PX 629, 678, 742, 971, 972, 1505, 1121B, 1124B, 1129B, 1218, 5158)  Lucent demonstrated how the Money help files specifically teach the use of the infringing composition and menu tools.  (*e.g.* PX 1121B, 1124B)  The help files expressly teach users to use a composition tool by "click[ing] the down arrow to use an in-field calculator" and to use a menu of alternatives tool by "[i]n the Category box, select[ing] . . . from the list."  *Id.*  In addition to the embedded help files, Lucent introduced evidence showing that Microsoft offers extensive online tutorials, user guides, videos, newsgroups, and other support for every version of Money, including teaching the use of the infringing tools.  (*e.g.* PX 678, 742)  Other Microsoft documents recognize that Money necessarily makes use of the infringing tools, such as the menu of alternatives "list box."  (*e.g.* PX 972)  Lucent also presented press releases where Microsoft touted the "intuitive" interface and "leading tools" used in Money.  (*e.g.* PX 5158)  Lucent also presented evidence and testimony of Microsoft's employees, including testimony that Microsoft publicized the "elegant, intuitive user interface" and "user friendly" and "easy to use" accused tools of Money.  (3/12/08 Tr. at 56:24-59:7)

Lucent also presented substantial evidence that Microsoft offered Microsoft Money for sale during and after the time it became aware of the '356 patent, and after the time that Microsoft was aware of Lucent's specific infringement contentions with respect to Money.  (2/27/08 Tr. at 117:22-120:5; 3/13/08 Tr. at 160:1-168:12; *see also supra* n.14)  Thus, Lucent presented ample

evidence from which the jury could reasonably conclude that Microsoft encouraged infringing use of Money, and that Microsoft knew, or should have known, that customers of Money were infringing the '356 patent, and that Microsoft specifically intended such infringement.

>    **b.    Microsoft Intends for Outlook to be Used in an Infringing Manner.**

Lucent presented substantial evidence that use of Outlook performs each and every step of claim 19. (2/27/08 Tr. at 122:8-136:6)  Indeed, Microsoft did not dispute that Outlook met each of the claim limitations other than a composition tool. (3/26/08 Tr. at 101:25-102:8; *see also supra* Section III.B.1)  Lucent also presented evidence that use of the infringing features is important in Microsoft Outlook, that Microsoft valued the infringing features, that the normal and intended use of Outlook involved use of the infringing features, and that Microsoft encouraged and intended users to infringe by using the infringing features. (2/27/08 Tr. at 136:7-145:5; 2/28/08 Tr. at 89:20-91:1, 143:10-17; 3/12/08 Tr. at 53:5-56:9)  Significantly, Lucent showed that the normal and intended use of Outlook involves the use of the menu tools and calendar composition tool, which use necessarily results in infringement of the claimed method because Outlook and admittedly includes the other limitations of claim 19, such as information fields, field labels, field indicators, and the insertion of information into fields. (2/27/08 Tr. at 122:8-136:6; PX 6223-31)

For example, Lucent presented substantial evidence that the infringing tools in Outlook, including the calendar composition tool, are central to the functionality of Outlook. (*Id.* at 136:7-137:11)  The Outlook help files teach that use of the accused Appointment feature necessarily uses form entry and "*every* Outlook item is based on a form." (PX 1138B, 1139B)  After reviewing thousands of pages of Microsoft documents and webpages, Mr. Tognazzini testified that using the infringing tools is "central" to the normal and intended operation of Outlook. (2/27/08 Tr. at 136:7-10, 136:22-137:7, 140:3-7)  And Mr. Tognazzini testified that Microsoft "intend[ed] users to use the forms and the different tools," "specifically promote[d] Outlook and its ease of use," and "encourag[ed] their customers to use the tools and the forms." (*Id.* at 136:17-21, 141:22-142:11).

Lucent also showed that Microsoft provided instruction, tutorials, help files, web pages, and other materials directing users to use Outlook in an infringing manner, that the normal and intended use of Outlook involves the infringing tools, and that Microsoft valued and marketed the infringing

features.  (PX 501, 626, 1138B, 1139B).[18]  Lucent demonstrated how the help files in Outlook teach users that "[e]very Outlook item is based on a form" and that users should use the "appointment" feature "to represent a meeting or scheduled event."  (*e.g.* PX 1138B, 1139B).  The embedded help files in Outlook are also directly linked to Microsoft's website, which further provides extensive online tutorials, help, videos, walk-throughs, and other support for various versions of Outlook, including teaching the use of the infringing tools; and Mr. Tognazzini testified that he reviewed substantial amounts of such promotional material, examples of which were offered at trial.  (2/27/08 Tr. at 141:17-21; *see also, e.g.,* PX 626, 1135, 1136, 1137, 1138, 1139, 1140)  Lucent also presented press releases where Microsoft touted the "usability" and "intuitive" interface in Outlook, including for working with "appointments."  (*e.g.* PX 501).  Lucent also presented testimony of Microsoft's employees, including testimony that Microsoft publicized the accused tools and calendaring features of Outlook.  (3/12/08 Tr. at 54:3-9, 54:20-25, 55:16-56:2)

Lucent also presented substantial evidence that Microsoft offered Microsoft Outlook for sale during and after the time it became aware of the '356 patent, and after the time that Microsoft was aware of Lucent's specific infringement contentions with respect to Outlook.  (2/27/08 Tr. at 145:6-147:15; 3/13/08 Tr. at 168:13-174:21; *see also supra* n.14)  Thus, Lucent presented ample evidence from which the jury could reasonably conclude that Microsoft encouraged infringing use of Outlook, and that Microsoft knew, or should have known, that its customers of Outlook were infringing the '356 patent, and that Microsoft specifically intended such infringement.

### c.    Microsoft Intends for Windows Mobile to be Used in an Infringing Manner.

Lucent also presented substantial evidence that use of Windows Mobile performs each and every step of claims 19 and 21.  (2/27/08 Tr. at 148:6-161:20)  Indeed, Microsoft did not dispute at trial that Windows Mobile met each of the claim limitations other than a composition tool.  (3/26/08 Tr. at 107:8-17; *see also supra* Section III.B.2)

---

[18]  Lucent's expert, Mr. Tognazzini, provided such opinion and testimony after reviewing thousands of pages of Microsoft documents and webpages, including documents that were introduced at trial. Lucent also introduced as evidence executable copies of the accused Outlook software.  (*e.g.* PX 1135, 1136, 1137, 1138, 1139, 1140).  Additional help files, instructions, and tutorials are also included and embedded within the executable software itself.  *Id.*

Lucent also presented evidence that use of the infringing features is important in Windows Mobile, that Microsoft valued the infringing features, that the normal and intended use of Windows Mobile involved use of the infringing features, and that Microsoft encouraged and intended users to infringe by using the infringing features.  (2/27/08 Tr. at 161:21-170:8; 2/28/08 Tr. at 89:20-91:1, 143:10-17; 3/12/08 Tr. at 61:9-62:2, 65:13-68:19)  Significantly, Lucent showed that the normal and intended use of Windows Mobile involves the use of the menu tools and composition tools, which use necessarily results in infringement of the claimed method because Windows Mobile admittedly includes the other limitations of claim 19, such as information fields, field labels, field indicators, and the insertion of information into fields.  (2/27/08 Tr. at 148:6-161:20; PX 6240-49)  For example, Lucent presented substantial evidence that the infringing tools in Windows Mobile, including the composition tools, are critical to the functionality of Windows Mobile.  (*Id.* at 161:21-163:11)  Indeed, after reviewing thousands of pages of Microsoft documents and webpages, Mr. Tognazzini testified that using the infringing tools is "central" to the normal and intended operation of Windows Mobile.  *Id.*  Mr. Tognazzini testified that "[t]he whole idea of organizing personal information and being able to bring up appointments and get reminders before meetings … all these kinds of activities are central to such [PDA] devices." (*Id.* at 161:24-162:3; *see also* 169:4-23)

Lucent also showed that Microsoft provided instruction, tutorials, help files, web pages, and other materials directing users to use the software in an infringing manner, and showing that Microsoft valued and marketed the infringing features.  (PX 627, 628, 647, 648, 649, 650, 652, 654, 651, 671, 832, 832A, 832B, 1163A, 1507, 5163)  Lucent also presented documentation, manuals, screenshots, press releases, and actual working devices showing that the normal and intended use of Windows Mobile on a PDA involved a stylus for inputting information, and necessarily involved composition tools such as the onscreen keyboard.  (*e.g.*, PX 651, 652, 832, 832A, 832B, 1163A, 1507, 5163)  And as with the other Microsoft products, Microsoft's website contains extensive product support and promotional materials, which Mr. Tognazzini reviewed in forming his opinions.  (2/27/08 Tr. at 141:17-21)  Lucent also presented testimony of defendants' employees, including testimony regarding demand for PDAs.  (3/12/08 Tr. at 39:11-40:1, 40:9-24, 67:12-68:1)

Lucent also presented substantial evidence that Microsoft offered for sale Windows Mobile

during and after the time it was aware of the '356 patent, and after the time that Microsoft was aware of Lucent's infringement contentions with respect to Windows Mobile.  (2/27/08 Tr. at 170:9-173:4; 3/13/08 Tr. at 174:22-180:7; *see also supra* n.14)  Thus, Lucent presented ample evidence from which the jury could reasonably conclude that Microsoft encouraged infringing use of Windows Mobile, and that Microsoft knew, or should have known, that users of PDAs running Windows Mobile were infringing the '356 patent, and that Microsoft specifically intended such infringement.

### 6. The Jury's Verdicts Regarding Infringement by Microsoft and Dell are Not Inconsistent and Microsoft is Not Entitled to a New Trial.

Microsoft suggests that it is entitled to a new trial because the jury found that Microsoft infringes but Dell does not.  [D.I. 735, Special Verdict Form at 3-4]  As discussed above, Lucent presented overwhelming evidence showing that Microsoft induced and contributed to infringement of claims 19 and 21 of the '356 patent.  Thus, the fact that the jury found that Dell does not infringe does not make its verdict with respect to Microsoft "fatally inconsistent" such that there is no "reasonable way to read the verdicts as expressing a coherent view of the case." *See, e.g., Toner for Toner v. Lederle Labs.*, 828 F.2d 510, 512 (9th Cir. 1987).

While Lucent believes that the jury's verdict with respect to Dell was against the clear weight of the evidence, as set forth in Lucent's co-pending Motion for Judgment as a Matter of Law or New Trial, [D.I. 760-2 at 29-36], that fact does not compel a finding that the verdicts are inconsistent. Indeed, because contributory infringement and infringement by inducement requires either knowledge or specific intent, the jury may have concluded that Microsoft acted with the requisite knowledge and intent while Dell did not.  Thus, there exists a "way to read the verdicts as expressing a coherent view of the case."

### C. This Court Properly Construed the Claims of the '356 Patent and Microsoft is Not Entitled to a New Trial.

This Court has already (multiple times) properly rejected Microsoft's argument that the term "concurrently displaying" should be limited to mean "automatically."  [*See, e.g.,* Civ. No. 02-2060 D.I. 152, 175, 1552].  This claim construction issue was discussed at length during the *Markman* hearing, and this court properly determined that "concurrently displaying" was not limited to the automatic display of tools.  (9/22/03 Hr'g. Tr. at 264) ("THE COURT: It doesn't come up

automatically.  I think I've decided that.")  And last year, defendants sought to reconstrue this term on the eve of trial.  This Court entertained briefing, and again, expressly rejected Microsoft's arguments.  (PX 7 at 1) ("Having now fully considered the parties' briefs and the oppositions filed thereto, the Court hereby retains the construction of the term ['concurrently displaying'].")  As Lucent demonstrated during the *Markman* hearing and subsequent briefing, the '356 patent discloses several examples and embodiments where predefined tools ***need not be automatically displayed***;  it would be improper to so limit the claim term and exclude the disclosed embodiments.  [Civ. No. 02-2060 D.I. 1365, 1488]  Accordingly, this Court's claim construction of "concurrently displaying" was correct, Microsoft was not prejudiced, and Microsoft is not entitled to a new trial.

### D.    This Court's Jury Instructions on Induced and Contributory Infringement Were Correct and Microsoft is Not Entitled to a New Trial.

The Court correctly instructed the jury on contributory and induced infringement.  In its brief, Microsoft rehashes two arguments that the Court already considered and rejected.[19]

### 1.    This Court's Jury Instructions Contributory Infringement Were Correct.

Microsoft argues that the Court's instruction on contributory infringement (Instruction No. 22) was incorrect because it focused on whether the accused "component" has substantial non-infringing uses.  (MB at 21)  Microsoft would have preferred the Court's instruction to focus on whether the "thing sold" has substantial non-infringing uses, because then Microsoft could have argued that— although its products include components that are especially adapted to infringe the patents-in-suit— it escapes liability for contributory infringement simply because it has chosen to package those components with unrelated, non-infringing features.  Not surprisingly, the law does not allow an

---

[19]  Microsoft also suggests the Court might have erred by refusing to include separate special verdict questions on contributory infringement and induced infringement.  But such decision was a matter entirely within the Court's discretion and therefore provides no basis for a new trial.  District courts have near absolute discretion in deciding whether to use a special verdict as opposed to a general verdict.  *See* Wright & Miller, Federal Practice and Procedure § 2505 ("Although ... there are frequent judicial statements in the reported cases that the district court's decision whether or not to use a special verdict under Rule 49(a) is reviewable by the court of appeals only for abuse of discretion, there appears never to have been a reversal on this ground."); *see also United States v. Real Property Located at 20832 Big Rock Drive, Malibu*, 51 F.3d 1402, 1408 (9th Cir. 1995) ("discretion extends to determining the content and layout of the verdict form"); *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 273 (Fed. Cir. 1988) (same).

infringer to so easily circumvent liability for misappropriating a patented invention.

As discussed above in Section III.B.4, courts have recently rejected Microsoft's argument, recognizing that it would "allow a potential infringer to avoid liability for contributory infringement by simply adding a noninfringing function to a device that practices a patented method." *Philips*, 411 F. Supp. 2d at 476 *see also Lucent*, 509 F. Supp. 2d at 930 n.11; *Imagexpo, L.L.C. v. Microsoft Corp.*, 284 F. Supp. 2d 365, 368 (E.D. Va. 2003); *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 994-95 (N.D. Ill. 1988). Finally, as discussed above, Microsoft's reliance on the *Hodosh* case is misplaced, and this Court has already distinguished *Hodosh*. *See supra* Section III.B.4.

### 2. This Court's Jury Instructions on Induced Infringement Were Correct.

Microsoft argues that the Court's instruction on induced infringement (Instruction No. 21) was erroneous because it stated that "one element of inducement is whether 'the person has intent to cause the encouraged acts.'" (MB at 21) Microsoft ignores the remainder of the instruction, and suggests that the Court's construction somehow failed to "focus on whether Microsoft had the intent to cause an infringement," as required by *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006). But the Court's instruction precisely and correctly instructed that:

> [It is not] sufficient that Microsoft or Dell were aware of the act(s) that allegedly constitute direct infringement. Rather, you must find that Microsoft or Dell ***specifically intended to infringe the patent***, in order to find inducement of infringement. If you do not find that Microsoft or Dell specifically intended to infringe, then you must find that Microsoft or Dell have not actively induced infringement.

(*See* Instruction No. 21) (emphasis added) This is entirely consistent with *DSU*'s requirement that the accused inducer "have an affirmative ***intent to cause direct infringement***," *DSU Med.*, 471 F.3d at 1306. Indeed, the Court's instruction on intent further stated that inducement requires "purposefully urg[ing] or encourage[ing] another to infringe a patent"; the accused must "know[] or should have known that the encouraged acts constitute infringement" and have "intent to cause the encouraged acts." (*See* Instruction No. 21) The Court's instruction was a proper statement of the law and did not mislead the jury with respect to the intent requirement of inducement.

1

## IV.  THE '295 PATENT:  INFRINGEMENT

### A.  Lucent Presented Substantial Evidence that Windows XP Tablet PC Compares a Tap to a Predefined Shape.

2

3    Microsoft presented only one noninfringement argument regarding the '295 patent: that the

4    accused products allegedly do not compare each gesture to at least one predefined shape.  Lucent,

5    however, presented substantial evidence (including Microsoft's own source code and documents)

6    demonstrating that the accused Windows XP Tablet PC products perform that function.  For example,

7    Lucent's expert on the '295 patent, Mr. Jean Renard Ward, testified that the accused Tablet PC

8    products practice every limitation of claim 1.  (2/28/08 Tr. at 210:6-277:16)  Lucent also introduced

9    the defendants' own documents, source code, and actual Windows XP Tablet PC devices showing

10   that those devices infringe claim 1.  (PX 964, 965, 557, 749, 5544, 5590, and 5594)  Significantly,

11   Lucent presented substantial evidence that the accused Tablet PC products recognize the tap gesture

12   by comparison to a predefined shape. (2/28/08 Tr. at 255:12-20, 258:2-24, 260:1-19; 2/29/08 Tr. at

13   41:4-44:6; 3/26/08 Tr. at 237:19-24, 238:10-14, 239:16 - 240:12, 241:25 - 242:4, 242:23 - 246:1,

14   270:11-15)  Mr. Ward presented detailed analysis of the code algorithm used by the accused products

15   to recognize a tap gesture, including proof that the algorithm recognizes a gesture by comparing it to

16   a predefined shape. (*Id.*; PX 964, 965)

17   For example, Mr. Ward explained how the source code compares the tap gesture to the shape

18   of a dot:

19   Q.    How do the two tests that are used by the source code for the accused products
          compare a tap gesture with a predefined shape?

20

21   A.    ***They compare it with a dot by seeing how close the input is to being actually a single
          dot.***

22   (3/26/2008 Tr. at 238:10-14 (emphasis added); *see also id.* at 237:19-24, 238:15-249:8; 2/28/08 Tr. at

23   252:12-257:5; 257:12-16; 258:2-4; 258:10-262:15)  Lucent also showed that the accused source code

24   compares the tap gesture to a predefined shape in another sense—by attempting to fit the gesture into

25   a square "bounding box" to determine whether the user intended a tap:

26   Q.    So you're explaining how tablet PC recognizes whether this is a tap or not?

     A.    That's correct, yes.

27   Q.    Okay. What does it do first?

28   A.    So, as I mentioned, there are two tests, and the first test is to look to see if the tap -- the

30

maximum tap distance is less than or equal to 100 units. ***What this boils down to saying is does the collection of points that we have here actually fit within a one millimeter square, and so that's the first test that's performed.***

(3/19/2008 Tr. at 244:3-12 (emphasis added).)

In addition, Mr. Ward confirmed his analysis with Microsoft's own documents stating that the tap is a gesture that matches a shape — or glyph — defined by the source code. (PX 964, 965, 5544; 2/28/08 Tr. at 248:11-257:5, 257:12-262:15; 3/26/08 Tr. at 235:19-242:13; 242:20-246:1). The defendants nevertheless disputed infringement on the single ground that the accused products allegedly fail to compare gestures to predefined shapes.[20] But even Dr. Kelly admitted Microsoft's own documents identify a tap as a gesture, state that a gesture is an ink stroke or pen movement that matches the set of glyphs defined by the recognizer, and disclose that a glyph is a predefined symbol. (3/20/08 Tr. at 45:14-46:9; PX 5544) Although Dr. Kelly originally testified that the accused products' source code does ***not*** disclose such glyphs (*see, e.g.,* 3/20/08 Tr. at 46:10-24, 64:7-13), Lucent proved on rebuttal that Dr. Kelly's statements were false. The source code for the accused product references glyphs in numerous places, and recognizes tap gestures by comparing them to a predefined shape. (PX 964, 965, 6326; *see specifically*, Source Code Page MSLT 0727643) Accordingly, the jury was entitled to conclude that the accused Windows XP Tablet PC edition software recognizes gestures by comparing them with a predefined shape.

**B.    Lucent Presented Substantial Evidence that Microsoft Induced and Contributed to the Infringement of Claim 1 of the '295 Patent.**

**1.    Lucent Presented Substantial Evidence That Microsoft Induced Infringement.**

Lucent presented substantial evidence from which a reasonable jury could conclude that Microsoft knew, and specifically intended, that Tablet PC manufacturers install the Tablet PC operating system on computers with rear-mounted digitizers. Lucent presented abundant evidence that Microsoft specifically told computer manufacturers to build Tablet PC computers that infringe

---

[20] Relying on inventor testimony, Microsoft contends that this function requires comparison of gestures with "an internal database of characters and their relevant features." (MB at 39). The Court's construction dictates no such requirement (PX 6 at 4), and the Federal Circuit has clearly stated that inventor testimony has no bearing on a claim's meaning. *See, e.g., Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 991 (Fed. Cir. 1995).

claim 1, including by using a rear-mounted digitizer. (PX 749, 5590) No dispute exists that Microsoft provides Tablet PC Edition software to Tablet PC manufacturers. (2/28/08 Tr. at 188:19-24, 189:6-25) Nor is there any dispute that Microsoft provides technical specification requirements to the Tablet PC manufacturers and intends for the manufacturers to assemble infringing Tablet PC computers in accordance with the instructions. (2/28/08 Tr. at 217:2-218:5, 218:12-220:2, 221:7-12; PX 557, 749, 5590) Lucent also presented substantial evidence that Microsoft encouraged computer manufacturers, through hardware requirements, specifications, FAQs, help files, and web pages, to manufacture the infringing Tablet PC products in an infringing configuration. (2/28/08 Tr. at 217:2-218:5, 218:12-220:2, 221:7-12; PX 557, 749, 5590) Indeed, the overwhelming evidence shows that Microsoft intends for computer manufacturers to build Tablet PCs having rear-mounted digitizers. *Id*.

For example, Microsoft published Tablet PC Hardware Requirements that required computer manufacturers to build devices with rear-mounted digitizers. (2/28/08 Tr. at 220:20-23; PX 749) Microsoft's Tablet PC Hardware requirements state that the digitizer must be integrated with the display screen and include proximity sensing—the digitizer "must report x and y stylus position coordinates accurately when the stylus tip is within 5 millimeters (mm) of the writing surface." (PX 749) The only commercially available digitizers meeting these requirements for use in portable personal computers were rear-mounted. (2/29/08 Tr. at 91:16-92:13) Indeed, Microsoft's expert Dr. Kelly admitted "there are no front-mounted digitizers that I am aware of that would meet [Microsoft's hardware] requirements." *Id*. Ample evidence, including Microsoft's own documents, further establishes that Microsoft *knew* that Tablet PC digitizers had to be rear-mounted. (PX 749; PX 5590)

In sum, Lucent presented ample evidence to support findings that (1) Microsoft induced Tablet PCs to be built and sold using rear-mounted digitizers, (2) Microsoft knew, or should have known, that the sale and use of Tablet PCs running Windows XP Tablet PC edition software constituted infringement of claim 1 of the '295 patent, and (3) Microsoft specifically intended for the infringing sale and use of Tablet PCs running Windows XP Tablet PC edition software.

### 2.    Lucent Presented Substantial Evidence That Microsoft Contributed to Infringement.

Microsoft argues that the accused Tablet PC products may have non-infringing uses because

allegedly (1) they can be made with front-mounted digitizers, (2) they have "many other substantial non-infringing uses," and/or (3) they "can recognize dozens of gestures that Lucent did not accuse of infringement."   (MB at 42)   None of Microsoft's arguments justify departure from the jury's infringement verdict concerning the '295 patent.

Regarding Microsoft's first argument, Lucent presented substantial evidence that front-mounted digitizers were ***not*** commercially available during the relevant time period for use in a portable personal computer.   The normal and intended use and installation for Windows XP Tablet PC Edition software, as set forth by Microsoft's very own documents, required electromagnetic digitizer hardware that detects proximity.  *See supra* Section V.B.1.  The defendants' own expert, Dr. Kelly, admitted that he knew of no commercially available front-mounted electromagnetic digitizer available in the entire world that would detect proximity.  (2/29/08 Tr. at 91:13-92:18)  Indeed, Lucent presented undisputed evidence showing that between 2003 and late 2007, the only Tablet PCs compatible with Microsoft's hardware requirements for licensing Windows XP Tablet PC edition operating system used rear-mounted digitizers.  (PX 749, 5590)[21]  The possibility that Microsoft's accused software may be used in a noninfringing computer ***today*** therefore fails to resolve Microsoft of contributory infringement liability during the relevant time-frame.

Regarding Microsoft's remaining "non-infringing use" arguments, Microsoft misstates the law and misrepresents the facts.  Microsoft suggests that there may be non-infringing uses for the accused Windows XP Tablet PC operating system ***as a whole*** or other non-infringing ways of using a Tablet PC.  But as discussed at length above, this Court has already rejected Microsoft's argument in this regard.  *See supra* Section III.B.4.

In any case, Lucent introduced overwhelming evidence that the normal and intended use of a Tablet PC is with a stylus and gestures.  (2/28/08 Tr. at 212:1-22; PX 749)  Lucent showed that the accused tap and double-tap gestures, used at both the operating-system level and application level, are critical gestures whose use is necessary in successfully operating a Tablet PC.  (2/29/08 Tr. at

---

[21] To the extent Microsoft suggests that the N-Trig digitizer would provide a non-infringing alternative, the N-Trig digitizer was not commercially available before recently in December 2007, or before the damages period presented by Lucent at trial.  (2/28/08 Tr. at 220:24-221:12)

95:11-22)  Further, Windows XP Tablet PC Edition software is not a staple article of commerce, and has no use other than to be installed on a Tablet PC and used in an infringing manner.  *Id.*  Therefore, regardless of whether Tablet PCs may use other gestures, there are no substantial non-infringing uses for Windows XP Tablet PC operating system, as the normal and intended use necessarily involves the tap and double-tap gestures.[22]  *Id.*

C.    **This Court's Jury Instruction on Means-Plus-Function Infringement was Correct and Microsoft is Not Entitled to a New Trial.**

Microsoft challenges this Court's means-plus-function jury instruction, which states that "[i]f you find that the structure in the accused product embraces technology developed after the issuance of the patent, that structure still may be an equivalent to the structure I have defined as being described in the patent under the doctrine of equivalents."  *See, e.g., Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 n.2 (Fed. Cir. 1999).  At trial, however, Microsoft expressly agreed with that the Court's statement of the law and Microsoft has never—including in its brief (MB at 42-43)—argued otherwise.  (3/26/08 Tr. at 224:13-16; 225:18-22)

Rather, the defendants have argued—and Microsoft now reargues—that this Court's Order granting Microsoft's Motion *in Limine* No. 13 in connection with the originally scheduled trial on the Agulnick '295 patent precludes a finding of infringement under the doctrine of equivalents. Microsoft further argues that it "relied on this ruling in preparing for and presenting its case at trial" and therefore it was prejudiced by the Court's instruction.  (MB at 42)  Microsoft's argument distorts the history of this issue and any alleged prejudice.  It was the ***defendants***—not Lucent—who attempted at trial to interject a previously undisclosed theory, alleging that the accused products embody "after-arising technology."  In its motion for judgment as a matter of law at the conclusion of Lucent's case, Microsoft argued—for the very first time—that some of the structures identified by Lucent's expert in the accused products as meeting means-plus-function elements in the Agulnick '295 patent were "after-arising technology."  [D.I. 619-1 at 9-10]  As a result, the defendants argued

---

[22]  Microsoft again argues that software is not a component under 35 U.S.C. § 271(c).  (MB at 42 n.25)  As discussed above, however, Microsoft misstates the law.  *See supra* Section III.B.4.c.  The Supreme Court, the Federal Circuit, and other courts have held that software is a component under § 271(c).  *Id.*

that there can be no literal infringement, and infringement may be considered only under the doctrine of equivalents.  This Court's Order on Microsoft's earlier Motion *in Limine* was based on Microsoft's argument that Lucent's expert had not addressed the doctrine of equivalents in his expert report.  But no reason existed for Lucent's expert to have addressed the doctrine of equivalents in his report, as the issue of after-arising technology had never been raised by defendants.  Because Microsoft was permitted to make its after-arising technology argument at trial, the Court properly concluded that it must instruct the jury on the consequences of that argument.

Microsoft, on the other hand, was in no way prejudiced by the Court's instruction allowing the jury to consider the doctrine of equivalents for the means-plus-function elements of the Agulnick '295 patent.  Microsoft was free to argue—and did argue—that Lucent's expert relied on after-arising technology to show that the accused products met the means-plus-function elements of the asserted claim.  The Court did not preclude that argument; it merely instructed the jury on the doctrine of equivalents issue interjected into the case by the defendants' "after-arising technology" argument. Finally, the test for doctrine of equivalents and structural equivalents under § 112, ¶ 6 is the same (*i.e.*, whether there are insubstantial differences).  *Chiuminatta* 145 F.3d at 1310; *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).  Thus, evidence adduced in support of or in opposition to infringement under one theory would be the same evidence necessary to support or oppose the other.  Because structural equivalents under § 112, ¶ 6 has always been in the case, both parties prepared and presented evidence regarding insubstantial differences between the accused structure and the structure disclosed in the patent.  Microsoft therefore was not prejudiced by the Court's instruction.

**D.    Mr. Ward Did Not Testify Beyond His Expert Report and Microsoft is Not Entitled to a New Trial.**

Lucent's technical expert, Mr. Jean Renard Ward, spent "2-1/2 to three days full-time" analyzing the accused Microsoft source code in this case.  (MX 25, 6/15/06 Ward Dep. Tr. at 123:25-124:5)  Mr. Ward's expert report on infringement of the '295 patent contains not only the opinions set forth at trial, but also all the bases for those opinions, including his extensive source code analysis.  (MX 24, 3/31/06 Ward Report at 36-37, 47-48, Tab 2)  Indeed, Mr. Ward's report specifically identifies and analyzes the very source code module "taps.c" that contains recognition

code for the Windows Tablet PC tap gesture, the very analysis about which Microsoft now complains.  Despite being on notice of Mr. Ward's source code analysis, Microsoft failed to examine him on that analysis during his deposition. (MX 24, 3/31/06 Ward Report at 47-48)

Microsoft's statement that Mr. Ward allegedly confirmed during his deposition that he did not perform certain source code analysis is simply false and misleading.  (MB at 43 citing Ward Dep. Tr. at 9:22-10:9)  The testimony Microsoft cites is not about the Tablet PC product accused at trial, but rather a discussion about the Pocket PC and Mobile PC products, which were not at issue during trial. (MX 25, 6/15/06 Ward Dep. Tr. at 9:4, 10:3-6)

Moreover, Mr. Ward's trial testimony regarding the Tablet PC tap gesture and whether it performs the same executable commands at both the operating system and the application level as required by the Court's construction is also set forth in his expert report.  (MX 24, 3/31/06 Ward Report at 39-40)  Microsoft asked Mr. Ward about this very opinion during his deposition:

> Q.    So the tap command would not satisfy -- excuse me, the tap gesture would not satisfy the identical executable commands language in the court's interpretation, do you agree with that?
>
> A.    No, I do not.

(MX 25, 6/15/06 Ward Dep. Tr. at 198:15-20)  Microsoft's suggestion that Mr. Ward's report and deposition testimony were inconsistent with his trial testimony therefore lacks merit.

**E.    Microsoft is Not Entitled to a New Trial Based On This Court's Claim Construction.**

After several days of argument, this Court determined that the algorithms, well-known to those skilled in the art, such as the algorithms described in "Automatic Recognition of Handprinted Characters—The State of the Art" Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 ("the IEEE Disclosure"), may be considered as part of the structure corresponding to the "means … for recognizing [and] comparing" gestures.  (PX 6 at 4)  Contrary to Microsoft's assertions, that ruling was not legal error.

Microsoft misapplies the long-standing rule that where a specification fails to disclose ***any*** corresponding structure, it may not satisfy the ***definiteness*** requirement and avoid invalidity by incorporating structure by reference. *Atmel Corp. v. Information Storage Devices, Inc.*,  198 F.3d 1374, 1381 (Fed. Cir. 1999) ("incorporation by reference cannot be substituted for a disclosure in the

specification"); *see also Budde v. Harley Davidson, Inc.*, 250 F.3d 1369, 1382 (Fed. Cir. 2001) (recognizing that *Atmel* "held that the patentee could not incorporate the disclosure of the cited article by reference to fulfill the definiteness requirement").  Here, however, it is not the case that the specification fails to disclose any corresponding structure.  (PX 1 at 4:41-46)

Microsoft's "incorporation by reference" argument misstates the law.  The *Atmel* and *Default Proof* decisions make clear that the critical inquiry is "*first*, whether structure is described in the specification, and, *if so*, whether one skilled in the art would identify the structure."  *See Atmel*, 198 F.3d at 1381 (second emphasis in original); *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1301 (Fed. Cir. 2005).  Here, there is no question that both the '295 patent specification *and* the prosecution history reference certain well-known methods of gesture recognition, and cite the IEEE Disclosure as providing examples.  (PX 1 at 4:41-46, PX 13, 5/26/92 response at 9)  Lucent's expert recognized this, and he compared well-known gesture recognition techniques in the IEEE Disclosure to those used in the accused products.  (MX 24, *see e.g.*, 3/31/06 Ward Report at 36, 47, 52)

Microsoft also ignores a long line of Federal Circuit cases making clear that the patent specification does not need to "explicitly" describe every detail about the corresponding structure. *See, e.g., Atmel*, 198 F.3d at 1380.  "Rather, disclosure of structure corresponding to a means-plus-function limitation may be implicit in the written description *if it would have been clear to those skilled in the art* what structure must perform the function recited in the means-plus-function limitation."  *Id.* (emphasis in original)  The Federal Circuit has emphasized this point, *especially with respect to well-known or well-understood structures*.[23]  In other words, so long as the specification

---

[23]  *Intel Corp. v. Via Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003) (mere disclosure of "core logic," without specific disclosure of circuitry, was well-understood and sufficient disclosure); *Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002) (a way of rotating cylinders by "conventional means" was well-known in the art and sufficient disclosure of corresponding structure)(emphasis omitted); *Budde*, 250 F.3d at 1382 (Fed. Cir. 2001) (mere disclosure of a "vacuum sensor" was well-known in the art and sufficient disclosure of corresponding structure); *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1369-70 (Fed. Cir. 2001) (mere disclosure of a "selector" was sufficient structure disclosure such that one of ordinary skill would understand it); *Atmel Corp.*, 198 F.3d at 1382 (disclosure of the title of an article alone was sufficient to indicate the structure to one of skill in the art); *In re Dossel*, 115 F.3d 942, 946 (Fed. Cir. 1997) (the disclosure of "known (Continued…)

1    discloses *some* corresponding structure, the knowledge of one of skill in the art can be called upon to

2    "flesh out" the understanding of the structural reference.  *See Creo Prods., Inc. v. Presstek, Inc.*, 305

3    F.3d at 1337, 1347 (Fed. Cir. 2002).  Here, the '295 patent clearly discloses well-known gesture

4    recognition techniques, including those in the IEEE Disclosure.  (PX 1 at 4:33-48)

5         After the numerous days of *Markman* hearings on the '295 patent, the Court also correctly

6    construed the "second detecting means" and "means for defining termination" terms as well. (PX 6 at

7    3-4)  The Court's construction correctly cites the various methods for detecting termination set forth

8    in the '295 patent as ways for detecting termination of a gesture. (*Id.* citing '295 Patent at 1:65-2:5)

9    Mr. Ward correctly followed the Court's construction and relied on, *e.g.*, the pen up and timeout

10   methods of termination in his infringement analysis.  Because this Court's claim construction is not

11   erroneous, Microsoft should not be granted a new trial.

12   **V.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S LUMP-SUM DAMAGES AWARDS.**

13        Faced with the choice of awarding a lump-sum or a running royalty, the jury chose to award a

14   lump sum as advocated by Microsoft.  The amount awarded by the jury falls squarely within the

15   range of the evidence presented at trial, which could have supported significantly higher lump-sum

16   damages.  Although Microsoft picks and chooses among the contested facts in order to challenge the

17   verdict, it simply ignores substantial evidence from which the jury could reasonably have reached the

18   result it did.  Because the jury's damages verdict is supported by substantial evidence, the Court

19   should deny Microsoft's motion for a judgment as a matter or law, a new trial or remittitur.

20        **A.    Substantial Evidence Supports the Jury's Damages Verdict.**

21        Upon a finding of infringement, the law prescribes the award of damages adequate to

22   compensate the patentee for infringement, but in no event less than a reasonable royalty.  35 U.S.C.

23   § 284.  The amount of damages based on a reasonable royalty is an issue of fact, *Micro Chem., Inc. v.*

24   *Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003), and a jury's award is entitled to deference.

25   *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004).  The jury's damages award "must be

26   upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or

27

28   algorithms" that were well-known in the art was sufficient disclosure).

based only on speculation or guesswork." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1580 (Fed. Cir. 1992) (internal quotation marks omitted). A court is not at liberty to supplant its own judgment on the damages amount for the jury's findings. *See id.* Nor is the jury bound to accept a rate proffered by one party's expert; rather, the jury may choose an intermediate royalty rate that differs from the parties' respective positions. *See Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("[T]he jury is not bound to accept a rate proffered by one party's expert but rather may chose an intermediate rate."); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167 (Fed. Cir. 1991) ("[T]he factual determination of a reasonable royalty, however, need not be supported and indeed, frequently is not supported by the specific figures advanced by either party.")

At Microsoft's last-minute insistence, the Special Verdict form was amended to provide the option of lump-sum damages for infringement of the Day '356 patent. The jury chose to use that lump-sum damages option. The jury had before it a wide range of evidence supporting damages at starkly varying magnitudes, as suggested by each party's damages expert. For the Day '356 patent, at the lower boundary, Microsoft's expert suggested a lump sum of $6,500,000. In contrast, Lucent's expert opined that in a hypothetical negotiation between the parties they would have agreed on a running royalty of 8% applied to the retail selling price of the accused software. The jury did not award the specific figure advocated by either expert, but instead chose an intermediate figure—and the evidence fully supports the jury's conclusion to award that intermediate royalty.

Abundant record evidence supports the jury's damages award for Microsoft's infringement of Day '356 patent. As Microsoft recognized in its opening brief, both damages experts recognized that there were no licenses specifically to the Day '356 patent, thus the reasonable royalty determination resulted in an analysis of comparable licenses. (3/12/08 Tr. at 52:3-11; 3/25/08 Tr. at 205:12-16) Numerous lump-sum agreements for patent rights to comparable technology were presented in evidence, ranging from royalty payments of $80 million to $290 million. (*See, e.g.,* PX 5142, 5150, 5151, 5152) Each of those agreements were cross-license agreements and were the product of real-world negotiations. The jury could have adjusted those representative lump-sum royalties upward to reflect the value of the cross-license and to account for the assumption of validity and

infringement required for the hypothetical negotiation—an assumption which both parties' expert agreed would have an upward influence on the royalty.  (3/11/08 Tr. at 166:16-25, 194:21-195:18; 3/25/08 Tr. at 225:6-14)  The jury could reasonably conclude as a factual matter in light of these real-world negotiations that the jury's substantial award reflects the amount Microsoft would pay for the Day '356 patent in light of the undisputed evidence of tens of millions of sales of the three infringing Microsoft products.  (3/13/08 Tr. at 160:1-180:7)

The jury also heard extensive evidence of running royalties that provide additional support for the jury's lump sum damages award.  Lucent's licensing expert, Roger Smith, testified based on Lucent's licensing policies, Microsoft's licensing policies, and license agreements in evidence that the appropriate reasonable royalty for Microsoft's infringement would be 8% applied to the retail selling price of the accused software.  (3/12/08 Tr. at 45:10-52:19; PX 5140, 5141, 5172)  Mr. Smith testified that this rate was supported by the evidence of the pervasiveness of the use of the patented invention in Microsoft's products and evidence of commercial importance and high profitability of the accused products.  (3/12/08 Tr. at 53:2-61:21, 65:13-69:13, 76:2-10, 77:3-13, 81:25-82:22; PX 250)  Thus, Mr. Smith's testimony itself provided substantial evidence in support of the jury's award.

In fact, Mr. Smith's 8% royalty on the base of the retail selling price of the software would have produced a substantially larger damages award—more than $500 million.  (3/13/08 Tr. at 186:1-21)  In reaching its damages award, the jury could have adjusted Mr. Smith's royalty rate or it could have adjusted the royalty base.  For instance, the jury could have concluded that Lucent was only entitled to a portion of the selling price of the software to reflect the value of the patented invention and adjusted the royalty base accordingly based on its own observation at trial of the infringing features of the software.

Alternatively, the jury could have applied a royalty rate lower than the 8% suggested by Mr. Smith.  Lucent presented evidence of an agreement between Lucent and Acer around the time of the hypothetical negotiation that provided for a 2% royalty on the base of the fair market value of the patented portion.  (PX 5183; 3/11/08 Tr. at 218:20-219:6)  The jury could have utilized this rate or adjusted the rate upwards based on Mr. Smith's testimony that the patent is assumed valid and infringed, that the Acer agreement was a settlement, that the rate was a commuted rate, and that the

40

Acer agreement also included a cross-license back with value to Lucent.  (3/11/08 Tr. at 166:16-25, 194:21-195:18, 204:5-17, 216:3-218:3, 218:20-219:22; 3/12/08 Tr. at 49:15-50:11; PX 5183)

The jury also heard substantial evidence of other royalty rates for PC-related patents, including individual per-unit rates varying from $1.50 to $2.00.  (PX 5247)  The jury could have considered those real-world rates and adjusted upward because they are commuted rates and/or to account for the assumption of validity and infringement.   (3/11/08 Tr. at 194:21-195:18, 210:15-211:1; 3/12/08 Tr. at 16:18-17:25)  Numerous license agreements related to the PC industry with per-unit rates were also entered in evidence.  (See PX 5183, 5189, 5190)  Again, the jury could have adjusted these rates based on Mr. Smith's testimony that these rates are commuted rates, were agreed to in a real-world negotiation, and reflect a cross-license.  (See 3/11/08 Tr. at 166:16-25, 194:21-195:18, 220:15-221:16)  The jury also heard evidence of Microsoft's own agreement to pay per-unit rates as high as $4 on sales of its computer software at the time of the hypothetical negotiation. (3/11/08 Tr. at 233:21-234:17, 235:7-12; PX 5105)

The jury also heard evidence concerning Lucent's 1% per patent policy and the value of a cross-license.  (3/11/08 Tr. at 200:18-201:3, 202:2-14, 203:10-20; 3/12/08 Tr. at 15:1-21; PX 5137, 5139, 5140, 5141)  As the jury heard, application of that Lucent licensing policy would yield a royalty of approximately $10 per unit.  (3/11/08 Tr. at 204:18-205:1)  That evidence, including the testimony of Mr. Smith, Lucent's licensing policies, license agreements, and evidence that the entire computer system was the infringing device, also provided a point of reference as to the reasonable royalty resulting from the hypothetical negotiation.

With respect to the Agulnick '295 patent, the jury was provided with the opportunity to identify the royalty rate used in calculating its award.  The jury declined to do so.  But Microsoft continues to engage in speculation as to how the jury reached its lump-sum damages award. Regardless of how the jury reached this exact amount, the amount awarded by the jury is supported by substantial evidence presented at trial.  As discussed in more detail below, the jury's verdict is supported by the testimony of Mr. Smith and the evidence Lucent presented at trial regarding the proper amount of damages for the Agulnick '295 patent.  And, as discussed in detail above, evidence of numerous rates for comparable technology was presented at trial that the jury could have applied

in reaching its damages verdict.

In addition, Microsoft's damages expert Brian Napper specifically mentioned two agreements during the course of his testimony.  (DX BCH, BCI)  One agreement was a patent cross-license agreement between Lucent and Casio wherein Casio paid Lucent a balancing payment of $10,000,000 for comparable technology.  (3/25/08 Tr. at 186:18-187:12)  The other was a patent cross-license agreement between Microsoft and Silicon Graphics.  Mr. Napper testified that Microsoft paid $30,000,000 for rights to two Tablet PC patents; he attributed $15,000,000 for a patent license to a single patent.  (3/25/08 Tr. at 206:6-20)  Both of those lump-sum agreements provide support for the jury's damages award.

The jury might properly have relied on any of this evidence in support of its award, considering it in light of common sense and its own experience.  *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); 35 U.S.C.§ 284 ("The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.")  Each party's expert supported his reasonable royalty determination with an analysis of relevant factors based on his view of the disputed facts.  The jury ultimately chose its conclusion between the amounts proposed by each party's expert, and the record provides ample factual support for the jury's conclusion.  The jury was instructed on the factors set forth in *Georgia-Pacific* for determination of a reasonable royalty and the record contains substantial evidence regarding the infringing features and evidence of the importance of the patented invention to the accused products.  Because the record contains "sound economic and factual predicates" to support the jury's lump-sum damages award, the Court should deny Microsoft's motion.[24]

**B.    The Entire Market Value Rule Does Not Justify Granting JMOL or New Trial on the Jury's Damages Verdict.**

**1.    The Entire Market Value is Not Applicable in This Case.**

As discussed above, the jury may have based its lump-sum damages awards on a number of different factual predicates, any of which provides ample support for the jury's conclusion.  As a result, it is unclear whether the jury's lump sums were derived from a running royalty at all, and if they

---

[24] Microsoft's contentions regarding the derivation of the jury's award is pure speculation.  None of Microsoft's musings match the jury's conclusion.

were, whether the jury applied some rate to the selling price of the complete software products or to just some portion of it. Despite that wealth of potential bases for the jury's verdict, Microsoft challenges the award based on the entire market value rule.

With respect to the Day '356 patent, not only is it unclear whether the jury based its award on the complete software product, Lucent's damages theory presented at trial does not require application of the entire market value rule. As detailed in his trial testimony, Mr. Smith's suggested royalty for the Day '356 patent used only the accused software products as the royalty base.[25] Despite arguing previously that the proper royalty base should be software, (*see, e.g.*, MX 7, Microsoft's Motion *in Limine* No. 4 Audio Coding Trial), Microsoft now suggests that the proper royalty base should be something else again—some undefined, non-functional snippet of the unitary commercial product as sold.[26] But as Mr. Smith recognized, Lucent's technical expert testified that it is the normal usage of the entire accused software programs that infringes the patents. (*See, e.g.*, 2/27/08 Tr. at 102:17-103:19, 136:7-137:11, 161:21-162:3, 181:6-14; 3/12/08 Tr. at 53:7-15) Mr. Tognazzini did not opine that the infringement is limited to some portion of the software; rather, he testified that the infringement is embodied in the entire software program as incorporated on a computer system and that the infringement is central to the operation of the accused products. Thus, the entire market value rule simply has no application to the royalty suggested by Mr. Smith, because it encompassed only the smallest commercially sold piece of the infringing product (the accused software) rather than the entire functional infringing system. *See State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1579-81 (Fed. Cir. 1989) (entire market value rule potentially implicated only where royalty base goes beyond the infringing product).[27]

---

[25]  Contrary to Microsoft's contention, Lucent has never conceded that a reasonable royalty on a base of the entire computer system violates the entire market value rule. In any event, contrary to Microsoft's assertion, Mr. Smith's 8% theory is not "simply a sleight of hand to achieve the same result"—the application of the 8% rate to the software product results in a much lower reasonable royalty than application of the 1% rate to the computer system.

[26] Microsoft's damages expert Brian Napper did not present an alternative base..

[27] Indeed, one District Court has already rejected Microsoft's argument that the software cannot be the royalty base simply because it bundles numerous features into a unitary infringing product:

Microsoft argues against the validity of any damage calculation wherein the value of a complex, (Continued…)

1    Similarly, with respect to the Agulnick '295 patent, the entire market value rule is also not

2 implicated where the patentee does not seek royalties on a base beyond the actual infringing product.

3 *See Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1458-59 (Fed. Cir. 1991) (upholding

4 district court damages award of 0.75% on the base of the entire product covered by the claims); *State*

5 *Indus.,* 883 F.2d at 1579-81.  As Mr. Ward, Lucent's technical expert for the Agulnick '295 patent

6 testified, it is the entire tablet PC that infringes.  (*See, e.g.,* 2/28/08 Tr. at 190:7-12, 191:6-12,

7 212:6-22)  Mr. Smith relied on this testimony in determining that the proper royalty base is the entire

8 tablet PC.  (3/12/08 Tr. at 29: 21-30:19, 33:18-34:3)   Furthermore, Mr. Smith recognized that

9 Microsoft would be standing in the shoes of its customers, like Dell, who sell the entire tablet PC and

10 thus would pay a royalty on the entire system.  (3/12/08 Tr. at 41:24-44:5)  Thus, the entire market

11 value rule has no application to Mr. Smith's opinion of the royalty base for the Agulnick '295 patent.

12    In addition, the *Georgia-Pacific* analysis itself provides an independent basis for a finding

13 that a hypothetical negotiation would have resulted in a royalty base larger than a particular portion

14 of an infringing product specifically addressed by the patent at issue.   For instance, the

15 *Georgia-Pacific* factors explicitly recognize, and give weight to, the patentee's licensing policies and

16 practices, licensing practices in the industry, convoyed sales, and even the value to be credited to the

17 invention as distinct from non-patented elements.  *Georgia-Pacific*, 318 F. Supp. at 1120 (listing as

18 relevant to the reasonable royalty factors 4, 6, 12 and 13).   Similarly, depending on industry

19 circumstances, a reasonable royalty can be based on something other than, or in addition to,

20 infringement alone.  *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 138

21

22    multi-functional product is the base from which a percentage is extracted-the percentage being
     the commercial value of a single infringing functionality. . . . [T]he bundling makes it very
23    difficult for either party to assess the value of each individual component.  Since Microsoft has
     created this difficulty for itself, it must bear the legal risks attendant to its way of business.  At
24    times, Microsoft's arguments seemed to border on proposing that an infringer could wrap
     together, in a single product, 150 technological innovations without having to any [sic] pay a
25    cent in royalties so long as each innovation contributed only a small part of the product's overall
     value and was not itself a standalone product.  But, few would be willing to adopt this position
26    explicitly.

27 *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99 C 0626, 2004 WL 170334, at *2 (N.D. Ill. Jan. 15,

28 2004).

(1969) (recognizing that the parties may find it convenient to base royalties on total sales rather than face the burden of figuring royalties on actual use); *Hanson v. Alpine Valley Ski Area, Inc.*,718 F.2d 1075, 1080 (Fed. Cir. 1983) (basing royalty on estimated cost savings rather than actual usage); *Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 289 (Fed. Cir. 1988) (upholding award of damages of a lump-sum royalty payment based on expected sales).  The Federal Circuit has held the jury is entitled to rely on evidence of bundling and convoyed sales in determining the proper scope of the royalty base.  *See Interactive Pictures Corp. v. Infinite Pictures Corp.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001).

Here, Mr. Smith, a licensing expert with decades of licensing experience in the computer industry, testified—based on Lucent's licensing policies and practices, as well as industry practice and the license agreements entered in evidence—that the proper royalty base is the accused software programs for the Day '356 patent, (3/11/08 Tr. at 178:23-180:12, 194:1-197:20; 3/12/08 Tr. at 45:10-18; PX 5125, 5137, 5139, 5140, 5141, 5172, 5456), and is computers running the accused software for the Agulnick '295 patent.  (3/11/08 Tr. at 178:23-180:12, 194:1-197:20; 3/12/08 Tr. at 29:21-30:19, 31:16-24; PX 5125, 5137, 5139, 5140, 5141, 5172, 5456)  Those conclusions, rooted in the industry's actual practice and the hypothetical negotiation itself, are entirely independent from any reliance on the entire market value rule.[28]  *See Georgia-Pacific*, 318 F. Supp. at 1120; *see also Hanson*, 718 F.2d at 1079, 1080 (finding expert testimony "credible and convincing" regarding "the basis upon which a willing licensor and a willing licensee would have negotiated a license").

> **2.      Even Under Proper Application of the Entire Market Value Rule, Substantial Evidence Supports Use of the Accused Software and Computer System as the Royalty Base.**

To the extent Microsoft interprets the entire market value rule to require that the accused feature must be the sole basis for consumer demand of the larger product, Microsoft is wrong.  The Federal Circuit has routinely applied the entire market value rule where the patented component is not the sole basis for the customer demand.  Rather, the proper test examines two interrelated factors: (1) whether there is a functional relationship between the patented and unpatented components and (2)

---

[28] This case is distinguishable from the arguments made by the patentee in *Imonex Services, Inc. v. W. H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1379-80 (Fed. Cir. 2005).  Here, unlike in *Imonex*, Mr. Smith's opinion is based on the industry licensing practice and numerous real-world license agreements and therefore relates to the *Georgia-Pacific* factors.

whether the patented feature contributes substantially to customer demand. *Lucent Techs. Inc. v. Microsoft Corp.*, Case No. 06-CV-0684-H (CAB), Docket No. 347; *Bose Corp. v. JBL Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001); s*ee also Juicy Whip*, 382 F.3d at 1371-73; *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1362 (Fed. Cir. 1999). Thus, even were it applicable, the entire market value rule may be satisfied by evidence that the patented features contributed to the demand for the accused software products or computer system.

In connection with the Day '356 patent, as Mr. Tognazzini testified, and Mr. Smith recognized, the accused features are central and material to each of the accused software programs and are promoted by Microsoft. (2/27/08 Tr. at 102:17-111:2, 136:7-145:3, 161:21-170:8, 181:6-185:11; PX 501, 626, 627, 628, 629, 647, 648, 649, 650, 651, 652, 654, 665, 678, 742, 971, 972, 1121B, 1124B, 1129B, 1138B, 1139B, 1144B, 1145B, 1145C, 1154B, 1154C, 1218, 1507, 1505, 5546; 3/12/08 Tr. at 53:7-15) Mr. Smith did not concede that the accused features were not central to the products on cross-examination, as Microsoft contends; instead, Mr. Smith confirmed that the patented features are necessarily implicated in use of the software, such as use of the calendaring feature in the accused Microsoft Outlook software program. (*See, e.g.*, 3/12/08 Tr. at 133:24-134:11)[29] And, when shown the "date picker" during cross-examination, Mr. Smith testified regarding the advantages of being able to see the calendar to pick a date as opposed to using other tools to enter a date. (3/12/08 Tr. at 142:17-21)[30] The jury also heard substantial additional evidence of the commercial importance of the patented features to the sales of the software and the customer

[29] Even Microsoft's expert conceded that the accused feature in Outlook appears multiple times and is not only found in the calendaring function, but also in tasks and journals. (3/25/08 Tr. at 203:12-17)

[30] Mr. Smith never testified "that he had not analyzed the non-patented functionality within the accused programs, despite being obligated by the *Georgia-Pacific* factors to do so." (MB at 25) The *Georgia-Pacific* analysis does not require Mr. Smith perform a detailed analysis of each alleged non-patented functionality within Microsoft's accused software programs and the jury was not required to engage in such an analysis in determining its damages award. (*See* Jury Instruction No. 44 at 1 ("I will list for you a number of factors you may consider. This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty."); at 3 ("13. The portion of the profit that is due to the patented invention, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented processes, or features or improvements developed by the defendants.") Indeed, Mr. Smith testified that he was aware of the other features of Outlook (3/12/08 Tr. at 133:13) and focused his analysis on the fact that the patented invention was an important aspect of the Outlook program. (*Id.* at 135:10-12)

Case No. 07-CV-2000-H (CAB)

demand for the software due to the patented features.  (2/27/08 Tr. at 52:2-59:9; 3/12/08 Tr. at 53:7-61:24, 65:13-69:13; PX 246, 248, 250, 253, 5158, 5163)  Based on its own experience and the abundant evidence about the infringing features, the jury was also free to conclude that the patented features were commercially important.

With respect to the Agulnick '295 patent, as Mr. Ward testified, a purchaser of a pen-based tablet PC demands the inventions of the Agulnick '295 patent to make stylus-based computing a reality.   (*See, e.g.*, 2/28/08 Tr. at 186:16-187:19, 237:18-238:11)    Mr. Smith also presented substantial evidence of the commercial importance of the patented features to sales of tablet PCs and customer demand for tablet PCs because of the patented features.  (3/12/08 Tr. at 33:12-44:19; PX 5206A)  Finally, the jury was free to make its own evaluation of the infringing features and based on its own experience and the evidence presented, could properly have concluded that the patented features were commercially important.  Thus, to the extent the entire market value rule is implicated, the jury heard sufficient evidence to support the damages award.

### C.    Damages for the '356 Patent Should Not Be Limited to the Extent to Which Lucent has Demonstrated Specific Instances of Infringement.

For purposes of establishing indirect infringement liability, it is settled law that circumstantial evidence is sufficient to establish the required connection between sales and direct infringement.  *See Symantec Corp. v. Computer Assocs. Int'l*, No. 2007-1201, -1239, slip op. at 17, 522 F.3d 1279 (Fed. Cir. Apr. 11, 2008); *Moleculon*, 793 F.2d at 1272; *Black & Decker v. Bosch*, No. 04 C 7955, 2006 WL 3883286, at *3 (N.D. Ill. Dec. 18, 2006) (including instructions on how to operate in an infringing manner was sufficient to uphold the jury's determination that the product was used in an infringing manner).  As discussed above, Lucent presented substantial evidence that the users of the accused products had performed all of the steps of the claimed method.  However, because proof of a one-to-one correspondence between units sold and directly infringing customers is not required to prove liability, applicable Federal Circuit law does not require that damages be limited to specific proven instances of direct infringement.  *See Philips Elecs. N. Am. Corp. v. Contec Corp.*, 177 F. App'x 981, 988-89 (Fed. Cir. 2006); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 1 F. App'x 879, 884 (Fed. Cir. 2001); *Black & Decker*, 2006 WL 3883286, at *2; *Hilgraeve, Inc. v. Symantec Corp.*, 272 F. Supp. 2d 613, 620-21 (E.D. Mich. 2003).

1
2
3
4
5
6
7
8
9

        In *Philips Elecs.*, the Federal Circuit made clear that the *Dynacore* opinion (on which Microsoft relies) does not require that damages for indirect infringement be limited to proven instances of direct infringement. 177 F. App'x at 988-89. The *Philips Elecs.* Court upheld the jury's calculation of damages where Philips argued that the reasonable royalty reached in the hypothetical negotiation between the parties would have been based on an agreed upon number of total sales rather than the difficult prediction of usage by individual customers. *Id*. The Court recognized that even in the absence of survey evidence or expert testimony as to the percentage of units sold that were actually used in an infringing manner, the jury could rely on its own personal experience and common sense in determining the reasonable royalty damages. *Id.*

10
11
12
13
14
15
16
17
18
19
20
21

        Similarly, Lucent is entitled to rely on circumstantial evidence to prove infringement, and damages are not limited to specific instances of infringement. *See Philips Elecs.*, 177 F. App'x at 988-89; *Chiuminatta*, 1 F. App'x at 884; *Black & Decker*, 2006 WL 3883286, at *3; *Hilgraeve*, 272 F. Supp. 2d at 621.[31] As discussed above, substantial trial evidence establishes that Microsoft instructs its customers to use the accused products in an infringing manner, and that the normal and intended use of the accused products involves the use of the accused features and performance of the claimed method. Ample evidence established Microsoft's indirect liability by encouraging others, through tutorials, instruction, help files, web pages, and other materials, to use the accused products in an infringing manner. That evidence is more than sufficient to establish infringing use of the accused products and to support Lucent's damages claim.[32]

22
23
24
25
26

[31] *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021 (S.D. Ind. 2006) (cited by Microsoft and pre-dating *Philips Elecs.*) is inapposite. In that case, direct infringement required the customer to modify the product in a particular way. *Id.* at 1040. But in this case the software already embodies the patented method when it reaches the customers, and requires nothing more from the user than to use the software without any further modification. *See Philips Elecs.*, 411 F. Supp. 2d at 475 (rejecting defendant's argument based on *Dynacore* where the accused device already embodies the patented method).

27
28

[32] In any event, the jury did not award Lucent the entire damages award sought. As the Federal Circuit recognized in *Philips Elecs.*, the jury could have relied on its own experience and common sense in weighing the evidence of direct infringement and awarded damages accordingly.

### D.     A Jury Award Based On an 8% Royalty for the '356 Patent is Supported by the Evidence.

As discussed above, it is unclear whether the jury actually used an 8% royalty to reach its lump-sum damages award, but even if it did, the record includes numerous real-world royalty rates and lump-sums fully supporting that award.  As Microsoft has recognized, there were no licenses specifically to the Day '356 patent, thus resulting in an analysis by both experts of comparable licenses.  Based on decades of licensing experience in the computer industry and consistent with the *Georgia-Pacific* methodology, Mr. Smith relied on Lucent's licensing policy and industry license agreements for comparable technology in determining that 8% was the proper royalty rate to apply to Microsoft's sales of the accused software.  (3/11/2008 Tr. at 153:20-156:2, 175:20-176:10; 3/12/08 Tr. at 45:10-18)  Mr. Smith testified and presented corroborating evidence that IBM's patent licensing policy was widely adopted in the computer industry before the time of the hypothetical negotiation, (3/11/08 Tr. at 184:17-187:14; PX 5125), and that Lucent adopted IBM's patent licensing policy. (3/11/08 Tr. at 200:18-201:3, 202:2-14, 203:10-20; 3/12/08 Tr. at 15:1-17; PX 5137, 5139)  Mr. Smith also testified and presented evidence that the 8% policy was a part of IBM's licensing practice and that a great number of computer manufacturers took licenses incorporating that rate. (3/11/08 Tr. at 181:25-182:6; 187:15-189:11; PX 5172)  As examples, Mr. Smith presented two IBM licensing agreements with Dell and Gateway—two major players in the computer industry and Microsoft customers—who took a license under IBM's policy at 8% of the fair market value of the licensed information handling system product, which included software programs such as the accused programs.  (3/11/08 Tr. at 190:8-192:14; PX 5140, 5141)[33]

---

[33]  Contrary to Microsoft's argument, the IBM agreements are plainly probative of Lucent's position at the hypothetical negotiation.  Lucent adopted IBM's licensing policy.  These agreements license patents for use in computers and other information handling products like software.  (*See* PX 5140; PX 5141)  Mr. Garrana's subjective opinion regarding the "fundamental" character of the IBM's patents to making a computer was just one fact the jury could have considered in its analysis.  As the trial evidence established, infringement of the Day '356 patent requires a computer and the accused software has no use other than to be installed on a computers.  (3/12/08 Tr. at 45:23-46:9)  The jury heard evidence of Microsoft's intent to stand in the stead of its computer manufacturer customers, like Dell and Gateway.  Thus, those unilateral agreements—the type of agreement that results from the hypothetical negotiation, unlike the subsequent Dell and Gateway IBM cross-licenses—are particularly relevant to the damages analysis.  (3/12/08 Tr. at 21:12-22:1, 23:11-25)

In addition to the IBM agreements, evidence of the industry licensing practices and Lucent's licensing policy, Mr. Smith presented evidence of the Lucent-Acer license agreement, which provides a royalty of 2% of a patented portion of an infringing product.  (PX 5183; 3/11/08 Tr. at 218:20-219:6)  The Lucent-Acer agreement was a cross-license, was entered in to as a result of a settlement, reflected a commuted rate, and was the result of a real-world license negotiation. (3/11/08 Tr. at 166:16-25, 194:21-195:18, 204:5-17, 216:8-218:3, 218:20-219:22; 3/12/08 Tr. at 49:15-50:11; PX 5183)  The jury could have found that the appropriate rate for the hypothetical negotiation is higher than the 2% provided in the Lucent-Acer agreement as a result of those factors and that the Lucent-Acer agreement is consistent with the IBM agreements and the 8% royalty proposed by Mr. Smith.  (3/11/08 Tr. at 166:16-25, 194:21-195:18)  Because the evidence fully supports a reasonable royalty rate of 8%, the Court should deny Microsoft's motion.

**E.    The Size of the Jury's Award for the '356 Patent is Not "Grossly Excessive" Warranting Judgment as a Matter of Law, a New Trial or a Remittitur.**

Microsoft argues that the damages awarded by this jury for the Day '356 patent are grossly excessive.  However, in relative terms, what the jury awarded is only a modest portion of the retail selling price and the overall revenue generated by the tens of millions of infringing units sold.  The record in this case reveals that the jury was instructed in the factors set forth in *Georgia-Pacific* for determination of a reasonable royalty and could have based its determination of a reasonable royalty on the testimony of an expert witness who was cross-examined by Microsoft's attorney.  Lucent's expert, Mr. Smith, provided testimony regarding the reasonable royalty and considered all the *Georgia-Pacific* factors in the context of the hypothetical negotiation.  (3/11/08 Tr. at 192:15-193:9; 193:25-195:18; 195:24-198:6)  Although Microsoft disagrees with the jury's conclusions, the record evidence outlined above provides ample support for the jury's damages award.  Because Microsoft has failed to meet its burden of showing that "the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty," *Monsanto*, 382 F.3d at 1383 (citation omitted), the Court should deny Microsoft's motion.

**VI.    CONCLUSION**

For the reasons given above, the Court should deny Microsoft's motions for judgment as a matter of law, new trial, and remittitur.

1

2    DATED:        May 19, 2008                    KIRKLAND & ELLIS LLP

3

4

5                                        By:    *s/ Jonas R. McDavit*

6                                               John M. Desmarais (admitted *pro hac vice*)
                                                Robert A. Appleby (admitted *pro hac vice*)
7                                               Paul A. Bondor (admitted *pro hac vice*)
                                                Jonas R. McDavit (admitted *pro hac vice*)
8                                               KIRKLAND & ELLIS LLP
                                                153 East 53rd Street
9                                               New York, NY  10022
                                                Telephone:    (212) 446-4800
10                                              Facsimile:    (212) 446-4900

11                                              Gregory F. Corbett (admitted *pro hac vice*)
                                                KIRKLAND & ELLIS LLP
12                                              655 Fifteenth Street, NW
                                                Washington, DC  20005
13                                              Telephone:    (202) 879-5000
                                                Facsimile:    (202) 879-5200

14

15                                              David A. Hahn (SBN 125784)
                                                HAHN & ADEMA
16                                              501 West Broadway, Suite 1600
                                                San Diego, CA  92101-3595
17                                              Telephone:    (619) 235-2100
                                                Facsimile:    (619) 235-2101

18                                              Attorneys for *Lucent Technologies Inc.*

19

20

21

22

23

24

25

26

27

28