1  John E. Gartman (SBN 152300)
   Juanita R. Brooks (SBN 75934)
2  John W. Thornburgh (SBN 154627)
   Roger A. Denning (SBN 228998)
3  Christopher S. Marchese (SBN 170239)
   Fish & Richardson P.C.
4  12390 El Camino Real
   San Diego, California  92130
5  Telephone:      (858) 678-5070
   Facsimile:      (858) 678-5099
6
   Stephen P. McGrath (SBN 202696)
7  Microsoft Corporation
   One Microsoft Way
8  Redmond, WA  98052
   Telephone:      (425) 882-8080
9  Facsimile:      (425) 936-7329

10 Attorneys for Intervenor/Counter-claimant
   and Plaintiff/Counter-defendant
11 MICROSOFT CORPORATION

12 *Additional Counsel Listed on the Last Page*

13                UNITED STATES DISTRICT COURT

14               SOUTHERN DISTRICT OF CALIFORNIA

15 LUCENT TECHNOLOGIES INC. and          Case No. 07-CV-2000 H (CAB)
   MULTIMEDIA PATENT TRUST,              consisting of matters severed from
16                                        consolidated cases:
            Plaintiffs and Counterclaim-defendants,  02-CV-2060 B (CAB)
17                                        03-CV-0699 B (CAB)
   v.                                     03-CV-1108 B (CAB)
18
   MICROSOFT CORPORATION,
19
            Intervenor and Counter-claimant,
20 MICROSOFT CORPORATION,                **MICROSOFT'S REPLY IN SUPPORT
                                          OF ITS COMBINED MOTION FOR
21          Plaintiff and Counter-defendant,  JMOL, NEW TRIAL, OR
                                          REMITTITUR**
22 v.

23 LUCENT TECHNOLOGIES INC.,

24          Defendant and Counter-claimant,
   LUCENT TECHNOLOGIES INC. and          **Date:  June 13, 2008**
25 MULTIMEDIA PATENT TRUST,              **Time:  10:30 a.m.**
                                          **Courtroom: 13**
26          Plaintiffs,                   **Judge: Honorable Marilyn L. Huff**

27 v.

28 DELL, INC.,
            Defendant and Counter-claimant.

# TABLE OF CONTENTS

**Page**

I.  THE ASSERTED '356 CLAIMS ARE OBVIOUS IN LIGHT OF THE
    *DATAMATION* ARTICLE ........................................................................................ 2

    A.  The "Indicating" Step Is Inherently Disclosed by the *Datamation*
        Article and, in Any Event, Was Obvious ..................................................... 2

    B.  The *Datamation* Article Discloses "Information Fields" Into
        Which Data Is "Inserted" ............................................................................. 4

    C.  The *Datamation* Article Discloses "Graphical" Tools.......................................... 5

    D.  The *Datamation* Article Discloses "Concurrently" Displayed Tools .................. 7

II.  THE '356 PATENT DAMAGES VERDICT HAS NO SUPPORT ................................ 8

    A.  Lucent's Improper Application of the Entire Market Value Rule
        Cannot Support the Verdict .......................................................................... 9

        1.  Having Pursued an Entire Market Value Theory from this
            Case's Inception, Lucent Cannot Abandon It Now to
            Salvage Its Verdict. ....................................................................... 9

        2.  Lucent *Still* Misunderstands and Misapplies the Entire
            Market Value Rule. ....................................................................... 12

        3.  Lucent *Cannot* Satisfy the Entire Market Value Rule. ................ 13

    B.  If Based on Pure Speculation, the Verdict Also Cannot Stand ........................ 14

    C.  Lucent's Improper Reliance on An Unpublished Case Cannot
        Overcome Its Failure to Demonstrate Actual Usage of the Claimed
        Method ........................................................................................................ 15

    D.  Lucent's Royalty Rate and the Total Amount of Damages Are Also
        Not Sustainable ............................................................................................ 16

III.  OTHER ISSUES ................................................................................................... 16

IV.  CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Checkpoint Systems, Inc. v. U.S. Intern. Trade Com'n*, 54 F.3d 756 ............................... 17

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H Patrick Co.*, 464 F.3d 1356 .................................................................................................................................. 1

*E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 ........................................................ 18

*Eaton Corp. v. ZF Meritor LLC*, No. 03-74844, 2007 WL 735000 ................................. 12

*Eolas Techs. Inc. v. Microsoft Corp.*, No. 99-C-0626, 2004 WL 170334 ....................... 10

*Harrington Manufacturing Co. v. Powell Manufacturing Co.*, 815 F.2d 1478 ............... 17

*Hodosh v. Block Drug Co.*, 833 F.2d 1575 ..................................................................... 18

*Izume Products Co. v. Koninklijke Philips Electrics N.V.*, 315 F.Supp.2d 589 ............... 12

*KSR Intern. Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 ......................................................... 1, 2

*Microsoft Corp. v. AT&T Corp.*, ---, U.S. -- 127 S.Ct. 1746 .......................................... 10

*O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351 .......... 6

*Orthopedic Equipment Co., Inc. v. U.S.*, 702 F.2d 1005 ................................................. 17

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 ................................. 1, 2

*Philips Elecs. N. Am. Corp. v. Contec Corp.*, 177 ......................................................... 15

*Sesma v. Hernandez*, No. 07-CV-0539 .......................................................................... 15

*Slimfold Manufacturing Co. v. Kinkead Industrial, Inc.*, 932 F.2d 1453 ....................... 11

*State Industrial, Inc. v. Mor-Flo Industrial, Inc.*, 883 F.2d 1573 ............................... 9, 10

## STATUTES

35 U.S.C. § 271 ............................................................................................................... 19

1    Microsoft focuses this reply brief on two key issues:  obviousness of the '356 patent and

2    damages under the Entire Market Value Rule.  Microsoft rests on its opening brief on other issues.

3    Lucent's opposition simply avoids (or buries in footnotes) the main reasons that the

4    asserted claims of the '356 patent are obvious.  For example, Lucent ignores the rule that common

5    sense must govern the obviousness analysis.  *KSR Intern. Co. v. Teleflex, Inc.*, 127 S. Ct. 1727,

6    1742 (2007)("it is likely the product not of innovation but of ordinary skill and common sense");

7    *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H Patrick Co*., 464 F.3d 1356, 1367 (Fed.

8    Cir. 2006) (obviousness test "not only permits, but requires, consideration of common knowledge

9    and common sense").  In its opening, Microsoft pointed out that common sense demands using a

10   cursor to indicate where data entry will occur on a computer -- indeed, that it would be

11   unimaginable to have a computer where data just appeared in a random location when one typed.

12   Yet Lucent offers no response.

13   Lucent also ignores the rule that to find obviousness, the Court must simply find that there

14   was (1) a reason to combine, and (2) a reasonable expectation of success in doing so.  *PharmaStem*

15   *Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).  Here, the reason to

16   combine an indicator with the other elements in the *Datamation* article is clear -- the user needs

17   some indication where her input will go.  And of course a programmer would have every

18   expectation of being able to successfully program such an indicator -- since indicators (such as

19   cursors) had been used in computers from the very beginning.

20   More generally, Lucent ignores the Supreme Court's rule in *KSR* that "[t]he combination of

21   familiar elements according to known methods is likely to be obvious when it does no more than

22   yield predictable result."  *KSR,* 127 S. Ct. at 1739.  Microsoft has demonstrated that all of the

23   elements of the asserted claims -- from cursors to graphical displays -- were well known and that

24   combining them was entirely predictable.

25   In addition, Lucent continues to rely on claim constructions that are contrary to this Court's

26   *Markman* rulings.  Lucent has no real response to the fact that this Court expressly rejected

27   Lucent's construction of "concurrently," and instead construed the term to mean simply "at the

28

1  same time." Similarly, Lucent has no real response to the fact that the Court's construction

2  requires a "graphical keyboard," not "graphics mode."

3       Finally, Lucent ignores the rule that exercise of judgment about obviousness is for the

4  Court where, as here, there are no genuine disputes about material historical facts. *KSR*, 127 S. Ct.

5  at 1742-43, 1745-46 (2007) (finding obviousness as a matter of law over a contrary expert

6  opinion); *PharmaStem*, 491 F.3d at 1347, 1350, 1359-67 (Fed. Cir. 2007) (reversing denial of

7  JMOL and finding obviousness as a matter of law). The *Datamation* article's scope and content is

8  beyond dispute. The level of ordinary skill is also undisputed. Thus, the *only* issues are legal.

9  They are: (1) claim construction (regarding "concurrent" and "graphical") and (2) whether the

10 undisputed facts make the claims obvious.

11       Lucent also avoids the real issues regarding damages. As in Audio, Lucent is asking the

12 Court to award it hundreds of millions of dollars for minor features that cannot possibly be "the

13 basis" for the demand for the accused products. This is not permitted as a matter of law under the

14 Entire Market Value Rule, as this Court held in Audio. Lucent's switch from 1% of computers to

15 8% of Microsoft's software is just a sleight of hand. In addition, to the extent that Lucent now

16 suggests that the jury simply made up its lump sum verdict -- without consideration of Lucent's

17 EMV evidence -- renders the verdict equally invalid as speculative and lacking a rational basis.

18 **I.     THE ASSERTED '356 CLAIMS ARE OBVIOUS IN LIGHT OF THE**

19 **     *DATAMATION* ARTICLE**

20       In the following sections, Microsoft addresses each claim limitation challenged by Lucent

21 in its opposition. There are no genuine factual disputes regarding the *Datamation* article's

22 disclosure. Again, the only disputes are legal: claim construction and obviousness.

23 **     A.     The "Indicating" Step Is Inherently Disclosed by the *Datamation* Article and,**

24 **          in Any Event, Was Obvious**

25       Lucent's assertion to the contrary, Microsoft does not concede that the *Datamation* article

26 lacks the claimed "indicating" element. [LB at 2.][1] Microsoft's expert, in the testimony that

27 Lucent cites, states only that the *Datamation* article does not use "the ***word*** 'indicating'" to

28

---

[1] LB refers to Lucent's opposition brief.

1  expressly describe this claim step.  [LB at 6, 9.]  However, as explained in Microsoft's opening

2  brief, the *Datamation* article actually **shows** a highlighted field that inherently discloses

3  "indicating."  [Trial Ex. AOE.][2]  Lucent ignores this.

4      Moreover, regardless of whether the *Datamation* article inherently discloses indicating,

5  nothing could be more obvious.  The *Datamation* article discloses a system that displays a form on

6  the right side of the screen and tools to complete the form on the left:

> The right half [of the screen] lists key information about the current
> transaction, including buyer bank, seller bank, currency, exchange
> rate (in dollars and foreign currency), broker, bank customer,
> exchange location, and method of payment…When the trader
> touches one of these areas, a list of potentially valid entries or a
> numeric keypad appears on the left half, inviting the user to choose
> the information needed on the right…In this way, an entire
> transaction can be completed directly on the workstation.

12  [Trial Ex. AOD at 148; Trial Ex. AOE.]  A person of skill in the art would recognize that the user

13  would need some indication of the "active" field, that is, the field that would be populated by her

14  use of the tool:

> Q.  How common was it in 1984 to provide some type of visual
> feedback to indicate what was selected by a user?
>
> A.  I think you always require feedback, back to the user, regardless
> of whether it was a touch screen or any other system.  It is important
> that the user knows that what they have selected has been recognized
> by the program. So absolutely common.

19  [Trial Tr. XIII-18:17-19:2.]  This is especially true for a system like the one disclosed in the

20  *Datamation* article.  For example, the screen displays a field for the currency exchange rate in

21  dollars and a field for the exchange rate in a foreign currency.  [Trial Ex. AOD at 148; Trial Ex.

22  AOE.]  These two rate fields use the same tool.  [Trial Ex. AOD at 148 ("For exchange rates and

23  other numerical data, the user hits the proper cell on the right and then types in the numeric data on

24  a keypad that appears on the left.")  The system therefore must "indicate" which field is active in

25  order for the user to know which of these similar fields is the target since they use the same tool:

> Well, it was important for the trader to know that the field that he
> thought he had selected had actually been selected by the application

---

[2] Unless otherwise noted, all citations to the trial transcripts, trial exhibits, trial demonstratives ("PX" and "RDX") and other miscellaneous exhibits are attached to the Declaration of John W. Thornburgh filed with Microsoft's opening brief.

1    and to make it clear what the value was that was in there already, if
2    there was any value.

3    [Trial Tr. XIII-18:6-18:17.]

4    Put another way, and applying the *PharmaStem* test, the reason to combine an indicator

5    with the other elements in the *Datamation* article is straightforward -- the user needs some

6    indication where her input will go.  And of course a programmer would have every expectation of

7    being able to successfully program such an indicator, since indicators (such as cursors) had been

8    used in computers from the very beginning.  Lucent does not dispute this critical fact.

9    Finally, and most importantly, this is a perfect example of applying common sense, as

10   demanded by the Federal Circuit and the Supreme Court.  Every computer user knows that a

11   computer must somehow indicate where input will go (e.g., with a cursor).  Omitting such an

12   indicator -- e.g., having data appear at a random location when the user types -- would be contrary

13   to all experience.

14   **B.     The *Datamation* Article Discloses "Information Fields" Into Which Data Is**

15   **"Inserted"**

16   The *Datamation* article explicitly discloses inserting information into "information fields":

17   The right half [of the screen] lists key information about the current
18   transaction, including *buyer bank, seller bank, currency, exchange
     rate (in dollars and foreign currency), broker, bank customer,
19   exchange location, and method of payment*…When the trader
     touches one of these areas, a list of potentially valid entries or a
20   numeric keypad appears on the left half, inviting the user to choose
     the information needed on the right…In this way, an entire
21   transaction can be completed directly on the workstation.

22   [Trial Ex. AOD at 148 (emphasis added); Trial Ex. AOE.]

23   The *Datamation* article likewise discloses "inserting" information into these fields:

24   For instance, when the user hits the "broker" cell on the right, a list
25   of broker appears on the left; the trader then hits the name of the
     broker to be involved in the current trade, and that information is
26   entered into the system.

27   [Trial Ex. AOD at 148; Trial Ex. AOE.]

28

4                    Case No. 07-CV-2000 H (CAB)

Lucent falsely asserts that Microsoft's expert "admitted" that the *Datamation* article does not disclose information fields. [LB at 7:7.]  In fact  Mr. Buscaino stated the exact opposite in the very testimony that Lucent cites:

> Q.  The article talked about a broker cell. It didn't say that the information in the broker cell goes into a field, did it? You know it didn't use that term, right?
>
> A.  I don't know that, but I -- you would understand a cell to be a field. It was very clear from the article.

[Trial Tr. XII-181:4-8, *see* D.I. 821-7.]  The same testimony also belies Lucent's contention that Microsoft's expert supposedly admitted that the *Datamation* article does not disclose "inserting" information into the fields.

There is no genuine dispute that the *Datamation* article discloses displaying information fields as well as inserting information into them.

**C.    The *Datamation* Article Discloses "Graphical" Tools**

The *Datamation* article plainly discloses and depicts an on-screen "graphical keyboard," as shown below:



[Trial Exs. AOE & AOD]  There is no question that the depicted tool is "graphical" -- that is, it is

1   displayed on the screen.  As explained by Microsoft's expert, the term "graphical" simply means

2   that the claim is referring to on-screen tools, such as an on-screen keyboard, rather than a real,

3   physical keyboard.  [Trial Tr. XII-96:10-96:15.]  Even Lucent's own expert acknowledged that

4   "computer graphics" is a general description that encompasses any computerized display of

5   imagery.  [Trial Tr. IV-74:6-74:9, attached to Millikan Reply Decl.]

6          Lucent argues that the *Datamation* disclosure is insufficient because the Court's

7   construction *should* have been "graphics mode keyboard" and "graphics mode keypad" instead of

8   "graphical keyboard" and "graphical keypad."  However, this is not what the Court said, and the

9   Court should so hold again as a matter of law.[3]  Once it does so, it is apparent that there is no

10  genuine dispute of fact that *Datamation* discloses graphical -- on-screen as opposed to physical --

11  tools, necessitating judgment as a matter of law.  At a minimum, since Lucent confused the jury at

12  trial with its false claim construction, a new trial is required.

13         Citing the Court's Summary Judgment Order, Lucent incorrectly contends that the meaning

14  of "graphical" was a fact issue for the jury.  This is contrary to law.  Where the parties disagree on

15  the claim construction's meaning, *that too* is an issue of claim construction – one for the Court to

16  resolve, even after trial, as the Federal Circuit recently held in *O2 Micro Intern. Ltd. v. Beyond*

17  *Innovation Technology Co.*, Ltd., 521 F.3d 1351 (Fed. Cir. 2008).  In *O2 Micro*, the Federal

18  Circuit held it was an error not to construe a claim term that was disputed at trial.  The parties

19  disputed whether "only if" allowed for exceptions.  *Id.* at 1360.  The Federal Circuit held:  "When

20  the district court failed to adjudicate the parties' dispute regarding the proper scope of 'only if,' the

21  parties presented their arguments to the jury.  By failing to construe this term, the district court left

22  the jury free to consider these arguments."  *Id.* at 1362.  This was found to be error, and the Federal

23  Circuit remanded the case and directed the District Court to resolve the dispute even though the

24  case had already proceeded to a jury verdict.  *Id.* at 1362-63 ("[w]hen the parties present a

25  fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it").

26

27

28         [3] If Lucent felt the *Markman* Order was in error, it should have moved for an amended Order
    during trial, as Lucent tried (unsuccessfully) with the '759 Fleming patent [D.I. 667], rather than
    mislead the jury with the incorrect construction.

Furthermore, even if this Court were to hold that "graphical" requires non-textual elements, it is apparent from the above photograph that *Datamation* discloses non-textual elements such as lines and arrows.  Indeed, it depicts a graphical user interface that substitutes a touch screen for a mouse.  [Trial Exs. AOE & AOD, Trial Tr. XII-95:25-96:15.]  This graphical user interface is also remarkably similar to the figures of the '356 patent cited by Lucent [LB at 8 n.5], as shown below:



[Trial Ex. 2, fig. 2.]                              [Trial Ex. AOD.]

In short, Lucent confused the jury by misstating the Court's claim construction, which requires the tools to be "a *graphical* keyboard tool or a *graphical* number keypad tool," *not* "graphics mode."  [Trial Ex. 7 at 9.]  Applying the correct claim construction -- a matter of law -- the Court should enter JMOL that the *Datamation* article satisfies the element.  At a minimum, it should order a new trial given Lucent's prejudicial use of a false claim construction at trial.

**D.    The *Datamation* Article Discloses "Concurrently" Displayed Tools**

There is no factual dispute about "concurrently."  The *Datamation* article undisputedly states: "When the trader touches the screen in one of these areas, a list of potentially valid entries or a numeric keypad appears on the left half, inviting the user to choose the information needed on the right."  [Trial Ex. AOD at 148; Trial Ex. AOE; *see also* Trial Tr. XIII-19:3-19:21.]  This behavior meets the Courts construction for "concurrently displaying," namely, "displaying at the same time, as by a window overlaying the form."  [Trial Ex. 7 at 9 (emphasis added).]

As with "graphical," the only dispute is claim construction.  Here, Lucent attempts to make "overlaying" (or windowing) a *requirement*, rather than an *example* – improperly reading "as by"

1    out of the Court's construction.

2         Lucent's citation to the *Markman* transcript is unavailing because the Court's actual claim

3    construction governs the case.  Moreover, later in the case the Court confirmed its construction

4    allowed for side-by-side display – and expressly rejected Lucent's requirement of an overlay:

5         Although the Court provided the definition of concurrently displaying to
     include the example "as by a window overlaying the form," that phrase is an

6         *example* of the definition of "displaying at the same time."  The Court's
     construction *does not exclude* side-by-side displays…."

7

8    [Ex. '356 MSJ Order at 7 fn. 3 (emphasis added).]  Lucent has no cogent response.[4]

9         Instead, as with "graphical," Lucent argues that the Court left the meaning of

10   "concurrently" as a fact dispute for the jury.  But again this is contrary to law.  The Court must

11   resolve disputes about the meaning of its claim construction as a matter of law.  Microsoft submits

12   that the Court has already done so, but the Court should now reaffirm its previous construction.

13   Once this is done, it is apparent both that JMOL is required and that Lucent misled the jury by

14   using another false claim construction at trial, necessitating a new trial at a minimum.

15   **II.    THE '356 PATENT DAMAGES VERDICT HAS NO SUPPORT**

16        Lucent's opposition to Microsoft's motions for JMOL and new trial on damages is nothing

17   more than a hodge-podge of speculative possibilities regarding how the jury **might** have reached its

18   result.  But, unlike Microsoft, Lucent refuses to undertake any mathematical analysis of the verdict

19   to substantiate any of its alternatives.  Instead, Lucent prefers to raise mere possibilities on the

20   hope that the mere fact the verdict amount fell between the largest and smallest numbers

21   mentioned at trial will allow it to stand.  But by giving the Court no guidance into the jury's

22   process, Lucent leaves Microsoft's mathematical analysis of the verdict unchallenged.

23   Accordingly, as Microsoft explained in its opening brief, the only two reasonable possibilities are

24   that the jury either (1) calculated the " lump sum" by applying Lucent' s proposed 8% rate to the

25   entire price of Microsoft' s software (using OEM and retail prices),[5] or (2) calculated an

26

27       [4] It is also unlikely that the Federal Circuit would affirm construing "concurrently" to mean
"overlay" or "window."  Concurrently just means at the same time.

28       [5] The Court will recall that Microsoft showed how using OEM prices 85% of the time and
retail prices 15% of the time, and applying Lucent' s 8% rate, one could obtain a damages total of

1   approximate midpoint between Lucent and Microsoft's damages opinions.  As explained in

2   Microsoft's opening brief, neither of these alternatives is legally acceptable, and Microsoft

3   reiterates and reincorporates those arguments herein.  To the extent Lucent opposed Microsoft's

4   arguments, Microsoft responds below.

### A.    Lucent's Improper Application of the Entire Market Value Rule Cannot Support the Verdict

7   Unsure how to proceed given its previous failures to satisfy the Entire Market Value Rule,

8   and unwilling to analyze the verdict lest it discover that the Entire Market Value Rule *was*

9   implicated, Lucent contends alternatively here that:  (1) the jury did not need to apply the Entire

10  Market Value Rule, but (2) even if the jury did apply the Entire Market Value Rule, doing so was

11  perfectly acceptable.  Neither of these arguments passes muster.

### 1.    Having Pursued an Entire Market Value Theory from this Case's Inception, Lucent Cannot Abandon It Now to Salvage Its Verdict.

14  Lucent raises three flawed arguments to suggest that the verdict does not implicate the

15  Entire Market Value Rule.

16  First, Lucent cites *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1579-81 (Fed.

17  Cir. 1989), to contend that "the entire market value rule simply has no application" here because

18  Microsoft's software "encompassed only the smallest commercially sold piece of the infringing

19  product . . . rather than the entire functional infringing system."  [LB at 43.]  But *State Industries* is

20  easily distinguishable from the situation here.  First, *State Industries* was a lost profits case, not a

21  reasonable royalty case.  883 F.2d at 1577-81.  Thus, after the district court had determined the

22  patentee had actually lost sales of water heaters to the defendant, it needed to determine how much

23  to award the patentee for the sales it would have made but for the defendant's infringement.  *Id.* at

24  1580.  Ultimately, the court settled on the defendant's profit margin on the entire water heater, and

25  the Federal Circuit found this approach acceptable.  *Id.*  Here, the situation is different, as Lucent

26  does not make competing software,.  Moreover, the defendant in *State Industries* raised the issue of

27  demand for unpatented portions of the water heaters only *after* the court had concluded the profit

28  $358,835,648, extremely close to the actual verdict the jury reached with respect to the '356 patent.
Opening Br. at 32.

1    margin was the appropriate amount.  *Id.*  Accordingly, defendant had "not identif[ied] or

2    present[ed] evidence of the value of these nonpatented components."  *Id.*  Here, just the reverse is

3    true, as Microsoft presented overwhelming evidence regarding the unpatented aspects of its

4    software.  Finally, the Federal Circuit noted that "no [unpatented] components c[ould] be used

5    separately, except as spare and repair parts for which State does not claim damages."  *Id.*  Again,

6    that is the opposite of the situation here, where Microsoft demonstrated that the unpatented

7    portions of its software were certainly usable separate and apart from practicing the narrow '356

8    method.[6]

9         Ultimately, Lucent's first argument reduces to nothing more than an excuse to attempt to

10   apply the Entire Market Value Rule to software rather than computers.  But if Lucent were correct,

11   the result would be absurd; unable to charge royalties on the unpatented features on a product later

12   in the stream of commerce, a patentee could still tax the unpatented features of a constituent

13   product without demonstrating that the patented feature was the driver of sales.  Doing so would

14   also render moot the *Georgia-Pacific* factors, such as factors 10 and 13, which address the

15   technical and financial contribution of the patented invention in comparison to unpatented features

16   in the products.  To take a simple example, Lucent is essentially arguing that, because it is

17   attempting to tax the entire value of the muffler rather than the entire car, it doesn't matter whether

18   the patented feature is the reason people buy those mufflers.  But the *Georgia-Pacific* factors and

19   the rationale underlying the Entire Market Value Rule applies just as well at this lower level of

20   consideration: the patentee should not be rewarded for that which he did not invent.  Here, just

21   because consumers cannot purchase the e-mail, contacts, and other noninfringing functionality of

22   Outlook separately from the date picker does not mean that Lucent should be able to impose a

23   royalty on the entire value of Outlook if it is actually the noninfringing functionality that is the

24   basis for consumer demand.  Lucent's focus on the smallest item sold also improperly assumes that

25   there always must be a royalty "base."  The patent statute does not require a base -- just a

26   ────────────────────
         [6] In a footnote, Lucent also refers to dicta in the district court's order denying post-trial motions
27   in *Eolas Techs. Inc. v. Microsoft Corp.*, No. 99-C-0626, 2004 WL 170334 (N.D. Ill. Jan. 15, 2004).
     Lucent completely omits the fact that, on appeal, the Federal Circuit expressly affirmed only the
     district court's claim construction, jury instruction, and finding on § 271(f) (which has since been
28   reversed by *Microsoft Corp. v. AT&T Corp.*, --- U.S. ---, 127 S.Ct. 1746 (2007)); and the
     remainder of the judgment was vacated and remanded.  399 F.3d 1325 (Fed. Cir. 2005).

1    reasonable royalty -- as recognized by the Court in permitting the verdict form to include a lump

2    sum.  Where the patented feature does not drive the sales of the overall thing sold, it would be

3    arbitrary to include the value of the unpatented items in calculating the reasonable royalty.  Instead,

4    the focus must be on the value of the patented feature.  As the Court can see, this argument

5    necessarily collapses into the Entire Market Value inquiry, so Lucent's attempt to suggest it acts as

6    an alternative to the Entire Market Value Rule must be rejected.[7]

7         Lucent's second argument cites *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453,

8    1458-59 (Fed. Cir. 1991), and *State Industries* in an effort to suggest that "the entire market value

9    rule is also not implicated where the patentee does not seek royalties on a base beyond the actual

10   infringing product."  [LB at 44.]  While that proposition may be true, the Entire Market Value Rule

11   *is* implicated where a party is attempting to recover damages on the entire value of a product,

12   including its unpatented portions, and that is *exactly* what Lucent is doing.  As Microsoft detailed

13   in its opening brief, Lucent's own witnesses conceded how little Lucent had allegedly invented.

14   While Lucent's damages expert Mr. Smith may have tried to confuse the jury by repeatedly

15   conflating the narrow claims with the entire accused products in an effort to improperly inflate

16   damages, Lucent cannot now cite that same misleading testimony to bootstrap its damages theory

17   out of the Entire Market Value Rule.

18        Finally, Lucent contends that "the *Georgia-Pacific* analysis itself provides an independent

19   basis for a finding that a hypothetical negotiation would have resulted in a royalty base larger than

20   a particular portion of an infringing product specifically addressed by the patent at issue."  [LB at

21   44.]  But this Court has already considered and summarily rejected that argument in Case

22   No. 3:06-cv-00684-H-CAB as nothing more than an attempt to circumvent the requirements of the

23   Entire Market Value Rule.  *Lucent Techs., Inc. v. Microsoft Corp.*, --- F. Supp. 2d ----, No. 06-CV-

24   0684-H, 2008 WL 410692 (S.D. Cal. Feb. 12, 2008); *compare* LB at 44-45, *with* Mem.of P's &

25        [7] Lucent also states that "Mr. Tognazzini did not opine that the infringement is limited to some
26   portion of the software; rather, he testified that the infringement is embodied in the entire software
     program as incorporated on a computer system and that the infringement is central to the operation
27   of the accused products."  [LB at 43.]  But Lucent's suggestion that the narrow '356 method is
     "all" of Microsoft Outlook, Money, or Pocket PC is laughable.  As Microsoft detailed in its
28   opening brief, the record is replete with evidence regarding the broad functionality of those
     products on the one hand and the narrow nature of the '356 patent on the other.  *See generally*
     opening brief at 24-26.

A's in Supp. of MPT's Opp'n to Microsoft's Mot. for Summ. J. that the Entire Market Value Rule Does Not Apply to the Microsoft Accused Programs and the Xbox 360 Prods at 12-14 (D.I. 251). Accordingly, Lucent's argument here cannot succeed.

### 2. Lucent *Still* Misunderstands and Misapplies the Entire Market Value Rule.

Inexplicably, after three years and numerous rounds of briefing about the Entire Market Value Rule, in the Group 2 Audio trial and appeal, the trial at issue here, and related Case No. 3:06-cv-00684-H-CAB, Lucent is still string-citing the same cases, clinging to its misapprehension of the Rule. Under Lucent's twisted interpretation of the Entire Market Value Rule, each and every one of its technologies—audio coding, video coding, speech coding, the '356 patent, the '295 patent, the '759 patent—can lead to a recovery on the value of the entire software or computer incorporating it just by being proven amorphously "important." But this kind of multiple recovery is *exactly* why the Entire Market Value Rule exists and *exactly* what it forbids. *See, e.g.*, *Eaton Corp. v. ZF Meritor LLC*, No. 03-74844, 2007 WL 735000 (E.D. Mich. Mar. 8, 2007) (If not for this restriction, an infringer could be required to pay multiple recoveries on a single product to numerous patentees."); *Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 614 (D. Del. 2004) ("In the absence of this restriction, an infringer could be required to pay multiple recoveries on a single product to numerous patentees, each of whom file infringement claims directed to different components of the product without regard to the extent to which its patented component contributed to the overall profitability of the product."). This is why the Federal Circuit requires the patented technology be the *sole* basis for consumer demand – it prevents multiple recoveries from multiple patentees. This Court has recognized the proper scope of the Rule by paraphrasing the Entire Market Value inquiry as whether the device being considered for the royalty base would be "commercially infeasible" without the patented technology." [*See, e.g.*, Ex. Mots. in Limine Order re '356 and '295 at 3.] Failing to acknowledge this standard, Lucent's argument that the Entire Market Value Rule supports the jury's verdict must be rejected.

### 3.     Lucent *Cannot* Satisfy the Entire Market Value Rule.

As explained in Microsoft's opening brief, Lucent's approach to the '356 patent closely resembled its effort in the Group 2 Audio trial: take an extremely narrow invention, mischaracterize it to the point where it can be confused with broader features and/or the product itself, and then declare the product itself to be the appropriate "royalty base."  Remarkably, based on its opposition brief, Lucent evidently still believes this tactic will persuade the Court, despite the Court's reversal of the Group 2 Audio verdict and its skepticism before the trial at issue now. [Ex. 2/8/08 Hrng Tr. at 160:2-13 ("On the issue of the entire market value, ***I'm highly skeptical as to the Day patent, that that's going to be able to support the basis for consumer demand***.") (emphasis added).]

Lucent continues to mischaracterize the functionality of, and bases of demand for, Microsoft's products.  For example, Lucent contends in its opposition that "[i]n connection with the Day '356 patent . . . the accused features are ***central and material*** to each of the accused software programs and are ***promoted by Microsoft***."  [LB at 46 (emphasis added).]  Yet Lucent fails to acknowledge the long list of things that Mr. Tognazzini and Mr. Smith admitted were neither invented by nor infringe the '356 patent.  [Trial Tr. VI-36:17-44:6, 45:11-49:16, 60:6-24; *see also generally* Trial Tr. VI-50:17-62:22.]  Lucent similarly ignores the demonstrations of all of the ways the accused products can be utilized without practicing the '356 method, [Trial Tr. XII-39:22-43:1, 110:9-112:19], as well as the evidence Microsoft presented regarding how its customers use the products and the lack of attendant feedback regarding the '356 functionality. [Trial Tr. XII-52:13-54:23.]  And Lucent merely recycles its citations to the "marketing evidence" that Microsoft systematically showed had nothing to do with the patented invention.  Opening Br. at 27-30.

As with the accused products, Lucent attempts to camouflage the truth about the damages calculations it presented to the jury.  For example, Lucent claims in its opposition that "Mr. Smith's 8% theory is not 'simply a sleight of hand to achieve the same result'—the application of the 8% rate to the software product results in a much lower reasonable royalty than application of the 1% rate to the computer system."  [LB at 43 n.25.]  Yet simple math dictates that Mr. Smith's "new"

1   opinion, increasing the rate eight-fold while reducing the base 90%, allowed Lucent to continue to

2   seek $0.80 on every $1 from its original theory seeking royalties on the entire market value of

3   computers.  Said another way, 1% of a $1000 computer is $10; 8% of $100 software is $8.  That is

4   hardly "a much lower reasonable royalty."

5           Ultimately, as Microsoft demonstrated in its opening brief, there is not a shred of evidence

6   that Microsoft Outlook, Money, or Pocket PC would be commercially infeasible without the

7   narrow method of the '356 patent.  Put another way, it is absurd to suggest that Microsoft would

8   have actually paid $357 million for a date picker.  If that were the actual price, Microsoft would

9   have used a design-around or left the feature out altogether.  Given that Lucent's approach to

10  damages cannot satisfy the fundamental requirement of the Entire Market Value Rule, the jury's

11  $357 million verdict based on that Rule must be deemed grossly excessive and against the clear

12  weight of the evidence.  No reasonable jury, applying the correct legal standard and considering

13  the complete lack of evidence regarding customer demand for the '356 patented method, could

14  possibly have awarded Lucent $357 million, and therefore the Court should grant JMOL, a new

15  trial on damages, or remittitur.

16          **B.      If Based on Pure Speculation, the Verdict Also Cannot Stand**

17          Lucent has no direct response to Microsoft's opening argument that the jury may have

18  based its verdict on pure speculation by merely picking a number between the two parties'

19  positions.  Indeed, as noted above, Lucent conspicuously avoids any mathematical analysis of the

20  verdict, instead preferring to merely recite a litany of its evidence in an effort to suggest that those

21  facts "support" the verdict.  But Lucent misses the entire point: other than possibly applying the

22  Entire Market Value Rule as discussed in Microsoft's opening brief, the damages amounts are not

23  explainable by reference to any "evidence" and therefore must have been the result of pure

24  speculation.  For example, Lucent goes so far as to suggest that the jury's $357 million verdict on

25  the '356 patent is justified because "lump-sum agreements . . . were presented in evidence, ranging

26  from royalty payments of $80 million to $290 million."  Yet Lucent fails to, and cannot, explain

27  how the jury could possibly jump from those values—which were for cross-licenses to entire

28  portfolios of patents—to $357 million for just the '356 patent when even Lucent's own expert

1  warned on several occasions that the balancing payments from cross-licenses could not be

2  translated to payments for individual patents.  [Trial Tr. VIII-212:23-213:9 (Millikan Reply Decl.),

3  Trial Tr. IX-24:15-21.]  For the reasons set forth in Microsoft's opening brief, such speculative

4  awards cannot stand.

5      **C.    Lucent's Improper Reliance on An Unpublished Case Cannot Overcome Its**

6         **Failure to Demonstrate Actual Usage of the Claimed Method**

7         As detailed in Microsoft's opening brief, by failing to demonstrate any instances of the

8  '356 method being practiced, Lucent forfeited its ability to recover any damages.  Lucent's only

9  real response is to cite an unpublished 2006 Federal Circuit opinion, contrary to Federal Circuit

10  rules.[8]  Even if that opinion were citable, persuasive authority here, however, that decision does not

11  help Lucent surmount its evidentiary shortcomings.

12         In *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 177 Fed. Appx. 981 (Fed. Cir. 2006), the

13  Federal Circuit found no reversible error in upholding a damages verdict where the patentee had

14  not demonstrated the actual usage of the claimed method.  But a key component in the district

15  court's decision was that "[t]here was substantial evidence in the record . . . to support the jury's

16  calculation of damages" using "agreed upon number of total sales rather than usage by individual

17  customers, since the latter would have been difficult to predict."  *Id.* at 988-89.  Here, in contrast,

18  there was no such evidence.  While Mr. Smith may have discussed what he called "commuted

19  rates," he did so in the context of the '226 and '759 patents, not the '356 patent.  [Trial Tr. VIII-

20  63:25-64:7, 203:25-204:17, 210:21-211:11, 216:14-217:15, 220:1-221:10 (see D.I. 821-4); Trial

21  Tr. VIII-222:23-223:13, 226:24-227:7 (Millikan Reply Decl); Trial Tr. IX-17:8-25, 18:18-19:9,

22  270:24-271:3 (Millikan Reply Decl.); Trial Tr. X-36:9-13.]  Neither Mr. Smith nor Lucent ever

23  provided ***any*** testimony or evidence that, because the '356 method was difficult to track or predict,

24  the parties would have agreed upon using the overall number of sales.  Accordingly, even if *Philips*

25  were citable, persuasive precedent, which it is not, Lucent cannot avail itself of *Philips*' rationale.

26

27         [8] Federal Circuit Rule 32.1(c) prohibits citation of nonprecedential opinions issued prior to
January 1, 2007.  This Court has followed the comparable Ninth Circuit Rule 36-3.  *See, e.g.,*
28  *Sesma v. Hernandez*, No. 07-CV-0539 WQH (JMA), 2007 WL 3243853, at *12 (S.D. Cal. Oct. 30,
2007).

1    Accordingly, Lucent's failure to show any usage of the claimed '356 method is fatal to its damages

2    case.

3        **D.    Lucent's Royalty Rate and the Total Amount of Damages Are Also Not**

4            **Sustainable**

5        In the Group 2 Audio case, this Court held that one license entered into at Lucent's

6    requested rate was insufficient to proof to justify applying that rate to a hypothetical negotiation

7    with Microsoft.  [Ex. Group 2 JMOL Order at 35-38 (ordering new trial on royalty rate).]  Here,

8    the situation is even worse: ***not a single license*** entered into by either of the parties here contains

9    the 8% rate that Lucent sought, and apparently obtained, at trial.  Indeed, the only licenses utilizing

10   an 8% rate were decades-old IBM licenses that would not have had any bearing on the negotiation

11   between Lucent and Microsoft for the '356 patent.  [Trial Ex. 5140, Trial Ex. 5141.]  The only

12   Lucent license containing a "patented portion" approach was the 1998 Acer license, but the rate

13   there was 2%, not 8%.  [Trial Tr. X-37:19-40:1, 43:1-16; Trial Ex. 5183.]  As discussed above and

14   in Microsoft's opening brief, the $357 million total—substantially more than the value of any other

15   license in the case, regardless of rights conferred—is also simply unreasonable.  Considering the

16   lack of support for an 8% royalty rate or the jury's final amount, the jury's award must be deemed

17   grossly excessive and against the clear weight of the evidence.  No reasonable jury could possibly

18   have awarded $357 million based on an 8% royalty rate given the evidence presented.  At a

19   minimum, new trial is required.

20   **III.    OTHER ISSUES**

21       As stated in the introduction, Microsoft rests on its opening brief on all issues raised therein

22   not discussed here.  However, Microsoft also wishes to note the following additional responses to

23   Lucent's opposition:

24       • Lucent implies that the level of ordinary skill in the art of the '356 patent is a fact

25           dispute.  [LB at 10:3-4.]  However, Lucent's expert did not offer an opinion  on this.

26           As such, it is undisputed that the person of ordinary skill in the art of the '356 patent

27           "would have had a degree in either computer science or electrical engineering or

28           some equivalent and would have had two to three years of experience working with

1    data arrangements such as what's described in the '356 patent." [Trial Tr. XII

2    139:1-139:6.] It is also not disputed that Lucent's expert does not have the

3    identified qualifications. [Trial Tr. V-36:6-36:10.]

4    • The FXFE system invalidates the asserted '356 claims for the same reasons as the

5    *Datamation* article. FXFE is prior art under both Sections 102(b) and (g). The law

6    establishes that disclosure to a reporter without confidentiality agreement

7    constitutes "public use" under Section 102(b). *Harrington Mfg. Co. v. Powell Mfg.*

8    *Co.,* 815 F.2d 1478, 1479-80 (Fed. Cir. 1986). Lucent fails to distinguish

9    *Harrington*. Such disclosure also precludes "abandonment" under Section 102(g).

10   *Checkpoint Systems, Inc. v. U.S. Intern. Trade Com'n*, 54 F.3d 756, 762 (Fed. Cir.

11   1995). There are also no genuine disputes about how FXFE worked, making

12   Lucent's "credibility" arguments beside the point. As with *Datamation*, the only

13   issues are legal: claim construction and the conclusion of invalidity.

14   • YMM also invalidates the asserted '356 claims. The claim construction issues are

15   the same as for *Datamation*. In addition, Lucent's arguments about combining

16   references are legally incorrect. Lucent's expert was required to consider whether it

17   would have been obvious to combine the ***teachings*** of Microsoft's references rather

18   than the software programs themselves. *Orthopedic Equipment Co., Inc.* v. U.S.,

19   702 F.2d 1005, 1013 (Fed. Cir. 1983) ("Claims may be obvious in view of a

20   combination of references, even if the features of one reference cannot be

21   substituted physically into the structure of the other reference."). But Lucent's

22   expert did not apply this test. [LB at 12:12-13 ("from a technical point of view,

23   back at the relevant time, one could not combine YMM with Windows 1.01").]

24   Lucent's arguments about insufficient computing power are also unavailing because

25   AT&T's own embodiment of the '356 patent used off-the-shelf hardware from

26   before the critical date: "They used an AT&T 6300 computer that was the system

27   that was introduced in 1984. So it was relatively a two year-old computer system at

28   that time period." [Trail Tr. XII-118:3-118:5.]

- Microsoft Outlook cannot infringe the asserted '356 claims because it lacks "a graphical keyboard tool or a graphical number keypad tool," as expressly required by the Court's claim construction. While Lucent argues about whether Microsoft's date-picker can "compose" dates, Lucent has no response for the fact that the Court required an actual "graphical keyboard tool" or "graphical number keypad."

- Microsoft does not instruct its users to use the method of the asserted '356 claims. Throughout its opposition, Lucent repeats the mantra that thousands of pages of documents prove that Microsoft instructs its users to infringe. Yet Lucent fails to quote a single example of such an instruction. Instead, it relies on documents mentioning only "forms" or "intuitive interfaces." [*E.g.*, LB at 25] Clearly, this is insufficient.

- "Circumstantial evidence" does not excuse Lucent for failing to prove even a single instance where Microsoft's accused products have been used to infringe the '356 patent. In *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1223 (Fed. Cir. 2007), the patentee argued that it was simply "unfathomable" that no customer who bought the accused device had performed the claimed invention. The Federal Circuit dismissed this argument easily, noting that were the plaintiff correct, it "should have had no difficulty in meeting its burden of proof and in introducing testimony of even one such user." *Id.* Here, if use of the patented methods was as "normal and intended" as Lucent says, Lucent should have had no difficulty providing one such example. It did not.

- Lucent cannot justify the inconsistent verdicts between Microsoft and Dell on the '356 patent when the alleged circumstantial evidence of intent was exactly the same as to both. There was no direct evidence of intent for either party.

- For both patents, *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987), *cert denied*, 485 U.S. 1007 (1988) precludes contributory infringement liability where *the thing sold* has substantial noninfringing uses. Lucent is wrong that *Hodosh* does not deal with contributory infringement. To the contrary, *Hodosh*

1    defined the bounds of contributory infringement because contributory infringement

2    is *a statutory element* of patent misuse under 35 U.S.C. § 271(d).  Moreover,

3    Lucent is wrong that this is a situation where Microsoft is somehow trying to avoid

4    liability by "adding" additional features to an infringing product.  That would be

5    like saying that a car manufacturer tries to avoid liability for an infringing cup

6    holder by adding an engine, body, and wheels.  The point is, where the car has

7    substantial noninfringing uses, the cup holder does not make *the car* a contributory

8    infringement.  Lucent's contrary argument -- like its argument on EMV -- is nothing

9    but an attempt to capture the value of things that it has not patented, which is a

10   misuse of its patents.  Liability, if it exists, must be analyzed under other rules --

11   namely the rules for direct or induced infringement.

12   • Lucent's EMV and contributory infringement arguments are also inconsistent

13   because Lucent focuses on the entire product for damages but only the accused

14   component for contributory infringement.

15   • For both patents, contributory infringement also cannot be established since §

16   271(c) requires that Microsoft, as the accused infringer, supply a component (for

17   apparatus claims) or material or apparatus (for method claims) to the end consumer,

18   as the accused direct infringer.  Microsoft's software is not a component, material,

19   or apparatus, and in most instances Microsoft does not supply anything to the

20   accused direct infringer.  Of course, this does not mean that Microsoft and other

21   software companies are immune from liability.  It just means that liability must be

22   analyzed in the context of direct or induced infringement (or indemnity) rather than

23   contributory infringement.

24   • The insufficiency of the evidence on contributory infringement is an independent

25   basis for a new trial.

26   • Regarding the '295 patent, despite Lucent's talk of "comparing" and "glyphs," it

27   does not refute the undisputed evidence that what Microsoft's products compare is

28   *size* and *length*, not *shape* as required by the claims.  [Trial Tr. VI-260:1-19; Trial

Tr. XIII-244:7-247:23, 249:5-23; Trial Tr. XVII-262:21-264:10.]  Lucent also does

not refute the fact that it misled the jury by referring to on-screen shapes rather

internal shapes used for comparison purposes. [Trial Tr. XIV-67:15-68:24; Trial Tr.

XVIII-187:15-188:7; Trial Tr. XIX-133:23-134:25.]

- The '295 damages verdict must be rejected for the same reasons as the '356 verdict, as both an improper application of EMV and/or as arbitrary.

- Microsoft rests on its opening brief on the indefiniteness of the '226 patent (addressed in a separate opposition filed by MPT).

## IV.    CONCLUSION

For the foregoing reasons, the Court should enter JMOL for Microsoft on the '356 and '295 patents, or at least order a new trial.  Above all, the Court should find the asserted claims of the '356 patent obvious as a matter of law over the *Datamation* article because the parties' only disputes are legal.  In addition, as in the Audio case, the Court should reject Lucent's misguided application of the Entire Market Value rule to obtain hundreds of millions of dollars for small features that could not possibly have been responsible for sales of the accused products.  At a minimum, the Court should order a new trial on this issue.

1  Dated:  May 27, 2008                    FISH & RICHARDSON P.C.

2

3                                          By:  /s/ John W. Thornburgh

4                                               John W. Thornburgh (SBN 154627)
                                                thornburgh@fr.com
5
                                           Attorney for Intervenor/Counter-claimant
6                                          and Plaintiff/Counter-defendant
                                           MICROSOFT CORPORATION
7  *Additional Counsel:*

8  Joseph P. Reid (SBN 211082)

9  Lara S. Garner (SBN 234701)
   Thomas Millikan (SBN 234430)
10 Fish & Richardson P.C.
   12390 El Camino Real
11 San Diego, California  92130
   Telephone:     (858) 678-5070
12 Facsimile:     (858) 678-5099

13

14 Jonathan J. Lamberson (SBN 239107)
   Fish & Richardson P.C.
15 500 Arguello Street, Suite 500
   Redwood City, CA  94063
16 Telephone:     (650) 839-5070
   Facsimile:     (650) 839-5071

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 27, 2008 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

/s/ John W. Thornburgh_____
John W. Thornburgh
thornburgh@fr.com

Attorney for Intervenor/Counter-claimant
and Plaintiff/Counter-defendant
MICROSOFT CORPORATION

10835929.doc