1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  LUCENT TECHNOLOGIES, INC. and
    MULTIMEDIA PATENT TRUST
12
            Plaintiffs and Counter-
13          Defendants,

14
15      vs.

16  GATEWAY, INC., *et al*.

17          Defendants and Counterclaimants.

18  and

19  MICROSOFT CORPORATION,

20          Intervenor and Counterclaimant

21  AND RELATED CLAIMS

22

CASE NO. 07-CV-2000-H (CAB)
consisting of matters severed from
the consolidated cases:
CASE NO. 02-CV-2060-B (CAB)
CASE NO. 03-CV-0699-B (CAB)
CASE NO. 03-CV-1108-B (CAB)

ORDER ON POST-TRIAL
MATTERS FOR UNITED
STATES PATENT NUMBERS
4,439,759; 4,763,356; 4,958,226;
AND 5,347,295; INCLUDING:

(1) MOTIONS FOR JUDGMENT
AS A MATTER OF LAW, NEW
TRIAL, OR REMITTITUR; AND

(2) RULINGS ON EQUITABLE
MATTERS TRIED TO THE
COURT

[Doc. Nos. 759, 760, 770, 772.]

23      This order addresses the remaining post-trial questions in this case, including

24  motions for judgment as a matter of law ("JMOL"), motions for new trial, and rulings

25  on equitable matters tried to the Court.  The trial involved four United States Patents:

26  4,439,759 ("Fleming '759" or "'759"); 4,763,356 ("Day '356" or "'356"); 4,958,226

27  ("Haskell '226" or "'226"); 5,347,295 ("Agulnick '295" or "'295").  Lucent

28  Technologies, Inc. ("Lucent") asserted the '356 and '295 patents against Microsoft

Corporation ("Microsoft") and Dell Inc.  ("Dell" and collectively with Microsoft "Defendants").  Lucent asserted the '759 patent against Microsoft only.  Multimedia Patent Trust ("MPT"), a Delaware trust with Lucent as the primary beneficiary, asserted the '226 patent against Microsoft only.

The parties filed their initial briefs on these post-trial matters on May 5, 2008.  MPT moved for JMOL, new trial, and entry of judgment on equitable matters related to the '226 patent. (Doc. No. 759.)  Lucent moved for JMOL and new trial on the '759 and '356 patents. (Doc. No. 760.)  Microsoft moved for JMOL, new trial, or remittitur on various issues related to the '356, '295, and '226 patents. (Doc. No. 770.)  Dell joined in sections of Microsoft's motions applicable to it. (Doc. No. 792.)  Microsoft also moved for entry of judgment on the equitable matters related to the '226 patent yet to be decided by the Court. (Doc. No. 772.)

The parties filed their responsive briefing on May 19, 2008.  Dell filed an opposition to Lucent's motion regarding the '759 and '356 patents. (Doc. No. 804.)  Microsoft filed an opposition to MPT's motion regarding the '226 patent. (Doc. No. 805.)  MPT opposed Microsoft's combined motion to the extent that it addressed the '226 patent. (Doc. No. 808.)  Lucent opposed Microsoft's combined motion to the extent that it addressed the '356 and '295 patents. (Doc. No. 809.)  MPT filed an opposition to Microsoft's motion for entry of judgment on the bench trial issues. (Doc. No. 810.)

The parties filed their reply briefs on May 27, 2008.  Microsoft filed replies in support of its post-trial motions and motion for entry of judgment on bench trial issues. (Doc. Nos. 826-28.)  Lucent filed a reply in support of its motion regarding the '759 and '356 patents. (Doc. No. 830.)  MPT filed a reply in support of its motion regarding the '226 patent. (Doc. No. 831.)

The Court held a hearing on these matters on June 13, 2008.  Robert Appleby, Paul Bondor, John Desmarais, Jeanne Heffernan, James Marina, and Michael Stadnick appeared for Lucent and MPT.  John Gartman, Juanita Brooks, and Roger Denning appeared for Microsoft.  Joseph Micallef appeared for Dell.

1  **Background**

2  **I.    Overview of Infringement Liability**

3         The underlying trial concerned the alleged infringement of four patents asserted

4  by Lucent and MPT against Microsoft and Dell.[1]  On April 4, 2008, the jury returned

5  a special verdict for all four patents, including advisory verdicts on certain equitable

6  issues to be decided by the Court.  (Doc. No. 735.)  The jury found that Microsoft

7  infringed the '356 patent, and that both Microsoft and Dell infringed the '295 patent.

8  The jury found no infringement of either the '226 or '759 patents.  The jury found

9  Microsoft liable to Lucent for $357,693,056.18 based on infringement of the '356

10  patent.  For infringement of the '295 patent, the jury found Microsoft liable to Lucent

11  for $10,350,000 and Dell liable for $51,000.

12  **II.    Day '356**

13         The Patent and Trademark Office ("PTO") issued the '356 patent, entitled

14  "Touch Screen Form Entry System," on August 9, 1988, based on an application filed

15  December 11, 1986.  Only method claims 19 and 21 were at issue in this trial.  Claim

16  19 is an independent claim, and claim 21 is a related dependent claim.  Claim 19 states:

17      A method for use in a computer having a display comprising the steps of

18      displaying on said display a plurality of information fields,

19      identifying for each field a kind of information to be inserted therein,

20      indicating a particular one of said information fields into which
21      information is to be inserted and for concurrently displaying a predefined
        tool associated with said one of said fields, said predefined tool being
22      operable to supply information of the kind identified for said one field,
        said tool being selected from a group of predefined tools including a tool
        adapted to supply an individual entry from a menu of alternatives and at
23      least a tool adapted to allow said user to compose said information, and

24      inserting in said one field information that is derived as a result of said
        user operating said displayed tool.

25  Claim 21 further limits the step of "displaying said pattern" to include "the step of

26  displaying one or more of said information fields as a bit-mapped-graphics field."

27

28         [1]Microsoft and Dell also asserted counterclaims for tortious interference with prospective
    economic advantage, relating to Lucent's allegedly improper creation of MPT.  The jury found for
    Lucent on this issue, and Defendants did not raise it in their post-trial motions.

For this patent, Lucent submitted evidence of indirect infringement.  Lucent asserted claim 19 against Microsoft and Dell based on versions of Microsoft Money, Microsoft Outlook, and Windows Mobile.  Lucent also asserted claim 19 against Dell only, based on sales of Quicken versions 2000 through 2006.  Lucent asserted claim 21 against Microsoft and Dell based only on the various versions of Windows Mobile.

The jury found Microsoft liable on claim 19 as to all three products and on claim 21 as to Windows Mobile, and it returned a finding of no infringement by Dell.[2]  The verdict did not distinguish between inducing and contributory infringement.  The jury awarded a single lump sum against Microsoft for all products involved.

Defendants presented affirmative defenses of anticipation and obviousness.  The jury found for Lucent on both.

## III.    Haskell '226

The PTO issued the '226 patent, entitled "Conditional Motion Compensated Interpolation of Digital Motion Video," on September 18, 1990, based on an application filed September 27, 1989.  At trial, Lucent only asserted claim 12, a means-plus-function apparatus claim which states:

> A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe deviations from approximated blocks and codes that describe deviations from interpolated blocks, comprising:
>
> means for developing block approximations from said codes that describe deviations from approximated blocks; and
>
> means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.

MPT introduced evidence of both direct and indirect infringement by Microsoft. The accused products included Microsoft software and hardware containing an MPEG-1, MPEG-2, or VC-1[3] video decoder, referring to industry standards for video

---

[2]The jury also found that Lucent had provided Dell with pre-suit notice regarding the '356 patent, and Dell did not bring a motion attacking this finding.

[3]VC-1 decoders are also referred to in the record as WMV-9 decoders.

compression and playback used for various products including DVDs and HD DVDs. Specifically, MPT accused Microsoft based on Windows operating system versions 95B through Vista, the Microsoft Xbox 360 video game system, and Windows Media Player versions 9 through 11.

The jury found that none of Microsoft's accused products had infringed claim 12. The jury also found that claim 12 was invalid for obviousness, though not invalid for anticipation. Furthermore, the Court asked the jury to return advisory verdicts on Microsoft's defenses of laches and inequitable conduct regarding the '226 patent. The jury recommended that Lucent be barred from obtaining pre-suit damages due to laches, but found no inequitable conduct.

## IV.   Agulnick '295

The PTO issued the '295 patent, entitled "Control of a Computer Through a Position-Sensed Stylus," on September 13, 1994, based on an application filed October 31, 1990. At trial, Lucent only asserted claim 1, a means-plus-function apparatus claim which states:

> An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a stylus having a tip for inputting information into the computer, including:
>
> first detecting means coupled to said computer for detecting a stroke of the stylus tip in contact with the screen;
>
> second detecting means coupled to said computer for detecting a departure of the stylus tip from the screen;
>
> means coupled to said computer for defining termination of a gesture comprising at least one stroke in response to said departure of the stylus tip;
>
> means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape;
>
> means coupled to said computer for implementing each said recognized gesture, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said gesture was used, including a first context in which said action is executed upon an operating system level object and a second context in which said action is executed upon an application level object.

Lucent introduced evidence of direct and indirect infringement by Dell, and

evidence of indirect infringement by Microsoft. The accused products were Tablet PC Computers installed with the Windows XP Tablet PC Edition operating system. Lucent based its accusations against Microsoft on all sales of Windows XP Tablet PC Edition, while its accusations against Dell were limited to Dell's sales of Windows XP Tablet PCs.

The jury returned a finding that both Microsoft and Dell had infringed claim 1. The jury awarded Lucent damages of $10,350,000 from Microsoft and $51,000 from Dell.

Defendants presented affirmative defenses of anticipation and obviousness. The jury found for Lucent on both.

## V.   Fleming '759

The PTO issued the '759 patent, entitled "Terminal Independent Color Memory for a Digital Image Display System," on March 27, 1984, based on an application filed May 19, 1981. At trial, Lucent only asserted claim 1, a means-plus-function apparatus claim which states:

In a digital image display system:

a memory for storing color data values;

processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising:

a first mode of access wherein an in-use foreground color is directly specified as a color data value;

a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and

a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and

display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode.

Lucent introduced evidence of both direct and indirect infringement by Dell. The accused products covered all computer systems sold by Dell between October 20,

1998, and May 19, 2001, that included a version of the Windows operating system. Lucent based its accusations on the presence of the Windows graphics device interface ("GDI") in these products.

The jury found that Lucent failed to prove that it had provided Dell with pre-suit notice of infringement for this patent. Significantly, the jury also returned a finding of no infringement. Dell asserted affirmative defenses of anticipation and obviousness, and the jury found for Lucent on both. Furthermore, the Court asked the jury to return advisory verdicts on Microsoft's defenses of laches and inequitable conduct regarding the '759 patent. The jury recommended that Dell should not prevail on either equitable defense.

## Discussion

### I.   Standards for JMOL, New Trial, and Remittitur

In patent cases, the standards on motions for judgment as a matter of law or new trial are questions of regional circuit law. Finisar Corp. v. DirecTV Group, 523 F.3d 1323, 1328 (Fed. Cir. 2008). Judgment as a matter of law is available where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A party may renew the motion when not granted at trial. Fed. R. Civ. P. 50(b). A court must uphold the jury's verdict if it is supported by substantial evidence. Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." Id. (quoting Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001)). Substantial evidence requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Blanton v. Anzalone, 813 F.2d 1574, 1576 (9th Cir. 1987) (quoting Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir. 1985)). The court must not weigh the evidence and must "disregard all evidence favorable to the moving party that they jury is not required to believe." Wallace, 479 F.3d at 624. Furthermore, the court draws all reasonable inferences in favor of the nonmoving party. Id. Judgment as a

matter of law is only appropriate if, once the court has applied this standard, it concludes that the evidence permits only one reasonable conclusion that is contrary to the jury's verdict. Id.

A party may also move for a new trial when requesting judgment as a matter of law following a jury trial. Fed. R. Civ. P. 50(b), 59. Whether to grant a new trial is a matter of the trial court's discretion. City Solutions, Inc. v. Clear Channel Communications, 365 F.3d 835, 843 (9th Cir. 2004). The court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1452 (9th Cir. 1988)). To make a "clear weight of the evidence" determination, the court weighs the evidence as the court saw it. Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990)). If a court concludes that a new trial is appropriate due to excessive damages, the court may exercise its discretion to grant a new trial either without qualification, or conditioned on the winner's refusal to accept a reduction in damages, known as remittitur. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996).

## II.    Day '356

### A.    Validity

#### 1.    Anticipation

Defendants seek judgment as a matter of law that a system known as the Foreign Exchange Front End ("FXFE") anticipated claim 19 under 35 U.S.C. §§ 102(b) or 102(g). Under section 102(b), patent protection may be unavailable where the invention was "in public use . . . more than one year prior to the date of the application . . . ." Under section 102(g), patent protection may be unavailable where "before . . . invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." An anticipating public use or prior invention must include every limitation of the patented invention. Netscape

1  Communications Corp. v. Konrad, 295 F.3d 1315, 1321 (Fed. Cir. 2002); Hybritech

2  Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1379 (Fed. Cir. 1986).

3  Anticipation, like other  invalidity defenses, requires proof by clear and convincing

4  evidence.  Netscape Communications Corp. 295 F.3d at 1320.

5       The application for the '356 patent was filed on December 11, 1986.  In January

6  1984, Datamation magazine published an article describing a prototype touch-screen

7  system used by Chemical Bank, through which currency traders could fill out forms

8  electronically.  (DX AOD (Datamation article); AOE (enlargement of Datamation

9  article's photograph).)  The system was known as the Foreign Exchange Front End.

10  The Datamation article included a single photograph of the FXFE display, with limited

11  detail.

12       Judgment as a matter of law or new trial is not appropriate because the jury could

13  have reasonably rejected the credibility of Defendants' witnesses, found that the FXFE

14  did not include all elements of the method in claim 19, or found that the FXFE was not

15  prior art under section 102.  The evidence is sufficient to support a finding that the

16  FXFE did not include "indicating a particular one of said information fields into which

17  information is to be inserted ."  The Datamation article did not describe this capability.

18  (See DX AOD.)  Defendants argue that a single FXFE photograph, of limited clarity,

19  shows that a particular on-screen button is highlighted.  (See DX AOE.)  The jury could

20  have concluded that this was not a "field" into which information could be entered.

21       Furthermore, applying the appropriate standards for these proceedings, there is

22  a limited showing of whether the FXFE even involved "information fields" into which

23  information was "inserted," within the meaning of the patent.  The available image is

24  limited in detail, and the text merely refers to entering information into "the system."

25   (See, e.g., DX AOD at 148 ("For instance, when the user hits the 'broker' cell on the

26  right, a list of brokers appears on the left; the trader then hits the name of the broker . . .

27  and that information is entered into the system."); DX AOE.) Particularly given the

28  standard of clear and convincing evidence, the jury could have reasonably concluded

that Defendants failed to meet their burden on these elements as well.  Lucent also

argued that the FXFE did not have "graphical" tools or "concurrently display" a tool with an information field, though the Court concludes that there are ample other grounds to support the jury's finding of no anticipation.

The jury also could have concluded that the FXFE did not meet the requirements of section 102(b) or 102(g) prior art.  Viewed under the applicable standards, the evidence indicates that the FXFE was developed mostly or entirely outside the United States, and still in a developmental or prototype form.  Furthermore, the nature and circumstances of the demonstration are unclear in many respects.  The jury could have reasonably concluded that the use was not sufficiently public or that any prior invention was abandoned.  Public use is determined under the totality of the circumstances, and the Court concludes that this demonstration does not constitute clear and convincing evidence of public use as a matter of law.  Cf. Harrington Mfg. Co. v. Powell Mfg. Co., 815 F.2d 1478, 1480-81 (Fed. Cir. 1986) (demonstration to reporter was sufficiently public use where evidence included "clear indication of . . . commercial motive," and indication that device operated "flawlessly").  The jury could draw many inferences against Defendants sufficient to conclude that the use was not public.  For example, even if made to a reporter, it is unclear to what extent the demonstration was completely functional.

Also, there is no dispute that the touch-screen FXFE, as demonstrated, was not commercialized.  "[A] first inventor may seek to avoid a determination of abandonment by showing that he or she marketed or sold a commercial embodiment of the invention or described the invention in a publicly disseminated document." Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n, 54 F.3d 756, 762 (Fed. Cir. 1995).  The ambiguities surrounding the FXFE demonstration, however, cast serious doubt on whether it preserved sufficient information about the system in the public domain to avoid a finding of abandonment.  See id. (citing Palmer v. Dudzik, 481 F.2d 1377, 1387 (C.C.P.A. 1973), for the proposition that "to negate a finding of suppression or concealment, the public must have gained knowledge of the invention which will insure its preservation in the public domain").  In summary, there is substantial

evidence in the record to support the jury's determination of no anticipation. Furthermore, the Court concludes that the jury's finding is not against the clear weight of the evidence.

## 2. Obviousness

Defendants challenge the jury's finding that the '356 patent was not obvious. As prior art, they assert both the Datamation article and the FXFE system described above, along with J.K. Lasser's Your Money Manager software ("YMM") and the Windows 1.01 calculator.  The obviousness defense requires proof by clear and convincing evidence.  Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1355 (Fed. Cir. 2007)  "The ultimate judgment of obviousness is a legal determination."  KSR Int'l Co. v. Teleflex Inc., 550 U.S. ___, 127 S.Ct. 1727, 1745 (2007) (citing Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17 (1966)). While courts therefore need not give deference to the jury's ultimate legal determination, courts still give deference to the jury's underlying findings of fact.  See Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1338 (Fed. Cir. 2008) ("[T]his court reviews a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence.") (quoting Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1343 (Fed. Cir. 2007)).  These underlying findings include "the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art . . . ."  Id. at 1338-39.[4]

When determining obviousness, "neither the particular motivation nor the avowed purpose of the patentee controls."  KSR Int'l Co., 127 S.Ct. at 1741-42. Instead, courts should determine whether the "objective reach of the claim" encompasses obvious subject matter.  Id. at 1742.  This may include "noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims."  Id.  "[T]he results of ordinary innovation

---

[4]Secondary considerations, or "objective indicia of nonobviousness," may also be considered, though they are not at issue here.  See Finisar, 523 F.3d at 1339.

are not the subject of exclusive rights under the patent laws." Id. at 1746.  However, courts must avoid "falling prey to hindsight bias," "ex post reasoning," and "[r]igid preventative rules that deny factfinders recourse to common sense."  Id. at 1742-43. Furthermore, "when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious." Id. at 1740.

"A patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR Int'l Co., 127 S.Ct. at 1741.  A combination is likely nonobvious if the elements work together "in an unexpected and fruitful manner."  Id. at 1740.  In contrast, a patent is likely to be obvious if it merely yields a predictable result by substituting one element for another known in the field.  Id.

On this record, the jury could have reasonably concluded that Defendants failed to provide clear and convincing evidence that the '356 patent is invalid for obviousness.  First, there are factual problems with treating the FXFE as prior art. There were factual questions with whether the FXFE constitutes a prior public use or prior invention under sections 102(b) or 102(g).  In this context the scope of prior art for obviousness purposes implicates the same considerations as section 102 prior art. Lucent Techs., Inc. v. Gateway, Inc., 537 F. Supp. 2d 1095, 1110 n.4 (S.D. Cal. 2008). Therefore, the jury was not required to accept the FXFE as prior art for the obviousness analysis.  Also, with regard to the Datamation article, there were substantial uncertainties about the capabilities of the system described.  The jury could have reasonably taken a narrow view of the descriptions offered by the article and its single photograph, which lacked any fine detail or portrayal of the FXFE interface at different steps in the process.

Regarding the YMM software, Lucent argued that it does not involve "graphical" tools, since its display is composed of text and symbols.  It also argued that YMM does not permit "pointing" to the display keys of any tool, since the user controls Your Money Manager only using the keyboard, without aid of a mouse, touch pad, or similar

device.  Around the time of the Day '356 patent, the personal computer industry was undergoing a change from text-based, keyboard-only operation to operation using a keyboard and mouse to control graphical user interfaces.  Based on the evidence, the jury could have concluded that there was insufficient evidence of obviousness.

The Court concludes that substantial evidence supports the jury finding of no obviousness. Lucent introduced evidence, including its expert's opinion and testimony from the designer of YMM, that adapting YMM to a mouse-driven graphical interface would not have been an obvious or trivial undertaking.  For example, the designer of YMM stated that "from a technical and business standpoint, it made no sense to even consider" this adaptation to an interface like Windows 1.01.   (Trial Tr. XII 215:13-216:16.)  The jury could reasonably have accepted this testimony, and the corresponding opinion of Lucent's technical expert, while rejecting that of Defendants' expert.  The patented technology is more than 20 years old, the patent term having expired in 2006.  While users of today's computers may find many graphical interfaces intuitive, and hardware advances have eased the implementation of more sophisticated controls, the obviousness analysis must avoid hindsight bias, as the jury did here. Neither JMOL or a new trial is appropriate on the jury's finding that the '356 patent is not invalid for obviousness.

### B.   Infringement

#### 1.   The Jury's Finding of Infringement by Microsoft

##### a.   Whether Outlook Contains a Composition Tool

A finding of infringement requires that every limitation of a claim be present, either literally or by the doctrine of equivalents.  Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268 (Fed. Cir. 1999).  "A determination of non-infringement, either literal or under the doctrine of equivalents, is a question of fact."  Miken Composites, L.L.C. v. Wilson Sporting Goods, Co., 515 F.3d 1331,1336 (Fed. Cir. 2008).

Microsoft challenges the jury's finding of infringement for Microsoft Outlook ("Outlook"), contending that Outlook does not contain a "composition tool," within the

meaning of the claims.[5]   A composition tool is one limitation in the third step of method claim 19, which requires:

> indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information.

The Court concludes that substantial evidence supports the jury's finding that Outlook infringes claim 19. Outlook is a software product that provides the user with a number of services including e-mail, calendar and appointment management, and management of contact information. Microsoft's documentation describes form entry as a central aspect of Outlook's user interface. (See, e.g., PX 1138B (Outlook help file stating that "Every Outlook item . . . is based on a form.").) Outlook includes a calendar tool to assist the user in entering dates on its form for specifying appointment information. The tool displays a monthly calendar as a grid of numbered dates, along with graphical controls that allow the user to scroll to adjacent months or skip directly to a different month and year. Within the currently displayed month, the user can select a particular date. Once the user defines a date with this tool, the software enters the numerical day, month, and year into the corresponding field in the appointments form. (See, e.g., PX 697 (screenshot); Trial Tr. VI 117:11-118:12 (testimony accompanying video demonstration).)

Much like the number pad tool shown in the patent, the calendar tool in Outlook allows the user to select a series of numbers, corresponding to the day, month, and year, using graphical controls. (Cf. '356 4:18-21 ("The number entry tool . . . operates similar to a standard hand-held calculator in which the user composes a string of numbers by touching individual ones of the displayed buttons . . . .").) Both competing experts testified that the normal definition of "composition" includes combining or

---

[5]Dell joined some, but not all, aspects of Microsoft's challenge to the jury's infringement finding. (See Doc. No. 792.) Dell did not join in certain arguments regarding the sufficiency of evidence of indirect infringement by Microsoft, nor did it join in Microsoft's argument that the findings as to Microsoft and Dell are inconsistent.

putting together different parts.  (See Trial Tr. VI 111:5-112:11 (Mr. Tognazzini, for Lucent); Trial Tr. XII 174:18-175:9 (Mr. Buscaino, for Microsoft).)

The jury rejected Microsoft's argument that the Outlook calendar tool is instead a "menu of alternatives."  The number of possible dates in the Outlook calendar exceeds one million.  (Trial Tr. V 135:17-136:6.)  The patent states that, with a menu of alternatives, "all that the user needs to do is point to one of the entries . . . ."  ('356 3:55-56.)  With the calendar tool, however, the user may change the various elements of the date before settling on a final entry.  The user cannot reach all options without making multiple selections.  The Court concludes that there was substantial evidence permitting the jury to conclude that the Outlook calendar tool allowed the user to compose the date.  Viewing all the evidence from the trial, the jury could have reasonably concluded that the calendar tool allowed the separate selection and combination of day, month, and year, thus making it a composition tool.

### b.    Whether Windows Mobile Contains a Composition Tool

Microsoft also argues that there can be no infringement of Windows Mobile because the Windows Mobile keyboard is not a composition tool that is "a predefined tool associated with said one of said fields."  The Court disagrees.  First, contrary to Microsoft's argument, the keyboard tool was not the only alleged composition tool offered by Lucent for Windows Mobile.  The passage of Lucent's expert testimony cited by Microsoft for this supposed limitation clearly asserts that the expert "found several tools that allow you to compose information," not just the keyboard tool. (See Trial Tr. V 155:24-156:4.)  Lucent also introduced evidence of both a Windows Mobile calendar tool, similar to that already discussed for Microsoft Outlook, and a Windows Mobile number pad tool.  (See, e.g., PX 832A (screenshots of Windows Mobile tools).)

Microsoft further argues that the keyboard tool is not "associated with said one of said fields," as required by claim 19, because it is an operating system level tool that may be used by a variety of applications.  Though the jury could have relied on one of

the other asserted composition tools, the Court also concludes that there was substantial evidence to support the conclusion that the keyboard tool was a composition tool "associated with said one of said fields." Microsoft does not dispute that the keyboard tool may be used by various applications running on a Windows Mobile system. (See, e.g., Microsoft's Mem. P. & A. Supp. Combined Mot. JMOL, New Trial, Remittitur, at 17 ("[Windows Mobile keyboard] is provided at the operating system level for use across many different applications . . . .").) Lucent introduced substantial evidence that the keyboard tool is used by these applications to input information directly into active fields, sufficient for the jury to conclude that it is "associated with said one of said fields." (See, e.g., Trial Tr. V 154:20-156:4, XVII 107:18-108:23.)

Finally, Microsoft challenges the credibility of Lucent's expert, Mr. Tognazzini, regarding the keyboard tool. The jury also assessed his credibility and rendered its verdict. Viewed under the standards for post-trial motions, there is substantial evidence to support Mr. Tognazzini's testimony.

### c.    Proof of Specific Acts of Infringement

Microsoft seeks judgment as a matter of law based on Lucent's purported failure to introduce evidence of specific acts of direct infringement. Proof of indirect infringement by inducement requires, in part, that the plaintiff prove there has been direct infringement. Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1292 (Fed. Cir. 2008). Since the asserted claims are method claims, proof of direct infringement requires a showing that the claimed process was performed, not merely that defendant sold an apparatus capable of infringement. Ormco Corp. v. Align Tech., Inc., 463 F.3d 1299, 1311 (Fed. Cir. 2006).

A plaintiff may prove direct infringement using circumstantial evidence. In Symantec Corp., the Federal Circuit vacated a summary judgment of non-infringement on an inducement claim, observing that "[the patentee] has produced sufficient circumstantial evidence of direct infringement . . . even though [it] has not produced evidence that any particular customer has directly infringed the . . . patent. Direct evidence of infringement, as opposed to circumstantial evidence, is not necessary."

Symantec Corp., 522 F.3d at 1292-93; see Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1363 (Fed. Cir. 2006) (concluding that patentee could rely on circumstantial evidence, including instruction sheets provided with product, to prove direct infringement); Arthrocare Corp. v. Smith & Nephew, Inc., 406 F.3d 1365, 1375-77 (Fed. Cir. 2005) (affirming denial of judgment as a matter of law of no indirect infringement based, in part, on "strong circumstantial evidence" of direct infringement, including literature accompanying the product involved); Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986) (upholding district court's determination that patentee demonstrated direct infringement, as part of inducement claim, using circumstantial evidence including extensive sales and instructions distributed with the product); cf. E-Pass Techs., Inc. v. 3Com Corp., 473 F.3d 1213, 1222-23 (Fed. Cir. 2007) (affirming summary judgment of no infringement under the approach of Moleculon, observing that product manuals in question, at best, only taught method steps in isolation).

Lucent introduced sufficient circumstantial evidence for the jury to conclude that Microsoft customers actually used the software to carry out the method steps of the '356 patent. Lucent provided evidence in the form of instruction and encouragement offered via tutorials, help files, web pages, manuals, promotional materials, the testimony of those familiar with these materials, and other sources. (See, e.g., PX 742 (excerpts of Microsoft Money user's guides); PX 1139B (excerpt from Microsoft Outlook help files); PX 651 (user's guide for Microsoft Windows Mobile product).) A reasonable jury could have reviewed this extensive record and concluded, based on the circumstantial evidence, that there was direct infringement.

The cases cited by Microsoft do not require a different result. In ACCO Brands, Inc. v. ABA Locks Mfrs. Co., 501 F.3d 1307, 1313 (Fed. Cir. 2007), the court stated, in the context of an inducement claim, that "[i]n order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit." Unlike the present case and others cited above, however, the court in ACCO Brands, Inc. concluded that there was

no evidence in the record that the alleged infringer distributed materials encouraging the infringing method of operation.  See id.

Microsoft also cites E-Pass for the proposition that the accused infringer must expressly instruct the user regarding every step together, in the required order.  E-Pass Techs., Inc. v. 3Com Corp., 473 F.3d at 1222.  The relevant portion of E-Pass concerned the requirement that a the patentee must show that all steps were actually performed, in order.  See id. at 1222.  The court concluded that the product manual evidence in that case showed "at best, that the Palm defendants taught their customers each step of the claimed method in isolation. Nowhere do the manual excerpts teach all of the steps of the claimed method together, much less in the required order."  Id. It also concluded that "the accused PDAs are general-purpose computing devices that can be used for a variety of purposes and in a variety of ways."  Id.  Here, the accused products are executable software, with their particular capabilities, not general-purpose computing devices.  Furthermore, the jury could have reasonably concluded that only minimal instruction was needed to encourage a user to cause the accused software to carry out all of the steps involved.  Viewing the evidence favorably to Lucent, a user of the accused software only needs to open a form and enter information in an appropriate field to trigger all steps of claim 19.

### d.    Contributory Infringement

Liability for contributory infringement derives from 35 U.S.C. § 271(c), which states:

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Microsoft argues that there can be no finding of contributory infringement since all three products in question are capable of substantial noninfringing uses.  It further argues that the Court's instructions failed to focus analysis on "the thing sold," and that

it should therefore receive a new trial.  Microsoft also points to a statement in <u>Hodosh v. Block Drug Co., Inc.</u>, 833 F.2d 1575, 1578 (Fed. Cir. 1987), that "the thing sold must not be a 'staple article or commodity of commerce suitable for substantial noninfringing use.'"  <u>Id.</u> (quoting with approval <u>P.J. Federico, Commentary on the New [1952] Patent Act, 35 U.S.C.A.</u> at 53 (1952)).

First, the Court notes that the jury verdict was not necessarily premised on contributory infringement.  The special verdict only stated that the jury found liability by either inducement or contributory infringement.  Nevertheless, even if contributory infringement was the basis for liability, the Court concludes that Microsoft's challenges to Lucent's contributory infringement theories do not support judgment as a matter of law or a new trial.

In <u>Hodosh</u>, the accused infringer argued that its toothpaste product, which admittedly resulted in infringement of a patented method when used by customers, should escape liability because it contained an ingredient that was a "staple article or commodity capable of substantial noninfringing use."  <u>See id.</u> at 1576-77.  When quoting the Federico commentary in this context, the Federal Circuit was explaining why the accused infringer could not avoid liability for its overall product by including a staple ingredient.  <u>See id.</u> at 1578.  The present situation is, in many respects, the opposite of that in <u>Hodosh</u>.  Microsoft attempts to avoid liability for the "ingredient," here a tool included in its software, by arguing that the entire software product has other noninfringing uses.  <u>Hodosh</u> prevented a proposed erosion of protection available under 35 U.S.C. § 271(c).  <u>See id.</u> ("The drafters of the section explicitly recognized that without protection from contributory infringers, owners of method patents, like the owner here, would have no effective protection.")  Extending it to these circumstances would have the opposite effect by allowing potential infringers to escape liability merely by packaging an infringing component for sale with some other staple article.  <u>See Philips Elecs. N. Am. Corp. v. Contec Corp.</u>, 411 F. Supp. 2d 470, 476 (D. Del. 2006) ("[I]t would indeed violate the 'logic of the patent laws' to allow a potential infringer to avoid liability for contributory infringement by simply adding a

- 19 -

noninfringing function to a device that practices a patented method.").

Lucent introduced evidence sufficient for the jury to conclude that Microsoft's tools did not have substantial noninfringing uses immunizing it from liability for contributory infringement. Microsoft argued, for example, that a user could bypass its graphical tools by keyboard entry, as with the Outlook calendar tool, or by downloading relevant data directly, as with the Microsoft Money transaction form. The jury could have reasonably concluded that typical users rarely, if ever, bypass the graphical tools by using these methods.

Microsoft also argues that its software cannot be an infringing component for purposes of section 271(c), citing Microsoft Corp. v. AT&T Corp., 127 S.Ct. 1746, 1755 (2007). The Microsoft Corp. opinion was not so broad. There, the Supreme Court held that software, in the abstract, could not be a component, for purposes of infringement of an apparatus patent under 35 U.S.C. § 271(f). Section 271(f) creates infringement liability in certain circumstances where a supplier in the United States sends a component abroad for purposes of combining it into an infringing product. Id. at 1752. The Supreme Court's opinion did not reach contributory infringement under section 271(c), and it expressly left open the question of whether software, even in the abstract, may be a component of a method claim for section 271(f) purposes. Id. at 1756 n.13 ("If an intangible method or process, for instance, qualifies as a 'patented invention' under § 271(f) (a question as to which we express no opinion), the combinable components of that invention might be intangible as well.") Furthermore, while the Supreme Court concluded that software "in the abstract" was not a component in the relevant context, it did not extend its holding to tangible copies of software. See id. at 1755 (distinguishing the abstract software code at issue from computer-readable copies, such as those "inserted into a CD-ROM drive or downloaded from the Internet"). The Court therefore declines to extend Microsoft Corp. in order to limit the application of section 271(c) here. The dispute over the '356 patent involves method claims and commercial sales of software copies, not apparatus claims and foreign distribution of software "in the abstract."

### e.   Inducement

Microsoft seeks judgment as a matter of law, arguing that there is insufficient evidence of intent to support a finding of indirect infringement by inducement. It also seeks a new trial based on a purported error in the Court's instructions, which required that the accused infringer have "an intent to cause the encouraged acts." (Jury Instruction 21, Doc. No. 738.) Microsoft asserts that Lucent must further prove that it had the specific intent to cause infringement, not merely acts constituting infringement. The Court's instructions, however, also required the jury to find that the accused infringer "is aware of the patent, and knows or should have known that encouraged acts constitute infringement of the patent." (Id.)

First, as with contributory infringement, the Court notes that the jury's verdict was not necessarily premised on inducement. The jury may have based its verdict on contributory infringement alone, inducement alone, or both. Nevertheless, even if inducement was the basis for liability, the Court concludes that these arguments do not support judgment as a matter of law or a new trial.

In DSU Medical Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part), the court stated that "the inducer must have an affirmative intent to cause direct infringement." "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." Id. In keeping with this directive, the Court required the jury to find more than mere intent to cause the acts constituting direct infringement. The Court also required the jury to find that the accused infringer "is aware of the patent, and knows or should have known that encouraged acts constitute infringement of the patent." (Jury Instruction 21, Doc. No. 738.) DSU Medical Corp. approved of the following formulation of the required state of mind:

> It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.

DSU Medical Corp., 471 F.3d at 1306 (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990), and observing that Supreme Court precedent had validated this approach).   The Court's instructions followed that approach.

The Court concludes that Lucent introduced substantial evidence to support a jury verdict of inducement.  The extensive record in this case, including the various manuals, help files, web pages, and other sources, is adequate for a jury to conclude that Microsoft intended customers to use the tools in an infringing manner.  Lucent also introduced substantial evidence that Microsoft was aware of the '356 patent as early as April, 2002.  (See, e.g., PX 367 (e-mail from Dell notifying Microsoft, for indemnification purposes, of Lucent's assertion of the '356 patent). )

## 2.    The Jury's Finding of No Infringement by Dell

Lucent moves for judgment as a matter of law that Dell infringed the '356 patent, or for a new trial.  As with its allegations against Microsoft, Lucent asserted claims 19 and 21 against Dell based on theories of inducement and contributory infringement.

Dell argues, and the Court agrees, that there is substantial evidence to support a finding that Dell lacked the culpable mental state required for indirect infringement. See, e.g., DSU Medical Corp., 471 F.3d at 1306 (discussing required state of mind). As with Microsoft, Lucent introduced evidence of alleged intent in the form of tutorials, help files, web pages, manuals, promotional materials, the testimony of those familiar with these materials, and other sources.  Not all of the documents and evidence necessarily implicated Dell, however, and the jury could reasonably disregard Microsoft documents as they relate to Dell's mental state.  Dell is a reseller of the accused Microsoft software, while Microsoft is the designer and programmer.  For judgment as a matter of law, the Court must "disregard all evidence favorable to the moving party that they jury is not required to believe."  Wallace, 479 F.3d at 624. Furthermore, the Court concludes that the clear weight of the evidence is not against the jury's verdict.  Though the parties' post-trial briefing focused on the Microsoft products, the Court also reaches an equivalent conclusion for Quicken, asserted only

against Dell.

Much like Microsoft, Dell also argued that there was no proof of direct infringement by Dell's customers, similarly citing <u>ACCO Brands, Inc.</u> and <u>E-Pass Techs., Inc.</u> Dell resells Microsoft's software to consumers, often packaged with a computer system.  As the Court noted with Microsoft's motion, the circumstantial evidence was sufficient for a jury to conclude that there were acts of direct infringement by users of the software. Since many of the end users in question overlap between Dell and Microsoft, the Court does not rely on this part of Dell's argument in upholding the jury's verdict on the Microsoft products.  Similarly, the Court does not rely on Dell's argument that substantial non-infringing uses precluded a finding of infringement for the Microsoft products.[6] The Court rejects this argument for the same reasons discussed above in regards to the infringement finding against Microsoft.

### 3.    Consistency of the Verdicts for Microsoft and Dell

Microsoft moves for a new trial on the ground that the jury verdict is facially inconsistent.  Whether to grant a new trial is a matter within the Court's discretion, and it is only required for an inconsistent verdict when "it is impossible under a fair reading to harmonize the [jury's] answers."  <u>See</u> <u>Magnussen v. YAK, Inc.</u>, 73 F.3d 245, 246 (9th Cir. 1996) (quoting <u>Omar v. Sea-Land Serv., Inc.</u>, 813 F.2d 986, 991 (9th Cir. 1987).  First, the special verdict is not facially inconsistent.  Nothing in the special verdict form or the jury instructions required the jury to reach the same conclusion as to Microsoft and Dell on this issue.  Furthermore, it is possible to harmonize the jury's answers for Microsoft and Dell.  The Court has reviewed the record and concludes that the jury could have reached different conclusions as to whether Microsoft and Dell had the required culpable mental state.

/ / /

/ / /

---

[6]These arguments may have more force as to Quicken, but the Court does not reach these questions, having concluded that the jury could have reasonably determined that Dell lacked the necessary culpable mental state as to Quicken.

07cv2000

1          **4.     Claim Construction**

2          Microsoft challenges the Court's construction of "concurrently displaying" as

3   "displaying at the same time, as by a window overlaying the form." It argues that the

4   definition of concurrently should also include "automatically." The Court declined to

5   include this limitation, both following its original <u>Markman</u> hearings and after

6   subsequent briefing. (<u>See</u> Claim Construction Order Clarifying and Superceding Order

7   of March 1, 2004, Case No. 02-CV-2060, Doc. No. 1552.) The Court continues to

8   conclude that, in this context, "concurrently displaying" does not require

9   "automatically displaying." The preferred embodiments described in the patent do not

10  always require that a predefined tool be automatically displayed. (<u>See</u>, <u>e.g.</u>, '356 Fig.

11  15, 13:46-53 (indicating that, under certain settings, the sample application may await

12  user input before displaying a specific tool).)

13         **C.     Damages**

14         **1.     Damages Verdict by Lump-Sum Royalty**

15         A patent holder is entitled to "damages adequate to compensate for the

16  infringement, but in no event less than a reasonable royalty for the use made of the

17  invention by the infringer . . . ." 35 U.S.C. § 284. The trial court has discretion to

18  determine the method of calculating damages. <u>Maxwell v. J. Baker, Inc.</u>, 86 F.3d 1098,

19  1108 (Fed. Cir. 1996). One common method for calculating damages, applied by the

20  experts for both sides in this case, is a hypothetical negotiation. Under this approach,

21  a reasonable royalty is the amount that the patentee and accused infringer would have

22  agreed upon in a hypothetical negotiation at the time of the first infringement, on the

23  assumption that the patent is valid and would be infringed. <u>See</u> <u>Rite-Hite Corp. v.</u>

24  <u>Kelley Co., Inc.</u>, 56 F.3d 1538, 1554-55 (Fed. Cir. 1995) (en banc); <u>Maxwell</u>, 86 F.3d

25  at 1108-1110; <u>Wang Labs., Inc. v. Toshiba Corp.</u>, 993 F.2d 858, 869-70 (Fed. Cir.

26  1993). "[W]hat an infringer would prefer to pay is not the test for damages." <u>Rite-Hite</u>

27  <u>Corp.</u>, 56 F.3d at 1555. The Court also instructed the jury that it may consider factors

28  including, but not limited to, commonly applied <u>Georgia-Pacific</u> factors. <u>See</u> <u>Georgia-</u>
<u>Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Lucent's expert advocated an 8% royalty on actual sales of the software products. Using this amount, Lucent asked the jury to award $561.9 million based on Microsoft's total sales of the accused products during the applicable time period.[7] Microsoft's expert countered that damages, if any, should be limited to a lump-sum royalty of $6.5 million for all three products. He argued that a lump-sum payment covering the entire period in question would be appropriate for several reasons, including the uncertainty and cost involved in monitoring and enforcing running royalty payments based on actual sales. (See, e.g., Trial Tr. XVI 180:22-185:8 (explaining benefits of lump-sum payment in context of the '295 patent), 206:6-20 (incorporating same reasons in discussion of the '356 patent).) The jury awarded a lump-sum royalty of approximately $358 million for infringement of the '356 patent. There is substantial evidence to support the jury's verdict.

Microsoft argues that the jury's verdict violates the entire market value rule, requiring judgment as a matter of law or a new trial. The entire market value rule considers whether a patentee may recover damages based on the value of an entire apparatus containing several features, not all covered by the patent. In this case, Lucent advocated a reasonable royalty at trial, and the experts disagreed as to the amount of the royalty. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1549 (Fed. Cir. 1995). The Federal Circuit has allowed recovery based on the value of an "entire apparatus containing several features when the patent-related feature is the 'basis for customer demand.'" Id. (quoting State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989)). The patented and unpatented components "must function together . . . in some manner so as to produce a desired end product or result." Id. at 1550. The components "must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit."

---

[7]This period extends from January 13, 2003, when Microsoft received notice of the '356 patent, to December 11, 2006, when the patent expired. Lucent also sought $125 million in damages for Dell's sales during this period, and sought to hold both Microsoft and Dell liable for the latter amount. (See, e.g., Trial Tr. XVIII 209:15-210:14 (excerpt from closing argument summarizing Lucent's damages theory for the '356 patent).)

Id.  The Federal Circuit has applied this rule where a patentee seeks to recover based on the entire value of a product used to practice a claimed method.  See Fonar Corp. v. Gen. Elec. Co., 107 F.3d 1543, 1552-53 (Fed. Cir. 1997) (applying entire market value rule to damages sought based on value of MRI machines where claims involved method for improved use of the machines).  The Court instructed the jury on the entire market value rule.  (See Jury Instruction 46, Doc. No. 738.)

The jury did not adopt either side's approach outright.  By examining the hypothetical scenario from the parties' standpoint at the time infringement began, the jury may have considered a wide variety of factors, not merely the actual product revenue.  Therefore, the award does not reflect an entire market value calculation on its face.  Furthermore, the Court concludes that substantial evidence supports the jury's verdict, whether or not the entire market value rule applies.

### 2.    Substantial Evidence

The jury's verdict is supported by substantial evidence.  Lucent introduced examples of actual lump-sum royalty licenses from the computer industry with payments ranging as high as $290 million.  (See, e.g., PX 5142, 5150, 5151, 5152.)  Lucent also introduced sample license agreements to support its expert's theory that a reasonably royalty would be 8% of the retail selling price.  (See, e.g., PX 5140, 5141, 5172.)  Lucent introduced evidence, including its experts' testimony, that the patented technology was an important part of Microsoft's products and that these products were highly profitable and commercially successful.  Microsoft sold tens of millions of copies of the accused software during the relevant period.  The jury could have reasonably accepted that, in a hypothetical negotiation, the success of these products would have been foreseeable.

The law allows a jury to settle on a royalty rate or lump-sum different than those offered by the parties' experts.  See, e.g., Fuji Photo Film Co., Ltd v. Jazz Photo Corp., 394 F.3d 1368, 1378 (Fed. Cir. 2005).  Furthermore, by considering the hypothetical negotiation's assumption that the patent is valid and would be infringed, the jury could reach an amount higher than those in actual licenses.  In a real-world negotiation,

validity and infringement may carry uncertainty that limits the strength of the patentee's negotiating position. By assuming validity and infringement, the patentee's position may be stronger in the hypothetical negotiation. Having viewed the testimony and reviewed the trial record, the Court concludes that the jury's verdict is supported by the evidence, is not excessive, and does not reflect mere speculation.

The Court also notes that, even if the entire market value rule applied, there was substantial evidence for the jury to rely on the whole value of the software. Lucent introduced substantial evidence, such as marketing material, product documentation, and expert testimony, that the accused features were important to the success of Microsoft's products and were promoted by Microsoft. (See, e.g., PX 651, 742 1139B.) The jury could have reasonably accepted this evidence and concluded that, without the user interface benefits provided by the patented method, the products would have suffered commercially by not meeting consumer expectations. See Tec Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1362 (Fed. Cir. 1999) (upholding award based on the entire value of radiator and condenser assemblies, where patents involved the manufacture of properly balanced fans without which the assemblies would not have met customer requirements). Additionally, viewing the record as a whole and considering the credibility of the witnesses, the Court concludes that the damages award is not against the clear weight of the evidence.

### 3.    Other Considerations

Microsoft argues in the alternative that, if the jury did not use an entire market value calculation, its verdict must be rejected as purely speculative. The Court disagrees. Substantial evidence supports the verdict. Indeed, Lucent's experts testified to an award of more than $500 million based on actual licenses and industry practice. Microsoft's own expert testified that Microsoft would negotiate a one-time lump sum payment for the life of the patent, rather than a running royalty. (See, e.g., Trial Tr. XVI 180:22-185:8, 206:6-20.) Furthermore, nothing on the face of the verdict indicates mere speculation. If the precision of the jury's "down-to-the-penny" calculation shows anything, it is that the jury used some form of numerical derivation

from values in the evidence.  This is not a case where the jury's award should be reduced because it was based on an expert's speculative testimony.  Cf. Go Medical Indus. Pty., Ltd. v. Inmed Corp., 471 F.3d 1264, 1274 (Fed. Cir. 2006) (affirming reduction in jury's award of trademark royalty based on expert's testimony that offered no rationale for selecting the particular values used); Shockley v. Arcan, Inc., 248 F.3d 1349, 1361-64 (Fed. Cir. 2001) (vacating jury's award of future lost profits for patent infringement where it was based on an expert opinion that used speculative assumptions).  Lucent's expert supported his theories with evidence including license agreements from contexts that the jury could accept as comparable to the present situation.

Microsoft also argues that the damages award is unwarranted due to a lack of evidence that the claimed method was actually used.  The Court concludes that there was adequate circumstantial evidence to support a finding of direct infringement.  Similarly, the jury could have reasonably concluded that the acts of direct infringement were sufficiently prevalent to support its award.  As a whole, the evidence is sufficient to support the damages awarded by the jury.

### D. Summary for Day '356

As to the '356 patent, the Court **DENIES** all motions for judgment as a matter of law and all motions for a new trial or remittitur.

## III. Haskell '226

### A. Validity

#### 1. Obviousness

MPT moves for judgment as a matter of law that claim 12 of the '226 patent is not invalid for obviousness.  The Court agrees that the evidence is insufficient to support the jury's finding of obviousness by clear and convincing evidence.  See Takeda Chem. Indus., Ltd., 492 F.3d at 1355 (burden for obviousness).  "The ultimate judgment of obviousness is a legal determination."  KSR Int'l Co., 127 S.Ct. at 1745.  Courts give deference, however, to the jury's underlying findings of fact.  See Finisar Corp., 523 F.3d at 1338.  These underlying findings include "the scope and content of

the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art . . . ."  Id. at 1338-39.[8]

### a.    The Micke Thesis and Related References

Microsoft offered two theories of obviousness.  The first focused on a document known as the Micke Thesis in combination with other references.  Thomas Micke wrote his 1986 "Comparison of a Predictive and an Interpolative Motion Compensating Coding Method for Television Video Signals" as a master's thesis for the University of Hanover's Institute for Theoretical Communications Engineering and Information Technology ("TNT").  (See DX CAN (translated); DX IKH (original German).)  The Micke Thesis describes an investigation into the benefits of combining "the DPCM method with motion compensating prediction" with "motion compensating interpolation of the video signal" into a single method called "motion compensating interpolation error coding."  (Id. at GW-LT 255055.)  Micke's research simulated this approach and concluded that the tests "yielded rather good results but still need confirmation by additional investigations and subjective tests."  (Id. at GW-LT 255083.)  Microsoft argued that the Micke thesis therefore encouraged what Microsoft characterized as the central innovation of the '226 patent, namely the transmission of interpolation error to aid in the overall video coding process.

Microsoft asserted the Micke Thesis in combination with either the "Musmann" or "Jain & Jain" references, or both.  Since the Micke Thesis did not involve the use of a discrete cosine transform ("DCT") to encode error information, as in the patent, Microsoft offered these references as prior art allegedly making it obvious to use a DCT in combination with the teachings of the Micke Thesis.  The Musmann article, entitled "Advances in Picture Coding," was published in the April 1985 proceedings

---

[8]MPT's motion did not seek to overcome the finding of obviousness with secondary considerations of nonobviousness.  There is no significant dispute as to the level of ordinary skill in the art.  Microsoft's expert testified that a person of ordinary skill would have either: (1) a Bachelor of Science degree in electrical engineering or computer engineering and two years of experience in video compression; or (2) a Master's degree in electrical engineering, computer engineering, or a similar field, including study of video compression technology.  (Trial Tr. XVI 60:13-25.)  MPT's expert has offered a similar definition.  See Lucent Techs. v. Gateway, Inc., 537 F. Supp. 2d 1095, 1101 (S.D. Cal. 2008).

of the IEEE. (DX CSN.) The article discusses the relative benefits of using a DCT for transform coding, including use for "natural pictures." (See, e.g., id. at MSLT_0004925.) Jain & Jain published "Displacement Measurement and Its Application in Interframe Image Coding" in the December 1981 IEEE Transactions on Communications. (DX CRO.) It discloses the use of DCT coding in the context of "motion compensated interframe hybrid coding." (See, e.g., id. at MSLT_0004887.) Micke observed that further improvement "is possible by . . . transformation coding of the motion compensated errors," and he cited to the Musmann and Jain & Jain references. (DX CAN at GW-LT 255072, 255084.) Dr. Delp offered his opinion that the Micke thesis, in combination with either or both of these references, rendered the '226 patent obvious. (See, e.g, XVI 63:6-80:5.)

The Court concludes that Microsoft's evidence of obviousness regarding the Micke Thesis and related references is insufficient, as a matter of law, to support the jury's conclusion that claim 12 is invalid for obviousness. In particular, Microsoft did not provide evidence, sufficient to meet a clear and convincing standard, that the structures corresponding to the means-plus-function elements in claim 12 would have been obvious in light of these references. A conclusory expert opinion, without factual support, will not support a finding of obviousness by clear and convincing evidence. See Upjohn Co. v. Mova Pharm. Corp., 225 F.3d 1306, 1311 (Fed. Cir. 2000); cf. Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1574-76 (Fed. Cir. 1991) (concluding that jury could rely on expert's ultimate opinion of infringement without detailed explanation, where burden is a preponderance of the evidence). Dr. Delp testified that certain code in Micke's Thesis corresponded to the means-plus-function elements of claim 12. (See, e.g., Trial Tr. XVI 76:5-77:4 (correlating first means-plus-function element to portions of the Micke Thesis); 77:5-12 (similar, second means-plus-function element).) Dr. Delp showed at most, however, that the code performed a similar or identical function, without explaining why the particular structures disclosed in the '226 patent would have been obvious to one of ordinary skill based on these references. For example, regarding the second means-plus-function, Dr. Delp

stated:

> Q:     . . . What does the next slide blowup show you, which is IKH at 5255 through 56?
>
> A:     This is some more code from the thesis, Micke thesis.  This is Element 2 of the 226 patent.  So he's talking about doing the interpolation field forward and backward, and he talks about quantizing the prediction error.  Now, in this case he's talking about the interpolation error.

(Trial Tr. XVI 77:5-12.)  At best, this testimony and the related evidence only provides clear and convincing evidence that a person of ordinary skill would have been motivated to pursue an invention implementing the same function, but not necessarily using the particular structure disclosed.

Furthermore, while the references show that it may have been obvious to use certain individual structural components in video coding, such as the DCT transform, the structure of a means-plus-function element is viewed as a whole, not just a collection of discrete pieces.  See, e.g., Odetics Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268 (Fed. Cir.1999).  In addition, an obviousness inquiry considers the claim "as a whole," not whether each individual element was known.  35 U.S.C. § 103(a). Microsoft did not offer clear and convincing evidence that it would have been obvious to implement claim 12's means-plus-function elements in combination using the overall structures disclosed by the patent.  Microsoft's efforts to rehabilitate the evidentiary offering with attorney argument are unavailing.

The Court also notes that there were factual disputes over whether the Micke Thesis even constitutes prior art since it was only available, if at all, from the TNT library, and the accessibility of the thesis during the relevant time period was disputed.[9] These uncertainties may present a further obstacle in finding claim 12 obvious by clear and convincing evidence, but the Court need not reach this issue.

/ / /

/ / /

---

[9]The Court discussed the nature of this dispute at the summary judgment stage, and though the trial record is more extensive, the essential character of the dispute remained the same.  See Lucent Techs., 537 F. Supp. at 1101.

- 31 -

### b.     The H.261 References

Microsoft's second obviousness theory also fails to present clear and convincing evidence of obviousness, taking the claim as whole.  Microsoft argues that claim 12 is obvious in light of two documents from a March, 1986 meeting in Tokyo regarding H.261, a video compression standard used in video conferencing.  (See Trial Tr. XVI 46:19-50:11.)  They are known as Document 81 and Document 103R.  Document 81, entitled "Comments on Conditional Motion Compensated Frame Interpolation," includes a diagram of a coder for conditional motion compensated interpolation. (See DX BJL at MSLT0625893 Fig. 1.)  The diagram shows the coder taking the difference of the received picture and a motion interpolative prediction, then sending that output through a coding unit.  (Id.)  Document 103R, entitled "Report of the Fifth Meeting in Tokyo (March 25-28, 1986)," contains a block diagram of a reference model video coder.  (See DX BXY at MSLT0626039 Fig. 3.)

Microsoft argues that Figure 3 of Document 103R discloses the first element of claim 12.  At least to this extent, the evidence supports Microsoft's position.  Indeed, Document 103R shows a model motion compensated coder, and the patent itself relates the first means-plus-function element to "conventional motion compensation coding." (See '226 4:26-34; 4:63-5:6.)[10]  Dr. Delp also offered his expert opinion, explaining how the elements of Figure 3 in Document 103R corresponded to the first means-plus-function element and were known before the '226 patent.  (See, e.g., Trial Tr. XVI 57:17-58:13.)

The crux of the matter lies with Document 81 and the second means-plus-function element of claim 12.  Microsoft did not make a sufficient showing for a jury to find that claim 12, as a whole, is obvious by clear and convincing evidence, particularly with regard to the second means-plus-function element, either alone or in combination with the more "conventional" coding of the first element.   Though

---

[10]This comment about "conventional" coding appears in the patent's description of its encoder, and the description of relevant structure in the decoder incorporates the relevant description of the encoder by reference.  (See '226 5:2-6.)

Document 81 discloses sending some form of data representing the difference between a motion interpolative prediction and an input signal, it does not indicate on its face that this process should involve blockwise coding or a DCT, as in claim 12.[11] Additionally, Dr. Delp testified that a person of ordinary skill would have read Document 81 in context as involving the use of a DCT, though he agreed that there is no reference to blockwise coding on the face of the document. (See, e.g., Trial Tr. XVI 59:25-60:4, 110:25-111:24.) Nevertheless, even if Document 81 disclosed the second means-plus-function element in its entirety, which the Court questions, there is insufficient evidence that it would have been obvious to combine its teachings with those of Document 103R to produce the invention of claim 12.

In reaching this conclusion, the Court recognizes that a "teaching, suggestion, or motivation" from the prior art is no longer strictly required to establish obviousness. See KSR Int'l Co., 127 S.Ct. at 1739-41. Nevertheless, that requirement provided "helpful insight" that the Court may still consider in a flexible, common sense manner. Id. at 1741. Microsoft presented insufficient evidence that it would have been obvious to combine these references. Though Document 103R cites to Document 81, it does so as one among many documents in the context of an industry organization exploring many possible options for a video coding standard. (See, e.g., DX BXY at MSLT0626010, 6018-19.) Furthermore, the Document 103R report described the motion-compensated interpolation of Document 81 merely as one option in the overall context of a complex, multifaceted standardization effort. (Id. at MSLT0626019.) Viewed in context, these documents do not rise to the level of clear and convincing evidence of obviousness.

/ / /

/ / /

/ / /

---

[11]Microsoft argues that the second means-plus-function element does not require blockwise operation, but this is contrary to the plain language of the claim. The second element involves developing "interpolated blocks" from "block approximations" and "codes that describe deviations from interpolated blocks."

## 2.    Indefiniteness

Microsoft moves for judgment as a matter of law that claim 12 of the '226 patent is invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2.[12]  Indefiniteness is a legal conclusion that may arise in the course of the Court's duty to construe the patent claims.  See Howmedica Osteonics Corp. v. Tranquil Propects, Ltd., 401 F.3d 1367, 1371 (Fed. Cir. 2005).  To be sufficiently definite, a claim must be amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree."  See Exxon Research and Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Courts "accord respect to the statutory presumption of validity" by finding claims "indefinite only if reasonable efforts at claim construction prove futile."  Id.

Microsoft argues that claim 12's use of the term "interpolated blocks" is nonsensical and inconsistent.  The Court construed claim 12 well in advance of trial, having provided the parties ample opportunity to brief and argue their positions on claim construction.  In doing so, the Court concluded that the claim was amenable to construction.  Id.  Therefore, the Court declines to reconsider its claim construction or to grant judgment as a matter of law that claim 12 of the '226 patent is indefinite.

## B.    Infringement

MPT moves for judgment as a matter of law that Microsoft infringed claim 12 of the '226 patent, or for a new trial on this issue.  Literal infringement of a means-plus-function claim "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification."  Odetics, Inc., 185 F.3d 1259, 1267 (Fed. Cir. 1999).  "[T]he claim limitation is the overall structure corresponding to the claimed function."  Id. at 1268.  An accused structure is equivalent if it "performs the claimed function in substantially the same way to achieve substantially the same result."  Id. at 1267.  "The proper test is whether the differences between the structure in the accused

---

[12]Dell did not join in this aspect of Microsoft's motion.  This legal question was not an issue at trial, and the Court understands that Microsoft wishes to preserve it for appeal.

device and any disclosed in the specification are insubstantial." <u>Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.</u>, 145 F.3d 1303, 1309 (Fed. Cir. 1998). To literally infringe a means-plus-function claim, a structural equivalent must have been available at the time the claim issued. <u>Al-Site Corp. v. VSI Int'l, Inc.</u>, 174 F.3d 1308, 1320 (Fed. Cir. 1999). After-arising technology may only infringe a means-plus-function claim under the doctrine of equivalents. <u>Id.</u> at 1320-21 & n.2.

### 1. MPEG-1 and MPEG-2 Products

There is substantial evidence to support the jury's verdict under Microsoft's theory that there is no infringement because its accused MPEG-1 and MPEG-2 decoders use a "measured motion" rather than a "guessed motion" technique. Microsoft contends that, as a result, the MPEG-1 and MPEG-2 decoders do not contain structure equivalent to the structure of the second means-plus-function element of claim 12, which states:

> means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.

The Court identified the corresponding structure as:

> Decoder 25, DCT$^{-1}$ 34, Adder 35, and Shift Circuits 31 and 39, including all inputs and outputs of these elements related to the claimed function (<i>See</i> Fig. 2; Col. 4, lines 63-65; Col. 5, lines 7-23 [description of the structure and inputs that correspond to these elements is at Col. 4, lines 38, 50]).[13]

The adder and shift circuits produce an interpolated estimate of a video frame using motion vectors representing motion between the frames preceding and succeeding the interpolated frame. (<u>See</u> '226 4:38-50, 5:7-10.) As described in the patent, these circuits produce the interpolated frame by taking the average of: (1) the preceding frame, shifted by half of the motion vectors; and (2) the succeeding frame, shifted by half of the same motion vectors, but in the opposite direction. (<u>Id.</u>) This is the so-called "guessed motion" approach.

---

[13]The bracketed text is part of the original claim construction and identifies the corresponding structure of the claimed encoder. At times, the patent describes the decoder of claim 12 with reference to the corresponding encoder elements. (<u>See</u>, <u>e.g.</u>, '226 5:7-10.)

For the MPEG-1 and MPEG-2 decoders, Microsoft introduced substantial evidence that the encoder measures and transmits two separate sets of motion vectors representing differences between the frame to be reconstructed by interpolation and the frames immediately preceding and succeeding it. The MPEG-1 and MPEG-2 decoders create an interpolated frame from estimates made using both sets of vectors, not from a single set of vectors that are, for example, divided in two to estimate motion. (See, e.g., Trial Tr. XVI 30:16-31:11, 36:8-37:2, 37:25-38:19, 40:6-22 (excerpts of Dr. Delp's testimony regarding these differences).) This is the so-called "measured motion" approach. MPT's expert, Dr. Girod, agreed that MPEG-1 and MPEG-2 do not send and use a single set of motion vectors in the same manner described in the patent. (See Trial Tr. XVII 39:13-21.)

MPT argues that the disclosed structure is not necessarily restricted to one that implements the "guessed motion" method, and that Shift Circuits 31 and 39 could be circuits that receive and process two sets of motion vectors in the same manner as in MPEG-1 and MPEG-2. Figure 2 of the patent plainly indicates, however, that the inputs to Shift Circuits 26, 31, and 39 are the same. Shift Circuit 26 reproduces the succeeding frame from the motion vectors representing differences from the preceding frame. (See '226 4:26-32, 4:67-5:6.) Based on the evidence, the jury could have reasonably concluded that a structure designed to process two sets of measured motion vectors was not identical to that disclosed in the patent.

Furthermore, Microsoft introduced substantial evidence from which the jury could conclude that the MPEG-1 and MPEG-2 decoders did not contain a structure equivalent to that disclosed in the patent. To be equivalent, the accused structure must perform "the claimed function in substantially the same way to achieve substantially the same result." Odetics, Inc., 185 F.3d at 1268. The jury could have reasonably found that either or both of these requirements were not met. While the Court was persuaded by the reasoning of MPT's expert Dr. Girod,[14] the jury could have

---

[14]The Court was not persuaded to an extent sufficient to prompt a new trial, however.

reasonably accepted the opinion of Microsoft's expert, based on his knowledge of the video coding standards and analysis of the source code involved, that the variance in motion compensation methods indicates that the accused products do not perform the claimed function in substantially the same way.  (See, e.g., Trial Tr. XVI 36:8-37:2, 37:25-38:19, 40:6-22.)   Furthermore, both Dr. Delp and one of the inventors, Dr. Haskell, testified that the "measured motion" method results in improvements over the approach in the '226 patent, and the jury could reasonably conclude that the MPEG-1 and MPEG-2 decoders do not achieve substantially the same result.  (See, e.g., Trial Tr. XVI 30:5-33:4 (Dr. Delp), 122:6-20 (Dr. Haskell); see also Trial Tr. III 42:11-15 (MPT's expert, Dr. Girod, discussing general benefits of motion vectors).)

## 2.   VC-1 Products

Microsoft also made the "measured" versus "guessed" motion argument for the products using VC-1 decoders.  Though the underlying analysis is similar in some respects, there are unique considerations to VC-1.  In particular, the VC-1 standard describes a "direct mode" of operation in which an interpolated frame is created by halving the motion vectors between the preceding and succeeding frames.  (See, e.g., PX 3556 Fig. 71.)  Microsoft counters by arguing that VC-1 only uses the direct mode after measuring the motions vectors for the interpolated frame, and that VC-1 source code never actually uses vectors between the preceding to the succeeding frame to guess at a location in the interpolated frame.  (See, e.g., Trial Tr. XVI 40:6-11, 102:2-104:17 (testimony from Dr. Delp on these issues).)   The jury could have reasonably accepted Dr. Delp's analysis and concluded that there were substantial differences between the claim and the VC-1 decoders.  The Court concludes that MPT is not entitled to judgment as a matter of law or a new trial.

Furthermore, Microsoft introduced substantial evidence for the jury to conclude that the accused structures were not equivalent because Microsoft's VC-1 products do not use the DCT, and its inverse, for encoding and decoding.  There is no dispute that the VC-1 integer transforms are not identical to the DCT.  Microsoft introduced substantial evidence sufficient for the jury to conclude that replacing the DCT with

VC-1 integer transforms would result in structures that, as a whole, were not equivalent to those in the claim elements.  For example, Microsoft introduced a memo describing the VC-1 integer transforms which observed that interchanging the two would result in a "severe mismatch" and that "the decoded sequence will quickly degenerate" (DX IIC at MSLT_1027528.)  VC-1 replaced the 32-bit inverse DCT processing from previous products with 16-bit operations allowing for better processing efficiency.  (Id.)  Microsoft also introduced evidence that VC-1's approach also resulted in better subjective performance for video playback, which won an industry competition.  (See, e.g., PX 1804 at LUC 1263646-48, Trial Tr. XV 118:4-121:2.)  Lucent counters that the Microsoft documentation indicates a high level of correlation with DCT, at times greater than 99%.  (See, e.g., DX IIC at MSLT_1027530.)  Given the other evidence that VC-1 achieved this high correlation with better efficiency and better subjective results, however, the jury could reasonably conclude that the differences were substantial.  Furthermore, the jury could reasonably conclude that this substitution rendered the overall structure of the VC-1 decoders substantially different from those in the claim elements.

Since the issues discussed here provide ample reason to deny MPT's motions with respect to infringement of the '226 patent, the Court declines to reach Microsoft's other arguments for upholding the finding.[15]

### C.    Equitable Defenses

The jury returned advisory verdicts on two equitable defenses for the '226 patent.  The jury found no inequitable conduct, and it found that the laches defense applied to Lucent's assertion of the '226 patent.  The ultimate determination of these issues rests with the Court, and it is not required to accept the jury's recommendations.  See, e.g., Huser v. Santa Fe Pomeroy, Inc., 513 F.2d 1298, 1299 (9th Cir. 1975); cf. Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993).

---

[15]Microsoft also argued, for example, that: (1) MPT failed to provide any evidence that certain VC-1 decoders include the claimed structures; (2) MPT failed to provide sufficient evidence of indirect infringement; and (3) downloads of Windows Media Player cannot infringe in light of Microsoft Corp. v. AT&T Corp., 127 S.Ct. 1746 (2007).

### 1.   Inequitable Conduct

Patent applicants "are required to prosecute patent applications with 'candor, good faith, and honesty.'"  Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003) (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995)).  "A patent applicant commits inequitable conduct when, during prosecution of the application, he makes an affirmative representation of a material fact, fails to disclose material information, or submits false material information, and does so with the intent to deceive."  Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1358 (Fed. Cir. 2003).  The defendant may prove inequitable conducting by showing both a failure to disclose information material to patentability and an intent to deceive.  M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 439 F.3d 1335, 1340 (Fed. Cir. 2006).  Inequitable conduct requires proof by clear and convincing evidence.  Id., 439 F.3d at 1340 (burden applies to both elements); Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 1239 (Fed. Cir. 2004).

The test for materiality is "what a 'reasonable examiner would consider . . . important in deciding whether to allow the application to issue as a patent.'"  A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1397 (Fed. Cir. 1986).  Under the rule in effect during the prosecution of the '226 patent, information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.  37 C.F.R. § 1.56 (1989).

Mere oversight or negligence is insufficient to meet the requisite intent to deceive.  See, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1351 (Fed. Cir. 2002); Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc in relevant part) (concluding that even gross negligence does not justify inference of intent to deceive).  The defendant may prove intent using circumstantial evidence.  See, e.g., Merck & Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422 (Fed. Cir. 1989).  In determining whether circumstantial evidence supports a finding of intent, "it is proper to consider the degree of materiality of the

information." <u>Lipman v. Dickinson</u>, 174 F.3d 1363, 1370 (Fed. Cir. 1999). The degree of intent the defendant must prove is based a sliding scale related to the materiality of the information. <u>Abbott Labs. v. TorPharm, Inc.</u>, 300 F.3d 1367, 1380 (Fed. Cir. 2002).

Microsoft argues that the applicants for the '226 patent committed inequitable conduct by failing to disclose the Micke Thesis and the H.261 documents. These references did not render the '226 patent invalid for obviousness, and the jury returned a finding that claim 12 was not invalid for anticipation. The materiality of the documents, if any, is limited accordingly, and Microsoft's burden of showing intent is correspondingly increased. Even assuming some degree of materiality, Microsoft did not offer clear and convincing evidence of an intent to deceive.

### a.   H.261 Documents

Dr. Haskell, one of the named inventors, attended the March, 1986, meeting in Tokyo where the H.261 documents, and any related demonstrations, were presented. (<u>See</u> Trial Tr. XVI 146:22-148:11; DX BJL; DX BXY at MSLT0626024.) Dr. Haskell testified that the H.261 meetings included breakout sessions only for interested parties. (Trial Tr. XVI 130:8-131:3.) Though Dr. Haskell conceded that the documents indicated that he attended, Dr. Haskell never recalled attending the meetings or viewing Document 81 or any related demonstration. MPT did not offer any other direct evidence that Dr. Haskell was aware of the H.261 documents. One other attendee, Dr. Steffan Ericsson, recalled a discussion of "conditional motion-compensated interpolation where interpolation error is transmitted," and credited the idea with some importance. (<u>See, e.g.,</u> Trial Tr. XV 170:22-172:18.) The patent application was filed more than three years after the Tokyo meeting. These circumstances, and all the evidence reviewed by the Court, do not prove by clear and convincing evidence that Dr. Haskell was specifically aware of Document 81 at any time, let alone at the time of the patent application.

/ / /

### b.  Micke Thesis

Dr. Haskell may have been aware of the existence and general subject matter of the Micke Thesis as early as 1987, though there is not clear and convincing evidence that he ever read it and was familiar with its details.  For example, Dr. Haskell was familiar with the work of the TNT institute, and even wrote a 1987 IEEE editorial that discussed a paper by Dr. Girod that referred to the Micke Thesis.  (See, e.g., DX ISU, Trial Tr. 126:7-22.)  Having determined that the Micke Thesis does not render the patent obvious in combination with other references, the Court concludes that these circumstances would not provide clear and convincing evidence of intent to deceive.  In summary, the Court adopts the jury's recommendation and concludes that Microsoft did not prove its defense of inequitable conduct by clear and convincing evidence.[16]

### 2.  Laches

To establish laches, a defendant must prove by a preponderance of the evidence that: (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) "the delay operated to the prejudice or injury of the defendant."  A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc).  If successful, the laches defense bars pre-suit damages.  Id. at 1028.

Courts also consider and weigh any excuse offered for a delay, such as other litigation and negotiations with the accused.  Id. at 1033.  Where the plaintiff delays more than six years, a presumption of laches arises.  Id. at 1034-36.  This presumption shifts only the burden of production, not the ultimate burden of persuasion.  Id. at 1037-39.

Material prejudice may be economic or evidentiary.  Id. at 1033.  Evidentiary prejudice includes the "inability to present a full and fair defense on the merits" for

---

[16]The Court also notes that the jury's recommendation of no equitable conduct followed its finding of obviousness, overturned by the Court here.  Thus, the jury reached its recommendation despite viewing some of the references as more material to patentability than in the Court's view.

1   reasons such as loss of records and fading memories.  Id.  Economic prejudice normally

2   requires more than the damages attributable to a finding of infringement liability,

3   though a patentee may not wait silently, watching damages escalate when the infringer

4   could have easily switched to a noninfringing product.  Id.  Courts look for a change

5   in the alleged infringer's economic position during the delay.  Id.

6       Laches is an equitable judgment made by the trial court "in light of all the

7   circumstances."  Id. at 1036.  The Court may decline to apply the laches defense, even

8   where the defendant establishes the laches factors by proof or presumption.  Id.

9       The evidence showed that for several years leading up to the start of the

10  litigation underlying this case, beginning around 1998 through 2002 and 2003, Lucent

11  engaged in efforts to sell a license for the '226 to computer manufacturers Gateway and

12  Dell.[17]   Eventually, Lucent sued both companies for infringement, initiating the

13  lawsuits underlying the present case.  (See, e.g., 02-CV-2060 (initially suit against

14  Gateway, transferred from E.D. Va. case 02-CV-389), 03-CV-1108 (initial suit against

15  Dell, transferred from D. Del. case 03-CV-205).)[18]   Microsoft then joined as an

16  intervener, seeking a declaratory judgment that it did not infringe.  (See, e.g., Intervener

17  Microsoft's Answer and Counterclaims filed March 18, 2003, Case No. 02-CV-2060,

18  Doc. No. 27.)  Under the circumstances of this case, the Court concludes that any delay

19  was reasonable or excusable since Lucent attempted to seek compensation for its patent

20  through the computer manufacturers, not Microsoft, and Microsoft entered the dispute

21  voluntarily.

22      Microsoft argues that the six year presumption should apply because it

23  announced its plans to implement MPEG-1 as early as 1995, more than six years before

24  the start of this litigation.  At best, however, this merely shifted the burden of

25  production, and Dell came forward with specific evidence to explain any delay.  The

26

27      [17]Lucent was the original plaintiff asserting the '226 patent in this case.  Lucent only created
28  MPT and transferred the patent to MPT after the start of this litigation.

        [18]These cases were eventually consolidated, and a portion of the litigation was severed to create
    the present case.  (See Doc. No. 1.)

burden of persuasion remains with Microsoft on this issue.  A.C. Aukerman Co., 960 F.2d at 1037-39.

In summary, the Court does not adopt the jury's recommendation.  Microsoft did not prove the laches factors by a preponderance of the evidence, and even if it had, the Court would exercise its discretion and decline to apply laches in light of all the circumstances of this case.

### D.    Summary

The Court **GRANTS** Lucent's motion for judgment as a matter of law that the '226 patent is not invalid for obviousness.[19]  The Court **DENIES** all other motions for judgment as a matter of law or new trial regarding the '226 patent.  As to the '226 patent, the Court follows the jury's advisory verdicts in part.  The Court finds no laches and no inequitable conduct as to the '226 patent.

## IV.    Agulnick '295

### A.    Infringement

#### 1.    Whether the Product Compares a Tap to a Predefined Shape

The fourth means-plus-function element of claim 1 requires a "means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined share."  The parties dispute whether Windows XP Tablet PC ("Tablet PC") devices recognize a tap gesture by comparing it to a predefined shape.  Lucent introduced evidence that, in order to identify a tap, the Tablet PC software examines a series of points representing the stylus location and determines whether they fall within a small bounded area, and whether they are below a certain length.  A gesture is considered a "tap" when it falls within both criteria.  (See, e.g., Trial Tr. VI 260:1-19.)  Defendants' expert offered a similar explanation.  (See, e.g., Trial Tr. XIII 244:3-12.)  Lucent also introduced the

---

[19]Having granted a renewed motion for JMOL, Rule 50(c)(1) requires the Court to conditionally rule on any motion for new trial in the event the judgment is later vacated or reversed. Fed. R. Civ. P. 50(c)(1).  Exercising its discretion in light of all the circumstances of this litigation, the Court conditionally denies any motion for new trial on this issue, subject to any future instruction from the appellate court.  See Fed. R. Civ. P. 50(c)(2).

source code analyzed by its expert to reach this conclusion, and Microsoft documents list a tap among various "gestures" recognized by the Tablet PC software. (See PX 964, 965, 5544, 6326.)

Defendants argue that this bounding box method merely examines the size of stylus movements, and thus does not involve "comparing . . . to at least one predefined shape." They also argue that there is no comparison of "shape" because the software will recognize any configuration of points that fits within the given space and length requirements. The Court did not further construe "predefined shape," and the jury could have reasonably applied common sense to the evidence and concluded that the Tablet PC tap recognition procedure meets this limitation. The procedures include comparison of a gesture to a small box. Lucent's expert also opined that, as whole, the procedure compares the gesture to a tap, or small dot, which the jury could reasonably conclude is a "predefined shape" within the meaning of the claim. (See, e.g., Trial Tr. VI 260:3-19.)

## 2. Substantial Evidence of Indirect Infringement

Microsoft argues that, as a matter of law, the evidence does not support a finding of indirect infringement.[20] This question concerns the Court's previous determination that products with front-mounted digitizers did not infringe the '295 patent. A pen position digitizer is part of a typical tablet PC's system for detecting the stylus location. (See, e.g., '295 Fig. 2, 6:20-22.) The Court previously granted summary judgment of no infringement as to certain products with a front-mounted digitizer. (See Order Granting Summ. Adjudication No Infringement '295 Patent, Case No. 02-CV-2060, Doc. No. 1226.) The Court reasoned that with the digitizer mounted in front, the stylus can never contact the "screen" as construed by the Court, thus preventing any infringement of the means-plus-function element "for detecting a stroke of the stylus tip in contact with the screen." (Id. at 4-7.)

---

[20]Though Dell joined in most aspects of Microsoft's motion regarding the '295 patent, it did not join in this portion. (See Doc. No. 792.) Lucent also accused Dell of direct infringement of the '295 patent.

Microsoft argues that there can be no inducement because it lacked the intent to induce computer manufacturers to use its Tablet PC software in systems using rear-mounted digitizers.  As discussed above regarding the '356 patent, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements."  DSU Medical Corp., 471 F.3d at 1306 (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990)).  Lucent introduced evidence sufficient for the jury to reasonably conclude that Microsoft induced infringement of the '295 patent.  Lucent introduced substantial evidence that Microsoft encouraged hardware manufacturers to use rear-mounted digitizers through technical specifications and other documents. (See, e.g., PX 749 (containing Microsoft Tablet PC hardware specification, including digitizer capabilities).) Lucent's expert testified that, during the relevant time period, the only commercially available digitizers meeting Microsoft's requirements were rear-mounted.  (See, e.g., Trial Tr. VII 90:11-93:10.)  Microsoft asserted the existence of front-mounted digitizer technology when the patent issued, but the jury could have reasonably accepted the position of Lucent's expert, who stated that such technology was not commercially available during the relevant time frame.  (See Trial Tr. VII 60:9-65:20.)  Based on the evidence, the jury could have reasonably concluded that Microsoft encouraged use of its software in Tablet PCs and knew or should have known that it would be used in an infringing manner on Tablet PCs with rear-mounted digitizers.

Similarly, Microsoft challenges any finding of contributory infringement on the ground that its product was not "especially made" or "especially adapted" for infringement.  See 35 U.S.C. § 271(c).  Lucent introduced substantial evidence sufficient for the jury to conclude that the product was especially made or adapted for use with rear-mounted digitizers since they were the only commercially available option.  Furthermore, Lucent introduced substantial evidence that the accused gestures were necessary to normal operation of a Tablet PC, sufficient for the jury to conclude that there were not substantial non-infringing uses.  (See, e.g., PX 749 (Microsoft

product documentation describing use of a Tablet PC running Windows software).) The Court also concludes that the infringement finding was not against the clear weight of the evidence.

### 3.    The Means-Plus-Function Instructions

Defendants challenge the Court's decision to instruct the jury on the doctrine of equivalents concerning after-arising technology in the context of a means-plus-function infringement.  The Court rejects Defendants argument that the Court's April 30, 2007, ruling on a motion in limine is a final order not subject to modification.  (See Order on Mots. Limine for Group 4 Trial, Case No. 02-CV-2060, Doc. No. 1737 at 3.)  On May 11, 2007, the Court vacated the original trial date.  (Case No. 02-CV-2060, Doc. No. 1780.)  The remaining patents from 02-CV-2060 were consolidated for a single trial date in February, 2008, and issues related to those patents were severed to create this case.  (See Doc. No.1; Case No. 02-CV-2060, Doc. No. 1876.)  On February 8, 2008, the Court held a new hearing on motions in limine for the consolidated trial.  (See Doc. No. 496.)

The Court has the authority to depart from its ruling on a motion in limine, depending on the circumstances of trial.  The Court advised the parties to object contemporaneously at trial regarding any ruling, as the Court would then have the full context of the proffered evidence.  Defendants argued that certain aspects of the Tablet PCs were after-developed technology and therefore could not meet the means-plus-function elements under a literal infringement theory.  See Chiuminatta Concrete Concepts, Inc., 145 F.3d at 1310-11 (Fed. Cir. 1998).  In light of Defendants' argument, and all the circumstances of this case, the Court permitted Lucent to respond by arguing that the after-developed technology may satisfy a means-plus-function element under the doctrine of equivalents.  See, e.g., Al-Site Corp., 174 F.3d at 1320 n.2 (Fed. Cir. 1999) ("Patent policy supports application of the doctrine of equivalents to a claim element expressed in means-plus-function form in the case of 'after-arising'

technology . . . ."). The Court instructed the jury accordingly.[21]  The Court declines to grant judgment as a matter of law or a new trial based on its decision to allow the jury to consider the doctrine of equivalents.

### 4.    Evidentiary Objection Regarding Expert Testimony

Defendants erroneously argue that Lucent's expert, Mr. Ward, testified about source code analysis not contained in his expert report, particularly how Tablet PC software recognizes tap gestures.  (Trial Tr. VI 257:1-261:25.)[22]  Mr. Ward's expert report of March 31, 2006, however, includes a discussion of specific Tablet PC source code, identified by filename.   (See 3/31/2006 Ward Expert Report at ¶ 157.) Defendants were free to challenge his opinion on cross examination and introduce statements from his deposition that he did not analyze the "size and exact criteria" in certain source code when he prepared his report.  (See Ward Depo. Tr., 6/15/06, 10:7-9.)  Mr. Ward made this statement, however, in a context primarily involving Pocket PC, not Tablet PC software. (See id. 7:19-10:19.)  In any case, the Court favors a determination on the merits and continues to exercise its discretion to allow the testimony.  See Childress v. Darby Lumber, Inc., 357 F.3d 1000, 1010 (9th Cir. 2004) (reviewing denial of motion to exclude expert opinion based on violation of Fed. R. Civ. P. 26(a)(2)(B) for abuse of discretion).

### 5.    The Court's Instructions on Indirect Infringement

For the '295 patent, Defendants incorporate by reference the same challenges to the sufficiency of the Court's jury instructions raised with the '356 patent.  Defendants again point to Hodosh, 833 F.2d at 1578, for the proposition that the Court's instruction must focus the jury on "the thing sold."  As with the '356 patent, extending Hodosh to the present circumstances would produce the opposite result sought by that opinion. Rather than ensuring patent protection, Defendants' reading would allow an infringer

---

[21] Microsoft's current motion does not challenge the Court's jury instruction on the doctrine of equivalents.

[22] Microsoft raised this objection contemporaneously, and the Court allowed a standing objection on the Rule 26 issue.  (See Trial Tr. VI 257:6-7, 258:5-7.)

to avoid liability merely by packaging an infringing component with a noninfringing component.  See id. at 1578 ("The drafters of the section explicitly recognized that without protection from contributory infringers, owners of method patents, like the owner here, would have no effective protection."); Philips Elecs. N. Am. Corp., 411 F. Supp. 2d at 476 (D. Del. 2006) ("[I]t would indeed violate the 'logic of the patent laws' to allow a potential infringer to avoid liability for contributory infringement by simply adding a noninfringing function to a device that practices a patented method.").

Defendants also incorporate their argument that the Court provided insufficient instructions on the intent required for inducement.  The Court properly instructed the jury that it is sufficient, in relevant part, that the alleged infringer "knew or should have known his actions would induce actual infringements." DSU Medical Corp., 471 F.3d at 1306 (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990)).  In summary, the Court denies Defendants' request for a new trial based on the instructions for indirect infringement.

### 6.    Claim Construction

Defendants seek judgment as a matter of law or a new trial based on alleged errors in the Court's claim construction.  First, Defendants object to the Court's definition of the corresponding structure for the "means coupled to said computer for recognizing a plurality of said gestures, said recognizing means including means for comparing each said gesture to at least one predefined shape."  The Court identified the corresponding structure as a processor running one of three handwriting recognition algorithms.

"Structure supporting a means-plus-function claim . . . must appear in the specification." Atmel Corp. v. Info. Storage Devices, Inc., 198 F.3d 1374, 1381 (Fed. Cir. 1999.)  This determination "must be made in light of the knowledge of one skilled in the art."  Id. at 1380.  "[D]isclosure of structure corresponding to a means-plus-function limitation may be implicit in the written description if it would have been clear to those skilled in the art what structure must perform the function recited in the means-plus-function limitation." Id. (quoting with approval PTO

Supplemental Examiner Guidelines on Applying 35 U.S.C. 112 ¶ 6, 58 Fed. Reg. 443, 444 & nn. 12-13 (1999)).  "[K]nowledge of one skilled in the art can be called upon to flesh out a particular structural reference . . . ." Creo Prods., Inc. v. Presstek, Inc., 305 F.3d 1337, 1347 (Fed. Cir. 2002).  Citing the title of an article may be sufficient to disclose structure, where it would provide sufficient indication of the structure to one skilled in the art. See Atmel Corp., 198 F.3d at 1382.

The Court concludes that one skilled in the art would have recognized the relevant algorithms as part of the structure disclosed by the '295 patent.  The external sources incorporated by the claim construction, an IEEE article and a related patent, are both expressly cited in the patent and indicate the nature of the information contained in them.  (See '295 4:41-46, 5:1-6.)  For example, the IEEE article is entitled "Automatic Recognition of Handprinted Characters—The State of the Art."  Furthermore, the element in question is only one part of a claim with several other means-plus-function elements, each with disclosed structure, and it was reasonable for the patentee to rely on the knowledge of one skilled in the art in describing this aspect of the invention.  See, e.g., Atmel Corp. 198 F.3d at 1382 ("The requirement of specific structure in § 112, ¶ 6 . . . does not raise the specter of an unending disclosure of what everyone in the field knows . . . .").

Defendants also challenge the Court's construction of the "second detecting means" and "means . . . for defining termination."  They argue that the Court's construction should have required proximity detection to terminate a gesture and that Lucent failed to present evidence on this issue.  This does not warrant judgment as a matter of law or a new trial.  First, the Court concludes that its construction of claim 1 appropriately omitted proximity detection.  Dependent claim 3 adds proximity detection as a further limitation, and including it in claim 1 would render claim 3 superfluous.  Courts presume that dependent claims are narrower in scope than the claims on which they depend. See, e.g., Regents of Univ. of Cal. v. Dakocytomation Cal., Inc., 517 F.3d 1364, 1375 (Fed. Cir. 2008).  Defendants did not overcome this presumption. Cf. id. at 1375-76 (holding that evidence in prosecution history overcame

the presumption).  Furthermore, Lucent did introduce evidence of proximity detection in the accused products.  (See, e.g., PX 749 (setting out Microsoft's Tablet PC hardware requirements, including proximity detection).)

## B.    Damages

Microsoft argues that it should receive a new trial or remittitur of the jury's allegedly speculative lump-sum award of $10.35 million.[23]  A jury may arrive at a royalty rate or lump-sum different than those offered by the parties' experts, if supported by substantial evidence.  See, e.g., Fuji Photo Film Co., 394 F.3d at 1378. In this case, substantial evidence supports the jury's award.  For example, Microsoft introduced lump-sum agreements licensing patents for similar technologies at $10 million and $30 million.  (See DX BCH, BCI; Trial Tr. XVI 186:3-187:23, 205:21-206:20.)  The $30 million license covered only two graphical user interface patents. (Trial Tr. XVI 205:21-206:20.)  Lucent also introduced evidence supporting its 1% royalty theory, including its expert testimony and sample license agreements.  (See, e.g., PX 5137, 5139-41; Trial Tr. VIII 200:18-201:3, 202:2-14, 203:10-20, IX 15:1-21.) In addition, Lucent introduced substantial evidence, in the form of expert testimony and marketing materials, sufficient for the jury to reasonably conclude that the '295 patent is important to the success of stylus based computing and customer demand for Tablet PCs.  (See, e.g., PX 5206A, Trial Tr. VI 186:16-187:19, 237:18-238:11 (technical expert opining that patent improved capability and flexibility of interface across different applications and contexts); IX 33:12-44:19 (damages expert discussing importance of patented feature in Tablet PCs).)

Defendants also challenge the lump-sum royalty awards against Microsoft and Dell as improper applications of the entire market value rule.  First, the Court concludes that the lump-sum damage awards do not necessarily reflect an entire market

---

[23]Dell does not join in this aspect of Microsoft's motion, though it does join in Microsoft's argument that the damages for the '295 patent violate the entire market value rule.

value calculation.  The jury did not adopt either expert's recommendation,[24] and the jury was free to consider a wide variety of factors in the evidence, not just the actual sales revenue.  Nevertheless, even if the entire market value rule applies, the Court determines that substantial evidence supports Lucent's theory.  Lucent introduced substantial evidence tying the patented technology to the commercial success of Tablet PCs.  (See, e.g., PX 5206A, Trial Tr. VI 186:16-187:19, 237:18-238:11; IX 33:12-44:19.)  Furthermore, the Court concludes that the damages awarded against Microsoft and Dell for the '295 patent were not against the clear weight of the evidence.

### C.    Summary

As to the '295 patent, the Court **DENIES** all motions for judgment as a matter of law and all motions for a new trial or remittitur.

## V.    Fleming '759

### A.    Pre-Suit Notice

Lucent challenges the jury's finding that it failed to prove by a preponderance of the evidence that it gave pre-suit notice to Dell.  See Dunlap v. Schofield, 152 U.S. 244, 248 (1894); Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1111-12 (Fed. Cir. 1996) (burden of showing compliance with section 287(a) is on patentee).  The '759 patent expired before this litigation began.  Under 35 U.S.C. § 287(a), a party required to give pre-suit notice in order to recover damages must provide "affirmative communication of a specific charge of infringement by a specific accused product or device." Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994).  This inquiry focuses on the actions of the patentee, not the subjective belief of the accused infringer.  Gart v. Logitech, Inc., 254 F.3d 1334, 1346 (Fed. Cir. 2001).  The communication must provide "sufficient specificity regarding [the patentee's] belief that the recipient may be an infringer." Id.

Lucent presented evidence of an October 20, 1998 meeting that allegedly provided notice of infringement for the '759 patent.  (See, e.g.,   Trial Tr. VII

---

[24]While the jury returned a verdict of $51,000 against Dell, as advocated by Lucent, it did not do so using a running royalty theory.

133:24-135:6, VIII 32:1-33:3, XIII 136:15-142:14, PX 1875-76, PX 351A-B.) Lucent also offered evidence of a meeting on December 16, 1998, which included a video demonstration.[25]   (See, e.g., PX 5057 (e-mail confirming meeting); DX EOK (video demonstration).)  The video begins by showing a Dell Inspiron 3000 M223XT installed with Windows.   Lucent then ran a demonstration on the computer, purportedly demonstrating the three modes of access involved in the '759 patent.

Had the Court been the fact finder, it would have concluded that Lucent gave sufficient notice.  This was a jury question, however, and there is substantial evidence to support the verdict.  For example, given the passage of time, the jury may have reasonably doubted the accuracy of Lucent's witnesses.   The jury may have also accepted Dell's theory that the video demonstration did not implicate Windows. (See, e.g., Trial Tr. XIII 187:18-188:20 (Dell's witness characterizing the video demonstration as being purely based in DOS, an older operating system).)

The subsequent indemnification letter sent from Dell to Microsoft would have persuaded the Court, as a fact finder.  Nevertheless, it does not require the Court to alter the jury's finding.  (See, e.g., PX 355 (indemnification notice of January 12, 1999).)  Dell sent the letter to inform Microsoft that Lucent had made a "charge of infringement" regarding seven patents, including '759, and that these accusations "potentially impact products that we have purchased from Microsoft, including Windows 98." (Id.)  The letter may provide evidence of actual notice by the patentee, but this was a matter for the jury.  The jury could have reasonably concluded that although Microsoft's letter characterized the meeting as presenting a "charge of infringement," the actual notice given did not meet the legal standard, which does not depend on the accused's subjective belief.  Gart, 254 F.3d at 1346.

The Court also concludes that the jury's finding of no pre-suit notice was not against the clear weight of the evidence.  Though the Court would have weighed the evidence differently, the jury's determination does not warrant a new trial.

---

[25]Though Dell disputes the characterization of these meetings and the materials presented there, it does not dispute that they took place.

07cv2000

**B.    Infringement**

Lucent seeks judgment as a matter of law or a new trial that Dell infringed claim 1 of the '759 patent.  First, the Court notes that recovery may be unavailable since Lucent did not establish pre-suit notice, and the patent expired before it brought this action against Dell.  Furthermore, the Court concludes that judgment as a matter of law is not required under Lucent's infringement theories.  For similar reasons, the Court also concludes that the jury's finding of no infringement is not against the clear weight of the evidence.

**1.    Evidence of Noninfringement**

Substantial evidence supports a finding that the structures related to GDI differ substantially from the "processing means" element of claim 1.  "The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial."  <u>Chiuminatta Concrete Concepts, Inc.</u>, 145 F.3d at 1309.  The structure for the processing means element includes a quantitative algorithm that sets to color mode based on the number of operands sent to the mode selection function.  (<u>See</u> '759 Fig. 4.)  In contrast, Dell introduced substantial evidence that the accused portions of GDI use a qualitative algorithm, meaning one in which the number of operands is constant and the mode selection, if any, depends on the values passed through the operands.  (<u>See</u>, <u>e.g.</u>, Trial Tr. XI 99:5-105:20 (testimony of Dell's expert, Dr. Wedig, on this issue); <u>see also</u> Trial Tr. IV 167:3-11 (testimony of Lucent's expert Mr. Richter, also stating that accused algorithm is qualitative, not quantitative).)  The jury could reasonably conclude that these differences were substantial, and that the accused structure was not an equivalent.  Lucent cites to deposition testimony from Dr. Wedig allegedly conceding that qualitative and quantitative algorithms are equivalent.  (<u>See</u> Trial Tr. XVII 200:13-17 (acknowledging that "qualitative commands for selecting modes of access were known prior to [the '759 patent].")  The jury could reasonably interpret Dr. Wedig's statement as merely conceding that qualitative commands were known prior the patent, not that the differences were insubstantial.  (<u>See</u> <u>id.</u>)

1    Dell also introduced substantial evidence that the accused structure could not

2    perform the function of the processing means element.  Dr. Wedig offered his analysis

3    that the commands identified by Mr. Richter merely involved setting specific colors,

4    not selecting modes of color access.  (See, e.g., Trial Tr. XI 88:13-24, 89:5-94:9,

5    95:4-10; see also PX 3901 (Microsoft GDI documentation).)  The jury could have

6    reasonably accepted this analysis and concluded that the accused structure was not able

7    to perform the function of selecting a mode of access.  The Court declines to reach

8    Dell's other arguments, having concluded that there are adequate grounds to deny

9    Lucent's motion for judgment as a matter of law or new trial.[26]

10                    **2.     Requests for Further Instructions**

11    The Court denies Lucent's request for a new trial based on argument offered by

12    Dell concerning the structure of the processing means elements.  In construing the

13    structure, the Court's expressly excluded text related to setting colors, as opposed to

14    selecting modes of access.  The disputed statements are consistent with the position

15    that the claim construction only excluded structures when they perform color-setting

16    alone, not that the Court excluded structure performing both functions.  (See, e.g., Trial

17    Tr.  XI  90:16-19,  91:11-14,  94:23-95:3  (excerpts  from  Dr.  Wedig's  direct

18    examination).)  Lucent did not raise contemporaneous objections, and even assuming

19    that its objections are preserved, the Court concludes that Lucent had an adequate

20    opportunity to respond to Dell's arguments and explain its infringement theory to the

21    jury.

22    Lucent also seeks a new trial based on the Court's infringement instructions.

23    Lucent argues that Dell misled the jury by suggesting that infringement of claim 1

24    required that the "predetermined command and data sequences" must have actually

25    been used, and that the Court should have issued further instructions explaining why

26    this is not required.  (See, e.g., Trial Tr. XI 155:13-18, 156:4-10, 156:25-157:11

27

28        [26]Dell also argued, for example, that: (1) its products do not include a processor programmed to perform an algorithm for selecting a mode of access, (2) the accused products are not "responsive to a predetermined command and data sequence," and (3) the accused products employ after-developed technology.

                                    - 54 -                              07cv2000

(excerpts from Dr. Wedig's testimony arguing that Lucent failed to show that the sequences are actually used).)  A new trial is not needed.  First, the Court properly instructed the jury that infringement is not limited to using the invention and may include "importing, making, using, offering to sell, or selling." (Jury Instruction 16, Doc. No. 735.)  The Court also explained the role of the function and structure in means-plus-function elements.  (Jury Instruction 19, Doc. No. 735.)  Furthermore, Lucent had adequate opportunity to respond to Dell's arguments and explain its infringement theory.  Finally, there were ample grounds for the jury to enter a finding a no infringement, independent of this issue.

### C.   Equitable Defenses

The jury entered advisory verdicts of no laches and no inequitable conduct with respect to Lucent's claims for the '759 patent.  Dell did not challenge these conclusions in its post-trial briefing, and neither party submitted proposed findings of fact or conclusions of law under the briefing schedule provided by the Court.  The ultimate determination of these issues rests with the Court.  See, e.g., Huser, 513 F.2d at 1299. As neither party has disputed the advisory verdicts at this stage of the proceedings, and the Court has reached the same conclusions on the trial record without deference to the jury on these questions, the Court adopts the advisory verdicts in their entirety as they relate to the '759 patent.

### D.   Summary

As to the '759 patent, the Court **DENIES** all motions for judgment as a matter of law and all motions for a new trial.  The Court follows the jury's advisory verdicts as they relate to the '759 patent.  The Court finds no laches and no inequitable conduct as to the '759 patent.

/ / /

/ / /

/ / /

/ / /

## Conclusion

### I.      Matters Tried to the Bench

For the reasons set forth above, the Court follows the jury's advisory verdicts on equitable issues in part.  The Court finds no laches for either the '226 or '759 patents.  Furthermore, the Court finds no inequitable conduct for either the '226 or '759 patents.

### II.     Motions for JMOL, New Trial, or Remittitur

As to the '356, '295, and '759 patents, the Court **DENIES** all motions for judgment as a matter of law, new trial, or remittitur.  As to the '226 patent, the Court **GRANTS** Lucent's motion for judgment as a matter of law that the '226 is not invalid for obviousness.  The Court **DENIES** all other motions for judgment as a matter of law or new trial regarding the '226 patent.

### III.    Closing Remarks

The Court takes this opportunity to compliment all attorneys involved for their excellent work in these proceedings.  Counsel for all parties worked diligently to accommodate the Court's schedule, prepared their materials thoroughly, and conducted themselves in a professional and courteous manner that does credit to their profession.

IT IS SO ORDERED.

DATED:  June 19, 2008

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record.

- 56 -

07cv2000