

1  James S. Blackburn (State Bar No. 169134)
   ARNOLD & PORTER LLP
2  777 South Figueroa Street, 44th Floor
   Los Angeles, California  90017-5844
3  Telephone:  (213) 243-4000
   Facsimile:  (213) 243-4199
4
   Attorneys for *Dell Inc.*
5



**FILED**

**JUL 18 2008**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

7

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  LUCENT TECHNOLOGIES INC.  and<br>MULTIMEDIA PATENT TRUST,     ) | Case No. 07-CV-2000-H (CAB)<br>consisting of matters severed from<br>consolidated cases: |
| 12                                    )<br>13     Plaintiffs and Counterclaim-defendants, ) | Case No. 02-CV-2060-B (CAB)<br>Case No. 03-CV-0699-B (CAB)<br>Case No. 03-CV-1108-B (CAB) |
| 14        v.                          ) | |
| 15  GATEWAY, INC., *et al.*            ) | **DELL'S NOTICE OF APPEAL FROM**<br>**JUDGMENT REGARDING U.S. PATENT** |
| 16     Defendants and Counter-claimants, ) | **NO. 4,439,295** |
| 17  and                               ) | |
| 18  MICROSOFT CORPORATION,             ) | |
| 19     Intervener and Counter-claimant, ) | |
| 20  MICROSOFT CORPORATION,             ) | |
| 21     Plaintiff and Counter-defendant, ) | |
| 22        v.                          ) | |
| 23  LUCENT TECHNOLOGIES INC. and<br>MULTIMEDIA PATENT TRUST,      ) | |
| 24                                    )<br>25     Defendants and Counter-claimants, ) | |

26

27

28

1   LUCENT TECHNOLOGIES INC. and
    MULTIMEDIA PATENT TRUST,                    )
2                                               )
            Plaintiffs and Counterclaim-defendants, )
3                                               )
    v.                                          )
4                                               )
    DELL INC.,                                  )
5                                               )
            Defendant and Counter-claimant.     )
6                                               )

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE IS HEREBY GIVEN, pursuant to Fed. R. App. P. 3, that Defendant Dell Inc. ("Dell") appeals to the United States Court of Appeals for the Federal Circuit from the final judgment entered in this proceeding on June 19, 2008 [D.I. 853] ("the Judgment") as it pertains to U.S. Patent No. 4,439,295 ("the '295 patent") in the above-captioned civil action, and any and all adverse rulings incorporated in, antecedent to, and/or ancillary to the Judgment as it pertains to the '295 patent.

Dell appeals from any and all adverse interlocutory judgments, decrees, decisions, rulings, finding, instructions, and opinions that merged into and became part of the Judgment, that shaped the Judgment, that are related to the Judgment, and/or upon which the Judgment is based as it pertains to the '295 patent.  Those adverse interlocutory judgments, decrees, decisions, rulings, finding, instructions, and opinions include, but are not limited to:

     a.     Order on Post-Trial Matters for United States Patent Numbers 4,439,759; 4,763,356; 4,958,226; and 5,347,295; including: (1) Motions for Judgment as a Matter of Law, New Trial, or Remittitur; and (2) Rulings on Equitable Matters Tried to the Court [D.I. 852], entered in this action on June 19, 2008;

     b.     Jury Instructions entered in this case[D.I. 738], entered in this action on April 4, 2008, and preliminary drafts thereof;

     c.     Order on Motions In Limine [D.I. 496], entered in this action on February 8, 2008;

     d.     Order Construing Claims for United States Patent Number 5,347,295 [D.I. 172 in 02-cv-2060 and consolidated cases], entered in this action on February 25, 2004; and

     e.     All decisions, rulings, finding, and instructions made during and/or in connection with the February 20, 2008 through April 4, 2008 trial in this action.

///
///
///
///
///
///

- 1 -

1   to the extent that those judgments, decrees, decision, rulings, finding, instruction, and opinions are

2   adverse to Dell.

3

4   July 18, 2008

              ARNOLD & PORTER LLP
              James S. Blackburn

5                 Joseph A. Micallef

6              McDERMOTT WILL & EMERY LLP
              Joel M. Freed

7

8

9              By: _James Block_
                James S. Blackburn

10              james.blackburn@aporter.com
               Attorneys for Dell Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

**ORIGINAL**

1   James S. Blackburn (State Bar No. 169134)
    ARNOLD & PORTER LLP
2   777 South Figueroa Street, 44th Floor
    Los Angeles, California  90017-5844
3   Telephone:  (213) 243-4000
    Facsimile:  (213) 243-4199
4
    Attorneys for *Dell Inc.*
5
                    **UNITED STATES DISTRICT COURT**
6
                    **SOUTHERN DISTRICT OF CALIFORNIA**
7

8   LUCENT TECHNOLOGIES INC. and          )   Case No. 07-CV-2000-H (CAB)
    MULTIMEDIA PATENT TRUST,              )   consisting of matters severed from
                                          )   consolidated cases:
9          Plaintiffs and Counterclaim-defendants, )   Case No. 02-CV-2060-B (CAB)
                                          )   Case No. 03-CV-0699-B (CAB)
10         v.                             )   Case No. 03-CV-1108-B (CAB)
                                          )
11  GATEWAY, INC., *et al.*               )   **CERTIFICATE OF SERVICE**
                                          )
12         Defendants and Counter-claimants, )
                                          )
13  and                                   )
                                          )
14  MICROSOFT CORPORATION,                )
                                          )
15         Intervener and Counter-claimant, )
                                          )
16  ─────────────────────────────────────)
    MICROSOFT CORPORATION,                )
17                                        )
           Plaintiff and Counter-defendant, )
18                                        )
    v.                                    )
19                                        )
    LUCENT TECHNOLOGIES INC. and          )
20  MULTIMEDIA PATENT TRUST,              )
                                          )
21         Defendants and Counter-claimants, )
                                          )
22  ─────────────────────────────────────)
    LUCENT TECHNOLOGIES INC. and          )
23  MULTIMEDIA PATENT TRUST,              )
                                          )
24         Plaintiffs and Counterclaim-defendants, )
                                          )
25  v.                                    )
                                          )
26  DELL INC.,                            )
                                          )
27         Defendant and Counter-claimant. )
                                          )
28  ─────────────────────────────────────)

1

## CERTIFICATE OF SERVICE

2      I am a citizen of the United States, over the age of eighteen years, and I am not a party to the

3 foregoing action.  My business address is 777 South Figueroa Street, Forty-Fourth Floor, Los

4 Angeles, California 90017-5844.

5      I HEREBY CERTIFY that on this 18 day of July 2008, in Case No. 07-CV-2000-H (CAB)

6 consisting of matters severed from consolidated cases: Case No. 02-CV-2060-B (CAB), Case No.

7 03-CV-0699-B (CAB), and Case No. 03-CV-1108-B (CAB), I caused a copy of the following

8 documents to be served on all counsel of record who are deemed to have consented to electronic

9 service via the Court's CM/ECF system per Civ. L. R. 5.4:

10      **1.    Dell's Notice of Appeal From Judgment Regarding U.S. Patent No. 4,439,295.**

11      A true and complete copy of the above named documents was served on counsel listed

12 below by the indicated methods:

13

**VIA FEDEX AND ELECTRONIC MAIL:**

14

David Hahn (dhahn@hahnadema.com)

15 Sue Frost (sfrost@hahnadema.com)
HAHN & ADEMA

16 501 West Broadway, Suite 1600
San Diego, California  92101-3595

17 Telephone:  (619) 235-2100
Facsimile:  (619) 235-2101

18

19

**VIA ELECTRONIC MAIL:**

Robert Appleby (rappleby@kirkland.com)
Jon T. Hohenthaner (jhohenthaner@kirkland.com)
Alan Kellman (akellman@kirkland.com)
Jay Mafale (jmafale@kirkland.com)
KIRKLAND & ELLIS, LLP
Citicorp Center
153 East 53rd Street
New York, NY 10022-4675
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

20

21 Christopher S. Marchese (marchese@fr.com)
John E. Gartman (gartman@fr.com)

22 Jennifer Bettencourt (bettencourt@fr.com)
Susie Rodriguez (srodriguez@fr.com)
Donna Rousseau (rousseau@fr.com)

23 John Thornburgh (thornburgh@fr.com)
FISH & RICHARDSON

24 12390 El Camino Real
San Diego, CA 92130

25 Telephone: (858) 678-5070
Facsimile: (858) 678-5099

26 Email: microsoft-lucentexchange@fr.com

27

28

- 1 -

1        I declare that I am employed by a member of the bar of this Court at whose direction the

2  service was made.  I declare under penalty of perjury that the above is true and correct.  Executed

3  on July 18, 2008 at Los Angeles, California.

4

5                                Leyla C. Çambel

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  LUCENT TECHNOLOGIES, INC. and            CASE NO. 07-CV-2000-H (CAB)
    MULTIMEDIA PATENT TRUST                  consisting of matters severed from
12                                           the consolidated cases:
            Plaintiffs and Counter-          CASE NO. 02-CV-2060-B (CAB)
13          Defendants,                      CASE NO. 03-CV-0699-B (CAB)
                                             CASE NO. 03-CV-1108-B (CAB)
14          vs.
                                             JUDGMENT
15  GATEWAY, INC., *et al.*

16          Defendants and Counterclaimants.

17  and

18  MICROSOFT CORPORATION,

19          Intervenor and Counterclaimant

20  ─────────────────────────────────

21  AND RELATED CLAIMS

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

                              - 1 -                              07cv2000

1   The jury returned a special verdict in this case on April 4, 2008. (Doc. No. 735.)

2   On April 28, 2008, the Court entered an order regarding the award of prejudgment

3   interest. (Doc. No. 754.)  On June 19, 2008, the Court ruled on the post-trial motions

4   and matters tried to the bench.  In accordance with these determinations and all relevant

5   proceedings to date,

6       IT IS ORDERED AND ADJUDGED THAT:

7       United States Patent Number 4,763,356 (Day '356)

8       Lucent provided Dell with pre-suit notice of its alleged infringement of the Day

9   '356 patent.  Microsoft infringed claim 19 of the Day '356 patent, with respect to the

10  accused versions of Microsoft Money, Microsoft Outlook, and Windows Mobile.

11  Microsoft infringed claim 21 of the Day '356 patent, with respect to the accused

12  versions of Windows Mobile.  Dell did not infringe claims 19 or 21 of the '356 patent.

13  Claims 19 and 21 of the Day '356 patent are not invalid.  The Court enters judgment

14  for Lucent against Microsoft in the amount of $357,693,056.18, plus prejudgment

15  interest of $139,545,657,[1] for Microsoft's infringement of the Day '356 patent in this

16  case.

17      United States Patent Number 5,347,295 (Agulnick '295)

18      Microsoft and Dell infringed claim 1 of the Agulnick '295 patent, with respect

19  to Tablet PC computers installed with the Windows XP Tablet PC Edition operating

20  system. Claim 1 of the Agulnick '295 patent is not invalid. The Court enters judgment

21  for Lucent against Microsoft in the amount of $10,350,000, plus prejudgment interest

22  of $4,037,807,[2] for Microsoft's infringement of the Agulnick '295 patent in this case.

23  The Court enters judgment for Lucent against Dell in the amount of  $51,000, plus

24

25

26  ───────────────

27  [1]In accordance with the parties' calculations, this includes $138,672,525 through June 6, 2008, plus $67,164 per day for June 7, 2008, through June 19, 2008.  (See Joint Notice Regarding Prejudgment Interest Calculations ("Joint Notice re Interest"), Doc. No. 801.)

28

[2]In accordance with the parties' calculations, this includes $4,012,548 through June 6, 2008, plus $1,943 per day for June 7, 2008, through June 19, 2008.  (See Joint Notice re Interest.)

- 2 -

07cv2000

1 | prejudgment interest of $19,592,[3] for Dell's infringement of the Agulnick '295 patent
2 | in this case.

3 |       United States Patent Number 4,958,226 (Haskell '226)

4 |       Microsoft did not infringe claim 12 of the Haskell '226 patent, with respect to
5 | the various accused products installed with MPEG-1, MPEG-2, or VC-1 decoders.
6 | Claim 12 of the Haskell '226 patent is not invalid.  The Court finds no inequitable
7 | conduct in the prosecution of the Haskell '226 patent.  The doctrine of laches does not
8 | limit Mutimedia Patent Trust's ("MPT") assertion of the Haskell '226 patent against
9 | Microsoft.  For the Haskell '226 patent, the Court enters judgment in favor of
10 | Microsoft against MPT.

11 |       United States Patent Number 4,439,759 (Fleming '759)

12 |       Lucent did not provide Dell with pre-suit notice of its alleged infringement of
13 | the '759 patent.  Dell did not infringe claim 1 of the Fleming '759 patent, with respect
14 | to Dell computers sold between October 20, 1998, and May 19, 2001, that included a
15 | version of the Windows operating system.  Claim 1 of the Fleming '759 patent is not
16 | invalid.  The Court finds no inequitable conduct in the prosecution of the Fleming '759
17 | patent.  The doctrine of laches does not limit Lucent's assertion of the Fleming '759
18 | patent against Dell.  For the Fleming '759 patent, the Court enters judgment in favor
19 | of Dell against Lucent.

20 |       Counterclaims

21 |       The Court enters judgment for Lucent on Microsoft's counterclaim for tortious
22 | interference with prospective economic advantage.  The Court enters judgment for
23 | Lucent on Dell's counterclaim for tortious interference with prospective economic
24 | advantage.

25 |       Costs and Further Interest

26 |       The Court awards costs and postjudgment interest to the prevailing party as
27 | provided by law.

28 |

---

[3]In accordance with the parties' calculations, this includes $19,462 through June 6, 2008, plus $10 per day for June 7, 2008, through June 19, 2008.  (See Joint Notice re Interest.)

1    <u>Summary of Infringement Liability</u>

2    Totaling the infringement awards stated above,

3    (1) Microsoft is liable to Lucent in the amount of $511,626,520.18;[4] and

4    (2) Dell is liable to Lucent in the amount of $70,592;

5    plus costs and postjudgment interest as provided by law.

6

7    DATED:  June 19, 2008

8                                          _Marilyn L. Huff_____

9                                          MARILYN L. HUFF, District Judge
                                           UNITED STATES DISTRICT COURT

10   COPIES TO:
     All parties of record.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
─────────────────────────────
     [4]This includes infringement damages and prejudgment interest of $497,238,713.18 for the '356
patent and $14,387,807 for the '295 patent.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

LUCENT TECHNOLOGIES, INC. and
MULTIMEDIA PATENT TRUST

      Plaintiffs and Counter-
      Defendants,

vs.

GATEWAY, INC., *et al.*

      Defendants and Counterclaimants.

and

MICROSOFT CORPORATION,

      Intervenor and Counterclaimant

AND RELATED CLAIMS

CASE NO. 07-CV-2000-H (CAB)
consisting of matters severed from
the consolidated cases:
CASE NO. 02-CV-2060-B (CAB)
CASE NO. 03-CV-0699-B (CAB)
CASE NO. 03-CV-1108-B (CAB)

ORDER ON POST-TRIAL
MATTERS FOR UNITED
STATES PATENT NUMBERS
4,439,759; 4,763,356; 4,958,226;
AND 5,347,295; INCLUDING:

(1) MOTIONS FOR JUDGMENT
AS A MATTER OF LAW, NEW
TRIAL, OR REMITTITUR; AND

(2) RULINGS ON EQUITABLE
MATTERS TRIED TO THE
COURT

[Doc. Nos. 759, 760, 770, 772.]

23
24
25
26
27
28

      This order addresses the remaining post-trial questions in this case, including motions for judgment as a matter of law ("JMOL"), motions for new trial, and rulings on equitable matters tried to the Court. The trial involved four United States Patents: 4,439,759 ("Fleming '759" or "'759"); 4,763,356 ("Day '356" or "'356"); 4,958,226 ("Haskell '226" or "'226"); 5,347,295 ("Agulnick '295" or "'295"). Lucent Technologies, Inc. ("Lucent") asserted the '356 and '295 patents against Microsoft

1   Corporation ("Microsoft") and Dell Inc.   ("Dell" and collectively with Microsoft

2   "Defendants").  Lucent asserted the '759 patent against Microsoft only.  Multimedia

3   Patent Trust ("MPT"), a Delaware trust with Lucent as the primary beneficiary,

4   asserted the '226 patent against Microsoft only.

5           The parties filed their initial briefs on these post-trial matters on May 5, 2008.

6   MPT moved for JMOL, new trial, and entry of judgment on equitable matters related

7   to the '226 patent. (Doc. No. 759.) Lucent moved for JMOL and new trial on the '759

8   and '356 patents. (Doc. No. 760.) Microsoft moved for JMOL, new trial, or remittitur

9   on various issues related to the '356, '295, and '226 patents. (Doc. No. 770.)  Dell

10  joined in sections of Microsoft's motions applicable to it. (Doc. No. 792.) Microsoft

11  also moved for entry of judgment on the equitable matters related to the '226 patent yet

12  to be decided by the Court. (Doc. No. 772.)

13          The parties filed their responsive briefing on May 19, 2008.  Dell filed an

14  opposition to Lucent's motion regarding the '759 and '356 patents.  (Doc. No. 804.)

15  Microsoft filed an opposition to MPT's motion regarding the '226 patent.  (Doc.

16  No. 805.) MPT opposed Microsoft's combined motion to the extent that it addressed

17  the '226 patent. (Doc. No. 808.) Lucent opposed Microsoft's combined motion to the

18  extent that it addressed the '356 and '295 patents.  (Doc. No. 809.)  MPT filed an

19  opposition to Microsoft's motion for entry of judgment on the bench trial issues.  (Doc.

20  No. 810.)

21          The parties filed their reply briefs on May 27, 2008.  Microsoft filed replies in

22  support of its post-trial motions and motion for entry of judgment on bench trial issues.

23  (Doc. Nos. 826-28.)  Lucent filed a reply in support of its motion regarding the '759

24  and '356 patents. (Doc. No. 830.) MPT filed a reply in support of its motion regarding

25  the '226 patent. (Doc. No. 831.)

26          The Court held a hearing on these matters on June 13, 2008.  Robert Appleby,

27  Paul Bondor, John Desmarais, Jeanne Heffernan, James Marina, and Michael Stadnick

28  appeared for Lucent and MPT.  John Gartman, Juanita Brooks, and Roger Denning

    appeared for Microsoft.  Joseph Micallef appeared for Dell.

                                              - 2 -                              07cv2000

1                                          **Background**

2   **I.     Overview of Infringement Liability**

3           The underlying trial concerned the alleged infringement of four patents asserted

4   by Lucent and MPT against Microsoft and Dell.[1]  On April 4, 2008, the jury returned

5   a special verdict for all four patents, including advisory verdicts on certain equitable

6   issues to be decided by the Court.  (Doc. No. 735.)  The jury found that Microsoft

7   infringed the '356 patent, and that both Microsoft and Dell infringed the '295 patent.

8   The jury found no infringement of either the '226 or '759 patents.  The jury found

9   Microsoft liable to Lucent for $357,693,056.18 based on infringement of the '356

10  patent.  For infringement of the '295 patent, the jury found Microsoft liable to Lucent

11  for $10,350,000 and Dell liable for $51,000.

12  **II.    Day '356**

13          The Patent and Trademark Office ("PTO") issued the '356 patent, entitled

14  "Touch Screen Form Entry System," on August 9, 1988, based on an application filed

15  December 11, 1986.  Only method claims 19 and 21 were at issue in this trial.  Claim

16  19 is an independent claim, and claim 21 is a related dependent claim. Claim 19 states:

17          A method for use in a computer having a display comprising the steps of

18          displaying on said display a plurality of information fields,

19          identifying for each field a kind of information to be inserted therein,

20          indicating a particular one of said information fields into which
21          information is to be inserted and for concurrently displaying a predefined
            tool associated with said one of said fields, said predefined tool being
22          operable to supply information of the kind identified for said one field,
            said tool being selected from a group of predefined tools including a tool
23          adapted to supply an individual entry from a menu of alternatives and at
            least a tool adapted to allow said user to compose said information, and

24          inserting in said one field information that is derived as a result of said
            user operating said displayed tool.
25
    Claim 21 further limits the step of "displaying said pattern" to include "the step of
26
    displaying one or more of said information fields as a bit-mapped-graphics field."
27

28          [1]Microsoft and Dell also asserted counterclaims for tortious interference with prospective
    economic advantage, relating to Lucent's allegedly improper creation of MPT.  The jury found for
    Lucent on this issue, and Defendants did not raise it in their post-trial motions.

1    For this patent, Lucent submitted evidence of indirect infringement. Lucent

2   asserted claim 19 against Microsoft and Dell based on versions of Microsoft Money,

3   Microsoft Outlook, and Windows Mobile. Lucent also asserted claim 19 against Dell

4   only, based on sales of Quicken versions 2000 through 2006. Lucent asserted claim

5   21 against Microsoft and Dell based only on the various versions of Windows Mobile.

6    The jury found Microsoft liable on claim 19 as to all three products and on claim

7   21 as to Windows Mobile, and it returned a finding of no infringement by Dell.[2] The

8   verdict did not distinguish between inducing and contributory infringement. The jury

9   awarded a single lump sum against Microsoft for all products involved.

10    Defendants presented affirmative defenses of anticipation and obviousness. The

11   jury found for Lucent on both.

12   **III.   Haskell '226**

13    The PTO issued the '226 patent, entitled "Conditional Motion Compensated

14   Interpolation of Digital Motion Video," on September 18, 1990, based on an

15   application filed September 27, 1989. At trial, Lucent only asserted claim 12, a means-

16   plus-function apparatus claim which states:

17    A circuit responsive to coded video signals where the video signals
     comprise successive frames and each frame includes a plurality of blocks
18    and where the coded video signals comprise codes that describe
     deviations from approximated blocks and codes that describe deviations
19    from interpolated blocks, comprising:

20    means for developing block approximations from said codes that describe
     deviations from approximated blocks; and
21

22    means responsive to said block approximations and to said codes that
     describe deviations from interpolated blocks to develop said interpolated
23    blocks.

24    MPT introduced evidence of both direct and indirect infringement by Microsoft.

25   The accused products included Microsoft software and hardware containing an

26   MPEG-1, MPEG-2, or VC-1[3] video decoder, referring to industry standards for video

27   ───────────────

28   [2]The jury also found that Lucent had provided Dell with pre-suit notice regarding the '356
     patent, and Dell did not bring a motion attacking this finding.

   [3]VC-1 decoders are also referred to in the record as WMV-9 decoders.

1  compression and playback used for various products including DVDs and HD DVDs.

2  Specifically, MPT accused Microsoft based on Windows operating system versions

3  95B through Vista, the Microsoft Xbox 360 video game system, and Windows Media

4  Player versions 9 through 11.

5      The jury found that none of Microsoft's accused products had infringed claim

6  12. The jury also found that claim 12 was invalid for obviousness, though not invalid

7  for anticipation. Furthermore, the Court asked the jury to return advisory verdicts on

8  Microsoft's defenses of laches and inequitable conduct regarding the '226 patent. The

9  jury recommended that Lucent be barred from obtaining pre-suit damages due to

10  laches, but found no inequitable conduct.

11 **IV.   Agulnick '295**

12      The PTO issued the '295 patent, entitled "Control of a Computer Through a

13  Position-Sensed Stylus," on September 13, 1994, based on an application filed October

14  31, 1990. At trial, Lucent only asserted claim 1, a means-plus-function apparatus claim

15  which states:

16      An apparatus for controlling a computer system, the computer system
        comprising a screen for displaying information and a stylus having a tip
17      for inputting information into the computer, including:

18      first detecting means coupled to said computer for detecting a stroke of
        the stylus tip in contact with the screen;
19

20      second detecting means coupled to said computer for detecting a
        departure of the stylus tip from the screen;

21      means coupled to said computer for defining termination of a gesture
        comprising at least one stroke in response to said departure of the stylus
22      tip;

23      means coupled to said computer for recognizing a plurality of said
        gestures, said recognizing means including means for comparing each
24      said gesture to at least one predefined shape;

25      means coupled to said computer for implementing each said recognized
        gesture, said implementing means including means for performing a
26      predetermined action associated with each said predefined shape, said
        predetermined action being determined by the context in which said
27      gesture was used, including a first context in which said action is
        executed upon an operating system level object and a second context in
28      which said action is executed upon an application level object.

      Lucent introduced evidence of direct and indirect infringement by Dell, and

- 5 -

1  evidence of indirect infringement by Microsoft. The accused products were Tablet PC

2  Computers installed with the Windows XP Tablet PC Edition operating system. Lucent

3  based its accusations against Microsoft on all sales of Windows XP Tablet PC Edition,

4  while its accusations against Dell were limited to Dell's sales of Windows XP Tablet

5  PCs.

6       The jury returned a finding that both Microsoft and Dell had infringed claim 1.

7  The jury awarded Lucent damages of $10,350,000 from Microsoft and $51,000 from

8  Dell.

9       Defendants presented affirmative defenses of anticipation and obviousness. The

10  jury found for Lucent on both.

11  **V.    Fleming '759**

12      The PTO issued the '759 patent, entitled "Terminal Independent Color

13  Memory for a Digital Image Display System," on March 27, 1984, based on an

14  application filed May 19, 1981. At trial, Lucent only asserted claim 1, a means-

15  plus-function apparatus claim which states:

16      In a digital image display system:

17      a memory for storing color data values;

18      processing means responsive to a predetermined command and data
19      sequence comprising at least one command, the processing means
        decoding the predetermined command and data sequence, the
        predetermined command and data sequence selecting one of a plurality of
20      modes of access to color data values, the modes comprising:

21      a first mode of access wherein an in-use foreground color is directly
22      specified as a color data value;

        a second mode of access wherein the in-use foreground color is specified
23      as an index into the color memory; and

24      a third mode of access wherein the in-use foreground color and an in-use
        background color are specified as indexes into the color memory; and
25
        display means responsive to the processing means, the display means
26      displaying the colors associated with the color data values accessed by the
        selected mode.
27
        Lucent introduced evidence of both direct and indirect infringement by Dell.
28
    The accused products covered all computer systems sold by Dell between October 20,

1   1998, and May 19, 2001, that included a version of the Windows operating system.

2   Lucent based its accusations on the presence of the Windows graphics device interface

3   ("GDI") in these products.

4       The jury found that Lucent failed to prove that it had provided Dell with pre-suit

5   notice of infringement for this patent. Significantly, the jury also returned a finding of

6   no infringement. Dell asserted affirmative defenses of anticipation and obviousness,

7   and the jury found for Lucent on both. Furthermore, the Court asked the jury to return

8   advisory verdicts on Microsoft's defenses of laches and inequitable conduct regarding

9   the '759 patent. The jury recommended that Dell should not prevail on either equitable

10  defense.

11      **Discussion**

12  **I.    Standards for JMOL, New Trial, and Remittitur**

13      In patent cases, the standards on motions for judgment as a matter of law or new

14  trial are questions of regional circuit law. Finisar Corp. v. DirecTV Group, 523 F.3d

15  1323, 1328 (Fed. Cir. 2008). Judgment as a matter of law is available where "a

16  reasonable jury would not have a legally sufficient evidentiary basis to find for the

17  party on that issue." Fed. R. Civ. P. 50(a)(1). A party may renew the motion when not

18  granted at trial. Fed. R. Civ. P. 50(b). A court must uphold the jury's verdict if it is

19  supported by substantial evidence. Wallace v. City of San Diego, 479 F.3d 616, 624

20  (9th Cir. 2007). "Substantial evidence is evidence adequate to support the jury's

21  conclusion, even if it is also possible to draw a contrary conclusion from the same

22  evidence." Id. (quoting Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222,

23  1227 (9th Cir. 2001)). Substantial evidence requires only "such relevant evidence as

24  a reasonable mind might accept as adequate to support a conclusion." Blanton v.

25  Anzalone, 813 F.2d 1574, 1576 (9th Cir. 1987) (quoting Transgo, Inc. v. Ajac

26  Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir. 1985)). The court must not

27  weigh the evidence and must "disregard all evidence favorable to the moving party that

28  they jury is not required to believe." Wallace, 479 F.3d at 624. Furthermore, the court

draws all reasonable inferences in favor of the nonmoving party. Id. Judgment as a

1  matter of law is only appropriate if, once the court has applied this standard, it
2  concludes that the evidence permits only one reasonable conclusion that is contrary to
3  the jury's verdict.  Id.

4       A party may also move for a new trial when requesting judgment as a matter of
5  law following a jury trial.  Fed. R. Civ. P. 50(b), 59.  Whether to grant a new trial is a
6  matter of the trial court's discretion.  City Solutions, Inc. v. Clear Channel
7  Communications, 365 F.3d 835, 843 (9th Cir. 2004).  The court may grant a new trial
8  if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence
9  which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of
10 justice."  United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999)
11 (quoting Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1452 (9th Cir. 1988)).  To
12 make a "clear weight of the evidence" determination, the court weighs the evidence as
13 the court saw it.  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) (quoting
14 Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990)).  If a court
15 concludes that a new trial is appropriate due to excessive damages, the court may
16 exercise its discretion to grant a new trial either without qualification, or conditioned
17 on the winner's refusal to accept a reduction in damages, known as remittitur.  See
18 Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433 (1996).

19 **II.  Day '356**

20      **A.   Validity**

21           **1.    Anticipation**

22      Defendants seek judgment as a matter of law that a system known as the Foreign
23 Exchange Front End ("FXFE") anticipated claim 19 under 35 U.S.C. §§ 102(b) or
24 102(g).  Under section 102(b), patent protection may be unavailable where the
25 invention was "in public use . . . more than one year prior to the date of the application
26 . . . ."  Under section 102(g), patent protection may be unavailable where "before . . .
27 invention thereof, the invention was made in this country by another inventor who had
28 not abandoned, suppressed, or concealed it."  An anticipating public use or prior
   invention must include every limitation of the patented invention.  Netscape

- 8 -

1  Communications Corp. v. Konrad, 295 F.3d 1315, 1321 (Fed. Cir. 2002); Hybritech
2  Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1379 (Fed. Cir. 1986).
3  Anticipation, like other invalidity defenses, requires proof by clear and convincing
4  evidence. Netscape Communications Corp. 295 F.3d at 1320.

5      The application for the '356 patent was filed on December 11, 1986. In January
6  1984, Datamation magazine published an article describing a prototype touch-screen
7  system used by Chemical Bank, through which currency traders could fill out forms
8  electronically. (DX AOD (Datamation article); AOE (enlargement of Datamation
9  article's photograph).) The system was known as the Foreign Exchange Front End.
10 The Datamation article included a single photograph of the FXFE display, with limited
11 detail.

12     Judgment as a matter of law or new trial is not appropriate because the jury could
13 have reasonably rejected the credibility of Defendants' witnesses, found that the FXFE
14 did not include all elements of the method in claim 19, or found that the FXFE was not
15 prior art under section 102. The evidence is sufficient to support a finding that the
16 FXFE did not include "indicating a particular one of said information fields into which
17 information is to be inserted ." The Datamation article did not describe this capability.
18 (See DX AOD.) Defendants argue that a single FXFE photograph, of limited clarity,
19 shows that a particular on-screen button is highlighted. (See DX AOE.) The jury could
20 have concluded that this was not a "field" into which information could be entered.

21     Furthermore, applying the appropriate standards for these proceedings, there is
22 a limited showing of whether the FXFE even involved "information fields" into which
23 information was "inserted," within the meaning of the patent. The available image is
24 limited in detail, and the text merely refers to entering information into "the system."
25 (See, e.g., DX AOD at 148 ("For instance, when the user hits the 'broker' cell on the
26 right, a list of brokers appears on the left; the trader then hits the name of the broker . . .
27 and that information is entered into the system."); DX AOE.) Particularly given the
28 standard of clear and convincing evidence, the jury could have reasonably concluded
   that Defendants failed to meet their burden on these elements as well. Lucent also

1   argued that the FXFE did not have "graphical" tools or "concurrently display" a tool

2   with an information field, though the Court concludes that there are ample other

3   grounds to support the jury's finding of no anticipation.

4       The jury also could have concluded that the FXFE did not meet the requirements

5   of section 102(b) or 102(g) prior art.  Viewed under the applicable standards, the

6   evidence indicates that the FXFE was developed mostly or entirely outside the United

7   States, and still in a developmental or prototype form.  Furthermore, the nature and

8   circumstances of the demonstration are unclear in many respects.  The jury could have

9   reasonably concluded that the use was not sufficiently public or that any prior invention

10  was abandoned.  Public use is determined under the totality of the circumstances, and

11  the Court concludes that this demonstration does not constitute clear and convincing

12  evidence of public use as a matter of law.  Cf. Harrington Mfg. Co. v. Powell Mfg. Co.,

13  815 F.2d 1478, 1480-81 (Fed. Cir. 1986) (demonstration to reporter was sufficiently

14  public use where evidence included "clear indication of . . . commercial motive," and

15  indication that device operated "flawlessly").  The jury could draw many inferences

16  against Defendants sufficient to conclude that the use was not public.  For example,

17  even if made to a reporter, it is unclear to what extent the demonstration was

18  completely functional.

19      Also, there is no dispute that the touch-screen FXFE, as demonstrated, was not

20  commercialized.  "[A] first inventor may seek to avoid a determination of abandonment

21  by showing that he or she marketed or sold a commercial embodiment of the invention

22  or described the invention in a publicly disseminated document."  Checkpoint Sys., Inc.

23  v. U.S. Int'l Trade Comm'n, 54 F.3d 756, 762 (Fed. Cir. 1995).  The ambiguities

24  surrounding the FXFE demonstration, however, cast serious doubt on whether it

25  preserved sufficient information about the system in the public domain to avoid a

26  finding of abandonment.  See id. (citing Palmer v. Dudzik, 481 F.2d 1377, 1387

27  (C.C.P.A. 1973), for the proposition that "to negate a finding of suppression or

28  concealment, the public must have gained knowledge of the invention which will

insure its preservation in the public domain").  In summary, there is substantial

- 10 -                                                        07cv2000

1    evidence in the record to support the jury's determination of no anticipation.

2    Furthermore, the Court concludes that the jury's finding is not against the clear weight

3    of the evidence.

4              **2.    Obviousness**

5              Defendants challenge the jury's finding that the '356 patent was not obvious.

6    As prior art, they assert both the Datamation article and the FXFE system described

7    above, along with J.K. Lasser's Your Money Manager software ("YMM") and the

8    Windows 1.01 calculator.   The obviousness defense requires proof by clear and

9    convincing evidence. <u>Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.</u>, 492 F.3d

10   1350, 1355 (Fed. Cir. 2007)   "The ultimate judgment of obviousness is a legal

11   determination." <u>KSR Int'l Co. v. Teleflex Inc.</u>, 550 U.S. ___, 127 S.Ct. 1727, 1745

12   (2007) (citing <u>Graham v. John Deere Co. of Kansas City</u>, 383 U.S. 1, 17 (1966)).

13   While courts therefore need not give deference to the jury's ultimate legal

14   determination, courts still give deference to the jury's underlying findings of fact. <u>See</u>

15   <u>Finisar Corp. v. DirecTV Group, Inc.</u>, 523 F.3d 1323, 1338 (Fed. Cir. 2008) ("[T]his

16   court reviews a jury's conclusions on obviousness, a question of law, without

17   deference, and the underlying findings of fact, whether explicit or implicit within the

18   verdict, for substantial evidence.") (quoting <u>Dippin' Dots, Inc. v. Mosey</u>, 476 F.3d

19   1337, 1343 (Fed. Cir. 2007)).   These underlying findings include "the scope and

20   content of the prior art, the differences between the prior art and the claims at issue, the

21   level of ordinary skill in the pertinent art . . . ." <u>Id.</u> at 1338-39.[4]

22             When determining obviousness, "neither the particular motivation nor the

23   avowed purpose of the patentee controls." <u>KSR Int'l Co.</u>, 127 S.Ct. at 1741-42.

24   Instead, courts should determine whether the "objective reach of the claim"

25   encompasses obvious subject matter. <u>Id.</u> at 1742. This may include "noting that there

26   existed at the time of invention a known problem for which there was an obvious

27   solution encompassed by the patent's claims." <u>Id.</u> "[T]he results of ordinary innovation

28   _____

     [4]Secondary considerations, or "objective indicia of nonobviousness," may also be considered,
     though they are not at issue here. <u>See</u> <u>Finisar</u>, 523 F.3d at 1339.

                                    - 11 -                              07cv2000

1    are not the subject of exclusive rights under the patent laws." Id. at 1746. However,
2    courts must avoid "falling prey to hindsight bias," "ex post reasoning," and "[r]igid
3    preventative rules that deny factfinders recourse to common sense." Id. at 1742-43.
4    Furthermore, "when the prior art teaches away from combining certain known
5    elements, discovery of a successful means of combining them is more likely to be
6    nonobvious." Id. at 1740.

7         "A patent composed of several elements is not proved obvious merely by
8    demonstrating that each of its elements was, independently, known in the prior art."
9    KSR Int'l Co., 127 S.Ct. at 1741. A combination is likely nonobvious if the elements
10   work together "in an unexpected and fruitful manner." Id. at 1740. In contrast, a
11   patent is likely to be obvious if it merely yields a predictable result by substituting one
12   element for another known in the field. Id.

13        On this record, the jury could have reasonably concluded that Defendants failed
14   to provide clear and convincing evidence that the '356 patent is invalid for
15   obviousness. First, there are factual problems with treating the FXFE as prior art.
16   There were factual questions with whether the FXFE constitutes a prior public use or
17   prior invention under sections 102(b) or 102(g). In this context the scope of prior art
18   for obviousness purposes implicates the same considerations as section 102 prior art.
19   Lucent Techs., Inc. v. Gateway, Inc., 537 F. Supp. 2d 1095, 1110 n.4 (S.D. Cal. 2008).
20   Therefore, the jury was not required to accept the FXFE as prior art for the obviousness
21   analysis. Also, with regard to the Datamation article, there were substantial
22   uncertainties about the capabilities of the system described. The jury could have
23   reasonably taken a narrow view of the descriptions offered by the article and its single
24   photograph, which lacked any fine detail or portrayal of the FXFE interface at different
25   steps in the process.

26        Regarding the YMM software, Lucent argued that it does not involve "graphical"
27   tools, since its display is composed of text and symbols. It also argued that YMM does
28   not permit "pointing" to the display keys of any tool, since the user controls Your
Money Manager only using the keyboard, without aid of a mouse, touch pad, or similar

1   device.  Around the time of the Day '356 patent, the personal computer industry was

2   undergoing a change from text-based, keyboard-only operation to operation using a

3   keyboard and mouse to control graphical user interfaces.  Based on the evidence, the

4   jury could have concluded that there was insufficient evidence of obviousness.

5       The Court concludes that substantial evidence supports the jury finding of no

6   obviousness. Lucent introduced evidence, including its expert's opinion and testimony

7   from the designer of YMM, that adapting YMM to a mouse-driven graphical interface

8   would not have been an obvious or trivial undertaking.  For example, the designer of

9   YMM stated that "from a technical and business standpoint, it made no sense to even

10  consider" this adaptation to an interface like Windows 1.01.   (Trial Tr. XII

11  215:13-216:16.)  The jury could reasonably have accepted this testimony, and the

12  corresponding opinion of Lucent's technical expert, while rejecting that of Defendants'

13  expert.  The patented technology is more than 20 years old, the patent term having

14  expired in 2006.  While users of today's computers may find many graphical interfaces

15  intuitive, and hardware advances have eased the implementation of more sophisticated

16  controls, the obviousness analysis must avoid hindsight bias, as the jury did here.

17  Neither JMOL or a new trial is appropriate on the jury's finding that the '356 patent is

18  not invalid for obviousness.

19      **B.      Infringement**

20              **1.      The Jury's Finding of Infringement by Microsoft**

21                      **a.      Whether Outlook Contains a Composition Tool**

22      A finding of infringement requires that every limitation of a claim be present,

23  either literally or by the doctrine of equivalents.  Odetics, Inc. v. Storage Tech. Corp.,

24  185 F.3d 1259, 1268 (Fed. Cir. 1999).  "A determination of non-infringement, either

25  literal or under the doctrine of equivalents, is a question of fact."  Miken Composites,

26  L.L.C. v. Wilson Sporting Goods, Co., 515 F.3d 1331,1336 (Fed. Cir. 2008).

27      Microsoft challenges the jury's finding of infringement for Microsoft Outlook

28  ("Outlook"), contending that Outlook does not contain a "composition tool," within the

1  meaning of the claims.[5]  A composition tool is one limitation in the third step of

2  method claim 19, which requires:

> 3  indicating a particular one of said information fields into which
> information is to be inserted and for concurrently displaying a predefined
> 4  tool associated with said one of said fields, said predefined tool being
> operable to supply information of the kind identified for said one field,
> 5  said tool being selected from a group of predefined tools including a tool
> adapted to supply an individual entry from a menu of alternatives and at
> 6  least a tool adapted to allow said user to compose said information.

7  The Court concludes that substantial evidence supports the jury's finding that

8  Outlook infringes claim 19.  Outlook is a software product that provides the user with

9  a number of services including e-mail, calendar and appointment management, and

10  management of contact information.  Microsoft's documentation describes form entry

11  as a central aspect of Outlook's user interface.  (See, e.g., PX 1138B (Outlook help file

12  stating that "Every Outlook item . . . is based on a form.").)  Outlook includes a

13  calendar tool to assist the user in entering dates on its form for specifying appointment

14  information.  The tool displays a monthly calendar as a grid of numbered dates, along

15  with graphical controls that allow the user to scroll to adjacent months or skip directly

16  to a different month and year.  Within the currently displayed month, the user can select

17  a particular date.  Once the user defines a date with this tool, the software enters the

18  numerical day, month, and year into the corresponding field in the appointments form.

19  (See, e.g., PX 697 (screenshot); Trial Tr. VI 117:11-118:12 (testimony accompanying

20  video demonstration).)

21  Much like the number pad tool shown in the patent, the calendar tool in Outlook

22  allows the user to select a series of numbers, corresponding to the day, month, and year,

23  using graphical controls.  (Cf. '356 4:18-21 ("The number entry tool . . . operates

24  similar to a standard hand-held calculator in which the user composes a string of

25  numbers by touching individual ones of the displayed buttons . . . .").)  Both competing

26  experts testified that the normal definition of "composition" includes combining or

27

28  [5]Dell joined some, but not all, aspects of Microsoft's challenge to the jury's infringement
finding.  (See Doc. No. 792.)  Dell did not join in certain arguments regarding the sufficiency of
evidence of indirect infringement by Microsoft, nor did it join in Microsoft's argument that the
findings as to Microsoft and Dell are inconsistent.

1    putting together different parts. (See Trial Tr. VI 111:5-112:11 (Mr. Tognazzini, for
2    Lucent); Trial Tr. XII 174:18-175:9 (Mr. Buscaino, for Microsoft).)

3         The jury rejected Microsoft's argument that the Outlook calendar tool is instead
4    a "menu of alternatives." The number of possible dates in the Outlook calendar
5    exceeds one million. (Trial Tr. V 135:17-136:6.) The patent states that, with a menu
6    of alternatives, "all that the user needs to do is point to one of the entries . . . ." ('356
7    3:55-56.) With the calendar tool, however, the user may change the various elements
8    of the date before settling on a final entry. The user cannot reach all options without
9    making multiple selections. The Court concludes that there was substantial evidence
10   permitting the jury to conclude that the Outlook calendar tool allowed the user to
11   compose the date. Viewing all the evidence from the trial, the jury could have
12   reasonably concluded that the calendar tool allowed the separate selection and
13   combination of day, month, and year, thus making it a composition tool.

14                  **b.      Whether Windows Mobile Contains a Composition**
15                          **Tool**

16        Microsoft also argues that there can be no infringement of Windows Mobile
17   because the Windows Mobile keyboard is not a composition tool that is "a predefined
18   tool associated with said one of said fields." The Court disagrees. First, contrary to
19   Microsoft's argument, the keyboard tool was not the only alleged composition tool
20   offered by Lucent for Windows Mobile. The passage of Lucent's expert testimony
21   cited by Microsoft for this supposed limitation clearly asserts that the expert "found
22   several tools that allow you to compose information," not just the keyboard tool.
23   (See Trial Tr. V 155:24-156:4.) Lucent also introduced evidence of both a Windows
24   Mobile calendar tool, similar to that already discussed for Microsoft Outlook, and a
25   Windows Mobile number pad tool. (See, e.g., PX 832A (screenshots of Windows
26   Mobile tools).)

27        Microsoft further argues that the keyboard tool is not "associated with said one
28   of said fields," as required by claim 19, because it is an operating system level tool that
     may be used by a variety of applications. Though the jury could have relied on one of

1    the other asserted composition tools, the Court also concludes that there was substantial
2    evidence to support the conclusion that the keyboard tool was a composition tool
3    "associated with said one of said fields." Microsoft does not dispute that the keyboard
4    tool may be used by various applications running on a Windows Mobile system. (See,
5    e.g., Microsoft's Mem. P. & A. Supp. Combined Mot. JMOL, New Trial, Remittitur,
6    at 17 ("[Windows Mobile keyboard] is provided at the operating system level for use
7    across many different applications . . . .").) Lucent introduced substantial evidence that
8    the keyboard tool is used by these applications to input information directly into active
9    fields, sufficient for the jury to conclude that it is "associated with said one of said
10   fields." (See, e.g., Trial Tr. V 154:20-156:4, XVII 107:18-108:23.)

11        Finally, Microsoft challenges the credibility of Lucent's expert, Mr. Tognazzini,
12   regarding the keyboard tool. The jury also assessed his credibility and rendered its
13   verdict. Viewed under the standards for post-trial motions, there is substantial
14   evidence to support Mr. Tognazzini's testimony.

15                    **c.    Proof of Specific Acts of Infringement**

16        Microsoft seeks judgment as a matter of law based on Lucent's purported failure
17   to introduce evidence of specific acts of direct infringement. Proof of indirect
18   infringement by inducement requires, in part, that the plaintiff prove there has been
19   direct infringement. Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279,
20   1292 (Fed. Cir. 2008). Since the asserted claims are method claims, proof of direct
21   infringement requires a showing that the claimed process was performed, not merely
22   that defendant sold an apparatus capable of infringement. Ormco Corp. v. Align Tech.,
23   Inc., 463 F.3d 1299, 1311 (Fed. Cir. 2006).

24        A plaintiff may prove direct infringement using circumstantial evidence. In
25   Symantec Corp., the Federal Circuit vacated a summary judgment of non-infringement
26   on an inducement claim, observing that "[the patentee] has produced sufficient
27   circumstantial evidence of direct infringement . . . even though [it] has not produced
28   evidence that any particular customer has directly infringed the . . . patent. Direct
     evidence of infringement, as opposed to circumstantial evidence, is not necessary."

1  Symantec Corp., 522 F.3d at 1292-93; see Golden Blount, Inc. v. Robert H. Peterson
2  Co., 438 F.3d 1354, 1363 (Fed. Cir. 2006) (concluding that patentee could rely on
3  circumstantial evidence, including instruction sheets provided with product, to prove
4  direct infringement); Arthrocare Corp. v. Smith & Nephew, Inc., 406 F.3d 1365,
5  1375-77 (Fed. Cir. 2005) (affirming denial of judgment as a matter of law of no indirect
6  infringement based, in part, on "strong circumstantial evidence" of direct infringement,
7  including literature accompanying the product involved); Moleculon Research Corp.
8  v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986) (upholding district court's
9  determination that patentee demonstrated direct infringement, as part of inducement
10  claim, using circumstantial evidence including extensive sales and instructions
11  distributed with the product); cf. E-Pass Techs., Inc. v. 3Com Corp., 473 F.3d 1213,
12  1222-23 (Fed. Cir. 2007) (affirming summary judgment of no infringement under the
13  approach of Moleculon, observing that product manuals in question, at best, only
14  taught method steps in isolation).

15      Lucent introduced sufficient circumstantial evidence for the jury to conclude that
16  Microsoft customers actually used the software to carry out the method steps of the
17  '356 patent. Lucent provided evidence in the form of instruction and encouragement
18  offered via tutorials, help files, web pages, manuals, promotional materials, the
19  testimony of those familiar with these materials, and other sources. (See, e.g., PX 742
20  (excerpts of Microsoft Money user's guides); PX 1139B (excerpt from Microsoft
21  Outlook help files); PX 651 (user's guide for Microsoft Windows Mobile product).)
22  A reasonable jury could have reviewed this extensive record and concluded, based on
23  the circumstantial evidence, that there was direct infringement.

24      The cases cited by Microsoft do not require a different result. In ACCO Brands,
25  Inc. v. ABA Locks Mfrs. Co., 501 F.3d 1307, 1313 (Fed. Cir. 2007), the court stated,
26  in the context of an inducement claim, that "[i]n order to prove direct infringement, a
27  patentee must either point to specific instances of direct infringement or show that the
28  accused device necessarily infringes the patent in suit." Unlike the present case and
others cited above, however, the court in ACCO Brands, Inc. concluded that there was

1  no evidence in the record that the alleged infringer distributed materials encouraging

2  the infringing method of operation.  See id.

3       Microsoft also cites E-Pass for the proposition that the accused infringer must

4  expressly instruct the user regarding every step together, in the required order.  E-Pass

5  Techs., Inc. v. 3Com Corp., 473 F.3d at 1222.  The relevant portion of E-Pass

6  concerned the requirement that a the patentee must show that all steps were actually

7  performed, in order.  See id. at 1222.  The court concluded that the product manual

8  evidence in that case showed "at best, that the Palm defendants taught their customers

9  each step of the claimed method in isolation. Nowhere do the manual excerpts teach

10  all of the steps of the claimed method together, much less in the required order." Id.

11  It also concluded that "the accused PDAs are general-purpose computing devices that

12  can be used for a variety of purposes and in a variety of ways." Id.  Here, the accused

13  products are executable software, with their particular capabilities, not general-purpose

14  computing devices.  Furthermore, the jury could have reasonably concluded that only

15  minimal instruction was needed to encourage a user to cause the accused software to

16  carry out all of the steps involved.  Viewing the evidence favorably to Lucent, a user

17  of the accused software only needs to open a form and enter information in an

18  appropriate field to trigger all steps of claim 19.

19                    **d.    Contributory Infringement**

20       Liability for contributory infringement derives from 35 U.S.C. § 271(c), which

21  states:

22       Whoever offers to sell or sells within the United States or imports into the
         United States a component of a patented machine, manufacture,
23       combination or composition, or a material or apparatus for use in
         practicing a patented process, constituting a material part of the invention,
24       knowing the same to be especially made or especially adapted for use in
         an infringement of such patent, and not a staple article or commodity of
25       commerce suitable for substantial noninfringing use, shall be liable as a
         contributory infringer.
26
27  Microsoft argues that there can be no finding of contributory infringement since all

28  three products in question are capable of substantial noninfringing uses.  It further

    argues that the Court's instructions failed to focus analysis on "the thing sold," and that

                                   - 18 -                              07cv2000

1   it should therefore receive a new trial. Microsoft also points to a statement in Hodosh
2   v. Block Drug Co., Inc., 833 F.2d 1575, 1578 (Fed. Cir. 1987), that "the thing sold
3   must not be a 'staple article or commodity of commerce suitable for substantial
4   noninfringing use.'" Id. (quoting with approval P.J. Federico, Commentary on the New
5   [1952] Patent Act, 35 U.S.C.A. at 53 (1952)).

6      First, the Court notes that the jury verdict was not necessarily premised on
7   contributory infringement. The special verdict only stated that the jury found liability
8   by either inducement or contributory infringement. Nevertheless, even if contributory
9   infringement was the basis for liability, the Court concludes that Microsoft's challenges
10  to Lucent's contributory infringement theories do not support judgment as a matter of
11  law or a new trial.

12     In Hodosh, the accused infringer argued that its toothpaste product, which
13  admittedly resulted in infringement of a patented method when used by customers,
14  should escape liability because it contained an ingredient that was a "staple article or
15  commodity capable of substantial noninfringing use." See id. at 1576-77. When
16  quoting the Federico commentary in this context, the Federal Circuit was explaining
17  why the accused infringer could not avoid liability for its overall product by including
18  a staple ingredient. See id. at 1578. The present situation is, in many respects, the
19  opposite of that in Hodosh. Microsoft attempts to avoid liability for the "ingredient,"
20  here a tool included in its software, by arguing that the entire software product has
21  other noninfringing uses. Hodosh prevented a proposed erosion of protection available
22  under 35 U.S.C. § 271(c). See id. ("The drafters of the section explicitly recognized
23  that without protection from contributory infringers, owners of method patents, like the
24  owner here, would have no effective protection.") Extending it to these circumstances
25  would have the opposite effect by allowing potential infringers to escape liability
26  merely by packaging an infringing component for sale with some other staple article.
27  See Philips Elecs. N. Am. Corp. v. Contec Corp., 411 F. Supp. 2d 470, 476 (D. Del.
28  2006) ("[I]t would indeed violate the 'logic of the patent laws' to allow a potential
    infringer to avoid liability for contributory infringement by simply adding a

- 19 -

1   noninfringing function to a device that practices a patented method.").

2        Lucent introduced evidence sufficient for the jury to conclude that Microsoft's

3   tools did not have substantial noninfringing uses immunizing it from liability for

4   contributory infringement. Microsoft argued, for example, that a user could bypass its

5   graphical tools by keyboard entry, as with the Outlook calendar tool, or by

6   downloading relevant data directly, as with the Microsoft Money transaction form. The

7   jury could have reasonably concluded that typical users rarely, if ever, bypass the

8   graphical tools by using these methods.

9        Microsoft also argues that its software cannot be an infringing component for

10  purposes of section 271(c), citing Microsoft Corp. v. AT&T Corp., 127 S.Ct. 1746,

11  1755 (2007). The Microsoft Corp. opinion was not so broad. There, the Supreme

12  Court held that software, in the abstract, could not be a component, for purposes of

13  infringement of an apparatus patent under 35 U.S.C. § 271(f). Section 271(f) creates

14  infringement liability in certain circumstances where a supplier in the United States

15  sends a component abroad for purposes of combining it into an infringing product. Id.

16  at 1752. The Supreme Court's opinion did not reach contributory infringement under

17  section 271(c), and it expressly left open the question of whether software, even in the

18  abstract, may be a component of a method claim for section 271(f) purposes. Id. at

19  1756 n.13 ("If an intangible method or process, for instance, qualifies as a 'patented

20  invention' under § 271(f) (a question as to which we express no opinion), the

21  combinable components of that invention might be intangible as well.") Furthermore,

22  while the Supreme Court concluded that software "in the abstract" was not a

23  component in the relevant context, it did not extend its holding to tangible copies of

24  software. See id. at 1755 (distinguishing the abstract software code at issue from

25  computer-readable copies, such as those "inserted into a CD-ROM drive or

26  downloaded from the Internet"). The Court therefore declines to extend Microsoft

27  Corp. in order to limit the application of section 271(c) here. The dispute over the '356

28  patent involves method claims and commercial sales of software copies, not apparatus

claims and foreign distribution of software "in the abstract."

### e.    Inducement

Microsoft seeks judgment as a matter of law, arguing that there is insufficient evidence of intent to support a finding of indirect infringement by inducement. It also seeks a new trial based on a purported error in the Court's instructions, which required that the accused infringer have "an intent to cause the encouraged acts." (Jury Instruction 21, Doc. No. 738.) Microsoft asserts that Lucent must further prove that it had the specific intent to cause infringement, not merely acts constituting infringement. The Court's instructions, however, also required the jury to find that the accused infringer "is aware of the patent, and knows or should have known that encouraged acts constitute infringement of the patent." (Id.)

First, as with contributory infringement, the Court notes that the jury's verdict was not necessarily premised on inducement. The jury may have based its verdict on contributory infringement alone, inducement alone, or both. Nevertheless, even if inducement was the basis for liability, the Court concludes that these arguments do not support judgment as a matter of law or a new trial.

In DSU Medical Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc in relevant part), the court stated that "the inducer must have an affirmative intent to cause direct infringement." "[I]nducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." Id. In keeping with this directive, the Court required the jury to find more than mere intent to cause the acts constituting direct infringement. The Court also required the jury to find that the accused infringer "is aware of the patent, and knows or should have known that encouraged acts constitute infringement of the patent." (Jury Instruction 21, Doc. No. 738.) DSU Medical Corp. approved of the following formulation of the required state of mind:

> It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement. The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.

- 21 -

1  DSU Medical Corp., 471 F.3d at 1306 (quoting Manville Sales Corp. v. Paramount

2  Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990), and observing that Supreme Court

3  precedent had validated this approach).   The Court's instructions followed that

4  approach.

5          The Court concludes that Lucent introduced substantial evidence to support a

6  jury verdict of inducement.  The extensive record in this case, including the various

7  manuals, help files, web pages, and other sources, is adequate for a jury to conclude

8  that Microsoft intended customers to use the tools in an infringing manner.  Lucent also

9  introduced substantial evidence that Microsoft was aware of the '356 patent as early

10  as April, 2002.  (See, e.g., PX 367 (e-mail from Dell notifying Microsoft, for

11  indemnification purposes, of Lucent's assertion of the '356 patent). )

12          **2.     The Jury's Finding of No Infringement by Dell**

13          Lucent moves for judgment as a matter of law that Dell infringed the '356 patent,

14  or for a new trial.  As with its allegations against Microsoft, Lucent asserted claims 19

15  and 21 against Dell based on theories of inducement and contributory infringement.

16          Dell argues, and the Court agrees, that there is substantial evidence to support

17  a finding that Dell lacked the culpable mental state required for indirect infringement.

18  See, e.g., DSU Medical Corp., 471 F.3d at 1306 (discussing required state of mind).

19  As with Microsoft, Lucent introduced evidence of alleged intent in the form of

20  tutorials, help files, web pages, manuals, promotional materials, the testimony of those

21  familiar with these materials, and other sources.  Not all of the documents and evidence

22  necessarily implicated Dell, however, and the jury could reasonably disregard

23  Microsoft documents as they relate to Dell's mental state.  Dell is a reseller of the

24  accused Microsoft software, while Microsoft is the designer and programmer.  For

25  judgment as a matter of law, the Court must "disregard all evidence favorable to the

26  moving party that they jury is not required to believe."  Wallace, 479 F.3d at 624.

27  Furthermore, the Court concludes that the clear weight of the evidence is not against

28  the jury's verdict.  Though the parties' post-trial briefing focused on the Microsoft

products, the Court also reaches an equivalent conclusion for Quicken, asserted only

1   against Dell.

2   Much like Microsoft, Dell also argued that there was no proof of direct

3   infringement by Dell's customers, similarly citing ACCO Brands, Inc. and E-Pass

4   Techs., Inc. Dell resells Microsoft's software to consumers, often packaged with a

5   computer system. As the Court noted with Microsoft's motion, the circumstantial

6   evidence was sufficient for a jury to conclude that there were acts of direct

7   infringement by users of the software. Since many of the end users in question overlap

8   between Dell and Microsoft, the Court does not rely on this part of Dell's argument in

9   upholding the jury's verdict on the Microsoft products. Similarly, the Court does not

10  rely on Dell's argument that substantial non-infringing uses precluded a finding of

11  infringement for the Microsoft products.[6] The Court rejects this argument for the same

12  reasons discussed above in regards to the infringement finding against Microsoft.

13  ### 3. Consistency of the Verdicts for Microsoft and Dell

14  Microsoft moves for a new trial on the ground that the jury verdict is facially

15  inconsistent. Whether to grant a new trial is a matter within the Court's discretion, and

16  it is only required for an inconsistent verdict when "it is impossible under a fair reading

17  to harmonize the [jury's] answers." See Magnussen v. YAK, Inc., 73 F.3d 245, 246

18  (9th Cir. 1996) (quoting Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 991 (9th Cir.

19  1987). First, the special verdict is not facially inconsistent. Nothing in the special

20  verdict form or the jury instructions required the jury to reach the same conclusion as

21  to Microsoft and Dell on this issue. Furthermore, it is possible to harmonize the jury's

22  answers for Microsoft and Dell. The Court has reviewed the record and concludes that

23  the jury could have reached different conclusions as to whether Microsoft and Dell had

24  the required culpable mental state.

25  ///

26  ///

27

28

---

[6]These arguments may have more force as to Quicken, but the Court does not reach these questions, having concluded that the jury could have reasonably determined that Dell lacked the necessary culpable mental state as to Quicken.

### 4.   Claim Construction

Microsoft challenges the Court's construction of "concurrently displaying" as "displaying at the same time, as by a window overlaying the form." It argues that the definition of concurrently should also include "automatically." The Court declined to include this limitation, both following its original Markman hearings and after subsequent briefing. (See Claim Construction Order Clarifying and Superceding Order of March 1, 2004, Case No. 02-CV-2060, Doc. No. 1552.) The Court continues to conclude that, in this context, "concurrently displaying" does not require "automatically displaying." The preferred embodiments described in the patent do not always require that a predefined tool be automatically displayed. (See, e.g., '356 Fig. 15, 13:46-53 (indicating that, under certain settings, the sample application may await user input before displaying a specific tool).)

### C.   Damages

#### 1.   Damages Verdict by Lump-Sum Royalty

A patent holder is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . ." 35 U.S.C. § 284. The trial court has discretion to determine the method of calculating damages. Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1108 (Fed. Cir. 1996). One common method for calculating damages, applied by the experts for both sides in this case, is a hypothetical negotiation. Under this approach, a reasonable royalty is the amount that the patentee and accused infringer would have agreed upon in a hypothetical negotiation at the time of the first infringement, on the assumption that the patent is valid and would be infringed. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1554-55 (Fed. Cir. 1995) (en banc); Maxwell, 86 F.3d at 1108-1110; Wang Labs., Inc. v. Toshiba Corp., 993 F.2d 858, 869-70 (Fed. Cir. 1993). "[W]hat an infringer would prefer to pay is not the test for damages." Rite-Hite Corp., 56 F.3d at 1555. The Court also instructed the jury that it may consider factors including, but not limited to, commonly applied Georgia-Pacific factors. See Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Lucent's expert advocated an 8% royalty on actual sales of the software products. Using this amount, Lucent asked the jury to award $561.9 million based on Microsoft's total sales of the accused products during the applicable time period.[7] Microsoft's expert countered that damages, if any, should be limited to a lump-sum royalty of $6.5 million for all three products. He argued that a lump-sum payment covering the entire period in question would be appropriate for several reasons, including the uncertainty and cost involved in monitoring and enforcing running royalty payments based on actual sales. (See, e.g., Trial Tr. XVI 180:22-185:8 (explaining benefits of lump-sum payment in context of the '295 patent), 206:6-20 (incorporating same reasons in discussion of the '356 patent).) The jury awarded a lump-sum royalty of approximately $358 million for infringement of the '356 patent. There is substantial evidence to support the jury's verdict.

Microsoft argues that the jury's verdict violates the entire market value rule, requiring judgment as a matter of law or a new trial. The entire market value rule considers whether a patentee may recover damages based on the value of an entire apparatus containing several features, not all covered by the patent. In this case, Lucent advocated a reasonable royalty at trial, and the experts disagreed as to the amount of the royalty. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1549 (Fed. Cir. 1995). The Federal Circuit has allowed recovery based on the value of an "entire apparatus containing several features when the patent-related feature is the 'basis for customer demand.'" Id. (quoting State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989)). The patented and unpatented components "must function together . . . in some manner so as to produce a desired end product or result." Id. at 1550. The components "must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit."

---

[7]This period extends from January 13, 2003, when Microsoft received notice of the '356 patent, to December 11, 2006, when the patent expired. Lucent also sought $125 million in damages for Dell's sales during this period, and sought to hold both Microsoft and Dell liable for the latter amount. (See, e.g., Trial Tr. XVIII 209:15-210:14 (excerpt from closing argument summarizing Lucent's damages theory for the '356 patent).)

1   Id. The Federal Circuit has applied this rule where a patentee seeks to recover based
2   on the entire value of a product used to practice a claimed method. See Fonar Corp.
3   v. Gen. Elec. Co., 107 F.3d 1543, 1552-53 (Fed. Cir. 1997) (applying entire market
4   value rule to damages sought based on value of MRI machines where claims involved
5   method for improved use of the machines). The Court instructed the jury on the entire
6   market value rule. (See Jury Instruction 46, Doc. No. 738.)

7       The jury did not adopt either side's approach outright. By examining the
8   hypothetical scenario from the parties' standpoint at the time infringement began, the
9   jury may have considered a wide variety of factors, not merely the actual product
10  revenue. Therefore, the award does not reflect an entire market value calculation on
11  its face. Furthermore, the Court concludes that substantial evidence supports the jury's
12  verdict, whether or not the entire market value rule applies.

13          **2.    Substantial Evidence**

14      The jury's verdict is supported by substantial evidence. Lucent introduced
15  examples of actual lump-sum royalty licenses from the computer industry with
16  payments ranging as high as $290 million. (See, e.g., PX 5142, 5150, 5151, 5152.)
17  Lucent also introduced sample license agreements to support its expert's theory that a
18  reasonably royalty would be 8% of the retail selling price. (See, e.g., PX 5140, 5141,
19  5172.) Lucent introduced evidence, including its experts' testimony, that the patented
20  technology was an important part of Microsoft's products and that these products were
21  highly profitable and commercially successful. Microsoft sold tens of millions of
22  copies of the accused software during the relevant period. The jury could have
23  reasonably accepted that, in a hypothetical negotiation, the success of these products
24  would have been foreseeable.

25      The law allows a jury to settle on a royalty rate or lump-sum different than those
26  offered by the parties' experts. See, e.g., Fuji Photo Film Co., Ltd v. Jazz Photo Corp.,
27  394 F.3d 1368, 1378 (Fed. Cir. 2005). Furthermore, by considering the hypothetical
28  negotiation's assumption that the patent is valid and would be infringed, the jury could
    reach an amount higher than those in actual licenses. In a real-world negotiation,

1  validity and infringement may carry uncertainty that limits the strength of the
2  patentee's negotiating position. By assuming validity and infringement, the patentee's
3  position may be stronger in the hypothetical negotiation. Having viewed the testimony
4  and reviewed the trial record, the Court concludes that the jury's verdict is supported
5  by the evidence, is not excessive, and does not reflect mere speculation.

6      The Court also notes that, even if the entire market value rule applied, there was
7  substantial evidence for the jury to rely on the whole value of the software. Lucent
8  introduced substantial evidence, such as marketing material, product documentation,
9  and expert testimony, that the accused features were important to the success of
10 Microsoft's products and were promoted by Microsoft. (See, e.g., PX 651, 742
11 1139B.) The jury could have reasonably accepted this evidence and concluded that,
12 without the user interface benefits provided by the patented method, the products
13 would have suffered commercially by not meeting consumer expectations. See Tec
14 Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1362 (Fed. Cir. 1999)
15 (upholding award based on the entire value of radiator and condenser assemblies,
16 where patents involved the manufacture of properly balanced fans without which the
17 assemblies would not have met customer requirements). Additionally, viewing the
18 record as a whole and considering the credibility of the witnesses, the Court concludes
19 that the damages award is not against the clear weight of the evidence.

20          **3.    Other Considerations**

21     Microsoft argues in the alternative that, if the jury did not use an entire market
22 value calculation, its verdict must be rejected as purely speculative. The Court
23 disagrees. Substantial evidence supports the verdict. Indeed, Lucent's experts testified
24 to an award of more than $500 million based on actual licenses and industry practice.
25 Microsoft's own expert testified that Microsoft would negotiate a one-time lump sum
26 payment for the life of the patent, rather than a running royalty. (See, e.g., Trial Tr.
27 XVI 180:22-185:8, 206:6-20.) Furthermore, nothing on the face of the verdict
28 indicates mere speculation. If the precision of the jury's "down-to-the-penny"
   calculation shows anything, it is that the jury used some form of numerical derivation

1 from values in the evidence.  This is not a case where the jury's award should be
2 reduced because it was based on an expert's speculative testimony.  Cf. Go Medical
3 Indus. Pty., Ltd. v. Inmed Corp., 471 F.3d 1264, 1274 (Fed. Cir. 2006) (affirming
4 reduction in jury's award of trademark royalty based on expert's testimony that offered
5 no rationale for selecting the particular values used); Shockley v. Arcan, Inc., 248 F.3d
6 1349, 1361-64 (Fed. Cir. 2001) (vacating jury's award of future lost profits for patent
7 infringement where it was based on an expert opinion that used speculative
8 assumptions).  Lucent's expert supported his theories with evidence including license
9 agreements from contexts that the jury could accept as comparable to the present
10 situation.

11      Microsoft also argues that the damages award is unwarranted due to a lack of
12 evidence that the claimed method was actually used.  The Court concludes that there
13 was adequate circumstantial evidence to support a finding of direct infringement.
14 Similarly, the jury could have reasonably concluded that the acts of direct infringement
15 were sufficiently prevalent to support its award.  As a whole, the evidence is sufficient
16 to support the damages awarded by the jury.

17     **D.**    **Summary for Day '356**

18     As to the '356 patent, the Court **DENIES** all motions for judgment as a matter
19 of law and all motions for a new trial or remittitur.

20 **III.**    **Haskell '226**

21     **A.**    **Validity**

22         **1.**    **Obviousness**

23     MPT moves for judgment as a matter of law that claim 12 of the '226 patent is
24 not invalid for obviousness.  The Court agrees that the evidence is insufficient to
25 support the jury's finding of obviousness by clear and convincing evidence.  See
26 Takeda Chem. Indus., Ltd., 492 F.3d at 1355 (burden for obviousness).  "The ultimate
27 judgment of obviousness is a legal determination."  KSR Int'l Co., 127 S.Ct. at 1745.
28 Courts give deference, however, to the jury's underlying findings of fact.  See Finisar
Corp., 523 F.3d at 1338.  These underlying findings include "the scope and content of

1   the prior art, the differences between the prior art and the claims at issue, the level of

2   ordinary skill in the pertinent art . . . ."  Id. at 1338-39.[8]

3                    **a.   The Micke Thesis and Related References**

4          Microsoft offered two theories of obviousness. The first focused on a document

5   known as the Micke Thesis in combination with other references. Thomas Micke wrote

6   his 1986 "Comparison of a Predictive and an Interpolative Motion Compensating

7   Coding Method for Television Video Signals" as a master's thesis for the University

8   of Hanover's Institute for Theoretical Communications Engineering and Information

9   Technology ("TNT"). (See DX CAN (translated); DX IKH (original German).) The

10  Micke Thesis describes an investigation into the benefits of combining "the DPCM

11  method with motion compensating prediction" with "motion compensating

12  interpolation of the video signal" into a single method called "motion compensating

13  interpolation error coding." (Id. at GW-LT 255055.) Micke's research simulated this

14  approach and concluded that the tests "yielded rather good results but still need

15  confirmation by additional investigations and subjective tests." (Id. at GW-LT

16  255083.) Microsoft argued that the Micke thesis therefore encouraged what Microsoft

17  characterized as the central innovation of the '226 patent, namely the transmission of

18  interpolation error to aid in the overall video coding process.

19         Microsoft asserted the Micke Thesis in combination with either the "Musmann"

20  or "Jain & Jain" references, or both. Since the Micke Thesis did not involve the use

21  of a discrete cosine transform ("DCT") to encode error information, as in the patent,

22  Microsoft offered these references as prior art allegedly making it obvious to use a

23  DCT in combination with the teachings of the Micke Thesis. The Musmann article,

24  entitled "Advances in Picture Coding," was published in the April 1985 proceedings

25  _____

26         [8]MPT's motion did not seek to overcome the finding of obviousness with secondary
    considerations of nonobviousness. There is no significant dispute as to the level of ordinary skill in
    the art. Microsoft's expert testified that a person of ordinary skill would have either: (1) a Bachelor
27  of Science degree in electrical engineering or computer engineering and two years of experience in
    video compression; or (2) a Master's degree in electrical engineering, computer engineering, or a
28  similar field, including study of video compression technology. (Trial Tr. XVI 60:13-25.) MPT's
    expert has offered a similar definition. See Lucent Techs. v. Gateway, Inc., 537 F. Supp. 2d 1095,
    1101 (S.D. Cal. 2008).

                                          - 29 -                              07cv2000

1    of the IEEE. (DX CSN.) The article discusses the relative benefits of using a DCT for

2    transform coding, including use for "natural pictures."    (See, e.g., id. at

3    MSLT_0004925.)    Jain & Jain published "Displacement Measurement and Its

4    Application in Interframe Image Coding" in the December 1981 IEEE Transactions on

5    Communications. (DX CRO.) It discloses the use of DCT coding in the context of

6    "motion compensated interframe hybrid coding." (See, e.g., id. at MSLT_0004887.)

7    Micke observed that further improvement "is possible by . . . transformation coding of

8    the motion compensated errors," and he cited to the Musmann and Jain & Jain

9    references. (DX CAN at GW-LT 255072, 255084.) Dr. Delp offered his opinion that

10    the Micke thesis, in combination with either or both of these references, rendered the

11    '226 patent obvious. (See, e.g, XVI 63:6-80:5.)

12        The Court concludes that Microsoft's evidence of obviousness regarding the

13    Micke Thesis and related references is insufficient, as a matter of law, to support the

14    jury's conclusion that claim 12 is invalid for obviousness. In particular, Microsoft did

15    not provide evidence, sufficient to meet a clear and convincing standard, that the

16    structures corresponding to the means-plus-function elements in claim 12 would have

17    been obvious in light of these references. A conclusory expert opinion, without factual

18    support, will not support a finding of obviousness by clear and convincing evidence.

19    See Upjohn Co. v. Mova Pharm. Corp., 225 F.3d 1306, 1311 (Fed. Cir. 2000); cf.

20    Symbol Techs., Inc. v. Opticon, Inc., 935 F.2d 1569, 1574-76 (Fed. Cir. 1991)

21    (concluding that jury could rely on expert's ultimate opinion of infringement without

22    detailed explanation, where burden is a preponderance of the evidence). Dr. Delp

23    testified that certain code in Micke's Thesis corresponded to the means-plus-function

24    elements of claim 12. (See, e.g., Trial Tr. XVI 76:5-77:4 (correlating first means-plus-

25    function element to portions of the Micke Thesis); 77:5-12 (similar, second means-

26    plus-function element).) Dr. Delp showed at most, however, that the code performed

27    a similar or identical function, without explaining why the particular structures

28    disclosed in the '226 patent would have been obvious to one of ordinary skill based on

these references. For example, regarding the second means-plus-function, Dr. Delp

1  stated:

2      Q:      . . . . What does the next slide blowup show you, which is IKH at
               5255 through 56?
3
4      A:      This is some more code from the thesis, Micke thesis.  This is
               Element 2 of the 226 patent.  So he's talking about doing the
               interpolation field forward and backward, and he talks about
5              quantizing the prediction error.  Now, in this case he's talking
               about the interpolation error.
6

7  (Trial Tr. XVI 77:5-12.)  At best, this testimony and the related evidence only provides

8  clear and convincing evidence that a person of ordinary skill would have been

9  motivated to pursue an invention implementing the same function, but not necessarily

10 using the particular structure disclosed.

11     Furthermore, while the references show that it may have been obvious to use

12 certain individual structural components in video coding, such as the DCT transform,

13 the structure of a means-plus-function element is viewed as a whole, not just a

14 collection of discrete pieces.  See, e.g., Odetics Inc. v. Storage Tech. Corp., 185 F.3d

15 1259, 1268 (Fed. Cir.1999).  In addition, an obviousness inquiry considers the claim

16 "as a whole," not whether each individual element was known.  35 U.S.C. § 103(a).

17 Microsoft did not offer clear and convincing evidence that it would have been obvious

18 to implement claim 12's means-plus-function elements in combination using the overall

19 structures disclosed by the patent.  Microsoft's efforts to rehabilitate the evidentiary

20 offering with attorney argument are unavailing.

21     The Court also notes that there were factual disputes over whether the Micke

22 Thesis even constitutes prior art since it was only available, if at all, from the TNT

23 library, and the accessibility of the thesis during the relevant time period was disputed.[9]

24 These uncertainties may present a further obstacle in finding claim 12 obvious by clear

25 and convincing evidence, but the Court need not reach this issue.

26 / / /

27 / / /

28     [9]The Court discussed the nature of this dispute at the summary judgment stage, and though the
    trial record is more extensive, the essential character of the dispute remained the same.  See Lucent
    Techs., 537 F. Supp. at 1101.

- 31 -

### b.     The H.261 References

Microsoft's second obviousness theory also fails to present clear and convincing evidence of obviousness, taking the claim as whole.  Microsoft argues that claim 12 is obvious in light of two documents from a March, 1986 meeting in Tokyo regarding H.261, a video compression standard used in video conferencing.  (See Trial Tr. XVI 46:19-50:11.)  They are known as Document 81 and Document 103R.  Document 81, entitled "Comments on Conditional Motion Compensated Frame Interpolation," includes a diagram of a coder for conditional motion compensated interpolation.  (See DX BJL at MSLT0625893 Fig. 1.)  The diagram shows the coder taking the difference of the received picture and a motion interpolative prediction, then sending that output through a coding unit.  (Id.)  Document 103R, entitled "Report of the Fifth Meeting in Tokyo (March 25-28, 1986)," contains a block diagram of a reference model video coder.  (See DX BXY at MSLT0626039 Fig. 3.)

Microsoft argues that Figure 3 of Document 103R discloses the first element of claim 12.  At least to this extent, the evidence supports Microsoft's position.  Indeed, Document 103R shows a model motion compensated coder, and the patent itself relates the first means-plus-function element to "conventional motion compensation coding." (See '226 4:26-34; 4:63-5:6.)[10]  Dr. Delp also offered his expert opinion, explaining how the elements of Figure 3 in Document 103R corresponded to the first means-plus-function element and were known before the '226 patent.  (See, e.g., Trial Tr. XVI 57:17-58:13.)

The crux of the matter lies with Document 81 and the second means-plus-function element of claim 12.  Microsoft did not make a sufficient showing for a jury to find that claim 12, as a whole, is obvious by clear and convincing evidence, particularly with regard to the second means-plus-function element, either alone or in combination with the more "conventional" coding of the first element.   Though

---

[10]This comment about "conventional" coding appears in the patent's description of its encoder, and the description of relevant structure in the decoder incorporates the relevant description of the encoder by reference.  (See '226 5:2-6.)

1    Document 81 discloses sending some form of data representing the difference between

2    a motion interpolative prediction and an input signal, it does not indicate on its face

3    that this process should involve blockwise coding or a DCT, as in claim 12.[11]

4    Additionally, Dr. Delp testified that a person of ordinary skill would have read

5    Document 81 in context as involving the use of a DCT, though he agreed that there is

6    no reference to blockwise coding on the face of the document. (See, e.g., Trial Tr. XVI

7    59:25-60:4, 110:25-111:24.) Nevertheless, even if Document 81 disclosed the second

8    means-plus-function element in its entirety, which the Court questions, there is

9    insufficient evidence that it would have been obvious to combine its teachings with

10   those of Document 103R to produce the invention of claim 12.

11        In reaching this conclusion, the Court recognizes that a "teaching, suggestion,

12   or motivation" from the prior art is no longer strictly required to establish obviousness.

13   See KSR Int'l Co., 127 S.Ct. at 1739-41.  Nevertheless, that requirement provided

14   "helpful insight" that the Court may still consider in a flexible, common sense manner.

15   Id. at 1741. Microsoft presented insufficient evidence that it would have been obvious

16   to combine these references.  Though Document 103R cites to Document 81, it does

17   so as one among many documents in the context of an industry organization exploring

18   many possible options for a video coding standard.   (See, e.g., DX BXY at

19   MSLT0626010, 6018-19.)  Furthermore, the Document 103R report described the

20   motion-compensated interpolation of Document 81 merely as one option in the overall

21   context of a complex, multifaceted standardization effort.  (Id. at MSLT0626019.)

22   Viewed in context, these documents do not rise to the level of clear and convincing

23   evidence of obviousness.

24   / / /

25   / / /

26   / / /

27

28   _____
     [11]Microsoft argues that the second means-plus-function element does not require blockwise
     operation, but this is contrary to the plain language of the claim.  The second element involves
     developing "interpolated blocks" from "block approximations" and "codes that describe deviations
     from interpolated blocks."

### 2.    Indefiniteness

Microsoft moves for judgment as a matter of law that claim 12 of the '226 patent is invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2.[12]  Indefiniteness is a legal conclusion that may arise in the course of the Court's duty to construe the patent claims.  See Howmedica Osteonics Corp. v. Tranquil Propects, Ltd., 401 F.3d 1367, 1371 (Fed. Cir. 2005).  To be sufficiently definite, a claim must be amenable to construction, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree."  See Exxon Research and Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).  Courts "accord respect to the statutory presumption of validity" by finding claims "indefinite only if reasonable efforts at claim construction prove futile."  Id.

Microsoft argues that claim 12's use of the term "interpolated blocks" is nonsensical and inconsistent.  The Court construed claim 12 well in advance of trial, having provided the parties ample opportunity to brief and argue their positions on claim construction.  In doing so, the Court concluded that the claim was amenable to construction.  Id.  Therefore, the Court declines to reconsider its claim construction or to grant judgment as a matter of law that claim 12 of the '226 patent is indefinite.

### B.    Infringement

MPT moves for judgment as a matter of law that Microsoft infringed claim 12 of the '226 patent, or for a new trial on this issue.  Literal infringement of a means-plus-function claim "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification."  Odetics, Inc., 185 F.3d 1259, 1267 (Fed. Cir. 1999).  "[T]he claim limitation is the overall structure corresponding to the claimed function."  Id. at 1268.  An accused structure is equivalent if it "performs the claimed function in substantially the same way to achieve substantially the same result."  Id. at 1267.  "The proper test is whether the differences between the structure in the accused

---

[12]Dell did not join in this aspect of Microsoft's motion.  This legal question was not an issue at trial, and the Court understands that Microsoft wishes to preserve it for appeal.

1   device and any disclosed in the specification are insubstantial." Chiuminatta Concrete

2   Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1309 (Fed. Cir. 1998).  To

3   literally infringe a means-plus-function claim, a structural equivalent must have been

4   available at the time the claim issued. Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308,

5   1320 (Fed. Cir. 1999).  After-arising technology may only infringe a means-plus-

6   function claim under the doctrine of equivalents. Id. at 1320-21 & n.2.

### 1.  MPEG-1 and MPEG-2 Products

8       There is substantial evidence to support the jury's verdict under Microsoft's

9   theory that there is no infringement because its accused MPEG-1 and MPEG-2

10  decoders use a "measured motion" rather than a "guessed motion" technique.

11  Microsoft contends that, as a result, the MPEG-1 and MPEG-2 decoders do not contain

12  structure equivalent to the structure of the second means-plus-function element of

13  claim 12, which states:

14      means responsive to said block approximations and to said codes that
        describe deviations from interpolated blocks to develop said interpolated
15      blocks.

16  The Court identified the corresponding structure as:

17      Decoder 25, DCT⁻¹ 34, Adder 35, and Shift Circuits 31 and 39, including
        all inputs and outputs of these elements related to the claimed function
18      (See Fig. 2; Col. 4, lines 63-65; Col. 5, lines 7-23 [description of the
        structure and inputs that correspond to these elements is at Col. 4, lines
19      38, 50]).[13]

20  The adder and shift circuits produce an interpolated estimate of a video frame using

21  motion vectors representing motion between the frames preceding and succeeding the

22  interpolated frame.  (See '226 4:38-50, 5:7-10.)  As described in the patent, these

23  circuits produce the interpolated frame by taking the average of: (1) the preceding

24  frame, shifted by half of the motion vectors; and (2) the succeeding frame, shifted by

25  half of the same motion vectors, but in the opposite direction.  (Id.)  This is the

26  so-called "guessed motion" approach.

27

28      [13]The bracketed text is part of the original claim construction and identifies the corresponding
    structure of the claimed encoder. At times, the patent describes the decoder of claim 12 with reference
    to the corresponding encoder elements. (See, e.g., '226 5:7-10.)

1        For the MPEG-1 and MPEG-2 decoders, Microsoft introduced substantial

2   evidence that the encoder measures and transmits two separate sets of motion vectors

3   representing differences between the frame to be reconstructed by interpolation and the

4   frames immediately preceding and succeeding it. The MPEG-1 and MPEG-2 decoders

5   create an interpolated frame from estimates made using both sets of vectors, not from

6   a single set of vectors that are, for example, divided in two to estimate motion. (See,

7   e.g., Trial Tr. XVI 30:16-31:11, 36:8-37:2, 37:25-38:19, 40:6-22 (excerpts of Dr.

8   Delp's testimony regarding these differences).) This is the so-called "measured

9   motion" approach. MPT's expert, Dr. Girod, agreed that MPEG-1 and MPEG-2 do not

10  send and use a single set of motion vectors in the same manner described in the patent.

11  (See Trial Tr. XVII 39:13-21.)

12       MPT argues that the disclosed structure is not necessarily restricted to one that

13  implements the "guessed motion" method, and that Shift Circuits 31 and 39 could be

14  circuits that receive and process two sets of motion vectors in the same manner as in

15  MPEG-1 and MPEG-2. Figure 2 of the patent plainly indicates, however, that the

16  inputs to Shift Circuits 26, 31, and 39 are the same. Shift Circuit 26 reproduces the

17  succeeding frame from the motion vectors representing differences from the preceding

18  frame. (See '226 4:26-32, 4:67-5:6.) Based on the evidence, the jury could have

19  reasonably concluded that a structure designed to process two sets of measured motion

20  vectors was not identical to that disclosed in the patent.

21       Furthermore, Microsoft introduced substantial evidence from which the jury

22  could conclude that the MPEG-1 and MPEG-2 decoders did not contain a structure

23  equivalent to that disclosed in the patent. To be equivalent, the accused structure must

24  perform "the claimed function in substantially the same way to achieve substantially

25  the same result." Odetics, Inc., 185 F.3d at 1268. The jury could have reasonably

26  found that either or both of these requirements were not met. While the Court was

27  persuaded by the reasoning of MPT's expert Dr. Girod,[14] the jury could have

28

---

[14]The Court was not persuaded to an extent sufficient to prompt a new trial, however.

1   reasonably accepted the opinion of Microsoft's expert, based on his knowledge of the

2   video coding standards and analysis of the source code involved, that the variance in

3   motion compensation methods indicates that the accused products do not perform the

4   claimed function in substantially the same way.  (See, e.g., Trial Tr. XVI 36:8-37:2,

5   37:25-38:19, 40:6-22.)  Furthermore, both Dr. Delp and one of the inventors, Dr.

6   Haskell, testified that the "measured motion" method results in improvements over the

7   approach in the '226 patent, and the jury could reasonably conclude that the MPEG-1

8   and MPEG-2 decoders do not achieve substantially the same result.  (See, e.g., Trial

9   Tr. XVI 30:5-33:4 (Dr. Delp), 122:6-20 (Dr. Haskell); see also Trial Tr. III 42:11-15

10  (MPT's expert, Dr. Girod, discussing general benefits of motion vectors).)

11          **2.     VC-1 Products**

12          Microsoft also made the "measured" versus "guessed" motion argument for the

13  products using VC-1 decoders.  Though the underlying analysis is similar in some

14  respects, there are unique considerations to VC-1.  In particular, the VC-1 standard

15  describes a "direct mode" of operation in which an interpolated frame is created by

16  halving the motion vectors between the preceding and succeeding frames.  (See,

17  e.g., PX 3556 Fig. 71.)  Microsoft counters by arguing that VC-1 only uses the direct

18  mode after measuring the motions vectors for the interpolated frame, and that VC-1

19  source code never actually uses vectors between the preceding to the succeeding frame

20  to guess at a location in the interpolated frame.  (See, e.g., Trial Tr. XVI 40:6-11,

21  102:2-104:17 (testimony from Dr. Delp on these issues).)  The jury could have

22  reasonably accepted Dr. Delp's analysis and concluded that there were substantial

23  differences between the claim and the VC-1 decoders.  The Court concludes that MPT

24  is not entitled to judgment as a matter of law or a new trial.

25          Furthermore, Microsoft introduced substantial evidence for the jury to conclude

26  that the accused structures were not equivalent because Microsoft's VC-1 products do

27  not use the DCT, and its inverse, for encoding and decoding.  There is no dispute that

28  the VC-1 integer transforms are not identical to the DCT.  Microsoft introduced

    substantial evidence sufficient for the jury to conclude that replacing the DCT with

                                        - 37 -                                    07cv2000

1   VC-1 integer transforms would result in structures that, as a whole, were not equivalent

2   to those in the claim elements. For example, Microsoft introduced a memo describing

3   the VC-1 integer transforms which observed that interchanging the two would result

4   in a "severe mismatch" and that "the decoded sequence will quickly degenerate" (DX

5   IIC at MSLT_1027528.)   VC-1 replaced the 32-bit inverse DCT processing from

6   previous products with 16-bit operations allowing for better processing efficiency.

7   (Id.) Microsoft also introduced evidence that VC-1's approach also resulted in better

8   subjective performance for video playback, which won an industry competition. (See,

9   e.g., PX 1804 at LUC 1263646-48, Trial Tr. XV 118:4-121:2.) Lucent counters that

10  the Microsoft documentation indicates a high level of correlation with DCT, at times

11  greater than 99%. (See, e.g., DX IIC at MSLT_1027530.) Given the other evidence

12  that VC-1 achieved this high correlation with better efficiency and better subjective

13  results, however, the jury could reasonably conclude that the differences were

14  substantial.   Furthermore, the jury could reasonably conclude that this substitution

15  rendered the overall structure of the VC-1 decoders substantially different from those

16  in the claim elements.

17       Since the issues discussed here provide ample reason to deny MPT's motions

18  with respect to infringement of the '226 patent, the Court declines to reach Microsoft's

19  other arguments for upholding the finding.[15]

20       **C.    Equitable Defenses**

21       The jury returned advisory verdicts on two equitable defenses for the '226 patent.

22  The jury found no inequitable conduct, and it found that the laches defense applied to

23  Lucent's assertion of the '226 patent. The ultimate determination of these issues rests

24  with the Court, and it is not required to accept the jury's recommendations.  See, e.g.,

25  Huser v. Santa Fe Pomeroy, Inc., 513 F.2d 1298, 1299 (9th Cir. 1975); cf. Los Angeles

26  Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993).

27  ───────────────

28       [15]Microsoft also argued, for example, that: (1) MPT failed to provide any evidence that certain
    VC-1 decoders include the claimed structures; (2) MPT failed to provide sufficient evidence of indirect
    infringement; and (3) downloads of Windows Media Player cannot infringe in light of Microsoft Corp.
    v. AT&T Corp., 127 S.Ct. 1746 (2007).

- 38 -                                                                07cv2000

### 1.   Inequitable Conduct

Patent applicants "are required to prosecute patent applications with 'candor, good faith, and honesty.'" Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003) (quoting Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995)). "A patent applicant commits inequitable conduct when, during prosecution of the application, he makes an affirmative representation of a material fact, fails to disclose material information, or submits false material information, and does so with the intent to deceive." Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1358 (Fed. Cir. 2003).  The defendant may prove inequitable conducting by showing both a failure to disclose information material to patentability and an intent to deceive.  M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc., 439 F.3d 1335, 1340 (Fed. Cir. 2006).  Inequitable conduct requires proof by clear and convincing evidence.  Id., 439 F.3d at 1340 (burden applies to both elements); Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 1239 (Fed. Cir. 2004).

The test for materiality is "what a 'reasonable examiner would consider . . . important in deciding whether to allow the application to issue as a patent.'" A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1397 (Fed. Cir. 1986).  Under the rule in effect during the prosecution of the '226 patent, information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. 37 C.F.R. § 1.56 (1989).

Mere oversight or negligence is insufficient to meet the requisite intent to deceive. See, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1351 (Fed. Cir. 2002); Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc in relevant part) (concluding that even gross negligence does not justify inference of intent to deceive).  The defendant may prove intent using circumstantial evidence.  See, e.g., Merck & Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1422 (Fed. Cir. 1989).  In determining whether circumstantial evidence supports a finding of intent, "it is proper to consider the degree of materiality of the

1  information." Lipman v. Dickinson, 174 F.3d 1363, 1370 (Fed. Cir. 1999).  The degree

2  of intent the defendant must prove is based a sliding scale related to the materiality of

3  the information.   Abbott Labs. v. TorPharm, Inc., 300 F.3d 1367, 1380 (Fed. Cir.

4  2002).

5      Microsoft argues that the applicants for the '226 patent committed inequitable

6  conduct by failing to disclose the Micke Thesis and the H.261 documents.  These

7  references did not render the '226 patent invalid for obviousness, and the jury returned

8  a finding that claim 12 was not invalid for anticipation.   The materiality of the

9  documents, if any, is limited accordingly, and Microsoft's burden of showing intent is

10  correspondingly increased.  Even assuming some degree of materiality, Microsoft did

11  not offer clear and convincing evidence of an intent to deceive.

12          **a.    H.261 Documents**

13      Dr. Haskell, one of the named inventors, attended the March, 1986, meeting in

14  Tokyo where the H.261 documents, and any related demonstrations, were presented.

15  (See Trial Tr. XVI 146:22-148:11; DX BJL; DX BXY at MSLT0626024.)  Dr. Haskell

16  testified that the H.261 meetings included breakout sessions only for interested parties.

17  (Trial Tr. XVI 130:8-131:3.)   Though Dr. Haskell conceded that the documents

18  indicated that he attended, Dr. Haskell never recalled attending the meetings or viewing

19  Document 81 or any related demonstration.  MPT did not offer any other direct

20  evidence that Dr. Haskell was aware of the H.261 documents.  One other attendee, Dr.

21  Steffan  Ericsson,  recalled  a  discussion  of  "conditional  motion-compensated

22  interpolation where interpolation error is transmitted," and credited the idea with some

23  importance.  (See, e.g., Trial Tr. XV 170:22-172:18.)  The patent application was filed

24  more than three years after the Tokyo meeting.  These circumstances, and all the

25  evidence reviewed by the Court, do not prove by clear and convincing evidence that

26  Dr. Haskell was specifically aware of Document 81 at any time, let alone at the time

27  of the patent application.

28  / / /

- 40 -

### b.   Micke Thesis

Dr. Haskell may have been aware of the existence and general subject matter of the Micke Thesis as early as 1987, though there is not clear and convincing evidence that he ever read it and was familiar with its details.  For example, Dr. Haskell was familiar with the work of the TNT institute, and even wrote a 1987 IEEE editorial that discussed a paper by Dr. Girod that referred to the Micke Thesis.  (See, e.g., DX ISU, Trial Tr. 126:7-22.)  Having determined that the Micke Thesis does not render the patent obvious in combination with other references, the Court concludes that these circumstances would not provide clear and convincing evidence of intent to deceive.  In summary, the Court adopts the jury's recommendation and concludes that Microsoft did not prove its defense of inequitable conduct by clear and convincing evidence.[16]

### 2.   Laches

To establish laches, a defendant must prove by a preponderance of the evidence that: (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) "the delay operated to the prejudice or injury of the defendant."  A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc).  If successful, the laches defense bars pre-suit damages.  Id. at 1028.

Courts also consider and weigh any excuse offered for a delay, such as other litigation and negotiations with the accused.  Id. at 1033.  Where the plaintiff delays more than six years, a presumption of laches arises.  Id. at 1034-36.  This presumption shifts only the burden of production, not the ultimate burden of persuasion.  Id. at 1037-39.

Material prejudice may be economic or evidentiary.  Id. at 1033.  Evidentiary prejudice includes the "inability to present a full and fair defense on the merits" for

---

[16]The Court also notes that the jury's recommendation of no equitable conduct followed its finding of obviousness, overturned by the Court here.  Thus, the jury reached its recommendation despite viewing some of the references as more material to patentability than in the Court's view.

- 41 -

1 reasons such as loss of records and fading memories. Id. Economic prejudice normally

2 requires more than the damages attributable to a finding of infringement liability,

3 though a patentee may not wait silently, watching damages escalate when the infringer

4 could have easily switched to a noninfringing product. Id. Courts look for a change

5 in the alleged infringer's economic position during the delay. Id.

6       Laches is an equitable judgment made by the trial court "in light of all the

7 circumstances." Id. at 1036. The Court may decline to apply the laches defense, even

8 where the defendant establishes the laches factors by proof or presumption. Id.

9       The evidence showed that for several years leading up to the start of the

10 litigation underlying this case, beginning around 1998 through 2002 and 2003, Lucent

11 engaged in efforts to sell a license for the '226 to computer manufacturers Gateway and

12 Dell.[17]   Eventually, Lucent sued both companies for infringement, initiating the

13 lawsuits underlying the present case. (See, e.g., 02-CV-2060 (initially suit against

14 Gateway, transferred from E.D. Va. case 02-CV-389), 03-CV-1108 (initial suit against

15 Dell, transferred from D. Del. case 03-CV-205).)[18]   Microsoft then joined as an

16 intervener, seeking a declaratory judgment that it did not infringe. (See, e.g., Intervener

17 Microsoft's Answer and Counterclaims filed March 18, 2003, Case No. 02-CV-2060,

18 Doc. No. 27.) Under the circumstances of this case, the Court concludes that any delay

19 was reasonable or excusable since Lucent attempted to seek compensation for its patent

20 through the computer manufacturers, not Microsoft, and Microsoft entered the dispute

21 voluntarily.

22       Microsoft argues that the six year presumption should apply because it

23 announced its plans to implement MPEG-1 as early as 1995, more than six years before

24 the start of this litigation.   At best, however, this merely shifted the burden of

25 production, and Dell came forward with specific evidence to explain any delay. The

26

27     [17]Lucent was the original plaintiff asserting the '226 patent in this case. Lucent only created
MPT and transferred the patent to MPT after the start of this litigation.

28

    [18]These cases were eventually consolidated, and a portion of the litigation was severed to create
the present case. (See Doc. No. 1.)

1    burden of persuasion remains with Microsoft on this issue. A.C. Aukerman Co., 960

2    F.2d at 1037-39.

3         In summary, the Court does not adopt the jury's recommendation. Microsoft did

4    not prove the laches factors by a preponderance of the evidence, and even if it had, the

5    Court would exercise its discretion and decline to apply laches in light of all the

6    circumstances of this case.

7         **D.    Summary**

8         The Court **GRANTS** Lucent's motion for judgment as a matter of law that the

9    '226 patent is not invalid for obviousness.[19] The Court **DENIES** all other motions for

10   judgment as a matter of law or new trial regarding the '226 patent. As to the '226

11   patent, the Court follows the jury's advisory verdicts in part. The Court finds no laches

12   and no inequitable conduct as to the '226 patent.

13   **IV.   Agulnick '295**

14        **A.    Infringement**

15             **1.    Whether the Product Compares a Tap to a Predefined Shape**

16        The fourth means-plus-function element of claim 1 requires a "means coupled

17   to said computer for recognizing a plurality of said gestures, said recognizing means

18   including means for comparing each said gesture to at least one predefined share." The

19   parties dispute whether Windows XP Tablet PC ("Tablet PC") devices recognize a tap

20   gesture by comparing it to a predefined shape. Lucent introduced evidence that, in

21   order to identify a tap, the Tablet PC software examines a series of points representing

22   the stylus location and determines whether they fall within a small bounded area, and

23   whether they are below a certain length. A gesture is considered a "tap" when it falls

24   within both criteria. (See, e.g., Trial Tr. VI 260:1-19.) Defendants' expert offered a

25   similar explanation. (See, e.g., Trial Tr. XIII 244:3-12.) Lucent also introduced the

26

---

27        [19]Having granted a renewed motion for JMOL, Rule 50(c)(1) requires the Court to
conditionally rule on any motion for new trial in the event the judgment is later vacated or reversed.

28   Fed. R. Civ. P. 50(c)(1). Exercising its discretion in light of all the circumstances of this litigation,
the Court conditionally denies any motion for new trial on this issue, subject to any future instruction
from the appellate court. See Fed. R. Civ. P. 50(c)(2).

1   source code analyzed by its expert to reach this conclusion, and Microsoft documents

2   list a tap among various "gestures" recognized by the Tablet PC software. (See PX

3   964, 965, 5544, 6326.)

4         Defendants argue that this bounding box method merely examines the size of

5   stylus movements, and thus does not involve "comparing . . . to at least one predefined

6   shape." They also argue that there is no comparison of "shape" because the software

7   will recognize any configuration of points that fits within the given space and length

8   requirements. The Court did not further construe "predefined shape," and the jury

9   could have reasonably applied common sense to the evidence and concluded that the

10  Tablet PC tap recognition procedure meets this limitation. The procedures include

11  comparison of a gesture to a small box. Lucent's expert also opined that, as whole, the

12  procedure compares the gesture to a tap, or small dot, which the jury could reasonably

13  conclude is a "predefined shape" within the meaning of the claim. (See, e.g., Trial Tr.

14  VI 260:3-19.)

15        **2.**    **Substantial Evidence of Indirect Infringement**

16        Microsoft argues that, as a matter of law, the evidence does not support a finding

17  of indirect infringement.[20] This question concerns the Court's previous determination

18  that products with front-mounted digitizers did not infringe the '295 patent. A pen

19  position digitizer is part of a typical tablet PC's system for detecting the stylus location.

20  (See, e.g., '295 Fig. 2, 6:20-22.) The Court previously granted summary judgment of

21  no infringement as to certain products with a front-mounted digitizer. (See Order

22  Granting Summ. Adjudication No Infringement '295 Patent, Case No. 02-CV-2060,

23  Doc. No. 1226.) The Court reasoned that with the digitizer mounted in front, the stylus

24  can never contact the "screen" as construed by the Court, thus preventing any

25  infringement of the means-plus-function element "for detecting a stroke of the stylus

26  tip in contact with the screen." (Id. at 4-7.)

27

28      [20]Though Dell joined in most aspects of Microsoft's motion regarding the '295 patent, it did not join in this portion. (See Doc. No. 792.) Lucent also accused Dell of direct infringement of the '295 patent.

1    Microsoft argues that there can be no inducement because it lacked the intent to

2  induce computer manufacturers to use its Tablet PC software in systems using rear-

3  mounted digitizers. As discussed above regarding the '356 patent, "[t]he plaintiff has

4  the burden of showing that the alleged infringer's actions induced infringing acts and

5  that he knew or should have known his actions would induce actual infringements."

6  DSU Medical Corp., 471 F.3d at 1306 (quoting Manville Sales Corp. v. Paramount

7  Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990)). Lucent introduced evidence sufficient

8  for the jury to reasonably conclude that Microsoft induced infringement of the '295

9  patent. Lucent introduced substantial evidence that Microsoft encouraged hardware

10  manufacturers to use rear-mounted digitizers through technical specifications and other

11  documents. (See, e.g., PX 749 (containing Microsoft Tablet PC hardware specification,

12  including digitizer capabilities).) Lucent's expert testified that, during the relevant time

13  period, the only commercially available digitizers meeting Microsoft's requirements

14  were rear-mounted. (See, e.g., Trial Tr. VII 90:11-93:10.) Microsoft asserted the

15  existence of front-mounted digitizer technology when the patent issued, but the jury

16  could have reasonably accepted the position of Lucent's expert, who stated that such

17  technology was not commercially available during the relevant time frame. (See Trial

18  Tr. VII 60:9-65:20.) Based on the evidence, the jury could have reasonably concluded

19  that Microsoft encouraged use of its software in Tablet PCs and knew or should have

20  known that it would be used in an infringing manner on Tablet PCs with rear-mounted

21  digitizers.

22    Similarly, Microsoft challenges any finding of contributory infringement on the

23  ground that its product was not "especially made" or "especially adapted" for

24  infringement. See 35 U.S.C. § 271(c). Lucent introduced substantial evidence

25  sufficient for the jury to conclude that the product was especially made or adapted for

26  use with rear-mounted digitizers since they were the only commercially available

27  option. Furthermore, Lucent introduced substantial evidence that the accused gestures

28  were necessary to normal operation of a Tablet PC, sufficient for the jury to conclude

that there were not substantial non-infringing uses. (See, e.g., PX 749 (Microsoft

- 45 -

1  product documentation describing use of a Tablet PC running Windows software).)

2  The Court also concludes that the infringement finding was not against the clear weight

3  of the evidence.

### 3.    The Means-Plus-Function Instructions

5  Defendants challenge the Court's decision to instruct the jury on the doctrine of

6  equivalents concerning after-arising technology in the context of a means-plus-function

7  infringement. The Court rejects Defendants argument that the Court's April 30, 2007,

8  ruling on a motion in limine is a final order not subject to modification. (See Order on

9  Mots. Limine for Group 4 Trial, Case No. 02-CV-2060, Doc. No. 1737 at 3.)  On May

10  11, 2007, the Court vacated the original trial date. (Case No. 02-CV-2060, Doc. No.

11  1780.)  The remaining patents from 02-CV-2060 were consolidated for a single trial

12  date in February, 2008, and issues related to those patents were severed to create this

13  case. (See Doc. No.1; Case No. 02-CV-2060, Doc. No. 1876.)  On February 8, 2008,

14  the Court held a new hearing on motions in limine for the consolidated trial. (See Doc.

15  No. 496.)

16  The Court has the authority to depart from its ruling on a motion in limine,

17  depending on the circumstances of trial.  The Court advised the parties to object

18  contemporaneously at trial regarding any ruling, as the Court would then have the full

19  context of the proffered evidence. Defendants argued that certain aspects of the Tablet

20  PCs were after-developed technology and therefore could not meet the means-plus-

21  function elements under a literal infringement theory.  See Chiuminatta Concrete

22  Concepts, Inc., 145 F.3d at 1310-11 (Fed. Cir. 1998).  In light of Defendants'

23  argument, and all the circumstances of this case, the Court permitted Lucent to respond

24  by arguing that the after-developed technology may satisfy a means-plus-function

25  element under the doctrine of equivalents. See, e.g., Al-Site Corp., 174 F.3d at 1320

26  n.2 (Fed. Cir. 1999) ("Patent policy supports application of the doctrine of equivalents

27  to a claim element expressed in means-plus-function form in the case of 'after-arising'

28

1  technology . . . ."). The Court instructed the jury accordingly.[21] The Court declines to

2  grant judgment as a matter of law or a new trial based on its decision to allow the jury

3  to consider the doctrine of equivalents.

### 4.    Evidentiary Objection Regarding Expert Testimony

5  Defendants erroneously argue that Lucent's expert, Mr. Ward, testified about

6  source code analysis not contained in his expert report, particularly how Tablet PC

7  software recognizes tap gestures. (Trial Tr. VI 257:1-261:25.)[22] Mr. Ward's expert

8  report of March 31, 2006, however, includes a discussion of specific Tablet PC source

9  code, identified by filename.   (See 3/31/2006 Ward Expert Report at ¶ 157.)

10  Defendants were free to challenge his opinion on cross examination and introduce

11  statements from his deposition that he did not analyze the "size and exact criteria" in

12  certain source code when he prepared his report. (See Ward Depo. Tr., 6/15/06,

13  10:7-9.)  Mr. Ward made this statement, however, in a context primarily involving

14  Pocket PC, not Tablet PC software. (See id. 7:19-10:19.) In any case, the Court favors

15  a determination on the merits and continues to exercise its discretion to allow the

16  testimony. See Childress v. Darby Lumber, Inc., 357 F.3d 1000, 1010 (9th Cir. 2004)

17  (reviewing denial of motion to exclude expert opinion based on violation of Fed. R.

18  Civ. P. 26(a)(2)(B) for abuse of discretion).

### 5.    The Court's Instructions on Indirect Infringement

20  For the '295 patent, Defendants incorporate by reference the same challenges to

21  the sufficiency of the Court's jury instructions raised with the '356 patent. Defendants

22  again point to Hodosh, 833 F.2d at 1578, for the proposition that the Court's instruction

23  must focus the jury on "the thing sold." As with the '356 patent, extending Hodosh to

24  the present circumstances would produce the opposite result sought by that opinion.

25  Rather than ensuring patent protection, Defendants' reading would allow an infringer

---

[21]Microsoft's current motion does not challenge the Court's jury instruction on the doctrine of equivalents.

[22]Microsoft raised this objection contemporaneously, and the Court allowed a standing objection on the Rule 26 issue. (See Trial Tr. VI 257:6-7, 258:5-7.)

1  to avoid liability merely by packaging an infringing component with a noninfringing

2  component.  See id. at 1578 ("The drafters of the section explicitly recognized that

3  without protection from contributory infringers, owners of method patents, like the

4  owner here, would have no effective protection."); Philips Elecs. N. Am. Corp., 411 F.

5  Supp. 2d at 476 (D. Del. 2006) ("[I]t would indeed violate the 'logic of the patent laws'

6  to allow a potential infringer to avoid liability for contributory infringement by simply

7  adding a noninfringing function to a device that practices a patented method.").

8      Defendants also incorporate their argument that the Court provided insufficient

9  instructions on the intent required for inducement.  The Court properly instructed the

10 jury that it is sufficient, in relevant part, that the alleged infringer "knew or should have

11 known his actions would induce actual infringements." DSU Medical Corp., 471 F.3d

12 at 1306 (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed.

13 Cir. 1990)).  In summary, the Court denies Defendants' request for a new trial based

14 on the instructions for indirect infringement.

15      **6.    Claim Construction**

16     Defendants seek judgment as a matter of law or a new trial based on alleged

17 errors in the Court's claim construction.  First, Defendants object to the Court's

18 definition of the corresponding structure for the "means coupled to said computer for

19 recognizing a plurality of said gestures, said recognizing means including means for

20 comparing each said gesture to at least one predefined shape." The Court identified the

21 corresponding structure as a processor running one of three handwriting recognition

22 algorithms.

23     "Structure supporting a means-plus-function claim . . . must appear in the

24 specification." Atmel Corp. v. Info. Storage Devices, Inc., 198 F.3d 1374, 1381 (Fed.

25 Cir. 1999.) This determination "must be made in light of the knowledge of one skilled

26 in the art."  Id. at 1380.   "[D]isclosure of structure corresponding to a

27 means-plus-function limitation may be implicit in the written description if it would

28 have been clear to those skilled in the art what structure must perform the function

recited in the means-plus-function limitation."  Id. (quoting with approval PTO

1  Supplemental Examiner Guidelines on Applying 35 U.S.C. 112 ¶ 6, 58 Fed. Reg. 443,

2  444 & nn. 12-13 (1999)). "[K]nowledge of one skilled in the art can be called upon to

3  flesh out a particular structural reference . . . ." Creo Prods., Inc. v. Presstek, Inc., 305

4  F.3d 1337, 1347 (Fed. Cir. 2002).  Citing the title of an article may be sufficient to

5  disclose structure, where it would provide sufficient indication of the structure to one

6  skilled in the art. See Atmel Corp., 198 F.3d at 1382.

7        The Court concludes that one skilled in the art would have recognized the

8  relevant algorithms as part of the structure disclosed by the '295 patent. The external

9  sources incorporated by the claim construction, an IEEE article and a related patent, are

10  both expressly cited in the patent and indicate the nature of the information contained

11  in them.  (See '295 4:41-46, 5:1-6.)  For example, the IEEE article is entitled

12  "Automatic Recognition of Handprinted Characters—The State of the Art."

13  Furthermore, the element in question is only one part of a claim with several other

14  means-plus-function elements, each with disclosed structure, and it was reasonable for

15  the patentee to rely on the knowledge of one skilled in the art in describing this aspect

16  of the invention.  See, e.g., Atmel Corp. 198 F.3d at 1382  ("The requirement of

17  specific structure in § 112, ¶ 6 . . . does not raise the specter of an unending disclosure

18  of what everyone in the field knows . . . .").

19        Defendants also challenge the Court's construction of the "second detecting

20  means" and "means . . . for defining termination."  They argue that the Court's

21  construction should have required proximity detection to terminate a gesture and that

22  Lucent failed to present evidence on this issue.  This does not warrant judgment as a

23  matter of law or a new trial.  First, the Court concludes that its construction of claim

24  1 appropriately omitted proximity detection.  Dependent claim 3 adds proximity

25  detection as a further limitation, and including it in claim 1 would render claim 3

26  superfluous.  Courts presume that dependent claims are narrower in scope than the

27  claims on which they depend.  See, e.g., Regents of Univ. of Cal. v. Dakocytomation

28  Cal., Inc., 517 F.3d 1364, 1375 (Fed. Cir. 2008).  Defendants did not overcome this

presumption. Cf. id. at 1375-76 (holding that evidence in prosecution history overcame

- 49 -

1   the presumption).  Furthermore, Lucent did introduce evidence of proximity detection

2   in the accused products.  (See, e.g., PX 749 (setting out Microsoft's Tablet PC

3   hardware requirements, including proximity detection).)

4   **B.    Damages**

5   Microsoft argues that it should receive a new trial or remittitur of the jury's

6   allegedly speculative lump-sum award of $10.35 million.[23]  A jury may arrive at a

7   royalty rate or lump-sum different than those offered by the parties' experts, if

8   supported by substantial evidence.  See, e.g., Fuji Photo Film Co., 394 F.3d at 1378.

9   In this case, substantial evidence supports the jury's award.  For example, Microsoft

10  introduced lump-sum agreements licensing patents for similar technologies at $10

11  million and $30 million.  (See DX BCH, BCI; Trial Tr. XVI 186:3-187:23, 205:21-

12  206:20.)  The $30 million license covered only two graphical user interface patents.

13  (Trial Tr. XVI 205:21-206:20.)  Lucent also introduced evidence supporting its 1%

14  royalty theory, including its expert testimony and sample license agreements.  (See,

15  e.g., PX 5137, 5139-41; Trial Tr. VIII 200:18-201:3, 202:2-14, 203:10-20, IX 15:1-21.)

16  In addition, Lucent introduced substantial evidence, in the form of expert testimony and

17  marketing materials, sufficient for the jury to reasonably conclude that the '295 patent

18  is important to the success of stylus based computing and customer demand for Tablet

19  PCs.  (See, e.g., PX 5206A, Trial Tr. VI 186:16-187:19, 237:18-238:11 (technical

20  expert opining that patent improved capability and flexibility of interface across

21  different applications and contexts); IX 33:12-44:19 (damages expert discussing

22  importance of patented feature in Tablet PCs).)

23  Defendants also challenge the lump-sum royalty awards against Microsoft and

24  Dell as improper applications of the entire market value rule.  First, the Court

25  concludes that the lump-sum damage awards do not necessarily reflect an entire market

26

27

28
---
[23]Dell does not join in this aspect of Microsoft's motion, though it does join in Microsoft's
argument that the damages for the '295 patent violate the entire market value rule.

1  value calculation. The jury did not adopt either expert's recommendation,[24] and the

2  jury was free to consider a wide variety of factors in the evidence, not just the actual

3  sales revenue. Nevertheless, even if the entire market value rule applies, the Court

4  determines that substantial evidence supports Lucent's theory. Lucent introduced

5  substantial evidence tying the patented technology to the commercial success of Tablet

6  PCs. (See, e.g., PX 5206A, Trial Tr. VI 186:16-187:19, 237:18-238:11; IX 33:12-

7  44:19.) Furthermore, the Court concludes that the damages awarded against Microsoft

8  and Dell for the '295 patent were not against the clear weight of the evidence.

9       **C.**    **Summary**

10       As to the '295 patent, the Court **DENIES** all motions for judgment as a matter

11  of law and all motions for a new trial or remittitur.

12  **V.**   **Fleming '759**

13       **A.**   **Pre-Suit Notice**

14       Lucent challenges the jury's finding that it failed to prove by a preponderance

15  of the evidence that it gave pre-suit notice to Dell. See Dunlap v. Schofield, 152 U.S.

16  244, 248 (1894); Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1111-12 (Fed. Cir. 1996)

17  (burden of showing compliance with section 287(a) is on patentee). The '759 patent

18  expired before this litigation began. Under 35 U.S.C. § 287(a), a party required to give

19  pre-suit notice in order to recover damages must provide "affirmative communication

20  of a specific charge of infringement by a specific accused product or device." Amsted

21  Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed. Cir. 1994). This

22  inquiry focuses on the actions of the patentee, not the subjective belief of the accused

23  infringer. Gart v. Logitech, Inc., 254 F.3d 1334, 1346 (Fed. Cir. 2001). The

24  communication must provide "sufficient specificity regarding [the patentee's] belief

25  that the recipient may be an infringer." Id.

26       Lucent presented evidence of an October 20, 1998 meeting that allegedly

27  provided notice of infringement for the '759 patent. (See, e.g., Trial Tr. VII

28

---

[24]While the jury returned a verdict of $51,000 against Dell, as advocated by Lucent, it did not do so using a running royalty theory.

1   133:24-135:6, VIII 32:1-33:3, XIII 136:15-142:14, PX 1875-76, PX 351A-B.) Lucent

2   also offered evidence of a meeting on December 16, 1998, which included a video

3   demonstration.[25]  (See, e.g., PX 5057 (e-mail confirming meeting); DX EOK (video

4   demonstration).)  The video begins by showing a Dell Inspiron 3000 M223XT installed

5   with Windows.    Lucent then ran a demonstration on the computer, purportedly

6   demonstrating the three modes of access involved in the '759 patent.

7        Had the Court been the fact finder, it would have concluded that Lucent gave

8   sufficient notice.  This was a jury question, however, and there is substantial evidence

9   to support the verdict.  For example, given the passage of time, the jury may have

10  reasonably doubted the accuracy of Lucent's witnesses.  The jury may have also

11  accepted Dell's theory that the video demonstration did not implicate Windows. (See,

12  e.g., Trial Tr. XIII 187:18-188:20 (Dell's witness characterizing the video

13  demonstration as being purely based in DOS, an older operating system).)

14       The subsequent indemnification letter sent from Dell to Microsoft would have

15  persuaded the Court, as a fact finder.  Nevertheless, it does not require the Court to

16  alter the jury's finding.  (See, e.g., PX 355 (indemnification notice of January 12,

17  1999).)  Dell sent the letter to inform Microsoft that Lucent had made a "charge of

18  infringement" regarding seven patents, including '759, and that these accusations

19  "potentially impact products that we have purchased from Microsoft, including

20  Windows 98." (Id.)  The letter may provide evidence of actual notice by the patentee,

21  but this was a matter for the jury.  The jury could have reasonably concluded that

22  although Microsoft's letter characterized the meeting as presenting a "charge of

23  infringement," the actual notice given did not meet the legal standard, which does not

24  depend on the accused's subjective belief.  Gart, 254 F.3d at 1346.

25       The Court also concludes that the jury's finding of no pre-suit notice was not

26  against the clear weight of the evidence.  Though the Court would have weighed the

27  evidence differently, the jury's determination does not warrant a new trial.

28  _____

[25]Though Dell disputes the characterization of these meetings and the materials presented there,
it does not dispute that they took place.

- 52 -                                                    07cv2000

### B.   Infringement

Lucent seeks judgment as a matter of law or a new trial that Dell infringed claim 1 of the '759 patent.  First, the Court notes that recovery may be unavailable since Lucent did not establish pre-suit notice, and the patent expired before it brought this action against Dell.  Furthermore, the Court concludes that judgment as a matter of law is not required under Lucent's infringement theories.  For similar reasons, the Court also concludes that the jury's finding of no infringement is not against the clear weight of the evidence.

### 1.   Evidence of Noninfringement

Substantial evidence supports a finding that the structures related to GDI differ substantially from the "processing means" element of claim 1.  "The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." Chiuminatta Concrete Concepts, Inc., 145 F.3d at 1309.  The structure for the processing means element includes a quantitative algorithm that sets to color mode based on the number of operands sent to the mode selection function.  (See '759 Fig. 4.)  In contrast, Dell introduced substantial evidence that the accused portions of GDI use a qualitative algorithm, meaning one in which the number of operands is constant and the mode selection, if any, depends on the values passed through the operands. (See, e.g., Trial Tr. XI 99:5-105:20 (testimony of Dell's expert, Dr. Wedig, on this issue); see also Trial Tr. IV 167:3-11 (testimony of Lucent's expert Mr. Richter, also stating that accused algorithm is qualitative, not quantitative).) The jury could reasonably conclude that these differences were substantial, and that the accused structure was not an equivalent. Lucent cites to deposition testimony from Dr. Wedig allegedly conceding that qualitative and quantitative algorithms are equivalent. (See Trial Tr. XVII 200:13-17 (acknowledging that "qualitative commands for selecting modes of access were known prior to [the '759 patent].")  The jury could reasonably interpret Dr. Wedig's statement as merely conceding that qualitative commands were known prior the patent, not that the differences were insubstantial. (See id.)

1    Dell also introduced substantial evidence that the accused structure could not

2    perform the function of the processing means element.  Dr. Wedig offered his analysis

3    that the commands identified by Mr. Richter merely involved setting specific colors,

4    not selecting modes of color access.  (See, e.g., Trial Tr. XI 88:13-24, 89:5-94:9,

5    95:4-10; see also PX 3901 (Microsoft GDI documentation).)  The jury could have

6    reasonably accepted this analysis and concluded that the accused structure was not able

7    to perform the function of selecting a mode of access.  The Court declines to reach

8    Dell's other arguments, having concluded that there are adequate grounds to deny

9    Lucent's motion for judgment as a matter of law or new trial.[26]

10          **2.     Requests for Further Instructions**

11    The Court denies Lucent's request for a new trial based on argument offered by

12    Dell concerning the structure of the processing means elements.  In construing the

13    structure, the Court's expressly excluded text related to setting colors, as opposed to

14    selecting modes of access.  The disputed statements are consistent with the position

15    that the claim construction only excluded structures when they perform color-setting

16    alone, not that the Court excluded structure performing both functions.  (See, e.g., Trial

17    Tr.  XI  90:16-19,  91:11-14,  94:23-95:3  (excerpts  from  Dr.  Wedig's  direct

18    examination).)  Lucent did not raise contemporaneous objections, and even assuming

19    that its objections are preserved, the Court concludes that Lucent had an adequate

20    opportunity to respond to Dell's arguments and explain its infringement theory to the

21    jury.

22    Lucent also seeks a new trial based on the Court's infringement instructions.

23    Lucent argues that Dell misled the jury by suggesting that infringement of claim 1

24    required that the "predetermined command and data sequences" must have actually

25    been used, and that the Court should have issued further instructions explaining why

26    this is not required.  (See, e.g., Trial Tr. XI 155:13-18, 156:4-10, 156:25-157:11

27

28    [26]Dell also argued, for example, that: (1) its products do not include a processor programmed
to perform an algorithm for selecting a mode of access, (2) the accused products are not "responsive
to a predetermined command and data sequence," and (3) the accused products employ after-developed
technology.

1   (excerpts from Dr. Wedig's testimony arguing that Lucent failed to show that the

2   sequences are actually used).)  A new trial is not needed.  First, the Court properly

3   instructed the jury that infringement is not limited to using the invention and may

4   include "importing, making, using, offering to sell, or selling." (Jury Instruction 16,

5   Doc. No. 735.)  The Court also explained the role of the function and structure in

6   means-plus-function elements.  (Jury Instruction 19, Doc. No. 735.)  Furthermore,

7   Lucent had adequate opportunity to respond to Dell's arguments and explain its

8   infringement theory.  Finally, there were ample grounds for the jury to enter a finding

9   a no infringement, independent of this issue.

10        **C.    Equitable Defenses**

11        The jury entered advisory verdicts of no laches and no inequitable conduct with

12   respect to Lucent's claims for the '759 patent. Dell did not challenge these conclusions

13   in its post-trial briefing, and neither party submitted proposed findings of fact or

14   conclusions of law under the briefing schedule provided by the Court.  The ultimate

15   determination of these issues rests with the Court.  See, e.g., Huser, 513 F.2d at 1299.

16   As neither party has disputed the advisory verdicts at this stage of the proceedings, and

17   the Court has reached the same conclusions on the trial record without deference to the

18   jury on these questions, the Court adopts the advisory verdicts in their entirety as they

19   relate to the '759 patent.

20        **D.    Summary**

21        As to the '759 patent, the Court **DENIES** all motions for judgment as a matter

22   of law and all motions for a new trial.  The Court follows the jury's advisory verdicts

23   as they relate to the '759 patent.  The Court finds no laches and no inequitable conduct

24   as to the '759 patent.

25   / / /

26   / / /

27   / / /

28   / / /

**Conclusion**

## I.   Matters Tried to the Bench

For the reasons set forth above, the Court follows the jury's advisory verdicts on equitable issues in part.  The Court finds no laches for either the '226 or '759 patents. Furthermore, the Court finds no inequitable conduct for either the '226 or '759 patents.

## II.   Motions for JMOL, New Trial, or Remittitur

As to the '356, '295, and '759 patents, the Court **DENIES** all motions for judgment as a matter of law, new trial, or remittitur.  As to the '226 patent, the Court **GRANTS** Lucent's motion for judgment as a matter of law that the '226 is not invalid for obviousness.  The Court **DENIES** all other motions for judgment as a matter of law or new trial regarding the '226 patent.

## III.   Closing Remarks

The Court takes this opportunity to compliment all attorneys involved for their excellent work in these proceedings.  Counsel for all parties worked diligently to accommodate the Court's schedule, prepared their materials thoroughly, and conducted themselves in a professional and courteous manner that does credit to their profession.

IT IS SO ORDERED.

DATED:  June 19, 2008

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record.

- 56 -

07cv2000

ORIGINAL

Lucent Technologies, Inc. and
Multimedia Patent Trust

v.

Microsoft Corporation

FILED

APR 4, 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

—————

Lucent Technologies, Inc.

v.

Dell Inc.

—————

Microsoft Corporation

v.

Lucent Technologies, Inc. and
Multimedia Patent Trust

—————

Dell Inc.

v.

Lucent Technologies, Inc.

# 07-CV-2000 H (CAB)

# JURY INSTRUCTIONS

INSTRUCTION NO. ___1___

Members of the Jury: Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you as to the law of the case. A copy of these instructions will be sent with you to the jury room when you deliberate You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

INSTRUCTION NO. ___2___

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;

2. the exhibits which are received into evidence; and

3. any facts to which the lawyers have agreed.

INSTRUCTION NO. __3__

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; where I have given a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

INSTRUCTION NO. __4__

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

Here is an example of how circumstantial evidence might be distinguished from direct evidence. If a witness testified that they were out in rain or saw rain from a window while indoors, that testimony would be considered direct evidence that it was raining in a specified place. However, if a witness testified that they had gone underground to catch a train when the weather was dry, but while on the train, noticed passengers boarding at one station after another wearing wet clothes and carrying wet umbrellas, their testimony would constitute circumstantial evidence that it was raining in the area.

INSTRUCTION NO. __5__

You have heard testimony from persons who, because of education or experience, are permitted to state opinions and the reasons for those opinions. Opinion testimony should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness' education and experience, the reasons given for the opinion, and all the other evidence in the case.

INSTRUCTION NO. _6_

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness' memory;

(3) the witness' manner while testifying;

(4) the witness' interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness' testimony;

(6) the reasonableness of the witness' testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not depend on the number of witnesses who testify.

INSTRUCTION NO. _7_

During the trial, certain testimony was presented to you by the reading of a deposition transcript or the playing of videotaped excerpts from a deposition. This testimony is entitled to the same consideration you would give it had the witness personally appeared in court.

INSTRUCTION NO. __8__

You should decide the case as to each party separately. Unless otherwise stated,

the instructions apply to all parties.

INSTRUCTION NO. __9__

Certain demonstrative exhibits, charts and summaries have not been received in evidence.  These demonstrative exhibits have been shown to you in order to help explain the contents of books, records, documents, or other evidence or the testimony of a witness.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

INSTRUCTION NO. ___10___

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

INSTRUCTION NO. _____

When a party has the burden of proof on any claim or affirmative defense by clear and convincing evidence, it means you must be persuaded by the evidence that it is highly probable that the claim or affirmative defense is true. The clear and convincing evidence standard is a heavier burden than the preponderance of the evidence standard.

You should base your decision on all of the evidence, regardless of which party presented it.

INSTRUCTION NO. 12

Before you decide the issues in this case, you will need to understand the role of patent "claims." The patent claims are numbered sentences at the end of the patent. The patent claims involved here for each patent are listed in the attachments. The patents are in evidence. The claims describe the invention made by the inventor(s) and describe what the patent owner owns and what the patent owner may prevent others from doing. Claims may describe products, such as machines or chemical compounds, or they may describe methods or processes for making or using a product.

Claims are usually divided into parts or steps, called "elements." For example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs to the tabletop. The tabletop, legs and glue are each a separate element of the claim

Only the claims of the patent can be infringed. Neither the written description, nor the drawings of a patent can be infringed. Each of the asserted claims must be considered individually, and to prove infringement for a particular patent, a party need

INSTRUCTION NO. ___13___

It is my job as the judge to provide you the meaning of the claim language that must be interpreted. You must accept the meanings I give you and use them when you decide whether any of the asserted claims is infringed and whether any of those claims is invalid. I am providing you the claim construction charts for each of the patents in suit. You will note that each claim construction chart lists in the left of two columns the verbatim language of claims at issue in this case. In the right column is presented the identical claim and each element which is re-written somewhat so as to translate certain words or phrases which you might find difficult to understand. The wording of all claim language in the right column is intended to as clearly as possible re-state certain technical words and phrases in language which you may find easier to understand, and thus to apply in this case. You should give the rest of the words in the claims their ordinary meaning in the context of the patent specification and prosecution history.

INSTRUCTION NO. __14__


Several of the claims at issue in this case use the word "comprising" before

reciting some of the elements of the claims.  "Comprising" means "includes, but is not

limited to."  A claim that uses the word "comprising" is not limited to the products or

methods having only the elements or steps that are recited in the claim, but also covers

products or methods that add additional elements or steps.

INSTRUCTION NO. ___15___

Several of the claims at issue in this case have elements that use the phrase "means for" or similar language, followed by the description of some function that must be performed.

This type of element has a special meaning in patent law. It is called a "means-plus-function" requirement. It covers a structure or a set of structures that performs that function and that is either identical or equivalent to the structure described in the patent for performing that function. The issue of whether two structures are identical or equivalent is for you to decide. I will explain to you later how to determine whether two structures or two sets of structures are equivalent to another. For purposes of this case, I have construed the function and corresponding structure of each means-plus-function element. In the claim construction charts I am providing to you, I have identified the structures described in the patent. You should apply my constructions for the means-plus-function elements as you would my construction of any other claim term.

INSTRUCTION NO. ___16___

Patent law gives the owner of a valid patent the right to exclude others from importing, making, using, offering to sell, or selling a patented invention within the United States during the term of the patent. Any person or business entity that has engaged in any of those acts without the patent owner's permission infringes the patent.

A patent may be infringed directly or indirectly. Direct infringement results if the accused product or method is covered by at least one claim of the patent. Indirect infringement results if the defendant induces or contributes to the infringement of a patent by another person or business entity.

INSTRUCTION NO. ___17___

There are two different types of claims in the patents. One type of claim is called an independent claim. The other type of claim is called a dependent claim.

An independent claim is a claim that does not refer to any other claim of the patent. An independent claim must be read separately from the other claims to determine the scope of the claim. A dependent claim is a claim that refers to at least one other claim in the patent. A dependent claim incorporates all of the elements of any claim to which the dependent claim refers, as well as the elements recited in the dependent claim itself.

For example, claims 19 of the Day '356 patent is an independent claim and recites several elements. Claim 21 of the Day '356 patent is a dependent claim that refers to claim 19 and includes an additional element. Claim 21 requires each of the elements of claim 19, as well as the additional element recited in claim 21 itself. Consequently, if you found that claim 19 of the Day '356 patent is not infringed, then you cannot find that claim 21 of the Day '356 patent is infringed.

INSTRUCTION NO. ___18___

 

 

      In order to literally infringe a patent claim, a product or method must include

every element of the claim.  A claim element is literally present if it exists in the

accused product or method just as it is described in the claim language, either as I

have explained that language to you or, if I did not explain it, as you understand it.

If the accused product or method omits even a single structure or step recited in a

claim, then you must find that the accused product or method does not literally

infringe that claim.  You must consider each of the patent claims separately.

INSTRUCTION NO. __19__

As I have previously explained, several of the claims at issue in this case include elements that are in means-plus-function form.

A product meets the means-plus-function requirements of the claims if two conditions are met: (1) it has a structure that performs the identical function recited in the claim and (2) that structure is either identical or equivalent to the structure that I have defined as performing the function. If the product does not have any structure that performs the specific function recited in the claim, the means-plus-function requirement is not met, and the product does not literally infringe the claim. Alternatively, if the product has a structure that performs the function recited in the claim but that structure is not either identical or equivalent to the structure that I defined to you as being described in the patent and performing this function, the product does not literally infringe. Determination of structural equivalence does not require a component-by-component analysis of the structure corresponding to the claimed function. The individual components of the corresponding structure are not claim elements. Rather, you should consider whether the structure in the accused

(Page 1 of 3)

product for performing the function is equivalent to the overall structure I have identified in the claim construction.

A structure is equivalent to the structure I have defined as being described in the patent if a person having an ordinary level of skill in the field of technology of the patent would have considered the differences between them to be insubstantial at the time the patent issued. In deciding whether the differences would be "insubstantial," you must consider whether the structures work in substantially the same way to achieve substantially the same result. You should also consider whether, at the time the patent issued, a person having an ordinary level of skill in the field of technology of the patent would have known of the interchangeability of the two structures.

Interchangeability itself is not sufficient; in order for the structure to be considered interchangeable, the interchangeability of the two structures must have been known to persons of ordinary skill in that area at the time the patent issued.

If you find that the structure in the accused product embraces technology developed after the issuance of the patent, that structure may still be an equivalent to the structure I have defined as being described in the patent under the doctrine of

(Page 2 of 3)

equivalents.  Two structures are equivalent under the doctrine of equivalents if a person having an ordinary level of skill in the field of technology of the patent would have considered the differences between them to be insubstantial at the time of the infringement.  In deciding whether the differences would be "insubstantial," you must consider whether the structures work in substantially the same way to achieve substantially the same result.

(Page 3 of 3)

INSTRUCTION NO. ___20___

In addition to enforcing a patent against a direct infringer, a patent owner may also enforce the patent against indirect infringers by proving indirect infringement by a preponderance of the evidence.

There are two types of indirect infringement that are at issue in this case. One type of indirect infringement is inducing infringement. The act of encouraging or inducing others to infringe a patent in the United States is called "inducing infringement." A second type of indirect infringement is contributory infringement. The act of contributing to the infringement in the United States of others by, for example, supplying them with components used in the patented invention is called "contributory infringement." I will explain these two types of indirect infringement in subsequent instructions.

INSTRUCTION NO. 21

A party induces patent infringement if it purposefully urges or encourages another to infringe a patent. Inducing infringement cannot occur unintentionally. As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

A person is liable for active inducement of a claim only if:

(1) the person takes action during the time the patent is in force which encourages acts by someone else; and

(2) the encouraged acts constitute direct infringement of that claim; and

(3) the person is aware of the patent, and knows or should have known that the encouraged acts constitute infringement of that patent; and

(4) the person has an intent to cause the encouraged acts; and

(5) the encouraged acts are actually carried out by someone else.

In order to establish active inducement of infringement, it is not sufficient that the person or company that is allegedly induced to infringe itself directly infringes the claim. Nor is it sufficient that Microsoft or Dell were aware of the act(s) that allegedly

(Page 1 of 2)

constitute the direct infringement. Rather, you must find that Microsoft or Dell specifically intended to infringe the patent, in order to find inducement of infringement. If you do not find that Microsoft or Dell specifically intended to infringe, then you must find that Microsoft or Dell have not actively induced infringement.

(Page 2 of 2)

INSTRUCTION NO. _22_

Contributory infringement can occur when a supplier provides a part, or a component, to another for use in a patented product or machine, or in a patented method. In order for there to be contributory infringement, the person or entity who received the component must infringe the patent. The component must also have certain characteristics:

1.    The component must be a material part of the invention.

2.    The component must be especially made or adapted for use in a manner that infringes the patent, and the supplier must know that the component was especially made for that use.

3.    The component must not have a substantial use that does not infringe the patent. A component that has a number of non-infringing uses is often referred to as a staple or commodity article. Providing such a staple or commodity article is not contributory infringement, even if the person to whom the article was supplied uses it in an infringing manner.

To establish that a defendant has contributorily infringed, a plaintiff must show five things by a preponderance of the evidence.

(Page 1 of 2)

1.      Defendant knew of the patent.

2.      Defendant sold or supplied a material part of the claimed invention.

3.      Defendant knew that the part was especially made for use in a manner that infringes the patent claims.

4.      The part is not a staple or commodity article.

5.      The component part was actually used in a manner that you find infringes the patent.

Each of these things may be proven by direct or circumstantial evidence.

INSTRUCTION NO. ___23___

A person may infringe a patent if he or she supplies a component from the United States knowing that the component will be used with other components overseas and assembled into an infringing product. Under these circumstances, there are two ways in which a plaintiff can prove that a defendant has infringed plaintiff's patents.

In the first way, plaintiff must prove by a preponderance of the evidence that there was inducement to infringe as follows:

1.    Defendant intended to supply or to cause to be supplied in or from the United States all or a substantial portion of the components of a patented invention of the patent;

2.    The components were uncombined in whole or in part when they were supplied;

3.    At the time defendant supplied or caused to be supplied the components, the defendant knew of the patent; and

(Page 1 of 3)

4.      Defendant knew or should have known that the combination or use of such components outside of the United States would cause the direct infringement of the patent.

Or in the second way, the patent owner must prove by a preponderance of the evidence that there was contributory infringement as follows:

1.      The party accused of infringement supplied or caused to be supplied in or from the United States any component of a patented invention;

2.      At least one supplied component was especially made or adapted for use in the invention and is not a staple article suitable for substantial non-infringing use;

3.      The components were uncombined in whole or in part when they were supplied;

4.      The accused infringer knew of the patents at the time of its conduct; and

5.      The accused infringer knew or intended that the components would be combined outside the United States in a manner that would infringe the patent.

(Page 2 of 3)

A copy of software downloaded from the Internet may be a "component," for the purposes of these two types of infringement, if it came from the United States including a server located in the United States and any other requirements I have described are met. Copies made outside the United States or from servers solely outside of the United States are not components supplied in or from the United States for purposes of the two types of infringement I have just described. For example, if someone sends a master copy of software from the United States to another country and then makes copies from the master in the foreign country, the original master might be an infringing component since it came from the United States, but the additional copies are not since they were created in the foreign country. In contrast, where someone sends multiple copies from the United States to another country, each of those copies might be an infringing component if the other requirements I have described are met.

(Page 3 of 3)

INSTRUCTION NO. _24_

A lawful right to use a patented product includes a right to make repairs on the product necessary for continued use. Repairs may include the replacement of unpatented parts. If you find that a download is a permissible repair, then it does not infringe and you cannot include them in your calculation of damages. However, if the repair or download also includes an infringing part, component, or method, you may include damages for the infringing part, component or method.

INSTRUCTION NO. _25_

The patents in this case are presumed to be valid because the United States Patent and Trademark Office has determined that the inventors have satisfied the legal requirements for obtaining a patent. Despite this presumption of validity, claims of an issued patent may be found to be invalid.

A party claiming the invalidity of a patent has the burden of proving by clear and convincing evidence that a claim is invalid.

INSTRUCTION NO. ___26___

Under the patent laws, a person is entitled to a patent only if the invention claimed in the patent is new and unobvious in light of what came before it. That which came before is referred to as the "prior art."

Prior art includes any of the following items received into evidence during trial:

1.      Any product or method that was publicly known or used by others in the United States before the patented inventions were made;

2.      Patents that issued more than one year before the filing date of the patents or before the inventions were made by named inventors;

3.      Printed publications that were publicly accessible to interested persons more than one year before the effective filing date of the patents or before the inventions were made;

4.      Any product or method that was in public use or on sale in the United States more than one year before the effective filing date of the patents;

(Page 1 of 2)

5.      Any United States patent that was granted on an application filed in the United States prior to the date the inventions were made; and

6.      Any invention that was made or used by anyone in the United States before the named inventors invented the patented product or method where the product or method was not abandoned, suppressed, or concealed.

(Page 2 of 2)

INSTRUCTION NO. _27_

Some of the different categories of prior art depend on the date at which the

inventor made the invention.  This is called the "date of invention."

I will now explain to you how to determine this date.  There are two parts to the

making of an invention.  The inventor has the idea of the invention.  This is referred

to as "conception" of the invention.  A conception of an invention is complete when

the inventor has formed the idea of how to make and use every aspect of the claimed

invention, and all that is required is that it be made without the need for any further

inventive effort.  The actual making of the invention is referred to as "reduction to

practice."  An invention is said to be "reduced to practice" when it is made and shown

to work for its intended purpose.

Under the patent laws, the date of invention is generally the date that the patent

application was filed.  This is also referred to as "constructive reduction to practice."

There are, however, two circumstances under which art dated before the

application filing date is not prior art.  The first occurs when the inventor on the patent

reduced the invention to practice before the date of the art.  Art dated after the

(Page 1 of 2)

reduction to practice is not prior art to the patent claims, unless the art is a printed publication that was publicly accessible more than one year before the filing date of the patent.

The second circumstance under which art dated before the application filing date is not prior art occurs when the inventor conceived of the invention before the date of the prior art and exercised reasonable diligence from just before the date of the art up to the date of the inventor's reduction to practice. In that case, art dated after the conception date is not prior art to the patent claims, unless the art is a printed publication that was publicly accessible more than one year before the filing date of the patent.

Remember, reduction to practice occurs either as of the filing of the patent application or when the invention was actually made and was shown to work for its intended purpose. Reasonable diligence means that the inventor worked continuously on reducing the invention to practice. Interruptions necessitated by the everyday problems and obligations of the inventor or others working with him or her do not prevent a finding of diligence.

(Page 2 of 2)

INSTRUCTION NO. _28_

A person cannot obtain a patent if someone else already has made an identical invention. Simply put, the invention must be new.  An invention that is not new or novel is said to be "anticipated by the prior art."  Under the U.S. patent laws, an invention that is "anticipated" is not entitled to patent protection.  To prove anticipation, a defendant must present clear and convincing evidence showing that the claimed invention is not new.

To anticipate a claim, each and every element in the claim must be present in a single item of prior art.  You may not combine two or more items of prior art to prove anticipation.

In determining whether every one of the elements of the claimed invention is found in the prior art, you should take into account what a person of ordinary skill in the art would have understood from his or her examination of the particular reference.

(Page 1 of 2)

In determining whether the single item of prior art anticipates a patent claim, you should take into consideration not only what is expressly disclosed in the particular item of prior art, but also what inherently occurred as a natural result of its practice. This is called "inherency." A party claiming inherency must prove it by clear and convincing evidence. To establish inherency, the evidence must make clear that the missing descriptive matter is necessarily present in the reference and that it would be so recognized by persons of ordinary skill in the art. Inherent anticipation, however, does not require that a person of ordinary skill in the art at the time would have recognized the inherent disclosure. Thus, the prior use of the patented invention that was accidental, or unrecognized and unappreciated can still be an invalidating anticipation.

You must keep these requirements in mind and apply them to each kind of anticipation you consider in this case. There are additional requirements that apply to the particular categories of anticipation. I will now instruct you about those.

(Page 2 of 2)

INSTRUCTION NO. _29_

A patent claim is invalid if the invention recited in that claim was publicly known by others in the United States before the patent applicant invented it. Private or secret knowledge does not invalidate a patent claim. Similarly, if something is only publicly known outside of the United States, this is not invalidating public knowledge.

INSTRUCTION NO. _30_

Microsoft and Dell contend that certain asserted claims are anticipated because the inventions defined in those claims were publicly used in the United States before they were invented by the patentee, and also that those inventions were publicly used in the United States more than one year before the effective filing date of each U.S. patent application.

A patent claim is invalid if the invention defined by that claim was publicly used by someone other than the patentee in the United States before it was invented by the patentee. A patent claim is also invalid if it was publicly used by anyone in the United States more than one year before the patentee filed his patent application.

An invention is publicly used if it is used by the inventor or by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor. Public use means the absence of affirmative steps to conceal. However, secret or private use by a third party is not an invalidating public use. If the public use was an experimental use performed in order to bring the invention to perfection or to determine if the invention was capable of performing its intended purpose, then such a use does not invalidate the claim.

INSTRUCTION NO. ___31___

Microsoft and Dell contend that the asserted claims of the patents in suit are anticipated because the inventions defined in those claims were described in a printed publication more than one year before the patentee filed the U.S. patent application, and also because the inventions defined in those claims were described in a printed publication before the patentee invented the invention.

A patent claim is invalid if the invention defined by that claim was described in a printed publication before the patentee conceived of and reduced to practice his or her invention. A patent claim is also invalid if the invention defined by that claim was described in a printed publication more than one year prior to the filing date of the U.S. application.

A printed publication must be reasonably accessible to those members of the public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public. The information must, however, have been maintained in some form, such as printed pages, typewritten pages, magnetic tape, microfilm, photographs or photocopies.

(Page 1 of 2)

For a printed publication to anticipate a patent claim, it must, when read by a person of ordinary skill in the art, expressly or inherently disclose each element of the claimed invention to the reader. The disclosure must be complete enough to enable one of ordinary skill in the art to practice the invention without undue experimentation. In determining whether the disclosure is enabling, you should take into account what would have been within the knowledge of a person of ordinary skill in the art at the time the inventions of the asserted patents were made, and you may consider evidence that sheds light on the knowledge such a person would have had.

In deciding whether a document or other item stored in a library was sufficiently accessible to count as a printed publication, you should consider factors including:

(1) whether the library was accessible to the public, (2) whether the item was cataloged or indexed in a meaningful way so that an interested member of the public could locate it, and (3) whether the item was shelved in the library. You should make your decision based on all the facts of the case, however, without necessarily limiting yourself to these factors.

A printed publication need not be in English or actually have been read as long as it meets the requirements I have described here.

(Page 2 of 2)

INSTRUCTION NO. _32_

A claim of a patent would be invalid if the invention defined by the claim was described in a United States patent issued on a patent application filed in the United States by another person before the invention was made by the patentee.

To show anticipation of a patent-in-suit, defendants must show by clear and convincing evidence that the application for the anticipating patent described each and every element of an asserted claim and that the specification, claims, and/or drawings of the application for the anticipating patent was filed in the United States before the date of invention of the patent-in-suit.

INSTRUCTION NO. 33

A patent claim is invalid if the invention defined by that claim was invented by another person in the United States before it was invented by the patentee, and that the other person did not abandon, suppress, or conceal the invention.

A defendant must show by clear and convincing evidence either that before the patentee invented his or her invention, a third party reduced to practice a product or method that included all of the elements of an asserted claim, or that a third party was first to conceive the invention and that he or she exercised reasonable diligence in later reducing the invention to practice.  In addition, a defendant must show that the third party's device was sufficiently developed that one skilled in the art would have recognized that it would work for its intended purpose.

If the prior invention was abandoned, suppressed, or concealed, it does not anticipate the patent.  However, it is not necessary that the patentee had  knowledge of that prior invention.

(Page 1 of 2)

Generally, an invention was not abandoned, suppressed, or concealed if the invention was made public, sold, or offered for sale, or otherwise used for a commercial purpose. A period of delay does not constitute abandonment, suppression, or concealment if the prior inventor was engaged in reasonable efforts to bring the invention to market.

(Page 2 of 2)

INSTRUCTION NO. _34_

A person is not entitled to a patent if the person did not invent the subject matter sought to be patented. If you find by clear and convincing evidence that an inventor did not invent the subject matter in the patent, you must find that patent to be invalid.

INSTRUCTION NO. _*35*_

A patent is invalid if it fails to meet the requirement that all of the actual inventors, and only the actual inventor, be named as inventors in the patent. This is known as the "inventorship" requirement.

To be an inventor, one must make a significant contribution to the conception of one or more of the claims of the patent. Whether the contribution is significant is measured against the scope of the full invention.

Explaining to the actual inventors well-known concepts or the current state of the art does not make someone an inventor. Merely helping with experimentation, by carrying out the inventor's instructions, does not make someone an inventor.

Persons may be inventors even if they do not make the same type or amount of contribution, and even if they do not contribute to the subject matter of each claim of the patent. Persons may be joint or co-inventors even though they do not physically work together, but they must have some open line of communication during or at approximately the time of their inventive effort.

(Page 1 of 2)

Defendants must show clear and convincing evidence of inventorship to invalidate a patent. To meet that burden, the alleged co-inventor must prove his contribution to the conception with more than simply his own testimony concerning the relevant facts. Whether the alleged co-inventor's testimony has been sufficiently corroborated is evaluated under a rule of reason analysis, which requires you to consider all pertinent evidence to determine the credibility of the alleged co-inventor's story. Reliable evidence of corroboration preferably comes in the form of records made contemporaneously with the inventive process. Circumstantial evidence of an independent nature may also corroborate. Additionally, oral testimony from someone other than the alleged inventor may corroborate.

(Page 2 of 2)

INSTRUCTION NO. _36_

An inventor is not entitled to a patent if his or her invention would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made.

Obviousness may be shown by considering more than one item of prior art. The question is, would it have been obvious for a skilled person who knew of the prior art to make the claimed invention? If the answer to that question is yes, then the patent claims are invalid. Microsoft and Dell have the burden of proving by clear and convincing evidence that one or more claims of either patent are invalid for obviousness.

Obviousness is determined from the perspective of a person of ordinary skill in the field of the invention. The issue is not whether the claimed invention would have been obvious to you, to me as a judge, or to a genius in the field of the invention. Rather, the question is whether or not the invention would have been obvious to a person of ordinary skill in the field of the invention.

In deciding obviousness, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent.

(Page 1 of 5)

You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill at the time the invention was made.

In determining whether or not these claims would have been obvious, you should make the following determinations:

1.    What is the scope and content of the prior art?

2.    What differences, if any, are there between the invention of the claims of the patent and the prior art?

3.    What was the level of ordinary skill in the art at the time the invention was made?

4.    Are there any objective secondary indications of non-obviousness?

Against this background, you must decide whether or not the invention covered by the patent claims would have been obvious.

I will now describe in more detail the specific determinations you must make in deciding whether or not the claimed invention would have been obvious.

(Page 2 of 5)

**The Scope And Content Of The Prior Art**

A prior art reference must be considered with the knowledge of one of ordinary skill in the pertinent art.  A prior art reference need not explain every detail since it is speaking to those skilled in the art.  Thus, in order to render an invention obvious, the asserted prior art must be sufficient to enable a person of ordinary skill, with his/her background, to practice the invention.

Determining the scope and content of the prior art means that you should determine what is disclosed in the prior art.  You must decide whether this prior art was reasonably relevant to the particular problem the inventor faced in making the invention covered by the patent claims.  Such relevant prior art includes prior art in the field of the invention, and also prior art from other fields that a person of ordinary skill would look to when attempting to solve the problem.

**Differences Between The Invention Of The Claims And The Prior Art**

In determining the differences between the invention covered by the patent claims and the prior art, you should not look at the individual differences in isolation.

(Page 3 of 5)

You must consider the claimed invention as a whole and determine whether or not it would have been obvious in light of all of the prior art.

In deciding whether to combine what is described in various items of prior art, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. The motivation or suggestion to combine the teachings of different prior art references may be found either explicitly or implicitly in the references themselves or in the knowledge generally available to one of ordinary skill in the art. You should also consider whether or not the prior art "teaches away" from the invention covered by the patent claims. The question to be answered is: Would someone reading the prior art be discouraged from following the path taken by the inventor?

### Level Of Ordinary Skill

Obviousness is determined from the perspective of a person of ordinary skill in the art. This person is presumed to know all of the prior art, not just what the inventor may have known. When faced with a problem, this ordinary skilled person is able to

(Page 4 of 5)

apply his or her experience and ability to the problem and also to look to any available prior art to help solve the problem.

Factors to consider in determining the level of ordinary skill in the art include the educational level and experience of people working in the field, the types of problems faced by workers in the art and the solutions found to those problems, and the sophistication of the technology in the field.

(Page 5 of 5)

INSTRUCTION NO. _____37_____

In making your decision as to the obviousness or non-obviousness of the claimed invention, you must also consider the following factors, if present, that may tend to show the non-obviousness of the claims at issue:

1.　Commercial success of products covered by the patents in suit;

2.　A long-felt need in the art that was satisfied by the invention of the patent-in-suit;

3.　The failure of others to make the invention;

4.　Copying of the invention by others in the field;

5.　Unexpected results achieved by the invention;

6.　Praise of the invention by the infringer or others in the field;

7.　Expressions of surprise by those skilled in the art upon learning of the invention;

8.　The inventor proceeded in a direction contrary to the accepted wisdom of those skilled in the art;

9.　The taking of licenses under the patent by others; and

(Page 1 of 2)

10.    Industry acceptance of the invention.

However, there must be a connection between the evidence showing any of these factors and the claimed invention if this evidence is to be given weight by you in arriving at your conclusion on the obviousness issue.  For example, if commercial success is due to advertising, promotion, salesmanship or the like, or is due to features of the product other than those claimed in the patent-in-suit, then any commercial success may have no relation to the issue of obviousness.

Evidence that may tend to show the obviousness of an invention is a showing of independent development or making of the invention by others before the inventor of the patent-in-suit or at about the same time.

INSTRUCTION NO. _38_

Every applicant for a patent has a duty of candor and good faith in its dealing

with the United States Patent and Trademark Office and with the Examiner handling

the application.  This duty of candor is important because the examiner has limited

resources. The examiner may have less information available to them than an applicant

may have from which to determine whether an invention is sufficiently different from

that which already exists to warrant a patent.  The examiner also has a limited amount

of time to spend determining whether the invention claimed in any particular

application meets the requirements for a patent.  To prevent patents from issuing on

inventions that are not sufficiently different from that which already exists, anyone

involved in a substantial way in the examination of an application is required to be

truthful and honest in all of their dealings with the Patent and Trademark Office and

to disclose all information in their possession which a reasonable examiner may

consider to be material to the examination of the application.

When a person involved in the prosecution of an application fails to comply with

the duty of candor and good faith, and does so with an intent to deceive the Patent and

Trademark Office, he or she may commit what is called "inequitable conduct."  When

(Page 1 of 6)

inequitable conduct occurs during the examination of an application, any patent that issues from that application may be rendered unenforceable as a matter of fairness. This means that despite the existence of the patent, the patent holder may not prevent others from using the invention covered by the patent and may not collect damages from those who use the invention that is covered by the patent.

Because a finding of inequitable conduct completely extinguishes a patent holder's right to prevent others from using an invention, the burden of proving inequitable conduct is high.  An alleged infringer must establish that inequitable conduct occurred during the examination of a patent with evidence by clear and convincing evidence.  That is, based on the evidence presented to you in this case you must have a clear conviction that inequitable conduct occurred in order for it to be considered unenforceable.

In this case, the Microsoft and Dell contend that Lucent failed to disclose material information to the Patent and Trademark Office during the examination of the '759, and '226 patents, and did so with an intent to deceive the examiner into issuing the '759, and '226 patents.  I will now explain to you what "materiality" and "intent to mislead" mean. I will then explain to you how any materiality and intent

(Page 2 of 6)

that you may find must be balanced in order to determine whether, given all the facts and circumstances, inequitable conduct occurred in this case as Microsoft and Dell contend.

Both of these elements, intent and materiality, must be proven by clear and convincing evidence. Materiality does not presume intent, which is a separate and essential component of inequitable conduct. Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent.

**Materiality**

In considering materiality, you first must determine whether or not information was withheld from the Patent and Trademark Office during the examination of the patents. If you find that the applicant, the applicant's representatives, or others involved in a substantial way with the examination of the application withheld information from the Patent and Trademark Office during the examination of the patents, you must then determine whether or not the withheld information was material.

Information or statements are material if they establish, either alone or in combination with other information or statements, that the invention sought to be

(Page 3 of 6)

patented more likely than not failed to satisfy one or more of the requirements for a

patent. Examples of such requirements would include that the invention be new, useful,

and non-obvious, among others.  Information or statements also are material if they

refute or are inconsistent with a position that the applicant for a patent took when

opposing an argument made by the examiner that the invention was not patentable or

when making an argument to the examiner that the invention was patentable.

Information that is cumulative of, or in other words, adds little to or has no more

bearing on the examination of an application than information the examiner already

had, is not material.  Information that discloses a more complete combination of the

relevant features of the invention sought to be patented may be highly material. This

is true even if those features were before the examiner in other, less complete

references.

I will now discuss the concept of "intent to mislead."

**Intent to Mislead**

In order for inequitable conduct to have occurred Microsoft or Dell must

establish that any failure to disclose material information was done with an intent to

deceive the examiner.  If the failure to disclose material information occurred through

(Page 4 of 6)

negligence, oversight, carelessness, or an error in judgment, even if it was grossly

negligent, then there was no intent to deceive and there is no inequitable conduct.

Intent may be shown through direct evidence, such as documents or testimony

about one's intent to deceive.  Intent also may be shown through indirect evidence, or

in other words, it may be inferred from conduct. For example, you may infer an intent

to mislead from acts substantially certain to accomplish a result, or a combination of

conduct and statements. However, you are not required to infer intent. Any inference

of intent will necessarily depend upon the totality of the circumstances as you find

them to have been, including the nature and level of any culpable conduct you may find

and the absence or presence of affirmative evidence of good faith on the patent holder's

part.

### Balancing of Materiality and Intent

If you find that Microsoft or Dell have proven that material information was

withheld and, further, that these acts or omissions were done with an intent to mislead

the examiner, you must then weigh the degree of materiality and the degree of intent

to determine whether, on balance, the evidence clearly and convincingly establishes

that the patent holder committed inequitable conduct and the patents should in fairness

(Page 5 of 6)

be declared unenforceable.  When performing this balancing, the higher the level of materiality of the withheld information, the lower the level of intent that is required to establish inequitable conduct, and vice versa.  Materiality and intent to deceive are separate issues: proof of materiality does not give rise to an inference of intent to deceive, and proof of an intent to deceive does not give rise to an inference of materiality.  There must be evidence that establishes materiality and there must be evidence that establishes an intent to deceive. If evidence of either, or both, is missing, there can be no inequitable conduct.

Although the question of whether there has been inequitable conduct is one that I will decide, I will ask for your findings so that I can consider them in making my decision. You should make determinations on this issue as you would for any other issue in this case because I will consider them seriously in making my determination. Your determination on the issue of inequitable conduct should not in any way affect your findings on any of the other issues you are being asked to decide in this case.

(Page 6 of 6)

INSTRUCTION NO. 39

The owner of a patent may not be entitled to recover damages for acts that occurred before it filed a lawsuit against an alleged infringer where: 1) the patent holder delayed filing the lawsuit for an unreasonably long period of time, 2) there was no excuse for the patent holder's delay in filing the lawsuit, and 3) the allegedly infringing party has been or will be prejudiced in a significant way due to the patent holder's delay in filing the lawsuit. This is referred to as laches, which can prevent a party recovering any damages before they filed this case.

The delay that must be considered in this case is the period of time beginning when Lucent first knew of, or reasonably should have known of, Microsoft's and Dell's allegedly infringing activities and ending when Lucent filed this lawsuit.

Whether any delay was unreasonably long is a question that must be answered by considering the facts and circumstances as they existed during the period of delay in the way that reasonably prudent businesspeople would have viewed them. Whether an otherwise unreasonably long delay was justified or should be excused also is a question that must be answered by considering the facts and

(Page 1 of 3)

circumstances as they existed during the period of delay in the way that reasonably prudent businesspeople would have viewed them.

Prejudice to Microsoft and Dell as a result of any delay by Lucent in filing this lawsuit can be economic or evidentiary in nature. If you find that either of these types of prejudice apply in this case, then that can support a finding of laches. I will now explain these two types of prejudice to you in more detail.

Whether Microsoft or Dell suffered evidentiary prejudice is a question that must be answered by evaluating whether any unreasonable delay in filing this case resulted in their not being able to present a full and fair defense on the merits to Lucent's infringement claims. Not being able to present a full and fair defense on the merits to an infringement claim can occur due to the loss of important records, the death or impairment of an important witness, the unreliability of memories about important events because they occurred in the distant past, or other similar types of things.

Whether Microsoft or Dell suffered economic prejudice is a question that must be answered by evaluating whether any unreasonable delay in filing this case resulted in Microsoft and/or Dell changing its economic position in a significant way during the period of delay, and also whether Microsoft or Dell's losses as a result of that change in economic position could have been avoided if Lucent had filed this lawsuit sooner.

(Page 2 of 3)

If you find that Lucent delayed filing this lawsuit for more than six years, then you must presume that all the elements of laches have been proved in this case unless you also find that the evidence introduced in this case proves that the delay in filing suit was reasonable or justified, or that Microsoft and Dell suffered no prejudice as a result of Lucent's delay. In all scenarios though, the ultimate determination of whether laches should apply in this case is a question of fairness given all the facts and circumstances. Thus, while you may not find that laches applies if there is no evidence establishing each of the three elements noted above (unreasonable delay, lack of excuse or justification, and significant prejudice), you may find that even though all of the elements of laches have been proved, it should not, in fairness, apply given all the facts and circumstances in this case.

Although the question of whether Lucent's right to damages is barred by laches is one that I will decide, I will ask for your findings so that I can consider them in making that decision. You should make determinations on this issue as you would for any other issue in this case because I will consider them seriously in making my determination.

(Page 3 of 3)

INSTRUCTION NO. _40_

If you find that any valid claim of the patents-in-suit is infringed, you must determine the amount of damages to be awarded for the infringement based on a reasonable royalty.

The party seeking damages has the burden of proving damages by a preponderance of the evidence and is entitled to all damages that can be proven with reasonable certainty. Reasonable certainty does not require proof of damages with mathematical precision. You may base your evaluation of reasonable certainty on opinion evidence. The amount of damages, if any, must be adequate to compensate Lucent and Multimedia Patent Trust for the infringement. You may not add anything to the amount of damages to punish the accused infringer or to set an example.

The fact that I am instructing you as to the proper measure of damages should not be construed as suggesting any view of the Court as to which party is entitled to prevail in this case. Instructions as to the measure of damages are given for your guidance in the event you find the evidence supports an award of damages.

INSTRUCTION NO. 41

The dates that Lucent and Multimedia Patent Trust first gave notice to Microsoft and Dell of their claims of patent infringement are the dates at which patent damages begin to be calculated. Those dates are in dispute here, and it is up to you to determine what those dates are. Lucent and Multimedia Patent Trust have the burden to prove by a preponderance of the evidence the dates they gave notice.

Lucent and Multimedia Patent Trust can give notice of an asserted patent by communicating a specific charge that an accused product infringes the asserted patent. This notice is effective from the time it is given. If you find that Lucent and Multimedia Patent Trust, before filing this lawsuit, did not notify Microsoft by communicating a specific charge that an accused product infringed an asserted patent, then Lucent and Multimedia Patent Trust can only recover damages for infringement of that patent that occurred after they sued Microsoft. Similarly, if you find that Lucent and Multimedia Patent Trust, before filing this lawsuit, did not notify

(Page 1 of 2)

Dell by communicating a specific charge that an accused product infringed an asserted

patent, then Lucent and Multimedia Patent Trust can only recover damages for

infringement of that patent that occurred after they sued Dell. Your conclusions about

whether or when notice was given may be different for Microsoft and Dell.

(Page 2 of 2)

INSTRUCTION NO. ____42____

Anyone who induces or contributes to infringement is liable the same as a direct infringer. The damages assessed for the indirect infringement will be the same as damages that would be assessed for that direct infringement.

INSTRUCTION NO. __43__

A reasonable royalty is the minimum permissible measure of damages set by patent law and is not necessarily the actual measure of damages, but it is the floor below which damages may not fall. A royalty is an amount of money that someone pays a patent owner to be able to use the patented invention.

A reasonable royalty is the amount of money that would be agreed to in a hypothetical arm's-length negotiation between the plaintiffs and the defendants, with the parties operating under the assumptions that the negotiated patent is valid and would be infringed by the accused products.

The reasonable royalty must be calculated as of the point in time just prior to when infringement would begin. In the hypothetical arm's-length negotiation, you must assume that both parties are willing participants. You must assume that the person negotiating on behalf of a defendant was willing to take a license and would have known that the asserted claims were valid, enforceable and infringed by the defendants. You must also assume that plaintiffs would have been willing to grant a license. Finally, you must assume that the parties knew all pertinent information at the time of the hypothetical negotiations.

INSTRUCTION NO. __44__

In deciding what is a reasonable royalty, you may consider the factors that plaintiffs and defendants would have considered in setting the amount defendants should pay, assuming the patents are both valid and infringed. You should consider all the facts known and available to the parties at the time the infringement began.

I will list for you a number of factors you may consider. This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty.

1.     Whether plaintiffs had established a royalty for any of the inventions of the patents-in-suit, for example, by granting other licenses at that royalty. You should remember, however, that an established royalty may have been set before the patent was determined to be valid and infringed in court and, therefore, may not be as much as it would be if both the patent owner and the party wanting to use the patent know it is valid.

2.     Royalties paid by the defendants or by others for patents comparable to the patents-in-suit, if any.

(Page 1 of 3)

3.     The nature and scope of the license as exclusive or nonexclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.     Whether Lucent and/or Multimedia Patent Trust had a policy of licensing or not licensing the patent or granting licenses under special conditions.

5.     Whether plaintiffs and defendants are competitors or in an inventor/promoter commercial relationship.

6.     Whether being able to use the patented invention helps in making sales of other products or services.

7.     The duration of the patents and the term of the license.

8.     The profitability of the product made using the patent, and whether or not it is commercially successful or popular.

9.     The advantages of using the patented invention over old modes or devices, if any, that had been used for working out similar results.

(Page 2 of 3)

10.    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by plaintiffs; and the benefits to those who have used the invention.

11.    The extent to which the defendant has made use of the invention; and any evidence probative of the value of that use.

12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the products or invention or analogous inventions.

13.    The portion of the profit that is due to the patented invention, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented processes, or features or improvements developed by defendants.

14.    Expert opinions as to what would be a reasonable royalty.

(Page 3 of 3)

INSTRUCTION NO. ___45___

The relevant date for the hypothetical reasonable royalty negotiation is just before the infringement began.  In this case, there may be a different hypothetical date for each of the patents.  You may consider in your determination of reasonable royalty damages any actual profits by Microsoft and Dell after that time and any commercial success of the patented invention in the form of sales of the patented or infringing products after that time.  You may only consider this information, however, if it was foreseeable at the time that the infringement began.

**INSTRUCTION NO. ___46___**

Where a party seeks to recover infringement damages based on the value of an entire product containing multiple features, but the infringed patent only covers part of the product's features, the party seeking damages must show two things:

(1) the patented feature is the basis for consumer demand, and

(2) the patented and unpatented components are part of a single functioning unit.

If the party fails to show both elements, they may still be able to recover damages, but those damages should not be based on the value of the entire product.

INSTRUCTION NO. __47__

Microsoft and Dell have a counterclaim for tortious interference with prospective economic advantage. The Court has already made several legal rulings related to this issue that you should take as established:

1.    Lucent's assignment of the Haskell '226 patent to Multimedia Patent Trust was not a violation of the Lucent/Alcatel Merger Agreement;

2.    The assignment of the Haskell '226 patent from Lucent to Multimedia Patent Trust was effective;

3.    Multimedia Patent Trust took the Haskell '226 patent unfettered by any obligations to Alcatel;

4.    Multimedia Patent Trust has full control of the licensing rights to the Haskell '226 patent;

5.    Alcatel has no rights to license or sublicense the Haskell '226 patent;

6.    Since Alcatel lacks these rights, it cannot provide them (and thus is not required to provide them) to MPEG LA;

7.    Multimedia Patent Trust is not an "affiliate" of Lucent (or Alcatel-Lucent) as defined in the MPEG LA Agreement Among Licensors;

8.    Multimedia Patent Trust is not the alter-ego of Lucent;

9.    Neither Lucent nor Multimedia Patent Trust has or had any obligations to MPEG LA.

INSTRUCTION NO. ___48___

The right of a person to pursue a lawful business and to enjoy the fruits and advantages of one's industry or efforts are rights which the law protects against unjustified and wrongful interference by another person. Thus, the law protects a person's interest in reasonable expectations of economic advantage.

In order for a party to prevail on its claim for tortious interference with prospective economic advantage, the party must prove:

(1) that it had a reasonable expectation of economic advantage that was lost as a direct result of malicious interference, and

(2) that it suffered losses caused by the malicious interference.

Malicious conduct must be both injurious and transgressive of generally accepted standards of common morality or of law.

Conduct that Lucent had a legal right to do is not to be considered tortious when done unless the conduct was malicious interference.

INSTRUCTION NO. ___49___

If you find that Lucent committed tortious interference with prospective economic advantage against Microsoft and/or Dell, you must determine the amount of damages to be awarded to Microsoft and/or Dell.  The fact that I am instructing you as to the proper measure of damages should not be construed as suggesting any view of the Court as to which party is entitled to prevail in this case.

Microsoft and Dell have the burden of proving by a preponderance of the evidence any damages caused by the tortious interference with prospective economic advantage.  Damages may not be based on conjecture or speculation, and may not punish a party for any tortious interference.

INSTRUCTION NO. _____ *50*

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

INSTRUCTION NO. _____5 1_____


Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by the notes.

INSTRUCTION NO. ___*52*___

If it becomes necessary during your deliberations to communicate with me,

you may send a note through the bailiff, signed by your presiding juror or by one or

more members of the jury.  No member of the jury should ever attempt to

communicate with me except by a signed writing; and I will communicate with any

member of the jury on anything concerning the case only in writing, or here in open

court.  If you send out a question, I will consult with the parties before answering

it, which may take some time.  You may continue your deliberations while waiting

for the answer to any question.  Remember that you are not to tell anyone –

including me – how the jury stands, numerically or otherwise, until after you have

reached a unanimous verdict or have been discharged.  Do not disclose any vote

count in any note to the court.

INSTRUCTION NO. ___*53*___

I have prepared a special verdict form for you to use in this case. The special verdict form is made up of questions. These questions are to be answered "yes" or "no" unless other instructions are given. Your answers on each question must be unanimous.

**PX 11a – Claim Construction for Haskell '226 Patent (U.S. Pat. No. 4,958,226)**

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
| **CLAIM 12** | |
| A circuit responsive to coded video signals where the video signals comprise successive frames and each frame includes a plurality of blocks and where the coded video signals comprise codes that describe derivations from approximated blocks and codes that describe deviations from interpolated blocks, comprising: | A **circuit [any path that can carry electrical current]** responsive to coded video signals where the video signals comprise **successive frames [one frame following another; consecutive frames]** and each frame includes a plurality of **blocks [sets of pixels (picture elements also called pels) that constitute a portion of a frame]** and where the **coded [change from one form of representation to another]** video signals comprise codes that describe deviations from **approximated blocks [predicted blocks]** and codes that describe **deviations [differences]** from interpolated blocks, comprising: |
| means for developing block approximations from said codes that describe deviations from approximated blocks; and | means for developing **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** from said codes that describe deviations from approximated blocks; and<br><br>Function:<br>The function is developing **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** from said codes that describe deviations from approximated blocks.<br><br>Corresponding structure:<br>Decoder 22, DCT[-1] 24, Adder 27, and Shift Circuit 26, including all inputs and outputs of these elements related to the claimed function (See Fig. 2; Col. 4, lines 3-10, 26-32, Col. 4, line 63 to Col. 5, line 7). |

---

[1] All terms appearing in bold face type have been construed by the Court and appear with their definitions in the chart and Glossary of Terms.

1

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
| means responsive to said block approximations and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks. | Means responsive to said **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** and to said codes that describe deviations from interpolated blocks to develop said interpolated blocks.<br><br>Function:<br>The function is to develop said interpolated blocks responsive to said **block approximations [the combinations of predicted blocks with differences between the actual blocks and the predicted blocks]** and to said codes that describe deviations from interpolated blocks.<br><br>Corresponding structure:<br>Decoder 25, DCT[-1] 34, Adder 35, and Shift Circuits 31 and 39, and Averager 32, including all inputs and outputs of these elements related to the claimed function (*See* Fig. 2; Col. 4, lines 63-65; Col. 5, lines 7-23 [description of the structure and inputs that correspond to these elements is at Col. 4, lines 38-50]). |

## GLOSSARY OF TERMS

**Approximated blocks** – predicted blocks

**Block approximations** – the combinations of predicted blocks with differences between the actual blocks and the predicted blocks.

**Blocks** – sets of pixels (picture elements also called pels) that constitute a portion of a frame.

**Circuit** – any path that can carry electrical current

**Coded** – change from one form of representation to another

**Deviations** – differences

**Pixels** – picture elements also called pels

**Successive frames** – one frame following another; consecutive frames

3

PX 12a – Claim Construction for the Fleming '759 Patent (U.S. Pat. No. 4,439,759)

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
| **CLAIM 1** | |
| In a digital image display system: | In a digital image **display system** [*hardware and software, needed to achieve a visible representation of information in a data-processing system*]: |
| a memory for storing color data values; | a **memory** [*a color map that stores a table of color data values indexed by numbers*] for storing **color data values** [*color components of a particular color (such as the red, green and blue (RGB) color components)*]; |
| processing means responsive to a predetermined command and data sequence comprising at least one command, the processing means decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values, the modes comprising | processing means responsive to a **predetermined command and data sequence** [*a command and data pattern having a known encoded meaning*] **comprising** [*including, but not limited to*] at least one command, the processing means **decoding** [*interpreting*] the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of **modes of access to** [*manners of retrieving*] color data values, the modes comprising<br><br>"Processing Means"<br>Function:<br>The function of this element is decoding the predetermined command and data sequence, the predetermined command and data sequence selecting one of a plurality of modes of access to color data values<br><br>Structure:<br>Data processor 1 programmed to perform the algorithm of boxes 301, 302, and 303 of Figure 3 and boxes 401, 402, 403, 404, 405, 407, 408, and 411 of Figure 4 (See, Col.5, line 60 – Col.6, line 19, Col.6, lines 20-23 (except for "and for setting foreground and background in-use colors for two of these modes"), lines 24- |

[1] All terms appearing in bold face type and underlined have been construed by the Court and appear with their definitions in the chart and Glossary of Terms. The definition for each construed term appears in italics after its first use in the patent.

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
|  | 29, 29-32 (except for "and the background and foreground color"), lines 33-43). |
| a first mode of access wherein an in-use foreground color is directly specified as a color data value; | a first <u>mode of access</u> [*manner of retrieving*] wherein an <u>in-use foreground color</u> [*a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed*] is directly <u>specified as</u> [*called for by*] a <u>color data value;</u> |
| a second mode of access wherein the in-use foreground color is specified as an index into the color memory; and | a second <u>mode of access</u> wherein the <u>in-use foreground color</u> is <u>specified as</u> an index into the <u>color memory</u> [*a color map that stores a table of color data values indexed by numbers*]; and |
| a third mode of access wherein the in-use foreground color and an in-use background color are specified as indexes into the color memory; and | a third <u>mode of access</u> wherein the <u>in-use foreground color</u> and an <u>in-use background color</u> [*a color that will be used as the background color for subsequently received text and graphics drawing commands until changed*] are <u>specified as</u> indexes into the <u>color memory</u>; and |
| display means responsive to the processing means, the display means displaying the colors associated with the color data values accessed by the selected mode. | display means responsive to the processing means, the display means displaying the colors associated with the <u>color data values</u> accessed by the selected mode.<br><br>"Display means"<br><u>Function</u>:<br>The function of this element is displaying the colors associated with the color data values accessed by the selected mode<br><br><u>Structures</u>:<br>(1) monitor;<br>(2) television set;<br>(3) video projection system;<br>(4) a liquid crystal display; or<br>(5) an LED display (*See e.g.*, Col. 4, lines 50-55). |

## GLOSSARY OF TERMS

**Color data value** – color component of a particular color (such as the red, green and blue (RGB) color components)

**Color memory** – a color map that stores a table of color data values indexed by numbers

**Comprising** – including, but not limited to

**Decoding** – interpreting

**Display system** – hardware and software needed to achieve a visible representation of information in a data-processing system

**In-use background color** – a color that will be used as the background color for subsequently received text and graphics drawing commands until changed

**In-use foreground color** – a color that will be used as the foreground color for subsequently received text and graphics drawing commands until changed

**Memory** – a color map that stores a table of color data values indexed by numbers

**Mode of access** – manner of retrieving

**Predetermined command and data sequence** – a command and data pattern having a known encoded meaning

**Setting** – storing

**Specified as** – called for by

3

**PX 7a – Claim Construction for the Day '356 Patent (U.S. Pat. No. 4,763,356)**

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
| **CLAIM 19** | |
| A method for use in a computer having a display comprising the steps of | A method for use in a computer having a display comprising the steps of |
| displaying on said display a plurality of information fields, | displaying on said display a plurality of information fields, |
| identifying for each field a kind of information to be inserted therein, | identifying for each field a kind of information to be inserted therein, |
| indicating a particular one of said information fields into which information is to be inserted and for concurrently displaying a predefined tool associated with said one of said fields, said predetermined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a tool adapted to allow said user to compose said information, and | indicating a particular one of said information fields into which information is to be inserted and for **concurrently displaying a predefined tool associated with said one of said fields,** said predefined tool being operable to supply information of the kind identified for said one field, said tool being selected from a group of predefined tools including a tool adapted to supply an individual entry from a menu of alternatives and at least a **tool adapted to allow said user to compose said information,** and<br><br>**Predefined tools associated with said one of said fields** – refers to a tool specified by the system as an appropriate tool for filling in the information called for by that field.<br><br>**Concurrently displaying** – displaying at the same time, as by a window overlaying the form.<br><br>**A tool adapted to allow said user to compose said information** – means a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool. |
| inserting in said one field information that is derived as a result of said user operating said displayed tool. | inserting in said one field information that is derived as a result of said user operating said displayed tool. |

---

[1] All terms appearing in bold face type have been construed by the Court and appear with their definitions in the chart and Glossary of Terms.

| CLAIM ELEMENT | COURT'S CONSTRUCTION |
|---|---|
| **CLAIM 21** | |
| The method set for claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a bit-mapped-graphics field. | The method set for claim 19 wherein the step of displaying said pattern includes the step of displaying one or more of said information fields as a **bit-mapped-graphics field.**<br><br>**Bit-mapped-graphics field –** refers to a field into which a user is to enter information by writing on a touch sensitive screen using a stylus. |

## GLOSSARY OF TERMS

**Predefined tools associated with said one of said fields** – refers to a tool specified by the system as an appropriate tool for filling in the information called for by that field.

**Concurrently displaying** – displaying at the same time, as by a window overlaying the form.

**Bit-mapped-graphics field** – refers to a field into which a user is to enter information by writing on a touch sensitive screen using a stylus.

**A tool adapted to allow said user to compose said information** – means a graphical keyboard tool or a graphical number keypad tool, which allows the user to compose information by pointing to the display keys of that tool.

3

**PX 6a – Claim Construction for the Agulnick '295 Patent (U.S. Pat. No. 5,347,295)**

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
| **CLAIM 1** | |
| An apparatus for controlling a computer system comprising a screen for displaying information and a **stylus** having a tip for inputting information into the computer, including: | As is.<br><br>**Stylus** – a pen-like object whose position and contact with a surface can be continuously detected electronically. |
| first detecting means coupled to said computer for detecting a **stroke** of the **stylus** tip in contact with the screen | Function: detecting a stroke of the stylus tip in contact with the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in specification at Col. 6:21-22; and Col. 6:53-68.<br><br>**Stroke** – a single drawing movement, including a tap. |
| second detecting means coupled to said computer for detecting a departure of the **stylus** tip from the screen; | Function: detecting a departure of the stylus tip from the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68. |
| means coupled to said computer for defining termination of a **gesture** comprising at least one **stroke** in response to said departure of the **stylus** tip; | Function: defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen.<br><br>Corresponding Structure:<br>(1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:53-68; and<br><br>(2) Pen position digitizer co-processor 90, with software that determines that a gesture is complete, as shown in fig. 3 and described in the specification at Col. 6:36-37, Col.1:65-Col.2:5, and Col. 17:1-14.<br><br>**Gesture** – a symbol or mark. |

---

[1] All terms appearing in bold face type have been construed by the Court and appear with their definitions in the chart and Glossary of Terms.

1

| CLAIM ELEMENT | COURT'S CONSTRUCTION[1] |
|---|---|
| means coupled to said computer for recognizing a plurality of said **gestures**, said recognizing means including means for comparing each said **gesture** to at least one predefined shape; | Function: recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6:36-37;<br><br>Programmed with one of the following handwriting recognition algorithms:<br><br>(2) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(3) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method for Pattern Recognition" (see Col. 5:1-6); or<br><br>(4) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10 |

| **CLAIM ELEMENT** | **COURT'S CONSTRUCTION**[1] |
|---|---|
| means coupled to said computer for implementing each said recognized **gesture**, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said **gesture** was used, including a first context in which said action is executed upon an **operating system level object** and a second context in which said action is executed upon an **application level object**. | Function: implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape<br><br>Corresponding Structure:<br>CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56.<br><br>This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level.<br><br>**Operating System Level Object** – an object that can be manipulated by a user, which is displayed outside the context of an application program<br><br>**Application Level Object** – an object that can be manipulated by a user, which is displayed within the context of an application program. |

## GLOSSARY OF TERMS

**Stylus** – a pen-like object whose position and contact with a surface can be continuously detected electronically.

**Stroke** – a single drawing movement, including a tap.

**Gesture** – a symbol or mark.

**Operating System Level Object** – an object that can be manipulated by a user, which is displayed outside the context of an application program

**Application Level Object** – an object that can be manipulated by a user, which is displayed within the context of an application program.

4

**TRIAL WITNESSES**

Lucent v. Microsoft, et al.
USDC Case No. 07-CV-2000 H (CAB)

| NAME | DATE TESTIFIED |
| --- | --- |
| Nikil Jayant | 2/20/08-2/21/08 |
| Gerard deBlasi | 2/21/08 |
| Bernd Girod | 2/21/08-2/22/08 2/26/08 3/26/08 |
| Stan Pennington | 2/26/08 |
| Sridhar Srinivasan | 2/26/08 |
| Barry Steinglass | 2/26/08 3/13/08 |
| Sudheer Sirivara | 2/26/08 |
| Jake Richter | 2/26/08 3/26/08 |
| Brian Decker | 2/26/08 |
| Kenneth Sykes | 2/26/08-2/27/08 |
| Bruce Tognazzini | 2/27/08-2/28/08 3/26/08 |
| Jean-Renard Ward | 2/28/08-2/29/08 3/26/08 |
| Christopher Godziela | 2/29/08 |
| James Tierney | 2/29/08 3/11/08 |
| Henry Garrana | 3/11/08 3/19/08 |
| John Weresh | 3/11/08 |
| Roger Smith | 3/11/08-3/13/08 |
| Jordi Ribas | 3/13/08 |
| Tim Onders | 3/13/08 |
| Todd Bowra | 3/13/08 |
| Wayne Hoeberlein | 3/13/08-3/14/08 3/26/08 |
| Robert Wedig | 3/14/08 |
| Jean Pec | 3/14/08 |
| William Kennedy | 3/18/08 |
| Dale Buscaino | 3/18/08 |
| Robert Long | 3/19/08 |
| Michael Tyler | 3/19/08 |
| Douglas O'Brien | 3/19/08 |
| William Frezza | 3/19/08 |
| Gerald Soloway | 3/19/08 |
| James Fleming | 3/19/08 |
| John Kelly | 3/19/08-3/20/08 |
| Todd Agulnick | 3/20/08 |
| Gerald Mossinghoff | 3/20/08 |
| Barbara Landmann | 3/20/08-3/21/08 |
| Jordi Ribas | 3/21/08 |

| NAME | DATE TESTIFIED |
|------|----------------|
| Staffan Ericsson | 3/21/08 |
| Edward Delp | 3/25/08 |
| Barry Haskell | 3/25/08 |
| Didier LeGall | 3/25/08 |
| Brian Napper | 3/25/08 |
| David Kaplan | 3/25/08 |
| Derrick Chisman | 3/26/08 |
| Deighton Maragh | 3/26/08-3/27/08 |

2

1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   LUCENT TECHNOLOGIES, INC. and              CASE NO. 07-CV-2000-H (CAB)
     MULTIMEDIA PATENT TRUST                    consisting of matters severed from
12                                              the consolidated cases:
              Plaintiffs and Counter-          CASE NO. 02-CV-2060-B (CAB)
13            Defendants,                       CASE NO. 03-CV-0699-B (CAB)
                                                CASE NO. 03-CV-1108-B (CAB)
14            vs.
                                                ORDER ON MOTIONS IN
15   GATEWAY, INC., *et al.*                    LIMINE

16            Defendants and Counterclaimants.  [Doc. Nos. 228, 229, 230, 231,
                                                232, 236, 239, 240, 241, 248, 249,
17   and                                        251, 252, 254, 255, 256, 258, 296,
                                                430.]
18   MICROSOFT CORPORATION,

19            Intervenor and Counterclaimant

20   ─────────────────────────────────────

21   AND RELATED CLAIMS

22
            The Court enters this order, with attachments, as a ruling on the motions in limine
23
     considered at the Court's hearing of February 8, 2008 at 9:00 AM.  These include the
24
     motions in limine filed on January 14, 2008 and the motion in limine filed by Microsoft
25
     on February 4, 2008 with leave of the Court.  (Doc. Nos. 228-32, 236, 239-41, 248-49,
26
     251-52, 254-56, 258, 296, 430.)  Robert A. Appleby, Paul A. Bondor, Gregory F.
27
     Corbett, James E. Marina, and Michael P. Stadnick appeared for Plaintiffs Lucent
28
     Technologies, Inc. and Multimedia Patent Trust.  John E. Gartman and Juanita R.

                                        - 1 -                              07cv2000

1   Brooks appeared for Microsoft Corporation.   Stephen Robert Daniels, Andrew
2   Thomases, Jeffrey B. Plies, and Jonathan D. Baker appeared for Gateway, Inc. and
3   related entities.  James S. Blackburn and Joel M. Freed appeared for Dell Inc.

4          Where the Court's ruling is to grant, the Court adopts, at least in part, the
5   rationale of a moving party.  Where the Court's ruling is to deny, the Court adopts, at
6   least in part, the rationale of an opposing party.  Where Court indicates "object at trial,"
7   the parties should raise a contemporaneous objection at trial.  Where the Court grants
8   a motion, the parties may not refer to the excluded evidence in the presence of the jury,
9   without first obtaining permission of the court.  The Court retains its authority to
10  modify any evidentiary ruling based on the evidence presented at trial, and the parties
11  may raise contemporaneous objections related to any of the motions.

12          IT IS SO ORDERED.

13

14  DATED:  February 8, 2008

15                                          _Marilyn L. Huff_
16                                          MARILYN L. HUFF, District Judge
                                            UNITED STATES DISTRICT COURT
17

18  COPIES TO:
    All parties of record.

19

20

21

22

23

24

25

26

27

28

- 2 -                                              07cv2000

LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST
MOTIONS IN LIMINE

| PARTY | MOTION | GRANT | DENY | OBJECT AT TRIAL |
|---|---|---|---|---|
| **Lucent Technologies & Multimedia Patent Trust** | 1.  Preclude Testimony from Defendant's "Prior Art" Witnesses | | X | √ |
| | 2. Preclude testimony of Untimely Disclosed Witnesses | | X | |
| | 3. Preclude Testimony Regarding Defendants' Unsupported Allegations of Non-Infringing Alternatives | | X | |
| | 4. Preclude Defendants from Presenting Evidence & Argument Inconsistent with the Court's Claim Construction Order | | | √ |
| | 5. Preclude Defendants from Presenting Evidence & Argument Regarding the Ex-Parte Reexamination of the Netravaili '272 Patent, the Haskell 226 Patent, the Day '356 Patent and the Fleming '759 Patent | | X | √ |
| | 6.  Preclude Argument that CCITT Documents are Printed Publications | | X | √ |
| | 7.  Preclude Defendants from Referencing the Fact that Lucent Originally Asserted Additional Video Coding Patents & Patent Claims | X | | Except for impeachment Must receive permission from the court in advance |
| | 8. Preclude Defendants from Referencing Prior Art Author's Nobel Prize | | X | |
| | 9.  Preclude Defendants from Presenting Tortious Interference Theories Not Timely Disclosed | | X | √ |
| | 10. Preclude Defendants from Presenting Evidence or Argument Under 35 U.S.C. 102(g) and 35 U.S.C. 102(b) Regarding Invalidity of U.S. Patent No. 4,763,356 (Day) | | X | √ |
| | 11.  Preclude Evidence or Argument Regarding the FXFE System on Tyler Article | | X | √ |

LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST
MOTIONS IN LIMINE

| PARTY | MOTION | GRANT | DENY | OBJECT AT TRIAL |
|---|---|---|---|---|
| Lucent | 12. Preclude Defendants from | | X | √ |
| Technologies | Presenting Evidence or Argument | | | |
| & Multimedia | Regarding the Paper-Like Interface | | | |
| Patent Trust | ("PLI") Video Reference | | | |
| | | | | |
| | 13. Preclude Defendants from | | X | √ |
| | Referring to Multiple Documents as | | | |
| | a Single Prior Art Reference | | | |
| | | | | |
| | 14.  Preclude Testimony of Lucent's | X | | 403 |
| | Assertion & the Court's Dismissal of | | | |
| | Certain Claims Against the Defendants | | | |
| | Alleging Infringement of U.S. Patent | | | |
| | Nos. 4,317,956, 4,763,356, | | | |
| | 5,347,295, and 5,649,131 | | | |
| | | | | |
| | 15. Preclude Defendants from | | X | √ |
| | Presenting Evidence or Argument | | | |
| | in Support of their Contention that | | | |
| | GDI Technology is After-Developed | | | |
| | Technology with Respect to | | | |
| | the Fleming Patent | | | |
| | | | | |
| | 16. Preclude Defendants from | | X | √ |
| | Presenting Evidence or Argument | | | |
| | Alleging that the final NASA Report | | | |
| | is Prior Art to the Fleming Patent | | | |
| | | | | |
| | 17. Preclude Defendants' Untimely | | X | √ |
| | Invalidity & Unenforceability Defenses | | | |
| | Based on Douglas O'Brien's Alleged | | | |
| | Co-Inventorship of the Fleming Patent | | | |
| | | | | |
| | 18. Preclude Gateway from | | X | √ |
| | Presenting Evidence or Argument | | | |
| | Regarding Its Untimely Defense | | | |
| | of Laches Regarding the | | | |
| | Fleming Patent | | | |
| | | | | |
| | 19.  Preclude Defendants' Untimely | | X | √ |
| | Unenforceability Defense as to the | | | |
| | Fleming Patent Based on | | | |
| | Recommendation S.100 | | | |
| | | | | |
| | 20. Preclude Defendants from Offering | X | | 403 |
| | Evidence or Argument Concerning | | | |
| | the Court's Dismissal of Claims | | | |
| | Alleging Infringement of U.S. Patent | | | |
| | No. 4,582,956 and Lucent's Original | | | |
| | Assertion of Claim 4 of | | | |
| | U.S. Patent No. 4,439,759 | | | |



LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST
MOTIONS IN LIMINE

| PARTY | MOTION | GRANT | DENY | OBJECT AT TRIAL |
|---|---|---|---|---|
| Lucent Technologies & Multimedia Patent Trust | 21. Preclude Defendants from Eliciting Expert Testimony Concerning Purported Surveys | X | | |
| | 22. Preclude Expert Testimony of David Kaplan that Dell & Gateway are not Liable for Damages | | X | √ |
| | 23. Exclude Evidence or Argument Regarding Extraneous Legal Matters | X | | Except for Impeachment W/O Mentioning case may refer to prior proceeding |
| | 24. Preclude Expert Testimony Regarding Allegations of Non-Infronging Alternatives | | X | |
| | 25. Preclude Defendants from Presenting Evidence & Argument Regarding Past & Future Trials | X In Part | X In Part | Argument - Grant Evidence - Deny Results - Grant |
| | 26. Preclude Defendants from Presenting Evidence & Argument Regarding Settlement Negotiations | X Settlement | X Reasonable Royalty | √ |
| | 27. Exclude Evidence or Argument Regarding Lucent's Market Capitalization Licensing Revenues, and "Valuation" | X | | √ Except for damages analysis |
| | 28. Exclude Evidence or Argument Regarding the Prior Audio Coding (Group 2) Disposition | X | | Except Evidence for Impeachment |

3



LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST
MOTIONS IN LIMINE

| PARTY | MOTION | GRANT | DENY | OBJECT AT TRIAL |
|---|---|---|---|---|
| **Microsoft Corporation** | 1. Preclude Lucent & Multimedia Patent Trust from Seeking Damages Due to Microsoft's Foreign Sales | X | | √ Except for downloads |
| | 2.  Preclude Lucent and Multimedia Patent Trust from Introducing a Hearsay Time Magazine Artilce Regarding the Xbox 360 | X | | |
| | 3. Preclude Lucent and Multimedia Patent Trust from Presenting Expert Testimony Regarding Damages | | X | √ |
| | 4. Preclude Lucent from Introducing or Discussing Irrelevant "Notice" Evidence | | X | √ |
| | 5.  Preclude Lucent and Multimedia Trust from Introducing Content from Professor Girod's Belated and Conclusory Expert Report | | X | √ |
| | 6.  Preclude Lucent and MPT from Discussing Third-Party Software of Intervideo and Cyberlink | | X | √ |
| | 7.  Preclude Lucent and Multimedia Patent from Introducing a Hearsay Article by Sakae Okubo | | X | √ |
| | 8.  Preclude Lucent and Multimedia Patent Trust from Discussing Secondary Considerations of Non-Obviousness Regarding the '295 and '356 Patents | | X | √ |
| | 9.  Preclude MPT/Lucent's Eleventh-Hour Damages Theory that Previously Unaccused and Free Microsoft Software Updates Justify One Billion Dollars in Additional Damages | | X | √ |

4

 

LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST
MOTIONS IN LIMINE

| PARTY | MOTION | GRANT | DENY | OBJECT AT TRIAL |
|-------|--------|-------|------|-----------------|
| Gateway, Inc. | 1. Preclude the Opinions of Roger S. Smith Related to Reasonable Royalty | | X | √ |
| | 2. Exclude the Licenses Gateway and Dell Entered Into with IBM as Alleged Reasonable Royalty Evidence | | X | √ |
| | 3. Preclude Evidence or Argument Regarding Kenneth Rubenstein's Opinions About the Video Coding Patents | | X | √ |
| | 4. Preclude Lucent's Expert on the Fleming 759 Patent from Providing Analysis of GDI Source Code in an Effort to Support His Infringement Opinions | | X | √ |
| | 5. Preclude Lucent's Expert on the Fleming 759 Patent from Providing Any Testimony or Opinion Raised in His Untimely Declaration | | X | √ |
| | 6. Preclude Lucent's Expert on the Fleming 759 Patent from Providing any Testimony or Opinion Regarding Conception, Diligence or Reduction to Practice | | X | √ (Moot) |
| | 7. Preclude Lucent's Expert on the Fleming 759 Patent from Providing any Testimony Regarding Secondary Consideratioins | | X | √ |
| | 8. Preclude Evidence or Argument of Indirect Infringement of Day Patent by Quicken New User Edition | | X | √ |
| | 9. Preclude Lucent's Expert from Testifying Regarding Gateway Web Pages that Have Never Been Adequately Identified or Produced | | X | √ |
| | 10. Preclude Lucent from Offering Evidence or Argument of Conception or Reduction to Practice Prior to the Filing Date of the Day '356 Patent | X | (Moot) | √ (Lucent does not oppose) |
| | 11. Preclude Lucent and its Expert from Offering Legally Irrelevant Evidence and Argument Regarding Alleged Prior Art to the Day '356 Patent | | X | √ |
| | 12. Preclude Testimony or Argument Contrary to the Court's Claim Construction of the Day '356 Patent | | X | √ |



LUCENT TECHNOLOGIES, INC., MULTIMEDIA PATENT TRUST
MOTIONS IN LIMINE

| PARTY | MOTIONS | GRANT | DENY | OBJECT AT TRIAL |
|---|---|---|---|---|
| | | | | |
| Dell Inc. | 1. Exclude Damages Testimony on | | X | √ |
| | Quicken, Money and Stand-Alone | | | |
| | Outlook from the Untimely Second | | | |
| | Supplemental Expert Report of | | | |
| | Wayne A. Hoeberlein and Validity | | | |
| | Testimony from the Untimely | | | |
| | Declaration of Bernd Girod | | | |
| | | | | |
| | 2. The Testimony of Roger Smith | | X | √ |
| | Regarding Royalty Rates and Royalty | | | |
| | Base Should be Excluded | | | |
| | | | | |
| | 3. Lucent Should be Precluded from | | X | |
| | Arguing that an "In-Use" Background | | | |
| | Color Must be a Background Color Used | | | |
| | by text and Graphics Commands, with | | | |
| | Respect to U.S. Patent No. 4,439,759 | | | |
| | | | | |
| | 4: Lucent Should be Precluded from | | X | |
| | Relying on Dell's Knowledge or Belief to | | | |
| | Prove Actual Pre-Suit Notice with Respect | | | |
| | to Patent Nos. 4,439,759, 4,958,226, and | | | |
| | 4,383,272 | | | |
| | | | | |
| | 5. Fed. R. Evid. 408 Does Not Preclude | X | X | On Reasonable |
| | Dell's Reliance on Lucent Licensing | | | Royalty Issues |
| | Documents | | | |

04 FEB 25  PH 3: 20

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> GATEWAY, INC AND GATEWAY COUNTRY STORES LLC; and, MICROSOFT CORPORATION; and, DELL, INC., <br><br> Defendants. | Civil No: 02CV2060-B(LAB); <br> 03CV0699-B(LAB); <br> 03CV1108-B(LAB) <br><br> **ORDER CONSTRUING CLAIMS FOR UNITED STATES PATENT NUMBER 5,347,295** |

Before the Court is the matter of claims construction for U.S. Patent Number 5,347,295 ("the Agulnick '295 Patent") in the above titled cases for patent infringement.[1] Pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), the Court

---

[1] Lucent originally filed two separate patent infringement actions, one against Defendant Gateway (02CV2060), and a second against Defendant Dell (03CV1108). Microsoft intervened in the action filed by Lucent against Gateway. Microsoft also filed a declaratory judgment action against Lucent (03CV0699) and Lucent filed counterclaims for patent infringement against Microsoft in that action. On July 7, 2003, the Court entered an order consolidating these three cases. There are a total of 15 different patents involved in these three cases collectively.

1                    02CV2060; 03CV0699; 03CV1108

172

1  conducted a Markman hearing regarding construction of the disputed claim terms for the

2  Agulnick '295 Patent on September 24-25, 2003 and February 3-9, 2004.  Plaintiff Lucent

3  Technologies, Inc. ("Lucent") was represented by the Kirkland & Ellis law firm, Defendant

4  Gateway Inc. ("Gateway") was represented by the Dewey Ballantine law firm, Defendant

5  Microsoft Corporation ("Microsoft") was represented by the law firm of Fish and

6  Richardson and Defendant Dell, Inc. ("Dell") was represented by the Arnold and Porter law

7  firm.

8        The purpose of the Markman hearing was for the Court, with the assistance of the

9  parties, to prepare jury instructions interpreting the pertinent claims for all claim terms at

10  issue in the Agulnick '295 Patent.  Additionally, the Court and the parties prepared a "case

11  glossary" for terms found in the claims and the specification for the Agulnick '295 Patent,

12  considered to be technical in nature and which a jury of laypersons would not understand

13  clearly without specific definition.  As the case advances, the parties may request additional

14  terms to be added to the glossary as to further facilitate the jury's understanding of the

15  disputed claims.

16        After careful consideration of the parties' arguments and the applicable statues and

17  case law, the Court **HEREBY CONSTRUES** all claim terms in dispute in the Agulnick

18  '295 Patent and **ISSUES** the relevant jury instructions as written in exhibit A, attached

19  hereto.  Further, the Court **HEREBY DEFINES** all pertinent technical terms as written in

20  exhibit B, attached hereto.

21        **IT IS SO ORDERED**

22  Dated: _2-24-04_                    _____

23                                      HON. RUDI M. BREWSTER
                                        United States District Judge

24  cc: Hon. Leo S. Papas
        United States Magistrate Judge
25

26

27        All Counsel of Record

28                                  2              02CV2060; 03CV0699; 03CV1108

1

2

## EXHIBIT A

| VERBATIM CLAIM ELEMENT[2] | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| **CLAIM 1** | |
| An Apparatus for controlling a computer system comprising a screen for displaying information and a **stylus** having a tip for inputting information into the computer, including: | As is.<br><br>**Stylus** - a pen-like object whose position and contact with a surface can be continuously detected electronically. |
| first detecting means coupled to said computer for detecting a **stroke** of the **stylus** tip in contact with the screen | Function: detecting a stroke of the stylus tip in contact with the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col 6: 53-68.<br><br>**Stroke** - a single drawing movement, including a tap. |
| second detecting means coupled to said computer for detecting a departure of the **stylus** tip from the screen; | Function: detecting a departure of the stylus tip from the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6: 53-68. |

---

[2]All terms which are underlined and bold-faced in the verbatim column are clarified and/or defined in the corresponding "meaning" column.

3

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| means coupled to said computer for defining termination of a **gesture** comprising at least one **stroke** in response to said departure of the **stylus** tip; | Function: defining termination of a gesture comprising at least one stroke in response to the departure of the stylus tip from the screen.<br><br>Corresponding Structure:<br>(1) Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col. 6: 53-68; and<br><br>(2) Pen position digitizer co-processor 90, with software that determines that a gesture is complete, as shown in fig. 3 and described in the specification at Col. 6: 36-37, Col.1:65 - Col.2:5, and Col. 17:1-14.<br><br>**Gesture** - a symbol or mark. |
| means coupled to said computer for recognizing a plurality of said **gestures**, said recognizing means including means for comparing each said **gesture** to at least one predefined shape; | Function: recognizing a plurality of said gestures which function includes the availability of using means for comparing each said gesture to at least one predefined shape.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following handwriting recognition algorithms:<br><br>(2) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (<u>see</u> Col. 4:41-46); or<br><br>(3) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (<u>see</u> Col. 5:1-6); or<br><br>(4) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10 |

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| means coupled to said computer for implementing each said recognized **gesture**, said implementing means including means for performing a predetermined action associated with each said predefined shape, said predetermined action being determined by the context in which said **gesture** was used, including a first context in which said action is executed upon an **operating system level object** and a second context in which said action is executed upon an **application level object**. | Function: implementing each said recognized gesture which function includes the availability of using means for performing a predetermined action associated with each said predefined shape<br><br>Corresponding Structure: CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56.<br><br>This paragraph specifically claims the system's design allowing use of a single set of gestures for identical executable commands at both the operating system level and the application level.<br><br>**Operating System Level Object** - an object that can be manipulated by a user, which is displayed outside the context of an application program<br><br>**Application Level Object** - an object that can be manipulated by a user, which is displayed within the context of an application program. |
| **CLAIM 3** | |
| The apparatus of claim 1, wherein: said second detecting means includes means for detecting proximity of the **stylus** tip to the screen; and | Function: detecting proximity of the stylus tip to the screen<br><br>Corresponding Structure: Complimentary electronic circuitry by which the proximity of the stylus tip to the computer is sensed, including:<br><br>(1) Stylus 4, including radio frequency inductor/capacitor circuit 42 and switch 44 (see Figs. 1-2; Col. 6:16-18; Col. 6: 26-31; Col. 1:18-21; and Abstract); and<br><br>(2) Pen position digitizer 20, as shown in Figs. 2 and 3 and described in the specification at Col. 6:21-22; and Col. 6:61-68. |

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| **Claim 6** | |
| The apparatus of Claim 1, further including means coupled to said computer for displaying on said screen a shape representing the actual **gesture** made by a user of the computer | Function: displaying on the screen a shape representing the actual gesture made by a user of the computer.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| **Claim 12** | |
| The apparatus of claim 3, further including means for terminating display of said indicator when the **stylus** tip departs from proximity to the screen. | Function: terminating display of said indicator when the stylus tip departs from proximity to the screen<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37)<br><br>(2) Display Controller 80 (see Fig. 3; Col. 6:36); and<br><br>(3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| **Claim 39** | |
| An apparatus for controlling a computer system, the computer system compromising a screen for displaying information and a **stylus** having a tip for inputting information into the computer, including: | **Stylus** - a pen-like object whose position and contact with a surface can be continuously detected electronically. |
| detecting means coupled to said computer for detecting a **stroke** of the **stylus** tip in contact with the screen; | Function: detecting a stroke of the stylus tip in contact with the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col 6: 53-68.<br><br>**Stroke** - a single drawing movement, including a tap. |

7

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| means coupled to said computer for recognizing a **gesture** at least one **stroke** and an event indicating termination of the **gesture**, said recognizing means including means for comparing said **gesture** to at least one predefined shape and being for recognizing at least a first **gesture**, a second **gesture**, and a third **gesture** comprising said first and second **gestures**; and | **Gesture** - a symbol or mark<br><br>Function: recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape and being for recognizing at least a first gesture, a second gesture, and a third gesture comprising the first and second gestures.<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below);<br><br>(2) Col.1:65 - Col. 2:5, and Col. 17:1-14; and<br><br>(3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col.5:1-6); or<br><br>(5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10. |

8

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| implementing means coupled to said computer for implementing each recognized **gesture**, said implementing means including means for performing a first predetermined action associated with said first **gesture**, a second predetermined action associated with said second **gesture**, and a third predetermined action associated with third said **gesture**. | Function: implementing said recognized gesture which function includes the availability of using means for performing a first predetermined action associated with said first gesture, a second predetermined action associated with said second gesture, and a third predetermined action associated with said third gesture."<br><br>Corresponding Structure:<br>CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56. |
| **Claim 40** | |
| The apparatus of claim 39, wherein the shapes of said first and second **gestures** are substantially identical. | As is. |
| **Claim 41** | |
| An apparatus for controlling a computer system, the computer system comprising a screen for displaying information and a **stylus** having a tip for inputting information into the computer, including | **Stylus** - a pen-like object whose position and contact with a surface can be continuously detected electronically. |
| first detecting means coupled to said computer for detecting a **stroke** of the **stylus** tip in contact with the screen; | Function: detecting a stroke of the stylus tip in contact with the screen.<br><br>Corresponding Structure: Pen position digitizer 20, as shown in figs. 2 and 3 and described in the specification at Col. 6: 21-22; and Col 6: 53-68.<br><br>**Stroke** - a single drawing movement, including a tap. |

02CV2060; 03CV0699; 03CV1108

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| means coupled to said computer for recognizing a **gesture** comprising at least one **stroke** and an event indicating termination of the **gesture**, said recognizing means including means for comparing said **gesture** to at least one predefined shape, each **stroke** of said **gesture** being located in substantially the same area of the screen: | **Gesture** - a symbol or mark<br><br>Function: recognizing a gesture comprising at least one stroke and an event indicating termination of the gesture, which function includes the availability of using means for comparing said gesture to at least one predefined shape, where each stroke of said gesture is located in substantially the same area of the screen<br><br>Corresponding Structure:<br>(1) Pen position digitizer co-processor 90, as shown in fig. 3 and described in the specification at Col. 6: 36-37;<br><br>Programmed with one of the following gesture termination algorithms (2 below) and one of the following handwriting recognition algorithms (3-5 below);<br><br>(2) Col.1:65 - Col. 2:5, and Col. 17:1-14; and<br><br>(3) The techniques for recognizing gestures disclosed in "Automatic Recognition of Handprinted Characters - - The State of the Art," Proceedings of the IEEE, pages 469-487, Vol. 68, No. 4, April 1980 (see Col. 4:41-46); or<br><br>(4) the techniques for recognizing gestures disclosed in U.S. Patent No. 5,151,950 to Hullender, entitled "Method For Pattern Recognition" (see Col.5:1-6); or<br><br>(5) The Handwriting Translation Subsystem, disclosed in Appendix I, Architecture Reference Manual, Part Five, Input and Handwriting Translation, Chapter 1.2, pp. 7-10. |

10

| VERBATIM CLAIM ELEMENT | MEANING AS DECIDED IN MARKMAN HEARING |
|---|---|
| second detecting means for detecting a direction of motion of the creation of said **gesture**, wherein the predefined shape of said recognized **gesture** also represents said direction of motion; and | Function: detecting a direction of motion of the creation of said gesture, wherein the predefined shape of said recognized gesture also represents said direction of motion <br><br> Corresponding Structure: <br> (1) Pen position digitizer 20 (see Figs. 2-3; Col. 6: 21-22; and Col. 6:53-68); and <br><br> (2) Pen position digitizer co-processor 90 (see Fig. 3 and Col. 6:36-37). |
| implementing means coupled to said computer for implementing said recognized **gesture**, said implementing means including means for performing a predetermined action associated with said predefined shape. | Function: implementing said recognized gesture which function includes the availability of using means for performing a predetermined action associated with said predefined shape <br><br> CPU 50 programmed with algorithms known to persons skilled in the art for implementing gestures, as referenced in Col. 4:32-41 and Col. 4:49-56. |
| **Claim 43** | |
| The apparatus of claim 41, further including means coupled to said computer for displaying on said screen a shape representing the actual **gesture** made by a user of the computer. | Function: displaying on the screen a shape representing the actual gesture made by a user of the computer. <br><br> Corresponding Structure: <br> (1) Pen position digitizer co-processor 90 and CPU 50 (see Fig. 3 and Col. 6:33-34 and Col. 6:36-37) <br><br> (2) Display Controller 80 (see Fig. 3; Col. 6:36); and <br><br> (3) Liquid Crystal display 10 (see Figs. 2-3; Col. 6: 20-21; and Col. 6: 48-52). |
| **Claim 46** | |
| The apparatus of claim 41, wherein said direction of motion of said **gesture** is associated with said predetermined action. | As is. |

11

1

## EXHIBIT B

2 **Stylus** - a pen-like object whose position and contact with a surface can be continuously detected electronically.

3

4 **Stroke** - a single drawing movement, including a tap.

**Gesture** - a symbol or mark.

5

6 **Operating System Level Object** - an object that can be manipulated by a user, which is displayed outside the context of an application program

7 **Application Level Object -** an object that can be manipulated by a user, which is displayed within the context of an application program.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28