1 | Juanita R. Brooks, brooks@fr.com, (SBN 75934)
Roger A. Denning, denning@fr.com, (SBN 228998)
2 | Joseph P. Reid, reid@fr.com, (SBN 211082)
Michael M. Rosen, rosen@fr.com, (SBN 230964)
3 | Frank J. Albert, albert@fr.com, (SBN 247741)
Fish & Richardson P.C.
4 | 12390 El Camino Real
San Diego, California 92130
5 | Telephone:    (858) 678-5070
Facsimile:     (858) 678-5099
6 |

7 | Attorneys for Defendant
MICROSOFT CORPORATION
8 |

9 |              UNITED STATES DISTRICT COURT

10 |            SOUTHERN DISTRICT OF CALIFORNIA

11 | ALCATEL-LUCENT USA, Inc.,            Case No. 07-CV-2000 H (CAB)
                                         consolidated cases:
12 |          Plaintiff,                 03-CV-0699 B (CAB)
                                         03-CV-1108 B (CAB)
13 |     v.                              02-CV-2060 B (CAB)

14 | MICROSOFT CORPORATION,              **MICROSOFT'S REDACTED
                                         OPPOSITION TO LUCENT'S
15 |          Defendant.                 MOTION FOR SANCTIONS**

16 |                                     Date:        May 16, 2011
                                         Time:        10:30 a.m.
17 |                                     Courtroom:   13, 5th Floor
                                         Judge:       **Honorable Marilyn L. Huff**
18 |
                                         **[PUBLIC VERSION]**
19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS .......................................................................... 2

III.   LEGAL STANDARDS................................................................................ 5

IV.    ARGUMENT ............................................................................................... 7

       A.    Microsoft Has Been Truthful With Respect to the Consumer
             Studies. ............................................................................................. 8

             1.    Microsoft Did Not Intentionally Withhold Documents. ........... 8

             2.    Microsoft's Witnesses Have Testified Truthfully Regarding
                   the Studies. ......................................................................... 10

                   a.    Mr. Numoto Testified Truthfully About Microsoft
                         Office................................................................. 10

                   b.    Mr. Paul-Jones Testified Truthfully About
                         Microsoft Money................................................ 13

                   c.    Mr. Kennedy Testified Truthfully at the First Trial.................. 15

             3.    Microsoft's Lawyers Were Truthful At Trial and On
                   Appeal. ............................................................................... 16

       B.    Microsoft Was Truthful and Forthright With Respect to the
             Licensing Issues. ............................................................................ 17

             1.    Dr. Sullivan's Testimony Was Truthful and Is Irrelevant
                   Here. ................................................................................... 17

             2.    None of Microsoft's Documents Support a 1-5% Per Patent
                   Royalty. .............................................................................. 18

       C.    The Court Previously Denied Sanctions Regarding the Johnson
             Survey. ............................................................................................ 19

       D.    None of Microsoft's Conduct is Sanctionable. ............................... 20

             1.    Microsoft is Not Subject to Sanctions under Rule 37(b). ....... 20

             2.    Microsoft is Not Subject to Sanctions under Rule 37(c)........ 21

             3.    Microsoft is Not Subject to Sanctions Under Rule 37(d). ...... 23

             4.    Sanctions Under the Court's Inherent Power Are
                   Inappropriate. .................................................................... 24

Case No. 07-CV-2000 H (CAB)

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

E.      Lucent Should Be Sanctioned for Filing this Frivolous Sanctions Motion. ........................................................................................................... 25

V.      CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Anderson v. Fresno County,*
    2007 WL 1865657 (E.D. Cal.) ........................................................................... 21

*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.,*
    970 F.2d 834 (Fed. Cir. 1992) ............................................................................ 1

*Banks v. Office of Senate Sergeant-at-Arms,*
    222 F.R.D. 7 (D.D.C. 2004) ......................................................................... 6, 23

*Bergeson v. Dilworth,*
    749 F.Supp. 1555 (D. Kan. 1990) ................................................................. 5, 9

*Brandt v. Vulcan, Inc.,*
    30 F.3d 752 (7th Cir. 1994) ........................................................................ 6, 20

*Brooks v. Motsenbocker Adv. Devs., Inc.,*
    2009 WL 414600 (S.D. Cal.) .............................................................................. 7

*Bruggeman v. Blagojevich,*
    219 F.R.D. 430 (N.D. Ill. 2004) ............................................................... 5, 8, 21

*ClearValue, Inc. v. Pearl River Polymers, Inc.,*
    560 F.3d 1291 (Fed. Cir. 2009) ...................................................................... 24

*Eolas Techs., Inc. v. Microsoft Corp.,*
    399 F.3d 1325 (Fed. Cir. 2005) ...................................................................... 18

*Fink v. Gomez,*
    239 F.3d 989 (9th Cir. 2001) ...................................................................... 7, 24

*Gen-Probe Inc. v. Becton, Dickinson and Co.,*
    2011 WL 997189 (S.D. Cal.) .............................................................................. 7

*Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing,*
    LLC, 2011 WL 690495 (S.D. Cal.) .................................................................... 6

*Inline Connection Corp. v. AOL Time Warner, Inc.,*
    470 F.Supp.2d 435 (D. Del. 2007) ................................................................. 18

*Karnazes v. San Mateo,*
    2010 WL 2672003 (N.D. Cal.) ........................................................................ 21

*Keithley v. HomeStore.com, Inc.,*
    2008 WL 3833384 (N.D. Cal.) ........................................................................ 21

Case No. 07-CV-2000 H (CAB)

## TABLE OF AUTHORITIES (CONT'D)

Page(s)

*Kelley v. Crate & Barrel, Inc.,*
    2008 WL 2233568 (E.D. Cal.) ............................................................................. 21

*Kunstler v. City of New York,*
    242 F.R.D. 261 (S.D.N.Y. 2007) ....................................................................... 7, 22

*Liss v. Exel Trans. Servs., Inc.,*
    2008 WL 370886 (D. Ariz) ................................................................................. 21

*Lucent Tech., Inc. v. Gateway, Inc.,*
    580 F.3d 1301 (Fed. Cir. 2009) ................................................................... passim

*Murphy v. Kmart Corp.,*
    255 F.R.D. 497 (D.S.D. 2009) .......................................................................... 6, 23

*Naerebout v. IBP, Inc.,*
    1992 WL 754399 (D. Kan.) .......................................................................... 5, 8, 21

*Paramount Pictures Corp., v. Replay TV,*
    2002 WL 32151632 (C.D. Cal. 2002) ................................................................ 13

*Parrick v. Fex Ground Package Sys. Inc.,*
    2010 WL 3724825 ............................................................................................... 21

*Payne v. Exxon Corp.,*
    121 F.3d 503 (9th Cir. 1997) .............................................................................. 21

*Peterson v. Hantman,*
    227 F.R.D. 13 (D.D.C. 2005) ............................................................................... 7

*Qualcomm, Inc. v. Broadcom Corp.,*
    2008 WL 66932 (S.D. Cal.) ............................................................................... 25

*ResQNet.com v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010) ............................................................................ 19

*Schendel v. Curtis,*
    83 F.3d 1399 (Fed. Cir. 1996) ............................................................................ 25

*Simms v. Ctr. for Corr. Health and Policy Studies,*
    272 F.R.D. 36 (D.D.C. 2011) ............................................................................... 7

*Southern Cal. Stroke Rehabilitation Assocs., Inc. v. Nautilus,*
    2010 WL 2998839 (S.D. Cal.) ........................................................................... 24

*Sure Fill & Seal, Inc. v. GFF, Inc.,*
    2010 WL 3063287 (M.D. Fla.) ...................................................................... 6, 24

Case No. 07-CV-2000 H (CAB)

## TABLE OF AUTHORITIES (CONT'D)

Page(s)

*Uniloc USA, Inc. v. Microsoft Corp.*,
   No. 2010-1035, slip op. (Fed. Cir. 2011) ............................................................... 18

**OTHER AUTHORITIES**

FED. R. CIV. P. 26(a)(1)(A)(ii) ........................................................................................ 21

FED. R. CIV. P. 26(g) ......................................................................................................... 5

FED. R. CIV. P. 34(b)(1)(A) ............................................................................................. 5

FED. R. CIV. P. 37(c)(1) .................................................................................................... 6

FED. R. CIV. P. 37(d)(1)(B) ........................................................................................ 7, 24

FED. R. CIV. P. 37(d)(3) ............................................................................................... 7, 24

Case No. 07-CV-2000 H (CAB)

1    **I.      INTRODUCTION**

2          "Unfounded requests for sanctions are themselves frivolous and sanctionable." *Atlantic*

3    *Thermoplastics Co., Inc. v. Faytex Corp.*, 970 F.2d 834, 835 n.1 (Fed. Cir. 1992).  Lucent paints

4    Microsoft's witnesses and lawyers as liars, accusing them of intentionally deceiving Lucent, the

5    first jury, this Court, the Federal Circuit, and the Supreme Court.  Not a word of that is true.

6          Lucent ignores the context and history of the document requests and 30(b)(6) topics on

7    which its motion for sanctions is based.  Those requests and topics were directed to a wide variety

8    of Microsoft products accused of infringing 15 different Lucent patents.  Microsoft responded with

9    a timely objection for overbreadth.  Lucent never moved to compel.  Notably, in spite of its

10   breadth, Lucent's discovery did not include even one word specific to the accused infringement of

11   the Day patent, which only late in the case became focused on the narrow feature of a drop down

12   tool within the calendar module of Outlook (and two other Microsoft products) called the date

13   picker.  Only after the Federal Circuit threw out Lucent's damage verdict because Lucent's

14   "position lacks . . . the requisite focus on the infringed claim," noting that "only when the date

15   picker is used to fill out a form does infringement occur," did Lucent, on remand, get down to

16   business and make requests specific to the date picker.

17         Microsoft produced over 200,000 pages on remand in response to these and other new

18   requests, including whatever it could find relating to the marketing and use of the date picker.

19   Only four of the new documents deal with the date picker, and they say the same thing as a

20   document in the pre-remand production that was never used by Lucent at the first trial.  This

21   confirms what Microsoft has said all along, that the date picker is a minor feature, neither highly

22   valued nor widely used.

23         Frustrated on the date picker, Lucent in its sanctions motion flails much more broadly at

24   Microsoft, complaining about supposed discovery failures and supposed false testimony having

25   nothing to do with the Day patent, and in some instances not even related to the Day trial.  But

26   Lucent never raised these issues until this belated motion, and it has now re-deposed the Microsoft

27   employees it calls liars, only to find that the new documents and the new testimony confirm what

28   was said before.  Lucent cites none of the new testimony in its brief.

1       Lucent's motion is nothing but a tactical distraction.  Lucent has already lost two similar

2 sanctions motions, one about an issue it reiterates here.  Lucent failed even to meet-and-confer

3 with Microsoft before filing this motion, violating Local Rule 26.1 and Judge Bencivengo's

4 scheduling order.  Lucent also failed to raise its discovery complaints within the 30-day limit of the

5 scheduling order.  Lucent's dual violations of Judge Bencivengo's orders, coupled with the fact

6 that she is more familiar with discovery and could quickly put Lucent's accusations in proper

7 context, explain why Lucent chose not to bring this discovery matter to the Magistrate Judge who

8 would normally handle such issues.

9       Enough.  This case should be resolved on the merits, not sidetracked by bickering between

10 lawyers.  Microsoft respectfully requests that the Court deny Lucent's motion and award Microsoft

11 its fees and costs associated with being forced to respond to this motion.

12 **II.     STATEMENT OF FACTS**

13       Discovery leading up to the first trial involving the Day Patent dealt with 15 patents and

14 almost every Microsoft product that had been sold to date.  Lucent sought correspondingly broad

15 discovery, as is apparent from the document requests that Lucent quotes in its brief—a subset of

16 the 407 total document requests Lucent served.  (Br. at 9, *quoting* Heffernan Decl., Ex. B.)  None

17 of these requests specifically seek documents showing customer feedback about the date picker or

18 how frequently customers use it.  Microsoft objected to these requests as overly broad, vague, and

19 ambiguous.  (Brooks Decl., Ex. 1.)  Lacking guidance about what Lucent really wanted, Microsoft

20 conducted a reasonable search and produced almost 1.25 million pages.

21 ███████████████████████████████████████████

22 ████████████████████████████████████

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 █████████████████████████████████████████████

26 ████████████████████████████████████

27 ████████████████████████████████████████████

28 ██████████████████████████████████████

1    With this document in hand, Lucent served the 30(b)(6) topics it quotes in its brief, topics

2    that were just as broad as its document requests. (Br. at 9-10, *citing* Ex. C.) No topic specifically

3    sought information about customer feedback on the date picker, how frequently it was used, or

4    "usability reports." Microsoft objected to the topics as overly broad and vague. (Ex. 2.) Microsoft

5    "requested that Lucent narrow the topics if it wanted specific information." (Ex. 3.) When Lucent

6    refused, Microsoft "warned Lucent that Microsoft would provide witnesses prepared to discuss

7    Windows and Office marketing from a high level unless the topics were narrowed." (Ex. 5.)

8    Microsoft designated Mr. Numoto to provide the promised "general marketing testimony"

9    about "Office." Lucent never asked Mr. Numoto about the usability study it had received over two

10   and a half years before his deposition. Lucent never complained at the time that Mr. Numoto's

11   30(b)(6) testimony was insufficient because he did not know more about customer surveys or

12   usage data for Outlook or the date picker. Lucent's only complaint after the deposition was that it

13   had not received testimony about Microsoft Money, a complaint Microsoft cured by providing

14   testimony from Mr. Paul-Jones. (Ex. 6.) Lucent never complained about his testimony.

15   Lucent also deposed Mr. Kennedy in his personal capacity before the first trial but used less

16   than two hours of the seven it was permitted with him. Lucent did not ask Mr. Kennedy about how

17   many customers use Outlook's calendar or the date picker at his original deposition.

18   There were two reasons for Lucent's failure to pursue evidence about customer use of the

19   date picker. First, Lucent's focus at the first trial was one of the supposed "crown jewels" of the

20   Bell Labs patent portfolio, the Haskell CODEC (Video **CO**mpression-**DEC**ompression) patent, for

21   which Lucent's shell company MPT was asking well over a billion dollars. The Day patent was an

22   afterthought for Lucent at the time. Second, Lucent knew that evidence regarding actual usage of

23   the "date picker" could only harm, not help, its damages case on the Day patent. Lucent was right

24   about that—before it had the "withheld" documents, Lucent asked for over $560 million and

25   obtained a jury award of $357 million. *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1323

26   (Fed. Cir. 2009). Lucent's current demand has dropped to $70 million. (Ex. 27 at 183, 213-14.)

27   Lucent's focus changed after the first jury found the Haskell CODEC patent invalid and not

28   infringed and the Federal Circuit set aside the first jury's damages award on the Day patent. The

1 Federal Circuit scolded Lucent because "the evidence of record is conspicuously devoid of any

2 data about how often consumers use the patented date picker invention." *Lucent*, 580 F.3d at 1334.

3 The court rejected Lucent's claim that general data on how frequently customers fill out forms,

4 could support the damages award because there are non-infringing ways to fill out the form:

5  In one respect, Lucent believes the damages award is supported by the pervasive use of
6  forms throughout the three software programs. What this position lacks is the requisite
   focus on the infringed claim. The damages award can't be supported by evidence that the
7  infringers also used additional, non-infringing features. Only when the date picker is used
   to fill out a form does infringement occur. All other means of filling out a form, such as
8  typing in the entire date, do not infringe. *Id.*

9 The court suggested that specific data about usage of the accused feature might come from

10 "consumer surveys" or "focus group testing." *Id.* The court remanded for a new trial on damages

11 for a single patent, significantly narrowing the case.

12  On remand, Lucent did not simply "repeat[] its prior requests" for consumer studies, as it

13 claims. (Br. at 4.) It served an entirely new set of requests that specifically sought consumer

14 survey and usage data for the accused date picker feature of Microsoft's products for the first time:

15  RFP No. 519: All usability studies, usability reports, or consumer surveys conducted or
    created by or on behalf of Microsoft related to the so-called "date picker" feature of
16  Microsoft Outlook.

17  RFP No. 526: All customer feedback received by or on behalf of Microsoft relating to the
    so-called "date picker" feature of Microsoft Outlook.
18
    30(b)(6) Topic 27: All information gathered by or on behalf of Microsoft relating to the . . .
19  extent of use of the so called "date picker" feature [of] any version of a Microsoft Product .
    . . including . . . all usability studies, all usability reports, all consumer surveys, all
20  customer feedback, all "SAT Tracker" surveys, all Software Quality Management ("SQM")
    data and reports, and all information collected through the Customer Experiment
21  Improvement Program ("CEIP").

22 (Exs. 10 and 11.) The trigger for these requests was not "Mr. Kennedy's testimony at trial," as

23 Lucent alleges, (Br. at 4), but the Federal Circuit's opinion. As Lucent's lawyer explained, "one

24 side effect of some of the Federal Circuit's pronouncements" is that "we're all going to become

25 much more familiar with surveys." (Ex. 20 at 14:16-21.)

26  Armed with more specific requests, Microsoft searched for new documents and provided

27 new 30(b)(6) witnesses. Microsoft produced the allegedly "withheld" documents over two months

28 before the close of remand fact discovery. (Exs. 13, 14, 16, 17.) Lucent deposed Messrs. Numoto,

1   Paul-Jones, and Kennedy about the new documents, plus four new witnesses. Microsoft allowed

2   Lucent to exceed the seven-hour limit for most of the depositions, often by around an hour.

3        Microsoft's new production only hurt Lucent's case. Lucent's motion identifies four new

4   documents that show customer use of the date picker. (Br. at 16 and n.12.) But none of the

5   documents says anything better about the date picker than the usability study Lucent had but chose

6   not to use before the first trial. The "thousands" of other studies and statistics that Lucent refers to

7   all deal with use of the "Calendar module," which, except for the date-picker, has nothing to do

8   with the Day patent. This is the same type of data the Federal Circuit told Lucent not to use

9   because it lacks "the requisite focus on the infringed claim." 580 F.3d at 1334. Lucent's expert

10  Mr. Sims used them anyway, but they caused him to reduce his proposed damages to $70 million.

11  (Ex. 27 at 183, 213-14.) Mr. Sims admits that none of Microsoft's documents show the percentage

12  of customers who use the date picker. (Ex. 27 at 176-77.)

13  **III.   LEGAL STANDARDS**

14       Discovery under the Federal Rules of Civil Procedure is not boundless. The Rules require

15  lawyers to respond "to the best of the [lawyer's] knowledge, information, and belief formed after a

16  *reasonable* inquiry." FED. R. CIV. P. 26(g). The scope of a "reasonable inquiry" depends on the

17  circumstances. *See* 1983 Advisory Committee Note to Rule 26. Reasonableness is determined

18  based on the facts known at the time: "the court must avoid hindsight and resolve all doubts in

19  favor of the [responding party]." *Bergeson v. Dilworth*, 749 F.Supp. 1555, 1566 (D. Kan. 1990).

20       The Federal Rules allow only discovery requests that are phrased with "reasonable

21  particularity." For example, Rule 34 requires that document requests "describe with reasonable

22  particularity each item or category of items to be inspected." FED. R. CIV. P. 34(b)(1)(A). The

23  request must give "reasonable notice of what is called for and what is not" and not require the

24  responding party "to ponder and to speculate in order to decide what is and what is not

25  responsive." *Bruggeman v. Blagojevich*, 219 F.R.D. 430, 436 (N.D. Ill. 2004) (request for

26  documents that "reflect in any manner noncompliance with the ADA or the RA" was not phrased

27  with reasonable particularity); *Naerebout v. IBP, Inc.*, 1992 WL 754399, at *10 (D. Kan.) (requests

28  for all documents "that in any way relate to handling workers' compensation claims," "relate to the

1  cost associated with workers' compensation claimants," and "pertain[]to workers' compensation

2  claims and/or anticipated losses" were not phrased with reasonable particularity).

3       Likewise, a deposition notice under Rule 30(b)(6) "must describe with reasonable

4  particularity the matters for examination." The burden is on the party noticing the deposition to

5  narrowly tailor its topics so they meet the particularity requirement, and topics that do not comply

6  with the rule may be struck. *Murphy v. Kmart Corp.*, 255 F.R.D. 497, 505, 514 (D.S.D. 2009)

7  (finding that 30(b)(6) topics directed generally to "defendant's policies and standards" and "the

8  corporate history of Kmart" failed to meet the reasonable particularity requirement); *Banks v.*

9  *Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 18-19 (D.D.C. 2004) (finding topic covering "all

10  conversations between Ann Harkins and any employee of the SAO concerning Mr. Banks" to be

11  "absurdly overbroad" and not in compliance with Rule 30).

12       Parties who do not promptly bring discovery disputes to the court's attention forfeit the

13  right to seek sanctions about alleged "deficiencies" later. *See, e.g.*, *Sure Fill & Seal, Inc. v. GFF,*

14  *Inc.*, 2010 WL 3063287, at *9 (M.D. Fla.) (rejecting the plaintiffs' argument that incomplete

15  discovery responses warranted sanctions where they "did not file any successful motions to compel

16  discovery during the litigation"). Indeed, Judge Bencivengo's scheduling order requires both

17  parties to bring discovery disputes to the court's attention within 30 days, or else they are forfeited.

18  (Ex. 12 at ¶ 2.) Failure to comply is a basis to deny a motion on the issue. *Hoot Winc, LLC v.*

19  *RSM McGladrey Fin. Process Outsourcing, LLC*, 2011 WL 690495, at *2-3 (S.D. Cal.).

20       Lucent asks for sanctions under Rules 37(b), 37(c), 37(d), Local Rule 83.1, and the Court's

21  inherent power. (Br. at 21.) Rule 37(b)(2) provides for sanctions when a party "fails to obey an

22  order to provide or permit discovery." There cannot be sanctions under Rule 37(b) when there is

23  no court order compelling discovery. *See, e.g.*, *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir.

24  1994). A motion for sanctions under Rule 37(b) can also be denied for untimeliness if it is not

25  brought within a reasonable time after the alleged offense. *Id.* at 756-57.

26       Rule 37(c) provides for sanctions when a party fails to make required initial disclosures

27  under Rule 26(a) or fails to timely supplement under Rule 26(e), unless the failure "was

28  substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "Substantially justified" means

1    only that there is a "genuine dispute," not "justified to a high degree." *Peterson v. Hantman*, 227

2    F.R.D. 13, 16 (D.D.C. 2005). Put another way, it means "justification to a degree that could satisfy

3    a reasonable person that parties could differ as to whether the party was required to comply with

4    the disclosure request." *Kunstler v. City of New York*, 242 F.R.D. 261, 264-65 (S.D.N.Y. 2007).

5        Rule 37(d) provides for sanctions when a party fails to appear at a deposition, "unless the

6    failure was substantially justified or other circumstances make an award of expenses unjust." FED.

7    R. CIV. P. 37(d)(3). "A motion for sanctions for failing to answer or respond must include a

8    certification that the movant has in good faith conferred or attempted to confer with the party

9    failing to act in an effort to obtain the answer or response without court action." FED. R. CIV. P.

10   37(d)(1)(B). Failure to meet-and-confer is a basis to deny sanctions, even if the court grants a

11   motion to compel further deposition testimony. *Simms v. Ctr. for Corr. Health and Policy Studies*,

12   272 F.R.D. 36, 39 (D.D.C. 2011).

13       The court can only use its inherent power to impose sanctions against a party that has acted

14   in bad faith or with an improper purpose. *Fink v. Gomez*, 239 F.3d 989, 992-94 (9th Cir. 2001).

15   Local Rule 83.1 also provides for sanctions for failure to comply with the Federal Rules or Local

16   Rules. Lucent's brief does not discuss the Local Rule separately, so neither shall Microsoft.

17       Finally, the Local Rules require a party to meet-and-confer before seeking sanctions under

18   any provision of Rule 37: "The court will entertain no motion pursuant to Rules 26 through 37,

19   Fed. R. Civ. P., unless counsel have previously met and conferred concerning all disputed issues,"

20   S.D. Cal. L.R. 26.1(a), and "counsel for the moving party must file a certificate of compliance with

21   this rule." L.R. 26.1(b). Judge Bencivengo's scheduling order reiterates that meet-and-confer

22   requirement. (Ex. 12 at ¶ 2.) Failure to comply with the Local Rule is a basis to refuse to entertain

23   a sanctions motion. *Gen-Probe Inc. v. Becton, Dickinson and Co.*, 2011 WL 997189, at *2 n.3

24   (S.D. Cal.); *Brooks v. Motsenbocker Adv. Devs., Inc.*, 2009 WL 414600, at *1 (S.D. Cal.).

25   **IV.    ARGUMENT**

26       Lucent's far-ranging motion seeks sanctions for three categories of alleged misconduct: (1)

27   conduct related to consumer studies about customer usage of Outlook, (2) conduct related to the

28

1   production of additional licensing documents on remand, and (3) conduct related to the Johnson

2   survey.  None of these baseless allegations justifies sanctions against Microsoft.

3      **A.      Microsoft Has Been Truthful With Respect to the Consumer Studies.**

4        Lucent makes three accusations regarding consumer studies:  (1) that Microsoft

5   intentionally withheld documents showing how customers use Microsoft Outlook, Money, and

6   Pocket PC, (2) that Microsoft employees Takeshi Numoto, Russell-Paul Jones, and William

7   Kennedy committed perjury during deposition and trial testimony, and (3) that Microsoft's lawyers

8   lied about the studies at the first trial and on appeal.  (Br. at 8-18.)  These accusations are false.

9         **1.      Microsoft Did Not Intentionally Withhold Documents.**

10       Lucent's first complaint is that Microsoft intentionally withheld the consumer studies

11  produced on remand during the discovery period before the first trial.  (Br. at 8-10.)  This is wrong.

12  Microsoft provided the documents to Lucent immediately after Lucent specifically asked for them.

13  Of all the documents Lucent cites, only four are relevant to the issue on remand (use of the date

14  picker), and they are all equivalent to a document Microsoft produced before the first trial.

15       Lucent's initial document requests were vastly overbroad.  For example, its request for "All

16  documents relating to the value of any of the subject matter disclosed or claimed by any of the

17  Asserted Patents," could potentially cover every document within Microsoft about any Microsoft

18  product.  (Ex. B.)  Even requests like "All documents relating to any market study or commercial

19  study relating to any Microsoft Accused Product," implicate an extraordinary swath of documents,

20  especially because the bounds of "market study" are unclear.  These requests did not provide

21  Microsoft with enough "reasonable particularity" to know that Lucent sought studies about

22  customers use of the date picker.  *Bruggeman*, 219 F.R.D. at 436; *Naerebout*, 1992 WL 754399, at

23  *10.  Microsoft objected for overbreadth and vagueness, but, rather than burden the court with a

24  request to strike the requests for failure to comply with Rule 34, it conducted a reasonable, good

25  faith search for documents related to the 15 patents and many accused products at issue at the time.

26       That initial search turned up at least one usability report that is equivalent to the four

27  additional date picker documents produced on remand.  (Ex. D.)  A main focus of the report was to

28  determine if five experienced test subjects used the date picker:

1

2

3    (*Id.* at MSLT_6122.)

4

5    ████████████████  (*Id.* at MSLT_6126.)  That statement is equivalent to the parts of the

6    four documents produced on remand that Lucent says show customer enthusiasm for the date

7    picker, although, interestingly, none of them describe the "date picker" being used in an infringing

8    manner, *i.e.*, to compose information that is entered into a field on a form—the documents just

9    describe using it to navigate between dates.  (Br. at 14, 16 and n.12, *citing* Exs. P, Z, AG, AH, and

10   AI.)  Despite having a study about the date picker before the first trial, Lucent never asked for

11   more or used the one it had.  Instead, Lucent remained silent, hoping to obtain a large damages

12   award by relying more broadly on customer interest for all of Outlook, since it knew such a large

13   award could not be supported by interest in the date picker alone.  That worked with the first jury,

14   but not at the Federal Circuit.  *See* 580 F.3d at 1334.  Only after the Federal Circuit told Lucent to

15   use only information specific to the date picker did Lucent serve document requests that

16   specifically sought the documents it now accuses Microsoft of withholding.  Lucent's claim that

17   Microsoft always should have known it was requesting these documents is pure hindsight.  *Cf.*

18   *Bergeson*, 749 F. Supp. at 1566.  If Lucent were confident its original document requests covered

19   all this information, it would have not needed new, specific requests on remand.  Indeed, the fact

20   that Lucent never used the date-picker document it had at the trial or in deposition underscores

21   Lucent's own, intentional lack of pre-remand focus on this kind of evidence.

22          Microsoft never concealed documents about customer usage of the date picker.  Not only

23   did Microsoft produce at least one usability report on the date-picker years ago, Microsoft

24   responded to Lucent's new requests by conducting a new search that turned up over 200,000 pages.

25   Microsoft produced the documents over two months before the close of fact discovery on remand.

26   (Exs. 13, 14, 16, 17.)  Lucent identifies only four documents from that production that discuss the

27   date picker, all of which are equivalent to the document Lucent had before the first trial but did not

28   use.  (Br. at 14, 16 and n.12.)  And, as Lucent's expert admits, none of the documents show how

1   frequently the date picker is used.  (Ex. 27 at 176-77.)  So, despite Lucent's fire and brimstone,

2   nothing in Microsoft's remand production is of any significance.

3         Lucent focuses mostly on new documents that allegedly show that customers "use and

4   value the Calendar module," (Br. at 1), because a certain percentage of certain subsets of

5   customers use the Outlook Calendar to schedule meetings.  (Br. at 11, 15-16, *citing* Exs. H, I, J, K.)

6   These documents are irrelevant because they do not indicate how many Outlook customers use the

7   accused ***date picker*** when they are using the Calendar module.  The Federal Circuit explicitly

8   rejected Lucent's argument that the damages award could be supported by "pervasive use of forms

9   throughout the three [accused] software programs" because only one way of filling out the form—

10  using the date picker—was accused of infringement, while "[a]ll other means of filling out a form,

11  such as typing in the entire date, do not infringe."  *See* 580 F.3d at 1334.  Lucent repeats the same

12  error by relying on use of the Calendar module, when only one feature of the Calendar module—

13  the date picker—is the "composition tool" that is accused of infringing the Day patent.  The Court

14  should prohibit Lucent from relying on those irrelevant documents at trial.  And, for present

15  purposes, the Court should reject the claim that the documents show Microsoft concealed evidence.

16        Finally, Lucent insinuates that Microsoft may still be hiding documents.  (Br. at 10 n.5.)

17  That is false.  This is also the first time Lucent has raised any of these alleged deficiencies, even

18  though it has had the documents for many months it says show Microsoft's production is

19  incomplete.  Lucent's attempt to raise this issue, despite failing to meet-and-confer within 30 days

20  after receiving the documents, violates both Local Rule 26.1 and Judge Bencivengo's scheduling

21  order.  It also shows that Lucent is only interested in smearing Microsoft, not resolving the issue.

22        **2.   Microsoft's Witnesses Have Testified Truthfully Regarding the Studies.**

23        Lucent tries to concoct evidence that Microsoft intentionally withheld documents by

24  accusing Microsoft's witnesses of lying about the existence and content of customer studies about

25  Microsoft's products.  Microsoft's witnesses have all testified fully and truthfully.

26        **a.   Mr. Numoto Testified Truthfully About Microsoft Office.**

27        Lucent's first target is Mr. Numoto, Microsoft's 30(b)(6) witness who was produced to

28  testify regarding "Office marketing from a high level unless the topics were narrowed."  (Ex. 5.)

1  Outlook is one program of several within Office.  Lucent never narrowed the topics.  Mr. Numoto

2  provided the promised general testimony. ███████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████

4  ██████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ██████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████

9      Lucent claims this portion of Mr. Numoto's testimony is "false or misleading" based on

10  four documents produced on remand that indicate the percentage of certain subsets of Outlook

11  customers use the Calendar or that refer to focus groups for Outlook.  (Br. at 11-13, *citing* Exs. I,

12  V, W, & H.)  None of the documents contradict Mr. Numoto's testimony.  Mr. Numoto was not

13  saying that no specific usage data existed anywhere within Microsoft—he simply said that he was

14  not aware of such data.  Likewise, he did not deny that Microsoft conducted focus groups for

15  Outlook—he just said he didn't know.  Although Lucent complains that Mr. Numoto should have

16  known because he was the 30(b)(6) designee, (Br. at 14), Lucent had already been put on notice by

17  Microsoft that there was an objection to the Topics based on overbreadth and therefore only

18  general testimony about Office could and would be provided.  Lucent never claimed at the time

19  that Mr. Numoto was inadequately prepared, and it never asked Microsoft for specific documents

20  regarding usage data and focus groups.  More importantly, the testimony shows that Mr. Numoto

21  did not "testif[y] that the documents did not exist," as Lucent has the audacity to claim.  (Br. at 2.)

22      Mr. Numoto's deposition testimony on remand confirms that his initial statements were

23  truthful. ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████. (Ex. 18 at 349:22-352:18.)

26      Lucent next makes multiple accusations that Mr. Numoto lied about whether Microsoft

27  studies competition between Outlook and other products. ████████████████████████

28  ██████████████████████████████████████████████████████

████████████████████████████

A. ████████████████████████████████

(*Compare* Ex. E; *with* Br. at 12, *citing* Ex. W.)  There is no inconsistency.  ████████
████████████████████████████████████
█████████████████████████████
████████████████████████████████████
██████████████████████████
██████████████████████████████████████
████████████████████████████████
██████████████████████████████

(Ex. E at 94:6-20.)  ██████████████████████
████████████████████████████████████████████
████████████.  (Ex. 18 at 349:23-350:3.)  This confirms that his original testimony that he did

not have personal knowledge of any such studies was accurate.

Lucent also accuses Mr. Numoto of testifying that Microsoft "had not conducted any

competitive studies against Lotus Notes."  (Br. at 2.)  On the contrary, ████████████████

████████████████████████████████████

████████████████████████████████.  (Ex. E

at 122:11-123:17.)  Mr. Numoto's focus on Office as a whole, rather than just Outlook, is

understandable.  Microsoft had committed to provide "general marketing testimony" for "Office,"

and Mr. Numoto was in charge of marketing for Office generally, not Outlook specifically.  (Ex. E

at 115:15-116:18; Ex. 3.)

Finally, Lucent accuses ██████████████████████████

████████████████████████████████.  (Br. at 14.)  Lucent claims he

testified that "Microsoft does not track usage at the feature level, much less the application level."

(Br. at 14, *citing* Ex. E at 115:15-116:18, 128:12-19.)  That is not what he said.  ████████

████████████████████████████████████████████

████████████████████████████████

1

2

3

4

5

6

7

8

9

10   (Ex. 3 at 115:15-116:18, 128:12-19.)  Even though Mr. Numoto identified Mr. Kennedy as the

11   individual with knowledge, Lucent never asked Microsoft to pursue the issue with him.

12          Lucent also appears to claim that Microsoft should have ████████████████

13   ████████████████████████ or be forced to explain why it did not track such data to the jury.

14   That position is contrary to the law.  Parties are required to provide only information in their

15   possession, not to change their procedures during litigation to create new evidence specifically for

16   the case.  *Paramount Pictures Corp., v. Replay TV*, 2002 WL 32151632, at *2-3 (C.D. Cal. 2002)

17   (holding the defendant did not have to start collecting new data regarding whether customers used

18   a feature, especially where the "information can be obtained by plaintiffs by conducting surveys").

19                   **b.     Mr. Paul-Jones Testified Truthfully About Microsoft Money.**

20          Lucent's next target is Mr. Paul-Jones, Microsoft's 30(b)(6) witness for the marketing

21   topics on Microsoft Money, who the parties agreed would only be deposed for 3.5 hours, to ensure

22   there would be "nothing crazy and unexpected" about Money at the first trial.  (Ex. 6.)  Lucent

23   accuses him not of concealing surveys, but of "unequivocally testif[ying] that Microsoft did not

24   maintain a repository of past surveys."  (Br. at 14.)  Lucent then leaps to the conclusion that,

25   because Microsoft produced surveys on remand, Mr. Paul-Jones's testimony must have been false.

26   Again, Lucent distorts facts and mischaracterizes testimony.  When asked about surveys

27   concerning Money 97, a product released more than a decade before the deposition and years

28   before his tenure, Mr. Paul-Jones indeed testified ████████████████████.  (Ex. F

1  at 93:8-21.)  However, this was **after** Mr. Paul-Jones testified ████████████

2  ████████████████████████████████████████████████████

3  ██████████

4  █████████████████████████████████████████████

5  ████████

6  █████████████████████████████████████████████████████

7  █████████████████████████████████████████████████

8  █████████████

9  ████████████████████████████████████████████████████

10  ████████████████████████████████████████████

11  (*Id.* at 55:25-56:23.)  ████████████████████████████████

12  ████████████████████████████████████.  (*Id.* at 93:8-21.)  It is clear

13  Mr. Paul-Jones testified truthfully and to the best of his ability about usage surveys that were

14  conducted and used within Microsoft, regardless of whether somewhere there was a repository for

15  decade-old products.  Lucent never followed up to ask for any of these studies.

16      Lucent also accuses Mr. Paul-Jones of perjury because of his testimony that he did not

17  personally know of testing regarding how Money customers felt about the drop-down calculator:

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████

23  ██████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ██████████████

27  (Ex. F at 64:14-65:8.)  Lucent says that the existence of a study comparing Money 95 to Money 97

28  contradicts Mr. Paul-Jones's testimony.  (Br. at 14, *citing* Ex. Z.)  It does not.  Mr. Paul-Jones

testified that he was not aware of such a study, not that no such study existed somewhere within Microsoft. Indeed, when Mr. Paul-Jones was asked about the study during his deposition on remand, he confirmed he had never seen it before. (Ex. 19 at 209:16-25.) Lucent complains that Mr. Paul-Jones was inadequately prepared, (Br. at 14), but it did not raise that objection at the time, and it knew he was being offered to provide only general marketing testimony.

### c. Mr. Kennedy Testified Truthfully at the First Trial.

Lucent's last target is Mr. Kennedy, with whom it has three gripes. (Br. at 15-17.) Lucent first complains that Mr. Kennedy's trial testimony that Microsoft had customer feedback and "usability tests" on Outlook was "news to Lucent." (Br. at 15.) It should not have been. Lucent had at least one of these "usability reports" over four and a half years before Mr. Kennedy's trial testimony. (Ex. D.) It never asked for more. It also never asked Mr. Kennedy about that study in particular, or customer feedback and usability tests in general, during his deposition, despite leaving over five hours of its allotted time with him unused. Lucent also knew before trial that he was knowledgeable on this topic based on Mr. Numoto's deposition. (Ex. E at 115:15-116:18.)

Lucent next accuses Mr. Kennedy of lying at trial when he said that "many" Outlook customers use it only for e-mail, not the calendar. Lucent says this is inconsistent with several Microsoft studies that show ███████████████████████████████. (Br. at 15-16, *citing* Exs. H, I, J, and K.) There is no inconsistency. First, the studies show that ██████████████████████████████████████████████████████. Second, the studies involve work users, who use the calendar far more than other customers, and are not representative of the percentage of total customers that use the Calendar module.

Mr. Kennedy discussed this distinction in detail when he was asked about each of the studies during the 11 hours of additional testimony he gave in this case on remand. (Ex. 15 at 160:2-161:11, 164:5-165:14, 171:6-173:13, 174:13-184:8, 209:25-213:6, 238:21-239:23, 355:13-356:25.) ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10



11   (Ex. 28; Ex. 15 at 357:21-358:23.)

12   Lucent's third complaint against Mr. Kennedy is about his trial testimony that "I don't

13   recall ever seeing any feedback about the date picker." (Br. at 16-17, Ex. G at 54:7-23.) Lucent

14   does not claim this testimony was false nor does it provide any evidence that Mr. Kennedy had

15   seen such feedback. Instead, Lucent says it was unable to "impeach" Mr. Kennedy because it

16   lacked a document Microsoft produced on remand allegedly indicating that Outlook consumers

17   prefer the date picker. (Br. at 16, *citing* Ex. P.) But Lucent already had the usability report

18   Microsoft produced years before Mr. Kennedy's trial testimony which indicated that, in a

19   particular application, the ███████████████████████ (Ex. D at MSLT_6125.) That

20   is an equivalent statement to the parts of the additional documents produced on remand that Lucent

21   relies upon, (Br. at 16-17 & n.12), yet Lucent chose not to use it to impeach Mr. Kennedy.

22   **3.    Microsoft's Lawyers Were Truthful At Trial and On Appeal.**

23   Lucent next takes aim at Microsoft's lawyers, claiming they "took advantage of the

24   evidence that [Microsoft] concealed to boast that Lucent lacked proof of actual usage" of the

25   accused date picker feature. (Br. at 18.) Microsoft's briefs all speak for themselves and belie

26   Lucent's treatment of them. Microsoft never denied there might be evidence of usage of the date

27   picker. Instead, Microsoft simply pointed out that Lucent, as the plaintiff, had the burden to

28

1  identify such evidence but did not do so, a task that should have been easy if the date picker was

2  really as important to consumers as Lucent said it was.

3       None of the evidence produced on remand changes Microsoft's position.  Only four of the

4  new documents relate to the date picker.  All the others relate generally to the Calendar, not to the

5  date picker, which was the only "composition tool" identified in Outlook.  The few new documents

6  that discuss the date picker are equivalent to the document Lucent chose not to use at the first trial.

7       **B.    Microsoft Was Truthful and Forthright With Respect to the Licensing Issues.**

8       Lucent makes two other accusations:  (1) that Microsoft withheld a license with Eolas that

9  contradicts testimony from a trial not involving the Day patent, and (2) that Microsoft withheld

10  documents that show a 1% per patent royalty rate is reasonable.  Neither accusation has merit.

11           **1.    Dr. Sullivan's Testimony Was Truthful and Is Irrelevant Here.**

12       Lucent accuses Microsoft's damages expert of lying under oath during the parties' May

13  2008 trial, which did not involve the Day patent, by allegedly testifying that "Microsoft never paid

14  more than $100 million for patent rights."  (Br. at 4-5, 19-20.)  This is yet another

15  mischaracterization of testimony by Lucent.  It is also unclear why Lucent raises this argument

16  now—the testimony had nothing to do with the Day patent, and the jury in that trial never reached

17  damages because it found non-infringement.  (Ex. 9.)

18       The full context of Dr. Sullivan's testimony shows he did not lie or mislead the Court.

19  Dr. Sullivan was asked about three licenses, ranging from $80-100 million, that Lucent's expert,

20  Mr. Smith, had previously discussed, and he agreed that they were "probably" the largest amounts

21  Microsoft had ever paid:

22       Q.    And in fact, we heard in this courtroom -- Mr. Smith was able to pick out and relate
             to the jury what are *probably* the three largest amounts of money Microsoft has ever
23           paid in a license, correct?
         A.    Yes, that's right.  (Ex. N at 47:8-12.)
24  Dr. Sullivan described the details of the licenses, then reiterated they were three "of the largest"

25  Microsoft licenses that were "relevant" to the case and did not have other "strategic implications":

26       Q.  Doctor Sullivan, I'm going to transition from the last point we made with regard to the
             three licenses we just talked about. I want to make sure the jury understands.  When we
27           talked about those being either the three largest or three of the largest agreements that
             Microsoft has entered, *we're talking just about agreements that related to what relates*
28           *in this courtroom,* which is patents and patents and a lump sum, correct?
         A. Yes, that's right.

1       Q. ***We weren't discussing agreements Microsoft might have had that had strategic***

2             ***implications or that went beyond the information that's relevant in this courtroom,***
        correct?

    A. Yes, that's right. (Ex. N at 49:11-23.)

3   Dr. Sullivan did not say Microsoft had never signed a license for more than $100 million, rather he

4   was only discussing Microsoft licenses that were relevant to that case.

5   ██████████████████████████████████████████████████

6   ██████████████████████████████████████████████████████

7   ██████████████████████████████████████████████████

8   ██████████████████████████████  A settlement agreement after such a large jury

9   verdict has far different "strategic implications" than a run-of-the-mill license negotiation, even

10  though the verdict had been set aside for a re-trial on liability.  In addition, there was no occasion

11  for Dr. Sullivan to consider the Eolas license because settlement agreements were generally

12  thought inadmissible at the time.  *See, e.g.*, *Inline Connection Corp. v. AOL Time Warner, Inc.*,

13  470 F.Supp.2d 435, 444 (D. Del. 2007).  The May 2008 trial was before *ResQNet*, the decision that

14  parties like Lucent argue changed the law on settlement agreements.

15         Lucent's mention of the Eolas license here is also puzzling because the Court granted

16  Microsoft's motion *in limine* to exclude the Eolas license (and other settlement agreements) from

17  this re-trial because "Lucent has not sufficiently tied the expert testimony on these licenses and

18  litigation awards to the facts of the case."  Ex. 26 at 23; *see also id*. at 8.  So the Eolas license is as

19  irrelevant to this case as it would have been to the May 2008 trial.  *Uniloc USA, Inc. v. Microsoft*

20  *Corp.*, No. 2010-1035, slip op. at 42 (Fed. Cir. 2011); *Lucent*, 580 F.3d at 1325.

21                 **2.**     **None of Microsoft's Documents Support a 1-5% Per Patent Royalty.**

22         Lucent's next accusation is that Microsoft concealed documents that allegedly show the

23  computer industry has a policy of seeking a 1-5% royalty rate per patent.  Lucent says that five

24  documents produced on remand show Microsoft "sought precisely this rate as part of its licensing

25  policy" and "confirm that industry practice is indeed a rate of 1% ***per patent*** and that 1% ***per***

26  ***patent*** is a reasonable royalty."  (Br. at 20, *citing* Exs. AQ, AR, AS, AT, AU.)  This is nonsense.

27         None of the documents are comparable to royalty rates for a naked patent license to a single

28  patent.  Instead, they deal with Microsoft's "program of protocol licensing, accompanied by

1   technical and marketing support," which entails "licensing portions of its source code and other

2   intellectual property as a series of protocols." (Ex. AQ at 1, 5.) The program enables developers

3   to design programs that work with Microsoft software. (Ex. 30 at 4-5, 16.) The five documents

4   cited by Lucent, two of which were publicly available on Microsoft's website, describe royalty

5   rates and terms associated two such programs—MCPP and WSPP. (Ex. AQ at 6; Ex. AR at 1-2;

6   Ex. AS at 5-9, 23-24; Ex. AT at 17, 20; Ex. AU at 9.) Far from supporting Lucent's faulty "1% per

7   patent up to 5%" theory, these licensing programs encompass licenses to all Microsoft patents

8   necessary to practice nearly 300 different protocols implemented in certain software programs, a

9   portfolio encompassing nearly 100 patents. (Exs. 7 and 8.) MCPP licensees also receive

10  documentation and programs to help them test compatible code. (Ex. 30 at 6.) Likewise, WSPP

11  licensees receive "communications protocols for more than 20 work group server services, tasks,

12  and scenarios," (*id.*), along with "technical documentation" and "software code." (Ex. AS at 5, 8;

13  Ex. 31 at 8, 27-28.) There is no contradiction whatsoever between these technology protocol

14  royalties and Microsoft's argument there is no industry policy of a 1-5% rate for one patent.

15  Indeed, the rates that Lucent cites are from precisely the sort of arrangements the Federal Circuit

16  has held are not comparable to a license involving a single patent. *ResQNet.com v. Lansa, Inc.*,

17  594 F.3d 860, 870-71 (Fed. Cir. 2010) (rejecting reliance on licenses that included rights to

18  "furnished finished software products and source code, as well as services such as training,

19  maintenance, marketing, and upgrades" in addition to patents); *Lucent*, 580 F.3d at 1328 ("[A]

20  reasonable juror could only conclude that the IBM-Dell license agreement for multiple patents to

21  broad, PC-related technologies is directed to a vastly different situation than the hypothetical

22  licensing scenario of the present case involving only one patent, the Day patent, directed to a

23  narrower method of using a graphical user interface tool known as the date-picker.")

24      **C.    The Court Previously Denied Sanctions Regarding the Johnson Survey.**

25      Finally, Lucent rehashes its accusation that Microsoft "hid" the fact that its expert, Philip

26  Johnson performed a survey at the request of counsel, a survey upon which he did not rely in his

27  rebuttal report. (Br. at 18-19.) Lucent already moved for sanctions on this issue and lost. (Ex. 24

28  at 7-8.) Since Lucent dredges it up again, however, a few comments are necessary.

1      Lucent claims that Mr. Johnson "affirmatively lied" and testified that he never conducted

2  his own survey. (Br. at 19.) That is wrong. Microsoft initially took the good faith position that

3  the existence of the survey and its results were not discoverable under the parties' agreement not to

4  produce an expert's notes, draft reports, and communications with counsel. When Lucent asked

5  questions about whether, as he began preparing for his expert report, Mr. Johnson discussed the

6  possibility of conducting his own survey with counsel (and whether such a study had been

7  conducted), Microsoft instructed him not to answer based on its understanding of the parties'

8  agreement. (Ex. 22 at 23:13-21, 34:6-23.) Lucent splices together different parts of Mr. Johnson's

9  testimony to suggest he claimed to have never conducted a survey, (Br. at 19), but the full context

10  shows that is not what he said. (Ex. 23 at 10-12.)

11      At a later point in the deposition, the parties raised the issue with Judge Bencivengo. Judge

12  Bencivengo agreed with Microsoft that the survey results were not discoverable, but allowed

13  questions on whether the survey existed and how the survey was conducted. (Ex. 21 at 19:18-

14  20:11, 21:9-22:3.) In response to that order, Microsoft immediately disclosed the existence of the

15  survey, which was conducted in October/November. (Ex. 21 at 10:17-21; Ex. 22 at 98:10-18.)

16  The parties eventually briefed the issue with this Court, which affirmed Judge Bencivengo's

17  rulings. (Ex. 24.) Microsoft's good faith attempt to invoke the parties' agreement was not

18  "misconduct," as Lucent alleges, especially because Judge Bencivengo, and this Court, agreed in

19  part with Microsoft. In denying Lucent's subsequent sanctions motion, this Court necessarily

20  recognized that Microsoft acted in good faith, so no more need be said on this issue.

21      **D.    None of Microsoft's Conduct is Sanctionable.**

22      Because Lucent has asked for sanctions under a myriad of provisions, we discuss each one

23  separately. Before doing so, however, we note two reasons that sanctions are inappropriate under

24  any provision: (1) Lucent failed to confer with Microsoft before filing this motion, as required by

25  Local Rule 26.1, and (2) Lucent's motion is untimely under Judge Bencivengo's scheduling order.

26      **1.    Microsoft is Not Subject to Sanctions under Rule 37(b).**

27      None of Microsoft's conduct is sanctionable under Rule 37(b). There can be no sanctions

28  under Rule 37(b) unless there is a court order, and a party violates that order. *Brandt*, 30 F.3d at

1   756.  Lucent never identifies any court order that Microsoft allegedly violated, and there is none.

2   Lucent cites several cases imposing sanctions under Rule 37(b) to support its position.  *See* Br. at

3   21-23, *citing Parrick v. Fex Ground Package Sys. Inc.,* 2010 WL 3724825; *Kelley v. Crate &*

4   *Barrel, Inc.,* 2008 WL 2233568 (E.D. Cal.); *Karnazes v. San Mateo,* 2010 WL 2672003 (N.D.

5   Cal.); *Anderson v. Fresno County,* 2007 WL 1865657 (E.D. Cal.); *Keithley v. HomeStore.com,*

6   *Inc.,* 2008 WL 3833384, *7-10, 16 (N.D. Cal.); *Liss v. Exel Trans. Servs., Inc.,* 2008 WL 370886,

7   at *5-7 (D. Ariz); *Payne v. Exxon Corp.,* 121 F.3d 503, 510 (9th Cir. 1997).  None of them justify

8   sanctions here because, among other things, they all involved failure to comply with a court order.

9             **2.**        **Microsoft is Not Subject to Sanctions under Rule 37(c).**

10         Microsoft's conduct is also not sanctionable under Rule 37(c).  To prevail, Lucent must

11   show Microsoft did not make adequate initial disclosures under Rule 26(a) or timely supplement

12   its discovery responses under Rule 26(e).  Lucent has not made either showing.

13         Microsoft was not required to disclose the allegedly "withheld" documents as part of its

14   initial disclosures because it did not intend to use any of it "to support its claims or defenses" at the

15   first trial. FED. R. CIV. P. 26(a)(1)(A)(ii).  Likewise, Microsoft complied with its obligations under

16   Rule 26(e).  Microsoft was faced with overly broad document requests that failed to comply with

17   the "reasonable particularity" requirement of Rule 34.  Other courts have struck similarly broad

18   requests, relieving the party to whom the requests were directed from responding at all.

19   *Bruggeman,* 219 F.R.D. at 436; *Naerebout,* 1992 WL 754399, at *10.  Microsoft did not seek such

20   draconian relief.  Instead, it objected on grounds of overbreadth and vagueness, but conducted a

21   reasonable search in what was then a 15 patent case that turned up at least one usability report on

22   the date picker. (Ex. D.)  Lucent never questioned Messrs. Numoto, Paul-Jones, or Kennedy about

23   the document, and it never asked Microsoft whether more such reports existed.  When Microsoft

24   received specific requests for the allegedly "withheld" documents for the first time on remand, it

25   immediately conducted a new, more targeted search and timely supplemented its production.  The

26   result of that search was only 4 new documents about the date picker, which are all materially

27   identical to the document Lucent chose not to use at the first trial.  Likewise, Lucent has not even

28   identified an original document request to which the irrelevant licensing documents about non-

Case No. 07-CV-2000 H (CAB)

1  comparable technology produced on remand would have been reasonably responsive. Microsoft

2  complied with its obligations under Rule 26(e), so sanctions under Rule 37(c) are unwarranted.

3        What is more, there can be no sanctions under Rule 37(c) if a party's lack of disclosure

4  "was substantially justified or is harmless." Any failing here by Microsoft was both. Even if

5  Microsoft should have done more to ascertain what specific types of documents Lucent wanted,

6  Microsoft was "substantially justified" in thinking it had complied with its discovery obligations.

7  Microsoft was faced with requests that did not comply with Rule 34, yet it promptly produced

8  thousands of documents including a document about the date picker that is equivalent to the few

9  new date picker documents produced on remand. Lucent never complained at the time. Microsoft

10 was reasonable in thinking it had proceeded appropriately. *Kunstler*, 242 F.R.D. at 264-65.

11       Likewise, the timing of Microsoft's production of the new documents is harmless. Again,

12 Lucent has identified only four ***relevant*** documents about the date picker produced on remand, all

13 of which are equivalent to the document Lucent had before the first trial but chose not to use.

14 None of the licensing documents Lucent relies upon are relevant. Lucent has since re-deposed all

15 Microsoft's original witnesses again, plus several new ones. Lucent spent over 55 hours of

16 deposition time on remand on this issue—far more than it could have spent before the first trial,

17 when this was a 15 patent case. Lucent was able to ask each witness about all the documents it

18 claims were withheld. It will have a new trial on this issue alone, where it will be easier for the

19 jury to focus on the evidence than during the last 20-day trial involving not only the Day patent but

20 three other technologically more complicated patents.

21       Despite the Federal Circuit's mandate, Lucent apparently still doesn't realize that general

22 usage data is immaterial. There are many ways to use the Calendar module without infringing the

23 Day patent. (Ex. 29 at 2.) All that matters is customer interest in and use of the date picker, not

24 use of the "Calendar Module" generally. *Lucent*, 580 F.3d at 1334. These documents Lucent cites

25 showing customer use of the Calendar Module are silent on whether those customers use the

26 accused date picker, and thus irrelevant. (Ex. 15 at 167:14-17, 168:3-8.)

27       If anything, the documents supposedly "withheld" helped Microsoft, not Lucent. Without

28 the documents, Lucent obtained a $357 million verdict. Now, Lucent's expert testified that he

used the Microsoft documents produced on remand and the survey of customer usage of the date-picker by Lucent's expert Dr. Jay to apportion the royalty base, and that his proposed damages award dropped from $90 million to $70 million as a result of that apportionment:

> Q. So a major factor in the reduction of your opinion of a reasonable royalty from 90 million to 70 million was applying the licensing policy to an apportioned royalty base, is that right?
> A. I think that's what I said.
> Q. Okay. And the way you were able to apportion the royalty base was by using figures that you had obtained from Microsoft internal documents, is that right?
> * * *
> THE WITNESS: In part.
> Q. Okay. What -- beside the figures that you obtained from Microsoft internal documents, what other numbers did you use to apportion the base?
> A. Information from the Jay survey.
> Q. Okay. Anything else?
> A. I don't think so. Not that I recall.  (Ex. 27 at 213:19-214:14.)

So the documents that Lucent accuses Microsoft of concealing forced Lucent to reduce its damages demand by $20 million.  In fact, in another part of Mr. Sims's testimony, the apportionment results in a reduction of his damages number from $111.5 million to $42 million.  (*Id.* at 183:17-25.)

Lucent's current claim of prejudice is an about-face from its position at the January 4 hearing, when it urged the court that "we can still go to trial next week," and that if "the trial is going to get kicked, rescheduling it sooner rather than later is obviously very important."  (Ex. 25 at 45:5-14.)  Lucent said nothing about withheld evidence or prejudice then.  It was only after it received Professor Mnookin's rebuttal of Mr. Sims's amended report that it decided to file this motion.  Lucent knows the evidence of customer use of the date picker is insufficient to support even its revised damages demand, so it is hoping for an improper adverse inference to fill the void.

### 3.    Microsoft is Not Subject to Sanctions Under Rule 37(d).

Microsoft's conduct is also not sanctionable under Rule 37(d) for failure to appear at a deposition.  Lucent wants sanctions under this Rule because it says Messrs. Numoto and Paul-Jones were inadequately prepared to give 30(b)(6) testimony, which Lucent equates with failure to appear.  But the problem was Lucent's overly broad deposition topics, which did not comply with Rule 30's requirement of "reasonable particularity."  *Murphy*, 255 F.R.D. at 514; *Banks*, 222 F.R.D. at 18-19.  Again, Microsoft proceeded reasonably by objecting, telling Lucent that Microsoft could provide only general marketing testimony unless Lucent narrowed the topics, and

1  then provided witnesses who did just that. Lucent never complained at the time that the witnesses

2  were inadequately prepared—its attempt to revive that claim now comes years too late and well

3  beyond the time set by Judge Bencivengo's scheduling order. *Sure Fill & Seal*, 2010 WL

4  3063287, at *9; Ex. 12 at ¶ 2. Only after Lucent provided more specific 30(b)(6) topics on

5  remand, was Microsoft able to provide witnesses that were prepared to discuss them. Lucent relies

6  on *Southern Cal. Stroke Rehabilitation Assocs., Inc. v. Nautilus*, 2010 WL 2998839 (S.D. Cal.),

7  where a party was sanctioned after it lost a motion to compel 30(b)(6) testimony, failed to present a

8  properly prepared witness for the subsequent deposition, tacitly admitted the witness was not

9  prepared, but argued the deposition was not a "total loss." The conduct here is nothing like that.

10 Microsoft gave Lucent exactly what it promised, and Lucent never complained until now.

11      There are two additional reasons that sanctions are unwarranted under Rule 37(d). First,

12 Microsoft's belief that it complied with the Rules is "substantially justified," which precludes the

13 imposition of sanctions. FED. R. CIV. P. 37(d)(3). Second, Lucent never conferred with Microsoft

14 about its complaints with witness preparation before filing its motion, as required by Rule

15 37(d)(1)(B). Had Lucent done so after the original depositions, Microsoft could have addressed

16 the alleged problem at the time, as it did on remand.

17          **4.    Sanctions Under the Court's Inherent Power Are Inappropriate.**

18      Lucent also generally asserts that sanctions are appropriate under the Court's inherent

19 power. (Br. at 21-22.) Such sanctions are inappropriate for the same reasons sanctions are

20 unwarranted under Rule 37. Indeed, Lucent's complaints all boil down to discovery issues, and it

21 is an abuse of discretion for district courts to impose sanctions for discovery violations using their

22 "inherent authority" if such sanctions would be impermissible under Rule 37. *ClearValue, Inc. v.

23 Pearl River Polymers, Inc.*, 560 F.3d 1291, 1309 (Fed. Cir. 2009).

24      In addition, sanctions under the "inherent authority" require a finding of subjective bad

25 faith. *Fink*, 239 F.3d at 992-94. It would be preposterous to say that Microsoft withheld

26 information in bad faith here: the information has forced Lucent's expert to lower his demand to

27 $70 million. (Ex. 27 at 183, 213-14.) No one would purposely conceal information that could

28 save it tens of millions of dollars in damages. Lucent cites no evidence suggesting otherwise.

1    Lucent tries hard to make this case resemble *Qualcomm, Inc. v. Broadcom Corp.*, 2008 WL

2 66932 (S.D. Cal.). The two cases are miles apart. In *Qualcomm*, counsel intentionally concealed

3 documents on a critical issue in the case (whether Qualcomm had participated in an industry

4 standards group), the lawyers and witnesses made false statements in discovery responses and at

5 trial, tens of thousands of documents on the precise issue had been withheld, opposing counsel had

6 been actively seeking the information throughout the entire case, and the withheld information

7 undermined Qualcomm's entire case. *Id.* at *2-6. Here, by contrast, Microsoft's witnesses and

8 lawyers have been truthful, Microsoft conducted an extensive search after Lucent specifically

9 requested the documents, the search turned up only four new documents related to the date picker,

10 all of which were equivalent to a document Microsoft produced years ago that Lucent never used,

11 and the withheld information actually helps Microsoft.

12    **E.**  **Lucent Should Be Sanctioned for Filing this Frivolous Sanctions Motion.**

13    Finally, Microsoft respectfully requests that the Court sanction Lucent for filing this

14 frivolous sanctions motion. "A baseless sanctions motion unfairly forces an opponent into

15 satellite litigation while diverting attention away from the real issues in a case. It also unjustly

16 challenges the integrity of the accused party and the professionalism of its counsel, and it wastes

17 judicial resources." *Schendel v. Curtis*, 83 F.3d 1399, 1406 (Fed. Cir. 1996). That describes

18 Lucent's motion to a T. Lucent has made serious charges in its motion, accusing three Microsoft

19 employees of perjury and accusing Microsoft's attorneys of violating the oath they took upon

20 joining the bar. Lucent timed its motion so Microsoft would need to prepare an opposition at the

21 same time it is taking and defending expert depositions and preparing pre-trial filings. Worst of

22 all, Lucent knows these charges are false, as even a cursory reading of the "evidence" cited in

23 support of its motion reveals. The Court should put an end to the slash and burn tactics of

24 Lucent's lawyers by awarding Microsoft the fees and costs associated with responding.

25 **V.**  **CONCLUSION**

26    For the reasons above, Microsoft respectfully requests that the Court deny Lucent's motion

27 and award Microsoft its fees and costs associated with responding to this motion.

28

1    Dated:  April 18, 2011                                FISH & RICHARDSON P.C.

2

3

4                                                          By:  /s/ Juanita R. Brooks
                                                               Juanita R. Brooks (SBN 75934)
5                                                              brooks@fr.com

6                                                          Attorneys for Defendant
                                                           MICROSOFT CORPORATION
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 07-CV-2000 H (CAB)

1

## PROOF OF SERVICE

2

3

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130.  I am over the age of 18 and not a party to the foregoing action.

4

5

The certify that a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4.  Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

6

7

On April 18, 2011, I caused a copy of the following document(s):

8

**MICROSOFT'S OPPOSITION TO LUCENT'S MOTION FOR SANCTIONS (FILED UNDER SEAL) [PUBLIC VERSION]**

9

to be served on the interested parties in this action as follows:

10

| | |
|---|---|
| Blair Silver<br>Jeanne Heffernan<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Tel:  (212) 446-4800<br>Fax:  (212) 446-4900 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email:  blair.silver@kirkland.com;<br>jeanne.heffernan@kirkland.com |
| Elizabeth Bernard<br>Kirkland & Ellis LLP<br>655 15th St., NW<br>Washington, D.C., 20005<br>Tel: (202) 879-5000<br>Fax: (202) 879-5200 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email:  elizabeth.bernard@kirkland.com |
| Luke L. Dauchot<br>Kirkland & Ellis LLP<br>333 South Hope Street<br>Los Angeles, CA 90071<br>Tel: (213) 680-8400<br>Fax: (213) 680-8500 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email:  luke.dauchot@kirkland.com |
| Eric Hayes<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Tel: (312) 862-2000<br>Fax: (312) 862-2200 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email:  eric.hayes@kirkland.com; |
| David A. Hahn<br>400 10th Street<br>Coronado, CA 92118<br>Tel: (619) 235-2100<br>Fax:  (619) 235-2101 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email:  dhahn@lawhahn.com |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27                                              Case No. 07-CV-2000 H (CAB)

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  I declare under penalty of perjury that the above is true and correct.  Executed on April 18, 2011, at San Diego, California.

/s/Juanita Brooks
Juanita Brooks