1  David A. Hahn, SBN 125784
   DAVID A. HAHN, ATTORNEY AT LAW
2  400 10th Street
   Coronado, California 92118
3  Telephone: (619) 235-2100
   Facsimile: (619) 235-2101
4

5  Attorney for *Lucent Technologies Inc.*

6  *(Additional Counsel listed on the last page)*

7

8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  LUCENT TECHNOLOGIES INC.,                    Case No. 07-CV-2000-H (CAB)

12                    Plaintiff,
                                                 **LUCENT'S MOTION IN LIMINE NO. 2**
13           v.                                  **TO PRECLUDE ROBERT MNOOKIN**
                                                 **FROM TESTIFYING AT TRIAL**
14  MICROSOFT CORPORATION,

15                    Defendant.                 Date:         June 10, 2011
                                                 Time:         10:30 a.m.
16                                               Courtroom:    13, 5th Floor
                                                 Judge:        Hon. Marilyn L. Huff
17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.   INTRODUCTION...........................................................................................................1

II.  ARGUMENT................................................................................................................2

    A.   Professor Mnookin's Testimony Fails To Meet The Requirements Of Federal
        Rules Of Evidence 702 and 703.......................................................................2

        *1.   Professor Mnookin's "negotiation theory" is not accepted as reliable
            in assessing a hypothetical negotiation.* .....................................................2

        *2.   Professor Mnookin's report is not based upon sufficient facts or data
            to be helpful or reliable under Rule 702 because it fails to connect
            theory to the facts of the case.* ...................................................................4

        *3.   Professor Mnookin is not qualified by way of "knowledge, skill,
            experience, training, or education" to testify as to a reasonable
            royalty under Rule 702 and fails to meet the requirements of Rule
            703.* ..........................................................................................................8

    B.   Professor Mnookin Is Prohibited From Giving An Opinion On An Ultimate
        Issue Of Law. ..................................................................................................10

    C.   If Allowed To Testify At Trial, Professor Mnookin's Testimony Would Be
        Irrelevant, Unfairly Prejudice Lucent, Confuse The Issues, Mislead The Jury,
        And Constitute A Waste Of Time.......................................................................11

III. CONCLUSION ...........................................................................................................12

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Ciba Specialty Chemicals Corp.*,
   No. 08-0068-WS-B, 2010 WL 779283 (S.D. Ala. Mar. 2, 2010) ................................................... 8

*Crow Tribe of Indians v. Racicot*,
   87 F.3d 1039 (9th Cir. 1996) .......................................................................................................... 11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ........................................................................................................................ 2

*Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ........................................................................................................... 7

*Finke v. Hunter's View, Ltd.*,
   596 F.Supp.2d 1254 (D. Minn. 2009) ............................................................................................. 8

*Hanson v. Alpine Valley Ski Area, Inc.*,
   718 F.2d 1075 (Fed. Cir. 1983) .................................................................................................... 3, 4

*In re Imperial Credit Industries, Inc. Securities Litigation*,
   252 F.Supp.2d 1005 (C.D. Cal. 2003) ............................................................................................ 7

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
   No. CV.96 CV 1307-B (AJB), 2004 WL 2284001 (S.D. Cal. Sept. 7, 2004) ................................. 7

*Jinro America Inc. v. Secure Investments, Inc.*,
   266 F.3d 993 (9th Cir. 2001) ..................................................................................................... 8, 12

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................................................ 2

*Lucent Techs., Inc. v. Gateway Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ...................................................................................................... 3

*LuMetta v. U.S. Robotics, Inc.*,
   824 F.2d 768 (9th Cir. 1987) .......................................................................................................... 8

*Mars, Inc. v. Coin Acceptors, Inc.*,
   527 F.3d 1359 (Fed. Cir. 2008) ...................................................................................................... 4

*Mars, Inc. v. Coin Acceptors, Inc.*,
   557 F.3d 1377 (Fed. Cir. 2009) ...................................................................................................... 4

*Martinez v. Davis*,
   No. CV 05-5684 ABC (JEMx), 2011 WL 486255 (C.D. Cal. Feb. 4, 2011)................................. 10

*Matter of James Wilson Associates*,
   965 F.2d 160 (7th Cir. 1992) .......................................................................................................... 7

*Mukhtar v. California State University, Hayward*,
   299 F.3d 1053 (9th Cir. 2002) ....................................................................................................... 10

*Panduit Corp. v. Stahlin Bros., Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ........................................................................................................ 3

*Ricciardi v. Children's Hospital Medical Center*,
   811 F.2d 18 (1st Cir. 1987) ............................................................................................................ 8

*S.E.C. v. Leslie*,
   No. C 07-3444, 2010 WL 2991038 (N.D. Cal. July 29, 2010) ..................................................... 11

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,

289 U.S. 689 (1933) ............................................................................................ 3

*TK-7 Corp. v. Estate of Barbouti*,
993 F.2d 722 (10th Cir. 1993) .......................................................................... 7

*Trilink Saw Chain, LLC v. Blount, Inc.*,
583 F.Supp.2d 1293 (N.D. Ga. 2008) ............................................................. 8

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994) ............................................................................... 11

*United States v. Lundy*,
809 F.2d 392 (7th Cir. 1987) ............................................................................ 8

*Valentin v. New York City*,
No. 94 CV 3911 (CLP), 1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997) ............ 8

*Wantanabe Realty Corp. v. City of New York*,
159 Fed. App'x 235 (2d Cir. 2005) .................................................................. 8

*Wantanabe Realty Corp. v. City of New York*,
No. 01 Civ. 10137 (LAK), 2004 WL 188088 (S.D.N.Y. Feb. 2, 2004) .............. 8

## Rules

FED. R. EVID. 401 ............................................................................................ 11

FED. R. EVID. 402 ............................................................................................ 11

FED. R. EVID. 403 ........................................................................................ 2, 12

FED. R. EVID. 702 .......................................................................................... 2, 8

FED. R. EVID. 703 ............................................................................................. 2

# I.     INTRODUCTION

Lucent moves to preclude Robert Mnookin from testifying at trial.  It does so for three reasons.

First, there is no scientific basis for Professor Mnookin's opinion.  Mr. Mnookin is a professor on the subject of negotiation, but he does not contend, and presents no evidence, that his negotiation theories have any application to the hypothetical negotiation required in patent damages cases.  Indeed, as Professor Mnookin admits, the hypothetical negotiation differs in material respects from the real-world negotiations he relies on.  For example, unlike a real-world negotiation, parties to a hypothetical negotiation have "Book of Wisdom" foresight and no option to "walk-away" from the negotiation table.

Second, there is no factual basis for Professor Mnookin's opinion.  In applying negotiation theory to this case, Professor Mnookin assumes that Microsoft's "walk-away" price for the Day Patent technology in 1996 would have been $2 million for a restricted license and $5 million for an unrestricted license.  That assumption is based on the declaration of Microsoft employee William Kennedy ("Kennedy Declaration").  How or why Mr. Kennedy derived those figures, Professor Mnookin does not know.  He does not know because Mr. Kennedy will not say and Professor Mnookin made no independent assessment.  What Professor Mnookin does know is that Mr. Kennedy's figures are a function of subjective judgment, which could vary from individual to individual.

And third, in arguing that Lucent presents no credible evidence that leads him to question Mr. Kennedy, Professor Mnookin roundly criticizes the opinions of Lucent's licensing and intellectual property valuation expert, Ray Sims, Lucent's survey expert, Deborah Jay, and Lucent's human-to-computer interface expert, Bruce Tognazzini.  But the law will only allow Professor Mnookin to do that if he qualifies as an expert in their respective fields of expertise.  Professor Mnookin has no such expertise and admits that he was not offered in this case as an expert on the subjects of accounting, economics, intellectual property valuation, surveys, or human-computer interface technology.

For these reasons, Professor Mnookin should be barred from testifying at trial.  As explained

in more detail below, his testimony is not competent under Federal Rules of Evidence 702 and 703 and would therefore be more prejudicial than probative under Federal Rule of Evidence 403.

## II.    ARGUMENT

### A.    Professor Mnookin's Testimony Fails To Meet The Requirements Of Federal Rules Of Evidence 702 and 703.

Federal Rule of Evidence 702 requires that an expert may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.  Rule 702 also requires that an expert be "qualified."  *Id*.  Federal Rule of Evidence 703 requires that facts or data relied upon by the expert must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED. R. EVID. 703.

The Court is entrusted with a "gatekeeping obligation" to ensure that any proffered expert testimony meets these requirements.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999) ("where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question … the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993) (the court's gatekeeping function "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").  Professor Mnookin's anticipated trial testimony does not comport with Rules 702 or 703 for the three fundamental reasons set forth below.

#### 1.    Professor Mnookin's "negotiation theory" is not accepted as reliable in assessing a hypothetical negotiation.

Professor Mnookin's opinions are based on negotiation theories that apply to "real-world negotiations."  (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 7–13; Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 408:24–409:14.)  Indeed, every article to which he points for validating these theories concerns real-world negotiations.  (*See*, Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 3, 8–13.)  None, however, apply to the

hypothetical negotiation, which differs from a real-world negotiation.  The differences, as Professor

Mnookin admits, are material.

Unlike in a real negotiation, in a hypothetical negotiation the patent is assumed valid and

infringed.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); (Ex. F,

Mnookin Apr. 8, 2011 Dep. Tr. at 411:3–15.).  Nor does a hypothetical negotiation allow the parties

to walk away as they might do (or in fact did do) in the real world.  To the contrary, in the

hypothetical negotiation the parties **must** reach an agreement.  *See Panduit Corp. v. Stahlin Bros.,*

*Fibre Works, Inc.*, 575 F.2d 1152, 1158–59 (6th Cir. 1978) ("The setting of a reasonable royalty

after infringement **cannot be treated**, as it was here, **as the equivalent of ordinary royalty**

**negotiations** among truly 'willing' patent owners and licensees," and noting that the legal fiction is

created to compensate the patentee); *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075,

1081 (Fed. Cir. 1983) ("The willing-buyer/willing-seller concept is ... employed by the court as a

means of arriving at reasonable compensation and its validity does not depend on the actual

willingness of the parties to the lawsuit to engage in such negotiations.") (internal citation omitted);

(Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 412:12–15.).  Moreover, unlike at a real negotiation, the

parties at a hypothetical negotiation have information about the future via the "Book of Wisdom."

*Lucent*, 580 F.3d at 1333–34 (*citing Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289

U.S. 689, 698 (1933)); (Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 412:16–22; 414:23–415:4.).

Professor Mnookin's negotiation theory pays no heed to the construct of the hypothetical

negotiation.  He assumes that two parties come to a negotiation with an understanding of the value of

their respective "best alternative to a negotiated agreement" ("BATNA").  The parties also decide on

a "walk-away" price, or "reservation price."  (Ex. F, Expert Report of Professor Robert H. Mnookin

dated Mar. 10, 2011 at 5–13.)  Depending on a variety of factors (*e.g.*, inferiority of alternative,

market forces, going-forward risk), the reservation price can be higher or lower than the BATNA.  If

the maximum one party is willing to pay is equal to or higher than the minimum the other party is

willing to take, then there is a "zone of potential agreement" (ZOPA).  If there is no ZOPA, then

there is no room for a deal.

As Professor Mnookin acknowledges, the reservation price in a real-world negotiation

1  captures uncertainty and imperfect knowledge of the future.  However, in a hypothetical negotiation,

2  the "Book of Wisdom," coupled with a presumption of infringement and validity, erases most, if not

3  all, of that uncertainty.  Professor Mnookin and the man he relies on for Microsoft's "reservation

4  price" acknowledged making no allowance for these assumptions required by the law of patent

5  damages.  (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 141:4–15, 190:11–191:17; Ex. H, Kennedy

6  Dec. 2, 2010 Dep. Tr. at 154:10–19 ("I didn't make any assumptions about the validity of the Day

7  patent.").)  Moreover, a "walk-away" threat (which might impact the real world reservation price)

8  does not exist in the hypothetical negotiation, where parties cannot walk-away.  *See Monsanto Co. v.*

9  *Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (rejecting the argument that a reasonable royalty

10  arrived at through the hypothetical negotiation process can never be set so high that no rational

11  infringer acting ex ante would ever have agreed to it); *see also Mars, Inc. v. Coin Acceptors, Inc.*,

12  527 F.3d 1359, 1373 (Fed. Cir. 2008) (noting that a reasonable royalty is not capped at the cost of

13  implementing an alternative), *mandate recalled and amended on other grounds by* 557 F.3d 1377

14  (Fed. Cir. 2009); *Hanson*, 718 F.2d at 1081–82 ("Alpine could have avoided infringement, and

15  paying royalties therefor, by purchasing non-infringing machines from SMI.  It chose, however, to

16  purchase and use Hedco's infringing machines. Having followed that course, it cannot invalidate an

17  otherwise reasonable royalty on the claim that by hindsight it would have been better off if it had

18  purchased the non-infringing SMI machines.").  Hence, the "reservation price" foundation on which

19  the negotiation theory rests is not only flawed, but has no place in the hypothetical negotiation.

20        For these reasons, negotiation theory fails to provide a reliable method for determining a

21  reasonable royalty in the context of a hypothetical negotiation.

> ### 2.    *Professor Mnookin's report is not based upon sufficient facts or data to be helpful or reliable under Rule 702 because it fails to connect theory to the facts of the case.*

24        Assuming negotiation theory were legitimate for purposes of assessing a hypothetical

25  negotiation, it is not reliably applied by Professor Mnookin to the facts of this case.  First, Professor

26  Mnookin cannot have a valid understanding of a ZOPA because he admits he has no understanding

27  of Lucent's behavior and motives.  (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 70:16–71:4, 71:19–

28  8.)  Second, Professor Mnookin has no insight into the basis, if any, for Mr. Kennedy's figures—the

1    very figures which form the cornerstone, if not the entire foundation, for his opinion in this case.[1]  A

2    mere explanation of how one negotiates in the real world is unhelpful in determining a reasonable

3    royalty in a patent infringement case given the material differences between those situations.

4           The books cited by Professor Mnookin, including his own, require consideration of **both**

5    parties' negotiation standpoints to determine what the outcome of that negotiation.  (*See*, Ex. E,

6    Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 3, 8–13.)  According to

7    Professor Mnookin, a ZOPA must exist for two parties to reach a deal in a negotiation, as defined by

8    **both** parties' reservation prices.  (Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 396:7–21.)  In other

9    words, in order for Microsoft and Lucent to reach an agreement, the maximum amount Microsoft

10   would be willing to pay for the Day Patent technology must be greater than the minimum amount

11   Lucent would accept to license the Day Patent technology.

12          But in reaching his conclusion that the parties in this case would have agreed to no more than

13   $5 million for an unrestricted license and not more than $2 million for a restricted license, Professor

14   Mnookin concludes that Lucent would have been happy to take **whatever** Microsoft was willing to

15   pay for the Day Patent technology:

16          What Mr. Sims fails to understand is that both of these numbers [from Mr. Sims'
             report] are at best a negotiator's aspiration price not a negotiator's reservation price.
17          For reasons discussed both above and below, in my opinion a rational negotiator in
             Lucent's position would have been prepared to accept far less than $33.8 million.
18
             Indeed, a license in 1996 of the '356 patent to Microsoft – a leading software
19          company – would have served Lucent's broader interests, even if it was for a number
             significantly lower than $33.8 million.  A license of the '356 patent to Microsoft
20          would have provided Lucent with powerful leverage to obtain licenses from many
             others.  This would be so even if the Microsoft license were deeply discounted.  In
21          establishing its "walk-away" number or reservation price vis-à-vis Microsoft, a
             rational negotiator in Lucent's position would take this broader interest into account.
22
23   (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 28.)  But Professor

24   Mnookin is not an economist or a licensing expert.  Nor has he ever run a business.  The statement

25   is, at best, a hunch from a law professor that is inconsistent with his own negotiation theory.  And

26   even if he were an expert in these fields, Professor Mnookin's opinion comes without a shred of

27   support.  Little wonder, then, that he twice admitted that his opinions were predicated on a guess:

28
_____
[1] Lucent is similarly moving *in limine* to preclude Mr. Kennedy's unsupported damages numbers.

Q. Well, you said [in prior deposition testimony], and I quote, I would have thought in 1996, if I were to speculate on Lucent's behavior, it would be very much to its advantage to be able to say we signed Microsoft up because Microsoft is a very big company. Therefore, although I don't express an opinion here, *if I were asked to speculate, and it would be speculation***,** I would believe there would be a ZOPA, unquote. Do you remember giving that testimony?

A. Yes.

Q. Does that still hold true today?

A. Yes.

(Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 401:12–23 (emphasis added); *see also* Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 28; Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 70:16–71:4 ("I do not express an opinion as to the dollar amount of Lucent or AT&T's reservation value. . . . I express no opinion about how Lucent would negotiate.").)

Professor Mnookin's conclusions regarding what Microsoft would have been willing to pay for the Day Patent technology also come without adequate support.  Only four pages of Professor Mnookin's report address the hypothetical negotiation between Lucent and Microsoft, and those four pages rely almost entirely and exclusively on the Kennedy Declaration.  (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 15–18.)  Professor Mnookin conceded that Mr. Kennedy's statement not only amounted to a personal judgment, but a personal judgment about which reasonable people could differ.  (Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 387:24–388:6 ("[T]he comparison of interest, requires a business judgment.  And different people could make different business judgments.").)  Despite that conclusion, Professor Mnookin obtained no facts from Mr. Kennedy that shed light on how or why the judgment was reached.  Professor Mnookin's conclusion on Microsoft's so-called final "reservation price" rests on the say-so of Mr. Kennedy's declaration.  (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 17–18, 27; Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 377:22–378:16.)  Mr. Kennedy's assertion that Microsoft would not pay more than $5 million for the Day Patent technology is the source of Professor Mnookin's conclusion in this case. (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 77:18–20; 195:24–196:1 ("Q. You didn't come up with 5 million? A. That is correct. I relied on Mr. Kennedy's declaration."); Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 356:7–15; 377:22–378:16.)

Though he does not have any idea as to how or why Mr. Kennedy reached the personal judgments that he did, Professor Mnookin felt comfortable "assessing" the final numbers:

> I took Mr. Kennedy's declaration as that business judgment, where he, in fact, indicated that in 1996 if he'd been responsible for the decision, Microsoft would have paid up to $2 million for a license for Outlook and up to $5 million for a general license. *In assessing that judgment* and in relying on that opinion, as I indicated earlier, I took into account a number of things that I've identified and *I reached the conclusion that his business judgment was entitled to be relied on*. I asked myself after reading the Sims' report, for example, after reading the opinions, would this be rational, and my conclusion is it would.

(Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 359:23–360:22.) But that "assessment" comes without any independent expertise. Distinguished as Professor Mnookin may be as a teacher of negotiation theory and contracts at Harvard Law School, his sense that Mr. Kennedy's conclusions are not contradicted by Lucent is simply not reliable expert testimony.

Professor Mnookin's lack of analysis, lack of expertise in any area relevant to the underlying "judgments," and lack of understanding with respect to Mr. Kennedy's lay opinions renders Professor Mnookin nothing more than a conduit for Mr. Kennedy's assertions. Numerous cases have held that acting as a conduit for another witness violates Rule 703. *See In re Imperial Credit Industries, Inc. Securities Litigation*, 252 F.Supp.2d 1005, 1012–13, n.5 (C.D. Cal. 2003) (rejecting reliance on documents containing opinions created for the sole purpose of litigation and noting that the expert could not validate another party's opinion as he was not qualified in that area); *see also Integra Lifesciences I, Ltd. v. Merck KGaA*, No. CV.96 CV 1307-B (AJB), 2004 WL 2284001, *8 (S.D. Cal. Sept. 7, 2004) (holding that substantial evidence did not support damages award where expert's opinion "was based on the statements of one of Telios' principals, and not on independent research or other factual basis.") (Ex. O); *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 615 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."); *Matter of James Wilson Associates*, 965 F.2d 160, 172–73 (7th Cir. 1992); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732–33 (10th Cir. 1993) (affirming directed verdict where damages expert "failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable other than the fact that it was the opinion of someone

he believed to be an expert who had a financial interest in making an accurate prediction."); *Abrams v. Ciba Specialty Chemicals Corp.*, No. 08-0068-WS-B, 2010 WL 779283, *3–4 (S.D. Ala. Mar. 2, 2010) (Ex. N) (excluding expert testimony as improper and inadmissible where expert merely adopted another's opinions as his own and citing cases); *Wantanabe Realty Corp. v. City of New York*, No. 01 Civ. 10137 (LAK), 2004 WL 188088, *2 (S.D.N.Y. Feb. 2, 2004) (Ex. T) (holding that an expert may not act as a "'mere conduit' for the hearsay of another" and excluding expert's opinion based on a third party's analysis because "it was not [the expert's] opinion at all and may not be received as expert testimony."), *aff'd by* 159 Fed. App'x 235 (2d Cir. 2005); *Valentin v. New York City*, No. 94 CV 3911 (CLP), 1997 WL 33323099, *27 (E.D.N.Y. Sept. 9, 1997) (Ex. S) (citing *United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) and *Ricciardi v. Children's Hospital Medical Center*, 811 F.2d 18, 25–26 (1st Cir. 1987)) (experts may not act as a "mere conduit for the opinions of other persons.").  Because Professor Mnookin "relies" on the unsupported assertions of Mr. Kennedy regarding the damages figure and conducted no independent assessment of his own, Professor Mnookin's testimony should be excluded.

### 3. Professor Mnookin is not qualified by way of "knowledge, skill, experience, training, or education" to testify as to a reasonable royalty under Rule 702 and fails to meet the requirements of Rule 703.

In opining that Mr. Kennedy's judgment is sound, Professor Mnookin challenges the testimony of Messrs. Sims and Tognazzini, as well as that of Dr. Deborah Jay.  But Professor Mnookin lacks any expertise in these areas.  Rule 702 bars such testimony because an expert must be qualified by way of "knowledge, skill, experience, training, or education."  FED. R. EVID. 702; *LuMetta v. U.S. Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir. 1987) (excluding expert witnesses based on a lack of experience with finders fees); *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1005–06 (9th Cir. 2001) (finding testimony of purported expert witness unreliable based on his inadequate qualifications in Korean business culture and practices); *Finke v. Hunter's View, Ltd.*, 596 F.Supp.2d 1254, 1264–65 (D. Minn. 2009) (excluding an expert's opinion on a survey because he was unqualified); *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F.Supp.2d 1293, 1305, 1309 (N.D. Ga. 2008) (excluding an expert's testimony on consumer surveys because it was outside of his area of expertise).

Although Professor Mnookin purports to be an expert in negotiation theory (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 2), even he does not hold himself out as an expert in economics, damages analysis, patent law, or graphical user interfaces.  (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 32:15–17; 34:12–18; 191:2–17; Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 345:3–15; 351:24–352:8; 360:23–25.)  He has never negotiated a patent license or a license for software.  (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 271:19–21; Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 383:6–21.)  He has never run a company.  (Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 383:4–5.)  Indeed, as Professor Mnookin recognizes, being an expert on negotiation theory does not make him an expert on the subject of a negotiation.  (*Id*. at 386:21–25.)

Professor Mnookin is also unqualified to be a survey expert.  Microsoft did not hire him to be a survey expert in this case.  (*Id*. at 351:24–352:2.)  Tellingly, his *curriculum vitae* makes no reference whatsoever to any training or experience with survey design, implementation, or interpretation.  (Ex. M, Mnookin *curriculum vitae*.)  He has never held himself out as an expert in the areas of survey design and evaluation, and has never been hired as an expert in those areas.  (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 137:8–14; 133:25–134:5; 136:23–137:1.)  He has never been called upon by corporations to train people in survey design.  (Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 348:24–349:2.)  Professor Mnookin has neither taught any courses on survey design nor published a single book or article about how to best conduct a survey.  (*Id*. at 349:7–10, 15–17; 350:9–14.)  Professor Mnookin even admitted to relying on Microsoft's designated survey expert—Mr. Johnson—for survey-related guidance because Mr. Johnson is a survey expert.  (*Id*. at 422:21–423:3.)

Despite his lack of qualifications, Professor Mnookin criticizes Lucent's experts on subjects as varied as the complexity of various graphical user interface technology to what advantages Lucent would receive from entering into a licensing agreement with Microsoft.

Professor Mnookin attacks Mr. Sims' analysis on various technical grounds.  He challenges Mr. Sims' reliance on the expert opinion of Bruce Tognazzini for the proposition that the Day Patent technology is a valuable component of Outlook.  (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 22–25.)  Professor Mnookin opines that the technology is not

valuable based on his personal belief and personal experience using Outlook. (*Id*. at 19; Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at 358:9–359:11.) But he is not an expert in the field of human-to-computer interface. He also seeks to rebut Mr. Sims' add-ins analysis with personal anecdotes. (Ex. E, Expert Report of Professor Robert H. Mnookin dated Mar. 10, 2011 at 25.) But anecdotes are no substitute for expertise.

Professor Mnookin also criticizes the Jay Survey and Mr. Sims' reliance on that survey. (*Id*. at 23, 25–26.) He notes, for example, that: "[I]n my opinion the Jay survey in no way establishes that Outlook would not be commercially acceptable if it lacked the date picker." (*Id*. at 23.) He also calls the survey methodology "flawed." (*Id*. at 25–26.) But all of this comes without any expertise in the highly specialized field of surveys. Indeed, the field is so specialized that Microsoft engaged Mr. Johnson on the subject of surveys.

Finally, Professor Mnookin challenges Mr. Sims in the area of licensing. This too is an area in which Professor Mnookin has no expertise. Among other things, Professor Mnookin opines that:

- the licenses Mr. Sims discusses are "irrelevant" (*Id*. at 19–20, 31);
- Lucent's licensing policy is nothing more than aspirational, "what a negotiator hopes to achieve," rather than what Lucent would accept (*Id*. at 20, 28–29);
- the Acer agreement is "certainly different" from a license to the Day Patent (*Id*. at 29); and
- Mr. Sims erroneously relies on the Locus agreement. (*Id*. at 30.)

Professor Mnookin's foregoing opinions and conclusions are not based on any expertise or specialized knowledge and should be excluded.

## B. Professor Mnookin Is Prohibited From Giving An Opinion On An Ultimate Issue Of Law.

Experts cannot opine on an ultimate issue of law. *Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1066, n.10 (9th Cir. 2002); *see also Martinez v. Davis*, No. CV 05-5684 ABC (JEMx), 2011 WL 486255, *3 (C.D. Cal. Feb. 4, 2011) (Ex. P). "[T]he use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *S.E.C. v. Leslie*, No.

1  C 07-3444, 2010 WL 2991038, *9–10 (N.D. Cal. July 29, 2010) (Ex. Q) (quoting *United States v.*
2  *Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). Instead, the role of an expert is to interpret and analyze
3  factual evidence in a relevant and legitimate field of demonstrated expertise. *Crow Tribe of Indians*
4  *v. Racicot*, 87 F.3d 1039, 1045–46 (9th Cir. 1996).

5  Scattered among Professor Mnookin's critiques of Lucent's expert report are improper legal
6  arguments and opinions as to the applicable law and its interpretation. (Ex. E, Expert Report of
7  Professor Robert H. Mnookin dated Mar. 10, 2011 at 18–32.) Professor Mnookin readily admits he
8  is not a patent law expert. (Ex. L, Mnookin Nov. 30, 2010 Dep. Tr. at 32:15–17; 76:12–17 ("I don't
9  consider myself a legal expert on patent damages."); Ex. F, Mnookin Apr. 8, 2011 Dep. Tr. at
10 409:15–17.) Even so, Professor Mnookin offers opinions on what case law is relevant and how
11 various Federal Circuit cases apply with regard to the entire market value rule, the 25% Rule, and
12 claim interpretation. He also comments that the Federal Circuit determined that the Day Patent
13 technology does not impact the sales or pricing of Outlook, and claims the Federal Circuit
14 determined which licenses are comparable in this case. (Ex. E, Expert Report of Professor Robert H.
15 Mnookin dated Mar. 10, 2011 at 6–7, 19–22, 29, 31.) Professor Mnookin goes so far as to pass
16 judgment on Mr. Sims' current report by invoking this Court's past rulings. (*See, e.g.*, *id.* at 32; Ex.
17 F, Mnookin Apr. 8, 2011 Dep. Tr. at 314:3–21.) Not only are these interpretations of the law
18 incorrect, but they are inappropriate as expert testimony. By presenting the law he deems relevant
19 and his personal interpretation of the law, he is usurping this Court's role in instructing the jury as to
20 the applicable law. *See Leslie*, 2010 WL 2991038 at *9–10.

### C. If Allowed To Testify At Trial, Professor Mnookin's Testimony Would Be Irrelevant, Unfairly Prejudice Lucent, Confuse The Issues, Mislead The Jury, And Constitute A Waste Of Time.

23 Under the Federal Rules of Evidence, "relevant" evidence is that which has "any tendency to
24 make the existence of any fact that is of consequence to the determination of the action more
25 probable or less probable than it would be without the evidence." FED. R. EVID. 401. "Evidence
26 which is not relevant is not admissible." FED. R. EVID. 402. For the reasons described in the
27 foregoing sections, Professor Mnookin's opinions are not admissible because they are not relevant.

28 Professor Mnookin's testimony should also be excluded under Federal Rule of Evidence 403.

Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, [or] waste of time." FED. R. EVID. 403.  Rule 403 provides a vital restraint on expert testimony.  "As Judge Weinstein explained:  'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than lay witnesses." *Jinro*, 266 F.3d at 1005. Through negotiation theory that has little, if any, application to the hypothetical negotiation and is in any event predicated on unsupported conclusions, Professor Mnookin hopes to testify to the jury that Mr. Kennedy's lay conclusions are credible and not rebutted by any of Lucent's experts.  But there is simply no independent support for the testimony; his expertise in negotiation theory does not make him an expert on the subject matter of this negotiation, much less an expert the subject matter of what the parties would or would not think of particular arguments during the course of negotiations. Indeed, his testimony would amount to little, if anything, more than attorney argument and improper bolstering.  Such testimony would unfairly prejudice Lucent and mislead the jury.  It would also constitute a waste of the Court's, the jury's, and the parties' time.

## III.    CONCLUSION

For the foregoing reasons, Lucent respectfully requests that the Court strike Professor Mnookin's testimony and preclude him from testifying at trial on the matters discussed in his expert report.

1    Dated:  May  13, 2011                  Lucent Technologies Inc.

2

3                                           By:____/s/ David A. Hahn_____
                                            David A. Hahn (SBN 125784)
4                                           DAVID A. HAHN, ATTORNEY AT LAW
                                            400 10th Street
5                                           Coronado, California  92118
                                            Telephone:  (619) 235-2100
6                                           Facsimile:  (619) 235-2101

7                                           Luke L. Dauchot (SBN 229829)
                                            KIRKLAND & ELLIS LLP
8                                           333 South Hope Street
                                            Los Angeles, CA 90071
9                                           Telephone: (213) 680-8400
                                            Facsimile: (213) 680-8500
10

11                                          Jeanne Heffernan (admitted *pro hac vice*)
                                            KIRKLAND & ELLIS LLP
12                                          601 Lexington Avenue
                                            New York, New York  10022
13                                          Telephone:  (212) 446-4800
                                            Facsimile:  (212) 446-4900
14

15                                          Attorneys for Lucent Technologies Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28