Juanita R. Brooks, brooks@fr.com, (SBN 75934)
Roger A. Denning, denning@fr.com, (SBN 228998)
Michael M. Rosen, rosen@fr.com, (SBN 230964)
Frank J. Albert, albert@fr.com, (SBN 247741)
Fish & Richardson P.C.
12390 El Camino Real
San Diego, California  92130
Telephone:     (858) 678-5070
Facsimile:     (858) 678-5099

Attorneys for Defendant
MICROSOFT CORPORATION

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES INC, <br><br> Plaintiff , <br><br><br> MICROSOFT CORPORATION, <br><br> Defendant. | Case No. 07-CV-2000 H (CAB) <br> consolidated cases: <br> 03-CV-0699 B (CAB) <br> 03-CV-1108 B (CAB) <br> 02-CV-2060 B (CAB) <br><br> **MICROSOFT CORPORATION'S OPPOSITION TO LUCENT'S MOTION IN LIMINE NO. 2 TO PRECLUDE ROBERT MNOOKIN FROM TESTIFYING AT TRIAL** <br><br> Date:          June 10, 2011 <br> Time:          10:30 a.m. <br> Courtroom:   13, Fifth Floor <br> Honorable Marilyn L. Huff <br><br> **REDACTED VERSION** |

TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ........................................................................................... 1

II.  BACKGROUND .......................................................................................... 3

III.  ARGUMENT .............................................................................................. 5

A.  Professor Mnookin's Opinion Is Based on Accepted Methodology.................... 6

1.  The Determination of an Appropriate Hypothetical Negotiation Must Be Premised On Real-World Negotiations ..................................................................... 6

B.  Professor Mnookin's Opinion Is Based on Sufficient Facts and Data ........................................................................................ 9

1.  Professor Mnookin Sufficiently Considers Lucent's Negotiating Position.................................................. 10

2.  Professor Mnookin's Opinion on the Impact of Microsoft's Negotiating Position Is Based on Sufficient Facts and Data................. 12

C.  Professor Mnookin Is Qualified to Provide His Opinion..................................... 14

D.  Professor Mnookin Does Not Opine on an Ultimate Issue of Law.................... 16

E.  Professor Mnookin's Testimony Is Relevant and Admissible ........................... 18

IV.  CONCLUSION ........................................................................................... 18

TABLE OF AUTHORITIES

PAGE(S)

CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................. passim

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................. 1

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................... 1, 2, 7, 8

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) ........................................... 9

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................. 1, 3

*Lampi Corp. v. American Power Products, Inc.*,
    2004 WL 1656547 (N.D. Ill. July 22, 2004) ..................... 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .............................. 2, 8, 13, 17

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008) ........................................... 9

*Minco Inc. v. Combustion Eng'g, Inc.*,
    95 F.3d 1109 (Fed. Cir. 1996) ............................................. 2

*Monsanto Co. v. Ralph*,
    382 F.3d 1374 (Fed. Cir. 2004) ........................................... 9

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) ............................................. 2

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) ............................................. 6

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989) ........................................... 2

*Transclean Corp. v. Bridgewood Servs.*,
    290 F.3d 1364 (Fed. Cir. 2002) ........................................... 2

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ................................... passim

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996) ............................................. 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.     INTRODUCTION

In its motion, Lucent asserts that an expert's opinion must have both a scientific and factual basis and that the expert must be qualified to render that opinion; otherwise, the Court must exclude that opinion in its entirety.  Lucent is absolutely right.  If an expert is not qualified or if the expert's methodology is not based on accepted scientific principles or is not based on the facts of the case, then the Court, as the gatekeeper, has no choice but to exclude that testimony and not allow the jury to hear it.  This is precisely what the Supreme Court has repeatedly held.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136 (1997).  In this case, however, it is the Lucent/Sims methodology that is not based on accepted scientific principles, nor based on the facts of this case, and it is Mr. Sims who is not qualified to offer most of his opinions.  Professor Mnookin's negotiation methodology, on the other hand, is a well-published and widely accepted methodology for valuing not just intellectual property, but property of many sorts.  And Professor Mnookin is one of the world's leading experts in that field.

Under a proper view of patent damages, Professor Mnookin's opinion appropriately applies the actual facts of this case to the actual law of damages.  The actual facts are that Lucent has never practiced the Day patent, has never received a penny in royalties on that patent, and cannot show that even one person purchased Microsoft's accused product because of the patented invention.  The actual law is that these real-world facts can, indeed must, be considered in determining damages.  Although Lucent understandably prefers to leave the actual law and the actual facts behind, this Court does not have that option.

Thus, Lucent's attack on Professor Mnookin's methodology must be rejected.  Lucent admits that Professor Mnookin's methodology is based on published and accepted negotiation theory and practice, an area in which Professor Mnookin is highly qualified.  Lucent argues, however, that testimony about how actual negotiations are conducted is irrelevant to a damages calculation.  This argument is premised on Lucent's contention that *Georgia-Pacific* does more than list a number of potentially relevant factors that one may consider in valuing intellectual property.  According to Lucent, *Georgia-Pacific* establishes a particular methodology that stands

separate and apart from the kind of real-world considerations Professor Mnookin has considered and applied, **and** patent law insists upon applying the *Georgia-Pacific* factors in a formulaic way. Lucent's motion to exclude Professor Mnookin's testimony must be rejected unless this Court agrees with Lucent that the real world must be ignored and that a rigid, formulaic application of the *Georgia-Pacific* factors is required in every case. On the other hand, if Microsoft is correct and *Georgia-Pacific* simply lists potentially applicable factors and patent damages are ultimately aimed at determining what a patentee might actually have been able to negotiate as a royalty in the real world, then Professor Mnookin's opinion more than meets the reliability criteria of *Daubert*, and Mr. Sims' opinion and underlying methodology does not.

To the extent that Lucent's motion rests on the notion that present damages law allows consideration only of the Lucent/Sims hypothetical negotiation construct and no others, its position is unfounded. The Federal Circuit has repeatedly stated that there is no single, correct test for assessing patent damages. *See, e.g., Minco Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996) (fashioning an appropriate damages award depends on the unique economic circumstances of each case); *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576-77 (Fed. Cir. 1989) (same); *Transclean Corp. v. Bridgewood Servs.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002) (same). Indeed, in this very case the Federal Circuit noted that "[l]itigants routinely adopt several approaches for calculating a reasonable royalty." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). But no matter how the expert analyzes the issues, the unique facts of the particular case must always be considered. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (affirming new trial on damages where expert "fail[ed] to tie a reasonable royalty base to the facts of the case at issue."); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (stating that, to be admissible, expert testimony opining on a reasonable royalty rate must "carefully tie proof of damages to the claimed invention's footprint in the market place."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1323-1339 (Fed. Cir. 2009) ("[W]e are left with the unmistakable conclusion that the jury's damages award is not supported by substantial evidence, but is based mainly on speculation and guesswork.").

Case No. 07-CV-2000 H (CAB)

1    Unlike Professor Mnookin, the Lucent/Sims methodology not only fails to look to the

2    "unique economic circumstances" of this case in determining the appropriate damages approach,

3    their methodology *intentionally* disregards the facts.  The unique economic circumstances of this

4    case include: (1) the licensor does not practice, and has never practiced, the invention; (2) no

5    company has ever taken a license to this patent; (3) the patent pertains to a minor feature in a

6    feature-rich software system; (4) the licensee's software system already contained alternatives to

7    the patented invention; (5) the cost of developing the accused feature is relatively small; (6) the

8    cost of removing the patented feature is relatively small; and (7) there is no evidence that anyone

9    ever purchased the software product because of the presence of the patented feature.  These are real

10   world facts and circumstances that were considered by Professor Mnookin but intentionally

11   ignored by Mr. Sims.  Professor Mnookin will testify that these real-world circumstances must be

12   *considered* in order to determine a reasonable royalty.  Mr. Sims will testify that these real world

13   circumstances must be *ignored* in order to determine a reasonable royalty.  In light of the Supreme

14   Court's guidance in *Daubert* and *Kumho*, this Court cannot allow both experts to testify.

15   **II.    BACKGROUND**

16   Professor Mnookin has extensive experience in negotiations and dispute resolution.  He is

17   a professor at Harvard Law School and teaches courses in negotiation and dispute resolution, as

18   well as contracts.  (Ex. A at 2; Attachment A, Mnookin CV, p. 1.)[1]  He is the Director of the

19   Harvard Negotiation Research Project and Chairman of the Program on Negotiation.  (*Id*.)  He has

20   researched negotiation and dispute resolution and published extensively on the subject.  (*Id*. at 3-

21   4.)  He has written or edited twelve books and numerous articles on negotiation and dispute

22   resolution.  (*Id*.)

23   Professor Mnookin has more than 25 years of hands-on professional experience as a

24   mediator and arbitrator and has successfully resolved a number of complex commercial disputes.

25   (*Id*. at 2-3.)  He has experience in dispute resolution as a mediator or arbitrator in over fifty

26   disputes, including a dispute concerning the license of intellectual property by an American firm

27

28   [1] All references to exhibits in this motion refer to exhibits attached to the Declaration of Juanita R. Brooks In Support
     of Microsoft Corporation's Oppositions to Motions in Limine Nos. 1 through 4.

3

to a large Japanese corporation, a dispute concerning patent licensing relating to cellular phone technology, and disputes involving conflicts between former joint venture partners over intellectual property rights. (*Id*.)

Professor Mnookin also has lectured extensively on negotiations.  For the past eleven years, Professor Mnookin has acted as a consultant to the World Intellectual Property Organization ("WIPO") and created a program and taught workshops relating to mediation and dispute resolution to intellectual property lawyers from more than 50 countries. (*Id*. at 4.)  The focus of these workshops is how professionals involved in patent, copyright and trademark conflicts can often create value by turning disputes into deals.  (*Id*. at 4.)  He has given workshops on negotiations to hundreds of practicing attorneys.  (*Id*.)

Professor Mnookin brought all of this experience to the methodology he applied in this case. Professor Mnookin will testify that Microsoft, as a rational negotiator, would necessarily consider the range of possible things it could lawfully do without a license.  (*Id*. at 5-6.)  It would consider what it could do away from the negotiation table without securing an agreement with Lucent.  (*Id*.)  He will offer testimony that the best of these alternatives, which is known as the "BATNA" (Best Alternative to a Negotiated Agreement) in negotiation literature, would be the starting point Microsoft would use to establish a "Reservation Price," the amount at which Microsoft would be indifferent between reaching agreement and walking away to its BATNA. (*Id*.)  In other words, a rational negotiator would never pay more than the reservation price for a license. (*Id*.)  Based on the assumptions detailed in the following section, Microsoft's reservation price in a negotiation with Lucent over the date picker patent would not have exceeded $5 million. (*Id*.)

Professor Mnookin will testify that an agreement also depends on the licensor's assessment of its alternatives and its reservation value.  (*Id*. at 10.)  While the potential licensee's reservation price sets a ceiling, the licensor's reservation price establishes a floor.  (*Id*.)  So long as the potential licensee's reservation price is higher than licensor's reservation price, there is a Zone Of Possible Agreement (ZOPA).  (*Id*.)  This means that any negotiated deal within this range makes both parties better off than would walking away to their best alternatives.  (*Id*.)

Case No. 07-CV-2000 H (CAB)

Professor Mnookin will testify that an agreement in this case resulting from a hypothetical negotiation would have been reached, and would have been no more than Microsoft's Reservation Price of $5 million.

His methodology entails intentionally disregarding the actual facts of this case. Part of his methodology includes a refusal to determine Microsoft's reservation price and Lucent's reservation price based on the actual facts of this case. He intentionally refuses to calculate, based on the actual facts of the case, the ceiling beyond which Microsoft, as a rational negotiator, would not pay. Doc. No. 1224 at 14-25. He also refuses to determine, based on the actual facts of the case, the floor below which Lucent, as a rational negotiator, would not accept. The Lucent/Sims methodology also intentionally ignores the fact that Microsoft had numerous non-infringing alternatives already in Outlook at the time of the hypothetical negotiation. The Lucent/Sims methodology ignores the fact that Lucent had never licensed the Day technology to anyone else by the time of the hypothetical negotiation, or even since. The Lucent/Sims methodology ignores the fact that the date picker is just one small feature among hundreds. In short, the Lucent/Sims methodology ignores all facts specific to this case and instead focuses on irrelevant licenses, untested theories, and misapplied law. This is not a case where two experts used similar methodologies but reached different conclusions. This is a case where one expert applied a scientifically accepted methodology to the specific facts of the case and the other expert did not. They cannot both be right, hence why Lucent has brought this motion to exclude the testimony of Professor Mnookin and Microsoft has brought a competing motion to exclude the testimony of Mr. Sims.

## III.   ARGUMENT

Professor Mnookin's opinion is proper and admissible. Professor Mnookin applies published and accepted negotiation theory as his offered damages methodology, applies this negotiation theory based on sufficient facts and data, and bases his opinion on specialized knowledge.

Case No. 07-CV-2000 H (CAB)

## A.      Professor Mnookin's Opinion Is Based on Accepted Methodology

Professor Mnookin bases his opinion regarding the parties' approaches to a negotiation over the date picker and the Day patent on methodologies published in numerous journals and accepted in the scientific community.[2]  (Ex. A at 11-13 (citing a survey of negotiation scholarship, including a discussion of seven negotiation articles that "demonstrate that [the applied] principles are firmly established").)  Lucent does not dispute the validity of negotiation theory.  Instead, Lucent asserts that a damages opinion cannot be based on how parties approach real-world negotiations because such negotiations are fundamentally different from a hypothetical negotiation.

Microsoft certainly agrees that Professor Mnookin's opinion takes real-world facts into account.  Consequently, if as Lucent argues, the law requires real-world facts to be ignored, then Professor Mnookin's reality based opinion cannot be admissible.  By the same token, Lucent admits that Mr. Sims not only fails to consider real-world facts, but intentionally disregards them. As a consequence, if Lucent is wrong and damages calculations in patent cases, like all other cases, must be based in reality, then Mr. Sims' opinion cannot be admissible.  As set forth below, the law leaves little doubt that damages must be based on the reality of the case, that Lucent's strained argument cannot succeed, that Professor Mnookin's opinion passes the *Daubert* test with flying colors, and that Mr. Sims' testimony should not go to the jury.

### 1.      The Determination of an Appropriate Hypothetical Negotiation Must Be Premised On Real-World Negotiations

The concept of a hypothetical negotiation has its foundation in the way parties approach real-world negotiations.  Indeed, the construct of the hypothetical negotiation envisions the negotiation that would have occurred at the time the infringement began.  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (absent an established royalty, a reasonable royalty may be assessed by envisioning "the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began.").  The Federal Circuit recently confirmed this real-world foundation in *Uniloc*, where it rejected the 25%

---

[2] Professor Mnookin's methodologies, which have been published and accepted in the relevant scientific community, are in stark contrast to those of Mr. Sims, which appear to have been created solely for the purpose of this litigation.

Case No. 07-CV-2000 H (CAB)

1   rule in part because it does not take into account factors that "would have affected a real-world

2   negotiation." *Uniloc*, 632 F.3d at 1313 ("[The 25 percent rule] takes no account of the importance

3   of the patent to the profits of the product sold, the potential availability of close substitutes or

4   equally noninfringing alternatives, or any of the other idiosyncrasies of the patent at issue that

5   would have affected a *real-world negotiation*") (emphasis added).

6         Even in *Georgia-Pacific* itself, the District Court explained that the hypothetical

7   negotiation should be "a marketplace confrontation of the parties" that relies on "any…economic

8   factor that normally prudent businessmen would, under similar circumstances, take into

9   consideration in negotiating a hypothetical license." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*,

10  318 F. Supp. 1116, 1121 (S.D.N.Y. 1970). "In applying the formulation, the Court must take into

11  account the realities of the bargaining table and subject the proofs to a dissective scrutiny." *Id*. at

12  1122. This negotiation must not take place "in a vacuum of pure logic" – it must instead take into

13  account what any normally prudent businessman would have considered under like circumstances.

14  *Id*. at 1121. With this backdrop, the *Georgia-Pacific* court went on to list several factors that may

15  be relevant to a hypothetical negotiation, some of which are necessarily based in real-world

16  considerations. For example, *Georgia-Pacific* factor 1 suggests the parties may consider the

17  "royalties received by the patentee for the licensing of the patent in suit, proving or tending to

18  prove an established royalty." *Id*. at 1120. Obviously, royalties *actually received* by the patentee

19  are necessarily the result of real-world negotiations.[3] Another example is *Georgia-Pacific* factor 2

20  which suggests that the parties could consider the "rates paid by the licensee for the use of other

21  patents comparable to the patent in suit."[4] *Id*. Rates *actually paid* by the licensee are also

22  necessarily the result of real-world negotiations. Finally, *Georgia-Pacific* factor 15 is nothing

23  more than a summary of what Professor Mnookin has described should result from a real-world

24  negotiation:

25        The amount that a licensor (such as the patentee) and a licensee (such as the
      infringer) would have agreed upon (at the time the infringement began) if both had

26        been reasonably and voluntarily trying to reach an agreement. That is, the amount
      which a prudent licensee—who desired, as a business proposition, to obtain a

27        license to manufacture and sell a particular article embodying the patented

28  

---

[3] This factor, of course, has no applicability here, since Lucent has never received any royalties for the Day patent.
[4] This factor also has no applicability in this case.

1   invention—would have been willing to pay as a royalty and yet be able to make a
2   reasonable profit and which amount would have been acceptable by a prudent
    patentee who was willing to grant a license.

3   *Id.*

4          This is not to say the hypothetical negotiation is *exactly* like a real-world negotiation, but

5   Professor Mnookin recognizes the differences.  For example, Lucent emphasizes that the "Book of

6   Wisdom" is one difference between the hypothetical and real-world negotiations, and Lucent

7   attacks Professor Mnookin for allegedly failing to apply the "Book of Wisdom."  But Professor

8   Mnookin acknowledges that in this very case the Federal Circuit noted that its case law "affirms

9   the availability of post-infringement evidence as probative in *certain* circumstances." *Lucent*

10  *Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) (emphasis added).  What

11  Professor Mnookin pointed out was that "the opinion of the federal circuit suggests that you

12  shouldn't blind yourself to that information; but on the other hand, it does not describe in any way

13  how it would affect the hypothetical negotiation."  (Ex. C at 191:13-17.)  Thus, while the Book of

14  Wisdom may teach that the accused product "Outlook" has been successful and profitable, it

15  remains Lucent's burden to provide evidence that the patented feature was the reason for that

16  success and profitability. Lucent has produced none, so the "Book of Wisdom" teaches nothing

17  that would affect this hypothetical negotiation in this respect.

18         Lucent also attacks the use of negotiation theory because real-world negotiations can result

19  in no agreement at all, whereas in a hypothetical negotiation an agreement must be reached.   It is

20  difficult to align Lucent's argument with *Georgia-Pacific* factor 15, for example, which

21  contemplates both parties "reasonably" and "voluntarily" approaching the negotiation and the

22  ultimate royalty being one that a "prudent licensee" would be willing to pay.  If Microsoft is not

23  allowed to consider its alternatives to taking a license, then it is not at the negotiation table

24  "voluntarily" and it must be willing to pay whatever Lucent demands, which certainly would not

25  be "prudent" or really even a "negotiation" at all.

26         Lucent is taking precisely this extreme position when it argues that Microsoft's "'walk-

27  away' threat (which might impact the real world reservation price) should play no role in the

28  hypothetical negotiation." Doc. No. 1220 at 4.  Again, if Lucent's view of the world is correct,

Case No. 07-CV-2000 H (CAB)

1   then Professor Mnookin's testimony should be excluded.  But once again, Lucent is wrong.  The

2   Federal Circuit expressly allows parties to consider alternatives to a negotiated agreement in

3   assessing the negotiating positions of each side in a hypothetical negotiation.  *Zygo Corp. v. Wyko*

4   *Corp.*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996) ("In contrast, the fact that [accused infringer]

5   COULD have continued marketing the [acceptable non-infringing alternative] is a factor relevant

6   to the determination of a proper royalty during hypothetical negotiations. [The accused infringer]

7   would have been in a stronger position to negotiate for a lower royalty rate knowing it had a

8   competitive noninfringing device 'in the wings.'"); *Lampi Corp. v. American Power Products,*

9   *Inc.*, 2004 WL 1656547 at *6 (N.D. Ill. July 22, 2004) (Citing *Zygo* and noting "at the time of the

10  hypothetical negotiations, APP already had its non-infringing 3-piece night-light under

11  development. Thus, it is this Court's belief, based on the record before us, that APP would have

12  been in a stronger position to negotiate a lower royalty.").

13          The cases Lucent cites are not to the contrary.  Lucent cites *Mars* and *Hanson* for the

14  proposition that a reasonable royalty is not limited to the cost to implement an alternative.  Doc.

15  No. 1220 at 4; *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008); *Hanson v.*

16  *Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081-82 (Fed. Cir. 1983).  While those cases cannot

17  be squared with the more recent decision in *Uniloc*, Professor Mnookin is not arguing that

18  damages should be limited to the cost to implement an alternative.  Rather, Professor Mnookin

19  contends that an appropriate reasonable royalty could be as much as $5 million, which is many

20  times what it would have cost to remove the infringing feature from Outlook and simply rely on

21  the pre-existing alternatives to the date picker.  And *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384

22  (Fed. Cir. 2004), a case in which the record established that the patentee would never have licensed

23  the infringing activity at issue regardless of royalty, has nothing to do with this case, where Lucent

24  not only had a policy to license its patents, but relied on licensing royalties as a source of revenue.

25          **B.      Professor Mnookin's Opinion Is Based on Sufficient Facts and Data**

26          Lucent argues that Professor Mnookin's opinion fails to consider Lucent's negotiating

27  position and fails to justify Microsoft's negotiating position.  Doc. No. 1220 at 4-8.  Once again,

28  Lucent's position is contrary to the law and contrary to the facts.

**1.** **Professor Mnookin Sufficiently Considers Lucent's Negotiating Position**

Lucent asserts that Professor Mnookin makes no allowance for and has no understanding of Lucent's behavior and motives. Not true. Professor Mnookin carefully considered the real-world facts that would have informed Lucent's negotiating position. *See, e.g.,* Ex. A at 28. Lucent cannot take issue with these facts because they are undisputed. There is no dispute that at the time of the hypothetical negotiation Lucent had not licensed the Day patent. There is no dispute that Lucent does not practice the Day patent and there is no dispute that Lucent relied on its patent licensing program to generate revenue for the company. Upon inspection, what Lucent's argument really reflects is an effort to shield from Professor Mnookin's expert scrutiny the failings of the Lucent/Sims' analysis of Lucent's reservation price.

In his amended report, Mr. Sims provided an estimate of Lucent's reservation price based on certain assumptions with which Professor Mnookin takes issue. (Ex. D at 50-53; Ex. A at 20 (discussing how Lucent's licensing policy relates to aspiration level, not reservation price), 21 (discussing why Lucent, as an economically rational actor, could not attach weight to Microsoft's gross revenues or net profits and could not base its reservation price on the entire market value of Outlook), 28 (discussing how Mr. Sims' offered 1–3 % royalty rate relates to aspiration level, not reservation price), 28 (discussing Lucent's broader interests in licensing patent to Microsoft), 29 (discussing effect of Lucent's licensing policy and inapplicability of AT&T-Acer agreement on Lucent's reservation price), 30 (discussing inapplicability of the Locus agreement on Lucent's reservation price).)

Lucent next claims that Professor Mnookin really only took into consideration Microsoft's reservation price and opined that Lucent would have taken anything Microsoft offered. Doc. No. 1220 at 5. This is not Professor Mnookin's conclusion. Professor Mnookin concludes that any potential licensor will accept a price higher than its reservation price. Read in context, the passage Lucent cites simply explains that in Professor Mnookin's opinion, Lucent's reservation price would have been lower than the reservation price claimed by Mr. Sims. (Ex. A at 28.) Unlike Mr. Sims, Professor Mnookin uses "The Book of Wisdom" to establish what the Lucent/Sims' methodology refused to acknowledge, i.e., that Lucent has been unable to license the Day patent to

1   anyone for any amount.  He then, very rationally, concludes that licensing the Day patent to

2   Microsoft for $5,000,000 or even less would have had great benefit to Lucent not only because it

3   would generate $5,000,000 that Lucent would otherwise not have received, but also because

4   Lucent in turn could use that license to induce other companies to take similar licenses, thereby

5   parlaying a patent that had netted zero revenues into one that is quite profitable.

6       Next, Lucent takes testimony out of context to claim that Professor Mnookin admitted that

7   his opinion on Lucent's negotiation position is speculation.  But Lucent fails to present Professor

8   Mnookin's actual testimony on this very point.

9       Mr. Sims' original report did not discuss what he believed to be Lucent's reservation price.

10   (Ex. E at 448:19-449:1.)  So when asked about Lucent's reservation price based on Mr. Sims'

11   original report, Professor Mnookin was hesitant to express an opinion, because it would have been

12   speculation.  (*Id.* at 448:7-18.)  But Mr. Sims later amended his report and added a discussion of

13   Lucent's reservation price.  Only after Mr. Sims' amendment did Professor Mnookin review the

14   soundness of that discussion and give his own opinion regarding Lucent's reservation price.

15       Q. Now, since your previous deposition, have you had an opportunity to give more
        thought to what, as a rational negotiator, Lucent's reservation price should be?
16                                      * * *
        A. This report of Mr. Sims, in contrast to his initial report, in fact offers an
17       assessment of what he would call Lucent's walkaway value, based on the one
        percent rule. And because of that and because for this report, I paid a lot of attention
18       and studied and offered opinions concerning that report, I focused on it in terms of
        this report.
19

20   (*Id.*).  Moreover, Lucent ignores Professor Mnookin's testimony that his opinion responding to Mr.

21   Sims' analysis of Lucent's reservation price is not speculation, but is an opinion:

22       Q. And did any of those opinions and criticisms of yours address Mr. Sims'
        business realities approach and what he believed to be the appropriate reservation
23       price?
        A. The page you referred to explicitly did so.
24       Q. And is that an opinion on your part or speculation?
        A. It is opinion.
25   (*Id.* at 450:17-25.)

26

27

28

11

2.     **Professor Mnookin's Opinion on the Impact of Microsoft's Negotiating Position Is Based on Sufficient Facts and Data**

Professor Mnookin's opinions regarding Microsoft's negotiating position are well supported by facts, most of which Lucent simply ignores.  Professor Mnookin's opinions are grounded not only in the testimony of William Kennedy – the person best situated to describe Microsoft's position at the time of the hypothetical negotiation – but also in objective evidence that Lucent cannot and does not dispute.  Accordingly, not only is Professor Mnookin's analysis based on facts, it is based on ***undisputed facts***.  For that reason, Lucent's attempt to undermine Professor Mnookin's opinion falls flat.

First, Professor Mnookin's assessment of Microsoft's position is based on the undisputed fact that Microsoft had at least ***eight non-infringing alternatives*** to the date picker readily available at the time of the hypothetical negotiation.  (Ex. A at 6, 15-16; Ex. E at 355:17-356:6, 357:2-7.)  Professor Mnookin lays out each of these eight alternatives in his expert report.  (*Id.*)  These alternatives are not "hypothetical," or "theoretical," or "judgments" on the part of Mr. Kennedy.  Rather, as Lucent must concede, each of these alternatives actually existed in the Outlook product well before the damages period in this case.  They are objective facts on which Professor Mnookin's opinions are based.

Second, because Microsoft's non-infringing alternatives were included in Outlook already, Professor Mnookin considered that the development cost for the alternatives would have been zero.  (Ex. A at 6-7.)  This fact also cannot be disputed by Lucent.

Third, Professor Mnookin considered that removing the date picker functionality from the source code for Outlook would have cost Microsoft approximately $31,200.  (*Id.* at 7.)  Professor Mnookin relies on William Kennedy for that figure, which is entirely appropriate, given Mr. Kennedy's prior position as General Manager of the Outlook Product Development Team.  In addition, Mr. Kennedy's analysis of the cost to remove the date picker is spelled out clearly in his declaration and his deposition.  (Ex. A at Attachment B, ¶ 4; Ex. G at 164:18-165:12.)  The $31,200 figure accounts for 39-person days of development time, split between feature design,

Case No. 07-CV-2000 H (CAB)

1  usability testing and design validation, programming, testing and user education.  (*Id.*)  Lucent and

2  its experts have not contested any of these facts, upon which Professor Mnookin relies.

3      Fourth, Professor Mnookin considered that Microsoft Outlook is a complex software

4  program that includes many features not covered by the Day patent and of which the date picker is

5  only a small part.  (Ex. A at 6-7; Ex. E at 362:9-16.)  Again, that fact cannot be disputed—indeed,

6  the Federal Circuit arrived at the same conclusion.  *Lucent*, 580 F.3d at 1332 (Outlook "is but a

7  tiny feature of one part of a much larger software program").

8      Fifth, Professor Mnookin considered that Lucent has not shown that a single person

9  purchased Outlook because of the date picker.  (Ex. A at 17; Ex. E at 328:7-329:25.)  As Professor

10  Mnookin explains, that undisputed fact would be an important consideration in forming

11  Microsoft's position in the hypothetical negotiation.  (*Id.*)

12      Sixth, Professor Mnookin  considered the survey of Dr. Jay – as well as the criticism of the

13  survey by Microsoft's survey expert, Phillip Johnson – in reaching his opinion.  (Ex. A at 17, 25-

14  26; Ex. E at 443:2-444:18.)  Just as Mr. Sims attempts to rely on Dr. Jay's survey to support his

15  damages number, Professor Mnookin is certainly allowed to rely on what the survey shows and

16  what it fails to show in his analysis of Mr. Sims' conclusions.

17      Finally, Professor Mnookin also considered Mr. Kennedy's declaration stating that

18  Microsoft would have believed, in 1996, that removing the date picker feature from Outlook would

19  not have impacted sales measurably, and therefore Microsoft would have been unwilling to pay the

20  exorbitant amount Lucent is seeking in order to obtain a license to the Day patent.  (Ex. A at 17-18;

21  Ex. E at 318:24-319:4, 320:15-321:8, 328:7-329:25.)  The importance that Microsoft placed on the

22  date picker feature is certainly a relevant fact to consider in determining how much Microsoft

23  would have been willing to pay for a license to the Day patent.  Because of his roles as General

24  Manager of the Outlook Product Development Team and Corporate Vice President in the Office

25  Division, Mr. Kennedy is uniquely positioned to testify about how Microsoft viewed the date

26  picker feature.  Professor Mnookin properly relies on that testimony.

27      Contrary to Lucent's portrayal, Professor Mnookin is not merely a "conduit for Mr.

28  Kennedy's assertions."  Instead, he carefully considered all of the factual evidence and drew his

1  own conclusions regarding Microsoft's reservation value. (Ex. E at 381:14-382:3; 384:5-23.)

2  Considering his 25 years of experience in negotiation theory and practice, Professor Mnookin's

3  reasoned analysis of the facts, many of them undisputed, easily meets the threshold for expert

4  testimony.

5       **C.    Professor Mnookin Is Qualified to Provide His Opinion**

6       Lucent's brief makes vague arguments that Professor Mnookin is unqualified to provide his

7  opinion. Lucent's argument is unsupported and without merit.

8       Lucent first attacks Professor Mnookin's critique about Mr. Sims' use of the Jay survey.

9  Lucent would have the Court believe that Professor Mnookin has no experience in surveys. But

10  that is simply not true. Professor Mnookin testified that he has had training in surveys, has written

11  a book that involved the use of surveys, has used surveys in his own empirical research, and has

12  taught courses where the adequacy of surveys was assessed. (Ex. E at 347:13-23; 349:3-6 ("I have

13  written a book that involved the use of surveys, yes."); 349:18-23 ("I have led research seminars

14  and attended and participated in many workshops where the adequacy of survey work was

15  assessed."); 350:4-8 ("As I answered earlier, I have taught and participated in seminars and

16  workshops that dealt with surveys and the adequacy of them."); Ex. C at 136:2-4 ("I have taken

17  courses in empirical research methods, which involved the use of surveys.") Professor Mnookin

18  thus does have specialized knowledge that can assist the trier of fact and he can apply that

19  specialized knowledge to rebut the implications of the survey on the hypothetical negotiation.[5]

20       Next, Lucent attacks Professor Mnookin's critique of Mr. Sims' use of certain licenses.

21  Lucent constrains Professor Mnookin's specialized knowledge too narrowly. Professor Mnookin's

22  experience includes negotiations and dispute resolution involving software licenses and negotiation

23  and dispute resolution involving patent cases, which necessarily involve licensing:

24         Q. Have you licensed out anyone's software?
       A. I'm not sure what you mean by licensed out, but I have participated in processes

25           that involved licenses.
       Q. Sure, mediations, right?

26         A. Yes, and arbitrations.

27  [5] ████████████████████████████████████████████████ Nevertheless, Mr.

28  Sims performs numerous manipulations of the Jay survey in an unsupported attempt to justify an inflated damages demand. This is yet another area where the Lucent/Sims methodology fails to meet the reliability criteria of *Daubert*.

Case No. 07-CV-2000 H (CAB)

1    Q. And arbitrations?
     A. Yes.
2

3   (Ex. E at 383:9-16).  Professor Mnookin further testified, "My guess is I've mediated between half

4   a dozen and a dozen patent cases."  (Ex. C at 270:4-6).  Professor Mnookin further testified that he

5   created and taught a mediation course involving patent disputes:

6        A. And in addition, for 15 years, I really have created and taught a mediation course
         at the World Intellectual Property Organization in Geneva, and those courses have
7        involved, probably, more people on the patent side than the copyright side.
         Q. But -- you're referring to your work with World Intellectual Property
8        Organization or WIPO?
         A. Yes.
9        Q. Okay. And that's a general mediation course; isn't that true?
         A. It's a mediation course really focused on intellectual property.
10       Q. Focused generally on intellectual property, but not specific to patents, true?
         A. In our teaching in that course, we use two different cases as simulations; one is a
11       copyright case, and one is a patent case.

12  (*Id.* at 270:8-24.)  Professor Mnookin thus does have specialized knowledge that can assist the trier

13  of fact and can apply that specialized knowledge to provide testimony rebutting the use of the

14  licenses Mr. Sims asserts are comparable in this case.

15       Lucent also attacks Professor Mnookin's critique of Mr. Sims' reliance on Lucent's

16  licensing policy.  As is clear from the "licensing policy" itself, it is nothing more than a negotiation

17  guide.  ███████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████

20  ██████████████████████        Professor Mnookin will testify on how the negotiation guide would

21  have affected the negotiation between Microsoft and Lucent, an exercise fully within his expertise

22  in negotiations and dispute resolution and fully consistent with the stated purpose of the licensing

23  policy itself.

24       Finally, Lucent attacks Professor Mnookin's critique of Mr. Sims' "quantitative value" of

25  the date picker, i.e.,  Mr. Sims' "add-in analysis" and "time saving analysis."  Lucent asserts that a

26  critique of this aspect of Mr. Sims' methodology requires expertise in "human-to-computer

27  interface."  Doc. No. 1220 at 9-10.  Ironically, Lucent attacks Professor Mnookin's rebuttal as

28  outside his qualifications even as it fails to provide any basis for Mr. Sims' qualifications in this

area or for his use of these untested, unpublished, brand new, damages theories.[6] Without any explanation, Lucent simply asserts that Professor Mnookin's opinion somehow requires an expertise in the field of human-to-computer interface. Doc. No. 1220 at 9-10. An examination of the relevant pages of the Mnookin report reveals that Professor Mnookin is simply offering a critique of the unsupported theories offered by Mr. Sims. This critique is based on Professor Mnookin's specialized knowledge in negotiation. For example, with the add-ins analysis, a rational negotiator would ask, is there any proof that anyone actually uses this add-in? The answer is no. A rational negotiator would also ask is this the only add-in which is comparable to the patented invention? The answer is once again no. In fact, a simple review of the web-site in question shows that there are free add-ins which are as comparable and other add-ins which have even more comparable functionality but sell for 1/18[th] the price of the Lucent/Sims chosen add-in.

As for the time-savings analysis, a rational negotiator would ask, is there any proof that there really is a time savings over the non-infringing alternatives? The answer is no. A rational negotiator would also ask, is there any proof that a customer would be willing to pay more for these supposed time savings? And once again the answer is no. One does not need to be an expert in human-computer interface to ask these questions, nor to find these answers. One only need be a rational negotiator, an area in which Professor Mnookin is exceptionally qualified.

### D. Professor Mnookin Does Not Opine on an Ultimate Issue of Law

Finally, Lucent argues that Professor Mnookin should be prevented from testifying about issues of law. To the contrary, Professor Mnookin's references to case law are entirely appropriate.

The vast majority of the references to legal authority in Professor Mnookin's report are to the Federal Circuit's opinion in this case. This Court already has denied Lucent's motion *in limine* to preclude any reference to the Federal Circuit opinion. Doc. No. 1008, 1179 at 2. In that Order, the Court states that "Microsoft argues that its experts intend to rely on statements of law from the Federal Circuit's opinion as the basis of their testimony," and orders that "The Court will allow

---

[6] Microsoft has moved to exclude these theories as fundamentally unreliable, contrary to the law, and not based on sufficient facts or data. *See* Doc. No. 1224 at 4-14.

Case No. 07-CV-2000 H (CAB)

1    references to the Federal Circuit opinion for legal standards on patent damages." Doc. No. 1179 at

2    2. ████████████████████████████████████████████████████████

3    ████████████████████████████████████████ and Lucent's attempt to prevent

4    Professor Mnookin from doing the same should not succeed.

5           More importantly, Lucent's efforts to prevent discussion of the applicable legal standards is

6    merely an attempt to cover up the fact that its own expert's damages opinion is based on

7    methodology that is contrary to the law. In sharp contrast to Professor Mnookin's proper

8    references to the Federal Circuit opinion, Lucent's expert's analysis repeatedly runs afoul of recent

9    Federal Circuit case law in various ways.

10          For example, here is one of the passages in Professor Mnookin's report about which Lucent

11   complains:

12              Further, there are only two ways that Mr. Sims can get to his claimed royalty
                of $65-75M. Either he must use a royalty over 1%, which makes no sense
13              given Lucent's aspiration value of a 1% royalty on an individual patent; or
                he would have to apply a 1% royalty to something greater than what he calls
14              the apportioned base. The Court, however, has said that *it would be
                improper not to apportion* because on the current record there is no
15              evidence the date picker is the basis for customer demand of Outlook.

16   (Ex. A at 32 (emphasis added)). In this section, Professor Mnookin appropriately criticizes Mr.

17   Sims' failure to apportion between the patented and unpatented features of the Outlook software.

18   That failure violates the directives given in *Lucent* and *Uniloc* regarding the entire market value

19   rule, and Lucent should not be allowed to prevent Professor Mnookin from pointing out that

20   violation.

21          In another example, Professor Mnookin criticizes Mr. Sims' reliance on license agreements

22   for patents that are not comparable to the Day patent, including the Acer and Apple agreements,

23   which the Federal Circuit has found not comparable, and the z4, Eolas, Imagexpo and VirnetX

24   agreements, which this Court has previously said are not "sufficiently comparable." (Ex. A at 29-

25   31.) Federal Circuit authority is clear that for license agreements to be relevant to a damages

26   analysis, they must be sufficiently comparable to the license that would be the result of the

27   hypothetical negotiation. *Lucent*, 580 F.3d at 1331. Professor Mnookin is well within his purview

28

Case No. 07-CV-2000 H (CAB)

as an expert to point out that Lucent's expert's analysis fails to show the comparability required by Federal Circuit case law.

Lucent's motion simply seeks to prevent Professor Mnookin from criticizing Mr. Sims' improper methodologies. Professor Mnookin certainly will not intrude on the Court's role of instructing the jury on the law, but he should be allowed to testify about the errors in the methodology used by, Mr. Sims.

### E.     Professor Mnookin's Testimony Is Relevant and Admissible

Finally, Lucent's grab-bag argument that Professor Mnookin's testimony is irrelevant, unfairly prejudicial, will confuse the issues, will mislead the jury, and will constitute a waste of time merely repeats arguments made elsewhere in its motion and should be rejected for the same reasons.

## IV.     CONCLUSION

For all of the above reasons, Lucent's motion to exclude Professor Mnookin's testimony should be denied and Microsoft's motion to exclude the testimony of Mr. Sims should be granted.


Dated: May 27, 2011                          FISH & RICHARDSON P.C.



                                             By:  /s/ Juanita R. Brooks
                                                  Juanita R. Brooks (SBN 75934)
                                                  brooks@fr.com

                                             Attorney for Defendant
                                             MICROSOFT CORPORATION

Case No. 07-CV-2000 H (CAB)

## PROOF OF SERVICE

I am employed in the County of San Diego. My business address is Fish & Richardson P.C., 12390 El Camino Real, San Diego, California 92130. I am over the age of 18 and not a party to the foregoing action.

The certify that a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Civil Rule 5.4. Any other counsel of record will be served by facsimile, overnight delivery, or other overnight service.

On May 27, 2011, I caused a copy of the following document(s):

**MICROSOFT CORPORATION'S OPPOSITION TO LUCENT'S MOTION IN LIMINE NO. 2 TO PRECLUDE ROBERT MNOOKIN FROM TESTIFYING AT TRIAL (REDACTED VERSION)**

to be served on the interested parties in this action as follows:

| | |
|---|---|
| Blair Silver<br>Jeanne Heffernan<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Tel: (212) 446-4800<br>Fax: (212) 446-4900 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email: blair.silver@kirkland.com; jeanne.heffernan@kirkland.com |
| Elizabeth Bernard<br>Kirkland & Ellis LLP<br>655 15th St., NW<br>Washington, D.C., 20005<br>Tel: (202) 879-5000<br>Fax: (202) 879-5200 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email: elizabeth.bernard@kirkland.com |
| Luke L. Dauchot<br>Kirkland & Ellis LLP<br>333 South Hope Street<br>Los Angeles, CA 90071<br>Tel: (213) 680-8400<br>Fax: (213) 680-8500 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email: luke.dauchot@kirkland.com |
| Eric Hayes<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Tel: (312) 862-2000<br>Fax: (312) 862-2200 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email: eric.hayes@kirkland.com; |
| David A. Hahn<br>400 10th Street<br>Coronado, CA 92118<br>Tel: (619) 235-2100<br>Fax: (619) 235-2101 | Attorneys for LUCENT TECHNOLOGIES INC.<br><br>Email: dhahn@lawhahn.com |

Case No. 07-CV-2000 H (CAB)

1       I declare that I am employed in the office of a member of the bar of this Court at whose
2 direction the service was made. I declare under penalty of perjury that the above is true and
correct. Executed on May 27, 2011, at San Diego, California.

3

4

5                                 /s/Juanita Brooks_____

6                                 Juanita Brooks

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 07-CV-2000 H (CAB)