1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

LUCENT TECHNOLOGIES, INC.,

CASE NO. 07-CV-2000 H (CAB)

12

Plaintiff,

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF LUCENT'S MOTIONS IN LIMINE**

13

vs.

14

MICROSOFT CORPORATION,

Defendant.

15
16

On May 13, 2011, Plaintiff Lucent Technologies, Inc. ("Lucent") filed its Motions in

17

Limine Nos. 1-4  (Doc. Nos. 1219-22.)  On May 27, 2011, Defendant Microsoft Corporation

18

("Microsoft") filed its opposition.  (Doc. Nos. 1256-59.)  On June 8, 2011, Lucent filed its

19

reply.  (Doc. Nos. 1263, 1265-67.)  The Court held a hearing on June 10 and 14, 2011.  Luke

20

L. Dauchot and Jeanne Heffernan appeared on behalf of Plaintiff Lucent.  Juanita Brooks,

21

Roger Denning, Francis Albert, and Michael Rosen appeared on behalf of Defendant

22

Microsoft. After due consideration, the Court GRANTS in part and DENIES in part the

23

motions.

24

## DISCUSSION

25

**I.      Motion In Limine regarding the Philip Johnson Survey (No. 1)**

26

Lucent seeks to preclude Microsoft from explaining at trial that the results of the survey

27

conducted by Microsoft's survey expert, Philip Johnson, are not being presented to the jury for

28

any other reason than that Microsoft elected to not share the results.  (Doc. No. 1219 at 2.)

Lucent furthermore seeks an jury instruction that the Johnson survey results are not in front of the jury because Microsoft elected to not disclose them.  (Id.)  In response, Microsoft that the motion is premature because Microsoft has no intention introducing the results of the survey at trial.  (Doc. No. 1256 at 1.)

The Johnson survey has already been the subject of several other motions, including a previous motion in limine.  (Doc. Nos. 1015-16, 1022, 1199.)  In its first order addressing evidentiary issues related to the Johnson Survey, the Court granted Lucent's request to prohibit Microsoft from introducing the results of the Johnson survey, absent further order of the Court outside the presence of the jury.  (Doc. No. 1099 at 8.)  The Court further ordered that:

> "Lucent may ask Microsoft's expert the reasons why he is critical of Jay's survey for Lucent—including the fact that Microsoft's expert submitted a survey to 600 to 800 individuals at a public mall.  However, the Court restricts Lucent from asking about attorney-expert communication with Microsoft, absent further order of the Court, or anything concerning draft reports between the expert and Microsoft.  In addition, either party may request a limiting instruction at trial if they believe that it is appropriate."

(Id. at 7.)  Following that order, in its first round of motions in limine, Microsoft renewed its request to strike Johnson's deposition testimony along with its request to preclude Lucent from mentioning his survey research during trial.  (Doc. No. 1130.)  The Court ordered that  Lucent may question Johnson about the survey but will not be allowed to question on communications between Johnson and Microsoft.  (Doc. No. 1180 at 4-5.)

After consideration of the parties' arguments, the Court prohibits mention of the Johnson survey at trial in opening statements.  The Court further prohibits testimony on the Johnson survey in Dr. Jay's direct testimony.  Otherwise, the Court DENIES the motion without prejudice to a contemporaneous objection at trial.  The Court has previously ruled that the survey results cannot be introduced at trial, absent further order of the Court outside the presence of the jury, and limited what Lucent may question Johnson about at trial.  Microsoft represents that it does not plan on discuss the survey results at trial.  If Microsoft argues at trial that the survey results are not in front of the jury due to Lucent's actions, Lucent may contemporaneously object at trial.

///

1  **II.     Motion In Limine to Exclude Expert Opinions from Aaron Marcus on Surveys**
2  **(No. 3)**

3       Lucent seeks to exclude the testimony of Microsoft's technical expert Aaron Marcus
4  as it pertains to surveys, survey techniques and survey interpretation. (Doc. No. 1221.) Lucent
5  argues that Marcus is qualified in the areas of user interface design, evaluation, planning,
6  research, documentation and training, not surveys. (Id. at 1.) Thus, Lucent argues that any
7  testimony from him criticizing Lucent's survey expert Dr. Jay's survey is improper under
8  Federal Rules of Evidence 401, 402, and 403. (Id. at 2-3.) In opposition, Microsoft represents
9  that it does not plan on introducing any statements by Marcus regarding surveys. (Doc. No.
10 1258.) Instead, Microsoft argues that it would only bring those statements in if Lucent's
11 technical expert Mr. Tognazzini testifies on the survey. (Id. at 1.) In particular, Microsoft
12 objects to his testimony that Dr. Jay's survey results confirm his understanding of the use and
13 importance of the Day patent technology. (Id.)

14      Under Federal Rule of Evidence 702, a witness who testifies to scientific, technical, or
15 other specialized knowledge must be qualified as an expert by knowledge, skill, experience,
16 training, or education. Fed. R. Evid. 702. Only such expert witnesses may form of an opinion
17 related to the technical knowledge. Id. The opinion to "assist the trier of fact" either "to
18 understand the evidence" or "to determine a fact in issue" and the witness has to be sufficiently
19 qualified to render the opinion. Primiano v. Cook, 598 F.3d 558, 563 (9th Cir. 2010).

20      The Court concludes that Microsoft's technical expert Marcus should be precluded from
21 testifying from areas he is not an expert in—including survey techniques and survey
22 interpretation. Microsoft has not put forth evidence that he is qualified as a survey expert. See
23 Primiano, 598 F.3d at 563. Lucent's technical expert Tognazzini would similarly be precluded
24 from opining on the correctness of Dr. Jay's survey or Dr. Jay's survey methodology.
25 However, the Court does not conclude that Tognazzini's statements as to the survey results
26 confirming his understanding of the use of the Day patent technology are prohibited. Such
27 statements do not opine on the correctness of Dr. Jay's survey or her methodology and do not
28 require expertise in surveys that is based on scientific, technical, or other specialized

knowledge.  See Federal R. Evid. 701.  Accordingly, the Court GRANTS the motion to exclude Microsoft's expert Marcus's testimony as to the correctness of survey results and survey methodologies.  Either party may make a contemporaneous objection at trial if any witness who is not an expert in surveys fails to adhere to these restrictions.

**III.    Motion In Limine to Preclude Microsoft's Damages Figure (No. 4)**

Lucent moves to preclude evidence of Microsoft's damages figure from trial.  (Doc. No. 1222.)  Microsoft's damages figure rests on the testimony of William Kennedy.  Kennedy testified that, at the time of the hypothetical negotiation, Microsoft would have only paid $2 million for rights to use the Day patent technology in Outlook or $5 million for an unrestricted license.  (Id. at 1-2.)   Lucent objects to the testimony because it argues the testimony lacks proper foundation.  (Id. at 4.)   In particular, Lucent argues that Kennedy—as a fact witness—does not have "personal knowledge of the matter" as required under Federal Rule of Evidence 602.  (Id.)  Lucent points out the Kennedy does not have experience in patent licensing or negotiations and that at the time of the hypothetical negotiation, Kennedy was programmer and development lead on Outlook, a product that is not accused and does not practice the Day patent technology.  (Id.)

In opposition, Microsoft argues that Kennedy has 19 years of experience with Microsoft, both as General Manager for the Outlook Product Development Team and recently as a Corporate Vice President in the Office division.  (Doc. No. 1259 at 1.)  Thus, he has an understanding of product development at Microsoft  knew the software market at the time of the hypothetical negotiation.  (Id. at 2.)  Furthermore, Kennedy knows about non-infringing alternatives to the Day patent technology and the development cost to remove the Day patent technology from Microsoft's programs.  (Id.)  Thus, taking everything in consideration, Microsoft argues that Kennedy could opine on how much Microsoft would have paid to license the feature.  (Id. at 4-7.)

After due consideration of the parties' arguments, the Court grants to motion to exclude the testimony of William Kennedy on his damages figure of $2 or $5 million.  A witness may only testimony on a matter when he has "personal knowledge of the matter."  Fed. R. Evid.

602. Furthermore, a lay witness testifying as to his opinion is limited to opinions that are "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." <u>Id.</u> R. 701. Kennedy's testimony as to what Microsoft would have paid at a hypothetical negotiation must be set in context of when the negotiation would have taken place—in 1996. <u>See</u>   <u>Lucent Technologies, Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The hypothetical negotiation tries, at best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement.").

At the time of the hypothetical negotiation in 1996, William Kennedy was a programmer for Microsoft working on Microsoft Word, a program that is not an accused product in this trial. (Doc. No. 1222 at 4.)  At that time in 1996, Kennedy's responsibilities did not include valuation of technology.  As a programmer, Kennedy appropriately gives testimony as to how much it would cost to remove the Day patent technology from Microsoft Outlook.  (<u>See</u> Doc. No. 1259 at 3-4 (explaining that based on the development and testing, it would cost $31,200 to remove the Day patent technology from Outlook).)  However, Kennedy fails to explain how, using his personal knowledge, he arrives at a license fee of $2 million for a single product license or $5 million for an unrestricted license from this $31,200 figure.  In particular, Kennedy does not adequately establish any knowledge he has in the area of licensing with specificity and only broadly claims that he has exposure to licensing in his role as a business leader.  Accordingly, the Court concludes that William Kennedy is precluded from testifying on valuation of the Day patent technology at trial.

**IV.    Motion In Limine to Preclude Robert Mnookin from Testifying at Trial (no. 2)**

Lucent seeks to preclude Microsoft's damages expert, Professor Robert Mnookin, from testifying at trial. (Doc. No. 1220.)  In particular, Lucent argues that Professor Mnookin's negotiation theory is improper, that there is no factual basis for his opinion, and that he is not qualified to criticize Lucent's experts.  (<u>Id.</u> at 1.)

///

## A.    Legal Standard

Under <u>Daubert</u>, the court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant.  <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993).  Courts have the "responsibility of ensuring that all expert testimony must pertain to 'scientific, technical, or other specialized knowledge.'"  <u>Uniloc USA, Inc. v. Microsoft Corp.</u>, 632 F.3d 1292, 1315 (Fed. Cir. 2011).  The court must decide if such testimony is based on a "firm scientific or technical grounding" as required under Federal Rule of Evidence 702.  <u>Id.</u>  Under Rule 702, a witness qualified as an expert by knowledge, skill, experience, training or education can testify in opinion or otherwise if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  Fed.  R. Evid. 702.  Rule 703 of the Federal Rules of Evidence  permits experts to render opinions even if based on inadmissible evidence so long as the inadmissible evidence is of the type reasonably relied on by experts in that field.  <u>Daubert</u>, 509 U.S. at 595.  Such inadmissible facts or data may be admissible as the basis for an expert's opinion if their "probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."  Fed. R. Evid. 703.

In addition to reliability and relevancy, "the patentee must sufficiently tie the expert testimony on damages to the facts of the case."  <u>Uniloc</u>, 632 F.3d at 1315 (citing <u>Daubert</u>, 509 U.S. at 59)).  "[O]ne major determinant of whether an expert should be excluded under <u>Daubert</u> is whether he has justified the application of a general theory to the facts of the case."  <u>Id.</u>  If the expert methodology is sound and the evidence relied upon sufficiently relates to the case at hand, disputes about the degree of relevance or accuracy may go to the testimony's weight but not its admissibility.  "Determining a fair and reasonable royalty is often . . . a difficult judicial chore, seeming often to involve more the talents of a conjurer than those of a judge."  <u>ResQNet.com Inc. v. Lansa, Inc.</u>, 594 F.3d 860, 869 (Fed. Cir. 2010).  Thus, the hypothetical negotiation necessarily involves "an element of approximation and uncertainty."  <u>Lucent Technologies, Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1327 (Fed. Cir. 2009).  However,

"neither a jury nor the court can base its damages calculation upon speculation about the significance of evidence—only reasonable inferences, supported by the evidence, are permissible." Id.

For a proper calculation of patent damages, the Federal Circuit requires "sound economic and factual predicates" for the analysis.  See Riles v. Shell Exploration and Production Co., 298 F.3d 1301, 1311 (Fed. Cir. 2002); see also Grain Processing Corp. v. American Maize-Products Co., 185 F. 3d 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."); Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc., 246 F.3d 1336, 1355 (Fed. Cir. 2001) ("Such market reconstruction, though hypothetical, requires 'sound economic proof of the nature of the market.'").

Accordingly, any economic expert testifying about patent damages must base the opinion on sound economic principles meeting the test in Daubert and Rule 702 of the Federal Rules of Evidence.  A trial court's decision to admit expert testimony under Daubert follows the law of the regional circuit.  Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).  A trial court has broad discretion in assessing the relevance and reliability of expert testimony.  United States v. Finley, 301 F.3d 1000, 1007 (9th Cir. 2002).  The requirement of Rule 702(1) "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, Adv. Comm. Note (2000).  The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." Primiano v. Cook, No. CV-03-00373, 2010 WL 1660303, at *4 (9th Cir. Apr. 27, 2010).  "Under Daubert, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony." Id. (quoting United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)).  As the Supreme Court noted in

1   Daubert, "[v]igorous cross-examination, presentation of contrary evidence, and careful
2   instruction on the burden of proof are the traditional and appropriate means of attacking shaky
3   but admissible evidence."  509 U.S. at 596.

4        **B.    Negotiation Theory**

5        First, Lucent argues that Professor Mnookin's "real-world" negotiation theory is not
6   appropriate in the context of the hypothetical negotiation.  (Doc. No. 1220 at 1.)  Under this
7   theory, two parties come to a negotiation with their "best alternative to a negotiated
8   agreement" ("BATNA") and a reservation price.  (Id. at 3.)  The two parties will only come
9   to an agreement if there is an overlap between their "zone of potential agreement" ("ZOPA").
10  (Id.)  Lucent argues that this theory ignores that the hypothetical negotiation between two
11  parties should (1) assume the patent is valid and infringed, (2) allow parties to walk away, and
12  (3) ignores information about the "Book of Wisdom."  (Id. at 3.)

13       A patentee is entitled to no less than a reasonable royalty on an infringer's sales for
14  which the patentee has not established entitlement to lost profits. 35 U.S.C. § 284.  In Lucent,
15  the Federal Circuit stated that "[l]itigants routinely adopt several approaches for calculating
16  a reasonable royalty." 580 F.3d at 1324.  One approach, "the hypothetical negotiation or the
17  'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the
18  parties would have agreed had they successfully negotiated an agreement just before
19  infringement began." Id.; see also Rite-Hite Corp v. Kelley Co., 56 F.3d 1538, 1554 (Fed. Cir.
20  1995); Radio Steel & Mfg. Co. v. MTD Prods., Inc., 788 F.2d 1554, 1557 (Fed. Cir. 1986);
21  Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The
22  hypothetical negotiation attempts to create the "*ex ante* licensing negotiation scenario"
23  between the two parties.  Lucent, 580 F.3d at 1325 ("In other words, if the infringement had
24  not occurred, willing parties would have executed a license agreement specifying a certain
25  royalty payment scheme.").  The hypothetical negotiation does assume that the patent is valid
26  and infringed.  Id.

27       In opposition, Microsoft argues that there is no single correct test for assessing patent
28  damages.  (Doc. No. 1257 at 2.)  Instead, Microsoft contends that Professor's Mnookin's

methodology is based on well-established negotiation theories that are widely accepted. (Id. at 6.) Furthermore, Microsoft argues that the hypothetical negotiation envisioned by the courts encompasses real-world considerations and considers the actual behavior of two parties in the ex ante negotiation. (Id. at 6-8.)

The Court agrees with Microsoft that there is no single correct approach at calculating reasonable royalties. See Lucent, 580 F.3d at 1324. Both Lucent and Microsoft agree that Professor Mnookin is well versed and qualified in the area of negotiation theory. (Doc. No. 1257 at 3-4.) Professor Mnookin's negotiation that he applies to the facts of this case is widely accepted in the scientific community and has been published in many journals. (Id. at 6.) The Court concludes that Professor Mnookin's negotiation theory is based on reliable principles and methods. See Fed. R. Evid. 702; Daubert, 509 U.S. at 595. Furthermore, the Court previously concluded during a previous motion in limine motion by Microsoft that both Lucent and Microsoft could each testify on their negotiation theories. (See Doc. Nos. 1026, 1180 at 11-12.) The Court denies the motion to preclude Professor Mnookin from testifying on his real-world negotiation theory.

### C.  Factual Basis for Negotiation Theory

Second, Lucent argues that Professor Mnookin's testimony as to what Lucent would have paid as part of the negotiation are not grounded in facts. (Doc. No. 1220 at 4.) In particular, Lucent argues that Professor Mnookin does not have any understanding of Lucent's behavior and motives. (Id. at 4-6.) In opposition, Microsoft argues that it has taken into account the facts of the case that Lucent would have considered in the negotiation. (Doc. No. 1257 at 10.) Based on those facts, Professor Mnookin opines on what Lucent would reasonable pay in the negotiation. (Id.) The Court declines to preclude this testimony from Professor Mnookin. The Court concludes that vigorous cross-examination would adequately address Lucent's concerns. See Daubert, 509 U.S. at 596.

Furthermore, Lucent argues that Professor Mnookin solely relies on Microsoft's lay witness William Kennedy's testimony as to what Microsoft would have paid in a negotiation. (Id. at 6-8.) Because the Court precludes William Kennedy from testifying as to what

1  Microsoft would have paid during the negotiation, see supra section III, the Court also

2  precludes Professor Mnookin from any testimony that relies on William Kennedy's valuation

3  figures.

### D.     Professor Mnookin's Other Opinions

5       Third, Lucent also moves to preclude Professor Mnookin from criticizing the testimony

6  of its survey expert, Deborah Jay, its technical expert, Bruce Tognazzini, and its damages

7  expert, Raymond Sims. (Doc. No. 1220 at 8-10.)  As to survey results, the Court previously

8  concluded that witnesses who are not experts in the area of surveys may testify as to the

9  correctness of survey results and survey methodologies. See supra section II (discussing limits

10  as applied to Aaron Marcus and Bruce Tognazzini).  The Court concludes that Professor

11  Mnookin has likewise not been qualified as an expert in surveys and also may not testify as

12  to the correctness of survey result and survey methodology.  As to the other experts, Microsoft

13  opposes and argues that the criticisms proffered by Professor Mnookin are based on his

14  knowledge in negotiation.  (Doc. No. 1257 at 15-16.)  The Court denies the motion as to the

15  other experts.  Lucent may make a contemporaneous objection at trial to Professor Mnookin's

16  testimony if appropriate.  At that time, the Court will be able to evaluate the statement in their

17  context to determine if the statements are to be considered expert testimony outside Professor

18  Mnookin's area of expertise.

19       In addition, Lucent moves to preclude certain statements that Professor Mnookin makes

20  in his expert reports and elsewhere that Lucent contends are ultimate issues of law.  (Doc. No.

21  1220 at 16.)  Most of these references Lucent objects to are references to the Federal Circuit's

22  opinion in Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301 (Fed. Cir. 2009).  As discussed

23  with the parties at the motion hearing, the Court will exclude all references to the Federal

24  Circuit opinion from trial.

25       In summary, the Court grants in part and denies in part Lucent's motion to exclude the

26  testimony of Microsoft's negotiation expert Professor Mnookin.  Professor Mnookin may

27  testify on his real-world negotiation theory.  Professor Mnookin may testify at to what is

28  reasonable for Lucent to do in this negotiation but may testify as to what Microsoft would do

to the extent he relies on the previously excluded testimony of William Kennedy.  Professor Mnookin may not testify as to the correctness of survey result and survey methodology and can only provide expert testimony in areas he has been qualified as an expert.  Finally, Professor Mnookin may not refer to the Federal Circuit's opinion in his testimony.

## CONCLUSION

After due consideration, the Court orders the following:

1.  The Court grants in part and denies in part Motion in Limine No. 1 regarding the Johnson survey.  The Court prohibits mention of the Johnson survey at trial in opening statements and during Dr. Jay's direct testimony.  Otherwise, the Court DENIES the motion without prejudice to a contemporaneous objection at trial.

2.  The Court grants in part and denies in part Lucent's Motion in Limine No. 2 to exclude the testimony of Microsoft's negotiation expert Professor Mnookin.  Professor Mnookin may testify on his real-world negotiation theory.  Professor Mnookin may testify at to what is reasonable for Lucent to do in this negotiation but may not testify as to what Microsoft would do to the extent he relies on the previously excluded testimony of William Kennedy.  Professor Mnookin may not testify as to the correctness of survey result and survey methodology and can only provide expert testimony in areas he has been qualified as an expert.  Finally, Professor Mnookin may not refer to the Federal Circuit's opinion in his testimony.

3.  The Court grants Lucent's Motion in Limine No. 3 to exclude Microsoft's expert Aaron Marcus's testimony as to the correctness of survey results and survey methodologies.  Either party may make a contemporaneous objection at trial if any witness who is not an expert in surveys fails to adhere to these restrictions.

4.  The Court grants Lucent's Motion in Limine No. 4 to preclude William Kennedy from testifying that Microsoft would pay $2 million for a license for the Day patent technology in Outlook or $5 million for an unrestricted license.

As to any motion in limine that the Court granted, any party seeking to admit evidence

at trial must seek a hearing outside the presence of the jury at an appropriate time and make the request for a hearing outside the presence of the jury.

In light of its rulings in this Order, the Court will allow the parties to supplement their damages expert reports to comport with the Court's rulings.  The parties may submit  any modified expert report or addendum on or before **June 23, 2011**.  The parties may file any further objection to the modified expert reports on or before **June 29, 2011**.  At the parties option, the Court permits a one hour deposition of any expert modifying a report and also of William Kennedy, to be completed by **July 11, 2011.**  The Court sets a motion hearing on any objections filed for **July 13, 2011** at **9:00 a.m.**

**IT IS SO ORDERED.**

DATED: June 16, 2011

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT