1   David A. Hahn, SBN 125784
    DAVID A. HAHN, ATTORNEY AT LAW
2   400 10th Street
    Coronado, California 92118
3   Telephone:  (619) 235-2100
    Facsimile:   (619) 235-2101
4

5   Attorney for *Lucent Technologies Inc.*

6   *(Additional counsel listed on the last page)*

7

8                       UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11  LUCENT TECHNOLOGIES INC.,                    Case No. 07-CV-2000-H (CAB)

12                      Plaintiff,
                   v.                            **LUCENT'S OPPOSITION TO
13                                               MICROSOFT'S MOTION *IN LIMINE*
                                                 NO. 17**
14  MICROSOFT CORPORATION,

15                      Defendant.               Date:          July 13, 2011
                                                 Time:          9:00 a.m.
16                                               Courtroom:     13, 5th Floor
                                                 Judge:         Hon. Marilyn L. Huff
17

18

19

20

21

22

23

24

25

26

27

28

---

LUCENT'S OPPOSITION TO MICROSOFT'S MOTION *IN*                    Case No. 07-CV-2000-H (CAB)
*LIMINE* NO. 17

1

**TABLE OF CONTENTS**

2   **I.      INTRODUCTION**..................................................................................................................1

3   **II.     BACKGROUND** ...................................................................................................................3

4   **III.    ARGUMENT**..........................................................................................................................5

5
        A.      Mr. Sims's Use Of Lucent's Actual Licensing Policy And Executed
6               Agreements Is Consistent With The Court's Order And Federal Circuit Case
                Law ...................................................................................................................................5
7
        B.      Mr. Sims's Alternative Analyses ..............................................................................6
8
        C.      Mr. Sims's Alternative *Georgia-Pacific* Approach Is Consistent With The
9               Court's Order ..................................................................................................................8

10
        D.      Mr. Sims's Alternative Business Realities Approach Is Consistent With The
11              Court's Order ..................................................................................................................9

12  **IV.    CONCLUSION** .....................................................................................................................10

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2 **Cases**

3 *Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................................................ 5, 8
4

*Hanson v. Alpine Valley Ski Area, Inc.*,
5    718 F.2d 1075 (Fed. Cir. 1983) ..................................................................................... 5, 6

6 *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*,
   2011 WL 218948 (E.D. Mich. Jan. 20, 2011) ................................................................. 6
7

*Lucent Tech., Inc. v. Gateway Inc.*,
8    509 F. Supp. 2d 912 (S.D. Cal. 2007) ............................................................................. 5

9 *Mondis Tech., LTD. v. LG Elec., Inc.*,
   2011 WL 2417367 (E.D. Tex. June 14, 2011) ................................................................ 6
10

*Sanofi-Aventis Deutschland GMBH et al. v. Glenmark Pharms Inc., USA et al.*,
11    2011 WL 383861 (Feb. 3, 2011) .................................................................................... 9

12 *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
   862 F.2d 1564 (Fed. Cir. 1988) ....................................................................................... 5
13

*Uniloc USA, Inc. v. Microsoft Corp.*,
14    632 F.3d 1292 (Fed. Cir. 2011) ................................................................................ 2, 6, 7

15 **Rules**

16 FED. R. EVID. 401 ................................................................................................................... 7

17 FED. R. EVID. 402 ................................................................................................................... 7

18 FED. R. EVID. 403 ................................................................................................................... 7

19 FED. R. EVID. 702 ................................................................................................................... 7

20 **Other Authorities**

21 Matthews Annotated Patent Digest, ANPATDIG § 30:89.50 ............................................. 6
22

Meyer, Christine Siegwarth and David Blackburn, "25 Percent, 50 Percent…What's In a Number?"
23    Law 360 (June 21, 2011)................................................................................................... 9

24 Rubinstein, A., "Perfect Equilibrium in a Bargaining Model," Econometrica, 50:97-110 (1982)....... 9

25

26

27

28

1

## I.    INTRODUCTION

2        Microsoft's Motion *in limine* No. 17 targets Mr. Sims's Supplemental Amended Expert

3   Report ("Supplemental Report"), which was filed after the Court's June 16, 2011 Order Granting In

4   Part and Denying In Part Microsoft's Motions *In Limine* ("Order").  In that Order, the Court invited

5   the parties to supplement their damages expert reports to comport with the Court's rulings.  Despite

6   the Court's Order striking its damages figures, Microsoft chose not to serve any supplemental report.

7   Lucent submitted Mr. Sims's Supplemental Report on June 23, 2011, in accordance with the Court's

8   Order.

9        Microsoft challenges the Supplemental Report, claiming that it presents a damages figure

10  calculated by applying a royalty rate to an unapportioned base of all infringing product revenue.  The

11  Court directed Lucent to file an opposition to Microsoft's challenge, "specifically addressing why

12  [Lucent] has not performed further apportionment to its damages calculation."  (D.I. 1305.)  The

13  answer is that Mr. Sims does not calculate his lump-sum royalty using a rate applied to a base of

14  infringing product revenue.  Instead, Mr. Sims's conclusion that Microsoft owes Lucent a lump-sum

15  royalty of $70 million is based on his evaluation of numerous factors—including factors the Court

16  has ruled it is appropriate for him to consider—no one of which by itself determines the outcome.

17       In its Order, the Court specifically ruled that Mr. Sims may present to the jury his Survey

18  Results Analysis, Time Savings Analysis, Business Realities Approach, and *Georgia-Pacific*

19  Approach.  In addition, the Court ruled that he may consider Lucent's historical licensing policy and

20  the Acer and Locus Agreements in his damages analyses.  In this regard, Lucent understands that the

21  Court has not required Mr. Sims to apportion the base to which Lucent's ***actual*** licensing policy

22  applied as part of his *Georgia-Pacific* analysis, since such an apportionment would be contrary to the

23  evidentiary record and would not have been consistent with Lucent's policy at the time of the

24  hypothetical negotiation.  However, the Court also ruled that, to the extent Lucent used for its

25  damages conclusion a base that included infringing product revenue, "Lucent must perform an

26  additional apportionment in order to introduce a proper royalty base for its damages calculation or

27  meet the three factored test for the entire market value rule if it seeks to use all revenue from

28  infringing copies … as its base."  (D.I. 1284 at 14.)  Because Mr. Sims's lump-sum damages

1    conclusion is not the calculation of a rate applied to a base of infringing product revenue, there was

2    no apportionment to perform.  Lucent therefore understands Mr. Sims's lump-sum conclusion to be

3    consistent with the Court's Order.

4         Even though his damages conclusion is not the calculation of a rate applied to a base, Mr.

5    Sims—in anticipation of the argument that he should still be required to apportion the base to which

6    Lucent's licensing rates historically applied—prepared an alternative analysis that does not consider

7    Lucent's licensing policy and practices at all.  Rather than testify to a policy that never in fact

8    existed, Mr. Sims eliminates from consideration Lucent's licensing policy.  Because his lump-sum

9    royalty determination is supported by many factors—only one of which was Lucent's licensing

10   policy in his original analysis—Mr. Sims's lump-sum conclusion is not altered by the exclusion of

11   that policy (although Lucent is prejudiced in that it can no longer present its actual licensing policy

12   and practices as additional support for Mr. Sims's conclusion).

13        Microsoft challenges Mr. Sims's first approach by arguing that his consideration of how

14   Lucent's actual licensing policy would impact discussions at the hypothetical negotiation table

15   violates the entire market value rule because it calls for the application of a rate to a base of product

16   revenue.  (D.I. 1302 at 3–7.)  In addition, Microsoft challenges Mr. Sims's alternative approach,

17   which does not include Lucent's licensing policy and practices among the factors that would have

18   been considered by the parties at the hypothetical negotiation, claiming the analysis suffers from a

19   lack of factual support.  Thus, Microsoft criticizes Mr. Sims's first approach *because* it is supported

20   by the facts (Lucent's actual licensing policy and practices); and it criticizes his alternative approach

21   because it is *unsupported* by the facts (Lucent's actual licensing policy and practices).  The irony

22   betrays the flaw in Microsoft's attacks.  *Uniloc* is not a mandate to rewrite history (*i.e.*, fabricate a

23   licensing policy that never actually existed).   Indeed, it stands for the exact opposite, requiring that

24   the analysis be tied to the facts of the case.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292,

25   1315 (Fed. Cir. 2011) (rejecting damages analysis that failed to tie reasonable royalty to facts of

26   case).  Arguing that Lucent's licensing practices must be fictionalized, Microsoft takes *Uniloc* and

27   this Court's Order too far.

28        In harmonizing the *fact* of Lucent licensing policy and practices on the one hand, with

LUCENT'S OPPOSITION TO MICROSOFT'S MOTION *IN*          2          Case No. 07-CV-2000-H (CAB)
*LIMINE* NO. 17

1    *Uniloc*'s statements regarding the entire market value rule on the other hand, this Court did not—and

2    could not—impose on the hypothetical negotiation a fictional licensing policy.  Instead, the Court

3    permitted Lucent to discuss how its **actual** licensing policies and practices would have impacted the

4    hypothetical negotiation, albeit without calculating a damages number that applies a rate to the entire

5    market value of the infringing products.  Mr. Sims's first approach in his Supplemental Report does

6    precisely that.  Should the Court insist on an alteration of Lucent's actual licensing policy and

7    practices, then Lucent will proceed with Mr. Sims's alternative approach, which excludes Lucent's

8    historical licensing policy and practices from consideration, reserving its rights for appeal.

9    **II.    BACKGROUND**

10          In its June 16, 2011 Order, the Court ruled that Mr. Sims may present at trial his Time

11   Savings Analysis, Survey Results Analysis, Business Realities Approach, and *Georgia-Pacific*

12   Approach.  (D.I. 1284 at 6–7, 19, 22–23.)  The Court also affirmatively ruled, for the second time,

13   that Lucent's actual licensing policy (*i.e.*, offering a non-exclusive license for its patents at a rate of

14   1% per patent, up to a maximum of 5%, applied to the fair market value of the product in which the

15   patented invention is incorporated) and two executed license agreements (*i.e.*, the Acer and Locus

16   Agreements in which Lucent licensed the Day Patent technology pursuant to its licensing policy) are

17   relevant to the *Georgia-Pacific* Approach and may be presented to the jury.  (D.I. 1284 at 15–16;

18   D.I. 1180 at 21–22, 29.)  The Court has now twice ruled that both of "[t]hese licenses are relevant to

19   show Lucent's licensing practices tied to the hypothetical negotiation in this case and to rebut

20   Microsoft's challenge to licensing rates."  (D.I. 1180 at 22; *see also* D.I. 1284 at 15–16.)  The

21   Court's most recent Order also specifically said that "these licenses are relevant to Georgia-Pacific

22   factors 1, 4, and 12."  (D.I. 1284 at 15–16.)

23          In his Supplemental Report, Mr. Sims considers the cumulative influence of numerous

24   factors, including the Survey Results Analysis and Time Savings Analysis, two analyses this Court

25   has ordered he may present to the jury.  (D.I. 1302, Ex. A, Sims Supp. Rep. at 7, 8–10, 13; D.I. 1284

26   at 19–20 (Time Savings); 22 (Survey Results).)  He also considers Lucent's actual licensing policy

27   and practices and their effect on Lucent's position at the hypothetical negotiation table.  Specifically,

28   he considers the point at which they would become a material factor and a source of resistance to

---

LUCENT'S OPPOSITION TO MICROSOFT'S MOTION *IN*          3                    Case No. 07-CV-2000-H (CAB)
*LIMINE* NO. 17

1    Microsoft's efforts to minimize its royalty burden.  (D.I. 1302, Ex. A, Sims Supp. Rep. at 7, 10–11.)

2    Mr. Sims does *not*, as Microsoft misstates, arrive at his $70 million royalty "by multiplying

3    Lucent's purported policy of 1% by the entire market value of Outlook (1% of 7.38 billion = $73.8

4    million)."  (*See* D.I. 1302 at 7.)  Rather, he concludes that the cumulative impact of the above factors

5    and other facts of the case (*e.g.*, Microsoft's competitors included the Day Patent technology in their

6    products, Microsoft would harm its business reputation if it did not include the patented technology,

7    etc.) would yield a lump-sum royalty in the range of $65 million to $75 million under the Business

8    Realities Approach and the *Georgia-Pacific* Approach, two approaches this Court has allowed him

9    to undertake.  (D.I. 1284 at 6 (*Georgia-Pacific*), 23 (Business Realities); D.I. 1302, Ex. A, Sims

10   Supp. Rep. at 2, 8, 11; *see also* D.I. 1302, Ex. B, Sims Am. Rep. at 50–85.)  Without using

11   infringing product revenue as a base to which he applies a rate, Mr. Sims ultimately concludes that a

12   $70 million lump-sum royalty would be reasonable.

13   Mr. Sims also provides an alternate analysis in the event the Court concludes that he is not

14   permitted to discuss the impact that Lucent's actual licensing policy would have had on the

15   hypothetical negotiation without apportioning the historical licensing policy base.[1]  As Mr. Sims

16   explains, he cannot further discount the base in a manner that stays true to the facts of this case.

17   Thus, he provides an alternate analysis that altogether excludes consideration of Lucent's policy and

18   licenses, and relies on the balance of factors this Court has allowed.  (*See, e.g.*, D.I. 1302, Ex. A,

19   Sims Supp. Rep. at 5, 11-13.)  Since Mr. Sims's lump-sum royalty was never a calculation based on

20   the application of Lucent's actual licensing policy and agreements, Mr. Sims's ultimate conclusion

21   in his alternative scenario does not change.  As he explains in his report:

22           While the other *Georgia-Pacific* factors and Business Realities
             considerations are key components of my analysis, Lucent's actual
23           licensing policy and executed license agreements offer additional,
             meaningful historical facts to support my conclusion. That said, and
24           for the reasons stated in my Amended Report, even excluding the
             Apportionment Analysis and the Add-Ins Analysis, the factors
25           outlined in my Amended Report compel no change to my ultimate
             conclusions.
26

27   _____
     [1] As Mr. Sims explains in his Supplemental Report, the original apportionment was developed to reach a "walk-away"
     number below which Lucent would not go because so doing would offend Lucent's actual licensing policy and place at
28   risk the integrity of Lucent's IP portfolio.  While that number was below what Lucent's historical licensing policy
     dictated, it did remain true to the policy.

1    (D.I. 1302, Ex. A, Sims Supp. Rep. at 13.)

2    **III.    ARGUMENT**

3        **A.    Mr. Sims's Use Of Lucent's Actual Licensing Policy And Executed Agreements
            Is Consistent With The Court's Order And Federal Circuit Case Law**

4

5        The Court has expressly allowed consideration of Lucent's actual licensing policy, which is

6    relevant to *Georgia-Pacific* Factors 1, 4, and 12. (D.I. 1284 at 15–16 ("The licensing policies

7    remain relevant to Lucent's damages case under the Georgia-Pacific framework."); D.I. 1180 at 21–

8    22 ("Recognizing the Georgia-Pacific factors, the Court ***declines*** to exclude Lucent's licensing

9    practice.") (emphasis added).) *See also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.

10   1116, 1120 (S.D.N.Y. 1970); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564,

11   1568 (Fed. Cir. 1988) ("[T]he patentee's usual licensing approach should be considered in assessing

12   a reasonable royalty."). In accordance with the Court's Order, Mr. Sims considers Lucent's actual

13   licensing policy and executed license agreements under *Georgia-Pacific* Factor 1.

14       Seizing on the fact that Lucent's licensing policy is discussed in the first factor in the 15-

15   factored analysis, Microsoft claims that Mr. Sims's *Georgia-Pacific* Approach starts and ends with

16   Lucent's licensing policy. Microsoft claims Mr. Sims uses the policy to establish the royalty range

17   and then applies the *Georgia-Pacific* factors to determine where in that range the reasonable royalty

18   would fall. (D.I. 1302 at 10.) That is incorrect. Mr. Sims begins with the values generated by the

19   Time Savings Analysis, the Survey Results Analysis, Microsoft's expected aspirational value (*i.e.*, as

20   close to zero as possible), and Lucent's actual licensing policy and practices to arrive at a

21   hypothetical negotiation range of values. (D.I. 1302, Ex. B, Sims Am. Rep. at 53–54; *id.* Ex. A,

22   Sims Supp. Rep. at 6–8.) He then evaluates the *Georgia-Pacific* factors to determine where in ***that***

23   range the royalty would fall.[2] (D.I. 1302, Ex. A, Sims Supp. Rep. at 6–8.)[3]

24   [2] Mr. Sims evaluates Lucent's licensing policy and practices in the context of the Business Realities Approach as well.
     (D.I. 1302, Ex. A, Sims Supp. Rep. at 8–12; *id.* Ex. B, Sims Am. Rep. at 50–53.)

25   [3] In a footnote, Microsoft again objects to the use of Lucent's licensing policy and cites to an order from an earlier part of
     the case (the Group II part) involving different patents (the Audio patents). (D.I. 1302 at 3 n. 1 (citing *Lucent Tech., Inc.*

26   *v. Gateway Inc.*, 509 F. Supp. 2d 912, 938–39 (S.D. Cal. 2007) (Brewster, J.).) Microsoft conflates an established
     royalty rate for a patent-in-suit with an analysis of a hypothetical negotiation under *Georgia-Pacific*. If there is an

27   established royalty, then that is the best approximation for the patentee's damages and the analysis ends. *Hanson v.*
     *Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) ("The reasonable royalty may be based upon an

28   established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between
     a willing licensor and a willing licensee."). But Lucent is not arguing that there is an "established royalty" for the Day

LUCENT'S OPPOSITION TO MICROSOFT'S MOTION *IN*            5            Case No. 07-CV-2000-H (CAB)
*LIMINE* NO. 17

1    Complaining that Mr. Sims's consideration of Lucent's actual licensing policy and executed

2    agreements improperly applies a royalty rate to the entire market value of the infringing products,

3    Microsoft once again conflates the *Georgia-Pacific* analysis with the entire market value rule.  Mr.

4    Sims's analysis is not only consistent with this Court's Order, it is also consistent with Federal

5    Circuit case law.  As the Federal Circuit expressly recognized, its decision in *Uniloc* did not overrule

6    *Georgia-Pacific*.  *Uniloc*, 632 F.3d at 1317 ("This court's rejection of the 25 percent rule of thumb is

7    not intended to limit the application of any of the *Georgia-Pacific* factors.").  Indeed, after *Uniloc*

8    issued, this Court has twice held that Lucent's actual licensing policy and executed agreements are

9    historical facts relevant to Factors 1, 4, and 12 of the *Georgia-Pacific* analysis.  (D.I. 1284 at 15–16;

10   D.I. 1180 at 21–22, 29.)  Consideration of Lucent's real-world licensing practices is not the same as

11   an attempt to gain damages for unpatented features under the entire market value rule.  *See, e.g*,

12   *Mondis Tech., LTD. v. LG Elecs., Inc.*, 2011 WL 2417367, *3 (E.D. Tex. June 14, 2011) (Ex. E)

13   (applying a rate to the entire product sales base was not a violation of the entire market value rule

14   and allowable in a *Georgia-Pacific* analysis when it was "economically justified" based on the

15   parties' history); *Lear Auto. Dearborn, Inc. v. Johnson Controls, Inc.*, 2011 WL 218948, *4 (E.D.

16   Mich. Jan. 20, 2011) (Ex. D) (noting that while the entire market value rule and *Georgia-Pacific*

17   share common principles one may apply *Georgia-Pacific* without meeting all the requirements of the

18   entire market value rule); Ex. A, Matthews Annotated Patent Digest, ANPATDIG § 30:89.50 (noting

19   that harmonizing *Lucent* and *Uniloc* allows for use of overall revenues of a product as a royalty base

20   if it is the industry norm, the past licensing practice of the parties, or there is some other

21   economically justified evidence for using that base even without meeting the requirements of the

22   entire market value rule).

23   **B.    Mr. Sims's Alternative Analyses**

24   If the Court determines that Mr. Sims may only discuss Lucent's licensing policy and

25   executed agreements in the context of a rate applied to a base that is inconsistent with Lucent's

26

27   patent.  Where, as here, there is no established royalty, the parties attempt to determine what a reasonable royalty would
     be based on the "willing-buyer/willing-seller concept" (*i.e.*, the hypothetical negotiation concept).  *Id*. at 1079. Mr. Sims

28   performs a Georgia-Pacific analysis of the factors relevant to the hypothetical negotiation, and Lucent's policy is relevant
     to those factors, as this Court has now twice held.  (D.I. 1280 at 15–16 (factors 1, 4, and 12); D.I. 1180 at 21–22.)

1  actual licensing policy and practices, Mr. Sims will, to Lucent's prejudice, exclude Lucent's

2  licensing policy and practices from his *Georgia-Pacific* and Business Realities Approaches. (D.I.

3  1302, Ex. A, Sims Supp. Rep. at 4–5, 11–12.)

4  Lucent's licensing policy is a specific rate applied to a specific base. By divorcing the rate

5  from the base, the resulting numbers are arbitrary and untethered to the facts of the case in violation

6  of the principles in *Uniloc*. To consider one without the other (the rate without the base or the base

7  without the rate) alters history and invites the very sort of speculation rejected by the court in *Uniloc*.

8  632 F.3d at 1315 ("Evidence relying on the 25 percent rule of thumb is thus inadmissible under

9  Daubert and the Federal Rules of Evidence, ***because it fails to tie a reasonable royalty base to the***

10 ***facts of the case at issue***.") (emphasis added).

11 Contravening the facts of the case, Microsoft claims Lucent should have applied a 1–3% rate

12 to a different base, namely the figure generated from the Survey Results Analysis ($138.7 million).

13 (D.I. 1302 at 7.) But the math generates the utter fiction that Lucent would agree to keep only 1% of

14 the value of the invention itself (1% of $168.8 million = $1.69 million (undiscounted)) when its

15 ***actual*** policy was to receive 1% of the revenues from the product that incorporates the invention

16 (1% of $67 x 109 million units = $73.8 million (undiscounted)). Under Microsoft's "calculation,"

17 the patent owner would ***give away 99% of the value of its intellectual property***. No rational

18 patentee would ever agree to give away essentially the full value of its invention, and no rational

19 company wishing to preserve the integrity of its intellectual property portfolio would do that.

20 Historically speaking, Lucent has never done that; neither has Microsoft.[4] It is for this reason that

21 Mr. Sims declines the invitation to commit (likely reversible) error by altering Lucent's licensing

22 policy from what it was in the real world. (D.I. 1302, Ex. A, Sims Supp. Rep. at 3–4.) Applying a

23 rate to just any base, whether it is the Survey Results Analysis or some apportioned base, would be

24 inconsistent with historical fact, misleading, confusing, and speculative.

25 Ironically, Microsoft claims that Mr. Sims's alternative analysis—in which he excludes

26 Lucent's actual licensing policy and executed agreements—"detaches [his] analysis from anything

27 remotely based on sound economic principles or the facts of this case." (D.I. 1302 at 7–8.) But it is

28

---

[4] The Court should preclude Microsoft from making this argument at trial under FED. R. EVID. 401–403 and 702.

1  for the purpose of *avoiding* speculation that Mr. Sims expressly refuses to divorce Lucent's rate

2  from the base to which it was actually applied. Indeed, by insisting that Lucent alter its actual

3  licensing policy and practices to accommodate the entire market value rule, it is Microsoft who

4  champions analysis divorced from fact.

5
        **C.**       **Mr. Sims's Alternative *Georgia-Pacific* Approach Is Consistent With The Court's Order**

6

7  Microsoft posits that without consideration of Lucent's licensing policy, Mr. Sims's

8  alternative analysis is "transform[ed] … into pure speculation" (D.I. 1302 at 8), one in which he

9  applies the *Georgia-Pacific* factors "to no number at all." (D.I. 1302 at 10–11.) Microsoft is wrong.

10  To be sure, Lucent's actual licensing policy and practices buttress the lump-sum royalty figure that

11  Mr. Sims concludes would have been the outcome of the hypothetical negotiation. But that is not to

12  say that his damages conclusion finds no support without them. Even without the advantage of

13  Lucent's actual licensing policy and practices, Mr. Sims's analysis is intended to bring about as

14  much clarity and definiteness in the ambiguity that Microsoft's conduct has sown. His analysis is

15  based on sound economic principles and the facts of this case that this Court has sanctioned for use

16  at trial.

17  In his alternative *Georgia-Pacific* Approach, Mr. Sims considers several measures of value in

18  arriving at his conclusion, including the Time Savings Analysis and Survey Results Analysis

19  (Factors 8, 9, 10, and 13), the qualitative value of the Day Patent technology (Factors 8, 9, 10, and

20  11), and the bargaining positions of the parties. Just because Lucent's actual licensing policy and

21  executed license agreements no longer contribute to the range of values does not mean that Mr. Sims

22  cannot look to the other *Georgia-Pacific* factors to determine where in the hypothetical negotiating

23  range the reasonable royalty would fall. As in *Georgia-Pacific*, here "there is a multiplicity of inter-

24  penetrating factors bearing upon the amount of a reasonable royalty. But there is no formula by

25  which these factors can be rated precisely in the order of their relative importance or by which their

26  economic significance can be automatically transduced into their pecuniary equivalent." *Georgia-

27  Pacific Corp.*, 318 F. Supp. at 1120–21.

28

### D. Mr. Sims's Alternative Business Realities Approach Is Consistent With The Court's Order

Microsoft once again seeks to exclude Mr. Sims's Business Realities Approach because it does not like his conclusion. Having unsuccessfully referred to the negotiated midpoint as the "50% Rule" in a previous motion (*see* D.I. 1224 at 22–23; D.I. 1284 at 22–23), Microsoft now characterizes it as a "50% royalty" and faults Lucent for failing to produce any licenses where Lucent received a "50% royalty" or where Microsoft agreed to pay a "50% royalty." (D.I. 1302 at 8.) The Court has already ruled that Mr. Sims may present his Business Realities Approach to the jury (D.I. 1284 at 22–23), and nothing raised by Microsoft changes the merits of that ruling. The Court's ruling should stand.

Mr. Sims does not conclude that the parties would agree to a "50% royalty," and he does not apply a 50% rate to a base. Rather, he opines that the parties would negotiate between $0 (what Microsoft would prefer to pay for the patented technology) and $138.7 million (the profits Microsoft would expect to forgo if it did not include the patented technology—*i.e.*, the value of the patent to Microsoft and Microsoft's point of economic indifference—based on the Survey Results Analysis). (D.I. 1302, Ex. A, Sims Supp. Rep. at 8–9.) Microsoft would be reluctant to provide consumers with products that did not include features found in competitor products (such as Lotus Notes). (D.I. 1302, Ex. A, Sims Supp. Rep. at 9–10.) Microsoft would be particularly reluctant to forgo inclusion of the Day Paten technology given that it would stand to lose $138.7 million in profits. Lucent would know that fact. This, in combination with other factors discussed by Mr. Sims, would counteract Microsoft's demands for a low royalty. (D.I. 1302, Ex. A, Sims Supp. Rep. at 10–11.) In short, Mr. Sims plots a negotiation range between $0 and $138.7 million and concludes—based on the facts of the case and his expert opinion—that the parties' bargaining positions (Lucent valuing its IP, Microsoft wanting to pay as little as possible) would eventually push the royalty rate towards the middle of the spectrum. (D.I. 1302, Ex. A, Sims Supp. Rep. at 10–11.) Two parties bargaining toward a midpoint based on their negotiation positions and the facts of the case is a recognized economic model. *Sanofi-Aventis Deutschland GMBH et al. v. Glenmark Pharms Inc., USA et al.*, No. 07-CV-5855, 2011 WL 383861, at *12-13 (D.N.J. Feb. 3, 2011) (Ex. F); Ex. C, Rubinstein, A.,

1   "Perfect Equilibrium in a Bargaining Model," Econometrica, 50:97-110 (1982); *see also* Ex. B,

2   Meyer, Christine Siegwarth and David Blackburn, "25 Percent, 50 Percent…What's In a Number?"

3   Law 360 (June 21, 2011).

4          Microsoft also claims that Mr. Sims secretly applies Lucent's licensing policy in his

5   alternative Business Realities Approach because the reasonable royalty outcome is similar with or

6   without Lucent's licensing policy in the mix.  The similarity in ranges points to precisely the

7   opposite conclusion: Mr. Sims's lump-sum royalty figure is ***not*** the application of a rate to a base

8   determined from Lucent's licensing policy and practices.  Rather, Mr. Sims's damages figure is a

9   conclusion reached on a variety of factors that, in the aggregate point to a certain value range.

10  Lucent's licensing policy and practices certainly help inform the figure and certainly lend it

11  additional support.  But that is not to say that the figure finds no support without that policy and

12  those practices.

13  **IV.    CONCLUSION**

14         For the foregoing reasons, Lucent respectfully requests that the Court deny Microsoft's

15  Motion *in limine* No. 17.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2     Dated:  July 7, 2011                          Lucent Technologies Inc.

3

4                                                   By:___/s/ Blair A. Silver_____
                                                    David A. Hahn (SBN 125784)
                                                    DAVID A. HAHN, ATTORNEY AT LAW
5                                                   400 10th Street
                                                    Coronado, California  92118
6                                                   Telephone:  (619) 235-2100
                                                    Facsimile:  (619) 235-2101
7
                                                    Luke L. Dauchot (SBN 229829)
8                                                   KIRKLAND & ELLIS LLP
                                                    333 South Hope Street
9                                                   Los Angeles, CA 90071
                                                    Telephone: (213) 680-8400
10                                                  Facsimile: (213) 680-8500

11
                                                    Jeanne Heffernan (admitted *pro hac vice*)
12                                                  KIRKLAND & ELLIS LLP
                                                    601 Lexington Avenue
13                                                  New York, New York  10022
                                                    Telephone:  (212) 446-4800
14                                                  Facsimile:  (212) 446-4900

15                                                  Blair A. Silver (admitted *pro hac vice*)
                                                    KIRKLAND & ELLIS LLP
16                                                  655 15th Street NW
                                                    Washington, DC  20005
17                                                  Telephone:  (202) 879-5000
                                                    Facsimile:  (202) 879-5200
18

19                                                  Attorneys for Lucent Technologies Inc.

20

21

22

23

24

25

26

27

28

LUCENT'S OPPOSITION TO MICROSOFT'S MOTION *IN*            11                    Case No. 07-CV-2000-H (CAB)
*LIMINE* NO. 17

1

**<u>CERTIFICATE OF SERVICE</u>**

2          The undersigned hereby certifies that a true and correct copy of the above and foregoing

3    document has been served on July 7, 2011 to all counsel of record who are deemed to have

4    consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other

5    counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

6

7    Dated:  July 7, 2011                          Lucent Technologies Inc.

8

9                                                 By:      /s/ Blair A. Silver

10                                                Blair A. Silver (admitted *pro hac vice*)
                                                  KIRKLAND & ELLIS LLP
11                                                655 15th Street NW
                                                  Washington, DC  20005
12                                                Telephone:  (202) 879-5000
                                                  Facsimile:  (202) 879-5200
13

14                                                Attorney for Lucent Technologies Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28