1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   LUCENT TECHNOLOGIES, INC.,                    CASE NO. 07-CV-2000 H (CAB)

12                               Plaintiff,        **ORDER GRANTING IN PART
                                                   AND DENYING IN PART**
     vs.                                           **DEFENDANT MICROSOFT'S**
13                                                 **MOTION IN LIMINE**
14   MICROSOFT CORPORATION,                        **CONCERNING SIMS'
                                                   SUPPLEMENTAL EXPERT**
15                               Defendant.        **REPORT**

16

17          On June 29, 2011, Defendant Microsoft Corporation filed a motion in limine to limit

18   Lucent's damages theories from its expert's, Raymond Sims, June 23, 2011 supplemental expert

19   report.  (Doc. No. 1302.)  On July, 7, 2011, Plaintiff Lucent Technologies, Inc. filed an

20   opposition.  (Doc. No. 1311.)  The Court held a motion hearing on July 13, 2011. Luke L.

21   Dauchot and Jeanne Heffernan appeared on behalf of Plaintiff Lucent. Juanita Brooks,  Roger

22   Denning, Francis Albert, and Michael Rosen appeared on behalf of Defendant Microsoft. After

23   due consideration, the Court GRANTS in part and DENIES in part the motion in limine.

24                                    **DISCUSSION**

25          Microsoft brings this motion in limine to challenge the supplemental report on damages

26   submitted by Lucent's expert Raymond Sims as in violation of Daubert v. Merrell Dow

27   Pharms., Inc., 509 U.S. 579, 597 (1993), and the entire market value rule. Uniloc USA, Inc. v.

28   Microsoft Corp., 632 F.3d 1292 (Fed. Cir. 2011).

                                          - 1 -                        07cv2000

The Court has already ruled on two sets of motions in limine filed by the parties.  (See Doc. Nos. 1179-80, 1284-85.)  The first motions in limine were filed on December 7, 2010. (See Doc. Nos. 1008-1013, 1020-1032.)  On the day of the motion hearing, January 4, 2011, the Federal Circuit rendered its opinion in Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292 (Fed. Cir. 2011).  In Uniloc, the Federal Circuit rejected the 25% rule of thumb under Daubert holding that the rule "fails to tie a reasonable royalty base to the facts of the case at issue" and further clarified the entire market value rule.  632 F.3d at 1315.  In light of the impact of the Uniloc opinion on the damages analysis in this case, the Court permitted the parties to update their damages expert reports and submit additional briefing.

The parties filed their second set of motions in limine on May 13, 2011.  (Doc. Nos. 1219-22; 1224-25.)  On June 16, 2011, the Court issued its order denying in part and granting in part the motions. (Doc. Nos. 1284-85.)  In its order regarding Lucent's damage calculations, the Court stated that "[i]n summary, the Court concludes that Lucent fails to properly apportion its damages calculation to separate between the patented features and unpatented features of Microsoft Outlook.  Lucent must perform an additional apportionment in order to introduce a proper royalty base for its damages calculation or meet the three factored test for the entire market value rule if it seeks to use all revenue from infringing copies of Outlook as its base." (Doc. No. 1284 at 14.)  In light of the rulings in its order, the Court granted the parties another opportunity to supplement their damages expert reports to comport with the rulings. (See Doc. Nos. 1284-85.)  In addition, the Court allowed further objections to be filed on modified expert reports.  (Id.)  On June 23, 2011, Lucent's expert Raymond Sims supplied his supplemental expert report. Microsoft brings this present motion on the grounds that the supplemental expert report fails to comport with the Court's previous ruling on apportionment.

## I.     Legal Standard under *Daubert*

Under Daubert, the court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).  Courts have the "responsibility of ensuring that all expert testimony must pertain to 'scientific, technical, or other specialized knowledge.'"  Uniloc, 632 F.3d at 1315.  The court

1 must decide if such testimony is based on a "firm scientific or technical grounding" as required

2 under Federal Rule of Evidence 702.  Id.  Under Rule 702, a witness qualified as an expert by

3 knowledge, skill, experience, training or education can testify in opinion or otherwise if: (1) the

4 testimony is based on sufficient facts or data; (2) the testimony is the product of reliable

5 principles and methods; and (3) the witness has applied the principles and methods reliably to

6 the facts of the case.  Fed.  R. Evid. 702.  Rule 703 of the Federal Rules of Evidence  permits

7 experts to render opinions even if based on inadmissible evidence so long as the inadmissible

8 evidence is of the type reasonably relied on by experts in that field.  Daubert, 509 U.S. at 595.

9 Such inadmissible facts or data may be admissible as the basis for an expert's opinion if their

10 "probative value in assisting the jury to evaluate the expert's opinion substantially outweighs

11 their prejudicial effect."  Fed. R. Evid. 703.

12         In addition to reliability and relevancy, "the patentee must sufficiently tie the expert

13 testimony on damages to the facts of the case."  Uniloc, 632 F.3d at 1315 (citing Daubert, 509

14 U.S. at 59)).  "[O]ne major determinant of whether an expert should be excluded under Daubert

15 is whether he has justified the application of a general theory to the facts of the case."  Id.  If

16 the expert methodology is sound and the evidence relied upon sufficiently relates to the case

17 at hand, disputes about the degree of relevance or accuracy may go to the testimony's weight

18 but not its admissibility.

19         For a proper calculation of patent damages, the Federal Circuit requires "sound economic

20 and factual predicates."  See Riles v. Shell Exploration and Prod. Co., 298 F.3d 1301, 1311

21 (Fed. Cir. 2002); see also Grain Processing Corp. v. American Maize-Products Co., 185 F. 3d

22 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation,

23 this court requires sound economic proof of the nature of the market and likely outcomes with

24 infringement factored out of the economic picture."); Crystal Semiconductor Corp. v. TriTech

25 Microelectronics Intern., Inc., 246 F.3d 1336, 1355 (Fed. Cir. 2001) ("Such market

26 reconstruction, though hypothetical, requires 'sound economic proof of the nature of the

27 market.'").

28 ///

1    Accordingly, any economic expert testifying about patent damages must base the opinion
2  on sound economic principles meeting the test in <u>Daubert</u> and Rule 702 of the Federal Rules
3  of Evidence.  A trial court's decision to admit expert testimony under <u>Daubert</u> follows the law
4  of the regional circuit.  <u>Micro Chem., Inc. v. Lextron, Inc.</u>, 317 F.3d 1387, 1390-91 (Fed. Cir.
5  2003).  A trial court has broad discretion in assessing the relevance and reliability of expert
6  testimony.  <u>United States v. Finley</u>, 301 F.3d 1000, 1007 (9th Cir. 2002).  The requirement of
7  Rule 702(1) "is not intended to authorize a trial court to exclude an expert's testimony on the
8  ground that the court believes one version of the facts and not the other."  Fed. R. Evid. 702,
9  Adv. Comm. Note (2000).  The inquiry into admissibility of expert opinion is a "flexible one,"
10 where "[s]haky but admissible evidence is to be attacked by cross examination, contrary
11 evidence, and attention to the burden of proof, not exclusion."  <u>Primiano v. Cook</u>, 598 F.3d 558,
12 564 (9th Cir. 2010).   "Under <u>Daubert</u>, the district judge is 'a gatekeeper, not a fact finder.'
13 When an expert meets the threshold established by Rule 702 as explained in <u>Daubert</u>, the expert
14 may testify and the jury decides how much weight to give that testimony."  <u>Id.</u> (quoting <u>United</u>
15 <u>States v. Sandoval-Mendoza</u>, 472 F.3d 645, 654 (9th Cir. 2006)).  As the Supreme Court noted
16 in <u>Daubert</u>, "[v]igorous cross-examination, presentation of contrary evidence, and careful
17 instruction on the burden of proof are the traditional and appropriate means of attacking shaky
18 but admissible evidence."  509 U.S. at 596.

19    There are two alternative categories of infringement compensation: the patentee's lost
20 profits and the reasonable royalty the patentee would have received through arms-length
21 bargaining.  <u>See</u> <u>Lucent Techs., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1324 (Fed. Cir. 2009).
22 "Determining a fair and reasonable royalty is often . . . a difficult judicial chore, seeming often
23 to involve more the talents of a conjurer than those of a judge."  <u>ResQNet.com Inc. v. Lansa,</u>
24 <u>Inc.</u>, 594 F.3d 860, 869 (Fed. Cir. 2010).  To ascertain the reasonable royalty, patentees
25 commonly consider a hypothetical negotiation, in which the asserted patent claims are assumed
26 valid, enforceable, and infringed, and attempt to ascertain the royalty upon which the parties
27 would have agreed had they successfully negotiated an agreement just before infringement
28 began.  <u>Lucent</u>, 580 F.3d at 1324–25; <u>Georgia–Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F.

Supp. 1116, 1120 (S.D.N.Y.1970); see also Rite–Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 n.13 (Fed. Cir.1995) (en banc). Thus, the hypothetical negotiation which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began," necessarily "involves an element of approximation and uncertainty." Lucent, 580 F.3d at 1324-25.

A lump sum license is a "upfront, paid-in-full royalty." Lucent, 580 F.3d at 1326. A lump sum royalty benefits the licensor by raising a substantial amount of money quickly. Id. On the other hand, a lump sum royalty benefits the licensee by limiting its liability and allowing it to use the patented technology without any concerns of further expenditure. Id. Furthermore, a lump sum royalty removes inherent risks in such negotiations, such as the risk of underreporting of actual usage of the patented technology by the licensee, and eliminates administrative burdens of having to monitor usage. Id. A lump sum royalty also eliminates any ability for the licensee to reevaluate the usefulness and value of the patented technology—the licensee is obligated to pay the agreed-upon lump sum royalty regardless of whether the patented technology is successful or even used. Id. While a lump sum royalty may eliminate risks for both parties, it may also create risks. If either party forecasts the popularity or use of the patented feature incorrectly, a licensee may end up paying a lump-sum far in excess of what the patented invention is later shown to be worth or a licensor may end up accepting a lump-sum that is far less than what the patented invention is later shown to be worth. Id.

During negotiation for a lump-sum royalty figure, the parties may "consider the expected or estimated usage" of the patented invention. Lucent, 580 F.3d at 1327. Generally, a more frequently used invention is more valuable and commands a high lump-sum royalty. Id. Conversely, a minimally used feature will command a lower lump-sum payment. The lump sum analysis does not require the parties to precisely calculate the use of the patented feature, unlike a running royalty license. In a typical running royalty, the license is tied to the use of the patented feature standing alone or incorporated into other products. "Royalties are dependent on the level of sales or usage by the licensee." Lucent, 580 F.3d at 1326. In a lump sum calculation, the parties agree on a fully paid up amount based on "expected or estimated usage."

1  Id. at 1327. "Running-royalty agreements can be relevant to lump-sum damages, but 'some

2  basis for comparison must exist in the evidence presented to the jury.'" Wordtech Systems, Inc

3  v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1320 (Fed. Cir. 2010)(quoting Lucent,

4  580 F.3d at 1330). There must be some link between the licensed patent and the infringed

5  patent  in order to properly consider royalties received for the licensed patent. ResQNet.com,

6  Inc., 594 F.3d at 869; Lucent, 580 F.3d at 1329.

7        The entire market value rule "recognizes that the economic value of a patent may be

8  greater than the value of the sales of the patented part alone." See King Instruments Corp. v.

9  Perego, 65 F.3d 941, 951 n.4 (Fed. Cir.1995). "The entire market value rule allows a patentee

10 to assess damages based on the entire market value of the accused product [if] the patented

11 feature creates the 'basis for customer demand' or 'substantially create[s] the value of the

12 component parts.'" Uniloc USA Inc. v. Microsoft Corp., 632 F.3d 1292, 2011 (Fed. Cir.2011)

13 (citing Lucent, 580 F.3d at 1336; Rite–Hite, 56 F.3d at 1549–50). "[T]he patentee ... must in

14 every case give evidence tending to separate or apportion the defendant's profits and the

15 patentee's damages between the patented feature and the unpatented features, and such evidence

16 must be reliable and tangible, and not conjectural or speculative," or show that "the entire value

17 of the whole machine, as a marketable article, is properly and legally attributable to the patented

18 feature." Uniloc, 632 F.3d 1292, 1318 (citing Garretson v. Clark, 11 U.S. 120, 121 (1884)); see

19 also Lucent, 580 F.3d at 1336–37. For minor patent improvements, a patentee cannot justify

20 using the entire market value of an accused product simply by asserting a low enough royalty

21 rate. Mirror Worlds, LLC v. Apple, Inc., --- F. Supp.2d ----, 2011 WL 1304488, at *16 (E.D.

22 Texas., April 4, 2011) (citing Uniloc, 632 F.3d 1292, 1320. Although a reasonable royalty

23 analysis "necessarily involves an element of approximation and uncertainty," Unisplay, S.A.

24 v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir.1995), the Court must ensure that the jury

25 verdict is supported by sufficient evidence.

26 **II.    Analysis**

27       Lucent's damages expert presents three "approaches" to damages calculation—the

28 Georgia-Pacific Approach, the Business Realities Approach, and the Alternative Analysis.

1   (Doc. No. 1302, Ex. A.)  Microsoft challenges all three approaches and moves to exclude Sims'

2   supplemental report.  (Doc. No. 1302.)

3          **A.      Lucent's "<u>Georgia-Pacific</u> Approach"**

4          Lucent's supplemental report now includes a new section, titled "Supplemental Analysis

5   that Accounts for Lucent's Actual Licensing Policy and Executed Agreements."  (Doc. No.

6   1302, Ex. A, Supplemental Expert Report of Raymond Sims ("Sims Supp. Report").)  Within

7   that section, the first subsection is titled "The <u>Georgia-Pacific</u> Approach." (<u>Id.</u> at 6).  Microsoft

8   objects to this subsection as a violation of the entire market value rule to the extent that it

9   applies a royalty rate of "1% per patent to their fair market value of the end product sold by the

10  licensee."  (<u>Id.</u> at 6.) Microsoft is really objecting to the calculation it contends underlies this

11  subsection, presented in Supplemental Exhibit 5.1. (<u>See</u> Doc. No. 1302, at 7.)

12          "The entire market value rule allows a patentee to assess damages based on the entire

13  market value of the accused product only where the patented feature creates the 'basis for

14  customer demand' or 'substantially create[s] the value of the component parts,'" <u>Uniloc</u>, 632

15  F.3d at 1318 (<u>citing</u> <u>Lucent</u>, 580 F.3d at 1336; <u>Rite-Hite Corp. v. Kelley Co., Inc.</u>, 56 F.3d

16  1538, 1549-50 (Fed. Cir. 1995)), or where the patented feature was of "such paramount

17  importance that it substantially created the value of the component parts," <u>Rite-Hite</u>, 56 F.3d

18  at 1549.  Application of the entire market value rule requires adequate proof of three conditions:

19  "(1) the infringing components must be the basis for customer demand for the entire machine

20  including the parts beyond the claimed invention, <u>Fonar Corp. v. Gen. Elec. Co.</u>, 107 F.3d 1543,

21  1552 (Fed. Cir. 1997); (2) the individual infringing and non-infringing components must be sold

22  together so that they constitute a functional unit or are parts of a complete machine or single

23  assembly of parts, <u>Paper Converting Mach. Co. v. Magna-Graphics Corp.</u>, 745 F.2d 11, 23 (Fed.

24  Cir. 1984); and (3) the individual infringing and non-infringing components must be analogous

25  to a single functioning unit, <u>Kalman v. Berlyn Corp.</u>, 914 F.2d 1473, 1485 (Fed. Cir. 1990).

26  <u>Cornell Univ. v. Hewlett-Packard Co.</u>, 609 F. Supp. 2d 279, 286-87 (N.D.N.Y. 2009).  It is not

27  enough that the infringing and non-infringing parts are sold together for mere business

28  advantage.  <u>See</u> <u>Rite-Hite</u>, 56 F.3d at 1549-50.

1     Unless a party satisfies the entire market value test, a patentee seeking damages for a

2 component cannot use the entire market value of the larger product as a royalty base. <u>Uniloc</u>

3 clarified that it is not enough to simply assert a low enough royalty rate and be able to use the

4 entire market value of the product without showing that the patented feature is the basis—or a

5 substantial basis—for consumer demand. 632 F.3d at 1319-20. It rejected the argument that

6 "the base used in a running royalty calculation can always be the value of the entire commercial

7 embodiment, as long as the magnitude of the rate is within an acceptable range as determined

8 by the evidence." <u>See</u> <u>Lucent Techs., Inc. v. Gateway, Inc.</u>, 580 F.3d 1301, 1338-39 (Fed. Cir.

9 2009). Instead, in <u>Uniloc</u>, the Federal Circuit noted that the qualifying language in the <u>Lucent</u>

10 case just before this statement that forecloses this argument: "[t]he first flaw with any

11 application of the entire market value rule in the present case is the lack of evidence

12 demonstrating the patented method of the Day patent as the basis—or even a substantial

13 basis—of the consumer demand for Outlook." <u>Uniloc</u>, 632 F.3d at 1219-20; <u>see</u> <u>Lucent</u>, 580

14 F.3d at 1338. If the patentee cannot meet this test, then "the patentee . . . must in every case

15 give evidence tending to separate or apportion the defendant's profits and the patentee's

16 damages between the patented feature and the unpatented features." <u>Uniloc</u>, 632 F.3d at 1318

17 (citing <u>Garretson v. Clark</u>, 111 U.S. 120, 121 (1884)).

18     In its previous February 4, 2011 expert report, Lucent's expert uses the following

19 apportionment methodology:

20     "Under this apportionment analysis, the base (revenue from Outlook) would be
      multiplied by 83% of users who use Outlook Calendar to manage work appointments,
21    events, or meetings. The discounted base would be further adjusted to account only for
      the 84% of Calendar users who set up new appointments or meetings, an activity that
22    implicates the Day patented technology. The base would then be further adjusted to
      account only for the 77% of Outlook Calendar users who use the patented technology
23    when entering the date of a new appointment.

24 (Doc. No. 1302 Ex. B, Expert Report of Raymond Sims, at 61.) The Court concluded that this

25 apportionment does not properly apportion between the patented and unpatented features of

26 Outlook in a way that separates out from the royalty base the portion that can be attributed to

27 the Day patent technology. <u>See</u> <u>Uniloc</u>, 632 F.3d at 1318. In particular, the Court pointed out:

28     Though Lucent discounts the base to include only the revenue from Outlook where a
      user uses the Day patent technology, Lucent fails to show that it is entitled to capture this

1   entire market value as the base.  Specifically, Lucent has not shown that the Day patent
technology is the basis for consumer demand for most Outlook users.  At best, Lucent
2   has introduced evidence to show that the Day patent technology is the basis for
consumer demand for about 7% of users based on the Jay survey.  (See Doc. No. 1226
3   Ex. L, Deborah Jay survey report; Doc. No. 1252 Ex. G, Deborah Jay survey report App.
E at Table 15.)  For a product that is feature-rich like Outlook, use as a proxy for value
4   does not appropriately account for all the other unpatented features that consumers use
besides the Day patent technology even when consumers invoke the Day patent
5   methods.  See IP Innovation LLC v. Redhat, Inc., 705 F. Supp. 2d 687, 689-90 (E.D.
Tex. 2010).
6           For example, every time a user invokes the Day patent technology to schedule a
new appointment or meeting, the user may contemporaneously use several other
7   patented features.  Moreover, just because a user of Outlook uses the Day patent
technology does not mean that the user does not at other times use the other patented
8   features of Outlook.  Thus, under Lucent's argument, if a user uses the Day patent
technology, revenue from the sale of Outlook to this user is included in the royalty base.
9   The user may also use Outlook for email or tasks or the other features in calendar.
Lucent does not show why it is entitled to a royalty base for the 43% of customers who
10   use the Day patent technology where other features, in addition to the Day patent
technology, are used.  Put into concrete terms, if a sample user uses the infringing Day
11   patent technology but also uses many other features in Outlook, Lucent has not shown
that it is entitled to include in the royalty base all $67 of revenue generated from this
12   sample user.

13   (Doc. No. 1284 at 12-13.)

14           Accordingly, the Court concluded that "Lucent fail[ed] to properly apportion its damages

15   calculation to separate between the patented features and unpatented features of Microsoft

16   Outlook.  Lucent must perform an additional apportionment in order to introduce a proper

17   royalty base for its damages calculation or meet the three factored test for the entire market

18   value rule if it seeks to use all revenue from infringing copies of Outlook as its base."  (Id. at

19   14-15.)

20           Microsoft contends that even after the Court's order, Lucent still fails to apportion.  After

21   a review of Sims's new damages calculations, the Court agrees.  Sims now purports to do a "per

22   unit analysis."  (Sims Supp. Report at 3, Ex. 5.0-5.1.)  The calculation that Sims now performs

23   is as follows:

24        $67.39          x        109,537,000         x        1%              =        $73,820,500

25      (per unit price              (total # units)              (royalty rate)

26        of Outlook)

27   (Id. at Ex. 5.1.)

28   ///

- 9 -                                                                 07cv2000

1

2   Numerically, this yields the same results as if Lucent were to perform the following

3   calculation:

4   $7,382,046,800              x       1%              =       $73,820,500

5   (total revenue of Outlook)        (royalty rate)

6   The first equation (which Lucent now urges the Court to accept) is less prejudicial than

7   the second in that it breaks the $7,382,046,800 figure into its constituent parts–the per unit price

8   of Outlook and the total number of units. However, while the Uniloc court was concerned about

9   the prejudicial effect of letting the entire revenue number out in front of the jury, it further

10  stated that unless the patentee can show that the component was the basis or a substantial basis

11  for consumer demand, then "the patentee . . . must in every case give evidence tending to

12  separate or apportion the defendant's profits and the patentee's damages between the patented

13  feature and the unpatented features." Uniloc, 632 F.3d at 1318 (citing Garretson v. Clark, 111

14  U.S. 120, 121 (1884)). Lucent's per unit analysis still relies solely on the whole per unit price

15  of Outlook—$67.39—without apportioning this to account for all the other unpatented features

16  that consumers use besides the Day patent technology even when consumers invoke the Day

17  patent methods.

18  Lucent contends that it should be allowed to introduce the entire market value of Outlook

19  because such consideration is rooted in its license practices, as shown through the Acer and

20  Locus licensing agreements. As the Court has previously recognized, these licenses may be

21  relevant to Georgia-Pacific factors 1, 4, and 12. (Doc. No. 1284 at 15-16.) However, the Court

22  explicitly stated that "Lucent may introduce its "Alternative Apportionment" on a unit price of

23  Outlook. Lucent needs to further apportion by some measure to separate between the patented

24  and unpatented features as tied to the facts of this case and economic realities." (Id. at 14.)

25  Lucent has failed to apportion by any further measure contrary to the Court's June 16, 2011

26  Order. Accordingly, the Court GRANTS Microsoft's motion to exclude Supplemental Exhibit

27  5.1 of Sims' Supplemental Report (Sims' Supp. Report at 15) for failure to apportion, but

28  reserves the right to revisit this ruling at trial if Lucent meaningfully apportions the per unit

price of Outlook, or otherwise convinces the court outside the presence of the jury that Exhibit

5.1 is permissible.

**B.     Lucent's Business Realities Approach**

Microsoft further objects to Lucent's business realities approach. Lucent's business realities approach methodology considers the negotiation between Microsoft and Lucent, assuming that Microsoft would want a royalty as close to zero as possible and Lucent would want a royalty rate as close to the full value of the Day patent technology as possible. (Sims Supp. Report at 8.) Sims values the full value of the Day patent technology at $138.7 million based on the results of his Results Analysis. The Court previously allowed this analysis and stated that it was an attempt to show the value of the Day patent technology to consumers as suggested by the Federal Circuit in Lucent. (Doc. No. 1284 at 20-21.) The Court further noted that Microsoft's objections are not appropriate as going to the weight of the evidence, not its admissibility and allowed Microsoft to challenge the results on cross-examination. (Id. at 21-22.)

In Lucent, the Federal Circuit stated that "[l]itigants routinely adopt several approaches for calculating a reasonable royalty." 580 F.3d at 1324. One approach, "the hypothetical negotiation or the 'willing licensor-willing licensee' approach, attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Id.; see also Rite-Hite, 56 F.3d at 1554; Radio Steel & Mfg. Co. v. MTD Prods., Inc., 788 F.2d 1554, 1557 (Fed. Cir. 1986); Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The hypothetical negotiation attempts to create the "*ex ante* licensing negotiation scenario" between the two parties. Lucent, 580 F.3d at 1325 ("In other words, if the infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme.").

The Court previously allowed Sim's business realities negotiation theory as reliable and concluded that Microsoft's objections were related more to the math and not the methodology. (See Doc. No. 1284 at 23 ("Microsoft disputes Lucent's values obtained under the add-ins analysis, the time savings analysis, and the survey results analysis—not the methodology of

- 11 -

the negotiation.").) Contrary to Microsoft's objection, Sims does not "rel[y] exclusively on [Lucent's] licensing policy to conclude that it would not have been willing to accept less than $65 to $75 million." (Doc. No. 1302 at 10). Rather, Sims's range is based on the parties' "knowledge of their respective bargaining positions," influenced by a host of factors apart from Lucent's licensing policy, including Microsoft's competitors in the marketplace, and the risk of negotiations breaking down (Sims Supp. Rep. at 9, 11.) Georgia Pacific endorses this kind of multi-factorial approach to evaluating the hypothetical negotiation, including among its eponymous factors "the competitive relationship between licensor and licensee . . .[and] the amount that licensor and licensee would have agreed upon ." Georgia-Pacific, 318 F. Supp. at 1120. Indeed, Sims' business realities approach does not differ significantly from Professor Mnookin's real world negotiation theory, in that both take into account factors that would influence the hypothetical negotiation. Compare (Sims Supp. Report at 8-11), with (Doc. No. 1293 at 7.) Sims puts forth a range of agreement–$65 to $75 million– that accounts for a variety of negotiating factors, without resorting to a rate times base calculation. (Id. at 11.) At trial, Lucent will still need to demonstrate that Sims' business realities analysis is not in violation of the entire market value rule. Lucent will also need to prove that the factual predicates for its calculations, such as the Jay survey's 7% multiplier and the $67 unit price of Outlook, are credible. Accordingly, the Court DENIES the motion in limine to exclude the business realities approach without prejudice to any contemporaneous objections at trial and subject to any post-trial motions.

### C. Lucent's Alternative Analysis

Lucent's supplemental report also includes a new section, titled "Alternative Analysis Without Lucent's Actual Licensing Policy and Executed Agreements." (Sims Supp. Report at 11-13.) Microsoft objects to this section as not based on sound economic principles.

In his report, Sims asserts that even without the value as calculated from the previous section of his report based on the 1% royalty rate, he still would come to the same final conclusion that Microsoft and Lucent would agree on about $70 million as the lump sum royalty. (Id. at 12.) Sims reaches this value by considering that Microsoft would want a royalty as close to $0 as possible and Lucent would want a royalty as close to $138.7 million

as possible—as calculated through his survey result analysis, which the Court has permitted and allows Microsoft to challenge on cross examination.  <u>Id.</u>  Sims then posits that around $70 million, both Lucent and Microsoft would  realize that they would be giving up too much if they held out any longer and would therefore agree to meet in the middle of the $0 to $138.7 million range.  (<u>Id.</u>)  Finally, Sims states that even if his numbers based on the 1% royalty rate were excluded, "other <u>Georgia-Pacific</u> factors and Business Realities considerations are key components of my analysis."  (<u>Id.</u> at 13.)

The Court agrees that this analysis is not based in sound economic principles and factual predicates as required under the law.  <u>See</u> <u>Riles v. Shell Exploration and Prod. Co.</u>, 298 F.3d 1301, 1311 (Fed. Cir. 2002); <u>see also</u> <u>Grain Processing Corp. v. American Maize-Products Co.</u>, 185 F. 3d 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."); <u>Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.</u>, 246 F.3d 1336, 1355 (Fed. Cir. 2001) ("Such market reconstruction, though hypothetical, requires 'sound economic proof of the nature of the market.'").  Sim's single page analysis does not provide any explanation for why—even if he could not consider the $73.82 million number that the Court found above to violate the entire market value rule— he concludes that the parties would meet around $70 million versus any other number in the range between $0 and $138.7 million.  Furthermore, Sims's vague statement on his reliance on "other <u>Georgia-Pacific</u> factors and Business Realities considerations" are not tied to any factual predicates.  It is unclear to the Court what else he relies on as part of these other factors to arrive at the $70 million number, apart from consideration of the 1% royalty rate.  Accordingly, the Court GRANTS Microsoft's motion to exclude Lucent's "Alternative Analysis."

## CONCLUSION

After due consideration, the Court **GRANTS** in part and **DENIES** in part Defendant Microsoft's motion in limine.  The Court **GRANTS** the motion in limine to exclude Lucent's

1  Supplemental Exhibit 5.1, but reserves the right to revisit this ruling. The Court also **GRANTS**

2  the motion in limine to exclude Lucent's alternative analysis of damages. The Court **DENIES**

3  the motion to exclude the business realities approach without prejudice to any

4  contemporaneous objections at trial and subject to any post-trial motions.

5        **IT IS SO ORDERED.**

6  DATED: July 13, 2011

7

8                            MARILYN L. HUFF, District Judge
                          UNITED STATES DISTRICT COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

          07cv2000