1               UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4  LUCENT TECHNOLOGIES, INC.,    )  Case No. 07CV2000-H(CAB)
   et al.,                       )
5                                )  San Diego, California
            Plaintiffs,          )
6                                )  Wednesday,
   vs.                           )  July 27, 2011
7                                )  9:00 a.m.
   GATEWAY, INC., et al.,        )
8                                )
            Defendants.          )
9  _____)  VOLUME V

10                  TRANSCRIPT OF TRIAL
             BEFORE THE HONORABLE MARILYN L. HUFF
11           UNITED STATES DISTRICT JUDGE, and a jury

12  APPEARANCES:

13  For Lucent Technologies:       JEANNE M. HEFFERNAN, ESQ.
                                   Kirkland & Ellis LLP
14                                 153 East 53rd Street
                                   New York, New York 10022
15                                 (212) 446-4800

16                                 LUKE L. DAUCHOT, ESQ.
                                   Kirkland & Ellis LLP
17                                 333 South Hope Street
                                   Los Angeles, California 90071
18                                 (213) 680-8348

19  For Microsoft Corporation:     JUANITA R. BROOKS, ESQ.
                                   MICHAEL M. ROSEN, ESQ.
20                                 ROGER DENNING, ESQ.
                                   FRANCIS ALBERT, ESQ.
21                                 Fish and Richardson
                                   12390 El Camino Real
22                                 San Diego, California 92130
                                   (858) 678-5070

23

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

V-ii

Transcript Ordered by:           LUKE L. DAUCHOT, ESQ.

Court Recorder:                  Lynnette Lawrence
                                 United States District Court
                                 940 Front Street
                                 San Diego, California 92101

Transcriber:                     Shonna D. Mowrer/Jordan Keilty
                                 Echo Reporting, Inc.
                                 6336 Greenwich Drive, Suite B
                                 San Diego, California 92122
                                 (858) 453-7590

V-iii

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William Kennedy | 7 | 62 | 89 | 97 |
| Robert Mnookin | 99 | 133 | 159 | 161 |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Plaintiffs' | | | |
| PX-1895 | Screen shot of Microsoft website offering Office products for sale | 69 | 69 |
| Defendants' | | | |
| ANA | Computer demonstrative | 173 | 173 |
| BGF | Software Outlook 2003 | 174 | 174 |
| BGI | Software Office 2003 | 174 | 174 |

V-1

1   <u>SAN DIEGO, CALIFORNIA  WEDNESDAY, JULY 27, 2011  9:00 AM</u>

2                             --oOo--

3        (Call to order of the Court.)

4            THE CLERK:  Jury entering.

5        (Jury enters courtroom.)

6            THE COURT:  Welcome back.

7            THE CLERK:  Please be seated and come to order.

8   This United States District Court is now in session.

9            THE COURT:  We're ready to continue.  You may

10  proceed.

11           MR. DENNING:  Thank you.  And good morning, your

12  Honor.  We would like to start the day with a short

13  deposition clip.  This deposition clip is from Roger

14  Stricker, who worked for Lucent and AT&T for 22 years.  Mr.

15  Stricker was a director of licensing in the intellectual

16  property business for Lucent and later the vice president of

17  licensing and intellectual property for Lucent.  And the

18  clip will be five minutes, 45 seconds.

19           THE COURT:  And the time allocation?  Or do you

20  give that later?

21           MR. DENNING:  I can give that now, your Honor.

22  It's 3:46 for Microsoft, 1:59 for Lucent.

23       (Start playing video.)

24           "Q     How long were you wish Lucent

25           Technologies?

V-2

1          A     Twenty-two years approximately.

2          Q     When you say with Lucent 22 years,

3     do you mean you were with AT&T prior?

4          A     Yes.  Lucent or their

5     predecessors.  I'm sorry.

6          Q     When Lucent was first formed --

7          A     Yes.

8          Q     -- what was your position at

9     Lucent?

10         A     I was a director of licensing the

11    intellectual property business or -- I

12    can't recall if that's the name of it at

13    that point in time, but it was

14    effectively the intellectual property

15    business.

16         Q     Did your position change at all

17    prior to May 2005?

18         A     Yes.

19         Q     What positions other than director

20    of licensing in the intellectual

21    property business did you hold?

22         A     I was the vice president of

23    licensing and -- of licensing

24    intellectual property.

25         Q     Do you recall when you became vice

1       president of licensing and intellectual

2       property?

3       A       Probably 1997, 1998.

4       Q       Was the position of vice president

5       of licensing and intellectual property a

6       promotion from the director of

7       licensing?

8       A       Yes.

9       Q       Do you recall how long you held

10      the position of manager in the

11      intellectual property business at AT&T?

12      A       I started that position, I

13      believe, in 1987.

14      Q       And just from the time frame on

15      things, Lucent was started in 1996; is

16      that right?

17      A       I think that's correct.

18      Q       So from approximately 1987 to

19      1996, you were with AT&T as the manager

20      in the intellectual property business.

21      Does that sound right?

22      A       That sounds approximately correct,

23      yes.  I can't recall when I got promoted

24      to director, whether that was with

25      Lucent or -- but it was about that time

V-4

1          frame with AT&T.

2          Q     I see.

3          A     I've been in the intellectual

4          property business since 1987.

5          Q     Were you ever involved in any

6          license negotiations where the issue of

7          the potential of paying a royalty to a

8          third party was involved?

9          A     Yes.

10         Q     In that instance, how did you go

11         about evaluating the royalty to be paid

12         to that third party?

13         A     Usually ask them what they want.

14         Q     Okay.  And when they told you what

15         they wanted, what did you tell them?

16         A     Laugh.

17         Q     Okay.  Why did you laugh?

18         A     I don't know.  It is -- it is very

19         rare that Lucent pays license fees to a

20         third party.  And in those cases, it's

21         usually in the area where the third

22         party is not in commerce to sell big

23         products or is a single patent owner or

24         a representative of a single patent

25         owner.

V-5

```
 1         And in those cases -- and this is
 2    why I'm not knowledgeable about it.  In
 3    all those cases, that's handled by the
 4    legal department, the legal half of the
 5    intellectual property business, with
 6    their clients being the business unit
 7    that may have to pay.
 8    Q    And licensing is necessarily a
 9    two-sided transaction, correct?
10    A    Yes.
11    Q    So it's not only an issue of what
12    Lucent would necessarily demand in
13    licensing, but also what a potential
14    licensee would be willing to pay, right?
15    A    That's correct.
16    Q    I understand, Doctor Stricker,
17    that the 1-percent per patent up to 5-
18    percent is what you were saying Lucent
19    would expect on its side of the
20    transaction, but you also had to factor
21    into your negotiations what a potential
22    licensee might be willing to pay,
23    correct?
24    A    Yes.
25    Q    So to a certain extent, you had to
```

V-6

1          put yourself in the shoes of the

2          potential licensee and examine the

3          transaction to consider what would make

4          financial sense for the potential

5          licensee, right?

6          A     Yes.

7          Q     Another question from the position

8          of a potential licensee.  Would a

9          potential licensee be willing to pay as

10         much, all things being equal, if there

11         was an easy design around around

12         patented technology?

13         A     I don't really know what the cross

14         benefit would be for a potential

15         licensee to design around something.

16         There are applications where you can't

17         do that, there are applications where

18         you can.  And that certainly is an

19         option, to get around patent use.

20         There's no question about it.  If a

21         licensee doesn't use a patent, they

22         shouldn't pay.  If they design around

23         it, they should not pay -- have to pay.

24         They only pay them to use it."

25     (Stop playing video.)

V-7

1          MR. DENNING:  And that's the end of that clip,

2   your Honor.

3          THE COURT:  Thank you.

4          MR. DENNING:  And for our first witness in our

5   case -- I mean second witness in our case, first today we'll

6   call William Kennedy back to the stand.

7     WILLIAM KENNEDY - DEFENDANTS' WITNESS - PREVIOUSLY SWORN

8          THE COURT:  We remind you you're still under oath.

9          MR. DENNING:  Set those aside and make room for

10  yourself.

11         THE WITNESS:  Okay.

12         MR. DENNING:  That's fine, Mr. Kennedy.

13         THE WITNESS:  There we go.

14             DIRECT EXAMINATION (Resumed)

15  BY MR. DENNING:

16  Q    Welcome back.

17  A    Thank you.

18  Q    Do I understand you were here in San Diego yesterday

19  and missed your son's 12th birthday?  Is that right?

20  A    I did.  He'll turn 12 again, though, so --

21  Q    I doubt that's the case.  We're going to do our best to

22  get your back to Seattle and get the jury on their way as

23  quickly as possible.

24  A    It's important for me to be here, so --

25  Q    Thank you, sir.

V-8

1      Mr. Kennedy, can you please remind the jury of your

2  current position at Microsoft.

3  A    Yes.  I'm the corporate vice president for the office

4  communications and mobile experiences team.

5  Q    And can you briefly describe your responsibilities in

6  that position.

7  A    Yes.  My team is part of the larger office team that

8  builds the entire office suite, and my team is responsible

9  for building several portions of the applications that go

10  into the office suite itself.  Specially, my team builds the

11  Outlook product for Windows.  My team builds all of the

12  Office for Mac software that we make that includes a version

13  of Word, Excel, Power Point and Outlook that run on the Mac.

14      My team also builds all of the Office Mobile software,

15  versions of Office that we make that run on cell phones of

16  various kinds, i-Pads, i-Phones, Windows Mobile phones,

17  things like that.

18      And then I also have two teams -- two smaller teams in

19  my organization that work on what we call infrastructure,

20  that are parts of the technical product that are used across

21  all of Office.  So I have a variety of things in my

22  organization.

23  Q    Now, you said that you oversee product development, and

24  then you listed a number of products.  What does that mean,

25  oversee product development?

1   A    So what that means is that my teams are the ones that

2   actually build those products.  I, along with my teams, are

3   the ones who make the decisions about what features go into

4   the products, what features don't go into the products, how

5   those products coordinate with other parts of Office, how

6   they coordinate with other products that Microsoft makes.

7   And so that's primarily what my responsibility is.

8   Q    What, if any, responsibilities do you have for valuing

9   features of the software programs that you just mentioned?

10  A    Well, that's really one of my core responsibilities.

11  As I've said, my team and I are the ones who make the

12  decisions about what features go into the products, and so

13  we have to evaluate many different things.

14      We look at customer feedback.  We look at technical

15  feasibility.  We look at overall cost in terms of how much

16  it would cost us to develop a particular feature.  We look

17  at alternatives that we might develop instead.  We look at

18  strategic importance of different features and how they're

19  valuable in that way with respect to other parts of Office,

20  but also other parts of Microsoft.

21      We look at strategic importance of how features work

22  with -- with other companies' products as well.  So we

23  really do -- my team is really responsible for those

24  products, for the all up evaluation of the value of the

25  features.  And those are all core parts of my job as well.

1  Q    Now, one of the products that you mentioned that you

2  have responsibility for is Outlook, correct?

3  A    Yes, that's correct.

4  Q    And how long have you had some responsibility for the

5  Outlook product?

6  A    I started working on the Outlook product directly in

7  April of 1999 as the development manager, which means that I

8  was responsible for all of the programmers on the product at

9  the time.  And I've moved up to general manager and now

10  corporate vice president.  And responsibility for the

11  Outlook product is still part of my job.

12  Q    So for the 12 years from 1999 until you're sitting here

13  today, you've had responsibility for Outlook; is that right?

14  A    That's correct.

15  Q    Okay.  Mr. Kennedy, I want to start today with an

16  exhibit that the jury saw yesterday with Mr. Sims.  And I'm

17  going to just ask Mr. Ang to bring up Plaintiff's Exhibit

18  838.  It's already in evidence.

19  A    Okay.

20  Q    Do you remember seeing this document yesterday when Mr.

21  Sims testified?

22  A    Yes, I believe I do.

23  Q    And do you remember that this is the document that Mr.

24  Sims says he relies on for the statement that 99-percent of

25  Office users use Outlook?  Do you remember that?

V-11

1 A    Yes.  I believe that's the conclusion that he drew from

2 this document.

3 Q    Okay.  That went by a little quickly.  We're going to

4 take it a little slower today and go through this document

5 with a little more -- with a little more care.

6      If we could start -- well, let's start right here.  It

7 says on the front, "Microsoft Office, IW end-user product

8 satisfaction."  We're going to break that out and figure out

9 what all of those mean, but let's start with product

10 satisfaction.

11      What does that mean to you, and what does the name of

12 that -- that part of the name of the document tell you about

13 what this is?

14 A    So at Microsoft, as many companies do, we track product

15 satisfaction.  We want to know how satisfied our customers

16 are with our products.  And so that includes how happy they

17 are, what the positives and negatives are of the particular

18 products.  But it's an all up way of measuring overall

19 product satisfaction from our customers.

20 Q    And what does that name tell you about what the

21 universe of survey respondents or people that you're

22 questioning would be for a particular product?

23 A    Well, we only do product satisfaction research with

24 people who actually use the products.

25 Q    And so if you're doing -- this says "Microsoft Outlook

V-12

1  report."  So if you're doing an Outlook satisfaction survey,

2  that means that all of the people you survey actually say

3  they use Outlook?

4  A    That's correct.  It wouldn't make a lot of sense to ask

5  people who don't use the product what their satisfaction

6  with the Outlook product in this particular case would be.

7  Product satisfaction is very geared towards talking to -- or

8  learning from users of our products themselves.  And so

9  those are the only people who participate in these product

10 satisfaction research studies.

11 Q    Okay.  So without even going to the next page, would it

12 surprise you to learn that in this document, 100-percent of

13 the people who say they use Outlook actually use Outlook?

14 A    Not at all.  They wouldn't have been in the survey if

15 they didn't.

16 Q    Okay.  Does that tell you anything about how many

17 people who use Office use the Outlook component of Office?

18 A    No.  It doesn't tell us anything about that at all

19 because all of the people who don't use Outlook have already

20 been selected out of the population before this study was

21 done.

22 Q    Okay.  Now, we mentioned this IW and the end user, and

23 I want to ask you about that, but we can -- I think we can

24 learn about that on the next page.

25 A    Okay.

V-13

1  Q    So Mr. Ang, if you can go to the next page and blow up

2  that top.  And this gives the methodology and scope, I

3  gather, of this particular satisfaction survey; is that

4  right?

5  A    Yes.  This is the -- this is the basic slide that

6  understands how the survey -- the product satisfaction

7  survey was done, what the parameters for it were and what

8  some of the techniques that were used were in doing it.

9  Q    Okay.  Now, it starts at the top, "Target audience,"

10 then there's a little logo here of some sort.  It says,

11 "Information workers."  And then on the right it says,

12 "Blind on-line survey among IW end-users.  A person who uses

13 a P.C. for work purposes is not in an ITISMIS function and

14 is not a business decision-maker."

15 A    Yes.

16 Q    Can you break that out and explain to us what that

17 means?

18 A    Sure.  You know, when we look at product satisfaction,

19 we look at a variety of different populations.  And this

20 particular study is really about finding out about product

21 satisfaction opinions from people who are real end-users of

22 a product.

23      And specifically in this case, we wanted to do that for

24 people who are what we call information workers.  That's

25 what the IW means there.  An information workers is a --

1  that's a term that we use internally at Microsoft to mean

2  someone who uses software, uses computers as a core part of

3  their job, and they use -- they need business productivity

4  software, things like the Microsoft Office product.

5       So it's people who use computers as part of their job

6  specifically.  And that's called out where it says a person

7  who uses a P.C. for work purposes.

8  Q    Now, in your experience, Mr. Kennedy, are information

9  workers and the way they use programs representative of the

10 universe of all users?

11 A    Not necessarily.  There's a variety of different

12 features that information workers might use, specific

13 features that we build for information workers who use the

14 software as part of their job that -- what we call consumer

15 customers, people who use it at home, people who use it in a

16 student setting might not ever have any need to use.

17 Q    Okay.

18 A    That's very common.

19 Q    Now, the end of this sentence, it says you're also the

20 target audience.  These are people who are not business

21 decision-makers.  Can you tell us what's meant by business

22 decision-maker?

23 A    That's correct.  So this study explicitly excludes

24 people who have an I.T. job.  That's the first part of that

25 phrase.  An information technology job.  So it's people who

V-15

1  are not involved in like an I.T. department at a company but

2  rather people who work at a company who use a computer to do

3  their regular job.

4       And it also excludes a group called business decision-

5  makers.  And those are typically people in an organization,

6  at a school or in a company in this particular case, but

7  there are even business decision-makers in a home, people

8  who decide whether or not to purchase software.

9       In this case, we're excluding the people who are

10 business decision-makers from this particular survey.

11 Q    Mr. Kennedy, in your experience, are business decision-

12 makers and the way that they use software products

13 representative of all users?

14 A    Certainly not.  Business decision-makers are the ones

15 who have primary responsibility to make a decision about

16 purchasing a product, but the way that they particularly use

17 the product might differ greatly from the way that the

18 actual end-users that they're buying it for use the product.

19      For example, in the workplace, there may be -- there

20 may be I.T.-specific features about being able to control

21 content or lock down particular parts of the computer's

22 functionality that an I.T. person or a business decision-

23 maker might care a lot about.  But the end-users of the

24 software wouldn't rely on those features at all.  In fact,

25 they might not even like those features.

V-16

1      And so the usage patterns and what's valued between

2 people who -- who are business decision-makers and the

3 actual end-users can be radically different.

4 Q     Why did you exclude business decision-makers, then,

5 from this survey?

6 A     Well, because we found that business decision-makers in

7 a lot of cases aren't very good proxies for the end-users in

8 general.  Even in the home, if you buy a copy of Office to

9 use at home, your kids may care a lot about some of the

10 features in Power Point if they need to use Power Point for

11 presentations at school, but you as an adult, you may have

12 no need to use Power Point, and so you may not even know

13 about a lot of the features there, even though you're the

14 one making the purchase decision.

15 Q     Okay.  Thank you.

16      I'm going to move to the bottom section of this slide

17 and figure out what this means in sample breakdown.  And Mr.

18 Ang, if you could just blow up that lower right-hand corner,

19 that little box down there and maybe make the numbers a

20 little more legible.  Oh, perfect.  Thank you, sir.

21      So now we see that -- it looks like there were three

22 different Office suites that were covered here, Office 2007,

23 Office 2003 and Office XP.  Is that right?

24 A     Yes, that's correct.

25 Q     And then for each one of them, you surveyed respondents

V-17

1  for Outlook, Excel, Power Point, Word, and then there's some

2  N/As, but Google apps and some open Office; is that right?

3  A    That's true, yes.

4  Q    Okay.  So let's just go through the first box in the

5  upper left-hand corner where it says 101.  What does that

6  number mean, 101?

7  A    That means that there were 101 people who participated

8  in the survey who were surveyed about the version of Outlook

9  that was part of the Office 2007 suite.

10 Q    Okay.  So did you ask people who don't use Outlook

11 about Outlook?

12 A    No, we didn't.

13 Q    Okay.

14 A    In order to be in one of those boxes, you had to have

15 previously said that you use that product.

16 Q    Okay.  And so in the Office 2003, for instance, there's

17 126 listed there?

18 A    Yes.

19 Q    What does that mean?

20 A    That means that there were 126 people who had said that

21 they used the Outlook product as part of Office 2003, and

22 those are the ones that we surveyed about product

23 satisfaction about that specific product.

24 Q    As kind of a qualifier?  To be able to get into this

25 survey about Outlook, you have to use Outlook?

V-18

1  A    Yes, correct.  Everyone in this survey would have

2  already said that they used at least part of the Office

3  suite for those specific applications.

4  Q    Okay.  Now, let's move forward to page 10, if we could,

5  Mr. Ang.

6      And this was the page that Mr. Kennedy -- I'm sorry --

7  Mr. Sims looked at.  And I want to talk with you about it,

8  Mr. Kennedy.  Do you see at the top this says, "Frequency of

9  usage across Office applications"?  Do you see that?

10  A    Yes.

11  Q    And then underneath it, it says, "The majority of

12  Office users rely on Outlook, Word or Excel on a daily basis

13  in their jobs."  Do you see that?

14  A    Yes, I do.

15  Q    And then underneath it -- and I think this is the

16  bullet point that Mr. Sims locked onto.  It says, "Outlook

17  is the most frequently used Office application by far with

18  nearly all using it at least several times a week."

19      Does that mean that more people who buy Office use

20  Outlook than any other program?

21  A    No, it does not.

22  Q    What does that mean?

23  A    This particular question -- and again, the people who

24  answered this particular question for each one of the

25  applications had already said they used that specific

V-19

1 application.  But this particular question is trying to

2 ascertain how often they used that particular application,

3 not whether they use it at all.  Because they've already

4 claimed that they use that application as a previous

5 question in order to be included in this survey.

6 Q    Okay.  Then we see some charts on the right where it

7 shows Outlook and -- maybe we can blow up, Mr. Ang, just the

8 far right bar and then the legend next to it, those two

9 together.

10     So this is the Outlook bar; is that right?

11 A    Yes.  That's the bar that shows the frequency of use,

12 how often people use the Outlook application.

13 Q    Okay.  And we see that there's -- it looks like 91-

14 percent of Outlook users say they use Outlook every day.  Is

15 that what this means?

16 A    Yes, that's what that means.

17 Q    Okay.  And then 5-percent, it looks like, use it

18 several times a week; is that right?

19 A    Yes.

20 Q    And then 2-percent of people who use Outlook use it

21 once a week; is that right?

22 A    The number is really small and cut off, but I think

23 it's a 2, if my math is right.

24 Q    Okay.  Now, there's not -- and then it goes up several

25 times a month and up to once a month or less often.  There's

V-20

1  no entry for never, is there?

2  A    No, there's not.  And there wouldn't be in this

3  particular case because all of the people who were even

4  asked this question had already said that they use Outlook

5  for work purposes.

6  Q    Okay.  If we could back that out, Mr. Ang, and just see

7  the entire box put together, that would be helpful.

8      Now, it looks like -- and the statement above says,

9  "Outlook is the most frequently used Office application."

10 And certainly the dark bar is bigger in Outlook than it is

11 in Power Point or Excel or Word.  Does that mean that people

12 who use Outlook use Outlook more often than people who use

13 Power Point use Power Point?

14 A    It means that people who use Outlook tend to use it on

15 a more regular basis, more frequently than people who use

16 Power Point use Power Point, yes.

17 Q    Does that surprise you?

18 A    Not at all.

19 Q    Why not?

20 A    Well, Outlook is a product that you -- you know, one of

21 the ways that I like to talk about it with my team is

22 Outlook is the place where you go to find out what to do

23 next.  It's the place where you go to read e-mail.  It's the

24 place to go to look for things that you need to follow up on

25 or to find out what to do next that's on your calendar, to

1  be able to initiate communications with people.  Outlook is

2  the place you go to find out what to do next.

3      And so people tend to run Outlook all day every day at

4  their -- especially in their work because they want to

5  always be able to easily switch and see what they need to do

6  next.  That's not true of Power Point.  It's not true of

7  Word, and it's not true of Excel necessarily.  But it's very

8  common for Outlook.

9  Q    Now, you heard Mr. Sims say that this slide means 99-

10 percent of Office users use Outlook.  Did he read that

11 right?

12 A    He did not.

13 Q    What does it mean to you?

14 A    This means that, of the people who use Outlook, 91-

15 percent of them use it every day.  Another 5-percent use it

16 several times a week.  It's just about how often people who

17 use Outlook use the product.

18 Q    In your experience, Mr. Kennedy, what percentage of

19 Office users actually use Outlook?

20      MR. DAUCHOT:  Your Honor, objection.  Foundation.

21 There is no data.

22      THE COURT:  Repeat the question.

23      MR. DENNING:  Sure.

24 BY MR. DENNING:

25 Q    In your experience, Mr. Kennedy, as somebody who's been

V-22

1 responsible for the Outlook product for the last 12 years,

2 including, as you said in your direct just a few moments

3 ago, monitoring customer feedback and usage data, in your

4 experience, what percentage of Office users use Outlook?

5          MR. DAUCHOT:  Objection, your Honor.  There is no

6 data here.  This is speculation.

7          THE COURT:  Sustained.

8 BY MR. DENNING:

9 Q    Mr. Kennedy, as part of your responsibilities

10 overseeing the Outlook product, overseeing the usage of

11 Outlook as part of the Office program, do you have knowledge

12 -- do you have experience understanding how often -- how

13 many people who use Office use Outlook?

14 A    Yes, I do.

15 Q    And what is that understanding, sir?

16          MR. DAUCHOT:  Objection, you Honor.  Foundation,

17 speculation, no data.

18          THE COURT:  Foundation.  Sustained.

19 BY MR. DENNING:

20 Q    Has it been part of your job, Mr. Kennedy, in the last

21 12 years to understand how many people who use Office use

22 Outlook?

23 A    Yes, it has been.

24 Q    And do you have an understanding of that, sir?

25 A    Yes, I do.

V-23

1  Q    And what is that understanding, sir?

2         MR. DAUCHOT:  Objection, your Honor.  Foundation,

3  no data.

4         THE COURT:  Sustained.  You need to establish a

5  foundation.

6  BY MR. DENNING:

7  Q    We'll come back to that, Mr. Kennedy.  I don't want to

8  get bogged down there.

9  A    Okay.

10  Q    We'll come back to that.  One thing we know is that

11  this document does not show that 99-percent of people who

12  use Office use Outlook, correct?

13  A    That's correct.  This document doesn't show that.  It

14  shows something very, very different.

15  Q    Okay.  Mr. Kennedy, you heard Mr. Harris testify

16  yesterday on the stand, correct?

17  A    Yes, I did.

18  Q    Mr. Harris actually used to work under you in the

19  Outlook team when he worked on Outlook before he went off to

20  work on Windows, correct?

21  A    Yes.  He was on the Outlook team for quite a while

22  while I was there as well.

23  Q    Okay.  And do you remember Mr. Harris talking about the

24  process of software design at Microsoft?

25  A    Oh, yes, of course.

V-24

1  Q    And Mr. Harris testified that software design is not a
2  data-driven process, but he relies on what I think he said
3  was more of a holistic approach.  Do you remember that?
4  A    Yes, I do.
5  Q    And do you agree with that?
6  A    Yes.  Data is certainly one of the things that we look
7  at when we make decisions about the product, about what to
8  put into the product, about what to change in a product from
9  version to version.  But there's a lot of other things that
10 we look at as well.  Product satisfaction, both in terms of
11 data, as we saw on that previous document, but also
12 narrative product satisfaction statements is something that
13 we look at very clearly, things that people write to us
14 about.
15      Customer suggestions is certainly one of the things
16 that we look at.  How particular features or even particular
17 products would fit into Microsoft's overall product strategy
18 is definitely one of the things that we look at.
19      Other sources of feedback that we look at, even in
20 terms of blogs and feedback that we get on our Facebook page
21 is one of the things that we look at very intimately.  And
22 not all of that can be distilled down into data.
23      In a lot of cases, the decisions that we have to make
24 about what features to put in and what changes to make to
25 the product and even what general direction to take the

V-25

1  product, it's really more art than science.  And we rely on

2  our skills and our experience in order to make those

3  decisions.

4  Q    You said that software design is more art than science.

5  Is that why sometimes Microsoft hires music majors to be

6  product developers?

7  A    That's certainly one of the reasons.  We want to have a

8  lot of different contributions that go into making our

9  software great.  But despite the -- despite the belief that

10 because it's on a computer, it must be this very

11 straightforward process of making those decisions, there is

12 a lot of nuance, and there is a lot of art involved in

13 making those decisions.

14     If there wasn't, we would just have the computers tell

15 us exactly what we should put into the product.  And that's

16 certainly not the case.

17 Q    Okay.  Mr. Kennedy, I want to change topics now and

18 talk about Mr. Sims' testimony yesterday.  You were in

19 court.  You heard Mr. Sims testify, correct?

20 A    Yes, I did.

21 Q    And you heard his opinion that Microsoft and Lucent

22 would have agreed upon a reasonable royalty, in his words,

23 of $70 million for the Day patent in 1996.  Did you hear

24 that?

25 A    I heard him say that, yes.

V-26

1  Q    Do you agree with that?

2  A    Absolutely not.

3  Q    Why not?

4  A    Well, there are a variety of reasons.  As the person

5  who would have been sitting at the table in some sense

6  during the hypothetical negotiation in 1996, given my role

7  as a product leader, there are a variety of things that I

8  would have to evaluate in deciding what to do if faced with

9  an offer to license a patent such as the Day patent for use

10 in the Outlook product.

11     And the biggest thing I would look at is what the

12 opportunity cost would be of the cost of the license.  And

13 Mr. Sims claimed that $70 million was a fair and reasonable

14 license that Microsoft would have agreed to.

15     And to put that into context, for -- yesterday I --

16 there's the concept of the fully burdened cost that we have

17 for an engineer at Microsoft that's sort of the full cost of

18 employing an engineer that includes buying their computers,

19 paying their salary.  And that's about $200,000.  And so to

20 put that 70 million --

21 Q    Two hundred thousand dollars --

22 A    Per year.

23 Q    Per engineer?

24 A    Per engineer per year.

25 Q    Okay.  Thank you, sir.  I'm sorry to interrupt.

V-27

1  A    So to put that $70 million into context, that's 350

2  engineers for a year or it's 35 engineers for 10 years.

3       Now, the Outlook team, the development team, all of the

4  programmers who write the code that goes into Outlook, in my

5  12 years of working on the product, the smallest that team

6  has been is 32, and the largest it's been is 48.  And so

7  what this licensing cost would be is roughly equivalent to

8  the cost of all of the engineering work that's gone into

9  building the Outlook product for the last 10 years for the

10 Date Picker.

11      MR. DAUCHOT:  Your Honor, a few objections.  One,

12 this is beyond the scope of the declaration.  And the Court

13 ruled in limine that any --

14      THE COURT:  Just a minute.  Just say your

15 objection.  That's all.

16      MR. DAUCHOT:  Any decisions on this issue are

17 supposed to be limited to declaration.  This is beyond the

18 declaration.

19      THE COURT:  Sustained.

20      MR. DAUCHOT:  And this expert is not a witness --

21 or this witness is not an expert witness, so we move to

22 strike the witness's statement.

23      THE COURT:  Sustained.  It's stricken.  But you

24 can rephrase it.  I'm going to permit you to ask him some

25 questions.

V-28

1          MR. DENNING:  Thank you, your Honor.  I appreciate

2    that.

3          MR. DAUCHOT:  Your Honor, may we have an

4    instruction that the jury is to disregard what the Court has

5    ordered stricken?

6          THE COURT:  Yes.

7          MR. DAUCHOT:  Thank you.

8    BY MR. DENNING:

9    Q    Mr. Kennedy, let me ask it this way.  We know that they

10   didn't, but if Lucent had come to Microsoft in 1996 and said

11   to Microsoft, here's the Day patent.  If you want a license

12   to use the Date Picker in Outlook, you need to pay us $70

13   million.  What would Microsoft's alternatives have been?

14   A    The clearest and simple obvious alternative is that we

15   would have removed the Date Picker control from the product.

16   Q    If you removed the Date Picker control from Outlook in

17   1996, what would users have used to enter a date?

18   A    Users would have been able to use, even if we hadn't

19   made any other changes, all of the other ways that we've

20   shown here in court to be able to enter dates into the

21   product.  They would be able to -- on the calendar, for

22   example, they'd be able to click on the calendar and type to

23   put an appointment at the correct time.  They'd be able to

24   click on the calendar -- or double-click on the calendar and

25   have the date and time prepopulated in the new appointment

V-29

1  form.

2      They would be able to type in the date field.  And that

3  doesn't just mean type the date like 7/27.  It means you can

4  type things like "next Tuesday."  There's a wide variety of

5  things that are already supported.  And that would be

6  unchanged if we were to remove the drop-down portion of the

7  Date Picker control.

8  Q    Would Microsoft have had to have programmed those

9  features into the product in 1996 when it took the Date

10  Picker out?

11  A    Absolutely not.  Those features were already in the

12  product at that time.

13  Q    Well, in your opinion, then, Mr. Kennedy, what would

14  the impact on sales have been if Microsoft had removed the

15  Date Picker from Outlook in 1996?

16      MR. DAUCHOT:  Your Honor, we just reassert out

17  standing objection to this.

18      THE COURT:  You may.  On this, overruled.

19      THE WITNESS:  I believe that removing the Date

20  Picker -- the drop-down calendar from the Date Picker

21  control would have had no impact on sales whatsoever.

22  BY MR. DENNING:

23  Q    And why do you say that?

24  A    Because I'm very familiar with the Outlook product and

25  all of the richness associated with all of the features in

V-30

1  the product.  And the Date Picker is one small feature in

2  one portion of the product.  And as I've stated previously,

3  we've received no feedback, positive, negative or neutral,

4  that I've seen about the Date Picker itself during all of my

5  12 years working on the Outlook product.

6       And so I just don't believe that it's a feature that

7  would have caused people to change a purchasing decision.

8  It's too small a feature in too broad a product.

9  Q    What is your opinion -- so we talked about Outlook and

10 what your opinion is on whether removing the Date Picker

11 from Outlook would have impacted sales.  What is your

12 opinion about whether removing the Date Picker from Outlook

13 would have impacted sales for the Office suite?

14 A    Well, as we've seen, most people --

15          MR. DAUCHOT:  Your Honor, that is beyond the scope

16 of the declaration.

17          THE COURT:  Overruled.

18          THE WITNESS:  As we've seen, most people purchased

19 Outlook as part of the Office suite.  And it just seems

20 impossible to me that people would make a decision not to

21 get Power Point or not to get Excel or not to get Word or

22 not to get any of the other value in the Office product

23 because the Date Picker control was removed from the Outlook

24 product.  That just doesn't seem to be a logical, reasonable

25 decision to me.

V-31

1          MR. DAUCHOT:  Your Honor, I renew the objection

2    and move to strike on the basis of foundation.  There is no

3    data.  This is just someone speculating that it would be

4    impossible.

5          THE COURT:  Overruled.

6    BY MR. DENNING:

7    Q    Now, Mr. Kennedy, yesterday during Mr. Harris'

8    testimony, a video deposition clip was played in which Mr.

9    Harris said removing the Date Picker from Outlook would have

10   cost money.  Do you remember that?

11   A    Yes, I do.

12   Q    Do you agree with that?

13   A    Yes, it would have cost some money.

14   Q    Have you determined how much it would have cost

15   Microsoft in 1996 to remove the Date Picker -- the physical

16   process of removing the Date Picker from the Outlook

17   product?

18   A    Yes, I figured that out.

19   Q    And how much would it have cost Microsoft to remove the

20   Date Picker from Outlook in 1996?

21   A    The amount that I came up with in terms of the total

22   engineering cost to remove the drop-down calendar portion of

23   the Date Picker control is $31,200.

24   Q    Can you please explain to the jury how you arrived at

25   that number?

V-32

1  A    Certainly.  So what I did, as the business leader and

2  the product development head of the team, is I looked at all

3  of the different activities that the team would have to do

4  in order to remove the Date Picker from the product.  And

5  those include designing the removal properly to make sure

6  that the form visually looked appropriate in all of the

7  places the Date Picker exists, making sure that the design

8  didn't impact any of the alternatives, which, as we see here

9  in court, doesn't seem that it would, but we would have to

10 make sure that that was designed properly.

11       It includes the actual coding, the changing of the

12 computer code itself to remove the drop-down portion of the

13 Date Picker control.  It includes the full verification and

14 testing to make sure that that has no other negative impact

15 on the product.  It includes changes -- any potential

16 changes we would have to make to what we call our user

17 education materials, things that tell the customers how to

18 use the product to make sure that those would be altered, to

19 not reference that Date Picker control if it were removed.

20       So I totaled up all of the different activities that we

21 would have to do in order to remove the -- do a complete

22 removal from the product and came up with estimates for each

23 one of those activities.  And I came up with a total of

24 about 39 person days of work.

25 Q    Okay.  And how did you get from the 39 person days to

1 the 31,200?

2 A    Well, I used what we call the fully burdened cost.

3 It's a relatively generous estimate of what it costs to

4 employ an engineer at Microsoft for a full year.  It's

5 around $200,000.  That includes everything, salary, air

6 conditioning, office chair, all of those things.

7      And I used that as the estimate for what it would cost

8 for an engineer for a year.  Given that it's 39 person days,

9 I pro rated that $200,000 cost for a year down to 39 days,

10 and it's about $31,200.

11 Q    Okay.  But Mr. Kennedy, are you telling the jury that

12 the value of the Date Picker to Microsoft is only 31,200?

13 A    No, I'm not.

14 Q    Are you saying that Microsoft would not have been

15 willing to pay a dollar more than 31,200 for a license so

16 that it could use the Date Picker in 1996?

17 A    No, that's not what I'm saying at all.

18 Q    Why aren't you saying that?

19 A    Well, to license a patent like the Day patent would

20 deliver some extra convenience value into the product to

21 allow our customers to be able to use the drop-down calendar

22 portion of the Date Picker control.  And so Microsoft, of

23 course, would be willing to pay some additional money in

24 order to get that convenience in the product.

25 Q    Now, Mr. Kennedy, as someone who's worked at Microsoft

V-34

1  for 20 years and is responsible for valuing features in its

2  software programs, including Outlook, how much do you think

3  Microsoft would have been willing to pay in 1996 for the

4  convenience of including the Date Picker in Outlook?

5  A    Well, based on my experience in leading the Outlook

6  team and understanding the feature value across the entire

7  product, I believe that Microsoft would be willing to pay up

8  to $2 million for a license to the Day patent for use in the

9  Outlook product.

10 Q    Why do you think that Microsoft would have been willing

11 to pay up to 2 million -- I gather but not more?

12 A    But not more, yes.

13 Q    -- for a license to use the Date Picker in Outlook?

14 A    Well, as I said, there's some process involved in

15 licensing any one of those patents, and the Day patent

16 technology would deliver some convenience value to the end-

17 user, and that would be valuable to our customers in some

18 sense.  But certainly we wouldn't go above $2 million, in my

19 opinion, simply because any value above that would far

20 outweigh the value we would get when our clear alternative

21 is to remove the product -- remove the Date Picker from the

22 product for only $31,000.

23 Q    Now, Mr. Kennedy, we talked just about Outlook.  Now,

24 would Microsoft have been willing to pay more for a license

25 that allowed Microsoft to use the Date Picker not just in

V-35

1  Outlook, but in other products as well?

2  A    Certainly.  And that would be -- that would be

3  something that Microsoft would be interested in looking at

4  as well.  And in my experience, based on my understanding of

5  how we make feature valuation decisions in our product,

6  Microsoft might be willing to pay up to $5 million for a

7  broad license, for use of the Day patent technology in all

8  of Microsoft's products.

9  Q    And why do you say not more than $5 million?

10 A    Well, because the convenience value of using the Day

11 patent technology might be valuable in other products,

12 products that existed at the time and products that didn't

13 exist at the time, that weren't even designed.  In order to

14 account for that, there's value in being able to use that

15 license more broadly.

16 Q    Okay.  Well, thank you, Mr. Kennedy.  I'm going to

17 change topics just a tiny bit.  We're still going to stay in

18 1996.

19 A    Okay.

20 Q    And, you know, you've heard that's the date of this

21 hypothetical negotiation, correct?

22 A    Yes, that's correct.

23 Q    Okay.  I want you to assume that Lotus Notes had a Date

24 Picker in 1996.  Can you do that for me, sir?

25 A    I can do that.

V-36

1 Q    Okay.  If Lotus Notes had had a Date Picker, but you

2 had removed the Date Picker from Outlook, based on your

3 experience, do you think that would have had a measurable

4 impact on sales of Outlook?

5 A    Absolutely not.

6         MR. DAUCHOT:  Objection, your Honor.  Beyond the

7 scope of the declaration.  This is new opinion testimony.

8         THE COURT:  Overruled.

9 BY MR. DENNING:

10 Q    And why not?

11 A    Well, there are many feature differences between Lotus

12 Notes and the Outlook product.  Some weigh in the favor of

13 Outlook, some weigh in the favor of Lotus Notes.  And

14 certainly, the differences between those two products have

15 changed over the years as those two products have evolved.

16     But comparison on the very small feature level of

17 things like the Date Picker control is never something that

18 we found would cause a customer to make a decision one way

19 or the other about which product to purchase.  Instead, the

20 feature differences that customers would tend to consider

21 would be much larger things like the development programming

22 environment of Lotus Notes compared to Outlook, the database

23 functionality that underlies Lotus Notes that Outlook really

24 doesn't have, some of the ease-of-use differences between

25 the two products, most of which favor the Outlook product,

V-37

1 but certainly there are exceptions to that as well.

2     Those are many, many of the larger things that our

3 customers would evaluate.  But individual small features

4 like the Date Picker, in my belief, would not have caused

5 customers to make a different decision about purchasing the

6 product.

7 Q    Now, Mr. Kennedy, you were here when Doctor Jay

8 testified about her survey, correct?

9 A    Yes, I was.

10 Q    And do you recall Doctor Jay discussing this 3-percent

11 number that then Mr. Sims discussed yesterday?

12 A    Yes, I do.

13 Q    And do you remember Doctor Jay saying in her direct

14 examination that that 3-percent number relies on an

15 assumption that purchase decision-makers would use the drop-

16 down calendar at the same rate of all Outlook users?  Do you

17 remember her saying -- relies on that assumption?

18 A    Yes, I remember her saying that.

19 Q    Based on your experience in Outlook, can you assume

20 that purchase decision-makers use Outlook in the same way as

21 all users?

22           THE COURT:  Just a second.

23           MR. DAUCHOT:  Your Honor, foundation, beyond the

24 scope of the declaration and in violation of the in limine

25 re Doctor Jay.

V-38

1          THE COURT:  Sustained.

2          MR. DENNING:  I'll move on, your Honor.

3          THE COURT:  You can take it up later.

4          MR. DENNING:  Thank you.

5          If we could pull up, Mr. Ang, MDX-518.

6    BY MR. DENNING:

7    Q    You remember this was one of the slides that was shown

8    during the cross examination of Mr. Sims.  Do you remember

9    that?

10   A    Yes, I do.

11   Q    And there was some discussion with Mr. Sims about

12   whether people could buy Office without Outlook as part of

13   the suite.  Do you remember that?

14   A    Yes, I remember that discussion.

15   Q    And this particular slide shows that there are four

16   components of this -- I think this was the standard edition

17   of Office 2003, and it included Outlook, right?

18   A    That's correct.

19   Q    And Mr. Sims said, well, somebody could have just

20   bought Office without Outlook.  Do you remember that?

21   A    I remember when he said that, yes.

22   Q    Has Microsoft ever had a version of Office that did not

23   include Outlook?

24   A    Yes, we have.

25   Q    And when was that version of Office available?

V-39

1  A    Well, there were -- to be excruciatingly correct, there

2  were versions before 1996 that -- before Outlook ever

3  shipped that didn't have Outlook, of course.

4  Q    Let me rephrase my question.  Since Outlook has existed

5  as a product --

6  A    Okay.

7  Q    -- has Microsoft offered a version of Office that

8  doesn't have Outlook in it?

9  A    Yes, we have.

10 Q    And when?

11 A    The first version of Office that did not include

12 Outlook, after Outlook became a product, was as part of the

13 Office 2007 suite, which was available in 2007.

14 Q    Okay.  So in 2003, could somebody have bought a version

15 of Office without Outlook in it?

16 A    No.  There were no versions of Office that did not have

17 Outlook.

18 Q    How about in 2004?

19 A    No.

20 Q    How about in 2005?

21 A    No.

22 Q    How about in the first three-quarters of 2006?

23 A    No.  There was no version of Office available during

24 that time that did not include Outlook.

25 Q    Okay.  Now, in 2007, you said there was a version

1   launched in late 2006 --

2   A    Yes.

3   Q    -- of a version of Office that did not have Outlook.

4   A    Yes, that's correct.

5   Q    First of all, how many versions of Office were there in

6   Office 2007?

7   A    In Office 2007, I believe there were six versions that

8   were available.

9   Q    Okay.  How many of those versions did not have Outlook?

10  A    Only one.

11  Q    And what was the name of that version?

12  A    That version was called the home and student version of

13  the product.

14  Q    Who could purchase the home and student version of

15  Office in Office 2007?

16  A    Well, it was primarily directed at what we call

17  academic sales, meaning that we sold it through channels

18  such as university bookstores or on-line catalogues that

19  were used by K through 12 schools, things like that.  So it

20  was primarily directed at the academic market.

21  Q    And why would you sell a version of Office 2007 that

22  didn't include Outlook in it and call it the home and

23  student version?

24  A    Well, there are a variety of reasons.  One reason was

25  that we found that lots of our customers who used Outlook

V-41

1  used it for their work or sort of in the business setting.

2  But another primary reason was that we wanted to be able to

3  offer a lower cost version of the Office product that would

4  be affordable to students and easily accessible to students

5  for a variety of reasons.

6      We wanted to help address a piracy problem that we had

7  with students who would -- you know, one person would buy a

8  copy of Office, pass it around their dorm hallway, for

9  example.  So we wanted to be able to build a version that

10 was priced in such a way that piracy would not be as

11 attractive.

12     And we also wanted to build a version that was priced

13 in such a way that students would get used to using Office

14 in their college setting especially so that they would be

15 consistent Office users throughout the rest of their lives

16 as well.

17 Q   Were there restrictions on how people who bought the

18 home and student version could use it?

19 A   For academic pricing of the home and student version,

20 someone needed to show or be affiliated with an academic

21 institution.  Typically, that would mean show a student I.D.

22 or faculty I.D. to qualify for academic pricing.

23     If -- in some case, we made the home and student

24 version available at retail, and you could purchase it there

25 at retail for the full price, the full retail price of the

V-42

1  product.

2  Q    Okay.  Were people who bought it in the academic

3  pricing model, could they use it for commercial or business

4  purposes?

5  A    No, they could not.  That was specifically called out

6  in the license, that it's not for use in commercial

7  purposes.

8  Q    Okay.  Now, you spoke just a moment ago about how there

9  was a lower price point because you wanted to allow students

10 to afford it and also to avoid this piracy issue.

11     Was there any correlation between the difference in

12 price of the Office 2007 standard edition and the Office

13 2007 home and student edition -- was there any correlation

14 between that difference in price and the value that

15 Microsoft put on Outlook?

16 A    Not in my belief.  The primary reason for the pricing

17 difference was in order to be able to price this lower end

18 academic version to make it available, to price that low

19 enough to make it available in the academic setting.

20 Q    Okay.  Let's -- let's change -- let's change topics for

21 a second and look at just a couple of Microsoft documents.

22 A    Okay.

23 Q    If we could -- and you have the binder, but I'll put it

24 up on the screen.  If you want to look at the hard copies,

25 let me know, and I'll bring you a copy.

V-43

1  A     Okay.

2  Q     If you could put up PX-832, please.  This is already in

3  evidence.

4        Mr. Kennedy, this is a document called "Outlook Usage

5  Study" dated November 2001; is that right?

6  A     Yes.

7  Q     And you've seen this before in this case, right?

8  A     Yes, I have.

9  Q     Okay.  Let's go, if we could, then, Mr. Ang, to the

10 second page of this document.  And blow up the top of the

11 screen.

12       And we saw -- we see on the second major bullet point

13 web-based survey participants from the Office panel.  Do you

14 remember that?

15 A     Yes, I do.

16 Q     And Mr. Harris testified yesterday about what the

17 Office panel is.  Remember that?

18 A     Yes.

19 Q     Okay.  I'm going to go forward and look at a couple of

20 things that we haven't seen yet in this document.  Mr. Ang,

21 if we could go to page 26.

22       Now, this was a document that we saw on Lucent's case

23 in chief, and they point out that -- oh, actually, I'm

24 sorry.  This page was not -- this is a page we haven't seen.

25 But it says at the top, "Attachments are a major reason to

V-44

1  send e-mail."

2      Do you see that?

3  A    Yes, I do.

4  Q    And in your -- in your work on the product, do you

5  agree with that statement?

6  A    In this context, yes, I would certainly agree with that

7  statement.  One of the things to note on the second page

8  before you jumped off of that that I saw --

9  Q    Sure.

10 A    -- is that -- is that this study was intentionally

11 geared towards learning about how people use the product at

12 their work site specifically called out there.  And so these

13 are for people who use the product as part of their job.

14 Q    Okay.  Very good.  Thank you, Mr. Kennedy.

15 A    And in that context, sending attachments via mail is

16 certainly a very common thing that I would assume people do,

17 yes.

18 Q    Okay.  And down on the left-hand side, it lists a

19 number of things, inserts, attach a file, check names,

20 request a reading receipt, request a delivery receipt,

21 change the importance, save it as a draft.  Do you see that?

22 A    Yes, I see all those things.

23 Q    Do any of those tasks invoke the Date Picker?

24 A    No, none of those do.

25 Q    Okay.  If we could go forward to page 32.  This was

V-45

1  another of the pages that we didn't see in Lucent's case,

2  and I just wanted to bring it to your attention.  This one

3  says the vast majority of users create folders.

4        Do you see that?

5  A     Yes, I do.

6  Q     Okay.  Does creating folders invoke the use of the Date

7  Picker?

8  A     Not at all.

9  Q     Okay.  Could we go forward to page 32, please, Mr. Ang.

10       And this one says that 34-percent of respondents

11  reported using rules to organize their messages.  Do you see

12  that?

13  A     Yes, I do.

14  Q     Does using rules to organize your message invoke the

15  Date Picker?

16  A     No, it doesn't.  Rules are a way that you can get the

17  program to automatically process e-mail for you on your

18  behalf.  So, for example, I could have a rule that moves all

19  of the mail from Roger to a specific folder.

20  Q     Not the trash folder, right?

21  A     Not the trash folder.  But when the mail arrives, the

22  program -- Outlook would automatically move it into a

23  specific folder just for sorting purposes.  That's one

24  example of what you could do with rules.

25  Q     Okay.  You don't have to use the Date Picker to use

V-46

1 rules, correct?

2 A    Oh, not at all, no.

3 Q    Okay.  Mr. Ang, could we go forward to page 41, please.

4      And this page talks about the preview pane at the top.

5 And it says it's widely used as a means of reading e-mail.

6 What's a preview pane?

7 A    The preview pane is the portion of the Outlook screen

8 that shows you what the e-mail looks like when you just

9 select it in the message list without having to open that

10 e-mail itself in a separate window.

11 Q    And do you have to use the Date Picker to use the

12 preview pane?

13 A    Not at all, no.

14 Q    Mr. Ang, could we please go forward to page 44.

15      Okay.  Now, this is a page that actually we did see in

16 Lucent's case.  And I want to ask you a couple of questions

17 about this.  It says, "79-percent of respondents use Outlook

18 to schedule some of their meetings."

19      Do you see that?

20 A    Yes.

21 Q    And then it lists below that 39-percent use Outlook to

22 schedule meetings very frequently, and 22-percent use

23 Outlook to schedule meetings somewhat frequently.

24      Does it say anywhere on this page anything about the

25 Date Picker?

V-47

1  A    No, it doesn't.

2  Q    Would a user have to use the Date Picker to do any of

3  these tasks?

4  A    No, not at all.

5  Q    Okay.  Mr. Ang, can we please go forward to page 45,

6  the next page.  We saw this page also in Lucent's case where

7  they say the most popular features when scheduling meetings,

8  defining meeting as recurring and changing default reminder

9  time.

10      Do you see that?

11 A    Yes, I see that.

12 Q    And then Lucent highlighted a couple of the headings

13 over here.  "Define meeting event as recurring.  Change the

14 default time.  Create an all-day event."

15      Do you see those?

16 A    Yes.

17 Q    Does this slide say anything about the Date Picker?

18 A    No, it does not.

19 Q    Do you have to use the Date Picker to do any of these

20 tasks?

21 A    No, you don't.

22 Q    Mr. Ang, can we please go one more page, page 48.

23      And then this was the third page that Lucent showed.

24 And it says, "Most popular feature when receiving meeting

25 requests are change the time of reminder, print and

V-48

1  forward."

2      Do you remember that?

3  A    Yes.

4  Q    And then they noticed a couple of these down here.

5  Changing the default time, propose a new time, those sorts

6  of things.

7      Does this slide say anything about the Date Picker

8  feature?

9  A    No, it doesn't.

10 Q    Do you have to use the Date Picker feature to do any of

11 these things?

12 A    No, you don't.

13 Q    Okay.  If -- Mr. Ang, if you could please pull up

14 PX-1889.

15     This is a document that's already been admitted into

16 evidence, we saw yesterday with Mr. Sims.  Do you remember

17 seeing this document, sir?

18 A    Yes, I do.

19 Q    Mr. Ang, can you just blow up the top, the heading --

20 there you go.  Perfect.

21     You see, this was what was called the Outlook 11

22 usability benchmark study.  Do you remember that?

23 A    Yes, I do.

24 Q    And what is Outlook 11 again?

25 A    Outlook 11 was the internal name that we used for

V-49

1 Outlook 2003.

2 Q    Okay.  And this was -- this was prepared on December

3 27th, 2002, so shortly before 2003; is that right?

4 A    Yes.  This was about eight months before we finished

5 the development work on the 2003 product.

6 Q    And Hernan Savastano (phonetic) deserves a bonus for

7 working between Christmas and New Years that year, correct?

8 A    Yes, I did notice that.  It was between Christmas and

9 New Years.

10 Q    Okay.  Mr. Ang, if we could go forward to the page that

11 ends in 180.  There.

12      Do you remember that Mr. Sims showed this page to the

13 jury yesterday?

14 A    Yes, I believe he did.

15 Q    And he talked about how one of the things Microsoft

16 does in evaluating its products is to look at the time that

17 it takes for people to perform certain tasks; is that right?

18 A    Yes, he said that.

19 Q    Okay.  Do any of these tasks -- Mr. Ang, if you could

20 just highlight the table.  We'll need the text above it.

21 Just the table and get that all on the screen.

22      Do any of these tasks talk about using the Date Picker?

23 And take your time, if you want to go through it.

24 A    No, none of them do.

25 Q    And in your experience, Mr. Kennedy, does using the

V-50

1  Date Picker save users any time?

2  A    I haven't seen any evidence in my job that using the

3  Date Picker saves customers any time at all.

4  Q    And in your experience -- remember Mr. Sims said that

5  using the Date Picker saves one second per use?  Do you

6  remember that?

7  A    Yes, I remember he said that.

8  Q    In your experience, does a one-second time savings

9  amount to any measurable value in a product?

10 A    It certainly doesn't seem to me that that would be

11 either measurable in terms of value or in terms of the

12 actual end-user's use of the various features involved.

13 Q    Okay.  I'm going to go forward and look at a couple of

14 other things in this document.  Mr Ang, if we could go

15 forward two pages to page 182.  And if you could highlight

16 this Task Number 2 right here.

17     This is -- well, actually, let's back up and look at

18 the very top and understand what we're doing here.  This is

19 task by task analysis.  Can you tell me what this is talking

20 about, what we're looking at here.

21 A    So this was evaluating for a variety of different tasks

22 that were shown in the previous table, in the big long

23 table, a variety of previous tasks, what customers'

24 performance and opinions about those particular things --

25 those particular tasks was.

V-51

1  Q    Okay.  So these were the tasks that you were interested

2  in understanding how people would use?

3  A    That's correct.

4  Q    Okay.  So the first task, read mail, we know that

5  reading mail doesn't require the use of the Date Picker,

6  right?

7  A    That's correct.

8  Q    Okay.  Mr. Ang, if you could highlight the second task.

9  And this one is sending mail.

10 A    Yes.

11 Q    And this is the one actually that says, "Send an e-mail

12 message to Will Kennedy and cc Jensen Harris."  Is that

13 right?

14 A    Yes.  We would assign -- the way these studies would

15 work is we would assign the subject, the person who was

16 participating in the study a very specific task for them to

17 complete.  And we tried to be precise so that they would

18 know how to complete that task.  And in this particular

19 case, we had the computer pre-set up with some e-mail

20 addresses already in there.  I suppose that mine was one of

21 the ones that they used.  And I suppose Mr. Harris was

22 another one that they used as well.

23 Q    Okay.  And does sending an e-mail invoke the use of the

24 Date Picker?

25 A    No, it does not.

1  Q    Okay.  Mr. Ang --

2  A    I didn't actually receive any of these e-mails, by the

3  way.  They were just in the study.

4  Q    Mr. Ang, if you could go down to the Task Number 3 and

5  just highlight that briefly.

6       This is called "Flag Message."  Do you see that one?

7  A    Yes.

8  Q    And does flagging a message invoke the use of the Date

9  Picker?

10 A    No, it does not.

11 Q    Okay.  I note here that in addition to describing what

12 the feature is, you call out how they would do it.  For

13 instance, in the second line here, you say, "Most

14 participants immediately right-click the message.  Click

15 follow-up and selected the red flag."

16      So for this feature, you were interested in actually

17 where the user was clicking and how they were performing

18 this task?

19 A    Yes.

20 Q    And is that common for the types of things -- for

21 features you're interested in, things you would be looking

22 at?

23 A    Yes, it is.

24 Q    Okay.  Mr. Ang, let's go to the next page.

25      We'll just look at a couple more, Mr. Kennedy.  Number

V-53

1  4, "Sort by Sender" at the top.  Sorting messages by sender,

2  that's not something that invokes the Date Picker, right?

3  A    That's correct.

4  Q    But here again, you were interested in most

5  participants clicked the "arrange by" column and "selected

6  from"; is that right?

7  A    That's correct.

8  Q    So you were, again, looking at where the users clicked

9  to do this task?

10  A    In this case, yes.

11  Q    And let's go to the next one down as the final one

12  here.  "Sort Order."  And sorting the messages by date.

13  Again, that's not something that uses the Date Picker,

14  correct?

15  A    No.  This just changes the order in which things are

16  sorted from oldest to newest to newest to oldest, for

17  example, but it doesn't use the Date Picker in any way.

18  Q    Okay.  But again, you were monitoring, you know, how

19  people did it, including simply clicking the "arrange by

20  date" column, correct?

21  A    That's correct.

22  Q    Okay.  Let's skip forward, then, because I want to get

23  to the one that Mr. -- Mr. Sims showed.  If we can go to

24  page 186, Mr. Ang.  And this was Task 10.  If you could just

25  blow up the Task 10 and down, that would be great.

V-54

1    Here, this is one he highlighted because it says
2    "Create new tasks."  Do you remember that?
3    A    Yes, I do.
4    Q    Okay.  And it says, "Most participants easily found
5    tasks on the nav bar, click new tasks on the tool bar and
6    accomplish the task without difficulty."
7         Do you see that?
8    A    Yes, I do.
9    Q    Now, it doesn't say anything here about using the Date
10   Picker, right?
11   A    That's correct.
12   Q    You didn't track whether people would create a new task
13   and use the Date Picker to, as it says here, set June 30th
14   as the new date?
15   A    That's correct.  It didn't track whether they used the
16   Date Picker control for that at all.
17   Q    Well, what does that tell you about the importance of
18   the Date Picker in the development of this product?
19   A    It tells me that in this case, the way that they
20   entered the date, in this case June 30th, was not something
21   that we were interested in finding out more information
22   about.  It wasn't something worth tracking.
23   Q    And Mr. Ang, let's go one more page to page 187.  And
24   if you could blow up Task 11 at the top.
25        This was the other one that Mr. Sims shows, and it

V-55

1  says, "Create a weekly appointment for 10:00 to 11:00 a.m.

2  on Thursday mornings."

3      Do you see that?

4  A    Yes, I do.

5  Q    Now, there's nothing here -- you say, "All participants

6  easily found the calendar on the nav bar, then clicked new

7  appointment from the toolbar or double-clicked into the

8  calendar to create a new appointment."

9      Do you see that?

10 A    Yes, I see that.

11 Q    So you did track what people double-clicked in the

12 calendar to pop up the new appointment, correct?

13 A    Well, in this case, it actually says that all of the

14 participants either navigated to their calendar to show the

15 context of when the appointment would be, and then once

16 there, they double-clicked on the calendar to create a new

17 appointment, yes.

18 Q    Did any of these people use the Date Picker to do this

19 task?

20 A    Not at all clear.

21 Q    Is that something that you -- that is mentioned in this

22 document?

23 A    No, it doesn't mention that at all.

24 Q    And what does that tell you about the importance of the

25 Date Picker as a feature in at least this survey of the

V-56

1 product?

2 A    It tells me that the particular method for entering the

3 date information was not an important thing for us to track.

4 Q    Okay.  I have one more topic and two quick documents to

5 show you, Mr. Kennedy.  And these are ones that we looked at

6 yesterday.

7     First I'm going to start with PX-812.  These were the

8 e-mails from irate users at the changes that you made in

9 the -- in the user interface for Outlook 2003.  Do you

10 remember those?

11 A    Yes, I do.

12 Q    Okay.  This is the one from the gentleman at Stanford

13 who had e-mailed and called you and Mr. Harris.  Not by

14 name, but you guys, some unmentionable names.  But I want to

15 track and understand a little bit about the sequence here.

16 A    Okay.

17 Q    Mr. Ang, can you lower that bottom -- just show me a

18 little more of that first message.  There you go.  Perfect.

19     So this starts -- if we look at the e-mail message on

20 the bottom, this is an e-mail message from the Outlook 2003

21 team to the Outlook new user; is that right?

22 A    Yes.

23 Q    And the subject is, "Welcome to Microsoft Office

24 Outlook 2003."

25 A    Yes.

V-57

1  Q    What is this message that's sent to new Outlook user?

2  A    So this is an e-mail message.  And I sort of want to

3  put the term "e-mail message" sort of in quotes in this case

4  because it's not an e-mail message that was ever actually

5  delivered over the internet.  The way this worked is, when

6  you set up the Office 2003 or Outlook 2003 product and

7  configured an e-mail account, we would automatically

8  deliver, automatically place into the in-box this thing that

9  looked like a mail message from the Outlook team.

10       And it had text in it.  You can see a little bit of it

11 there that thanks them for purchasing the product and

12 describes some of the new features in the product.  It was

13 sort of a way of getting the word out, if you will, to our

14 customers about some of the things in the product.

15       And we configured it in such a way that when this got

16 placed into the in-box, it had a reply address.  And you

17 could actually reply to it as if it were a real e-mail

18 message that went over the internet.

19 Q    Why did you configure it so that people could reply?

20 A    We thought it would be certainly interesting and

21 valuable to be able to receive direct feedback from

22 individual end-users through this mechanism.

23 Q    Okay.  So when the user installs Outlook, this is the

24 first message that comes up?

25 A    The very first thing, yes.

V-58

1  Q    And it comes up right when you install Outlook, right?

2  A    Yes.

3  Q    Okay.  Let's look at the timing here for this

4  individual from Stanford.  It looks like the original

5  message showed up in his in-box on March 12, 2004 at 12:18

6  p.m.; is that right?

7  A    Yes, that's what it shows.

8  Q    And he sent his reply e-mail on March 12, 2004 at 12:22

9  p.m.; is that right?

10 A    Yes, four minutes later.

11 Q    Four minutes after installing Outlook, he sent this

12 reply e-mail; is that right?

13 A    Yes, he did.

14 Q    All right.  Well, the other interesting thing, though,

15 is what happens next?  The next message is from you to

16 Jensen Harris; is that right?

17 A    Yes.

18 Q    And talking about your alma mater at Stanford.  But you

19 sent that e-mail on March 12, 2004 at 2:30 p.m.; is that

20 right?

21 A    That's correct.

22 Q    Now, how did you get this e-mail from the individual at

23 Stanford?

24 A    Well, all of these -- all of the replies to this e-mail

25 message, this alias O.L. team at Microsoft.com came to

V-59

1   what's called an alias, which is a group of people at

2   Microsoft.  And anybody at Microsoft who is interested in

3   mail that was sent to this e-mail address could be part of

4   that group.  And so I was part of that group who received

5   every one of these e-mail messages from our customers.

6   Q    What was your title at this time in 2004 at Microsoft?

7   A    I was the general manager of the Outlook product

8   development team.

9   Q    How many people were reporting to you at that time?

10  A    At that time, it was about 120.

11  Q    And yet you personally received all of these replies

12  from new users on Outlook regarding what they think of the

13  product?

14  A    Every one.

15  Q    Why?

16  A    Because I care about what they think.

17  Q    Now, I notice here that you sent this to Mr. Harris at

18  2:30 p.m.  Basically within two hours of getting his e-mail,

19  you had sent it?

20  A    That's correct.

21  Q    Was it common for you to forward these e-mails to other

22  people on the team?

23  A    It certainly was not uncommon.  I didn't forward them

24  all, but if there was one that I thought was particularly

25  interesting or had some amount of particular importance,

V-60

1   either to me personally or the team, then yeah, I would

2   forward it on.

3   Q    So you forward some because they're funny and they call

4   you flaming twits.  But would you forward them for purposes

5   of helping develop the product as well?

6   A    Oh, of course.  And in this case, I would actually say

7   that I forwarded this one both so I could make the funny

8   comment about Stanford, but also because it's a clear

9   indication that there are people who aren't happy with the

10  product as their first impression.  And it's valuable for us

11  to see those things.

12  Q    Now, Mr. Ang, if we could pull up 815 as the final

13  document, please.

14      This is another one of the e-mails that we saw

15  yesterday.  And if we look at the e-mail on the bottom to

16  track the sequence here again, we see that this individual

17  set up their Outlook on January 7th at 7:42 a.m.; is that

18  right?

19  A    Yes, 7:42 in the morning.

20  Q    Okay.  And then the e-mail that he sent back to the

21  team, the thanks for nothing e-mail was sent January 7th,

22  2004 at 5:11 a.m.  Do you see that?

23  A    Yes.

24  Q    I'm assuming there must be an East Coast/West Coast

25  time change here which explains why this e-mail was a couple

V-61

1  of hours earlier than this one.  But he certainly sent it

2  shortly after installing Outlook 2003; is that right?

3  A    Yes.  I would say it's the same day, and the difference

4  is accounted for by some time zone difference.

5  Q    Okay.  And again, this is one that you then forwarded

6  on to Mr. Harris.  This was an e-mail you received directly,

7  right?

8  A    Yes, that's correct.

9  Q    And that day on January 7th, 2004, you forwarded it on

10  to Mr. Harris and Mr. Lukehart (phonetic), correct?

11  A    Yes, I did.

12  Q    Okay.  And you said -- I'm going to put you to the

13  test.  You say that innervative is indeed a word.  It just

14  doesn't mean what he thinks it means.

15  A    That's correct.

16  Q    Did you know what innervative means?

17  A    Well, I remember -- I couldn't have pulled this up out

18  of my own memory, but when this came up on the screen

19  yesterday, I actually remembered exactly what happened when

20  this e-mail came across my desk seven years ago.  I remember

21  very explicitly that I typed a response to Jensen where I

22  was forwarding it to him, and I said innervative isn't even

23  a word.

24      And I thought to myself, you know, if anybody is going

25  to catch me on being wrong there, it's going to be Jensen.

V-62

1 And so I better go check.  And so I went on the internet and

2 I checked, and sure enough, it is a real word.  And so I

3 corrected my text before I sent it on.

4          MR. DENNING:  Thank you, Mr. Kennedy.

5          No more questions, your Honor.

6          THE COURT:  Thank you.

7          Cross.

8          MR. DAUCHOT:  Thank you, your Honor.

9                    CROSS EXAMINATION

10 BY MR. DAUCHOT:

11 Q    Mr. Kennedy, as I start, my colleague here Mike is

12 going to hand you a couple of binders.

13      You testified earlier that the process that we're

14 talking about, these programs and the like, that it's

15 more -- that it's an art, it's not a science.  Do you

16 remember that testimony?

17 A    Yes, I do.

18 Q    And art is in the eye of the beholder.  Fair to say?

19 A    Fair to say as a general broad statement, yes.

20 Q    And from your perspective, the ultimate judge of that

21 art, the ultimate beholder is the consumer who buys your

22 product.  Am I right?

23 A    I would argue that in the context in which I used it,

24 that's not correct.

25 Q    Well, don't you care how the consumer views the art

V-63

1  that you present the consumer?

2  A    The particular art I was talking about was the process

3  of making feature value decisions, not the art of the

4  product itself.

5  Q    All right.  But in any event, you do care about what

6  your consumers think?

7  A    Oh, yes, of course.

8  Q    You just testified to that.

9  A    Yes.

10  Q    All right.  That's why surveys are helpful?

11  A    In some cases, surveys can be helpful.

12  Q    You heard that Mr. Harris testified yesterday that

13  surveys from his perspective don't do anyone any good in

14  your group?

15  A    It certainly depends on the way the survey is

16  constructed, and there are many other ways that are more

17  valuable to our groups than surveys themselves, yes.

18  Q    All right.  Now, turning to the question of the Date

19  Picker, as you've used the term, a survey using Outlook

20  without the Date Picker in it, like the one that you

21  testified to building for purposes of a survey in this case.

22  Do you remember that testimony?

23  A    I don't remember that testimony.

24  Q    You don't remember that you testified to the jury last

25  week that you -- your group built an Outlook program without

V-64

1  the Date Picker feature in it for purposes of testing to see

2  how customers would react to it?  You don't remember that

3  testimony?

4  A    I did not testify to that, no.

5  Q    You did not testify to that?

6  A    No, I did not.

7  Q    All right.  Jeannie, can you pull the testimony up.

8  We'll come back to that.

9       You do understand that a survey was taken in this case

10 with an Outlook product that did not have the Date Picker in

11 it, do you not?

12          MR. DENNING:  Objection, your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  I don't have any knowledge of a

15 survey that was taken in this case without the Date Picker

16 in it.

17 BY MR. DAUCHOT:

18 Q    It's your testimony under oath that you don't have any

19 knowledge of Microsoft undertaking a survey in this case

20 with an Outlook program that did not have the Date Picker in

21 it?  Is that your testimony?

22 A    I don't know of a survey that was taken in this case.

23 Q    Do you know that you -- do you recall now, now that

24 we're revising this, your testimony last week where you

25 explained to the jury that your group did build an Outlook

V-65

1  program without the Date Picker in it?  Do you remember that

2  testimony?

3  A    Oh, yes, I remember that testimony.  Yes.

4  Q    And the group built -- your group built an Outlook

5  program without the Date Picker in it for purposes of having

6  someone test it with consumers.  Am I correct?

7  A    That's not what I testified to last week.

8  Q    All right.  We're going to put your testimony up on the

9  screen from last week.

10          THE COURT:  Maybe we have to do the auto focus.

11          MR. DAUCHOT:  How do I -- just push the button

12  here?

13          THE COURT:  There.

14          MR. DAUCHOT:  Thank you, your Honor.

15  BY MR. DAUCHOT:

16  Q    This is your testimony to the jury on July 19, 2011.

17  The question put to you was:

18          "Q    Have you ever created -- is it

19          your testimony -- let me ask the

20          question differently.  Is it your

21          testimony today, Mr. Kennedy, that

22          Microsoft has not prepared a version of

23          Outlook that has the drop-down calendar

24          tool removed from it?  Is that your

25          testimony today?

V-66

1        A       No, it's not.

2        Q       So you have prepared it?

3        A       Yes."

4        And your answer, sir?

5   A    For testing purposes.

6   Q    All right.  And since you care so much about what

7   consumers think, would you have an interest in the results

8   of the testing?

9   A    Not particularly.

10  Q    Not particularly.  Okay.

11       Let's turn to PX-838.  Dave, can you put that up,

12  please.

13  A    Is it in here?

14  Q    It is in your binder.  It's an exhibit that counsel

15  used with you.  It's in Binder Number 1, 838.

16  A    Okay.

17  Q    All right.  Can you turn -- you testified about this on

18  direct.  Can you turn to page 10 of that document.

19       Dave, are you with me?  Can you blow that up for me?

20  Thank you.

21  A    Yes.

22  Q    All right.  Now, you testified that the testing to get

23  these results was based on a number of questions put to

24  consumers.  Do you remember that?

25  A    I believe I said that it was information workers, not

V-67

1  consumers.

2  Q     Okay.  Questions put to information workers, right?

3  A     That's correct.

4  Q     Where is the data of the questions put to these people?

5  A     Where is the -- I don't understand the question.

6  Q     The question is, where are the questions?  Where is the

7  data underlying the survey to which you testified here?

8  A     Where are the questions.  The specific wording of the

9  question?  Is that what you're asking?

10  Q    Yes, sir.  Where are the questions?

11  A    I don't believe it's included in this particular

12  report.  It's not on this slide.

13  Q    Well, have you reviewed them?  Have you reviewed them?

14  A    No, not the specific questions.  No.

15  Q    Before you gave the jury testimony about what all this

16  means, I assume you went back to the survey, sir, and you

17  looked at the actual questions put to these people, and you

18  looked at the exact -- all of the data associated with it.

19  I assume you did that.

20  A    No, I haven't looked at the specific questions that

21  were asked --

22  Q    You did not do that.

23  A    -- on this particular slide, no.

24  Q    All right, sir.  Now -- thank you.

25       You testified about a number of things pertaining to

V-68

1  how these programs -- how consumers react to these programs,

2  et cetera, et cetera.  And much of the testimony pertained

3  to "In my belief, in my belief."

4       Do you recall that?

5  A    Yes, I do.

6  Q    Now, when you say "In my belief, in my belief," it's

7  accurate to say that your belief is not supported, backed

8  up, if you will, with hard data, fair?

9  A    My beliefs about some things are, and my beliefs about

10 other things are based primarily on my experience in leading

11 the Outlook development team for a dozen years.

12 Q    Right.  But that wasn't my question.  My question was,

13 it's not backed up by hard data.

14 A    Which specific belief are you asking about?

15 Q    The beliefs you testified to this morning without

16 showing the jury any data.  Those beliefs.

17 A    I don't want to make any broad statements about whether

18 there's any data behind any of the beliefs I expressed this

19 morning, but as I said, some have data behind them and some

20 are based on my experience of leading the team for a dozen

21 years.

22 Q    Well, can we presume that if the beliefs you expressed

23 to the jury this morning such as the removal of the Date

24 Picker from the Outlook program having no impact -- can we

25 assume that if you had hard data for beliefs like that that

V-69

1  you expressed to our jury this morning, that you would have

2  shared it with us this morning?  Can we assume that to be

3  true?

4  A    I don't have hard data to that effect, and so I

5  hesitate to make any such assumption.

6  Q    All right, sir.  Can you turn to the last exhibit in

7  the second volume that we handed you.  It's Plaintiff's

8  Exhibit 1895, and it's marked for purposes of

9  identification.  The last document in there, Mr. Kennedy.

10 The last -- there you go.

11 A    Okay.

12 Q    You with me?

13 A    Yes.

14 Q    Are we looking at a screen shot from a Microsoft

15 website offering Office products for sale?

16 A    It looks like that's what it is, yes.

17 Q    All right.  Pertaining to Office 2010?

18 A    Yes.

19        MR. DAUCHOT:  All right.  Your Honor, we move

20 what's been identified for identification purposes as 1895

21 into evidence.

22        THE COURT:  It's received.

23        MR. DAUCHOT:  Thank you, your Honor.

24        MR. DENNING:  May I lodge an objection that Office

25 2010 is irrelevant because of the time frame.

V-70

1       THE COURT:  Overruled.

2       MR. DENNING:  Thank you.

3       THE COURT:  It's received.

4       MR. DAUCHOT:  David, can you put it up for us.

5 BY MR. DAUCHOT:

6 Q    All right.  Now, you testified that Microsoft -- that

7 there's no correlation -- I think the way you put it was

8 that Microsoft does not correlate value of the Office

9 product with Outlook and the Office product without Outlook

10 to the standalone value of Outlook.

11      That was your testimony earlier, right?

12 A    That's correct.

13 Q    Okay.  Now, if we look at Exhibit 1895, you see that

14 the suggested retail price of Office Home and Business

15 2010 -- and that's the top one -- which includes Outlook is

16 $279.99.  Do you see that?

17 A    Home and Business 2010, yes, is 279.

18 Q    And that includes Outlook?

19 A    Yes, it does.

20 Q    All right.  Now, if we drop down to the lower left

21 hand, Office Home and Student 2010.  Do you see that?

22 A    Yes, I do.

23 Q    Okay.  And then it says, "What's included."  Do you see

24 that?

25 A    Yes.

V-71

1  Q    And it says, "Word, Excel, Power Point and One Note,"
2  right?

3  A    Yes.

4  Q    Outlook is not included in that package, right?

5  A    That's correct.

6  Q    And the suggested retail price for that is $149.99.

7  A    That's correct.

8  Q    All right.  Now, if we subtract 279.99 from 149.99,
9  that gets us to $130.

10          THE COURT:  The opposite.

11          MR. DAUCHOT:  I'm sorry, your Honor?

12          THE COURT:  Never mind.

13 BY MR. DAUCHOT:

14 Q    If we subtract -- if we subtract 149.99 from 279.99 --

15          THE COURT:  There we go.

16 BY MR. DAUCHOT:

17 Q    -- we get 130.

18          THE COURT:  Math genius that I am.

19          THE WITNESS:  Let's see.  Yes, I believe that is
20 correct.

21 BY MR. DAUCHOT:

22 Q    That's $130.

23 A    Yes.

24 Q    So let's correlate that $130, the difference between
25 the two Office products -- let's correlate that with the

V-72

1  value that Microsoft ascribes to a standalone Outlook

2  product.  Okay?  Are you with me?

3  A    I don't know what you mean in my participation in

4  correlating them, but we can keep going if you'd like.

5  Q    Well, "correlating" was the word you used this morning.

6  A    Yes, in that they were not particularly correlated.

7  Q    Right.  So let's correlate the value of Office with and

8  Office without, which is $130 -- we did the math -- to just

9  Outlook standalone.  And let's look at what the price for

10 Outlook standalone is.

11     Dave, can you point to that.

12     What do we have?

13 A    It's $139.

14 Q    Boy, that's close, isn't it?

15 A    Are you asking me a math question?

16 Q    Yeah.  A hundred thirty is close to a hundred thirty-

17 nine ninety-nine, isn't it?

18 A    Yes.  Nine dollars and ninety-nine cents difference, I

19 believe.

20 Q    All right.  So there is correlation.

21 A    No.

22 Q    No.  Okay.

23     Let's go to -- you testified this morning to a bunch of

24 alternative ways that -- I think your testimony was this

25 morning that if Microsoft removed the Day patent from the

V-73

1  Outlook product in 1996, it really wouldn't make much

2  difference because consumers had alternative ways to do it

3  that were just as good.  Fair?

4  A    Yes.

5  Q    All right.  Now, the first time you expressed those

6  alternative ways in this litigation was through a

7  declaration that was submitted in early November of last

8  year, 2010.  Am I correct?

9  A    I don't believe -- I don't recall whether that was the

10  first time.  I may have been asked about some of those

11  alternative ways during deposition or during the prior

12  trial.  I don't recall what the first time was.

13  Q    Right.  But the first time you wrote them out the way

14  you did, do you remember the eight that you listed?

15  A    The first time they were in that declaration was in

16  that declaration, yes, of course.  Yes.

17  Q    The first time that you came out and listed eight

18  specific alternatives --

19  A    Oh, yes.

20  Q    -- was in your declaration; am I correct?

21  A    Yes, it was in the declaration.  That's correct.

22  Q    Yes.  That's right.

23  A    Yes.

24  Q    And it was the declaration in early November of 2010;

25  am I right?

V-74

1  A     Yeah, I believe it was early November.

2  Q     And it was a declaration that you put together to help

3  Professor Mnookin come up with his opinions?

4  A     Yes, that's correct.

5  Q     That's right.

6        Now, your lawyers helped you come up with those

7  alternatives.  I'm sorry.  Microsoft's lawyers helped you

8  come up with those alternatives, did they not?

9  A     It was a topic of discussion as I listed them.  There

10 were --

11 Q     My question was, your lawyers helped you come up with

12 those alternatives as listed in the declaration.  Am I

13 correct?

14 A     I'm not quite sure what you mean by helped me come up

15 with them.  Does that mean that they suggested some of the

16 alternatives or that they wrote them down when I said them?

17 I'm trying to get -- I'm trying to answer your question, but

18 I don't know what the meaning of it is.

19 Q     How about the eight alternatives were prepared as an

20 output of conversation with you and your attorneys.  Let's

21 put it that way.

22 A     Yes, that's correct.

23 Q     Okay.  So it was a collaborative project?

24 A     It's my declaration.

25 Q     I know.  But the point is that the alternatives in the

V-75

1  declaration that you provided and to which you testified

2  today to a jury was the result of a collaborative effort

3  with Microsoft's lawyers; am I right?

4  A    Mr. Dauchot, I would argue that all of my work in this

5  case over the last five years has been in some way a

6  collaboration with attorneys.

7  Q    All right.  Now -- by the way, on the subject -- I want

8  to just jump to one point.  You testified to your belief

9  about why Microsoft priced certain things and the like.  Do

10 you remember that testimony this morning?

11 A    Yes, I do.

12 Q    And you testified at the beginning of your testimony

13 that your job responsibilities with Microsoft pertained to

14 building Outlook and building Office.

15 A    That's correct.  That's my primary responsibility, yes.

16 Q    You're a builder?

17 A    Yeah.  Product development is the part that my team

18 works on, yes.

19 Q    Now, there's a separate organization at Microsoft that

20 deals with pricing, I assume?

21 A    That's correct.

22 Q    Are you a part of the pricing department as well?

23 A    No, I'm not part of that department.

24 Q    Now, you're not part of the licensing department at

25 Microsoft either, are you?

V-76

1 A     No, I'm not.

2 Q     In fact, you've never been in Microsoft's patent

3 licensing department; am I correct, sir?

4 A     That's correct.

5 Q     In fact, you have no licensing experience whatsoever;

6 am I correct, sir?

7 A     Not as a professional working in the licensing area,

8 that's correct.

9 Q     You have no licensing experience; is that correct, sir?

10 A     Yes, that's correct.

11 Q     Now, you testified, despite not having licensing

12 experience to the jury, that in your opinion, Microsoft

13 would be willing, back in 1996, to pay Lucent $2 million for

14 the use of the Day patent technology in Outlook; am I right?

15 A     That's correct.

16 Q     And no more than that?

17 A     That's correct.

18 Q     All right.  And you testified to the jury that back in

19 1996, Microsoft would be willing to pay Lucent no more than

20 $5 million for the right to use the Day patent technology in

21 any of its products; am I right?

22 A     That's correct.

23 Q     Okay.  Now, you don't have any mathematical calculation

24 to explain how you arrived at the 2 million or 5 million

25 amounts; am I correct?

V-77

1  A    That's correct.  Those are business judgments on my

2  part.

3  Q    Business judgments.  All right.

4       Now, you agree that the business judgments that you

5  reached in this case about this issue also were made in

6  collaboration with Microsoft's lawyers, will you not?

7  A    In the sense that the concept of a hypothetical

8  negotiation never would have come up if I had not actually

9  talked to attorneys.  It was done in that context.

10 Q    My point is is that the 2 and $5 million numbers that

11 you gave us this morning were numbers that you reached after

12 conversing with your attorneys that they had input in those

13 valuations as well.  Am I correct?

14 A    Those are my numbers.

15          MR. DAUCHOT:  Can we please play -- do we have the

16 deposition transcripts for the witness?

17          THE COURT:  Do you have it right now?

18          MR. DAUCHOT:  I'm sorry, your Honor?

19          THE COURT:  Do you have --

20          MR. DAUCHOT:  It's in this binder.

21          THE COURT:  What we can do is we'll take our

22 morning recess break.  It's 10:30.  And then you can --

23          MR. DAUCHOT:  All right.

24          THE COURT:  -- locate that.

25          MR. DAUCHOT:  We'll impeach the witness then.

V-78

1  Thank you, your Honor.

2          THE COURT:  So we'll be in recess until 10:45.

3  Please remember the admonition I gave to you earlier.

4      (Jury exits courtroom.)

5          THE WITNESS:  May I step down?

6          THE COURT:  You may.

7          We're outside the presence of the jury.

8          In doing the Court's final run-through of the jury

9  instructions, the Court then took a look at the parties'

10 original proposed instructions and the instructions the

11 Court had given to you.  The Court had an addition to the

12 burden of proof because of the survey issue and added a

13 sentence, "Microsoft is not obligated to put on any

14 evidence."

15         Then the Court also did an introductory

16 instruction on the Day or the 356 patent because of the

17 number and the issue of the comparable licenses and then

18 specified the products, Microsoft Money, Microsoft Outlook,

19 Windows Mobile and which versions.

20         And then the Court also did an instruction -- a

21 couple of instructions on comparability of the licenses.

22 And I think these are warranted under Rescue Net.  And so

23 you could take a look at those too.  Because I think it's a

24 factual issue, but nevertheless, they have to make some

25 determination as to whether or not these licenses are

V-79

1  comparable.

2          And then we did not talk about verdict forms.  And

3  I had suggested a special verdict.  And I don't think we

4  have received one.  And the Lucent case had asked for the

5  Court to break out the three different -- the three

6  products.

7          And so can I get from the parties another -- if

8  you've already submitted it, but send to the -- to our

9  court's e-mail your proposed verdict forms.  And then if you

10 have a special verdict.  Are we asking them how they did

11 their apportionment or any other -- I'm -- any other way of

12 teasing these issues out?

13         MR. DAUCHOT:  Your Honor, on behalf of Lucent on

14 the special verdict form, we do -- it is our position that

15 adding apportionment to the special verdict form atop the

16 apportionment instructions would be prejudicial.  In fact, I

17 think there is -- I know there is case law to that effect.

18         I suspect that is why neither party really

19 submitted a special verdict form with these sorts of things

20 in the verdict questionnaire.

21         From the standpoint, though, of apportioning out

22 the total damage numbers across the three individual

23 products, we don't have any issue with that, your Honor.

24 We're happy to do without.

25         THE COURT:  Well, do you think you should or not?

1          MR. DAUCHOT:  To me --

2          THE COURT:  Only because Lucent said -- in the

3    opinion before, it says, oh, I wish they would have broken

4    those out.

5          MR. DAUCHOT:  Right.

6          THE COURT:  The other two are relatively minor,

7    and the main one is Outlook.

8          MR. DAUCHOT:  Yeah, they are.  They are.  We

9    submitted a general one with the numbers not broken out.

10   We're happy to do it that way, your Honor, if you want them

11   broken out.  I don't see an issue with that at all.

12          What is it, Jeannie?

13          THE COURT:  Is that the docket number?

14          MR. DAUCHOT:  Well, that's true.  Ms. Heffernan

15   makes a good point that the lump-sum royalty ultimately

16   testified to by Mr. Sims --

17          THE COURT:  Is one number?

18          MR. DAUCHOT:  Well, it's one lump sum based on

19   different components that he walked the jury through.  So I

20   don't think that in terms of breaking it out that way --

21          THE COURT:  So could you just say, what lump sum

22   do you do, and then what is for this, what is for that, what

23   is for that?  Can you revise one and send it to the court

24   soon, before -- over by the end of lunch, so I'll have that.

25          And then Ms. Brooks?

V-81

1        MS. BROOKS:  It was on a different subject, your
2 Honor.  I stood up too soon.
3        THE COURT:  Okay.  Will Microsoft get me an either
4 recent what you had or send me another one ASAP?
5        MS. BROOKS:  We will, your Honor.
6        THE COURT:  Okay.  All right.  Different subject.
7        MS. BROOKS:  Different subject.  Just --
8        MR. DAUCHOT:  Oh, your Honor -- I'm sorry, Ms.
9 Brooks.  Just one point.  On the breaking it out, I said we
10 wouldn't have an issue with it.  Now that I'm thinking it
11 through, we may.  But as the Court -- we'll do what the
12 Court requested and submit them, and if we can take it out.
13        THE COURT:  Well, submit it, and then you can
14 submit both.  Here's your preferred that doesn't, and here's
15 the other one.
16        MR. DAUCHOT:  Fair enough.
17        MS. BROOKS:  Your Honor, the issue of reading in
18 the interrogatories.  Lucent wanted us to read in the
19 entirety of both the question and then the answer.  My
20 concern -- and I just want to check with Lucent on this --
21 is that the answer, then, if I read the entirety of it,
22 would include claims that they ended up dropping, would
23 include products that they ended up not going forward on.
24        And so I just wanted to make sure they understood
25 what they were doing if they had me read this whole thing.

V-82

1  I'm happy to eliminate and just boil it down to the accused

2  products in this case and the Claims 19 and 21.  But if

3  Lucent requests the whole thing, then obviously I won't read

4  the whole thing.

5          THE COURT:  Do you want to think about that over

6  the break, and then we'll --

7          MR. DAUCHOT:  Yes, your Honor.  We will think

8  about that over the break.

9          THE COURT:  Okay.

10          MR. DAUCHOT:  Thank you.

11          MS. BROOKS:  And we do intend to read these right

12  after Mr. Kennedy finishes and before we call Professor

13  Mnookin.

14          THE COURT:  So why don't you meet and confer on

15  that.

16          MS. BROOKS:  Thank you.

17          MS. HEFFERNAN:  Thank you, your Honor.

18          THE COURT:  Thank you.  We'll be in recess until

19  10:45.  And remember, we're breaking at 11:25 and then until

20  1:00.  I hope to be back by 1:00.  Cross your fingers.

21          THE CLERK:  We're in recess.

22      (Proceedings recessed briefly.)

23      (Jury enters courtroom.)

24          THE COURT:  Welcome back.

25          We remind you you're still under oath.

V-83

1           THE WITNESS:  Okay.

2           THE COURT:  You may proceed.

3           MR. DAUCHOT:  Thank you, your Honor.

4    BY MR. DAUCHOT:

5    Q    Mr. Kennedy, before we broke, I was going to -- you

6    have a binder up there.  I think it says "Prior Testimony."

7    A    Okay.

8    Q    And one of the tabs should be your testimony given on

9    December 2, 2010.  Do you have that?

10   A    Yes.  I believe that was a deposition.

11   Q    And I'd ask you to turn to page 162.

12   A    It's the little page numbers?

13   Q    That's right.

14   A    Okay.  Okay.

15   Q    And specifically lines six through 11.

16        Dave, can we run Clip 124, please.

17        (Start playing video.)

18           "Q    Did you come up with the $5

19           million -- I'll just ask it this way.

20           Who came up with the $5 million number?

21           A    In discussions with my attorneys,

22           we discussed different options or

23           different valuations."

24        (Stop playing video.)

25   //

V-84

1  BY MR. DAUCHOT:

2  Q    All right.  Now, Mr. Kennedy, you're testifying today

3  as to the rationale behind the numbers, but do you recall

4  that at your deposition, you refused to answer what you

5  discussed with your lawyers on the subject of how you came

6  about with the $5 million?

7            MR. DENNING:  Objection, your Honor.

8            THE COURT:  Argumentative.  Sustained.

9  BY MR. DAUCHOT:

10 Q    Mr. Kennedy, do you recall at the time during your

11 testimony in December of 2010 choosing not to answer

12 questions about the evaluation process that you entered into

13 with your lawyers to get at the $5 million numbers?  Do you

14 recall choosing not to answer that question?

15           MR. DENNING:  Objection, your Honor.  Same

16 grounds.  An inference.

17           THE COURT:  Overruled.

18           THE WITNESS:  I recall that during that

19 deposition, there were some questions that I chose not to

20 answer.  I don't recall what the specific topics were about

21 those.

22 BY MR. DAUCHOT:

23 Q    All right.  Can you turn to page 162 in your binder, in

24 your book.

25 A    Okay.

V-85

1  Q    Same deposition.

2       MR. DAUCHOT:  Dave, can you run Clip 138, please.

3       (Start playing video.)

4            "Q    What were those different

5            valuations?

6            A    I choose not to answer.

7            Q    Because you can't without

8            revealing communications you had with

9            your attorney?

10           A    That's right.

11           Q    Okay."

12      (Stop playing video.)

13 BY MR. DAUCHOT:

14 Q    All right.  Now, Mr. Kennedy, you testified on direct

15 examination that as part of the Outlook building group, you

16 made the decisions as to what went in and what came out of

17 Outlook; am I correct?

18 A    I'm one of the people who contributed to those

19 decisions, certainly, yes.

20 Q    And when did you lead the group?

21 A    I was the development manager for about six years, and

22 then I've led the entire product development team, including

23 development, testing and feature design for the past six

24 years.

25 Q    So as -- for the past six years?

V-86

1  A    Yes.

2  Q    Okay.  So that takes us back to -- so certainly you

3  were the development manager of Outlook back in 2003; am I

4  correct?

5  A    Yes, that's correct.

6  Q    All right.  And at that point in time, you would have

7  been part of any discussions as to what comes in and what

8  goes out of the Outlook product.  Am I fair to say in that

9  capacity?

10 A    I would have -- I would have had direct knowledge of

11 any features that we put into the product or removed from

12 the product, certainly.

13 Q    All right.  Now, it's a fact that you are not aware of

14 any discussions regarding the removal of the Day patent

15 technology from the Outlook product except as to -- putting

16 aside the special program that you built.  But that aside,

17 you are aware of no discussions regarding taking the Day

18 patent technology out of Outlook?  Putting that aside.

19 A    That's correct.  I don't have any direct knowledge of

20 those discussions or whether they even happened.  That's

21 correct.

22 Q    As far back as 2003, correct?

23 A    Yes, that's correct.

24 Q    Now, when was Outlook 2003 released, sir?

25 A    Let's see.  I seem to -- I believe that we signed off

V-87

1  on it on August 15th, 2003, somewhere in there, somewhere in

2  mid August.  And then general availability, meaning when you

3  could go into a store and buy it, was approximately two

4  months later in the U.S.

5  Q    Late 2003?

6  A    Yeah, it would have been late 2003 at some point.

7  Q    Okay.  Now, Mr. Kennedy, is it your testimony that

8  Microsoft would not pay $70 million for a product that is a

9  small component of a feature-rich program that can easily be

10  removed and the removal of which would have no impact on

11  consumer demand?

12          MR. DENNING:  Objection, your Honor.  We're

13  talking about the Date Picker here.  He's talking about any

14  small --

15          THE COURT:  Just rephrase the question.

16          MR. DAUCHOT:  Sure.

17  BY MR. DAUCHOT:

18  Q    Mr. Kennedy, is it your testimony that Microsoft -- you

19  testified as to the rationale behind not paying more than 2

20  or $5 million that you associated with labor costs and that

21  type of thing.

22  A    Right.

23  Q    You gave a rationale.  And so my question is, is it

24  your testimony that Microsoft would not pay $70 million on a

25  product that is a small component of a feature-rich program

V-88

1 that can easily be removed without consumers caring one way

2 or the other as to whether it was in the product or not?

3             MR. DENNING:  Objection, your Honor.

4             THE COURT:  Overruled.

5             THE WITNESS:  It was my testimony that Microsoft

6 would not pay $70 million to be able to use the Date Picker

7 control in the Outlook product.

8 BY MR. DAUCHOT:

9 Q    Right.  Now, what about -- let me expand on that.  Is

10 it your testimony that Microsoft -- you applied your

11 rationale as to why Microsoft wouldn't.  Small component of

12 a feature-rich product, right?

13 A    Uh-huh.

14 Q    Easily removed, right?

15 A    Yes.

16 Q    And if you removed it, nobody would care, right?

17 A    That's my testimony about the Date Picker in

18 particular, yes.

19 Q    Now, is there other technology out there that fits

20 within those parameters on which you would pay as much as 70

21 million?

22             MR. DENNING:  Objection, your Honor.  Relevance,

23 403.

24             MR. DAUCHOT:  He was offered as an opinion.

25             MR. DENNING:  Relevance and 403.

1         THE COURT:  Overruled.

2         THE WITNESS:  Certainly every case would have to

3 be evaluated in particular.  With this one, I'm very

4 familiar with all of the parameters involved.

5         MR. DAUCHOT:  All right.  Your Honor, I have no

6 further questions.  I just want to check with my colleague.

7         THE COURT:  You may.

8         MR. DAUCHOT:  I have no further questions.  Thank

9 you, Mr. Kennedy.

10         THE WITNESS:  Thank you.

11         THE COURT:  Redirect.

12         MR. DENNING:  Just a few, your Honor, and then

13 maybe just a tiny bit of math.

14         THE WITNESS:  Okay.

15                    REDIRECT EXAMINATION

16 BY MR. DENNING:

17 Q    Mr. Kennedy, you submitted a declaration as part of the

18 legal proceedings in this case in which you outlined eight

19 alternatives to the Date Picker.  And you were asked

20 questions about that on cross examination, correct?

21 A    Yes.

22 Q    Now, who came up with those eight alternatives?

23 A    I did.

24 Q    And were those alternatives already in the product in

25 1996?

V-90

1  A     Yes, they were.

2  Q     So did the lawyers feed you those alternatives or were

3  they your own?

4  A     No, they were my own.

5  Q     Okay.  Let's spend a second on the $2 million and $5

6  million figure.  We saw there was some attorney/client

7  privileged information.

8        You testified on cross examination that those were your

9  numbers, correct?

10 A     That's correct.

11 Q     Did the lawyers feed you those numbers?

12 A     Absolutely not.

13          MR. DENNING:  Okay.  Now -- your Honor, may I

14 approach with a calculator for Mr. Kennedy?

15          THE COURT:  You may.

16          THE WITNESS:  Thank you.

17          MR. DENNING:  Come to the ELMO, please, Mr. Ang.

18 BY MR. DENNING:

19 Q     Okay.  I'm showing you Plaintiff's Exhibit 1895, which

20 is one of the exhibits you were shown on your cross

21 examination.  And this is -- I guess it's a printout from

22 Microsoft's website talking about purchasing Office 2010,

23 right?

24 A     Yes.

25 Q     Okay.  First of all, when did Office 2010 become

V-91

1 available?

2 A    In late June of 2010.

3 Q    Okay.  So not between 2003 and 2006?

4 A    No, not at all.

5 Q    Okay.  There are two versions shown here.  Maybe I'll

6 zoom in a little bit now so that everybody can see.

7     There are two versions shown on this page that include

8 Outlook, correct?

9 A    Two versions of the suite there at the top that include

10 Outlook, yes.

11 Q    Okay.  So one right here, this is the Office Home and

12 Business 2010, includes Outlook, right?

13 A    Yes.

14 Q    And down here, Office Professional includes Word,

15 Excel, Power Point and Outlook, right?

16 A    And One Note, Access and Publisher.

17 Q    Sure.  Thank you for the clarification.  But Outlook is

18 among the software programs in this Office package?

19 A    Yes, that's correct.

20 Q    And this one over here doesn't have Office in it,

21 right?

22 A    That's correct.  Home and Student does not have Outlook

23 in it.

24 Q    Home and Student.  Okay.  Very good.

25     Let's look at the two that do, and let's do a little

V-92

1  bit of math.

2  A    Okay.

3  Q    So we know in the -- let me get a pad, and we can do

4  this together.  Let's start with the Home and Business 2010.

5  It has Word, Excel, Power Point.  All this.  Home and

6  Business 2010.  And it has Word, it has Excel, it has Power

7  Point, and then it also has Outlook and One Note, correct?

8  A    Yes.

9  Q    Okay.  So Outlook and One Note.  Okay.  Let's look at

10 the prices listed on this sheet for each of those as

11 standalone products.

12 A    Okay.

13 Q    So down here we see Word.  Word.  It's 139.99.  Can you

14 see that from there?

15 A    Yes.

16 Q    So let's write down 139.99.  Excel is 139.99; is that

17 right?

18 A    Yes.

19 Q    Okay.  One thirty-nine ninety-nine.  Power Point,

20 139.99?

21 A    Yes.

22 Q    Okay.  One thirty-nine ninety-nine.  Outlook right

23 here, 139.99?

24 A    Yes.

25 Q    Okay.  One thirty-nine ninety-nine.  And One Note down

V-93

1 here, 79.99?

2 A    Yes.

3 Q    Okay.  This is where I need you to pull out your

4 calculator --

5 A    Okay.

6 Q    -- and add -- hold on.  Let me see what you're adding.

7 Add those five numbers for me, please.

8 A    I get -- hope it's right -- 639.95.

9 Q    I got 639.95 as well.

10 A    Okay.

11 Q    So let's write that down.  Six thirty-nine ninety-five.

12      Now what I want to do is figure out what the standalone

13 prices -- what the percentage of the overall would be.

14 A    Okay.

15 Q    For instance, for Word, I want to know what the

16 percentage of 139.99 is of that 639.95.

17      MR. DAUCHOT:  Your Honor, this is closing

18 argument, leading the witness.

19 BY MR. DENNING:

20 Q    Can you calculate that for me, please, Mr. Kennedy?

21      THE COURT:  Overruled.

22      THE WITNESS:  Sure.  One thirty-nine

23 ninety-nine --

24 BY MR. DENNING:

25 Q    Yes, sir.

V-94

1  A    -- divided by 639.95, 21.87514-percent.

2  Q    Eight seven five.  Can I say 21 point --

3  A    Twenty-one point nine.

4  Q    -- nine.  Very good.

5       Okay.  Now, we can make this easier.  We know Excel,

6  Power Point and Outlook have the same price as Word, so they

7  would have the same percentage as Word; is that fair?

8  A    That's correct.

9  Q    All right.  So 21.9, 21.9, 21.9.  And it looks to me

10 like you're a step ahead and you've already calculated One

11 Note?

12 A    Yes.  Twelve point four nine -- 12.5-percent.

13 Q    Twelve point five percent.  Okay.

14      The one we're talking about in this courtroom is

15 Outlook, right?

16 A    Yes.

17 Q    Okay.  So let's circle 21.9.  Let's do -- we're halfway

18 done.  Let's do the other one --

19 A    Okay.

20 Q    -- which is the Office Professional.  And that includes

21 Word, Excel, Power Point.  I'm going to take them slow here

22 and write Office Pro, Word, Excel, Power Point.  It also

23 includes Outlook, One Note -- Outlook, One Note and then

24 Access and Publisher.

25      Okay.  Let's -- we can transfer some of these over and

V-95

1  save ourselves some time here.  We know that Word is 139.99,

2  Excel same price, Power Point 139.99, Outlook 139.99, One

3  Note 79.99.

4      And then if you'll look with me, Mr. Kennedy, Access

5  has a price of 139.99?

6  A    Yes.

7  Q    Okay.  And Publisher has a price of 139.99; is that

8  correct?

9  A    Yes.

10 Q    Okay.  So if you would, please, sir, use your

11 calculator and add those numbers for me.

12 A    Okay.

13 Q    And what do you come up with?

14 A    Nine hundred nineteen dollars, ninety-three cents.

15 Q    I come up with the same, 919.93.

16     Now, if you could do the same apportionment --

17 A    Okay.

18 Q    -- to apportion what the Word, for example, 139.99 is

19 of that 919.93 for me, please.

20 A    Okay.

21         MR. DAUCHOT:  I restate my objection, your Honor.

22         THE COURT:  Overruled.

23         THE WITNESS:  All of the 139 ones are 15.2-percent

24 of the cost.

25 //

V-96

1 BY MR. DENNING:

2 Q    Fifteen point two percent.  Okay.  And I can use that

3 for all of them that are that price?

4 A    Yes.

5 Q    Okay.  And then One Note, can you tell me what that

6 would be?

7 A    Eight point seven percent.

8 Q    Eight point seven.  Okay.

9      Now, again, we're focused on Outlook here.

10 A    Right.

11 Q    Now, I'd be happy to do the same for the Home and

12 Student, but that one doesn't have Outlook, so we can't

13 figure out what percentage of that cost is Outlook, correct?

14 A    That's correct.

15 Q    Okay.  So of the two that have Outlook, if we apportion

16 the price based on the standalone prices and figure out

17 what -- what apportionment goes to Outlook, in the Office

18 Pro, it's 15.2-percent; is that right?

19 A    Yes.

20 Q    And in the Home and Business 2010, it's 21.9-percent;

21 is that right?

22 A    Yes, that's correct.

23 Q    Okay.  And these are based on the 2010 prices, right?

24 Not the 2003 or 2007 prices, right?

25 A    That's right.

V-97

1  Q    All right.  Were you here yesterday when Mr. Sims said

2  that he's attributing 69-percent of the Office revenue to

3  Outlook?

4  A    Yes, I was.

5  Q    Is that supported by these numbers?

6  A    No, it's not.

7         MR. DENNING:  Thank you.  No more questions, your

8  Honor.

9         THE COURT:  Thank you.

10         MR. DAUCHOT:  Just a brief point on recross.

11                    RECROSS EXAMINATION

12  BY MR. DAUCHOT:

13  Q    Mr. Kennedy, this math that you've done for us today,

14  have you ever done that math before, these calculations?

15  A    No, I don't think I've ever typed those numbers into a

16  calculator and done it, no.

17  Q    Okay.  Have you taken out a pencil and done a

18  calculation using a pencil?

19  A    I don't -- I don't believe I've ever done that specific

20  calculation, no.

21  Q    And when you said a calculator, I didn't mean to --

22  A    No, I'm not making a point about that.

23  Q    I see.  Okay.

24       Part of the reason is because you're not part of

25  Microsoft's pricing department, right?

V-98

1 A     That's correct.

2 Q     And you stand by your earlier testimony that I walked

3 you through with this document, don't you, sir?

4 A     Yes, I do.

5           MR. DAUCHOT:  No further questions.  Thank you,

6 your Honor.

7           THE COURT:  Thank you.

8           MR. DENNING:  Nothing here, your Honor.

9           THE COURT:  All right.  You may step down.

10          THE WITNESS:  Thank you.

11          THE COURT:  And you have some interrogatories?

12          MS. BROOKS:  We do, your Honor, but apparently

13 they're still in the sheet book, so perhaps we'll read that

14 at the end of our case, with the Court's permission.

15          THE COURT:  All right.

16          MS. BROOKS:  And so we would call as our next

17 witness, your Honor, Professor Mnookin.

18          THE CLERK:  Raise your right hand, please.

19        ROBERT MNOOKIN - DEFENDANTS' WITNESS - SWORN

20          THE CLERK:  Please be seated.

21          MS. BROOKS:  And with the Court's permission, your

22 Honor, might we remove some of those binders so I'll be able

23 to see Professor Mnookin?

24          THE COURT:  Sure.

25          MR. DAUCHOT:  Are you going to have Professor

V-99

1 Mnookin use a calculator?

2          MS. BROOKS:  We may as well leave it up there just

3 in case.

4          THE CLERK:  Please state your name and spell your

5 first and last name for the record.

6          THE WITNESS:  Robert, R-O-B-E-R-T, Mnookin, M, as

7 in Mary, N, as in Nancy, O-O-K-I-N.  As you can imagine,

8 I've spelled my last name a few times.

9                    DIRECT EXAMINATION

10 BY MS. BROOKS:

11 Q    Good morning, Professor Mnookin.

12 A    Good morning.

13 Q    Could you please tell the jury how you're presently

14 employed.

15 A    I am a law professor at Harvard University.

16 Q    And are you endowed with a particular chair?  And then

17 I'm going to ask what that means.

18 A    Yes, I have a chair, and it's the Samuel Williston

19 Chair of Law.

20 Q    What does it mean to be an endowed professor with a

21 chair at Harvard?

22 A    Frankly, it's mostly honorific, given to senior

23 appointments.  It doesn't necessarily make any difference in

24 terms of one's compensation or what your teaching load is.

25 But it is reserved for people who are considered more

V-100

1  senior, perhaps more distinguished.

2  Q     Now, is there something called the Harvard Negotiation

3  Research project at Harvard?

4  A     Yes, there is.

5  Q     And could you -- do you have any kind of connection to

6  that?

7  A     I'm the director of the Harvard Negotiation Research

8  project.

9  Q     And is there a program on negotiation at Harvard?

10 A     There is.

11 Q     And are you connected to that?

12 A     Yes.  I'm the chair of the steering committee of the

13 program on negotiation.

14 Q     Now, could you tell the ladies and gentlemen of the

15 jury, what is the Harvard negotiation research project, and

16 what is its purpose?

17 A     The purpose of the Harvard negotiation research project

18 is to do research study, more effective means of dispute

19 resolution, negotiation, mediation, arbitration.  And it

20 does this across a broad range of topics, from family

21 conflicts to international conflicts.

22 Q     And is this case the perfect example of why we need

23 better negotiation?

24 A     It certainly is.

25 Q     Now, is it confined to Harvard Law School or is it an

V-101

1 interdisciplinary program?

2 A    It is interdisciplinary.  And the program on

3 negotiation, in fact, represents an inner university

4 consortium.  Apart from faculty, from various schools and

5 departments at Harvard, it also includes faculty from MIT

6 and the Fletcher School Diplomacy at Tufts.

7 Q    Now, before coming to Harvard, where were you?

8 A    I was at Stanford University.

9 Q    And were you also a professor there?

10 A    I was a professor there, and I held a chair at Stanford

11 University.

12 Q    Now, were you -- is there at Stanford any sort of

13 center on conflict and negotiation resolution?

14 A    There is.  And in fact, while I was at Stanford, I

15 founded and was directed of what was then called the

16 Stanford Center on Conflict and Negotiation.

17 Q    Have you published any books in the area of conflict

18 resolution and negotiation?

19 A    I've published several books in that area.

20 Q    Have you written any articles in that area?

21 A    I've written probably scores of articles.

22 Q    Have you given any lectures in that area?

23 A    I have.  Apart from my teaching -- well, first at

24 Berkeley, then at Stanford, now at Harvard, I've given

25 lectures all over the world.

V-102

1  Q    And have you given any workshops?

2  A    I'm regularly called on to give workshops in

3  negotiation, to help train professionals, lawyers,

4  executives, managers in effective ways of negotiation.

5  Q    So this isn't purely theoretical?  This is eventually

6  hopefully going to relate to a real-world negotiation and

7  resolution of an issue?

8  A    Absolutely.  The program on negotiation is committed to

9  improving both the theory and practice of negotiation.  We

10 want to develop theory that's relevant to helping people do

11 it better.

12 Q    And do you teach, then, not just students, but people

13 who might actually go on to become a mediator or a

14 negotiator?

15 A    Absolutely.

16 Q    Now, do you consult in any way with any intellectual

17 property organizations?

18 A    I do.  I've been a consultant to the World Intellectual

19 Property Organization, which is an organization in Geneva.

20 It's a U.N. affiliate.  It's concerned with intellectual

21 property, trademark, copyright, patents.  And I helped

22 advise them on the founding of a dispute resolution program

23 there.

24      And every year for the last 12 or 13 years, they've

25 invited me to Geneva to give workshops to intellectual

V-103

1  property lawyers and intellectual property professionals who

2  are interested in learning more effective means of resolving

3  conflict.

4  Q     What is your Bachelor's degree in?

5  A     Economics.

6  Q     And did you ever clerk at the United States Supreme

7  Court?

8  A     I did, after I graduated from law school.  I was a law

9  clerk for two years, one year on the D.C. Circuit for Judge

10 Carl McGowan, and the second year on the Supreme Court for

11 Justice John Harlan.

12 Q     And is it easy to get a U.S. Supreme Court clerkship?

13 A     No.  I considered myself enormously fortunate.

14 Q     Now, you talked about your teaching aspects and your

15 consulting aspects.  Have you yourself personally ever

16 served as a neutral mediator or arbitrator?

17 A      Frequently.  Primarily, I have served as a mediator,

18 but on occasion, I've also been an arbitrator.  Let me

19 explain the difference.  A mediator is someone who

20 facilitates negotiations.  Both are neutral professionals,

21 but a mediator has no power to impose an outcome.  You help

22 parties that are having problems negotiating.

23      An arbitrator is in many ways like a private judge.

24 Typically, an arbitrator has the power to impose an outcome

25 on the parties because the parties, by contract, have agreed

1  that a third party neutral, who is not a state or federal

2  judge, can have the power to impose an outcome.

3  Q    Now, have these been -- these disputes that you've

4  either mediated as a neutral mediator or been involved in as

5  an arbitrator, are they simple disputes or complex disputes?

6  A    Typically, they are very complicated disputes, often

7  between large enterprises.

8  Q    Could you give the jury an example, something -- ever

9  been involved in basketball?

10  A    Yes.  One time, I served on -- this, in fact, was an

11  arbitration panel.  There was a dispute about the salary cap

12  in the National Basketball Association.  And indeed, I

13  recall that the player involved was -- makes Mr. Kennedy

14  look like a squirt -- came in to the arbitration room.  He

15  was a genuine giant.

16      The issue was whether that team had somehow violated

17  the salary cap rules.  And I was part of an arbitration

18  panel and asked to resolve that conflict.

19  Q    Now, of those commercial disputes that you've been

20  involved in as either a neutral mediator or arbitrator, how

21  many would you say you've been involved in?

22  A    I would say during the course of my career, between 50

23  and 100.

24  Q    Have any of them involved intellectual property where

25  you've been the actual neutral mediator or arbitrator?

V-105

1  A    Yes.  A number of them have.  I would estimate

2  approximately 15.

3  Q    Now, the jury has already heard -- I think it was in

4  the questioning of Lucent of Mr. Kennedy in their case --

5  I'm not quite sure how -- but that you're being paid $950 an

6  hour.  Is that correct, Professor Mnookin?

7  A    It's true.

8  Q    Is that a lot of money?

9  A    It's an enormous amount of money.

10 Q    How does it compare to what your salary is as a Harvard

11 law professor?

12 A    It is vastly more than what I make at Harvard, although

13 Harvard's compensation isn't per hour.  But that, in fact,

14 is the professional rate that I regularly charge for my

15 services as a mediator.  And I have to say, this is the

16 first time I've been an expert, called upon to be an expert

17 in a Federal Court proceeding.

18 Q    So you are not a professional expert witness; is that

19 right, Professor Mnookin?

20 A    I am not a professional expert witness.  In fact, as I

21 say, this is the first time I've served as an expert witness

22 in a case.

23 Q    Are you here to help the jury reach a determination in

24 this case as to what a reasonable royalty would be?

25 A    Yes, I am.

1  Q    Do you consider yourself an advocate for Microsoft?

2  A    Not at all.  I consider myself as a neutral expert to

3  help the jury and the Court assess what the outcome of a

4  hypothetical negotiation is.

5       By the way, I should append one thing.  I have served

6  on a couple other occasions as an expert, but I've never

7  testified in a case in Federal Court.  And the only time

8  I've testified in a proceeding as an expert was a Federal

9  Trade Commission proceeding.

10 Q    Now, Professor Mnookin, does Harvard limit the amount

11 of time that you are allowed to engage in outside

12 activities?

13 A    Absolutely.  Under Harvard's rules, I'm permitted to

14 spend 20-percent of my professional time as a mediator, an

15 expert, a consultant, to give workshops to professionals.

16 So on average, a day a week at Harvard, an academic who's a

17 full-time appointment is permitted to serve in this role.

18 Q    So if you weren't spending a portion of that 20-percent

19 consulting in this case, would you then be doing it in some

20 other capacity as a mediator or a consultant?

21 A    In all probability, I would, yes.  Most of my -- most

22 of the time I spend away from my teaching and writing at

23 Harvard, that is, that involves these professional

24 activities, is spent as a mediator.  But I also am invited

25 to give guest lectures, to give workshops, occasionally to

V-107

1  give a keynote speech to some professional group.

2  Q    Now, in viewing the hypothetical negotiation in this

3  case -- so now we get to go back to 1996.  In viewing what

4  you believe to be a reasonable resolution at the

5  hypothetical negotiation, did you bring to bear all of your

6  experience in teaching, publishing, writing books,

7  conducting workshops, actively mediating and actively

8  arbitrating?

9  A    Absolutely.  I brought it all to bear.

10 Q    All right.  So let's take all of that.  We are now in

11 the negotiation room.  And Lucent has shown a picture

12 several times to the jury.  There's someone sitting there in

13 red, and there's someone sitting there in blue.  Mr. Kennedy

14 always wanted to know which one he was.  We don't know that.

15          THE COURT:  Stanford.

16          MS. BROOKS:  Pardon me?  Stanford.  So it's going

17 to be red.

18 BY MS. BROOKS:

19 Q    Mr. Kennedy is in the Cardinal, and Lucent is in the

20 blue.  All right.  We're in the hypothetical negotiation

21 room.

22      Now, let's start with some basic premises that you've

23 learned over the years.  What is the most fundamental

24 premise to any negotiation, whether it's a real-world

25 negotiation or a hypothetical negotiation?

1 A    In any negotiation, the first thing we always advise

2 people is to consider what are your alternatives?  What are

3 the alternatives available to you if you don't make a deal.

4 If you don't buy this house, what other houses might you

5 buy?  If you don't buy this car, what other car might you

6 buy?  If you don't work for this employer, what other

7 employer might you work for?  And in fact, in the

8 negotiation jargon, there's a word for that.

9 Q    And what is the word for that?

10 A    Well, the best option or alternative if you don't make

11 the deal is called often in jargon your best alternative to

12 a negotiated agreement or a BATNA.

13 Q    All right.  And in this particular case, have you

14 viewed what Microsoft's alternative would have been in the

15 hypothetical negotiation?  Actually, let me back up for a

16 minute, Professor Mnookin.

17     We keep saying hypothetical negotiation.  Why is this a

18 hypothetical negotiation versus a real-world negotiation?

19 A    What makes this negotiation hypothetical is that it

20 never occurred.  In 1996, these parties, of course, didn't

21 negotiate.  Indeed, in 1996, as we heard, Lucent had not yet

22 made its claims.

23 Q    And in fact, Lucent didn't make its claims until 2003;

24 is that right?

25 A    That's my understanding.

V-109

1  Q    But we must put ourselves back in 1996, as if -- as if,
2  even though they didn't, Lucent made a claim, and now we're
3  in the hypothetical negotiation?
4  A    That's correct.  And for purposes of this negotiation,
5  as a matter of law, one is supposed to assume the patent is
6  valid and that there's been an infringement.
7  Q    And in the negotiation room, do we have something
8  called the Book of Wisdom?
9  A    We do.
10 Q    And now, that's only in the hypothetical negotiation
11 world, right?
12 A    That's correct.
13 Q    That's one difference between a real-world negotiation
14 and a hypothetical negotiation?
15 A    That's -- well, the purpose of the Book of Wisdom, in
16 my view, is it allows a couple of things.  First, the
17 parties in this negotiation are negotiating with each other
18 with all information available on the table.  In other
19 words, often in a negotiation, people keep secrets from one
20 another.  But in this negotiation, there aren't such
21 secrets.
22     And indeed, in this negotiation, the Book of Wisdom
23 would include information about the future that was known to
24 both parties.
25 Q    And would both parties have access to that Book of

V-110

1  Wisdom?

2  A    Absolutely.  Indeed, I think the jury could assume that

3  both parties would have access to all the information

4  presented to you in this trial, even though some of that

5  information obviously wouldn't have been available in 1996.

6  Q    Okay.  Now, just because it's a hypothetical

7  negotiation, does that mean that real-world negotiation

8  concepts go out the window?

9  A    In my opinion, not at all.  I think, in fact, the

10 important thing to do is to assess one of the arguments the

11 parties would be making to each other at this negotiation.

12 What were the alternative available to each party if they

13 didn't make a deal?

14 Q    But we've heard also that in the hypothetical

15 negotiation -- and do you have water up there, Professor,

16 Mnookin?  We can get you some.

17 A    Thank you.

18 Q    Go ahead.  Take your time.

19 A    Thanks.

20 Q    Now, one of the other things that we've heard, though,

21 a difference between a real-world negotiation and a

22 hypothetical negotiation is that in the hypothetical

23 negotiation, because the patent is assumed valid and

24 infringed, that the parties must reach an agreement.

25 A    That's correct.

1 Q    So in that scenario, why wouldn't Lucent just be able

2 to say to Microsoft, look, you have to pay us $70 million.

3 You're not allowed to leave this room until you do cash up

4 front.

5 A    In the hypothetical negotiation, it is assumed that

6 both parties are there willingly and voluntarily.  There can

7 be no coercion.  Even though it's a hypothetical negotiation

8 and neither party can leave and not negotiate further, this

9 does not give either side permission to extort the other

10 side.

11    In some ways, I've sometimes drawn the analogy it's a

12 little bit like what the College of Cardinals does when

13 they're electing a new Pope.  My understanding is that in

14 the Vatican, they are literally almost locked in a room, and

15 they're told, we'll send in food, but you're going to keep

16 at it until you reach a conclusion as to who the new Pope

17 is.

18 Q    So we're now in the hypothetical negotiation room with

19 the concepts -- real-world negotiation concepts applicable.

20 What was Microsoft's alternative to taking a license to the

21 Day patent?

22 A    Microsoft's alternative, as you heard, would be to

23 remove the Date Picker, which was the composition tool, and

24 have their consumers rely on the other methods in Outlook of

25 inserting dates.

V-112

1     That, according to Mr. Kennedy's testimony, was their

2 best alternative.  He didn't use those words, but in my

3 negotiation terms, that was his best alternative.

4 Q     So according to Mr. Kennedy, then -- and again, you're

5 right, he didn't use negotiation terms, but according to Mr.

6 Kennedy, Microsoft's BATNA, the best alternative to the

7 negotiated agreement, would be to remove the Date Picker

8 code so that the Date Picker was no longer in Outlook.

9     Is that your understanding?

10 A     It is.

11 Q     And did you hear Mr. Kennedy say how much that would

12 have cost, literally cost Microsoft in terms of executing on

13 that, how much that would have cost?

14 A     I did hear that.

15 Q     And what was that?

16 A     Thirty-one thousand two hundred dollars.

17 Q     Now, have you seen any evidence -- have you been here

18 throughout the entire trial?

19 A     I have.

20 Q     Has it been painful?

21 A     Actually, it's been extraordinarily interesting.  I've

22 never sat through a jury trial before.  So I enjoyed it.

23 Q     Have you heard anything during the course of this trial

24 that would contradict that -- the cost, the actual cost of

25 removing the Date Picker would be 31,200?

V-113

1  A     I have not.

2  Q     Now, does that mean, then, that Microsoft's walk-away

3  number, in other words, I'm not going a penny over, that

4  that would be 31,200?

5  A     Not at all.  And this is a critically important thing

6  to understand.  You have to have your best alternative in

7  mind at the negotiation table.  You then need to compare

8  that with the value to you of making the deal, in this case,

9  acquiring a paid-up license for the use of the Date Picker

10 in all of its products.

11      And in making that comparison, the dollar price on the

12 BATNA is not necessarily your reservation value or walk-away

13 value at all.  Sometimes it can be -- the reservation value

14 can be lower.  Sometimes it can be higher.  Let me give you

15 an example.

16           THE COURT:  Before you give the example, we'll do

17 that after lunch.  Be back at -- I'm going to give you a

18 break until 1:00 o'clock.  I hope to be back by that time.

19 We play for Hospice victims at the Veterans Association.  We

20 do -- another judge and I do it every other month, and this

21 happens to be the day.

22           So we hope to be back by 1:00 o'clock.  Please

23 remember the admonition I gave to you earlier.

24      (Jury exits courtroom.)

25           THE CLERK:  We're in recess.

V-114

1     (Proceedings recessed to reconvene.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

V-115

1                    <u>AFTERNOON SESSION</u>

2                         --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Do you have the form contentions for

5    me?

6            MS. BROOKS:  We do, your Honor.  It's rather

7    lengthy.  We have the pages which we're going to read.

8            THE COURT:  We can take that up later, and we'll

9    have Professor Mnookin take the stand, and you can show me

10   the --

11           MS. BROOKS:  Thank you, your Honor.

12           MS. HEFFERNAN:  The issue, your Honor, is that we

13   were not told which infringement contentions would be read

14   until this morning and were not given highlighted copies at

15   all today.  It appears that from what will be read that

16   Microsoft has selectively chosen certain -- three certain of

17   the seven infringement contention responses that Lucent has

18   provided regarding the Day patent in the case to create a

19   misleading impression that Lucent did not identify the

20   Calendar tool in Outlook until 2006.

21           THE COURT:  So you want to read the other ones?

22           MS. HEFFERNAN:  I think that if -- we don't think

23   the contentions should be read at all, but if they are going

24   to be read, we think they all should be read.

25           THE COURT:  Do you have them there?

V-116

1        MS. BROOKS:  That's fine, your Honor.  They'll be

2 the ones that we said we were going to read, and if counsel

3 wants to read the other ones, we certainly have no

4 objection.

5        MS. HEFFERNAN:  We don't think -- to be fair, your

6 Honor, we don't think that they should be read, any of them

7 at all.  We don't think that should be an issue in this

8 trial because of the waiver of attorney-client privilege.

9        THE COURT:  Let me see what they are.  And then

10 we'll put Professor Mnookin back on the stand, and we'll

11 bring out the jury.

12        MS. BROOKS:  This is a complementary set for Ms.

13 Brooks.

14        THE COURT:  We'll put Professor Mnookin on the

15 stand, and we'll bring out the jury.

16     (Jury enters courtroom.)

17        THE COURT:  Welcome back.  Nice to have you here.

18 We remind you you're still under oath.

19        You may proceed.

20        MS. BROOKS:  Thank you very much, your Honor.

21    ROBERT MNOOKIN - DEFENDANT'S WITNESS - PREVIOUSLY SWORN

22             DIRECT EXAMINATION  (RESUMED)

23 BY MS. BROOKS:

24 Q    Good afternoon, Professor Mnookin.

25 A    Good afternoon.

V-117

1  Q    Right before we broke for lunch, you had just turned to

2  the jury and said "Let me give you an example."  Now,

3  hopefully you remember the example you were about to give

4  them.

5  A    I do.  The example is to illustrate that once you've

6  identified what your best alternative is to making a deal in

7  this particular negotiation, you have to compare that with

8  the benefits to you of making the deal and that the cost of

9  your alternative, the cost of your best alternative is not

10 necessarily the amount you pay to make a deal in terms of

11 your own reservation value.

12      Let me give you an example that I think demonstrates,

13 that sometimes your reservation value may be lower than the

14 dollar cost of your best alternative.  Sometimes the dollar

15 cost of your reservation value will be higher.  In this

16 case, in my opinion, it would be higher.

17      Example would be as follows.  Assume you're looking to

18 negotiate to purchase a low-mileage two-year-old Honda.

19 That's what you're negotiating over.  Your best alternative

20 might be to buy a new Honda.  The new Honda, for purposes of

21 this hypothetical, let's assume would cost $26,000.  The

22 buyer might be asking $25,000 for this used -- excuse me --

23 the seller might be asking $25,000 for the used Honda, but

24 your reservation value is not going to be the $26,000 you

25 pay for a new one, because in terms of your own interest,

V-118

1  you no doubt conclude, well, I'm a little bit better off

2  having a new one than one that is a year and a half old,

3  even if it has more mileage.

4      So in setting your reservation value in that instance,

5  your reservation value might be $23,000, but it wouldn't

6  necessarily be the price of your alternatives.

7      The other example is one where, in fact, making a

8  negotiated deal gives you something more than what you'd

9  have with your best alternative.  In my opinion, that is the

10  situation in this case because reliance on the alternative

11  methods is not a complete substitute for the date picker.

12      On the other hand, the date picker, in my view is one

13  of thousands of features, and I don't think you would attach

14  very much -- I don't think you would attach a value, an

15  astronomical value to making this deal and certainly not one

16  in terms of tens of millions of dollars.

17  Q   Well, now, Professor Mnookin, are you basing that just

18  on this case or are you basing it on experience that you've

19  had throughout your career in mediation and arbitration?

20  A   And negotiation.

21  Q   And negotiation.

22  A   And teaching negotiation.  I'm basing it on all of

23  that.  Indeed, in terms of the negotiation literature, in my

24  report I cited numerous articles that make this point about

25  how you have to assess your best alternative away from the

V-119

1  table in order to decide what your walk-away value or

2  reservation value is.

3  Q    And so, now, in this case Mr. Kennedy just testified

4  that Microsoft's reservation value or what we call the walk-

5  away number would be no more than $5,000,000.  In your

6  expert opinion, is that reasonable?

7  A    In my expert opinion, that is a reasonable number on

8  the facts of this case, yes.

9  Q    Why is that?

10  A    It's reasonable for a lot of reasons.  First of all, I

11  believe there's some benefit of having the date picker extra

12  but not very much.  Why?  Because there are all these

13  alternative means that already exist in the program of being

14  able to enter a date.  Moreover, I do not believe and Mr.

15  Kennedy has testified that creating the best alternative to

16  a negotiated deal, which would be to remove the date picker

17  and simply continue with all the alternative -- the other

18  means, would not measurably impact revenues or profits.  I

19  think that's true.

20  Q    Why do you think that's true, Professor Mnookin?

21  A    I think it's true based on a lot of things, including,

22  among other things, my own experience as a user of Outlook

23  entourage and the calendaring function, but most

24  fundamentally, I know for a fact that -- and I certainly

25  would be telling Lucent if I were a mediator, this date

1 picker feature is one tiny feature among hundreds, Mr.

2 Kennedy says thousands, in Outlook.  Moreover, most people

3 acquire Outlook by acquiring Office, which is an ensemble, a

4 suite of several different programs, and I find quite

5 credible Mr. Kennedy's conclusion that there'd be no

6 measurable impact on revenues or sales.

7 Q     So, Professor Mnookin, now, you say you've brought all

8 your experience to the table in rendering your opinion in

9 this case, but just to be clear, your opinion as to what

10 Microsoft should or should not be willing to pay in this

11 case is based upon the fact that the feature is the date

12 picker, is that right?

13 A     The feature is the date picker, and I've been here and

14 listened to all the evidence.  I've read the other expert

15 reports.  It's based on all of that.

16 Q     All right.  And you're not trying to extrapolate it to

17 other features in Outlook?

18 A     Not at all.  I think there might be single features

19 that, in fact, might be indispensable to using Outlook.

20 There was testimony, for example, what if you got rid of the

21 send button.  Well, if it meant that you couldn't send E-

22 mail and you needed a patent license in order to send E-

23 mail, let me assure you that in terms of Outlook, that would

24 be extraordinarily valuable.

25          MR. DAUCHOT:  Your Honor, I'll object as to beyond

V-121

1  the scope of his report.  He's not a technical witness.

2          THE COURT:  Sustained.

3          MR. DAUCHOT:  Request that the testimony be

4  stricken.

5          THE COURT:  All testimony?  Denied.

6          MR. DAUCHOT:  Just the testimony about what the

7  technology was about.

8          THE COURT:  Sustained.  I'll strike the last

9  answer.

10  BY MS. BROOKS:

11  Q    Professor Mnookin, when you were talking about the send

12  button, you didn't discuss that in your expert report, is

13  that right?

14  A    I did not.

15  Q    When did you hear for the first time an example of

16  removing the send button as -- as a feature in Outlook?

17  A    In this trial.

18  Q    Okay.  And that was from whom, do you recall?

19  A    I think it was from Mr. Tognazzini.

20  Q    Okay.  Now, we've discussed Microsoft's walk-away

21  number.  We've now heard Mr. Sims say that in his opinion

22  the reasonable royalty in this case, in other words, the

23  parties -- the number the parties would have agreed to,

24  would have been $70,000,000 for the date picker.  In your

25  expert opinion, is that a reasonable royalty for the date

V-122

1 picker?

2 A    No.

3 Q    Why not?

4 A    There are really a number of reasons.  Mr. Sims in

5 terms of his quantitative analysis, of course, relies on the

6 Jay survey, but his computation, as was demonstrated I

7 believe yesterday, assumes that three percent of all Office

8 users wouldn't buy Outlook, even though it's included as

9 part of the Office ensemble.  He also attaches in reaching

10 that number I believe a $67 number as to the revenue loss to

11 Microsoft from each lost sales.  I think that involves an

12 apportionment of the Office ensemble, the suite, which makes

13 no sense.

14 Q    And did you discuss that, in fact, in your expert

15 report, Professor Mnookin?

16 A    I did.

17 Q    Now, did you also discuss in your second expert report

18 what you believe would be a reasonable reservation value

19 position for Lucent to take based on the facts of this case

20 at the hypothetical negotiation?

21 A    In my report I did not give a number for Lucent's

22 reservation value, but I did express an opinion that it

23 would be below $5,000,000 and that the parties, in fact,

24 would have reached a deal.

25 Q    All right.  Why do you say in your expert opinion that

V-123

1  Lucent's reservation value, meaning their walk-away number,

2  would have been below $5,000,000?

3  A    It's really based on a number of things.  First,

4  there's no evidence that Lucent ever licensed the Day patent

5  individually.  It was only included in bulk licenses where

6  it was included among all of AT&T's licenses or all of

7  Lucent's licenses.

8       Second, I think had Lucent in 1996, for example, been

9  able to persuade in the negotiation Microsoft to acquire a

10  license for $1,000,000, I think that would have had enormous

11  benefit to Lucent in terms of its being able to get other

12  revenues from other parties.  Microsoft, after all, is one

13  of the leading software companies in the world, and I think

14  there would have -- in terms of Lucent's interests, I

15  believe it would have served Lucent's interests enormously

16  to have made a deal for an amount below $5,000,000.

17  Q    Now, this Book of Wisdom we've talked about, you've

18  said both parties have access to it?

19  A    Correct.

20  Q    So Microsoft in 1996 could open up the Book of Wisdom,

21  and what would they see about Lucent's position in the

22  marketplace going into the future?

23  A    They would see that Lucent had never licensed for a

24  dollar this particular patent.

25  Q    And what would they see -- we saw some deposition

V-124

1  testimony and Mr. Sims also talked about it, about Lucent's

2  position in 2003 as far as their drive for cash and wanting

3  up-front payment?

4  A    One of the videos we show -- that was shown here

5  involving a Lucent employee said that Lucent in 2003 at

6  least very much preferred lump sum royalties because they

7  wanted to get money up front in what you just said was a

8  drive for cash.

9  Q    And so just so I make sure I understand you, if Lucent

10 then at the hypothetical negotiation had taken a position

11 where their walk-away number was below $5,000,000, do you

12 think then there would have been an agreement reached at the

13 hypothetical negotiation?

14 A    Absolutely.  It's my opinion there would have been an

15 agreement reached, and it would have been an agreement below

16 $5,000,000.

17 Q    And I think there's another term we haven't talked

18 about, but there is also jargon for that which is when the

19 buyer's price is above the seller's price.  Is there some

20 term for what that is?

21 A    Well, I think what you may be referring to is something

22 that in the jargon is sometimes called somebody's aspiration

23 value.  I have no doubt based on this trial that Lucent at

24 the negotiation table in the hypothetical negotiation might

25 have asked for tens of millions of dollars.  They might have

1  aspired to that, but I simply think it would not have been

2  realistic.

3  Q    If as a mediator you had been able to get Lucent to a

4  realistic position and you've already told us you believe

5  Microsoft's number was a realistic number, then do you

6  believe a negotiation would have been reached and, if so,

7  why?

8  A    Well, I think, in fact, because it would have been in

9  the interests of both parties to have made a deal.  That's

10  why I think that there would have been a deal reached.  I

11  mean, for example -- I'm volunteering something, but I will

12  anyway -- if I were mediating between Lucent and Microsoft

13  -- let the record show I was not asked to -- I would have

14  said to Microsoft if they said "Oh, well, we'll offer

15  $33,000," I would have said that's entirely unrealistic.

16  Even though I think your belief that excluding this feature

17  would have no substantial material effect on profits or

18  revenues, surely there are some people who like using it,

19  and Microsoft likes to provide benefits to its consumers.

20      But, similarly, I must say if Lucent said "Oh, we want

21  tens of millions, we want $70,000,000," I would have said

22  "How in the world, given the absence of evidence that it

23  would materially impact sales or profits, given that this is

24  one small feature among thousands in one program and it's

25  usually sold as part of a suite, how in the world do you

V-126

1 think that's reasonable or realistic?"

2     Now, so those are the kinds of things if I were a

3 mediator I would be saying to both sides.

4 Q    And Lucent would come back at you and say, "Well, but

5 we have this survey in the future.  So we're opening up the

6 Book of Wisdom and we have this survey that was done by

7 Doctor Jay, and then Mr. Sims took those survey numbers and

8 extrapolated it out to the whole population, and it showed

9 that Microsoft, when discounted back to present value, could

10 have expected to lose as much as $138,000,000 in profits.

11 We're not asking for the whole thing.  We're just asking for

12 about half."  What would your response be to them as a

13 mediator?

14 A    My response as mediator is that, Mr. Sims, your

15 analysis doesn't make sense to me.

16 Q    Now, I went through -- were you here in the Court when

17 I was cross examining Mr. Sims and we went through some

18 alternative calculations to Mr. Sims' calculations based on

19 the very numbers out of the Jay survey?  Do you recall that?

20 A    I do recall that.

21 Q    All right.  But I want to do one more just because you

22 have a calculator and I have a red pen.

23        MR. DAUCHOT:  Your Honor, I'll object.  This is

24 beyond the scope of the expert report.

25        THE COURT:  Rephrase the question.  Sustained.

1 BY MS. BROOKS:

2 Q    Professor Mnookin, did you discuss in your expert

3 report what the issues were, what was wrong with Mr. Sims'

4 use of the Jay survey?

5 A    I did.

6 Q    All right.  We're going to walk through a chart --

7            MR. DAUCHOT:  Your Honor, I object.  There was a

8 motion in limine on that --

9            THE COURT:  Just a second.

10           MS. BROOKS:  Your Honor, he's not talking about --

11           THE WITNESS:  I'm not --

12           MS. BROOKS:  I'm sorry.

13           THE COURT:  You may proceed.

14           MS. BROOKS:  I may proceed?  Thank you.

15           THE WITNESS:  I'm sorry.  I think you may have

16 misspoken.  In my report I talked essentially about Mr.

17 Sims' report.

18 BY MS. BROOKS:

19 Q    Right.

20 A    Not Ms. -- Doctor Jay's report.

21 Q    Exactly, and I'm sorry if I phrased it wrong.  In your

22 expert report, did you comment, in fact, critique on how Mr.

23 Sims used the data from the Jay survey?

24 A    I did.

25 Q    Now, I'd like to walk you through that, and we're going

V-128

1  to start with Mr. Sims' own demonstrative.  First of all,

2  Mr. Sims started by applying what would eventually become a

3  three percent number to all 109.5 million Office licenses,

4  of which only 241,000 were stand-alone Outlook.  Do you

5  recall that?

6  A    Yes.  And, indeed, in my expert report, one of the

7  things I criticized was this confusion and conflation of

8  Outlook with Office because most people, as I said in my

9  expert report, the overwhelming majority of people who

10 acquire Outlook, do so because it's already on the computer

11 along with other Microsoft products or as part of the Office

12 suite.

13 Q    Were you here yesterday when Mr. Harris testified?

14 A    I was.

15 Q    And did you hear him testify that based on his vast

16 experience with Calendar, Outlook, Office and now he's moved

17 on to Windows, but his vast experience with the Calendar

18 module, in turn the Outlook program, in turn, the entire

19 Office program, that approximately 40 percent of Office

20 users use Outlook?

21 A    I heard him testify to that, yes.

22 Q    Now, if Mr. Sims had properly apportioned this number,

23 could you take -- and, actually, we'll back out the stand-

24 alone Outlook.

25      So let's take 109.3 million and take 40 percent of

V-129

1   that.  Hopefully you still have a calculator up there.

2          MR. DAUCHOT:  Your Honor, I object again.  This is

3   nowhere to be found in the expert report.

4          THE COURT:  Overruled.

5   BY MS. BROOKS:

6   Q    Professor Mnookin, if you could take 40 percent of

7   109.3 million and tell the jury what that is.

8   A    I guess the first thing I have to learn how to do is

9   turn this on.

10  Q    Push the C button I believe.  Did it come on?

11  A    No.

12  Q    Maybe the AC button.

13  A    That's it, AC button.

14  Q    AC.

15  A    Thank you. Sorry.  I apologize.

16  Q    May the record reflect Mr. Denning said C, and I knew

17  that it was AC.

18  A    Okay.  So the first thing you asked me to do, since

19  only 40 percent in the testimony yesterday Office users use

20  Outlook, you asked me to take 40 percent of 109,000,000

21  even?

22  Q    No, 109.3, 109,300,000.

23  A    That's 43,720,000.

24  Q    Okay.  We'll give them the benefit of the doubt and

25  round up to 43.8 million.  Now, we had a big discussion, Mr.

V-130

1  Sims and I, as to whether that should be multiplied by .8

2  percent or three percent.  Do you recall that?

3  A    Yes.

4  Q    All right.  For the purpose of today, let's go with the

5  three percent.  What is three percent of 43.8 million?

6  A    I believe it's 13 --

7  Q    Should be 1.3 million?

8  A    Excuse me, 1.3116 is what it says here.

9  Q    We'll do 1.3 million.  Sorry.  We're taking -- the

10 percentage should be down here, 1.3 million.  Now, you also

11 heard our lengthy discussion about using the $67 stand-alone

12 Outlook revenue price when doing this computation to Office

13 licenses.  Do you recall that, Professor Mnookin?

14 A    I do recall that.  And in my opinion it was

15 preposterous to use the $67 number as the revenue loss for

16 this three percent of licenses that presumably were going to

17 be lost.

18 Q    And did you discuss that in your expert report?

19 A    I did discuss the fact that it -- that using Office as

20 a base was inappropriate.

21 Q    And then if you use the $67, did you have an opinion as

22 to whether or not you needed to apportion that amount?

23 A    Indeed, in my belief you have to apportion to Outlook

24 the fraction of the revenue loss from Office that's in

25 proportion to the total, the sum of the stand-alone prices

V-131

1  of all the items included in the suite.

2  Q    And so I'll do the math for you, Professor Mnookin.  If

3  we use the number that we used yesterday with Mr. Sims of

4  $13.45, it should come, this bottom line number, to $17.6

5  million.  Does that sound reasonable?  And if you'd like to

6  check my math, you're welcome to.

7  A    Well, I think the step that you're leaving out which I

8  think is important to include is if that -- there's a number

9  for the revenue loss from an Office suite and my

10  recollection was about $97.  And if you take the fraction of

11  that $97 that Outlook stand-alone represents to the sum of

12  the four programs stand-alone, I think you then get $13.75.

13  Q    Okay.  And then if we -- actually, $13.45.

14  A    Thirteen forty-five, excuse me.

15       MR. DAUCHOT:  Your Honor, objection.  All of this

16  is nowhere to be found in the expert report.

17       MS. BROOKS:  Your Honor --

18       THE COURT:  Overruled.

19       MS. BROOKS:  Thank you.

20  BY MS. BROOKS:

21  Q    And now we come then to $17.6 million, and now we have

22  to take into consideration the profit margin.  So if we took

23  $17.6 million and multiplied it by 76.2 percent, do we come

24  to $13.4 million?

25  A    I think what this math demonstration shows is that if,

V-132

1 in fact, you look only at Outlook users of Office, first of

2 all, and, secondly, correctly apportion the revenue loss of

3 Outlook to that in -- excuse me -- in Office to that of

4 Outlook, you come up with this not -- you come up with a

5 number that is 13.4 million, correct.

6 Q    And that is giving Mr. Sims his entire three percent,

7 is that right?

8 A    That's using the three percent number that Doctor Jay

9 testified about, exactly.  I have to say that I'm not an

10 expert on survey, but in this negotiation --

11         MR. DAUCHOT:  Your Honor, if there's going to be a

12 criticism of Doctor Jay's survey, I object.  This is --

13         THE WITNESS:  I'm not offering an opinion

14 criticizing Doctor Jay's survey.

15         MS. BROOKS:  May he proceed, your Honor?

16         THE COURT:  Well, is there a question?  Maybe you

17 should ask a question.

18 BY MS. BROOKS:

19 Q    Yes.  So the question, sir, was, Professor Mnookin,

20 that this computation we just did here gives the entire

21 three percent number that Mr. Sims said was reasonable and

22 then Doctor Jay later said she agreed with Mr. Sims it was a

23 reasonable extrapolation, is that right?

24 A    That's correct.  Doctor Jay in her testimony and in her

25 report did not quantify damages.

V-133

1   Q    And -- I'm sorry.  Go ahead.

2   A    Okay.

3   Q    And do you understand that it's our position that at

4   best this number should be .8 percent?

5   A    It is certainly my understanding that Microsoft

6   disputes that number.

7   Q    Now, taking all of this into consideration, Professor

8   Mnookin, you told the jury that you believed, despite the

9   rather disparate positions of the parties, that you believed

10  that if the parties approached this negotiation as rational,

11  reasonable negotiators, a resolution would be reached?

12  A    I believe that, yes.

13  Q    And what do you believe that resolution would be?

14  A    It would be under $5,000,000.

15       MS. BROOKS:  Thank you very much.  No further

16  questions.

17       THE COURT:  Cross?

18                    CROSS EXAMINATION

19  BY MR. DAUCHOT:

20  Q    Good afternoon, Professor Mnookin.

21  A    Good afternoon.

22  Q    We meet again.

23  A    We meet again.

24  Q    Last time we met, other than in the context of this

25  trial, was in the beautiful City of Boston where I had the

V-134

1 pleasure of taking your deposition.

2 A    I remember it well.

3 Q    I'm not sure you had the pleasure of having your

4 deposition taken by me, but in any event.

5 A    It was a pleasure.

6 Q    The -- Professor Mnookin, let me take a step back.  You

7 testified late this morning that you are not a professional

8 expert.  Is that correct?

9 A    I testified I believe that I'm not a professional

10 expert witness.

11 Q    But you are -- you don't deny that you are being paid

12 today?

13 A    Of course I am.

14 Q    All right, $950 an hour?

15 A    That's correct.

16 Q    All right.  And I think there was testimony to the

17 effect that you had not been an expert who had been paid by

18 a party before, but you corrected yourself I think and then

19 said that, in fact, you had, albeit not in a federal court,

20 in a trial setting?

21         MS. BROOKS:  Objection.  Mischaracterizes the

22 testimony, your Honor.

23         THE COURT:  Overruled.

24         THE WITNESS:  That's correct.  I, in fact, often

25 as a consultant have been asked to be an expert coaching a

V-135

1  party, for example, in a negotiation.  And I have a couple

2  of times before this instant been an expert in a contested

3  matter, a neutral expert, but I've never before testified in

4  court.

5  BY MR. DAUCHOT:

6  Q    All right.

7  A    And the only time I ever testified, I think as I

8  indicated, was in an FGC proceeding.

9  Q    Fair enough.  Mr. -- or Professor Mnookin, there are

10  actually two reports that you submitted in this case,

11  correct?

12  A    That's correct.

13  Q    And there was a report that you submitted on November

14  12 of 2010, correct?

15  A    That is correct.

16  Q    And you signed that report, am I correct?

17  A    I did.

18  Q    And then there was a later report that you submitted on

19  March 11, 2011?

20  A    That's correct.

21  Q    And you signed that report, am I correct?

22  A    Yes.

23  Q    Now, can we put demonstrative RM2 up, please.  Thank

24  you.  Can we agree, Professor Mnookin, that the conclusions

25  of your report dated November 12, 2010 and March 11, 2011

V-136

1  were identical?

2  A    The reports were not identical.  My conclusion, in

3  fact, in both reports, was that $5,000,000 was a reasonable

4  number for reservation value.

5  Q    Right.  And, in fact, if we looked at the two

6  conclusions of the report, you have the same typo in both.

7  It looks like it was sort of a cut and paste.  You see that

8  the last sentence you have based my analysis?  That's a

9  typo?

10  A    Sure is.

11  Q    Sure.  And if you look at November 12, 2010, you have

12  the same typographical, based my, right?

13  A    That's correct.

14  Q    So it was cut and paste?

15  A    Well, win fact --

16  Q    This section, sir, conclusion?

17  A    If you are implying --

18  Q    I'm not implying anything, sir.  I'm just asking you

19  whether or not the conclusion sections in both reports are

20  identical.  That's my question.

21  A    Yes, the are identical.

22  Q    All right, sir.  Now, the first time you heard of this

23  case was on November 2 of 2010.  Am I correct?

24  A    That's correct.

25  Q    That was 10 days before you submitted your report and

V-137

1  signed it, am I correct?

2  A    That's correct.  It was November 12th that I submitted

3  it.

4  Q    And signed it.  And before -- 10 days before you

5  submitted that report with the conclusion and signed it, you

6  hadn't even heard of this case?

7  A    That's correct.

8  Q    Now, you understand that Doctor Jay spent many many

9  many months in putting her survey together and actually

10 getting the results?

11 A    I heard Doctor Jay's testimony.

12 Q    And you heard that she spent quite a bit of time on it?

13 A    I heard her describe how much time she had spent, yes.

14 Q    All right.  And you also heard from Mr. Tognazzini?

15 A    Yes.

16 Q    All right.  And Mr. Tognazzini as well spent a lot of

17 time on this case.  You heard him say that?

18 A    Yes.

19 Q    All right.  Certainly more than a couple of days?

20 A    Certainly more than a couple of days.

21 Q    All right.  Now, in fact, you did not get any

22 deposition testimony, sworn testimony or reports from Doctor

23 Jay or Mr. Tognazzini or, for that matter, Mr. Sims, until

24 November 10 or thereabouts?

25 A    I don't know whether it was November 10th, but, in

V-138

1  fact, you are correct that during that period I was -- I'll

2  testify I was working flat out preparing the report.

3  Q    All right.  Now, Mr. -- or, Professor Mnookin, we have

4  a copy of your deposition transcript.  It's dated -- do you

5  see your deposition transcript of -- well, I don't have the

6  date here.  What's the date?  Oh, 2010.  Okay.  Here we got.

7       All right.  Do you have that?

8  A    Which tab is it, please?

9  Q    Let me see if I can pull it out for you.  It's tab two.

10  A    This is a tab of Mr. William Kennedy's deposition.

11  Q    I'm sorry.  All right.  You with me, Professor Mnookin?

12  A    I have in front of me a transcript of the --

13  Q    All right.

14        MS. BROOKS:  Might we inquire as to the tab

15  number, your Honor, so we can find it?

16        MR. DAUCHOT:  Page 26.

17        MS. BROOKS:  Apparently we need a binder switch.

18  I had the wrong binder.  Thank you.

19        THE COURT:  Page 26.

20  BY MR. DAUCHOT:

21  Q    Lines 18 through 24.  You with me?  Can you --

22  A    I'm not sure I am because are you referring --

23  Q    Well, let's --

24  A    These have four on a page.  Are you referring to page

25  26 of the deposition or page --

V-139

1  Q    Yes, page 26 of the deposition --

2  A    -- 26 of this --

3  Q    -- 18 to 24.

4  A    Okay.

5  Q    And why don't we run the clip.

6       (Video begins.)

7            "Q    Okay.  So you wouldn't have

8            received those other materials, the

9            expert reports from Sims, Tognazzini,

10           Debra Jay and the deposition transcripts

11           until as late as November 10, 2010,

12           correct?

13           A    Or thereabouts.  I don't know

14           precisely."

15      (Video ends.)

16      All right.  At the time, Professor Mnookin, that you

17 signed your November 12, 2010 report, you understood that

18 Microsoft had hired other experts of its own, is that

19 correct, sir?

20 A    Yes.

21 Q    All right.  You understood that Microsoft at the time

22 had hired a survey expert of its own by the name of Phillip

23 Johnson?

24 A    I had heard Mr. Johnson's name, but I did not have Mr.

25 .Johnson's report.

V-140

1  Q    But you knew that Mr. Johnson would be submitting a

2  report critiquing the report of Doctor Jay?

3  A    I was told that at the same time I was going to be

4  submitting my report that he and I believe Mr. Marcus were

5  also going to be submitting reports.

6  Q    And you, in fact, at some point read Mr. Johnson's

7  critique of Doctor Jay's survey?

8  A    I did read his report, but it was after I submitted my

9  report.

10 Q    And Mr. Johnson has not testified in the trial of this

11 matter, has he?

12 A    That's correct.

13 Q    All right.  Now, you also knew on November 12 that

14 Microsoft would be submitting a report of an individual

15 named Aaron Marcus?

16 A    Yes.

17 Q    And Mr. Marcus was a human computer interface expert

18 like Mr. Tognazzini.  Do you recall that?

19 A    I was not familiar with Mr. -- until I read his report,

20 I was not familiar ahead of time with --

21 Q    Correct, but you knew he'd be submitting a report?

22 A    I knew that Mr. Marcus too would be submitting a

23 report.

24 Q    And you ultimately read his report?

25 A    I did.

1  Q     And Mr. Marcus was hired by Microsoft to critique Mr.

2  Tognazzini, right?

3  A     He was hired to be an expert on the same subject, yes.

4  Q     All right.  And you have not heard Mr. Marcus testify

5  here today?

6  A     No.

7  Q     Now, you did understand, Mr. -- Professor Mnookin, that

8  as part of Mr. Johnson's work that there was a survey

9  undertaken by Microsoft for purposes of this case.  You knew

10 that as an expert for Microsoft?

11 A     I did not know that at the time I submitted my report.

12 In fact, I learned it some months later, I believe

13 immediately before my second deposition.

14 Q     All right.  A survey conducted by Mr. Johnson with an

15 Outlook program that did not include the date picker, do you

16 remember that?

17 A     I did not know that.  What I did know was that, in

18 fact, his report was not going -- his survey was not going

19 to be used as evidence by Microsoft.  That's what I was

20 told.

21 Q     All right.  Now, with respect to your opinions,

22 Professor Mnookin, you did no -- you did no work with

23 respect to Money or Pocket PC/Windows Mobile, am I correct?

24 A     That's correct.

25 Q     Those have not factored into any of your opinions in

1 this case?

2 A    Well, that's not correct because what I did know, that

3 it is -- that in terms of Mr. Sims, who is Lucent's damage

4 expert, that the overwhelming majority is a tiny fraction of

5 the total amounts he was claiming were attributable to Money

6 and the telephone, Windows application.

7 Q    All right.  Now, Mr. -- Professor Mnookin, when you

8 submitted your report, your conclusion of November 12, 2010,

9 you did not review any Microsoft usage or survey data, did

10 you?

11 A    Before my initial report, I had not.  That's correct.

12 Q    All right.  And when you signed a report with your

13 conclusion to the effect that $5,000,000 would be it on

14 November 12, 2010, you had not reviewed any Microsoft

15 financial documents for this case, am I correct?

16 A    At that time I had not, that's correct.

17 Q    And at that time you didn't ask anyone about

18 Microsoft's licensing policy, am I correct?

19 A    I did not, indeed, in my first report.  The focus of my

20 first report was to describe a methodology based on

21 negotiation theory and to say that in my opinion, Mr.

22 Kennedy's $5,000,000 reservation value was reasonable.

23 Q    Right.  And in reaching that opinion, you did no work

24 in terms of determining the number of infringing units that

25 Microsoft sold, am I correct?  Am I correct?

V-143

1  A     The reason for my hesitation is that I did read Mr.

2  Sims' report.  Now --

3  Q     Two days before --

4  A     Yes.

5  Q     Two days before you signed off on your opinion?

6  A     And I read it very carefully I assure you, and Mr.

7  Sims, of course, has submitted a number of reports, and they

8  have different numbers and they're based on different

9  things.  And what I can't say for a fact is whether or not

10 his initial report made claims about the number of licenses.

11 Q     And when you submitted your report of November 12, 2010

12 and signed it, taking the opinion that Mr. Kennedy's

13 conclusion that Microsoft wouldn't have paid a dime back

14 over $5,000,000 and finding that reasonable, you did not

15 determine the amount of profits attributable to the Day

16 technology, am I correct?

17 A     What I -- that is correct.

18 Q     All right.

19 A     I can tell you what I did do.

20 Q     Now, on the subject of the -- the testimony regarding

21 -- or your opinions regarding the $5,000,000, the

22 reservation value, right, that was Microsoft's reservation

23 value, $5,000,000?

24 A     Yes.

25 Q     And the alternative, which is $31,200, right?

1  A    No.  The alternative was relying on the existing other

2  methods of --

3  Q    Right, but taking --

4  A    -- and the cost of removing the date picker, which

5  would make Outlook non-infringing was $31,200, that's

6  correct.

7  Q    All right.  Now, in coming -- in opining that the

8  $5,000,000 was reasonable, you did not -- what you did is

9  you relied on Mr. Kennedy's opinion in his declaration?

10  A    I relied on the business judgment of Mr. Kennedy

11  translating a BATNA or best alternative into a reservation

12  value, that's correct.

13  Q    Well, in fact --

14  A    I also --

15  Q    In fact --

16  A    I also -- well, sorry.

17  Q    No.  Go ahead.  Finish.  I didn't mean to cut you off.

18  A    What I also did was I read very carefully at the time

19  Doctor Jay's report and Mr. Sims' report, and I asked myself

20  is there information here that makes me uncomfortable with

21  my opinion, that leads me to doubt my opinion, and Mr. Sims'

22  analysis, which was a damage analysis, I found unpersuasive.

23  Q    Did you feel at all uncomfortable about making

24  conclusions like that based on 48 hours worth of work, not

25  including sleep and not including, of course, the fact that

V-145

1  at the time you had teaching responsibilities at the Harvard

2  Law School?  Did you feel uncomfortable about making fast

3  judgments like that about Mr. Sims' analysis that took years

4  and Doctor Jay's analysis that took as long as it did?  Did

5  you have discomfort about that?

6  A    No.

7  Q    Okay.  Now, you testified that in addition to relying

8  on Mr. Kennedy's declaration, you also relied on his

9  judgment?

10 A    As I think I explained, a reservation value involves a

11 business judgment.  It's not something you can just look up

12 somewhere in a book and find is a number.  It requires a

13 comparison, and the critical fact in Mr. Kennedy's

14 declaration that I relied on substantially was his

15 observation that reliance on the other ways of entering a

16 date and the absence of a date picker would not materially

17 affect profits or sales.

18 Q    Right.  And you took Mr. Kennedy at his word as laid

19 out in the declaration?

20 A    I did more than -- I did other things as well.

21 Q    You read the reports that you received on November 10?

22 A    I read the reports that, in fact, Lucent had submitted,

23 and I asked myself do these reports lead me to question my

24 decision, and they did not.

25 Q    Now, when you received your assignment on November 2 of

V-146

1   2010, you knew how to reach Mr. Kennedy, did you not?

2   A    No.

3   Q    Well, you, in fact, had a phone conversation with Mr.

4   Kennedy between November 2 and November 12, 2010, did you

5   not?

6   A    I had one phone conversation with Mr. Kennedy --

7   Q    Right.  So you --

8   A    -- in the presence -- excuse me.  I'm sorry.

9   Q    No.  In the presence of, go ahead.  I didn't mean to

10  cut you off.

11  A    -- Mr. Denning.

12  Q    In the presence of Mr. Denning.  So you had a

13  conversation with Mr. Kennedy?

14  A    I had a short telephone conversation.

15  Q    Short, right.  And that's my point.  You had access to

16  Mr. Kennedy, right?

17  A    I had a short telephone conversation.

18  Q    No, that's not my question.  I know you had a short

19  conversation, but my point is you had access to Mr. Kennedy.

20  A    I spoke to Mr. Kennedy, that's correct.

21  Q    You had access to him?

22  A    If access means could I talk to him, yes.

23  Q    All right.

24  A    If what you're implying --

25  Q    Sir, please --

V-147

1  A    -- is that Mr. Kennedy would be available for days to

2  me, I had no reason to think that at all.

3  Q    Did you ask?

4  A    I was told that Mr. Kennedy, in fact, was on his way to

5  China.

6  Q    So he was busy?

7  A    I'm sure executives of Microsoft are usually very busy.

8  Q    Well, did you say to the lawyers, "Look, before I can

9  sign this thing on November 12, 2010 and put my signature

10 and conclude that your $5,000,000 opinion that we're hearing

11 about today is reasonable, hey, I need to sit down with Mr.

12 Kennedy and find out how he came up with his numbers?"  Did

13 you ask the Microsoft lawyers that?

14 A    I did not.

15 Q    You didn't ask?

16 A    I did not.

17 Q    But you had a 10-minute conversation with Mr. Kennedy?

18 A    I had a short conversation with Mr. Kennedy.

19 Q    Well, don't you think that sitting down with Mr.

20 Kennedy and figuring out exactly how he got to the

21 $2,000,000 and the $5,000,000 would have been helpful before

22 you signed off on that opinion?

23 A    I didn't find it necessary.

24 Q    Because you had his declaration?

25 A    Because I had a declaration under penalty of perjury

V-148

1  and, most fundamentally, he gave reasons that I found

2  entirely plausible.  His reasons were, first of all, there

3  were these alternative ways of entering the information,

4  and, secondly, in fact, he was setting a reservation value

5  of several million dollars, and it was his view that it

6  would have no material effect on revenues or profits.  I

7  found that reasonable.

8  Q    Right.  And you undertook no independent investigation

9  about those statements in Mr. Kennedy's declaration, am I

10 correct?

11 A    I did no independent investigation, that's correct.

12 Q    All right.  Now --

13 A    Other than as I described.

14 Q    Reading the reports over the course of 48 hours, not

15 including sleep and your teaching responsibilities at

16 Harvard, right?

17 A    You're assuming 48 hours.  I mean, I cannot testify

18 under oath that I didn't get it on the 9th or the 8th, but I

19 did get it very late, and if you're implying that there was

20 a lot of time pressure, you're correct.

21 Q    All right.  Now, you negotiated an agreement with

22 Microsoft in early 2010 for your services provided between

23 -- for your services in coming up with the opinion of

24 November 12, 2010, am I correct?

25 A    That's correct.

1  Q    And you asked Microsoft $60,000 to write that report,

2  am I correct?

3  A    The initial report, that's correct.

4  Q    And then on top of the $60,000, another $950 an hour?

5  A    Not for the time spent --

6  Q    No, no, no.

7  A    Not for the time spent -- the $60,000 was for

8  essentially dropping everything else and during this 10-day

9  period working close to around the clock except for my

10 teaching to prepare a report, that's correct.

11 Q    All right.  Now, Professor Mnookin, you testified to

12 the hypothetical negotiation in this case and testified to

13 -- to when Lucent did and did not approach Microsoft.  Do

14 you understand that Lucent approached Microsoft in 2003?

15 A    That's what I understand, yes.

16 Q    All right.  And do you know when Lucent acquired the

17 Day patent?

18 A    I believe we heard testimony it was 2001 or 2002,

19 that's correct.  Is that correct?  I think that's what it

20 is.

21 Q    I think it's 2001.

22 A    2001.

23 Q    All right.  Now, when you concluded on November 12,

24 2010 that the $5,000,000 figure to which you're testifying

25 here today was correct and that the negotiation price would

V-150

1   actually be less than that, you did not take into

2   consideration what Lucent's position would be at the

3   hypothetical negotiation, did you?

4   A    My initial report expressed no opinion about Lucent's

5   reservation value.  That's correct, my initial report.

6   Q    So on November 12, 2010, you signed a report and you

7   said, "Look, you -- this is where the deal would have come

8   out.  It would have come out under $5,000,000," and you did

9   not -- you did not take into consideration Lucent's position

10  at the bargaining table, am I correct?

11  A    What I did in my opinion -- my opinion was an opinion

12  regarding (a), how one arrives at a reservation value, and

13  in my opinion, the $5,000,000 number that Mr. Kennedy had

14  included in his declaration was reasonable.

15  Q    As an aside, you testified that you placed a fair bit

16  of importance on the fact that Mr. Kennedy signed a

17  declaration under penalty of perjury that you reviewed

18  before November 12, 2010, am I correct, that was your

19  testimony?

20  A    That's correct, and as it turned out --

21  Q    May I finish my next question?

22  A    Well, I think --

23          MS. BROOKS:  Your Honor, may Professor Mnookin

24  finish his answer?

25          THE COURT:  No.  Let him ask a question.

V-151

1          THE WITNESS:  Okay.

2          MR. DAUCHOT:  Thank you, your Honor.

3  BY MR. DAUCHOT:

4  Q    Professor Mnookin, you are aware that the declaration

5  that you reviewed before November 12, 2010 was, in fact, an

6  unsigned declaration for Mr. Kennedy, am I correct?

7  A    I was sent a copy -- that is correct.  I was sent a

8  copy of Mr. Kennedy's unsigned declaration.  I was told that

9  he was going to sign it.  I believe, as it turned out, he

10 didn't sign it before it was submitted, but in his

11 deposition, he acknowledged under penalty of perjury the

12 same things.

13 Q    Right, but that was after November 12, 2010?

14 A    And I did assume -- you're correct, I did assume that,

15 in fact, what he was including in his declaration were

16 things that he would swear to.

17 Q    Right.  Mr. Kennedy, you are not an economic -- or, I'm

18 sorry, Professor Mnookin, you are not an economic expert, am

19 I correct?

20 A    I'm not offering myself here today as an economic

21 expert.  I did -- I did major in economics as an

22 undergraduate.  I had a full-ride scholarship to study

23 econometrics as a graduate student for a year.  I am not

24 here as an economics expert.

25 Q    All right.  And you've never licensed rights to

V-152

1  patents, am I correct?

2  A    I myself have no patents, and I've never licensed a

3  patent.

4  Q    All right, sir.  Now, in making your opinion about the

5  -- reaching your opinion about the reasonability of the five

6  and the two million dollar figures, it is fair to say that

7  you are principally relying on Mr. Kennedy?

8  A    At the time of my initial report, I was relying on Mr.

9  Kennedy and the materials I identified in my report that I

10 had reviewed.

11 Q    Well, when I deposed you, sir, on November 2nd -- was

12 it November 2nd?

13 A    You didn't depose me until March.

14 Q    April 8th, when I deposed you on April 8th, you did

15 tell me in deposition that you were still then principally

16 relying on Mr. Kennedy's opinions, is that correct?

17 A    I certainly relied on Mr. Kennedy's opinions.  But, as

18 I said in my second report, I had reviewed other materials

19 as well, including materials cited -- Microsoft materials

20 cited by Mr. Sims and Doctor Jay.

21 Q    Now, when I deposed you, sir, you had already written

22 your second report, am I correct?

23 A    That's correct.

24 Q    I deposed you on the subject of your second report, am

25 I correct?

V-153

1 A     You did.

2 Q     All right.  I'll point you to the deposition transcript

3 at page 394, lines five to 13.  David, can you run that

4 clip, 116, please.

5          MS. BROOKS:  Your Honor, I would object until I

6 have a chance to review and see if it's actually

7 impeachment.  He seemed to have agreed with everything Mr.

8 Dauchot said.

9          THE COURT:  Overruled.

10          THE WITNESS:  Do you want me to follow it in here

11 or just --

12          MR. DAUCHOT:  You can listen.  It's the same.

13      (Video begins.)

14          "Q     Just a couple of short -- would

15          it be fair to say that in terms of the

16          translation of the BATNA to the

17          reservation price, your principal

18          reliance here is Mr. Kennedy, is that a

19          fair statement?

20          A     It's a fair statement that I rely

21          on Mr. Kennedy, correct.

22          Q     And he's your principal source of

23          reliance?

24          A     I think that's right."

25      (Video ends.)

V-154

1  BY MR. DAUCHOT:

2  Q    All right.  Now, when I say the transition from the

3  best alternative to the negotiated agreement and the

4  reservation price, we were talking about relying on the

5  alternatives and paying $31,200 and translating that to

6  $5,000,000, correct?

7  A    Correct.

8  Q    All right, sir.  Now, you testified earlier that in

9  your judgment, as you sit here, it seems perfectly

10 reasonable for Microsoft to have been willing to pay no more

11 than $5,000,000 given the fact that the Day patent

12 technology is but one tiny feature among hundreds of

13 thousands of lines of code.  Do you remember that?

14 A    I don't think I said hundreds of thousands of lines of

15 code.

16 Q    You said hundreds of thousands of features?

17 A    I'm not sure I said hundreds of thousands, but I -- I

18 believe it's thousands.

19 Q    Thousands of features, and that's one reason why you

20 think that Microsoft wouldn't pay over $5,000,000 for it?

21 A    No, that's incomplete, your statement.

22 Q    No, I'm saying that's one reason.

23 A    I think, as I testified earlier, something could be one

24 feature but an indispensable feature.

25 Q    That's right.  Now, in this --

V-155

1  A     And the date picker was not.

2  Q     That's right.  Well, from your perspective.  The -- the

3  Day patent technologies, Professor Mnookin, you feel that

4  Microsoft shouldn't have paid over $5,000,000 for it because

5  it is something that consumers would be -- would not care

6  one way or the other about, is that fair?

7  A     I think -- no, I don't think that is fair.

8  Q     Okay.  So you do think that consumers like the Day

9  patent technology?

10 A     No.  I think that there may be some consumers who, in

11 fact, find the date picker a neat little feature and might

12 like it.

13 Q     Right, but you think Microsoft wouldn't pay over

14 $5,000,000 because most consumers out there wouldn't care?

15 A     Because I do not think Microsoft would lose revenues

16 and profits if it were removed.

17 Q     Okay.

18 A     Indeed, the reason, in fact, I think it wouldn't be

19 fair and it wouldn't be reasonable for Lucent to be paid

20 $31,200, is because, in fact, it's yet another added way --

21 it's cumulative to, in fact, enter a date.

22 Q     Now, Professor Mnookin, is it your testimony as an

23 expert here that Microsoft would never pay $70,000,000 or

24 something above that for -- to have an invention in a

25 product, that invention being a very small feature of the

V-156

1 entire product and that invention being such that if it were

2 removed, consumers wouldn't care one way or the other?  Is

3 it your testimony that Microsoft would never pay over

4 $70,000,000 for something like that?

5 A    I could imagine circumstances, not the facts of this

6 case, in terms of the hypothetical negotiation where

7 Microsoft might pay a great deal more in terms of the

8 settlement of litigation.

9 Q    Okay.  And on the subject of settlement of litigation,

10 you understand that Microsoft was put on notice of this

11 lawsuit in January of 2003?

12 A    I understand that that's when, in fact, Lucent made its

13 claim, that's correct.

14 Q    You understand that Microsoft was on notice of

15 infringement as of that date?

16 A    I do understand that.  You used the word "suit."  I did

17 not know -- I don't think suit was brought as of that date.

18 Q    Right.  But you knew that -- but as of that date,

19 Microsoft was on notice of infringement, am I correct?

20 A    That is correct.

21 Q    And at the time, Microsoft had a choice, leave the

22 invention behind or proceed into litigation, correct?

23 A    At that time, Microsoft could have, had it wished,

24 removed the date picker.

25 Q    But it did not?

1 A    It did not.

2 Q    Instead, Microsoft took the risk, decided, made the

3 decision that it would instead pay what it has paid to

4 defend itself, including people like you $950 an hour,

5 correct?

6 A    I am being paid $950 an hour, correct.

7 Q    And there are other experts in this case?

8 A    On both sides there are many experts and many many

9 lawyers.

10 Q    Lots of lawyers.  The litigation costs are not cheap,

11 are they, Professor Mnookin?

12 A    As a mediator, it pains me to see this.

13 Q    Well --

14 A    I assure you --

15 Q    -- that's how you make a living.

16 A    -- there are millions of dollars being spent by both

17 sides here.

18 Q    Well, that's how --

19 A    As a mediator, I want to say "Come on, guys, be

20 reasonable."

21 Q    Exactly.  Be reasonable.  And as a mediator, what you

22 say is don't litigate, be reasonable, right?

23 A    I try.

24 Q    Exactly.  One of the things you say to a party in

25 mediation and telling them to be reasonable, you say, "Look,

V-158

1  if you don't settle" --

2  A    It's going to cost you a lot of money.

3  Q    -- it's going to cost you a lot of money, and if you

4  don't settle, there's a risk of?

5  A    You could lose.

6  Q    You could lose.  That's an expense.  That's a potential

7  expense.

8  A    It's a risk.

9  Q    That's a risk.

10  A    And it's a risk, of course, for the license -- the

11  patent holder faces the risk that if you don't, in fact,

12  establish a reasonable royalty, the other side may resist,

13  and you're going to have to spend millions or a lot of money

14  as a point of finding it out, and there's a risk that you

15  may recover very very little.

16  Q    And if Microsoft -- in this negotiation Microsoft told

17  you, listen, we'd rather proceed, march on to litigation and

18  assume all of that cost and assume all of that risk, you'd

19  say, "Well, what for," wouldn't you?

20  A    What I --

21  Q    As a mediator?

22  A    No.

23  Q    You wouldn't say what for?

24  A    What I would say -- if I could explain.

25  Q    No, no.  My question is would you say what for?  Why

V-159

1  would you take that on?

2  A    I would ask why.

3  Q    Right.  And if Microsoft responded, "Well, we could

4  take the product out for $31,200 and nobody -- nobody in the

5  world would care, consumers wouldn't even know," what would

6  you tell Microsoft?

7  A    I would tell them --

8  Q    Let me rephrase the question.  You'd tell Microsoft,

9  "Excuse me.  You're being irrational.  Why take on all that

10 risk if the -- if taking this thing out causes you nothing?"

11 A    And if Microsoft told me --

12 Q    My question is would you tell them that?

13 A    No, I wouldn't tell them that.

14 Q    You wouldn't tell them that?

15 A    No.  I would tell them something different, which I'd

16 be glad to say.

17        MR. DAUCHOT:  All right.  With that I think I will

18 -- all right.  I have no further questions.  Thank you,

19 Professor Mnookin.

20        THE WITNESS:  Thank you.

21        MS. BROOKS:  Just a few, your Honor.

22                    REDIRECT EXAMINATION

23 BY MS. BROOKS:

24 Q    Professor Mnookin, we're back at the hypothetical

25 negotiation.  If Microsoft is saying to you "Lucent wants

V-160

1  $70,000,000 for the date picker.  That's crazy," what would

2  you say to them?

3  A     Well, in fact, what I was going to say earlier was that

4  if, in fact, Microsoft's reasons were that Lucent's demands

5  were unreasonable on the facts of this case, then to me this

6  can make sense.  These parties have a dispute about the

7  reasonable royalty.  That's what the jury's going to have to

8  decide.  If they had been able to agree, we wouldn't have

9  had the trial, but that's the reason it's happened, because

10 they haven't been able to agree.

11 Q     And in your experience as a mediator, Professor

12 Mnookin, just because Lucent could say to Microsoft at the

13 hypothetical negotiation "Pay us $70,000,000 or else," does

14 that mean that Microsoft should therefore have to capitulate

15 and pay it?

16 A     No.  I think a key thing to understand, as I understand

17 the hypothetical negotiation, this is between two

18 knowledgeable parties negotiating with free will.  And

19 although they, in fact, have to reach an agreement

20 ultimately, neither party can extort an unreasonable amount

21 or compel acceptance of an unreasonable amount.

22 Q     And is it still your opinion after everything you've

23 heard that if Lucent had a reasonable reservation value at

24 the hypothetical negotiation, would a resolution have been

25 reached and would we have avoided being here today?

V-161

1  A    In my opinion, yes.

2  Q    And what would that resolution have been?

3  A    It would be somewhere between $1,000,000 and

4  $5,000,000.

5         MS. BROOKS:  Thank you.

6         MR. DAUCHOT:  One point on recross, your Honor, if

7  I may.

8         THE COURT:  You may.

9                  RECROSS EXAMINATION

10  BY MR. DAUCHOT:

11  Q    Professor Mnookin, you mentioned the word "extortion."

12  The fact is Microsoft had the option of taking it out.

13  Didn't you hear Mr. Kennedy say that?

14  A    Microsoft had the opportunity of taking it out, that's

15  correct.

16         MR. DAUCHOT:  All right.  No further questions.

17         THE COURT:  Thank you.  Anything else?

18         MS. BROOKS:  No, your Honor.  Thank you.

19         THE COURT:  You may step down.

20         We'll take a short early afternoon recess.  I just

21  want to go over a couple of things with the lawyer, and then

22  is Microsoft -- other than -- there's no other live

23  witnesses, is that right?

24         MS. BROOKS:  That's correct, your Honor, and we

25  would -- after the interrogatories, we would rest.

V-162

1          THE COURT:  All right.  And then no other -- will

2   there be rebuttal?

3          MR. DAUCHOT:  No, your Honor.

4          THE COURT:  Okay.  So we'll take a short afternoon

5   recess.  We'll be -- we'll be in recess for 15 minutes.

6   Please remember the admonition I gave to you earlier.

7       (Jury exits courtroom.)

8          THE COURT:  We're outside the presence of the

9   jury.

10          I now have all of these interrogatories and

11   Lucent's complaint that it violates the 48-hour rule.

12   Apparently they didn't know until this morning.  Anyway --

13          MS. HEFFERNAN:  No, our objection is not that it

14   violates the 48-hour rule.  It's that infringement is a

15   decided issue.  The Court upheld the infringement verdict of

16   contributory infringement which requires actual knowledge of

17   infringement, and inducement of infringement.

18          On post-trial motions, Microsoft never raised this

19   new argument and waived it, never raised it on appeal.

20          THE COURT:  What new argument?

21          MS. HEFFERNAN:  That they didn't have knowledge

22   that the drop-down calendar tool in Outlook was a

23   "composition" tool until March of 2006, not raised at the

24   trial in 2008, not raised in post-trial briefing when they

25   were trying to overturn the verdict of contributory

V-163

1 infringement which requires actual knowledge, not raised on

2 appeal either.

3          THE COURT:  So earlier I didn't have the

4 interrogatories.  I only had one part which talked about the

5 keyboard.  But in the first set, Lucent's response to the

6 first set of interrogatories, it does say Microsoft Outlook

7 concurrently displays a predefined tool such as a calendar

8 associated with the field.  So the calendar was mentioned.

9          MS. HEFFERNAN:  That's exactly right, your Honor.

10          MS. BROOKS:  Indeed, your Honor.  It absolutely

11 was, and it's our position that it was not identified as

12 being a composition tool or the only composition tool, in

13 fact, until March of 2006.  Now --

14          THE COURT:  But where is the question that says

15 list each composition tool?

16          MS. BROOKS:  It isn't.  It's list every single

17 thing that you say that we do in order to infringe, and they

18 did.

19          THE COURT:  So what I'm going to do, having read

20 -- so you've got your first set, the second set, the

21 supplemental set, the seventh set.  I'm going to say on 403

22 grounds I think having read it and now see that they did

23 list the calendar tool in the answers to interrogatories, I

24 think that it's 403 to go into all of the interrogatories.

25 So you've got your issue, but I don't -- we were only doing

V-164

1   it for a remote reason as to why did you remove it.  You

2   have the testimony from Kennedy, which is testimony saying

3   we didn't.  But I don't think that the actual

4   interrogatories support your current view of it.  You'd have

5   to go through all of them and that because it was mentioned

6   and even the other one says composition tool such as a

7   keyboard when later it talks about a calendar.  It's -- so,

8   clearly, the drop-down calendar was referenced specifically

9   in the answers to interrogatories.  So I think unless you

10  can come up with a very short question and answer to read

11  all of this would be really 403 as to each claimed element,

12  identifying the documents, as to each means plus function

13  element.  And so I just think that we're getting kind of far

14  afield.

15          MS. BROOKS:  We will stand on our request, your

16  Honor, and we will also stand on the testimony as it has --

17          THE COURT:  And you can argue from the testimony.

18          MS. BROOKS:  Thank you very much, your Honor.

19          THE COURT:  And Lucent shouldn't say in argument,

20  "Well, you've seen no answers to interrogatories."

21          MS. HEFFERNAN:  Understood, your Honor.

22          MS. BROOKS:  Thank you.

23          THE COURT:  So I'll give these back, and then with

24  respect to the verdict form so that you would have some

25  knowledge about the verdict form prior to argument, I take

V-165

1 it that Microsoft wants to preserve its issue about the

2 notice for purposes of appeal.

3         MS. BROOKS:  Correct, your Honor, under <u>Global</u>

4 <u>Tech</u>.

5         THE COURT:  And so you have that, but we're not

6 going to separately ask them the date.  We determined the

7 date.  It's January 13, 2003.

8         Then on the verdict form proposals, you want to

9 reference the burden of proof in yours.

10         MS. BROOKS:  Yes, that's correct, your Honor.

11 Ours I believe reads what -- proposed is:

12         "What is the amount of total damages, if

13         any, that Lucent has shown by a

14         preponderance of the evidence are

15         adequate to compensate it for

16         infringement during the time period" --

17         It says now "you found in part one," but it would

18 be the specified time period of 2003 to 2006.

19         MS. HEFFERNAN:  Ms. Brooks, I'm sorry.  I missed

20 that.  Could you repeat that?

21         MS. BROOKS:  Sure.  It would be:

22         "What is the total amount of damages, if

23         any, that Lucent has shown by a

24         preponderance of the evidence are

25         adequate to compensate it for

V-166

1          infringement of the Day patent from

2          January 13th, 2003 to December 11,

3          2006."

4          While maintaining, of course, our Global Tech

5    argument.

6          MS. HEFFERNAN:  Does the Court wish to hear

7    Lucent's response on that or just should we go to our

8    proposed verdict?

9          THE COURT:  So combining -- do you object to a

10   lump sum?  What if we said "What is a reasonable royalty

11   that you find Lucent has proved by a preponderance of the

12   evidence for Microsoft's infringement from" -- I should get

13   a pencil so I can change it.

14         MS. HEFFERNAN:  Was there the word "lump sum" in

15   there?

16         THE COURT:  Do you care about lump sum or not?

17         MS. BROOKS:  No, we do not, your Honor.

18         THE COURT:  Okay.  You want the preponderance of

19   the evidence in there?

20         MS. BROOKS:  Correct.

21         THE COURT:  And I think that is appropriate, what

22   is the --

23         MS. HEFFERNAN:  And Lucent will just note for the

24   record its objection to that, but it's already in the

25   instructions.

1          THE COURT:  -- lump sum reasonable royalty that

2   you find Lucent has proved by a preponderance of the

3   evidence for Microsoft's infringement of the Day patent from

4   January 13, 2003 to December 11, 2006 for -- and then I put

5   Microsoft Outlook first because that's the main one,

6   Microsoft Money and then the Windows Mobile.

7          And are the versions that they have -- and then

8   they could come back -- do you want me to say what amount do

9   you put -- then it's like we do one, the lump sum first, and

10  then do you want to say what amount is for Outlook, what

11  amount is for this, and what amount is for that or do you

12  want me to wait until after they come back with a verdict?

13         MS. BROOKS:  We believe, your Honor, that the lump

14  sum, especially under our damages theory, we would be

15  getting an unrestricted license.  So we could put it in any

16  product going forward.

17         THE COURT:  So the concern the Federal Circuit had

18  is really not present by either side under the strategy of

19  this case?

20         MS. BROOKS:  Correct, your Honor.

21         THE COURT:  Okay.

22         MS. HEFFERNAN:  That's correct, your Honor.

23         THE COURT:  So why don't we type that out, and

24  then we'll show it to you, and then you can see it.

25         And then any -- I did give some supplemental jury

V-168

1  instructions as I did my final run-through.  Any objections?

2            MR. FLOREY:  Your Honor, no additional objections.

3            THE COURT:  Thank you.

4            MS. HEFFERNAN:  And, your Honor, just for Lucent's

5  part, we just restate the objections we already have made to

6  the Court regarding the instructions, including the filing

7  from three hours of this morning.  Did the Court see that

8  filing?  It was a request to issue the standard instruction

9  that damages need not be proven with mathematical precision.

10 Did the Court see that filing?

11           THE COURT:  Do you --

12           MS. HEFFERNAN:  I do have a copy.

13           THE COURT:  Can I see that?  I was trying to

14 monitor the docket at the wee hours in the morning, but I

15 guess I must have missed that one.

16           We kind of bombed on the Beach Boys, but we did

17 great on Stars and Stripes.

18           MS. HEFFERNAN:  And if you'd like to, your Honor,

19 at the bottom of page two sets forth the requested

20 instructions.

21           THE COURT:  Reasonable certainty does not require

22 proof of damages with mathematical precision.  That's

23 different than that sound economic principal.  So I think

24 that -- that one is appropriate.

25           MS. HEFFERNAN:  Thank you, your Honor.

V-169

1          MS. BROOKS:  Mr. Florey, may he address that, your

2   Honor?

3          THE COURT:  The party seeking damages has the

4   burden of proving damages by a preponderance of the evidence

5   and is entitled to all damages that can be proven with

6   reasonable certainty.  Reasonable certainty does not require

7   proof of damages with mathematical precision.

8          MR. FLOREY:  Your Honor, this language was not in

9   the Federal Bar -- Circuit Bar instruction.  I think it's

10  cumulative.  I think the instructions as they're written

11  certainly convey that concept.  At some point we have to

12  stop piling jury instructions on.

13         THE COURT:  I gave three for you today.

14         MS. HEFFERNAN:  Thank you, your Honor, for

15  noticing that.

16         MR. FLOREY:  Our objection is it's cumulative.

17         THE COURT:  On cumulative the Court overrules

18  that, and then the Court will then do that one.

19         Any others?  Was that the main one?

20         MS. HEFFERNAN:  The last -- the last instruction

21  we'd ask your Honor to read would be an additional language

22  on the apportionment instruction that the Court will be

23  giving which is basically the Westinghouse instruction.  You

24  see that on the bottom of page two:

25         "Lucent need not give evidence to

V-170

1           separate or apportion Microsoft's

2           profits if Microsoft made such

3           apportionment impossible."

4           THE COURT:  I'm not going to give that.  And then

5  you can have that as a -- so going back to some of the law,

6  if you remember, you made your motion for sanctions because

7  some of the documents were not produced earlier.  The Court

8  denied that, and I don't -- but now the parties do have all

9  of the documents.

10          So the jury's had a fair chance.  You've got two

11 different approaches.  Both sides are doing an apportionment

12 but factually disagree on the extent of the apportionment

13 and the numbers.  So I don't think that it's correct that

14 Microsoft has made it impossible.  They'd say the reason

15 they haven't studied it is because it's a very small

16 feature, so why should they study a small feature.

17          I don't think that there's anything to show that

18 they intentionally used bad faith in not doing it.  As to

19 the Johnson survey, it's their option whether they wish to

20 share that or not share that.

21          MS. HEFFERNAN:  And the last part we make -- and I

22 take your Honor's point there, but the last point is that

23 Mr. Sims relied on the way that Microsoft keeps its

24 financial information in the ordinary course of business,

25 and that's all he could rely on, and --

1          THE COURT:  Sure,

2          MS. HEFFERNAN:  -- that's part of the reason for

3    asking for the instruction, your Honor.

4          THE COURT:  I don't think that they've shown --

5    so, for example, have they -- I don't think this is the

6    case, but let's take one of those other little functions in

7    either PowerPoint or Word, the spell check, do they -- is

8    there something where in the profit and loss we can -- spell

9    check is helpful for many people -- that -- does Microsoft

10   track the profits associated with the spell check?  Probably

11   not.

12         If you could show that they did all of the other

13   small features and had profits and losses associated with

14   them but intentionally as of the date of notice, 2003, then

15   stopped doing it for the date picker, well, then you'd have

16   a different argument.  So you've got your objection.  The

17   Court declines that.

18         MS. HEFFERNAN:  Thank you, your Honor.

19         THE COURT:  Let me hand out the proposed special

20   verdict.  We will still need to add the signature of the

21   foreperson of the jury and the date on this.  There's a

22   space  Remember I talked about spell check.

23         MS. HEFFERNAN:  There's just one slight spacing

24   problem in the Outlook versions, and I don't know if the

25   Court wishes to change the article before lump sum

V-172

1  reasonable royalty from a to the.

2          THE COURT:  To the?

3          MS. HEFFERNAN:  Yes.

4          THE COURT:  Any objection to the?

5          MS. BROOKS:  No, your Honor.

6          THE COURT:  And then do you need all these Windows

7  Mobile, Pocket PC?  Is it all that and Windows Mobile 2003

8  and Windows Mobile 5?  Are those all of them?

9          MS. HEFFERNAN:  Yes, they're all the infringing

10 products.  And Mr. Sims considered all that in reaching his

11 analysis.

12         THE COURT:  Okay.  So beyond your request for

13 preserving your Global Tech on the date, any objection to

14 this?

15         MR. DENNING:  The only other thing, and maybe it's

16 just preserving the objection, but we also had if any in our

17 proposed instruction because there is case law supporting

18 the fact that a damages number can be zero from the jury in

19 a patent damages trial.  So we would propose what is the

20 lump sum royalty -- reasonable royalty, if any, that you

21 find Lucent has proved.

22         THE COURT:  I don't think even under -- so you're

23 saying $5,000,000.  So I'm not going to do that.

24         MR. DENNING:  Preserving that objection, your

25 Honor, we have no other suggestions.

V-173

1        THE COURT:  So we'll put the foreperson on there.

2   We'll make copies.  You'll have copies for argument, and

3   then in setting up your argument, how much time do you need,

4   five minutes or so?  Have you gone over the exhibits with my

5   court clerk?  Are we all set on those?

6        MS. BROOKS:  We actually have three more to move

7   to introduce, your Honor, before we formally rest.  Other

8   than that, everything --  I think we only moved in two

9   exhibits.  So --

10       THE COURT:  Okay.  So do you want to move your

11  three in now?

12       MS. BROOKS:  If we could, your Honor.  We would

13  move in Exhibit ANA.  That's the computer that has been

14  repeatedly used here in court.

15       THE COURT:  But the computer -- so the -- you want

16  the screenshots or what?

17       MS. BROOKS:  No.  We would move the computer

18  itself into evidence, your Honor.  As Lucent argued last

19  time, apparently there was a computer sent in with the jury

20  with the accused software on it.

21       THE COURT:  This -- I'm only going to use the

22  computer as a demonstrative.

23       MS. BROOKS:  We would also move, your Honor --

24       THE COURT:  I don't want them playing around with

25  the computer in the jury room.

V-174

1          MS. BROOKS:  Mr. Harris probably wouldn't like

2  that either, your Honor, but we felt like we should move it

3  into evidence since it had been discussed at such lengths.

4          We would also, your Honor, move in BGF.  That's

5  the actual software for Outlook 2003, and BGI, that's the

6  actual software for Office 2003.

7          THE COURT:  Those are received.

8          MS. BROOKS:  And, with that, your Honor, we would

9  rest, and we would -- Mr. Florey's written down in big red

10  letters that I am to --

11          THE COURT:  Make a motion?

12          MS. BROOKS:  -- make a motion to renew our motion

13  for judgment as a matter of law on all the points that we

14  have previously made and will also further brief.

15          THE COURT:  All right.  So -- and did you brief

16  that last -- did you submit your brief?

17          MR. DENNING:  We submitted our brief yesterday at

18  the close of Lucent's case, your Honor.  We did, and we'll

19  submit a supplemental brief renewing after our case.

20          THE COURT:  All right.  So the Court takes that

21  under submission.

22          MS. HEFFERNAN:  And Lucent did submit its

23  opposition in the wee hours of the morning, your Honor.

24  We're working around the clock.  We did our best.  They

25  filed theirs at 4:30 last night, and we put together our

V-175

1  opposition.  So it's on file.

2          THE COURT:  All right.  I do appreciate that, and

3  I'll hold those up and read them, and then I'll get you the

4  special verdict.

5          So do you just need about five minutes to group?

6          MR. DAUCHOT:  I'm ready to go when you are, your

7  Honor.

8          THE COURT:  You're ready to go?

9          MS. BROOKS:  We're ready, your Honor.

10          THE COURT:  Okay.  So does anybody need a quick

11  break or not?

12          MS. BROOKS:  Exactly.

13          THE COURT:  Okay.  A five-minute recess, and then

14  we'll be back for argument and the one more instruction that

15  we'll give you, the damages one.

16      (Proceedings recessed briefly.)

17      (Jury enters courtroom.)

18          THE COURT:  So both parties have now rested and

19  the evidence is finished, and so now it's their opportunity

20  to give you their final argument and then pull the evidence

21  together for you.

22          Because Lucent has the burden of proof, it goes

23  first.  Then Microsoft responds.  Then it has an opportunity

24  to address you one other time, and then we've been working

25  carefully with the lawyers on the instructions the Court

V-176

1  will give you, and I'll make copies of these instructions so

2  that you'll be able to read along with the Court as we go

3  when these instructions are done, and then the case will be

4  submitted to you for your decision.

5          THE COURT:  Mr. Dauchot.

6          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

7          MR. DAUCHOT:  Thank you, your Honor.

8          Well, members of the jury, we are nearing the end.

9  First and foremost, and I'm sure Microsoft will feel the

10  same way, thanks for your attention.  This has been an

11  extraordinarily attentive panel, and as lawyers and clients,

12  we certainly do appreciate that.

13          So, with respect to Lucent and everyone, thank

14  you, however the outcome comes.

15          And you have a tough job.  You know, we've been

16  talking about this hypothetical negotiation and back in 1996

17  and parties hammering it out back then and trying to figure

18  out what would they have valued this invention at, the Day

19  patent invention.

20          On top of that you have the Book of Wisdom, and

21  you have to reach a verdict.  Professor Mnookin mentioned,

22  you know, having the cardinals locked up it the Sistine

23  Chapel trying to come up with the next pope, and in some

24  respects, you know, you have to decide that as well.

25          So let me take a step back.  Where are we in these

V-177

1 proceedings?  The Court will instruct you that the Day

2 patent is valid, that is, it was properly issued by the

3 United States.  So that's not an issue.

4        And part of this case you did hear testimony about

5 prior products and the fact that calculators were out there,

6 onscreen calculators and the like and that and this.  Well,

7 the patent is valid.  That issue is done and over with.

8        The second point is the patent was infringed.

9 What that means is that the invention, as granted by the

10 government, specifically, Claims 19 and 21 of the Day patent

11 that were reviewed, is in the products that were found to

12 infringe.  We're talking about Outlook, which is sold as a

13 stand-alone product and as part of Office.  We're talking

14 about Money, and we're talking about Pocket PC.

15        Now, quick point on the notion that because the

16 relative damage amount for Money and for Pocket PC that

17 Lucent seeks is small compared to Outlook, that, you know,

18 the position that it means nothing that the invention was in

19 those products.  Well, we beg to differ.  It does mean

20 something, and it means something because, again, it shows

21 that this invention wasn't just worthy of being put in

22 Outlook but was, as well, put in other -- in other products,

23 all right.

24        Now, let's begin with the time line that we have.

25 Can you put the time line up.  We've scrambled today to put

V-178

1 some of this together.  This has gone a whole lot faster

2 than we thought.

3          Do you know where the time line is?  It's a Sims

4 demonstrative.

5          MS. BROOKS:  If it would help, I believe it's RS5.

6          MR. DAUCHOT:  Thanks, Ms. Brooks.

7          MS. BROOKS:  You're welcome.

8          MR. DAUCHOT:  Okay.  Here we go.

9          What do we have?  Day patent issued in 1988.  1995

10 there was evidence of product development.  1996 the

11 infringement begins.  And, again, we're not claiming from

12 1996 on, right.  1996 Lucent spins off from AT&T.  2001,

13 Lucent acquires the patent, and in 2003, Lucent notifies

14 Microsoft of the infringement.

15          Now, on that issue the Court will instruct you

16 that Microsoft had notice of the infringement as of that

17 date, January 2003.  The period of damages that we are -- on

18 which we are seeking recovery extends through to the

19 expiration of the Day patent, and that happened the end of

20 2006.  So we're talking roughly four years.

21          Could I have slide three up, please, closing slide

22 three.  Thanks.  All right.  Again, what are we trying to

23 do, get back in '96.  The issue is what will Microsoft --

24 what would -- is Lucent going to receive for selling rights

25 to Microsoft to the Lucent patent -- the Day patent for

V-179

1  rights 2003 to 2006.  No issue in this case but that the

2  payment, this sort of payment would be a lump sum payment,

3  and that lump sum would be paid in 2003.  Why not 1996?

4  Because the license, given the damages period that we're

5  involved with, takes effect in 2003 but negotiated back in

6  1996, and that was the discounting factor that we spoke

7  about earlier.

8           All right.  Now, what are we trying to figure out

9  at this table?  Next slide, David.  Well, let me take a step

10 back.  Hypothetical negotiations, the parties assume -- in

11 fact, it is true here that the patent is valid and

12 infringed.  Full and complete information, the parties at

13 the hypothetical negotiation, they all have their cards up

14 on the table, right.  And they must reach an agreement.

15          And we also have the Book of Wisdom.  We talk

16 about how popular this product would be, how many people

17 would use it, et cetera, et cetera.  We can look to the

18 future and inform what the discussion back in 1996 would

19 have been. No issue about that, none.

20          As far as having all the cards on the table, we do

21 have all the cards on the table as far as we know them.  And

22 part of the evidence that you've hear is some cards we don't

23 know.

24          As you heard Professor Mnookin testify, he was

25 aware of a survey taken with an Outlook product that did not

V-180

1 include the date picker.  You heard Mr. Kennedy testify

2 about that, and the survey took place according to Professor

3 Mnookin.  We don't know the results.  They haven't been

4 disclosed.

5        All right.  Next slide, please.  Let's go back to

6 1996.  What are the parties trying to assess?  They're

7 trying to assess the value of the Day patent invention.  All

8 right.  Next slide, please.

9        Apportionment, a very big concept in this case

10 because the Court will instruct you -- and we have the

11 instruction up here for you -- that Lucent is only entitled

12 to the value of its invention.  Its invention rests within a

13 larger product, and we've heard testimony about that.  And

14 so what's key here is the value of the invention.  And, as I

15 walk you through the evidence, you're going to hear

16 Microsoft say that there was no apportionment.  We beg to

17 differ.

18        There's apportionment in two respects, and as I'll

19 show you, we'll get to that in a little while.  First of

20 all, when we came up with the $138,000,000 figure that Mr.

21 Sims testified to, that 138 takes into account just sales

22 lost because people who want that Day patent in there, in

23 the Outlook product, okay, because it's not going to be

24 there.  They're not going to buy the Outlook product, just

25 that portion, all right.

V-181

1          Point number two, the $67 per unit figure that was
2    used by Mr. Sims, that $67 value correlates to how Microsoft
3    values Outlook.  Namely, we have the Office Suite with all
4    of the products in it, and then we have the Office with
5    everything except Outlook.  That difference is the $67.  I
6    walked through that with Mr. Kennedy this morning, and I'll
7    touch on it again.

8          Next slide, please.  The Book of Wisdom, I touched
9    on that earlier, very important here.  Doctor Jay's survey,
10   the results are assumed to be on the table.  The popularity
11   of the Day patent technology, not just its pervasiveness in
12   the Microsoft product with its forms but as well its
13   popularity with respect to competitors like Lotus Notes and
14   its popularity with respect to what we see today, airline
15   sites, restaurant sites and the like, all right.  All of
16   that is part of the Book of Wisdom, and the parties are
17   considering that as they're negotiating the value of the Day
18   patent.

19         Next slide, please.  Outlook -- let's turn to
20   Outlook where we find the Day patent technology -- is a very
21   popular part of Office, and what do we have in that respect?
22   We have PX838.  Can you put that up, please, David.

23         Now, you heard Mr. Kennedy testify about that this
24   morning.  And can we go to page 10.  All right.  Outlook,
25   this is their own survey, Microsoft's own survey.  Outlook

1  is the most frequently used Office application by far.

2          Now, we heard all sorts of explanations from Mr.

3  Kennedy about what this really means and what this really

4  doesn't mean.  But do you remember when I cross examined Mr.

5  Kennedy and I asked Mr. Kennedy, "When you are explaining to

6  the jury what this really means and what the questions were

7  really to the people being asked questions, what they were

8  and what the results were, where's the data, where is the

9  data, Mr. Kennedy," he didn't have it.  Not only did he not

10 have it, but in providing this testimony to you all about

11 this document -- and, by the way, Microsoft has it.

12         In providing this data to you or in providing

13 these explanations to you, Mr. Kennedy did not even -- did

14 not even consult it on his own, just sat and explained it to

15 you without any support and telling you that the words

16 "Outlook is the most frequently used Office application by

17 far" aren't what they appear to be.  It's something else.

18         Well, Mr. Sims took the words as they are and the

19 information as they are.

20         What else do we know?  PowerPoint slide number

21 nine, please, David.  When we look at some of these forms,

22 you remember that we had a number of Microsoft witnesses

23 going around showing you how the Day patent technology --

24 how you could work around it and how if you turned to other

25 forms -- let's look at the new appointment form, form used

V-183

1   in the survey.  There's a reason it was used in the survey.
2   Microsoft's own documents explain that this is a high-impact
3   form, among others that use the Day patent technology.
4           Microsoft's own documents indicate that the forms
5   in which the Day patent technology sits are important.  Now,
6   are we saying there's only one way to work these forms out?
7   Are we saying that there's only one way to fill them in?
8   No.  We are not saying that.  We are not saying that.  There
9   are other ways to do it.  We agree.  But the Day patent
10  technology does -- does provide an easy fast, reliable way
11  to do it that consumers like.  In other words, it has value.
12          Next slide, please.  We have the information about
13  the testimony about the Gantt chart.  Remember that?  With
14  the slider, that type of thing.  And so what we heard from
15  Microsoft witnesses, well, you know, the slider is a whole
16  lot easier.  You just as soon slide up 15, 16, 17, 18 days
17  using the slider.  We'd just as soon go about it that way
18  than using the drop-down calendar and just dropping in the
19  date.
20          Well, that's what the Microsoft witnesses are
21  saying to you.  These are people who work for Microsoft and
22  who appear here in court to testify on behalf of Microsoft.
23          But what do the consumers say?  We have
24  Plaintiff's Exhibit 963.  These aren't our words.  These are
25  consumers' words in evidence saying "Look, we prefer the

V-184

1  date picker to the Gantt chart."  And this is while
2  Microsoft was working with this thing in development.
3          Now, then we hear things like, you know, Mr.
4  Harris who I'm sure is a good man, he is, but, you know,
5  saying, "Well, I don't believe that consumers prefer the
6  date picker to the -- you know, to other ways to do it,
7  including the Gantt chart.  I don't believe that."  And the
8  statement was something to the effect, you know, it's
9  illogical.  If cars had wings, cars would fly or something
10 like that.  It's illogical.  Why would people prefer a date
11 picker to typing in?
12         Well, Mr. Harris, where's the data?  Where's the
13 data?  Ms. Heffernan was asking him, where's the data?
14 "There's no data.  Take my word for it, it's my experience."
15         Well, here's some data that suggests otherwise.
16 Next slide, please.  The drop-down calendar itself in some
17 of these Microsoft studies is called out where consumers
18 say, "Hey, I like the date picker.  I like the drop-down
19 calendar."  Well, you know, it's one person out of -- no.
20 It's one out of six or seven in this particular case, and
21 there were some others that we showed you.  I mean, it is
22 not a trivial thing.  People notice it.  People notice it.
23 That's what Doctor Jay's survey indicated to you.  We'll get
24 to that in a second.
25         Next slide, please.  Remember we had the

V-185

1  publication, the outside publication commenting on the -- I

2  think that this was Money.  And I can't see the exhibit

3  number.  What exhibit number is that, 1883.  And this is

4  like a professional journal sizing these products up, and

5  they even notice the pop-up calculator in Calendar.  I mean,

6  it's not a thesaurus.  It's not a thing this thick.  It's

7  actually a very small article.  They're professionals sizing

8  the product up, and they point it out.

9          Trivial?  Well, if it's so trivial, why do they

10  notice it?  Next slide, please.  Several of Microsoft

11  Money's improvements are grabbed from its biggest

12  competitor.  Microsoft 97 now offers a pop-up calendar and

13  calculator during transaction entry.  Next slide, please.

14          And it really is pervasive in Outlook,

15  particularly in the Calendar module.  If it's there in all

16  these forms, it's there for a reason.  Worthless?  It's

17  there for a reason, because people like it.  Next slide,

18  please.

19          Mr. Tognazzini was on the stand pointing out where

20  this technology can be found in the forms.  Next slide,

21  please.  Lotus Notes, a competitor, uses it.  Mr. Tognazzini

22  testified to that.  And, by the way, you did see the

23  evidence that Outlook was created competition with Lotus

24  Notes.  Next slide, please, and the next slide.  Next slide,

25  please, and the next slide.

V-186

1       And then we have these companies out here.  David,
2  why don't you just scroll through them.  Do you recognize
3  it?  We all do.  We use it in our daily lives.  This is
4  popular technology.  This is the form entry system that Mr.
5  Gillon came up with, along with the co-inventors.  Next
6  slide.  Keep going, David.
7       Now, before I get to the testimony of Mr. Gillon,
8  there was a point made about Lucent's licensing and how it
9  goes about licensing the Day patent.  Not a penny -- it's
10 interesting during the trial, when you heard about this,
11 about our licensing, it was always carefully worded, and the
12 question was have you ever received a dollar for an
13 individual license to the Day patent, always couched that
14 way.
15      Well, Lucent, like many other major companies of
16 its nature, tend to get into these cross-licensing
17 transactions as you've heard, and these cross-licensing
18 transactions involve exchanges of a whole many patents.  And
19 the Day patent was in a number of those transactions, and
20 you saw two of them, the Acer and the Locus agreement, and
21 I'll get to that in a second.
22      But let's talk about Mr. Gillon.  When we try to
23 assess the value of the invention, remember Mr. Gillon?  He
24 came in to testify.  Not a Lucent employee. He's on his own.
25 He came in from Oregon, though I don't think that's where he

V-187

1  lives.  And it was important for him to come down.  Now,
2  sure, was it important for Mr. Kennedy to be here as well?
3  Yes, it is important for Mr. Kennedy, but there's a
4  difference.  Mr. Gillon has nothing to do with Lucent
5  anymore.  He's just here talking about his invention.  And
6  what did Mr. Gillon say to you?  That the project took a
7  number of years.  It took much effort.  This wasn't
8  something that they came up with on a moment's notice, and
9  that invention is new.  That has been adjudged by the Court.
10 The Government granted it, and it was deemed valid.  Next
11 slide, please.  Next slide.
12         We put a lot of effort into the product, and Bell
13 Labs put a lot of investment into this.  And so that's where
14 we get to Lucent's licensing policy.  We heard Professor
15 Mnookin take the position that, well, at this hypothetical
16 negotiation Lucent would have, you know, been happy to deal
17 with a company as big as Microsoft, a company as big as
18 Microsoft.  That's what he said.  There are all sorts of
19 advantages in dealing with a big company like Microsoft.
20         Well, all due respect to Professor Mnookin,
21 Microsoft isn't the only big company with which Lucent does
22 business, and Lucent has licensed its patents.  It's
23 licensing policy applies to dealings with big companies, and
24 the licensing policy provides that you just don't give away
25 your intellectual property for free or virtually free,

V-188

1 because what happens?  You start doing that, you devalue the

2 portfolio.  You send a message out there that your patents,

3 people are free to infringe them.  We're not going to ask a

4 whole lot for them.  The policy is there to preserve the

5 integrity of the portfolio, and the policy was one to five

6 percent over the base, the base, the smallest commercially

7 sold product in which the invention rests.

8        That policy here -- and we're talking about the

9 base, the smallest commercially sold product in which the

10 Day patent technology rests, is Outlook.  We have money in

11 Pocket PC as well.

12        Next slide.  Now, let's talk a little bit about

13 the witnesses from whom we've heard in addition to Mr.

14 Gillon.  We heard from Mr. Tognazzini.  Bruce Tognazzini is

15 an expert in the area of human to computer interaction.  As

16 you heard him say, it is a specialized field.  He has lived

17 his life in that field, right.  He was hired by Apple just

18 in that field.

19        What's the field about?  The field is about making

20 it easier for human beings to work with the computer.  Now,

21 particularly in form-based programs where you're dealing

22 with forms, it is important, and you heard Mr. Tognazzini

23 say that, critically important that the user experience

24 provide intuition, that it be an intuitive experience, that

25 it be fast, that it be accurate.

V-189

1          And so when we speak about the thousands of
2   features in Outlook and the thousands of features elsewhere,
3   let us not forget that this invention is where the rubber
4   hits the road.  It's at the point of interface.  It is the
5   thing that a consumer seeks.  It is a thing that a consumer
6   works with as the consumer is really accessing the power
7   that the program provides.
8          Now, again, are we saying that the Day patent
9   technology is responsible for all of it?  No.  No.  We're
10  not.  But it is not trivial.  Next slide, please.
11          Now, Mr. Kennedy's position is, well, it's just a
12  few lines of code compared to the rest.  Well, what does
13  that really say?  And you heard Mr. Tognazzini's response.
14  Next slide.
15          From the perspective of the effort to remove it,
16  not much, but the issue is the ramification.  What happens
17  if you pull that drop-down out?  Are people going to notice
18  it?  Are people going to like the product less?  Well, we
19  have two sources of evidence at least if you look at the
20  hard data.  We had Doctor Jay's evidence, and we had another
21  survey that was undertaken with the date picker actually
22  taken out of Outlook.  We don't know the results.  Next
23  slide please.  Dave, next slide.
24          Okay.  On to Deborah Jay.  This is the survey that
25  we do know about, the survey that was undertaken by one of

*Echo Reporting, Inc.*

V-190

1 Lucent's experts and the results of which were shared with
2 you.  Doctor Jay is a -- is qualified, and that is probably
3 understating it.  You heard her explain to you her
4 qualifications.  Her qualifications are impressive.  In
5 fact, they're so impressive, so impressive -- can you turn
6 to slide 46, please -- that the law firm of Fish and
7 Richardson Microsoft hired called up Doctor Jay and asked
8 her if she could work on their behalf in this case.  She
9 didn't because she was working with us.  She had already
10 been engaged to create a survey for the presentation here at
11 trial.
12         Now, one of the things that Doctor Jay did say, do
13 you remember this, she was asked "Do you critique other
14 surveys?  Do you always critique them?"  And she says,
15 "Well, I only critique them when I've tried to do a survey
16 like that on my own."  You remember that testimony?  And she
17 explained "The reason I hold back criticism until I've tried
18 to do it myself is because the process of doing it yourself,
19 a particular survey where you're trying to get certain
20 information, that process informs the criticism."
21         Now, we've heard plenty, plenty of criticism about
22 Doctor Jay and about her survey.  And I shouldn't say about
23 Doctor Jay.  No one in this courtroom criticized Doctor Jay.
24 Criticized her survey, but plenty of criticisms about Doctor
25 Jay's survey and you should have asked this and you should

V-191

1 have asked that and why didn't you ask this and why didn't

2 you do this and why didn't you do that and why didn't you do

3 this.  Does anybody in this courtroom really believe --

4 really believe that anything would have been satisfactory to

5 Microsoft unless the results were what Microsoft would like

6 them to be?

7 And we hear plenty of criticism from this side of

8 the courtroom, but where is their own survey?  We know that

9 one was taken.  We don't have the results.  We know that

10 Microsoft hired a survey expert by the name of Phil Johnson.

11 You heard Professor Mnookin testify about that.  Where's Mr.

12 Johnson?  We haven't heard from Mr. Johnson.

13 The attacks on Doctor Jay's survey come from the

14 lawyers.  Now, Lucent didn't bring lawyers in.  We have

15 lawyers here.  Fair enough.  But, you know, you don't have

16 the lawyers here providing you opinions about what these

17 things mean and don't mean.  We had Doctor Jay on the stand

18 to do that for a long time because it was a thorough survey.

19 But what we brought you through Doctor Jay were

20 1187 people who were surveyed.  They're neutral.  They don't

21 have a stake in this game.  It's not a game, but you know

22 what I mean.  They're the neutrals.

23 And so what do we see from the neutrals?  Next

24 slide please.  Keep going through here.  Let me work back a

25 second before I go there.  Go back to 30, Dave.  There you

1  go.  Next slide.  Next slide.  And there's a question about

2  whether or not she loaded up her survey question so that she

3  could get favorable answers, and the answer was absolutely

4  not, and that question came from us after her cross

5  examination.  Next slide.

6          What do we know from the neutrals that Doctor Jay

7  brought into this courtroom?  Seventy-seven percent of the

8  people who've entered the date of an appointment using the

9  Calendar feature, the Calendar suite in Microsoft Outlook,

10 77 percent of them used the Day patent technology.  Next

11 slide.

12         Fifty-nine percent of them use it very frequently,

13 most often, to be precise.  Next slide.  Fifty-eight percent

14 of them prefer using the calendar tool as opposed to typing.

15 What's the response we get from Microsoft?  Based on my

16 experience, don't believe it.  Based on my experience, don't

17 believe it.  Well, where's the data?  Trust my experience.

18 I've been at this a long time, and based on my experience,

19 don't believe it.  Cars with wings fly or something like

20 that.  I forgot what the line was.  Next slide.

21         Now, what else does Microsoft have to answer the

22 question?  It's SQM data.  And you heard testimony about the

23 SQM data, the fact that Microsoft can if it wants to track

24 the information, how often do people use it.  It's

25 available.  Next slide.

V-193

1          And it's something that only Microsoft can do.
2   "Mr. Kennedy, that's something that only Microsoft can do,
3   correct?"  "Yes, indeed."  Next slide.
4          And there's no technical reason, no technical
5   reason why we couldn't have done that.  We had invested the
6   resources to be able to do that.  Now, you'll hear, I
7   suspect, "Hey, it's not our burden of proof.  We infringe.
8   We infringe.  We keep it in, despite requests to take it
9   out.  We go into court, and we say your burden of proof."
10  They're right.  It is our burden of proof, and we're working
11  with the information that we have, but when Microsoft says
12  that this stuff is stuff that people don't care about,
13  common sense would suggest that if Microsoft knew what this
14  sort of information would show and Microsoft believed that
15  it would be helpful, common sense, which, by the way, you
16  are free to bring with you in the jury deliberation room,
17  common sense tells you maybe Microsoft knows something.
18  Maybe there's something they don't want us to know.  Where's
19  the data, Microsoft, when you tell us this is worthless?
20  Where is your data?
21          Next slide, please.  And we heard others talk
22  about SQM as well.  Next slide.  Flip through it, Dave.
23  Next slide.  Next slide.  Again, plenty of testimony from
24  Microsoft.  People wouldn't have cared.  People -- where is
25  the data?  No data.  Trust me.  It's my experience.  Next

V-194

1  slide.

2         Do you recall the cross examination of Mr. Kennedy

3  here this morning?  It was uncomfortable.  I was

4  uncomfortable when we're asking -- when I'm asking Mr.

5  Kennedy about testimony he gave a week ago, about his group

6  creating an Outlook module, an Outlook thing without the

7  date picker in it for testing purposes.  That was the

8  testimony.  Where are the results?  We don't know.  One

9  party in this room does.  Microsoft.

10         Next slide.  Keep going.  Keep going.  All right.

11  Now, let me flip back or let me flip up to slide -- here we

12  go -- 48.  Brings us to Mr. Sims.  Now, Mr. Sims has worked

13  on this case for many many months.  He testified to that.

14  Plenty of calculations, a ton of work, a ton of analysis.

15  Remember the slide we had up just to go through everything

16  that Mr. Sims went through, he and his team went through for

17  purposes of analysis in this case?  A ton of work over a lot

18  of time, work that in a matter of less than 48 hours,

19  assuming some sleep and teaching responsibilities, Professor

20  Mnookin dismissed.  He signed the report on November 12,

21  2010 saying Microsoft no more than $5,000,000 and come in

22  here to testify about the number.

23         Mr. Sims is not a lawyer.  And Mr. Sims is not a

24  contract professor at Harvard.  And Mr. Sims does not teach

25  mediation.  What Mr. Sims is is an expert at intellectual

V-195

1   property valuation and financial analysis.  And you've only

2   heard from one such individual in this courtroom, and that's

3   Mr. Sims.  Yes, does Professor Mnookin have experience that

4   Mr. Sims does not?  Of course, he does.  Professor Mnookin

5   is a distinguished teacher and a distinguished mediator.

6   But when it comes to financial analysis, when it comes to

7   looking at the numbers, working through them and trying to

8   come up with a reliable figure, the only person with the

9   professional qualifications to do that presented in this

10  courtroom was Mr. Sims.  You've heard from no one else.

11          Did we stop Microsoft from bringing someone else

12  into the courtroom?  No.  You heard from lawyers, all

13  lawyers really but no one on Mr. Sims' qualifications.  Next

14  slide.

15          Now, you remember the $168,000,000 that Mr. Sims

16  calculated, and that figure discounted, if you will, back to

17  2003, amounted to roughly $138,000,000.  There are two

18  principal challenges that Microsoft -- Microsoft's lawyers

19  addressed here.  The first one was the three percent figure,

20  right.  So let's look at the three percent and what happened

21  with the three percent.  Next slide.

22          The Microsoft lawyer challenge to the three

23  percent -- and, by the way, the three percent that Doctor

24  Jay -- Doctor Jay said was appropriate was that 27 --

25  Microsoft's position, 27 out of 3,387 people said that they

1 would not acquire Outlook without the Day technology in it.

2 They said that amounts to .8 percent.  Remember the .8

3 percent figure that you have up there.

4        Well, that is not true.  That is funny math.  I'm

5 sure we'll be accused of it as well.  But 27 out of 3,387

6 wasn't it.  It was 27 out of 384 purchase decision makers

7 who were asked the question.  That amounted to seven.  Seven

8 applied to the whole gets you to three.  How did we get from

9 seven to three?  Mr. Sims walked you through it step by

10 step.  Next slide, please.

11        Out of the total of 43 who use the drop-down

12 calendar module to enter a new appointment, three of the

13 decision makers would have said no.  That's seven percent,

14 three.  Next slide.  Apply three to the whole -- go back one

15 slide, please.  If you apply three to the whole, you get

16 three out of 100.  That's three percent.  Members, he walked

17 through it slide by slide.

18        Next slide.  Seven percent of 43 percent is three

19 percent.  That's how Doctor Jay explained it.  Next slide.

20 Now, what about the $67?  Okay.  By the way, the application

21 of the three percent, that's apportionment.  A hundred

22 percent is unapportioned.  The $138,000,000 figure only

23 reflects money lost based on the three who said without the

24 Day patent technology in it we're not buying.  That's

25 apportionment, but there's more apportionment.  The $67

V-197

1 figure, most of the Outlook is bundled in Office.  Three

2 percent of the purchasers would not buy Outlook without the

3 Day patent technology in it.  So what's the loss to

4 Microsoft?  Mr. Sims repeatedly explained to you that the

5 fact that Outlook is bundled in Office is of no moment.

6 Why?  The loss is you take Office with Outlook, right, these

7 are the people who like Outlook just the way it is, and you

8 deduct from that revenue from Office without Outlook, right,

9 because presumably those who don't like Outlook without the

10 date picker will get Office without it, and they'll go find

11 a competitive product to Outlook.

12          That difference he said was $67.  He multiplied

13 $67 by three percent.  And, by the way, that $67 is the

14 value of Outlook.  But you multiply it by three percent,

15 that's apportionment.  We're not taking all of the $67.  The

16 $138,000,000 is an apportionment.  That's the three percent

17 applied to it.  You take that of all licenses to Outlook and

18 you get to $138,000,000.

19          Now, let me explain how -- next slide -- the $67

20 works in.  Remember this morning when I walked Mr. Kennedy

21 through and he testified in direct examination that there

22 was no correlation between Office with Outlook, okay, Office

23 without Outlook in it, and the individual price of Outlook.

24 He said Outlook as it is individually priced has nothing to

25 do with the relative value of the whole Office with Outlook

V-198

1  in it and Office without Outlook in it.

2          And so we have the exhibit.  What was the number

3  of the exhibit again, 1895. We had Exhibit 1895, which was

4  the Web thing we saw with the Microsoft 2010.  I'm sorry,

5  the Office 2010.  And remember what we saw.  Can you put it

6  up there real quickly, PX -- there we go.  Remember, $279.99

7  with Outlook, $149.99 without Outlook.  That difference was

8  $130, the difference between with and without.  And then go

9  down, Dave.  What's the individual price, $139.99.

10          That's correlation.  That is exactly what Mr. Sims

11  assumed.  Now, is this 2010?  Yes.  But we can use these

12  figures to see how Microsoft goes about valuing Outlook.

13  That is part of the Book of Wisdom.  Now, next slide.

14          All right.  So what Mr. Sims did with the $67

15  figure is the $67 was the value of stand-alone Outlook,

16  okay, between 2003 and 2006.  Now, how did he calculate the

17  value of stand-alone Outlook?  He took Microsoft's record,

18  all stand-alone revenue.  He divided by all stand-alone

19  licenses, and he came up with $67, and he said "Given what

20  we know about Microsoft pricing Office with Outlook and

21  Office without Outlook, that $67 tracks the difference.

22  That's why $67 was used."

23          And, by the way, this is the best financial

24  information when you look at actual tracking of revenue.

25  That is about as good as we can do.  Now, we can have

V-199

1 lawyers come up.  If we take the $67 and try to come up with

2 other figures, we can't, but those are not Microsoft's

3 internal documents.  Next slide.

4          So what does Mr. Sims conclude?  Given that, given

5 that Microsoft stood to lose that much, assuming you accept

6 Doctor Jay's survey -- by the way, you don't have to.  You

7 can be critical of it.  You should be critical of it, not in

8 the sense that you should think negatively of it but study

9 it, weigh it, consider it.  Does this hold up?  What else do

10 we have?  All right.  And there was other testimony that Mr.

11 Sims -- and evidence that Mr. Sims considered, including the

12 licensing policy and its effect on the negotiations, the

13 fact that Lucent negotiators don't come into the negotiation

14 table prepared to give up IP for free.  And there were other

15 factors that Mr. Sims walked through, qualitative and

16 quantitative.

17          Members of the jury, think about all of the

18 effort, all of the effort that has gone into presenting you

19 with these calculations, Doctor Jay's survey, Mr.

20 Tognazzini's analysis, document upon document, hours after

21 hours, analysis after analysis, because we're working in a

22 hypothetical world where we need to recreate the

23 negotiation.  And what do we get from Microsoft?  We get

24 from Microsoft lawyer argument -- I'm arguing here to, yes

25 -- but lawyer argument during the trial, lawyer argument, a

V-200

1  ton of it, and witnesses saying, "Hey, based on my belief,

2  based on my thinking, this is what it would have been."

3  Where is the data?  Where is the data?  There's no data.

4  Yes, there is data.  They have it.  We're just not seeing

5  it.

6          And ask yourself one final question, and I asked

7  this question at the beginning of the trial.  If, in fact,

8  this technology is worthless and if, in fact, it would have

9  cost them nothing, virtually nothing to remove it, why put

10 yourself through this?  Why take the risk?  Why take the

11 expense of litigation if, in fact, this technology is worth

12 zero?  We submit that Microsoft knows full well that it's

13 worth plenty.

14          Actions speak louder than words.  Members of the

15 jury, with that I'll stop for now.  Given that we have the

16 burden of proof in this case, I'll get a chance to stand up

17 and address some of the remarks that Ms. Brooks makes on

18 behalf of Microsoft.

19          Thank you.

20          MS. BROOKS:  Thank you, your Honor.  May I

21 proceed?

22          THE COURT:  You may.

23          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

24          MS. BROOKS:  Good afternoon.  I believe that Mr.

25 Dauchot just said it all.  Actions speak louder than words,

V-201

1  and he asked you the critical question in this case.  If,

2  indeed, the date picker is of such little value, why not

3  have taken it out in 1996.  And, Mr. Ng, if you could pull

4  up RS5, please.

5           Actions speak louder than words.  This says it

6  all.  Why did Microsoft not remove the date picker in 1996

7  before it launched Outlook?  Because Lucent never came to

8  Microsoft in 1996.  And if actions speak louder than words,

9  why -- now, Lucent didn't have the Day patent yet, but AT&T

10 did.  Why didn't AT&T come to Microsoft in 1996 if they

11 believed they were hanging onto a patent that was so

12 valuable it was where, according to Lucent, the rubber met

13 the road?  Why?  Because they didn't believe that for a

14 second.

15          Why didn't they come in '97, '98, '99, all the way

16 up to 2003?  Why?  Because they didn't believe for a second

17 that this was a patent worth, frankly, anything.  So why

18 come then in 2003?  We heard it from Mr. Sims, and we heard

19 it from the deposition clip that was played before Mr. Sims.

20 Remember the gentleman, and I can't remember his name.  He

21 was asked about how would Lucent like its -- its licensing,

22 and he said cash on the barrel, cash up front, that's what

23 we want.  And then when I was asking Mr. Sims about that, I

24 said, "And that started, that policy of cash up front

25 started in 2003 when Lucent began its drive for cash," and

V-202

1  he agreed.  Lucent instituted a program because their bottom

2  line didn't look good enough to take whatever patents they

3  had, dig through the files, dust them off, break them out.

4  Doesn't matter if they issued almost 20 years ago.  They

5  haven't expired yet, and go out and find the biggest

6  software company in the world and see if you can't figure

7  out a way to accuse them of infringement, and then try to

8  get tens of millions of dollars out of them for a feature

9  that is one of tens of thousands.  Now, Mr. Ng, if we could

10  go back and start with MDX601.

11          So what did Lucent bring us?  What was the first

12  thing we heard in this trial?  We heard about the invention

13  of the telephone.  We heard about the invention of the

14  laser.  We heard about the invention I think of the Sputnik

15  or the satellites.  We heard about the invention of HDTV.

16  If we go to the next slide, we heard about the invention of

17  binary computers and talking computers and C code and C plus

18  plus code.  This was all Bell Laboratories.  This had

19  nothing to do with Lucent.

20          If, indeed, this invention was so valuable, why

21  isn't that the very first thing that Lucent would tell you

22  about?  Why did we need to spend an hour learning about

23  Alexander Graham Bell and the telephone?  Actions speak

24  louder than words.  Lucent's counsel is right.  They didn't

25  want you to look at the patent.  They didn't want you to

V-203

1   look at the issues.  They wanted you to look at everything

2   but that because if you did look at it, you would finally do

3   what we've been asking Lucent to do for all these years.

4   You would finally tell them to be reasonable.

5           So what happened?  Lucent does come to Microsoft

6   in 2003, and they say "Microsoft, you're infringing."

7   Microsoft says, "How do you say that?  This patent's been

8   issued since 1988.  Our product's been on the market since

9   1996.  Why in 2003 are you saying this and how are we

10  infringing?"

11          And Lucent gave them all sorts of explanations,

12  and Mr. Kennedy told you about it.  I'm going to talk about

13  it in a few minutes, but I'll tell you what they didn't say

14  in 2003.  They didn't say that the date picker was the

15  composition tool in the Day patent and that all you needed

16  to do was remove it and you wouldn't be infringing

17  Microsoft.

18          MR. DAUCHOT:  Your Honor, I object.  There's just

19  no evidence --

20          THE COURT:  Overruled.

21          MS. BROOKS:  They didn't say that, and you'll see

22  in just a moment testimony from Mr. Kennedy about that.  Why

23  didn't they say that?  Well, maybe Lucent will get up here

24  and explain it to us in the next period of time that he has

25  to talk to you.  But the bottom line is they didn't.

V-204

1            So Microsoft is approached in 2003, and they're

2   shown the Day patent.  And what is it that Microsoft knows?

3   If we could go to the next slide, Mr. Ng.  Well, Microsoft

4   knows that this can't be about just having a calculator on a

5   computer screen because our Windows 1.0 already has that.

6   This can't be about just having a calendar on a computer

7   screen.  Our Windows 1.0 already has that.  This can't be

8   just about menus of alternatives on a computer screen.  Our

9   Windows 1.0 already has that.

10           What is it that you have, Lucent, that is so

11  different from what we already have?  And if we can go

12  through the next few slides, we can see, there's the

13  calculator.  Here's another drop-down menu.  Here's a

14  calendar.  And here are yet more drop-down menus, all in

15  Windows 1.0.  So what is it that Microsoft -- and, actually,

16  we can just go through the next couple of slides, Mr. Ng.

17  Thank you.

18           What is it that Lucent is actually selling to

19  Microsoft that Microsoft doesn't already have?  It's right

20  here.  This is the deed to their property.  And what's

21  interesting is you didn't see this claim during Lucent's

22  closing, and you probably won't see it when they get back up

23  again.  Why?  Because this is a very very tiny piece of

24  property.  We must do each and every one of these things in

25  order to be on their property.  If it's missing just one

1  thing, then we're not on their property.  We don't infringe.

2  And so right here this whole case has come down to this.  In

3  order to be on their property, not only do we have to have

4  forms and fields and indicators and tools and menus of

5  alternatives, we could have all of those, but we also must

6  have a tool adapted to allow the user to compose

7  information, and the only tool in all of Outlook that Lucent

8  has accused finally now in 2006 is the date picker, and Mr.

9  Tognazzini admitted no date picker, no infringement.  So

10  it's all come down to what is the value of the date picker.

11        Now, who has to prove that to you?  If we can go

12  to the next slide, Mr. Ng.  What you're going to be asked to

13  do when you go into the jury room is you're going to be

14  asked to take the facts that you've already gotten and apply

15  them to the law that the Court will give you, and this is

16  you are to take all the Court's instructions together and

17  not single any particular one out, but there are a few I

18  would like to discuss with you right now.

19        Lucent has the burden to prove by a preponderance

20  of the evidence the amount of damages adequate to compensate

21  it for Microsoft's infringement.  When a party has the

22  burden of proof on any claim by a preponderance of the

23  evidence, it means you must be persuaded by the evidence

24  that the claim is more probably true than not true.  You

25  should base your decision on all of the evidence, regardless

V-206

1  of which party presented it.  Because Lucent has the burden

2  of proof, Microsoft is not obligated to put on any evidence

3  regarding what the amount of damages should be.

4         And so Lucent got up here and said to you "What

5  happened to Mr. Johnson, Microsoft's survey expert?"  The

6  answer is Doctor Jay was cross examined by Mr. Denning, and

7  there was utterly on need for Mr. Johnson after that.  What

8  happened to Mr. Marcus who was supposed to be the

9  counterpoint to Mr. Tognazzini?  The answer is Mr.

10 Tognazzini was cross examined by Mr. Denning and there was

11 utterly no need for Mr. Marcus.

12        And Lucent kept saying "Why no survey?"  The

13 answer is, number one, we have absolutely no burden to

14 present any evidence whatsoever.  But the second answer is

15 how duplicitous would it be of us to stand here, have Mr.

16 Harris tell you why he doesn't use surveys, why surveys just

17 show you how somebody filled out the survey and not how they

18 actually used the product, have us talk about the hindsight

19 bias in Doctor Jay's survey, how you can't adequately ask

20 someone in 2010 what they would have done in 2003 without

21 getting what's called hindsight bias.  We all say it, right,

22 hindsight is 20/20, Monday morning quarter backing.  How

23 duplicitous of us would it be if we should attack Doctor Jay

24 and her survey and then ask you to rely on a survey of our

25 own?  You would throw us out.  It would be ridiculous.  And

V-207

1  so we stand on the fact -- and I'm going to get to it in a

2  minute -- of all the things that are wrong with Lucent's

3  survey, and we stand on what Mr. Harris told you and Mr.

4  Kennedy told you and what your own common sense tell you

5  about how users really use this product, and when you go

6  into that jury room, you not only take the facts with you

7  and the law and the evidence, you do take your common sense.

8        And you may remember in voir dire I asked every

9  single person on the panel how many of you use Office.

10 Virtually everybody raised their hand.  I asked every single

11 person on the panel how many of you use Outlook.  About half

12 raised their hand.  I asked everybody of those that use

13 Outlook, how many of you use it to calendar.  About half of

14 the people who used Outlook used it to calendar.  And there

15 are as many people on the jury and in this courtroom,

16 including myself, who have a paper calendar who use Outlook

17 all the time.

18        You know that.  Lucent knows that.  Mr. Harris

19 knows that.  Mr. Kennedy knows that.  And the reason Doctor

20 Jay didn't know it is she doesn't even use Outlook.  They

21 hired someone to do a survey who doesn't even use the

22 product in question.  So why no survey from us?  Because it

23 would be absolutely and utterly duplicitous and a typical

24 lawyer talking out of both sides of their mouth if we attack

25 surveys on the one hand and then present our own on the

V-208

1  other.

2          So let's see what Lucent, the party with the

3  burden of proof, brought to us.  This is Lucent's opening

4  statement.  It began:

5          "All right.  Two questions that I want

6          to start off with, why are we here and

7          how did we get here?  Let's turn to the

8          first question, why are we here.  Well,

9          we're here because Microsoft took a

10         patented invention that belongs to

11         Lucent, put it in its products, didn't

12         pay for it, just took it, and when we

13         asked that it stop or pay for it, it

14         kept right on going."

15         Talk about lawyer argument that is absolutely

16 unsupported by the facts and, in fact, contradicted by the

17 facts.  What's the next thing we heard?  Well, what do you

18 do when you go into a store and you look at something that

19 you want to -- that you're thinking about buying and you

20 look at the price tag and you go "What?  That's way too

21 much."  Do you stick it in your pocket and walk out with it?

22 I don't think so.

23         Lucent accused Microsoft in opening statement of

24 literally going in, hearing that Lucent wanted $70,000,000

25 for the Day technology, saying "What?  That's crazy," and

V-209

1  stealing it, when you heard that Outlook had been in
2  development for three years before 1996, before it was ever
3  shipped and that the date picker had been in Schedule Plus
4  even before that, developed at Microsoft by Microsoft
5  developers.
6          Why make that kind of argument if you truly have a
7  valuable patent and you should just get down to the issue of
8  a reasonable royalty?
9          What did we hear next?
10         "So what does Professor Mnookin say?
11         Well, for the real, real low number,
12         well, Professor Mnookin will say 'Hey,
13         I've listened to the Microsoft people
14         say they could have used anything,
15         anything.  Lots of other ways to do it.
16         Okay.  We'll see if that's the case.'"
17         Why did they stick it in?  Well, because nobody
18  told us that we couldn't.  Why wasn't it pulled out in 2003?
19  Well, because the date picker wasn't accused of being a
20  composition tool at that point.  Why did it stay in until
21  2006 and beyond?  Because it wasn't found to be an
22  infringing composition tool until 2008, and by then the
23  patent had expired, and we had every right to leave it in.
24  So all of those questions are answered.
25         Lucent kept up the accusations.  When they called

*Echo Reporting, Inc.*

V-210

1  Mr. Kennedy to the witness stand in their case, they asked

2  Mr. Kennedy, "So if you had a desire to do that" -- it was

3  about the SQM data -- "you could have gathered some of that

4  data?"  "Oh, yes."  "Microsoft never sought to do anything

5  like that during this lawsuit?"  "That's correct."

6         It went on.  "Isn't it true that throughout the

7  course of this litigation Microsoft never removed the date

8  picker, and that's because I guess you believed you had a

9  right to keep it in, right?"  Mr. Kennedy, "In some sense,

10  yes."

11         Only when I got up was he allowed to explain why.

12  And here's what Mr. Kennedy told you.  "Now, if you wanted

13  to monitor what had been accused in 2003 of being in

14  Outlook, what would you have monitored?"  Mr. Kennedy,

15  "Well, we would not have monitored the date picker.  As it

16  was, it did not stand accused of being a composition tool.

17  Based on my understanding, we would have needed to monitor

18  the pop-ups onscreen keyboard that comes on top of Outlook

19  Windows that's not part of the Outlook product."  "It's not

20  even part of the Outlook product?"  "That's correct."  The

21  next slide.

22         "And, Mr. Kennedy, why didn't you pull it out,"

23  meaning the date picker, "in 2004?"  "My understanding is

24  that then it was not accused as a composition tool by

25  Lucent."  "Why didn't you pull it out in 2005?"  "It was

1 still not accused as a composition tool by Lucent."  "Why

2 didn't you pull it out as late as January of 2006?"  "My

3 understanding is that it was still not accused as a

4 composition tool."  And no one, no one will say otherwise.

5        Now, Lucent in this case, for you to believe

6 Lucent's case, you will have to believe that Mr. Kennedy got

7 up on that witness stand and did not tell you the truth

8 because that's what Lucent is implicitly saying.  You will

9 have to believe that Mr. Harris got up on that witness stand

10 and did not tell you the truth because that's what Lucent is

11 implicitly saying, and you will even have to believe that

12 Professor Mnookin got up on that witness stand and did not

13 tell you the truth, because that is what Lucent is

14 implicitly saying.

15        And I want to talk for just a moment about

16 Professor Mnookin and how he was treated by Lucent.  He was

17 asked, "Now, your first report, you had less than 48 hours

18 to digest all the information and put that report together,

19 assuming you went without sleep and assuming you didn't

20 teach classes, et cetera."  Professor Mnookin said, "Well,

21 I'm not sure if I got the reports of the other experts two

22 days before or it could have been as long as four days

23 before," but the bottom line is Professor Mnookin "Are you

24 asking if we were under a serious time crunch?  You bet."

25        And what did Professor Mnookin say he put in his

V-212

1 first report?  His first report commented on the concepts

2 behind negotiation.  What is the BATNA, the best alternative

3 to the negotiated agreement.  What is a reservation value?

4 What is a reasonable reservation value?  Professor Mnookin

5 didn't need two days to write that.  He didn't need 10

6 minutes to write it.  He spent his entire life teaching it.

7           "Well, but how can you decide whether Microsoft's

8 reservation value of no more than $5,000,000 is reasonable

9 in such a short period of time, Professor Mnookin?"  He

10 sizes up parties in 10 minutes as a mediator.  He walks into

11 the mediation room.  He hears what one party says.  He hears

12 what the other party says.  He hears their arguments, and

13 within 10 minutes, he knows which party is reasonable and

14 which party is not.  He knows which party is rational and

15 which party is not.  He doesn't need two days.  He doesn't

16 even need two hours.  But he did spend all of that time.  Do

17 you believe for a moment that he would get up here and take

18 a position he did not believe in?  And is there anything

19 you've heard in this courtroom that contradicts the position

20 that he did?  And that is Professor Mnookin.

21           And so what do we have?  Lucent comes to us in

22 2003.  They don't accuse the date picker of being the

23 composition tool right up front, but they do accuse us of

24 infringement, and they want $70,000,000 for it, and here we

25 are today in 2011 because we don't believe it's reasonable.

V-213

1  Here we are in this court of law, two big companies fighting

2  over money.

3          Well, there's a refreshing change.  That certainly

4  doesn't happen every day.  But, you know what?  This isn't

5  about the money?  This is actually about what's fair and

6  what's unfair.  This is about what is reasonable and what is

7  unreasonable.  This is about what is just and what is

8  unjust, and this is why we're here talking to you, why we

9  spent all this time, all this effort, all these resources to

10  come to this day to bring this issue to you, because despite

11  the best efforts of people like Professor Mnookin who try to

12  teach people to be reasonable, people to see what the

13  appropriate position should be, despite those best efforts,

14  there are irrational actors out there in the business world

15  with unreasonable demands, and so we have to stand our

16  ground, and we have to bring it to you, ladies and

17  gentlemen, to do something about it.

18          So how do we know that it's all come back to the

19  date picker?  Mr. Tognazzini admitted it.  What else did he

20  admit?  Let's go to the next slide.  This is Mr. Tognazzini

21  being cross examined by Mr. Denning.

22          "Q   So watch me if you would.  What I

23          do -- and tell me if I use the date

24          picker, all right?"

25          And Mr. Denning, he clicked here on the 26th,

V-214

1    dragged to the 28th, right clicked, hit new appointment.

2              "Q     That brings up the new

3              appointment form, and all these dates

4              are already entered, isn't that right?

5              A     That's correct.

6              Q     And I don't have to click all day

7              event because it's already an all day

8              event, is that right?

9              A     Yeah."

10             And, again, as long as you're already in the

11   calendar, what he's showing you is the most efficient way of

12   doing it.  And we went over and over and over again showing

13   you way after way after way of how to win an appointment

14   without ever using the date picker that was more efficient

15   than using the date picker, and I won't do it again.  I'm

16   sure you've been sick of seeing that computer and how to

17   enter the appointments, but you know it.  Your common sense

18   showed you.  Every -- this wasn't any trick.  This was no

19   parlor trick where I tried to -- Mr. Tognazzini, the 66th

20   person hired at Apple couldn't work the scroll bar.  He was

21   up there going, "Oh, my gosh, it's too far.  I went too far.

22   Oh, I've got to come back."  That scroll bar that was down

23   at the bottom on that one, that's the same scroll bar that's

24   on the side of every single pace that you ever look at on

25   your computer, and Mr. Tognazzini, the 66th employee of

V-215

1 Apple, couldn't work it.

2          But he had to admit when we showed him all the

3 ways to enter an appointment without using the date picker,

4 all of those non-infringing alternatives that were present

5 in Outlook in 1996, he had to admit that every way we showed

6 him was, in fact, more efficient.

7          So what did Lucent then say?  Well, we went

8 through Microsoft documents and literally Lucent's counsel

9 said to Mr. Sims, "Mr. Sims, did you -- did you prepare a

10 demonstrative to assist the jury in understanding your

11 testimony regarding your review of Microsoft's documents?"

12 "Yes, I did."  And he put this up there.

13          I thought we were going to actually see a

14 document, but instead we saw this, and out of all -- and

15 this is their slide.  I didn't alter it in any way.  And out

16 of all of these documents, this is what they brought us.  If

17 we can go to the next slide, please.  This is Exhibit 835.

18 This was a 1994 study when Outlook was still in beta

19 testing, and someone said I like the calendar's date pickers

20 entered in start 12/26 and do 12/30, and that's right in

21 Exhibit 835, and that's all they showed us.

22          Now it's an oldie but a goodie, Paul Harvey used

23 to say for the test of the story.  In that same document,

24 this is what was observed as early as 1994.  Most users will

25 view their calendar for availability and then double click

V-216

1  the calendar to enter an appointment.  That's the exact way
2  we showed all of you over and over again, right.  You go to
3  your calendar.  You see what your availability is.  You
4  double click.  That would pull up the new appointment form
5  with the date already entered.  You never touch the date
6  picker.  That's -- you want data?  That's data.  That's hard
7  data starting in 1994.  It's how users used it.  It's how
8  users used it in 2003, and it's how users use it today.  And
9  it goes on.  No, I'm sorry, if we stay back there, users
10 will double click at a time on the calendar when they want
11 the appointment to begin.  For example, if users want to
12 schedule an appointment for 8:00 to 9:00 a.m., they will
13 double click the 8:00 to 8:30 row in the calendar.  Double
14 clicking the appointment time may also be a common behavior
15 when users need to enter a 45-minute appointment time.
16          And now if we could go to the next slide, in the
17 very same document, a task, create appointments.  Five
18 subjects double clicked the calendar to enter an
19 appointment.  Subjects three, six, and seven selected the
20 time frame of the appointment and typed the description.
21 Double click, double click, double click.  You all know it.
22 For any of you that use Outlook Calendar, you know that's
23 how you enter your appointment is you either double click
24 and up comes the new appointment form with the date already
25 in there or you single click and you just type in the

V-217

1  subject and you're done.  You never use the date picker.

2          Now, Lucent keeps bringing up, "Well, we saw

3  Orbitz and we saw Budget, and we saw Open Table, and that

4  date picker's in all of those."

5          Well, first let's go back.  We had to hear from

6  Mr. Sims.  It took that long before it came out that no one,

7  not Budget, not Hertz, not National, not American, not

8  United, not any company in the world has taken a license

9  just to the Day patent, none of them.  And these big cross-

10 licenses Lucent's talking about, the Acer license -- the Day

11 patent Lucent didn't even have it to give when they entered

12 into that license, and the Locus license that supposedly the

13 Day patent is thrown in there, they've received zero revenue

14 for.

15         So the evidence before you is that not one company

16 ever in the history of the lifetime of the Day patent has

17 ever paid Lucent a dime for it, but they want $70,000,000 in

18 this courtroom today.  Why?  Because they say it is such a

19 popular technology.  Look, it's everywhere.

20         Now, we don't know why United never took a

21 license, Budget never took a license.  We don't know if it's

22 because Lucent never asked them or if they said "Get out of

23 here.  You're crazy."  We don't know.  We just know that

24 they didn't.

25         But what else do we know?  You know how you use

V-218

1 the date picker when you go to their sites?  You already

2 know your availability.  You know what day you want to fly

3 on.  You want to find out their availability.  That's why

4 you might use the date picker, but in your own calendar

5 you're going to use your calendar first to see your

6 availability, unless it's in your head.  Now, you may keep a

7 calendar in your head like Mr. Tognazzini said he did, but

8 if you do that, then you don't need the date picker either,

9 unless the date picker is the perfect tool for someone who

10 keeps their calendar in their head.  Other than that,

11 everybody else doesn't use the date picker.

12           So that's what we've come to here.  That is the

13 best that Lucent could bring to us.  Now if we could go to

14 the next slide, Mr. Ng.

15           The story goes on in the very same document.  When

16 users enter an appointment, they look at their calendar.

17 What a crazy idea.  They look at their calendar to check

18 their availability prior to creating the item.  When

19 scheduling a meeting, users appear to want to take a similar

20 approach.

21           However, it really doesn't matter what your common

22 sense tells you, and it really doesn't matter what this

23 tells you because the Jay survey shows otherwise.  So let's

24 go look at the Jay survey.

25           First of all, this is a quote from Doctor Jay.

V-219

1    She's talking about the kind of questions she asked.

2             "Q    So you chose to take some of the

3             words from Mr. Kennedy, used point and

4             click and type, but when it came to name

5             the feature, you decided to use drop-

6             down calendar rather than the words that

7             Mr. Kennedy used, date picker, correct?

8             A    Yes."

9             Now, this is in no way a disparagement upon Doctor

10   Jay.  She doesn't use Outlook.  She has no idea whether

11   users think of that little calendar as the date picker

12   because they use it to pick dates because she's never used

13   it, and I'm sure she really didn't think about the fact that

14   how confusing it might be to call the big thing the calendar

15   feature and the little feature the drop-down calendar, and

16   we'll never know how many people were confused by that

17   question.

18           It's not a fault of Doctor Jay's because she's not

19   an Outlook user, and so she didn't know that everybody

20   refers to the date picker that you use to pick the date as

21   the date picker.

22           Let's go to the next slide, if we could.  This is

23   another problem with the survey.  Her survey could only be

24   extrapolated back to Outlook users.  It can't go back to

25   Office users unless we know whether or not they use Outlook,

V-220

1   and she specifically didn't ask them whether they bought

2   Outlook as a part of Office or even preinstalled on the

3   computer.  Why not?  Because she never bought Outlook, and

4   she doesn't know that most people get it as a part of

5   Office.  We can go to the next slide.

6           And she didn't ask how many people would be

7   willing to pay for Outlook without the date picker.  "Did

8   you?"  "No."  Now if we can go to the next slide.  This is

9   the law that you're going to be told to apply to Doctor

10  Jay's survey.  You have been presented with evidence from a

11  consumer survey.  In assessing what weight, if any, to give

12  those survey results in your analysis, you may consider the

13  margins of error associated with those results together with

14  all the evidence you heard concerning the consumer survey.

15          This is the law that you will be asked to apply.

16  What's interesting is you never heard a word from Doctor Jay

17  on direct examination about the margins of error.  It was

18  only on cross examination that it came up, and here's what

19  came up.  Mr. Denning established that Doctor Jay had put a

20  question in there, "How many of you use Outlook's music

21  player to listen to music?"  Do you remember that?  And she

22  did that to detect guessing or noise, and 161 people out of

23  the 3,300 people said they used Outlook to play music.

24          So we go to the next slide.  That means this is

25  the level of guessing error.  Now, Lucent's entire damages

V-221

1  calculation is based on the 27 people who said they wouldn't

2  have bought Outlook if it didn't have the drop-down

3  calendar.  We can put that number on here.  It is subsumed

4  underneath the level of guessing or noise, swallowed

5  completely up.

6         That fact alone you could disregard the results of

7  the Jay survey in its entirety.  No fault of Doctor Jay's.

8  That's just how the survey data came out.

9         Let's go to the next slide if we could.  So here's

10 another really interesting thing Doctor Jay said.  She said,

11 "So when we had guessers in the 384 people who got asked

12 whether they would or would not have bought Microsoft

13 Outlook, they were I believe -- there were, I believe, 21

14 people out of the 384 who had guessed on that first music

15 player question."  So even that 384 people where 27 of them

16 said they wouldn't have bought Outlook if it didn't have a

17 drop-down calendar, within that 384 were 21 people who said

18 they listened to music on a non-existent music player in

19 Outlook.

20         If we can see what that correlates to, here would

21 have been one of Doctor Jay's pie charts.  Let's say Lucent

22 comes to you with the proposition that Microsoft has a non-

23 existent music player in Outlook and they want us to prove

24 we don't have a non-existent music player in Outlook.  Well,

25 you can't prove a negative.  So here's how they prove the

V-222

1   affirmative.  They say, okay, well, we have 3,387 Outlook

2   users.  Three hundred and eighty-four of them are purchase

3   decision makers.  Of the purchase decision makers, 21 say

4   they use Outlook to play music.

5           That is slightly less than seven percent.  Now, if

6   we can go to the next slide, but Mr. Sims would then take

7   that, and he would say, "Oh, but you can't confine it to the

8   purchase decision makers because purchase decision makers

9   affect non-purchase decision makers."  So let's see how many

10  people out of all the Outlook users said they listened to

11  music on a non-existent music player, 4.8 percent.

12          Now let's do the math, if you would, ladies and

13  gentlemen, together.  I don't have a slide on it.  What Mr.

14  Sims would do with this data is he would take the 4.8

15  percent and he would multiply it by the 109.5 million Office

16  users, right, because that's what he did with his

17  percentage, and he would testify under oath that 5,256,000

18  people are listening to music on a non-existent music player

19  based on the Jay survey, and that, as Lucent would say, is

20  hard data.  That is proof that there are over 5,000,000

21  people out there listening to music on a non-existent music

22  player based on the Jay survey hard data and the

23  mathematical computations done by Mr. Sims.

24          If you find that impossible to believe, you can

25  toss out the Jay survey in its entirety, and you can toss

V-223

1  out what Mr. Sims did with it.  Now, just to go very quickly

2  through these next set of slides, these are the actual

3  questions that Doctor Jay asked.  There is the non-existent

4  music player.  Next slide.  This is the one that shows that

5  she didn't give the survey respondents the most common way

6  of doing it, of entering a date.  One, she asked them if

7  they typed the date in the date box.  Next.  Point and click

8  on the calendar, without ever asking if they need to see

9  their calendar to understand whether or not they're

10 available.  The third option she gave them was locating the

11 day, selecting a time, and then typing.

12         So two options required typing, and the third

13 required just pointing and clicking.  The problem with that

14 is you can't enter an appointment without typing, even if

15 you use the date picker, because you've got to type in the

16 subject or your appointment, your schedule, calendar is just

17 going to be blank.  It's just going to have a whole bunch of

18 blank appointments.  And so we put the three together.

19         Which one do you think most of the users are going

20 to say?  They're going to say point and click.  Whether

21 that's the way they actually do it or not, because if you

22 double click on your calendar, that in your head is still

23 pointing and clicking, but she didn't give them that option.

24 What she did, if we go to the next slide, is she simply said

25 either typing din the date, pointing and clicking on the

V-224

1  drop-down calendar or "using another method."

2          There's no shock here as to how come you had so

3  many people say they pointed and clicked.  If we can go to

4  the next slide.  And then the ultimate one.  Assume

5  Microsoft Outlook did not have the capability of entering

6  the date of an appointment by using the drop-down calendar,

7  would you -- and there we are.

8          Ask yourself with your common sense do you really

9  believe there is anyone ever that has ever bought Outlook

10 because the calendar feature has a date picker.  If you

11 believe that, then you can believe there's someone who

12 wouldn't buy it if it didn't have a date picker, but if you

13 don't believe that, then it cannot be true.  And surveys can

14 essentially be made to say whatever -- they're only as good

15 as the questions that are asked.  And, again, this is not to

16 fault Doctor Jay.  She didn't understand the product.  She'd

17 never worked with it before.  And, of course, these

18 questions came out this way.

19          We can go to the next slide, please.  This is just

20 more of the same questions, although this one's interesting,

21 just to show how you can manipulate a survey.  So they were

22 asked if you purchased -- if you paid $109 to purchase

23 Outlook, how much more would you pay for the drop-down

24 calendar, less than a dollar, a dollar and so on up to more

25 than $10.  And it turned out, coincidentally, that the

1  average was right about five, whether Doctor Jay started

2  with less than a dollar and ended with more than 10 or

3  started with more than 10 and ended with less than a dollar,

4  of course.

5        Now, ask yourself this.  If the survey question

6  said this, less than a quarter, a quarter, .75 cents, a

7  dollar, more than a dollar -- I'm sorry, a quarter, .50

8  cents, .75 cents, a dollar, more than a dollar, guess what

9  the average would have been?  Fifty cents.  From the very

10 same people, because the survey is only as good as the

11 alternatives that you give the people.

12       Now if we could go to the next slide.  But Lucent

13 says, oh, come on, we gave you data.  Microsoft simply gave

14 you the testimony of Mr. Harris, who, of course, has spent

15 his entire career working with these products and Mr.

16 Kennedy who spent his entire career working with these

17 products.  This is another instruction.

18       In this case Lucent seeks damages for use of the

19 Day patent.  It is for you to determine what damages, if

20 any, have been proved.  Patent damages must be limited to

21 the amount adequate to compensate the patent owner for

22 infringement.  They cannot be used to punish the infringer.

23 Your award must be based upon the evidence, not upon

24 speculation, guesswork, or conjecture.  Your award must be

25 tied to the facts of this case and supported by evidence of

V-226

1  what Microsoft would have agreed to pay and Lucent would

2  have agreed to accept for use of the patented technology.

3  You cannot base your damages award on any evidence that is

4  unrelated to the claimed invention of the Day patent.

5          That is the law as the Court will give it to you.

6  If we could go to the next slide please.  So what have they

7  brought you?

8          Here's Mr. Sims' calculations.  We've been through

9  this ad nauseam.  He cannot use the entire 109.5 million

10 Office licenses.  He did, but he cannot.  The evidence is,

11 and Mr. Harris testified to it under oath that approximately

12 40 percent of people who use Office use Outlook.  Yet Mr.

13 Sims took 100 percent.  That is not the apportionment that

14 the Court will instruct you that you are to do.  He cannot

15 use that three percent.  He got to it the most bizarre way.

16 He took the seven percent of the 384 people, and he

17 multiplied it by the 42 percent who were not purchase

18 decision makers to come out to three percent.  I still can't

19 follow it.  Maybe some of you did.

20         If you did, remember the testimony of Mr. Kennedy.

21 Purchase decision makers and non-purchase decision makers do

22 not behave the same, and yet Mr. Sims treated them as if

23 they did, and he sure as heck can't use the full $67 figure

24 of Outlook.  So if we go now to the next -- oh, and then, by

25 the way, he ends up discounting it back to 2003.  So if we

V-227

1  can go to the next slide, please.  Actually, we can go to

2  the next one after this.  Don't think these are my slides.

3  Let's see.  Perhaps we ended up on the wrong -- oh, no, this

4  is.  This is how he did it.  Okay.

5           So here's how he did -- because I'm thinking, boy,

6  this doesn't look like something I would say, but it's not.

7  That's their slide.  Okay.  This explains it.  So this is --

8  this was Mr. Sims' slide.

9           Doctor Jay's survey is probability based.  The

10 survey indicates that 43 percent of all Outlook users use

11 the drop-down calendar.  Purchase decision makers are users.

12 Therefore, it is expected that 43 percent of purchase

13 decision makers use the drop-down calendar.

14          I remember as a kid there was some -- I've been

15 struggling with it in my head every since I saw this slide.

16 It was something like all chimpanzees are primates.  Men are

17 primates, therefore, men are chimpanzees, and it was some

18 silly syllogism like that.  But this is what you actually

19 saw here in this courtroom when Mr. Sims testified.

20          So if we can go to the next slide, please, here's

21 what he did with it.  This is the seven percent.  So he

22 said, "So I took seven percent of purchase decision makers,

23 and I took them down to 43 percent of non-purchase decision

24 makers, and I got three percent, and then I multiplied that

25 all by 109.5 million, and I came up with this huge

V-228

1 astronomical figure and you need to trust me because that's

2 hard data and there you are."  If we can go to the next

3 slide, please.

4        This is the actual data, and I don't know if you

5 all got a chance to write this down.  These are the actual

6 numbers from the Jay survey, not what Mr. Sims did with

7 them, the actual numbers.  And Lucent may think this is

8 funny math, but my fifth grade math teacher would tell me I

9 was spot on that 27 out of 3,387 is .8 percent.  That is

10 absolutely spot on, and I didn't do any funny math to get

11 there.  And yet Mr. Sims uses three percent.

12        Now if we could go to the next slide, please.  So

13 let's look at the numbers, the hard numbers here.  We come

14 back to this.  We don't know how many of the stand-alone

15 Office users use Outlook.  We do know how many stand-alone

16 Outlook licenses there are, 241,800.  If we use Mr. Sims'

17 number and we use -- of three percent and we use the $67,

18 this is the figure, 486,000.  That's it.  That's the whole

19 figure.  If we can go to the next slide, Mr. Ng. And if this

20 -- if we can go to the next slide.

21        We don't know the answer to this right here, how

22 many are there.  If we can go to the next slide now.  So

23 what did we decide?  In making your decision on what a

24 reasonable royalty should be in this case, you may not base

25 your award on the overall revenues or profitability of

V-229

1  Outlook or Money or Pocket PC.  That's because each of the

2  Microsoft products at issue is made up of thousands of

3  features.  This is the law.  This is not attorney argument.

4  Thousands of features, and the infringing Day patent is one

5  component of a much larger software program.

6         The patentee, meaning Lucent, must give evidence

7  to separate or apportion the Defendant's profits and the

8  patentee, Lucent's, damages between the patented feature,

9  meaning the date picker, and the unpatented features, and

10 such evidence must be reliable.  It must be tangible.  It

11 must not be conjectural or speculative, and you may not

12 consider the overall revenue of Microsoft.  The overall

13 revenues are not relevant to your damages analysis, and you

14 should not speculate on them in your deliberation.  You need

15 to stick to the facts of this case and the law as the Court

16 has given it to you or will give it to you.  And if we can

17 go to the next slide, please.

18        So what do we know?  If we do the appropriate

19 apportionment, and we're not using 2010 figures.  We're

20 using 2003 figures because that's the relevant time period.

21 If we appropriately apportion the contribution that Outlook

22 makes to -- just in the standard edition of Office, it's

23 13.7 percent.  If we take that number and we use the average

24 revenue per Office Suite unit of 13.7 percent, if we go to

25 the next slide, that's $13.45.  It is not $67.  If we can go

1 to the next slide, please.

2          Why is that the case?  This is Excel.  You saw Mr.

3 Harris show it.  It's not accused here.  It is a part of

4 Office.  Mr. Sims wants to take over two-thirds of the price

5 of Office and contribute it just to Outlook when you've got

6 this kind of a program in there.  We can go to Word.  This

7 is Word.  It is part of Office.  It is not accused.  Mr.

8 Sims wants to relegate Word to a teeny tiny little part of

9 the value of Office with Outlook being the huge gorilla.

10          We go to the next slide, this is PowerPoint, one

11 of the most, again, feature rich programs in Office.  Mr.

12 Sims wants to ignore this one all together and give it no

13 credit whatsoever.  And then, finally, to put it in

14 perspective, if we go to Outlook, this is Outlook.  Every

15 single one of these features has nothing to do with the date

16 picker.  And yet Mr. Sims wants you to believe that

17 $70,000,000 is a reasonable royalty.

18          So what are we left with?  Go back to the

19 hypothetical negotiation.  In the hypothetical negotiation

20 room is Mr. Kennedy.  Now, we don't know who would be in the

21 hypothetical negotiation room for Lucent.  Why do we not

22 know that?  Because even though this is apparently an

23 incredibly valuable patent worth tens of millions of dollars

24 to Lucent, no one from Lucent got up on the witness stand

25 and said one word.  They didn't tell you about Lucent as a

1  company.  They didn't tell you about Lucent as a licensing

2  entity.  They didn't tell you anything at all about Lucent.

3          So who might be at the hypothetical negotiation

4  table?  Well, we played in our case a deposition clip of Mr.

5  Stricker who was the head of licensing for Lucent during the

6  applicable time, and so in the hypothetical negotiation room

7  wearing Stanford cardinal would be Mr. Kennedy, and perhaps

8  there for Lucent would be Mr. Stricker.  And what would Mr.

9  Stricker have to admit?  That licensing is necessarily a

10 two-sided transaction, correct.  And so it is not only an

11 issue of what Lucent would necessarily demand in licensing

12 but also what a potential licensee would be willing to pay,

13 right?  That is correct.

14          Then you're at a loss.  Lucent says $70,000,000 is

15 reasonable.  Microsoft says no more than $5,000,000.

16 Professor Mnookin says they would meet somewhere in between

17 $1,000,000 and $5,000,000.  It would be absolutely rational.

18 And I as the mediator, the neutral mediator, would do my

19 best to make it happen, and I believe if Lucent had only

20 gone to Microsoft in 1996, it would have happened.

21          Well, now, how do you know that?  Lucent wants

22 data points.  Here go the data points.  What are we looking

23 at here?  Data point number one, $31,200 we know is a hard

24 data point as to how much it would cost to pull -- would

25 have cost to pull Outlook -- excuse me -- the date picker

V-232

1  out of Outlook back in 1996.

2        Now, Lucent keeps saying "But you didn't do it."

3  We keep saying, "But you didn't come to us," because that's

4  why it's a hypothetical negotiation.  So what's this number

5  here?  This number here is $67, the full stand-alone price

6  of Outlook times all the stand-alone licenses during the

7  time period in question multiplied by the three percent of

8  Mr. Sims' $486,000.  What do we have here?  This is

9  Microsoft's what they believe to be a reasonable reservation

10 value for a restricted license where they could only use the

11 Day technology in Outlook and not in any future products.

12        What number do we have here, this 3.5?  Well, it

13 comes from this 7.1 million.  What this 7.1 million is is

14 100 percent of those Office licenses, not 40 percent, 100

15 percent of those Office licenses multiplied by the .8

16 percent which is the correct number to multiply it by,

17 multiplied by the $13.45 apportion value for Outlook which

18 is the correct number and discounted back to 2003, it would

19 be 7.1 million.  And, as Mr. Sims said, this would be the

20 upper limit for Lucent.  Microsoft would be back here at

21 zero.  There would be pressure, and if they met in the

22 middle, it would be 3.5 million.

23        So what is this other data point, 5.3 million?

24 Well, we start over here at the 10.7.  This is 40 percent of

25 the Office licenses which is the correct number to take.

1 But this is now giving Mr. Sims his three percent rate.

2 Discounted back to 2003, we have 10.7 million.  If they met

3 in the middle, it would be here at 5.3 million.

4          Now, there is something conspicuously absent from

5 this chart.  Lucent wanted data points.  These are hard data

6 points.  If we could go to the next slide, please.  There's

7 Lucent's data point.  All by itself, way out there.  If this

8 were our solar system, this is Pluto, and here we are.  It's

9 hard data.  I didn't make up any of these numbers.

10          Now, it's in your hands.  I'm going to share with

11 you what my concern is here, that Lucent, in asking for

12 $70,000,000, thinks, well, you know what the jury will do.

13 They'll split the baby.  They'll come in in between.

14 Microsoft says five, we say 70.  They'll come in around 35,

15 40 million.

16          Please don't do that.  If you do that, we didn't

17 need a jury for that.  You just wasted three weeks of your

18 life if you do that, and all of you have lives.  I know.  I

19 saw your questionnaires.  You have family.  You have jobs.

20 You have interests, and you gave them all up to sit here in

21 this courtroom and hear about two companies arguing over

22 money.

23          If you split the baby, we didn't need a jury for

24 that.  We don't even need one of those big calculators.  We

25 could have all done it.  What I ask you to do is go back and

V-234

1   look at the facts that you've heard in this courtroom.  You

2   get to decide.  Apply the law to those facts.  If you find,

3   indeed, that Lucent's demand is unreasonable, please tell

4   them so.  Please tell them the reasonable royalty is where

5   all these other numbers line up.  The reasonable royalty is

6   exactly what Professor Mnookin told us that it was.

7            I thank you.  I have to sit down now.  I don't

8   want to because I don't get to get back up again, and

9   Lucent's counsel does, and he's going to say things that I

10  have the answers to and I don't get to answer them, but you

11  can because you heard the evidence, and you will have the

12  law, and you will have your common sense.

13           So I thank you so much.

14           THE COURT:  You want to pass the microphone?

15           MS. BROOKS:  Yes, your Honor.

16         CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

17           MR. DAUCHOT:  Can I have that last exhibit that

18  you just put, that slide.  Would you mind putting that up

19  for me.   Thanks.

20           Counsel for Microsoft and I don't agree on a whole

21  lot of things, but one thing we do agree on, having to sit

22  down as defendant's counsel and have a plaintiff's counsel

23  have the last word is painful.  So I -- I give her that.

24  I've been in that situation as well.

25           But let's pick up where counsel for Microsoft left

V-235

1   off and, you know, basically saying we're Pluto.  Well, if
2   you take a look back at this entire trial and you ask
3   yourselves where's the evidence, one of the things that the
4   Court has instructed you is that what lawyers say is not
5   evidence.  Of course, we try to sway you and we try to --
6   you know, yes, that's me.  That's what we're here for.  But
7   we really are vehicles during the trial process, vehicles
8   through which evidence, be it from witnesses, be it from
9   documents, come through to you.  And so a lawyer standing up
10  and fighting with a witness and coming up with theories on
11  his or her own and coming up with stuff, that's not
12  evidence.  That's not evidence.  Lawyer argument is not
13  evidence.  And so if you look at the $70,000,000 figure that
14  Mr. Sims came up with based on Doctor Jay's survey as well
15  as other documents, these calculations are evidence.  You
16  don't have to agree with them.  You don't have to agree with
17  them.  That's your -- that's your province really.  But it
18  is evidence.
19          And when we get to the numbers on this side here,
20  what do we have?  What do we have?  Let's take a step back.
21  What we have is Mr. Kennedy taking the stand and saying it
22  would have cost us 31.2 to take it out, and based on that,
23  wouldn't have paid a dime over $2,000,000 to stick it into
24  Outlook and wouldn't have paid a dime over $5,000,000 to
25  have the right to stick it in.  Now, Mr. Kennedy, why?  Why?

V-236

1  It's my judgment, my belief.

2          Remember my cross examination, when I asked Mr.

3  Kennedy if his belief, his judgment was helped along through

4  conversations with counsel, if it was a collaborative effort

5  with counsel, and Mr. Kennedy was impeached on that point.

6  In fact, the two to five million dollar judgment that he

7  came up with on which Professor Mnookin relied in signing

8  the November 12, 2010 expert report about 10 days after he

9  first learned of the case, you know, that -- that came

10 through a collaborative effort with lawyers.  So where's the

11 evidence?  Where's the evidence?

12         Now, when -- you recall when Professor Mnookin was

13 on the stand on cross examination, I asked Professor

14 Mnookin, I said, "Professor Mnookin, you know -- you know

15 that Microsoft had notice of the infringement as of January

16 2003," and he said yes.  And I put the question to him.  I

17 said "You're a negotiator.  You sit here and mediate, and

18 you sit in a conference room, and you say wait a second,

19 Microsoft, it will cost you $31,000 to take this thing out

20 and you really believe that no one will care.  It is of zero

21 -- practically zero value to you.  And you want to do what?

22 Keep it in and fight on?"

23         Remember that question.  Now, counsel said that we

24 did not accuse the date picker until 2006.  There's not a

25 shred of evidence of that, not a shred.

V-237

1          MS. BROOKS:  Objection, your Honor.

2          THE COURT:  Overruled.  Members, you're the triers

3   of the fact.  If you remember the evidence different from

4   the way the lawyers have stated them, then your memory

5   controls.

6          MR. DAUCHOT:  Now, let's look -- and the reliance

7   is on Mr. Kennedy, and Mr. Kennedy is saying on the stand

8   when Ms. Heffernan was examining Mr. Kennedy, Mr. Kennedy is

9   saying, "Oh, yes, in preparation for my testimony here at

10  trial, I was handed some stuff from my lawyers."  Remember

11  that, court documents, "And I reviewed them, and it doesn't

12  seem that this was accused."

13         Now, we asked Mr. Kennedy if any of that

14  influenced his decision.  Let's read what Mr. Kennedy said.

15         "Q     Okay.  Did you see those

16         documents in 2003?

17         A     No, I didn't see those documents

18         in 2003.

19         Q     How about 2004?

20         A     No.

21         Q     2005?

22         A     No."

23         Remember I was sitting here yelling the questions

24  out to Ms. Heffernan who got upset with me, but not in 2005.

25  No decision.  Mr. Kennedy said that.  He did not know of any

V-238

1  decision, any decision Microsoft made based on those

2  documents that were fed to him by lawyers.

3        And you remember I asked Mr. Kennedy today, I said

4  "You're in charge of the building, not the pricing and all

5  of that stuff.  You would have known if there was any

6  discussion about taking this stuff -- taking anything out?"

7  "Yeah."  "Any discussion since -- that you know of since

8  2003?  No, no. no."

9        And then what we did is we said, "Well, where did

10 you get this notion about what this stuff said?"  And what

11 did he say?  What did he say?  He said:

12        "Q    Now, your statement that Lucent

13        allegedly did not identify the drop-down

14        calendar tool as a composition tool as

15        that term has been construed by the

16        Court, that's based on discussions you

17        had with your lawyers, right?

18        A    Yes, it is."

19        So here he's telling you about his conversations

20 with the lawyers.  Is that evidence, what his lawyers are

21 feeding to him?  And then Mr. Kennedy is asked the question:

22        "Q    Would it surprise you to learn,

23        Mr. Kennedy, that as of March of 2003,

24        Lucent had, in fact, given a

25        presentation to Microsoft and in that

V-239

1           presentation identified its infringement

2           allegations relating to Outlook,

3           specifically pointing out the drop-down

4           calendar tool in the new appointment

5           form.  Would it surprise you to learn

6           that?

7           A     I don't have any knowledge of such

8           a presentation.

9           Q     Now, Mr. Kennedy, you're not a

10          lawyer, right?

11          A     That's correct.

12          Q     And you were involved in this

13          process?

14          A     That's correct."

15          So when you hear, all right, about counsel

16   argument, about what was said to Microsoft and what was not

17   said to Microsoft and Microsoft relying on that and not

18   doing anything, not pulling anything out, that is lawyer

19   argument.  There is not a shred of evidence, zero, none.  In

20   fact, Professor Mnookin testified that as far as he

21   understood, Microsoft did have an understanding.  And you'll

22   have an instruction based on Microsoft as of January 2003

23   being on actual notice.

24          Second point, and so this point about Microsoft

25   not taking anything out in 1996, that's not the point.  The

1  point is in 2003 Microsoft -- if you really believe this is

2  worth nothing, why don't you just take it out.  You don't

3  have to pay $70,000,000.  You don't have to.  Just take it

4  out.  They weren't going to take it out.  They needed to

5  keep it in because it had value.  And if this thing has no

6  value and if it is as worthless as we hear Microsoft say it

7  is, why is Microsoft wasting all of our time?  Why are we

8  here?  What have we been doing for two weeks?  If the Day

9  patent technology can be yanked out of there for $31,200 and

10 if the Day patent technology after it's yanked out of the

11 product won't make a lick of a difference to anybody in this

12 world, if they really believe that, why are we here?  Take

13 it out if it's worthless.  You don't have to pay for it.

14 It's the point I made about the store.

15          You go to the store.  You look at the thing, and

16 you say, wow, this looks -- you know, this is too expensive.

17 Well, if it's too expensive, don't use it.  Don't use it.

18 Get rid of it.  But they didn't.  Actions speak louder than

19 words.

20          Another point, the survey, you heard counsel for

21 Microsoft tell you, well, we did not use the survey.  We

22 weren't going to be two-faced about this.  If we're going to

23 criticize Doctor Jay's survey, we are not going to burden

24 you with a survey of our own.  If we are going to take the

25 position that surveys suffer from hindsight bias I think it

V-241

1  was, we're not going to bring one to you.  Really.

2          Well, here's a question to Microsoft.  If you

3  really felt that way about surveys, why did you put Mr.

4  Kennedy's team through the effort of creating an Outlook

5  module without the date picker in it?  If you really believe

6  in hindsight bias and you think that surveys are a big waste

7  of time, why put Mr. Kennedy's team through the trouble.  If

8  you really believe that surveys are a big waste of time --

9  you hear Professor Mnookin testify.  He knew that a survey

10  had been done with this module.  Why go through a survey?

11  Why do it?  Don't do it.  But they did, and the results are

12  not here.  And I leave it to you to decide why that is.

13          Now, much criticism about what Doctor Jay did.  Am

14  I an expert in surveys?  No.  I don't pretend to be.  I

15  don't pretend to be, and I don't think counsel for Microsoft

16  pretends to be.  That's why we have experts in the field.

17  That is why Microsoft hired an expert of its own in the name

18  of Mr. Johnson to do it.  Why did they hire Mr. Johnson if

19  they had counsel experts in surveys?  Have we heard any

20  evidence about how many surveys counsel for Microsoft has

21  taken, any evidence?  Any evidence about counsel's

22  qualifications?  I'm not challenging counsel's

23  qualifications as an attorney.  I am not, but I am

24  challenging counsel's qualifications as a survey expert.

25  We've only seen one survey expert in this room, somebody who

V-242

1  dedicates her life to it, and that is Doctor Jay.

2          Now, are you free to assess whether or not what

3  Doctor Jay is saying is believable or not?  Of course.  That

4  is within your province as jurors.  Margins of error, the

5  Court will instruct that margins of error are to be taken

6  account of, along with everyone else.  Now, you heard Doctor

7  Jay on the subject of margins of error.  Doctor Jay says a

8  margin of error works both ways, plus or minus, plus or

9  minus.

10          Not my words.  Those are Doctor Jay's words.  And

11  then we have the testimony attorney argument that tries to

12  say the people who believed this thing played music, that

13  that's a margin of error.  That is not.  Those are two

14  different concepts.  And, in fact, the evidence in this case

15  shows that that really had no impact in this case.  This is

16  just an example of an attorney standing up and arguing

17  things and experts saying, no.  You recall Doctor Jay

18  tracked these people.  "Did you trace those respondents'

19  responses to this question to see whether it would have

20  affected your results?"  And what did she testify to?  She

21  said no.  Instead of seven, it becomes 6.9 and rounds to

22  seven.  It doesn't change the result.  And, in fact, she had

23  an exhibit, a calculation that was used, and it's in

24  evidence -- is it in evidence or a demonstrative, where she

25  worked through that?  And she explained it.  It's not

V-243

1 attorney argument.  This is an expert working it through.

2 This is not an attorney coming up and throwing things up in

3 the air and saying look at this, look at this, look at this.

4 No.  Expert.  Expert.

5          All right.  The $5,000,000 figure, where does that

6 come from?  I mean, if you heard what Mr. Sims went through,

7 the calculations, yes, are they complicated, yes, is it

8 tough math, yes, yes, it is.  But where does the $2,000,000

9 come from?  From attorneys.  It is a number that is picked

10 out of the air.  Think for yourselves.  You've been taking

11 notes.  How does the 31.2 to take it out correlate to the

12 $2,000,000?  Not a shred of evidence, not a shred of

13 evidence.

14          How does the 31.2 change to five?  Not a shred of

15 evidence and then they put an expert on, Professor Mnookin,

16 who takes those numbers and says perfectly reasonable to me.

17 In a matter of 10 days, signs the thing.  Ten days it took

18 him.  Hired on November 2, signed the report on November 12,

19 10 days.

20          You are the judges of credibility in this case.

21 Five million, two million, lawyers.

22          Non-infringing alternatives.  Remember asking Mr.

23 Kennedy when is the first time you came up with that list of

24 eight to which you testified that would be just as good for

25 consumers?  And, by the way, when he says just as good for

V-244

1  consumers as the Day patent technology, Mr. Kennedy, where

2  is your evidence?  "I have no evidence -- no data.  It's my

3  experience."  All right.  Look at the non-infringing

4  alternatives.  Where did you come up with those in your

5  declaration?  Remember, the lawyers helped draft it.  The

6  lawyers helped draft it.  Lawyer argument, lawyer argument.

7          The $67 figure, I heard what counsel had to say

8  about it.  You have the exhibit in evidence, Microsoft 2010.

9  I'm not coming up with these numbers.  I am not.  If you

10  look at what Microsoft sells the Office Suite with Outlook

11  and without Outlook, and the difference is the stand-alone

12  price for Outlook.  Those are Microsoft's numbers, not ours,

13  not ours.

14          So I'll leave it at that.  And I'm not so

15  presumptuous as to think you will go into a jury room and

16  split this thing in half.  I don't.  You know, if that is --

17  that is your -- you know, when I started off, I said we have

18  a Seventh Amendment to the United States Constitution where

19  these issues are left to jurors.  That is now your -- and I

20  do mean it.  It is your sacred responsibility, and I ask one

21  thing.  In executing that responsibility, you'll have the

22  Court's instructions.  Follow the evidence.  Use your common

23  sense, please.

24          We really do thank you for your service.

25          THE COURT:  Thank you.  So we're now done with the

V-245

1  argument.  Tomorrow I'll give you instructions on the law,

2  and we've made copies of the instructions so that you can

3  follow along with them.  We'll give them out tomorrow

4  morning, and we'll start at 9:00 o'clock.  The instructions

5  shouldn't take that long.  It's the most fun part of the

6  trial, but it's really quite important that you do listen to

7  the Court's instruction on the law, and then the case will

8  be submitted to you for your deliberations.  So we'll see

9  you tomorrow at 9:00 o'clock.  Please remember the

10  admonition that I gave you earlier.

11      (Jury exits courtroom.)

12          THE COURT:  Thank you.  Congratulations on

13  completing the case.  Now your job is done, and now the

14  Court's instructions on the law are the next important part

15  for me to do.

16          The Court wants to remind you that we did have a

17  letter from one of the jurors who has a commitment on

18  Monday.  And so do I have a stipulation from the parties

19  that if the deliberations continue to Monday, if he's unable

20  to continue, that the jurors may just proceed without him

21  rather than -- typically we would tell them you have to stop

22  what you've done and then start all over again.  Is that all

23  right?  And perhaps he'll readjust his schedule.  So it may

24  become a moot point if they have a decision by Friday, but

25  one never knows about these things.  Is there a stipulation

V-246

1   that we could then proceed without him and not start the

2   deliberations all over?

3           MR. DAUCHOT:  That's fine by Lucent, your Honor.

4           MS. BROOKS:  Yes, your Honor.

5           THE COURT:  All right.  Thank you.  See you

6   tomorrow 9:00 o'clock.

7        (Proceedings recessed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

V-247

1      I certify that the foregoing is a correct

2 transcript from the electronic sound recording of the

3 proceedings in the above-entitled matter.

4

5 /s/Shonna Mowrer                    7/28/11
  Transcriber                          Date

6
  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

7

8 /s/L.L. Francisco
  L.L. Francisco, President
9 Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*