1   Juanita R. Brooks, brooks@fr.com, (SBN 75934)
    Roger A. Denning, denning@fr.com, (SBN 228998)
2   Michael M. Rosen, rosen@fr.com, (SBN 230964)
    Frank J. Albert, albert@fr.com, (SBN 247741)
3   Craig E. Countryman, countryman@fr.com, (SBN 244601)
    Fish & Richardson P.C.
4   12390 El Camino Real
    San Diego, California  92130
5   Telephone:    (858) 678-5070
    Facsimile:    (858) 678-5099
6
7   Attorneys for Defendant
    MICROSOFT CORPORATION
8
9               UNITED STATES DISTRICT COURT
10             SOUTHERN DISTRICT OF CALIFORNIA
11  LUCENT TECHNOLOGIES, INC.,          Case No. 07-CV-2000 H (CAB)
                                        consolidated cases:
12         Plaintiff,                   03-CV-0699 B (CAB)
                                        03-CV-1108 B (CAB)
13      v.                              02-CV-2060 B (CAB)
14  MICROSOFT CORPORATION,              **MICROSOFT'S MEMORANDUM OF**
                                        **POINTS AND AUTHORITIES IN**
15         Defendant.                   **SUPPORT OF ITS POST-VERDICT**
                                        **MOTION FOR JUDGMENT AS A**
16                                      **MATTER OF LAW**
17                                      Date:        October 12, 2011
                                        Time:        1:30 p.m.
18                                      Courtroom:   13, Fifth Floor
                                        Honorable Marilyn L. Huff
19
20
21
22
23
24
25
26
27
28
                                                   Case No. 07-CV-2000 H (CAB)

## I.    INTRODUCTION

Long before trial, Lucent decided that it wanted to recover $70 million. It initially tried to do so by invoking the Entire Market Value ("EMV") rule and arguing, based on the Jay survey and the Sims analysis, that the date-picker was the basis of customer demand for Outlook. This Court rejected that effort, and Lucent, nominally at least, agreed that an apportionment was therefore necessary. But while Lucent assured the Court that it understood the Court's direction concerning apportionment, Lucent never complied. Instead, Lucent's so-called "apportionment" is nothing more than a concealed EMV calculation, one that, coincidentally, produced the same $70 million figure produced by the old EMV approach this Court rightly rejected.

Lucent refused to abide by this Court's rulings and Federal Circuit law because it recognized that any approach that actually tried to value the date-picker feature—*i.e.*, a true apportionment—would produce a value nowhere near its target of $70 million, as indeed its own add-ins analysis and survey question concerning valuation demonstrated. The jury verdict, which adopted Lucent's legally improper approach, cannot stand. The Court should therefore set aside the verdict and enter judgment of $5 million—the only amount the evidence supports.

## II.    STATEMENT OF FACTS

Lucent's damages expert, Raymond Sims, arrived at his $70 million damages figure by determining the alleged "estimated financial impact" to Microsoft of removing the date-picker to determine how much Microsoft would pay Lucent in the hypothetical negotiation. (*See generally* Exh. C[1] at 244:13-257:4, Exh. D at 5:22-32:19; Exh.F, RS-8-30.)  He started by trying to compute the number of "infringing licenses" for Microsoft Outlook—a misnomer because the Day patent does not cover the software, so the licenses themselves are not "infringing."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) ("Claims 19 and 21 are method claims; thus, Microsoft's sales of its software alone cannot infringe the patent."). Mr. Sims determined there were 109.3 million Office suite licenses sold from 2003-2006. The Office suite includes at a minimum not only Outlook, but also Word, PowerPoint, and Excel. (Exh. D at 159:6-160:22; Exh.

---

[1] All references to exhibits in this memorandum refer to exhibits attached to the Declaration of Juanita R. Brooks In Support of Microsoft's Memorandum of Points and Authorities In Support of Its Post-Verdict Motion For Judgment as a Matter of Law.

1  F, RS-16.) Mr. Sims included all 109.3 million Office suite licenses in his analysis, along with

2  241,000 licenses for stand-alone Outlook. (*Id.*; *see also* Exh. D at 15:4-16:12.)

3  Mr. Sims then multiplied the 109.5 million total "infringing" licenses by 3% to obtain what

4  he said was the number of license sales Microsoft would expect to forgo if the date-picker were

5  removed—3.3 million. (Exh. D at 14:16-15:3; Exh.F, RS-16.) He arrived at the 3% figure by

6  manipulating results obtained by the Jay survey. (Exh. D at 11:20-16:12; Exh. F, RS-11-15.)

7  The Jay survey reflected responses from 3,387 people who used Microsoft Outlook before

8  2007, when the Day patent expired. (Exh. G, DJ-15-16; Exh. B at 185:24-186:8.) According to the

9  Jay survey, 43% of those pre-2007 Outlook users had used the date-picker. (Exh. B at 159:1-6,

10  187:4-8; Exh. G, DJ-33.) Respondents who had used the date-picker were then asked whether they

11  were "involved in the decision to purchase Microsoft Outlook." (Exh. B at 151:12-152:22, 194:23-

12  195:6; Exh. G, DJ-27-28.) 384 of the respondents said that they were. (*Id.*) Those 384

13  respondents (and only those 384) were then asked whether they would have bought Microsoft

14  Outlook if it did not have the date-picker, and 27 (7%) replied that they "would not have bought

15  Microsoft Outlook" if the date-picker were removed. (Exh. G, DJ-29; Exh. B at 152:23-153:19,

16  195:7-21.) But 23 of those 27 also said they were unwilling to pay any extra for the feature. (Exh.

17  C at 10–11.) Moreover, all of the Jay survey questions were directed to **Outlook**, even though

18  109.3 million of the licenses Mr. Sims used were for the **Office** suite. (Exh. G, DJ-27 and DJ-29;

19  Exh. B at 250:5-251:4, 254:5-255:14.)

20  In order to extrapolate from the Jay survey even under Lucent's flawed methodology, Mr.

21  Sims needed to know the percentage of purchase decision-makers *overall* who would not have

22  bought Outlook without the date-picker. (Exh. F, RS-16; Exh. D at 10:6-14.) But besides asking

23  whether respondents were "involved in" the purchase decision rather than actual decision-makers,

24  the Jay survey only asked so-called purchase decision-makers *who had used the date-picker*

25  whether removing the date-picker would have caused them not to buy Outlook. (Exh. G, DJ-29;

26  Exh. B at 152:23-153:19.) How did Lucent extrapolate the survey results to the number Mr. Sims

27  needed? Not with data showing the actual number of Outlook purchase decision makers who had

28  been surveyed.

1    Instead, after learning that Mr. Sims had estimated on his own that the number was 3%,

2    Dr. Jay performed a calculation to replicate his results. (Exh. B at 257:20-260:13, 159:7-160:21;

3    Exh. G, DJ-34.)  She assumed that pre-2007 Outlook "purchase decision-makers" use the date-

4    picker at the same rate as pre-2007 Outlook users generally—43%. (*Id*.)  That assumption enabled

5    her to conclude that her 7% was a fraction of 43% of the total Outlook "purchase decision

6    makers," and that the percentage of all Outlook "purchase decision makers" who would not buy

7    **Outlook** if the date-picker were removed was 7% x 43% = 3%. (*Id*.)  Applying the 3% figure,

8    Mr. Sims then argued that Microsoft would lose 3.3 million **Office** licenses by removing the date-

9    picker. (Exh. D at 11:20-15:3; Exh. F, RS-13-16.)  Critically, in performing these calculations

10   Mr. Sims assumed that *all* 109.5 million Office licensees were *also* Outlook users. (Exh. D at 14–

11   15, 164.)  No record evidence supports this assumption, and the uncontested testimony from

12   Microsoft witness Jensen Harris was that only about 50% of Office licensees use Outlook. (Exh. D

13   at 241–42.)

14   Mr. Sims' next step was to calculate the revenue loss associated with selling 3.3 million

15   fewer licenses. He multiplied the 3.3 million licenses by $67, which he said was the per unit

16   revenue from each Outlook license, to find that Microsoft would have lost $221.4 million in

17   revenue. (Exh. D at 16:14-18:1, 167:23-168:13, 172:7-10; Exh. F, RS-17.) Mr. Sims applied the

18   $67 figure to both Office and standalone Outlook licenses, even though he derived the figure from

19   standalone Outlook data while nearly all of the licenses he applied it to were for Office. (*Id*.)

20   Mr. Sims next multiplied the $221.4 million by Microsoft's 76.2% division-wide profit

21   margin and, after performing a similar calculation for Money, discounted the total "expected

22   forgone profit" to 2003 to yield a total of $138.7 million. (Exh. D at 18:3-14, 22:13-28:10; Exh. F,

23   RS-18, RS-23and RS-27.)[2]

24   The remaining question for Mr. Sims was how to split his $138.7 million royalty base. His

25   solution was to count the *Georgia-Pacific* factors that favored Microsoft and those that favored

26   Lucent. (Exh. D at 90:19-91:13, 94:11-19.) Because "there are more factors that have an upward

27

28   [2]Mr. Sims discounted the figure to 2003, not the date of the hypothetical negotiation in 1996, because he thought the
     parties would agree that Microsoft would not pay the lump sum until 2003. (Exh. C at 210:5-9; Exh. D at 28:11-

1   influence than factors that have a downward influence," Mr. Sims explained, a hypothetical

2   negotiation using the *Georgia-Pacific* approach would yield a lump sum payment closer to $138.7

3   million than to $0. (Exh. D at 91:2-13.)  He used the same rationale to conclude that a Business

4   Realities Approach would yield the same result. (Exh. D at 94:13-16.)  Both analyses led him to a

5   range of $65-75 million, which he split, for a lump sum payment of $70 million. (Exh. D at 95:5-

6   96:6; Exh. F, RS-78.) Mr. Sims did not point to any actual licenses or negotiations that had

7   produced such a split, yet he used his assumption to arrive at an effective royalty rate of over 50%.

8       The rest of Lucent's case was not even arguably tied to any amount Microsoft would pay.

9   For example, Mr. Sims performed a "time savings analysis" to estimate the value of the date-picker

10  to consumers. (Exh. D at 32:20-55:8; Exh. F, RS-32-58.) This assumed that "users would save at

11  least one second of time per use" of the date-picker (Exh. D at 42:6-7), even though Mr. Sims and

12  Lucent's technical expert, Mr. Tognazzini, admitted there are multiple situations in which using

13  the date-picker was slower than the non-infringing alternatives. (Exh. B at 10:5-17; Exh. A at

14  252:25-253:25; Exh. D at 141:7-23, 142:7-15.)  Based on the one second assumption, Mr. Sims

15  estimated a value of $170.1 million in time savings to consumers (Exh. D at 49:13-53:22; Exh. F,

16  RS-42, RS-49, RS-56-57), but never tied this to what Microsoft would pay for a license.

17      There was one other set of numbers lurking in Lucent's case. Lucent repeatedly referenced

18  its "policy" of receiving at least 1% per patent of the total revenue of the smallest commercial

19  saleable unit covered by the patent—in this case, Outlook. Mr. Sims stressed the 1% rate during his

20  testimony, and Lucent's questions attempted to tie the rates in the Acer and Locus agreements to

21  the value of "the smallest commercially sold unit," here "Outlook, Money, and Pocket PC." (Exh.

22  D at 70:10-23, 72:1-12, 74:14-21.) Lucent repeated the point in closing:  "the policy was one to

23  five percent over the base, the base, the smallest commercially sold product in which the invention

24  works. That policy here–and we're talking about the base, the smallest commercially sold product

25  in which the Day patent technology rests, is Outlook." (Exh. E at 188:5-11.) What number would

26  the jury have obtained by applying Lucent's 1% policy to Outlook revenue?  Using Lucent's

27  figures:  109.5 million "infringing" licenses x $ 67 per license x 1% = $73 million.

28

---

29:10.)  The Lucent witness who testified on this issue, however, said Lucent always wanted "cash up front" and

III.   **LEGAL STANDARDS**

   A.     **Judgment as a Matter of Law**

   "Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion." *Edgerly v. City and County of San Francisco*, 599 F.3d 946, 953 (9th Cir. 2010); FED. R. CIV. P. 50. "The evidence must be viewed in the light most favorable to the nonmoving party, and all ***reasonable*** inferences must be drawn in favor of that party." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (emphasis added).

   The Court may set aside a damages award and enter JMOL setting a lower amount if the lower amount is all the evidence supports. *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1351-52 (Fed. Cir. 2001) ("re-presenting this issue to the jury would have been pointless because, as a matter of law, the compensatory damages award could not exceed the $520 already awarded."); *Integra Life Sci., Ltd. v. Merck KGaA*, 2004 WL 2284001, at *12 (S.D. Cal.), *rev'd on unrelated grounds,* 496 F.3d 1334 (Fed. Cir. 2007); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 291-92 (N.D.N.Y. 2009) (Rader, J.).

   B.     **If Any Link in the Damages Calculation is Faulty, the Award Cannot Stand**

   Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995), "on post-trial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Lucent*, 580 F.3d at 1336.

   The damages award cannot stand if any part of the calculation leading to it was unsupported or contrary to law. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317, 1321 (Fed. Cir. 2011). For example, "[e]ven if the jury's damages calculation was not based wholly on the entire market value check, the award was supported in part by the faulty foundation of the entire market value. . . . Thus, the fact that the entire market value was brought in as only a 'check' is of no moment." *Id*. at 1321. Likewise, "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id*. at 1317.

   ---

   "on signing." (Exh. C at 185:24-186:8.)  No evidence supports discounting to 2003.

1  IV.    **ARGUMENT**

2          A.      **Lucent Was Required Yet Failed To Produce Evidence Apportioning The**
                   **Value Of The Date-Picker Separate From The Value Of The Numerous Non-**
3                  **Infringing Features In The Accused Products.**

4          Lucent could not use the entire market value of any Microsoft product as the base for its

5  royalty calculation. To prove that the entire value of Outlook is "properly and legally attributable"

6  to the date-picker, Lucent would have to "prove that the patent-related feature is the basis for

7  customer demand." *Lucent*, 580 F.3d at 1336 (quoting *Rite-Hite*, 56 F.3d at 1549).

8          In this remand trial, Lucent admitted that it could not satisfy the entire market value rule:

9          THE COURT: Okay. So we agree that the application of the entire market value rule which
           requires proof of three conditions, does not need to be given because you're not seeking
10         that?

11          MR. DAUCHOT: Correct, your Honor.

12  (Exh. H, at 65:17-21.)  In other words, Lucent agreed it could not prove that the patented date-

13  picker feature was the "basis for customer demand" for Outlook, much less for Office.

14         Lucent's inability to satisfy the three conditions of the EMV rule in the remand trial was

15  hardly surprising, since the Federal Circuit had already found that the date-picker is a "tiny,"

16  "minor" and "very small" feature, that the profits attributable to it are "exceedingly small," and

17  that there is no evidence that customers purchase Outlook "because of" the date-picker. *Lucent*,

18  580 F.3d at 1332-33, 1337-38. The Federal Circuit thus held that application of the entire market

19  value rule "would amount to legal error" and could not support the first jury's verdict. *Id*. at 1336.

20         Lucent not only had explicit direction from the Court of Appeals, but also from this Court.

21  Lucent initially tried to show the date-picker was the basis of consumer demand in its December

22  2010 submissions. (Doc. No. 1180 at 15-20.)  After reviewing Lucent's filings (*id*.), the Court

23  expressed doubt that the entire market value rule could apply:

24         After considering evidence as it stands—including the new documents produced by
           Microsoft, Dr. Jay's survey, and the testimony of Lucent's damages expert—***the Court***
25         ***doubts that there is enough specific evidence to support the entire market value rule.***

26  (Doc. No. 1180 at 19.)  The Court nevertheless entertained supplemental briefing and expert

27  reports on the issue "in fairness to the parties."  (*Id*.)

28

Lucent's supplement did not attempt to show that the date-picker was the basis of consumer demand. Instead, Lucent purported to honor its obligation to "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, [with] … evidence … [that is] reliable and tangible, and not conjectural or speculative." *Uniloc*, 632 F.3d at 1318 (citing *Garretson v. Clark*, 11 U.S. 120, 121 (1884)). Lucent claimed to have "apportioned" by limiting the royalty base to 43% of Outlook customers who supposedly used the date-picker. (Doc. No. 1284 at 9-12.) The Court disagreed:

> After careful consideration of Lucent's expert's calculation and the arguments of the parties, the Court concludes that Lucent's method of apportionment does not properly apportion between the patented and unpatented features of Outlook in a way that separates out from the royalty base the portion that can be attributed to the Day patent technology. *See Uniloc*, 632 F.3d at 1318. Though Lucent discounts the base to include only the revenue from Outlook where a user uses the Day patent technology, Lucent fails to show that it is entitled to capture this entire market value as the base. Specifically, Lucent has not shown that the Day patent technology is the basis for consumer demand for most Outlook users.

(Doc. No. 1284 at 12-13.) As the Court held, Lucent had failed to show "why it is entitled to a royalty base for the 43% of customers who use the Day patent technology where other features, in addition to the Day patent technology, are used. Put into concrete terms, if a sample user uses the infringing Day patent technology but also uses many other features in Outlook, Lucent has not shown that it is entitled to include in the royalty base all $67 of revenue generated from this sample user." (*Id*. at 13.) The Court directed Lucent to perform a proper apportionment between patented and unpatented features or show it could satisfy the entire market value rule. (*Id*. at 14.)

Lucent did neither. Rather than abandon his $70 million royalty figure, Mr. Sims found new numbers that he could manipulate to produce the same result: he multiplied the 109.5 million licenses for Office and standalone Outlook by his $67 figure, then applied Lucent's 1% licensing policy to obtain $73 million. (Doc. No. 1323 at 9-10.) The Court again held that Lucent had failed to apportion:

> Lucent's per unit analysis still relies solely on the whole per unit price of Outlook—$67.39—without apportioning this to account for all the other unpatented features that consumers use besides the Day patent technology even when consumers invoke the Day patent methods.

(*Id*. at 10.)

This left Lucent with Mr. Sims' "estimated financial impact" analysis, described above. (*Id.* at 11-12.)  The Court, however, warned that:

> At trial, Lucent will still need to demonstrate that Sims' business realities analysis is not in violation of the entire market value rule. Lucent will also need to prove that the factual predicates for its calculations, such as the Jay survey's 7% multiplier and the $67 unit price of Outlook, are credible. Accordingly, the Court DENIES the motion in limine to exclude the business realities approach without prejudice to any contemporaneous objections at trial and subject to post-trial motions.

(Doc. No. 1323 at 12.)  The Court also told Lucent that it could not support its $70 million number simply by splitting the difference between $0 and $138.7 million:

> [Sims'] single page analysis does not provide any explanation for why—even if he could not consider the $73.82 million number that the Court found above to violate the entire market value rule— he concludes that the parties would meet around $70 million versus any other number in the range between $0 and $138.7 million. Furthermore, [Sims'] vague statement on his reliance on "other Georgia-Pacific factors and Business Realities considerations" are not tied to any factual predicates. It is unclear to the Court what else he relies on as part of these other factors to arrive at the $70 million number, apart from consideration of the 1% royalty rate [from Lucent's licensing policy]. Accordingly, the Court GRANTS Microsoft's motion to exclude Lucent's "Alternate Analysis."

(Doc. No. 1323 at 13.)

Throughout this process, the Court went out of its way to explain to Lucent *why* its damages theory had to apportion the value of the date-picker: "For a product that is feature-rich like Outlook, use as a proxy for value does not appropriately account for all the other unpatented features that consumers use besides the Day patent technology even when consumers invoke the Day patent methods."  (Doc. No. 1284 at 13, *citing IP Innovation LLC v. Redhat, Inc.,* 705 F.Supp.2d 687, 689-90 (E.D. Tex. 2010).)  All told, this Court directed Lucent **on four separate occasions** to apportion between the patented and unpatented features of Outlook and calculate damages based only on the patented features. (Doc. No. 1323 at 7-10; Doc. No. 1305 at 1-2; Doc. No. 1284 at 9-13; Doc. No. 1180 at 15-20.)   Lucent ignored the Court's clear direction.

### 1.   Lucent's $67 Per Unit Revenue Figure Is Not A Proper Apportionment Between Patented and Unpatented Features.

A fundamental problem with Lucent's damages model was that it failed to apportion the $67 of revenue that Mr. Sims estimated was attributable to each unit of Outlook, and failed to calculate damages based only on the portion of the $67 attributable to the date-picker. This Court has twice held that Lucent was not permitted to base damages on the entire $67 but instead had to

1   limit the damages calculation to the part of the $67 attributable to the date-picker. *See* Doc. No.

2   1323 at 10 ("Lucent's per unit analysis still relies solely on the whole per unit price of Outlook—

3   $67.39—without apportioning this to account for all the other unpatented features that consumers

4   use besides the Day patent technology even when consumers invoke the Day patent methods.");

5   Doc. No. 1284 at 13 ("Put into concrete terms, if a sample user uses the infringing Day patent

6   technology but also uses many other features in Outlook, Lucent has not shown that it is entitled to

7   include in the royalty base all $67 of revenue generated from this sample user."). As the Court

8   explained, the reason Lucent had to apportion the $67 is simple: a customer who uses the date-

9   picker "may also use Outlook for email or tasks or other features in calendar." (Doc. No. 1284 at

10  13.) Nothing supports attributing the entire $67 to the date-picker when the customer uses many

11  features in addition to it. Indeed, a customer has to use non-infringing features to even access the

12  date-picker.

13          Compounding the error, Lucent applied the $67 per unit not only to the 241,000 licenses for

14  stand-alone Outlook, but also to the 109.3 million licenses for the Office suite, which includes at a

15  minimum Word, Excel, and PowerPoint. (Exh. D at 160:13-22, 167:20-168:13.) There was no

16  evidence that $67 of the revenue from a copy of the Office suite is attributable to Outlook.

17  Mr. Sims estimated that the average revenue attributable to the whole Office suite was $98.19.

18  (Exh. D at 166:13-167:4.) Lucent presented no evidence apportioning the relative revenue

19  attributable to Word, Excel, PowerPoint, and Outlook. It offered nothing to show that over 68% of

20  the revenue for Office was attributable to Outlook, a proposition that defies logic in light of the

21  countless other features in Office as a whole. And, most importantly, Lucent presented nothing to

22  show that over 68% of the revenue for Office was attributable to the date-picker.

23          Lucent defended its use of the $67 figure for Outlook 2000, 2002, and 2003 by noting that

24  Microsoft had sold two versions of Office 2010: Office Home and Business 2010 (with Outlook)

25  for a retail price of $279.99, and Office Home and Student 2010 (without Outlook) for a retail

26  price of $149.99. (Exh. E at 70:6-71:23, 181:1-7; 197:19-198:22; Exh. I, PX-1895.) Lucent could

27  only point to Office 2010, a version sold years after the damages period, because no version of

28  Office 2000, 2002, and 2003 – the versions of Office sold during the damage period – were sold

1    without Outlook. The 2010 Office Business version includes Outlook while the 2010 Office

2    Student version does not, so Lucent argued that the $130 price difference for Office 2010 is the

3    value attributable to Outlook 2000, 2002, and 2003. (*Id.*)  But Lucent presented no evidence that

4    the $130 price difference was tied to the value of Outlook rather than some other factor or

5    combination of factors. In fact, the evidence showed, without contradiction, that the primary

6    targets of the Student version were students, who Microsoft wanted to encourage to buy with a

7    lower price, both to avoid piracy and to develop early loyalty to the Office. (Exh. E at 40:9-42:19.)

8           **2.      Mr. Sims' Use Of The Jay Survey Did Not Even Attempt To Apportion
                       The Value Of The Date-Picker Separate From The Value Of Numerous**

9                      **Other Features In Outlook.**

10          Lucent insisted at trial that it was allowed to use the entire $67 revenue because it applied it

11   to a subset of the allegedly "infringing" 109.5 million licenses for the Office suite and Outlook.

12   (Exh. D at 87:21-88:1, Exh. E at 180:9-25, 196:18-197:18.)  In particular, Mr. Sims narrowed the

13   109.5 million licenses to the 43% of Jay survey respondents who said they had used the date-

14   picker, then further narrowed it by multiplying it by the 7% of survey respondents who used the

15   date-picker and were "involved in" the purchase decision who said they "would not have bought

16   Microsoft Outlook" if the date-picker were removed. (Exh. D at 87:21-88:1, Exh. E at 180:9-25,

17   196:18-197:18.)  While this exercise has the appearance of an apportionment, it in no way actually

18   apportioned the value of the patented vs. the unpatented features.

19          The first step of Lucent's calculation—restricting the 109.5 million licenses to the 43% of

20   people who actually used the date-picker—was not an apportionment at all. This Court's *in limine*

21   order so held, explaining that "use as a proxy for value does not appropriately account for all the

22   other unpatented features that consumers use besides the Day patent technology even when

23   consumers invoke the Day patent methods."  Doc. No. 1284 at 13. Lucent was legally required to

24   limit its damages claim to only customers who used the date-picker because claims 19 and 21 of

25   the Day patent are method claims that can only be infringed by use of the patented feature, not sale

26   of software that includes the feature. *Lucent*, 580 F.3d at 1317 ("Claims 19 and 21 are method

27   claims; thus, Microsoft's sales of its software alone cannot infringe the patent. Infringement occurs

28   only when someone performs the method using a computer running the necessary software."); *id.*

1    at 1334 ("Only when the date-picker is used to fill out a form does infringement occur."); *Cardiac*

2    *Pacemakers*, 576 F.3d at 1359 ("Therefore, [a patentee] can only receive infringement damages on

3    those devices that actually performed the patented method during the relevant infringement

4    period."). The fact that Lucent characterized all 109.5 million licenses as "infringing" was contrary

5    to the Federal Circuit's opinion and tainted Lucent's analysis. *Id.*

6            Further restricting the base to the 3% of date-picker users who were also "involved in"

7    purchase decisions and who said they would not have bought Outlook without the date-picker was

8    not apportionment either. Lucent still used the entire $67 per unit revenue for the resulting 3.3

9    million licenses. Use of the full $67 violates the entire market value rule no matter how Lucent

10   narrows the subset of licenses to which it was applied.

11           Lucent's response at trial was to say that it can allocate 100% of the value of Outlook to the

12   date-picker for the 3.3 million extrapolated licensees who purportedly wouldn't have bought

13   Outlook without it. (Exh. D at 87:21-88:1, Exh. E at 180:9-25, 196:18-197:18.)  But apportionment

14   is supposed to separate the value of the patented feature from the value of the non-patented

15   features that the customer acquires and that Microsoft can freely sell. There may be many reasons

16   why a consumer would not buy a particular product. Lucent's survey did nothing to determine if

17   there were other features—such as spell check, search functionality, appointment color coding,

18   spam filters, an undo button, the ability to create e-mail signatures or attach documents to e-mail,

19   or e-mail in its entirety (or even the imaginary music player)—that if removed would have caused

20   the same consumers not to buy the product. (Exh. B at 237:18-239:17.)  Lucent could have asked

21   those questions:  Dr. Jay had asked about non-infringing features in one of her previous cases.

22   (Exh. B at 236:9-16; Exh. C at 65:22-24.)  Without answers to them, it is impossible to know

23   whether some (or all) of the 27 of the 384 who said they wouldn't buy Outlook without the date-

24   picker also wouldn't have purchased Outlook if it didn't have one of these other features. And if

25   the same survey respondents who wouldn't have bought Outlook without the date-picker also

26   wouldn't have bought it if it were missing another feature, like the e-mail send button, then it is

27   impossible to say that 100% of the value of Outlook is attributable to either of those features. It

28   would still be necessary to apportion the $67 figure between features.

Instead of apportioning as it should have, Lucent used the Jay survey to argue *sub rosa* that it *had* satisfied the entire market value rule for 27 out of 384 survey respondents who said they would not purchase "Microsoft Outlook" without the date-picker, and therefore was entitled to use the *entire* $67 for that group and the extrapolated group. But satisfying the entire market value rule is an all-or-nothing proposition. A patented feature is either "the basis or a substantial basis of customer demand" for a larger product, or it is not. If it is, then the patentee can calculate damages based on the entire price of the product. If not, then the patentee's damages claim *must* apportion between the value of patented and unpatented features and can claim damages based on *only* the portion attributable to the patented feature. Since Lucent admitted it was not seeking damages based on the entire market value of Outlook, it could not then turn around and claim the entire market value of Outlook for 3% of Outlook users.

Moreover, even if one could invoke the entire market value rule for fewer than all customers, the Jay Survey did not even ask the relevant question. "For the entire market value rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand." *Lucent*, 580 F.3d at 1336 (quoting *Rite-Hite*, 56 F.3d at 1549). The phrase "basis for customer demand" is another way of saying that the customer bought the product "because of" the patented feature. *Id*. at 1337 ("Consistent with this description of Outlook, Lucent did not carry its evidentiary burden of proving that anyone purchased Outlook *because of* the patented method."); *id*. at 1338 ("we can only arrive at the unmistakable conclusion that the invention described in claim 19 of the Day patent is not *the reason consumers purchase Outlook*."). But the Jay survey never asked respondents why they bought Outlook, or if they bought Outlook "because of" the date-picker. The Jay survey asked them if they would not have bought Outlook if the date-picker were removed. Those are two different questions that can yield different answers, as Dr. Jay (circuitously) volunteered:

> Q.  … *You could have asked people why did you buy Outlook. You didn't ask that question either, did you?*
>
> A.    *I did not ask that question, but it measures something different.* So just to be clear, you may have reasons for buying something and yet -- so, for example, there might be reasons for buying a car. And if I ask you to say why did you want a particular car, you might have listed out gas mileage, and you might have listed out price and consumer reports. And you might not have mentioned color because you

might not have thought that's a reason why I bought the car, but if I then told you the car only came in purple and asked you would you or would you have not -- you know, would you have bought it if it only came in purple or would you not have bought it if it only came in purple, it's -- you're measuring something different, so -- and it works both ways. ***So sometimes you can list something as a reason and it may be you didn't mention it but you wouldn't have bought whatever you bought without it***. . . . ***So you don't know. You're just measuring something different***, and I have asked questions like that in other surveys, what are the reasons you did something, and I've also asked this type of question.

(Exh. B at 230:21-232:3.)

Even Dr. Jay acknowledged that asking why a person bought a product (*i.e.*, if they bought it "because of" a feature) "measures something different" than asking whether they would have bought the product if a feature were removed. Picking up on Dr. Jay's example of a car, someone shopping for a new car may be interested in a car with cup holders, side airbags, anti-lock brakes, a CD changer and Bluetooth capability. After buying the car, if you asked that person whether they would have bought the car if it did not have a cup holder, that person would say no. But nobody would conclude that the cup holder was the "basis for customer demand" for the car, or that one would not need to apportion the value of the cup holder apart from the other features. To understand what (if any) individual features of the car are the bases of customer demand, you'd have to ask different questions. In this case, those questions would ask customers whether they bought Outlook (or Office) solely or primarily "because of" the date-picker, or whether the date-picker was the "reason consumers purchase Outlook." *Lucent*, 580 F.3d at 1337-38. The Jay survey never asked those questions. Therefore, the Jay survey does not show the date-picker is the basis of customer demand for even 27 out of 384 respondents who said they would not buy Outlook without the date-picker. Mr. Sims and Lucent had to apportion the value of Outlook for those respondents, and their extrapolated counterparts, and they did not.

> **3.** **Lucent Also Failed To Apportion By Improperly Assuming that All Office Licensees Were Outlook Users.**

The Jay survey never asked consumers about whether they would buy Office without the date picker. Instead of properly applying the survey to the context in which its questions were asked, Lucent used Mr. Sims' testimony to mislead the jury into concluding that Microsoft would have lost some of its sales of 109.3 million Office licenses. But the Jay survey at the most showed that after filtering out respondents who 1) did not use Outlook, or 2) did not use Outlook to

1  calendar appointments, or 3) did not use the date-picker when calendaring appointments, or 4)

2  were not "involved" in the purchase decision, 27 remaining respondents, having indicated they

3  were somehow "involved in the decision to purchase Outlook," said they would not have

4  purchased Outlook without the date-picker. Mr. Sims ignores those filters when he extrapolates

5  that number back to all date-picker users, even if they were not "purchase decision makers." (Exh.

6  D at 14.) Most importantly, he wrongly extrapolates that number back to all Office licenses. (Exh.

7  D at 14–15.) Neither the Jay survey nor Mr. Sims' analysis provides any basis for establishing that

8  Office licensees used the Outlook component of Office, let alone used Outlook to calendar

9  appointments, or more importantly used the date-picker when calendaring those appointments.

10       The judgment is premised on the factual assertion that more than 3.3 million Office

11  licensees would not have purchased **Office** merely because one part of the Office suite, **Outlook,**

12  lacked the date-picker. (Exh. D at 14.) The survey provides no data to support that assertion. And

13  Mr. Sims could not and did not justify it on any other basis. Mr. Sims—not an expert on consumer

14  purchasing decisions—simply applied the 3% "would not have bought Outlook" to consumers who

15  actually purchased Office. (Exh. D at 14–15.) When pressed to explain why, he did not even

16  speculate that the decision to purchase Outlook is the same as the decision to purchase Office.

17  Instead, he admitted that he did not assume that purchasers would have foregone Word, Excel and

18  PowerPoint (the other products in the standard Office suite) merely because Outlook's calendar

19  module did not include the date-picker. He offered two alternatives for consumers:

20       [O]ne could certainly possibly conclude that they may not have bought
         Office, but I didn't assume that. I assumed they wouldn't have bought the

21       Outlook. . . . They could have bought other products individually or they
         could have bought a suite of products, Office, that didn't include Outlook.

22

23  (Exh. D at 152–53.)

24       Lucent's damages theory hinges entirely on the second alternative: that consumers would

25  have purchased an Office version that did not include Outlook. But Lucent never presented *any*

26  evidence that consumers could have purchased a version of Office without Outlook during the

27  relevant period (from 2003 through 2006). The evidence shows that the only version of Office

28  referred to in the record that did not include Outlook, a "Home and Student" version of Office

(Exh. E at 40–41), wasn't available until late 2006, the very end of the damages period. (Exh. E at 39-40.) And there is no evidence that version was marketed to the general public even in that fraction of the damages period; to the contrary, the evidence indicates it was marketed at "academic pricing" to students and academics who presented a valid school ID. (Exh. E at 40-41.)

Lucent's counsel during closing emphasized that the judgment depends on the jury accepting that purchasers during the relevant period could have purchased Office without Outlook:

> Mr. Sims repeatedly explained to you that the fact that Outlook is bundled in Office is of no moment. Why? The loss is you take Office without Outlook, right, these are the people who like Outlook just they way it is, and you deduct from that revenue from Office without Outlook, right, because presumably those who don't like Outlook without the date-picker will get office without it, and they'll go find a competitive product to Outlook.

(Exh. E at 197; *see also* Exh. E at 180 ("They're not going to buy the Outlook product, just that portion.").) There is no evidence to support this argument, which is essential to the judgment. *No such version of Office was in fact available*.

Mr. Sims never elaborated upon, and Lucent's counsel never relied upon, Mr. Sims' alternative speculation: that consumers would have purchased the various products in the Office suite—Word, Excel and PowerPoint—individually. The reason is clear: the argument makes no sense, and if it were true, it would require vacating the verdict. The bundled version of Office offered a significant discount over buying the products individually—for example, even after excluding Outlook, purchasing the other 2010 Office components individually would cost ***more*** than buying the Office bundle with Outlook. (Exh. E at 70 and 92–93.) So not only is it irrational to assume consumers would have been willing to pay more to avoid having Outlook without the date-picker, but in Lucent's scenario ***Microsoft would have made more money, not lost money.***

Further, Mr. Sims applied the 3% figure he derived from the Jay survey—supposedly a percentage of ***Outlook*** users—to 109.3 million ***Office*** licenses, by assuming that 100% of Office licensees are also Outlook users. (Exh. D at 14–15, 164.) There was no basis in the evidence for that assumption. Mr. Sims claimed a Microsoft document (Exh. J, PX-838) showed that "over 98 percent [of Office users] used Outlook." (Exh. D at 164.) But that document on its face indicates that it is a survey of ***Outlook users,*** not Office licensees—and the figures Mr. Sims referred to only

show what percentage of Outlook users use Outlook daily. (Exh. E at 10–21.) The document has no information about what percentage of Office licensees use Outlook. (Exh. E at 12.)

Mr. Sims' flawed analysis of the Jay survey, and his application of that analysis to all Office licenses, provided the sole basis for the grossly excessive damage award, and without it, the jury's verdict is supported by no evidence whatsoever.

### 4. Lucent Tried To Apportion But Abandoned That Effort When It Didn't Produce The Damages Number Lucent Wanted.

Nothing prevented Lucent from apportioning the $67 between the date-picker and the unpatented features. Indeed, Lucent initially tried to do such a calculation with Mr. Sims' "add-ins" analysis, ascribing a $4.80 value to the date-picker. (Doc. No. 1284 at 16-18.) The Court excluded that analysis because Lucent failed to show there was a market for the allegedly "comparable" add-in that Mr. Sims used, but allowed Lucent to supplement its analysis. (*Id*. at 16-18, 24) Rather than do a proper add-in analysis, Lucent decided to abandon the "add-ins" analysis altogether—because the add-ins that were comparable to the date-picker were free (*id.* at 16), and could not support the extravagant $70 million award Lucent sought.

Lucent made a similar effort at apportionment by using the Jay survey to determine the value of the date-picker as an "add-in," asking respondents whether they would pay something extra (and how much) to add the date-picker to Outlook. (Exh. C at 8.) But those results showed that 95% of Outlook users had no interest in purchasing the date-picker as an add-in (*see* Exh. B at 161)—and that included nearly all of the respondents who said they wouldn't buy Outlook without the date-picker (Exh. C at 10-13). This effort at apportionment showed the date-picker had little value as an add-in. Consequently, Lucent abandoned this effort as well, and stuck with the legally-baseless theory that it could recover an award based on the full $67 of Outlook revenue.

The law does not permit Lucent to ignore comparable add-ins that could support a small royalty merely because it asserted that Outlook is the "smallest" product that Microsoft sells that includes the date-picker. (Exh. E at 188:5-11.) What an accused infringer chooses to sell cannot limit the universe of comparable items for purposes of valuing a single aspect of a feature rich product like Outlook. Just because Apple chooses not to sell apps separate from its iPhone doesn't mean that if a particular app (say, the maps app) comes preloaded on the iPhone, then a patentee

suing Apple for infringement would be free to "value" the app based on the total price of the iPhone. The market for apps would be the place to look for the value of the infringing, preloaded app. The same is true for Microsoft and a single aspect of its feature-rich Outlook product.

**B.     Lucent's Evidence Failed To Identify Any Hypothetical Lost Revenues Associated With Removing The Date-Picker From Outlook.**

Even if the Court concludes that Mr. Sims' analysis presented a theoretically permissible method of apportionment, the damages award still cannot stand. Each of the figures Mr. Sims used to calculate the award was unsupported by substantial evidence. Discussed below are the calculations for Office, as that was the bulk of the award, but the deficiencies apply equally to Money and Pocket PC. If the Court finds that any stage of Mr. Sims' calculation was flawed, the entire calculation fails. *Uniloc*, 632 F.3d at 1317, 1321.

**1.     The Survey Did Not Actually Identify Purchase Decision Makers.**

Mr. Sims began by multiplying the 109.5 million Office and Outlook licenses by 3%, which he said was the fraction of "purchase decision makers" who would not have purchased Outlook if the date-picker were removed. There is no evidence that even 3% of *all* Outlook "purchase decision-makers" would not buy Outlook if the date-picker were removed, let alone evidence to extrapolate that to all Office licensees.

First, the Jay survey asked respondents to identify whether they were "involved in" the decision to purchase Outlook. It did not ask whether they made the decision. Treating those "involved in" the decision to purchase as if they had the power to control purchase decisions is a speculative leap with no evidentiary basis.

Further, the Jay survey only measured the percentage of Outlook "purchase decision-makers" *who had used the date-picker* who would not have bought Outlook if the date-picker were removed. (Exh. G, DJ-29; Exh. B at 152:23-153:19.)  The Jay survey merely found that 7% of that group (27/384) would not have bought Outlook without the date-picker. (*Id*.)  But Mr. Sims had to make an assumption to formulate a percentage of overall Outlook users who wouldn't buy Outlook without the date-picker. (Exh. G, DJ-34; Exh. B at 159:7-23, 160:3-21.)  That was because neither Mr. Sims nor Dr. Jay could be sure how many total Outlook purchase decision-makers were in the survey pool of respondents. The Jay survey only asked people who had used the date-

1 | picker whether they were "involved in" the purchase decision, rather than asking all 3,387 pre-
2 | 2007 Outlook users whether they were purchase decision-makers.

3 |       The assumption Lucent used to try to bridge this evidentiary gap was that "purchase
4 | decision-makers" use the date-picker at the same 43% rate that the Jay survey found that Outlook
5 | users generally do. (Exh. G, DJ-34; Exh. B at 159:7-23; Exh. D at 11:20-15:3; Exh. F, RS-13-16.)
6 | But an assumption is not evidence, and the fact that Dr. Jay deemed the assumption "reasonable"
7 | does not make it so. There is no reason why Lucent should not have been required to ask each one
8 | of the 3,387 pre-2007 Outlook users surveyed whether they were an Outlook purchase decision-
9 | maker. At most, the Jay survey showed that 27 people out of the 3,387 pre-2007 Outlook users
10 | surveyed would not have bought Outlook without the date-picker.

11 |       Lucent protests that 27 out of 3,387 is the wrong number to use because only 384 people
12 | were asked whether they would have bought Outlook without the date-picker. (Exh. D at 179:19-
13 | 181:9.) But the reason the rest of the pre-2007 Outlook users weren't asked whether removing the
14 | date-picker would have caused them not to buy Outlook was because Lucent already knew the
15 | answer. Of those 3,387 users, 1,500 didn't use the calendar module, 442 never used the date-
16 | picker, and 1,061 weren't "purchase decision-makers." (Exh. D at 155:24-157:6.) None of these
17 | people could have decided against purchasing Outlook based on the removal of the date-picker.
18 | Rather than excluding these groups from the computation, Lucent should have included them as
19 | users for whom removal of the date-picker would have made no difference.

20 |       **2.    The Survey Provides No Information About Office Purchases**

21 |       As discussed above, the Jay survey did not ask whether respondents purchased Outlook as
22 | part of Office, yet Mr. Sims used 109.3 million Office licenses in his analysis. Even if 3% were the
23 | correct percentage of Outlook "purchase decision-makers" who would not have purchased stand-
24 | alone **Outlook**, there was no evidentiary basis for extrapolating that to say that 3% of **Office**
25 | "purchase decision-makers" would not have purchased the **Office** suite if the date-picker were
26 | removed. The Jay survey only asked whether respondents would still buy Microsoft **Outlook** if the
27 | "drop-down calendar" were removed. (Exh. G, DJ-29.) The survey did not ask whether
28 | respondents would still buy Microsoft **Office**. (Exh. D at 152:11-18.) The survey likewise did not

1    ask whether respondents who acquired Outlook because it was pre-installed on a computer would

2    have chosen to purchase a different computer—one without Outlook pre-installed—if the "drop-

3    down calendar" were removed. (Exh. D at 154:5-8.)  The survey did not even ask respondents how

4    they had acquired Outlook—whether standalone, part of Office, or pre-installed on a computer.

5    (Exh. D at 152:8-10.)  Yet Mr. Sims applied the 3% figure for Outlook "purchase decision-

6    makers" not just to the 241,000 standalone Outlook licenses, but also the 109.3 million licenses for

7    the Office suite.

8            There is no evidence to show that if 3% of people would not buy **Outlook** without the

9    "drop-down calendar," then 3% of people would not purchase **Office** without the drop-down

10   calendar, or that 3% of people would change which computer they purchased if the drop-down

11   calendar were removed to ensure they bought a computer without Outlook. There is no evidence

12   that customers consider exactly the same things when deciding whether to buy standalone Outlook

13   that they consider when deciding whether to buy the entire Office suite or a computer. Common

14   sense suggests customers would consider different things. The Office suite includes at a minimum

15   not just Outlook, but also Word, Excel, and PowerPoint. (Exh. D at 159:6-160:22.)  Office

16   customers may not base their decision on the functionality of Outlook at all. Indeed, the Jay survey

17   showed that more respondents had used Word (78%) and Excel (59%) than had used Outlook

18   (52%)—confirming Mr. Harris's testimony that only half of Office licensees use Outlook. (Exh. G,

19   DJ-14; Exh. B at 256:3-11; Exh. D at 241–42.)  Likewise, a customer's decision regarding whether

20   to purchase a computer likely turns on many things besides a "tiny, small, minor" feature in one

21   pre-installed program.

22           When questioned about this issue at trial, Dr. Jay and Mr. Sims responded that they thought

23   it was reasonable to extrapolate the 3% from standalone Outlook to the Office suite. (Exh. B at

24   249:11-255:14; Exh. D at 152:1-18.)  At times, they said they "assume[d]" that the survey

25   respondents would have understood that the question about whether a person would have bought

26   "Microsoft Outlook" would have applied equally to Office or to a computer with pre-installed

27   Outlook, if that is how the respondent purchased the product. (*Id.*)  But assumptions are not

28   evidence. Mr. Sims expressly rejected any such (baseless) assumption, relying instead on the

1   equally baseless speculation that those Office purchasers who said they would not have purchased

2   Outlook if it did not have the date-picker would have purchased a version of Office without

3   Outlook. (Exh. D at 152-153.)  But, as discussed above, such a product was not even available

4   until the very end of the relevant period, and even then was marketed only to students and

5   academics. (Exh. E at 39-41.)

6          None of the survey respondents actually was asked about Office (or purchasing a PC with

7   Office pre-installed). Even a tiny change in the 3% rate would have significantly influenced

8   Mr. Sims' calculations. Worse yet, there were millions more licenses for Office (109.3 million) at

9   issue than there were for standalone Outlook (241,000). So the question the survey actually asked

10  applied to only a fraction of the licenses at issue, even though Lucent was aware of the discrepancy

11  and could have had Dr. Jay ask the relevant question.

12         Third, Dr. Jay's testimony cannot support the 3% figure because it was unreliable and

13  inadmissible under *Daubert*. Microsoft has explained the flaws in the survey in pre-trial motions

14  and its new trial motion, including its failure to use a control group, confusing questions, and high

15  error rate. (Doc. Nos. 1327, 1224, 1032.)  Unreliable expert testimony cannot support the verdict.

16         **3.     Lucent Should Not Have Applied the $67 Figure to Office Licenses**

17         The next stage of Mr. Sims' calculation was no better. Having erroneously determined that

18  Microsoft would have licensed 3.3 million fewer copies of Office and Outlook by removing the

19  date-picker (109.5 million x 3%), he applied the wrong revenue per unit ($67) when trying to

20  convert that to lost revenue. As a legal matter, the $67 was not a proper apportionment for either

21  Office or Outlook; moreover, Lucent failed to establish as a factual matter that $67 of the revenue

22  from a sale of the Office suite is attributable to Outlook. In other words, regardless of whether $67

23  is the right number to use with standalone Outlook, it is the wrong number to use for Office.

24         The largest amount of lost revenue attributable to Outlook for a unit of Office that the

25  evidence could support is $13.45, not $67. Mr. Sims began with the proposition that the revenue

26  attributable to the entire Office suite is $98 per unit. (Exh. D at 166:13-167:4.) Office includes at a

27  minimum Word, Excel, PowerPoint, and Outlook. (Exh. D at 159:6-160:22) The retail standalone

28  prices for the 2003 versions of those products were $229 each for Word, Excel, and PowerPoint,

1   and $109 for Outlook. (Exh. D at 170:8-171:20; Exh. K, PX-467.)  So if a customer purchased all

2   four products individually, Outlook would comprise only 13.7% of the purchase price. (*Id.*)

3   Applying that percentage to Mr. Sims' $98 per unit for the Office suite would yield $13.45 revenue

4   per unit that is attributable to Outlook. Yet Mr. Sims assigned $67 of revenue per unit to

5   Outlook—68% of the value of the Office suite. There was no evidence to support such a leap.

6       Lucent claimed that Mr. Sims' use of $67 was supported by the price difference between

7   two versions of Office 2010. (Exh. E at 70:6-71:23, 181:1-7; 197:19-198:22; Exh. I, PX-1895.)

8   But, as discussed above, there was no evidence that the price difference reflected the value of

9   Outlook, and, in fact, the evidence was otherwise. (Exh. E at 40:9-42:19.)

10              **4.      Lucent Should Have Discounted to 1996, Not Just 2003**

11      After erroneously applying the $67 per unit revenue to all 3.3 million Office and Outlook

12  licenses, then multiplying by Microsoft's 76.2% profit margin, Mr. Sims determined that Microsoft

13  would have foregone $168.8 million in profit if it removed the date-picker from Outlook. (Exh. D

14  at 18:3-14, 22:13-28:10; Exh. F, RS-18.)  Performing similar calculations for Money and Pocket

15  PC, he found Microsoft would have forgone $172.3 million in total profit. (Exh. F, RS-27.)  He

16  then discounted that to 2003 to arrive at a value of $138.7 million. (Exh. F, RS-27.)  But Mr. Sims

17  should have discounted back to 1996—the date of the hypothetical negotiation—not 2003.

18      It is undisputed that the hypothetical negotiation would have taken place in 1996. (Exh. C,

19  III-198:21-199:15.)  Nonetheless, Mr. Sims merely assumed Lucent would have waited 7 years to

20  receive a lump sum payment (Exh. C at 198:21-199:15, 210:5-9, Exh. D at 28:11-29:10.)  That

21  view lacks an evidentiary basis. To the contrary, the only evidence on the subject was that "cash up

22  front was always the desired payment" for Lucent and that "up front ***on signing*** was the preferred

23  approach."  (Exh. C at 185:24-186:8.)  The hypothetical license between the parties would have

24  been signed in 1996, so Lucent would have demanded payment in 1996.

25      **C.      In Addition To Its Other Errors, Lucent Presented No Evidence To Support
             Its 50% Royalty Rate**

26

27      After Lucent "calculated" $138.7 million as potential lost profits to Microsoft if the date-

28  picker were removed, and treated that figure as its royalty base, the remaining question was how

Microsoft and Lucent would divide this amount at the hypothetical negotiation, *i.e.*, what royalty

1   rate should be applied. Mr. Sims applied an over 50% effective royalty to arrive at his bottom line

2   of $70 million. The Court recognized that a 50% royalty is "[w]ay too high" during one of the *in*

3   *limine* motion hearings. (Exh. L at 99:4-7.) The lack of evidence at trial to support a 50% royalty

4   shows that the Court was correct. Lucent presented no evidence to show how Lucent or Microsoft

5   would divide such a base. Lucent did not rely upon any comparable licenses. Lucent introduced

6   nothing to prove how the value for other comparable features had been divided in other real-world

7   negotiations. Instead, Mr. Sims justified his 50% royalty by asserting that more *Georgia-Pacific*

8   factors favored Lucent, so Lucent would take more than half the $138 million base:

> And we know that that range was somewhere between zero and 138.7 million. I've just gone through all of these *Georgia Pacific* factors, and on balance, they favor Lucent, which means there are more factors that have an upward influence than factors that have a downward influence. So I would expect that the rate would be in the upper end of that range rather than the lower end of that range, but to be conservative, I've assumed that the parties would have -- there would be no upward or downward influence. It would be relatively neutral. And therefore, the parties would likely agree that there would be -- a reasonable royalty would be a lump sum in the middle of that range between 65 and $75 million.

13  (Exh. D at 91:1-13.) Mr. Sims used the same reasoning moments later, when repackaging his

14  analysis as a "Business Realities" approach to again arrive at a 50% royalty:

> On balance, because of their bargaining positions, I believe the bargaining strength would be in Lucent's favor, just as it was in the Georgia Pacific factors. There's (sic) more factors that favor Lucent than favor Microsoft. So on balance, I would expect there would be -- the negotiating strength would be on Lucent's side of the table.

18  (Exh. D at 94:11-16.)

19      Such conclusory analysis cannot support a 50% rate. This Court's *in limine* order excluded

20  an earlier Lucent analysis where Mr. Sims said the parties would bargain from $0 and $138.7

21  million to arrive at $70 million based on "other *Georgia-Pacific* factors and Business Realities

22  considerations." (Doc. No. 1323 at 13.) The Court found this "vague statement" was "not tied to

23  any factual predicates," and that there was inadequate explanation of why "the parties would meet

24  around $70 million versus any other number in the range between $0 and $138.7 million." (*Id.*)

25  Mr. Sims' analysis at trial was likewise deficient. Simply throwing out high numbers, like $138.7

26  million, that are not tethered to what Microsoft would pay cannot support the verdict.

27      The Honorable Rudi M. Brewster rejected a similar "split the difference" approach in

28  *Integra*. There, the patentee's damages expert opined that the most the defendant would be willing

1    to pay would be $40 million and the least the plaintiff would accept would be $0. *Integra,* 2004

2    WL 2284001, at *7. The plaintiff's damages expert "split the difference to arrive at what he opined

3    was a reasonable royalty," namely $20 million. *Id.* The jury awarded $15 million. The District

4    Court rejected the "split the difference" approach, which would have yielded a 28.9% royalty on

5    profits, because it failed to account for the fact the defendant bore all the risk while the plaintiff

6    bore zero risk. The Court thus granted JMOL and reduced the award to $6.3 million, the highest

7    number the Court believed was supported by substantial evidence. *Id.* Here, Lucent's "split the

8    difference" analysis is just as perfunctory, and resulted in an even more inflated royalty.

9          Having witnessed the demise of the 25% rule in *Uniloc,* Lucent's response was to create a

10    50% rule, in which the patent holder gets at least a 50% royalty when more *Georgia-Pacific* factors

11    supposedly favor it than favor the defendant. This Court should reject such a rule for the same

12    reason that *Uniloc* rejected the 25% rule:  it fails to tie the royalty rate to the facts of the case. 632

13    F.3d at 1315-18. The *Georgia-Pacific* factors are an "unprioritized and often overlapping" list of

14    factors,  *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010), and Lucent

15    presented no evidence regarding their relative weights or proving that the parties would simply

16    count them up and assign a royalty rate based on how many favored Lucent.

17         **D.**    **None of the Other Evidence Could Support An Award Over $5 Million.**

18          The remaining question for the Court is whether the other "evidence"—(1) Lucent's

19    licensing policy, (2) the "time savings" analysis, and (3) the "qualitative analysis"—can support

20    the verdict. As explained in detail in Microsoft's Motion for New Trial, it cannot.

21         **1.**    **Lucent's Licensing Policy Should Not Have Been Admitted and Cannot**
               **Support the Verdict.**

22

23          As set forth at Section III.C of Microsoft's Rule 59 Motion, it was error to allow Lucent to

24    introduce its alleged licensing policy into evidence. Lucent spent much time at trial emphasizing its

25    policy of receiving 1% of total revenue from the smallest commercially saleable unit of a product

26    practicing one of its patents. (Exh. E at 188:5-11; Exh. D at 70:10-23, 72:1-12, 74:14-21.)  Lucent

27    and Mr. Sims repeatedly stressed that the smallest commercially saleable unit in this case was

28    Outlook. (*Id.*)  Lucent also characterized all 109.5 million licenses for Office and Outlook as

    "infringing" (Exh. D at 15:4-16:7, Exh. F, RS-16-19), even though the Federal Circuit held that use

of the date-picker—not sale of the software—is what constitutes infringement. *Lucent*, 580 F.3d at 1317, 1334. Lucent repeatedly invited the jury to apply the 1% rate to Microsoft's revenue from all 109.5 million licenses. (Exh. D at 70:10-23, 72:1-12, 74:14-21; Exh. E at 188:5-11) The jurors had the figures to calculate that alleged revenue —109.5 million licenses multiplied by the $67 per unit figure = $7.3 billion. The jurors also had the tools (calculators) to arrive at 1% of $7.3 billion, i.e., $73 million. And Lucent itself applied the 1% to the Outlook revenue. On direct, when determining how to split the alleged $138 million foregone profit, Mr. Sims testified the royalty would be between $65 and $75 million and the licensing policy would be a neutral factor, not surprising since it resulted in a royalty exactly in the range Lucent was seeking. (Exh. D at 70:10-23, 72:1-12, 74:14-21, 78:23-79:4; Exh. E at 188:5-11). On cross, however, in determining whether a 50% foregone profit split would be appropriate if the foregone profit was $8.9 million instead of $138 million, Mr. Sims asserted there "would be other factors that would influence the negotiation" such as "Lucent's licensing policy". (Exh. E at 178:2-18). Again, not surprising, as the policy of applying 1% to all Outlook sales would result in royalty higher than the foregone profit in that scenario. But this calculation cannot support the jury's award because it violates the entire market value rule. This Court's *in limine* order so held. (Doc. No. 1323 at 9-10.) Legally erroneous theories cannot support the jury verdict.

### 2. The Time Savings Analysis Cannot Support the Verdict.

It was error to allow Lucent to present its time savings analyses to the jury. In addition to being inadmissible, there are at least two reasons why the time savings analysis cannot support the jury's award. First, the analysis was based on Mr. Sims' assumption that "users would save at least one second of time per use" of the date-picker. (Exh. D at 42:6-7.) There was no evidence to support that assumption. Messrs. Sims and Tognazzini admitted that there are multiple situations in which using the date-picker is slower than non-infringing ways of scheduling an appointment and that using the date-picker can introduce errors. (Exh. B at 10:5-17; Exh. D at 141:7-23 and 142:7-15; Exh. A at 252:25-253:25.) Lucent accordingly had its witnesses say that the date-picker was one second faster "on average," instead of every time it was used. (Exh. A at 197:20-200:20, 214:19-25; Exh. D at 141:24-142:6.) But Lucent offered no analysis to support this claim other

1    than Mr. Tognazzini's conclusory assertion. A party cannot rely only on an expert's "conclusory"

2    or "unsupported" assertion a fact is true. *Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589

3    F.3d 1179, 1184-86 (Fed. Cir. 2009); *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042,

4    1046 (Fed. Cir. 2000).

5            Second, even if the one second assumption were permissible, the most Mr. Sims' time

6    savings analysis shows is that the date-picker has $170.1 million in value to consumers. (Exh. D at

7    40:16-41:19, 53:11-22; Exh. F, RS-57.)  However, despite the Court's instructions (Exh. D at

8    39:24-40:9, 49:20-23; Exh. M at 13:3-9; Doc. No. 1284 at 18-20),  Lucent did nothing to convert

9    the alleged "value to consumers" into a value to Microsoft or to link this to any amount that

10   Microsoft would be willing to pay Lucent in the hypothetical negotiation. Indeed, Mr. Sims

11   admitted that his $170.1 million number was not what Microsoft would pay. (Exh. D at 40:16-

12   41:19, 53:11-22.)  Given the absence of any evidence linking the $170.1 million to an amount

13   Microsoft would pay for the Day patent, the time savings analysis cannot support the jury's award.

14   Lucent recognized as much by omitting the time savings analysis from its closing entirely.

15            **3.     Qualitative Evidence about Outlook Usage Cannot Support the Verdict.**

16            Finally, Mr. Sims' "qualitative analysis" cannot support any specific damages award. That

17   analysis consisted of Mr. Sims discussing various Microsoft internal documents about Outlook and

18   Lotus Notes. (Exh. D at 212:17-220:18, 230:12-257:4.)  Lucent never tied that discussion to a

19   specific amount that Microsoft would have been willing to pay at the hypothetical negotiation.

20   Much of the discussion was unrelated to the date-picker and focused instead on how frequently

21   some customers use Outlook or the Calendar generally. (*See, e.g.*, Exh. C at 215:8-216:18, 218:21-

22   220:18.) That is the very evidence the Federal Circuit said cannot support the damages award, and

23   it was error to admit it at this re-trial. *Lucent*, 580 F.3d at 1334. Therefore, Lucent failed to show

24   that any damages award above $5 million could be supported by substantial evidence.

25   **V.     CONCLUSION**

26            For the reasons above, the Court should set aside the verdict and enter judgment of no more

27   than $5 million in damages, or, at a minimum, reduce the award to correct for Lucent's errors.

28

Dated:  August 26, 2011                    FISH & RICHARDSON P.C.


                                           By:  s/ Juanita R. Brooks
                                                Juanita R. Brooks (SBN75934)
                                                brooks@fr.com

                                           Attorneys for Defendant
                                           MICROSOFT CORPORATION

1

## CERTIFICATE OF SERVICE

2

3        The undersigned hereby certifies that a true and correct copy of the above and foregoing

4   document has been served on August 26, 2011 to all counsel of record who are deemed to have

5   consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any

6   other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

7

8                                              /s/ Juanita R. Brooks_____
                                               Juanita R. Brooks (SBN 75934)
9                                              brooks@fr.com

10                                             Attorney for Defendant
                                               MICROSOFT CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28