1   Luke L. Dauchot (SBN 229829)
    KIRKLAND & ELLIS LLP
2   333 South Hope Street
3   Los Angeles, CA 90071
    Telephone: (213) 680-8400
4   Facsimile: (213) 680-8500

5   Attorney for *Lucent Technologies Inc.*

6   *(Additional counsel listed on the last page)*

7

8                   **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  LUCENT TECHNOLOGIES INC.,                Case No. 07-CV-2000-H (CAB)

12                    Plaintiff,             **MEMORANDUM OF POINTS AND
                                             AUTHORITIES IN SUPPORT OF**
13            v.                             **LUCENT'S OPPOSITION TO
                                             MICROSOFT'S MOTION FOR A NEW**
14  MICROSOFT CORPORATION,                   **TRIAL**

15                    Defendant.             Date:          October 12, 2011
                                             Time:          1:30 p.m.
16                                           Courtroom:     13, 5th Floor
                                             Judge:         Hon. Marilyn L. Huff
17

18                                           **[REDACTED VERSION]**

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      **INTRODUCTION**.................................................................................................1

II.     **LEGAL STANDARD FOR A NEW TRIAL**..................................................3

III.    **ARGUMENT**.....................................................................................................5

    A.    Dr. Jay's Survey Asked Proper Questions And Yielded Reliable Results .............5

        1.    Dr. Jay properly asked respondents about Outlook. ...................................6

        2.    Dr. Jay properly identified respondents involved in the purchase decision. .......................................................................................................7

        3.    Dr. Jay properly identified respondents who would not have purchased. .....................................................................................................8

        4.    Dr. Jay properly accounted for error in her results. ...................................9

        5.    Dr. Jay properly accounted for guessing in her results............................10

        6.    Dr. Jay's 7% result is reliable. .................................................................11

    B.    Mr. Sims Properly Relied on the Jay Survey Results to Determine the Value of the Day Patent Technology to Microsoft.........................................................11

        1.    Mr. Sims's 3% figure is statistically justified............................................12

        2.    Mr. Sims properly valued Outlook at $67. ...............................................13

        3.    Mr. Sims's properly applied 3% to 109.5 million Outlook licenses..........15

        4.    Mr. Sims did not assume Microsoft would forgo sales of Office..............17

    C.    The Court Did Not Err by Allowing References to the Johnson Survey...............19

    D.    The Court Properly Instructed the Jury on the *Georgia-Pacific* Factors ...............20

        1.    The Court properly instructed the jury on all Georgia-Pacific factors. .....20

        2.    The Court properly admitted evidence on the Georgia-Pacific factors. ....22

    E.    *Global-Tech* Does Not Impact the Verdict in This Case .......................................25

IV.    **CONCLUSION** ................................................................................................**25**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*
   576 F.3d 1348 (Fed. Cir. 2009) ........................................................................................ 16

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
   418 F. Supp. 2d 1021 (S.D. Ind. 2006) ........................................................................... 16

*Costa v. Desert Palace, Inc.*,
   299 F.3d 838 (9th Cir. 2002) .............................................................................................. 5

*Coursen v. A.H. Robins Co., Inc.*,
   764 F.2d 1329 (9th Cir. 1985) ......................................................................................... 22

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) ....................................................................................... 16

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
   95 F.3d 1422 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999) ................................................ 4

*Duffy v. City of Desert Hot Springs*,
   342 F. App'x 279 (9th Cir. 2009) ...................................................................................... 4

*Google, Inc. v. American Blind & Wallpaper*,
   2007 WL 1159950 (N.D. Cal. Apr. 18, 2007) ................................................................. 10

*Grepke v. Gen. Elec. Co.*,
   280 F.3d 508 (7th Cir. 1960) ........................................................................................... 25

*In re Exxon Valdez*,
   270 F.3d 1215 (9th Cir. 2001) ........................................................................................... 4

*Landes Construction Co. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987) ........................................................................................... 4

*Lucent Techs., Inc. v. Gateway, Inc*,
   580 F.3d 1301 (Fed. Cir. 2009) .............................................................................. 3, 16, 21

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) ......................................................................................... 4

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003) ......................................................................................... 3

*Monsanto Co. v. Ralph*,
   382 F.3d 1374 (Fed. Cir. 2004) ......................................................................................... 3

*Pavao v. Pagay*,
   307 F.3d 915 (9th Cir. 2002) ...................................................................................... 4, 25

*Roy v. Volkswagen of Am., Inc.*,
    896 F.2d 1174 (9th Cir. 1990) ................................................................................ passim

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
    251 F.3d 814 (9th Cir. 2001) ........................................................................................ 15

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
    862 F.2d 1564 (Fed. Cir. 1988) .................................................................................... 23

*Tennant v. Peoria & Perkin Union Ry.*,
    321 U.S. 29 (1944) .................................................................................................. 4, 11

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .................................................................................... 21

*Union Oil Co. of Cal. v. Terrible Herbst, Inc.*,
    331 F.3d 735 (9th Cir. 2003) ..................................................................................... 4, 15

*United States v. 4.0 Acres of Land*,
    175 F.3d 1133 (9th Cir. 1999) ....................................................................................... 7

*Venegas v. Wagner*,
    813 F.2d 1514 (9th Cir. 1987) ....................................................................................... 9

*Weinar v. Rollform Inc.*,
    744 F.2d 797 (Fed. Cir. 1984) ..................................................................................... 22

*Ziggity Sys., Inc. v. Val Watering Sys.*,
    769 F. Supp. 752 (E.D. Pa. 1990) ................................................................................ 25

**<u>STATUTES</u>**

35 U.S.C. § 284 ................................................................................................................ 3

## I.       INTRODUCTION

Under Rule 59 of the Federal Rules of Civil Procedure, a trial court "may grant a new trial only if the verdict is against the clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).[1]  "A jury's verdict *must* be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion."  *Id.*[2]

In challenging the jury's verdict as against the clear weight of the evidence, Microsoft props up a straw man.  Throughout its motion for a new trial, Microsoft argues that Lucent failed to prove that Microsoft would have lost any given amount of profits in a but-for world without the Day Patent technology.  (*See, e.g.*, D.I. 1434 at 1 ("Lucent presented no evidence, much less substantial evidence, that could have led a reasonable jury to conclude that Microsoft would have lost $67 in revenue for any fraction of the 109 million licenses to Office if Outlook did not include the date picker.").)  But in so doing, Microsoft forgets that this is a reasonable royalty case based on the outcome of a hypothetical negotiation, not a lost profits case.  The distinction is critical.  Lucent's evidentiary burden was not to prove up the amount of Microsoft's lost profits (not to mention that in a lost profits case it would be Lucent's lost profits, not Microsoft's, at issue).  It was, rather, to present sufficient evidence regarding the outcome of a hypothetical negotiation based on competing positions about the value of the Day Patent technology to Microsoft.  And that is precisely what Lucent did at trial.  Lucent's position is that the value of the Day Patent technology to Microsoft is equivalent to the expected financial impact to Microsoft if Microsoft did not include the Day Patent technology—*i.e.*, Microsoft's excepted forgone profits from 3% of consumers who would not have purchased Outlook if, in the hypothetical world, Outlook did not include the Day Patent technology.[3]

---

[1]  Because a motion for a new trial is not unique to patent law, regional circuit law is applied.  *See Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed. Cir. 2004).

[2]  Unless otherwise indicated, all emphasis is added.

[3]  Of course, Microsoft never experienced that "expected" financial impact in the real world because it chose to infringe rather than remove the Day Patent technology from its products.  But that is why the exercise is called a "hypothetical" negotiation.

Lucent proved up these numbers through Dr. Jay's survey evidence and Microsoft's own financial documents.  Microsoft's position, by contrast, is that the Day Patent technology really has no value to Microsoft.  Microsoft's corporate witness claimed that removing the Day Patent technology from Outlook would have no impact on consumers' purchasing decisions and that Microsoft would pay no more than $5 million for a license.  Microsoft deliberately decided not to support its position with survey evidence or testimony from its own survey expert (strategically deciding to leave its expert at home).  It chose instead to "support" its position with the say-so of a biased Microsoft executive, uncorroborated by any evidence.  The jury's award was not against the clear weight of the evidence.

Lucent presented evidence adequate to support the jury's conclusion that Microsoft would agree to a reasonable royalty of $70 million for the Day Patent when faced with the possibility of forgoing $138.7 million in profits if it did not take a license.  Dr. Jay's survey provided evidence that 3% of Outlook consumers who use the Day Patent technology would not have bought Outlook if it did ***not*** include the patented technology.  Dr. Jay identified Outlook users and Outlook purchase decision makers, accounted for error and guessing, and obtained reliable results.  In arguing to the contrary, Microsoft renews the same challenges to Dr. Jay's survey that both this Court (in pretrial motions) and the jury (at trial) rejected.  Moreover, Microsoft was free to challenge Dr. Jay's survey with one of its own.  It elected not to do so, opting to challenge Dr. Jay with attorney argument only. The jury's decision to accept Dr. Jay's survey was not against the clear weight of the evidence.

The value of Outlook ($67, whether sold stand-alone or as part of Office) and Microsoft's profit margin came from Microsoft's own pricing practices and financial records.  Microsoft was free to challenge these figures and present competing ones.  Rather than present evidence of its own, Microsoft decided once again to rely on attorney argument.  The jury acted well within its province when it agreed with the evidence presented by Lucent.  The jury was repeatedly instructed that a reasonable royalty award had to be apportioned to reflect the value of the Day Patent technology. The jury's conclusion that $70 million reflected the apportioned value of the Day Patent technology was based on substantial evidence; it most definitely was not against the clear weight of the evidence.

Apportioning Microsoft's expected forgone profits strictly to those consumers who would

1   not have purchased the infringing products if they did not include the Day Patent technology, Mr.

2   Sims concluded that Microsoft would have expected to forgo approximately $138.7 million in profits

3   discounted to 2003.[4]  Applying the *Georgia-Pacific* and business realities models to that figure, Mr.

4   Sims's concluded that Lucent and Microsoft would have agreed to a royalty of $70 million for the

5   Day Patent technology.  Microsoft was free to challenge the conclusion.  It elected to do so with the

6   unsubstantiated testimony of a biased Microsoft executive with no licensing experience who

7   proclaimed that Microsoft would not have paid a dime over $5 million for a license to the Day Patent

8   technology.  Microsoft's negotiation theory expert merely parroted that proclamation.  To say the

9   jury's verdict is against the clear weight of the evidence is to ignore the evidentiary record.

10          As detailed below, Microsoft's additional challenges to the jury verdict also fail.  Microsoft's

11  trial strategy was to meet Lucent's evidence with attorney argument and conclusory witness

12  testimony unsupported by any documents.  In view of that deliberate strategy—one that failed to

13  overcome the evidence and analysis presented by Lucent—Microsoft's claim that the jury verdict is

14  against the clear weight of the evidence rings particularly hollow.  The jury's award of a reasonable

15  royalty of $70 million for Microsoft's infringement of the Day Patent is supported by substantial

16  evidence, is not grossly excessive, and does not warrant a new trial.

17  **II.    LEGAL STANDARD FOR A NEW TRIAL**

18          Upon a finding of infringement, the law requires an award of damages adequate to

19  compensate the patentee for infringement, but in no event less than a reasonable royalty.  35 U.S.C.

20  § 284.  A reasonable royalty is the floor below which damages may not fall.  *Lucent Techs., Inc. v.*

21  *Gateway, Inc.*, 580 F.3d 1301, 1324–25 (Fed. Cir. 2009).  The amount of damages based on a

22  reasonable royalty is an issue of fact for the jury.  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387,

23  1394 (Fed. Cir. 2003).  A jury's award is entitled to deference.  *Monsanto*, 382 F.3d at 1383.

24          As noted above, a trial court "may grant a new trial only if the jury's verdict is against the

25  _____

26  [4]  Mr. Sims's $138.7 million expected forgone profits figure related only to Outlook and Money; it did not include any forgone profits for Windows Mobile, as the Jay Survey did not include purchasing questions for Microsoft Mobile.

27  Although Dr. Jay's survey indicated that approximately 1 in every 3 purchases of Outlook and Money was at risk, Mr. Sims did not include a quantification of those at-risk sales in his $138.7 million figure, rendering the amount even more conservative.

28

clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict." *Pavao*, 307 F.3d at 918. The jury, and not the court, is given the task of weighing conflicting evidence and making credibility determinations. *See Roy v. Volkswagen of Am., Inc.*, 896 F.2d 1174, 1179 (9th Cir. 1990); *amended and reh'g en banc denied by* 920 F.2d 618 (9th Cir. 1990); *see also Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987) (jury entitled to believe one set of witnesses over others). And, "it is not the courts' place to substitute our evaluations for those of jurors" *Union Oil Co. of Cal. v. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003). "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *See Tennant v. Peoria & Perkin Union Ry., Co.*, 321 U.S. 29, 35 (1944); *see also Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1374 (Fed. Cir. 2001) ("[The trial court] may not grant a new trial merely because it might have come to a different result from that reached by the jury.")

The bar for granting a new trial is especially high when damages are determined by a jury. *In re Exxon Valdez*, 270 F.3d 1215, 1247–48 (9th Cir. 2001) ("We afford substantial deference to a jury's finding of the appropriate amount of damages" (quotation marks omitted)); *see also Duffy v. City of Desert Hot Springs*, 342 F. App'x 279, 281 (9th Cir. 2009); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999); *Landes*, 833 F.2d at 1373 ("Proof of damages is governed by a less strict standard than proof of liability."). "Doubts as to correctness of the verdict are not sufficient grounds for a new trial." *Del Monte Dunes*, 95 F.3d at 1372. Indeed, courts should resolve "any doubts about the amount…against the infringer." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006).[5]

---

[5] As set forth in this opposition, the jury's $70 million verdict is supported by substantial evidence. The Court requested that Microsoft consider requesting remittitur in an amount higher than what Microsoft presented at trial, but lower than what the jury awarded. (Ex. B at 33:14–34:15.) Microsoft indicated that it would not make such a request in light of its belief that such a request would not be supported by any evidence. (*Id*. at 33:20–34:3.) Lucent agrees that remittitur is inappropriate. Remittitur requires the Court to view the evidence concerning damages in the light most favorable to Lucent, yet conclude that the jury's factual conclusions are inconsistent with the amount of the verdict. *Buritica v. United States*, 8 F. Supp. 2d 1188, 1191 (N.D. Cal. 1998). Indeed, "the mere fact of a remittitur does not entitle a court to disregard the jury's fact finding." *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1474 (9th Cir. 1993). Here, the Court's concerns surrounding the $70 million verdict seem not to be based on an alleged inconsistency between the jury's resolution of the facts and the amount of the verdict; rather, the Court's concerns seem to be focused

1

## III.    ARGUMENT

2        Microsoft cites the legal standard at the beginning of its memorandum but conspicuously

3   fails to apply that standard to the arguments it makes.  None of Microsoft's criticisms demonstrate

4   that the jury verdict was grossly excessive or against the clear weight of the evidence.

5        ### A.    Dr. Jay's Survey Asked Proper Questions And Yielded Reliable Results

6        Microsoft attacks the jury's verdict by claiming that Dr. Jay's survey was flawed, thereby

7   rendering any damages analysis based on that survey equally flawed.  At trial, Microsoft attempted

8   to undermine the Jay Survey results through attorney argument and the self-serving testimony of two

9   Microsoft witnesses (Mssrs. Kennedy and Harris) who claimed, without any documentary

10  corroboration, that consumers did not use or value the Day Patent technology.  (Ex. C at 89:25–90:6;

11  96:3–12; 97:4–99:15; 101:21–102:15; Ex. A at 257:10–259:18; 271:2–271:7; 277:12–13; 277:17–

12  18; 279:17–18; Ex. O at 66:22–69:5 (collectively, instances where Mssrs. Harris and Kennedy

13  admitted they provided no data to support their claims).)  Microsoft never presented any contrary

14  expert testimony or an alternative survey that came out with different results. The jury was free to

15  reject such biased and uncorroborated testimony.  *See Costa v. Desert Palace, Inc.*, 299 F.3d 838,

16  859 (9th Cir. 2002) ("[C]redibility, inferences, and factfinding are the province of the jury, not this

17  court.").

18        By contrast, the jury heard almost a day and a half of testimony (on direct and cross) from

19  Dr. Jay, during which she:  (a) explained in detail every question, result, and calculation in her

20  survey; (b) presented the jury with 68 demonstratives to facilitate their understanding of the survey,

21  the mathematical calculations she performed, the margin of error, and the effect of guessing on the

22  results; and (c) demonstrated that her methodology and results were consistent with internal

23  Microsoft surveys conducted during the ordinary course of business.  The jury had before it the

24  responses of 3,387 disinterested witnesses who qualified for the survey.  (Ex. J, PX 2023.)  The jury

25

26  on whether the verdict is based on *legally* sufficient evidence.  Although Lucent strongly believes that the verdict is
    supported by such evidence, FED. R. CIV. P. 50 does authorize a court, if appropriate under established standards, to enter

27  judgment in the amount it determines based on legally sufficient evidence.  Such a judgment is appealable and, unlike
    a remittitur that may be rejected by a party, does not immediately implicate a new trial.

28

1   also heard that Microsoft's trial counsel tried to retain Dr. Jay as their survey expert in this very case,

2   noting that she is considered a top survey expert.  (Ex. C at 60:24–61:18.)  As Dr. Jay established at

3   trial, the survey questions were proper and yielded reliable results.  (Ex. D at 56:5–57:12.)

4   Microsoft's attorney argument and uncorroborated testimony from biased witnesses do not provide

5   grounds for a new trial.

6   *1.      Dr. Jay properly asked respondents about Outlook.*

7          Dr. Jay conducted a survey of 3,387 pre-2007 Outlook users to determine, among other

8   things, whether consumers use the Day Patent technology and whether they value it.  (Ex. E at

9   105:16–106:6.)  Microsoft claims the jury's verdict is unsupported because Dr. Jay should have

10  asked questions specifically about Outlook within the Office suite rather than Outlook as a stand-

11  alone software program.  Because Dr. Jay did not ask questions specifically directed to Outlook

12  within Office, Microsoft argues that Dr. Jay's survey results are limited to stand-alone Outlook

13  users.  (D.I. 1434 at 6.)  This is so, according to Microsoft, because the majority of Outlook licenses

14  are sold as part of the Office suite.  (*Id*.)  But as Dr. Jay explained at trial, the survey questions and

15  results were not restricted to the stand-alone Outlook program.  (Ex. E at 249:14–22; 251:8–15.)

16         The Jay Survey questions were directed to users and purchase decision-makers of Outlook no

17  matter what form of Outlook they used or purchased.  (*Id*.)  Microsoft merely ***speculates*** that

18  respondents read into each question a restriction to stand-alone versions of Outlook, without any

19  basis for doing so.  (*Id*.)  But Microsoft never conducted a survey of its own to determine what

20  respondents understood by the term "Outlook," nor did it present any evidence that differently-

21  worded questions would have yielded different results.  Microsoft's speculation should be rejected.

22         Microsoft is correct that the vast majority of Outlook licenses are sold as part of the Office

23  suite.  But that very fact validates Dr. Jay's survey and undermines Microsoft's "stand-alone"

24  argument.  Dr. Jay used a representative sample and her survey was probability-based.  (*Id*. at 70:6–

25  25; 79:13–81:8; 249:11–22; 252:9–21; 255:3–14; Ex. F, DJ9, DJ34.)  As Dr. Jay and Mr. Sims

26  explained at trial, Dr. Jay's survey represents the entire population of Outlook users regardless of

27  whether they bought Outlook as part of an Office suite or as a stand-alone product.  (Ex. E at 79:13–

28

81:8; 249:11–22; 252:9–21; 255:3–14; 258:4–259:21; Ex. A at 172:15–25.)  Because Dr. Jay's survey is representative of all Outlook users, it follows that if 99.8% of Outlook licenses are sold as part of the Office suite, then 99.8% of Outlook users surveyed used a version of Outlook that was sold as part of the Office suite.[6]  Dr. Jay and Mr. Sims explained why this logic holds given the representativeness of the survey sample.  (*Id.*)  Moreover, Microsoft only presented attorney argument to try to discredit Dr. Jay's survey results; it did not offer any evidence to show that Dr. Jay's universe of survey respondents did not include users of Outlook within Office.  The jury was free to—and did—reject Microsoft's attorney argument.  *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1142 (9th Cir. 1999) (noting that the jury is entrusted with all credibility determinations).

### 2.    *Dr. Jay properly identified respondents involved in the purchase decision.*

After she identified respondents who use the Outlook Calendar module, Dr. Jay next identified the percentage of those users who use the drop-down calendar to schedule appointments. Dr. Jay determined that 43% of all Outlook users select the date of an appointment by using the drop-down calendar.  She next determined who, in that group of respondents, was involved in the decision to purchase Outlook.  Once she determined that subset of respondents, Dr. Jay asked follow-up questions about whether their decision to purchase would have been affected by the absence of the drop-down calendar in Outlook.

Microsoft *claims* that there is "a great difference between 'involvement' in the decision to purchase Outlook and actually making the decision," (D.I. 1434 at 3), but cites no evidence to support its speculation that such a difference exists.  Nor does Microsoft present any evidence to show that a differently-worded question would have yielded different results.  (Ex. E at 61:4–62:10; Ex. C at 56:2–16.)  All of the evidence at trial indicates that Dr. Jay properly identified Outlook purchase decision makers.  (Ex. E at 65:16–67:18; 151:12–153:23; 250:15–252:21; Ex. F, DJ8, DJ27–DJ28.)  Microsoft had a chance to cross-examine Dr. Jay on this point, but failed to do so. Moreover, Microsoft's absent survey expert also asked survey respondents whether they were

---

[6]    Microsoft claims that the vast majority of the Outlook licenses used by Mr. Sims were pre-installed on PCs (D.I. 1434 at 2, 4), but it cites to nothing in the record for that proposition, likely because there is no evidence supporting that statement from trial.

"involved" in the decision to purchase Outlook.  (Ex. G at 116:18–117:6; 134:5–10; 136:21–137:7.)
He chose that wording before ever seeing Dr. Jay's survey questionnaire, thereby providing
independent validation of the question wording.  In any event, whether and how the survey wording
affected the results was a factual question for the jury, who believed Dr. Jay's expert testimony.

### 3. Dr. Jay properly identified respondents who would not have purchased.

Having correctly identified purchase decision makers who use the drop-down calendar to
schedule appointments in Outlook, Dr. Jay asked whether they would have purchased Outlook if it
did not include the drop-down calendar tool for entering appointments.  The Jay Survey determined
that of those who were asked the question, 62% said they would have bought Outlook anyway, 31%
said they were not sure whether they would or would not have bought Outlook, and 7% said they
would not have bought Outlook.  (Ex. E at 66:23–67:18.)

Microsoft claims that the 7% who answered they would not have bought Microsoft without
the drop-down calendar tool in it (and who therefore represent expected forgone profits to Microsoft
at the hypothetical negotiation) indicate nothing about the value of the Day Patent technology.
Microsoft reaches this conclusion by noting that some of the respondents who said that they would
not have bought Outlook without the infringing technology also said that they would not have paid
anything above and beyond $109 (the retail price) to have the feature included.  (D.I. 1434 at 4.)
According to Microsoft, the combined answers prove that those purchase decision makers valued the
Day Patent technology at $0.  Microsoft's logic is flawed, however.  As Dr. Jay testified at trial, the
combined responses actually show that consumers expect this core technology to be included at the
$109 price—a price *Microsoft* attributed to the value of Outlook.  (Ex. C at 10:22–11:5; Ex. H, PX
467.)  Dr. Jay's survey therefore indicates that those consumers could value the Day Patent
technology as high as $109.  (*Id.*)

Microsoft asserts, without any citation to the record that "customers would necessarily assign
proportionally less value to the date-picker feature when considering a much larger software package
like Office."  (D.I. 1434 at 4.)  But if it truly were "a reality" that customers "would necessarily"
assign proportionally less value to the Day Patent technology if they bought their version of Outlook

1   as part of the Office suite, one would expect Microsoft to cite evidence of this phenomenon in the

2   record.  Microsoft makes no such citation to the record because it never made this argument at trial

3   and never offered into evidence at trial any documentary support for the assertion.  Even Microsoft's

4   own survey expert never made such a claim.  In fact, although he claimed that the $109 price for

5   Outlook influenced consumers in some manner, Mr. Johnson conceded that he could not say how the

6   price influenced the results (*e.g.*, the amount of the price could have led respondents to answer that

7   they would have bought anyway and would not have paid anything extra).  (Ex. G at 302:11–24.)

8   Moreover, "a stringent standard applies when the motion is based on insufficiency of the evidence,"

9   and the verdict may only be overturned if it is against the "***great weight***" of the evidence or if "it is

10   quite clear that the jury has reached a ***seriously erroneous*** result."  *See Venegas v. Wagner*, 831 F.2d

11   1514, 1519 (9th Cir. 1987).  Microsoft cannot meet this standard with its unsubstantiated assertions

12   about how consumers value Outlook.

### 4.     *Dr. Jay properly accounted for error in her results.*

13

14          Dr. Jay determined that the maximum sampling error at the 95% confidence interval for her

15   survey was +/- 1.5% and demonstrated to the jury how to account for error when reporting survey

16   results:  (a) one either reports the midpoint of the range, citing the margin of error, or (b) one reports

17   the entire range.  (Ex. C at 43:7–44:4; 45:20–49:7; DJ69.)

18          For the fourth time, Microsoft misrepresents Dr. Jay's survey results and claims that Dr. Jay

19   failed to account for error.  (D.I. 1032; D.I. 1224; D.I. 1327; D.I. 1434.)  Microsoft's criticisms are

20   based on flawed statistical analysis.  Using a proper analysis of the margin of error in Dr. Jay's

21   survey, the survey shows that at the 95% confidence interval for those purchase decision makers

22   who would not have purchased Outlook if it did not include the patented technology, the range is

23   9.6% to 4.4%, with the expected value being 7%—the percentage testified to by Dr. Jay.  (Ex. E at

24   196:19–199:23.)  Trying to skew the numbers in its favor, Microsoft misrepresents the margin of

25   error when it looks only at the range ***below*** the expected value, when in reality sampling error creates

26   a range both ***above*** and below the expected value, with the expected value being the midpoint of the

27   range.  The jury rightly rejected Microsoft's statistically incorrect analysis, a decision this Court may

28

1    not second-guess.[7]  *See Roy*, 896 F.2d at 1179.

2                    **5.      Dr. Jay properly accounted for guessing in her results.**

3          Although the subject matter of her survey did not require it, Dr. Jay asked a control question

4    designed to get at the amount of yea-saying or guessing in her survey.  (Ex. E at 116:19–117:25; Ex.

5    F, DJ16.)  Based on the way respondents answered the control question *and all subsequent*

6    *questions*, Dr. Jay determined that the amount of guessing in the survey was negligible and did not

7    affect the results.  (Ex. E at 153:24–155:8 (testifying that even if the music-player-feature

8    respondents were removed from all subsequent results, the percentage of those who would not buy

9    remained the same, and further testifying that of those who made it through to the purchasing

10   questions, 15 out of 21 answered they would have bought Outlook even if it did not include the

11   drop-down calendar and 4 were not sure one way or another).)  Dr. Jay further explained that if one

12   were to "blindly" discount the results by 5%, one would not do as Microsoft proposed and simply

13   *subtract* 5 percentage points from each of the response results in all of the following questions.  (Ex.

14   E at 155:22–158:2; Ex. F, DJ30–DJ32.)  Rather, one would multiply the result by 95% (100% - 5%).

15   (*Id*.)  Dr. Jay further illustrated the flaws in Microsoft's approach with a demonstrative exhibit,

16   which Lucent discussed in closing argument.  (*See* Ex. F, DJ30–DJ32.)  The jury agreed that

17   Microsoft's calculations were unsound, and this Court must do the same.

18         Microsoft betrays a fundamental misunderstanding of survey design when it complains that

19   Dr. Jay did not include a separate control group in her survey.  Microsoft points to *Google Inc. v.*

20   *American Blind & Wallpaper*, No. C 03-5340 JF (RS), 2007 WL 1159950 (N.D. Cal. Apr. 18, 2007)

21   (Ex. Z), a trademark dispute in which the survey evaluated a causal proposition—namely, whether

22   consumers, when confronted with a knock-off good, were confused as to the source of the good.

23   *Google*, 2007 WL 1159950 at *9.  Control groups (and control questions) are only necessary when

24   testing such causal propositions.  (Ex. E at 241:3–10; *See* Ex. I at 256–60.)  Here, by contrast, Dr.

25

26   ───────────────
     [7]  In addition, Microsoft requested and received—over Lucent's objection—a special instruction regarding the margin of
27   error in surveys, even though Microsoft could not cite a single case in support of such an instruction being given in a
     trademark or patent case.  The instruction unduly singled out margin of error among all of the components of evaluating
28   a survey's reliability.

Jay surveyed consumers' past use of Microsoft products, which is not a causal proposition.

Eager to claim that the survey results are statistically insignificant, Microsoft conflates yea-saying with the margin of error, and compounds its mistake by **subtracting both numbers** from Dr. Jay's 3% would-not-have-bought result.  (D.I. 1434 at 5–6.)  Microsoft made this unsuccessful argument in pretrial motions.  Even Microsoft's own survey expert conceded he had no intention of performing such a misguided calculation at trial.  (Ex. G at 295:9–296:10.)  When Microsoft made the same flawed argument at trial, Dr. Jay testified that it was methodologically and statistically improper to add two unrelated percentages together and subtract them from the results of any particular question.  (Ex. C at 18:11–19:9.)  Dr. Jay was the only survey expert at trial, and she testified that Microsoft's treatment of margin of error and yea-saying was wrong.  (Ex. E at 155:22–158:2; Ex. F, DJ30–DJ32.)  The jurors agreed with her, and the Court must defer to that determination.  *See Roy*, 896 F.2d at 1179.

### 6. *Dr. Jay's 7% result is reliable.*

Dr. Jay's survey results show that 27 out of the 384 Outlook users who answered that they (i) first used Outlook before 2007, (ii) use the drop-down calendar to enter the date, and (ii) were involved in the decision to purchase Outlook, said that they would not have purchased Outlook if it did not include the capability.  27 out of 384 is 7%.  (Ex. E at 66:24–67:7; 153:11–19; 228:20–229:12; Ex. J, PX 2023; Ex. K, PX 1616.)  Microsoft misrepresents those respondents who indicated they would not have bought Outlook as "fewer than 1% of pre-2007 Outlook users."  (D.I. 1434 at 5–6.)  Microsoft tried the same maneuver at trial, when its attorneys tried to represent the 27 out of 384 who answered that they would not have bought as if it were 27 out of 3,387 (*i.e.*, 0.8%) during cross-examination of Dr. Jay and Mr. Sims.  (Ex. E at 185:3–194:22; Ex. A at 154:9–21; 155:10–17; 157:7–16; 162:17–163:2; 176:18–177:2; 180:1–181:9.)  This was consistently rejected by both Dr. Jay and Mr. Sims, both of whom are experts in statistical analysis.  (*Id*.)  The jury also rejected Microsoft's flawed statistical analysis, and the Court must do the same.  *See Peoria & Perkin Union Ry.*, 321 U.S. at 35 ("It is the jury, not the court, which is the fact-finding body.").)

### B. Mr. Sims Properly Relied on the Jay Survey Results to Determine the Value of the Day Patent Technology to Microsoft

Mr. Sims relied on the results of the Jay Survey to determine the value of the Day Patent technology to Microsoft. He did this by calculating the expected financial impact on Microsoft, based on the survey results, if Microsoft had forgone use of the Day Patent technology. Of course, Microsoft never offered a version of the infringing products without the Day Patent technology in the real world, so the exercise was necessarily hypothetical (just like the negotiation). After determining the percentage of all Outlook purchase decision makers who would not have bought Outlook if it did not include the patented technology, Mr. Sims monetized these expected forgone sales, applied Microsoft's established profit margins, and determined the amount of expected forgone profit Microsoft would have in mind when evaluating how much to pay for a license to the patented technology at the hypothetical negotiation. (Ex. A at 14:16–26:13.) Based on this methodology, Mr. Sims conservatively determined that Microsoft would be economically indifferent between paying Lucent $138.7 million for a license versus losing at least the same amount in the marketplace.[8] (Ex. A at 91:17–92:6; 93:10–94:9.) Microsoft challenges every step in Mr. Sims's analysis. Microsoft's challenges fail, and certainly do not render the jury's verdict against the clear weight of the evidence.

### 1. Mr. Sims's 3% figure is statistically justified.

Mr. Sims concluded that Microsoft would expect that 3% of all Outlook purchase decision makers would not have bought Outlook without the Day Patent technology in it. Mr. Sims arrived at the 3% figure by starting with the percentage of Outlook purchase decision makers who use the drop-down calendar and who would not have bought Outlook if it did not include the drop-down calendar (*i.e.*, 7%). He multiplied that percentage by the percentage of all Outlook users who use the drop-down calendar (*i.e.*, 43%) to arrive at 3%. (Ex. C at 192:23–193:11; Ex. A at 10:6–14:15; Ex. L, RS11–RS15, RS21–RS24.) Dr. Jay confirmed this. (Ex. E at 159:7–160:21; Ex. F, DJ34.)

Microsoft criticizes Dr. Jay and Mr. Sims for projecting from purchase decision makers to the whole (*i.e.*, Lucent's 3% number). In doing so, Microsoft ignores the key advantage of using a

---

[8] In truth, Microsoft would be more inclined to pay Lucent $138.7 million than lose that amount and incur harm to its competitive reputation in the marketplace. (Ex. A at 94:5–10.) Moreover, $138.7 million is conservative, in that Mr. Sims did not quantify how much of the at-risk sales (31%) Microsoft might forgo. (Ex. A at 19:9–21:10; 24:21–25:11; 29:18–30:23; Ex. L, RS20, RS26, RS28–RS30.)

probability sample.  In Dr. Jay's words, "a probability sample…allows you to project those results to a larger population with a certain mathematical certainty."  (Ex. E at 80:16–22.)  With a probability sample, one may project to a larger population (*e.g.*, every one of the millions of Outlook users in the United States) who would be practically impossible to poll.  (Ex. E at 55:1–20.)  Given that the survey was a probability sample, Mr. Sims was able to determine with mathematical certainty the percentage of all Outlook purchase decision makers who would not have bought Outlook if it did not include the Day Patent technology.

Microsoft claims that the survey at most shows that a certain percentage of ***stand-alone*** Outlook users would not have bought ***stand-alone*** Outlook if it did not include the drop-down calendar tool.  (D.I. 1434 at 6.)  Microsoft is wrong for two reasons.  First, Microsoft reads into the survey questions a restriction that simply is not there:  nowhere in the survey does Dr. Jay refer to "stand-alone Outlook."  (Ex. E at 152:23–153:23; 249:11–22; Ex. M, PX 1617.)  Microsoft then speculates that even though the questions do not mention stand-alone Outlook, the respondents must have included such a restriction in their answers.  Dr. Jay explained why such speculation was unfounded and unwarranted.  (Ex. E at  249:11–22; 251:5–15; 253:7–255:14.)  Second, the way Dr. Jay obtained her survey sample proves the lie in Microsoft's argument.  Dr. Jay obtained a representative sample of ***all*** Outlook users in the U.S. population.  Thus, if 99.8% of all Outlook licenses are licenses to Outlook within Office, then 99.8% of all Outlook survey respondents use a version of Outlook within Office.  Both Dr. Jay and Mr. Sims explained this logic and why it holds given the representativeness of the survey.  (*Id.*; *see also id.* at 79:13–81:8; 249:11–22; 252:14–21; 258:9–14; Ex. A at 12:13–13:4; 21:25–22:11.)

### 2.    *Mr. Sims properly valued Outlook at $67.*

In determining the economic impact to Microsoft of forgoing 3% of its Outlook sales, Mr. Sims concluded that the average revenue for Outlook during the relevant time period was $67, whether sold stand-alone or as part of the Office suite.  (Ex. A at 14:16–21:10; 159:9–160:8; 161:22–162:5; 167:23–169:16; 174:6–17; 181:10–182:9; Ex. N, PX 1895; Ex. L, RS17.)  He accordingly used the $67 revenue in his expected forgone profits calculations.  (*See, e.g.*, RS16–RS20.)  It is

1   important to note that the parties do ***not*** dispute that, for purposes of Mr. Sims's expected forgone

2   profits analysis, Microsoft would forgo all of the value of Outlook for the portion (3%) of consumers

3   who would not have bought Outlook.  In other words, for every consumer who would not have

4   bought Outlook, Microsoft would forgo the full value of its profits on that Outlook sale.  The parties'

5   disagreement relates to how Mr. Sims determines what that value is when Outlook is sold as part of

6   Office.  Microsoft claims no evidence supports Mr. Sims's conclusion that the value for Outlook is

7   the same, whether sold stand-alone or as part of Office.

8       Microsoft's counsel agrees that Mr. Sims accurately calculated the average per-unit revenue

9   for stand-alone Outlook using Microsoft's internal financial documents.  (Ex. A at 17:5–18:1;

10  161:22–162:5.)  Mr. Sims relied on that same evidence—the only evidence available given how

11  Microsoft keeps its financial records—as a proxy for the value of Outlook when sold as part of

12  Office.  Both Mr. Sims and Rodney Jenkins, Microsoft's profit and loss controller (and its Rule

13  30(b)(6) witness on the topic), testified at trial that Microsoft did not attribute Office revenue to

14  individual programs found within the Office suite.  (Ex. C at 186:14–189:10; Ex. A at 17:5–18:1.)

15      Mr. Sims's decision to use the stand-alone price of Outlook as a proxy for the value of

16  Outlook sold as part of Office was corroborated by one of Microsoft's own pricing documents.  Mr.

17  Sims compared the sales price of a version of the Office suite with Outlook ($279.99) to a version of

18  the Office suite without Outlook ($149.99).  (Ex. A at 167:23–169:5; 174:6–17; 181:10–182:9; Ex.

19  N, PX 1895.)  The difference was $130 dollars, a number virtually identical to the $139.99 retail

20  price of Outlook.  (Ex. N, PX 1895.)  Microsoft's own corporate representative agreed with this

21  calculation.  (Ex. O at 70:13–72:19.)  Mr. Sims presented the best evidence of value of Outlook

22  within Office for purposes of the hypothetical negotiation.[9]

23      Microsoft asserts that $13.45 is the correct amount to attribute to Outlook when it is sold as

24  part of the Office suite.  (D.I. 1434 at 10.)  During trial, Microsoft's counsel asserted the same

25  lawyer-made "calculation" based on the relative sale price of each of the individual components of

26

27  [9] Microsoft presents a red herring when it complains that Office without Outlook was not available for purchase until the end of the damages period.  Mr. Sims only looked to Microsoft's Office pricing scheme as a proxy for the value of Outlook to Microsoft.

28

1   Office.  (Ex. A at 170:15–171:25; 173:1–174:17.)  But when counsel for Microsoft asked Lucent's

2   expert about this calculation, Mr. Sims repeatedly rejected it.  (*Id*. at 173:25–174:17; 177:7–17.)

3   And Mr. Kennedy—the only person Microsoft cites for its "calculation" in its motion—was

4   impeached at trial, admitting that he had never done the calculation before and that he was not

5   involved in pricing at Microsoft.  (Ex. O at 75:7–76:10; 97:13–98:4.)  Microsoft's $13.45 figure is

6   nothing more than unsupported attorney argument.

7            At trial, Microsoft's counsel correctly noted that the appropriate percentage to apply for

8   expected forgone sales and the unit price for Outlook were decisions for the ***jury*** to make.  (Ex. A at

9   176:25–177:2; 177:12–20.)  And the jury as the finder of fact was instructed multiple times on both

10  apportionment and credibility.  (Ex. P at 2:8–5:21; 6:25–16:10.)  To that end, Microsoft's per unit

11  calculation was squarely rejected by the jury when it adopted Lucent's damages number in its

12  verdict; Mr. Sims's analysis and internal Microsoft documents submitted at trial provide ample

13  support for $67 as the revenue attributable to Outlook.  Even in instances where the evidence could

14  have supported a different result, a new trial cannot be granted.  *See Silver Sage Partners, Ltd. v.*

15  *City of Desert Hot Springs*, 251 F.3d 814, 819–21 (9th Cir. 2001) (reversing grant of new trial,

16  noting that district court failed to properly credit damages expert's testimony);[10] *Roy*, 896 F.2d at

17  1179 (reversing grant of new trial even when "[t]he evidence in [a] case was substantially balanced"

18  between prevailing party and movant); *Union Oil Co. of Cal.*, 331 F.3d at 743 (reversing grant of

19  new trial despite "substantial evidence that goes both ways").

20               **3.       Mr. Sims's properly applied 3% to 109.5 million Outlook licenses.**

21           Microsoft does not dispute that it sold approximately 109.5 million Outlook licenses (stand-

22  alone and as part of Office) during the damages period.  Mr. Sims testified to the total number of

23  licenses at trial, and Microsoft chose not to cross-examine him on that point.  (Ex. A at 14:16–16:12;

24  159:9–160:8; Ex. L, RS16.)  Indeed, there was no contrary evidence presented by Microsoft.

25  Substantial evidence supports a finding that 109.5 million licenses of Outlook were sold during the

---

[10]  In *Silver Sage Partners*, the district court ordered a new trial after the plaintiff refused to accept remittitur.  At the second trial the plaintiff won only nominal damages.  On appeal, the Ninth Circuit found that the court improperly granted the new trial and reinstated the original jury verdict.  *Silver Sage Partners*, 251 F.3d at 825.

1    damages period.

2          Microsoft owes Lucent a reasonable royalty for its inclusion of the Day Patent technology in

3    all of the 109.5 million Outlook licenses sold during the damages period.  The 2008 jury found every

4    sale or license of Outlook to be an act of inducement and/or contributory infringement.  (D.I. 735,

5    2008 Verdict.)  Microsoft never appealed the number of infringing licenses and waived the issue.

6    The *Lucent* decision itself notes that Microsoft sold approximately 110 million infringing licenses.

7    *Lucent*, 580 F.3d at 1323.  The issue of Microsoft's infringement and the scope of that

8    infringement—namely, 109.5 million infringing licenses of Outlook (in addition to the infringing

9    licenses of Money and Windows Mobile)—is *res judicata*.  (D.I. 1012; D.I. 1179 (granting Lucent's

10   motion *in limine* regarding infringement).)  The law requires that Microsoft pay a reasonable royalty

11   for its inclusion of the Day Patent technology in ***all*** of its infringing licenses.  *Crystal Semiconductor*

12   *Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1353–54 (Fed. Cir. 2001) ("Thus, a

13   reasonable royalty for each infringing device sold by [defendants] is the minimum measure of

14   damages in this case.").[11]  Moreover, Lucent need not prove every instance of direct infringement in

15   order to recover damages for all of Microsoft's indirect infringement.  *See, e.g., Lucent*, 580 F.3d at

16   1323–24, 1334.

17          In any event, Microsoft's claim that Lucent did not prove that all 109.5 million licenses were

18   used by customers who directly infringed misses the mark.  Mr. Sims's lump-sum royalty is based

19

20   _____

     [11]  Microsoft's citations to *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.* are unavailing.  576 F.3d 1348 (Fed. Cir.
     2009). In *Cardiac Pacemakers*, the patent dispute concerned implantable cardioverter defibrillators ("ICDs").  One

21   model as programmed permitted the practice of the patented method (among other methods).  Another model was not so
     programmed.  *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021, 1039–40 (S.D. Ind. 2006). The

22   district court ruled that damages could only be collected on the former.  *Id.*  The Federal Circuit upheld the decision,
     finding that "the district court correctly limited damages to those devices that were shown to infringe the [method

23   claims]."  *Cardiac Pacemakers*, 576 F.3d at 1358. In so doing, the Federal Circuit concluded that "Cardiac can only
     receive infringement damages on those devices that actually performed the patented method."  *Id.* at 1359.  Citing to

24   these passages, Microsoft reads the case to stand for the proposition that Lucent can only recover damages for those
     licenses that were actually used by consumers to perform the patented method.  That is a misreading of the case.  To say

25   that damages may only be recovered on a device that allows a user to perform the patented method is not to say that
     damages must be limited to those devices with which a user actually practices the method.  Indeed, in *Cardiac*

26   *Pacemakers*, the devices for which the plaintiff was allowed to collect damages were programmed with more than one
     method, including the patented method.  Regardless of whether consumers actually used the patented method, the

27   plaintiff was allowed to collect damages on those devices.  *Cardiac Pacemakers*, 418 F. Supp. 2d at 1024.  The only
     devices the plaintiff could not collect on were those that were not programmed with the patented method.  *Id.* at 1040.

28

on the profits Microsoft would expect to forgo from *3%* of all Outlook licenses if Microsoft removed the Day Patent technology.  Moreover, those consumers who said they would not purchase were self-described users of the Day Patent technology in Outlook (*i.e.*, direct infringers).

Moreover, if Lucent *had* based its damages analysis on every instance of direct infringement, it would result in an amount far higher than the $138.7 million in expected forgone profits.  The Day Patent is infringed at least every time the drop-down calendar is used in Outlook to fill out a form.  Based on uncontested evidence presented at trial, Microsoft would be facing almost 50 billion instances of direct infringement for Outlook alone.  (Ex. A at 44:3–47:2; 48:23–49:6; Ex. L, RS34– RS37, RS40 (average of 728 appointments per copy of Outlook over life of product; 109.5 million copies of Outlook sold during damages period; 60% of Outlook Calendar users use the Day Patent technology only or most often).)  Applying Mr. Sims's conservative analysis on a per-infringement basis, the jury's award of $70 million amounts to just over 1/10 of a cent per infringing use.

Finally, the Court instructed the jury that it should consider use of the Day Patent technology when determining damages.  (Ex. P at 12:17–13:2; 14:25–15:4.)  And as the Court made clear, Lucent's damages could not be supported by evidence that infringers used additional noninfringing features.  (Ex. P at 12:17–13:2; 14:25–15:4.)  The evidence presented at trial—including Dr. Jay's survey showing substantial use of the Day Patent technology—supports the jury's verdict.

### 4.    *Mr. Sims did not assume Microsoft would forgo sales of Office.*

Mr. Sims takes into account both stand-alone Outlook licenses and Outlook licenses sold as part of the Office suite when determining the expected financial impact to Microsoft if it decided not to take a license and did not include the Day Patent technology in its products.  As explained above, Mr. Sims only counted the value of Outlook, not the value of Office.

Microsoft claims that for Lucent to prevail on its damages theory, it "would have had to present evidence that showed that some Office purchasers *would not have bought Office* if Outlook did not have the date-picker."  (D.I. 1434 at 3.)  Microsoft repeats this mistake later in its memorandum when it claims that the verdict is premised on the so-called "factual assertion that more than 3.3 million Office purchasers would not have purchased *Office* merely because *Outlook*

1   lacked the date-picker." (*Id.* at 7 (emphases in original).)  But Mr. Sims never claimed convoyed

2   sales in this case and expressly did ***not*** assume that Microsoft would have lost sales of Office.  (Ex.

3   A at 152:1–153:23; 172:7–25.)  Mr. Sims only took into account Microsoft's expected forgone

4   profits based on the value of Outlook and never assumed that Microsoft would forgo Office sales.

5   (*Id.* at 167:23–169:5; 174:6–17; 181:10–182:9.)  If Mr. Sims had accounted for expected forgone

6   ***Office*** sales then Microsoft's expected forgone profits would have been much higher based on the

7   $98.19 average revenue of Office.  (*Id.* at 166:19–23; 167:23–169:16.)

8        Microsoft further claims that Mr. Sims's analysis is flawed because Microsoft did not offer a

9   version of Office without Outlook during the damages period, and therefore consumers could not

10  have bought such a version.  But just as Mr. Sims need not (and does not) assume that Microsoft

11  would forgo 3% of Office sales, Mr. Sims need not prove that Microsoft would make any sales of a

12  version of Office without Outlook.  In short, Mr. Sims need not prove what consumers would have

13  done in the real world if Microsoft had removed the Day Patent technology from its products

14  because Microsoft never did so in the real world.  So whether or not Microsoft offered a version of

15  Office without Outlook for those consumers to purchase during the damages period is beside the

16  point.  The exercise is hypothetical:  Microsoft never actually faced the financial consequences Mr.

17  Sims posits because Microsoft chose to continue to infringe.  Thus he need not, contrary to

18  Microsoft's contention, prove that 3% of Microsoft Outlook consumers would have bought Lotus

19  Notes in the real world if they did not buy Outlook, nor need he prove that those consumers also

20  would have bought a version of Office without Outlook in it.  The point is to determine how the

21  parties at the hypothetical negotiation would have valued the Day Patent technology.  Dr. Jay's

22  survey results inform that analysis by showing that 3% of Outlook consumers expect the Day Patent

23  technology to be included in Outlook and would not buy the product if it did not include the

24  technology.  Any rational business entity at the hypothetical negotiation table would take that into

25  consideration and quantify its financial impact, just as Mr. Sims said Microsoft would do.  (Ex. A at

26  89:11–24; 92:1–12; 95:4–13; Ex. L, RS71.)  Professor Mnookin, Microsoft's negotiation theory

27  expert, agreed.  (Ex. O at 119:3–19; 147:19–148:11.)  Whether or not 3% of Microsoft's customers

28  would have actually purchased something else in the real world if Microsoft had removed the

1  patented technology is irrelevant; the key question is what Microsoft would have done when faced

2  with such statistical evidence at the hypothetical negotiation.[12]

3         Microsoft also claims that there is no evidence that consumers who bought the Office suite

4  actually used Outlook, but Microsoft's own internal documents showed that Outlook was "the most

5  frequently used Office application by far."  (Ex. C at 218:21–219:23; Ex. A at 163:14–164:15; Ex.

6  Q, PX 838.)  Although Microsoft elicited testimony from its own biased fact witness to try to

7  undercut the plain meaning of the document, on cross-examination Mr. Kennedy admitted that he

8  did not review the underlying Microsoft survey, had no idea what questions were asked, and had no

9  hard data to back up his claims.  (Ex. O at 66:14–69:5.)  Furthermore, Mr. Sims was not required to

10  prove that all licenses of Outlook were used by consumers to directly infringe the Day patent.  The

11  jury in 2008 reached that conclusion, which is *res judicata* in this case.  In any event, Mr. Sims

12  never applied a royalty rate to the entire base of revenue from all Outlook licenses.  Rather, he

13  determined what amount of profits Microsoft would expect to forgo from the 3% of self-described

14  Outlook Calendar users who said they use the drop-down calendar to enter appointments (and who

15  therefore directly infringe the Day Patent) and would not buy Outlook if it did not have that

16  capability.  The jury agreed Mr. Sims's testimony and awarded a $70 million verdict based on the

17  substantial evidence Lucent presented.  *See Roy*, 896 F.2d at 1176, 1179.  That verdict was not

18  grossly excessive; the evidence supported a verdict at least as high as $138.7 million.

19         **C.     The Court Did Not Err by Allowing References to the Johnson Survey**

20         Microsoft claims that it was error for the Court to permit Lucent to question Microsoft

21  witnesses on the survey Microsoft conducted but did not disclose.  Throughout the trial, Microsoft

22  attacked the Jay Survey methodology and results, arguing that the flaws in the questions led to

23  results that did not accurately measure consumer behavior.  (Ex. E at 206:4–20, 215:9–217:24,

24  220:11–226:21, 227:17–228:3, 230:6–232:3, 236:17–239:17, 242:23–245:17, 257:20–260:4.)  That

25  extensive cross-examination made the existence of Microsoft's survey relevant to show Dr. Jay's

26  ---

[12] Microsoft claims, for the first time in its motion for a new trial, that Microsoft actually stood to gain by requiring consumers to purchase the components of the Office suite as individual stand-alone products.  (D.I. 1434-1 at 8-9.)  No witness at trial ever claimed that consumers would purchase Word, Excel, and PowerPoint individually because Outlook lacked the Day Patent technology or that Microsoft would sell its products that way in the hypothetical world.

1    methods were accepted and reliable.  The Court recognized the survey's relevance at trial.  Microsoft

2    claims that it should have been able to cross-examine Dr. Jay in this manner without having to

3    defend its decision to conceal the results of its own survey which was conducted on the same subject

4    matter as the Jay Survey.  As this Court acknowledged, Microsoft's criticisms of the Jay Survey

5    methodology and results made relevant the fact that Microsoft itself conducted a survey designed to

6    get at the same information.  (Ex. C at 34:6–19.)

7         In addition, Mr. Kennedy's claim that Microsoft could have removed the drop-down calendar

8    tool from Outlook without any financial impact—indeed, without consumers even noticing that it

9    had been removed—made the Johnson survey relevant.  (*Id.* at 83:1–6; 89:25–90:4; Ex. O at 29:13–

10   21; 30:9–25.)  It also brought into focus Mr. Kennedy's involvement in designing the version of

11   Outlook without the drop-down calendar in it that Mr. Johnson tested on consumers, even though

12   Mr. Kennedy disingenuously denied having any knowledge of the survey.  (Ex. C at 99:4–102:3; Ex.

13   O at 63:18–66:5.)

14        **D.    The Court Properly Instructed the Jury on the *Georgia-Pacific* Factors**

15        Lucent's damages expert determined what the reasonable royalty should be based on a

16   hypothetical negotiation conducted under two analytical frameworks:  (1) the Business Realities

17   Approach (advocated by Microsoft's negotiation theory expert) and (2) the *Georgia-Pacific*

18   Approach (based on decades of federal case law).  Lucent proposed, and the Court read, the Federal

19   Circuit Bar Association's model jury instruction containing the accepted recitation of the *Georgia-*

20   *Pacific* factors.  (Ex. P at 9:6–11:20.)  Microsoft claims it was error for the Court to instruct the jury

21   on ***all*** of the factors, alleging that certain of the factors were recently overturned by the Federal

22   Circuit.  Microsoft further claims the Court improperly admitted evidence related to "irrelevant"

23   *Georgia-Pacific* factors.  Microsoft is wrong on both points.

24        ***1.    The Court properly instructed the jury on all* Georgia-Pacific *factors.***

25        Not only is it typical to include all the *Georgia-Pacific* factors when reading them to the jury,

26   the model instructions have a note to just that effect.  (Ex. R at 90–91 (noting that "[a]lthough

27   lengthy, the Committee believes it is necessary for all factors to be shared with the jury, so as to not

28   unfairly emphasize any one factor.").)  Microsoft cites no contrary authority.

1    Microsoft claims that five of the *Georgia-Pacific* factors (6, 8, 11, 12, and 13) have been

2    overturned by *Uniloc*.  Microsoft is incorrect.  As the *Uniloc* Court itself recognized, nothing in

3    *Uniloc* changes the fact that the *Georgia-Pacific* factors provide a helpful framework for a

4    reasonable royalty analysis:  "This court's rejection of the 25 percent rule of thumb is ***not*** intended

5    to limit the application of any of the *Georgia-Pacific* factors."  *Uniloc USA, Inc. v. Microsoft Corp.*,

6    632 F.3d 1292, 1317 (Fed. Cir. 2011).  Microsoft apparently believes that *Georgia-Pacific* factors 6,

7    8, 11, 12, and 13 necessarily implicate the entire market value rule and cannot be part of a court's

8    instructions unless a party satisfies the entire market value rule test.  (D.I. 1434 at 11.)  Microsoft

9    cites no case law in support of this contention, nor is such a requirement found in *Uniloc*.  In any

10   event, Lucent sought a reasonable royalty only on the value of the Day Patent technology, not the

11   entire market value of all Outlook or Office revenues.

12   Microsoft speculates that by instructing the jury on these factors, the Court invited the jury to

13   award on outsized amount based on Microsoft's overall profitability.  First, Microsoft confuses

14   profitability with profits.  Total profits, something never presented at trial, would reflect the total

15   amount, in dollars, that Microsoft made on sales of the infringing products.  Profitability, by

16   contrast, is the ratio of revenue to profits.  It is a percentage rather than a dollar amount.  The Federal

17   Circuit has already noted that the profitability of the product made "supports a higher versus a lower

18   reasonable royalty," and found that Lucent presented "unrebutted evidence that the products at issue

19   are sold with an approximately 70-80% profit margin."  *Lucent*, 580 F.3d at 1335.  Microsoft never

20   challenged the profit margins used by Mr. Sims in his analysis.

21   Second, Lucent never informed the jury what Microsoft's overall revenues and profits were

22   (over $100 billion in overall revenue; $40 billion in overall profits) and never used those amounts as

23   an improper "check" on the amount of the reasonable royalty.  Nor did Lucent inform the jury what

24   Microsoft's revenues or profits were from sales of all Outlook licenses ████████ in revenues;

25   ████████ in profits) or Office licenses ████████ in revenues; ████████ in profits) and never

26   used these figures as an improper "check" on the reasonable royalty amount.  Instead, Lucent

27   presented evidence of the properly-apportioned value of the Day Patent technology to Microsoft in

28   terms of its expected forgone profits from 3% of Outlook sales, and asked for a reasonable royalty

1    only on that apportioned value.  (Ex. C at 211:22–212:7; 216:25–217:20; 220:2–5; Ex. O at 180:5–

2    17; Ex. P at 6:20–24; 7:5–7; 12:17–21; 14:25–16:1.)

3           Third, the Court instructed the jurors that they **may** consider the *Georgia-Pacific* factors and

4    that the factors were not exhaustive.  (Ex. P at 9:6–7; 11:11–15.)  Moreover, the Court instructed the

5    jurors many times on apportionment.  (*Id.* at 6:20–24; 6:25–7; 10:4–19; 12:17–13:2; 14:25–16:10)

6           In addition, Microsoft's criticisms about the *Georgia-Pacific* factors overlook the fact that

7    Mr. Sims arrived at his reasonable royalty based on a hypothetical negotiation conducted pursuant to

8    the Business-Realities Approach as well as the *Georgia-Pacific* Approach.  He discussed the

9    considerations the parties would have in mind in the Business Realities scenario and arrived at the

10   same conclusion that a $70 million royalty is reasonable.  Microsoft cannot even show that the jury's

11   verdict was based on a *Georgia-Pacific* analysis.  Thus the Court's reading of the *Georgia-Pacific*

12   instruction was not error as it did not render the jury verdict contrary to the clear weight of the

13   evidence.  *See Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1337 (9th Cir. 1985) ("an error in

14   jury instructions does not require reversal if it is more probable than not that the error was

15   harmless"), *opinion corrected by* 773 F.2d 1049 (9th Cir. 1985); *see also Weinar v. Rollform Inc.*,

16   744 F.2d 797, 808 (Fed. Cir. 1984).

17           **2.    The Court properly admitted evidence on the Georgia-Pacific factors.**

18           Microsoft claims the Court improperly admitted evidence under the *Georgia-Pacific* factors

19   regarding Lucent's licensing policy and Mr. Sims's time savings analysis.  Microsoft's challenges

20   should be rejected for the reasons set forth below.[13]

21           **Lucent's Licensing Policy and Executed Agreements**:  Microsoft challenges the Court's

22   decision to admit evidence of Lucent's historical licensing policy and executed licenses, rehashing

23   its previously-rejected arguments.  (*See, e.g.*, D.I. 1029 at 4–11; D.I. 1137 at 3–6; D.I. 1225 at 6–13;

24   D.I. 1270 at 5–7; D.I. 1317 at 2–3.)  This Court has found that licensing evidence to be relevant and

25   admissible on numerous occasions. (D.I. 1180 at 22; D.I. 1284 at 15–16; Ex. E at 74:10–75:1.)

26           The Court properly allowed Mr. Sims to present testimonial and documentary evidence

27   ---
[13]  Microsoft also contends the Court committed error by allowing in evidence of Microsoft's profits and profitability.
28   Those arguments are addressed above at 21.

proving the existence of Lucent's licensing policy—a policy that should be considered under Federal Circuit law.  (Ex. C at 180:7–186:8; Ex. A at 60:6–68:8; 69:8–77:23; Ex. S, PX 498; Ex. T, PX 499; Ex. U, PX 1541; Ex. V, PX 1153; Ex. W, PX 528); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988) ("[T]he patentee's usual licensing approach should be considered in assessing a reasonable royalty.").  Microsoft even received a special instruction to the jury on this point over Lucent's objection.  (Ex. P at 13:18–14:3.)  Curiously, Microsoft claims that because Lucent never "applied" its licensing policy at trial, any *Georgia-Pacific* instruction related to the policy was prejudicial.  But it was ***Microsoft*** who moved *in limine* to prevent Lucent from applying its licensing policy.  (D.I. 1028; D.I. 1029; D.I. 1225; D.I. 1302.)  At trial, Lucent presented the framework of its licensing policy to rebut Microsoft's claims that Lucent would take any amount for the Day Patent.  (Ex. A at 75:15–77:16.)  In reality, Lucent's negotiators had rules they were required to follow in licensing negotiations.  (Ex. C at 180:2–183:19; Ex. A at 60:5–65:18.)  The policy also showed that Lucent would accept either a lump-sum royalty or a running royalty; indeed, Mr. Sims explained the benefits and burdens of each.  (Ex. C at 207:12–209:5.)  The existence of the policy and its effect on the hypothetical negotiation was a question of fact for the jury.

Given the relevance of Lucent's licensing policy, the executed Locus and Acer agreements are relevant to prove up that policy.  Both agreements were executed about the time of the hypothetical negotiation and include a license to the Day Patent.  (Ex. A. at 67:11–24; 72:24–74:9; Ex. U, PX 1541; Ex. V, PX 1153.)  The Locus agreement specifically related to "graphics products," defined as "a computer program (whether marketed software or firmware) which, when used in conjunction with a hardware device, produces a visual pattern of information," the same kind of technology described in the Day Patent.  (Ex. V, PX 1153 at 15; Ex. X, PX 1 at col. 17, ln. 27 to col. 18, ln. 14; col. 18, ln. 19–22.)  In addition, the Court gave special jury instructions regarding both comparable license agreements and licensing policies.  (Ex. P at 11:21–12:9; 13:18–14:18.)

Microsoft asserts that Lucent's executed licenses are only relevant if Lucent can show what "people actually pay," but cites no authority for its assertion.  (D.I. 1434 at 17.)  Nor would such a requirement make sense as it would entail a wasteful trial within a trial, given that the amount any particular entity might pay depends on a host of factors unrelated to the value of the licensed

1   technology (*e.g.*, whether the licensee marketed a product that utilized the patent, the success of the

2   licensee's business,[14] whether the licensee underreported sales).

3           After faulting Lucent for not applying its licensing policy, Microsoft then speculates that the

4   jury ***might have*** applied Lucent's licensing policy to arrive at a jury verdict that was grossly

5   excessive.  Microsoft speculates that the jury combined Mr. Sims's explanation of Lucent's licensing

6   policy with information from other analyses in the record to calculate Microsoft's Outlook revenue

7   and then applied Lucent's policy to those numbers.  Lucent never invited the jury to make such a

8   calculation nor is there any evidence the jury did make such a calculation.  Microsoft points out that

9   the jury asked for calculators (D.I. 1434 at 18), claiming that it is "hard to imagine" another use for

10  the calculators.  While it is true that ***Microsoft's*** proposed damages number lacked any supporting

11  calculations (Ex. O at 76:23–77:2; 147:8–23), Mr. Sims's damages analyses and Dr. Jay's survey

12  results were replete with calculations.  Furthermore, ***Microsoft*** gave three separate witnesses

13  calculators on the stand, directing each of the witnesses to punch certain numbers into the

14  calculators.  (Ex. A at 97:4–7; 154:9–21; 155:10–17; 173:25–174:17; Ex. O at 90:13–15; 92:9–

15  96:22; 128:22–129:13; 129:16–130:8.)  Microsoft's speculation should be rejected.

16          Finally, Microsoft continually refers to the jury's award as "oversized," but Lucent proved at

17  trial that Microsoft would have been willing to pay at least up to $138.7 million for a license to the

18  Day Patent.  (Ex. A at 91:19–92:6.)  In the end, based on an evaluation of the considerations in the

19  Business Realities Approach and the *Georgia-Pacific* factors, Mr. Sims determined that $70 million

20  was a reasonable royalty.  (*Id*. at 93:10–96:6; Ex. L, RS77–RS78.)  The jury agreed, awarding

21  Lucent $70 million in damages based upon the evidence.  (D.I. 1383.)  Nor was the amount grossly

22  excessive.  The jury could have awarded up to $138.7 million based upon the evidence.

23          **Time Savings Analysis**:  Microsoft also claims that Mr. Sims's time savings analysis was

24  speculative and "skewed" the jury's award, but again Microsoft fails to cite any evidence in support

25  of its claim.[15]  In addition, Mr. Sims's analysis is fully supported by the record.  Both Mr.

26

27  [14]  For instance, Locus Computing ceased to exist in 1995.

28  [15]  Use of time savings analyses is relevant to multiple *Georgia-Pacific* factors, including factors 9, 10, and 11.  *Georgia-Pacific*, 318 F. Supp. at 1120.  Courts—including this one—have approved the use of such analyses in damages cases.

1   Tognazzini and Mr. Sims testified to the amount of time a person saves when using the Day Patent

2   technology compared to other methods.  (Ex. A at 42:2–17; 54:7–55:8; Ex. Y at 197:20–200:20.)

3   Microsoft chose not to cross on this subject and the jury was free to determine the credibility of

4   Lucent's experts.  Microsoft also chose not to call its technical expert to the stand.  How much time

5   is saved, its worth, and how much of that value Microsoft would agree to pay to Lucent are all

6   questions of fact for the jury, who determined that Mr. Sims's analysis was reasonable.

7          **E.**    ***Global-Tech* Does Not Impact the Verdict in This Case**

8         Microsoft again argues that because it did not know that the drop-down calendar tool in

9   Outlook was a composition tool until March 3, 2006, damages should be limited to the remainder of

10  the damages period after that date.  (D.I. 1434 at 21–22; D.I. 1288.)  Lucent incorporates herein by

11  reference its opposition to Microsoft's Motion *in limine* No. 16 (D.I. 1299).  The Court has already

12  rejected Microsoft arguments, and it should do so again for the same reasons.  (D.I. 852 at 22, 25

13  n.7; D.I. 1180 at 12; D.I. 1304 at 4–6.)  In addition, the Court permitted Microsoft to make its

14  noninfringement arguments at trial—over Lucent's objections—and the jury rightly rejected them.

15  (Ex. Y at 93:15–18; 102:23–25; Ex. O at 203:11–25; 208:2–209:24; 210:11–211:4; 212:21–25.)

16  **IV.**    **CONCLUSION**

17        Microsoft fails to meet the high threshold for a new trial.  Microsoft's list of complaints

18  regarding the jury's award is directed to issues of the credibility or weight of the evidence—the

19  jury's unique province—and the Court may not grant a new trial simply because it would have come

20  to a different conclusion than the jury did.  *Pavao*, 307 F.3d at 918.  Lucent presented substantial

21  evidence to support the jury's reasonable royalty award and requests that the Court deny Microsoft's

22  motion and affirm the jury's verdict.

23  Dated:  September 27, 2011          Lucent Technologies Inc.

24                                By:   /s/ David A. Hahn

25                                David A. Hahn (SBN 125784)

26

27  (D.I. 1284 at 19.)  *See Grepke v. Gen. Elec. Co.*, 280 F.3d 508, 511–13 (7th Cir. 1960); *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F. Supp. 752, 827–28 (E.D. Pa. 1990).

28

1

2          DAVID A. HAHN, ATTORNEY AT LAW
           400 10th Street
3          Coronado, California  92118
           Telephone:  (619) 235-2100
4          Facsimile:  (619) 235-2101

5          Luke L. Dauchot (SBN 229829)
           KIRKLAND & ELLIS LLP
6          333 South Hope Street
           Los Angeles, CA 90071
7          Telephone: (213) 680-8400
           Facsimile: (213) 680-8500
8
           Jeanne Heffernan (admitted *pro hac vice*)
9          KIRKLAND & ELLIS LLP
           601 Lexington Avenue
10         New York, New York  10022
           Telephone:  (212) 446-4800
11         Facsimile:  (212) 446-4900

12         Attorneys for Lucent Technologies Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28