1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCENT TECHNOLOGIES, INC., | CASE NO. 07-CV-2000 H (CAB) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MICROSOFT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND IN THE ALTERNATIVE, A NEW TRIAL WITH A REMITTITUR** |
| vs. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

This case is on remand from the Federal Circuit for a new trial on damages for Microsoft's infringement of claims 19 and 21 of U.S. Patent Number 4,763,356 ("Day patent"). See Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301 (Fed. Cir. 2009). The first jury returned a finding of infringement and validity of the Day patent, and Microsoft appealed the verdict and damages award. See id. The Federal Circuit affirmed the jury's verdict on the infringement and validity of the Day patent, but remanded the case for a new trial on damages. Id.

On July 29, 2011, the jury returned a verdict of $70 million as the lump-sum reasonable royalty for Microsoft's infringement of the Day patent for Microsoft Outlook (versions 2000, 2002, and 2003); Microsoft Money (versions 2000 through 2006); and Windows Mobile (versions Pocket PC 2000, 2002, and 2003, Windows Mobile 2003, and Windows Mobile 5). (Doc. No. 1383.) On July 29, 2011, this Court issued judgment in favor of Lucent against

1  Microsoft in the amount of $70 million.  (Doc. No. 1387.)

2  　　　On August 26, 2011, Microsoft filed a motion for a new trial (Doc. No. 1434) and a

3  post-trial motion for judgment as a matter of law (Doc. No. 1433).[1]  On September 27, 2011,

4  Lucent filed a response in opposition to Microsoft's motion for a new trial and post-trial

5  motion for judgment as a matter of law.  (Doc. Nos. 1451 & 1454.)  On October 4, 2011,

6  Microsoft filed its reply.  (Doc. Nos. 1457 & 1458.)

7  　　　On October 12, 2011, the Court held a hearing on these post-trial motions.  Luke

8  Dauchot, Jeanne Heffernan, and Ryan Kane appeared for Plaintiff Lucent.  Roger Denning,

9  Michael Florey, Francis Albert, and Craig Countryman appeared for Defendant Microsoft.

10  The Court compliments the attorneys and trial counsel for their excellent advocacy in this case.

11  　　　After due consideration, the Court grants in part and denies in part the motion for

12  judgment as a matter of law and enters judgment of $26.3 million.  The Court also

13  conditionally grants in part and denies in part the motion for a new trial under Federal Rule of

14  Civil Procedure 50(c), with a remittitur of $26.3 million.

15  **I. Background**

16  　　　This case illustrates the difficulty of properly valuing a small patented component,

17  without a stand-alone market, within a larger program.  See Lucent, 580 F.3d at 1324; Uniloc

18  U.S.A., Inc. v. Microsoft, 632 F.3d 1292 (Fed. Cir. 2011); ResQNet.com Inc. v. Lansa, Inc.,

19  594 F.3d 860, 869 (Fed. Cir. 2010); Georgia-Pacific Corp. v. United States Plywood Corp.,

20  318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

21  　　　Microsoft's popular Outlook product infringes claims 19 and 21 of the Day patent.

22  Lucent, 580 F.3d at 1321; (PX-1 at 17:27-18:14, 18:19-22.)  Specifically, the date-picker

23  permits users to calendar appointments by clicking on a calendar and populating the field with

24  the resulting date.  The Day patent's technology is included in 109.3 million Office suite

25  ("Office") licenses and in 241,800 stand-alone Outlook products, for a total of 109.5 million

26  

27  　　　[1]During trial, Microsoft filed a motion for judgment as a matter of law at the close of
Lucent's case  (Doc. No. 1369) and Microsoft filed a motion for judgment as a matter of law

28  at the close of all evidence.  (Doc. No. 1377.)  During trial, Lucent filed its opposition to these
motions.  (Doc. Nos. 1371 & 1381.)  The Court submitted these motions.  (Doc. No. 1422.)

1  licenses during the relevant period from January 13, 2003 to December 11, 2006.[2]
2  Additionally, Microsoft Money and Windows Mobile infringe the Day patent, but the vast
3  majority of the claimed damages relate to the 109.3 million Office licenses.

4      In a trial for damages for patent infringement, a prevailing party deserves damages
5  "adequate to compensate for the infringement, but in no event less than a reasonable royalty
6  for the use made of the invention by the infringed." 35 U.S.C. § 284 (2006).  The parties
7  dispute whether the jury had a legally sufficient evidentiary basis to award $70 million for the
8  infringement as a lump-sum royalty.  Microsoft argues that Lucent failed to provide the jury
9  with a properly-apportioned damages calculation in violation of the entire market value rule.
10  (Doc. Nos. 1434 & 1433.)  Lucent responds that it properly apportioned between the patented
11  features and unpatented features under the relevant Georgia-Pacific factors without relying on
12  the entire market value rule.  Georgia-Pacific, 318 F. Supp. at 1120.

13      To support its claim of damages, Lucent called Bruce Tognazzini, a well-recognized
14  technical expert; Dr. Deborah Jay, a survey expert sought by both sides for her renowned
15  expertise in probability surveys; Raymond Sims, an economic expert; Stephen Samuels, Bruce
16  Schneider, and Roger Stricker, Lucent's licensing witnesses; and adverse witness, William
17  Kennedy, a Microsoft executive.  Microsoft strategically elected to put Lucent to its burden
18  of proof.  In so doing, Microsoft declined to call its survey expert, a licensing witness, or an
19  economist to evaluate damages.  Instead, Microsoft called a professor of negotiation theory,
20  Robert Mnookin, and Microsoft executives William Kennedy and Jensen Harris.  The jury,
21  after evaluating the credibility of witnesses, agreed with Lucent and rejected Microsoft's
22  arguments and biased witness testimony in reaching its valuation of $70 million.

23  **II. Microsoft's Motion for Judgment as a Matter of Law**

24      **A. Legal Standards for Motion for Judgment as a Matter of Law**

25      A jury verdict can be overturned and a post-trial motion for judgment as a matter of law

26  ─────────────────

27      [2]The Court again rejects Microsoft's challenge under Global-Tech Appliances, Inc. v.
    SEB S.A., 131 S.Ct. 2060 (2011), to the notice period as it did not preserve this issue on appeal
28  and on the merits.  (See Doc. No. 1304.)

granted "only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" <u>Winarto v. Toshiba Am. Elecs. Components, Inc.</u>, 274 F.3d 1276, 1283 (9th Cir. 2001). In ruling on a motion for judgment as a matter of law, the district court "is not to make credibility determinations or weigh the evidence." <u>Id.</u> The district court "must accept the jury's credibility findings consistent with the verdict." <u>Id.</u>

For the motion, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable evidentiary inferences in favor of the non-moving party. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000); <u>Josephs v. Pac. Bell</u>, 443 F.3d 1050, 1062 (9th Cir. 2006). The Court must uphold a jury's verdict even if the record contains evidence that might support a contrary conclusion to the jury's verdict. <u>Pavao v. Pagay</u>, 307 F.3d 915, 918 (9th Cir. 2002). The district court must disregard evidence favorable to the moving party that the jury is not required to believe. <u>Reeves</u>, 530 U.S. at 150-51; <u>Pavao</u>, 307 F.3d at 918; <u>Winarto</u>, 274 F.3d at 1283, 1286-87 (district court must "accept the jury's credibility findings consistent with the verdict" and "disregard all evidence favorable to the moving party that the jury is not required to believe" because "[w]hen two sets of inferences find support in the record, the inferences that support the jury's verdict of course win the day.").

"On post-trial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." <u>Lucent</u>, 580 F.3d at 1336. Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," <u>Unisplay, S.A. v. Am. Elec. Sign Co.</u>, 69 F.3d 512, 517 (Fed. Cir. 1995), the damages cannot stand if any part of the calculation leading to it was unsupported or contrary to law. <u>Uniloc</u>, 632 F.3d at 1317, 1321. "Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." <u>Id.</u> at 1317. Moreover, when an accused device includes patented and unpatented features, as in this case

1   for the Day patent, "the patentee ... must in every case give evidence tending to separate or

2   apportion the defendant's profits and the patentee's damages between the patented feature and

3   the unpatented features, and such evidence must be reliable and tangible, and not conjectural

4   or speculative," or show that "the entire value of the whole machine, as a marketable article,

5   is properly and legally attributable to the patented feature." Uniloc, 632 F.3d 1292, 1318

6   (citing Garretson v. Clark, 111 U.S. 120, 121 (1884)); see also Lucent, 580 F.3d at 1336–37.

7   For minor patent improvements, a patentee cannot justify using the entire market value of an

8   accused product simply by asserting a low enough royalty rate. Uniloc, 632 F.3d 1292, 1320.

9   If the plaintiff, as in this case, cannot meet the entire market value rule, the plaintiff must

10   apportion between the patented and unpatented features. Uniloc, 632 F.3d at 1318.

11   **B. Lucent's Damages Calculation**

12   Microsoft challenges the jury's $70 million verdict.   (Doc. No. 1434-1 at 1.)

13   Significantly, Microsoft argues that "Lucent presented no evidence, much less substantial

14   evidence, that could have led a reasonable jury to conclude that Microsoft would have lost $67

15   in revenue for any fraction of the 109 million licenses to Office if Outlook did not include the

16   date-picker." (Id.) Specifically, Microsoft argues that Lucent failed to provide the jury with

17   a properly-apportioned damages calculation for Outlook based on reliable expert methodology

18   as required by the Federal Circuit and this Court's previous rulings. (See Doc. No. 1323,

19   Court's Motion in Limine Order, at 9-10; Uniloc, 632 F.3d 1292.)

20   Lucent refers to the entire record at trial and the jury's credibility determinations in

21   support of the jury's damage award. Further, Lucent emphasizes that this is a reasonable

22   royalty case based on the outcome of a hypothetical negotiation for a lump-sum, not a lost

23   profits case. (Doc. No. 1451 at 1.)

24   A lump-sum license is an "upfront, paid-in-full royalty." Lucent, 580 F.3d at 1326. A

25   lump-sum royalty benefits the licensor by raising a substantial amount of money quickly. Id.

26   On the other hand, a lump-sum royalty benefits the licensee by allowing it to use the patented

27   technology without any concerns of further expenditure. Id. Furthermore, a lump-sum royalty

28   removes the inherent risk of under-reporting the actual usage of the patented technology by the

1  licensee, and eliminates administrative burden of having to monitor usage.  Id.  A lump-sum

2  royalty also eliminates any ability for the licensee to reevaluate the value of the patented

3  technology.  The licensee agrees to pay the lump-sum royalty regardless of whether the

4  patented technology is successful or even used.  Id.

5       A lump-sum royalty may also create risks.  If either party incorrectly forecasts the use

6  of the patented feature, a licensee may end up paying a lump-sum far in excess of what the

7  patented invention is later shown to be worth or a licensor may end up accepting a lump-sum

8  that is far less than what the patented invention is later shown to be worth.  Id.  The licensee

9  may also consider its risk of not including the patented invention in its product under Georgia-

10 Pacific.  318 F. Supp. at 1120.

11       During a hypothetical negotiation for a lump-sum royalty figure, the parties may

12 "consider the expected or estimated usage" of the patented invention.  Lucent, 580 F.3d at

13 1327.  Generally, a frequently used invention is more valuable and commands a higher

14 lump-sum royalty.  Id.  Conversely, a minimally used feature commands a lower lump-sum

15 payment.  The lump-sum analysis does not require the parties to precisely calculate the use of

16 the patented feature, unlike a running royalty license.  In a typical running royalty, the license

17 is tied to the use of the patented feature standing alone or incorporated into other products.  In

18 a lump-sum calculation, the parties agree on a fully paid up amount based on "expected or

19 estimated usage."  Id. at 1327.

20       Here, Lucent sought a lump-sum royalty based on its Georgia-Pacific analysis and the

21 business risk to Microsoft from not including the Day patent technology in its products.

22 Lucent properly points out that its evidentiary burden to show a lump-sum reasonable royalty

23 under Georgia-Pacific was to present sufficient evidence regarding the outcome of a

24 hypothetical negotiation based on competing positions about the value of the Day patent

25 technology to Microsoft.  (Id.)

26       Lucent's $70 million figure considered an expected financial impact to Microsoft

27 without the Day patent technology in Outlook.  (R. Tr. at III-244:13-257:4; IV-5:22-32:19.)

28 It is undisputed that Microsoft sold 109.3 million Outlook licenses within Office during the

- 6 -

1   damages period. (R. Tr. at IV-160:4-8.) Mr. Raymond Sims ("Mr. Sims"), Lucent's economic

2   expert, included the 109.3 million Office licenses in his analysis, along with 241,800 licenses

3   for Outlook sold on a stand-alone basis, for a total of 109.5 million licenses. (Id.; see also R.

4   Tr. at IV-15:4-16:12.)

5        Mr. Sims then multiplied the 109.5 million total Outlook licenses by 3% to obtain the

6   number of license sales Microsoft would potentially lose if the Day patent technology was not

7   included in Outlook. The result is a risk of loss of up to 3.3 million license sales. (R. Tr. at IV-

8   14:16-15:3.)  He arrived at the 3% figure using data generated by a survey conducted by

9   Lucent's expert Dr. Deborah Jay ("Dr. Jay"). (R. Tr. at IV-11:20-16:12.)  Dr. Jay's survey

10  results showed that 7% of Outlook purchase-decision makers that use the drop-down calendar

11  feature would not have bought Outlook if it lacked the drop-down calendar. (R. Tr. at II-66:24-

12  67:7, 153:11-19,118:10-119; PX-1012; PX-1616.)   Mr. Sims multiplied the 7% by the

13  percentage of all Outlook users who use the drop-down calendar—43%—to arrive at 3%. (R.

14  Tr. at IV-10:6-14:15; Doc. No. 1454-3 at 33-37, 43-46 (RS11-RS15, RS21-RS24).)  Dr. Jay

15  agreed with Mr. Sims' calculation of the 3% figure. (R. Tr. at II-159:7-160:21; Doc. No. 1454-

16  3 at 523 (DJ34).)  This evidentiary record supports the conclusion that Microsoft would face

17  a potential loss of 3.3 million licenses at the hypothetical negotiation if Microsoft did not

18  include the Day patent technology in Outlook.

19       Mr. Sims' next step was to calculate a hypothetical revenue loss associated with selling

20  3.3 million fewer licenses of Outlook.  Mr. Sims testified that Microsoft's average per-unit

21  revenue is $67 from sales of stand-alone Outlook. (R. Tr. at IV-167:23-168:4.) Mr. Sims also

22  testified that Microsoft's average per-unit revenue from sales of Office that includes Outlook

23  is $98.19. (R. Tr. at IV-166:13-167:4.) Based on the testimony of Microsoft's Rule 30(b)(6)

24  witness on the subject, Mr. Sims testified that Microsoft does not attribute revenue received

25  from sales of Office to the individual programs within Office. (R. Tr. at III-186:14-189:10; IV-

26  17:5-18:1.)  As a result, Mr. Sims used a $67 stand-alone value of Outlook as a proxy for the

27  value of Outlook sold as part of Office.

28

1    Mr. Sims testified that his use of $67 as the value for Outlook sold as part of Office was
2    corroborated by a 2010 Microsoft pricing document.  The internal document showed that the
3    difference in retail prices between Office with Outlook ($279.99) and Office without Outlook
4    ($149.99) was $130, roughly the retail price of stand-alone Outlook at that time ($139.99).
5    (PX-1895; R. Tr. at IV-167:23-169:5, 174:6-175:7, 181:10-182:9.)

6    Mr. Sims also testified that use of $67 as the value of Outlook within Office was
7    appropriate based on internal Microsoft documents showing that Microsoft Outlook is the most
8    frequently used Office application "by far." (PX-838; R. Tr. at III-218:21-219:23; R. Tr. at IV-
9    163:14-164:15.) Mr. Sims testified that he reviewed internal Microsoft records concerning use
10   of the calendar feature within Outlook and Office.  (Id.)  An internal Microsoft presentation
11   states  83%  of  respondents  use  Outlook's  calendar  to  manage  their  work
12   appointments/events/meetings.  In another internal Microsoft survey, Microsoft listed several
13   calendar based tasks as "high-impact," noting that 90% of the respondents used calendar
14   features, 84% set up new appointments or meetings, and 79% forwarded or changed meeting
15   requests.  (Doc. No. 1399, PX-838.)  Therefore, Mr. Sims multiplied the 3.3 million licenses
16   for Office and Outlook by $67 to arrive at his opinion that Microsoft would have potentially lost
17   $221.4 million in revenue if it did not include the Day patent technology in Outlook. (R. Tr. at
18   IV-16:14-18:1, 167:23-168:13, 172:7-10.) The Court also dismisses Microsoft's claim that only
19   50% of Office licenses infringe.  That testimony came from a biased Microsoft employee that
20   both the jury and the Court reject as not credible.

21   Mr. Sims next multiplied the $221.4 million by Microsoft's uncontested 76.2% division-
22   wide profit margin and, after performing a similar calculation for Money, discounted the total
23   "expected forgone profit" to 2003 to yield a total of $138.7 million.[3]  (R. Tr. at IV-18:3-14,
24   22:13-28:10.)

25

26   ────────────────
27   [3]The Court finds no legal error in Lucent's calculations for Microsoft Money and
     Microsoft Mobile/Pocket PC, but these figures are insignificant compared to the Outlook
28   numbers in the damages calculation.

1    Mr. Sims also performed an analysis of time savings to consumers by using the Day
2  patent technology over other methods in Microsoft's three infringing products.  Based on
3  internal Microsoft documents, Mr. Sims testified that Microsoft values the time saved by its
4  consumers. (R. Tr. at IV-33:7-38:9, 40:156-41:8, 53:11-54:2; PX-1000; PX-1048; PX-1889.)
5  Mr. Bruce Tognazzini, Lucent's technical expert, and Mr. Sims testified to the amount of time
6  a person saves when using the Day patent technology compared to other methods.  (R. Tr. at
7  IV-42:2-17, 54:7-55:8; I-197:20-200:20.)  Based on internal Microsoft documents, Mr. Sims
8  determined the number of events over the life of a product where a user can save time by using
9  the infringing technology to schedule appointments. (R. Tr. at IV-44:3-47:2, 48:23-49:6; Doc.
10  No. 1451-4 at 543-547 (RS34-RS37, RS40); PX-829.)  Mr. Sims monetized the time by using
11  $12.09, the average per-hour wage in 1996 for workers at the time of the hypothetical
12  negotiation. (R. Tr. at IV-48:2-49:19.)  Finally, Mr. Sims testified that he took the number of
13  licenses sold during the infringement period and reduced the number of licenses to account for
14  the users of the Day patent technology. (Id.) Mr. Sims performed the same analysis for Money
15  and Pocket PC, discounted the total amount to 2003, and concluded that the time savings value
16  to the consumer is $170 million. (R. Tr. at IV-49:25-53:10.)

17    Mr. Sims next opined on the outcome of the Georgia-Pacific hypothetical negotiation.
18  This hypothetical negotiation tries to recreate the "ex ante licensing negotiation
19  scenario"—"[i]n other words, if infringement had not occurred, willing parties would have
20  executed a license agreement specifying a certain royalty payment scheme." Lucent, 580 F.3d
21  at 1324-25.   In evaluating the hypothetical negotiation, the parties often apply the
22  Georgia-Pacific framework.

23    The fifteen Georgia-Pacific factors include: (1) established royalty rate for the patent;
24  (2) license rates paid for comparable patents; (3) type of license (exclusive/non-exclusive or
25  restricted/non-restricted); (4) licensor's established licensing policies; (5) competitive
26  relationship between licensor and licensee; (6) convoyed sales; (7) duration and terms of the
27  license; (8) commercial success and established profitability; (9) advantages over old methods;
28  (10) nature of patented invention and benefits to those that use it; (11) extent of use of the

1 | patent by the infringer; (12) customary industry rate for invention or analogous inventions; (13)

2 | portion of profit that should be credited to the invention as distinguished from nonpatented

3 | elements, manufacturing process, business risks, or significant features added by the infringer;

4 | (14) opinion testimony of qualified experts; and (15) amount that licensor and licensee would

5 | have agreed upon. Georgia-Pacific, 318 F. Supp. at 1120. In Uniloc, the Federal Circuit

6 | explicitly "sanction[s] the use of the Georgia-Pacific factors to frame the reasonable royalty

7 | inquiry." 632 F.3d at 1317. "Those factors properly tie the reasonable royalty calculation to

8 | the facts of the hypothetical negotiation at issue." Id. Mr. Sims' testimony concerning the

9 | applicable Georgia-Pacific factors was proper as was the Court's instruction to the jury on the

10 | factors.

11 |      Mr. Sims reviewed the survey results, expected foregone profits, value of time savings

12 | to consumers, documents reflecting the qualitative value of the patented technology, Lucent's

13 | licensing policy, and the parties' respective bargaining positions. He concluded that, during the

14 | hypothetical negotiation, Microsoft and Lucent would choose a lump-sum license payment

15 | closer to $138.7 million than to zero based on the applicable Georgia-Pacific factors. (R. Tr.

16 | at IV-91:2-13; see also R. Tr. at IV-90:19-91:13, 94:11-19.)

17 |      Mr. Sims also examined the hypothetical negotiation using a business realities approach.[4]

18 | This approach takes into account the parties' various interests and alternatives to reaching an

19 | agreement. Mr. Sims testified that Microsoft would consider that it would be at risk for

20 | potentially losing $138.7 million dollars if it did not reach an agreement with Lucent. (R. Tr.

21 | at IV-91:17-95:24.) Microsoft's competitor to Outlook, Lotus Notes, included the Day patent

22 | technology. (R. Tr. at III-250:10-13.) He also testified that while Microsoft would attempt to

23 | _____

24 | [4]Mr. Sims' business realities approach is somewhat similar to Microsoft's expert Professor Mnookin's testimony concerning the interests of the parties in a hypothetical negotiation but with different conclusions. Professor Mnookin referred to one of the parties'

25 | interests as a BATNA, the best alternative to a negotiated agreement and a reservation price. Professor Mnookin acknowledged that the parties will come to an agreement if there is overlap

26 | in the zone of potential agreement. Microsoft acknowledged that Professor Mnookin's methodology is based on well-established negotiation theories that are widely accepted. (Doc.

27 | No. 1257 at 6.) The jury soundly rejected Professor Mnookin's conclusions—not his methodology about negotiations—because there was no credible evidence to support

28 | Microsoft's licensing value of $2 to $5 million.

1  pay the lowest amount it could for a license to the Day patent, Lucent would seek a royalty as
2  close to $138.7 million as possible to preserve the value of its intellectual property portfolio.
3  (Id.) Based on his apportionment, the Georgia-Pacific factors, and business realities, Mr. Sims
4  testified that a conservative lump-sum royalty would be $70 million. (R. Tr. at IV-95:5-96:6,
5  94:13-16.)  The jury agreed.  The issue is whether the jury's verdict is supported by legally
6  sufficient substantial evidence.  Winarto, 274 F.3d at 1283.

7        **C. The Court Advised Lucent that it Needed to Properly Apportion the Value of
       the Day Patent**
8

9        The Court next evaluates whether the trial record supports a legally sufficient basis of
10  apportionment between the patented and unpatented features of the Day patented technology
11  within Outlook and Office as required by the Federal Circuit and this Court's previous rulings.
12  (See Doc. No. 1323, Court's Motion in Limine Order, at 9-10; Uniloc, 632 F.3d 1292.)

13        Lucent is entitled to a reasonable royalty for Microsoft's infringement of the Day patent.
14  See Lucent, 580 F.3d at 1324; see also 35 U.S.C. § 284 (2006).  A reasonable royalty is the
15  "floor below which damages shall not fall." Lucent, 580 F.3d at 1324. The amount of damages
16  based on a reasonable royalty is an issue of fact for the jury. Micro Chem., Inc. v. Lextron, Inc.,
17  317 F.3d 1387, 1394 (Fed. Cir. 2003).  A jury's award is entitled to deference.  Monsanto Co.
18  v. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004).  In damages cases, courts should resolve "any
19  doubts about the amount . . . against the infringer." DSU Med. Corp. v. JMS Co., 471 F.3d
20  1293, 1309 (Fed. Cir. 2006).  In measuring damages, Lucent conceded that it cannot show that
21  the Day patent technology—the date-picker—is the basis for consumer demand of Outlook or
22  Office.  Therefore, Lucent cannot meet the entire market value rule. Uniloc, 632 F.3d at 1318.

23        "The entire market value rule allows a patentee to assess damages based on the entire
24  market value of the accused product only where the patented feature creates the 'basis for
25  customer demand' or 'substantially create[s] the value of the component parts,'" Uniloc, 632
26  F.3d at 1318 (citing Lucent, 580 F.3d at 1336; Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d
27  1538, 1549-50 (Fed. Cir. 1995)), or where the patented feature was of "such paramount
28  importance that it substantially created the value of the component parts." Rite-Hite, 56 F.3d

1    at 1549. Application of the entire market value rule requires adequate proof of three conditions:

2    "(1) the infringing components must be the basis for customer demand for the entire machine

3    including the parts beyond the claimed invention, <u>Fonar Corp. v. Gen. Elec. Co.</u>, 107 F.3d 1543,

4    1552 (Fed. Cir. 1997); (2) the individual infringing and non-infringing components must be sold

5    together so that they constitute a functional unit or are parts of a complete machine or single

6    assembly of parts, <u>Paper Converting Mach. Co. v. Magna-Graphics Corp.</u>, 745 F.2d 11, 23 (Fed.

7    Cir. 1984); and (3) the individual infringing and non-infringing components must be analogous

8    to a single functioning unit, <u>Kalman v. Berlyn Corp.</u>, 914 F.2d 1473, 1485 (Fed. Cir. 1990).

9    <u>Cornell Univ. v. Hewlett-Packard Co.</u>, 609 F. Supp. 2d 279, 286-87 (N.D.N.Y. 2009) (Rader,

10   C.J., by designation).[5]  It is not enough that the infringing and non-infringing parts are sold

11   together for mere business advantage. <u>See</u> <u>Rite-Hite</u>, 56 F.3d at 1549-50.  Instead, Lucent

12   argues that its analysis apportions the value of the Day patent within Outlook between the

13   patented and unpatented features as required by <u>Uniloc</u>.

14        In <u>Uniloc</u>, the Federal Circuit noted the qualifying language in the <u>Lucent</u> case that

15   forecloses the entire market value rule because of "the lack of evidence demonstrating the

16   patented method of the Day patent as the basis—or even a substantial basis—of the consumer

17   demand for Outlook. . . . The only reasonable conclusion supported by the evidence is that the

18   infringing use of the date-picker tool in Outlook is but a very small component of a much larger

19   software program." <u>Uniloc</u>, 632 F.3d at 1219-20; <u>see</u> <u>Lucent</u>, 580 F.3d at 1338.  If the patentee

20   cannot meet the entire market value rule, then "the patentee . . . must in every case give

21   evidence tending to separate or apportion the defendant's profits and the patentee's damages

22   between the patented feature and the unpatented features." <u>Uniloc</u>, 632 F.3d at 1318 (citing

23   <u>Garretson v. Clark</u>, 111 U.S. 120, 121 (1884)).

24        Lucent conceded that it cannot satisfy the entire market value rule in this case. (R. Tr.

25   at 65:10-21.)  As a result, Lucent needed to separate or apportion the defendant's profits and

26   the patentee's damages between the patented and unpatented features.  <u>Uniloc</u>, 632 F.3d at

27   _____

28   [5]The parties declined the Court's suggestion to instruct the jury on the entire market value rule.  (R. Tr., July 18, 2011, at 65:12-21.)

1  1318. The Court concludes that Lucent's initial apportionment of 7% of the purchase-decision

2  makers for Outlook who would not buy Outlook without the drop-down calendar with 43% who

3  use the drop-down calendar sought to apportion between the patented and unpatented features

4  as required by Uniloc.[6]  (R. Tr. at IV-10:6-14:15; Doc. No. 1454-3 at 33-37, 43-46 (RS11-

5  RS15, RS21-RS24.))  The jury credited the testimony of Dr. Jay and Mr. Sims over vigorous

6  cross-examination by Microsoft.   The Court declines to re-weigh the evidence or make

7  credibility determinations on Lucent's initial apportionment.  Winarto, 274 F.3d at 1283.

8         Lucent further apportioned the damages by using a $67 per license figure for all Outlook

9  programs.  The Court gave Lucent plenty of notice that it would have to justify its use of the

10  $67 royalty base[7]—or apportionment of its use—in its damages calculation.  During three

11  rounds of motions in limine, the Court concluded that Lucent failed to properly apportion

12  between the patented and unpatented features of Outlook in a way that separates out from the

13  royalty base the portion that can be attributed to the Day patent technology.  See Uniloc, 632

14  F.3d at 1318.  In particular, the Court pointed out:

15         Though Lucent discounts the base to include only the revenue from Outlook where a
       user uses the Day patent technology, Lucent fails to show that it is entitled to capture this

16         entire market value as the base.  Specifically, Lucent has not shown that the Day patent
       technology is the basis for consumer demand for most Outlook users.  At best, Lucent

17         has introduced evidence to show that the Day patent technology is the basis for
       consumer demand for about 7% of users based on the Jay survey.

18

19  (Doc. No. 1284 at 12-13.)  The Court explained its rationale for a further apportionment: "[f]or

20  a product that is feature-rich like Outlook, use as a proxy for value does not appropriately

21  account for all the other unpatented features that consumers use besides the Day patent

22  technology even when consumers invoke the Day patent methods."  (Doc. No. 1284 at 12-13.)

23  See IP Innovation LLC v. Redhat, Inc., 705 F. Supp. 2d 687, 689-90 (E.D. Tex. 2010).  Pretrial,

24  the Court questioned Lucent's use of $67 as a proper base: "[p]ut into concrete terms, if a

25

26        [6]The Court also rejects Microsoft's argument that Lucent violated the entire market
value rule.  Rather, Lucent sought to apportion between the patented and unpatented features

27  in Microsoft's infringing products.

28        [7]Both parties round Lucent's base to $67 in their briefs, but in reality, Lucent used
$67.39 as the base of Outlook.

1  sample user uses the infringing Day patent technology but also uses many other features in
2  Outlook, Lucent has not shown that it is entitled to include in the royalty base all $67 of revenue
3  generated from this sample user." (Doc. No. 1284 at 12-13.)

4     The Court included a diagram to illustrate the need for a further apportionment:



13  (Doc. No. 1284 at 13.)  The Federal Circuit also noted that the Day patent is a minor feature
14  within Outlook.  Lucent, 580 F.3d at 1331.  Because "the patentee . . . must in every case give
15  evidence tending to separate or apportion the defendant's profits and the patentee's damages
16  between the patented feature and the unpatented features, and such evidence must be reliable
17  and tangible, and not conjectural or speculative," the Court warned Lucent before trial that its
18  expert failed to properly apportion the Day patent technology as one feature within many
19  features of Outlook and within Office.[8]  Uniloc, 632 F.3d 1292, 1318.

20     **D. Lucent's Evidence of its Valuation of Outlook within Office is Not Supported by Substantial Evidence**
21

22     The Court turns to Lucent's specific evidence of apportionment of the $67 for Outlook.
23  Despite the Court's pretrial admonitions, Mr. Sims concluded at trial that the average revenue
24  for Outlook during the relevant time period was $67, whether sold as part of Office or as a
25  stand-alone product.  (R. Tr. at IV-14:16-21:10; 159:9-160:8; 161:22-162:5; 167:23-169:16;
26  174:6-17; 181:10-182:9; Ex. N, PX 1895; Ex. L, RS16-RS20.)  The majority of the damages

27  ────────────
      [8]The Federal Circuit decided Uniloc at the time of the Court's initial Daubert
28  evidentiary hearing of Lucent's economic expert.  In response, the Court permitted the parties
   to supplement and revise their expert reports.  (Doc. Nos. 1194 & 1284.)

1  for the 109.5 million licenses are for Office versus the 241,800 stand-alone Outlook sales.

2       In Uniloc, the Federal Circuit additionally held that for minor patent improvements, a
3  patentee cannot justify using the entire market value of an accused product simply by asserting
4  a low enough royalty rate. Uniloc, 632 F.3d at 1320; see also Mirror Worlds, LLC v. Apple,
5  Inc., 2011 WL 1304488, at *16 (E.D. Tex., Apr. 4, 2011). Although a reasonable royalty
6  analysis "necessarily involves an element of approximation and uncertainty," Unisplay, 69 F.3d
7  at 517, the Court must ensure that the jury verdict is supported by sufficient evidence.

8       Microsoft contends that Lucent introduced no competent evidence to support application
9  of the $67 stand-alone Outlook revenue to the lost sales of Outlook licenses within Office.[9]
10  (Doc. No. 1434-1 at 9-11.) Specifically, Microsoft argues that applying the stand-alone revenue
11  figure to Office licenses improperly apportions the revenue associated with Outlook when
12  included in Office. The bundled Office price offers a significant discount over purchasing the
13  component software individually. (Id.) Lucent's expert, Mr. Sims, relied on the evidence
14  available from internal Microsoft documents[10] and Microsoft component prices as a proxy for
15  the value of Outlook when sold as part of Office. (Doc. No. 1451 at 14.)

16       For example, Rodney Jenkins, Microsoft's profit and loss controller, testified at trial that
17  Microsoft did not attribute Office revenue to individual programs found within Office. (R. Tr.
18  at III-186:14-189:10; R. Tr. at IV-17:5-18:1.) Nevertheless, an internal Microsoft document
19  indicates that Outlook is the  most popular of the Office components (see Doc. No. 1399, PX-
20  838 at 39) and other internal Microsoft documents demonstrate that use of calendar features in
21  Outlook ranks among the top-10 rated tasks. (Id. at 41). The jury agreed with the evidence of

22       [9]Microsoft agrees that Mr. Sims accurately calculated the average per-unit revenue for
23  stand-alone Outlook using Microsoft's internal financial documents. (R. Tr. at IV-17:5–18:1; 161:22–162:5.)

24       [10]Microsoft did not turn over these documents during discovery before the 2008 trial,
25  even though the documents were responsive to broad discovery requests. The documents included consumer studies regarding the Day patent. (Doc. No. 1246, Court's Order.) Lucent
26  became aware of the existence of the consumer studies involving the Day patent when William Kennedy testified for Microsoft during the 2008 trial that Microsoft gathered information about
27  how its customers use Outlook through focus groups, consumer feedback, and usability tests. (Doc. No. 119 at 15.) The Court denied Lucent's motion for sanctions for Microsoft's earlier
28  non-production of records. (Doc. No. 1246.) During discovery for the new trial, Lucent's specific discovery requests led Microsoft to produce the documents.

    07cv2000

1  Outlook's value within Office and rejected the biased testimony of Microsoft witnesses who
2  attempted to contradict the internal Microsoft documents. As a result, Lucent contends that Mr.
3  Sims presented the best evidence of value of Outlook within Office for purposes of the
4  hypothetical negotiation. (Doc. No. 1451 at 14.) Lucent also cites to other portions of the trial
5  record to support its substantial evidence position. (R. Tr. at IV-14:16-21:10, 159:9-160:8,
6  161:22-162:5, 167:23-169:16, 174:6-17, 181:10-182:9; Ex. H; PX 1895; Ex. G, RS 17.)

7          At the same time, Mr. Sims estimated that the average revenue attributable to Office was
8  $98.19. (R. Tr. at IV-166:13-167:4.) Lucent's calculation using a $67 revenue figure assumes
9  that Outlook represents 68% of the revenue of Office. If so, the collective value of Word,
10 Excel, and PowerPoint represents only $31 for these popular programs. A current version of
11 Office including Word, Excel, PowerPoint, and Outlook retails for $279.95, but each individual
12 component retails for $139.95 as a stand-alone product.[11] (Doc. No. 1434, Ex. E at 70, 92-93.)
13 Added together, the stand-alone components retail for well over twice the bundled price, but
14 Mr. Sims applied a $67 revenue figure to Outlook as a component of Office. The Court
15 concludes that Lucent's attribution of $31 collectively to Microsoft Word, PowerPoint, and
16 Excel is not based on sound economic or factual predicates.

17         For a proper calculation of patent damages, the Federal Circuit requires "sound economic
18 and factual predicates." See Riles v. Shell Exploration and Prod. Co., 298 F.3d 1301, 1311
19 (Fed. Cir. 2002); see also Grain Processing Corp. v. American Maize-Products Co., 185 F. 3d
20 1341, 1350 (Fed. Cir. 1999) ("To prevent the hypothetical from lapsing into pure speculation,
21 this court requires sound economic proof of the nature of the market and likely outcomes with
22 infringement factored out of the economic picture."); Crystal Semiconductor Corp. v. TriTech
23 Microelectronics Intern., Inc., 246 F.3d 1336, 1355 (Fed. Cir. 2001) ("Such market
24 reconstruction, though hypothetical, requires 'sound economic proof of the nature of the
25 market.'").

26 ///

27

_____

28    [11]The Court excludes OneNote as inapplicable for the damages period between 2003
   to 2006.

1   Mr. Sims attempts to justify the $67 value by comparing the sales price of a version of

2   Office with Outlook ($279.99) to a version of Office without Outlook ($149.99). (R. Tr. at IV-

3   167:23–169:5; 174:6–17; 181:10–182:9; Ex. N, PX-1895.) Lucent argues that the difference

4   of $130 dollars, a number close to the $139.99 retail price of Outlook sold on its own,

5   demonstrates that Microsoft values Outlook at $130. (Doc. No. 1451, Ex. N, PX-1895.) In

6   other words, because the price difference ($130) is approximately the price of stand-alone

7   Outlook ($139), Lucent argues that Microsoft values Outlook within Office at the same price

8   ($67) that it values stand-alone Outlook ($67). The Court recognizes that there is some

9   evidence in the record to support Lucent's position. But the version of Office without Outlook

10  that Mr. Sims references was directed at the academic market. (R. Tr. at V-40, 1-25.) The

11  Home and Student version was not sold until the end of the damages period in late 2006. (Doc.

12  No. 1451, Ex. N, PX-1895.) Therefore, Mr. Sims' reliance on the sales price of the Home and

13  Student version without Outlook does not provide substantial evidence that Outlook is worth

14  $67 within Office.

15      Microsoft, on the other hand, suggested to the jury through attorney argument that

16  $13.45 is the correct amount to attribute to Outlook when it is sold as part of Office. (Doc. No.

17  1434-1 at 10.) Based on Microsoft's contention that $13.45 is a reasonable base for Outlook

18  sales, Outlook would account for 13.7% of the $98 of revenue per unit of Office. (Doc. No.

19  1434, Ex. D at 172-73, 175.) The Court, and the jury, disagree with this apportionment as well.

20  Internal Microsoft documents demonstrate that Outlook is the most popular Office component.

21  (See Doc. No. 1399, PX-838 at 39). Microsoft's internal documents also demonstrate that 84%

22  of Outlook 2007 users set up new appointments or meetings and 90% use calendar features.

23  (Id.) Further, Microsoft's internal consumer feedback surveys demonstrate that use of calendar

24  features in Outlook ranks among the top-10 rated tasks. (Id. at 41.) Internal Microsoft

25  documents also list "Calendar & Meetings Base menu" as a strength of Outlook. (Id. at 47.)

26  Further, internal Microsoft documents state that "Outlook is the most frequently used Office

27  application by far, with nearly all [purchasers] using it at least several times a week. By

28  contrast, PowerPoint is the least used Office application." (Id. at 53; Ex. I, PX-838.) The Court

- 17 -

1  concludes that Microsoft's $13.45 apportionment to Outlook within Office is not supported by
2  substantial evidence.  Similarly unavailing is Microsoft's assertion that Outlook accounts for
3  only 13.7% of the $98 of revenue per unit of Office.  In fact, the Court finds it telling that
4  Microsoft never sold Office without Outlook between almost all of 2003-2006. (R. Tr. at V-39,
5  11-23.)  It was not until late 2006 that Microsoft first launched a Home and Student version of
6  Office, directed at the academic market, that did not include Outlook.  (R. Tr. at V-40, 1-25.)
7  The evidentiary record demonstrates that Outlook is worth more than Microsoft's suggested
8  apportionment of 13.7%.

9          Moreover, the district court must view the evidence in the light most favorable to the
10 non-moving party and draw all reasonable evidentiary inferences in favor of the non-moving
11 party.  Reeves, 530 U.S. 133 at 150.  The jury chose to reject the testimony from biased
12 Microsoft executives regarding the interpretation of the internal Microsoft documents, and the
13 Court agrees that the Microsoft executive witnesses were discredited.

14         On post-trial motions, the district court must "scrutinize the evidence carefully to ensure
15 that the 'substantial evidence' standard is satisfied."  Lucent, 580 F.3d at 1336 (quoting
16 Unisplay, 69 F.3d at 517)).  Although a reasonable royalty analysis "necessarily involves an
17 element of approximation and uncertainty," Unisplay, 69 F.3d at 517, it is the court's duty "to
18 ensure that estimates are tied to . . . proper economic methodologies, not just numbers in an
19 accounting format." Cornell, 609 F. Supp. 2d at 290.  The Court concludes that no reasonable
20 jury could conclude that Outlook within Office is worth $67, leaving the value of Word, Excel,
21 and PowerPoint combined to be only $31.  (R. Tr. at IV-159:6-160:22.)  As a result, the Court
22 concludes that the jury's verdict is not supported by substantial evidence, and therefore,
23 damages are excessive.

24         Microsoft suggests an alternative apportionment of $24.55 based on the four components
25 of Office.  The Court agrees with the alternative apportionment.  The Court concludes that,
26 when Outlook is sold as part of Office, the highest amount of revenue attributable to Outlook
27 that is supported by substantial evidence is $24.55.  The 2010 pricing data for Microsoft
28 products shows that the prices for stand-alone Outlook, Word, Excel, and PowerPoint were each

1   $139.99. (PX-1895.) Thus, the Court concludes that the evidence supports, at most, allocating

2   25% of the Office revenue to Outlook, representing one-fourth of Office products—Outlook,

3   Word, Excel, and PowerPoint. This allocation yields a per-unit revenue attributable to Outlook

4   within Office of $24.55 by multiplying the $98.19 per unit revenue of Outlook by 25%.

5          In response, Lucent cites to an internal Microsoft document that characterizes "Outlook

6   as the most frequently used Office application by far" and PowerPoint as the least frequently

7   used application. (PX-838). But the pricing data for the components of Office was the same,

8   (PX-1895), adding additional justification in the evidentiary record for $24.55 for each

9   component.

10          At the post-trial motion hearing, Lucent argued that if the Court applied the $24.55 per

11  unit figure for Outlook when sold as part of Office, the Court should enter judgment in the

12  amount of $52.6 million under the maximum recovery doctrine. Tronzo v. Biomet, Inc., 236

13  F.3d 1342, 1351 (Fed. Cir. 2001); Unisplay, 69 F.3d at 519. Lucent contends that Mr. Sims'

14  testimony supports an award of all of Microsoft's expected forgone profits to Lucent. (R. Tr.

15  at IV-9:23-10:5, 91:2-9, 92:1-6, 94:5-19.) The Court disagrees. Any award above $26.3

16  million would contradict the methodology of Lucent's expert and result in a speculative

17  windfall to Lucent. As a result, the highest damages award supported by substantial evidence

18  results in a lump-sum damages award of $26.3 million.

19          Therefore, the Court adjusts Lucent's damages calculation to apply only $24.55—not

20  $67—to the 109.3 million Office licenses and otherwise follows Lucent's damages calculation.

21  The Court concludes that $67 is the appropriate per-unit revenue to use for the 241,800 units

22  of stand-alone Outlook that were included in Lucent's damages calculation. The Court

23  determines that a lump-sum reasonable royalty of $26.3 million is the highest damages award

24  that is supported by substantial evidence, and that this award reflects a proper apportionment

25  as required by law. See Uniloc, 632 F.3d at 1318.[12]

26  ///

─────────────────────

[12]The Court is not persuaded that a further micro-apportionment is warranted to account
for the minor nature of the date-picker within Outlook. Lucent's initial apportionment, based
on testimony credited by the jury, is substantial evidence to support the $26.3 million award.

### E. Lucent's Survey Evidence

1
2        Microsoft renews its <u>Daubert</u> challenges to the testimony of Lucent's survey expert, Dr.
3   Jay. (Doc. No. 1434-1 at 2.)  The Federal Circuit in <u>Lucent</u> suggested the use of a consumer
4   survey on remand as a possible source of data for evaluating reasonable royalties.  580 F.3d at
5   1333-1334 ("Consideration of evidence of usage after infringement started can, under
6   appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty
7   is reasonable.   Usage (or similar) data may provide information that the parties would
8   frequently have estimated during the negotiation. . . . Such data might, depending on the case,
9   come from sales projections based on past sales, consumer surveys, focus group testing, and
10  other sources.").

11       After remand, both parties conducted a consumer survey.  Lucent hired Dr. Jay and
12  questioned 3,387 online survey respondents.  Microsoft hired Philip Johnson, questioned 600
13  people in a public mall, and had its 30(b)(6) witness, William Kennedy, remove Outlook from
14  Office for testing.  (R. Tr. at II-147; IV-126; V-63-64, 139.)  Microsoft declined on work
15  product grounds to share the results of its survey. And Microsoft's 30(b)(6) witness, discredited
16  on other grounds, disavowed any knowledge of the test results.

17       Microsoft contends that Dr. Jay's survey employed biased and misleading questions and
18  did not adequately control its results or account for sampling error.  (<u>Id.</u>) Lucent responds that
19  Dr. Jay explained in detail every question, result, and calculation in her survey.  She presented
20  the jury with 68 demonstratives to facilitate their understanding of the survey.  She explained
21  the mathematical calculations she performed, the margin of error, and the effect of guessing on
22  the results.  She demonstrated that her methodology and results were consistent with internal
23  Microsoft surveys conducted during the ordinary course of business.  (Doc. No. 1451 at 5.)
24  Further, the jury heard that Dr. Jay is a top survey expert in probability-based surveys.  (R. Tr.
25  at III-60:24–61:18.)  In sum, Dr. Jay persuaded the jury that the survey questions were proper
26  and yielded reliable results. (R. Tr. at II-181-182.)

27       Under <u>Daubert</u>, the court is charged with a "gatekeeper function" to ensure expert
28  testimony is both reliable and relevant.  Courts have the "responsibility of ensuring that all

1   expert testimony must pertain to 'scientific, technical, or other specialized knowledge.'"

2   Uniloc, 632 F.3d at 1315. The court must decide if such testimony is based on a "firm scientific

3   or technical grounding" as required under Federal Rule of Evidence 702. Id. Under Rule 702,

4   a witness qualified as an expert by knowledge, skill, experience, training, or education can

5   testify in opinion or otherwise if: (1) the testimony is based on sufficient facts or data; (2) the

6   testimony is the product of reliable principles and methods; and (3) the witness has applied the

7   principles and methods reliably to the facts of the case. Fed. R. Evid. 702.

8         In addition to reliability and relevancy, "the patentee must sufficiently tie the expert

9   testimony on damages to the facts of the case." Uniloc, 632 F.3d at 1315 (citing Daubert, 509

10  U.S. at 59)). "[O]ne major determinant of whether an expert should be excluded under Daubert

11  is whether he has justified the application of a general theory to the facts of the case." Id.

12        A trial court's decision to admit expert testimony under Daubert follows the law of the

13  regional circuit. Micro Chem., 317 F.3d at 1390-91. A trial court has broad discretion in

14  assessing the relevance and reliability of expert testimony. United States v. Finley, 301 F.3d

15  1000, 1007 (9th Cir. 2002). The requirement of Rule 702(1) "is not intended to authorize a trial

16  court to exclude an expert's testimony on the ground that the court believes one version of the

17  facts and not the other." Fed. R. Evid. 702, Adv. Comm. Note (2000). The inquiry into

18  admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is

19  to be attacked by cross examination, contrary evidence, and attention to the burden of proof,

20  not exclusion." Primiano v. Cook, 2010 U.S. App. LEXIS 8858, at *4 (9th Cir. Apr. 27, 2010).

21  "Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets

22  the threshold established by Rule 702 as explained in Daubert, the expert may testify and the

23  jury decides how much weight to give that testimony." Id. (quoting United States v.

24  Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)). As the Supreme Court noted in

25  Daubert, "[v]igorous cross-examination, presentation of contrary evidence, and careful

26  instruction on the burden of proof are the traditional and appropriate means of attacking shaky

27  but admissible evidence." 509 U.S. at 596.

28  ///

1    The Court concludes that Dr. Jay is highly qualified in probability surveys.  Further, a
2  probability survey is a scientific model that is recognized as a reputable method for a survey.
3  (R. Tr. at II-51-60; III-43.) Moreover, Dr. Jay was subject to vigorous cross-examination about
4  her questions, methods, and conclusions.  Dr. Jay's survey was drawn from a representative
5  sample of 3,387 online users.  Dr. Jay adequately explained the error rate and correlated it to
6  the data to show that it did not invalidate the survey results.  The jury found her reasoning to
7  be persuasive.[13]

8    The Court observes that Dr. Jay responded to each of Microsoft's challenges, and
9  adequately explained her methodology and reasoning.  Dr. Jay had a reasonable explanation for
10 not asking specifically about Office applications since the overwhelming use of
11 Outlook—99.8%—is within Office.  Microsoft's contrary percentages, suggested in attorney
12 questioning, do not constitute evidence to challenge the verdict on JMOL.  In sum, Dr. Jay met
13 the standards in Daubert, and the jury was persuaded by her reasoned opinions.  Reeves, 530
14 U.S. at 150; Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir. 1987);
15 Union Oil Co. of Cal. v. Terrible Herbst, Inc., 331 F.3d 735, 743 (9th Cir. 2003).

16   Microsoft claims that it was error for the Court to permit Lucent to question Microsoft
17 witnesses on the survey Microsoft conducted but did not disclose after Microsoft challenged
18 Dr. Jay's survey on cross-examination.  Microsoft's criticisms of the Jay survey methodology
19 and results and Kennedy's testimony made relevant and not overly prejudicial the fact that
20 Microsoft conducted its own survey.  (R. Tr. at III-34:6-19.)  The Court finds no error in its
21 decision to allow Lucent's limited questions about the survey.

22   **F. The Court Properly Admitted the Time Savings Analysis**

23   Microsoft challenges the Court's admission of Lucent's time savings analysis.
24 Microsoft's own documents admitted without objection showed that it valued the time saved
25 by its consumers.  (PX-1000; PX-1048; PX-1889.)  Mr. Sims' time savings analysis indicated

26         [13]In a bench trial, the outcome may have been different.  The Court questions whether
27 7% of Outlook users would not buy Outlook or Office simply because it lacks the date-picker.
   But the Court is not the trier of fact, and it is not the role of the Court to weigh the evidence
28 or make credibility determinations on a JMOL motion.  Winarto, 274 F.3d at 1286-87.

07cv2000

1  that consumers would value the Day patent technology at $170 million and explained why that
2  value is important to Microsoft. (R. Tr. at IV-33:7–38:9, 40:16–41:8, 53:11–54:2.) Based on
3  internal Microsoft documents, Mr. Sims testified that Microsoft values the time saved by its
4  consumers. (Id.; see also PX-1000; PX-1048; PX-1889.) Mr. Sims testified that some portion
5  of the time savings amount would be paid by Microsoft to Lucent as a royalty. (R. Tr. at IV-
6  40:16–41:8, 53:11–54:2, 87:1–89:7.) Additionally, the Court gave a limiting instruction that
7  the evidence was to show the value to consumers. Courts have considered time savings as a
8  proper basis for calculating damages. See Grepke v. Gen. Elec. Co., 280 F.2d 508, 511-513
9  (7th Cir. 1960); Ziggity Sys. Inc. v. Val. Watering Sys., 769 F. Supp. 752 (E.D. Pa. 1990).
10  Finally, the fact that consumers of Microsoft's Outlook may enjoy a time savings as a result of
11  the Day patent technology is relevant to Georgia-Pacific factors 9, 10, and 11, including the
12  advantages of the patented technology. 318 F. Supp. at 1120. As a result, the Court properly
13  admitted the evidence.

14  **G.  Lucent's Licensing Policy Regarding Acer and Locus**

15  Microsoft also challenges Mr. Sims' reference to Lucent's licensing policy at trial, as
16  well as the Acer and Locus agreements. The Court concludes that Lucent's licensing policy and
17  the Acer and Locus agreements are relevant to Georgia-Pacific factors 4 and 12 and were
18  properly admitted at trial. (See also Doc. No. 1284 at 15-16 (allowing evidence and testimony
19  regarding Lucent's licensing policy and Acer and Locus agreements).)

20  A district court may only consider license agreements that are "sufficiently comparable
21  to the hypothetical license at issue in suit." Lucent, 580 F.3d at 1325; see also ResQNet, 594
22  F.3d at 872. The district court "must consider licenses that are commensurate with what the
23  defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable
24  royalty analysis with conveniently selected licenses without an economic or other link to the
25  technology in question." ResQNet, 594 F.3d at 872. In ruling on motions in limine, the Court
26  permitted Lucent to introduce two licenses, Acer and Locus, covering graphical user interfaces
27  such as the Day patent, and declined to permit use of other licenses. (Doc. No. 1180.)
28  ///

1    In order for a license agreement to support a reasonable royalty rate, the license
2  agreement must involve similar technology. Lucent, 580 F.3d at 1327. Both agreements were
3  executed about the time of the hypothetical negotiation and include licenses that covered the
4  Day patent. (R. Tr. at IV-67:11-24; 72:24-74:9; PX-1541; PX-1153.) The Court carefully
5  examined whether the cross license structure precluded their admission, and the Federal
6  Circuit's previous criticism of the Acer license. Lucent, 580 F.3d at 1331. Lucent called three
7  licensing witnesses and had limited expert testimony concerning the agreements. The record
8  demonstrates Lucent consistently asked for a minimum of 1% per patent. The Acer and Locus
9  licenses demonstrated Lucent's license structure, industry practice, and Lucent's licensing
10  practices for the hypothetical negotiation. (Doc. No. 1451 at 23-24.) Ultimately, the Court
11  instructed the jury that the licenses had to be comparable in order for the jury to consider them
12  as examples of Lucent's licensing policy. (Doc. No. 1392, Jury Instructions, No. 25.)

13    Moreover, Lucent used Acer and Locus, in combination with testimony about its
14  licensing policy, to rebut Microsoft's speculative claims from witnesses William Kennedy and
15  Microsoft expert, Professor Mnookin, that Lucent would take only $2 million to $5 million for
16  the Day patent. (R. Tr. at IV-75:15-77:16.) Lucent introduced evidence at trial that Lucent's
17  negotiators had a policy to follow in licensing negotiations. (R. Tr. at III-180:2-183:19; IV-
18  60:5-65:18.) Specifically, Lucent introduced evidence that Lucent's licensing policy is to
19  receive 1% of the total revenue from the smallest commercially saleable unit of a product
20  practicing one of its patents. (R. Tr. at V-188:5-11, IV-70:10-23, 72:1-12, 74:14-21.) Mr. Sims
21  testified that the smallest commercially saleable unit in this case was Outlook. (Id.)
22  Additionally, at trial, Lucent called Lucent's licensing witness Stephen Samuels, a former
23  Lucent employee who worked in Lucent's licensing division for almost 29 years, Bruce
24  Schneider, and Roger Stricker, to confirm Lucent's 1% licensing policy for its intellectual
25  property portfolio. (R. Tr. at III-180:2-183:19; IV-60:5-65:18.)

26    Further, the Court excluded evidence regarding Microsoft's settlement license, z4, which
27  involved infringing features within Office. (Doc. No. 1180); z4 Techs., Inc. v. Microsoft Corp.,
28  2006 U.S. Dist. LEXIS 58374 (E.D. Tex. 2006). In z4, Microsoft's damages expert testified

1   that the patented feature was a small feature worth a small lump-sum royalty of $3 million to

2   $5 million.  z4 Techs., 2006 U.S. Dist. LEXIS 58374.  Despite Microsoft's assertion that

3   although it valued the technology at $3 million to $5 million, Microsoft settled the case for ████

4   ████ after infringement was affirmed.  z4 Techs., 2006 U.S. Dist. LEXIS 58374.  Lucent

5   wanted to introduce the z4 Microsoft license to rebut Professor Mnookin's testimony that

6   Microsoft would only pay $2 million to $5 million for the Day patent as a small feature within

7   Office.  The Court kept this license out of evidence because the technology was not sufficiently

8   comparable to the Day patent technology even though it was a small feature within Office.

9   (Doc. No. 1180.)

10      Accordingly, the Court concludes that it was not error under the totality of the record to

11   admit the Acer and Locus licenses to rebut Microsoft's speculative claims that Lucent would

12   take only $2 million to $5 million for the Day patent, and in any event, harmless error.  See,

13   e.g., Mondis Technology Ltd. v. LG Electronics Inc., Case No. 07-cv-565-TJW-CE Doc. No.

14   55 at 5 (E.D. Tex. June 14, 2011).

15      **H.  JMOL Motion Conclusion**

16      The Court concludes that judgment as a matter of law, and an alternative new trial, is the

17   appropriate remedy.  Tronzo, 236 F.3d at 1351-52; Cornell, 609 F. Supp. 2d at 291-92.[14]

18   Accordingly, the Court grants in part Microsoft's motion for judgment as a matter of law that

19   a reasonable jury could not have returned a verdict in excess of $26.3 million based on the

20   evidence of record.  The Court otherwise denies Microsoft's motion for judgment as a matter

21   of law.

22   **III.  Microsoft's Motion for a New Trial**

23      Microsoft also moved for a new trial.  A trial court "may grant a new trial only if the

24   jury's verdict is against the clear weight of the evidence, and may not grant it simply because

25   the court would have arrived at a different verdict."  Pavao, 307 F.3d at 918.  The jury, and not

26   the court, is given the task of weighing conflicting evidence and making credibility

27   ────────────────

28   [14]At the hearing on the JMOL and motion for new trial, the Court discussed a new trial, but the parties preferred an order granting the motion for judgment as a matter of law and alternatively for a new trial rather than a new trial only.

1  determinations.  See Roy v. Volkswagen of Am., Inc., 896 F.2d 1174, 1179 (9th Cir. 1990),
2  amended and reh'g en banc denied by 920 F.2d 618 (9th Cir. 1990); see also Landes Const. Co.,
3  833 F.2d at 1372 (jury entitled to believe one set of witnesses over others).  And, "it is not the
4  courts' place to substitute our evaluations for those of jurors."  Union Oil Co. of Cal., 331 F.3d
5  at 743.  In evaluating a motion for new trial, the court "need not view the evidence from  the
6  perspective most favorable to the prevailing party."  Landes, 833 F.2d at 1371.  Instead, the
7  court should "set aside the verdict of the jury, even though supported by substantial evidence,
8  where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the
9  evidence."  Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007).  For the reasons
10 previously stated, the Court conditionally grants in part Microsoft's motion for a new trial.

11        The Court also considers a remittitur.  "[W]here there is no evidence that passion and
12 prejudice affected the liability finding, remittitur is an appropriate method of reducing an
13 excessive verdict."  Snyder v. Freight, Constr. Gen. Drivers, Warehousemen & Helpers, 175
14 F.3d 680, 689 (9th Cir. 1999).

15        In the event that the judgment as a matter of law is vacated or reversed on appeal, the
16 original verdict is not reinstated, and the case is remanded for further proceedings, the Court
17 grants a new trial, subject to Lucent's decision whether to accept a remittitur award of $26.3
18 million.  Cornell, 609 F. Supp. 2d at 291-92 (granting judgment as a matter of law and entering
19 judgment on a particular amount, but also conditionally granting a new trial in the alternative
20 subject to a remittitur in the same amount).  The Court denies the remainder of Microsoft's new
21 trial motion to the extent Microsoft seeks a new trial based on any other ground.

22 **IV.  Conclusion**

23        Based on the foregoing, the Court orders the following:

24        (1)  The Court grants in part Microsoft's motion for judgment as a matter of law and
25 enters judgment of $26.3 million plus interest and costs.  The Court denies Microsoft's motion
26 for judgment as a matter of law in all other respects.

27        (2)  In the alternative, the Court conditionally grants in part Microsoft's motion for a new
28 trial, and, in the event of a remand, offers Lucent a remittitur award of $26.3 million plus

07cv2000

1  interest and costs.  The Court denies Microsoft's motion for a new trial in all other respects.

2       (3) The Court previously taxed costs for the 2008 and 2011 trials against Microsoft in

3  the amount of $450,479.68.  (Doc. No. 1460.)  Because the Court ordered Microsoft to pay

4  $156,646.82 of that amount within 30 days, the Court deducts that amount from the final

5  judgment.  The Court incorporates the remaining costs into the final judgment.[15]

6       (4) The Court previously awarded Lucent pre-judgment interest calculated from January

7  13, 2003 through December 11, 2006.  Applying that calculation to a judgment of $26.3 million

8  yields pre-judgment interest in the amount of $14,401,653.81.  The Court incorporates that

9  amount into the final judgment.

10       Therefore, the Court enters a final judgment in Lucent's favor, inclusive of costs and

11  pre-judgment interest, in the amount of $40,995,486.67.

12  **IT IS SO ORDERED.**

13  Dated: November 10, 2011

15  MARILYN L. HUFF, District Judge
    UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25

26

27

28  [15]Both parties agreed to this deduction from the final judgment.  (See Doc. No. 1476-3.)

- 27 -